

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER L.L.P.
100 Southeast Second Street
Suite 2800
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br>a Delaware corporation,<br><br>Plaintiff,<br>vs.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, a New York corporation,<br><br>Defendant. | **SCO'S AMENDED ANSWER TO<br>IBM'S AMENDED<br>COUNTERCLAIMS**<br><br>**Case No. 03-CV-0294**<br><br>Hon: Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |



Plaintiff and counterclaim-defendant The SCO Group, Inc. ("SCO"), by and through counsel,
answers the amended counterclaims of defendant and counterclaim-plaintiff International
Business Machines Corporation ("IBM") and further admits, denies and alleges as follows:

**ANSWER**

1.  Admits that the UNIX operating system was originally developed by Bell Laboratories, then
    a development arm of AT&T Corp., but denies the remaining allegations of ¶1.

2.  Admits that it respects the intellectual property rights of others, but denies the remaining
    allegations of ¶2.

3.  Admits the allegations of ¶3.

4.  Admits the Court has jurisdiction over the claims, but denies that IBM has any valid claims
    and denies the remaining allegations of ¶4 not specifically admitted herein.

5.  Admits the allegations of ¶5.

6.  Admits the allegations of ¶6.

7.  Admits the allegations of ¶7.

8.  Admits that the earliest UNIX operating system was built by software engineers at Bell
    Laboratories, the research division of AT&T, but denies the remaining allegations of ¶8 not
    specifically admitted herein.

9.  Admits the allegations of ¶ 9.

10. Admits that AT&T sold UNIX assets, through its subsidiary USL, to Novell in 1993, admits
    that Novell sold UNIX assets to The Santa Cruz Operation, Inc., now known as Tarantella,
    Inc. ("Tarantella") in 1995, admits that Tarantella is not affiliated with SCO, but denies that

Novell sold only part of its UNIX assets and further denies the remaining allegations contained in ¶10 not specifically admitted herein.

11. Denies the allegations of ¶11.

12. Admits that in 1985 IBM acquired certain UNIX rights pursuant to license with AT&T, and admits that IBM and AT&T entered agreements as referenced in ¶12, but denies that IBM's UNIX-related rights are characterized as "broad," denies that IBM has any remaining rights under the referenced agreements and denies the remaining allegations of ¶12 not specifically admitted herein.

13. Admits that IBM developed a version of UNIX pursuant to license originally with AT&T and admits that IBM's version of UNIX is called AIX but denies that IBM properly exercised its rights and  is without information sufficient to admit or deny the remaining allegations of ¶13, and therefore denies the same.

14. Admits that Sequent, like IBM, acquired certain UNIX rights pursuant to its own license agreements with AT&T, all of which IBM failed to attach to the its counterclaim, and admits that IBM acquired the stock of Sequent and denies the remaining allegations of ¶14 not specifically admitted herein.

15. Admits that Amendment X was entered into in 1996 by and among IBM, Original SCO and Novell, but denies the remaining allegations in ¶15.

16. Denies the allegations of ¶16 and alleges that Linux is, in actuality, an unauthorized version of UNIX that is structured, assembled and designed to be technologically indistinguishable from UNIX, and practically is distinguishable only in that Linux is a "free" version of UNIX designed to destroy proprietary operating system software.

17. Admits that Linus Torvalds assembled the original Linux kernel but is without information sufficient to admit or deny the remaining allegations of ¶17 not specifically admitted herein, and therefore denies the same.

18. Is without information sufficient to admit or deny the allegations of ¶18, and therefore denies the same.

19. Admits that many developers have contributed software code to the Linux kernel, admits that IBM has contributed software code to the Linux kernel, admits that the first iteration of Version 2.4 of the Linux kernel was released in 2001, but is without information sufficient to admit or deny the remaining allegations of ¶19 not specifically admitted herein, and therefore denies the same.

20. Admits that Red Hat has distributed one or more versions of Linux, which may include one or more versions of the Linux kernel, and admits that other distributors may have done so as well, including SCO, but denies the remaining allegations of ¶20 not specifically admitted herein.

21. Admits the allegations of ¶21, but alleges that Linux software contains other additional characteristics not identified in ¶21, and further alleges that ¶21 does not provide a complete definition of Linux.

22. Admits that software license agreements typically reflect legal limitations restricting the use and reproduction of works, admits that Linux is available for free download, admits that the license presently governing Linux (the General Public License) generally is oriented to keep source code publicly available, but denies the remaining allegations of ¶22 not specifically admitted herein.

4

23. Admits the allegations of ¶23, but denies enforceability or applicability of the GPL.

24. Is without information sufficient to admit or deny the allegations of ¶24, and therefore denies the same.

25. Admits that the GPL purports to guarantee the right to freely share and change free software, but denies that the GPL applies to any program whose authors commit to using it, denies enforceability or applicability of the GPL, and is without information sufficient to admit or deny the remaining allegations of ¶25 not specifically admitted herein, and therefore denies the same.

