

Brent O. Hatch (5715)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver, Esq. (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JUL - 9 2004

MARKUS B. ZIMMER, CLERK
BY_____
          DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>          Plaintiff/Counterclaim-<br>          Defendant,<br><br>vs.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION,<br><br>          Defendant/Counterclaim-<br>          Plaintiff. | **MEMORANDUM IN OPPOSITION TO DEFENDANT INTERNATIONAL BUSINESS MACHINES' MOTION FOR SUMMARY JUDGMENT ON ITS TENTH COUNTERCLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**<br><br>Civil No. 2:03CV0294 DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke Wells |

206

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF DISPUTED FACTS.............................................................9

    A.    The Development and Licensing of UNIX ............................................9

    B.    SCO's Ownership Interest ....................................................................11

    C.    The Development of Linux....................................................................12

    D.    SCO's Legal Claims Against IBM .......................................................14

          1.    SCO's Contract Claims................................................................14

          2.    SCO's Copyright Claim................................................................18

    E.    IBM's Tenth Counterclaim and Summary Judgment Motion ...............22

    F.    IBM's "Linux-Related Activities" .......................................................23

    G.    SCO'S Compliance With Its Discovery Obligations.............................28

    H.    IBM's Mischaracterizations of SCO's Public Statements ....................41

ARGUMENT.....................................................................................................42

I.    IBM'S REQUEST FOR A RETROACTIVE DISCOVERY CUT-OFF,
    AND THE SANCTION OF SUMMARY JUDGMENT, ON ITS
    RECENTLY-ADDED TENTH COUNTERCLAIM IS MERITLESS AS
    A MATTER OF FACT AND LAW ...................................................................42

    A.    IBM's Misguided Accusations Fail to Establish Any Discovery
         Noncompliance, Much Less Bad Faith Noncompliance, by SCO, A
         Legal Prerequisite to the Imposition of Any Dispositive Sanction........44

          1.    SCO Has Complied With Its Discovery Obligations In
              Good Faith ..................................................................................44

          2.    Bad Faith Noncompliance Is an Indispensable Legal
              Prerequisite to the Extreme Dispositive Sanction That IBM
              Seeks ..........................................................................................50

    B.    The Extreme Sanction That IBM Requests Lacks Any Legal Basis .....51

i

1.  IBM's Motion Ignores, and Miserably Fails, All Five
    Prongs of This Circuit's "Just Sanction" Test ...........................................51

2.  IBM's Requested Sanction Is Not Even Rationally, Much
    Less Specifically, Related to IBM's Discovery Complaints ....................54

II. EVEN IF CONSTRUED AS A PROPER MOTION FOR SUMMARY
    JUDGMENT, IBM'S MOTION FAILS UNDER THE FACTS AND
    THE WELL-ESTABLISHED LAW ........................................................................55

A.  IBM Has Failed to Meet Its Burden of Production on Summary
    Judgment........................................................................................................56

B.  IBM's Motion for Summary Judgment Is Premature Under Federal
    Rule of Civil Procedure 56(f) .................................................................60

    1.  In Conjunction with SCO's Rule 56(f) Materials, the
        Procedural Posture of the Case Compels Denial of IBM's
        Motion on Several Bases ........................................................................63

    2.  The Materials SCO Has Filed Pursuant to Rule 56(f)
        Further Compel Denial of IBM's Motion................................................71

CONCLUSION....................................................................................................90

ADDENDUM

Plaintiff The SCO Group, Inc. ("SCO") respectfully submits this memorandum in opposition to Defendant International Business Machines' ("IBM") Motion for Partial Summary Judgment on its Tenth Counterclaim for Declaratory Judgment of Non-Infringement.

## PRELIMINARY STATEMENT

IBM moves for summary judgment on its broad and complex Tenth Counterclaim less than two months after it was filed, and after SCO has moved to dismiss it. Given its prematurity, IBM's motion does not attempt to address the underlying substantive issues: IBM does not contend that, with the benefit of discovery going forward, SCO could not develop facts to oppose the Tenth Counterclaim.

Instead, IBM makes a procedural argument: IBM argues that SCO must oppose the counterclaim now – only with facts SCO discovered and developed before the counterclaim was filed. IBM actually claims that SCO should be sanctioned with the penalty of summary judgment if SCO even attempts to develop additional evidence to oppose IBM's new counterclaim.

No doubt IBM, like many litigants, would like to win its claim before it even has to file it. But if IBM has a claim, it must support that claim and permit SCO to test it through discovery and on its merits. IBM presents no facts or law to excuse it from that obligation.

On March 29, 2004, IBM filed its Tenth Counterclaim, seeking a declaration that "IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyright through its Linux activities, including its use, reproduction and improvement of Linux, and that some or all of SCO's purported copyrights in UNIX are invalid and unenforceable." IBM's Second Am. Countercl. ¶ 173. On April 23, SCO moved to dismiss or stay the

counterclaim, and that motion is now pending before the Court.  On May 18, IBM opposed

SCO's motion and simultaneously filed its present motion asking the Court to declare that none

of IBM's ongoing "Linux activities" infringes any SCO copyright.[1]

The scope of the issues included in the proposed declaration is sweeping:  even aside

from the issue of its own contributions and other Linux-related activities, in its capacity just as a

Linux end-user, IBM would not be entitled to a non-infringement declaration under the copyright

laws if Linux contains any infringing material – no matter who contributed it.  IBM's claim thus

adds the substantial issue of such third-party contributions, made by thousands of unaffiliated

computer programmers over almost a decade.

Despite the sweeping immunity that IBM seeks and even now unforseeable number of

issues its new claim would add, IBM claims that SCO must defend against that claim based only

on facts SCO developed before that claim was filed.

To support its extraordinary request, IBM relies on claims about certain discovery

documents and Magistrate decisions.  Those are the claims that provide the material fact

questions at the center of this summary judgment motion.  It is precisely because IBM places

those claims at the center of its motion – and because the facts at issue are all matters of record

available for the Court's review – that IBM's demonstrably inaccurate descriptions are so

inexplicable.  To support its claim that SCO should not be permitted to develop additional facts

to defend against its new counterclaim, IBM offers selected quotations from documents and

omits key portions that contradict its theory.  IBM then reinforces these selected quotations with

---

[1] IBM's Linux activities – which just last year caused a 50% increase in IBM's multi-billion-dollar Linux-related revenues –appear to be vast and constantly expanding.  See ¶ 44, below.

an equally selective presentation of the Magistrate Judge's Orders, omitting decisions that expressly contradict the facts as IBM has portrayed them.

The problem before the Court is not whether IBM's motion is premised on material inaccuracies – it demonstrably is – but why IBM has required SCO and the Court to go through the exercise of correcting them. This is not the first time IBM has advanced such inaccurate discovery claims in an attempt to cut short SCO's ability to develop its proof for trial. When IBM was last before this Court, it argued for, but did not receive, an August 4, 2004 fact-discovery cut-off. Now IBM seeks the retroactive imposition of an <u>April 19, 2003</u> cut-off – four months earlier than the cut-off IBM requested last time, and ten months earlier than the cut-off this Court imposed.

<u>IBM's Motion Rests on Selected and Misleading Quotations from<br>SCO's Discovery Responses and the Court's Discovery Rulings</u>

At the center of IBM's argument are the discovery responses that SCO provided on January 12 and April 19, 2004, with which SCO provided certifications in accordance with the Magistrate Judge's December and March Orders. Pursuant to those Orders, SCO described in the certfications its good faith discovery compliance efforts. IBM tells the Court that SCO certified its responses as "complete, detailed and thorough," and, on that basis, argues that SCO should be limited to those responses for purposes of IBM's dispositive motion. SJ Mem. ¶ 40. Alternatively, IBM claims, if SCO seeks to oppose the counterclaim with material not produced in January or April, or if SCO seeks more discovery to develop such facts, then SCO "falsely certified that it has provided complete, detailed and thorough answers to IBM's interrogatories and the Court's orders." <u>Id.</u> at 30. In that case, IBM asserts, this Court should sanction SCO by granting IBM summary judgment on its Tenth Counterclaim. <u>Id.</u>

3

This is the sole ground for IBM's motion, and it depends on the accuracy and

"completeness" of IBM's description of SCO's discovery certifications and the Magistrate

Judge's orders.  But the very documents and decisions on which IBM relies <u>by their express</u>

<u>terms</u> contradict IBM's representations to this Court.  For example, IBM fails to mention either

of the following statements from SCO's discovery responses:

> --    "These Supplemental Responses, which exceed 60 pages, fully respond to
> the interrogatories <u>based on the information in SCO's possession.  Upon receiving</u>
> <u>complete discovery from IBM</u>, including all versions of AIX and Dynix/ptx, there
> undoubtedly will be further evidence of IBM's contractual breaches and other
> violations of law, <u>as detailed in the attached Declaration of Ryan</u>
> <u>Tibbits.  Accordingly, SCO reserves the right to further supplement or amend its</u>
> <u>answers as discovery or further investigation may reveal.</u>"   SCO's Notification of
> Compliance, Jan. 12, 2004 (Ex. 11) (emphasis added).

> --    "<u>Based on the information currently in SCO's possession</u>, the
> answers given and materials produced in response to the Order are given
> to <u>the best of SCO's knowledge</u> and are complete detailed and thorough."
> Decl.  of Chris Sontag, Apr. 19, 2004 (Ex. 18) (emphasis added).

Consistent with the approach the Magistrate Judge approved, these certifications described <u>why</u>

SCO's discovery responses were not final and complete, and explained what additional

information SCO needed from IBM in order to provide more complete responses.

What makes IBM's omissions even worse is that at the time SCO provided its

certifications, there was a live dispute as to whether SCO had even the beginnings of sufficient

discovery from IBM and, as IBM further fails to mention, the Magistrate Judge <u>agreed with</u>

<u>SCO</u>.  In her March 3 Order, the Magistrate Judge concluded:

> --    that SCO's efforts to comply with its discovery obligations were in "good faith,"
> 3/3/04 Order at  3 ¶ 1 (Ex. 15); and

> --    that SCO <u>did</u> need more information from IBM to respond to IBM's discovery
> demands (and to develop its own case), <u>ordering</u> IBM to provide some of the basic
> information SCO said it needed to provide additional discovery responses, <u>id.</u> at 4 ¶ 1.

Until these orders – issued nine months after SCO requested the material – IBM had not provided SCO with even a single version of one of the two (not publicly available) operating systems at the center of SCO's contract case, IBM's AIX program.  Id.  Until SCO could begin work on that program, it could not begin portions of work needed even to begin to respond more fully to IBM's discovery requests.  By the time IBM produced a readable version of AIX, SCO had been unable even to begin that initial work until fewer than <u>twenty business days</u> before the April 19 fact cut-off that IBM now proposes.

Moreover, based on the Court's "good faith" finding and the very points from SCO's certification that IBM's motion omits, the Magistrate Judge also established a procedure for deciding additional such issues.  The Magistrate established the ongoing procedure – which is now underway – precisely to preserve its jurisdiction to accord SCO the very discovery rights that IBM asks this Court to sanction SCO for seeking to exercise.

Thus, in addition to relying on selective quotations directly contradicted by omitted express language, IBM's motion ignores – and depends on the outright denial of – this indisputable discovery history.

### IBM's Continued Stonewalling Has Forced SCO to File a<br>*Renewed* Motion to Compel in Order to Obtain Fundamental Discovery

While asking the Court to block SCO from even trying to develop facts beyond what it had on April 19, IBM also continues to hold back material that the Magistrate Judge <u>ordered</u> IBM to produce in her March 3 Order.  This is discovery material of the most rudimentary kind that SCO requested <u>over a year ago</u>, that courts routinely rely on in making copyright infringement determinations, and for which SCO has now been forced to <u>renew</u> its prior motion

5

to compel – this time simply to secure compliance with the Court's Order.  See SCO's Renewed

Motion to Compel, July 6, 2004 (Exh. 25).

SCO seeks material that directly overlaps with the kinds of discovery and fact

development IBM wants to stop by imposing its retroactive April 19 cut-off.  For example, SCO

has been seeking for over a year, and in March the Magistrate ordered IBM to produce, the

identities and precise contributions of AIX programmers.  In the first instance, this information

would allow SCO to take depositions of principal programmer contributors to show IBM's

reliance on protected SCO material; such depositions would provide, or lead to, admissions of

IBM's contract liability.  See Part I.B.2, below.  But this discovery is also directly relevant to

IBM's new counterclaim:  SCO needs such depositions to streamline the otherwise extremely

time-consuming investigation and discovery process so that SCO can further develop proof of

IBM's non-literal copyright violations.  See Part II.B.1, below.  IBM still refuses to provide this

information, claiming that it was contained in the AIX program itself.  Even if that claim were

true, SCO only received access to the first version of AIX from IBM on March 24, far too short a

time to notice and take depositions and then build on the results before the April 19 cut-off that

IBM's motion seeks to impose.  But, as SCO has shown in its renewed motion to compel, IBM's

claim is not true.  See id.  IBM's present motion makes the extraordinary request to this Court to

cut-off SCO's ability to work, so that even IBM's refusal to comply with its Court-ordered

obligations to produce critically relevant discovery will have no impact on SCO's ability to

defend against IBM's counterclaim.

<u>IBM Attempts to Force SCO to Use an Impossibly Time-Consuming Copyright Investigation
Process (Without Discovery or Relevant Depositions) – While Cutting Off SCO's Time to
Develop Its Case.</u>

IBM further contends that SCO should be forced to use the most inefficient and time-
consuming means of developing its defense to IBM's counterclaim.  IBM notes that it is possible
for SCO to set UNIX and Linux side by side and simply compare the millions and millions of
lines of source code in the multiple versions of these operating systems.  Although it is <u>possible</u>
to do this, when the comparison is being made to find evidence of non-literal copying, and when
the magnitude of the search is as broad as this comparison would entail, this method would waste
an enormous amount of time and resources.  <u>See</u> Part II.B.2, below.

SCO is not required to try to accomplish a non-literal copyright investigation of this
magnitude in the least efficient way, without targeted depositions and other discovery that IBM's
withholding of fundamental information has precluded.  As discussed above, the discovery IBM
seeks to prevent by its motion includes the very deposition discovery SCO would be able to
pursue once IBM complies with the Magistrate Judge's order.  IBM may not force SCO to use
the least efficient and most time-consuming method of investigation – which would shield IBM's
admissions of contract liability from scrutiny – while at the same time demanding that SCO's
investigation be cut off on a retroactive basis.

IBM's motion thus turns the law of summary judgment on its head.  IBM tries to
withhold discovery, slow down the process of investigation, and then cut off the time for work.
The law requires just the opposite:  that discovery be used to make the process as efficient as
possible – and then, in complex software cases involving non-literal copying, that summary

judgment motions be deferred until after fact and expert discovery has been completed (where, even then, they are disfavored). See Part II.A, below.

### IBM's Motion Fails for Several Additional, Independent Legal Reasons

In sum, IBM's motion depends on the actual facts of the discovery process in this case – and IBM's version of those facts cannot withstand scrutiny. As discussed further herein, IBM's motion fails for the following independently-sufficient reasons:

-- IBM cannot satisfy a single element of the multi-part test a litigant must meet to warrant the sanction IBM seeks, see Part I, below;

-- Even if its motion is construed as a proper motion for summary judgment, IBM does not remotely satisfy its burden of production, see Part II.A, below;

-- If necessary, the Court should deny IBM's motion under Fed. R. Civ. P. 56(f) in light of the procedural posture of this case, such as the absence of any expert reports in this complex area of copyright law, SCO's pending and renewed motion to compel, and the very early stage of discovery on the Tenth Counterclaim, see Part II.B.1, below; and

-- The Court should deny IBM's motion on the grounds set forth in SCO's 56(f) materials, which also demonstrate the existence of genuine issues of material fact, see Part II.B.2, below.

As to each of those independent lines of authority, IBM's only response is its contention that SCO represented its previous discovery responses to constitute all of the evidence SCO could ever find on the subject of the requests. As shown above, that contention is not at all accurate; indeed, it is inexplicably inaccurate.

————————

A pattern to IBM's conduct has emerged. First, IBM takes every possible step to hold back the most basic information to prevent SCO's investigation from proceeding. Second, IBM inaccurately represents what has occurred in discovery and inaccurately represents the Magistrate Judge's response. Third, having prevented SCO from receiving basic discovery, IBM

asks the Court to cut off the possibility of further discovery and further work. The same pattern characterized IBM's opposition to SCO's motion to amend the Scheduling Order, where IBM implicated the same discovery matters that it does here, asked the Court to cut short work before IBM had even allowed it to begin, and asked the Court to overrule Judge Wells in some (though not all) of the same ways it does here.

IBM repeatedly tells the Court (and the world) that SCO has no case and that SCO seeks only to delay. But a defendant who truly believes its adversary has no case, who truly wishes to avoid delay, does not:

-- take every possible step – even in the face of court orders – to withhold access to the information needed to test its position, thereby ensuring great delay; and

-- then ask the Court to cut off all work so that its position can never be tested, thereby ensuring that even a plaintiff with a very strong case could never prosecute it.

Discovery battles are common and, to some extent, unavoidable in complex civil litigation. This pattern is not. SCO demonstrates below the multiple, independently-sufficient grounds that defeat IBM's motion.

## STATEMENT OF DISPUTED FACTS[2]

### A.     The Development and Licensing of UNIX

1.     In 1969, SCO's predecessor-in-interest, AT&T, created the UNIX computer

---

[2] IBM's "Statement of Undisputed Facts" contains numerous improper conclusions of fact and law, legal argument, and other statements that are inappropriate under Local Rule of Civil Procedure 56-1(b). Much of IBM's Statement is rhetoric or legal argument. The following paragraphs in IBM's "Statement of Undisputed Facts" contain, in whole or in part, improper legal arguments and conclusions of law: Paragraphs 23-25, 28-30, and 33-48. Genuine issues of material fact also exist regarding the purported "undisputed facts" in Paragraphs 1-3, 16-17, 19-23, 25, 28-30, 33-34, 36-37, and 39-48 of IBM's Statement. SCO also attaches, in the Addendum hereto, a chart detailing which paragraphs of IBM's Statement SCO disputes, and where SCO's response is addressed in this Memorandum.

operating system ("UNIX").[3]  IBM's Second Am. Countercl. ¶ 8 (Exh. 16).[4]

    2.     Over the years, AT&T Technologies, Inc., a wholly-owned subsidiary of AT&T,

participated with related companies in licensing UNIX to numerous businesses for widespread

enterprise use. Id. ¶ 9.  IBM, Hewlett-Packard, Inc. ("HP"), Sun Microsystems, Inc. ("Sun"),

Silicon Graphics, Inc. ("SGI"), and Sequent Computer Systems, Inc. ("Sequent") (which has

since merged into IBM through a stock acquisition) became some of the principal United States-

based UNIX licensees.  See, e.g., IBM Software Agreement (Exh. 26); Sequent Software

Agreement (Exh. 30); SGI Software Agreement (Exh. 34).

    3.     IBM, HP, Sun, SGI and Sequent each created modifications of UNIX to operate

on their processors, modifications that are commonly referred to as "flavors."  The Many Flavors

of Unix, http://www.albion.com/security/intro-3.html (last visited July 8, 2004) (Exh. 57).

    4.     After licensing UNIX System V (a version of UNIX) in 1985, IBM devised its

AIX operating system, IBM's Second Am. Countercl. ¶ 13 (Exh. 16), and Sequent devised its

Dynix/ptx ("Dynix") operating system. Id. ¶ 16.

    5.     AIX and Dynix/ptx are each modifications of, and derivative works based on,

UNIX System V source code:  AIX and Dynix each contain thousands of lines of UNIX System

V Code, SCO's Am. Resp. to IBM's Fourth Set of Interrogs. at 11-44 (Exh. 5-1), and IBM's

---

[3] A computer's operating system manages the hardware and software resources of the computer.
Essentially, it acts as a link between the computer hardware and the applications (programs). Sontag
Decl. ¶ 6.

[4] As used herein, "Exh." refers to the exhibits attached to this brief; "Harrop Decl." refers to the Rule
56(f) Declaration of John K. Harrop; "Sontag Decl." refers to the Declaration of Christopher Sontag; and
"Gupta Decl." refers to the Declaration of Sandeep Gupta. Also, "SJ Mem." refers to IBM's
Memorandum in Support of Its Cross-Motion for Partial Summary Judgment on Its Claim for Declaratory
Judgment of Non-Infringement, and "IBM Statement" refers to IBM's "Statement of Undisputed Facts"
included therein.

internal documents even refer to AIX as a derivative work based on UNIX System V. Exhs. S-5
at 2 ("AIX was derived from System V."); S-6 ¶ 8.4 ("AIX is derived from software under
license from SCO."); S-4 (stating that AIX is "derived from System V"); see also Rodgers Dep.
at 19-23 (Exh. S-2) (discussing how Sequent required access to UNIX source code), 138
("Dynix/ptx is almost certainly a derivative work of Unix System V.").

**B.     SCO's Ownership Interest**

6.     Through a series of corporate acquisitions, SCO owns all right, title, and interest
in and to UNIX operating system source code, software, licensing agreements, and any legal
claims arising out of those agreements. SCO also owns copyrights and additional licensing
rights in and to UNIX. Specifically, in May 2001, Caldera International, Inc. ("Caldera
International") purchased the Professional Services and Server divisions and their UNIX-related
assets from The Santa Cruz Operation, Inc., IBM Statement ¶ 14, which had acquired these
assets in 1995 from Novell, Inc. ("Novell"). See Asset Purchase Agreement Between SCO and
Novell, Sept. 19, 1995 (Exh. 32). Novell, in turn, had purchased its rights from AT&T in 1993.
See IBM's Second Am. Countercl. Against SCO ¶ 10 (Exh. 16).

7.     At the time of Caldera International's acquisition of Santa Cruz's assets in 2001,
Caldera International also acquired the stock of Caldera Systems, Inc., which had been formed in
1998. Caldera International Reports Second Quarter Results, Business Wire, June 6, 2001 (Exh.
40). In May 2003, Caldera International changed its name to The SCO Group. IBM Statement
¶ 15.

## C.    The Development of Linux

8.    Linux is a computer operating system that was developed through decentralized

contributions of computer code by thousands of developers around the world.  IBM Statement

¶ 4; Sontag Decl. ¶ 57.  Linux is an "open source" program, meaning that the program's source

code is available for anyone to access, use, extend, or modify.  IBM's Second Am. Countercl.

