Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff*

FILED
2004 SEP -8  P 6:31

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, <br><br> Plaintiff, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant. | Case No. 2:03CV0294DAK <br><br> Hon. Dale A. Kimball <br> Magistrate Judge Brooke C. Wells <br><br><br> DECLARATION OF <br> MARTIN PFEFFER |

278

I, Martin Pfeffer, declare as follows:

1. I submit this Declaration in connection with *The SCO Group v. International Business Machines Corporation*, No. 2:03CV0294DAK (D. Utah 2003).

## I. EDUCATION AND WORK HISTORY

2. I received a bachelor's degree in Electrical Engineering from City College of the City University of New York in 1957 and an L.L.B. degree from New York University in 1961. I was admitted to practice law in New York in 1962. My specialty is intellectual property law, and I am registered to practice before the United States Patent and Trademark Office.

3. I was employed as an attorney in the legal department of AT&T or one of its subsidiary companies (including Western Electric) from 1962 until 1993. I worked in company offices located in New York, New Jersey, and Illinois. During my tenure, I held several positions in which I was responsible for drafting, and supervising the drafting of, patent applications and contracts to protect the company's intellectual property and other proprietary rights as well as for handling, and supervising the handling of, other efforts to enforce those rights.

4.  In the 1980s, I was General Attorney for AT&T and provided legal consulting for AT&T's UNIX System Laboratories, Inc. ("USL"). Together with Burt Levine (another attorney employed in AT&T's legal department), I participated in, supervised, and approved the legal department's drafting of the terms of the written license agreements (and any modifications thereto), whereby AT&T and USL licensed UNIX computer operating system source code and related proprietary materials. I had the primary responsibility for such matters.

## II.  LICENSING OF UNIX

5.  AT&T and USL used their license agreements to protect their intellectual property and other proprietary rights in UNIX. In 1985, during my tenure as General Attorney for AT&T, AT&T entered into written license and sublicense agreements with, among others, IBM and Sequent Computer Systems, Inc. ("Sequent") relating to the UNIX System V version of UNIX. Although not every single such license agreement was identical, they generally contained substantially similar terms and reflected the same intent, especially insofar as those agreements concerned protections for the licensor's intellectual property and other proprietary rights in UNIX.

2

6. Section 2.01 of AT&T's standard license agreement stated:

"AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE'S own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT."

Based on my personal knowledge and professional experience at AT&T and USL (including my extensive involvement in reading, drafting, approving, and enforcing such license agreements as well as my communications with AT&T and USL employees and licensees), I know that this language set forth the parties' intent and agreement that the "SOFTWARE PRODUCT" licensed and protected under the terms of the license agreements included the full content of all of the "resulting materials" created over time from the licensees' exercise of their contractual "right to modify" and "to prepare derivative works" based on the original licensed material, including the UNIX source code and all of the proprietary information reflected or embodied therein.

Accordingly, under Section 2.01, if a licensee created a modification or derivative work based on the original licensed product, then the agreement treated the "resulting" work as if it had been part of the original SOFTWARE PRODUCT, and any further modifications or derivatives of that "resulting" work would be treated in the same manner.

3

7. In 1985, AT&T added language to its software license agreements to address inquiries from certain of its licensees concerning the ownership of modifications and derivative works. Later that year, the following language was added to AT&T's standard license agreement: "AT&T-IS claims no ownership interest in any portion of such a modification or derivative work that is not part of a SOFTWARE PRODUCT." Based on my personal knowledge and professional experience at AT&T and USL (including my extensive experience in this area as described above), I know that this language set forth the parties' intent and agreement concerning only the ownership of modifications or derivative works, and that this language was not intended to change, and did not in fact change, AT&T's right to control (for example, the use and disclosure) of such modifications and/or derivative works, as set forth in Section 2.01 and other provisions of the software license agreements. Indeed, during my tenure at AT&T and USL, I specifically discussed and agreed with certain licensees that AT&T and USL would not acquire ownership over material that a licensee independently created merely because the licensee included that material in a "SOFTWARE PRODUCT," but I do not recall

4

any such instances in which AT&T or USL changed or agreed to change the contractual limitations on use and disclosure that were set forth in the UNIX license agreement.

