RECEIVED CLERK

2004 NOV 31 I A 12: 01

U.S. DISTRICT COURT
DISTRICT OF UTAH

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

NOV 3 0 2004

MARKUS B. ZIMMER, CLERK
BY _____
          DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP,<br><br>   Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>   Defendant/Counterclaim-Plaintiff | **SCO'S MEMORANDUM IN OPPOSITION TO IBM'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS COUNTERCLAIM FOR COPYRIGHT INFRINGEMENT (EIGHTH COUNTERCLAIM)**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

342

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

SCO'S RESPONSE TO IBM'S "STATEMENT OF UNDISPUTED FACTS"............................3

ARGUMENT ...........................................................................................................11

I.    THE GPL AUTHORIZED SCO TO DISTRIBUTE LINUX, INCLUDING ANY
CONTRIBUTIONS MADE BY IBM OF COPYRIGHTED MATERIAL ..................12

II.    SCO DID NOT REPUDIATE OR BREACH THE GPL .................................13

    A.    SCO Did Not "Repudiate" the GPL.................................................13

    B.    SCO's Licensing Activities Did Not Violate the GPL .....................15

        1.    SCO Has Been Collecting Licensing Fees Only for Its
Own Code ...................................................................................15

        2.    SCO Has Otherwise Complied With the GPL......................17

    C.    IBM's Proposed Interpretation of the GPL Would Impermissibly
Interfere With Enforcement of Intellectual Property Rights and Would Raise
Serious Antitrust Concerns ..................................................................19

        1.    The GPL Should Not Be Read to Interfere With SCO's Right
To Enforce Its Own Intellectual Property Rights ...............19

        2.    The GPL Should Not Be Read to Allow a Competitor to Regulate
What May Be Charged for an Intellectual Property License ..............20

    D.    The GPL Provides No Basis for IBM to Retroactively Seek
Forfeiture of SCO's Right to Distribute GPL-Licensed Works.........................21

III.    IBM'S UNCLEAN HANDS PRECLUDE ITS MOTION ............................25

    A.    IBM's Misappropriation of UNIX Code.........................................26

    B.    IBM's Unauthorized Access Into SCO's Website............................27

CONCLUSION.......................................................................................................28

## **TABLE OF AUTHORITIES**

**Cases**                                                                  **Page(s)**

Allegro Corp. v. Only New Age Music, Inc., No. Civ. 01-790-HU
        2003 WL 23571745 (D. Or. Jan. 23, 2003) .............................................. 10, 11, 21

Amoco Oil Co. v. Premium Oil Co.,
        313 F. Supp. 2d 1233 (D. Utah 2004) ................................................................. 12

AOL, Inc. v. LCGM, Inc.,
        46 F. Supp 444 (E.D. Va. 1998) ...................................................................... 27

Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.,
        351 A.2d 349 (N.J. 1976)................................................................................... 24

Berger v. Computer Info. Pub'g Inc., No. 84 Civ. 0331 (JFK)
        1984 WL 595 (S.D.N.Y. July 2, 1984) ............................................................. 21

Board of Directors and Officers, Forbes Federal Credit Union v.
National Credit Union Administration,
        477 F.2d 777 (10th Cir. 1973) .......................................................................... 20

Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.,
        843 F.2d 600 (1st Cir. 1988)............................................................................. 19

Creative Computing v. GetLoaded.com LLC,
        386 F.3d 1314 (9th Cir. 2004) .......................................................................... 28

Dow Chemical Co.v. United States,
        226 F.3d 1334 (Fed. Cir. 2000)......................................................................... 13

Estate of Harris v. Harris,
        218 F.3d 1140 (10th Cir. 2000) ........................................................................ 15

First Nationwide Bank v. Florida Software Services, Inc. ,
        770 F.Supp. 1537 (M.D. Fla. 1991).................................................................. 16

Fleming v. Miles,
        181 F. Supp. 2d 1143 (D. Or. 2001) ................................................................. 27

Ford v. United States,
        273 U.S. 593 (1927).......................................................................................... 12

Foresight Res. Corp. v. Pfortmiller,
    719 F. Supp. 1006 (D. Kansas 1989) ...................................................................... 10

Fusion, Inc. v. Nebraska Aluminum Castings,
    962 F.Supp. 1392 (D. Kan. 1997) .......................................................................... 25

Galvin v. S. Hotel Corp.,
    154 F.2d 970 (4th Cir. 1946) ................................................................................. 22

Gates Rubber Co. v. Bando Chem. Indus. Ltd.,
    9 F.3d 823 (10th Cir. 1993) ................................................................................... 10

Gemveto Jewelry Co., Inc. v. Lambert Bros. Inc.,
    542 F. Supp. 933 (D.C.N.Y. 1982) ........................................................................ 27

Grady v. de Ville Motor Hotel, Inc.,
    415 F.2d 449 (10th Cir. 1969) ............................................................................... 19

Graham v. James,
    144 F.3d 229 (2d Cir. 1998) ........................................................................... 11, 21

Grundberg v. Upjohn Co.,
    140 F.R.D. 459 (D. Utah 1991) ....................................................................... 19, 26

Guthart v. White,
    263 F.3d 1099 (9th Cir. 2001) ............................................................................... 20

Hamilton Tailoring Co. v. Delta Air Lines, Inc.,
    1974 WL 21756 (S.D. Ohio 1974) ......................................................................... 23

Hasbro, Inc. v. Catalyst USA, Inc.,
    367 F.3d 689 (7th Cir. 2004) .......................................................................... 17, 22

Humphrey v. C.G. Jung Educ. Ctr. of Houston Tex.,
    714 F.2d 477 (5th Cir. 1983) ................................................................................. 22

I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys. Inc.,
    307 F.Supp. 521 (S.D.N.Y. 2004) ......................................................................... 27

In re Indep. Serv. Organization Antitrust Litig.,
    964 F. Supp. 1469 (D. Kan. 1997) ........................................................................ 10

Jacob Maxwell, Inc. v. Veeck,
    110 F.3d 749 (11th Cir. 1997) ............................................................................... 21

Jo-Ann, Inc. v. Alfin Fragrances, Inc.,
    731 F.Supp 149 (D.N..J. 1989) ................................................................ 23

Justine Realty Co. v. American Nat'l Can Co.,
    976 F.2d 385 (8th Cir. 1992) ................................................................ 19

Lantec Inc. v. Novell, Inc.,
    306 F.3d 1003 (10th Cir. 2002) ............................................................ 12

Lawser v. Poudre Sch. Dist.R-1,
    171 F.Supp 2d 1155 (D. Colo. 2001) ..................................................... 14

Lippo v. Mobil Oil Corp.,
    776 F.2d 706 (7th Cir. 1985) ................................................................ 22

Looney v. Farmers Home Admin.,
    749 F.2d 310 (7th Cir. 1986) ................................................................ 25

Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.,
    843 F.2d 600 (1st Cir. 1988) ................................................................ 21

MCA Television, Ltd., v. Public Interest Corp.,
    171 F.3d 126 (11th Cir. 1999) .............................................................. 21

Mendler v. Winterland Prod., Ltd.,
    207 F.3d 1119 (9th Cir. 2000) .............................................................. 16

Miller v. Glenn Miller Prods.,
    318 F. Supp. 2d 923 (C.D. Cal. 2004) ................................................... 16

N.L.R.B. v. Local 32B-32J Service Employees Intern. Union,
    353 F.3d 197 (2d Cir. 2003) ................................................................. 20

NYNEX Corp. v. Discon, Inc.,
    525 U.S. 128 (1998) ............................................................................ 20

Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.,
    324 U.S. 806 (1945) ............................................................................ 25

Queens Boulevard Wine & Liquor Corp. v. Blum,
    503 F.2d 202 (2d Cir. 1974) ................................................................. 25

Quinn v. City of Detroit,
    23 F.Supp 2d 741 (E.D. Mich. 1998) ..................................................... 23

Rano v. Sipa Press,
    987 F.2d 580 (9th Cir. 1993) .................................................................. 22

