1    the judges, and you put in a request that you want a specific

2    judge, a specific year, and a specific rule of procedure,

3    mentioning a specific word.  It can go through that database

4    and give you the results in seconds.  And that's what CMVC is.

5         Now, Ms. Thomas said -- her declarations are based

6    on what we call a bottom up approach, which is, we're going to

7    look at every file in the database on AIX.  And first we're

8    going to identify every file, we're going to look at every

9    file, and we're going to extract what the system tells us is

10   AIX.  And then we're actually going to look at what we

11   extracted to make sure the system is correct, that it really

12   is AIX.  Even though it came out as an AIX file, we don't

13   believe that.  We're going to check that out.  And then you go

14   and you copy it.

15        And she says that work of extracting it is going to

16   take several weeks.  My guess is if you extract it, it's going

17   to take a day or two, and what's going to take the rest of the

18   several weeks is the unnecessary task of double-checking the

19   AIX files to make sure that the system is correct.  But her

20   affidavit doesn't explain that.  She doesn't list time.  It's

21   just these huge estimates.

22        But she says that the top down approach, which

23   makes use of the hierarchical structure, which is what we

24   suggested which is how a programmer would do it, doesn't work

25   because AIX is not hierarchical.

1          Well, I beg to differ.  That's from their own

2     manual.  That's a hierarchical structure.  Folders,

3     subfolders, files, subfiles.

4          We have another document.  There are two other

5     documents, Your Honor, that IBM marked as confidential.  One

6     is the overview of AIX source control.  That was attached to

7     the Sontag declaration, and it was attached to it.  The other

8     one is the overview -- I'm sorry -- another document called

9     SCO, CMVC and code drop procedures.  And that was Exhibit A to

10    the August 19th declaration of Jeremy Evans.  Both of those

11    documents confirm the hierarchical structure.

12         Indeed, IBM says, Joan Thomas says, well, even

13    though all of the AIX files are on one server, they're

14    commingled with hundreds of other products, hundreds of other

15    products, and you have to separate them out.  Sort of as

16    though trying to imply that it's a very difficult job, and

17    it's hard to separate it out.

18         IBM touts itself as the largest information

19    technology company in the world.  They have touted this system

20    as having incredible capabilities.  And they would not have

21    put hundreds of other product, source code from other hundreds

22    of products into CMVC if they couldn't separate it out

23    quickly.

24         THE COURT:  Mr. Frei, I'm going to limit you to

25    five minutes.

1          MR. FREI:  Okay.

2          How do you extract files?  Specify a file location

3    or identity or identify release.  These are two ways.  There

4    are many others.

5          How does CMVC track the changes?  That explains in

6    very detail about changes to documents, changes to source

7    code, fixing bugs, improving it.  It says that the users can

8    query the history.  Identify the contents.  The reason why it

9    changed over time.  Perhaps they changed over time to make it

10   more Unix-like.  They can get the details of the defects and

11   features.  That's an awful lot of information that is

12   available on this system.

13         I pointed out this release extraction.  That is one

14   way of obtaining information.  The test window was another

15   way.  The features window is another way.  There are loads of

16   other ways all outlined in the manual, all designed to make

17   this thing very, very, very, very searchable.

18         Now, all of the AIX is on one server.  It's

19   accessible all over the country in many geographical

20   locations.  We could get remote access.  If there is a burden,

21   we could easily get remote access and do it ourselves.  In

22   fact, we would rather do that.  We would rather search that

23   system ourselves for AIX than have to rely on IBM.

24         Basically, if you read Joan Thomas' declarations

25   literally, what you come up with, I submit, is that no

1    company, especially not IBM, would tolerate a configuration

2    management or version control system that was as difficult to

3    use as Joan Thomas says.  It just doesn't make -- it doesn't

4    make sense.

5         She also says -- she attacked our discovery on two

6    grounds of burden.  One was the hierarchical structure that I

7    went through, and that's just incorrect.  She's inconsistent

8    with her own documents, and the system wouldn't even work.

9    The other way she attacked it, she said, okay, after we get

10   all this information, we then have to produce it.  And it's

11   going to take weeks and weeks to produce it.

12        Well, that's not -- that's not correct.  Once they

13   get that information assembled in the database, it's just

14   burned onto CDs at an hour a piece.  Our affidavits -- or our

15   declarations show that it is probably a one-day task to put

16   all that information onto a DVD for us.  But again, we'd like

17   to have the remote access ourselves.

18        Throughout her declaration, she talks about

19   40 million pages of paper and the source codes equivalent to

20   10 million pages of paper.  That may be true.  But what she's

21   not saying is that this stuff is electronically stored.  We

22   don't want much paper.  We would rather have the

23   electronically stored information.  And they can provide it to

24   us without much of a burden.  Even if there is several weeks

25   worth of burden, in a case like this of this importance, if

1    you apply Rule 27, it is not an undue burden whatsoever.

2           Now, we need this information so badly because you

3    can have copyright infringement of software without copying a

4    single line of source code.  And the cases are clear on that.

5    No source code is copied.  But if you copy the sequence, the

6    structure, the organization, the algorithms, the data flow,

7    that can be -- that's protectable, and that can constitute

8    copyright infringement.  No software comparison tool picks

9    that up.  This is what you read between the lines when skilled

10   individuals analyze the code.  And they analyze it, and they

11   determine how it's working.  Software tools don't do that.

12   Just like you couldn't get the plot of a book out of a

13   software tool.  You've got to read the book, and you have to

14   understand it.

15          And we need the information in there to target and

16   focus this.  What modules do we look at?  You've got 8750

17   files, for example, in Linux and, you know, about the same

18   thing in AIX.  And those files contain from tens of lines to

19   tens of thousands of line.  We need to have the database to

20   know where to look.

21          Your Honor, that's it.

22          THE COURT:  I understand.  Thank you, Mr. Frei.

23          Mr. Eskovitz, do you want to take your --

24          MR. HATCH:  I believe I can do it in five minutes,

25   thank you.

```
 1              THE COURT:  Five minutes.  And that will give
 2    Mr. Marriott his time, and we'll have limited rebuttal.
 3              MR. ESKOVITZ:  I appreciate your indulgence, Your
 4    Honor.  We obviously have a lot to say, as our papers probably
 5    foretold.
 6              THE COURT:  Sure.
 7              MR. ESKOVITZ:  As I mentioned before, there's the
 8    second submission in front of the Court, and it relates to the
 9    Court's last March 3rd order.  And our renewed motion to
10    compel relates to two provisions of the Court's last order
11    with which IBM has not complied.  The first relates to the
12    Court's direction that they supplement their response on
13    contributor information, programmer contributor information;
14    and the second relates to Linux documents on the high level
15    executives.  I'll take the first one first.
16              This is what our original interrogatory asked for,
17    and this is what they originally said.  We asked them to
18    specify who contributed code to AIX, Dynix, and Linux, and to
19    identify the contributions.
20              What they originally did was they gave us lists of
21    7200-plus names, and they said, these are people who may have
22    access or may have had access to AIX or Dynix or may have made
23    contributions to Linux.  That was plainly deficient.  It
24    plainly didn't give us what we were looking for, and so we
25    moved the Court to compel last November a response to -- a
```

1    supplemental or full response to our interrogatory.

2            This is what we said.  We said, we can't -- they

3    haven't told us what files have been contributed.  It's not

4    responsive to the most important part of our interrogatory,

5    and as such, it's nearly useless to us as a starting point for

6    further discovery.  Who are we supposed to depose when they

7    give us a list of 7200 names?  We have 40 depositions in this

8    case.  We can't take 7200 depositions, nor would anybody want

9    us to.

10           The next board, this is what we said about the

11   Court's argument.  It's just reiterating the same thing in

12   February.  They are required to identify the contributor

13   information.  We have no idea who to weigh, who we're supposed

14   to be paying attention to.

15           So the Court ordered IBM to supplement their

16   interrogatory response to Interrogatory Number 5, and this is

17   what IBM did.  First, in response to our interrogatory, they

18   listed the same 7,000-plus names.  And they said that they

19   believed that the people who had access include the people who

20   made contributions, so within that 7200 names they're

21   somewhere in there.

22           Even more importantly, they didn't give us any of

23   the contribution information that was, as we explained, the

24   most important part of the interrogatory.  Rather, they said,

25   to the extent readily determinable, now that was not part of

1    the Court's order, but that's a new thing that IBM added.

2    They told us, we can get Linux contributions from the public

3    record, and we can get IBM contributions to -- with respect to

4    AIX and Dynix, we can get it from the products themselves.

5              Well, it turns out that's just not true.  We can't

6    get program information from AIX.  It doesn't include any

7    programmer or contribution information.

8              And with respect to Dynix, there is a limited

9    amount of information.  It has nicknames often, or it has

10   abstract to the contribution.  But importantly, it doesn't

11   identify the code which was contributed, and it doesn't

12   identify the code that the newly contributed code was

13   replacing.  This is kind of taken separately.  This is a

14   separate document.  It is not associated with the code, and it

15   doesn't tell you the precise program of contribution, which is

16   what the interrogatory requested.

17             With respect to Linux, it's true that you can get

18   some information publicly available, but it's obviously not

19   going to be as thorough as IBM's only information about what

20   they contributed to Linux.  We tried.  We found about a

21   million-plus lines that IBM contributed to Linux from the

22   public information, but there's huge deficiencies in terms of

23   our practical ability to ascertain that information.  The

24   publicly available information is on hundreds of websites

25   disbursed.  There's not one single place where it's available.

1    It frequently uses programmers names, handles, like you saw

2    REM on the Dynix thing.  It's the same thing.  They use

3    nicknames.  It doesn't tell you who it did.  And for the more

4    than 1 million lines of patches, if you go to the IBM that

5    they acknowledge, patches that they contributed to Linux, it

6    certainly doesn't attribute it to any anybody or any IBM

7    programmer.  It attributes some contributions to groups, open

8    source groups that IBM is a member of.  And some of it, it

9    doesn't attribute it, like I said, to anybody.

10           So we are asking the Court to re-order, to compel

11   IBM to comply with this.  This is the same programmer

12   information that is so critically relevant.  It's a subset,

13   and the Court ordered it produced, and IBM did not produce it.

14   And here's what IBM had to say about its noncompliance.

15           After we pointed out it's not true, you can't get

16   this information from the sources that you say are available

17   to us, they say, our response, they underline, "to the extent

18   readily determinable" in their supplemental response, and they

19   say, IBM's response is not misleading.  That's the best they

20   can say about it.  And they say, it is best undertaken in the

21   first instance, by reviewing -- this project is best

22   undertaken in the first instance, by reviewing the source code

23   for AIX and Dynix for authorship information.

24           Well, however that is to justify their

25   noncompliance, it's still not true.  You can't get that

1   information from AIX and Dynix. So I don't know what they
2   mean by best undertaken in the first instance because they
3   have no basis for making that statement.

4          So now they tell the Court that they always
5   understood this order to be about contact information when, in
6   fact, what SCO had said and what the Court had ordered and
7   what IBM had even purported to do with respect to
8   contributions, they say, that's not what SCO's principal
9   complaint was. And we understood the Court's order to be
10  directing IBM to provide contact information. Well, that's
11  obviously inconsistent with everything you've seen about the
12  history of this issue. But it's also inconsistent with the
13  Court's order because, as the Court is aware, in Paragraph 6,
14  the Court specifically ordered separately, apart from the
15  contribution information the production of contact
16  information.

