information for witnesses for whom the Court did not require IBM to provide such information. With respect to each of these three categories of information, IBM has already provided to SCO all of the information it is obligated or should be required to produce.[5]

As IBM has fully complied with this Court's Order, SCO's "renewed" motion to compel should be denied. There is no legitimate basis for SCO's motion. Instead, SCO appears to have filed this motion merely to prolong discovery unnecessarily (by making IBM gather and produce masses of irrelevant information and information that SCO could discover on its own with little effort) and to forestall the adjudication of IBM's pending motion for summary judgment on its Tenth Counterclaim. Indeed, SCO filed this motion without conferring with IBM as required under DUCivR 37-1(a) and Fed. R. Civ. P. 37(a)(2)(A), presumably because SCO knew the issues it raises could easily have been resolved by the parties without involvement of the Court.

### Argument

### I.      SCO DID NOT CONFER WITH IBM BEFORE FILING ITS MOTION.

SCO filed the instant motion the day before it filed its opposition to IBM's summary judgment motion on IBM's Tenth Counterclaim and then relied on the pendency of the motion to compel as grounds for denying IBM's summary judgment motion. It filed this motion, however, without any attempt properly to confer with IBM and in disregard of this Court's rule that the moving party submit "a statement showing that the attorney making the motion has made a reasonable effort to reach agreement with opposing attorneys on the matters set forth in the motion". DUCivR 37-1(a); see also Fed. R. Civ. P. 37(a)(2)(A) (requiring certification "that the

---

[5]   As the Court has never previously required IBM to provide these materials, SCO cannot properly characterize its instant application as a "renewed" motion.

- 4 -

movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action"). SCO's motion should therefore be denied for this reason alone. See e.g., Haselhorst v. Wal-Mart Stores, Inc., 163 F.R.D. 10, 11 (D. Kan. 1995) (denying motion to compel because moving party failed to adequately confer before filing motion); Hoelzel v. First Select Corp., 214 F.R.D. 634, 635-36 (D. Colo. 2003) (same).

Although the matters raised in SCO's motion could easily have been resolved without imposing on the Court, SCO failed even to discuss them with IBM. Instead, when IBM simply sought clarification as to exactly what information SCO proposed IBM provide for certain third-party witnesses, and to confirm that SCO was willing to provide IBM with the same information, SCO abruptly ended communication with IBM and filed this motion. (See Declaration of Amy F. Sorenson ("Sorenson Decl.") Exs. 1 & 2.) Moreover, had SCO asked (and it never did), IBM would have confirmed in writing that it has produced the non-privileged, responsive documents located in the files of its senior executives. Finally, as to the additional source code files sought by SCO, IBM would have suggested (quite reasonably, we believe) that SCO's Memorandum Regarding Discovery be addressed by the Court before SCO filed a separate motion seeking the same materials.

## II.   IBM HAS FULLY COMPLIED WITH THE COURT'S ORDER.

SCO's "renewed" motion to compel should further be denied because IBM has fully complied with the Court's Order and there is no valid basis for the relief SCO seeks.

309594.1

A.    IBM Has Produced All of the Source Code Files to Which SCO Is Entitled.

Despite SCO's request (in its original motion to compel) that IBM be ordered to produce all source code files for its AIX and Dynix operating systems, the Court ordered in its March 3, 2004 Order, only that IBM provide "the releases of AIX and Dynix consisting of 'about 232' products as was represented by Mr. Marriott at the February 6, 2004 hearing". (3/3/04 Order at II.1.) IBM produced all of these releases of AIX and Dynix well in advance of the April 19, 2004 deadline set by the Court.[6]

In this "renewed" motion to compel, however, SCO asserts that IBM failed to comply with this Court's Order and engaged in "discovery abuse" by not producing the very source code files the Court held IBM did not have to produce. SCO's argument is frivolous. The Court rejected SCO's original motion seeking this information. Indeed, the Court specifically provided in its Order that it would "consider ordering IBM to produce more code from AIX and Dynix" only if SCO submitted additional briefing to the Court that would "include, with specificity, and to the extent possible, identification of additional files SCO requests and the reasons for such requests". (3/3/04 Order at II.1.)

SCO purportedly invoked this very procedure in filing its Memorandum Regarding Discovery on May 28, 2004 requesting the production of all source code (rather than just specific files) maintained by IBM for its AIX and Dynix programs in its internal "CMVC" and "RCS" databases. On June 23, 2004, IBM filed its Response to SCO's Memorandum Regarding Discovery (which IBM hereby incorporates by reference and will not repeat here)

---

[6] IBM produced virtually all of the source code ordered by the Court to be produced in its March 3, 2004 order on March 4 (the day after it was ordered to do so and six weeks before it was required). IBM completed its production of source code five days later on March 9.

- 6 -

setting forth the reasons IBM believes SCO's Memorandum Regarding Discovery should be denied. In short, IBM opposes SCO's application because the additional source code, roughly two billion lines of code, sought by SCO is irrelevant and unnecessary to this case and is unduly burdensome to produce.[7]

Nevertheless, before SCO's reply brief in support of its Memorandum Regarding Discovery was due, and before this Court even had the opportunity to consider SCO's application, SCO filed this "renewed" motion asking for the same source code files from IBM's internal databases. The request should be denied for the same reasons set out in IBM's Response to SCO's Memorandum Regarding Discovery. In any event, SCO's Memorandum Regarding Discovery should be heard by the Court before SCO is permitted to "renew" its motion to compel seeking additional source code files from IBM.

SCO's further insinuation that IBM failed to comply with the Court's direction to "provide further responses to SCO's interrogatory numbers two, five and eleven" by not producing the source code files from its internal databases also is meritless.[8] (3/3/04 Order at II.5.) Again, there is no basis for SCO's contention that IBM's failure to produce materials the Court specifically ruled IBM did not have to produce constitutes non-compliance with the Court's Order.

---

[7] Indeed, in light of SCO's complaints in opposition to IBM's summary judgment motion that it could take SCO "25,000 man-years" to review the millions of lines of source code already in its possession, SCO's contention that it requires still more source code from IBM is not credible and appears crafted solely to give SCO an excuse to further delay the proceedings in this case.

[8] As SCO points out, there appears to be a typographical error in the Court's Order, as SCO did not move to compel a further response to Interrogatory No. 11.

309594.1

SCO's initial motion to compel filed on November 4, 2003 (Sorenson Decl. Ex. 3)

concerned three interrogatories—Interrogatory Nos. 2, 4 and 5. They provide as follows:

> Interrogatory No. 2
> List the names and addresses of all persons who are believed or known by you, your
> agents, or your attorneys to have any knowledge concerning any of the issues of this
> lawsuit; and specify the subject matter about which the witness has knowledge.
>
> Interrogatory No. 4
> Identify all persons who have or had access to UNIX source code, AIX source code and
> Dynix source code, including derivative works, modifications, and methods. For each
> such person, set forth precisely the materials to which he or she had access.
>
> Interrogatory No. 5
> Identify IBM or Sequent personnel that work or worked on developing source code,
> derivative works, modifications or methods for AIX, Dynix and Linux, specifying for
> each person their precise contributions to each.

(Sorenson Decl. Ex. 4.) SCO's principal complaint regarding IBM's initial responses to these

interrogatories was that IBM failed to identify certain senior executives of IBM and third-party

witnesses in response to Interrogatory No. 2 and to provide addresses for the individuals

identified in response to Interrogatory Nos. 4 and 5. As we understood the March 3, 2004 Order,

the Court directed IBM to provide this additional information. Accordingly, IBM served

supplemental interrogatory responses on April 19, 2004 (Sorenson Decl. Exs. 5 & 6), identifying

additional witnesses in response to Interrogatory No. 2 and providing contact information for

certain IBM employees identified in Interrogatory Nos. 4 and 5.

