RECEIVED CLERK

2004 DEC 29  12 10: 59

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>    Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff | **REPLY MEMORANDUM IN<br>FURTHER SUPPORT OF SCO'S<br>MOTION FOR LEAVE TO FILE A<br>THIRD AMENDED COMPLAINT<br>PURSUANT TO FEDERAL RULES OF<br>CIVIL PROCEDURE 15(a) AND 16(b)**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

unsealed

**CONFIDENTIAL, FILED UNDER SEAL**

369

The SCO Group, Inc. ("SCO") respectfully submits this Reply Memorandum in Further
Support of SCO's Motion for Leave to File a Third Amended Complaint Pursuant to Federal
Rule of Civil Procedure 15(a) and 16(b).

## PRELIMINARY STATEMENT

In its opening brief, SCO showed that the Court should permit SCO to add a single claim
for copyright infringement for the principal reasons that (1) SCO discovered its new claim based
on its review of internal IBM documents, and previously unavailable AIX source code, that IBM
produced only in March and April 2004, after the time for amendment had passed; (2) SCO's
claim would not unduly prejudice IBM, because the claim concerns issues already in this
litigation by virtue of (for example) IBM's own Ninth Counterclaim; and (3) SCO's claim is
based on clear and unmistakable evidence that IBM copied, without authorization, SCO's
UnixWare System V Release 4 ("SVR4") product.

In opposition, IBM offers no serious argument on any of these points. IBM offers no
analysis on the core issue of how IBM supposedly acquired a license to use SCO's SVR4
software in AIX for Power. IBM also cannot presume to know what SCO knew, and if there
were any doubt on that issue SCO testifies that neither SCO nor its predecessor-in-interest knew
until this summer that IBM had copied SCO's SVR4 product into IBM's products. As to any
supposed prejudice, the plain, broad language of IBM's Ninth Counterclaim belies IBM's
insistence that the Counterclaim concerns only SCO's termination of IBM's UNIX System V
license. SCO's proposed amendment does not add any significant burdens to the case; with or
without the amendment, the parties will undertake essentially the same work to prosecute and
defend the existing claims. It is noteworthy that IBM declines to address the substance of SCO's

proposed claim, because the point of the liberal construction of Federal Rule of Civil Procedure 15(a) is to enable a claim to be heard on the merits.

Instead, in support of its blithe claim (at 19) that "enough is enough," IBM contends in several different ways that SCO "should have known" about IBM's copyright infringement before this year. The documents on which IBM exclusively relies – and from which IBM pulls partial quotes and paraphrased excerpts – do not support IBM's argument. Project Monterey was intended to develop a software product (first known as "IA-64" or "Monterey-64" and later known as "AIX5L for Itanium") for use in conjunction with Intel's 64-bit Itanium processor. IBM and SCO planned and expected that, after the necessary conditions were satisfied, IBM would migrate SCO's SVR4 software and the Project Monterey product into IBM's AIX for under a future license. Given that context, both internal SCO and IBM documents and marketing materials pre-dating the planned release of AIX5L for Itanium reflect the anticipated creation of a family of products (including AIX5L for Itanium and IBM's AIX for Power) to be based in part upon SCO's SVR4 software. Under the circumstances, those documents would not have put SCO on notice of anything other than the rationale for Project Monterey. As to the other documents that IBM cites, SCO did not and had no reason to see them, and most refer ambiguously in their title only to "AIX 5L" -- a phrase used to refer to the joint SCO-IBM Project Monterey product, which SCO does not claim is infringing. Those documents do not evidence any knowledge of IBM's infringement upon SCO's copyrights, and do not evidence any reason for SCO to suspect that such an infringement had taken or was going to take place.

If further grounds were needed, the parties had sought to negotiate a Project Supplement C (which IBM conspicuously ignores) to the Joint Development Agreement ("JDA") pertaining to Project Monterey, which Supplement would have allowed IBM to use SCO's SVR4 software

3

in IBM's AIX operating system without restriction. But the parties did not execute the Supplement. SCO was reasonably entitled to believe that IBM would not proceed as if the parties had executed the Supplement.

As it happened (and as SCO detailed in its opening brief), IBM failed to satisfy the conditions to permit IBM to use SCO's SVR4 software in AIX for Power. IBM's "first release" of the AIX5L product lacked a working compiler, any commercially available hardware on which the product could operate, and the contractually mandated product support. IBM mistakenly contends that SCO thereafter should have known (from the documents that SCO did not and does not read) of IBM's use of SCO's software. SCO's and IBM's internal documents both reflect that, in the absence of a proper general release of AIX5L, IBM would not possess a license to SCO's SVR4 software. Cognizant that IBM lacked such a license, SCO did not know that IBM had incorporated that technology into IBM's AIX for Power, and had no duty to investigate the possibility of copyright infringement in a context in which IBM (to an even greater extent than others) was specifically precluded from copying SCO's SVR4 software. IBM's fact-based arguments regarding SCO's supposed constructive knowledge are thus incorrect, and are no basis for precluding SCO's amendment.

The few additional arguments that IBM makes fare no better. Given its express refusal to take issue with the merits of SCO's claims – even putting aside the sweeping scope of the Ninth Counterclaim that IBM asserted over eight months ago – IBM's argument that SCO's motion is merely a delay tactic to permit SCO to seek additional discovery is inexplicable. Indeed, in light of IBM's repeated concession that it has used SCO's SVR4 software in IBM's AIX for Power, SCO is surely entitled to protect its rights in that intellectual property.

IBM further contends that the statute of limitations in the JDA bars SCO's claim for copyright infringement. Among the other reasons that argument fails, the limitations period (which is strictly construed under the law) concerns only claims relating to "breach" of the JDA, and SCO does not propose to bring a claim for breach of the JDA. Under copyright law, moreover, each instance of IBM's infringement constitutes a separately actionable claim, and IBM has continued to infringe SCO's copyrights well into the supposedly applicable limitations period. IBM's invocation of the forum selection clause in the JDA similarly fails. That clause again pertains only to claims relating to "breach" of the JDA. In addition, with no credible basis for limiting the scope of its Ninth Counterclaim, and as a matter of the federal rules of procedure, IBM has waived its right to enforce the clause. IBM does not dispute, moreover, that the Court may take into account the interests of judicial economy in considering a forum selection clause – and those interests sharply favor this Court as the venue for SCO's proposed claim.

## ARGUMENT

The Court is to treat a motion to amend liberally in order to "enable a claim to be heard on its merits." Calderon v. Kan. Dep't of Social and Rehab. Servs., 181 F.3d 1180, 1186 (10th Cir. 1999) (citing Froman v. Davis, 371 U.S. 178, 181-82 (1962)).

## I.   SCO HAS "GOOD CAUSE" AND HAS NOT UNDULY DELAYED IN SEEKING TO AMEND ITS COMPLAINT

Where the cut-off date for amendment in the Court's Rule 16(b) order has passed, the moving party must demonstrate "good cause." Proctor & Gamble Co. v. Haugen, 179 F.R.D. 622, 630 (D. Utah 1998), rev'd on other grounds, 222 F.3d 1262 (10th Cir. 2000).[1]  As SCO

---

[1] The Tenth Circuit has long held that a pre-trial order "is a procedural tool to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality." Century Refrigeration Co. v. Hall, 316 F.2d 15, 20 (10th Cir. 1963).

acknowledged in its opening brief (and as IBM emphasizes), the "primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001). The moving party meets that standard where it "uncovered previously unknown facts during discovery that would support an additional cause of action." Forstmann v. Culp, 114 F.R.D. 83, 86 (M.D.N.C. 1987).

SCO satisfies these standards. When it filed its original and amended complaints, SCO did not know that IBM had used SVR4 code or technology in AIX for Power. See Declaration of Jay F. Petersen (Dec. 29, 2004) ("Petersen Decl.") ¶¶ 9-10 (Exh. A). SCO uncovered the evidence of IBM's copying only through careful examination of documents and previously unavailable AIX source code that IBM produced in discovery, after the cut-off for the amendment of pleadings, in this action. SCO could not have gained access to the source code for AIX for Power from any source to examine it for potential infringement until IBM produced that product in this litigation, in April 2004. Accordingly, SCO did not possess the knowledge necessary even to permit SCO to meet the Court's amendment deadline.

In contending (at 8-11) that SCO "should have known" that "IBM copied at least certain UnixWare/SVR4 technology into the AIX for Power product," IBM misapprehends both the documents at issue and the relevant precedent. IBM relies on Exhibits 2-23 of the Shaughnessy Declaration in support of its argument. SCO shows below that those documents are unavailing. Under the relevant law, a copyright holder has no "duty of inquiry" in the absence of evidence suggesting a reason for suspicion. Jacobsen v. Deseret Book Co., 287 F.3d 936, 950 (10th Cir. 2002); see, e.g., Jackson Jordan, Inc. v. Plasser Am. Corp., 219 U.S.P.Q, 922, 926 (E.D. Va. 1983) (the commercial release of the infringing product, coupled with the copyright owner's

examination of that product, triggers a duty of inquiry).  SCO never possessed evidence to

trigger any such "duty to investigate."

IBM and SCO conceived that the joint development work of Project Monterey would

create an IA-32 product based on SCO's existing SVR4/UnixWare software and an IA-64

product based on IBM's existing AIX for Power software.  Both products would also be

compatible with SCO's existing SVR4/UnixWare software and IBM's AIX for Power software.

Thus, internal SCO and IBM documents and marketing materials sometimes reflected the

anticipated creation of a "family" of products, and the parties (in the JDA) anticipated reciprocal

licensing rights once this "family" of products was created.  In that event, each party would grant

the other a worldwide, non-exclusive license to certain of their respective copyrighted source

code for eventual use in other products to the extent that such intellectual property was included

in "deliverables," JDA ¶ 2.0(d)(2), defined as "Licensed, Materials, Project Work, and

Documentation under any Project Supplements."  JDA ¶ 1.2; see also Petersen Decl. ¶ 7.  Under

"Delivery of Licensed Materials," Project Supplement B provides as follows:

> "The License Materials detailed in Attachments 3 and 4 are to be used solely for
> development of the IA-64 Product.  Notwithstanding the foregoing, any such
> licensed material included in the IA-64 Product Release 1 shall be licensed
> pursuant to the terms and conditions set forth in the Agreement.  Any licensed
> materials which are not included in the IA-64 Product Release 1 may be licensed
> under a separate Project Supplement or by separate agreement."  Petersen Decl.
> Exh.1 ¶ 4.

The parties thus expected that each would use the other's copyrighted source code only after IA-

64 became a "deliverable" through a general release.

IBM primarily relies on documents (Exhibits 2-10, 12-15) – many from the files of

SCO's predecessor-in-interest, and which SCO did not see at the time – that were created during

or before Project Monterey and that reflect the parties' understanding regarding the "family" of

7

products (IA-32, AIX for Itanium, AIX for Power and SCO's SVR4/UnixWare) to be developed pursuant to the JDA and supplements thereto. Those documents show that each party understood that only after the IA-64 product was generally released would the other party be permitted to use IA-64-based source code in other products. In that context, the reference in certain documents to IBM's future use of SCO's software in connection with its products did not put SCO on notice of anything other than the rationale for Project Monterey.

IBM secondarily relies on documents (Exhibits 11, 16-23) that SCO did not see at the time and had no reason to have seen, and that in most instances (Exhibits 11, 16-19, 21-23) ambiguously refer in their title only to "AIX 5L." As far as SCO has reasonably been able to determine, neither SCO's predecessor-in-interest nor SCO saw any of Exhibits 11 or 16-23 before IBM used them in its opposition brief. Petersen Decl. ¶ 12. In addition, SCO did not review and had no reason to review sources such as an "AIX" website (Exh. 11); an "Andrews Consulting Group" report on AIX (Exh. 16); an "IBM Software Announcement" (Exhs. 18 & 19) – SCO did not track IBM's software releases; the "Memorandum" of "Release Notes" for AIX addressed to AIX licensees (Exh. 20) – SCO was not an AIX licensee; or IBM's "Redbooks" published by IBM's "International Technical Support Organization" (Exhs. 20-23) – SCO did not have any IBM hardware or software for which it needed support. Petersen Decl. ¶¶ 13-14. The references to "AIX 5L" in most of those documents, moreover, is ambiguous: the phrase could refer either to the Project Monterey product (the joint SCO-IBM product in which IBM was authorized to use SCO's code) or IBM's AIX for Power product (the proprietary IBM product in which IBM was not authorized to use SCO's code). Indeed, IBM's Exhibit 17 states unequivocally that "AIX 5L was previously known as Project Monterey."

8

In addition to the foregoing ambiguity, three of the documents (Exhs. 20-23) that post-date Project Monterey, and that were not found in SCO's files, would not have triggered the "duty" that IBM proposes for still additional reasons. Those exhibits discuss the use of a "System V printing sub-system" on AIX. System V is a generic term used in connection with all of SCO's UNIX products and is not specific to SVR4 software. That is relevant because at the time the JDA was executed, IBM had a license to use certain System V Release 3 software ("SVR3"), an earlier version of SCO's SVR4 software that did not contain certain functionality available in SVR4.[2] In sum, none of the foregoing documents triggered or should have triggered any "duty to investigate" on SCO's part.

With respect to those documents, moreover, the copyright holder who supplies software to another does not come "under a never-ending obligation to discover whether anyone to whom he ever supplied his software would copy it. The Copyright Act does not recognize such an obligation." MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 780 (3d Cir. 1991). That is especially true where, as here, there was an express agreement between the parties permitting a party to use the copyrighted material only under certain, specific conditions that were never satisfied. The documents do not evidence any knowledge of IBM's infringement upon SCO's copyrights, and do not evidence any reason for SCO to suspect that such an infringement was going to take place.

---

[2] IBM argues that Exhibits 21, 22 and 23 are available on IBM's website, but does not say when they became available. In addition, even if they were available before the amendment deadline, under the website's search function, the search term "AIX 5L" yields numerous results. Petersen Decl. ¶¶ 8, 15. The website also restricts access on a keyword search to only the first 100 search results. Id. ¶ 15. IBM's website is no basis on which to find that SCO "should have known" about IBM's copyright infringement.

Indeed, the parties had sought to negotiate a Project Supplement C (which IBM conspicuously ignores) to the JDA. This unexecuted document, prepared by IBM, would have modified the definition of "deliverables" so that SCO's proprietary software would be licensed for use in other IBM products. The unexecuted Project Supplement C states as follows:

> "Unless specifically noted otherwise in Attachment 1, all Deliverables are licensed solely for IBM's use in adding UnixWare compatible functionality to its AIX operating system where 'AIX' shall mean the Unix-based operating system for the Power PC architecture, currently marketed by IBM under the name 'AIX' and all current and/or future Enhancements, marketed, licensed or otherwise distributed by IBM to third parties, with or without IBM's names or logos. Such Deliverables may also be incorporated in IBM's OS/400 and OS/390 operating systems and any IBM middleware or applications that operate on AIX, OS/400, OS/390, or UnixWare 7." Petersen Decl. Exh. 2 ¶ 7.3.

IBM sought to negotiate the execution of Project Supplement C over a period of several months, but SCO declined to sign the supplement. SCO's refusal to enter into Project Supplement C did not itself charge SCO with the knowledge of or duty to investigate possible infringements. See In re Indep. Serv. Orgs. Anti-Trust Litig., 114 F. Supp. 2d 1070, 1112 (D. Kan. 2000) (explaining that "a party 'is not reasonably charged with knowledge of copying simply because it has refused to sell a protected product'"); see also Schock v. United States, 21 F. Supp. 2d 115, 119 (D.R.I. 1998) (duty to investigate is not triggered until a plaintiff receives warning of a potential problem). SCO was reasonably entitled to believe that IBM would not proceed as if the parties had executed the Supplement. See also Petersen Decl. ¶ 8.

IBM's fact-based arguments regarding SCO's supposed constructive knowledge are thus mistaken. In addition, under the "summary judgment" standard that IBM proposes (at 17) on the question of what SCO knew or should have known, those arguments are certainly no basis for

precluding SCO's amendment.[3]  See, e.g., Kling v. Hallmark Cards Inc., 225 F.3d 1030, 1039-41 (9th Cir. 2000) (citing cases) (holding that question of whether copyright owner "should have known" of copyright infringement presents fact issues precluding summary disposition); Armstrong v. Virgin Records, Ltd., 91 F. Supp. 2d 628, 640 (S.D.N.Y. 2000) (holding that questions concerning when copyright holder "should have known of the infringement" "do not lend themselves to summary disposition"); In re Indep. Serv. Orgs. Anti-Trust Litig., 964 F. Supp. 1469, 1479 (D. Kan. 1997) (holding that question of whether copyright owner "should have discovered" defendant's infringement presents fact issues precluding summary disposition).

In addition, although the Tenth Circuit has not addressed the interplay between Rules 15(a) and 16(b), the additional factors that other federal Circuit Courts identify as relevant under Rule 16(b) further support SCO's motion. Those factors include (1) the importance of the amendment, (2) the potential prejudice in allowing the amendment, and (3) the availability of a continuance to cure the prejudice. See Southwestern Bell v. City of El Paso, 246 F.3d 541, 546-47 (5th Cir. 2003). In this case, (1) SCO's proposed amendment concerns an egregious and clandestine copyright violation that (for example) goes to the heart of IBM's request for a clean bill of health on its development of its supposedly proprietary AIX operating system; (2) the amendment would not cause IBM any undue prejudice, see Part II, below; and (3) this Court and the Magistrate Court already have before them motions and applications demonstrating how

---

[3] In Bauchman v. West High School, 132 F.3d 542 (10th Cir. 1997), the court applied the "summary judgment" standard to the motion to amend only after having held the motion in abeyance pending discovery on the claims in the amendment. See id. at 546-47, 561; see also Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) (distinguishing between motions to amend filed prior to motions for summary judgment on the claim and those filed subsequently when selecting appropriate standard for review of proposed amendment).

IBM's discovery conduct justifies a continuance in the fact discovery in this case (and those filings <u>preceded</u> SCO's motion to amend).

Further, the sole alleged basis for IBM's claim of "undue delay" under Rule 15(a) is its "good cause" argument. IBM Mem. at 11-12. IBM fails even to address the central fact that, notwithstanding SCO's document requests beginning in June 2003, IBM did not produce until March and April 2004 (after the cut-off for amendment of pleadings) the documents evidencing IBM's copying and clandestine plan to use Project Monterey to undertake unauthorized copying. On this basis alone, SCO's proposed amendment is not unduly "delayed" (or "delayed" at all). <u>See</u> SCO's Mem. at 17-18 (citing cases).[4]

## II.    SCO'S AMENDMENT WOULD NOT UNDULY PREJUDICE IBM

IBM claims undue prejudice on the grounds that SCO's copyright claim would raise issues that are not part of the current case. IBM Mem. at 15. IBM is mistaken, and does not remotely carry its burden. <u>See</u> SCO's Mem. at 19 (citing cases). SCO has explained that, as an initial matter, it will present the facts of IBM's misappropriation of SCO's code through Project

---

[4] The cases IBM cites are inapposite. In <u>Panis v. Mission Hills Bank, N.A.</u>, 60 F.3d 1486 (10th Cir. 1995), the plaintiff's proposed "amendments were not based on new evidence, but on knowledge she held at the time when she first filed this action," and she "provided no explanation why she did not seek to amend her complaint before the deadline." <u>Id.</u> at 1495. In <u>Pallottino v. City of Rio Rancho</u>, 31 F.3d 1023 (10th Cir. 1994), the "proposed amendment was not based on new evidence unavailable at the time of the original filing," and plaintiff "did not explain his failure to amend the complaint earlier." <u>Id.</u> at 1027. In <u>Frank v. U.S. West, Inc.</u>, 3 F.3d 1357 (10th Cir. 1993), "Plaintiffs' counsel conceded at oral argument that their failure to add Northwestern Bell as a defendant was a strategic decision." <u>Id.</u> at 1366 n.9.    In <u>Woolsey v. Marion Laboratories, Inc.</u>, 934 F.2d 1452 (10th Cir. 1991), plaintiff "offered no explanation for the delay," plaintiff's counsel acknowledged that "in researching another matter he had identified an additional cause of action," and "no new evidence that was unavailable at the original filing" had come to plaintiff's attention. <u>Id.</u> at 1462 (internal quotations and brackets omitted). In <u>Las Vegas Ice and Cold Storage Co. v. Far West Bank</u>, 893 F.2d 1182 (10th Cir. 1990), it was undisputed that "the facts underlying the claim were known to the plaintiff at the time suit was instituted." <u>Id.</u> at 1185. In <u>Heard v. Bonneville Billing and Collections, Inc.</u>, No. 2:97-CV-445C, 1998 U.S. Dist. LEXIS 23035 (D. Utah Nov. 30, 1998) (Exh. B), the court concluded that plaintiff's counsel should have been aware of the facts giving rise to the amended claims at the outset of the action by virtue of counsel's involvement in a "parallel" and "substantially similar" class action in the same court. <u>Id.</u> at *4-7.

Monterey in support of SCO's own contract claims, and that IBM's own interrogatory responses have treated Project Monterey as (in IBM's words) one of the "issues in this lawsuit." SCO's Mem. at 20. IBM says _nothing_ about that express concession.

In its Ninth Counterclaim, moreover, IBM seeks a "declaratory judgment of non-infringement of copyrights." IBM alleges that it "is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyrights or the reproduction, improvement, and distribution of AIX and Dynix, and that some or all of SCO's purported copyrights in UNIX are invalid and unenforceable." IBM's 2d Am. Countercl. ¶ 167. IBM lists "UNIX System 5 Release 4.0" as one of the copyrights for which it is seeking a declaration of non-infringement. _Id._ ¶ 163.

IBM's Ninth Counterclaim thus plainly encompasses SCO's copyright claim. IBM asks the Court to declare that IBM has not infringed any SCO copyright in developing AIX, and SCO seeks to prove such infringement.[5] The prosecution of SCO's proposed claim would require the presentation of substantially the same evidence that SCO would adduce in order to defend against IBM's Ninth Counterclaim. Where a party's proposed new claim would otherwise be a defense to its opponent's claim, the amendment is appropriate. _See_ SCO Mem. at 20-21 (citing cases). Given the foregoing, IBM's assertion (at 14) that SCO has proposed its amendment merely "for obtaining expanded discovery" is particularly groundless.[6]

---

[5] IBM attempts to argue (at 15) that its Ninth Counterclaim seeks only a declaration that SCO's termination of IBM's UNIX System V licenses is invalid. The plain language of the Counterclaim – which IBM does not attempt to rationalize with its new and indefensible gloss and which IBM has made no attempt to amend in order to assert what the Counterclaim purportedly was "never intended to" encompass – directly contradicts IBM's argument.

[6] Indeed, since its opening brief, SCO has noticed and deposed two witnesses primarily regarding IBM's conduct during Project Monterey and interpretation of the JDA and related documents. (Both witnesses provided substantial testimony in support of SCO's proposed copyright claim.) IBM would thus have this

IBM also fails to meet its burden of showing undue prejudice even independent of the plain scope of its Ninth Counterclaim. The crux of IBM's argument is that SCO's proposed copyright claim "would require (and has already required) IBM to divert time and resources away from the claims that are currently part of this case in order to conduct additional discovery and undertake additional motion practice relating to the new claim." IBM Mem. at 15. But "'the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.'" Kreinik v. Showbran Photo, Inc., No. 02 Civ. 1172 (RMB)(DF), 2003 WL 22339268, at *10 (S.D.N.Y. Oct. 14, 2003) (Exh. C) (quoting United States v. Cont'l Ill. Nat'l Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir. 1989)). That is true, moreover, even if discovery had been completed. See id. In this case, SCO has repeatedly shown this Court and the Magistrate Court that IBM's discovery conduct has precluded SCO from obtaining a great deal of relevant evidence before the scheduled end of fact discovery.[7] If the Court determines to permit such discovery, IBM's proposed basis for opposing SCO's amendment would fail for that additional reason. In all likelihood, moreover, this Court and the Magistrate Court will have resolved whether to extend discovery in this case even before SCO's

_____

Court believe that IBM consented to those depositions even though their subject matter, according to IBM, would not relate to any claim currently in the litigation. That is not credible.

