Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

*Attorneys for The SCO Group, Inc.*



RECEIVED CLERK
FILED
2005 JAN 12  P 6: 56
DISTRICT COURT
DISTRICT OF UTAH

SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>    Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff | **MEMORANDUM IN SUPPORT OF SCO'S MOTION TO COMPEL IBM TO PRODUCE SAMUEL J. PALMISANO FOR DEPOSITION**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |



unsealed

375

The SCO Group, Inc. ("SCO") respectfully submits this Memorandum in support of its Motion to Compel IBM to Produce Samuel J. Palmisano for Deposition.

## PRELIMINARY STATEMENT

On December 2, 2004, SCO duly noticed the deposition of Samuel J. Palmisano, who at the key times relevant to this suit was an IBM Vice-President in charge of the computer-server group, with responsibility for IBM's Linux strategy. SCO seeks to depose Mr. Palmisano because (1) this litigation concerns the nature and scope of all of IBM's "activities relating to Linux," including IBM's well-publicized "Linux strategy" (Exh. B at 1); and (2) before Mr. Palmisano became IBM's CEO, he was the senior IBM executive who "spearheaded" that strategy (Exh. J at 2); who "pushed most emphatically for the Linux initiative" (Exh. B at 2); who presented to IBM's then-CEO the "rigorous and exhaustive" report on how IBM should adapt to Linux (Exh. B at 2); who chose IBM's "Linux czar" to oversee IBM's strategy (Exh. B at 3); and who personally committed to make technologies at the heart of this case available to the open source community (Exh. N). Mr. Palmisano's involvement in Linux before his promotion to CEO was so substantial that IBM has described its Linux strategy as "Sam's bet." Exh. B at 2.

IBM, however, has refused to produce Mr. Palmisano for deposition based on Mr. Palmisano's current position as IBM's Chief Executive Officer and Chairman of the Board. IBM incorrectly claims that Mr. Palmisano does not have "any knowledge" of any facts relevant to this litigation. Exh. C. at 1 (IBM has not even claimed undue burden.) SCO shows below that because Mr. Palmisano does have first-hand knowledge of substantial facts directly relevant to this litigation (and because there is no undue burden on him or IBM), the Court should order IBM to produce Mr. Palmisano for deposition.

## BACKGROUND

IBM's "Linux strategy" is directly at issue in this litigation, by virtue of both SCO's claims and IBM's counterclaims. Indeed, in refusing to produce Mr. Palmisano for deposition, IBM has not contended otherwise. To illustrate:

– SCO's core contract claims put IBM's Linux strategy at issue because that strategy explains IBM's strong financial motivation to use shortcuts in order to promote Linux's commercial appeal, including by contributing important UNIX technologies from the AIX and Dynix operating systems to Linux; and

– IBM's own Tenth Counterclaim puts IBM's Linux strategy at issue, because in that counterclaim IBM seeks a declaration that "IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyright through its Linux activities, including its use, reproduction and improvement of Linux." IBM's 2d Am. Countercl. ¶ 173.

SCO has further demonstrated the extent of IBM's worldwide Linux-related activities and the concomitant need for significant discovery on those activities. See SCO's Mem. in Opp. to IBM's Motion for Partial Summary Judgment on its Tenth Counterclaim (July 9, 2004) at 76-78.

Accordingly, using IBM's own documents and publicly available information, SCO briefly summarizes below the advent and evolution of IBM's Linux strategy. Mr. Palmisano has played a direct and critical role in formulating and fostering that strategy.

### A.    The Origin and Goals of IBM's Linux Strategy

In the late 1990s, IBM concluded that its UNIX-based operating system (AIX) would not successfully compete with products from Sun (Solaris, also based on UNIX) and Microsoft (Windows NT). Solaris was "rapidly becoming the de facto UNIX, and posed a significant threat to IBM servers" and also "disadvantaged IBM middleware." IBM's internal "Linux Strategy Update" (Exh. D) at 1710189072; see also id. at 1710189068 ("Sun and Microsoft continue to grow at an impressive rate. AIX continues to lag Solaris and NT in popularity, a

2

situation unlikely to change with their broader application portfolio and skills pool."); <u>see also</u> <u>A Mainstream Giant Goes Countercultural; I.B.M.'s Embrace of Linux Is a Bet That It Is the Software of the Future</u>, The New York Times, Mar. 20, 2000, at 3 (Exh. B) ("I.B.M.'s version of Unix has become an also-ran behind Sun's more popular Solaris.").

Accordingly, in order "to neutralize the Solaris and Windows control points in Unix servers and high volume platforms," in December 1999, IBM decided to "act quickly, decisively and with common purpose" to execute a broad and "disruptive" Linux strategy. Exh. D at 1710189068. IBM reasoned (given that Linux was available free of charge) that "Linux's low cost compared with that of rival Windows leaves customers who opt for the cheaper OS with more money to spend on IBM's related products and services." <u>IBM:  Linux is the 'logical successor'</u>," C/Net News.com, http://news.com (Jan. 29, 2003) (Exh. E); <u>see also</u> Exh. B at 3 ("I.B.M. would love to drive the profit out of the operating system business of its rivals – just as Microsoft did to Netscape, the browser pioneer, by giving browser software away free.").

To execute this strategy, IBM made a series of multi-billion dollar investments intended to convert Linux from a hobbyist system controlled by "anti big business," "wild guys" and "geeks," IBM's Internal "Linux Community v. Linux Market" Memorandum (Exh. F), into an industrial-strength computing system capable of handling financial transactions and other complex tasks, <u>see</u> Exh. B at 4. To that end, IBM contributed substantial portions of the UNIX-based AIX and Dynix operating systems to Linux, and even announced it was "willing to open source any part of AIX that the Linux community considers valuable." Interview with Robert LeBlanc of IBM, Free OS.com, http://www.freeos.com/articles (Dec. 20, 2000) (Exh. G). In other words, IBM was willing to "abandon" its UNIX-based products in order to "move its 'enterprise strength' features into Linux," so that Linux would look like the "true" UNIX "in the

<div align="center">3</div>

mind of the customer." Notes of Internal IBM Meeting (Dec. 14-15, 1999), at 1910041459-60 (Exh. L); <u>see also</u> Exh. E (detailing IBM's long-term plan to replace UNIX/AIX with Linux).

SCO will show that, if IBM considered its obligations under its software agreements with SCO at all in deciding whether and what contributions to make to Linux, IBM simply placed a higher priority on defeating Sun and other competitors than on compliance with those contractual obligations, just as it had done on previous occasions. As one IBM official then put it, if it is necessary to breach a licensing agreement to prevent a customer from choosing Sun over IBM, "I'm inclined to <u>shoot first and answer questions later. It's easier to ask for forgiveness than to ask for permission</u>." Exhibit H (IBM email 10/11/95) at 2 (emphasis added).

### B.     Mr. Palmisano's Key Role in IBM's Linux Strategy, Before Becoming CEO

Mr. Palmisano originated IBM's Linux strategy in 1999: "At the end of October, fresh from a global tour, Sam Palmisano, a senior vice president, reported that the Internet companies he spoke with told him that the preferred language of the young programmers they were hiring was Linux." Exh. B, at 1. Shortly after Mr. Palmisano returned from that trip, an eleven-person team of researchers, led by Nick Bowen, was given seven weeks to make a "rigorous and exhaustive" report on how IBM should adapt to Linux. <u>Id.</u> at 2. The report concluded that IBM should "push Linux as the operating system of choice for the Internet – more robust and reliable than Windows NT and eventually overtaking Solaris, Sun's flavor of Unix, as the industry standard for Unix." <u>Id.</u> To this end, the report urged Palmisano to "establish a Linux 'division' with the following responsibilities:

* Provide IBM-wide Linux leadership (internal and external)
* Business Development
* Strategy

4

\* Brand Management
\* Standards, consortia, communities."

N. Bowen, <u>Creating a Linux Volume Application Development Platform for IBM Servers and Middleware</u> (12/20/99) at 181516909 (Exh. M).

Mr. Bowen presented his team's report to Mr. Palmisano on December 20, 1999 – six days after the meeting where, as shown in Exhibit L, the IBM team proposed abandoning UNIX/AIX and moving its "enterprise strength" features into Linux, so that Linux would become the "true UNIX' in the mind of the customer.  On December 22, 1999, Mr. Palmisano presented the report to IBM's then-chairman, Louis Gerstner, who approved both the plan and Mr. Palmisano's choice of Mr. Irving Wladawsky-Berger as IBM's "Linux czar."  Mr. Wladawsky-Berger became vice president of technology and strategy in the computer-server group, then headed by Mr. Palmisano.  Exh. B at 3.  Less than three weeks later, Mr. Palmisano personally proclaimed: "We intend to be a leader in our industry by ... making IBM technologies available to the Linux and open source communities."  M. Chang, <u>IBM Linux</u> (September 2004), http://www.mindwork.com.tw/0909/sildes/3_0909%20Novell%20Linux%20Day%20-%20For%20Download.pdf, at 10 (Exh. N) (quoting Palmisano speech of Jan. 10, 2000).

Indeed, IBM has publicly stated that Mr. Palmisano "led IBM's adoption of the Linux operating environment," <u>IBM Press Release</u>, http://www-1.ibm.com/press/PressServletForm.wss (Jan. 2003) (Exh. I), and (on the occasion of Mr. Palmisano's election as CEO, in January 2002) that he had "spearheaded a major initiative to embrace Linux."  http://www-1.ibm.com/press/PressServletForm.wss (Jan. 29, 2002) (Exh. J).  IBM has already invested billions of dollars into Linux, its 2004 sales revenue for Linux servers is expected to be nearly $2 billion, and its services and sales revenue is doubling annually and is expected to exceed server

5

revenue in two to five years.  See IBM's Linux revenue:  Services to overtake servers, CNET

News.com, http://news.zdnet.com/2100-3513_22-5297392.html (Aug. 4, 2004) (Exh. K); see

also SCO's Mem. in Opp. to IBM's Motion for Partial Summary Judgment on its Tenth

Counterclaim at 76-78.  As IBM itself describes Mr. Palmisano's role in IBM's Linux strategy:

"This is Sam's bet."  Exh. B at 2.

On December 2, 2004, SCO noticed Mr. Palmisano for a deposition to take place on

January 24, 2005.  Exh. A.  On December 17, 2004, counsel for IBM objected to producing Mr.

Palmisano "because we do not believe that he has any knowledge regarding any specific issues

that are relevant to this lawsuit or any knowledge that cannot be obtained by deposing other

individuals within IBM."  Exh. C.  Shortly thereafter, counsel met and conferred (by

teleconference), during which SCO's counsel referenced the publicly available information

concerning Mr. Palmisano's key role in formulating and promoting IBM's Linux strategy, but

the parties were unable to reach agreement on Mr. Palmisano's deposition.

## ARGUMENT

As an initial matter, under Federal Rule of Civil Procedure 30(a), SCO may depose "any

person, including a party."  An officer of a party noticed for deposition must appear unless he

moves for a protective order under Rule 26(c) and successfully bears the burden of proving that

justice requires that the deposition be quashed or limited due to "annoyance, embarrassment,

oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c); see, e.g., Speadmark, Inc. v.

Federated Dep't Stores, 176 F.R.D. 116, 118 (S.D.N.Y. 1997).  With respect to SCO's notice to

depose Mr. Palmisano, IBM has neither sought a protective order nor invoked (in discussions

with counsel for SCO) any of the Rule 26(c) factors.  In light of the impending discovery cut-off

date of February 11, 2005, however, SCO has brought the instant motion rather than waiting for IBM to move to quash at a later date.

It is "most extraordinary relief" to preclude the deposition of a party's executive. Speadmark, 176 F.R.D. at 118; see, e.g., Pepsi-Cola Bottling Co. of Pittsburgh v. Pepsico, Civ. A. Case No. 01-2009-KHV, 2002 WL 922082, at *1 (D. Kan. May 2, 2002) (Exh. O) (courts "disfavor barring a deposition" and, absent "extraordinary circumstances, courts rarely grant a protective order that totally prohibits a deposition"); see also Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979) (it "is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error").

Indeed, IBM bears the burden of demonstrating that Mr. Palmisano "has nothing to contribute." Speadmark, 176 F.R.D. at 118 (allowing deposition of CEO). In considering whether to preclude a deposition altogether, the Court gives "considerable deference" to "counsel's good faith judgment as to the needs of his case" because a court should not "be in a position of second-guessing counsel's judgment except when counsel goes beyond the pale, so to speak, and seeks discovery for which there is no factual basis or which is taken in bad faith or for tactical advantage or solely for the purpose of harassment or oppression." Travelers Rental Co. v. Ford Motor Co., 116 F.R.D. 140, 146-47 (D. Mass. 1987) (allowing depositions of Ford's president and other top executives).

SCO respectfully submits that, for several reasons, IBM has no basis for precluding SCO from deposing Mr. Palmisano.

First, the Court has in effect already determined that Mr. Palmisano is relevant to and "has something to say" about this litigation. In response to SCO's requests for the production of documents, IBM previously contended that Mr. Palmisano had no documents relevant to this

7

dispute. Judge Wells rejected that argument and ordered IBM to produce documents from Mr. Palmisano's files. See Order dated March 3, 2004, at 4-5. IBM was "to provide documents and materials generated by, and in possession of employees that have been and that are currently involved in the Linux project. IBM is to include materials and documents from executives including inter alia, Sam Palmisano and Irving Wladawsky-Berger. Such materials and documents are to include any reports, materials or documents from IBM's 'ambitious Linux Strategy'." After SCO raised the issue of the sufficiency of IBM's production in response to the March 3 Order, the Court directed IBM to provide affidavits from "the Board of Directors, Mr. Palmisano, and Mr. Wladawsky-Berger regarding production of all non-privileged documents pertaining to IBM's Linux strategy." Order dated Oct. 20, 2001, at 1. In specifically identifying Mr. Palmisano's files as discoverable by SCO, the Court has thus already recognized the relevance of the discovery that SCO seeks through Mr. Palmisano's deposition.[1]

Second, independent of the Court's March 3 and October 20 Orders, and as the foregoing background demonstrates, Mr. Palmisano has unique and relevant testimony to give regarding a crucial aspect of this litigation – namely, IBM's "Linux strategy." It is well-settled that a company's CEO and other high-level executives are appropriately subject to deposition where their knowledge is even arguably relevant to the case – and that is true even if they claim by affidavit (or otherwise) to lack knowledge of specific facts pertaining to the case. See, e.g., Pepsi-Cola, 2002 WL 922082, at *1-3 (Exh. O) (allowing depositions of Pepsico's president and vice-chairman, despite their declarations that they had "no personal knowledge of the facts or issues" of the case); Simpson v. Home Depot, Inc., Civ. A. No. 00-2285-JAR, 2002 WL 485661,

---

[1] On December 22, 2004, SCO filed a renewed motion to compel, seeking the Court's assistance in securing IBM's full compliance with the Court's prior orders.

at *1-2 (D. Kan. Mar. 7, 2002) (Exh. P) (allowing deposition of high-level Home Depot executive who claimed to have "no knowledge specifically related to Plaintiff's accident"); In re Bridgestone/Firestone, Inc., Tires Prods. Liability Litig., 205 F.R.D. 535, 536-37 (S.D. Ind. 2002) (Ford's chairman of the board could be deposed because "conduct and knowledge at Ford's highest corporate levels may well be relevant"); Six West Retail Acquisition v. Sony Theatre Mgmt. Corp., 203 F.R.D. 98, 105-07 (S.D.N.Y. 2001) (allowing depositions of SonyUSA's president and other executives because Sony's corporate policies were at issue); Rolscreen Co. v. Pella Prods. of St. Louis, 145 F.R.D. 92, 97-98 (S.D. Iowa 1992) (plaintiff entitled to depose defendant's president to "test" his professed lack of knowledge).

