SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)˙
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

FILED
U.S. DISTRICT COURT

2005 MAY -4  P  4: 58

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **DEFENDANT/COUNTERCLAIM-PLAINTIFF IBM'S REDACTED OPPOSITION TO SCO'S SUPPLEMENTAL MEMORANDUM REGARDING DISCOVERY**<br>**[Docket 304]**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this opposition to the Supplemental Memorandum Regarding Discovery filed by Plaintiff/Counterclaim Defendant The SCO Group, Inc. ("SCO").

### Preliminary Statement

After briefing had already closed on SCO's "Memorandum Regarding Discovery" and its "Renewed Motion to Compel"—both of which seek essentially the same discovery, materials contained in IBM's internal "CMVC" database—SCO submitted on September 3, 2004 yet another brief addressed to the same topic.[1] SCO's "Supplemental Memorandum Regarding Discovery", SCO's fifth brief devoted to the same issues (for a total of 88 pages), is no more compelling than any of its other four briefs. Nothing SCO argues in any of its briefs, however, obscures the fact that SCO wants simply to engage in a massive fishing expedition to which it is not entitled.

As an initial matter, SCO's Supplemental Memorandum relies inappropriately on documents that IBM has informed SCO are protected by the attorney-client privilege and were inadvertently produced during discovery. In disregard of IBM's requests, however, SCO has refused to return the documents to IBM and, indeed, continues to rely on such documents in its Supplemental Memorandum. These documents (which SCO in any case misrepresents) reflect communications made by IBM employees to an in-house IBM attorney for the purpose of seeking legal advice and are plainly privileged. Accordingly, SCO should be directed to promptly return all copies of such documents to IBM, and the documents should not be relied upon by the Court in considering SCO's discovery applications.

More importantly, SCO's Supplemental Memorandum misstates the scope of IBM's Ninth Counterclaim in an effort to concoct a new reason that IBM should have to produce

---

[1] SCO's late submission of this additional memorandum occasioned the postponement of the hearing scheduled with this Court for September 14, 2004.

irrelevant discovery. IBM's Ninth Counterclaim seeks merely a declaration that SCO's purported termination of the several agreements specified in SCO's Second Amended Complaint is invalid and that SCO has no claim for copyright infringement based on such purported termination. None of the information that SCO is seeking is relevant to IBM's Ninth Counterclaim, and IBM should not have to undertake the burdensome task of producing these materials.

Although SCO repeats in its Supplemental Memorandum the conclusory refrain from its four other briefs that producing the materials contained in CMVC would not be unduly burdensome for IBM, nothing in SCO's latest memorandum provides any basis for that belief.

### Argument

I.    **THE PRIVILEGED DOCUMENTS RELIED ON BY SCO IN ITS SUPPLEMENTAL MEMORANDUM SHOULD BE RETURNED TO IBM AND SHOULD NOT BE CONSIDERED BY THE COURT.**

Two of the documents upon which SCO relies in its Supplemental Memorandum are plainly privileged, and should therefore be returned to IBM and disregarded by the Court. These documents, attached as Exhibits D and E to the Declaration of Jeremy O. Evans ("Evans Declaration") submitted by SCO together with its brief, are communications by IBM employees to IBM counsel seeking legal advice. Although IBM properly requested that SCO return the documents to IBM immediately, SCO refused to do so and continues to rely on the documents in its Supplemental Memorandum in total disregard of IBM's privilege claims.

Upon discovering the inadvertent production of these two documents, IBM asked SCO on August 25, 2004 to return the documents immediately, together with all copies of the documents in SCO's possession. As IBM stated in its letter to SCO, pursuant to paragraph 3(k) of the Attorneys' Planning Report and Proposed Scheduling Order, "[d]ocuments that a party claims as privileged, including all copies made, will be returned immediately upon the request of the disclosing party without the need to show the production was inadvertent". (See Exhibit 1.)

3

Instead of returning the documents to IBM, or even responding to IBM's letter, SCO continued to rely on the documents in its submissions to the Court. On September 3, 2004, in its reply brief in support of its application to file its Supplemental Memorandum, SCO informed the Court that it did not believe it had to return the documents to IBM because "IBM [in its letter] does not identify a single attorney in the e-mails nor does it identify any basis for its claim of 'attorney-client privilege'". (SCO's Reply Mem. at 4.)[2]  SCO repeated this argument when it finally responded to IBM's letter on September 8, 2004, <u>two weeks</u> after IBM requested that SCO return the privileged documents. In its letter to IBM, SCO stated that was refusing to return the privileged documents because "IBM had failed to make any showing that the documents are, in fact, privileged". (Exhibit 2.)

SCO's position is flatly inconsistent with the parties' agreement concerning inadvertently-privileged documents. Under the Attorneys' Planning Report, SCO is obligated to return any "[d]ocuments that a party claims as privileged . . . immediately upon the request of the disclosing party without the need to show the production was inadvertent". IBM did not in its letter have to prove "that the documents are, in fact, privileged", as SCO now contends is necessary, and therefore did not undertake that effort. SCO's attempt on this ground to retain and rely on inadvertently-produced privileged documents is entirely improper.

