

Westlaw.

Not Reported in F.Supp.
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
J T GIBBONS, INC.
v.
SARA LEE CORPORATION.
**Civ. A. No. 93-4050.**

Oct. 19, 1995.

*ORDER AND REASONS*

DUVAL, District Judge.

*1 Before the Court is a Motion for Summary Judgment filed on behalf of Sara Lee Corporation and Bryan Foods, Inc. (hereinafter collectively "Bryan"). After having entertained oral argument and having reviewed the pleadings, the copious memoranda, the voluminous exhibits and the relevant law, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment.

I. BACKGROUND

This is a breach of contract case involving a 1968 contract, a 1981 letter agreement and a series of negotiations for a third contract in 1992 and 1993. Specifically, J.T. Gibbons, Inc. (hereinafter "Gibbons") alleges breach of contract, negligent misrepresentation, detrimental reliance and Unfair Trade Practices violations.

Bryan is a Mississippi-based manufacturer of fresh and canned meat products. It sells these products under several brand names, including "Bryan", "Sweet Sue", "Picnic", and others. Bryan also manufacturers "private label" products for third parties, which arrange to have their labels affixed to the product after Bryan packs them. [FN1] Currently Hygrade Food Products Associates, an Illinois limited partnership holds Bryan's stock. Sara Lee is the general partner of Hygrade.

Gibbons is an export management company located in Metairie, Louisiana. Cecil Keeney bought Gibbons in 1975 and divided the company's stock with his two sons, Richard (President) (hereinafter "Keeney") and Michael (Vice-President).

In November 1968, Gibbons and Bryan Brothers Packing Company ("BBPC"), one of Bryan's predecessor companies, entered into a contract which appoints Gibbons as exclusive sales agent for Bryan's canned meat products in all territories outside of the continental U.S., with the exception of several countries and Puerto Rico.

In December 1981, the parties entered into a letter agreement. Bryan contends that this agreement superseded the 1968 contract while Gibbons contends that the 1981 agreement is to be read in conjunction with the 1968 agreement. Gibbons' Keeney and Bryan's former General Manager Terry Wilkey (hereinafter "Wilkey") were the only signatories to the 1981 agreement.

Nevertheless, Bryan contends that Gibbons breached the 1981 agreement thereby excusing any alleged Bryan breaches. Specifically, Bryan contends that Gibbons breached this agreement by offering and selling Hormel products to the Honduran Military Commissary. Further, Bryan contends that Gibbons refused to perform under this agreement in 1992-93 rendering its claims of breach against Bryan unenforceable.

Gibbons, on the other hand, contends that Bryan consistently breached the 1981 agreement by using companies other than Gibbons to export its canned meat products into territories covered by its contract with Gibbons. Specifically, Gibbons contends that these companies sold private label canned meat in competition to Gibbons' sales of Bryan canned meat violating the 1981 agreement. Further, Gibbons contends that Bryan breached the 1981 agreement by selling Bryan canned meat to the United States military for consumption during Operation Desert Storm.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

Page 2

*2 In 1992-93, negotiations were initiated between Gibbons' Keeney and Bryan's Richard Lanke (hereinafter "Lanke"). Keeney testified that the result of the 1992-93 negotiations was to be a long-term written agreement [FN2] between Bryan and Gibbons unlike the prior agreements which contained short cancellation clauses. *See* Keeney Dep. 965-66. During these negotiations, Lanke provided Keeney with a draft contract. After reviewing that draft, Keeney made handwritten changes to it and sent it back to Lanke with a note reading "I have inclosed the changes I wish made." *See* Bryan Exhibit 12-10. Keeney alleges that a binding oral contract existed thereafter. [FN3] Specifically, Keeney contends that "at the time Mr. Lanke boarded the airplane to travel with [[Keeney] to meet Gibbons' Middle East Customers, the parties had committed to a long term contract on the terms set forth in the draft contract" including Keeney's handwritten changes. *See* Keeney Dep. p. 495-98.

At the very least, Gibbons alleges that the 1992 negotiations form the basis of a claim for detrimental reliance. Specifically, Keeney contends that he would not have introduced Lanke to Gibbons' Middle East Customers if he had known that Bryan was also negotiating with Zetra. *See* Keeney Dep. p. 378-79.

Lastly, Gibbons claims that Bryan's actions during the 1992-93 negotiations constitute bad faith actionable by the Louisiana Unfair Trade Practices Act, La. R.S. 51:1405 (hereinafter "LUTPA"). Specifically, Gibbons contends that Bryan's simultaneous travels with Keeney and negotiations with Zetra were in bad faith and, as such, violative of LUTPA.

II. MOTION TO STRIKE

Before reaching the merits, the Court must determine which documents in the record should be considered. Specifically, Bryan has moved to strike Gibbons' references to two affidavits and various deposition excerpts.

A. SULLIVAN AFFIDAVIT

First, Bryan moves to strike the affidavit of Jim Sullivan (hereinafter "Sullivan"), a former Gibbons employee. In that affidavit, Sullivan states that the intent of the 1981 agreement was "to reconfirm Bryan's commitment to push its canned meat product line. It was not the intent of this document to supersede or abrogate the 1968 agreement." *See* Affidavit of Jim Sullivan (Gibbons' Memorandum in Opposition to Defendants' Motion to Strike, Exhibit 1). That opinion is based on "[his] involvement in the negotiations that led up to the execution of the 1981 letter agreement, and discussions [he] had with [[[Gibbons' President], Richard Keeney (hereinafter "Keeney") and [Bryan's former General Manager], Terry Wilkey (hereinafter "Wilkey")...." *Id.* Since Sullivan did not sign the 1981 agreement, the Court finds his affidavit curious. [FN4] Further, as stated *infra,* Wilkey's undisputed testimony indicates that he was completely unaware of the 1968 contract when he signed the 1981 agreement. [FN5]

"Supporting and opposing affidavits" on summary-judgment motions "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See* Fed.R.Civ.P. 56(e). An affidavit based merely on information and belief is unacceptable. *See Londrigan v. Federal Bureau of Investigation,* 670 F.2d 1164, 1174 (1981).

*3 Irrefutably, the most critical part of the Sullivan affidavit does not rise to the level of Rule 56(e) demands. [FN6] It is undisputed that Sullivan was not a signatory to the 1981 agreement. Sullivan is competent to testify to his participation in the negotiations. At this point, however, Sullivan's competence terminates. He cannot possibly have personal knowledge of others intentions. Thus, even if this court were to rely on Sullivan's affidavit, it is not dispositive of the parties' intentions. Despite its probative value, the Court agrees that the affidavit is improper summary judgment evidence and, as such, the Motion to Strike this affidavit is GRANTED.

B. DEPOSITION EXCERPTS

Second, Bryan moves to strike excerpts from the following depositions: Richard Keeney, Terry Wilkey, Marwan Kabbani, Carolyn Sanders and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

Page 3

Andre Baira.

1. RICHARD KEENEY DEPOSITION EXCERPTS

Bryan moves to strike certain excerpts of Keeney's deposition testimony which total over nine hundred pages claiming that they are not based on personal knowledge. Inasmuch as Keeney testified that he did not know certain things, the Court disagrees with Bryan. Specifically, an answer of "I don't know" does not necessarily require that testimony stricken. Deponents are not required to testify to a certainty in all areas of their universe of knowledge. *See Nicholas Acoustics, ETC. v. H & M Const. Co., Inc.,* 695 F.2d 839 (5th Cir. 1983) (court held that parties' response must set forth facts supporting allegation or denial). Thus, Keeney's admissions of ignorance in certain areas will be interpreted, if necessary, to surmise his intentions and, as such, his lack of knowledge will not suffice to create a genuine issue of material fact. Instead of striking bits and pieces of Keeney's testimony, the Court will evaluate the entire deposition which sets forth Keeney's universe of knowledge regarding the facts in this case.

2. TERRY WILKEY DEPOSITION EXCERPTS

Bryan objects to the excerpt of Wilkey's deposition wherein he, in essence, states, to the best of his knowledge after perusing the files, that the 1968 contract was not in Bryan's files. Such testimony is permissible Rule 56 evidence. That rule does not require absolute certainty. Rather, it requires testimony based only on personal knowledge. Wilkey did not testify that the document was lost. Instead, he simply testified that he was unable to find it in the file.

3. MARWAN KABBANI DEPOSITION EXCERPTS

Bryan objects to Gibbons' Kabbani's testimony regarding his understanding of the relationship between Bryan and Gibbons claiming that it is hearsay. Specifically, Kabbani testified that "[he] was not aware" of whether Bryan and Gibbons had a contract. Inasmuch as Kabbani testified regarding the nature of any contractual relationship, that testimony is improper under Rule 56. Kabbani, however, is able to testify as to his actions relating to Bryan sales.

