*Clinic & Research Fdn. v. Genentech, Inc., 927 F.2d 1565, 1571 (Fed. Cir. 1991)* (quoting *Anderson, 477 U.S. at 249, 106 S. Ct. at 2510)*. Frazier has not presented any such evidence, relying instead on its affirmative defense of patent invalidity. Indeed, Frazier does not even dispute Konstant's charges of infringement. Consequently, summary judgment on this issue in Konstant's favor is entirely [*42] appropriate.

In addition, we note that Frazier has failed to respond to any of the facts Konstant has submitted in its Local Rule 12(m) statement in support of its motion for summary judgment. Instead, Frazier contends that no response is required. (F.12(n)(A)). Under Local Rule 12(n), however, all non-movants -- such as Frazier in this instance -- must file a response to the movant's Local Rule 12(m) statement listing the factual assertions of the movant with which the non-movant disagrees, and must include reference to the evidentiary materials upon which it relies. Local Rule 12(n); *Brown v. U.S., 976 F.2d 1104, 1108 (7th Cir. 1992)*. Material facts that are set forth in the movant's statement are deemed admitted unless they are controverted in the non-movant's response. Id. Accordingly, Frazier's decision not to respond to Konstant's Local Rule 12(m) statement operates as an admission of all the facts required to support Konstant's motion for summary judgment on the issue of infringement. This further bolsters the propriety of summary judgment in Konstant's favor on this issue of Frazier's infringement of Patents 546, 240, and 241. Konstant's [*43] motion should therefore be granted, leaving the issue of the validity of those patents for trial.

D. Laches and Estoppel

Finally, Konstant contends that Frazier's claims that Konstant infringed Patent 313 are barred by laches and estoppel. It focuses its laches and estoppel arguments on Frazier's letter of October 25, 1989. We do not feel, however, that the effects of that letter can be analyzed apart from the milieu from which it came. There is no dispute that Konstant knew of Patent 313 as early as May, 1982, and no later than July, 1984. (K.Mem(C), Ex.B, P 4). As already noted, both parties began producing rolling rack systems in 1987, and began correspondence regarding exclusivity at about the time Konstant applied for Patent 546. Supra, at 7. In the wake of the issuance of Patent 546, on November 3, 1988, Konstant demanded Frazier cease infringement of same. Further correspondence ensued, culminating in Konstant's letter of January 31, 1989, informing Frazier that:

> unless Frazier is willing to accept a license promptly, legal action will be taken against Frazier. Although our client believes that a license is worth far more

than this to Frazier, our client is [*44] willing to grant to Frazier a non-exclusive license, to manufacture, use and sell the invention, without the right to grant sublicenses, for a flat fee of $ 500,000.00 per year, payable at the beginning of each year. This offer is subject to being accepted within ten days from the date of this letter.

(F.Resp.(C), Ex.B). Although the record does not reveal what transpired in the wake of this warning, the parties seem to agree that some additional correspondence occurred. Needless to say, Konstant did not enforce the ten-day limit, or its patent rights, against Frazier.

The next communication between the parties that is part of the record in these proceedings is Frazier's letter of October 25, 1989. In that letter, Frazier informed Konstant that it had secured the rights to Patent 313 and opined that Patent 313 was dominant over Konstant's rolling rack systems. The letter continued:

> As practitioners you and I are aware of the presumption which attaches to all U.S. issued patents and I can tell you that our own investigation has confirmed that the rights accorded to Frazier under U.S. Patent No. *4,341,313* are valid and irrefutable.
>
> I bring these facts to your attention [*45] because it is important that we understand the basis upon which Frazier intends to exploit the monopoly rights afforded by U.S. Patent No. *4,341,313*. And although these rights dominate Mr. Konstant's patent we do not seek to assert any exclusivity thereto because we believe that the market can best be served by competition between our clients.
>
> If any exclusivity is to be asserted Frazier suggests that this be done by alerting the competition to the patent rights which are own owned by our respective clients.

If you wish to discuss please don't hesitate to contact me. (F.Resp.(C), Ex.C). Konstant's only response was to request proof of Frazier's acquisition, which Frazier provided November 20, 1989. The parties agree that there was no further communication between them until Konstant filed suit on July 17, 1991: 21 months after Frazier's letter; 30 months after giving Frazier notice of infringement and threatening litigation. Frazier

responded with its counterclaim on August 7, 1991: 23 months after it acquired Patent 313; 22 months after informing Konstant of its acquisition. Upon these facts, Konstant seeks to establish that laches and estoppel bar Frazier's counterclaim. [*46]

1. Laches

To establish the defense of laches, the defendant must establish two factors:

> (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time the plaintiff knew or reasonably should have known of its claim against the defendant, and

> (2) the delay operated to the prejudice or injury of the defendant.

*Meyers v. Asics Corp., 974 F.2d 1304, 1307 (Fed. Cir. 1992)* (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992)).* Unless the delay amounts to six years or more -- in which case a presumption of laches applies -- the party asserting laches has the burden of proving both the above elements. *Meyers, 974 F.2d at 1307.* We find that Konstant has failed to meet that burden.

First of all, we must reject Konstant's attempt to characterize Frazier's delay as a four-year period beginning when Konstant began manufacturing its rolling rack system. (K.Mem.(C), at 3). It is clear, however, that Frazier would have had no standing to file suit until it acquired Patent 313 on September 7, 1989. Indeed, this court has already [*47] determined that Frazier is not entitled to damages prior to that date. See Report and Recommendation of September 18, 1992. Konstant has not provided any support for its opinion as to the starting date, aside from arguing that Frazier must accept the consequences of Mr. Doring's conduct. (K.Mem.(C), at 8 n.1). More properly stated, the law is that Frazier, as successor in interest to Mr. Doring, is charged with the knowledge of the patentee, Mr. Doring, and the consequences of his dilatory conduct. *Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375, 1377 (7th Cir. 1972); MGA, Inc. v. Centri-Spray Corp., 639 F. Supp. 1238, 1242 (E.D. Mich. 1986).* As the record stands, Konstant has provided no evidence that Mr. Doring, a German citizen living in Switzerland, had any knowledge of Konstant's activities in 1987. (F.Resp.(C), Ex.A, P 12). Further, Konstant fails to demonstrate that Mr. Doring engaged in any dilatory conduct. Instead, Konstant's strategy would appear to be

to belittle the inventor with sarcasm, which we feel is insufficient to meet Konstant's burden of proof. (K.Reply (C), at 2). Accordingly, the [*48] appropriate date any period of laches can be considered to have begun to run is September 7, 1987, the date Frazier acquired Patent 313.

Given that starting point, just 23 months passed before Frazier filed suit by asserting its counterclaim on August 7, 1991. We decline to find 23 months to be an unreasonable and inexcusable delay, especially in view of the fact that Konstant delayed 30 months after threatening litigation before filing suit against Frazier. In addition, it would appear from the record that Frazier's delay in filing suit stemmed, excusably so, from Konstant's lack of any objection whatsoever to the compromise Frazier posed in its letter of September 7, 1989. As we find that Konstant has failed to establish the primary element in the defense of laches -- unreasonable and inexcusable delay -- we must recommend that Konstant's motion for summary judgment with regard to laches be denied. n4

> n4 It is also apparent that Konstant has failed to establish the secondary element, that Frazier's delay operated to Konstant's prejudice. While Konstant may have suffered some economic or evidentiary detriment, it is unable to show that detriment resulted from Frazier's delay; such a casual link is required. *Meyers, 974 F.2d at 1308.* Any prejudice Konstant may have suffered -- evidentiary or economic -- can be more readily traced to its own 30-month delay in enforcing its patent rights. Indeed, Mr. Konstant himself knew that his suit against Frazier would precipitate a counterclaim. (F.Resp.(C), Ex.F at 283).

[*49]

2. Estoppel

To establish equitable estoppel, a defendant must show:

> (a) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there was an obligation to speak.

> (b) the alleged infringer relies on that conduct.

(c) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*Meyers, 974 F.2d at 1308* (citing *Aukerman, 960 F.2d at 1028*). Again, it is Konstant's burden to establish each element. Id.

