Westlaw.

Not Reported in F.Supp.2d
2004 WL 830461 (N.D.Ill.)
(Cite as: 2004 WL 830461 (N.D.Ill.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
WARD ENTERPRISES, INC., a Washington
corporation, and Gary Ward, Plaintiffs,
v.
BANG & OLUFSEN AMERICA, a Delaware
corporation, Defendant.
**No. 02 C 7640.**

April 15, 2004.

Christopher N. Mammel, Childress & Zdeb, Ltd.,
Chicago, IL, Kenneth G. Yalowitz, Green and
Yalowitz, Seattle, WA, Mark E. Griffin, Griffin and
McCandlish, Portland, OR, for Plaintiffs and
Counter-Defendant.

Harry N. Arger, Marc Alan Primack, Gwen Marie
Geraghty, Daniel Matthew Noland, Dykema Gossett
Rooks Pitts PLLC, Chicago, IL, Douglas Clayton
Berry, Arthur J. Lachman, Graham & Dunn, PC,
Seattle, WA, for Defendant and Counter-Claimant.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

*1 This matter is before the Court on defendant
Bang & Olufsen America's motion to strike
plaintiffs' jury demand. For the following reasons,
the motion to strike jury demand is granted.

BACKGROUND

Plaintiff Ward Enterprises, Inc. is in the business of
retail sales of audio and video products and
telephones, and plaintiff Gary Ward is the owner
and operator of Ward Enterprises. Defendant Bang
& Olufsen America ("BOA") is the sole distributor
in the United States of audio and video products
and telephones produced by Bang Olufsen Denmark
and its subsidiaries and affiliates. On June 1, 1999,
Ward Enterprises and BOA executed a Licensed
Dealer Agreement for Ward Enterprises to sell

BOA products at a retail outlet in Seattle,
Washington for a term of five years. Plaintiff Ward
executed a personal guaranty in connection with the
Agreement, in which he guaranteed Ward
Enterprises' obligations to BOA. On January 31,
2003, BOA terminated the Agreement before the
end of its five-year term.

Plaintiffs filed a four count second amended
complaint. Previously, this Court dismissed Counts
II and IV as to both plaintiffs and also dismissed
Count III with respect to Gary Ward. Thus, Counts
I and III remain. Count I alleges a claim for fraud,
and Count III states a claim for a violation of the
Washington Franchise Investment Protection Act.
BOA now seeks to strike the jury demand filed by
plaintiffs.

DISCUSSION

BOA argues that plaintiffs have waived their right
to a jury because the Licensed Dealer Agreement
(the "Agreement"), which governs the parties'
relationship, contains a waiver provision. Section
24 of the Agreement specifically provides:

This Agreement shall be governed by and
construed in accordance with the laws of the State
of Illinois. Any action related to or arising from
this Agreement may be brought only in a state or
federal court located within Cook County,
Illinois. Dealer and Gary Ward consent to the
jurisdiction of any state or federal court located
within Cook County, Illinois, waive trial by jury
and further waive any objection to jurisdiction
and venue of any action related to or arising from
this Agreement, and further agree not to assert
any defense based on jurisdiction or venue.

A jury waiver will be enforced if it was made
knowingly and voluntarily. *Sutter Ins. Co. v.
Applied Systems, Inc.,* 2004 WL 161508, at *7
(N.D.Ill. Jan.26, 2004). Though it is unclear in this
Circuit which party bears the burden on the issue of
voluntariness of the waiver, we find it unnecessary
in this case to address that issue. Either way,
plaintiffs are required to come forward with some
evidence that calls the voluntariness of the waiver
into question, and they have offered no evidence.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Id.; see also Reggie Packing Co. v. Lazare Fin. Corp.,* 671 F.Supp. 571, 573 (N.D.Ill.1987). Indeed, plaintiffs concede that the jury waiver provision in the Agreement is clear, conspicuous and unambiguous, and they do not dispute that they have "waived a jury trial ... as to actions which are related to or arise from the Agreement." Instead, plaintiffs argue that there is no waiver of their right to a jury in this case because Counts I and III are not related to and do not arise from the Agreement.

*2 A similar argument, however, already has been raised and rejected in this case by Judge Robert Lasnik of the United States District Court for the Western District of Washington. Plaintiffs initially filed this case in Seattle, Washington. BOA then filed a motion to transfer venue to the Northern District of Illinois pursuant to Section 24 of the Agreement, the same section at issue in the instant motion, arguing that plaintiffs had agreed to a forum selection clause which dictated that "[a]ny action related to or arising from this Agreement may be brought only in a state or federal court located within Cook County, Illinois."

Before Judge Lasnik, plaintiffs argued that their claims did not arise from or relate to the Agreement, and therefore, the case should not be transferred. Rejecting plaintiffs' argument, Judge Lasnik stated:

> Here, the forum selection clause provides that "any action related to or arising from this Agreement may be brought only in a state or federal court located within Cook County, Illinois." The language of the clause clearly states that actions both "arising from" and "relating to" the Agreement must be brought in Illinois. Plaintiffs' assertions that their claims do not "arise from" or "relate to" the Licensed Dealer Agreement are contradicted by the fact that plaintiffs have referenced and attached the Licensed Dealer Agreement to their complaint for damages. The court agrees with BOA and finds that plaintiffs' causes of action, at the very least, "relate to" the Licensed Dealer Agreement.

Order, at 2-3. Judge Lasnik also found that plaintiffs' reliance on *Tracer Research Corp. v. National Environmental. Services. Corp .,* 42 F.3d 1292 (9th Cir.1994), a case which plaintiffs cite in this motion as well, was misplaced. Judge Lasnik noted that the clause at issue in *Tracer* contained

the phrase "arising from" but did not contain any "relating to" language. Order, at 3 n. 1. Relying on *Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 798 F.2d 1458, 1464 (9th Cir.1983), Judge Lasnik concluded that the omission of the "relating to" language is significant, holding:

> The scope of the "arising from" language is narrow and is intended to cover only those disputes relating to the interpretation and performance of the contract itself. In contrast, the scope of "relating to" language is broad and is intended to cover a much wider scope of disputes, not just those arising under the agreement itself.

Order, at 3 n. 1 (internal citations omitted). Accordingly, Judge Lasnik found that the forum selection clause was applicable to this case and transferred the matter to this Court.

Similarly, the "related to" and "arising from" language of the forum selection clause is identical to the language of the jury waiver provision, and we agree with Judge Lasnik's analysis and interpretation of the language of Section 24 of the Agreement. Indeed, specific allegations in Counts I and III of plaintiffs' second amended complaint relate to and arise from the Agreement. For example, in paragraphs 10 and 11 of the second amended complaint, plaintiffs allege that BOA made certain fraudulent statements and concealed information relating to the Agreement including allegations, among others, that: (1) plaintiff was not a franchise; (2) plaintiff could expect to derive profits from the operation of the store in amounts projected by BOA; and (3) business projections given to plaintiffs relating to the operation of the store under the Agreement were accurate. These allegations are based on plaintiffs' operation of the store pursuant to the Agreement and in some instances on statements contained in the Agreement itself. Count III also incorporates all of the allegations pertaining to the Agreement discussed above, and the essence of the allegations in Count III is that, contrary to the statements and structure of the Agreement, plaintiff actually was a franchise even though the Agreement specifically stated otherwise.

## CONCLUSION

*3 For all of the foregoing reasons, the motion to strike jury demand is granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 830461 (N.D.Ill.)
**(Cite as: 2004 WL 830461 (N.D.Ill.))**

It is so ordered.

2004 WL 830461 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

C
Only the Westlaw citation is currently available.


United States District Court, E.D. North Carolina.
Robert S. KEATING, et al. Plaintiffs,
v.
BASKIN-ROBBINS USA, CO., a California
Corporation, et al. Defendants.
BASKIN-ROBBINS USA, CO., et al.
Counterplaintiffs,
v.
Robert S. KEATING, et al. Counterdefendants.
No. 5:99-CV-148-BR(3).

March 27, 2001.

*ORDER*

BRITT, Senior J.

