SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

FILED
U.S. DISTRICT COURT

2005 JUN 20  P 4: 46

DISTRICT OF UTAH

BY:_____
       DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| THE SCO GROUP, INC. | **DEFENDANT/COUNTERCLAIM-PLAINTIFF IBM'S UNSEALED MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIMS** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | [Docket No. 230] |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV0294 DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

AUG 13 2004

MARKUS B. ZIMMER, CLERK
BY_____
DEPUTY CLERK

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>      Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>      Defendant/Counterclaim-Plaintiff. | **DEFENDANT/COUNTERCLAIM-PLAINTIFF IBM'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIMS**<br><br>**FILED UNDER SEAL**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

## TABLE OF CONTENTS

Page

Preliminary Statement...................................................................................... 1

Statement Of Undisputed Facts ........................................................................ 3

   I.      The UNIX Operating System. ........................................................... 3

   II.     The Linux Operating System. ........................................................... 5

   III.    IBM's And Sequent's Licenses To UNIX System V ........................ 6

   IV.   AT&T's UNIX Assets. ..................................................................... 7

   V.    SCO's Failure Properly To Provide Evidence In Support Of Its Lawsuit.... 9

   VI.   SCO's Newfound Contract Theory. ................................................. 13

   VII.  AT&T's Interpretation Of Its UNIX System V Licenses .............................. 18

        A.     Testimonial Evidence........................................................ 18

             1.     The Witnesses. .................................................... 18

             2.     Testimony Regarding The Software Agreements. ................. 20

        B.     Contemporaneous Documentary Evidence. ......................... 35

   VIII. Novell's Waiver Of Any Purported Breaches Of Contract By IBM And Sequent. ..................................................................................... 40

   IX.   SCO Disclosed The Code It Claims Is At Issue............................... 44

**TABLE OF CONTENTS**
(continued)

Page

Summary Judgment Standard.................................................................................. 46

Argument ................................................................................................................. 47

I.     IBM's UNIX SYSTEM V LICENSES DO NOT, AS A MATTER OF
LAW, RESTRICT IBM FROM DISCLOSING ITS OWN
HOMEGROWN CODE. ................................................................. 47

     A.     The IBM And Sequent Software Agreements, By Their Plain
And Unambiguous Terms, Do Not Pertain To The Code Allegedly
Contributed By IBM To Linux............................................. 49

     B.     In Any Event, All Of The Relevant Testimonial And
*Documentary Evidence Supports The Conclusion*
That The Software Agreements Do Not Pertain To
IBM's Original Code. ......................................................... 56

         1.     The Testimonial Evidence. ....................................... 57

         2.     The Documentary Evidence. ..................................... 63

         3.     The Extrinsic Evidence Is So One-Sided That No
Reasonable Fact-Finder Could Agree With SCO's
Interpretation Of The Agreements........................... 66

     C.     SCO's Interpretation Of The Software Agreements Is
Unreasonable....................................................................... 67

II.    NOVELL AND SCO HAVE IN ANY EVENT WAIVED ANY
PURPORTED BREACH AS A MATTER OF LAW. ................................... 71

     A.     Novell Has Explicitly Waived The Alleged Breaches By IBM.......... 71

     B.     Through Its Own Conduct, SCO Has Waived Its Purported
Rights To Claim Breach of Contract. .................................. 74

Conclusion ............................................................................................................... 77

ii

## TABLE OF AUTHORITIES

<u>Cases</u>

<u>AXA Global Risks U.S. Ins. Co. v. Sweet Assocs., Inc.</u>,
   755 N.Y.S.2d 759 (N.Y. App. Div. 2003) .........................................................................71

<u>American Express Bank Ltd. v. Uniroyal, Inc.</u>,
   562 N.Y.S.2d 613 (N.Y. App. Div. 1990) .......................................................................49

<u>Banks v. Rite Aid Corp.</u>,
   No. 1:98CV115K, 2001 WL 1806857 (D. Utah Mar. 15, 2001)................................. 46-47

<u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,
   Fenner & Smith, Inc.</u>, 232 F.3d 153 (2d Cir. 2000)..........................................................66

<u>Croce v. Kurnit</u>,
   737 F.2d 229 (2d Cir. 1984)...........................................................................................64

<u>Elec. Distribs., Inc. v. SFR, Inc.</u>,
   166 F.3d 1074 (10th Cir. 1999) .....................................................................................49

<u>Elsky v. Hearst Corp.</u>,
   648 N.Y.S.2d 592 (N.Y. App. Div. 1996) ......................................................................70

<u>In Re Estate of Flake</u>,
   71 P.3d 589 (Utah 2003).........................................................................................71, 74

<u>Factors, Etc., Inc. v. Creative Card Co.</u>,
   444 F. Supp. 279 (S.D.N.Y. 1977) .................................................................................65

<u>Farmland Indus., Inc. v. Grain Board of Iraq</u>,
   904 F.2d 732 (D.C. Cir. 1990) ................................................................................. 62-63

<u>Farrell Lines, Inc. v. City of New York</u>,
   281 N.E.2d 162 (N.Y. 1972)..........................................................................................67

<u>Federal Ins. Co. v. Americas Ins. Co.</u>,
   691 N.Y.S.2d 508 (N.Y. App. Div. 1999) .................................................................62, 64

<u>General Elec. Capital Co. v. Armadora, S.A.</u>,
   37 F.3d 41 (2d Cir. 1994)......................................................................................... 65-66

Glezos v. Frontier Inv.,
    896 P.2d 1230 (Utah Ct. App. 1995) ...................................................................49

Goodman v. Resolution Trust Corp.,
    7 F.3d 1123 (4th Cir. 1993) ...........................................................................62

In re Grandote Country Club Co.,
    252 F.3d 1146 (10th Cir. 2001) .................................................................46, 47

Heidi E. v. Wanda W.,
    620 N.Y.S.2d 665 (N.Y. App. Div. 1994) ..........................................................74

In re Holocaust Victim Assets Litig.,
    256 F. Supp. 2d 150 (E.D.N.Y. 2003) .........................................................53-54

Jacobson v. Sassower,
    489 N.E.2d 1283 (N.Y. 1985)........................................................................66

