At his deposition, he further noted:

"[T]he statement [at paragraph 12 of the declaration] goes . . . to the heart of the licensing program, from the standpoint that we required our licensees to protect the software products under the . . . stipulations in the software agreement, and we did not intend to exercise any control or restriction on those products that did not contain portions of the software products."

(Ex. 34 at 53:7-14.)

83.     Mr. Frasure states similarly in his declaration:

"Each of these provisions was intended to define the scope of the licensee's rights only with respect to the 'SOFTWARE PRODUCT' or 'SOFTWARE PRODUCTS', in other words, the UNIX System V source code and related materials. We did not intend these provisions to restrict our licensees' use, export, disclosure or transfer of anything besides the licensed UNIX System V source code and related materials. It would be inconsistent with the language of the software agreements, and the intentions of AT&T Technologies in licensing UNIX System V, to say that the provisions apply, for instance, to our licensees' own code (that, for example, they developed)."

(Frasure Decl. ¶ 12.)

At his deposition he testified consistently:

"Q: Can you tell me what, in your understanding[,] these sections [of the contract] are intended to place restrictions on?

A: The restrictions were put on the actual Unix System V source code product, that the licensee licensed from us."

(Ex. 35 at 41:6-17.)

84.     According to each of the witnesses, the "resulting materials" that are to be treated as part of the "SOFTWARE PRODUCT" in Section 2.01 of the Software Agreements include only code taken directly from UNIX System V. (See Wilson Decl. ¶¶ 14-15; Ex. 34 at 55:23-57:14; Frasure Decl. ¶¶ 13-16; Ex. 35 at 42:17-48:25; McDonough Decl. ¶¶ 11-20; Rodgers Decl. ¶¶ 7-9; Ex. 36 at 25:15-30:20; 100:1-102:5; DeFazio Decl. ¶¶ 16-17; Kistenberg Decl. ¶¶

11-12; Vuksanovich Decl. ¶¶ 14-15; Cronan Decl. ¶ 11; Mobley Decl. ¶¶ 8-9; Swanson Decl. ¶ 10.)

85.     The witnesses do not dispute that the "resulting materials" referenced in Section 2.01 do not include homegrown code, even when that code is itself contained in a modification or derivative work based on UNIX System V. (See Wilson Decl. ¶¶ 14-15; Ex. 34 at 55:23-57:14; Frasure Decl. ¶¶ 13-16; Ex. 35 at 42:17-48:25; McDonough Decl. ¶¶ 11-20; Rodgers Decl. ¶¶ 7-9; Ex. 36 at 25:15-30:20, 100:1-102:5; DeFazio Decl. ¶¶ 16-17; Kistenberg Decl. ¶¶ 11-12; Vuksanovich Decl. ¶¶ 14-15; Cronan Decl. ¶ 11; Mobley Decl. ¶¶ 8-9; Swanson Decl. ¶ 10.)

86.     Mr. Wilson of AT&T states:

> "As my staff and I communicated to our licensees, this provision [Section 2.01] was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement. As we understood Section 2.01, any source code developed by or for a licensee and included in a modification or a derivative work would not constitute 'resulting materials' to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein."

(Wilson Decl. ¶ 14.)

87.     Indeed, Mr. Wilson states that he "do[es] not believe that our licensees would have been willing to enter into the software agreement if they understood Section 2.01 to grant AT&T or USL the right to own or control source code developed by the licensee or provided to the licensee by a third party". (Wilson Decl. ¶ 16; see also Ex. 34 at 57:15-58:20.) Mr. Wilson, in fact, was of the view at the time "that we could not claim any rights to non-UNIX System V code source . . . without raising serious antitrust issues". (Id. ¶ 18; see also Ex. 34 at 57:15-58:20, 59:15-61:3.)

23

88.     Mr. Frasure of AT&T similarly states:

"As we assured our licensees, this language does not, and was never
intended to, give AT&T Technologies the right to assert ownership or
control over modifications or derivative works prepared by its licensees,
except to the extent of the licensed UNIX System V source code that was
included in such modifications or derivative works.  The term 'resulting
materials' in the context of the software agreements was intended only to
mean those portions of a licensees' modifications or derivative works
that included the licensed UNIX System V source code."

(Frasure Decl. ¶ 14; see also Ex. 35 at 46:13-48:25.)

89.     Mr. Frasure notes further that, "[o]bviously, any materials created by the licensees

that could not even be considered modifications or derivative works of UNIX System V were not

subject to the software agreements at all.  Licensees were free to use and disclose any such

materials." (Frasure Decl. ¶ 15.)

90.     Mr. DeFazio of AT&T likewise states:

"The [software] agreements did not (and do not) give AT&T, USL,
Novell or any of their successors or assigns the right to assert ownership
or control over modifications and derivative works prepared by its
licensees, except to the extent of the original UNIX System V source code
included in such modifications and derivative works. . . .  I do not believe
that our licensees would have been willing to enter into the software
agreement if they understood Section 2.01 to grant AT&T, USL, Novell
or their successors or assigns the right to own or control source code
developed by or for the licensee.  Modifications and derivative works
contained UNIX System V source code and code developed by or
provided to the licensee.  The UNIX System V source code contained in a
modification or derivative work continued to be owned by AT&T, USL,
Novell or their successors, while the code developed by or provided to the
licensee remained the property of the licensee or provider to the licensee."

(DeFazio Decl. ¶ 17.)

91.     Mr. Vuksanovich of AT&T concurs with this interpretation:

"Our standard software agreements also gave licensees the right to modify
UNIX System V source code and to prepare derivative works based upon
the code.  As I believe we intended the agreements, and as I told our
licensees, our licensees owned their modifications and derivative works

24

they prepared based on UNIX System V, and were therefore permitted to do as they wished with those modifications and derivative works, as long as they treated those portions of the modifications or derivative works consisting of any UNIX System V source code the same way they treated the UNIX System V source code that we provided to them. I recall that during our negotiations IBM specifically wanted to make sure that IBM, and not AT&T, would own and control code that was developed by or for IBM, even if that code was mixed with AT&T's UNIX System V code in a product. I assured IBM that we had the same understanding."

(Vuksanovich Decl. ¶ 13.)

92.    Mr. Kistenberg of AT&T states:

"In my understanding, Section 2.01 did not in any way expand the scope of the software agreement to restrict our licensees' use, export, disclosure or transfer of their own original code, even if such code was contained in a modification or derivative work of UNIX System V. The purpose of the software agreement was to protect AT&T Technologies' UNIX System V source code, and was not meant to claim for AT&T Technologies our licensees' own work. It would not make sense to me to read this Section 2.01 to place restrictions on code that our licensees created themselves—that code was theirs."

(Kistenberg Decl. ¶ 12.)

93.    Mr. Green of AT&T states:

"Without disclosing any legal advice I may have rendered . . . I can say that, as I understood AT&T's UNIX System V licensing agreements, AT&T did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. Accordingly, a licensee was free to do with as it wished (e.g., use, copy, distribute or disclose) code developed by or for the licensee in its modifications and derivative works, provided that the licensee did not use, copy, distribute or disclose any portions of the original UNIX System V code provided by AT&T (except as otherwise permitted by the license agreements)."

(Green Decl. ¶ 6.)

94.    Mr. McDonough of IBM had the same understanding of Section 2.01 of the IBM

Software Agreement.  He states in his declaration:

> "The language in the standard software agreement relating to the
> treatment of resulting materials did not give AT&T Technologies the
> right to assert ownership or control over modifications or derivative
> works prepared by its licensees, except to the extent that the licensed
> UNIX software product was included in such modifications or derivative
> works.  I understood this language to mean that licensees owned their
> modifications and derivative works and were permitted to use or disclose
> them as they might choose, so long as any modification or derivative
> work containing any part of an AT&T Technologies-licensed software
> product was treated the same as an AT&T Technologies-licensed
> software product under the license agreements."

(McDonough Decl. ¶ 12.)

He further states:

> "As I understood the [agreements] between IBM and AT&T
> Technologies, and as the parties intended those agreements to mean, they
> did not seek to impose any limitations on the materials separately owned
> or developed by IBM or AT&T Technologies, respectively.  IBM was
> free to use, copy, distribute, or disclose any portion of a modification or
> derivative work that was not part of a licensed software product provided
> by AT&T Technologies.
>
> . . .
>
> Based on my role in negotiating and executing the attached AT&T
> Agreements, I cannot understand the basis for plaintiff's contentions that
> the AT&T Agreements restricted IBM's freedom of action with respect
> to any programming code, source code or otherwise, independently
> developed by IBM or its contractors.  There is absolutely no way that
> IBM would have entered into an agreement with AT&T giving it the
> right to control IBM code merely because that code was or had once been
> associated with AT&T code in an IBM product.  Never would we have
> knowingly agreed to a provision that gave AT&T the right to control
> what IBM did with its own code (or for that matter the code of third
> parties)."

