FILED
U.S. DISTRICT COURT

2005 JUN 27  P 3: 38

DISTRICT OF UTAH

BY:_____
     DEPUTY CLERK

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S UNSEALED OPPOSITION TO SCO'S MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 15(a) AND 16(b)**<br>**[Docket No. 337]**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

**NOV 3 0 2004**

MARKUS B. ZIMMER, CLERK
BY _____
DEPUTY CLERK

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **IBM'S OPPOSITION TO SCO'S MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 15(a) AND 16(b)** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **FILED UNDER SEAL** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV-0294 DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this opposition to Plaintiff/Counterclaim-Defendant The SCO Group, Inc.'s ("SCO") Motion for Leave to File a Third Amended Complaint.

### Preliminary Statement

SCO's motion for leave to file yet another amended complaint is just one more attempt by SCO to prolong unnecessarily the resolution of this case, which has been pending for more than 20 months. SCO has already twice amended its complaint. SCO should not be allowed to amend its complaint yet again, just months before the close of discovery, when the plain purpose of the amendment is merely to set up another request for a discovery extension so that SCO may continue to pursue a useless fishing expedition.

The premise of the new claim asserted by SCO in its proposed complaint is that IBM has infringed SCO's purported UNIX copyrights, not just by its copying of the Linux operating system as SCO's present complaint alleges, but also by its copying of IBM's own "AIX for Power" operating system.[1] There is no merit to this claim. The evidence will establish that IBM has a valid license to the UNIX source code included in its AIX products, a license obtained as part of the Joint Development Agreement entered into by IBM and SCO's alleged predecessor-in-interest, The Santa Cruz Operation, Inc. ("Santa Cruz") in 1998. Even setting aside, however, the question of whether IBM in fact has a license for the allegedly infringing code—which the Court obviously need not decide on this motion—there is no reason why the current case should be broadened to include SCO's new claim at this late date.

Since SCO's motion for leave to amend was filed eight months after the deadline set by the Court for such motions (and more than 19 months after SCO filed its original complaint), SCO must satisfy the requirements of both Rule 16(b) and 15(a) of the Federal Rules of Civil

---

[1] IBM developed versions of the AIX operating system to run both on computer processors developed by Intel Corporation and "PowerPC" computer processors. "AIX for Power" is the IBM AIX operating system that runs on "PowerPC" processors.

Procedure.  Under Rule 16(b), a court should not modify a scheduling order to allow for the late amendment of pleadings "except upon a showing of good cause".  Under Rule 15(a), although leave to amend "shall be freely given when justice requires", a court may deny leave to amend where there is a showing of (1) undue delay, (2) undue prejudice to the opposing party, (3) bad faith or dilatory motive on the part of the movant or (4) futility of the proposed amendment.  In this case, SCO cannot satisfy either Rule 16(b) or Rule 15(a).

First, SCO's motion should be denied under Rule 16(b) because SCO has not shown, and cannot show, "good cause" for its late application to amend its pleadings.  Despite its claim to have only recently discovered facts supposedly supporting its new claim for copyright infringement against IBM, SCO unquestionably was in possession of such facts long before October 2004, indeed, long before it ever filed its original complaint in March 2003.  Documents within SCO's possession that were produced to IBM in this lawsuit reflect the very facts that SCO now asserts form the basis of its new claim—that IBM included UnixWare 7/UNIX System V Release 4 ("UnixWare/SVR4") code in its AIX for Power product.  In fact, publicly available industry reports and IBM publications issued at the time AIX for Power was released in 2001 expressly state that the product contained UnixWare/SVR4 code.  SCO's claim, therefore, that it did not know, and could not have known, until October 2004, that any UnixWare/SVR4 code was included in AIX for Power is disingenuous at best.

Second, SCO's motion should further be denied under Rule 15(a) because (1) SCO unduly delayed in bringing this motion, given that it plainly knew (or should have known) of the facts supporting its claim long before it even filed its original complaint; (2) SCO's motive in seeking the new amendment is merely to allow it to pursue another extension of discovery in this case (which the Court has otherwise already refused to grant SCO); (3) IBM would be prejudiced by the addition of an entirely new copyright claim just a few months before the close of discovery in a case that has already been pending for more than a year and a half; (4) SCO's new

copyright infringement claim is in any case futile because it has not been brought in the proper venue and is barred by an applicable statute of limitations.

SCO's motion for leave to amend further its pleadings should be denied. SCO should not be allowed to continue to perpetuate the fear, uncertainty and doubt it has created in the marketplace concerning Linux simply by devising new ways to delay the resolution of this case.

### Argument

I.      SCO'S MOTION SHOULD BE DENIED UNDER RULE 16(b) BECAUSE SCO CANNOT SHOW GOOD CAUSE FOR ITS UNTIMELY FILING.

Since SCO filed its motion to amend eight months after the Court's deadline for filing such motions had passed, SCO must first satisfy the requirements of Rule 16(b).[2] See Deghand v. Wal-Mart Stores, Inc., 904 F. Supp. 1218, 1221 (D. Kan. 1995); Colo. Visionary Acad. v. Medtronic, Inc., 194 F.R.D. 684, 687 (D. Colo. 2000). Rule 16(b) provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the [Court]". Fed. R. Civ. P. 16(b). "The 'good cause' standard primarily considers the diligence of the party seeking the amendment." Deghand, 904 F. Supp. at 1221. Thus, SCO "must show that despite due diligence it could not have reasonably met the scheduled deadlines." Id. at 1221 (emphasis added); accord Rowen v. New Mexico, 210 F.R.D. 250, 252 (D.N.M. 2002).

In this case, SCO has not demonstrated—because it cannot do so—that there is good cause for SCO's untimely filing. As we have noted before, in order to prevail on a claim for copyright infringement against IBM, SCO must show that (1) it owns valid copyrights and (2) IBM copied protectable elements of SCO's copyrighted work. See Mitel, Inc. v. Iqtel, Inc., 124

---

[2] Where, as here, a court-ordered deadline to amend has passed, a court need not consider a motion to amend under Rule 15(a) unless the movant first satisfies the requirements of Rule 16(b). See E. Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 340 (3d Cir. 2000) (affirming denial of motion to amend under Rule 16(b) standard where trial court concluded it need not reach Rule 15(a) argument in the absence of good cause shown); Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998) (affirming denial of motion to amend for lack of good cause even though movant had argued under more lenient Rule 15(a) standard).

F.3d 1366, 1370 (10th Cir. 1997) (stating elements of copyright infringement); accord Country

Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280, 1284 (10th Cir. 1996).  Here, although SCO

claims to have only recently discovered that IBM copied SCO's UnixWare/SVR4 code into its

AIX for Power product, SCO has long been in possession of the very facts that it now claims

serve as the basis for its new infringement claim.[3]  Accordingly, SCO has no excuse for waiting

eight months after the deadline for amending pleadings has passed to bring the instant motion.

