

FILED
U.S. DISTRICT COURT

2005 JUL -5 P 4: 46

DISTRICT OF UTAH

BY:_____
        DEPUTY CLERK

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Attorneys for The SCO Group, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>     Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>     Defendant/Counterclaim-Plaintiff | **UNSEALED EXHIBITS TO MEMORANDUM IN OPPOSITION TO DEFENDANT INTERNATIONAL BUSINESS MACHINES' MOTION FOR SUMMARY JUDGMENT ON ITS TENTH COUNTERCLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**<br>[Docket No. 206]<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

# EXHIBIT S-2

# In The Matter Of:

*THE SCO GROUP, INC., v.*
*INTERNATIONAL BUSINESS MACHINES CORPORATION*

---

## DAVID P. RODGERS
*June 10, 2004*

---

# *LEGALINK MANHATTAN*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

RODGERS, DAVID P.



LEGALINK
A WORDWAVE COMPANY

DAVID P. RODGERS

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
--oOo--

THE SCO GROUP, INC.,          )
                              )
      Plaintiff/              )
      Counterclaim-Defendant, )
                              ) Case No.
      -against-               ) 203CV-0294 DAK
                              )
INTERNATIONAL BUSINESS        )
MACHINES CORPORATION,         )
                              )
      Defendant/              )
      Counterclaim-Plaintiff. )
_____)

DEPOSITION OF
DAVID P. RODGERS

_____

Thursday, June 10, 2004
Volume 1 (Pages 1 - 216)

REPORTED BY:  ANA M. DUB, RMR, CRR, CSR 7445 (03-351091)

---

Page 2

```
1              I N D E X
2         INDEX OF EXAMINATIONS
3                                    Page
4   EXAMINATION BY MR. KAO ............... 6
5   EXAMINATION BY MR. HEISE ............. 52
6   FURTHER EXAMINATION BY MR. KAO ...... 178
7   FURTHER EXAMINATION BY MR. HEISE .... 201
8   FURTHER EXAMINATION BY MR. KAO ...... 210
9   FURTHER EXAMINATION BY MR. HEISE .... 214
10
11
12   DEPOSITION EXHIBITS MARKED FOR IDENTIFICATION
13   No.    Description              Page
14   100    Declaration of David P. Rodgers ........... 12
15   101    Letter on the Letterhead of AT&T Dated ...... 163
            August 5, 1985 to Sequent Computer Systems,
16          Inc., from AT&T Information Systems
17   102    Letter on the Letterhead of AT&T Dated ...... 163
            June 24, 1986 to Sequent Computer Systems,
18          Inc., from AT&T Information Systems
19   103    Letter on the Letterhead of AT&T Dated ...... 163
            July 27, 1987 to Sequent Computer Systems,
20          Inc., from AT&T Information Systems
21
22
23
24
25
```

---

Page 3

```
1            A P P E A R A N C E S
2
3   FOR THE PLAINTIFF AND COUNTERCLAIM DEFENDANT THE SCO
    GROUP, INC.:
4
        BOIES SCHILLER & FLEXNER LLP
5       BY:  MARK J. HEISE, ATTORNEY AT LAW
        100 Southeast Second Street, Suite 2800
6       Miami, Florida 33131
            Telephone:  (305) 539-8400
7           E-Mail:  mheise@bsfllp.com
8   and
9       HATCH, JAMES & DODGE, P.C.
        BY:  MARK F. JAMES, ATTORNEY AT LAW
10      10 West Broadway, Suite 400
        Salt Lake City, Utah  84101
11          Telephone:  (801) 363-6363
            E-Mail:  mjames@hjdlaw.com
12
13  FOR THE DEFENDANT AND COUNTERCLAIM PLAINTIFF
    INTERNATIONAL BUSINESS MACHINES CORPORATION AND THE
14  DEPONENT:
15      CRAVATH, SWAINE & MOORE LLP
        BY:  CHRISTOPHER KAO, ATTORNEY AT LAW
16      Worldwide Plaza
        825 Eighth Avenue
17      New York, New York  10019-7475
            Telephone:  (212) 474-1342
18          E-Mail:  ckao@cravath.com
19              --oOo--
20  ALSO PRESENT:
21      VIDEO SOLUTIONS, A LegaLink Company
        PATRICK MURRAY, VIDEOGRAPHER
22      50 First Street, Suite 507
        San Francisco, California  94105-2415
23          Telephone:  (415) 546-6400
24              --oOo--
25
```

---

Page 4

```
1       IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF UTAH
3                 --oOo--
4   THE SCO GROUP, INC.,          )
                                  )
5       Plaintiff/               )
        Counterclaim-Defendant,  )
6                                 ) Case No.
        -against-                 ) 203CV-0294 DAK
7                                 )
    INTERNATIONAL BUSINESS         )
8   MACHINES CORPORATION,          )
                                  )
9       Defendant/                )
        Counterclaim-Plaintiff.   )
10  _____)
11              --oOo--
12      BE IT REMEMBERED that, pursuant to Subpoena,
13  and on Thursday, June 10, 2004, commencing at 8:06 a.m.
14  thereof, at the Doubletree Hotel, 2050 Gateway Place,
15  Santa Clara, California, before me, Ana M. Dub, a
16  Certified Shorthand Reporter, Registered Merit Reporter,
17  and Certified Realtime Reporter, personally appeared
18              DAVID P. RODGERS
19
20  called as a witness by the Defendant and Counterclaim
21  Plaintiff International Business Machines Corporation,
22  who, having been first duly sworn, was examined and
23  testified as follows:
24
25
```

LEGALINK MANHATTAN (212) 557-7400

DAVID P. RODGERS

Page 5

1           - -oOo--
2              P R O C E E D I N G S
3      THE VIDEOGRAPHER: Here begins Videotape No. 1
4   in the deposition of David Rodgers, in the matter of The
5   SCO Group v. IBM, in U.S. District Court, District of
6   Utah, Case No. 2:03CV-0294 DAK.
7      Today's date is June 10th, 2004. The time on
8   the video monitor is 8:06.
9      The video operator today is Patrick Murray, a
10  notary public, contracted by LegaLink New York of
11  New York, New York.
12     This video deposition is taking place at 2050
13  Gateway Place, San Jose, California, and was noticed by
14  Christopher Kao of Cravath, Swaine & Moore.
15     Counsel, please voice-identify yourselves and
16  state whom you represent.
17     MR. KAO: Chris Kao, with Cravath, Swaine &
18  Moore LLP, on behalf of defendant IBM and the witness
19  here today, Mr. Rodgers.
20     MR. HEISE: Mark Heise, from Boies Schiller,
21  on behalf of The SCO Group; and here with me today is
22  Mark James, also on behalf of The SCO Group, from Hatch,
23  James & Dodge.
24     THE VIDEOGRAPHER: The court reporter today is
25  Ana Dub of LegaLink.

Page 6

1      Will the reporter please swear in the witness.
2              DAVID P. RODGERS,
3   sworn by the Certified Shorthand Reporter,
4         testified as follows:
5         EXAMINATION BY MR. KAO
6      MR. KAO: Q. Good morning. Can you please
7   state your full name for the record, Mr. Rodgers.
8      A.  Yes. I'm David Parran Rodgers.
9      Q.  And can you please state your full address.
10     A.  21359 Toll Gate Road, Saratoga, California.
11     Q.  Can you review your educational history with
12  me, for the record, after high school?
13     A.  Okay. I attended Carnegie-Mellon University,
14  Pittsburgh, Pennsylvania. I graduated in 1968 with a
15  Bachelor of Science in electrical engineering.
16     Q.  Did you do any studies after that?
17     A.  I did an incomplete M.B.A. program at Clark
18  University in Worcester, Massachusetts.
19     Q.  Now, can you review your -- briefly review
20  your employment history for me after graduating from
21  Carnegie-Mellon?
22     A.  Right. I worked for a time for
23  Carnegie-Mellon University. After Carnegie-Mellon, I
24  joined Digital Equipment Corporation in Maynard,
25  Massachusetts. After Digital Equipment, I joined

Page 7

1   Sequent Computer Systems in Portland, Oregon. After
2   Sequent, Compaq Computer Systems in Houston, Texas.
3   After Compaq, I joined Brightlink Networks in Sunnyvale,
4   California. And after Brightlink, IP Unity in Milpitas,
5   California, where I'm currently employed.
6      Q.  Can you tell me approximately the years that
7   you were at Digital?
8      A.  I was employed by Digital from 1973 to 1983.
9      Q.  And what years were you employed at Sequent?
10     A.  From 1983 to 1996.
11     Q.  Can you review the positions that you held at
12  Sequent from 1983 to 1996?
13     A.  Yes. I joined the company as the
14  vice president of engineering. After vice president of
15  engineering, I was the chief information officer.
16  During a posting in France, I was responsible for remote
17  development sites in Europe and in Japan. And when I
18  returned to the United States, I was head of the
19  professional services organization.
20     Q.  While you were the vice president of
21  engineering, you were based in the --
22     A.  In --
23     Q.  -- United States?
24     A.  -- Portland, Oregon.
25     Q.  And when was your posting overseas?

Page 8

1      A.  From 1991 to 1993.
2      Q.  And when you returned in 1993, you were then
3   in professional services?
4      A.  Yes.
5      Q.  And what responsibilities did you have while
6   you were in the professional services group?
7      A.  It was principally interacting with customers
8   and go-to-market partners around solution creation,
9   systems engineering, helping customers to architect
10  large-scale enterprise business applications.
11     Q.  And from approximately 1986 -- or excuse me --
12  1983 to 1991, you were the vice president of
13  engineering?
14     A.  That's correct.
15     Q.  Can you describe for me the responsibilities
16  that you had while you were the vice president of
17  engineering?
18     A.  Right. My -- the product of Sequent at the
19  time consisted of a hardware platform, an operating
20  system, and some additional application software to make
21  that system useful. My responsibilities were to
22  supervise the hardware development, the software
23  development, the documentation, and the testing of those
24  two products.
25     Q.  By the "two products," you mean the

2 (Pages 5 to 8)

DAVID P. RODGERS

Page 9

1   operating --
2       A. The hardware and the software.
3       Q. -- system?
4       A. The operating system and the hardware.
5       Q. Okay. And sorry. Maybe I'm getting confused.
6   I think you mentioned that there was a hardware
7   platform, operating system software, and then
8   application software.
9       A. Right.
10      Q. So as the vice president of engineering, you
11  were responsible for what with respect to those three
12  categories?
13      A. I supervised the individuals doing the work.
14      Q. After leaving Sequent in 1996, I believe you
15  said you went to Compaq.
16      A. That's correct.
17      Q. How many years were you employed at Compaq?
18      A. Approximately three years. Two of the years I
19  was posted in Houston, and the third year I was posted
20  in California, Cupertino.
21      Q. And can you briefly describe for me what your
22  responsibilities were at Compaq?
23      A. Right. I joined Compaq as vice president of
24  business applications, which was both an engineering and
25  a marketing responsibility that comprised relationships

Page 10

1   with key application providers like SAP, Baan,
2   PeopleSoft, Oracle, Microsoft, and some others.
3           And the engineering component of that job was
4   to create configuration tools and go-to-market aids for
5   the Compaq indirect sales channel.
6       Q. And approximately what year did you leave
7   Compaq?
8       A. It was in 1999, right at the end.
9       Q. And you went to Brightlink Networks?
10      A. I went to Brightlink Networks, yes.
11      Q. How long were you at Brightlink?
12      A. About two years. The company ceased
13  operations.
14      Q. In approximately 2001?
15      A. It ceased operations in, I think, April of
16  2001. Might have been a little later. The winding down
17  took some time.
18      Q. And after that, you went to IP Unity?
19      A. Yes.
20      Q. And what is it you currently do at IP Unity?
21      A. I'm responsible for hardware and software
22  development of an enhanced services product for
23  telephony; "enhanced services" meaning voice mail,
24  conferencing, other applications such as find-me,
25  follow-me, caller screening.

