DAVID P. RODGERS

Page 97

1  in the United States?
2      A.  Yes.
3      MR. KAO:  Objection to form.
4      MR. HEISE:  Q.  Do you know whether the
5  software product was used outside the United States by
6  Sequent at any time?
7      MR. KAO:  Objection to form.
8      THE WITNESS:  I assume you're referring to the
9  period of time that this agreement alone was in force?
10     MR. HEISE:  Q.  No.  I need to ask you what
11 you mean by "this agreement alone was in force."
12     A.  After the distribution rights agreement was
13 signed, then certain elements, as part of the binary
14 distribution, might have been distributed outside of the
15 United States.
16     Q.  Okay.  And I appreciate you making that
17 clarification, because I'm talking strictly source code,
18 not binary code.
19     A.  Okay.
20     Q.  So my question to you is:  Do you know whether
21 Sequent at any time distributed source code covered by
22 this software agreement outside the United States?
23     A.  Not to my knowledge.
24     MR. KAO:  Objection to form.
25     MR. HEISE:  Q.  Did Sequent have any

Page 98

1  facilities outside of the United States?
2      A.  It did.
3      Q.  Where?
4      A.  It had sales offices in the U.K., outside of
5  London.  It had sales offices in Hong Kong.  It had
6  sales offices in France and Paris.  It had sales offices
7  in Japan, outside of Tokyo.
8      Q.  Did Sequent have engineers working anywhere
9  outside the United States?
10     A.  Yes.
11     Q.  Did it have engineers working on Dynix outside
12 the United States?
13     A.  Do you mean in the creation of Dynix or in the
14 support or —
15     Q.  At any time after the System V code was
16 licensed from AT&T.
17     MR. KAO:  Objection to form.
18     THE WITNESS:  Of course.  I mean, part of the
19 sales process and technical sales is to have an engineer
20 tell the customer when the sales guy's lying.
21     MR. HEISE:  Q.  Do you know whether Unix
22 System V was used by Sequent in India, for example?
23     A.  Not to my knowledge.
24     MR. KAO:  Objection to form.
25     MR. HEISE:  Q.  Did Sequent have engineers

Page 99

1  working on Dynix with access to Unix System V in India?
2      MR. KAO:  Objection to form.
3      THE WITNESS:  Not to my knowledge.
4      MR. HEISE:  Q.  Did Sequent, in fact, have
5  engineers in India?
6      MR. KAO:  Objection to form.
7      THE WITNESS:  During my tenure at Sequent, no.
8  I'm aware that Sequent made outsourcing arrangements
9  with Indian firms later, although I don't think that
10 those were related to System V.
11     MR. HEISE:  Q.  What do you think they were
12 related to?
13     A.  I think they were related to other product
14 support issues.
15     Q.  Were they related to Dynix?
16     A.  They may have been related to Dynix, yes.
17     Q.  In Section 2.01, is there anything that you
18 thought was unclear or ambiguous at the time that you
19 signed it or as you sit here today, after having
20 reviewed it on various occasions both by yourself and
21 with IBM's counsel?
22     MR. KAO:  Objection to form.
23     THE WITNESS:  There's nothing particularly
24 unclear.  I mean, it has the same vagueness that we
25 discussed earlier.

Page 100

1      MR. HEISE:  Q.  The next sentence in
2  Section 2.01 says:
3      "Such right to use includes the right to
4      modify such SOFTWARE PRODUCT and to prepare
5      derivative works based on such SOFTWARE
6      PRODUCT, provided the resulting materials are
7      treated hereunder as part of the original
8      SOFTWARE PRODUCT."
9      Do you see where I'm reading from?
10     A.  I do.
11     Q.  Did you understand that to be identifying what
12 Sequent could or could not do with the Unix System V
13 code that it had licensed?
14     MR. KAO:  Objection to form.
15     THE WITNESS:  I understood it to mean that
16 Sequent was required to maintain the confidentiality of
17 the System V materials that might have been embodied in
18 the derivative work.
19     MR. HEISE:  Q.  What did you understand the
20 phrase "the resulting materials" to be referring to in
21 that sentence?
22     A.  In this paragraph, "the resulting materials"
23 would apply to the source code, the object code that was
24 derived from that source code, and the documentation
25 that would describe the behavior of that object code.

25 (Pages 97 to 100)

DAVID P. RODGERS

Page 101

1    Q.   Did you understand that the resulting
2   materials referred to the modifications and derivative
3   works based on the software products?
4    A.   I don't understand your question.
5    Q.   In this sentence where it says,
6   ". . . provided the resulting materials are treated
7   hereunder as part of the original SOFTWARE PRODUCT," did
8   you understand, sir, that the phrase "the resulting
9   materials" was referring to the modifications and
10   derivative works based on the software product?
11    A.   No, I did not.
12    Q.   What did you believe it was referring to?
13    A.   To the original System V source code and
14   object code.
15    Q.   Well, if that's the case then, sir, why
16   wouldn't there just be a period after "software product"
17   and you would eliminate the entire second half of that
18   sentence?
19       MR. KAO:  Objection to form.
20       THE WITNESS:  I don't know.
21       MR. HEISE:  Q.  Isn't that what you are now
22   telling us you understood the sentence to mean, that the
23   second half of that sentence didn't mean anything
24   differently than the first half?
25       MR. KAO:  Objection to form.

Page 102

1       THE WITNESS:  No.  My comprehension of this
2   paragraph is that there's an unmodified software product
3   and a modified software product that incorporates other
4   things created by Sequent and that with regard to the
5   unmodified portion, the same treatment applies.
6       MR. HEISE:  Q.  Well, when you would give a
7   customer a copy of Dynix code --
8    A.   Yes.
9    Q.   Source code, not object code.
10    A.   That didn't occur frequently.
11    Q.   But you did make provision for that?  There
12   were licenses for customers to get source code, was
13   there not?
14    A.   There was at least one that I know of.
15    Q.   When a customer would get source code, would
16   it come on a CD or a digital tape as "Here is Dynix," or
17   how would it be provided to a customer?
18    A.   I don't actually recall how the distribution
19   was done.
20    Q.   Would it separate out, this part is Unix
21   System V; this part is BSD; this is Sequent's changes,
22   additions, modifications?
23    A.   The source code distributions that I recall
24   were piecemeal, that as they -- for instance, it was a
25   parallel programming library that was distributed.  They

Page 103

1   were specific to -- the one that I recall very precisely
2   is that in working with Oracle, we needed their help to
3   modify a particular treatment so that Oracle would run
4   better.
5    Q.   So --
6    A.   So it was a piece, is the short answer.
7    Q.   So is Oracle the only company that you can
8   recall Sequent ever providing access to source code?
9       MR. KAO:  Objection to form.
10       THE WITNESS:  There probably were others.
11   That's the one I recall.
12       MR. HEISE:  Q.  So whenever Sequent would
13   provide Dynix to customers, with the exception of Oracle
14   and possibly a few others, it was always in object code
15   format?
16    A.   The typical distribution was object, yes.
17    Q.   Would the object code format encompass all of
18   Dynix, including the BSD portions, the Unix System V
19   portions, and whatever changes, modifications,
20   derivative works that Sequent created for Dynix?
21    A.   If your meaning is that, for instance, for the
22   System V environment, there would be header files that
23   are different and the object code to do the conditional
24   symbolic link treatment was included in that object
25   code, yes.

Page 104

1    Q.   It would be one unified product that would be
2   given to a customer?
3       MR. KAO:  Objection.
4       MR. HEISE:  Q.  Wouldn't be in bits and
5   pieces, would it?
6       MR. KAO:  Objection to form.
7       THE WITNESS:  Well, now there were optional
8   components.  I mean, you didn't get everything.
9       MR. HEISE:  Q.  What would be an optional
10   component?
11       Well, first, you said, ". . . now there are
12   optional components."  Was that a change, or is that how
13   it always was?
14    A.   No, it was always -- starting at the
15   beginning, there was only one product; but --
16    Q.   Well, what are you refer- --
17    A.   -- after there were subsequent developments to
18   enhance the product, then the customer didn't, for
19   example, get the compiler if they didn't buy the
20   compiler.
21    Q.   So is that what you're referring to when you
22   talk about "optional components," the compiler?
23    A.   That's an example.
24    Q.   What else are you referring to when you say
25   "optional components"?

26 (Pages 101 to 104)

DAVID P. RODGERS

Page 105

1    A.  The parallel programming library was another
2  example. I'm trying to recall now what else we made
3  optional.
4    Q.  Can you think of anything else?
5    A.  No. I don't have a good recall of what was
6  optional.
7    MR. HEISE: Why don't we just take a
8  couple-minute break. I need to . . .
9    THE VIDEOGRAPHER:  Going off the record. The
10  time is 10:50.
11    (Recess taken.)
12    THE VIDEOGRAPHER:  We are back on the record.
13  The time is 11:03.
14    MR. KAO:  I think at the break Mr. Rodgers had
15  the opportunity to review the software agreement with
16  respect to the provision that he was looking for that
17  was vague, and so he would like to clarify for the
18  record.
19    MR. HEISE:  Q.  Sure.
20    A.  I apologize. I was looking for an open
21  parenthesis, and actually, there's no parenthetical note
22  in the agreement.
23    Q.  What phrase are you looking for now?
24    A.  It's actually in -- I think it's 7.06(a). And
25  the phrase is "at any time becomes available without

Page 106

1  restriction to the general public." That phrase.
2    Q.  And just so that this is all in context,
3  you're identifying the phrase that "at any time becomes
4  available without restriction to the general public"
5  from Section 7.06(a) as something that you find to be
6  unclear or ambiguous, as you sit here today. It's not
7  something that you found unclear and ambiguous at the
8  time that the agreement was entered into. Is that
9  correct?
10    A.  No. What I was saying is that at the time, my
11  interpretation of that phrase was based upon my
12  experience with other confidentiality agreements. It's
13  not explicit in this agreement, but it requires
14  interpretation from context.
15    Q.  What was your understanding at the time
16  leading up to the execution of this agreement what this
17  phrase meant, based on your experience?
18    A.  As I stated, I think in response to Mr. Kao's
19  question, it was either as publicly disclosed by the
20  originator or the information is independently derived
21  or becomes public through the result of a court
22  proceeding.
23    Q.  I'm having trouble understanding, based upon
24  what you've described as your understanding what
25  similar-type phrases mean in your experience, what is

Page 107

1  unclear about this particular phrase as identified by
2  you in 7.06 about becoming available without restriction
3  to the general public.
4    A.  Your question was:  Is this -- in essence,
5  was:  Where did I find this document vague? And my
6  response was, in this particular respect, most such
7  documents are more explicit and so you're forced to rely
8  upon context or experience.
9    Q.  Is there anything else in this document
10  besides what we've discussed in 1.04 and 7.06?
11    A.  I think we also covered 2.01, because it
12  relies on the software product definition is open to
13  interpretation. The paragraph itself is not vague, but
14  the interpretation is open.
15    Q.  Okay. In reviewing paragraph 5 of your
16  declaration, sir, we talked about much of this when
17  Mr. Kao was examining you, and I just want to follow up
18  on a few points.
19    Here you indicate that you did not personally
20  negotiate. In your mind, who was it that was personally
21  negotiating this agreement?
22    A.  Roger Swanson.
23    Q.  Okay. So not the other executives you
24  identified, Mr. Beck or Mr. Kasten. It was really Roger
25  Swanson that was negotiating?

Page 108

1    A.  Correct.
2    Q.  Are there any other Sequent employees besides
3  Mr. Swanson, Mr. Beck, or Mr. Kasten with whom you
4  reviewed these agreements before signing on behalf of
5  Sequent?
6    A.  It's possible. I don't have a specific
7  recollection.
8    Q.  Given that, would it be fair to assume you
9  don't have a specific recollection of discussions with
10  these other possible Sequent employees?
11    A.  That's accurate.
12    Q.  Okay. Hate to beat something to death, but
13  occasionally you have to.
14    Later on in this paragraph you state that you,
15  quote, have personal knowledge of the parties'
16  understanding of, and intent behind, the terms and
17  conditions of the agreements.
18    Could you tell us where you get your personal
19  knowledge of AT&T's understanding of the terms and
20  conditions of the agreements?
21    A.  It would have come through either the
22  conference calls or a recounting of the consultations
23  with AT&T coming from Roger and others.
24    If I can be more specific, there are elements
25  of the System V source code that, by the nature of the

27 (Pages 105 to 108)

DAVID P. RODGERS

Page 109

1  Unix operating environment, have to be exposed to the
2  customer. And it's just how the system is built. The
3  system uses text files for configuration. The system,
4  as I've previously said, uses header files to bind
5  things in.
6      So we had to clarify the AT&T intent, because
7  the definition of "software product" was so wide-open
8  that no, they didn't mean make it unusable; they meant
9  just don't expose, in bulk, the source code.
10     Q.  Well, besides the header files being allowed
11  to be exposed, what else was discussed between Sequent
12  and AT&T that could be exposed before you entered into
13  this agreement?
14         THE WITNESS:  Again --
15         MR. KAO:  Objection to form.
16         You can answer.
17         THE WITNESS:  I don't have a specific
18  recollection. What I can recount to you is just that
19  there are -- because Unix is built with a lot of text
20  files that are meant to be interpreted or used as
21  configuration information, there are elements of the
22  operating system that are open, that just have to be
23  open. That's the nature of the operating system.
24         MR. HEISE:  Q.  Was it your understanding,
25  then, that as a licensee of Unix System V, that you

Page 110

1  could provide or make public the header files of Unix
2  System V or the text files of Unix System V?
3         MR. KAO:  Objection to form.
4         You can answer.
5         THE WITNESS:  Yes, certain of those things are
6  necessary.
7         MR. HEISE:  Q.  That's what I'm trying to you
8  know, winnow down as to what you mean by that. Let's
9  just stick with the header files, for example.
10     What in the header files was discussed that
11  could be made publicly available by Sequent without
12  Sequent violating the terms of confidentiality?
13         MR. KAO:  Objection to form.
14         You can answer.
15         THE WITNESS:  I don't have a specific
16  recollection about what was discussed, but the header
17  files, in their entirety -- certain header files, in
18  their entirety, have to be exposed.
19         MR. HEISE:  Q.  Which header files have to be
20  exposed publicly from Unix System V?
21     A.  You're asking a question I can't answer from
22  own knowledge.
23     Q.  Then how do you know that header files must be
24  exposed from System V?
25     A.  As a person experienced using Unix.

