# EXHIBIT "A"



**H**

Motions, Pleadings and Filings

United States District Court,
N.D. Illinois,
Eastern Division.

COMPUTER ASSOCIATES INTERNATIONAL, a
Delaware corporation, Plaintiff,
v.
QUEST SOFTWARE, INC., a California
corporation, Michael J. Friel, an Illinois
resident, Debra Jenson, an Illinois resident, Robert
M. Mackowiak, an Illinois
resident, Elizabeth W. Wahlgren, an Illinois resident,
and Frank L. Bisotti, a
Wisconsin resident, Defendants.

No. 02 C 4721.

June 28, 2004.

**Background:** Software manufacturer brought copyright infringement and trade secret misappropriation action against competitor, alleging infringement of the source code for its database administration software. Manufacturer moved for preliminary injunction.

**Holdings:** The District Court, Moran, Senior District Judge, held that:
(1) mathematical and typographical errors that appeared in expert's report went the weight of his evidence rather than to its admissibility;
(2) manufacturer made reasonable efforts to protect the source code for its database administration software, as required for trade secret protection under Illinois law;
(3) software could be protected by copyright despite its use of previously known, publicly available source code;
(4) manufacturer's use of freeware source code in copyrighted database administration software did not violate general public license applicable to the freeware;
(5) manufacturer had a strong likelihood of proving literal copying of the source code; and
(6) competitor waived attorney-client privilege with regard to its attorney's communications with

employees working in "clean room."

Ordered accordingly.

**[1] Evidence** ⊗508
157k508

**[1] Evidence** ⊗555.2
157k555.2

Evidence presented by an expert must be both relevant and reliable; district court serves as a "gatekeeper," determining whether the knowledge is helpful. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[2] Evidence** ⊗536
157k536

The simple fact that a witness has never testified as an expert before is not enough to disqualify him. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[3] Evidence** ⊗555.2
157k555.2

Expert's comparison of specific parts of source code in copyrighted and allegedly infringing programs went to weight of his conclusions in infringement action and did not undermine his overall methodology. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Evidence** ⊗555.4(1)
157k555.4(1)

Expert used appropriate abstraction-filtration-comparison methodology when he determined whether copyrighted source code had been infringed, where he broke down the code to its basic "rules" and compared them to those used in the allegedly infringing software. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[5] Evidence** ⊗555.2
157k555.2

Mathematical and typographical errors that appeared in expert's report on infringement of copyrighted source code went the weight of his evidence rather

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

than to its admissibility.

**[6] Torts** ⬚10(5)
379k10(5)

In determining whether something is a trade secret, Illinois courts look to six guidelines: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known to employees and others within the business; (3) the measures taken to protect the information; (4) the value of the information to competitors; (5) the amount of time, money and effort expended in developing the information; and (6) the ease with which the information could be acquired by others. S.H.A. 765 ILCS 1065/3(a).

**[7] Torts** ⬚10(5)
379k10(5)

Aspects of database administration software could be protectable trade secrets under Illinois law; although parsers, analysis engines and job schedulers were well known and commonly used in programming, they were not widely used in database administration software. S.H.A. 765 ILCS 1065/3(a).

**[8] Torts** ⬚10(5)
379k10(5)

Software manufacturer made reasonable efforts to protect the source code for its database administration software, as required for trade secret protection under Illinois law; confidentiality policies set forth in employee manuals prevented outsiders from gaining access to source code and limited access to the code within the company, access to manufacturer's facility was limited to employees with a security key card, and source code was never distributed with programs or made available to the general public. S.H.A. 765 ILCS 1065/3(a).

**[9] Torts** ⬚10(5)
379k10(5)

Illinois Trade Secrets Act (ITSA) requires only reasonable measures to protect confidential information, not perfection. S.H.A. 765 ILCS 1065/3(a).

**[10] Injunction** ⬚138.33
212k138.33

Software manufacturer had strong likelihood of

proving that competitor misappropriated trade secrets in the source code for its database administration software, in violation of the Illinois Trade Secrets Act (ITSA), as required for preliminary injunction; competitor hired former employees of manufacturer and assigned them to tasks that were nearly identical to those they performed while working for manufacturer, those employees repeatedly accessed manufacturer's source code while developing their program, attempted to erase files from computers in order to cover up the use of the source code, and developed a similar product. S.H.A. 765 ILCS 1065/3(a).

**[11] Copyrights and Intellectual Property** ⬚10.4
99k10.4

Database administration software could be protected by copyright despite its use of previously known, publicly available source code; use of elements of preexisting code in the final software product was an original creation. 17 U.S.C.A. § 410(c).

**[12] Copyrights and Intellectual Property** ⬚48
99k48

Software manufacturer's use of freeware source code in copyrighted database administration software did not violate general public license applicable to the freeware, which restricted modification and subsequent distribution of freeware programs; manufacturer did not attempt to claim a copyright in the freeware source code, but instead used its output files, as allowed by an exception to the license.

**[13] Copyrights and Intellectual Property** ⬚50.20
99k50.20

Software manufacturer's failure to list all of the third party software in its copyright applications for its database administration software did not support claim of copyright fraud or misuse, where such third-party work did not constitute more than 4-4.5% of the source code.

**[14] Copyrights and Intellectual Property** ⬚50.20
99k50.20

Even if date used on the copyright application for database administration software was inaccurate, it only undermined the presumption of validity that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1459495
--- F.Supp.2d ---
(Cite as: 2004 WL 1459495 (N.D.Ill.))

applicant was entitled to, and had no effect on the other registrations that protected the majority of the intellectual property at issue. 17 U.S.C.A. § 410(c).

**[15] Copyrights and Intellectual Property** 31
99k31

Even if software manufacturer's distribution of its copyrighted computer software to another company more than five years before copyright's registration date amounted to a "publication" of the software within meaning of the Copyright Act, such publication did not invalidate the copyright, but only resulted in a different type of registered copyright. 17 U.S.C.A. § § 101, 410(c).

**[16] Copyrights and Intellectual Property** 85
99k85

Software manufacturer had a strong likelihood of proving literal copying of the source code for its copyrighted database administration software, as required for preliminary injunction in its infringement action against competitor; manufacturer's former employees, who were hired by competitor, admitted that they used some of manufacturer's source code in competitor's program, comparison of the codes showed that a large number of lines in the competitor's source code were identical to those in manufacturer's code, and nonfunctional comments in manufacturer's code had been copied. 17 U.S.C.A. § 106.

**[17] Copyrights and Intellectual Property** 85
99k85

Software manufacturer was likely to prove non-literal copying of the source code for its copyrighted database administration software, as required for preliminary injunction in its infringement action against competitor; abstraction-filtration-comparison analysis showed that 53 "rules" in copyrighted program's analysis engine were similar to rules in competitor's program. 17 U.S.C.A. § 106.

**[18] Copyrights and Intellectual Property** 85
99k85

There is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation and copyright infringement; defendants may rebut this presumption by demonstrating that plaintiff will not suffer any harm if the preliminary injunction is not granted.

**[18] Injunction** 147
212k147

There is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation and copyright infringement; defendants may rebut this presumption by demonstrating that plaintiff will not suffer any harm if the preliminary injunction is not granted.

**[19] Copyrights and Intellectual Property** 85
99k85

Plaintiff in action for trade secret misappropriation and copyright infringement does not need to market a competing product in order to demonstrate irreparable harm necessary for preliminary injunction.

**[19] Injunction** 138.33
212k138.33

Plaintiff in action for trade secret misappropriation and copyright infringement does not need to market a competing product in order to demonstrate irreparable harm necessary for preliminary injunction.

**[20] Copyrights and Intellectual Property** 85
99k85

"Clean room" procedure used by software manufacturer's competitor to create database administration software that did not contain manufacturer's copyrighted source code did not remedy the irreparable harm created by the infringement; clean room procedure did not cover all of competitor's alleged infringement, and plans to release product containing the cleansed source code did not eliminate harm suffered from the sales of the infringing product.

**[21] Witnesses** 219(3)
410k219(3)

Software manufacturer's competitor waived attorney-client privilege with regard to its attorney's communications with employees working in "clean room" in attempt to write database administration software without using infringing source code; competitor attempted to use the clean room process as a defense to the claims seeking injunctive relief, and as a way to mitigate any harm caused by the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

copying of manufacturer's source code, putting the effectiveness of the clean room's walls at issue.

Jac A. Cotiguala, Luanne M. Galovich, John Friedrich Zabriskie, Jeanne Marie Gills, Therese Colleen King, Jason J. Keener, Foley & Lardner, Chicago, IL, for Plaintiff.

Brian Douglas Sieve, Arthur Gollwitzer, Michael John Newman, Joel Alan Blanchet, Colby Anne Kingsbury, Alma M. Lugtu, David Rokach, Ann Chen, Kirkland & Ellis LLP, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

MORAN, Senior District Judge.

*1 Plaintiff Computer Associates International, Inc. (CA) brought this action against defendants Quest Software Inc. (Quest), Michael J. Friel, Debra A. Jenson, Robert M. Mackowiak, Elizabeth W. Wahlgren, and Frank L. Bisotti alleging copyright infringement and trade secret misappropriation. It now seeks a preliminary injunction enjoining defendants from using, selling, licensing, distributing or marketing Quest Central or any future product derived from CA's source code. Defendants filed a motion to strike the testimony of plaintiff's witness Martin Hubel, a motion to strike Hubel's reply brief and objections to Magistrate Judge Mason's April 5, 2004, order compelling the disclosure of certain communications. For the following reasons, plaintiff's motion for a preliminary injunction is granted, defendants' motions are denied, and defendants' objections are overruled.

### BACKGROUND

The creation of computer programs involves writing "source code." This code may be expressed in one of several languages that can be read and understood by trained programmers. Files written in the languages relevant to this case, C and C++, contain suffixes (.c and .cpp, respectively) indicating what type of file they are. After a program is written, these files of source code are converted into executable files with suffixes of .exe or .dll. Computers read and process the executable files, but they cannot be read by humans. When a customer purchases computer software, he or she typically receives only these executable files, not the readable source code.

In 1996, Platinum *technology* International, Inc. (Platinum) released its first version of the software

program Enterprise Database Administrator (EDBA). This program allowed database administrators to automate numerous tasks that would previously have been extremely time-consuming. Following IBM's release of its DB2 database, Platinum began the process of modifying the EDBA source code so as to release a DB2-compatible version. Because DB2 was (and is) widely used by database administrators, such a program could be extremely valuable.

The individual defendants played important roles in both the development of the EDBA source code and the attempt to adapt it to DB2. Jenson was the manager of Platinum's EDBA development lab in Oak Brook, Illinois, and Friel was the head of the EDBA development team. Mackowiak developed the EDBA parser, a tool that allows the EDBA program to communicate with the DB2 database by breaking down DB2's language (known as Structured Query Language, or SQL) into its component parts so that EDBA can understand the commands. Wahlgren wrote the EDBA analysis engine, which determines what changes need to be made to a database. Bisotti created the job scheduler, a tool that ensures that the tasks requested by the database administrator are accomplished at the proper time.

