

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah  84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:   (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>    Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff | **UNSEALED EXHIBITS TO**<br>**PLAINTIFF'S MEMORANDUM IN**<br>**SUPPORT OF RENEWED MOTION**<br>**TO COMPEL DISCOVERY**<br>[Docket No. 365]<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

# EXHIBIT A



Brent O. Hatch (5715)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

David Boies (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, | ) |
| | ) **PLAINTIFF'S FIRST REQUEST** |
| Plaintiff, | ) **FOR PRODUCTION OF DOCUMENTS** |
| | ) **AND FIRST SET OF** |
| v. | ) **INTERROGATORIES** |
| | ) |
| INTERNATIONAL BUSINESS | ) Case No. 2:03CV0294DAK |
| MACHINES CORPORATION, | ) |
| | ) Judge: Dale A. Kimball |
| Defendant. | ) Magistrate David Nuffer |
| | ) |

Defendant is directed to give answers to the written interrogatories separately, fully, in writing, under oath, and in accordance with the following definitions and instructions. Defendant is requested to produce the documents and things in its possession, custody or control pursuant to the document requests.

Answers to the interrogatories and all documents and things responsive to the document requests must be served on the undersigned attorneys for The SCO Group at the offices of Boies, Schiller & Flexner LLP, 100 Southeast Second Street, Suite 2800, Miami, Florida 33131 within 30 days of service of these interrogatories and document requests.

## DEFINITIONS AND INSTRUCTIONS

For purposes of these interrogatories and requests for production of documents, the following definitions and instructions apply.

A. **Definitions.**

1.    The term "AIX" shall mean the UNIX-based operating system distributed and/or developed by IBM, including all prior versions, releases and maintenance modifications.

2.    The term "concerning" shall mean relating to, referring to, reflecting, describing, evidencing, referencing, discussing or constituting.

3.    The term "describe" shall mean in the case of an event or circumstance, to set forth in detail the date, time, place, individuals or entities involved and context and content of the event or circumstance.

4.    The term "document" shall be deemed to include every record of every type including, without limitation, information stored on any electromagnetic storage device, or computer, any written, printed, typed, recorded, stored, or graphic matter, however

2

produced, reproduced, or existing in the possession, custody, or control of Defendant, or any agent, employee, or attorney of the Defendant, and all drafts, notes, or preparatory material concerned with said document, and every additional copy of such record or document where such copy contains any commentary, notation, or other change whatsoever that does not appear on the original or other copy of the document produced. "Document" shall be deemed also to include any summary of a document or documents called for hereafter.

5. The term "Dynix" shall mean the UNIX-based operating system distributed and/or developed by Sequent Computer Systems, Inc. and/or IBM, including all prior versions, releases, derivative works, methods, and modifications.

6. The terms "IBM," "Defendant" "you," "your," and any synonym thereof and derivatives therefrom are intended to and shall embrace IBM and include its parents, subsidiaries, divisions, or affiliates and any corporate predecessor or successor of any of them, including **Sequent Computer Systems, Inc.**, and, in addition all of the Defendant's attorneys and accountants, and all of its respective agents, servants, associates, employees, representatives, investigators, officers, directors and others who are or have been in possession of or may have obtained information for or on behalf of such Defendant in any manner with respect to any matter referred to in the pleadings in the above-styled case.

7. The term "identify" shall mean:

    a. in the case of a natural person, to state the full name, current or last known job title and position, current or last known address, current or last known home and work telephone numbers, and current or last

3

known electronic mail address, and to indicate the basis of that person's knowledge, including but not limited to the identification of documents and communications and a description of his/her personal involvement in any transaction, meeting, software development, marketing, or other activity relating in any way to the allegations of the Complaint and any defenses;

b.   in the case of any entity other than a natural person, to state its name, address, principal place of business and, if applicable, place of incorporation and a contact person at the entity;

c.   in the case of a document, to state the author(s), title, subject matter, date, place, source of publication of the document and substance of the document;

d.   in the case of an oral communication, to give a complete description of such oral communication, including but not limited to: (i) the speaker(s) and actual or intended recipient(s) or witnesses of the communication; (ii) the date of the communication; and (iii) the substance of the communication;

e.   in the case of alleged trade secrets or confidential or proprietary information, whether computer code, methods or otherwise, to give a complete and detailed description of such trade secrets or confidential or proprietary information, including but not limited to an identification of the specific lines and portions of code claimed as trade secrets or confidential or proprietary information, and the location (by module

4

name, file name, sequence number or otherwise) of those lines of code within any larger software product or property.

    f.  in the case of an alleged right, to give a completed and detailed description of such right, including but not limited to: (i) the issuer of the right; (ii) the date the right became effective; (iii) the date the right expired; and (iv) any limitations placed upon such right.

8.    The term "open source" shall mean any software code that is made available in source code form without any confidentiality restrictions, including but not limited to any code made available under the General Public License, the BSD license, or the MIT license.

9.    The term "person" shall be deemed to include natural persons, partnerships, firms, and corporations, and all of their subsidiaries or divisions, and, in the case of partnerships, firms, and corporations, the individual member(s) or agent(s) thereof.

10.    The term "source code" shall mean the human-readable form of a computer program written in the original and preferred form for human inspection and modification, and includes but is not limited to source code listings; compiler and/or assembler output listings for such source code; source code listings for macros or "includes" (both executable and mapping) listings used in such source code; job control language files; and/or other files required to create an executable version of a program, including but not limited to user interface components; panels; screen definitions and help text; and e-lists.

**B.** <u>**Instructions.**</u>

1.  Unless otherwise indicated, all requests and interrogatories are from January 1, 1999 to present.

2.  Information requested in these interrogatories shall include information within the knowledge or possession of any of Defendant's agents, employees, attorneys, investigators or any other persons, firms or entities directly or indirectly subject to Defendant's control in any way whatsoever.

3.  Each interrogatory shall be answered in its entirety.  If any interrogatory or subsection thereof cannot be answered in full, it shall be answered to the fullest extent possible with an explanation as to why a complete answer is not provided.

4.  If there is a claim of privilege as to any communication concerning information requested by these interrogatories, specify the privilege claimed, the communication and/or answer to which that claim is made, the topic discussed in the communication and/or answer to which that claim is made, the topic discussed in the communication and the basis upon which the claim is asserted.

5.  *These interrogatories are continuing in nature and require supplemental or additional responses in accordance with Rule 33 of the Federal Rules of Civil Procedure.*

6.  All documents produced in response to these requests shall be produced in the same order as they are kept or maintained in the ordinary course of business and, where multiple pages or documents are assembled, collated, grouped, or otherwise attached, shall not be separated or disassembled.

7.   With respect to any document responsive to this request that is withheld from production based upon a claim of privilege, please provide the information required pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure.

8.   If, for reasons other than a claim of privilege, you refuse to produce any document requested herein, state the grounds upon which the refusal is based with sufficient specificity to permit a determination of the propriety of such refusal.

9.   If there are no documents responsive to any paragraph or subparagraph set forth in the requests, please provide a written response so stating.

These requests are continuing and, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, require further and supplemental production by Defendant whenever Defendant acquires, makes, or locates additional documents between the time of the initial production hereunder and the time of the trial in this action.

### REQUESTED DOCUMENTS

1.   All documents concerning or relating to any agreements entered into with AT&T relating to UNIX, including but not limited to the agreements attached to the First Amended Complaint.

2.   All versions or iterations of AIX source code, modifications, methods and/or derivative works from May 1999 to the present, including but not limited to version 4.3 and above.

3.   All versions or iterations of Sequent Dynix source code, derivative works, modifications and/or methods from January 1, 1999 to the present.

7

4. All documents concerning IBM's efforts, if any, to maintain the confidentiality of UNIX source code, derivative works, modifications, and/or methods.

