**ORIGINAL**

FILED
U.S. DISTRICT COURT

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

2005 JUL 16   P 4: 27
DISTRICT OF UTAH
BY
DEPUTY CLERK

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC. <br><br> Plaintiff/Counterclaim-Defendant <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff | **UNSEALED EXHIBITS TO REPLY MEMORANDUM IN SUPPORT OF SCO'S MOTION TO COMPEL IBM TO PRODUCE SAMUEL J. PALMISANO FOR DEPOSITION** <br> [Docket No. 419] <br><br> Case No. 2:03CV0294DAK <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
2000 WL 796142 (D.Kan.)
(Cite as: 2000 WL 796142 (D.Kan.))

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.
COTRACOM COMMODITY TRADING CO., et al.,
Plaintiffs,
v.
SEABOARD CORPORATION, et al, Defendants.
No. CIV.A. 97-2391-GTV.

June 14, 2000.

*MEMORANDUM AND ORDER*

RUSHFELT.

*1 The Court has under consideration Plaintiffs' Motion for Protective Order (doc. 258) and Defendants' Motion to Extend Discovery Deadline (doc. 283). Pursuant to Fed.R.Civ.P. 26, plaintiffs seek an order to prohibit three depositions noticed by defendants. They request that the Court limit further discovery to written interrogatories. Defendants oppose the motion. By their motion they seek to extend the discovery deadline to forty-five days after the Court rules on the motion for protective order. Plaintiff has no objection to extending the deadline for discovery already propounded that is within the confines of limitations imposed by the Court at the pretrial conference held November 10, 1999. It otherwise opposes the motion.

At the aforementioned pretrial conference the Court extended the discovery deadline "through February 10, 2000, for Defendants to pursue discovery ... as to the following matters ... No. 1 will be 'loss of business, alleged as part of Plaintiffs' damages,' and 2, 'losses incurred from the Patchara Naree, Tolgam and Argus wheat shipments." (Tr. of Audiotapes from Pretrial Conference [hereinafter Tr.] at 121, attached as Ex. 2 to Pls.' Mem. Supp. of Mot. Prot. Order, doc. 259 [hereinafter Mem. Supp.].) The Court specifically declined to "put any limit on the nature of discovery." (*Id.* at 116.) It felt it would be unfair to artificially limit discovery on the information then before it. (*Id.* at 117.) For the same reason it declined to limit the location of any future deposition. (*Id.* at 118-20.)

Plaintiffs claim that defendant Seaboard Corporation (Seaboard) has already conducted extensive discovery on the two matters, for which the Court granted extension. They contend the depositions are burdensome, untimely, unnecessary, and far beyond the limited scope of discovery discussed at the pretrial conference. They object to the method and volume of discovery, the persons selected for deposition, and the location of the depositions. They suggest that defendants seek the depositions only for purposes of harassment and to facilitate settlement. They also suggest that the Court has a "special duty," furthermore, to monitor and regulate discovery propounded to foreign parties.

Plaintiffs object to the persons selected for deposition on various grounds. They claim to have identified none of them as witnesses on the issue of damages--the only remaining issue proper for discovery. Two of the individuals are outside members of the Board of Directors of plaintiff Bendel Feed and Flour Mill, Ltd. (Bendel). Plaintiffs claim these two men have no responsibility for the day-to-day operations of Bendel and have no knowledge of the limited issues left for discovery. Plaintiffs offer to provide affidavits about the lack of knowledge. In their reply brief they agree to answer interrogatories or requests for admission relating to the lack of knowledge. They also express a willingness to stipulate to the lack of knowledge. They suggest that, if Seaboard truly wanted to conduct legitimate discovery, it would have noticed a deposition on the limited matters left for discovery pursuant to Fed.R.Civ.P. 30(b)(6). As for the third individual, Thadeus Ogboghodo, plaintiffs claim they have not identified him as a trial witness on the matters available for discovery. They suggest that, in view of the other matters argued in their motion, his deposition is unnecessary, irrelevant, and unduly burdensome.

Defendants claim they seek to depose individuals with information relevant to this case. They suggest the depositions are necessary, notwithstanding other discovery. They assert that Mr. Ogboghodo is General Manager of Bendel with responsibility for its day-to-day activities. They submit that he has sworn in a related proceeding that he has knowledge of the facts surrounding the current dispute between the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 796142 (D.Kan.)
(Cite as: 2000 WL 796142 (D.Kan.))

Page 2

parties. Defendants speculate that his absence as a listed witness on the issue of damages might mean that his testimony is unfavorable to plaintiffs. They contend they reasonably noticed the three depositions in the United States. They submit that it would be dangerous to travel to Nigeria where the deponents reside.

**\*2** "The [United States Supreme] Court has more than once declared that the deposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing litigants in civil trials." *Herbert v. Lando*, 441 U.S. 153, 176, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). To accomplish that purpose, the Federal Rules of Civil Procedure provide that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1). Courts broadly construe relevancy at the discovery stage. *Caldwell v. Life Ins. Co. of N. Am.*, 165 F.R.D. 633, 638 (D.Kan.1996). "[A] request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Id.* (quoting *Smith v. MCI Telecomms. Corp.*, 137 F.R.D. 25, 27 (D.Kan.1991)).

Discovery provisions are also "subject to the injunction of Rule 1 that they 'be construed to secure the just, speedy, and inexpensive determination of every action.' " *Lando*, 441 U.S. at 176. In addition, "[u]pon motion by a party ... and for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). Although the rules contemplate discovery as a nearly unencumbered search for the truth, courts also recognize it as an intrusive fact-gathering tool that is subject to abuse. Courts, therefore, "balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled." *Frank v. County of Hudson*, 924 F.Supp. 620, 623 (D.N.J.1996) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir.1994)); *see also*, *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1368 (10th Cir.1997) (holding that "the desire to afford 'broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant' ")

Whether to enter a protective order is within the sound discretion of the court. *Thomas v. IBM*, 48 F.3d 478, 482 (10th Cir.1995). A party may request a protective order to completely preclude inquiry into matters that are outside the scope of appropriate discovery. *Caldwell*, 165 F.R.D. at 637. Courts, nevertheless, disfavor barring a deposition. *Leighr v. Beverly Enterprises- Kansas Inc.*, 164 F.R.D. 550, 552 (D.Kan.1996). Absent extraordinary circumstances, "[t]hey rarely grant a protective order which totally prohibits a deposition." *Mike v. Dymon, Inc.*, 169 F.R.D. 376, 378 (D.Kan.1996); *see also*, *Simmons Foods, Inc. v. Willis*, 191 F.R.D. 625, 630 (D.Kan.2000). The party seeking a protective order, furthermore, has the burden to show good cause for a protective order. *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 (D.Kan.1996). To establish good cause, that party must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

**\*3** In this instance the Court finds the requisite extraordinary circumstances to prohibit the depositions noticed by defendants. Except for the limited discovery granted at the pretrial conference, discovery closed July 29, 1999. Defendants conducted extensive discovery before discovery closed. Upon its re-opening, furthermore, they served an additional interrogatory and three requests for production upon each plaintiff. They also noticed depositions in Washington D.C. for three foreign witnesses. Citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District of Iowa*, 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987), plaintiffs provide solid authority for exercising greater control over discovery directed to foreign litigants. Defendants fail to address the repercussions of that case. They also fail to deny a suggestion that they seek the depositions only for purposes of harassment and to motivate settlement. The Court finds good cause to prohibit the depositions.

Defendants indicate that, if a proposed deponent lacks knowledge of the matters sought to be discovered, they want to present such lack of knowledge to the jury in admissible form. They need not depose the witnesses, however, to secure such admissible evidence. Plaintiffs have presented reasonable alternatives to such depositions. Although parties generally have the right to choose the method and order of discovery, the Court may impose necessary restrictions to facilitate the just, speedy, and inexpensive determination of the action. At this late date, it appears unreasonable to permit international depositions of individuals who profess

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 796142 (D.Kan.)
**(Cite as: 2000 WL 796142 (D.Kan.))**

no knowledge of the limited matters subject to discovery. Defendants can obtain sufficient discovery through written interrogatories or requests for admission. The Court recognizes the general rule that "a party seeking discovery may test an asserted lack of knowledge." *See Horsewood v. Kids "R" Us,* No. Civ.A. 97-2441-GTV, *1998 WL 526589, at *6 (D.Kan. Aug.13, 1998).* The rule, however, is not absolute. The circumstances here justify precluding the depositions of the two members of the Board of Directors of Bendel.

The deposition of Mr. Ogboghodo presents a more difficult question. He undoubtedly has relevant knowledge of matters subject to the limited discovery permitted by the Court at the pretrial conference. Defendants have known of such knowledge, however, since receiving an affidavit signed by the witness on April 15, 1999. (*See* Aff. in Supp., attached as Ex. 5 to Defs.' Resp. to Pls.' Mot. Prot. Order, doc. 262.) Other than suggesting they did not know plaintiffs were asserting damage claims regarding certain contracts for the purchase of wheat or regarding lost profits, defendants present no reason why they could not have deposed Mr. Ogboghodo before discovery ended in July 1999. The Complaint of plaintiffs, furthermore, is broad enough to encompass such claims. (Tr. at 47.) Defendants knew or should have known of the claims. In view of all the circumstances of this case, it appears appropriate to preclude the oral deposition of Mr. Ogboghodo.

