**ORIGINAL**

FILED
U.S. DISTRICT COURT

2005 JUL -6  P 4: 27

DISTRICT OF UTAH

BY:_____
     DEPUTY CLERK

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>    Plaintiff/Counterclaim-Defendant<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff | **UNSEALED EXHIBITS TO MEMORANDUM IN SUPPORT OF SCO'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 15(a) AND 16(b)**<br>[Docket No. 323]<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

# EXHIBIT 1

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street
Suite 2800
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

*Attorneys for Plaintiff The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation, <br><br> Defendant. | **THIRD AMENDED COMPLAINT** <br><br> (Jury Trial Demanded) <br><br> Case No. 03-CV-0294 <br><br> Hon. Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

Plaintiff, The SCO Group, Inc., a Delaware corporation ("SCO"), sues Defendant International Business Machines Corporation ("IBM") and alleges as follows:

### Nature of This Action

1.    UNIX is a computer operating system program and related software and documentation originally developed by AT&T Bell Laboratories ("AT&T"). UNIX is widely used in the corporate, or "enterprise," computing environment.

2.    Through a series of corporate acquisitions, SCO presently owns all right, title and interest in and to UNIX and UnixWare operating system source code, software and sublicensing agreements, together with copyrights, additional licensing rights in and to UNIX and UnixWare, and claims against all parties breaching such agreements. Through agreements with UNIX vendors, SCO controls the right of all UNIX vendors to use and distribute UNIX. These restrictions on the use and distribution of UNIX are designed to protect the economic value of UNIX.

3.    A variant or clone of UNIX currently exists in the computer marketplace called "Linux." Linux is, in material part, based upon UNIX source code and methods.

4.    The UNIX software distribution vendors, such as IBM, are contractually and legally prohibited from giving away or disclosing proprietary UNIX source code and methods for external business purposes, such as contributions to Linux, or from otherwise using UNIX for the benefit of others. This prohibition extends to products that are modifications of, or derivative works based on, UNIX System V source code or technology.   IBM is violating this prohibition, *en masse*, as though no prohibition or proprietary restrictions exist at all with respect to the UNIX technology. As a result of IBM's wholesale disregard of its contractual and legal obligations to SCO, Linux 2.4.x

2

and 2.6.x and the development Linux kernel, 2.5.x, are replete with protected technology. As such, the Linux 2.4.x, Linux 2.5.x and 2.6.x kernels are unauthorized derivatives of UNIX System V.

5.  This case is not about the debate about the relative merits of proprietary versus open source software. Nor is this case about IBM's right to develop and promote open source software if it decides to do so in furtherance of its independent business objectives, so long as it does so without SCO's proprietary information. This case is, and is only, about the right of SCO not to have its proprietary software misappropriated and misused in violation of its written agreements and well-settled law.

6.  As set forth in more detail below, IBM has breached its obligations to SCO, induced and encouraged others to breach their obligations to SCO, interfered with SCO's business, and engaged in unfair competition with SCO, including by:

   a)  misusing UNIX software licensed by SCO to IBM and Sequent;

   b)  inducing, encouraging, and enabling others to misuse and misappropriate SCO's proprietary software; and

   c)  incorporating (and inducing, encouraging, and enabling others to incorporate) SCO's proprietary software into Linux open source software offerings.

7.  As a result of these breaches, SCO sent a notice of termination to Mr. Sam Palmisano, the Chief Executive Officer of IBM on March 6, 2003. The termination notice specified that, pursuant to SCO's contractual rights under controlling agreements, IBM's right to use or distribute any software product based on UNIX System V technology, including its own

3

version of UNIX known as "AIX," would be terminated on June 13, 2003, unless such breaches were reasonably cured prior to that time.

8.   The termination notice was based, in part, on IBM's publicly announced contributions of AIX source code to Linux, and use of UNIX/AIX methods for accelerating the development of Linux in contravention of IBM's contractual obligations to SCO.

9.   Pursuant to its rights under the controlling agreements, IBM was entitled to 100 days to cure its underlying contractual breaches, provided it was willing and able to do so. Both parties were contractually required to "exert their mutual good faith best efforts to resolve any alleged breach short of termination."

10.  To that end, SCO did everything reasonably in its power to exert a good faith effort to resolve the termination of IBM's UNIX contract rights. Conversely, during the 100-day period, IBM did not set forth a single proposal or idea for cure.

11.  SCO has therefore terminated IBM's right to use any part of the UNIX System V source code, including its derivative AIX, effective as of June 13, 2003 (the "AIX Termination Date").

12.  For similar reasons and following a similar process, SCO has terminated IBM's right to use any part of Dynix/ptx, also a derivative work of UNIX System V, which was developed under license with SCO, effective as of July 30, 2003 (the "Dynix/ptx Termination Date").

13.  As of the AIX Termination Date, IBM is contractually obligated to discontinue use of and return or destroy any and all copies of the Software Products defined in the controlling agreements, which include UNIX System V source code and all its derivatives, including AIX.

4

14.  As of the Dynix/ptx Termination Date, IBM is contractually obligated to discontinue use of and return or destroy any and all copies of the Software Products defined in the controlling agreements, which include UNIX System V source code and all its derivatives, including Dynix/ptx.

### Parties, Jurisdiction and Venue

15.  Plaintiff SCO is a Delaware corporation with its principal place of business in Utah County, State of Utah.

16.  Defendant IBM is a New York corporation with its principal place of business in the State of New York.

17.  Sequent Computer Systems, Inc. ("Sequent") was formerly an Oregon corporation that contracted with SCO's predecessor in interest, AT&T. Sequent was subsequently merged into IBM in a stock transaction.

18.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1332, 1338 and 1367. There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs, and the copyright claims arise under federal law.

19.  Venue is properly situated in this District pursuant to 28 U.S.C. §§ 1391 and 1400.

### Background Facts

The UNIX Operating System

20.  UNIX is a computer software operating system. Operating systems serve as the link between computer hardware and the various software programs ("applications") that run on the computer. Operating systems allow multiple software programs to run at the same

5

time and generally function as a "traffic control" system for the different software programs that run on a computer.

21. By way of example, in the personal computing market, Microsoft Windows is the best-known operating system. The Windows operating system was designed to operate on computer processors ("chips") built by Intel. Thus, Windows serves as the link between Intel-based processors and the various software applications that run on personal computers.

22. In the business computing environment for the Fortune 1000 and other large corporations (often called the "enterprise" environment), UNIX is widely used. As detailed below, before IBM's involvement in and improper contributions to Linux, Fortune 1000 companies were not using Linux for mission critical applications, such as wire transfers and satellite control systems. Linux, as an operating system, simply was incapable of performing such high level enterprise computing before IBM's improper contributions to Linux.

23. The UNIX operating system was originally developed by Dennis Ritchie, Ken Thompson and other software engineers at AT&T. After successful in-house use of the UNIX software, AT&T began to license UNIX as a commercial product for use in enterprise applications by other large companies.

24. Over the years, AT&T Technologies, Inc.("AT&T Technologies"), a wholly owned subsidiary of AT&T, and its related companies licensed UNIX for widespread enterprise use. IBM, Hewlett-Packard, Inc. ("HP"), Sun Microsystems, Inc. ("Sun"), Silicon Graphics, Inc. ("SGI") and Sequent became some of the principal United States-based UNIX licensees, among many others.

6

25. IBM, HP, Sun, SGI and the other major UNIX vendors each modified UNIX to operate on their own processors. Thus, for example, the operating system known as "HP-UX" is HP's version of UNIX. HP-UX is a modification of, and derivative work based on, UNIX System V source code.

26. Similarly, the operating system known as "Solaris" is Sun's version of UNIX. Solaris is a modification of, and derivative work based on, UNIX System V source code.

27. SGI's UNIX-based operating system is known as "IRIX." IRIX is a modification of, and derivative work based on, UNIX System V source code.

28. IBM's UNIX-based operating system is known as "AIX." AIX is a modification of, and derivative work based on, UNIX System V source code.

29. Sequent's UNIX-based operating system is known as "Dynix/ptx." Dynix/ptx is a modification of, and derivative work based on, UNIX System V source code.

30. The various identified versions of UNIX are sometimes referred to as UNIX "flavors." All commercial UNIX "flavors" in use today are modifications of, and derivative works based on, the UNIX System V Technology ("System V Technology").

31. SCO is the sole and exclusive owner of all Software and Sublicensing Agreements that control use, distribution and sublicensing of UNIX System V and all modifications thereof and derivative works based thereon. SCO is also the sole and exclusive owner of copyrights related to UNIX System V source code and documentation and peripheral code and systems related thereto.

32. During the 1990s the enterprise computing market for high-performance workstation computers came to be dominated by UNIX and the primary UNIX vendors identified above, each supplying its own version of the UNIX operating system based on UNIX

7

System V pursuant to the license agreements with SCO's predecessors in interest. UNIX became synonymous with "workstation" computers that typically operated on a RISC processing platform.

33. The RISC processing platform provides high-power computing capabilities at a relatively higher price for "workstation" computing. The alternative to "workstation" computing is commonly known as "desktop" computing on personal computers. The operating system market for "desktop" personal computers is dominated by Microsoft Corporation and its various Windows-based operating system products. The reason for this distinction is that most desktop computers (PCs) are designed to operate on Intel and Intel-compatible computing platforms. Most workstations are designed to operate on variants of RISC processing platforms and RISC-compatible computing platforms. PC systems and RISC systems are not hardware compatible with each other. Thus, most versions of UNIX will not operate on Intel-based PC's for desktop computing; and Windows will not operate on RISC-based workstations for enterprise computing.

34. Most of the primary UNIX vendors identified above did not attempt to develop a UNIX "flavor" to operate on an Intel-based processor chip set. This is because the earlier Intel processors were considered to have inadequate processing power for use in the more demanding enterprise market applications.

SCO's Creation of a Market for Intel – The Genesis of SCO OpenServer

35. As computers grew in popularity to perform business functions, the processing power of Intel-based processor chips also began to increase dramatically. Consistent with Intel founder Gordon Moore's prediction, computer chips remained inexpensive while exponentially increasing in power and performance.

8

36. Seeing this emerging trend, it became evident to SCO that Intel chips would gradually gain widespread acceptance for use in the enterprise marketplace.

37. Therefore, while other major UNIX vendors modified UNIX for their respective RISC-based computing platforms, SCO developed and licensed the UNIX-based operating system for Intel-based processors for enterprise use that is now known as "SCO OpenServer."

38. SCO's early engineers faced difficult design challenges in modifying UNIX for effective use on an Intel processing platform. The principal design constraint centered on the limited processing power the Intel chip possessed in the early 1980's. The Intel chip (designed as it was for personal computers) was not nearly as powerful as the enterprise RISC chips used by IBM, Sun, SGI and others in their respective UNIX offerings.

39. Despite the early design constraint of Intel's limited processing power, SCO was able to develop a version of UNIX for Intel PCs with full multi-processing and multi-user support as well as excellent reliability. A PC running SCO's OpenServer UNIX was a much more viable business application platform than the same PC running any available version of Windows. SCO found an appropriate enterprise market niche for the early versions of SCO OpenServer as a highly reliable platform for business critical applications such as point-of-sale control, inventory control and transactions processing. Intel systems running UNIX were fully capable of performing multi-user business applications and could do so at a much lower cost (and just as reliably) as the proprietary mini-computer hardware sold by other UNIX vendors, such as Sun and IBM.

40. One example of a customer well suited to the earlier version of SCO OpenServer software is McDonald's Corp. McDonald's has thousands of stores worldwide and needs

9

all stores to operate on an integrated computing platform for ease of use, immediate
access to information and uniformity. However, the actual computing requirements for
each individual McDonald's location are functionally simple—sales need to be tracked
and recorded, and inventory functions need to be linked to sales. SCO OpenServer
reliably fulfills McDonald's computing requirements at reduced cost.

41. SCO's business model for SCO OpenServer provides enterprise customers the reliability,
extensibility (ease of adding or changing functionality), scalability (ease of adding
processors or servers to increase processing power) and security of UNIX—but on
inexpensive Intel processor chips. This combination allowed customers to perform an
extremely high number of transactions and, at the same time, gather and present the
information from those transactions in an economical and useful way for enterprise
decision makers.

42. The simplicity and power of this "UNIX on Intel" business model helped SCO grow
rapidly. SCO gained other large enterprise customers such as CitiGroup, K-Mart,
Cendant, Target Stores, Texas Instruments, Walgreens, Merck, Sherwin Williams, Radio
Shack, Auto Zone, British Petroleum, Papa John's Pizza, Costco and many others.

43. As Intel's prominence grew in the enterprise computing market, SCO's early version of
OpenServer also grew into the operating system of choice for enterprise customers who
wanted an Intel-based computing solution for a high volume of repetitive computing
transactions.

44. SCO OpenServer is based on the original UNIX Software Code developed by AT&T, but
was modified by SCO for the functionality described above. Thus, while performing

10

single-function applications, SCO OpenServer did so, and continues to do so, with the 99.999% reliability of UNIX.