26. Admits that the GPL allows a licensee to distribute copies of free software, receive source code and change and use the software in new free programs but is without information sufficient to admit or deny the remaining allegations of ¶ 26 not specifically admitted herein and therefore denies the same.

27. Admits that Linux is licensed under the GPL and admits that Linux contains some notices placed by some copyright holders, but denies enforceability or applicability of the GPL and denies the remaining allegations of  ¶27 not specifically admitted herein.

28. Denies the allegations of ¶28.

29. Admits that it was originally founded as Caldera, Inc., admits that in 1998 Caldera, Inc. sold certain of its assets to Caldera Systems, Inc., but denies the remaining allegations in ¶29 not specifically admitted herein.

30. Admits that it has distributed certain versions of the Linux operating system but denies the remaining allegations of ¶30.

5

31. Admits that it previously developed and marketed software based on certain versions of the Linux operating system, and admits that it has provided certain Linux-related services, but denies the remaining allegations of ¶31.

32. Admits that it previously distributed or re-distributed SCO Linux server, SCO OpenLinux Server, SCO OpenLinux Workstation and SCO Volution Manager, and admits that SCO has suspended its Linux distribution, but denies the remaining allegations contained in ¶32.

33. Denies the allegations of ¶33.

34. Admits that it previously distributed certain versions of Linux, admits that it previously provided Linux-related educational programs, admits that it joined UnitedLinux, but denies the remaining allegations of ¶34 not specifically admitted herein.

35. Admits the allegations of ¶35.

36. Admits that it previously supported in some ways the open-source community prior to discovery of violation of its intellectual property rights by IBM and others, but denies the existence of any "scheme," and denies the allegations of ¶36 not specifically admitted herein.

37. Admits that some of its products were previously made available for licensing under the GPL, but denies the remaining allegations of  ¶37 not specifically admitted herein.

38. Denies the allegations of ¶38.

39. Admits that it previously engaged in certain Linux-related activities, but denies the remaining allegations of ¶39 not specifically admitted herein.

40. Admits that it has contributed to certain open-source development projects, but denies the remaining allegations of ¶40 not specifically admitted herein.

41. Denies the allegations of ¶41.

42. Admits the allegations of ¶42, but alleges that SCO was unaware of IBM's Linux-related investment prior to its formal announcements thereof, and further alleges that IBM secretly and improperly failed to disclose to SCO such Linux-related investments and its intentions with respect to Linux before and during Project Monterey.

43. Admits the allegations of ¶43.

44. Admits that IBM has contributed source code to Linux projects under the GPL, but denies that such contributions were proper or legal, and denies the remaining allegations of ¶44 not specifically admitted herein.

45. Admits that it completed a public offering, admits that IBM has established its business around Linux and that IBM has received a significant amount of revenue and profit related to Linux, admits that SCO has never generated a profit related to Linux, admits that SCO has not generated profit until recently, but denies the remaining allegations of ¶45 not specifically admitted herein and alleges that IBM's Linux-related revenue is from its wrongful conduct in violation of SCO's legal and contractual rights.

46. Admits that Caldera Systems, Inc. was merged into Caldera International, Inc., admits that SCO acquired rights to the UNIX operating system originally developed by Bell Laboratories, but denies the remaining allegations of ¶46 not specifically admitted herein.

47. Denies the allegations of ¶47.

48. Denies the allegations of ¶48.

49. Denies the allegations of ¶49.

50. Denies the allegations of ¶50.

51. Denies the allegations of ¶51.

52. Denies the allegations of ¶52.

53. Admits it alleges that IBM has breached contractual obligations to SCO by, among other things, incorporating and inducing others to incorporate source code in the Linux kernel in violation of SCO's contractual and intellectual property rights, and that IBM has competed unfairly, interfered with SCO's contract rights with others and misappropriated and/or misused trade secrets, but denies the remaining allegations of ¶53 not specifically admitted herein.

54. Denies the allegations of ¶54.

55. Admits having sent letters to 1500 of the world's largest corporations, alleges that the letters are the best evidence of the contents thereof, denies that said letters threatened litigation and denies the remaining allegations of ¶55 not specifically admitted herein.

56. Denies the allegations of ¶56.

57. Admits that it has made certain public statements regarding IBM's rights to use AIX and Dynix, admits that it claims the legal right and authority to revoke, and has effectively revoked, IBM's right to use, license or distribute AIX and that it has so stated in certain statements, admits that it claims the legal right to revoke IBM's use, license or distribution of Dynix and has so stated in certain statements, but denies the remaining allegations of ¶57 not specifically admitted herein.