¶ 22 (Exh. 16).

9.    Linux was first created in 1991, when a Finnish college student named Linus

Torvalds began developing Linux as a hobby after studying an operating system that one of his

professors had based on and derived from UNIX.  IBM Statement ¶ 2; SCO Linux Introduction

Version 1.2 § 1-5 (2002) (Exh. S-7).

10.    Thereafter, Mr. Torvalds posted his programming material on the Internet for

comment, and the development of the operating system became in effect a group project in

which Mr. Torvalds and his delegates made final determinations about which suggestions from

third parties to incorporate.  Sontag Decl. ¶ 57.  The kernel of the operating system[5] that resulted

came to be known as Linux.  IBM Statement ¶ 3.

11.    The Linux development process did not employ any mechanism to ensure that

intellectual property rights, confidentiality, or security were protected, or to prevent the improper

inclusion of computer code that had been stolen outright or had been developed by improper use

of proprietary methods and concepts; contributors to Linux were not even required to formally

---

[5] An operating system is organized into three layers:  applications, shell, and kernel.  Applications include
such programs as word processors and spreadsheets.  The shell interprets user commands and interacts
with the kernel.  In turn, the kernel is the heart of the operating system.  It interacts with the computer's
hardware, schedules processes, and manages program storage.  See Sontag Decl. ¶ 6; SCO Linux
Introduction Version 1.2 § 1-14 (2002) (Exh. S-7).

assign their copyrights or to guarantee their ownership of copyrights over the materials they contributed. Sontag Decl. ¶ 57; Roger Parloff, <u>Gunning for Linux</u>, Fortune, May 17, 2004, at 90, 92 (Exh. 44).

     12.    SCO is not aware of any "road map" that allows it to trace the migration of UNIX code into Linux. Sontag Decl. ¶ 57. Although there is limited public information (and some public consensus) regarding contributors of source code into Linux, even the identities of all the principal contributors to Linux are not public information. Amy Harmon, <u>The Rebel Code</u>, N.Y. Times, Feb. 21, 1999, § 6 at 34 (Exh. 59). Some contributors of source code indicate their identity therein – but even then their identity may be pseudonymous. <u>Id.</u> Many other contributors of source code do not indicate their identity therein, and have not publicly acknowledged their contributions. <u>Id.</u>

     13.    It is undisputed that IBM has contributed source code to Linux. Frye Decl. ¶ 5 (Exh. 21); IBM Statement ¶ 4. In fact, IBM has contributed source code from UNIX "flavors" AIX and Dynix into Linux. <u>See</u> SCO's Revised Supplemental Response to IBM's First and Second Set of Interrogs. at 3-29 (Exh. 13); 4/19/04 Hatch Letter Tabs C, D, E and F (Exh. 19). Moreover, SCO has identified evidence of literal and non-literal copying of material from UNIX into Linux. <u>See</u> Harrup Decl. ¶ 72; Gupta Decl. ¶ 3.

     14.    Linux contains approximately 8,750 individual files and 4 million lines of code, in the kernel alone. Sontag Decl. ¶ 4.

**D.    SCO's Legal Claims Against IBM**

      **1.    SCO's Contract Claims.**

     15.    SCO filed this lawsuit against IBM on March 6, 2003. SCO's lawsuit has always been based principally on IBM's violation of its obligations under UNIX licensing agreements that IBM and its predecessor-in-interest Sequent had entered into with SCO's predecessor-in-interest, AT&T.[6] The primary license agreements at issue in this case were entered into by IBM on February 1, 1985 and by Sequent on April 18, 1985 (the "Software Agreements").[7]

     16.    These Software License Agreements prohibited the licensees from transferring, in any manner, in whole or in part, UNIX and/or any derivative works based on UNIX:

> AT&T grants to Licensee a personal, <u>nontransferable</u> and nonexclusive right to use in the United States each Software Product[8] identified in the one or more Supplements hereto, <u>solely for Licensee's own internal business purposes and</u>

---

[6] Claims arising out of IBM's violation of its contractual obligations as UNIX licensee have always predominated in SCO's complaints. In addition to contract-related claims – which account for six of SCO's nine claims in its Second Am. Complaint – SCO's complaints have asserted claims for interference with business relationships and unfair competition, which arise out of the same basic facts. <u>See</u> Second Am. Compl. ¶¶ 181-88 (Exh. 14). SCO originally asserted, but later voluntarily withdrew, a trade secrets claim, and, as explained in paragraph 15 n.6, SCO added a limited copyright claim in its Second Amended Complaint based on IBM's use and distribution of AIX and Dynix following the termination of its license agreements.

[7] Specifically, on February 1, 1985, AT&T and IBM entered into the following agreements, among others: Software Agreement Number SOFT-00015 (Exh. 26), Sublicensing Agreement Number SUB-00015A (Exh. 27), and a side letter agreement (Exh. 28). AT&T and Sequent entered into Software Agreement Number SOFT-000321 (Exh. 30) on April 18, 1985, as well as Sublicensing Agreement Number SUB-000321A (Exh. 31) on January 28, 1986.

[8] Section 1.04 of the Software License Agreements define "Software Product" broadly: "Software Product means materials such as Computer Programs, information used or interpreted by Computer Programs and documentation relating to the use of Computer Programs. Materials available from AT&T for a specific Software Product are listed in the Schedule for such Software Product." Exhs. 26, 30. "Computer Program" is defined in section 1.02 to mean "any instruction or instructions, in source-code or object-code format, for controlling the operation of a CPU [which, in turn, is defined in section 1.01 to mean 'central processing unit']." Exhs. 26, 30.

solely on or in conjunction with Designated CPUs for such Software
Product. Such right to use includes the right to modify such Software Product and
to prepare derivative works based on such Software product, provided the
resulting materials are treated hereunder as part of the original Software Product.
IBM Software Agreement, SOFT-00015 § 2.01 (Exh. 26) (emphases added).

17.    In addition to specifying that the licensees' use of UNIX and its derivatives was

"nontransferable" and restricted to the licensees' "own internal business purposes" on designated

computers, the Software Agreements provided, in Section 2.05, that "[n]o right is granted by this

Agreement for the use of Software Products directly for others, or for any use of Software

Products by others."[9]  Exh. 26.

18.    Each of the UNIX licensees was also required to hold "Software Products subject

to this Agreement" – i.e., UNIX and any "resulting materials" from "derivative works based on

such Software product" under Paragraph 2.01 – "in confidence."  Sequent Software Agreement,

SOFT 000321 § 7.06 (Exh. 30); IBM Side Letter ¶ A.9 (Exh. 28).  Moreover, Sequent's

Software Agreement prohibited it from making "any disclosures of any or all of such

SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to

employees of LICENSEE to whom such disclosure is necessary to the use for which rights are

granted hereunder."  Sequent Software Agreement, SOFT 000321 § 7.06 (Exh. 30) (emphasis

added).

19.    At the time that IBM executed its Software Agreement, it also entered into a side

letter agreement with AT&T (the "IBM Side Agreement"), by which the parties agreed that IBM

---

[9] Separate sublicensing agreements permitted UNIX licensees such as IBM and Sequent to subdistribute
computer programs in object-code format based on UNIX provided that such licensees required their
sublicenses to comply with certain provisions of the Software License Agreements, specifically including
Section 2.01.  See Exhs. 27, 31.

would own derivative works prepared by or for it: "Regarding Section 2.01, we agree that modifications and derivative works prepared by or for you are owned by you. However, ownership of any portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work remains with us." IBM Side Agreement ¶ A.2 (Exh. 28). Nothing in the IBM Side Agreement abrogated IBM's obligation, pursuant to the plain language of Section 2.01 of its Software Agreement, to restrict its use of derivative works based on UNIX according to the terms of that agreement. [10]

20.    The Sequent Software Agreement (Exh. 30), which was executed more than two months after both IBM's Software Agreement and the IBM Side Letter, never included any such side agreement.

21.    SCO's contract claims do not depend on any proof that IBM contributed original source code from UNIX to Linux. Rather, the theory of SCO's case – which is based on the plain, unambiguous meaning of the Software Agreements – is that IBM breached those agreements by contributing code from AIX and Dynix – "modifications or derivative works based on" the UNIX Software Product – to Linux, in violation of IBM's obligation to treat such works as if they had been part of the original Software Product (i.e., solely for IBM's own internal business purposes, in confidence, without transferring them, as required by the Software

---

[10] The IBM Side Agreement, as subsequently amended, see Amendment X ¶ 6 (Exh. 29), also differed from the Sequent Software License Agreement in that it permitted IBM to "develop[ ] or market[ ] products or services employing ideas, concepts, know-how or techniques relating to data processing embodied in SOFTWARE PRODUCTS subject to this Agreement, provided that LICENSEE shall not copy any code from such SOFTWARE PRODUCTS into any such product or in connection with any such service." IBM Side Agreement ¶ 9 (Exh. 28). Although this provision amended and replaced in its entirety paragraph 7.06(a) of the IBM Software Agreement, it of course had no effect on IBM's obligations under paragraph 7.01 of that agreement or on any other contractual obligations of either IBM or Sequent.

Agreements). IBM Software Agreement, SOFT 00015 § 2.01 (Exh. 26) and Sequent Software

Agreement, SOFT 000321 § 2.01 (Exh. 30). Furthermore, IBM's contributions of code from

Dynix violated its obligation under the Sequent Software Agreement not to disclose "any or all

of such SOFTWARE PRODUCTS (including methods or concepts utilized therein)." Sequent

Software Agreement, SOFT 000321 § 7.06(a) (Exh. 30).

22.     SCO has detailed for IBM its proof of the substantial contributions of offending

code from both AIX and Dynix to the Linux operating system. See ¶¶ 59-61, below.

23.     SCO believes that IBM does not want to defend against a breach of contract

action. For example, it is IBM's position that, to establish such a breach, SCO must show IBM

copying of UNIX code into Linux. But that is what SCO would have to show under the

copyright laws, rendering the much broader language of the license agreements inexplicable and

also making it impossible to explain what protections the innovator received beyond what it had

without the agreement. (Indeed, SCO would have more rights and fewer burdens under the

copyright laws than under the contracts as IBM now describes them.)

24.     SCO contends that if IBM did not want the burden of responsibility for contract

breaches, it should not have entered into and accepted the benefits of the contracts now at issue.

If IBM only wanted to be responsible under the copyright laws, it should have foregone the

benefits of the agreements it signed. Others – who would remain subject only to copyright

regulation – did not receive those benefits and thus, unlike IBM and Sequent, were not able to

rely on SCO predecessor innovations as the bases for products critical to their own businesses.

## 2.    SCO's Copyright Claim.

25.    Accordingly, this case, from its outset, has been about IBM's breaches of its own

Software Agreement as well as the Software Agreement that it inherited when it acquired

Sequent. And, until February 2004, there was no copyright claim of any sort in this case. On

February 27, 2004, with the filing of its Second Amended Complaint, SCO added a single

copyright claim (Count V) against IBM. As SCO's complaint makes abundantly clear, however,

that claim is based primarily on IBM's use and distribution of AIX and Dynix after SCO

terminated IBM's UNIX licenses. See Second Am. Compl. ¶¶ 173-80 (Exh. 14).[11]

26.    Indeed, SCO's sole copyright claim is expressly predicated on its claim that

"Despite termination of such Agreements, IBM has continued to reproduce, prepare derivative

works of, and distribute UNIX software, source code, object code, programming tools, and

documentation related to UNIX operating system technology, and has induced others to do the

same." Second Am. Compl. ¶ 175 (Exh. 14); see generally id. ¶¶ 173-80. It is on that basis that

SCO has alleged that "IBM's breaches of the IBM Related [software license] Agreements and

the Sequent [software license] Agreements and its post-termination actions have infringed, have

induced infringement of, and have contributed to the infringement of, copyright registrations of

SCO and its predecessors." Id. ¶ 179.

---

[11] In addition to IBM's post-termination use of SCO's copyrighted materials giving rise to copyright
infringement, SCO claims IBM exceeded the scope of the license in other ways that make IBM liable for
copyright infringement. For example, IBM violated the geographic limitations of the license when it used
UNIX outside the United States without written permission. SCO alleged in the complaint that IBM used
UNIX in India without such written permission, Second Am. Compl. ¶¶ 114, 147, which results in
copyright infringement. See Gilliam v. Am. Broad. Cos., 538 F.2d 13, 20 (2d Cir. 1976).

27.     Furthermore, in a prior submission to this Court, SCO has expressly

acknowledged that its copyright claim does not involve any claim relating to IBM's Linux-

related activities:

> The only copyright claim SCO has asserted against IBM is primarily for IBM's
> continuing use of AIX and Dynix after SCO terminated IBM's UNIX
> licenses. See Second Amended Complaint, Count V. The Second Amended
> Complaint, however, does not contain a claim against IBM for copyright
> infringement arising out of its use, reproduction or improvement of Linux. Mem.
> in Support of SCO's Motion to Dismiss or Stay the Tenth Counterclaim at 3 (Exh.
> 20).

28.     Thus, SCO's complaint does not involve any claims arising out of contributions to

Linux of any sort by parties other than IBM.   Moreover, SCO's Linux-related claims in this case

are expressly limited to contract claims involving IBM's capacity as a contributor to Linux; SCO

has not asserted any claims arising out of any of IBM's other numerous, varied, and expanding

activities involving Linux.  See ¶¶ 42-45, below.

29.     Even though nothing in SCO's copyright claim concerns IBM's Linux-related

activities and SCO has expressly stated to this Court that it has no such claim, in support of its

argument that SCO has already had an adequate opportunity to develop its proof of IBM's

Linux-related copyright infringement, IBM attempts to construct for SCO a copyright claim that

SCO has never asserted against IBM.

30.     In paragraphs 19 and 20 of its "Statement of Undisputed Facts," IBM cobbles

together selected, isolated portions of SCO's complaint and concludes, in paragraph 23, that

"After all, SCO has charged IBM with copyright infringement, including with respect to IBM's

Linux activities."  IBM's selective quotations from SCO's complaint mischaracterizes SCO's

copyright claim.

31.    For one thing, IBM's depiction of SCO's complaint omits any mention of the allegations from SCO's statement of its copyright claim (quoted in paragraph 25 above), which make clear that SCO's claim is based primarily on IBM's post-termination conduct, and does not concern IBM's Linux-related activities.

32.    Moreover, only one of the six quotations that IBM employs from SCO's Second Amended Complaint actually comes from the section in which SCO states its copyright claim and IBM does not even quote that one paragraph accurately.

33.    In fact, that allegation, stated in full, makes clear that that SCO's copyright claim arises from IBM's breaches of its license agreements and its use and distribution of AIX and Dynix after the licenses were terminated:

> IBM's breaches of the IBM Related Agreements and the Sequent Agreements and its post-termination actions have infringed, have induced infringement of, and have contributed to the infringement of, copyright registrations of SCO and its predecessors.  Second Am. Compl. ¶ 179 (emphasis added).

In its repeated recitation of this quotation, however, IBM removes the portion underlined above, to suggest that SCO's copyright claim involves Linux-related activities.  See IBM SJ Mem. ¶¶ 19, 23, 42.

34.    The remainder of the quotations that IBM extracts from portions throughout SCO's sixty-four-page Second Amended Complaint do not state a copyright claim against IBM for any of its Linux-related activities.  Indeed, each of the selected portions on which IBM relies were also included in SCO's First Amended Complaint, which did not include any copyright claim.  See First Am. Compl. ¶¶ 5(c) (Exh. 2) (stating that IBM is responsible for "incorporating (and inducing, encouraging, and enabling others to incorporate) SCO's proprietary software into Linux open source software offerings"); 81 ("As a result, a very significant amount of UNIX

protected code is currently found in Linux 2.4.x and Linux 2.5.x releases in violation of SCO's contractual rights and copyrights."), 100 ("IBM has knowingly induced, encouraged, and enabled others to distribute [SCO's] proprietary information . . . ."); 102 (noting IBM's "coordination of the development of enterprise Linux, and the misappropriation of UNIX to accomplish that objective").

35.    Finally, paragraph 21 of IBM's "Statement of Undisputed Facts" refers to SCO's pending suit against AutoZone in the District of Nevada and, ostensibly based on Paragraph 109 of SCO's Second Amended Complaint, asserts that "According to SCO, IBM is at least partially responsible for AutoZone's allegedly infringing conduct."  IBM SJ Mem. ¶ 21 (citing SCO's Second Am. Compl. ¶ 109).  But Paragraph 109 of SCO's Complaint does not include any such allegation.  In any event, the fact is that SCO has not made IBM a party in the AutoZone case. Moreover, while SCO is now litigating against IBM in this suit, SCO has not alleged any copyright violation based on IBM's contributions to Linux and has brought only a single, limited copyright claim against IBM that is expressly based on IBM's use and distribution of AIX and Dynix after the termination of its licenses.[12]

---

[12] Although SCO is currently engaged in a continuing investigation of improper contributions to Linux, SCO has made clear since at least SCO's counsel's public comments on November 18, 2003, that its litigation plan was to identify (at the time, within ninety days) "a defendant" to "illustrate the nature of the problem," i.e., "a significant user that has not paid license fees and is in fact using proprietary and copyrighted material."  SCO Builds 'Significant' War Chest for Legal Fight, ComputerWeekly.com, Nov. 19, 2003 (Exh. 60).  Since that time, SCO has sued one end-user of Linux (AutoZone) – "a defendant" – to "illustrate" the nature of the end-user problem.  As SCO's actions have made clear, it continues to believe that the most rational route to an overall resolution of this end-user problem is through negotiation, not broad-based litigation.

**E.    IBM's Tenth Counterclaim and Summary Judgment Motion**

36.    More than a year after SCO filed its lawsuit, on March 29, 2004, IBM attempted

to insert into this case for the first time an extraordinarily broad counterclaim that seeks the

following declaratory judgment:

> IBM does not infringe, induce the infringement of, or contribute to the
> infringement of any SCO copyright through its Linux activities, including its use,
> reproduction and improvement of Linux, and that some or all of SCO's purported
> copyrights in UNIX are invalid and unenforceable.  (IBM's Second Am.
> Countercl. ¶ 173.)

37.    IBM's Tenth Counterclaim thus seeks to introduce into this case new and wide-

ranging issues concerning:  (1) all of IBM's Linux-related activities, including (but not limited

to) its end use, reproduction, distribution, and exploitation of Linux products (as distinct from its

role as a contributor to Linux); (2) contributions to Linux that were made by literally thousands

of parties other than IBM; (3) the propriety of Linux's content as a whole.

38.    On April 23, 2004, SCO moved to stay or dismiss IBM's Tenth Counterclaim.  In

its opening memorandum, SCO argued that the Court should exercise its discretion to grant the

requested relief because the "newly added counterclaim raises issues separate and apart from the

primary breach of contract and other direct claims and counterclaims in this case."  Mem. in

Support of Mot. to Dismiss or Stay IBM's Second Am. Countercl. at 2.  IBM opposed SCO's

motion on May 18, 2004 (Exh. 25B), and SCO will file its reply brief in support of its motion on

July 26, 2004.

39.    On the same day that IBM filed its opposition to SCO's motion to dismiss or stay

the Tenth Counterclaim – and less than two months after IBM had interposed that claim for the

first time – IBM moved for summary judgment on that claim.  By that motion, IBM has asked

the Court for a summary "declaration of non-infringement with respect to IBM's Linux activities." IBM SJ Mem. at 2.[13]  IBM is thus seeking a summary declaration that it did not violate any of SCO's numerous relevant copyrights under any three types of infringement – (1) direct infringement; (2) contributory infringement; and (3) inducing infringement – through any of IBM's Linux-related activities, including (but not limited to) its capacities as (1) a contributor to Linux; (2) a distributor of Linux; and (3) an end-user of Linux.

40.    IBM does not attempt to identify or describe all of its Linux-related activities (for which it seeks a declaration of immunity) with any degree of specificity.  But what is clear is that IBM's motion amounts to a request for, among other things, a clean bill of health for the entirety of Linux – including each of its approximately 8,750 individual files and 4 million lines of code in the kernel alone.  Sontag Decl. ¶¶ 8, 15.  Because IBM's role as a distributor or end-user of Linux alone would be sufficient to demonstrate IBM's liability under black-letter copyright law if Linux contains any infringing content, no matter what the source of that content, see Argument Part II below, IBM's Tenth Counterclaim, and its motion for a summary declaration of non-infringement, requires at least a finding that nothing in Linux infringes any copyright of SCO's.

**F.    IBM's "Linux-Related Activities"**

41.    Various public sources have reported on IBM's vast, and expanding, Linux-related activities.  For example:

      a.    "The company has 250 developers working on 29 separate Linux projects worldwide, according to Ken King, director of technical strategy from

---

[13] IBM's motion expressly disclaims any intention of seeking summary judgment on the validity or enforceability of SCO's copyrights to UNIX.  See IBM SJ Mem. at 3 n.3.

23

I.B.M.'s software group," Steve Lohr, <u>No Concession from I.B.M. in Linux Fight</u>, N.Y. Times, June 14, 2003 (Exh. 58);

b.      "IBM Global Services offers the industry's most comprehensive portfolio of Linux consultive and support offerings, from planning and design, to implementation and technical support.  IBM consultants skilled in Linux are available worldwide to help customers design, build, enhance and operate their Linux solutions." <u>Linux Sweeps IBM Customers—From Smallest to Largest</u>, IBM Press Release, Aug. 4, 2003 (Exh. 55);

c.      "IBM plans to invest about $2 billion this year on open standards technologies such as Linux." <u>Brazil, IBM Sign Deal to Develop Linux Technology</u>, Forbes, Oct. 10, 2003 (Exh. 39);

d.      "'With the success of Linux on the server, the shift to deploy Linux on technical workstations, as well as a growing array of applications that run under Linux, many customers are seeing the productivity and cost benefits of these types of open platform services.  IBM is leveraging its own industry consultants and worldwide services expertise to respond to growing customer demand in these emerging countries and niche segments of the market.'" <u>IBM Blueprints Open Client Services for Customers in Brazil</u>, IBM Press Release, June 14, 2004 (Exh. 43);

e.      "All told, more than 12,000 IBMers today devote at least part of their time to Linux.  IBM has invested millions in two leading distributors, Red Hat and SuSe.  It has spent millions more to cofound and fund the nonprofit

24

organization that oversees Linux development." Daniel Lyons, <u>Kill Bill</u>, Forbes.com, June 7, 2004 (hereinafter <u>Kill Bill</u>) (Exh. 52);

f.      "IBM could generate hefty consulting fees installing and customizing Linux-based hardware and software for clients." <u>Kill Bill</u> (Exh. 52);

g.      "IBM has been helping companies move their applications to Linux." <u>Kill Bill</u> (Exh. 52);

h.      "IBM has created 45 Linux tech centers in 12 countries, where programmers crank out Linux code.  These are not the hippie hackers who created the early versions of Linux.  They are experienced engineers with backgrounds designing IBM's own operating systems, including AIX, its version of the Unix operating system." <u>Kill Bill</u> (Exh. 52).