8. AT&T license agreements contained a confidentiality provision that required the licensee to hold the "SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T." Based on my personal knowledge and professional experience at AT&T and USL (including my extensive experience in this area as described above), I know that this language set forth the parties' intent and agreement that the "SOFTWARE PRODUCTS" covered by the license agreements (and, pursuant to Section 2.01, any modifications or derivative works "based on such SOFTWARE PRODUCT") would be subject to the restrictions set forth in AT&T's confidentiality provision, regardless of the licensee's ownership interest in any part of such "SOFTWARE PRODUCTS."

9. The confidentiality provision of AT&T's standard license agreement further provided that the licensee "shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted

5

hereunder." Based on my personal knowledge and professional experience at AT&T and USL (including my extensive experience in this area as described above), I know that this language was specifically designed to cast the widest possible net in order to ensure protection for AT&T's proprietary information, beyond the common law protections that would otherwise have been available (absent the agreement) for AT&T's trade secrets and "know-how."

10. Accordingly, as explained above, it was AT&T's intent to prevent through its UNIX license agreements the unauthorized use and disclosure of more than just literally copied UNIX source code. AT&T intended to protect, and through its standard license agreements expressly protected, its UNIX business by preventing anyone from using AT&T's proprietary material in UNIX (including by literally or non-literally copying UNIX source code, disclosing methods or concepts from UNIX, and/or exploiting licensees' access to the technology in UNIX) without paying UNIX license fees to AT&T. AT&T effected this protection through its license agreements by, among other things, requiring licensees to treat all materials resulting from any exercise of their "right to modify" and "to prepare derivative works" as if such materials had been "part of the original SOFTWARE PRODUCT"; by specifically requiring licensees to hold

6

AT&T's "SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T"; and by strictly controlling the disclosure of "any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein)."

11. I do not recall any instance during my tenure in which either AT&T or USL agreed (in any license agreement or supplement or modification thereof) to reduce its protection under a UNIX license to prevent the unauthorized use or disclosure of only source code. Any such change would have been a significant and material change to the standard terms of AT&T's license agreement and, in 1985, clearly would have required my, or to a lesser extent Burt Levine's, approval. I do not recall any such proposed or actual modification to the standard license agreement.

12. AT&T's license agreement contained a clause stating that:

"This Agreement and its Supplements set forth the entire agreement and understanding between the parties as to the subject matter hereof and merge all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. No provision appearing on any form originated by LICENSEE shall be applicable unless such provision is expressly accepted in writing by an authorized representative of AT&T."

7

Based on my personal knowledge and professional experience at AT&T and USL (including my extensive experience in this area as described above), I know that this language set forth the parties' intent and agreement that only the terms of each licensee's written agreements with AT&T would govern those parties' contractual obligations. In other words, any agreements (including any side letter agreements) that AT&T entered into with one of its UNIX licensees would have no legal effect on the contractual obligations of AT&T vis-à-vis any of its other UNIX licensees.

13. I have previously executed another Declaration in this same matter, which I provided only to counsel for IBM.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: Sept. 7, 2004

New York, New York

Martin Pfeffer

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing DECLARATION OF MARTIN PFEFFER to be hand-delivered this 8 day of September, 2004, to the following:

> Alan L. Sullivan, Esq.
> Todd M. Shaughnessy, Esq.
> Snell & Wilmer L.L.P.
> 15 West South Temple, Ste. 1200
> Gateway Tower West
> Salt Lake City, Utah 84101-1004

mailed by U.S. Mail, first class postage prepaid, to the following:

> Evan R. Chesler, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, NY 10019
>
> Donald J. Rosenberg, Esq.
> 1133 Westchester Avenue
> White Plains, New York 10604

*/s/ Mark F. James*