Rixon, Inc. v. Racal-Milgo, Inc.,
    551 F. Supp. 163 (D. Del. 1982).............................................................. 27

Russ Berrie & Co. v. Jerry Elsner Co.,
    482 F. Supp. 980 (S.D.N.Y. 1980) ......................................................... 27

RW Power Partners, L.P. v. Va. Elec. & Power Co.,
    899 F. Supp. 1490 (E.D. Va. 1995) ................................................... 22, 25

SAS Institute, Inc. v. S & H Computer Systems, Inc.,
    605 F. Supp. 816 (M.D. Tenn. 1985)...................................................... 16

San Huan New Materials High Tech. Inc. v. International Trade Comm'n,
    161 F.3d 1347 (Fed. Cir. 1998).............................................................. 19

Seneca-Cayuga Tribe of Oklahoma v. National Indian Gaming Com'n,
    327 F.3d 1019 (10th Cir. 2003) .............................................................. 12

Sony Corp. of Am. v. Universal City Studio, Inc.,
    464 U.S. 429 (1984)............................................................................... 21

Stenograph L.L.C. v. Bossard Assoc., Inc.,
    144 F.3d 96 (D.C. Cir. 1998)............................................................ 11, 21

Tempo Music, Inc. v. Myers,
    407 F.2d 503 (4th Cir. 1969) ............................................................ 25, 26

United States v. Alpine Land & Reservoir Co.,
    291 F.3d 1062 (9th Cir. 2002) ................................................................ 22

United States v. Socony-Vacuum Oil Co.,
    310 U.S. 150 (1940)............................................................................... 20

Worden & Co. v. Cal. Fig Syrup Co.,
    187 U.S. 516 (1903)............................................................................... 26

Worthington v. Anderson,
    386 F.3d 1314 (10th Cir. 2004) .............................................................. 26

**Rules and Codes**

Fed. R. Civ. P. 8(e)(2) ................................................................................................. 14

The Computer Fraud Abuse Act, 18 U.S.C. § 1030(a)(2)(C) ......................................... 27

UCC § 2-309(1) ........................................................................................................... 23

UCC § 2-309(3) ........................................................................................................... 23

**Other Authorities**

3 Nimmer on Copyright § 10.15[A] .............................................................................. 21

4 Nimmer on Copyright §13.09 (2004) ........................................................................ 27

4 Nimmer on Copyright §13.09 [B] ............................................................................... 26

5 M. Kniffin, Corbin on Contracts § 24.22 (Rev. ed. 1998) ................................... 17, 23

13 R. Lord, Williston on Contracts § 32.11 (4th ed. 2000) ............................................ 17

18 Am. Jur. 2d Copyright § 220 .................................................................................... 25

Restatement (2d) of Contracts § 227(1) ........................................................................ 17

Restatement (2d) of Contracts § 229 ............................................................................. 25

Restatement (2d) of Contracts § 241 (1981) .................................................................. 25

E. Allan Farnsworth, Contracts §§ 8.12 (2d ed. 1990) ................................................. 26

R. Epstein, Why Open Source Is Unsustainable, FT.com (Oct. 21, 2004) ...................... 17

D. Kennedy, A Primer on Open Source Licensing Legal Issues: Copyright,
Copyleft and Copyfuture, 20 St. Louis U. Pub. L. Rev. 345 (2001) .............................. 17

The SCO Group, Inc. ("SCO") respectfully submits this Memorandum in Opposition to IBM's Motion for Partial Summary Judgment on IBM's Counterclaim for Copyright Infringement (the Eighth Counterclaim).

## PRELIMINARY STATEMENT

IBM's Eighth Counterclaim and its motion for summary judgment on that counterclaim are thinly veiled attempts to try to retaliate against SCO for seeking to enforce its contractual and intellectual property rights with respect to UNIX.

IBM's motion puts at issue sixteen programs in Linux that IBM licensed for free use under the GNU General Public License and Lesser General Public License (collectively, the "GPL"). IBM thus made its allegedly copyrighted material freely available for SCO's (and others') copying and distribution. IBM concedes that the GPL would authorize SCO's use of the programs, but claims both that SCO has "repudiated" the GPL (and thus cannot invoke it) and that SCO breached the GPL (and thus immediately "forfeited" its authorization). IBM's arguments to limit the scope and applicability of that authorization fail on several grounds.

First, SCO has not "repudiated" (or "renounced") the GPL. There is no question that the GPL expressly authorized third parties, including SCO, to distribute IBM's allegedly copyrighted code. The argument IBM advances here, without citation to any authority, is that SCO has retroactively lost its authorization to copy the programs at issue by asserting certain affirmative defenses in this litigation. SCO's assertion of defenses regarding the enforceability of supposed GPL restrictions does not constitute a repudiation. SCO also states that "IBM's claims are barred by license" (that is, the GPL) and that SCO has acted "within the contractual

rights granted to it concerning software made freely available by IBM under the GPL." There is no basis in fact or law for the type of retroactive copyright liability that IBM seeks to impose.

Second, SCO has not "forfeited" (let alone immediately and without notice) its GPL copying rights by charging for its Intellectual Property License for Linux (the "UNIX License"), beginning in August 2003. IBM asserts that SCO has thereby "collected, and attempted to collect, royalties and licensing fees from Linux users in excess of the fees permitted by the GPL." IBM Mem. ¶ 66. But what IBM attacks are SCO's licenses for its UNIX rights and releases of potential claims for the infringement of those rights – not licenses of Linux. Neither the GPL nor any other agreement gives IBM the right to dictate how much or how little SCO may charge for the use of its own intellectual property, or for the release of claims.

In addition to the factually incorrect bases for its motion, moreover, IBM misapprehends the language and operation of the GPL. Even if the facts of SCO's conduct were different:

- Nothing in the GPL prohibits a licensee from imposing "further restrictions" on a third party's use of GPL-licensed material that the third party did not receive from that licensee. SCO has sold its license for UNIX software only to those who acquired a Linux operating system from someone other than SCO; and

- The GPL does not prohibit a licensee from collecting a royalty or licensing fee on verbatim (as opposed to modified) copies of GPL-licensed material.

Indeed, IBM proposes an interpretation of the GPL that would substantially interfere with licensees' enforcement of their intellectual property rights, and that would implicate the antitrust laws by allowing competitors to agree as to the respective nature and amount they may charge for distribution of Linux, let alone for licensing of their own intellectual property.

SCO has complied with the GPL as a matter of law and therefore is entitled to invoke those provisions of the license that plainly entitled SCO to copy and use IBM's programs as it

2

did.  The foregoing grounds themselves warrant denial of IBM's motion for summary judgment.

Moreover, as a matter of equity,  IBM comes to the Court with unclean hands:  IBM seeks to

enforce its alleged copyrights having itself misappropriated SCO's proprietary source code, and

having improperly hacked into SCO's website to obtain the very evidence that is the supposed

basis for IBM's motion.

### SCO'S RESPONSE TO IBM's "STATEMENT OF UNDISPUTED FACTS"

1.      SCO copied and distributed the Linux kernel and other related Linux software for

years prior to 2003, when SCO discovered that IBM and others had misappropriated SCO's

copyrighted UNIX code by contributing it to Linux without SCO's approval.  Promptly after this

discovery, SCO suspended all sales and marketing of its entire Linux product line.  Declaration

of Erik W. Hughes (11/30/04) ("Hughes Decl.") ¶ 3.