17         And finally, just briefly, with respect to the
18  other issue on Linux documents. This is what the Court
19  ordered them to do, produce highly -- high-level documents
20  from your Linux. Relating to Linux, this is what IBM has
21  said. They said, they've -- we've given you everything we
22  have from our senior executives and our board of directors.

23         And we brought this to the Court's attention
24  because it just doesn't seem possible that they fully
25  complied. And these are a list of some of the deficiencies on

1    that production.  With respect Paul Palmisano, the chairman

2    and CEO, they haven't produced a single e-mail or

3    correspondence discussing Linux, even though he was the person

4    who's been computed to be the major force behind the Linux

5    shift.

6           With respect to -- even more dramatically with

7    respect to their self-proclaimed Linux Czar, they haven't

8    produced a single document, not one document in their entire

9    production, with respect to the Linux Czar.  And with respect

10   to the board minutes, board documents, they gave us one single

11   power point presentation.  We don't have any of the board's

12   consideration of Linux.  And it's just hard to imagine a

13   company of this size and this sophistication considering a

14   billion, multi-billion dollar investment in Linux doesn't have

15   more high-level documents from its executives and board

16   related to Linux.

17          Thank you for your indulgence, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Marriott, do you want to go forward, or do you

20   want to take a short break?

21          MR. MARRIOTT:  It's up to Your Honor.

22          THE COURT:  Let's go.

23          MR. MARRIOTT:  Good morning, Your Honor.  In the

24   few minutes that I have, if I may, Your Honor, I would like to

25   explain why it is that the criticism is directed at IBM's

1   compliance with the Court's order and IBM's responses to SCO's

2   discovery requests is misplaced and why it is that the

3   discovery that SCO seeks ought not to be allowed.

4           Your Honor, despite the number and the length of

5   the memoranda submitted in support of SCO's discovery

6   requests, there are, in fact, very few issues presented by

7   these papers.  I count the pages -- we count the pages of

8   those memoranda at 227, Your Honor, and that does not include

9   the documents provided to us for the first time today, which

10  include new arguments and new information.  And that doesn't

11  include the expert testimony effectively offered here by

12  counsel today as to the content of the CMVC system.

13          Nevertheless, Your Honor, notwithstanding the

14  length of those memoranda, there really are essentially only

15  three categories of discovery which SCO contends that it ought

16  to have received, but that IBM has failed somehow to properly

17  provide.  Let me take, if I may, each of those in turn.

18          The first, Your Honor, is SCO's request for contact

19  information with respect to certain third parties.  The second

20  is SCO's request for documents from the files of certain IBM

21  executives.  And the third is SCO's request for roughly

22  2-plus billion lines of additional source code relating to AIX

23  and to Dynix, two IBM operating systems.

24          First with respect to the contact information, Your

25  Honor.  Your Honor asked IBM to provide SCO with contact

1    information for certain individuals, and we did that.  The

2    dispute that is presently before the Court concerns contact

3    information with respect to certain third parties.  SCO sent

4    us a letter requesting that we provide contact information

5    with respect to certain third parties including the former

6    general counsel of the SCO Group, including the former chief

7    technology officer of the SCO Group, including the former --

8    the founder of the company and its former CEO.

9            It also asked that we provide contact information,

10   not with expect to individuals whose contact information might

11   be just in the files of IBM, but -- bless you -- but instead

12   with respect to contact information that counsel at

13   Snell & Wilmer where perhaps in their preparation of their

14   case found.  We said to SCO what we thought were obvious

15   reasons, we didn't believe we were required to provide this

16   information.  We said, however, that we were willing to do it

17   so long as it occurred on a reciprocal basis.

18           What SCO said in response, Your Honor -- what SCO

19   did in response, rather, is that the day before its opposition

20   was due to IBM's motion for summary judgment, it filed a

21   motion to compel with Your Honor, the motions to compel that

22   we've heard today, which it then turned around and argued in

23   front of Judge Kimball were sufficient in and of themselves to

24   preclude the entry of summary judgment because they had a

25   pending position to compel.  They cited some cases which they

1   construed to sort of represent the principles of those motions
2   to compel. Be it pending, the Court couldn't possibly grant
3   IBM summary judgment.

4       Your Honor, we think this particular request is,
5   frankly, silly. And in our opposition papers, we got out the
6   phone book, and we got on the Internet, and we found the
7   contact information from the individuals in question, and we
8   gave it to them, I think mooting the request. And we ask only
9   that if the rule is going to be that counsel does one
10  another's homework for another, then we ought to reciprocally
11  have them provide to us the contact information for third
12  parties who they may have discovered contact information.
13  That's the first of the three categories, Your Honor, that's
14  at issue on this motion.

15      The second one concerns documents from the files of
16  certain IBM executives. Here again, Your Honor, IBM did not
17  from the beginning withhold documents from the file of the
18  executives. Your Honor asked us to provide documents from the
19  files of executives. We undertook a reasonable search for
20  those documents, and to the extent we found responses,
21  non-privileged documents, we provided them.

22      It shouldn't be any huge surprise to SCO that not
23  all executives have enormous volumes of documents in their
24  files. We asked for e-mails sent by Mr. McBride, the CEO of
25  SCO, and in response we were told, quote, that he infrequently

1   sends e-mails, close quotes. So, therefore, we don't have
2   many e-mails.
3            Your Honor, we undertook a search. We produced
4   what we found. We can't produce what we don't find.
5            THE COURT: Mr. Marriott, have you prepared a
6   privileged log?
7            MR. MARRIOTT: Your Honor, we are, as I believe SCO
8   is, preparing privilege logs. And we have not yet, the
9   parties, exchanged those logs, and I think we ought to set a
10  day for that. We prepared it, but the parties have not
11  exchanged privilege logs.
12           IBM has produced thousands of files and documents
13  from the files of its executives. And from Mr. Palmisano's
14  files, we produced more than a thousand pages of papers. We
15  can't produce what we don't find. That's the second category
16  of discovery that they want.
17           Now, the third category concerns the two or so-plus
18  billion lines of code and the other related information that
19  SCO says it must critically have for presentation of this
20  case. Parenthetically, Your Honor, it sounds an awful like
21  listening to counsel, they don't need any discovery. It
22  sounds to me that the case is proved, and the door's been
23  opened and now the door has now been shut. The only thing,
24  Your Honor, really at issue on this motion is whether IBM
25  should be required to produce now 2-plus billion lines of

1    additional source code relating to its AIX and Dynix product.

2              A little background.  IBM has produced, as counsel

3    for SCO acknowledges, the AIX and the Dynix releases of that

4    source code during the period from roughly 1999 to 2004.

5    That's the period of SCO's original request.  It's the only

6    period that could conceivably relate to the allegations of

7    their underlying claims.  That's been produced.

8              Counsel, in the book given to us in morning,

9    included a chart which shows in black presumably what they

10   believe and agree we have produced and in red what we haven't

11   produced.  We told SCO long ago, Your Honor, that we've looked

12   for this AIX Power 5.0 product, which was a beta release, and

13   we haven't been able to find it, and, therefore, we haven't

14   been able to produce it.  And counsel knows that.

15             THE COURT:  Are you prepared to submit affidavits

16   in support of those arguments --

17             MR. MARRIOTT:  Yes, Your Honor.

18             THE COURT:  -- these arguments related to your

19   search of the executives files, as well as the alleged missing

20   source code?

21             MR. MARRIOTT:  Yes, Your Honor.  We're happy to --

22   with respect to Mr. Wladawsky-Berger and Mr. Palmisano, we're

23   happy to look again for documents.  We will, and we found

24   nothing.  We'll look again, and we will provide you and

25   counsel, if you wish, with an affidavit describing the efforts

1    we've undertaken to find those documents.  And

2    parenthetically, it would be nice, Your Honor, if the same

3    were true with respect to SCO's production.

4              THE COURT:  I understand.

5              MR. MARRIOTT:  If the parties are going exchange

6    affidavits, that's fine.  We think it ought to go both ways.

7              So we have produced, Your Honor, we have produced

8    substantial source code relating to the AIX and Dynix products

9    from that period of '99 to 2004.  That code amounts to

10   somewhere in the order of 900 million lines of source code,

11   which is roughly equivalent, if you were to print it to paper,

12   about 50 million pages of paper.

13             THE COURT:  Is that what's sitting in front of

14   Mr. Shaughnessy?

15             MR. MARRIOTT:  That is not, Your Honor.  But we'll

16   come to those papers momentarily.

17             Now, according to SCO, Your Honor, the code we have

18   produced, the 900 million lines of code isn't enough.  They've

19   got to have more.  Despite the fact, frankly, that very little

20   has happened with the code that they have received.  They have

21   not taken a single deposition of an IBM person.  They've only

22   recently noticed three depositions of IBM individuals.

23             There are at least, Your Honor, five reasons, I

24   respectfully submit, why the Court ought not to grant this

25   request that IBM provide 2-plus billion additional lines of

1    code and millions and millions of additional pages of hard

2    copy documents from files of IBM programs.

3            First of all, Your Honor, Your Honor previously

4    denied SCO's request for essentially this same information.

5    And SCO has done nothing, we submit, to justify a change or

6    reconsideration of the Court's order.  We advised Your Honor

7    when we were here previously that we didn't believe we had any

8    AIX and Dynix with respect to the claims that are at issue in

9    this case, but that in an effort to avoid a discovery fight,

10   we would produce that had code which we have produced from

11   1999 to 2004, the 900 million lines of code, and we did that.

12           THE COURT:  What about your counterclaim?

13           MR. MARRIOTT:  We don't believe, Your Honor, and I

14   will come to this shortly --

15           THE COURT:  Address it as you go.

16           MR. MARRIOTT:  -- that that code bears any

17   relationship to the essential elements of those claims, to the

18   defenses that relate to those claims.

19           Now, Your Honor, we provided this code.  They asked

20   for more.  Your Honor said no.  Your Honor said what IBM had

21   indicated that it would voluntarily produce was sufficient.

22   And you said, also, I think not surprisingly, that after you

23   have identified that code, which you contend was improperly

24   used by IBM or improperly contributed by IBM to Linux, that

25   I'll reconsider your request in light of your disclosures.

1        And now, Your Honor, what SCO says is, well, we

2   have produced some code.  We have produce some information to

3   IBM.  We've identified with some specificity information which

4   we say IBM misappropriated.  And that, therefore, they say, is

5   reason for the Court simply to open up the flood gates and to

6   give them all of the AIX code and Dynix code known to man.

7   All the AIX and Dynix code written in the last 20 years by

8   thousands of developers over a very -- in different locations.

9        What we understood Your Honor to say in her ruling

10  with respect to SCO's original motion to compel was that SCO

11  would be required to identify that code which SCO contends IBM

12  misappropriated.  And that when SCO had identified that code,

13  the Court would in view of that disclosure consider requiring

14  IBM to produce additional code, to produce the drafts, the

15  iterations, which is the development history, as they call it,

16  that relates to that particular code.