SCO now suggests IBM failed to comply with the Court's Order because IBM has

not specified, for each of the more than 7,200 individuals who IBM identified in its responses to

Interrogatory Nos. 4 and 5, the exact contributions, if any, that such individual made to AIX,

Dynix or Linux. The unreasonableness of SCO's request is obvious on its face, which is why

IBM specifically objected to having to provide such information. SCO's case against IBM

- 8 -

309594.1

concerns code that IBM is alleged to have improperly <u>contributed to Linux</u>, as opposed to code

that IBM developed for AIX and Dynix and <u>did not</u> contribute to Linux.  As to Linux, the

identity of each IBM employee that contributed source code to Linux and the exact contribution

that employee made to Linux is a matter of public record and readily obtainable by SCO.

Indeed, the Court specifically ruled in its Order that, with respect to IBM's Linux contributions,

"SCO should use its best efforts to obtain relevant discovery from the Linux contributions that

are known to the public".[9]  (3/3/04 Order at II.2.)

As to AIX and Dynix, apart from reviewing the approximately two billion lines of

source code that exist in IBM's internal databases (which even then will not necessarily identify

the exact contributions of each individual), there is no precise way to determine what code any of

the more than 7,200 individuals identified in response to Interrogatory Nos. 4 and 5 contributed

to AIX or Dynix.[10]  Since the vast majority of these source code files are wholly irrelevant to this

case (under any theory) because they were <u>not</u> contributed to Linux, IBM does not believe there

---

[9]  To the extent IBM employees made submissions to Linux that were not adopted and might not
be available in the public domain, IBM has already produced such submissions to SCO as the
Court directed.

[10]  Accordingly, IBM noted in its response to Interrogatory No. 5 that, "[t]o the extent readily
<u>determinable</u>, the precise contributions of these individuals can be ascertained from the public
record in the case of IBM contributions to Linux and in the cases of AIX and Dynix from the
products themselves".  IBM's response is not misleading.  Identifying the contributions of more
than 7,200 individuals to AIX and Dynix, which each consist of millions of lines of code, cannot
be performed with any precision, and is best undertaken in the first instance by reviewing the
source code for AIX and Dynix for authorship information.  SCO's complaint that IBM's
response is "an abusive discovery response not designed to further the resolution of this case, but
to obfuscate" is misdirected.  (SCO Br. at 5 n.6.)  On the contrary, it is SCO's <u>request</u>, which
asks IBM to undertake a burdensome review of billions of lines of source code to provide
information that is not even relevant to this case, that is abusive.  SCO's interrogatory request is
intended merely to provide cover for the shortcomings of SCO's discovery's responses and to
delay the prompt resolution of this case.

309594.1

is any basis for ordering the production of these source code files.[11]  Moreover, as the Court

established a specific procedure by which SCO could seek additional source code files, IBM did

not understand the Court's order that IBM "provide further responses to SCO's interrogatory

numbers two, five and eleven" to mean that IBM was required to produce all the source code

files in IBM's CMVC and RCS databases that the Court had elsewhere ruled IBM need not

produce.  SCO's contrary interpretation of the Court's Order is illogical.

      B.      IBM Has Searched For, and Produced, Responsive Documents From the Files of
             Its Executives and Board of Directors.

          IBM has conducted a diligent search of its files for documents responsive to

SCO's requests and has produced nearly one million pages of documents to SCO to date, almost

twice the number of pages of documents produced by SCO.  Notwithstanding SCO's speculation

to the contrary, IBM has collected and produced the non-privileged, responsive documents that

were found in the files of its senior executives and its Board of Directors.  SCO's suggestion,

therefore, that IBM has improperly "filtered" and excluded responsive documents is simply

wrong.  Accordingly, there is nothing for this Court to compel IBM to do—IBM has produced

the documents requested by SCO.

          Moreover, SCO in any event misstates the sequence of events in this case and the

scope of the discovery to which SCO is entitled.  First, SCO suggests that it has moved to

compel "two times" to obtain documents from IBM's senior management.  (SCO Br. at 3.)  That

is false.  SCO's original motion to compel (Sorenson Decl. Ex. 3) addressed only three (Nos. 2, 3

---

[11]  Apart from its bare assertions that the code is relevant, SCO still does not—because it
cannot—explain the relevance of the millions of lines of source code that IBM did not contribute
to Linux.

and 11) of the 52 requests contained in SCO's First Request for the Production of Documents (Sorenson Decl. Ex. 4), each of which requested that IBM produce certain computer code, not documents. Although some of the requests in SCO's First Set of Document Requests (e.g., Requests Nos. 32-35 and 42) call for the production of certain categories of documents concerning Linux, SCO's motion did not concern those requests.

The first time SCO asserted its (mistaken) belief that IBM had failed to produce responsive documents from its senior executives was at oral argument at the February 6, 2004 hearing before this Court, during which SCO appeared to complain primarily about IBM's failure to produce documents responsive to requests in SCO's Second Set of Document Requests (Sorenson Decl. Ex. 7), which were served on December 4, 2003, the day before the Court stayed further discovery of IBM.[12]  (See 2/6/04 Hearing Tr. at 26.)  In particular SCO appeared concerned that IBM had failed to produce documents responsive to Request No. 53, which asks for the production of:

> "All documents concerning IBM's decision to adopt, embrace or otherwise promote Linux, including but not limited to the following:
>
> a.  all such documents in the possession of Sam Palmisano, Irving Wladawsky-Berger, Paul Horne [sic] and Nick Bowen;
>
> b.  the report prepared by Nick Bowen, including all drafts and e-mails pertaining thereto, submitted to IBM management on or about December 20, 1999;
>
> c.  all presentations made to IBM's top management including its Board of Directors concerning such decision;

---

[12]  SCO did not confer with IBM as required under DUCivR 37-1(a) or Fed. R. Civ. P. 37(a) before raising this issue at oral argument.

309594.1

d.      all documents from all Board of Directors' meetings relating to such
        decision, including Board notebooks, Board minutes and notes from all
        persons in attendance at such meetings."

(Sorenson Decl. Ex. 7.) This, of course, should have come as no surprise to SCO as it had served

the request on IBM the day before the Court entered the stay, and the stay had not been lifted as

of February 6, 2004.

In any case, IBM has fully complied with the Court's March 3, 2004 Order. IBM

has produced approximately 2,500 pages of documents directly responsive to SCO's Request No.

53, which seeks documents concerning the Linux strategy adopted by IBM in 1999 and

discussed in the March 20, 2000 *New York Times* article, including from IBM's CEO Samuel

Palmisano, Paul Horn and Nick Bowen.

Second, SCO is plainly not entitled to "the full files of Palmisano, Wladawsky-

Berger, [and] IBM's Board" as it now apparently suggests. (SCO Br. at 4 (emphasis added).)

There is no basis for the Court to compel IBM to produce every document in the possession of

Mr. Palmisano, Mr. Wladawsky-Berger and IBM's Board of Directors (such as those that simply

contain the word "Linux" in them), without regard to the relevance of those documents to the

issues in this lawsuit or whether they are privileged. SCO's request is overbroad on its face.

SCO has served document requests seeking materials that at least SCO has identified as being

relevant (often incorrectly, we believe) to its lawsuit against IBM. IBM searched the files of Mr.

Palmisano, Mr. Wladawsky-Berger and the Board of Directors and produced whatever non-

privileged, responsive documents exist in those files. IBM should not be made to produce

documents that SCO has not even asked for in any of its document requests, and which bear no

relevance to the issues in this case.

- 12 -

C.   IBM Has Provided Contact Information For the Individuals Identified In IBM's Interrogatories.

SCO's contention that IBM has failed properly to provide SCO with contact information for certain witnesses is also mistaken. As an initial matter, IBM objected to providing contact information for each of the more than 7,200 individuals identified in response to Interrogatory Nos. 4 and 5 because IBM did not believe the information to be relevant and because of the burden involved in supplying such information. The Court's March 3, 2004 Order directed IBM to provide contact information for 1,000 of these individuals, as agreed upon by SCO and IBM, and IBM promptly sent a letter on March 9, 2004 to SCO asking it to identify the 1,000 individuals for whom it desired contact information. (See Sorenson Decl. Ex. 8.)