[7] IBM suggests (at 16) that because SCO was able to identify the 245,026 and 260,785 lines of code that IBM has copied from SCO's software into AIX for Power 5.1 and 5.2, respectively, SCO must also be able quickly to undertake the other necessary source code comparisons in this litigation. IBM misses the mark. SCO was able to identify the 505,811 lines that IBM copied because it copied those lines verbatim, making the copying relatively easy to identify – after SCO received the AIX5L source code. SCO has repeatedly explained in filings to this Court and the Magistrate Court that SCO needs substantial additional discovery to permit SCO to identify instances of IBM's non-literal copying, and copying of structure, sequence, organization, methods and concepts – and has not received nearly all of the source code that SCO will use to undertake such comparisons. Such comparisons are particularly time-consuming where the programmers have sought to obfuscate the evidence of the copying.

14

instant motion is argued. IBM's claim (at 13) that SCO would "seek to extend discovery in this case" if the motion were granted is thus illusory.

## III.   SCO'S PROPOSED COPYRIGHT CLAIM IS NOT FUTILE

IBM first claims, incorrectly, that the limitations period set forth in the JDA bars SCO's proposed copyright claim. Section 22.3 of the JDA provides that "any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York." The Court must strictly construe a contractual provision modifying a statute of limitations. See Fireman's Fund Ins. Co. v. Warehouse No. 1, Inc., No. 89 Civ. 4069, 1989 U.S. Dist. LEXIS 13507, at *11 (S.D.N.Y. Nov. 13, 1989) (Exh. D); Brink's, Inc. v. City of New York, 528 F. Supp. 1084, 1086 (S.D.N.Y. 1981); Raymond Int'l, Inc. v. City of New York, 511 F. Supp. 773, 776 (S.D.N.Y. 1981) (collecting cases). Section 22.3 addresses a "legal or other action related to a breach of this Agreement."[8]  SCO proposes to bring a copyright claim, not a claim for breach of the JDA.

Further, the discovery rule applies to claims for copyright infringement. "A claim accrues under the Copyright Act when the copyright holder knows or reasonably should have known of the infringement." In re Indep. Servs. Orgs. Anti-Trust Litig., 85 F. Supp. 2d 1130, 1174 (D. Kan. 2000) (citing cases); see also SCO's Mem. at 22 (citing cases). Under that

---

[8] In claiming generally that "contractual forum selection clauses" encompass copyright claims, IBM Mem. at 17 n.8, IBM both fails to acknowledge the plain language of section 22.3 (let alone strictly construe it) and mischaracterizes the cases IBM cites for its generic proposition. In contrast to the sweeping forum selection provisions in the cases that IBM cites, section 22.3 specifically pertains only to actions relating to a "breach" of the JDA. Section 22.3 encompasses neither "all disputes arising out of this Agreement," Omron Healthcare, Inc. v. MaClaren Exports Ltd., 28 F.3d 600, 601-02 (7th Cir. 1994), nor all claims concerning the "validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties hereto." Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc., 949 F. Supp. 1427, 1429 (N.D. Cal. 1997).

standard, SCO's claim did not accrue until this year, when SCO first learned of IBM's infringement. See Part I, above.

In addition, the principle of continuing infringement (a doctrine the Tenth Circuit has not addressed) should govern SCO's copyright claim. Under that doctrine, each individual act of infringement constitutes a separate claim so that acts of infringement which took place during the limitations period are not time-barred. See, e.g., Makedwide Pub'g Co. v. Johnson, 37 F.3d 180, 181 (5th Cir. 1994); United States v. Shabazz, 724 F.2d 1536, 1540 (11th Cir. 1984); Taylor v. Merick, 712 F.2d 1112, 1118-19 (7th Cir. 1983).

IBM's argument for improper venue is equally meritless. The argument first fails because (as explained above) section 22.3 of the JDA relates only to claims for "breach" of the JDA, and SCO's copyright claim is not a claim for "breach" of the JDA. The argument further fails because (even assuming that the venue provision could apply), IBM has waived its claim of improper venue. In invoking (at 18) the "no waiver" provision of the JDA, IBM misapprehends the relevant precedent. See SCO's Mem. at 23 (citing cases). The contractual provision is irrelevant to the operative question: whether as a matter of federal procedure IBM has waived its defense of improper venue. See Steward v. Up N. Plastics, 177 F. Supp. 2d 953, 959 (D. Minn. 2001) (holding that, with respect to "a contractual non-waiver provision," "the Court does not interpret that provision as relevant to the threshold issue, which is, that Ag-Bag did not timely raise its defense of improper venue as prescribed under the Federal Rules of Civil Procedure"). In fact IBM has waived any forum selection right in two principal respects:

   –      Notwithstanding its express concession in October 2003 that Project Monterey is one of the "issues in this lawsuit," IBM has not raised the "defense of improper venue" in its responsive pleading.

—    In its responsive pleading, IBM <u>has</u> asserted a counterclaim (its Ninth
Counterclaim) that plainly encompasses the entire development history of AIX, which
includes the use of SCO's code arising out of Project Monterey.

<u>See</u> <u>B-S Steel of Kan., Inc. v. Tex. Indus., Inc.</u>, Nos. 01-2410-JAR, 03-2664-JAR, 2004 WL

946894, at *2 & n.6 (D. Kan. Apr. 28, 2004) (Exh. E); <u>In re Am. Freight Sys., Inc.</u>, 236 B.R. 47,

50-51 (D. Kan. 1999).  (On these same bases, IBM has waived the non-waiver provision in the

JDA.  <u>See</u> <u>Steward</u>, 177 F. Supp. 2d at 958 n.7.)

Indeed, if (contrary to fact) the JDA's venue provision did encompass SCO's copyright

claim, then IBM's request for a declaration that it did not engage in that very same copyright

infringement necessarily implicates the same venue provision.  Under the federal rules, IBM's

pursuit of JDA-related litigation in this forum constitutes a clear waiver of IBM's ability to

enforce the forum selection clause for New York.

IBM does not dispute, moreover, that the interests of judicial economy in favor of

pending litigation can override a forum-selection clause, and that "each case must be considered

based on its particularized facts" before a claim is transferred on the basis of such a clause.

<u>Steward v. Up N. Plastics</u>, 177 F. Supp. 2d 953, 959 (D. Minn. 2001) (refusing to transfer

litigation to designated forum, despite forum selection clause, pointing to pending litigation and

explaining that "both cases can be adjudicated simultaneously before a Court that is intimately

familiar with the issues in this case").  In claiming only that its Ninth Counterclaim "was never

intended to" encompass Project Monterey, IBM both ignores the plain, sweeping language of

that Counterclaim and the fact that (as IBM had previously conceded) Project Monterey is

already an issue in this lawsuit by virtue of SCO's contract claims.  <u>See</u> Part II, above.

17

## CONCLUSION

SCO respectfully submits, for the reasons set forth above, that this Court should grant

SCO's request for leave to file its Third Amended Complaint.

DATED this 29th day of December, 2004.

Respectfully submitted,

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stephen N. Zack
Edward Normand
Sean Eskovitz

By _____

*Counsel for The SCO Group, Inc.*

18

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and

correct copy of the foregoing Plaintiff's Memorandum in Support of its Motion for Leave to File

Third Amended Complaint was served by mail on Defendant International Business Machines

Corporation on the 29th day of December, 2004, by U.S. Mail to:

David Marriott, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York  10604

Todd Shaughnessy, Esq.
Snell & Wilmer LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, Utah 84101-1004



Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER, LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER, LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP<br><br>Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff | **DECLARATION OF JAY F.**<br>**PETERSEN**<br><br>**Case No. 2:03CV0294DAK**<br>**Honorable Dale A. Kimball**<br>**Magistrate Judge Brooke C. Wells** |

I, Jay F. Petersen, declare:

1. I am employed by The SCO Group, Inc. ("SCO") as a Director.

2. I have been employed by SCO and its predecessors-in-interest since 1986 in various different engineering positions.

3. In my capacity as Director of Program Management of The Santa Cruz Organization, Inc. (unless otherwise indicated, "SCO")), I was involved in, and had responsibilities related to, a joint development project between SCO and International Business Machines Corporation ("IBM") known generally as Project Monterey. My involvement in Project Monterey began approximately August 1999 and continued through and until IBM terminated the project in June 2001. In that capacity and based on my involvement in Project Monterey, I have personal knowledge of the matters stated hereinafter. I also have corporate authority to represent the matters stated hereinafter on behalf of SCO.

4. During approximately 1999 and 2000, as part of Project Monterey and subject to the terms and limitations of Project Supplement B, SCO delivered to IBM certain modules from its SVR4/UnixWare source code that were to be used for developing the joint IA-64 product that would operate on Itanium hardware being developed at the time by Intel Corporation. (A true and correct copy of Project Supplement B is attached hereto as Exhibit 1.) These SVR4/UnixWare technology modules were not to be used for any other purpose without a separate written agreement authorizing such use.

5. IBM attempted to gain SCO's approval for broader use of SVR4/UnixWare code under a new project supplement, designated "Project Supplement C." (A true and correct copy of IBM's proposed Project Supplement C is attached hereto as Exhibit 2.) This unexecuted

document would have modified the definition of "deliverables" so that SCO's proprietary software would be licensed for use in other IBM products, including its AIX for Power product. Although SCO and IBM negotiated the execution of Project Supplement C over a period of several months, SCO declined to sign the supplement.

6.   Project Supplement C thus remained unsigned and unexecuted at the time IBM terminated Project Monterey in June 2001.

7.   Project Monterey was intended from the outset to result in the creation of new Unix-based software for use in conjunction with Intel's 64-bit Itanium processor which was expected to be released in late 2000 or early 2001. This software was initially to be known as the "IA-64 Product" and later as "AIX5L for Itanium." The IA-64 Product was intended to be compatible with SCO's existing SVR4/Unixware software, and IBM's existing AIX for Power software. Thus, internal SCO and IBM documents and marketing materials reflected the anticipated creation of a "family" of products. It was anticipated that SCO and IBM would jointly market and receive benefit from this "family" of products, both from royalties that would accrue from licensing of the IA-64 product and from enhanced sales of UnixWare and AIX for Power as a part of the "family" of products. It was never anticipated that IBM would take SCO's code intended for use in the IA-64 product, use that code commercially only in AIX for Power, fail to pay SCO any royalties from such use, terminate IA-64 commercialization (the "cornerstone" of the "family" of products), or eliminate SCO's ability to market the "family" of products that it heavily relied upon for future revenue growth opportunities for UnixWare.

-3-

8.  At no time during or after Project Monterey did I or, to the best of my knowledge, any other SCO employee visit IBM's website in an attempt to determine whether the website contained any information regarding whether IBM was infringing upon any of SCO's copyrights in its production of its AIX for Power products.  Nor did I, nor, to the best of my knowledge, any other SCO employee become aware of any infringement as a result of any article in any trade publication.  Because SCO had not signed Project Supplement C, IBM lacked any license to use SCO's proprietary software and SCO did not know and did not have any reason to believe that IBM had included SVR4/UnixWare code in any of its AIX for Power products.

9.  During the course of these litigation proceedings, in or about June 2004, I was shown certain information produced by IBM revealing that, in fact, IBM had used SVR4/UnixWare code in its AIX for Power product since and after October 2000, including AIX5L for Power version 5.1 and AIX5L for Power version 5.2.  (This finding is referenced in the Declaration of Barbara L. Howe dated August 19, 2004.)  Until shown this information in June 2004, I did not know that IBM had included SVR4/UnixWare code in any AIX for Power offering.  To the best of my knowledge, no one else at SCO knew that either.  I was surprised to find out that IBM had done that.

10. To the best of my knowledge and information, SCO did not know that IBM had included SVR4/UnixWare code in any of its AIX for Power products until review of the documents produced by IBM in this litigation in or around April 2004.

11. Exhibits 2-23 to the Shaughnessy Declaration submitted with IBM's Memorandum in Opposition to SCO's Motion for Leave to File Third Amended Complaint are not the type of documents that we at SCO would review in the ordinary course of business, and to the best of

my knowledge, we did not review any of those documents prior to IBM's filing these
documents for use in this case.

12. To be specific, to the best of my knowledge, neither I nor anyone else at Santa Cruz or SCO
saw any of Exhibits 11 or 16-23 to the Shaughnessy Declaration before IBM submitted them
with its Opposition Memorandum.

13. To the best of my knowledge, neither I nor anyone else at Santa Cruz or SCO had any reason
to review or access an "AIX" website (Exh. 11); an "Andrews Consulting Group" report on
AIX (Exh. 16); or an "IBM Software Announcement" (Exhs. 18 & 19).

14. To the best of my knowledge, SCO did not monitor or track IBM's software releases; the
releases to AIX licensees (SCO was not an AIX licensee); or the IBM "Redbooks" published
by IBM's "International Technical Support Organization" (SCO was neither an IBM support
provider nor have any IBM hardware or software for which it needed support).

15. IBM asserts that Exhibits 21 through 23 to the Shaughnessy Declaration are available on
IBM's website. However, neither the Declaration nor IBM's Memorandum make mention of
when these materials were placed on the website. Even if they were present at a time
applicable hereto, a search for the term "AIX 5L" would currently yield a return in excess of
400,000 results under the search system utilized on IBM's website. I believe it is reasonable
to conclude that the search results that would have been produced in 2001 would also have
been very large. Further, IBM's website appears to restrict access on a keyword search to
only the first 100 results responsive to the search term, making it impractical to accurately
verify the content of all documents purportedly on IBM's website at any given time.

I declare under penalty of perjury that the above is true and correct.

Dated this _27_ day of December, 2004.

_____
Jay F. Petersen

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and

correct copy of the foregoing Declaration of Jay F. Petersen was served by mail on Defendant

International Business Machines Corporation on the 29th day of December, 2004, by U.S. Mail

to:

David Marriott, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York  10604

Todd Shaughnessy, Esq.
Snell & Wilmer LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, Utah 84101-1004

# Project Supplement B to Agreement Number 4998CR0349
## Version 1.0 February 19, 1999

## 1 Purpose

Project Supplement B (hereinafter "Supplement B") defines the joint development efforts between IBM and SCO in the creation of Release 1 of the IA-64 Product (hereinafter IA-64 Product Release 1") as noted in Agreement Number 4998CR0349, with an effective date of October 23, 1998 by IBM and SCO.

## 2 Technical Management Representatives

The Technical Manager contacts for Project Supplement B are:
- David Higgins, Monterey Program Manager, IBM, 512-838-1637, dwh@us.ibm.com
- Ed Whelan, Director, Core Operating System Development, SCO, 908-790-2420, eww@sco.com

## 3 Development Resources

The Preliminary Work Split included as Attachment 1 identifies the preliminary staffing and work split between IBM and SCO required to produce IA- 64 Product Release 1. A refined staffing matrix, finalizing work split, location and staffing levels will be included in the Project Plan deliverable described in Section 6.3.4 below.

## 4 Delivery of Licensed Materials

The Licensed Materials detailed in Attachments 3 and 4 are to be used solely for development of the IA-64 Product. Notwithstanding the foregoing, any such Licensed Material included in the IA-64 Product Release 1shall be licensed pursuant to the terms and conditions set forth in the Agreement. Any Licensed Materials which are not included in the IA-64 Product Release 1may be licensed under a separate Project Supplement or by separate agreement. In the event of termination of the Agreement or Supplement B, subject to Section 15 of the Agreement, the parties may continue to use the Licensed Materials detailed in Attachments 3 and 4 for the development of the IA-64 Product Release 1. IBM will deliver the Licensed IBM Materials in Attachment 3 within 30 days of the signing of Supplement B and verification that the prerequisite Licensing requirements are met. SCO will deliver the Licensed SCO Materials in Attachment 4 within 30 days of the signing of Supplement B and verification that the prerequisite Licensing requirements are meet. The list of Licensed Materials included in the attachments is an initial list prepared by the parties based on the current understanding of the definition of IA-64 Product Release 1. It is understood that this list will likely need to be revised to add and/or delete individual items as the product definition evolves. Any such changes will be made via amendments to this Project Supplement. Further, the Project Plan may identify additional Licensed Materials and if such is the case this will require an amendment to this Project Supplement document. Notification of deliverables will be via letter to the Technical Manager of the company making the delivery.

The Licensed SCO Materials and Licensed IBM Materials described in Attachments 3 and 4 are licensed in accordance with the Agreement as modified by this Project Supplement. The license contained in Supplement Number 4998PKM02 of Confidential Disclosure Agreement AUS970557 is hereby expressly superceded by the Agreement with respect to the Licensed SCO Materials and Licensed IBM Materials identified in Attachment 3 and 4.

## 5 Project Work

IBM Project Work, SCO Project Work and Joint Project Work will be described in the Project Plan. The intent is for there to be no additional license prerequisites or license restrictions. However, if license prerequisites or license restrictions do occur in the process of doing the Project Work, then the Project Plan will have to list them and the Project Supplement amended.

SCO/IBM Confidential

Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

The Documentation associated with the Code is assumed to be classified in the same way as the code is classified. For example, the Design Documentation for IBM Project Work is assumed to be IBM Project Work, the Design Documentation for Joint Project Work is assumed to be Joint Project Work.

## 6   Project Management
The IA-64 Product Release 1 is a joint development project being managed by a team consisting of members from both IBM and SCO. Regular status meetings are in place to track progress at all levels. The following sections provide more details.

### 6.1 Status Meetings
The project to produce Release 1 is being managed via regular meetings at each of the engineering/planning, technical and project levels.  A schedule for such meetings will be detailed in the Project Plan.

### 6.2 Milestone Tracking
Milestone tracking for this project will occur at two levels, the Development Level, and the Project Level. The Project Documents are defined in section 6.3. The schedule in Attachment 2 is the Project Level schedule. It identifies key checkpoints that will be used to track progress on the Project Documents. Future versions of the Project Documents will be determined on a case by case basis. The detailed Development Level schedule will be provided in the Project Plan. The identification of the tools used to track and present milestone status will be detailed in the Monterey Development Process document.

### 6.3 Project Documents

The Project Documents will be updated to the extent necessary, as agreed to by the parties, on a quarterly basis (the last month of each quarter: March, June, Sept & Dec) to reflect changes in progress and minor revisions / corrections to the content.

Until the parties agree in writing to Version 1.0 of each Project Document, such Project Document shall be classified IBM and SCO Confidential and may not be provided to a third party without the appropriate non-disclosure agreement in place between all the parties or expressed written consent of the Technical Managers identified in the Agreement.
When approved, all Project Documents become Project Works.
 All changes to approved versions of Project Documents will follow the change control process as provided for in Section 8.7 of the Agreement.

#### 6.3.1  Exhibit A ("Product Roadmap Document")

The Product Roadmap Document referred to as Exhibit A in Agreement Number 4998CR0349 between SCO and IBM, will be executed concurrent with this Project Supplement. The execution of a revised version of Exhibit A is scheduled to coincide with Version 1.0 of the IA-64 Product Release 1 Project Plan, in accordance with the schedule in Attachment 2 .

#### 6.3.2 Product Requirements Specification
The Product Requirements Specification provides the product requirements for  the IA-64 Product Release 1. It provides general criteria that apply to all aspects of the product such as performance and internationalization, and also provides specific feature requirements.  The Product Requirements Specification Version 1.0 must be baselined before execution of this



**Project Supplement B to Agreement Number 4998CR0349**
**Version 1.0 February 19, 1999**

Supplement and will be revised as needed. Other documents may be required by the Product
Requirements Specification; schedules for such documents will be provided therein.

### 6.3.3 Monterey Product Development Process Document

The Monterey Product Development Process Document will describe in detail how IBM and SCO
will produce the IA-64 products.. This document will identify what tools will be used and the
procedures that will be followed for all aspects of the development lifecycle including (but not
limited to) architecture, specifications/design, coding testing, source control, packaging, user
documentation, quality measurements, change control, project information storage and retrieval,
and project management. This document will also provide the plans, steps, and resources
necessary to implement these procedures. The Development Process Version 1.0 must be in
Draft format before execution of this agreement and must be baselined and revised in
accordance with the schedule provided in Attachment 2. Other documents may be required by
the Monterey Product Development Process Document; schedules for such documents will be
provided therein.

### 6.3.4 Project Plan

The IA-64 Product Release 1 Project Plan must contain detailed plans for the entire IA-64
Product Release 1 program as described in the Product Requirement Specification including, but
not limited, to:
- Detailed feature descriptions required to implement Release 1 as defined by the Product
  Requirements Specification, including detailed staffing requirements and development
  milestones.
- Project Work
- Build Plan
- Performance Plan
- System Test Plan
- Internationalization & Translations/Localization Plan
- Documentation Plan
- Packaging/Manufacturing Plan
- Alpha/Beta Program Plan
- Early Access Plan

The Project Plan Version 1.0 must be in Draft format before execution of this agreement and
must be baselined and revised in accordance with the schedule provided in Attachment 2. Other
documents may be required by the Monterey Project Plan; schedules for such documents will be
provided therein.

### 6.3.5 Maintenance & Support Plan

A Maintenance and Support Plan must be written and agreed to by both IBM and SCO prior to
IA-64 Release 1 shipment. This document will detail what each company's obligation is once the
product ships for ongoing maintenance and support.  A schedule for this document is provided in
Attachment 2.

Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

**7.0 Attachments**
      Attachment 1 – Preliminary Work Split
      Attachment 2 – Project Document Milestones
      Attachment 3 – Licensed IBM Materials
      Attachment 4 – Licensed SCO Materials

          SCO/IBM Confidential

**Project Supplement B to Agreement Number 4998CR0349**
**Version 1.0 February 19, 1999**

THE PARTIES ACKNOWLEDGE THAT EACH HAS READ THIS PROJECT
SUPPLEMENT, UNDERSTANDS IT, AND AGREES TO BE BOUND BY ITS
TERMS AND CONDITIONS. FURTHER, THE PARTIES AGREE THAT THIS
PROJECT SUPPLEMENT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF
THE AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL
PROPOSALS OR ALL PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL
OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE
SUBJECT MATTER HEREOF.