In Tulip Computers International, B.V. v. Dell Computer Corp., 210 F.R.D. 100, 102 (D. Del. 2002), for example, the plaintiff claimed that Dell Computer ("Dell") had infringed its patents. The court permitted the plaintiff to depose Dell's CEO, Michel Dell, regarding (among other things) Dell's "method and strategy of developing the technology that is in issue in this case." SCO proposes to explore such issues with Mr. Palmisano. Given his role in spearheading and fostering IBM's Linux strategy, Mr. Palmisano has first-hand knowledge of and unique testimony to give regarding issues such as IBM's consideration of its software licensing agreements, and the scope of activities, in the development of the technology used in furtherance of the Linux strategy.[2]

Third, SCO's request to take Mr. Palmisano's deposition is made in good faith (and, at least to date, IBM has not suggested otherwise). The deference courts give to counsel's

---

[2] In the unlikely event that Mr. Palmisano does testify to a lack of knowledge on such issues, that would itself be relevant: the claimed ignorance of "high executives may, in and of itself, be relevant evidence," because "a corporation, when engaging in potentially illegal activities, would act in such a way as to make it seem that top executives had no knowledge." Ford Motor, 116 F.R.D. at 144.

evaluation of testimony relevant to its claims (and, here, defenses) applies with particular force *in the circumstances of this case, where the Court's Case Management Order limits the number* of depositions each side is entitled to take. Counsel for both sides have special incentives not to "waste" depositions for any tactical advantage.

In that vein, the deposition would not unduly burden Mr. Palmisano or IBM (and again, at least to date, IBM has not suggested otherwise). SCO proposes to depose Mr. Palmisano in Armonk, New York, where he has his office. Cf. Gazaway v. Makita U.S.A., No. Civ. A. 97-2287-JWL, 1998 WL 219771, at *2-3 (D. Kan. Apr. 16, 1998) (Exh. Q) (executive residing in Japan would not be obliged to attend deposition in Kansas City, but he could be deposed if he returned to the United States). Further, under the Case Management Order, the deposition is limited to seven hours. Indeed, SCO has noticed the depositions of other IBM executives and employees with their own unique testimony regarding their participation in devising and executing IBM's Linux strategy; there can be no serious claim that SCO's notice of deposition for Mr. Palmisano is improperly intended for harassment purposes.[3]

Finally, IBM has noticed, and SCO has not objected to producing, SCO's CEO and other top executives for depositions in this case. IBM should be required to produce Mr. Palmisano

---

[3] Thus, IBM cannot rely on Thomas v. International Business Machines, 48 F.3d 478, 483-84(10th Cir. 1995), an age discrimination case where the plaintiff made an eleventh-hour attempt, without adequate notice, to depose IBM's board chairman at a location far from his office, even though plaintiff had made no attempt to depose his direct supervisors, the ones who had evaluated and ranked him. This case is clearly distinguishable in view of the plaintiff's obvious lack of good faith and intent to harass. Thomas and virtually every other case quashing an executive deposition involved "an individual personal injury, employment, or contract dispute with which the 'apex' official had no personal involvement." Bridgestone/Firestone, supra at 536 (distinguishing Thomas). Where general corporate policy, strategy or knowledge is relevant to the case, plaintiff's counsel have the right to pursue any good faith deposition strategy they deem appropriate. Pepsi-Cola, supra (executives could be deposed on strategies and decisions in the execution of Pepsico's consolidation plan); Home Depot, supra (executive who lacked knowledge of plaintiff's injury could be deposed about his possible knowledge of risks stemming from Home Depot's warehouse-style operations); Sony, supra (corporate policy at issue); Dell Computer, supra (corporate methods and strategies at issue).

for deposition – particularly where, as here, his extensive Linux-related activities preceding his promotion to CEO are directly relevant to issues at the heart of this case.

## CERTIFICATION OF COMPLIANCE WITH MEET AND CONFER OBLIGATIONS

On December 2, 2004, SCO noticed Mr. Palmisano for a deposition to take place on January 24, 2005. Exh. A. On December 17, 2004, counsel for IBM objected to producing Mr. Palmisano "because we do not believe that he has any knowledge regarding any specific issues that are relevant to this lawsuit or any knowledge that cannot be obtained by deposing other individuals within IBM." Exh. C. Shortly thereafter, counsel met and conferred (by teleconference), during which SCO's counsel referenced the publicly available information concerning Mr. Palmisano's key role in formulating and promoting IBM's Linux strategy, but the parties were unable to reach agreement on Mr. Palmisano's deposition.

## CONCLUSION

For the reasons set forth above, SCO respectfully requests that the Court compel IBM to produce Samuel Palmisano for deposition.

11

DATED this ___th day of January, 2005.

Respectfully submitted,

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stephen N. Zack
Edward Normand
Sean Eskovitz

By_____

*Counsel for The SCO Group, Inc.*

12

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing Memorandum in Support of SCO's Motion to Compel IBM to Produce Samuel J. Palmisano for Deposition was served by mail on Defendant International Business Machines Corporation on the 12th day of January, 2005, by U.S. Mail to:

> David Marriott, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, New York 10019
>
> Donald J. Rosenberg, Esq.
> 1133 Westchester Avenue
> White Plains, New York 10604
>
> Todd Shaughnessy, Esq.
> Snell & Wilmer LLP
> 1200 Gateway Tower West
> 15 West South Temple
> Salt Lake City, Utah 84101-1004

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant. | **PLAINTIFF/COUNTERCLAIM-DEFENDANT SCO'S NOTICE OF VIDEOTAPED DEPOSITIONS** <br><br> Case No. 2:03CV0294DAK <br><br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

PLEASE TAKE NOTICE that pursuant to Rules 26, 30, and 45 of the Federal Rules of

Civil Procedure, counsel for Plaintiff/Counterclaim-Defendant, The SCO Group, Inc., ("SCO")

will take the following depositions upon oral examination at the dates and times specified:

| WITNESS | DATE AND TIME | LOCATION |
|---|---|---|
| Michael J. DeFazio | December 17, 2004 at 9:00 a.m. | Boies, Schiller & Flexner LLP<br>570 Lexington Avenue<br>16th Floor<br>New York, New York 10022<br>212-446-2300 |
| Thomas L. Cronan III | December 20, 2004 at 9:00 a.m. | Boies, Schiller & Flexner LLP<br>333 Main Street<br>Armonk, New York 10504<br>914-749-8200 |
| Jeffrey W. Mobley | December 22, 2004 at 9:00 a.m. | Boies, Schiller & Flexner LLP<br>333 Main Street<br>Armonk, New York 10504<br>914-749-8200 |
| Richard A. McDonough III | December 23, 2004 at 9:00 a.m. | Boies, Schiller & Flexner LLP<br>333 Main Street<br>Armonk, New York 10504<br>914-749-8200 |
| Roger G. Swanson | December 28, 2004 at 9:00 a.m. | Location in Portland, Oregon to be determined |
| Irving Wladawsky-Berger | December 29, 2004 at 9:00 a.m. | Boies, Schiller & Flexner LLP<br>333 Main Street<br>Armonk, New York 10504<br>914-749-8200 |
| Ira Kistenberg | January 3, 2005 at 9:00 a.m. | Boies, Schiller & Flexner LLP<br>Bank of America Tower<br>100 Southeast 2nd Street<br>Suite 2800<br>Miami, FL 33131<br>(305) 539-8400 |
| Stephen D. Vuksanovich | January 7, 2005 at 9:00 a.m. | Location in Greenville, NC to be determined |
| Samuel J. Palmisano | January 24, 2005 at 9:00 a.m. | Boies, Schiller & Flexner LLP<br>333 Main Street<br>Armonk, New York 10504<br>914-749-8200 |

The depositions will be taken pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, will be recorded by stenographic and videotape means, and will continue from day to day until completed.

DATED this 2nd day of December, 2004.

*Sean Eskovitz*

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*

3



3/20/00 NYT C1

3/20/00 N.Y. Times C1
2000 WLNR 3248450



New York Times (NY)

Copyright (c) 2000 The New York Times. All rights reserved.

March 20, 2000

Section: C

A Mainstream Giant Goes Countercultural; I.B.M.'s Embrace of Linux Is a Bet That It Is the Software of the Future

STEVE LOHR

International Business Machines Corp embraces Linux, symbol of software's counterculture, as operating system of future for Internet; begins costly program to make all its hardware and software work seamlessly with Linux, which is available for free on Internet; shift is example of IBM's new ability, under Louis V Gerstner Jr's leadership, to move swiftly and decisively; timeline of IBM operating systems; graph of operating system shipments; photos (M)

A huge company with deep pockets, I.B.M. can afford to dabble in promising technologies. And that is what the International Business Machines Corporation seemed to be doing throughout much of last year with Linux, an increasingly popular version of the Unix operating system that is available free on the Internet.

I.B.M. dispatched emissaries to speak with members of the Linux community, a worldwide network of programmers who develop and debug the code. I.B.M. met with academics, consultants, economists and venture capitalists to plumb the Linux phenomenon. It made small investments in a couple of Linux start-ups, and offered Linux on one line of its computers.

But last fall, Big Blue suddenly got serious about Linux.

At the end of October, fresh from a global tour, Sam Palmisano, a senior vice president, reported that the Internet companies he spoke with told him that the preferred language of the young programmers they were hiring was Linux.

At about the same time, Irving Wladawsky-Berger, an I.B.M. executive with longstanding ties to the nation's supercomputing centers, was hearing that Linux was generating a lot of excitement in these leading-edge research institutions. And he had been sending e-mail to the company's other top technology executives about the rise of Linux.

"In the technical community and in the marketplace," Mr. Wladawsky-Berger recently recalled, "the signs were clear that something profound was going on."

Less than two months later, a few days before Christmas, I.B.M. had fashioned -- and Louis V. Gerstner Jr., the chairman, had approved -- an ambitious Linux strategy. The company that personifies mainstream corporate computing had itself done something profound: embrace Linux, a symbol of software's counterculture, as the operating system of the future for the Internet.

I.B.M., it was decreed, would embark on a costly program to make all its hardware and software work seamlessly with Linux. So quickly did the company mobilize that even now, hundreds of engineers across the company are already engaged in the Linux campaign, and I.B.M. says its army of Linux engineers will number in the thousands within a few years.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

To be sure, other major companies in the industry, including Hewlett-Packard, Dell Computer and Oracle, also have Linux efforts. "But I.B.M. has tightly focused on Linux more than any other big company," observed Dan Kusnetzky, director of operating systems research at the International Data Corporation.

I.B.M.'s Linux strategy represents more than a bold, and risky, step in the field of software. The move is a textbook example of I.B.M.'s management style under Mr. Gerstner, who has worked to overhaul the company and its culture since he arrived in 1993.

In the pre-Gerstner days, decision making at I.B.M. was once described as "swimming through peanut butter." But these days, after a brief period of intense scrutiny -- during which the company's technical experts play a key role -- choices are made decisively and with remarkable swiftness, given that I.B.M. is a sprawling, $80-billion-a-year corporation.

In this most recent example, Mr. Palmisano, 48, who is regarded as a leading candidate to someday succeed Mr. Gerstner, is the senior executive who pushed most emphatically for the Linux initiative -- and has the most riding on its outcome. "This is Sam's bet," Mr. Wladawsky-Berger said.

The first step toward I.B.M.'s Linux strategy came in a Saturday morning telephone call on Oct. 30 that Nick Bowen received at his home in Newtown, Conn. The caller was his boss, Paul Horn, the head of the I.B.M. Watson labs. He told Mr. Bowen, a 39-year-old senior researcher, that he would lead an 11-person team to make recommendations on how I.B.M. -- the entire company -- should adapt to Linux. The investigation must be rigorous and exhaustive, Mr. Horn told him -- and finished in seven weeks.

The Bowen report, submitted to top management on Dec. 20, presented a plan for using Linux to undermine the software advantage enjoyed by I.B.M.'s two key rivals, Microsoft and Sun Microsystems. Microsoft's Windows NT and Sun's Solaris are the leading operating systems used today on server computers, the data-serving machines that are the engines of corporate networks and the Internet.

To combat Sun and Microsoft, the report recommended, I.B.M. should retool all its server operating systems, from the mainframe OS/390 to AIX, I.B.M.'s version of Unix, to run Linux smoothly. The same should be true of all I.B.M.'s database, Web applications and messaging software, the report said. And I.B.M., the Bowen team concluded, should push Linux as the operating system of choice for the Internet -- more robust and reliable than Windows NT and eventually overtaking Solaris, Sun's flavor of Unix, as the industry standard for Unix.

The goal would be to win the hearts and minds of perhaps the most influential audience in computing -- the software developers who write the applications that bring the Web to life and make Internet commerce actually work.

"Today, Microsoft and Sun dominate the application development seats," the report stated. "We recommend that I.B.M. aggressively pursue a Linux-based application development platform. Doing so would disrupt the Sun-Microsoft stranglehold."

The Linux strategy would "provide our server business with a single, homogeneous server platform," from desktops to mainframes, giving I.B.M. a "level playing field" in software and allowing it to compete with Sun and Microsoft for "mindshare in key software growth segments and in universities."

The report, known as a "corporate assessment" inside I.B.M, ran just over 10 pages. In the pre-Gerstner days, such reports to top management could be 100 pages in length. But today's I.B.M. executives are familiar with the Gerstner edict: If you cannot say it in 10 pages, you are not focused on the right thing.

It was only at the beginning of last October that Mr. Palmisano took over I.B.M.'s server business. And he started at once to scout for "major initiatives" to help

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

revive the growth of I.B.M.'s big server computers -- mainframes, minicomputers and AIX Unix machines. He closely followed the activities of the Bowen assessment team, he read early drafts of the group's report and he liked the finished document: a coherent, top-to-bottom software strategy for I.B.M.

Moving quickly, he said, was imperative. "The Internet has taught us all the importance of moving early, the advantage of being a first-mover," Mr. Palmisano said in an interview. "We want to be riding that Linux momentum at the front, not trailing it and defending the past. I.B.M. understands, believe me, what it means to be defending the past."

When Mr. Bowen met on Dec. 20 with Mr. Palmisano and Nick Donofrio, senior vice president for technology, at I.B.M.'s headquarters in Armonk, N.Y., he noted a nontechnical recommendation in the report: put one person in charge of the Linux effort companywide. "I'm already working on that," Mr. Bowen recalls Mr. Palmisano saying.