In addition, the American Bar Association's Committee on Ethics and Professional Responsibility has stated clearly that when privileged materials are inadvertently received, the receiving lawyer "should not examine the materials once the inadvertence is discovered" and "should abide by the sending lawyer's instructions as to their disposition". ABA Comm'n on Ethics and Prof'l Responsibility, Formal Op. 368 (1992). This opinion pertains to "situations in which the sending lawyer has notified the receiving lawyer of the erroneous transmission and has

---

[2]  SCO does not dispute that IBM's production of the documents was inadvertent. (SCO's Reply Mem. at 4.)

requested return of the materials sent as well as those situations in which the inadvertent sending lawyer and his client remain ignorant that the materials were missent". Id. All that is required to trigger the ethical obligation to return inadvertently-produced privileged documents is a notification by the sending lawyer of a claim of privilege and a request that the materials be sent back.[3]

**REDACTED**

---

[3] The Oregon State Bar Association has squarely addressed this issue and provided additional clarification of the ethical obligation to return inadvertently produced documents immediately upon an assertion of privilege. Formal Opinion 150 discusses the following scenario:

> "Lawyer A inadvertently includes a privileged document in a set of documents provided to Lawyer B in response to a discovery request. Lawyer A discovers the mistake, calls Lawyer B, and asks Lawyer B to return the privileged document without examining it."

Ore. State Bar Assoc. Bd. of Governors, Formal Op. 150 (1998). In response to the questions "Must Lawyer B return the document?" and "Must Lawyer B return the document if Lawyer B has already reviewed the document before being informed of the inadvertent disclosure?", the Bar Association answered unequivocally, "Yes". Id. Clearly, the receiving attorney's ethical obligation to return the inadvertently produced document "without examining it" upon the simple request of the producing attorney is incompatible with SCO's assertion that IBM must convince SCO that the documents are privileged <u>before</u> SCO will return them or refrain from relying on them in their court filings.

**REDACTED**

On the basis of its earlier request to SCO, and the declarations submitted herewith, IBM is plainly entitled to the prompt return of its two privileged documents, along with all copies in SCO's possession, and the Court should disregard SCO's Supplemental Memorandum to the extent it relies on these documents. See Prescient Partners, L.P., v. Fieldcrest Cannon, Inc., 96 Civ. 7590, 1997 U.S. Dist. LEXIS 18818, at *21 (S.D.N.Y. Nov. 26, 1997) (ordering that party receiving inadvertently-produced privileged documents to "promptly return [to the producing party] the material (and all copies thereof)", "destroy all notes or other work product reflecting the contents of such material", and "delete any information in any computer database reflecting the contents of these documents", and further ordering that the receiving party is "prohibited from using these documents or references to these documents in discovery or at trial") (attached hereto as Exhibit 3); Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co., 133 F.R.D. 171, 175 (D. Kan. 1989) (ordering the return of all copies of privileged documents inadvertently produced by plaintiff, and further ordering that the defendant "may not use these documents except by further order of the trial judge").

6

## II. THE DISCOVERY SCO SEEKS IS NOT RELEVANT TO IBM'S NINTH COUNTERCLAIM.

Leaving aside the issue of SCO's improper use of IBM's privileged documents, SCO does not need any additional source code to defend against IBM's Ninth Counterclaim. Contrary to SCO's contention, IBM's Ninth Counterclaim does not seek a declaration that IBM, during the entire development history of its AIX and Dynix products, never infringed SCO's alleged copyrights (although IBM believes that to be the case), nor would that make any sense, as SCO has never alleged any such infringement.

SCO has asserted four contract claims against IBM, alleging that IBM has breached various licensing agreements permitting IBM to use the UNIX System V program and to distribute its own products containing UNIX System V code, AIX and Dynix. (See Second Amended Complaint ¶¶ 110-172.) Based on IBM's alleged breaches of these license agreements, SCO purported to terminate IBM's rights under the agreements in June 2003. (Id. ¶¶ 128-131, 139, 158-161, 169.) SCO has also asserted a copyright infringement claim against IBM, alleging that IBM's breaches of the licensing agreements "and its post-termination actions have infringed, have induced the infringement of, and have contributed to the infringement of, copyright registrations of SCO and its predecessors". (Id. ¶ 179.)

In response to SCO's claims, IBM has asserted two counterclaims that mirror different aspects of SCO's claim for copyright infringement. IBM's Tenth Counterclaim seeks a declaration that IBM's on-going Linux activities, in particular its use and distribution of Linux, do not infringe any of SCO's alleged copyrights. IBM's Ninth Counterclaim seeks a declaration that IBM's AIX and Dynix activities, in particular its distribution of AIX and Dynix (if any) after SCO's purported termination of IBM's licensing agreements, do not infringe any of SCO's alleged copyrights.

7

SCO's argument that IBM's Ninth Counterclaim provides a new and independent ground for IBM's production of AIX code and other information from CMVC is therefore untenable. IBM's Ninth Counterclaim seeks nothing more than a declaration that SCO's purported termination of IBM's UNIX System V licenses—the agreements specified in SCO's Second Amended Complaint—is invalid and that SCO has no claim for copyright infringement based on such purported termination.

IBM's Ninth Counterclaim is only as broad as the scope of the first five counts of SCO's own complaint, which do not concern any issues relating to Project Monterey or any of the agreements submitted with SCO's Supplemental Memorandum, to which almost the entirety of SCO's Supplemental Memorandum is devoted.[4] Indeed, it would have made little sense for IBM to bring a claim seeking a declaration of rights relating to agreements to which SCO was never a party. The Joint Development Agreement ("JDA"), attached as Exhibit F to the Evans Declaration, and the various amendments and supplements to that JDA, were agreements between IBM and The Santa Cruz Operation, Inc. ("Santa Cruz"), a company now known as Tarantella, Inc. IBM fulfilled all of its obligations under its contracts with Santa Cruz, and in turn obtained certain irrevocable licensing rights to source code provided by Santa Cruz under the JDA.[5]

---

[4] In any event, SCO misrepresents both the scope of IBM's rights to use source code under IBM's agreements with The Santa Cruz Operation, Inc.— the company from which SCO purports to have purchased its alleged UNIX copyrights— and the significance of both the privileged and non-privileged IBM documents SCO attached to its Supplemental Memorandum. SCO contends, without any justification, that IBM did not have a right to use any UNIX System V Release 4 source code in IBM's version of AIX for the Power PC. The very agreements which SCO attaches to its supplemental memorandum, however, contradict SCO's accusation that IBM misappropriated any code.