4. CAROLYN SANDERS DEPOSITION EXCERPTS

*4 Bryan objects to Gibbons' use of Sanders' deposition to "prove" that Bryan's Lanke was familiar with the 1981 agreement. Bryan's objections are well-founded. These excerpts indicate that Sanders' assumptions about the relationship between Gibbons and Bryan upon which her testimony rely are faulty. Specifically, Sanders testified that Gibbons was a broker and, as such, must be operating pursuant to a written contract. Indeed, it is undisputed that Gibbons was a distributor and not a broker. Further, Sanders is unable to competently testify as to what another person, Lanke, knew, did not know, or should have known. Thus, Sanders' testimony does not rise to the level of personal knowledge as is required by Rule 56.

5. ANDRE BAIRA DEPOSITION EXCERPTS

Bryan objects to Baira's testimony on hearsay grounds. Specifically, when asked the basis of his opinion, Baira testified that "[he was] sure that [was] what Richard Keeney would have requested." Such testimony clearly does not rise to level of necessary for summary judgment.

C. ORIHEL AFFIDAVIT

Lastly, Bryan moves to strike the affidavit of its designated expert witness, C. Ted Orihel as proof of the damages Gibbons has sustained. Specifically, Bryan contends that Orihel's affidavit is "immaterial and improper" because Bryan only contests Gibbons' damages insofar as Gibbons can prove causation between the alleged damages and Gibbons' reliance on Bryan's alleged promise.

Gibbons, however, contends that Orihel's affidavit is proper as an expert affidavit pursuant to Fed. R. Evid. 705 and, as such, presents the necessary "process of reasoning beginning from a firm foundation" citing *Mid-State Fertilizer v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333 (7th Cir. 1989).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

Page 4

Orihel's affidavit, as Bryan contends, is immaterial because Bryan does not contest whether Gibbons suffered damages. Rather, Bryan contests whether Gibbons suffered damages as a result of Bryan's promise. [FN7] Thus, insofar as Orihel's affidavit does not address causation, it is immaterial to the current motion for summary judgment.

III. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When a moving party satisfies the requisites of Rule 56(c), a motion for summary judgment should be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial. Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (emphasis supplied).

*5 Thus, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Finally, the court notes that the substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court now turns to the merits of the arguments with these standards in mind.

IV. ANALYSIS

Evidence in the record supports conflicting understandings of the relationship between Gibbons and Bryan. Giving credence to the inferences most favorable to Gibbons, the non-moving party, the Court concludes that Bryan is entitled to judgment as a matter of law on Gibbons' claim for breach of the 1968 contract, Gibbons' claim for breach of the 1981 agreement relating only to military sales and Gibbons' claim that a contract was formed during the 1992 negotiations. On the other hand, Gibbons' claim for breach of the 1981 letter agreement including whether it encompasses private label sales, Gibbons' claim for detrimental reliance and Gibbons' claim under the Unfair Trade Practices claim may not be dismissed summarily.

The law to be applied here is, of course, that of the State of Louisiana. *Erie R. Co. v. Tompkins*, 58 S. Ct. 817 (1938).

A. The 1968 Contract

The gravamen of the dispute surrounding the 1968 contract is whether it remains viable after the signing of the 1981 agreement. Specifically, Bryan contends that the 1981 agreement supersedes the 1968 contract citing *CMS Industries v. LPS Int'l*, 643 F.2d 289, 294 (5th Cir. 1981). In *CMS*, the Fifth Circuit held that "when the two agreements are read together, it is evident that an attempt was made to undo in one precisely what was done in the other. Hence, we cannot, as the long-standing rule of construction enjoins, so read them as to preserve both." *Id.*

Gibbons, on the other hand, contends that the 1981 agreement is to be read in conjunction with the 1968 contract citing *Admiral Paint Co. v. Goltzman*, 254 So. 2d 104 (La. App. 3d Cir. 1971). In *Admiral*, the court held that

[W]hen more than one instrument is used, it becomes necessary to ascertain whether or not the parties contemplated that all are to be construed together in deriving the totality of the contract, thus, enabling complete evaluation as to the rights and obligations of the parties.

*Id.* at 106 (footnotes omitted).

The 1981 agreement covered precisely the same object as the 1968 obligation. The 1981 agreement, however, makes no reference to the 1968 contract. The 1981 agreement "confirms" Bryan's appointment of Gibbons as Bryan's sales agent in foreign territories excluding Puerto Rico, the Virgin Islands, Jamaica, Trinidad, and Barbados. The 1968

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

Page 5

contract, however, excludes two other countries, Curacao and British Honduras, but includes Jamaica, the Virgin Islands, and Barbados. [FN8] Further, the 1981 agreement transforms the nature of the relationship between Bryan and Gibbons. The 1981 agreement states that Gibbons was to act as Bryan's agent. Yet the 1968 document makes very clear that Gibbons was not an agent or representative of Bryan for any purpose. [FN9] Thus, according to the Fifth Circuit's pronouncement in *CMS*, it is clear that an "attempt to undo in one [1981 contract] precisely what was done in the other [1968 agreement]" such that, the Court cannot "preserve them both." *See CMS Industries v. LPS Int'l,* 643 F.2d 289, 294 (5th Cir. 1981).

*6 In further support of the Court's finding that the 1981 agreement can not be read in conjunction with the 1968 contract. The 1981 agreement was signed by Keeney and Wilkey. Wilkey testified that he was completely unaware of the 1968 contract. *See* Wilkey Dep. at 157-58. That testimony is undisputed.

Keeney's testimony regarding his intent is not so clear. Specifically, Keeney testified as follows regarding his intentions in 1981:
  Q. You don't know what you intended in 1981?
  A. That is a possibility.
*See* Keeney Dep. at 637. Keeney, however, did testify that "in all likelihood, [[he] reviewed [the 1968 contract] at the time [he] purchased the company [[1975] and possibly also at this time as well [1981]." *See* Keeney Dep. at 635. Keeney further testified that "[the 1981 agreement] does affect the 1968 agreement, but only in certain specific areas, but it does not supersede it, in my opinion." *See* Keeney Dep. at 637.

For purposes of this motion, the Court will assume that Keeney intended to "amend" the 1968 contract and not supplant it by the 1981 agreement. The evidence, however, is undisputed that Wilkey had no such intentions. Rather, Wilkey's testimony indicates that he had no knowledge of the 1968 contract when he signed the 1981 agreement. Thus, according to the teachings of *Admiral* and Wilkey's lack of knowledge, this Court must conclude that the parties did not contemplate that [both contracts] are to be construed together in deriving the totality of their agreement. [FN10] In the instant suit, the writings were signed thirteen (13) years apart. Furthermore, Gibbons is unable to prove that the parties contemplated that both contracts were to be read together since Wilkey's undisputed testimony is that he was unaware of the 1968 contract. Thus, Keeney's intentions are not dispositive. [FN11] Therefore, after the 1981 agreement was signed, it alone governed the relationship between Bryan and Gibbons.

B. The 1981 Agreement

Next, the Court must determine the viability of the 1981 agreement from the date of its inception through the 1992-93 negotiations. Bryan contends that Gibbons breached this agreement by selling Hormel products to the Honduran Commissary. Specifically, Bryan contends that this agreement precluded Gibbons from selling competitive items. Further, Bryan contends that this alleged breach is significant because Bryan provided Gibbons with the Honduran Commissary lead.

Gibbons, on the other hand, denies breaching the 1981 agreement. Specifically, Gibbons claims that the agreement provides that Gibbons shall not "represent and offer for sale any competitive item or items." *See* Gibbons Exhibit 6, (1981 agreement). Indeed, Gibbons contends that there is no evidence that they ever represented and offered for sale another supplier's product.

Bryan, however, is unable to prove that Gibbons sold a competing product in violation of the 1981 agreement. Instead, Bryan relies on an unsigned letter written by Gibbons' former marketing manager, Anthony Jarana (hereinafter "Jarana") which states that "the Honduras Military Commissaries are again in the market for at least one container load of your excellent Hormel products, ... [Spam]." *See* Bryan Exhibit 9-2. Even if Bryan were to prove that Gibbons sold Spam in Honduras in addition to other isolated sales allegedly violative of the 1981 agreement, Bryan fails to prove that these breaches are of such a significant nature as to justify a termination of rights.

*7 Louisiana law recognizes the principle that where one party substantially breaches a contract

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the other party to it has a defense and an excuse for non-performance. *Sullivan v. Carpenter,* 193 So. 2d 105 (La. App. 1st Cir. 1966).

Bryan cites *Olympic Insurance Company v. H.D. Harrison, Inc.,* 463 F.2d 1049 (5th Cir. 1972), *cert. denied* 93 S. Ct. 1373 (1973), for the proposition that Gibbons' alleged breaches are significant as a matter of law and, as such, excuse any Bryan "breaches." The *Olympic* case, however, is clearly distinguishable from the instant one. There Harrison (agent) claimed that Olympic (principal) had breached the parties' contract by failing to give the requisite 90 days notice of termination. The Fifth Circuit agreed with Olympic that Harrison's numerous breaches excused Olympic's breach. Harrison's admitted breaches were quite serious. The following is simply an illustrative list of Harrison's breaches:

1) Harrison sold insurance policies having a term of seven years, but only remitting one year's premiums to Olympic; and

2) Harrison withheld $50,000 in premiums due Olympic; and

3) Harrison attempted to withdraw his personal guaranty; and

4) Harrison transferred assets out of the corporation. *Id.* at 1051.