In order to establish the first estoppel element, Konstant must show that Frazier's statements or conduct supported an inference that Frazier would not press an infringement claim against Konstant. *Meyers, 974 F.2d at 1308.* Konstant argues that Frazier's letter of October 25, 1989 is just such conduct, characterizing it as nothing more than Frazier informing Konstant that it would not enforce its patent rights against [*50] Konstant. The letter, however, is more than that. It informs Konstant that Frazier, in its opinion, has rights to the patent that dominates Konstant's rolling rack systems, and suggests the following compromise: "we do not seek to assert any exclusivity thereto because we believe that the market can best be served by competition between our clients." Clearly, Frazier's forbearance is conditioned on competition between the two parties -- which is exactly what transpired for 21 months before Konstant filed suit. The letter simply cannot be interpreted as Frazier dropping Konstant a note just to say it would enforce its patent regardless of what Konstant did. Unlike Konstant's counsel, it would appear that Mr. Konstant did not interpret it that way. (F.Mem.(C), Ex.F).

That being said, it is difficult to characterize Frazier's letter of October 25, 1989, as the type of "misleading conduct" that Konstant is required to prove to establish the first element of estoppel. *Meyers, 974 F.2d at 1308; Aukerman, 960 F.2d at 1028.* The type of conduct that must be shown in order to establish estoppel "includes misrepresentations, affirmative [*51] acts of misconduct, or intentionally misleading silence by the patentee." *Adelberg Laboratories, Inc. v. Miles, Inc., 921 F.2d 1267, 1273 (Fed. Cir. 1990).* There is nothing misleading or misrepresentative about Frazier's letter. Indeed, it turned out to be an accurate prediction of the ensuing events. While the parties competed, Frazier did not enforce its patent rights; when Konstant put an end to the competition, with its lawsuit, Frazier counterclaimed. Konstant simply fails to demonstrate anything misleading about Frazier's letter of October 25, 1989. That failure precludes summary judgment in Konstant's favor on the issue of estoppel.

3. Summary

Clearly, Konstant has failed to demonstrate that it is entitled to summary judgment on the basis of laches and estoppel. In assessing the record in order to evaluate Konstant's arguments, however, we could not help but be left with a troubling impression of Konstant's conduct. Konstant issued a threat of litigation against Frazier in a letter dated January 31, 1989, demanding that Frazier purchase a license within ten days. In the end, Konstant did not enforce its patent rights until 30 months later, [*52] a period significantly longer than Frazier's delay; yet it is Frazier's delay that Konstant calls unreasonable, arguing that it gives rise to the application of laches against Frazier. Similarly, Konstant's threat of immediate enforcement of its patent rights, followed by a substantial period of inaction, is more closely akin to the type of misleading conduct needed to establish estoppel than is Frazier's letter. *Meyers, 974 F.2d at 1309; Hottel Corp. v. Seaman Corp., 833 F.2d 1570, 1574 (Fed. Cir. 1987).* As Frazier does not seek to invoke laches or estoppel against Konstant, however, the record is not sufficiently developed to allow such a finding. Suffice it to say, Konstant's arguments for the application of laches and estoppel against Frazier are curious in view of Konstant's own course of conduct.

III. CONCLUSION

As we view the record in this case, the question at the core of the parties' dispute is whether the claims of Patent 313 are sufficiently definite under *35 U.S.C. § 112.* That question cannot be resolved before the parties define who qualifies as a person skilled in [*53] the art -- such a person may then present expert testimony as to the meaning of Patent 313's claims in the context of the relevant art, the second issue precluding summary judgment on the definiteness of Patent 313's claims. Predictably, there are, and will be, conflicting expert opinions on this issue. While one side may ultimately convince a jury of its expert's authoritativeness, the issue cannot be resolved in the context of summary judgment, especially given the burdens attendant to Konstant proving Patent 313 is invalid. Because this question is an open one, so too are the questions of whether Konstant infringed Patent 313, and whether Konstant's patents are invalid for obviousness. Summary judgment is simply inappropriate on any of these issues.

It is perhaps due to the manner in which the parties have chosen to proceed herein, through the use of multiple statements of fact and memoranda, that the factual disputes are inherent in the record. Perhaps, too, this is why the parties can often be seen throughout their submissions, abandoning their positions as it suits them. Thus, Konstant at one point waxes eloquently as to the respect to be accorded the Patent Office, while [*54] at another speculates that the Patent Office may not know there is more than one definition of the word "flat." At

1993 U.S. Dist. LEXIS 7957, *

another point Konstant argues a 23-month delay in filing suit is unreasonable, while Konstant itself delayed 30 months in filing suit. Frazier, too, would have us believe that the Patent Office's decisions as to issuance of patents are correct unless, of course, those patents are issued to Konstant. The interchangeability of the parties' positions suggests either that they are strong and therefore incredibly attractive or so weak that they are discardable without reluctance. In either case, it should have been apparent to both parties that summary judgment, for the most part, was inappropriate here. The only issue we find amenable to summary judgment is one that has gone undisputed: Frazier's infringement of Patents 546, 240, and 241.

For the foregoing reasons, it is hereby recommended that the motion of plaintiff-counterdefendant for summary judgment on the issue of patent infringement by defendant-counterclaimant be granted, and that all other pending motions for summary judgment discussed herein be denied.

Respectfully submitted,

**EDWARD A. BOBRICK**

**United [*55]  States Magistrate Judge**

**DATE:** June 7, 1993



930 F.2d 33 (Table)                                                                    Page 1
930 F.2d 33 (Table), 1991 WL 47101 (10th Cir.(Kan.))
**Unpublished Disposition**
(Cite as: 930 F.2d 33, 1991 WL 47101 (10th Cir.(Kan.)))

**H**
NOTICE:   THIS   IS   AN   UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA10 Rule 36.3 for
rules   regarding   the   citation   of   unpublished
opinions.)

United States Court of Appeals, Tenth Circuit.
Debbie D'ZURELLA, Plaintiff-Appellant
v.
STATE OF KANSAS, Department of Social
Rehabilitation Services, Dr. Robert L.
Harder, Secretary State Department of Social
Rehabilitation Services, Julia
Lambert, Supervisor State Department Social
Rehabilitation Services, and
Individually, Steve Lusk, Supervisor State
Department of Social Rehabilitation
Services, and Individually, Mike Oliver, Employee,
State Department of Social
Rehabilitation Services, and Individually, Ernie
Dyer, Supervisor State
Department of Social Rehabilitation Services, and
Individually, Barbara Gaines,
Supervisor State Department of Social
Rehabilitation Services and Individually,
Defendants-Appellees,
and
Nelson Martin, Employee, State Department of
Social Rehabilitation Services,
and Individually, Roz Muirhead, Supervisor State
Department of Social
Rehabilitation Services, and Individually,
Defendants.
**No. 90-3202.**

March 18, 1991.

D.Kan., No. 86-2529.

D.Kan.

AFFIRMED.

Before LOGAN, SEYMOUR and TACHA, Circuit
Judges.

ORDER AND JUDGMENT [FN*]

SEYMOUR, Circuit Judge.

**\*\*1** Debbie D'Zurella brought this action under 42
U.S.C.   §   2000e-5   (1988)   (Title   VII)   [FN1]
asserting retaliation and constructive discharge
against the Kansas State Department of Social and
Rehabilitation   Services   (SRS)   and   eight   SRS
employees. The district court granted summary
judgment in favor of individual defendants Robert
Harder, Julia Lambert, and Steve Lusk. The court
also granted summary judgment against D'Zurella
on her constructive discharge claim, holding that
this claim, as to which D'Zurella had not filed an
administrative charge, was not within the scope of
the EEOC retaliation charge she did file. Finally,
the court found in favor of the SRS and individual
defendants Barbara Gaines and Ernest Dyer after a
bench trial. [FN2] D'Zurella appeals pro se and we
affirm.

I.

D'Zurella filed her complaint on November 21,
1986. She moved to amend and add a First
Amendment claim under 42 U.S.C. § 1983 on
September 12, 1989, after discovery had been
completed, a pretrial order entered, and the case set
for trial. The district court denied D'Zurella leave
to amend, citing her failure to establish sufficient
good cause for a delay of well over two years and
the prejudice to defendants from the need to
undertake additional discovery at that late point in
the proceedings. We agree.

The district court recognized that while leave to
amend under Fed.R.Civ.P. 15(a) "shall be fully
given when justice so requires," unexcused and
truly inordinate delay alone may be a sufficient
basis for denial of the motion, *see* Rec., vol. II, doc.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

930 F.2d 33 (Table)
930 F.2d 33 (Table), 1991 WL 47101 (10th Cir.(Kan.))
Unpublished Disposition
(Cite as: 930 F.2d 33, 1991 WL 47101 (10th Cir.(Kan.)))