*1 Defendant-counterplaintiffs Baskin-Robbins
USA, Co., Baskin-Robbins Incorporated, Dunkin'
Donuts Incorporated, and Allied Domecq QSR
(collectively referred to hereafter as the "Baskin
Robbins" defendants) have submitted a motion for
summary judgment on their claims as well as a
motion for summary judgment on plaintiffs'
amended complaint.

On 2 February 1999, many franchisees [FN1] filed
a complaint in the Superior Court of Wake County
against the Baskin-Robbins defendants, David
Ohlin, Ralph Gabellieri, and Ron Piunti, alleging
breach of contract, breach of the implied covenant
of good faith and fair dealing, unfair and deceptive
trade practices, fraud, and negligent
misrepresentation arising out of the franchise
agreements and licensing relationships between the
parties. Baskin-Robbins removed the action to
federal court on 4 March 1999 and filed an answer
on 11 March 1999.

> FN1. The complete list of plaintiffs who
> have participated in this action follows:
> Robert S. Keating, Andrea Keating, The

Keating Company, Ivan Goodson, George
Golde, Joan E. Golde, Burhan Ghanayem,
Marwan Ghanayem, NC Subs, Inc., Betsy
Wood, James Wood, Simon Estroff,
Samuel Watkins, Patricia Watkins, and
JLA Ice Cream, Inc. As explained below,
many of these plaintiffs have been
dismissed as the action has proceeded.

On 12 October 1999, in response to plaintiffs'
motion to amend, Magistrate Judge Alexander B.
Denson permitted plaintiffs to add the Keating
Company, Joan E. Golde, NC Subs, Inc., and JLA
Ice Cream Inc. as plaintiffs and Baskin-Robbins
Inc. as a defendant, but refused plaintiffs' request to
add a RICO claim. Plaintiffs filed their amended
complaint on 12 November 1999. On 2 December
1999, defendants filed an answer to the amended
complaint.

On 29 February 2000, following a hearing, this
court allowed defendants' motion to amend their
counterclaims and declared defendants' motion for a
preliminary injunction moot. The court further
directed that plaintiffs' motions for sanctions and
contempt should be presented as added claims in
the case and instructed counsel to file a motion to
amend with respect to such claims. In an Order
memorializing the foregoing rulings, this court
appointed Magistrate Judge Webb as Settlement
Master.

On 22 August 2000, the parties entered a
stipulation of dismissal with prejudice as to Ivan
Goodson, James Wood, Betsy Wood and JLA Ice
Cream, Inc., and those parties were subsequently
dismissed. On 27 September 2000, the parties
stipulated to the dismissal with prejudice of the
plaintiffs' claims concerning defendants Ronald
Piunti, Ralph Gabellieri and David Ohlin, and those
defendants were dismissed. On 11 December 2000,
the parties submitted a partial stipulation of
dismissal as to George and Joan Golde, and the
Goldes were dismissed. On 15 March 2001, the
parties stipulated to the dismissal with prejudice of
all claims concerning the Ghanayems and NC Subs,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

Page 2

Inc., and these parties will be dismissed from the action. At this point, the remaining plaintiffs are the Keatings and The Keating Company, Simon Estroff, and the Watkins.

In the interim, on 28 August 2000, Baskin-Robbins filed a motion for summary judgment regarding their claims against plaintiff counter-defendants, the Keatings, along with a supporting memorandum and exhibits. [FN2] On that date, Baskin-Robbins also submitted a motion for summary judgment as to all of the claims set forth in plaintiffs' amended complaint along with a memorandum and exhibits. Plaintiff counter-defendants responded to both motions on 20 September 2000, and Baskin-Robbins filed replies on 10 October 2000. Plaintiff-counter-defendants filed a supplemental memorandum in support of their opposition to defendants' motion for summary judgment on plaintiffs' amended complaint with the permission of this court. Although permitted to do so, defendants did not file a supplemental memorandum. The motions for summary judgment are now ripe for review.

> FN2. The motion also pertained to the Goldes who have since been dismissed from this action.

*2 On 5 February 2001, this court entered an Order resetting the trial in this matter for 4 June 2001 in Raleigh, North Carolina and denying defendants' request for oral argument.

I. Facts

Plaintiffs are current and former franchisees of Baskin-Robbins and Dunkin' Donuts stores located in North Carolina. Dunkin' Donuts and Baskin-Robbins Inc. are Delaware corporations with principal places of business in Massachusetts, and Baskin-Robbins USA, Co. is a California corporation with its principal place of business in Massachusetts. Allied Domecq Retailing USA is an unincorporated division of Allied Domecq PLC, a United Kingdom corporation and the parent corporation of Dunkin' Donuts Inc. and Baskin-Robbins Inc. (Def.s' Mem. at 2.) In July 1999, after this suit was filed, Allied Domecq Retailing USA changed its name to Allied Domecq Quick Service Restaurants. [FN3]

> FN3. Defendants have recently filed a motion to dismiss defendant Allied Domecq Retailing USA from this action on the grounds that, as an unincorporated division of a larger company, it is not an entity capable of being sued. Subsequently, plaintiffs filed a motion to add Allied Domecq PLC as a defendant. The court finds these issues moot in light of its decision to award summary judgment in defendants' favor on plaintiffs' claims. Accordingly, defendants' motion to dismiss Allied Domecq Retailing USA and plaintiffs' motion to add Allied Domecq PLC as a defendant will be denied.

The facts pertaining to the Keatings and their Baskin-Robbins franchises that are relevant to the disposition of Baskin-Robbins' motion for summary judgment on its counterclaims follow. The Keatings held two Baskin-Robbins franchises, one located at 151 Cary Parkway, and the other at 968 High House Road in Cary, North Carolina. The Keatings' opened the Cary Parkway store (also known as the Kildaire store) pursuant to a franchise agreement dated 5 February 1992, and they subsequently signed a new franchise agreement with respect to that store on 23 May 1996. [FN4] The Keatings opened the High House Road store (also known as the Preston Corners store) in January 1996 pursuant to a franchise agreement signed 12 December 1995. They ceased operating as a Baskin-Robbins franchisee at the Preston Corners location on or about 31 December 1999, and, on 10 January 2000, began selling Edy's ice cream at the Preston Corners shop. (Keating Dep., Ex. 2A at 15-16.) Baskin-Robbins terminated the Cary Parkway franchise agreement on 11 January 2000 because Baskin-Robbins believed that the Keatings had violated the in-term covenant not to compete contained in that agreement by selling Edy's ice cream at the Preston Corners location. The Keatings closed the Cary Parkway store on 31 January 2000.

> FN4. The Keatings signed the 1992 franchise agreement in the name of The Keating Company. The 1996 agreement was signed by Robert and Andrea Keating, and The Keating Company was no longer a franchisee. (Keating Dep. Ex. 2A at 13-14.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

The facts pertinent to the resolution of the issues presented by defendants' motion for summary judgment on plaintiffs' amended complaint are set forth in some detail below. Plaintiffs' amended complaint includes the following claims: breach of contract (Count One); breach of the implied covenant of good faith and fair dealing (Count Two); unfair and deceptive trade practices (Count Three); fraud (Count Four); and negligent misrepresentation (Count Five).

## II. Summary Judgment

Summary judgment is appropriate in those cases in which there is no genuine dispute as to a material fact, and in which it appears that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Haavistola v. Community Fire Co. of Rising Sun. Inc.,* 6 F.3d 211, 214 (4 th Cir.1993). Summary judgment should be granted in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." *Id.* In making this determination, the court draws all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate ." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4 th Cir.1991).

*3 While this court must take the evidence in the light most favorable to plaintiff for purposes of defendants' summary judgment motion, the court need not " 'accept unreasonable inferences based on conjecture or speculation." ' *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Town of Randolph,* 932 F.2d 89, 92 (1 st Cir.1991)(quoting *Santiago-Negron v. Castro-Davila,* 865 F.2d 431, 445 (1st Cir.1989)). As the Fourth Circuit has explained,

[O]nly "reasonable" inferences from the evidence need be considered by the court.... Whether an inference is reasonable cannot be decided in a vacuum; it must be considered "in light of the competing inferences" to the contrary.... In the end, the non-moving party must do more than present a "scintilla" of evidence in its favor.... Rather, the non-moving party must present sufficient evidence such that "reasonable jurors

could find by a preponderance of the evidence" for the non-movant, ... "for an apparent dispute is not 'genuine' within the contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact[s] in his favor." ... Thus, if the evidence is "merely colorable" or "not significantly probative," a motion for summary judgment may be granted. *Sylvia Development Corp. v. Calvert County, Maryland,* 48 F.3d 810, 818 (4 th Cir.1995) (citations omitted).