Johnson v. Werner,
    407 N.Y.S.2d 28 (N.Y. App. Div. 1978) ..........................................................67

Kaiser-Francis Oil Co. v. Producer's Gas Co.,
    870 F.2d 563 (10th Cir. 1989) .......................................................................66

Leighton's Inc. v. Century Circuit, Inc.,
    463 N.Y.S.2d 790 (N.Y. App. Div. 1983) ..........................................................67

In re Lipper Holdings, LLC,
    766 N.Y.S.2d 561 (N.Y. App. Div. 2003) ..........................................................67

Litchfield v. Spielberg,
    736 F.2d 1352 (9th Cir. 1984) .......................................................................52

Mandelblatt v. Devon Stores, Inc.,
    521 N.Y.S.2d 672 (N.Y. App. Div. 1987) ..........................................................67

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)...................................................................................47

Moncrief v. Williston Basin Interstate Pipeline Co.,
    174 F.3d 1150 (10th Cir. 1999) .....................................................................56

Nassau Trust Co. v. Montrose Concrete Prods. Corp.,
    436 N.E.2d 1265 (N.Y. 1982)........................................................................65

Ocean Transp. Line, Inc. v. American Philippine Fiber Indus., Inc.,
 743 F.2d 85 (2d Cir. 1984)..................................................................................65

Old Colony Trust Co. v. City of Omaha,
 230 U.S. 100 (1913)..........................................................................................64

RJE Corp. v. Northville Indus. Corp.,
 198 F. Supp. 2d 249 (E.D.N.Y. 2002) .........................................................54, 65

R/S Assoc. v. New York Job Dev. Auth.,
 98 N.Y.2d 29 (N.Y. 2002) ................................................................................49

Reape v. New York News, Inc.,
 504 N.Y.S.2d 469 (N.Y. App. Div. 1986) ........................................................67

Rehberger v. Richtberg,
 744 N.Y.S.2d 477 (N.Y. App. Div. 2002) ........................................................49

Rieter v. Tavella,
 549 N.Y.S.2d 888 (N.Y. App. Div. 1990) ........................................................67

Sec. Indus. Automation Corp. v. United Comp. Capital Corp.,
 723 N.Y.S.2d 668 (N.Y. App. Div. 2001) ........................................................76

Soter's Inc. v. Deseret Fed. Sav. & Loan Ass'n,
 857 P.2d 935 (Utah 1993)..................................................................................71

T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc.,
 No. 2001-900, 2002 WL 1311648 (N.Y. App. Term Apr. 2, 2002)..................76

Teachers Ins. & Annuity Ass'n of Am. v. Ocwen Fin. Corp.,
 No. 98 Civ. 7137, 2002 WL 237836 (S.D.N.Y. Feb. 19, 2002) ..................64-65

This Is Me, Inc. v. Taylor,
 157 F.3d 139 (2d Cir. 1998)...............................................................................53

United Rentals (North America), Inc. v. Keizer,
 355 F.3d 399 (6th Cir. 2004) ............................................................................62

Vault Corp. v. Quaid Software Ltd.,
 847 F.2d 255 (5th Cir. 1988) ............................................................................52

Viacom Int'l, Inc. v. Lorimar Productions, Inc.,
 486 F. Supp. 95 (S.D.N.Y. 1980) .....................................................................65

v

Westchester Resco Co., L.P. v. New England Reinsurance Corp.,
        818 F.2d 2 (2d Cir. 1987)...................................................................................................66

## Statutes

17 U.S.C. § 101 .............................................................................................................52

17 U.S.C. § 103(b) .........................................................................................................70

17 U.S.C. § 106 .............................................................................................................70

17 U.S.C. § 201(a) .........................................................................................................70

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in support of its motion for partial summary judgment on Plaintiff/Counterclaim-Defendant The SCO Group, Inc.'s ("SCO") breach of contract claims.

### Preliminary Statement

Nearly two decades ago, IBM entered into licensing agreements with AT&T for the source code to the UNIX System V operating system. After all this time, SCO—which played no part in negotiating the agreements but purports recently to have acquired rights to them through a succession of corporate acquisitions—seeks to use the agreements to prevent IBM from contributing its own original source code (not UNIX System V source code) to the public operating system known as Linux. SCO's contract claims rely on an unsupported and unsupportable reading of IBM's agreements with AT&T and should be rejected as a matter of law.[1]

SCO has asserted four separate contract claims against IBM relating to the UNIX System V licenses entered into by IBM and Sequent Computer Systems, Inc. (a company acquired by IBM in 1999) with AT&T. These licenses are in the form of a "Software Agreement", which sets forth the terms under which UNIX System V source code can be used and disclosed, and a "Sublicensing Agreement", which sets forth the terms under which software based on UNIX System V code can be distributed.

Although SCO for months perpetuated the illusion that it had evidence that IBM took confidential source code from UNIX System V and "dumped" it into Linux, it has become clear that SCO has no such evidence. Instead, SCO's claims that IBM breached its agreements with AT&T depend entirely on the allegation that IBM improperly contributed certain of IBM's

---

[1] SCO also asserts claims against IBM for copyright infringement, unfair competition and tortious interference. These claims are not at issue in this motion (although SCO's copyright claim depends in part on its contract claims).

original source code, contained in its own AIX and Dynix operating systems (each of which contain tens of millions of lines of source code), to Linux. According to SCO, because AIX and Dynix allegedly contain some small component of source code from UNIX System V (SCO claims there are approximately 74,000 lines of UNIX System V code in AIX and approximately 78,000 lines in Dynix, which amounts to less than one percent of the total lines of code in AIX and Dynix), IBM is prohibited by its licensing agreements from disclosing any of the other millions of lines of code in AIX or Dynix, even if that code was created by or for IBM and contains no UNIX System V code.

SCO is wrong as a matter of law, and IBM is entitled to partial summary judgment on SCO's contract claims, for at least two independent reasons.

First, the AT&T agreements upon which SCO's claims are based do not preclude IBM from using and disclosing source code that is written by IBM and does not include UNIX System V code (referred to herein as "homegrown" code):

1. The plain and unambiguous language of the agreements imposes no restrictions on the use or disclosure of source code that does not contain UNIX System V code. (See Section I.A.)