(Id. ¶¶ 15, 18.)

95.    Mr. Cronan of IBM similarly states in his declaration:

"Based on my discussions with AT&T Technologies, I did not
understand this language regarding the treatment of 'resulting materials'
to give AT&T Technologies the right to assert ownership or control over
all of the source code of any modifications or derivative works based on
UNIX System V that we prepared.  To the contrary, I understood this
language to mean—and I believe AT&T Technologies believed
likewise—that IBM had to treat those parts of our modifications or
derivative works that contained UNIX System V source code as we
would treat the UNIX System V source code itself."

(Cronan Decl. ¶ 11.)

He states further:

"As I understood the AT&T Agreements between IBM and AT&T
Technologies, therefore, and as I believe the parties intended those
agreements, the agreements impose no restrictions on IBM's use, export,
disclosure or transfer of those portions of any modifications or derivative
works of UNIX System V that were created by or for IBM and do not
contain any UNIX System V source code.

So that there would be no confusion, we told the AT&T Technologies'
representatives with whom we negotiated the AT&T Agreements that
IBM intended to include portions of AT&T's UNIX System V code in
products with IBM code and to make changes to the AT&T code (such as
by adding to it) and thus IBM had to ensure that the parties agreed that
IBM had the right to do so, without forfeiting any rights (including the
right to control) to such IBM products and code.  AT&T Technologies'
representatives advised us that they did not seek to preclude such
activities.  In fact, they assured us that the purpose of the restrictions
imposed by the AT&T Agreements was to protect AT&T's original code
and that IBM could do whatever it wanted with its own code so long as it
did not use, export, disclose or transfer AT&T's original code (except as
otherwise permitted by the AT&T Agreements).

No one involved in the negotiation of the AT&T agreements ever
suggested that the agreements would give AT&T Technologies (or
anyone else other than IBM) the right to control IBM original code.  It
seems quite clear to me, based on the statements of its representatives,
that AT& T Technologies' concern was the protection of its original code
only.  I have no doubt that the AT&T Technologies' representatives with"

whom we negotiated the AT&T Agreements understood that IBM would not have entered into the AT&T Agreements if AT&T Technologies had sought and insisted on the right to control any product or code that might in the future be associated with UNIX System V code, except insofar as it might include UNIX System V code."

(Id. ¶¶ 18-19, 23.)

96. Mr. Mobley of IBM agrees:

"[T]he AT&T Technologies representatives with whom we negotiated assured us that under the standard Software Agreement, IBM owned, and was permitted to use however it wanted, the modifications or derivative works that we created, or that others created for us, based on the UNIX System V software, except for any protected UNIX System V source code that might be contained within our modification or derivative works. AT&T Technologies made clear to us that we could do whatever we wanted with original source code that we developed or that was developed for us by others."

(Mobley Decl. ¶ 9.)

Mr. Mobley added:

"Based on my role in negotiating the attached AT&T Agreements, I do not believe there is any merit to the plaintiff's contentions. IBM would never have entered into any agreement that gave AT&T Technologies the right to control IBM's use of source code that IBM wrote itself, that IBM paid others to develop, or that IBM licensed from others. That is why we specifically discussed this issue of ownership of our modifications and derivative works with AT&T Technologies in detail before entering into the AT&T Agreements. AT&T Technologies assured us repeatedly that the AT&T Agreements were not intended to limit IBM's freedom of action with respect to its original source code and was merely intended to protect AT&T Technologies' interest in its own UNIX System V source code, and I believed them."

(Id. ¶ 17.)

97. Mr. Rodgers of Sequent interpreted the Sequent Software Agreement the exact same way. Mr. Rodgers states that Section 2.01 did not give AT&T "the right to assert ownership or control over modifications or derivative works prepared by Sequent, except to the

extent that the licensed Unix software product was included in such modifications or derivative works". (Rodgers Decl. ¶¶ 7-9, 13; <u>see also</u> Ex. 36 at 25:15-30:20.)

98.    In fact, Mr. Rodgers further states that he "would never have signed an agreement that would grant ownership or control to AT&T Technologies over modifications or derivative works prepared by Sequent to the extent those modifications or derivative works contained no part of the Unix software product licensed from AT&T Technologies". (<u>Id.</u> ¶ 7.) As he explained it at his deposition:

> "It would have been foolish of me, as an officer of a venture finance[d] start-up company, to give away the rights to the company's core products in perpetuity. I mean, I certainly would not have done that. So my understanding—and this was confirmed in some phone calls [with AT&T]—my understanding was that what AT&T wanted to hold private was their contribution, their source code contribution, and that that work which had already been created by Sequent and any work that in the future that was created by Sequent, not based upon that source code, remained the property of Sequent."

(Ex. 36 at 27:15-28:14.)

99.    Mr. Swanson of Sequent likewise states:

> "I did not understand this language in Section 2.01 to give AT&T Technologies the right to assert ownership or control over modifications or derivative works based on UNIX System V prepared by Sequent, except for the licensed UNIX System V code that was included in such modifications or derivative works. In fact, I recall having discussions with AT&T Technologies at the time to clarify that Sequent would own whatever source code we developed.
>
> As a small company at the time, it would not have made any sense for Sequent to have entered into an agreement that gave AT&T Technologies control over the source code that we developed for our own software programs. I never would have agreed to a contract that would grant AT&T Technologies rights in Sequent's proprietary code, as that source code was the core of Sequent's software business."

(Swanson Decl. ¶¶ 10-11.)

He further states:

> "As the AT&T Technologies explained the agreements to me, Sequent was free to use, export, disclose or transfer all of the code contained in any modifications or derivative works of UNIX System V developed by Sequent, provided that Sequent did not improperly use, export, disclose or transfer any portion of the UNIX System V code we were licensing from AT&T Technologies (except as otherwise permitted by the licensing agreements)."

(Id. ¶ 12.)

100.    According to the AT&T representatives involved with UNIX System V licensing, a number of AT&T's licensees in fact requested clarification regarding the original language of Section 2.01. (See Wilson Decl. ¶ 17; Ex. 34 at 58:22-59:13, Frasure Decl. ¶ 17; Ex. 35 at 45:14-46:5, 60:18-62:11, 190:12-23; DeFazio Decl. ¶ 18; Kistenberg Decl. ¶ 13; Vuksanovich Decl. ¶ 15.) AT&T always provided the same response (both orally and in writing) whenever asked—that AT&T's UNIX System V licensees owned their homegrown code and could use and disclose such code as they wished. (See id.)

101.    As Mr. Frasure described it at his deposition:

> "We explained to [our licensees] verbally, and if required in writing, that we did not own, tried to clarify that we did not own the source code that they generated themselves. We had no interest in that."

(Ex. 35 at 46:2-5.)

> "Well, there was just questions that would pretty much on a regular basis come up about the ownership of the derivative works or modifications, and what we were trying to do was to just further define that and to ensure the licensees that AT&T was not trying to take ownership in any of the work that they put in to providing their derivative works of Unix System V."

(Id. at 190:16-23.)

102.    IBM was one of AT&T's licensees that raised such concerns. (See Wilson Decl. ¶ 19; Frasure Decl. ¶ 18; DeFazio Decl. ¶ 18; Vuksanovich Decl. ¶¶ 13, 16.)

103.    Mr. McDonough relates that IBM specifically requested clarification from AT&T regarding the interpretation of Section 2.01.  (McDonough Decl. ¶¶ 13-14; see also Cronan Decl. ¶¶ 13-17; Mobley Decl. ¶¶ 10-12.)

104.    Mr. McDonough states in his declaration that "IBM wanted the agreements to be clarified so that there would be no question that IBM, as a licensee, not AT&T Technologies, would own and control source code developed by IBM or provided to IBM by a third party". (McDonough Decl. ¶ 13; see also Cronan Decl. ¶¶ 13-17; Mobley Decl. ¶¶ 10-12.)  In response, according to Mr. McDonough, AT&T informed IBM that it "understood IBM's desire to retain ownership and control of source code and products prepared by or for IBM, and also that, in any event, that was what AT&T already intended and understood the language in the standard AT&T Software Agreement to mean".  (McDonough Decl. ¶ 13; see also Cronan Decl. ¶¶ 13-17; Mobley Decl. ¶¶ 10-12.)

105.    Mr. Vuksanovich similarly recalled that "during our negotiations IBM specifically wanted to make sure that IBM, and not AT&T, would own and control code that was developed by or for IBM, even if that code was mixed with AT&T's UNIX System V code in a product". (Vuksanovich Decl. ¶ 13.)