As an initial matter, the agreement at the heart of SCO's new claim, the Joint

Development Agreement ("JDA") entered into by Santa Cruz—SCO's alleged predecessor-in-

interest—and IBM in October 1998, specifically envisioned IBM's use of the purportedly

copyrighted UnixWare/SVR4 code in IBM's AIX products, so it should not have come as a

surprise to SCO that IBM in fact included UnixWare/SVR4 code in AIX for Power.  Indeed, the

JDA, which set forth the parties' rights and obligations with respect to the joint development

project known as "Project Monterey", specifically gave IBM a royalty-free license to include

such UnixWare/SVR4 code in its products, including AIX for Power, the allegedly infringing

product here.  (See Shaughnessy Decl. Ex. 1 § 2.0(d)(2).)  Geoff Seabrook, Santa Cruz's Senior

Vice President for Development, memorialized the parties' basic understanding in a

September 10, 1998 memorandum:

> Both companies [Santa Cruz and IBM] will exchange technology
> to be used in [Santa Cruz's] UnixWare 7 on the IA32 and [IBM's]
> AIX on PPC [Power].  The purpose of these exchanges is to create
> a compatible family of products, together with the resultant IA64
> product [that was to be developed jointly by Santa Cruz and IBM].
> It is intended that the effective value of these exchanges will be
> equivalent, and that no royalties will be due to either company as a
> result of these exchanges.  The zero royalty agreement is also to

---

[3]  SCO does not contend that it lacked knowledge of its purported ownership of the copyrights at issue prior to the deadline for amending pleadings.  Notably, however, Novell, Inc. has publicly challenged SCO's ownership of such copyrights.  Moreover, as stated in IBM's memoranda submitted in support of its motion for summary judgment on IBM's Tenth Counterclaim, SCO has so far failed to adduce evidence establishing SCO's ownership of the alleged copyrights.

> allow our engineering teams to freely select the best available
> technology, without worrying about any royalty impact.

(Shaughnessy Decl. Ex. 2, at 1710141629.)  In any case, even setting aside whether the JDA

gives IBM a royalty-free license to the code—which, as stated, the Court need not decide on this

motion, and which IBM will therefore not debate on the merits here—SCO was well aware (or

should have been had it exercised due diligence) that IBM did in fact incorporate certain

UnixWare/SVR4 code into its AIX for Power product.

    First, documents within SCO's possession that were produced in this litigation reflect that

Santa Cruz (and thus, SCO, by extension) had long been aware that IBM intended to, and did,

incorporate purportedly copyrighted UnixWare/SVR4 code into AIX for Power, the allegedly

infringing product.

    For example, a number of documents produced from SCO's files show that Santa Cruz

and IBM intended from the outset that Project Monterey would consist of a "family" of three

operating systems, Santa Cruz's UnixWare/SVR4 operating system, IBM's AIX for Power

operating system, and the jointly-developed Monterey operating system, all of which would

share certain source code.[4]  Thus, the documents reflect that certain UnixWare/SVR4 code

would be incorporated into IBM's AIX for Power product, just as certain AIX code would be

incorporated into Santa Cruz's UnixWare/SVR4 product:

- An undated joint Santa Cruz/IBM document, titled "Genus: An IBM/SCO UNIX
  Project Marketing Plan Development", outlined the parties' intent to create a
  "family" of UNIX products—"UnixWare (IA32), AIX (PPC [Power]) and new
  [Monterey] IA64 product)".  These products, including specifically
  UnixWare/SVR4 and AIX for Power, were to be "significantly enhanced by cross
  pollination of technologies, middleware and applications from other family
  members".  (Shaughnessy Decl. Ex. 3, at SCO1233397 (emphasis added).)

- A November 4, 1998 presentation created by Santa Cruz regarding Project
  Monterey stated explicitly that the plan was to create "a single UNIX product line
  that spans IA-32 [UnixWare/SVR4], IA-64 [Monterey] and IBM Power
  processors [AIX for Power]".  (Shaughnessy Decl. Ex. 4, at SCO1311081.)

---

[4]  The documents produced by SCO in this litigation have been marked with the prefix "SCO".

Among other things, Santa Cruz would be "supplying IBM with <u>UnixWare 7 APIs and technologies for [inclusion in] AIX [for Power]</u>". (<u>Id.</u> at SCO1311082 (emphasis added); <u>see also</u> <u>id.</u> at SCO1311085 (noting that the parties intended to create "<u>AIX with UnixWare ++</u>" for "<u>Power PC</u>" (emphasis added).))

- On February 19, 1999, Santa Cruz and IBM together issued Version 1.0 of the "Monterey-64 Release 1 Product Requirement Specification" ("PRS"). (<u>See</u> Shaughnessy Decl. Ex. 5.) The PRS states unambiguously that one of the principal objectives of Project Monterey was the development of a "family" of compatible UNIX products, including the jointly-developed "Monterey-64" product, Santa Cruz's "<u>Unixware 7 for IA-32</u>" and IBM's "<u>AIX for Power PC</u>", and that the Monterey-64 product would "maximize the amount of common source code shared with <u>AIX PPC</u>". (<u>Id.</u> at SCO1235277 (emphasis added).)[5]

Perhaps even more telling are the documents within SCO's possession concerning the AIX for Power product in particular, which expressly state that certain UnixWare/SVR4 code was included in AIX for Power:

- A September 2, 1998 document titled "IBM-SCO Family Unix Technical Proposal" sets forth specific "Technology from U[nix]W[are]" intended by the parties to be incorporated into AIX for Power. (Shaughnessy Decl. Ex. 7, at SCO1310626 (emphasis added).)

- An October 1999 presentation prepared by Miles Barel, IBM's UNIX Marketing Program Director, noted the Project Monterey partners' intent to "aggressively grow and enhance [the] AIX - Power offering" by including "[c]ontributions from SCO's UnixWare". (Shaughnessy Decl. Ex. 8, at SCO1230472 (emphasis added).)

---

[5] Other documents created by Santa Cruz (but not produced by SCO) also reflect the understanding that UnixWare/SVR4 code was going to be included in the AIX for Power product. For example, in September 1999, Michael Orr of Santa Cruz drafted a joint statement to be issued by Santa Cruz and IBM emphasizing the parties' intent that AIX for Power would include code from Santa Cruz's UnixWare/SVR4 product. That statement provides:

> "IBM is providing [Santa Cruz] with AIX technology for inclusion in UnixWare and <u>[Santa Cruz] is providing UnixWare technology to IBM for inclusion in AIX</u>. Thus users should think of AIX (on PowerPC), UnixWare (on IA32) and Monterey (on IA64) as becoming the same operating system over the next year or two. The end result of Project Monterey will be a single UNIX product line that runs on IA-32, IA-64, and PowerPC processors . . ."