Page 11

1       Q. Forgive me. I think I skipped over this
2   earlier, but of course, at any time during this
3   deposition if you need to take a break, just let me know
4   and we'll take a break. And if I ask you any questions
5   that you don't understand, let me know and I'll try to
6   rephrase so you understand what I'm asking.
7           I guess I should also ask if you've ever been
8   deposed before.
9       A. Yes, I have.
10      Q. Can you tell me in what circumstance you were
11  deposed before?
12      A. I was a party in an automobile accident case,
13  and I gave my deposition as a result of that suit, and
14  the case was eventually settled.
15      Q. You did not end up testifying at trial in that
16  case?
17      A. I did not.
18      Q. And how long ago was that?
19      A. It was in -- I don't remember the date of the
20  deposition, but it was in 2001 that the accident took
21  place.
22      Q. Did that accident occur around here?
23      A. It occurred very near my home.
24      MR. KAO: Okay. For the record, at the
25  Frasure deposition, I screwed up and we didn't use

Page 12

1   consecutive numbering; but at -- my understanding is
2   today at the Wilson deposition, they're going to pick up
3   where Sontag left off --
4       MR. HEISE: Okay.
5       MR. KAO: -- which I believe was 74. So
6   they're going to start with 75.
7       MR. HEISE: Okay.
8       MR. KAO: So I'm going to start -- we'll just
9   have this marked as 100. That should give enough
10  space --
11      MR. HEISE: That's fine.
12      MR. KAO: -- I think.
13          And I'm sorry about the --
14      MR. HEISE: We knew it was going to happen.
15  It was just a matter of when.
16      MR. KAO: So this will be Exhibit 100.
17      (Whereupon, Defendant's Exhibit 100 was
18          marked for identification.)
19      MR. KAO: Q. You've been handed by the court
20  reporter, Mr. Rodgers, what's been marked as Exhibit 100
21  in this case. And I'll ask you to review this exhibit,
22  and my first question, after you've had a chance to
23  review it, is whether or not you recognize what
24  Exhibit 100 is.
25      A. Yes. This is my deposition, prepared last

3 (Pages 9 to 12)

DAVID P. RODGERS

Page 13

1    year.
2       Q.  Declaration?
3       A.  I'm sorry.  Declaration.  Sorry.
4       Q.  Just to clarify, have you been deposed in this
5    case --
6       A.  I have not been deposed --
7       Q.  -- apart from today?
8       A.  -- in this case before today.  I'm sorry.
9       Q.  And if you look at page 6 of this declaration,
10   is that your signature, Mr. Rodgers?
11      A.  Yes, it is.
12      Q.  Now, without -- as your counsel, I instruct
13   you not to reveal any communications you had -- direct
14   communications you've had with me.  But without doing
15   so, can you describe how it is that this declaration,
16   Exhibit 100, came to be prepared?
17      A.  Certainly.  I was contacted by your office, I
18   think by you personally, to ask if I recalled the fact
19   situation around some contracts between AT&T and
20   Sequent.  And after some discussion and some question
21   and answer, a draft declaration was prepared by your
22   offices.  I received that draft, edited it, corrected
23   it, made it conform to my recollection.  And then a
24   final form was prepared for my signature.  I executed it
25   and returned it to you.

Page 14

1       Q.  Do you have in your possession any of the
2    markups that you did --
3       A.  I do not.
4       Q.  -- on the draft?
5       A.  I do not.
6       Q.  I'll ask you to take your time to review each
7    of the paragraphs in your declaration, and after you've
8    done so, can you let me know?
9       A.  Certainly.
10          I'm ready.
11      Q.  Do you believe everything that you've stated
12   in your declaration to be true and accurate --
13      A.  Yes.
14      Q.  -- to the best of your knowledge?
15          Is there anything about -- anything in this
16   declaration that you wish to change?
17      A.  No.  It's an accurate statement.
18      Q.  Okay.  Now, turning back just to the page
19   that's marked page 2, I'll ask you to look now at some
20   specific paragraphs within your declaration.
21          First, as to paragraph 1, is everything
22   contained in paragraph 1 true and accurate?
23      A.  Yes.
24      Q.  Okay.  Looking at paragraph 2, is everything
25   contained in paragraph 2 true and accurate?

Page 15

1       A.  Yes.
2       Q.  Now, in paragraph 2 you state that you
3    executed several agreements with AT&T Technologies for
4    the licensing of Unix software.  Do you see that?
5       A.  Yes.
6       Q.  And attached as Exhibit 1 there is a document
7    titled "AT&T Technologies, Inc., Software Agreement."
8    Do you see that?
9       A.  Mm-hmm, yes.
10      Q.  Can you look at that exhibit?  Do you
11   recognize this document?
12      A.  Yes, I do.
13      Q.  Can you tell me what it is?
14      A.  This particular document gives Sequent the
15   right to access the source code for AT&T software and
16   essentially to use it to produce additional works on the
17   Sequent hardware.
18      Q.  And do you recall what particular software
19   this software agreement related to?
20      A.  It was a version of AT&T System V.  I don't
21   actually remember which edition of AT&T System V it was.
22   I think it was 5.2, but I don't recall.
23      Q.  Unix System V?
24      A.  Unix System V.
25      Q.  And at the bottom of the page on this

Page 16

1    agreement, there's a signature there.  Is that your
2    signature?
3       A.  It is.
4       Q.  And you executed this software agreement on
5    behalf of Sequent?
6       A.  I did.
7       Q.  If you can look at the document behind Tab 2,
8    which is titled "AT&T Technologies, Inc., Sublicensing
9    Agreement."
10      A.  Yes.
11      Q.  Do you see that?
12      A.  Mm-hmm.
13      Q.  Do you recognize this agreement?
14      A.  Yes, I do.
15      Q.  Can you tell me what this agreement is?
16      A.  This agreement gives Sequent the right to
17   distribute the work, based on the AT&T System V source
18   code that was previously licensed, to its customers,
19   both directly and indirectly.
20      Q.  And at the bottom of the first page, there's a
21   signature there.  Is that your signature?
22      A.  It is.
23      Q.  And did you execute this sublicensing
24   agreement on behalf of Sequent?
25      A.  I did.

4 (Pages 13 to 16)

DAVID P. RODGERS

Page 17

1    Q.  And if you can look with me at the document
2  behind Tab 3, which is titled "AT&T Technologies, Inc.,
3  Substitution Agreement," do you recognize this
4  agreement?
5    A.  I do.
6    Q.  Can you tell me what this is?
7    A.  I don't recall the precise terms that were
8  being modified, but it essentially was an agreement
9  between the companies to change certain specific terms
10 of the earlier agreement.
11   Q.  And is that your signature at the bottom of
12 the page?
13   A.  It is.
14   Q.  And did you execute this agreement on behalf
15 of Sequent?
16   A.  I did.
17   Q.  And turning back to your declaration itself,
18 at paragraph 2 of your declaration, are the three
19 agreements that we just looked at the agreements that
20 you discuss in paragraph 2 of your declaration?
21   A.  Yes, they are.
22   Q.  Now, if you can turn to page 3 of your
23 declaration, I'll refer you to paragraph 5; and I'll ask
24 you, for the record, just to read your statement in
25 paragraph 5.

Page 18

1    A.  Yes.
2  "Although I did not personally negotiate the
3    Sequent Agreements with representatives of
4    AT&T Technologies, I carefully reviewed the
5    agreements myself and with other Sequent
6    employees before executing them and have
7    personal knowledge of the parties'
8    understanding of, and intent behind, the
9    terms and conditions of the agreements."
10   Q.  Is that a true and accurate statement?
11   A.  It is.
12   Q.  And can you explain to me what your
13 involvement was with the negotiation and execution of
14 the agreements that you executed on behalf of Sequent?
15   A.  Yes.  At the time, Sequent had need to extend
16 its basic product offering, the Dynix operating system,
17 to allow additional applications that were built for the
18 AT&T System V operating environment, which is different
19 than the Unix BSD 4.2 environment that the Sequent
20 product was built upon.  And so Sequent needed to have
21 access to the source code in order to make that
22 possible.  Roger Swanson and others in the software
23 development team worked with people at AT&T to secure a
24 license to that source code so that the work could
25 begin.

Page 19

1         And my role in that was to review the
2  documents and to ascertain the intent of the parties,
3  make sure that we were getting what we needed and that
4  it was a fair deal.
5    Q.  During the course of the negotiations with
6  AT&T, did you have any personal interactions with anyone
7  from AT&T?
8    A.  From time to time, I participated in
9  conference calls.  I don't recall -- it's possible, but
10 I don't recall that we ever met face to face.  I think
11 they were all telephone interactions.
12   Q.  And on these conference calls, were the terms
13 of the licensing agreements discussed?
14   A.  Yes, they were.
15   Q.  Do you remember who from AT&T was on these
16 conference calls?
17   A.  I do not.  The one thing I do remember is that
18 it wasn't the guy who signed the agreement.  It wasn't
19 Mr. Wilson.  It was another guy, but I don't remember
20 who it was.
21   Q.  Do you -- have you ever had any interactions
22 with Mr. Wilson?
23   A.  I might have since.  I mean, I might have met
24 him at some conference or something like that, but not
25 during this time.

Page 20

1    Q.  Do you remember what other Sequent
2  representatives were on the conference calls with AT&T?
3    A.  Usually, it would have been Roger Swanson, who
4  is the director of software engineering.  We may have
5  included some of the key software engineers at the time
6  that we were discussing particular technical issues.
7    Q.  Do you remember who those individuals were?
8    A.  I don't remember precisely.  It probably would
9  have been Bob Beck, who was the principal software
10 architect for the Dynix operating system.  Might have
11 been Bob Kasten, who was also a principal software
12 engineer.  But I don't have a precise recollection.
13   Q.  You've mentioned in your testimony the Dynix
14 operating system.  Can you just explain --
15   A.  Yes.
16   Q.  -- what you're referring to when you say that?
17   A.  Yes.  Sequent -- the principal product, as I
18 mentioned earlier, of Sequent was a hardware platform
19 that consisted of multiple microprocessors sharing a
20 common memory structure, and the operating environment
21 was a variant of Unix that was derived from the Berkeley
22 Standard Distribution 4.2 code.  So Dynix was a variant
23 adapted to the multiple microprocessor architecture of
24 the Sequent hardware.
25   Q.  Did you have any involvement in developing the

5 (Pages 17 to 20)

DAVID P. RODGERS

Page 21

1    Dynix operating system?
2        A.   I wouldn't claim architectural or any
3    authorship.  Yes, of course I wrote programs and
4    reviewed plans, and I had a direct involvement in the
5    development of the Dynix operating system, but I would
6    not consider myself an author of the software.
7        Q.   Do you recall approximately when the first
8    version of the Dynix operating system was created?
9        A.   The first working version probably was created
10   sometime in early 1984.
11       Q.   And do you specifically recall that the Dynix
12   operating system was based on the Berkeley -- the BSD
13   4.2 release, or is that --
14       A.   No.  That's --
15       MR. HEISE:  Objection to form.
16       You may answer.
17       MR. KAO:  Q.  Oh, I should also note that
18   during the course of the deposition, counsel may object.
19   So you should give -- before answering any of my
20   questions, you should pause and allow counsel to
21   interpose an objection.
22       A.   Shall I answer?
23       Q.   Yeah, you can answer if you --
24       A.   Yes, the Dynix operating system was based on
25   the Berkeley Standard Distribution 4.2 version.

Page 22

1        Q.   Going back to the conference calls you
2    discussed being a part of with AT&T, what was the
3    purpose of those calls, to the best you can recall?
4        A.   The licensing agreement is somewhat vague, and
5    so we wanted to understand the meaning or the intent of
6    some of the paragraphs.
7        Q.   Let's turn back to your declaration.  And
8    looking at paragraph 6, I'll ask you to read paragraph 6
9    for the record, if you could.
10       A.   Yes.
11       "It was my understanding that the licensing
12   agreements that I executed were standard form
13   agreements used by AT&T Technologies to
14   license Unix software products to its users.
15   The Software Agreement granted Sequent the
16   right to use Unix software products,
17   including source code, for its internal
18   business purposes.  The agreement further
19   granted Sequent the right to modify Unix
20   software products and to prepare" --
21       THE COURT REPORTER:  Excuse me.
22       MR. KAO:  You may need to read a little slower
23   so the court reporter can get everything down.
24       THE WITNESS:  Oh, excuse me.  Where shall I
25   pick up?