Page 111

1      Q.  Okay.  What about text files?  What text
2  files, if any, were discussed between Sequent a nd AT&T
3  that you understood could be publicly displayed from
4  Unix System V?
5      A.  Again, we probably wouldn't have discussed it
6  at the level of it's RC1.txt or something like that. We
7  would have discussed it as the system configuration
8  files or the disk table or things like that.
9      Q.  Okay.  So besides hea der files and text files,
10  was anything else discussed tha t you believe Sequent
11  could publicly display from Unix System V and still be
12  in complete compliance with the terms of the software
13  agreement?
14         MR. KAO:  Objection to form.
15         THE WITNESS:  We would have also had to
16  confirm that we could document known defects. When the
17  product is distributed in bina ry form, you have to be
18  able to tell your customers "Don't rely on the CPO-H
19  parameter." And that would be a reference to a System V
20  component, but it's referring to a defect in that
21  component.
22         MR. HEISE:  Q.  Well, would you provide them
23  the source code for that component?
24     A.  No, we would not.
25     Q.  So there's still -- just telling a customer

Page 112

1  that gets it in only the binary, the 1s and 0s, that
2  there's a defect in X portion is not identifying
3  System V code or modification or derivative work, is it?
4      A.  Well --
5         MR. KAO:  Objection to form.
6         THE WITNESS:  That's where the definition of
7  "software product" causes the problem, because it's so
8  expansive, it includes the documentation, which includes
9  the release notes, which includes the defect list. So
10  that's where it gets tangled up.
11         MR. HEISE:  Q.  Okay. So that was your
12  concern, by way of example:  Identifying for a customer
13  that X has a defect is somehow violating the terms of
14  the confidentiality clause as written in this agreement?
15     A.  If you interpret it --
16         MR. KAO:  Objection to form.
17         THE WITNESS:  -- the way it's written, yes,
18  that could cause you a problem.
19         MR. HEISE:  Q.  Any other examples that were
20  discussed with AT&T besides this header files, text
21  files, or defect notes?
22     A.  I wouldn't have been party to the whole of the
23  conversation.
24     Q.  Did you ever see any correspondence between
25  Sequent and AT&T regarding Sequent's belief that it

28 (Pages 109 to 112)

DAVID P. RODGERS

Page 113

1  could, in full compliance with the agreement, disclose
2  header files, text files, or identify in defect notes?
3      A. I did not.
4      MR. KAO: Objection to form.
5      MR. HEISE: Q. Did you see correspondence
6  regarding Sequent's ability to reveal anything from
7  System V other than what I just described? So that I'm
8  not limiting it just to header files, text files, and
9  defect notes.
10      A. I did not.
11      Q. These conversations that we've been discussing
12  about the -- what you've characterized as the intent
13  behind the terms and conditions of the agreements, were
14  these conversations that took place before entering into
15  this agreement?
16      A. Yes.
17      Q. Were there any conversations afterwards?
18      A. I'm sure there were. I don't have a specific
19  recollection.
20      Q. So you cannot relate to us any of the
21  conversations that took place after the agreement was
22  executed regarding what you've described as the intent
23  behind the terms and conditions of the agreements?
24      A. No, not with any precision.
25      Q. In paragraph 6, you start with:

Page 114

1  "It was my understanding that the licensing
2      agreements that I executed were standard form
3      agreements . . . ."
4      From whom did you get that understanding?
5      A. I don't know the name of the person. It would
6  have been one of the AT&T representatives who portrayed
7  the documents as a standard form license agreement.
8      Q. So it was strictly a statement by someone. It
9  wasn't that you had seen other AT&T agreements for
10  software code?
11      A. That's correct.
12      Q. Continuing on in this declaration that you
13  signed, in your second sentence you state:
14      "The Software Agreement granted Sequent the
15      right to use Unix software products,
16      including source code, for its internal
17      business purposes."
18      The way that this sentence was written and
19  which you signed, you seem to indicate that Unix
20  software products is something more than source code.
21      A. Yes.
22      Q. What did you understand the Unix software
23  products to be besides source code?
24      A. It also includes the object code for the
25  unmodified System V, includes the documentation.

Page 115

1      Q. What documentation?
2      A. There's a set of man pages, they're called,
3  which document the commands.
4      Q. Anything else?
5      A. I'm sure there were release notes and various
6  other pieces of descriptive information.
7      Q. Anything else?
8      A. Not to my specific recollection.
9      Q. The phrase "for its internal business
10  purposes," we talked about this earlier. That appears
11  in Section 2.01; is that correct?
12      A. Mm-hmm.
13      Q. You have to say "yes" or "no" out loud.
14      A. Sorry. Yes.
15      Q. What did you understand "internal business
16  purposes" to mean?
17      A. Our intent -- I'll start with that -- was to
18  use the System V materials to create the derivative
19  work. How I interpret internal business purposes is for
20  anything that might please the company. So we might
21  have done a benchmark on a System V platform, which I do
22  recall that we did. So it would have been anything we
23  chose to do for our own education and satisfaction.
24      Q. In other words, keep it within Sequent?
25      A. Yes.

Page 116

1      MR. KAO: Objection to form.
2      MR. HEISE: Q. You continue on that:
3      "The agreement further provided [sic] Sequent
4      the right to modify Unix software products
5      and to prepare derivative works based upon
6      such software products."
7      A. Yes.
8      Q. What did you understand it to mean that, as
9  you say here, that Sequent had the right to modify Unix
10  software products?
11      A. So modifications can take two forms. They can
12  either be an augmentation, the creation of a new
13  capability; or they can be an adaptation, making
14  something that would work except for some minor
15  incompatibility. And I gave some examples earlier about
16  symbol definitions and character sets and things like
17  that as an example of the latter.
18      Q. And if Sequent -- well, could you tell us
19  what, if anything, from Unix System V that Sequent
20  modified?
21      A. In either sense?
22      Q. In either sense of how you are defining
23  "modification."
24      A. Yes. The two examples that I can recall
25  precisely are we modified the way in which Unix System V

29 (Pages 113 to 116)

DAVID P. RODGERS

Page 117

1  semaphores work in order to perform better. The
2  semantics of a -- perhaps I should say that a semaphore
3  is a software object that allows for multiple users of a
4  single resource to coordinate their access to that
5  single resource so that they don't collide.
6      The meaning of a semaphore in System V is
7  different than the meaning of a semaphore release in
8  BSD, and the consequence of that difference in meaning
9  is that System V is less efficient. So in the case of
10  Sequent, we modified, in the sense of augmentation, the
11  way that System V semaphores work so that they were as
12  efficient as the Dynix operating system made them be.
13      Q.  Just to interrupt your train of thought for
14  just one second, when you talk about the System V
15  semaphores, is that also sometimes referred to as
16  System V IPCs?
17      A.  IPC is one of the users of it, but that's
18  not -- it's not the same.
19      Q.  So it's a subset of semaphores, or am I
20  overstating?
21      A.  Interprocess communication is a bigger concept
22  than -- than a semaphore.
23      Q.  Okay. I didn't mean to interrupt. So you
24  were saying the things that you believed that Sequent
25  modified from System V is modified the way that the

Page 118

1  semaphores work. Is there anything else?
2      A.  I'm sure there were many other things, but --
3  and not least of which is adapting System V to run in a
4  large-scale multiprocessor environment, to do resource
5  management in a way that was more efficient with a large
6  number of processors.
7      A small diversion here. The common wisdom at
8  the time was that -- driven largely by the mainframe
9  world, was that multiprocessors stopped being more
10  efficient than uniprocessors at about four processors,
11  which was a true statement but only true because of the
12  way that the operating systems were implemented.
13      So coming back to your question, there were
14  lots of modifications underneath the covers that allowed
15  for the System V semantics to be expressed in an
16  efficient way on a larger-scale multiprocessor.
17      Q.  Well, if I were to look at Dynix code, for
18  example, how would I be able to determine the
19  modifications of the System V semaphores that now
20  appears in the Dynix code?
21      A.  The simple answer is I don't know. The more
22  complicated answer is if the software developer was
23  being a good boy that day, they would have commented it.
24      Q.  The comment would have indicated that "These
25  semaphores are from System V, and I've changed it by

Page 119

1  doing X, Y and Z"?
2      A.  Yes.
3      Q.  Are there any other instances that you can
4  identify for us where Sequent modified System V code for
5  use in any of its Dynix products?
6      A.  I'm struggling to think of another example.
7  But I would say, generally, there were also lots of
8  adaptations where the system product code was modified
9  in some largely cosmetic way to make it compatible with
10  the compiler technology we were using. For a variety of
11  reasons, the binary output format for System V and the
12  binary output format for Berkeley are different in an
13  incompatible way. And so we would have done
14  adaptations, essentially low-value changes, so that the
15  binary output formats could be compatible.
16      Q.  If I'm trying to determine all of the
17  instances of modifications, meaning either new or
18  adaptations, in Dynix that came from System V and a
19  developer was not being a good boy that day, how would I
20  go about determining anything else that was modified
21  or -- modified from System V?
22      MR. KAO:  Objection to form.
23      THE WITNESS:  First, I would say it would be
24  an extremely difficult assignment because the
25  modifications would have taken place over an extended

Page 120

1  period of time by many people.
2      An approach that I would adopt, if I were
3  given that assignment, is to see if I could recover the
4  RCS logs. Sequent, like many companies, maintain a
5  source control system called RCS; and I would attempt to
6  recover, from some archival storage medium, the RCS
7  logs.
8      MR. HEISE:  Q.  In this same sentence that we
9  were just discussing -- we just got done talking about
10  the modification to the right to, quote, prepare derivative
11  works based upon such products, meaning Unix System V?
12      A.  I think my interpretation is straightforward.
13  It means incorporate some or all of the source code, the
14  object code, or the documentation into a resultant
15  source, object, or document.
16      Q.  Can you identify for us, in Sequent's Dynix
17  products, any source, object, or documentation that was
18  incorporated from Unix System V?
19      A.  I don't have specific knowledge.
20      Q.  Do you know whether, in fact, that did take
21  place?
22      A.  Well, we can infer from the earlier discussion
23  that certainly some of the parameterization files might
24  have been incorporated and certainly some of the release

30 (Pages 117 to 120)

Page 121

1   notes might have been incorporated.
2       Q.  If I were to attempt to determine the source,
3   object -- the source code, the object code, or the
4   documentation that was incorporated from System V into
5   some version of Dynix, how would I go about doing that?
6       MR. KAO: Objection to form; calls for
7   speculation.
8       THE WITNESS: That's a near impossibility.
9       MR. HEISE: Q.  Well, your answer is
10  100 percent right, because for me to go about doing that
11  is an impossibility.  So maybe I should rephrase the
12  question.
13      For you to determine what source code, object
14  code or documentation from Unix System V appears, either
15  in whole or in part, in Dynix, what steps would you have
16  to undertake?
17      MR. KAO: Objection to form.
18      THE WITNESS: First, let me say, I am not a
19  forensic expert in document comparison.
20      MR. HEISE: Q.  Right.
21      A.  So my first step would be to go find one.
22      But the techniques that are well understood
23  are that you scan the relevant material for repeating
24  patterns that are above chance probability.  And that's
25  true for whether those repeating patterns are in source

Page 122

1   code or documents or object code.
2       Q.  From the time that the software agreement was
3   executed in 1985, how many versions of Dynix or
4   Dynix/ptx did Sequent create?
5       A.  I don't know a precise number.  Once again, a
6   small number.  Releases happened maybe once a year, but
7   I don't have a precise number.
8       Q.  Not limiting your answer to release, how many
9   changes would occur between, let's say, Release 1 and
10  Release 2?  And I'm just making up numbers just for
11  discussion purposes.  Would there just be, you know, two
12  or three minor changes, or would it go through numerous
13  changes between Release 1 and Release 2 that the public
14  actually saw?
15      MR. KAO: Objection to form.
16      THE WITNESS: There would be probably
17  thousands of changes between releases.
18      MR. HEISE: Q.  Would those changes either
19  appear in the programmer's notes in the code or on the
20  RCS, the control system?
21      A.  The check-ins would occur in the RCS logs.
22  The developer might make small changes, a few changes,
23  or large changes, hundreds or even thousands of changes
24  between check-ins.  There's no way to know that.
25      Q.  You're going to have to forgive me because I'm

Page 123

1   not a hundred percent sure what you mean by "check-ins."
2       A.  Sorry.
3       Q.  So if we could just take one step backwards.
4       If here is Version 1 of Dynix or Dynix/ptx,
5   one of the Sequent products, a programmer, you said,
6   checks in on the RCS log.  What does that mean?
7       A.  Let me start with a just a high-level
8   description.
9       Q.  Okay.
10      A.  As with, I'm sure, preparation of legal
11  documents, if you have more than one contributor, you
12  have the problem of synchronizing the contributions.
13      So in the case of source code, some tool -- in
14  the Sequent case, it was called RCS -- would provide a
15  mechanism where a copy would be checked out, meaning
16  removed from access by others, and that copy is then
17  assigned to a particular developer.  They'll do whatever
18  changes or inspection, whatever modification they need
19  to make; and then they will restore the now modified
20  version to full access, to check it in to the source
21  control system.  At that point that it's checked in,
22  it's now accessible to some other developer to make
23  their changes.
24      Q.  Given that Sequent certainly had more than one
25  engineer, if, for example, you've checked out your --

Page 124

1   and you're working on a particular version and then
2   Engineer No. 2 is also working -- I guess Engineer No. 2
3   cannot also be working on that same version that you
4   checked out.
5       A.  Unfortunately, yes, they can.  And herein lies
6   the bigger challenge, in that it's perfectly acceptable
7   for the developer who's checked it out to second a copy
8   to another developer, and then they take upon themselves
9   the task of reconciling any incompatible changes.
10      Q.  Okay.  So to be able to identify the changes
11  which would include incorporating System V source code
12  or object code, the first step, from what you've
13  described, would be get the RCS logs?
14      MR. KAO: Objection.
15      MR. HEISE: Q.  Is that correct?
16      MR. KAO: Objection to form.
17      THE WITNESS: That would be my approach.
18      MR. HEISE: Q.  And if you didn't have access
19  to the RCS logs, how would you go about determining what
20  Unix System V source code, object code, or documents
21  were incorporated, in whole or in part, into Dynix?
22      MR. KAO: Objection to form.
23      THE WITNESS: Again, I do not qualify as
24  someone --
25      MR. HEISE: Q.  I understand.

DAVID P. RODGERS

Page 125

1    A.  -- who can do this; but my approach, if that
2  was your question, would be to get some sort of
3  comparison tool -- and there are now some very
4  sophisticated ones that are being used by universities
5  to detect plagiarism -- identify suspect areas, and then
6  have a software expert identify whether the similarity
7  that arose in that -- as a result of that activity was
8  as a consequence of the movement of source code or
9  simply because the algorithm required that particular
10  expression.
11    Q.  And just to put this in context, how many
12  lines of code does Dynix -- a version of Dynix comprise?
13    A.  Oh, I have no idea today.  I would guess that
14  it's on the order of 1 to 2 million.
15    Q.  And what about the Unix System V code that
16  you'd have to be comparing it against?
17    A.  System V.2 is actually pretty small, if you
18  exclude the utilities and the --
19    Q.  Right.
20    A.  -- things like that.
21    So it wouldn't be huge.  It would be in the
22  hundreds of thousands maybe.
23    Q.  And then you would have to get this computer
24  program to do the comparison for you?
25    A.  Right.

Page 126

1    MR. KAO:  Objection to form.
2    THE WITNESS:  And most importantly, you'd have
3  to -- once you had suspect areas, you'd have to have
4  someone who is a technical expert in the expression of
5  algorithms say, "Yeah, it's for sure that that's a copy
6  of the source code because it's written so badly" or
7  some other reason; or "Oh, no.  There's only one way to
8  express that."
9    And I gave an example earlier.  There's really
10  only a couple of ways to do digit production when you're
11  printing, and so everybody's going to write the same
12  code.
13    MR. HEISE:  Q.  Right.  That, of course, is a
14  time-consuming task?
15    A.  Yes.
16    MR. KAO:  Objection to form.
17    MR. HEISE:  Q.  With respect to Section 7 of
18  your affidavit, you are making reference to
19  Section 2.01.
20    A.  Let me -- yes, I am.
21    Q.  And in particular, you quote the portion that
22  appears in the second sentence of 2.01.
23    A.  Yes.
24    Q.  I'm curious, in Section 2.01, you identify in
25  the next sentence, you state:

Page 127

1    "I did not understand this language to give
2    AT&T Technologies the right to assert
3    ownership or control over modifications or
4    derivative works prepared by Sequent, except
5    to the extent that the licensed Unix software
6    product was included in such modifications or
7    derivative works."
8    Rather than telling us what you did not
9  understand this language to give AT&T Technologies the
10  right to, what did you understand it, in fact, did give
11  AT&T the right with respect to Sequent?
12    MR. KAO:  Objection to form.
13    THE WITNESS:  My understanding of AT&T's
14  rights were to the ownership, authorship and ownership
15  of the source code that was delivered to Sequent and, to
16  such extent as that source code was carried forward in
17  the derivative work, that ownership prevailed; the
18  consequence being that they had a right to control the
19  distribution of the portions which they owned.
20    MR. HEISE:  Q.  Well, what I don't understand,
21  sir -- and hopefully you can clear up for us -- is
22  nowhere in Section 2.01 does the word "own" or
23  "ownership" or "control" appear.  So where is it that
24  you're coming up with your understanding of what this
25  language did not do?