In the spring of 1999, CA announced that it intended to purchase Platinum. By this time, Platinum's EDBA team had made at least some progress towards converting EDBA for use with DB2. When CA acquired Platinum, many employees, including Wahlgren, were fired, and others, such as Jenson, Friel, Mackowiak and Bisotti, chose to leave. Quest, who had decided to write database administration software for DB2 from scratch, hired the five individual defendants and assigned them to roles similar to (or the same as) those they had in developing the source code for Platinum.

*2 Despite Quest's rule prohibiting the new employees from bringing proprietary information with them to the new jobs, there is evidence that Mackowiak, Wahlgren and Bisotti brought copies of the EDBA source code to their new positions. There is also evidence that defendants repeatedly referenced the source code in developing the program for Quest, In fact, defendants concede that some of the developers had copies of the EDBA source code to use as a reference while writing their program.

In October 2000, Quest released the first version of Quest Central for DB2 (QCDB2), a database administration program for DB2. Since then, several new versions have been released, most recently

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

version 3.0 in May 2003. There are currently four major competitors in the market for DB2 administration software: Quest, BMC, Embarcadero and IBM. CA does not sell a competing product.

In early 2000, CA received information indicating that Quest may have portions of the EDBA source code. Following a letter from CA, Quest denied this allegation. In February 2002, however, CA received an unsigned letter detailing specific uses of the source code by Quest and the individual defendants. CA wrote another letter to Quest in March 2002, referring to this new information, and eventually filed this suit in July 2002. There is evidence that defendants, including Mackowiak, erased, or attempted to erase, files on their computers containing parts of the EDBA source code, after receiving the letters from CA.

Upon learning that the source codes for EDBA and QCDB2 were arguably similar, the defendants engaged in a "clean room" exercise to rewrite the parser code. They attempted to write the source code from scratch while closing the room to improper outside information. That lengthy process was completed on January 9, 2004, and Quest plans to incorporate the new code into QCDB2 version 4.0.1.

## DISCUSSION

*I. Defendants' Motions to Strike Testimony and Reply Brief of Martin Hubel*

Defendants moved to strike the testimony of plaintiff's source code expert Martin Hubel pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In response to that motion, Hubel submitted a reply declaration addressing the arguments raised in the initial motion to strike, which defendants also seek to strike.

### A. *Motion to Strike Hubel's Testimony*

Plaintiffs introduced Hubel's declaration in an attempt to show that Quest copied large parts of the EDBA source code in QCDB2, and that Quest used commercially valuable information that CA knew, but was not generally known to the public or relevant community. Defendants raise four general arguments in favor of striking the testimony of Hubel. First, they claim that he does not have sufficient qualifications to serve as an expert witness. Second, they argue that Hubel's methodology in comparing the source codes was fatally flawed. Third, they point out substantive errors made by Hubel in preparing his report. Finally,

defendants claim that he failed to take into account many key issues when reaching his conclusions.

*3 At this stage of the litigation defendants' motion to strike is largely unnecessary as they have the opportunity to challenge or rebut the opinions presented in Hubel's report. *See Fenje v. Feld*, 301 F.Supp.2d 781, 789 (N.D.Ill.2003). In any case, Hubel is qualified to present opinions regarding the source code that assist the court in ruling on the preliminary injunction motion. This does not, of course, prevent defendants from seeking to prevent Hubel from testifying should this matter go to trial.

[1][2] The admissibility of expert testimony is governed by Federal Rule of Evidence 702, and the principles set forth by the Supreme Court in *Daubert*. *Smith v. Ford Motor Co.*, 215 F.3d 713, 717-18 (7th Cir.2000). Evidence presented by an expert must be both relevant and reliable. *Id.* at 718, *quoting Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. The district court serves as a "gatekeeper," determining whether the knowledge is helpful. *Id.* The simple fact that a witness has never testified as an expert before is not enough to disqualify him. *Hecny Transportation, Inc. v. Chu*, 2003 WL 21823610, *1 (N.D.Ill.).

While Hubel has significant experience working with database systems and with DB2 in particular, he does not have the same level of expertise in C or C++. Much of his report, however, deals with the interaction between the database administration software and DB2, using the DB2 language SQL, with which he is clearly an expert. It may be extremely difficult to find an expert who is knowledgeable in both sets of languages. [FN1] Moreover, the report indicates that Hubel has at least some familiarity with C and C++ and that, when necessary, he was able to refer to reasonable sources for assistance. While this approach is not perfect, it allowed Hubel to prepare a report on the source codes that proved helpful to the court.

[3] The methodology used by Hubel in searching for copying was reliable. There does not appear to be any perfect way to compare millions of lines of source codes, especially in a case like this where the plaintiff's claim both literal and non-literal copying of the code. Hubel began by attempting to use software programs to count the number of identical lines in the two codes. He claims that these programs were both over- and under-inclusive and returned results that did not make sense. He then manually compared the source codes, directing his attention to the areas of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1459495
--- F.Supp.2d ---
(Cite as: 2004 WL 1459495 (N.D.Ill.))

Page 6

the program in which CA (and its attorneys) believed copying would be found. These suspicions arose because the code areas in question had been developed by the individual defendants. This is similar to the approach undertaken by defendants' source code expert, who used a software program to isolate some areas of code and them moved on to a manual analysis. While the direction by CA to specific parts of the code is certainly open to criticism by defendants, this goes to weight of the conclusions and does not undermine the overall methodology.

*4 [4] In searching for non-literal copying of the source code, Hubel looked for the functional rules of the EDBA software. He then compared these to the rules used in Quest's products to see if they were the same. While it was not formal, this methodology is essentially that endorsed by the Second Circuit in *Computer Associates, Intern., Inc. v. Altai, Inc.,* 982 F.2d 693, 706-12 (2d Cir.1992). *See also Gates Rubber Co. v. Bando Chemical Industries, Ltd.,* 9 F.3d 823, 834-42 (10th Cir.1993). In *Computer Associates,* the court approved the use of the "abstraction-filtration-comparison" (AFC) test, whereby non-literal copyright infringement is proven by reducing a computer program to its basic abstract levels, filtering out the functional elements and non-proprietary information, and comparing the remaining elements. While defendants and their experts disagree with his conclusions, this is basically what Hubel did when he broke down EDBA to its basic rules and compared them to those used in the Quest software.

Defendants also criticize Hubel for failing to research trade secret law and certain parts of copyright law before opining that certain parts of EDBA were "useful secrets." Hubel is clear that useful secrets was a term he invented for purposes of his report, and nothing more. His role was to apply his knowledge of DB2 to the facts, and to determine which parts of EDBA made it a desirable software program, and which of these were used by Quest in developing QCDB2. There was no reason for Hubel to put a specific dollar value on this information, only to determine what information can reasonably be considered to be valuable to competitors.

[5] Finally, defendants point to a number of specific, substantive errors in Hubel's report. Some of these result from confusion about Hubel's process. Others are simply typos or mathematical errors that Hubel admitted at his deposition. In any case, his opinion involves the comparison of millions of lines of computer source code. As this litigation is still in the preliminary injunction phase, some errors are inevitable. To the extent that such errors appear in Hubel's report, they go to the weight that we give his evidence rather than to the admissibility.

B. *Motion to Strike Hubel's Reply Declaration*

Defendants also seek to strike the reply declaration of Hubel that the plaintiff filed in opposition to the original motion to strike. That declaration contains two sections, one detailing Hubel's qualifications and one discussing his methodology. Both of these sections directly respond to arguments raised in defendants' brief in support of their motion to strike and do not represent any effort by the plaintiff to introduce new evidence. That motion is denied.

II. *Plaintiff's Motion for a Preliminary Injunction*

CA seeks to enjoin defendants from using, selling, licensing, distributing, and/or marketing QCDB2, or any other similar product derived from the EDBA software code, arguing that QCDB2 infringes CA's copyrights and incorporates CA's protectable trade secrets. CA bears the burden of demonstrating that it has a reasonable likelihood of prevailing on the merits of its claim, that it has no adequate remedy at law, and that it will suffer irreparable harm absent an injunction. *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 803- 04 (7th Cir.2002). If CA meets those burdens, the court must consider any potential harm to defendants and whether injunctive relief would harm or foster the public interest. *Id.* at 803-04.

A. *Likelihood of Success on the Merits*

1. *Trade Secret Misappropriation*

*5 [6] The Illinois Trade Secrets Act (ITSA) allows the court to issue an injunction in the case of "actual or threatened misappropriation of a trade secret." 765 ILCS 1065/3(a); *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1267 (7th Cir.1995). In order to prevail, CA must establish that it has a strong likelihood of demonstrating that (1) the source code is a protectable secret under the ITSA, and (2) defendants used the source code in the course of business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.* 342 F.3d 714, 721 (7th Cir.2003). In determining whether something is a trade secret, Illinois courts look to six guidelines: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known to

employees and others within the business; (3) the measures taken to protect the information; (4) the value of the information to competitors; (5) the amount of time, money and effort expended in developing the information; and (6) the ease with which the information could be acquired by others. *Id.* at 722.

[7] Despite defendants' claims to the contrary, the entire EDBA source code may qualify for trade secret protection. *See Unix Systems Laboratories, Inc. v. Berkeley Software Design, Inc.*, 1993 WL 414720, 27 U.S.P.Q.2d 1721, 1733-34 (D.N.J.1993) ("even if all of the pieces of the 32V code had been thoroughly revealed in the publicly available literature, the overall organization of the code might remain a trade secret unless it too had been disclosed.") There is also no merit to defendants' argument that the specific aspects of the code are not protectable because they were not novel ideas. Though parsers, analysis engines and job schedulers are well known and commonly used in programming, they were not widely used in database administration software. Moreover, the specific versions of these applications as they are used in EDBA are protectable--plaintiff is not attempting to claim intellectual property rights in the generic concepts.

The evidence indicates that these applications, as used by CA and the EDBA source code as a whole, were valuable trade secrets. When IBM released DB2, there was clearly a market for administration software that would be compatible, and the company to release the first software would have a competitive advantage in that market. Because it had already created EDBA, Platinum had resources to take advantage of that that were not widely available to other software producers.

[8] The evidence also shows that Platinum (and then CA) took steps to protect this information from falling into the hands of outsiders. Confidentiality policies were set forth in employee manuals. These policies prevented outsiders from gaining access to source code and limited access to the code within the company. Employees were reminded of these obligations when leaving the company. Access to CA's Oak Brook facility was limited to employees with a security key card. The source code was never distributed with programs or made available to the general public. These procedures demonstrate reasonable efforts to keep the source code secret--all that is required under the ITSA. *Learning Curve Toys*, 342 F.3d at 725. Moreover, the deposition testimony of defendants indicates that they were

aware of the measures taken by plaintiff and knew that the source code material was intended to remain secret. Quest maintains that it explicitly ordered its new employees to honor confidentiality agreements with previous employers.