5. All documents concerning IBM's efforts, if any, to maintain the confidentiality of AIX source code, derivative works, modifications, and/or methods.

6. All documents concerning IBM's efforts, if any, to maintain the confidentiality of Sequent Dynix source code, derivative works, modifications, and/or methods.

7. All documents concerning IBM's efforts, if any, to restrict distribution of Unix source code, derivative works, modifications, and/or methods.

8. All documents concerning IBM's efforts, if any, to restrict distribution of AIX source code, derivative works, modifications, and/or methods.

9. All documents concerning IBM's efforts, if any, to restrict distribution of Sequent Dynix source code, derivative works, modifications, and/or methods.

10. All documents concerning Prerequisite Source Licenses, including but not limited to all instances in which IBM required persons or entities to obtain a Prerequisite Source License under paragraph 2.2(a) of its contract with its customers.

11. All contributions made without confidentiality restrictions by IBM or anyone under its control including, but not limited to, source code, binary code, derivative works, methods, and modifications to Open Source Development Lab, Linus Torvalds, Red Hat or any other entity.

12. All documents that identify any person or entity to whom IBM has provided UNIX source code, derivative works, modifications and/or methods.

13. All documents that identify any person or entity to whom IBM has provided AIX source code, derivative works, modifications and/or methods.

8

14. All documents that identify any person or entity to whom IBM has provided Sequent Dynix source code, derivative works, modifications and/or methods.

15. All documents that identify any person at IBM and Sequent who had access to UNIX source code, derivative works, modifications and/or methods.

16. All documents that identify any person at IBM and Sequent who had access to AIX source code, derivative works, modifications and/or methods.

17. All documents that identify any person at IBM and Sequent who had access to Sequent Dynix source code, derivative works, modifications and/or methods.

18. All documents, agreements and correspondence between IBM or any person or entity under IBM's control and Linus Torvalds including, but not limited to, those with or copied to Sam Palmisano.

19. All documents, agreements and correspondence with Open Source Development Lab.

20. All documents, agreements and correspondence with Red Hat.

21. All documents, agreements and correspondence with SuSe.

22. All documents, agreements and correspondence between IBM and Novell regarding UNIX, including but not limited to all correspondence with Jack Messman, Chris Stone and/or Novell's counsel.

23. All documents, agreements and correspondence between IBM and Santa Cruz Operation regarding UNIX.

24. All documents, agreements and correspondence between IBM and Caldera.

25. All documents, agreements and correspondence between IBM and The SCO Group.

26. All documents identifying any IBM personnel who are or were employed or working at the Linux Technology Center.

9

27. All documents identifying any IBM personnel who are or were employed or working at the Linux Center of Competency.

28. All documents concerning Project Monterey.

29. All documents concerning any UNIX source code, derivative works, modifications or methods disclosed by IBM to any third party or to the public.

30. All documents concerning any AIX source code, derivative works, modifications or methods disclosed by IBM to any third party or to the public.

31. All documents concerning any Sequent Dynix source code, derivative works, modifications or methods disclosed by IBM to any third party or to the public.

32. All documents concerning any UNIX source code, derivative works, modifications or methods found in Linux, open source, or the public domain.

33. All documents concerning any AIX source code, derivative works, modifications or methods found in Linux, open source, or the public domain.

34. All documents concerning any Sequent Dynix source code, derivative works, modifications or methods found in Linux, open source, or the public domain.

35. All documents concerning any contributions to Linux or to open source made by IBM and/or Sequent.

36. All documents sufficient to show IBM's organizational and personnel structure, including but not limited to organizational charts, flow charts and personnel directories.

37. All documents concerning any statement, affidavit, declaration, or opinion in IBM's possession relating to contributions by IBM to open source, including but not limited

10

to those statements identified in the Complaint made by Messrs. Mills, LeBlanc and Strassmeyer.

38. All documents concerning the Open Source Developer's Class, including any guidelines relating thereto.

39. All documents concerning export controls for any UNIX source code, derivative works, modifications or methods contributed to open source, including all portions of AIX, and Dynix and their derivative works, modifications, or methods.

40. All documents concerning IBM's use of Intel processors prior to January 1, 1998.

41. All documents concerning IBM's use of Intel processors after January 1, 1998.

42. All documents concerning IBM's contributions to development of the 2.4 and 2.5 Linux Kernel.

43. All documents concerning IBM's First Affirmative Defense that the Complaint fails to state a claim upon which relief can be granted.

44. All documents concerning IBM's Second Defense that Plaintiff's claims are barred because IBM has not engaged in any unlawful or unfair business practices, and IBM's conduct was privileged, performing the exercise of an absolute right, proper and/or justified.

45. All documents concerning IBM's Third Affirmative Defense that Plaintiff lacks standing to pursue its claims against IBM.

46. All documents concerning IBM's Fourth Affirmative Defense that Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations.

11

47. All documents concerning IBM's Fifth Affirmative Defense that Plaintiff's claims are barred, in whole or in part, by the economic loss doctrine or the independent duty doctrine.

48. All documents concerning IBM's Sixth Affirmative Defense that Plaintiff's claims are barred by the doctrines of laches and delay.

49. All documents concerning IBM's Seventh Affirmative Defense that Plaintiff's claims are barred by the doctrines of waiver, estoppel and unclean hands.

50. All documents concerning IBM's Eighth Affirmative Defense that Plaintiff's claims are, in whole or in part, preempted by federal law.

51. All documents concerning IBM's Ninth Affirmative Defense that Plaintiff's claims are improperly venued in this district.

52. All documents used, referred to, identified, or relied upon in responding to Plaintiff's First Set of Interrogatories.

12

## INTERROGATORIES

1. Identify the name and address of the person(s) answering these interrogatories, and, if applicable, the persons' official position or relationship with Defendant?

2. List the names and addresses of all persons who are believed or known by you, your agents, or your attorneys to have any knowledge concerning any of the issues of this lawsuit; and specify the subject matter about which the witness has knowledge.

3. If you intend to call any expert witness at the trial of this case, state, as to each such expert witness, the name and business address of the witness, the witness' qualifications as an expert, the subject matter upon which the witness is expected to testify, the substance of the facts and opinions to which the witness is expected to testify, and a summary of the grounds for each opinion.

4. Identify all persons who have or had access to UNIX source code, AIX source code and Dynix source code, including derivative works, modifications, and methods. For each such person, set forth precisely the materials to which he or she had access.

5. Identify all IBM or Sequent personnel that work or worked on developing source code, derivative works, modifications or methods for AIX, Dynix and Linux, specifying for each person their precise contributions to each.

DATED this 24th day of June, 2003.

By: _____

Brent O. Hatch
HATCH, JAMES & DODGE

David Boies
Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
Attorneys for Plaintiff

13

# EXHIBIT B



Brent O. Hatch (5715)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| INTERNATIONAL BUSINESS | ) |
| MACHINES CORPORATION | ) |
| | ) |
| Defendant | ) |
| | ) |

**PLAINTIFF'S SECOND SET OF
INTERROGATORIES AND SECOND
REQUEST FOR PRODUCTION FOR
PRODUCTION OF DOCUMENTS**

Case No. 2:03CV0294DAK

Judge: Dale A. Kimball
Magistrate Judge Brooke C. Wells

Defendant is directed to give answers to the written interrogatories separately, fully, in writing, under oath, and in accordance with the following definitions and instructions. Defendant is requested to produce the documents and things in its possession, custody or control pursuant to the document requests.

Answers to the interrogatories, and all documents and things responsive to the document requests must be served on the undersigned attorneys for The SCO Group at the offices of Boies, Schiller & Flexner LLP, 100 Southeast Second Street, Suite 2800, Miami, Florida 33131 within 30 days of service of these interrogatories and document requests.