*4 Plaintiffs have consented to the granting of leave to defendants to serve the written discovery already propounded. (Mem. Supp. at 8 n.3.) Accordingly, the Court, pursuant to D.Kan. Rule 33.1, grants defendants leave to serve that discovery. They want further discovery limited to written interrogatories. They have shown no good cause for such a restriction. The Court grants defendants leave to serve written interrogatories or requests for admission consistent with this opinion and the limitations on discovery set at the pretrial conference of November 10, 1999. Considering the relevance of information possessed by Mr. Ogboghodo, it also grants defendants leave to depose him upon written questions in accordance with Fed.R.Civ.P. 31.

All interrogatories or requests for admission propounded shall be served in time for responses to be given within forty-five days of the date of this Order. If defendants pursue a deposition upon written questions they shall commence it within that same time period. The Court finds good cause to extend the discovery deadline for forty-five days from the date of this Order.

For the foregoing reasons, the Court sustains in part and overrules in part Plaintiffs' Motion for Protective Order (doc. 258) and sustains Defendants' Motion to Extend Discovery Deadline (doc. 283). On its own motion, it grants defendants leave to serve discovery as set forth herein. Each party shall be responsible for its own costs and expenses incurred on the motions and subsequent briefing.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this *14 th* day of June, 2000.

2000 WL 796142 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**

· 2:97CV02391 _____(Docket) (Aug. 08, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
2002 WL 922082 (D.Kan.)
(Cite as: 2002 WL 922082 (D.Kan.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.
PEPSI-COLA BOTTLING COMPANY OF
PITTSBURGH, INC., Plaintiff,
v.
PEPSICO, INC., and Bottling Group L.L.C.,
Defendants.
**Civil Action Case No. 01-2009-KHV.**

May 2, 2002.

MEMORANDUM AND ORDER

DAVID J. WAXSE, Magistrate Judge.

*1 Pending before the Court is Defendant PepsiCo, Inc.'s Motion for Protective Order to Preclude Two Noticed Depositions (doc. 223). PepsiCo, Inc. (PepsiCo) requests the Court issue a protective order precluding the depositions of two of its senior-level executives, Indra Nooyi and Roger Enrico. For the reasons stated below, PepsiCo's Motion for Protective Order is denied.

I. Relevant Background Information

Prior to the discovery deadline, Plaintiff served notices of deposition on Indra Nooyi and Roger Enrico for their depositions to be taken on March 27 and 28, 2002 in Purchase, New York. Indra Nooyi is the President, Chief Financial Officer, and a member of the Board of Directors of PepsiCo. In 1998, she was Senior Vice President of corporate strategy and development. Roger Enrico is the former Chairman and current Vice Chairman of the Board of Directors of PepsiCo.

Both Ms. Nooyi and Mr. Enrico were deposed in similar litigation in Ohio and Illinois. *PepsiCo, Inc. v. Central Investment Corp.,* No. c-1-98-389 (S.D.Ohio); *PepsiCo, Inc. v. Marion Pepsi-Cola Bottling Co.,* No. 00-229-DRH (S.D.Ill.). Their depositions in the *Marion* case were videotaped.

II. Standard for Ruling on a Motion for Protective Order

Federal Rule of Civil Procedure 26(c) provides that a court, upon a showing of good cause, "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The party seeking a protective order has the burden to show good cause for it. *Reed v. Bennett,* 193 F.R.D. 689, 691 (D.Kan.2000). To establish good cause, that party must make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 n. 16 (1981). The decision to enter a protective order is within the court's discretion. *Thomas v. International Bus. Machs.,* 48 F.3d 478, 482 (10th Cir.1995).

A party may request a protective order to completely preclude inquiry into matters that are outside the scope of appropriate discovery. *Cotracom Commodity Trading Co. v. Seaboard Corp.,* No. 97-2391-GTV, 2000 WL 796142, *2 (D. Kan. June 14, 2000). Courts, however, disfavor barring a deposition. *Id.* Absent extraordinary circumstances, courts rarely grant a protective order that totally prohibits a deposition. *Id.*

. Discussion

PepsiCo advances several arguments in support of its request for a protective order precluding Plaintiff from deposing two of its senior-level executives, Ms. Nooyi and Mr. Enrico. First, PepsiCo contends that both Ms. Nooyi and Mr. Enrico have signed Declarations that state they have no personal knowledge of the facts or issues in this case. It next argues that Plaintiff has already deposed top officials, as well as lower-level employees of PepsiCo with personal knowledge of the division's strategies and decisions regarding Plaintiff. Permitting Plaintiff to depose these executives would also be cumulative in that Ms. Nooyi and Mr. Enrico have already been deposed on the same subject in similar litigation in Ohio and Illinois. In addition, PepsiCo claims that Plaintiff's insistence on deposing the executives is in retaliation for an unsuccessful mediation.

*2 Plaintiff opposes the motion contending that PepsiCo has not demonstrated good cause to preclude

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
2002 WL 922082 (D.Kan.)
(Cite as: 2002 WL 922082 (D.Kan.))

the depositions. It argues that it should be permitted the opportunity to depose Ms. Nooyi and Mr. Enrico's because of their key positions and involvement in PepsiCo's strategic consolidation plan known as Project Broncos. [FN1] Further, it should not be restricted to the questions and style of examination used by another attorney in other litigation about matters primarily devoted to other issues.

> FN1. According to Plaintiff, Project Broncos is a bottler consolidation strategy document used by PepsiCo strategic planners in 1998, which describes PepsiCo's plan to arrive at an anchor bottling strategy, to document the need for alignment, and to create a less favorable contractual relationship with the bottling system.

The Court agrees. Plaintiff is entitled to depose Ms. Nooyi and Mr. Enrico. Plaintiff does not have the burden to justify his decision to depose Ms. Nooyi and Mr. Enrico. Rather, PepsiCo has the burden to show that good cause exists to prevent the deposition from going forward in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). The Court finds that PepsiCo has not met this burden. PepsiCo has not demonstrated how either it or Ms. Nooyi and Mr. Enrico will be annoyed, embarrassed, oppressed, or subjected to undue burden or expense if Plaintiff is allowed to depose Ms. Nooyi and Mr. Enrico. In addition, the Court finds this case distinguishable from *Thomas*, 48 F.3d 478, *Gazaway v. Makita U.S.A., Inc.*, No. 97-2287-JWL, 1998 WL 219771 (D.Kan. Apr. 16, 1998), and *Cotracom*, 2000 WL 796142, upon which PepsiCo relies. In *Thomas*, an employment discrimination case, the Tenth Circuit held that the district court did not abuse its discretion in granting a protective order to prevent the deposition of a the corporate defendant's chairman. *Thomas*, 48 F.3d at 483- 84. In so ruling, the Tenth Circuit relied upon, *inter alia*, the chairman's lack of knowledge about the plaintiff and her work performance. *Id.* at 483. In addition, the defendant demonstrated that the deposition would impose "severe hardship" on the chairman. *Id.*

Similarly, in *Gazaway*, another employment discrimination case, Magistrate Judge Rushfelt concluded that the defendant was entitled to a protective order to prevent the deposition of its former president. *Gazaway*, 1998 WL 219771 at *3. There, the defendant demonstrated that it would be "unduly burdensome and expensive" to produce the

witness for his deposition in Kansas City, rather than Japan, where he resided. *Id.* The defendant also established that the witness had no personal knowledge as to the plaintiff or the criteria used to implement the reduction in force at issue. *Id.* In addition, Judge Rushfelt held that Plaintiff's deposition notice violated the rule that the deposition of a corporate defendant or its officers should take place at its principal place of business. *Id.* Significantly, Judge Rushfelt ruled that in the event the deponent were to return to the United States, where the deposition would not be burdensome, Plaintiff could depose him. *Gazaway*, 1998 WL 219771 at * 3.

In *Cotracom*, Magistrate Judge Rushfelt ruled that extraordinary circumstances justified precluding the depositions of two outside members of the board of directors and the general manager of plaintiff corporation. *Cotracom*, 2000 WL 796142 at *1. The court noted that all three were foreign witnesses who would have to travel to the United States to be deposed and several months had elapsed since discovery closed. *Id.* The Court held that, in light of these facts, it was unreasonable to permit international depositions of individuals who professed no knowledge of the limited matters subject to discovery. *Id.* at 3.

*3 In contrast, in this case, the Court determines that Ms. Nooyi and Mr. Enrico possess knowledge regarding PepsiCo's Project Broncos. The Court also finds that this knowledge is unique and appears significant to some of Plaintiff's claims in this case. The fact that their depositions have already been taken in similar litigation is not persuasive. Counsel for Plaintiff should not be restricted to the questions and style of examination used by a different attorney in another case. Further, there is no issue in this case about the deposition being taken in an improper or burdensome location, the deposition resulting in a "severe hardship" or "undue burden" to deponents or PepsiCo or the deposition being noticed after the discovery deadline. Finally, the Court finds that there is no evidence, other than perhaps timing, that the depositions are retaliatory for an unsuccessful mediation.

In sum, the Court does not find that PepsiCo is entitled to a protective order on the basis that Ms. Nooyi and Mr. Enrico are senior-level executives who lack knowledge and have been previously deposed in other litigation.