45. Over 4,000 separate applications have been written by developers around the world specifically for SCO OpenServer. Most of these applications are vertical applications for targeted functions, such as point-of-sale control for specific industries, inventory control for specific industries, and related functions.

SCO's Development of UnixWare on Intel

46. While the original SCO OpenServer operating system performs with all the reliability and dependability of other UNIX systems, it was originally designed for the initially low processing power of Intel chips. Therefore, SCO OpenServer does not offer the same level of multiprocessor capabilities that other flavors of UNIX offer.

47. During or about 1993, SCO's predecessor in interest, Novell, Inc. ("Novell"), acquired from AT&T all right, title and interest in and to the UNIX software code, the AT&T Software and Sublicensing Agreements, the copyrights and related and ancillary products. For branding purposes, Novell renamed UNIX as "UnixWare."

48. On or about September 19, 1995, The Santa Cruz Operation, Inc. acquired all right, title and interest in and to UNIX and UnixWare source code, the AT&T Software and Sublicensing Agreements, the copyrights, claims arising after the closing date against any party and all related and ancillary products and rights from Novell, excepting only the right to certain existing ongoing royalty payments which was retained by Novell.

49. From and after September 1995, SCO dedicated significant amounts of funding and a large number of UNIX software engineers, many of whom were original AT&T UNIX

11

software engineers, to upgrade UnixWare for high-performance computing on Intel processors.

50. By approximately 1998, SCO had completed the majority of this task. That is to say, UnixWare had largely been modified, tested and "enterprise hardened" to use Intel-based processors in competition against IBM and Power PC chips, the Sun SPARC chip and all other high-performance computing UNIX platforms for all complex computing demands. The term "enterprise hardened" means to assure that a software product is fully capable of performing under the rigorous demands of enterprise use.

51. SCO was ready to offer large enterprise customers high-end UNIX computing platforms based on inexpensive Intel processors. Given the rapid growth of Intel's performance capabilities and Intel's popularity in the marketplace, SCO found itself in a highly desirable market position. In addition, SCO still had its SCO OpenServer business for retail and inventory-targeted functions, with its 4,000 applications.

52. Prior to the events complained of in this action, SCO was the undisputed global leader in the design and distribution of commercial UNIX-based operating systems on Intel-based processing platforms.

Project Monterey

53. As SCO was poised and ready to expand its market and market share for UnixWare targeted to high-performance enterprise customers, IBM approached SCO to jointly develop a 64-bit UNIX-based operating system for a new 64-bit Intel platform. This joint development effort was widely known as Project Monterey.

54. At this point in time, IBM's UNIX expertise was centered on its own Power PC processor. IBM had little or no expertise on Intel processors.

12

55. SCO, on the other hand, had over 15 years of expertise in adapting UNIX to Intel based systems. Moreover, SCO had spent the previous 18 months working closely with Intel to adapt its existing UnixWare product to work on the new 64-bit Intel processor. That project, known as "Gemini-64," was well underway when work on Project Monterey was started. In furtherance of, and in reliance on, IBM's commitment to Project Monterey, which included IBM's commitment to SCO to create joint sales and marketing opportunities, SCO ceased work on the Gemini-64 Project and expended substantial amounts of money and dedicated a significant portion of SCO's development team to Project Monterey. Specifically, plaintiff and plaintiff's predecessor provided IBM engineers with valuable confidential information with respect to architecture, schematics, and design of UnixWare and the UNIX source code for both 32- and 64-bit Intel-based processors.

56. By about May 2001, all technical aspects of Project Monterey had been substantially completed. The only remaining tasks of Project Monterey involved marketing and branding tasks to be performed substantially by IBM.

57. On or about May 2001, IBM notified plaintiff that it refused to proceed with Project Monterey, and that IBM considered Project Monterey to be "dead."

The AT&T UNIX Agreements

58. AT&T Technologies originally licensed the UNIX operating system software code to hundreds of software licensees, including defendant IBM, for the UNIX operating system software source code, object code and related schematics, documentation, modifications and derivative works (collectively, the "UNIX Source Code"). To protect the confidential and proprietary source code information, these license agreements, as

13

detailed below, contained strict limitations on use and distribution of UNIX source and binary code.  These provisions prohibited licensees from copying or replacing UNIX source code in competing systems that would diminish the value of UNIX.

59.   When SCO acquired the UNIX assets from Novell in 1995, it acquired all right, title and interest in and to the UNIX operating system technology, including all claims against any parties relating to any right, property or asset used in the business of developing UNIX and UnixWare.  As a result of this acquisition, SCO became the authorized successor in interest to the original position of AT&T  with respect to all licensed UNIX software products.

60.   There are two primary types of software licensing agreements between AT&T Technologies and its various licensees:

      a.   The AT&T-related software agreements are collectively referred to hereinafter as the "AT&T UNIX Software Agreements."

      b.   The AT&T-related sublicensing agreements are collectively referred to hereinafter as the "AT&T UNIX Sublicensing Agreements."

The AT&T UNIX Software Agreements and the AT&T UNIX Sublicensing Agreements are sometimes collectively referred to hereinafter as the "AT&T UNIX Agreements."

61.   Plaintiff is successor in interest to, and owner of, all contractual rights arising from and related to the AT&T UNIX Agreements.

The IBM Related Agreements

62.   On February 1, 1985, AT&T and IBM entered into certain AT&T UNIX Agreements:

      a)   Software Agreement Number Soft-00015 ("AT&T / IBM Software Agreement" attached hereto and incorporated herein as Exhibit A);

14

b) Sublicensing Agreement Number Sub-00015A ("AT&T / IBM Sublicensing

Agreement" attached hereto and incorporated herein as Exhibit B).

63. AT&T and IBM also entered into a side letter on that date ("AT&T / IBM Side Letter"

attached hereto and incorporated herein as Exhibit C).

64. In addition, AT&T and IBM have entered into nearly 400 supplemental agreements over

the years, including Supplement No. 170 (Supplement No. 170 is attached hereto and

incorporated herein as Exhibit D). Supplement No. 170 is the document that specifies the

royalty amounts and computer CPUs upon which royalty amounts were due to be paid by

IBM.

65. Thereafter, Amendment X to Software Agreement SOFT-00015, as amended, was

executed on or about October 16, 1996 by and among IBM, The Santa Cruz Operation,

Inc. ("SCO") and Novell, Inc. ("IBM Amendment X" attached hereto and incorporated

herein as Exhibit E). Among other things, Amendment X effectuated a royalty buy-out

by IBM pursuant to the royalty terms and amounts specified in Supplement No. 170, and

it confirmed other restrictions on IBM, including restrictions on the use of source code.

66. Collectively, these agreements, side letter and amendment are referred to hereinafter as

the "IBM Related Agreements."

The Sequent Agreements

67. On January 28, 1986, AT&T and Sequent (now merged into IBM through a stock

acquisition) entered into certain AT&T UNIX Agreements:

a) Software Agreement Number SOFT-000321 ("Sequent Software Agreement"

attached hereto and incorporated herein as Exhibit F);

15

b) Sublicensing Agreement Number SUB-000321A ("Sequent Sublicensing Agreement" attached hereto and incorporated herein as Exhibit G).

68. The Sequent Software Agreement and the Sequent Sublicensing Agreement are sometimes collectively referred to hereinafter as the "Sequent Agreements."

69. The IBM Related Agreements and Sequent Agreements collectively identify the "Protected Materials."

Marketplace Value of UNIX

70. UNIX's value in the enterprise marketplace is largely a function of its reliability, extensibility, and robust performance capability. That is to say, it virtually never needs repair, it performs well under a wide variety of adverse circumstances, and it can be extended throughout an enterprise and across multiple processors to perform unified or disparate tasks in a seamless computing environment. Because of these features, UNIX-based equipment has replaced mainframe computers for all but the most demanding computing tasks. And, because UNIX-based equipment is far cheaper than mainframe computing equipment, a customer who cannot otherwise justify the cost of mainframe computers can otherwise gain the advantages of "supercomputing" operations through use of UNIX-based equipment.

71. One or more of the different versions of UNIX-based operating systems sold by Sun, IBM, SCO, SGI, and others, is the operating system of choice for large enterprise computing operations in virtually 100% of the Fortune 1000 companies.

72. UNIX gained this prominence in the computing marketplace because of twenty years of development and over one billion dollars invested by plaintiff and its predecessors to

16

create a stable, reliable operating system to perform the mission critical work required by large enterprises.

73. The recent rise of the global technology economy has been powered in large part by UNIX. Virtually every mission critical financial application in the world is powered by UNIX, including electronic transfers of funds. Real time stock trades are powered by UNIX. Inventory controls and distributions are powered by UNIX. All major power grids and all major telecommunications systems are powered by UNIX. Many satellite control and defense control systems are powered by UNIX. Virtually every large corporation in the world currently operates part or all of its information technology systems on a UNIX operating system.

74. Based on its value in the marketplace, UNIX has become the most widely used and widely accepted operating system for enterprise, institutional and manufacturing applications throughout the world.

Linux

75. Linux is an operating system variant or clone of UNIX System V Technology. According to leaders within the Linux community, Linux is not just a "clone," but is intended as a successor to displace UNIX System V. Linux, unlike UNIX, is distributed without a fee to its users. Moreover, it is developed under and open source model, meaning that the source code is publicly available to all who want to see or use it.

76. IBM's entry into the open source community and its concerted effort to control the community for its own economic benefit have substantially altered the use and impact of Linux.

17

77. In furtherance of its plan to destroy its UNIX competitors, IBM has announced its intention to make Linux, distributed to end users without a fee, the successor to all existing UNIX operating systems used by Fortune 1000 companies and other large companies in the enterprise computing market.

78. However, as is widely reported and as IBM executives knew, or should have known, a significant flaw of Linux is the inability and/or unwillingness of the Linux process manager, Linus Torvalds, to identify the intellectual property origins of contributed source code that comes in from those many different software developers. If source code is code copied from protected UNIX code, there is no way for Linus Torvalds to identify that fact.

79. As a result, a significant amount of UNIX protected code and materials are currently found in Linux 2.4.x, 2.5.x and Linux 2.6.x releases in violation of SCO's contractual rights and copyrights.

The Functional Limitations of Linux Before IBM's Involvement

80. The first versions of Linux evolved through bits and pieces of various contributions by numerous software developers using single or dual processor systems. Unlike IBM, virtually none of these software developers and hobbyists had access to enterprise-scale equipment and testing facilities for Linux development. Without access to such equipment, facilities and knowledge of sophisticated development methods learned in many years of UNIX development, it would be difficult, if not impossible, for the Linux development community to create a grade of Linux adequate for enterprise use.

81. Also, unlike IBM, the original Linux developers did not have access to multiprocessor code or multi-processor development methods needed to achieve high-end enterprise functionality.

82. To make Linux of necessary quality for use by enterprise customers, it needed to be re-designed and upgraded to accommodate complex multi-processor functionality that had taken UNIX nearly 20 years to achieve. This rapid re-design was not feasible or even possible at the enterprise level without (a) a high degree of design coordination, (b) access to expensive and sophisticated design and testing equipment; (c) access to UNIX code and development methods; (d) UNIX architectural experience; and (e) a very significant financial investment. The contributions of IBM, which had access to UNIX System V Protected Materials and years of enterprise level experience, made possible this rapid re-design of Linux for enterprise use.

83. As a result of the forgoing, Linux is a clone of UNIX, including protected UNIX System V Technology, including modifications and derivatives thereof.

IBM's Scheme

84. As market awareness of Linux evolved, IBM initiated a course of conduct with the purpose and effect of using Linux to **unfairly** compete in the enterprise market. At that point in time, four important events were occurring simultaneously in the enterprise software computing marketplace:

   a) Intel chips were becoming widely demanded by enterprise customers since Intel's processing power had increased and its cost had remained low;

19

    b) SCO's market power in the enterprise marketplace was increasing based on the combined capabilities of SCO OpenServer, SCO UnixWare and SCO's unique position as UNIX on Intel;

    c) Sun and Microsoft's market share in the enterprise market continued to grow; and

    d) IBM was in the process of evolving its business model from software technology to services.

85. In the process of moving from product offerings to services offerings, IBM dramatically increased its staff of systems integrators to 120,000 strong under the marketing brand "IBM Global Services." By contrast, IBM's largest historic competitor as a seller of UNIX software, Sun Microsystems, has a staff of approximately 12,000 systems integrators. With ten times more services-related personnel than its largest competitor, IBM sought to move the corporate enterprise computing market to a services model based on free software on Intel processors.

86. By making the Linux operating system free to end users, IBM could undermine and destroy the ability of any of its competitors to charge a fee for distribution of UNIX software in the enterprise market. Thus, IBM, with its army of Global Services integrators who earn money by *selling services,* would gain a tremendous advantage over all its competitors who earn money by *selling UNIX licenses.*

87. To accomplish the end of transforming the enterprise software market to a services-driven market, IBM set about to deliberately and improperly destroy the economic value of UNIX and particularly the economic value of UNIX on Intel-based processors.