58. Admits it claims that licensing and sublicensing agreements and related agreements with IBM give SCO the right to control certain uses of AIX by IBM, admits it claims that Linux is, in material part, an unauthorized derivative of UNIX and that SCO has so stated, admits it claims that as of and after June 16, 2003 IBM's right to further use, license or distribute AIX

was terminated and that SCO has so stated, admits it claims that IBM customers who license AIX following June 16, 2003 are doing so in violation of SCO's rights and that SCO has so stated, admits it claims that certain uses of Linux infringe on SCO's intellectual property rights and that SCO has so stated, but denies the remaining allegations of ¶58 not specifically admitted herein.

59. Admits it claims that IBM has contributed certain Dynix code to Linux in violation of its contractual and legal obligations to SCO and that SCO has so stated, admits it claims that IBM's violation of SCO's rights are giving rise to damages as a result of IBM's improper profit from Linux and improper continued use of AIX, and that SCO has so stated, but denies the remaining allegations of ¶59 not specifically admitted herein.

60. Admits the existence of the letter of June 9, 2003 but denies any legal or factual basis for the said letter and denies the remaining allegations of ¶60 not specifically admitted herein.

61. Admits the existence of the letter of June 12, 2003 but denies any right in Novell to waive or revoke SCO's rights and denies any legal or factual basis for the said letter and denies the remaining allegations of ¶61 not specifically admitted herein.

62. Denies the allegations of ¶62.

63. Admits it has revoked IBM's right to further use, license or distribute AIX, pursuant to the express terms of the Software Agreement and related documents, and that it has so stated, but denies the remaining allegations of ¶63 not specifically admitted herein.

64. Admits that IBM sent letters dated April 2, 2003 and May 5, 2003 but denies the remaining allegations of ¶64 not specifically admitted herein.

65. Denies the allegations of ¶65.

66. Denies the allegations of ¶66.

67. Admits that IBM is currently without legal or contractual authority to use, license or distribute AIX or Dynix, based on its breach of agreement with SCO and SCO's resulting termination of IBM's AIX software agreement and related agreements and Sequent's Dynix software agreement and related agreements, and admits that SCO has so stated, but denies the remaining allegations of ¶67 not specifically admitted herein.

68. Admits that SCO has offered a license to Fortune 1000 and Global 500 Linux users as a means of permitting lawful use of certain Linux products and that SCO has so stated, but denies the remaining allegations of ¶68 not specifically admitted herein.

69. Denies the allegations of ¶ 69.

70. Denies the allegations of ¶70.

71. Admits that IBM has made contributions of source code to Linux 2.4 and 2.5 kernels under the GPL, but denies the applicability or enforceability of the GPL and denies the remaining allegations of ¶71 not specifically admitted herein.

72. Admits that IBM and others have breached SCO's intellectual property rights, but denies the remaining allegations of ¶72.

73. Denies the allegations of ¶73 and denies the enforceability or applicability of the GPL.

74. Denies the allegations of ¶74.

75. Admits that SCO licenses and distributes UnixWare, "OpenServer," "SCO Manager," and "Reliant HA," but denies infringement and denies the remaining allegations of ¶75.

76. Denies the allegations of ¶76.

77. Denies the allegations of ¶77.

78. Repeats and realleges ¶¶ 1-77, above.

79. Admits that IBM continues to be obligated to SCO by confidentiality requirements and other provisions in the AT&T Agreements and Amendment X that, by their terms, specifically continue beyond termination, but alleges that IBM's right to use, license and distribute under the said agreements has been lawfully and properly terminated, and therefore denies that IBM has any right under the said agreements and denies the remaining allegations of ¶79 not specifically admitted herein.

80. Denies the allegations of ¶80.

81. Denies the allegations of ¶81.

82. Denies the allegations of ¶82.

83. Denies the allegations of ¶83.

84. Repeats and realleges ¶¶1-83, above.

85. Admits that IBM sells Linux-related services in interstate commerce, but denies that IBM has or had authority to sell, license or distribute AIX in interstate commerce from and after June 16, 2003, and denies that IBM has or had authority to license, sell or distributeDynix in interstate commerce from and after September 2, 2003, alleges that IBM's rights in AIX and Dynix have been lawfully and properly terminated, and denies the remaining the allegations of ¶85 not specifically admitted herein.

86. Denies the allegations of ¶86.

87. Denies the allegations of ¶87.

88. Denies the allegations of ¶88.

89. Denies the allegations of ¶89.

11

90. Repeats and realleges ¶¶1-89, above.

91. Admits that IBM has expended a substantial investment of time, effort,  and money in development of AIX pursuant to the terms of its license with SCO and SCO's predecessors in interest, admits that AIX has become one of the world's leading UNIX operating systems, admits that IBM's products and services are sold and used throughout the United States, admits that IBM acquired Sequent and thereby acquired Sequent's interest in Dynix, subject to the terms and conditions of Sequent's agreements with SCO and/or its predecessors, but denies the remaining allegations of ¶91 not specifically admitted herein.