42.    Moreover, IBM has submitted a Declaration from Daniel Frye, the co-founder and present director of IBM's Linux Technology Center, concerning several of IBM's Linux-related activities.  Beyond participating in the development of Linux, including by contributing source code to Linux, Frye Decl. ¶ 5 (Exh. 21), the following additional Linux-related activities are listed in Mr. Frye's declaration:

a.      providing "Linux training and support, applications testing, technical advice and a hands-on environment in which to evaluate Linux and Linux-based applications," <u>id.</u> ¶ 5;

b.      offering "mainframes and servers that run Linux," "memory solutions for Linux environments," and "a broad range of Linux-compatible software," <u>id.</u> ¶ 7;

c.    providing "services that assist companies in deployment of Linux-based computing environments, migration of database applications and data to Linux systems, support for Linux-based cluster computing, server consolidation, and a 24-hour technical engineering support line," id. ¶ 7;

d.    "reproduc[ing] Linux and making Linux available to others, both in developing and producing hardware, software and services for customers, and for other, internal business purposes," id. ¶ 8; and

e.    using Linux internally within IBM, as "many IBM employees – particularly those who work in the IBM Linux Technology Center – use Linux as their platform for day-to-day business computing, running office productivity applications, developing software (including Linux itself), and exchanging e-mail," id. ¶ 9.

43.    Even though SCO is aware of certain of IBM's Linux-related activities through public sources and through IBM's own statements in this litigation, SCO does not have sufficient information to know the specifics of what such activities entail or, indeed, the full extent of IBM's Linux–related activities.  Thus, although certain information about Linux activities may be "public knowledge," SJ Mem. 30, neither IBM's submissions to this Court nor Mr. Frye's Declaration purports to identify all of IBM's Linux-related activities or to describe with any degree of specificity IBM's conduct with respect to each such identified activity.

44.    Whatever the full extent of IBM's Linux-related activities, according to public reports, IBM's Linux business is thriving.  For example:

a.   "Last year [2003] IBM's Linux-related revenues grew 50% to more than
     $2 billion.  Even IBM's supposedly moribund mainframe hardware
     business grew 7% to just over $3 billion, thanks to Linux, which shipped
     on 20% of the mainframe horsepower IBM delivered last year."  Kill Bill
     (Exh. 52).

b.   IBM earned "$1 billion in Linux-based revenues in 2002 – more than
     double what it got in 2001."  The Big Guys Latch Onto Linux, Bus. Wk.,
     Mar. 3, 2003 (Exh. 38);

c.   "Today IBM Senior Vice Present William Zeitler will announce at the
     Linux World Conference that IBM has already recouped nearly all of its
     investment in Linux development, which has totaled about $1 billion over
     the past few years."  Lisa DiCarlo, IBM Revives The Mainframe,
     Forbes.com, Jan. 30, 2002 (Exh. 47).

d.   "'As recently as three years ago Linux was not a household name,' [Ann]
     Altman [manages IBM's business with federal government] told Reuters,
     'Today, Linux is growing at a tremendous clip with the federal
     government and we really aimed to deliver a robust security classification
     for Linux.'"  IBM Clinches Security Certification for Linux, Forbes.com,
     Aug. 5, 2003 (Exh. 44).

e.   "But 2500 customer engagements on Linux in a single year by just our
     company speak to how pervasively this movement has taken hold in the
     commercial world in which we operate."  Linux, Open Movement to

Transform E-business, Zeitler Says, IBM Press Release, Feb. 1, 2001

(Exh. 54).

**G.     SCO'S Compliance With Its Discovery Obligations**

45.     SCO has diligently complied with its discovery obligations and with the

Magistrate Judge's discovery orders.  To date, SCO has produced 241 CDs containing hundreds

of thousands of pages of documents.  SCO's Source Log (Exh. 35).  As requested by IBM, SCO

has produced all of the source code for its products in its possession, which exceeds over 700

million lines of code.  Id.  Moreover, over the span of dozens and dozens of pages, SCO has

detailed its claims, provided file and line numbers for source code IBM contributed to Linux in

violation of its contractual obligations, and otherwise provided all information in its possession

requested by IBM or ordered by the Magistrate.  See SCO Reply Mem. in Support of Mot. to

Amend Sched. Order at 9-13 (Exh. 22).  Indeed, in the most recent discovery order, Magistrate

Judge Wells expressly found that SCO had responded to IBM's discovery requests in "good

faith," 3/3/04 Order at 3 (Exh. 15) – a fact that is conspicuously absent from IBM's motion.

46.     An accurate recitation of SCO's efforts to obtain basic, but critical, discovery

from IBM and of IBM's unrelenting efforts to stymie those efforts demonstrates that SCO in fact

has complied with its discovery obligations to the fullest extent possible.  SCO initiated

discovery on June 24, 2003, when it asked for a variety of documents, including all versions or

iterations of AIX and Dynix since 1999, and also a listing of all persons who worked on AIX and

Dynix and the precise contributions of each of these persons to the source code.  See SCO's First

Request for Production of Documents, Items 2 and 3 (Exh. 1); SCO's First Set of Interrogs.,

Interrogatory 5 (Exh. 1).  After lengthy meet-and-confer sessions, IBM claimed compliance or

28

ongoing efforts at compliance, IBM's Memo. in Opposition to SCO's Mot. to Compel, Nov. 19,

2003, at 2, 6 (Exh. 7), but SCO was left without this discovery and eventually was forced to file

a motion to compel to receive it.  On the eve of the hearing on SCO's motion to compel, in early

December 2003, IBM produced limited Dynix source code but still no AIX code.  In fact, IBM

did not produce AIX code until March 2004 – one year after suit was filed and after ordered to

do so by Magistrate Judge Wells.[14]  Of course, when IBM finally produced the first portions of

the necessary source code in December 2003 and March 2004, it provided only selected

snapshots of AIX and Dynix and failed to identify the precise contributions of the IBM

individuals involved in the development of AIX and Dynix.  Without even this rudimentary

information from IBM, SCO was hampered in its ability to undertake focused and meaningful

discovery and, as SCO has maintained each time it answered IBM's interrogatories, it was not in

a position to provide the specificity that IBM was demanding.

     47.     As detailed below, each time IBM was ordered to and actually did produce critical

discovery, SCO was able to provide, and provided, increasingly detailed responses to IBM's

requests.  As more of this code and information is turned over to SCO, it expects to be able to

make further disclosures of IBM's violations of SCO's rights.  Rather than provide SCO with the

information that SCO requires and that this Court has ordered IBM to produce, however, IBM is

again making it virtually impossible for SCO to provide further responses, while continuing to

claim that SCO is disregarding its discovery obligations.  For example, IBM's continuing refusal

---

[14] In addition, as SCO's renewed motion to compel also addresses, IBM's overall document production is
obviously incomplete as it apparently omits documents from key members of IBM's Linux group, such as
IBM's Vice President of Technology and Strategy Irving Wladawsky-Berger, as well as from any of the
members of IBM's Board of Directors (other than an obviously under-inclusive set of documents from
Samuel Palmisano, who is also the Chief Executive Officer).  Renewed Mot. to Compel at 2-5 (Exh. 25).

to specify its own engineers' contributions to AIX and Dynix, even after being specifically

ordered to do so by the magistrate, has prevented SCO from noticing depositions and otherwise

focusing its discovery to seek evidence that would flow from this underlying information.  Due

to the great length and complexity of the relevant computer code in this case, and the enormous

amount of labor and time that is involved in performing the necessary code comparisons, see

Sontag Decl. ¶¶ 5-9, such discovery is critical to identifying leads for potential "hot spots" in

Linux and, therefore, indispensable to SCO's ability to take, and produce, adequate discovery in

this case.  By steadfastly refusing to provide this critical discovery while simultaneously

demanding that SCO answer interrogatories that unquestionably require access to this

information, IBM has attempted to maximize the tactical advantage of its own stonewalling.

     48.     The discovery issues on which IBM focuses the accusations in its brief concern

two interrogatories that IBM propounded on September 16, 2003.  IBM's Interrogatory 12 (Exh.

3) states:

> Please identify, with specificity (by file and line of code), (a) all source code and
> other material in Linux (including but not limited to the Linux kernel, any Linux
> operating system and any Linux distribution) to which plaintiff has rights; and (b)
> the nature of plaintiff's rights, including but not limited to whether and how the
> code or other material derives from UNIX.

Interrogatory 13 (Exh. 3) states:

> For each line of code and other material identified in response to Interrogatory
> No. 12, please state whether (a) IBM has infringed plaintiff's rights, and for any
> rights IBM is alleged to have infringed, describe in detail how IBM is alleged to
> have infringed plaintiff's rights; and (b) whether plaintiff has ever distributed the
> code or other material or otherwise made it available to the public, as part of a
> Linux distribution or otherwise, and, if so, the circumstances under which it was
> distributed or otherwise made available, when it was distributed or made
> available, to whom it was distributed or made available, and the terms under
> which it was distributed  or made available (such as under the GPL or any other
> license).

49.     When IBM served these interrogatories, no claim for copyright infringement existed in this case, not even SCO's narrow claim for IBM's use and distribution of AIX and Dynix after the termination of the license agreements.  Rather, the case was focused on SCO's claims concerning IBM's breach of its obligations under the license agreements by contributing code from AIX and Dynix to Linux.  Accordingly, on October 23, 2003, SCO initially answered Interrogatories 12 and 13 as follows:

> In addition to the General Objections, SCO notes that it has not received responsive discovery from IBM that would allow it to fully answer this question because part of this information is peculiarly within the knowledge of IBM.  In addition, SCO objects to this question as overly broad and unduly burdensome, and on the basis that it seeks information neither relevant nor calculated to reasonably lead to the discovery of admissible evidence insofar as it requests the identity of source code and other material in Linux contributed to Linux by parties other than IBM or Sequent.  Subject to and without waiving these objections, as it pertains to SCO's rights involving IBM's contributions, SCO incorporates its answers to its revised and supplemental answers to Interrogatory Nos. 1 and 2.[15] (Exh. 13)

SCO's revised and supplemental responses to Interrogatories 1, 2, and 4 at that time were over 20 pages and detailed the numerous ways that SCO believed IBM had violated the terms of its license agreement.  Id.  SCO specifically noted, however, that it needed further discovery from IBM in order to effectively identify the offending code in further detail.  In fact, as noted above, at the time SCO answered these questions, it had not received a single line of code from AIX or Dynix from IBM.[16]  Thus, contrary to IBM's claim, SCO did not "refuse" to identify with

---

[15] The response to Interrogatory 12 incorporated SCO's response to Interrogatory 2 and the response to Interrogatory 13 incorporated the response to Interrogatory 4.  These responses similarly noted SCO's need for additional information from IBM.  Exh. 13.

[16] SCO was able to identify certain code that IBM had contributed to Linux based on the limited public information available.

specificity IBM's contributions to Linux, IBM Statement ¶ 32, but instead was limited in what it could discover and produce by IBM's failure to provide requested discovery, such as AIX and Dynix source code.

50.    IBM claimed that these answers were inadequate and, on November 6, 2003, filed a motion to compel.  At the time, IBM stated that its Interrogatories 12 and 13 were "relevant to IBM's defenses and counterclaims irrespective of whether SCO alleges IBM misappropriated" any material in Linux in which SCO claims rights.  IBM Mem. in Support of Second Mot. to Compel at 6.  IBM further specified how this information was purportedly relevant:

> For example, IBM alleges that SCO has:  violated the Lanham Act by misrepresenting SCO's rights to Linux by falsely claiming ownership of intellectual property created by the open source community (e.g., portions of Linux); tortiously interfered with IBM's prospective economic relations by making false and misleading statements to IBM's prospective customers concerning Linux; and engaged in unfair and deceptive trade practices by publishing false and disparaging statements about Linux. Id. at 6-7.

See also IBM's Reply Mem. in Support of Second Mot. to Compel, at 6.[17]

51.    In response to IBM's motion to compel, on December 12, 2003, Magistrate Judge Wells ordered SCO to "respond fully and in detail to Interrogatory Nos. 12 and 13 as stated in IBM's Second Set of Interrogatories."  Exh. 10 at 2.  The Magistrate also directed SCO to

---

[17] Page 6 of IBM's reply memo also stated IBM's position as to precisely what SCO was to provide in response to Interrogatories 12 and 13.  Contrary to the characterization in paragraph 34 of IBM's Statement, IBM's memo did not list matching files and lines of code and showing derivation by lines of code.  Rather, IBM's reply memo simply stated that it believed that SCO's responses were deficient because SCO purportedly did not "(1) identify with specificity (by file and line of code) (a) all source code and other material in Linux to which SCO has rights and (b) the nature of those rights, (2) how (if at all) IBM has infringed SCO's rights, and (3) whether, and under what circumstances, SCO has itself ever made any of the material available to the public."  IBM's Reply Mem. in Support of Second Mot. to Compel, at 6 (Exh. 8).  SCO, as constrained by the limited discovery provided to it by IBM, has answered these questions as set forth in its January 2004 and April 2004 responses to this requested information.

"identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM." Id.[18]

52.    Based on SCO's demonstration that it did not have sufficient information in its possession to provide much of the detail IBM was requesting, the Magistrate's December 12 Order also provided that in cases where "SCO does not have sufficient information in its possession, custody, or control to specifically answer any of IBM's requests that are the subject of this order, SCO shall provide an affidavit setting forth the full nature of its efforts, by whom they were taken, what further efforts it intends to utilize and the expected date of compliance." Id.

53.    In response to the December 12, 2003 Order, SCO undertook exhaustive efforts during the thirty-day period provided by the Order.  On January 13, 2004, SCO produced nearly seventy pages of detailed supplemental and revised answers to IBM's Interrogatories 12 and 13 and other discovery requests.  SCO's Revised Supplemental Resp. to IBM's First and Second Set of Interrogs. (Exh. 13).[19]  In these supplemental and revised answers, SCO devoted fourteen

---

[18] In statements to this Court, IBM has previously attempted to recast the stay that the Magistrate imposed in December 2003 in a manner that places the blame for that stay on SCO.  Contrary to IBM's depiction, however, the simple basis for the stay was the fact that because each side needed more discovery from the other, the Magistrate concluded it was "essential to get the ball rolling in this circumstance" and believed that SCO, as the plaintiff, should go first.  12/5/03 Tr. at 52.  Indeed, on March 3, 2004, in addition to lifting the stay, the Magistrate granted SCO's pending motion to compel and, in numbered directives, ordered IBM to produce numerous items, including, specific information concerning the identities of, and contributions from, IBM's programmers that "work or worked on developing source code, derivative works, modifications or methods for AIX, Dynix and Linux"; documents from IBM's top level management; and contact information for IBM's potential witnesses.  3/3/04 Order (Exh. 15).  Because IBM still has not produced each of these items, they are now the subject of SCO's renewed motion to compel.

[19] SCO supplemented these responses two days later to identify a filing system (XFS) that had been contributed to Linux by another UNIX licensee (Silicon Graphics) in violation of its license agreement.  SCO's Revised Supplemental Response at 61.  This identification included a complete listing of all of the

pages to identifying, by file and line of code, those materials from Dynix that IBM had copied into Linux. Id. at 3-17. SCO was able to provide this detailed information because IBM had produced limited versions of Dynix source code on December 4, 2003, the day before the hearing on SCO's motion to compel the production of that code, among other items. SCO's Reply Mem. in Support of Mot. to Amend the Scheduling Order at 5-6 (Exh. 22). SCO also identified other areas of Dynix that appeared to have been contributed to Linux in violation of the license agreements, but because IBM's production of Dynix source code was incomplete, SCO could not provide the detail of identifying files and lines of code, which SCO explained in its responses. SCO's Revised Supplemental Response to IBM's First and Second Set of Interrogs. at 4, 30 (Exh. 13).

54.    Although IBM provided at least some samples of Dynix source code, it refused to provide any source code for AIX. This severely hampered SCO's ability to supplement its answers to identify files and lines of AIX that IBM had contributed to Linux in violation of its license agreements; SCO only had in its possession a 1999 version of AIX and most of IBM's contributions to Linux came from later versions of AIX. Based on that limited information, over the next ten pages of its responses SCO was able to identify certain improper contributions by

---

files that comprise this filing system that appear in Linux, and SCO identified this as code that SCO claims rights to in Linux. Id. at 61-66. As detailed in its answer, SCO was able to make this claim based on public statements Silicon Graphics had made about its contribution of XFS to Linux. Because SCO is without access to Silicon Graphics' source code, however, it is obviously impossible for SCO to identify the lines of the original XFS code that Silicon Graphics copied directly into Linux. IBM nonetheless proclaims that SCO's response regarding this unrelated third party's contribution to Linux is deficient because SCO did not identify line numbers. See IBM Statement ¶¶ 37, 43. Again, IBM is ignoring the fact that without access to the original source code, identification of line numbers within source code is impossible. In any event, the code contributed by another licensee has no bearing on IBM's breach of its license agreements.

IBM of AIX source code to Linux.[20]  SCO's Revised Supplemental Response to IBM's First and

Second Set of Interrogs. at 17-26 (Exh. 13).  SCO concluded its supplemental and revised

response by identifying other technologies that SCO believed IBM had contributed to Linux in

violation of its license agreements, including specifying the bases for its belief and its need for

IBM's comprehensive source code in order to provide further details.  Id. at 26-30.

     55.     Based on these thirty pages of answers detailing the code IBM had contributed to

Linux in violation of its license agreements, SCO further supplemented its responses to

Interrogatories 12 and 13.  Specifically, SCO incorporated this detailed information in its

response to Interrogatories 12 and 13 in order to identify code from IBM that SCO claimed rights

to in Linux and to indicate that those rights arose from the license agreements.  Id. at 58-69.

SCO further supplemented its response by identifying specific code that other UNIX licensees

had improperly contributed to Linux in violation of their license agreements[21] as well as code

from unknown sources that had been copied from UNIX System V.  Id. at 59-66.

---

[20] IBM ignores SCO's detailed responses, including its identification of the lines of code from AIX and
Dynix that IBM contributed to Linux, when it incorrectly claims that SCO "declines" to identify such
lines of code.  IBM Statement ¶ 43.

[21] IBM claims that even when SCO identified instances of exact copying of UNIX System V code into
Linux, SCO did not specify the nature of the rights.  IBM Statement ¶ 45.  This is wrong.  In the example
referred to by IBM, SCO's answer specified that the code had been copied from UNIX System V by
Silicon Graphics in violation of the terms of its UNIX license.  That is certainly specifying the nature of
SCO's rights and how they were violated.  Nor is there any merit to the remainder of IBM's criticisms
(set forth in paragraph 45) regarding SCO's purported failure to specify whether and how IBM or others
infringed SCO's rights, including copyrights.  First, at the time of this question, copyright infringement of
any type was not an issue in this case, so there would have been no reason to discuss such violations of
SCO's rights by IBM.  Second, again because copyright infringement was not an issue in the case, SCO
had not undertaken any discovery to determine what versions of Linux IBM may have been using,
copying, or reproducing and whether such versions included the code in question.  Without this
information, SCO could not have provided such disclosure.

56.    In addition to providing the supplemental answers required by the Magistrate's

December 12 Order, SCO supplied a declaration, pursuant to that Order, detailing its extensive

compliance efforts.  Decl. of Ryan Tibbitts, Jan. 13, 2004 (Exh. 12).  SCO's declaration detailed

the difficulties created by IBM's refusal to provide the necessary source code to SCO and

specifically identified the need for complete disclosure of IBM's source code and complete

disclosure of IBM's contributions to Linux.  Id. ¶¶ 19-20 ("In order to fully answer IBM's

interrogatories, we require access to the missing versions of the software. . . .").  While IBM

repeatedly makes reference to SCO's certifications in which SCO stated that it had responded

"fully and in detail" to IBM's discovery requests, see, e.g., IBM Statement ¶¶ 36-37, 40-41, IBM

nevertheless consistently ignores that the certifications and the discovery responses themselves

uniformly stated that SCO needed additional discovery (and, once such discovery was provided,

additional time) to provide any further information.  See ¶¶ 45, 57, 49, 54 above.

57.    Magistrate Judge Wells thereafter considered SCO's supplemental responses and

SCO's motion to compel discovery from IBM.  By Order dated March 3, 2004, the Magistrate

Judge specifically noted "SCO's good faith efforts to comply with the Court's prior order," and

accordingly directed IBM to produce necessary discovery (including prior versions of AIX and

Dynix) much of which IBM still has failed to provide.  Exh. 15 at 3 (emphasis added).  In that

Order, the Court also recognized that the thirty-day time limitation in its December 2003 Order

had made it difficult for SCO to collect all requested documents[22] and to provide further

_____

[22] The record is undisputed that on January 13, 2004, SCO produced to IBM approximately seventy CDs
containing source code for various products, executive files, press and media documents, Linux sales
invoices, and financial documents filed with the Securities and Exchange Commission.  SCO's Source
Log, Exh. 35.

responses to IBM's interrogatories. Id. at 2. Thus, the Magistrate gave SCO an additional forty-five days to provide further discovery pursuant to the earlier Order and "to provide and identify all specific lines of code that IBM is alleged to have contributed to Linux from either AIX or Dynix," to "identify all specific lines of code from UNIX System V from which IBM's contributions from AIX or Dynix are alleged to be derived,"[23] to "provide and identify with specificity all lines of code in Linux that it claims rights to," and to "provide and identify with specificity the lines of code that SCO distributed to other parties." Id. at 2.[24] Again, however, the Magistrate recognized the limitations on SCO's ability to provide such information due to IBM's failure to produce the needed AIX and Dynix source code; indeed, the Court specifically stated that SCO would only be required to identify those specific lines of code IBM had contributed to Linux that SCO could identify "at this time." Id. at 2.

58.    On April 19, 2004, SCO provided detailed responses corresponding to each of the items in the Court's March 3 Order.  Specifically, SCO provided the additional documents that it had difficulty in collecting and reviewing during the thirty days following the Magistrate Judge's

---

[23] This request had not been included in IBM's interrogatories or in the Magistrate's December 12 Order.