2.      In light of the legal issues arising from the misappropriation, SCO began offering

its Intellectual Property License for Linux (the "UNIX License") for sale beginning on August 5,

2003.  Hughes Decl. ¶ 6.  The UNIX License is a license of SCO's UNIX software, not a license

or sublicense of Linux or of any IBM-copyrighted work.  Declaration of Chris Sontag (11/30/04)

("Sontag Decl.") ¶ 30.  SCO has never attempted to license or sublicense Linux or any IBM

copyrighted work, or any other GPL-licensed code.  Id.  (SCO therefore disputes IBM Statement

of Undisputed Facts ("IBM St.") ¶ 66.)  None of the documents listed in paragraph 66 of IBM's

"Statement of Undisputed Facts" represents an attempt to collect royalties or licensing fees for

Linux or any IBM product:

3

a. SCO's May 2003 letters to Fortune 1000 companies (IBM Ex. 28) stated that SCO intended to protect and enforce its "UNIX intellectual property" and did not attempt to license Linux or any IBM work;

b. SCO's May 14, 2003 press release (IBM Ex. 29) warned that "SCO's own UNIX software code is being illegally copied into Linux" and did not attempt to license Linux or any IBM work;

c. SCO's July 21, 2003 press release (IBM Ex. 30) announced that SCO would soon be offering "UnixWare® licenses" for the specific purpose of resolving intellectual property issues arising from the unauthorized contributions of SCO's proprietary code into Linux, and nowhere in this release did SCO make any attempt to license Linux or any IBM work;

d. SCO's August 5, 2003 press release (IBM Ex. 31) announced the availability of the UNIX License, which permits "the use of SCO's intellectual property" in Linux distributions, and this release does not reflect any attempt by SCO to license Linux or any IBM work;

e. SCO's August 10, 2003 agreement with Computer Associates (IBM Ex. 32) granted a "license to use SCO UNIX rights" on a Linux operating system, and did not license Linux or any IBM work;

f. SCO's October 14, 2003 invoice to Leggett & Platt (IBM Ex. 33) for an "IP Compliance License" does not even mention Linux and did not license Linux or any IBM work;

g. SCO's December 19, 2003 agreement with Questar (IBM Ex. 34) granted a license to use "SCO IP rights," which were defined as SCO's UNIX rights and expressly excluded Linux, and did not license Linux or any IBM product;

h. SCO's December 22, 2003 press release (IBM Ex. 35) announced "new initiatives to enforce and protect the company's intellectual property rights," and this release does not reflect any attempt by SCO to license Linux or any IBM product;

i. SCO's December 19, 2003 template letter (IBM Ex. 36) restated SCO's belief that SCO's proprietary code had been illegally copied into Linux, and this release does not reflect any attempt by SCO to license Linux or any IBM product;

j. SCO's January 16, 2004 letter to Lehman Brothers Holdings (IBM Ex. 37) stated that legal action would be considered unless Lehman purchased a UNIX License, and this letter does not reflect any attempt by SCO to license Linux or any IBM product;

k. SCO's March 1, 2004 agreement with Everyones Internet (IBM Ex. 38) granted a license to use SCO's proprietary UNIX code, and did not grant a license for Linux or any IBM product;

l. SCO's March 3, 2004 suit against AutoZone (IBM Ex. 39) alleges infringement of SCO's UNIX copyrights and does not reflect any attempt by SCO to license Linux or any IBM product;

m. In August 2004, SCO contemplated raising the price of its UNIX License (as noted in IBM Ex. 40), and SCO did not attempt to license Linux or any IBM product;

n. SCO's SCOSource division sells the UNIX License (as indicated in IBM Ex. 41), and neither this division nor any other part of SCO has ever attempted to license Linux or any IBM product.

3.      SCO determined to offer its UNIX License, beginning in August 2003, only because IBM had misappropriated SCO's proprietary source code and contributed hundreds of thousands of lines of that code into Linux.  Hughes Decl. ¶ 6.

4.      All sixteen of IBM's allegedly copyrighted programs at issue in this motion were licensed to SCO under the GPL.  IBM Mem. at 12 ¶ 61.

5.      Under the GPL, a licensee may charge a fee for its distribution of GPL-licensed software.  GPL Preamble ¶¶ 2, 4; GPL ¶ 1.  Indeed, companies such as Red Hat and SuSe built businesses based on the sale and service of Linux-based software.  Red Hat's founder Robert Young, for example, has stated that "many people prefer to purchase Official Red Hat Linux in a box for $50 when they could download it for free or buy unofficial CD-ROM copies of Red Hat for as little as $2."  Robert Young Interview, http://www.press.umich.edu/jep/04-03/young.html.

6.      Section 1 of the GPL authorizes the general public to copy and distribute verbatim copies of the source code of the licensed program, subject to certain notice publication requirements.  GPL § 1.  SCO complied with all of these requirements in all of its Linux distributions.  Hughes Decl. ¶ 9.  IBM does not contend otherwise.

7.      Section 3 of the GPL authorizes the general public to copy and distribute verbatim copies of the licensed program in object code or executable form, subject to the condition that it be accompanied by the source code or by an offer to provide the source code.  GPL § 3.  SCO complied with these conditions in all of its Linux distributions.  Hughes Decl. ¶ 9.  IBM does not contend otherwise.

8.      Section 3 of the GPL does not prohibit a licensee from charging "royalty or licensing fees" on the licensed works.  Section 3 does not even mention fees or royalties at all. GPL § 3.  (SCO therefore denies IBM St. ¶ 65.)

9.      Section 2 states that, if a licensee <u>modifies</u> the licensed work, the <u>modified</u> <u>work</u> must be licensed at no charge.  GPL § 2.  IBM does not allege that SCO modified any of the sixteen subject works; IBM relies on SCO's <u>verbatim</u> copying of these works.  IBM Mem. at 6-12, 19; Declaration of Kathleen Bennett ("Bennett Decl.") ¶¶ 9, 11.  In fact, SCO never modified any of these works.  Sontag Decl. ¶ 31.  In contrast to section 2 (which authorizes the copying of modified works), section 1 (which authorizes verbatim copying) does not require no-charge licensing.

10.      In addition, even though the GPL would not have prohibited SCO from doing so, SCO has not sought to collect royalties or licensing fees for any of IBM's allegedly copyrighted works.  Hughes Decl. ¶ 9; Sontag Decl. ¶ 30.

11.      IBM has also claimed that, in violation of section 6 of the GPL, SCO has imposed "further restrictions" on a third party's use of licensed material.  However, section 6 refers exclusively to situations where the third party has received the GPL-licensed material from the licensee.  SCO has not attempted to sell the UNIX License to anyone who received a Linux distribution from SCO.  Hughes Decl. ¶ 8.  (SCO therefore disputes IBM St. ¶ 64.)

12.      The GPL says that a licensee's use of licensed material beyond the scope of the License will "automatically terminate" the licensee's rights under the License, but it does not say when such a termination becomes effective, and it provides no mechanism by which the licensee

7

is put on notice of an alleged unauthorized use of the licensed material.  GPL § 4.  (SCO therefore disputes IBM St. ¶ 63.)

13.     Fifteen of the sixteen alleged IBM programs at issue in this motion were included verbatim in SCO Linux Server 4.0.  The remaining one (the omni print driver) was included verbatim in the Asia CD of SCO Open Linux 3.1.1.  IBM Mem. at 5, 6-12, 19-20.  IBM alleges that SCO thereafter "forfeited" its GPL rights by attempting to sell the UNIX License, and that SCO infringed its copyrights by (1) distributing SCO Linux Server 4.0, IBM Mem. at 5 ¶ 26, and (2) making SCO Linux Server 4.0 and SCO Open Linux 3.1.1 available for public download via the internet.  Id. at 5-12 ¶¶ 27-60.

14.     SCO distributed SCO Linux Server 4.0 for only a few months, from November 19, 2002, until May 14, 2003.  Hughes Decl. ¶¶ 2-3.  A few months after determining that Linux was tainted with misappropriated SCO code, SCO suspended its sales of Linux products pending clarification of the intellectual property issues.  Hughes Decl. ¶ 3.  After May 14, 2003, SCO entered into no further obligations to sell SCO Linux Server 4.0 or any other Linux product.  Id. SCO made limited post-May 14 sales to customers in consideration of its obligations to its customers.  Id. ¶¶ 3-5; Sontag Decl. ¶¶ 12-14.  The last sale of Linux Server 4.0 was on May 31, 2004.  Hughes Decl. ¶ 4.  (SCO therefore disputes IBM St. ¶ 26.)  All of SCO's Linux distributions (both prior to and after May 2003) were made under the GPL, with no charge of any nature for royalties or licensing fees.  Hughes Decl. ¶ 9.