17        What instead, Your Honor, SCO now seeks is not

18  disclosures relating only to the code identified by SCO as

19  supposedly misappropriated or supposedly infringed, but

20  instead all AIX code and all Dynix code.  In other words, the

21  principle that SCO must first identify that code which has

22  allegedly been misappropriated before IBM is required to

23  provide specific discovery as to that code is out the window.

24  They asked for it all again just as they asked for it before.

25  And for the same reasons, Your Honor, and I'll come to them as

1    to the particular claims, that Your Honor denied the request

2    and Your Honor ought to deny the request now, nothing has

3    changed except that they have now asked again for everything.

4           The second reason, Your Honor, why the additional

5    2-or-so-plus billion lines of code ought not be provided is

6    that it simply isn't necessary and isn't relevant to the

7    claims in the case.  SCO says, Your Honor, that this code is

8    relevant to three claims.  They say it's relevant to IBM's

9    counterclaim seeking a declaration of non-infringement with

10   respect to IBM's Linux activity; they say it's relevant to

11   their claims for breach of contract; and finally, they say

12   it's relevant to IBM's Ninth Counterclaim.

13          We have moved, as counsel and Your Honor discussed,

14   Your Honor, for summary judgment with respect to two of those

15   categories of claims, SCO's contract claims and IBM claim

16   seeking declaration of non-infringement with respect to Linux.

17   And we also separately moved for summary judgment on our claim

18   seeking -- claiming copyright infringement as to SCO.  Let me

19   take each of those claims in turn.

20          First, Your Honor, there's IBM's claim seeking a

21   declaration of non-infringement with respect to IBM's Linux

22   activities.  SCO says that IBM's Linux activities infringe

23   SCO's alleged copyrights, and we disagree.  Whether IBM's

24   Linux activities infringe SCO's alleged copyrights depends

25   under the controlling case law on a comparison between on the

one hand Linux, that which is supposedly infringing; and on

the other hand, Unix, that which is supposedly infringed.  SCO

was founded in 1994 as a Linux company.  We all have access to

Linux.  It's available with anyone with an Internet

connection.

They have the Unix code, Your Honor, the other

element necessary for this comparison, because they are the

purported owner of the copyright.  The only information

necessary to determine whether Linux infringes Unix is Linux

and Unix.  That's it.

Now, counsel suggests that what is necessary here

and suggested in the footnotes in the briefs before Your

Honor, and it was suggested in court in argument in front of

Judge Kimball, what they need is a road map.  And that without

a road map, they're forever lost and will never be able to

find the connection between Linux and Unix.  In fact, the

analogy was used, Your Honor, that if a person were to go from

Aurora, New York, I think it was, to Los Angeles, they would

surely need a map.  And similarly, too, if a person wishes to

connect up between Linux and Unix, truly you would have to

have a map.

Well, Your Honor, the map is Unix and it's Linux.

It's not AIX and Dynix, neither the allegedly infringed

product or the allegedly infringing product.  As we told Judge

Kimball, Your Honor, the notion that they need AIX and Dynix

54

1    to show infringement between Unix and Linux is like asking for

2    a map of China.  They might as well be talking about a map of

3    an entirely different country.

4              But it's actually worse than that, Your Honor.  The

5    request is I think more disingenuous than that, and that's

6    because we have given them a map.  We have given them

7    900 million lines of code.

8              Now what they're telling you is, they just don't

9    need a map, Your Honor, what they need is every iteration and

10   draft of that map over a period of 20 years.  So they don't

11   just want the map what effectively is a map of China, but they

12   want to know what drafts the map went through, what road did

13   or didn't exist 15, 20 years ago.  That is entirely irrelevant

14   to this claim, Your Honor.

15             The second claim to which they say this discovery

16   relates is their contract claims.  And we heard -- we've heard

17   a lot about the contract claims, Your Honor.  And I'm not

18   going to -- I'm not going to argue our contract case now.

19   We've made a motion for summary judgment.  We think those

20   claims should be dismissed and adjudicated as a matter of law.

21             But let me just say this briefly about them.  I

22   think there is no dispute, and you heard it again today from

23   counsel, that the nature of the contract claim is very simple.

24   We took Unix on the one hand, their allegedly proprietary

25   secret code, and we dumped it into the Linux operating system.

1    That is a public contact.  We did it, they say, and it is out

2    there, and it is compromising rights.  The evidence of that

3    alleged breach, Your Honor, if there is any such evidence, and

4    they have yet to produce any in a year and a half of

5    litigation notwithstanding two orders of this Court, if there

6    is any, it is a matter of public record.

7              Consider, Your Honor, if you would, this chart,

8    which you may recall.  Do we have copies?  You can perhaps see

9    is from here, Your Honor.  It was provided to the Court, and

10   it's counsel's chart, so I assume they're familiar with it.

11             THE COURT:  I remember it.

12             MR. MARRIOTT:  May I approach?

13             THE COURT:  And I can sort of see it.  Sure.

14             MR. MARRIOTT:  Okay.  And counsel has been provided

15   a copy.

16             This chart was presented at the last discovery

17   hearing before Your Honor.  And the point I take of this chart

18   is to show that in effect IBM and Sequent, which was at some

19   point acquired by IBM, had been bad corporate citizens, and

20   they breached SCO's -- they breached their contractual

21   obligations to SCO, whereas by contrast according to SCO,

22   hp and Sun, who have similar agreements to the IBM agreement,

23   have not breached their contractual obligations.  And this is

24   meant to show how IBM is different.

25             Well, Your Honor, SCO was able to reach this

1    conclusion with I'm sure all diligence to its obligations to

2    its shareholders to publicly disclose no infringement, no

3    breach of contract by hp, and none by Sun and not by Solaris

4    without a single line of code. Not one.

5          We are not saying, Your Honor, that they can have

6    no code relating to AIX and Dynix. We've given them, after

7    all, the 900 million lines of code. We're saying they don't

8    need -- in order to figure out whether IBM has breached

9    contracts what effectively amounts to a public breach, they

10   don't need billions of additional lines of drafts. It cannot

11   possibly be that they need no code as to hp and no code as to

12   Sun and 2-plus billion lines of draft code from IBM. It

13   doesn't make sense, Your Honor. And we respectfully submit

14   that it is further indication that this discovery is not in

15   any way necessary to prove a claim for a public breach of

16   contract.

17         Now, the final claim about which SCO makes so much,

18   Your Honor, concerns IBM's Ninth Counterclaim. This

19   counterclaim, this counterclaim is I think quite

20   straight-forward. And it is, I think, frankly, in recognition

21   of the problems that SCO has with respect to the relevance of

22   this discovery to the other claims that it makes an issue of

23   the Ninth Counterclaim, which we heard about, by the way, for

24   the first time in their supplemental memoranda.

25         The Ninth Counterclaim, Your Honor, was

1   straight-forward.  SCO said at the outset of the case, IBM,

2   you have breached our contracts.  You breached them, and

3   therefore, we're terminating your rights.  We're terminating

4   your right to use the Unix System V software in your product.

5   And so they say, you may no longer continue to distribute your

6   AIX product because we've terminated your license.

7           And we don't think that's right, but indulge for a

8   moment the argument that we somehow improperly breached the

9   agreement, and therefore they can terminate our rights.  We

10  brought a claim that said, we don't think that's right, and we

11  want a declaration that our continuing distribution of the AIX

12  operating system isn't an infringement of your alleged

13  copyright.  That's what the claim was about.

14          Now, I drafted the claim, Your Honor.  I did not

15  for a moment contemplate the construction that they place on

16  the claim now to make it sweep as broadly as they sweep.  That

17  isn't what was intended.  That isn't what we intend to pursue,

18  and we are perfectly happy to stipulate.  If SCO drafts the

19  stipulation, we are perfectly happy to stipulate, Your Honor,

20  that that claim doesn't even remotely, remotely cover that

21  which they say it covers.

22          The discovery there, Your Honor, is no different

23  and no more relevant than the discovery that it relates to the

24  other claims, because the claim simply isn't what they contend

25  it to be, and there's no sense in the parties litigating

1    unintended claims.  And if they want to draft a stipulation,

2    I'm sure we can arrange to narrow that claim along the lines

3    of that which we believe the claim is about.

4              I had said there were five reasons, Your Honor.

5    The third reason why the information they seek ought not be

6    provided is because it imposes an undue burden.  I would have

7    thought that this would require much more than a statement.

8    They have asked for the production of 2-plus billion lines of

9    source code, and they don't stop there.  They don't stop

10   there.  What they say is we should also have to go to the

11   files of the thousands of people who have had access to AIX

12   and Dynix and Linux over the years, and we should have to

13   actually collect from their files the hard copy documents

14   which those individuals may have.  So it isn't enough to

15   produce the CMVC database, which they think is such a trivial

16   task, they want the hard copy documents, too.

17             THE COURT:  What about their request for remote

18   access?

19             MR. MARRIOTT:  Your Honor, the request for remote

20   access is admittedly a new request.  I don't think the request

21   lessens the burdens at all.  Apparently, unlike counsel, I am

22   not an expert in the CMVC database.  The IBM witness who has

23   provided the testimony that she has provided who is an expert

24   doesn't specifically address the remote access.  So we don't

25   have sworn testimony.  We have the arguments of counsel.

1           But it is my belief that remote access is not a

2    feasible option for the production of that information.  That

3    database consists not only of billions of lines of AIX code,

4    but as counsel acknowledged, it includes codes relating to

5    different products.  And I don't believe that that can be

6    managed in a way that imposes much less burden than doing what

7    they otherwise suggest, which is the database be manipulated

8    and the AIX code in which they're interested in be extracted

9    out and copied and provided to them.  So I don't believe

10   that's a real solution to that problem, Your Honor.

11          We're talking about billions of lines of code.

12   There is no, I don't believe, inconsistency between what we've

13   said about how long this code will take.  As Ms. Thomas said,

14   we don't know exactly how long that will take.  We've not had

15   tutous, Your Honor, so we don't know exactly how long it will

16   take.  The best estimates from the people who are

17   acknowledgeable about the database say it will take weeks,

18   likely months to extract out the information from this

19   database and to make it available and that it will occur at a

20   substantial expense.  And we don't think in view of the

21   irrelevance of the information and in view of the substantial

22   data that has already been provided that we ought to have to

23   do that.

24          The fourth reason, Your Honor, why the Court ought

25   not grant this discovery is that, frankly, what this motion

1    and this request for discovery is about is I think something

2    other than discovery.  From the beginning of this case, we

3    have asked SCO to identify that which is publicly touted as

4    the evidence of our misconduct.  We asked in motions to

5    compel.  SCO declined to provide it.  Your Honor ordered SCO

6    to provide it.  A year and a half after the litigation was

7    filed and after SCO was touting its claims, they still have

8    not produced any evidence that IBM's Linux activities

9    infringed SCO's alleged copyrights.  They still have not

10   identified a single line of the Unix System V code that IBM

11   was alleged to have infringed.  SCO has identified only that

12   code which is IBM's own home-grown code which it said to have

13   been infringed.  Your Honor, the reason they haven't

14   identified the code that represents the evidence that was

15   supposed to be the predicate for any subsequent production of

16   the graphs of code is because they don't have any.  And if I

17   may, Your Honor, approach.