SCO apparently took the Court's Order as a license to demand that IBM provide contact information for any 1,000 individuals, including individuals never identified by IBM in response to any of SCO's interrogatories and third-party witnesses for whom IBM does not even possess any information. Thus, in response to IBM's March 9 letter, SCO asked IBM to provide contact information for individuals that IBM did not identify in response to SCO's Interrogatory Nos. 4 and 5.[13] (See Sorenson Decl. Ex. 9.) Subsequently, SCO sent a letter on June 4, 2004 requesting contact information for certain third-party witnesses identified by IBM in response to Interrogatory No. 2, including such individuals as SCO's co-founders Ransom Love and Bryan

---

[13] SCO claims that its March 26, 2004 letter merely asked for contact information for witnesses either identified by IBM in response to Interrogatory Nos. 4 and 5 or from whom IBM produced documents, but did not identify in its responses. However, SCO's request in fact also asked for contact information for witnesses whom IBM has never identified in its interrogatory responses and from whom IBM has not produced any documents.

309594.1

Sparks, <u>SCO's former general counsel</u> Harrison Colter[14] and <u>current SCO employee</u> Michael Davidson, among others. (<u>See</u> Sorenson Decl. Ex. 10.) IBM does not possess contact information for these individuals, although <u>counsel</u> for IBM has found contact information or possible contact information for certain of these individuals in the course of its investigation (information that could just as easily be found by SCO).

IBM did not understand SCO's interrogatory requests or the Court's Order to be so far-ranging. Indeed, SCO itself has not come anywhere near to providing the type of information it now seeks to compel IBM to provide. For instance, for the majority of the third-party witnesses SCO identifies in its Supplemental Answer to IBM's Interrogatory No. 10 (Sorenson Decl. Ex. 11), SCO does not even provide the name of each witness's employer (as IBM did), let alone any contact information. (<u>See id.</u>) In addition, SCO provides no contact information for any of the nearly 40 individuals from whom it produced documents but failed to identify in its interrogatory responses. (<u>See</u> Sorenson Decl. Ex. 12.)

Although we do not believe SCO is entitled to such information, in the interest of moving this case forward and obviating a silly dispute, IBM has supplemented its interrogatory responses (without waiving its work product protections) and provided contact information for the individuals identified by SCO in its two letters to IBM. (<u>See</u> Sorenson Decl. Exs. 13 & 14.) For the third-party witnesses, IBM does not purport to certify the accuracy of the information provided, as the information has been gathered from public sources, such as the telephone book

---

[14] Mr. Colter is a member of the Utah State Bar, and counsel for The Canopy Group—SCO's largest shareholder—from whom third party discovery has been sought in this case. Mr. Colter's address and phone number not only appears in local legal directories and phone books, it appears on the letters he has written in this case, copies of which have been sent to SCO's counsel.

- 14 -

and various Internet websites. In fact, for many of these witnesses, such as current or former

SCO employees, IBM believes that SCO is in a better position than IBM to know their contact

information.

        As a matter of fairness and reciprocity, IBM requests that SCO be ordered

similarly to provide contact information in the possession of SCO or SCO's counsel for each of

the witnesses identified in SCO's responses to IBM's interrogatories, including third-party

witnesses, and each of the persons from whom SCO has produced documents but did not identify

in its interrogatory responses.

## III.    SCO'S "RENEWED" MOTION IS CRAFTED ONLY TO DELAY FURTHER THE PROCEEDINGS OF THE CASE.

        SCO devotes nearly four pages of its brief to a diatribe touting the strength of its case

against IBM (yet, consistent with its conduct throughout the case, still without showing any of its

supposed evidence) and the alleged weakness of IBM's defenses. SCO's invective is not in any

way relevant to the issues raised in its motion to compel and appears, in fact, to be written for an

audience other than the Court.[15]

---

[15] The "pattern" of alleged discovery abuse is, as IBM has explained in this memorandum, entirely imagined by SCO. IBM has complied with its discovery obligations. Moreover, the notion that IBM "sandbagged" SCO by not providing SCO with certain fact witness declarations prior to their depositions is not well-founded. Courts have found such declarations to be work product not required to be produced in discovery. See, e.g., Abell v. Babbitt, No. 98-2315, 1999 WL 215403 at *2, (10th Cir. Apr. 14, 1999) (holding that witness affidavits attached to summary judgment motion were "not part of the discovery process, and are protected by the attorney-client and attorney work product privileges") (copy attached as Exhibit A); Battenfield of Am. Holding, Inc. v. Baird, Kurts & Dobson, No. 97-2336, 1999 WL 414312 at *2 (D. Kan. May 13, 1999) (denying motions to strike and for sanctions for failure to produce an executed witness declaration because the declaration constituted work product and was not required to be disclosed to opposing party) (copy attached as Exhibit B); Intel Corp. v. VIA Techs., Inc., 204 F.R.D. 450, 452 (N.D. Cal 2001) (denying motion to strike because executed witness declaration

- 15 -

In any event, SCO's assertion that IBM is seeking to prevent SCO from conducting discovery is baseless. As IBM's contributions to Linux and the identity of the contributors are a matter of public record, SCO has had from the beginning of this case (indeed, well before the beginning of this case), all it needs to determine who from IBM it would like to depose. In addition, with respect to any third-party witnesses, SCO is as least as well equipped as IBM to locate those witnesses. SCO's excuses for not diligently proceeding with discovery are entirely manufactured. There has been no impediment to SCO's taking discovery in this case apart from SCO's own desire to delay the resolution of this case for as long as possible so as to cultivate the fear, uncertainty and doubt it has sown in the marketplace regarding Linux.

Indeed, SCO has abjectly resisted all efforts by IBM to proceed with discovery at every turn. Among other things:

- SCO has consistently refused to provide proper answers to IBM's interrogatories, including failing repeatedly—and despite two Court orders to do so—to identify the UNIX System V code from which code in Linux is allegedly copied. This despite the fact that SCO has represented in the media, and indeed to another federal district court, that SCO is aware of "significant instances of line-for-line and 'substantially similar' copying of code from Unix System V into Linux".

- SCO has consistently refused to produce documents responsive to IBM's document requests, including in particular source code analyses SCO has publicized as supporting its claims.

---

"was clearly work product right up until the moment it was filed" with summary judgment motion). Indeed, we believe SCO itself to be in possession of numerous such declarations that it has not produced to IBM. At any rate, simply because a witness's testimony is unfavorable for SCO does not mean that SCO has been "sandbagged".

- 16 -

- SCO has interfered with subpoenas IBM has served on third parties, including instructing third parties not to produce documents to IBM until after SCO had reviewed the third party's documents.[16]

- SCO moved (three days before they were scheduled to be taken) to prevent IBM from taking depositions of third-party witnesses that IBM had properly noticed and scheduled nearly one month in advance.

SCO's "renewed" motion is nothing more than an attempt by SCO to deflect attention from its own failings in discovery and to delay further the proceedings in this case, by forestalling a decision on IBM's pending motion for summary judgment and by seeking to occupy IBM in gathering and producing unnecessary and irrelevant discovery.

### Conclusion

For the foregoing reasons, SCO's "renewed" motion to compel should be denied.

DATED this 4th day of August, 2004.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

---

[16] In at least one instance so far, SCO directed a third party, S2 Consulting, to withhold subpoenaed documents from IBM, claiming attorney-client privilege and the work product immunity. IBM believes such withholding is inappropriate.

- 17 -

Of counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff International
Business Machines Corporation*

309594.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of August, 2004, a true and correct copy of the

foregoing was hand delivered to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

> Robert Silver
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, NY 10504
>
> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131

- 19 -

Exhibits/
Attachments
to this document
have **not** been
scanned.

Please see the
case file.