Accepted and Agreed:
International Business                The Santa Cruz Operation, Inc.
Machines Corporation

By: _____                By: _____
    Haig D. McNamee                      Kimberly A. Madsen
              print or type                         print or type

Title: SW Contracts Account Mgr.     Title: Mgr. Law & Corp Affairs

Date: 19 Feb 1999                    Date: 19 February 1999

Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

# ATTACHMENT 1

# PRELIMINARY WORK SPLIT

| All Staff Estimates Provided in Person-Months | Staff Estimates | |
|---|---|---|
| Technology Area | IBM | SCO |
| Directory Services | 0 | 0 |
| ELF/DWARF/PROC | 82 | 30 |
| Enhanced DLKE | 12 | 12 |
| Family Compatibility | 69 | 3 |
| Generic IA-64 System (SMP & ccNUMA) Support | 919 | 66 |
| Hot Plug PCI | 36 | 12 |
| IA32 Binary Compatibility | 24 | 57 |
| Intel-Platform Device Support | 27 | 45 |
| NUMA | 57 | 75 |
| Scalability | 36 | 36 |
| SCO/Intel SDK | 36 | 60 |
| Source Compatibility | 12 | 36 |
| SVR5 Print Subsys. | 6 | 6 |
| UDI | 84 | 0 |
| System Test | 192 | 96 |
| Documentation | 140 | 43 |
| Release Overhead | 828 | 483 |
| Translations | 80 | 0 |
| Support | 0 | 0 |
| Grand Total (Person Months) | 2640 | 1060 |
| Grand Total (Person Years) | 220 | 88 |

SCO/IBM Confidential

Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999



# ATTACHMENT 2
# PROJECT DOCUMENT MILESTONES

| Milestone | Original | Revised | Final |
|---|---|---|---|
| Roadmap ("Exhibit A") | 1/29/99 | 2/19/99 | |
| Product Requirements Version 1.0 Baselined | 1/29/99 | 2/19/99 | |
| Project Plan Initial Draft Available | 1/29/99 | | |
| Development Process Initial Draft Available | 1/29/99 | | |
| Project Supplement B Signed | 2/5/99 | 2/19/99 | |
| Roadmap ("Exhibit A") Version 1.0 Baselined | 2/5/99 | 1Q99 | |
| Project Plan Version 1.0 Baselined | 1Q99 | | |
| Development Process Version 1.0 Baselined | 1Q99 | | |
| Maintenance & Support Plan Baseline | 4Q99 | | |

SCO/IBM Confidential

Attachment 3 to Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

# Attachment 3

## 1 Licensed IBM Materials

For each Licensed Materials described below, IBM will identify any third party Source Code that IBM cannot disclose without SCO obtaining a license from such third party (prerequisite source licenses). Upon notification from SCO that such third party source licenses are in place, IBM will make the Code available to SCO through CMVC and make a source tape available to SCO. In addition, in each section below, IBM will identify any other restrictions that apply to use or distribution of the Code.

Source Code may be excluded from the Deliverables below where:

(1)     IBM does not possess the entire Deliverable in Source Code form; there may be Code in the Deliverable which is owned and controlled by a third party and IBM does not have the Source Code, or

(2)     IBM does not have the right or license to disclose or distribute all of the third party Source Code used in the Deliverable; there may be Code in the Deliverable which is owned and controlled by a third party and IBM may not distribute the Source Code, or

(3)     IBM has determined that particular feature is proprietary in nature to the extent that divulging the Source Code could lead to a major loss of business or competitive advantage in the market place.

### 1.1 Subset of AIX 4.3.2

The following components from AIX 4.3.2 will be the basis of the Licensed IBM Materials for the IA-64 product. Some components from AIX 4.3.2 will be licensed in binary format only. In all cases, the exclusion of source code by AIX is a result of the limitations described in Section 1.0.

AIX 4.3.2 Source Code (with the exceptions identified in the "Code" section below):
 - Base Operating System Runtime Environment/Application Development Toolkit
 - AIXwindows (X11)
 - Monterey Device Drivers
 - Printer Subsystem
 - System Management
 - Networking Subsystem
 - English Help Messages
 - English Messages
 - Hardware Diagnostics Framework
 - Locale Support
 - Taiwan dictionary utility (src/tw)
 - Text Formatting Services (src/cmdtext)
 - Build Environment/Tools
 - AIX System Backup/Recovery
 - On-line Documentation (src/idd)
 - Base Performance Tools (src/perf/cmdperft)
 - LDAP (Lightweight Directory Access Protocol)
 - AIX Common Desktop Environment (src/cde)
 - Translated Help Message Catalogues
 - Translated Message Catalogues



Attachment 3 to ι ιoject Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999



Binary only:

Open Network Computing Plus (src/oncplus)  - this code provides basic network support including
NFS and NIS functionality. To obtain this source code, SCO will have to acquire a source license
from Sun.

- Data Encryption Standard Library – this code provides the ONC and rpc data encryption
libraries. . This source code is not provided due to United States export restrictions on shipment
of such source code out of the United States.

  - Online Documentation Search Engine – this code provides the search functionality for the
html-based documentation library. This is an IBM technology for which AIX does not possess or
have right to sublicense the source code.

- Java Binaries and Classes – this code provides the Java programming environment. To obtain
this source code, SCO will have to acquire a source license from Sun.

- RSA Inc's bsafe encryption/authentification libs – this code provides the data encryption for IP
Security. To obtain this source code, SCO will have to acquire a source license from RSA.

- DB2 backing store for LDAP – this code provides the backing store for the directory services
component. This is an IBM technology for which AIX does not possess or have right to sublicense
the source code.
  - C ++ Runtime (src/xlC) – this code provides the C and C++ language runtime. This is an IBM
technology for which AIX does not possess or have right to sublicense the source code.

Not included in IA-64 Release 1 product:
-   Non-Monterey Device Drivers
-   3D Graphics:
        OpenGL Application Development Toolkit
        PEX Runtime Environment/Application Development Toolkit
        Collabration (Video Conferencing)
- IPX/SPX Netware
- Xstation Manager
- INed Editor
- InfoExplorer/InfoExplorer Extended License
- License Use Management (ifor_LS)

AIX technologies that are not based in AIX 4.3.2 but are required for the IA-64 Product Release 1,
such as FastConnect Server, will be investigated to be licensed to SCO in amendments to this
Supplement.

Prerequisite Licensing Requirements:

IBM cannot disclose (includes viewing) certain third party Source Code to any party who does not
have a license that permits access to the Code.  Prior to receiving or accessing the Source Code
described above in this Supplement SCO must obtain the following Source Code licenses:

UNIX System V, Release 3 or later from Santa Cruz Operation (SCO) or current licensor.

UNIX ™ System Laboratories, Inc Software Licensing for Toolchest/KSH-I and for
Toolchest/AWK or equivalent license from current licensor.

Attachment 3 to ₁ ₁oject Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

UNIX ™ System Laboratories, Inc Software Agreement Supplement for UNIX Documenter's
Workbench Release 2.0 or equivalent license from current licensor.

University of California Tahoe or Reno Versions of Release 4.3 or 4.4 of Berkley Software
Distribution.

The Open Software Foundation, Inc. Master Software License Agreement plus the OSF/1 1.2
Operating System Component Standard Supplement or equivalent license from current licensor.
The origin analysis is work in progress, there maybe other items in this subsection.

## Other Licensing Restrictions

Files with Origin Number 24 are Sun Microsystems' Open Networking Computing Network File
System (NFS) Version 4.1 or later Releases or Derivative Works thereof and must be packaged
with a substantial portion of the Deliverables delivered under Project Supplement A. If the NFS
code is distributed separately, SCO must obtain the appropriate license from Sun Microsystems.

University of California Tahoe or Reno Versions of Release 4.3 or 4.4 of Berkley Software
Distribution (BSD) are subject to additional license terms contained in Appendix A to this
Attachment 4. These terms must be included in any SCO license when SCO distributes such
BSD Code.

For Code containing the OSF Motif Source Code (files with origin numbers 73, 92, 117, 118, 119,
120, 121, 126, 167, 188 and 195), SCO may only sublicense this Code as bundled with a
substantial portion of the Deliverables delivered under Project Supplement B. The Motif Source
Code may not be distributed separately.

## Code

Subject to 1.0 above, IBM will provide Licensed IBM Materials in Source Code form from AIX
4.3.2 that are needed to provide the functionality for the IA-64 Product.

Within the broad category of AIX 4.3.2 source code described in 1.1 above, IBM is restricted from
licensing all the source code for certain components obtained from third party sources. These
components are Licensed IBM Materials in Object Code only. To obtain source rights for the
following components, SCO will need the appropriate license from the third party named:

*Adobe (Origin Number 1): this code provides a variety of font support.*

src/cmdtext/usr/bin/enscript/enscript.c
src/cmdtext/usr/bin/enscript/enscript.pro.S
src/cmdtext/usr/bin/managefonts/afmdit.sh
src/cmdtext/usr/bin/managefonts/charset.S
src/cmdtext/usr/bin/managefonts/devspecs.S
src/cmdtext/usr/bin/managefonts/font.troff.S
src/cmdtext/usr/bin/managefonts/makefamily.sh
src/cmdtext/usr/bin/managefonts/makeout.sh
src/cmdtext/usr/bin/managefonts/map.c
src/cmdtext/usr/bin/managefonts/ts.fontdirs.S
src/cmdtext/usr/bin/ps4014/ps4014.c
src/cmdtext/usr/bin/ps4014/ps4014.pro.S
src/cmdtext/usr/bin/ps630/ps630.c
src/cmdtext/usr/bin/ps630/ps630.pro.S

Attachment 3 to Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

```
src/cmdtext/usr/bin/ps630/types.h
src/cmdtext/usr/bin/pscommon/config.c
src/cmdtext/usr/bin/pscommon/mapname.c
src/cmdtext/usr/bin/pscommon/psutil.c
src/cmdtext/usr/bin/pscommon/transcript.h
src/cmdtext/usr/bin/psdit/psdit.c
src/cmdtext/usr/bin/psdit/psdit.pro.S
src/cmdtext/usr/bin/psplot/psplot.c
src/cmdtext/usr/bin/psplot/psplot.pro.S
src/cmdtext/usr/bin/psrev/psrev.c
src/cmdtext/usr/bin/psroff/psroff.sh
src/cmdtext/usr/lib/ps/ehandler.ps.S
src/cmdtext/usr/lib/ps/fontmap.S
src/gos/2d/XTOP/demos/muncher/muncher.c
src/gos/2d/XTOP/fonts/bdf/iso88591/sansB18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansB21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansB24.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansBO18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansBO21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansO18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansO21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansR18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansR21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/sansR24.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/serifR18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/serifR21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/symbolR18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/symbolR21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeB18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeB21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeBO18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeBO21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeO18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeO21.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeR18.bdf
src/gos/2d/XTOP/fonts/bdf/iso88591/typeR21.bdf
src/gos/2d/XTOP/fonts/scaled/Type1/UTBI____.afm
src/gos/2d/XTOP/fonts/scaled/Type1/UTBI____.pfa
src/gos/2d/XTOP/fonts/scaled/Type1/UTB_____.afm
src/gos/2d/XTOP/fonts/scaled/Type1/UTB_____.pfa
src/gos/2d/XTOP/fonts/scaled/Type1/UTI_____.afm
src/gos/2d/XTOP/fonts/scaled/Type1/UTI_____.pfa
src/gos/2d/XTOP/fonts/scaled/Type1/UTRG____.afm
src/gos/2d/XTOP/fonts/scaled/Type1/UTRG____.pfa
src/gos/2d/XTOP/programs/Xserver/os/osshm.c
```

*Applied Arabic font files (Origin Number 106): this code provides bi-directional font support.*

| | | |
|---|---|---|
| src/bos/usr/lib/pios/bidi/fonts/4019/bask-nasseem-bold | | [ 106 ] |
| src/bos/usr/lib/pios/bidi/fonts/4019/bask-nasseem-italic | | [ 106 ] |
| src/bos/usr/lib/pios/bidi/fonts/4019/courier-nasseem | [ 106 ] | |
| src/bos/usr/lib/pios/bidi/fonts/4234/CP1046.4234.dp | | [ 106 ] |
| src/bos/usr/lib/pios/bidi/fonts/4234/CP1046.4234.nlq | | [ 106 ] |

Attachment 3 to Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

| | |
|---|---|
| src/bos/usr/lib/pios/bidi/fonts/4019/bask-nasseem-bold | [ 106 ] |
| src/bos/usr/lib/pios/bidi/fonts/4019/bask-nasseem-italic | [ 106 ] |
| src/bos/usr/lib/pios/bidi/fonts/4019/courier-nasseem | [ 106 ] |
| src/bos/usr/lib/pios/bidi/fonts/4234/CP1046.4234.dp | [ 106 ] |
| src/bos/usr/lib/pios/bidi/fonts/4234/CP1046.4234.nlq | [ 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIso.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIsoB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIsoBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIsoI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIso.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIsoB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIsoBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIsoI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/Rokaa.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/RokaaB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/RokaaBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/RokaaI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/Setting.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/SettingB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/SettingBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/SettingI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/Typing.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/TypingB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/TypingBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/TypingI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/Rokaa.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIso.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIsoB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIsoBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissTamIsoI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIso.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIsoB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIsoI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/NarkissimIsoBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/RokaaB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/RokaaBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/RokaaI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/Setting.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/SettingB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/SettingBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/SettingI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/Typing.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/TypingB.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/TypingBI.afm | [ 27 106 ] |
| src/cmdtext/usr/lib/ps/TypingI.afm | [ 27 106 ] |

*HP-Vue modules from CDE (Origin Number 120)*
*These files provide a variety of functionality for CDE version 1.0.  There are almost 6,000 source*
*files that cannot be provided at this time.*

*Neuron Data (Origin Number 207): this code provides widgit support for WebSM.*

src/sysmgt/websm/vendorPkgs/microline/MI31Key.class
F 0 0 444        /usr/websm/codebase/MI31Key.class
S 2 2 777       /usr/lib/java/MI31Key.class /usr/websm/codebase/MI31Key.class
src/sysmgt/websm/vendorPkgs/microline/mct3_1.zip

F 0 0 444        /usr/websm/codebase/mct3_1.zip
S 2 2 777        /usr/lib/java/mct3_1.zip /usr/websm/codebase/mct3_1.zip


*Shafir (Origin Number 208): this code provides widgit support for WebSM.*
src/sysmgt/websm/vendorPkgs/shafir/jct.jar
F 0 0 444        /usr/websm/codebase/jct.jar
S 2 2 777        /usr/lib/java/jct.jar /usr/websm/codebase/jct.jar


**Software Specifications**

Functional Requirement Specifications (FRS) and Design Specifications that are needed to
develop the IA-64 Product release 1and that are in existence will be provided.  These
specifications were written before the development of the products and they may not completely
and accurately reflect the actual code, and are therefore, provided "AS IS."

                    SCO/IBM Confidential

Attachment 3 to Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999



Appendix A:  Additional license terms for University of California Tahoe or Reno
Ver 4.3 or 4.4 Berkley Software Distribution (BSD)

This software and documentation is based in part on the Fourth Berkeley Software Distribution under license from the Regents of the University of California. We acknowledge the following institutions for their role in its development: the Electrical Engineering and Computer Sciences Department at the Berkeley campus.

The Fourth Berkeley Software Distribution is provided by the Regents and other contributors on an "AS-IS" basis. NEITHER THE REGENTS NOR THE OTHER CONTRIBUTORS MAKE ANY WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE FOURTH BERKELEY SOFTWARE DISTRIBUTION, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, THAT THE OPERATION OF THE PROGRAM WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT THE USE OF THE PROGRAM WILL NOT INFRINGE ANY COPYRIGHT, TRADE SECRET, PATENT , OR OTHER PROPRIETARY OR CONTRACTUAL RIGHTS OF ANOTHER PARTY. THE LIMITATION OF LIABILITY SET FORTH IN THIS AGREEMENT IS APPLICABLE TO ANY CLAIM THAT FOURTH BERKELEY SOFTWARE DISTRIBUTION, OR ANY PORTION THEREOF, INFRINGES ANOTHER'S COPYRIGHT, TRADE SECRET, PATENT, OR OTHER PROPRIETARY OR CONTRACTUAL RIGHTS.

The Regents and other contributors are under no obligation to provide either maintenance services, update services, notices of latent defects, or correction of defects for the Fourth Berkeley Software Distribution.

Licensee agrees to indemnify, defend and hold harmless the Regents, its successors, agents, officers, and employees, either in their individual capacities or by reason of their relationship to the Regents, with respect to any expense, claim, liability, lose or damages, including any direct, indirect, special, incidental, or consequential damages (including lost profits), whether incurred, made or suffered by licensee or any of its sublicensees or by third parties, in connection with or in any way arising out of the furnishing, sublicensing, performance or use of the Fourth Berkeley Software Distribution in connection with this Agreement. Licensee's obligation include, but are not limited to, its obligation to indemnify, defend, and hold the Regents, their agents, officers and employees harmless in the case of any claim of copyright, trade secret, patent, or any other type of proprietary or contractual rights infringement based in any manner in licensee's use of the Fourth Berkeley Software Distribution.

THE REGENTS SHALL NOT BE LIABLE FOR ANY COSTS, DAMAGES, INCLUDING DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL (INCLUDING LOST PROFITS), FEES, INCLUDING, BUT NOT LIMITED TO, ATTORNEY'S FEES, OR OTHER LIABILITY WITH RESPECT TO ANY CLAIM BY LICENSEE OR ANY THIRD PARTY ON ACCOUNT OF OR ARISING FROM THIS AGREEMENT OR USE OF FOURTH BERKELEY SOFTWARE DISTRIBUTION.

# Attachment 4

# Licensed SCO Materials

This Attachment identifies the materials <u>SCO will license to IBM as Licensed SCO Materials</u> in accordance with Project Supplement B. <u>For each component of Licensed SCO Materials, SCO will identify any licensing restrictions or encumbrances.</u>

Section 1, Licensed Material, below lists the Licensed SCO Materials by describing the content of each delivery vehicle (e.g. the UnixWare 7.0.1 Platform Source Code Product) containing the material and gives a functional description and an enumeration of the components. The overall description is not meant to be exhaustive but focuses on areas believed to be relevant to IA-64 Product Release 1. Functionality not mentioned explicitly but which is delivered in source code form is also to be considered as Licensed SCO Materials.

Section 2, Materials Not Licensed, lists the components and/or functionality of each delivery that are not licensed in source code form. Source code that is not licensed falls into one of the following categories:

(1)     SCO does not possess the source code; there may be code which is owned and controlled by a third party and SCO does not have the source code, or

(2)     SCO does not have the right or license to disclose or distribute all of the third party source code or the licensing by SCO requires payment of a royalty to the owning third party; there may be code that is owned and controlled by a third party and SCO may not distribute the source code.

Source code that falls into category 2 may be moved up the Licensed Material section: delivery and Licensing of such source will depend upon IBM demonstrating the appropriate license prerequisites and if the license is obtained from SCO paying any required third party license fees.

Section 3, Sublicensing Restrictions, lists all source code restrictions that would prevent IBM from sublicensing Licensed SCO Materials in source code form.

## 1 Licensed Material

### 1.1 UnixWare 7.0.1 Platform Source Code Product

<u>SCO has delivered to IBM a copy of SCO's international version of the UnixWare 7.0.1 Platform Source Code Product.</u> This product is delivered as a mix of source code and object code and consists of a Platform Source CD, binary product Media Kit and Platform Documentation Source CD. The Platform Source CD contains all the components that are delivered in source code form and some binary components. Additional binary components which are required to build complete UnixWare 7.0.1 binary products are contained on the first CD (Installation CD-ROM Disk 1 of 3) in the Media Kit. Object code is delivered where SCO does not have the rights to distribute source code or where a separately executed license is required. The components delivered in source form are to be considered Licensed SCO Materials in accordance with Project Supplement B. Object code, if any, appearing in Section 1.4, Licensed Binaries are also to be considered as Licensed SCO Materials in accordance with Project Supplement B. The Platform Source Code Product includes, but is not limited to, support for the following functionality in source code form:

- Modem Support
- Print Subsystem
- Source, Binary and Application Compatibility
- Packaging and Installation Tools

Attachment 4 to Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999



- Curses Library
- Kernel Interface Versioning
- Memory, File Descriptor and Named file systems
- Hot Plug PCI
- MultiPath I/O
- NUMA APIs
- Optimizing C Compilation System and Enhanced Debugger
- Locale Definition Files
- Dump
- Truss (system call tracing)
- Performance Tools (sar, rtpm, profiling tools)

No prerequisite licenses are required for SCO to license this source to IBM: the ability for IBM to sublicense this source code is covered in Section 3 below.

Components that are in the Source Code Product in object form only are listed below in Section 2, Materials Not Licensed along with the reason they may not be provided in source code form. Those components will be provided in binary form only unless expressly listed in Section 1.3 Additional Licensed Material and IBM meets any prerequisite licensing requirements identified therein.

## 1.2 Gemini 64 BL3 Source

The Gemini 64 BL3 Source Code CD contains UnixWare 7 code equivalent to that on the UW7.0.1 Platform Source Code CD which has been ported to Intel's Soft SDV (the Merced simulator environment). The code is not a complete port of UnixWare 7.
The code includes, but is not limited to, support for the following:

- Low Level Machine Code (trap handling, etc.)
- IA-32 Execution Environment
- Development System Tools consisting of Commands and libraries for linking, loading, reading, and manipulating ELF Object Files
- Merced disassembler
- Boot Code
- /proc support
- kernel and user debugger

The components supplied in source code form on the Gemini 64 BL3 CD shall be treated as Licensed SCO Materials in accordance with Project Supplement B. The contents of this CD shall have the same restrictions as the UW7.0.1 Platform Source CD. Additionally, prior to SCO licensing this source, IBM must obtain the appropriate license from Intel. This license needs to cover the following components:

Dissasembler and decoder library
cc/CC Driver
Document titled "Sample implementation of Stack Unwinding for IA-64" (this lists the vunwind.c source code)
OS Enabling Sample Code in source code form

## 1.3 Additional Licensed Material

- SGI NFB Graphics Driver DDX Layer

The component is supplied as a binary in the UW7.0.1 Platform Source Code Product. SCO has the right to deliver this source code to IBM under the constraint that it may only be used for creating and/or

supporting a product which is compatible with a SCO operating system. In order for IBM to make any other use of the source code or sublicense it to others, IBM must obtain a license from SGI.

## 1.4 Licensed Binaries

The following components of the UnixWare 7.0.1 Platform Source Code Product are binary only Licensed SCO Materials. Third party license requirements or constraints, if any, are also indicated for each component.

SCO believes that currently there are no requirements for any such components for inclusion in IA-64 Product Release 1. As SCO and IBM refine the product definition components may be identified to be added to this section.

## 1.5 Software Specifications

Licensed SCO Material also includes documentation dealing with functional requirements and design specifications that are needed to develop the IA-64 Product Release 1 and that are in existence. These specifications were written before the development of the products and they may not completely and accurately reflect the actual code, and are therefore, provided "AS IS."

## 1.6 Future Licensed Materials

Future UnixWare technologies that are included in releases later than UnixWare 7.0.1 but are required for the IA-64 Product Release 1, such as EELS and DMI , will be investigated for licensing to IBM in amendments to this Supplement.

## 2 Materials Not Licensed

### 2.1 UnixWare 7.0.1 Restricted Source Code Functional Areas

The source code of the following components of UnixWare 7.0.1 is restricted (i.e. is not contained in UnixWare 7.0.1 Platform Source Code Product) and is not licensed under this agreement for the reasons identified below. SCO believes that this source code is not needed for IA-64 Product Release 1 as it is currently defined.

- C++ Compiler
- Debugger C++ Expression Evaluation

The above components are the property of the Edison Design Group (EDG) and require a separate source code license in order to receive source code from SCO. While SCO has the right to sublicense the source, such sublicensing requires a fee be paid to EDG which depends on the scope of usage and does not permit a licensee of SCO to further sublicense the source code.