And when Mr. Palmisano met with Mr. Gerstner two days later, the chairman not only approved the plan but also agreed with his choice of who should be the company's Linux czar: Mr. Wladawsky-Berger. At the time, Mr. Wladawsky-Berger was general manager of the Internet division, responsible for making sure Internet technology and an Internet mindset was spread broadly throughout the company.

That job, Mr. Gerstner and Mr. Palmisano agreed, was done; I.B.M. "got" the Internet. Now, it was time for Mr. Wladawsky-Berger to move onto the next, hearts-and-minds challenge. So the staff of the Internet unit went elsewhere in the company, the division was folded and Mr. Wladawsky-Berger assumed the title vice president of technology and strategy in the computer-server group, headed by Mr. Palmisano.

They are a contrasting pair. Tall and physically imposing, Mr. Palmisano is regarded as a brilliant executive and hard-charging salesman. Previously, he ran the company's fast-growing global services group, where he had a special talent for bringing in big computer services deals, which can span several years and total billions of dollars. Mr. Palmisano's nickname at I.B.M. is "the closer."

Mr. Wladawsky-Berger is six years older and about a head shorter than his boss. Raised in Cuba, he fled with his parents, Eastern European immigrants who owned a store in Havana, when Castro came to power in 1959. He holds a Ph.D. in physics from the University of Chicago, speaks with a lilting Spanish accent and could easily be mistaken for a college professor.

After his postgraduate studies, Mr. Wladawsky-Berger joined I.B.M.'s Watson labs in 1970 as a researcher, but he had a taste for business side of the company as well. He led the drive to transform I.B.M.'s traditional mainframes by retooling them with low-cost microprocessors, the chips best known as the engines of personal computers.

"The Linux issue," Mr. Wladawsky-Berger explained, "is whether this is a fundamentally disruptive technology, like the microprocessor and the Internet. We're betting that it is."

I.B.M.'s Linux effort is a long-term strategy, not one likely to affect its quarterly earnings any time soon. And the strategy appeals to I.B.M., in part, because it has lost its operating system battles with Microsoft and Sun. Its effort in personal computer software, OS/2, was quickly crushed by Microsoft's market-dominating Windows. And I.B.M.'s AIX version of Unix has become an also-ran behind Sun's more popular Solaris.

So I.B.M. would love to drive the profit out of the operating systems business of its rivals -- just as Microsoft did to Netscape, the browser pioneer, by giving browsing software away free. "The operating systems wars of today are the equivalent of the browser wars of a few years ago," said Scott Hebner, an I.B.M. software executive. "The operating system is not where the value is."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Yet I.B.M.'s strategy can succeed only if Linux, which is distributed free, does become a genuine alternative to Windows or Solaris, thereby putting real pressure on their prices. And Linux has a long way to go. Today, it is used mainly for simpler tasks, like serving up Web pages, instead of for industrial-strength computing chores like financial transaction systems that must handle complex tasks, 24 hours a day, without crashing. Even I.B.M., which plans eventually to use Linux as its unifying Unix platform (shelving AIX), says Linux's true ascendance may not come for five years or so -- until Linux is built up to become more powerful and reliable.

Throughout the software field, the excitement surrounding Linux has less to do with the technology itself than with the fact that it is the leading example of so-called open-source software -- software that is distributed free, with its underlying source code openly published, and is developed, debugged and improved by an international community of programmers.

"It's the Web phenomenon coming to software development that is intriguing," said Larry Smarr, director of the National Center for Supercomputing Applications in Urbana-Champaign, Ill. "We now have the potential for collaborative, decentralized software authorship on large complex systems."

Still, it is unclear whether the open-source approach can solve the kind of complex software problems that have consumed countless programming hours and billions of dollars at Sun and Microsoft. And for I.B.M., there is a question of whether the Linux community, which works mostly on personal computers, will have much to contribute to the company's Linux efforts on mainframes and minicomputers.

"Linux on non-PC platforms is a nonstarter," said Greg Papadopoulos, chief technology officer for Sun Microsystems. "The ecosystem of open source is not going to be working for I.B.M. on other platforms."

But Mr. Wladawsky-Berger says he will side with the recommendations of I.B.M.'s best technical minds. "Not only did they say, 'Irving, this is doable,' " he observed. "They said, 'Irving, do it.' "

Certainly, veterans of the open-source counterculture seemed to have welcomed Big Blue into the fold. "It should accelerate the pace of adoption of Linux," said Eric Raymond, an evangelist of the open-source movement.

"Sure, there's some irony here, since I.B.M. used to be the enemy," Mr. Raymond said. "But everybody in the community is happy about I.B.M. wanting to play with us."

Photo: Sam Palmisano, left, and Irving Wladawsky-Berger lead I.B.M.'s Linux push. (Joyce Dopkeen/The New York Times)(pg. C1)

Chart: "A Software Evolution"
I.B.M.'s software model has evolved from all homegrown to open-source Linux, a free operating system developed by a worldwide community of programmers. I.B.M. is retooling all its software to run seamlessly with Linux, which is based on source code written by Linus Torvalds, a Finnish programmer, in 1991.

MILESTONES IN OPERATING SYSTEM SOFTWARE AT I.B.M.

1960
I.B.M.'s pioneering 360 mainframe fed information to so-called dumb terminals. Today's mainframes can be the engines behind corporate e-commerce networks.

1970
I.B.M.'s minicomputers, the company's first departure from mainframes, were intended for use by small businesses.

1980
DOS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The I.B.M. PC, running DOS, established the industry standard. Microsoft became the dominant supplier of DOS-based operating system software.

1990
AIX
I.B.M. introduced work stations running AIX, the company's version of the Unix operating system, which was created in 1969 at AT&T.

2000
*LINUX -- NETFINITY 7000 SERVER*
I.B.M. plans to have Linux work smoothly on all its server computers, from PC's to mainframes. Such machines are the data-serving hubs that power modern computer networks.
(Source: I.B.M.)(pg. C1)

Chart: "Betting on Linux"
Linux, the popular version of the Unix operating system that is available free on the Internet, is gaining ground.

Share of server-client (nonmainframe) network operating software shipments
New unit shipments 1998
Total: 4.4 million

1999
Total: 5.4 million

WINDOWS NT
New unit shipments 1998: 38%
1999: 38%
Growth of total unit shipments '98 to '99: +23.6%

LINUX
*New unit shipments 1998: 16%*
1999: 25%
Growth of total unit shipments '98 to '99: +93.2%

*NETWARE*
New unit shipments 1998: 23%
1999: 19%
Growth of total unit shipments '98 to '99: +5.9%

UNIX
New unit shipments 1998: 19%
1999: 15%
Growth of total unit shipments '98 to '99: +1.4%

OTHER
New unit shipments 1998: 4%
1999: 3%
Growth of total unit shipments '98 to '99: -25.5%
(Source: International Data Corporationments)(pg. C11)

---- INDEX REFERENCES ----

COMPANY: DELL INC; SUN MICROSYSTEMS INC; INTERNATIONAL BUSINESS MACHINES CORP

NEWS SUBJECT:  (Business Management (1BU42); Forecasts (1FO11); Major Corporations (1MA93); Corporate Globalization (1XO29))

*INDUSTRY:  (High-Performance Operating Systems (1HI98); I.T. Consulting & Services (1IT92); Software (1SO30); Enterprise Business Operations Software (1EN75); Application Software (1AP32); Open Source (1OP97); Trends in Technology (1TR23); Application Software Development (1AP78); Software Products (1SO56); I.T. (1IT96); High-Performance Computing (1HI51); Advanced Digital Technologies (1AD50); Computer*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Equipment Advanced Technology (1C081); Science & Engineering (1SC33); Sales &
Marketing Software (1SA22); Software O/S Platforms (1SO68); Supercomputers (1SU31);
PC (1PC82))

REGION:   (North America (1NO39); Latin America (1LA15); Cuba (1CU43); Americas
(1AM92); USA (1US73); Illinois (1IL01); Caribbean (1CA06))

Language:   EN

OTHER INDEXING:   (AIX; BIG BLUE; DELL COMPUTER; DOS; IBM; INTERNATIONAL BUSINESS
MACHINES CORP; INTERNET; MAINSTREAM GIANT GOES COUNTERCULTURAL; MICROSOFT; NATIONAL
CENTER FOR SUPERCOMPUTING APPLICATIONS; NETSCAPE; ORACLE; SOFTWARE EVOLUTION; SUN;
SUN MICROSOFT; SUN MICROSYSTEMS; UNIVERSITY OF CHICAGO; WINDOWS) (B.M. Watson;
Berger; Bowen; Dan Kusnetzky; Eric Raymond; Gerstner; Gerstner Jr; Greg
Papadopoulos; Horn; I.B.M; I.B.M.; I.B.M. PC; Irving; Irving Wladawsky; Irving
Wladawsky-Berger; Joyce Dopkeen; Larry Smarr; Linus Torvalds; Linux; Louis V.
Gerstner Jr.; Nick Donofrio; Palmisano; Paul Horn; PC; Previously; Raymond; Sam; Sam
Palmisano; Scott Hebner; Solaris; Tall; Today; Web; Wladawsky) (Computers and the
Internet; Computer Software; Computers and the Internet)

EDITION: Late Edition - Final

Word Count: 2992
3/20/00 NYT C1




END OF DOCUMENT

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Snell & Wilmer
### L.L.P.
#### LAW OFFICES

15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
(801) 257-1900
Fax (801) 257-1800
www.swlaw.com

December 17, 2004

SALT LAKE CITY, UTAH

PHOENIX, ARIZONA

TUCSON, ARIZONA

IRVINE, CALIFORNIA

DENVER, COLORADO

LAS VEGAS, NEVADA

Todd M. Shaughnessy (801) 257-1937
tshaughnessy@swlaw.com

*VIA FACSIMILE AND REGULAR MAIL*

Edward Normand
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

    Re:    *The SCO Group v. International Business Machines Corporation*
          Civil No. 2:03cv0294

Dear Ted:

To follow-up and confirm our telephone conversation yesterday afternoon concerning SCO's notice of deposition dated December 2, 2004:

Mr. Wladawsky-Berger is available to be deposed at the offices of Cravath, Swaine & Moore on January 18, 2005.

Mr. Swanson is available to be deposed in Portland, Oregon on January 21, 2005.

We are attempting to get a date on which Mr. Mobley will be available. We anticipate that his deposition will be conducted in Williamsburg, Virginia.

Mr. McDonough is available to be deposed in Savannah, Georgia on February 10, 2005.

Please let me know as soon as possible if these dates are acceptable to SCO so that I may confirm the dates with the witnesses.

In addition, we object to producing Mr. Palmisano because we do not believe that he has any knowledge regarding any specific issues that are relevant to this lawsuit or any knowledge that cannot be obtained by deposing other individuals within IBM. If there are specific topics

12/17/2004 12:19 FAX 8012571800          SNELL & WILMER                          ☑003



Snell & Wilmer
—— L.L.P. ——

Edward Normand
December 17, 2004
Page 2

that you believe Mr. Palmisano is uniquely able to address, please let us know and we will
reconsider your request to depose him.

           Very truly yours,

           SNELL & WILMER

           Todd M. Shaughnessy

TMS:dw
cc:    Brent O. Hatch (via facsimile)
       Christopher Kao

PAGE 3/3 * RCVD AT 12/17/2004 2:17:43 PM [Eastern Standard Time] * SVR:RIGHTFAX/0 * DNIS:8300 * CSID:8012571800 * DURATION (mm-ss):01-10



## Executive Summary

*At the end of 1999, we updated our Linux strategy for IBM. That strategy called for targeted investments aimed at leadership in areas where Linux was already making inroads in the marketplace with "early adopters."  had established acceptance. The key recommendations in principles of this strategy were:*

- Speak with one voice to the market.
- Strengthen business unit support for the IBM Linux strategy.
- Invest for leadership in the key market segments where Linux is already being  embraced by "early adopter" customers, established Linux customer use scenarios (e.g., web infrastructure, file/print, and mail on Netfinity servers, supercomputing, etc).
- Invest for leadership in providing with 24x7 service and support.
- Get ready for the next set of market segments  where Linux usage is emerging, e.g., Complete Linux support in IBM's core businesses for those customer scenarios where Linux is beginning to emerge (such as collaboration, e-business, etc.).
- Continue to position Linux in the context of a broader Develop an integrated IBM UNIX strategy comprising Linux and AIX.
- Start investments in new areas where Linux will likely be used in the future, e.g., Begin a new round of "get started" investments: Thinkpad, Intellistation, S/390, AIX,  etc.

In 2000, we made steady progress on executing our strategy.  We:

- Consolidated our corporate Linux mission, presenting one voice to the market.
- Strengthened eServer support for Linux as a part of our MACH1 initiatives.
- Enabled our key middleware on Linux.
- Added Linux support for all PSG servers.
- Developed initial IGS offerings for education, consulting and remotely delivered support.
- Crafted an integrated AIX/Linux strategy.
- Increased our Linux investments across development, sales and marketing.
- Developed creative partnerships with Linux distributors to increase middleware sales.
- Established an Open Source Development Lab in conjunction with industry partners.
- Established worldwide customer references.

Although we've made good progress, we need to improve our execution on several fronts:

- Linux Marketing:  A recent Ogilvy & Mather study found IBM's Linux message integration spotty and uncoordinated.  We must increase the consistency and clarity of our Linux messages, and elevate them to an IBM level.
- xSeries: IBM lags Compaq, Dell and VA-Linux for Linux server shipments.  We must market our existing offerings more aggressively, and develop an aggressive appliance plan.
- Services: A recent Gartner study cites lack of services as the top inhibitor for Linux adoption.  A more aggressive services and support focus will accelerate mainstream Linux adoption and

Last Revised:

CONFIDENTIAL                                              1710189067

differentiate IBM. [1]

* Applications: Although lack of applications has been cited as a major inhibitor for Linux adoption[1], Evans research projects a rapid embrace of Linux by ISVs.[2] IBM must increase our efforts to recruit ISVs to establish our platforms as the Linux reference platforms.

Linux is now entering the second phase of adoption. The first phase was characterized by technology-centric, early adopters. The second phase is characterized by business-centric, mainstream adopters. These users leverage proven technology to solve business problems. They are more demanding, and look for complete solutions backed with 24x7 service and support.

Many large enterprises are already conducting Linux pilots is being piloted aggressively in large enterprises (45% based on Gartner)[1]. Given our strong relationships with have strong value-nets in large enterprises, we have an opportunity to become the preferred IT partner as they put Linux into production. Linux is already being deployed in small and medium enterprises (34% based on Gartner)[1] and with service providersegments[3]. These are high growth segments, currently dominated by Microsoft and Sun respectively. We have the opportunity to leverage Linux to change the game and capture new sources of revenue.

A major goal of our Linux strategy is to neutralize the Solaris and Windows control points in Unix servers and high volume platforms repectively, so that IBM can better execute its e-business strategy, and increase our share of hardware, software and services in the marketplace.

In summary, IBM's the main objectives of our Linux strategy are:

* Accelerate Linux adoption by mainstream users.
* Change the game in high growth segments where we have a weak competitive position.