[5] IBM disagrees both with SCO's interpretation of the contracts and other documents attached to its Supplemental Memorandum, and with SCO's unsupportable accusations that IBM and its attorneys engaged in any fraud. Nevertheless, we do not undertake here to debunk SCO's interpretation or refute its accusations, as these issues are beyond the scope of any claim or counterclaim in this lawsuit.

IBM has already produced hundreds of millions of lines of code to SCO, constituting all of the source code for each version and release of AIX and Dynix that was distributed by IBM after the dates specified in SCO's Document Request Nos. 2 and 3, and there is simply no reason for IBM to have to produce any more to SCO. In its March 3, 2004 Order, this Court specifically provided that it would "consider ordering IBM to produce more code from AIX and Dynix" if SCO submitted additional briefing that "include[d], with specificity, and to the extent possible, identification of additional files SCO requests and the reasons for such requests". (3/3/04 Order at II.1.) Despite submitting no less than <u>five</u> briefs on the issue, SCO has failed to make a proper showing. SCO is ultimately just asking this Court to give SCO what the Court has already once denied SCO, <u>all</u> of the source code in IBM's internal CMVC database, without regard to whether that code is at all relevant to any of the claims in this case. This sort of fishing expedition should not be allowed.

## III.   IT REMAINS UNDULY BURDENSOME TO REQUIRE IBM TO PRODUCE THE INFORMATION STORED ON CMVC.

SCO submitted with its Supplemental Memorandum the Declaration of Barbara L. Howe ("Howe Declaration"), purportedly to show that IBM would not bear any burden to produce the massive amount of information sought by SCO. Ms. Howe, however, fails to show that producing all of the materials requested by SCO would be anything less than enormously burdensome for IBM.

Ms. Howe's declaration describes only the normal, day-to-day use of CMVC by an individual developer for the purpose of writing code. Nowhere does Ms. Howe even purport to have knowledge of, or to describe, the work effort that would be involved if IBM were required to extract, reproduce and review the massive amount of information stored on CMVC in order to produce that information to SCO.

9

Moreover, Ms. Howe nowhere claims that the lengthy, multi-step process described in the June 23 Declaration of Joan Thomas is incorrect. Ms. Howe states only, in conclusory terms, that "[t]o the best of my knowledge, it would be trivial" and "[t]o the best of my knowledge, it would be a straightforward process" for IBM to produce the massive amount of source code and other irrelevant information stored on CMVC. (Howe Declaration ¶¶ 17-18.) As is evident from Ms. Howe's declaration, her statements about the supposed ease with which IBM could produce the requested information are mere conjecture and should not be countenanced.[6]

## Conclusion

For the foregoing reasons, IBM respectfully requests that the Court deny SCO's request for the materials sought in its Supplemental Memorandum Regarding Discovery.

DATED this 24th day of September, 2004.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

---

[6] Ms. Howe also says nothing that alters the fact that the CMVC data sought by SCO is entirely irrelevant to any of SCO's claims or defenses. While parties are given wider latitude during discovery to request and obtain documents that might not be admissible, discovery must still be "relevant to the claim or defense of any party". Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." (emphasis added)).

Of counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000
*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 24ᵗʰ day of September, 2004, a true and correct copy of the

foregoing was hand delivered to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131
>
> Robert Silver
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

SORENSA\SLC\316528.1

12

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2005, a true and correct copy of the

foregoing was sent by U.S. Mail, postage prepaid, to the following:

        Brent O. Hatch
        Mark F. James
        HATCH, JAMES & DODGE, P.C.
        10 West Broadway, Suite 400
        Salt Lake City, Utah 84101

        Stephen N. Zack
        Mark J. Heise
        BOIES, SCHILLER & FLEXNER LLP
        100 Southeast Second Street, Suite 2800
        Miami, Florida 33131

        Robert Silver
        Edward Normand
        Sean Eskovitz
        BOIES, SCHILLER & FLEXNER LLP
        333 Main Street
        Armonk, New York 10504

# Snell & Wilmer
### L.L.P.
LAW OFFICES

15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
(801) 257-1900
Fax: (801) 257-1800
www.swlaw.com

SALT LAKE CITY, UTAH

PHOENIX, ARIZONA

TUCSON, ARIZONA

IRVINE, CALIFORNIA

DENVER, COLORADO

LAS VEGAS, NEVADA

August 25, 2004

Todd M. Shaughnessy (801) 257-1937
tshaughnessy@swlaw.com

*VIA HAND DELIVERY*

Brent Hatch
Mark James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

     *Re:*    *SCO v. IBM*

Dear Brent and Mark:

     Pursuant to paragraph 3(k) of the parties' Attorneys' Planning Report and Proposed Scheduling Order dated June 19, 2003, we are hereby demanding that SCO immediately return to us the documents bearing bates numbers 1710069294-95, and 181509837-38, copies of which are appended as Exhibits D and E to the Declaration of Jeremy O. Evans in Support of Plaintiff Counterclaim Defendant SCO's Supplemental Memorandum Regarding Discovery. Each of the foregoing documents is privileged.