Gibbons' alleged breaches in the instant case are not so easily classified as substantial. Rather, such a determination must be made by a jury after hearing all of the evidence. *See Ouachita Nat. v. Gulf States Land & Dev.,* 579 So. 2d 1115 (La. App. 2 Cir. 1991) (court held that determination of whether breach is substantial involves factual issues and may not be disposed of by motion for summary judgment).

### 1. Private Label Sales

Gibbons, on the other hand, contends that Bryan consistently breached the 1981 letter agreement by selling private label canned meat products and by selling canned meat products to the military. Relying on the 1981 agreement and the testimony of its author, Wilkey, Gibbons contends that selling private label canned meat in competition to Gibbons' sales efforts would amount to "[Bryan] cutting [its] nose off to spite [its] face." *See* Wilkey Dep. p. 216. Gibbons' appointment as "exclusive sales agent for Bryan Canned Meat products" could reasonably be construed to include private label canned meat. This construction is buttressed by Wilkey's own testimony as follows:

> A. I will just say this; it would be somewhat defeating our purpose. You know we're trying to build Bryan label business in these areas; it would be defeating our purpose if we willingly accepted private label business knowing, in fact, that it was going to go into these areas. And what would be accomplishing; nothing.

*See* Wilkey Dep. p. 218.

"In their 25-year 'association,' Gibbons never once sold the Bryan-produced private label products of third parties," and, as such, Bryan claims that the 1981 agreement does not encompass private label sales. Such an argument, however, is facile. Specifically, Gibbons presented testimony from Bryan's Lanke stating that "[m]y discussions with Mr. Keeney over the period of time that we discussed [private label commissions] ... were partly whether Bryan Foods was obligated to do it ...." *See* Lanke Dep. p. 50. Indeed, the parameters of the 1981 agreement can not be defined to exclude private label sales simply because Gibbons sold no private label products.

*8 Based on the testimony of Bryan's Wilkey, who negotiated, drafted and signed the 1981 agreement, Bryan's Lanke and noting that any contractual ambiguities must be construed against the drafter, [FN12] the Court concludes that Gibbons' claim for breach resulting from Bryan's continued sales of private label canned meats in competition to Gibbons' sales is not subject to dismissal. Thus, the motion for summary judgment is denied as it pertains to Gibbons claim for breach resulting from Bryan's sales of private label canned meat products.

### 2. Military Sales

Gibbons further contends that Bryan breached the 1981 letter agreement by selling canned meat products to the United States military. This contention is devoid of merit in light of the unambiguous language of that agreement. Specifically, the 1981 agreement appoints Gibbons as "exclusive sales agents for Bryan Canned Meat

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A0055800000... 2/18/2005

Not Reported in F.Supp.
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

Page 7

products...in all territories outside the continental limits of the United States of America...." (emphasis added). That agreement further provides that "[Bryan] looks forward ... toward developing a ... rewarding canned meat export sales business." (emphasis added). It is clear that the 1981 agreement can not possibly encompass sales made in the United States. *See* Gibbons Exhibit 6, (1981 agreement). Nor can sales made to the United States in the United States constitute export sales. Further, Gibbons has failed to put forth any evidence, as it is required to do under Rule 56, that the Bryan canned meat admittedly consumed by the armed forces, was purchased outside the United States. Thus, Gibbons' claim for military sales pursuant to the 1981 agreement must be dismissed.

C. The 1992-93 Negotiations

The gravamen of this claim is Gibbons' contention that the 1992-93 negotiation resulted in the formation of an oral contract. Such a contention, however, is not supported by the evidence. Indeed, Keeney's own testimony and writings indicate that he required a written agreement. Specifically, Keeney sent a letter to Bryan's Loeffelbein, after his trip with Lanke, stating that "[f]inalization of a written agreement would assure Bryan Meats of the exclusive services of J.T. Gibbons for Bryan products." *See* Keeney Dep. Exhibit 1-67. Thus, Keeney's claim that an oral contract was formed when Lanke boarded the plane is without merit.

The Louisiana Civil Code art. 1947 states that where "the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." La. Civ. Code art. 1947 (West 1987). The evidence indicates that the parties indeed contemplated a final writing. *See* Lanke Aff. ¶ 12. The agreement is contained in a four-page writing. Further, that document has blank lines for the parties' signatures. *See* Bryan Exhibit 1, Exhibit 1-24. Lastly, Keeney himself testified that the agreement was not finalized until signed. *See* Keeney Dep. p. 963. Because no agreement was signed as contemplated by the parties, no contract was confected as a result of these negotiations and, as such, summary judgment must be granted. *See Boothe v. May*, 425 So. 2d 313, 314 (La. App. 3d Cir. 1982).

D. Detrimental Reliance

*9 Gibbons also seeks recovery under Louisiana Civil Code article 1967, which provides in pertinent part:
> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

To recover under article 1967, Gibbons must establish that Bryan made a promise on which Gibbons relied justifiably and to its detriment. *See Breaux v. Schlumberger Offshore Services*, 817 F.2d 1226, 1229 (5th Cir. 1987). Gibbons need not prove the existence of a contract to establish its claim of detrimental reliance, even in a context where a contract would normally govern. *See Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058 (5th Cir. 1993) (allowing a plaintiff to proceed to trial under detrimental reliance).

Gibbons predicates this claim on various of Bryan's statements. The most notable of these include a February 18, 1993 letter authored by Bryan's Mathews which states, in pertinent part, that "[Gibbons] is presently involved in contractual negotiations for (sic) 6 (six) year representation." *See* Gibbons Exhibit 36. Furthermore, Mathews testified that he "agonized" over the decision to hire Zetra, in light of the fact that he "had made commitments" to Gibbons such as "the private label agreement with Al-Moudi." *See* Gibbons Exhibit 17, pgs. 275-76. Indeed, a jury could find that Gibbons had expended considerable time, money and effort, and had provided Bryan with its "customer list", in reasonable reliance on the commitment Bryan expressed to enter into a long-term distribution contract. Thus, summary judgment is not appropriate on Gibbons' claim for detrimental reliance.

E. The Louisiana Unfair Trade Practices Act

Gibbons' unfair trade practices claim is governed by The Louisiana Unfair Trade Practices and Consumer Protection Law (hereinafter "LUTPA").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                           Page 8
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

That act declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are illegal. La.Rev.Stat. § 51:1409. The real thrust of the LUTPA, modeled after the Federal Trade Commission Act, 15 U.S.C. § 45, is to deter injury to competition. *See e.g., Federal Trade Comm'n v. Raladam Co.*, 283 U.S. 643 (1931) (construing the Federal Trade Commission Act). [FN13] Louisiana has left the determination of what is an "unfair trade practice" to the courts to decide on a case-by-case basis. *Marshall v. Citicorp. Mortg. Inc.*, 601 So. 2d 669, 670 (La. App. 5th Cir. 1992). An "unfair trade practice" is defined as one that is "unethical, oppressive, unscrupulous, or substantially injurious." *See Bolanos v. Madary*, 609 So. 2d 972, 977 (La. App. 1992), *writ denied*, 615 So. 2d 339 (1993). While mere negligence is not prohibited, fraud, misrepresentation, deception, and similar conduct are. *Marshall*, 601 So. 2d at 670.

*10 In the instant suit, the evidence, at a minimum, supports the submission of Gibbons' LUTPA claim to a jury. Specifically, Keeney contends that Bryan deceived him by negotiating with Zetra and Gibbons simultaneously. *See* Mathews' Dep. at 275-76, 279-80. Further, Gibbons contends that Bryan was engaged in a price manipulation conspiracy with Zetra in an attempt to force Gibbons out of the Saudi Arabian market by conspiring with Zetra. *See* Gibbons Exhibit 42. Based on these allegations, the LUTPA claim is not deficient as a matter of law and, as such, summary judgment is not appropriate. *See Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993).

F. Attorneys' Fees

In light of the Court's finding on the LUTPA claim, the issue of attorneys' fees is moot at this time.

Accordingly,

IT IS ORDERED that Bryan's Motion for Summary Judgment is GRANTED as it pertains to Gibbons' claim for breach of the 1968 contract, Gibbons' claim for breach of the 1981 letter agreement only relating to military sales, and Gibbons' claim that an oral contract was formed in 1992-93.

IT IS FURTHER ORDERED that Bryan's Motion for Summary Judgment is DENIED as it pertains to Gibbons' claim for breach of the 1981 letter agreement save the previously dismissed military sales claim, Gibbons' claim for detrimental reliance and Gibbons' claim under the Unfair Trade Practices Act.