223 at 2 (citing *First City Bank v. Air Capitol Aircraft Sales, Inc.,* 820 F.2d 1127, 1133 (10th Cir.1987)). Here, in addition to undue delay, the court relied on prejudice to defendants and D'Zurella's failure to establish cause for the delay, noting that she had been represented by counsel since shortly after filing her complaint. In so doing, the court acted well within its discretion. *See Las Vegas Ice & Cold Storage Co. v. Far West Bank,* 893 F.2d 1182, 1184-85 (10th Cir.1990).

## II.

Defendants SRS, Lusk, and Dyer moved for summary judgment on D'Zurella's constructive discharge claim, asserting that she had not exhausted her administrative remedies as to that charge. The filing of a charge of discrimination with the EEOC "is a jurisdictional prerequisite to the institution of a lawsuit." *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1311 (10th Cir.1980). However, EEOC complaints are to be liberally construed, *id.,* and the scope of a charge is considered to include "any discrimination like or reasonably related to the allegations of the EEOC charge." *Brown v. Hartshorne Pub. School Dist. No. 1,* 864 F.2d 680, 682 (10th Cir.1988) (quoting *Oubichon v. North Am. Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973)). A claim is reasonably related to an EEOC charge if "the original EEOC investigation would have encompassed the additional charges." *Green v. Los Angeles County Superintendent of Schools,* 883 F.2d 1472, 1476 (9th Cir.1989). We agree with the district court that D'Zurella's claim of constructive discharge allegedly occurring in May 1988, three years after the EEOC charge was filed and two years after she received a right-to-sue letter, is not reasonably related to the original EEOC charge and investigation. Accordingly, we affirm the grant of summary judgment on this claim.

## III.

**\*2** D'Zurella challenges the district court's grant of summary judgment for defendants Harder, Lambert, and Lusk on her retaliation claim. To establish a prima facie case of retaliation under Title VII, a plaintiff must show:

"(1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII

proceeding; (2) she was disadvantaged by an action of her employer subsequent to or contemporaneous with such opposition or participation; and (3) there is a causal connection between the protected activity and the adverse employment action."

*Burrus v. United Tel. Co.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071 (1982).

The district court described the state of the record as to these defendants as follows:

"As regards defendant Harder, it is uncontroverted that at all times pertinent to this litigation, he was the Secretary of SRS and that in July 1986, he directed an investigation to be completed regarding internal grievances filed by plaintiff concerning alleged retaliation. The result of this investigation was plaintiff's transfer to the Lawrence office. With respect to defendant Lambert, it is uncontroverted that she was plaintiff's supervisor in 1982 and 1983, at which time Lambert was transferred to the Winfield office. Plaintiff's only allegation against defendant Lambert is that she provided a "bad reference" at a later time; however, the reference was not provided on any of the four occasions alleged to be retaliatory. Similarly, defendant Lusk, although plaintiff's supervisor in 1983, left employment with SRS in 1984. Plaintiff's only allegation against Lusk is that he told her in 1983 that there would be no retaliation against her for filing the KCCR complaint."

Rec., vol. II, doc. 223 at 10. Based on the above facts, the court concluded that D'Zurella had failed to raise a genuine issue of fact as to whether these defendants knew of or acquiesced in the alleged retaliatory conduct. Our own review of the record, conducted most favorably to D'Zurella, leads us to agree with the lower court. Accordingly, we affirm summary judgment for these defendants.

## IV.

Finally, D'Zurella complains that the testimony of her expert witness was disallowed at trial, and that the district court's findings in favor of defendants SRS, Gaines, and Dyer are clearly erroneous. Our review of these issues is precluded by D'Zurella's failure to include the trial transcript in the record on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

appeal. "Without the record before us to substantiate the general allegations of error, we must defer to the trial court's decisions in these areas." *Moore v. Subaru of America,* 891 F.2d 1445, 1448 (10th Cir.1989).

AFFIRMED.

> FN* This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3.

> FN1. D'Zurella originally asserted claims pursuant to 42 U.S.C. §§ 1981, 1983 and 1985 in addition to her Title VII claims. She states on appeal that these claims were eliminated by the court at a pretrial conference. Although the district court docket sheet indicates that a pretrial proceeding was held on June 26, 1989, that D'Zurella objected to the proposed pretrial order presumably resulting from this pretrial conference, and that a pretrial order was entered on September 11, 1989, none of these occurrences are included in the record on appeal. We are not told, nor are we able to discern from the record, the grounds on which the district court dismissed these civil rights claims. We are thus unable to review the propriety of the dismissals. We note, however, that the disposition of the Title VII claims covered by this order would equally dispose of the claims under section 1983.

> FN2. The claims against defendants Roz Muirhead and Nelson Martin were dismissed with prejudice, a ruling D'Zurella does not challenge on appeal. Proceedings against Mike Oliver were stayed pending bankruptcy.

930 F.2d 33 (Table), 1991 WL 47101 (10th Cir.(Kan.)), Unpublished Disposition

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
1990 WL 192738 (D.Kan.)
(Cite as: 1990 WL 192738 (D.Kan.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Kansas.
Steven NELSON and Sharon Nelson, Plaintiffs,
v.
A.O. SMITH HARVESTORE PRODUCTS, INC.,
et al., Defendants.
No. 86-4230-R.

Nov. 30, 1990.

*MEMORANDUM AND ORDER*

ROGERS, District Judge.

*1 This matter is presently before the court upon plaintiffs' motion for review. Plaintiffs seek review of the magistrate's order of January 7, 1988 in which he ordered plaintiffs' amended complaint of December 7, 1987 stricken from the file. Having carefully reviewed the background, the court is now prepared to rule.

Plaintiffs filed this action on June 23, 1986. The defendants filed answers and discovery was begun. On September 21, 1987, the magistrate entered a scheduling order in which he set various deadlines in the case. He established discovery and amendment deadlines of December 4, 1987. On December 7, 1987, plaintiffs, without seeking leave of the court, filed an amended complaint. The amended complaint added several new claims and parties. Defendants Mid-America Harvestore, Inc. and AgriStor moved to strike the amended complaint as untimely and improper under Fed.R.Civ.P. 15(a). Plaintiffs argued in response that they had mailed the motions on December 4, 1987 and that the court's order of September 21, 1987 granted them the "leave of the court" to amend contemplated by Rule 15(a). The magistrate rejected the plaintiffs' interpretation of the September 21, 1987 order but, nevertheless, proceeded to determine whether the plaintiffs should be allowed leave to amend. The magistrate

concluded that "if plaintiffs are permitted to amend their complaint at this late stage to include additional defendants, to assert a new cause of action, and to assert RICO claims against defendants who have not previously had to defend against such claims, defendants would be prejudiced and would be forced to duplicate previous discovery efforts." Accordingly, he granted the defendants' motion to strike and ordered the plaintiff's amended complaint stricken.

In the instant motion, plaintiffs seek review of only a portion of the magistrate's ruling. Plaintiffs contend that the portion of their amended complaint in which they asserted claims of reformation and rescission should be reinstated. Plaintiffs argue that the magistrate's finding of prejudice to the defendants on these claims was erroneous.

Defendant AgriStor Leasing contends that the plaintiffs' motion should be denied as untimely pursuant to the time restrictions set forth in Fed.R.Civ.P. 72(a). AgriStor further argues that the magistrate's order was not clearly erroneous.

The court shall proceed directly to the merits of the plaintiffs' motion because we find that the motion was timely filed. Under 28 U.S.C. § 636(b)(1)(A), the district court's scope of review of a magistrate's determination is whether the order has been shown to be "clearly erroneous or contrary to law." *Ocelot Oil Corp. v. Sparrow Industries,* 847 F.2d 1458, 1461-62 (10th Cir.1988). The "clearly erroneous standard" requires that the court affirm the decision of the magistrate unless "on the entire evidence [the court] is left with a definite and firm conviction that a mistake has been committed." *Id.* at 1464 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)).

*2 Rule 15(a) provides that "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." In determining whether to grant leave to amend, the court may consider such factors as undue delay, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moving party's bad faith and dilatory motive, the prejudice an amendment may cause the opposing party, and the futility of amendment. *Foman v. Davis,* 371 U.S. 178, 182 (1962).