The Franchise Agreements signed by the Keatings, Estroff, and the Watkins are governed by California law. (Def.'s Mem. re Amended Compl. at 12.)

## III. Discussion
### Motion for Summary Judgment on Plaintiffs' Amended Complaint

Defendant counter-plaintiffs argue that they are entitled to summary judgment on the claims in plaintiffs' amended complaint. [FN5] First, they contend that most of plaintiffs' claims are barred by the contractually established one-year period within which either party may sue the other for violation of the franchise agreement. Accordingly, before addressing the merits of the allegations in this case, it is necessary to determine whether plaintiffs' claims are time-barred.

> FN5. Plaintiffs contend that defendants' motion for summary judgment should be denied because the certifications offered in support of their motion are not affidavits as required by Rule 56 and because they contain hearsay. Plaintiffs' argument is not persuasive. *See* 28 U.S.C. § 1746; *Willard v. Internal Revenue Service,* 776 F.2d 100, 102, n. 3 (4 th Cir.1985)(unsworn declarations in support of the motion for summary judgment, made under penalty of perjury, are permitted in lieu of affidavits).

A. One Year Contractual Limitations Clause in Franchise Agreements

Paragraph 30 of each Agreement states that any claim brought by either party under the Franchise Agreement must be commenced within one year from the discovery of facts giving rise to any claim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

Page 4

or that claim is barred. (Mem. at 12, citing Exs. 1.A-B, 1.D-F ¶ 30.)

Any and all claims and actions arising out of or relating to this agreement, the relationship of franchisee, Baskin-Robbins or the franchisee's operation of the retail unit, brought by any party hereto against the other, shall be commenced within one (1) year from the discovery of facts giving rise to any such claim or action, or such claim or action shall be barred, except for any unperformed financial obligations by franchisee to Baskin-Robbins.

*4 As parties to an agreement, plaintiffs and defendants were free to contractually limit the period within which claims could be asserted to one year. A period of one year is reasonable, valid and enforceable. See *Han v. Mobil Oil Corp.,* 73 F.3d 872 (9 th Cir.1995)(affirming district court's award of summary judgment to defendant on plaintiff's claims for breach of contract, bad faith denial of the existence of contract, and contractual breach of the covenant of good faith and fair dealing based on the 12-month contractual limitations period contained in the parties' franchise agreement); *Hays v. Mobil Oil Corp.,* 930 F.2d 96, 100 (1 st Cir.1991); *Campanelli v. Allstate Insurance Co.,* 97 F.Supp.2d 1211, 1214 (C.D.Cal.2000)(citing *Han* ); *H.P.S. Capitol, Inc. v. Mobil Oil Corp.,* 186 A.D.2d 98, 99, 588 N.Y.S.2d 29 (N.Y.App.Div.1992) (12-month limitation period reasonable, valid and enforceable).

Specifically,

California permits contracting parties to agree upon a shorter limitations period for bringing an action than that prescribed by statute, so long as the time allowed is reasonable.... A contractual limitation period requiring a plaintiff to commence an action within 12 months following the event giving rise to a claim is a reasonable limitation which generally manifests no undue advantage and no unfairness.

*Han,* 73 F.3d at 877.

Defendants have asserted that the "vast majority" of plaintiffs' claims are barred by the contractual limitations period. (Def.s' Mem. at 12-13.) Beyond that, defendants have not stated in detail which claims are barred and which are not. Plaintiffs have not contradicted defendants' assertions that they knew about the facts giving rise to their claims by

1997. In fact, plaintiffs have not made any response to defendants' contractual limitations argument beyond the mere assertion that the limitations provision is an unconscionable clause of the franchise agreements, which they characterize as contracts of adhesion.

Plaintiffs' argument that the contractual one-year limitations period renders the franchise agreements unconscionable is unpersuasive. The contractual language indicates that the one-year limitation period is equally applicable to both parties. Only one class of claims, that regarding unperformed financial obligations owed to Baskin-Robbins, is exempted from the limitation. Such a limited exception does not render the clause, or the agreement as a whole, unconscionable. [FN6]

FN6. Plaintiffs' attempts to distinguish cases cited by defendants are unavailing, and plaintiffs have not submitted any authority on point in support of their argument regarding the one-year limitations period.

To determine whether plaintiffs' claims are barred by the contractual limitations period, the court must consider the nature of each claim and determine the date by which plaintiffs became aware of the facts underlying those claims. Plaintiffs filed suit on 2 February 1999. If plaintiffs were aware of the facts underlying any of the asserted claims before 2 February 1998, their claims are precluded by the limitations clause.

1. Ice Cream Prices

Plaintiffs have alleged that Baskin-Robbins has charged and continues to charge plaintiffs higher prices for ice cream and other ice cream products than Baskin-Robbins has charged other franchise owners, including franchise owners in competition with plaintiffs. (Am.Compl.¶ 17.) Most of the plaintiffs testified that they knew that other Baskin-Robbins franchisees paid less for ice cream than they did by 1997. (Estroff Dep., Ex. 2.B. at 92-93 (discovered price differential in 1989); Keating Dep. Ex.2A at 84-85 (learned of differential in 1993); and Watkins Dep., Ex. 2C at 55-56 (learned of differential from other franchisees approximately 2 1/2 years before June 2000).) Each

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

of these plaintiffs' claims based on the price of ice cream sold by Baskin-Robbins is barred by the one-year contractual limitations period.

## 2. Marketing

*5 Defendants allegedly have made substantial changes in the allocation of advertising and marketing resources by providing different levels of advertising support for stores in different geographical areas, resulting in greatly reduced advertising in plaintiffs' markets. These changes allegedly eliminated standardized advertising and marketing, which is ostensibly an integral part of the System, in breach of the agreements and to plaintiffs' detriment. (Am.Compl.¶ 23.)

The Tier Marketing system to which plaintiffs refer in their amended complaint was a media plan in effect from 1 September 1996 through 31 August 1998. (Def.'s Mem. at 6.) The program was announced to all Baskin-Robbins franchisees in a memorandum dated 11 July 1996. (Def.s' Mem. at 6, 18.) Each of the plaintiffs confirmed that he or she was aware of the tier marketing program by 1997 at the latest. (Estroff Ans. to Int., Ex. 2H ¶ 12; Keating Dep., Ex. 2A at 152-53, Keating Ans. to Int., Ex 2I ¶ 12, and Ex. 2P; Watkins Dep., Ex 2C at 77, 80; Watkins Ans. to Int., Ex. 2G ¶ 12.) Because plaintiffs were aware of the facts underlying their claims regarding the tier marketing system as early as 1997, the one-year limitations period contained in the Agreements precludes them from bringing claims based on that system in this suit.

In addition, some of the plaintiffs allege that defendants have unreasonably refused to approve or have otherwise restricted their local marketing efforts. (Am.Compl.¶ 20.) Specifically, Keating asserts that Baskin-Robbins effectively made it impossible for him to sell ice cream at a permanent installation at the Carolina Mudeats' ballpark because Baskin-Robbins would have charged him an additional $15,000 franchise fee to do so. In 1994, Baskin-Robbins refused to pay the $6,000-8,000 advertising fee that Alltel Pavilion would have required to allow Keating to sell ice cream at the amphitheater. Both incidents occurred several years before Keating filed this suit. Estroff asserts that defendants unreasonably refused to

approve his numerous requests to reinstate television advertising in his market area although he repeatedly made this request to Susan Hale at marketing meetings sponsored by defendants. (Estroff Ans. to Int. Ex. 2H ¶ 7.) To the extent that Estroff's allegations are offered in support of the claim regarding the restriction of local marketing efforts, the facts underlying his complaint were known before 1997. [FN7] The Watkins do not make specific claims that Baskin-Robbins interfered with their local marketing efforts. (Watkins Ans. to Int. Ex. 2G ¶ 7.)