2. The individuals who executed the licenses and were involved in their negotiation, on behalf of both AT&T and IBM, have offered unequivocal testimony that the agreements were not intended and should not be understood to preclude IBM's use and disclosure of homegrown code and contemporaneous documents reflect this interpretation of the licenses. (See Section I.B.)

3. Interpreting the licenses to prohibit the disclosure of homegrown code would be patently unreasonable. (See Section I.C.)

Second, even if the AT&T agreements could be read to preclude the disclosure of homegrown code—and they cannot be—any breach based upon such a reading has been waived by Novell, Inc. ("Novell") on behalf of SCO, and by SCO itself:

2

1. Novell, which at one time owned all rights in the AT&T agreements at issue, retains the right to waive alleged breaches of the agreements, and Novell has exercised that right to effect a waiver of the alleged breaches in this case. (See Section II.A.)

2. SCO itself sold or otherwise made available to its customers and the public the code it claims IBM should not have revealed. By its own conduct, therefore, SCO has waived any right to claim that IBM acted improperly by contributing its code to Linux. (See Section II.B.)

For these reasons, partial summary judgment should be entered on behalf of IBM on SCO's claims for breach of contract (SCO's First, Second, Third and Fourth Causes of Action).

## Statement Of Undisputed Facts[2]

## I. The UNIX Operating System.

1. The earliest UNIX operating system was developed in 1969 at Bell Laboratories, then the research division of AT&T Corp. ("AT&T"). (See Ex. 1 (Second Am. Compl.) ¶¶ 1, 23; Ex. 2 (Ans. to Second Am. Counterclaims)[3] ¶¶ 1, 8; Ex. 4 (SCO's Opp. to IBM's Motion for Summary Judgment on its Tenth Counterclaim) ¶ 1.)

2. AT&T developed many different versions of its UNIX operating systems (including, for example, UNIX Versions 1 through 7, UNIX 32V and UNIX System III). (See Ex. 2 ¶ 9.) The version of UNIX developed by AT&T during the early 1980s was known as UNIX System V, of which there were multiple subsequent releases (e.g., System V Release 2.0,

---

[2] The undisputed (and indisputable) facts supporting this motion are set forth in the accompanying declarations of Kathleen Bennett ("Bennett Decl."); Thomas L. Cronan III ("Cronan Decl."); Randall Davis ("Davis Decl."); Michael J. DeFazio ("DeFazio Decl."); David W. Frasure ("Frasure Decl."); Geoffrey D. Green ("Green Decl."); Ira Kistenberg ("Kistenberg Decl."); Richard A. McDonough III ("McDonough Decl."); Jeffrey W. Mobley ("Mobley Decl."); Scott Nelson ("Nelson Decl"); David P. Rodgers ("Rodgers Decl."); Roger C. Swanson ("Swanson Decl."); Joan Thomas ("Thomas Decl."); Steven D. Vuksanovich ("Vuksanovich") and Otis L. Wilson ("Wilson Decl."), and the documents appended to the Declaration of Todd M. Shaughnessy, which are cited herein as "Ex. __".

[3] IBM's Second Amended Counterclaims are attached as Exhibit 3 to the Shaughnessy Declaration.

System V Release 3.0, System V Release 4.0). (See Ex. 5 (30(b)(6) Deposition of William M. Broderick) at 32:2-13.)

3.      Over the years, through various business units and subsidiaries, including AT&T Technologies, Inc. and UNIX System Laboratories, Inc. ("USL"), AT&T licensed various versions of its UNIX operating system, both in source code and object code form, to many thousands of persons and entities for their use. (See Ex. 1 ¶¶ 23-24 ; Ex. 2 ¶ 9; Ex. 4 ¶ 2.)

4.      AT&T also licensed many companies to distribute their own UNIX operating systems, at least some versions of which contained some source code from AT&T's UNIX software. (See Ex. 1 ¶¶ 24-27; Ex. 4 ¶ 3.)  Such operating systems include Sun Microsystems, Inc.'s "Solaris" operating system, Hewlett-Packard Co.'s "HP-UX" operating system, and Silicon Graphics, Inc.'s "IRIX" operating system. (See Ex. 1 ¶¶ 24-27; Ex. 4 ¶ 3.)

5.      Like these other companies, IBM developed and distributed a UNIX operating system known as AIX. (See Ex. 2 ¶ 13.)  In 1999, IBM acquired Sequent Computer Systems, Inc. ("Sequent"), which had itself developed and distributed a UNIX operating system known as Dynix/ptx ("Dynix"). (See id. ¶ 16.)

6.      Like many software programs, IBM's AIX and Dynix operating systems—which each consist of millions of lines of code—contain code from numerous sources, including code written by IBM software engineers (or outside contractors retained by IBM) and also code written by third parties and licensed to IBM for inclusion in AIX or Dynix. (See Thomas Decl. ¶¶ 4-5; Nelson Decl. ¶¶ 4-5.)  The AIX 5.2.0 release, for example, contains approximately 63 million lines of source code. (See Thomas Decl. ¶ 4.)  The latest Dynix release contains approximately 30 million lines of source code. (See Nelson Decl. ¶ 4.)

7.      SCO alleges that it has found approximately 74,000 lines of UNIX System V code in AIX and approximately 78,000 lines of UNIX System V code in Dynix. (See Ex. 6 (4/19/04

4

Letter from B. Hatch to T. Shaughnessy) at Exs. E & F.)  SCO does not contend (and in any case has no evidence) that IBM has misused any of these lines of code.  (See id.)

## II.   The Linux Operating System.

8.      Linux is an operating system originally developed by a student at the University of Helsinki named Linus Torvalds.  (See Ex. 7 (SCO Linux Introduction Version 1.2) at 1-5.) Torvalds's idea was to create a new, free operating system.  (See id.)

9.      Torvalds began developing the Linux "kernel", the core of the operating system, in 1991, and posting news of his project to Internet newsgroups, along with a call for volunteers to assist in his efforts.  (See Ex. 7 at 1-5.)

10.     Through the use of the Internet, other volunteer programmers collaborated with Torvalds to develop the source code in the Linux kernel, the first version of which, Version 1.0, was released to the public in 1994.  (See Ex. 7 at 1-5.)