106.    As IBM "was particularly interested in clarifying that it owned the code that it developed, even if it was meshed with UNIX System V", AT&T provided written clarification to IBM in the Side Letter.  (Vuksanovich Decl. ¶ 16.)  As Mr. Vuksanovich explains:

> "This clarification did not, however, represent a substantive change to the standard software agreement.  We were only trying to make more clear what we thought our standard software agreement meant in the first place.  AT&T never intended to assert ownership or control over IBM's modifications or derivative works, except to the extent of the UNIX System V source code included in such modifications or derivative works."

(Id.)

107.    Mr. Wilson and Mr. Frasure concur that the Side Letter was intended precisely to confirm the understanding between AT&T and IBM that the IBM Software Agreement did not place any restrictions on IBM's original code.  (See Wilson Decl. ¶¶ 19-20; Ex. 34 at 62:13-65:17; Frasure Decl. ¶ 18; Ex. 35 at 62:12-64:19; see also DeFazio Decl. ¶¶ 18-19.)

108.    Like Mr. Vuksanovich, both Mr. Wilson and Mr. Frasure also emphasize that the clarification provided to IBM did not represent a change to the standard Software Agreement, but merely confirmed what AT&T intended all along.  (See Frasure Decl. ¶ 18; Ex. 35 at 64:8-21; Wilson Decl. ¶ 20; Ex. 34 at 64:23-65:17; see also DeFazio Decl. ¶¶ 18-19.)

109.    Mr. Frasure states:

> "This clarification (and those like it that we provided to other licensees) did not represent a change to the standard software agreement.  It merely spelled out what AT&T Technologies had always intended—that AT&T Technologies did not assert any right to control the use and disclosure of modifications and derivative works prepared by its licensees, except to the extent of the licensed UNIX System V source code included in such modifications and derivative works."

(Frasure Decl. ¶ 18.)

110.    Indeed, as discussed below (at ¶¶ 113-122), because so many licensees requested clarification of the language in Section 2.01 of the standard software agreement, AT&T ultimately decided to make revisions to Section 2.01 expressly to clarify that AT&T's Software Agreements did not place any restrictions on a licensee's original code.  (See Wilson Decl. ¶¶ 25-27; Frasure Decl. ¶¶ 22-24; DeFazio Decl. ¶ 19; Kistenberg Decl. ¶¶ 17-21; Vuksanovich Decl. ¶¶ 20-26.)  This revised language of Section 2.01 (which was intended to apply to all of AT&T's licensees), like the language in the Side Letter, was again intended only to clarify the meaning of the original language of Section 2.01.  (See id.)

111.    Regardless of whether or not a particular licensee was given a written clarification of Section 2.01 in a side letter or in the form of a new agreement, the AT&T witnesses who were

responsible for licensing UNIX System V all state that AT&T intended Section 2.01 to mean the same thing for all its licensees.  (See Wilson Decl. ¶ 27; Frasure Decl. ¶ 24; DeFazio Decl. ¶ 20; Kistenberg Decl. ¶ 22; Vuksanovich Decl. ¶ 27.)

       112.   As Mr. Wilson put it:

> "Whether or not we entered into a side letter or other agreements with our licensees to clarify the treatment of modifications and derivative works, or altered the language of Section 2.01, AT&T's and USL's intent was always the same.  We never intended to assert ownership or control over any portion of a modification or derivative work that was not part of the original UNIX System V source code provided by AT&T or USL.  The licensee was free to use, copy, distribute or disclose its modifications and derivative works, provided that it did not use, copy, distribute or disclose any portions of the original UNIX System V source code provided by AT&T or USL except as permitted by the license agreements."

(Wilson Decl. ¶ 27.)

       113.   When informed of the interpretation of the IBM and Sequent Software Agreements that SCO is advancing in this case, the individuals from AT&T who were involved in negotiating the agreements state unequivocally that SCO is wrong.  Mr. Wilson states:

> "In my view, any claim that the IBM Software Agreement and the Sequent Software Agreement prohibit the use, export, disclosure or transfer of any code other than UNIX System V code is clearly wrong. Not only did we at AT&T not intend the agreements to be read that way, but we also went out of our way to assure our licensees that that is not what the agreements meant."

(Wilson Decl. ¶ 30.)

       Mr. Frasure states:

> "[SCO's] interpretation of the IBM Software Agreement and the Sequent Software Agreement is impossible to reconcile with what I, and I believe others at AT&T Technologies, understood our software agreements to mean.  I never suggested, or would have thought to suggest, to our customers that the agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose

any UNIX System V code.  Moreover, I do not believe that our customers (particularly large ones like IBM) would have entered into agreements that placed such restrictions on their use of code that they developed.  In fact, some, including IBM, specifically said so."

(Frasure Decl. ¶ 29.)

Mr. DeFazio states:

"[SCO's] claims are, in my view, inconsistent with the provisions of the license agreements generally and the IBM Related Agreements and the Sequent Related Agreements in particular.  I do not believe that anyone at AT&T, USL or Novell intended these agreements to be construed in this way.  In all cases, modifications and licensees' contributions to derivative works are not subject to the confidentiality and other restrictions contained in the license agreements (except for any protected UNIX System V source code actually included therein) because they are owned by the licensees."

(DeFazio Decl. ¶ 31.)

Mr. Kistenberg states:

"I understand that plaintiff claims that Sequent has breached its license agreement with AT&T Technologies by improperly using, exporting, disclosing or transferring Dynix source code, irrespective of whether Sequent has disclosed any specific protected source code from UNIX System V.  At least as I understand the Sequent Agreements, that is simply not consistent with what the parties intended by the agreements."

(Kistenberg Decl. ¶ 24.)

Mr. Vuksanovich states:

"I understand that plaintiff claims that IBM and Sequent have breached their license agreement with AT&T Technologies by improperly using, exporting, disclosing or transferring AIX and Dynix/PTX source code, irrespective of whether IBM or Sequent has disclosed any specific protected source code from UNIX System V.  At least as I understand the IBM Agreements and the Sequent Agreements, that is completely inconsistent with what the parties intended and discussed during the negotiation of the agreements."

(Vuksanovich Decl. ¶ 30.)

**B.     Contemporaneous Documentary Evidence.**

114.    Consistent with this testimony regarding the IBM and Sequent Software
Agreements, AT&T specifically communicated to all of its UNIX System V licensees at the time,
including IBM and Sequent, that Section 2.01 of the standard software agreement should not be
construed to mean that AT&T had the right to control the use and disclosure of any code created
entirely by its licensees.  (See Wilson Decl. ¶¶ 20-21, Frasure Decl. ¶ 19; Ex. 35 at 64:22-66:3;
Kistenberg Decl. ¶ 14; Vuksanovich Decl. ¶ 17.)

115.    In response to concerns raised by numerous of its UNIX System V licensees,
AT&T notified all licensees, through seminars hosted by Mr. Frasure and in the April 1985
edition of AT&T's "*$ echo*" newsletter, that AT&T intended to make certain changes to the
standard UNIX System V software agreement to "clarify ownership of modifications or
derivative works prepared by a licensee" under Section 2.01.  (Ex. 37 at 5 (emphasis added); see
also Ex. 35 at 64:22-66:3, 67:16-73:15.)  These changes were intended only to clarify the original
meaning of Section 2.01, not to change it.  (See Wilson Decl. ¶¶ 21-23; Frasure Decl. ¶¶ 19-20;
Kistenberg Decl. ¶¶ 17-18; Vuksanovich Decl. ¶¶ 21-22.)

116.    Mr. Frasure testified that at the seminars he hosted, he made clear what AT&T's
original intent was with respect to Section 2.01:

> "Q:  And can you just explain for me what it is you told the licensees
> about Section 2.01?
>
> A:  Just that we, AT&T had no intent to claim ownership to that software
> code that they developed themselves.  In essence that's what we told
> them to the extent it did not contain Unix code.  But if they developed it,
> if they wrote it, it was their code.  They owned that."

(Ex. 35 at 73:6-14.)

117.    The *$ echo* newsletter was "published by the AT&T Software Sales and Licensing
organization for licensees of UNIX System V" and was intended "to reach all UNIX System V
licensees through one defined medium" and to keep them "abreast of any product

announcements, policy changes, company business and pricing structures". (Ex. 37; <u>see also</u> Ex. 34 at 66:11-69:3; Ex. 35 at 64:22-66:3, 66:20-67:5.)  The guidance published in the newsletter was intended to reach, and to apply to, all of AT&T's UNIX System V licensees. (<u>See</u> Frasure Decl. ¶ 19; Ex. 35 at 64:22-66:3; Wilson Decl. ¶ 21; Ex. 34 at 69:20-70:15; Kistenberg Decl. ¶ 15; Vuksanovich Decl. ¶ 19.)