(Shaughnessy Decl. Ex. 6, at 181444070 (emphasis added).)

7

- In a February 2000 presentation prepared for the Santa Cruz Partner Conference, Tamar Newberger of Santa Cruz stated that as part of the Project Monterey strategy, "[e]nhancements from SCO's UnixWare" would be included to "aggressively grow and enhance [the] AIX- Power offering". (Shaughnessy Decl. Ex. 9, at SCO1352694 (emphasis added).)

- In an August 10, 2000 e-mail, John Boland of Santa Cruz distributed internally a press release prepared by IBM concerning AIX 5L, the release of AIX that included technology from UnixWare/SVR4. The press release makes clear that AIX 5L for Power, like AIX 5L for IA-64, contained "key technologies" from "UnixWare" and "UNIX System 5 [SVR4]". (Shaughnessy Decl. Ex. 10, at SCO1374969-70 (emphasis added).) In particular, the release noted that "[a]mong the UNIX System V [SVR4] technologies to be incorporated in this release is the SVR4 printing subsystem". (Id. at SCO1374970.)

- A May 2, 2001 print-out of the webpage for AIX 5L, which was jointly sponsored by IBM, Santa Cruz and Intel, states that AIX 5L "for both Intel Itanium- and IBM POWER-based systems" combines IBM's AIX product "with the best technologies from [Santa Cruz's] UnixWare operating system". (Shaughnessy Decl. Ex. 11 (emphasis added).)

- An undated joint Santa Cruz/IBM document summarizing the differences between AIX for Power and AIX for IA-64 notes that the two products have in "common" the "[UnixWare] SVR4 print subsystem". (Shaughnessy Decl. Ex. 12, at SCO1242161 (emphasis added).)

SCO has therefore known (or should have known) for more than three years—and certainly before the February 2004 deadline for amending pleadings—that IBM copied at least certain UnixWare/SVR4 technology into the AIX for Power product. Even if SCO were not imputed with Santa Cruz's knowledge (which it should be, since SCO claims to be Santa Cruz's successor-in-interest to the UNIX assets and the above-cited documents were produced to IBM by SCO), if SCO had exercised any diligence during and upon its acquisition of Santa Cruz's assets in 2001, it would have uncovered the facts it now claims it only learned upon review of IBM's document production in this case. Given that Santa Cruz understood at least as early as August 2000 that IBM had copied UnixWare/SVR4 code into AIX for Power, there is plainly no good cause for SCO to have waited until October 2004 to attempt to assert a claim against IBM relating to such actions.

Second, numerous publicly-available product announcements and industry reports issued years ago also plainly reflect the inclusion of UnixWare/SVR4 code in AIX for Power— specifically AIX 5L, the release of AIX for Power (and for the Intel IA-6A processor) that contained technology from UnixWare/SVR4.

For example:

- An August 2000 report (which, incidentally, was produced by SCO in this litigation) prepared by IDC on the beta release of AIX 5L lists the [UnixWare] SVR4 printing subsystem as one of the features included in the release. (Shaughnessy Decl. Ex. 13, at SCO1294140.)

- An August 8, 2000 article in The Register noted that AIX 5L, which ran on both Intel and Power processors, included contributions from "SCO UnixWare and UNIX System V [UnixWare/SVR4] standard technologies". (Shaughnessy Decl. Ex. 14.)

- An August 10, 2000 article in InfoWorld discussing AIX 5L expressly stated that the product would be offered for both the IA-64 and Power platforms and contained "Unix System 5 [UnixWare/SVR4] support, including the SVR4 printing subsystem". (Shaughnessy Decl. Ex. 15.)

- A June 2001 industry report prepared by the Andrews Consulting Group evaluating the newly-released AIX 5L described the product as "a single UNIX for both PowerPC and IA-64." (Shaughnessy Decl. Ex. 16, at 12.)  In describing the features of AIX 5L, the report states: "AIX 5L supports a number of Unix System V Release 4 (SVR4) commands and utilities, especially in the printing subsystem." (Id. at 17.)

- A September 24, 2001 article in VNU Net discussing AIX 5L noted that the operating system "can be used with both IBM PowerPC processors and the emerging Intel IA-64 Itanium chips" and that AIX 5L included a "SVR4-compatible printing subsystem". (Shaughnessy Decl. Ex. 17.)

The product announcements and manuals published openly by IBM concerning the AIX for Power product are equally explicit regarding the inclusion of UnixWare code in the product:

- IBM's April 17, 2001 Software Announcement introducing AIX 5L for Power expressly states that UnixWare/SVR4 file spooling subsystem and packaging commands were part of the product. (Shaughnessy Decl. Ex. 18, at 3.)

- IBM provided still more information about the UnixWare/SVR4 Printing Subsystem and Packaging Commands that were included in AIX 5L for Power in the "Announcement Supplemental Information" document also issued by IBM on April 17, 2001.  (Shaughnessy Decl. Ex. 19, at 8.)

- The 2001 "Release Notes" for "AIX 5L for POWER Version 5.1" specifically reference the inclusion of the "System V [UnixWare/SVR4] Printing Subsystem" in AIX.  (Shaughnessy Decl. Ex. 20, at 17-18.)

- The March 2001 "Printing for Fun and Profit under AIX 5L" publication, which is available on IBM's website, is devoted in large part to discussing the operation of the System V [UnixWare/SVR4] print subsystem in AIX 5L.  (Shaughnessy Decl. Ex. 21.)

- The June 2001 "AIX 5L Differences Guide" publication, which is available on IBM's website, specifically notes that "[t]he System V [UnixWare/SVR4] print subsystem was ported from SCO's UnixWare 7 to AIX 5L".  (Shaughnessy Decl. Ex. 22, at 206 (emphasis added).)

- The January 2002 "Problem Solving and Troubleshooting in AIX 5L" publication, which is available on IBM's website, devoted an entire section to "Troubleshooting for System V [UnixWare/SVR4] printing".  (Shaughnessy Decl. Ex. 23, at 389-402.)

Thus, even ignoring the fact that IBM was given a license to include UnixWare/SVR4 code in its AIX for Power product, and even if SCO were permitted to ignore all of the documents in its own possession that expressly reference IBM's use of UnixWare/SVR4 code in AIX for Power, the most basic of investigations of publicly available documents relating to AIX for Power would have revealed that IBM had copied UnixWare/SVR4 code into the product.