Page 23

1        (Record read.)
2        THE WITNESS:  "The agreement further
3    granted Sequent the right to modify Unix
4    software products and to prepare derivative
5    works based upon such products."
6        MR. KAO:  Q.  Are your statements in
7    paragraph 6 true and accurate?
8        A.   Yes.
9        Q.   And can you explain what you mean by the
10   statement that it was your understanding that the
11   licensing agreements were standard form agreements?
12       A.   Yes.  If I may give you some context, AT&T's
13   interest at this point in time was to create a broader
14   following for the System V variation of Unix, and so
15   the -- they had a kind of a proselytizing or marketing
16   program going on to get people signed up to use the AT&T
17   Unix variant.
18       As a consequence of that, there were
19   applications written for the System V variant of Unix
20   that Sequent wanted to have access to; and so we needed
21   to license from AT&T the specific elements, the specific
22   APIs that were necessary to allow those -- those
23   applications to run.
24       That meant that we needed to look at the
25   source code, take those little elements of the source

Page 24

1    code that were System V specific, and weld them into the
2    Dynix operating system environment.
3        Q.   When you say "APIs," what do you mean by that?
4        A.   Application programming interfaces.
5        Q.   Do you remember, sitting here today, what
6    specific elements of the Unix System V program Sequent
7    wanted access to?
8        A.   I don't recall a specific -- I mean, I can say
9    generally that it was the system calls of System V,
10   which are somewhat different than the system calls of
11   Berkeley, but I don't remember precisely which
12   application needed which system call.
13       Q.   And can you just describe for me what a system
14   call is?
15       A.   Right.  An operating system generally is a
16   resource allocation piece of programming.  And things
17   that the operating system allocates are pieces of
18   memory, access to a processor, access to a storage
19   device such as a disk, access to a terminal device.  The
20   system calls are the way the software expresses the need
21   to access one of those resources.
22       Q.   I guess, going back to a question that I
23   asked, I'm not sure -- maybe I asked it unclearly --
24   about your -- that you answered the question earlier
25   that I had asked about what it is you meant by the fact

6 (Pages 21 to 24)

DAVID P. RODGERS

Page 25

1  that you executed standard form agreements used by AT&T
2  Technologies.
3      A.  Yes.  AT&T provided a document, and -- which
4  is the document that's here under Tab 1, and they
5  represented it as the form that they used routinely with
6  all of their customers, all of their partners, to
7  provide access to the source code.
8      Q.  Did anyone from AT&T at any point ever
9  communicate to you that they intended to treat their
10 licensees for Unix System V the same way?
11     MR. HEISE:  Objection to form.
12     You may answer.
13     THE WITNESS:  I don't recall that particular
14 content.
15     MR. KAO:  Q.  Turning now to paragraph 7 of
16 your declaration, can you read paragraph 7 —
17     A.  Yes.
18     Q.  -- for me, please.
19     A.  "Section 2.01 of the Software Agreement
20     states that Sequent's right to use includes
21     the right to modify such SOFTWARE PRODUCT and
22     to prepare derivative works based on such
23     SOFTWARE PRODUCT, providing that the
24     resulting materials are treated hereunder as
25     part of the original SOFTWARE PRODUCT.'  I

Page 26

1      did not understand this language to give AT&T
2      Technologies the right to assert ownership or
3      control over modifications or derivative
4      works prepared by Sequent, except to the
5      extent that the licensed Unix software
6      product was included in such modifications or
7      derivative works.  I would never have signed
8      an agreement that would grant ownership or
9      control to AT&T Technologies over
10     modifications or derivative works prepared by
11     Sequent to the extent those modifications or
12     derivative works contained no part of the
13     Unix software product licensed from AT&T
14     Technologies."
15     Q.  Are the statements that you make in
16 paragraph 7 of your declaration true and accurate?
17     A.  They are.
18     Q.  Can you -- well, first, let's look at the
19 document behind Tab 1, at the software agreement.
20     A.  Yes.
21     Q.  Is the language that you read from in your
22 declaration contained in Section 2.01 of this agreement
23 that's attached as Tab 1?
24     A.  Yes, it is.
25     Q.  And can you explain to me -- well, strike

Page 27

1  that.
2      You state that you did not understand this
3  language to give AT&T Technologies the right to assert
4  ownership or control over modifications or derivative
5  works prepared by Sequent, except to the extent that the
6  licensed Unix software product was included in such
7  modifications or derivative works.
8      Do you see that?
9      MR. HEISE:  Objection; form.
10     You may answer.
11     MR. KAO:  Q.  Do you see that in your
12 declaration?
13     A.  Yes, I do see that.
14     Q.  Can you explain to me what you mean by that?
15     A.  It would have been foolish of me, as an
16 officer of a venture finance start-up company, to give
17 away the rights to the company's core products in
18 perpetuity.  I mean, I certainly would not have done
19 that.  So my understanding -- and this was confirmed in
20 some phone calls -- my understanding was that what AT&T
21 wanted to hold private was their contribution, their
22 source code contribution, and that that work which had
23 already been created by Sequent and any work that in the
24 future was created by Sequent, not based upon that
25 source code, remained the property of Sequent.

Page 28

1      Q.  Did you understand Section 2.01 of the
2  software agreement to impose any restrictions on
3  Sequent's use of code that Sequent developed on its own?
4      A.  No, I did not.
5      Q.  Even if that code was contained in a Dynix
6  product that had Unix System V code in it?
7      MR. HEISE:  Objection to form.
8      You may answer.
9      THE WITNESS:  Yes.  My understanding of the
10 license is that the Unix System V code had to be
11 maintained as the AT&T private property and withheld
12 from disclosure but, if there were other elements of the
13 software product created by Sequent, that those were
14 Sequent's to dispose of as it chose.
15     MR. KAO:  Q.  If you can turn to page 4 of
16 your declaration, I'll have you read paragraph 8 of your
17 declaration, if you could.  I guess, for the court
18 reporter's benefit and for the jury's benefit, if you
19 could take your time and read it slowly.
20     A.  Certainly.
21     "As I understood the Software Agreement
22     between Sequent and AT&T Technologies,
23     Sequent was free to use, copy, distribute or
24     disclose any modifications or derivative
25     works developed by Sequent, provided that it

7 (Pages 25 to 28)

DAVID P. RODGERS

Page 29

1    did not copy, distribute or disclose any
2    portion of the licensed Unix software product
3    source code (except as otherwise permitted by
4    the licensing agreements)."
5        Q.   Are the statements that you make in
6    paragraph 8 of your declaration —
7        A.   They are.
8        Q.   -- true and accurate?
9        And can you tell me what you base your
10   understanding of the software agreement on?
11       A.   A combination of reading of the document and
12   conversations with my staff and the AT&T parties to the
13   agreement.
14       Q.   And when you say "my staff," can you --
15       A.   Principally, Roger Swanson and Bob Beck and
16   others.
17       Q.   And is that the understanding you had when you
18   executed these agreements?
19       A.   Yes, it is.
20       Q.   I'll ask you to now read paragraph 9 into the
21   record, if you could. Take your time.
22       A.   "It is my understanding that Sequent's
23       Dynix products might include some small parts
24       of the licensed Unix System V source code,
25       although I don't [sic] personally know

Page 30

1    whether it does or not. I also do not know
2    whether Dynix is so similar to Unix System V
3    that it may be" -- "may properly be viewed as
4    a 'derivative work' based on Unix System V,
5    particularly in light of the fact that Dynix
6    was originally created using Berkeley
7    Software Design" -- parenthetically --
8    "('BSD') Unix as a base and not AT&T
9    Technologies' Unix System V. In any event,
10   as I understood the Sequent Agreements,
11   Sequent was free to use, copy, distribute, or
12   disclose Dynix (including source code),
13   provided that it did not copy, distribute or
14   disclose any Unix System V source code that
15   might be contained therein (except as
16   otherwise permitted by the licensing
17   agreements)."
18       Q.   Mr. Rodgers, are the statements that you make
19   in paragraph 9 of your declaration true and accurate?
20       A.   Yes, they are.
21       Q.   Now, in paragraph 9 you discuss the fact
22   that -- well, strike that.
23       Do you know -- do you have any personal
24   knowledge as to what Unix System V code is contained in
25   Dynix?

Page 31

1        A.   I do not.
2        Q.   Do you have any personal knowledge as to what
3    BSD Unix code is contained in Dynix?
4        A.   A substantial portion, but I couldn't claim to
5    know what proportion.
6        Q.   What is your understanding of what the term
7    "derivative work" means?
8        A.   A derivative work is something that contains
9    all or part of some other piece of work.
10       Q.   Do you have an understanding of what the term
11   "modifications" mean?
12       A.   "Modifications" means either an augmentation,
13   meaning an additional function, or a change to
14   accommodate some other factor.
15       Q.   And by "augmentation," do you mean adding --
16   well, how do you augment something?
17           MR. HEISE:  Objection; form.
18           You may answer.
19           MR. KAO:  Q.  You could answer.
20       A.   "Augmentation" means an additional function.
21           If I can use an example, based on the earlier
22   description, the Unix operating environment, as
23   conceived first by Berkeley and by AT&T, had no notion of
24   multiple processors and the need to preserve the content
25   of a cache memory system in order to improve

Page 32

1    performance. So an augmentation that exists in Dynix is
2    so-called processor affinity. It's the ability of a
3    program to say: I would like to continue running on the
4    processor that I was running on before so that I can
5    preserve those dynamic memory contents and, as a result,
6    operate at a higher speed.
7        So an augmentation that exists in Dynix is
8    processor affinity. It's a system call that doesn't
9    exist in another version of Unix, that specifically
10   allows for a program to get higher execution speed.
11       Q.   And is an augmentation implemented through new
12   source code?
13       A.   It's completely new source code.
14       Q.   Now, you also mentioned, in your understanding
15   of the word "modification," that it could include
16   changes.
17       A.   That's right.
18       Q.   Can you explain to me what you mean by that?
19       A.   Certainly. For example, the compilers that
20   were used to build the Dynix operating system are the
21   Berkeley-derived compilers, and there are subtle
22   differences in the way symbols are treated. And so it
23   might be necessary, if you wanted to compile, without
24   adding additional function, a System V source module to
25   make a modification that was really cosmetic or had no

8 (Pages 29 to 32)

DAVID P. RODGERS

**Page 33**

1 meaning other than to make it compatible with the form
2 of the compiler. So you might change a symbol·from
3 having a dollar sign in it to not having a dollar sign
4 in it to make it compatible. .
5    Q.  Have you ever heard of something, Mr. Rodgers,
6 called Dynix/ptx?
7    A.  Yes. That was a later version of the Dynix
8 operating system that was prepared that had a higher
9 degree of compatibility with the System V operating
10 environment. '
11    Q.  Do you know when Dynix/ptx was created?
12    A.  I don't have a precise date recollection. It
13 was certainly during my tenure at Sequent, but I don't
14 have an exact recollection. And it was certainly --
15 certainly after 1985, 1986.
16    Q.  Did -- earlier you talked about the Dynix
17 operating system. Did the Dynix operating system
18 continue to exist after Dynix/ptx was created, or was it
19 replaced by Dynix/ptx?
20    A.  They coexisted. Gradually — AT&T ultimately
21 was successful in their campaign to proselytize the
22 System V operating environment, and so more and more
23 application software was created for the System V
24 operating environment. And although there were new
25 applications created for the BSD family of Unixes, they

**Page 34**

1 were mostly aimed at technical and university-oriented
2 markets.
·3       Sequent continued to sell both Dynix and
4 Dynix/ptx, but as its business became more and more
5 commercially oriented, aimed at high-end business
6 systems and commercial applications based on databases,
7 I would say the proportion of Dynix/ptx to Dynix sales
8 changed in favor of Dynix/ptx.
9    Q.  In paragraph 9, then, of your declaration, are
10 you referring to Dynix or Dynix/ptx?
11    A.  Actually, both of the products, Dynix and
12 Dynix/ptx, started from the same source base. In this
13 paragraph, I'm actually referring to the Dynix, the
14 predecessor operating environment, but the paragraph
15 applies to both versions of the product. The core of
16 the Dynix/ptx operating system is also Berkeley derived.
17    Q.· I'll ask you to review now paragraph 10 of
18 your declaration for yourself. There's no need to read
19 that into the record.
20    A.  Yes.
21    Q.  Is that a true and accurate statement?
22    A.  It is.
23    Q.  And I'll ask you also to review paragraph 11
24 of your declaration to yourself.
25    A.  Okay.