Page 128

1    MR. KAO:  Objection to form.
2    THE WITNESS:  The keyword in my reading of
3  Section 2.01 of the document is in the last phrase:
4    ". . . provided [that] the resulting materials
5    are treated hereunder as part of the original
6    SOFTWARE PRODUCT."
7    MR. HEISE:  Q.  Right.
8    A.  So "treatment," again, is an open-ended word.
9  Treated in what context?
10    Q.  What did you understand them to be treated?
11    A.  So my understanding of the word "treated" here
12  was with regard to confidentiality, not with regard to
13  intellectual property ownership.
14    Q.  So then what you understood on Section 2.01
15  was that it was not discussing ownership but, instead,
16  was stating that the right to use includes the right to
17  modify and to prepare derivative works, providing the
18  resulting materials are treated confidentially?
19    MR. KAO:  Objection to form.
20    MR. HEISE:  Q.  Is that what you're telling
21  us?
22    A.  Yes.
23    Q.  Did Sequent maintain in confidence its Dynix
24  source code?
25    A.  To the best of my knowledge, we did.

32 (Pages 125 to 128)

DAVID P. RODGERS

Page 129

1    Q. Other than, I think you said, Oracle having a
2 right to view Dynix's source code -- first, when Oracle
3 got the right to view Dynix source code, did it do so
4 pursuant to a license from Sequent?
5    A. It was -- I can't say that it was a license
6 agreement. I'm sure there was a confidentiality
7 agreement.
8    Q. Do you know whether Oracle or any other
9 company that was allowed to see Sequent's Dynix code was
10 also required to get a source viewing license from AT&T
11 or any of its successors, including SCO?
12    MR. KAO: Objection to form.
13    THE WITNESS: I don't know that with
14 certainty. I recall anecdotally that we did check with
15 other companies with whom we partnered to do development
16 that they had an AT&T license.
17    MR. HEISE: Q. So, to your knowledge, Dynix
18 code was always maintained in confidence?
19    A. To the best of my knowledge.
20    Q. Do you know whether at any point in time Dynix
21 code has not been maintained in confidence?
22    MR. KAO: Objection to form.
23    THE WITNESS: Now you have to be specific with
24 respect to which portion of Dynix code.
25    MR. HEISE: Q. Any portion of Dynix code.

Page 130

1    A. And so as I've previously explained, certain
2 elements of Dynix which were wholly created by Sequent
3 have been made available. And as a consequence of the
4 design of the operating system, specific pieces of the
5 Dynix operating system are routinely made public.
6    Q. If we could, I'd like to address those
7 separately.
8    You said certain elements of Dynix code have
9 been made publicly available. What elements of Dynix
10 code have been made publicly available?
11    A. The one that I explicitly know about is the
12 parallel programming library.
13    Q. How was that made publicly available?
14    A. There was a little distribution kit made, and
15 there was a little handbook published.
16    Q. And when was that done?
17    A. A long time ago. Maybe '85, '84 sometime.
18    Q. So sometime prior to entering into the
19 agreement with AT&T?
20    A. I don't know the timing.
21    Q. Well, if it was '84, it would have been
22 before; if it was '85, it would have been right around
23 that time.
24    A. Yeah.
25    Q. Are you aware of any other elements of Dynix

Page 131

1 code that have been made publicly available besides this
2 distribution kit?
3    A. Not explicitly.
4    Q. Do you know whether any portions of Dynix have
5 been made available publicly by contribution of it to
6 Linux?
7    A. I don't know that from own knowledge. I've
8 heard that reported.
9    Q. From whom have you heard it reported?
10    MR. KAO: I guess I would caution you, to the
11 extent you learned things from counsel, you're not to
12 disclose that; but if you learned such information from
13 anywhere else --
14    THE WITNESS: Yeah.
15    MR. KAO: -- you can testify to that.
16    THE WITNESS: I've seen some Web article, or
17 something like that, that talked about various
18 contributions.
19    MR. HEISE: Q. Other than the distribution
20 kit, some Web article that you may have seen regarding
21 Dynix code being contributed to Linux, are you aware of
22 any other instance in which Dynix code was made publicly
23 available?
24    A. None to my explicit knowledge.
25    Q. Why would -- why was it important to Sequent

Page 132

1 to keep the Dynix code confidential?
2    MR. KAO: Objection to form.
3    THE WITNESS: At the time -- times, of course,
4 change; but at the time, Sequent had a performance and a
5 stability advantage over its competitors because of the
6 way in which we implemented the parallel processing and
7 the resource allocation. And like all trade secrets, I
8 mean, it has some value at the time.
9    Eventually, as happens in the computer
10 industry, somebody figures out how to do it in another
11 way and then you're done.
12    MR. HEISE: Q. Right. Now, you also
13 indicated that you thought certain portions of Dynix,
14 based upon its design, were routinely made publicly
15 available. What specifically are you referring to?
16    A. I'm just referring to the release notes which
17 describe defects, the configuration files, the header
18 files, as we have talked about.
19    Q. You're not including source code in that?
20    A. Not including algorithmic source.
21    Q. Now, with respect to 2.01 and your
22 understanding that it meant to keep the resulting
23 materials as confidential, I still don't understand how
24 it is that from that you are indicating your view that
25 you did not understand this language to cover subjects

33 (Pages 129 to 132)

DAVID P. RODGERS

Page 133

1  such as ownership and control that are nowhere mentioned
2  in there.
3       MR. KAO: Objection to form.
4       THE WITNESS: Well, I think that's my point,
5  is that the word "treated" is pretty open-ended.
6       MR. HEISE: Q. And I understand that's your
7  statement and that you've said you believe that to mean
8  to be covering confidential --
9       A. Right.
10      Q. -- or confidentiality requirements.
11      A. So if you're asking how did I come to that
12  understanding of the word "treated," it was through a
13  conversation with the AT&T guys.
14      Q. Tell us about that conversation.
15      A. You know, I don't think I can recount it word
16  for word, but it would have been along the lines of
17  "You're certainly not trying to capture my source code."
18      And it's not something I would have done or
19  even could have done.
20      Q. Well, when you say "capture," are you talking
21  about that AT&T indicated to you that it would not be
22  claiming ownership in --
23      A. Yes.
24      Q. -- Dynix?
25      A. That's correct.

Page 134

1       MR. KAO: Objection to form.
2       MR. HEISE: Q. Do you understand there to be
3  a difference between ownership and control?
4       A. There can be.
5       Q. What's your understanding of the difference
6  between ownership and control?
7       A. I mean, to own something means that I have the
8  right to dispose of it as I choose. To control
9  something -- examples might be restrictive covenants in
10 a deed or something like that -- simply means that I
11 have the ability to restrain certain actions.
12      Q. Would you agree that the ability to restrain
13 certain actions would also include the right to dictate
14 what an owner of the property can do with that property?
15      MR. KAO: Objection to form.
16      THE WITNESS: As in my example, yes.
17      MR. HEISE: Q. And included in your example,
18 would it be that the fact that somebody owns something,
19 they can be restricted in disposing of what it is that
20 they own?
21      MR. KAO: Objection to form.
22      THE WITNESS: It's possible.
23      MR. HEISE: Q. Now, you conclude in
24 paragraph 7 that you never -- I quote:
25      "I would never have signed an agreement that

Page 135

1       would grant ownership or control to AT&T
2       Technologies . . . ."
3       And then you continue on. Is this a statement
4  on your part as to what you would do, or is this a
5  statement of Sequent's corporate position?
6       MR. KAO: Objection to form.
7       THE WITNESS: I think it can be interpreted
8  both ways; that is, acting on behalf of Sequent, I was
9  not authorized to bargain away the intellectual property
10 rights of Sequent's investment of years in the Dynix
11 source code.
12      As an individual -- and I hope that, you know,
13 I wasn't being made a fool by the AT&T lawyers. As an
14 individual, I did not interpret this language and the
15 words of explanation that were given to me as meaning
16 that AT&T had any -- was making any attempt to take
17 control of my source code.
18      MR. HEISE: Q. Did you understand, when you
19 viewed the word "treated" as restricting
20 confidentiality, that that was going to place
21 restrictions on your source code?
22      MR. KAO: Objection to form.
23      THE WITNESS: Yes, with regard to disclosure.
24      MR. HEISE: Q. And in fact, from what you've
25 described to us, other than what you may have read in a

Page 136

1  Web posting, Dynix -- or excuse me -- Sequent did not
2  make public Dynix that contained Unix System V at any
3  point in time?
4       MR. KAO: Objection to form.
5       THE WITNESS: Not to my knowledge.
6       MR. HEISE: Q. Based upon what we've
7  discussed so far, I'd like to clarify your understanding
8  of Dynix.
9       Is it your understanding, as you sit here
10 today, that Dynix or Dynix/ptx contains some or no part
11 of Unix System V?
12      A. First, let me state, I don't know --
13      Q. Okay.
14      A. -- today. I have no idea.
15      Q. Well, how about let's then take you back to a
16 time when were you there last in 1996.
17      A. In the past, I think I can state with
18 reasonable confidence that Dynix did not contain any
19 System V source code --
20      Q. Okay.
21      A. -- given its derivation.
22      I can be reasonably certain that Dynix/ptx had
23 some elements of System V source code embodied in it; in
24 particular, some of the utilities.
25      Q. Would you agree then that with Dynix/ptx

34 (Pages 133 to 136)

DAVID P. RODGERS

Page 137

1  embodying or containing Unix System V, that it was
2  subject at least to this confidentiality restriction
3  that we've been discussing?
4    A.  Those portions --
5    MR. KAO:  Objection to form.
6    THE WITNESS:  -- which were derived from
7  System V, yes.
8    MR. HEISE:  Q.  And we've already discussed
9  about how you would, at least according to you, go about
10  and identify those, quote, portions of Dynix.
11   A.  Yes.
12   Q.  Why is it that you believe it only restricts
13  those portions as opposed to Dynix/ptx?
14   A.  Because in my interpretation, the restrictions
15  apply to those things which are owned by AT&T and do not
16  apply to those things which are owned by Sequent.
17   Q.  And according to the way that you're
18  interpreting this, only if you found actual System V
19  source code, that's the only thing that could not be --
20  that had to be treated confidentially?
21   A.  Essentially.  We've talked earlier about the
22  methods and procedures issue as well.
23   Q.  We're going to get to that, but I'm trying to
24  just follow the format of your --
25   A.  Yeah.

Page 138

1    Q.  Okay.  When you state that you don't know
2  whether Dynix is a derivative work based on Unix
3  System V, what's preventing you from being able to make
4  that determination?
5    A.  And you're now saying Dynix or Dynix/ptx?
6    Q.  Well, I'm going to -- I'll clarify it as
7  Dynix/ptx.
8    A.  Okay.
9    Q.  And I guess what I should do -- I'll let you
10  answer the question as to Dynix/ptx; then I'll ask you
11  another question.
12   A.  Okay.  Dynix/ptx is almost certainly a
13  derivative work of Unix System V.
14   Q.  In paragraph 8 of your declaration, sir, you
15  start the sentence with "As I understood the Software
16  Agreement between Sequent and AT&T Technologies . . . ,"
17  and then you continue on.  I just want to focus on your
18  first part there of --
19   A.  Yes.
20   Q.  -- "as I understood . . . ."
21    Is that from your reading of the agreement
22  only, or is that from some other sources?
23   A.  It relies upon my conversations with the AT&T
24  individuals.
25   Q.  In paragraph 9 is when you first used the word

Page 139

1  "Dynix."  So I know you talked about this a little bit
2  earlier, so I just want to see if I can make sure the
3  record's clear.
4    Dynix starts out, and then after Unix System V
5  is licensed, Dynix/ptx is created; but at the same time,
6  they're both being sold.  And eventually, does Dynix
7  cease or does it just -- what happens?
8    MR. KAO:  Objection to form.
9    THE WITNESS:  Both products continue on.
10  Ultimately, the marketplace for Dynix/ptx was larger
11  than the marketplace for Dynix for Sequent.
12   Q.  Given that statement, that the
13  Dynix/ptx became the larger marketplace, did there come
14  a point in time when Dynix just stopped being worked on
15  or sold and that it was strictly Dynix/ptx?
16    MR. KAO:  Objection to form.
17    THE WITNESS:  I don't know that from own
18  knowledge.  I can't speculate.  I don't know.
19    MR. HEISE:  Q.  In terms of just trying to
20  give us a broad view of Dynix and Dynix/ptx, when
21  Dynix/ptx is where the marketplace was going for the
22  high-end business computing, what is the relative ratio
23  between how much of Sequent was devoted to Dynix/ptx
24  versus its former product of Dynix?
25    MR. KAO:  Objection to form.

Page 140

1    THE WITNESS:  Certainly within development,
2  the bulk of the resources would have been working on
3  Dynix/ptx because it was under development.
4    MR. HEISE:  Q.  Right.
5    A.  And Dynix itself would have been getting, of
6  course, bug fixes and customer support attention from
7  development and probably enhancement.  As I've
8  previously described, the hardware platform evolved over
9  time.  So with each new hardware platform, then Dynix
10  would get revisited to test it, make it compatible, take
11  advantage of any new hardware.
12   Q.  Would it be fair to say that more than
13  50 percent of the company's revenues, expenses,
14  resources, and the like were devoted to Dynix/ptx once
15  that was the product line that was being developed by --
16    MR. KAO:  Objection.
17    MR. HEISE:  Q.  -- Sequent?
18    MR. KAO:  Excuse me.  Objection to form.
19    THE WITNESS:  After some period of time, I
20  would say yes to revenues.  Expenses, I would say no to.
21  SG&A was always bigger.  And so it depends.
22    MR. HEISE:  Q.  Okay.  That's a fair response.
23  But I think you've made clear Dynix/ptx was on the
24  upswing and Dynix without the ptx was on the downswing.
25  Is that --

35 (Pages 137 to 140)

DAVID P. RODGERS

Page 141

1   MR. KAO: Objection to form.
2   MR. HEISE: Q. -- an accurate statement?
3   A. It was certainly not being evolved, yeah.
4   Q. In terms of your role as the vice president of
5   engineering, we know that you at least signed one or
6   more license agreements.
7   A. Yes.
8   Q. What else was encompassed in your role? What
9   I'm getting at is to find out what, if any, work you
10  were doing on Dynix or Dynix/ptx.
11  A. Okay. Let me answer the second question
12  first --
13  Q. Okay.
14  A. -- which is that any work I might have done on
15  Dynix/ptx would have been limited to writing a utility
16  program or editing a text file for English grammar. You
17  would certainly not consider me a contributor to
18  Dynix/ptx in any way.
19  Q. Okay.
20  A. And I referred to myself as the programmer of
21  last resort.
22  With regard to my duties, my job was
23  essentially to maintain the organization. So to recruit
24  new engineers, to sustain the engineers that we did
25  have, to make sure that they received adequate training,

Page 142

1   that there were project plans in place, to monitor the
2   project development schedules, to meet with customers,
3   and to act as a part of the sales process, and to -- as
4   a member of the executive team, to make strategic
5   decisions.
6   MR. HEISE: Two things that are coming up
7   right now. One, we need it take a tape change break.
8   THE WITNESS: Okay.
9   MR. HEISE: And also, I need to check out of
10  the hotel.
11  THE WITNESS: Okay.
12  MR. KAO: All right.
13  THE WITNESS: All right.
14  MR. HEISE: If we could just go ahead and --
15  MR. KAO: Why don't we just --
16  MR. HEISE: -- make this a lunch break.
17  MR. KAO: -- go off the record then.
18  MR. HEISE: Yeah.
19  THE VIDEOGRAPHER: This marks the end of Tape
20  No. 2 in the deposition of David Rodgers.
21  We're going off the record. The time is
22  11:59.
23  (Luncheon recess taken at 11:59 a.m.)
24  --oOo--
25

Page 143

1   AFTERNOON SESSION        1:02 P.M.
2   (Mr. James not present.)
3   THE VIDEOGRAPHER: We're back on the record.
4   This marks the beginning of Tape No. 3 in the
5   deposition of David Rodgers. The time is 1:02.
6   MR. HEISE: Q. Sir, just continuing on a
7   little bit past where we left off, if I can direct your
8   attention to Section 11 of your declaration.
9   A. Okay.
10  Q. You identified this as the confidentiality
11  clause, and you indicated earlier that this was
12  one of the areas -- although I may be misspeaking, so.
13  please feel free to correct me -- this was one of the
14  areas that you thought had ambiguity in it or was not
15  clear at the time that you signed the agreement?
16  A. Yes, particularly with regard to methods or
17  concepts.
18  Q. Okay. Was there anything in Section 7.06 at
19  the time that you were discussing and ultimately
20  executed the agreement that you thought was unclear or
21  ambiguous other than the section pertaining to methods
22  or concepts?
23  A. No. Again, this paragraph is clear in its own
24  sense, although it relies upon the software products
25  definition that has some vagueness to it.