*6 [9] Defendants manage to point out aspects of plaintiff's procedures that could have been stronger. Employees were allowed to work from home (as they are at Quest); the employee manual was written in a lighthearted manner; and another former Platinum employee may have taken some EDBA source code with him to a new job. Even if this demonstrates some weaknesses in Platinum and CA's confidentiality procedures, the ITSA requires only reasonable measures, not perfection. *Learning Curve Toys*, 342 F.3d at 725. CA's EDBA source code therefore contains protectable trade secrets under the ITSA.

[10] The evidence also shows that plaintiff has a strong likelihood of proving that defendants misappropriated these trade secrets. The individual defendants were hired by Quest and assigned to tasks that were nearly identical to those they performed while at Platinum. While that in itself may have been permissible, Quest put itself at risk by placing the new employees in situations where the use of protected information was likely. *See PepsiCo*, 54 F.3d at 1269 ("a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets"); *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 875-76 (N.D.Ill.2001).

The forensic records also show that defendants repeatedly accessed the EDBA source code while developing their program. At the very least, the EDBA code acted as a guide to the defendants and made it easier for them to develop a competing product. This alone, even without actual copying, likely rises to the level of misappropriation. *See Affiliated Hospital Products, Inc. v. Baldwin*, 57 Ill.App.3d 800, 15 Ill.Dec. 528, 373 N.E.2d 1000, 1006 ("[e]ven accepting their denial of any literal copying of MPL drawings, these drawings aided defendants in the design of Hypomed machinery, if only to demonstrate what pitfalls to avoid"). The forensic analysis shows that defendants went beyond this, attempting to erase files from computers in order to cover up the use of the EDBA code. Again, that behavior by defendants may constitute evidence of misappropriation. *See RKI*, 177 F.Supp.2d at 875.

Finally, and most importantly, Quest's product bears

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1459495
--- F.Supp.2d ---
(Cite as: 2004 WL 1459495 (N.D.Ill.))

Page 8

a strong relationship to CA's. QCDB2 uses a parser, an analysis engine and a job scheduler, all of which are similar to those used by EDBA. These applications, while, again, not novel, do not appear together in the competing software. These similarities exist despite the fact that Quest claims to have developed the QCDB2 source code from scratch. These similarities, combined with the unfettered access of defendants to plaintiff's source code, give strong support to plaintiff's claims of trade secret misappropriation.

### 2. Copyright Infringement

Federal law gives district courts the power to issue an injunction to prevent or restrain copyright infringement. 17 U.S.C. § 502. CA must prove its ownership of a valid copyright and the copying of original elements by the defendants. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

### a. *Valid copyrights*

*7 [11] CA has registered copyrights in the various versions of the EDBA source code and its components. These registrations are *prima facie* proof that CA owns valid copyrights. 17 U.S.C. 410(c). Again, defendants argue that CA has no copyright protection for the EDBA code because it contains elements that were created by third parties. Defendants are correct that if plaintiff simply reproduces previously existing material, it has no rights to prevent a third party from doing the same. Here, the EDBA source code admittedly contains some elements that were developed by other parties and that are publicly available. While CA has no right to prevent Quest (or any other software manufacturer) from using these parts of the work that were in the public domain, it may have a perfectly valid copyright in the modifications to that third party code and in the finished product--the complete EDBA source code.

Defendants attempt to characterize plaintiff's claims as similar to those in Qad. Inc. v. ALN Associates, Inc., 974 F.2d 834 (7th Cir.1992), in which the Seventh Circuit affirmed the district court's decision to grant summary judgment for the defendant and dissolve an injunction. In Qad, the court found that the plaintiff was attempting to claim a copyright in a product that was essentially the same as previously existing software. *Id.* at 838. The court determined that even though the source code was different the

fact that the program functions were virtually identical made the plaintiff's program a derivative work. *Id.* at 838-39. Unlike the plaintiff in qad, CA willingly admits that Platinum used elements of preexisting code in creating EDBA. The use of these elements and the final software product, on the other hand, was an original creation. The fact that EDBA contains previously known source code (even hundreds or thousands of lines) does not prevent CA from protecting its creation.

[12] One publicly available program used in the creation of EDBA was Bison, a program distributed by the Free Software Foundation (FSF). The EDBA code contains a string indicating that it uses "GNU Bison version 1.25." Bison is open source code, meaning that it is distributed by the FSF at no cost. Any user of that code is, however, bound by the terms of the GNU General Public License (GPL). The GPL puts restrictions on the modification and subsequent distribution of freeware programs. Essentially, once the programs are freely released into the public domain, the creators intend for them to stay free. Defendants claim that plaintiff's are violating the GPL by attempting to claim a copyright in a program that contains Bison source code.

Defendants' argument fails because plaintiff is not attempting to claim a copyright in the Bison source code. Instead, the creators of EDBA used the Bison utility program to create the parser source code. While doing so they made modifications to the Bison program to suit the specific task of creating a parser to use in database administration software. The GPL would prevent plaintiff from attempting to claim a copyright in that modified version of Bison. The output of that program (the parser source code), however, is not subject to the restrictions of the GPL-
-it is the creation of plaintiff. FSF explicitly allowed for such commercial use of the output by adopting the following exception to the GPL:

*8 /* As a special exception, when this file is copied by Bison into a Bison output file, you may use that output file without restriction. This special exception was added by the Free Software Foundation in version 1.24 of Bison */

There is no indication that Mackowiak, or any other Platinum or CA employee, used a version of Bison older than 1.24. Therefore, even though the output lines contain some of the utility source code, CA is free to use the output files without restriction, as allowed by the exception to the GPL.

[13] Defendants' claims of copyright fraud, and/or misuse, are also largely baseless. While plaintiff

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1459495                                                                                    Page 9
--- F.Supp.2d ---
(Cite as: 2004 WL 1459495 (N.D.Ill.))

concedes that it did not list all of the third party software in its copyright applications (only listing previous versions of its own programs), such a disclosure is only necessary when a party uses a substantial amount of a preexisting work. (Copyright Office Circular 61.) Defendants' own expert witness concedes that such third-party work does not constitute more than 4 or 4.5% of the source code. Again, plaintiff's use of these preexisting elements is perfectly acceptable as long as the finished product is an original creation.

[14] Defendants also claim that the date used on the copyright application for EDBA v. 2.2.0 was misleading. Because the effective date of that registration was June 20, 2002, the EDBA code could not have a publication date older than June 20, 1997 (five years earlier), if it was to enjoy the benefit of a presumption of validity. 17 U.S.C. § 410(c). The original application contained only the year 1997, but was later changed to say December 31, 1997. Plaintiff maintains that is was very difficult, if not impossible, to determine the exact date of publication, but that December 31, 1997, is the most accurate date according to the person most knowledgeable. Even if that date is inaccurate, it would only undermine the *presumption* of validity that plaintiff was entitled to. Moreover, such an error would have no effect on the other registrations that protect the majority of the intellectual property at issue.

[15] Finally, there is nothing to indicate that plaintiff misrepresented its publication of the 1999 code when it confidentially distributed a copy of the work to GAD in May 1999. The Copyright Act defines publication as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. It is unlikely that confidentially giving one copy to another company would constitute distribution of the code to the "public." Even if it qualified, this publication of the code would likely only result in a different type of registered copyright ("TX" rather than "TXu"), rather than an invalid copyright. (*See* Announcement from the Copyright Office--January 1, 1978). There is no reason to believe that the different type of registration would have any effect on this litigation.

b. *Copying of original expressions*

*9 While the comparisons of the EDBA source code to different versions of the QCDB2 source code are not entirely complete, the evidence gathered so far

indicates that plaintiff is likely to prove that defendants copied original parts of the source code. Plaintiff claims that defendants infringed on its exclusive rights to reproduce copies, prepare derivative works and distribute these derivatives to the public. 17 U.S.C. § 106. CA may prove copying by showing that Quest had access to its source code and that QCDB2 is substantially similar to EDBA, or by showing that Quest literally copied the code. *Atari Games Corp. v. Nintendo of America Inc.*, 975 F.2d 832, 837-38 (Fed.Cir.1992).

[16] CA has a strong likelihood of proving literal copying of the source code. First of all, Mackowiak and Bisotti have both admitted to some use of CA's source code in QCDB2. Secondly, while Hubel's comparison of the codes is not perfect, it shows that a large number of lines in the QCDB2 source code are identical to those in EDBA. The parser was the subject of the largest amount of this copying. For example, in the grammar source code of the parser (db2.y files), Hubel estimates that Quest's original code contains about 2897 of CA's 7369 lines. Likewise, he found that Quest's code contains 2626 out of 2791 lines of CA's lexicon source code (db2.1 files). In version 3.0 of WCDB2 (the version currently on the market), approximately 2/3 of those source code lines are still being used. In the job scheduler, Hubel estimates that Quest used 890 identical lines in version 1.0 and that 129 of these lines still remain in the code. Even if these numbers are not exact, they demonstrate repeated use of CA's source code by Quest in QCDB2.

While his estimates differ, Webster (defendants' source code expert) also found many lines in QCDB2 versions 1.0 and 3.0 that were identical to those in the EDBA source code. Defendants claim that these are the result of innocent factors: use of third-party code, technological restraints and common authorship. As stated above, Webster eventually found that only about 4.5% of the EDBA code was third-party code. This does not provide an adequate defense to such a widespread use of CA's code. Likewise, while technological restraints undoubtedly shape the creation of any source code, there are simply too many similarities here to ignore. Both parties concede that similar functions may be expressed in many ways within the same computer language. While the same programmer is likely to write programs in similar ways using his/her previous experience as a guide, there are far too many identical or nearly identical lines appearing in the two source codes (and in the same order) for the similarities to be a coincidence.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1459495                                                                  Page 10
--- F.Supp.2d ---
(Cite as: 2004 WL 1459495 (N.D.Ill.))

Also, many of the comments from EDBA have been copied into QCDB2. These comments are not part of the functional code; they instead act only as a guide to future programmers working with the source code. There would be no reason for two programmers to use the same language, even if expressing similar comments, but that is the case. For example, the source code in db2.y lines 002451-002465 is identical to that in udb.y lines 002374-002388. Even creation by the same programmer would not explain the exact replication of these 15 non-functional lines.

*10 [17] Plaintiff is also likely to prove non-literal copying of the EDBA code. As we discussed above, the best way to establish a substantial similarity between computer programs is the AFC test set forth by the courts in _Computer Associates_ and _Gates Rubber_. This test allows the plaintiff to show that defendants copied protected elements of the source code by removing unprotected and essential programs from the code. While the plaintiff has not formally performed such a test, Hubel's report does attempt to break down the source codes into their functional parts and compare the two codes. For example, EDBA's analysis engine contains a number of "rules" as to how it processes each object. These rules are the fundamental blocks of the analysis engine. Hubel has found similarities in 53 of these rules. Again, even allowing for the fact that these rules are a good way to organize the program and may have been developed independently, this is a substantial amount of similarity between the two programs.