## DEFINITIONS AND INSTRUCTIONS

Plaintiff hereby incorporates by reference all instructions, definitions and rules contained in the Federal Rules of Civil Procedure and further incorporates the definitions and instructions that are in Plaintiff's First Set of Interrogatories and First Request for Production of Documents as if fully set forth herein.

## INTERROGATORIES

6.  Please identify, with specificity (by product, file in light of code, where appropriate) all of the alleged contributions to Linux made by IBM, included but not limited to those claimed in paragraphs 108, 115 and 120 of IBM's Amended Counterclaims.

2

7. Please identify all agreements that IBM alleges or contends that SCO has breached, including specific provisions or portions of those agreements that IBM alleges or contends that SCO breached, and describe, in detail, each instance in which IBM alleges or contends that SCO breached those agreements, including but not limited to:

    (a) the date of the alleged breach;

    (b) all persons involved in the alleged breach;

    (c) the specific manner in which SCO is alleged to have breached the agreement;

    (d) the type of damage and dollar amount, if any, IBM alleges or contends it suffered as a result of the alleged breaches by SCO.

8. Please describe, in detail, each instance in which IBM alleges that SCO engaged in unfair competition as claimed in paragraphs 90 through 94 of IBM's Amended Counterclaim, including but not limited to,

    (a) the dates in which SCO allegedly engaged in any unfair competition;

    (b) all persons involved in the alleged unfair competition;

    (c) the specific manner in which SCO is alleged to have engaged in unfair competition, including but not limited to, as alleged in paragraph 93 of IBM's Amended Counterclaim;

    (d) the type and dollar amount, if any, of any damages allegedly caused by SCO's actions.

9. Please identify each "prospective business relationship" IBM claims to have with "numerous companies and individuals to whom IBM has sold and/or licensed these products and services and/or to whom IBM seeks to sell and/or license these products

3

and services" in which IBM alleges or contends that SCO interfered with, including but not limited to,

    (a) the date of the alleged interference;

    (b) all persons involved in the alleged interference;

    (c) the specific manner in which SCO is alleged to have interfered with such relationship;

    (d) the specific actions, if any, that SCO induced or encouraged IBM's prospective business relationships to take;

    (e) the specific action, if any, that IBM's prospective business relationships took as a result of the actions allegedly induced or encouraged by SCO;

    (f) the type and dollar amount, if any, of any damages from SCO's alleged actions.

## REQUESTED DOCUMENTS

53. All documents concerning IBM's decision to adopt, embrace or otherwise promote Linux, including *but not limited to* the following:

    a. all such documents in the possession of Sam Palmisano, Irving Wladawsky-Berger, Paul Horne and Nick Bowen;

    b. the report prepared by Nick Bowen, including all drafts and e-mails pertaining thereto, submitted to IBM management on or about December 20, 1999;

    c. all presentations made to IBM's top management including its Board of Directors concerning such decision;

4

    d.  all documents from all Board of Directors' meetings relating to such decision, including Board notebooks, Board minutes and notes from all persons in attendance at such meetings.

54. All documents concerning Hewlett-Packard and/or Compaq in Project Monterey, including but not limited to, all Memoranda of Understanding in all press releases.

55. All documents, including drafts, submitted to the Department of Justice concerning Project Monterey.

56. All business plans for Linux.

57. All source code for AIX and Dynix since 1985 including all instructions, information used and all documentation relating to the use of AIX and Dynix, including but not limited to, all development notes.

58. All notifications of third parties IBM has obtained since 1985 for providing access to the source code for AIX and/or Dynix

Dated this 4th day of December 2003.

By: _____
Brent O. Hatch
HATCH, JAMES & DODGE

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP

*Attorneys for Plaintiff*

5

# EXHIBIT C

March 20, 2000

# I.B.M. Goes Countercultural With Linux

**By STEVE LOHR**

A huge company with deep pockets, IBM can afford to dabble in promising technologies. And that is what the International Business Machines Corp. seemed to be doing throughout much of last year with Linux, an increasingly popular version of the Unix operating system that is available free on the Internet.

IBM dispatched emissaries to speak with members of the Linux community, a worldwide network of programmers who develop and debug the code. IBM met with academics, consultants, economists and venture capitalists to plumb the Linux phenomenon. It made small investments in a couple of Linux start-ups, and offered Linux on one line of its computers.

But last fall, Big Blue suddenly got serious about Linux.

At the end of October, fresh from a global tour, Sam Palmisano, a senior vice president, reported that the Internet companies he spoke with told him that the preferred language of the young programmers they were hiring was Linux.

At about the same time, Irving Wladawsky-Berger, an IBM executive with longstanding ties to the nation's supercomputing centers, was hearing that Linux was generating a lot of excitement in these leading-edge research institutions. And he had been sending e-mail to the company's other top technology executives about the rise of Linux.

"In the technical community and in the marketplace," Wladawsky-Berger recently recalled, "the signs were clear that something profound was going on."

Less than two months later, a few days before Christmas, IBM had fashioned -- and Louis V. Gerstner Jr., the chairman, had approved -- an ambitious Linux strategy. The company that personifies mainstream corporate computing had itself done something profound: embrace Linux, a symbol of software's counterculture, as the operating system of the future for the Internet.

IBM, it was decreed, would embark on a costly program to make all its hardware and software work seamlessly with Linux. So quickly did the company mobilize that even now hundreds of engineers across the company are already engaged in the Linux campaign, and IBM says its army of Linux engineers will number in the thousands within a few years.

To be sure, other major companies in the industry, including Hewlett-Packard, Dell Computer and Oracle, also have Linux efforts. "But IBM has tightly focused on Linux more than any other big company," observed Dan Kusnetzky, director of operating systems research at the International Data Corp.

IBM's Linux strategy represents more than a bold, and risky, step in the field of software. The move is a textbook example of IBM's management style under Gerstner, who has worked to overhaul the company and its culture since he arrived in 1993.

In the pre-Gerstner days, decision making at IBM was once described as "swimming through peanut butter." But these days, after a brief period of intense scrutiny -- during which the company's technical experts play a key role -- choices are made decisively and with remarkable swiftness, given that IBM is a sprawling, $80-billion-a-year corporation.

In this most recent example, Palmisano, 48, who is regarded as a leading candidate to someday succeed Gerstner, is the senior executive who pushed most emphatically for the Linux initiative -- and has the most riding on its outcome. "This is Sam's bet," Wladawsky-Berger said.

The first step toward IBM's Linux strategy came in a Saturday morning telephone call on Oct. 30 that Nick Bowen received at his home in Newtown, Conn. The caller was his boss, Paul Horn, the head of the IBM Watson labs. He told Bowen, a 39-year-old senior researcher, that he would lead an 11-person team to make recommendations on how IBM -- the entire company -- should adapt to Linux. The investigation must be rigorous and exhaustive, Horn told him -- and finished in seven weeks.

The Bowen report, submitted to top management on Dec. 20, presented a plan for using Linux to undermine the software advantage enjoyed by IBM's two key rivals, Microsoft and Sun Microsystems. Microsoft's Windows NT and Sun's Solaris are the leading operating systems used today on server computers, the data-serving machines that are the engines of corporate networks and the Internet.

To combat Sun and Microsoft, the report recommended, IBM should retool all its server operating systems, from the mainframe OS/390 to AIX, IBM's version of Unix, to run Linux smoothly. The same should be true of all IBM's database, Web applications and messaging software, the report said. And IBM, the Bowen team concluded, should push Linux as the operating system of choice for the Internet -- more robust and reliable than Windows NT and eventually overtaking Solaris, Sun's flavor of Unix, as the industry standard for Unix.