IT IS THEREFORE ORDERED that Defendant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 922082 (D.Kan.)
**(Cite as: 2002 WL 922082 (D.Kan.))**

Page 3

PepsiCo's Motion for Protective Order to Preclude
Two Noticed Depositions (doc. 223) is denied.

IT IS SO ORDERED.

2002 WL 922082 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**

2:01CV02009 _____ (Docket)
(Jan. 05, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d
2002 WL 485661 (D.Kan.)
(Cite as: 2002 WL 485661 (D.Kan.))

Page 1

# H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas. ·
Gary SIMPSON, Plaintiff,
v.
The HOME DEPOT, INC., d/b/a Home Depot, et al.,
Defendants.
**Civil Action No. 00-2285-JAR.**

March 7, 2002.

MEMORANDUM AND ORDER

WAXSE, United States Magistrate Judge.

*1 A telephone hearing was held on January 31, 2002 regarding the Motion for Protective Order Quashing Deposition Notice of Larry Mercer (doc. 173) filed by Defendant Home Depot, Inc., d/b/a/ Home Depot ("Home Depot"). Plaintiff appeared through counsel Daniel J. Cohen. Defendants Home Depot and Home Depot U.S.A., Inc., appeared through counsel Daniel O. Herrington. The Court deferred ruling on the motion at the hearing in order to provide Home Depot the opportunity to file a reply brief. The Court has reviewed the reply brief, and is now prepared to rule.

I. Background Information

This is a personal injury case in which Plaintiff alleges he was struck by falling merchandise while shopping at a Home Depot Store. Home Depot seeks a protective order preventing Plaintiff from deposing Larry Mercer, who is Home Depot's Vice-President of Operations. Plaintiff seeks to depose Mr. Mercer regarding Home Depot's nationwide operations and whether there is an inherent risk to employees and customers stemming from Home Depot's warehouse-style operations.

I. Standard for Ruling on a Motion for Protective Order

Federal Rule of Civil Procedure 26(c) provides that a

court, upon a showing of good cause, "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The party seeking a protective order has the burden to show good cause for it. *Reed v. Bennett,* 193 F.R.D. 689, 691 (D.Kan.2000). To establish good cause, that party must make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). The decision to enter a protective order is within the court's discretion. *Thomas v. Int'l Bus. Mach.,* 48 F.3d 478, 482 (10th Cir.1995).

II. ANALYSIS

A. Is Home Depot Entitled to a Protective Order Based on Mr. Mercer's High-Level Position and Lack of Knowledge About Plaintiff's Accident?

Home Depot contends it is entitled to a protective order because Mr. Mercer is a high-level executive who has no knowledge specifically related to Plaintiff's accident. Home Depot argues that Plaintiff has no need to depose Mr. Mercer regarding any risk to employees and customers stemming from Home Depot's warehouse-style operations given that Plaintiff has already noticed the deposition of a lower-level corporate representative regarding this very same topic. According to Home Depot, Plaintiff must show that he cannot obtain the information he desires through less intrusive means than deposing a corporate vice-president.

Plaintiff argues that he is entitled to take Mr. Mercer's deposition because he is in charge of nationwide operations and Plaintiff has the right to depose individuals whose decision-making responsibility extends that far. Plaintiff also claims that he has been trying for months to obtain the depositions of Home Depot's lower-level managers, and that he did not notice Mr. Mercer's deposition until Home Depot unexpectedly canceled their depositions.

*2 The Court holds that Plaintiff is entitled to depose Mr. Mercer. Plaintiff does not have the burden to justify his decision to depose Mr. Mercer. Rather, Home Depot has the burden to show that good cause exists to prevent the deposition from going forward

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 485661 (D.Kan.)
**(Cite as: 2002 WL 485661 (D.Kan.))**

in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). The Court does not find that Home Depot has met this burden. Home Depot simply has not demonstrated how either it or Mr. Mercer will be annoyed, embarrassed, oppressed, or subjected to undue burden or expense if Plaintiff is allowed to depose Mr. Mercer.

In addition, the Court finds this case distinguishable from *Thomas v. Int'l Bus. Mach.,* 48 F.3d 478 (10th Cir.1995) and *Gazaway v. Makita USA, Inc.,* No. 97-2287-JWL, 1998 WL 219771 (D.Kan. April 16, 1998), upon which Home Depot relies. In *Thomas,* an employment discrimination case, the Tenth Circuit held that the district court did not abuse its discretion in granting a protective order to prevent the deposition of a the corporate defendant's chairman. 48 F.3d at 483-84. In so ruling, the Tenth Circuit relied upon, *inter alia,* the chairman's lack of knowledge about the plaintiff and her work performance. *Id.* at 483. In addition, the defendant demonstrated that the deposition would impose "severe hardship" on the chairman. *Id.*

Similarly, in *Gazaway,* another employment discrimination case, Magistrate Judge Rushfelt concluded that the defendant was entitled to a protective order to prevent the deposition of its former president. There, the defendant demonstrated that it would be "unduly burdensome and expensive" to produce the witness for his deposition in Kansas City, rather than Japan, where he resided. *Gazaway,* 1998 WL 219771, at *3. The defendant also established that the witness had no personal knowledge as to the plaintiff or the criteria used to implement the reduction in force at issue. *Id.* In addition, Judge Rushfelt held that Plaintiff's deposition notice violated the rule that the deposition of a corporate defendant or its officers should take place at its principal place of business. Significantly, Judge Rushfelt ruled that in the event the deponent were to return to the United States, where the deposition would not be burdensome, Plaintiff could depose him. *Id.*

In contrast, in this case, Defendant has made no showing of "severe hardship" or "undue burden." Moreover, there is no assertion that Mr. Mercer lacks knowledge of the topic about which Plaintiff seeks to depose him. While Mr. Mercer may lack knowledge of Plaintiff's injuries and his accident, Home Depot does not claim that he also lacks knowledge about any risk to employees and customers stemming from Home Depot's warehouse-style operations. Rather,

Home Depot merely asserts that other, lower-level employees also possess this information. Finally, there is no issue in this case about the deposition being taken in an improper or burdensome location. Mr. Mercer's deposition was noticed to take place at Home Depot's principal place of business where Mr. Mercer works.

*3 In sum, the Court does not find that Home Depot is entitled to a protective order on the basis that Mr. Mercer is a high-level executive who lacks knowledge of Plaintiff's accident.

B. Is Home Depot Entitled to a Protective Order Based on Insufficient Notice?

Home Depot also contends that it is entitled to a protective order because Plaintiff did not provide at least five days notice of the deposition as required by D. Kan. 30.1. Plaintiff concedes that he did not provide Home Depot with the required five days notice. He contends, however, that the short notice was necessitated by Home Dept's unexpected, last-minute refusal to comply with its prior agreement to produce certain corporate managers for their depositions.

The Court finds that this issue is now moot inasmuch as the noticed deposition date has passed. The Court will, however, require Plaintiff's counsel to comply with the notice provision of D. Kan, Rule 30.1 when he re-notices Mr. Mercer's deposition.

IT IS THEREFORE ORDERED that the Motion for Protective Order Quashing Deposition Notice of Larry Mercer (doc. 173) filed by Defendant Home Depot, Inc., d/b/a/ Home Depot, is denied.

IT IS SO ORDERED.

2002 WL 485661 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**

• 2:00CV02285 _____ (Docket) (Jun. 27, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d
2003 WL 21293757 (D.Minn.)
(Cite as: 2003 WL 21293757 (D.Minn.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Mark **CARDENAS**, Pamela Muldoon, Terry
Struzyk, Plaintiffs,
v.
THE **PRUDENTIAL** INSURANCE CO. OF
AMERICA, Defendant.
Nos. Civ.99-1421(JRT/FLN), Civ.99-
1422(JRT/FLN), Civ.99-1736(JRT/FLN).

May 16, 2003.

John M. Degnan, Murnane, Conlin, White & Brandt,
St. Paul, MN, and Theresa A. Freeman, Neff Law
Office, Bloomington, MN, for plaintiff.

Neil H. Abramson, Proskauer Rose LLP, New York,
NY, and Thomas C. Kayser, Robins, Kaplan, Miller
& Ciresi, Minneapolis, MN, for defendant.

ORDER AFFIRMING ORDER OF MAGISTRATE
JUDGE DATED FEBRUARY 12, 2002 AND
DENYING
DEFENDANT'S LETTER/MOTION TO STRIKE
AFFIDAVIT

TUNHEIM, J.

*1 Plaintiffs have sued defendant Prudential
Insurance Company of America ("Prudential")
alleging a variety of employment discrimination
claims. This matter is now before the Court on
appeals of the Order by United States Magistrate
Judge Franklin L. Noel dated February 12, 2002. An
order of a magistrate judge on nondispositive pretrial
matters may be reversed only if it is clearly erroneous
or contrary to law. See 28 U.S.C. § 636(b)(1)(A);
Fed.R.Civ.P. 72(a); D. Minn. LR 72.1(b)(2). The
Court has reviewed the Magistrate Judge's Order and
the parties' submissions, and now denies the appeals.