88. As detailed elsewhere, IBM misappropriated the confidential and proprietary information

from SCO in Project Monterey. IBM also misused its access to the UNIX source code, in

violation of the IBM Related Agreements..

89. On or about August 17, 2000, IBM and Red Hat, Inc., the leading Linux distributor,

issued a joint press release through M2 Presswire announcing, *inter alia*, as follows:

IBM today announced a global agreement that enables Red Hat, Inc. to bundle
IBM's Linux-based software.

IBM said it would contribute more than 100 printer drivers to the open source
community. With these announcements, IBM is making it easier for customers to
deploy e-business applications on Linux using a growing selection of hardware
and software to meet their needs. ***The announcements are the latest initiative in
IBM's continuing strategy to embrace Linux across its entire product and
services portfolio.***

***Helping build the open standard, IBM has been working closely with the open
source community, contributing technologies and resources.***

90. Thereafter, on December 20, 2000, IBM Vice President Robert LeBlanc disclosed IBM's

improper use of confidential and proprietary information learned from Project Monterey

to bolster Linux as part of IBM's long term vision, stating:

Project Monterey was actually started before Linux did. When we started the
push to Monterey, the notion was to have one common OS for several
architectures. The notion actually came through with Linux, which was open
source and supported all hardware. ***We continued with Monterey as an
extension of AIX [IBM UNIX] to support high-end hardware.*** AIX 5 has the
best of Monterey. ***Linux cannot fill that need today, but over time we believe it
will. To help out we're making contributions to the open source movement like
the journal file system.*** We can't tell our customers to wait for Linux to grow up.

***If Linux had all of the capabilities of AIX, where we could put the AIX code at
runtime on top of Linux, then we would.***

Right now the Linux kernel does not support all the capabilities of AIX. ***We've
been working on AIX for 20 years. Linux is still young. We're helping Linux
kernel up to that level. We understand where the kernel is. We have a lot of***

21

*people working now as part of the kernel team.* At the end of the day, the customer makes the choice, whether we write for AIX or for Linux.

*We're willing to open source any part of AIX that the Linux community considers valuable.* We have open-sourced the journal file system, print driver for the Omniprint. AIX is 1.5 million lines of code. If we dump that on the open source community then are people going to understand it? *You're better off taking bits and pieces and the expertise that we bring along with it. We have made a conscious decision to keep contributing.*

91. IBM, however, was not and is not in a position legally to "open source any part of AIX that the Linux community considers valuable." Rather, IBM is obligated *not* to open source AIX because it contains SCO's confidential and proprietary UNIX source code, derivative works, modifications and methods.

92. Over time, IBM made a very substantial financial commitment to improperly put SCO's confidential and proprietary information into Linux, the free operating system. On or about May 21, 2001 IBM Vice President Richard Michos, stated in an interview to Independent Newspapers, New Zealand, *inter alia*:

*IBM will put US $1 billion this year into Linux, the free operating system.*

IBM wants to be part of the community that makes Linux successful. It has a development team that works on improvements to the Linux kernel, or source code. *This includes programmers who work in the company's Linux technology center, working on making the company's technology Linux-compatible.*

That team of IBM programmers is improperly extracting and using SCO's UNIX technology from the same building that was previously the UNIX Technology Center.

93. In a news article issued by e-Business Developer on or about August 10, 2001, the following conduct was attributed to IBM regarding participation in the open source software movement:

22

Another example is when IBM realized that the open-source operating system (OS) Linux provided an economical and reliable OS for its various hardware platforms. However, *IBM needed to make changes to the source to use it on its full range of product offerings*.

IBM received help from the open-source community with these changes and in return, released parts of its AIX OS to open source. IBM then sold its mainframes running Linux to Banco Mercantile and Telia Telecommunications, replacing 30 Windows NT boxes and 70 Sun boxes respectively - obviously a win for IBM, which reduced its cost of maintaining a proprietary OS while increasing its developer base. *IBM's AIX contributions were integrated into the standard Linux source tree, a win for open source.*

94. Again, "IBM's AIX contributions" consisted of the improper extraction, use, and

dissemination of SCO'S UNIX source code, derivative works, modifications and

methods.

95. In a news article issued by IDC on or about August 14, 2001, the following was reported:

IBM continued its vocal support of the Linux operating system Tuesday, saying the company will gladly drop its own version of UNIX from servers and replace it with Linux if the software matures so that it can handle the most demanding tasks.

IBM executives speaking here at the company's solutions developer conference outlined reasons for the company's Linux support, pointing to features in the operating system that could push it past UNIX for back-end computing. *While they admit that Linux still has a way to go before it can compete with the functions available on many flavors of UNIX, IBM officials said that Linux could prove more cost-effective and be a more user-friendly way to manage servers.*

'*We are happy and comfortable with the idea that Linux can become the successor, not just for AIX, but for all UNIX operating systems,*' said Steve Mills, senior vice president and group executive of the IBM Software Group, during a news conference.

96. Continuing with its "happy and comfortable" idea that Linux succeeds at the expense of

UNIX, on or about January 23, 2003, IBM executive Steve Mills gave a keynote speech

at LinuxWorld, a trade show, which was reported by Computer Reseller News, *IBM's*

23

*Mills: Linux Will be on Par with UNIX in No Time*, January 23, 2003, *inter alia*, as

follows:

> **IBM will exploit its expertise in AIX to bring Linux up to par with UNIX**, an
> IBM executive said Thursday.
>
> During his keynote at LinuxWorld here, IBM Senior Vice President and group
> executive Steve Mills acknowledged that **Linux lags behind UNIX in scalability,
> SMP support, fail-over capabilities and reliability--but not for long.**
>
> **'The pathway to get there is an eight-lane highway,' Mills said, noting that
> IBM's deep experience with AIX and its 250-member open-source development
> team will be applied to make the Linux kernel as strong as that of UNIX. 'The
> road to get there is well understood.'**
>
> * * *
>
> **Mills hinted that the company's full development capabilities will be brought to
> bear in engineering the Linux kernel to offer vastly improved scalability,
> reliability and support for mixed workloads--and to obliterate UNIX.**

97.   The only way that Mills' pathway becomes an "eight-lane highway" for Linux to achieve

the scalability, SMP support, fail-over capabilities and reliability of UNIX is by the

improper extraction, use, and dissemination of the proprietary and confidential UNIX

source code, derivative works and methods.  Indeed, UNIX was able to achieve its status

as the premiere operating system only after decades of hard work, beginning with the

finest computer scientists at AT&T Bell Laboratories, plaintiff's predecessor in interest.

98.   Based on other published statements, IBM currently has over 7,000 employees involved

in the transfer of UNIX knowledge into the Linux business of IBM, Red Hat, Inc. and

SuSE Linux AG (the largest European Linux distributor). On information and belief, a

large number of the said IBM employees currently working in the transfer of UNIX to

Linux have, or have had, access to the UNIX Software Code.

24

99. Consistent with these public pronouncements, IBM made significant contributions of the Protected Materials, including AIX and Dynix/ptx, in an effort to make Linux enterprise hardened. In violation of the IBM Related Agreements and Sequent Agreements and legal obligations regarding UNIX System V, including maintaining System V source code and any modifications or derivative works in confidence, IBM contributed key technology to Linux for enterprise use. Among the numerous contributions are the AIX Journaling File System, the AIX Enterprise Volume Management System, and the Dynix/ptx Read Copy Update technology.

100. The contribution of the Journaling File System ("JFS") was done in a series of "drops" of AIX code identified as "reference files" inside Linux. The first such drop occurred on or about February 2000, with multiple additions and significant follow-up work by IBM since that time to adapt AIX/JFS for enterprise use inside Linux. These drops of reference files do not necessarily become part of the source code in the Linux kernel, but rather are public displays of the Protected Materials so that anyone has access to them and can use them to construct a similar file in Linux. The first drop contains (a) a partially functioning port, or transfer, of JFS from AIX to Linux; (b) a set of reference directories (named ref/) which contain the AIX reference version of AIX/JFS; (c) AIX/JFS-related utility files used to maintain and upkeep AIX/JFS; and (d) a set of directories (named directory ref_utils/) which contain the AIX reference version of utilities. Copies of AIX/JFS files into Linux are shown in Table A, below. Table A compares a 1999 version of AIX and shows the following similarities, demonstrating copying of code, structures and/or sequences.

25

## TABLE A

| AIX 9922A_43NIA File | Line #s | Linux 2.2.12 ref/ File | Line #s |
|---|---|---|---|
| usr/include/jfs/inode.h | 16-37 | include/linux/jfs/ref/jfs_inode.h | 84-95, 126-138 |
| kernel/sys/vnode.h | 109-133 | include/linux/jfs/ref/jfs_inode.h | 96-122 |
| usr/include/jfs/inode.h | 39-40 | include/linux/jfs/ref/jfs_inode.h | 189-90 |
| usr/include/jfs/inode.h | 161-166 | include/linux/jfs/ref/jfs_inode.h | 414-421 |
| usr/include/jfs/inode.h | 172-180 | include/linux/jfs/ref/jfs_inode.h | 37-48 |
| usr/include/jfs/inode.h | 199-205 | include/linux/jfs/ref/jfs_inode.h | 52-59 |
| usr/include/jfs/inode.h | 62-66 | include/linux/jfs/ref/jfs_inode.h | 286-290 |
| usr/include/jfs/inode.h | 72-76 | include/linux/jfs/ref/jfs_inode.h | 295-302 |
| usr/include/jfs/inode.h | 83-158 | include/linux/jfs/ref/jfs_inode.h | 322-411 |

These transfers of AIX/JFS to Linux are in violation of the IBM Related Agreements, and are an improper use of AIX for adaptation to a general operating system.

101. IBM has also improperly transferred a UNIX/AIX-based enterprise volume management system ("AIX/EVMS") to Linux. Again, this was done by IBM to transfer enterprise-class capabilities from AIX to Linux, and was a violation of the IBM Related Agreements and IBM's promise not to adapt AIX as a general operating system for a non-IBM company. The purpose of AIX/EVMS is to allow the management of disk storage in terms of logical 'volumes' in a large enterprise environment. Tools with this level of sophistication and performance were entirely unavailable and unknown to the open source development community prior to IBM's improper transfer to Linux. The actual transfer "patch" by IBM can be found at http://www.sourceforge.net/project/showfiles.php?group_id=25076&package_id=17436. The first code drop of AIX/EVMS by IBM was v0.0.1, which occurred on 03/21/2001. The first major release of AIX/EVMS by Linux was v1.0.0, in Linux 2.4, which occurred

on 03/27/2003. The latest Linux release version of AIX/EVMS is v2.2.1, which occurred

on 12/20/2003. The following table, Table B, identifies the AIX/EVMS "patches" of

source code improperly transferred by IBM to the Linux 2.4 version.

## TABLE B

| AIX MERCED/9922A_43NIA | Line #s | EVMS 1.0.0 patches to Linux 2.4.x | Line #s |
|---|---|---|---|
| kernel/sys/IA64/bootrecord.h | 64-170 | include/linux/evms/evms_aix.h | 157-263 |
| usr/include/liblvm.h | 234-250 | include/linux/evms/evms_aix.h | 311-327 |
| usr/include/liblvm.h | 252-272, 289-307 | include/linux/evms/evms_aix.h | 329-349 |
| usr/include/liblvm.h | 316-363 | include/linux/evms/evms_aix.h | 352-400 |
| usr/include/lvmrec.h | 24-92 | include/linux/evms/evms_aix.h | 266-294 |
| usr/include/lvm.h | 26-35 | include/linux/evms/evms_aix.h | 6-11 |
| kernel/sys/hd_psn.h | 32 | include/linux/evms/evms_aix.h | 26 |
| kernel/sys/vgsa.h | 37, 56-73 | include/linux/evms/evms_aix.h | 13, 300-309 |

102. As with the other violations described herein, these transfers by IBM constitute improper

use of AIX for and by others, improper transfers of AIX to others, and improper

adaptation of AIX as a general operating system for a non-IBM company under the

restrictions of the IBM Related Agreements. In disregard of the IBM Related

Agreements, IBM has transferred this key enterprise technology from AIX to Linux.

103. Sequent also had certain contractual obligations and restrictions on its use of the UNIX

System V code that it licensed from AT&T, SCO's predecessor. These restrictions,

which are more fully stated in the Sequent Agreements, also restricted Sequent's use of

the modifications they made to UNIX System V and derivative works of UNIX System

V, including Sequent's Dynix/ptx. Like IBM, Sequent agreed to restrictions on

27

Dynix/ptx, including that Dynix/ptx would be used solely for internal business purposes, that it would not allow the use of Dynix/ptx for or by others, and that it would not transfer any part of Dynix/ptx to parties who do not have a UNIX System V source code agreement with SCO. Sequent also agreed that they would maintain all of Dynix/ptx in confidence. In violation of these contractual restrictions, IBM provided entire files of Dynix/ptx source code as a patch to Linux 2.4.1-01, including Read Copy Update ("RCU").