92. Denies the allegations of ¶92.

93. Denies the allegations of ¶93.

94. Denies the allegations of ¶94.

95. Repeats and realleges ¶¶1-94, above.

96. Admits the allegations of ¶96.

97. Admits it is generally aware that IBM has or may have certain prospective business relationships that IBM deems important, but denies the remaining allegations of ¶97 not specifically admitted herein.

98. Denies the allegations of ¶98.

99. Denies the allegations of ¶99.

100.    Denies the allegations of ¶100.

101.    Repeats and realleges ¶¶1-100, above.

102.    Denies the allegations of ¶102.

103.    Denies the allegations of ¶103.

12

104.    Denies the allegations of ¶104.

105.    Denies the allegations of ¶105.

106.    Denies the allegations of ¶106.

107.    Repeats and realleges ¶¶1-106, above.

108.    Admits that IBM has made contributions of source code to Linux under the GPL, but denies the applicability or enforceability of the GPL and denies the remaining allegations of ¶108 not specifically admitted herein.

109.    Denies the allegations of ¶109.

110.    Denies the allegations of ¶110.

111.    Denies the allegations of ¶111.

112.    Denies the allegations of ¶112.

113.    Repeats and realleges ¶¶1-112, above.

114.    Denies the allegations of ¶114.

115.    Denies the allegations of ¶115.

116.    Denies the allegations of ¶116.

117.    Denies the allegations of ¶117.

118.    Denies the allegations of ¶118.

119.    Repeats and realleges ¶¶1-118, above.

120.    Admits that IBM has made contributions of source code to Linux under the GPL, but denies the applicability or enforceability of the GPL, alleges that part of said contributions by IBM violate SCO's contract and intellectual property rights, and denies the remaining allegations of ¶120 not specifically admitted herein.

13

121.   Is without information sufficient to admit or deny the allegations of ¶ 121, and therefore denies the same.

122.   Admits that IBM has placed copyright notices on certain of its AIX and Dynix contributions to UNIX, but denies it has the legal authority to do so, denies the applicability or enforceability of the GPL, and denies the remaining allegations of ¶122 not specifically admitted herein.

123.   Denies the allegations of ¶123.

124.   Denies the allegations of ¶124.

125.   Denies the allegations of ¶125.

126.   Denies the allegations of ¶126.

127.   Repeats and realleges ¶¶1-126, above.

128.   Is without information sufficient to admit or deny the allegations of ¶ 128, and therefore denies the same.

129.   Denies the allegations of ¶129.

130.   Denies the allegations of ¶130.

131.   Denies the allegations of ¶131.

132.   Denies the allegations of ¶132.

133.   Repeats and realleges ¶¶1-132, above.

134.   Is without information sufficient to admit or deny the allegations of ¶ 134, and therefore denies the same.

135.   Denies the allegations of ¶135.

136.    Denies the allegations of ¶136.

137.    Denies the allegations of ¶137.

138.    Denies the allegations of ¶138.

139.    Repeats and realleges ¶¶1-138, above.

140.    Is without information sufficient to admit or deny the allegations of ¶140, and therefore

denies the same.

141.    Denies the allegations of ¶141.

142.    Denies the allegations of ¶142.

143.    Denies the allegations of ¶143.

144.    Denies the allegations of ¶144.

145.    Repeats and realleges ¶¶1-144, above.

146.    Is without information sufficient to admit or deny the allegations of ¶146, and therefore

denies the same.

147.    Denies the allegations of ¶147.

148.    Denies the allegations of ¶148.

149.    Denies the allegations of ¶149.

150.    Denies the allegations of ¶150.

151.    Repeats and realleges ¶¶1-150, above.

152.    Denies the allegations of ¶152.

153.    Denies the allegations of ¶153.

154.    Denies the allegations of ¶154.

155.    Denies the allegations of ¶155.

156. Denies the allegations of ¶156.

## FIRST AFFIRMATIVE DEFENSE

IBM fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

IBM's claims are barred by the doctrines of waiver, estoppel, acquiescence, and/or laches.

## THIRD AFFIRMATIVE DEFENSE

IBM's contractual right to license, distribute or use AIX or Dynix has been properly and validly terminated, and any claim based thereon is barred.

## FOURTH AFFIRMATIVE DEFENSE

IBM's claims are barred by license.

## FIFTH AFFIRMATIVE DEFENSE

IBM's claims are barred by illegality, collusion, conspiracy and/or lack of clean hands.

## SIXTH AFFIRMATIVE DEFENSE

The General Public License ("GPL") is unenforceable, void and/or voidable, and IBM's claims based thereon, or related thereto, are barred.

## SEVENTH AFFIRMATIVE DEFENSE

The GPL is selectively enforced by the Free Software Foundation such that enforcement of the GPL by IBM or others is waived, estopped or otherwise barred as a matter of equity.