[24] Contrary to IBM's claims, neither of the Magistrate Judge's December 12 or March 3 Orders directed SCO to "match up the lines of Linux code to which it claims rights to the specific lines of the UNIX software code from which the Linux code is alleged to derive." IBM SJ Mem. ¶ 44 (citing 12/12/03 Order ¶ 4 (Exh. 10)). Rather, the December 12 Order (to which IBM cites) directed SCO to "identify and state with specificity the source code(s) that SCO is claiming form the bases of their action against IBM," Exh. 10 ¶ 4, and the relevant provision of the March 3 Order directed SCO to "identify all specific lines of code from UNIX System V from which IBM's contributions from AIX and Dynix are alleged to be derived." 3/3/03 Order ¶ 4. SCO provided such detailed answers in its January responses and in its April 19 update. SCO's Revised Supplemental Response to IBM's First and Second Set of Interrogatories at 3-30, 40-43, 56-69 (Exh. 5); 4/19/04 Hatch Letter Tabs B-F (Exh. 19). What is also absent from IBM's Interrogatories and the Court's orders is any directive to "detail SCO's claims of copyright infringement," IBM SJ Mem. ¶ 33, or to "describe (let alone detail) how IBM's Linux activities infringe SCO's alleged copyrights related to the UNIX software." IBM SJ Mem. ¶ 37. IBM's statement nonetheless points to these alleged shortcomings and incorrectly claims that SCO has not complied with its obligations. Id.

December 12 Order. Sontag Decl. (Exh. 18). It then provided detailed exhibits that answered

each of the items set forth in the Magistrate's March 3 Order. For example, SCO identified

further "specific lines of code that IBM is alleged to have contributed to Linux from either AIX

or Dynix." 4/19/04 Hatch Letter at Tabs B and C. SCO did so by attaching exhibits further

specifying, by file and line, AIX and Dynix code that IBM had contributed to Linux. SCO's

supplemental discovery represented an additional 21,000 lines of code. Id. SCO was able to

provide this information because IBM had finally produced selected versions of AIX code and

additional versions of Dynix code pursuant to the Court's March 3, 2004 Order. However, this

code was not received in a usable format – the one both parties had been using throughout the

case – until March 24, so SCO had only a few weeks to undertake the time-consuming and

detailed analysis.

    59.    Similarly, on the question of the lines of UNIX System V code from which IBM's

Linux contributions from AIX and Dynix had derived, SCO initially noted that IBM's refusal to

provide the necessary versions of AIX and Dynix made it difficult, if not impossible, to answer

this question in full detail. 4/19/04 Hatch Letter ¶ 3 (Exh. 19). Nonetheless, SCO responded that

AIX and Dynix, as a whole, are modifications or derivative works based on UNIX System V,[25]

and provided two additional exhibits identifying, by file and lines, the UNIX System V code that

remains in AIX and Dynix and from which AIX and Dynix are derived. Id. at Tabs E and F.

---

[25] IBM's memorandum quotes only this single sentence from SCO's lengthy response and proclaims it to be insufficient. SCO, however, provided a detailed explanation of how the lines in AIX and Dynix were derived from UNIX System V. 4/19/04 Hatch Letter ¶ 3 (Exh. 19). Moreover, SCO attached charts detailing files and lines of code from UNIX System V from which AIX and Dynix are derived. Hatch Letter, Tabs E and F (Exh. 19). None of this information appears in IBM's memorandum.

Again, without being provided access to the evolution of AIX and Dynix, SCO explained that it could not further answer this question. Sontag Decl. ¶ 6.

60.    SCO also specified additional "lines of code in Linux that it claims rights to." 4/19/04 Hatch Letter at Tab G (Exh. 19). In addition to the files and lines previously identified, SCO identified other lines in Linux to which it claims rights. Id. Because none of these lines were apparently contributed by IBM, the relevance of this information was questionable. In any event, SCO attempted to identify as much as possible under the limited time available.

61.    As it has had to do in every discovery response, SCO noted that it was limited in its responses based on IBM's failure to provide all requested discovery. Sontag Decl. ¶ 9 (Exh. 18) ("Based on the information currently in SCO's possession, the answers given and materials produced in response to the Order are given to the best of SCO's knowledge and are complete, detailed and thorough."). For these April 19 supplemental responses, SCO only had the selected snapshots of AIX and Dynix source code and still had not received any identification of the contributors and specifically what they had contributed to this source code. Of course, had IBM timely provided that information, SCO could have used it to decide who to depose and what other discovery may be necessary, both the support its own claims and to further respond to IBM's discovery requests. IBM, as noted, did not provide this information to make this discovery possible and, even today, after being ordered to do so by this Court has not provided the necessary materials.[26]

---

[26] With these same limitations caused by IBM's failure to provide complete discovery, SCO more recently filed its amended responses to IBM's Fourth Set of Interrogatories on June 25, 2004. (The original responses were filed on May 28, 2004.) As with the SCO's other discovery responses in the case, SCO noted that its responses to these two interrogatories were "based on the evidence SCO has discovered independently and based on information contained in IBM's limited production to date" and

62.     Despite SCO's detailed answers and IBM's refusal to provide critical discovery,

IBM repeatedly claims that "SCO still has not identified the specific code contained in UNIX

System V that IBM allegedly misused in violation of its licenses to that software," IBM SJ Mem.

at 5, and that "SCO has not identified a single line of UNIX source code that IBM is alleged to

have dumped into Linux." IBM Statement ¶ 28. But no matter how many times IBM

mischaracterizes it, this case is not about literal copying of UNIX source code into Linux.

Instead, SCO has claimed from the very outset that IBM's contribution to Linux of the "resulting

materials" it created as modifications to or derivative works based on UNIX System V (i.e., AIX

and Dynix/ptx) constitutes a breach of IBM's licensing agreements, and that by continuing to use

and distribute AIX and Dynix following the termination of its licenses, IBM's actions constituted

copyright infringement. Second Am. Compl. ¶¶ 173-180 (Exh. 14). Without full and complete

access to IBM's works based on UNIX System V (i.e., AIX and Dynix) and information about

and from the programmers who contributed such code to Linux, SCO is left to guess as to the

origins of large amounts of code IBM contributed to Linux and obviously would be unable to

present to this Court and ultimately to a jury proof that the code IBM contributed was in

violation of the license agreements.

---

that "[u]pon receiving complete discovery from IBM, including all versions of AIX and Dynix/ptx, there
undoubtedly will be further evidence of IBM's contractual breaches and other violations of law." SCO's
Am. Resp. to Fourth Set of Interrogatories at 2 (Exh. S-1). Again, within the constraints imposed by
IBM's failure to provide foundational discovery, including but not limited to all versions of AIX and
Dynix, SCO identified, among other items, what the code identified in its earlier answers constituted
(idea, procedure, process, expression, etc.), the limits on its expression, if any, its location in the public
domain (if at all), and whether it had been distributed without a copyright notice. IBM has never
contacted SCO about any purported deficiency in these answers.

**H.    IBM's Mischaracterizations of SCO's Public Statements**

63.    IBM's "Statement of Undisputed Facts" also inaccurately describes public statements made by SCO representatives outside of this litigation.  Contrary to IBM's claim, SCO's representatives have not "stated" that "it has been the company's strategy to obfuscate its alleged evidence," IBM Statement ¶ 29, and SCO has no such strategy.  To the contrary, as described above, SCO has fully complied with its discovery obligations and has, since the beginning of this litigation, disclosed precisely how IBM has violated its obligations under the IBM and Sequent license agreements.

64.    IBM pulls out of context and misleadingly abridges a statement made by SCO's Vice President responsible for its licensing business, Gregory Blepp, in an April 2004 "Spiegel Online" article.  See IBM Statement ¶ 29.  The article quoted Mr. Blepp as saying: "There you don't put everything on the table at the start, but instead you bring out arguments and evidence piece by piece."  Holger Dambeck, Linux Hunter SCO Puts Everything on the Line, Spiegel Online (emphasis added) (Exh. 53).  As the article makes clear, Mr. Blepp made that statement in the context of explaining the procedures that govern "legal actions in the United States" and the role of confidentiality ("non-disclosure") agreements in preventing certain information from being released publicly.  By omitting entirely the context of Mr. Blepp's statement, as well as the word "There" at the beginning of his statement, IBM distorts the meaning of Mr. Blepp's statement and draws the unjustifiable conclusion that the statement evinces SCO's "stated . . . strategy to obfuscate its alleged evidence."

65.    IBM also claims that "SCO's counsel indicated in an interview with Maureen O'Gara of LinuxWorld in March 2003, at the beginning of the case, that SCO 'doesn't want IBM

to know what they [SCO's substantive claims] are.'"  See IBM Statement ¶ 29 (alteration in

original).  A review of this article, however, demonstrates that the quoted statement on which

IBM relies was the opinion of the author and cannot be attributed to SCO's counsel.  Maureen

O'Gara, SCO's Lawyer Speaks, Says Nothing, LinuxWorld, Mar. 21, 2003 (Exh. 62).  That

SCO's counsel would not discuss the substance of SCO's claims with a reporter no more evinces

a design to obfuscate than does IBM's spokesperson's refusal "to spell out [for The New York

Times] what steps it [IBM] was taking to monitor the technology it contributes to open-source

projects like Linux and to ensure that its Linux development does not violate the intellectual

property rights or licenses of others" – even though the article revealed that "I.B.M. contends

that these matters will be evidence if the SCO suit goes to trial."  Steve Lohr, No Concession

from I.B.M. in Linux Fight, N.Y. Times, June 14, 2003 (Exh. 58).

## ARGUMENT

There are numerous substantive reasons why this Court should deny IBM's motion for

summary judgment on the broad and complex issues that IBM's copyright counterclaims

introduced into this case less than three months ago.  For the reasons discussed below, IBM's

dispositive motion is meritless both (1) as a request for discovery sanctions under Rule 37(b)(2)

and (2) as a motion for summary judgment under Rule 56.

## I.    IBM'S REQUEST FOR A RETROACTIVE DISCOVERY CUT-OFF, AND THE SANCTION OF SUMMARY JUDGMENT, ON ITS RECENTLY-ADDED TENTH COUNTERCLAIM IS MERITLESS AS A MATTER OF FACT AND LAW

IBM argues that the Court should enter judgment on its recently-added Tenth

Counterclaim on the ground that SCO has not identified evidence of Linux-related copyright

infringement by IBM to date, and should not be permitted to do so in the future – even in

response to IBM's early dispositive motion. IBM's motion thus rises or falls with its claim that SCO should have produced any evidence relating to copyright infringing materials in Linux – even though no such copyright infringement claims were in this case until IBM attempted to add its Tenth Counterclaim on March 29, 2004 – by the time SCO supplemented its discovery responses on April 19, 2004.

But IBM makes no attempt to show that SCO has had an adequate opportunity to conduct complete discovery concerning such issues; indeed, for reasons explained herein, SCO has been deprived of such an opportunity in large part due to IBM's failure to supply critical, and court-ordered, discovery. Nor does (or can) IBM identify any information in SCO's possession, custody, or control that SCO has failed to disclose in response to IBM's discovery requests.

Rather, IBM's dispositive motion is, in effect, a Rule 37(b)(2) motion for the entry of "sanctions against SCO" – i.e., by summarily entering a declaratory judgment for IBM on its wide-ranging copyright counterclaim – as punishment for SCO's purported discovery misconduct. Id. at 32-33; see also id. at 7 (arguing that because of SCO's alleged discovery misconduct, "the fact of IBM's non-infringement should simply be established against SCO, and SCO should not even be allowed to adduce evidence on this issue under Rule 37(b)(2)"). IBM requests such sanctions from this Court even though, as IBM neglects to mention, the Magistrate Judge supervising discovery in this case – the same Magistrate Judge who has heard all of the issues presented in IBM's motion and who issued the two orders that IBM claims SCO has violated – expressly found, when last presented with these issues in March, that SCO was responding to IBM's discovery requests in "good faith." 3/3/04 Order at 3 (Exh. 15). Moreover, IBM's motion effectively requests a retroactive cut-off of discovery related to its Tenth

43

Counterclaim even though (1) this Court just granted SCO's motion to extend, for all issues in this case, the fact discovery cut-off to February 11 and the expert discovery cut-off to April 22, 2005; and (2) IBM's motion is based on the same misguided accusations about discovery conduct that IBM hurled at SCO when IBM unsuccessfully opposed extension of the discovery cut-off dates.

The Court should reject IBM's request for the sanction of summary judgment on its recently-asserted Tenth Counterclaim because (A) far from acting in bad faith noncompliance of its discovery obligations – a legal prerequisite to such a sanction – SCO has diligently complied with its discovery obligations in good faith; and (B) the extreme dispositive sanction that IBM requests would be as manifestly unjust and incongruous as it is legally unprecedented.

A.    **IBM's Misguided Accusations Fail to Establish Any Discovery Noncompliance, Much Less Bad Faith Noncompliance, by SCO, A Legal Prerequisite to the Imposition of Any Dispositive Sanction**

1.    **SCO Has Complied With Its Discovery Obligations In Good Faith.**

IBM's request for a retroactive discovery cut-off and dispositive sanctions against SCO is based on its inaccurate, but repeated, assertions that "SCO has twice certified to the Court that it has provided complete, detailed, and thorough responses to IBM's discovery requests and the Court's orders," IBM SJ Mem. at 23, but that SCO has "consistently refused to provide the information" sought by two IBM interrogatories "despite two court orders requiring it to do so." Id. at 2, 7, 26, 32. These conclusory assertions are blatant mischaracterizations of the discovery record in this case, as are the factual predicates to those statements, which IBM inaccurately attempts to portray as "undisputed facts."

44

As an initial matter, there is no factual basis for IBM's suggestion that SCO has represented – in its discovery responses or court-ordered certifications – that SCO has, or has been able to, provide full responses to IBM's interrogatories concerning material in Linux to which SCO claims rights. Although SCO has fully complied with its discovery obligations, and has provided "complete, detailed, and thorough" responses to all of IBM's discovery requests based on the information SCO has, SCO has never represented (or been required to certify) that it has exhausted its information about IBM's contract breaches.

To the contrary, SCO's investigation of IBM's improper contributions to Linux is continuing and, in every one of its discovery responses, including the two certifications that SCO provided pursuant to the Magistrate Judge's December 12 and March 3 Orders, SCO has specifically explained that its ability to identify the source code information that IBM requested has been significantly impeded by IBM's failure to produce necessary discovery. See Exhs. 4, 5, 13, 17, 18, S-1. Specifically, SCO has explained that its ability to provide the discovery IBM seeks has been hampered by IBM's failure to produce adequate discovery concerning AIX and Dynix source code as well as design documents, programmer notes, and other information that would assist SCO in identifying contributions that IBM made to Linux in violation of the UNIX license agreements.

The two certifications on which IBM relies were submitted at the Magistrate Judge's direction pursuant to its December 2003 and March 2004 discovery orders. The Magistrate's December 12, 2003 Order expressly provided for an explanation, by affidavit, that SCO did "not have sufficient information in its possession, custody, or control to specifically answer any of IBM's requests that are the subject of this order." 12/12/03 Order ¶ 6 (Exh. 10) (emphasis

added).  Similarly, the March 3, 2004 Order – in which the Court gave SCO more time to

produce additional discovery and ordered IBM to produce key information SCO needed for its

responses – directed the parties to certify that their "answers and materials provided are given <u>to</u>

<u>the best of each parties' knowledge</u> and are complete, detailed and thorough."  3/3/04 Order at 6

(Exh. 15) (emphasis added).

But IBM's selective quotation from SCO's certifications and accompanying affidavits

omits the important language that SCO specifically included to comply with the Magistrate's

orders.  For example, while IBM quotes SCO's January 12, 2004 certification as saying that

"SCO has responded fully and in detail to Interrogatories 1-9, 12 and 13," IBM Statement ¶ 36,

IBM omits the following key language from the remainder of that certification:

> These Supplemental Responses, which exceed 60 pages, fully respond to the
> interrogatories <u>based on the information in SCO's possession.  Upon receiving</u>
> <u>complete discovery from IBM, including all versions of AIX and Dynix/ptx, there</u>
> <u>undoubtedly will be further evidence of IBM's contractual breaches and other</u>
> <u>violations of law</u>, as detailed in the attached Declaration of Ryan Tibbitts.
> <u>Accordingly, SCO reserves the right to further supplement or amend its answers</u>
> <u>as discovery or further investigation may reveal.</u>   Exh. 12 ¶ 1 (emphases
> added).[27]

IBM's similar mischaracterization of SCO's April 19 submission, IBM Statement ¶ 40, neglects

to include any mention of the specific statements therein concerning SCO's need for further IBM

discovery in order to fully answer IBM's interrogatories, Exh. 18 ¶ 6, as well as the express

statement that the answers given in that submission were "complete, detailed, and thorough" to

the extent that they were "[b]ased on the information currently in SCO's possession."  <u>Id.</u> ¶ 9

---

[27] IBM also omits any mention of the Declaration of Ryan Tibbitts that accompanied IBM's certification,
which further detailed SCO's need for additional IBM discovery (<u>i.e.,</u> additional versions of AIX and
Dynix and "depositions of IBM individuals involved in programming the actual Linux modules in
question").  Tibbitts Decl. ¶¶ 14-17, 19-21 (Exh. 12).

(emphasis added). Thus, contrary to IBM's misguided accusations, SCO's certifications not only fully complied with the Magistrate Judge's Orders, but also expressly indicated (as those Orders directed) that SCO's investigation of IBM's improper contributions to Linux had not been (and could not be) completed.

Nor is there any other basis for IBM's claims of SCO's non-compliance with the Court's orders or its discovery obligations. SCO has diligently complied with its discovery obligations and, as detailed above, has conscientiously endeavored to respond to all of IBM's discovery requests. See Statement of Disputed Facts ¶¶ 45-62. SCO has provided IBM with detailed answers, to the extent the information was available to SCO, to all of IBM's interrogatories and other requests, specifically including IBM's requests for detailed information about the source code in Linux on which SCO bases its claims in this case. Id. ¶¶ 46, 52, 53, 56, 58. Where SCO could not produce information because IBM had not provided needed discovery (including earlier versions of AIX and Dynix and information concerning IBM's contributions and contributions to Linux), SCO so indicated in its responses. Indeed, the last time these issues were presented to Magistrate Judge Wells, she expressly found in her March 3, 2004 Order that SCO had made "good faith efforts to comply with the Court's prior order." Exh. 15 at 3.

As noted above, SCO provided an additional supplemental response to IBM's Interrogatories 12 and 13 on April 19, 2004. 4/19/04 Hatch Letter (Exh. 19). In that submission, SCO identified additional lines of code in Linux to which SCO claims rights, including specifying, by file and line, over 21,000 lines of additional code that IBM contributed to AIX and Dynix. Id. at Tabs E, F. SCO had previously detailed for IBM the specific provisions of the IBM and Sequent license agreements violated by such IBM contribution, SCO's Supplemental

47

and Revised Supplemental Responses to IBM's First Set of Interrogs. 1 and 9, Aug. 4, 2003

(Exh. 4), and in its April 19 submission SCO provided a detailed explanation of how the lines in

AIX and Dynix were derived from UNIX System V.  4/19/04 Hatch Letter ¶ 3 (Exh. 19).

Moreover, in Exhibits E and F to SCO's submission, SCO specifically identified all lines of code

from UNIX System V from which IBM's contributions to AIX or Dynix were derived.  In

Exhibit G, SCO identified other Linux files and lines to which it claimed rights; even though this

information was of questionable relevance because it had not apparently been contributed by

IBM, SCO attempted to identify as much as possible under the limited time available.  And, as

discussed above, SCO certified, pursuant to the Court's March Order, that "[b]ased on the

information currently in SCO's possession, the answers given and materials produced in

response to the Order are given to the best of SCO's knowledge and are complete, detailed, and

thorough." Sontag Decl. ¶ 9 (Exh. 18).

In light of the information SCO supplied in its April 19 submission, there is no merit to

IBM's general and conclusory assertion that SCO's supplemental response failed to "identify the

precise location of all the material in Linux to which it claims rights," "failed properly to allege

the nature of its alleged rights, including in particular whether and, if so, how the material

derives from UNIX," and "declined to state how IBM infringes SCO's alleged rights."  IBM SJ

Mem. at 28.  To the contrary, as explained above, SCO's April 19 submission included precisely

that information, to the extent that SCO could provide it based on the information available to it.

Furthermore, while IBM suggests that SCO could have provided the supplemental information it

supplied on April 19 in response to the Court's December Order, SJ Mem. 28, the fact is that

SCO was able to provide the supplemental information because, pursuant to the Court's March 3

Order, IBM had finally produced selected versions of AIX code and additional versions of Dynix code. Because IBM did not produce this code until March 24, however, SCO had only a few weeks to undertake the time-consuming and detailed analysis required to respond by April 19. Id. ¶ 60. Moreover, at the time SCO prepared its supplemental April 19 response, SCO still only had selected portions of AIX and Dynix source code and no information identifying the contributors and what they had contributed to this source code.

The one, and only, portion of any of SCO's response about which IBM provides any degree of specification for its complaint – that relating to the "IRIX/XFS" files that UNIX-licensee Silicon Graphics (SGI) contributed to Linux – highlights the emptiness of IBM's position. As to those files, IBM complains that "SCO still declines to identify the lines of code, as opposed to just the files, to which it claims rights." IBM SJ Mem. at 28. What IBM ignores, however, is that because SCO does not have access to Silicon Graphics' source code, and based its identification of those files on Silicon Graphics' public statements, SCO could not possibly identify the lines of source code. In any event, although SCO produced such information because it was responsive to IBM's very broad discovery requests, it is difficult to fathom IBM's complaint with respect to this code, given that another licensee's violation of its UNIX license agreement does not bear in any way on any of the claims in this case against IBM.

Finally, IBM mischaracterizes the nature of the discovery at issue based on its repeated mischaracterization of SCO's complaint. IBM argues:

> To establish that IBM 'copied' protected elements of SCO's alleged copyrights, one critical element SCO must show is that Linux is 'substantially similar' to the allegedly copyrighted work (here, the UNIX software), so that the 'copying' of Linux could be said to constitute 'copying' of UNIX. This necessarily requires SCO to identify the precise lines of Linux code in which it claims rights and the

precise lines of code in the UNIX software from which SCO alleges the Linux
code is copied or derives.  SJ Mem. at 28 (emphasis added).