15.     In accordance with its obligations, SCO continued to provide its Linux customers with internet access to files containing Linux source code and enhancements thereto.  SCO stored these files on its computers, which its customers could access via the internet.  In

8

accordance with its agreement with the UnitedLinux consortium, SCO provided customers who purchased SCO Linux Server 4.0 with a password to enter at a log-in screen on SCO's download site so that only they would have access. Sontag Decl. ¶ 17-19. (Password protection was in place for three of the four URLs listed in the declaration of Kathleen Bennett that IBM submits in support of its motion; the remaining URL was for OpenLinux files and did not provide access to any files for SCO Linux Server 4.0. Id. ¶ 29.) The only way a non-customer could access the Linux Server 4.0 code was to bypass the password-protected security system by hacking into the system. Id. ¶¶ 20-21. In addition, the download site contained an explicit notice that access to the Linux Server 4.0 files was limited to SCO customers. Id. ¶ 28.

16.     Between October 31 and December 1, 2003, IBM repeatedly accessed the SCO log-in site but did not obtain access to the SCO Linux Server 4.0 files. Id. ¶ 25. After news of a bug in the SCO site's security system was reported on internet websites, IBM exploited the bug to bypass the security system, hack into SCO's website, and download the very files IBM has now attached to its motion. Id. ¶¶ 22-27 (SCO therefore disputes IBM St. ¶ 27.)

17.     The files that IBM hacked remained on SCO's website after August 5, 2003, because of SCO's pre-existing contractual obligations with its customers and with the UnitedLinux consortium. Sontag Decl. ¶ 17-19. Under the GPL, each time SCO distributed a copy of IBM's purported works in executable form, SCO was to provide the customer "with the complete corresponding machine-readable source code" on a "medium customarily used for software interchange" or with an offer to provide the code at cost. GPL § 3. SCO complied by making the source code available to its customers on its website. SCO will remove all Linux-related code from its website promptly after expiration of the last of its contractual commitments,

on December 31, 2004. Hughes Decl. ¶ 11; Sontag Decl. ¶ 17. SCO's "distribution" of any Linux products, even in this limited fashion, will cease by the end of 2004. Id.

18.     Prior to the filing of its Second Amended Counterclaim on March 29, 2004, IBM never provided SCO with any notice of its claim that SCO's rights under the GPL had terminated or that SCO was infringing its copyrights. Hughes Decl. ¶ 12.

19.     SCO never repudiated the GPL, and it always endeavored to comply with its GPL obligations. Hughes Decl. ¶ 9; IBM Ex. 23 (Sontag Deposition) at 213:21-214:1.

20.     IBM contributed at least one of the sixteen subject programs to Linux in violation of its contractual obligations to SCO, Declaration of Michael Davidson (11/22/04) ("Davidson Decl.") ¶¶ 10-52 (submitted with SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims (Nov. 30, 2004)), and (as detailed above) it supports this motion with documents obtained through unauthorized access into SCO's website. Sontag Decl. ¶¶ 18-27.

21.     IBM St. ¶¶ 1-4 repeat IBM's erroneous statements on the history of Linux from its earlier briefs. SCO disputes each of these statements based on the evidence and reasons set forth in its Memorandum in Opposition to IBM's Motion for Summary Judgment on its Tenth Counterclaim for Declaratory Judgment of Non-Infringement ¶¶ 8-14.

22.     SCO disputes IBM St. ¶ 8 and all other statements to the extent they refer to "IBM Copyrighted Works" or suggest that the sixteen subject works are owned by IBM or that IBM's copyrights are valid, because IBM may have misappropriated some or all of these works

10

in violation of its agreements with SCO and, in any event, IBM may have assigned these works

or failed to register them properly.  SCO is conducting discovery on these issues.[1]

## ARGUMENT

In order to prevail on its counterclaim, IBM bears the burden of proving that SCO

violated the Copyright Act.  See Allegro Corp. v. Only New Age Music, Inc., No. Civ. 01-790-

HU, 2003 WL 23571745, at *10 (D. Or. Jan. 23, 2003) (Exh. A); Indep. Serv. Orgs. Antitrust

Litig., 964 F. Supp. 1469, 1472 (D. Kan. 1997).  This requires proof that SCO's actions were

unauthorized.  See Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 832 (10th Cir.

1993) ("Once the plaintiff has shown that it holds a valid copyright, it must next prove that the

defendant unlawfully appropriated protected portions of the copyrighted work." (emphasis

added)); Foresight Res. Corp. v. Pfortmiller, 719 F. Supp. 1006, 1011 (D. Kan. 1989) ("In

general, a prima facie case of copyright infringement consists of proof that the plaintiff owns a

valid copyright and the defendant has engaged in unauthorized copying.").

Given SCO's undisputed reliance on the GPL, IBM bears the burden of proving that SCO

violated that license.  See Allegro, 2003 WL 23571745, at *10 ("To prevail on their counterclaim

of copyright infringement under a license, defendants must prove 1) ownership of copyright, and

2) 'copying' of protectible expression beyond the scope of the license."); see also Graham v.

James, 144 F.3d 229, 236 (2d Cir. 1998) (noting that "the copyright owner bears the burden of

---

[1] One of the subject programs, for example, is Linux Kernel S390 Support, IBM St. ¶ 17, even though IBM apparently has assigned "all of IBM's modifications to the kernel for use with IBM's S/390 mainframe computers" to the Free Software Foundation.  Moglen, FSF Statement on SCO v. IBM, http://gnu.cdpa.nsysu.edu.tw/philosophy/sco-statement.html.  Another subject program is Journaled File System ("JFS"), IBM St. ¶ 14, which appears to be a derivative of the JFS in UNIX.  See Davidson Decl. ¶¶ 10-52.

proving that the defendant's copying was unauthorized under the license"); <u>Stenograph L.L.C. v. Bossard Assocs., Inc.</u>, 144 F.3d 96, 99 (D.C. Cir. 1998) (explaining copyright plaintiff must prove defendant's copying of protected expression exceeded scope of "the license possessed by the defendant").

## I.   THE GPL AUTHORIZED SCO TO DISTRIBUTE LINUX, INCLUDING ANY CONTRIBUTIONS MADE BY IBM OF COPYRIGHTED MATERIAL

Although in certain respects "the language of the GPL is opaque and it contains many ambiguities," Radcliffe, <u>SCO v. IBM Part Deux</u>, http://www.alwayson-network.com/comments, it clearly grants the public at large "freedom to distribute copies" of the licensed software and to "charge for this service if you wish." GPL Preamble ¶ 2. Section 1 of the GPL authorizes the public to "copy and distribute verbatim copies" of source code licensed thereunder, subject only to certain notice publication requirements. GPL § 1. SCO complied with these requirements, Hughes Decl. ¶ 9, and thus was entitled to copy any material IBM licensed under the GPL.

Section 1 also permits the charging of fees for transfer of the software and for warranty protection. IBM appears to contend that the GPL's express grant of permission to charge transfer and warranty fees should be read as a prohibition of all other types of fees. It is well established that this type of reasoning is unreliable and even "dangerous" in the construction of contracts and statutes. <u>Ford v. United States</u>, 273 U.S. 593, 612 (1927); <u>Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n</u>, 327 F.3d 1019, 1034-35 & n.26 (10th Cir. 2003). Section 2(b), which prohibits licensing fees where the licensee distributes modified works, shows that the drafters knew how to write a fee prohibition where such was intended.

The GPL also authorizes a party to copy and distribute the licensed works verbatim in object code or executable form under the terms of section 1, as long as the party accompanies it

with the source code or with an offer to provide the source code. GPL § 3. It is undisputed that SCO complied fully with this condition. Hughes Decl. ¶ 9. GPL section 3 allows a licensee to comply by "offering access to copy from a designated place" (such as an internet site).

SCO complied with all of the GPL's requirements and therefore was authorized to distribute all sixteen of the works allegedly copyrighted by IBM that IBM contributed to Linux.