18            This document, which I will not read because it's

19   marked confidential, unlike the documents of IBM's which were

20   marked confidential which counsel did read, is I think, Your

21   Honor, part of the explanation as to why no evidence has been

22   produced.  There is none.  SCO has looked.  It has attempted

23   to find evidence of alleged infringement, and it has none.

24            And I'll let Your Honor read this for herself and

25   draw your own conclusions.

1          (Time lapse.)

2          THE COURT:  I've got the gist.

3          MR. MARRIOTT:  Thank you, your Honor.

4          The reason that nothing has been disclosed is

5    because there is nothing.  And the basis, the reasons for

6    these motions to compel contact information of people that

7    were their founders and the other information that is at issue

8    here is because they want a basis for contending that IBM's

9    motion for summary judgment shouldn't be granted.

10         Your Honor, consider this.  In the footnotes in the

11   briefs submitted to Your Honor and more prominently in the

12   briefs submitted to Judge Kimball, SCO contends that

13   comparison, and Mr. Frei made some reference to it today, that

14   the comparison of one version of Unix and one version of

15   Linux, a couple million lines of code probably in each of

16   those programs, would take, according to SCO's declarant

17   Chris Sontag, 25,000 man years to review.  A couple million

18   lines, 25,000 man years.

19         And yet, Your Honor, what they ask of you

20   purportedly in an effort to streamline things is the

21   production, not only of the 900 million which they already

22   have, but 2-plus billion lines of draft code.  How is it

23   possible, conceivable, Your Honor, that the production of

24   billions of lines of additional code will somehow streamline

25   proceedings?  It isn't.

1    And, Your Honor, under their own rationale, their

2    only reasoning as to how they get to 25,000 man years of code

3    to compare these two, it would take 14 billion -- rather

4    14 million man years to compare the codes.  The reason for

5    these requests, Your Honor, is to create a basis for summary

6    judgment -- for avoiding summary judgment that I think is

7    respectfully nonexistent.

8    The fifth reason, Your Honor, why the Court should

9    not grant SCO the additional billions of lines of code it

10   seeks is because the very information, the very information at

11   issue on these motions today is in front of Judge Kimball, and

12   there is therefore no reason for Your Honor to consider the

13   questions.  The only thing that can be gained by Your Honor

14   deciding the questions presented here, which are already in

15   front of Judge Kimball, is a potential inconsistency of result

16   and a duplication of judicial resources.  Judge Kimball, as

17   I'll explain, must decide the question.  Your Honor, as I'll

18   explain, need not decide the question, and here's why.

19   IBM submitted, as you know, three motions for

20   summary judgement, a motion for summary judgment on our claim

21   seeking a declaration of non-infringement, which is fully

22   briefed and it's argued.  SCO's only real opposition to that

23   motion, Your Honor, was to say, you know, it takes a long time

24   to review this material.  We need more time.  Give us more

25   time.  Without more discovery, we can't possibly respond.

1   Speaking frankly, the very same discovery here -- there that

2   it seeks here.

3           With respect to the other two motions, Your Honor,

4   SCO's yet to file its opposition papers, but we've heard a lot

5   about them.  We've heard a lot about them today, and we heard

6   a lot about them in the 80-page request SCO made of

7   Judge Kimball to put off our IBM summary judgment motion

8   indefinitely.  SCO has made perfectly clear that its

9   opposition to IBM's other motion for summary judgment is going

10  to consist of among other things a Rule 56(f) request for more

11  time on the grounds that it needs the very discovery that it

12  here said that it needs.

13          So, Your Honor, IBM in considering these --

14  Judge Kimball, rather, in considering these motions has to

15  resolve the questions.  If Your Honor were to agree with SCO

16  and to grant their request today that, IBM, you are required

17  to produce 2 billion-plus lines of code and millions of other

18  lines of code and search the files of hundreds of people,

19  Judge Kimball would still have to consider in the context, for

20  example, of IBM's motion for summary judgment seeking a

21  declaration of non-infringement whether that code matters at

22  all to the claim presented there, whether it's relevant to the

23  claims in the case.

24          Similarly, if Your Honor agrees with us that SCO

25  ought not be entitled to this code, that it has more than

1    enough, Judge Kimball is still faced with the Rule 65

2    application which is pending before them which says this

3    discovery is somehow essential to SCO's case.

4            By contrast, Your Honor, is Judge Kimball agrees

5    with IBM that if the discovery that's sought here is not

6    relevant to the claims on which IBM's move for summary

7    judgment, then presumably he will grant summary judgment in

8    our favor and effectively moot SCO's claim.

9            On the other hand, if he decides with SCO that that

10   discovery is essential to the case, we presume he will deny

11   our motions for summary judgment and give them the discovery

12   they need.

13           He's got to decide the questions, Your Honor.  You

14   don't.  And we think it makes the most sense to have them

15   decided once and to have them decided on the fuller record

16   where, for example, these papers represent part of the

17   briefing on the summary judgment motion which are, as you can

18   tell, lengthy.  And we think that a request for billions of

19   lines of additional discovery shouldn't be predicated on

20   claims that are flawed in our view as a matter of law.  SCO

21   disagrees that they're flawed as a matter of law.  They can

22   make their arguments to Judge Kimball that they're not.  But

23   if they're flawed as a matter of law, they ought not be

24   allowed to get billions of lines of additional discovery.

25           Your Honor, I have nothing further.  SCO's request

1    for this discovery should be denied. Thank you.

2              THE COURT: Thank you, Mr. Marriott.

3              Mr. Eskovitz, we have, let's see, about 10 minutes

4    for rebuttal. First let me ask you a question, however.

5              MR. ESKOVITZ: Sure.

6              THE COURT: It is my understanding that SCO has

7    filed yet another amended complaint. Is that correct?

8              MR. ESKOVITZ: That's correct, Your Honor.

9              THE COURT: And how does that fit into this?

10             MR. ESKOVITZ: I'm glad you asked that, Your Honor,

11   because we heard Mr. Marriott generously agree to limit their

12   Ninth Counterclaim to something that clearly doesn't say --

13   you didn't hear him talk about the text of the Ninth

14   Counterclaim. What you heard was firsthand, personal

15   testimony from the drafter of that, his intent in the

16   language.

17             THE COURT: I have also heard testimony from

18   non-present witnesses through your submissions.

19             MR. ESKOVITZ: Correct, Your Honor. The point is

20   our amended complaint seeks to add claims relating,

21   specifically relating to project Monterey. It's the AIX

22   infringement information that we've discovered that I outlined

23   in part for the Court. That is, I submit to Your Honor, the

24   reason why IBM is now offering to magnanimously limit its very

25   broad counterclaim is because it doesn't want that to be the

1   basis for the discovery that I've explained to the Court, CMVC

2   is at the heart of it.

3          And secondly, it's going to argue to Judge Kimball,

4   I suggest, that it's not already -- that those claims -- SCO

5   should not be granted leave to amend because those claims are

6   not already in the case because of IBM's new interpretation of

7   its Ninth Counterclaim.  You didn't see Mr. Marriott address

8   the language of the counterclaim, which I explained to the

9   Court is patterned exactly after their Tenth Counterclaim.

10         And the other thing is, Your Honor, there is a

11  board that we have in the notebook, it makes no sense as a

12  matter of law what Mr. Marriott is arguing with respect to

13  this Ninth Counterclaim, because if the Ninth Counterclaim is

14  purely redundant with what's already in the case, then there's

15  no point in bringing it in the first place.  The law is clear

16  that redundant counterclaims should be dismissed.  Courts

17  regularly dismiss them.

18         So even if there were some argument based on the

19  tortured reading, which I submit there absolutely isn't, and

20  even if Mr. Marriott didn't have clear reason for this new

21  magnanimous offer to limit based on our drafting the

22  stipulation, the explanation that he gives for that

23  counterclaim makes no sense at all.

24         So that's exactly how the project Monterey ties in

25  with our request in our complaint.  It's a narrow request.  It

1    relates to just project Monterey copyright infringement and

2    AIX, which we submit is already subsumed within their

3    Ninth Counterclaim.  It just seeks affirmative relief for the

4    declaratory judgment action that they've already brought.

5            Mr. Marriott ended on a point that I want to start

6    with, Your Honor.  He suggested to this Court that the Court

7    no longer control the discovery in this case.  That 19 months

8    into this litigation based on IBM's own submission of

9    premature fact-intensive summary judgment motions, this Court

10   need not and should not consider the discovery issues that

11   have been pending before this Court since at least last

12   November.  And he does that just based on the filing of the

13   summary judgment motions that IBM has unilaterally decided to

14   file.

15           And even worse than that, he doesn't tell the Court

16   what the schedule we're working under is.  Judge Kimball gave

17   a fact discovery cutoff of February 11th.  We submit that

18   we're already in significant jeopardy under that because we

19   haven't even gotten this basic predicate core discovery.  But

20   Mr. Marriott knows that the argument on the summary judgment

21   motions, the two that he alluded to including the contract

22   claims, isn't going to take place until January.

23           Now, he said, well, if Judge Kimball denies our

24   motions, then SCO will get the discovery.  Well, even if

25   Judge Kimball rules from the bench and denies their motions,

1    you know, presumably in a January hearing, that will give us

2    about a month to work with this very complicated evidence

3    under the current operating discovery schedule.  And the point

4    is, Judge Kimball is not controlling discovery in this case

5    just because IBM chooses to file summary judgment motions.

6    Your Honor is in control of discovery, and the argument that

7    IBM has somehow taken aware Your Honor's control of discovery

8    is troubling, to say the least.

9         Now, you heard Mr. Marriott repeatedly refer to the

10   large numbers of lines of code and the numbers of pages.  And

11   I submit to you, Your Honor, none of that matters, because, as

12   Mr. Frei explained, what we're talking about here is 10

13   compact disks, one hard drive.  You can put all of the data on

14   there.  And, frankly, Your Honor, it would be insane for us to

15   try to proceed with discovery by going line for line.  That's

16   exactly what we're not trying to do.  You didn't hear

17   Mr. Marriott talk about the programmer notes and about the

18   audit trail that CMVC and these documents like programmer

19   design documents and programmer comments, which is really at

20   the heart of the discovery we're talking about here, how those

21   things, you didn't hear him say that's excessive.  And the

22   point is, those are the guidelines.  Those are the road maps.

23        And Mr. Marriott with respect to the Tenth

24   Counterclaim even called the argument that we need this road

25   map disingenuous and suggested that the road map we're looking

1  for is like the road map to China.  Well, Your Honor, I submit

2  that that is extraordinarily disingenuous because what that

3  ignores is how critical this paper trail is between when they

4  first started developing this product in 1985 until IBM began

5  dumping this product into Linux around the year 2000.  And

6  what Mr. Marriott is saying is all we need is the code from

7  1999 to 2003.

8      Well, first of all, if the code is already going

9  into Linux, that doesn't give you any information about the

10 history or very little information about the history of what

11 that code is that's going into Linux.  It's just not as simple

12 as Mr. Marriott's over simplification has you believe about,

13 put the lines of Unix up here, and put the lines of Unix up

14 there and compare it.  You can't do that.  It's not practical

15 to do.  You can't do a non-literal copyright investigation

16 like that.  It would take forever.