1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5             FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

6

7

8

9    _____ )

10   THE SCO GROUP, INC., a Delaware    )
     corporation,                       )
                                        )
11                                      )
                                        )
12               Plaintiff,             )
                                        )
13        vs.                           )      Case 2:03-CV-294
                                        )
14   INTERNATIONAL BUSINESS             )
     MACHINES CORPORATION,              )
15                                      )
                 Defendant.             )
16                                      )
     _____ )

17

18

19           BEFORE THE MAGISTRATE BROOKE C. WELLS

20                    OCTOBER 19, 2004

21          REPORTER'S TRANSCRIPT OF PROCEEDINGS

22                     MOTION HEARING

23

24

25        Reported by:  KELLY BROWN HICKEN CSR, RPR, RMR

```
 1                      A P P E A R A N C E S
        FOR THE PLAINTIFFS:   HATCH, JAMES & DODGE
 2                            BY: BRENT O. HATCH
                                  Attorney at Law
 3                            10 West Broadway, Suite 400
                              Salt Lake City, Utah  84101
 4
                              ANDREWS & KURTH
 5                            BY:  FREDERICK S. FREI
                                   Attorney at Law
 6                            1701 Pennsylvania Avenue, NW
                              Suite 300
 7                            Washington, D.C.  20006

 8                            BOIES, SCHILLER & FLEXNER
                              BY:  SEAN ESKOVITZ
 9                                 Attorney at Law
                              333 Main Street
10                            Armonk, New York  10504

11      FOR THE DEFENDANT:    CRAVATH, SWAINE & MOORE
                              BY:  DAVID R. MARRIOTT
12                                 CHRIS KAO
                                   Attorney at Law
13                            825 Eighth Avenue
                              New York, NY  10019
14
                              SNELL & WILMER
15                            BY:  TODD M. SHAUGHNESSY
                                   Attorney at Law
16                            15 West South Temple, Suite 1200
                              Salt Lake City, Utah  84101
17

18

19

20

21

22

23

24

25
```

2

1            SALT LAKE CITY, UTAH, TUESDAY, OCTOBER 19, 2004

2                         *   *   *   *   *

3            THE COURT:  Good morning, ladies and gentlemen.

4    We're here in the matter of SCO vs. IBM, here on SCO's renewed

5    motions for discovery and similar motions by IBM.  We have

6    some different counsel indicated.  Could I ask counsel,

7    please, to identify themselves for the record.

8            MR. ESKOVITZ:  Absolutely.  Good morning, Your

9    Honor.  Sean Eskovitz from Boies, Schiller & Flexner for the

10   plaintiff.

11           MR. FREI:  Good morning, Your Honor.  Frederick

12   Frei from Andrews & Kurth for the plaintiff.

13           THE COURT:  Mr. Frei.

14           MR. NORMOND:  Good morning, Your Honor.

15   Ted Normond from Boies, Schiller & Lexner.

16           THE COURT:  Nice to see you.

17           Good morning, Mr. Hatch.

18           MR. HATCH:  Good morning, Your Honor.

19           MR. MARRIOTT:  Good morning, Your Honor.  David

20   Marriott for IBM.

21           THE COURT:  Good morning.

22           MR. KAO:  Good morning Chris Kao for IBM.

23           THE COURT:  Good morning.

24           MR. SHAUGHNESSY:  Todd Shaughnessy with IBM.

25           THE COURT:  Thank you, counsel.

1    Please go forward. And we'll start with SCO.

2    MR. ESKOVITZ: Thank you, Your Honor.

3    Your Honor, with the Court's permission, we have a

4    number of slides that will assist in the presentation. We've

5    provided copies to defense counsel.

6    THE COURT: All right. Also, with regard to what

7    may be put on the screen, counsel for the other side, if you

8    wish to move around the courtroom, please feel free to do

9    that. And I would ask that we limit that to counsel who's

10   made appearances this morning.

11   MR. MARRIOTT: Thank you, Your Honor.

12   MR. ESKOVITZ: May I approach?

13   THE COURT: Sure.

14   Thank you.

15   MR. ESKOVITZ: There's one other preliminary

16   matter, Your Honor, which we raised with Your Honor's clerk

17   yesterday, and that concerns a few sealed documents. As the

18   Court is I'm sure aware, there are some of the memoranda that

19   are going to be argued this morning that were submitted under

20   seal, primarily because the documents that were -- that the

21   basis for those memoranda were marked as confidential by IBM

22   in discovery. And there's also some privilege issues that

23   have been raised recently.

24   I don't intend to discuss the documents on which

25   the privilege assertions have been raised, but I do intend to

1    discuss the documents that have been marked as confidential

2    and raised this issue with Mr. Marriott before the hearing.  I

3    don't think that there's anything in those documents that

4    raises issues.  But out of consideration for the fact that

5    they're marked as confidential, I just want to ask the Court's

6    guidance in terms of how you would like those to be addressed.

7            THE COURT:  Well, just -- do you intend to put

8    those on the screen?

9            MR. ESKOVITZ:  I do.  They're also in the books.  I

10   don't know that anybody in the back can see what's on the

11   screen.

12           THE COURT:  Well, then, if you will just refer to a

13   particular document as confidential, direct me to it within

14   the book, as well as to counsel for IBM, and then I think

15   we're all right.

16           MR. ESKOVITZ:  Fair enough.

17           As the Court is aware, this case is about computer

18   software development.  And specifically it's about the way in

19   which IBM used its special access to SCO's valuable

20   intellectual property in Unix for almost 20 years to develop

21   derivative products and how IBM then properly exploited SCO's

22   intellectual property for its own business purposes by dumping

23   large portions of those derivative products which are called

24   AIX and Dynix into a new computer operating system called

25   Linux.

1          The discovery that SCO seeks in the two

2    applications that before Your Honor this morning are the key

3    development history of the key programs that are at issue in

4    this case.  In this programming history discovery, as I'll

5    explain further during this argument, is the primary source

6    evidence that goes directly to the heart not only of SCO's

7    contract claims, but also to two very broad counterclaims that

8    IBM has added to this case since the Court's last discovery

9    order on March 3rd.  Those two counterclaims, which I'll

10   discuss in greater detail, were added on March 29th of this

11   year.

12          Both of SCO's discovery applications arise out of

13   the Court's March 3rd order.  The first application, which was

14   styled "SCO's Memorandum Regarding Discovery," is brought

15   pursuant to the prior order in which the Court directed SCO to

16   begin with the discovery that the Court previously ordered and

17   to identify if SCO requests additional files and code the

18   reasons why SCO needs that additional code for discovery.

19          And SCO's second motion, which is the renewed

20   motion to compel, seeks to compel IBM to produce two specific

21   categories of discovery that the Court has already ordered IBM

22   to produce but that IBM has withheld now for over six months

23   since the Court's prior order.

24          In SCO's first admission, the memorandum regarding

25   discovery, we seek the discovery that will reveal the

1    programming history of AIX and Dynix, those derivative

2    products that I referred to earlier. So far in this case

3    pursuant to the Court's order, IBM has produced selected

4    versions of commercially released code, but only for the past

5    five years. And as I mentioned earlier, the development

6    process of these derivative products, the products that went

7    through a development process, lasted for 20 years before they

8    were dumped into Linux. And that's why this programming

9    history, one of the reasons why this programming history is so

10   critically important.

11        What the discovery that IBM has produced already

12   has permitted SCO to do is to uncover certain evidence to

13   defend against their counterclaims and also to prove our

14   contract claims, and I'll discuss that, as well. But what the

15   discovery that IBM has produced has not permitted SCO to do in

16   any way is to discover this programming history. As I said,

17   the limited snapshots that IBM has produced in terms of code

18   are just a very selected portion of the long development

19   history of, for example, the AIX product.

20        IBM has produced, Your Honor will see on the

21   screen, versions, commercially released versions of AIX going

22   back from October of '98 to the present. But that leaves out

23   the important development history which is so critically

24   relevant to the claims. So these are snapshots frozen in

25   time, and they tell you nothing about the way in which these

1    particular programs were developed.