- Third-party device drivers

UnixWare 7.0.1 contains driver support for a large number of third party devices the source code of which may not be distributed by SCO. These include but are not necessarily limited to the source code for the following:

- 3COM Network Interface Cards (NICs)
- Adaptec SCSI HBA drivers
- AMD SCSI HBA driver and NICs
- ATI graphics driver
- Mylex/BusLogic SCSI HBA drivers
- Cirrus Logic graphics cards

Attachment 4 to Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

- Compaq drivers (e.g., NICs. HBAs. Hot Plug and other system drivers)
- Corollary/Intel C-BUS support
- Eicon Technology NICs
- Future Domain SCSI HBA drivers
- IBM network drivers
- Intel NICs
- Matrox International graphics cards
- National Semiconductor ethernet adapters
- Qlogic HBA drivers
- Standard Microsystems Corp (SMC) NICs
- Symbios Logic SCSI HBA driver
- 4Front audio drivers

• Additional Compaq Software

This includes Compaq front end and Hot Plug GUI support source which SCO may not license to third parties.

• DES Encryption

Source code for DES encryption is not part of SCO's Platform Source Code Product due to the US government restriction on shipment of such source code outside the United States



• I2O

The I2O source code is the property of Symbios Logic and may only be licensed in source code form under a separate agreement by SCO to a select list of OEMs solely for support of an SCO operating system. In order to have expanded rights to these components or to obtain sublicensing rights. IBM would need to obtain a license directly from Symbios.

• License Key Management (ifor_LS, brand, PMD/SLD, License Manager)

The license management software included in UnixWare 7.0.1 is the property of Isogon (formerly Gradient) and may not be licensed by SCO to third parties except for support purposes associated with an SCO product and only after obtaining written permission from Isogon. Any source license executed by SCO requires the payment of a royalty to Isogon. SCO is investigating if there are components of the license management function in UnixWare 7.0.1 which belong to SCO and may be licensed to IBM. If such components exist and are applicable for use in IA-64 Product Release 1, SCO will add them to the Licensed SCO Materials with any required restrictions via an amendment to this Project Supplement.

• DSHM – Dynamic Shared Memory Libraries

The DSHM support source is the property of Data General and may not be licensed by SCO to third parties. In order to obtain this source code IBM will need to obtain a license from DG.

• B2 Security

B2 Security features are contained in the UnixWare 7.0.1 internal source tree solely for historical reasons but do not build into the final binary product and consequently are not provided in source code form as part of the Platform Source Code Product.

• Veritas File System and Volume Manager

Attachment 4 to Project Supplement B to Agreement Number 4998CR0349
Version 1.0 February 19, 1999

The Veritas File System and Volume Manager are the property of Veritas and require a separate source code license in order to receive source code from SCO. While SCO has the right to sublicense the source, such sublicensing requires a significant fee be paid to Veritas and imposes significant usage restrictions and further does not permit a licensee of SCO to further sublicense the source code.

- *perl* and *shell* utilities, lynx and *gzip* code.

These utilities are furnished by SCO with its UnixWare 7.0.1 Platform Source Code Product but are not part of the product. Use of this code is governed solely by the GNU General Public License required by the Free Software Foundation.

- TriTeal CDE Desk Top

The source code for this component is licensed from TriTeal and may not be distributed by SCO in source code form. To obtain this code IBM will need a license from TriTeal.

- NetScape Components

SCO does not have the source code for the NetScape components in UnixWare 7.0.1 and consequently is unable to provide them.

- Verity Search Engine

The source code of the search engine is the property of Verity Inc and SCO does not have the right to deliver it to third parties. To obtain this code IBM will need a license from Verity.



- TermLite

SCO's TermLite 1.05 software contained in the termlite package is not licensable in source code form.

- JDK

The source code for the Java Development Kit is obtained from SUN and may not be provided by SCO in source code form. To obtain this code IBM will need a license from SUN.

- NetWare Components

The NetWare Components are the property of Novell and require a separate source code license in order to receive source code from SCO. While SCO has the right to sublicense the source, such sublicensing requires a significant fee be paid to Novell and imposes significant usage restrictions and further does not permit a licensee of SCO to further sublicense the source code.

## 2.2 Gemini 64 BL3 Restricted Source

The following source code is restricted and not licensed under this Project Supplement.

- The IA64 Intel C/C++ Compiler and Assembler

The source requires a license from Intel.
[Note, SCO has but may not distribute the assembler source. We believe IBM can get assembler source from us given Intel's permission, but the source is not part of BL3. The linker provided as part of BL3 is an SCO linker that effectively replaces the one supplied by Intel]

## 3 Source Code Sublicensing Restrictions

This section identifies additional sublicensing restrictions on the Licensed SCO Materials provided in source code form. All Licensed SCO Materials with licensing prerequisites identified above are assumed to be restricted from sublicensing as well and will not be restated here. The first table below identifies Licensed SCO Materials which may not be sublicensed in source code form. For each restriction, the company that owns the source code, the technology, and the list of files that may not be sublicensed are identified.

| Company | Technology | Files |
|---|---|---|
| Adaptec | SCSI Drivers | uts/io/hba/adsa/*<br>uts/io/hba/adss/*<br>uts/io/hba/adse/* |
| DPT | SCSI Driver | uts/io/hba/dpt/* |
| Olivetti | SCSI Driver | uts/io/hba/efp2/* |
| Interactive | SCSI Drivers | uts/io/hba/efp2/*<br>uts/io/hba/wd7000/*<br>uts/io/hba/mcis/* |
| Data General | Clariion Driver<br>MultiPath I/O<br><br><br><br><br>Atup toolkit<br>MPS toolkit<br>PSMv2 support | usr/src/i386at/uts/io/layer/clariion/*<br>usr/src/i386at/uts/io/layer/mpio/*<br>usr/src/i386at/cmd/pdi.cmds/sdipath.c<br>usr/src/i386at/cmd/pdi.cmds/sdipath.str<br>usr/src/i386at/cmd/pdi.cmds/sdistatic.sh<br>usr/src/i386at/cmd/pdi.cmds/S15static_conf<br>usr/src/i386at/uts/psm/atup/*<br>usr/src/i386at/uts/psm/mps/*<br>usr/src/i386at/uts/psm/toolkits/* |
| Intel | P6 Support<br>MP Spec V1.4 Support | \<TBD><br>\<TBD> |
| Compaq | Hot Plug GUI | common/subsys/scoadmin/sysAdm/presObjs/hotplug/* |

The following components represent a preliminary list of Licensed SCO Materials in source code form which may be sublicensed but which may have restrictions associated with such sublicensing rights. Possible additions to the list are still being identified.

- AT&T Ksh 93 (Versions thru "e") – may only be sublicensed as part of SCO operating system source code
- OSF Motif, object and runtime - may only be sublicensed as part SCO operating system source code
- Computer Associates (Lachman) [TCP/IP, PPP, SLIP, SNMP, NFS] source may only be sublicensed as part of SCO operating system source code.
- Xylogic drivers – Xylogic owns modifications made by third parties
- Possibly others still to be identified.

     SCO/IBM Confidential

Version 1.0,  19 February 1999

## Exhibit A to Agreement Number 4998CR0349

### Content of Exhibit A

As stipulated in Section 4.0 of Agreement Number 4998CR0349 (hereinafter the Agreement), Exhibit A contains a Product Roadmap for the IA-32 Product and the IA-64 Product. Each Product Roadmap will contain the schedule, sequence, and description for developing new versions and new releases of the IA32 Product and the IA64 Product.

### Execution of Exhibit A

Any modification to Exhibit A will be handled in accordance with the Project Management Process described in the Agreement.  Notwithstanding Section 4.0 of the Agreement, the Parties agree to commit the resources for a release of the IA 64 Product only upon the agreement to a Project Plan for each release. However, the IA-64 Product Roadmap for Release 1 is also subject to additional obligations set forth in Supplement B. While the Project Plan for Release 1 remains in draft form, the Parties agree that they may jointly modify the IA-64 Roadmap without engaging the Project Management Process. Once the Project Plan Version 1.0 is finalized, the Parties agree to amend Exhibit A to reflect any changes to the IA64 Roadmap contained herein.

The IA-32 Roadmap represents SCO's intentions to integrate AIX technologies into the Unixware7 Product. Modifications to the IA-32 Roadmap may occur as a result of additional detailed planning from the SCO internal development process.  The following is a list of additional technology which SCO desires to include in future versions of the IA-32 Product, but which is not currently included in the Licensed IBM Materials in Project Supplement A:



- Java Technologies
- In-kernel Windows file sharing
- Broader LDAP utilization
- Common Active directory Solution
- More application compatibility (AIX command compatibility)
- Concurrent Diagnostics (Service Processors. Diagnostics on live HW, error log analysis)
- IPQS
- http server get engine

The IBM technologies listed above are subject to further negotiation between IBM and SCO and may be subject to additional terms and conditions, including royalties. Inclusion of these technologies in Exhibit A does not imply that IBM has agreed to license such technologies to SCO under the IBM/SCO Joint Development Agreement or any other agreement.

The Parties further agree that they will jointly prepare a version of the IA-64 and IA-32 Roadmaps forming a part of this Exhibit which either Party may share with third parties under terms and conditions which will be agreed to by both Parties.

IBM/SCO Confidential

Version 1.0, 19 February 1999

## IA-32 Product Roadmap

| Target Dates | 2H99 | 1H00 | 2H00 | 1H01 |
|---|---|---|---|---|
| Targeted AIX Header files for Compatibility (compile and go) | | Phase 1: Targeted AIX application code compatibility | Phase 2: Targeted AIX application code compatibility | |
| AIX Specific cmds/libs | Phase 1: Object Data Manager; System Resource Controller | Phase 2: SMIT | | |
| AIX Network Stack | | | Phase 1: AIX Network Stack (IPV6, IPSEC). | |
| WebSM Framework and Application Managers | | Phase 1: Targeted WebSM Applications | Phase 2: WebSM Framework, WebsSM Applications | |
| Improved NLS compatibility (locales, fonts, input methods) | Phase 1: Macedonian. Serbian localedef; X11 and Type 1 Postscript Fonts | Phase 2: X11 input methods (Chinese, Japanese, Korean) | Phase 3: Additional Compatibility | |
| Base AIX Performance Analysis Tools | | Phase 1: Selected Tools | Phase 2: Additional Tools | |
| Base LDAP Directory Service (exclusive of SSL and DB2 backing store) | | Phase 1: LDAP client APIs (v3) | | Phase 2: LDAP Directory Services Enablement |

**Version 1.0, 19 February 1999**

## Monterey-64 Roadmap v1.0

| Target Dates | 2H99 - Alpha | 1H00 - Beta | 2H00 - Release 1 | 2H01 - Release 2 |
|---|---|---|---|---|
| Application APIs | ccNuma Topology Services APIs<br>/proc filesystem support<br>Unix98 Server | ccNuma Topology Services APIs<br>/proc filesystem support<br>Unix98 Server | /proc filesystem support<br>Unix98 Server<br>I18N/L10N framework<br>- common locale def files<br>Unix Developers Guide Compliance<br>Limited UW app src code compat<br>- header file compatibility | |
| Development Environment | elf/dwarf2 object format<br>C SDK (compiler,linker, headers,libs)<br>C HDK (native & UDI) | elf/dwarf2 object format<br>C and C++ SDK<br>C HDK (native & UDI)<br>Application debugger | elf/dwarf2 object format<br>C, C++ & Java SDK<br>C HDK (native & UDI)<br>Application debugger | |
| System Management and Installation | OS Packaging/Install | OS Packaging/Install<br>Common App Install and Packaging | OS Packaging/Install<br>Common App Install and Packaging<br>Common Directory Services<br>OS License Management<br>WebSM & SNMPv3<br>OEM/IHV Friendly OS Install | |
| Networking | | TCP/NFS Support | TCP/NFS, IPSec Support<br>UW7-based modem config file support | |
| Runtime Environment | ILP32 Execution Environment<br>LP64 Execution Environment | ILP32 Execution Environment<br>LP64 Execution Environment<br>IA32 Execution Environment | ILP32 Execution Environment<br>LP64 Execution Environment<br>IA32 Execution Environment<br>UW7 Targeted App. Binary Support | More Application Compatibility<br>- UW command compat |
| Base OS | Core IA64 Merced Kernel<br>Kernel Debugger<br>JFS2<br>UDI & Native Device Driver Model | Core IA64 Merced Kernel<br>Kernel Debugger<br>JFS2<br>UDI & Native Device Driver Model<br>Kernel Interface Versioning<br><br>X-Server 2D Support<br>Java 2.X Classic JVM | Core IA64 Merced Kernel<br>Kernel Debugger<br>JFS2<br>UDI & Native Device Driver Model<br>Kernel Interface Versioning<br><br>X-Server 2D Support<br>Java 2.X Classic JVM<br>Merced 8-way SMP, 4X4 ccNuma<br>SVR4/SVR5 printing subsystem<br>Workload balancing (memory & cpu)<br>UDI Drivers Support<br>CDE & 2D X Support<br>Basic Partitioning<br>Hot Swap CPU<br>Hot Add Memory | Merced 32-way scalability<br>8x4 ccNUMA<br>- Enhanced Workload balancing<br>UDI-based premiere DD model<br>Enhanced partitioning (LPAR) |
| Hardware Support | Intel SDV Motherboard/Integ devices<br>PC Standard I/O  ide,fd, kbd, etc<br>Monterey-64 OEM PAL support | Intel SDV Motherboard/Integ devices<br>PC Standard I/O, ide,fd, kbd, etc<br>Monterey-64 OEM PAL support | Intel SDV Motherboard/Integ devices<br>PC Standard I/O, ide,fd, kbd, etc<br>Monterey-64 OEM PAL support<br>MultiPath I/O<br>Hot Plug PCI Suspend/Resume<br><br>FC-AL, SCSI, USB, etc<br>Hot Plug PCI Buses | Enhanced PAL/ PSM Framework<br>I2O<br>FDDI<br>HPPI<br>ESCON<br>P1394 |

Version 1.0, 19 February 1999

THE PARTIES ACKNOWLEDGE THAT EACH HAS READ THIS EXHIBIT A. UNDERSTANDS IT, AND
AGREES TO BE BOUND BY ITS TERMS AND CONDITIONS. FURTHER. THE PARTIES AGREE THAT
THIS EXHIBIT A IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN
THE PARTIES. WHICH SUPERSEDES ALL PROPOSALS OR ALL PRIOR AGREEMENTS. ORAL OR
WRITTEN. AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE
SUBJECT MATTER HEREOF.

Accepted and Agreed:
**International Business**                    The Santa Cruz Operation, Inc.
**Machines Corporation**

By: _____              By: _____

Haig D. McNamee                              Kimberlee A. Madsen
    print or type                                    print or type

Title: SW Contracts Account Mgr.             Title. Mgr Lam i Corp Affairs

Date: 19 Feb 1999                            Date: 15 February 1999



Project Supplement C to Agreement Number 4998CR0349
Version 0.2-3 May 26August 2,1999

## 1   Purpose

Project Supplement C (hereinafter Supplement C) is intended to define the technology (Licensed SCO Materials) licensed from SCO to IBM in support of the "UnixWare Compatible AIX Operating System Product (AIXUW)" as contemplated in Agreement Number 4998CR0349 with an effective date of October 23, 1998 between SCO and IBM (the "Agreement").

## 2   Revision History and distribution.

Version 0.1, 14 May 1999, issued for SCO internal review.
Version 0.2, 26 May 1999, issued for IBM review.
Version 0.3, 2 August 1999, issued for IBM review.

## 3   Structure of Supplement C

Supplement C is in two parts. The first part is general in nature and concentrates on the overall scope of the work covered by Supplement C; the second part (Attachment 1 to Supplement C) gives specific details for each of the Licensed SCO Materials covered by Supplement C.

## 4   Technical  Management Representatives and Other Contacts

The Technical Manager contacts for Project Supplement C are:

- Betty Courte, Director, Program and Platform Services, SCO, 908-790-2300, evcourte@sco.com
- David Higgins, Monterey Program Manager , IBM, 512-838-1637, dwh@us.ibm.com

IBM and SCO may each appoint a Program Manager to represent the Technical Management Representatives and to manage the Deliverables and other procedures prescribed in  Supplement C.

## 5   Scope of the work

The scope of the work described  in Supplement C is to manage the delivery of existing UnixWare 7 technology from SCO to IBM and the acceptance of that technology by IBM.  Some consulting by SCO is expected to accomplish this delivery.  After the delivery is completed, all development work on the AIXUW product is an IBM responsibility unless specifically agreed to by the parties pursuant to Section 9 of Supplement C.

## 6   Product Roadmap

A IBM agrees that it will provide updates of its Product Roadmap for the AIXUW Product to  SCO  on a  semi-annual basis . will be agreed to no later than the time period associated with execution of this Project Supplement C and will be attached hereto as Attachment 2.   Any modifications to the Product Roadmap shall be handled in accordance with the Project Management process described in Section 8 below.   The parties agree to commit the necessary resources to execute the agreed to Product Roadmap.

## 7   Deliverables

### 7.1   Required Content of each Deliverable

In general terms, each Deliverable from SCO to IBM will contain the materials described in Attachment 1 to Supplement C.  For example, each Deliverable  may include, but is not limited to,  Code to be ported and if available any user Documentation to be ported and test suites to be used for verification.  Each Deliverable is described in a section of Attachment 1.

Project Supplement C to Agreement Number 4998CR0349
Version 0.2 3 May 26August 2,1999

## 7.2   *Technologies covered by  Supplement C*

The following technologies, are covered by Supplement C:

| |
|---|
| bootfs |
| /proc |
| curses library |
| targeted UW7 source compatibility, including SVR5 command/libs, shared files, makefiles, archive formats |
| UDI |
| multipath I/O |
| subsystem licensing |
| namefs |
| SVR4/5 print subsystem |
| USB |
| PSM |
| truss |

Additional technologies will be covered either in an amendment to Supplement C or in a subsequent supplement.

## 7.3   *Licensing of deliverables*

Unless specifically noted otherwise in Attachment 1,  all Deliverables are licensed  solely for IBM's use in adding UnixWare compatible functionality to its AIX operating system where "AIX" shall mean the UNIX-based operating system for the Power PC architecture, currently marketed by IBM under the name "AIX", and all current and/or future Enhancements, marketed, licensed or otherwise distributed by IBM to third parties, with or without IBM's names or logos.  Such Deliverables may also be incorporated  in  IBM's OS/400 and  OS/390 operating systems  and any  IBM middleware or applications that operate on AIX, OS/400, OS/390, or UnixWare 7.

## 7.4   *Maintenance Modifications and Support for  Licensed SCO  Materials*

Except as stated below, IBM is responsible for continued maintenance of the Licensed SCO Materials, including, but not limited to, all end-user support. SCO shall have no obligations to provide support to IBM or IBM's end-users for Code licensed under Supplement C.

SCO will license to IBM updates of the source files described in Attachment 1, if IBM has integrated that technology into the AIXUW product , subject to any licensing restrictions introduced in the updated file. The intent of delivering *updates of the source files is to provide Maintenance Modifications, although these updated files may also contain* Enhancements.  SCO will deliver these updated files to IBM  within 30 days of general availability of a new modification level of UnixWare 7, or will do so annually if no such modification levels are planned on UnixWare 7 while UnixWare 7  is marketed by SCO and the Agreement is in effect.  Such Maintenance Modifications/Enhancements shall be considered Licensed SCO Materials upon delivery to IBM.

# 8   Project Management

The Technical Managers or their designated representatives will meet as necessary by telephone or in person to review the following agenda items. These reviews will include, as a minimum: Milestone Status, Open Issues, Change *Control Items,* and any requirement for escalation to the Project Managers.  Minutes will be distributed at least to document any decisions made or milestones completed or changed. Between these meetings, email is the official means of communicating Supplement C information.

Project Supplement C to Agreement Number 4998CR0349
Version 0.2~~3 May 26~~August 2, 1999

When project reviews are held with the SCO and IBM Project Managers, AIXUW project issues will be included as an agenda item with the IA-64 Joint Development Project.

Page 3

Project Supplement C to Agreement Number 4998CR0349
Version 0.2-3 May 26August 2,1999

## 9   Delivery and Acceptance  Schedule

SCO will deliver all the items identified by technology area in Attachment 1 within 30 days of the signing of
Supplement C.  IBM will have 45 days from the receipt of the Deliverables to determine their completeness and
readability.  The IBM AIXUW Program Manager will notify the SCO AIXUW Program Manager, via email,  of the
accepted Deliverables. Should IBM identify additional Code or other Deliverables required to license the technology
IBM will furnish a written request for such Deliverables to SCO, SCO will have 30 days from the receipt of such
request to determine applicability to the technology, its rights to make delivery to IBM, and make the delivery as
appropriate.

## 10   Consulting by SCO

### 10.1  Consulting during the acceptance period

During the acceptance period for the Deliverables, IBM will be entitled to 8 hours of consulting for each of the
technologies identified in Attachment 1, free of charge. This consulting may be related to the acceptance of the
Deliverables, porting of the Deliverables, or in the preparation of a request for additional consulting after the
acceptance period ends.

### 10.2  Consulting after the acceptance period

Consulting after the acceptance period will be on a time and materials basis at the same rate stipulated in Section 5.1
of the Agreement for IBM consultation to SCO. IBM must make a written request to SCO within 30 days of IBM's
acceptance of the technology deliverables for any additional consulting requirements needed to port the technology to
the AIXUW Product. The request should indicate the type of consulting or development/porting support required by
IBM and be submitted to the SCO AIXUW Program Manager as described in section 10.3. SCO will reasonably
consider requests for additional consulting requirements received from IBM after the above-referenced 30 day time
period.

### 10.3  Consulting Commitment and Reimbursement

SCO and IBM shall each appoint an AIXUW Program Management person who will be the focal point for
consultation requests and the associated reimbursement activities. SCO will commence support within (30) days of
receipt of IBM's written notification or will notify IBM that it is not able to commence support within (30) days and
discuss with IBM the best way to deal with the issue. If the actual effort exceeds the estimated effort by 10% then
SCO will notify IBM of this event and will discuss with IBM the best way to deal with this issue. The SCO AIXUW
Program Management person will then activate the requested consulting.  An SCO report of time activity will be
generated and an itemized bill will be sent to IBM on a quarterly basis. IBM will provide SCO with a valid Purchase
Order # for the bill. The bill will be generated by SCO and sent to IBM's AIXUW Program Management person
within 30 days of the end of the previous quarter.  IBM will remit payment within thirty (30) days after receipt of an
invoice from SCO.

The initial AIXUW Program Management person for each party is as follows:

For IBM:      Ron St. Pierre
For SCO:      Andy Nagle

The parties may change their AIXUW Program Management person by written notice to the other party.

## 11  Copyright Notices

Any copyright notices (SCO or third party) contained in the SCO Deliverables must remain in tact in the Code when
distributed by IBM.

Project Supplement C to Agreement Number 4998CR0349
Version 0.2 3 May 26August 2,1999

## 12 Attachments

Attachment 1 – Details of each Deliverable as prescribed by section 7.2 above.
Attachment 2 – Product Roadmap covering plans for inclusion of UnixWare 7 technology in the AIXUW Product.