The key actions to execute our strategy are:

* Lower the major barriers to Linux adoption in the mainstream.
* Deliver complete solutions, optimized for selected segments.
* Establish regional sales teams with a dedicated Linux sales mission.
* Execute Linux-based disruptive strategies in Service Provider and Small/Medium business segments.
* Develop barriers to entry through a strong Linux based value-net.
* Integrate Linux messages into brand and corporate marketing campaigns.
* Invest in technologies that will enable IBM to differentiate our offerings.

We must act quickly, decisively and with common purpose, investing ahead of the revenue opportunity, if we are to capitalize on this disruptive opportunity. Sun and Microsoft continue to grow at an impressive rate. AIX continues to lag Solaris and NT in popularity, a situation unlikely to change with their broader application portfolio and skills pool. A recent report by Merrill Lynch stated "IBM's bet on and evangelism of Linux is key, in our opinion.... If Linux does not take off in the enterprise, Sun could walk away with a big piece of the server market."[3]

CONFIDENTIAL                                      1710189068

Linux Strategy Update

## Outline

| | |
|---|---|
| 1.0 Executive Summary................... | 1 page |
| 2.0 Strategy Overview & Objectives.... | 1.5 pages |
| 3.0 Execution Update....................... | 9 pages |
|     3.1 Sales Update... 3.5 pages | |
|     3.2 Marketing Update.. 1 page | |
|     3.3 Technology Evolution 1.5 pages | |
|     3.4 ISV Update... 1 page | |
|     3.5 LDP Update ... 1.5 pages | |
|     3.6 AD Update...0.5 pages | |
| 4.0 Market Update........................... | 1 pages |
|     4.1 Customer adoption.. 0.5 page | |
|     4.2 Competition Update.. 0.5 page | |
| 5.0 Strategic Issues........................... | 3.5 pages |
| 6.0 Conclusion................................. | 1 page |
| TOTAL........................................... | 17 pages |

## Executive Summary

CONFIDENTIAL

1710189069

### Linux Strategy Update

In early 1999, we launched the initial Linux strategy for IBM. The strategy recommended that we should participate in the emerging market, and position ourselves as the leader should the market become significant. In 2000, we increased our investments in Linux to strengthen our capabilities. We established:

- An organization to coordinate IBM's overall Linux strategy and execution
- The Linux Technology Center to accelerate the technology maturation.
- A dedicated Linux sales and marketing team to increase our go to market capabilities.

In December 2000, we developed a strategy to accelerate Linux adoption in mainstream markets. Our primary objective was to slow Sun's strong growth. Our strategy has 3 key elements:

1. Establish beachheads in markets where Sun has a stronger competitive position.
2. Evolve Linux from an Internet OS to an enterprise OS.
3. Replace Solaris as the primary Unix development platform, especially for new applications.

We were successful in establishing beachheads in 1H01. Our sales performance was above target (1xx% of plan) largely due to workload consolidation on zSeries. We established mind share leadership through focused marketing campaigns. But, Ddespite our early success, we face several obstacles:

4. Linux revenue mix is dominated by hardware. We need to increase software and services content to improve the overall PTI.
5. Workload consolidation has been for infrastructure workloads only. Success requires migration of business application workloads.
6. Linux cluster success has been limited to the High Performance Computing market.
7. We are not leveraging Linux to change the game in the Intel server space.
8. Microsoft has mounted a major attack to undermine Linux and spread "FUD." Linux community has been unable to respond effectively to Microsoft's attacks.
9. The Open Source communities have been slow to adopt enterprise features.
10. ISVs are slow to embrace Linux, posing the most significant threat to our strategy.
11. Our strategy is exposed by the rapidly changing Linux distributor landscape.

We need to take the following actions to neutralize the emerging threats to our strategy:

12. Significantly accelerate investment in ISV recruitment efforts, especially on zSeries.
13. Strengthen our Linux distributor strategy.
14. Increase advertising to respond to significant increase in competitive actions from Microsoft, Sun and Linux vendors (i.e. Compaq, HP, Dell) in order to maintain mind share leadership.
15. Significantly increase the sales and marketing investment on Intel servers (xSeries, clusters, appliances)
16. Leverage the established beachheads to disrupt Sun and to capture new opportunities.

2

CONFIDENTIAL                                        1710189070

**Linux Strategy Update**

16. Announce full Linux support in the Eclipse AD project in November 2001.

3

CONFIDENTIAL

1710189071

Linux Strategy Update

## Strategy Overview & Objectives

Our primary objective for embracing Linux iswas to ~~slow Sun's strong growth~~ and ~~establish technology leadership~~. Solaris has beenwas rapidly becoming the de facto UNIX, and posesd a significant threat to IBM servers. This also disadvantagesd IBM middleware, as Oracle and BEA arewere much stronger players in the Solaris value net. Linux iswas a strong play against Solaris because:

- It iswas popular in **markets** where Sun holdsheld a stronger competitive position like Service Provider, Telecommunications, Financial Services, dot.coms. (50%+ of Suns revenue comes from these segments[1]).

- It handlesd the infrastructure **workloads** very well, especially those related to the internet like web serving, firewalls, e-mail, etc. These workloads have beenwere driving Sun's growth.

Our Linux strategy has 3 key elements:

17. Establish beachheads in markets where Sun has a stronger competitive position. Target workloads where Linux excels today, evolving to new workloads as Linux matures. For 2001, we are focusing ondesigned the following four4 plays:

    a. **Workload Consolidation**: Consolidation of distributed Unix and Windows workloads, like web-serving, from competitor's systems onto IBM platforms (e.g. zSeries, iSeries). *Customer value:* reduced cost, efficient resource utilization, simplified management.

    b. **Linux Clusters**: Scalable configurations of rack-mounted server and storage hardware and cluster management infrastructure, optionally augmented with pre-integrated, pre-tested IBM middleware and with IBM services to create segment-specific offerings. *Customer value:* highly scalable, low-initial cost, easy to deploy/manage solutions

    c. **Distributed Enterprise**: Turnkey Linux offerings for enterprises that have distributed offices. *Customer value:* Low-cost, centrally managed, robust servers that are easy to replicate.

    d. **Server Appliances**: xSeries-based turn-key servers for edge-of-network Internet workloads, File and Print workloads, etc. *Customer value:* easy-to-use, fast set-up, easy to expand, low-cost

18. Evolve Linux from an Internet OS to an enterprise OS. We are focusinged in three2 areas:

    a. **Technology**. We established the Linux Technology Center to work with the open source communities to accelerate the enterprise capabilities of Linux.

4

Linux Strategy Update

    b.  **Applications.** We designed several initiatives to recruit ISVs and Business Partners to enable enterprise applications on Linux.

    c.  **Support.** We are developing the ability to support enterprise customer, handling defects .
. . . . .

19. Replace Solaris as the primary UNIX development platform, especially for new applications. This included contributing technologies to open source as well as working with tools vendors to build a rich tool set on Linux.

Along with slowing Sun's momentum, Linux promises the following value to IBM:

- **Revenue Growth.** Linux iswas the fastest growing operating system. Given no vendor hasd a control point for Linux, we standstood a much better chance of gaining share in servers, middleware, storage and services.

- **New Applications.** Linux iswas becoming a popular application development platform. Linux is also was very portable, and runsan on the entire eServer product line. Linux hasd the potential be a catalyst for new applications on IBM platforms.

- **Larger Skills Pool.** Linux iswas popular in universities. We expected the next generation of skills to be trained in Linux.

- **Enhanced Image.** Linux hasd strong market pull, especially around the Iinternet and with younger IT professionals where IBM relevance is low. A concerted marketing campaign could significantly enhance IBM's image and relevance with this key audience.

In summary, Linux hasd the potential to neutralize the Solaris (and later the Windows) control points so we canould better execute our e-business strategy.

5

1710189073

IBM: Linux is the 'logical successor' | CNET News.com       http://news.com.com/IBM+Linux+is+the+logical+successor/2100-1...



CNET tech sites: | Price comparisons | Product reviews | Tech news | Downloads | Site map

E-mail alerts | News.com Extra

The web filtered by humans, not bots: www.news.com/extra

### Enterprise Hardware

# IBM: Linux is the 'logical successor'
Published: January 29, 2003, 4:00 AM PST

By Stephen Shankland
Staff Writer, CNET News.com

[TalkBack] [E-mail] [Print] [TrackBack]

**NEW YORK**--The day is approaching when Linux will likely replace IBM's version of Unix, the company's top software executive said, an indication that the upstart operating system's stature is rising within Big Blue.

THE BIG PICTURE

Read more about IBM, Linux and Unix

While IBM doesn't expect Linux to replace its own AIX version of Unix any time soon, Big Blue is pushing the open-source OS in the that direction, Steve Mills, senior vice president of IBM's Software Group, told CNET News.com at last week's LinuxWorld trade show.

Asked whether IBM's eventual goal is to replace AIX with Linux, Mills responded, "It's fairly obvious we're fine with that idea...It's the logical successor."

A replacement "won't happen overnight," Mills said, but years of experience designing operating systems at IBM and other companies means developers know just where Linux needs to go. "The road map is clear. It's an eight-lane highway."

No one believes replacing AIX with Linux could happen quickly, or that IBM will leave its AIX customers in a lurch. But the degree of Mills' Linux support surprised some.

"They've denied it would replace AIX in the past," said Illuminata analyst Gordon Haff. "Perhaps their thinking is beginning to shift. They've been quite clear that they see Linux as picking up AIX technologies maybe a year, two years later, that they've certainly been quite circumspect about saying Linux would ever replace AIX."

The IBM executive in charge of AIX--a product overseen by IBM's server group, not the software group Mills heads--exemplifies that more circumspect outlook, and argues that AIX still has a promising future.

"Steve's view is really on a multidecade time frame," said Nick Bowen, vice president of Unix and Intel server software development at IBM. "Over time, Linux and Intel and Windows will catch up to where we were yesterday (with AIX). When they catch up, we'll be two steps down the road."

It's not difficult to connect Linux to the profit motive at IBM. The company said it had $1.5 billion in Linux-related revenue in 2002. Its Linux customers include Thrifty car rental, China Post, the Bank of Birmingham in Alabama, Unilever, J.P. Morgan, Tommy



Introducing data centers on demand

New architecture supports power densities of today... and tomorrow

InfraStructure

**Click Here**

› This week's headlines

Readers who read IBM: Linux is the 'logical successor' also read....
- SCO sues Big Blue over Unix, Linux
- IBM: Linux investment nearly recouped
- SCO casts wider net for infringers
- Hackers deface SCO site
- Oracle buys PeopleSoft for $10 billion
  More Info

### Latest headlines
- Year in review: Road to recovery
- Playing Net movies on your TV
- Oracle gains controlling stake in PeopleSoft
- Quake may have altered Earth's rotation
- Purported Elvis water brings $455 on eBay
- Cabir cell phone threat worsens
- Giants throw in the towel on TV tech
- CEO resigns from PeopleSoft
- Feds convict warez pirate
- Google worm targets AOL, Yahoo
- Game sales thrive thanks to big kids
- Retail in review: More bah than sis-boom
- MSN to stream Times Square fete
- Lexar kicks off China sales effort
- Blockbuster may force rival's hand

Hilfiger, Dresdner Kleinwort Wasserstein and L.L. Bean.

**Special coverage**
**LinuxWorld 2003** ▶
Linux advocates gather
to promote the OS.

Though IBM relies on partners such as Red Hat and SuSE to produce the versions of Linux used by these customers, Big Blue makes money by selling servers, additional software and services.

Linux is in many ways a clone of Unix, but it has several major differences. For one thing, Linux is an open-source project, meaning that any company or person may see, modify and redistribute the software. Additionally, it works on many processors, most notably Intel's widely used products. Various versions of Unix are typically tied to a particular processor--for example, AIX to IBM's Power chips.

**Eating into Microsoft's profits**
Linux's flexibility when it comes to running on many types of computers is one reason the OS has caught on at IBM, which has four major server lines. Another advantage, Mills said, is that Linux's low cost compared with that of rival Windows leaves customers who opt for the cheaper OS with more money to spend on IBM's related products and services.

Customers have a finite amount of money they can spend on applications, hardware, operating systems, storage and the other components of their computing infrastructure, Mills explained. "Reducing the cost of the operating system allows them to spend more money elsewhere," he said.

IBM is aware that its strong backing for Linux likely isn't well-received at Microsoft, Mills said.

"Microsoft sees IBM spending money on Linux, making Linux more robust, getting in the way of their aspirations. I think it makes them very unhappy," Mills said.

While IBM sells numerous servers running Windows, the company also had a long and bitter falling out with Microsoft over the OS/2 operating system in the 1980s and 1990s.

"There's a long history of no love lost between Redmond and Armonk," Illuminata's Haff said, referring to Microsoft's and IBM's respective headquarters, in Washington and New York.

Microsoft argues that Linux, like Unix, is good for customers who like to assemble all the various components of their computer systems on their own, while Microsoft's goal is to offer integrated software that includes many features.

Most analysts agree that Linux is growing fast but still hasn't matched the abilities of AIX or of other versions of Unix, including Hewlett-Packard's HP-UX and Sun Microsystems' Solaris.

"It's very clear that Unix still has some significant functional advantages over Linux in high-end systems," said D.H. Brown Associates analyst Tony Iams, who annually assesses the abilities of different versions of Unix and Linux.

Specifically, Unix can take advantage of all the chips in servers with 16 or more processors, Iams said. With Unix, several copies of an OS can run simultaneously in separate "partitions" on the same server. The OS has features that let processors and memory be added or removed without shutting down the

**Most popular headlines**          1:43 AM

computer. And workload management features can be used to govern the amount of computing power that can be dedicated to a particular process.

Linux is growing rapidly, however. What was once a project by hobbyists is now funded by just about every major computing company except Microsoft.

"The notion of a lead in Unix is eroding faster than we expected. Linux has grown up incredibly fast already. I don't see any sign of a deceleration," said RedMonk analyst James Governor.

**Confidence-building measures**
Bowen, the executive in charge of AIX, emphasized that IBM's Unix isn't being replaced by Linux on any product plans.

"We've got people now who are building chips for 2007 systems. If we had any belief that AIX was going to fall down and stumble, we wouldn't be doing that," Bowen said. In particular, a major revamp of AIX is due in early 2004.

And though Bowen wouldn't provide specifics, he said the AIX development team is somewhere between two and four times as large as the 250 people IBM employs to improve Linux at its Linux Technology Center.

"IBM has never decommissioned an operating system, and they're not about to start now," said Governor.

Rather, the debate is over how IBM can best spend its money.

"As IBM puts more resources into Linux...you do have to ask, what incremental value does AIX bring? And is it worth the incremental development costs?" Haff said.

There are reasons IBM needs to project confidence in AIX: HP and Sun, which aggressively promote their own versions of Unix, will pounce on any weakness. IBM doesn't want to undo the last few years of work rebuilding AIX and the pSeries hardware it runs on, which was outpaced in the market by HP and Sun.

"What happens is the competitive folks at HP and Sun immediately say, 'IBM is shooting AIX,'" and that customers should move to a version of Unix with a future, Haff said. And IBM has some vulnerabilities in this area. Measured by how much support software companies have given AIX, "certainly it's not as strong as other Unixes out there," Haff said.

But the tables could turn if demand means a fast adoption of Linux, giving IBM the edge.