     Under the terms of paragraph 3(k), "[d]ocuments that a party claims as privileged, including all copies made, will be returned immediately upon the request of the disclosing party without the need to show the production was inadvertent." Please immediately return the foregoing documents, together with all copies thereof. If you have any questions or would like to discuss this issue further, please feel free to contact me.

                Very truly yours,

                Todd M. Shaughnessy

TMS:dw
cc:   David Marriott

Snell & Wilmer is a member of LEX MUNDI, a leading association of independent law firms.

LAW OFFICES

# HATCH, JAMES & DODGE
A PROFESSIONAL CORPORATION

10 WEST BROADWAY, SUITE 400
SALT LAKE CITY, UTAH 84101
TELEPHONE (801) 363-6363
FAX (801) 363-6666

September 8, 2004

**Via Facsimile (257-1800) and U.S. Mail**

Todd M. Shaughnessy, Esq.
Snell & Wilmer
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101

>       Re:     Sco v. IBM; Case No. 2-03CV-0294

Dear Todd:

You previously demanded on behalf of IBM that SCO return documents bearing Bates numbers 1710069294-95 and 181509837-38 based on a claim of privilege. You cited paragraph 3(k) of the Attorneys' Planning Report and Proposed Scheduling Order dated June 19, 2003, which indicates a party is initially entitled to a return of privileged documents without a showing that the production of the documents was inadvertent. In SCO's Memorandum in Reply to IBM's Opposition to SCO's Ex Parte Motion for Leave to File a Supplemental Memorandum Regarding Discovery, SCO noted that, aside from the issue of inadvertent production, IBM had failed to make any showing that the documents are, in fact, privileged. IBM has not provided SCO with sufficient information even to justify placing these e-mails on a privilege log. For example, IBM does not identify a single attorney in the e-mails nor does it identify any basis for its claim of "attorney-client privilege." We continue to await such information setting forth the basis for IBM's assertion of privilege.

>       Sincerely yours,

>       Mark F. James

c. Robert Silver

LAW OFFICES
# HATCH JAMES & DODGE
A PROFESSIONAL CORPORATION

10 West Broadway, Suite 400            Telephone (801) 363-6363
Salt Lake City, Utah 84101            Facsimile  (801) 363-6666
                                     e-mail: mjames@hjdlaw.com

## FAX TRANSMISSION SHEET

**CONFIDENTIALITY NOTE:**

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individuals or entities named below.  If you, the reader of this message, are not the intended recipient, you are hereby no tified that any dissemination, distribution, or copy of this facsimile is strictly prohibited.  If you have received this facsimile in error, please forgive the inconvenience, immediately notify the sender, and return the original message to the sender at  the address above via the United States Postal Service.  Thank you.

DATE:  September 8, 2004

# OF PAGES (INCLUDING THIS COVER SHEET):  2

TO:    Todd M. Shaughnessy                     Fax No.  257-1800

FROM:     Brent O. Hatch/Mark F. James

RE:       *SCO v. IBM*

MESSAGE:   *See* accompanying letter

If you do not receive the entire transmission in legible form, please call 801.363.6363.

LEXSEE 1997 U.S. DIST. LEXIS 18818

**PRESCIENT PARTNERS, L.P., Plaintiff, - against - FIELDCREST CANNON, INC., FIELDCREST CANNON SURE FIT, INC., UTC HOLDINGS, INC., and BERT SHLENSKY, Defendants/Third-Party Plaintiffs, - against - PAULA RILEY, Third-Party Defendant.**

**96 Civ. 7590 (DAB)(JCF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 18818*

**November 26, 1997, Decided**
**November 26, 1997, Filed**

**DISPOSITION:** [*1] Plaintiff's motion for a protective order granted except that the application for sanctions, including costs and attorneys' fees, denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For PRESCIENT PARTNERS, L.P., plaintiff: Ned W. Branthover, Morgan & Finnegan, L.L.P., New York, NY.

For FIELDCREST CANNON, INC., FIELDCREST CANNON SURE FIT, INC., UTC HOLDINGS, INC., BERT SCHLENSKY, defendants: David Robert Gelfand, Milbank, Tweed, Hadley & McCloy, New York, NY.

For FIELDCREST CANNON, INC., FIELDCREST CANNON SURE FIT, INC., UTC HOLDINGS, INC., BERT SCHLENSKY, third-party plaintiffs: David Robert Gelfand, Milbank, Tweed, Hadley & McCloy, New York, NY.

For PAULA RILEY, third-party defendant: Kathryn E. Diaz, Morgan & Finnegan, NY, NY.

For FIELDCREST CANNON, INC., FIELDCREST CANNON SURE FIT, INC., UTC HOLDINGS, INC., BERT SCHLENSKY, counter-claimants: David Robert Gelfand, Milbank, Tweed, Hadley & McCloy, New York, NY.

For PRESCIENT PARTNERS, L.P., counter-defendant: Ned W. Branthover, Morgan & Finnegan, L.L.P., New York, NY.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JAMES C. FRANCIS IV

**OPINION:**

MEMORANDUM AND ORDER

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

The plaintiff [*2] PRescient Partners ("PRescient") and Third Party Defendant Paula Riley move for a protective order: (1) directing the defendants, Fieldcrest Cannon, Inc., Fieldcrest Cannon Sure Fit, Inc., UTC Holdings, Inc., and Bert Shlensky (collectively, the "defendants") to return certain privileged documents PRescient claims it inadvertently produced to the defendants; (2) barring the defendants from using this material in discovery or at trial; (3) requiring the destruction of work product generated by these documents; and (4) awarding plaintiff's costs and attorneys' fees for making this motion. In response, the defendants maintain that PRescient waived its privilege by producing the documents and failing to take the reasonable steps necessary to maintain the documents' confidentiality. For the reasons that follow, PRescient's motion is granted in part and denied in part.