> FN1. One aspect of Gibbons' suit involves the alleged sale of private label goods in breach of the 1981 letter agreement which will be discussed *infra*.
>
> FN2. *See* Keeney Dep. Exhibit 1-67 (Letter from Keeney to Bryan's President, Roger Loeffelbein (hereinafter "Loeffelbein"), wherein Keeney states that "[f]inalization of a written agreement would assure Bryan Meats of the exclusive services of J.T. Gibbons ....")
>
> FN3. Gibbons makes clear that it has never urged the existence of a written contract. Rather, Gibbons alleges that an oral contract was confected.
>
> FN4. Sullivan's affidavit is no different than Lanke's affidavit about which Gibbons claims that "[Mr. Lanke's affidavit] is nothing more than rank speculation and hearsay, as he was not a party to the letter.... This hearsay should not be considered by the Court in ruling on the instant motion as it is not admissible evidence as required by Fed. R. Civ. Pro. 56.
>
> FN5. Keeney, the only other signatory to the 1981 agreement, testified, as stated *infra*, that he has no specific recollection of the 1968 contract when he signed the 1981 agreement.
>
> FN6. That part being the one in which Sullivan states that "[i]t was not the intent of [the 1981 agreement] to supersede or abrogate the 1968 agreement."
>
> FN7. The Court addresses Gibbons' claim for detrimental reliance *infra*. Nevertheless, in support of causation,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 619770 (E.D.La.)
(Cite as: 1995 WL 619770 (E.D.La.))

Page 9

Gibbons contends that it gave Bryan a list of customers based on the 1992-93 negotiations and the "promise" of a long-term contract. *See* Keeney Dep. pp. 929-30, Lanke Dep. pp. 252-54. Gibbons further contends that it lost those customers to Zetra when Bryan reneged on its promise.

FN8. *See* Bryan's Exhibit 12-1 (1968 Contract) and 12-3 (1981 agreement).

FN9. *See* supra, Note 8.

FN10. The cases which hold that multiple, interrelated documents should be construed together generally involve documents which were executed on the same date or within days of one another. *See e.g., Tramonte v. Palermo,* 640 So. 2d 661 (La. App. 3d Cir. 1994); *Lagarde v. Elms,* 541 So. 2d 413 (La. App. 4th Cir. 1989); *Bailey v. Railroad Co.,* 84 U.S. (17 Wall.) 96, (1873) (The Supreme Court held that
[I]t is well-settled law that several writings executed between the same parties substantially at the same time and relating to the same subject-matter may be read together as forming parts of one transaction....
*Bailey,* 84 U.S. at 108.

FN11. Despite the Court's prior ruling, Sullivan's affidavit cannot change Wilkey's intentions or lack thereof as is the instant situation.

FN12. *See Lumar Marine, Inc. v. Insurance Co. of North America,* 910 F.2d 1267 (5th Cir. 1990).

FN13. Louisiana courts have recognized the appropriateness of referring to federal interpretations when deciding unfair trade practices cases. *Rousatabouts, Inc. v. Hamer,* 447 So. 2d 543, 548 (La. App. 1984).

1995 WL 619770 (E.D.La.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



LEXSEE 1993 U.S. DIST. LEXIS 7957

KONSTANT PRODUCTS INC., Plaintiff-Counterdefendant, v. FRAZIER INDUSTRIAL COMPANY, INC., Defendant-Counterclaimant.

No. 91 C 4491

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1993 U.S. Dist. LEXIS 7957*

June 7, 1993, Decided
June 8, 1993, Docketed

LexisNexis(R) Headnotes

JUDGES: [*1] BOBRICK

OPINIONBY: EDWARD A. BOBRICK

OPINION:

REPORT AND RECOMMENDATION of Magistrate Judge Edward A. Bobrick

Before the court are the following motions: (1) the motion of defendant-counterclaimant Frazier Industrial Company, Inc. ("Frazier") for summary judgment on the issue of patent infringement by plaintiff-counterdefendant Konstant Products, Inc. ("Konstant") on Frazier's United States Patent No. *4,341,313* ("Patent 313"); (2) the motion of Konstant for summary judgment on the issue of patent infringement by Frazier on Konstant's United States Patents Nos. *4,773,546*; *4,915,240*; and *5,080,241* ("Patent 546," "Patent 240" and "Patent 241"); (3) the motion of Konstant for summary judgment on the issue of laches and estoppel; and (4) the motion of Konstant for summary judgment on the validity of Frazier's Patent 313.

In an ordinary case, the court might label this matter as "cross-motions for summary judgment," but that would be somewhat inaccurate here. Konstant has chosen to proliferate these proceedings by filing three separate motions for summary judgment and one supplemental memorandum of law. In all, this tactic has led to the parties filing fifteen different memoranda of law and a dozen [*2] separate Local Rule 12 submissions -- be they statements of undisputed facts or responses thereto -- which, when combined with the accompanying exhibits, amount to nearly one-thousand pages of materials. Given that this is a patent case encompassing four separate patents, that is not an unseemly amount of argument and evidence. n1 The fact that the parties assure the court that this case is perfectly amenable to summary judgment -- that there exist no material issues of fact for trial -- stretches credulity, however, given the sheer magnitude of the record the parties have created. Surely a genuine issue of material facts lurks somewhere in the dozen factual statements that have been filed. As the parties assure us this is not the case, we endeavor to determine whether either party is entitled to judgment as a matter of law. n2

> n1 We feel constrained to mention that the parties did reach the outer perimeter of acceptable and appropriate argument, which in content often alternated between minutia, pithiness, and at times pettiness.

> n2 In order to simplify citation to the blizzard of documents the parties have snowed upon the court, abbreviations in the text correspond to the following key:

| Document | Abbreviation |
|---|---|

Case 2:03-cv-00294-DN   Document 447-2   Filed 05/04/05   PageID.3605   Page 11 of 20

Page 2
1993 U.S. Dist. LEXIS 7957, *

|     | Document | Abbreviation |
| --- | --- | --- |
| 1.  | Frazier's Motion for Summary Judgment | ("F.MSJ") |
| 2.  | Frazier's Memorandum in Support | ("F.Mem.") |
| 3.  | Frazier's Rule 12(m) Statement | ("F. 12(m)") |
| 4.  | Konstant's Brief in Opposition | ("K.Br.Opp.") |
| 5.  | Konstant's Response to Frazier's Rule 12(m) Statement | ("K.12(n)") |
| 6.  | Frazier's Reply | ("F.Reply") |
| 7.  | Konstant's Motion for Summary Judgment and Infringement | ("K.MSJ(A)") |
| 8.  | Konstant's Memorandum in Support | ("K.Mem(A)") |
| 9.  | Konstant's Statement of Uncontested Facts | ("K.12(m)(A)") |
| 10. | Frazier's Memorandum in Response | ("F.Resp.(A)") |
| 11. | Frazier's Response to Konstant's Statement of Uncontested Facts | ("F.12(N)(A)") |
| 12. | Konstant's Reply | ("K.Reply(A)") |
| 13. | Konstant's Response to Frazier's Response | ("K.12(x)(A)") |
| 14. | Konstant's Motion for Summary Judgment on Invalidity | ("K.MSJ(B)") |
| 15. | Konstant's Memorandum in Support | ("K.Mem(B)") |
| 16. | Konstant's Statement of Uncontested Facts | ("K.12(m)(B)") |
| 17. | Frazier's Memorandum in Response | ("F.Resp.(B)") |
| 18. | Frazier' Response to Konstant's Statement of Uncontested Facts | ("F.12(n)(B)") |
| 19. | Konstant's Reply | ("K.Reply(B)") |
| 20. | Konstant's Response to Frazier's Response | ("K.12(x)(B)") |
| 21. | Konstant's Motion for Summary Judgment on Laches and Estoppel | ("K.MSJ(C)") |
| 22. | Konstant's Memorandum in Support | ("K.Mem(C)") |
| 23. | Konstant's Statement of Uncontested Facts | ("K.12(m)(C)") |
| 24. | Frazier's Memorandum in Response | ("F.Resp.(C)") |
| 25. | Frazier's Response to Konstant's Statement of Uncontested Facts | ("F.12(n)(C)") |
| 26. | Konstant's Reply | ("K.Reply(C)") |
| 27. | Konstant's Response to Frazier's Response | ("K.12(x)(C)") |
| 28. | Konstant's Memorandum Re: Co-existing Patents | ("K.Mem(D)") |
| 29. | Frazier's Memorandum in Response | ("F.Resp.(D)") |
| 30. | Konstant's Reply | ("K.Reply(D)") |

[*3]

The parties' hostilities center on rack systems for storing pallets and products in warehouses. The patents-in-suit all focus on the same basic technology: space-saving, rolling rack storage systems designed so that pallets and their loads can be stored in succession, such that each load pushes back the cart on which the preceding load was placed. Basically, both parties began manufacturing such systems at about the same time. When this became apparent, Konstant applied for a patent on its system -- Patent 546-- and eventually threatened Frazier with an action for infringement. In response, Frazier purchased the rights to an earlier patent on a rolling rack system -- Patent 313 -- and informed Konstant that it superseded Patent 546. Thereafter, Konstant received Patent 240, and filed this action against Frazier, charging that Frazier's rolling rack systems infringed on Konstant's Patents 546 and 240. Frazier counterclaimed that Konstant's rolling rack systems infringed on Patent 546. Konstant then received Patent 241, and amended its complaint to include a charge of infringement on that patent as well.