After reviewing the magistrate's order and the arguments of the parties, we conclude that the order is neither clearly erroneous nor contrary to law. The magistrate's denial of the proposed amendment was grounded on both untimeliness and prejudice to the defendants. Regarding untimeliness, we agree that plaintiffs' unexcused delay of over two years in seeking to amend would alone have been sufficient ground to deny the amendment. *Franks v. Nimmo,* 796 F.2d 1230, 1238 n. 4 (10th Cir.1986). Moreover, the additional discovery or preparation which would be required as a result of the belated addition of new claims is recognized as a source of prejudice justifying denial of a motion to amend. *See, e.g., Zurn Contractors, Inc. v. B.F. Goodrich Co.,* 746 F.Supp. 1051, 1055 (D.Kan.1990). Accordingly, plaintiffs' motion for review shall be denied.

IT IS THEREFORE ORDERED that plaintiffs' motion to review (Doc. # 86) be hereby denied.

IT IS SO ORDERED.

1990 WL 192738 (D.Kan.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

E

Westlaw.

Not Reported in F.Supp.                                              Page 1
1995 WL 404866 (N.D.Ill.)
(Cite as: 1995 WL 404866 (N.D.Ill.))

**C**
Only the Westlaw citation is currently available.


United States District Court, N.D. Illinois, Eastern
Division.
Scott MCGARVEY, on behalf of himself and all
others similarly situated,
Plaintiff,
v.
CITIBANK (SOUTH DAKOTA) N.A., Citicorp
Credit Services, Inc., and Resolution
Services, Inc., Defendants.
No. 95 C 123.

July 05, 1995.

*MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.

*1 Scott McGarvey filed this purported class action
against Citibank (South Dakota) N.A., Citicorp
Credit Services, Inc. (collectively "Citibank"), and
Resolution Services, Inc. ("Resolution") for
violations of the Fair Credit Billing Act, 15 U.S.C. §
1666 *et seq.* ("FCBA"), which is Part D of the
Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*
("TILA"), and the Illinois Consumer Fraud Act, 815
ILCS 505/2 ("ICFA"). McGarvey alleges that
Citibank imposes arbitrary and unauthorized
"documentation deadlines" on consumers who
attempt to assert claims arising under 15 U.S.C. §
1666i. Section 1666i subjects credit card issuers to
certain claims or defenses that cardholders may
have against merchants furnishing goods or services
paid for by the credit card. McGarvey moves to
certify a class. Fed.R.Civ.P. 23.

*BACKGROUND*
In ruling on a motion for class certification, the
allegations of the complaint are taken as true. *Allen
v. Isaac,* 99 F.R.D. 45, 49 (N.D.Ill.1983). Citibank
issued McGarvey a Visa credit card account.
McGarvey used the account primarily for personal
purposes. On December 2, 1993, McGarvey

brought his car to a MAACO Auto Painting and
Bodyworks ("MAACO") shop for repairs.
McGarvey charged the $1,076 cost of the repairs to
his Citibank Visa account. McGarvey, however,
was dissatisfied with the repair job and asked
MAACO to correct the problems. MAACO
agreed, and attempted to correct the deficiencies
identified by McGarvey. Nevertheless, McGarvey
remained dissatisfied and asked MAACO for a
refund of the price of the repairs. MAACO refused
to issue McGarvey a refund.

The debit for the MAACO repair appeared on
McGarvey's December 22, 1993 Citibank Visa
statement. McGarvey gave Citibank's customer
service unit information that MAACO had failed to
perform the repairs in accordance with the parties'
agreement. At the time, the entire amount of the
credit for the transaction was outstanding. In a
letter dated December 24, 1993 responding to
McGarvey's complaint, Citibank issued McGarvey a
conditional credit for the price of the repairs,
informed him that it would try to help him resolve
the dispute, and requested that McGarvey provide
Citibank with additional information and
documentation regarding the problem within ten
days (the "ten-day letter"). *See* Compl.Ex. B.
McGarvey provided Citibank with the requested
information on January 14, 1994. In a letter dated
January 22, 1994, Citibank asked McGarvey to
provide more information, including an estimate
from another merchant indicating any original work
needed to be redone, within five days (the "five-day
letter"). *See* Compl.Ex. C. McGarvey alleges that
he telephoned Citibank several times between
January 22nd and March 7, 1994 to report that the
other merchant had not yet redone the work and that
he would send an invoice upon completion. The
merchant did not complete the work until March 2,
1994. [FN1]

On February 22, 1994, Citibank sent McGarvey a
letter stating that "[w]e previously wrote to you
requesting necessary information concerning this
dispute(s) and did not receive a reply." *See*
Compl.Ex. D. Citibank then notified McGarvey

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 404866 (N.D.Ill.)
(Cite as: 1995 WL 404866 (N.D.Ill.))

that its investigation was complete and that Citibank would rebill McGarvey's account for the $1,076 price of the MAACO repairs (the "turn-down letter"). *See* Compl.Ex. D. On March 7, 1994, McGarvey responded with a letter enclosing the requested information and noting that it was not possible for him to send the information earlier. *See* Compl.Ex. E. On April 6, 1994, Citibank informed McGarvey that it was unable to assist him in the dispute "because we received your correspondence after the requested response date." *See* Compl.Ex. F. McGarvey continued to make minimum payments on his Visa account until June 1994, when he abruptly stopped. Heinemann Aff. ¶ 7. McGarvey does not explain why he ceased making payments on his account.

*2 McGarvey alleges that Citibank "deni[ed] his claim under § 1666i" for arbitrary and unauthorized reasons. McGarvey claims that but for this arbitrary action, "Citibank would have been required to pay or credit McGarvey with the full $1,076 claimed." Compl. ¶ 24. McGarvey also alleges that Citibank and Resolution have attempted to collect his MAACO debt and have threatened to report the debt to credit bureaus. McGarvey argues that it is illegal for Citibank to impose ten and five-day deadlines on a cardholder's "claims" under § 1666i. McGarvey further asserts that Citibank has a policy and practice of reporting delinquent debts to credit bureaus even though consumers have asserted claims or defenses. McGarvey requests certification of a class of all Illinois residents who satisfy the following criteria: [FN2]

a. Citibank sent them a letter demanding that additional information be submitted within a period of time not provided for in the FCBA.

b. Citibank sent them a letter denying a claim within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12 because requested information had been received after a "requested response date."

c. After they had notified Citibank in writing of a dispute within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12, Citibank or its affiliates threatened to report or did report the debt to a credit bureau, without first obtaining a resolution of the dispute by settlement or judicial determination.

d. The class period for purposes of Count I begins one year prior to the filing of this action. The class period for purposes of Count II begins three years prior to the filing of this action.

Motion for Class Certification ¶ 10.

### DISCUSSION

In order to maintain a class action, McGarvey must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). If these prerequisites are satisfied, the court must determine whether one of the standards of Rule 23(b) is met. *Patrykus v. Gomilla,* 121 F.R.D. 357, 360 (N.D.Ill.1988). Here, McGarvey looks to Rule 23(b)(3) and asserts that questions of law or fact common to the class predominate over questions affecting only individual members. In addition, McGarvey claims that a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Fed.R.Civ.P. 23(b)(3).

The certification decision is committed to the sound discretion of the court. *First Interstate Bank, N.A. v. Chapman & Cutler,* 837 F.2d 775, 781 (7th Cir.1988). In assessing the certification petition, the court does not examine the merits of the case, *Allen v. Isaac,* 99 F.R.D. 45, 49 (N.D.Ill.1983), although "[t]he boundary between a class determination and the merits may not always be easily discernible." *Eggleston v. Chicago Journeymen Plumbers' Local Union,* 657 F.2d 890, 895 (7th Cir.1981); *accord General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160 (1982). Failure to meet any one of the Rule 23 requirements precludes certification. *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir.1980). McGarvey bears the burden of showing that certification is proper. *Trotter v. Klincar,* 748 F.2d 1177, 1184 (7th Cir.1984).