> FN7. In his deposition, Estroff seems to assert that his complaints regarding the elimination of television advertising in the Charlotte area predated the tier marketing scheme. Whether the complaints predated Baskin-Robbins' tier marketing scheme or whether Estroff's allegation actually stems from Baskin-Robbins' implementation of tier marketing, Estroff was aware of the facts before 1997.

## 3. Royalties, Other Franchise Requirements and Non-traditional Outlets

Plaintiffs also allege that all or some of the defendants permitted and continue to permit some vendors to sell Baskin-Robbins ice cream without paying the same royalties as plaintiffs. (Am.Compl. ¶ 18.) Moreover, plaintiffs allege that defendants allow non-franchisees, including operations in competition with plaintiffs, to sell Baskin-Robbins brand products and services free of the training, financial, and supervisory requirements imposed on plaintiffs, and that, in doing so, defendants have damaged the goodwill associated with the brand name to plaintiffs' detriment. (Am.Compl.¶ 22.) Plaintiffs also state that defendants' marketing of ice cream products through non-traditional outlets at different prices and without requiring the same (or any) franchise fees, advertising fees, or royalty payments violates the North Carolina Unfair and Deceptive Trade Practices Act and breaches the implied covenant of good faith and fair dealing. (Pl.'s Supp. Mem. at 13.)

*6 The specific circumstances that appear to have given rise to the foregoing allegations concern Baskin-Robbins' decision to market ice cream in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

Page 6

alternative fora, such as Duke University Hospital and Denny's and Show Mars restaurants. As defendants explain in their memorandum, Baskin-Robbins sold ice cream through a non-traditional operator, i.e., a non-franchisee, at Duke University Hospital. Based on plaintiffs' supplemental memorandum, it appears that the non-traditional Baskin-Robbins store at the Duke University Hospital was operated pursuant to a Test License Agreement between Marriott Management Services (MMS) and Baskin-Robbins USA dated 19 April 1995. (Pl.s' Supp. Mem. at 13.) Defendants acknowledge that Baskin-Robbins ice cream was also test marketed at selected Denny's restaurants. To the extent that plaintiffs' claims regarding royalties and different training, financial, and supervisory requirements rest on Baskin-Robbins' decision to sell ice cream in alternative fora, each plaintiff had knowledge of these circumstances during 1997 or before. (Estroff Dep., Ex.2B at 101(Duke) and 98-99 (Denny's) and 104-107 (Show Mars restaurants); Keating Dep., Ex.2A at 93 (Duke) and 102 (Denny's) and 141- 44, 150 (Wal-Mart), Ex. 2M (Duke); Watkins Dep. Ex 2C at 57 (Duke) and 58 (Denny's); Watkins Ans. to Int. Ex. 2G ¶ 5 (Duke).) Accordingly, plaintiffs' claims based on defendants' marketing of Baskin-Robbins ice cream in alternative fora such as Duke University Hospital, Denny's, and Show Mars restaurants are barred by the one-year contractual limitations period.

### 4. Equipment and Supplies

Plaintiffs assert that defendants required and continue to require plaintiffs to purchase equipment and supplies without demonstrated economic benefit to the franchisees and that defendants require them to purchase such equipment from vendors selected by defendants when equivalent or similar equipment is available for a lower price from other sources. (Am.Compl.¶ 19.) All of the claims pertaining to overpriced equipment appear to be based upon purchases made before 1997 (often in association with the opening of the various franchises) and thus the claims are barred by the contractual limitations period. (Keating Dep., Ex. 2A at 119, 122-25 (topping center in 1995) and 119- 23 (yogurt machine in 1995) and 115-20 (plumbing fixture in 1996); Watkins Dep., Ex. 2C at 65-69 (blenders and associated containers in

1995) and 65 (ice maker in 1995).)

### 5. Business Support

Defendants have allegedly failed to provide the business support and assistance contemplated by the Agreements. (Am.Compl.¶ 24.) While Estroff and Watkins do not appear to assert claims based on lack of business support, (Estroff Ans. to Int., Ex. 2H ¶ 13, Watkins Ans. to Int., Ex. 2G ¶ 13), the Keatings developed the belief that they were not receiving appropriate levels of support by 1997. (Keating Dep., Ex. 2A at 206-29, Ex. 2O (Letter from Keating to Gioia, Pres. of Baskin-Robbins USA Co., dated 26 February 1997).) Specifically, Keating testified in his deposition that Baskin-Robbins began providing inadequate levels of support in the summer of 1994 when Baskin-Robbins employees were terminated and Dunkin' Donuts employees took their posititons and Raleigh-Durham became a test market for combo stores. (Keating Dep., Ex. 2A at 209-210, 227-28.) Accordingly, the lack of business support claims are barred by the one-year contractual limitations period.

### 6. Allegedly Fraudulent Inducements to Build and Buy Franchises

*7 Plaintiffs also allege that defendants made certain inaccurate representations that consumer demand would support the opening of various stores and that plaintiffs obtained new franchises in reliance upon those representations. Plaintiffs assert that they were also induced to open new stores when defendants threatened to allow others to open new stores in competition with their existing stores. (Am.Compl.¶ 21.)

These particular allegations seem to be based primarily on Keating's experience with Baskin-Robbins in 1994 and 1995 with respect to the opening of a second store. (Keating Ans. to Int. 2I ¶ 8.) While the communication between the parties regarding that new store seems to have been anything but clear, the events complained of nevertheless occurred in 1994 and 1995 and therefore cannot be the basis of a claim asserted against Baskin-Robbins in 1999. The remaining plaintiffs do not assert facts supporting the allegations of fraudulent inducement and threats by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

Baskin-Robbins. (Watkins Ans. to Int. 2G ¶ ¶ 8-10; Estroff Ans. to Int. 2H, ¶¶ 8-10.)

### 7. Interference with Franchisees' Ability to Sell

Plaintiffs claim that defendants have interfered with their efforts, as well as the efforts of franchisees in other states, to sell their stores by discouraging prospective buyers from purchasing and by failing to respond to or unreasonably denying requests for approval of prospective purchasers. (Am.Com pl.¶ ¶ 25-26.)

Specifically, Keating explained that his problems with the Baskin-Robbins USA Corporation began in 1995 when he invested in his second store. By 1997 he had decided to sell, and he met with Dave Ohlin regarding the details of the sales and Baskin-Robbins' assistance with those sales. Despite Ohlin's expressed belief that Baskin-Robbins could work with Keating on the sales, Ohlin subsequently refused to confirm or verify his conversation with Keating *pertaining to the sales.* (*Keating Dep., Ex,* 2A at 160-163; Keating Ans. to Int. Ex. 21 ¶ 8.) Because Keating knew of Baskin-Robbins' alleged interference with his ability to sell his stores in 1997, his action is barred by the one-year contractual limitations period.

The Watkins explain that, in the Spring of 1998, they attempted to sell their franchise to a gentleman named Mr. Lee and that Baskin-Robbins refused to approve Lee's purchase of the store because Lee did not speak English well. In fact, Lee had been attempting to buy the store for his son who was fluent in English. (Watkins Ans. to Int. Ex. 2G ¶ 14; Watkins Dep., Ex. 2C at 90, 99, 105.) The Watkins also attempted to sell their store in 1999 and 2000. (Watkins Dep., Ex. 2C at 90.) The Watkins' claim based on alleged interference with their attempts to sell their franchise is not barred by the contractual limitations period.

Estroff successfully sold his store without any interference by Baskin-Robbins, so the interference claim is not applicable to him. (Estroff Dep., Ex. 2B at 191-205 and 216, Estroff Ans. to Int., Ex. 2H ¶ 14.)

*8 Plaintiffs have also asserted that defendants have implemented a rating system, undisclosed to their franchisees, that has placed many plaintiffs in an undesirable and potentially unmarketable category for purposes of resale. (Am.Compl.¶ 27.) Estroff and Watkins learned of the rating system as early as 1997 because they signed rating forms after their stores were evaluated on 29 August 1997 and 8 September 1997, respectively. (Estroff Dep., Ex. 2Q, Ex. 2B at 207-212; Watkins Dep., Ex. 2C at 111-116, Ex. 2R.) The parties have not discussed, nor has the court been able to locate in his deposition, any mention by Keating of the effect of the rating system on his business or his ability to sell his stores.