11.     Linux is an "open source" program, which means, among other things, that its source code is publicly available, royalty-free, and users have the freedom to run, copy, distribute, study, adapt and improve the software.  (See Ex. 2 ¶ 22; Ex. 4 ¶ 8.)  Indeed, the source code for Linux is publicly available for download on the Internet.  (See Ex. 2 ¶ 23.)

12.     In the years since the first public release of Linux, thousands of additional developers, including developers at IBM and SCO, have contributed to the further development of Linux.  (See Ex. 2 ¶ 20; Ex. 8 (SCO website pages identifying SCO's contributions to Linux); Ex. 9 (SCO's Fiscal Year 2000 10K/A) at 15, 22, 26.)  Version 2.4 of the Linux kernel was released in 2001.  (See Ex. 2 ¶ 20.)

13.     Various companies, such as Red Hat, Inc., offer commercial "Linux distributions", which typically comprise the Linux kernel, the applications that the kernel runs (which, with the kernel, comprise a complete operating system), and whatever other programs the distributor chooses to include in its product.  (See Ex. 2 ¶ 21; Ex. 9 at 5-9, 26.)  SCO is among

the companies that make their own Linux distributions available to the public. (See Ex. 2 ¶ 21; Ex. 9 at 5-9, 26.)

### III.  IBM's And Sequent's Licenses To UNIX System V.

14.     In the mid-1980s, IBM and Sequent entered into a number of agreements with AT&T concerning UNIX System V, as did hundreds of other companies. (See Ex. 1 ¶¶ 62-69; Ex. 2 ¶¶ 12, 15.)

15.     The basic licensing agreements IBM and Sequent entered into with AT&T, the IBM Software Agreement (Number SOFT-00015), dated February 1, 1985 (Ex. 10), and the Sequent Software Agreement (Number SOFT-000321), dated April 18, 1985 (Ex. 11), were standard form agreements that AT&T utilized at the time to license UNIX System V. (See Wilson Decl. ¶ 6; Frasure Decl. ¶ 11; DeFazio Decl. ¶ 14; Kistenberg Decl. ¶ 7; Vuksanovich Decl. ¶ 10.) The standard software agreements set forth the terms under which UNIX System V can be used and disclosed. (See Exs. 10 & 11; Wilson Decl. ¶ 6; Frasure Decl. ¶ 11; DeFazio Decl. ¶ 14; Kistenberg Decl. ¶ 8; Vuksanovich Decl. ¶ 11.)

16.     IBM and Sequent also entered into sublicensing agreements with AT&T. (Exs. 12 & 13.) Like the software agreements, the IBM Sublicensing Agreement (Number SUB-00015A), dated February 1, 1985 (Ex. 12), and the Sequent Sublicensing Agreement (Number SUB-000321A), dated January 28, 1986 (Ex. 13), were standard form agreements utilized by AT&T at the time. (See Wilson Decl. ¶ 6; DeFazio Decl. ¶ 15; Kistenberg Decl. ¶ 7.) The sublicensing agreements set forth the terms under which software programs "based on" UNIX System V can be distributed. (Exs. 11 & 12; Wilson Decl. ¶ 6; DeFazio Decl. ¶ 15.)

17.     The same day that IBM and AT&T entered into the IBM Software and Sublicensing Agreements, they also executed a letter agreement dated February 1, 1985 (the "Side Letter"). (Ex. 14.)

18.     The Side Letter clarified the parties' understanding of certain provisions of the IBM Software and Sublicensing Agreements and amended certain other provisions thereof.  (See Ex. 14 at 1.)

**IV.     AT&T's UNIX Assets.**

19.     In 1993, AT&T sold USL, which then held all of AT&T's UNIX-related assets (including AT&T's licensing agreements relating to all its versions of UNIX, such as UNIX System V), to Novell.  (See Ex. 2 ¶ 10.)

20.     In 1995, Novell sold certain of the UNIX assets it had acquired from AT&T, along with other UNIX assets Novell had developed during its ownership of USL (such as the UnixWare software), to The Santa Cruz Operation, Inc. ("Santa Cruz") pursuant to an Asset Purchase Agreement (the "APA"), dated September 19, 1995.  (Ex. 15.)

21.     Notwithstanding Novell's sale to Santa Cruz of most of its UNIX and UnixWare assets, Novell nevertheless retained certain rights with respect to the licenses AT&T had granted for releases of UNIX System V, known as "SVRX Licenses" (System V Release X Licenses). (See Ex. 15 § 4.16 & Schedule 1.1(a)(VI) (listing releases of UNIX System V for which AT&T had granted licenses).)

22.     Specifically, under Section 4.16(a) of the APA, Novell retained the rights to "all royalties, fees and other amounts due under all SVRX Licenses", less a five percent administrative fee to be paid to Santa Cruz for the collection of such royalties.  (Ex. 15 § 4.16(a).)

23.     In addition, under Section 4.16(b) of the APA, Novell retained the right "at [its] sole discretion" to direct Santa Cruz to "amend, supplement, modify or waive any rights under . . . any SVRX License", and to take any such actions on Santa Cruz's behalf if Santa Cruz failed to do so. (Ex. 15 § 4.16(b) (emphasis added).) In relevant part, Section 4.16(b) of the APA provides:

> "Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller. In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller. In the event that Buyer shall fail to take any such action concerning the SVRX License as required herein, Seller shall be authorized, and hereby is granted, the rights to take any action on Buyer's own behalf."

(Id.)

24.     On October 17, 1996, after Novell's sale of assets to Santa Cruz, IBM, Novell and Santa Cruz entered into Amendment X to the IBM Software and Sublicensing Agreements. (Ex. 16.)

25.     Amendment X specifically acknowledged that as part of the sale by Novell of its UNIX assets to Santa Cruz, "SCO purchased, and Novell retained, certain rights with respect to" the agreements IBM entered into with AT&T, including "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended". (Ex. 16 at 1 (emphasis added).)

26.     Under Amendment X, among other things, IBM was granted by Novell and Santa Cruz, in exchange for a payment of $10,125,000, "the irrevocable, fully-paid-up, perpetual right to exercise all of its rights under [the IBM Software and Sublicensing Agreements] beginning January 1, 1996 at no additional royalty fee". (Ex. 16 at 1, 4.)