118.    Subsequently, in the August 1985 edition of *$ echo*, AT&T announced it had *revised Section 2.01 of its standard software agreement to include* language to "<u>assure licensees that AT&T will claim no ownership in the software that they developed—only the portion of the software developed by AT&T</u>". (Ex. 38 at 5 (emphasis added)); Ex. 35 at 73:22-76:5.)

119.    As clarified to better reflect this meaning, Section 2.01 of the standard UNIX System V software agreement provided as follows:

> "AT&T-IS grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT.  Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivate works based on such SOFTWARE PRODUCT, <u>provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT.  AT&T-IS claims no ownership interest in any portion of such a modification or derivative work that is not part of a SOFTWARE PRODUCT</u>."

(<u>E.g.</u>, Ex. 39 (Software Agreement Number SOFT-000302, between AT&T Information Systems, Inc. and The Santa Cruz Operation, dated May 6, 1987) (emphasis added); <u>see</u> Wilson Decl. ¶ 25; Frasure Decl. ¶ 22; Ex. 35 at 76:6-79:12; DeFazio Decl. ¶ 19; Kistenberg Decl. ¶¶ 19-20; Vuksanovich Decl. ¶¶ 23-24.)

120.    This revised language of Section 2.01 makes plain that AT&T did not claim a right to control in any manner original code created by its licensees, and is present in all standard

UNIX System V licenses executed after August 1985.  (See Frasure Decl. ¶¶ 22-24; Ex. 35 at 79:1-23; Wilson Decl. ¶¶ 25-27.)  Mr. Frasure described his understanding of the revised language at his deposition:

> "Q: . . . [W]hat is your understanding of what AT&T intended and told its licensees Section 2.01 means?
>
> A:  It means that any source code developed by the licensee, originated by the licensee, is the property of the licensee.  They own that source code, and AT&T makes no claim of ownership in that source code.
>
> Q:  Was it the case then from AT&T Technologies' perspective that the licensee could do whatever it wanted with the source code that it developed?
>
> . . .
>
> A:  Yes."

(Ex. 35 at 79:1-23.)

121.    As Mr. Wilson and Mr. Frasure again note, however, this revised language was intended only to clarify the original meaning of Section 2.01, not to change it.

Mr. Wilson states:

> "As we communicated at our seminars and in our newsletters to UNIX System V licensees, this new language was intended only to clarify the language in the original Section 2.01, not change its meaning.  My licensing group interpreted the language of the original Section 2.01 and this revised Section 2.01 in exactly the same way."

(Wilson Decl. ¶ 25.)

Mr. Frasure states:

> "Again, as we made clear in the newsletter, the revised language was added only to assure licensees that AT&T Technologies did not claim any right to its licensees' original work contained in modifications or derivatives of UNIX System V.  The language did not represent in any way a departure from the original intent of Section 2.01."

(Frasure Decl. ¶ 21; see also Kistenberg Decl. ¶ 20; Vuksanovich Decl. ¶ 24.)

122.    Mr. Frasure explained in particular that the revised language of Section 2.01 had the same meaning as the original language of Section 2.01 that appears in the IBM Software Agreement and the Sequent Software Agreement:

> "Q:  Do you understand Section 2.01 as it appears in the Santa Cruz Agreement, to mean anything different than the Section 2.01 in the IBM Agreement that we looked at earlier?
>
> . . .
>
> A:  There is no difference in meaning between the two paragraphs.
>
> Q: . . . Do you believe there to be any difference in meaning between Section 2.01 as it appears in the Santa Cruz Agreement and Section 2.01 as it appears in the Sequent Agreement that we looked at earlier?
>
> . . .
>
> A:  No.  There is no difference."

(Ex. 35 at 80:6-23.)

123.    Moreover, this revised language was intended to apply to all of AT&T's UNIX System V licensees, not just those licensees that executed a new agreement containing the revised Section 2.01.  (See Wilson Decl. ¶ 26; Frasure Decl. ¶ 23; Kistenberg Decl. ¶ 21; Vuksanovich Decl. ¶ 26.)  Although, as the $ echo newsletter states, AT&T made specimen copies of the revised software agreement available, AT&T did not require its licensees to enter into new agreements.  (See id.)  Rather, AT&T "intended for all of our UNIX System V licensees to receive the benefit of the changes and clarifications we outlined at our seminars and in the newsletter".  (Wilson Decl. ¶ 26; see also Frasure Decl. ¶ 23; Kistenberg Decl. ¶ 21; Vuksanovich Decl. ¶ 26.)

124.   Mr. Frasure elaborated at his deposition:

"A:  We told [UNIX System V licensees] specimen copies were available
if, if my account executives [or] licensing people were told that if a
licensee called, that they could receive a specimen copy and it would
apply, the language in the new specimen copy.  They, that in effect would
be the new language of their agreement, although they did not have to
sign that.

Some licensees, for whatever reason, wanted to sign a new agreement,
and we upgraded their agreement to the new language at no charge.  It
was just a matter of signing the new agreement, providing that to them.

But we wanted everyone to know what the changes were and they would
have the benefit of that language.

Q:  Did a licensee have to execute a new agreement to get the benefit of
the changes?

. . .

A:  No."

(Ex. 35 at 82:20-83:17.)

125.   The revised Section 2.01 in AT&T's software agreements is similar to the terms

of the licensing agreements that SCO apparently uses for its own software programs today:

"Proprietary Nature of Source Code Products and Ownership. . . .
Notwithstanding any provision of this Agreement to the contrary,
Licensee acknowledges that [SCO] . . . owns and retains all title and
ownership of all intellectual property rights in the Source Code Products,
including all software, firmware, copies of software, documentation and
related materials that are acquired, produced or shipped by [SCO] under
this Agreement.  Such title and ownership by [SCO] extends to any
Modifications to and derivative works from software acquired under this
Agreement that include any portion of the [SCO] Source Code
Product(s).  [SCO] claims no ownership interest in any portion of such
Modification(s) by Licensee that do not include any portion of the Source
Code Product."

(Ex. 40 (Caldera Intellectual Property Title and Ownership) at SCO1178124 (emphasis added).)

126.    SCO interprets its own language as follows:

"Basically it states that if we license A-B-C to a Licensee, we retain all
title and ownership to A-B-C.  If the Licensee modifies the source code
and adds D-E-F to it, the Licensee has rights to create derivative works
and ship or use the resulting binary A-B-C-D-E-F or A-D-F-B-C-E and
the Licensee will own D-E-F if it does not include any of A-B-C, but no
title or ownership is transferred to A-B-C."

(Ex. 40.)

## VIII.  Novell's Waiver Of Any Purported Breaches Of Contract By IBM And Sequent.

127.    After this lawsuit was commenced, Novell sent a series of letters to SCO that
explicitly waived the purported breaches of contract SCO has asserted IBM committed.  (See
Exs. 41, 42, 43 and 44.)

128.    On October 7, 2003, in a letter from Joseph A. LaSala, Jr. to Ryan Tibbitts,
Novell directed SCO to waive any purported right to assert a breach of the IBM Software
Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V
source code.  (Ex. 41.)  The letter states: ·

"[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell
hereby directs SCO to waive any purported right SCO may claim to
require IBM to treat IBM Code itself as subject to the confidentiality
obligations or use restrictions of the Agreements.  Novell directs SCO to
take this action by noon, MST, on October 10, 2003, and to notify Novell
that it has done so by that time."

(Id.)

129.    In the letter, Novell informed SCO that its position that IBM's own homegrown
code "must be maintained as confidential and subject to use restrictions is contrary to the
agreements between AT&T and IBM, including Amendment X, to which Novell is a party".  (Ex.
41.)

130.    According to Novell, the agreements between AT&T and IBM provide "a straightforward allocation of rights":

> "(1) AT&T retained ownership of its code from the Software Products ('AT&T Code'), and the Agreements' restrictions on confidentiality and use apply to the AT&T Code, whether in its original form or as incorporated in a modification or derivative work, but (2) IBM retained ownership of its own code, and the Agreements' restrictions on confidentiality and use do not apply to that code so long as it does not embody any AT&T Code".

(Ex. 41.) Novell concluded that any other interpretation "would defy logic as well as the intent of the parties". (Id.)

131.    After SCO failed to follow Novell's instruction, on October 10, 2003, Novell expressly waived any purported right of SCO's to assert a breach of the IBM Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 42.) Novell states in its letter to SCO:

> "Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreements between AT&T and IBM, itself as subject to the confidentiality obligations or use restrictions of the Agreements."

(Id.)