\*        \*        \*

In sum, SCO has failed abjectly to demonstrate good cause for its untimely filing of the instant motion.  In light of the extensive information contained in SCO's own files and from publicly available sources that IBM had copied UnixWare/SVR4 technologies into AIX for Power, SCO's contention that it "did not know (and could not reasonably have determined) that IBM had improperly converted SCO's [UnixWare/SVR4] code and incorporated that code in

IBM's AIX for Power product" until it reviewed discovery produced by IBM (SCO Mem. at 16) is unquestionably and demonstrably false. The "new" facts that SCO claims only recently to have discovered are in reality nothing of the sort. It is plain that SCO knew (or at least with due diligence should have known) the facts that it claims form the basis of its new copyright infringement claim well before it even filed its original lawsuit against IBM. SCO's motion should therefore be denied.

II.     SCO'S MOTION SHOULD ALSO BE DENIED UNDER RULE 15(a).

Even if SCO could satisfy the requirements of Rule 16(b)—which it cannot—SCO's motion for leave to amend its complaint should still be denied under Rule 15(a). Although Rule 15(a) provides that leave to amend "shall be freely given when justice requires", the Court may deny a motion to amend where there is a showing of (1) undue delay, (2) undue prejudice to the opposing party, (3) bad faith or dilatory motive on the part of the movant or (4) futility of the proposed amendment. See Frank v. U.S. West, Inc., 3 F.3d 1357, 1365 (10th Cir. 1993) (affirming denial of motion to amend for untimeliness where movant filed motion four months after deadline and knew or should have known facts underlying amendment). In this case, all four factors weigh against SCO's motion.

A.     SCO Has Delayed Unduly In Making This Motion.

As discussed above (at 4-11), SCO has plainly delayed unduly in making the instant motion. SCO brought this motion more than 19 months after it filed its original complaint and eight months after the deadline imposed by the Court for amending pleadings. As SCO cannot articulate a credible or justifiable reason for this substantial delay—since, as discussed above (at 4-11), SCO has known (or should have known) of the facts purportedly supporting its new claim for copyright infringement since before it even filed its original complaint—the delay alone is reason to deny the motion. See U.S. West, 3 F.3d at 1365-66 ("It is well-settled in this circuit

11

that untimeliness alone is a sufficient reason to deny leave to amend, especially when the party

filing the motion has no adequate explanation for the delay." (citations omitted)); see also Las

Vegas Ice and Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990)

("Where the party seeking amendment knows or should have known of the facts upon which the

proposed amendment is based but fails to include them in the original complaint, the motion to

amend is subject to denial.").

Courts in similar circumstances have denied motions for leave to amend when the

plaintiff has unreasonably delayed in bringing its motion.  See, e.g., U.S. West, 3 F.3d at 1365-

66 (affirming denial of motion to amend made four months after deadline); Panis v. Mission

Hills Bank, N.A., 60 F.3d 1486, 1494-95 (10th Cir. 1995) (affirming denial of motion to amend

made six months after the deadline); Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1026 (10th

Cir. 1994) (affirming denial of motion to amend made eight months after original complaint was

filed and more than five months after previous amended complaint); Woolsey v. Marion Labs,

934 F.2d 1452, 1462 (10th Cir. 1991) (affirming denial of motion to amend made 17 months

after filing of original complaint); Heard v. Bonneville Billing and Collections, Inc., 1998 U.S.

Dist. LEXIS 23035, at *4-*7 (D. Utah Nov. 30, 1998) (denying motion to amend where movant

should have been aware of facts giving rise to amendment at outset of action but waited until

discovery nearly complete to file motion) (attached hereto as Exhibit A).

B.   SCO Has Brought This Motion Solely In An Attempt Further To Delay The
     Resolution Of The Case.

SCO's motion should further be denied because the motion has plainly been brought only

to seek further delay in the resolution of this case.  As we have described in other filings and will

not repeat again here, it has been SCO's strategy from the outset of this litigation to seek to delay

the proceedings, apparently to further the fear, uncertainty and doubt that SCO has created concerning Linux and IBM's products and services.[6]

The instant motion is just part and parcel of SCO's delay tactics. In particular, this motion seems crafted specifically to evade the Court's admonition in its June 10, 2004 Order that the scheduling order in this case would not be modified again "absent extremely compelling circumstances". (6/10/04 Order at 3.) Since the issuance of the Court's Order, SCO has been regularly noting in briefs its dissatisfaction with the current discovery schedule and its intention to bring yet another motion to amend the scheduling order. Most recently, SCO argued on September 24, 2003 in support of its ironically-titled motion to "enforce" the scheduling order that "a modification of the schedule will inevitably become necessary" and that SCO intended to "make an appropriate motion to this Court" after Magistrate Judge Wells ruled on certain discovery issues. (See SCO's Consolidated Reply Mem. at 18.) Instead of making any properly-supported motion to amend the scheduling order (or waiting for Judge Wells to rule for that matter), however, SCO has instead attempted to help itself to an extension by simply filing a motion to assert a claim against IBM that requires new and different discovery just a few months before discovery is supposed to end. If SCO's instant motion to amend were granted, it would no doubt be followed immediately by a motion from SCO seeking to extend discovery in this case.

The timing of SCO's motion is particularly instructive. SCO filed this motion on October 14, 2004, just two weeks after the Court denied SCO's emergency request for a

---

[6] In fact, SCO has even successfully sought to delay the deadline for amending pleadings in this case once already. The Court's original scheduling order issued on July 10, 2003 established October 1, 2003 as the deadline for the amendment of pleadings. SCO filed its First Amended Complaint on July 22, 2003 and, on September 26, 2003, filed a motion (which IBM opposed) seeking to extend the deadline for amending pleadings until February 4, 2004. The Court granted the motion and SCO filed its Second Amended Complaint on the last day permitted, February 4, 2004.

scheduling conference, at which SCO by its own admission intended to propose an extension of discovery. This timing is not coincidental. It is clear from SCO's actions (even setting aside IBM's license to use UnixWare/SVR4 code in its AIX for Power product and SCO's long-term knowledge of that use) that at least as of August 2004, SCO was in possession of the very IBM internal documents that it has appended to the instant motion—indeed, it was disclosing the substance of those documents (we believe improperly) to the media. (See Shaughnessy Decl. Exs. 24 & 25 (reporting that SCO executives had discussed IBM documents produced during discovery with the press).) Yet, notably, SCO did not seek to amend its pleadings based on such documents until after this Court denied SCO's attempt informally to amend the scheduling order.