**Page 35**

1    Q.  Is that an accurate statement?
2    A.  It is.·
3    Q.  And in paragraph 11, you note that
4 Section 7.06(a) of the software agreement includes
5 language concerning confidentiality; is that right?
6    A.  Yes, I do.
7    Q.  Can you turn with·me to the software agreement
8 that's attached behind Tab 1 of your declaration. And
9 there, if you can turn to Section 7.06(a).
10    A.  Okay.
11    Q.  My only question is whether this
12 Section 7.06(a) that appears in the software agreement
13 is the same section that you discuss in your
14 declaration.
15    A.  Yes, it is.
16    Q.  Now, turning back to your declaration, to
17 paragraph 12, can you read paragraph 12 into the record
18 for me?
19    A.  Okay.
20    "It was my understanding that the purpose of
21    this confidentiality provision from the
22    perspective of AT&T Technologies was to
23    protect the Unix System V source code that it
24    was licensing. Although there is reference
25    in Section 7.06(a) to 'methods or

**Page 36**

1 concepts'" -- in quotes -- "I had no
2 understanding at the time that AT&T
3 Technologies was interested in protecting·
4 anything other than the Unix source code."
5    Q.  Is that true and accurate?
6    A.  It is.
7    MR. HEISE:  Excuse me.
8    MR. KAO:  Q.  Can you -- well, first, can you
9 explain to me where you get your understanding of the
10 purpose of Section 7.06(a) of the software agreement?
11    A.  From the reading of the document and from the
12 conversations with AT&T Technologies folks.
13    Q.  And what is it in particular that you base
14 your understanding that AT&T Technologies was not
15 interested in protecting methods or concepts?
16    A.  Actually, there are several things that lead
17 to that understanding.
18       The first is that contemporaneous with this
19 document and with Sequent's work, AT&T employees and
20 others were publishing books and generally exposing the
21 structure of the Unix operating system. Universities,
22 by this time, had switched to training young engineers
23 in software methods using the Unix operating system. So
24 the notion of protecting the methods or concepts of Unix
25 actually was turned on its head. Instead of protecting,

9 (Pages 33 to 36)

DAVID P. RODGERS

Page 37

1   they were actually exposing and proselytizing methods or
2   concepts because they were trying to build a broad base
3   of technical workers who were competent in the
4   technologies.
5       So as a consequence, it was very clear from
6   the paragraph and from the conversations that what they
7   were mostly interested in was just keeping the source
8   code under control.
9       Q.  Did you ever ask anybody from AT&T to delete
10   that language from the software agreement?
11       A.  I did not because we had an understanding what
12   it referred to.
13       Q.  Do you know if anybody from your staff ever
14   asked anyone from AT&T to delete the language?
15       A.  Not to my knowledge.
16       Q.  Did anybody, in your discussions with AT&T,
17   ever attempt to define for you what the term "methods or
18   concepts" means?
19       A.  It's a pretty vague term, but I would say an
20   example of a method is how to produce digits for
21   printing from a binary number.
22       And the technique, of course, is well known.
23   You divide by the base. The remainder is the digit to
24   which you add the base of the character. In ASCII, it's
25   60 octal. You take, then, the quotient and divide it

Page 38

1   again by the base, producing the next digit, and so on.
2       So that's an example of a method where
3   repeated division by the base, using the remainder to
4   produce a character and using the quotient to do the
5   next digit until it becomes zero.
6       Q.  Is the method that you described something
7   that's a method from Unix System V, or were you just
8   giving an example?
9       A.  That's certainly used in Unix System V, but
10   it's an example of a method that probably goes back to
11   the origin of numbers. Probably the Greeks did it.
12       Q.  With respect to this Section 7.06(a), did you
13   understand AT&T to be asserting any right to control
14   methods or concepts contained in the Dynix software?
15       MR. HEISE:  Objection to form.
16       You may answer. Excuse me.
17       THE WITNESS:  Certainly not. In fact, the
18   later agreement that we had with AT&T suggested that
19   they didn't have such concepts and that they needed
20   Sequent to help them develop them.
21       MR. KAO:  Q.  Can you tell me what later
22   agreement you're referring to?
23       A.  We did a consulting agreement with AT&T later
24   on, where we added some multiprocessor enhancements for
25   System V.

Page 39

1       Q.  Were you involved in negotiating that
2   agreement?
3       A.  I don't recall direct involvement. I think it
4   was probably Michael Simon who did that one.
5       Q.  And who is Michael Simon?
6       A.  He was the V.P. of marketing at the time.
7       Q.  Do you know what time period that agreement
8   was entered into?
9       A.  I have no precise recollection.
10       Q.  And can you describe for me generally what
11   that agreement entailed?
12       A.  It was basically a consulting services
13   agreement where Sequent technical resources would be
14   applied to development on behalf of AT&T.
15       Q.  Do you know if any work was ever performed
16   pursuant to that agreement?
17       A.  I believe so, but I don't have direct
18   knowledge.
19       Q.  Was that agreement entered into while you were
20   vice president of engineering?
21       A.  Actually, I think it was after I had moved on
22   to be CIO or even later.
23       Q.  What did it -- sorry.
24       Was it executed during a time that you were
25   overseas, or were you still in Portland?

Page 40

1       A.  I don't have a precise recollection.
2       Q.  Do you have any recollection of specifically
3   what technology was involved in that agreement?
4       A.  Only generally, that it related to
5   multiprocessing.
6       Q.  Turning back to your declaration,
7   paragraph 13, can you read paragraph 13 for the record,
8   please?
9       A.  Yes.
10   "As I understood the agreement regarding
11       confidentiality, Sequent had no obligation to
12       keep confidential any information embodied in
13       any of the software products provided to
14       Sequent, provided that Sequent did not
15       disclose source code (except as otherwise
16       permitted by the license agreements). In
17       addition, as I discuss above, Sequent had no
18       obligation to keep confidential any
19       modification or derivative work developed by
20       Sequent that did not include . . . System V"
21       -- "Unix System V source code. Sequent was
22       free to use, copy, distribute or disclose
23       such modifications and derivative works,
24       provided that it did not copy, distribute or
25       disclose any portions of the licensed Unix

10 (Pages 37 to 40)

DAVID P. RODGERS

**Page 41**

1    source code (except as otherwise permitted by
2    the license agreements)."
3        Q.   Are the statements that you make in
4    paragraph 13 of your declaration --
5        A.   They are.
6        Q.   -- true and accurate?
7            And again, I'll ask you what you base your
8    understanding of the software agreement on.
9        A.   Again, it's based on a reading of the
10   agreement and conversations with AT&T personnel at the
11   time.
12       Q.   At several places in your declaration,
13   including in this paragraph, you say that "except as
14   otherwise permitted by the license agreements."
15           Do you see that?
16       A.   Yes, I do.
17       Q.   What do you mean by that?
18       A.   There are certain elements that are in the
19   source code that actually have to be reproduced.
20           I think a trivial example is the copyright
21   notice which is in the source code but we're required to
22   reproduce it in viewable form, so . . .
23           Header files are another example of things
24   that have to be exposed in order to make the operating
25   environment usable.

**Page 42**

1        Q.   What's a header file?
2        A.   It's a source module that contains symbol
3    definitions.
4        Q.   And what do you mean by they had to be
5    exposed?
6        A.   In order to make a program that effectively
7    uses the System V calls, you have to have those symbols
8    defined for the program.
9        Q.   And was it your understanding that AT&T
10   permitted those header files to be disclosed without any
11   restriction?
12       A.   Yes. They have to be.
13       Q.   Did somebody from AT&T ever tell you that?
14       A.   No. It's how it works.
15       Q.   Let me ask you to turn to the last page of
16   your declaration, and I'll ask you to read paragraph 14
17   into the record.
18       A.   "The confidentiality provision of the
19       Software Agreement provided that Sequent was
20       not required to keep a software product
21       confidential if it became 'available without
22       restriction to the general public.' As" --
23       quoted -- "I understood the agreement,
24       Sequent would be free to disclose, without
25       any restriction whatsoever, information that

**Page 43**

1    became available without restriction to the
2    general public by acts not attributable to
3    Sequent or its employees."
4        Q.   Are those statements true and accurate --
5        A.   They are.
6        Q.   -- Mr. Rodgers?
7            Now, the language that you referred to in
8    paragraph 14, is that language contained in
9    Section 7.06(a) of the software agreement that's
10   attached behind Tab 1 to your declaration?
11       A.   Yes, it is.
12       Q.   And can you tell me what your understanding of
13   that language is based on?
14       A.   Yes. The -- in fact, generally, in
15   confidentiality agreements, there are some basic
16   provisions that if the owner of the restricted
17   information makes it public, say through a public
18   disclosure, or that someone else lawfully in possession
19   of that information makes it public or it's
20   independently discovered or it's subject to a court
21   order, that that information then becomes free for
22   disclosure.  That was my understanding -- even though
23   that language here is vague, that was my understanding
24   as to what it meant to be otherwise accessible.
25       Q.   Did you have any discussions with anyone at

**Page 44**

1    AT&T specifically about that language?
2        A.   I don't recall those discussions.
3        Q.   If you could look now at paragraph 15 of your
4    declaration.
5        A.   Yes.
6        Q.   I'll ask you to read that into the record.
7    And again, take your time for the court reporter.
8        A.   Mm-hmm.
9        "Although I do not recall any particular
10       definition being given to the term 'available
11       without restriction to the general public,'
12       at the time the Software Agreement was
13       executed, I believe a number of circumstances
14       would meet the definition.  For example, a
15       software product or any part of a software
16       product would be considered 'available
17       without restriction to the general public' if
18       it was lawfully published by someone outside
19       of Sequent.  I believe that any number of
20       books and other materials have been published
21       regarding the Unix software, and that the
22       information contained in those materials at
23       least would not be subject to the
24       confidentiality restrictions in the Software
25       Agreement."

11 (Pages 41 to 44)

DAVID P. RODGERS

Page 45

1    Q.  Are the statements that you make in
2  paragraph 15 of your declaration true and accurate?
3    A.  They are.
4    Q.  Can you explain for me the circumstances that
5  you believe would be considered -- well, strike that.
6        Can you just explain to me the circumstances
7  that you discuss in your declaration and how that would
8  make something available without restriction to the
9  general public?
10   A.  Yes.  As I've said previously, AT&T was on a
11  marketing campaign, and they were encouraging or perhaps
12  allowing a number of their employees to publish books,
13  documenting the inner workings of Unix System V.  They
14  were encouraging professors at universities to teach
15  their students on how to develop and enhance the Unix
16  operating environment.
17       So in particular, I was in possession of a
18  book at the time that talked a lot about how Unix worked
19  internally.  There were lots of books published then and
20  since on how Unix works internally.  And at least if you
21  read the preface, many of those were actually encouraged
22  by AT&T Technologies.
23   Q.  Do you remember the names of any of the books
24  that you had regarding Unix?
25   A.  There are zillions.  The one I remember

Page 46

1  personally is Unix System Primer, but -- and I won't be
2  able to give you a precise title, but there was another
3  book I remember that was the Design of the Unix
4  Operating System.  That's an approximate title.
5    Q.  Was the author of that a guy by the name of
6  Maurice Bach or Bach, by any chance?
7        MR. HEISE:  Objection to form.
8        THE WITNESS:  Yeah, Maury Bach certainly would
9  have been one of the authors.
10       MR. KAO:  Q.  And those are -- strike that.
11       Do you have those books pursuant to any
12  license from AT&T?
13   A.  No.  Those were freely available.  You go to
14  the bookstore.
15   Q.  Did those books, to the extent you remember,
16  contain any source code from Unix System V?
17   A.  There were source code fragments in many of
18  the books.
19   Q.  Are there any other circumstances that you
20  believe would meet the definition of "available without
21  restriction to the general public," sitting here today?
22   A.  Certainly a public announcement would qualify
23  as available to the general public.
24   Q.  Now, after -- after leaving Sequent, did you
25  have the occasion to ever review these agreements that

Page 47

1  we've been talking about here today?
2    A.  Until our first contact, I did not.
3    Q.  I'd like you now just to turn to the software
4  agreement itself, which is the document behind Tab 1 of
5  your declaration.
6    A.  Yes.
7    Q.  And in particular, at Section 2.01.
8    A.  Okay.
9    Q.  And my question to you is whether, in your
10  understanding of Section 2.01, AT&T placed any
11  restrictions on the use of Sequent's Dynix source code
12  that it wrote on its own?
13       MR. HEISE:  Objection to form.
14       You may answer.
15       THE WITNESS:  None that I understood from my
16  reading or my conversations.  My reading of this
17  paragraph and my understanding of this paragraph is that
18  it relied -- or it referred only to the Unix System V
19  source code that was contributed by AT&T.
20       MR. KAO:  Q.  I'll ask you to look at
21  Section 2.05 of this agreement.  And my question for you
22  is whether you understood Section 2.05 of this agreement
23  to place any restrictions on Sequent's use of the Dynix
24  source code that Sequent wrote on its own?
25   A.  No, I did not understand this to --

Page 48

1        MR. HEISE:  Let me --
2        THE WITNESS:  -- apply.
3        MR. HEISE:  -- object to form as well, but --
4        THE WITNESS:  Sorry.
5        MR. HEISE:  -- I was a little bit slow on the
6  draw.  That was my fault.
7        MR. KAO:  Q.  I'll ask you to look at
8  Section 4.01 of the agreement.
9    A.  Yes.
10   Q.  And my question is whether you understood
11  Section 4.01 to place any restrictions on Sequent's
12  export of any Dynix source code that Sequent wrote on
13  its own.
14       MR. HEISE:  The same objection.
15       You may answer.
16       THE WITNESS:  No, I did not understand this to
17  apply to Sequent's own source code.
18       MR. KAO:  Q.  Let me ask you to turn to
19  Section 7.06(a) of the agreement.  And can you review
20  that for yourself.
21   A.  Yes.
22       Okay.
23   Q.  And my question is whether you understood
24  Section 7.06(a) to place any restrictions on Sequent's
25  ability to disclose Dynix source code that Sequent wrote

12 (Pages 45 to 48)

DAVID P. RODGERS

Page 49

1 on its own.
2        MR. HEISE: Objection; form.
3        You may answer.
4        THE WITNESS: Again, no, I did not understand
5 this to apply to the Sequent source code.
6        MR. KAO: Q. And finally, I'll have you look
7 at Section 7.10 to the software agreement.
8        A. Okay.
9        Q. And my question is whether you understood
10 Section 7.10 to restrict Sequent's ability to sell,
11 lease, or otherwise transfer or dispose of any Dynix
12 source code that Sequent wrote on its own.
13        MR. HEISE: Same objection.
14        You may answer.
15        THE WITNESS: No. This, in particular, would
16 have been crazy if I had interpreted it as applying to
17 the Sequent source code, because that was the -- one of
18 the key assets of the company. To bind a key asset
19 would have required a board decision.
20        MR. KAO: Can we go off the record?
21        THE VIDEOGRAPHER: Going off the record. The
22 time is 9:08.
23        (Recess taken.)
24        THE VIDEOGRAPHER: We are back on the record.
25 The time is 9:31.