Page 144

1   Q. Right. But I'm just focusing you on anything
2   else in 7.06 that you thought was unclear at the time
3   that you were negotiating or people were negotiating and
4   you ultimately executed the software agreement besides
5   what you've identified as methods or concepts and now
6   referring back to the definition of "software products"
7   from Section 1.04. Anything else?
8   A. No. That's it.
9   Q. Would you agree, then, sir, that the
10  restriction was with respect to all parts of the
11  software products subject to this agreement and not just
12  some parts?
13  A. Can you say that --
14  MR. KAO: Objection to form.
15  THE WITNESS: -- in a different way?
16  MR. HEISE: Q. Sure. In reviewing
17  Section 7.06, it states that:
18  "[The] LICENSEE," meaning Sequent, "agrees
19  that it shall hold all parts of the SOFTWARE
20  PRODUCTS subject to this Agreement in
21  confidence for AT&T."
22  Based upon that language, would you agree that
23  Sequent was obligated to hold all parts of the software
24  products subject to this agreement in confidence for
25  AT&T as opposed to just some or -- as opposed to some

36 (Pages 141 to 144)

DAVID P. RODGERS

Page 145

1  parts?
2      MR. KAO: Objection to form.
3      THE WITNESS: Okay. So as I've previously
4  said, with the comprehension that the parts of the
5  software product, meaning the source code, the
6  algorithmic portion of the source code, but not with
7  regard to documentation, some documentation elements,
8  some scripting elements.
9      So the short answer is no, I don't agree.
10     MR. HEISE: Q. Okay. So that's going back to
11 your view that the definition of Section 1.04 and
12 software products is not clear to you?
13     MR. KAO: Objection to form.
14     THE WITNESS: Well, I made an assumption at
15 the time, clarified by conversation, about what was and
16 was not in scope.
17     MR. HEISE: Q. And we've talked about that --
18 A.  We've talked about that.
19 Q.  -- at length.
20     And do you have anything further to add as to
21 what you assumed or decided or heard was encompassed in
22 software products that we've not already discussed this
23 morning?
24 A.  We've covered it.
25 Q.  With respect to this statement in

Page 146

1  Section 7.06, that it includes methods and concepts as
2  being something that will not be disclosed, who did you
3  speak to at AT&T that indicated to you that that clause
4  of restricting methods and concepts does not apply to
5  Sequent?
6  A.  Again, I don't recall the name of the
7  individual. It was whoever Roger had on the call.
8      And as I think I mentioned earlier, I'm also
9  relying upon my knowledge at the time that many of the
10 methods and concepts for Unix were already disclosed by
11 other -- other means.
12 Q.  Well, did you or anyone at Sequent attempt to
13 modify the agreement so that it no longer included the
14 phrase "including methods or concepts utilized therein"
15 so that it would be clear that Sequent was not, in fact,
16 restricted in its use of the methods and concepts of
17 Unix System V?
18 A.  Not to my knowledge.
19     MR. KAO: Objection to form.
20     THE WITNESS: Sorry.
21     MR. KAO: Give me a chance to object.
22     THE WITNESS: Not to my knowledge. We were
23 relying upon the assurances of AT&T folks on how they
24 were going to enforce the language.
25     MR. HEISE: Q. And those assurances -- I

Page 147

1  think we've covered this -- were never in writing
2  regarding this methods and concepts clause; is that
3  correct?
4  A.  Not to my knowledge.
5  Q.  And the reason that you believed that the
6  methods and concepts could not be restricted or was not
7  subject to the restrictions of this agreement was
8  because they appeared in the public?
9  A.  Many of them, yes, had already appeared in
10 public.
11 Q.  Okay. Could you identify for us the methods
12 and concepts of Unix System V that publicly appeared
13 that were used in Dynix/ptx?
14     MR. KAO: Objection to form.
15     THE WITNESS: I can give you an example. I
16 certainly can't enumerate all of them.
17     MR. HEISE: Q. If you could just tell us all
18 that you can identify for us.
19 A.  So, for example, the notion of a treed
20 directory structure, which is fundamental to Unix, is
21 well documented in lots of literature. The concept of
22 an I-node as a way of traversing a directory tree. The
23 concept of dynamic memory allocation. The concept of a
24 process identifier.
25 Q.  Did you say a process identifier?

Page 148

1  A.  Process identifier, PID. I'm trying to think
2  of -- the concept of a file handle.
3      There are a whole series of concepts
4  associated with Unix around the file system, basically
5  treats the file system as an extended text string
6  without any real delimiters.
7  Q.  Anything else, sir?
8  A.  I'm running out of -- you know, if you get me
9  long enough, I might come up with some more, but . . .
10     Very many of the concepts are documented and
11 well explained in the text that were available at the
12 time and certainly in text available since.
13 Q.  Okay. I noticed in introducing each of these
14 categories, you identified them as the concept, for
15 example, of a treed structure or as an I-node.
16     What about the method of actually implementing
17 that concept? Was that also publicly displayed in these
18 texts and other public forum that you --
19 A.  In many cases, yes.
20 Q.  So you could see the actual manner in which
21 the source code was written for I-nodes in System V in
22 these texts?
23 A.  Right. You would typically find a fragment of
24 C language programming that would show tree traversal or
25 something like that.

37 (Pages 145 to 148)

DAVID P. RODGERS

Page 149

1    Q.  And when you talk about a fragment, what do
2    you mean by "a fragment"?
3    A.  It will be less than all of a source module,
4    but the core lines of code in a source module that are
5    actually doing the work.
6    Q.  Why would it be limited to merely a fragment
7    in these texts as opposed to the entire file?
8         MR. KAO:  Objection to form.  It calls for
9    speculation.
10        MR. HEISE:  Q.  You can answer.
11        MR. KAO:  You can answer the question.
12        THE WITNESS:  Because there's a lot of chaff
13   in a source module.  There's usually about a dozen lines
14   of commentary that have a copyright notice and
15   authorship indication and, you know, a few comments
16   about what the intent of the module is.
17        And very often, particularly if you're just
18   trying to be illustrative, you don't need to provide all
19   the symbol definitions.  Those are things you can
20   establish by context as you're reading the code.
21        MR. HEISE:  Q.  So when you've been talking
22   about fragments, it's eliminating copyright notice,
23   authorship, comments, and definitional portions of that
24   particular file?
25   A.  Yes.

Page 150

1         MR. KAO:  Objection to form.
2         MR. HEISE:  Q.  Is there anything else that
3    would be eliminated from these fragments besides actual
4    source code?
5         MR. KAO:  Objection to form.  Are we talking
6    about the context of these books that he's talking
7    about?
8         MR. HEISE:  He's been talking about these
9    methods and concepts that appear publicly in books.
10        MR. KAO:  Okay.
11        MR. HEISE:  And I'm just trying to establish
12   what it is that he believes is in these books and what
13   isn't.
14   Q.  So you've identified what you've been using
15   the term "fragments" of it appear.  And a fragment, at
16   least as I understand it from you, is the source code,
17   taking away the copyright, the authorship, comments, and
18   definitional section.
19        Is there anything else that does not appear in
20   these fragments, or are you telling us that if you strip
21   all that, you're left with all the source code that
22   appears in a given file?
23   A.  Now it will depend upon the example and the
24   author.  Sometimes the author will use ellipses,
25   omitting a repetitive section of the code.  So, for

Page 151

1    example, if the code is a case statement, where it wants
2    to treat -- where the code is intended to treat a series
3    of values -- you know, let's say it's the digits from 0
4    to 9 -- the author might show the code for digit 0,
5    digit 1, skip all the digits up to 9, and just show the
6    code for digit 9.
7    Q.  If all of the necessary information appears in
8    these public texts, why would a company like Sequent
9    bother to enter into a license to get what's otherwise
10   publicly available?
11        MR. KAO:  Objection to form.
12        THE WITNESS:  First of all, the presumption
13   that all of the code appeared in the text is incorrect.
14   It doesn't.
15        MR. HEISE:  Q.  Was there any part of the code
16   that was necessary that did not appear in the text?
17        MR. KAO:  Objection to form.
18        THE WITNESS:  Many parts.
19        MR. HEISE:  Q.  With respect to the read-copy
20   update at Sequent, were you -- were you at Sequent when
21   that technology was written?
22        MR. KAO:  Objection to form.
23        THE WITNESS:  I think not.
24        MR. HEISE:  Q.  Do you have any understanding
25   about read-copy update, how it interfaces with a kernel,

Page 152

1    where it's located, anything like that; or is that,
2    since it was not during your tenure, something that you
3    are not familiar with?
4    A.  I'm not familiar with.
5    Q.  Fair enough.  How about NUMA, Non-Uniform
6    Memory Access?  Were you involved in the authorship or
7    creation of that at Sequent?
8    A.  In the sense of architecture, yes.  In the
9    sense of coding, no.
10   Q.  In terms of architecture, is it your
11   understanding that this NUMA technology operates inside
12   the kernel?
13   A.  NUMA implementation appears at many layers.
14   It appears at the hardware layer, requiring some
15   specific behaviors of the cache and the bus.  It appears
16   in the operating system that requires some specific
17   behaviors with regard to memory allocation and process
18   dispatch and I/O handling.  It appears occasionally in
19   certain kinds of applications, such as database
20   applications, that need to be cognisant of the
21   underlying architecture.
22   Q.  The NUMA technology, was that in Dynix/ptx?
23   A.  It was eventually in Dynix/ptx.  It wasn't
24   initially in Dynix/ptx.
25   Q.  Is started in Dynix, is your understanding?

38 (Pages 149 to 152)

DAVID P. RODGERS

Page 153

1      A.   That's a harder question.  I don't know, is
2   the best answer.
3      Q.   Does NUMA appear in Dynix/ptx?
4      A.   NUMA support certainly appears in Dynix/ptx.
5      Q.   Well, when you talked about NUMA appearing at
6   various levels, hardware, operating system, does it appear in the kernel?
7   operating system level, does it appear in the kernel?
8      A.   It will appear principally in the kernel.
9      Q.   But with the NUMA that appears, I think you
10  said, principally in the kernel at the operating system
11  level, how does it interface with the existing kernel?
12         MR. KAO:   Objection to form.
13         THE WITNESS:   Not clear what your question is.
14         MR. HEISE:   Q.   Does the kernel have to be
15  modified in any way to accept the NUMA code or
16  technology that's being incorporated?
17         MR. KAO:   Objection to form.
18         THE WITNESS:   Yes.
19         MR. HEISE:   Q.   When you talk about -- I think
20  you used this word earlier, a code module?  Is that my
21  making things up, or --
22      A.   No.
23      Q.   -- is that something that you said earlier?
24      A.   Right.
25      Q.   Okay.  Trying to get an understanding on your

Page 154

1   view of what did or did not have to be maintained in
2   confidence or could be made public or disposed of,
3   et cetera.  If -- when you're using the phrase "code
4   module," could you tell me what you mean by that?  Is
5   that an entire file?  Is it a part of a file?  I'm just
6   trying to get a handle on that.
7      A.   First of all, it would almost certainly be a
8   file.  It might be multiple files, but it would be at
9   least one file.
10         And under most circumstances, a module is a
11  piece of code that implements a function.  It's not
12  complete by itself.  It has to be bound with other
13  functions and bound into the overall operating
14  environment, but it would implement a specific function.
15         So, for example, malloc, which is the way that
16  memory is allocated in the Unix operating environment,
17  is a module that appears in lots of Unixes; but the
18  implementation of malloc, which is give me a piece of
19  virtual memory, will make some calls on lower-level
20  system services that will actually do the allocation of
21  physical memory, the backing store -- meaning the disk
22  that keeps the physical memory when it's not in the main
23  memory -- allocate page table entries, potentially makes
24  notice to -- of the kind of usage of the memory
25  allocation.  If it's for I/O, it's special.  And that

Page 155

1   part of the module could be completely different from
2   one Unix to the next.
3         So if you looked at it from the top, they all
4   look like malloc.  If you look at it from the bottom,
5   they all look different.
6      Q.   So using memory allocation as an example of a
7   code module, was that memory allocation from Unix
8   System V incorporated into Dynix/ptx, to your knowledge?
9      A.   I don't know, is the accurate statement.  My
10  guess is not.
11      Q.   Okay.  Can you identify for us a code module
12  that was used in Dynix/ptx?
13         MR. KAO:   Objection to form.
14         THE WITNESS:   Not specifically.
15         MR. HEISE:   Q.   Well, then let's talk about
16  code module X.
17      A.   Okay.
18      Q.   If we have code module X that is put into
19  Dynix/ptx, what is your understanding as to what Dynix
20  can do with code module X that came from Unix System V?
21         MR. KAO:   Objection to form.
22         THE WITNESS:   Okay.  Whatever the module might
23  be, it will have some application programming interface;
24  it will have some exposed symbol, which is the way in
25  which it's called; and it'll have some parameters, in

Page 156

1   most cases, that are specified in the documentation.
2         MR. HEISE:   Q.   So if code module X is
3   incorporated into Dynix/ptx from System V, is it true
4   that it contains then Unix System V code in that module?
5         MR. KAO:   Objection to form.
6         THE WITNESS:   It's possible.
7         MR. HEISE:   Q.   Okay.
8      A.   It's not required.
9      Q.   Okay.  So just by way of example, then, if we
10  did have code module X that has Unix System V source
11  code in it and that is put into Dynix, is it your
12  understanding that the Unix System V code that appears
13  in that code module X must be maintained in confidence?
14      A.   Yes, if it were copied from the System V
15  source.
16      Q.   What if the -- in the process of taking the
17  Unix System V code module X and putting it into Dynix,
18  would that require that additional lines of code be
19  written so that it would function with the Dynix/ptx
20  system?
21      A.   Quite likely.
22      Q.   Okay.  That's what I assumed, but I just
23  wanted to be sure.
24      A.   And just by completeness, if it's a module
25  that doesn't make sense in the Dynix/ptx context, you

39 (Pages 153 to 156)

DAVID P. RODGERS

Page 157

1 might subtract lines of code. That is, it might simply
2 return successful.
3    Q. Okay. In that situation where, however, you
4 have to add lines of code to this code m odule X so that
5 it functions properly with Dynix/ptx, what is your
6 understanding as to what Sequent's obligations are to
7 maintain in confidence the source code? In the ex ample
8 I just gave you, you've got source code that Sequent
9 wrote so that it would work, and then you've got the
10 original Unix System V source code that appears in code
11 module X.
12    A. Right. On the presumption that it's a single
13 file, if it were a mix of Unix System V code and
14 Sequent-authored code, most likely the entirety would be
15 held in confidence beca use it would be ha rd to expose
16 only the changed lines.
17    Q. Okay. What about if, after going through
18 numerous changes because of programmers dealing with it
19 through Version 1 to Version 2, the Unix System V code
20 lines don't appear as they did in Unix System V? What,
21 if anything, is Sequent obligated to do now with that
22 code module X?
23      MR. KAO: Objection to form.
24      THE WITNESS: In my reasoning, if the function
25 X is now performed in some other way, including the null

Page 158

1 way, then it ceases to have any System V content and
2 it's disclosable at the choice of Sequent, of course.
3      MR. HEISE: Q. So if the lines get rewritten
4 so that they no longer appear as they were in Unix
5 System V, at that point Sequent is no longer obligated
6 to maintain it in confidence?
7    A. Now it's on a fine point. That is, you know,
8 did you just change A to B? I wouldn't consider that to
9 be a sufficient difference. If the module was rewritten
10 to implement the function with a new algorithm and there
11 were no lines of the original code, then I would say
12 yes.
13    Q. Even though it's performing the same function
14 as originally?
15    A. Right. The functions are specified by the
16 operating system interface.
17    Q. Do you make any distinction in this example as
18 to whether we're taking about C code versus header file
19 code?
20      MR. KAO: Objection to form.
21      THE WITNESS: Yes. I mean, again, you can
22 have the same either huge difference or small difference
23 as the possibility. But because header files generally
24 have to be exposed in order to allow use, they're
25 treated differently.