Hubel also found similar functions in the job schedulers of the two programs. He estimated that the first version of QCDB2 contained 8 identical functions in that area, one of which remains in version 3.0. Likewise, in addition to containing many identical lines of code, the parsers in the two programs function in a similar manner. For example, the parser contains a number of "reduction functions" that process certain parts of the SQL statements. After writing these functions, a CA employee created a manual detailing how they operate that eventually fell into Quest's hands. QCDB2, though it does not use identical source codes, uses a similar technique in implementing the reduction functions. These conclusions by Hubel indicate that a formal AFC test is likely to show substantial similarities between EDBA and QCDB2.

3. _Summary_

It is premature to attempt to detail exactly how much of CA's intellectual property was used by Quest in the creation of QCDB2. The evidence shows, however, that CA is likely to demonstrate that it controlled valuable information relating to the creation of database administration software and, particularly, for administration software for IBM's DB2. Even though they used previously existing ideas, the overall design of the EDBA source code and the parser, analysis engine and job scheduler used in the EDBA, are all likely protectable secrets. They are also likely to show that defendants improperly used this information. Quest and its employees clearly had access to the source code and other related information. Despite its claims of building the code from scratch, the QCDB2 program shares a number of characteristics with the EDBA program. A closer look at the programs shows that QCDB2 contains many source code lines and functions found in EDBA. While many of these similarities may be explained by innocent factors, there are simply too many to be explained away. For those reasons, CA is likely to prevail on the merits of its intellectual property claims.

B. _Irreparable Harm/Balance of Harms_

*11 [18][19] There is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation and copyright infringement. See _ISC-Bunker Ramo Corp. v. Altech. Inc.,_ 765 F.Supp. 1310, 1329 (N.D.Ill.1990). The defendants may rebut this presumption by demonstrating that plaintiff will not suffer any harm if the injunction is not granted. Plaintiff does not need to market a competing product in order to demonstrate irreparable harm. _Midway Mfg. Co. v. Artic Intern., Inc.,_ 547 F.Supp. 999, 1014 (N.D.Ill.1982). Platinum and CA expended significant resources in their attempts to create administration software for DB2. It would be nearly impossible to determine the dollar value of Quest's head start in that market. They filed this lawsuit seeking an injunction shortly after receiving credible information indicating that defendants were infringing. If Quest is allowed to continue marketing QCDB2 it will become more difficult for CA to become competitive in the market and make damages even more difficult to assess.

[20] The clean room procedure does not remedy the irreparable harm. First of all, the clean room exercise actually gives credence to plaintiff's arguments that the parser was very difficult to create as it took defendants' teams about a year to write parser code without the help of the EDBA code. Secondly, the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1459495
--- F Supp.2d ---
(Cite as: 2004 WL 1459495 (N.D.Ill.))

Page 11

clean room exercise only involved the parser, and not other potential infringement by defendants. Finally, the QCDB2 version containing the cleansed source code is not yet on the market. The fact that Quest plans to release such a product does not eliminate the harm suffered from the sales of the infringing product.

The balance of harms is also clearly in favor of plaintiff. Quest has admitted to some use of the EDBA code, and the evidence shows that plaintiff is likely to prove material infringement. The harm to Quest's business and reputation is clearly offset by the irreparable harm it caused to CA through the use of an infringing product.

### C. Public Interest

The granting of an injunction is in the public interest. The public is generally interested in upholding intellectual property rights, encouraging creativity and innovation, and rewarding the investment of resources in these pursuits. Moreover, the public is unlikely to suffer any harm from the removal of QCDB2 from the market as there are multiple competing products available to consumers.

### III. Objections to the Magistrate's Order

[21] On April 5, 2004, Magistrate Judge Mason ordered defendants to produce certain e-mails and transcribed phone messages, even though he found them to be attorney-client communications. Magistrate Judge Mason found that defendants' trial counsel, Mike Newman, had communicated with the team involved in the clean room exercise attempting to rewrite the parse source code. Defendants now challenge that order, arguing that the magistrate judge improperly found that the communications were "at issue," that he improperly determined that the communications were necessary to evaluate the integrity of the clean room, and that the order was inconsistent with a prior ruling concerning plaintiff's counsel Norm Rich.

*12 Defendants attempt to use the clean room process as a defense to the claims seeking injunctive relief, and as a way to mitigate any harm caused by the copying of CA's source code. The clean room, however, is a valuable exercise only if procedures are followed to make certain that no improper material passes through the walls. Defendants' counsel Newman communicated with the clean room team during their exercise. He also had access to the EDBA source code because of his participation in this litigation. Though we have no reason to believe that Newman actually contaminated the clean room in any way, we agree with Magistrate Judge Mason that plaintiff has the right to inspect the questionable communications. When defendants chose to use the clean room exercise as a defense, they implicitly represented that the clean room's walls were effective.

Defendants argue that this is an improper application of the "at issue" doctrine because that applies only when a party attempts to wield specific privileged communications as a sword, while hiding behind the privilege as a shield. That is essentially what defendants seek to do here by claiming that the clean room process was secure, while also preventing plaintiff from reviewing communications that passed through its walls. While the attorney-client privilege is certainly worthy of protection, we reiterate that Magistrate Judge Mason's order encompasses only conversations from Newman to the clean room team and not those conversations leaving the clean room.

Finally, we find no inconsistencies between the order requiring these disclosures and the order preventing defendants from obtaining conversations between plaintiff and its attorney Rich. Plaintiff did not (either explicitly or implicitly) place any communications at issue by asserting copyright claims. Defendants had every opportunity to review the copyright applications and plaintiff did not rely on any alleged conversations with Rich to help establish their validity.

### CONCLUSION

For the foregoing reasons, defendants' motions to strike the testimony of Martin Hubel and to strike Hubel's reply brief are denied and their objections to the magistrate's order are overruled. Plaintiff's motion for a preliminary injunction will be granted upon the submission of an appropriate draft order and bond.

FN1. For example, while he is not the subject of this motion, defendants' source code expert Bruce Webster, while well-versed in C and C++, has no expertise in SQL.

2004 WL 1459495 (N.D.Ill.), 2004 Copr.L.Dec. P 28,823

Motions, Pleadings and Filings (Back to top)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1459495
--- F.Supp.2d ---
(Cite as: 2004 WL 1459495 (N.D.Ill.))

Page 12

• 2004 WL 869873 (Trial Motion, Memorandum and Affidavit) Computer Associates' Motion to Extend Time to File Its Reply Brief in Support of Motion for Preliminary Injunction and to Exclude Clean Room Materials (Feb. 10, 2004)

• 2004 WL 869869 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Leave to File Their First Amended Answer, Affirmative Defenses, and Counterclaim (Jan. 16, 2004)

• 2004 WL 869871 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Leave to File an Opposition Brief in Excess of Fifteen Pages (Jan. 16, 2004)

• 2003 WL 23418925 (Trial Motion, Memorandum and Affidavit) Computer Associates' Motion to File Instanter Corrected Hubel Declaration and Appendices in Support of its Motion for Preliminary Injunction (Nov. 26, 2003)

• 2003 WL 23418909 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel the Deposition of Norm J. Rich (Nov. 03, 2003)

• 2003 WL 23418916 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Partial Relief from the Protective Order Relating to the Declaration of Martin Hubel (Nov. 03, 2003)

• 2003 WL 23418896 (Trial Motion, Memorandum and Affidavit) Computer Associates' Motion for Leave to Brief in Excess of Fifteen Pages Instanter (Oct. 15, 2003)

• 2003 WL 23418904 (Trial Motion, Memorandum and Affidavit) Computer Associates' Motion for Preliminary Injunction (Oct. 15, 2003)

• 2003 WL 23418890 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Their Motion to Compel Discovery Relating to CA's Witness Interviews (Sep. 05, 2003)

• 2003 WL 23418873 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel Computer Associates to Disclose its Copyright and Trade Secrets Allegations (Jul. 22, 2003)

• 2003 WL 23418878 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel Discovery Relating to Computer Associates' Witness Interviews (Jul. 22, 2003)

• 2003 WL 23418866 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendants' Motion to Dismiss Counts III Through V of CA's First Amended Complaint (Jul. 11, 2003)

• 2003 WL 23418856 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss Counts III Through V of CA's First Amended Complaint (Jun. 04, 2003)

• 2003 WL 23418850 (Trial Motion, Memorandum and Affidavit) Computer Associates' Motion for Leave to File its First Amended Complaint (May. 09, 2003)

• 2003 WL 23418832 (Trial Motion, Memorandum and Affidavit) Motion to Require Computer Associates to Pay for its Electronic Discovery Requests (Mar. 20, 2003)

• 2003 WL 23418822 (Trial Motion, Memorandum and Affidavit) Plaintiff Computer Associates' Motion to Approve Martin Hubel as A "Qualified Person" Entitled to View Confidential Material Pursuant to the Protective Order (Mar. 07, 2003)

• 2003 WL 23418815 (Trial Motion, Memorandum and Affidavit) Computer Associates' Motion for Turnover of its Proprietary Information Defendants Improperly Obtained Outside Discovery and to Bar Defendants' Use of Such Information (Jan. 24, 2003)

• 2002 WL 32452537 (Trial Motion, Memorandum and Affidavit) Plaintiff Computer Associates International, Inc.'s Reply Brief in Support of its Motion for Entry of A Protective Order Regarding Confidential Information (Dec. 10, 2002)

• 2002 WL 32452532 (Trial Motion, Memorandum and Affidavit) Plaintiff Computer Associates International, Inc.'s Motion for Entry of A Protective Order Regarding Confidential Information (Nov. 25, 2002)

• 2002 WL 32452525 (Trial Motion, Memorandum and Affidavit) Agreed Motion for Extension of Time to Answer or Otherwise Plead (Jul. 22, 2002)

END OF DOCUMENT

# EXHIBIT "B"

Not Reported in F.Supp.2d                    Page 1
2002 WL 31115239 (D.Kan.)
**(Cite as: 2002 WL 31115239 (D.Kan.))**

**H**
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.

Michael DEAN, Plaintiff,
v.
Jack ANDERSON; Pegasus Engineering, L.L.C.;
Thomas Waterhouse; Charles Baker;
and Baker Associates, Defendants/Third-Party
Plaintiffs,
v.
W.K. JENKINS and Guadlupe Dean, Third-Party
Defendants.

**No. 01-2599-JAR.**

Sept. 18, 2002.

MEMORANDUM AND ORDER GRANTING
PLAINTIFF'S MOTION TO DISMISS
COUNTERCLAIM

ROBINSON, District J.

*1 This matter is before the Court on Plaintiff's Motion to Dismiss Counterclaim (Doc. 61) filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants filed a Response (Doc. 64) and plaintiff Michael Dean ("Plaintiff Dean") filed a Reply (Doc. 66). The Court has reviewed the parties' filings, and for the reasons set forth below, Plaintiff Dean's motion to dismiss shall be granted.