The goal would be to win the hearts and minds of perhaps the most influential audience in computing -- the software developers who write the applications that bring the Web to life and make Internet commerce actually work.

"Today, Microsoft and Sun dominate the application development seats," the report stated. "We recommend that IBM aggressively pursue a Linux-based application development platform. Doing so would disrupt the Sun-Microsoft stranglehold."

The Linux strategy would "provide our server business with a single, homogeneous server platform," from desktops to mainframes, giving IBM a "level playing field" in software and allowing it to compete with Sun and Microsoft for "mindshare in key software growth segments and in universities."

The report, known as a "corporate assessment" inside IBM ran just over 10 pages. In the pre-Gerstner days, such reports to top management could be 100 pages in length. But today's IBM executives are familiar with the Gerstner edict: If you cannot say it in 10 pages, you are not focused on the right thing.

It was only at the beginning of last October that Palmisano took over IBM's server business. And he started at once to scout for "major initiatives" to help revive the growth of IBM's big server computers -- mainframes, minicomputers and AIX Unix machines. He closely followed the activities of the Bowen assessment team, he read early drafts of the group's report and he liked the finished document: a coherent, top-to-bottom software strategy for IBM.

Moving quickly, he said, was imperative. "The Internet has taught us all the importance of moving early, the advantage of being a first-mover," Palmisano said in an interview. "We want to be riding that Linux momentum at the front, not trailing it and defending the past. IBM understands, believe me, what it means to be defending the past."

When Bowen met on Dec. 20 with Palmisano and Nick Donofrio, senior vice president for technology, at IBM's headquarters in Armonk, N.Y., he noted a nontechnical recommendation in the report: put one person in charge of the Linux effort companywide. "I'm already working on that," Bowen recalls Palmisano saying.

And when Palmisano met with Gerstner two days later, the chairman not only approved the plan but also agreed with his choice of who should be the company's Linux czar: Wladawsky-Berger. At the time, Wladawsky-Berger was general manager of the Internet division, responsible for making sure Internet technology and an Internet mindset was spread broadly throughout the company.

That job, Gerstner and Palmisano agreed, was done; IBM "got" the Internet. Now, it was time for Wladawsky-Berger to move onto the next, hearts-and-minds challenge. So the staff of the Internet unit went elsewhere in the company, the division was folded and Wladawsky-Berger assumed the title vice president of technology and strategy in the computer-server group, headed by Palmisano.

They are a contrasting pair. Tall and physically imposing, Palmisano is regarded as a brilliant executive and hard-charging salesman. Previously, he ran the company's fast-growing global services group, where he had a special talent for bringing in big computer

services deals, which can span several years and total billions of dollars. Palmisano's nickname at IBM is "the closer."

Wladawsky-Berger is six years older and about a head shorter than his boss. Raised in Cuba, he fled with his parents, Eastern European immigrants who owned a store in Havana, when Castro came to power in 1959. He holds a Ph.D. in physics from the University of Chicago, speaks with a lilting Spanish accent and could easily be mistaken for a college professor.

After his postgraduate studies, Wladawsky-Berger joined IBM's Watson labs in 1970 as a researcher, but he had a taste for the business side of the company as well. He led the drive to transform IBM's traditional mainframes by retooling them with low-cost microprocessors, the chips best known as the engines of personal computers.

"The Linux issue," Wladawsky-Berger explained, "is whether this is a fundamentally disruptive technology, like the microprocessor and the Internet? We're betting that it is."

IBM's Linux effort is a long-term strategy, not one likely to affect its quarterly earnings any time soon. And the strategy appeals to IBM, in part, because it has lost its operating system battles with Microsoft and Sun. Its effort in personal computer software, OS/2, was quickly crushed by Microsoft's market-dominating Windows. And IBM's AIX version of Unix have become an also-ran behind Sun's more popular Solaris.

So IBM would love to drive the profit out of the operating systems business of its rivals -- just as Microsoft did to Netscape, the browser pioneer, by giving browsing software away free. "The operating systems wars of today are the equivalent of the browser wars of a few years ago," said Scott Hebner, an IBM software executive. "The operating system is not where the value is."

Yet IBM's strategy can succeed only if Linux, which is distributed free, does become a genuine alternative to Windows or Solaris, thereby putting real pressure on their prices. And Linux has a long way to go. Today, it is used mainly for simpler tasks, like serving up Web pages, instead of for industrial-strength computing chores like financial transaction systems that must handle complex tasks, 24 hours a day, without crashing. Even IBM, which plans eventually to use Linux as its unifying Unix platform (shelving AIX), says Linux's true ascendance may not come for five years or so -- until Linux is built up to become more powerful and reliable.

Throughout the software field, the excitement surrounding Linux has less to do with the technology itself than with the fact that it is the leading example of so-called open-source software -- software that is distributed free, with its underlying source code openly published, and is developed, debugged and improved by an international community of programmers.

"It's the Web phenomenon coming to software development that is intriguing," said Larry Smarr, director of the National Center for Supercomputing Applications in

Urbana-Champaign, Ill. "We now have the potential for collaborative, decentralized software authorship on large complex systems."

Still, it is unclear whether the open-source approach can solve the kind of complex software problems that have consumed countless programming hours and billions of dollars at Sun and Microsoft. And for IBM, there is a question of whether the Linux community, which works mostly on personal computers, will have much to contribute to the company's Linux efforts on mainframes and minicomputers.

"Linux on non-PC platforms is a nonstarter," said Greg Papadopoulos, chief technology officer for Sun Microsystems. "The ecosystem of open source is not going to be working for IBM on other platforms."

But Wladawsky-Berger says he will side with the recommendations of IBM's best technical minds. "Not only did they say, 'Irving, this is doable,'" he observed. "They said, 'Irving, do it.'"

Certainly, veterans of the open-source counterculture seemed to have welcomed Big Blue into the fold. "It should accelerate the pace of adoption of Linux," said Eric Raymond, an evangelist of the open-source movement.

"Sure, there's some irony here, since IBM used to be the enemy," Raymond said. "But everybody in the community is happy about IBM wanting to play with us."

# EXHIBIT D

SNELL & WILMER LLP
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
15 West South Temple
Gateway Tower West
Salt Lake City, Utah 84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES  DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF TODD M. SHAUGHNESSY** |
| Plaintiff/Counterclaim-Defendant, | |
| -against- | Civil No. 2:03CV-0294 DAK |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Honorable Dale A. Kimball |
| Defendant/Counterclaim-Plaintiff. | Magistrate Judge Brooke C. Wells |



295077.1

I, Todd M. Shaughnessy, declare as follows:

1.      I represent IBM in the lawsuit filed against IBM by Caldera
Systems, Inc., a Delaware corporation that has since changed its name to The SCO
Group, Inc. ("SCO"), The SCO Group, Inc. v. International Business Machines
Corporation, Civil No. 2:03CV-0294 DAK (D. Utah 2003).

2.      The Court issued an order on March 3, 2004 (the "Order")
directing both SCO and IBM to produce certain discovery.  This declaration is
submitted in response to Section III of the Order, instructing each party "to provide to
the Court an affidavit detailing their efforts in complying with this order".  IBM has
complied fully with the Order.

3.      On March 4, 2004, IBM produced the bulk of the releases of AIX
and Dynix ordered by the Court to be produced in Section II.1 of the Order, and on
March 9, 2004, IBM completed its production of all such source code.  Although the
Court gave IBM a deadline of 45 days from the date of the Order to produce this
source code, IBM produced the source code immediately to provide SCO time to
evaluate the code and take it into account in answering IBM's discovery requests.