I. Plaintiffs' Appeal of Order Denying Motion to
Compel Depositions

The Magistrate Judge denied plaintiffs' motion to
compel the depositions of several Prudential
executives: Susan Sangillo, Eric Schwimmer, Art
Ryan, and Michelle Darling. Plaintiffs appeal that

portion of the Order, arguing that these individuals
have knowledge that is relevant to plaintiffs'
allegations in this case. There is no per se rule
barring depositions of top corporate executives. See
Salter v. Upjohn Co., 593 F.2d 649, 651 (5th
Cir.1979). However, courts frequently restrict efforts
to depose senior executives where the party seeking
the deposition can obtain the same information
through a less intrusive means, or where the party has
not established that the executive has some unique
knowledge pertinent to the issues in the case. See id.
at 650- 51 (affirming district court's holding that
defendant's president need not be deposed until
plaintiff deposed lower level employees with relevant
knowledge, and where president did not have any
direct knowledge of the facts); Thomas v.
International Business Machines, 48 F.3d 478, 483-
84 (10th Cir.1995) (upholding protective order
barring deposition of top executive where lower level
employees were available for deposition and where
executive lacked personal knowledge of plaintiff's
case); Baine v. General Motors Corp., 141 F.R.D.
332, 334-35 (M.D.Ala.1991) (stating that for a top
executive to be deposed, prospective deponent must
have unique personal knowledge of the facts of the
case).

Plaintiffs cite several cases for the proposition that
depositions of top executives are "routinely
compelled." (Pl. Br. at 7.) None of these cases,
however, applies here because in none of them was
the deponent's executive status relevant to the court's
decision. See Borase v. M/A Com, Inc., 171 F.R.D. 10
(D.Mass.1997) (granting motion to compel
deposition based on fact that deponent was not acting
as corporate attorney); Crossley v. Iroquois Foundry
Co., Civ. Nos. A. 91-1657, A. 91-2041, 1992 WL
114956 at * *1-3 (E.D.Pa. May 18, 1992) (denying
protective order sought on basis of duplicative
questions and late notice, where executive had
already been deposed once without defendant
objecting on basis of executive status); Marchon
Eyewear, Inc. v. Marchon, Inc., No. 87-C-5943, 1988
WL 74447 at *2 (N.D.Ill. July 13, 1988) (granting
motion to compel second deposition of defendant's
president where defendant objected only to extent
that new deposition might be duplicative). Thus, the
Court must examine whether the Prudential
executives personally possess any unique information
about the case.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21293757 (D.Minn.)
(Cite as: 2003 WL 21293757 (D.Minn.))

Page 2

*2 The Court finds that plaintiffs' affidavits do not demonstrate that Sangillo, Schwimmer, Ryan, or Darling possess any information that could not be obtained from lower level employees or other sources, much less that their knowledge of plaintiffs' allegations is "unique." Moreover, plaintiffs have not demonstrated that deposing Sangillo and Schwimmer--Prudential's in-house lawyers--would satisfy the Eighth Circuit's requirement that deposition of in-house counsel must not disclose Prudential's litigation strategy. *See Pamida, Inc. v. E.S. Originals, 281 F.3d 726, 730 (8th Cir.2002); Shelton v. American Motors Corp., 805 F.2d 1323, 1326-27 (8th Cir.1986).*

Based on the discussion above, the Court finds that the Magistrate Judge's Order was neither clearly erroneous nor contrary to law. Therefore, the February 12, 2002 Order denying plaintiffs' motion to compel the depositions of Susan Sangillo, Eric Schwimmer, Art Ryan, and Michelle Darling is affirmed. Because the Court affirms the Magistrate Judge's Order, plaintiffs' contention that the deposition should have been held in Minneapolis, Minnesota and its request for costs and attorneys fees are moot.

II. Defendant's Appeal of Order Denying Motion to Compel Plaintiffs to Appear for Continuation of Depositions

This motion involves the depositions of plaintiffs Mark Cardenas ("Cardenas") and Pamela Muldoon ("Muldoon"). Following these depositions, Prudential moved to compel the plaintiffs to return for further questioning, arguing that plaintiffs had been so uncooperative and disruptive during questioning that the depositions were useless. Prudential also sought appointment of special master to supervise the continued depositions, and establishment of rules of conduct for the depositions.

The Magistrate Judge denied Prudential's motion, finding that it would be "just and practicable" to apply the new (and optional in this case) federal rule limiting depositions to one day of seven hours. *See Fed.R.Civ.P. 30(d)(2).* In so ruling, the Magistrate Judge specifically rejected Prudential's arguments that plaintiffs' conduct rendered the depositions useless:

It is apparent to this Court that the conduct of both the deponents, on the one hand, and the defendant's attorney, on the other, contributed to the confrontational nature of the depositions. While it is true that the deponents, at times, gave argumentative and non-responsive answers, Defense Counsel's suggestion that the depositions were "useless" because of the deponent's argumentative speeches, is hyperbole.

*Cardenas v. Prudential Ins. Co. of Amer., Civ. 99-1421, slip op. at 2 (D.Minn. Feb. 12, 2002) (emphasis added).*

Prudential appeals the Magistrate Judge's Order, arguing that plaintiffs' conduct did impede the depositions, and that application of the Rule 30(d)(2) time limit is inappropriate. [FN1] Prudential is correct that application of the Rule is optional in this case because the action commenced before the new rule took effect. Nevertheless, Prudential's argument against applying the time limit rests upon its assertion that plaintiffs were solely responsible for any delays or impediments. It is evident from the record that these depositions were contentious. After hearing oral argument and reviewing the parties' submissions, the Magistrate Judge concluded that both sides were to blame for any breakdown in the depositions. Prudential has not shown that this determination is clearly erroneous or contrary to law. Assigning blame in such circumstances is never a clear cut task, and the Magistrate Judge made a reasonable determination based on the evidence presented to him. Even if this Court would reach a different conclusion upon a *de novo* review of the evidence, it would not change the Court's conclusion that the Magistrate Judge's Order was not clearly erroneous or contrary to law. Therefore, the Order is affirmed.

> FN1. Prudential moves to strike some of the materials that plaintiffs submitted with its papers on appeal of the Magistrate Judge's Order. Prudential argues that these must be excluded because they were not submitted to the Magistrate Judge and therefore violate Local Rules 72.1(g)(9) and (g)(11). As plaintiffs note, these rules do not apply to appeals of non-dispositive motions, but govern appeals to the district court of proceedings by consent before a Magistrate Judge. The Court finds that Prudential suffers no prejudice from the submission of these materials, and their submission does not violate Local Rule 72.1(b), which governs this appeal. Therefore, Prudential's motion to strike is denied.

ORDER

*3 Based on the foregoing, all the records, files, and proceedings herein, IT IS HEREBY ORDERED that:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21293757 (D.Minn.)
(Cite as: 2003 WL 21293757 (D.Minn.))

Page 3

1. Plaintiff's appeal [Civil Case No. 99-1421, Docket No. 123; Civil Case No. 99-1422, Docket No. 104; Civil Case No. 99-1736, Docket No. 71] and defendant's appeal [Civil Case No. 99-1421, Docket No. 121; Civil Case No. 99-1422, Docket No. 102] are DENIED.

2. The Magistrate Judge's Order dated February 12, 2002 denying plaintiffs' motion to compel the depositions and denying defendant's motion to Appoint a Special Master, Issue Rules of Conduct, and Compel Plaintiffs to Appear for the Continuation of their Depositions [Civil Case No. 99-1421, Docket No. 109; Civil Case No. 99-1422, Docket No. 92; Civil Case No. 99-1736, Docket No. 63] is AFFIRMED.

2. Defendant's Letter/Motion to Strike the Affidavit of Theresa Freeman [Civil Case No. 99-1421, Docket No. 141; Civil Case No. 99-1422, Docket No. 122] is DENIED.

2003 WL 21293757 (D.Minn.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.
1993 WL 364471 (S.D.N.Y.)
(Cite as: 1993 WL 364471 (S.D.N.Y.))

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
CONSOLIDATED RAIL CORPORATION,
Plaintiff,
v.
PRIMARY INDUSTRIES CORPORATION,
Defendant.
CONSOLIDATED RAIL CORPORATION,
Plaintiff,
v.
PRIMARY COAL, INC., Defendant.
Nos. 92 Civ. 4927 (PNL), 92 Civ. 6313 (PNL).

Sept. 10, 1993.

MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

*1 The plaintiff in these related actions, Consolidated Rail Corporation ("Conrail"), has moved for a protective order precluding certain depositions and directing that others be conducted in Philadelphia, Pennsylvania. The defendants, Primary Industries Corp. and Primary Coal, Inc. (collectively referred to as "Primary"), have cross-moved for an order compelling discovery responses and extending the deadline for completion of discovery. Each of these issues will be addressed in turn.

*Background*

Conrail, a common carrier, seeks to recover freight charges that it contends are owed by Primary, a coal producer. Primary has counterclaimed, asserting that it suffered damages when Conrail wrongfully closed its port facility at Philadelphia and diverted its coal traffic to Baltimore. Conrail has filed a motion for summary judgment on statute of limitations grounds which is currently pending.