104. RCU is a mechanism that can significantly improve the performance and scalability of multi-processor systems by allowing simultaneous access to data without the need for expensive and time consuming locking protocols. Dynix/ptx/RCU structures and sequences were originally offered as a patch to the Linux 2.4 kernel by IBM, with rather limited functionality inside Linux 2.4. However, in the development of Linux version 2.6, the deployment of Dynix/ptx/RCU structures and sequences has spread into new uses inside Linux, including networking, device drivers, list management, and directory access. This demonstrates how improper contribution of a few hundred lines from Dynix/ptx has had a massive impact on Linux kernel efficiency, particularly relating to multi-processor functionality and processor memory synchronization. Virtually the entire files identified in Table C that originated in Dynix/ptx were published as a patch to Linux 2.4.1-01, with only minimal changes.

28

## TABLE C

| DynixV v4.6.1 Files | Linux 2.4.1-01 files |
|---|---|
| kernel/sys/rclock.h | include/linux/rclock. |
| kernel/os/rclock.c | kernel/rclock.c |
| kernel/sys/kma_defer.h | include/linux/kmemdef.h |
| kernel/os/kma_defer.c | kernel/kmemdef.c |

105. As stated, the entire files specified above show direct line-by-line copying of the files with the same name in Dynix as in Linux, with slight changes made to reflect some variations between the two operating systems. That the code in Linux comes from Dynix/ptx is further confirmed by the commentary in the Linux patch that expressly states that it is "[b]ased on a Dynix/ptx implementation by Paul McKenney..." Mr. McKenney was formerly an engineer at Sequent, and is now employed at IBM following IBM's acquisition of Sequent. After the first initial improper contribution of RCU by IBM, RCU became more widespread in the Linux kernel.

106. Code from Dynix/ptx files, but less than the entire file, was also copied line-for-line from DynixV v4.6.1 to Linux 2.4.1-01. Table D maps the line-for-line copied code from specified lines in DynixV v4.6.1 to Linux 2.4.1-01, with the file name and file line number in each code base identified appropriately.

**TABLE D**

| DynixV v4.6.1 Files and line #s | | Linux 2.4.1-01 files and line #s | |
|---|---|---|---|
| kernel/os/kern_clock.c | 2028-2059 | arch/i386/kernel/apic.c | 25-28,    662-664, 676-684 |
| kernel/os/kern_clock.c | 2028-2059 | kernel/timer.c | 26-29,    681-683, 688-697 |
| kernel/i386/locore.s | 1487-1497 | arch/i386/kernel/entry.S | 199-205 |
| kernel/i386/trap.c | 1554-1563 | arch/i386/kernel/traps.c | 52-54,    244-247, 331-334, 542-545, 659-662, 718-721 |
| kernel/i386/startup.c | 2054 | init/main.c | 30-33, 609-616 |

107. Although the actual count of lines of code in each of these contributions appears small,
     the impact is significant for a number of reasons: (a) In the case of JFS and EVMS, the
     number of lines that can be conclusively proven with the evidence currently available is
     shown. There is much more copying that is anticipated to be found in discovery; (b) In
     the case of RCU, a highly valuable and effective technological improvement can be
     expressed rather succinctly in computer code; and (c) In most cases, simple changes to
     code can have far reaching effects, and once the technology is revealed, thousands of
     developers can apply the technology to a myriad of places in the kernel.

IBM's Coordination of Linux Development Efforts

108. On information and belief, IBM has knowingly induced, encouraged, and enabled others
     to distribute proprietary information in an attempt to conceal its own legal liability for
     such distributions:

> What is wrong about this [Linux] distribution, is basically the millions of lines
> of code that we never have seen. We don't know if there are any patent
> infringements [in this code] with somebody we don't know. *We don't want to
> take the risk of being sued for a patent infringement. That is why we don't
> do distributions, and that's why we have distributors.* Because distributors
> are not so much exposed as we are. So that's the basic deal as I understand it.

30

Karl-Heinz    Strassemeyer,    IBM    The    Register,    11/19/2002,
www.theregister.co.uk/content/4/28183.html

109. IBM is affirmatively taking steps to destroy all value of UNIX by improperly extracting

and using the confidential and proprietary information it acquired from UNIX and

dumping that information into the open source community. As part of this effort, IBM

has heavily invested in the following projects to further eliminate the viability of UNIX:

a) The Linux Technology Center was launched in 2001 with the intent and

foreseeable purpose of transferring and otherwise disposing of all or part of

UNIX, including its derivative works, modifications and methods, into an open

source Linux environment;

b) The IBM Linux Center of Competency was launched to assist and train financial

services companies in an accelerated transfer of UNIX to Linux with the

advertised intent and foreseeable purpose of transferring and otherwise disposing

of all or part of UNIX, including its derivative works, modifications and methods

into open source.

c) A carrier-grade Linux project has been undertaken to use UNIX source code,

derivative works, modifications and methods for the unlawful purpose of

transforming Linux into an enterprise-hardened operating system;

d) A data center Linux project has been undertaken to use UNIX source code,

derivative works, modifications and methods for the unlawful purpose of

transforming Linux into an enterprise-hardened operating system; and

e) Other projects and initiatives have been undertaken or supported that further evidence the improper motive and means exercised by IBM in its efforts to eliminate UNIX and replace it with free Linux.

110. But for IBM's coordination of the development of enterprise Linux, and the misappropriation of UNIX to accomplish that objective, the Linux development community would not have timely developed enterprise quality software or customer support necessary for widespread use in the enterprise market.

## · FIRST CAUSE OF ACTION
### (Breach of IBM Software Agreement)

111. Plaintiff incorporates and re-alleges paragraphs No. 1-110, above.

112. As set forth above, SCO is the successor to AT&T under that certain Software Agreement originally executed by and between AT&T and IBM designated as SOFT-00015. The Software Agreement specifies the terms and conditions for use of UNIX System V source code, documentation and methods related thereto, together with modifications and derivative works created by IBM based on UNIX System V (collectively, the "Software Products").

2.01 of the Software Agreement, IBM received the following:

> [A] personal, **nontransferable** and nonexclusive right to **use** in the United States each Software Product identified in the one or more Supplements hereto, **solely for Licensee's own internal business purposes** and solely on or in conjunction with Designated CPUs for such Software Product. Such right to use includes the right to **modify** such Software Product and to **prepare derivative works based on** such Software product, provided the resulting materials are **treated hereunder as part of the original Software Product**. [Emphasis added.]

32

113. IBM has violated §2.01 of the Software Agreement by, *inter alia*, using, and assisting others to use, the Software Products (including System V source code, derivative works, documentation related thereto and methods based thereon) for *external purposes* that are different from, and broader than, IBM's own internal business purposes. By actively supporting, assisting and promoting the transfer of UNIX technology to Linux, and using its access to UNIX technology to accomplish this objective, IBM is (a) using the Software Product for *external business purposes,* which include use for the benefit of Linus Torvalds, the general Linux community and IBM's Linux distribution partners, Red Hat, Inc., Novell, Inc., SuSE Linux AG and their respective subsidiaries; and is (b) directly and indirectly preparing *unauthorized derivative works* based on the Software Products and *unauthorized modifications thereto* in violation of §2.01 of the Software Agreement.

114. In addition, § 2.01 limited use to the United States. This limitation was modified in the Side Letter to include other countries, but at no time was IBM granted the right to use the Software Products (including System V source code, derivative works, modifications, documentation related thereto and methods based thereon) in India. On information and belief, IBM has violated this restriction by allowing the Protected Materials to be used in India.

115. IBM agreed in §2.05 of the Software Agreement to the following additional restrictions on use of the Software Products (including System V source code, derivative works, modifications, documentation related thereto and methods based thereon):

> No right is granted by this Agreement for the use of Software Products directly *for others, or for any use of Software Products by others*.

33

116. IBM has breached §2.05 of the Software Agreement by, *inter alia*, actively promoting and allowing use of the Software Products, documentation and development methods related thereto in an open and hostile attempt to destroy the entire economic value of the Software Products and plaintiff's rights to protect the proprietary nature of the Software Products. By way of example and not limitation, IBM has used protected UNIX source code, documentation, development notes and methods for others in accelerating development of the 2.4.x kernel and above in, among others, the following areas: (a) scalability improvements, (b) performance measurement and improvements, (c) serviceability and error logging improvements, (d) NUMA scheduler and other scheduler improvements, (e) Linux PPC 32- and 64-bit support, (f) *AIX Journaling File System,* (g) enterprise volume management system to other Linux components, (h) clusters and cluster installation, including distributed lock manager and other lock management technologies, (i) threading, (j) general systems management functions, and (k) other areas. But for the use by IBM of these protected UNIX methods in Linux development, the Linux 2.4.x kernel, 2.5.x kernel, and 2.6.x kernel's capacity to perform high-end enterprise computing functions would be severely limited.

117. IBM agreed in §7.10 of the Software Agreement to the following restrictions on ***transfer*** of the Software Product, including AIX as a derivative work of UNIX System V:

> [N]othing in this Agreement grants to Licensee the right to sell, lease or otherwise transfer or dispose of a Software Product in whole or in part.

118. IBM has breached §7.10 of the Software Agreement by, *inter alia*, transferring portions of the Software Products (including System V source code, documentation,

34

modifications, derivative works and methods based thereon), including but not limited to the AIX Journaling File System and all other UNIX-based source code publicly announced by IBM, to Linus Torvalds for open distribution to the general public under a software license that destroys the proprietary and confidential nature of the Software Products.

119. IBM has further stated its intention to transfer the entirety of AIX into open source in anticipatory violation of its obligations under §7.10 of the Software Agreement.

120. IBM agreed in Side Letter ¶9, a substitute provision to §7.06(a) of the Software Agreement, to the following restrictions on *confidentiality* of the Software Product, including AIX as a derivative work of UNIX System V:

> Licensee agrees that it shall hold Software Products subject to this Agreement *in confidence for AT&T*. Licensee further agrees that it *shall not make any disclosure* of such Software Products to anyone, except to employees of Licensee to whom such disclosure is necessary to the use for which rights are granted hereunder. Licensee shall appropriately notify each employee to whom any such disclosure is made that such disclosure is made in confidence and shall be kept in confidence by such employee.

121. In recognition of SCO's right of confidentiality of the Software Products, IBM directs all customers who need to view AIX source code to first obtain a source code license from SCO as a condition to viewing *any part* of AIX. For example, SCO received a letter on or about March 4, 2003 from Lockheed Martin Corporation requesting verification of the existence of a Software Agreement by and between Lockheed and SCO as a condition to Lockheed obtaining access to view AIX source code. The letter stated, in part, as follows:

35

LMATM is in the process of licensing [AIX] from IBM to be used for integration purposes only. Per the attached supplement to the subject document, contained within the AIX source code is third party IP which must be licensed from the owner prior to IBM providing the AIX source code to any licensee (see Prerequisite Source License, Para.2.2).

\* \* \*

2.2 <u>Prerequisite Source License</u>. *IBM cannot disclose* (includes viewing) certain Third-Party Source Code *to any party who does not have a license that permits access to the Code*. Prior to receiving or accessing the Source Code described above in this Supplement, LMATM must obtain the following Source Code Licenses:

a) *AT&T Technologies, Inc., AT&T Information Systems, Inc., or UNIX ™ Systems Laboratory Software Agreement* No. SOFT---and AT&T Information Systems, Inc. Software Agreement Supplement for Software Product AT&T UNIX System V Release 4.0, or AT&T Information Systems, Inc. Schedule for Upgrades (from UNIX System V Release 3.1 to UNIX System V Release 3.2 or from UNIX System V Release 3.1 International Edition to UNIX System V Release 3.2 International Edition) or *equivalent SCO Group License*.

122. IBM has breached its obligation of confidentiality, and has failed to otherwise hold the Software Products in confidence for SCO by contributing portions of the Software Product (including System V source code, modifications, derivative works and methods based thereon, together with documentation and development notes) to open source development of Linux and by using UNIX development methods, programming notes, change logs and other documentation in making modifications to Linux 2.4.x kernel and above, which are, in material part, unauthorized derivative works of the Software Product. These include, among others, (a) scalability improvements, (b) performance measurement and improvements, (c) serviceability and error logging improvements, (d) NUMA scheduler and other scheduler improvements, (e) Linux PPC 32- and 64-bit

36

support, (f) AIX Journaling File System, (g) enterprise volume management system to other Linux components, (h) clusters and cluster installation, including distributed lock manager and other lock management technologies, (i) threading, (j) general systems management functions, and (k) others.

123. IBM has further stated its intention to transfer the entirety of AIX into open source in anticipatory violation of its obligations under §7.06 (a) of the Software Agreement.

124. Export of UNIX technology is controlled by the United States government. Thus, SCO, IBM and all other UNIX vendors are subject to strict export control regulations with respect to any UNIX-based customer distribution. To this end, IBM agreed in §4.01 of the Software Agreement to restrictions on *export* of the Software Product (including System V source code, derivative works, modifications, and methods based thereon), as follows:

> Licensee agrees that it will not, without the prior written consent of AT&T, export, *directly or indirectly*, Software Products covered by this Agreement to any country outside of the United States.