## EIGHTH AFFIRMATIVE DEFENSE

The GPL violates the U.S. Constitution, together with copyright, antitrust and export control laws, and IBM's claims based thereon, or related thereto, are barred.

### NINTH  AFFIRMATIVE DEFENSE

IBM's claims are barred, in whole or in part, by the First Amendment to the U.S. Constitution, by the doctrine of judicial immunity and by privilege.

### TENTH  AFFIRMATIVE DEFENSE

IBM lacks standing to assert these claims.

### ELEVENTH AFFIRMATIVE DEFENSE

IBM's claims are barred or preempted, in whole or in part, by the laws of the United States.

### TWELFTH AFFIRMATIVE DEFENSE

IBM's own conduct, including that of its agents, contractors and partners, and/or conduct of third parties constitute superseding or intervening causes with respect to IBM's claims of damage or injury.

### THIRTEENTH AFFIRMATIVE DEFENSE

SCO has acted legally and properly at all relevant times and IBM is therefore barred from any relief whatsoever.

### FOURTEENTH AFFIRMATIVE DEFENSE

IBM's purported copyright registrations are invalid and/or IBM has violated copyright laws in respect to its claims alleged and the claims based on, or related to, copyrights are barred.

### FIFTEENTH AFFIRMATIVE DEFENSE

IBM is not, or may not be, the owner of the '746, '211, '209 or '785 Patents at issue.

### SIXTEENTH AFFIRMATIVE DEFENSE

17

The patents at issue, and particularly the claims of those patents alleged to be infringed, are invalid and of no effect for failure to comply with one or more requirements set forth in Title 35 of the United States Code, including, but not limited to Sections 101, 102, 103, 112, 116 and/or 256.

## SEVENTEENTH AFFIRMATIVE DEFENSE

On information and belief, IBM's claims under the patents at issue are precluded by the doctrine of prosecution history estoppel based on the admissions and representations made by IBM in proceedings before the United States Patent and Trademark Office during the prosecution of the applications of the patents at issue.

## EIGHTEENTH AFFIRMATIVE DEFENSE

On information and belief, U.S. Patent 4,814,746 ("the '746 patent") is unenforceable by reason of IBM's inequitable conduct, acts or omissions before the U.S. Patent and Trademark Office ("PTO"). The '746 patent, in the section entitled "Background of the Invention," cites one article directed to LZ78 data compression and indicates that it is representative of the prior art. U.S. Patent No. 4,814,746, column 1, lines 13-27. That statement is material, false and misleading and was known by IBM to be material, false and misleading. In fact, the single article cited in the '746 patent is not representative of the prior art. There are numerous other techniques such as LZ77, described in an article entitled "A Universal Algorithm For Sequential Data Compression," IEEE Transactions on Information Theory, Vol. IT-23, No. 3, May 1977, pp. 337-343. Other types of prior art data compression methods include run length encoding, arithmetic encoding and Huffman encoding. The falsity of IBM's statement is also reflected by

the fact that in the period from December 9, 1975 to March 1, 1983, IBM itself obtained the issuance of at least 31 patents directed to data compression.

On September 22, 1988, during prosecution of the continuation patent application which led to issuance of the '746 patent, IBM filed an Information Disclosure Statement ("IDS") with the PTO. That IDS discloses European Patent Office ("EPO") patent publication 129439. The inventor of that patent publication was Terry Welch. The patent publication was published on December 27, 1984. Inexplicably, while IBM mentioned the United States counterpart of the EPO publication, it did not cite that counterpart in the citation of prior art. Thus, the face of the '746 patent does not contain any reference to the U.S. counterpart. That counterpart was U.S. Patent No. 4,558,302. That patent contains claims which overlap with the '746 patent. The Welch U.S. Patent No. 4,558,302 was filed 19 days after the '746 patent application was filed in the PTO. The closeness of these dates implicates 35 U.S.C. § 102(g) and raises a serious question as to who was the first inventor of the claimed subject matter and who is entitled to the patent. The failure to cite the U.S. counterpart, the fact that IBM waited almost three years after the U.S. counterpart issued as a patent to even inform the PTO of the EPO publication, and the additional fact that IBM waited until after the claims of the '746 patent were allowed to file an IDS,   were intended  to deter the Patent Examiner from comparing the claims of the U.S. counterpart to the allowed claims of the '746 patent. These actions were material to the examination of the '746 patent.

IBM's IDS states that the U.S. counterpart patent "apparently is an improvement on the teaching of [another reference] and offers nothing more that would affect the patentability of the allowed claims in this case. These statements were material, false and misleading and were

known by IBM to be material, false and misleading.  These statements and  the fact that IBM cited the EPO publication and not the U.S. patent counterpart had the effects of not only mischaracterizing the disclosure of the Welch patent application, but also of concealing from the PTO the overlap between the claimed subject matter of  the '746 patent and the counterpart U.S. patent.