But the express premise of IBM's claim (underlined above) is incorrect because, as explained

above, SCO to date has not asserted any copyright claim against IBM based on copying of code

(by IBM or anyone else) to Linux.  See Statement of Disputed Facts ¶¶ 21, 25-29.  Moreover, as

further explained above, none of IBM's claims in this case – which are based on the license

agreements at issue – require SCO to prove copying of UNIX code (as opposed to code from the

UNIX-derived AIX and Dynix flavors) to Linux.  See id. ¶¶ 15-24.

### 2. Bad Faith Noncompliance Is an Indispensable Legal Prerequisite to the Extreme Dispositive Sanction That IBM Seeks.

IBM's accusations thus fall far short of establishing SCO's noncompliance, much less

bad faith noncompliance, with any of its discovery obligations.  Such a showing is an

indispensable legal prerequisite to the extreme sanction that IBM seeks.

Because the law favors the resolution of legal claims on their merits, Meade v. Grubbs,

841 F.2d 1512, 1520 (10th Cir. 1988), dismissal of claims is a strongly disfavored sanction.  As

the Tenth Circuit has repeatedly recognized, "Dismissal under circumstances that defeat

altogether a litigant's right to redress grievances in the courts is a severe sanction, applicable

only in the extreme circumstances [and] should be used as a weapon of last, rather than first,

resort." Gocolay v. N.M. Fed. Sav. & Loan Ass'n, 968 F.2d 1017, 1021 (10th Cir. 1992)

(internal quotations omitted; alteration in original); Ehrenhaus v. Reynolds, 965 F.2d 916, 920-

21 (10th Cir. 1992).  It is thus well-settled that a violation of discovery rules may not justify a

dispositive sanction unless that violation is the result of willfulness or bad faith on the part of the

non-compliant party.  Ehrenhaus, 965 F.2d at 920-21 ("[D]ismissal represents an extreme

50

sanction appropriate only in cases of willful misconduct."); Toma v. City of Weatherford, 846

F.2d 58, 60 (10th Cir. 1988) ("Because of the harshness of dismissal, considerations of due

process require that violation of the discovery rules is a sufficient ground only when it is a result

of willfulness, bad faith, or [some] fault of petitioner rather than inability to comply." (internal

quotations omitted)).[28]

### B.    The Extreme Sanction That IBM Requests Lacks Any Legal Basis

The impossibility of IBM's position is only further underscored by controlling law that

limits the Court's discretion under Rule 37(b)(2) to impose discovery sanctions: "First, any

sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim'

which was at issue in the order to provide discovery." Ins. Corp. of Ir. v. Compagnie des

Bauxites de Guinee, 456 U.S. 694, 707 (1982); see also Myers v. Colgate-Palmolive Co., 26 Fed.

Appx. 855, 862 (10th Cir. 2002) (same); Ehrenhaus, 965 F.2d at 920 (same). IBM's motion

makes no effort to apply this test to its request for the drastic sanction of summary judgment on

its Tenth Counterclaim, and that extreme request does not come close to meeting either of the

Rule 37(b)(2) requirements.

---

[28] Indeed, all of the cases cited by IBM agree that dispositive or otherwise substantial sanctions are based on bad faith misconduct. See Knowlton v. Teletrust Phones, Inc., 189 F.3d 1177, 1182 n.6 (10th Cir. 1999) ("'We recognize that dismissal represents an extreme sanction appropriate only in cases of willful misconduct.'" (quoting Ehrenhaus, 965 F.2d at 920-21)); Volkart Bros., Inc. v. M/V "Palm Trader", 130 F.R.D. 285, 290 (S.D.N.Y. 1990) ("It is evident that [the sanctioned party's] non-compliance was sufficiently 'willful' to authorize the imposition of substantial Rule 37 sanctions."); Burns v. Imagine Films Entm't, Inc., 164 F.R.D. 594, 598 (W.D.N.Y. 1996) ("Although drastic sanctions such as striking the answer or entering a default judgment are available, they ordinarily are not imposed unless disobedience has been willful, in bad faith, or otherwise culpable.").

1.    **IBM's Motion Ignores, and Miserably Fails, All Five Prongs of This Circuit's "Just Sanction" Test.**

To assist courts in applying Rule 37(b)(2)'s "just sanction" requirement, in Ehrenhaus, the Tenth Circuit outlined the following five factors for consideration:

> (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.[29]  965 F.2d at 920-21 (internal citation and quotations omitted).

See also Rueb v. Morales, 91 Fed. Appx. 95, 97-98 (10th Cir. 2004) (overturning dismissal sanction where neither magistrate judge nor district court addressed Ehrenhaus factors). "'Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits is dismissal an appropriate sanction.'" Ehrenhaus, 965 F.2d at 921 (quoting Meade, 841 F.2d at 1521 n.7).

IBM does not even cite Ehrenhaus in its brief, let alone attempt to apply its controlling Tenth Circuit test to this case.  This is not surprising, because IBM cannot satisfy any of the Ehrenhaus factors.

---

[29] Although Ehrenhaus upheld the district court's imposition of dispositive sanctions, that case is readily distinguished because it involved blatant and willful defiance of multiple court orders.  The plaintiff in Ehrenhaus had been ordered to attend a deposition in a federal courthouse, and the court warned him that if he failed to attend, he should "expect a motion from the defendants that [the] case be dismissed for failure to cooperate in discovery."  965 F.2d at 919.  The plaintiff moved for a protective order to delay the deposition so he could attend a business meeting, but the protective order was denied and the court again warned him that failure to attend the deposition would subject him to sanctions under Rule 37.  Id. Nevertheless, the plaintiff failed to appear at the deposition.  Id.  Indeed, the plaintiff's behavior in Ehrenhaus was so extreme that the district court "apparently believed that dismissal might in fact be too lenient a sanction and that jailing Ehrenhaus for contempt might be more appropriate."  Id. at 922.

First, IBM does not, and cannot, identify any cognizable prejudice it has suffered from the discovery certifications it misquotes or the other conduct it inaccurately describes.[30] Second, IBM's misplaced accusations provide no basis for any finding of "interference with the judicial process." Interposed for the first time on March 29, 2004, IBM's Tenth Counterclaim is still in the very early stages. Moreover, given IBM's failure to provide key discovery in this case, it should not be heard to complain about interference with the discovery process. Third, as detailed above in Part I.A, SCO has no culpability, but rather has acted, and has been found by the Magistrate Judge to have acted, in "good faith." 3/3/04 Order at 3 (Exh. 15).[31] Fourth, the Court's prior "good faith" finding certainly did not provide SCO with any warning that summary judgment on IBM's subsequently-added counterclaim could result if SCO sought to develop proof to defend against such a counterclaim after it was actually filed.[32] Fifth, IBM has not

---

[30] See Baker v. IBP, Inc., No. 02-4067, 2002 U.S. Dist. LEXIS 23869, at *3 (D. Kan. Dec. 5, 2002) (Exh. 67) (finding dismissal improper where "the degree of actual prejudice to the Defendant is low"); Resolution Trust Corp. v. Williams, 162 F.R.D. 654, 661 (D. Kan. 1995) (refusing to strike plaintiff's pleadings even though plaintiff had failed to produce court-ordered documents where there was no prejudice in light of court's extension of discovery period); see also Quinn v. City of Kansas City, 64 F. Supp. 2d 1084, 1095 (D. Kan. 1999) (refusing to dismiss plaintiffs claims even though plaintiff had provided false testimony because defendants were not prejudiced in their ability to present their case at trial).

[31] See Biocore Med. Techs., Inc. v. Khosrowshahi, No. 98-2031, 1998 U.S. Dist. LEXIS 20512, at *18 (D. Kan. Nov. 6, 1998) (finding dismissal inappropriate where violations did "not involve bad faith, fault, or a willful violation" because defendant had no intention to violate scheduling order).

[32] See, e.g., Zhou v. Pittsburg State Univ., No. 01-2493, 2003 U.S. Dist. LEXIS 1355, at *20 (D. Kan. Jan. 29, 2003) (Exh. 87) (refusing to dismiss plaintiff's suit even though first three Ehrenhaus factors were satisfied, and even though plaintiff had been warned that continued failure to appear for scheduled depositions may result in "sanctions, up to and including dismissal of the case with prejudice," because warning contained some ambiguity); Resolution Trust Corp., 162 F.R.D. at 661 (refusing to strike plaintiff's pleadings even though plaintiff had failed to produce court-ordered documents required by the scheduling order where "there was no warning afforded for the conduct in issue").

addressed lesser sanctions, nor can it provide any rational basis for concluding that the sanction of summary judgment on its newly added counterclaim would be necessary in this case.[33]

The cases on which IBM relies for its sanctions request only further undermine its argument. See SJ Motion at 32-33. In none of those cases did the courts find dispositive sanctions to be appropriate, even in response to a party's proven discovery malfeasance. Burns, 164 F.R.D. 597; Knowlton, 189 F.3d 1177; Volkart Bros., 130 F.R.D. 285. In fact, in two of the three cases that IBM cites, the courts explicitly rejected dispositive sanctions. In Knowlton, the district court concluded that granting the plaintiff's "motion for default judgment would be too severe a sanction," 189 F.3d at 1182, while in Volkart Bros. the court found that default judgment "would be inequitable under the circumstances of this case." 130 F.R.D. at 290. In the third case, the court expressly acknowledged that the sanctions it imposed were "non-dispositive." Burns, 164 F.R.D. at 601.

### 2. IBM's Requested Sanction Is Not Even Rationally, Much Less Specifically, Related to IBM's Discovery Complaints.

IBM's requested sanction also fails the second prong of the Rule 37(b)(2) test because it is not rationally, much less "specifically related to the particular 'claim' which was at issue in the order to provide discovery." Ins. Corp. of Ir., 456 U.S. at 707; see Olcott v. Del. Flood Co., 76 F.3d 1538, 1555 (10th Cir. 1996) (same); Okla. Federated Gold & Numismatics, Inc., 24 F.3d

---

[33] See Cuenca v. Univ. of Kan., No. 98-4180, 2001 U.S. Dist. LEXIS 9942, at *10 (D. Kan. May 14, 2001) (Exh. 71) ("Not convinced that the defendants' conduct even warrants a sanction, the court cannot rule out the efficacy of lighter sanctions."); see also, e.g., Baker, 2002 U.S. Dist. LEXIS 23869, at *3 (holding that dismissal was improper where "Defendant provides no reason why lesser sanctions would not accomplish the stated goals"); Hite v. PQ Corp., No. 98-2088, 1998 U.S. Dist. LEXIS 19933, at *8 (D. Kan. Dec. 10, 1998) (Exh. 75) ("The court finds no substantial prejudice to defendant which cannot be alleviated by imposition of lesser sanctions. In such a case, the remaining factors generally lose much of their importance.").

136, 139 (10th Cir. 1994) (same). As detailed in Part I.B.1, SCO's alleged (but unsubstantiated)

failure to comply with IBM's discovery requests occurred at a time when this case did not

include any copyright claim or any claim relating to contributions of UNIX code to Linux, much

less a claim (like IBM's Tenth Counterclaim) involving the propriety of all of IBM's numerous,

varied, and expanding Linux activities.

Not surprisingly, IBM does not cite a single case in which a court has granted summary

judgment for a party on a claim – much less its adversary's counterclaim -- that was not even in

the case at the time of the alleged discovery misconduct. And the cases IBM does cite are

inapposite because, in each such case, the sanction that the court applied against the offending

party's pending claim or defense was directly related to the discovery request with which that

party had failed to comply. See Burns, 164 F.R.D. at 596 (finding issue against party who had

refused to provide documents related to that issue); Knowlton, 189 F.3d at 1182 (instructing jury

that defendants should be treated as single employer where defendants had refused to produce

evidence on that issue); Volkart Bros., 130 F.R.D. at 290 (deeming certain paragraphs of

plaintiff's complaint about which defendant had refused to produce evidence to be admitted in

order to "facilitate [the plaintiff's] litigation of this case without the requested information").

Because IBM's motion for the extreme sanction of summary judgment finds no support

in either the facts of this case or by any remotely applicable law, it should be denied.

## II.    EVEN IF CONSTRUED AS A PROPER MOTION FOR SUMMARY JUDGMENT, IBM'S MOTION FAILS UNDER THE FACTS AND THE WELL-ESTABLISHED LAW

IBM does not remotely satisfy its burden on summary judgment, and its motion fails for

that reason alone. See Part II.A below. SCO also requests a continuance pursuant to Fed. R.

55

Civ. P. 56(f) and has filed substantial materials in support of that request. If necessary, the Court

should deny IBM's motion on several, separate bases in light of the procedural posture of this

case, and on the additional grounds set forth in SCO's 56(f) materials. See Part II.B below. As

to each of those independent lines of authority, IBM's only response is its contention that SCO

represented its previous discovery responses to constitute all of the evidence SCO could ever

find on the subject of the requests. As shown above, that contention is not at all accurate.

### A.    IBM Has Failed to Meet Its Burden of Production on Summary Judgment

"The moving party carries the burden of showing beyond a reasonable doubt that it is

entitled to summary judgment, and the court must review the record in the light most favorable

to the opposing party." Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). The

moving party "has both the initial burden of production on a motion for summary judgment and

the burden of establishing that summary judgment is appropriate as a matter of law." Id.; see

also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"If a moving party fails to carry its initial burden of production, the nonmoving party has

no obligation to produce anything, even if the nonmoving party would have the ultimate burden

of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir.

2002) (quotation omitted); see Adickes v. S.H. Kress & Co., 398 U.S. 144, 160-61 (1970)

(holding that plaintiff was not required to come forward with material supporting her claim

because defendant's initial production had failed to foreclose plaintiff's claim); see also

MomsWIN, LLC v. Lutes, No. 02-2195, 2003 U.S. Dist. LEXIS 11713, *16 (D. Kan. July 8,

2003) (Exh. 80) (denying plaintiffs' summary judgment motion for declaration that plaintiffs and

one defendant were joint authors of programming code where plaintiffs did not produce evidence that their contribution to the code was independently copyrightable).

If the moving party would bear the burden of persuasion at trial, moreover, the moving party's burden of production on summary judgment is higher: "If the moving party will bear the burden of persuasion at trial on the claim addressed by the motion, that party must support its motion with credible evidence – using any of the materials specified in Rule 56(c) – that would entitle it to a directed verdict if not controverted at trial." Anderson v. Dep't of Health & Human Servs., 907 F.2d 936, 947 (10th Cir. 1990); accord Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 868 F. Supp. 1278, 1287 (D. Utah 1994).[34]

It has long been settled in the Tenth Circuit that the declaratory judgment claimant (here, IBM) bears the burden of persuasion at trial. In Steiner Sales Co. v. Schwartz Sales Co., 98 F.2d 999, 1011 (10th Cir. 1938), the Tenth Circuit held, in a suit for a declaration of invalidity as to patents and related license contracts, that the declaratory plaintiff had the burden of establishing that the contracts had tended to lessen competition and had resulted in loss or damage to plaintiff. This decision was followed more recently in Wuv's International, Inc. v. Love's Enterprises, Inc., No. 78-F-107, 1980 WL 30296 (D. Colo. Nov. 4, 1980) (Exh. 85), a trademark case in which the plaintiff sought a declaration of non-infringement. Citing Steiner Sales, the court in Wuv's recognized: "In this circuit, the plaintiff in a declaratory judgment action carries the burden of proving its claims." Id.; accord 10B C. Wright et al., Federal Practice and Procedure § 2770 (3d ed. 1998) (citing Steiner as standing for the view, for which "there seems

---

[34] Accord Timmer v. Mich. Dep't of Commerce, 104 F.3d 833, 843 (6th Cir. 1997); Smith v. City of Des Moines, Iowa, 99 F.3d 1466, 1471 (8th Cir. 1996); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

to be a good deal to be said," that "the party who institutes an action . . . should carry the burden"); Ericsson Inc. v. Harris Corp., No. CIVA3:98CV2903D, 1999 WL 604827, at *3 (N.D. Tex. Aug. 11, 1999) (Exh. 73) (imposing burden of proof on party seeking declaratory judgment of noninfringement).[35]

Seeking a summary declaration that none of its Linux-related activities infringe on any of SCO's copyrights, IBM does not remotely satisfy its summary judgment burden under Rule 56. As an initial matter, although IBM asserts in its brief that its Linux activities "are public knowledge" (SJ Mem. ¶ 30), it does not anywhere purport even to identify all of its Linux activities – let alone to describe what they entail. Nor does the cursory declaration that IBM has supplied from the co-founder and present director of its Linux Technology Center purport to supply this critical information. IBM's activities appear to go beyond those identified in Mr. Frye's declaration, and to be continually expanding. See Part III.B.2 below. Without a complete

---

[35] The only Tenth Circuit case that IBM cites, Lefler v. United Healthcare of Utah, Inc., 162 F. Supp. 2d 1310, 1314-15 & n.6 (D. Utah 2001), involved neither the Copyright Act nor the Declaratory Judgment Act, but instead concerned particular standards enumerated in the ERISA statute. See id. at 1316. The other two cases, Interactive Network, Inc. v. NTN Communications, 875 F. Supp. 1398, 1403 (N.D. Cal. 1995), and Larami Corp. v. Amron, No. Civ. A. 91-6145, 1993 WL 69851 at *3 (E.D. Pa. Mar. 11, 1993) (Exh. 78), involved counterclaims for infringement that were the mirror images of the plaintiffs' preexisting declaratory judgment claims for noninfringement. Those cases show at most that the burden of proof may shift to a declaratory defendant only when it asserts such a mirror-image claim. See Reliance Life Ins. Co. v. Burgess, 112 F.2d 234, 239 (8th Cir. 1940) (where defendants did not seek affirmative relief in response to plaintiff's declaratory judgment claim, plaintiff retained burden of proof). But see Ericsson, 1999 WL 604827, at *3 (Exh. 73) ("Merely because Harris [the declaratory defendant] is now asserting infringement counterclaims does not remove the burden of proof from Ericsson on its declaratory judgment claim."). SCO alleges that IBM violated SCO's copyrights by continuing to use and distribute AIX and Dynix after the termination of IBM's licenses. See Statement of Disputed Facts ¶¶ 26-28, above. IBM's election to seek much broader relief in its Tenth Counterclaim comes with a price: the burden of persuasion at trial and the burden of producing credible evidence to support its summary judgment motion. In any event, to the extent that Interactive Network and Larami conflict with Steiner Sales and Wuv's, they do not apply.

catalog of the activities on which IBM seeks a declaration of non-infringement, IBM cannot

possibly meet its burden of production on its extraordinarily broad counterclaim.

IBM in effect seeks a clean bill of health for the <u>entirety</u> of Linux, including each of its

approximately 11,717 individual files and 5 million lines of code. Counter-Statement of Facts

¶ 40. IBM's role as distributor or end-user of Linux alone would be sufficient to make IBM

liable under black-letter copyright law if Linux contains <u>any</u> infringing content, no matter what

the source of that content. IBM's Tenth Counterclaim therefore requires a finding that nothing in

Linux infringes any copyright of SCO's. <u>See</u> 17 U.S.C.A. § 106(1) (providing that using or

loading copyrighted material onto a computer constitutes "copying" the program for purposes of

the Copyright Act); <u>Stenograph L.L.C. v. Bossard Assoc., Inc.</u>, 144 F.3d 96, 100 (D.C. Cir.

1998) (interpreting the Copyright Act as holding that loading copyrighted material onto a

computer constitutes "copying"); <u>Vault Corp. v. Quaid Software Ltd.</u>, 847 F.2d 255, 260 (5th

Cir. 1988) (same). It follows that on its motion IBM must at least establish, through credible

evidence, the absence of any material factual issues as to whether Linux contains any material

that infringes a SCO copyright. In fact IBM has not attempted to make even the most minimal

showing that Linux does not contain material that infringes SCO's copyrights. IBM has not

provided any analysis (expert or otherwise) of Linux and UNIX. Nor has or could IBM show

that reasonable steps were taken to prevent Linux from becoming polluted by infringing content.

IBM's bare claim that SCO cannot demonstrate copyright infringement based on IBM's

"Linux activities" is not "credible evidence," but merely conclusory legal argument. Having

failed to meet its initial burden, IBM's summary judgment motion fails out of the gate. <u>See</u>

Adickes, 398 U.S. at 161 ("No defense to an insufficient showing is required."); accord Reed v.

Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002) (same).

**B.    IBM's Motion for Summary Judgment Is Premature
Under Federal Rule of Civil Procedure 56(f)**

Under Rule 56(f), summary judgment is premature where "the nonmoving party has not

had an opportunity to make full discovery." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986);

see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986) (summary judgment

should be refused "where the nonmoving party has not had the opportunity to discover

information that is essential to his opposition"). It is fundamental that summary judgment is

improper "at a stage of the case when all of the facts and circumstances material to a just

determination of the controversy [are] not before the court." Morrison Flying Serv. v. Deming

Nat'l Bank, 340 F.2d 430, 432 (10th Cir. 1965). Summary judgment "is drastic and should be

applied with caution to the end that litigants will have a trial on bona fide factual issues." Id. at

433. Further, "because the purpose of Rule 56(f) is to provide an additional safeguard against an

improvident or premature grant of summary judgment, the rule should be applied with a spirit of

liberality." King Airway Co. v. Routt County, No. 97 CJ C.A.R. 563, 1997 WL 186256 (10th

Cir. Apr. 17, 1997) (quotations omitted) (Exh. 77); accord Committee for the First Amendment

v. Campbell, 962 F.2d 1517, 1522 (10th Cir. 1992).

The procedural posture of this case bears directly on the application of Rule 56(f). See

Harrop Decl. ¶¶ 28-29, 35-36. Indeed, when the summary judgment motion is filed prior to or

early in discovery on the claim at issue and the courts specifically consider the application of

Rule 56(f), they have imposed a reduced burden on the non-moving party:

> When the parties have had the opportunity to conduct discovery, an insistence that one claiming a need for additional discovery specify the information he seeks and how it would preclude summary judgment is a sensible requirement. The party is able to target specific areas of inquiry based on the discovery he has already conducted and explain why prior discovery was insufficient. It is unreasonable, however, to demand a detailed explanation of the evidence the appellants in this case hoped to discover. The appellants had no real opportunity to conduct discovery and, in terms of specifying how the desired evidence would preclude summary judgment, could do little more than state that it was relevant to one of their theories of recovery. Radich v. Goode, 886 F.2d 1391, 1403 (3d Cir. 1989) (Hutchinson, J. concurring in relevant part).[36]

In addition, the moving party's exclusive control of information essential to the non-moving party's opposition "is a factor weighing heavily in favor of relief under Rule 56(f)." Price v. W. Resources, Inc., 232 F.3d 779, 783 (10th Cir. 2000) (citation omitted).