## II.     SCO DID NOT REPUDIATE OR BREACH THE GPL

IBM asserts that SCO "forfeited" its rights under the GPL by "repudiating" and "breaching" the GPL. IBM is wrong on both points as a matter of law.

### A.     SCO Did Not "Repudiate" the GPL

IBM contends (without citations) that SCO was not authorized to copy and distribute IBM's allegedly copyrighted material because, IBM contends, SCO has <u>since</u> "repudiated" the GPL. SCO has not "repudiated" the GPL.

"A repudiation occurs when a party to a contract makes an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." <u>Amoco Oil Co. v. Premium Oil Co.</u>, 313 F. Supp. 2d 1233, 1238 (D. Utah 2004) (quotations and citation omitted); <u>see also</u> <u>Lantec Inc. v. Novell, Inc.</u>, 306 F.3d 1003, 1014-15 (10th Cir. 2002). Put another way, a party "repudiates" a contract when it "refuses to perform and communicates that refusal distinctly and unqualifiedly to the other party." <u>Dow Chem. Co. v. United States</u>, 226 F.3d 1334, 1344 (Fed. Cir. 2000). IBM does not even <u>allege</u> that SCO has made any such refusal, far less communicated any such refusal to anyone. In fact, in the very materials IBM cites, SCO Vice President Christopher Sontag confirms that, with respect to the GPL, SCO "treated it as an obligation for which it

13

needed to abide by," and SCO "made our best efforts to abide by all of the obligations of the

GPL agreement." IBM Ex. 23 at 213:21-214:1. On this basis alone, IBM's "repudiation"

argument fails.

IBM also misapprehends the significance of the assertions SCO has made in its pleadings

regarding the enforceability of the GPL. IBM ignores those assertions that directly contradict its

characterization of SCO's supposed "repudiation": SCO asserts as its Fourth Affirmative

Defense that "IBM's claims are barred by license" (IBM's 2d Am. Countercl. at 19 (emphasis

added)), and as its Eleventh Affirmative Defense that "SCO has acted legally and properly at all

relevant times and IBM is therefore barred from any relief whatsoever" (id. at 20 (emphasis

added)). In a portion of SCO's Response to IBM's Third Set of Interrogatories that IBM does

not cite, SCO explains that it has acted "within the contractual rights granted to it concerning

software made freely available by IBM under the GPL." Plaintiff SCO's Response to IBM's

Third Set of Interrogatories at 20 (Apr. 19, 2004). SCO thus has not remotely stated that any

licensee who relies on the GPL is liable for copyright infringement.

IBM also ignores the context in which SCO has made its forward-looking assertions

regarding the enforceability of the GPL. In its Seventh Counterclaim, IBM asserts a state law

claim for breach of contract based on the GPL. In response, SCO asserted the following

affirmative defenses:

- "The GPL is selectively enforced by the Free Software Foundation such that enforcement of the GPL by IBM or others is waived, estopped or otherwise barred as a matter of equity." SCO's Am. Answer to IBM's Am. Countercl. at 16 (Mar. 11, 2004); accord SCO's Answer to IBM's 2d Am. Countercl. at 20 (Apr. 23, 2004); Plaintiff SCO's Response to IBM's Third Set of Interrogatories at 39; and

- "The General Public License ('GPL') is unenforceable, void and/or voidable, and IBM's claims based thereon, or related thereto, are barred." SCO's Answer to IBM's

14

2d Am. Countercl. at 20; <u>accord</u> Plaintiff SCO's Response to IBM's Third Set of
Interrogatories at 38.

In addition, in response to IBM's claim for "Breach of the GNU General Public License" (IBM's

2d Am. Countercl. at 33), SCO "denies the applicability or enforceability of the GPL" (SCO's

Answer to IBM's 2d Am. Countercl. at 16).  Indeed, SCO submits that the interpretation of the

GPL that IBM proposes in its instant motion is unenforceable for several reasons.  But SCO has

<u>not</u> asserted, either literally or in the context of its responsive pleadings, that the GPL did not

authorize the licensees thereunder to copy and distribute the licensed material.  Such defensive

assertions in litigation do not remotely qualify as a party's decision to "repudiate" the contract at

issue.  In sum, none of SCO's assertions could reasonably be construed to preclude SCO from

arguing (and proving) that, under the GPL, SCO was authorized to copy and distribute the

material at issue.

IBM's argument would fail, moreover, even if the Court accepted IBM's

mischaracterization of SCO's assertions.  IBM at most points to instances of permissible

pleading in the alternative.  <u>See</u> Fed. R. Civ. P. 8(e)(2); <u>see, e.g.</u>, <u>Lawser v. Poudre Sch. Dist.</u>,

171 F. Supp. 2d 1155, 1158 (D. Colo. 2001) (Rule 8(e)(2) "specifically provides that a party may

plead in the alternative, even where the alternative claims are inconsistent").  Nor has IBM even

claimed that it changed its position or relied on any of SCO's statements.  <u>See</u> <u>Estate of Harris v.</u>

<u>Harris</u>, 218 F.3d 1140, 1153 (10th Cir. 2000).

**B.**     **SCO's Licensing Activities Did Not Violate the GPL**

IBM contends that SCO immediately, and without notice from anyone, "forfeited" its

GPL rights by attempting to "license Linux."  In fact SCO has never sought to license Linux (or

15

any IBM program contained therein).  In addition, regardless of how SCO's UNIX License is characterized, the sale of this claims-settlement license did not breach the GPL.

### 1. SCO Has Been Collecting Licensing Fees Only for Its Own Code

SCO has not sought any fees or royalties for any material legitimately licensed under the GPL.  The product to which IBM objects is SCO's UNIX License, which is a license and release that SCO has entered into with third parties to authorize use of UNIX and to release such parties from any potential liability arising from the unauthorized use of UNIX in a Linux operating system.  That SCO's action is directed at protecting its UNIX rights is reflected in the legal actions, press releases, and letters about which IBM complains.  IBM Br. ¶¶ 66(a)-(d), (h)-(j), (l)-(n).  IBM may not approve of such activities, but they do not constitute a Linux "license fee or royalty."  IBM points to nothing in the GPL – and there is nothing – that expressly or impliedly forbids actions aimed at enforcing a party's intellectual property rights.

IBM claims that SCO has sold Linux licenses to several companies.  IBM Br. ¶¶ 66(e)-(g), (k).  What IBM refers to is SCO's charging licensing fees for the use of its own UNIX software, by non-SCO customers.  Sontag Decl. ¶ 30.  IBM also omits to mention that the agreements contain releases of claims because they settle SCO's potential legal claims against the licensee.  Id.  The licenses include a covenant not to sue and a waiver of any copyright infringement claims that SCO might have against the licensee.  Id.

IBM has wrongly claimed, for example, that SCO has sold a Linux license to Leggett & Platt, even though IBM's Exhibit 33, an invoice for the license in question, does not contain the word Linux anywhere in the document.  IBM also points to the license that SCO sold to Questar,

but that is only a license granting Questar permission "to use SCO IP Rights" for business purposes in connection with the use of a Linux operating system. That license (IBM Ex. 34 ¶ 2.1) defines "SCO IP Rights" as "SCO's intellectual property rights in any and all past, current or future versions or portions of the SCO's software products commonly known as UNIX System V and/or UnixWare" concurrent with run-time use of Linux. <u>Id.</u> ¶ 1.11. The definition <u>explicitly</u> <u>excludes</u> <u>Linux</u> from its scope: "Except as expressly provided herein, SCO IP Rights shall not include any right to copy, distribute, modify or alter Linux Software." <u>Id.</u> ¶ 1.11.

The licensing clauses of all of the UNIX Licenses are worded similarly. Sontag Decl. ¶ 30. SCO has not attempted to "license Linux" or to collect Linux or IBM-program "royalties and licensing fees." Hughes Decl. ¶ 3. Thus, IBM's contention that SCO breached the GPL fails because its underlying premise – that SCO is licensing Linux – is incorrect.