17     And the code that we're talking about here just

18 with respect to the their own Tenth Counterclaim, it's exactly

19 that road map.  It's the line that let's you decide what you

20 need to investigate further.  And it started in 1985, and, you

21 know, I don't know if it's continuing to this day, but it

22 began at least around the year 2000.

23     And we have a board on the public statements that

24 IBM has made.  This is what IBM said at least the beginning of

25 2000 about what it was going to do with Linux.  It says, we're

1  going to exploit our expertise in AIX to bring Linux up to par

2  with Unix.  This is 2003.

3       In 2000, and that's one year into the source code

4  that they produced, they said, we're definitely going to use

5  the people that were involved in AIX to help Linux grow.  And

6  then IBM's vice-president or former vice-president says, we're

7  willing to open source, any part of AIX to the Linux

8  community, anything that they consider valuable.

9       Well, Your Honor, we have discovered and we have

10  identified for IBM what we have been able to discover in terms

11  of literal copying from AIX into Unix.  What we need is the

12  evidence that will let us investigate non-literal copying and

13  especially for our contract claims the historical evidence

14  that will let us, as Mr. Pfeffer and Mr. Wilson and

15  Mr. Frasure's testimonies explain, the contracts protects.

16  Let us trace those contributions back to show that those

17  contributions and others that undoubtedly will discover with

18  the program history evidence were based on, were derived from,

19  were created with the benefit of exposure to the original

20  licensed product.  And that's what this over simplification

21  about, you know, you've got a lot of lines of source code at

22  the end of the road and that's all you need, doesn't work for

23  the Tenth Counterclaim, and it doesn't work for the contract

24  claim.

25       And, you know, you didn't hear Mr. Marriott talk

1    about the difference between those two, but it's critical.  As

2    Mr. Marriott says, and this is true as a matter of law, that

3    for copyright infringement, we would have to show either

4    literal copying or non-literal copies between the first

5    product and the end product.  It doesn't mean that the

6    discovery is not reasonably calculated to lead to admissible

7    evidence.  In fact, as we explained, we need that road map to

8    identify that.  But that's critically different than what we

9    need to show under the contract claims because the exposure

10   theory and the derivative of the derivative theory doesn't

11   mean you have to compare the first thing to the last thing in

12   order to approve a contracting violation.  And that's exactly

13   what that testimony explains.

14             And if we have the versioning slides.

15             This is just an illustration for Your Honor of what

16   we're talking about here.  It's complicated, but I'll try to

17   get it down to basics.  This is the beginning and the end.

18   This is a comparison of the beginning and the end of two

19   versions of just Unix product.  This is SCO's Unix product.

20   And the white spots show the difference -- I'm sorry -- show

21   you the things that are similar between the first version and

22   the end version.  And you see, it's pretty limited in terms of

23   what's identical in code between the first version and the end

24   version.  This is just illustrating.  This is where the track

25   changes where it compares the differences.

1          Now, if you look at the next slide, and this is in

2     the book, if it's easier to see.  But what this shows you is

3     the versioning going through all of the development history

4     from the beginning to the very end.  And what it shows you is

5     from version to version, there's actually an extraordinary

6     amount of similarities and that the products derive, and this

7     is the way software development works, the products derive

8     from the predecessors.  And then they lend to their

9     successors.  And you see from version to version, there's a

10    lot of white space.  But at the end of the process what is

11    actually literally the same is very limited.  And that's what

12    we're trying to show is this versioning process, this program

13    development.

14         Mr. Frei is pointing out to me that Version 17 had

15    16 of the 28 lines from Version 1.  So it shows very limited

16    literal copying, but a lot of copy-to-copy or

17    version-to-version copying, and that's the kind of paper trail

18    that we're looking for here.

19         I don't know why Mr. Marriott is talking about

20    contact information.  The issue is moot.  They produced the

21    contact information we wanted after we filed our renewed

22    motion to compel.

23         With respect to the Linux documents, I showed you

24    the document where it talks about the Linux Czar and how he

25    sent e-mails, and they haven't produced any of those.  There's

1    serious question about what they've done.  Mr. Marriott said

2    he'll look again.  I thought that's what they were supposed to

3    be doing in response to the Court's March 3rd order.  I think

4    it's the time now respectfully to get affidavits or get at

5    least a description of the process rather than summary

6    assertions of full compliance.

7         Mr. Marriott in addition to telling the Court that

8    it's given away -- that IBM has taken away the Court's power

9    to deal with the discovery issues has also told the Court that

10   it basically closed the door on this discovery in March

11   because the Court previously denied giving SCO the discovery

12   that we're talking about here.  And I showed Your Honor that

13   in March what happened was the Court said, start with this.

14   Do what you can with this, and that's precisely what we've

15   done.  And the Court said, I'll consider upon further showing

16   of need ordering more files and more code.  And that's what

17   we're here on the renewed -- on the memorandum regarding

18   discovery to do.

19        Mr. Marriott says that, you know, what we're asking

20   for is the programming contributions of people all over the

21   world, and it's so hard to get.  But as Mr. Frei explained,

22   this is all in one central server location, and it all can be

23   downloaded onto 10 compact disks.  It's not the paper involved

24   and the billions of lines in code doesn't -- isn't really all

25   that relevant.

1   What Mr. Marriott is trying to do is put the cart
2   before the horse. He's saying, identify the proof that you
3   have, the further proof that you have before we give you the
4   code that you need in order to develop that proof. And he
5   said, you know, it sounds like we've got a very strong case.
6   And, your Honor, frankly, I believe we do have a strong case.
7   It doesn't mean we're not entitled to take discovery to
8   support our claims and to also defend against their
9   counterclaim.

10      In arguing that we don't need this discovery
11  because all we have to do is line up the two lines of code,
12  and, again, that's just limited to the copyright infringement
13  issue on the Tenth Counterclaim, IBM is turning the discovery
14  rules on its head. It's saying, here's the least efficient
15  way of going about a copyright investigation. We're going to
16  file a motion for summary judgment. We're not going to give
17  you the discovery that you need to proceed efficiently. And
18  if you can't come up with evidence, then we should be entitled
19  to summary judgment.

20      But that's not what the discovery rules or, indeed,
21  the federal rules are designed to do. To the contrary,
22  they're designed to give the parties predicate discovery so
23  they can identify who they need to depose. They can take
24  those depositions. They can use the leads from those
25  depositions to pursue further investigation. And then when

1    all of the facts are discovered and when all of the
2    practicably discoverable facts are discovered, that's when the
3    claims get adjudicated on their merits.

4         But IBM doesn't want an adjudication on its merits.
5    It wants the district court to consider its summary judgment
6    motions and wants this Court not even to consider the
7    discovery that's so critically relevant to those issues.

8         With respect to hard copy documents, we have, as
9    we've explained, the CMVC and RCS is purely electronic and
10   readily assessable under the Volocky (sic) case, presents very
11   little burden.

12        With respect to hard copy documents, IBM has taken
13   the position that they wouldn't even meet and confer with us
14   with respect to documents like design documents and white
15   papers relevant to our discovery claims.  I don't know what's
16   there electronically.  I suspect a lot of it is maintained
17   electronically and is readily available.  But IBM has put us
18   in a position of basically, you know, having no knowledge
19   about it because they won't even meet to confer on the issue.
20   They just say it's irrelevant.

21        Mr. Marriott says remote access is a new issue and
22   he's never heard about this and he didn't really know.  Well,
23   the truth is that we submitted first of all in the declaration
24   of Barbara Howe, which is before the Court in Paragraph 14,
25   she explained that remote access is available.  IBM's own

1    internal documents tout the fact that remote access is

2    available. And what Barbara Howe explained was that remote

3    access was, in fact, what they gave SCO during the project

4    Monterey project, SCO had access to limited portions of the

5    source tree within CMVC. So this is nothing new, and it is

6    certainly nothing exceptional.

7          Mr. Marriott brought out to the Court this Swartz

8    report. This a confidential document that he handed up to the

9    Court. I just wanted to say a couple things about that.

10         First of all, the Swartz report was prepared in

11    1999. That was while the Linux Kernel was less than half its

12    size of what it is now and before --

13         THE COURT: It says 2002.

14         MR. ESKOVITZ: That's an e-mail reflecting or

15    purporting to reflect what the report said. And we have the

16    report itself.

17         THE COURT: That's fine.

18         MR. ESKOVITZ: And it's available. It was argued

19    to the Court, to Judge Kimball, and it's in the transcript.

20         This is before IBM's contributions to Linux. And

21    actually the Swartz report is exactly what we're saying here

22    in terms of why we need this discovery. What Swartz said was,

23    I tried to investigate literal copying. I need more leads in

24    order to investigate non-literal copies. He said --

25         THE COURT: I'm going to stop you there. If these

1    are intended to be confidential, I think the contents should

2    be confidential, and Mr. Marriott did not refer to the

3    contents.  I've read it.

4              MR. ESKOVITZ:  Understood, Your Honor.  We actually

5    submitted this to the Court and waived our confidentiality

6    with respect to this document, in order to clarify the record,

7    in a very similar circumstance before Judge Kimball.  But in

8    any event, we can submit this document to the Court for your

9    in camera review.

10             The bottom line here is that the discovery we're

11   seeking imposes very little burden on IBM.  This is, the CMVC

12   program is a program that they use in their everyday business.

13   They are a very sophisticated computer technology company.  If

14   it had all the problems of extracting irrelevant code or

15   irrelevant sections that IBM wants the Court to believe, IBM

16   wouldn't be able to get its work done.  It is just not

17   conceivable that this is such an impractical and difficult to

18   use program.

19             And even if you take everything they say at face

20   value, their view is it will take weeks, not many months, not,

21   you know, months, and months and months, as Mr. Marriott said

22   that and repeated again in his argument here, just a matter of

23   weeks.  And given how critically relevant this discovery is to

24   our contract claim and to their Ninth Counterclaim and their

25   Tenth Counterclaim, there is just no conceivable justification

1    to withhold this discovery.

2              THE COURT:  You've got a minute.

3              MR. ESKOVITZ:  IBM wants to withhold this discovery

4    for the exact same reason why we want it, and that's because

5    without it, we can't get to trial on the merits of this claim.

6    I mean, why else would IBM had told the Court it takes many

7    months when it just takes weeks?  Why else would IBM have told

8    Judge Kimball that this evidence is relevant to the contract

9    claims and not the copyright claims when that was being argued

10   and now tell this Court it is not relevant to the contract

11   claims, either?  Why else would IBM tell the Court that CMVC

12   really doesn't function the way all of its publicly available

13   information says it does and common sense dictates?  Why would

14   IBM assert an unambiguously broad counterclaim and then try to

15   impose this new gloss based on testimony of Mr. Marriott about

16   what he intended only in response to evidence that disproves

17   that claim and that shows our entitlement to further discovery

18   to disprove it?

19             And why else would IBM take the position that by

20   simply asking for core predicate discovery, the kind of

21   discovery that is produced early on in every software case

22   that SCO is simply just trying to drag out and delay the

23   proceedings?

24             To the contrary, Your Honor, we want this discovery

25   so we can move ahead, so we can take the depositions, so we

1     can identify who among the 7,000 people they have listed for

2     us we need to depose and so we can get to a trial on the

3     merits of this case.