2            That's why in our memorandum regarding discovery

3    we're seeking two specific types of evidence that will lead us

4    to the evidence that we need on programming history.

5            First of all, we're seeking production of the

6    electronically stored programming history evidence that's

7    consisted -- that makes up IBM's CMVC, it's Configuration

8    Management Version Control system, which is the version that

9    the program that IBM maintains for AIX, and a similar program

10   that IBM has for Dynix, which is called RCS, the Revision

11   Control System.

12           And how these electronically stored programs are

13   different and critically different than what has already been

14   produced is not only because it's going to give us additional

15   source code to fill in the gaps of the snapshots that IBM has

16   produced just for these past five years, but it will also give

17   us drafts and unreleased versions, in other words, the working

18   copies.  It will also critically tell us the revision and log

19   information.  And that is, as Mr. Frei will talk about in

20   connection with CMVC in greater detail, that is a detailed

21   audit trail.  When a programmer goes into CMVC to make a

22   change to AIX, for example, he logs in.  It says his name.  It

23   says when he's making the change.  It has programmer comments

24   about the reasons the change is being made.  If there's a

25   copying, if there's derivative works being prepared during

1    that process, that's where you're going to find the evidence
2    of it.  It's in the programming history.  It's electronically
3    maintained, and it's easily accessible to IBM.

4              Now, in addition to this electronically stored
5    information in these day-to-day base operation programs that
6    IBM uses, we also seek design documents, white papers, and
7    programmer notes.  And those are basically contemporaneous,
8    also contemporaneous reflections of the reasons for
9    programming, the reasons why programers did what they did in
10   the development history of these products.  And we believe
11   that the vast majority of those are also undoubtedly stored
12   electronically and are accessible, readily accessible.

13             So unlike these snapshots, what we're going to get
14   with this discovery is the information about what programmers
15   made what changes, when, for what reasons, and critically
16   importantly, based on what Unix intellectual property when
17   they developed AIX, the Dynix before those programs were
18   dumped into Linux.

19             As I explained, this programming history is so
20   important, but it's -- the reason why it's so important is
21   because it goes directly to SCO's contract claims as well as
22   the two counterclaims that IBM has asserted.  And let me take
23   each of those in turn.

24             The first independently sufficient reason on which
25   this programming history is reasonably calculated to lead to

 1   admissible evidence relates to SCO's contract claims.  And for

 2   SCO's part in this case, the case has always been a contract

 3   action.  The evidence that we seek on programming history goes

 4   directly to two distinct portions of our contract claims,

 5   contract interpretation and contract violation or contract

 6   breach.. And in order to explain exactly why that's the case,

 7   I need to give you a short background on the contract claims

 8   at issue and the license agreements at issue.

 9         In 1985, SCO's predecessor in interest AT&T

10   licensed its seminal intervention, the then dominate Unix

11   operating system to a number of large commercial, high-tech

12   corporations, including IBM and Sequent, as well as some large

13   educational institutions.  And what those licenses agreements

14   did is they gave the licensees the right to repair

15   modifications and derivative work based on the original

16   license product.  But those license agreements also came with

17   very strict limitations.

18         And Section 2.01 is the cornerstone of those

19   limitations.  This is the provision that appears in both the

20   IBM and the Sequent software license agreement.  And what it

21   says is that you have a right to develop modifications or

22   derivative works, but that right includes the right to modify

23   those works and prepare derivative works based on the software

24   product provided that the resulting materials are treated

25   hereunder as part of the original software product.

1          In other words, all the restrictions on use, all of

2     the restrictions on disclosure that apply to the original Unix

3     licensed product also apply to any derivatives or

4     modifications that AT&T's licensees made based on that

5     original license product.  This is a very broad protection,

6     and it's exactly the kind of protection that you would expect

7     that a company that's going to permit the crown jewels of its

8     intellectual property to -- you know, it's going to give

9     access to these crown jewels to high-tech companies to develop

10    their own products is going to write into their contract in

11    order to ensure that the intellectual property is not given

12    away, is not exploited without compensation for that property.

13    And that's exactly what the evidence that's been obtained by

14    SCO in this matter confirms.

15          THE COURT:  From IBM?

16          MR. ESKOVITZ:  This is -- well, there is actually

17    evidence from the witnesses that IBM has proffered in

18    connection with the contract claims, which I'll discuss in one

19    moment, this is the chief attorney from AT&T, the general

20    attorney from AT&T, whose job it was to draft and enforce

21    these contract agreements.  And this is what his sworn

22    declaration says about the protections of 2.01.

23          He says, just consistently with the plain language

24    of 2.01 that 2.01 protected the full contents of any resulting

25    materials created over time during this development process,

1    and the agreements treated the resulting work as if they'd

2    been part of the original software products.  And any further

3    modifications or derivatives based on modifications or

4    derivatives of the original license product had to be treated

5    the same way.

6            In other words, if a licensee develops a derivative

7    or modification based on the original software product, that

8    modification or derivative needs to be treated with the same

9    care and needs to be restricted use and disclosure in the same

10   way as the original product.  And if you then modify or derive

11   from that product, it needs to be treated the same way, as

12   well.

13           And Your Honor asked about evidence from IBM.  If

14   you remember last -- the beginning of the summer the Court was

15   asked to intervene on an issue regarding declarations from

16   Messrs. Wilson and Frasure who were witnesses that IBM had

17   obtained declarations from.  Well, it turns out, and we

18   learned this through discovery, about 40 boxes of documents

19   that were dumped on us within a couple of weeks of those

20   depositions, and we didn't have that material before the

21   depositions.  But it turns out that both Wilson and Frasure

22   gave testimony in a prior lawsuit, sworn testimony that is

23   diametrically opposite to what they are now testifying to

24   since they've become represented by IBM.

25           And if we put up the first testimony from

1   Mr. Wilson. This is what Mr. Wilson testified about in a
2   prior lawsuit involving very strikingly similar contract
3   interpretation issues. He was talking about Section 2.01, and
4   this was in a case where USL, which was the AT&T successor,
5   was suing Berkley, which was one of the educational licensees,
6   virtually identical language in 2.01. And he said his
7   understanding of that agreement was that anything that the
8   licensee created with exposure to the licensed product based
9   on, contained, part of, was a derivative work and had to be
10  treated as licensed software under the agreement, just as
11  Mr. Pfeffer's sworn declaration says.
12          David Frasure gave testimony to the exact same
13  effect. He said, if you developed, due a licensee, I presume,
14  if you developed products with the benefit of the licensed
15  software, you cannot distribute them to anyone in the case,
16  anyone who was not a licensee themselves.
17          These men gave very broad testimony consistent with
18  the very broad protections that the license agreements
19  provide. If a licensee had exposure, they used words, mental
20  contamination, if they had exposure to the intellectual
21  property in Unix and then they went out and created a work
22  they want to call their own, it still has to be treated as if
23  it was part of the original license software product.
24          Now, IBM has taken the position that these
25  agreements only protect literal copying, verbatim copying of

13

1   the original source code in the Unix product.  And that

2   position, they're entitled to pursue it as their defense to

3   their contract claims, but we're also entitled by the same

4   token to pursue evidence to refute that claim and to further

5   support our contract claim.  And that's precisely what this

6   programming history evidence will permit us to do.  And as I

7   mentioned before, the program history evidence is relevant,

8   this is board 7, to interpretation and to breach.

9            On the question of interpretation, this programming

10  history evidence will let us see what the contemporaneous

11  understanding of the programmers who are developing works

12  based on a licensed program, based on the original Unix

13  product, understood to be the limitations on them when they

14  were working with AT&T's intellectual property, now SCO's

15  intellectual property.  It will show the programmers'

16  understanding of those limitations.