THE PARTIES ACKNOWLEDGE THAT EACH HAS READ THIS PROJECT SUPPLEMENT C, UNDERSTANDS IT, AND AGREES TO BE BOUND BY ITS TERMS AND CONDITIONS. FURTHER, THE PARTIES AGREE THAT THIS PROJECT SUPPLEMENT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR ALL PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

**Accepted and Agreed:**
**International Business**          **The Santa Cruz Operation, Inc.**
**Machines Corporation**

By:_____          By:_____

  Haig D. McNamee                          _____
        print or type                                print or type

Title:_SW Contracts Account Mgr.          Title:_____


Date:_____          Date:_____



LEXSEE 1998 U.S. DIST. LEXIS 23035

**TWILA HEARD, Plaintiff, vs. BONNEVILLE BILLING AND COLLECTIONS, INC., et al., Defendant(s),**

**Case No. 2:97-CV-445C**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

*1998 U.S. Dist. LEXIS 23035*

**November 30, 1998, Decided**

**DISPOSITION:** [*1] Plaintiff's motion to amend the complaint DENIED. Defendants' motion to strike DENIED. Plaintiff's motion for summary judgment DENIED and judgment entered in favor of defendants. Plaintiff's motion for summary judgment GRANTED. Plaintiff's motion for summary judgment DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff joint checking account holder filed an action alleging that defendant collections corporation violated the Utah Consumer Sales Practices Act (Act), Utah Code Ann. § § 13-11-4, 5 (1996), the Fair Debt Collections Practices Act (FDCPA), *15 U.S.C.S. § 1692e*, and Utah Code § 78-51-31. The account holder also alleged that attorneys of the corporation illegally split fees with the corporation.

**OVERVIEW:** The account holder filed an action alleging that the corporation's practice of collecting dishonored checks from non-signing joint account holders violated the Act, the FDCPA, and Utah Code Ann. § 78-51-31, and that attorneys of the corporation engaged in illegal fee splitting. After holding that the account holder did not have standing to assert the issue of illegal fee-splitting, the court: (1) granted summary judgment in favor of the account holder on her claim that the practice violated the Act because after the account holder informed the corporation that she was not liable for the debts of her daughter, with whom she jointly owned the account, the corporation continued making attempts to collect the debt from her; (2) granted summary judgment in favor of the account holder on her

claim that the practice violated the FDCPA because the corporation falsely represented that the account holder was liable for the debt; and (3) denied the account holder's motion for summary judgment on her claim that the practice violated of Utah Code Ann. § 78-51-31 because there was a genuine issue of fact as to whether the attorneys intended to deceive the court.

**OUTCOME:** The court granted summary judgment in favor of the account holder as to her claims that the practice of the corporation violated the FDCPA and the Utah Consumer Sales Practices Act, denied the account holder's motion for summary judgment on her claim that the attorney's violated state law by intentionally deceiving the court, and denied the account holder's motion for summary judgment on her claim of illegal fee-splitting.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN1] While Fed. R. Civ. P. 15 provides that leave to amend a complaint should be freely given, leave to amend may be properly denied upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. In addition, untimeliness alone is a sufficient reason to deny leave to amend.

*Constitutional Law > The Judiciary > Case or Controversy > Standing*

1998 U.S. Dist. LEXIS 23035, *

[HN2] To satisfy the standing requirement implicit in U.S. Const. art. III, the plaintiff bears the burden of showing that she has suffered an injury in fact that is traceable to the actions of the defendants and will be redressed by a favorable decision.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
[HN3] The Utah Consumer Sales Practices Act makes it unlawful for a supplier to knowingly and intentionally commit deceptive acts or unconscionable practices in connection with a consumer transaction. Utah Code Ann. § § 13-11-4, 5 (1996).

*Banking Law > Bank Activities > Consumer Protection > Fair Debt Collection Practices*
[HN4] The Fair Debt Collection Practices Act (FDCPA) prohibits a collector from using any false, deceptive or misleading representation in connection with the collection of any debt. *15 U.S.C.S. § 1692e*. Under *15 U.S.C.S. § 1692k*(c), if defendants prove by a preponderance of the evidence that they maintain "extensive systems" designed to prevent errors, the unintentional violation of the FDCPA will not result in liability. Mere inadvertence is not sufficient to provide a defense.

*Civil Procedure > Sanctions > Misconduct & Unethical Behavior*
[HN5] Utah Code Ann. § 78-51-31 (1996) prohibits attorneys from engaging in deceit or collusion with intent to deceive a court.

**COUNSEL:** For TWILA HEARD, plaintiff: Lester A. Perry, Mr., KESLER & RUST, SALT LAKE CITY, UT.

For BONNEVILLE BILLING AND COLLECTIONS, defendant: Kira M. Slawson, Dori K Petersen, BLACKBURN & STOLL LC, Paul C Droz, Mr., DROZ REED & WANGSGARD, SALT LAKE CITY, UT.

For BONNEVILLE BILLING AND COLLECTIONS, defendant: Jesse L. Riddle, RIDDLE & ASSOCIATES PC, SANDY, UT.

For WILFORD N. HANSEN JR. P.C., WILFORD N. HANSEN, JR., defendants: Wilford N. Hansen, Jr, Mr., WILFORD N HANSEN JR PC, PAYSON, UT.

**JUDGES:** TENA CAMPBELL, United States District Judge.

**OPINIONBY:** TENA CAMPBELL

**OPINION:**

ORDER

On April 30, 1997, plaintiff Twila Heard filed this action alleging that defendants were engaged in two collection practices that violated state and federal law: (1) splitting of attorneys' fees between Bonneville and its attorneys; and (2) collecting dishonored checks from non-signing joint account holders. The case is now before the court [*2] on the following motions: (1) plaintiff's motion for summary judgment; (2) plaintiff's objection to the proposed order denying leave to amend the complaint; and (3) defendants' motion to strike. The court conducted a hearing on these motions on October 15, 1998, at which plaintiff was represented by Lester Parry and defendants were represented by Paul Droz and Wilford Hansen. Having fully considered the arguments of counsel, the submissions of the parties, and applicable legal authorities, the court now enters the following order.

Background

Bonneville Billing and Collections, Inc. ("Bonneville") is a Utah corporation which is assigned 1500 dishonored checks each day for collection. Before 1994, all attorneys' fees awarded in lawsuits by Bonneville were split between Bonneville and its attorneys. In 1994, the Utah State Bar Association issued recommendations to all collection attorneys reminding them that it was a breach of ethics to split attorneys' fees *with their clients. Shortly thereafter, Bonneville's* attorneys began retaining 100% of the attorneys' fees collected but began paying Bonneville an amount equivalent to 50% of the attorneys' fees for rent, maintenance of a group [*3] health plan, and use of Bonneville's computer system.

When Bonneville receives a dishonored check written on a joint account, Bonneville's collectors routinely enter both names on the face of the check into *Bonneville's computer system as "Debtors."* Calls are then placed and bad check notices are sent to both account holders listed in the computer system.

In September and October 1996, Tiana Heard wrote three checks payable to three different merchants on a checking account that had been closed. The closed account had been a joint account held by Tiana and her mother, plaintiff Twila Heard.

When Tiana Heard's checks were dishonored by the bank, the merchants referred the checks to Bonneville for collection. Bonneville had previously contacted plaintiff at least twice, on May 14, 1996, and October 17, 1996, regarding dishonored checks written by her daughter. Each time, plaintiff had told the collectors that Tiana Heard was her adult daughter and did not live with plaintiff. Despite collectors' notes in Bonneville's

computer system memorializing these conversations, Bonneville continued to send bad check notices and certified letters for the three checks at issue in this case to [*4] plaintiff's home.

On January 25, 1997, Tiana Heard was served with a summons and complaint which named both Tiana Heard and Twila Heard as defendants in a suit to collect the three dishonored checks. The constable also served Tiana Heard with a second copy of the summons and complaint which he asked her to give to plaintiff.

After plaintiff learned that she had been named in a lawsuit, she contacted Bonneville on January 27, 1997, and asked to speak with a supervisor. She was connected to Denise Porter Maw. Plaintiff told Ms. Maw that she had removed her name from the checking account belonging to her adult daughter, that Tiana Heard had written and signed the checks, and that Tiana Heard no longer lived with plaintiff. When plaintiff spoke to Ms. Maw the next day, Ms. Maw said that she had checked with the bank and that plaintiff's name was still listed on the account. After this conversation, plaintiff paid $ 196.39 to Bonneville, which included $ 100.00 in attorneys' fees.

Discussion

I. Motion to Amend

On April 27, 1998, plaintiff filed a motion for leave to amend her complaint. Through the amended complaint, plaintiff sought to maintain this lawsuit as a class [*5] action, to name David Toller, Bonneville's president and sole shareholder, as an additional defendant, and to assert a new claim for civil conspiracy. After hearing argument on August 21, 1998, United States Magistrate Judge Samuel Alba denied plaintiff's motion to amend as both untimely and unnecessary. Plaintiff has filed an objection to Judge Alba's proposed order.

[HN1] While Rule 15 provides that leave to amend a complaint should be freely given, leave to amend may be properly denied "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc., 3 F.3d 1357, 1365 (10th Cir. 1993)*. In addition, "it is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend." Id.; see also *Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996)* (affirming denial of motion to amend for untimeliness when motion was filed within three months of trial date).

Plaintiff's counsel should have been aware of the facts giving rise to the amended claims at the outset of

this action by virtue [*6] of counsel's involvement in the parallel case of Pickering, et al., v. Bonneville Billing & Collections, et al., No. 1:95-CV-125B, filed in 1995. Nonetheless, plaintiff waited one year, until discovery was nearly complete and this case had been set for trial, n1 before seeking to amend her complaint. Plaintiff's motion is untimely and denial of leave to amend was proper on that basis alone.

n1 Trial is set for December 21, 1998.

In addition, the class action plaintiff seeks to bring is substantially similar to the Pickering class action pending before Judge Benson. If plaintiff's counsel wishes to pursue additional claims, leave to amend may be sought in the Pickering case, which is already plead as a class action and has not yet been set for trial. Given that the instant case is set for trial next month, however, allowing plaintiff to allege a class action, name a new defendant, and state a new claim at this time would severely prejudice the defendants. Therefore, leave to amend the complaint is [*7] denied on the basis of undue delay and undue prejudice to the defendants.

II Motion for Summary Judgment n2

n2 In deciding plaintiff's motion to dismiss, the court considered the deposition testimony taken in the Pickering case over the objection of defendants. The court finds that the use of a deposition taken in a previous action is permitted so long as there is sufficient identity of interest in the two actions. See *Minyen v. American Home Assurance, 443 F.2d 788, 791-92 (10th Cir. 1971); Insul-Wool Insulation Corp. v. Home Insulation, Inc., 176 F.2d 502, 503-04 (10th Cir. 1949)*; see also *23 Am. Jur. 2d Depositions & Discovery § 190* (1983) (indicating that use of deposition taken in prior action is permitted "if there is substantial identity of issues and parties in the two actions"). The court finds that the Pickering case involves substantially similar parties and issues as the instant case and therefore the identity of interest requirement is satisfied. Accordingly, defendants' motion to strike is denied.

[*8]

A. Fee Splitting

Plaintiff contends that Bonneville and its attorneys were involved in illegal fee splitting at the time plaintiff paid Bonneville $ 100.00 in attorneys' fees. Plaintiff

1998 U.S. Dist. LEXIS 23035, *

claims that the payments made to Bonneville by its attorneys for rent, health insurance, and use of the computer system are actually disguised payments of half of the attorneys' fees awarded in Bonneville's collection cases. Plaintiff seeks a determination by this court that Bonneville's alleged fee splitting practice is illegal and an injunction prohibiting Bonneville from engaging in this practice.

Even assuming that Bonneville's attorneys were improperly splitting legal fees with their client, plaintiff does not have standing to challenge this practice. [HN2] To satisfy the standing requirement implicit in Article III of the U.S. Constitution, plaintiff bears the burden of showing that she has suffered an "injury in fact" that is traceable to the actions of the defendants and will be redressed by a favorable decision. See *American Forest & Paper Ass'n v. EPA, 154 F.3d 1155, 1158 (10th Cir. 1998)* (holding that association lacked standing to bring claim where it failed to establish [*9] that its members suffered injury).

Here, plaintiff has suffered no injury from Bonneville's alleged fee splitting practice that could be redressed by a favorable decision. Plaintiff does not allege that the amount of attorneys' fees collected from her by defendants was excessive. In fact, it is undisputed that Bonneville's attorneys collected the amount of attorneys' fees authorized by Rule 4-505.01 of the Code of Judicial Administration. Plaintiff's claim relates only to the later distribution of fees collected by Bonneville's attorneys. Because plaintiff has suffered no concrete, particularized injury from defendants' distribution of attorneys' fees, she lacks standing to bring a claim based on Bonneville's alleged fee splitting practice. n3

> n3 The prohibition on splitting attorneys' fees with nonlawyers is a disciplinary rule enforceable by the local bar association. If plaintiff suspects defendants of engaging in illegal fee splitting, the proper course of action would be to file a complaint with the Utah State Bar Association in hopes of initiating a disciplinary proceeding.

[*10]

B. Collection from Joint Account Holders

Plaintiff claims that defendants regularly engage in collection activities directed at both joint account holders listed on a dishonored check even though the signer of the check alone is liable. Plaintiff alleges that this collection practice violates the Utah Consumer Sales Practices Act, the federal Fair Debt Collection Practices Act, and Utah Code Ann. § 78-51-31. Because plaintiff's motion to amend her complaint to allege a class action

has been denied, the court will look only to the actions taken against Twila Heard to determine if defendants violated these provisions.

1. Utah Consumer Sales Practices Act

[HN3] The Utah Consumer Sales Practices Act ("the Act") makes it unlawful for a supplier to knowingly and intentionally commit deceptive acts or unconscionable practices in connection with a consumer transaction. See *Utah Code Ann. § § 13-11-4 & -5* (1996). n4 Plaintiff alleges that defendants violated the Act by intentionally attempting to collect a debt from plaintiff after plaintiff told them that she was not liable for the checks written by her adult daughter. While defendants concede that she was not liable for her daughter's [*11] debt, they insist that collection efforts against plaintiff were not deceptive or unconscionable because plaintiff never received the bad check notices, the telephone calls were merely an attempt to reach Tiana Heard, and plaintiff was named in the lawsuit as a result of a clerical error.

> n4 The court has previously determined that defendants are "suppliers" and that collection of dishonored checks is a "consumer transaction" for purposes of the Utah Consumer Sales Practices Act. See Heard v. Bonneville Billing & Collections, et al., No. 2:97-CV-445C, Order (D. Utah Feb. 26, 1998).

Yet the undisputed facts show that after plaintiff had informed Bonneville that she was not liable for her daughter's checks, the defendants continued to phone her and to send bad check notices and certified letters addressed to both women. Further, defendants named plaintiff in a lawsuit to collect the checks even though the collectors' notes clearly indicated that plaintiff was the debtor's mother and that the family expense [*12] doctrine n5 did not apply. Because defendants' actions suggested that Twila was liable for her daughter's debt when in fact she was not, the defendants' practice was both deceptive and unconscionable in violation of both *Utah Code Ann. § 13-11-4* and § 13-11-5.

> n5 Under Utah law, a non-signing joint account holder is generally only liable for a check if the joint account holders are husband and wife and the check was used for a family expense. *Utah Code Ann. § 30-2-9* (1998). Both parties agree that the family expense doctrine is clearly inapplicable to the facts of this case.

The court reserves its decision on the propriety and scope of injunctive relief pursuant to *Utah Code Ann. § 13-11-19(1)(a)* until after trial.

2. Federal Fair Debt Collection Practices Act

[HN4] The Fair Debt Collection Practices Act ("FDCPA") prohibits a collector from using any false, deceptive or misleading representation in connection with the collection of any debt. See *15 U.S.C. § 1692e*. Plaintiff alleges [*13] that defendants violated subsection 1692e(2)(A) of the Act by misrepresenting the nature of plaintiff's liability for her daughter's checks. Specifically, by sending bad check notices addressed to plaintiff, phoning her regarding the dishonored checks, and naming her in a lawsuit, the defendants misrepresented that plaintiff was liable for her daughter's checks. In response, defendants claim they cannot be held liable under the FDCPA because "the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." *15 U.S.C. § 1692k(c)*. Under § 1692k(c), if defendants prove by a preponderance of the evidence that they "maintain 'extensive systems' designed to prevent errors, the unintentional violation of the [FDCPA] will not result in liability. Mere inadvertency is not sufficient to provide a defense." *Dutton v. Wolhar, 809 F. Supp. 1130, 1138 (D. Del. 1992)*.

In asserting the bona fide error defense, defendants fail to offer any evidence that they maintain procedures reasonably calculated to avoid erroneously pursuing collection activities against a [*14] joint account holder who is not liable for the debt. To the contrary, the evidence is undisputed that it was defendants' routine practice to attempt to collect from both holders of a joint account. Specifically, Bonneville's collectors entered both names on a joint account into its computer system as debtors against whom collection action would be taken. Bonneville's collectors would then contact both account holders by phone and by mail in an attempt to collect on the debt. See *Martinez v. Albuquerque Collection Services, 867 F. Supp. 1495, 1502-03 (D. N.M. 1994)* ("The purpose of the bona fide error defense is to protect collectors in cases of inadvertent 'clerical errors' . . . no to shield collectors from liability for systematic errors or abuses"). Furthermore, although defendants claim that naming plaintiff in the lawsuit to collect on her daughter's checks was a clerical error, defendants have produced no evidence that procedures were in place to guard against such an error. Because defendants have not shown by a preponderance of the evidence that they maintained procedures reasonably calculated to avoid improper collection activities against joint account holders, [*15] the bona fide error defense fails.

The court finds that by mailing collection notices addressed to plaintiff and by naming plaintiff in a lawsuit, defendants falsely represented that plaintiff was liable for her daughter's debt in violation of *15 U.S.C. § 1692e(2)(A)*. See *Dutton, 809 F. Supp. at 1137* (finding violation of § 1692e(2)(A) as a matter of law where unsophisticated consumer would have believed herself obligated to pay debt incurred by her mother). Because defendants have failed to assert a valid defense, plaintiff is entitled to summary judgment on this claim. See *Martinez, 867 F. Supp. at 1503*.

3. Utah Code Ann. § 78-51-31

[HN5] Utah Code Ann. § 78-51-31 prohibits attorneys from engaging in deceit or collusion with intent to deceive a court. See Utah Code Ann. § 78-15-31 (1996). Plaintiff has alleged that defendants violated this statute by improperly suing plaintiff to collect on her daughter's debt. Defendants argue that the inclusion of plaintiff's name on the complaint was a clerical error and was not done with "intent to deceive a court." The court finds that defendants have raised a question of material [*16] fact and therefore denies summary judgment on this claim.

Order

For the reasons stated above, the court orders as follows:

(1) Plaintiff's motion to amend the complaint is DENIED.

(2) Defendants' motion to strike is DENIED.

(3) Plaintiff's motion for summary judgment is DENIED and judgment entered in favor of defendants as to the following claims arising from Bonneville's alleged fee splitting practice:

(a) violation of *Utah Code Ann. § 7-15-1*;

(b) violation of the federal Fair Debt Collection Practices Act;

(c) violation of Utah Consumer Sales Practices Act; and

(d) violation of Utah Code Ann. § 78-51-31.

(4) Plaintiff's motion for summary judgment is GRANTED as to the following claims arising from Bonneville's collection activity directed at Twila Heard as a joint account holder:

(a) violation of the federal Fair Debt Collection Practices Act; and

(b) violation of Utah Consumer Sales Practices Act.

(5) Plaintiff's motion for summary judgment is DENIED as to the following claim arising from Bonneville's collection activity directed at Twila Heard as a joint account holder:

(a) violation of Utah Code Ann. § 78-51-31.

[*17]

SO ORDERED this 30 day of November, 1998.

BY THE COURT:

TENA CAMPBELL

United States District Judge

Westlaw.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
**(Cite as: 2003 WL 22339268 (S.D.N.Y.))**



Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court.
S.D. New York.

Edward KREINIK, Plaintiff,
v.
SHOWBRAN PHOTO, INC., et al, Defendants.

**No. 02Civ.1172(RMB)(DF).**

Oct. 14, 2003.

Former employee filed suit against employer seeking to enforce rights under Employee Retirement Income Security Act (ERISA) plan and also claiming right to unpaid commissions under state law. After employee amended complaint, employer counterclaimed, asserting state tort and statutory claims. Employee sought leave to amend complaint to add two new claims alleging that assertion of counterclaims constituted unlawful retaliation. Employer opposed amendment on ground of futility. The District Court, Freeman, United States Magistrate Judge, held that: (1) ERISA covered post-employment retaliation; (2) employee stated prima facie cases of retaliation for exercise of ERISA and Labor Law rights sufficient to survive motion to dismiss, such that amendment would not be futile; and (3) allowing amendment would not unduly delay suit or prejudice employer.

Motion granted.

West Headnotes

**[1] Labor and Employment** 794
231Hk794 Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
Prima facie case of retaliation against employee for exercising rights under ERISA required proof that: (1) employee was engaged in a protected activity; (2) employer was aware of employee's participation in the protected activity; (3) employer took adverse employment action against employee; and (4) a causal connection existed between the protected activity and the adverse action. Employee Retirement

Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[2] Labor and Employment** 796
231Hk796 Most Cited Cases
(Formerly 255k30(1.20) Master and Servant)
Employee's attempt to assert his right to employee benefits under ERISA plainly constituted protected activity against which interference was prohibited. Employee Retirement Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[3] Labor and Employment** 827
231Hk827 Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
Section of ERISA prohibiting retaliation for exercise of employee rights covered post-employment retaliation. Employee Retirement Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[4] Labor and Employment** 858
231Hk858 Most Cited Cases
(Formerly 255k39(1) Master and Servant)
Because of their apparent potential for adverse impact on former employee's livelihood, allegations made in employer's counterclaims in employee's ERISA suit involved type of adverse employment action sufficient for ERISA retaliation claim to survive at pleading stage; employer's claims alleged trade name infringement, unfair competition, misappropriation, tortious interference with actual and prospective business relations, and statutory violations of business law. Employee Retirement Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Labor and Employment** 858
231Hk858 Most Cited Cases
(Formerly 255k39(1) Master and Servant)
Fact that tort claims based on post-employment competition could have been asserted against former employee earlier, but were instead asserted only as counterclaims after the former employee had initiated ERISA claims seeking to vindicate his federal rights was sufficient at pleading stage to show causal element for ERISA retaliation claim based on those counterclaims. Employee Retirement Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[6] Labor and Employment** 858
231Hk858 Most Cited Cases
(Formerly 255k39(1) Master and Servant)
To state a claim under Labor Law for alleged retaliation by employer in response to former

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

Page 2

employee's assertion of right under state law to unpaid commissions, former employer was required to adequately plead that employer's counterclaims constituted an adverse employment action taken because of employee's complaints under the Labor Law. McKinney's Labor Law § 215.

[7] Labor and Employment ⬤858
2311k858 Most Cited Cases
(Formerly 255k39(1) Master and Servant)
Because of their apparent potential for adverse impact on former employee's livelihood, allegations made in employer's counterclaims for business torts in employee's suit to recover unpaid commissions involved type of adverse employment action that could support claim for retaliation at pleading stage under New York Labor Law; filing of complaint for unpaid commissions could be deemed motivating factor for counterclaims, because counterclaims closely followed complaint, even though they could have been raised earlier. McKinney's Labor Law § § 190, 215.

[8] Federal Civil Procedure ⬤841
170Ak841 Most Cited Cases
Allowing employee leave to amend complaint to assert claims of retaliation based on employee's exercise of right under ERISA and state labor law would not unduly delay suit or prejudice employer; claims, which related to employer's motivation for filing counterclaims, would not significantly prolong discovery or litigation, and forcing employee to institute new suit would have run counter to interests of judicial economy. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

MEMORANDUM AND ORDER

FREEMAN, Magistrate J.