"I think they like sticking it to Sun and HP, who are less interested in seeing their Unix franchises go away," said Giga Information Group analyst Stacey Quandt.

| 🗨 TalkBack | ✉ E-mail | 🖨 Print | 🔗 TrackBack |

**Track this story's companies and topics**

| | |
|---|---|
| Intl Business Machines Corp | **Create alert** |
| Red Hat Inc | **Create alert** |
| Sun Microsystems Inc | **Create alert** |
| Hewlett-packard Co | **Create alert** |
| Intel Corp | **Create alert** |

*Create your own e-mail alert >*

**Related stories**

# Linux Community vs. Linux Market

## Two distinct, yet overlapping audiences

### Community

- Fiercely independent
- Developers, geeks, coders
- In their own firm - academics
- Employed by corporate business
- Freelancers
- Tools developers
- Anti rules and anti control
- Anti big business
- In charge of Linux
- Create the code and approve the code

IBM role - Help, Support, Contribute
IBM Don'ts - Lead, Drive, Own, Control
Assure, Ensure

### Market

Large, medium, small customers want to know
- Where/why do I use Linux?
- Who is going to manage the wild guys?
- Is Linux enterprise ready?
- Who will support me?
- Its FREE??????
- Where are the applications?
- NetGene, ISPs/ASPs, Web integrators
- Got it, use it, Intel preference
- Who's IBM?
- Developers, geeks, coders, academics
- Got it, use it, Intel preferred
- Who's IBM?

IBM Role - Focus (harder than Lead, Offerings, Skills, Shared)
Integration, Infrastructure consulting...
IBM does it...
IBM Don'ts - Tools, widgets, and people



e-business

CONFIDENTIAL



1710189124



**Linux Comparison**
Get The Facts: Windows vs. Linux. Read The
Independent Analysis Now.

**Free Linux**
Product testers wanted. Evaluate & keep it.
No cost shipping. Aff.

- Home
- About Us
- Feedback
- Contribute
- Comparisons
- Downloads
- Press

Pick a Free OS

Linux

**FreeOS Most Popular**

* Most Read stories
* Commended Stories
* Active Categories
* Non Linux Section
* User Submitters
* Top Polls
* Top Authors
* Top Reviews
* Top Rated
* Top Search Terms

**Top Articles**

* Mandrake 7.2 Install guide
* Writing a Linux device driver
* Samba NT Domain Controller
* GRUB: Multi-boot without LILO!
* Web server tutorial - Part 1

**FreeOS Highlights**

* Howtos (72)
* Reviews (19)
* Opinions (16)
* Interviews (6)
* News (3)

**My FreeOS**

Nick:
Pass:
Logon Register
Forgot your password?

Contact Us
Contact Us

Project: Linux ▶ Interviews ▶

### Robert LeBlanc, VP, IBM, Software Strategy, Software Solutions Division

*By Prakash Advani <prakash@NOSPAMfreeos.com>*
*Posted: ( 2000-12-20 04:57:18 EST by)*
Robert LeBlanc was part of the original team that evaluated Linux, the open source movement and decided that this was where IBM should be. IBM's recently announced billion dollar fund is proof that IBM is serious about Linux. Here, Mr. Robert LeBlanc talks about a variety of issues including the reasons for choosing Linux, the status of Monterey and the release of AIX code into the open source community.

**How and why did IBM decide to support Linux when they already have their own OS?**

*The shift started about two years ago. An internal effort was started and I was also part of this team of 6-7 people. We wanted to know what this thing was and whether we needed yet another OS. We also looked at open source. Open source had far more benefits in terms of process. There was a lot of vigor in the process, lot of value in the process. It was a self-policing environment. If you did good work, you got noticed and got to do more good work. If you didn't pull your weight then you were shunned by the community. We also liked Linux. It was built right from the ground up. A small kernel which was very important as was the ability to add modules. Linux could scale upwards and downwards. The open source model was very good. We saw that Linux as an OS had very strong technical underpinnings. Another point to note was that customers were wanting a more open environment. We had just been through the Internet evolution and we saw the power of the Internet a lot before our competitors did. We were also members of the Apache project. The world did not need another web server, but the world needed a very good web server that could grow and expand. The world did not need another OS, but what the world did need was a common OS that was open source and scalable. We made the decision 18 months ago. We're way ahead of HP and Sun. So it's customer demand and we're giving them what they want.*

**Will IBM not support the other Unixes like the BSD?s?**

*Right now we have no plans for that. One is just a variation of the other. The decision had a lot to do with market momentum which was behind Linux at that point. FreeBSD is a good OS but so is Linux. The world does not need two open source operating systems. We've been through the Unix evolution and we have seen what fragmentation does. Customers really don't care which OS they use. They ask IBM for help here. So we made a conscious decision to go with only one OS.*

**IBM has also made contributions to Project Monterey, which is kind of competition to Linux.**

*Project Monterey was actually started before Linux did. When we started the push to Monterey, the notion was to have one common OS for several architectures. The notion actually came through with Linux which was open source and supported all hardware. We continued with Monterey as an extension of AIX to support high-end hardware. AIX 5 has the best of Monterey. Linux cannot fill that need today, but over time we believe it will. To help out we're making contributions to the open source movement like the journal filesystem. We can't tell our customer to wait for Linux to grow up. They need solutions today.*

**So if Linux grows up, will you abandon Monterey?**

*You're speculating that if all were equal, I'd rather be on one OS than the other. There are always customers that have written software for AIX API's and might want to use the capabilities of Monterey. We're trying to make they co-exist. We're trying to allow customers to write to Linux API's that run on top of a Monterey based OS.*

**More Interviews**

* Interview: Morphix founder Alex de Landgraaf
* A talk with Paul Leroux
* In conversation with Martin Konold
* "Linux is a very strong and reliable operating system"— Philippe Kahn
* Sun shines on Linux too!

**Contents**

**Articles**
  Howtos
  Interviews
  News
  Opinions
  Reviews
**Comparison**
**Links**
  Articles
  Howtos
  Interviews
  Opinions
  Reviews
  Websites
**News**

**Linux**
**About Linux**

**Print it!**
Printer Friendly Version

**What about the other way round? AIX apps running on Linux?**

Yeah. If Linux had all of the capability of AIX, where we could put the AIX code at runtime on top of Linux, then we would.

**Are you doing anything?**

Right now the Linux kernel does not support all the capabilities of AIX. We've been working on AIX for 20 years. Linux is still young. We're helping Linux kernel up to that level. We understand where the kernel is is. We have a lot of people working now as part of the kernel team. At the end of the day, the customer makes the choice, whether we write for AIX or for Linux.

**Will AIX be open source?**

We're willing to open source any part of AIX that the Linux community considers valuable. We have open-sourced the journal filesystem, print driver for the Omniprint. AIX is 1.5 million lines of code. If we dump that on the open source community then are people going to understand it? You're better off taking bits and pieces and the expertise that we bring along with it. We have made a conscious decision to keep contributing. There are some things that the Linux community can do better. Linus is worried that there is too much code in the kernel and it's taking longer and longer to get a new release out. So, we could open source AIX but it is just not practical.

IBM
Monterey
AIX


Other articles by Prakash Advant

Current Rating: [ 0 / 10 ] Number of Times Rated: [ 0 ]

5 ▣ ▤▤▤▤▤

### Comments and Discussions

Threshold 0 ▣ | Threaded ▣ | Oldest First | ▤ Refresh | Add
Comments

The comments are owned by the poster. We aren't responsible for its content.

**Your Name** [_____]

**Your EMail** [_____]

**Subject**
[Robert LeBlanc, VP, IBM, Software Strategy, Software]

**Comment**

Allowed HTML:
<p> <b> <i> <a> <em> <br> <strong> <blockquote> <tt> <li> <ol> <div> <ul>
▤▤▤▤▤ | Plain Old Text                ▣

© 1998-2004 FreeOS Technologies (I) Pvt. Ltd. All rights reserved. [Privacy Policy]

From: SANDVE  --AUSVM6                    Date and time    10/11/95 16:32:28
To: DDIXON  --AUSVM6

From the desk of: Bill Sandve  -- AUSVM6(SANDVE) T/L 678-3250
Program Director, AIX Strategy and Business Development
Dept HHT/Bldg 905   9580/Austin                    Fax 678-3882
SUBJECT: NO SUBJECT
Here's the issue I mentioned:
I think there must be a way around this one--pls see what can be done. If the
code can be found on a default BSD tape, for instance, then we can
legitimately remove the other origins as errors in our classification..
Let me know what can be done tomorrow morning--I'll need to get back to Irving
tomorrow sometime.

Regards,
        Bill
*** Forwarding note from IRVING  --RHQVM02  10/11/95 16:00 ***
To: SANDVE  --AUSVM6
cc: SOUTH   --F.HQVM02  South, S. L.

FROM:   Irving Wladawsky-Berger  (e-mail: irving@vnet.ibm.com)
        General Manager, IBM RISC System/6000 Division
        Somers, New York        914-766-3900 or t/l 826-3900
SUBJECT: NO SUBJECT
Bill,
I called you today to get your view on what we should do here.  If you
could look into this and give me a call tomorrow with how you recommend
Irving respond on this I would greatly appreciate it.  Thanks.
Jim Kelly

*** Forwarding note from DFAULKNE--NYCVMIC1 10/11/95 15:35 ***
To: IRVING  --RHQVM02
cc: DFAULKNE--NYCVMIC1

From: David P. Faulkner, 8/391-4659, NYCVMIC1(DFAULKNE)
      M&SG B/O - JGI, Client Mktg -  Financial Services Sector
      27 Commerce Drive, Cranford, NJ  07016   FAX: 8/391-4370
Subject: NO SUBJECT
I've chosen to escalate this situation to your attention because I refuse
to lose to competition (Sun) without IBM having focused all its energy
on the fight.  This issue is particularly important because of the focus
we have on the Internet.

An ISV named Raptor Systems provides an Internet firewall product that
runs on RS/6000, HP, and Sun. Their latest version requires some
modifications to the UNIX kernal.  Both HP and Sun have very willingly
supplied their UNIX OS's to Raptor for modification.  However, IBM has
been reluctant to do so because of licensing concerns with OSF, Berkeley,
and UNIX Systems Labs (now owned by Novell).  Apparently, some of our
kernal has code that came from these sources and we aren't willing to
give away what's not ours without ADP having licensing arragements in
place.  However, HP's and Sun's operating systems have the same origins
which they supplied without all hurdles that IBM has put in the way.

ADP would much prefer to install RS/6000's and they are astonished that
the "new IBM" can't come up with a fix to this problem.  They have
recently installed their first Sun box to run this Raptor product.

This is the foothold that Sun has been seeking in this all-Blue

CONFIDENTIAL                          1710074694

account. Their strategy is to now penetrate and radiate throughout ADP.
This will become easier as ADP builds skills with Sun.
We should stop the bleeding now by freeing up this log jam before the
situation is irrecoverable.  I need any help your office can provide.

Please see the attached for further information.

Thanks...Dave Faulkner

Regards,
Dave Faulkner
Client Marketing Representative
*** Forwarding note from DFAULKNE--NYCVMIC1 10/11/95 14:25 ***
To: RNSMITH --AUSVM6
cc: DFAULKNE--NYCVMIC1                    DJCOHEN --NYCVMIC1
    GMCHESTE--NYCVMIC1

From: David P. Faulkner, 8/391-4659, NYCVMIC1(DFAULKNE)
      M&SG B/O - JGI, Client Mktg - Financial Services Sector
      27 Commerce Drive, Cranford, NJ  07016   FAX: 8/391-4370
Subject: NO SUBJECT
Ron, ADP has just installed their first Sun box in the enterprise to
run Raptor's firewall product.  They have seen our software and did not
like it.  The PRPQ route would take longer than ADP is willing to wait.
They want the RS/6000 and can't believe that we can't make this happen.
I have spoken with Raptor and was told that both HP and Sun very willing-
ly supplied their source code for Raptor to modify.

Both ADP and Raptor understands that ALL the support would have to come
from Raptor and that they would have to accomodate any future changes.
ADP is using these boxes for internal use only, and not for
resale.  If you need a letter from ADP stating that, let me know.

Ron, I can't emphasize my feelings on this strongly enough.  Lou Gerstner
has indicated that IBM is NOT TO LOSE to competition under any circum-
stances and I take losses personally.  If there is any way to make this
happen (eg. option 3) please let me know.  I'm inclined to shoot first
and answer questions later.  It's easier to ask for forgiveness than to
ask for permission.

Thx...Dave

Regards,
Dave Faulkner
Client Marketing Representative
*** Forwarding note from RNSMITH --AUSVM6   10/03/95 08:16 ***
To: DFAULKNE--NYCVMIC1

Ron Smith, AWS Austin                       T/L 678-3207
D25 - AIX OEM Relations
                                     IBM INTERNAL USE ONLY
SUBJECT: NO SUBJECT

David,

OK, I sent out several more notes on this, this morning.  I would be
lying if I said that things look good.  The files in question have ORIGIN
statements that indicate that the files contain code from OSF, BSD, and
some outfit named IP Multicasting.  Both BSD and OSF require a USL Source
Code license as a prerequisite in addition to their own source code

CONFIDENTIAL                    1710074695

license requirements.  I have also asked software contracts to tell me
what the licensing restrictions are on the IP Multicasting code.

Dave, if this were all our (IBM) code, we would not have a problem.  The
problem is that these files contain code that is not our code to give.
I don't know how Sun and HP did it.  Perhaps Sun doesn't care since they
did some sort of USL buy-out and perhaps HP wrote their own version
of the code.  We are in neither one of those situations and I seriously
doubt that we are going to come out clean on this.

Of course, you know that we still have the IBM/Raptor licensing hurdle
to overcome, even if we do have the right to license this code.  We
typically do not give this code away.  I don't know if Raptor expected
the code free, but this would be setting a dangerous precedent.  Of
course, there is the system drag to consider, but this might attach a
lot of strings to this code.

Additionally, I assume Raptor (and ADP) know, that if this happens, it
will break any fixes that IBM would apply to these files. ADP would have
to be aware and smart enough not to load any IBM fixes to this code
because this would overlay any changes or versions of these files that
Raptor had modified.

I don't want to give up yet, but I think the above approach is the least
likely to happen.  Other approaches to consider:

1.  I noticed that we have announced a new, upgraded (I assume better)
version of our Firewell product for AIX Version 4.1.3.  Have you looked
into that, as possibly supplying what ADP wants or needs.

2. Have you tried the PRPQ route.  If IBM could not do the work, we
could contract it out to Raptor and have them do the work.  Of course,
we would own the resulting work and or course, you would have to get
someone at IBM to support the PRPQ, both generating the code and
supporting it (because the same fix problems mentioned above would also
apply to the IBM PRPQ).

3. I have a 3rd option that I can't talk to you about, but I will talk
to another person in my shop to see if there is anything else we can
do.  Can you tell me if these machines that ADP is interested in are
going to be all used internally (i.e. all within ADP; none for re-sale,
re-lease, etc.).

I will get back to you when I have any new news.