Case 2:03-cv-00294-DN  Document 444  Filed 05/04/05  PageID.3516  Page 18 of 22

Page 2
1997 U.S. Dist. LEXIS 18818, *

Background

PRescient owns a patent for a device that stabilizes covers and cushions on upholstered furniture. On October 7, 1996, PRescient commenced this action against the defendants alleging infringement of the patent, breach of a confidential disclosure agreement, misappropriation of trade secrets, false patent [*3] marking, and false advertising, among other claims.

On October 29, 1996, the defendants filed their answer, along with counterclaims and a Third-Party Complaint against Paula Riley, PRescient's principal. Subsequently, the parties negotiated an agreement to preserve the confidentiality of documents produced in the course of this litigation ("Confidentiality Agreement"), which this Court entered as a protective order on January 21, 1997. See Stipulated Protective Order, attached as Exh. A, Subexh. 5 n1 and Exh. C to Declaration of Kathryn E. Diaz in Support of Plaintiff's Motion for a Protective Order Directing Defendants to Comply with the 1/21/97 Protective Order and Return Privileged Documents, and Barring Defendants from Utilizing Such Material in Discovery or at Trial ("Diaz Decl."). Paragraph 16 of the Confidentiality Agreement states that when a party claims that privileged documents were inadvertently produced, the receiving party must "promptly return" the material but may move thereafter for an Order compelling production.

> n1 Exh. A to the Diaz Declaration includes five separate exhibits, each of which will be referred to as a subexhibit in this Memorandum and Order.

[*4]

On November 5, 1996, the defendants served their first document request. PRescient served its initial response to the defendants' request on May 15, 1997. Diaz Decl. P 16. To comply with its ongoing duty of document production, PRescient also produced documents to the defendants on May 23, June 9, August 15, and September 3, 1997. Diaz Decl. P 21. The May 23 and June 9 document productions included privileged communications with counsel. Diaz Decl. P 21 (identifying the documents produced on each date); Letter from Ned Branthover to Michael McCoy dated Sept. 9, 1997, attached as Exh. A, Subexh. 3 to Diaz Decl. (list of documents claimed to be inadvertently produced); Letter from Albert Allan to Ned Branthover dated Aug. 11, 1997, attached as Exh. E to Diaz Decl. (stating that the plaintiff's document production contained attorney-client communications).

Attorney Kathryn Diaz managed PRescient's document production. See Diaz Decl. PP 13-14, 18-20. Paralegals numbered approximately 16,000 documents retrieved from PRescient Partners' storage facility, and made three copies: the "pristine set," the "attorney set," and the "paralegal set." Diaz Decl. PP 14, 18; Ms. Diaz personally [*5] reviewed the "attorney set" and marked the privileged documents with a yellow sticker. Diaz Decl. P 19. She then gave the color-coded "attorney set" to paralegal Joseph Ramirez, who was to remove the specified documents from his "paralegal set" before shipping them to the defendants. Diaz Decl. P 20. Mr. Ramirez delegated this task to another paralegal, who shipped the documents without removing all the privileged material. Diaz Decl. P 24. Ms. Diaz's later investigation revealed that this second paralegal erred due to a "chronic and serious health problem which caused her to be unable to perform her job duties," a problem unknown to Ms. Diaz at the time of the document production. Diaz Decl. P 32. Apparently, the paralegal experienced a stress-related emotional breakdown in which she "froze up" and was unable to follow the directions.

PRescient learned that privileged documents had been sent to the defendants on August 11, 1997, when it received a letter from defendants' counsel. The letter stated that PRescient had "waived its privileges through voluntary disclosure of . . . communications between PRescient . . . and its counsel" and cited four disclosed documents. Diaz Decl. PP [*6] 22-23. The next day, Mr. Ramirez sent a letter to one of defendants' paralegals citing paragraph 16 of the Confidentiality Agreement and requesting the return of the privileged documents. Letter from Joseph Ramirez to Marcia Siuda dated Aug. 12, 1997, attached as Exh. A, Subexh. 1 to Diaz Decl. Defendants' counsel responded ten days later with a letter stating that they were conducting an investigation to determine whether they agreed that the documents were "inadvertently produced." Letter from Albert Allan to Ned Branthover dated Aug. 22, 1997, attached as Exh. A, Subexh. 2 to Diaz Decl.

PRescient's counsel then conducted a comprehensive review of the more than 12,000 pages that had been produced in order to determine if other privileged material had been disclosed. Diaz Decl. PP 26, 28. On September 9, 1997, they sent defendants' counsel a letter requesting the return of 117 pages of privileged material that had been included in the document production. Letter from Ned Branthover to Michael McCoy dated Sept. 9, 1997, attached as Exh. A, Subexh. 3 to Diaz Decl. Responding the next day, defendants' counsel refused to return the documents, claiming that the documents were not "inadvertently [*7] produced" and that PRescient had waived its privilege by producing

them. Letter from Albert Allan to Ned Branthover dated Sept. 10, 1997, attached as Exh. A, Subexh. 4 to Diaz. Decl. PRescient then filed the instant motion.

Discussion

A. General Standard for a Protective Order

*Rule 26(c) of the Federal Rules of Civil Procedure* provides that

> upon motion . . . accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, including . . .
>> (1) that the disclosure or discovery not be had;
>> (2) that the disclosure or discovery may be had only on specified terms and conditions . . . .