Frazier moves for summary judgment on its claim that Konstant's rolling rack [*4] systems infringe on Patent 313. Konstant counters by arguing that Patent 313 is invalid and unenforceable, and the Frazier's claim of infringement is barred by the doctrine. Konstant, in turn,

also maintains that Frazier's rolling rack systems infringes its Patent 546, 240, and 241. It would appear that Frazier agrees that the elements of its rolling rack systems are found in Patents 546, 240, and 241; Frazier's retort is that those patents are invalid in light of Patent 313. While the central issue would appear to be whether any of the patents -- 313, 546, 240, or 241 -- are valid, Konstant claims this question cannot be resolved on summary judgment.

I. BACKGROUND

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when the record demonstrates "there is no genuine issue as to any material fact." *Fed. R. Civ. P. 56(c)*. It would be a rare summary judgment proceeding then, where the parties, both of whom are moving for summary judgment, are able to compile a dozen separate submissions as to the material facts of the case -- but that is what we have here. The parties have filed these submissions in order to comply with Local Rules 12(m) and 12(n), [*5] which provide, in pertinent part:

> (m) Motions for summary judgment; Moving Party. With each motion for summary judgment . . . the moving party shall serve and file . . . a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law . . . That statement shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion.
>
> (n) Motions for summary judgment; Opposing party. Each party opposing a Rule 56 motion shall serve and file . . . a concise response to the movant's statement. That response shall contain (1) a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (2) a statement, consisting of short numbered paragraphs, of any additional facts which require the denial of summary [*6] judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

Local Rule 12(m); (n). Obviously, one of the goals of the rule -- facilitation of accurate review of the record, *Tatalovich v. City of Superior, 904 F.2d 1135, 1139 (7th Cir. 1990)* -- is thwarted when parties file this many separate statements of fact and responses thereto, all accompanied by citations to various compilations of exhibits. It is from such a milieu, however, that we attempt to provide an account of the facts of this case.

A. Facts

Frazier was formed in 1949; Konstant in 1985. (F.12(m), at PP 1, 2). Since September 7, 1989, Frazier has owned Patent 313, which issued July 27, 1982 to inventor Erich Doring. (K.12(m)(C), PP 7, 12). Patent 313 discloses a shelving system utilizing rolling carriages for the storage of pallets. (K.12(m)(B), P 9). There are six claims in Patent 313, the first and fourth of which appears to be at issue here. They read as follows: [*7]

> Shelving for pallets in which compartments defined by a frame are continuous in side by side relation and on top of one another and adapted to receive at least three pallets positioned on a plane which is inclined towards a common loading and unloading side of said frame, comprising:
>
>> at least one pair of rails, in each compartment, which extend at an inclination toward the common loading and unloading side; and
>>
>> at least two flat pallet carriages of different heights positioned in rolling engagement on said pair of rails, said at least two flat pallet carriages including a lower carriage being adapted to roll completely under a higher carriage wherein a first

> pallet may be positioned on said higher carriage, a second pallet may urge said first pallet and said higher carriage away from said common loading and unloading side and be positioned on said lower carriage and a third pallet may urge said first pallet and said higher carriage and said second pallet and said lower carriage away from said common loading and unloading side and be positioned on said pair of rails.
>
> * * *
>
> a third very flat pallet which is supported for movement on another pair of rails disposed between [*8] the first pair of rails and which fits completely under the lower pallet carriage designed with free ground clearance.

(F.12(m), P 8). Frazier provides an excellent explanation of how this system operates in practice at pages 4-6 of its Memorandum in Support of its motion for summary judgment. (F.Mem., at 4-6). It would appear that the inventor, Erich Doring, never exploited or commercialized the invention disclosed in Patent 313 in this country until the events leading up to this litigation.

Konstant and Frazier both manufacture and market rolling pallet storage systems -- Konstant since March, 1987; Frazier since August of 1987. (K.R.12(m)(C), P 13). Konstant's system was known as "Konstant Flow," while Frazier's was known as "Glide-in." The type of system Konstant produced would eventually lead to Patent 546, for which Konstant applied May 21, 1987, and which issued September 27, 1988. (Id. at 9; F.12(m), Ex.D). The difference between Patent 313 and Patent 546 is in the rails upon which the wheels of the pallet cars ride, as well as the wheels of the pallet cart itself. In Patent 313, the wheels are flanged and ride on opposite sides of the top of a square-shaped rail, [*9] much like a rail car wheel on a railroad. Patent 546 described its difference from Patent 313 thusly:

> Patent 313 requires rolling carts for holding pallets, which carts must have flanged wheels, and which must ride on wide, unprotected surfaces.
>
> In accordance with this invention, a pallet rack system is provided with rolling carts for holding the pallets in which the wheels of the carts are not flanged, which results in a reduction in manufacturing expense, and also permits less critical control in the control of dimensions of the wheels and their placement. Additionally, in accordance with this invention, the rails upon which the wheeled carts roll may be protected to a significantly increased extent against failing debris from the pallets and the like, so that the problem of obstructions to the free rolling of the carts is significantly reduced. Additionally, the vertical space in a stack of pallet racks in accordance with this invention may be utilized in a particularly efficient manner, for improvements in storage density.
>
> In either of the above mentioned patents, nothing prevents the second entering load from accidentally contacting and pushing the lower cart under [*10] the upper cart, causing the second pallet to be placed on the rails. This blocks placement of the third pallet. This present invention prevents this possibility.

(F.12(m), Ex.D). The patent's claimed improvements over Patent 313 are more technically set out in the claims portion of Patent 546 (Id.). Essentially, it would appear that the difference between Patent 546 and Patent 313 is that while a cross-section of Patent 313's rail is square-shaped, a cross-section of Patent 546's rail is I-shaped. Further, while the wheels of Patent 313's carts ride on the two upper "corners of the square," the wheels of Patent 546's carts ride on the lower two "serifs of the 'I.'"

Konstant informed Frazier of its Patent 546 application by letter dated December 22, 1987, and requested information on Frazier's "Glide-in" system. The parties continued to correspond over the subject and, by letter dated November 3, 1988, Konstant informed Frazier of the issuance of Patent 546 and demanded that Frazier cease infringement. During further correspondence, Frazier apparently suggested to Konstant that Patent 546 was anticipated by prior act. (F.Resp. (C), Ex.B). In a letter dated January 31, [*11] 1989, Konstant rejected this suggestion and offered Frazier a license for Patent 546 under the threat of litigation, giving Frazier ten days in which to accept. (Id.). Far more than the ten days passed, however, and by

September of 1987, Frazier secured the rights to Patent 313. In a letter dated October 25, 1989, Frazier informed Konstant of this acquisition, indicated that Patent 313 was dominant over Patent 346, but suggested that neither party attempt to exercise exclusivity against the other; specifically, Frazier suggested that the two continue to compete in the market. (Id., Ex.C; (K.Mem.(c), Ex.D at 126). Konstant requested evidence of the assignment of Patent 313, which Frazier provided November 20, 1989. Apparently, there was no further communication between the parties until July 17, 1991, when Konstant filed suit.

Prior to filing suit, Konstant applied for and received Patent 240, which issued April 10, 1990. Patent 240 purported to be an improvement over Patent 546, said improvement described in the patent as follows:

> In Patent 546 a pallet rack is disclosed in which pallets may be sequentially placed on first and second wheeled carts, that may be then [*12] rolled rearwardly on a pair of rails by subsequent pallets as they are added to the storage bay. The rails used are arranged so that the wheels of the first and second carts roll on separate tracks or sections of the same rail, so that the carts can roll past each other, one above the other, without interference.
>
> By the invention of this application, a modification is provided in which pallets may be placed on a plurality of wheeled carts, two of which can roll on the same rail surface without interference in the operation of either cart in providing multiple pallet storage in a single storage bay. Additionally, by this invention, a single storage bay and pair of rails can provide convenient, accessible storage for pallets using up to four wheeled carts that will roll on the same rails, for convenient storage of a large number of pallets on a single set of rails.
>
> In this invention, a pallet rack is provided which comprises at least one pair of spaced, parallel rails, and first and second wheeled carts, mounted in rolling relation with a pair of rails. The carts each define a load-carrying area and front and rear wheels, with the second cart being capable of rolling over the [*13] first cart to overlie the first cart.
>
> In accordance with this invention, the wheels of the first and second carts respectively roll on the same rail surfaces. This of course means that the wheels of different carts are in a position to collide with each other to limit the cart motion. However, in this invention, the front wheels of the second cart are positioned between the front and rear wheels of the first cart. The result of this is that the second cart can roll between a first, overlying position relative to the first cart and a second position where most of the second cart can be spaced along with the rails from the first cart before the front wheels of the second cart and the rear wheels of the first cart collide to limit relative motion between the carts.