#### I. Numerosity

*3 Citibank contends that McGarvey cannot show

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 404866 (N.D.Ill.)
(Cite as: 1995 WL 404866 (N.D.Ill.))

numerosity. Under Rule 23(a)(1), McGarvey must show that the class is so numerous that joinder of all members is impracticable. The exact number of class members need not be pleaded or proved. *See Gomez v. Comerford*, 833 F.Supp. 702, 706 (N.D.Ill.1993). Nevertheless, the impracticability of joinder must be positively shown and not merely speculative. *Kohn v. Mucia*, 776 F.Supp. 348, 352 (N.D.Ill.1991). McGarvey cannot rely on conclusory allegations or speculation as to the size of the class in order to prove numerosity. *See Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir.1989).

McGarvey attempts to show numerosity in two ways. First, McGarvey alleges (without attaching evidence) that Citibank has more than 12 million credit card accounts and that 1978 Federal Reserve Board statistics indicate that between . 87 percent and 6 percent of credit card holders "question their billing statement during any given month." *See* Mot.Class Cert. ¶ 12. But the class is not defined in terms of how many people, nationwide, "question their billing statement." The class consists of all Illinois residents who received a letter from Citibank requesting information within a time not specified by the FCBA, received a letter denying a "claim within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12" because the requested information was received late, and who thereafter were threatened with notification of the disputed debt to a credit bureau. McGarvey's statistics are not helpful in estimating this class. Similarly, McGarvey's statistics only estimate the number of credit card customers who "question their billing statement." This term may include many customers who inquire about possible billing mistakes on their statements, *see* 15 U.S.C. § 1666 (procedure for correction of billing errors), as opposed to those who assert against the card issuer any claims and defenses they may have against a merchant for defective goods or services. *See Exercise of Consumer Rights Under the Equal Credit Opportunity and Fair Credit Billing Acts,* 64 Fed.Reserve Bull. No. 5 at 363 (May 1978).

McGarvey also notes that Citibank admitted in an interrogatory to sending the ten-day letter to over 100 cardholders and to sending letters that included "some of the language in Exhibits B, C, D, or F" to more than 100 persons. In his reply, McGarvey

buttresses this showing with evidence that the ten-day letter was sent to approximately 9000 individuals, Heinemann Dep. 94, and that the turn-down letter was sent to 700 in 1994. Heinemann Dep. 90. McGarvey does not produce evidence showing the number of people who received the five-day letter. [FN3]

These facts do not establish numerosity under McGarvey's current class definition. McGarvey's motion urges certification of a class definition that is conjunctive. *See* Mot.Class Cert. ¶ 10. The class consists of all Illinois residents who received a letter requesting information within a time period not specified in FCBA, *and* who received a letter denying a claim within the scope of § 1666i or 12 C.F.R. § 226.12 because of a tardy response to the first letter, *and* who became the subject of threats to report delinquent accounts. McGarvey must show that joinder of individuals satisfying all three criteria would be impracticable. The ten-day letter is the initial letter that Citibank sent to McGarvey asking for more information about his claim. The fact that Citibank sent the ten-day letter to 9000 customers may establish numerosity as to the first part of the class definition. [FN4] McGarvey cannot establish that Citibank has a letter "denying a claim within the scope of § 1666i." *See infra* pp. 11-13. Moreover, McGarvey fails to present any evidence whatsoever that Citibank threatened to report delinquent customers who had asserted claims under § 1666i to a local credit bureau. McGarvey excuses himself from this showing "because all such persons would have previously received the ten-day, five-day, or turn-down letters." McGarvey Reply at 6. However, the fact that these persons would have received the other letters first says nothing about whether persons who receive the first three letters *also* receive the letter threatening to report them to a credit bureau. Thus, McGarvey has not established that the number of Illinois residents satisfying all three criteria are so numerous that joinder is impracticable. [FN5]

*4 Perhaps recognizing the problem with his class definition, McGarvey changes his tack considerably in his reply. [FN6] McGarvey now boldly asserts that he is really proffering a disjunctive definition that Citibank has "seriously mischaracterized." The court disagrees. The only reasonable reading of McGarvey's proposed class definition is that it is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 404866 (N.D.Ill.)
(Cite as: 1995 WL 404866 (N.D.Ill.))

Page 4

conjunctive. *See* Mot. for Class Cert. ¶ 10. Citibank (and the court) reasonably read it as such. McGarvey's attempt to change the definition in his reply is unacceptable, for it sidesteps Citibank's arguments in opposition to certification while affording Citibank no further opportunity to respond. Accordingly, the court reads the definition as conjunctive and finds that McGarvey cannot establish numerosity.

Nevertheless, McGarvey's certification motion would fail even if his disjunctive definition were used. Under this definition, the first part of the class would consist of all persons whom Citibank "sent a letter demanding that additional information be submitted within a period of time not provided for in the FCBA." This definition is fatally vague and overbroad. The definition would encompass anyone, customers of Citibank or otherwise, who were sent a letter by Citibank demanding information within a time not specified by the FCBA. Thus, it could include Citibank's suppliers, Citibank's counsel, charities to whom Citibank was considering making a donation, or Citibank's affiliates. The class definition could also include potential customers looking to open a Citibank credit account or customers seeking to resolve a billing error under § 1666.

Rule 23(a)(3) requires that the claims of the representative be typical of the claims of the class. The representative's claims must have the "same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983). "If proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims." *Brooks v. Southern Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D.Fla.1990). The first element of McGarvey's class definition is overbroad. Determination of whether the demands Citibank made on McGarvey violates § 1666i would not resolve the "claims" of all other persons potentially included in the class. Courts faced with an overbroad class definition may deny certification for want of typicality. *See, e.g., Lundquist v. Security Pacific Automotive Financial Servs.,* 993 F.2d 11, 14 (2d Cir.1993) (involving McGarvey's counsel); *Hickey v. Great Western Mortgage Corp.,* 1995 U.S.Dist. Lexis 3357

(N.D.Ill.1995) (involving McGarvey's counsel); *Avila v. Van Ru Credit Corp.,* No. 94 C 3234, slip op. at 5 (N.D.Ill. Nov. 14, 1994) (involving McGarvey's counsel). The court holds that McGarvey's claims are not typical of the claims of all other class members under McGarvey's class definition.

*5 The second portion of McGarvey's disjunctive class consists of all Illinois residents to whom "Citibank sent a letter denying a claim within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12 because requested information had been received after a 'requested response date.' " Citibank, however, argues that it does not have a letter "denying a claim" within the scope of § 1666i or regulation § 226.12; Citibank therefore contends that there exist no individuals, including McGarvey, who will be a member of the class.

McGarvey contends that Citibank denies a claim within the scope of § 1666i when it issues a turn-down letter, as it did to McGarvey. McGarvey has not carried his burden on this issue. Section 1666i provides that a card issuer shall be subject to all claims and defenses that the cardholder has against the merchant. Thus, a "claim within the scope of § 1666i" is a personal defense, such as breach of contract, that a cardholder asserts against the creditor to avoid payment.

McGarvey informed Citibank that he was dissatisfied with the MAACO repair work. Citibank issued a conditional credit to McGarvey and agreed to try to assist McGarvey in his dispute with MAACO. The FCBA does not require Citibank either to issue the conditional credit or to attempt to help McGarvey, although Citibank may choose to do so in the interest of goodwill. Citibank's turn-down letter informs McGarvey that Citibank's "investigation is complete" and that Citibank "is unable to help in this matter." *See* Am.Compl.Exs. D & F.

Thus, Citibank's turn-down letter simply informs McGarvey that Citibank is reversing its conditional credit and that Citibank will no longer assist McGarvey. The turn-down letter does not appear to "deny a claim" under § 1666i; it does not assert that McGarvey's breach of contract defense is unmeritorious or deny McGarvey's right to withhold

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payment by asserting a personal defense against Citibank. Nor does the turn-down letter state that McGarvey waives any personal defenses because of his failure to comply with Citibank's deadlines. *See In re Beneficial Corp.,* 96 F.T.C. 120 (1980). Indeed, Citibank does not have any power to "deny a claim" under § 1666i. The turn-down letter simply informs McGarvey that Citibank will not voluntarily assist him in his dispute because McGarvey failed to submit information in a timely fashion.

Thus, whether Citibank's letter "denies a claim within the scope of § 1666i" conflates with the legal question that must ultimately be decided on the merits. McGarvey bears the certification burden. McGarvey has not established that the turn-down letter "den[ies] a claim within the scope of § 1666i and 12 C.F.R. § 226.12." Accordingly, McGarvey has not established that he is not a member of the proposed class and he cannot establish that anyone exists who will satisfy this portion of the class definition.