### 8. Summary

To the extent that the court has held that plaintiffs' specific claims are barred by the contractual limitations period, that holding applies to all counts asserted by plaintiffs in their amended complaint: breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the unfair and *deceptive trade practices act,* [FN8] fraud and negligent misrepresentation. [FN9] This is so because the contractual limitations period explicitly limits to one year the time within which a franchisee or franchisor can bring *"[a]ny and all claims and actions arising out of or relating to this agreement, the relationship of franchisee, Baskin-Robbins or the franchisee's operation of the retail unit."* See generally, *Cange v. Stotler and Company, Inc.,* 826 F.2d 581, 584-585 (7 th Cir.1987)(explaining that plaintiff had failed to demonstrate how enforcing a reasonable, contracted-for limitations period is contrary to the public policy of Illinois against fraudulent business practices and relying on plaintiff's inability to cite any pertinent authority condemning a shorter limitations provision, court affirmed application of contractual one-year limitations period to state law claims, including those asserted under the Illinois Consumer Fraud and Deceptive Business Practices Act, which contained a three-year limitations period); *Reynolds Industries Inc. v. Mobil Oil Corp.,* 618 F.Supp. 419, 422 (D.Mass.1985)(holding that both breach of contract and statutory causes of action were barred by contractual provision requiring plaintiff to commence action on any claim "based on or arising out of" the contract within one year where the statutory claim arose from a dispute concerning the proper interpretation of the quantity term in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retail dealer contract). [FN10]

> FN8. The unfair and deceptive trade practices plaintiffs complain of include: full-line forcing, tying, interference with the right to contract, and other illegal restraints of trade. (Pl.s' Amended Compl. ¶ 37.) All of these claims arise from plaintiffs' dissatisfaction with various requirements contained in their franchise agreements, particularly those pursuant to which plaintiffs must buy equipment and ice cream from Baskin-Robbins.

> FN9. Plaintiffs' fraud and negligent misrepresentation claims appear to be based on defendants' allegedly false and misleading representations to franchise owners regarding the market demand for additional stores, the allocation of advertising and marketing funds, and the economic benefit of required purchases or promotions. (Amended Compl. at ¶¶ 7-8.) Again, these claims arise out of defendants' enforcement of specific provisions of the franchise agreements between the parties.

> FN10. Although the franchise agreements signed by plaintiffs in this case are not technically contracts for the sale of goods, it is worthy of note that the Uniform Commercial Code, as adopted by North Carolina, also provides that parties to a contract may shorten the applicable limitations period: "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it." N.C. Stat. § 25-2-725.

The Watkins' claim that Baskin-Robbins interfered with their ability to sell their store to potential purchasers like Mr. Lee is the only claim not barred by the contractual limitations period and is, therefore, the only remaining claim in plaintiffs' action. The court will discuss this claim in the context of each of plaintiffs' counts: breach of contract, breach of the implied covenant of good faith and fair dealing, unfair and deceptive trade practices, fraud and negligent misrepresentation.

B. Watkins' Interference with Sale Claim

*1. Breach of Contract*

\*9 Plaintiffs argue that defendants' motion for summary judgment on the Watkins' claim regarding interference with their ability to sell their store must be denied because a genuine issue of material fact exists as to why Mr. Lee was summarily rejected as a prospective purchaser without being given an English test. (Pl.s' Mem. at 10.) Pursuant to Section 18.5 of the Watkins' Franchise Agreement, however, Baskin-Robbins may withhold consent to a transfer of the franchisee's interest in the franchise agreement "arbitrarily and for any reason whatsoever or may condition any consent in their sole discretion." (Def.s' Ex. 1E ¶ 18.5.) See *Flight Concepts Ltd, Partnership v. Boeing Co.,* 38 F.3d 1152, 1157 (10 th Cir.1994)(finding contract clause vesting absolute discretion in one party valid and enforceable).

Baskin-Robbins does not dispute plaintiffs' allegation that Mr. Lee, the Watkins' prospective purchaser, was denied approval based on his inability to speak English fluently. The Watkins assert that the potential franchisee was not even permitted to take the English language proficiency test that Baskin-Robbins uses to evaluate new franchisees before being denied and that Mr. Lee was, in fact, attempting to purchase the franchise for his son, a graduate of the University of North Carolina. While the Watkins correctly allege that Mr. Lee was denied on the telephone before he was interviewed and given an opportunity to take the test, there is nothing in the agreement that required Baskin-Robbins to administer a proficiency test before denying approval. The Agreement explicitly states that Baskin-Robbins' denial of a potential franchisee may be based on any reason whatsoever. In any event, as noted by plaintiffs, "bad faith is not synonymous with erroneous judgment." *In re Sizzler Restaurant Int'l, Inc.,* 225 B.R. 466, 475 (Bankr.C.D.Cal.1998) (citations omitted). Accordingly, Baskin-Robbins' conduct, as described by the Watkins, does not constitute a breach of contract.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

Page 9

## 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Whether Baskin-Robbins' conduct constitutes a breach of the implied covenant of good faith and fair dealing is a separate issue. The doctrine of good faith and fair dealing "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4 th 342, 372, 826 P.2d 710, 726 (Cal.S.C.1992). When matters are left to a party's discretion, the party must exercise that discretion reasonably and must not act in bad faith. See *In re Sizzler*, 225 B.R. at 473 (to defeat a motion for summary judgment on a claim asserting breach of implied covenant of good faith and fair dealing, plaintiff had to offer evidence that defendant acted dishonestly, outside of accepted commercial practices, with an improper motive, or in an unreasonable manner that was arbitrary, capricious or inconsistent with the reasonable expectations of the parties).

*\*10 An exception to this doctrine applies in this case, however.

Although the doctrine is generally implied for all contract provisions, it is irrelevant where the contract is drawn so as to leave a decision to the *"uncontrolled* discretion" of one of the parties.... In such a case, the parties contracted to allow one of them the unconditional right to act, and an implied promise to deal fairly has no purpose.

*Flight Concepts*, 38 F.3d at 1157 (emphasis added).

It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.... We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms.... "The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.... [I]f

defendants were given the right to do what they did by the express provisions of the contract there can be no breach."

*Carma*, 826 P.2d at 727-728 (citations omitted). Consequently, the Watkins' assertion of a breach of the implied covenant of good faith and fair dealing must fail because that covenant cannot be relied upon to override the express terms of the Agreement. *In re Sizzler*, 225 B.R. at 473 (implied covenant of good faith and fair dealing cannot override express contractual provisions); *Dunkin' Donuts Inc. v. Panagakos*, 5 F.Supp.2d 57, 64 (D.Mass.1998)(same). Section 18.5 expressly allows Baskin-Robbins to withhold consent to a transfer of the franchisee's interest in the franchise agreement "arbitrarily and for any reason whatsoever." As such, an implied promise to deal fairly has no relevance in this context.

## 3. Fraud, Negligent Misrepresentation and Unfair and Deceptive Trade Practices

The Watkins' grievances pertaining to the manner in which Baskin-Robbins has executed its contractual responsibilities cannot be parlayed into tort claims. *Broussard v. Meineke Discount Muffler Shops. Inc.*, 155 F.3d 331, 346 (4 th Cir.1998) (noting that the district court had ignored North Carolina law limiting the circumstances under which an ordinary contract dispute can be transformed into a tort action, court held that the crux of the matter was and always had been a contract dispute and that the lower court erred by allowing plaintiffs to advance tort and UTPA counts paralleling their breach of contract claims). See also *Strum v. Exxon Company*, 15 F.3d 327, 329 (4th Cir.1994)(attempt by the plaintiff to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim is inconsistent both with North Carolina law and sound commercial practice). Accordingly, to the extent they are based on the potential sale of the Watkins' store to Mr. Lee and are not barred by the one-year limitations period in the Agreement, the Watkins' claims for fraud and negligent misrepresentation are barred because they are, at bottom, contract claims.