27.     Plaintiff SCO, which was then known as Caldera Systems, Inc. ("Caldera"), purports subsequently to have acquired certain of Santa Cruz's business units in August 2000.

(See Ex. 17 (8/2/00 SCO Press Release).) As part of this acquisition, Caldera allegedly acquired all of Santa Cruz's assets and rights related to UNIX and UnixWare. (See id.)

28.     Caldera changed its name to The SCO Group, Inc. in May 2003. (Ex. 2 ¶ 36.)

## V.     SCO's Failure Properly To Provide Evidence In Support Of Its Lawsuit.

29.     SCO filed its original Complaint, which featured a claim for the misappropriation of trade secrets, on March 6, 2003. (Ex. 18 (Complaint).) In that Complaint, SCO also alleged that IBM had breached its UNIX System V license by "subject[ing] SCO's UNIX trade secrets to unrestricted disclosure, unauthorized transfer and disposition, unauthorized use, and has otherwise encouraged others in the Linux development community to do the same". (Id. ¶ 135.)

30.     SCO failed in the Complaint, however, to identify with any specificity what "UNIX trade secrets" it claimed were at issue. (See Ex. 18.) SCO instead described its trade secrets only as "unique know how, concepts, ideas, methodologies, standards, specifications, programming, techniques, UNIX Software Code, object code, architecture, design and schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability and security". (Id. ¶ 105.) SCO did not identify any specific UNIX code upon which it based its claim. (See id.)

31.     IBM served its First Set of Interrogatories on June 13, 2003. (Ex. 19.) Among other things, IBM's interrogatories requested that SCO "identify, with specificity (by product, file and line of code, where appropriate) all of the alleged trade secrets and any confidential or proprietary information that plaintiff alleges or contends IBM misappropriated or misused". (Interrogatory No. 1 (emphasis added).) The interrogatories further requested that SCO identify the "nature and source of [its] rights" to the code at issue (Interrogatory No. 2 (emphasis added)) and the "origin" of such code (Interrogatory No. 6 (emphasis added)).

32.     Prior to responding to IBM's interrogatories, SCO filed an Amended Complaint on July 22, 2003. (Ex. 20.) The Amended Complaint, however, did not identify in any greater

detail the trade secrets allegedly misappropriated by IBM. (See id.) Again, SCO described its trade secrets only as "unique know how, concepts, ideas, methodologies, standards, specifications, programming, techniques, UNIX Software Code, object code, architecture, design and schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability and security". (Id. ¶ 161.)

33.     With respect to its breach of contract claims, SCO alleged in the Amended Complaint only that IBM has misused SCO's "Software Products (including System V source code, derivative works and methods based thereon)". (Ex. 20 ¶ 106.) Although SCO purported to provide a list of "protected UNIX methods" allegedly misused by IBM (id. ¶ 108), SCO still failed to identify any code from UNIX System V in which these methods were embodied. (See id.)

34.     SCO answered IBM's First Set of Interrogatories on August 4, 2003. (Ex. 21.) In its response to Interrogatory No. 1, SCO stated only that its trade secrets—which it correspondingly claimed IBM misused in breach of its licensing agreements—"include without limitation UNIX software design methods for creation and modification of software based on UNIX System V". (Id. at 5.) Again, however, SCO failed to identify any code in UNIX System V that it claimed to contain trade secrets, or that IBM misused in breach of its licenses. (See id.)

35.     SCO also failed to provide proper responses to IBM's Second Set of Interrogatories, which IBM served on September 16, 2003. (Ex. 22.) Those interrogatories requested, among other things, that SCO "identify, with specificity (by file and line of code): (a) all source code and other material in Linux . . . to which plaintiff has rights; and (b) the nature of plaintiff's rights, including but not limited to whether and how the code or other material derives from UNIX." (Interrogatory No. 12 (emphasis added).)

36.     Based on SCO's continuing refusal to provide more detail regarding its allegations, IBM moved to compel complete responses to both sets of interrogatories. (Exs. 23 &

24.) Judge Wells held a hearing on December 5, 2003 to consider IBM's motions to compel. (See Ex. 25 (hearing transcript).)

37.    At the hearing, and despite its earlier pleadings, SCO finally acknowledged that there are in fact no trade secrets in UNIX System V. Counsel for SCO stated: "There is no trade secret in Unix system [V]. That is on the record. No problem with that." (Ex. 25 at 46:2-3.)

38.    In addition, SCO clarified that the basis of its contract claims against IBM was not that IBM contributed to Linux code that had been literally copied from UNIX System V, but had instead contributed code that had been derived from UNIX System V code. (Ex. 25 at 13-14.)

39.    At the conclusion of the hearing, Judge Wells granted IBM's motions. (Ex. 25 at 52-53.) Judge Wells subsequently issued an Order dated December 12, 2003 directing SCO, among other things, to "identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM" by January 12, 2004. (Ex. 26 (12/12/03 Order) ¶ 4.)

40.    SCO served its "Revised Supplemental Response" to IBM's interrogatories on January 15, 2004, which SCO claimed complied with the December 12, 2003 Order. (Ex. 27.)

41.    In its Revised Response, SCO did not identify any trade secrets that IBM allegedly misappropriated, from UNIX System V or any other of SCO's allegedly proprietary materials. (See Ex. 27.)

42.    In addition, SCO did not identify a single line of UNIX System V code upon which based its contract claims. (See Ex. 27.) Instead, SCO asserted its claims were based solely on IBM's disclosure of modules of code related to certain technologies contained in IBM's AIX and Dynix software programs. (See id. at 3-30.)

43.    Specifically, SCO claimed that IBM breached its contract by contributing to Linux specific files and lines of code in AIX and Dynix associated with the Read Copy Update ("RCU"), Journaling File System ("JFS"), Enterprise Volume Management System ("EVMS")

and asynchronous input/output ("AIO") technologies. (See Ex. 27 at 3-30.) In addition, SCO claimed that IBM improperly contributed code for scatter/gather input/output and symmetric multiprocessing ("SMP"), though SCO did not identify the specific code at issue. (See id.) Moreover, SCO did not identify any code in UNIX System V from which any of these technologies in AIX and Dynix were allegedly derived. (See id.)