132.    Additionally, on February 6, 2004, in a letter from Mr. LaSala to Mr. Tibbitts, Novell further directed SCO to waive any purported right to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 43.) The letter states:

> "[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as

41

> subject to the confidentiality obligations or use restrictions of Sequent's SVRX license.
>
> Novell directs SCO to take this action by noon, MDT, on February 11, 2004, and to notify Novell that it has done so by that time."

(Id.)

133.    In the letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software Agreement was misplaced, and stated that "SCO's interpretation of section 2.01 is plainly contrary to the position taken by AT&T, as author of and party to the SVRX licenses". (Ex. 43.)

134.    After SCO failed to follow Novell's instruction, on February 11, 2004, Novell expressly waived any purported right of SCO's to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 44.) Novell states in its letter to SCO:

> "Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license."

(Id.)

135.    Novell also waived any purported right of SCO to terminate the IBM Sublicensing Agreement. (See Exs. 45, 46.)

136.    On June 9, 2003, in a letter from Jack L. Messman to Darl McBride, Novell informed SCO that under the terms of Amendment X, SCO did not have the right to terminate

any of IBM's rights under the Sublicensing Agreement to distribute its AIX software program. (Ex. 45.)  The letter states:

> "Pursuant to Amendment No. X, however, Novell and SCO granted IBM the 'irrevocable, fully paid-up, perpetual right' to exercise all of the rights under the IBM SVRX Licenses that IBM then held.  IBM paid $10,125,000 for the rights under Amendment No. X.  Novell believes, therefore, that SCO has no right to terminate IBM's SVRX Licenses, and that it is inappropriate, at best, for SCO to be threatening to do so."

(Id.)

137.    Novell further directed SCO to waive any purported right under its SVRX

Licenses with IBM to terminate IBM's right to distribute AIX under the IBM Sublicensing

Agreement:

> "[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM.  Novell directs SCO to take this action by noon, MDT, June 12, 2003, and to notify Novell that it has done so by that time."

(Id.)

138.    After SCO failed to follow Novell's instruction, on June 12, 2003, Novell

expressly waived any purported right of SCO's to terminate IBM's rights under the IBM

Sublicensing Agreement.  (Ex. 46.)  Novell states in its letter to SCO:

> "Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM."

(Id.)

**IX.**     **SCO Disclosed The Code It Claims Is At Issue.**

139.    Prior to its filing this lawsuit, SCO's business included the distribution of the Linux operating system, the development and marketing of software based on Linux, and the provision of Linux-related services to customers.  (Ex. 2 ¶ 31; Ex. 9 at 5-9.)

140.    In 2002, SCO formed the UnitedLinux partnership with three other Linux distributors to streamline Linux development and certification around a global, uniform distribution of Linux designed for business.  (Ex. 47 (5/30/02 SCO Press Release).)

141.    UnitedLinux released its first Linux distribution, "UnitedLinux Version 1.0" in November 2002.  (Ex. 48 (11/19/02 UnitedLinux press release).)  UnitedLinux Version 1.0 was marketed and sold by each of the partners in UnitedLinux under its own brand name.  (See id.)

142.    SCO's release of UnitedLinux 1.0 was called "SCO Linux 4".  (Ex. 49 (11/19/02 SCO press release).)

143.    Just two months before SCO filed its Complaint against IBM, UnitedLinux signed IBM as a technology partner  (Ex. 50 (1/14/03 UnitedLinux press release).)  IBM's relationship with UnitedLinux included, among other things, joint marketing activities for UnitedLinux products.  (See id.)

144.    As SCO admits, its distributions of Linux, including its UnitedLinux distribution, contain code that SCO claims IBM improperly contributed to Linux.  (See Ex. 27 at 43.)  In its Revised Response to IBM's interrogatories, SCO stated that the code it identified "is included in any product that contains the Linux kernel 2.4 and above, which is sold or distributed by hundreds of entities around the world", including by SCO.  (Id.)  In particular, SCO conceded that its "SCO Linux Server 4.0" products contain such code.  (Id.)

145.    Although SCO fails to identify them in its interrogatory responses, SCO's earlier Linux distributions also contain code SCO claims IBM improperly contributed to Linux.  (See Exs. 51, 52.)  Among other products, SCO's "OpenLinux Server 3.1.1" and "OpenLinux

Workstation 3.1.1" products, which were released in January 2002, both include the Linux 2.4 kernel. (See Ex. 51 (1/24/02 Product Announcement for OpenLinux Server 3.1.1) at 2; Ex. 52 (1/24/02 Product Announcement for OpenLinux Workstation 3.1.1) at 2; Ex. 53 (30(b)(6) Deposition of Erik W. Hughes) at 16:18-19:18.)

146.   In fact, SCO specifically advertised to its customers that its distributions of Linux included some of the very technology it now complains IBM should not have contributed to Linux. (See Exs. 51, 52, 54, 55, 56.)

147.   For example, in its product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO specifically advertised that the products included new features such as "better SMP scaling up to 32 processors" and "journaling file system support". (Ex. 51 at 2; Ex. 52 at 2.)

148.   Similarly, in its product announcement for "SCO Linux Server 4.0", which was based on UnitedLinux Version 1.0, SCO noted that:

> "The core of SCO Linux Server 4.0 is the 2.4.19 Linux kernel. New features include broadened USB support, Logical Volume Manager, improved journaling file system support, POSIX-ACL'S, new O(1) schedule (improves SMP support), Asynchronous I/O, Enterprise Volume Management Systems (EVMS), PCI Hot plug support on supported hardware, NUMA support and many other performance enhancing capabilities".

(Ex. 54 (Product Announcement) at SCO1270430 (emphasis added).)

149.   Likewise, SCO's Technical Overview of SCO Linux 4.0 emphasized that its product included "POSIX Asynchronous I/O", "EVMS", and "JFS (Journaling File System Developed by IBM)". (Ex. 55 (Technical Overview) at SCO1307698-701 (emphasis added).)

150.   Although SCO claims to have "discontinued" distributing any products containing the source code it claims IBM should not have disclosed, it continued to do so after it filed this lawsuit. (See Exs. 53 at 92:1-23; 56, 57, 58, 59.)

151.   For example, SCO released its "SCO Linux Server 4.0 for the Itanium Processor Family" distribution on April 14, 2003, after SCO filed its original Complaint. (See Ex. 56 (Product Announcement).) In the product announcement, SCO touted the new features of this release, including "improved journaling file system support", "Asynchronous I/O" and "Enterprise Volume Management Systems (EVMS)". (Id. at SCO1269793.)

152.   SCO has also produced invoices and other documentation reflecting SCO's continued distribution of its OpenLinux 3.1.1 and Linux Server 4.0 products until at least January 2004. (See Ex. 57 (Tab 121 to SCO's Revised Supplemental Responses to IBM's First and Second Set of Interrogatories); Ex. 58 (invoices produced by SCO); Ex. 53 at 92:1-23; Ex. 59 (Hughes Dep. Ex. 3(a)).)

153.   Moreover, SCO made available to the public and continues to make available (as recently as August 4, 2004) the Linux 2.4 kernel for download from its website. (See Bennett Decl. ¶¶ 4-5, 7.) The version of Linux available from SCO's website includes code SCO claims IBM disclosed in violation of its contracts. (See Ex. 27 at 43; Bennett Decl. ¶ 5.)

154.   SCO distributed source code for the Linux 2.4 kernel, which is contained in SCO's OpenLinux Server 3.1.1, OpenLinux Workstation and Linux Server 4.0 products, under the terms of the General Public License ("GPL"). (Ex. 60; Ex. 53 at 75:9-12.) The terms of the GPL permit licensees freely to use, copy, distribute and modify whatever code is provided thereunder. (Ex. 60.)

### Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to a judgment as a matter of law." In re Grandote Country Club Co., 252 F.3d 1146, 1149 (10th Cir. 2001); see also Banks v. Rite Aid

Corp., No. 1:98CV115K, 2001 WL 1806857, at *1 (D. Utah Mar. 15, 2001) (attached hereto as Exhibit A).

Although the Court must view the record in the light most favorable to the non-moving party, the non-moving party cannot rely on unsupported conclusory allegations to create a genuine issue of fact. See In re Grandote, 252 F.3d at 1149. "To withstand summary judgment, the nonmoving party 'must come forward with specific facts showing that there is a genuine issue for trial'". Id. at 1150 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### Argument

I.  IBM's UNIX SYSTEM V LICENSES DO NOT, AS A MATTER OF LAW, RESTRICT IBM FROM DISCLOSING ITS OWN HOMEGROWN CODE.

As stated above (at ¶¶ 49-65)[5], SCO asserts four causes of action for breach of contract (Counts 1-4) against IBM. SCO's claims concern a set of nearly twenty-year-old licensing agreements for the UNIX System V operating system—the IBM Software Agreement, the IBM Sublicensing Agreement, the Sequent Software Agreement and the Sequent Sublicensing Agreement—and seek redress for a laundry list of alleged breaches. (¶¶ 49-51, 64.) At bottom, however, SCO's contract claims rest entirely upon its (unfounded) charge that IBM improperly contributed certain source code to Linux in violation of the two Software Agreements.[6]

By their terms, the Software Agreements limit the circumstances under which IBM can use and disclose, and thus contribute to Linux, source code from the "SOFTWARE PRODUCT" that IBM licensed from AT&T—UNIX System V. (¶¶ 51, 55.) According to SCO's

---

[5] The undisputed facts are cited herein (in the "Argument" section of this memorandum) as "¶ __", referring to the relevant paragraph number(s) in the foregoing "Statement of Undisputed Facts".