The facts and circumstances surrounding SCO's motion suggest that SCO's true motivation is merely to support its effort to delay unnecessarily the proceedings of this case. That is not proper, and SCO's motion should be denied. This Court has previously held that a party may not use the amendment process as a tactic for obtaining expanded discovery. See Proctor & Gamble Co. v. Haugen, 179 F.R.D. 622, 631 (D. Utah 1998), rev'd on other grounds, 222 F.3d 1262 (10th Cir. 2000) (denying motion to amend complaint where movant admitted that it only sought to amend in order to obtain discovery court had previously denied). Other courts have also denied motions to amend in similar circumstances. See, e.g., Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1518-19 (10th Cir. 1990) (affirming denial of motion to amend where court determined that attempt to amend after deadline was tactical decision by attorneys); Wimm v. Jack Eckerd Corp., 3 F.3d 137, 139-40 (5th Cir. 1993) (affirming denial of motion to amend where the motion appeared to have been brought as a tactic to delay summary judgment); Hughes Aircraft Co. v. Nat'l Semiconductor Corp., 857 F. Supp. 691, 701 (N.D. Cal. 1994) (denying motion to amend where movant should have known about facts underlying amendment at time suit was filed and prior litigation tactics suggested bad faith).

C.     The Addition Of Another New Claim To The Case Would Unduly
       Prejudice IBM.

SCO's motion should also be denied because allowing SCO to amend at this late date

would unduly prejudice IBM.  IBM has long stated its interest in having the important issues

presented by this lawsuit resolved promptly, so that IBM and other Linux users may go about

their business without any of the fear, uncertainty and doubt concerning Linux that SCO (in part

through its multiple lawsuits) has fostered in the marketplace.  Despite SCO's assertions to the

contrary, the new claim SCO seeks to add at the eleventh hour will in fact expand the scope of

the case and prejudice IBM's entitlement to a prompt resolution.

SCO's new claim, among other things, raises issues relating to the negotiation, execution

and performance of the JDA between Santa Cruz and IBM and the specific contents of IBM's

AIX for Power product—issues which are not currently part of this case.  To add this claim at

this point in the discovery process, when there are just a few months left to go, would require

(and has already required) IBM to divert time and resources away from the claims that are

currently part of this case in order to conduct additional discovery and undertake additional

motion practice relating to the new claim.  SCO's attempt belatedly to inject another issue into

the case is particularly prejudicial to IBM given that discovery on the claims in the case is nearly

complete and IBM has already moved for summary judgment on SCO's principal claims and

certain of IBM's counterclaims.

Although SCO contends that its proposed claim for copyright infringement could not be

prejudicial on the grounds that it does not raise any issues beyond those already in the case,

SCO's argument is based on a misreading of IBM's Ninth Counterclaim.  The Ninth

Counterclaim seeks only a declaration that SCO's purported termination of IBM's UNIX System

V licenses—the agreements specified in the first four counts in SCO's Second Amended

Complaint—is invalid and that SCO therefore has no claim for copyright infringement based on

such purported termination.[7]  IBM's Ninth Counterclaim does not seek any declaration concerning any of IBM's rights and obligations under the Project Monterey JDA.  Indeed, it would make little sense for IBM to bring a claim against SCO seeking a declaration of rights relating to the JDA since SCO was not a party to the JDA in the first place.

Tellingly, in support of its contention that the addition of this new copyright infringement claim would not require extensive additional discovery, SCO purports in its current motion (and in its proposed complaint) to have already analyzed its own UnixWare/SVR4 code and IBM's AIX code and identified 245,026 specific lines of "copied and derived code" from UnixWare/SVR4 in IBM's AIX for Power Version 5.1.0 and 260,785 specific lines of "copied and derived code" from UnixWare/SVR4 in IBM's AIX for Power Version 5.2.0.  At the same time, of course, SCO continues to maintain—both in opposition to IBM's pending motion for summary judgment on IBM's Tenth Counterclaim and in support of SCO's discovery motions pending before Magistrate Judge Wells—that SCO is unable, without significant additional discovery from IBM and potentially thousands of additional man-years of expert work, to identify the specific lines of "copied and derived code" from UNIX that it claims is present in Linux.  Indeed, SCO argued before this Court and Judge Wells that it could not capably perform any code comparisons between UNIX and Linux in a reasonable time frame without access to more discovery from IBM (concerning AIX no less).

Like its motions to "enforce" the scheduling order and for an emergency scheduling conference, SCO's motion for leave to amend represents just more gamesmanship.  With the close of discovery fast approaching, SCO seeks to add a claim in order simply to extend discovery once more and forestall for as long as possible the resolution of its baseless claims against IBM.  This last-minute request is prejudicial to IBM and should be denied.

---

[7]  In fact, IBM has offered to stipulate to this limitation on its Ninth Counterclaim.

D.   SCO's Proposed Copyright Claim Is Futile.

SCO's motion should further be denied because the new claim SCO seeks to assert against IBM is futile in any event. It is well-settled in the Tenth Circuit that the Court "properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment". Bauchman v. West High School, 132 F.3d 542, 562 (10th Cir. 1997). Here, SCO's new claim is futile because it has been brought in the wrong forum and is barred by a contractual statute of limitations.

In its opening brief, SCO "recognize[d] that the parties' JDA for Project Monterey contains a forum-selection clause for New York courts" that applies to the new claim brought by SCO. (SCO Mem. at 5.) That provision, Section 22.3 of the JDA, provides in relevant part: "Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York". (Shaughnessy Decl. Ex. 1 § 22.3.)[8]

Under Section 22.3 of the JDA, therefore, SCO's new claim for copyright infringement is subject to dismissal because it was not brought "in a court sited in the State of New York". Moreover, SCO's new claim is also subject to dismissal because it was not brought within the

---

[8]  As SCO concedes, Section 22.3 of the JDA plainly applies to SCO's claim for copyright infringement because the claim is "related to" an alleged breach of the JDA. IBM could only be liable for copyright infringement if IBM exceeded the scope of the license to the purportedly copyrighted materials granted under the JDA. Thus, as is evident from SCO's opening brief and its proposed complaint, SCO's claim for copyright infringement necessarily depends on the interpretation and meaning of the JDA. In such circumstances, courts have routinely held that contractual forum selection clauses apply to other claims brought by a plaintiff, including claims for copyright infringement. See, e.g., Omron Healthcare, Inc. v. Maclaren Exports Ltd., 28 F.3d 600, 603 (7th Cir. 1994) (affirming application of contractual forum selection clause to trademark infringement claim when the resolution of the claim arguably depended on the construction of the agreement); Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc., 949 F. Supp. 1427, 1432-33 (N.D. Cal. 1997) (applying contractual forum selection clause to copyright claim because copyright claim related to interpretation of the contract).

two-year statute of limitations provided for in Section 22.3. SCO alleges in its own proposed complaint that IBM began distributing the AIX for Power product containing the allegedly infringing code "at least by October 2000". (Third Am. Compl. ¶ 229.) Thus, even under SCO's own theory of its claim, IBM first breached the JDA (and therefore began to commit copyright infringement) at least as early as October 2000, meaning SCO was required to bring a claim against IBM by October 2002.[9] As SCO did not bring the instant claim until October 2004, the claim is barred by the applicable statute of limitations.