Page 50

1        MR. KAO: Q. I just have a few remaining
2 questions for you, Mr. Rodgers. And you might as well
3 pretend like I'm sitting over there --
4        A. Okay.
5        Q. -- so the video will look all right.
6        A. All right.
7        Q. First question for you is, you referred to
8 Dynix/ptx in your testimony earlier. And I was curious
9 to know what it is that "ptx" stands for.
10        A. Ptx is kind of a tweak on POSIX. The
11 government was promulgating some standards for Unix at
12 the time under the rubric of POSIX, which I think was
13 also known as P1109, or something like that, at the
14 time. In any case, "psx," which was a more obvious
15 reference to POSIX, wasn't available; so we settled on
16 "ptx" as the reference to POSIX compliance. And that
17 was to give us some more credibility in government
18 sales.
19        Q. What is POSIX?
20        A. POSIX is a government standard for Unix
21 application programming interfaces. It's -- there are,
22 as you probably know, a lot of government standards
23 designed to improve the portability and the
24 cost-effectiveness of government procurements, and POSIX
25 is one of those standards relating to Unix.

Page 51

1        Q. Do you know which agency within the government
2 issued POSIX standards?
3        A. I don't, at this moment in time, remember who
4 was doing it. It was probably Commerce, but I don't
5 know.
6        Q. Was there an independent -- was it actually a
7 government agency, or was it some sort of joint, you
8 know, independent -- joint government and commercial
9 body? Do you know?
10        A. Like a lot of these standards activities,
11 there are contributors and hangers-on and authorizers
12 and sponsors. And so it was government-sponsored,
13 contributed-to-by-private-sector activity.
14        Q. And I think you mentioned POSIX compliance
15 before. What does it mean to be compliant with POSIX?
16        A. To comply with the POSIX standard, you have to
17 implement the system program interface, the application
18 programming interface, and the system calls in a
19 specific way so that the applications run the way
20 they're expected to run and that there are no unexpected
21 side effects of the way it's implemented.
22        Q. While you were employed at Sequent, did
23 Sequent ever, to your knowledge, disclose any Unix
24 System V source code without permission?
25        A. Not to my knowledge.

Page 52

1        Q. Did Sequent ever export any Unix System V
2 source code without permission?
3        A. Not to my knowledge.
4        Q. Did Sequent ever transfer -- well, let me ask
5 it this way: Did Sequent ever sell, lease, or otherwise
6 transfer or dispose of any Unix System V source code
7 without permission?
8        A. Not to my knowledge.
9        Q. Did Sequent ever allow any other entities to
10 use Unix System V source code without permission?
11        A. Not to my knowledge.
12        Q. Did Sequent ever use Unix System V source code
13 in any way that was not permitted by its license with
14 AT&T?
15        A. Not to --
16        MR. HEISE: Objection to form.
17        You may answer.
18        THE WITNESS: Not to my knowledge.
19        MR. KAO: That's all I have.
20        EXAMINATION BY MR. HEISE
21        MR. HEISE: Q. Good morning, Mr. Rodgers.
22        A. Good morning.
23        Q. As I mentioned earlier, I'm Mark Heise,
24 representing The SCO Group in this case. And as Mr. Kao
25 mentioned, to the extent I ask you a question that is

13 (Pages 49 to 52)

DAVID P. RODGERS

Page 53

1    unclear to you or I mumble or do something to prevent
2    you from answering, just please let me know. I'll be
3    glad to rephrase it or try and accommodate your
4    concerns.
5          You and I have never met before; is that
6    correct?
7          A.   That's correct."
8          Q.   And I want to essentially follow the same
9    format that you did with the lawyer for IBM. I'm going
10   to go through some of your personal history and then go
11   through some of the statements that you made in the
12   affidavit.
13         The address that you gave us earlier in
14   Saratoga, is that your home or office address?
15         A.   That's my home.
16         Q.   What is your office address?
17         A.   It's 475 Sycamore, S-y-c-a-m-o-r-e, Drive in
18   Milpitas, California.
19         Q.   And that's for IP Unity?
20         A.   That's IP Unity.
21         Q.   Do you currently own any stock in IBM?
22         A.   I may. My personal investment advisers invest
23   in mutual funds, and so from time to time I may.
24         Q.   Other than a possible investment in a mutual
25   fund, you don't own individual shares of IBM?

Page 54

1          A.   Correct.
2          Q.   With respect to some of your personal history,
3    you know, I have to ask these questions. Have you ever
4    been arrested?
5          A.   No.
6          Q.   Have you ever been convicted of any crime?
7          A.   No.
8          Q.   You mentioned that you were in an automobile
9    accident in 2001.
10         A.   Yes.
11         Q.   Were you the plaintiff in that case or the
12   defendant in that case?
13         A.   I was the defendant.
14         Q.   And you said it ultimately --
15         A.   Settled.
16         Q.   -- settled.
17         What was the name of the plaintiff in that
18   case?
19         A.   His last name is Kitikoon. I don't recall his
20   first name.
21         Q.   Do you have a copy of the deposition that you
22   gave in that case?
23         A.   I do not.
24         Q.   Who was your lawyer in that case?
25         A.   It was the insurance company lawyer, and his

Page 55

1    name was, I think, Mike McDonald, but that's not -- I
2    don't recall his name.
3          Q.   Is he here in San Jose or Saratoga?
4          A.   Yes, he's in San Jose.
5          Q.   In terms of your professional background after
6    you graduated from college, you indicated that you began
7    at Digital Equipment Corporation in approximately 1973.
8          A.   That's right.
9          Q.   From the time that you graduated in 1968 up
10   until 1973, how were you employed?
11         A.   I was employed by Carnegie-Mellon University,
12   in the computer science.
13         Q.   That's right. You mentioned that.
14         A.   Right.
15         Q.   I forgot.
16         As your employment at Carnegie-Mellon, did you
17   have any involvement whatsoever with licensing of any
18   type at Carnegie-Mellon?
19         A.   I don't recall doing any.
20         Q.   How about with Digital Equipment Corporation?
21   What was your position there?
22         A.   My position was as a development engineer and
23   later as a development manager, and it was a series of
24   engineering jobs.
25         Q.   So in those engineering jobs, did your

Page 56

1    position require you to review or execute licenses on
2    behalf of Digital?
3          A.   No.
4          Q.   When you went to Sequent in approximately
5    1983, I think you indicated for us that you were there
6    as the vice president of engineering from approximately
7    1983 to 1991. Is that correct?
8          A.   I wasn't V.P. of engineering that whole time,
9    but I was V.P. of engineering initially and then in a
10   variety of other roles until I left the company.
11         Q.   Okay. Then I misunderstood, then.
12         If we could, if you could just track for us
13   your roles, because what I -- this is what I understood,
14   and maybe it's high level enough to be accurate.
15         Vice president of engineering from 1983 to
16   1991, chief information officer in Europe from '91 to
17   '93, and then head of professional services from
18   approximately 1993 to 1996.
19         A.   The misunderstanding is that from about '88 to
20   '91, I was CIO; '91 to '93, I was in Europe as the --
21         Q.   Okay.
22         A.   -- European engineering manager.
23         Q.   Thank you for correcting that.
24         In your role as vice president of engineering
25   from '83 to approximately '88, did you execute any

14 (Pages 53 to 56)

software license agreements other than the ones that we've talked about this morning?
A. Yes. I'm sure we licensed a variety of tools and other technology for engineering.
Q. What companies would you have executed license agreements on behalf of Sequent during that time frame?
A. I don't recall specific names at this point in time, but we would have had license agreements with -- I can't think of the name of the company -- with a compiler company that I think was called Green River Software or something like that. In any case, it was a Bay Area company that had compiler technology that we used. We had some license agreements for some test tools. We had some license agreements with Mentor Graphics for the computer-aided design workstations. We had -- I'm trying to think what else.
In any case, the bulk of the license agreements were for engineering tools, and then there were a couple of license agreements that were for software that was passed through to the customer, a Fortran compiler, a C compiler, and so on.
Q. Could you tell us or give us an approximation of the number of licenses? Are we talking about four or five? Are we talking about 40 or 50? Just --
A. Oh, it's not in the tens. It's going to be

countable on the fingers of two hands.
Q. Okay. Were you the person that was assigned to execute all of these licenses, or was there somebody else in the company that was also involved at the execution level?
A. It was certainly a matter of convenience, whoever -- whatever executive was around at the time that the license agreement needed to be signed. I saw a lot of them, but certainly not every one of them.
Q. Was there a person at Sequent that was designated to negotiate the licenses on behalf of Sequent, whether it be with AT&T or Mentor Graphics or any of these test tool companies?
A. Again, it would depend a little on what the nature of it was. So, for instance, Roger Swanson, who was the director of software engineering, did a lot of the software licenses, specifically the compilers and the source code licenses. Walt Mayberry would have done the hardware licenses and -- the hardware design tool licenses. But again, it was a small company, so it was whoever was in town at the time.
Q. Is that how it ended up that you signed on behalf of Sequent? You happened to be in town as opposed to some of the other engineers that had the authority to sign?

MR. KAO: Objection to form.
MR. HEISE: Q. You may answer.
MR. KAO: You can answer.
THE WITNESS: Okay. Sorry.
In the case of that license agreement, I had more involvement perhaps because it was a major piece of function, but it certainly wasn't necessary that I be the person executing.
MR. HEISE: Q. And the reason I'm asking is, you indicated earlier that you did not personally negotiate any of the terms.
A. Right.
Q. And so I was wondering why the person who did negotiate the terms was not that. And it seems to be that you're telling us that it just happened that you were the person that would have been in town that day to sign the agreement.
A. It was probably --
MR. KAO: Objection to form.
Give me a chance to object, but you can answer the question.
THE WITNESS: Okay. It was probably a little more than that, because it was a technical issue. But yeah, it would have been one of the executives who was executing on the recommendation of the director of

software engineering.
MR. HEISE: Q. And the director of software engineering, I've already forgotten his name and you've said it three times.
A. Roger Swanson.
Q. Okay. What was the process that Sequent would follow when it would license? And just to give you an idea of what I'm talking about, would it be done by committee headed by Roger Swanson? He would meet with all of you? Would it go to the legal department? Just, if you could, walk us through the steps of Sequent wants to license X product. How does Sequent go about doing that during the time that you were there?
A. Okay. First, there's a difference between licensing a product for internal use and licensing a product for incorporation in resale.
And so for internal use, they were largely standard form licenses: negotiate the best price you can for as few seats as you can buy and get on with it. So there wasn't a lot of negotiating.
In the case of a product for resale, as it would have been for the compilers or operating system components, again there would be a cost consideration. Is there an appropriate royalty that's not unsustainable from a commercial perspective? Are the licensing terms

DAVID P. RODGERS

Page 61

1  fair, meaning there's no undue restriction on the
2  ability to distribute, for example?
3      And then whoever happened to be the subject
4  matter expert -- in the case of most of the software, it
5  was Roger -- would proceed to engage with whoever was
6  the source of the technology and come to a draft
7  agreement. We'd read it over, have a discussion with --
8  to see if we could move them around a little bit, if
9  that was necessary, and then executed the document.
10      Q.  So in the case --
11      A.  There wasn't a corporate counsel to respond to
12  the question.
13      Q.  Okay.  So in the case of an agreement for
14  internal use -- which you understood the Unix System V
15  agreement to be for internal purposes only; right?
16      A.  It varied at different moments in time.  The
17  initial agreement was for internal use.  It was to get
18  access to the source code --
19      Q.  Correct.
20      A.  -- so that we could put a System V face on the
21  Dynix operating system.
22      At the point in time when there was a
23  derivative work prepared and it was ready for sale, then
24  we executed the next agreement, which was to give us
25  distribution rights for that.