Page 159

1      MR. HEISE: Q. If there was a code module
2 that -- let's call it code module Y, that contains
3 structures and sequences and organization as it appears
4 in System V, is that, according to your understanding of
5 the software agreement, restricted in any manner?
6      MR. KAO: Objection to form.
7      THE WITNESS: It would depend. If the rea son
8 for the similarity were essentially that there wasn't
9 any other way to do it, then it would hinge on who
10 authored it and when. If the rea son the similarity was
11 there was because it was just copied, then yeah, I would
12 agree that that would be subject to the constra ints.
13      MR. HEISE: Q. So if you have code module Y
14 that has structure, sequence, a nd organization that came
15 from Unix System V and it's not the only way to do
16 something, your understanding is that that would be
17 restricted and would have to be maintained in
18 confidence; is that correct?
19      MR. KAO: Objection to form.
20      THE WITNESS: Yes.
21      MR. HEISE: Q. What if over time that same
22 code module Y that contained the structure, sequence,
23 and organization from System V was rewritten so many
24 times between Version 1 and Version 2 that came out from
25 Sequent so that it no longer followed tha t original Unix

Page 160

1 System V structure, sequence, and organization? Would
2 you consider that something that also had to be
3 maintained in confidence, or could that be provided
4 publicly?
5      MR. KAO: Objection to form.
6      THE WITNESS: Generally, no.
7      MR. HEISE: Q. No, it would not need to be
8 maintained --
9    A. Would not need to be maintained.
10    Q. -- in confidence?
11      No, it would not need to be maintained in
12 confidence?
13    A. Yes. Or yes to a no.
14    Q. Yes, I am correct that would not need to be
15 maintained in confidence, according to you?
16    A. Yes.
17      (Mr. James joins the proceedings.)
18      MR. HEISE: Q. Are you aware of any
19 publications that provided source code for Unix System
20 V, Release 4.0?
21    A. I have no awareness.
22    Q. Well, you had mentioned earlier -- I need to
23 maybe look at my notes -- that you had -- you had a
24 book -- I think it was the Unix System Primer.
25    A. Mm-hmm.

40 (Pages 157 to 160)

DAVID P. RODGERS

Page 161

1    Q.   Is that the one that you said you had in your
2  possession?
3    A.   Yes.
4    Q.   -- that identified Unix.
5         So, first, is this -- when you talk about
6  that, are you talking about identifying fragments in
7  Unix?
8    A.   Yes.
9    Q.   Do you know whether that Unix System Primer
10  was identifying source code from Unix System V,
11  Release 4.0?
12    A.   I don't know.  I don't think so because it
13  appeared much earlier than System V, Release 4.
14    Q.   When is the book that you're talking about,
15  this Unix System Primer?
16    A.   Oh, 1983.
17    Q.   Were there ever times in which Sequent or AT&T
18  did address specific terms of the license in writing?
19         MR. KAO:  Objection to form.
20         THE WITNESS:  I'm not clear what the question
21  is.
22         MR. HEISE:  Okay.  I'll be glad to try and
23  rephrase it.
24    Q.   We've talked at length about certain issues
25  that you said you discussed and learned the intent of

Page 162

1  AT&T; for example, definition of "software product" or
2  what needed to be maintained in confidence, whether it
3  was methods or concepts.  And all those were oral,
4  nothing in writing; is that correct?
5    A.   That's correct.
6    Q.   So my question is:  Were there ever times when
7  something was put in writing about any aspect of the
8  contractual relationship between Sequent and AT&T,
9  either from AT&T or from Sequent?
10         MR. KAO:  Objection to form.
11         THE WITNESS:  Yes.  Again, I don't have a
12  recollection of the date; but at some later time, AT&T
13  contracted with Sequent to do development work which
14  required disclosure of the Dynix source code to AT&T.
15  And so there was a document about that time.
16         MR. HEISE:  Q.  Okay.  How about with respect
17  to the Unix System V code?  So I understand your example
18  was with respect to the Dynix code.
19    A.   Mm-hmm.
20    Q.   So with respect to the Unix System V code that
21  was licensed from AT&T, was there ever anything in
22  writing between AT&T and Sequent pertaining to this
23  Exhibit 1 to Exhibit 100?
24    A.   Not to my knowledge.
25         MR. HEISE:  Let me hand you a couple of

Page 163

1  documents and just see if this refreshes your
2  recollection at all.
3         One, I only have one copy of, so we'll mark
4  that as 101.  And the other I do have copies for the
5  whole gang, which we'll mark as 102.
6         And you can just put the sticker over it.
7         THE WITNESS:  Thank you.
8         (Whereupon, Deposition Exhibits 101 and 102
9         were marked for identification.)
10         MR. KAO:  I guess we should give that to her
11  first.
12         So this one is 102?
13         MR. HEISE:  Yes.
14         MR. KAO:  Okay.
15         MR. HEISE:  And this is going to be 103,
16  which -- oh, that's your copy.
17         (Whereupon, Deposition Exhibit 103 was marked
18         for identification.)
19         MR. HEISE:  And 101 is the sole copy.  I
20  apologize for that.
21         MR. KAO:  You want to start with 101?
22         MR. HEISE:  Yes, but I'm going to have to ask
23  you to give it back to me since, as I mentioned, it was
24  the only copy and it's not stapled and all sorts of
25  other maladies.

Page 164

1    Q.   This document makes reference to an April 1983
2  software agreement as modified, and it's regarding
3  Release 2.0.
4    A.   Okay.
5    Q.   And it appears to have a signature for Otis
6  Wilson and for yourself, talking about various terms of
7  that earlier 1983 agreement.
8    A.   Okay.
9    Q.   Is that how changes would be communicated
10  between Sequent and AT&T pertaining to the agreement,
11  whether it's the earlier version of the 1983 or these
12  1985 agreements that are attached to your Exhibit 100
13  declaration?
14    A.   That's what I --
15         MR. KAO:  I object to form.  And could I just
16  have a chance to look at the document --
17         MR. HEISE:  Here you go.  Absolutely.
18         MR. KAO:  -- along with the witness --
19         MR. HEISE:  Yeah.
20         MR. KAO:  -- before we ask questions about it,
21  since we don't have a copy?
22         MR. HEISE:  Q.  Are you done?
23    A.   Yes.
24    Q.   Have you had to time to look at it?  Because
25  I'm not really asking you substantively about the

41 (Pages 161 to 164)

DAVID P. RODGERS

Page 165

1  contents of the document as much as I am about trying to
2  understand the way in which Sequent and AT&T would
3  operate when there was anything that needed to be
4  addressed regarding the agreements.
5          This one, obviously, Exhibit 101, references
6  an earlier agreement between AT&T --
7      A.  Right.
8      Q.  -- and Sequent.
9          Were you involved in the negotiation or
10  execution of the earlier agreement, the 1983 --
11      A.  Yes.
12      Q.  -- that's referenced?
13      A.  I'm presuming that we're talking about --
14      Q.  Well, this references a 1983 agreement, and
15  that's why -- I'm just trying to get clarification on
16  that first.
17      A.  I have no recollection of that.
18      Q.  Okay.  Then going back to my original
19  question, is this your understanding as to how AT&T and
20  Sequent would operate when they were addressing terms in
21  the documents; namely, there would be this
22  correspondence from AT&T and then you or someone at
23  Sequent would sign and return the document?
24      MR. KAO:  Objection to form.
25      THE WITNESS:  I presume so.  I mean, I don't

Page 166

1  have a recollection.  I'm trying to remember now.  I
2  don't think I joined Sequent until July of 1983.  So
3  this -- the agreement that's referred to here would have
4  been executed by somebody else.
5      MR. HEISE:  Q.  Okay.
6      A.  And with regard to is this how we would
7  exchange notes, I think we probably would have
8  exchanged -- when we requested something different, we
9  probably would have phoned them, said "How do you want
10  to deal with this?"
11      Q.  And after a phone call was made, it would be
12  memorialized in a letter and then you would sign it and
13  return it back to AT&T?  Was that the procedure?
14      MR. KAO:  Objection to form.
15      THE WITNESS:  I don't recall that as an
16  ongoing process.
17      MR. HEISE:  Q.  Well, if you could, sir,
18  turning your attention to Exhibit 102, which does make
19  reference to Exhibit 1 of your declaration, the software
20  agreement.
21      A.  Right.
22      Q.  Apparently somebody at Sequent had asked for a
23  particular copy of a book.
24      A.  Right.
25      Q.  And then, again, is that your signature that

Page 167

1  appears on the document?
2      A.  It is my signature.
3      Q.  And again, was this the procedure that would
4  be followed to identify any issues between AT&T
5  regarding the software agreement; namely, a letter from
6  AT&T that would be countersigned by you?
7      MR. KAO:  Objection to form.
8      THE WITNESS:  Actually, this exhibit gives me
9  one other piece of recollection, which is that it was
10  Ira Kistenberg who was on the phone calls most of the
11  time.
12      MR. HEISE:  Q.  Is Mr. -- could you spell the
13  last name?
14      A.  K-i-s-t-e-n-b-e-r-g.
15      Q.  You're reading his name off the --
16      A.  Off the --
17      Q.  -- bottom of the document?
18      A.  Off the document.
19      Q.  So he was the AT&T person --
20      A.  Right.
21      Q.  -- who was on the phone calls?
22      A.  So, but to answer your question, this would be
23  the form that we would take when we asked for something
24  additional.
25      Q.  Okay.  And what about Exhibit 103?

Page 168

1      THE WITNESS:  Do you have this one?
2      MR. KAO:  Yeah.
3      MR. HEISE:  Q.  Is that your signature that
4  appears on 103?
5      A.  Yes, it is.
6      Q.  While you're taking the time to review it, my
7  question is:  When terms were changed or clarified or
8  discussed, is this the procedure that would be followed:
9  AT&T would provide you with correspondence and you would
10  countersign it and return it?
11      A.  That would certainly --
12      MR. KAO:  Object to form.
13      THE WITNESS:  That would certainly be the case
14  with regard to correspondence.
15      Okay.
16      MR. HEISE:  Q.  You've had the opportunity
17  to --
18      A.  I did read it, yes.
19      Q.  -- review this?
20      Having had the opportunity to review
21  Exhibits 101, 102, and 103, just to make sure I covered
22  it for all three, it does have your signature on each of
23  these exhibits; is that correct?
24      A.  It is mine.
25      Q.  And with respect to 103, this was a -- this

42 (Pages 165 to 168)

DAVID P. RODGERS

Page 169

1  was correspondence regarding the sublicensing agreement,
2  meaning the one for the binary --
3      A.  That's correct.
4      Q.  -- code?
5      And was this an example of how terms would be
6  discussed or clarified when AT&T and Sequent concluded
7  that something needed to be clarified?
8      MR. KAO:  Objection to form.
9      THE WITNESS:  In this particular case, I
10 believe that this was a general -- a general change in
11 terms that was not initiated by Sequent.  There was
12 nothing new requested by Sequent.  They obviously had
13 somebody whose behavior they didn't like and they wanted
14 to clarify.
15     MR. HEISE:  Q.  And Sequent agreed to it by
16 indicating --
17     A.  By acknowledging the letter.
18     Q.  -- by indicating and countersigning the
19 document and returning it to AT&T; is that correct?
20     A.  Yes, we did.
21     Q.  Having had the opportunity to review
22 Exhibits 101, 102, and 103, does this refresh your
23 recollection at all as to written correspondence being
24 the manner in which changes or clarifications to the
25 various agreements would occur; namely, they would be

Page 170

1  done in writing and countersigned by Sequent or somebody
2  at Sequent?
3      MR. KAO:  Objection to form.
4      THE WITNESS:  If there was a material change,
5  if it was an increment of rights or content.
6      MR. HEISE:  Q.  Continuing on, sir, with your
7  declaration, in paragraph 14, again, you start a
8  sentence with "As I understood the agreement . . . ."
9      Is that from your reading of the agreement or
10 from any other basis?
11     A.  It's based on having read the agreement,
12 having had the conversations with the parties.
13     Q.  And then in paragraph 15, we touched on this
14 before, about the phrase from Section 7.06 of "available
15 without restriction to the general public" not having a
16 particular definition or example attached to it.  Do you
17 recall that?
18     A.  Yes.
19     Q.  You indicate in your declaration under oath
20 that you believe there are a number of circumstances
21 that would meet the definition of "available without
22 restriction to the general public"?
23     A.  Yes, I do.
24     Q.  The example that's provided here, was that
25 provided by the lawyers or is that an example that was

Page 171

1  provided by you?
2      A.  The example was mine.
3      Q.  Did you provide any other examples that do not
4  appear in your declaration?
5      MR. KAO:  To -- let me -- let me ask.  Are you
6  asking did he provide other examples in discussions with
7  counsel, or did he provide other examples in the
8  declaration, which I think speaks for itself?
9      MR. HEISE:  I will clarify.
10     Q.  Prior to orally agreeing to have Cravath,
11 Swaine & Moore, IBM's lawyers, represent you, did you
12 have any discussions with them about other examples from
13 you, not from them, of instances that would meet the
14 definition of, quote, available without restriction to
15 the general public?
16     A.  I don't have a specific recollection.  In
17 recollecting the conversation, I explicitly remember
18 mentioning books, and I probably -- this is
19 speculation -- I probably would have mentioned public
20 speaking engagements by AT&T personnel.
21     Q.  Backtracking for just one second, but you just
22 brought it up a few minutes ago and it jogged my memory,
23 you talked about this situation where Dynix code was
24 revealed to AT&T.  Was that pursuant to a written
25 agreement?