I. BACKGROUND

On April 3, 2002, Plaintiff Dean filed a First Amended Complaint (Doc. 34) alleging common law claims of fraud, negligence, and conversion; violations of Kansas securities law; securities fraud in violation of Federal law; and recision for use of an unregistered broker dealer in violation of Federal securities law. The basis of Plaintiff Dean's complaint stems from a transaction occurring in November of 2001. At that time, defendants Baker and Waterhouse approached W.K. Jenkins, Plaintiff Dean's business

associate, soliciting an investment in defendant Pegasus Engineering, L.L.C ("Pegasus"). Later, W.K. Jenkins forwarded the materials he received from Baker and Waterhouse, regarding the possible investment in Pegasus, to Plaintiff Dean. Plaintiff Dean began communicating with defendant Anderson. Plaintiff Dean's discussions with Anderson culminated in a check for $55,000 made to Anderson and drawn from Plaintiff Dean and Guadlupe Dean's joint bank account. The memo line on the check contains the following language, "personal loan, 10% per annum." Defendants claim that the $55,000 did not come from Plaintiff Dean's personal funds, but instead, the money actually belonged to W.K. Jenkins and Plaintiff Dean was working as his agent.

After Plaintiff Dean's complaint was filed, defendants filed a motion to dismiss or transfer based on venue. The Court denied defendants' motion in a Memorandum and Order ("M & O") dated May 2, 2002. [FN1] In defendants' motion to dismiss or transfer venue they argued that venue was not proper in Kansas because contacts between defendants and Plaintiff Dean that occurred in Kansas did not serve as a basis for venue. Defendants alleged that the transaction actually occurred between defendants and W.K. Jenkins, who is a Missouri resident; and Plaintiff Dean merely acted as an agent. The relevant contacts, according to defendants, would have been the contacts with W.K. Jenkins. In rejecting this assertion, the Court noted that the record was clearly contrary to defendants' contentions. The Court found that while defendants may have initially approached W.K. Jenkins, "defendants later sought out plaintiff's personal investment." [FN2] The Court noted that defendants' own correspondence pointed to the fact that the deal was with Plaintiff Dean, not with W.K. Jenkins.

FN1. *Dean v. Anderson,* No. 01-2599-JAR, 2002 WL 1067454 (D.Kan. May 2, 2002).

FN2. *Id.* at *2.

After the Court denied defendants' motion to dismiss, defendants filed a "Counterclaim/Third Party Claim" seeking declaratory relief (Doc. 50). Defendants' counterclaim seeks "a judicial

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31115239 (D.Kan.)
(Cite as: 2002 WL 31115239 (D.Kan.))

Page 2

determination as to whether the $55,000 described in counterdefendant Michael Dean's First Amended Complaint is owed and to whom, and a judicial determination binding counterdefendants Guadlupe Angelica Dean and W.K. Jenkins to any judgment entered in this case with respect to the $55,000." (Doc. 50 at 3). Defendants further seek "a judicial determination as to whether [W.K.] Jenkins has a claim for violations of state securities fraud or Federal securities fraud." While it is not completely clear from the face of defendants' pleading exactly what they are attempting to accomplish, it appears that defendants are asserting a counterclaim against Plaintiff Dean, Guadlupe Dean, and W.K. Jenkins pursuant to Rule 13 of the Federal Rules of Civil Procedure. It also appears that defendants are asserting a third-party complaint against Guadlupe Dean and W.K. Jenkins pursuant to Rule 14 of the Federal Rules of Civil Procedure. However, defendants' Response to Plaintiff Dean's motion to dismiss the counterclaim discusses the necessity of joining Guadlupe Dean and W.K. Jenkins as parties pursuant to Rules 19 and 20 of the Federal Rules of Civil Procedure. Incidentally, defendants have not moved to join Guadlupe Dean or W.K. Jenkins as parties pursuant to Rules 19 or 20. In any event, this order will only address defendants' counterclaim against Plaintiff Dean and defendants' counterclaim against Guadlupe Dean and W.K. Jenkins. Whether defendants have properly asserted a third-party claim against Guadlupe Dean and W.K. Jenkins or whether Guadlupe Dean and W.K. Jenkins should be joined as parties is not before the Court.

## II. STANDARD OF REVIEW

*2 The court will dismiss a counterclaim for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure when it appears beyond a doubt that the counterclaimant can prove no set of facts supporting its counterclaim which would entitle it to relief. [FN3] In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, as distinguished from conclusory allegations, and must draw all reasonable inferences in favor of the nonmovant. [FN4]

FN3. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249- 50 (1989).

FN4. *Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F . 2d 1183, 1187 (10th Cir.1991); *Swanson v. Bixler*, 750 F.2d 810,

813 (10th Cir.1984).

## III. DISCUSSION

Plaintiff Dean seeks dismissal of defendants' counterclaim, alleging the counterclaim is unnecessary, duplicative, and redundant. Plaintiff Dean argues that the subject of defendants' counterclaim has already been framed by the parties in their pleadings and has essentially been rejected by the Court in its May 2, 2002 M & O.

Defendants do not disagree that the subject of the counterclaim has already been framed by the parties, but defendants assert that their counterclaim is not duplicative because the counterclaim accomplishes the necessary joinder of Guadlupe Dean and W.K. Jenkins. Defendants claim that while the check was written out of Plaintiff Dean and Guadlupe Dean's bank account, W.K. Jenkins provided the money to Plaintiff Dean and he should therefore be bound by any judgment regarding the $55,000. Defendants assert that it is critical to join all parties of interest, including Guadlupe Dean and W.K. Jenkins, if this dispute is going to be resolved in one action.

Defendants' arguments regarding the necessity of joining Guadlupe Dean and W.K. Jenkins as parties are not persuasive in deciding whether the counterclaim should be dismissed. Defendants' arguments completely miss the mark. Contrary to defendants' assertion, filing a counterclaim against non-parties does not accomplish the task of joining those individuals as parties. To the extent defendants have attempted to assert a counterclaim against Guadlupe Dean and W.K. Jenkins, the supposed counterclaim is *sua sponte* dismissed. [FN5] Guadlupe Dean and W.K. Jenkins are not "counterdefendants" as defendants refer to them in their pleadings. A counterclaim must be asserted against an existing, opposing party. [FN6] Defendants may not circumvent this rule by asserting a third-party claim against Guadlupe Dean and W.K. Jenkins. [FN7] Neither Guadlupe Dean nor W.K. Jenkins are existing or opposing parties for purposes of the counterclaim. Additionally, while it is true Rule 13(h) would permit the joinder of Guadlupe Dean and W.K. Jenkins in accordance with Rules 19 and 20, if there is no valid counterclaim against Plaintiff Dean, as discussed below, there can be no joinder of additional parties necessary to adjudicate the counterclaim. Furthermore, defendants have not moved to join Guadlupe Dean and W.K. Jenkins as parties to the counterclaim pursuant to Rule 13(h);

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31115239 (D.Kan.)
**(Cite as: 2002 WL 31115239 (D.Kan.))**

nor have defendants moved to join Guadlupe Dean and W.K. Jenkins as parties to the original action pursuant to Rule 19 or 20.

> FN5. *See McKinney v. Okla. Dept. of Human Servs., 925 F.2d 363, 365 (10th Cir.1991)* (upholding a district court's *sua sponte* dismissal of a claim because it was obvious that no claim was stated in the complaint).

> FN6. *See Fed.R.Civ.P. 13; Ponderosa Dev. Corp. v. Bjordahl, 787 F.2d 533, 536 (10th Cir.1986)* ("An attempt to implead additional parties is materially different from a claim against an already opposing party under Rule 13(a).").

> FN7. *Moore's Federal Practice,* § 13.90[2][b] (Matthew Bender 3d ed.) ("The defendant may not confer compulsory status upon a claim by using it as a basis for impleading third-party defendants not currently parties to the action.").

*3 As to defendants' counterclaim against Plaintiff Dean, the Court finds that whether the funds in question came from Plaintiff Dean personally or from another individual is an issue that will be determined in the primary litigation and does not require a counterclaim. The proposed counterclaim against Plaintiff Dean will become moot upon disposition of his claims, and is therefore redundant. [FN8] In their Response, defendants do not dispute that the issue raised by their counterclaim has already been framed by prior pleadings. Instead, defendants merely make arguments regarding the propriety of joining Guadlupe Dean and W.K. Jenkins. These arguments are irrelevant in determining the viability of defendants' counterclaim against Plaintiff Dean; and consequently, the Court finds the counterclaim shall be dismissed.

> FN8. *Mille Lacs Band of Chippewa Indians v. Minnesota,* 152 F.R.D. 580, 582 (D.Minn.1993) (citing *Aldens, Inc. v. Packel,* 524 F.2d 38, 51- 52 (3d Cir.1975)).

IV. CONCLUSION

Plaintiff Dean's motion to dismiss defendants' counterclaim shall be granted. The Court finds that the counterclaim is redundant as it applies to Plaintiff Dean and is therefore unnecessary. To the extent defendants assert a counterclaim against Guadlupe Dean and W.K. Jenkins, the counterclaim is also dismissed because Guadlupe Dean and W.K. Jenkins are not existing, opposing parties against whom a counterclaim may be asserted.

IT IS THEREFORE BY THIS COURT ORDERED that plaintiff's Motion to Dismiss Counterclaim (Doc. 61) is granted.

IT IS FURTHER ORDERED that defendant's counterclaim as it applies to Guadlupe Dean and W.K. Jenkins shall be dismissed.

2002 WL 31115239 (D.Kan.)

Motions, Pleadings and Filings (Back to top)

• 2;01CV02599 (Docket) (Dec. 17, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "C"

1991 WL 203864
1991 WL 203864 (N.D.Ill.)
**(Cite as: 1991 WL 203864 (N.D.Ill.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.

RSL HOLDING COMPANY, INC., Reliance
Standard Insurance Company of Texas and
Reliance Standard Insurance Company, Plaintiffs,
v.
DRESSER INDUSTRIES, INC., Defendant.

**No. 89 C 7004.**

Oct. 1, 1991.

*MEMORANDUM OPINION AND ORDER*

ANN C. WILLIAMS, District Judge.

*1 This matter is before the court on three motions
by plaintiffs asking this court to strike defendant's
affirmative defense, defendant's counterclaim, and
references to settlement negotiations made in the
counterclaim.    Also before the court are the
defendant's motion to amend it's answer, and motion
for leave to file its counterclaim.    With respect to
these motions, the court rules as follows.