4.      With respect to Section II.2 of the Order, IBM undertook a
reasonable search to identify any "non-public" contributions it made to Linux.  Since
Linux is publicly developed and available via the Internet, however, all of IBM's
contributions to Linux are a matter of public record.  IBM nevertheless also
endeavored to identify materials that IBM unsuccessfully attempted to contribute to

2

295077.1

Linux and are not publicly available. To the extent IBM identified any such material, IBM has produced it.

5.     With respect to Section II.3 of the Order, IBM has undertaken a reasonable search for and has produced all non-privileged responsive documents, including those from the files of Sam Palmisano and Irving Wladawsky-Berger.

6.     Although not ordered to complete its document production by any specific date, IBM has already substantially completed its document production in response to SCO's first set of document requests and expects to shortly complete the production.

7.     IBM has, pursuant to Section II.5 of the Order, provided additional supplemental answers to SCO's first set of interrogatories. With respect to Interrogatory No. 2, IBM has included the names of persons outside of IBM whom IBM believes may have knowledge about the issues of this lawsuit. With respect to Interrogatory No. 5, IBM has provided contact information, where such information exists in IBM's records, for each person for whom SCO requested such information. IBM believes that the reference to Interrogatory No. 11 in Section II.5 of the Order was a typographical error, because the time for responding to Interrogatory No. 11 had not yet passed, and was not the subject of SCO's motion to compel. In any event, IBM served on SCO its responses to SCO's Interrogatory No. 11 today, April 19, 2004, in accordance with an agreement between SCO and IBM.

8.     In response to Section II.6 of the Order, IBM asked SCO on March 9, 2004 to let IBM know for which 1,000 of the persons listed by IBM in response to

3

SCO's Interrogatory Nos. 4 and 5 SCO wished to obtain contact information. On March 26, 2004, SCO informed IBM that it wished to have contact information for all persons listed on Attachment E to IBM's answers to SCO's first set of interrogatories, as well as for 81 additional persons listed by SCO. SCO indicated that it would in the future request contact information for additional persons as appropriate, up to a total of 1,000 names. Of the 328 persons listed on Attachment E, IBM was able to locate contact information for 326 of them, and has provided such contact information to SCO. Of the 81 additional persons listed by SCO, only 32 of them (not including persons already appearing on Attachment E) were listed in IBM's answers to SCO's Interrogatory Nos. 4 and 5. IBM has provided contact information for each of those 32 persons. Thus, to date, IBM has provided SCO with contact information for 358 of the persons listed by IBM in response to SCO's Interrogatory Nos. 4 and 5. IBM will provide contact information for additional names as SCO requests such information, up to a total of 1,000 names.

9.      With respect to Section III of the Order, IBM has provided, and will continue to provide, SCO with source logs that identify how documents were kept in the ordinary course of business, for all materials produced in discovery.

10.     The documents and interrogatory answers provided to SCO are given to the best of IBM's knowledge and are complete, detailed and thorough.

4

295077.1

11. I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 19, 2004

_____

Todd M. Shaughnessy

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April, 2004, a true and correct copy of the

foregoing was sent by U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Kevin P. McBride
1299 Ocean Avenue, Suite 900
Santa Monica, California 90401

# EXHIBIT E

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple
Gateway Tower West
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800



CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>        Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>        Defendant/Counterclaim-Plaintiff. | **DEFENDANT/COUNTERCLAIM-<br>PLAINTIFF IBM'S MEMORANDUM<br>IN OPPOSITION TO SCO'S<br>"RENEWED" MOTION TO<br>COMPEL**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Civil No. 2:03CV-0294 DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

217

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM")

respectfully submits this memorandum in opposition to Plaintiff/Counterclaim-Defendant The

SCO Group, Inc.'s ("SCO") "renewed" motion to compel.

<u>**Preliminary Statement**</u>

IBM has complied in all respects with this Court's Order of March 3, 2004.

Nevertheless, in the apparent hope of further delaying discovery and the resolution of claims ripe

for summary adjudication,[1] SCO has submitted a "renewed" motion to compel claiming that

*IBM has failed to comply with its discovery obligations.  SCO's is wrong and its motion should*

be denied.

To date, SCO has served 141 document requests and 22 interrogatories on IBM.  In

response, IBM has produced nearly one million pages of documents and more than 40 million

lines of source code from IBM's AIX and Dynix operating systems, and has also provided a

substantial amount of information in response to SCO's interrogatories (even in instances where

IBM believed the information to be irrelevant).

SCO has moved to compel just once,[2] seeking the production of additional source code

from IBM and contact information for more than 7,200 individuals.  Upon consideration of

SCO's motion, this Court directed IBM to provide information that IBM had offered voluntarily

to provide SCO in an attempt to resolve the dispute without the Court's assistance (but which

---

[1]  SCO filed the instant motion the day before it filed its opposition to IBM's motion for
summary judgment on its Tenth Counterclaim.  SCO then argued in its opposition papers that
IBM's summary judgment motion should be denied, among other reasons, because a motion to
compel was pending before this Court.

[2]  After IBM filed a motion to compel seeking discovery, SCO moved in November 2003 to
compel additional responses to only three of its document requests (Nos. 2, 3 and 11) and three
of its interrogatories (Nos. 2, 4, and 5).

309594.1

SCO refused to accept): certain specified releases of AIX and Dynix and contact information for a limited number of individuals. IBM provided all of these materials promptly upon receiving the Court's Order. SCO's accusation, therefore, that IBM has engaged in an "ongoing pattern of discovery abuse" (SCO Br. at 9) is unfounded and crafted, we believe, solely to detract attention from its own discovery failings and to delay the efficient resolution of this case.[3]

Setting aside SCO's grandstanding, SCO here asks that IBM be compelled to provide three categories of information that SCO claims (incorrectly) IBM failed to provide in response to the Court's Order. First, SCO seeks the production of the same AIX and Dynix source code that this Court already ruled IBM did not have to produce and that is also the subject of SCO's pending Memorandum Regarding Discovery (which was not even fully briefed when SCO filed this motion and has not yet been addressed by this Court).[4] Second, SCO seeks additional documents from IBM's "top level management" (SCO Br. at 2), despite the fact that IBM has repeatedly advised SCO that it has already produced the non-privileged documents responsive to SCO's requests located in the files of IBM's senior management. Third, SCO seeks contact

---

[3] SCO states that IBM has attempted to "hinder and delay SCO's prosecution of its claim" (SCO Br. at 11), despite the fact that SCO has resisted providing discovery sought by IBM at every turn and has refused for more than a year to match the source code in Linux to which SCO claims rights to source code in UNIX System V. Indeed, SCO recently represented to the court in Red Hat, Inc. v. The SCO Group, Inc. Civ. No. 03-772 (D. Del.) that SCO is aware of "significant instances of line-for-line and 'substantially similar' copying of code from Unix System V into Linux", but still refuses to provide that information to IBM.

[4] By this "renewed" motion, SCO has helped itself to no less than four briefs on the same issue—whether SCO is entitled to all of the source code files contained in IBM's internal databases regardless of whether SCO asserts that any of that source code is at issue in the case. SCO submitted its 17-page Memorandum Regarding Discovery on May 28, 2004 and its 27-page Reply Memorandum Regarding Discovery on July 12, 2004, both of which were devoted solely to this issue. SCO's 12-page brief in support of this "renewed" motion also is largely devoted to this issue. Presumably, SCO intends to submit a reply brief in support of its "renewed" motion as well.

- 3 -

information for witnesses for whom the Court did not require IBM to provide such information. With respect to each of these three categories of information, IBM has already provided to SCO all of the information it is obligated or should be required to produce.[5]

As IBM has fully complied with this Court's Order, SCO's "renewed" motion to compel should be denied. There is no legitimate basis for SCO's motion. Instead, SCO appears to have filed this motion merely to prolong discovery unnecessarily (by making IBM gather and produce masses of irrelevant information and information that SCO could discover on its own with little effort) and to forestall the adjudication of IBM's pending motion for summary judgment on its Tenth Counterclaim. Indeed, SCO filed this motion without conferring with IBM as required under DUCivR 37-1(a) and Fed. R. Civ. P. 37(a)(2)(A), presumably because SCO knew the issues it raises could easily have been resolved by the parties without involvement of the Court.