*Discussion*

A. *Executive Officer Depositions*

Primary has served a notice for the deposition of ten Conrail employees. Conrail has agreed to produce seven of these witnesses, but has moved for a protective order precluding the depositions of three others: James Hagan, Chairman, President, and Chief Executive Officer of Conrail; Robert Swert, Vice President of Labor Relations; and David LeVan, Senior Vice President of Operations. Each of these individuals has submitted an affidavit attesting that he has no personal knowledge of the facts underlying the claims and counterclaims in these cases except for what he may have learned from other Conrail employees.

Highly-placed executives are not immune from discovery. "[T]he fact that the witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *CBS, Inc. v. Ahern,* 102 F.R.D. 820, 822 (S.D.N.Y.1984) (citation omitted). Moreover, a claim that the witness lacks knowledge is subject to testing by the examining party. *See Amherst Leasing Corp. v. Emhart Corp.,* 65 F.R.D. 121, 122 (D.Conn.1974).

At the same time, permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation. Accordingly, where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed executive. *See CBS,* 102 F.R.D. at 822 n. 2; *Amherst,* 65 F.R.D. at 123.

Given these considerations, it is appropriate in these cases to defer any live depositions of the three named executives until it has been demonstrated that they have some unique knowledge pertinent to the issues in these cases. Primary may seek to establish such a foundation through Rule 31 depositions upon written questions of these executives as well as through the deposition testimony of other witnesses. Until such a showing has been made, however, these three individuals shall not be deposed in person.

B. *Site of Depositions*

Conrail next contends that the depositions of its seven remaining witnesses should be held in Philadelphia, where Conrail's headquarters are located, rather than in New York, as the deposition

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1993 WL 364471 (S.D.N.Y.)
(Cite as: 1993 WL 364471 (S.D.N.Y.))

Page 2

notice indicates.

*2 This request has merit.  It is far more efficient to require Primary's counsel to travel to Philadelphia than it is to require Conrail's attorney and seven witnesses to come to New York.  *See Huynh v. Werke*, 90 F.R.D. 447, 449 (S.D.Ohio 1981). Moreover, it is possible that documents available in Conrail's offices but not previously disclosed in discovery will be necessary for the depositions.

Accordingly, the depositions of Conrail's employees shall be taken in Philadelphia.  Since Conrail, as the plaintiff, would normally be expected to produce its witnesses for deposition in the forum district, it shall initially bear the costs of conducting the depositions in Philadelphia, including the travel and accommodation expenses of Primary's counsel, as well as his reasonable attorney's fees. *See id.;* local civil rule 15.  These costs shall ultimately be taxed against the losing party at the conclusion of the litigation.

*C. Document Requests*

In its cross-motion, Primary seeks to compel production of a variety of documents primarily related to the reasons that Conrail closed its Philadelphia facility.   Such documents are of doubtful relevance to any issue in the cases and are clearly not pertinent to Conrail's pending summary judgment motion. Since the request for this discovery will be moot if the summary judgment motion is granted, the motion to compel is denied without prejudice to renewing it after the dispositive motion is decided.

*D. Discovery Schedule*

Finally, Primary seeks an extension of the discovery deadline.   Because of the pending summary judgment motion, the parties may decide to defer some discovery until the motion is decided.   The discovery deadline shall therefore be held in abeyance until the motion for summary judgment has been determined.

SO ORDERED.

1993 WL 364471 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

· 1:92CV06313 _____ (Docket) (Aug. 20, 1992)

· 1:92CV04927 _____ (Docket) (Jul. 02, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

Page 1

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Anne DESMETH, Curator of Dikarpa N.V.S.A., et.
al., Plaintiffs,
v.
SAMSUNG AMERICA, INC. and NADJA
INTERNATIONAL TRADING CORP., Defendants.
No. 92 CIV. 3710(LBS)RLE.

Feb. 20, 1998.

OPINION & ORDER

ELLIS, Magistrate J.

*1 This matter was referred to the undersigned by
Leonard B. Sand, U . S.D.J. for general pretrial
purposes on July 29, 1997.    Before the court is
plaintiffs' motion to compel discovery from
defendant, Samsung America, Inc.    [FN1]
Specifically, plaintiffs move pursuant to Federal
Rules of Civil Procedure 26, 33, 34 and 37 for an
order: (1) compelling Samsung America to answer
interrogatories and to produce documents in response
to requests propounded by plaintiffs; (2) requiring
that Samsung America supplement its responses to all
discovery requests propounded to date by plaintiffs to
include documents within the possession, custody or
control of Samsung Corporation Group [FN2] and its
Korean subsidiary Samsung Company Limited
[FN3], and to include information available to those
entities   [FN4];   (3) striking the objections of
Samsung America to said interrogatories and requests
for production of documents;  (4) requiring Samsung
America to produce full, unredacted copies of
documents that it has produced in redacted form; (5)
requiring Samsung America to supplement its
responses to discovery requests to include
modifications thereto made by its attorneys in
correspondence; and (6) requiring Samsung America
to pay plaintiffs' expenses of this motion, including
attorneys' fees.

> FN1. Hereinafter referred to as "Samsung
> America."

> FN2. Hereinafter referred to as "Samsung
> Corp."

> FN3. Hereinafter referred to as "Samsung
> Co. Ltd."

> FN4. Samsung America and Samsung Co.
> Ltd. are fully owned subsidiaries of the
> Samsung Corp., which is headquartered in
> Seoul, Korea.   Samsung Co. Ltd. and the
> Samsung Corp. are collectively referred to
> as "Samsung Korea."

For the reasons set forth below, the motion is
GRANTED, IN PART, with instructions to proceed
in accordance with this opinion.

I. BACKGROUND

In this action, plaintiffs, collectively Dikarpa
N.V.S.A.   [FN5],   a company in bankruptcy
liquidation pursuant to Belgian law, Henri Karp and
Myriam Karp-Majer, seek to recover damages based
upon the alleged breach of the February 2, 1989
agreement   [FN6] for the purchase of leather
garments manufactured by Dikarpa, breach of certain
royalty agreements and alleged acts of fraud against
the plaintiffs.     Plaintiffs allege that Samsung
America is liable for damages because of the nature
of its relationship with Nadja International Trading
Corporation   [FN7], the company with which
Dikarpa contracted for the sale and distribution of
leather garments . [FN8] Establishing a longstanding
and involved relationship between the various entities
of Samsung America, the Samsung Korea entities
and Nadja is a central component of plaintiffs' motion
to compel discovery.

> FN5. Hereinafter referred to as "Dikarpa."

> FN6. Hereinafter referred to as "the 1989
> agreement."

> FN7. Hereinafter referred to as "Nadja."

> FN8. Default judgment was entered against
> Nadja as to all claims in the amended
> complaint on the issue of liability on June
> 20, 1996.

Samsung America has maintained that it is not liable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

Page 2

to the plaintiffs because it was not a party to the agreement between Dikarpa and Nadja. Samsung America maintains that its role was solely that of Nadja's financier. However, plaintiffs allege that discovery to date has revealed, that Nadja and Samsung America were actually joint venturers or partners, and that they acted together in damaging the interests of Dikarpa.

A second major component of this motion is establishing the close relationship between Samsung America and its parent entity, Samsung Corp., as well as other Korean affiliates, such as Samsung Co. Ltd. This nexus is the basis upon which Dikarpa seeks the production of documents from Samsung Korea by serving Samsung America in this action.

## II. DISCUSSION
### A. Outstanding Discovery

**\*2** Plaintiffs allege that many responses to interrogatories and document requests propounded to the defendant Samsung America are incomplete. The first set of interrogatories and requests for production of documents was served on June 30, 1995. Procedural Declaration of Plaintiffs' Attorney Ted G. Semaya, ¶ 3. [FN9] Several adjournments were agreed to through 1995, during which time Jaffe & Asher, who had been representing both Samsung America and Nadja, withdrew as counsel. Further agreements were made with Coudert Brothers, counsel presently representing Samsung America. Proc. Decl. ¶ ¶ 6- 10; Declaration of Ted G. Semaya executed May 22, 1997, ¶ 5. [FN10] Since the time this motion was noticed, Samsung America claims it has produced documents and supplemented answers to interrogatories. Declaration of Samsung Attorney Richard A. DePalma executed on June 25, 1997, ¶ 21. [FN11] Samsung America does not dispute that its first responses to plaintiffs' first set of interrogatories were served on February 23, 1996, several weeks after February. 8, 1996, the last date either represented by Samsung America or agreed to by plaintiffs. Nor does Samsung America contest that documents were not produced until April 19, 1996, two months later still. Semaya Decl., ¶ 6. While Samsung America has represented that no documents were withheld on the basis of privilege or confidentiality, DePalma Decl. ¶ 10, it has in fact asserted one or both of these grounds in response to various discovery requests. *See* DePalma Decl., Exhs. D, E & F.

FN9. Hereinafter referred to as "Proc. Decl."

FN10. Hereinafter referred to as "Semaya Decl."

FN11. Hereinafter referred to as "DePalma Decl."

In responding to this motion, Samsung America has grouped the requests to which it continues to object into three broad categories:
1. Documents in the care, custody and control of non-party Samsung-Korea;
2. Documents and information regarding business transactions between Samsung America and Nadja which are wholly unrelated to the business that Nadja did with plaintiffs; and
3. Documents and information regarding Samsung America's business which are wholly unrelated to the business that Samsung America did with Nadja. Defendant Memorandum of Law in Opposition to Plaintiffs' Motion to Compel at 2. [FN12] However, these categories as defined by Samsung America are conclusory, in that they suggest that the responses sought are wholly unrelated to the instant action. This court finds Samsung's characterizations of the requests erroneous, and finds that the documents, when properly defined, are discoverable.