This provision was later modified to allow export rights to several countries outside the United States. However, no permission has ever been granted by SCO or its predecessors to IBM to allow it to indirectly make available all or portions of the Software Product to countries outside the United States that are subject to strict technology export control by the United States government: *viz.*, Cuba, Iran, Syria, North Korea and Libya. IBM is ignoring and attempting to circumvent the export control restrictions that apply to UNIX as it accelerates development of Linux for enterprise use.

37

125. Thus, IBM has breached §4.01 of the Software Agreement by, *inter alia*, making extensive, advanced multiprocessor scaling functions of the Software Product, including derivative works and methods based thereon, available for free distribution to anyone in the world with a computer. As it relates to Linux 2.4.x and above releases, IBM is indirectly making the Software Product and operating system modifications available to countries and organizations in those countries for scaling single processor computers into multi-processor supercomputers that can be used for encryption, scientific research and weapons research.

126. IBM was aware of the importance of these restrictions and the need to protect the confidentiality of UNIX System V, including modifications and derivatives such as AIX and Dynix/ptx. Indeed, Amendment X, ¶3.7, provides examples under which IBM is entitled to disclose UNIX and AIX source code to its development partners—and examples under which IBM is not entitled to make such disclosures. Paragraph 3.7 of Amendment X provides as follows:

> The following illustrations are intended to clarify and illustrate the relief provided in Subsection 2.1 of this Amendment [relating to disclosure of source code to contractors].
>
> Company A, sublicensee of the Sublicensed Product [AIX] is a general computing system manufacturing firm. IBM may distribute Source Copies to Company A for Authorized Purposes.
>
> ***However, IBM may not distribute Source Copies to Company A for purposes of making modifications to adapt the Sublicensed Products [AIX] as a general operating system for Company A's general computer hardware system.*** (Emphasis added).

127. As is made perfectly clear in ¶3.7 of Amendment X, IBM may not use any Sublicensed Product from SCO, including AIX, for the purposes of making modifications to adapt

AIX as a competing general operating system. IBM nonetheless has chosen to adapt

UNIX, AIX, and Dynix/ptx for use in a competing operating system (i.e. Linux) in

violation of its obligations to SCO.

128. SCO has the self-executing contractual right to terminate IBM's right to use and

distribute the Software Product, including derivative works and methods based thereon, if

IBM fails to fulfill one or more of its obligations under the Software Agreement. This

authority is contractually granted under the following provisions of the IBM Related

Agreements:

> If Licensee fails to fulfill one or more of its obligations under this
> Agreement, AT&T may, upon its election and in addition to any
> other remedies that it may have, at any time terminate all the rights
> granted by it hereunder by not less than two (2) months' written
> notice to Licensee specifying any such breach, unless within the
> period of such notice all breaches specified therein shall have been
> remedied; upon such termination Licensee shall immediately
> discontinue use of and return or destroy all copies of Software
> Products subject to this Agreement. [Software Agreement, §6.03]

> Regarding Section 6.03 of the Software Agreement and Sections
> 2.07 and 3.03 of the Sublicensing Agreement, we will not
> terminate your rights for breach, nor will we give notice of
> termination under such Sections, for breaches we consider to be
> immaterial. We agree to lengthen the notice period referenced in
> such Sections from two (2) months to one hundred (100) days. If a
> breach occurs that causes us to give notice of termination, you may
> remedy the breach to avoid termination if you are willing and able
> to do so. In the event that a notice of termination is given to you
> under either of such Sections and you are making reasonable
> efforts to remedy the breach but you are unable to complete the
> remedy in the specified notice period, we will not unreasonably
> withhold our approval of a request by you for reasonable extension
> of such period. We will also consider a reasonable extension under
> Section 2.07 of the Sublicensing Agreement in the case of a
> Distributor who is making reasonable efforts to remedy a breach.

> In any event our respective representatives will exert their mutual
> good faith best efforts to resolve any alleged breach short of
> termination. [Side Letter, ¶ 5]

129. Consistent with these rights, on March 6, 2003, plaintiff delivered a notice of termination
     to Sam Palmisano, Chief Executive Officer of IBM (the "AIX Termination Notice") for
     IBM's breaches of the Software (and Sublicensing) Agreement by IBM.

130. Following delivery of the AIX Termination Notice, plaintiff took every reasonable step to
     meet and confer with IBM regarding IBM's breach of the Software Agreement and
     Related Agreements.

131. IBM has disregarded SCO's rights under the IBM Related Agreements by failing to
     undertake any efforts to cure its numerous and flagrant violations thereunder. As a result,
     effective June 13, 2003, the IBM Related Agreements are terminated and IBM has no
     further rights thereunder.

132. IBM nonetheless continues to operate under the IBM Related Agreements, and use the
     Software Products and Source Code thereunder as though its rights under the Agreement
     have not been terminated.

133. IBM no longer has any right to use the UNIX Software Code or make modifications or
     derivative works thereunder. In fact, IBM is contractually obligated to "immediately
     discontinue use of and return or destroy all copies of Software Products subject to this
     Agreement."

134. As a result of IBM's breaches before termination, SCO has been damaged in the
     marketplace for violations by IBM in an amount to be proven at trial, but not less than $1
     billion.

40

135. In addition, and to the extent that IBM continues to completely repudiate its obligations regarding the Software Product, plaintiff will sustain substantial continuing and ongoing damages. These damages include the full amount IBM receives as a result of its ongoing sales of AIX, including software, services and hardware.

136. Moreover, if IBM does not return or destroy all source and binary copies of the Software Products and/or continues to contribute some or all of these protected materials to open source, SCO will be irreparably harmed. As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

## SECOND CAUSE OF ACTION
### (Breach of IBM Sublicensing Agreement)

137. Plaintiff incorporates and re-alleges paragraphs No. 1-136, above.

138. As set forth above, SCO is the successor to AT&T under that certain Sublicensing Agreement originally executed by and between AT&T and IBM designated as SUB-00015A. The Sublicensing Agreement grants the right to *distribute object-based code* of UNIX System V and modifications thereto and derivative works based thereon.

139. SCO has terminated IBM's right to use and distribute the Software Product, including derivative works and methods based thereon as of the AIX Termination Date, June 13, 2003.

140. From and after the AIX Termination Date, any and all distributions of AIX by IBM are in violation of the Sublicensing Agreement.

41

141. IBM has disregarded and continues to completely disregard and repudiate its obligations under the Sublicensing Agreement, to plaintiff's substantial, continuing and ongoing damage. These damages include the full amount IBM receives as a result of its ongoing sales of AIX, including software, services and hardware.

142. Moreover, if IBM does not return or destroy all source and binary copies of the Software Products and/or continues to contribute some or all of these protected materials to open source, SCO will be irreparably harmed. As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

## THIRD CAUSE OF ACTION
### (Breach of Sequent Software Agreement)

143. Plaintiff incorporates and re-alleges paragraphs No. 1-142, above.

144. As set forth above, SCO is the successor to AT&T under that certain Software Agreement originally executed by and between AT&T and Sequent designated as SOFT-000321. The Software Agreement specifies the terms and conditions for use of UNIX System V source code, documentation and methods related thereto, together with modifications and derivative works created by IBM/Sequent based on UNIX System V (collectively, the "Software Products").

145. With respect to the rights granted for use of the System V source code under Section 2.01 of the Sequent Software Agreement, Sequent received the following:

> [A] personal, *nontransferable* and nonexclusive right to *use* in the United States each Software Product identified in the one or more Supplements hereto, *solely for Licensee's own internal business purposes* and solely on or in conjunction with Designated CPUs

42

for such Software Product. Such right to use includes the right to *modify* such Software Product and to *prepare derivative works based on* such Software product, provided the resulting materials are *treated hereunder as part of the original Software Product*. [Emphasis added.]

146. IBM has violated §2.01 of the Sequent Software Agreement by, *inter alia*, modifying and assisting others to modify the Software Products (including System V source code, derivative works, documentation related thereto and methods based thereon) for purposes *other than* Sequent and/or IBM's own internal business purposes. By actively supporting, assisting and promoting the transfer from UNIX to Linux, and using its access to UNIX technology to accomplish this objective, IBM is (a) using the Software Product for *external business purposes*, which include use for the benefit of the Open Source Development Laboratory ("OSDL"), IBM's various joint venture partners in OSDL, Linus Torvalds, the general Linux community and IBM's Linux distribution partners, Red Hat, Inc., Novell, Inc. and SuSE Linux AG and their respective subsidiaries; and is (b) directly and indirectly preparing *unauthorized derivative works* based on the Software Product and *unauthorized modifications thereto* in violation of §2.01 of the Sequent Software Agreement.

147. In addition, § 2.01 limited use to the United States. At no time was Sequent granted the right to use the Software Products (including System V source code, derivative works, modifications, documentation related thereto and methods based thereon) in India. On information and belief, IBM has violated this restriction by allowing the Protected Materials to be used in India.

43

148. Sequent agreed in §2.05 of the Sequent Software Agreement to the following restrictions on *use* of the Software Products (including System V source code, modifications, derivative works, documentation related thereto and methods based thereon):

> No right is granted by this Agreement for the use of Software Products directly *for others, or for any use of Software Products by others.*

149. IBM has breached Sequent's obligations under §2.05 of the Sequent Software Agreement by, *inter alia*, actively promoting and allowing use of the Software Products and development methods related thereto in an open and hostile attempt to destroy the entire economic value of the Software Products and plaintiff's rights to protect the proprietary nature of the Software Products. Particularly, IBM has caused all or materially all of Dynix/ptx-based NUMA source code and methods, and RCU source code and methods, to be used for the benefit of Linux. But for the use by IBM of these protected UNIX methods in Linux development, the Linux 2.4.x kernel through 2.6.x kernel's capacity to perform high-end enterprise computing functions would be severely limited.

150. IBM has even gone so far as to publish the Dynix/ptx copyright as part of the source code and documentation contribution of UNIX-derived RCU technology it has improperly made available to the open source community. The following copyright attribution is found in Linux kernel 2.4.x:

> *Copyright (c) International Business Machines Corp., 2001* This program is free software; you can redistribute it and/or modify it under the terms of the GNU General Public License as published by the Free Software Foundation; either version 2 of the License, or (at your option) any later version. This program is distributed in the hope that it will be useful, but WITHOUT ANY WARRANTY; without even the implied warranty of MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE. See the GNU General Public License for more details.

44

> You should have received a copy of the GNU General Public
> License along with this program; if not, write to the Free Software
> Foundation, Inc., 59 Temple Place - Suite 330, Boston, MA 02111-
> 1307, USA. Author: Dipankar Sarma (***Based on a Dynix/ptx
> implementation by Paul Mckenney).*** (Emphasis added).

151. This publication of the RCU copyright is an example of IBM's blatant disregard of

SCO's rights to control the use of the Software Product, including derivative works and

modifications thereof, pursuant to §2.05 of the Sequent Software Agreement.

152. Sequent agreed in §7.10 of the Sequent Software Agreement to the following restrictions

on ***transfer*** of the Software Product, including Dynix/ptx as a derivative work of UNIX

System V:

> [N]othing in this Agreement grants to Licensee the right to sell,
> lease or otherwise transfer or dispose of a Software Product in
> whole or in part.

153. IBM has breached Sequent's obligations under §7.10 of the Sequent Software Agreement

by, *inter alia*, transferring portions of the Software Product (including System V source

code, modifications, derivative works and methods based thereon), including Dynix/ptx

source code, documentation and methods for NUMA, RCU and SMP technologies, to the

OSDL and/or Linus Torvalds for open distribution to the general public under a software

license that destroys the proprietary and confidential nature of the Software Products.

154. Sequent agreed under §7.06(a) of the Sequent Software Agreement, to the following

restrictions on ***confidentiality*** of the Software Product, including Dynix/ptx as a

derivative work of UNIX System V:

> Licensee agrees that it shall hold all parts of the Software Products
> subject to this Agreement *in confidence* for AT&T. Licensee
> further agrees that it ***shall not make any disclosure*** of any or all of
> such Software Products (including methods or concepts utilized
> therein) to anyone, except to employees of Licensee to whom such

45

> disclosure is necessary to the use for which rights are granted
> hereunder. Licensee shall appropriately notify each employee to
> whom any such disclosure is made that such disclosure is made in
> confidence and shall be kept in confidence by such employee.

155. IBM has breached Sequent's obligation of confidentiality by contributing portions of the

Software Product (including System V source code, derivative works, modifications, and

methods based thereon) to open source development of Linux and by using UNIX

development methods in making modifications to Linux 2.4.x kernel and above, which

are in material part, unauthorized derivative works of the Software Product, including but

not limited to Dynix/ptx-based NUMA technology, source code and methods, RCU

source code and methods, and SMP source code and methods.