IBM withheld additional prior art from the PTO.  In February, 1981, IBM published an article entitled "Message Compression Method."  The article was published as an IBM Technical Disclosure Bulletin, Volume 23, No. 9, pages 4197-98.  That publication was material to the patentability of the '746 patent.  IBM withheld this prior art with intent to deceive the PTO.

On information and belief, IBM was aware prior to the issuance of the '746 patent, of U.S. Patent No. 4,366,551, issued December 28, 1982, to Klaus E. Holtz.  This patent is material to the patentability of the claims of the '746 patent.  On information and belief, IBM's intentional failure to disclose this prior art to the PTO was part of IBM's scheme to withhold material prior art.

On information and belief, U.S. Patent 5,805,785 ("the '785 patent") is unenforceable by reason of IBM's inequitable conduct, acts or omissions before the PTO.  The '785 patent, entitled "Method for Monitoring and Recovery of Subsystems in a Distributed/Clustered System," was filed on February 27, 1996, listing as joint inventors Daniel Manuel Dias, Richard Pervin King, and Avraham Leff.  Applicants also filed an IDS on this date.  The IDS listed 12 references that are all U.S. patents.  No other references, including technical papers authored by one or more of the joint inventors were listed.  A review of papers authored by the three inventors reveals several that are material to patentability.  In particular, Avraham Leff's Ph.D

dissertation, entitled "A Dynamic and Decentralized Approach to Management of CPU and Memory," published at Columbia University in 1992, is material to the patentability of the '785 patent application. The dissertation describes a system of resource management that does not require a centralized coordinator. Sites cooperate in transmitting important state information to each other. Decisions made at one site are then factored by other sites into subsequent decisions. Because this dissertation was material to the patentability of the '785 patent application, the dissertation should have been disclosed to the PTO during prosecution of the '785 patent application. IBM withheld this reference with the intent to deceive the PTO.

Inventor Daniel M. Dias appears as joint author on three papers that relate directly to the subject matter claimed in the '785 patent. These three papers appear to have been published at about the same time as the '785 patent filing date of February 27, 1996. All three papers list joint authors, none of whom, other that Mr. Dias, appears as an inventor on the '785 patent. "A Scalable and Highly Available Web Server," published in Proceedings of COMPCON '96, lists as authors, in addition to Mr. Dias, William Kish, Rajat Mukherjee, and Renu Tewari. "High Availability in Clustered Multimedia Servers," published in Proceedings – International Conference on Data Engineering 1996, lists as authors, in addition to Mr. Dias, Renu Tewari, Rajat Mukherjee, and Harrick Vin. "Design and Performance Tradeoffs in Clustered Video Servers," published in Proceedings – International Conference on Multimedia Computing and Systems 1996, lists as authors, in addition to Mr. Dias, Renu Tewari, Rajat Mukherjee, and Harrick Vin. All three of these papers describe concepts that can be found in the '785 patent claims, and thus Messrs. Kish, Mukherjee, Tewari, and Vin should have been listed as inventors

on the '785 patent. IBM's decision not to list Messrs. Kish, Mukherjee, Tewari, and Vin as inventors on the '785 patent was with the intent to deceive the PTO.

U.S. Patent 5,129,080 ('the '080 patent'), entitled "Method and System Increasing the Operational Availability of a System of Computer Programs Operating in a Distributed System of Computers," filed October 17, 1990, issued July 7, 1992, and assigned to IBM, is material to patentability of the '785 patent, and should have been disclosed by IBM to the PTO. In particular, the '080 patent discloses high availability architectures, cooperative processing among nodes of a computer network, and fault recovery techniques. The '080 patent also discloses sharing of state information among the computer network nodes and global and local management. Because the '080 patent is material to patentability of the '785 patent application, the '080 patent should have been disclosed to the PTO during prosecution of the '785 patent application. IBM withheld this reference with the intent to deceive the PTO.

On information and belief, U.S. Patent 4,821,211 ("the '211 patent") is unenforceable by reason of IBM's inequitable conduct, acts or omissions before the PTO. The '211 patent was filed on November 19, 1987 and issued on April 11, 1989. During prosecution of the '211 patent application, Applicants did not disclose any prior art references to the PTO through filing an IDS. On information and belief, Applicants were aware of prior art references that were material to patentability of the '211 patent, and which, therefore, were required to be disclosed to the U.S. Patent and Trademark Office.