SCO shows through accompanying declarations that it has not had sufficient time since IBM filed its counterclaim to analyze the millions of lines of Linux source code, to compare it to UNIX source code, and to trace the geneology, ownership, registration and licensing of that code.[37] Most importantly, SCO further shows through the declarations that SCO has not received discovery essential to oppose IBM's motion, nor even basic discovery that would permit SCO simply to efficiently identify targets for future, focused discovery and efficient investigation of facts to oppose IBM's motion. SCO explains below, and the accompanying

---

[36] See, e.g., Am. Maplan Corp. v. Heilmayr, 165 F. Supp. 2d 1247, 1254 (D. Kan. 2001) ("The court also notes that, unlike most Rule 56(f) requests that are made after the close of discovery, the discovery period in this case has not yet closed."); Superior-FCR Landfill, Inc. v. County of Wright, 59 F. Supp. 2d 929, 936 (D. Minn. 1996) (denying motion for summary judgment because, although the non-moving party should have filed a Rule 56(f) affidavit, the "motion was filed at an early stage of the proceedings" and the court would allow plaintiff "the opportunity to conduct discovery"); cf. Harris v. City of Seattle, 315 F. Supp. 2d 1112, 1120 (W.D. Wash. 2004) ("This is not a situation in which defendants file a summary judgment motion before plaintiff has had a full opportunity to pursue discovery and obtain the evidence necessary to defeat a summary judgment motion.").

[37] Although IBM excludes from its present motion issues of ownership, SCO's investigation would nevertheless need to encompass such issues. There is also a fact issue as to whether SCO owns copyright in one of the two IBM programs at issue in the case. See Part II.B.2 below.

declarations set forth in detail, that without such basic discovery SCO's investigation for non-literal copying would be made much slower and more inefficient than would otherwise be necessary.

SCO sets forth below examples of copying discovered to date. SCO does so without waiving other instances of copying that SCO reasonably expects appropriate discovery to uncover. The fact is that SCO has not even been given the basic, court-ordered discovery on which SCO has now been required to renew a motion to compel necessary to permit SCO to build and prioritize its investigation of non-literal copying into Linux. SCO submits that neither logic nor the law requires SCO in such circumstances to submit a definitive discovery plan now or to make definitive statements about what is or is not copied now. Otherwise the law would invite defendants to refuse to produce even rudimentary discovery and then file summary judgment motions to force their adversary to freeze its case before it had been given even the beginnings of the information required to build it.

In fact the law governing summary judgment motions does the very opposite. While IBM tries to withhold discovery, slow down the process of investigation, and then cut off the time for work, the law requires that discovery be used to make the process as efficient as possible -- and then requires that summary judgment motions such as the present one in complex software cases involving non-literal copying be deferred until after the filing of expert reports (where, even then, they are disfavored).

1.    **In Conjunction with SCO's Rule 56(f) Materials,**
      **The Procedural Posture of the Case Compels Denial**
      **Of IBM's Motion on Several Bases.**

<u>The Parties Have Not Submitted Expert Reports</u>.  In evaluating whether computer

programs and/or portions thereof are "substantially similar" under the Copyright Act, the Tenth

Circuit employs the "Abstraction-Filtration-Comparison" test.  <u>Gates Rubber Co. v. Bando</u>

<u>Chem. Indus., Ltd.</u>, 9 F.3d 823, 834 (10th Cir. 1993); <u>see also</u> <u>Computer Assocs. Int'l v. Altai,</u>

<u>Inc.</u>, 982 F.2d 693, 706 (2d Cir. 1992).  The test is fact intensive:

> Application of the abstractions test will necessarily vary from case-to-case and
> program-to-program.  Given the complexity and ever-changing nature of
> computer technology, we decline to set forth any strict methodology for the
> abstraction of computer programs.  <u>Indeed, in most cases we foresee that the use</u>
> <u>of experts will provide substantial guidance to the court in applying an</u>
> <u>abstractions test.</u>  <u>Gates</u>, 9 F.3d at 834-35 (internal citation omitted and emphasis
> added).

The determination of substantial similarity "is primarily a qualitative rather than a purely

quantitative analysis, and must be performed on a case-by-case basis."  <u>Id.</u> at 839.  Further,

"because substantial similarity is customarily an extremely close question of fact, summary

judgment has traditionally been frowned upon in copyright litigation."  <u>Sturdza v. United Arab</u>

<u>Emirates</u>, 281 F.3d 1287, 1296 (D.C. Cir. 2002) (reversing summary judgment) (quotations

omitted).

The case law demonstrates the impropriety of summary judgment in copyright cases in

which expert reports provide substantial guidance on the question of substantial similarity.  The

parties here indisputably have not submitted expert reports.  In fact, because (among other

reasons) SCO's principal claims in this case have always been for breach of contract and tort,

SCO has not yet retained a testifying expert on copyright issues.  <u>See</u> Harrop Decl. ¶ 72.

In Huthwaite, Inc. v. Sunrise Assisted Living, Inc., 261 F. Supp. 2d 502 (E.D. Va. 2003),

for example, the court considered a suit for infringement of a copyrighted sales manual. The

defendant moved for summary judgment. Without even mentioning Rule 56(f), the court

concluded: "This motion is premature at this point, as it is brought before the submission of

expert reports on the substantial similarity question." Id. at 511. The rationale in Huthwaite is

even more powerful here, given the emphasis the Tenth Circuit in Gates and numerous other

courts have placed on expert reports in the context of comparisons among computer programs.

Indeed, in Madrid v. Chronicle Books, 209 F. Supp. 2d 1227 (D. Wyo. 2002), which IBM cites,

the court expressly carved out the comparison of computer programs as a task the court could not

undertake on summary judgment through a naked comparison of the works at issue. In

comparing the works (a novel and a movie), the court in Madrid explained that it could resolve

the motion before it on summary judgment because "unlike technical computer programs and

like that are copyright protected, the Court does not require further discovery to compare two

literary works that are expressed in plain English." Id. at 1234 (emphasis added). The court then

noted (the ellipses and emphases are its own):

> See Gates Rubber Co. v. Bando Chemical Laboratories, Limited, 9 F.3d 823, 831
> (10th Cir. 1993), which, when analyzing a computer program, states that it is "far
> preferable . . . in an area of legal and technological sophistication as complex as
> this area of copyright protection, to draw upon a larger arsenal of facts in order to
> design or derive the appropriate legally significant facts. Once these are gathered
> and expert testimony is heard, the court can then analyze which portions of the
> program, according to the expert testimony, infringes the protected expression."
> Id. at 1234 n.2.

The copyright issues that IBM's motion raises are of precisely the type that Gates and Madrid

court make clear cannot be resolved on summary judgment.

Other courts, both within and outside the Tenth Circuit, agree. In <u>Autoskill, Inc. v.</u>

<u>National Educational Support Systems Inc.</u>, 793 F. Supp. 1557, 1568 (D.N.M. 1992), <u>aff'd</u>, 994

F.2d 1476 (10th Cir. 1993), the court noted that reliance on expert testimony "is particularly

appropriate in the complex area of reading software programs." <u>Accord</u> <u>Kohus v. Mariol</u>, 328

F.3d 848, 857-58 (6th Cir. 2003); <u>see also</u> <u>Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.</u>, 797

F.2d 1222, 1232 (3d Cir. 1986) (noting that "when the subjects of the copyright are particularly

complex, such as computer programs," the applicable analysis of copying must recognize that

"the expert testimony is essential to even the most fundamental understanding of the objects in

question"); <u>Altai</u>, 982 F.2d at 713 (acknowledging "the reality that computer programs are likely

to be somewhat impenetrable by lay observers – whether they be judges or juries").

The Court should await the submission of expert reports before resolving the copyright

issues raised in IBM's Tenth Counterclaim.

<u>The Parties Have Not Remotely Completed Relevant Discovery</u>. IBM filed its Tenth

Counterclaim on March 29, 2004, and fact discovery is not scheduled to end until February 11,

2005. The parties have not even begun to take discovery specifically on the Tenth Counterclaim.

Harrop Decl. ¶¶ 35-36, 40, 47-48, 56, 58, 62. SCO does not contend that the Court may enter

summary judgment only if all discovery has been completed. <u>But see</u> 10B <u>Federal Practice and</u>

<u>Procedure</u> § 2741 ("[T]he granting of summary judgment will be held to be error when discovery

is not yet completed, and summary judgment has been denied as premature when the trial court

determines that discovery is not finished."). Rather, in factually analogous circumstances, courts

have held that summary judgment motions are premature.[38]

It is also undisputed that the parties have consumed much of the time since IBM brought

the Tenth Counterclaim by addressing for the Court and Magistrate Judge whether the Court

shall have jurisdiction over the Counterclaim at all, the extent to which IBM has complied with

the Magistrate Judge's Order regarding SCO's first motion to compel, and the scheduling order

that this Court amended.  Harrop Decl. ¶¶ 11-17.  See Burnside-Ott Aviation Training Ctr., Inc.

v. United States, 985 F.2d 1574, 1582-83 (Fed. Cir. 1993) (denying summary judgment where

discovery on the claim was allowed for only two months and the parties consumed much of that

time moving to extend the discovery deadline and to compel discovery, and the moving party

had not responded to the non-moving party's discovery requests).  On the basis of those facts

alone, pursuant to the foregoing cases, the Court should deny IBM's motion.

The courts have specifically held, moreover, that when the non-moving party has had no

reasonable opportunity to take depositions that could provide relevant testimony, summary

judgment is inappropriate.  See St. Surin v. Virgin Islands Daily News, Inc., 21 F.3d 1309, 1314-

15 (3d Cir. 1994) (reversing summary judgment where the plaintiff had not yet deposed third-

party witnesses); Velikonja v. Mueller, 315 F. Supp. 2d 66, 79 (D.D.C. 2004) (noting that "in

---

[38] See, e.g., Rio Vista Oil, Ltd. v. Southland Corp., 667 F. Supp. 757, 760 (D. Utah 1987) ("motions for summary judgment should not be granted if discovery has not been had and would be helpful"); see also Velikonja v. Mueller, 315 F. Supp. 2d 66, 80-81 (D.D.C. 2004) (noting the "undeveloped record" and holding that consideration of any summary judgment would occur after discovery was completed); Does v. Mercy Health Corp. of Southeastern Pa., 150 F.R.D. 83, 85 (E.D. Pa. 1993) (granting Rule 56(f) continuance where "Defendants submit this motion for summary judgment in the early stages of discovery"); Magic Mktg., Inc. v. Mailing Servs. of Pittsburgh, 634 F. Supp. 769, 772-73 (W.D. Pa. 1986) (considering defendant American Paper's motion for summary judgment in action for copyright infringement and concluding that "Discovery has recently commenced and plaintiff must be given an opportunity to uncover evidence which may contradict American Paper's position").

particular, plaintiff has yet to conduct any depositions"); <u>Gallup, Inc. v. Talentpoint, Inc.</u>, No.

CIV.A. 00-5523, 2001 WL 1450592, at *14 (E.D. Pa. Nov. 13, 2001) (Exh. 74) (denying

summary judgment because the plaintiff had not been able to depose certain employees of the

defendant). That factor applies with particular force here, for two principal reasons:

>    -- In cases involving comparison of computer programs under the copyright laws,
>
>    the courts have held that lay testimony (in addition to expert testimony) is relevant to the
>
>    "substantial similarity" inquiry. <u>See, e.g.</u>, <u>Whelan Assocs.</u>, 797 F.2d at 1232-33;
>
>    <u>Autoskill</u>, 793 F. Supp. at 1569, <u>aff'd</u>, 994 F.2d 1476 (10th Cir. 1993); and
>
>    -- Only by deposing current and former employees of IBM (and its predecessor in
>
>    interest) can SCO demonstrate the full extent of IBM's broad access to UNIX, which
>
>    proof will reduce SCO's burden on the question of substantial similarity. <u>See</u> <u>Gates</u>, 9
>
>    F.3d at 833 n.7.

IBM improperly presupposes (for example) that no current or former IBM employee would

acknowledge that portions of Linux – including portions that SCO may not yet have identified –

are substantially similar to portions of protected UNIX material. <u>See</u> Part II.B.2 below.

Additional and analogous case law belies IBM's argument that deposition testimony

would be irrelevant. In <u>Sanders v. Quikstak, Inc.</u>, 889 F. Supp. 128 (S.D.N.Y. 1995), for

example, in considering the defendant's motion for summary judgment regarding the plaintiff's

claim of design defect, the court did not limit its inquiry to whether the plaintiff could at that

time produce direct evidence of the alleged defect. Rather, the court recognized that prospective

deposition testimony could support the plaintiff's claims:

>    Defendant argues that plaintiff should not be given additional time for discovery
>    because plaintiff has had ample time, during the eleven months since his case was

> removed to this court, to inspect the hydraulic unit and to specify the defects he is
> alleging. While we wish to encourage the expeditious preparation of cases for
> trial, we do not find defendant's argument persuasive. Inspection of the hydraulic
> unit is not the only avenue of discovery through which plaintiff may gain
> information about the unit. Depositions of Rexroth personnel may reveal
> potential design flaws, manufacturing imperfections, or operating dangers that are
> not apparent from a visual inspection or even upon trial runs of the machinery.
> Id. at 132-33.

SCO indisputably has not yet had the opportunity to depose IBM employees who could have

knowledge about the contribution of copyrighted SCO System V code into AIX, Dynix, and/or

Linux, and has not yet had the opportunity to depose third-party contributors (such as Linus

Torvalds) who also could have placed System V code into Linux. Sanders and the other cases

cited above make clear that summary judgment is inappropriate where, as here, future deposition

testimony could bear on issues of liability.[39]

SCO's Renewed Motion to Compel. Summary judgment is premature when the non-

moving party has filed a pending motion to compel discovery. In Morrison Flying, 340 F.2d

430, the Tenth Circuit – without even mentioning Rule 56(f) – denied summary judgment where

the non-moving party's motion to compel answers to interrogatories was pending at the time the

district court granted summary judgment. The court's reasoning demonstrates the reduced

burden that the non-moving party faces in a procedural posture such as the one here:

> We do not conclude that these questions must be answered or that, if answered,
> they will finally permit Morrison to prevail in the case. The trial court should first
> have an opportunity to rule upon the matter. Nevertheless, some of this evidence

---

[39] IBM relies on Gemisys Corp. v. Phoenix American, Inc., 186 F.R.D. 551 (N.D. Cal. 1999), but at the time of summary judgment in that case the Magistrate Judge had previously granted the non-moving party's Rule 56(f) motion and permitted it to depose numerous witnesses from the moving party. See id. at 565. In addition, the non-moving party's subsequent Rule 56(f) motion either sought only the right to depose individuals it had already deposed or else was based purely on "mere speculation." Id. at 565-66. Nor did the non-moving party present any evidence of substantial similarity. See Part II.B.2 below.

<u>may be</u> very material for a final disposition of the litigation. <u>Id.</u> at 432 (emphasis added).

<u>See also</u> <u>Vining v. Runyon</u>, 99 F.3d 1056, 1058 (11th Cir. 1996) (holding that "it is error for a district court to decide a summary judgment motion before ruling on an outstanding motion to compel"); <u>Snook v. Trust Co. of Georgia Bank of Savannah</u>, 859 F.2d 865, 871 (11th Cir. 1988) ("The district court should have ruled on the motion to compel prior to entering summary judgment for the defendants. Its failure to rule on the motion to compel circumvented the policy underlying discovery in cases in which a summary judgment motion is filed.").

The holdings in these cases are perfectly sensible – otherwise a litigant would have an incentive to drag its feet in discovery and then move for summary judgment before the record was developed in any detail. The reasons for precluding summary judgment where such motions to compel are pending are manifest in this case. SCO served interrogatories and requests for production on IBM over a year ago. Because IBM's responses were incomplete or non-existent, SCO filed a motion to compel on November 3, 2003. In March 2004, the Magistrate Judge ordered IBM to comply with its discovery obligations by providing specified discovery and supplementing its deficient responses. <u>See</u> Order Regarding SCO's Motion to Compel Discovery dated March 3, 2004 (Exh. 15). IBM has failed to comply with the Order. Therefore, SCO has filed a motion to compel IBM to comply with the Court order prompted by SCO's initial motion to compel. <u>See</u> Mem. in Support of Plaintiff's Renewed Motion to Compel, dated July 6, 2004 (Exh. 25).

Accordingly, if the distinct were even relevant, SCO's renewed motion to compel relates directly back to its motion to compel pre-dating IBM's motion for summary judgment. The cases, however, do not distinguish between motions to compel filed before or after the summary

judgment motion.  See, e.g., Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 563, 571

(11th Cir. 1990) (reversing district court for granting summary judgment prior to resolving

motion to compel filed after the motion for summary judgment); Lux v. Cox, 23 F. Supp. 2d 92,

103-104 (W.D.N.Y. 1998) (denying summary judgment motion in light of motion to compel

filed the day before oral argument on the motion).  And there certainly would be no basis for

drawing any such distinction where, as here, the party files the motion to follow up on discovery

ordered in response to a previous motion to compel.  See, e.g., G-I Holdings, Inc. v. Baron &

Budd, 213 F.R.D. 146, 146-47 (S.D.N.Y. 2003) (summary judgment denied as "premature"

where the non-moving party has prevailed on a motion to compel but has not received the

discovery to be produced).  If the Magistrate Judge determines to require IBM to produce

additional documents, SCO should be permitted to review and use them.

 The courts also have specifically held that summary judgment is premature when the

moving party has failed to respond to interrogatories.  See, e.g., Sames v. Gable, 732 F.2d 49,

51-52 (3d Cir. 1984) (reversing summary judgment against plaintiff where "plaintiff's

interrogatories remained unanswered by defendant" and "the court had denied defendants'

motion to limit the scope of those very discovery requests").  SCO demonstrates in its Renewed

Motion to Compel that IBM has failed adequately to respond to SCO's Interrogatory 5, which

seeks the identity of "IBM or Sequent personnel that work or worked on developing source code,

derivative works, modifications or methods for AIX, Dynix, and Linux, specifying for each

person their precise contributions to each."  If IBM answers this Interrogatory appropriately,

SCO will know (for example) the precise contributions made to AIX and Dynix.  Such

information would allow SCO to depose the significant authors of AIX and Dynix, and that

information will enable SCO to streamline and prioritize its searches for source code in Linux

derived over time from source code in UNIX.  That testimony will also provide direct evidence

(good or bad) relating to IBM's request for a declaration of non-infringement with respect to all

of its activities relating to Linux.  See Part II.B.2 below.  On these additional bases, the Court

should deny IBM's motion.[40]

### 2.     The Materials SCO Has Filed Pursuant to Rule 56(f) Further Compel Denial of IBM's Motion.

Under Rule 56(f), the moving party must identify "the probable facts not available and

what steps have been taken to obtain these facts," and must "demonstrate how additional time

will enable him to rebut movant's allegations of no genuine issue of fact."  Brightway

Adolescent Hosp. v. Health Plan of Nev., No. Civ. 2:98CV0729C, 2000 WL 33710845, *2-3 (D.

Utah Sept. 20, 2000) (Exh. 69) (quotations and citations omitted); see also Holt v. Wesley Med.

Ctr., LLC, No. 00-1318-JAR, 2002 WL 31778785, at *1 (D. Kan. Nov. 25, 2002) (Exh. 76)

(granting 56(f) continuance in light of pending and unanswered discovery requests); Am.

Maplan, 165 F. Supp. 2d at 1254-55 (granting 56(f) continuance prior to completion of discovery

---

[40] The other cases IBM cites are not at all to the contrary.  In Jean v. Bug Music, Inc., No. 00 CIV 4022, 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002), the court relied extensively on the declaration and deposition testimony of the defendants' expert.  Id. at *3-6.  In I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996), which turned on the application of Indiana law to an implied license, the court had the benefit of extensive discovery, including a variety of depositions.  In Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425 (S.D.N.Y. 2002), the court premised its grant of summary judgment on the fact that the alleged infringer did not have access to the protected work.  Id. at 339.  In CACI Int'l, Inc. v. Pentagen Tech. Int'l, Ltd. 70 F.3d 111 (Table), 1995 WL 679952 at **3 (4th Cir. 1995), the court granted summary judgment because, inter alia, the statute of limitations had run.  Further, the undisputed evidence demonstrated that the alleged infringer did not have access to the copyright holder's work and had not distributed it.

where plaintiff "has demonstrated that it has been delayed in obtaining documents that might prove to be critical in its opposition of defendant's motion").

SCO's 56(f) submissions fully meet the foregoing criteria. At the same time, in light of the very early stage of discovery regarding IBM's Tenth Counterclaim and IBM's failure to date to provide complete responses to the most basic discovery requests, SCO need not satisfy the same requirements as a party opposing summary judgment after substantial discovery on the claim at issue has been taken. SCO explains below its efforts to take relevant discovery, the discovery SCO would need to take to oppose IBM's motion, and illustrative facts demonstrating that SCO reasonably expects to discover additional facts precluding summary judgment.

<u>SCO's Discovery Efforts to Date</u>

The procedural posture here is one in which (i) until February 2004, SCO had not asserted any claim for copyright infringement in this case, (ii) SCO has not filed any claim that IBM has contributed source code to Linux in violation of any SCO copyright, (iii) SCO has not brought any claim in this action against IBM relating to any of IBM's numerous activities relating to Linux, and (iv) SCO's motion to dismiss IBM's Tenth Counterclaim is pending -- and, in fact, IBM filed its motion for summary judgment with its opposition to SCO's pending motion to dismiss.

By bringing the claims it did, SCO had specifically avoided the need for the broad and time-consuming discovery necessary to determine (by way of example) the full scope of IBM's numerous activities relating to Linux, the source code thousands of third parties had contributed to Linux, the origins of the source code they contributed, the ways in and extent to which thousands of end-users use Linux, and all of the other discovery necessary to give SCO an

72

opportunity to discover facts essential to oppose IBM's Counterclaim. The necessary (and foreseeable) effect of IBM's Tenth Counterclaim would be to introduce those substantial issues (among others) into the discovery process. Harrop Decl. ¶ 19.