### 2.   <u>SCO Has Otherwise Complied with the GPL</u>

SCO did not breach the GPL by selling its UNIX license. The Court is to interpret a copyright license agreement in accordance with general principles of contract construction. <u>See Miller v. Glenn Miller Prods.</u>, 318 F. Supp. 2d 923, 934 (C.D. Cal. 2004) ("Courts apply general principles of contract interpretation when interpreting the terms and scope of a licensing agreement."); <u>Mendler v. Winterland Prod., Ltd.</u>, 207 F.3d 1119, 1121 (9th Cir. 2000) (applying such principles in interpretation of copyright license). A copyright license includes implied covenants of good faith and fair dealing. <u>First Nationwide Bank v. Fla. Software Servs., Inc.</u>, 770 F. Supp. 1537, 1542 (M.D. Fla. 1991); <u>SAS Inst., Inc. v S & H Computer Sys., Inc.</u>, 605 F. Supp. 816, 827-28 (M.D. Tenn. 1985). Under well-established doctrine, the Court should

construe the agreement to avoid a harsh or unreasonable result, or a forfeiture.  5 M. Kniffin,
Corbin on Contracts § 24.22 (Rev. Ed. 1998) ("Corbin"); 13 R. Lord, Williston on Contracts
§ 32.11 (4th ed. 2000); Restatement (2d) of Contracts § 227(1) ("Restatement of Contracts").
When the terms of a contract are "indefinite, uncertain and susceptible of two constructions," the
"contract should be construed as not creating a forfeiture."  Hasbro, Inc. v. Catalyst USA, Inc.,
367 F.3d 689, 693 (7th Cir. 2004).

     In arguing that SCO breached the GPL, IBM relies on GPL section 2, which states that, if
a licensee modifies the licensed work, the modified work must be "licensed at no charge."  GPL
§ 2(b).  IBM does not even allege that SCO modified any of the programs; rather, IBM stresses
that SCO copied the works verbatim.  IBM Mem. at 6-12, 19; Bennett Decl. ¶¶ 9, 11.  In fact
SCO never modified any of these works.  Sontag Decl. ¶ 31.  In contrast to section 2 (which
authorizes the copying of modified works), the GPL's section 1 (which authorizes verbatim
copying) does not expressly require no-charge licensing.[2]  Even where (unlike here) section 2
does apply, the GPL disclaims any intent to "claim rights or contest your rights to work written
entirely by you."  GPL § 2.  Section 2 is inapplicable here, and it does not preclude SCO from
enforcing its rights to UNIX.  (In addition, the "at no charge" clause of section 2 is illegal and
thus unenforceable.  See Part II.C.2, below.)

---

[2] See, e.g., R. Epstein, Why Open Source Is Unsustainable, FT.com (Oct. 21, 2004), at http://news.ft.com
(Oct. 21, 2004) (noting that with respect to the language in Section 2, "as a straight interpretive matter, it
only states what the obligation of each programmer is with his own private improvements"); D. Kennedy,
A Primer on Open Source Licensing Legal Issues:  Copyright, Copyleft and Copyfuture, 20 St. Louis U.
Pub. L. Rev. 345, 363 (2001) ("If a licensee distributes modifications of a program, source code must be
made available and there is to be no fee other than copying and similar charges." (emphasis added)).

IBM also contends that SCO has violated section 6 by imposing "further restrictions" by "collecting royalties or licensing fees" for Linux. IBM Mem. at 13, 22. IBM's argument fails for several independently sufficient reasons. Section 6 states:

> "Each time you redistribute the Program (or any work based on the Program), the recipient automatically receives a license from the original licensor to copy, distribute or modify the Program subject to these terms and conditions. You may not impose any further restrictions on the recipients' exercise of the rights granted herein."

Section 6 thus applies only to restrictions placed by the licensee on third parties to whom the licensee has distributed the GPL-licensed program.

IBM repeatedly quotes the second part of section 6 without quoting the first part, which says that section 6 applies "Each time you redistribute the Program." The section discusses the license that "the recipient" receives, and provides that the licensee "may not impose any further restrictions on the recipients' exercise of the rights granted herein." SCO has never attempted to collect licensing or royalty fees from anyone who received a Linux distribution from SCO, Hughes Decl. ¶ 8; Sontag Decl. ¶ 30, and IBM does not even purport to present any evidence to the contrary. SCO sold a UNIX License only to those who acquired a Linux operating system from another source. Hughes Decl. ¶¶ 8-9. SCO did not breach section 6.

Nor has SCO breached section 4 of the GPL, which states: "You may not copy, modify, sublicense, or distribute the Program except as expressly provided under this License." To the extent there is no breach of other sections of the GPL, such as Section 2 or 6, as argued above, there is no breach of Section 4, because SCO's distributions of IBM's programs were "as expressly provided under this License." Hughes Decl. ¶ 9. Moreover, Section 4 only deals with copying and distribution of GPL-licensed works; it does not and cannot be read to constitute an

19

agreement by a licensee to refrain from charging for other products in which it holds a

proprietary interest or to desist from enforcement of its intellectual property or contractual rights.

### C.   IBM's Proposed Interpretation of the GPL Would Impermissibly Interfere with Enforcement of Intellectual Property Rights and Would Raise Serious Antitrust Concerns

#### 1.   The GPL Should Not Be Read to Interfere with SCO's Right to Enforce Its Own Intellectual Property Rights

The above arguments easily suffice to resolve the pending motions, but there are

additional reasons why IBM's position must be rejected.  Nothing in the GPL expressly forbids a

party from licensing its own software or entering into settlements to resolve potential

infringement of such rights.  Any construction of the GPL to do so should be rejected as

inconsistent with the public policy in favor of protecting intellectual property, San Juan New

Materials High Tech, Inc. v. Int'l Trade Comm'n, 161 F.3d 1347, 1363 (Fed. Cir. 1998);

Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612 (1st Cir. 1988), as

well as the public policy favoring and encouraging settlements.  Grady v. de Ville Motor Hotel,

415 F.2d 449, 451 (10th Cir. 1969); Grundberg v. Upjohn Co., 140 F.R.D. 459, 468 (D. Utah

1991); see also Justine Realty Co. v. Am. Nat'l Can Co., 976 F.2d 385, 391 (8th Cir. 1992).

#### 2.   The GPL Should Not Be Read to Allow a Competitor to Regulate What May Be Charged for an Intellectual Property License

By arguing that SCO breached the GPL by collecting "royalties and licensing fees in

excess of the fees permitted by the GPL," IBM Mem. at 14, IBM seeks in essence an

interpretation that the GPL fixes limits on the amounts that may be charged for unmodified

works, even though the parties to the agreement are competitors.  Agreements between

competitors that fix a maximum price that may be charged for products are per se illegal under

antitrust law. <u>NYNEX Corp. v. Discon, Inc.</u>, 525 U.S. 128, 133 (1998); <u>United States v. Socony-Vacuum Oil Co.</u>, 310 U.S. 150, 218 (1940).

While SCO has shown above that section 2 of the GPL (the only GPL provision requiring licensing "at no charge") is inapplicable here, because this motion does not involve modified works, this provision is illegal and unenforceable.  The general counsel for the Open Source Initiative acknowledges in his recent treatise:  "There is also a problem that may prevent enforcement of the GPL's *at no charge* provision.  It may be an illegal restraint of trade in some countries.  Ordinarily, companies are allowed to set their own prices, and it is improper for a GPL licensor to restrain that in any way."  L. Rosen, <u>Open Source Licensing</u> 132 (2004), available at http://www.phptr.com/content/images/0131487876/samplechapter/0131487876 _ch06.pdf.

It is a "well settled principle that where a contract is susceptible of two interpretations, preference will be given to the interpretation which does not violate the law." <u>Bd. of Dirs. and Officers, Forbes Fed. Credit Union v. Nat'l Credit Union Admin.</u>, 477 F.2d 777, 784 (10th Cir.1973); <u>accord</u> <u>NLRB v. Local 32B-32J Serv. Employees Int'l Union</u>, 353 F.3d 197, 202 (2d Cir. 2003); <u>Guthart v. White</u>, 263 F.3d 1099, 1104 (9th Cir. 2001).  Accordingly, the Court should not construe the GPL as IBM suggests.