4               THE COURT:  Thank you, Mr. Eskovitz.

5               Mr. Marriott, do you want to respond?

6               MR. MARRIOTT:  Just briefly, Your Honor.

7               Counsel suggests that it was conceded in front of

8     Judge Kimball that the discovery requested here is relevant to

9     the contract claims.  That is not true, and the transcripts,

10    Your Honor, I think bears that out.

11              Counsel makes much of the notion that all of this

12    historical code is required if they are to prove their case,

13    and how could we have not produced all of the historical code?

14    Your Honor, the same historical code exists with respect to

15    the SCO product in this case.  Not a single line of it has

16    been produced to IBM.

17              They purport to be the copyright owners of the Unix

18    operating system.  If IBM is supposed to be holding back the

19    most important discovery in the case, why do we not have the

20    very same discovery from the SCO?

21              You again heard counsel testify about the CMVC.  I

22    don't purport to be an expert in the CMVC database, Your

23    Honor.  Those who do have submitted sworn testimony telling

24    you what is required, that it's a complicated and involved

25    process.  I take them at their word.  I don't take counsel's

1    argument that a day or two at most are required for the

2    production of that information.  There's no evidence in the

3    record to support that.

4           The notion of remote access is new, Your Honor.  It

5    is new in the supplemental memorandum submitted by them in

6    this matter.  That to me is new.  A memorandum outside of the

7    ordinary course of the proceedings.  And it isn't a simple

8    matter to provide remote access to that code.  Giving access

9    remotely to code is part of a joint development project where

10   the access being provided is very limited.  It's very

11   different from provided access to historical code that

12   concerns a period of approximately 20 years and is written by

13   thousands of individuals.

14          Your Honor, they make much of the motion of this

15   paper trail and how they have to figure out which line changed

16   from this version to that version and this version to the next

17   version.  The copyright law, Your Honor, with respect to that

18   claim makes that entirely irrelevant.  It does not matter.  If

19   at the end of the day Linux is not substantially similar to

20   Unix, it matters not, how it is that Linux came to look like

21   it does and how Unix came to look like it does.  The notion

22   that they need to dig into the paper trail to figure out what

23   actually happened here is a red herring.

24          Counsel talks about the scheduling and suggests I

25   think that I'm somehow misleading Your Honor into believing

1    that they will get this discovery and have no time to do

2    anything with it.  SCO asked Judge Kimball, Your Honor, to

3    change the schedule.  They said they needed a status

4    conference to change the order of proceedings because IBM

5    shouldn't be allowed there to proceed with summary judgment

6    motion.  There is something improper about that, counsel

7    suggests.

8            Judge Kimball denied their request to deny IBM the

9    right to proceed with its summary judgment motions and to hold

10   a status conference addressing the concerns counsel had

11   expressed.  Judge Kimball said that if SCO has issues with

12   respect to the discovery as it relates to IBM summary judgment

13   motion, then SCO can make those part of the Rule 56(f)

14   application.

15           Your Honor, I don't believe I said, and I certainly

16   don't believe that our suggestion that it makes more sense to

17   have Judge Kimball consider these questions as they're raised

18   on the summary judgment motions is in any way an indication

19   that IBM does not recognize who is in charge of these

20   proceedings.  We understand it is Your Honor.  And I don't

21   believe that's what I said, and I don't believe that counsel

22   accurately reconstructs my argument.

23           The contact information, Your Honor, is relevant to

24   the case.  Why do I raise it?  Because they haven't given us

25   the very information they made a big deal about our not giving

1    them.  That's why I raised the issue.  It is not entirely a

2    moot point.  What is moot is their request of us.

3           The Ninth Counterclaim, Your Honor, we don't

4    believe there is any basis less the record be in any way

5    unclear to their contentions with respect to the Ninth

6    Counterclaim.  I'm not going to walk the Court through in

7    detail why it is we believe the claim they wish to bring

8    before copyright infringement is meritorious.  We think the

9    claim is without merit.  If they want to bring the claim, they

10   obviously do, they can file a motion as they have with

11   Judge Kimball seeking leave to proceed on that claim.  If

12   Judge Kimball grants their motion, it will be in the case, and

13   they can proceed with respect to discovery on that claim.

14   What they're effectively asking Your Honor to do is to give

15   them discovery with respect to a claim that is not in the

16   case, with respect to a counterclaim which is suggested that

17   counsel for IBM, me, is somehow improperly misconstruing today

18   in an effort to avoid something.

19          The claim was intended as I described.  We're

20   perfecting happy to stipulate to it.  It sounds to me like SCO

21   doesn't want the claim to be removed from the case for its own

22   strategic advantage.

23          Your Honor, I thought I heard counsel say that they

24   are not seeking information in hard copy from the files of

25   thousands of IBM developers.  That's news to me.  And if they

1    aren't, then that makes it a simpler question for the Court.

2    It is only about the CMVC.

3            But the suggestion that we didn't meet and confer

4    with them is flatly wrong.  Mr. Eskovitz shows up, Your Honor,

5    today for the first time.  I have spoke to his partner

6    Bob Silver about this very issue, and we reached clearly an

7    impasse on that point.  So the notion that we haven't met to

8    confer is simply factually wrong.

9            Thank you, Your Honor.

10           THE COURT:  Thank you, Mr. Marriott.

11           Well, you did that.  Counsel, I'm going to do three

12   things at this time.  First, I'm going to require that the

13   parties prepare and exchange privilege logs within 30 days

14   reciprocally.  I'm also going to, Mr. Marriott, require that

15   within 30 days that you provide to SCO affidavits from those

16   individuals in management, Mr. Palmisano and

17   Mr. Wladawsky-Berger, concerning what may exist within their

18   files.  Also affidavits regarding the board of directors

19   information.  And thirdly, I'm going to take the remainder of

20   this argument under advisement.

21           Anything further?

22           MR. MARRIOTT:  Thank you, Your Honor.

23           MR. ESKOVITZ:  Thank you, Your Honor.

24           THE COURT:  And gentlemen, thank you for a

25   well-presented and well-argued positions.

```
1              MR. MARRIOTT:  Thank you, Your Honor.

2              MR. HATCH:  Your Honor, one thing.  There's one

3    affidavit that would probably be included in your order.

4              (Discussion off the record between co-counsel.)

5              MR. ESKOVITZ:  I think we're okay, Your Honor.

6              MR. MARRIOTT:  May I just inquire?  This affidavit

7    exchange, is that to be reciprocal with respect to SCO, as

8    well?

9              MR. ESKOVITZ:  Your Honor, if I can just address

10   that quickly.  Mr. Marriott in his argument has raised a lot

11   of issues about SCO discovery that they've never submitted as

12   arguments to the Court in any kind of motion.

13             MR. HATCH:  There's no motion.

14             MR. ESKOVITZ:  There's no motion.

15             THE COURT:  That was my concern, Mr. Marriott, that

16   it's not the subject of a motion.  So at this time, no.  But

17   we'll leave that issue --

18             MR. MARRIOTT:  We can bring a motion, if you'd

19   like.

20             THE COURT:  All right.  Thank you.

21             MR. MARRIOTT:  Thank you.

22             THE COURT:  And I understand the position of the

23   parties on that.  I don't know that it will be necessary to

24   have a hearing on it.

25             MR. MARRIOTT:  Thank you.
```

1          THE COURT:  Thank you.  We're in formal recess.

2          (Whereupon, the court proceedings were concluded.)

3                          *   *   *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     STATE OF UTAH          )

```
1                              ) ss.

2       COUNTY OF SALT LAKE   )

3               I, KELLY BROWN HICKEN, do hereby certify that I am

4       a certified court reporter for the State of Utah;

5               That as such reporter, I attended the hearing of

6       the foregoing matter on October 19, 2004, and thereat reported

7       in Stenotype all of the testimony and proceedings had, and

8       caused said notes to be transcribed into typewriting; and the

9       foregoing pages number from 3 through 86 constitute a full,

10      true and correct report of the same.

11              That I am not of kin to any of the parties and have

12      no interest in the outcome of the matter;

13              And hereby set my hand and seal, this 26th day of

14      October 2004.

15

16

17

18

19                          _____
                             KELLY BROWN HICKEN, CSR, RPR, RMR
20

21

22

23

24

25
```



SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF SAMUEL J. PALMISANO** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **FILED UNDER SEAL** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV-0294 DAK |
| | Honorable Dale A. Kimball |
| Defendant/Counterclaim-Plaintiff. | Magistrate Judge Brooke C. Wells |

I, Samuel J. Palmisano, declare as follows:

1.     I am the Chief Executive Officer and Chairman of the Board of Directors of International Business Machines Corporation ("IBM").

2.     *This declaration is submitted in connection with the lawsuit brought by The SCO Group, Inc.* ("SCO") against IBM, titled The SCO Group, Inc. v. International Business Machines Corporation, Civil No. 2:03CV-0294 DAK (D. Utah 2003).  I make this declaration based upon personal knowledge.

3.     I allowed attorneys from IBM and Cravath, Swaine & Moore LLP to have unrestricted access to all of the documents in my possession or control, including hard copy documents, soft copy documents, and e-mails.

4.     On February 18, 2004, two attorneys, and on February 19, 2004, one attorney, came to my office in Armonk, New York, and searched through my files for documents responsive to SCO's discovery requests.  I did not withhold any documents from the attorneys' review.

5.     I declare under penalty of perjury that the foregoing is true and correct.


Executed: November 18 2004.

Armonk, New York

_____

Samuel J. Palmisano

2

## CERTIFICATE OF SERVICE

I hereby certify that on the |9|ʰ day of November, 2004, a true and correct copy of

the foregoing was hand delivered to the following:

        Brent O. Hatch
        Mark F. James
        HATCH, JAMES & DODGE, P.C.
        10 West Broadway, Suite 400
        Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

        Stephen N. Zack
        Mark J. Heise
        BOIES, SCHILLER & FLEXNER LLP
        100 Southeast Second Street, Suite 2800
        Miami, Florida 33131

        Robert Silver
        Edward Normand
        Sean Eskovitz
        BOIES, SCHILLER & FLEXNER LLP
        333 Main Street
        Armonk, New York 10504

3



SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>    Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff. | **DECLARATION OF IRVING WLADAWSKY-BERGER**<br><br>**FILED UNDER SEAL**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

I, Irving Wladawsky-Berger, declare as follows:

1.      I am currently employed by International Business Machines Corporation ("IBM") as Vice President, Technical Strategy and Innovation.

2.      This declaration is submitted in connection with the lawsuit brought by The SCO Group, Inc. ("SCO") against IBM, titled The SCO Group, Inc. v. International Business Machines Corporation, Civil No. 2:03CV-0294 DAK (D. Utah 2003).  I make this declaration based upon personal knowledge.

3.      On August 12, 2003, I met with counsel for IBM for the purpose of providing all documents in my possession that were responsive to SCO's document requests.  The attorneys discussed with me in detail each of the categories of documents sought by SCO through its document requests.

4.      During this meeting, I, with help from my administrative assistant, identified the documents in my possession (in both hard copy or electronic form) that I believed might be responsive to the document requests.  We subsequently searched for, located and forwarded all of those documents to IBM's Corporate Litigation department in White Plains, New York.