17           And in light of the motion for summary judgment

18  that IBM has submitted on these contract claims in which they

19  rely extensively on extrinsic evidence, including declarations

20  from Mr. Wilson and Mr. Frasure given 20 years down the road,

21  this is so critical evidence -- such critical evidence because

22  it's contemporaneous, it's the contemporaneous understanding

23  of what the people who were actually working under these

24  contracts understood what their limitations would be.

25           THE COURT:  And that was the summary judgment

14

1    motion that is presently under advisement by Judge Kimball.

2              MR. ESKOVITZ:  Actually it's not.  There are three

3    pending summary judgment motions that IBM has filed in this

4    case.  The first one that's currently pending has been argued

5    in front of Judge Kimball relates to the Tenth Counterclaim,

6    which is the copyright counterclaim.  I'm going to address the

7    relevance of our discovery to that as my third point.

8              But in addition, they filed a motion for summary

9    judgment on the contract claims based almost entirely on this

10   extrinsic evidence.  And this programming history evidence is

11   the key extrinsic evidence.  And we also have the declaration

12   of Mr. Pfeffer, which the Court has already seen, which

13   supports the plain reading of the --

14             THE COURT:  So there are two that are presently

15   pending but have not been argued.

16             MR. ESKOVITZ:  That's correct.

17             THE COURT:  All right.

18             MR. ESKOVITZ:  In addition, as I said, this

19   programming history discovery is critically relevant to proof

20   of contract violation.  And that almost argues itself because,

21   as the Court saw, 2.01 said that if you and -- Mr. Wilson and

22   Mr. Frasure and Mr. Pfeffer, if you base on or derive from the

23   original Unix product a derivative product, a modification, if

24   you prepare those modifications of derivatives with exposure

25   to the original license product, then that needs to be treated

1     as if it's part of the original product.

2             And so the evidence that we're seeking will show us

3     how the code that ultimately worked its way through this

4     development process and was dumped into Linux at the end of

5     this development process how that code traveled through the

6     programming history and how the programmers who created that

7     code relied on, based their products on, derived their

8     products from, and benefitted from their exposure to the

9     original licensed Unix work.

10            THE COURT:  Mr. Eskovitz, I just want to stop you

11    for a moment.  We did not talk about the time of argument.

12            MR. ESKOVITZ:  Yes.

13            THE COURT:  We have two hours devoted to this.  In

14    the event that you want some rebuttal time, and my experience

15    is that there's likely to be rebuttal, then you need to plan

16    on concluding your argument by a quarter till.

17            MR. ESKOVITZ:  Very well.

18            THE COURT:  Okay.

19            MR. ESKOVITZ:  In that case, Your Honor, I'll just

20    move to what IBM said about these contracts.

21            THE COURT:  And let me -- and I also did not say at

22    the beginning, I have reviewed your submissions and am

23    familiar with what you're arguments are, although your oral

24    arguments are certainly helpful.

25            MR. ESKOVITZ:  We appreciate that.

1           THE COURT:  Go ahead.

2           MR. ESKOVITZ:  If we could look at board 19.

3           This is what IBM said to Judge Kimball on the

4    argument that Your Honor referred to earlier on the Tenth

5    Counterclaim, which is the counterclaim regarding to copyright

6    infringement in Linux.  This is what IBM counsel said in

7    rebuttal.  He said, Your Honor, when SCO says that it needs

8    this road map, this programming history on copyright, that

9    merely conflates SCO's contract claims with its copyright

10   claims.

11          Well, we happen to agree with them, at least

12   halfway there.  This evidence is critically relevant to our

13   contract claims, but we disagree on the part about the

14   copyright claim, and I'll explain to the Court why that is in

15   just a moment.

16          The second independently sufficient basis on which

17   this discovery is relevant is on IBM's Ninth Counterclaim.

18   And as I mentioned, IBM asserted this new Ninth Counterclaim

19   after the Court's prior discovery order.  But this could not

20   be more straight-forward.  The Ninth Counterclaim is a very

21   broadly framed counterclaim, and it asks for a declaratory

22   judgment that nothing during the improvement of AIX or Dynix

23   infringed any SCO copyright.

24          The evidence that we're seeking here is direct --

25   is the evidence of the improvements of AIX and Dynix, and IBM

1    is trying to hold it back.  They want the Court to give them a

2    clean bill of health on AIX and Dynix.  Nothing in there

3    infringes, and they're not willing to give us the evidence

4    that shows how those programs were improved, how they relied

5    on SCO's -- AT&T's and now SCO's intellectual property.

6            Now, the AIX business, Unix business for IBM is

7    still a growing business.  It's worth over $4 billion in

8    revenues, so you can understand why they would want this clean

9    bill of health.  But they're not entitled to get it without

10   producing the evidence that goes directly to the heart of

11   those claims.

12           Now, in our supplemental memorandum regarding

13   discovery, we brought to the Court's attention some additional

14   evidence that we've discovered since the March 3rd order

15   regarding project Monterey, which was a joint development that

16   SCO's predecessor in interest, the Santa Cruz operation, had

17   entered into with IBM.  And what that showing reveals is that

18   we have actually uncovered evidence by happenstance, and

19   that's the critical thing, by happenstance of discovery

20   internal IBM e-mails that show that IBM misappropriated SCO's

21   SVR4, a System V Release 4 code, without a license infringed

22   SCO's copyrights in that code with an improved AIX.

23           And the reason why this evidence is so important is

24   because not only does it show that we've got evidence of

25   copyright infringement to defend against this Ninth

1   Counterclaim, and not only does it show that we've used the

2   discovery that the Court has ordered and that IBM has produced

3   to support our claims and defenses, but it also shows a very

4   powerful example of exactly why CMVC and its programming

5   history is so important because it cuts to the heart of

6   evidence that we just happen to discover through the

7   happenstance of internal IBM e-mails in which IBM personnel

8   discussed how they're going to try to create a pretextual

9   release to justify the infringement of SCO's SVR4 code.

10              THE COURT:  You're talking about the material that

11   is challenged by IBM as privileged.

12              MR. ESKOVITZ:  Actually, Your Honor, I'm not

13   relying at all on those materials.  You can take those two

14   materials, we'll litigate those another day.  Those two

15   e-mails are not in any way the basis for the presentation that

16   I'm making.  There's other, plenty of other non-privileged

17   documents on which there has been no assertion of privilege

18   that support this evidence.

19              And as I explained, in 1998, there was this project

20   Monterey Joint Development Agreement.  And the point of the

21   agreement was that SCO would give IBM access to copyrighted

22   SCO material, the SVR4 code, and IBM was permitted to use that

23   only pursuant to this joint development arrangement, only to

24   improve a product that they were working on together, which

25   was called AIX-4 Itanium.  It was Intel's Itanium chip that

1    they were developing a product to work on.  It is called the

2    IA-64 product.

3            But what happened is and the evidence shows that

4    even though IBM knew it was not permitted to use SCO's

5    copyrighted code for its own products but only for this

6    jointly developed IA-64 product, IBM nevertheless took the

7    code, took it off of CMVC, dumped it into its own AIX for

8    Power product.  And that is different because it was running

9    on IBM's own power PC chip as opposed to the Intel Itanium

10   chip that the joint development agreement was supposed to be

11   developing a product for.  And they used it to improve their

12   AIX for Power product without a license to do so.

13           And Your Honor asked about privilege documents.

14   I'm going to show you documents upon which no privilege has

15   been asserted that establish this evidence.  Let's start with

16   board 25.

17           This document, this is one of the confidential

18   documents, Your Honor, so I'll give you a chance to read it.

19   But what it shows is as of May 2000, IBM had taken the

20   proprietary SVR code and put it into its base product, its AIX

21   for Power product.  And that they recognized they didn't have

22   the right to do it.  They said they need to renegotiate the

23   license.