INTRODUCTION

*1 Plaintiff Edward Kreinik ("Kreinik") has moved pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend his First Amended Complaint to add two new claims alleging that defendants' assertion of counterclaims in this action constitutes unlawful retaliation under (1) Section 510 of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et. seq. ("ERISA"), and (2) Section 215 of the New York State Labor Law, and also to add new factual allegations in support of claims previously asserted. Defendants Showbran Photo, Inc., Showbran, Inc., Showbran, Inc. 401(K) Plan, and Showbran Photo, Inc. Atlantis Health Plan (collectively "Showbran"), oppose Kreinik's motion to the extent that Kreinik seeks to add new claims, on

the ground that such amendments would be futile. For the reasons stated below, Kreinik's motion to amend is granted in its entirety.

BACKGROUND

On February 13, 2002, Kreinik filed a complaint against his former employer, Showbran Photo, Inc., seeking to enforce his rights under the terms of two employee benefit plans, [FN1] and also claiming, inter alia, that he was entitled to payment of unpaid commissions. In that initial pleading, Kreinik sought both damages and equitable relief under ERISA, the New York Labor Law § 190, et seq., and state common law. (Complaint dated Feb. 13, 2002 (Dkt.1), ¶ ¶ 1-2.) Defendant Showbran Photo Inc., filed an Answer to the Complaint on March 26, 2002 (Dkt.4), but asserted no counterclaims at that time.

> FN1. The benefits plans at issue are: (1) a 401(K) Plan, which is a pension and welfare benefit plan available to Showbran employees administered by Showbran, Inc.; and (2) the Showbran Photo, Inc. Atlantis Health Plan, an additional welfare benefit plan provided to employees. (First Amended Complaint dated June 14, 2002 ("First Am. Compl.") (Dkt.14), ¶ ¶ 7-10.)

On June 14, 2002, after receiving documents regarding Showbran Photo, Inc.'s, benefit plans, Kreinik filed his First Amended Complaint, adding as defendants certain parties responsible for the plans at issue. (First Am. Compl.; Affidavit of Anne Clark sworn to Nov. 14, 2002 ("Clark Aff.") (Dkt.22), ¶ ¶ 5, 8.) On July 16, 2002, Showbran answered the First Amended Complaint, asserting seven counterclaims against Kreinik demanding monetary and injunctive relief for: (1) trade name infringement, unfair competition, and misappropriation under New York State common law; (2) violations of New York Business Law § § 368-d, 133, and 349; (3) tortious interference with actual business relations; (4) tortious interference with prospective business relations; (5) misappropriation of proprietary information; (6) breach of contract; and (7) breach of implied covenants of good faith and fair dealing. (Answer to Amended Complaint dated July 16, 2002 (Dkt.15), ¶ ¶ 61-126.) The counterclaims are based on events that allegedly occurred during, as well as subsequent to, the time Showbran Photo, Inc., employed Kreinik. On August 7, 2002, Kreinik answered the counterclaims, asserting, as affirmative defenses, that the counterclaims constituted retaliation for his claims, in violation of ERISA and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 3
2003 WL 22339268 (S.D.N.Y.)
**(Cite as: 2003 WL 22339268 (S.D.N.Y.))**

the Labor Law. (Answer to Defendants' Counterclaims dated Aug. 7, 2002 (Dkt.17), ¶¶ 135-36.)

On November 14, 2002, Kreinik moved to amend the First Amended Complaint to add new claims charging that Showbran's counterclaims had been asserted unlawfully, in retaliation for Kreinik's assertion of his rights, under ERISA and the Labor Law. (Proposed Second Amended Complaint dated Nov. 14, 2002 ("Proposed Second Am. Compl."), ¶¶ 57-62.) According to Kreinik, the retaliation claims pleaded in his Proposed Second Amended Complaint are supported by law, and permitting them at this juncture would not cause undue prejudice or delay. (Plaintiff's Memorandum of Law in Support of his Motion for Leave to Amend the Complaint ("Plaintiff's Mem.") (Dkt.21), dated Nov. 14, 2002, at 1.) Showbran, however, argues that the new retaliation claims do not satisfy the elements of a *prima facie* case under ERISA or New York Labor Law, and that the proposed amendments should therefore be denied as futile. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Amend ("Opp.Mem."), dated Dec. 11, 2002, at 2, 4.) Showbran adds that allowing the amendments would cause undue delay and prejudice, although it argues that the Court need not reach those issues because of the purported futility of the amendments. (Opp. Mem. at 2.)

*2 Kreinik also seeks to amend the factual allegations asserted in paragraphs 12, 14 and 26 of the First Amended Complaint, to conform those paragraphs to deposition testimony. (Plaintiff's Mem. at 1.) Showbran does not oppose these proposed factual amendments. (Opp.Mem. at 11.)

## DISCUSSION
## I. APPLICABLE LEGAL STANDARDS

Because Kreinik already amended his Complaint once as a matter of right, he must obtain leave of the Court for any further amendment. Fed.R.Civ.P. 15(a). Although leave to amend "shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), a motion to amend should be denied for reasons " 'such as undue delay, bad faith or dilatory motive ..., undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment .'' *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (interpreting Fed.R.Civ.P. 15(a)); *The Randolph Found. v. Duncan,* No. 00 Civ. 6445, 2002

WL 32862, at *1 (S.D.N.Y. Jan.1, 2002). The Court has broad discretion in determining whether to grant a motion to amend. *Local 802, Associated Musicians of Greater New York v. Parker-Meridian Hotel,* 145 F.3d 85, 89 (2d Cir.1998).

Where a party opposes a motion to amend a complaint based on futility, the proposed pleading may be reviewed for adequacy. *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). The amendment will be deemed futile, and the motion to amend denied, where the amendment would be subject to "immediate dismissal" for failure to state a claim upon which relief can be granted, or would be subject to dismissal on some other basis. *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Housing Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979); *see Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (upholding denial of motion where "granting leave to amend is unlikely to be productive"); *Whimsicality, Inc. v. Battat,* 27 F.Supp.2d 456, 465 (S.D.N.Y.1998) (denying the motion where proposed claim would fail in any event). If, however, there are " 'at least colorable grounds for relief, justice ... require[s]' ' that the motion to amend be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir.1984) (quoting *S.S. Silberblatt,* 608 F.2d at 42); *Schwimmer v. Guardian Life Ins. Co.,* No. 93 Civ. 0428, 1996 WL 146004, at *3 (S.D.N.Y. Apr. 1) (allowing amendment where "it is not so frivolous or outlandish to render it futile"), aff'd. 104 F.3d 354 (2d Cir.1996); *Weg v. Macciarola,* 729 F.Supp. 328, 341 (S.D.N.Y.1990) (motion should be granted unless amendment is frivolous or facially insufficient).

Determining whether the amendment states "colorable grounds for relief" mandates an inquiry into the sufficiency of the proposed pleading comparable to that required by Fed.R.Civ.P. 12(b)(6). *Barrett v. United States Banknote Corp.,* 806 F.Supp. 1094, 1098 (S.D.N.Y.1992); *CBS, Inc. v. Ahern,* 108 F.R.D. 14, 18 (S.D.N.Y.1985). Thus, as both parties acknowledge (*see* Plaintiff's Mem. at 6; Opp.Mem. at 2), the standard for evaluating Showbran's opposition to the amendment, on the ground that it would be futile, requires the Court to examine whether Kreinik's proposed retaliation claims could withstand a Rule 12(b)(6) motion to dismiss. *See Nettis v. Levitt,* 241 F.3d 186, 194 n. 4 (2d Cir.2001) ("Determinations of futility are made under the same standards that govern Rule 12(b)(6) motion to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
**(Cite as: 2003 WL 22339268 (S.D.N.Y.))**

Page 4

dismiss."); *Finley v. Simonovitch*, No. 97 Civ. 1455, 1997 WL 746460, at *4 (S.D.N.Y. Dec. 2, 1997) (citing cases).

*3 A Rule 12(b)(6) motion is decided solely on the pleadings. *See, e.g., Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *CBS, Inc.*, 108 F.R.D. at 18. The Court must accept all factual allegations in the complaint as true and "draw inferences from those allegations in the light most favorable to the plaintiff." *Jaghory v. New York State Dep't of Ed.*, 131 F.3d 326, 329 (2d Cir.1997) (citing *Albright v. Oliver*, 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)); *see Rotter v. Leahy*, 93 F.Supp.2d 487, 497 (S.D.N.Y.2000) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993)). A claim may not be dismissed under Rule 12(b)(6) unless " 'it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The task of the Court is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Connell v. City of New York*, No. 00 Civ. 6306, 2002 WL 22033, at *2 (S.D.N.Y. Jan.8, 2002) (quoting *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir.2000)); *Coffey v. Cushman & Wakefield, Inc.*, No. 01 Civ. 9447, 2002 WL 1610913, at * 1 (S.D.N.Y. July 22, 2002). These standards will be applied to Kreinik's proposed amended claims of retaliation under ERISA and New York Labor Law to determine whether his motion should be granted.

II. *KREINIK'S PROPOSED RETALIATION CLAIM UNDER ERISA*

[1] Section 510 of ERISA makes it unlawful for an employer to retaliate against an employee for, *inter alia*, "exercising any right to which [the employee] is entitled under the provisions of an employee benefit plan...." 29 U.S.C. § 1140. To prove unlawful retaliation for the assertion of rights under ERISA, the employee must establish that the employer's action was at least partially motivated by the specific intent to engage in the prohibited retaliatory conduct. [FN2] *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988). Because direct evidence of intent is often scarce or non-existent in this context, the Court evaluates retaliation claims under Section 510 of ERISA using the same analytical framework applied to similar claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and other civil rights

statutes, where direct evidence of discriminatory intent is often equally unavailable. *Id.* at 1112. [FN3] Thus, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which allows a plaintiff to prevail with indirect proof of intent, applies to claims brought pursuant to Section 510 of ERISA. *Id.*

> FN2. It is not necessary that retaliation for the protected activity was the sole cause of the adverse action, but only that the retaliatory motive played "a part" in the motivation behind that action. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980); *Titch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd*, 742 F.2d 1441 (2d Cir.1983).

> FN3. The courts have frequently relied on interpretations of the anti-retaliatory provisions in federal labor statutes interchangeably, given that such provisions in Title VII, the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), the National Labor Relations Act ("NLRA"), the Fair Labor Standards Act ("FLSA"), and ERISA are modeled on one another or are similarly worded, thus assuming parallel congressional intent with respect to meaning. *See, e.g., Robinson v. Shell*, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (noting that the NLRA, FLSA and Title VII all share a "primary purpose" of "maintaining unfettered access to statutory remedial mechanisms"); *Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 330 (D.C.Cir.1991) (comparing parallel retaliation provisions in the ADEA and Title VII and noting that "cases interpreting the latter are frequently relied upon in interpreting the former"); *Patterson v. McCarron*, No. 99 Civ. 11078, 2001 WL 1488122, at *3 (S.D.N.Y. Nov.21, 2001) (employing Title VII analysis in ERISA retaliation case).

Under this framework, Kreinik would first have to establish a *prima facie* case of retaliation by showing that: (1) he was engaged in a protected activity; (2) Showbran was aware of Kreinik's participation in the protected activity; (3) Showbran took adverse employment action against Kreinik; and (4) a causal connection existed between the protected activity and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
2003 WL 22339268 (S.D.N.Y.)
**(Cite as: 2003 WL 22339268 (S.D.N.Y.))**

the adverse action. [FN4] *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993); *Patterson v. McCarron,* No. 99 Civ. 11078, 2001 WL 1488122, at *3 (S.D.N.Y. Nov.21, 2001). Kreinik's claim of retaliation will survive a motion to dismiss if, after construing all reasonable inferences and implications of the allegations in the complaint liberally in his favor, the Court determines that he has pleaded facts sufficient to support the elements of a *prima facie* case, as set out above. *See Coffey,* 2002 WL 1610913, at *4-5; *Mendelsohn v. Univ. Hosp.,* 178 F.Supp.2d 323, 329 (E.D.N.Y.2002); *Connell,* 2002 WL 22033, at *4; *E.E.O.C. v. Die Fliedermaus,* 77 F.Supp.2d 460, 471-72 (S.D.N.Y.1999).

> FN4. Neither party disputes that this is the appropriate test for establishing a *prima facie* case, although Kreinik articulates the test in an alternative manner that combines the first two elements, requiring him to have been "engaged in a protected activity known to defendants." (Plaintiff's Reply Memorandum of Law in Support of his Motion for Leave to Amend the Complaint dated Dec. 18, 2002 ("Reply Mem.") (Dkt.23), at 2); *see, e.g., Quinn v. Green Tree Credit,* 159 F.3d 759, 769 (2d Cir.1998) (identifying three elements of *prima facie* case).

*4 If a plaintiff's retaliation claim survives the pleading stage, then, either at trial or on a motion based on the evidence, the plaintiff would have to prove its *prima facie* case, the defendant would then need to articulate a legitimate reason for its allegedly retaliatory conduct, and the plaintiff would ultimately bear the burden of demonstrating that the stated reason was pretextual. *See Dister,* 859 F.2d at 1115; *Patterson,* 2001 WL 1488122, at *3; *see also Richardson v. New York State Dept. of Corr. Serv.,* 180 F.3d 426, 444-45 (2d Cir.1999) (on summary judgment motion, parties must meet their burdens under the complete burden-shifting analysis); *Cosgrove,* 1999 WL 163218, at *23 (same); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995) (same).

At this stage, the Court need not look beyond the question of whether Kreinik has sufficiently pleaded facts which identify and support a *prima facie* case of retaliation. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (to survive a motion to dismiss, an employment discrimination complaint need not specifically establish every fact proving a *prima facie* case under

the *McDonnell-Douglas* framework, as long as the complaint gives defendant fair notice of the claim and on what grounds it is based as required by the federal pleading rules); *Coffey,* 2002 WL 1610913, at *5 (complaint alleging retaliation under the ADEA was sufficient to withstand a motion to dismiss, where defendant was placed on notice of the nature and basis of the claim). This, therefore, is the question to which both parties have addressed their arguments. (Reply Mem. at 2-7; Opp. Mem. at 4-7.)

*A. The First and Second Elements of a Prima Facie Case: Kreinik's Protected Activity and Showbran's Awareness of that Activity*

[2] Showbran does not dispute that Kreinik's proposed ERISA retaliation claim, as pleaded, would satisfy the first and second elements of a *prima facie* case. (Opp. Mem. at 4.) With respect to the first element, Kreinik's attempt to assert his right to employee benefits under the statute plainly constitutes a protected activity against which interference is prohibited. *See* 29 U.S.C. § 1140. More specifically, ERISA expressly empowers individuals to enforce their rights under the terms of their employee benefit plans by bringing civil actions. 29 U.S.C. § 1132(a)(1)(a).

As to the second element, there is no question that Showbran was fully aware of Kreinik's involvement in a protected activity, given that Showbran has appeared in and defended this suit. (Opp. Mem. at 4.)

*B. The Third Element of a Prima Facie Case: Showbran's Alleged Adverse Action Against Kreinik*

Showbran does challenge Kreinik's ability to demonstrate that counterclaims, asserted after the termination of a plaintiff's employment, can constitute the type of "adverse employment action" required to meet the third element of a *prima facie* case of retaliation. (Opp. Mem. at 4.) In evaluating Kreinik's argument on this point, the first inquiry is whether *former* employees can be protected under ERISA against retaliatory action by their *former* employers. *See, e.g., Straus v. Prudential Employment Sav. Plan,* 253 F.Supp.2d 438, 447-48 (E.D.N.Y.2003) (analyzing whether non-employee beneficiaries are entitled to Section 510 protection). The second inquiry is whether the challenged action can be considered "adverse" in relation to the plaintiff's employment. *See Wannamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (noting that "because there are no bright-line rules, courts must pore over each case to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

determine whether the challenged employment action reaches the level of 'adverse' "); *see also Ginsberg v. Valhalla Anesthesia Assoc.*, 971 F.Supp. 144, 148-49 (S.D.N.Y.1997) (analyzing the extent to which the alleged retaliatory conduct had some impact on plaintiff's employment or prospective employment); *Yankelevitz v. Cornell Univ.*, No. 95 Civ. 4593, 1996 WL 447749, at *5 (S.D.N.Y. Aug.7, 1996) (discussing whether the adverse action was related to the "terms, privileges, duration, or conditions of the plaintiff's employment").

*1. ERISA's Coverage of Former Employees*

**\*5** [3] Although the law is not well-settled as to whether "post-employment" retaliation is actionable under Section 510 of ERISA, the Supreme Court has articulated a broad rationale behind anti-retaliation provisions in federal statutes, stating that the primary purpose of such provisions is to maintain "unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). In *Robinson*, the Court noted that the exclusion of former employees from the protection of Title VII's retaliatory provisions would undermine the effectiveness of that statute by allowing the threat of post-employment retaliation to deter victims of discrimination from complaining and by providing "a perverse incentive for employers to fire employees who might bring ... claims." *Id.* The Court therefore reasoned that the best approach would be to include former employees within the scope of protected "employees." *Id.* at 345.

This reasoning, combined with the case law in this circuit as it has developed with respect to this issue in various statutory contexts, supports Kreinik's position that Section 510 should be read to cover post-employment retaliation. *See, e.g., Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir.1979) (post-employment blacklisting falls within the scope of retaliatory provisions of Title VII), *rev'd on other grounds*, 477 U.S. 807, 814 n. 17 (1980); *Patchenko v. C.B. Dolge Co., Inc.*, 581 F.2d 1052, 1055 (2d Cir.1978) (finding that Title VII "prohibits discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct"); *Straus*, 253 F.Supp.2d at 447-48 (noting that while the Second Circuit hasn't spoken squarely on this issue, "[i]t seems only logical that former employees and beneficiaries, who in many instances have as strong an interest in the pension rights as their employee counterparts, receive

some protection from alienation of those rights under § 510 of ERISA"); *Patel v. Lutheran Med. Ctr.*, 753 F.Supp. 1070, 1073 (S.D.N.Y.1991) (noting that a claim for retaliation under the ADEA is cognizable even where the employment relationship had been terminated before the alleged adverse action occurred).

Further, the text of Section 510 itself suggests that post-employment retaliation is actionable under the statute. *See Straus*, 253 F.Supp.2d at 447-48 (accepting the textual argument that protection under Section 510 includes former employees and beneficiaries; *see also Mattei v. Mattei*, 126 F.3d 794, 801 (6th Cir.1997) (Section 510 specifically covers "participants" and "beneficiaries," which are defined as including both employees and former employees); *Choi v. Mass. Gen. Physicians Org.*, 66 F.Supp.2d 251, 254 (D.Mass.1999) (for the purposes of retaliation claims under Section 510 of ERISA, an adverse employment action need not relate to a current employer-employee relationship because the statute specifically protects "participants," which includes former employees).

**\*6** For these reasons, the Court concludes that Kreinik's proposed retaliation claim under ERISA is not barred merely because he no longer had an employment relationship with Showbran at the time the counterclaims were asserted.

*2. The Adverse Effect of the Counterclaims*

[4] The next question is whether Showbran's counterclaims, by their nature, can constitute an "adverse employment action." On this point, Kreinik argues that his proposed claim is sufficient because the allegations made in the counterclaims may have the effect of marring his reputation as a businessman and jeopardizing his future business relations. (Plaintiff's Reply Mem. at 4- 6.) Showbran argues that the allegations fail to assert an adverse employment action because the alleged retaliation lacks any "nexus" to Kreinik's employment. (Opp. Mem at 5.)

Although an adverse employment action is generally one that affects the terms, privileges, duration, or conditions of a plaintiff's employment, reprisals less flagrant than job termination or reduced wages can constitute adverse employment actions that warrant statutory protection. *Wannamaker*, 108 F.3d at 466; *Yankelevitz*, 1996 WL 447749, at *5 (claims of retaliation are not limited " 'only to acts of retaliation that take the form of cognizable employment actions

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

such as discharge, transfer or demotion" ') (quoting *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 331 (D.C.Cir.1991)); *Dortz v. New York*, 904 F.Supp. 127, 156 (S.D.N.Y.1995). Indeed, retaliatory actions injurious to a plaintiff's ability to secure future employment are actionable. *See, e.g., Wannamaker*, 108 F.3d at 466 (a retaliation claim could be maintained where a former employer sullies a plaintiff's reputation, thereby affecting "tangible *future* employment objectives") (emphasis in original); *see also Silver*, 602 F.2d at 1090 (finding that post-employment blacklisting falls within the scope of retaliatory provisions of Title VII); *Patchenko*, 581 F.2d at 1055 (finding that a refusal to provide an employee with an employment reference, allegedly in retaliation for filing a claim against the employer, constituted an adverse employment action); *Gonzalez v. Police Comm'r Bratton*, 147 F.Supp.2d 180, 196 (S.D.N.Y.2001) ("[R]etaliatory conduct that would naturally create major obstacles for a former employee in obtaining employment in her field ... is actionable under [Title VII]."), *aff'd.* No. 01 Civ. 7826, 2002 WL 31317871 (2d Cir. Oct.16, 2002); *E.E.O.C. v. Die Fliedermaus, L.L.C.*, 77 F.Supp.2d 460, 472 (S.D.N.Y.1999) (finding that public distribution of derogatory flyers in response to the filing of a charge with the E.E.O.C. constituted retaliation under Title VII where the flyers could affect plaintiffs' ability to find jobs).

Specifically, with regard to allegedly retaliatory counterclaims, this Court has expressly refused "to adopt a rule stating that ... counterclaims, or any other legal cause of action, cannot, as a matter of law, constitute retaliation in violation of the employment discrimination laws." *Yankelevitz*, 1996 WL 447749, at *4. The plaintiff in *Yankelevitz* was a doctor, and the defendant's counterclaim was based on the plaintiff's alleged failure to conform with professional practice procedures. *Id.* The court found that the counterclaim at issue was actionable because it "shed a negative light on plaintiff's professionalism and ethics ... mar[red] plaintiff's professional reputation ... [and] could have an adverse impact on plaintiff's employment prospects." *Id.* at *5.

*7 For a counterclaim to be actionable as retaliatory, however, it must, as in *Yankelevitz*, have "some impact on [the] plaintiff's employment or prospective employment." *Ginsberg*, 971 F.Supp. at 148 (finding that a doctor had not stated a claim for retaliation based on the assertion of a breach-of-contract counterclaim that did not reflect negatively on her ethical or professional reputation); *see also Jetter v. Knothe Corp.*, 200 F.Supp.2d 254, 267

(S.D.N.Y.2002) (plaintiff failed to demonstrate that his former employer's communication to clients of plaintiff's retirement rose to the level of adverse), *aff'd*, 324 F.3d 73 (2d Cir.2003); *Patel*, 753 F.Supp. at 1074 (former employer's alleged tortious interference was not an adverse employment action because, where the employee had not worked for the employer for two years and was not even undertaking to find a new job when the alleged act occurred, the challenged action did not impact on the employee's attempt to secure future employment). Thus, for Kreinik's proposed retaliation claim to withstand a motion to dismiss, the claim as pleaded must sufficiently suggest that Showbran's counterclaims could have a direct, adverse impact on Kreinik's present employment or future employment prospects.

In this case, Showbran's counterclaims allege that Kreinik engaged in trade name infringement, unfair competition, and misappropriation under state common law; violations of New York Business Law § § 368-d, 133, and 349; tortious interference with actual business relations; tortious interference with prospective business relations; misappropriation of proprietary information; breach of contract; and breach of implied covenants of good faith and fair dealing. (Answer to Amended Complaint, ¶ ¶ 61-126.) These counterclaims go beyond what Showbran characterizes as "simple breach of contract and related claims." (Opp. Mem. at 6.) The counterclaims challenge Kreinik's ability to compete fairly and to exhibit good faith in his business relationships. Accepting all factual allegations as true and drawing all inferences in the light most favorable to Kreinik, it is reasonable to assume that Showbran's counterclaims could impact on Kreinik's personal and professional reputation and on his ongoing efforts to create and maintain his own business. (Proposed Second Am. Compl. ¶ ¶ 28, 57-59.) Furthermore, Kreinik is apparently seeking to compete with Showbran and to share the same clientele. (Plaintiff's Reply Mem. at 4.) In these circumstances, the ancillary consequences of litigation, such as the potential need for customers to testify, could have a detrimental effect on Kreinik's future business relationships.