Ron

R. N. Smith      VM ID:  AUSVM6(RNSMITH)   --Outside·Address--
512 838-3207 Loc W/S ID:  rnsmith@rnsmith  Bldg. 905  Zip 9581
T/L 678-3207 W/S via VM:  AUSTIN(RNSMITH)  11400 Burnet Rd.
FAX 678-3882 I'net:rnsmith@austin.ibm.com  Austin, TX  78758
*** Forwarding note from DFAULKNE--NYCVMIC1 10/02/95 17:24 ***
To: RNSMITH --AUSVM6

From: David P. Faulkner, 8/391-4659, NYCVMIC1(DFAULKNE)
      M&SG B/O - JGI, Client Mktg -  Financial Services Sector
      27 Commerce Drive, Cranford, NJ  07016   FAX: 8/391-4370
Subject: NO SUBJECT
Yes, Ron, please keep digging.  HP already has a trial box in here
because they supplied their code to Raptor for modification.  ADP





Samuel J. Palmisano
Chairman of the Board &
Chief Executive Officer

Sam Palmisano is chairman of the board and chief executive officer of the IBM
Corporation. He was elected chairman in October 2002, effective January 1,
2003, and has served as chief executive officer since March 2002. Prior to his
appointment, Mr. Palmisano was president and chief operating officer.

Mr. Palmisano has held a number of key leadership positions during his IBM
career, including senior vice president and group executive for IBM's Enterprise
Systems Group, where he led IBM's adoption of the Linux operating
environment, as well as the launch of the company's unified eServer family.
Prior to that, Mr. Palmisano was senior vice president and group executive for
IBM Global Services, with responsibility for the worldwide operations of the
largest and most diversified IT services organization in the industry.

Mr. Palmisano has served as senior vice president and group executive for IBM's
Personal Systems Group; led IBM's strategic outsourcing business; and was
president of the Integrated Systems Solutions Corp. (ISSC), an IBM wholly
owned subsidiary, and now part of IBM Global Services. Before joining ISSC,
Mr. Palmisano was IBM senior managing director of operations for IBM Japan.
He joined IBM in 1973 in Baltimore, Maryland.

January 2003

Case 2:03-cv-00294-DN Document 375 Filed 01/12/05 PageID.2982 Page 43 of 66



Samuel J. Palmisano Elected IBM CEO; Louis V. Gerstner, Jr. to Remain
Chairman Through 2002

**ARMONK, N.Y., January 29, 2002 . . .** The IBM board of directors today
elected Samuel J. Palmisano chief executive officer of the company effective
March 1. Mr. Palmisano, who currently is IBM president and chief operating
officer, will remain president. As CEO, Mr. Palmisano succeeds Louis V.
Gerstner, Jr., who will remain IBM chairman through the end of 2002.

Also today, IBM announced that John M. Thompson, IBM vice chairman, will
retire from the company and board on September 1.

"Over the last decade, Sam Palmisano has taken on a number of IBM's most
significant challenges, from building the services business to transforming our
server line," Mr. Gerstner said. "In each instance, Sam has done far more than
manage operations effectively. He has made it both his personal mission and that
of IBM to become the number one competitor in each of these markets. Sam's
unique mix of strategic vision, passion and discipline, combined with his
intimate understanding of IBM, make him the right person to become IBM's next
CEO."

Mr. Palmisano said: "I'm truly excited to lead IBM in this next chapter of what
already is an impressive era. I feel very fortunate to succeed Lou Gerstner as
CEO. Against all odds, he led IBM back from its darkest days. He transformed
the company's culture and reignited growth. IBM's unflagging focus on both the
customer and technology innovation is a direct result of Lou's leadership over
the last nine years. He will leave a significant legacy."

Mr. Gerstner, 59, is widely credited with transforming IBM into a
customer-focused global enterprise dedicated to leadership in services and
technology. Since Mr. Gerstner joined IBM in April 1993 through year-end
2001, the company's share price has increased more than 800 percent, and its
market value has grown by $180 billion. The company also has gained market
share in key strategic areas, including servers, software, storage and
microelectronics. IBM has received more U.S. patents than any other company
for nine consecutive years.

Mr. Thompson, 59, currently is responsible for identifying and cultivating major
growth initiatives and oversees the company's worldwide business and
technology strategy. Mr. Thompson was largely responsible for building IBM's
Software Group into a $13 billion business and the worldwide leader in
middleware. He managed IBM's acquisitions of Lotus Development Corporation
and Tivoli Systems. He also served as president and CEO of IBM Canada during
the late 1980s.

"I want to thank John Thompson for his many contributions to IBM over the
course of his 36-year career," Mr. Gerstner said. "John's special talent is that he
possesses both an insightful understanding of the strategic imperatives in our
business as well as a savvy operational focus. In the past two years, he has
worked tirelessly with our next generation of leaders to help IBM build new
businesses. As a result, his mark will be felt for years to come."

Mr. Palmisano, 50, became president and chief operating officer of IBM in September 2000 after holding leadership positions in virtually all of IBM's operating units. During his tenure as head of IBM Global Services, the business unit's revenues grew nearly 30 percent to $32.2 billion.

Mr. Palmisano also played a key leadership role in a three-year project to develop and launch IBM's eServer product line, which incorporates open standards and mainframe-like reliability across all platforms. As head of IBM's server and enterprise storage businesses, he spearheaded a major initiative to embrace Linux, the open source software, across IBM's server line. Today all of IBM's hardware and software products support Linux. In more recent years, Mr. Palmisano has overseen a cross-company effort to improve IBM's go-to-market approach, dramatically streamlining sales procedures and strengthening relationships with all of IBM's major customers. Mr. Palmisano spent several years in senior leadership positions in Asia. A graduate of The Johns Hopkins University, he joined IBM in 1973 as a sales representative in Baltimore, Maryland.

# # #

To download a photograph of Sam Palmisano and Lou Gerstner please click here.

To see biographical information on Lou Gerstner, Sam Palmisano or John Thompson please click here.

*To print:* **Click here** or Select **File** and then **Print** from your browser's menu

------------------------------------------------------------
This story was printed from ZDNet News,
located at http://news.zdnet.com
------------------------------------------------------------

By Stephen Shankland
URL: http://news.zdnet.com/2100-3513_22-5297392.html

**SAN FRANCISCO--Selling servers is IBM's biggest Linux business, with nearly $2 billion in sales expected in 2004, but the company says services and software revenue will grow in coming years.**

"The services business is growing much faster than we ever thought," doubling annually, said Jim Stallings, IBM's Linux general manager, in an interview at the LinuxWorld Conference and Expo. "Services is growing faster than servers, and middleware is growing faster than servers."

▼ advertisement

**A Winning Combination for Security, Stability, and Responsiveness**
Enhance manageability, reduce security risks, increase the total business value of your computing assets.
**Recommended Practices: Strategic Management of the PC Installed Base**
These findings help establish a comprehensive picture of best practices in PC installed base management.
**Execute Disable Bit and SP2: Improving PC Security**
Offers better data protection and decreases system and network downtime caused by malicious code.
**TechRepublic videocast- Manageability and Security**



Middleware, foundational software that lies above the operating system, includes databases to house information and application servers to run Java programs on a server. Services includes providing support, helping companies migrate from one system to another, running customers' entire computing infrastructure and translating software so it runs on Linux.

In two-to-five years, Linux services and software revenue each will be larger than Linux server revenue, Stallings estimated. The statistics highlight the payoff to the billions of dollars IBM is spending on Linux and why it's so eager to defuse intellectual property threats to the open-source operating system.

Linux prices may have risen in recent years, but the open-source operating system now does more, Stallings said. "Now Linux is running bigger and bigger workloads and adding a lot more functions," he said.

Stallings also took issue with a prominent rival, Sun Microsystems Chief Operating Officer Jonathan Schwartz. Schwartz argues that the success of top Linux seller Red Hat has allowed the company to lock customers into their software, success that has forced IBM to back Novell's SuSE Linux.

Lock-in is a matter of degree, Stallings said, and it's less with Linux than with other operating systems. "There's a lot more freedom of movement from servers underneath and applications on top with Linux in the middle," Stallings said. "Windows has control points. There's no way out."

IBM did feel it important to help SuSE, though, <u>investing $50 million</u> in Novell when it acquired SuSE earlier this year.

"Customers are saying, 'I want at least two choices in the market.' We wanted to help make that happen," Stallings said. "The $50 million was not a life raft. We wanted to affirm to those customers that Novell was going to embrace SuSE, and we were going to support it and guarantee those customers a road map."

SuSE has been a tight ally with IBM in its effort to spread Linux to Big Blue's Power processor-based servers and its top-end mainframes. "SuSE clearly had a head start on that," Stallings said, adding that it's more widely used on those machines.



IBM CONFIDENTIAL

This document will not be filed. It is being kept active.

created by: Joachim Frank on 14-Dec-99
modified on 15-Dec-99

**Jim Frank - Notes from Dec 14/15 meeting**

| | |
|---|---|
| Type | Notes |
| Category | Meeting 4 (Full Team) - December 14 & 15 |

Notes taken during Dec/14 CTC assessment meeting

**Fundamental questions:**

- What's the overall IBM Linux strategy (co-habitation, vs. Linux dominated)?
- *Jeff Nick*: Is the end-to-end, single bottom-to-top platform strategy essential to success of a server platform?
- *Lee Nackmann*: It's not just the APIs ... it's much more that constitutes a platform, such as, systems management, tools, etc.
- *Nick Bowen*: If our Linux based AD platform just "feeds" RS, AS, 390, it'll be less successful than if it is lired to an IBM Linux server strategy.
- *Lee Nackman*: We need ISVs' support, ergo, need AD platform that runs on Linux, deploys on Linux, -and- on other IBM server platforms.
- *Dan Frye*: A Linux AD environment will happen, one way or another. We can choose to participate, get involved, and have IBM servers benefit, or stand aside and benefit less. At the same time, we can neutralize the RedHat/Cygnus
- *Lee Nackman*: MS has helped ISVs with other business aspects (consulting, financing, etc.) besides the technical matters.
- *Dan Frye*: The only way to compete with MS is through a community based value net.
- *John Wolpert*: Whom in IBM does an ISV call for "Linux"? It's not even clear whom she should call to talk about Java ....
- *John Wolpert*: EMEA customer experience in 96/97 showed that OS/2 customers liked IBM's focus on Java, because it offered a transition path (?)
- *Dan Frye*: You cannot compete in the Linux space "on your own", it is moving too fast and being supported by too large a community
- Jay Ashford: You need to "look like" the "true" UNIX in the mind of the customer, that is, what they are used to, and that is not just the API, it is the entire operating environment, etc., etc.
- *Jeff Nick*: If we believe Linux will be successful as a unifying environment, then it is going to mature and develop at a rate and pace *not* controlled by IBM.
- *Dan Frye*: We can choose to support Linux, but even if we don't, this is not gonna die. Also, you have to participate, you cannot simply leverage.
- *Orran Krieger*: Basically, there are two possible strategies for supporting Linux - (1) LPAR (2) emulate Linux APIs/ABIs on top of existing UNIX.
- *Dan Frye*: The crucial decision is whether we (1) declare Linux the strategic IBM OS and let the brands figure out how to protect / migrate their legacy customer base or (2) try to "exploit" Linux in one way or another to support our existing server platforms.

CONFIDENTIAL

- *Orran Krieger:* We should abandon our proprietary UNIX (AIX) and instead move its "enterprise strength" features into Linux. What we've been talking about so far is a "transition strategy", allowing to run applications on IBM's legacy platforms until Linux is "mature" enough. Viability of the PowerPC platform is tbd.
- *Orran Krieger:* People at RedHat and Suse have begun porting their applications to Linux on the PowerPC/Mac hardware platform.
- *John Wolpert:* Technologies are not disruptive or sustaining - it's what you do with them. With Java and XML, we have been doing sustaining things, not chosen to follow a disruptive strategy.

Dec 15 meeting

- *Dan Frye's PERSONAL OPINION:* Monterey was aimed at the right goal, even before Linux became popular, that is, a unifying UNIX on Intel and PowerPC. However, with the Linux phenomenon having happened, doing this on the base of a "proprietary UNIX" may not be a viable business proposition any more.

IBM CONFIDENTIAL

CONFIDENTIAL

1910041460

# Creating a Linux Volume Application Development Platform for IBM Servers and Middleware.

## Outline of Findings

**CTC Express Assessment**
**Nick Bowen**
**December 20, 1999**

CONFIDENTIAL

181516893

# Summary of Recommendations

1. IBM should lead the formation of an industry community to establish Linux as the application development platform of choice for the next generation of application programmers.

2. IBM should leverage Linux as the unifying UNIX platform for volume server development and seamless deployment across the server family.
   - ▼ Linux as a Major Disruption to the A/D and Volume Server Market (<$15K)
   - ▼ Linux as a Major Disruption to the Server Operating Environment
   - ▼ Using Linux as a unifying theme for IBM servers

3. A high volume Linux deployment platform is required to create the market pull for a high volume Linux A/D platform.   IBM must ensure that an Enterprise Linux Server Distribution exists on IA32 that can be used on IBM Servers and has IBM's strategic middleware.

4. IBM's current Linux management structure is not strong enough to provide sufficient coordination across IBM, which leads to inconsistent prioritization of Linux activities across product brands.

CONFIDENTIAL

181516903

# 1: IBM should lead the formation of an industry community to establish Linux as the application development platform of choice for the next generation of application programmers.

## Statements

- Requires integrated technical, marketing, and ISV effort
- What is community going to do?
- Create technical open standard and software
- Market this standard to make it the defacto Linux development environment
- Foster ISV uptake
- Capture commodity idea: Certain level of AD tools are being commoditized and these should be standardized and open-source. Existing examples: C/C++ compilers and debuggers; emacs; make. Enhance and extend GNU toolset, e.g., by contributing PPC optimization technology. Compete above the commodity line. Action [Brian Thomson]: draw the stacks for C/C++ and Java on Linux and place the line.
- Success requires that Linux has adequate personal productivity applications so that application developers use the platform for personal productivity and "corporate citizen" needs.

## Actions

- Immediately approach key Linux players (Cygnus/Red Hat, VA Linux, Corel, Intel, SGI, etc.) to build an AD partnership aiming for public announce at LinuxWorld in Feb. [LeBlanc, working with Sweinson; John Wolpert working to bring in Silicon Valley]
- Immediately commit IBM resources (technical and ISV evangelization) to foster this community [Swainson]
- Small group of people (handful) to jump start both technical and ISV activity [Feb.]
- Technical involvement transitioning to the AD product groups [Summer]
- Software Group must with high priority make developer versions of its middleware (DB2, Websphere, Domino, MQ) available on Linux. Market: convenient to develop applications on this middleware with this common AD platform. [Mills, as SWG Linux advocate].
- IBM should provide tools as part of this AD platform for developing and deploying Enterprise Java Beans. Whether this is above or below the "commodity line" is tbd. [Sabbah]

CONFIDENTIAL

## 2: IBM should leverage Linux as the unifying UNIX platform for volume server development and seamless deployment across the server family.

- Linux as a Major Disruption to the A/D and Volume Server Market (<$15K)

▼ Must establish Linux as the A/D environment and low end deployment platform for emerging applications in order to disrupt the NT/Sun A/D ~deployment stranglehold.

▼ Must ensure wemake our strategic programming model, Websphere, a first class citizen in this AD environment and on IBM servers.