*Fed. R. Civ. P. 26(c).* The burden rests on the movant, *In re Agent Orange Product Liability Litigation, 821 F.2d 139, 145-46 (2d Cir. 1987),* who must establish good cause by a "particular and specific demonstration of fact[.]" *In re Akron Beacon Journal, 1995 U.S. Dist. LEXIS 5183, No. 94 Civ. [\*8] 1402, 1995 WL 234710,* at \*10 (S.D.N.Y. April 20, 1995) (citations omitted). PRescient has certified that it conferred in good faith with the defendants in an effort to resolve the issues raised in the motion without court action. See Diaz Decl. P 4. The plaintiff argues that good cause exists for issuing a protective order because the defendants breached paragraph 16 of the Confidentiality Agreement and because PRescient did not waive any privileges through disclosure of the documents. In response, the defendants argue that paragraph 16 does not govern this situation because the documents were not "inadvertently produced" as the term is defined by caselaw.

B. The Confidentiality Agreement

Paragraph 16 of the Confidentiality Agreement is entitled "Inadvertent Production of Privileged Information, Confidential Information or Restricted Information," and provides in relevant part:

> 16. If information subject to a claim of . . . privilege . . . is inadvertently produced, such production shall not . . . constitute a

waiver of . . . any claim of privilege . . . . If . . . a claim of inadvertent production is made . . . [the party in receipt of the documents] . . . [\*9] shall promptly return to the claiming party or person the material (and all copies thereof) as to which the claim of inadvertent production has been made. All notes or other work product reflecting the contents of such material shall be destroyed and any information in any computer database shall be deleted.

Stipulated Protective Order, attached as Exh. A, Subexh. 5 and Exh. C to Diaz Decl.

The defendants argue that because this provision uses the language "inadvertently produced," it incorporates caselaw on waiver of privilege through inadvertent production of privileged documents. Defendants' Memorandum in Opposition to Plaintiff's Motion for Protective Order at 4-13 ("Defendants' Memo."). Under the defendants' interpretation, paragraph 16 applies only where the privilege was not waived under governing caselaw because the producing party took reasonable steps to maintain the confidentiality of the disclosed documents. Defendants' Memo. at 4-13. See generally *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 1996 U.S. Dist. LEXIS 17094, No. 96 Civ. 2064, 1996 WL 668862,* at \*3 (S.D.N.Y. Nov. 19, 1996) ("Courts in this district . . . have found waiver of the privilege [as a result of inadvertent [\*10] production] only if the disclosing party failed to take reasonable steps to maintain the confidentiality of the assertedly privileged documents . . . .") (quotations and citations omitted). The defendants argue that the protective order does not govern these circumstances because PRescient failed to take such reasonable steps.

In contrast, PRescient maintains that paragraph 16 controls the instant situation regardless of whether the documents would be deemed inadvertently produced under governing caselaw. Taking the plain meaning of the provision's language, PRescient argues that it applies to any documents about which a claim of inadvertent production is made. Memorandum of Law in Support of Plaintiff's Motion for a Protective Order under *Fed. R. Civ. P. 26(c)* at 3 ("Plaintiff's Memo.").

Magistrate Judge Bernikow construed a similar provision in *Union Carbide Corp. v. Montell N.V., 1997 U.S. Dist. LEXIS 14330, No. 95 Civ. 0134 (S.D.N.Y. Aug. 15, 1997).* He held that the provision did not merely incorporate the caselaw standards governing inadvertent waiver because, if it did, the provision would have no effect. Id. at 4. Furthermore, the provision "was designed to protect the parties, who face massive [\*11] discovery

obligations, from having to litigate the issue of inadvertence." Id. Judge Bernikow noted however that "perhaps a completely reckless production of privileged documents would result in waiver." Id.

The same reasoning leads to the conclusion in this case that paragraph 16 does not incorporate the caselaw governing inadvertent waiver. The parties drafted this provision to provide for the out-of-court resolution of inadvertent production issues and to avoid litigating these issues. If the provision applied only to documents deemed inadvertently produced under governing caselaw, then the parties would have to brief that law for the court to determine even whether the provision applied to a particular situation. This would contravene the provision's purpose of protecting the parties from having to litigate inadvertent production issues. See Union Carbide, slip. op. at 4.

Thus, unless the production was "completely reckless," id., paragraph 16 governs any document as to which "a claim of inadvertent production is made." For a production to be "completely reckless," the producing party must have shown no regard for preserving the confidentiality of the privileged [*12] documents. Here, PRescient certainly attempted to preserve the documents' confidentiality. Attorney Diaz personally reviewed thousands of documents and color-coded the privileged documents to be pulled before shipment to the defendants. The error occurred when a paralegal experienced an emotional breakdown and failed to follow instructions. Because the production was not reckless, paragraph 16 governs the present situation.

C. Inadvertent Production of Privileged Documents

Even if the defendants were correct and paragraph 16 applied only where the privilege was not waived under governing caselaw, I would reach the same result. This is because, under the applicable legal principles, the privilege was not waived through the disclosure.

The voluntary disclosure of a document protected by the attorney-client privilege generally waives any claim of privilege as to that document. *Carter v. Rosenberg & Estis, P.C., 1996 U.S. Dist. LEXIS 17798, No. 95 Civ. 10439, 1996 WL 695866,* at *2 (S.D.N.Y. Dec. 4, 1996) (citing *In re von Bulow, 828 F.2d 94, 101 (2d Cir.1987)); Eigenheim Bank v. Halpern, 598 F. Supp. 988, 991 (S.D.N.Y. 1984).* However, if the disclosure is inadvertent, the privilege will not be waived [*13] unless the producing party's conduct was "so careless as to suggest that it was not concerned with the protection of the asserted privilege." *Aramony v. United Way of America, 969 F. Supp. 226, 235 (S.D.N.Y. 1997)* (citing *Desai v. American International Underwriters, 1992 U.S. Dist. LEXIS 6894, No. 91 Civ. 7735, 1992 WL 110731,* at *1 (S.D.N.Y. May 12, 1992)).