(F.12(m), Ex.E). Again, the patent's claimed improvements are more specifically set forth in the claims section of the patent. (Id.). The essential difference here would appear to be that the wheels of the two carts roll on the same "serif," and that the front wheels of the second or upper cart are actually positioned before the first or lower cart's rear wheels.

On July 17, 1991, two-and-a-half years after it [*14] demanded Frazier purchase a license in ten days, Konstant filed suit against Frazier for infringement of Patents 546 and 240. Frazier answered the complaint and filed a counterclaim alleging Konstant infringed Patent 313, on August 27, 1991. Subsequently, Konstant amended its complaint to include a charge of infringement of Patent 241, which issued January 14, 1992. Patent 241 claimed improvement over Patent 240 as follows:

> In the previously cited [Patent 240] pairs of overlapping carts are disclosed which roll on the same track surfaces. To provide substantial free rolling of individual carts over a limited distance, the front wheels of the upper carts are positioned between the front and rear wheels of the lower cart, so that the upper cart can roll rearwardly, carrying a pallet or the like without causing motion of the lower cart until the front wheels of the upper cart collide with the rear wheels of the lower cart. Thus, if the lower cart is long enough, the upper cart can be pushed backward far enough to permit a pallet to be placed on the lower cart after a pallet has been placed on the upper cart.

While the above system works well, it does require that at least [*15] the lower carts must be of extended length, over and above what they would normally have to be to receive a pallet.

In accordance with this invention, a rolling pallet system is provided in which the respective carts do not have to be of extra length, while the same rail surfaces may be used by both carts. In this invention, the upper cart can be moved rearwardly as far as desired without engaging any wheels of a lower cart, which provides an added advantage to this invention.

It is also preferred for the carts of this invention to be modified to receive a slipsheet, skid or the like. A "skid" is a support structure for merchandise or other articles which has only two stringers and a top board, typically without middle support. The two stringers are positioned on opposed edges of the top board. Alternatively, there are other kinds of skids which may have multiple legs, extending downwardly from a board which legs are made of coiled cardboard or the like. A nine legged skid is typically used. By this invention racks for use with slipsheets and skids of both types may be provided.

(F.12(m), Ex.F). As before, the claimed improvements are more specifically set forth in the claims [*16] section of Patent 241 (Id.).

B. Parties' Positions

Konstant has, as already noted, advanced several positions in these proceedings. First, Konstant argues that Frazier's 3 deep "Glide-in" system ("Glide-in I") -- introduced in 1987-- was a copy of Konstant's "Konstant Flow" system, and infringes Claim I of Patent 546. Further, Konstant argues that Frazier's 4 deep "Glide-in" system ("Glide-in II") infringes Claim 1 of Patents 546 and 240; that Frazier's second version of that system ("Glide-in III") infringes Claim 1 of Patent 546; and that Frazier's 5 deep "Glide-in" system ("Glide-in IV") infringes Claim 1 of Patents 546 and 241. Frazier does not dispute Konstant's allegations of infringement but, instead, contends that Konstant's patents are invalid as they are all obvious in light of prior art including by Patent 313. In turn, Konstant argues that the only issue properly before the court is the infringement of Patents 546, 240, and 241, not their validity. According to Konstant, this issue of infringement must be resolved in these proceedings without reference to patent validity. Nevertheless, Konstant points out that its patents are entitled to a presumption [*17] of validity that can only be overcome by clear and convincing evidence.

Next, Konstant argues that Patent 313, which Frazier claims is the dominant patent, is invalid and unenforceable. Essentially, Konstant contends that Claims 1 through 6 of Patent 313 are invalid because they are vague, and because the inventor engaged in fraud on the Patent Office, or other inequitable conduct, in connection with the prosecution of his application for Patent 313. In response, Frazier disputes each of Konstant's contentions and echoes Konstant's point that patents are presumed valid under the law, and can only be overcome by clear and convincing evidence. Frazier claims Konstant has failed to submit such evidence here. Indeed, Frazier argues that Konstant's patents -- Patent 546, 240, and 241 -- infringe on Patent 313, and moves for summary judgment on that question. In addition to its claims that Patent 313 is unenforceable, Konstant submits that Frazier has failed to establish infringement as a matter of law.

Finally, Konstant argues that Frazier's suit is barred by laches and estoppel. Essentially, Konstant maintains that Patent 313's inventor never enforced his patent and that, once it [*18] acquired the rights to that patent, Frazier put Konstant at ease about any litigation over the patent. Konstant claims it relied on that assurance to its prejudice, and that Frazier has no excuse for not filing its suit earlier. Frazier contends that its actions were reasonable and that, in any event, Konstant cannot establish that Frazier's actions were sufficient to invoke laches and estoppel.

II. ANALYSIS

In order for a party to prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In the context of a summary judgment proceeding, the court does not weigh evidence or determine the truth of asserted matters, but simply determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)*. When a defendant moves for summary judgment, it must demonstrate, based on the record, that there is an absence [*19] of evidence to support the plaintiff's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 324-325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)*. Similarly, a plaintiff

cannot rest on mere allegations of a claim, especially with respect to an issue on which it bears the burden of proof, but must affirmatively demonstrate through a specific, factual showing that there is a genuine issue for trial. *Celotex, 477 U.S. at 322-324, 106 S. Ct. at 2552-2553*. Summary judgment is appropriate when the evidence supporting the non-movant is merely colorable or is not significantly probative.

A. Validity and Enforceability of Patent 313

When the parties' fifteen memoranda of law on this dispute are distilled, it would appear that the threshold issue is the validity and enforceability of the earliest of the patents in suit, Patent 313, which Frazier acquired from Mr. Doring. In order to defend against Frazier's charges that it infringed on this patent, Konstant attacks the patent validity and enforceability. This is a difficult task, for patents are presumed valid under the law. *35 U.S.C. § 282;* [*20] *Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1574 (Fed. Cir. 1992)*. The presumption of validity is based, at least in part, on the expertise of the patent examiners and a confidence that they do their jobs. *Brooktree, 977 F.2d at 1574*. Konstant, which seeks to overcome this presumption, offers, curiously, a fine explanation of the thinking that underlies it, at least in regard to Konstant's patents:

> each [patent] was examined by a Patent Examiner who was highly skilled in the relevant technology. In each, the Patent Office concluded that the invention claimed was both new and nonobvious to persons of ordinary skill in the relevant art and otherwise satisfied all the requirements of the patent law. The first page of each issued United States patent, in fact, says precisely that -- the patent has been examined by the Patent Office and found to satisfy all of the requirements of the patent law.

(K.Mem.(D), at 3). The presumption of validity works just as strongly in Frazier's favor in regard to Patent 313. To overcome it, Konstant must present clear and convincing evidence. *Intel Corp. v. U.S. Intern. Trade Comm'n, 946 F.2d 821, 829 (Fed. Cir. 1991)*. [*21] Clear and convincing evidence has been described as producing in the mind of the trier of fact an abiding conviction that the truth of the contentions are highly probable. *Buildex Inc. v. Kason Industries, Inc., 849 F.2d 1461, 1463 (Fed. Cir. 1988)*. Konstant's burden is further magnified here because it seeks to refute Patent 313's presumption of validity in the context of a summary judgment proceeding, and must establish that there is no genuine issue of material fact in dispute. *Fed. R. Civ. P. 56(c)*. All doubt regarding the presence or absence of material factual issues must be resolved in favor of the party opposing summary judgment; here, that is Frazier. *Jonsson v. Stanley Works, 903 F.2d 812, 816 (Fed. Cir. 1990)*. It is with these burdens in mind that we assess Konstant's two attacks on Patent 313's validity: (1) that the patent's claims are indefinite and vague in violation of *35 U.S.C. § 112;* and (2) that Mr. Doring violated his duty of disclosure to the Patent Office.

1. Definiteness of Claims

Konstant argues that certain terms and phrases in Patent 313's claims are too indefinite [*22] to meet the requirements of *35 U.S.C. § 112*. Specifically, Konstant contends the term "flat" used in Claim 1 phrase ". . . at least two flat pallet carriages of different heights . . ." and the term "very flat" used in Claim 4 phrase" . . . a third very flat pallet carriage . . ." are not sufficiently definite to meet § 112. Further, Konstant submits that the phrase "roll completely under" in Claim 1 is similarly flawed. See supra, at 6-7. Section 112 provides, in pertinent part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.
>
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

\* \* \*

*35 U.S.C. § 112*. A decision as to whether a [*23] claim is invalid for indefiniteness under this provision necessitates a determination whether those skilled in the art would understand what is claimed. *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd., 927 F.2d 1200, 1217 (Fed. Cir. 1991)*. While a determination of indefiniteness is a question of law, *Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1577 (Fed. Cir. 1986)*, it necessarily rests upon, like many legal questions, certain questions of fact. *Laitram Corp. v. NEC Corp., 952 F.2d 1357, 1364 (Fed. Cir. 1991)*. Based on the record as it stands, we cannot find, under the clear and convincing

evidence standard, that Konstant has established that there is no issue of fact as to the definiteness of Patent 313's claims and that it is entitled to judgment as a matter of law on the issue.