The third part of McGarvey's class definition includes all Illinois residents who, "[a]fter they had notified Citibank in writing of a dispute within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12, Citibank or its affiliates threatened to report or did report the debt to a credit bureau, without first obtaining a resolution of the dispute be settlement or judicial determination." McGarvey presents no evidence reflecting the number of people who received this letter, much less how many received this response after notifying Citibank in writing of a dispute within the scope of § 1666i. There is no reasonable basis to estimate how many individuals satisfy this element of the class definition. [FN7] As a result, McGarvey also fails to establish numerosity as to this element of his definition.

*6 McGarvey bears the burden of demonstrating that the numerosity requirement of Rule 23(a)(1) is satisfied. The evidence offered by McGarvey on numerosity is fatally vague and only marginally relevant to his class definition. McGarvey's numerosity showing is complicated by an unworkable class definition, making it impossible to determine who, if anyone, is included in the class. Although a numerosity showing may be aided by common sense and appropriate inferences, the court finds that McGarvey's numerosity showing amounts

only to pure speculation. *See, e.g., Kohn,* 776 F.Supp. at 353; *Faraci v. Regal Cruise Line, Ltd.,* 1994 WL 573305, *1-3, 1994 U.S.Dist. Lexis 14817, *4-7 (S.D.N.Y.1994) (Martin, J.). Because numerosity cannot be based on speculation as to the size of the class, *see Marcial,* 880 F.2d at 957, the court concludes that McGarvey has not demonstrated that the class is so numerous as to make joinder impracticable. Accordingly, the motion for class certification is denied.

II. *Predominance of Common Questions*

McGarvey seeks class certification under Rule 23(b)(3). Rule 23(b)(3) requires that common issues of law or fact predominate over questions affecting only individual class members. Certification under Rule 23(b)(3) is improper where liability determinations are both individual and fact-intensive. *See, e.g., Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.,* 149 F.R.D. 65, 76 n. 21 (D.N.J.1993).

Citibank argues that common questions do not predominate because determining the applicability of § 1666i is a fact-intensive inquiry. Citibank contends that McGarvey's claim will require the court to decide the applicability of § 1666i to each class member. McGarvey responds that he is only challenging the "policy of setting arbitrary deadlines for consumers with claims within the scope of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12 ." Mot.Class.Cert. at 9. McGarvey argues that the court can determine the legality of Citibank's procedure without adjudicating any of the class members' underlying claims or defenses.

The court agrees that individual issues will predominate over issues common to the class. McGarvey alleges that Citibank's practice of imposing documentation deadlines as a condition to providing assistance in resolving billing disputes violates § 1666i and 12 C.F.R. § 226.12. Neither Congress nor the Federal Reserve Board ("the Board") imposed any explicit timing requirements for asserting claims or defenses under these sections. *Compare* 15 U.S.C. § 1666i and 12 C.F.R. § 226.12 *with* 15 U.S.C. § 1666 and 12 C.F.R. § 226.13 (explicit timing requirements for billing error resolution). McGarvey essentially claims that Citibank's documentation deadlines contravene

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 404866 (N.D.Ill.)
(Cite as: 1995 WL 404866 (N.D.Ill.))

Page 6

procedural protections that are implied in the rights provided in § 1666i and 12 C.F.R. § 226.12.

McGarvey's claims depend on the applicability of § 1666i; a Citibank letter will only violate the implied procedural protections or rights of § 1666i if § 1666i applies to a particular plaintiff. However, the rights in § 1666i "apply only if" (1) the cardholder has made a good faith attempt to resolve the dispute with the person honoring the credit card; and (2) the amount of credit extended to obtain the property or services exceeds $50 and the disputed transaction occurred in the same state as the cardholder's designated address or within 100 miles from that address. *See* 15 U.S.C. § 1666i(a), 12 C.F.R. § 226.12(3). The first limitation is a highly individualized inquiry. The Board's commentary notes that determining whether a consumer tried in good faith to resolve a dispute with a merchant is "a matter for factual determination in each case." 12 C.F.R. pt. 226, Supp. I, ¶ 12(c)(3)(i). In order to determine whether an individual class member can obtain relief for a violation of § 1666i, the court would be required to conduct an evidentiary inquiry into every putative class member's attempt to resolve the dispute with the merchant. Such an individualized inquiry will be time-consuming and inimical to the policies served by class actions.

*7 Any question that McGarvey's claims necessarily require application of § 1666i is foreclosed by McGarvey's own class definition. Under the definition's second element, a consumer may only be a class member if the consumer received a letter from Citibank "denying a claim within the scope of § 1666i and 12 C.F.R. § 226.12 ." Thus, a prerequisite to class membership is that the consumer's claims are "within the scope of § 1666i." Claims are only within the scope of § 1666i if the consumer made a good faith attempt to resolve the dispute, the amount of credit extended exceeds $50, and the transaction at issue occurred within the geographic limitation.

Contrary to McGarvey's suggestion, this approach should not be equated with deciding the underlying merits of the class members' claims. The "underlying merits" consist of whether the personal defenses class members assert against a creditor are valid and allow them to avoid payment. In

McGarvey's case, for example, the underlying merits of his claim are whether MAACO breached its contract with McGarvey. However, the three requirements listed in the statute are conditions or prerequisites that must be satisfied before any rights under § 1666i apply; § 1666i does not even come into play unless a plaintiff satisfies these requirements. In order to obtain relief for Citibank's alleged violation of § 1666i, each class member must establish that he is entitled to the right to assert his underlying claim against the creditor. *See also* Am.Compl. ¶ 11 (treating the three requirements of § 1666i as a prerequisite to relief). This inquiry is unacceptably individualized for class purposes.

McGarvey cites several cases for the proposition that a class action is a proper mechanism to challenge a defendant's procedures with respect to a denial of a benefit despite the fact that the merits of the class members' underlying claims would be different. *See, e.g., Andre H. v. Ambach,* 104 F.R.D. 606 (S.D.N.Y.1985); *Wilder v. Bernstein,* 499 F.Supp. 980 (S.D.N.Y.1980); *Morgan v. Laborers Pension Trust Fund,* 81 F.R.D. 669 (N.D.Cal.1979); *Fischer v. Weaver,* 55 F.R.D. 454 (N.D.Ill.1972). McGarvey's reliance on these cases is flawed in two respects. First, the cases are all inapposite because they involve certification under Rule 23(b)(2). Rule 23(b)(2) does not require a finding that common issues predominate over individual issues. As a result, McGarvey's cases do not consider whether certification would have been proper under Rule 23(b)(3). Here, McGarvey seeks certification under Rule 23(b)(3), which requires a finding that common issues predominate over individual issues. [FN8] Second, none of McGarvey's cases involve the issue of whether the source of the plaintiffs' alleged procedural rights actually apply to the plaintiffs. [FN9] Here, however, the rights and alleged implied procedural protections of § 1666i do not apply unless specific prerequisites are satisfied. [FN10]

## CONCLUSION

*8 Plaintiff Scott McGarvey's motion for class certification is denied. McGarvey's motion to strike the affidavit of Catherine Heinemann is moot.

FN1. It is unclear why McGarvey had the work "redone" when Citibank merely

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 404866 (N.D.Ill.)
(Cite as: 1995 WL 404866 (N.D.Ill.))

Page 7

asked for a letter or estimate from another merchant indicating what work needed to be redone. *See* Compl.Ex. C.

FN2. The motion for class certification does not contain a geographical limitation in the definition. McGarvey assured Citibank that he intends to limit his class to Illinois residents. *See* Citibank Br. at 4 n. 4. Accordingly, the court assumes McGarvey seeks certification of an Illinois-based class.

FN3. McGarvey contends that he need not show this number because "all or almost all persons receiving it would also have received the ten-day letter." McGarvey Reply at 3 n. 2.

FN4. However, this portion of the class definition is defective as overbroad. *See infra* pp. 10-11.

FN5. Citibank submits an affidavit from its compliance manager. The compliance manager avers that she has no knowledge of a cardholder dispute relating to the quality of goods or services with the same facts as those alleged by McGarvey. *See* Heinemann Aff. ¶ 12. Although this statement is self-serving and must be discounted as such, it nevertheless militates against a numerosity finding given the weak and speculative nature of the numerosity evidence McGarvey presents.