*\*11 Specifically, with respect to North Carolina's Unfair and Deceptive Trade Practices Act, the Fourth Circuit has explained:

It has been said that because "[p]roof of unfair or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

deceptive trade practices entitles a plaintiff to treble damages," a UTPA count "constitutes a boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina." ... To correct this tendency, and to keep control of the extraordinary damages authorized by the UTPA, North Carolina courts have repeatedly held that "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UTPA,] N.C.G.S. § 75-1.1," ... Even though "[i]n a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted," ..., North Carolina law requires a showing of "substantial aggravating circumstances" to support a claim under the UTPA.... And "the courts have consistently recognized that § 75-1.1 does not cover every dispute between two parties. The courts differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." *Broussard,* 155 F.3d at 347 (citations omitted). As the court noted in *Strum,* "it [is] unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." *Strum,* 15 F.3d at 333. Given the contractual center of plaintiffs' dispute with Baskin-Robbins, plaintiffs' UTPA claims are out of place. The court cannot conclude that plaintiffs have offered evidence of "substantial aggravating circumstances" that would enable them to state a claim under this act. Defendants' motion for summary judgment as to the Watkins' claims will be allowed.

Motion for Summary Judgment on Defendants' Counterclaims
A. The Keatings' Breach of the In-Term Non-Compete Covenant and Baskin-Robbins' Termination of the Cary Parkway Franchise Agreement

Beginning on 9 January 2000, the Keatings simultaneously operated a Baskin-Robbins ice cream store and a store offering Edy's ice cream.

1. *The Agreement and the Sublease*

The Baskin-Robbins franchise agreement signed by the Keatings, which authorized them to sell ice cream at the Cary Parkway location, contains the following provision:

15.2 FRANCHISEE acknowledges that, pursuant to this Agreement, FRANCHISEE will receive valuable specialized training and trade secrets, including, without limitation, confidential information regarding the operational, sales, promotional and marketing methods and techniques of BASKIN-ROBBINS and the System. FRANCHISEE covenants that, except as otherwise approved in writing by BASKIN-ROBBINS, FRANCHISEE shall not, during the term of his Agreement, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation:

*12 15.2.3. own, maintain, operate, engage in, or have any interest in any business which is the same or similar to the Retail Unit. Same or similar to shall mean more than five percent (5%) of the gross revenue is derived from the sale of frozen dairy desserts.

(Ex. 1A ¶¶ 15.2, 15.2.3.) Baskin-Robbins refers to this provision as an "in-term covenant not to compete." Pursuant to Sections 16.3 and 16.3.8 of the Cary Parkway Franchise Agreement, the franchisee shall be "deemed to be in default under this Agreement ... and BASKIN-ROBBINS may, at its option, terminate this Agreement and all rights granted to FRANCHISEE hereunder, without affording FRANCHISEE any opportunity to cure the default, effective immediately upon written notice from BASKIN-ROBBINS" if and when the franchisee fails to comply with the interm covenant not to compete set forth in Paragraph 15. Moreover, Section 15.7 of the Cary Parkway Franchise Agreement provides that the Keatings shall pay Baskin-Robbins all costs and expenses, including attorneys' fees, incurred by Baskin-Robbins in its efforts to enforce the Keatings' covenants under Section 15 of the Agreement.

The Agreement signed by the Keatings explicitly sets forth their post-termination obligations to Baskin-Robbins.

17.1.2 FRANCHISEE shall immediately cease to operate the Retail Unit, and shall not thereafter,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

Page 11

directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of BASKIN-ROBBINS.

17.1.3 FRANCHISEE shall immediately and permanently cease to use, in any manner whatsoever, the System, including, without limitation, methods, procedures and techniques associated therewith, and all Proprietary Names and Marks and distinctive forms, slogans, symbols and devices associated with the System or the Products. In particular, FRANCHISEE shall cease to use, without limitation, all signs, advertising materials, displays, stationary, forms, and any other articles which display the Proprietary Names and Marks.

The Keatings are obligated under Section 17.1.9 of the Agreement to pay all costs and expenses, including attorneys' fees, associated with Baskin-Robbins' attempt to enforce the Keatings' post-termination contractual obligations.

The Keatings leased the Cary Parkway store from Baskin-Robbins pursuant to a sublease dated 23 May 1996 (the Sublease). Section 9 of that Sublease provides:

It is understood that Lessee has entered into a Baskin-Robbins Franchise Agreement with respect to Lessee's conduct of its business at the subleased premises. In the event that said Baskin-Robbins Franchise Agreement shall be canceled or terminated by either party for any reason whatsoever, Lessor shall have the right at its election, to terminate this Sublease and all rights granted to Lessee hereunder, without affording the Lessee any opportunity to cure, effective upon written notice to Lessee and Lessor shall be entitled to immediate recovery of possession of the subleased premises and all appurtenances and Lessor shall have the right against Lessee to all remedies on default, as provided herein.

*13 (Laudermilk Cert., Ex. 1C 9; Counterclaims ¶ 13.) Section 17 of the Sublease requires the Keatings to pay Baskin-Robbins' attorneys' fees and costs incurred in connection with the enforcement of the terms of the sublease.

## 2. Facts

Baskin-Robbins learned that the Keatings were offering Edy's ice cream for sale at the High House Road location on 11 January 2000. Plaintiffs do not dispute that the Edy's store derives more than 5% of its gross revenues from the sale of frozen dairy desserts. Because the Keatings' sale of Edy's ice cream at the High House Road location constituted a violation of the Cary Parkway Franchise Agreement, Baskin-Robbins sent the Keatings a notice of termination, terminating the Franchise Agreement and the Sublease for the Cary Parkway location on 11 January 2000. The notice demanded that the Keatings "quit the premises and immediately deliver up possession thereof" to Baskin-Robbins and required that the Keatings immediately comply with all post-termination obligations under the Agreement and Sublease. (Counterclaims ¶ 17; Letter from Worthen to Unti dated 11 January 2000.) Among other things, the Keatings were required to cease using any methods associated with Baskin-Robbins, cease using any or all of the proprietary marks of Baskin-Robbins, and return all manuals to Baskin-Robbins. (Id.) The letter also explained that, if they contested the claimed defaults, i.e., contested Baskin-Robbins' assertion that they were operating a competing ice cream business at the High House Road location, Baskin-Robbins would not enforce the action by itself but would, instead, submit the matter to a court for judicial termination.

The Keatings initially refused to cease operating their Baskin-Robbins franchise. Indeed, their counsel wrote Baskin-Robbins a letter dated 13 January 2000 stating that the Keatings contested the termination and that the "Keatings will not quit the premises at 151 Cary Parkway and will continue to operate their business at that location." (Id. at 18.) Ultimately, however, the Keatings ceased operations at the Cary Parkway location on 31 January 2000 and closed the store. (Pl.s' Opp. at 3.)

## 3. Count I--Breach of the Franchise Agreement's In-Term Covenant not to Compete

Defendants seek a judicial declaration that the Cary Parkway Franchise Agreement was properly terminated pursuant to the 11 January 2000 Notice of Termination, which was based on the Keatings' operation of a competing ice cream store while the Cary Parkway Franchise Agreement was still valid. As defendants have explained, this is a clear violation of the Agreement's in-term covenant not to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

compete. Plaintiffs have made a brief argument pertaining to a post-termination covenant not to compete, [FN11] which is not at issue in this case, and plaintiffs have failed to cite any authority for the proposition that an in-term covenant not to compete is void as against public policy.

> FN11. The Agreement does contain a geographically limited, two-year post-termination covenant not to compete at Paragraph 15.3. The specifics of that provision are not at issue in this case.

As defendants point out, the covenant is temporally limited by its very terms--the covenant is relevant and applicable only during the term of the franchise agreement. It is beyond cavil that an ice cream franchise may reasonably require a franchisee not to operate a competing ice cream store during the term of its franchise agreement. While California Business and Professions Code 16600 has been interpreted to bar enforcement of certain post-termination covenants not to compete, the Ninth Circuit has held that "California cases clearly establish that contractual prohibitions against current employees' competing with their employers do not violate 16600." *Shaklee U.S. Inc. v. Giddens,* 934 F.2d 324 (Table), 1991 WL 90003,*3 (9 th Cir.1991), cert. denied, 502 U.S. 1033 (1992); *Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.,* 124 Cal.Rptr. 678, 681-82 (Cal.App.1975) (upholding enforcement against a franchisee of in-term covenant not to compete). See also *Deutchland Enterprises, Ltd. v. Burger King Corp.,* 957 F.2d 449, 452-53 (7 th Cir.1992)(affirming district court ruling enforcing in-term covenant not to compete with no geographical limitation); *McDonald's System Inc., v. Sandy's, Inc.,* 195 N.E.2d 22 (Ill.App.1963)(territory is not a factor in determining the validity of an in-term covenant).