44.     In a letter dated January 30, 2004, IBM informed SCO that it did not believe that SCO's Revised Response complied fully with Judge Wells' December 12, 2003 Order, principally because "SCO still fails to identify any files or lines of code in its own UNIX System V product that IBM is alleged to have misappropriated or misused". (Ex. 28.)

45.     SCO responded by letter on February 4, 2004, declining to identify any UNIX System V code, and explaining that its claims did not require the identification of UNIX System V code. (Ex. 29.) As SCO put it, "IBM keeps insisting on something that is not part of SCO's claims, so it should come as no surprise that files or lines of code in System V have not been identified." (Id. at 2.)

46.     At a hearing on February 6, 2004, IBM informed Judge Wells that it did not believe that SCO had complied with the December 12, 2003 Order. (See Ex. 30 (hearing transcript) at 4.) Judge Wells subsequently issued an Order on March 3, 2004, directing SCO once again to comply "with the Court's previous order dated December 12, 2003", this time by April 19, 2004. (Ex. 31.) Among other things, the Court directed SCO "to provide and identify all specific lines of code that IBM is alleged to have contributed to Linux from either AIX or Dynix" and "to provide and identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived". (Id. ¶ I.2-3.)

47.     In the meantime, SCO sought, and was granted, permission to file a Second Amended Complaint. (Ex. 1.) In its Second Amended Complaint, filed on February 27, 2004, SCO abandoned its claim for misappropriation of trade secrets altogether. (See id.)

12

48.     On April 19, 2004, SCO submitted additional discovery responses to IBM, which SCO claimed "fully complied" with the Court's orders. (Ex. 6.) SCO's April 19, 2004 submission, however, does not even attempt to "identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived", as ordered by the Court. (Ex. 31 ¶ I.3.) Neither that submission nor any of SCO's other responses to IBM's discovery requests discloses any evidence that IBM contributed to Linux or otherwise disclosed any UNIX System V code or IBM's entire AIX and Dynix programs. (Exs. 6 & 27.)

## VI.     SCO's Newfound Contract Theory.

49.     In its Second Amended Complaint, SCO asserts four separate breach of contract claims, all of which rest on the underlying allegation that IBM breached its licenses for the UNIX System V software program. (Ex. 1 ¶¶ 110-172.)

50.     SCO's First and Third Causes of Action allege that IBM misused source code subject to the IBM and Sequent Software Agreements by contributing such code to Linux. (Ex. 1 ¶¶ 110–136, 143-166.)

51.     Specifically, SCO alleges that IBM and Sequent breached Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10 of the Software Agreements.[4] (Ex. 1 ¶¶ 112-125.) Those sections provide as follows:

### Section 2.01

"AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in

---

[4] Similar to its claim for breach of the IBM and Sequent Sublicensing Agreements (discussed at ¶¶ 64-65 below), SCO also asserts that IBM breached Section 6.03 of the IBM and Sequent Software Agreements by continuing to use "SOFTWARE PRODUCTS" after SCO's purported termination of the agreements. (See Ex. 27 at 57.)

13

conjunction with DESIGNATED CPUs for such SOFTWARE
PRODUCT.  Such right to use includes the right to modify such
SOFTWARE PRODUCT and to prepare derivative works based on such
SOFTWARE PRODUCT, provided the resulting materials are treated
hereunder as part of the original SOFTWARE PRODUCT."

### Section 2.05

"No right is granted by this Agreement for the use of SOFTWARE
PRODUCTS directly for others, or for any use of SOFTWARE
PRODUCTS by others."

### Section 4.01

"LICENSEE agrees that it will not, without the prior written consent of
AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered
by this Agreement to any country outside of the United States."

### Section 7.06(a)

"LICENSEE agrees that it shall hold all parts of the SOFTWARE
PRODUCTS subject to this Agreement in confidence for AT&T.
LICENSEE further agrees that it shall not make any disclosure of any or
all of such SOFTWARE PRODUCTS (including methods or concepts
utilized therein) to anyone, except to employees of LICENSEE to whom
such disclosure is necessary to the use for which rights are granted
hereunder. . . . If information relating to a SOFTWARE PRODUCT
subject to this Agreement at any time becomes available without
restriction to the general public by acts not attributable to LICENSEE or
its employees, LICENSEE's obligations under this section shall not
apply to such information after such time."

### Section 7.10

"Except as provided in Section 7.06(b), nothing in this Agreement grants
to LICENSEE the right to sell, lease or otherwise transfer or dispose of a
SOFTWARE PRODUCT in whole or in part."

(Exs. 10 & 11.)

14

52.     IBM's Side Letter with AT&T contains additional language relating to certain of these provisions.  (See Ex. 14.)  In particular, the Side Letter provides:

> "Regarding Section 2.01, we agree that that modifications and derivative works prepared by or for [IBM] are owned by [IBM].  However, ownership of any portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work remains with [AT&T]."

(Id. at 2.)

53.     This additional language in the Side Letter was intended only to clarify the parties' intent in Section 2.01 of the IBM Software Agreement, not to change it.  (Wilson Decl. ¶¶ 19-20; Frasure Decl. ¶¶ 17-18; DeFazio Decl. ¶ 18; Vuksanovich Decl. ¶¶ 15-16; McDonough Decl. ¶¶ 13-14; Cronan Decl. ¶¶ 13-16; Mobley Decl. ¶¶ 10-13.)

54.     In addition, the Side Letter, and later Amendment X, amended Section 7.06(a) of the IBM Software Agreement to provide as follows:

> "LICENSEE agrees that it shall hold SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T.  LICENSEE further agrees that it shall not make any disclosure of such SOFTWARE PRODUCTS to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder. . . . Nothing in this Agreement shall prevent LICENSEE from developing or marketing products or services employing ideas, concepts, know-how or techniques relating to data processing embodied in SOFTWARE PRODUCTS subject to this Agreement, provided that LICENSEE shall not copy any code from such SOFTWARE PRODUCTS into any such product or in connection with any such service. . . . If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE's obligations under this section shall not apply to such information after such time."

(Exs. 14 ¶ A.9 & 16 ¶ 6.)