[6] SCO's claims for breach of the IBM and Sequent Sublicensing Agreements are merely derivative of and depend entirely upon its claims relating to the IBM and Sequent Software Agreements. (¶¶ 64-65.)

47

interpretation, however, the Software Agreements go even further and also limit the circumstances under which IBM can use and disclose any source code from its own AIX and Dynix programs, because those programs are alleged to be derived from UNIX System V. (¶¶ 62-63.)

It is undisputed that IBM has not contributed to Linux <u>any</u> source code from the "SOFTWARE PRODUCT" IBM licensed from AT&T nearly twenty years ago—UNIX System V. (¶¶ 31-48, 58 (discussing SCO's failure and refusal to identify any UNIX System V code IBM is alleged to have misused).) Moreover, although SCO alleges that IBM has taken certain code from AIX and Dynix and improperly contributed it to Linux, SCO does not dispute that IBM has not contributed its <u>entire</u> AIX and Dynix programs to Linux. (¶¶ 42-43, 48.) Thus, SCO's claims for breach of contract depend entirely upon whether the IBM and Sequent Software Agreements in fact preclude IBM from contributing to Linux original code that can be found in AIX or Dynix, but is separate from (and does not include) any UNIX System V source code. (¶¶ 62-63.)

As discussed below, the IBM and Sequent Software Agreements do not, as a matter of law, preclude IBM from contributing its or Sequent's homegrown code to Linux. The plain language of the agreements, the extrinsic evidence of the meaning of the agreements and general principles of public policy support only one conclusion—that IBM owns and is free to disclose any source code that it or Sequent creates, so long as that code does not contain UNIX System V code. Accordingly, partial summary judgment should be entered in favor of IBM on SCO's contract claims.

A.     The IBM And Sequent Software Agreements, By Their Plain And Unambiguous
Terms, Do Not Pertain To The Code Allegedly Contributed By IBM To Linux.

The IBM and Sequent Software Agreements, which (as stated) are the cornerstone of
SCO's contract case, are governed by New York law.  (¶ 66.)[7]  Under New York law, when a
contract's language is "clear, unequivocal and unambiguous, the contract is to be interpreted by
its own language".  R/S Assoc. v. New York Job Dev. Auth., 98 N.Y.2d 29, 32 (N.Y. 2002).  It is
the Court's role, as a matter of law, to interpret unambiguous contracts.  See American Express
Bank Ltd. v. Uniroyal, Inc., 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990); Rehberger v.
Richtberg, 744 N.Y.S.2d 477, 478 (N.Y. App. Div. 2002).

Based upon the plain language of the IBM and Sequent Software Agreements, IBM is
entitled to summary judgment as a matter of law on SCO's contract claims.  There is no genuine
issue of material fact that the agreements do not preclude IBM from contributing to Linux (or
otherwise disclosing) source code that may be found in AIX or Dynix but is separate from (and
does not include) any UNIX System V source code.

The provisions of the IBM and Sequent Software Agreements that IBM is alleged to have
breached pertain to "SOFTWARE PRODUCT[S]".  (¶ 51.)  Specifically:

- Section 2.01 grants licensees a "personal, nontransferable and
nonexclusive right to use in the United States each SOFTWARE
PRODUCT identified in the one or more Supplements hereto, solely for
LICENSEE's own internal business purposes . . . ."

- Section 2.05 provides: "No right is granted by this Agreement for the use
of SOFTWARE PRODUCTS directly for others, or for any use of
SOFTWARE PRODUCTS by others."

---

[7]  As SCO's contract claims are before this Court based on diversity jurisdiction, Utah choice of
law rules determine the applicable law.  See Elec. Distribs., Inc. v. SFR, Inc., 166 F.3d 1074,
1083 (10th Cir. 1999).  Utah law provides that the parties' choice of law in a contract should be
respected.  See id. at 1083-84; see also Glezos v. Frontier Inv., 896 P.2d 1230, 1234 (Utah Ct.
App. 1995).

- Section 4.01 provides: "LICENSEE agrees that it will not, without the prior written consent of AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the United States."

- Section 7.06(a) provides: "LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T."

- Section 7.10 provides: "Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part."

(Exs. 11 & 12.)

The term "SOFTWARE PRODUCT" as defined in the IBM and Sequent Software Agreements pertains only to the UNIX System V computer program (and certain related materials, such as product documentation, that are identified in the Schedules attached to the agreements). (¶¶ 56-57.) It is undisputed that IBM has not breached any of the above provisions as they relate to a SOFTWARE PRODUCT. As stated above, SCO has not identified (and has refused to identify) any UNIX System V code or related materials that IBM has improperly used, exported, or disclosed in violation of Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10. (¶¶ 31-48, 58.) In response to IBM's interrogatories asking SCO to identify with specificity the lines of code SCO claimed IBM misused in violation of its contracts, SCO did not identify a single line of UNIX System V code. (¶¶ 31-35.) Even after IBM moved to compel complete responses to IBM's interrogatories, resulting in two court orders directing SCO to "identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM", SCO still failed to identify any UNIX System V code. (¶¶ 36-48.) Indeed, the only UNIX System V code SCO has identified to date is UNIX System V code SCO claims to have discovered in AIX and Dynix, but which SCO does not assert IBM has misused in violation of its licenses. (¶¶ 7, 61.)

Instead, to support its claim that IBM breached the IBM and Sequent Software Agreements, SCO appears to rely on a single sentence in Section 2.01 of the agreements relating to certain "resulting materials". As originally drafted, Section 2.01 grants licensees "the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT". (Ex. 10 § 2.01; Ex. 11 § 2.01.) Based on this language, SCO claims that all of the tens of millions of lines of code contained in IBM's AIX and Dynix programs must be treated like AT&T's UNIX System V program, whether or not portions of that code, standing alone, consist of UNIX System V code or could be considered modifications or derivative works based on UNIX System V. (¶¶ 62-63.)

SCO's interpretation of the IBM and Sequent Software Agreements is not supported by the plain language of Section 2.01 as it was originally drafted. Under even the most expansive reading of the original language of Section 2.01, the "resulting materials" that must be treated as part of the SOFTWARE PRODUCT can consist only of modifications or derivative works of AT&T's UNIX System V source code. The term "resulting materials" cannot be construed to include code that is itself neither a modification of UNIX System V code nor a derivative work of UNIX System V code. The plain language of Section 2.01 precludes such an interpretation.

SCO's focus on IBM's AIX and Dynix programs is therefore misguided. SCO appears to contend that both AIX and Dynix should be considered "resulting materials", because they are (allegedly) modifications or derivative works based on UNIX System V. Whether AIX and Dynix as a whole (each of which consists of tens of millions of lines of source code) are modifications or derivative works of UNIX System V, and are themselves subject to the use and disclosure restrictions in the Software Agreements, is irrelevant. SCO does not—because it

51

cannot—allege that IBM has contributed its entire AIX operating system (which contains approximately 63 million lines of code) and its entire Dynix operating system (which contains approximately 30 million lines of code) to Linux. (¶¶ 6, 48.) Instead, as set forth above (at ¶¶ 42-43), SCO's case rests solely on IBM's alleged misuse of some comparatively small amount of code (less than 27,000 lines) purportedly contained in AIX and Dynix for technologies such as Read Copy Update ("RCU"), Journaling File System ("JFS"), Enterprise Volume Management System ("EVMS") and asynchronous input/output ("AIO"). SCO's contract claims fail for this reason alone. Even under a broad reading of the original language of Section 2.01 of the agreements, SCO must show that IBM misused code that can be considered a modification or a derivative work based on UNIX System V code. SCO, however, fails to offer any evidence that IBM's purported contributions to Linux (such as RCU, JFS, EVMS and AIO)—extracted from AIX and Dynix and standing alone—are modifications or derivative works of any code in UNIX System V. (¶¶ 31-48, 58-60.)[8] When SCO at last purported to identify the code it claims IBM improperly contributed to Linux—only after IBM had filed two motions to compel seeking such information, and Judge Wells had ordered SCO to provide it—SCO made no attempt to show that such code was a modification or a derivative work of UNIX System V. (¶¶ 42-43.) Informed by IBM of this deficiency, SCO flatly refused to supplement its responses, arguing that

---

[8]  A derivative work, under federal copyright law, is "a work based upon one or more preexisting works". 17 U.S.C. § 101. "A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." Id.  A derivative work, therefore, "must incorporate in some form a portion of the [preexisting] copyrighted work" and "must be substantially similar to the [preexisting] copyrighted work". Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 267 (5th Cir. 1988); accord Litchfield v. Spielberg, 736 F.2d 1352, 1357 (9th Cir. 1984). SCO does not identify any UNIX System V code that is allegedly incorporated into or is substantially similar to any of the code IBM is alleged to have improperly contributed to Linux. (¶¶ 31-48, 58-61.) To the contrary, the only UNIX System V code SCO claims to have discovered in AIX and Dynix is not part of the code that SCO claims IBM improperly contributed to Linux. (¶¶ 7, 61.)