SCO's only argument that Section 22.3 of the JDA should not be applied in this case is that IBM, by filing its Ninth Counterclaim against SCO, has waived the right to enforce Section 22.3. This argument has no merit. Section 22.11 of the JDA provides unambiguously that "[n]o . . . waiver of any provision of this Agreement shall be effective unless it is set forth in a writing which refers to the provisions so affected and is signed by an authorized representative of each Party." (Shaughnessy Decl. Ex. 1 § 22.11.) IBM has never executed such a writing setting forth its intention to waive Section 22.3 of the JDA, and thus cannot be held to have waived its rights under that provision.

Moreover, and as discussed above (at 16), IBM's Ninth Counterclaim does not, and was never intended to, seek a declaration concerning IBM's rights under the Project Monterey JDA with Santa Cruz. Rather, the Ninth Counterclaim seeks a declaration that IBM's continued distribution of AIX after SCO's purported termination of IBM's UNIX System V licenses with AT&T did not infringe any of SCO's purported copyrights. There is therefore no basis for the Court to infer, as SCO suggests it should, that IBM has waived its rights under Section 22.3 by asserting its Ninth Counterclaim in this case.

---

[9] SCO cannot rely on its contention that it did not discover IBM's allegedly wrongful conduct until recently to avoid Section 22.3. As an initial matter, the statute of limitations in Section 22.3 explicitly runs "from the date of the breach", not the date that such breach was discovered. Furthermore, as discussed above (at 4-11), SCO plainly was aware or should have been aware of IBM's conduct by at least October 2000.

18

Thus, since the new copyright infringement claim SCO seeks to add to the case should be dismissed under Section 22.3 of the JDA because it was brought both in the wrong forum and after the applicable statute of limitations had expired, allowing the claim to be added to the case would be futile. SCO's motion for leave to amend should therefore be denied.

### Conclusion

We respectfully submit that enough is enough. SCO should be required to complete the discovery process concerning the claims and counterclaims that were timely pled in this case. Its consistent efforts to delay and derail that process should finally be put to rest. Accordingly, IBM respectfully requests that the Court deny SCO's Motion for Leave to File a Third Amended Complaint.

DATED this 30th day of November, 2004.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

Of counsel:

INTERNATIONAL BUSINESS
MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 30 day of November, 2004, a true and correct copy of the

foregoing was hand delivered to the following:

      Brent O. Hatch
      Mark F. James
      HATCH, JAMES & DODGE, P.C.
      10 West Broadway, Suite 400
      Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

      Stephen N. Zack
      Mark J. Heise
      BOIES, SCHILLER & FLEXNER LLP
      100 Southeast Second Street, Suite 2800
      Miami, Florida 33131

      Robert Silver
      Edward Normand
      Sean Eskovitz
      BOIES, SCHILLER & FLEXNER LLP
      333 Main Street
      Armonk, New York 10504

                              Amy F. Sorenson

325904.1

**EXHIBIT A**

LEXSEE 1998 U.S. DIST. LEXIS 23035

TWILA HEARD, Plaintiff, vs. BONNEVILLE BILLING AND COLLECTIONS, INC., et al., Defendant(s),

Case No. 2:97-CV-445C

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

*1998 U.S. Dist. LEXIS 23035*

**November 30, 1998, Decided**

**DISPOSITION:** [*1] Plaintiff's motion to amend the complaint DENIED. Defendants' motion to strike DENIED. Plaintiff's motion for summary judgment DENIED and judgment entered in favor of defendants. Plaintiff's motion for summary judgment GRANTED. Plaintiff's motion for summary judgment DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For TWILA HEARD, plaintiff: Lester A. Perry, Mr., KESLER & RUST, SALT LAKE CITY, UT.

For BONNEVILLE BILLING AND COLLECTIONS, defendant: Kira M. Slawson, Dori K Petersen, BLACKBURN & STOLL LC, Paul C Droz, Mr., DROZ REED & WANGSGARD, SALT LAKE CITY, UT.

For BONNEVILLE BILLING AND COLLECTIONS, defendant: Jesse L. Riddle, RIDDLE & ASSOCIATES PC, SANDY, UT.

For WILFORD N. HANSEN JR. P.C., WILFORD N. HANSEN, JR., defendants: Wilford N. Hansen, Jr, Mr., WILFORD N HANSEN JR PC, PAYSON, UT.

**JUDGES:** TENA CAMPBELL, United States District Judge.

**OPINIONBY:** TENA CAMPBELL

**OPINION:**

ORDER

On April 30, 1997, plaintiff Twila Heard filed this action alleging that defendants were engaged in two collection practices that violated state and federal law: (1) splitting of attorneys' fees between Bonneville and its attorneys; and (2) collecting dishonored checks from non-signing joint account holders. The case is now before the court [*2] on the following motions: (1) plaintiff's motion for summary judgment; (2) plaintiff's objection to the proposed order denying leave to amend the complaint; and (3) defendants' motion to strike. The court conducted a hearing on these motions on October 15, 1998, at which plaintiff was represented by Lester Parry and defendants were represented by Paul Droz and Wilford Hansen. Having fully considered the arguments of counsel, the submissions of the parties, and applicable legal authorities, the court now enters the following order.

Background

Bonneville Billing and Collections, Inc. ("Bonneville") is a Utah corporation which is assigned 1500 dishonored checks each day for collection. Before 1994, all attorneys' fees awarded in lawsuits by Bonneville were split between Bonneville and its attorneys. In 1994, the Utah State Bar Association issued recommendations to all collection attorneys reminding them that it was a breach of ethics to split attorneys' fees with their clients. Shortly thereafter, Bonneville's attorneys began retaining 100% of the attorneys' fees collected but began paying Bonneville an amount equivalent to 50% of the attorneys' fees for rent, maintenance of a group [*3] health plan, and use of Bonneville's computer system.

Case 2:03-cv-00294-DN   Document 465   Filed 06/27/05   PageID.3996   Page 24 of 28

Page 2
1998 U.S. Dist. LEXIS 23035, *

When Bonneville receives a dishonored check written on a joint account, Bonneville's collectors routinely enter both names on the face of the check into Bonneville's computer system as "Debtors." Calls are then placed and bad check notices are sent to both account holders listed in the computer system.