Page 62

1      Q.  Just so that we're clear on the record, what
2  you're referring to is initially what was executed for
3  internal business purposes only was Exhibit 1 to
4  Exhibit 100, the software agreement?
5      A.  That's correct.
6      Q.  And then, when you were ready to distribute
7  the derivative work, it was based upon entering into
8  Exhibit 2 to Exhibit 100; is that correct?
9      A.  That's correct.
10      Q.  Okay.  When you entered into Exhibit 2, the
11  sublicensing agreement to Exhibit 100, that was to allow
12  Sequent to distribute in binary form only; is that
13  correct?
14      A.  That's correct.
15      Q.  And so that we all understand, binary form is
16  different than source form; is that correct?
17      A.  That's correct.
18      Q.  Could you tell us the difference between
19  source code versus binary or object code?
20      A.  Right.  At the highest level, source code is
21  human readable and binary code is machine readable or
22  computer executable.  Specifically, the binary form will
23  be a highly encoded representation of the detailed
24  instructions for whatever the program is, and the source
25  code will be a representation in something close to a

Page 63

1  language --
2      Q.  Right.
3      A.  -- that humans can interpret that gives them
4  control over what algorithm is being executed.
5      The source code form often will be larger than
6  the binary code form.  The source code form almost
7  always will have a layer of abstraction like a library
8  between it and the binary code form.
9      Q.  And so if we were to look at the binary form,
10  it would just appear as a series of 1s and 0s?
11      A.  That's correct.
12      Q.  After your tenure as the vice president of
13  engineering at Sequent, during which time you executed
14  these agreements, for the remainder of your time at
15  Sequent, either as the chief information officer or head
16  of professional services, did you have any involvement
17  in executing any other licenses on behalf of Sequent?
18      A.  Certainly as the CIO, I executed license
19  agreements for software for internal use.  We used
20  Oracle extensively.  There were a number of accounting
21  programs and other programs that we used.
22      As professional services head, I don't recall
23  executing any license agreements.  I might have done one
24  with respect to -- with Lotus Corporation with respect
25  to Notes, but I don't have a specific recollection of

Page 64

1  that.
2      Q.  Again, in terms of these other licenses,
3  Oracle or Lotus that were for internal business
4  purposes, can we count those on a hand or two or are
5  those in the dozens?
6      A.  Still small numbers.
7      Q.  Okay.
8      A.  Yes.
9      Q.  After you left Sequent in approximately 1996,
10  you said you went to Compaq Corporation?
11      A.  That's right.
12      Q.  As the vice president of business
13  applications, did you have any responsibility for
14  executing licenses on behalf of Compaq?
15      A.  No.
16      Q.  How about during your tenure at Brightlink?
17  Did you have any responsibility for negotiating or
18  executing license agreements on behalf of Brightlink?
19      A.  Yes.  Again, it would have been engineering
20  tools.
21      Q.  So not for internal business purposes?  The
22  other type of --
23      A.  Correct.
24      Q.  -- contracts?
25      And how about at IP Unity?  Do you have any

16 (Pages 61 to 64)

DAVID P. RODGERS

Page 65

1 involvement in the execution or negotiation of license
2 agreements?
3   A.  Yes.
4   Q.  And are those for internal use only license
5 agreements or for the tools and the like?
6   A.  Both types. ''*
7   Q.  Of the companies other than Sequent, which
8 we're obviously discussing this morning, have you
9 executed or been involved in the negotiation of any
10 license agreements with AT&T or any of its successors
11 for Unix System V code?
12   A.  Not to my recollection.
13   Q.  You had indicated earlier that you met with
14 Mr. Kao, the lawyer for IBM, sometime in 2003.  Is that
15 correct?
16   A.  I don't recall the exact date, but I've met
17 with Mr. Kao two times before today.
18   Q.  Okay. Let's -- if you could, sir, tell us the
19 first time that you met with Mr. Kao.
20   MR. KAO:  Again, I'd caution the witness not
21 to reveal any attorney-client communications, but you
22 are able to answer Mr. Heise's question here.
23   THE WITNESS:  Okay. After the preparation of
24 my document here, I had the occasion to meet with
25 Mr. Kao here in San Jose; and basically, we just

Page 66

1 reviewed the content of the document and confirmed that
2 it was an accurate statement of my recollection.
3   MR. HEISE:  Q.  Okay. I may have used a word
4 that unnecessarily confined your answer, so let me just
5 take one step back.  When is the first time you had any
6 contact with anybody on behalf of IBM?
7   A.  Okay.  That would have been in 2003.  It was a
8 phone call. Again, I don't recall whether it was
9 Mr. Kao or someone else from his office who made the
10 initial contact, but it was a phone call asking me if I
11 was the guy who signed the document.
12   Q.  Was anything else discussed in that first
13 phone call?
14   A.  Again, I don't have a precise recollection;
15 but I probably, in the first phone call, recounted the
16 general sequence of events.
17   Q.  Okay. And in that first phone call, could you
18 recount for us the general sequence of events that took
19 place at that point?
20   A.  Yes.  The history of Sequent is that it
21 started off building a multimicroprocessor hardware
22 platform running the Unix operating system, and it chose
23 the Unix Berkeley Standard Distribution as the source
24 basis for that operating system.  Its innovations were
25 in the area of symmetric multiprocessing and parallel

Page 67

1 processing.
2   At some point in time, it became necessary to
3 expand the base of application software that was
4 available for the platform in order to expand sales, and
5 this was a time when the applications were being written
6 for a number of variants of Unix, but the most prominent
7 ones were the Berkeley variant and the System V variant.
8 And so we sought to license System V technology from
9 AT&T in order to add that second flavor, that second
10 body of application code.
11   So we -- Roger engaged with someone at AT&T.
12 I don't actually recall how we got to find out who would
13 do the licensing.  And we executed the source agreement,
14 which is this Exhibit 1; started working on it;
15 developed a first version of the Dynix operating system
16 that had a so-called System V personality.  And
17 internally, we referred to it as "the oil slick" because
18 that was about how much difference there was. And we
19 went to market with that, and that was adequate to
20 secure some additional applications.
21   Over time, as POSIX and AT&T's marketing
22 program were successful, there were more applications
23 available for the System V API variant, and so we needed
24 to make a more faithful expression of the System V
25 system calls, and so that was the -- when we started

Page 68

1 building and marketing the Dynix/ptx variant.  Continued
2 to market both versions of the software.
3   Eventually -- there were several platform
4 changes during this time, first going from a National
5 Semiconductor 32-bit -- 16-bit micro to a 32-bit micro
6 to an Intel 386-based product to an Intel 486-based
7 product; and ultimately, very close to the end of my
8 employment at Sequent, we started working on distributed
9 coherent cache architecture that was an opportunity to
10 scale up the number of processors that could be put in a
11 shared memory architecture.
12   MR. KAO:  Could we go off the record for one
13 second?
14   THE VIDEOGRAPHER:  Going off the record. The
15 time is 9:56.
16   (Discussion off the record.)
17   THE VIDEOGRAPHER:  We're back on the record.
18   This marks the end of Tape No. 1 in the
19 deposition of David Rodgers.  We're going off the
20 record.  The time is 9:57.
21   (Recess taken.)
22   THE VIDEOGRAPHER:  We're back on the record.
23   This marks the beginning of Tape No. 2 in the
24 deposition of David Rodgers.  The time is 10 o'clock.
25   MR. KAO:  For the record, Mr. Rodgers just

17 (Pages 65 to 68)

DAVID P. RODGERS

Page 69

1  testified as to communications he had with either myself
2  or somebody at my law firm before we agreed to represent
3  Mr. Rodgers.
4          Mr. Rodgers informed me at break that he
5  wasn't sure if he actually had those discussions with me
6  or with somebody else before or after. So I don't
7  intend his testimony to be a waiver -- to constitute a
8  waiver of the attorney-client privilege to the extent
9  that those discussions happened after we agreed to
10  represent him.
11         MR. HEISE: Q. When I was asking you the
12  question, this was all what I understood you in the
13  first phone conversation. So that's where I'm limiting
14  my questions to right now.
15     A.  Okay. So I've misled you. Describing things
16  that happened in a series of conversations and the first
17  meeting.
18     Q.  Okay. Then let me make sure that we're all
19  perfectly clear on the record.
20         You indicated you got a phone call from
21  somebody at IBM's counsel's office, asking if you are
22  the David Rodgers that signed the agreement.
23     A.  Yes.
24     Q.  You indicated that in that conversation, other
25  matters were discussed. And so I thought you had

Page 70

1  indicated you talked about the history of Sequent in
2  that initial conversation and that's what you just
3  provided to us. Is that correct?
4     A.  Yes.
5     Q.  What else was discussed in that first
6  conversation when you were contacted by IBM's attorneys?
7     A.  I don't have a precise recollection, but
8  probably I was asked would I be willing to document my
9  recollection.
10     Q.  Was anything else discussed during that first
11  conversation?
12     A.  No.
13     Q.  Did you take any notes from that first
14  conversation?
15     A.  I did not.
16     Q.  Did you prepare any -- any documentation as a
17  result of that first conversation, specifically in
18  response to the request of would you document what took
19  place?
20     A.  I did not.
21     Q.  When was the next time you had any contact
22  with anybody from IBM's attorneys' offices?
23     A.  I met with Mr. Kao here in San Jose, and that
24  was my opportunity to see the -- these exhibits.
25     Q.  Were there any other discussions, phone calls,

Page 71

1  correspondence from the time of that initial phone call
2  and the time that IBM's attorneys came and met you here
3  in San Jose, California?
4     A.  None that I recall. I mean, possibly one to
5  organize the meeting, but . . .
6     Q.  At that second meeting, who was in attendance?
7     A.  Myself and Mr. Kao.
8     Q.  Nobody else?
9     A.  Right.
10     Q.  Was that at your home or your office?
11     A.  Actually, it was here in San Jose, but I don't
12  recall where it was.
13     Q.  Besides the three exhibits that were attached
14  to Exhibit 100, were you shown anything else at that
15  second meeting?
16         MR. KAO: And here, at that meeting, we agreed
17  to represent Mr. Rodgers. So I'm going to instruct the
18  witness not to answer that. And I --
19         MR. HEISE: Well, let me --
20         MR. KAO: The fact that the exhibits were
21  disclosed, I also would not -- you know, I would like to
22  state that's not intended to waive the privilege.
23         MR. HEISE: Well, then let me just explore
24  this for just one moment.
25     Q.  During your first meeting with IBM's attorneys

Page 72

1  here in San Jose, California, did a point in time -- at
2  what point in time during that meeting was there a
3  discussion about IBM's attorneys representing you?
4     A.  Sometime during the meeting. I don't recall
5  whether it came up at the beginning or, you know, after
6  the pleasantries, but sometime during that meeting.
7     Q.  Was there ever a point in time in which you
8  have signed or -- scratch that.
9         Was there ever a point in time when you had a
10  written agreement that IBM's attorneys were going to
11  represent you?
12     A.  No.
13     Q.  Have you had discussions about them
14  representing you? Let me --
15     A.  Unclear.
16     Q.  Let me put that back into English.
17         You do not have a written agreement with
18  anybody representing IBM in this case --
19     A.  That's correct.
20     Q.  -- to be your attorney?
21     A.  That's correct.
22     Q.  Would it be fair, then, to say that the
23  agreement that IBM's attorneys represent you is only
24  oral?
25     A.  That's correct.