Page 172

1      A.  Yes, it was.
2      Q.  When's the last time that you looked at that
3  agreement?
4      A.  I don't think I ever looked at that agreement.
5      Q.  Okay.  I guess I assumed something that did
6  not occur.
7      How is it that you became aware of the terms
8  of that agreement between AT&T and IBM for AT&T to
9  review the Dynix code?
10     MR. JAMES:  AT&T and Sequent?
11     MR. KAO:  Objection to form.
12     MR. JAMES:  You said "AT&T and IBM."
13     MR. HEISE:  Thank you.  I will go ahead and
14 start that one over.
15     Q.  How is it you became aware of any of the terms
16 between AT&T and Sequent for AT&T to view the Dynix
17 code?
18     A.  Again, no specific recollection.  The likely
19 occurrence was that Michael Simon spoke at an executive
20 staff meeting about the agreement with AT&T, and my part
21 in that would be to execute on the fulfillment.
22     Q.  Okay.  Are you aware of any books, going back
23 to your paragraph 15, that provide source code from Unix
24 System V in greater than a fragment?
25     A.  I personally am unaware of them.  It would not

43 (Pages 169 to 172)

DAVID P. RODGERS

Page 173

1  be shocking to me that there are texts in use at
2  universities.
3      Q.  Do you have any understanding, sir, as to the
4  confidentiality obligations of universities that have
5  Unix System V?
6      A.  No, I do not.
7      Q.  Do you know one way or the other whether
8  universities, its employees, and students are obligated
9  to maintain in confidence Unix System V and all the
10  other items identified in the agreements between AT&T
11  and the universities?
12     A.  I don't know that.
13     Q.  You indicated that another possible example of
14  situations where something would become available
15  without restriction to the general public would occur
16  because of speaking engagements.
17     A.  Yes.
18     Q.  Could you tell us what you're referring to
19  there?
20     A.  There, as there are in many industries,
21  industry gatherings, industry events where technical
22  people will give talks on how a particular problem was
23  solved or how a particular marketplace need was
24  addressed.  And it was very frequently the case that a
25  developer from AT&T or other company would stand up and

Page 174

1  talk about how they did something really cool.
2      Q.  In these discussions, would they provide the
3  entire source code for that particular item that they
4  may have been discussing?
5      A.  It's not likely, because in a public speaking
6  event, you're limited as to time and you're not likely
7  to go through it line by line.  However, you'll -- in
8  such a case, you'll usually provide the key block
9  diagram of how the module's put together and then some
10  of the key code fragments to say, "Here's how this
11  problem was solved."
12     Q.  In your experience, did you ever see -- did
13  you ever attend any speaking functions where AT&T
14  personnel talked about source code?
15     A.  I'm sure I did.  I don't remember a specific
16  incident.
17     Q.  Do you recall any instance in which more than
18  just source code fragments were ever revealed at any of
19  the engagements that you attended?
20     A.  No, I can't imagine that.
21     MR. HEISE:  If we could just take a short
22  break and I'll check my notes, and --
23     THE WITNESS:  Sure.
24     MR. HEISE:  -- we might get you out of here.
25     THE WITNESS:  Awesome.

Page 175

1      MR. HEISE:  Thank you, sir.
2      THE VIDEOGRAPHER:  Going off the record.  The
3  time is 1:50.
4      (Recess taken.)
5      THE VIDEOGRAPHER:  We're back on the record.
6  The time is 2:11.
7      MR. HEISE:  Q.  Sir, I just have a few quick
8  areas I just want to touch base on.
9      When you gave us your employment history from
10  Carnegie-Mellon all the way through IP Unity, were there
11  any breaks between times when you, for example, went
12  from Digital to Sequent or Sequent to Compaq that are
13  not covered?
14     A.  The only break in my employment was after I
15  left Brightlink and before I started at IP Unity.
16     Q.  What did you do during that time?
17     A.  I took the summer off and looked for a job.
18     Q.  Okay.  Because Brightlink decided it was time
19  to go belly-up?
20     A.  Yep.
21     Q.  All right.  What was the reason that you left
22  Sequent?
23     A.  Essentially, because Sequent was no longer
24  sort of at the forefront of enterprise application
25  innovation.

Page 176

1      The context here is that my expertise over
2  time at Sequent had become IT oriented.  My stint as the
3  CIO and as the professional services guy gave me a lot
4  of insight into how businesses were using open systems
5  technology and enterprise scale applications like SAP
6  and Oracle.  And at that point in time, Compaq was
7  making a big push to partner with those application
8  providers and to use the Windows NT platform as a
9  vehicle to kind of crash the cost of enterprise
10  computing, and that seemed like an innovative thing to
11  do.
12     Q.  Okay.  What about this Roger Swanson?  Do you
13  know why he left Sequent?
14     A.  I don't.  In fact, I don't even know when he
15  left Sequent.
16     Q.  Okay.  How is it that you believe he's in
17  Beaverton or Portland, Oregon, area?
18     A.  I think I maintain sort of peripheral contact
19  with ex-Sequent employees through an Internet mail group
20  called Ex-Sequent, and I've seen Roger appear there in
21  some postings.
22     Q.  Got it.  Then the last thing I just wanted to
23  ask you about, and I meant to earlier, is in paragraph 5
24  of your declaration.
25     A.  Okay.

44 (Pages 173 to 176)

DAVID P. RODGERS

Page 177

1    Q.  Specifically what I'm not understanding is, in
2  your declaration you state:
3      "Although I did not personally negotiate the
4      Sequent Agreements with representatives of
5      AT&T . . . I carefully reviewed the
6      agreements myself with other Sequent
7      employees before executing them . . . ."
8      And then you continue on.
9    A.  Yes.
10    Q.  In reading this, it doesn't indicate anywhere
11  in here that you talked with AT&T personnel.  Because
12  you specifically state that you did not personally
13  negotiate the Sequent agreements with AT&T personnel.
14      Is that just an inaccurate statement as it
15  appears in No. 5?
16      MR. KAO:  Objection to form.
17      THE WITNESS:  I certainly did make contact
18  with AT&T personnel during this process.  And the intent
19  of this statement was just to say that I didn't
20  participate in the drafting; I did participate in the
21  review.
22      MR. HEISE:  I don't have anything further at
23  this time.
24      You may or may not be aware that we were in
25  court earlier this week about your deposition, and for

Page 178

1  the reasons that were stated at length there, we're
2  going to reserve the right to come back when we get
3  additional documentation.  But for today, I very much
4  appreciate the time that you've given us, sir.
5      THE WITNESS:  Thank you.
6      MR. KAO:  I just have a few questions that
7  I'll go through with you.  But --
8      THE WITNESS:  Okay.
9      MR. KAO:  although I may be sitting over
10  here, you can pretend like I'm sitting in Mark's seat.
11      MR. HEISE:  Exactly.  I'll be the puppet
12  master.
13      FURTHER EXAMINATION BY MR. KAO:
14      MR. KAO:  Q.  The first question I had was:
15  With respect to Dynix/ptx, are you aware of what
16  third-party code, apart from code written by Sequent, is
17  in Dynix/ptx?
18    A.  I don't have specific knowledge.  I can say
19  that there are pieces of third-party code in Dynix/ptx,
20  one element of which was written by Oracle.  And there
21  are others, but I don't know them specifically.
22    Q.  Based on your understanding of the licensing
23  agreement, would AT&T have the right to control in any
24  way Sequent's use or disclosure or distribution of that
25  third-party code in Dynix?

Page 179

1      MR. HEISE:  Objection to form.
2      You may answer.
3      MR. KAO:  Q.  Dynix/ptx, I should say.
4    A.  I would hope not.  That's certainly not my
5  interpretation of the licensing agreement.
6    Q.  In your telephone discussions with
7  representatives of AT&T, did you believe that the --
8  well, strike that.
9      Let me ask it this way:  When you were having
10  phone discussions with AT&T about the Unix System V
11  license that you were entering into, did you have
12  discussions regarding changes that Sequent wanted to
13  make to the agreement?
14      MR. HEISE:  Objection to form.
15      You may answer.
16      THE WITNESS:  No.  It was just trying to
17  clarify what was the intent of the language and how they
18  were going to enforce it.
19      MR. KAO:  Q.  Did you yourself feel any need
20  to document in writing your discussions with AT&T
21  Technologies regarding the license agreement?
22    A.  I did not.
23    Q.  And why is that?
24    A.  Perhaps naively, I took them at their word.
25    Q.  Do you know if anyone on your staff at Sequent

Page 180

1  attempted to document discussions with AT&T?
2    A.  It's possible, but not to my knowledge.
3    Q.  Now, if you can look at the software agreement
4  again with me, when Mr. Heise was questioning you, you
5  looked at Section 1.04 --
6    A.  Yes.
7    Q.  -- of the agreement.  Do you remember that?
8    A.  Yes.
9    Q.  And I believe you testified that that -- at
10  the time that you executed this agreement, you believed
11  that that particular section was vague.  Do you remember
12  that testimony?
13    A.  Yes, I do.
14    Q.  Can you explain to me in what sense you
15  believe this section to be vague?
16      MR. HEISE:  Objection.
17      You may answer.
18      THE WITNESS:  Okay.  The description of
19  computer programs and documentation, the capture in that
20  language is too broad to be practical.  As we've
21  discussed previously, the essence of Unix requires that
22  some of the source be exposed and modifiable by the
23  customers.  Certainly the documentation has to be
24  exposed to customers.  And so it's just overbroad.
25      MR. KAO:  Q.  Did you have -- do you recall

45 (Pages 177 to 180)

DAVID P. RODGERS

Page 181

1 specific discussions you had with AT&T Technologies
2 regarding this Section 1.04?
3     A.  I don't have a specific recollection, only
4 clarifying that their intent was not to make the source
5 code unusable.
6     Q.  In other words, you don't remember the exact
7 words they told you?
8     A.  That's correct.
9     Q.  But you do remember discussions where you
10 talked about this section?
11     A.  Right.
12     MR. HEISE: Objection.
13     THE WITNESS: We clarified the intent.
14     MR. HEISE: Objection to form.
15     I know she doesn't want two of us speaking at
16 the same time. She definitely doesn't want three of us
17 speaking at the same time.
18     MR. KAO: Q. Let me ask it this way: Can you
19 just tell me what discussions you remember having with
20 AT&T generally about this Section 1.04?
21     MR. HEISE: Objection.
22     You may answer.
23     THE WITNESS: Only that the intended
24 interpretation of this paragraph was not to restrict our
25 ability to create the derivative work or to sell a

Page 182

1 usable product.
2     MR. KAO: Q. Can you explain what you mean by
3 that?
4     A.  That those things which are necessary to be
5 exposed to make use of the resulting Dynix/ptx or Dynix
6 would be within the interpretation of this paragraph.
7     Q.  I'm not sure I'm understanding your answer.
8     What materials did you understand AT&T to
9 consider part of the software product?
10     MR. HEISE: Objection.
11     You may answer.
12     THE WITNESS: The language is inclusive of
13 object code, source code, and documentation. We
14 clarified with AT&T that that would not be construed to
15 limit our ability to expose those pieces of source code
16 that were necessary for customization or those pieces of
17 documentation that were necessary for use.
18     MR. KAO: Q. And I think in -- when you were
19 discussing this issue with Mr. Heise, the source code
20 that you were referring to were header files?
21     A.  Among them, yes.
22     Q.  Now, did you understand this Section 1.04 to
23 include, as part of the software product, any materials
24 or any source code developed by Sequent on its own?
25     A.  I did not.

Page 183

1     MR. HEISE: Objection.
2     You may answer.
3     THE WITNESS: Sorry.
4     MR. KAO: Q. Did you have any discussions
5 with AT&T regarding whether AT&T considered the software
6 product to include source code that Sequent developed on
7 its own?
8     MR. HEISE: Objection.
9     You may answer.
10     THE WITNESS: I don't recall a specific
11 conversation.
12     MR. KAO: Q. Do you recall general
13 discussions?
14     MR. HEISE: Same objection.
15     THE WITNESS: No, I don't recall a specific
16 conversation. I recall being satisfied that our -- we
17 were not bargaining away the rights to our intellectual
18 property.
19     MR. KAO: Q. And how did you become satisfied
20 with that?
21     A.  Through a verbal assurance from someone at
22 AT&T.
23     Q.  Now, in response to questions from Mr. Heise,
24 I believe you testified that Sequent attempted to
25 maintain the Dynix/ptx source code confidential. Is

Page 184

1 that correct?
2     A.  That's correct.
3     Q.  As you understand the license agreements with
4 AT&T for Unix System V, did Sequent attempt to maintain
5 the Dynix/ptx source code confidential because it was
6 obligated to under the agreement or because it chose to
7 do so as a matter of business practice?
8     MR. HEISE: Objection.
9     You may answer.
10     THE WITNESS: Both of those.
11     MR. KAO: Q. Can you explain what you mean by
12 that?
13     A.  Yes. Certainly, the Dynix/ptx source code
14 that was derived from AT&T was required to be maintained
15 in confidentiality; and for that matter, any third-party
16 contributions that were similarly covered would have had
17 to be maintained in confidentiality.
18     And then in my view, Sequent was free to do
19 what it would with its own source code; but as I
20 explained earlier, we had, at least for the time, a
21 competitive advantage in performance and stability that
22 we wanted to maintain as a trade secret.
23     Q.  Did Sequent maintain its Dynix/ptx source code
24 confidential from AT&T Technologies?
25     A.  It did.

46 (Pages 181 to 184)

DAVID P. RODGERS

Page 185

1    MR. HEISE: Objection.
2    You may answer.
3    MR. KAO: Q. If AT&T requested the Dynix/ptx
4  source code, would you have provided -- would Sequent
5  have provided that source code to AT&T without a license
6  from Sequent?
7    MR. HEISE: Objection.
8    You may answer.
9    THE WITNESS: With an appropriate
10  nondisclosure document or a license.
11    MR. KAO: Q. Did you understand the license
12  agreement that you entered into with AT&T for Unix
13  System V to give AT&T the right to obtain the source
14  code that Sequent developed on its own without any
15  license agreement from Sequent?
16    MR. HEISE: Objection.
17    You may answer.
18    THE WITNESS: No.
19    MR. KAO: Q. Now, in response to a question
20  from Mr. Heise, you stated that you believed that
21  Dynix/ptx was a derivative work of Unix System V. Do
22  you remember that testimony?
23    A. Yes.
24    Q. Can you tell me what you base that answer on?
25    A. Dynix/ptx, because it was -- it had a System V

Page 186

1  personality, would be required to contain, at the very
2  least, the utilities that are a part of Unix System V
3  that are not a part of the Berkeley Standard
4  Distribution.
5    Q. Do you know if Dynix/ptx today still contains
6  that Unix System V code?
7    A. I don't know it from personal knowledge. I
8  would make that assumption.
9    Q. During the time that you were at Sequent, did
10  you know, based on personal knowledge, that there was
11  any Unix System V code contained in Dynix/ptx?
12    MR. HEISE: Objection.
13    You may answer.
14    THE WITNESS: I did not inspect the code to
15  know that to be true.
16    MR. KAO: Q. Do you recall discussing with
17  Mr. Heise the NUMA technology earlier?
18    A. Yes.
19    Q. Can you explain for me what the NUMA
20  technology is?
21    A. NUMA is an acronym for Non-Uniform Memory
22  Access, and it's a way of constructing multiprocessor,
23  multimemory computer systems that give the appearance of
24  having a single shared memory, but the physical
25  realization is multiple distributed memories.