The Motion to Strike the Affirmative Defense

As a preliminary statement, the court notes that
when deciding a motion to strike, "the court must
treat all well-pleaded facts as admitted and cannot
consider matters outside the pleadings." *Federal
National Mortgage Association v. Cobb, 738 F.Supp.
1220, 1224 (N.D.Ind.1990).    A motion to strike
should not be granted unless the court is "convinced
that there are no questions of fact, that any questions
of law are clear and not in dispute, and that under no
set of circumstances could the defense succeed."
Lirtzman v. Spiegel, Inc., 493 F.Supp. 1029, 1031
(N.D.Ill.1980), quoting, Systems Corp. v. American
Telephone & Telegraph.*

This action was filed on September 15, 1989.
Plaintiff's first claim is predicated upon Section 10(b)
of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78(j)(b) (1988), and
Rule 10b-5, promulgated thereunder.    On October
29, 1990, defendant filed a notice of motion seeking
leave to amend its answer to assert a statute of
limitations defense based on the limitations period
held applicable in *Short v. Belleville Shoe Mfg Co.,
908 F.2d 1385 (7th Cir.1990)*, to 10b-5 cases filed in
Illinois.    *Short* overruled eighteen years of clear
Seventh Circuit precedent applying the statute of
limitations from state blue sky laws to cases under
Section 10b-5 of the Exchange Act and Rule 10b-5.
*See e.g., Davenport v. A & C Davenport and Son Co.,
903 F.2d 1139 (7th Cir.1990).*

In *Short* the Seventh Circuit held that Section 13 of
the of Securities Act as amended by the Securities
Act of 1934 (¶ 13) 15 U.S.C. ¶ 77, provides the
most appropriate limitations period for 10b-5, and
10b-5 actions. *Short, 908 F.2d 1385 (7th Cir.1990).*
Section 13 provides that an action is barred unless
brought within one year of the discovery of the
untrue statement or omission but in no event shall
any action be brought more than three years after the
sale. 15 U.S.C. ¶ 77m.  This action was filed nearly
a year before *Short* was decided.    Defendant states
that the affirmative defense is based upon facts
uncovered during discovery. [FN1]

In view of the liberal standards governing leave to
amend, plaintiff filed a timely statement of non-
opposition to the motion to amend, but they have also
filed a motion to strike defendant's statute of
limitations defense on the merits, pursuant to 12(f).
Plaintiffs contend that the affirmative defense should
be stricken because the new, shorter statute of
limitations should not be applied retroactively to this
action.

Plaintiffs' motion to strike is denied for the following
reasons.    First, "as a general rule, judicial decisions
apply 'retroactively.' " *Anton v. Lehpamer, 787 F.2d
1141, 1143 (7th Cir.1986)* (quoting *Solem v. Stumes,
465 U.S. 638, 642 (1984)*).    To determine whether an
exception to the general rule of retroactivity should
be applied, a court must consider the factors stated in
*Chevron Oil Co v. Hudson, 404 U.S. 97 (1971)*:

*2 First, the decision to be applied retroactively must
establish a new principle of law, either by overruling
clear past precedent on which litigants may have
relied, ... or by deciding an issue of first impression

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1991 WL 203864                                                                 Page 2
1991 WL 203864 (N.D.Ill.)
(Cite as: 1991 WL 203864 (N.D.Ill.))

whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect and whether the retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively there is ample basis in our cases for avoiding the 'injustice or hardship by a holding of non-retroactivity.'"

*Id.* at 107 (citations omitted).

The courts have interpreted the first prong of the *Chevron* test to require more than a clear line of prior authority, and have explained that the purpose of the first part of the test is to protect parties who have justifiably relied on the previously existing authority. *See e.g., Gatto v. Meridian Medical Association, Inc., 882 F.2d 840, 843 (3rd Cir.1989), and Short, 908 F.2d at 1389-90 (7th Cir.1990).* Hence, to avoid the retroactive application of a new limitations period, *Chevron* requires a party to show a clear line of authority (which is present here), and to demonstrate justified reliance on that authority.

Plaintiffs contend that it would be improper to retroactively apply the shorter statute announced in *Short* because they justifiably relied on eighteen years of Seventh Circuit precedent in filing their suit. The court rejects this argument. Plaintiffs focus only on the fact that the statute of limitations was three years when the suit was filed, but present no argument or concrete evidence which suggest their reliance on the three year statute. Further, plaintiffs have stated in their complaint that they were not aware of defendant's fraud until a few months before they filed their suit. (See ¶ 23, "RSLH and RSL Texas discovered the fraud by Dresser in connection with the 1989-1990 renewal process". Plaintiffs filed this lawsuit in September 1989). The facts currently before the court indicate that plaintiff has not demonstrated reliance within the meaning of the *Chevron* test. [FN2]

In the affirmative defense, defendant asserts that plaintiff should have been aware of the alleged fraud years before they filed suit, so that they are barred under the three year statute. The court has not yet been presented with the evidence which will support this argument, but the court is not convinced that the defense cannot succeed. At the same time, the question of whether the statute applies retroactively

in this case, under the *Chevron* test cannot yet be determined. [FN3] The motion to amend defendant's answer is granted, and plaintiffs' motion to strike the defense is denied.

Motion to Strike the Counterclaim

*3 Defendant Dresser seeks leave to file a counterclaim for a declaratory judgment in this action. Plaintiff argues that the counterclaim is the mirror image of plaintiffs' complaint, and therefore should be stricken because it is futile. Plaintiff states that the defendant seeks declaratory judgment on the same issues of contractual interpretation which form the basis of plaintiffs' complaint. Plaintiff contends that there are no issues raised by the counterclaim which have not been previously raised by the complaint, and that any judgment on the complaint would dispose of the counterclaim. In addition, as will be dealt with below, plaintiff argues that the only factual matter raised in the counterclaim that is not raised in the claim are improper references to plaintiff's position during settlement negotiations, which should themselves be stricken.

Initially, the court notes that an amendment to add a counterclaim is judged by the same standards governing other amendments under Fed.R.Civ.P. 15(a). Generally, leave to amend is freely given

[i]n the absence of any apparent or declared reason-- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment [or] futility of the amendment....

*Foman v. Davis, 371 U.S. 178, 182 (1962).*

Courts regularly dismiss redundant counterclaims. *See e.g., Schlossberg v. Koehring Co., 333 F.Supp. 1345 (E.D. Wis.1971)* (After trial, counterclaim dismissed on the grounds that it essentially asked for relief on matters already put at issue by the complaint and answer). In the instant case, however, it is not clear that defendant's counterclaim is completely redundant.

First, Dresser seeks a declaration by the court that Dresser did not breach the Agreement by rejecting plaintiff's proposal or by purchasing insurance from another carrier. Defendant contends that without such a declaration plaintiffs might later argue that Dresser's award of business to another carrier

constituted a separate breach of the Agreement. Plaintiffs do not deny the legitimacy of this argument. Thus, it appears that a disposition of plaintiffs' breach of contract claim would not resolve whether actions taken by Dresser subsequent to the filing of the complaint amounted to breach of the Agreement. [FN4] Count II of the counterclaim seeks a declaration that plaintiffs breached the Agreement by filing suit, and that therefore, the Agreement was terminated. [FN5] Dresser again argues that even if it prevails on plaintiffs' breach of contract claim, it will not be granted all the relief it seeks in Count II, since its contention that plaintiffs *are in breach is not covered by the complaint. It* appears that in this lawsuit, the fact that one party did not breach the contract is not necessarily evidence that the other party was in breach, especially since the counterclaim covers a time period which plaintiffs' complaint does not consider.

*4 The court finds that disposition of plaintiffs' breach of contract claim will not resolve all of the issues presented in defendant's counterclaim, and that giving defendant's leave to file their counterclaim will not be futile. Accordingly, defendant's motion for leave to file a counterclaim is granted, and plaintiffs' motion to strike the counterclaim is denied.

Motion to Strike References to Settlement Negotiations

If the court gives the defendant leave to file the counterclaim, plaintiffs request that the court strike from the counterclaim, pursuant to Fed.R.Civ.P. 12(f), all references to settlement negotiations. Plaintiffs contend that the counterclaim contains both factual allegations concerning plaintiffs' refusal to compromise its claims (See Counterclaim, ¶ ¶ 20, 21, 25) as well as a request for a declaration concerning the legal implications of plaintiffs' negotiating posture. Plaintiff contends that such references are plainly prohibited by Fed.R.Evid. 408, and thus should be stricken from the counterclaim. Plaintiff also notes that it would be highly prejudicial if the jury were to learn that the plaintiffs at one point valued the case for settlement purposes as described in the counterclaim.

Federal Rule of Evidence 408 prohibits the admission of evidence concerning the positions taken by litigants during settlement talks, which is offered "to prove liability for or invalidity of the claim. Evidence of conduct or statements made in compromise negotiations is likewise not admissible." Plaintiff correctly notes that courts in this district have not hesitated to strike allegations which violated Rule 408. *See e.g., Bramen v. Woodfield Gardens Assoc.,* 715 F.Supp. 226, 230 (N.D.Ill.1989).

At issue, at this point, is whether the disputed paragraphs refer to settlement negotiations. Defendant contends that none of the statement set forth in paragraphs 20, 21 and 25 constitute "settlement negotiations". The court will not speculate on what defendant means by placing the phrase settlement negotiations in quotation marks. For purposes of this motion, defendant's allegations are taken as true.

Given the record currently before us, the court cannot determine whether the disputed paragraphs make reference to settlement negotiations, and if so whether those references are prohibited. [FN6] It is more likely that this issue can resolved when the court reviews the pending motion for summary judgment. In conjunction with that motion the parties may submit affidavits and legal argument on the issue within seven days of the date of this opinion, if they have not already done so. At summary judgment, the court will be better able to determine whether the references concern settlement, will have a clearer understanding of the legal theory that the references are intended to support, and will be better able to determine whether those references are proper. Accordingly, at this juncture, plaintiffs' motion to strike is denied without prejudice.

*Conclusion*

*5 For the foregoing reasons the plaintiffs' motions to strike are denied. The motion to strike references to settlement negotiations is denied without prejudice. Defendant's motion to amend it's answer, and for leave to file a counterclaim for declaratory judgment is granted.

> FN1. Dresser contends that plaintiffs knew or should have known that the fraudulent statements of omissions alleged in the complaint were untrue before the closing date of the Stock Purchase Agreement (November 6, 1987), and that plaintiffs' 10b-5 claim is barred because this suit was filed within one year of the time the plaintiffs discovered the alleged fraud.

> FN2. The court also notes that there has been no suggestion that retroactive

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1991 WL 203864                                                                          Page 4
1991 WL 203864 (N.D.Ill.)
(Cite as: 1991 WL 203864 (N.D.Ill.))

application would result in any inequity to plaintiffs (the third prong of the *Chevron* test), since under the allegations made in the complaint, plaintiffs' cause of action is not barred under the one year statute.

FN3. It seems to the court that this is an issue which would be resolved on a motion to dismiss, or more likely a motion for summary judgement.

FN4. Plaintiffs' suggestion that this point could be remedied by simply amending plaintiffs' does not address all of the relief sought in the counterclaim.

FN5. Defendant contends, once again, that without such a declaration, plaintiffs might later argue that Dresser has some continuing obligation to do business with the plaintiffs.

FN6. Citing *Central Soya Co. v. Epstein Fisheries, Inc., 676 F.2d 939, 944 (7th Cir.1982)*, defendant claims that the paragraphs are proper and admissible even if the court were to view the paragraphs as references to settlement negotiations, because they are being offered to show the course of action taken by the plaintiff to coerce the defendant into doing business with them.   Defendant also argues that evidence of plaintiffs' statements should be admissible to prove that they were not part of settlement negotiations.  *See McCormick on Evidence,* at 812 (3d Ed.1984).