<u>**Argument**</u>

## I.   SCO DID NOT CONFER WITH IBM BEFORE FILING ITS MOTION.

SCO filed the instant motion <u>the day before</u> it filed its opposition to IBM's summary judgment motion on IBM's Tenth Counterclaim and then relied on the pendency of the motion to compel as grounds for denying IBM's summary judgment motion. It filed this motion, however, without any attempt properly to confer with IBM and in disregard of this Court's rule that the moving party submit "a statement showing that the attorney making the motion has made a reasonable effort to reach agreement with opposing attorneys on the matters set forth in the motion". DUCivR 37-1(a); <u>see also</u> Fed. R. Civ. P. 37(a)(2)(A) (requiring certification "that the

---

[5] As the Court has never previously required IBM to provide these materials, SCO cannot properly characterize its instant application as a "renewed" motion.

309594.1

movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action"). SCO's motion should therefore be denied for this reason alone. See e.g., Haselhorst v. Wal-Mart Stores, Inc., 163 F.R.D. 10, 11 (D. Kan. 1995) (denying motion to compel because moving party failed to adequately confer before filing motion); Hoelzel v. First Select Corp., 214 F.R.D. 634, 635-36 (D. Colo. 2003) (same).

Although the matters raised in SCO's motion could easily have been resolved without imposing on the Court, SCO failed even to discuss them with IBM. Instead, when IBM simply sought clarification as to exactly what information SCO proposed IBM provide for certain third-party witnesses, and to confirm that SCO was willing to provide IBM with the same information, SCO abruptly ended communication with IBM and filed this motion. (See Declaration of Amy F. Sorenson ("Sorenson Decl.") Exs. 1 & 2.) Moreover, had SCO asked (and it never did), IBM would have confirmed in writing that it has produced the non-privileged, responsive documents located in the files of its senior executives. Finally, as to the additional source code files sought by SCO, IBM would have suggested (quite reasonably, we believe) that SCO's Memorandum Regarding Discovery be addressed by the Court before SCO filed a separate motion seeking the same materials.

## II.    IBM HAS FULLY COMPLIED WITH THE COURT'S ORDER.

SCO's "renewed" motion to compel should further be denied because IBM has fully complied with the Court's Order and there is no valid basis for the relief SCO seeks.

- 5 -

A.    IBM Has Produced All of the Source Code Files to Which SCO Is Entitled.

Despite SCO's request (in its original motion to compel) that IBM be ordered to produce all source code files for its AIX and Dynix operating systems, the Court ordered in its March 3, 2004 Order, only that IBM provide "the releases of AIX and Dynix consisting of 'about 232' products as was represented by Mr. Marriott at the February 6, 2004 hearing". (3/3/04 Order at II.1.) IBM produced all of these releases of AIX and Dynix well in advance of the April 19, 2004 deadline set by the Court.[6]

In this "renewed" motion to compel, however, SCO asserts that IBM failed to comply with this Court's Order and engaged in "discovery abuse" by not producing the very source code files the Court held IBM did not have to produce. SCO's argument is frivolous. The Court rejected SCO's original motion seeking this information. Indeed, the Court specifically provided in its Order that it would "consider ordering IBM to produce more code from AIX and Dynix" only if SCO submitted additional briefing to the Court that would "include, with specificity, and to the extent possible, identification of additional files SCO requests and the reasons for such requests". (3/3/04 Order at II.1.)

SCO purportedly invoked this very procedure in filing its Memorandum Regarding Discovery on May 28, 2004 requesting the production of all source code (rather than just specific files) maintained by IBM for its AIX and Dynix programs in its internal "CMVC" and "RCS" databases. On June 23, 2004, IBM filed its Response to SCO's Memorandum Regarding Discovery (which IBM hereby incorporates by reference and will not repeat here)

---

[6] IBM produced virtually all of the source code ordered by the Court to be produced in its March 3, 2004 order on March 4 (the day after it was ordered to do so and six weeks before it was required). IBM completed its production of source code five days later on March 9.

- 6 -

setting forth the reasons IBM believes SCO's Memorandum Regarding Discovery should be denied. In short, IBM opposes SCO's application because the additional source code, roughly two billion lines of code, sought by SCO is irrelevant and unnecessary to this case and is unduly burdensome to produce.[7]

Nevertheless, before SCO's reply brief in support of its Memorandum Regarding Discovery was due, and before this Court even had the opportunity to consider SCO's application, SCO filed this "renewed" motion asking for the <u>same</u> source code files from IBM's internal databases. The request should be denied for the same reasons set out in IBM's Response to SCO's Memorandum Regarding Discovery. In any event, SCO's Memorandum Regarding Discovery should be heard by the Court before SCO is permitted to "renew" its motion to compel seeking additional source code files from IBM.

SCO's further insinuation that IBM failed to comply with the Court's direction to "provide further responses to SCO's interrogatory numbers two, five and eleven" by not producing the source code files from its internal databases also is meritless.[8] (3/3/04 Order at II.5.) Again, there is no basis for SCO's contention that IBM's failure to produce materials the Court specifically ruled IBM did not have to produce constitutes non-compliance with the Court's Order.

---

[7] Indeed, in light of SCO's complaints in opposition to IBM's summary judgment motion that it could take SCO "25,000 man-years" to review the millions of lines of source code already in its possession, SCO's contention that it requires still more source code from IBM is not credible and appears crafted solely to give SCO an excuse to further delay the proceedings in this case.

[8] As SCO points out, there appears to be a typographical error in the Court's Order, as SCO did not move to compel a further response to Interrogatory No. 11.

- 7 -

SCO's initial motion to compel filed on November 4, 2003 (Sorenson Decl. Ex. 3)

concerned three interrogatories—Interrogatory Nos. 2, 4 and 5.  They provide as follows:

> Interrogatory No. 2
> List the names and addresses of all persons who are believed or known by you, your
> agents, or your attorneys to have any knowledge concerning any of the issues of this
> lawsuit; and specify the subject matter about which the witness has knowledge.
>
> Interrogatory No. 4
> Identify all persons who have or had access to UNIX source code, AIX source code and
> Dynix source code, including derivative works, modifications, and methods.  For each
> such person, set forth precisely the materials to which he or she had access.
>
> Interrogatory No. 5
> Identify IBM or Sequent personnel that work or worked on developing source code,
> derivative works, modifications or methods for AIX, Dynix and Linux, specifying for
> each person their precise contributions to each.

(Sorenson Decl. Ex. 4.)  SCO's principal complaint regarding IBM's initial responses to these

interrogatories was that IBM failed to identify certain senior executives of IBM and third-party

witnesses in response to Interrogatory No. 2 and to provide addresses for the individuals

identified in response to Interrogatory Nos. 4 and 5.  As we understood the March 3, 2004 Order,

the Court directed IBM to provide this additional information.  Accordingly, IBM served

supplemental interrogatory responses on April 19, 2004 (Sorenson Decl. Exs. 5 & 6), identifying

additional witnesses in response to Interrogatory No. 2 and providing contact information for

certain IBM employees identified in Interrogatory Nos. 4 and 5.