FN12. Hereinafter referred to as "Opp. Mem."

The first category of disputed discovery consists of requests of the Samsung Korea entities regarding any transactions with Nadja (or other companies which Lucien Padawer, Nadja's President was the principal operator), and/or Dikarpa related to this action. [FN13] This would include correspondence between any or all of the parties to this action.

FN13. Companies for which Padawer acted as the principle operator are hereinafter referred to as "Padawer related companies/entities."

The second category of disputed discovery includes requests of Samsung America regarding its relationship over many years with Nadja, Padawer, and other Padawer related companies in order to discern the extent of their relationship in the instant action. This category of discovery bears on the disputed issue of Samsung America's liability in this case.

**\*3** The third disputed discovery category consists of requests geared toward illuminating the extent of the alleged knockoffs of Dikarpa styles, alleged to have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

been produced by Samsung America, Nadja and/or Samsung Korea during and after the period in which the 1989 agreement between Nadja and Dikarpa was in effect. [FN14] This category would include any documents in the custody of the Samsung Korea entities. Since the basis for this action is the alleged breach of the 1989 agreement, the issue of knockoffs may bear directly on a motive for the breach.

> FN14. Dikarpa alleges that discovery has revealed that Nadja and Samsung America sold more Dikarpa styles to retail stores than they actually accepted from Dikarpa pursuant to the 1989 agreement. Dikarpa was the only authorized manufacturer of its leather garments. Discovery has revealed that garments allegedly manufactured elsewhere were labeled and sold as Dikarpa styles.

Under the Federal Rules of Civil Procedure, the scope of discovery extends to "any matter not privileged which is relevant to the subject matter in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party..." Fed.R.Civ.P. 26. The phrase "relevant to the subject matter involved in the pending action" has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978).* The party receiving a request must not only produce information which is admissible as evidence, but also information which "appears reasonably calculated to lead to the discovery of admissible evidence." *Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, 300 (S.D.N.Y.1991).* "Reasonably calculated" in Rule 26 means "any possibility that the information sought may be relevant to the subject matter of the action." *Morse/Diesel, Inc. v. Fidelity & Deposit Co.,* 122 F.R.D. 477, 449 (S.D.N.Y.1988). The contents of the discovery sought by the plaintiffs meets the liberal standard of Rule 26 and must be produced.

B. The Nadja/Samsung Relationship

Samsung America contends that its involvement with Nadja was only that of financier for the purchase of leather garments per the 1989 agreement with Dikarpa. Samsung America has therefore limited its discovery responses to documents and information related to its financing agreement with Nadja as

Samsung America perceives they relate to the 1989 agreement. However, a key issue in this action is the general nature of the relationship between Samsung America and Nadja. It bears on the basic, disputed issue of whether Samsung America can be held liable on the claims against it in this action. Plaintiffs allege that discovery thus far has disclosed that a primary function of Nadja was to be a joint venturer or partner with Samsung America to do business with Dikarpa. Plaintiffs allege that Dikarpa's entire experience with the defendants, Nadja and Samsung America, is the subject of this action.

Plaintiffs further allege that discovery has revealed that Nadja was only the latest of several companies owned and controlled by Lucien Padawer, Nadja's president, that had entered into agreements with and done business with Samsung America and Samsung Korea for many years. Semaya Decl., ¶ 22. A document executed by these companies near the time of the apparent conclusion of their relationship, a "Settlement and Release Agreement," defined the "Samsung Releasees" to include Samsung America and Samsung Co. Ltd ., and define the "Padawer Releasees" to include "Padawer, Foxrun, Tiger Fox, Jadine, Nadja and Nadja II." Semaya Decl., Exh. 5. Plaintiffs seek further discovery to determine the extent and complexity of the relationship between these companies, in order to hold Samsung America liable on the 1989 agreement.

*4 Samsung America has been doing business with Lucien Padawer, Nadja's President, since as early as 1982, and with Samsung-Korea since the 1970's. Declaration of Henri Karp executed on July 24, 1997, ¶ 4; [FN15] Reply Declaration of Ted G. Semaya, executed on July 28, 1997, ¶ 7. [FN16] Information regarding the relationship of the Padawer entities in the years prior to the 1989 agreement may provide a clearer picture of the true extent of the relationship between Nadja and Samsung America in this action. Henri Karp, Dikarpa's principal, claims that Padawer represented to him throughout their negotiations that Nadja and Samsung America were partners or joint venturers. *See* Semaya Decl. ¶ ¶ 35-46.

> FN15. Hereinafter referred to as "Karp Decl."

> FN16. Hereinafter referred to as "Semaya Reply Decl."

While this motion was pending, plaintiffs' attorney came across copies of some documents that were in the custody of Nadja's present attorney. Plaintiffs'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

Page 4

attorney supplemented this motion with some of these newly discovered documents in an attempt to strengthen Dikarpa's argument that Samsung America had withheld documents responsive to discovery requests. In response, S.K. Lee, who asserts that he was personally responsible for directing the search of documents relative to Samsung America's production of documents to plaintiffs in this case claims he is "able to say that I do not recall ever seeing, prior to production by Mr. Semaya, the documents marked as Exhibits 1(C), (D), (E), (F), (G), (H), & (I) ... None of these documents were contained in any of the Samsung files I located during my search relative to plaintiffs' document requests in this case." Declaration of S.K. Lee, executed on January 14, 1998, ¶ ¶ 1, 11. [FN17]; *See also* Supplemental Declaration of Ted G. Semaya, executed on December 18, 1997, Exhs. C-I. [FN18] Lee further asserts that he "personally conducted a reasonable search of Samsung's files for documents responsive to plaintiffs' discovery requests." Also that he "caused Samsung employees to make reasonable searches for all documents responsive to plaintiffs requests." Supp. Lee Decl., ¶ 4. While Lee protests, "[q]uite simply, the documents marked as Exhibits 1(C), (D), (E), (F), (G), (H), & (I) to Mr. Semaya's Declaration have not been found in any of Samsung files we have located to date, " he goes on to assert that "Samsung has made clear at all times that it objects to producing certain categories of documents which it believes has no bearing on the issues in this case." *Id.* at ¶ ¶ 25, 26.

> FN17. Hereinafter referred to as "Supp. Lee Decl."

> FN18. Hereinafter referred to as "Supp. Semaya Decl."

In support of their position, plaintiffs submit letters addressed to J.S. Lee, H.J. Kang, and Bruce Bloom at Samsung America from the accounting firm of Rashba & Pokart. Supp. Semaya Decl., Exh. C & D. These letters were written during the period of the 1989 agreement and allude to a "joint venture" between Samsung America and Nadja. Also included is a fax, on Samsung America letterhead, from J.S. Lee at Samsung America in New York to Padawer regarding the work done by the accounting firm on behalf of their joint venture. *Id.* at Exh. E. Lee does not challenge the authenticity of any of these newly discovered documents. *See* Supp. Lee Decl., ¶ ¶ 18-22. His assertion, therefore, that these documents were unknown to him is highly suspect.

*5 Samsung America asserts that while Nadja was continuously referred to either in terms of a "joint venture" or as a "division of Samsung America," these terms carried no legal significance. Supp. Lee Decl., ¶ 8. Lee further asserts that since the documents were recovered by Dikarpa from Nadja's attorney, it was Nadja's and not Samsung America's responsibility to produce them to the plaintiffs. This assertion lacks merit. There is simply no authority under the rules of discovery to withhold responsive documents within a party's custody or control, claiming that someone else should have produced them.

Discovery thus far has revealed that Samsung America kept accounts for Nadja and Foxrun, a Padawer related company. The entities shared offices, facilities and employees. Samsung America maintained Nadja and Foxrun accounts on its computer system, and analyzed the consolidated budgets of Nadja and Foxrun, and before that, for Tiger Fox and Foxrun. Semaya Decl. ¶ 30, Exhs. 17, 18. All of this evidence compels the further production of documents and information related to Samsung America and Nadja's business dealings both before and during the time the 1989 agreement was in effect.

1. The Financing Agreement

Samsung America and Nadja entered into a financing agreement for the purchase of the leather garments from Dikarpa in 1989 and 1990. Semaya Decl., Exh. 4. The agreements contain import financing arrangements, whereby Samsung America would take delivery of the leather clothing and remit payment to Dikarpa upon delivery. Samsung America, however, claims that it did not know of the February 1989 agreement between Dikarpa and Nadja until discovery in the instant case. Lee aff. ¶ 26. The documentary evidence contradicts this assertion. For example, in May of 1989 Samsung America, through Marvin Winston, then Vice President of Samsung America's Textile Division, corresponded directly to Karp regarding shipment dates and letter of credit. Karp Decl., Exh. 3. A letter of credit was issued from Korea Exchange Bank by Samsung America in February 1989 to the order of Dikarpa. *Id.,* Exh. 4. A July 7, 1989 letter of credit describes Nadja as a "div [sic] of Samsung America." *Id.* Exh. 12. There are two shipping invoices from Dikarpa to Samsung America dated May 2, 1989 and March 15, 1990. *Id.,* Exh. 10. Samsung America even admits that it opened an irrevocable letter of credit to the order of Dikarpa at the request of Nadja

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

for purchases pursuant to the 1989 agreement. *See* Lee Aff., ¶ 31. The court concludes that Samsung America's assertion that it knew nothing about the 1989 agreement until discovery is not credible.