156. Export of UNIX technology is controlled by the United States government. Thus, SCO,

Sequent, IBM and all other UNIX vendors are subject to strict export control regulations

with respect to any UNIX-based customer distribution. To this end, Sequent agreed in

§4.01 of the Software Agreement to restrictions on *export* of the Software Product

(including System V source code, derivative works, documentation related thereto and

methods based thereon), as follows:

> Licensee agrees that it will not, without the prior written consent of
> AT&T, export, ***directly or indirectly***, Software Products covered
> by this Agreement to any country outside of the United States.

No permission has ever been granted by SCO or its predecessors to Sequent to allow it to

directly or indirectly make available all or portions of the Software Product to countries

outside the United States that are subject to strict technology export control by the United

States government: *viz.*, Cuba, Iran, Syria, North Korea and Libya. IBM is ignoring and

46

attempting to circumvent the export control restrictions that apply to UNIX as it accelerates development of Linux for enterprise use.

157. Thus, IBM has breached §4.01 of the Sequent Software Agreement by, *inter alia*, making extensive, advanced multiprocessor scaling functions of the Software Product, including NUMA technology, RCU technology, SMP technology and other derivative works and methods based thereon, available for free distribution to anyone in the world with a computer. As it relates to Linux 2.4.x and above releases, IBM is indirectly making the Software Product and operating system modifications, particularly NUMA technology, RCU technology and SMP technology, available to countries and organizations in those countries for scaling single processor computers into multi-processor supercomputers that can be used for encryption, scientific research and weapons research.

158. SCO has the self-executing, contractual right to terminate IBM's right to use and distribute the Software Product, including modifications, derivative works and methods based thereon, if IBM fails to fulfill one or more of its obligations under the Software Agreement. This authority is contractually granted under the following provisions of the Sequent Agreements:

> If Licensee fails to fulfill one or more of its obligations under this Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than two (2) months' written notice to Licensee specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination Licensee shall immediately discontinue use of and return or destroy all copies of Software Products subject to this Agreement. [Software Agreement, §6.03]

159. Consistent with these rights, plaintiff delivered a notice of termination to Sequent (the "Dynix/ptx Termination Notice") for IBM's breaches of the Software (and Sublicensing) Agreement.

160. Following delivery of the Dynix Termination Notice, IBM did not respond during the two months provided to cure.

161. IBM has disregarded SCO's rights under the Sequent Agreements by failing to undertake any efforts to cure its numerous and flagrant violations thereunder. As a result, effective July 30, 2003, the Sequent Agreements were terminated and IBM has no further rights thereunder.

162. IBM nonetheless continues to operate under the Sequent Agreements, and use the Software Products and Source Code thereunder as though its rights under the Agreements have not been terminated.

163. IBM no longer has any right to use the UNIX Software Code or make modifications or derivative works thereunder. In fact, IBM is contractually obligated to "immediately discontinue use of and return or destroy all copies of Software Products subject to this Agreement."

164. As a result of IBM's breaches before termination, SCO has been damaged in the marketplace for violations by IBM in an amount to be proven at trial, but not less than $1 billion.

165. In addition, and to the extent that IBM continues to completely repudiate its obligations under the Sequent Agreements regarding the Software Product, plaintiff will sustain substantial continuing and ongoing damages. These damages include the full amount

48

IBM receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware.

166. Moreover, if IBM does not return or destroy all source and binary copies of the Software Products received pursuant to the Sequent Agreements and/or continues to contribute some or all of these Protected Materials to open source, SCO will be irreparably harmed. As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

### FOURTH CAUSE OF ACTION
### (Breach of Sequent Sublicensing Agreement)

167. Plaintiff incorporates and re-alleges paragraphs No. 1-166, above.

168. As set forth above, SCO is the successor to AT&T under that certain Sequent Sublicensing Agreement originally executed by and between AT&T and Sequent designated as SUB-000321A. The Sequent Sublicensing Agreement grants the right to distribute *object-based code* of UNIX System V and modifications thereto and derivative works based thereon.

169. SCO has terminated IBM's right to use and distribute under the Sequent Agreements the Software Product, including derivative works and methods based thereon as of the Dynix/ptx Termination Date.

170. From and after the Dynix/ptx Termination Date, any and all distributions of Dynix/ptx by IBM, or any part or sub-program or sub-routine thereof, is in violation of the Sequent Sublicensing Agreement.

49

171. IBM has disregarded and continues to completely disregard and repudiate Sequent's obligations under the Sequent Sublicensing Agreement, to plaintiff's substantial, continuing and ongoing damage. These damages include the full amount IBM receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware.

172. Moreover, if IBM does not return or destroy all source and binary copies of the Software Products and/or continues to contribute some or all of these protected materials to open source, SCO will be irreparably harmed. As a result, SCO is entitled to a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source.

### FIFTH CAUSE OF ACTION
### (Copyright Infringement)

173. Plaintiff incorporates and re-alleges paragraphs No. 1-172, above.

174. As set forth above, SCO is the successor in interest to the IBM Related Agreements and the Sequent Agreements.

175. Despite termination of such Agreements, IBM has continued to reproduce, prepare derivative works of, and distribute UNIX software, source code, object code, programming tools, and documentation related to UNIX operating system technology, and has induced others to do the same.

176. SCO is the owner of copyright rights to UNIX software, source code, object code, programming tools, documentation related to UNIX operating system technology, and derivative works thereof. These materials are covered by numerous copyright

50

registrations issued by the United States Copyright Office (the "Copyrighted Programs").

These registrations have been obtained by SCO and its predecessors in interest and are

owned by SCO. For example, included among such registrations (attached as Exhibits H

toU) are the following:

| | Title | Registration Number | Registration Date |
|---|---|---|---|
| H | UNIX Operating System Edition 5 and Instruction Manual | TXU-510-028 | March 25, 1992 |
| I | UNIX Operating System Edition 6 and Instruction Manual | TXu-511-236 | April 7, 1992 |
| J | UNIX Operating System Edition 32V and Instruction Manual | TXu-516-704 | May 15, 1992 |
| K | UNIX Operating System Edition 7 and Instruction Manual | TXu-516-705 | May 15, 1992 |
| L | Operating System Utility Programs | TXu-301-868 | November 25, 1987 |
| M | UNIXWARE 7.1.3 | TX 5-787-679 | June 11, 2003 |
| N | UNIX SYSTEM V RELEASE 3.0 | TX 5-750-270 | July 7, 2003 |
| O | UNIX SYSTEM V RELEASE 3.1 | TX 5-750-269 | July 7, 2003 |
| P | UNIX SYSTEM V RELEASE 3.2 | TX 5-750-271 | July 7, 2003 |
| Q | UNIX SYSTEM V RELEASE 4.0 | TX 5-776-217 | July 16, 2003 |
| R | UNIX SYSTEM V RELEASE 4.1ES | TX 5-705-356 | June 30, 2003 |
| S | UNIX SYSTEM V RELEASE 4.2 | TX 5-762-235 | July 3, 2003 |
| T | UNIX SYSTEM V RELEASE 4.1 | TX 5-762-234 | July 3, 2003 |
| U | UNIX SYSTEM V RELEASE 3.2 | TX 5-750-268 | July 9, 2003 |

177. SCO and its predecessors in interest created the Copyrighted Programs as original works

of authorship, and, as such, the Copyrighted Programs constitute copyrightable subject

matter under the copyright laws of the United States. The Copyrighted Programs were

automatically subject to copyright protection under 17 U.S.C. § 102(a) when such

programs were fixed in a tangible medium of expression. Copyright protection under 17

U.S.C. § 106 extends to derivative works which are defined in 17 U.S.C. §101 to include

works based on the original work or any other form in which the original work may be recast, transformed, modified or adapted.

178. Pursuant to 17 U.S.C. §410 (c), the certificates of copyright registrations for each Copyrighted Program constitute *prima facie* evidence of the validity of the copyrights and of the facts stated in the certificates. SCO and its predecessors' registered copyrights in the Copyrighted Programs are entitled to such statutory presumptions.

179. IBM's breaches of the IBM Related Agreements and the Sequent Agreements and its post-termination actions have infringed, have induced infringement of, and have contributed to the infringement of, copyright registrations of SCO and its predecessors. Such actions have been willful and have been done with knowledge of the copyright rights of SCO.

180. SCO has been damaged by IBM's conduct and has no adequate remedy at law. IBM's conduct has caused, and, if not enjoined, will continue to cause, irreparable harm to SCO. As a result of IBM's wrongful conduct, SCO is entitled to injunctive relief pursuant to 17 U.S.C. § 502 and SCO's actual damages and IBM's profits as a result of the infringing acts pursuant to 17 U.S.C. § 504 (a), statutory damages to the extent applicable pursuant to 17 U.S.C. § 504 (b) and enhanced damages, together with attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### SIXTH CAUSE OF ACTION
### (Unfair Competition)

181. Plaintiff incorporates and re-alleges paragraphs No. 1-180, above.

52

182. Plaintiff and its predecessors have built the UNIX System V Technology, the UNIX
Software Code, SCO OpenServer, UnixWare and their derivatives through very
substantial efforts over a time span in excess of 20 years and expenditure of money in
excess of $1 billion.

183. IBM has engaged in a course of conduct that is intentionally and foreseeably calculated to
undermine and/or destroy the economic value of UNIX anywhere and everywhere in the
world, and to undermine and/or destroy plaintiff's rights to fully exploit and benefit from
its ownership rights in and to UNIX System V Technology, the UNIX Software Code,
SCO OpenServer, UnixWare and their derivatives, and thereby seize the value of UNIX
System V Technology, the Unix Software Code, SCO OpenServer, UnixWare and their
derivatives directly for its own benefit and indirectly for the benefit of its Linux
distribution partners.

184. In furtherance of its scheme of unfair competition, IBM has engaged in the following
conduct:

    a)  Misappropriation of source code, methods, and confidential information of
plaintiff;

    b)  Breach of contract;

    c)  Violation of confidentiality provisions running to the benefit of plaintiff;

    d)  Inducing and encouraging others to violate confidentiality provisions;

    e)  Contribution of protected source code and methods for incorporation into one or
more Linux software releases, intended for transfer of ownership to the general
public;

53

f) Use of deceptive means and practices in dealing with plaintiff with respect to its software development efforts; and

g) Other methods of unlawful and/or unfair competition.

185. IBM's unfair competition has directly and/or proximately caused significant foreseeable and consequential harm to plaintiff in the following particulars:

a) Plaintiff's revenue stream from UNIX licenses for Intel-based processing platforms has decreased substantially;

b) As Intel-based processors have now become the processing platform of choice for a rapidly-increasing customer base of enterprise software users, plaintiff has been deprived of the opportunity to fairly exploit its market-leading position for UNIX on Intel-based processors, which revenue opportunity would have been very substantial on a recurring, annual basis but for IBM's unfairly competitive practices;

c) Plaintiff stands at imminent risk of being deprived of its entire stream of all UNIX licensing revenue in the foreseeably near future;

d) Plaintiff has been deprived of the effective ability to market and sell its new UNIX-related improvements, including a 32-bit version of UNIX for Intel processors developed prior to Project Monterey, and its new web-based UNIX-related products, including UNIX System V Release 6;

e) Plaintiff has been deprived of the effective revenue licensing opportunity to transfer its existing UNIX System V Release 4 and Release 5 customer base to UNIX System V Release 6; and

54

    f) Plaintiff has been deprived of the effective ability to otherwise fully and fairly exploit UNIX's market-leading position in enterprise software market, which deprivation is highly significant given the inability of Microsoft Windows to properly support large-scale enterprise applications.

186. As a result of IBM's unfair competition and the marketplace injury sustained by plaintiff as set forth above, plaintiff has suffered damages in an amount to be proven at trial, but no less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's unfair competition in an amount to be proven at the time of trial.

187. IBM's unfairly competitive conduct was also intentionally and maliciously designed to destroy plaintiff's business livelihood and all opportunities of plaintiff to derive value from its UNIX-based assets in the marketplace. As such, IBM's wrongful acts and course of conduct has created a profoundly adverse effect on UNIX business worldwide. As such, this Court should impose an award of punitive damages against IBM in an amount to be proven and supported at trial.

### SEVENTH CAUSE OF ACTION
### (Interference with Contract)

188. Plaintiff incorporates and re-alleges by reference paragraphs 1-187, above.

189. SCO has contracts with customers around the world for licensing of SCO OpenServer and UnixWare.

190. IBM knew, or should have known, of these corporate software licensing agreements between SCO and its customers, including the fact that such agreements contain

confidentiality provisions and provisions limiting the use of the licensed object-based code.

191. IBM, directly and through its Linux distribution partners, has intentionally and without justification induced SCO's customers and licensees to breach their corporate licensing agreements, including but not limited to, by inducing the customers to reverse engineer, decompile, translate, create derivative works, modify or otherwise use the UNIX software in ways that violate the license agreements. These customers include Sherwin Williams, Auto Zone, and others.

192. IBM's tortious interference has directly and/or proximately caused significant foreseeable damages to SCO, including a substantial loss of revenues.