More specifically, U.S. Patent 4,688,181 to Cottrell et al. ("the '181 patent"), filed April 30, 1986 and issued August 18, 1987, and assigned to IBM was material to the patentability of the '211 patent, but was not disclosed to the PTO. The '181 patent was cited by the patent

22

examiner during prosecution of the '211 patent. Further, the '181 patent listed a number of prior art references that were themselves material to patentability of the '211 patent. These additional prior art references were not disclosed to the PTO during prosecution of the '211 patent. One of the prior art references cited during the Cottrell patent application prosecution is U.S. Patent 4,613,946 to Forman ("the '946 patent"). That patent was also material to the patentability of the '211 patent. Thus, the '946 patent, and the other references cited during prosecution of the Cottrell patent application should have been disclosed to the PTO by IBM. IBM withheld these material references with the intention to deceive the PTO.

On information and belief, IBM was aware of other references that were material to the patentability of the '211 patent, and with deceptive intent, IBM did not disclose these references to the PTO. For example, U.S. Defensive Publication T980,008 ('the '008 publication"), entitled "Interactive Design of Character-Recognition Logics," filed July 19, 1976, published March 6, 1979, and assigned to IBM, is material to the patentability of the '211 patent, and should have been disclosed by IBM to the PTO. The '008 publication discloses generating graphic display of pattern locations and a menu of operations. The '008 publication also discloses using auxiliary operations in the menu to modify the sequence of input patterns. Because the '008 publication is material to the patentability of the '211 patent, the '008 publication should have been disclosed to the PTO during prosecution of the '211 patent. IBM withheld this reference with intent to deceive the PTO.

Other references of which IBM was aware and that were required to be disclosed to the PTO include U.S. Patent 4,731,606 to Bantz et al. ("the '606 patent), filed August 2, 1985 and issued March 15, 1988 and U.S. Patent 4,719,571 to Rissanen et al. ("the 571 patent"), filed

March 5, 1986 and issued January 12, 1988, both assigned to IBM. Both the '606 patent and the '571 patent are material to patentability of the '211 patent, and both should have been disclosed to the PTO during prosecution of the '211 patent. IBM withheld these references with the intent to deceive the U.S. Patent and Trademark Office.

On information and belief, U.S. Patent 4,953,209 ("the '209 patent") is unenforceable by reason of IBM's inequitable conduct, acts or omissions before the PTO. The '209 patent, entitled "Self-verifying Receipt and Acceptance System for Electronically Delivered Data Objects," was filed on October 31, 1988. The '209 patent, in the section entitled "Background of the Invention," describes only two prior art references: U.S. Patent No. 4,757,533 to Allen et al. and U.S. Patent No. 4,757,534 ("the '534 patent") to Stephen M. Matyas et al.

The '534 patent is assigned to IBM. Stephen M. Matyas, co-inventor of the '534 patent, is listed as an author of more than 100 IBM publications related to cryptography or data encryption. Mr. Matyas is also listed as an inventor on more than 70 issued patents in this field. Mr. Matyas is well known in the field of cryptography and data encryption at IBM. When the '209 patent application was filed, IBM knew that some of Mr. Matyas' activities were material to the patentability of the '209 patent. However, as noted above, only the '534 patent was listed. IBM failed to cite other material prior art references associated with Mr. Matyas, including, for example, U.S. Patent 4,203,166 ("the '166 patent") in which Mr. Matyas is listed as an inventor. The '166 patent, entitled "Cryptographic File Security for Multiple Domain Networks," filed December 5, 1977, issued May 13, 1980, and assigned to IBM, is material to patentability of the '209 patent, and should have been disclosed by IBM to the PTO.

The '166 patent discloses a file security system for data files created at a first host system in one domain and recovered at a second host system in another domain of a multiple domain network. Specifically, the '166 patent discloses, a first host system that provides a file recovery key for subsequent recovery of a data file at a second host system. The first host system enciphers (modifies) the first host system plaintext to obtain first host system ciphertext as the data file. The file recovery key is used as header information for the data file. When the data file is to be recovered at the second host system, the file recovery key is provided at the second host system and the second host system transforms the file recovery key into a form, which is usable to decipher the data file. The second host system uses the transformed file recovery key to perform a cryptographic operation to obtain the first host system ciphertext in clear form (unmodified) at the second host system. Thus, the '166 patent is material to the patentability to the claims of the '209 patent. Because the '166 patent is material to the patentability of the '209 patent, the '166 patent should have been disclosed to the PTO during prosecution of the '209 patent. IBM withheld this reference with the intention to deceive the PTO.

IBM also failed to cite U.S. Patent 4,238,854 ("the '854 patent") in which Mr. Matyas is again listed as an inventor. The '854 patent, entitled "Cryptographic File Security for Single Domain Networks," filed December 5, 1977, issued December 9, 1980, and assigned to IBM, is material to patentability of the '209 patent, and should have been disclosed by IBM to the PTO. The '854 patent was filed concurrently with the '166 patent described above.