In addition, SCO has been unable to obtain facts essential to justify opposition to IBM's motion for summary judgment given IBM's inadequate responses to basic interrogatories and requests for production that SCO propounded over a year ago. The Magistrate Judge has already granted SCO's initial motion to compel adequate responses to that discovery. On March 3, 2004, the Magistrate Judge granted SCO's motion to compel and required IBM to provide specified discovery that it had refused to provide and also to supplement deficient responses. Yet IBM has still failed to comply with the Court's Order. IBM's failure has forced SCO to now renew its earlier motion to compel – simply to secure compliance with the Court's prior Order. See Mem. in Support of Plaintiff's Renewed Motion to Compel, July 6, 2004 (Exh. 25); see also SCO's Mem. Regarding Discovery, May 28, 2004 (Exh. 23).

IBM's refusal to provide the basic information set forth in SCO's Renewed Motion to Compel prejudices SCO's defense of all of IBM's counterclaims. The effect of IBM's failure adequately to respond to SCO's discovery requests is to have precluded SCO from deposing principal programmer contributors to streamline the otherwise extremely time-consuming investigation and discovery process with respect to issues of non-literal copying under the copyright laws on which IBM's Tenth Counterclaim is based. With full discovery responses, for example, SCO would have known the identities and precise contributions of each person to AIX, which in turn would have allowed SCO to take depositions of significant authors of AIX, which

would have provided direct evidence relating to IBM's duplication, modification, and/or distribution of material in UNIX in which SCO holds copyright. Harrop Decl. ¶¶ 59-64, 77-90.

After hearing argument on SCO's motion to compel, the Magistrate Judge also issued a specific numbered directive requiring that IBM finally produce at least some version of AIX code (and additional Dynix code). Only on March 24, 2004, almost nine months after SCO originally requested its production, did SCO finally receive limited versions of AIX and additional Dynix source code that were readable so that SCO could begin to conduct source code comparisons. Comparison of AIX and Dynix source code with source code in UNIX and Linux will enable SCO to identify the specific files and lines of AIX and Dynix that IBM contributed to Linux and to continue the complex and technically demanding analysis to identify all of the instances of IBM's copying from UNIX into AIX and Dynix and into Linux.

<u>SCO's Proposed Discovery on the Tenth Counterclaim</u>

IBM's motion begs the question of the full scope of its "activities relating to Linux," which is an issue on which SCO has taken very little discovery. In addition to discovery to determine the nature and scope of IBM's activities relating to Linux, SCO would need to begin and take substantial discovery of facts essential to oppose IBM's broad request for a declaration of non-infringement of SCO's copyrights. IBM seeks a declaration that it has not infringed SCO's copyrights through any of its "Linux activities" – as both a contributor and an end-user. IBM of course may be liable for contributing SCO's copyrighted material from UNIX into Linux. <u>See, e.g.</u>, <u>Gates</u>, 9 F.3d 823. Further, as an end-user of Linux, if <u>anyone</u> has contributed protected material from UNIX System V into Linux, IBM can be held derivatively liable for

copyright infringement.  See, e.g., Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.,

75 F. Supp. 2d 1290, 1293-94 (D. Utah 1999).

On the issue of copying, IBM places near-exclusive weight on SCO's purported ability

simply to place the millions of lines of UNIX source code side-by-side with the millions of lines

of Linux source code and compare them.  Such comparisons are possible, but not within any

reasonable time frame.  They are in fact an extremely inefficient and time-consuming way of

identifying similarities in code given the circumstances and the magnitude of the search required.

Even using automated search tools, there are inherent obstacles in identifying all line-for-line

similarities between two computer operating systems.

But as shown below, and demonstrate concretely in the accompanying declarations, this

is even more plainly true as to issues of non-literal copying, which does not depend on the

presence of identical code and which therefore requires even more time and effort to investigate.

Basic discovery SCO has sought but not received would have permitted and permit SCO to

streamline the investigation of similarities in code that IBM's Tenth Counterclaim requires, by

enabling SCO to prioritize and target areas to analyze.  With such discovery investigation of non-

literal copying is efficient; without it the investigation is much more time consuming and

unnecessarily inefficient.  Given the time constraints and inherent limitations on side-by-side

comparison of source code in the absence of other information, the means summarized below of

identifying copying between computer operating systems, and of the modification or derivation

of source code from one operating system into the source code of another operating system, are

crucial tools.

IBM thus not only proposes that SCO is constrained to use only the most time-consuming search methods, but further proposes that SCO can use only the facts discovered through those methods before IBM filed its counterclaim.  In a process where the plaintiff seeks to employ the most efficient means of discovering facts to support its claim, IBM seeks to constrain SCO to using only inefficient means; where the plaintiff would develop its case prior to opposing a motion for summary judgment, IBM proposes to cut that process off entirely.  SCO demonstrates below that on both points the law compels the exact opposite outcome.  The law further demonstrates that the discovery SCO seeks not only is the most reasonable means of discovering facts on the direct comparison of source code, but would permit SCO to obtain direct testimony essential for SCO to oppose IBM's Tenth Counterclaim.[41]

*IBM's Activities Relating to Linux*

IBM's own descriptions of the enormous extent of its worldwide Linux-related activities reveals the broad scope of the discovery the Tenth Counterclaim would entail.  For example:

> As of a year ago, "The company has 250 developers working on 29 separate Linux projects worldwide, according to Ken King, director of technical strategy from I.B.M.'s software group."  Harrop Decl. ¶ 37 (quoting No Concession from IBM IN Linux Fight, N.Y. Times, June 14, 2003)

---

[41] See, e.g., Williams v. Arndt, 626 F. Supp. 571, 579-81 (D. Mass. 1985) (in finding substantial similarity during bench trial, considering the defendant's testimony in evaluating his credibility, motivation and purpose for creating the substantially similar work); Midway Mfg. Co. v. Bandai-America, Inc., 546 F. Supp. 125, 153-54 (D. N.J. 1982) (in finding issues of material fact precluding summary judgment, citing defendant's later-rescinded decision to include another feature of the copyrighted work in the defendant's work, and the testimony of the creator of defendant's work that the work is similar to the plaintiff's work); cf. Plains Cotton Co-op Ass'n of Lubbock, Tex., v. Goodpasture Computer Serv., Inc., 807 F.2d 1256, 1260-61 (5th Cir. 1987) (affirming district court's decision that plaintiff was unlikely to succeed on the merits in copyright action and citing as relevant evidence defendant's testimony "that he did not rely on any material" belonging to plaintiff, his familiarity when designing defendant's work based on "just experience and industry knowledge," and the testimony of an employee of defendant that the program subroutines he wrote for defendant while employed there "were written without reference to any material relating to any of" plaintiff's software systems).

In light of published reports, moreover, SCO reasonably believes that it would be entitled to

discovery regarding a great deal of subject matter relating to those activities, such as the

following:

     --     In 2001, IBM granted $1 billion for the vice president of technology and strategy at IBM to build a Linux business;

     --     In 2003 IBM's Linux-related revenues grew 50% to more than $2 billion. IBM's mainframe hardware business grew 7% to just over $3 billion; that growth is principally attributable to Linux, which shipped on 20% of the mainframe support IBM delivered in 2003;

     --     IBM is helping at least hundreds of third parties migrate their computers off of other operating systems and onto the Linux operating system. Since 2001 IBM has trained at least 3000 employees in Linux in order to launch the practice to help customers migrate to Linux; and

     --     IBM has created 45 Linux technology centers in 12 countries, where experienced engineers with backgrounds designing AIX contribute source code to Linux.

See Kill Bill, Exh. 52; Harrop Decl. ¶ 38.

Other published reports also indicate that IBM's Linux-related activities have grown and

expanded and continue to do so – making SCO's ability now to oppose IBM's request for a

declaration regarding all such activities even more inconceivable. For example:

     --     IBM issued this press release on January 19, 2004: "IBM today announced new programs and supporting classes to help Business Partners and customers move from the legacy Microsoft Windows NT operating system to Linux, the fastest growing server operating system in the world." (Exh. 45);

     --     IBM issued this press release on March 16, 2004: "IBM today announced new partners, programs and incentives that are helping to fuel Linux adoption and growth among small-to-medium-sized businesses." (Exh. 49); and

     --     On June 6, 2004, the vice president of technology and strategy at IBM was quoted as saying: "Linux is helping us win business," and "If you become convinced that something is going to happen whether you like it or not, you are far better off embracing it." Kill Bill (Exh. 52).

Harrop Decl. ¶ 39.

Discovery regarding all of IBM's Linux-related activities would thus be substantial and time consuming. Yet there is no question that IBM's sweeping Tenth Counterclaim would necessarily pull those issues into this litigation. That is one reason SCO believes the Court should not exercise jurisdiction over the counterclaim. If the Court does exercise jurisdiction, however, SCO would of course ask IBM to produce at least core documentation of the "activities relating to Linux" to which IBM refers in its Tenth Counterclaim. SCO would also depose, for example, the IBM principals who have been identified as those responsible for the decision to build a Linux business regarding the nature and extent of IBM's activities relating to Linux. See Harrop Decl. ¶¶ 40, 54.

*Discovery to Determine Identities of Contributors and Contributions to Linux*

As a result of how Linux evolved, there is no "road map" that will allow SCO to trace the migration of UNIX code into Linux completely. One principal way for SCO to discover some of the facts essential to oppose IBM's Tenth Counterclaim is to take discovery to determine who made contributions of source code to Linux, and what they contributed. To the best of SCO's knowledge, there is no existing list of all of the contributors to Linux, and no list of any sort that SCO could reasonably utilize to identify the principal contributors of such code. SCO does not propose to depose thousands of contributors worldwide to determine who made material contributions to Linux. Instead, SCO seeks discovery to pursue reasonable steps to identify at least the most important contributions made to Linux. Harrop Decl. ¶¶ 41-45; Sontag Decl. ¶ 57.

*Depositions of Contributors to Linux Are Essential*

Another principal way for SCO to discover some of the facts essential to oppose IBM's Tenth Counterclaim is to depose the persons and entities that contributed source code to Linux. If one company had compiled Linux, for example, SCO would be permitted to depose the principal employees who compiled the operating system. Such depositions will reduce the extremely time-consuming direct comparisons of source code that would otherwise be required. Sontag Decl. ¶¶ 24-26, 57-58. This is an especially important form of discovery that will, SCO believes, lead to the discovery of admissions of copying of source code, structure and sequence, and/or the preparation of a derivative work by such contributors. Harrop Decl. ¶¶ 46-54, 73; Sontag Decl. ¶ 59.

SCO has not had the opportunity to depose any of the contributors of any source code into any version of Linux – much less the major contributors – and therefore has not had any opportunity to discover admissions highly relevant to IBM's copyright infringement counterclaim. Indeed, SCO has not had the opportunity to depose even the person (Mr. Torvalds) who is acknowledged to have compiled the first versions of Linux – and who indisputably did so after having studied an operating system expressly based on and derived from UNIX. Nor has SCO has the opportunity to depose any of the kernel maintainers. Mr. Torvalds and the kernel maintainers (and there have been numerous such individuals since at least the mid-1990s) are more likely than anyone else to be able to help identify who contributed source code to Linux. Harrop Decl. ¶¶ 46-48; Sontag Decl. ¶ 57.

In addition, many corporations have made contributions to Linux, and SCO would take discovery on certain of these companies to determine the sources of their contributions. SCO

also needs to depose the programmers who work for these companies and made the contributions

to determine the sources of those programmers' code contributions. This discovery will show

why the contributions were made and what features the contributions relate to, and will allow

SCO to trace back from the Linux code to UNIX. Harrop Decl. ¶¶ 49-50.

SCO has identified with specificity some principal authors of various portions of Linux

code. Those authors should know the sources of their code and should be able to provide

information as to whether the code they contributed to Linux was obtained from SCO

copyrighted code. Harrop Decl. ¶¶ 51-53.

*Depositions of Persons with Access to UNIX*

Another principal way for SCO to discover some of the facts essential to oppose IBM's

Tenth Counterclaim is to depose the persons and entities that had access to the UNIX, AIX

and/or Dynix software. (That class of persons of course may overlap with the individuals

described above.) SCO has not had the opportunity to depose (for example) any of the persons

employed by IBM or Sequent who had access to the UNIX software, nor any of the persons at

IBM or Sequent who participated in producing AIX and Dynix, respectively. The depositions of

(at least) the principal IBM and Sequent employees who were permitted to and did access the

UNIX software prior to the advent of AIX and Dynix not only may provide evidence in support

of SCO's claims, but also may permit SCO to identify other persons who in fact had access to

UNIX. That information will, in turn, permit SCO more reasonably to determine which of the

individuals who had access to UNIX to depose. Harrop Decl. ¶¶ 55-58; Sontag Decl. ¶¶ 24-28.

*Examination of Multiple Versions of AIX and Dynix*

Another principal way for SCO to discover some of the facts essential to oppose IBM's Tenth Counterclaim is to examine the lineages of IBM's programs. SCO can significantly streamline its efforts to discover facts essential to oppose IBM's Tenth Counterclaim examining the lineages of AIX, Dynix, ptx, and Dynix/ptx. By examining the source code in early and then subsequent versions of AIX, Dynix, ptx and Dynix/ptx, SCO can relate an existing version of AIX, Dynix, ptx, or Dynix/ptx code to UNIX code. Assuming that Linux code is similar to AIX. Dynix, ptx, and Dynix/ptx code, SCO can then prioritize its search effort to find evidence of substantial similarity between UNIX and Linux code. Without the ability to prioritize its search efforts, SCO may be required to spend an enormous amount of time, on the order of 35 man-years, searching Linux code for evidence of copying. Harrop Decl. ¶¶ 59-65 & Exh. 12 thereto; Sontag Decl. ¶¶ 15, 29-54.

The evidence SCO currently has – a few versions of AIX that IBM selected, Linux code, and System V code – is insufficient to show infringement because IBM could have copied System V code into early versions of AIX and Dynix and subsequently modified in the later versions that SCO has. Tracing the derivation of SCO-owned UNIX code from System V into the code's current form in Linux will be facilitated by SCO's access to IBM's Configuration Management Version Control (CMVC) and the versions of AIX, Dynix, ptx and Dynix/ptx. Sontag Decl. ¶¶ 31-35. IBM has produced only later versions of AIX. IBM has not yet produced the earlier versions of AIX (or of Dynix, ptx, and Dynix/ptx). On that basis alone, SCO therefore has not had the opportunity to discover facts essential to oppose IBM's motion. Harrop Decl. ¶¶ 61-62.

SCO seeks the following materials to prioritize its analysis of copying of UNIX code into Linux, and so that it can rebut IBM's Cross-Motion: (i) all version control system and bug-tracking information (including documents, data, logs, files, and so forth) for AIX, Dynix/ptx, ptx, and Dynix from 1984 to the present, and (ii) source code and log information for all interim and released versions of AIX, Dynix, ptx and Dynix/ptx from 1984 to the present. Harrop Decl. ¶ 60; Sontag Decl. ¶¶ 35-36.

The following materials also are relevant to prioritize SCO efforts to find evidence to rebut IBM's Cross-Motion: All design documents, white papers and programming notes, created from 1984 to the present. These materials provide a wealth of information related to code development beyond that which can be found in the source code testing, VCS and bug-tracking log. Design documents also list authors of code whom SCO can then depose to help SCO prioritize its search to find evidence of Linux code that is substantially similar to UNIX code. Harrop Decl. ¶ 63; Sontag Decl. ¶¶ 50-54.

Further, programming notes contain the thought processes of individual programmers as they write and revise code sequences. For example, programming notes often list changes made to code, and sometimes list additional changes to consider. Thus, programming notes provide detailed rationale for code changes and an indication of how the code may change in the future. Programming notes also list authors of code whom SCO can then depose to help SCO prioritize its search to find evidence of Linux code that is substantially similar to UNIX code. Harrop Decl. ¶ 64; Sontag Decl.¶ 53.

In addition, the examination of the lineage of any given code sequences faces substantial obstacles as explained further below. Harrop Decl. ¶¶ 91-95; Sontag Decl. ¶¶ 36-42.

*Comparison of Source Code*

Another principal way for SCO to discover some of the facts essential to oppose IBM's

Tenth Counterclaim is to compare the source code (i) in UNIX and AIX/Dynix, (ii) in

AIX/Dynix and Linux, and (iii) in UNIX and Linux. SCO has not been given a reasonable

opportunity to complete any of the kinds of comparisons necessary to uncover facts essential to

justify SCO's opposition to IBM's motion for summary judgment. There are inherent limitations

on SCO's (and anyone's) ability to compare source code within a reasonable period of time. By

way of example:

    --     Both the UNIX and Linux operating systems are large and complex computer programs with many lines of code to compare. Linux code that is modified or derived from UNIX code may not necessarily bear line-for-line character similarity.

    --     To show that Linux code is substantially similar to UNIX code requires a comparison of that code. In other words, the 4 million lines of Linux code must be compared with the 3.5 million lines of UNIX code, line-by-line, or in groups of lines according to the structure, sequence or function of the group of lines.

    --     Attempting to use an automated process to perform a complete comparison of all of the source code in UNIX and Linux computer operating systems is not feasible.

    --     Because of shortcomings with automated code comparison processes, SCO and its experts must rely largely on manual comparisons. Such manual comparisons are very labor and time intensive. SCO and its experts must know or learn both the UNIX and Linux operating systems in detail. This process can take many months.

    --     To execute the comparison, without some roadmaps or list of "hot spots" in Linux, SCO and its experts must compare page after page of code.

The 4 million lines of Linux kernel code takes up 66,000 pages; the 3.4 million lines of UNIX

code takes up 58,000 pages. A simplistic manual comparison would involve placing the pages of

code side by side in some ordered manner and then looking for the same or similar structure,

sequence and organization of the code. Assuming each page comparison takes one (1) minute,

and that there are 66,000 x 58,000 comparisons, this "initial" review could take on the order of 25,000 man-years. Following the initial review, SCO and its experts must conduct a detailed comparison of likely copying candidates. This "second-level" review would also be very lengthy. Harrop Decl. ¶¶ 66-67, 91-95; Sontag Decl. ¶¶ 4-23.

As explained above, moreover, IBM indisputably has not produced multiple early versions of AIX or Dynix source code so that SCO could compare it with the source code in Linux and SCO's copyrighted UNIX code. Just as fundamentally, IBM has failed to produce the discovery that would allow SCO to depose principal programmer contributors to streamline the discovery process on issues of non-literal copying. See Harrop Decl. ¶¶ 45, 47, 49, 54; Sontag Decl. ¶¶ 24-28.

<u>SCO's Proposed Discovery Is Likely to Create Additional Issues of Fact</u>

*Recognition of Potentially Infringing Material in Linux*

The record demonstrates that many individuals familiar with Linux recognize that source code therein may infringe SCO's copyrights. SCO submits that such evidence alone establishes that in proposing to begin and take substantial discovery on IBM's Tenth Counterclaim, SCO reasonably expects to find evidence to create genuine issues of material fact regarding IBM's motion for summary judgment. Harrop Decl. ¶¶ 69-71; Sontag Decl. ¶ 4.

*Comparison of Source Code*

In addition to the foregoing, SCO reasonably expects that further comparisons of source code will permit SCO to present evidence that creates genuine issues of material fact regarding IBM's Tenth Counterclaim. Examples of facts from discovery to date that show copying of material from UNIX into Linux include (i) copying of SCO's UNIX Executable and Linking

Format (ELF) codes in Linux; (ii) substantial similarity in the Read-Copy-Update ("RCU")
routine in Linux version 2.6.5 and in patches to Linux and the RCU version in SCO's
copyrighted work, specifically UNIX SVR4.2 MP; (iii) copying of UNIX SMP 4.2 System V
initialization (SYS V init) code in Linux version 2.6; (iv) substantial similarity in the user level
synchronization (ULS) routines in Linux and similar routines in UNIX; (v) copying of SCO's
UNIX System V IPC code in Linux 2.4.20; and (vi) copying of SCO's copyrighted UNIX
"header and interfaces" in Linux.  Gupta Aff. ¶¶ 3-86.  Another example of the results of SCO's
comparison of source code is the copying of the journaled file system (JFS) module in IBM's
successive later versions of AIX in Linux version 2.6.  Id.  IBM has not produced the early
versions of AIX, so that SCO cannot (yet) establish how the JFS in Linux version 2.6 derives
from the JFS in UNIX.  Harrop Decl. ¶¶ 88-90.  The foregoing evidence demonstrates copying
from UNIX into Linux – and is probative even if SCO is not seeking to assert copyright in the
foregoing material.  See Gates, 9 F.3d at 833 n.7.

 In addition, SCO has not retained a testifying expert on copyright issues, including the
foregoing, because SCO has filed only a relatively narrow copyright claim in this action and did so
only in February 2004.  Such an expert would testify to the relative importance of the foregoing
materials in Linux to the operation of that operating system.  Harrop Decl. ¶ 72.  The case law
demonstrates that resolution of the issue of substantial similarity on summary judgment in this case
without consideration of such expert testimony would be improper.  See Part II.B.1 above.

 The foregoing examples are themselves sufficient to create genuine issues of material fact
precluding summary judgment on IBM's Tenth Counterclaim.  In addition, they demonstrate that

SCO reasonably expects that further comparison of source code will further create additional genuine issues of material fact.

<em>Depositions of Contributors to Linux</em>

The depositions of contributors to Linux would permit SCO to discover facts essential to oppose IBM's Tenth Counterclaim, and to do so in a way that substantially reduces the extremely time-consuming direct comparisons of source code that would otherwise be required. Sontag Decl. ¶¶ 24-26, 46-54, 59, 73-75. SCO reasonably expects that it will discover through such depositions facts essential to oppose IBM's motion for summary judgment. In addition to the statements quoted above by others familiar with Linux, Sam Palmisano, then senior vice president of IBM and now its Chief Executive Officer, has acknowledged Linux to be "a community developed version of UNIX." <u>I.B.M. to Use Linux In Software For Internet</u>, N.Y. Times, Jan. 10, 2000 (Exh. 48). SCO reasonably expects that the depositions of individuals who (like IBM) acknowledge at the outset that they have participated in the development of a "version of UNIX" are likely to provide testimony that would demonstrate (for example) that as a derivative of UNIX, Linux violates one or more SCO copyrights.