### D.     The GPL Provides No Basis for IBM to Retroactively Seek Forfeiture of SCO's Right to Distribute GPL-Licensed Works

There is an additional flaw in IBM's position:  a determination today that SCO has "repudiated" or breached the GPL does not serve as a basis upon which retroactively to declare SCO's actions to constitute an infringement of copyright.  IBM's burden is to prove that, <u>at the time</u> SCO copied and distributed IBM's allegedly copyrighted work, SCO was not authorized to

21

do so.  See Allegro, 2003 WL 23571745, at *10 (counterclaim-plaintiff must prove copying

"beyond the scope of the license."); Graham, 144 F.3d at 236 (alleged copyright owner must

prove that the "copying was unauthorized under the license"); Stenograph, 144 F.3d at 99

(explaining copyright plaintiff must prove defendant's copying of protected expression exceeded

scope of "the license possessed by the defendant"); Berger v. Computer Info. Pub'g, Inc., No. 84

Civ. 0331 (JFK), 1984 WL 595, at *2 (S.D.N.Y. July 2, 1984) (Exh. B) (action for copyright

infringement lies "once a licensing contract expires," and not for conduct when the authorization

"was still in effect").  That is, "anyone who is authorized by the copyright owner to use the

copyrighted work in a way specified in the [Copyright Act] or who makes a fair use of the work

is not an infringer of the copyright with respect to such use." Sony Corp. of Am. v. Universal

City Studio, Inc., 464 U.S. 429, 433 (1984) (emphasis added).

     The copyright cases expressly discussing the issue have rejected the "retroactive

infringement" argument IBM advances here.  In MCA Television, Ltd., v. Public Interest Corp.,

171 F.3d 1265 (11th Cir. 1999), for example, the court explained:

> The notion that MCA had the power retroactively to rescind the contract makes a
> mockery of that contractual agreement and would put any contracting party in
> PIC's position in terror of upsetting the licensor in any way for fear of being
> declared in breach, having the contracted-for licenses "retroactively revoked," and
> being sued both for breach of contract and in copyright for statutory damages that
> can far outweigh contractually negotiated licensing fees.

Id. at 1274 n.8; see also Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 753 (11th Cir. 1997)

(holding that one party's breach does not automatically rescind a contract simply because that

breach might give the other party the right to rescind); 3 Melvin B. Nimmer, Nimmer on

Copyright § 10.15[A] at 10-120 (2004) ("[T]he license is terminated and the copyright proprietor

may hold his former grantee liable as an infringer for subsequent use of the work.  Failing such

22

rescission . . . the grant continues in place ... until such time as the copyright owner exercises his entitlement to rescind.").

This is consistent with the law's general disfavor of a forfeiture. <u>United States v. Alpine Land & Reservoir Co.</u>, 291 F.3d 1062, 1077 (9th Cir. 2002). The rule across jurisdictions is that "when the terms of a contract are, or, by any act of parties under the contract, become indefinite, uncertain and susceptible of two constructions, and by giving them one construction one of the parties would be subject to forfeiture, and by giving them the other no such forfeiture would be incurred and no injustice would be done to the other party, the contract should be construed as not creating a forfeiture." <u>Hasbro, Inc. v. Catalyst USA, Inc.</u>, 367 F.3d 689, 693 (7th Cir. 2004).[3] A court will not deem a party to a contract to have "forfeited" its rights thereunder unless the contractual language at issue gave the party clear notice of the potential bases for such forfeiture. <u>See, e.g.</u>, <u>RW Power Partners, L.P. v. Va. Elec. & Power Co.</u>, 899 F. Supp. 1490, 1502-03 (E.D. Va. 1995) (declaring electric utility <em>improperly terminated purchase agreement because forfeiture provisions, which permitted termination upon supplier's failure "to perform any of the obligations pursuant to this Agreement," did not "clearly state" that supplier's non-material breach would trigger forfeiture rights</em>); <u>see also</u> <u>Humphrey v. C.G. Jung Educ. Ctr. of Houston, Tex.</u>, 714 F.2d 477, 480 (5th Cir. 1983) ("Forfeitures clauses fail in the event they are ambiguously expressed.").

---

[3] <u>See also</u> <u>Lippo v. Mobil Oil Corp.</u>, 776 F.2d 706, 713-16 (7th Cir. 1985) (stating that "contract language upon which a right to forfeiture is grounded [must] be strictly and narrowly construed"); <u>Galvin v. S. Hotel Corp.</u>, 154 F.2d 970, 973-74 (4th Cir. 1946) (stating that "every violation of a contract containing forfeiture provision does not necessarily require an actual forfeiture of the defaulting party's rights").

The GPL says that a licensee's use of licensed material beyond the scope of the License will "automatically terminate" the licensee's rights under the License, but does <u>not</u> say <u>when</u> such a termination becomes effective. In the absence of any such provision, and in light of the governing interpretive standards (cited above), the only reasonable interpretation of the GPL is one which permits the licensee a reasonable time to wind down its activities based on the use of the licensed material. <u>Cf.</u> UCC § 2-309(1) (if no time period specified in contract, a reasonable time is implied); <u>Jo-Ann, Inc. v. Alfin Fragrances</u>, 731 F. Supp. 149, 160 (D.N.J. 1989) (terminated party must be given time "to make alternate arrangements or close its affairs in an economically proper manner"); <u>Hamilton Tailoring Co. v. Delta Air Lines, Inc.</u>, 1974 WL 21756, 14 UCC Rep. Serv. 1310 (S.D. Ohio 1974) (Exh. C) (manufacturer must be allowed reasonable time to sell off inventory before termination became effective).

In <u>Quinn v. City of Detroit</u>, 23 F. Supp. 2d 741, 750 (E.D. Mich. 1998), for example, the court specifically rejected the licensor's argument that his revocation of the software license had immediate effect. The software at issue enabled the city-licensee to track ongoing cases. The court ruled that, without a transitional period to acquire and set up a replacement system, "the City would have been left helpless, with no way to update cases or access information in the manner necessary to properly monitor cases." <u>Id.</u> Therefore, with respect to "any agreement where hardship would result if sudden, immediate termination occurred," a reasonable time for transition is required. <u>Id.</u>

The transition period would begin, moreover, only when the licensee knew or had received notice of its alleged breach of the license agreement. <u>See</u> Corbin § 24.22 (endorsing judicial precedent acknowledging "public policy" against forfeiture and construing a lease

24

provision giving the landlord a termination right if the tenant breached to require notice and an opportunity for cure before the forfeiture would be effective); cf. UCC § 2-309(3), comment 8 (good faith calls for "such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement"); see also Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., 351 A.2d 349, 352 (N.J. 1976) (holding that a reasonable period of notice of termination of the distributorship, under all the circumstances, would have been twenty months). The GPL provides no mechanism by which the licensee is put on notice of an alleged unauthorized use of the licensed material.

In this case, given the absence of any such provision in the GPL, SCO did not receive "notice" from IBM that it had allegedly breached the GPL until IBM filed its Eighth Counterclaim, on March 29, 2004. IBM thus not only asks the Court to conclude that SCO forfeited its rights to copy and distribute IBM's allegedly copyrighted material, but also asks the Court to declare retroactively that SCO was obligated immediately to terminate that portion of its business that relates to the copying and distribution of material licensed under the GPL, upon SCO's supposed breach of the GPL of which IBM gave SCO no notice. SCO submits that, under the foregoing standards, no such "forfeiture" could apply.