5.      I understand that further review by attorneys for IBM determined that none of the documents I provided were responsive to any of SCO's document requests.

6.      Subsequently, in both February 2004 and March 2004, my assistant and I searched again for documents that were responsive to additional document requests from SCO, as well as the March 3, 2003 Order of this Court.  We did not find any additional responsive documents.

2

7.      On October 29, 2004, I met again with several attorneys representing IBM in this litigation.  During that meeting, I recalled the existence of two folders of electronic documents on my computer that I may have overlooked in our prior searches for relevant documents.  I gave to the attorneys CDs containing copies of all of the documents in the two folders.  I understand that the attorneys have determined that some of the documents I recently provided are responsive to some of SCO's document requests, and that the attorneys will be producing those documents to SCO.

8.      I declare under penalty of perjury that the foregoing is true and correct.


Executed:  November 17, 2004.

Somers, New York

_____
                    Irving Wladawsky-Berger

[[NYLIT:2297875v1:4116W:11/11/04--11:02 a]]

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2004, a true and correct copy of the foregoing was hand delivered to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
Sean Eskovitz
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

4



SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
  *International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF ANDREW BONZANI** |
| Plaintiff/Counterclaim-Defendant, | **FILED UNDER SEAL** |
| v. | Civil No. 2:03CV-0294 DAK |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Honorable Dale A. Kimball |
| Defendant/Counterclaim-Plaintiff. | Magistrate Judge Brooke C. Wells |

I, Andrew Bonzani, declare as follows:

1.    I am currently employed by International Business Machines Corporation ("IBM") as Assistant Secretary and Associate General Counsel.

2.    This declaration is submitted in connection with the lawsuit brought by The SCO Group, Inc. ("SCO") against IBM, titled The SCO Group, Inc. v. International Business Machines Corporation, Civil No. 2:03CV-0294 DAK (D. Utah 2003). I make this declaration based upon personal knowledge.

3.    As Assistant Secretary, I am responsible for overseeing and maintaining the files with respect to the meetings of the IBM Board of Directors, including materials delivered or presented to the Board.

4.    IBM maintains files for all such materials and members of the Board are not required to maintain or preserve their own copies of such materials. At the end of each meeting of the Board of Directors, the materials for that Board meeting are left behind for collection by members of the Secretary's staff.

5.    In March 2004, I and persons under my direction conducted a full and complete search of the Board's files for documents responsive to SCO's document requests. We turned over all such documents that we believed to be responsive to our outside counsel at Cravath, Swaine & Moore LLP for their review. I understand that all responsive, non-privileged documents from the Board files have been produced to SCO.

6.      I declare under penalty of perjury that the foregoing is true and correct.

Executed:  November __, 2004.

Armonk, New York

Andrew Bonzani

## CERTIFICATE OF SERVICE

I hereby certify that on the \_\_\_ day of November, 2004, a true and correct copy of

the foregoing was hand delivered to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131

> Robert Silver
> Edward Normand
> Sean Eskovitz
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

4



SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF ALEC S. BERMAN** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **FILED UNDER SEAL** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV-0294 DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

I, Alec S. Berman, declare as follows:

1.     I am currently employed by International Business Machines Corporation ("IBM") as Associate General Counsel—Corporate Litigation.

2.     This declaration is submitted in connection with the lawsuit brought by The SCO Group, Inc. ("SCO") against IBM, titled <u>The SCO Group, Inc. v. International Business Machines Corporation</u>, Civil No. 2:03CV-0294 DAK (D. Utah 2003). I make this declaration based upon personal knowledge.

3.     On February 18, 2004, Peter Ligh, an attorney from Cravath, Swaine & Moore LLP ("Cravath"), and I visited the office of Samuel Palmisano in Armonk, New York. Mr. Ligh and I performed a thorough search of Mr. Palmisano's files. We reviewed Mr. Palmisano's documents (including his e-mails), and selected all documents that were potentially responsive to SCO's document requests for copying and further review.

4.     On February 19, 2004, I returned to Mr. Palmisano's office to review files in two additional file drawers that had been inadvertently overlooked on our visit the day before. I again selected all documents that were potentially responsive for copying and further review.

5.     After copies were made of Mr. Palmisano's potentially responsive documents, attorneys from Cravath reviewed those documents for responsiveness and privilege. I understand that more than 1,000 pages of Mr. Palmisano's documents were determined to be responsive and non-privileged and have been produced to SCO.

2

6.      I declare under penalty of perjury that the foregoing is true and correct.


Executed:  November 15, 2004.

White Plains, New York

_____
Alec S. Berman

3

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19 May of November, 2004, a true and correct copy of

the foregoing was hand delivered to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131

> Robert Silver
> Edward Normand
> Sean Eskovitz
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

4

PLEASE TAKE NOTICE that pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, counsel for plaintiff/counterclaim-defendant The SCO Group, Inc. ("SCO") will take the deposition upon oral examination of defendant/counterclaim-plaintiff International Business Machines Corporations ("IBM"), on December 15, 2004, beginning at 9:00 a.m.  This deposition will be taken at the offices of SCO's counsel Boies, Schiller & Flexner LLP, 333 Main Street, Armonk, New York, and will be taken pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure.

IBM is directed, pursuant to Fed. R. Civ. P. 30(b)(6), to designate one or more officers, directors, managing agents or other person(s) who consent to testify on its behalf concerning matters known or reasonably available to IBM, concerning the topics specified below.  The deposition will be taken before a Notary Public authorized by law to administer an oath and will continue from day-to-day until completed.  The deposition will be recorded by stenographic and videotape means.

SCO hereby incorporates all instructions, definitions and rules contained in Rules 30 and 34 of the Federal Rules of Civil Procedure, SCO's First Request for Production of Documents and First Set of Interrogatories (June 23, 2003), and the local rules or individual practices of this Court, and supplements them as follows:

As used herein the term "UNIX Software Product" refers to the entire contents of any licensed UNIX product, including all intellectual property, source code, structures, sequences, organization, ideas, methods and concepts therein; and the entire contents of any software product(s) based (in whole or in part) on, derived or modified from, or created through exposure to, the original licensed UNIX product.

DATED this 30th day of November, 2004.

*Edward Normand* /P

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*

## TOPICS FOR DEPOSITION

1. The extent to and manner in which UNIX Software Products were used, directly or indirectly, in the creation, derivation, or modification of any source code that IBM contributed to Linux, including, but not limited to, the following:

   a. The date and nature of IBM's contributions of source code from AIX or Dynix, whether copied in a literal or non-literal manner, to Linux;

   b. IBM's and Sequent's use of structures, sequences, organization, ideas, methods or concepts contained within any UNIX Software Product in developing source code that IBM contributed to Linux; and

   c. The identity of the programmers who were exposed to any UNIX Software Product.

2. Identification of and role of IBM employees or contractors involved in the work responsive to Topic 1 above.

3. Identification of the steps taken by corporate representative witness to be able to respond fully and accurately to Topics 1 and 2 above, including, but not limited to, documents reviewed, persons consulted, and databases consulted.

4. Nature of information maintained in IBM's Configuration Management Version Control ("CMVC") System, specifically with respect to AIX.

5. All actions, measures, or safeguards taken or considered by IBM related to the protection of UNIX Software Products subject to license agreements between AT&T and IBM.

6. All actions, measures, or safeguards taken by or considered by IBM in connection with the development of AIX to ensure compliance with the protection of UNIX Software Products under license agreements between AT&T and IBM.

7. All actions, measures, or safeguards taken by or considered by IBM in connection with contributions made by IBM to Linux to ensure compliance with the protection of UNIX Software Products under license agreements between AT&T and IBM.

8. Topics 1 through 7 above, with respect to conduct by Sequent, license agreements between AT&T and Sequent, Dynix code, and Revision Control System ("RCS") for Dynix.

9. All agreements entered into by IBM concerning IBM's intent to contribute source code to Linux from AIX and/or Dynix, and/or IBM's contribution of such source code to Linux.

10. IBM's consideration, discussion, or analysis of the source code that IBM decided to contribute to Linux and IBM's reasons for contributing that code to Linux.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing

**PLAINTIFF/COUNTERCLAIM-DEFENDANT SCO'S NOTICES OF 30(b)(6)**

**DEPOSITION** to be served on this 30th day of November, 2004, to the following:

By Hand Delivery –

    David R. Marriott, Esq.
    Cravath, Swaine & Moore LLP
    Worldwide Plaza
    825 Eighth Avenue
    New York. New York 10019
    Tel:   212-474-1000
    Fax:  212-474-3700

And by U.S. Mail, first class postage prepaid –

    Alan L. Sullivan, Esq.
    Todd M. Shaughnessy, Esq.
    Snell & Wilmer L.L.P.
    15 West South Temple, Ste. 1200
    Gateway Tower West
    Salt Lake City, Utah 84101
    Tel:   801-257-1900
    Fax:  801-257-1800

    Donald J. Rosenberg, Esq.
    1133 Westchester Avenue
    White Plains, New York 10604

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **PLAINTIFF/COUNTERCLAIM-DEFENDANT SCO'S AMENDED NOTICE OF 30(b)(6) DEPOSITION** <br><br><br> Case No. 2:03CV0294DAK <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

PLEASE TAKE NOTICE that pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, counsel for plaintiff/counterclaim-defendant The SCO Group, Inc. ("SCO") will take the deposition upon oral examination of defendant/counterclaim-plaintiff International Business Machines Corporations ("IBM"), on December 16, 2004, beginning at 9:00 a.m.  This deposition will be taken at the offices of SCO's counsel Boies, Schiller & Flexner LLP, 333 Main Street, Armonk, New York, and will be taken pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure.

IBM is directed, pursuant to Fed. R. Civ. P. 30(b)(6), to designate one or more officers, directors, managing agents or other person(s) who consent to testify on its behalf concerning matters known or reasonably available to IBM, concerning the topics specified below.  The deposition will be taken before a Notary Public authorized by law to administer an oath and will continue from day-to-day until completed.  The deposition will be recorded by stenographic and videotape means.

SCO hereby incorporates all instructions, definitions and rules contained in Rules 30 and 34 of the Federal Rules of Civil Procedure, SCO's First Request for Production of Documents and First Set of Interrogatories (June 23, 2003), and the local rules or individual practices of this Court, and supplements them as follows:

As used herein the term "UNIX Software Product" refers to the entire contents of any licensed UNIX product, including all intellectual property, source code, structures, sequences, organization, ideas, methods and concepts therein; and the entire contents of any software product(s) based (in whole or in part) on, derived or modified from, or created through exposure to, the original licensed UNIX product.

DATED this 2nd day of December, 2004.

*Sean Eskovitz*

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*

## TOPICS FOR DEPOSITION

1. The negotiation and execution of all license agreements between IBM and AT&T regarding any UNIX Software Product, and any and all amendments or modifications thereto.

2. IBM's interpretation of the restrictions regarding use of UNIX Software Products contained in all license agreements relating to such products, and any and all amendments thereto.

3. Consideration and discussion concerning UNIX licensing rights, limitations, and potential liabilities, in connection with IBM's acquisition of Sequent.