24           THE COURT:  Is a copy of that included in the book?

25           MR. ESKOVITZ:  It is, yes.  It's Tab 25.

1          And also this document explains the reason why IBM

2     wanted this code which it was not licensing was because Sun

3     Micro System, which had a competing product, the Solaris

4     product, and was licensing the SVR4 code, which was an upgrade

5     from what IBM was licensing, the SVR-3 code, they wanted it to

6     make it compatible for Sun customers to switch over to IBM's

7     new AIX for Power product that is to be based on this code.

8     The problem is that IBM knew it didn't have a license for the

9     code, and it had already put it into its product.

10          The next document from October of 2000 reveals that

11     this was shipping in -- that this code, the SVR4 code, was

12     shipping in the Version 5.0 for Power for AIX, which actually

13     went out in October of 2000, even though there's no dispute,

14     there's no argument that IBM ever had a license to use this as

15     of October 2000.

16          Critically on this one, Your Honor, it shows that

17     the code that IBM took and put into its AIX for Power product

18     came off of the CMVC system.  So we didn't need these e-mails.

19     We didn't need to go hunting through all these reams of paper

20     that IBM's produced.  If we had the CMVC system, we would have

21     discovered that this code had been removed.  We would have

22     seen why it would have been removed.  We would have seen who

23     removed it, and we wouldn't have had to put this altogether in

24     the most inefficient way possible.  And we wouldn't have to

25     depend upon the happenstance of this having been

1    contemporaneously recorded internally by IBM.

2              Now, apparently IBM believed that if it could

3    muster a general availability release of its product that it

4    could justify at least future infringement, because they

5    thought that by issuing a general availability release they

6    would get a license.  So what they did was they went about

7    trying to concoct a general availability release, even though

8    they knew that the IA-64 product was not even close to being

9    ready for general availability release.

10             And here's an e-mail from the IBM Enterprise System

11   group leader where he's describing the state of the IA-64, the

12   project Monterey, the draft product, as of January 2001.  And

13   what it shows is that they were planning to release the next

14   version, AIX for Power 5.1, as an I-Listed PRPQ, and that

15   needs a little explanation.  That means Product Request For

16   Pricing Quote.  It's the opposite of general availability

17   release.  It's a limited release to a select number of

18   customers.

19             And what this e-mail shows is that the person

20   writing it knew they didn't have a compiler, which is a

21   critical -- which performs a critical function.  It let's the

22   code operate on the end user's equipment.  So without

23   compilers, you can't -- they're virtually useless programmers.

24   And it says, compilers are not available, not included in the

25   PRPQ.  Follow up with the June GA, June general availability,

1    that we released.

2              Here's what the response of the supervisor was.  We

3    have must have a compiler.  If not, the whole thing, the whole

4    pretextual release that we're planning doesn't make any sense.

5    SCO won't buy it.

6              It's the exact same effect echos the exact same

7    point.  April 2001, another senior IBM executive responds to

8    what the marketing director had used to describe what they had

9    called this PRPQ release.  And she says, I'm concerned that

10   your words do not call this release GA, so I've taken a

11   stronger hand in stating our delivery.  In other words, I've

12   beefed up, I've mislabeled.  This is a general availability

13   release.  And as you know, we need to call this a GA in order

14   to gain the rights to SCO code that we've been using since at

15   least October in shipping in our AIX 5.0 for Power product.

16   And everyone is rather tired of me harping and remaining on

17   this point.

18             So in May of -- May 4th, 2001, IBM did this limited

19   distribution.  They called it a general availability release.

20   It was shipped without a functioning compiler.  The Intel

21   Itanium chip that the IA-64 product was supposed to run on

22   wasn't even generally available at the time.  And if there

23   were any doubts about the time to release the IBM manufactured

24   in May of 2001 in an attempt to at least after the fact

25   justify its infringement, this is what their internal document

1    from 2002 says. It says:

2              As you know, when we changed strategic

3         decision -- the direction to limit Monterey a

4         PRPQ. We distributed 32 copies. You'll need $256

5         in royalties to SCO.

6              The same day, May 4, 2001, that IBM concocted this

7    general availability release for the IA-64 product, it also

8    released the next version for AIX for Power, which also

9    includes SCO's code, May 4th, on this ostensible

10   rationalization. And every version that has -- that went

11   before it and that has come since has contained substantial

12   amounts of copying of our copyrighted code.

13             And I'll just show you quickly boards 34 and 35.

14   These are the copying that we found for AIX for Power Version

15   5.1 and then Version 5.2. And this is just based on discovery

16   of the code that we knew to look to because of these internal

17   documents.

18             Now, significantly, Your Honor, even though IBM has

19   produced various versions of AIX since 1998 in response to the

20   Court's order, the one version they have not produced was AIX

21   for Power 5.0. That was the October product that included

22   infringing code before IBM even concocted this idea of the

23   general availability release. That was the product the

24   document said they shipped with our copyrighted code in it,

25   and they haven't produced it.

1            But this isn't just about one version of AIX code.

2      This is about programming history, and it's about CMVC,

3      because, like I said, we just happen to fall upon this

4      evidence based on these internal documents.  We know that the

5      SCO code came out of the CMVC system, as this document

6      reveals.  And if we had CMVC, we would find directly evidence

7      of this copyright infringement and other improper conduct to

8      support our claims generally in this case.  This would have

9      all been in the audit record contained in CMVC, as this

10     document reveals.

11           Now, IBM has made no attempt to refute any of this

12     project Monterey evidence.  They asked the Court for more time

13     to respond to our supplemental briefing, and they haven't said

14     anything about project Monterey.  What they say is that after

15     all, their Ninth Counterclaim, that broad counterclaim,

16     doesn't really cover this, because even though this says

17     broadly, they want a declaratory judgment that IBM does not

18     infringe in its improvement of AIX, now they say it's limited

19     to SCO's purported termination of the license.

20           Well, there's nothing -- there's no such limitation

21     in their counterclaim.  This is an after-the-fact loss that

22     they're trying to reread their counterclaim to steer clear of

23     the discovery and the evidence that we're seeking.

24           Third, on the Tenth Counterclaim, which is the one

25     that Judge Kimball has heard argument on.  This is another

1    independent reason for granting this discovery.  This

2    counterclaim is very similar to the Ninth Counterclaim in its

3    language and its breadth, but it changes the word AIX "Dynix"

4    for "Linux," and it changes the word "distribution," which is

5    more appropriate in the AIX and Dynix context, for "use" in

6    the Linux context.  It is the same, substantively identical

7    otherwise.  And it's very broad, just like the Ninth

8    Counterclaim.

9         And this is actually another reason for dismissing

10   IBM's new reading, new loss on its Ninth Counterclaim because

11   there's no possible, there's no conceivable argument that this

12   counterclaim is limited to post-termination, post-license

13   termination conduct.  There was no license.  There was no

14   termination of license that has anything to do with Linux.

15   There's another basis for objecting their new reading.

16        Now, with respect to the issue of the Tenth

17   Counterclaim.  They're asking again for a clean bill of health

18   for all of Linux.  Very broad counterclaim.  No copyright

19   infringement of any sort in Linux.  And the task at hand in

20   investigating this and defending against this is a daunting

21   one.  These programs are gigantic.  There's no easy way to

22   compare them.  This just gives you a sense of what's involved.

23   There's 8,000-plus files in this Linux version.  There's 6-,

24   almost 7,000 filings in Unix.  If you do permutations, if you

25   compare file to file, you come up with something like

26

1    60 million, upwards of 60 million comparisons.  It's not

2    something that you can do in a practical matter.

3              And what we need this discovery on the

4    Tenth Counterclaim to do is to help us in three ways.  First

5    of all, to focus our investigation.  It's one thing -- it's a

6    daunting task to compare those files manually line for line

7    literal copying, but it's a whole other thing to compare those

8    for non-literal copying, as the 10th Circuit has recognized

9    applies to computer programming in Gates and sequence

10   organization and structure copying.  You can't just do that

11   manually automatically by lining up files.  You need people

12   who know what they're looking for to find the derivatives, the

13   non-literal or substantially similar copying.