Even if, as Showbran argues, the likelihood is not great that the counterclaims will have an actual, adverse effect on Kreinik's business, the apparent potential for an adverse impact to his livelihood is sufficient for the retaliation claim to survive at the pleading stage. *See, e.g., Mendelsohn*, 178 F.Supp.2d at 329 (finding that a description of the employment duties that diminished after filing a complaint under

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
**(Cite as: 2003 WL 22339268 (S.D.N.Y.))**

Page 8

Title VII was sufficient to plead an adverse employment action); *Connell*, 2002 WL 22033, at *4 (the allegation that pension board members "commenced actions to arbitrarily deprive [plaintiff] of a [pension], as retribution for seeking complaints against their peers," sufficiently alleged a *prima facie* case of retaliation to withstand a motion to dismiss); *Coffey*, 2002 WL 1610913, at * 4-5 (despite the fact that plaintiff did not specify what the adverse action was, the allegations in the complaint sufficiently placed the defendant on notice of the nature and basis of the retaliation claim); *Die Fliedermaus*, 77 F.Supp.2d at 471-72 (adverse employment action identified where plaintiffs alleged that defendants had publicly distributed derogatory flyers about employees who had filed of charges of discrimination).

**\*8** The Court therefore concludes that Kreinik's proposed allegations are sufficient, for pleading purposes, to satisfy the third element of a *prima facie* case of retaliation under ERISA.

C. *The Fourth Element of a* Prima Facie *Case: Causal Connection Between the Protected Activity and the Adverse Action*

[5] Finally, the "causal connection" between (a) Kreinik's assertions of his rights through the commencement of this suit, and (b) the challenged counterclaims, can be inferred from the circumstances of the case. In the Title VII context, the Second Circuit has held that evidence of a causal connection between a protected activity and an adverse employment action may be established indirectly, by showing that the adverse action or discriminatory treatment occurred shortly following the protected activity. See *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986); *see also, e.g.*, *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998) (finding a casual connection between the protected activity and the retaliatory conduct where the adverse action occurred less than two months after the filing of a complaint); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995) (causal element of retaliation met where adverse action occurred three months after the protected activity); *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d. Cir.1986) (firing plaintiff "within one year" of a Title VII action may be probative of an indirect causal connection).

Applying this reasoning, this Court has permitted a plaintiff to challenge a defendant's counterclaims as retaliatory, where, as here, the claims could have

been asserted earlier, but were instead asserted only after the plaintiff had initiated the action seeking to vindicate his federal rights. *See Yankelevitz*, 1996 WL 447749, at *6 (further noting that the fact that asserted counterclaims might have been compulsory did not *per se* negate the retaliatory animus). Indeed, Showbran does not contest that this element is likely satisfied in this case "as the counterclaims were filed after the instant complaint." (Opp. Mem. at 4.) Thus, Kreinik has established that a causal connection could exist between the assertion of rights and the adverse action, satisfying the fourth element of the *prima facie* case.

Overall, regardless of whether Kreinik's ERISA retaliation claim will ultimately stand, Kreinik has stated a *prima facie* case for retaliation and has shown that the claim would not be subject to "immediate dismissal" for failure to state a claim. There is therefore no basis for the Court to reject the proposed amendment on the ground of futility.

III. *NEW YORK LABOR LAW*

[6] Kreinik also seeks leave to amend his First Amended Complaint to assert a retaliation claim under New York Labor Law Section 215. (Proposed Second Am. Compl., ¶ ¶ 1, 60-62.) In relevant part, this state statute provides that an employer may not "discharge, penalize, or in any other manner discriminate against any employee because such employee has made a complaint ... or because such employee has caused to be instituted a proceeding under or related to this chapter...." N.Y. Labor Law § 215(1). Section 215 is analogous to Section 510 of ERISA, in that it covers claims for retaliation against employees who make complaints under the state Labor Law. See *Jacques v. DiMarzio*, 200 F.Supp.2d 151, 162 (E.D.N.Y.2002) (evaluating claim of retaliation under New York Labor Law § 215); *Warden v. E.R. Squibb & Sons, Inc.*, 840 F.Supp. 203, 208 (E.D.N.Y.1993) ("[Section 215] provide[s] a right of action to an employee who has been subjected to retaliation."); *Kelly v. Xerox Corp.*, 681 N.Y.S.2d 322, 256 A.D.2d 311 (2d Dep't 1998). To state a claim under Section 215, Kreinik must adequately plead that Showbran's counterclaims constitute an adverse employment action taken because of Kreinik's complaints under the Labor Law. *Jacques*, 200 F.Supp. at 162; *Shaw v. Baldowski*, 747 N.Y.S.2d 136, 145, 192 Misc.2d 635, 646 (Sup.Ct. Albany Co.2002).

**\*9** [7] Under New York law, as under federal law, an alleged adverse employment action need not rise to

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

the level of improper discharge, demotion, or reduction in pay, in order to be actionable as retaliatory. *See Shaw*, 747 N.Y.S.2d at 145, 192 Misc.2d at 646 (non-traditional employment actions may be sufficient to sustain a claim under Section 215); *cf. In the Matter of Electchester Housing Project, Inc. v. Rosa*, 639 N.Y.S.2d 848, 849, 225 A.D.2d 772, 773 (2d Dep't 1996) (under analogous provision of New York Executive Law, defendant's contesting of former employee's unemployment benefits, in response to the filing of a complaint with the State Division of Human Rights, constituted retaliation). This Court has recognized that counterclaims can be used as a retaliatory practice, with a concrete, adverse impact on the plaintiff. *See Jacques*, 200 F.Supp.2d at 162 ("The Court is deeply troubled by [defendant employer's counterclaim], which appears to be nothing more than a naked form of retaliation [against the employee]."). Here, as discussed above, Kreinik has alleged facts sufficient to infer that the counterclaims asserted against him could harm his reputation in his industry and negatively affect his prospective employment or business opportunities. (Proposed Second Am. Compl. ¶ ¶ 28, 60-62.) Kreinik's assertions, if proven, could lead a trier of fact to view the counterclaims as an adverse employment action under Section 215. *Cf. Shaw*, 747 N.Y.S.2d at 146, 192 Misc.2d at 647 (dismissing a claim of retaliation under Section 215 where a potential adverse impact could not be fairly inferred from the facts as alleged).

In addition, Kreinik's First Amended Complaint alleged violations of Section 190, *et seq.*, of New York Labor Law (*see* First Am. Compl., ¶ ¶ 1-2, 32-36). and Showbran's counterclaims, which could have been raised earlier, instead closely followed the assertion of those claims. For this reason, Kreinik's allegations sufficiently plead that his labor law complaints were a motivating factor for Showbran's adverse action. *See Jacques*, 200 F.Supp.2d at 162 (finding that a close connection in time between the complaint and termination indicated that labor law complaints could have been a motivating factor for the employee's discharge).

Therefore, for essentially the same reasons discussed above in connection with Kreinik's proposed ERISA retaliation claim, Kreinik's proposed amendment to add a claim under Section 215 may not be rejected as futile.

## IV. *UNDUE PREJUDICE AND DELAY*

[8] Kreinik additionally maintains that his proposed

amended complaint will not cause undue delay or prejudice and, therefore, that his motion should not be denied on this basis. (Plaintiff's Mem. at 5-6; Reply Mem. at 1). Showbran does not offer any meaningful opposition to Kreinik's argument, stating only that the amendments would also cause delay and prejudice, but that the "Court need not reach these[ ] issues because the proposed claims are in any case futile." (Opp. Mem. at 2.) The Court has nonetheless reviewed these issues, and concludes that granting the motion to amend will not inordinately delay the proceedings or unduly prejudice Showbran.

*\*10* Mere delay, absent a showing of bad faith or undue prejudice, does not provide a basis to deny a motion to amend. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993) (citing *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981)). In determining whether a party's interests will be unduly prejudiced by an amendment, this Court must consider "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute...." *Id.* (citations omitted).

Here, although the deadline for completion of discovery has passed and the amendments may result in a slight delay, Kreinik asserts that additional discovery will be minimal, and Showbran has not shown to the contrary. (Plaintiff's Mem. at 5-6, n. 3.) Moreover, the mere fact that discovery has concluded does not provide a reason for denying leave to amend. *Cemar Tekstil Ithalat Ihracat San ve Tic, A.S. v. Joinpac, Inc.*, No. 91 Civ. 8408, 1993 WL 126890, at \*1 (S.D.N.Y. Apr.16, 1993) (allowing amendment to add a counterclaim where discovery had already closed). This is especially true where the proposed amendment arises from the same set of operative facts as the original claims, or from events closely related to those originally pleaded. *Fluor Corp.*, 654 F.2d at 856; *see, e.g., Harrison v. New York City Admin. for Children's Servs.*, 02-Civ. 0947, 2002 WL 2022932, \*1 (S.D.N.Y. Sept.3, 2002); *Union Carbide Corp. v. Siemens Westinghouse Power Corp.*, No. 99 Civ. 12003, 2002 WL 31387269, \*3 (S.D.N.Y. Oct.23, 2002). Even if discovery were to be prolonged, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States v. Continental Ill. Nat'l Bank & Trust Co.*, 889 F.2d 1248, 1255 (7d Cir.1989) (citation omitted). In this case, the proposed new claims relate to the defendants motivation and intent in asserting their counterclaims, a subject on which the parties should

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

not need substantial additional discovery. Thus, allowing the amendments will not call for a great expenditure of resources or significantly prolong the dispute.

Showbran also has not alleged any bad faith on Kreinik's part. Showbran does not contest Kreinik's assertions that he had good reasons for failing to raise his new claims sooner, nor does Showbran contest that it was on notice of these claims for some time . [FN5] Nor has Kreinik asserted these claims on the eve of trial in an attempt to "sandbag" Showbran.

> FN5. For instance, Showbran does not contest that it took some time to respond to Kreinik's counsel's inquiries as to whether Showbran would consent to the proposed amendments, and that Showbran requested that counsel hold off in filing the proposed amendments in order to explore a resolution of the claims. (*See* Clark Aff. at ¶ ¶ 14-19.)

Finally, forcing Kreinik to institute a new action against Showbran would run counter to the interests of judicial economy. Kreinik's proposed retaliation claims are related to his original claims and are also tied to his affirmative defense of unclean hands and retaliation, which he pleaded in reply to Showbran's counterclaims. (Answer to Defendant's Counterclaims ¶ ¶ 128, 135-36.) Allowing all of the claims and counterclaims to be litigated in a single action would avoid unnecessary duplication of effort by counsel, ultimately reduce litigation costs, and save time. *See Expoconsul Int'l, Inc. v. A/E Sys., Inc.,* 145 F.R.D. 336, 339 (S.D.N.Y.1993) (granting motion to amend, even though five years had passed and over 5600 pages of deposition testimony had been taken, because the amendment did not add to the complexity of the case or to discovery, and a separate lawsuit would have resulted in duplicative efforts and might have resulted in consolidation in any event).

*11 Thus, in the circumstances presented, concerns about undue delay and prejudice are insufficient to warrant denial of the motion to amend.

*CONCLUSION*

For all of the foregoing reasons, Kreinik's motion to amend his First Amended Complaint is granted in its entirety.

2003 WL 22339268 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**
• 1:02CV01172 (Docket)
(Feb. 13, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.



LEXSEE 1989 U.S. DIST. LEXIS 13507

**FIREMAN'S FUND INSURANCE COMPANY, As Subrogee of Oswaldo and Ela Cisneros, Plaintiff, v. WAREHOUSE NO. 1, INC., a/k/a WAREHOUSE ONE, INC., Defendant**

**No. 89 Civ. 4069(CES)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1989 U.S. Dist. LEXIS 13507*

**November 13, 1989, Decided; November 14, 1989, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insurer, as subrogee, brought an action against defendant warehouse company to recover the value of certain items that plaintiff's insureds had stored in defendant's warehouse. Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The insurer alleged conversion and negligence as causes of action in its amended complaint.

**OVERVIEW:** The insureds rented space at the warehouse company's facility pursuant to a written storage agreement. The company delivered their personal belonging to its warehouse for storage. When the insureds attempted to retrieve their belongings, warehouse employees told them that the items could not be located and offered no explanation for their disappearance. The court converted the company's motion into one for summary judgment and denied the motion. The court found that genuine issues of material fact existed regarding the insurer's claims of negligence and conversion. The court first held that by reason of the storage agreement executed between the insureds and the company, the relationship between them was one of landlord and tenant. Such a relationship could not exempt the company from liability for conversion or negligence. The court declared void as against public policy and unenforceable those terms of the storage agreement attempting to contract away liability for negligence. The action was not time-barred. The court

held that the agreement's provision seeking to shorten the limitation period was void and enforceable because its terms were unreasonable and too indefinite.

**OUTCOME:** The court denied the warehouse company's motion to dismiss the complaint after converting into a motion for summary judgment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] A motion for summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Real & Personal Property Law > Landlord & Tenant*
*Real & Personal Property Law > Personal Property > Bailments*
[HN2] If a bailee fails to return a bailor's property there is a presumption of liability, and a prima facie case of negligence exists if the property cannot be found. Where no bailment exists, such as in a landlord-tenant relationship, the failure to return property gives rise to no presumption.

*Real & Personal Property Law > Personal Property > Bailments*

1989 U.S. Dist. LEXIS 13507, *

[HN3] To determine whether a bailment has been established, the test to be applied is whether or not the person leaving the property has made such a delivery as to amount to a relinquishment of his exclusive possession, control and dominion thereof, and vested such control and dominion in the person upon whose premises the property has been left. On the other hand, if the property owner's control and dominion over the items left in storage is not dependent on the cooperation of the owner of the premises and access to the items is not subject to the latter's control, it is generally held that the property owner is a tenant or lessee.

*Real & Personal Property Law > Landlord & Tenant > Commercial Leases*
[HN4] Under New York law it is the access to and control of the items stored that determines the relationship between the parties. Generally, a landlord-tenant relationship is found where the person storing items has unimpeded access to those items during business hours.

*Contracts Law > Contract Conditions & Provisions > Waivers*
*Real & Personal Property Law > Landlord & Tenant > Commercial Leases*
[HN5] Under New York law a contractual clause which changes the relationship between parties to that of landlord-tenant from that of bailor-bailee extinguishes only the presumption of negligence that a loss of property in the context of a bailment imposes. To extinguish the presumption of negligence and to relieve a party from the effect of its own negligence are two entirely different matters. Landlords are expressly forbidden by statute from contracting away liability for their own negligence. N.Y. Gen. Oblig. Law § 5-321.

*Contracts Law > Contract Conditions & Provisions > Waivers*
*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN6] New York law allows parties to provide for reasonable shorter periods of limitation by agreement, but such agreements are strictly construed, and the parties' intention to provide a shorter than usual limitations period must be clear.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN7] Under New York law, vagueness of a contractual term renders the term unenforceable.

**OPINIONBY:** [*1]

STEWART, JR.

**OPINION:**

MEMORANDUM DECISION

CHARLES E. STEWART, JR., UNITED STATES DISTRICT JUDGE

Plaintiff, Fireman's Fund Insurance Company, a California corporation, brought this action against defendant Warehouse No. 1, Inc. ("Warehouse One") a New York corporation, to recover the value of certain items that plaintiff's insureds, Oswaldo and Ela Cisneros (the "Cisneroses"), had stored in the defendant's warehouse. n1 Defendant has filed a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure.* However, in accordance with the requirements of *Fed. R. Civ. P. 12(b)* since we have considered matters outside of the pleadings, the motion has been converted into one for summary judgment pursuant to *Fed. R. Civ. P. 56.* n2 For the reasons that follow, we deny defendant's motion.

> n1 Plaintiff pursues this action as subrogee of the Cisneroses pursuant to an insurance policy issued to the Cisneroses by plaintiff. It alleges two causes of action in its amended complaint:
> Count One - conversion by defendant of $ 209,751.00 worth of items belonging to the Cisneroses stored at defendant's warehouse;
> Count Two - failure to return $ 209,751.00 worth of the Cisneroses' stored property through negligence of defendant. [*2]

> n2 The parties were advised by letter dated October 4, 1989, of the conversion of the dismissal motion into a motion for summary judgment. Pursuant to that letter they were instructed to submit to the court any material relevant to the disposition of the motion as one for summary judgment.

*Factual Background*

In July of 1983, the Cisneroses, pursuant to a written agreement (the "Storage Agreement" or "Agreement"), rented warehouse space at defendant's facility in New York. In late July of 1987, certain items belonging to the Cisneroses, valued by plaintiffs at over $ 200,000, were transported and delivered by defendant to its warehouse for storage. On September 1, 1988, the Cisneroses attempted to retrieve their belongings from the warehouse but were told by defendant's employees that the requested items could not be located. The employees offered no explanation for the disappearance

of the Cisneroses' property. Since that time the items remain missing without explanation.

Defendant contends that four paragraphs within the fifteen paragraph Storage Agreement between the Cisneroses and Warehouse One expressly absolve it of liability for the loss of the Cisneros property. n3 We [*3] disagree and deny defendant's motion for the reasons that follow.

> n3 Paragraph "4" of the Agreement reads in relevant part:

> Tenant hereby agrees that landlord shall have no liability whatsoever or to any extent for any occurrence of any injury to any property or to tenant at any time or for or on account of the destruction of any property at the time. Tenant hereby releases landlord from any and all responsibility whatsoever in connection with the tenant and tenant's property; acknowledges that tenant's use of the premises shall be solely at tenant's risk. In the event of any loss, tenant shall look solely to his own insurance coverage if any and shall make no claim whatsoever against the landlord. Tenant acknowledges insurance is available for its property at the premises

> Paragraph "14" of the Agreement reads in relevant part:

> It is specifically agreed by the parties that all properties are under the control care custody and possession [sic] of the tenant and not the landlord.

> Paragraph "13" of the Agreement reads in relevant part:

> It is specifically agreed by the parties that no bailment contract exists and the relationship of the parties is one of landlord and tenant for rental of the designated area.

> Paragraph "12" reads in relevant part:

> It is agreed that any claim by the tenant against the landlord must be in writing and submitted to the landlord . . . and any action, proceeding or cause of action in any court must be commenced within three (3) months of the incident that gave rise to the writing. [*4]

Discussion

[HN1] A motion for summary judgment shall be granted when "there is no genuine issue of material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The parties have focused much of their attention on the character of the relationship between the Cisneroses and the defendant. Defendant claims that the Storage Agreement created a landlord-tenant relationship and since that agreement expressly absolved the landlord of any liability, it is entitled to judgment as a matter of law. Plaintiff counters that the relationship was that of bailee-bailor and not landlord-tenant.

It is our view that determination of the instant motion does not turn solely on the resolution of the relationship between the parties since the defendant may not contract away its liability for tortious conduct irrespective of the character of the relationship. However, since defendant appears to strenuously argue that the resolution of the motion is dependent on the determination of the relationship between the parties, we will discuss that issue first.

Whether the relationship of the parties is defined as that of bailor-bailee or landlord-tenant has certain [*5] legal ramifications. [HN2] If a bailee fails to return a bailor's property there is a presumption of liability, and a prima facie case of negligence exists if the property cannot be found. See Maisel v. Gruner & Jahr USA, Inc., 89 A.D.2d 503, 504, 452 N.Y.S.2d 192, 193 (N.Y. App. Div. 1st Dept. 1982). Where no bailment exists, such as in a landlord-tenant relationship, the failure to return property gives rise to no presumption. See Motors Ins. Corp. v. American Garages, Inc., 98 Misc.2d 887, 889, 414 N.Y.S.2d 841, 842 (N.Y. Sup. Ct. 1979). n4

> n4 Under New York law a bailment is defined as:

> [a] delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it.

> Rich v. Touche Ross & Co., 415 F. Supp. 95, 99 n. 2 (S.D.N.Y. 1976) (quoting Mays v. New York, N.H. & H.R.R., 197 Misc. 1062, 1063-64, 97 N.Y.S.2d 909, 911 (N.Y. Sup. Ct. App. Term. 1950)).

[HN3] To determine whether a bailment has been established, the test to be applied is "whether [*6] or not the person leaving the property has made such a delivery as to amount to a relinquishment of his exclusive

possession, control and dominion thereof, and vested such control and dominion in the person upon whose premises the property has been left." Phillips v. City of New York, 71 Misc.2d 861, 863, 337 N.Y.S.2d 303, 306 (N.Y. Civ. Ct. 1972) (citing Osborne v. Cline, 263 N.Y. 434, 189 N.E. 483 (N.Y. Ct. App. 1934)).

On the other hand, if the property owner's control and dominion over the items left in storage is not dependent on the cooperation of the owner of the premises and access to the items is not subject to the latter's control, it is generally held that the property owner is a tenant or lessee. See Cornelius v. Berinstein, 183 Misc. 685, 688, 50 N.Y.S.2d 186, 189 (N.Y. Sup. Ct. Onondaga Cty. 1944) (relationship between operator of bowling alley and patron who rented locker space at bowling alley more akin to that of landlord and tenant rather than bailee and bailor).

[HN4] Under New York law it is the access to and control of the items stored that determines the relationship between the parties. Generally, a landlord-tenant relationship is found where the person   [*7} storing items has unimpeded access to those items during business hours. See Cornelius, 183 Misc. at 688-89, 50 N.Y.S.2d at 189 (distinguishing between lockers at a bowling alley, a landlord-tenant relationship, and safety deposit boxes in a bank, a bailee-bailor relationship, because the latter requires the depositor to be admitted to the safety deposit box area by a bank employee thereby diminishing the depositor's unimpeded access during business hours to the items stored); see also Kahn & Rolnick, Inc. v. Interborough Fur Storage Co., Inc., 196 Misc. 749, 750-51, 92 N.Y.S.2d 894, 895 (N.Y. Sup. Ct. New York Cty. 1949) (owner of premises found to be a landlord and not a bailee because he did not have sole custody of items stored on premises since tenant had sole key to room and had unimpeded access during business hours to items stored there); cf. Motor Ins. Corp., 98 Misc.2d at 889, 414 N.Y.S.2d at 842 (a parking arrangement gives rise to bailee-bailor relationship if there is dominion and control of automobile by garage owner); Fire Ass'n of Philadelphia et al. v. Fabian, 170 Misc. 665, 9 N.Y.S.2d 1018, 1021 (N.Y. City Ct. Rochester 1938) (parking lot owner a   [*8] bailee since he could move parked cars at his discretion).

There are insufficient facts before the court to definitively assess whether the Cisneroses enjoyed unimpeded access to their property during business hours and were, therefore, tenants rather than bailors, or whether defendant exercised dominion and control over the stored items and was a bailee rather than a landlord.

However, as noted earlier, we need not reach that determination in disposing of the instant motion because even assuming, arguendo, that a bailor-bailee

relationship originally existed between the Cisneroses and defendant, the parties subsequently defined their relationship as that of landlord-tenant in the Storage Agreement. See Langenthal v. American Stuyvesant Garage, 72 Misc.2d 189, 190, 338 N.Y.S.2d 727, 729 (N.Y. Civ. Ct. New York Cty. 1972) (parties to a parking arrangement were contractually free to redefine their relationship as that of licensor-licensee ins ead of bailor-bailee without running afoul of New York General Obligations Law ("GOL") § 5-325 which forbids a garage owner from insulating himself against liability).