▼ This recommendation is covered in #1 (Lead industry movement) plus #3 (High volume deployment). It is here because IBM Servers must neutralize this long term advantage that Sun and NT have over us.

CONFIDENTIAL

181516905

## 2: IBM should leverage Linux as the unifying UNIX platform for volume server development and seamless deployment across the server family.

- Linux as a Major Disruption to the Server Operating Environment
  - ▼ There is significant movement towards Linux as a native environment:
    - • HP 64-bit PA-RISC (1H00)
    - • Sun's 64-bit Ultrasparc (done)
    - • HP 32-bit PA-RISC (done, not released?)
    - • Compaq's 64-bit Alpha (done)
    - • Trillion for IA64 (Intel, HP, IBM, VA Linux; RedHat, Caldera, SuSE, TurboLinux)
  - ▼ ISV's are indicating that Linux could be a unification point
    - • Oracle declared Linux as reference platform for Unix
    - • SAP is about to make a similar claim.
- This could be the seeds of a massive shift towards Linux.
  - ▼ Won't happen overnight - legacy issues and that Linux must mature.
  - ▼ However, IBM server platforms must begin making the investment to ensure that Linux runs on S/390, PPC, and NUMA-Q (we assume Netfinity makes a strong Linux play in several segments).
  - ▼ We must also understand the requirement for having the IBM AD & Middleware story on these platforms and understand the incremental cost for supporting these (i.e., does having a unified Linux across various processors game the game with respect to cost of deploying on multiple platforms)

CONFIDENTIAL

181516906

## 2: IBM should leverage Linux as the unifying UNIX platform for volume server development and seamless deployment across the server family.

- Using Linux as a unifying theme for IBM servers
  - ▼ Binary compatability is a major advantage of the Solaris product line
    - • We believe that binary compatability Linux->AIX and Linux->OS/400(via PASE) is technically feasible
      - ◆ We need to understand requirements for source compatability (& doability).
    - • There is a movement towards Linux/PPC mostly centered around Apple (Apple/Linux is second most popular Linux platform,,,need supporting facts here).
    - • There is an opportunity to establish a new PPC/Linux platform that could provide a new source of apps for AIX & OS/400 that would do better than Sun/NT with the value proposition of "palmtops to teraflops."
      - ◆ Apple alliance (include Mac-on-Linux, runs MacOS in Xwindow on Linux BeOS, & Open Source)
      - ◆ Drive Linux/PPC into the Server Appliance Market
      - ◆ OEM PPC (IMD's POP strategy)
      - ◆ Corel productivity apps on Linux
  - ▼ WebSphere - must do A/D and Middleware on IA32, ensure portability
  - ▼ The Linux native story (outlined above) provides source code compatability across all IBM platforms
    - • S/390 plans to provide tight integration with Linux/390 (LPAR, Communications, etc.)
    - • AIX & OS/400 will focus on binary compat via emulation in the short term,, mature LPARs, increase the potential for shared strategy/technology across AIX/OS/400 and S/390.

CONFIDENTIAL

181516907

**3: A high volume Linux deployment platform is required to create the market pull for a high volume Linux A/D platform. IBM must ensure that an Enterprise Linux Server Distribution exists on IA32 that can be used on IBM Servers and has IBM's strategic middleware.**

⊗

- Specific Recommendations
  - ▼ IBM must define our Linux distribution model
  - ▼ Software Group should prioritize key middleware for Linux
  - ▼ Server Group should
    - • get directly involved in this effort with the objective of getting accepted into the core team.
    - • Provide technology to fix Linux problems (poor distributed file system).
  - ▼ Decide on overall system definition for Linux segments we are expecting to participate in (covers tools, middleware, etc.)
    - • Low end Linux servers (ia32)
    - • ST&C (ia32) per "XXX CTC study"
    - • ISP / Intimidator
    - • A Tier-2 platform of choice for IBM servers when alternative platform is requested
      - • Ensure world class interoperability (connectors, sharing, admin)
      - • Have a consolidation strategy to the Linux/LPARs (for S390 now, others may follow)

88

**CONFIDENTIAL**                                                                                                181516908

**4: IBM's current Linux management structure is not strong enough to provide sufficient coordination across IBM, which leads to inconsistent prioritization of Linux activities across product brands.**

- Therefore, we [Palmisano] must establish a Linux "division" with the following responsibilities:

  - ▼ Provide IBM-wide Linux leadership (internal and external)
  - ▼ Business Development
  - ▼ Strategy
  - ▼ Brand Management
  - ▼ Standards, consortia, communities

- Establish evangelism efforts aimed at

  - ▼ Articulating to the industry our commitment to a strategy that starts at a volume application development platform to a range of deployment options across our entire server family.
  - ▼ NetGen ISVs as part of a coordinated Linux evangelism effort.
  - ▼ Universities as their primary development platform
  - ▼ Coordinate (and fund?) Linux product development within line product organizations
  - ▼ Incubation organization for Linux-based "white-space" projects
  - ▼ Technology transfer into Linux open-source community
  - ▼ Coordination of contributions from line product development organizations (analogous to Java Leadership Council role with respect to Java JSRs)
  - ▼ Results of "white-space" incubation

CONFIDENTIAL

181516909



IBM Linux

# Linux Commitment by IBM CEO's



**Lou Gerstner : Former CEO**

"We're betting a big piece of IBM's future Linux. Fifteen hundred IBM developers are dedicated to Linux-enabling our products and services-and not just for applications that run on a wristwatch, which we've built by the way."



**Sam Palmisano : Current CEO**

....... a first step by making a significant announcement to support Linux and the open source movement and to drive the next generation of the Internet. We intend to be a leader in our industry by:

- making all of our server platforms Linux ready;
- engaging closely with the Linux community to help Linux evolve; and,
- making IBM technologies available to the Linux and open source communities.

Jan 10 2000

© 2004 IBM Corporation

Westlaw.

Not Reported in F.Supp.2d
2002 WL 922082 (D.Kan.)
**(Cite as: 2002 WL 922082 (D.Kan.))**

Page 1

# H
## Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.

PEPSI-COLA BOTTLING COMPANY OF
PITTSBURGH, INC., Plaintiff,
v.
PEPSICO, INC., and Bottling Group L.L.C.,
Defendants.

**Civil Action Case No. 01-2009-KHV.**

May 2, 2002.

MEMORANDUM AND ORDER

DAVID J. WAXSE, Magistrate Judge.

**\*1** Pending before the Court is Defendant PepsiCo,
Inc.'s Motion for Protective Order to Preclude Two
Noticed Depositions (doc. 223). PepsiCo, Inc.
(PepsiCo) requests the Court issue a protective order
precluding the depositions of two of its senior-level
executives, Indra Nooyi and Roger Enrico. For the
reasons stated below, PepsiCo's Motion for Protective
Order is denied.

I. Relevant Background Information

Prior to the discovery deadline, Plaintiff served
notices of deposition on Indra Nooyi and Roger
Enrico for their depositions to be taken on March 27
and 28, 2002 in Purchase, New York. Indra Nooyi is
the President, Chief Financial Officer, and a member
of the Board of Directors of PepsiCo. In 1998, she
was Senior Vice President of corporate strategy and
development. Roger Enrico is the former Chairman
and current Vice Chairman of the Board of Directors
of PepsiCo.

Both Ms. Nooyi and Mr. Enrico were deposed in
similar litigation in Ohio and Illinois. *PepsiCo, Inc. v.
Central Investment Corp.*, No. c-1-98-389
(S.D.Ohio); *PepsiCo, Inc. v. Marion Pepsi-Cola
Bottling Co.*, No. 00-229-DRH (S.D.Ill.). Their

depositions in the *Marion* case were videotaped.

II. Standard for Ruling on a Motion for Protective
Order

Federal Rule of Civil Procedure 26(c) provides that a
court, upon a showing of good cause, "may make any
order which justice requires to protect a party or
person from annoyance, embarrassment, oppression,
or undue burden or expense." The party seeking a
protective order has the burden to show good cause
for it. *Reed v. Bennett, 193 F.R.D. 689, 691
(D.Kan.2000)*. To establish good cause, that party
must make "a particular and specific demonstration
of fact, as distinguished from stereotyped and
conclusory statements." *Gulf Oil Co. v. Bernard, 452
U.S. 89, 102 n. 16 (1981)*. The decision to enter a
protective order is within the court's discretion.
*Thomas v. International Bus. Machs ., 48 F.3d 478,
482 (10th Cir.1995)*.

A party may request a protective order to completely
preclude inquiry into matters that are outside the
scope of appropriate discovery. *Cotracom
Commodity Trading Co. v. Seaboard Corp.*, No. 97-
2391-GTV, 2000 WL 796142, \*2 (D. Kan. June 14,
2000). Courts, however, disfavor barring a
deposition. *Id.* Absent extraordinary circumstances,
courts rarely grant a protective order that totally
prohibits a deposition. *Id.*

• Discussion

PepsiCo advances several arguments in support of its
request for a protective order precluding Plaintiff
from deposing two of its senior-level executives, Ms.
Nooyi and Mr. Enrico. First, PepsiCo contends that
both Ms. Nooyi and Mr. Enrico have signed
Declarations that state they have no personal
knowledge of the facts or issues in this case. It next
argues that Plaintiff has already deposed top officials,
as well as lower-level employees of PepsiCo with
personal knowledge of the division's strategies and its
decisions regarding Plaintiff. Permitting Plaintiff to
depose these executives would also be cumulative in
that Ms. Nooyi and Mr. Enrico have already been
deposed on the same subject in similar litigation in
Ohio and Illinois. In addition, PepsiCo claims that
Plaintiff's insistence on deposing the executives is in
retaliation for an unsuccessful mediation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 922082 (D.Kan.)
**(Cite as: 2002 WL 922082 (D.Kan.))**

Page 2

**\*2** Plaintiff opposes the motion contending that PepsiCo has not demonstrated good cause to preclude the depositions. It argues that it should be permitted the opportunity to depose Ms. Nooyi and Mr. Enrico's because of their key positions and involvement in PepsiCo's strategic consolidation plan known as Project Broncos. [FN1] Further, it should not be restricted to the questions and style of examination used by another attorney in other litigation about matters primarily devoted to other issues.

> FN1. According to Plaintiff, Project Broncos is a bottler consolidation strategy document used by PepsiCo strategic planners in 1998, which describes PepsiCo's plan to arrive at an anchor bottling strategy, to document the need for alignment, and to create a less favorable contractual relationship with the bottling system.

The Court agrees. Plaintiff is entitled to depose Ms. Nooyi and Mr. Enrico. Plaintiff does not have the burden to justify his decision to depose Ms. Nooyi and Mr. Enrico. Rather, PepsiCo has the burden to show that good cause exists to prevent the deposition from going forward in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). The Court finds that PepsiCo has not met this burden. PepsiCo has not demonstrated how either it or Ms. Nooyi and Mr. Enrico will be annoyed, embarrassed, oppressed, or subjected to undue burden or expense if Plaintiff is allowed to depose Ms. Nooyi and Mr. Enrico. In addition, the Court finds this case distinguishable from *Thomas,* 48 F.3d 478, *Gazaway v. Makita U.S.A., Inc.,* No. 97-2287-JWL, 1998 WL 219771 (D.Kan. Apr. 16, 1998), and *Cotracom,* 2000 WL 796142, upon which PepsiCo relies. In *Thomas,* an employment discrimination case, the Tenth Circuit held that the district court did not abuse its discretion in granting a protective order to prevent the deposition of a the corporate defendant's chairman. *Thomas,* 48 F.3d at 483- 84. In so ruling, the Tenth Circuit relied upon, *inter alia,* the chairman's lack of knowledge about the plaintiff and her work performance. *Id.* at 483. In addition, the defendant demonstrated that the deposition would impose "severe hardship" on the chairman. *Id.*

Similarly, in *Gazaway,* another employment discrimination case, Magistrate Judge Rushfelt concluded that the defendant was entitled to a protective order to prevent the deposition of its former president. *Gazaway,* 1998 WL 219771 at \*3.

There, the defendant demonstrated that it would be "unduly burdensome and expensive" to produce the witness for his deposition in Kansas City, rather than Japan, where he resided. *Id.* The defendant also established that the witness had no personal knowledge as to the plaintiff or the criteria used to implement the reduction in force at issue. *Id.* In addition, Judge Rushfelt held that Plaintiff's deposition notice violated the rule that the deposition of a corporate defendant or its officers should take place at its principal place of business. *Id.* Significantly, Judge Rushfelt ruled that in the event the deponent were to return to the United States, where the deposition would not be burdensome, Plaintiff could depose him. *Gazaway,* 1998 WL 219771 at \* 3.

In *Cotracom,* Magistrate Judge Rushfelt ruled that extraordinary circumstances justified precluding the depositions of two outside members of the board of directors and the general manager of plaintiff corporation. *Cotracom,* 2000 WL 796142 at \*1. The court noted that all three were foreign witnesses who would have to travel to the United States to be deposed and several months had elapsed since discovery closed. *Id.* The Court held that, in light of these facts, it was unreasonable to permit international depositions of individuals who professed no knowledge of the limited matters subject to discovery. *Id.* at 3.

**\*3** In contrast, in this case, the Court determines that Ms. Nooyi and Mr. Enrico possess knowledge regarding PepsiCo's Project Broncos. The Court also finds that this knowledge is unique and appears significant to some of Plaintiff's claims in this case. The fact that their depositions have already been taken in similar litigation is not persuasive. Counsel for Plaintiff should not be restricted to the questions and style of examination used by a different attorney in another case. Further, there is no issue in this case about the deposition being taken in an improper or burdensome location, the deposition resulting in a "severe hardship" or "undue burden" to deponents or PepsiCo or the deposition being noticed after the discovery deadline. Finally, the Court finds that there is no evidence, other than perhaps timing, that the depositions are retaliatory for an unsuccessful mediation.

In sum, the Court does not find that PepsiCo is entitled to a protective order on the basis that Ms. Nooyi and Mr. Enrico are senior-level executives who lack knowledge and have been previously deposed in other litigation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 922082 (D.Kan.)
**(Cite as: 2002 WL 922082 (D.Kan.))**

Page 3

IT IS THEREFORE ORDERED that Defendant PepsiCo's Motion for Protective Order to Preclude Two Noticed Depositions (doc. 223) is denied.

IT IS SO ORDERED.

2002 WL 922082 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**
• 2:01CV02009 (Docket)
(Jan. 05, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d
2002 WL 485661 (D.Kan.)
**(Cite as: 2002 WL 485661 (D.Kan.))**

Page 1

**H**
**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.

Gary SIMPSON, Plaintiff,
v.
The HOME DEPOT, INC., d/b/a Home Depot, et al.,
Defendants.

**Civil Action No. 00-2285-JAR.**

March 7, 2002.

MEMORANDUM AND ORDER

WAXSE, United States Magistrate Judge.

**\*1** A telephone hearing was held on January 31,
2002 regarding the Motion for Protective Order
Quashing Deposition Notice of Larry Mercer (doc.
173) filed by Defendant Home Depot, Inc., d/b/a/
Home Depot ("Home Depot"). Plaintiff appeared
through counsel Daniel J. Cohen. Defendants Home
Depot and Home Depot U.S.A., Inc., appeared
through counsel Daniel O. Herrington. The Court
deferred ruling on the motion at the hearing in order
to provide Home Depot the opportunity to file a reply
brief. The Court has reviewed the reply brief, and is
now prepared to rule.