The standard test for waiver through inadvertent disclosure was developed in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Company, 104 F.R.D. 103, 105 (S.D.N.Y. 1985).* See *Aramony, 969 F. Supp. at 235; Lloyds Bank PLC v. Republic of Ecuador, 1997 U.S. Dist. LEXIS 2416, No. 96 Civ. 1789, 1997 WL 96591* at *3 (S.D.N.Y. Mar. 5, 1997); Liz Claiborne, 1996 WL 668862,* at *3; Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 443 (S.D.N.Y. 1995); Martin v. Valley National Bank of Arizona, 1992 U.S. Dist. LEXIS 11571, No. 89 Civ. 8361, 1992 WL 196798,* at *2 (S.D.N.Y. Aug. 6, 1992) (all applying Lois Sportwear test). Under the Lois Sportswear analysis, a court considers four factors in determining whether the release of documents was a "knowing waiver" or "simply a mistake, immediately recognized and rectified." *Lois Sportswear, 104 F.R.D. at 105.* These [*14] are: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of the discovery and the extent of the disclosure, and (4) overarching issues of fairness. *Id. at 105.*

1. Reasonableness of Precautions

The fact of disclosure does not necessarily mean that the precautions were unreasonable. *Bank Brussels Lambert, 160 F.R.D. at 443.* Generally, precautions will be reasonable if "the procedure followed in maintaining the confidentiality of the document [is] not . . . 'so lax, careless, inadequate or indifferent to consequences as to constitute a waiver.'" *Martin, 1992 WL 196798,* at *2 (quotation and citation omitted).

Here, the precautions taken by PRescient's counsel to preserve privilege were reasonable. Attorney Diaz personally reviewed the documents in the "attorney set," marked privileged documents, and instructed paralegal Ramirez to remove the designated documents before shipment to the defendants. Diaz Decl. PP 19-20. The other paralegal to whom Mr. Ramirez delegated this task had an emotional breakdown and failed to follow through. Diaz Decl. PP 24, 32.

PRescient's counsel explains [*15] that an attorney did not check the paralegals' duplication and sorting before shipment to the defendants because of the "press to produce documents." Plaintiff's Memo. at 5. However, this step was not necessary in order for the production to pass the reasonable precautions test. Imposing a duty on attorneys to personally double check simple tasks performed by paralegals in a large document production would needlessly increase the costs of litigation.

The defendants argue that PRescient's counsel failed to take reasonable precautions because it did not "ensure that someone was available that was capable of performing the duties involved." Defendants' Memo. at

8. However, Ms. Diaz did not know of the paralegal's health problem at the time of the production, Diaz Decl. P 32, and the record contains nothing to indicate that she was negligent in failing to be aware of it. Thus, the precautions taken by PRescient were reasonable. See *Aramony, 969 F. Supp. at 235-6* (precautions reasonable where four attorneys and three paralegals reviewed 630,000 pages of documents for privilege before shipment to defendants); *Lloyds Bank PLC, 1997 WL 96591,* at *4 (precautions reasonable where attorneys [*16] conducted document review); *Martin, 1992 WL 196798,* at *3 (same); *see also Lois Sportswear, 104 F.R.D. at 105* (precautions "only just adequate[]" where attorney demonstrated to paralegals which types documents were privileged and then delegated the segregation of privileged documents to the paralegals).

2. Time to Rectify Disclosure

"Inordinate delay in claiming the privilege can prejudice the adversary and may be deemed a waiver." *Bank Brussels Lambert, 160 F.R.D. at 445* (citation omitted). The delay should be measured from the time the producing party learns of the disclosure, not from the time of the disclosure itself. *Aramony, 969 F. Supp. at 237; Georgia-Pacific Corp. v. GAF Roofing Manufacturing Corp., 1995 U.S. Dist. LEXIS 3338, No. 93 Civ. 5125, 1995 WL 117871,* at *2 (S.D.N.Y. Mar. 16, 1995).

No inordinate delay occurred in this case because PRescient's counsel wrote defendants' counsel the day after learning of the error to demand return of the documents. Diaz Decl. P 25. See *Aramony, 969 F. Supp. at 237* (no waiver where counsel sent letter demanding return of documents the day after learning that privileged documents had been produced); *Georgia-Pacific, 1995 WL 117871,* [*17] at *2 (no waiver where producing party acted within two business days after discovery of inadvertent disclosure). After receiving the defendants' final refusal to return the documents on August 22, 1997, PRescient's counsel began a comprehensive review to uncover other inadvertently produced privileged material, Diaz Decl. at P 28, and sent the defendants what they believed was a comprehensive list of inadvertently produced documents eighteen days later, on September 9, 1997. See Diaz Decl., Exh. A, Subexh. 3.

The defendants argue that PRescient's attempt to rectify was not timely because it did not produce the list of inadvertently produced documents until September 9th, almost a month after it became aware of the disclosure. Defendants' Memo. at 8-9. In addition, recently conducted depositions have revealed six more pages of privileged attorney-client communications that were produced but were not listed in PRescient's

September 9th letter. Defendants' Memo. at 4. While PRescient could have begun its comprehensive review as soon as it learned of the disclosure on August 11th, the fact that it did not begin that review until August 22nd -- when counsel learned that the defendants [*18] would not immediately return the documents -- does not constitute an inordinate delay. Cf. *Baxter Travenol Laboratories, Inc. v. Abbott Laboratories, 117 F.R.D. 119, 121 (N.D.Ill. 1987)* (finding waiver where party waited over three months to assert privilege).