One factual question that underlies the definiteness issue is the question of what constitutes a person skilled in the art. *Graham v. John Deere Co., 383 U.S. 1, 17, 86 S. Ct. 684, 694, 15 L. Ed. 2d 545 (1966)*. To demonstrate that Patent 313's claims are indefinite, [*24] Konstant submits the affidavit of Mark Newman. Mr. Newman is a patent attorney with a degree in mechanical engineering and a former patent examiner for several "examining groups." (K.Mem.(B), Ex.B). Frazier counters with the affidavit of Peter Higgins, a structural engineering consultant with degrees in physics, mathematics, and engineering, as well as eleven years' experience in the storage rack industry. (F.Mem.(B), Ex.C). According to Mr. Higgins, a person skill in the art relevant to Patent 313 must have 2-4 years experience in the design of storage rack structures -- experience he has but that Mr. Newman apparently does not. (K.Mem.(B), Ex.B, P 7). Konstant submits no evidence to guide us on the question of what constitutes a person skilled in the art. That Mr. Newman was a patent examiner is significant, but there is no indication of what type of inventions were under his jurisdiction. Mr. Higgins may be every bit the expert that Mr. Newman is, or more. In addition, Mr. Newman essentially argues that the patent examiner that granted Patent 313-- which is entitled to a presumption of validity -- must be overturned because that examiner was unaware that the words "flat" or "very [*25] flat" have several meanings, and wrongly interpreted the phrase "rolling completely under." (K.Mem.(B), Ex.B, PP 13-14). If that is representative of the expertise a patent examiner brings to bear on a patent application, then the experience Mr. Newman gained as patent examiner would be of little value in resolving the question before us, and we would have to find Mr. Higgins' opinion to be dispositive. We prefer, however, to accord a patent examiner the respect discussed earlier in this analysis. Supra, at 15. Nevertheless, Konstant's failure to resolve the question of who is skilled in the art precludes summary judgment on the definiteness issue.

Assuming, for the moment, that there were no dispute as to what constitutes a person skilled in the art, we will address the substance of the parties' submissions as to the definiteness of Patent 313's claims. It goes without saying that each parties' submission supports its case. Predictably, Mr. Newman states that the terms "flat," "very flat," and "roll completely under" are insufficient, in the following way:

> If the Examiner responsible for examining the '313 patent had known that Mr. Doring chose the wrong claim words [*26] when he used the terms "flat" and "very flat," the Examiner would have been obligated to reject all the claims of the '313 patent as not patentable because they did not particularly point out and distinctly claim the subject matter of the invention, as required by *35 U.S.C. § 112* (P 2). Moreover, if the Examiner were made aware of the various and completely different meanings which Mr. Doring applied to the terms "flat" and "very flat," the Examiner would have been obligated to reject the claims as being indefinite under *35 U.S.C. § 112*.

> I believe that Claim 1 of the '313 patent to be misdescriptive of the operation of the invention. In reviewing the disclosure of this '313 patent, as confirmed by the deposition of Mr. Allen, I understand that during operation of the pallet storage system described in the '313 patent, the upper carriage rolls over the lower carriage. The lower carriage never rolls under the upper carriage as recited in the claims. Thus, I believe the claims of the '313 patent are inapposite to the operation of the invention as set forth in the specification and, thus, are invalid under *35 U.S.C. § 112* [*27] (P 2).

(K.Mem.(B), Ex.B, PP 13-14). Just as predictably, Mr. Higgins finds the terms at issue sufficiently definite, opining as follows:

> The term "flat" as used in Claim 1 has its ordinary meaning as used the storage rack industry on June 29, 1979 (the U.S. filing date of the Doring '313 patent) as well as on July 4, 1978 (the filing date of the German Patent 2,829,325). The term flat is an adjective that means "having a low profile" or "having little depth." As used in the Doring '313 patent, the term "flat" has the same meaning as it does in the well known phrase "flat as a pancake." When Claim 1 recites "at least two flat pallet carriages," Claim 1 means nothing more than that the invention has at least two pallet carriages of low profile. There

is nothing in the Doring '313 patent specification or its prosecution history that is to the contrary. Moreover, the drawings make this meaning clear. The drawings visually show pallet carriages having a low profile.

The phrase "a lower carriage being adapted to roll completely under a higher carriage" as used in Claim 1 means simply that the lower carriage rides below the higher carriage with respect to the rails and that, [*28] in operation, the higher carriage is free to roll over the lower carriage. There is nothing in the Doring '313 patent specification or its prosecution history that is to the contrary.

The term "very flat" as used in Claim 4 to define the third pallet carriage means that the third pallet carriage has a lower profile than the second pallet carriage. There is nothing in the Doring '313 patent specification or its prosecution history that is to the contrary. Moreover, the drawings, and in particular figure 3, illustrate the third carriage as having a lower profile than the other two carriages. This Claim 4 also demonstrates that "flat" does not mean "smooth" or "level."

(F.Mem.(B), Ex.C, PP 10, 14, 16). One further addition to the mix is the deposition testimony of Mr. Doring, which suggests he was confused about the meaning of the terms and in which he states it is "entirely possible" they were wrongly chosen. (K.Mem.(B), Ex.C at 115).

Konstant argues that Mr. Newman's declaration and Mr. Doring's confusion must win out over Mr. Higgins' declaration, which Konstant claims is a merely conclusory statement insufficient to raise a genuine issue of fact. Given the facts that Konstant [*29] must show invalidity by "clear and convincing" evidence; that as the proponent of summary judgment, Konstant must establish that there are no material issues of fact; and that, as opponent of summary judgment, Frazier is entitled to certain inferences in its favor, summary judgment is inappropriate on this question.

First, we must reject Konstant's characterization of Mr. Higgins' declaration as merely conclusory and not based on any facts. We find Mr. Higgins' declaration no more conclusory than Mr. Newman's. The question is how a person skilled in the art would interpret the claims at issue; the only bases for such an interpretation are the claims and the experience of the interpreter. Indeed, Mr. Newman's observations are based in part on speculation; as to what the patent examiner might have known or what he or she might have been made aware of. (K.Mem.(B), Ex.B, P 13). Mr. Higgins' declaration, on the other hand, is based on the claims, the accompanying drawings, and eleven years' experience in the relevant industry. By definition, both declarations must be somewhat conclusory in order to constitute interpretations of persons skilled in the art. They provide conflicting answers [*30] to the questions of whether the claims are sufficiently definite, and of what the claims mean to someone skilled in the art. We find both to be statements of persons arguably skilled in the art set forth in sufficient detail to raise a genuine issue as to claim interpretation. That is all that is required of Frazier to stave off summary judgment here. *Palumbo v. Don-Joy Co., 762 F.2d 969, 976 (Fed. Cir. 1985)*.

Second, we find Mr. Doring's confusion over the meaning of the terms chosen as translation of his original German patent does not win the day for Konstant. It is not the patentee that must understand the invention's claims under *35 U.S.C. § 112*, but those skilled in the art. The inventor's post-issue interpretation of a claim is not dispositive. *Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1570 (Fed. Cir. 1983); Waterloo Furniture Components, Ltd. v. Haworth, Inc., 798 F. Supp. 489, 495 (N.D. Ill. 1992)*. Mr. Doring's testimony is relevant evidence, to be sure, but it does not entitle Konstant to summary judgment, especially given Konstant's [*31] burden of presenting clear and convincing evidence.

In sum, the record establishes that there are differing opinions as to the interpretation of the claims at issue. The patent examiner -- who Konstant considers an expert when it suits its purpose -- and Mr. Higgins who found the claims sufficiently detailed; Mr. Newman does not. If the patent examiner and Mr. Higgins are wrong, and Mr. Newman's background is shown to give his declaration sufficient weight to carry the day, then Konstant has the opportunity to convince a jury of the claims' indefiniteness. After our examination of Patent 313 and the additional materials the parties have submitted, we are not convinced for the purpose of summary judgment and under a standard of clear and convincing evidence, that Patent 313 is invalid for indefinitions.

2. Conduct in Connection with Application

Konstant next argues that Patent 313 is invalid and unenforceable as a result of inequitable conduct on the part of Mr. Doring, which Konstant characterizes as a fraud on the Patent Office. Specifically, Konstant charges that Mr. Doring failed to file a proper oath during the prosecution of Patent 313, thereby avoided acknowledging his required [*32] duty of disclosure,

and did not prepare, review, or understand Patent 313's claims. We have already discussed the burdens Konstant faces in its attempt to overturn Patent 313 presumption of validity. We add here that in order to establish inequitable conduct, Konstant must demonstrate an intent to deceive on the part of Mr. Doring. *Kimberly-Clark v. Proctor & Gamble, 973 F.2d 911, 918 (Fed. Cir. 1992)*. Evidence of mere misstatements or negligent omissions in connection with a patent application does not establish fraud on the Patent Office. *Kangaroos, USA, Inc. v. Caldor, Inc., 778 F.2d 1571, 1576 (Fed. Cir. 1985)*. When Konstant's submissions on this point are examined, it is clear that Konstant has failed to meet these requirements.