FN6. Indeed, McGarvey effectively concedes that he cannot satisfy numerosity if his definition is read as conjunctive. *See* McGarvey Reply at 2-3.

FN7. The relevant inquiry is not how many people received a letter attempting to collect a Citibank debt and threatening to report the consumer to a credit bureau. Instead, the relevant question is how many people received such a letter after first notifying Citibank of a dispute within the scope of § 1666i.

FN8. In his reply, McGarvey makes a conclusory assertion that he also moves for certification under Rule 23(b)(2). *See* McGarvey Reply at 2. McGarvey has never presented (even in his reply) *any* argument or analysis for certification under Rule 23(b)(2), and the court declines to make the argument for him. *See Hartmann v. Prudential Ins. Co.*, 9 F.3d 1207, 1212 (7th Cir.1993) (failure to press a point with proper argument forfeits it).

FN9. McGarvey's reliance on *Avila v. Van Ru Credit Corp.*, 1995 WL 41425, 1995 U.S.Dist. Lexis 461 (N.D.Ill.1995), is misplaced. In *Avila*, a determination that the form letter sent by the debt collector violated the relevant provisions of the Fair Debt Collect Practices Act would have established that the plaintiff class was entitled to relief; no issue was presented as to whether the relevant sections of the statute applied to the class, and relief could be granted without engaging in collateral, individualized issues for each class member. Here, in contrast, the members of McGarvey's class are not entitled to relief unless they show both that Citibank's letter violates the FCBA and that they have satisfied the other prerequisites for relief.

FN10. McGarvey moves to strike the affidavit of Catherine Heinemann, submitted by Citibank in opposition to class certification. Because the court does not rely on any of the challenged material in the affidavit, McGarvey's motion is moot.

1995 WL 404866 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



LEXSEE 1989 U.S. DIST. LEXIS 13507

**FIREMAN'S FUND INSURANCE COMPANY, As Subrogee of Oswaldo and Ela Cisneros, Plaintiff, v. WAREHOUSE NO. 1, INC., a/k/a WAREHOUSE ONE, INC., Defendant**

No. 89 Civ. 4069(CES)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1989 U.S. Dist. LEXIS 13507*

November 13, 1989, Decided; November 14, 1989, Filed

LexisNexis(R) Headnotes

OPINIONBY: [*1]

STEWART, JR.

OPINION:

MEMORANDUM DECISION

CHARLES E. STEWART, JR., UNITED STATES DISTRICT JUDGE

Plaintiff, Fireman's Fund Insurance Company, a California corporation, brought this action against defendant Warehouse No. 1, Inc. ("Warehouse One") a New York corporation, to recover the value of certain items that plaintiff's insureds, Oswaldo and Ela Cisneros (the "Cisneroses"), had stored in the defendant's warehouse. n1 Defendant has filed a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. However, in accordance with the requirements of *Fed. R. Civ. P. 12(b)* since we have considered matters outside of the pleadings, the motion has been converted into one for summary judgment pursuant to *Fed. R. Civ. P. 56*. n2 For the reasons that follow, we deny defendant's motion.

n1 Plaintiff pursues this action as subrogee of the Cisneroses pursuant to an insurance policy issued to the Cisneroses by plaintiff. It alleges two causes of action in its amended complaint: Count One - conversion by defendant of $ 209,751.00 worth of items belonging to the Cisneroses stored at defendant's warehouse; Count Two - failure to return $ 209,751.00 worth of the Cisneroses' stored property through negligence of defendant. [*2]

n2 The parties were advised by letter dated October 4, 1989, of the conversion of the dismissal motion into a motion for summary judgment. Pursuant to that letter they were instructed to submit to the court any material relevant to the disposition of the motion as one for summary judgment.

*Factual Background*

*In July of 1983, the Cisneroses, pursuant to a written agreement (the "Storage Agreement" or "Agreement"), rented warehouse space at defendant's facility in New York. In late July of 1987, certain items belonging to the Cisneroses, valued by plaintiffs at over $ 200,000, were transported and delivered by defendant to its warehouse for storage. On September 1, 1988, the Cisneroses attempted to retrieve their belongings from the warehouse but were told by defendant's employees that the requested items could not be located. The employees offered no explanation for the disappearance*

1989 U.S. Dist. LEXIS 13507, *

*of the Cisneroses' property. Since that time the items remain missing without explanation.*

Defendant contends that four paragraphs within the fifteen paragraph Storage Agreement between the Cisneroses and Warehouse One expressly absolve it of liability for the loss of the Cisneros property. n3 We [*3] disagree and deny defendant's motion for the reasons that follow.

> n3 Paragraph "4" of the Agreement reads in relevant part:
>
> Tenant hereby agrees that landlord shall have no liability whatsoever or to any extent for any occurrence of any injury to any property or to tenant at any time or for or on account of the destruction of any property at the time. Tenant hereby releases landlord from any and all responsibility whatsoever in connection with the tenant and tenant's property; acknowledges that tenant's use of the premises shall be solely at tenant's risk. In the event of any loss, tenant shall look solely to his own insurance coverage if any and shall make no claim whatsoever against the landlord. Tenant acknowledges insurance is available for its property at the premises.
>
> Paragraph "14" of the Agreement reads in relevant part:
>
> It is specifically agreed by the parties that all properties are under the control care custody and possession [sic] of the tenant and not the landlord.
>
> Paragraph "13" of the Agreement reads in relevant part:
>
> It is specifically agreed by the parties that no bailment contract exists and the relationship of the parties is one of landlord and tenant for rental of the designated area.
>
> Paragraph "12" reads in relevant part:
>
> It is agreed that any claim by the tenant against the landlord must be in writing and submitted to the landlord . . . and any action, proceeding or cause of action in any court must be commenced within three (3) months of the incident that gave rise to the writing. [*4]

### Discussion

A motion for summary judgment shall be granted when "there is no genuine issue of material fact and that

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The parties have focused much of their attention on the character of the relationship between the Cisneroses and the defendant. Defendant claims that the Storage Agreement created a landlord-tenant relationship and since that agreement expressly absolved the landlord of any liability, it is entitled to judgment as a matter of law. Plaintiff counters that the relationship was that of bailee-bailor and not landlord-tenant.

It is our view that determination of the instant motion does not turn solely on the resolution of the relationship between the parties since the defendant may not contract away its liability for tortious conduct irrespective of the character of the relationship. However, since defendant appears to strenuously argue that the resolution of the motion is dependent on the determination of the relationship between the parties, we will discuss that issue first.

Whether the relationship of the parties is defined as that of bailor-bailee or landlord-tenant has certain [*5] legal ramifications. If a bailee fails to return a bailor's property there is a presumption of liability, and a prima facie case of negligence exists if the property cannot be found. See Maisel v. Gruner & Jahr USA, Inc., 89 A.D.2d 503, 504, 452 N.Y.S.2d 192, 193 (N.Y. App. Div. 1st Dept. 1982). Where no bailment exists, such as in a landlord-tenant relationship, the failure to return property gives rise to no presumption. See Motors Ins. Corp. v. American Garages, Inc., 98 Misc.2d 887, 889, 414 N.Y.S.2d 841, 842 (N.Y. Sup. Ct. 1979). n4

> n4 Under New York law a bailment is defined as:
>
> [a] delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it.
>
> Rich v. Touche Ross & Co., 415 F. Supp. 95, 99 n. 2 (S.D.N.Y. 1976) (quoting Mays v. New York, N.H. & H.R.R., 197 Misc. 1062, 1063-64, 97 N.Y.S.2d 909, 911 (N.Y. Sup. Ct. App. Term. 1950)).

To determine whether a bailment has been established, the test to be applied is "whether [*6] or not the person leaving the property has made such a delivery as to amount to a relinquishment of his exclusive

possession, control and dominion thereof, and vested such control and dominion in the person upon whose premises the property has been left." Phillips v. City of New York, 71 Misc.2d 861, 863, 337 N.Y.S.2d 303, 306 (N.Y. Civ. Ct. 1972) (citing Osborne v. Cline, 263 N.Y. 434, 189 N.E. 483 (N.Y. Ct. App. 1934)).