*14 Because the Keatings' breached their Cary Parkway Franchise Agreement by selling Edy's ice cream at the Preston Corners location while operating as a Baskin-Robbins franchisee at the Cary Parkway location, termination of their franchise agreement was warranted, and Baskin-Robbins is entitled to partial summary judgment on Count 1 of its Amended Counterclaim.

Within Count I of their Counterclaims, defendants

assert that, as a direct and proximate result of the Keatings' breach, Baskin-Robbins has incurred damages and attorneys' fees and is likely to incur substantial and irreparable injury to the goodwill associated with the Baskin-Robbins trade name and trademarks. (Counterclaims ¶ 23.) Despite the notice of termination they received on January 11, plaintiffs did not cease operating as a Baskin-Robbins store until January 31 in violation of Section 17 of their Agreement. Because the Keatings did not cease operations immediately upon notice of termination, the Keatings may be required to pay Baskin-Robbins damages incurred by Baskin-Robbins in its effort to enforce the Keatings' post-termination obligations. Indeed, the Keatings, through their counsel, informed Baskin-Robbins on 13 January 2000, that they would not quit the premises and that they would continue to operate the business at that location. (Worthen Cert., Ex. 3 ¶ 3.)

Although Baskin-Robbins appears to be entitled to damages under the terms of the Agreement, and it is conceivable that damages were incurred as a result of the Keatings' continued and unauthorized operation of the Cary Parkway store from 11 January 2000 through 31 January 2000, defendants have not quantified their damages flowing from the Keatings' breach of the Agreement, and this court cannot make such an award under Count I at this time. The issue of damages as they pertain to Count I will be reserved for determination at a later time.

### 4. *Count II--Breach of the Sublease*

Defendants are also entitled to partial summary judgment on Count II of their amended counterclaim, which asserts breach of the Sublease, because, in accordance with the terms of the Sublease, Baskin-Robbins is entitled to possession of the Cary Parkway premises upon termination of plaintiffs' franchise agreement.
9. Use of Premises The subleased premises shall be used solely for the purpose of conducting therein a Baskin-Robbins Store, in accordance with the provisions of the Baskin-Robbins Franchise Agreement pertaining to the subleased premises.... In the event that said ... Agreement shall be ... terminated, by either party or for any reason whatsoever, Lessor shall have the right, at its election, to terminate this Sublease and all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 407017 (E.D.N.C.)
(Cite as: 2001 WL 407017 (E.D.N.C.))

Page 13

rights granted Lessee hereunder, without affording Lessee any opportunity to cure, effective upon written notice to Lessee[,] and Lessor shall be entitled to immediate recovery of possession of the subleased premises and all appurtenances[,] and Lessor shall have the right against Lessee to all remedies on default, as provided herein.

*15 (Keating Sublease at 5.) The Sublease also provides that, in the event of Lessee's breach of any agreement or covenant under the sublease "and upon five (5) days written notice thereof by Lessor to Lessee.... Lessor may reenter or take possession of the subleased premises, or any part thereof, and expel or remove Lessee ... using such force as may be necessary to do so, if permitted by law, and such rights shall be in addition to any other remedies which may be provided by law or contained in this Sublease." (Keating Sublease at 7-8.)

In Count II, defendants assert that, as a direct and proximate result of the Keatings' breach, Baskin-Robbins has incurred damages and attorneys' fees and is likely to incur substantial and irreparable injury to the goodwill associated with the Baskin-Robbins trade name and trademarks. (Counterclaims ¶ 27.) While defendants have pursued their claims for attorneys' fees and costs, defendants have not quantified the damages to which they are entitled under Count II. Accordingly, the court cannot award damages under Count II at this time.

The court notes that defendants have also requested an award of "such exemplary or punitive damages against the Keatings as are deemed appropriate because of the wilful, intentional and malicious nature of the Keatings' conduct." (Counterclaims at ¶ 17.g.) The Franchise Agreement, however, provides, at Paragraph 25.3, that "[n]o punitive or exemplary damages shall be awarded against either Baskin-Robbins, or Franchisee, or entities affiliated with any of them, and are hereby waived." Accordingly, the court must conclude that an award of exemplary or punitive damages would not be "appropriate" under the terms of the Agreement.

*5. Counts I and II--Attorneys' Fees and Costs*

Elaborating upon the "damages" that they are seeking in the context of the memoranda,

defendants assert that they are entitled to attorneys' fees and costs incurred in enforcing the termination of the Cary Parkway Franchise Agreement based on three separate and independent contractual grounds: Section 15.7, Section 17.1.1, and Section 17.1.9. (Def.s' Reply re Mtn. for Summ. Judg. on their Claims at 3-4.) In accordance with Section 15.7 of the Agreement, the Keatings are required to pay Baskin-Robbins' attorneys' fees and costs associated with Baskin-Robbins' attempts to enforce the Keatings' covenants under Section 15 of the Agreement. Because the Keatings did not cease operations immediately upon notice of termination, the Keatings will also be required to pay Baskin-Robbins costs and expenses, including attorneys' fees, incurred by Baskin-Robbins in its effort to enforce the Keatings' post-termination obligations set forth in Section 17. See Sections 17.1.1 [FN12] and 17.1.9 (requiring franchisee to pay all damages, costs and expenses, including attorneys' fees incurred by Baskin-Robbins in obtaining injunctive or other relief for the enforcement of Section 17).

> FN12. Upon termination of the Agreement, "FRANCHISEE shall promptly pay all sums owing to BASKIN-ROBBINS.... In the event of termination for any default of FRANCHISEE, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by BASKIN-ROBBINS." Section 17.1.1.

*16 Baskin-Robbins has also made an argument that it is entitled to fees and costs for its defense of the action initiated by plaintiffs based on the alleged violations of their franchise agreements. (Answer at ¶ 9 and Counterclaim at ¶ 17.) The Agreement provides as follows:

25.6 If BASKIN-ROBBINS should bring an action against FRANCHISEE, or if FRANCHISEE should bring an action against BASKIN-ROBBINS, with respect to the subject matter of this Agreement, the prevailing party shall be entitled to recover from the other(s) all of the legal expenses of the prevailing party, including reasonable attorney's fees, and to have the same awarded as a part of the judgment in the proceeding in which such legal expenses and attorney's fees were incurred. In the event that BASKIN-ROBBINS[ ] should incur any costs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and expenses, including attorney's fees, in enforcing any of the provisions of, or their rights under, this Agreement, they or either of them shall be entitled to recover from FRANCHISEE all such costs and expenses.
(Keating Franchise Agreement ¶ 25.6.)

Although the court will grant summary judgment in favor of defendants on plaintiffs' claims and partial summary judgment for defendants on their counterclaims, the issue of damages remains to be determined in this matter along with Counts III and IV of defendants' Counterclaims, which deal with federal trademark infringement and federal unfair competition respectively, and which were not addressed in defendants' motion for summary judgment. Defendants' attorneys' fees, costs and related expenses are therefore ongoing. Accordingly, the submission of a fee petition at this point would be premature. Accordingly, this Order does not dispose of Counts III and IV of defendants' counterclaims, defendants' claims for damages, or defendants' request for attorneys' fees.