55.     In any case, as is evident on their face, whatever restrictions imposed by Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10 of the IBM and Sequent Software Agreements pertain only to the "SOFTWARE PRODUCT" that is the subject of the agreements.  (Exs. 10 & 11.)

15

56.     The IBM and Sequent Software Agreements define the term "SOFTWARE PRODUCT" as:

> "[M]aterials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS. Materials available from AT&T for a specific SOFTWARE PRODUCT are listed in the Schedule for such SOFTWARE PRODUCT."

(Ex. 10 § 1.04; Ex. 11 § 1.04.) The various schedules attached to the IBM and Sequent Software Agreements identify the specific "SOFTWARE PRODUCT" or "SOFTWARE PRODUCTS", and related materials, that AT&T provided under the terms of the agreements. (Exs. 10 & 11.)

57.     The particular "SOFTWARE PRODUCT" at issue in this case is "UNIX System V". (E.g., Exs. 32 (Supplement No. 1 to the IBM Software Agreement (pertaining to the "UNIX System V, Release 2.0" computer program and related documentation)) & 33 (Supplement No. 2 to the Sequent Software Agreement (pertaining to the "UNIX System V, Release 2.0" computer program and related documentation)).)

58.     As stated above (at ¶¶ 31-48), SCO's responses to IBM's interrogatories do not, however, identify any UNIX System V source code that IBM allegedly contributed to Linux or otherwise disclosed. (See Exs. 6 & 27.)

59.     Moreover, SCO's responses to IBM's interrogatories do not identify any UNIX System V source code from which any of the code that IBM contributed to Linux is allegedly derived. (See Exs. 6 & 27.) Indeed, SCO refused to provide such information because it "is not part of SCO's claims". (Ex. 29 at 2.)

60.     It is plain from SCO's discovery responses that SCO has no evidence that any of the source code IBM contributed to Linux is either literally copied from source code in UNIX System V or is derived from source code in UNIX System V. (See Exs. 6 & 27.) Indeed, SCO has purported to identify the lines of UNIX System V code that are present in AIX and Dynix,

16

and <u>none</u> of those lines are among the lines of code SCO claims IBM improperly contributed to Linux. (<u>See</u> Ex. 6 at Exs. E & F.)

61.     In addition, Dr. Randall Davis, Professor of Computer Science and Engineering at the Massachusetts Institute of Technology, has analyzed the specific lines of source code from AIX and Dynix that SCO claims IBM contributed to Linux. (Davis Decl. ¶ 23.) As Dr. Davis has concluded, that code does not contain any portion of source code from UNIX System V and is not substantially similar to any source code in UNIX System V. (<u>See id.</u> ¶ 48.) Accordingly, Dr. Davis opines that the specific code IBM allegedly contributed from AIX and Dynix is neither a modification nor a derivative work of UNIX System V. (<u>See id.</u> ¶ 49.)

62.     SCO's contract claims instead rest entirely on the proposition that "[t]he AIX work as a whole and the Dynix/ptx work as a whole are modifications of, or are derived from [UNIX] System V". (Ex. 6 at 2.) Under SCO's theory of the case, <u>all</u> of the tens of millions of lines of code ever associated with any technology found in AIX or Dynix, even if that code does not contain any UNIX System V code, is subject to the restrictions of the IBM and Sequent Software Agreements. (<u>See id.</u>)

63.     SCO made this position clear in its opposition to IBM's motion for partial summary judgment on IBM's Tenth Counterclaim. (Ex. 4.) In that brief, SCO argued: "SCO's contract claims do not depend on any proof that IBM contributed original source code from UNIX to Linux. Rather, the theory of SCO's case—which is based on the plain, unambiguous meaning of the Software Agreements—is that IBM breached those agreements by contributing code from AIX and Dynix." (Ex. 4 ¶ 21.)

64.     SCO's Second and Fourth Causes of Action allege that IBM breached the IBM and Sequent Sublicensing Agreements by continuing to distribute AIX and Dynix after SCO's purported termination of those agreements on June 13, 2003. (<u>See</u> Ex. 1 ¶¶ 137-42, 167-72.)

65.     These two causes of action ultimately depend on SCO's allegation that IBM "fail[ed] to fulfill one or more of its obligations under the Software Agreement[s]". (Ex. 1 ¶¶ 128, 158.) SCO contends that because IBM breached the IBM and Sequent Software Agreements, SCO had the right unilaterally to terminate the IBM and Sequent Sublicensing Agreements. (See id.) Absent breach of the Software Agreements, therefore, there is no breach of the Sublicensing Agreements.

66.     The construction and performance of the IBM and Sequent Software Agreements and the IBM and Sequent Sublicensing Agreements are governed by New York law. (See Ex. 10 § 7.13; Ex. 11 § 7.13; Ex. 12 § 6.05; Ex. 13 § 6.05.)

## VII.   AT&T's Interpretation Of Its UNIX System V Licenses.

### A.     Testimonial Evidence.

#### 1.     The Witnesses.

67.     The IBM Software Agreement was executed by David Frasure for AT&T, on behalf of his manager Otis Wilson. (See Ex. 10; Frasure Decl. ¶ 6; Wilson Decl. ¶ 7.) The Sequent Software Agreement was executed by Mr. Wilson for AT&T. (See Ex. 11; Wilson Decl. ¶ 8.)

68.     At the time the agreements were signed, Mr. Wilson was the head of AT&T's department responsible for licensing AT&T's UNIX software, including UNIX System V, worldwide. (See Wilson Decl. ¶ 3; Ex. 34 (Deposition of Otis L. Wilson) at 41:4-14.) Mr. Wilson personally signed almost all of the hundreds of UNIX System V licenses AT&T entered into with its customers. (See Wilson Decl. ¶ 5; Ex. 34 at 42:7-43:6.)

69.     Mr. Wilson reported to Michael DeFazio, who was then the head of the overall AT&T organization responsible for the UNIX software, including product management, marketing and licensing. (See DeFazio Decl. ¶ 1.) As head of the organization, Mr. DeFazio had

18

the ultimate responsibility for the terms and conditions of the IBM Software Agreement and the Sequent Software Agreement. (See id. ¶¶ 6-7.)