"IBM keeps insisting on something that is not part of SCO's claims, so it should come as no surprise that files or lines of code in System V have not been identified". (¶¶ 44-45.) Indeed, although Judge Wells issued a second order directing SCO specifically "to provide and identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived", SCO still fails to offer any evidence that IBM's alleged contributions from AIX and Dynix are modifications or derivative works of any code in UNIX System V. (¶¶ 46-48.)

In addition, Dr. Randall Davis of MIT analyzed the specific lines of code IBM is alleged to have improperly contributed to Linux from AIX and Dynix and concluded that such code does not contain any portion of source code from UNIX System V and is not substantially similar to any source code in UNIX System V. (See Davis Decl. ¶ 45.) Accordingly, Dr. Davis concluded that such lines of IBM code are neither modifications nor derivative works of UNIX System V, as is explained in more detail in his declaration. (See Davis Decl.) Thus, regardless of whether they can be (or were once) found within AIX or Dynix, IBM's alleged contributions to Linux cannot themselves be considered modifications or derivative works based on UNIX System V, and are not subject to any of the provisions of the IBM and Sequent Software Agreements.

Moreover, SCO's argument in any case ignores the plain language of the full agreements that IBM entered into with AT&T concerning UNIX System V and of which AT&T intended for both IBM and Sequent to have the benefit. AT&T specifically agreed in its Side Letter with IBM that, under Section 2.01, AT&T intended only to assert ownership over the "portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work" prepared by or for IBM. (¶ 52 (emphasis added).)[9] The language of the Side Letter cannot be any more clear

---

[9] Under New York law, the Side Letter (which was executed at the same time as the IBM Software Agreement) must be read together with the IBM Software Agreement. See This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."); accord In re Holocaust Victim Assets Litig., 256 F. Supp. 2d 150, 153 (E.D.N.Y. 2003) ("Where several instruments constitute part of the

that AT&T only intended to restrict IBM's use of the UNIX System V code that was <u>included in</u> IBM's modifications and derivative works based on UNIX System V. AT&T plainly, therefore, did not intend to restrict IBM's use of the portions of IBM's modifications and derivative works that <u>did not</u> include UNIX System V code.

Also, as discussed further below (at Section I.B.2), AT&T represented to all of its licensees, including both IBM and Sequent, that they were to have the benefit of the revised language in Section 2.01, which was intended merely to clarify Section 2.01's original meaning. (¶¶ 114-124.) This clarified language provided:

> "AT&T-IS grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivate works based on such SOFTWARE PRODUCT, <u>provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT. AT&T-IS claims no ownership interest in any portion of such a modification or derivative work that is not part of a SOFTWARE PRODUCT.</u>"

(Ex. 39 (emphasis added).) As with the Side Letter, this clarified version of Section 2.01 makes plain that AT&T did not intend to assert any rights to "any portion" of IBM's or Sequent's modifications or derivative works that is not part of the UNIX System V code licensed from AT&T.

---

same transaction, they must . . . be interpreted together.") (quoting <u>RJE Corp. v. Northville Indus. Corp.</u>, 198 F. Supp. 2d 249, 263 (E.D.N.Y. 2002).

The plain and unambiguous language of IBM's and Sequent's agreements with AT&T therefore establishes that the use and disclosure restrictions of Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10 of the IBM and Sequent Software Agreements do not apply to original code created by IBM and Sequent. To the contrary, AT&T expressly disclaimed any purported right to control the use and disclosure of IBM's or Sequent's homegrown code.

SCO in fact provides a good summary of the plain meaning of its own similar licensing terms. SCO's licensing agreements provide:

> "Proprietary Nature of Source Code Products and Ownership. . . . Notwithstanding any provision of this Agreement to the contrary, Licensee acknowledges that Caldera . . . owns and retains all title and ownership of all intellectual property rights in the Source Code Products, including all software, firmware, copies of software, documentation and related materials that are acquired, produced or shipped by Caldera under this Agreement. Such title and ownership by Caldera extends to any Modifications to and derivative works from software acquired under this Agreement that include any portion of the Caldera Source Code Product(s). Caldera claims no ownership interest in any portion of such Modification(s) by Licensee that do not include any portion of the Source Code Product."

(Ex. 40 at SCO1178124 (emphasis added).)

According to SCO:

> "Basically [this language] states that if we license A-B-C to a Licensee, we retain all title and ownership to A-B-C. If the Licensee modifies the source code and adds D-E-F to it, the Licensee has rights to create derivative works and ship or use the resulting binary A-B-C-D-E-F or A-D-F-B-C-E and the Licensee will own D-E-F if it does not include any of A-B-C, but no title or ownership is transferred to A-B-C."

(Id. at SCO1178124 (emphasis added).) Putting the instant case in these exact terms, the plain language of IBM's and Sequent's agreements with AT&T can only be interpreted to mean that IBM and Sequent own the D-E-F code they developed, even if such code is contained within programs such as AIX (A-B-C-D-E-F) or Dynix (A-D-B-E-C-F), and are free to use and disclose

D-E-F as they choose, so long as they do not misuse or disclose A-B-C, the UNIX System V

code. (Given the actual proportion of the code, the alleged AT&T code in AIX and Dynix

(which is less than a hundred thousand lines of code according to SCO) is better represented as

A, and AIX and Dynix code (each of which contain tens of millions of lines of code) is better

represented as B-C-D-E-F-G-H-I-J-K-L-M-O-P-Q-R-S-T-U-V-W-X-Y-Z-AA-BB-CC-DD-EE-

FF, GG, HH, II, JJ, KK, LL, MM, NN, OO, PP, QQ, RR, SS, TT, UU, VV, WW, XX, YY, ZZ,

etc., etc.).)

As stated above (at ¶¶ 31-48, 58-63), SCO provides no evidence that the code IBM is

alleged to have improperly contributed to Linux from AIX and Dynix—which consists of code

for various technologies developed by IBM, such as RCU, JFS, EVMS and AIO—contains any

UNIX System V code. Therefore, such code is not subject to any restrictions under the IBM and

Sequent Software Agreements, and SCO's contract claims fail as a matter of law.

> B.  In Any Event, All Of The Relevant Testimonial And Documentary Evidence
> Supports The Conclusion That The Software Agreements Do Not Pertain To
> IBM's Original Code.

Even if the Court finds the IBM and Sequent Software Agreements to be ambiguous,

however, SCO's claims still fail as a matter of law. The relevant admissible extrinsic evidence

regarding the proper interpretation of the Software Agreements supports the view that the

SOFTWARE PRODUCT subject to the use and disclosure restrictions in the agreements

includes only UNIX System V source code and those portions of any modifications or derivative

works of UNIX System V that consist of UNIX System V source code. (¶¶ 78-124.) In such a

case, "where [the] evidence so clearly weighs in one direction that there is no genuine issue of

material fact left", summary judgment is appropriate. Moncrief v. Williston Basin Interstate

Pipeline Co., 174 F.3d 1150,1173 (10th Cir. 1999).

1.    The Testimonial Evidence.

As an initial matter, each of the individuals who executed the IBM and Sequent Software Agreements has offered sworn testimony that the term "resulting materials" in Section 2.01 was intended to refer only to the UNIX System V code contained within any modifications or derivative works prepared by IBM or Sequent:

- Otis Wilson, AT&T's Manager of Software Sales and Marketing, who negotiated the IBM and Sequent Software Agreements, and executed almost every UNIX System V license entered into by AT&T, including the Sequent Software Agreement, states:

  "As my staff and I communicated to our licensees, this provision [Section 2.01] was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement. As we understood Section 2.01, any source code developed by or for a licensee and included in a modification or a derivative work would not constitute 'resulting materials' to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein." (Wilson Decl. ¶ 14.)