In September and October 1996, Tiana Heard wrote three checks payable to three different merchants on a checking account that had been closed. The closed account had been a joint account held by Tiana and her mother, plaintiff Twila Heard.

When Tiana Heard's checks were dishonored by the bank, the merchants referred the checks to Bonneville for collection. Bonneville had previously contacted plaintiff at least twice, on May 14, 1996, and October 17, 1996, regarding dishonored checks written by her daughter. Each time, plaintiff had told the collectors that Tiana Heard was her adult daughter and did not live with plaintiff. Despite collectors' notes in Bonneville's computer system memorializing these conversations, Bonneville continued to send bad check notices and certified letters for the three checks at issue in this case to [*4] plaintiff's home.

On January 25, 1997, Tiana Heard was served with a summons and complaint which named both Tiana Heard and Twila Heard as defendants in a suit to collect the three dishonored checks. The constable also served Tiana Heard with a second copy of the summons and complaint which he asked her to give to plaintiff.

After plaintiff learned that she had been named in a lawsuit, she contacted Bonneville on January 27, 1997, and asked to speak with a supervisor. She was connected to Denise Porter Maw. Plaintiff told Ms. Maw that she had removed her name from the checking account belonging to her adult daughter, that Tiana Heard had written and signed the checks, and that Tiana Heard no longer lived with plaintiff. When plaintiff spoke to Ms. Maw the next day, Ms. Maw said that she had checked with the bank and that plaintiff's name was still listed on the account. After this conversation, plaintiff paid $ 196.39 to Bonneville, which included $ 100.00 in attorneys' fees.

Discussion

I. Motion to Amend

On April 27, 1998, plaintiff filed a motion for leave to amend her complaint. Through the amended complaint, plaintiff sought to maintain this lawsuit as a class [*5] action, to name David Toller, Bonneville's president and sole shareholder, as an additional defendant, and to assert a new claim for civil conspiracy. After hearing argument on August 21, 1998, United States Magistrate Judge Samuel Alba denied plaintiff's motion to amend as both untimely and unnecessary. Plaintiff has filed an objection to Judge Alba's proposed order.

While Rule 15 provides that leave to amend a complaint should be freely given, leave to amend may be properly denied "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc., 3 F.3d 1357, 1365 (10th Cir. 1993)*. In addition, "it is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend." Id.; see also *Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996)* (affirming denial of motion to amend for untimeliness when motion was filed within three months of trial date).

Plaintiff's counsel should have been aware of the facts giving rise to the amended claims at the outset of this action by virtue [*6] of counsel's involvement in the parallel case of Pickering, et al., v. Bonneville Billing & Collections, et al., No. 1:95-CV-125B, filed in 1995. Nonetheless, plaintiff waited one year, until discovery was nearly complete and this case had been set for trial, n1 before seeking to amend her complaint. Plaintiff's motion is untimely and denial of leave to amend was proper on that basis alone.

n1 Trial is set for December 21, 1998.

In addition, the class action plaintiff seeks to bring is substantially similar to the Pickering class action pending before Judge Benson. If plaintiff's counsel wishes to pursue additional claims, leave to amend may be sought in the Pickering case, which is already plead as a class action and has not yet been set for trial. Given that the instant case is set for trial next month, however, allowing plaintiff to allege a class action, name a new defendant, and state a new claim at this time would severely prejudice the defendants. Therefore, leave to amend the complaint is [*7] denied on the basis of undue delay and undue prejudice to the defendants.

II Motion for Summary Judgment n2

n2 In deciding plaintiff's motion to dismiss, the court considered the deposition testimony taken in the Pickering case over the objection of defendants. The court finds that the use of a deposition taken in a previous action is permitted so long as there is sufficient identity of interest in the two actions. See *Minyen v. American Home*

*Assurance, 443 F.2d 788, 791-92 (10th Cir. 1971); Insul-Wool Insulation Corp. v. Home Insulation, Inc., 176 F.2d 502, 503-04 (10th Cir. 1949); see also 23 Am. Jur. 2d Depositions & Discovery § 190* (1983) (indicating that use of deposition taken in prior action is permitted "if there is substantial identity of issues and parties in the two actions"). The court finds that the Pickering case involves substantially similar parties and issues as the instant case and therefore the identity of interest requirement is satisfied. Accordingly, defendants' motion to strike is denied.

[*8]

A. Fee Splitting

Plaintiff contends that Bonneville and its attorneys were involved in illegal fee splitting at the time plaintiff paid Bonneville $ 100.00 in attorneys' fees. Plaintiff claims that the payments made to Bonneville by its attorneys for rent, health insurance, and use of the computer system are actually disguised payments of half of the attorneys' fees awarded in Bonneville's collection cases. Plaintiff seeks a determination by this court that Bonneville's alleged fee splitting practice is illegal and an injunction prohibiting Bonneville from engaging in this practice.

Even assuming that Bonneville's attorneys were improperly splitting legal fees with their client, plaintiff does not have standing to challenge this practice. To satisfy the standing requirement implicit in Article III of the U.S. Constitution, plaintiff bears the burden of showing that she has suffered an "injury in fact" that is traceable to the actions of the defendants and will be redressed by a favorable decision. See *American Forest & Paper Ass'n v. EPA, 154 F.3d 1155, 1158 (10th Cir. 1998)* (holding that association lacked standing to bring claim where it failed to establish [*9] that its members suffered injury).

Here, plaintiff has suffered no injury from Bonneville's alleged fee splitting practice that could be redressed by a favorable decision. Plaintiff does not allege that the amount of attorneys' fees collected from her by defendants was excessive. In fact, it is undisputed that Bonneville's attorneys collected the amount of attorneys' fees authorized by Rule 4-505.01 of the Code of Judicial Administration. Plaintiff's claim relates only to the later distribution of fees collected by Bonneville's attorneys. Because plaintiff has suffered no concrete, particularized injury from defendants' distribution of attorneys' fees, she lacks standing to bring a claim based on Bonneville's alleged fee splitting practice. n3

n3 The prohibition on splitting attorneys' fees with nonlawyers is a disciplinary rule enforceable by the local bar association. If plaintiff suspects defendants of engaging in illegal fee splitting, the proper course of action would be to file a complaint with the Utah State Bar Association in hopes of initiating a disciplinary proceeding.

[*10]

B. Collection from Joint Account Holders

Plaintiff claims that defendants regularly engage in collection activities directed at both joint account holders listed on a dishonored check even though the signer of the check alone is liable. Plaintiff alleges that this collection practice violates the Utah Consumer Sales Practices Act, the federal Fair Debt Collection Practices Act, and Utah Code Ann. § 78-51-31. Because plaintiff's motion to amend her complaint to allege a class action has been denied, the court will look only to the actions taken against Twila Heard to determine if defendants violated these provisions.