18 (Pages 69 to 72)

DAVID P. RODGERS

Page 73

1    Q.   And you don't recall what was said in this
2    meeting with Mr. Kao before you came to this oral
3    understanding of the fact that IBM's attorneys were
4    going to also represent you in this case?
5    A.   No. As I said, we might have exchanged
6    pleasantries or something.
7    Q.   How long was the meeting?
8    A.   Maybe an hour.
9    Q.   After that meeting, when was the next contact
10   you had by anyone who was also representing IBM in this
11   case?
12   A.   There was a later phone call. I don't have a
13   precise recollection as to time.
14   Q.   With whom?
15   A.   I think it was with Mr. Kao. And my
16   recollection is it was just "Are you available to give a
17   deposition?"
18   Q.   Approximately when would that phone call have
19   been?
20   A.   Actually, let me correct myself. The next
21   contact would have been to discuss the review of a draft
22   declaration and then, after that, it would have been to
23   discuss my willingness to give a deposition.
24   Q.   Okay. In looking at your Exhibit 100, this
25   declaration that you signed, it indicates that it was

Page 74

1    signed on November 5th, 2003.
2    A.   Yes.
3    Q.   Is that when, in fact, it was signed?
4    A.   Yes.
5    Q.   So using November 5th, 2003 as a date of which
6    we are certain, how far before that was your first
7    contact by phone with Mr. Kao and then your meeting with
8    Mr. Kao? Can you tell us that?
9    A.   I have no recollection.
10   Q.   Was it within days? Weeks? Months?
11   A.   I would guess that it's more a span of weeks.
12   Q.   From the time that you said -- excuse me --
13   Mr. Kao and you met and the declaration was prepared,
14   did you prepare the declaration during that time frame?
15   A.   No. I gave the fact statements, and then the
16   declaration was prepared by someone in Mr. Kao's office
17   and delivered to me -- I think it was delivered
18   electronically -- for review. I marked it up.
19   Q.   When you say "electronically," you mean as an
20   attachment to an e-mail?
21   A.   Yes.
22   Q.   Do you maintain your sent or deleted e-mails?
23   A.   For a period of time.
24   Q.   Do they become automatically deleted, or do
25   you have to manually permanently delete them?

Page 75

1    A.   I purge them every two or three months.
2    Q.   Do you know whether you've purged the e-mails
3    going back and forth between you and the lawyers for
4    IBM?
5    A.   Not definitively.
6    Q.   Can you agree not to purge any of the e-mails
7    that go between you and IBM's attorneys until this case
8    has been resolved?
9    A.   Well, depends on when that is.
10   Q.   Certainly for the next 12 months, so that in
11   the event we need to see them, they won't be made more
12   difficult to retrieve by going to archives and all that?
13   A.   I can't agree to keep them on-line. That's
14   what I have to do to maintain the integrity of my
15   e-mail. What I can do is agree to preserve them in some
16   machine-readable form.
17   Q.   That would be fine.
18        When you got the first draft of this
19   declaration prepared by IBM's attorneys, you indicated
20   you had made some changes to it and sent those back.
21   A.   Yes.
22   Q.   What changes were made to it?
23   A.   Don't have a precise recollection. I think
24   there were a number of incorrect references to Dynix and
25   Unix System V. I think there was one statement that

Page 76

1    just seemed awkwardly put. It was substantively
2    accurate, but it wasn't technically accurate.
3    Q.   Was there anything from your first phone call
4    that was not included in the declaration that was
5    ultimately prepared by IBM's attorneys?
6    A.   Not to my recall, but . . .
7    Q.   How many times was there a back-and-forth of
8    changing this declaration before you signed it on
9    November 5th, 2003?
10   A.   I recall only one update, one edit.
11   Q.   After November 5th, 2003, when you signed the
12   declaration prepared by IBM's attorneys, did you have
13   any further contact with anybody representing IBM in
14   this case?
15        MR. KAO:  Again, I'll caution the witness to
16   limit the answer to whether you had contact and not what
17   the substance of the communications were.
18        THE WITNESS:  And your question is between
19   November 5th and now?
20        MR. HEISE:  Q.  As we sit here today, correct.
21   A.   Yes.
22   Q.   Okay. When was the next contact after you
23   executed this declaration, November 5th, 2003, that you
24   had contact with the lawyers for IBM?
25   A.   Sometime earlier this year I was contacted,

19 (Pages 73 to 76)

DAVID P. RODGERS

Page 77

1  asking if I was available.
2        MR. KAO:  I mean, again, I don't intend that
3  to be a waiver of the attorney-client privilege.  I
4  think Mr. Heise was just asking -- you are allowed to
5  tell Mr. Heise the occasions on which you were
6  contacted --
7        THE WITNESS:  I see.
8        MR. KAO:  -- and how often and the dates, to
9  the extent you can remember them, but I instruct you not
10  to disclose the content of any communications between
11  you and myself.
12        MR. HEISE:  Q.  So sometime in 2004 you were
13  contacted again by --
14    A.  Yes.
15    Q.  -- IBM's attorneys?
16        And was that telephone or in person?
17    A.  Telephone.
18    Q.  How long was that conversation, approximately?
19    A.  Would have been a short conversation.
20    Q.  After that short telephone conversation, did
21  you have any further contact with IBM's attorneys?
22    A.  Yes.
23    Q.  When was that?
24    A.  Relatively recently.  It would have been in
25  the last month.

Page 78

1    Q.  Was that in person or by telephone?
2    A.  By telephone.
3    Q.  Okay.  Was that also a short telephone
4  conversation, or was that a --
5    A.  Basically a short call.
6    Q.  After that phone conversation, did you have
7  any other contact with anybody representing IBM?
8    A.  Yes.
9    Q.  When was that?
10    A.  Yesterday.
11    Q.  Was that in person or by phone?
12    A.  It was in person with Mr. Kao.
13    Q.  How long was your meeting -- how long was your
14  meeting with Mr. Kao yesterday?
15    A.  Not including lunch, about an hour.
16    Q.  Did you meet today before your deposition?
17    A.  Briefly.
18    Q.  You indicated that Roger Swanson was the
19  director of software at Sequent.
20    A.  That's correct.
21    Q.  Do you know where he is currently?
22    A.  I believe that he resides in either Portland
23  or Beaverton, Oregon.
24    Q.  Do you know where he's employed?
25    A.  I don't know.

Page 79

1    Q.  When's the last time that you had contact with
2  Mr. Swanson?
3    A.  It's been years.
4    Q.  In preparation to give your deposition today,
5  have you taken any steps?
6        MR. KAO:  Again, I would --
7        THE WITNESS:  I don't understand the question.
8        MR. HEISE:  Q.  Have you done anything to
9  prepare yourself for today's deposition?
10        MR. KAO:  And again, I would instruct the
11  witness, to the extent it discloses any attorney-client
12  communications, that you not answer the question.
13        THE WITNESS:  I read the document.
14        MR. HEISE:  Q.  Have you reviewed anything
15  other than the Exhibit 100 with its attachments?
16        MR. KAO:  I'm going to instruct the witness
17  not to answer the question.
18        MR. HEISE:  On what basis?
19        MR. KAO:  On the basis of attorney-client
20  privilege.
21        MR. HEISE:  Q.  Have you had conversations
22  with anyone other than your attorney --
23        MR. KAO:  The same position you guys took.
24        MR. HEISE:  Q.  -- about your deposition
25  today?

Page 80

1    A.  I told my father I was going to do it.
2    Q.  Have you talked with anybody who is a witness
3  in this case or a potential witness in this case?
4    A.  I don't think so.  I suppose that's possible.
5    Q.  For example, you didn't talk to Mr. Swanson?
6    A.  I have not.
7    Q.  You just said you hadn't talked to him in
8  years.  So that's what I'm trying to get at, is whether
9  you've talked to anybody, if you've talked to
10  Mr. Wilson, who you said --
11    A.  No.
12    Q.  -- signed this agreement and that sort of
13  thing.  Okay.
14        During the time that you were at Sequent, who
15  else besides Mr. Swanson was involved in the
16  negotiations, discussions, or execution of the license
17  for the Unix System V software that's attached to your
18  declaration?
19    A.  I don't have a precise recollection.  It's
20  possible that any number of people were.  And it's
21  certainly likely that we would have discussed the
22  agreement at the executive staff meetings, but as to
23  negotiations, I think it was probably only Roger and a
24  couple of the other staff members who I've mentioned
25  before.

20 (Pages 77 to 80)

DAVID P. RODGERS

Page 81

1    Q.  Was there anybody that would be, in your mind,
2  the person who was the lead negotiator on behalf of
3  Sequent since, as you've indicated, you had no personal
4  contact with AT&T?
5    MR. KAO:  Objection; mischaracterizes the
6  witness's testimony.
7    MR. HEISE:  Q.  Okay. You can answer the
8  question.
9    A.  Roger is the lead negotiator, was the lead
10  negotiator. I was certainly on phone calls with AT&T
11  personnel at various points in time.
12    Q.  Did you participate, or were you just
13  listening?
14    A.  Be hard to imagine me not participating.
15    Q.  Okay. Who at AT&T was on these phone calls?
16    A.  That, I don't have a precise recollection of.
17  As I said, I don't think it was Mr. Wilson, and I don't
18  remember the name of the lead guy on the AT&T side.
19    Q.  Was it just one person from AT&T?
20    A.  There's certainly one person with whom we
21  worked most frequently, but I recall that there were
22  other people involved in the process.
23    Q.  What do you mean by that, others involved in
24  the process?
25    A.  Preparing the drafts and transmitting the

Page 82

1  documents, things like that.
2    Q.  When you say "preparing the drafts," what
3  drafts are you referring to?
4    A.  The drafts of this license agreement.
5    Q.  Well, Sequent didn't prepare those drafts.
6    A.  That's correct. They were prepared by AT&T.
7    Q.  So I thought from your testimony before you
8  indicated that this was a -- you had been told this was
9  a standard form agreement --
10    A.  Yes.
11    Q.  -- and that you had to sign it?
12    A.  Yeah.
13    Q.  So what terms, if any, were negotiated
14  differently from the standard form agreement?
15    A.  None that I'm aware of. I mean, you had to
16  put the names and addresses and parties into the
17  document.
18    Q.  So would it be fair, then, to say that there
19  really was no negotiation other than price?
20    MR. KAO:  Objection to form.
21    MR. HEISE:  Q.  You may answer.
22    A.  Okay.
23    MR. KAO:  Yeah, sorry.
24    MR. HEISE:  You can tack that onto the end of
25  every time somebody says "objection" unless he says it's

Page 83

1  attorney-client privilege.
2    MR. KAO:  Yeah. Unless I instruct you not to
3  answer, you can still answer the question.
4    THE WITNESS:  It wasn't -- I would say except
5  for price, it wasn't about the language. It was -- and
6  all of the discussions about intent or meaning were ·
7  oral.
8    MR. HEISE:  Q.  Okay. And that's -- I'm just
9  trying to make sure we're very clear on this.
10    AT&T said, "Here's the agreement." No terms
11  are negotiated, changed in any way, other than
12  discussions of price?
13    MR. KAO:  Objection to form.
14    THE WITNESS:  I don't think it was that
15  heavy-handed. I mean, I think they said, "We want to
16  recruit you as a System V licensee. Is there anything
17  here that gives you particular heartburn?"
18    But it wasn't -- you know, it wasn't like,
19  "Let's start drafting from the first paragraph."
20    MR. HEISE:  Q.  Okay. And when you were asked
21  something along the lines of "Is there anything here .
22  that gives you particular heartburn?" if there was
23  anything, none of those terms were changed from the
24  standard agreement?
25    A.  Not that I recall. ·It was a pretty benign

Page 84

1  agreement.
2    Q.  If you could, sir, just at a general level of
3  what you've described as a benign agreement, this
4  Exhibit 1, the software agreement, what is your
5  understanding as to what it provided to Sequent?
6    A.  You're speaking just of the first agreement?
7    Q.  Just to the first agreement.
8    A.  The first agreement provides Sequent with
9  access to the AT&T System V source code for its internal
10  use, and that internal use was preparation of a
11  derivative work that incorporated System V APIs.
12    Q.  Did it incorporate anything from System V
13  other than the application programming interfaces, the
14  APIs?
15    MR. KAO:  Objection to form. ·
16    You can answer.
17    THE WITNESS:  Not that I know of. As I've
18  said before, there were probably some things like
19  copyright notices and header files and things like that
20  that had to be, just as a matter of making it useful,
21  copied from the System V source.
22    MR. HEISE:  Q.  And do you recall whether
23  Sequent had licensed System V, Release 3, or System V,
24  Release 4, or any other particular release of System V?
25    A.  To my recollection, only 5.2 was licensed.