Page 187

1    The Non-Uniform Memory Access refers to the
2  speed of access for memory that's attached directly to a
3  particular processor being faster than memory that's
4  attached to another processor in the cluster. It's a
5  technology that existed a long time before and
6  independent of Unix or any other operating system.
7    Q. Do you understand the NUMA technology that
8  Sequent developed for Dynix/ptx to be based on any code
9  contained in Unix System V?
10    MR. HEISE: Objection.
11    You may answer.
12    THE WITNESS: It's almost certainly not based
13  on Unix System V code.
14    MR. KAO: Q. And why is that?
15    A. There's no contemplation of inhomogeneous
16  memory access or distributed memory in Unix System V.
17    Q. Are there any methods or concepts within Unix
18  System V upon which the NUMA technology that Sequent
19  developed for Dynix/ptx are based on?
20    A. There are certainly related concepts in Unix
21  System V. We mentioned earlier interprocess
22  communication. That is a concept that's useful
23  independent of Non-Uniform Memory Access. But
24  certainly, an application that wants to take advantage
25  of a NUMA machine will lean more heavily on it because

Page 188

1  it's oriented toward communication that doesn't depend
2  on memory speed of access.
3    Q. I guess I don't -- I mean, I may be lost in
4  the technology. Is the NUMA technology based on those
5  methods or concepts within Unix System V?
6    A. No, it is not. I'll give you a little bit
7  more.
8    We talked earlier about different programs
9  wanting to make access to a common resource. It doesn't
10  matter what that resource is.
11    In a shared memory architecture, you can
12  utilize a relatively inefficient synchronization
13  technique called a spin lock, where all the processes
14  that want to access the resource keep looking at a
15  common memory location and waiting for their number to
16  come up essentially.
17    In a Non-Uniform Memory Access machine, that
18  would be very inefficient, because except for the
19  processor that happened to be close to the memory
20  location that was being referenced, all the other
21  processors would have to be using some expensive access
22  mechanism to look at that memory location.
23    So in a NUMA architecture, it's more efficient
24  to use interprocess communication, which is more of a
25  wake-me-when-it's-my-turn mechanism rather than a

47 (Pages 185 to 188)

DAVID P. RODGERS

Page 189

1  I'll-keep-waiting-until-I-see-it's-my-turn mechanism.
2      Q.  And is the interprocess communication concept
3  something unique to Unix System V?
4      A.  No, not at all.
5      MR. HEISE:  Objection.
6      You may answer, which you already did.
7      MR. KAO:  Q.  Is that a method or concept that
8  is used by Unix System V?
9      A.  Yes, it is.
10     MR. HEISE:  Same objection.
11     THE WITNESS:  Yeah.
12     MR. KAO:  Q.  Do you know what the origin of
13 that concept is from?
14     A.  I don't know from own knowledge.  It's lost in
15 the history of computer science.
16     Q.  Now, you looked at Section 7.06(a) of this
17 agreement with Mr. Heise earlier, and I just want to ask
18 you some questions about that.  And in particular, I
19 think you looked at the first sentence, which says that:
20     "LICENSEE agrees that it shall hold all parts
21     of the SOFTWARE PRODUCTS subject to this
22     Agreement in confidence for AT&T."
23     A.  Yes.
24     Q.  Do you see that?
25     And I believe your testimony was that -- well,

Page 190

1  strike that.
2      Let me ask it this way:  Is it your
3  understanding of this provision in the software
4  agreement that Sequent was to hold all parts of the Unix
5  System V source code in confidence for AT&T?
6      A.  Yes.
7      MR. HEISE:  Objection.
8      You may answer.
9      THE WITNESS:  Yes, that's my understanding.
10     MR. KAO:  Q.  Is it your understanding from
11 this agreement that licensee, meaning Sequent, has to
12 hold all parts of the Dynix/ptx software in confidence
13 for AT&T?
14     MR. HEISE:  Objection.
15     You may answer.
16     THE WITNESS:  No, that's not my understanding.
17     MR. KAO:  Q.  What is your understanding of
18 what Sequent has to hold in confidence for AT&T with
19 respect to Dynix/ptx?
20     MR. HEISE:  Same objection.
21     You may answer.
22     THE WITNESS:  Those modules or components
23 which are wholly or in part comprised of the System V
24 source code would have to be held in confidence.  Those
25 modules or components that are independent of Unix

Page 191

1  System V source code are disclosable at the discretion
2  of Sequent.
3      MR. KAO:  Q.  And looking now at the next
4  sentence, which includes the language "methods or
5  concepts utilized therein," did you understand this
6  Section 7.06(a) to require Sequent to hold in confidence
7  methods and concepts contained in Dynix/ptx?
8      MR. HEISE:  Objection.
9      You may answer.
10     THE WITNESS:  It would be a similar response.
11 That is, if there were some patented method within the
12 System V source code, that would certainly be required
13 to be held in confidence.  If it was an invention of
14 Sequent alone, then it was, again, Sequent's discretion.
15     MR. KAO:  Q.  Now, if you can turn with me to
16 Section 2.01, which I believe you also reviewed with
17 Mr. Heise, I believe you testified that as you
18 understood the meaning of the word "treated," that that
19 was distinguishing between ownership on the one hand and
20 treatment of something as confidential on the other.  Is
21 that --
22     MR. HEISE:  Objection.
23     MR. KAO:  Q.  -- correct?
24     MR. HEISE:  You may answer.
25     THE WITNESS:  That's accurate.

Page 192

1      MR. KAO:  Q.  Okay.  Now, with respect to code
2  that Sequent developed on its own for Dynix/ptx, was it
3  your understanding that this Section 2.01 required
4  Sequent to treat that code as confidential?
5      MR. HEISE:  Objection.
6      You may answer.
7      THE WITNESS:  Please repeat the question.
8      MR. KAO:  Can you just read it back.
9      (Record read.)
10     THE WITNESS:  My understanding is that if the
11 code were purely a Sequent development, that that would
12 not be subject to the provisions of this license
13 agreement.
14     MR. KAO:  Q.  In testimony that you gave when
15 speaking with Mr. Heise, you recognized the distinction
16 between ownership and control.  Do you remember that?
17     A.  Yes, I do.
18     Q.  Do you believe that -- well, let me ask it in
19 two parts.  First, do you believe that Sequent owned the
20 source code that it developed for Dynix/ptx?
21     MR. HEISE:  Objection.
22     You may answer.
23     THE WITNESS:  I believe that Sequent owned, in
24 its entirety, the source code for Dynix.  I believe that
25 Sequent owned those portions of Dynix/ptx which were not

DAVID P. RODGERS

Page 193

1  contributed by others, including AT&T.
2       MR. KAO: Q. Do you believe that Sequent
3  controlled and had the right to control the source code
4  for Dynix/ptx that it developed on its own?
5       MR. HEISE: Objection.
6       You may answer.
7       THE WITNESS: Yes, I believe that subject to
8  limitations that were applied by the licensed
9  third-party components, that Sequent controlled those
10  portions, again, in the entirety for those portions
11  which were uniquely Sequent's and jointly for those
12  portions which third parties were involved.
13      MR. KAO: Q. Now, do you recall earlier
14  discussing with Mr. Heise how one would go about
15  determining whether there is Unix System V code in
16  Dynix?
17      A. Yes.
18      Q. If I wanted to know with res- -- well, let me
19  give you some background here.
20      Do you understand that, at least as it's -- at
21  least as the plaintiff SCO alleges, IBM has contributed
22  code from Dynix/ptx to Linux?
23      MR. HEISE: Objection.
24      You may answer.
25      MR. KAO: Q. Do you have an understanding of

Page 194

1  that or not?
2       A. I do, but you were my source.
3       Q. Oh. Well, if I -- let me --
4       I'll put on the record that that was not meant
5  to be a waiver of the attorney-client privilege.
6       MR. HEISE: Too late.
7       MR. KAO: Q. Assume with me that -- assume
8  with me that IBM has contributed source code from
9  Dynix/ptx to Linux. Whether or not that's true, let's
10  assume that's the case for the purposes of my question
11  here.
12      A. Okay.
13      Q. Can you do that?
14      A. I can do that.
15      Q. If I wanted to determine whether there was any
16  Unix System V code contained in the source code that was
17  contributed from Dynix/ptx to Linux, how would I do
18  that?
19      MR. HEISE: Objection.
20      You may answer.
21      THE WITNESS: The most reliable mechanism
22  would be to do a source-to-source compare and, as I
23  previously described, after suspect areas are
24  identified, to have a software expert determine whether
25  those are chance likenesses or the result of copying.

Page 195

1       MR. KAO: Q. Would I need the modification
2  histories for Dynix/ptx in order to make that
3  determination, whether there was Unix System V code
4  contained in the contributions to Linux?
5       MR. HEISE: Objection.
6       You may answer.
7       THE WITNESS: You would not.
8       MR. KAO: Q. Now, in your understanding of
9  the term "derivative work," does something need to
10  contain code from Unix System V in order to be
11  considered a derivative work of Unix System V?
12      MR. HEISE: I'm sorry to interrupt. Could you
13  just repeat the question?
14      MR. KAO: Sure. I'm not -- I'm probably not
15  asking it in a very clear way.
16      MR. HEISE: No. Somebody just distracted me
17  for a moment.
18      MR. JAMES: Here, I'll shut the door.
19      MR. KAO: Q. As you under- -- well, let me
20  just ask you this way: How do you understand -- what do
21  you understand a derivative work to be?
22      A. A derivative work is something which contains
23  a part or all of some other preexisting work.
24      Q. Okay. So what would you consider to be a
25  derivative work of Unix System V?

Page 196

1       A. I would consider a source module or a document
2  which contained some substantial portion, meaning not a
3  comment line consisting of a semicolon, some substantial
4  portion of Unix System V.
5       Q. Would I need the modification history of
6  Dynix/ptx in order to determine whether Dynix/ptx
7  contains source code from Unix System V?
8       MR. HEISE: Objection.
9       You may answer.
10      THE WITNESS: You wouldn't.
11      MR. KAO: Q. I could just do a comparison
12  between the Unix System V source code and the Dynix
13  source code; correct?
14      A. Yes.
15      MR. HEISE: Objection.
16      You may answer.
17      THE WITNESS: And then, after that, an
18  inspection.
19      MR. KAO: Q. Now, as you understand the term
20  "modification," does something need to have Unix
21  System V code in it to be considered a modification of
22  Unix System V code?
23      MR. HEISE: Objection.
24      You may answer.
25      THE WITNESS: I think it's the same. That is,

49 (Pages 193 to 196)

DAVID P. RODGERS

Page 197

1  if the Unix System V code is substantively unchanged --
2  we used the example of changing a -- removing a dollar
3  sign -- then, yes, I would consider that.
4      MR. KAO:  Q.  And I could determine whether
5  something, then, was a modification of Unix System V
6  code without having access to the revision histories?
7      MR. HEISE:  Objection.
8      You may answer.
9      THE WITNESS:  Yes, you could.
10     MR. KAO:  Q.  I could do that by comparing the
11 Unix System V code to the modified Unix System V code?
12     A.  Yes, you could.
13     MR. HEISE:  Objection.
14     MR. KAO:  Q.  What information would the
15 revision -- I think you called it -- maybe I should ask
16 you.  What did you call Sequent's revision history
17 information?
18     A.  The RCS logs.
19     Q.  What information would the RCS logs give me
20 that having all the source code to Dynix/ptx would not
21 give me?
22     A.  It would give you the programmer's intent for
23 the change.
24     Q.  If you had the source code itself, could you
25 determine whether something was based on Unix System V

Page 198

1  without having the programmer's notes?
2      MR. HEISE:  Objection.
3      You may answer.
4      THE WITNESS:  With some high probability, yes.
5      MR. KAO:  Q.  When you talk about Dynix/ptx
6  source code, what are you referring to?  What universe
7  of source code is considered Dynix/ptx source code?
8      A.  You need to give me a time bound for this.
9      Q.  Sure, okay.  We've been talking in this
10 deposition just generally about Dynix/ptx source code.
11 And all I'm trying to understand is:  If you were asked
12 by -- if you were asked by a customer or anybody else to
13 provide them with the Dynix/ptx source code, what would
14 you provide them with?  I guess let's say at the time
15 that you were at Sequent.
16     A.  Okay.  Generally, when someone wants access to
17 the source code, they want access to the kernel, to the
18 libraries, to the utilities, to the on-line and off-line
19 documents, and to the makefile.
20     Q.  That's what you would consider to be
21 Dynix/ptx?
22     A.  Right.
23     Q.  Now, do the RCS logs that you discuss include
24 code that never made its way into a release of
25 Dynix/ptx?

Page 199

1      A.  Lots.
2      Q.  Would you consider that code to be part of
3  Dynix/ptx?
4      A.  No.
5      Q.  What is a release of Dynix/ptx?  Can you
6  explain that for the record?
7      A.  Certainly.  A software release is the
8  completed, tested, documented, and authorized for
9  distribution version of a particular piece of software.
10 So the release viewed from inside the organization would
11 include the source, would include the tools, would
12 include the build files.  A release as viewed from
13 outside the organization would be the binary code, the
14 release notes, the documentation.
15     Q.  And releases are assigned different numbers to
16 identify them?
17     A.  Yes.  A release will typically have a major
18 and a minor version number.  Sometimes more precision
19 than that if there's a lot of either customer-specific
20 or other variation.
21     Q.  If I wanted to determine if any code in a
22 release of Dynix/ptx is based on any code in Unix
23 System V, would I need to have the RCS logs?
24     MR. HEISE:  Objection.
25     You may answer.

Page 200

1      THE WITNESS:  No.  The straightforward method
2  would be to DIF the files module by module.
3      MR. KAO:  Q.  When you say "DIF the files,"
4  what do you mean?
5      A.  A utility that would do a line-by-line
6  comparison of the source code and identify where lines
7  were either added or subtracted or changed.
8      Q.  In order to determine whether a particular
9  release of Dynix/ptx contained code implementing any
10 methods or concepts of Unix System V, would I need the
11 RCS log?
12     MR. HEISE:  Objection.
13     You may answer.
14     THE WITNESS:  You might, only with regard to
15 programmer intent.
16     A more likely place to find it would be in the
17 release notes.
18     MR. KAO:  Q.  And release notes are -- well,
19 strike that.
20     Are release notes provided with -- to
21 customers?
22     A.  Yes, they are.  They're part of the
23 distribution.
24     MR. KAO:  That's all I have for you.
25     MR. HEISE:  Just a few follow-up questions.