1991 WL 203864 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "D"

1989 WL 135203
1989 WL 135203 (N.D.Ill.)
(Cite as: 1989 WL 135203 (N.D.Ill.))

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Trustee,
the United States Department of Commerce, by the Economic Development Administration; and Navistar International Transportation Corp., as Beneficiaries, Plaintiffs,
v.
INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Dependable Insurance Company,
Inc., International Fidelity Insurance Company; and Indiana Lumbermens Mutual Insurance Co., Defendants.

No. 87 C 8439.

Nov. 1, 1989.

MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

*1 In this action to recover amounts allegedly owed under a performance bond, plaintiff United States Department of Commerce, Economic Development Administration ("EDA" or "the government") objects to the magistrate's order of September 5, 1989 ("the magistrate's order") compelling answers to deposition questions and disclosure of documents.

BACKGROUND

Plaintiff Continental Bank formerly known as Continental Illinois National Bank and Trust, is the trustee of the Wisconsin Steel Trust ("the trust"). Plaintiff EDA is a beneficiary of the trust. On March 16, 1984, the trust entered a license agreement with Cuyahoga Equipment Corporation ("Cuyahoga"). The license agreement required Cuyahoga to demolish and dispose personal property

and fixtures at the Wisconsin Steel Works in Chicago, Illinois ("the site"). Cuyahoga promised to obtain $3,000,000 in performance and payment bonds before beginning the project. The bonds were intended to secure Cuyahoga's obligation to complete the demolition and removal by December 31, 1986.

In March 1984, Cuyahoga obtained a $3,000,000 bond jointly issued by Union Indemnity Insurance Company of New York ("Union") and Indemnity Insurance Company of North America. Under the bond, Union was liable to the extent of $2,500,000. In June 1985, Union filed for receivership, leaving only $500,000 secured by the bond.

EDA advised Cuyahoga to obtain a replacement bond in August 1985. Cuyahoga did not comply with EDA's request. In February 1986, EDA threatened to withhold payments from Cuyahoga unless Cuyahoga obtained a replacement bond. In March 1986, a representative of defendant Dependable Insurance Company, Inc. ("Dependable") spoke on the telephone with William Ogden, an attorney at EDA, concerning the status of the demolition project, the need for a replacement bond, and other subjects. On May 20, 1986, Dependable issued bonds in the aggregate amount of $2,000,000.

When Cuyahoga defaulted on the licensing agreement, EDA filed this action to recover on Dependable's bonds. In its second affirmative defense, Dependable alleges that EDA knew that Cuyahoga was in default of its contractual obligations prior to the execution of the replacement bonds on May 20, 1986. Dependable further alleges that EDA knew that completing the project was economically unfeasible by May 1986. Dependable contends that EDA withheld this information from Dependable and refrained from declaring Cuyahoga in default in order to procure the replacement bonds.

In the course of discovery regarding these allegations, EDA refused to disclose documents allegedly protected from discovery by the governmental deliberative process privilege, the attorney-client privilege and the work product privilege. This dispute was referred to a magistrate. Dependable moved the magistrate to compel EDA to disclose the documents. The magistrate granted the motion under Fed.R.Civ.P. 37. The magistrate also ruled on specific questions that EDA employees

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1989 WL 135203
1989 WL 135203 (N.D.Ill.)
(Cite as: 1989 WL 135203 (N.D.Ill.))

Page 2

refused to answer in depositions.

*2 EDA objects to the magistrate's order compelling disclosure of the documents.  In addition, EDA seeks clarification of the magistrate's order regarding several deposition questions.

### DISCUSSION

The magistrate's order will be reviewed to determine if it is clearly erroneous or contrary to law. Fed.R.Civ.P. 72(a).

I. Governmental Deliberative Process Privilege

EDA maintains that numerous documents included in the magistrate's order are protected by the governmental deliberative process privilege.  The privilege exists to protect the decision-making process of government agencies.  *EEOC v. Sears, Roebuck & Co.,* 111 F.R.D. 385, 390 (N.D.Ill.1986). A document is protected if it is "predecisional"-- generated before the adoption of an agency policy-- and "deliberative"--reflecting the give and take of the consultative process.  *United States v. Bd. of Educ.,* 610 F.Supp. 695, 698 (N.D.Ill.1985);  *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980).  The privilege does not extend to factual or objective material.  *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87-89;  93 S.Ct. 827, 836-37 (1973).  The documents also shed the privilege if an agency adopts the documents as its position on an issue.  *Sears, Roebuck,* 111 F.R.D. at 390, n. 13 citing *N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 151-152, 95 S.Ct. 1504, 1516-17 (1975).

Applying the privilege is a two-step process.  First, the government must show that the privilege applies to the documents in issue.  Second, the court must balance the need for disclosure against the government's need for secrecy.  *Bd. of Educ.,* 610 F.Supp. at 698.

EDA has established that the privilege applies to the documents in issue.  The documents contain recommendations and opinions regarding the management of the site.  The documents were produced by George Harper, plan manager of the site and various members of the consulting firms of Epstein Engineering and Kudrna and Associates. Dependable argues that the communications are not privileged because they were not produced by EDA employees.  However, the privilege may extend to documents prepared for an agency by outside experts.

*Soucie v. David,* 448 F.2d 1067, 1078 n. 44 (D.C.Cir.1971).  *See also Wu v. Nat'l Endowment for Humanities,* 460 F.2d 1030, 1032 (5th Cir.1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1352 (1973).

In support of its claim of privilege, EDA submits the affidavit of Michael Oberlitner, Acting Deputy Assistant Secretary for Loan Programs for EDA. Oberlitner formally claims the privilege for the EDA, stating that the documents in question provided expertise regarding the use, maintenance and disposal of the site and recommended alternative courses of action. Oberlitner affidavit ¶ 9, EDA memorandum in support of its motion to compel.  *See Bd. of Educ.,* 610 F.Supp. at 698;  *King v. Internal Revenue Service,* 684 F.2d 517, 519 (7th Cir.1982).  EDA has adequately established that the privilege applies to these documents.

*3 EDA fails to establish that the need for secrecy outweighs the need for disclosure in this case.  Since the benefits of the governmental deliberative privilege are " 'at best indirect and speculative,' the privilege must be strictly confined 'within the narrowest possible limits consistent with the logic of [its] principles'."  *Bd. of Educ,* 610 F.Supp. at 698 (citations omitted).  The documents in issue are largely technical.  They contain factual information regarding the site to supplement opinions and recommendations of the author.  They are also of little interest to anyone other than the parties to this case.  Exposure of these documents will not chill the deliberative process or expose the author to public ridicule.  *See, Coastal States,* 617 F.2d at 866.

Furthermore, the documents are relevant to Dependable's second affirmative defense. Dependable requires evidence of knowledge attributable to the government prior to the execution of the replacement bonds.  The government allegedly misrepresented the status of the demolition to Dependable.  The seriousness of the claim and the government's active involvement in the litigation dictate disclosure of the documents.  *See, In re Franklin Nat'l Bank Securit. Litig.,* 478 F.Supp. 577, 583 (E.D.N.Y.1979).

The magistrate's determination that the documents must be disclosed is not clearly erroneous or contrary to law.  In addition, the magistrate's rulings on ¶ ¶ 15, 31-33 of his memorandum opinion and order reach the correct result.  Consequently, EDA's objections regarding the governmental deliberative process privilege are overruled.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1989 WL 135203
1989 WL 135203 (N.D.Ill.)
(Cite as: 1989 WL 135203 (N.D.Ill.))

Page 3

## II. Attorney-Client Privilege

EDA submits four documents allegedly protected by the attorney-client privilege. EDA must establish that the documents were communications (1) concerning the seeking of legal advice; (2) between EDA and an attorney acting in his professional capacity; (3) related to legal matters; and (4) at EDA's insistence permanently protected. *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir.1980).

This court has reviewed the documents at issue. Document C007222 is a letter from Frank Auwarter of the law firm of Mayer, Brown & Platt, responding to a request for legal advice from EDA. The document is protected by the attorney-client privilege. A second letter between George Harper and Michael Oberlitner, document C007224, assigns a carbon copy to an EDA attorney. The second letter clearly falls beyond the scope of the privilege. The second letter is not primarily directed to an attorney, nor does it seek legal advice. The carbon copy may have served to keep counsel for EDA informed of the contents of the letter. This incidental communication to an attorney is not protected by the privilege.

The final two documents allegedly protected by attorney-client privilege contain the notes of financial analyst Bob Reilly. The notes reflect the contents of three meetings. Document C007118 includes notes from meetings on October 31 and November 3. [FN1] The first meeting was held to advise EDA of an internal environmental audit of the site. It was not held primarily to seek legal advice. The presence of an outsider, Ed Wolezynski, an employee of the National Oceanic and Atmospheric Administration, indicates that the meeting was not a confidential communication between attorney and client. The notes on document C007118 also describe the services performed by counsel for EDA discussed on November 3. The description does not contain confidential matter. *See, Schacher v. Am. Academy of Ophthalmology,* 106 F.R.D. 187, 192 (N.D.Ill.1985). Document C007118 is not protected by the attorney-client privilege.

*4 Document C007119 contains Bob Reilly's notes of a report made by George Braam of Kudrna & Associates to counsel for EDA. Braam is not an attorney for EDA or a client of EDA. The communication reflected in the notes is not protected by the attorney-client privilege. Consequently, the notes are discoverable.

## III. Work Product

EDA submits several documents that it contends are protected by the work product privilege. The privilege protects documents prepared in anticipation of litigation for a party or a party's representative (including an attorney or consultant). Fed.R.Civ.P. 26(b)(3). Privileged documents are discoverable only upon a showing of substantial need by the party seeking discovery. *Id.*

Some of the documents EDA submitted to this court *in camera* are the product of the terminated Wisconsin Steel Trust bankruptcy litigation. Dependable argues that work product protection does not extend to documents prepared in prior litigation. Dependable is wrong. Work product protection extends to documents prepared in anticipation of prior, terminated litigation, regardless of the interconnectedness of the issues or facts. *Panter v. Marshall Field & Co.,* 80 F.R.D. 718, 724 (N.D.Ill.1978), citing, *In re Murphy,* 560 F.2d 326, 333-35 (8th Cir.1977). *See also FTC v. Grolier,* 462 U.S. 19, 26- 27, 103 S.Ct. 2209, 2213-14 (citing authority that work product materials retain their immunity from discovery after termination of the litigation). EDA documents that qualify for work product protection will not be released simply because prior litigation has terminated. Dependable must overcome the privilege with the requisite showing of substantial need.

EDA submits document C007119, Bob Reilly's notes. The notes were not prepared in anticipation of litigation. At the time of the meeting and the underlying communication between George Braam and counsel for EDA, Cuyahoga had not formally defaulted under the license agreement. Although the potential for litigation existed, EDA has not established that the underlying communication was made because of the litigation. *Binks Mfg. v. Nat'l Presto Indus.,* 709 F.2d 1109, 1119 (7th Cir.1983). Rather, the meeting was held in anticipation of default by Cuyahoga and was relevant to the management of the site. The document is not protected.