SCO now suggests IBM failed to comply with the Court's Order because IBM has

not specified, for each of the more than 7,200 individuals who IBM identified in its responses to

Interrogatory Nos. 4 and 5, the exact contributions, if any, that such individual made to AIX,

Dynix or Linux.  The unreasonableness of SCO's request is obvious on its face, which is why

IBM specifically objected to having to provide such information.  SCO's case against IBM

- 8 -

concerns code that IBM is alleged to have improperly <u>contributed to Linux</u>, as opposed to code that IBM developed for AIX and Dynix and <u>did not</u> contribute to Linux. As to Linux, the identity of each IBM employee that contributed source code to Linux and the exact contribution that employee made to Linux is a matter of public record and readily obtainable by SCO. Indeed, the Court specifically ruled in its Order that, with respect to IBM's Linux contributions, "SCO should use its best efforts to obtain relevant discovery from the Linux contributions that are known to the public".[9] (3/3/04 Order at II.2.)

        As to AIX and Dynix, apart from reviewing the approximately two billion lines of source code that exist in IBM's internal databases (which even then will not necessarily identify the exact contributions of each individual), there is no precise way to determine what code any of the more than 7,200 individuals identified in response to Interrogatory Nos. 4 and 5 contributed to AIX or Dynix.[10] Since the vast majority of these source code files are wholly irrelevant to this case (under any theory) because they were <u>not</u> contributed to Linux, IBM does not believe there

---

[9] To the extent IBM employees made submissions to Linux that were not adopted and might not be available in the public domain, IBM has already produced such submissions to SCO as the Court directed.

[10] Accordingly, IBM noted in its response to Interrogatory No. 5 that, "[t]o the extent readily determinable, the precise contributions of these individuals can be ascertained from the public record in the case of IBM contributions to Linux and in the cases of AIX and Dynix from the products themselves". IBM's response is not misleading. Identifying the contributions of more than 7,200 individuals to AIX and Dynix, which each consist of millions of lines of code, cannot be performed with any precision, and is best undertaken in the first instance by reviewing the source code for AIX and Dynix for authorship information. SCO's complaint that IBM's response is "an abusive discovery response not designed to further the resolution of this case, but to obfuscate" is misdirected. (SCO Br. at 5 n.6.) On the contrary, it is SCO's <u>request</u>, which asks IBM to undertake a burdensome review of billions of lines of source code to provide information that is not even relevant to this case, that is abusive. SCO's interrogatory request is intended merely to provide cover for the shortcomings of SCO's discovery's responses and to delay the prompt resolution of this case.

309594.1

is any basis for ordering the production of these source code files.[11]  Moreover, as the Court

established a specific procedure by which SCO could seek additional source code files, IBM did

not understand the Court's order that IBM "provide further responses to SCO's interrogatory

numbers two, five and eleven" to mean that IBM was required to produce all the source code

files in IBM's CMVC and RCS databases that the Court had elsewhere ruled IBM need not

produce.  SCO's contrary interpretation of the Court's Order is illogical.

      B.       **IBM Has Searched For, and Produced, Responsive Documents From the Files of Its Executives and Board of Directors.**

IBM has conducted a diligent search of its files for documents responsive to

SCO's requests and has produced nearly one million pages of documents to SCO to date, almost

twice the number of pages of documents produced by SCO.  Notwithstanding SCO's speculation

to the contrary, IBM has collected and produced the non-privileged, responsive documents that

were found in the files of its senior executives and its Board of Directors.  SCO's suggestion,

therefore, that IBM has improperly "filtered" and excluded responsive documents is simply

wrong.  Accordingly, there is nothing for this Court to compel IBM to do—IBM has produced

the documents requested by SCO.

Moreover, SCO in any event misstates the sequence of events in this case and the

scope of the discovery to which SCO is entitled.  First, SCO suggests that it has moved to

compel "two times" to obtain documents from IBM's senior management.  (SCO Br. at 3.)  That

is false.  SCO's original motion to compel (Sorenson Decl. Ex. 3) addressed only three (Nos. 2, 3

---

[11]  Apart from its bare assertions that the code is relevant, SCO still does not—because it cannot—explain the relevance of the millions of lines of source code that IBM did not contribute to Linux.

and 11) of the 52 requests contained in SCO's First Request for the Production of Documents (Sorenson Decl. Ex. 4), each of which requested that IBM produce certain computer code, not documents. Although some of the requests in SCO's First Set of Document Requests (e.g., Requests Nos. 32-35 and 42) call for the production of certain categories of documents concerning Linux, SCO's motion did not concern those requests.

The first time SCO asserted its (mistaken) belief that IBM had failed to produce responsive documents from its senior executives was at oral argument at the February 6, 2004 hearing before this Court, during which SCO appeared to complain primarily about IBM's failure to produce documents responsive to requests in SCO's Second Set of Document Requests (Sorenson Decl. Ex. 7), which were served on December 4, 2003, the day before the Court stayed further discovery of IBM.[12]  (See 2/6/04 Hearing Tr. at 26.)  In particular SCO appeared concerned that IBM had failed to produce documents responsive to Request No. 53, which asks for the production of:

> "All documents concerning IBM's decision to adopt, embrace or otherwise promote Linux, including but not limited to the following:
>
> a.    all such documents in the possession of Sam Palmisano, Irving Wladawsky-Berger, Paul Horne [sic] and Nick Bowen;
>
> b.    the report prepared by Nick Bowen, including all drafts and e-mails pertaining thereto, submitted to IBM management on or about December 20, 1999;
>
> c.    all presentations made to IBM's top management including its Board of Directors concerning such decision;

---

[12]  SCO did not confer with IBM as required under DUCivR 37-1(a) or Fed. R. Civ. P. 37(a) before raising this issue at oral argument.

    d.    all documents from all Board of Directors' meetings relating to such decision, including Board notebooks, Board minutes and notes from all persons in attendance at such meetings."

(Sorenson Decl. Ex. 7.)  This, of course, should have come as no surprise to SCO as it had served the request on IBM the day before the Court entered the stay, and the stay had not been lifted as of February 6, 2004.

In any case, IBM has fully complied with the Court's March 3, 2004 Order.  IBM has produced approximately 2,500 pages of documents directly responsive to SCO's Request No. 53, which seeks documents concerning the Linux strategy adopted by IBM in 1999 and discussed in the March 20, 2000 *New York Times* article, including from IBM's CEO Samuel Palmisano, Paul Horn and Nick Bowen.

Second, SCO is plainly not entitled to "the full files of Palmisano, Wladawsky-Berger, [and] IBM's Board" as it now apparently suggests.  (SCO Br. at 4 (emphasis added).)  *There is no basis for the Court to compel IBM to produce every document in the possession of Mr. Palmisano, Mr. Wladawsky-Berger and IBM's Board of Directors (such as those that simply contain the word "Linux" in them), without regard to the relevance of those documents to the issues in this lawsuit or whether they are privileged.*  SCO's request is overbroad on its face. SCO has served document requests seeking materials that at least SCO has identified as being relevant (often incorrectly, we believe) to its lawsuit against IBM.  IBM searched the files of Mr. Palmisano, Mr. Wladawsky-Berger and the Board of Directors and produced whatever non-privileged, responsive documents exist in those files.  IBM should not be made to produce documents that SCO has not even asked for in any of its document requests, and which bear no relevance to the issues in this case.

C.   IBM Has Provided Contact Information For the Individuals Identified In IBM's
     Interrogatories.

SCO's contention that IBM has failed properly to provide SCO with contact

information for certain witnesses is also mistaken.  As an initial matter, IBM objected to

providing contact information for each of the more than 7,200 individuals identified in response

to Interrogatory Nos. 4 and 5 because IBM did not believe the information to be relevant and

because of the burden involved in supplying such information.  The Court's March 3, 2004

Order directed IBM to provide contact information for 1,000 of these individuals, as agreed upon

by SCO and IBM, and IBM promptly sent a letter on March 9, 2004 to SCO asking it to identify

the 1,000 individuals for whom it desired contact information.  (See Sorenson Decl. Ex. 8.)