Samsung America further claims that it never communicated with Dikarpa directly regarding any *transactions pursuant to the 1989 agreement.* Lee aff. ¶ ¶ 29, 30. However, Samsung America was invoiced for royalties payable to Dikarpa, pursuant to the 1989 agreement. Karp Decl., Exh. 11. Discovery has disclosed correspondence from Dikarpa to Samsung America regarding the late opening of the letter of credit scheduled for November 15, 1989. *Id.,* Exh. 13. There are several faxes from Y.S. Lee of Samsung America to Karp regarding problems with the letter of credit. *Id.,* Exh. 14,15. Again, Samsung America's own documents demonstrate their claim to be untrue.

*6 Though not explicit, the agreements bear some earmarks of joint venture agreements. Under New York law, a joint venture is an informal partnership among two or more persons for a limited purpose. The legal consequences of a joint venture are tantamount to those of a partnership. *See Gramercy Equities v. Dumont,* 72 N.Y.2d 560, 565, 534 N.Y.S.2d 908, 531 N.E.2d 629 (1988); *Sherrier v. Richard,* 564 F.Supp. 448 (S.D.N.Y.1983). In determining when a joint venture exists, the court has considered these factors: (1) the intent of the parties to form a joint enterprise; (2) joint control of management and business; (3) sharing profits and losses; and (4) a combination of property, skill or knowledge. *Union Carbide Corp. v. Montell N.V.,* 944 F.Supp. 1119, 1132 (S.D.N.Y.1996) (quoting *Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 700 F.Supp. 127, 138 (S.D.N.Y.1988)).

The relationship of Samsung America to Nadja seems closer to that of a partner or joint venturer than simply to that of a financier. The companies shared profits and losses. Semaya Decl. ¶ 46, Exh. 24, ¶ 12; Semaya Reply Decl., ¶ 8. The companies shared joint control and management of business records and required joint agreement for delivery of garments to customers. Semaya Reply Decl., ¶ 13(b). Samsung referred to Nadja as a "Division of Samsung America." Karp Decl. ¶ 12. Nadja was also referred to as a "section within the Textile Department," and as a "Profit Center 98" in a document generated by Samsung America. Semaya Reply Decl. ¶ 13(c), Exh. 6.

Samsung points to a clause in the 1989 Financing

Agreement between Samsung America and Nadja which provides:

> It is expressly agreed and understood by both parties that [Nadja] shall not be granted any right or authority to assume or to create any obligation or duty, express or implied, on behalf of or in the name of Samsung or to bind Samsung in any manner whatsoever. Nothing herein shall be construed to place Samsung and [Nadja] in a relationship of partners, joint venture[rs] or principal agent.

Semaya Decl., Exh. 4, ¶ 26. However, this paragraph is not determinative on the partnership issue. Statements that no partnership is intended are not conclusive. If as a whole a contract contemplates an association of two or more persons to carry on as co-owners of a business for profit, a partnership exists. *Union Carbide,* 944 F.Supp. at 1132. Additionally, such a clause is of no effect with regard to liability to a third party, such as Dikarpa, which had no notice of the existence of the clause. *See Royal Bank v. Weintraub, Gold & Alper,* 68 N.Y.2d 124, 128, 506 N.Y.S.2d 151, 497 N.E.2d 289 (1986) (acts of a partner in apparently carrying on the partnership business in the usual way are binding on the partnership business unless that partner has no authority to act, and the person dealing with that partner knows that fact.).

### 2. Knockoffs

Plaintiffs allege that they have learned through discovery that defendants engaged in the *unauthorized manufacture of Dikarpa-style garments* without payment of commission for such production or compliance with any of the provisions of the 1989 agreement. *See* Semaya Decl. ¶ ¶ 48-54. Samsung America has resisted nearly all discovery requests addressed to this knockoff issue, usually objecting to the information as irrelevant or burdensome. *See* Opp. Mem. at 19-20. Given the abundance of documentary evidence which points to such unauthorized manufacture by the defendants and the likelihood that such production could reveal a motive for the breach of contracts at issue in this litigation, the court finds this category of documents discoverable, despite their potential volume.

*7 The interaction among Samsung America, Samsung Korea and Nadja related to the unauthorized manufacture of Dikarpa styles is critical to the analysis of whether the defendants acted to the detriment of Dikarpa. Pursuant to the 1989 agreement, Nadja was to be the sole distributor of Dikarpa leather garments in North America. Dikarpa

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

had production factories in Belgium, Turkey and Portugal. While Nadja did have the right to produce Dikarpa styles elsewhere, it had to receive prior approval from Dikarpa. Semaya Decl., Exh. 23 (the 1989 Agreement). Dikarpa claims that many garments were produced and sold without its knowledge or approval. Plaintiffs have discovered invoices, not produced by Samsung America, which reveal that garments labeled "Casual Leather Games," a Dikarpa trademark, were scheduled for delivery to "Foxrun/Samsung" in New York by June 30, 1989. Supplemental Reply Declaration of Ted Semaya, executed on January 20, 1998, Exh. 3. [FN19] These garments were to be shipped from the Republic of Korea. *See* Declaration of Jennifer Dowd, executed on January 20, 1998, ¶ 3. Without the knowledge and approval of Dikarpa, such a scenario would be impossible under the 1989 agreement, which was in full force at the time, since Dikarpa had no factories in the Republic of Korea. Under the agreement, Nadja received specifications of all Dikarpa styles shipped to Nadja and Samsung America. Samples of the garments were also sent to Nadja and Samsung America. Plaintiffs allege that Nadja and/or Samsung America provided these garment specifications to Samsung Korea to create inferior quality knockoffs. Semaya Decl., ¶ 51. Plaintiffs believe that Samsung Korea was producing much, and possibly all, of the garments ordered pursuant to the agreement. *See* Memorandum in Support of this Motion at 24-25.

FN19. Hereinafter referred to as "Supp. Semaya Reply Decl."

Documents produced by Samsung America reveal that in May 1989, it sold to Limited Stores 15,000 garments of a Dikarpa style named "Wellington" into which it placed labels identifying the garments as genuine Dikarpa garments. Semaya Decl. ¶¶ 49-50, Exh. 25. Nadja had agreed to purchase 40,000 units of Wellington, but ultimately took delivery of only 10,500. Semaya Decl. ¶ 49. Plaintiffs allege that the discrepancy between the number of garments actually purchased from Dikarpa and those sold to Limited Stores was filled with knockoffs produced by Samsung Korea. During his deposition, Padawer admitted a production of Dikarpa-style garments by Samsung Korea, on the order of Samsung America, into which Foxrun labels were placed, and which were sold to Macy's in the United States. Semaya Decl. ¶ 53. Samsung America also produced a Samsung Co. Ltd. garment production schedule disclosing production by Samsung Korea of at least another 27,500 pieces of Wellington, plus substantial

amounts of other Dikarpa styles. Semaya Decl. ¶ 54, Exh. 26. Dikarpa claims all of these productions were unauthorized.

This evidence warrants further investigation of Nadja, Samsung America and Samsung Korea's alleged production of knockoffs. Not only would such unauthorized production violate the 1989 agreement, but may also provide a motive for breach of the agreement, specifically the rejection of Dikarpa garments upon delivery to Samsung America. Samsung America's attempt to limit its responses by limiting document production to information regarding Dikarpa is clearly intended to skirt the very discovery intended by the plaintiffs.

*8 While Dikarpa has made specific requests for invoices and other documents related to sales and shipment of garments from various transactions which came to light in previous discovery, they may also inquire into other transactions which they do not know about. Since Dikarpa is unaware of the extent of the alleged knockoff production and Samsung America has limited discovery to only garments manufactured by Dikarpa, Samsung America should produce all relevant documents regarding unauthorized production of Dikarpa garments from 1989 to the present.

C. Objections

Samsung America has interposed various general objections to production of documents. It asserts that the discovery requests (1) seek confidential information, (2) are not relevant, or (3) are overly broad and burdensome. In addition it limits the temporal scope of its responses to the years 1989 to 1992. None of these positions have merit.

It is unclear what supplemental discovery, if any, took place between the parties since the filing of this motion. Some of Samsung America's responses seem to indicate that documents were turned over even though Samsung America objected to their production. For example, regarding request number 60 of Plaintiffs' Second Request for Production of Documents, the exchange between the parties is as follows:

Request # 60:
All letters of credit and all confirmations thereof concerning garments purchased by Samsung[-]America, Nadja or Foxrun, or any of them.

Response:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

Page 7

Samsung objects to this request on the grounds that it seeks confidential information. Samsung further objects to this request on the grounds that it seeks information and documents neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Samsung further objects to this request on the grounds that it is overly broad and unduly burdensome.

Request to Supplement:

This request seeking letters of credit and confirmations concerning garments purchased by Samsung America, Nadja or Foxrun is relevant to the issue of knock [[[-]]offs of the Dikarpa-style garments as discussed above and also relevant to the issue of the course of dealing in which these entities generally engaged in the use of letters of credit for the purchase of garments, which bears directly on the dispute between defendants and plaintiffs regarding the terms of the purchase agreements and related letters of credit at issue in this action.