193. IBM's tortious conduct was also intentionally and maliciously designed to destroy plaintiff's business livelihood and all opportunities of plaintiff to derive value from its UNIX-based assets in the marketplace. As such, this Court should impose an award of punitive damages against IBM in an amount to be proven and supported at trial.

## EIGHTH CAUSE OF ACTION
### (Interference with Contract)

194. Plaintiff incorporates and re-alleges by reference paragraphs 1- 193, above.

195. Through an Asset Purchase Agreement dated September 19, 1995, as amended ("Asset Purchase Agreement," attached hereto with amendments as Exhibit "V") wherein Novell received 6.1 million shares of SCO common stock, valued at the time at over $100 million in consideration, SCO, through its predecessor in interest, acquired from Novell all right, title, and interest in and to the UNIX and UnixWare business, operating system, source code, and all copyrights related thereto, as well as all claims arising after the

closing date against any parties relating to any right, property, or asset included in the

business.

196. Schedule 1.1(a) to the Asset Purchase Agreement provides that SCO, through its

predecessor in interest, acquired from Novell:

    I.    All rights and ownership of UNIX and UnixWare, including but not limited to all versions of UNIX and UnixWare and copies of UNIX and UnixWare (including revisions and updates in process), and all technical, design, development, installation, operation and maintenance information concerning UNIX and UnixWare, including source code, source documentation, source listings and annotations, appropriate engineering notebooks, test data and results, as well as all reference manuals and support materials normally distributed by [Novell] to end-users and potential end-users in connection with the distribution of UNIX and UnixWare ...

    II.    All of [Novell's] claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business.

    (Exh. V, at Schedule 1.1(a) I and II)

197. In Amendment No. 2 to the Asset Purchase Agreement, Novell and SCO made clear that

SCO owned all "copyrights and trademarks owned by Novell as of the date of the [Asset

Purchase Agreement] required for SCO to exercise its rights with respect to the

acquisition of UNIX and UnixWare technologies," and that Novell would no longer be

liable should any third party bring a claim against SCO "pertaining to said copyrights and

trademarks." (Exh. V, Amendment No. 2 to the Asset Purchase Agreement dated

October 16, 1996 at 1).

198. IBM is well aware of the terms of the Asset Purchase Agreement and the obligations

Novell owes to SCO pursuant to the Asset Purchase Agreement. Indeed, IBM expressly

acknowledged the existence of the Asset Purchase Agreement when it executed

Amendment X, attached hereto as Exhibit E.

199. After suit against IBM was filed, and more than seven years after the Asset Purchase Agreement was executed by Novell, IBM intentionally and improperly interfered with the Asset Purchase Agreement.

200. Specifically, commencing on or about May 2003, Novell began falsely claiming that Novell, not SCO, owned the copyrights relating to UNIX System V. On information and belief, IBM had induced or otherwise caused Novell to take the position that Novell owned the copyrights—a position that is flatly contradicted by the Asset Purchase Agreement. Since that time, Novell has improperly registered the same copyrights that it sold to SCO and that SCO had previously registered.

201. In addition, IBM intentionally and improperly interfered with the Asset Purchase Agreement by inducing or otherwise causing Novell to violate the Asset Purchase Agreement by claiming Novell could waive and was waiving breaches of license agreements by various licensees, including IBM. Specifically, with the IBM Termination Date looming only days away, Novell wrote to SCO claiming that either SCO must waive its right to terminate IBM's license based upon IBM's numerous breaches thereof or else Novell would purportedly waive SCO's right to terminate the license and otherwise excuse IBM's numerous breaches of the license agreements.

202. Again, Novell's position, improperly encouraged and induced by IBM, is flatly contrary to the terms of the Asset Purchase Agreement.

203. Under the Asset Purchase Agreement, Novell merely retained an interest in receiving future royalties from System V licensees. SCO, conversely, obtained "all of Sellers' right, title and interest in and to the assets and properties of the seller relating to the Business (collectively the "Assets") identified on Schedule 1.1(a) hereto." The Assets

58

identified on Schedule 1.1(a) include "all rights and ownership of Unix and UnixWare," including source code, software and sublicensing agreements and "all claims against any parties relating to any right or asset included in the business."

204. Thus, SCO acquired all of Novell's right, title and interest: (a) to the AT&T software and sublicensing agreements, including the IBM Related Agreements and Sequent Agreements, and (b) to all claims against any parties.

205. As a beneficiary of the royalties, Novell arguably can modify or waive the royalty amounts due under a license agreement. However, at IBM's improper urging and inducement, Novell now claims that it can amend, modify or waive any and all terms of the software and sublicensing agreements. Thus, according to Novell's position prompted by IBM, if a licensee such as IBM is egregiously breaching its agreement and thereby destroying the value of System V, Novell claims that it can waive any such breach of the agreement. Such position, of course, is unfounded and preposterous; otherwise, the over $100 million dollars paid for the software and sublicensing agreements was for naught if Novell retained all rights to waive *any* breach by a licensee. Of course, Novell could not sell all right, title and interest to the AT&T software and sublicensing agreements and the rights to all claims against third parties, only to have Novell also claim it can waive those rights. While Novell may be able to modify or waive the royalties to which Novell was entitled, Novell cannot waive rights it clearly unequivocally sold to SCO (*i.e.* the software and sublicensing agreements, including all the restrictive covenants, and all claims against any parties relating to those agreements.) Novell nonetheless has attempted to do so at IBM's improper direction.

59

206.  Since improperly inducing Novell to breach the Asset Purchase Agreement by falsely

claiming copyright ownership of System V (and subsequently registering those

copyrights after SCO had registered them) and since improperly inducing Novell to

attempt to breach the Asset Purchase Agreement by purporting to waive SCO's rights

under the Asset Purchase Agreement, IBM has contributed $50 million dollars to Novell

so that Novell can complete the purchase of SuSE, the largest Linux distributor in

Europe.

207.  IBM's tortious interference has directly and/or proximately caused significant foreseeable

damages to SCO.

208.  IBM's tortious conduct was also intentionally and maliciously designed to destroy

plaintiff's business livelihood and all opportunities of plaintiff to derive value from its

Unix based assets in the marketplace.  As such, this Court should impose and award

punitive damages against IBM in an amount to be proved and supported at trial.

### NINTH CAUSE OF ACTION
### (Interference with Business Relationships)

209.  Plaintiff incorporates and re-alleges by reference  paragraphs 1- 208, above.

210.  SCO had existing or potential economic relationships with a variety of companies in the

computer industry, including but not limited to Hewlett Packard.

211.  IBM has intentionally interfered with plaintiff's existing or potential economic relations.

For example, at Linux World in January, 2003 IBM representatives contacted various

companies with whom SCO had existing or potential economic relations. These IBM

representatives said that IBM was discontinuing doing business with SCO and that these

*other companies, some of whom are business partners with IBM, also should discontinue doing business with SCO.*

212. IBM, as the world's largest information technology company, as well as the world's largest business and technology services provider ($36 billion), and the world's largest IT financier ($35 billion in assets), has considerable clout with these companies that it told to stop doing business with SCO.

213. IBM's intentional interference was for an improper purpose and/or by improper means.

214. IBM's intentional interference has directly and/or proximately caused significant foreseeable damages to SCO.

215. IBM's tortious conduct was also intentionally and maliciously designed to destroy plaintiff's business livelihood. As such, this Court should impose an award of punitive damages against IBM in an amount to be proved and supported at trial.

### TENTH CAUSE OF ACTION
### (Copyright Infringement)

216. Plaintiff incorporates and re-alleges by reference paragraphs 1- 215, above.

217. Based on internal IBM documents first produced by IBM in discovery in March and April 2004, SCO has learned that IBM misappropriated, and used in its own "AIX for Power" operating system, substantial copyrighted source code relating to UnixWare System V Release 4 ("SVR4") even though IBM did not have then and does not have now any license or legal right to use the code in AIX for Power. IBM obtained access to the copyrighted UnixWare SVR4 code through "Project Monterey," a joint development effort in which IBM participated with SCO's predecessor-in-interest The Santa Cruz Operation, Inc. (unless otherwise specified, "SCO"). The newly discovered evidence

reveals that IBM converted SCO's copyrighted code for IBM's own use, in violation of the specific restrictions of the parties' Joint Development Agreement ("JDA") for Project Monterey.

218. As a result, IBM has infringed and will continue to infringe SCO's copyrights in and relating to UnixWare/SVR4 Copyrighted Materials (as defined below) by using, copying, modifying, and/or distributing parts of the UnixWare/SVR4 Copyrighted Materials, and/or derivative works based on the UnixWare/SVR4 Copyrighted Materials, in connection with IBM's development, improvement, and distribution of its AIX for Power software.

219. SCO owns copyrights in certain UNIX software, source code, object code, programming tools, and documentation related to UNIX-operating-system technology, as well as derivative works thereof. Numerous copyright registrations issued by the United States Copyright Office cover these materials (the "UnixWare/SVR4 Copyrighted Materials"). SCO and its predecessors in interest have obtained these registrations in the UnixWare/SVR4 Copyrighted Materials, and SCO now owns them. Such registrations include the following reference materials:

| TITLE | REGISTRATION NO. |
|---|---|
| UNIX SYSTEM V/386: RELEASE 4: Integrated Software Development Guide | TX 2 931-646 |
| UNIX SYSTEM V, RELEASE 4: User's Reference Manual, System Administrator's Reference Manual (commands m-z) For Intel Processors | TX 3 221-656 |
| UNIX SYSTEM V RELEASE 4: User's Reference Manual/System Administrator's Reference Manual | TX 3 227-639 |

| | |
|---|---|
| (Commands a-l) For Intel Processors | |
| Device Driver Interface/Driver-Kernel Interface: Reference Manual For Intel Processors | TX 3 232-578 |
| Programmer's Guide: Streams For Intel Processors: UNIX SYSTEM V, RELEASE 4 | TX 3 218-286 |
| UNIX SYSTEM V Programmer's Guide | TX 2 120-502 |
| UNIX SYSTEM V/386, RELEASE 4, Transport Application Interface Guide | TX 2 881-542 |
| UNIX SYSTEM V/386 RELEASE 4 Device Interface/Driver-Kernel Interface (DDI/DKI) Reference Manual | TX 2 883-235 |
| UNIX SYSTEM V/386, RELEASE 4: Programmer's Guide: SCSI Driver Interface | TX 2 902-863 |
| UNIX SYSTEM V/386 RELEASE 4 System Administrator's Reference Manual | TX 2 881-543 |
| UNIX SYSTEM V/386 RELEASE 4: Programmer's Reference Manual | TX 2 853-760 |
| UNIX SYSTEM V/386 RELEASE 4: User's Reference Manual | TX 2 890-471 |
| UNIX SYSTEM V, RELEASE 4: User's Reference Manual | TX 2 820-791 |
| UNIX SYSTEM V, RELEASE 4: Device Driver Interface/Driver-Kernel Interface (DDI/DKI) Reference Manual | TX 2 820-792 |
| UNIX SYSTEM V, RELEASE 4: Programmer's Guide: STREAMS | TX 2 833-114 |
| UNIX SYSTEM V, RELEASE 4: Programmer's Reference Manual | TX 2 832-009 |
| UNIX SYSTEM V, RELEASE 4: System Administrator's Reference Manual | TX 2 830-989 |

These Certificates of Copyright Registrations constitute *prima facie* evidence of the validity of the copyrights and of the facts stated in the Certificates.  17 U.S.C. § 410(c). SCO's registered copyrights in the UnixWare/SVR4 Copyrighted Materials as embodied in the above Copyright Registrations are entitled to such statutory presumptions.

220.   SCO's registrations in the UnixWare/SVR4 Copyrighted Materials also include the following registrations in the following software code:

| TITLE | REGISTRATION NO. |
|---|---|
| UNIXWARE 7.1.3 | TX 5-787-679 |
| UNIX SYSTEM V RELEASE 4.2MP | TX 5-972-097 |
| UNIX SYSTEM V RELEASE 4.0 | TX 5-776-217 |
| UNIX SYSTEM V RELEASE 4.1ES | TX 5-705-356 |
| UNIX SYSTEM V RELEASE 4.2 | TX 5-762-235 |
| UNIX SYSTEM V RELEASE 4.1 | TX 5-762-234 |

221.   SCO and its predecessors in interest created the UnixWare/SVR4 Copyrighted Materials as original works of authorship, and, as such, the UnixWare/SVR4 Copyrighted Materials constitute copyrightable subject matter under the copyright laws of the United States. The UnixWare/SVR4 Copyrighted Materials were automatically subject to copyright protection under 17 U.S.C. § 102(a) when they were fixed in a tangible medium of

64

expression. Copyright protection under 17 U.S.C. §§ 102 and 103 extends to derivative works. 17 U.S.C. § 101.