The '854 patent discloses that an operational key enciphered under the file key of the designated storage media, as header information, together with the host data enciphered under the operational key is written on the storage media as an enciphered data file. When the data file

25

is recovered, the host data security device transforms the enciphered operational key header information under control of a host master key into a form which permits the operational key to be used for deciphering the enciphered data file to obtain the file data in clear form. Thus, the '854 patent is material to the patentability to the claims of the '209 patent. Because the '854 patent is material to the patentability of the '209 patent, the '854 patent should have been disclosed to the PTO during prosecution of the '209 patent. IBM withheld this reference with the intention to deceive the PTO.

Matyas is also one of the authors of an article entitled "Cryptographic Key Authentication in Communication System" published by IBM in March, 1978. The article was published as an IBM Technical Disclosure Bulletin, March 1978, pages 3990-92. This publication discloses that message communication protection is obtained by enciphering a clear data message X at a host under control of a working key KS to yield a ciphered data message Y. At the receiving terminal, the enciphered data message Y is deciphered under control of the working key KS to yield the clear data message X.

Another article in which Matyas is an author is entitled "Terminal Control of Encipher and Decipher Data Operations" published by IBM in August, 1981. The article was published as an IBM Technical Disclosure Bulletin, August, 1981, pages 1334-1339.. This publication discloses that in communication security applications where data is to be transmitted in a cryptographic session, between a host unit and a remote terminal controller unit, a data encrypting session key (KS) is required to be established in a form suitable for use at each unit. Data may then be enciphered under KS at one unit and transmitted to the other unit where it is deciphered under KS.

Thus, the above publications, published as IBM Technical Disclosure Bulletins, are material to the patentability to the claims of the '209 patent. Because these publications are material to the patentability of the '209 patent, these articles should have been disclosed to the PTO during prosecution of the '209 patent. IBM withheld these references with the intention to deceive the PTO.

The foregoing actions constitute inequitable conduct and render the claims of the '746, '785, '211 and '209 patents unenforceable. Discovery in this proceeding is ongoing, and additional acts of inequitable conduct will be added to this defense at the appropriate time.

## NINTEENTH AFFIRMATIVE DEFENSE

SCO has not infringed, literally or under the doctrine of equivalents, any valid or enforceable claim of the '746, '211, '209 and '785 Patents.

## TWENTIETH AFFIRMATIVE DEFENSE

On information and belief, IBM failed to mark patent articles covered by the '746, '211, '209 and/or '785 Patents at issue in the counterclaims. Any claim for damages is therefore limited by 35 U.S.C. §287.

## TWENTY FIRST AFFIRMATIVE DEFENSE

On information and belief, IBM failed to provide SCO with actual notice of IBM's allegations of infringement of the patents at issue, and therefore IBM cannot recover any damages for SCO's actions before the filing of IBM's counterclaims.

## TWENTY SECOND AFFIRMATIVE DEFENSE

IBM has not and cannot plead and meet the requirements for an award of enhanced damages or attorneys' fees.

## TWENTY THIRD AFFIRMATIVE DEFENSE

SCO has an express or implied license to practice some or all of the claims embodied in the patents at issue.

## TWENTY FOURTH AFFIRMATIVE DEFENSE

Upon information and belief, IBM lacks standing to assert that SCO infringed some or all of the patents at issue.

## TWENTY FIFTH AFFIRMATIVE DEFENSE

SCO states that IBM's request for treble damages and attorneys fees is barred because SCO acted in good faith, and this is not an exceptional case within the meaning of the Patent Code.

## TWENTY SIXTH AFFIRMATIVE DEFENSE

IBM has failed to join one or more parties needed for just adjudication of the counterclaims, including but not limited to the Free Software Foundation and contributors to the Linux 2.4 and 2.5 kernels.


**WHEREFORE**, having fully answered IBM's amended counterclaims, SCO prays for dismissal with prejudice of all claims, or in the alternative judgment in its favor thereunder, together with attorneys' fees and costs, and together with all other legal and equitable relief deemed just and proper by this Court.

## JURY DEMAND

SCO demands trial by jury on all issues raised in IBM's amended counterclaims that are so triable.

DATED THIS 11th day of March, 2004

By: _____

HATCH, JAMES & DODGE
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER
Stephen N. Zack
Mark J. Heise

Attorneys for The SCO Group, Inc.

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, hereby certifies that a true and correct copy of the SCO's

AMENDED ANSWER TO IBM's AMENDED COUNTERCLAIMS was served on Defendant

International Business Machines Corporation on this 11th day of March, 2004,

by hand delivery to:

> Alan L. Sullivan, Esq.
> Todd Shaughnessy, Esq.
> Snell & Wilmer L.L.P.
> 15 West South Temple, Ste. 1200
> Gateway Tower West
> Salt Lake City, Utah 84101-1004

and also by U.S. Mail, first class, postage prepaid to:

> Evan R. Chesler, Esq.
> David Marriott, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, NY 10019

> Donald J. Rosenberg, Esq.
> 1133 Westchester Avenue
> White Plains, New York 10604