The Linux kernel, for example, uses a ULS routine to block and unblock access to shared data. The Linux ULS routine is substantially similar to a ULS routine in UNIX. A Mr. Russel of IBM helped a Mr. Jamie Lokier contribute the UNIX ULS code into Linux. If SCO had access to IBM's CMVC, then SCO might have discovered that Mr. Russel worked on ULS for IBM, and could have deposed Mr. Russel to determine what specific help he provided in the contribution of ULS to Linux and to whom he provided that help. Using the CMVC, and by deposing individuals such as Mr. Russel of IBM, SCO can significantly reduce the burden of

86

reviewing Linux and UNIX code.  Mr. Russel and other programmers can identify areas of Linux

code that are copies of or are derived from AIX and Dynix code.  Mr. Russel and other

programmers can also identify contributors to the Linux code and can show the necessary access

to AIX and Dynix that these contributors had.  Sontag Decl. ¶¶ 24-28.

*Depositions of Persons with Access to UNIX, AIX and/or Dynix*

The depositions of persons and entities that had access to UNIX, AIX and/or Dynix

would permit SCO the opportunity to discover facts essential to oppose IBM's Tenth

Counterclaim.  As an initial matter, if SCO presents substantial evidence of IBM's access to SCO's

copyrighted material, SCO faces a reduced burden to produce evidence of copying in order to

create a genuine issue of material fact.  See Gates, 9 F.3d at 833 n.7.  On that basis alone, SCO's

ability to prove IBM's full access to the UNIX source code is a basis for denying IBM's motion.

Without such depositions, moreover, SCO will have no opportunity to discover (for example) IBM

admissions of copying and distribution, which would be directly relevant to the Tenth

Counterclaim.[42]  SCO reasonably expects that such depositions will enable SCO to overcome the

otherwise substantial time restrictions that inhere in comparison of source code, and that SCO will

---

[42] See, e.g., Adobe Sys. Inc. v. One Stop Micro, Inc., 84 F. Supp. 2d 1086, 1093 (N.D. Cal. 2000) (evidence supporting summary judgment for plaintiff included defendant's admissions of distribution of copyrighted material); Dynamic Microprocessor Assocs., Inc. v. EKD Computer Sales & Supplies Corp., No. 92-CV-2787 (FB), 1997 WL 231496, at *15 (E.D.N.Y. Apr. 14, 1997) (Exh. 72) (evidence supporting summary judgment for plaintiff included defendant's acknowledgement of plaintiff's copyright and admission of distribution of copyrighted material); In re Independent Serv. Orgs. Antitrust Litig., 910 F. Supp. 1537, 1540 (D. Kan. 1995) (evidence supporting preliminary injunction included defendant's deposition admissions that they were copying plaintiff's copyrighted materials); Peer Int'l Corp. v. Luna Records, Inc., 887 F. Supp. 560, 566 (S.D.N.Y. 1995) (evidence supporting summary judgment for plaintiff included defendant's admissions that it continued to distribute plaintiff's copyrighted material without a license); Zeon Music v. Stars Inn Lounge, Ltd., No. 92 C 7607, 1994 WL 163636, at (N.D. Ill. Apr. 28, 1994) (Exh. 86) (evidence supporting summary judgment for plaintiff included deposition admissions of the distribution of plaintiff's copyrighted material).

discover through such discovery facts essential to oppose IBM's motion for summary judgment. Harrop Decl. ¶¶ 46-57, 59, 73-75.

The Sequent License Agreement Also Creates Genuine Issues of Fact on the Issue of Copyright. If the Tenth Counterclaim remains in the case, SCO's License Agreement with Sequent creates an additional fact issue precluding summary judgment, because the agreement is ambiguous as to whether SCO holds copyright to Dynix.

Under its choice-of-law provision, New York law governs the construction and interpretation of the Sequent License Agreement. When a contract is ambiguous, such that "the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." Manchester Techs., Inc. v. Didata Inc., 757 N.Y.S.2d 439, 444 (N.Y. App. Div. 2003) (internal quotations and citation omitted). The relevant provisions of the Sequent License Agreement are:

> -- Section 2.01, which gives Sequent the right to prepare derivative works based on System V code, "provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT."

> -- Sections 6.02 and 6.03, which require Sequent to either return or destroy "all copies of SOFTWARE PRODUCTS subject to this agreement" once Sequent's license is terminated (and regardless of whether SCO or Sequent terminates the license).

> -- Section 7.06, which requires Sequent to protect the confidentiality of "all parts of the SOFTWARE PRODUCTS subject to this Agreement" and prevents Sequent from disclosing any part (or the entirety) of such products to anyone other than Sequent employees when such disclosure is necessary.

The Agreement thus provides that any derivative work based on System V code is to be treated as a part of System V under the Agreement. In addition, pursuant to a reasonable reading of Sections 6.02, 6.03 and 7.06, SCO holds copyright in Dynix.

The relevant facts in <u>Liu v. Price Waterhouse LLP</u>, 302 F.3d 749 (7th Cir. 2002), demonstrate why summary judgment for IBM is inappropriate. Price Waterhouse agreed to provide Xioamei Yang with access to the copyrighted source code for its computer program ("RevUp32") so that Yang could develop a faster version. The parties contracted via a Letter Agreement which stated, in pertinent part:

> It is clearly understood that the source code is the sole property of Price Waterhouse and Price Waterhouse gives no authority, implied or otherwise, to distribute or copy this source code in any way. Upon completion of the project, ALL source code will be given back to Price Waterhouse. <u>Id.</u> at 752.

Price Waterhouse then disclosed its "RevUp32" source code to Yang, who in turn disclosed it to programmers to do the work. Yang and her programmers completed their work and sent the object code of the derivative program, "China RevUp32," to Price Waterhouse. Yang refused, however, to return the source code of the derivative program. <u>Id.</u> Yang assigned the copyrights to her daughter, Xu Liu, and registered them in Liu's name. Both parties alleged copyright infringement. The jury found for Price Waterhouse. The case came before the Seventh Circuit on appeal from a motion for judgment as a matter of law. <u>See id.</u> at 753-54.

The Seventh Circuit reasoned that Price Waterhouse, as the holder of the copyright in the original work, had the exclusive right to prepare derivative works therefrom. <u>See id.</u>; 17 U.S.C. § 106. The Court explained that under the copyright laws the parties to a license agreement may provide that the licensee does not obtain copyright protection in the derivative work. <u>See id.</u> The issue was whether the Letter Agreement granted copyright in the derivative program to the licensor (the holder of the copyright in the original program) or the licensee (the author of the derivative work). The court focused on the portion of the Agreement stating: "Upon completion of the project ALL source code will be given back to Price Waterhouse." The court held that this

language was ambiguous as to which party obtained copyright protection in the derivative work, making the interpretation of the agreement a question of fact for the jury. See id. at 755. The court affirmed the verdict holding that Price Waterhouse, the licensor, held those rights. See id.

Liu demonstrates that contractual language requiring the return of all the source code of a derivative program is a sufficient basis for a jury to infer that the contract grants the full copyright in the derivative work to the owner of the original work. The Sequent License Agreement is identical, in all material respects, to the Agreement in Liu. As in Liu, once IBM's use of System V is terminated, Sequent must return or destroy all copies of "SOFTWARE PRODUCTS" (i.e. original System V and derivative Dynix) that it possesses. The Sequent License Agreement also states that no "SOFTWARE PRODUCTS" (defined, again, as original System V and derivative Dynix) are to be copied or disclosed to anyone in any way that is not authorized under the Agreement.

The Sequent License Agreement is ambiguous on the question of whether SCO holds the copyright in any version of Dynix that is a derivative work based on UNIX System V code. The question of whether SCO holds copyright rights to Dynix would be for the jury.

## CONCLUSION

SCO respectfully submits, for the reasons set forth above, that the Court should deny IBM's Motion for Summary Judgment on its Tenth Counterclaim.

## CONCLUSION

SCO respectfully submits, for the reasons set forth above, that the Court should deny IBM's

Motion for Summary Judgment on its Tenth Counterclaim.

DATED this 8th day of July, 2004.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver, Esq. (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)

Counsel for Plaintiff/Counterclaim-Defendant

Frederick S. Frei (admitted pro hac vice)
Aldo Noto (admitted pro hac vice)
John K. Harrop (admitted pro hac vice)
ANDREWS KURTH LLP
1701 Pennsylvania Avenue, Ste. 300
Washington, DC 20006
Telephone: (202) 662-2700
Facsimile: (202) 662-2739

Of Counsel

# ADDENDUM

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
| --- | --- |
| IBM ¶ 1 – "Linux is an operating system that stems from a rich history of collaborative development." | SCO ¶¶ 8-14 |
| IBM ¶ 2 – "The development of Linux began when an undergraduate student at the University of Helsinki, by the name of Linus Torvalds, set out to create a new, free operating system." | SCO ¶¶ 9-10 |
| IBM ¶ 3 – "With the internet providing for a distributed collaboration, other programmers joined to create code making up the kernel." | SCO ¶¶ 10-12 |
| IBM ¶ 16 – "On March 6, 2003, SCO sued IBM for allegedly "dumping" into Linux certain unspecified code from the UNIX software it allegedly acquired from Santa Cruz." | SCO ¶¶ 15-24 |
| IBM ¶ 17 – "Although its initial complaints against IBM did not include a claim for copyright infringement, SCO repeatedly accused IBM and others publicly of infringing SCO's copyrights, and threatened imminent litigation concerning IBM's Linux activities." | SCO Footnote 11 |
| IBM ¶ 19 – "SCO alleges both direct and contributory infringement of its copyrights, stating that IBM has 'infringed, [has] induced infringement of, and [has] contributed to the infringement of, | SCO ¶¶ 25-35 |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| copyright registrations of SCO and its predecessors.' According to SCO, 'a significant amount of UNIX protected code and materials are currently found in Linux 2.4.x, 2.5.x, and 2.6.x releases in violation of SCO's contractual rights and copyrights.' IBM is responsible, says SCO, for 'incorporating (and inducing, encouraging, and enabling others to incorporate) SCO's proprietary software into Linux open source software offerings'." | |
| IBM ¶ 20 – "With respect to contributory infringement, SCO further asserts, for example, that 'IBM has knowingly induced, encouraged, and enabled others to distribute [SCO's] proprietary information' through the 'coordination of the development of enterprise Linux, and misappropriation of UNIX to accomplish that objective'." | SCO ¶¶ 25-35 |
| IBM ¶ 21 – "Moreover, SCO recently filed suit against AutoZone, Inc., alleging that the use of Linux infringes copyrights SCO purports to hold to the UNIX software. SCO asserts that 'Linux has been transformed from a non-commercial operating system into a powerful general enterprise operating system'. SCO further claims that 'parts or all of [SCO's] Copyrighted Material has been copied or otherwise improperly used as the basis for creation of derivative work software code, included [in] one or more Linux implementations, including Linux versions 2.4 and 2.6, without the permission of SCO'. According to SCO, IBM is at least | SCO ¶ 35 |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| partially responsible for AutoZone's allegedly infringing conduct." | |
| IBM ¶ 22 – "In response to SCO's threats of copyright infringement, IBM asserted counterclaims against SCO on August 6, 2003…" | SCO ¶¶ 36-37 |
| IBM ¶ 23 – "There is an actual controversy with respect to this claim, as evidenced, for example, by the fact that SCO moved to dismiss IBM's claim for a declaration of non-infringement regarding IBM's Linux activities, but did not challenge the Court's subject matter jurisdiction over this claim." | SCO Footnote 1 [improper legal argument]; ¶¶ 30-35 |
| IBM ¶ 24 – "Further, there is also an actual controversy here based on SCO's campaign against Linux, including its threats against Linux users, such as IBM (illustrated above).<br><br>"Following SCO's attempt to dismiss the Red Hat case, which SCO represented to the Delaware Court included the same issues as in this case, the court ruled there was an actual controversy as to Red Hat's claim for a declaration of non-infringement, but stayed the case pending resolution of the claims in this case." | SCO Footnote 1 [improper legal argument]<br><br>SCO Footnote 1 [improper legal argument] |
| IBM ¶ 25 – "From the beginning of this litigation SCO has touted its claims and the strength of its alleged evidence." | SCO Footnote 1 [improper legal argument]; Footnote 11 |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
| --- | --- |
| IBM ¶ 28 – "At the same time, SCO has consistently refused to disclose the particulars of its claims and alleged evidence." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-65 |
| "For instance, SCO commenced this case claiming that it was about IBM's dumping source code from the UNIX software into Linux." | SCO ¶¶ 15-24 |
| "To date, SCO has not identified a single line of UNIX source code that IBM is alleged to have dumped into Linux." | SCO Footnote 1 [improper legal argument]; ¶¶ 57, 61-62 |
| "In fact, SCO now claims that its case against IBM is not about IBM's alleged misuse of code from the UNIX software, but rather about IBM's use of code written entirely by IBM or other third parties." | SCO Footnote 1 [improper legal argument]; ¶¶ 15-35 |
| IBM ¶ 29 – "As SCO representatives have stated, it has been the company's strategy to obfuscate its alleged evidence." | SCO Footnote 1 [improper legal argument]; ¶¶ 63-65 |
| "For example, SCO's counsel indicated in an interview with Maureen O'Gara of LinuxGram in March 2003, at the beginning of the case, that SCO 'doesn't want IBM to know what they [SCO's substantive claims] are'." | SCO Footnote 1 [improper legal argument]; ¶ 65 |
| "Further, SCO Vice President Gregory Blepp stated in a published interview in April 2004 that 'you don't put everything on the table at the state, but instead you bring out arguments and evidence piece by piece'." | SCO Footnote 1 [improper legal argument]; ¶ 47 |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| IBM ¶ 30 – "Following SCO's refusal to disclose the nature of its claims or its alleged evidence...." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-65 |
| IBM ¶ 33 – "Instead of providing the information requested, SCO merely offered a single sentence explanation and incorporated by reference SCO's response to IBM's Interrogatory Nos. 1, 2 and 4." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-49 |
| "Neither SCO's response to Interrogatory Nos. 1, 2 and 4, which precipitated IBM's first motion to compel (which was granted by Magistrate Judge Wells), nor its single sentence explanation, provided IBM with the information requested." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-49 |
| "SCO refused to identify with any degree of specificity the material in Linux in which it supposedly has rights or the nature of those rights, and to detail SCO's claims of copyright infringement." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-47, 49, 59-62 |
| IBM ¶ 34 – "IBM filed a second motion to compel, seeking a meaningful response to Interrogatory Nos. 12 and 13, on November 3, 2003." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-62 |
| IBM ¶ 35 – "Despite its prior refusal to provide this information, counsel for SCO stated at the oral argument on IBM's motions that SCO would provide the information requested." | SCO Footnote 1 [improper legal argument] |
| IBM ¶ 36 – "In a submission dated January 12, 2004, SCO certified to the Court that 'SCO has responded fully and in detail to | SCO Footnote 1 [improper legal argument]; ¶ 56; Brief at 46-47 |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| Interrogatories 1-9, 12 and 13'." | |
| IBM ¶ 37 – "Notwithstanding SCO's certification and the Court's order, however, SCO did not provide meaningful responses to the interrogatories." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-62 |
| "In response to the Court's order, SCO listed certain materials in Linux to which SCO claims to have rights, but SCO failed to identify all of the materials with the requisite particularity." | SCO Footnote 1 [improper legal argument]; ¶¶ 45-62; Brief at 44-50, 72-74 |
| "SCO failed, for example, to identify most of the lines of code in Linux allegedly contributed by Silicon Graphics, Inc. ("SGI") to which SCO claims rights; it merely identified files." | SCO Footnote 1 [improper legal argument]; Brief at 49-50 |
| "More importantly, SCO failed to show how, if at all, the listed materials derive from the UNIX software and made no attempt to describe (let alone detail) how IBM's Linux activities infringe SCO's alleged copyrights related to the UNIX software." | SCO Footnote 1 [improper legal argument]; ¶¶ 25-44, 59, 62; Brief at 48-50 |
| IBM ¶ 38 – "Again after trying unsuccessfully to persuade SCO to provide the information requested, IBM advised the Court that SCO had failed to comply with IBM's requests and the Court's order." | SCO Footnote 1 [improper legal argument]; Brief Part I.A |
| IBM ¶ 39 – "The Court again ordered SCO to provide meaningful responses to IBM's interrogatories, this time on or before April 19, 2004." | SCO Footnote 1 [improper legal argument]; ¶ 57; Brief Part I.A |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| IBM ¶ 40 – "In response to the second order, SCO again certified that it fully complied with the Court's order. SCO stated that 'the answers given and materials produced in response to the Order are given to the best of SCO's knowledge and are complete, detailed and thorough'." | SCO Footnote 1 [improper legal argument]; ¶¶ 46-47, 56, 61 |
| IBM ¶ 41 – "However, notwithstanding its certification, SCO again failed to comply with the Court's order."<br><br>"While SCO has identified more materials in Linux to which it claims rights (albeit without the particularity ordered by the Court and without an adequate explanation as to why it did not provide all of these materials in response to the Court's first order), SCO has still not detailed the nature of its alleged rights or described in detail how IBM is alleged to have infringed SCO's rights." | SCO Footnote 1 [improper legal argument]; ¶¶ 56, 58-62; Brief Part I.A<br><br>SCO Footnote 1 [improper legal argument]; ¶¶ 4-7, 25-44, 56; Brief Part II.B.2 |
| IBM ¶ 42 – "While SCO has widely claimed that IBM's Linux activities infringe SCO's alleged copyrights relating to the UNIX software, SCO cannot substantiate its claims." | SCO Footnote 1 [improper legal argument]; ¶¶ 25-35, 37-62 |
| IBM ¶ 43 – "With respect to the materials to which SCO claims rights, it fails to identify all of it with the particularity ordered by the Court."<br><br>"SCO identifies four general categories of code in Linux to which it claims rights: (1) material allegedly contributed to Linux by | SCO Footnote 1 [improper legal argument]; ¶¶ 45-62; Brief Part I.A<br><br><br>Brief at 88-90 |

7

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| IBM from its AIX and Dynix operating systems programs; (2) certain so-called Application Binary Interface ("ABI") files; (3) code allegedly contributed to Linux by SGI; and (4) an assortment of code identified for the first time in an April 19, 2004 supplement to SCO's discovery responses."<br><br>"SCO declines to identify the lines of code to which it claims rights with respect to some part of the code in the first category and virtually all of the code in the third category." | <br><br><br><br><br><br><br><br><br>SCO Footnote 1 [improper legal argument]; Brief Part I.A |
| IBM ¶ 44 – "Moreover, SCO does not particularize the nature of its alleged rights to this code."<br><br>"For example, SCO makes no meaningful attempt to detail how, if at all, the materials derive from the UNIX software, despite the fact that the oral argument on IBM's motions to compel focused specifically on this issue."<br><br>"SCO was ordered to match up the lines of Linux code to which it claims rights to the specific lines of the UNIX software code from which the Linux code is alleged to derive."<br><br>"Yet, in plain derogation of the Court's order, SCO states merely that 'the entirety of UNIX System V licensed to IBM and Sequent are the lines from which IBM's contributions [to Linux] of AIX and Dynix/pts are derived'." | SCO Footnote 1 [improper legal argument]; ¶¶ 4-7, 15-35; Brief Part II.B.2<br><br>SCO Footnote 1 [improper legal argument]; ¶¶ 45-62; Brief Part I.A<br><br><br><br>SCO ¶¶ 57-58.<br><br><br><br>SCO Footnote 1 [improper legal argument]; ¶¶ 59-62; Brief Part I.A. |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| IBM ¶ 45 - "In only one instance does SCO identify code in Linux to which it claims rights, and the corresponding code in the UNIX software from which the Linux code was allegedly derived." | SCO ¶ 21; Footnote 20 |
| "This Linux code, which comprises about 160 lines of code altogether, was allegedly contributed by SGI (not IBM), and is no longer present in Linux. SCO does not specify, however, whether and how IBM (or any others) infringe any of its purported rights, including its alleged copyrights, with respect to this code." | SCO Footnote 1 [improper legal argument]; Footnote 20; Brief at 49-50 |
| IBM ¶ 46 – "As a consequence, SCO does not show (and cannot show) that IBM's Linux activities infringe SCO's alleged copyrights." | SCO Footnote 1 [improper legal argument and no cite to record]; ¶¶ 25-44; Brief at 56-60 |
| IBM ¶ 47 - "In its responses to IBM's discovery requests and the Court's orders, SCO fails to identify with specificity a single copyright IBM is alleged to have infringed, let alone show that the copyrights are valid." | SCO Footnote 1 [improper legal argument]; ¶¶ 6-7, 25 |
| "Similarly, although it is undisputed that IBM copies and makes Linux available to customers, SCO fails to demonstrate (or even undertake to demonstrate) how IBM's Linux activities (indeed, any of IBM's activities) exercise one or more of the exclusive rights of SCO's alleged copyrights relating to the UNIX software." | SCO Footnote 1 [improper legal argument]; ¶¶ 25-62; Brief at 56-90 |
| IBM ¶ 48 – "To establish that IBM's Linux activities infringe SCO's alleged | SCO Footnote 1 [improper legal argument and no citation to record]; ¶¶ 25-62; Brief |

| Statements Disputed By SCO From IBM's Statement of Undisputed Facts | Facts Disputed In SCO's Statement of Disputed Facts |
|---|---|
| copyrights, SCO is required to establish that the material in Linux to which SCO claims rights—which all Linux users copy and distribute (at least in part)—is covered by SCO's alleged copyrights.  That SCO has not done and cannot do." | at 56-90 |

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, hereby certifies that a true and correct copy of

**MEMORANDUM IN OPPOSITION TO DEFENDANT INTERNATIONAL BUSINESS**

**MACHINES' MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS TENTH**

**COUNTERCLAIM FOR DECLARATORY JUDGMENT ON NON-INFRINGEMENT**

**AND IN SUPPORT OF ITS RULE 56(f) MOTION** was served on Defendant International

Business Machines Corporation on the 9th day of July, 2004, as follows:

BY HAND DELIVERY:

Alan L. Sullivan, Esq.
Todd M. Shaughnessy, Esq.
Snell & Wilmer L.L.P.
15 West South Temple, Ste. 1200
Salt Lake City, Utah 84101-1004

Evan R. Chesler, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York 10604

# 2: 03-cv-294-DAK

# SCO

# vs.

# IBM

**Exhibits to document number 206 (Exhibit Vols 1-4) are oversized and have been placed in an expandable folder on the shelf.  SEALED Exhibits (Exhibit Vol 5) are placed in the sealed room.**

**DOCUMENT DESCRIPTION: Exhibits to Memo in Opposition [206-1]**

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.