Here, retroactive determinations are sought by IBM because SCO suspended its Linux distribution activities months before it began selling the UNIX License to allow parties to make use of SCO's UNIX intellectual property in connection with their use of Linux, and months before IBM registered any of the sixteen alleged copyrights. IBM Mem. at 3 ¶ 8. The few SCO Linux Server 4.0 sales thereafter (all based on what SCO believed to be obligations under pre-existing contracts) ceased six months ago: SCO's last sale of Linux Server 4.0 was on May 31,

25

2004, just two months after IBM filed its Eighth Counterclaim. Hughes Decl. ¶ 4. All Linux

code will be taken off SCO's password-protected website at the end of 2004. Id. ¶ 11; Sontag

Decl. ¶ 17. These actions were taken not because SCO is infringing any of IBM's copyright

rights, but instead because of IBM's actions in violating SCO's proprietary rights through IBM's

Linux activities. IBM's theory of retroactive infringement fails as a matter of law.[4]

## III.    IBM'S UNCLEAN HANDS PRECLUDE ITS MOTION

IBM's motion also fails for IBM's "unclean hands." As a general matter, the doctrine

"closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to

the matter in which he seeks relief, however, improper may have been the behavior of the

defendant." Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814

(1945). The doctrine applies in the copyright context when the "plaintiff's transgression is of

serious proportions and relates directly to the subject matter of the infringement action." Tempo

Music, Inc. v. Myers, 407 F.2d 503, 507 & n.8 (4th Cir. 1969); see also 4 Nimmer, supra,

---

[4] Given SCO's voluntary suspension of its Linux business, the limited extent of SCO's copying after the alleged forfeiture, and the lack of notice, Hughes Decl. ¶¶ 3-5, 12, any breach was immaterial. A forfeiture provision should not cause a party to lose a "disproportionate" share of contractual benefits. Restatement of Contracts § 229 and comment B; see also Looney v. Farmers Home Admin., 794 F.2d 310, 314 (7th Cir. 1986) (reversing summary judgment enforcing forfeiture clause in land sale contract because "result seems inequitable and unnecessary"); Queens Boulevard Wine & Liquor Corp. v. Blum, 503 F.2d 202, 206-07 (2d Cir. 1974) (declining to enforce termination clause because breach did not injure lessor and enforcement would needlessly harm lessee, creditors, and investors and "would be grossly inequitable"). The courts apply the materiality standard in considering whether a "forfeiture" applies. See, e.g., RW Power, 899 F. Supp. at 1502-03 (declining to enforce forfeiture provision, which permitted termination upon supplier's failure "to perform any of the obligations pursuant to this Agreement," because the provision did not "clearly state" that supplier's non-material breach would trigger forfeiture rights). That is, the "risk of forfeiture" is "one factor to be considered in determining whether a breach of contract is material." Restatement of Contracts § 241 & E. Allan Farnsworth, Contracts §§ 8.12, 8.16 (2d ed. 1990). In the forfeiture context, materiality is a question of fact. Fusion, Inc. v. Neb. Aluminum Castings, 962 F. Supp. 1392, 1395 (D. Kan. 1997).

§ 13.09; 18 Am. Jur. 2d Copyright § 220.

### A.     IBM's Misappropriation of UNIX Code

The Tenth Circuit has recently affirmed the following tenet of the "unclean hands" doctrine: "Where a plaintiff interferes with the defendant's ability to comply with his or her responsibilities, a court of equity will not turn a bind eye to the net effect on the parties' equitable relationship." Worthington v. Anderson, 386 F.3d 1314, 1321-22 (10th Cir. 2004). The court further, and specifically, affirmed in that case that the "unclean hands" doctrine applies where "the plaintiff's own machinations had prevented the defendant from meeting the conditions of its licensing agreement." Id. at 1321; see, e.g., Tempo Music, 407 F.3d at 507-08 (applying doctrine of unclean hands in holding that it would be inequitable to permit the plaintiff to recover for copyright infringement that occurred, "in part at least," by the plaintiff's "dereliction"). It is also well established, in the intellectual-property context that the defense will apply if the claimant made "material false statement in connection with the property which he seeks to protect." Worden & Co. v. Cal. Fig Syrup Co., 187 U.S. 516, 528 (1903).

SCO determined to offer its UNIX License, beginning in August 2003, only because IBM had misappropriated SCO's proprietary source code and contributed thousands of lines of that code into Linux. Hughes Decl. ¶ 6. Indeed, based on the limited discovery to date, SCO has determined that among the material that IBM misappropriated and contributed to Linux is one of the very programs – the "Journaled File System" – for which IBM claims copyright in its instant

27

motion.  Davidson Decl. ¶¶ 10-52; <u>compare</u> SCO's Memorandum in Opposition to IBM's

Motion for Summary Judgment on Its Tenth Counterclaim at 81 <u>with</u> IBM Br. at 8 ¶¶ 39-40.[5]

### B.    IBM's Unauthorized Access Into SCO's Website

Another well-established basis for the application of the doctrine in the context of the

Copyright Act arises when the claimant has obtained evidence by improper means.[6]

SCO provided its customers who purchased SCO Server 4.0 with a password to enter at a

log-in screen so that only they could access source code via the internet.  Sontag Decl. ¶ 17-19.

After news of a bug in the website's security system was reported on internet websites, IBM

exploited the bug to bypass SCO's security system, hack into SCO's computers, and download

the very files IBM has now attached to its motion.  <u>Id.</u> ¶¶ 20-27.

The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), makes it a felony for

any person to access another person's computer, via the internet or otherwise, unless authorized

to do so.  <u>See, e.g.</u>, <u>Creative Computing v. GetLoaded.com LLC</u>, 386 F.3d 930 (9th Cir. 2004);

---

[5] For these same reasons, SCO disputes that IBM owns valid copyrights in the works at issue, and discovery on this issue has not been completed.  SCO Statement of Facts ¶ 22.  Although IBM's copyright registrations are prima facie evidence of ownership, the presumption is rebuttable.  <u>Grundberg v. Upjohn Co.</u>, 137 F.R.D. 372, 379 (D. Utah 1991).  This fact issue is an independent basis on which IBM's motion must be denied or at least continued.

[6] <u>See, e.g.</u>, <u>Fleming v. Miles</u>, 181 F. Supp. 2d 1143, 1154 (D. Or. 2001) (holding copyright registrant who denied existence of competing registration in his registration application could not recover damages for alleged infringement by competing registrant); <u>Russ Berrie & Co. v. Jerry Elsner Co.</u>, 482 F. Supp. 980, 987-88 (S.D.N.Y. 1980) (declining to enforce copyright because the owner's knowing failure to disclose material facts in registration applications constituted "reason for holding the registration invalid and thus incapable of supporting an infringement action, or denying enforcement"); <u>Rixon, Inc. v. Racal-Milgo, Inc.</u>, 551 F. Supp. 163, 171 (D. Del. 1982) ("Unclean hands in the procurement of a patent from the Patent and Trademark Office or in prior enforcement action, for example, may render the patent unenforceable."); <u>see also</u> Nimmer, <u>supra</u>, § 13.09[B] (the doctrine applies where the claimant "obtained information as to the nature of defendant's work through unfair means"); <u>see also</u> <u>Gemveto Jewelry Co., Inc. v. Lambert Bros., Inc.</u>, 542 F. Supp. 933, 939 (S.D.N.Y. 1982).

I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc., 307 F. Supp. 2d 521, 523-24, 526

(S.D.N.Y. 2004) (citing cases); AOL, Inc. v. LCGM, Inc., 46 F. Supp. 2d 444, 450 (E.D. Va.

1998).  By improperly obtaining the evidence assertedly in support of its counterclaim and

instant motion, IBM comes to the Court with unclean hands.

## CONCLUSION

SCO respectfully submits, for the reasons set forth above, that the Court should deny

IBM's motion for partial summary judgment.

DATED this 30th Day of November 2004

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*

29

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, Inc. hereby certifies that a true and correct copy of the foregoing SCO's Memorandum in Opposition to IBM's Motion for Partial Summary Judgment on Its Counterclaim for Copyright Infringement (Eighth Counterclaim) was served via first class mail on this 30th day of November, 2004, to:

Alan L. Sullivan, Esq.
Todd M. Shaughnessy, Esq.
Snell & Wilmer L.L.P.
15 West South Temple, Ste. 1200
Gateway Tower West
Salt Lake City, Utah 84101-1004

Evan R. Chesler, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York 10604

*Attorneys for Defendant/Counterclaim Plaintiff IBM Corp.*

30

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.