4. All communications with Novell, Inc. ("Novell") relating to SCO and/or any of its predecessor entities, including, but not limited to, communications relating to the Asset Purchase Agreement between Novell and the Santa Cruz Operation, Inc., and any amendments thereto.

5. IBM's decision to pursue its Linux-related business, including, but not limited to, any assessments of (a) IBM's ability to contribute to Linux in compliance with its contractual obligations regarding UNIX Software Products; (b) the effect on UNIX and UNIX-related products of supporting Linux; (c) the importance of IBM support to making Linux successful as an operating system for large businesses; and (d) the manner(s) in which IBM would recoup its investment in contributing to and promoting Linux.

6. All measures, actions, and efforts taken by IBM to access, obtain, or download computer files and/or code from SCO's website, including, without limitation, the materials identified in the Declaration of Kathleen Bennett that IBM submitted in

support of its motion for summary judgment on SCO's breach-of-contract claims and the Declaration of Kathleen Bennett that IBM submitted in support of its motion for summary judgment on its counterclaim for copyright infringement (Eighth Counterclaim).

7. Identification of all individual(s) (by name, position, particular responsibility, and current location) who were principally responsible for (1) the programming development of AIX and Dynix (including Dynix/ptx); and (2) the programming development of Linux using, in any manner whatsoever, materials from those programs. This request includes, without limitation, identification of all relevant chief technology officers, chief software architects, and chief software engineers.

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing

PLAINTIFF/COUNTERCLAIM-DEFENDANT SCO'S AMENDED NOTICE OF

30(b)(6) DEPOSITION was served on Defendant International Business Machines

Corporation on December 2, 2004, by hand delivery and U.S. Mail to:

David R. Marriott, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

And U.S. Mail to:

Alan L. Sullivan, Esq.
Todd Shaughnessy, Esq.
Snell & Wilmer L.L.P.
15 West South Temple, Ste. 1200
Gateway Tower West
Salt Lake City, Utah 84101-1004

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York 10604

BOIES, SCHILLER & FLEXNER LLP

By: *Sean Eskovitz*

Robert Silver
Edward Normand
Sean Eskovitz

HATCH, JAMES & DODGE
Brent O. Hatch

Attorneys for The SCO Group, Inc.

FROM CRAVATH SWAINE & MOORE LLP (FRI) 12-10-04 18:57/ST 18:57/NO. 4864592011 P 1

FAX DEPT.
04 DEC 10 PM 6:56

# CRAVATH, SWAINE & MOORE LLP

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:   (212) 474-1000
Fax:   (212) 474-3700



Date:  December 10, 2004

| Name/Firm | | Fax No. | Phone No. |
|---|---|---|---|
| To:  Edward Normand, Esq.<br>      Boies, Schiller & Flexner LLP | | (914) 749-8300 | (914) 749-8200 |
| From:  Christopher Kao/4752 | Room:  3914W | (212) 474-3700 | (212) 474-1342 |

## TOTAL NUMBER OF PAGES, INCLUDING THIS COVER SHEET: 05
### IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL (212) 474-1342.

Message:

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN
INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE. If the reader of this message is not the intended recipient or
an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (212) 474-1342 and return the
original message to us by mail. Thank you.

Reference No.        02281-293

# CRAVATH, SWAINE & MOORE LLP

GEORGE J. GILLESPIE, III
THOMAS R. BROME
ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN W. WHITE
JOHN E. BEERBOWER
EVAN R. CHESLER
PATRICIA GEOGHEGAN
D. COLLIER KIRKHAM
MICHAEL L. SCHLER
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
NEIL P. WESTREICH
FRANCIS P. BARRON

RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
W. CLAYTON JOHNSON
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
WILLIAM B. BRANNAN
LEWIS R. STEINBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
JOHN T. GAFFNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOCKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE

SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE

SPECIAL COUNSEL
SAMUEL C. BUTLER
THOMAS D. BARR

OF COUNSEL
ROBERT ROSENMAN
CHRISTINE BESHAR

December 10, 2004

SCO v. IBM; IBM v. SCO

Dear Ed:

I write in response to the 30(b)(6) notices served by SCO on November 30, 2004 (the "First Notice") and December 2, 2004 (the "Second Notice"). This letter sets forth IBM's responses and objections to SCO's notices and incorporates by reference IBM's General Objections set forth in IBM's response to SCO's first set of interrogatories and document requests.

First Notice

Topic 1. IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. IBM further objects to this topic as it seeks discovery more appropriately sought by other means. Please let us know if you would like IBM to treat this request as an interrogatory.

Topic 2. IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. IBM further objects to this topic as it seeks discovery more appropriately sought through interrogatories. Please let us know if you would like IBM to treat this request as an interrogatory.

Topic 3. As Topic 3 relates entirely to Topics 1 and 2, IBM will not produce a witness on Topic 3.

Topic 4. IBM objects to this topic on the grounds that it is overbroad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence, particularly to the extent it relates to programs other than AIX. Subject to, as limited by, and without waiving its objections, IBM will produce

Joan Thomas to testify as to the nature of information concerning AIX maintained in
IBM's CMVC system.

Topic 5.  IBM objects to this topic on the grounds that it is vague, ambiguous,
overbroad and unduly burdensome.  Subject to, as limited by, and without waiving its
objections, IBM will produce Joan Thomas to testify as to actions, measures or
safeguards taken by IBM related to the protection of code obtained from AT&T pursuant
to license agreements between AT&T and IBM.

Topic 6.  IBM objects to this topic on the grounds that it is vague, ambiguous,
overbroad and unduly burdensome.  Subject to, as limited by, and without waiving its
objections, IBM will produce Joan Thomas to testify as to actions, measures or
safeguards taken by IBM related to the protection of code obtained from AT&T pursuant
to license agreements between AT&T and IBM.

Topic 7.  IBM objects to this topic on the grounds that it is vague, ambiguous,
overbroad and unduly burdensome.  Subject to, as limited by, and without waiving its
objections, IBM will produce Joan Thomas to testify as to actions, measures or
safeguards taken by IBM related to the protection of code obtained from AT&T pursuant
to license agreements between AT&T and IBM.

Topic 8.  IBM restates its objections to Topics 1 through 7 above.  IBM will
produce Scott Nelson to testify to the nature of information concerning Dynix maintained
in Sequent's RCS system.  IBM will also produce Scott Nelson to testify as to actions,
measures or safeguards taken by Sequent related to the protection of code obtained from
AT&T pursuant to license agreements between AT&T and Sequent.

Topic 9.  IBM objects to this topic on the grounds that it vague, ambiguous and
seeks discovery more appropriately sought by other means.  Subject to, as limited by, and
without waiving its objections, IBM will produce Daniel Frye to testify as to agreements,
if any, entered into by IBM concerning IBM's contribution of source code to Linux from
AIX and/or Dynix.

Topic 10.  IBM objects to this topic on the grounds that it is overbroad, unduly
burdensome, seeks discovery more appropriately sought by other means, and seeks
information that is duplicative and cumulative of information already produced by IBM
in response to SCO's discovery requests.  Subject to, as limited by, and without waiving
its objections, IBM will produce Daniel Frye to testify as to the factors generally
considered, discussed or analyzed by IBM before deciding to contribute any source code
to Linux.  IBM cannot, and will not, produce a witness to testify concerning the specific
consideration, discussion or analysis of each and every contribution IBM has ever made
to Linux.

FROM CRAVATH SWAINE & MOORE LLP     Case 2:03-cv-00294-DN   Document 365-2   Filed 12/23/04   PageID.2735   Page 84 of 86
(FRI) 12. 10' 04 18:59/ST.18:57/NO. 4864992011 P 4

3

Second Notice

Topic 1. IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence. IBM further objects to this topic on the grounds that it seeks discovery more appropriately sought by other means. IBM further objects to this topic on the grounds that it seeks information duplicative and cumulative of testimony that has been, or will be, provided to SCO.

Topic 2. IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence. IBM further objects to this topic as it seeks discovery more appropriately sought by other means. IBM further objects to this topic on the grounds that it is duplicative and cumulative of testimony that has been, or will be, provided to SCO.

Topic 3. IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence. IBM further objects to this topic on the grounds that it calls for legal conclusions and information protected by the attorney-client privilege.

Topic 4. IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence and information. IBM further objects to this topic on the grounds that it seeks discovery more appropriately sought by other means. IBM further objects to this topic on the grounds that it is duplicative and cumulative of information already produced by IBM in response to SCO's discovery requests.

Topic 5. IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence. IBM further objects to subpart (a) of this topic on the grounds that it calls for legal conclusions and information protected by the attorney-client privilege. Subject to, as limited by, and without waiving its objections, IBM will produce Daniel Frye to testify as to Topic 5(b), (c) and (d).

FROM CRAVATH SWAINE & MOORE LLP            (FRI)12.10 04 18:59/ST.18:57/NO.4864992011 P 5

4

Topic 6.  IBM objects to this topic on the grounds that it is overbroad and unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to admissible evidence.  IBM further objects to this topic on the grounds that it seeks information that is duplicative and cumulative of information already provided to SCO.  Subject to, as limited by, and without waiving its objections, IBM will produce Kathleen Bennett to testify as to the measures, actions and efforts taken by IBM to access, obtain or download code from SCO's website as described in the Declaration of Kathleen Bennett submitted in support of IBM's Motion for Partial Summary Judgment on SCO's Contract Claims and the Declaration of Kathleen Bennett submitted in support of IBM's Motion for Partial Summary Judgment on IBM's Eighth Counterclaim.

Topic 7.  IBM objects to this topic on the grounds that it is vague, ambiguous, overbroad and unduly burdensome.  IBM further objects to this topic on the grounds that it seeks information that is duplicative and cumulative of information already provided by IBM in response to SCO's discovery requests.

The witnesses identified herein are not available to be deposed on December 15, 2004 and December 16, 2004 as proposed by SCO.  We are inquiring into their schedules and will provide you with alternate dates as soon as possible.

Please feel free to call me if you have any questions.

Sincerely,

Christopher Kao

Edward Normand, Esq.
   Boies, Schiller & Flexner LLP
      333 Main Street
        Armonk, NY 10504

VIA FACSIMILE

Copy to:

Todd M. Shaughnessy, Esq.
   Snell & Wilmer L.L.P.
      15 South West Temple, Suite 1200
        Salt Lake City, Utah 84101

VIA FACSIMILE

# BOIES,    SCHILLER  &  FLEXNER  LLP

333 MAIN STREET • ARMONK, NY 10504 • PH. 914.749.8200 • FAX 914.749.8300

December 14, 2004

By Facsimile and First Class Mail
Amy Sorensen, Esq.
Snell & Wilmer LLP
15 W. South Temple
Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101

Re:    SCO v. IBM, Case No. 2:03CV-0294 DAK

Dear Amy:

This is to confirm my understanding from our conversation yesterday morning that counsel for IBM has undertaken to obtain deposition dates in early January for the witnesses IBM has agreed to produce in response to the notices of deposition pursuant to Rule 30(b)(6) that SCO served on November 30 and December 2, 2004. In consideration of that undertaking, SCO agrees to postpone those depositions from their originally scheduled dates of December 15 and 16, 2004.

Sincerely,

Edward Normand