14             And so what we need this programming history

15   evidence to do is help us focus on the hot spots, to help us

16   determine where we need to look to do our -- especially our

17   non-literal investigation.  It would also help us identify the

18   programmers that we need to depose to further help us focus

19   our investigation.  And it would help us to obtain programmer

20   admissions or may give us programmer admissions.

21             I just want to point out to the Court the case of

22   Computer Associates recently in which the Court grants a

23   preliminary injunction based on programmer admissions and

24   comments after recognizing that it is not that practical to

25   compare millions of lines of source code.  Nevertheless, the

1   Court based on these admissions and the comments that were in

2   the programs themselves, just like CMVC and RCS include,

3   granted a preliminary injunction on a copyright infringement

4   software case.

5          THE COURT:  Just pointing out to you that your time

6   is running out.

7          MR. ESKOVITZ:  I'm painfully aware of that.

8          THE COURT:  And Mr. Frei is just kind of squirming

9   over there.

10         MR. ESKOVITZ:  Well, let me just say a final thing

11  on the Tenth Counterclaim.

12         Their argument is that we can just line them up and

13  compare them.  All we need is the first product and the last

14  product.  And that's a gross over simplification of what's

15  involved here.  They ignore copying entirely, and it basically

16  turns the discovery rule on its head.  It's trying to box us

17  into the least efficient way of defending against their own

18  very broad counterclaim.  It's not something that can be done

19  manually or with automated tools.  And given materials on that

20  in the briefs, I'll move on to the question of burden.

21         I know Mr. Frei is itching to get up here and talk

22  about the technical issues of burden, so let me just address

23  some of the things you don't need to be an IT lawyer to say.

24         First of all, they make this burden argument, but

25  they don't make any burden argument for RCS.  That's the

1    program that performs a similar function as CMVC.  And they

2    haven't produced that without any explanation.  Secondly, they

3    told the Court, they told this Court in February that it would

4    take many, many months to produce this discovery, and now

5    their declarants say it's a matter of weeks.

6          Well, Your Honor, many weeks have past over this

7    case, 68 weeks since we first requested this discovery.  IBM

8    has had plenty of time to produce this discovery.  And if they

9    really wanted to get an expedited resolution on the merits of

10   this case, they would have produced this discovery and let us

11   get on with things.

12         Fourth, this is the most readily available type of

13   electronic discovery that the Court will consider.  Electronic

14   discovery, this is a leading case out of the Southern

15   District.  Electronic evidence is frequently easier and

16   cheaper to produce.  And the kind of data that we're talking

17   about here, which is active online data and computer online

18   data, are the most accessible and less burdensome to produce.

19         Fifth, if the copying were an issue, if the copying

20   were an excessive burden, then we know from their own

21   documents and from our experience in project Monterey that

22   they can give us remote access.  That they did do that, in

23   fact, in project Monterey.  They just shut off the engineers

24   from having any access to the portions of which they were

25   dumping our copyrighted code into AIX for Power.  They can

```
 1    give us a password.  They can restrict it to appropriate
 2    files, and we get it mode access.  That way, they don't have
 3    to worry about the burden of copying, if there were one.
 4           So I'm going to turn over the podium to Mr. Frei
 5    who will address the technical issues.  The bottom line here
 6    is that even if this was a matter of weeks, even if we take
 7    them at face value, it's certainly not the kind of burden that
 8    would justify withholding this discovery that's so critically
 9    relevant to the claims and counterclaim.  And Mr. Frei is
10    going to explain why that burden even just a matter of weeks
11    have been overstated.
12           THE COURT:  Thank you for your argument,
13    Mr. Eskovitz.
14           MR. ESKOVITZ:  Your Honor, there's one other issue.
15    And maybe I can take this time out of my rebuttal time, and
16    I'll do it quickly.
17           THE COURT:  I'll hold you to that.
18           MR. ESKOVITZ:  That's fair.  I feel remiss because
19    I did not address the renewed motion to compel.  I can do it
20    in five minutes at the end of Mr. Frei's presentation.
21           MR. FREI:  Good morning, Your Honor.
22           THE COURT:  Good morning.
23           MR. FREI:  I've made some adjustments as we've been
24    here, and I'm trying to shorten this as much as possible.
25           What I'm going to talk about today is what CMVC is,
```

1    what information it contains, how you can search it, how you

2    retrieve information from it, and why in the words of

3    Barbara Howe who was trained by IBM and worked with the CMVC

4    system with remote access for five months, why she says that

5    it's a trivial burden, trivial chore to produce the

6    information that we've sought.

7              With respect to the burden, they've relied on two

8    declarations from Joan Thomas.  These declarations are

9    inconsistent with the public record, IBM statements.  They

10   are -- they confirm, actually, what we've been saying about

11   the information that is contained on CMVC system and IBM's

12   prior public statements about how capable this system is, how

13   flexible it is, and how it gives you literally every bit of

14   information available about every version.  The most

15   significant thing about these Thomas declarations is not what

16   they say, because they're so artfully worded, it's what they

17   don't say.  And I'm going to go through some of those as we

18   get into it.

19             The information that we're seeking by IBM's own

20   estimate is 40 gigabytes.  That's a hard drive on a laptop.

21   That's 10 DVDs.  It takes about an hour to burn a DVD.  So

22   it's going to take 10 hours or a day to get that information

23   to us after it's been extracted.

24             Okay.  CMVC is a system.  It's an electronic data

25   base.  It's analogous to what you had in a library where you

1    have a librarian that's sort of equivalent to the user

2    interface.  You ask the librarian for what you want.  Then you

3    have a card catalog, and that's sort of similar to that

4    descriptive data.  Then you have the actual stacks, and in

5    those stacks you've got all the books.

6              In this system, you have this graphical user

7    interface, and here is an example of one.  You want to

8    release.  You type in the release you want at the top.  You

9    want the current version.  Bengal is the name of your

10   computer.  Each person would have their own computer.  And

11   that's where it's going to go, the directory it's going to go

12   into.  You know, that's your access number, and this type of

13   thing.  So that's the user interface.

14             Another user interface is this, the task window.

15   As to a particular programmer, you can get -- by the way,

16   defects refers to bugs.  Features refers to improvements and

17   enhancements.  So you can get all your bug work, all your

18   enhancement work, all your releases, everything you want.

19             Here's another information window.  This is on a

20   feature.  A feature is a particular improvement.  This

21   particular improvement, it will give you the name of the

22   programmer, the date of the improver, why it was done.  And an

23   interesting note at the bottom, one of the programmer notes,

24   they made this improvement to make it more Unix-like.  Let's

25   hope they didn't violate our copyrights or the contract when

1    they made it more Unix-like.

2            The kind of information that is contained on CVC is

3    all of the source code information.  Picture a file cabinet,

4    and every line of code is in that file cabinet sequentially.

5    Every line of code has a tag in the front and the back.  The

6    tag enables it to be retrieved by the software.  When you

7    change a line of code, an additional line is put into the file

8    cabinet with a tag, and it has a version number on it.

9            So if you have, for example, a 10-line program,

10   lines 1 to 10, and you change line 1, the box will now contain

11   11 lines, and the 11th line will have, say, the number 2,

12   Version 2.  So when you put into the system that you want

13   Version 1, it gives you lines 1 to 10.  And when you put in

14   the system you want Version 2, it replaces the line 1 with the

15   new line 1 and then gives you the remaining lines.

16           Here's an example of some of the information that's

17   stored in the CMVC system.  And all this is coming out of

18   their publicly available manual about CMVC.  The location,

19   identity of releases, each version, identity of the

20   programmers.  Here's some more information.  Users.

21   Components is a file.  It's a file.  Releases.  Defects.  All

22   the bugs.  All the improvements.  The design documents.

23   Archive files and releases.  All of this is searchable.  It is

24   designed to be searchable.  It's like in Westlaw, Nexis or

25   Lexis, you've got millions of cases from all the courts, all