[HN5] Under New York law a contractual clause which changes the relationship   [*9]   between parties to that of landlord-tenant from that of bailor-bailee extinguishes only the presumption of negligence that a loss of property in the context of a bailment imposes. See Langenthal, 72 Misc.2d at 190-91, 338 N.Y.S.2d at 729; see also Motors Ins. Corp., 98 Misc.2d at 890, 414 N.Y.S.2d at 843. To extinguish the presumption of negligence and to relieve a party from the effect of its own negligence are two entirely different matters. Therefore, even if a landlord-tenant relationship was created by provisions of the Storage Agreement, defendant still could not contract away liability for its own negligence -- landlords being expressly forbidden from doing so by statute. See GOL § 5-321. n5 See also Graphic Art Supply, Inc. v. Raynor, 91 A.D.2d 827, 827-28, 458 N.Y.S.2d 115, 116 (N.Y. App. Div. 4th Dept. 1982) (lease requirement that tenant obtain insurance and to hold the landlord harmless from effects of negligence was void); Palanker v. Edwards Properties, Inc., 32 Misc.2d 772, 774, 222 N.Y.S.2d 266, 268 (N.Y. Sup. Ct. Erie Cty. 1961) (lessor of fur storage vault could not insulate itself from liability for its negligence by provisions in the   [*10]   lease) (construing precursor to GOL § 5-321); cf. Motors Ins. Corp, 98 Misc.2d at 891, 414 N.Y.S.2d at 843-44 (clauses limiting liability are upheld where there is no contracting away of liability).

n5 GOL § 5-321 reads in relevant part:

Every covenant, agreement or understanding in or in connection with or collateral to any lease of real property exempting the lessor from liability for damages for injuries to person or property caused by or resulting from the negligence of the lessor, his agents, servants or employees, in operation or maintenance of the demised premises or the real property containing the demised premises shall be deemed void as against public policy and wholly unenforceable.

Accordingly, we believe that Paragraph 4 of the Storage Agreement which purports to hold harmless the

defendant as landlord from any liability is in contravention to GOL § 5-321 and void as against public policy.

Finally, defendant contends that the complaint is time-barred since Paragraph 12 of the Storage Agreement states that any claim by the tenant against the landlord must be made in writing, and any action must be commenced within three months of the "incident that gave rise [*11] to the writing." Defendant's Memorandum of Law at 4.

[HN6] New York law allows parties to provide for reasonable shorter periods of limitation by agreement, but such agreements are strictly construed, and the parties' intention to provide a shorter than usual limitations period must be clear. n6 See Oil & Gas Ventures -- First 1958 Fund, Ltd. v. Kung, 250 F. Supp. 744, 753 (S.D.N.Y. 1966). Under this standard, we find paragraph 12 of the Storage Agreement fails.

    n6 New York's limitations period for injuries to property is three years. N.Y. Civ. Prac. L. & R. § 214(4) (McKinney 1972).

First, the three month limitation period afforded the tenant both to notify the landlord in writing of any complaint and to bring an action or proceeding is unreasonable. It is obvious that such a provision actually prejudices the tenant who waits in good faith for the landlord to cure any possible problem. It also encourages a culpable landlord to wait as long as possible before responding to any complaint.

Second, Paragraph 12 does not expressly and clearly indicate that it is the intention of the parties to waive the statutory limitations period.

Finally, [HN7] under New York law, vagueness of a contractual [*12] term renders the term unenforceable. See, e.g., Brown & Guenther v. North Queensview Homes, Inc., 18 A.D.2d 327, 330, 239 N.Y.S.2d 482, 484 (N.Y. App. Div. 1st Dept. 1963) (vagueness of contractual provision renders it unenforceable). Paragraph 12 of the Storage Agreement requires the tenant to commence his or her action within three months from the time of the "incident" which "gives rise" to the written complaint to the landlord. Under the instant facts the "incident" triggering Paragraph 12 could be interpreted to mean:

1. the point at which the Cisneroses became aware that their property was missing;

2. the point at which they first communicated their concern to the defendant;

3. the point at which no explanation for the missing items was forthcoming from defendant; or,

4. the point at which the missing items were actually misplaced or stolen. n7

        n7 Indeed, plaintiff indicates that there was some uncertainty as to whether defendant ever confirmed that the Cisneroses' items were missing or in another part of the warehouse. Plaintiff's Supplemental Memorandum of Law at 4 (and attached exhibits).

As it is unclear from the agreement which incident will trigger the three month [*13] limitations period, we hold that Paragraph 12 is too vague to be an enforceable provision. Consequently, for the reasons enumerated, we reject defendant's contention that the instant action is time-barred by operation of Paragraph 12 of the Storage Agreement.

To summarize, we conclude that by reason of the Storage Agreement executed between the Cisneroses and defendant, the relationship between them was one of landlord and tenant. However, that relationship does not insulate defendant from liability for conversion or negligence, notwithstanding the terms of Paragraph 4 of the Storage Agreement which is void as against public policy and unenforceable. Further, we have concluded that Paragraph 12 of the Storage Agreement is void because the time limitations set forth within it are unreasonable and its terms too indefinite to be enforceable. Therefore, the action is not time-barred.

Conclusion

Because genuine issues of material fact remain to be determined regarding plaintiff's claims of negligence and conversion, defendant's motion to dismiss the complaint, converted into a motion for summary judgment, is denied.

SO ORDERED.

Dated: New York, New York
November 13, 1989 [*14]

Westlaw.

Not Reported in F.Supp.2d
2004 WL 946894 (D.Kan.)
(Cite as: 2004 WL 946894 (D.Kan.))

Page 1



**H**
**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.

B-S STEEL OF KANSAS, INC., Plaintiff,
v.
TEXAS INDUSTRIES, INC., et al., Defendants.
CHAPARRAL STEEL MIDLOTHIAN, L.P.,
Plaintiff,
v.
B-S STEEL OF KANSAS, INC., Defendant

**No. 01-2410-JAR, 03-2664-JAR.**

April 28, 2004.

James R Eiszner, Shook, Hardy & Bacon L.L.P.,
Kansas City, MO, for Plaintiff.

David A. Rameden, Jerrod A. Westfahl, Shook,
Hardy & Bacon L.L.P., Overland Park, KS, Dennis
D. Palmer, Shughart Thomson & Kilroy, PC, Kansas
City, MO, for Plaintiff and Defendants.

George E. Leonard, Shughart Thomson & Kilroy,
PC, Kansas City, MO, for Defendants.

*MEMORANDUM AND ORDER DENYING
MOTION TO DISMISS*

ROBINSON, J.

*1 This matter comes before the Court on defendant
B-S Steel of Kansas, Inc.'s (B-S Steel) Motion to
Dismiss (Doc. 3) plaintiff Chaparral Steel
Midlothian, L.P.'s (Midlothian) Petition for Order
Confirming Arbitration Award (Doc. 1) filed in Case
No. 03-2664. B-S Steel argues dismissal is warranted
pursuant to Fed.R.Civ.P. 12(h)(3) for lack of subject
matter jurisdiction and Fed.R.Civ.P. 12(b)(3) for
improper venue. For the reasons stated below, B-S
Steel's motion is denied.

A. Procedural History

On August 15, 2001, B-S Steel filed suit in Case No.

01-2410, naming as defendants Texas Industries, Inc.
and Chaparral Steel Company. B-S Steel filed an
amended complaint on December 6, 2001, naming as
additional defendants Chaparral Steel Texas, Inc. and
Midlothian. By its Order dated September 4, 2002,
this Court referred B-S Steel's claims against
Midlothian, which were based on transactions
occurring before April 3, 2001, to arbitration
pursuant to the Conditions of Sale Contract between
B-S Steel and Midlothian. This Court found in its
Order that the Conditions of Sale Contract signed on
February 26, 1997 and effective with invoices after
July 1, 1996 was "valid and enforceable."

In a likely attempt to avoid arbitration and following
this Court's Order compelling arbitration, B-S Steel
voluntarily dismissed Midlothian from Case No. 01-
2410 on September 17, 2002. On that same day, B-S
Steel informed Midlothian by letter that it was
unwilling to proceed to arbitration. Subsequently,
Midlothian filed a Demand for Arbitration with the
American Arbitration Association seeking an order
declaring that Midlothian was not liable to B-S Steel
on its claims against Midlothian. On November 6,
2002, B-S Steel filed in the arbitration counterclaims
against Midlothian, which were based on the same
transactions and representations that the original
claims in B-S Steel's Amended Complaint were based
upon. A three member panel of arbitrators was
appointed, and after a nine day hearing and the
designation of over six hundred exhibits, the
arbitrators issued a reasoned award.

Midlothian sought to confirm the reasoned award by
filing a Motion for Order Confirming Arbitration
Award in Case No. 01-2410. In its response, B-S
Steel argued that because Midlothian had already
been dismissed from the lawsuit, it could not bring a
motion to confirm without first filing a new action
and paying its filing fees. Perhaps recognizing it was
no longer a party, Midlothian voluntarily dismissed
its Motion for Order Confirming Arbitration Award
and filed a new action. In the new action, Case No.
03-2664, Midlothian sought only a Petition for Order
Confirming Arbitration Award, which was nearly a
verbatim recitation of its previously filed Motion to
Confirm in Case No. 01-2410. B-S Steel then filed
the Motion to Dismiss Midlothian's Petition for lack
of subject matter and improper venue. Subsequently,
Case Nos. 01-2410 and 03-2664 were consolidated
and the Motion to Dismiss is now pending before this

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 946894 (D.Kan.)
(Cite as: 2004 WL 946894 (D.Kan.))

Page 2

Court.

B. Lack of Subject Matter Jurisdiction

*2 B-S Steel argues that Midlothian's Petition must be dismissed for lack of subject matter jurisdiction because pursuant to § 9 of the Federal Arbitration Act [FN1] (FAA) and the forum selection clause entered into by B-S Steel and Midlothian, any motion to confirm the arbitration award must be brought in the Northern District of Texas.

> FN1. 9 U.S.C. § 9.

Although not mentioned in either party's briefs to the Court, the Tenth Circuit has articulated a standard for determining whether a court has subject matter jurisdiction to confirm an arbitration award. [FN2] The inquiry is twofold: first, because the FAA does not create any independent federal-question jurisdiction, there must be diversity of citizenship or some other independent basis for federal jurisdiction before a federal court can act under the FAA. [FN3] Additionally, the parties must have "agreed, explicitly or implicitly, that any eventual arbitration award shall be subject to judicial confirmation." [FN4]

> FN2. See P & P Indus., Inc. v. Sutter Corp., 179 F.3d 861, 866 (10th Cir.1999).

> FN3. Id.

> FN4. Id. at 866-67.

There is no question that diversity jurisdiction is present. [FN5] Nor is there any doubt that the parties agreed that any arbitration award would be subject to judicial confirmation. The Conditions of Sale Agreement, which this Court has already determined is valid, provides *inter alia:*

> FN5. The Pretrial Order in Case No. 01-2410 provides that "subject matter jurisdiction is invoked under ... 28 U.S.C. § 1332 ... and is not disputed."

Any controversy or claim arising out of or related to these Conditions of Sale or any other transactions between Buyer and Seller shall be resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and judgment upon the award rendered by the arbitrator(s) may be entered in any court having competent jurisdiction thereof.

Because an independent basis for subject matter jurisdiction in the form of diversity of citizenship exists and because B-S Steel and Midlothian agreed that any arbitration award could be confirmed, this Court concludes it has subject matter jurisdiction over the parties.

B-S Steel's contention that this Court's subject matter jurisdiction is somehow implicated by the forum selection clause and § 9 of the FAA defies reason. It is well settled that a motion to dismiss based on a forum selection clause is treated not as a motion to dismiss for *lack of subject matter jurisdiction,* but rather as a motion to dismiss for *improper venue* under Fed.R.Civ.P. 12(b)(3). [FN6] Indeed, this Court in interpreting the 'exclusive jurisdiction' clause which B-S Steel refers to, has already determined that the clause is a "forum selection clause" and should be analyzed under the Fed.R.Civ.P. 12(b)(3) standard. [FN7] Moreover, the FAA provisions which B-S Steel claims mandate dismissal for lack of subject matter jurisdiction, have been described by the Supreme Court as "venue provisions." [FN8] Consequently, the Court will analyze B-S Steel's remaining jurisdictional arguments under the standards for improper venue.

> FN6. *United Int'l. Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207, 1222 (10th Cir.2000) ("We disagree with the premise underlying this argument--that forum selection or choice of law issues implicate a court's subject matter jurisdiction. Forum selection issues raise concerns not of subject matter jurisdiction but of improper venue or failure to state a claim on which relief may be granted."); *K & V Scientific Co., Inc., v. BMW,* 314 F.3d 494, 497 (10th Cir.2002).

> FN7. *See B-S Steel of Kansas, Inc., v. Texas Indus., Inc.,* 229 F.Supp.2d 1209, 1227 (D.Kan.2002).

> FN8. *Cortez Byrd Chips, Inc., v. Bill Harbert Constr. Co.,* 529 U.S. 193, 195, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000).

C. Improper Venue

B-S Steel contends that the forum selection clause and § 9 of the FAA make venue in the District of Kansas improper. In response, Midlothian contends that venue is proper because B-S Steel initially chose this forum when it filed suit and has since waived any

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 946894 (D.Kan.)
(Cite as: 2004 WL 946894 (D.Kan.))

Page 3

right to object to lack of proper venue, the forum selection clause does not apply, and § 9 of the FAA states that any court with jurisdiction and venue may confirm arbitration awards.

*1. Forum Selection Clause*

*3 Quite disingenuously, B-S Steel argues that venue is improper due to the forum selection clause; yet, it was B-S Steel that originally chose this forum when it filed suit in the District of Kansas in Case No. 01-2410. It is well settled that a plaintiff's choice of forum should rarely be disturbed. [FN9] But, rather than admitting that it originally chose this forum, B-S Steel engages in a game of smoke and mirrors. B-S Steel argues that the issue raised by its motion to dismiss is "this Court's jurisdiction to hear Case No. 03- 2664. This action is not a continuation of Case No. 01-2410 ... it is a brand new action filed by Midlothian...." B-S Steel has *not* forgotten the reason Midlothian was forced to file a new action to confirm the arbitration award. After this Court compelled arbitration, *B-Steel voluntarily dismissed Midlothian* from Case No. 01-2410, most likely in an attempt to avoid arbitration and the Court's Order entirely. Moreover, Case No. 03-2664 has been substantively consolidated with Case No. 01-2410 so any argument that the cases should be treated separately is moot. [FN10]

> FN9. *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir.1992); *B-S Steel of Kansas, Inc.*, 229 F.Supp.2d at 1222.

> FN10. *See* Memorandum and Order dated April 14, 2004, in Case No. 03-2664 (Doc. 14).

Even more disingenuous, if possible, is B-S Steel's contention that it was "duped into adding Midlothian" and surprised by the forum selection clause, "of which B-S Steel was unaware." This, B-S Steel contends, is how more than two years post-filing, it has yet to waive the defense of improper venue. Far from being "duped," BS-Steel voluntarily filed a motion to amend its complaint to add Midlothian. B-S Steel now claims it was unaware of the Conditions of Sale agreement containing the forum selection clause, however, the agreement was signed by B-S Steel's president. This Court wonders how a party could be tricked into amending its complaint and claim ignorance of a document signed by its president, unless that party failed to conduct adequate discovery before amending its complaint in the first instance. [FN11] Furthermore, if B-S Steel

was indeed deceived into adding Midlothian, it had ample opportunity to voluntarily dismiss Midlothian as soon as it became aware of the forum selection clause and before the Court compelled arbitration. Instead of dismissing Midlothian right away, B-S Steel delayed until after the Court's September 3, 2002 Order, and only following the Court's Order, which was not favorable to B-S Steel, did B-S Steel seek to dismiss Midlothian.

> FN11. *See* Fed.R.Civ.P. 11(b) ("By presenting to the court ... a pleading ... an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.)

B-S Steel argues that it has not waived venue because after it was duped into adding Midlothian, it "was placed in a responsive position so it was not obligated to argue either jurisdiction or venue." Interestingly though, when Midlothian originally sought dismissal based on improper venue, BS-Steel asserted that venue was proper in Kansas and stated:

Midlothian's improper venue argument is flawed and incorrect. The Conditions of Sale agreement has a narrow forum selection clause for claims to enforce or interpret them or for breach of contract claims. Nothing in Plaintiff's Amended Complaint alleges facts that implicate the Conditions of Sale or could be interpreted as a breach of contract claim against Defendants. *This forum selection clause cannot, therefore, serve as the basis for dismissal on venue grounds*.

*4 Thus, B-S Steel *was in a position to argue venue* and argued that venue was proper. Additionally, the Pretrial Order entered on December 22, 2003, which serves as the final and binding pleading in the case, contains no mention of B-S Steel's alleged venue objection. [FN12] B-S Steel chose this forum when it filed suit in the District of Kansas in August 2001 and cannot now claim that venue is improper.

> FN12. It is settled that "[t]he pretrial order controls the subsequent course of the action, and the trial court need not consider any matter that is not embodied in it." *Gardner v. Safeway Stores, Inc.*, 99 F.R.D. 258, 260 (D.Kan.1983).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 946894 (D.Kan.)
(Cite as: 2004 WL 946894 (D.Kan.))

Page 4

Midlothian further argues that even if B-S Steel has not waived venue, the forum selection clause does not apply. Because the Court has determined that B-S Steel long ago waived venue by filing this lawsuit and remaining silent, the Court need not address this argument.

*2. § 9 of the FAA*

B-S Steel argues that venue is improper [FN13] under § 9 of the FAA because the Conditions of Sale agreement selects the Northern District of Texas as the exclusive forum for interpreting and enforcing the agreement. Midlothian responds that § 9 of the FAA is a permissive, not a mandatory venue provision, such that venue is proper in the District of Kansas

> FN13. B-S Steel's argument is actually titled a subject matter jurisdiction argument, not an improper venue one. But, as discussed earlier, the portion of § 9 of the FAA at issue is a venue, rather than a jurisdictional provision.

Section 9 of the FAA governs venue for the confirmation of arbitration awards. [FN14] Pursuant to § 9:

> FN14. *Cortez Byrd Chips, Inc.*, 529 U.S. at 197.

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. [FN15]

> FN15. 9 U.S.C. § 9.

In *Cortez Byrd Chips*, the Supreme Court interpreted § 9. The court explained that only by giving § 9 a permissive, rather than mandatory effect could it avoid "plac[ing] § 3 and § § 9-11 of the FAA in needless tension." [FN16] Section 3 provides that any court in which an action "referable

to arbitration under an agreement in writing" is pending "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." [FN17] The court noted that, "[i]f an arbitration were then held outside the district of that litigation, under a restrictive reading of § § 9-11 a subsequent proceeding to confirm, modify, or set aside the arbitration award could not be brought in the district of the original litigation (unless that also happened to be the chosen venue in a forum selection agreement)." [FN18] Such an interpretation clashes with established precedent that a court with the power to stay the action under § 3 has the further power to confirm any ensuing arbitration award. [FN19] Thus, the court concluded that § 9 is permissive not restrictive, permitting a motion to confirm, vacate, or modify an arbitration award to be brought either where the award was made or in any district proper under the general venue statute. [FN20]

> FN16. *Cortez Byrd Chips, Inc.*, 529 U.S. at 201.

> FN17. 9 U.S.C. § 3.

> FN18. *Cortez Byrd Chips, Inc.*, 529 U.S. at 202; *P & P Indus.*, 179 F.3d at 869 (noting that to give § 9 a restrictive interpretation, would render § 3 meaningless. If a court had no power to confirm the award, then it should dismiss the action, not stay the proceedings pursuant to § 3, because the court would have no power to take further action in the case).

> FN19. *Cortez Byrd Chips, Inc.*, 529 U.S. at 202; *Denver & Rio Grande W. R.R. Co., Union Pac. R.R. Co.*, 868 F.Supp. 1244, 1250 (D.Kan.1994) (quoting *Smiga v. Dean Witter Reynolds Inc.*, 766 F.2d 698, 706 (2d Cir.1985), *cert. denied* 475 U.S. 1067, 106 S.Ct. 1381, 89 L.Ed.2d 607 (1986) ("Once a federal court has subject matter jurisdiction over an action, it may confirm an arbitration award even though it was not the district where the award was granted.")

> FN20. *Cortez Byrd Chips, Inc.*, 529 U.S. at 204.

*5 B-S Steel argues that the Conditions of Sale agreement dictates that the arbitration award can be confirmed only in the Northern District of Texas. The

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 946894 (D.Kan.)
(Cite as: 2004 WL 946894 (D.Kan.))

Page 5

agreement states, *inter alia:*
In any proceeding to enforce or interpret these conditions of sale, buyer expressly consents to the exclusive jurisdiction of the state and federal courts of the State of Texas and venue shall be proper in Ellis County.
Additionally, the agreement provides that "judgement upon the [arbitration] award may be entered in any court having jurisdiction thereof." B-S Steel asserts that the permissive aspects of § 9 "only come into play if no court is specified in the arbitration agreement" and that because the parties chose Texas as their forum, only Texas may confirm the award.

B-S Steel's assertion, however, ignores the reasoned analysis of the Supreme Court. Under B-S Steel's view, § 3 and § 9 would be very much in conflict. This Court has already determined that it has jurisdiction to stay the proceedings pursuant to § 3 and refer the case to arbitration; indeed, the Court has already done just that. To suggest now that the Court cannot confirm the award under § 9 mirrors the reasoning considered and rejected in *Cortez Byrd Chips* . Moreover, it is well-settled that a party who elects to sue in a federal district court that stays his suit under the FAA consents to the filing of a motion to confirm an arbitration award under § 9 in that district. [FN21] Because the Court has already determined that jurisdiction and venue are proper, § 9 is a permissive, not a mandatory venue provision, and B-S Steel impliedly consented to the filing of the motion to confirm by choosing this venue, B-S Steel's motion to dismiss must be denied.

FN21. *Id.* at 202; *T & R Enter., Inc. v. Cont'l Grain Co.,* 613 F.2d 1272, 1279 (5th Cir.1980) ("[T]he power of the federal court in the Northern District of Alabama was invoked by T & R when they initially filed the complaint on these contracts in that jurisdiction. We conclude that, once invoked, the power of that court to enter a judgment on the arbitrator's award which was an outgrowth of the original action was sufficient to satisfy the jurisdictional requirements.") (citing *Marine Transit Corp. v. Dreyfus,* 284 U.S. 263, 276-77, 52 S.Ct. 166, 76 L.Ed. 282 (1931)); *Smart v. Sunshine Potato Flakes, L.L.C.,* 307 F.3d 684, 685 (8th Cir.2002) ("The district court initially had diversity jurisdiction over this action. After it entered a stay pending arbitration under 9 U.S.C. § 3, the court had the further power to confirm any ensuing

arbitration award.")

IT IS THEREFORE ORDERED BY THE COURT that B-S Steel's Motion to Dismiss (Doc. 3) originally filed in Case No. 03-2664, which has been consolidated with Case No. 01-2410, shall be DENIED.

IT IS SO ORDERED.

2004 WL 946894 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**
• 2:03CV02664 (Docket) (Dec. 31, 2003)

• 2:01CV02410 (Docket) (Aug. 15, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.