I. Background Information

This is a personal injury case in which Plaintiff
alleges he was struck by falling merchandise while
shopping at a Home Depot Store. Home Depot seeks
a protective order preventing Plaintiff from deposing
Larry Mercer, who is Home Depot's Vice-President
of Operations. Plaintiff seeks to depose Mr. Mercer
regarding Home Depot's nationwide operations and
whether there is an inherent risk to employees and
customers stemming from Home Depot's warehouse-
style operations.

I. Standard for Ruling on a Motion for Protective
Order

Federal Rule of Civil Procedure 26(c) provides that a
court, upon a showing of good cause, "may make any
order which justice requires to protect a party or
person from annoyance, embarrassment, oppression,
or undue burden or expense." The party seeking a
protective order has the burden to show good cause
for it. *Reed v. Bennett,* 193 F.R.D. 689, 691
(D.Kan.2000). To establish good cause, that party
must make "a particular and specific demonstration
of fact, as distinguished from stereotyped and
conclusory statements." *Gulf Oil Co. v. Bernard,* 452
U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693
(1981). The decision to enter a protective order is
within the court's discretion. *Thomas v. Int'l Bus.
Mach.,* 48 F.3d 478, 482 (10th Cir.1995).

II. ANALYSIS

A. Is Home Depot Entitled to a Protective Order
Based on Mr. Mercer's High-Level Position and Lack
of Knowledge About Plaintiff's Accident?

Home Depot contends it is entitled to a protective
order because Mr. Mercer is a high-level executive
who has no knowledge specifically related to
Plaintiff's accident. Home Depot argues that Plaintiff
has no need to depose Mr. Mercer regarding any risk
to employees and customers stemming from Home
Depot's warehouse-style operations given that
Plaintiff has already noticed the deposition of a
lower-level corporate representative regarding this
very same topic. According to Home Depot, Plaintiff
must show that he cannot obtain the information he
desires through less intrusive means than deposing a
corporate vice-president.

Plaintiff argues that he is entitled to take Mr.
Mercer's deposition because he is in charge of
nationwide operations and Plaintiff has the right to
depose individuals whose decision-making
responsibility extends that far. Plaintiff also claims
that he has been trying for to months to obtain the
depositions of Home Depot's lower-level managers,
and that he did not notice Mr. Mercer's deposition
until Home Depot unexpectedly canceled their
depositions.

**\*2** The Court holds that Plaintiff is entitled to depose
Mr. Mercer. Plaintiff does not have the burden to
justify his decision to depose Mr. Mercer. Rather,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Home Depot has the burden to show that good cause exists to prevent the deposition from going forward in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). The Court does not find that Home Depot has met this burden. Home Depot simply has not demonstrated how either it or Mr. Mercer will be annoyed, embarrassed, oppressed, or subjected to undue burden or expense if Plaintiff is allowed to depose Mr. Mercer.

In addition, the Court finds this case distinguishable from _Thomas v. Int'l Bus. Mach.,_ 48 F.3d 478 (10th Cir.1995) and _Gazaway v. Makita USA, Inc.,_ No. 97-2287-JWL, 1998 WL 219771 (D.Kan. April 16, 1998), upon which Home Depot relies. In _Thomas,_ an employment discrimination case, the Tenth Circuit held that the district court did not abuse its discretion in granting a protective order to prevent the deposition of a corporate defendant's chairman. 48 F.3d at 483-84. In so ruling, the Tenth Circuit relied upon, _inter alia,_ the chairman's lack of knowledge about the plaintiff and her work performance. _Id._ at 483. In addition, the defendant demonstrated that the deposition would impose "severe hardship" on the chairman. _Id._

Similarly, in _Gazaway,_ another employment discrimination case, Magistrate Judge Rushfelt concluded that the defendant was entitled to a protective order to prevent the deposition of its former president. There, the defendant demonstrated that it would be "unduly burdensome and expensive" to produce the witness for his deposition in Kansas City, rather than Japan, where he resided. _Gazaway,_ 1998 WL 219771, at *3. The defendant also established that the witness had ` no personal knowledge as to the plaintiff or the criteria used to implement the reduction in force at issue. _Id._ In addition, _Judge Rushfelt held that Plaintiff's deposition notice violated the rule that the deposition of a corporate defendant or its officers should take place at its principal place of business._ Significantly, Judge Rushfelt ruled that in the event the deponent were to return to the United States, where the deposition would not be burdensome, Plaintiff could depose him. _Id._

In contrast, in this case, Defendant has made no showing of "severe hardship" or "undue burden." Moreover, there is no assertion that Mr. Mercer lacks knowledge of the topic about which Plaintiff seeks to depose him. While Mr. Mercer may lack knowledge of Plaintiff's injuries and his accident, Home Depot does not claim that he also lacks knowledge about

any risk to employees and customers stemming from Home Depot's warehouse-style operations. Rather, Home Depot merely asserts that other, lower-level employees also possess this information. Finally, there is no issue in this case about the deposition being taken in an improper or burdensome location. Mr. Mercer's deposition was noticed to take place at Home Depot's principal place of business where Mr. Mercer works.

*3 In sum, the Court does not find that Home Depot is entitled to a protective order on the basis that Mr. Mercer is a high-level executive who lacks knowledge of Plaintiff's accident.

B. Is Home Depot Entitled to a Protective Order Based on Insufficient Notice?

Home Depot also contends that it is entitled to a protective order because Plaintiff did not provide at least five days notice of the deposition as required by D. Kan. 30.1. Plaintiff concedes that he did not provide Home Depot with the required five days notice. He contends, however, that the short notice was necessitated by Home Dept's unexpected, last-minute refusal to comply with its prior agreement to produce certain corporate managers for their depositions.

The Court finds that this issue is now moot inasmuch as the noticed deposition date has passed. The Court will, however, require Plaintiff's counsel to comply with the notice provision of D. Kan. Rule 30.1 when he re-notices Mr. Mercer's deposition.

IT IS THEREFORE ORDERED that the Motion for Protective Order Quashing Deposition Notice of Larry Mercer (doc. 173) filed by Defendant Home Depot, Inc., d/b/a/ Home Depot, is denied.

IT IS SO ORDERED.

2002 WL 485661 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**
•              2:00CV02285              (Docket) (Jun. 27, 2000)

END OF DOCUMENT





Not Reported in F.Supp.
1998 WL 219771 (D.Kan.), 8 A.D. Cases 330
**(Cite as: 1998 WL 219771 (D.Kan.))**

▷

**Motions, Pleadings and Filings**

United States District Court, D. Kansas.

Jeffrey W. GAZAWAY, Plaintiff,
v.
MAKITA USA, INC., Defendant.

**No. Civ.A. 97-2287-JWL.**

April 16, 1998.

Denise M. Anderson, Anderson Platts Law Firm, Kansas City, MO, for Jeffrey W Gazaway, plaintiff.

Joyce R. Rosenberg, Spencer, Fane, Britt & Browne, Kansas City, MO, Mark P Johnson, Rowdy B. Meeks, Sonnenschein, Nath & Rosenthal, Kansas City, MO, for Makita USA Inc, defendant.

**MEMORANDUM AND ORDER**

RUSHFELT, Magistrate J.

*1 The court has before it Defendant Makita's Motion for a Protective Order Pursuant to Rule 26(c) (doc. 36). It seeks an order to forbid plaintiff from deposing Kenji Karube, its former president. It contends the deposition would cause undue burden and expense within the meaning of Rule 26(c)(1). It also suggests plaintiff gave defendant insufficient notice of the deposition and thus violated the guidelines attached to the Scheduling Order. Plaintiff opposes the motion.

In this case plaintiff alleges defendant wrongfully terminated his employment as a salesman and thereby violated the Americans with Disabilities Act. Defendant denies the allegations. It states it terminated plaintiff for a legitimate business purpose in reducing the number of employees in its work force.

On January 30, 1998 plaintiff provided defendant by FAX with a notice to depose Kenji Karube on February 6, 1998. The notice requested defendant to produce Mr. Karube for his deposition at the law office of counsel for plaintiff in Kansas City, Missouri. On February 11 defendant filed the present motion for a protective order. The court finds the motion moot as to the scheduled date of February 6. The question remains, nevertheless, whether the deposition should otherwise be prohibited.

Kenji Karube was president of defendant Makita U.S.A., Inc. He now serves as general manager of its parent company. He resides in Japan. Plaintiff characterizes him as "the sole individual available who has any knowledge of the decisions surrounding the alleged reduction in force." Mr. Karube made the decision to reduce the work force. Plaintiff explains the late timing of the deposition and the shortness of the notice to be the result of failure by defendant to identify Mr. Karube either in initial disclosures or otherwise. Upon deposing two corporate managers of defendant on January 29, 1998, plaintiff learned that Karube had made the decision for the reduction.

In support of its motion defendant has filed the affidavit of Kenji Karube. It states the following: Mr. Karube served as president of defendant from December 1995 to November 1997. He now serves as general manager of Makita Inc., the parent company of defendant. Mr. Karube has no personal knowledge of any of the alleged events surrounding the termination of the employment of plaintiff. Karube has no personal knowledge about the criteria defendant used to lay off employees. As then president of defendant, he only evaluated and approved the overall plan of reduction, but did not select the sales representatives to be laid off. In his present job Karube works 60 to 70 hours per week. His principal place of business is Anjo, Japan. He remains in Japan except for "very infrequent business trips to the United States." A trip to the United States for his deposition would be "extremely burdensome and disruptive" to his work.

Plaintiff disputes the affidavit of Kenji Karube and suggests that it be disregarded for lack of truthfulness. To support this suggestion, plaintiff submits a memorandum dated August 2, 1996, from Gary Houck, vice-president of defendant to Karube as president. Plaintiff's Supplemental Response/Surreply to Defendant's Motion for a Protective Order, Ex. A (doc. 48). It refers to a prior discussion between them about consolidating Kansas City "into one territory." It reports that plaintiff has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 219771 (D.Kan.), 8 A.D. Cases 330
(Cite as: 1998 WL 219771 (D.Kan.))

less seniority than another person and "has also been struggling to make his number." It discusses the possibility of hiring a retail service representative in St. Louis and having one in Kansas City. It then requests that "we hire a 2nd retail service representative in the Chicago Metro area." At the bottom of the page is a handwritten note by an unidentified author: "(illegible) Buck Gazaway has smaller territory."

\*2 Plaintiff apparently reads more into the memorandum of Mr. Houck than does the court. The court does not find it inconsistent with the affidavit of Kenji Karube. Nor does the court find the affidavit untruthful. The Houck memorandum merely reflects a prior discussion about Kansas City as a territory, reports facts about plaintiff and others, and requests approval for hiring someone in Chicago. The memorandum neither requests nor necessarily engages any participation by Karube in a decision about the future employment or termination of plaintiff Gazaway. In his affidavit Karube says he has no personal knowledge of the "events surrounding the ending of Jeffrey Gazaway's employment with Makita U.S.A., Inc.," of "any performance evaluations he may have received at Makita U.S.A., Inc.," or of the criteria defendant used "to lay off employees." The court construes the lack of "personal knowledge" by Mr. Karube to refer to an absence of personal perception or first-hand knowledge. This contrasts with knowledge gained by hearsay or the reports of other persons. Karube admittedly evaluated and approved a policy decision, an "overall plan to reduce the workforce." This does not necessarily equate to participation in further decisions by management to determine which employees would be terminated or what criteria would be used. The court finds no reason to discredit the affidavit.

In discussing the motion, the parties have cited only one case: _Thomas v. International Business Machines,_ 48 F.3d 478 (10th Cir .1995). In an age discrimination case the court there upheld a protective order to block the deposition of the chairman of the corporate defendant. Plaintiff had argued that the deposition was critical, because the deponent had authored a policy designed to discriminate against older employees. The court first noted that the notice of the deposition violated a local rule, requiring notice of five days for deponents outside the jurisdiction. It further observed that the deposition would have violated the general principle that a corporation through its agents and officers should ordinarily be deposed at its principal place of business. The court highlighted the fact that an affidavit by the deponent confirmed his lack of knowledge about the plaintiff and his work performance for defendant. It also noted that plaintiff had failed to depose any other corporate personnel for the information she was seeking from the chairman.

The court finds _Thomas_ helpful to the motion here. First, the Deposition Guidelines incorporated into the Scheduling Order require notice of ten calendar days for a deposition, absent leave of court or agreement of counsel for a shorter period. In this instance plaintiff provided notice of only seven calendar days. Plaintiff has not adequately supported her blame of defendant for the lateness of the scheduling. Nor has he shown that a failure to identify Karube violated a duty for initial disclosures. Nor has plaintiff adequately explained why he waited until late January to depose the corporate managers.

\*3 Second, defendant has adequately demonstrated that it would be unduly burdensome and expensive to produce Kenji Karube for deposition in Kansas City, Missouri. It would require roundtrip transportation between Japan and Kansas City. Plaintiff has shown no crucial need for the deposition. He already has testimony from the managers that the layoff was the result of a general policy decision by Karube to reduce the work force. The affidavit demonstrates a lack of personal knowledge, however, as to what criterion was used to implement the reduction. It also shows a lack of personal knowledge by Karube about plaintiff and his work performance. The court can reasonably infer from the affidavit that the proposed deposition would disrupt the work of the deponent, with little if anything of consequence to be gained from it. The deposition as scheduled would also violate the principle, set forth in _Thomas,_ that depositions of a corporate defendant or its officers should generally be taken at its principal place of business.

Third, plaintiff has failed to convince the court that the deposition of Mr. Karube is in any way critical to this case. He apparently had no specific role in the decision to terminate plaintiff. Determining and evaluating an overall policy for reduction in force does not constitute discrimination. The management personnel or supervisors over plaintiff apparently determined the criteria for who should be terminated and why plaintiff was selected. Plaintiff has not shown why discovery from them has not or could not be obtained.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 219771 (D.Kan.), 8 A.D. Cases 330
**(Cite as: 1998 WL 219771 (D.Kan.))**

Page 3

If any critical need for the deposition of Mr. Karube exists, which plaintiff has failed to demonstrate, he may pursue it upon written questions; if indeed sufficient time remains for that procedure. Rule 30, of course, authorizes depositions upon written questions. Another possibility, perhaps less likely, would be to depose Mr. Karube when he returns to the United States for one of his infrequent trips. The court does not propose or even suggest, however, that trial of this case will be continued for his deposition. It is merely leaving open the possibility for plaintiff to pursue an alternative procedure for the deposition, if it can be accomplished within the time remaining before trial.

For the foregoing reasons the court deems moot in part and otherwise sustains in part and overrules in part Defendant Makita's Motion for a Protective Order Pursuant to Rule 26(c) (doc. 36), as herein set forth.

IT IS SO ORDERED.

1998 WL 219771 (D.Kan.), 8 A.D. Cases 330

**Motions, Pleadings and Filings (Back to top)**
• 2:97CV02287 (Docket)
(Jun. 12, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.