3. Scope of Discovery and Extent of Disclosure

The third Lois Sportswear factor focuses on the number of privileged documents disclosed in relation to the overall size of the document production. *Martin, 1992 WL 196798,* at *3-4 (no waiver where five protected documents disclosed out of 50,000 pages produced). "Courts have routinely found that where a large number of documents are involved, there is more likely to be an inadvertent disclosure rather than a knowing waiver." *Baker's Aid v. Hussmann Foodservice Co., 1988 U.S. Dist. LEXIS 14528, No. 87 Civ. 0937, 1988 WL 138254* at *5 (E.D.N.Y. Dec. 19, 1988) (no waiver where one document disclosed out of approximately 5,000 documents inspected); see also *Lois Sportswear, 104 F.R.D. at 105* (no waiver where 22 documents disclosed out of approximately 16,000 pages inspected).

PRescient produced 117 pages of privileged material. See Diaz Decl., Exh. A, Subexh. 3 (list of documents claimed [*19] to be inadvertently produced). However, this was less than one percent of the overall document production of 12,612 pages. Diaz Decl. P 21. More importantly, the circumstances surrounding the disclosure do not indicate recklessness regarding the documents' confidentiality. Virtually the entire disclosure n2 was caused by a single unforeseen error, the paralegal's emotional breakdown, as opposed to numerous errors evidencing imprudence. Therefore, despite the large size of the disclosure, this factor does not weigh in favor of the defendants. See *Lloyds Bank, 1997 WL 96591,* at *2-4 (finding no waiver where producing counsel inadvertently disclosed 227 pages of privileged documents in production involving approximately 10,000 pages of material and where counsel "committed only one error which resulted in the production of all fifty allegedly privileged documents, not fifty distinct errors").

> n2 All of the disputed documents except one were disclosed in a document production on May 23, 1997, when the paralegal apparently had her emotional breakdown. The other disputed

document (PP 7430-33) was disclosed in a document production on June 9, 1997.

[*20]

### 4. Fairness

Absent any prejudice to the defendants caused by restoring immunity to the documents, "it would be inappropriate for the client of producing counsel to suffer the waiver of privilege . . . due to an isolated, inadvertent error." *Aramony, 969 F. Supp. at 237.* Some of the disclosed documents involve attorney-client communications about case strategy in the instant case and could be damaging to PRescient. The defendants claim that preserving the documents' privileged status would prejudice them by depriving them of evidence to challenge PRescient's claims for damages and attorneys' fees. Defendants' Memo. at 11-13. However, "the prejudice factor focuses only on whether the act of restoring immunity to an inadvertently disclosed document would be unfair, not whether the privilege itself deprives parties of pertinent information." *Bank Brussels Lambert, 160 F.R.D. at 446.* The defendants have not shown that unfairness would result from restoration of the privilege. Therefore, the fourth factor also weighs in PRescient's favor. Based on the *Lois Sportswear* factors, then, there has been no waiver of the attorney-client privilege.

### D. Relief

As discussed above, [*21] paragraph 16 of the *Confidentiality Agreement governs this situation.* Therefore, as provided in that paragraph, the defendants shall: (1) promptly return to PRescient the material (and all copies thereof) listed in Ned Branthover's September 9, 1997 letter to Michael McCoy, see Diaz Decl., Exh. A, Subexh. 3; (2) destroy all notes or other work product reflecting the contents of such material; and (3) delete any information in any computer database reflecting the contents of these documents. Furthermore, the defendants are prohibited from using these documents or references to these documents in discovery or at trial.

In addition, PRescient asks for an award of costs and attorneys' fees for making this motion. Plaintiff's Memo. at 7. This application is governed by *Rule 37(a)(4)(A) of the Federal Rules of Civil Procedure,* which authorizes a court to:

> require the party . . . whose conduct necessitated the motion or the party or

attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that . . . the opposing party's . . . response . . . was substantially [*22] justified, or that other circumstances make an award of expenses unjust.

*Fed. R. Civ. P. 37(a)(4)(A).* Under this rule, then, attorneys' fees and expenses must be awarded unless the defendants' conduct was "substantially justified" or "other circumstances make an award of expenses unjust." *Sanstrom v. Rosa, 1996 U.S. Dist. LEXIS 11923, No. 93 Civ. 7146, 1996 WL 469589,* at *7 (S.D.N.Y. Aug. 16, 1996).

In this case, the defendants refused to return the documents because they believed that paragraph 16 of the Confidentiality Agreement incorporated general principles governing inadvertent disclosure and that PRescient had waived its privilege under the applicable caselaw. That position was not unreasonable. Paragraph 16 is subject to alternative interpretations, including the one offered by the defendants. Furthermore, the defendants' argument that PRescient waived its privilege under the *Lois Sportswear* test was warranted considering both the large number of privileged documents produced and the fact that the defendants were unaware that the disclosure was attributable to the paralegal's emotional breakdown when they originally refused to return the documents. Therefore, although the defendants' position [*23] was not ultimately vindicated, it was "substantially justified," and I decline to award costs or attorneys' fees.

### Conclusion

For the reasons set forth above, the plaintiff's motion is granted except that the application for sanctions, including costs and attorneys' fees, is denied.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

November 26, 1997