Apparently, although it is somewhat difficult to discern from Konstant's submissions, Mr. Doring's original declaration, which he signed in connection with his patent application in June of 1979, did not include a clause indicating he acknowledged his duty to disclose information of which he was aware and which was material to the examination of his patent application. (K.Mem.(B), at 12-13). [*33] The Patent Office informed Mr. Doring of this deficiency by form letter dated August 18, 1980. (F.12(n)(B), P 37). Konstant contends that Mr. Doring never filed a supplemental declaration correcting this deficiency, based on the fact that none appears in the Patent Office file of the patent's prosecution history. (K.Mem.(B), Ex.E). Frazier submits the declaration of Mr. Doring's patent counsel, Dieter Behrens, that such a declaration was filed, along with copies of same, to support its contention that Mr. Doring complied with the requirement at issue. (F.Mem.(B), Exs. E, F, G, H). This evidence, at the very least, raises a genuine issue of fact that precludes summary judgment in Konstant's favor on this question. In addition, we find it significant that the Patent Office issued Patent 313, which, in Konstant's words, means that the Patent Office found Mr. Doring had satisfied "all of the requirements of the patent law." Supra, at 15. At the very least, Konstant has failed to demonstrate Mr. Doring intended to deceive the Patent Office.

Next, Konstant claims that Mr. Doring failed to file a supplemental oath required to cover the amendment of Claim 4 of Patent 313 regarding [*34] a third "very flat" pallet carriage. A supplemental oath is required when "a claim is presented for matter originally shown or described but not substantially embraced in the statement of invention or claims originally presented. *37 C.F.R. § 1.67(b)*. Again, the evidence Frazier presents regarding the sequence of communications between the Patent Examiner and Mr. Doring's patent counsel in the context Patent 313's prosecution history preclude summary judgment by, at the very least, raising a genuine issue of fact. According to that evidence, Claim 4 was not amended but merely elaborated upon with an additional drawing, which did not require a supplemental oath. (F.Mem.(B), at 14-15; Ex.J). Once again, in any event, there is no evidence of any intent to deceive.

Finally, Konstant submits that Mr. Doring failed to read or understand his patent application, which constitutes a fraud on the Patent Office. This purported fraud consisted of (1) Mr. Doring receiving a German patent based on a German language application; (2) Mr. Doring essentially relying on his patent counsel to handle his application for a U.S. patent which necessarily involved a translation from German to a language [*35] that Mr. Doring does not fully understand, and (3) Mr. Doring's failure to read the U.S. application, presumably in a translation back to German from the translation to English from the original German. (K.Mem.(B), Ex.C, at 55-58; 62-67). We refuse to equate this type of conduct, and indeed any of the conduct Konstant raises in its arguments regarding Mr. Doring's conduct in connection with his application for his patent, with the type of conduct necessary to establish fraud on the Patent Office or inequitable conduct. Konstant has simply failed to provide the requisite evidence to make its case. Consequently, summary judgment on the issue of the invalidity of Patent 313 is inappropriate.

B. Frazier's Claims of Infringement

Having determined that issue of the validity and enforceability of Patent 313 is not amenable to summary judgment, we turn to address Frazier's motion for summary judgment on its claim that Konstant's rolling rack systems infringe on Patent 313. A determination of patent infringement under *35 U.S.C. § 271(a)* requires a two-part analysis: (1) the language of the claim must be interpreted to define its proper scope, and (2) [*36] the evidence before the court must be examined to ascertain whether the claim has been infringed in the accused product. *Minnesota Mining and Mfg. v. Johnson & Johnson, 976 F.2d 1559, 1570 (Fed. Cir. 1992)*. The second part of the analysis -- whether the accused product infringes a claim -- is a question of fact. Id. As already stated, the first part of the analysis, claim interpretation, is a question of law, but it may involve underlying factual disputes. *Laitram Corp., 952 F.2d at 1364*. Such a dispute may arise when there is conflicting expert testimony as to the scope of a claim. *H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 389 (Fed. Cir. 1987)*. At this point, the issue of the meaning of the terms "flat," "very flat," and "roll completely under" in the relevant art once again rears its head, accompanied by the previously discussed expert opinion. The difference is that, this time, Konstant, which had previously argued that there was no material issue as to the indefiniteness of the terms, now argues that there is a material issue as to the meaning of the

terms. Frazier, [*37] on the other hand, fresh from arguing that there is a material issue concerning the meaning of the terms, now argues, as it must, that there is no such material issue. Obviously, given our previous discussion on this subject, the parties' positions, and the conflicting expert opinions, the meaning of the terms in the relevant art cannot be resolved as a matter of law and, consequently, the scope of Patent 313's claims. With these issues remaining as to the first part of the patent infringement analysis, we cannot proceed to the second, dependent part, of the analysis and render a decision regarding infringement. Accordingly, Frazier's motion for partial summary judgment on the issue of Konstant's infringement of Patent 313 must be denied.

C. Konstant's Allegations of Infringement

Next, Konstant moves for summary judgment on the issue of whether Frazier's rolling rack systems infringe Patents 540, 240, and 241. Specifically, Konstant charges that: Frazier's 3 deep Glide-in I infringes Claim 1 of Patent 546; that Frazier's 4 deep Glide-in II infringes Claim 1 of Patents 546 and 240; that Frazier's 4 deep Glide-in III infringes Claim 1 of Patent 546; and that Frazier's 5 deep Glide-in [*38] IV infringes Claim 1 of Patents 546 and 241. Konstant supports these allegations with its Local Rule 12(m) submission (K.12(m)(A)), which is based on drawings of Frazier's products (K.Mem.(A), Ex.D); deposition testimony of Donald R. Allen, Frazier's *Fed. R. Civ. P. 30(b)(6)* designate (K.Mem.(A), Ex.E); and Frazier's Response to Konstant's Request for Admissions (K.Mem.(A), Ex.H). All of these materials suggest that Frazier's products, rather than follow along the lines of Mr. Doring's Patent 313, more closely approximate Konstant's patents. Indeed, Frazier does not dispute Konstant's charges in its Local Rule 12(m) submission or its Memorandum in Response. Instead, Frazier argues that there are genuine issues of material fact as to the validity of Konstant's patents in terms of obviousness n3 that preclude summary judgment in Konstant's favor on the issue of Frazier's infringement. For its part, Konstant does not contend that there is not an issue regarding obviousness, but argues instead that the question of infringement may be resolved independently of that issue; that Frazier cannot stave off summary judgment on infringement merely by raising an issue as to the validity of Konstant's [*39] patents.

n3 Under *35 U.S.C. § 103*, a patent is invalid if the differences between the subject matter patented and the prior art are such that the patented subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art. While obviousness is a legal determination, it is based on a series of factual determinations, including (1) the scope and content of prior art, (2) the difference between the art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any other objective evidence. *Graham, 383 U.S. at 17, 86 S. Ct. at 694; In Re Hayes Microcomputer Products Patent Lit., 982 F.2d 1527, 1539 (Fed. Cir. 1992)*. Frazier has submitted a well-supported argument that there are factual issues regarding the obviousness of Konstant's patents in light of differences between Konstant's patents and the prior art would appear to be limited to the shape of the rails on which the carts roll, and the position of the wheels of the carts on those rails. Based on the record, we agree with Frazier that there are genuine issues of material fact regarding the obviousness of Konstant's patents.

[*40]

As we interpret Konstant's arguments, it would appear that Konstant seeks summary judgment on infringement, as opposed to liability therefore. Frazier argues that Konstant is unentitled to such a judgment because there are material issues regarding the validity of Konstant's patents. The issues of infringement and patent validity, however, are distinct and amenable to separate judgments. See *Morton Intern. Inc. v. Cardinal Chemical Co., 967 F.2d 1571, 1577 (Fed. Cir. 1992)* judgment of noninfringement and judgment of invalidity not redundant as they are based on distinctly different factual inquiries); *Vieau v. Japax, Inc., 823 F.2d 1510, 1517-1518 (Fed. Cir. 1987)* judgments infringement and validity may be distinct) (Bennet, J., concurring). Frazier does not challenge Konstant's allegations of infringement, but instead contends that, at trial it will show that it is not liable for infringement because Konstant's patents are invalid under *35 U.S.C. § 103*. Accordingly, we see no reason why the resolution of the issue of infringement, in the context of Konstant's motion for summary [*41] judgment, is inappropriate at this time.

In this instance, Konstant has supported its motion for summary judgment on the issue of Frazier's infringement of Patents 546, 240, and 241, with deposition testimony; Frazier's admissions, and other evidence. It is incumbent upon Frazier, therefore, to go beyond the pleadings and produce evidence to demonstrate specific facts showing there is a genuine issue for trial regarding its infringement. *Celotex, 477 U.S. at 324-25, 106 S. Ct. at 2553*. Frazier must show there is "sufficient evidence supporting the claimed factual dispute [to require] a jury or judge to resolve the parties' differing versions of the truth at trial." *Scripps*