On the other hand, if the property owner's control and dominion over the items left in storage is not dependent on the cooperation of the owner of the premises and access to the items is not subject to the latter's control, it is generally held that the property owner is a tenant or lessee. See Cornelius v. Berinstein, 183 Misc. 685, 688, 50 N.Y.S.2d 186, 189 (N.Y. Sup. Ct. Onondaga Cty. 1944) (relationship between operator of bowling alley and patron who rented locker space at bowling alley more akin to that of landlord and tenant rather than bailee and bailor).

Under New York law it is the access to and control of the items stored that determines the relationship between the parties.  Generally, a landlord-tenant relationship is found where the person  [*7]  storing items has unimpeded access to those items during business hours. See Cornelius, 183 Misc. at 688-89, 50 N.Y.S.2d at 189 (distinguishing between lockers at a bowling alley, a landlord-tenant relationship, and safety deposit boxes in a bank, a bailee-bailor relationship, because the latter requires the depositor to be admitted to the safety deposit box area by a bank employee thereby diminishing the depositor's unimpeded access during business hours to the items stored); see also Kahn & Rolnick, Inc. v. Interborough Fur Storage Co., Inc., 196 Misc. 749, 750-51, 92 N.Y.S.2d 894, 895 (N.Y. Sup. Ct. New York Cty. 1949) (owner of premises found to be a landlord and not a bailee because he did not have sole custody of items stored on premises since tenant had sole key to room and had unimpeded access during business hours to items stored there); cf.  Motor Ins. Corp., 98 Misc.2d at 889, 414 N.Y.S.2d at 842 (a parking arrangement gives rise to bailee-bailor relationship if there is dominion and control of automobile by garage owner); Fire Ass'n of Philadelphia et al. v. Fabian, 170 Misc. 665, 9 N.Y.S.2d 1018, 1021 (N.Y. City Ct. Rochester 1938) (parking lot owner a  [*8]  bailee since he could move parked cars at his discretion).

There are insufficient facts before the court to definitively assess whether the Cisneroses enjoyed unimpeded access to their property during business hours and were, therefore, tenants rather than bailors, or whether defendant exercised dominion and control over the stored items and was a bailee rather than a landlord.

However, as noted earlier, we need not reach that determination in disposing of the instant motion because even  assuming,  arguendo,  that  a  bailor-bailee

relationship originally existed between the Cisneroses and defendant, the parties subsequently defined their relationship as that of landlord-tenant in the Storage Agreement. See Langenthal v. American Stuyvesant Garage, 72 Misc.2d 189, 190, 338 N.Y.S.2d 727, 729 (N.Y. Civ. Ct. New York Cty. 1972) (parties to a parking arrangement were contractually free to redefine their relationship as that of licensor-licensee instead of bailor-bailee without running afoul of New York General Obligations Law ("GOL") §  5-325 which forbids a garage owner from insulating himself against liability).

Under New York law a contractual clause which changes the relationship  [*9]  between parties to that of landlord-tenant from that of bailor-bailee extinguishes only the presumption of negligence that a loss of property in the context of a bailment imposes. See Langenthal, 72 Misc.2d at 190-91, 338 N.Y.S.2d at 729; see also Motors Ins. Corp., 98 Misc.2d at 890, 414 N.Y.S.2d at 843. To extinguish the presumption of negligence and to relieve a party from the effect of its own negligence are two entirely different matters. Therefore, even if a landlord-tenant relationship was created by provisions of the Storage Agreement, defendant still could not contract away liability for its own negligence -- landlords being expressly forbidden from doing so by statute. See GOL § 5-321. n5 See also Graphic Art Supply, Inc. v. Raynor, 91 A.D.2d 827, 827-28, 458 N.Y.S.2d 115, 116 (N.Y. App. Div. 4th Dept. 1982) (lease requirement that tenant obtain insurance and to hold the landlord harmless from effects of negligence was void); Palanker v. Edwards Properties, Inc., 32 Misc.2d 772, 774, 222 N.Y.S.2d 266, 268 (N.Y. Sup. Ct. Erie Cty. 1961) (lessor of fur storage vault could not insulate itself from liability for its negligence by provisions in the  [*10]  lease) (construing precursor to GOL § 5-321); cf. Motors Ins. Corp, 98 Misc.2d at 891, 414 N.Y.S.2d at 843-44 (clauses limiting liability are upheld where there is no contracting away of liability).

n5 GOL § 5-321 reads in relevant part:

Every covenant, agreement or understanding in or in connection with or collateral to any lease of real property exempting the lessor from liability for damages for injuries to person or property caused by or resulting from the negligence of the lessor, his agents, servants or employees, in operation or maintenance of the demised premises or the real property containing the demised premises shall be deemed void as against public policy and wholly unenforceable.

Accordingly, we believe that Paragraph 4 of the Storage Agreement which purports to hold harmless the

defendant as landlord from any liability is in contravention to GOL § 5-321 and void as against public policy.

Finally, defendant contends that the complaint is time-barred since Paragraph 12 of the Storage Agreement states that any claim by the tenant against the landlord must be made in writing, and any action must be commenced within three months of the "incident that gave rise   [*11]   to the writing." Defendant's Memorandum of Law at 4.

New York law allows parties to provide for reasonable shorter periods of limitation by agreement, but such agreements are strictly construed, and the parties' intention to provide a shorter than usual limitations period must be clear. n6 See Oil & Gas Ventures -- First 1958 Fund, Ltd. v. Kung, 250 F. Supp. 744, 753 (S.D.N.Y. 1966). Under this standard, we find paragraph 12 of the Storage Agreement fails.

> n6 New York's limitations period for injuries to property is three years. N.Y. Civ. Prac. L. & R. § 214(4) (McKinney 1972).

First, the three month limitation period afforded the tenant both to notify the landlord in writing of any complaint and to bring an action or proceeding is unreasonable. It is obvious that such a provision actually prejudices the tenant who waits in good faith for the landlord to cure any possible problem. It also encourages a culpable landlord to wait as long as possible before responding to any complaint.

Second, Paragraph 12 does not expressly and clearly indicate that it is the intention of the parties to waive the statutory limitations period.

Finally, under New York law, vagueness of a contractual [*12] term renders the term unenforceable. See, e.g., Brown & Guenther v. North Queensview Homes, Inc., 18 A.D.2d 327, 330, 239 N.Y.S.2d 482, 484 (N.Y. App. Div. 1st Dept. 1963) (vagueness of contractual provision renders it unenforceable). Paragraph 12 of the Storage Agreement requires the tenant to commence his or her action within three months from the time of the "incident" which "gives rise" to the written complaint to the landlord. Under the instant facts the "incident" triggering Paragraph 12 could be interpreted to mean:

1. the point at which the Cisneroses became aware that their property was missing;

2. the point at which they first communicated their concern to the defendant;

3. the point at which no explanation for the missing items was forthcoming from defendant; or,

4. the point at which the missing items were actually misplaced or stolen. n7

> n7 Indeed, plaintiff indicates that there was some uncertainty as to whether defendant ever confirmed that the Cisneroses' items were missing or in another part of the warehouse. Plaintiff's Supplemental Memorandum of Law at 4 (and attached exhibits).

As it is unclear from the agreement which incident will trigger the three month   [*13]   limitations period, we hold that Paragraph 12 is too vague to be an enforceable provision. Consequently, for the reasons enumerated, we reject defendant's contention that the instant action is time-barred by operation of Paragraph 12 of the Storage Agreement.

To summarize, we conclude that by reason of the Storage Agreement executed between the Cisneroses and defendant, the relationship between them was one of landlord and tenant. However, that relationship does not insulate defendant from liability for conversion or negligence, notwithstanding the terms of Paragraph 4 of the Storage Agreement which is void as against public policy and unenforceable. Further, we have concluded that Paragraph 12 of the Storage Agreement is void because the time limitations set forth within it are unreasonable and its terms too indefinite to be enforceable. Therefore, the action is not time-barred.

Conclusion

Because genuine issues of material fact remain to be determined regarding plaintiff's claims of negligence and conversion, defendant's motion to dismiss the complaint, converted into a motion for summary judgment, is denied.

SO ORDERED.

Dated: New York, New York
November 13, 1989 [*14]

110NGG
********** Print Completed **********

Time of Request:  February 18, 2005  04:36 PM EST

Print Number:    1821:32558580
Number of Lines:  181
Number of Pages:

Send To:  SMITH, EMILY
        SNELL & WILMER
        GATEWAY TOWER WEST
        15 WEST S TEMPLE STE 1200
        SALT LAKE CITY, UT 84101