### IV. Conclusion

Defendants' motion for summary judgment on plaintiffs' amended complaint is ALLOWED, and plaintiffs' claims are DISMISSED. Defendants' motion for summary judgment on their amended counterclaims is ALLOWED in part. The court hereby DECLARES that the Keatings' conduct violated the terms of their Cary Parkway Franchise Agreement and Sublease, and that the Keatings' conduct provided a legitimate basis for Baskin-Robbins' termination of the Agreement and the Sublease. It is HEREBY ORDERED, ADJUDGED and DECREED that Baskin-Robbins is in rightful possession of the Cary Parkway premises in accordance with the sublease signed by the Keatings. The Keatings are DIRECTED to comply with their post-termination obligations under the Franchise Agreement and Sublease. The court will RESERVE JUDGMENT on defendants' motion for summary judgment to the extent defendants request damages as to Counts I and II, and those claims are reserved for trial. Counts III and IV of defendants' motion are also RESERVED for trial.

On 29 January 2001, defendants submitted a motion to dismiss defendant Allied Domecq

Retailing USA (Allied Domecq QSR) as an entity incapable of being sued. On 2 February 2001, defendants submitted an additional motion to strike Robert Justis as an expert witness and a motion in limine to exclude Justis's testimony at trial with a supporting memorandum. Finally, on 21 February 2001, plaintiffs submitted a response to defendants' 29 January 2001 motion and a motion to join Allied Domecq PLC as a party defendant. Because defendants' motion for summary judgment has been allowed as to plaintiffs' amended complaint, defendants' motions regarding Allied Domecq Retailing USA, now known as Allied Domecq QSR, and the testimony of Robert Justis, are DENIED as MOOT. Plaintiffs' motion to join Allied Domecq PLC as a party defendant is also DENIED as MOOT.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
1992 WL 279361 (S.D.N.Y.)
(Cite as: 1992 WL 279361 (S.D.N.Y.))

Page 1

c

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
The YOUNG WOMEN'S CHRISTIAN
ASSOCIATION OF THE UNITED STATES OF
AMERICA,
NATIONAL BOARD, Plaintiff,
v.
HMC ENTERTAINMENT, INC., Defendant.
No. 91 Civ. 7943 (KMW).

Sept. 25, 1992.

OPINION AND ORDER

KIMBA M. WOOD, District Judge.

*1 Defendant moved, pursuant to Rules 12(b)(1)
and (6) of the Federal Rules of Civil Procedure, to
dismiss plaintiff's action for lack of subject matter
jurisdiction and for failure to state a claim upon
which relief can be granted, on the ground that the
Complaint fails to allege an "actual controversy" as
required for a declaratory judgment under 28
U.S.C. § 2201. In the alternative, defendant moved,
pursuant to Rule 12(b)(3) of the Federal Rules of
Civil Procedure and 28 U.S.C. § 1406, to dismiss
this action for improper venue, on the grounds that
venue is controlled by the choice-of-forum
provision in parties' contract and that venue is not
otherwise proper in this district pursuant to 28
U.S.C. § 1391; and, pursuant to 28 U.S.C. § 1404,
to transfer this action to the Central District of
California in the interest of justice and for the
convenience of the parties.

BACKGROUND

Plaintiff is a not-for-profit corporation organized
under the laws of the state of New York, and its
principal place of business is in New York.
(Complaint ¶ 1). Defendant is a corporation
organized under the laws of the state of California,
and its principal place of business is in California.
(Complaint ¶ 2).

Plaintiff is the corporation formed by the Young
Women's Christian Association of the United States
of America ("YWCA"), an unincorporated
association, to implement the goals and day to day
activities of the YWCA. The YWCA is dedicated
to the advancement of women and the elimination
of racism and sexism. To advance these goals, the
YWCA and affiliated community and student
groups offer programs and they often give awards to
women in recognition of their achievements.
(Complaint ¶¶ 7-12).

Defendant is a California corporation with three
permanent employees. Founded in 1989, defendant
is in the business of producing special events, such
as live concerts, corporate-sponsored programs,
television shows and charity events. Defendant has
a particular expertise in producing special projects,
or one-of-a-kind productions. (Affidavit of Donald
Colhour [hereinafter "Colhour Aff."] ¶¶ 3-5).

Plaintiff and defendant entered a contract on April
20, 1990, according to which defendant "was to
develop and produce a televised award program
honoring women of achievement, tentatively titled
'The American Woman Awards' (the 'Program')."
Complaint ¶ 20. Pursuant to the contract, plaintiff
granted defendant a license to use plaintiff's
trademarks in connection with the program.
(Exhibit B to Colhour Aff. at 2). Furthermore, the
contract included the following choice-of-law and
choice-of-forum provisions:
  This agreement shall be governed by California
  law. The parties agree that any litigation arising
  under this agreement shall be commenced in the
  Federal District Courts in California.
(Exhibit B to Colhour Aff. at 11).

The contract expired by its terms on March 31,
1991, before the program went into production.
(Memorandum of Law in Opposition to Motion to
Dismiss or to Transfer Venue [hereinafter "Pl.'s
Opp.Mem."] at 5). Following the expiration of the
agreement between plaintiff and defendant, plaintiff
entered into negotiations with dick clark
productions, inc. ("dcp") to produce a similar

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1992 WL 279361 (S.D.N.Y.)
(Cite as: 1992 WL 279361 (S.D.N.Y.))

television program featuring awards to be given to women to honor their various achievements. (Pl.'s Opp.Mem. at 5).

*2 Plaintiff brought this action seeking a declaratory judgment that any televised program that plaintiff might sponsor with dcp does not give rise to unfair competition under section 43 of the Lanham Act, common law trademark infringement, common law unfair competition, misappropriation, or breach of an implied contract. Defendant moved to dismiss the complaint as not ripe for disposition, and, alternatively, to transfer the action to California. The gravamen of defendant's motion is that plaintiff brought this action as a declaratory judgment action in order to preempt defendant's potential action on the contract and in order to avoid the choice-of-law and choice-of-forum provisions of the contract, thereby litigating this matter in a forum more favorable to plaintiff.

DISCUSSION
On a motion to dismiss, a district court must accept as true the factual allegations made in the complaint. *See LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991) (citations omitted). Furthermore, the complaint must be construed in favor of the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The function of a district court in considering a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985), *citing Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984). A district court will not dismiss a complaint for failure to state a claim " 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Scheuer,* 416 U.S. at 236 (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

I. SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM
Defendant first argues that plaintiff's complaint should be dismissed because there is no actual controversy between the parties, as is required for plaintiff to bring a declaratory judgment action pursuant to 28 U.S.C. § 2201. Defendant argues that plaintiff's claims merely present the abstract or

hypothetical question of whether plaintiff's proposed program with dcp, which "is in a very early developmental stage," would violate any rights of defendant. (Memorandum in Support of Motion to Dismiss or Transfer Venue [hereinafter "Def.'s Mem."] at 10; Reply Memorandum in Support of Motion to Dismiss or To Transfer Venue ["Def.'s Reply Mem."] at 4, *citing* Complaint ¶ 38).

Plaintiff responds that there is an actual controversy here because defendant sent plaintiff two letters prior to plaintiff's initiation of this action stating that defendant was "fully prepared to take all necessary legal action in order to protect [defendant's] work of the past three years." (Exhibit C to Colhour Aff., 9/3/91 Letter of Donald Colhour to Joel Behr, at 1; 9/18/91 Letter of James Primm to Christine Carty, at 1). Furthermore, on the eve of plaintiff's filing of this action, defendant drafted a letter, which it never sent, stating that "[a]ny attempts [by plaintiff] to utilize the American Woman Awards name, concept or format w[ould] be vigorously opposed by [defendant]." (Exhibit D to Colhour Aff., 10/22/91 Letter of James Primm to Aviva Bergman, at 2). Plaintiff claims that defendant's "threat" of litigation should suffice to create an actual controversy for purposes of a declaratory judgment action. (Pl.'s Opp.Mem. at 7-8). Plaintiff further argues that defendant has attempted to interfere with plaintiff's contractual relation with dcp, creating a litigable controversy. (Pl.'s Opp.Mem. at 9).

*3 Pursuant to 28 U.S.C. § 2201, "[i]n the case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The Second Circuit has stated that the Declaratory Judgement Act ("DJA") brings issues before the courts that otherwise might require a delay until the declaratory judgment defendant brings a coercive action. *See United States V. Doherty,* 768 F.2d 491, 498 (2d Cir.1986). Furthermore, according to the Second Circuit, "the fundamental purpose of the DJA is to 'avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued.' " *Id., citing*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.