70.    Mr. Frasure, who reported to Mr. Wilson, was then AT&T's national sales and licensing manager for its UNIX products. (See Frasure Decl. ¶ 5; Ex. 35 (Deposition of David Frasure) at 8:1-22.) He participated in negotiating many of AT&T's UNIX System V licenses, and on occasion signed the agreements on Mr. Wilson's behalf. (See Ex. 35 at 8:13-9:6.)

71.    Mr. Steven Vuksanovich also participated in the negotiation of the IBM Software Agreement on AT&T's behalf. (See Vuksanovich Decl. ¶ 7.) Mr. Vuksanovich was the AT&T account representative assigned to the IBM account during the time the agreement was negotiated. (See id.)

72.    Mr. Ira Kistenberg also participated in the negotiation of the Sequent Software Agreement on AT&T's behalf. (Kistenberg Decl. ¶ 4.) Mr. Kistenberg was the AT&T account representative specifically assigned to the Sequent account during the time the agreement was negotiated. (See id.)

73.    Mr. Geoffrey Green was an attorney for AT&T during the time the IBM and Sequent Software Agreements were entered into. (Green Decl. ¶¶ 3-5; Ex. 35 at 162:18-20.) Although Mr. Green does not recall having any involvement in negotiating the agreements (see Green Decl. ¶ 4), at least Mr. Frasure recalls that Mr. Green had some involvement in the negotiations. (Ex. 35 at 162:18-20.)

74.    Mr. Richard McDonough executed the IBM Software Agreement on behalf of IBM. (See Ex. 10; McDonough Decl. ¶ 10.) Mr. McDonough was then the Division Counsel for IBM's System Products Division. (McDonough Decl. ¶ 4.)

75.    Mr. Thomas Cronan and Mr. Jeffrey Mobley also participated in the negotiation of the IBM Software Agreement on IBM's behalf. (See Cronan Decl. ¶ 5; Mobley Decl. ¶ 4.) Mr. Cronan was then an attorney in IBM's System Products Division. (See Cronan Decl. ¶ 4.) Mr.

Mobley was a member of IBM's corporate Commercial & Industry Relations staff. (<u>See</u> Mobley Decl. ¶¶ 1, 3.)

76. Mr. David Rodgers executed the Sequent Software Agreement on behalf of Sequent. (<u>See</u> Ex. 10; Rodgers Decl. ¶ 2.) Mr. Rodgers was then Sequent's Vice President of Engineering. (<u>See</u> Rodgers Decl. ¶ 2.)

77. Mr. Roger Swanson was responsible for the negotiation of the Sequent Software Agreement on Sequent's behalf. (<u>See</u> Swanson Decl. ¶ 3.) Mr. Swanson was then Sequent's Director of Software Engineering. (<u>See id.</u> ¶ 2.)

## 2. **Testimony Regarding The Software Agreements.**

78. AT&T's licensing agreements for UNIX System V, including the IBM Software Agreement and the Sequent Software Agreement, were form agreements, as AT&T intended to apply the same terms to all its licensees. (<u>See</u> Wilson Decl. ¶¶ 10-14, 27; Ex. 34 at 88:9-20; Kistenberg Decl. ¶¶ 6-7; Vuksanovich Decl. ¶ 10.) As Mr. Frasure states, "our intent was to hold all licensees to the same basic standard". (Frasure Decl. ¶¶ 9, 23-24; <u>see also</u> Ex. 35 at 25:10-26:18.)

79. All of the individuals who executed the IBM and Sequent Software Agreements on behalf of their respective companies, Mr. Wilson, Mr. Frasure, Mr. McDonough and Mr. Rodgers, agree on the interpretation of AT&T's UNIX System V licenses. (<u>See</u> Wilson Decl. ¶¶ 14-15, 27-30; Ex. 34 at 72:8-73:17, Frasure Decl. ¶¶ 13-16, 24-29, McDonough Decl. ¶¶ 11-19; Rodgers Decl. ¶¶ 7-9; Ex. 36 (Deposition of David P. Rodgers) at 25:15-30:20.) There is no dispute among them that the IBM Software Agreement and the Sequent Software Agreement were not intended to, and do not, restrict in any manner the use or disclosure of any original code written by, or for, IBM and Sequent. (<u>See id.</u>)

80.     Moreover, other individuals who participated in, and were responsible for, the negotiation of the IBM and Sequent Software Agreements, have the same interpretation. (See DeFazio Decl. ¶¶ 16-17, 20, 22; Kistenberg Decl. ¶¶ 9, 11-12, 22-24; Vuksanovich Decl. ¶¶ 12-15, 27, 29-30; Green Decl. ¶ 6; Cronan Decl. ¶¶ 9, 11-12, 18-23; Mobley Decl. ¶¶ 6, 8-9, 14-17; Swanson Decl. ¶¶ 8, 10-13.)  Each of these witnesses concurs that the agreements were not intended to place any restrictions on the use or disclosure of code that was written by, or for, IBM and Sequent.  (See id.)

81.     As the witnesses have testified (and as is plain on their face), the sections of the IBM and Sequent Software Agreements that SCO claims IBM has breached—Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10—pertain only to the "SOFTWARE PRODUCT" that is the subject of the agreements, UNIX System V, and not any of IBM's and Sequent's homegrown code.  (See Wilson Decl. ¶ 12; Ex. 34 at 48:20-54:6; Frasure Decl.¶ 12; Ex. 35 at 34:13-41:17; Ex. 36 at 47:3-49:19; Kistenberg Decl. ¶ 9; Vuksanovich Decl. ¶ 12; Cronan Decl. ¶ 9; Mobley Decl. ¶ 6; Swanson Decl. ¶ 8.)

82.     For example, Mr. Wilson states in his declaration:

> "These provisions set forth our licensees' rights as they relate to the UNIX System V source code and related materials—the 'SOFTWARE PRODUCT' or 'SOFTWARE PRODUCTS'—that AT&T provided to them.  At least as I understood these sections and discussed them with our licensees, they do not, and were not intended to, restrict our licensees' right to use, export, disclose or transfer their own products and source code, as long as they did not use, export, disclose or transfer AT&T's UNIX System V source code along with it.  I never understood AT&T's software agreements to place any restrictions on our customers' use of their own original work."

(Wilson Decl. ¶ 12.)

21