  Indeed, Mr. Wilson states that he "do[es] not believe that our licensees would have been willing to enter into the software agreement if they understood Section 2.01 to grant AT&T or USL the right to own or control source code developed by the licensee or provided to the licensee by a third party". (Id. ¶ 16.) Mr. Wilson, in fact, was of the view at the time "that we could not claim any rights to non-UNIX System V code source . . . without raising serious antitrust issues". (Id. ¶ 18.)

  Mr. Wilson further states, plainly and unequivocally that:

  "In my view, any claim that the IBM Software Agreement and the Sequent Software Agreement prohibit the use, export, disclosure or transfer of any code other than UNIX System V code is clearly wrong. Not only did we at AT&T not intend the agreements to be read that way, but we also went out of our way to assure our licensees that that is not what the agreements meant." (Wilson Decl. ¶ 30 (emphasis added).)

57

- David Frasure, the AT&T Sales Manager who negotiated the IBM and Sequent Software Agreements, and signed the IBM Software Agreement on Mr. Wilson's behalf, states:

  "As we assured our licensees, this language [in Section 2.01] does not, and was never intended to, give AT&T Technologies the right to assert ownership or control over modifications or derivative works prepared by its licensees, except to the extent of the licensed UNIX System V source code that was included in such modifications or derivative works. The term 'resulting materials' in the context of the software agreements was intended only to mean those portions of a licensees' modifications or derivative works that included the licensed UNIX System V source code." (Frasure Decl. ¶ 14.)

  He further states:

  "[SCO's] interpretation of the IBM Software Agreement and the Sequent Software Agreement is impossible to reconcile with what I, and I believe others at AT&T Technologies, understood our software agreements to mean. I never suggested, or would have thought to suggest, to our customers that the agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose any UNIX System V code." (Id. ¶ 29 (emphasis added).)

- Richard McDonough, Division Counsel for IBM's System Products Division, who signed the IBM Software Agreement on IBM's behalf, states:

  "As I understood the [agreements] between IBM and AT&T Technologies, and as the parties intended those agreements to mean, they did not seek to impose any limitations on the materials separately owned or developed by IBM or AT&T Technologies, respectively. IBM was free to use, copy, distribute or disclose any portion of a modification or derivative work that was not part of a licensed software product provided by AT&T Technologies." (McDonough Decl. ¶ 15.)

  He further states:

  "There is absolutely no way that IBM would have entered into an agreement with AT&T giving it the right to control IBM code merely because that code was or had once been associated with AT&T code in an IBM product. Never would we have knowingly agreed to a provision that gave AT&T the right to control what IBM did with its own code (or for that matter the code of third parties)." (Id. ¶ 18 (emphasis added).)

- David Rodgers, Sequent's Vice President of Engineering, who signed the Sequent Software Agreement on behalf of Sequent, likewise states that he did not understand Section 2.01 "to give AT&T Technologies the right to assert ownership or control over modifications or derivative works prepared by Sequent, except to the extent that the licensed Unix software product was included in such modifications or derivative works". (Rodgers Decl. ¶ 7.)

  In fact, Mr. Rodgers further states that he "would never have signed an agreement that would grant ownership or control to AT&T Technologies over modifications or derivative works prepared by Sequent to the extent those modifications or derivative works contained no part of the Unix software product licensed from AT&T Technologies". (Id. (emphasis added).)

Moreover, other individuals who were responsible for the negotiation of the IBM and Sequent Software Agreements, on both sides, hold the same view of the IBM and Sequent Software Agreements:

- Michael DeFazio, the AT&T executive with overall responsibility for the licensing of UNIX System V, states:

  "The agreements did not (and do not) give AT&T, USL, Novell or any of their successors or assigns the right to assert ownership or control over modifications and derivative works prepared by its licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. . . . I do not believe that our licensees would have been willing to enter into the software agreement if they understood Section 2.01 to grant AT&T, USL, Novell or their successors or assigns the right to own or control source code developed by or for the licensee. Modifications and derivative works contained UNIX System V source code and code developed by or provided to the licensee. The UNIX System V source code contained in a modification or derivative work continued to be owned by AT&T, USL, Novell or their successors, while the code developed by or provided to the licensee remained the property of the licensee or provider to the licensee." (DeFazio Decl. ¶ 17.)

- Steve Vuksanovich, who was the AT&T account representative for the IBM account and participated in the negotiation of the IBM Software Agreement, states:

  "Our standard software agreements also gave licensees the right to modify UNIX System V source code and to prepare derivative works based upon the code. As I believe we intended the agreements, and as I told our licensees, our licensees owned their modifications and derivative works they prepared based on UNIX System V, and were therefore permitted to do as they wished with those

modifications and derivative works, as long as they treated those portions of the modifications or derivative work consisting of any UNIX System V source code the same way they treated the UNIX System V source code that we provided to them. I recall that during our negotiations IBM specifically wanted to make sure that IBM, and not AT&T, would own and control code that was developed by or for IBM, even if that code was mixed with AT&T's UNIX System V code in a product. I assured IBM that we had the same understanding." (Vuksanovich Decl. ¶ 13.)

- Ira Kistenberg, who was the AT&T account representative for the Sequent account and participated in the negotiation of the Sequent Software Agreement, states:

"In my understanding, Section 2.01 did not in any way expand the scope of the software agreement to restrict our licensees' use, export, disclosure or transfer of their own original code, even if such code was contained in a modification or derivative work of UNIX System V. The purpose of the software agreement was to protect AT&T Technologies' UNIX System V source code, and was not meant to claim for AT&T Technologies our licensees' own work. It would not make sense to me to read this Section 2.01 to place restrictions on code that our licensees created themselves—that code was theirs." (Kistenberg Decl. ¶ 12.)

- Geoffrey Green, an AT&T attorney at the time, states:

"Without disclosing any legal advice I may have rendered . . . I can say that, as I understood AT&T's UNIX System V licensing agreements, AT&T did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. Accordingly, a licensee was free to do with as it wished (*e.g.*, use, copy, distribute or disclose) code developed by or for the licensee in its modifications and derivative works, provided that the licensee did not use, copy, distribute or disclose any portions of the original UNIX System V code provided by AT&T (except as otherwise permitted by the license agreements)." (Green Decl. ¶ 6.)

- Jeffrey Mobley, a member of IBM's corporate Commercial and Industry Relations staff, states:

"Based on my role in negotiating the attached AT&T Agreements, I do not believe there is any merit to the plaintiff's contentions. IBM would never have entered into any agreement that gave AT&T Technologies the right to control IBM's use of source code that IBM wrote itself, that IBM paid others to develop, or that IBM licensed from others. That is why we specifically discussed this issue of ownership of our modifications and derivative works with AT&T Technologies in detail before entering into the AT&T Agreements. AT&T Technologies assured

us repeatedly that the AT&T Agreements were not intended to limit IBM's freedom of action with respect to its original source code and was merely intended to protect AT&T Technologies' interest in its own UNIX System V source code, *and I believed them.*" *(Mobley Decl. ¶ 17.)*

● Thomas Cronan, an attorney in IBM's System Products Division, states:

"As I understood the AT&T Agreements between IBM and AT&T Technologies, therefore, and as I believe the parties intended those agreements, the agreements impose no restrictions on IBM's use, export, disclosure or transfer of those portions of any modifications or derivative works of UNIX System V that were created by or for IBM and do not contain any UNIX System V source code.

So that there would be no confusion, we told the AT&T Technologies' representatives with whom we negotiated the AT&T Agreements that IBM intended to include portions of AT&T's UNIX System V code in products with IBM code and to make changes to the AT&T code (such as by adding to it) and thus IBM had to ensure that the parties agreed that IBM had the right to do so, without forfeiting any rights (including the right to control) to such IBM products and code. AT&T Technologies' representatives advised us that they did not seek to preclude such activities. In fact, they assured us that the purpose of the restrictions imposed by the AT&T Agreements was to protect AT&T's original *code and that IBM could do whatever it wanted with its own code so long as it did* not use, export, disclose or transfer AT&T's original code (except as otherwise permitted by the AT&T Agreements)." (Cronan Decl. ¶¶ 18-19.)

Mr. Cronan further states:

"No one involved in the negotiation of the AT&T agreements ever suggested that the agreements would give AT&T Technologies (or anyone else other than IBM) the right to control IBM original code. It seems quite clear to me, based on the statements of its representatives, that AT&T Technologies' concern was the *protection of its original code only. I have no doubt that the AT&T Technologies'* representatives with whom we negotiated the AT&T Agreements understood that IBM would not have entered into the AT&T Agreements if AT&T Technologies had sought and insisted on the right to control any product or code that might in the future be associated with UNIX System V code, except insofar as it might include UNIX System V code." (Id. ¶ 23.)