1. Utah Consumer Sales Practices Act

The Utah Consumer Sales Practices Act ("the Act") makes it unlawful for a supplier to knowingly and intentionally commit deceptive acts or unconscionable practices in connection with a consumer transaction. See *Utah Code Ann. § § 13-11-4 & -5 (1996).* n4 Plaintiff alleges that defendants violated the Act by intentionally attempting to collect a debt from plaintiff after plaintiff told them that she was not liable for the checks written by her adult daughter. While defendants concede that she was not liable for her daughter's [*11] debt, they insist that collection efforts against plaintiff were not deceptive or unconscionable because plaintiff never received the bad check notices, the telephone calls were merely an attempt to reach Tiana Heard, and plaintiff was named in the lawsuit as a result of a clerical error.

n4 The court has previously determined that defendants are "suppliers" and that collection of dishonored checks is a "consumer transaction" for purposes of the Utah Consumer Sales Practices Act. See Heard v. Bonneville Billing & Collections, et al., No. 2:97-CV-445C, Order (D. Utah Feb. 26, 1998).

Yet the undisputed facts show that after plaintiff had informed Bonneville that she was not liable for her daughter's checks, the defendants continued to phone her and to send bad check notices and certified letters addressed to both women. Further, defendants named plaintiff in a lawsuit to collect the checks even though

the collectors' notes clearly indicated that plaintiff was the debtor's mother and that the family expense [*12] doctrine n5 did not apply. Because defendants' actions suggested that Twila was liable for her daughter's debt when in fact she was not, the defendants' practice was both deceptive and unconscionable in violation of both *Utah Code Ann. § 13-11-4* and § 13-11-5.

n5 Under Utah law, a non-signing joint account holder is generally only liable for a check if the joint account holders are husband and wife and the check was used for a family expense. *Utah Code Ann. § 30-2-9* (1998). Both parties agree that the family expense doctrine is clearly inapplicable to the facts of this case.

The court reserves its decision on the propriety and scope of injunctive relief pursuant to *Utah Code Ann. § 13-11-19(1)(a)* until after trial.

2. Federal Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act ("FDCPA") prohibits a collector from using any false, deceptive or misleading representation in connection with the collection of any debt. See *15 U.S.C. § 1692e.* Plaintiff alleges [*13] that defendants violated subsection 1692e(2)(A) of the Act by misrepresenting the nature of plaintiff's liability for her daughter's checks. Specifically, by sending bad check notices addressed to plaintiff, phoning her regarding the dishonored checks, and naming her in a lawsuit, the defendants misrepresented that plaintiff was liable for her daughter's checks. In response, defendants claim they cannot be held liable under the FDCPA because "the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." *15 U.S.C. § 1692k(c).* Under § 1692k(c), if defendants prove by a preponderance of the evidence that they "maintain 'extensive systems' designed to prevent errors, the unintentional violation of the [FDCPA] will not result in liability. Mere inadvertency is not sufficient to provide a defense." *Dutton v. Wolhar, 809 F. Supp. 1130, 1138 (D. Del. 1992).*

In asserting the bona fide error defense, defendants fail to offer any evidence that they maintain procedures reasonably calculated to avoid erroneously pursuing collection activities against a [*14] joint account holder who is not liable for the debt. To the contrary, the evidence is undisputed that it was defendants' routine practice to attempt to collect from both holders of a joint account. Specifically, Bonneville's collectors entered both names on a joint account into its computer system as debtors against whom collection action would be taken. Bonneville's collectors would then contact both account holders by phone and by mail in an attempt to collect on the debt. See *Martinez v. Albuquerque Collection Services, 867 F. Supp. 1495, 1502-03 (D. N.M. 1994)* ("The purpose of the bona fide error defense is to protect collectors in cases of inadvertent 'clerical errors' . . . no to shield collectors from liability for systematic errors or abuses"). Furthermore, although defendants claim that naming plaintiff in the lawsuit to collect on her daughter's checks was a clerical error, defendants have produced no evidence that procedures were in place to guard against such an error. Because defendants have not shown by a preponderance of the evidence that they maintained procedures reasonably calculated to avoid improper collection activities against joint account holders, [*15] the bona fide error defense fails.

The court finds that by mailing collection notices addressed to plaintiff and by naming plaintiff in a lawsuit, defendants falsely represented that plaintiff was liable for her daughter's debt in violation of *15 U.S.C. § 1692e(2)(A).* See *Dutton, 809 F. Supp. at 1137* (finding violation of § 1692e(2)(A) as a matter of law where unsophisticated consumer would have believed herself obligated to pay debt incurred by her mother). Because defendants have failed to assert a valid defense, plaintiff is entitled to summary judgment on this claim. See *Martinez, 867 F. Supp. at 1503.*

3. Utah Code Ann. § 78-51-31

Utah Code Ann. § 78-51-31 prohibits attorneys from engaging in deceit or collusion with intent to deceive a court. See Utah Code Ann. § 78-15-31 (1996). Plaintiff has alleged that defendants violated this statute by improperly suing plaintiff to collect on her daughter's debt. Defendants argue that the inclusion of plaintiff's name on the complaint was a clerical error and was not done with "intent to deceive a court." The court finds that defendants have raised a question of material [*16] fact and therefore denies summary judgment on this claim.

Order

For the reasons stated above, the court orders as follows:

(1) Plaintiff's motion to amend the complaint is DENIED.

(2) Defendants' motion to strike is DENIED.

(3) Plaintiff's motion for summary judgment is DENIED and judgment entered in favor of defendants as to the following claims arising from Bonneville's alleged fee splitting practice:

1998 U.S. Dist. LEXIS 23035, *

(a) violation of *Utah Code Ann. § 7-15-1;*

(b) violation of the federal Fair Debt Collection Practices Act;

(c) violation of Utah Consumer Sales Practices Act; and

(d) violation of Utah Code Ann. § 78-51-31.

(4) Plaintiff's motion for summary judgment is GRANTED as to the following claims arising from Bonneville's collection activity directed at Twila Heard as a joint account holder:

(a) violation of the federal Fair Debt Collection Practices Act; and

(b) violation of Utah Consumer Sales Practices Act.

(5) Plaintiff's motion for summary judgment is DENIED as to the following claim arising from Bonneville's collection activity directed at Twila Heard as a joint account holder:

(a) violation of Utah Code Ann. § 78-51-31.

[*17]

SO ORDERED this 30 day of November, 1998.

BY THE COURT:

TENA CAMPBELL

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2005, a true and correct copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
Sean Eskovitz
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

Amy F. Sorenson