DAVID P. RODGERS

Page 85

1    Q.  And when you say "5.2," you're seeing
2  System V, Release 2?
3    A.  Yes.
4    Q.  Do you know whether any subsequent agreements
5  were ever entered into by Sequent for licensing of
6  System V code besides the three that are attached to
7  your declaration?
8    A.  Not to my knowledge.
9    Q.  Do you know whether Sequent ever license
10  System V, Release 4?
11    A.  I don't know that.
12    Q.  After you left Sequent in 1996, did Sequent
13  continue to use Unix, to your knowledge?
14    A.  You mean continue to sell it as a product?
15    Q.  Continue to use -- I may have misspoken.
16    After you left, do you know whether Sequent
17  continued to use Unix System V?
18    A.  Internally -- I'll answer it:  Internally,
19  Sequent used Dynix as its operating system for its own
20  commercial applications and, of course, others, Windows.
21  It continued to sell both Dynix and Dynix/ptx.
22    Q.  Well, you understood that both Dynix and
23  Dynix/ptx contained Unix System V code?
24    MR. KAO:  Objection to form.
25    THE WITNESS:  No.

Page 86

1    MR. HEISE:  Q.  You have no understanding of
2  that?
3    A.  First, I don't know it.  And Dynix itself
4  doesn't have, to the best of my knowledge, any System V
5  code in it.
6    Q.  Do you know whether it contains anything from
7  System V, whether it be source code, methods and
8  concepts, structures, sequence and organization,
9  anything --
10    MR. KAO:  Objection.
11    MR. HEISE:  Q.  -- whatsoever from Unix
12  System V?
13    MR. KAO:  Objection to form.
14    THE WITNESS:  I don't know that explicitly.
15    MR. HEISE:  Q.  Was there any reason, besides
16  having access to the Unix System V application
17  *programming interfaces,* that Sequent licensed Unix
18  System V?
19    A.  I can't state what value I would put on it,
20  but there was certainly a marketing value to having --
21  to being an AT&T System V licensee.
22    Q.  Why is that?
23    A.  It's essentially attraction of customers and
24  third-party application developers.
25    Q.  Was the marketing value of being an AT&T

Page 87

1  customer something that Sequent would allow its
2  customers to advertise?
3    MR. HEISE:  Objection to form.
4    THE WITNESS:  I don't understand the question.
5    MR. HEISE:  Sure.  I'll be glad to --
6    Q.  So, for example, the marketing value of being
7  an AT&T customer, would Sequent tell its customers that
8  it could tell the world that it's using Dynix which is
9  derived from AT&T?
10    A.  No.
11    MR. KAO:  Objection to form.
12    MR. HEISE:  Q.  Do you know whether Sequent
13  has stated, either publicly or internally, that Dynix is
14  derived from Unix System V?
15    A.  I don't know that explicitly.  I doubt that
16  that statement was made.
17    Q.  At the time that you signed Exhibit 1 to
18  Exhibit 100, which you characterized as a benign
19  agreement, was there anything that you found unclear or
20  ambiguous in the document itself?
21    A.  Yes.
22    Q.  Okay.  Tell us, at the time that you signed
23  it, what you thought was unclear or ambiguous.
24    A.  Well, there are many terms, many things that
25  are imprecise.  In this particular case, the definition

Page 88

1  of "software product" just says System V source code.
2  It's not a listing of all the modules.  Methods and
3  procedures is not specific as to are these patented
4  methods, are these industry-standard procedures, covered
5  by a standards body.  I mean, there's lots of
6  imprecision in this document.
7    Q.  Well, that's what I'm trying to find out from
8  you is:  What in this agreement you believe was unclear
9  or ambiguous at the time that you entered into it?  So,
10  so far you've identified Section 1.04, the definition of
11  "software product"; and in Section 7.06, the methods and
12  concepts.
13    Is there anything else that you believed was
14  unclear or ambiguous at the time that you entered
15  into -- excuse me -- Exhibit 1 to Exhibit 100?
16    MR. KAO:  Objection to form.
17    THE WITNESS:  I don't have a specific
18  recollection of something that I thought was unclear at
19  the time.  I remember only that we needed to ask them
20  some questions about what their intent was.
21    MR. HEISE:  Q.  In these conversations that
22  you've indicated you believe took place between Sequent
23  and AT&T, was it -- were they limited solely to
24  discussions of what the intent was or was there anything
25  else discussed during these conversations?

22 (Pages 85 to 88)

DAVID P. RODGERS

Page 89

1    A.  The ones that I was party to, it was mostly
2  about what the intent was.  I don't know what the other
3  ones were.
4    Q.  Have you seen a single document from Sequent
5  or AT&T that memorialized these discussions that you've
6  described regarding the intent of the parties to this
7  written agreement?
8    A.  I haven't seen --
9      MR. KAO:  Objection to form.
10      THE WITNESS:  I have not seen such a document.
11      MR. HEISE:  Q.  Is there anything else that
12  you can identify for us that you believe was clear --
13  excuse me -- unclear or ambiguous other than what we've
14  just discussed in Section 1.04 and Section 7.06, the
15  definition of "software product" and "methods and
16  concepts," respectively?
17      MR. KAO:  Objection to form.  Are you asking
18  for his recollection of what he remembers from the time
19  period or sitting here today?
20      MR. HEISE:  I'm still back at the time of
21  entering into this agreement.
22      THE WITNESS:  Not to my recollection.
23      MR. HEISE:  Q.  Having had the opportunity to
24  review the agreements again this morning, having had the
25  opportunity to review them apparently on several

Page 90

1  occasions with counsel for IBM, is there anything that
2  you view in this agreement that is unclear or ambiguous
3  today?
4      MR. KAO:  Objection to form.
5      You can answer.
6      THE WITNESS:  Look, today I would also
7  critique it on the parenthetical exceptions, "except as
8  otherwise may be permitted," since there's no reference
9  there.
10      MR. HEISE:  Q.  And what paragraph are you
11  referring to, sir?
12    A.  The phrase "except as otherwise may be
13  authorized or permitted."  I'll see if I can find you a
14  citation here.  It's in the confidentiality paragraph.
15    Q.  That would be Section 7.06.
16    A.  That's not it.
17      Well, I'm not finding it right away.  But
18  there's a parenthetical note in several occasions that
19  just says -- it provides an exception to the
20  confidentiality rule, but there's no citation.  So it's
21  vague as to what those exceptions are and where they
22  might reside.  This is not a monument to drafting.
23      MR. KAO:  I was going to say, if it may speed
24  things up, I think he's talking about 7.06(a), but --
25      MR. HEISE:  Well, that's what I thought he was

Page 91

1  looking at, so -- but I'm --
2      MR. KAO:  But, yeah.
3      THE WITNESS:  Yeah.
4      MR. KAO:  Is that what you're --
5      THE WITNESS:  But I couldn't find the --
6      MR. HEISE:  Q.  I want you to take whatever
7  time you need to --
8      MR. KAO:  Yeah, look through the document and
9  see.
10      THE WITNESS:  Let me look ahead at the next
11  one, see if I find it there.
12      MR. KAO:  Did they get out of order?
13      Oh, it could be that -- looks like his copy
14  is --
15      THE WITNESS:  I got them scrambled.
16      MR. KAO:  -- gotten out of order.  Yeah.
17      THE WITNESS:  Okay.
18      I know it's not in there.  I'll be careful
19  here.
20      I think it's my error.  The parenthetical
21  notes are in my declaration, not in the document.
22      MR. HEISE:  Q.  So that portion of your
23  declaration is unclear?
24    A.  I don't think it's unclear.
25      MR. KAO:  Objection to form.

Page 92

1      MR. HEISE:  Q.  My question before was:  When
2  you signed the agreement, what did you believe was
3  unclear and ambiguous?  And you identified 1.04 --
4    A.  Two items.
5    Q.  -- software products, and methods and concepts
6  in 7.06.
7    A.  Right.
8    Q.  I then asked you:  As you sit here today,
9  after having the opportunity to review with counsel for
10  IBM, go through all this stuff again, is there anything
11  further that you found to be unclear or ambiguous?  And
12  you said, "The parenthetical "except as otherwise
13  permitted."  And I asked you where that is in the
14  document, and it does not appear in the document.
15    A.  That's correct.
16    Q.  And the document I'm referring to is
17  Exhibit 1, the software agreement; right?
18    A.  Yes.
19    Q.  So that is not something that --
20    A.  That is not something --
21    Q.  -- is newly found to be --
22    A.  That is correct.
23    Q.  -- ambiguous or unclear?
24    A.  That's correct.
25    Q.  And in fact, where that appears is in your

23 (Pages 89 to 92)

DAVID P. RODGERS

**Page 93**

1  affidavit or declaration?
2      A.  In my declaration, that's right.
3      Q.  Is there anything else, sir, either at the
4  time or as you sit here today, that you can identify for
5  us in this software agreement that you believe is
6  unclear or ambiguous?
7          MR. KAO:  Objection to form.
8          THE WITNESS:  No.  I think the initial
9  document is very clear.  It's a grant of access to
10 source for internal use.
11         MR. HEISE:  Q.  Well, let's talk about that
12 grant of right to use for internal use.
13         You're referring to Section 2.01; is that
14 correct?
15     A.  Yes.
16     Q.  And actually, I'm going out of order.  I'm
17 going to get back to that in one second.
18         The first item that you indicated was unclear
19 at the time that you signed it was Section 1.04, the
20 software product.
21     A.  Yes.
22     Q.  The agreement states that:
23     "SOFTWARE PRODUCT means materials such as
24     COMPUTER PROGRAMS, information used or
25     interpreted by COMPUTER PROGRAMS and

**Page 94**

1  documentation relating to the use of COMPUTER
2  PROGRAMS.  Materials available from AT&T for
3  a specific SOFTWARE PRODUCT are listed in the
4  Schedule for such SOFTWARE PRODUCT."
5      Is that a correct statement of what the
6  agreement defines "software product" under Section 1.04?
7      A.  That is.
8      Q.  What is unclear about the definition of
9  "software product" as set forth in the agreement?
10     A.  In this particular case, it's not an exact
11 list of what those programs are.  The definition is
12 clear, so far as it goes, in that it's the programs.  It
13 doesn't state that they're in source form.  It's pretty
14 vague as to information used or interpreted by computer
15 programs, because that might come from human beings as
16 well as be part of the text files and documentation
17 files.  So it's a pretty wide-open definition.
18     Q.  Well, in fact, sir, computer programs is
19 defined both to include source code and object code.
20     A.  Yes.
21     Q.  So it is clear with respect to that, is it
22 not?
23         MR. KAO:  Objection to form.
24         THE WITNESS:  It's clear that it includes
25 source and object forms, and then it goes -- however, it

**Page 95**

1  goes on to talk about interpreted information.  It's
2  pretty expansive.
3      MR. HEISE:  Q.  That's correct.  It's much
4  more expansive than just source code, is it not?
5          MR. KAO:  Objection to form.
6          THE WITNESS:  Yes.
7          MR. HEISE:  Q.  Was there anything unclear
8  about the fact that 1.04 covered much more than simply
9  source code?
10         MR. KAO:  Objection to form.
11         THE WITNESS:  No, it's not unclear that it
12 covers much more.  What it is unclear about is:  What
13 are those items?
14         MR. HEISE:  Q.  Well, you would agree that it
15 defines "computer programs" to include source code in
16 object code format; right?
17     A.  Yes.
18     Q.  It also expands to include information used or
19 interpreted by computer programs and documentation
20 relating to the use of the computer programs.
21         So you understood that there were more than
22 just source code being covered by the term "software
23 product"?
24     A.  Yes.
25     Q.  With respect to 2.01, the one we were just

**Page 96**

1  getting ready to talk to before I interrupted myself, it
2  indicates that:
3      "AT&T grants to LICENSEE -- in this case,
4      meaning Sequent -- "a personal,
5      nontransferable and nonexclusive right to use
6      in the United States each SOFTWARE PRODUCT
7      identified in the one or more Supplements
8      hereto, solely for LICENSEE'S own internal
9      business purposes and solely on or in
10     conjunction with DESIGNATED CPUs for such
11     SOFTWARE PRODUCT."
12         Is that a correct statement, sir?
13     A.  Yes, that's a . . .
14     Q.  And it's in here where it makes clear one of
15 the topics we were talking about earlier, that it's for
16 licensee's own internal business purposes, which is how
17 you had characterized this agreement before.  Is this
18 where you're getting the language from --
19     A.  Yes.
20     Q.  -- that this was a document memorializing that
21 it was for Sequent's own internal business purposes?
22     A.  Right.
23         MR. KAO:  Objection to form.
24         MR. HEISE:  Q.  Would you agree, sir, that it
25 clearly limits the right of Sequent to use the product

24 (Pages 93 to 96)