DAVID P. RODGERS

Page 201

1    THE WITNESS: Sure.
2         FURTHER EXAMINATION BY MR. HEISE ·
3    MR. HEISE: Q. Before entering into the
4    agreement on behalf of Sequent, you've indicated that
5    you carefully reviewed it and discussed it with Sequent
6    personnel and were involved in some phone conversations
7    with AT&T personnel. Is that correct?
8    A.   That is correct.
9    Q.   In all of the time that you carefully reviewed
10   this agreement, did you note paragraph 4 on page 1 of
11   the agreement? And just so that the record's clear, in
12   paragraph 4 it states that:
13       "This Agreement and its Supplements set forth
14       the entire agreement and understanding
15       between the parties as to the subject matter
16       hereof and merge all prior discussions
17       between them, and neither of the parties
18       shall be bound by any conditions,
19       definitions, warranties, understandings or
20       representations with respect to such subject
21       matter other than as expressly provided
22       herein or as duly set forth on or subsequent
23       to the date of acceptance hereof in writing
24       and signed by a proper and duly authorized
25       representative of the party to be bound

Page 202

1    thereby."
2         Did you carefully review that clause as well?
3    A.   I did.
4    Q.   And you understood that that meant all of the
5    terms of the agreement were set forth in the agreement
6    alone; right?
7    A.   Yes.
8    Q.   When we were talking earlier about keeping the
9    Dynix code confidential, you stated, both in your
10   declaration and here, that you did not want to be
11   bargaining away the rights to Sequent's IP. Do you
12   recall that?
13   A.   Yes, I do.
14   Q.   AT&T telling Sequent to keep Dynix
15   confidential when Sequent was keeping Dynix confidential
16   was not a bargaining away of any of Sequent's IP rights,
17   was it?
18       MR. KAO: Objection to form.
19       THE WITNESS: No.
20   MR. HEISE: Q. When we talk about Dynix/ptx,
21   just so we're clear, that arose after the Unix System V
22   license was entered into that we've been discussing all
23   day today; right?
24   A.   That is correct.
25   Q.   And the -- the kernel of Dynix/ptx, was that

Page 203

1    from Unix System V?
2         MR. KAO: Objection to form.
3         THE WITNESS: No, it was not.
4         MR. HEISE: Q. What was the core or the basis
5    of the Dynix/ptx operating system?
6         MR. KAO: Objection to form.
7         THE WITNESS: The core was a combination of
8    the Berkeley Standard Distribution 4.2 version and code
9    created by Sequent.
10        MR. HEISE: Q. And are you suggesting that
11   the only code that came from Unix System V in Dynix/ptx
12   were the utilities?
13        MR. KAO: Objection to form.
14        THE WITNESS: I can't state that as an
15   absolute. Certainly, the preponderance of the code in
16   Dynix/ptx predates the licensing of AT&T System V.
17        MR. HEISE: Q. But in terms of after the Unix
18   System V license was entered into, are you suggesting
19   that the only source code that was used from Unix
20   System V were the utilities as they appear in Unix
21   System V?
22        MR. KAO: Objection to form.
23        THE WITNESS: No. There would have been a few
24   system services that would have been in the kernel.
25        MR. HEISE: Q. In reviewing Section 2.01, in

Page 204

1    particular the phrase -- or sentence:
2        "Such right to use includes the right to
3        modify such SOFTWARE PRODUCT and to prepare
4        derivative works based on such SOFTWARE
5        PRODUCT, provided the resulting materials are
6        treated hereunder as part of the original
7        SOFTWARE PRODUCT."
8        Do you see where I'm reading from?
9    A.   Yes, I do.
10   Q.   If the phrase "resulting materials" is
11   determined to mean the modifications or derivative works
12   of Unix System V -- and for our purposes, consider that
13   Dynix/ptx -- would you agree that Dynix/ptx would have
14   to be maintained in confidence?
15       MR. KAO: Objection to form.
16       THE WITNESS: If the -- you're posing a
17   hypothetical, that is, "resulting materials" is an -- is
18   determined to mean any source code. Is that accurate?
19       MR. HEISE: Q. I'm asking you if the phrase
20   "resulting materials" is determined to include Dynix/ptx
21   as a modification or derivative work based on Unix
22   System V, would you agree that in that case, Dynix/ptx
23   would be required to be maintained in confidence and
24   could not be publicly displayed?
25       MR. KAO: Objection to form.

51 (Pages 201 to 204)

DAVID P. RODGERS

Page 205

1    THE WITNESS: If, hypothetically, the
2  resulting materials was inclusive of all of the
3  Dynix/ptx source code, then yes, I would agree it would
4  have to be maintained in confidence.
5    MR. HEISE: Q. With respect to the RCS log --
6  the Revision Control System, I guess it stands for.
7    A. Yes.
8    Q. You were asked a series of questions as to
9  whether it would be helpful to have that -- or excuse
10  me -- whether it would be needed or necessary to have
11  that. Would you agree that it would be helpful to have
12  the RCS to be able to track the history of the code as
13  it appears in Dynix/ptx?
14    MR. KAO: Objection to form.
15    THE WITNESS: It would actually both be
16  helpful and confusing, because the progression of a
17  piece of software from one release to the next is a
18  series of additions and subtractions, so you'd have
19  to know what you were looking at.
20    The real help in the RCS logs is the statement
21  of programmer intent, like "I'm adding a new module" as
22  opposed to "I'm modifying such-and-such to fix a bug" or
23  something like that.
24    MR. HEISE: Q. Well, if in determining where
25  Unix System V either source code or methods and concepts

Page 206

1  appear in Dynix, would you agree that it would be
2  necessary to have every version of Dynix/ptx from the
3  beginning until present as opposed to just the last few
4  versions?
5    A. Not --
6    MR. KAO: Objection --
7    MR. HEISE: -- of Dynix/ptx.
8    MR. KAO: Objection to form.
9    THE WITNESS: Actually, it would be simpler to
10  start with the last version and DIF it against the first
11  version. The middle versions -- and let me elaborate by
12  saying, the progression of Dynix/ptx toward the NUMA-Q,
13  N-U-M-A-Q, architecture probably resulted in the
14  subtraction of more and more System V code because it
15  was inappropriate.
16    So it would actually be confusing to go to the
17  middle releases. Starting with the beginning and the
18  end would be better.
19    MR. HEISE: Q. So at a bare minimum, to
20  undertake a complete analysis, you would need the first
21  copy and the last copy?
22    A. That would be the ideal.
23    MR. KAO: Objection to form.
24    MR. HEISE: Q. Would you agree it would be
25  impossible, in the absence of having the first copy of

Page 207

1  Dynix/ptx, to be able to see what Unix System V was
2  throughout Dynix/ptx from the beginning to the end?
3    MR. KAO: Objection to form.
4    THE WITNESS: Impossible, I don't think I'd go
5  for.
6    MR. HEISE: Q. What would you go for?
7  Extremely difficult?
8    A. It just makes it a little harder to figure
9  out, yeah.
10    Q. But if you were given the task, what you would
11  require to do it would be the first copy and the last
12  copy of Dynix/ptx --
13    MR. KAO: Objection to form.
14    MR. HEISE: Q. -- is that correct?
15    A. Actually, the first copy I was referring to in
16  that statement was the copy of the System V.2
17  distribution as delivered by AT&T pursuant to this
18  agreement.
19    Q. Okay.
20    A. And the last copy would be whatever version of
21  Dynix/ptx is the now current Dynix/ptx.
22    Q. Well, if -- using a statement you made
23  earlier, where there was addition and subtraction of
24  code, how would one be able to determine what System V
25  code was in Dynix without access to all of the versions

Page 208

1  if over time some code is put in, some code is taken
2  out?
3    MR. KAO: Objection.
4    MR. HEISE: Q. If you're only looking at the
5  last version of Dynix/ptx.
6    A. I don't think I'm tracking the question.
7    Q. Okay. Let me try and break it into a couple
8  bits then.
9    A. Okay.
10    Q. If one is to look at Dynix/ptx to locate
11  System V code, to locate System V methods and concepts,
12  et cetera, you've indicated you need to have the
13  System V release that was given to Dynix and you would
14  also want the last version of Dynix/ptx.
15    A. Correct.
16    Q. Would you also agree that to determine, over
17  time, what System V code was included in Dynix/ptx, you
18  would need to see the prior versions from the beginning
19  of Dynix/ptx until the last version of Dynix/ptx?
20    MR. KAO: Objection to form.
21    THE WITNESS: If your question is would I --
22  if I wanted to know at any instant in time --
23    MR. HEISE: Q. Exactly.
24    A. -- what System V code was in or out?
25    Yeah, I would need whatever -- the code

DAVID P. RODGERS

Page 209

1  snapshot at that instant in time. I'm having a hard
2  time tracking the question because I'm not -- the only
3  ones that count are the ones that were released.
4      Q.  That's really what the judge is going to
5  decide. So I'm just trying to get from you a clear
6  understanding of if -- just making up numbers -- if
7  there were ten releases of Dynix/ptx, if there was
8  System V code that was in Release No. 4 but it doesn't
9  appear subsequently in Release No. 10, the last one --
10     A.  Mm-hmm.
11     Q.  -- I would have no way of knowing that unless
12 I had access to Release No. 4; right?
13     A.  That's so, if you needed to know that --
14     Q.  Right.
15     A.  -- particular fact.
16         Let me elaborate by saying, let's suppose --
17 this is a hypothetical, but let's suppose that the
18 developer wants to introduce a System V module to
19 Dynix/ptx, and they just want to run an experiment:
20 Does this thing bind? Are there any missing symbols?
21 So they might put the code in, compile it. It throws
22 out a million compiler errors, all these missing
23 symbols. And then they figure out how they're going to
24 deal with that set of missing symbols.
25         So that's why I'm questioning the utility of

Page 210

1  looking at the interim versions. It's an experiment,
2  not necessarily a result.
3      Q.  I understand. But it's an experiment that
4  makes use of Unix System V?
5      A.  Sure.
6      Q.  Okay. And I would have no way of knowing what
7  use of Unix System V occurred unless I had access to the
8  RCS, in your example?
9          MR. KAO: Objection to form.
10         THE WITNESS: Well, the RCS would give you the
11 programmer's intent, but not necessarily what was --
12         MR. HEISE: Q. I'd need to see the code --
13 I'm sorry. We broke the rule.
14         I would need to see the code, not necessarily
15 the RCS, in the example we were just discussing?
16     A.  Yes, you would need to see the code.
17         MR. HEISE: If you give me just 30 seconds to
18 review my notes, we might be done.
19         As I said before, subject to our reservations,
20 I again thank you for your time today.
21         THE WITNESS: Thank you.
22         MR. KAO: I just have two quick questions.
23         MR. HEISE: Uh-oh.
24         FURTHER EXAMINATION BY MR. KAO
25         MR. KAO: Q. One, Mr. Heise was just asking

Page 211

1  you a series of questions where he was referring to
2  versions of Dynix/ptx.
3      A.  Yes.
4      Q.  Did you understand him to be referring to
5  releases of Dynix/ptx? Do you make a distinction in
6  your mind between versions and releases?
7      A.  Actually, that was the source of my confusion.
8  In my opinion, the things that are relevant to inclusion
9  or noninclusion of source code are the releases, and
10 they're -- as development proceeds, there are many, many
11 versions.
12     Q.  What's the difference, in your mind, between a
13 version and a release, just so I understand?
14     A.  A collection of source gets compiled one day
15 and it might run; it might not run. It's just a point
16 in time. And the essence of Mr. Heise's questions were:
17 How would I determine over all time, essentially, what
18 was the inclusion or noninclusion? And I was trying to
19 figure out why that was an important thing to know.
20     Q.  I understand. But in responding to -- in
21 responding to Mr. Heise's questions, I was just trying
22 to understand what it was that you were -- you had in
23 your mind. Were you -- were you -- were you responding
24 as to versions or as to releases?
25         MR. HEISE: Objection.

Page 212

1      You may answer.
2          THE WITNESS: My response was both to versions
3  and releases because of the confusion about whether for
4  any moment in time, you want to know what was included
5  or whether at specific release points, when someone
6  outside of Sequent might have had access, you would know
7  what was included. So I was responding to both terms.
8          MR. KAO: Q. Okay. Is it the case that as
9  far as Sequent was concerned, the code that was
10 contained in a release is what is considered Dynix/ptx?
11     A.  That's accurate.
12     Q.  The only other question I have is back now to
13 Section 2.01. Mr. Heise asked you some questions, and I
14 just wanted to make sure I understood what you were
15 saying. Looking at the last sentence, which says:
16     "Such right to use includes the right to
17     modify such SOFTWARE PRODUCT and to prepare
18     derivative works based on such SOFTWARE
19     PRODUCT, provided the resulting materials are
20     treated hereunder as part of the original
21     SOFTWARE PRODUCT."
22         And I believe Mr. Heise asked you to assume
23 that the words "resulting materials" are to be defined
24 to include Dynix/ptx.
25     A.  In its entirety.

53 (Pages 209 to 212)

DAVID P. RODGERS

Page 213

1    Q.   In its entirety.
2         Now, if that's the case, then it was your
3    testimony that Dynix/ptx, in its entirety, has to be
4    treated confidentially; correct?
5    A.   That's correct.
6    Q.   Now, if you were to take out pieces of the
7    code from Dynix/ptx that Sequent developed on its own,
8    would Sequent still have an obligation, in your
9    understanding of this language, to treat those materials
10   as confidential, even assuming that the whole has to be
11   treated confidential?
12        MR. HEISE:  Objection.
13        You may answer.
14        THE WITNESS:  In my opinion, no.  That is, if
15   I create something independent of what ultimately
16   becomes a derivative work, that's a separately treatable
17   and disclosable, in this case, item when it becomes a
18   part of the derivative work.  The entirety of the
19   derivative work is the thing that's bound by the
20   confidentiality.
21        MR. KAO:  Q.  Under the assumption that
22   Mr. Heise --
23   A.   Under the assumption that it was so
24   determined.
25   Q.   So even under that assumption, Sequent would

Page 214

1    still have the right to pull materials out of Dynix/ptx
2    and disclose those materials as it chose to?
3         MR. HEISE:  Objection.
4         You may answer.
5         THE WITNESS:  That would be my opinion.
6         MR. KAO:  That's all I have.
7         MR. HEISE;  A couple of quick follow-ups and
8    we will hopefully be done.
9         FURTHER EXAMINATION BY MR. HEISE
10        MR. HEISE:  Q.  When we were talking earlier
11   about seeing what System V code appeared in Dynix/ptx at
12   any moment in time, that is when we would need to have
13   access to all the versions as opposed to the final
14   releases.  Is that a correct statement?
15   A.   Yeah.  If it were important to know on any
16   given day, yes.
17   Q.   Do you know whether the contributions of
18   Dynix/ptx that went to Linux came from Dynix/ptx as the
19   whole or if they came from the separate place where they
20   were independently developed and incorporated into
21   Dynix/ptx?
22        MR. KAO:  Objection to form.
23        THE WITNESS:  I don't know.
24        MR. HEISE:  Again, subject to the
25   reservations, I thank you for your time today.

Page 215

1         MR. KAO:  I don't have any follow-up.
2         THE VIDEOGRAPHER:  Here marks --
3         MR. KAO:  Just one more question.
4         THE VIDEOGRAPHER:  Here marks the end of Tape
5    No. 3 in the deposition of David Rodgers.
6         The original videotapes will be retained by
7    LegaLink New York at 420 Lexington Ave., Nos. 2108 and
8    2112, New York, New York.
9         Going off the record.  The time is 3:04.
10        (Whereupon, the deposition was adjourned at
11        3:04 p.m.)
12             - -oOo--
13        I declare under penalty of perjury the
14   foregoing is true and correct.  Subscribed at
15   _____, California, this ____ day of
16   _____, 2004.
17
18             David P. Rodgers
19
20
21
22
23
24
25

Page 216

1         CERTIFICATE OF REPORTER
2         I, ANA M. DUB, a Certified Shorthand Reporter,
3    Registered Merit Reporter, and Certified Realtime
4    Reporter, hereby certify that the witness in the
5    foregoing deposition was by me duly sworn to tell the
6    truth, the whole truth, and nothing but the truth in the
7    within-entitled cause;
8         That said deposition was taken down in
9    shorthand by me, a disinterested person, at the time and
10   place therein stated, and that the testimony of the said
11   witness was thereafter reduced to typewriting, by
12   computer, under my direction and supervision;
13        That before completion of the deposition,
14   review of the transcript [ ] was [X] was not requested.
15   If requested, any changes made by the deponent (and
16   provided to the reporter) during the period allowed are
17   appended hereto.
18        I further certify that I am not of counsel or
19   attorney for either or any of the parties to the said
20   deposition, nor in any way interested in the event of
21   this cause, and that I am not related to any of the
22   parties thereto.
23        DATED:  June 14, 2004.
24
25        ANA M. DUB, RMR, CRR, CSR No. 7445

54 (Pages 213 to 216)