The remaining documents were apparently prepared because of either this litigation or the prior bankruptcy proceeding. These documents were all prepared by EDA or its representative. Consequently, the documents will be protected if disclosure contravenes the two broad purposes of the work product privilege. Work product privilege protects material prepared by an attorney with an eye

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1989 WL 135203                                              Page 4
1989 WL 135203 (N.D.Ill.)
(Cite as: 1989 WL 135203 (N.D.Ill.))

toward litigation and revealing his mental processes. _Fed.R.Civ.P. 26(b)(3)._ *Am Floral Services v. Florists' Transworld Delivery Ass'n,* 107 F.R.D. 258, 260 (N.D.Ill.1985). In addition, the work product doctrine prevents opposing counsel from waiting until another party does the investigatory work in a case. *Eirhart v. Libbey-Owens-Ford Co.,* 93 F.R.D. 370, 372 (N.D.Ill.1981).

*5 None of the remaining documents submitted by EDA contain the mental impressions of counsel. The question remains whether Dependable would simply benefit from the investigatory work of EDA via discovery. Rule 26(b)(3) favors EDA retaining the documents unless Dependable establishes substantial need.

Documents C007217-7219 contain a list of correspondence, regarding a steel mill, collected by EDA's consultant. The list was requested by EDA counsel for use in the bankruptcy proceedings. Dependable shows no substantial need for these documents. Consequently, they are protected from discovery.

Documents C007226-7227 are a compilation of information by George Harper in preparation for the bankruptcy litigation. They do not entail the type of investigatory work that the work product privilege protects. Rather, the documents appear to be notes regarding the site. Work product protection does not extend to these documents.

Documents C007322-7332 are estimates of scrap, inventory and other information allegedly prepared by EDA's consultant at the request and direction of EDA's counsel. The compilation was produced on January 9, 1987. Documents C007233-7308 also contain scrap estimates prepared at the direction of EDA counsel. In fairness, these investigatory documents should not be turned over to Dependable absent a showing of substantial need. Since Dependable has not shown a substantial need, the documents need not be disclosed.

IV. Clarification of the Magistrate's Order

EDA requests the court to clarify the magistrate's order regarding several questions asked in depositions. EDA should request the magistrate to clarify his order, if necessary. This court reviews only objections based on alleged clear error by the magistrate. This court finds none.

CONCLUSION

EDA's objections to the magistrate's order are overruled regarding the governmental deliberative process privilege. The objections are sustained as to the following documents that need not be disclosed: C007222 (attorney-client privilege); C007217-7219, C007233-7300, C007322-7332 (work product privilege). EDA's remaining objections are overruled.

FN1. The notes mistakenly indicate that the meetings occurred in 1985. The affidavit of Russell Craig indicates that the actual year of the meetings was 1986. EDA objections, Ex.C.

1989 WL 135203 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "E"

1992 WL 122856
1992 WL 122856 (E.D.Pa.)
(Cite as: 1992 WL 122856 (E.D.Pa.))

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Philip KRAMER and Kathleen Kramer
v.
The RAYMOND CORPORATION and Werres
Corporation.

**Civ. No. 90-5026.**

May 29, 1992.

Kathy M. Manderino, John A. Rothschild, Wendy
Fleishman, Maureen A. Mahoney, Phildelphia, Pa.,
for plaintiffs.

Thomas M. Hinchey, William J. Ricci, Lavin,
Coleman, Finarelli & Gray, Philadelphia, Pa.,
Thomas J. Bradley, Philadelphia, Pa., for defendants.

*MEMORANDUM*

LOUIS H. POLLAK, District Judge.

*1 On March 20, 1992, the parties in this action
entered into a stipulation, subsequently approved by
the court, regarding the conduct of discovery. That
stipulation provided in part:

All documents, including reports, minutes,
directives, analyses and conclusions generated by
the Corporate Product Liability Management Team
in connection with safety concerns, alternative
designs, risk reduction, driver injuries, repairs or
modifications to the Model No. 31 Forklift shall be
provided by defendant Raymond to the Court on or
before March 30, 1992 for the Court to review, *in
camera,* along with any supporting
memorandum....

As a result of this stipulation, defendant Raymond
Corporation ("Raymond") submitted to the court six
pages of minutes from the Corporate Product
Liability Management Team ("CPLMT"). Raymond
takes the position that the information contained in
these six pages is protected by the attorney-client
privilege and by the work product doctrine. These

contentions will be discussed in turn.

*1. Attorney-Client Privilege*

The attorney-client privilege is intended to
encourage frank and open communication between
attorney and client by insuring that such
communication remains confidential. The privilege
applies when:

(1) the asserted holder of the privilege is or sought
to become a client; (2) the person to whom the
communication was made (a) is a member of the
bar of a court, or his subordinate and (b) in
connection with this communication is acting as a
lawyer; (3) the communication relates to a fact of
which the attorney was informed (a) by his client
(b) without the presence of strangers (c) for the
purpose of securing primarily either (i) an opinion
of law or (ii) legal services or (iii) assistance in
some legal proceeding, and not (d) for the purpose
of committing a crime or tort; and (4) the privilege
has been (a) claimed and (b) not waived by the
client.

*Aamco Transmissions, Inc. v. Marino,* No. 88-5522,
1991 WL 193502, at *2, 1991 U.S. Dist. LEXIS
13326 at *7-8 (E.D.Pa. Sept. 24, 1991) (quoting *In re
Grand Jury Investigation,* 599 F.2d 1224, 1233 (3d
Cir.1979)). The party asserting the privilege bears
the burden of demonstrating its applicability. *See
Delco Wire & Cable, Inc. v. Weinberger,* 109 F.R.D.
680, 687-88 (E.D.Pa.1986).

It is beyond dispute that the attorney-client privilege
may apply when the client is a corporation rather than
a natural person. *See Upjohn Co. v. United States,*
449 U.S. 383, 389-90 (1981). Likewise, it is clear
that the privilege may apply where the
communication is to in-house counsel rather than to
outside counsel retained for a particular matter. *See
id.* at 394-95. Because of the resulting obstruction to
the truth-finding process, however, the attorney-client
privilege is construed narrowly. *See Westinghouse v.
Republic of the Philippines,* 951 F.2d 1414, 1423 (3d
Cir.1991). This is especially so when a corporate
entity seeks to invoke the privilege to protect
communications to in-house counsel. Because in-
house counsel may play a dual role of legal advisor
and business advisor, the privilege will apply only if
the communication's primary purpose is to gain or
provide legal assistance. Business communications

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1992 WL 122856                                                                   Page 2
1992 WL 122856 (E.D.Pa.)
(Cite as: 1992 WL 122856 (E.D.Pa.))

are not protected merely because they are directed to an attorney, and communications at meetings attended or directed by attorneys are not automatically privileged as a result of the attorney's presence. *See Super Tire Engineering Co. v. Bandag, Inc.,* 562 F.Supp. 439, 441 (E.D.Pa.1983). Rather, the corporation "must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice." *Aamco,* 1991 WL 193502, at *3, 1991 U.S. Dist. LEXIS 13326, at *9.

*2 Raymond has submitted an affidavit of David E. Sonn, Esq., former general counsel for Raymond, describing the purpose and functions of the CPLMT. That affidavit reads, in part:

    10. Throughout the time that it existed, the responsibility of the Corporate Product Liability Management Team was to coordinate the gathering and sharing of information concerning (a) pending product liability claims, (b) reported accidents which might lead to product liability claims, and (c) possible actions which might be taken to minimize or avoid potential produce liability claims.
    11. In my role of directing the Corporate Product Liability Management Team, I regularly provided legal advice to members of the Team and used the information gathered by the Team to provide legal advice to the Corporation and to assist outside counsel in defending litigation....

Affidavit, Defendants' Memorandum of Law Regarding CPLMT Materials, exhibit B at 2-3. From this affidavit, it is apparent that some, perhaps many, of the communications that occurred in CPLMT meetings would be protected by the attorney-client privilege. The affidavit does not establish, however, that all communications in CPLMT meetings are protected by the privilege, much less that the communications at issue here are so protected. Indeed, there is nothing in any of the communications submitted for the court's review that suggests that the communications were made primarily for the purpose of securing legal advice. I therefore conclude that the communications at issue here are not protected by the attorney-client privilege.

2. *Work Product*

Federal Rule of Civil Procedure 26(b)(3) provides in pertinent part:

    Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise

discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Fed.R.Civ.P. 26(b)(3). Raymond claims that, as the CPLMT was headed by an attorney and reviewed pending and potential product liability actions, the documents submitted for review were prepared in anticipation of litigation and contain the mental impressions, conclusions, opinions, or legal theories of attorneys and other Raymond representatives. The burden is on Raymond, as the moving party, to establish that the documents are protected as work product. *See Conoco, Inc. v. United States Dep't of Justice,* 687 F.2d 724, 730 (3d Cir.1982). Once Raymond has met this burden, the burden shifts to plaintiffs to show substantial need.

*3 Raymond appears to take the position that because the CPLMT was headed by an attorney, and because part of its mission was to evaluate pending and potential product liability suits, all of the documents produced by the CPLMT are immune from discovery as work product. The mere fact that a party finds itself in circumstances that may lead to litigation, however, does not render all documents prepared with regard to those circumstances protected work product. "Rather, there must be a substantial probability that particular litigation will occur." *Aamco,* 1991 WL 193502, at *4, 1991 U.S. Dist. LEXIS 13326, at *12; *see also Hydramar, Inc. v. General Dynamics Corp.,* 115 F.R.D. 147, 149-50 (E.D.Pa.1986). A company's concern with the safety of its products and a desire to avoid potential liability, however laudable, are insufficient to extend immunity to all documents generated by that concern. Raymond has failed to demonstrate that the particular documents submitted for the court's review were prepared in the expectation that particular litigation was substantially likely to occur. Raymond's claim that the documents are protected under Rule 23(b)(3) therefore must fail. [FN1]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1992 WL 122856                                                      Page 3
1992 WL 122856 (E.D.Pa.)
(Cite as: 1992 WL 122856 (E.D.Pa.))

Conclusion

For the foregoing reasons, I have concluded that the documents submitted by Raymond for *in camera* review must be produced to plaintiffs.   An appropriate order follows.

*ORDER*

For the reasons given in the accompanying memorandum, it is hereby ORDERED and DIRECTED that the six documents produced by the Raymond Corporation's Corporate Product Liability Management Team and submitted to the court for *in camera* review pursuant to this court's order of April 6, 1992, shall be produced to plaintiffs. Defendants shall produce the documents within five days of the date of this order.

> FN1. Because I have concluded that the documents at issue are not protected work product, it is unnecessary to address Raymond's contention that the documents reveal the mental impressions and opinions of its counsel and other representatives. *See Hydramar,* 115 F.R.D. at 149-50 n. 1.

1992 WL 122856 (E.D.Pa.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant IBM on the 6th day of July, 2005 by U.S. Mail to:

David Marriott, Esq.
CRAVATH SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Donald Rosenberg, Esq.
1133 Westchester Avenue
White Plains, NY 10604

Todd Shaughnessy, Esq.
SNELL & WILMER LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, UT 84101-1004