SCO apparently took the Court's Order as a license to demand that IBM provide

contact information for any 1,000 individuals, including individuals never identified by IBM in

response to any of SCO's interrogatories and third-party witnesses for whom IBM does not even

possess any information.  Thus, in response to IBM's March 9 letter, SCO asked IBM to provide

contact information for individuals that IBM did not identify in response to SCO's Interrogatory

Nos. 4 and 5.[13]  (See Sorenson Decl. Ex. 9.)  Subsequently, SCO sent a letter on June 4, 2004

requesting contact information for certain third-party witnesses identified by IBM in response to

Interrogatory No. 2, including such individuals as SCO's co-founders Ransom Love and Bryan

---

[13]  SCO claims that its March 26, 2004 letter merely asked for contact information for witnesses
either identified by IBM in response to Interrogatory Nos. 4 and 5 or from whom IBM produced
documents, but did not identify in its responses.  However, SCO's request in fact also asked for
contact information for witnesses whom IBM has never identified in its interrogatory responses
and from whom IBM has not produced any documents.

- 13 -

Sparks, SCO's former general counsel Harrison Colter[14] and current SCO employee Michael
Davidson, among others. (See Sorenson Decl. Ex. 10.) IBM does not possess contact
information for these individuals, although counsel for IBM has found contact information or
possible contact information for certain of these individuals in the course of its investigation
(information that could just as easily be found by SCO).

       IBM did not understand SCO's interrogatory requests or the Court's Order to be
so far-ranging. Indeed, SCO itself has not come anywhere near to providing the type of
information it now seeks to compel IBM to provide. For instance, for the majority of the third-
party witnesses SCO identifies in its Supplemental Answer to IBM's Interrogatory No. 10
(Sorenson Decl. Ex. 11), SCO does not even provide the name of each witness's employer (as
IBM did), let alone any contact information. (See id.) In addition, SCO provides no contact
information for any of the nearly 40 individuals from whom it produced documents but failed to
identify in its interrogatory responses. (See Sorenson Decl. Ex. 12.)

       Although we do not believe SCO is entitled to such information, in the interest of
moving this case forward and obviating a silly dispute, IBM has supplemented its interrogatory
responses (without waiving its work product protections) and provided contact information for
the individuals identified by SCO in its two letters to IBM. (See Sorenson Decl. Exs. 13 & 14.)
For the third-party witnesses, IBM does not purport to certify the accuracy of the information
provided, as the information has been gathered from public sources, such as the telephone book

---

[14] Mr. Colter is a member of the Utah State Bar, and counsel for The Canopy Group—SCO's
largest shareholder—from whom third party discovery has been sought in this case. Mr. Colter's
address and phone number not only appears in local legal directories and phone books, it appears
on the letters he has written in this case, copies of which have been sent to SCO's counsel.

309594.1

and various Internet websites. In fact, for many of these witnesses, such as current or former

SCO employees, IBM believes that SCO is in a better position than IBM to know their contact

information.

      As a matter of fairness and reciprocity, IBM requests that SCO be ordered

similarly to provide contact information in the possession of SCO or SCO's counsel for each of

the witnesses identified in SCO's responses to IBM's interrogatories, including third-party

witnesses, and each of the persons from whom SCO has produced documents but did not identify

in its interrogatory responses.

### III. SCO'S "RENEWED" MOTION IS CRAFTED ONLY TO DELAY FURTHER THE PROCEEDINGS OF THE CASE.

      SCO devotes nearly four pages of its brief to a diatribe touting the strength of its case

against IBM (yet, consistent with its conduct throughout the case, still without showing any of its

supposed evidence) and the alleged weakness of IBM's defenses. SCO's invective is not in any

way relevant to the issues raised in its motion to compel and appears, in fact, to be written for an

audience other than the Court.[15]

---

[15] The "pattern" of alleged discovery abuse is, as IBM has explained in this memorandum, entirely imagined by SCO. IBM has complied with its discovery obligations. Moreover, the notion that IBM "sandbagged" SCO by not providing SCO with certain fact witness declarations prior to their depositions is not well-founded. Courts have found such declarations to be work product not required to be produced in discovery. See, e.g., Abell v. Babbitt, No. 98-2315, 1999 WL 215403 at *2, (10th Cir. Apr. 14, 1999) (holding that witness affidavits attached to summary judgment motion were "not part of the discovery process, and are protected by the attorney-client and attorney work product privileges") (copy attached as Exhibit A); Battenfield of Am. Holding, Inc. v. Baird, Kurts & Dobson, No. 97-2336, 1999 WL 414312 at *2 (D. Kan. May 13, 1999) (denying motions to strike and for sanctions for failure to produce an executed witness declaration because the declaration constituted work product and was not required to be disclosed to opposing party) (copy attached as Exhibit B); Intel Corp. v. VIA Techs., Inc., 204 F.R.D. 450, 452 (N.D. Cal 2001) (denying motion to strike because executed witness declaration

- 15 -

In any event, SCO's assertion that IBM is seeking to prevent SCO from conducting discovery is baseless. As IBM's contributions to Linux and the identity of the contributors are a matter of public record, SCO has had from the beginning of this case (indeed, well before the beginning of this case), all it needs to determine who from IBM it would like to depose. In addition, with respect to any third-party witnesses, SCO is as least as well equipped as IBM to locate those witnesses. SCO's excuses for not diligently proceeding with discovery are entirely manufactured. There has been no impediment to SCO's taking discovery in this case apart from SCO's own desire to delay the resolution of this case for as long as possible so as to cultivate the fear, uncertainty and doubt it has sown in the marketplace regarding Linux.

Indeed, SCO has abjectly resisted all efforts by IBM to proceed with discovery at every turn. Among other things:

- SCO has consistently refused to provide proper answers to IBM's interrogatories, including failing repeatedly—and despite two Court orders to do so—to identify the UNIX System V code from which code in Linux is allegedly copied. This despite the fact that SCO has represented in the media, and indeed to another federal district court, that SCO is aware of "significant instances of line-for-line and 'substantially similar' copying of code from Unix System V into Linux".

- SCO has consistently refused to produce documents responsive to IBM's document requests, including in particular source code analyses SCO has publicized as supporting its claims.

---

"was clearly work product right up until the moment it was filed" with summary judgment motion). Indeed, we believe SCO itself to be in possession of numerous such declarations that it has not produced to IBM. At any rate, simply because a witness's testimony is unfavorable for SCO does not mean that SCO has been "sandbagged".

309594.1

- SCO has interfered with subpoenas IBM has served on third parties, including instructing third parties not to produce documents to IBM until after SCO had reviewed the third party's documents.[16]

- SCO moved (three days before they were scheduled to be taken) to prevent IBM from taking depositions of third-party witnesses that IBM had properly noticed and scheduled nearly one month in advance.

SCO's "renewed" motion is nothing more than an attempt by SCO to deflect attention from its own failings in discovery and to delay further the proceedings in this case, by forestalling a decision on IBM's pending motion for summary judgment and by seeking to occupy IBM in gathering and producing unnecessary and irrelevant discovery.

### Conclusion

For the foregoing reasons, SCO's "renewed" motion to compel should be denied.

DATED this 4th day of August, 2004.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

---

[16] In at least one instance so far, SCO directed a third party, S2 Consulting, to withhold subpoenaed documents from IBM, claiming attorney-client privilege and the work product immunity. IBM believes such withholding is inappropriate.

- 17 -

Of counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff International
Business Machines Corporation*

- 18 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of August, 2004, a true and correct copy of the

foregoing was hand delivered to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

and was sent by U.S. Mail, postage prepaid, to the following:

Robert Silver
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

- 19 -