Response to Request to Supplement:

You have Samsung's response.

Semaya Decl., Exh. 30 at 22.

In responding to the instant motion, Samsung America supplements its response only by adding:

Subject to and without waiving any General or Specific Objections, to the extent that Request No. 60 seeks information relating to Dikarpa, Samsung has produced all responsive documents in its care, custody or control. Samsung has not withheld any documents on the basis of privilege or confidentiality.

DePalma Decl., Exh. E at 18. It is unclear when, if ever, such responsive production took place. It is equally unclear whether by its response Samsung America means to indicate that it has withheld responsive documents based on its own definition of relevance. If in fact Samsung America has produced documents responsive to requests, Samsung America should create a log of such documents with their Bates numbers. Samsung America may not limit the scope of its responses to information related only to Dikarpa. Such limitation foils the production of the very documents intended by the requests. Any information regarding the relationship between Samsung America and any Padawer related entity--previous to, during, or after its involvement with Dikarpa--is relevant to the issue of Samsung America's liability in this case, particularly as such information relates to alleged unauthorized manufacture and sale of Dikarpa styles.

\*9 The asserted confidentiality of relevant business records is not a proper basis for refusing production. See generally In re Agent Orange Product Liability Litigation, 821 F.2d 139 (2d Cir.1987). The parties could have entered into a stipulation of confidentiality, with the burden on Samsung America, the party claiming confidentiality, to establish good cause for such treatment in accordance with Rule 26(c) of the Federal Rules of Civil Procedure. See Litton Industries v. Lehman Bros. Kuhn Loeb Inc., 122 F.R.D. 433, 436 (S.D.N.Y.1988). Similarly, any assertions of privilege should have been accompanied by a schedule of the withheld documents, detailing the grounds of privilege asserted for each document or refusal to respond. Having done neither, Samsung America must now produce the requested information or documents. Furthermore, given the liberal discovery rules, relevance is rarely a legitimate basis to withhold discovery. Samsung America has not provided any details regarding its burdensomeness objection, thus the court will not address these objections.

D. The Parent/Subsidiary Relationship

Rule 34 (a) of the Federal Rules of Civil Procedure provides that a party may serve a request for the production of documents that are in the possession, custody or control of the party upon whom the request is served. A party seeking the production bears the burden of establishing control. Camden Iron & Metal v. Marubeni America Corp., 138 F.R.D. 438, 441 (D.N.J.1991).

In parent/subsidiary situations, the determination of control turns upon whether the intracorporate relationship establishes some legal right, authority or ability to obtain requested documents on demand. Evidence considered by the courts includes the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operate as one, demonstrated access to documents in the ordinary course of business, and an agency relationship. Id. at 442.

Plaintiffs rely on Kossoff v. Samsung Company, Ltd., 123 N.Y. Misc.2d 177 (Sup.Ct.1984), in asserting that Samsung America and Samsung Korea have a sufficient nexus. In that case, the New York court held that it had jurisdiction over Samsung Company Limited based on evidence that Samsung Company Limited did business in New York through Samsung America. [FN20] Samsung America denies that there

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

Page 8

is a sufficient nexus and states conclusorily that it has no "legal right, authority or ability to obtain documents or other information from Samsung Corp.," and "it is important to note that the relationship between Samsung Corporation and Samsung America has changed dramatically in the nearly two decades since the evidence in *Kossoff* was produced by the parties." Further, it states, "[t]his court is looking at a far different company from the one *Kossoff* looked at many years ago." Lee Aff., ¶ ¶ 56-57, 59.

> FN20. Samsung Co. Ltd. is the predecessor company to the Samsung Corporation Group.

The facts, however, fail to denote any concrete difference between the relationship of Samsung Corp. and Samsung America at the time of the *Kossoff* case and now. Indeed, some of the alleged differences do not exist. For example, while Lee asserts that Samsung America and Samsung Corp. do not share any officers or employees, J.Y. Chung appears to be both Senior Vice President of Samsung America and *General Manager of Samsung Corp. Compare Lee* Aff., ¶ 48 *with* Semaya Decl., ¶ 23, Exh. 5. In addition, Lee never explains when or how the relationship between Samsung America and Samsung Corp. changed. Samsung Corp.'s most recent annual report and financial statement describe the structure of the company as "numerous companies under common management and control." Semaya Decl., Exh. 6. This language tracks that used by the *Kossoff* court in finding that Samsung Co., Ltd. was subject to the jurisdiction of the New York court. *See Kossoff, 123 Misc.2d at 178, 474 N.Y.S.2d 180.* This court finds *Kossoff* both persuasive and analogous to the present situation.

*10 In response to documents requests by the plaintiffs, Samsung America has produced documents that clearly came from Samsung Korea. *See* Semaya Decl., Exh. 26. These documents bear the letterhead of Samsung Co. Ltd. As evidenced by their production, such documents are in the actual possession of Samsung America.

It is unfathomable how Samsung America now asserts that it did not even know about the 1989 agreement until discovery in this case, since it was financing the payments for all of the purchases pursuant to the agreement, as well as took delivery of garments shipped directly from Dikarpa. Further, Samsung America and Nadja prevailed on Dikarpa to use Samsung Corp. as a supplier for materials such as

snaps, buttons and hanging tags for the garments that Dikarpa designed and manufactured for sale to Samsung America. Karp Decl., ¶ 17. During this period of time, Samsung Corp. and Nadja were allegedly negotiating a deal with Karp to take over a majority share of Dikarpa. *See* Semaya Decl., Exh. 2 (Complaint), ¶ ¶ 65-70.

Samsung America argues that control of documents can only be found in situations that warrant piercing the corporate veil. *Gerling Int'l. Ins. Co. v. Commissioner of Internal Revenue,* 839 F.2d 140 (3d Cir.1988); *Glaxo, Inc. v. Boehringer Ingelheim Corp., 1996 WL 710836 (D.Conn. Oct.8, 1996),* aff'd *1997 WL 355339 (Fed. Cir. Jan 4, 1997).* However, these cases clearly list additional alternate grounds where control can be established. They include, (1) where there is access to documents when the need arises in the ordinary course of business. *Glaxo,* at *3, *Camden Iron,* 138 F.R.D. at 442; and (2) where the subsidiary was the marketer and servicer of the parent's product in the United States. *Id.* Other court have found that the control analysis under Rule 34 of the Federal Rules of Civil Procedure does not require that a party have actual managerial power over the foreign corporation, but rather that there be close coordination between them. *Afros, S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127, 129 (D.Del.1986).*

There is much evidence contrary to Samsung America's claim that entities of Samsung Korea were not involved in the transactions between Padawer related companies and Dikarpa. Documents already produced by Samsung America in discovery originate from Samsung Korea. *See* Semaya Decl. Exh. 12, 15. Such a pragmatic approach, based upon common sense notions of control, is employed in many decisions in this area, rather than limiting the analysis to specific facts of preceding decisions. Samsung Corp. holds itself out as one of the world's largest companies comprised of 340 offices and facilities in 66 countries. Semaya reply Decl. ¶ 5, Exh. 1 (page from 1995 Samsung Annual Report). The Samsung companies may not hold themselves out as united for some purposes, but unconnected for others.

While maintaining that Samsung America was under no obligation to have done so, Lee states that he sent plaintiffs' discovery requests to Samsung Korea. He further states that Samsung Corp. has stated that it does not posses any documents or information responsive to plaintiffs' requests. Lee Aff. ¶ 55. Again, this assertion contradicts the documentary evidence discovered in this case thus far.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 9
1998 WL 74297 (S.D.N.Y.)
(Cite as: 1998 WL 74297 (S.D.N.Y.))

### III. CONCLUSION

**\*11** IT IS ORDERED that Samsung America reevaluate its discovery responses in view of this opinion, and produce every document responsive to the plaintiffs' discovery requests. Samsung America should also forward a copy of this opinion to the various Samsung Korea entities, along with copies of all discovery requests propounded by plaintiffs to date. Discovery responses and document production should include:

(1) any information and documents withheld on the basis of privilege, confidentiality, burdensomeness or relevance;

(2) documents and information in the possession, custody and control of Samsung Korea entities;

(3) documents and information regarding Samsung America's prior dealings with Nadja and other Padawer related companies, including information regarding suits brought against these companies resulting from their relationship; and

(4) documents and information related to manufacture of Dikarpa style garments, not manufactured by Dikarpa pursuant to the 1989 agreement, from 1989 to the present.

Samsung America should produce the discovery within 20 days of the date of this order. Plaintiffs should submit to the court, within 15 days of receipt of the defendants' responses, a summary report of any outstanding requests. The court will reserve the issue of fees and expenses until that time.

1998 WL 74297 (S.D.N.Y.)


**Motions, Pleadings and Filings (Back to top)**

1:92CV03710 _____ (Docket)
(May. 20, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant IBM on the 6th day of July, 2005 by U.S. Mail to:

David Marriott, Esq.
CRAVATH SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Donald Rosenberg, Esq.
1133 Westchester Avenue
White Plains, NY 10604

Todd Shaughnessy, Esq.
SNELL & WILMER LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, UT 84101-1004