222. Project Monterey began on or about October 23, 1998, when IBM and SCO executed the JDA to develop a new operating system that would be used on Intel Corporation's 64-bit "Itanium" processor. IBM needed SCO's expertise for this project because SCO had successfully developed and sold UNIX-based operating systems that operated on Intel 32-bit processors, whereas IBM had very little experience or success in this area. IBM's UNIX-derived product, AIX, had operated on IBM's own Power PC processor.

223. The product to be developed under Project Monterey was originally known as "IA-64" and later known as "AIX5L for Itanium." Paragraph 1.10 of the JDA defines "IA-64 Product" as "the UNIX operating system that is designed to run on Intel architecture and compatibles and which consists of IBM's AIX operating system with the addition of Licensed SCO Materials and any additional Project Work developed under this Agreement."

224. At the time the JDA was executed, IBM had a license to use certain System V Release 3 software ("SVR3"), an earlier version of the SVR4 software that did not contain certain functionality available in SVR4. When IBM and SCO entered into the JDA, IBM desired access to SCO's SVR4 source code so that, among other things, IBM could use that code in IBM's AIX for Power software. IBM's AIX for Power software competed with Sun Corporation's UNIX product, "Solaris," which was based on SVR4. With access to SVR4, IBM could, among other things, make its AIX for Power product mirror the "look and feel" of the Solaris operating system and thereby encourage Solaris customers to switch to IBM's AIX for Power.

65

225. The terms of the JDA and related documents, however, restricted IBM's use of the SVR4 source code to Project Monterey. Paragraphs 1.16 and 5.1 of the JDA provided that the parties would enter into "Supplements" to the JDA that would specifically describe the intellectual property to be shared in the project and the terms on which any such intellectual property, including source code, would be licensed.

226. On February 19, 1999, the parties executed "Supplement B," which sets forth the specific code that SCO would share with IBM (including SVR4) for developing the "IA-64 Product" as well as the restrictions on IBM's use of such code. Supplement B limited IBM's use of the licensed materials (including SVR4) to the development of the UNIX product for Intel's 64-bit "Itanium" processor:

> *The Licensed Materials detailed in Attachments 3 and 4 are to be used solely for development of the IA-64 Product.* Notwithstanding the foregoing, any such Licensed Material included in IA-64 Product Release 1 shall be licensed pursuant to the terms and conditions set forth in the Agreement. *Any Licensed Materials which are not included in IA-64 Product Release 1 may be licensed under a separate Project Supplement or by separate agreement.* In the event of termination of the Agreement or Supplement B, subject to Section 15 of the Agreement, the parties may continue to use the Licensed Materials detailed in Attachment 3 and 4 for the development of IA-64 Product Release 1. (Emphasis added).

227. During the course of Project Monterey, IBM requested a separate project supplement to license SCO's copyrighted code in AIX for Power. To this end, the parties attempted to negotiate a Project Supplement C, which would have allowed IBM to use SCO's code in AIX for Power. But the parties never reached terms on any such supplement; among other things, IBM would not pay the royalties that SCO requested for IBM's use of the code.

66

228.  Thus, neither Supplement B nor any other document permitted IBM to use the licensed materials (including SVR4) in any software other than the IA-64 product envisioned by the JDA.  And the JDA and related documents specifically precluded IBM from using the licensed materials (including SVR4) in its AIX for Power software (which ran on IBM's proprietary Power PC processor, and not on Intel's Itanium processor).  IBM does not own any copyright to the UnixWare/SVR4 Copyrighted Materials, and was never licensed or authorized to copy the UnixWare/SVR4 Copyrighted Materials into its AIX for Power products.

229.  Yet internal IBM documents and source code that IBM produced, in response to SCO's discovery requests, in March and April 2004, show that IBM ignored the restrictions on its use of SCO's copyrighted materials and, at least by October 2000 had begun placing substantial portions of SCO's SVR4 code in IBM's AIX for Power and distributing that infringing product.

230.  Moreover, IBM's own internal documents further reveal that by the time IBM had begun misappropriating SCO's code for use in IBM's AIX for Power, IBM had internally decided not to pursue the Project Monterey Itanium project in earnest, but instead to devote its efforts and resources to Linux, a competing operating system.  Thus, while perpetuating SCO's belief that IBM was pursuing the IA-64 product through Project Monterey, IBM secretly went to work for itself to improve its competitive position with Sun's Solaris by developing its AIX for Power product through IBM's unlicensed access to SCO's copyrighted code.

231.  SCO's analysis of the AIX source code that IBM has produced in this action reveals that IBM's AIX for Power releases after September 2000 contain substantial literal and non-

67

literal copying of SCO's copyrighted SVR4 source code. Every version of IBM's AIX

for Power software shipped since October 2000 contains SCO's copyrighted source code.

232. IBM improperly copied into AIX for Power (Version 5.1.0) at least the following lines of

UnixWare/SVR4 Copyrighted Materials:

| | Lines of Verbatim Copied Code | Lines of Derived Code | Total lines of Copied and Derived Code | Total number of files with Copied and Derived Code |
|---|---|---|---|---|
| Package and Installation Tools | 46,104 | 3,787 | 49,891 | 188 |
| Truss | 3,954 | 3,695 | 7,649 | 16 |
| Print Subsystem | 122,089 | 3,743 | 125,832 | 606 |
| Administrative commands | 8,159 | 504 | 8,663 | 32 |
| Header files | 39,774 | 115 | 39,889 | 275 |
| /proc | | 13,102 | 13,102 | 13 |
| **Total** | **220,080** | **24,946** | **245,026** | **1,130** |

233. In addition, IBM improperly copied into AIX for Power (Version 5.2.0) at least the

following lines of UnixWare/SVR4 Copyrighted Materials:

| | Lines of Verbatim Copied Code | Lines of Derived Code | Total lines of Copied and Derived Code | Total number of files with Copied and Derived Code |
|---|---|---|---|---|
| Package and Installation Tools | 46,076 | 4,660 | 50,736 | 188 |
| Truss | 3,947 | 6,492 | 10,439 | 20 |
| Print Subsystem | 122,409 | 4,458 | 126,867 | 616 |
| Administrative commands | 7,569 | 9,757 | 17,326 | 55 |
| Header files | 39,775 | 213 | 39,988 | 275 |
| /proc | | 15,419 | 15,419 | 15 |
| **Total** | **219,776** | **40,999** | **260,775** | **1,169** |

234. IBM also copied into AIX for Power certain "man pages" (electronic UNIX user documentation) from SCO's copyrighted materials, consisting of tens of thousands of words in dozens of separate files.

235. IBM's recently produced documents also reveal that after IBM improperly placed SCO's SVR4 code in IBM's AIX for Power, IBM shipped AIX for Power Version 5.0 in or about October 2000 even though IBM had no license to do so. After distributing the infringing product, IBM continued to seek a license from SCO to use the SVR4 code in Power without disclosing to SCO that it was already using the code without a license. SCO has not been able to review AIX for Power Version 5.0 to more specifically identify the SVR4 code that IBM copied because IBM has withheld the Version 5.0 source code from SCO in discovery.

236. Knowing that it had already copied SCO's copyrighted SVR4 source code into AIX for Power without a license to do so, IBM then coordinated a pretextual release of a Project Monterey product in an attempt to manufacture a contractual rationalization for IBM's past and continued copying of SCO's SVR4 source code into AIX for Power. The Itanium product that IBM "released," in May 2001, could not have remotely entitled IBM to use any of SCO's UnixWare/SVR4 Copyrighted Materials for any purposes other than Project Monterey. Among other things, IBM's Itanium "release" included a "compiler" that (as IBM knew) was not even minimally acceptable for use on any commercial basis, and would not compile (if at all) at a minimally acceptable speed on Intel's Itanium processor. SCO did not view the compiler issue as a technical problem for Project Monterey; Intel had a functioning compiler that it would license on appropriate terms.

69

But IBM refused to use the Intel compiler and insisted on sending out its pretextual release without an acceptably functioning compiler. At the time IBM released the product, moreover, there was no commercially available Itanium hardware on the market on which the draft Product Monterey Itanium product could run.

237. Although IBM internally understood that this product "release" was of no commercial use and had limited functionality, IBM publicly maintained otherwise.

238. SCO did not know, and could not reasonably have determined, that IBM had thus infringed the copyrights until March or April 2004, at the earliest, when IBM produced to SCO the internal IBM documents from which SCO discovered IBM's copyright infringement relating to AIX for Power. At that time, IBM produced, in response to discovery requested by SCO in this action, almost one million pages of documents and more than sixty source code CDs. In reviewing those discovery materials, SCO learned the facts of IBM's conduct that underlie this cause of action. Specifically, IBM's internal documents revealed IBM's intent to place SCO's copyrighted code into IBM's AIX for Power releases by accessing that code through Project Monterey, and to conceal its conduct so that SCO would not seek to enforce its rights by preventing IBM's use of the code or requiring IBM to pay royalties for such use.

239. Until IBM produced the CDs in March and April, SCO did not have and could not reasonably have gained access to IBM's AIX for Power source code. Moreover, IBM shielded SCO's engineers on Project Monterey from discovering IBM's improper use of the SVR4 code. Although IBM placed SCO's SVR4 code on IBM's Configuration Management Version Control ("CMVC") system, and thereby enabled IBM's AIX for Power engineers to obtain access to that code, IBM did not grant SCO's engineers access

70

to the AIX for Power-related files on the CMVC. SCO's engineers were thus shielded from IBM's copying of SVR4 code into AIX for Power.

240. SCO has been damaged by IBM's conduct and has no adequate remedy at law. IBM's conduct has caused and, if not enjoined, will continue to cause, irreparable harm to SCO.

241. As a result of IBM's wrongful conduct, SCO is entitled to injunctive relief, pursuant to 17 U.S.C. § 502, against IBM's further use or copying of any part of the UnixWare/SVR4 Copyrighted Materials; a declaration that IBM has infringed SCO copyrights in connection with its use, development, improvement, and distribution of its AIX for Power software; actual damages resulting from IBM's infringement and, to the extent applicable and elected by SCO before trial pursuant to 17 U.S.C. § 504, SCO's statutory damages and enhanced damages; and all profits IBM has obtained in connection with its AIX for Power business activities that are attributable to IBM's infringement of SCO's copyrights, together with attorneys' fees and costs pursuant to 17 U.S.C. § 505.

WHEREFORE, having fully set forth its complaint, plaintiff prays for relief from this Court as follows:

1. Under the First Cause of Action, damages for breach of the IBM Software Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing,

improper use of the Software Products, including the full amount IBM receives as a result of its ongoing sales of AIX, including software, services and hardware; and for attorneys fees and costs;

2. Under the Second Cause of Action, damages for breach of the IBM Sublicensing Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing, improper use of the Software Products, including the full amount IBM receives as a result of its ongoing sales of AIX, including software, services and hardware; and for attorneys fees and costs;

3. Under the Third Cause of Action, damages for breach of the Sequent Software Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing, improper use of the Software Products, including the full amount IBM receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware; and for attorneys fees and costs;

4.  Under the Fourth Cause of Action, damages for breach of the Sequent Sublicensing Agreement in an amount not less than $1 billion, together with additional damages through and after the time of trial foreseeably and consequentially resulting from IBM's breach, in an amount to be proven at the time of trial; and together with a permanent injunction requiring IBM to return or destroy all source code and binary copies of the Software Products and/or prohibiting IBM from further contributions of the protected Software Products into open source; and for restitution in an amount measured by the benefits conferred upon IBM by its ongoing, improper use of the Software Products, including the full amount IBM receives as a result of its ongoing sales of Dynix/ptx, including software, services and hardware; and for attorneys fees and costs;

5.  Under the Fifth and Tenth Causes of Action, injunctive relief pursuant to 17 U.S.C. § 502 and SCO's actual damages and IBM's profits as a result of the infringing acts pursuant to 17 U.S.C. § 504 (a), statutory damages to the extent applicable pursuant to 17 U.S.C. § 504 (b) and enhanced damages, together with attorneys' fees and costs pursuant to 17 U.S.C. § 505

6.  Under the Sixth Cause of Action, for damages in an amount not less than $1 billion, for unfair competition arising from common law, and damages for violations thereof, together with additional damages through and after the time of trial;

7.  Under the Seventh  through Ninth Causes of Action, for damages in an amount to be proven at trial for tortious interference, together with additional damages through and after the time of trial;

8.  For a permanent injunction to prohibit IBM from further contributions of the protected Software Products into open source;

73

9. For punitive damages under the Sixth through Ninth Causes of Action for IBM's malicious and willful conduct, in an amount to be proven at trial;

10. For attorneys' fees and costs as provided by statute and/or by contract in an amount to be proven at trial; together with pre- and post-judgment interest and;

11. For all other legal and equitable relief deemed just and proper by this Court.

## Jury Trial Demand

SCO demands trial by jury on all issues so triable.

DATED THIS 14th day of October, 2004

By:

HATCH, JAMES & DODGE
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stephen N. Zack
Mark J. Heise
Edward Normand
Sean Eskovitz

Attorneys for The SCO Group, Inc.

Plaintiff's address:

355 South 520 West
Lindon, Utah 84042

74