# EXHIBIT A

Westlaw.

19 F.3d 1429 (Table)                                                                 Page 1
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
**Unpublished Disposition**
**(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))**

▷
<u>Briefs and Other Related Documents</u>

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA4 Rule 36 for rules
regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

In re: LONE STAR INDUSTRIES, INC. Concrete
Railroad Cross Ties Litigation
CSX TRANSPORTATION, INCORPORATED;
National Railroad Passenger Corporation;
Metro-North Commuter Railroad Company;
Massachusetts Bay Transportation
Authority, Plaintiffs,
v.
LONE STAR INDUSTRIES, INCORPORATED;
Lone Star Transportation Corporation;
San-Vel Concrete Corporation, Defendant & Third
Party Plaintiff-Appellants,
v.
Lafarge Corporation; Lafarge Canada, Inc., Third
Party Defendants-Appellees
and
Northeast Cement Company, Incorporated; the
Thompson & Lichtner Company,
Incorporated, Third Party Defendants.
In re: LONE STAR INDUSTRIES, INC. Concrete
Railroad Cross Ties Litigation
CSX TRANSPORTATION, INCORPORATED;
National Railroad Passenger Corporation;
Metro-North Commuter Railroad Company;
Massachusetts Bay Transportation
Authority, Plaintiffs,
v.
LONE STAR INDUSTRIES, INCORPORATED;
Lone Star Transportation Corporation;
San-Vel Concrete Corporation, Defendant & Third
Party Plaintiff-Appellants,
v.
Lafarge Corporation; Lafarge Canada, Inc., Third
Party Defendants-Appellees
and

Northeast Cement Company, Incorporated; the
Thompson & Lichtner Company,
Incorporated, Third Party Defendants.

**Nos. 93-1505, 93-1506.**

Argued Dec. 8, 1993.
Decided April 7, 1994.

Appeals from the United States District Court for the
District of Maryland, at Baltimore.    Alexander
Harvey II, Senior District Judge.  (CA-89-2005-H,
CA-89- 3085-H, CA-90-748-H, CA-90-1741-H, CA-
89-3343-H)

<u>Andrew Jay Graham</u>, Kramon & Graham, P.A.,
Baltimore, Md., for appellants.

<u>Lawrence T. Hoyle, Jr.</u>, Hoyle, Morris & Kerr,
Philadelphia, Pa., for appellees.

On Brief:  Rogers & Wells, New York, New York,
for appellants.

Richard M. Bernstein, Hoyle, Morris & Kerr,
Philadelphia, Pa., for appellees.

D.Md.

VACATED, REVERSED, AND REMANDED.

Before HALL, <u>LUTTIG</u>, and <u>MICHAEL</u>, Circuit
Judges.

OPINION

<u>MICHAEL</u>, Circuit Judge:

**\*1** I. *Introduction*

In this diversity action, Lone Star Industries, Inc.,
Lone Star Transportation Corporation and San-Vel
Concrete Corporation (collectively "Lone Star") sued
Lafarge Corporation and Lafarge Canada, Inc.
(collectively "Lafarge") for claims arising out of
Lafarge's sale of cement to Lone Star. After a five-
week jury trial, the $1.2 million verdict for Lone Star

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

19 F.3d 1429 (Table)                                                                    Page 2
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
*Unpublished Disposition*
(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))

was but a small fraction of the $93 million it had sought. Lone Star appeals and Lafarge cross appeals certain rulings of the district court during the course of the litigation.

Lone Star asserts that the district court erred in (1) determining that Lone Star abandoned $83 million in consequential damage claims, (2) denying Lone Star leave to amend its complaint and third-party complaints, (3) granting Lafarge judgment as a matter of law on Lone Star's damage claims for lost future profits and asset write-offs, and (4) ruling that any fault on Lone Star's part precluded its recovery for common-law indemnification. For the reasons discussed below, we vacate the judgment of the district court and remand for a new trial on both liability and damages. With this disposition, we need not address the issues raised in Lone Star's fourth assignment of error or in Lafarge's cross appeal.

II. *Some Background Pertinent to the Abandonment Issue*

Between 1983 and 1988, Lafarge sold cement to Lone Star which Lone Star used in manufacturing over 500,000 concrete railroad crossties. The ties were bought by several railroads, including Amtrak, and were installed throughout the Eastern United States. In 1988 and 1989, several railroads notified Lone Star that the ties were showing signs of premature, severe cracking and required replacement. Lone Star claimed that the cracking was due to Lafarge's defective, over-sulfated cement. In 1989, the railroads began suing Lone Star in various federal courts, including the Districts of Maryland, Massachusetts and Southern New York. In these actions, Lone Star filed third-party complaints against Lafarge, asserting claims for breaches of express and implied warranties, negligence, and fraudulent misrepresentation (the "non-indemnification claims"). Lone Star also commenced a separate action against Lafarge in the District of Maryland. The Judicial Panel on Multidistrict Litigation consolidated all of these actions in the District of Maryland pursuant to 28 U.S.C. § 1407.

Lone Star's amended third-party complaint sought damages from Lafarge on each of the non-indemnification (warranty, negligence and fraud) claims for, *inter alia,* "the full amount of any judgment rendered herein [for the railroads against Lone Star], as well as for related costs and expenses." JA 106, 108- 10, 113-14. Shortly before trial, Lone

Star settled the railroads' claims for $67.1 million.

In early September 1992, pursuant to Local Rule 106, Rules of the U.S. District Court for the District of Maryland ("Local Rule"), Lone Star submitted a proposed pretrial order covering its claims against Lafarge. In the pretrial order, a party must identify "[a]ny issue in the pleadings that is to be abandoned." Md. Dist. Ct. R. 106(2)(e). "None" was Lone Star's response. JA 250.

**2 In the pretrial order, Lone Star listed its separate legal theories, *i.e.,* the non-indemnification claims, as follows:

> Lone Star will maintain the following claims against Lafarge *at trial:*
> . that Lafarge breached its express warranty that the cement would comply with ASTM specification C150; [FN1]
> . that Lafarge breached its implied warranty of merchantability and fitness for a particular purpose;
> . that Lafarge was negligent in the manufacture of the cement in question; and
> . *that Lafarge falsely represented that the cement which it sold to Lone Star complied with ASTM specifications, either knowing such representations to be false, or with reckless disregard as to their truth or falsity.*

JA 250 (emphasis added). In describing the details of its damages Lone Star said:

> Lone Star will also prove that, as a result of Lafarge's failure to comply with its warranties and contractual commitments, Lafarge is liable to indemnify Lone Star with respect to the claims of the plaintiff railroads. In addition, Lone Star has sustained damages through the destruction of its concrete railroad ties business, related closing costs and asset write-offs, lost profits, litigation fees and expenses, and reorganization costs.... Additional costs and damages are continuing to accrue.

JA 250.

Lone Star repeated the foregoing statements in an amended pretrial order submitted in late September 1992. The district court approved the two pretrial orders on September 10 and October 1, 1992, respectively.

At the district court's request, Lone Star filed a supplemental pretrial order on November 9, 1992, with an attachment describing and updating damages sought as follows:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

DAMAGES CLAIMED AGAINST LAFARGE

As of September 30, 1992, the *components of Lone Star's damage claims* were as follows:

Direct Costs (*$000* )
Litigation fees and expenses $15,757

Interest on Professional Fees 300
*Related Asset Write-offs* 1,727
San-Vel Closing Costs 1,300
Reorganization Costs 4,217
Direct Lost Profits 1,213
Future Lost Profits 1,800
$26,314
Indemnification (*$000* )
Amtrak $39,000
Metro-North 3,000
CSX Transportation 3,400
U.S. Navy/Railroad Service 85
LSM Concrete Tie Company 419
Mass. Bay. Trans. Authority 15,500
Maryland MTA 5,700
$67,104
TOTAL:$93,418
JA 362 (emphasis added).

Trial commenced on November 9, 1992. While Lone Star was still presenting its case, the parties filed their proposed jury instructions. Lone Star's proposed instructions discussed in detail the elements of its non-indemnification claims as well as its common-law indemnification claim. In a proposed damage instruction, Lone Star made clear that it "claim[ed] the same damages with respect to each of its theories of recovery." JA 414. Damages listed in the instruction included railroad settlement costs and litigation fees, expenses, and interest ("settlement costs and litigation expenses"). During Lafarge's case, Lone Star filed revised instructions which reiterated that the settlement costs and litigation expenses were sought on each theory of recovery.

**\*\*3** Lafarge argues, and the district court agreed, that exchanges during trial between the district court and one of Lone Star's counsel establish that Lone Star had decided to seek recovery of settlement costs and litigation expenses only under the common-law indemnification claim. The first exchange occurred after the close of Lone Star's case:

THE COURT: And then you talk about contribution. I hadn't heard any mention of contribution in this case. I thought it was strictly indemnification.

MR. QUINLAN [for Lone Star]: I believe that is

correct, your Honor.

THE COURT: There were some references in the instructions to contribution which is a slightly different theory and I don't think it's mentioned in opening statements and nor in the pretrial order claim. All right. So I think we're agreed, then, with what the five claims are and it's the-- indemnification and I think we're also agreed that it *is Massachusetts law. Everybody agrees that it is* Massachusetts law. And when we get to instructions, we will be discussing that in more detail.

JA 1054.

The second exchange occurred during Lafarge's case:

THE COURT: Because there are different considerations and they are being charged separately on each of those elements. Of course, the indemnification, seems to me that would be the first thing because that is where you get your claims form [sic] amounts paid in settlement and attorneys fees and so on and there are elements there that you have to prove, plus you have the indemnification plus the wrongful act, correct?

MR. QUINLAN: I believe that is correct, your Honor.

THE COURT: It wasn't really set up that way, and, of course, if the jury found for Lafarge on indemnification, that wipes those claims out, whether or not you prove the others, correct?

MR. QUINLAN: I am at something of a disadvantage, your Honor, because my colleagues working on this are not here, but I believe that may be correct.

JA 1153-54.

At the conclusion of Lafarge's case, the district court conducted the customary charge conference. At the conference, the court indicated that Lone Star, in its pretrial order materials, had abandoned any claim for settlement costs and litigation expenses, except under the common-law indemnification theory. Lone Star's repeated objections to this determination were overruled. Therefore, Lone Star could recover settlement costs and litigation expenses (alleged to total $83 million) *only* if the jury found for Lone Star on the common-law indemnification claim. Lone Star's potential to collect damages on its non-*indemnification* claims (breach of warranties, negligence and fraud) would be limited to $1,213,000, the amount sought for direct lost profits.

The jury returned its verdict in favor of Lone Star on

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

19 F.3d 1429 (Table)
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
**Unpublished Disposition**
**(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))**

Page 4

all but the common-law indemnification and breach of implied warranty of merchantability claims. Thus, the jury found that Lafarge acted fraudulently, negligently, and contrary to certain warranties. However, because of the district court's abandonment determination, Lone Star was denied the potential recovery of $83 million in settlement costs and litigation expenses under the non-indemnification claims. Lone Star was awarded $1,213,000 in consequential damages for direct lost profits.

**\*\*4** At the post-trial motion stage, the district court reaffirmed its conclusion that Lone Star (to avoid potential statutes of limitations problems) had dropped its consequential damage claims for settlement costs and litigation expenses prior to trial. Specifically, the district court said that "Lone Star had for tactical reasons limited its claim for the recovery of settlement amounts paid and litigation expenses to one asserted solely under a theory of [common-law] indemnification...." JA 581. The district court cited the following to justify its conclusion: (1) Lone Star's use of the word "indemnify" in one paragraph discussing damages in its pretrial orders, (2) Lone Star's use of the word "indemnify" in narrative introducing a partial listing of its damages in an attachment to the pretrial order, (3) Lone Star's use of the words "Direct Costs" and "Indemnification" as headings in an attachment listing the components of its damages in the supplemental pretrial order set out above, and (4) the two brief exchanges with Lone Star's counsel, also set out above. We believe that the district court focused too much on the places where the words "indemnify" or "indemnification" were used and missed the broader picture. That broader picture (which includes other parts of the pretrial order material, Lone Star's proposed instructions and an analysis of the key colloquies) compels the conclusion that Lone Star was seeking settlement costs and litigation expenses under *all* theories of recovery, *not* just common-law indemnification.

III. *Analysis of the Abandonment Issue*

Lone Star contends the district court erred in determining that Lone Star had abandoned settlement costs and litigation expenses as damage elements under its non-indemnification claims. [FN2] We review the district court's determination, at both the trial and post-trial motion stages, under an abuse of discretion standard. *See, e.g., Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 817-18 (10th Cir.1979) (citation omitted); *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429,

1433 (4th Cir.1985), *cert. denied*, 475 U.S. 1016 (1986).

In finding abandonment, the district court relied mainly on Lone Star's pretrial order materials and two of the court's exchanges with Lone Star's counsel during trial. In our review, we examine these materials and exchanges as well as certain other portions of the record.

A. *The Pretrial Order Materials*

Federal Rule of Civil Procedure 16(e) and Local Rule 106(1) provide for the entry of a pretrial order. Generally, pretrial orders are construed " 'liberally ... to cover any of the legal or factual theories that might be embraced by their language.' " *Trujillo*, 608 F.2d at 818 (citation omitted); *Lamborn v. Dittmer*, 873 F.2d 522, 527 (2nd Cir.1989) (dicta); *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 368 (9th Cir.1985); *Howard v. Kerr Glass Mfg. Co.*, 699 F.2d 330, 333 (6th Cir.1983) (dicta); *United States Gypsum Co. v. Schiavo Bros., Inc.*, 668 F.2d 172, 181 n. 12 (3rd Cir.1981), *cert. denied*, 456 U.S. 961 (1982); *Geremia v. First Nat'l Bank of Boston*, 653 F.2d 1, 5 (1st Cir.1981); *see Scutieri v. Paige*, 808 F.2d 785, 792 (11th Cir.1987); 6A Charles A. Wright et al., *Federal Practice and Procedure* § 1527 (2d ed.1990). We echo the view of the Tenth Circuit:

> **\*\*5** Any other [than a liberal] construction of the pre-trial order would tend to unduly constrict the trial of the case and defeat the central and salutary purpose of the Federal Rules of Civil Procedure *to insure the trial of every lawsuit on its merits.... It is a procedural tool to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality.* We must not allow ourselves to construe the pre-trial order in the spirit of a common law pleading.

*Century Ref. Co. v. Hall*, 316 F.2d 15, 20 (10th Cir.1963) (emphasis added).

Even if construction of the pretrial order material is necessary, the district court's abandonment conclusion went beyond the normally broad discretion accorded a trial judge in this context. First, Lone Star's amended third-party complaint sought damages on each of the non-indemnification claims for "the full amount of any judgment rendered herein [for the railroads], as well as for related costs and expenses." When required under Local Rule 106(2)(e) to state (in the pretrial order) what pleading issues were being abandoned, Lone Star responded

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

"none." Second, the pretrial order sets forth the five nonindemnification claims and then clearly states that all of the claims are based on a preceding factual narrative which includes a discussion of the railroad settlement costs and litigation expenses. Third, both sets of Lone Star's jury instructions state directly that "Lone Star claims the same damages with respect to each of its theories of recovery." JA 414, 489. These damages are then set forth with particularity and include the settlement costs and litigation expenses.

The district court emphasized Lone Star's use of the words "indemnify" twice and "indemnification" once in the pretrial order materials. A look at how these words were used does not support the abandonment determination. Read in context, "indemnify" and "indemnification" refer to a category of damages rather than a distinct legal claim.

We believe the district court's failure to distinguish between the *claims pursued* and *damages sought* helped lead to the erroneous determination. This failure to distinguish is highlighted in the March 26, 1993, Memorandum and Order denying the post-trial motions. For instance, in interpreting the "Direct Costs" and "Indemnification" headings in the attachment to the supplemental pretrial order, the district court said:

Both the Court and counsel for Lafarge interpreted Lone Star's original and supplemental Pretrial Orders as presenting only two basic *theories* of recovery, first a claim of indemnification and second a direct claim for the recovery of certain other consequential damages.

JA 583-84 (emphasis added).

The record does not support the characterization of "Direct Costs" as a "basic theor[y] of recovery." Lone Star repeatedly emphasized in its pleadings and other submissions that its theories of recovery consisted only of the non-indemnification claims and the common-law indemnification claim. An examination of the pretrial order attachment which had the "Direct Costs" and "Indemnification" headings reveals that they were not meant to characterize legal theories. Indeed, the headings were introduced as "the components of Lone Star's *damage claims." See, e.g.,* JA 362 (emphasis added). Lone Star's legal theories were discussed elsewhere.

**6 The settlement costs and litigation expenses were preserved in the pretrial order materials as part

of the consequential damages sought under the five non-indemnification claims.

B. *The District Court's Exchanges with Counsel*

In addition to the pretrial order material, the district court relied on two exchanges with counsel for Lone Star to reach its abandonment determination. We set out the exchanges in the background discussion, and they are worth repeating here. The first (after Lone Star had rested) was:

THE COURT: And then you talk about contribution. I hadn't heard any mention of contribution in this case. I thought it was strictly indemnification.

MR. QUINLAN: I believe that is correct, your Honor.

THE COURT: There were some references in the instructions to contribution which is a slightly different theory and I don't think it's mentioned in opening statements and nor in the pretrial order claim. All right. So I think we're agreed, then, *with what the five claims are and it's the-- indemnification* and I think we're also agreed that it is Massachusetts law. Everybody agrees that it is Massachusetts law. And when we get to instructions, we will be discussing that in more detail.

(Emphasis added.)

Lone Star counsel's agreement with the district court is hardly surprising. His response simply indicates that *as between* contribution and indemnification, Lone Star determined the better course was to pursue indemnification. This position was entirely consistent with the representations made in Lone Star's pretrial order. Additionally, the underscored portion of the district court's follow-up buttresses Lone Star's assertion that it was surprised when the court subsequently announced its conclusion that Lone Star was pursuing only *two* basic theories of recovery. The underscored portion is also consistent with Lone Star's proposed jury instructions asserting the nonindemnification claims and one common-law indemnification claim. Accordingly, this first exchange does not support the abandonment determination.

The second exchange occurred during Lafarge's case when proposed written interrogatories to the jury were being discussed:

THE COURT: Because there are different considerations and they are being charged separately on each of those elements. Of course,

Case 2:03-cv-00294-DN   Document 495-3   Filed 07/06/05   PageID.5013   Page 7 of 46
Page 6
19 F.3d 1429 (Table)
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
**Unpublished Disposition**
(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))

the indemnification, seems to me that would be the first thing because that is where you get your claims form [sic] amounts paid in settlement and attorneys fees and so on and there are elements there that you have to prove, plus you have the indemnification plus the wrongful act, correct?

MR. QUINLAN: I believe that is correct, your Honor.

THE COURT: It wasn't really set up that way, and, of course, if the jury found for Lafarge on indemnification, that wipes those claims out, whether or not you prove the others, correct?

MR. QUINLAN: I am at something of a disadvantage, your Honor, because my colleagues working on this are not here, but I believe that may be correct.

**7 Mr. Quinlan did serve as a lead trial counsel for Lone Star. However, he did not draft the proposed jury instructions and he was quick to tell the court that he was not prepared to address the technical points under discussion. Perhaps to assuage Mr. Quinlan's obvious hesitancy, the court added, "I am just trying to get some advanced idea because I am going to be taking a close look at the instructions tomorrow and over the weekend...." JA 1154.

Mr. Quinlan's two brief responses in the second exchange do not evince a willingness to forego an alternative opportunity to recover over $83 million in settlement costs and litigation expenses--damages Lone Star had sought in this complicated case from the filing of the third-party complaints through the submission of proposed jury instructions. Mr. Quinlan's hesitant, equivocal statements do not assist in justifying the district court's abandonment determination. [FN3] *Cf. Lamborn*, 873 F.2d at 529 (" 'To establish an implied waiver, there must be a clear, unequivocal and decisive act of a party showing such a purpose' ") (citation omitted); *accord Holder v. Maaco Enters.*, 644 F.2d 310, 312 (4th Cir.1981). Accordingly, we conclude that the exchanges between the district court and counsel do not reveal an intent to abandon by Lone Star.

C.   *Other Considerations Relevant to the Abandonment Issue*

The district court justified its abandonment determination in part by surmising that Lone Star abandoned recovery of settlement costs and litigation expenses under the non-indemnification claims because of concern about the statutes of limitations. In its Memorandum and Order denying the parties' post-trial motions, the court said:

During argument on Lafarge's motion for judgment as a matter of law, it became apparent why Lone Star's substantial claim for settlement amounts paid and litigation expenses was being presented solely under a theory of indemnification.... [A]ny direct claim for the recovery of settlement amounts paid and litigation expenses as consequential damages would have to overcome serious hurdles based on the applicable statutes of limitations.
JA 585.

The record does support the conclusion that Lone Star was concerned that its warranty claims might be restricted by a four-year statute of limitations. For instance, in objecting to the court's ruling after the close of the evidence that settlement costs and litigation expenses could only be recovered under the common-law indemnification claim, counsel for Lone Star said:

MR. QUITMEYER: ... As a matter of fact, the reason for indemnification being pled as a separate claim was to get around or was to deal with the statute of limitations problems, which the Court has otherwise resolved.

For example, if we had no indemnification, no affirmative indemnification claim, *but simply a breach of ... warranty claim,* we were concerned, and there was some authority, as the Court knows, for the proposition that our claim would be limited to the four-year statute of limitations.
**8 JA 1250 (emphasis added).

In other words, Lone Star added the common-law indemnification claim as an alternative to the non-indemnification claims to bolster its chances of recovering the settlement costs and litigation expenses. The district court, however, surmised that Lone Star had pursued a more cunning strategy: At the close of its case when it was concerned about statutes of limitations problems, Lone Star embraced common-law indemnification as the theory for recovery of settlement costs and litigation expenses. Then, at the close of evidence when it became concerned about the strength of its proof on indemnification, Lone Star reversed course and insisted it had been pursuing these costs and expenses under the non-indemnification claims all along. Such a strategy would have made no sense.

Even if Lone Star's breach of warranty claims had been subject to the four-year statute of limitations, it still had the potential to recover tens of millions of dollars. Lafarge claimed that about sixty percent of the damages sought by Lone Star would be barred

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

19 F.3d 1429 (Table)
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
**Unpublished Disposition**
**(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))**

under the statute of limitations defense. Such a reduction would still have left about $33 million on the table. Why then would Lone Star abandon efforts to recover at least some of the many millions spent on the railroad litigation?

Further, concerns about statutes of limitations would not have justified an abandonment strategy by Lone Star on its fraud claim. Lafarge does not dispute that Maryland prescribes a three-year statute of limitations for fraud running from the time of discovery. Lafarge conceded that the discovery inquiry was properly left to the jury and did not seek judgment as a matter of law on this issue. But for the abandonment determination, the jury could potentially have awarded Lone Star consequential damages under the fraud claim in the *full amount* of the settlement costs and litigation expenses.

### D. *Conclusion*

For the reasons outlined above, we hold that the district court's abandonment determination amounted to an abuse of discretion. The district court should have permitted the jury to consider the settlement costs and litigation expenses as a part of damages under both the common-law indemnification claims and (subject to the statutes of limitations defenses) the non-indemnification claims.

Accordingly, we vacate the judgment and remand for a new trial in accordance with this opinion. [FN4]

### IV. *Scope of the New Trial*

The parties disagree whether a new trial should encompass both liability and damages or just damages. Because of Lone Star's statements and submissions and the district court's rulings, Lafarge says it concluded before it began its defense case that Lone Star was not seeking settlement costs and litigation expenses under the nonindemnification claims. Had it concluded the opposite, Lafarge says it would have presented its case quite differently. Lone Star maintains that Lafarge fully defended all claims and that a new trial should be ordered only to determine damages.

**9 Although the district court denied Lone Star's motion for a new trial, it observed that "[c]ertainly, if a new trial were to be granted, it would necessarily have to include a re-trial of both liability and damages issues." JA 589. We agree.

Rule 59(a), Federal Rules of Civil Procedure, provides that "[a] new trial may be granted ... on all or part of the issues...." Both appellate and trial courts enjoy broad discretion in determining whether to grant a new trial on all or only some of the issues. *Spell v. McDaniel,* 824 F.2d 1380, 1400 (4th Cir.1987), *cert. denied,* 484 U.S. 1027 (1988); *Young v. International Paper Co.,* 322 F.2d 820, 822 (4th Cir.1963); *Kuehne & Nagel (AG & Co) v. Geosource, Inc.,* 874 F.2d 283, 293 (5th Cir.1989); 6A James W. Moore et al., *Moore's Federal Practice* ¶ 59.06 (2d ed.1993). In making the determination, a court should consider "the totality of the circumstances." *See* Wright et al., *supra,* § 2814.

For a partial new trial to be ordered, it must appear that the issue to be retried is distinct and separable from the other issues. *Atlantic Coast Line R.R. Co. v. Bennett,* 251 F.2d 934, 938 (4th Cir.1958); *Mason v. Mathiasen Tanker Indus., Inc.,* 298 F.2d 28, 33 (4th Cir.), *cert. denied,* 371 U.S. 828 (1962); 58 Am.Jur.2d *New Trial* § 67 (1989). The grant of a new trial on part of the issues is improper "unless it is clear that no injustice will result." *Bennett,* 251 F.2d at 938.

We have concluded that the district court was wrong in characterizing some of Lone Star's statements as confirming abandonment of certain damage claims. However, we cannot go so far as to conclude that these statements (made before and during Lafarge's case) and certain rulings did not have an effect on Lafarge's trial strategy.

Lafarge insists it believed that Lone Star was seeking $83 million on the common-law indemnification claim, but only $1.2 million on the non-indemnification claims. Lafarge argues that, based on that belief, "the incentive to [defend the non-indemnification] ... portion of the case paled by comparison with the need to defend the $83,000,000 claim for [common-law] indemnification." Resp. Br. at 32. Some of Lafarge's trial strategy does support these assertions. For example, the district court excluded, on hearsay grounds, evidence showing that Lafarge offered to assist Lone Star in finding the cause of cracking in the ties. According to Lafarge, this evidence was relevant to defending Lone Star's fraud claim, which Lafarge believed was limited to $1.2 million. Lafarge says that it did not present testimony of witnesses with first-hand knowledge of these assistance offers because of its much greater need to concentrate on defending the $83 million common-law indemnification claim. We accept that.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

19 F.3d 1429 (Table)
Page 8
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
*Unpublished Disposition*
(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))

We are also persuaded that Lafarge would have concentrated on a fuller development of its statutes of limitations defenses if it had believed it was facing $83 million in damages on each and every claim.

**\*\*10** After looking at all the circumstances (including the district court's rulings and the way the case was tried), we conclude that the issues of liability and damages are intertwined to the point that they should not be severed. It would be unjust to remand this case for less than a full trial. Accordingly, the scope of the new trial will encompass both liability and damages.

*V. Lone Star's Motion to Amend its Complaint and Third-Party Complaints*

This litigation was stayed under Section 362 of the Bankruptcy Code after Lone Star filed a Chapter 11 petition on December 10, 1990. The stay was not lifted until June 13, 1991. On June 14, 1991, the day after the stay was lifted and a year and a half before trial, Lone Star served a motion to amend its complaint and third-party complaints by adding a claim under the Massachusetts unfair trade practices statute. Mass. Ann. Laws ch. 93A, § 2 (Law. Co-op.1991) ("the Chapter 93A claim"). The scheduling order's pleading amendment deadline had expired on November 5, 1990, thirty-five days before Lone Star's bankruptcy filing. At the time Lone Star filed its motion to amend, discovery cutoff and trial dates had not been set.

Lone Star asserts that its motion to amend was based in substantial part on deposition testimony about kiln instability which was elicited from Lafarge witnesses after the pleading amendment deadline. According to Lone Star, this new testimony contradicted earlier testimony of other Lafarge witnesses. Lafarge opposed the motion, but did not claim that Lone Star had delayed intentionally or that it (Lafarge) would have been prejudiced by an amendment at that stage of the litigation.

The district court indicated that for Lone Star to amend, it had to satisfy two prerequisites: First, under Fed.R.Civ.P. 16(b), it had to "show [ ] ... good cause" for modifying the amendment deadline in the scheduling order; and, second, it then had to show the amendment was proper under Fed.R.Civ.P. 15(a). The court denied leave to amend because it did not find "good cause" under the first prong of the test, and it therefore did not consider the second.

The district court had three reasons for not finding "good cause": (1) it said the Chapter 93A claim was essentially duplicative of claims already asserted by Lone Star, (2) it said that much of the evidence to support the new claim was available prior to the amendment deadline, and (3) it was concerned about delay.

A district court's decision to deny amendment of pleadings will not be disturbed absent an abuse of discretion. *Foman v. Davis,* 371 U.S. 178, 182 (1962). This discretion, however,

> is limited by the principle, embodied in Rule 15(a) that "leave shall be freely given when justice so requires," and by the general policy embodied in the Federal Rules favoring resolution of cases on their merits.

*Davis v. Piper Aircraft Corp.,* 615 F.2d 606, 613 (4th Cir.), cert. dismissed, 448 U.S. 911 (1980).

**\*\*11** In exercising its discretion, a district court should center its attention " 'on prejudice or futility or bad faith as the only legitimate concerns in denying leave to amend, since only these [factors] truly relate to protection of the judicial system or other litigants.' " *Island Creek Coal Co. v. Lake Shore, Inc.,* 832 F.2d 274, 279 (4th Cir.1987) (quoting *Piper Aircraft,* 615 F.2d at 613). Delay alone is insufficient to deny leave to amend. *Island Creek,* 832 F.2d at 279. Rather, " '[t]he delay [must be] accompanied by prejudice, bad faith, or futility.' " *Id.* at 279 (quoting *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509-10 (4th Cir.1986)). Indeed, the "absence of prejudice, though not alone determinative, will normally warrant granting leave to amend." *Piper Aircraft,* 615 F.2d at 613 (citation omitted).

Neither party has questioned whether the district court was correct to link Rule 16(b) and Rule 15(a). We need not consider that issue here because we conclude that Lone Star satisfied both rules. [FN5] As for Rule 16(b), first, it is implicit in the district court's ruling that *some* of the evidence needed by Lone Star to prove its new Chapter 93A claim did not surface until after the amendment deadline. This alone justifies a finding of good cause under Rule 16(b). *Forstmann v. Culp,* 114 F.R.D. 83, 86 n. 1 (M.D.N.C.1987) (" 'Good cause' for modifying the scheduling order might exist if ... plaintiff uncovered previously unknown facts during discovery that would support an additional cause of action"); *cf. Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039, 1044 (4th Cir.1984) (finding abuse of discretion in refusal to permit amendment of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 495-3   Filed 07/06/05   PageID.5016   Page 10 of 46

19 F.3d 1429 (Table)                                                      Page 9
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
**Unpublished Disposition**
**(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))**

complaint where evidence for amendment was discovered shortly before trial). Second, if the time of the bankruptcy stay is excluded, Lone Star served its motion to amend only thirty-six days after the deadline. We appreciate the district court's concern about the potential for delay. But, at the time the district court denied the motion to amend, no cutoff date for discovery had been established and no trial date had been set. Indeed, discovery continued for about a year after Lone Star's motion to amend. There is no suggestion that Lone Star was being dilatory. Given the bankruptcy, it appeared to be doing the best it could. Accordingly, we conclude that Lone Star, under Rule 16(b), demonstrated good cause for deviation from the pleadings amendment deadline in the scheduling order.

As for Rule 15(a), there is no showing by Lafarge that it would have been prejudiced by the proposed amendment. This militates strongly in favor of granting leave to amend. As the district court recognized, the factual issues raised by the new claim were encompassed in claims asserted from the outset. In any event, there was plenty of time left for Lafarge to analyze the new Chapter 93A claim and to do any additional discovery. Finally, there is no suggestion that Lone Star acted in bad faith or that the amendment would be futile.

**12 We conclude that "this is one of those rare cases in which a refusal by the district judge to grant an amendment represents an abuse of discretion." Island Creek, 832 F.2d at 281. We reverse the district court's orders on this issue and, on remand, grant Lone Star leave to amend to add its Chapter 93A claim.

VI. *Lone Star's Damage Claims for Lost Future Profits and Asset Write-offs*

Lone Star contends the district court also erred in granting Lafarge's motion for judgment as a matter of law on Lone Star's damage claims for over $3 million in lost future profits and asset write-offs. Lafarge counters that it was not the proximate cause of these alleged damages, and, further, that the evidence concerning lost future profits was uncertain, contingent, and speculative.

We review the district court's determination *de novo, Anheuser-Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.), *cert. denied,* 113 S.Ct. 206 (1992), and examine whether, "viewing the evidence in the light most favorable to the non-moving party

and giving [it] the benefit of all reasonable inferences, there is sufficient evidence in the record to support a jury verdict in [its] favor." *Herold v. Hajoca Corp.,* 864 F.2d 317, 319 (4th Cir.1988), *cert. denied,* 490 U.S. 1107 (1989).

At trial, Lone Star claimed that the cracking of the ties led to adverse publicity and forced its withdrawal from the tie manufacturing business. As a result, Lone Star said it had to shelve assets and forego prospective profits it otherwise would have enjoyed.

First, Lafarge argues that Lone Star failed to show, as a matter of law, that its allegedly defective cement was the proximate cause of the asset write-offs and any lost future profits. We disagree.

Prior to the widespread cracking of the hundreds of thousands of ties sold to the railroads, Lone Star appears to have enjoyed steady success in the industry. While profits were not "great," according to Lone Star's board chairman, David Wallace, Lone Star's expectations of substantial future business from existing customers appear to have been justified. For instance, Victor Burton oversaw Lone Star's tie manufacturing for eight years and supervised its marketing. Approximately two months before the first reports of cracking, Burton projected that Lone Star would manufacture in excess of 1,560,000 ties for Amtrak and the Massachusetts Bay Transportation Authority (MBTA) alone ("the Burton forecast"). The Burton forecast was based on his conversations with management and engineering personnel from both Amtrak and MBTA. The following facts provided a further basis for the Burton forecast: (1) both MBTA and Amtrak had purchased ties from Lone Star before, (2) MBTA had performed engineering studies and specified the number of ties it would require, (3) the MBTA track bed adjoined the Lone Star facility, and (4) Amtrak was pleased with Lone Star's quality control. Further, Lone Star's accounting expert, Frederic Miller, testified that between 1984 and 1989, Lone Star's share of the East Coast market was fifty-three percent. However, following the railroads' first complaint to Lone Star in August 1988 that ties were cracking, Lone Star never again received a *single order* for ties.

**13 Lafarge's most substantial argument on the causation issue concerns "indications" that Lone Star had considered selling its tie business even before it received the first word of tie cracking. This may be so. But that was for the jury to weigh and did not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

19 F.3d 1429 (Table)
Page 10
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
Unpublished Disposition
(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))

entitle Lafarge to judgment as a matter of law.

Viewing the foregoing evidence in the light most favorable to Lone Star and giving it the benefit of all reasonable inferences, we conclude that it was sufficient to withstand a motion for judgment as a matter of law on the proximate cause issue.

Second, Lafarge argues that Lone Star's evidence of lost future profits was speculative and conjectural. The district court and the parties were all correct that Massachusetts law applies to this issue. We begin with the proposition that Massachusetts permits "an element of uncertainty" in proving damages for lost profits. *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.,* 440 N.E.2d 29, 48 (Mass.App.Ct.), *review denied,* 441 N.E.2d 260 (Mass.1982). Further, a plaintiff need not prove its lost profits with mathematical precision. *See Delano Growers' Coop. Winery v. Supreme Wine Co., Inc.,* 473 N.E.2d 1066, 1077 (Mass.1984); *Smith Pontiac,* 440 N.E.2d at 48 ("an award of [lost profits] can stand on less than substantial evidence. This is particularly the case in business torts, where the critical focus is on the wrongfulness of the defendant's conduct") (citations omitted).

Testimony by both experts and company management is suitable for proving lost profits. *Hendricks & Assocs., Inc. v. Daewoo Corp.,* 923 F.2d 209, 220 (1st Cir.1991) ("we cannot say that [a company representative's] uncontroverted fiscal 1985 projection, weak as it was, was insufficient to support a $45,000 award of consequential damages for loss of prospective profits...."); *Knightsbridge Mktg. Servs. Inc. v. Promociones Y Proyectos, S.A.,* 728 F.2d 572, 576 (1st Cir.1984) ("Expert testimony alone has been explicitly recognized as a method of proving prospective damages" in Massachusetts) (citation omitted); *see City Welding & Mfg. Co. v. Gidley-Eschenheimer Corp.,* 451 N.E.2d 734, 736 (Mass.App.Ct.1983) (testimony of company president proper on question of lost profits even though he failed to "give the basis of his calculations" because "this omission merely [went] to the weight of his opinion and not to its admissibility").

Nevertheless, "profits cannot be recovered ... when they are remote, or so uncertain, contingent, or speculative as not to be susceptible of trustworthy proof." *White Spot Constr. Corp. v. Jet Spray Cooler, Inc.,* 183 N.E.2d 719, 722 (Mass.1962) (citing *John Hetherington & Sons, Ltd v. William Firth, Co.,* 95 N.E. 961, 964 (Mass.1911)).

Commentators say that Massachusetts "has not ... consistently applied any articulated standard for recovery of lost profits." Michael D. Weisman & Ben T. Clements, *Protecting Reasonable Expectations: Proof of Lost Profits for New Businesses,* 76 Mass. L.Rev. 186, 189 (1991). We agree that the Supreme Judicial Court of Massachusetts does not always use precisely the same language. But the inquiry does center on "whether [plaintiff] has shown by reasonable proof that at least he certainly has lost some profits by the breach and that a fairly accurate estimate may be made of this portion." *Gagnon v. Sperry & Hutchinson Co.,* 92 N.E. 761, 763- 64 (Mass.1910); *see Knightsbridge,* 728 F.2d at 575.

**14 The Burton forecast was enough to raise a jury question on whether some profits were lost by Lone Star. Miller, the accounting expert, estimated the amount of these lost profits. Miller's analysis was based on a lost profit opportunity with Amtrak for work on the Northeast Corridor Improvement Program II. Miller referred to this as an "absolutely known opportunity," because Congress had approved the program and the contract was to be put out to bid. Miller testified that Lone Star would have an "upper hand" in bidding on the contract because its manufacturing plant was located in Littleton, Massachusetts, and "the distinct competitive advantage in this industry [is] location." JA 1008. This contract would involve the purchase of 422,400 ties. Miller calculated Lone Star's average gross profit per tie at $9.62, which multiplied by the ties in the Amtrak contract yielded over $4 million. Miller, however, reduced the $4 million figure to approximately $2.1 million to coincide with Lone Star's eastern market share of fifty-three percent. Miller further discounted this figure by an interest rate of fifteen percent, because Lone Star would not be able to earn the entire profit in a single year. The final amount for the single lost profit opportunity on the Amtrak contract was $1,239,387. Miller increased this figure to $1.8 million based upon market analyses which indicated that Lone Star would have had tie orders in addition to the single Amtrak contract.

This expert testimony, together with the Burton forecast and other testimony and exhibits, was sufficient to withstand judgment as a matter of law. We disagree with the district court that this evidence was "much too speculative and conjectural" because it presupposed "[t]oo many diverse and unknown factors." JA 593, 1080. As stated in *Smith Pontiac,*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
**Unpublished Disposition**
**(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))**

some element of uncertainty is inherent in any estimate of prospective damages. *See also United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992-93 (4th Cir.), *cert. denied*, 454 U.S. 1054 (1981) ("the calculation of [future profits] was necessarily dependent upon calculations and estimates of experts in the field" and a "reasoned estimate" by such an expert provided the jury a basis upon which to award $571,000 in damages).[FN6]

We therefore conclude that the district court erred in granting Lafarge judgment as a matter of law on Lone Star's damage claims for lost future profits and asset write-offs.

VII. *Conclusion*

For the foregoing reasons, the judgment of the district court is vacated and remanded for a new trial on all issues relating to both liability and damages. Further, the district court's August 8, 1991 and October 1, 1992 orders denying Lone Star leave to amend its complaint and third-party complaints are reversed.

*VACATED, REVERSED, AND REMANDED*

FN1. Lafarge provided written certification with each shipment to Lone Star that the cement met American Society for Testing and Materials (ASTM) Specification C150. That specification, among other things, establishes maximum permissible levels of sulphate in cement.

FN2. Lafarge says that "[t]he fundamental issue in this case is not whether Lone Star has 'abandoned' an issue in the pleadings--a word which [the district court] never used and to which [it] properly attributed no significance--but instead whether Lone Star should be permitted to disavow ... a theory of indemnification to which it has hewed from the very outset...." Resp. Br. at 4-5. Regardless of the words used, a reading of the record clearly establishes that the district court in effect ruled that Lone Star had abandoned or waived settlement costs and litigation expenses as to the non-indemnification claims--claims it had asserted since the beginning of this litigation.

FN3. Lafarge cites additional statements in the record in an attempt to shore up the district court's abandonment determination. They are of little value to our inquiry. For instance, Lafarge relies on the following exchange that occurred immediately after Mr. Quinlan said he was "at ... a disadvantage" in trying to respond to the court:

THE COURT:    ... when we get to limitations, I have already ruled on the limitations in terms of the indemnification, and that covers the greater amount of the claim, so we only have limitations left for the direct claim for lost profits. Would that be correct?
* * *
MR. QUINLAN:  Even as to that, your Honor, I believe that is only partial, part of the period.
JA 1154-55.

These statements and others cited by Lafarge are even more tenuous than those we have discounted above.

We also discount an ambiguous statement by *Lafarge's* counsel that was relied on by the district court.    Ambiguity aside, statements by Lafarge's counsel cannot be used to impute abandonment intent to Lone Star.

FN4. Lone Star argues separately that even if it somehow abandoned pursuit of the settlement costs under the non-indemnification claims, it clearly sought consequential damages for the litigation expenses under these claims.    Given our conclusion that Lone Star sought the same damages under each of its claims, we need not reach this issue.

Lone Star states (Reply Br. at 17-18) that "if this Court holds that the trial court erred as to the alleged waiver of these consequential damages claims ... it would be unnecessary to reach" the issue whether the district court erred in instructing the jury that any negligence by Lone Star precluded indemnification even if Lafarge committed fraud.  Accordingly, we do not take up this issue.

Finally, because we remand this action for a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

19 F.3d 1429 (Table)                                                          Page 12
19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.))
**Unpublished Disposition**
**(Cite as: 19 F.3d 1429, 1994 WL 118475 (4th Cir.(Md.)))**

new trial on all issues, *see infra,* we do not separately address Lafarge's cross appeal which sought, in the alternative, a new trial on the ground that Lone Star's evidence was legally insufficient to establish causation and fraud.

FN5. Recent cases illustrate differing conclusions on the interaction between Rules 15(a) and 16(b). *See, e.g., Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607-08 (9th Cir.1992) (once scheduling order is filed pursuant to Rule 16(b), the good cause standard controls over the Rule 15(a) standard); *Riofrio Anda v. Ralston Purina, Co.,* 959 F.2d 1149, 1154-55 (1st Cir.1992) (applied a Rule 15(a) analysis without mentioning the good cause requirement of Rule 16(b)); *Reynolds v. Borough of Avalon,* 799 F.Supp. 442, 450 (D.N.J.1992) (reading Rule 15(a) "in conjunction with" Rule 16(b)).

FN6. We have also considered, and find no merit in, Lafarge's other arguments on the lost future profits/asset write-offs issue.

19 F.3d 1429 (Table), 1994 WL 118475 (4th Cir.(Md.)), Unpublished Disposition

Briefs and Other Related Documents (Back to top)

• 1993 WL 13015113 (Appellate Brief) Reply Brief of Cross-Appellants Lafarge Corporation and Lafarge Canada Inc. (Aug. 17, 1993)Original Image of this Document (PDF)

• 1993 WL 13015115 (Appellate Brief) Appellants' and Cross Appellees' Reply and Answering Brief (Aug. 06, 1993)Original Image of this Document with Appendix (PDF)

• 1993 WL 13015114 (Appellate Brief) Brief of Appellees and Cross-Appellants Lafarge Corporation and Lafarge Canada Inc. (Jul. 01, 1993)Original Image of this Document with Appendix (PDF)

• 1993 WL 13015116 (Appellate Brief) Appellants' Brief (1993)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in F.Supp.                                                                              Page 1
1987 WL 348635 (D.Kan.)
**(Cite as: 1987 WL 348635 (D.Kan.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Kansas.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its corporate capacity, and
Federal
Deposit Insurance Corporation, in its capacity as
Receiver of Indian Springs
State Bank, Plaintiffs,
v.
Mario RENDA, et al., Defendants.

**Civ. A. No. 85-2216-O.**

Aug. 6, 1987.

*MEMORANDUM AND ORDER*

EARL E. O'CONNOR, Chief Judge.

*1 In this complex action, plaintiff Federal Deposit Insurance Corporation ("FDIC"), *in its corporate* capacity, and plaintiff Federal Deposit Insurance Corporation ("Receiver"), as receiver of Indian Springs State Bank ("ISSB"), allege that defendants have committed several violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). Plaintiffs also claim violations of various securities laws and raise several state law claims. Pending before the court are the following motions: (1) Defendants' motion for a stay of further proceedings and for a protective order as to pending discovery matters; (2) defendants' motion for review of the magistrate's order denying their motion for a protective order; (3) plaintiffs' joint motion for leave to file a second amended complaint and for an order permitting the Federal Savings and Loan Insurance Corporation ("FSLIC") to intervene as a plaintiff; (4) defendants' motion to dismiss the first amended complaint or for a more definite statement; and (5) a motion filed by certain of the defendants for leave to amend their answers. We shall make the following rulings.

I. *Background.*

Plaintiffs FDIC and the Receiver originally filed this action on April 5, 1985. On September 4, 1985, plaintiffs filed their first amended complaint. In their first amended complaint, plaintiffs name as defendants several individuals and entities, including, among others: Mario Renda, Southbrook Homes, Inc., Nina Associates, Ltd., First United Realty Co., First United Fund, Ltd., First United Financial Corporation, and Joseph J. DeCarlo, Sr., ("the Renda defendants"); Sammy G. Daily and Sam Daily Realty, Inc., ("the Daily defendants"); Renate Winkler, as trustee for Barclay Trust; and V. Leslie Winkler. [FN1]

The essence of plaintiffs' multiple-count first amended complaint is that defendants devised an elaborate and complicated "linked financing" scheme to gain profit from the acquisition of fraudulent and illegal loans. Two of the targets of the scheme, plaintiffs allege in that complaint, were ISSB, a bank in Kansas City, Kansas, and Rexford State Bank ("Rexford"), a small rural bank in Kansas. Defendants effected the scheme, plaintiffs claim, through a pattern of regular and continuing criminal conduct, in violation of RICO. Plaintiffs also claim that defendants violated the federal securities laws. Finally, plaintiffs raise several state law claims, including common law fraud on the part of the defendants.

II. *Renda Defendants' Motion to Stay Further Proceedings.*

On June 29, 1987, the Renda defendants filed a motion to stay further proceedings and for a protective order as to pending discovery motions. They had twice earlier sought a stay and have filed other motions for protective orders. Indeed, as we noted above, defendants have asked the court to review the magistrate's denial of a protective order.

The Renda defendants' latest motion is prompted by the recent indictments handed down by a federal grand jury in Kansas on June 10, 1987, against Mario Renda and others involved in this civil action. An indictment is also pending in the Eastern District of New York. In their motion, the Renda defendants seek a blanket stay of all further proceedings in this action until after resolution of the criminal charges.

*2 In considering defendants' motion, the court is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1987 WL 348635 (D.Kan.)
**(Cite as: 1987 WL 348635 (D.Kan.))**

Page 2

mindful that "[t]here is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions." *Securities and Exchange Commission v. First Financial Group of Texas, Inc.,* 659 F.2d 660, 666-67 (5th Cir.1981). The Supreme Court has refused to create a per se rule prohibiting the simultaneous prosecution of civil and criminal actions because "prompt investigation and enforcement both civilly and criminally [are] sometimes necessary in order to protect the public interest...." *Id.* at 667 (citing *United States v. Kordel,* 397 U.S. 1, 11 (1970)).

It is well settled, however, that a trial court, in the exercise of its discretion, has the power to stay an action. As Justice Cardozo stated, in an oft-repeated phrase,

> the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment which must weigh competing interests and maintain an even balance.

*Landis v. North American Co.,* 299 U.S. 248, 254-55 (1936).

Five factors have been universally recognized as being critical to a proper balancing of the competing interests at stake. *Those factors are: (1) the interests of the plaintiff in proceeding expeditiously with the civil action and the potential prejudice to plaintiffs of a delay; (2) the burden on the defendants; (3) the convenience to the court; (4) the interests of persons not parties to the civil litigation; and (5) the public interest. In Re Mid-Atlantic Toyota Antitrust Litigation,* 92 F.R.D. 358, 359 (D.Md.1981); *Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers,* 87 F.R.D. 53, 56 (E.D.Pa.1980). A fair and careful analysis of these five factors, we conclude, indicates that the blanket stay sought by the Renda defendants is neither necessary nor appropriate.

*A. Plaintiffs' Interest.*

The Renda defendants' motion, if granted, would halt all further proceedings for a minimum of five to six months and perhaps much longer. Obviously, then, their motion threatens to seriously impinge on plaintiffs' "right to pursue [their] case and to vindicate [their] claim expeditiously." *Golden Quality,* 87 F.R.D. at 56.

Defendants argue that resolution of the criminal trial before continuation of this civil action would ultimately benefit plaintiffs by resolving many of the issues of civil liability. But, as plaintiffs note, most of the remaining discovery with respect to the Renda defendants concerns issues of causation and damages; those issues most certainly will not be resolved at the criminal trials.

Moreover, plaintiffs' interest in expediting its case weighs even more strongly than usual where, as here, plaintiffs are charged by Congress with acting quickly to protect the public interest. That charge, we believe, counsels caution in our contemplating the delay of this action.

*B. Burden on Defendants.*

**\*3** Defendants cite several burdens they would face should the court deny their motion. Some of these "burdens" reflect legitimate concerns. Others, however, are exaggerated.

First, Mario Renda maintains that continuation of discovery in this case would divert his energies and resources from his defense of the criminal actions. Certainly, that would be true during the actual trial. But that fact does not indicate that a blanket stay of all further proceedings and discovery as to all *other* defendants is warranted. Rather, we conclude that a more reasonable, fair, and balanced approach is to *stay discovery, at least as it affects Renda, during the* actual trial. Indeed, even plaintiffs recognize that a stay of discovery during trial would be appropriate. Hence, Renda's concern can be alleviated through a far less draconian solution than a blanket stay.

Second, the Renda defendants charge that plaintiffs have and will share information gained through the liberal civil discovery process with the criminal prosecutors; information to which those prosecutors might not otherwise be entitled. *Corbin v. F.D.I.C.,* 74 F.R.D. 147, 149-50 (E.D.N.Y.1977). This burden, we believe, is entirely illusory. Defendants have no real evidence that plaintiffs have improperly shared information in the past. Certainly, there is no evidence that plaintiffs are using civil discovery as a pretext for gathering information for use in the criminal cases. *Cf. Campbell v. Eastland,* 307 F.2d 478 (5th Cir.1962), *cert. denied,* 371 U.S. 955 (1963). And if there were any reason to believe that plaintiffs might share information with the prosecutors, the solution would be a limited protective order proscribing such conduct, not a blanket stay.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
1987 WL 348635 (D.Kan.)
**(Cite as: 1987 WL 348635 (D.Kan.))**

Finally, Mario Renda argues that continuation of this action will infringe his fifth amendment right against self-incrimination. To support his argument, he cites several potential threats to his fifth amendment right. First, he notes that if the court either denies the pending motion to dismiss the first amended complaint or grants plaintiffs leave to file a second amended complaint, he will be required to file an answer. If he has to answer, he insists, he would be forced to choose between defense of this action and his right against self-incrimination. The fact of the matter is that he faces no such potential dilemma.

In a series of opinions--known as the *Garrity-Lefkowitz* line of cases--the Supreme Court has held that the use of a threat of serious economic harm to compel a person to waive his fifth amendment right and testify is unconstitutional. *Mid-America's Process Service v. Ellison,* 767 F.2d 684, 686 (10th Cir.1985) (citing *Baxter v. Palmigiano,* 425 U.S. 308 (1976). Here, Renda faces a potential civil judgment of millions of dollars. Certainly he faces "serious economic harm." But that potential harm will not be used to force him to waive his fifth amendment right. Rather, should he be required to answer the second amended complaint, he may answer the allegations by invoking the privilege. *National Acceptance Co. of America v. Bathalter,* 705 F.2d 924 (7th Cir.1983). His assertion of the privilege will be treated as equivalent to a specific denial. *Id.* at 929. *See also* 5 C. Wright & A. Miller, *Federal Practice and Procedure § 1280* at 360-61. Consequently, because Renda may assert his fifth amendment privilege without penalty, his privilege would not and will not be infringed.

**\*4** Second, Renda notes that, even though he may be able to invoke the privilege, the corporate defendants in this action have no such privilege. *See, e.g., Wilson v. United States,* 221 U.S. 361, 385 (1911). That fact, he argues, "creates a dilemma for [him] because a failure to answer by the corporate entities will expose them to a default judgment. [But] [i]f an answer is filed on their behalf, that answer may well be used against [him] in his capacity as president of those corporations." Renda Defendants' Motion to Stay, at 16. Thus, he argues, the court should stay further proceedings to relieve him of the "dilemma." In support of that position, he further notes that the Supreme Court, in *Kordel,* stated that if no individual could answer for the corporation without a risk of self-incrimination, "[f]or present purposes we may assume that in such a case the appropriate remedy would be a protective order under Rule 30(b),

postponing civil discovery until termination of the criminal action." 397 U.S. at 9.

As Plaintiffs correctly observe, Renda does not suggest that, *in fact,* no other individual could answer interrogatories or other discovery matters on behalf of the corporate Renda defendants without risking self-incrimination. Indeed, an affidavit was prepared on behalf of First United Fund, Ltd., by Stuart Steinberg. No reason is given why he could not do so in the future. Hence, the *Kordel* dicta, even if accepted as the law, is apparently irrelevant to this action.

Moreover, the mere fact that the corporate defendants might provide information that would incriminate Mario Renda provides no reason to grant a stay. The fifth amendment only protects an individual from being forced to incriminate *himself;* it does not insulate him from damaging evidence provided by other individuals or entities. The United States District Court for the District of Utah aptly stated:

> The privilege is a personal privilege that protects against the testimonial compulsion of an accused to testify against himself. [Citation omitted.] The priceless and time honored shield provided by the privilege cannot be used as an insurmountable barrier to block the introduction of other damaging evidence through the mouths of others, that provides, as here, the measure of defendant's responsibility. The invocation of the Fifth Amendment privilege does not and cannot stop the mouths of all witnesses as evidence against the person claiming the privilege. *The Fifth Amendment protects an individual, not from the introduction of incriminating evidence, but from compelling him to produce it.* [Citations omitted.]
> *Hughes Tool Co. v. Meier,* 489 F.Supp. 354, 374-75 (D.Utah 1977) (emphasis added).

Finally, we also note that, to the extent Renda complains about the potential prejudice he might suffer from having to assert his fifth amendment privilege, a stay would not be likely to improve his situation. He has already asserted the privilege at his deposition and the law permits a jury in a civil action to draw an adverse inference from such an assertion. *See Fidelity Bankers Life Insurance Co. v. Wedco, Inc.,* 586 F.Supp. 1123, 1126 (D.Nev.1984). Hence, any damage that may arise from invoking the privilege in this civil action has already been done. (In any event, plaintiffs represent that, with the possible exception of his answer, "it is unlikely that Mr. Renda will be asked to speak again prior to trial."

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1987 WL 348635 (D.Kan.)
(Cite as: 1987 WL 348635 (D.Kan.))

Page 4

Plaintiffs' Memorandum in Support, at 11.)

### C. *Burden on the Court.*

*\*5* The Renda defendants argue that a stay will lessen the burden on the court because the outcome of the criminal trial may lessen the amount of court time in the civil action necessary to prove liability and because "continuation of civil discovery in the face of the pending indictment will require substantial supervisory judicial effort." We do not agree.

It is not at all clear that the plaintiffs and the court will be relieved of the burden inherent in plaintiffs' need to prove liability. Unlike the case cited by defendants--*Golden Quality*--the liability issues in the criminal and civil cases are far from identical. Moreover, even if the court denies the stay, the criminal case will undoubtedly be tried first. Hence, any potential lessening of the court's burden because of the criminal verdict will occur regardless of our decision here.

Finally, we are not convinced that the court will save itself a significant amount of effort--if any at all--by granting a stay. It is far more likely that a stay would only postpone the court's work, thereby frustrating the court's strong interest in moving its docket.

### D. *The Interest of Non-Parties.*

In an effort to suggest a potential detriment to non-parties, the Renda defendants note that both the civil complaint and the indictment allege that named and unnamed individuals fraudulently obtained loans from ISSB. If subpoenaed to provide deposition testimony in the civil action, these non-parties would have to choose between asserting the privilege and incriminating themselves. Thus, defendants contend, a "[c]ontinuation of the civil action could jeopardize the Fifth Amendment rights of at least thirty individuals." Renda Defendants' Motion to Stay, at 18.

This suggested burden is of little weight. If non-parties are deposed and choose to invoke their privilege not to testify, their rights would be fully respected. Indeed, the court fails to perceive on what basis a party could assert that his constitutional right against self-incrimination had been impaired by the very exercise of that right.

Furthermore, the fact that a non-party, or a party for

that matter, may not like some of the consequences of exercising his privilege is not a legitimate reason for depriving plaintiffs of their right to proceed with their case. As the court stated in *Controller of the Currency v. Lance,* 632 F.Supp. 437 (N.D.Ga.1986), "[t]he choice between testifying, or invoking the Fifth Amendment may be difficult, but it does not create a basis for a stay." *Id.* at 442.

### E. *The Public Interest.*

This factor, as do most of the others, weighs against the granting of the Renda defendants' motion. Plaintiffs, pursuant to a congressional mandate, are seeking to recover damages allegedly caused by defendants as the result of a scheme that purportedly caused the failure of at least three financial institutions in Kansas. Obviously, the public has a keen interest in the swift resolution of the issues involved in this action, as well as in the payment of damages if liability should be established. Those public interests are especially critical where, as here, plaintiffs are a public agency specially charged with the responsibility of enforcing federal law. As the Supreme Court stated in *Kordel:*

> *\*6* It would stultify enforcement of a federal law to require a governmental agency ... invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, *or to defer civil proceedings pending the ultimate outcome of a criminal trial.*

397 U.S. at 11 (emphasis added).

### F. *Conclusion.*

The above analysis demonstrates that a blanket stay, as sought by the Renda defendants, would be unnecessary, violative of plaintiffs' rights, and against the public interest. We recognize, however, that Mario Renda has a legitimate concern about the plaintiffs' pursuit of discovery from him during the actual criminal trial. Because his civil attorneys are also representing him in the criminal matters, his counsel will need to be free of distractions from this civil action during the criminal trial, if Renda is to receive adequate assistance of counsel. Therefore, we shall deny the Renda defendants' motion for a blanket stay. We shall, however, order a stay of discovery during the actual criminal trial itself. The Honorable Dale E. Saffels has scheduled the criminal trial to begin on October 19, 1987. *United States v. Renda,* No. 87-20049-01 (D.Kan., *unpublished,* July 23, 1987). We shall, thus, order that discovery be stayed as to those defendants named both in this action and in the criminal action pending before

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 495-3   Filed 07/06/05   PageID.5025   Page 19 of 46
Not Reported in F.Supp.
1987 WL 348635 (D.Kan.)
(Cite as: 1987 WL 348635 (D.Kan.))

Page 5

Judge Saffels from the date trial begins until the conclusion thereof.   The court will, of course, consider modifying its order on a showing of good cause as the need may arise.

Concerning the Renda defendants' motion for review of the magistrate's order denying their request for a stay of discovery, we affirm the magistrate's order for all of the reasons stated above.

III. *Plaintiffs' Motion for Leave to Amend and the FSLIC's Motion to Intervene*

Plaintiffs have moved for leave to file a second amended complaint, which would add the following seven defendants: Antoinette Renda; Cindy Real Estate Partners, Inc.; MFS Partners, Inc.; Nevada Holdings Co., Inc.;      Seaside Ventures, Ltd.; Waikiki Gateway Partners, Inc.;   and Kansas City Associates, Inc. a/k/a Hawaiian Properties, Inc. (the "new Renda defendants").  Plaintiffs and the FSLIC have jointly moved for an order permitting the FSLIC to intervene and to file plaintiffs' second amended complaint.   The second amended complaint would add new counts against the defendants based on their alleged participation in a scheme perpetrated upon Coronado Federal Savings & Loan Association ("Coronado").   Plaintiffs and the FSLIC allege that the scheme involving Coronado was substantially identical to that perpetrated upon ISSB and, to a lesser extent, upon Rexford.   The motion to amend and the joint motion to intervene are opposed by both the original and the new Renda defendants.   The *Daily* defendants join in the Renda defendants' Memorandum in Opposition.

A. *Motion to Amend*

Motions to amend are governed by Federal Rule of Civil Procedure 15(a).  Rule 15(a) clearly states that leave to amend "shall be freely given when justice so requires," and the Supreme Court has warned that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962).   A trial court has wide discretion in deciding whether to grant such a motion. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971).

*7 In the absence of a specific factor such as flagrant abuse, bad faith, futility of amendment, or truly inordinate and unexplained delay, prejudice to the opposing party is the key factor to be evaluated in deciding a motion to amend. *Dunn v. Kaaz Holding Co.*, No. 83-2375 (D.Kan., *unpublished*, July 2, 1985).   Prejudice under Rule 15 "means undue

difficulty in prosecuting [or defending] a lawsuit as a result of a change of tactics or theories on the part of the other party." *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3d Cir.1969).  *See also LeaseAmerica Corp. v. Eckel*, 710 F.2d 1470, 1474 (10th Cir.1983) (no prejudice where the amended complaint referred to the "same chattels, the same consideration, and the same transaction which was the basis for the original complaint.").     Such a change of theories would be prejudicial if, for example, the opposing party could show that it would be "disadvantaged or deprived of the opportunity to present facts or evidence which it would have [been able to] offer[ ] had the [movant's] amendments been timely." *Heyl & Patterson Inter'l v. F.D. Rich Housing*, 663 F.2d 419, 426 (3d Cir.1981).    The party opposing the amendment of the pleadings has the burden of showing prejudice. *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 540 (8th Cir.1977).

Defendants first argue that plaintiffs have unduly delayed in seeking to name the seven new defendants.   We disagree.

First, as to the six new corporate defendants, defendants offer no reason why plaintiffs should have been able to name them sooner.  Moreover, we agree with plaintiffs that the extremely complex nature of the purported scheme itself caused the delay. Plaintiffs state that they have had to "digest hundreds of thousands of pages of documents, and to unravel complicated real estate transactions conducted through shell corporations and straw entities ..." to learn the relationship of the six new corporate defendants to the purported scheme.

Second, as to Antoinette Renda, defendants' sole argument is that plaintiffs should have discovered a reference to her activities in an article that appeared in the Kansas City Business Journal on December 10, 1984, more than three years before the motion to amend was filed.   In that article, it was stated that Mario Renda had testified in a deposition that "Southbrook [one of the original Renda defendants] helped First United Fund broker deposits into Indian Springs."   The deposition referred to in the article, defendants note, is attached to plaintiffs' proposed second amended complaint and identifies the connection between Mrs. Renda and Southbrook.

As plaintiffs correctly observe, however, Mrs. Renda is not even named in the article and the deposition itself was taken in a completely unrelated action, one in which the FDIC was not a party.   Therefore, we find defendants' assertion that plaintiffs should have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1987 WL 348635 (D.Kan.)
(Cite as: 1987 WL 348635 (D.Kan.))

Page 6

discovered Mrs. Renda's activities from the deposition and resulting article quite unpersuasive.

Defendants' second argument is that they would be prejudiced should the court grant plaintiffs leave to amend. Specifically, they note that over forty depositions have been taken and that, if the new Renda defendants choose to repeat the depositions, the original Renda defendants would have to attend them at a considerable cost.

*8 In our view, defendants' assertion of prejudice is, however, grossly overstated. As plaintiffs point out, many of the depositions were attended only by local counsel and often no questions were asked by any defense counsel. Moreover, at many of the depositions, no answers were given because the deponents invoked their fifth amendment privileges. It seems unlikely that the new defendants would want to reschedule any of those depositions. Indeed, plaintiffs maintain that "very little if any of the discovery taken to date would need to be retaken by the new Renda defendants, especially in light of the fact that the Renda defendants already intend to resume the depositions of a number of witnesses at a later date." Plaintiffs' Reply Memorandum, at 36.

We also note that, although we granted the Renda defendants leave to file a Sur-Reply, they did not use that opportunity to challenge the plaintiffs' detailed analysis of why the depositions already taken would not have to be repeated. They did point to "three weeks of depositions" taken after plaintiffs filed the instant motion and, as to those depositions, again baldly assert that they will have to be retaken. Although plaintiffs have not been able to respond to that allegation, we believe it likely that defendants' position is as exaggerated on that point as it has been on many of their other claims of prejudice. The court concludes that defendants will not be *unduly* prejudiced--if prejudiced at all--by the addition of the new defendants or by the filing of the second amended complaint.

Finally, defendants argue that leave to amend should be denied because the amendments would be futile; that is, the second amended complaint would be subject to immediate dismissal. To support their claim of futility, defendants argue that the court would lack personal jurisdiction over Antoinette *Renda and the six new corporate defendants, that* some of the counts fail to state a claim, and that many of the counts would be barred by the applicable statutes of limitations.

It is true that the court need not allow the amendment of the pleadings if the amendment would clearly prove futile. *See Dickerson v. City Bank & Trust Co.,* 575 F.Supp. 872, 876 (D.Kan.1983). Here, however, defendants have attempted to raise a number of issues that cannot and should not be decided on a motion to amend.

For example, one of defendants' main arguments is that many of the counts would be barred by the statutes of limitation as to the new defendants. In their original response to the motion to amend, defendants argued that, in Kansas, the period of limitation as to the RICO counts is two years. Subsequent to the filing of their response, however, the Supreme Court held that four years is the appropriate period nationwide. *Agency Holding Corp. v. Malley-Duff & Associate,* 55 U.S.L.W. 4952 (June 22, 1987). Although defendants have since filed their Sur-Reply, it is not clear what their new position is with respect to the effect of that decision. We are satisfied that there are still factual questions as to when the various causes of action arose. *See* Renda Defendants' Memorandum in Opposition, at 45-49. Hence, we simply cannot resolve the statutes of limitations issues at this juncture.

*9 Similarly, defendants' suggestion that the court could not exercise personal jurisdiction over the seven new defendants cannot properly be decided now. Defendants' position is that service of process is not authorized under the Kansas long-arm statute and that the new defendants have not had sufficient contacts with this state to meet the requirements of due process. Plaintiffs respond, in part, by noting that nationwide service of process is authorized under the RICO statute, 18 U.S.C. § 1965(b), and that due process under that statute requires only that a nonresident defendant have minimum contact with the United States. *F.T.C. v. Jim Walter Corp.,* 651 F.2d 251, 256 (5th Cir.1981); *Pioneer Properties, Inc. v. Martin,* 557 F.Supp. 1354, 1358 n. 6 (D.Kan.1983). *See also Butcher's Union Local No. 498 v. SDC Investment, Inc.,* 788 F.2d 535 (9th Cir.1986). In their Sur-Reply, defendants argue that the RICO statute's nationwide service of process provision cannot be used to obtain personal jurisdiction over Antoinette Renda because the second amended complaint fails to state a claim under RICO as to her.

Obviously, then, at least with respect to the RICO counts, the court would first have to determine whether those counts sufficiently plead causes of action as to Mrs. Renda before it could determine

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1987 WL 348635 (D.Kan.)
(Cite as: 1987 WL 348635 (D.Kan.))

Page 7

whether personal jurisdiction could be exercised. And even if those counts did not state a claim, the court would have to examine the non-RICO counts to determine whether the court could exercise personal jurisdiction over her under the Kansas long-arm statute and the traditional due process analysis.

In short, defendants' arguments do not clearly indicate that the proposed amendments would be futile. (Indeed, even if correct, many of defendants' points would only relate to certain counts, not the entire complaint.) We agree with plaintiffs that defendants have, "in essence, [asked the court] to grant summary judgment in favor of defendants on each issue raised by defendants." Plaintiffs' Reply Memorandum, at 39. That is, without observing the strict requirements wisely imposed on such motions (see, e.g., Local Rule 15(c)), defendants ask the court to resolve numerous complex legal and factual issues in their favor in the context of a motion to amend. We obviously are not in a position to resolve those issues at this stage of the case. Defendants' suggestion that leave to amend should be denied on the ground of futility is thus not well taken and the court shall grant plaintiffs' motion for leave to file a second amended complaint.

Given the court's decision to allow plaintiffs to file a second amended complaint, defendants' motions to dismiss the first amended complaint and for leave to amend their answers are moot.

B. *Motion to Intervene*

The FSLIC, in a joint motion with plaintiffs, moves for permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. That rule provides, in pertinent part:

**\*10** (b) *Permissive Intervention.* Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The decision whether to allow a party to intervene is left to the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Shump v. Balka*, 574 F.2d 1341, 1345 (10th Cir.1978); *Brown v. Board of Education*, 84 F.R.D. 383, 405 n. 16 (D.Kan.1979).

We first find, despite defendants' assertion to the contrary, that the FSLIC's claim has numerous questions of law and fact in common with plaintiffs' action. Factually, the alleged scheme that FSLIC claims defendants perpetrated upon Coronado is for all practical purposes identical to that allegedly aimed at ISSB and Rexford; both schemes involved the same defendants, the same hired borrowers, and defendants allegedly used the same alter ego entities to hide transfers of funds. In fact, plaintiffs allege that defendants used proceeds of the scheme against Coronado to maintain its scheme against ISSB.

Similarly, both actions have nearly identical issues of law. Plaintiffs and the FSLIC allege that defendants conducted a scheme in violation of RICO. To prove their various RICO claims, they will have to prove that defendants conducted their affairs through a "pattern" of racketeering (18 U.S.C. § § 1961(5) and 1962(c)), that defendants conducted the affairs of an "enterprise" through such a pattern (*id.* at § § 1961(5) and 1962(c)), and that defendants invested income received from a pattern of racketeering in the operation of an enterprise.

In addition, we agree with the FSLIC and plaintiffs that "requiring FSLIC to proceed in a parallel action rather than allowing FSLIC to intervene in this action would result in two nearly identical trials." Joint Memorandum in Support, at 5. Proof of defendants' racketeering activity directed at Coronado would be relevant and introduced in plaintiffs' action to show the requisite "continuity plus relationship" of defendants' pattern of racketeering activity" and vice versa. *See Sedima, S.P.R.L. v. Imrex Co.*, 105 S.Ct. 3275, 3285 n. 14 (1985). Obviously, then, the interests of justice and the efficient use of the court's resources strongly weigh in favor of granting the motion to intervene.

Defendants, however, urge that the motion should be denied for three reasons: (1) that they will be unduly prejudiced; (2) that the FSLIC's motion is not timely; and (3) the FSLIC's complaint would be subject to immediate dismissal. Turning to their first reason, we are simply not convinced that defendants would be unduly prejudiced. Defendants' professed concern for jury confusion is unwarranted. Certainly, this is an extremely complex case. But we see very little, if any, danger of making this case any more complicated by the intervention of the FSLIC. As we indicated above, the jury will hear a great deal of evidence about the defendants' alleged activities at Coronado whether the FSLIC is added as a plaintiff or not.

**\*11** Moreover, defendants' plea that intervention

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1987 WL 348635 (D.Kan.)
(Cite as: 1987 WL 348635 (D.Kan.))

would cause too much additional discovery has little merit. As plaintiffs point out, "none of these defendants had conducted a single deposition in the discovery phase of this litigation until March 2, 1987, [and] [p]rior to that date counsel for defendants had been advised that FSLIC's entry into the case was imminent." Joint Memorandum in Support, at 6. Further, defendants have long been on notice that their activity at Coronado was considered relevant by plaintiffs to establishing a pattern of racketeering activity. In fact, defendants apparently have already scheduled depositions of Coronado witnesses, including its officers. Hence, the addition of the FSLIC will not significantly increase the need for discovery. We might also add that defendants would face at least as great a discovery burden should the FSLIC be denied permission to intervene and be forced to file a separate action.

Second, we find unpersuasive defendants' assertion that the FSLIC's motion is untimely. Defendants rely on an article that appeared in the Kansas City Business Journal on December 24, 1984, to argue that the FSLIC has had notice of its claims against defendants for more than three years. The article in question merely mentions that the FSLIC had entered a cease and desist order *directed against Coronado itself* because Coronado had "violated the loans-to-one-borrower regulation and engaged in unsafe or unsound practices by granting large loans without prior approval of the board of directors and accepting excessive deposits from a savings broker." The article does not state that the FSLIC was aware that the named defendants were committing acts for which they are potentially liable under RICO.

Perhaps even more significantly, intervention by the FSLIC will not "unduly delay" this action. As we noted above, defendants have long known that plaintiffs considered defendants activity at Coronado to be relevant to this action. In addition, defendants' assertion that they are anxious to proceed to trial is belied by the fact that they themselves have sought to delay this action, as evidenced by their motion to stay further proceedings.

As to defendants' third reason to deny intervention-- that the FSLIC's complaint would be subject to immediate dismissal--we adopt and incorporate the conclusions we reached in rejecting an identical argument made by defendants in opposition to plaintiffs' motion to amend. To resolve the arguments made by defendants, the court would have to decide disputed questions of fact and law. A motion to intervene is simply not the proper vehicle

for the resolution of such issues.

In sum, we conclude that allowing the FSLIC to intervene will not unduly delay the case or prejudice defendants. Because the FSLIC's claims present so many common questions of law and fact, the court and the parties will be spared the time and expense of conducting two complex, parallel actions. Therefore, we shall grant the motion.

*12 IT IS THEREFORE ORDERED that the Renda defendants' motion for a stay of further proceedings and for a protective order is denied, except that the court shall stay discovery as to those defendants who are named in both this civil action and in the criminal action pending before the Honorable Dale E. Saffels from the date the criminal trial actually begins until the conclusion thereof.

IT IS FURTHER ORDERED that defendants' motion for review of the magistrate's order denying defendants' motion for a protective order is denied.

IT IS FURTHER ORDERED that plaintiffs' motion for leave to file a second amended complaint is granted.

IT IS FURTHER ORDERED that defendants' motion to dismiss the first amended complaint and defendants' motion to amend their answer are denied as moot.

IT IS FURTHER ORDERED that the joint motion of plaintiffs and the Federal Savings & Loan Insurance Corporation ?? an order permitting the FSLIC to intervene is granted.

> FN1. Other defendants, against whom default judgment has already been entered, included Franklin A. Winkler, F & I Real Estate Holding Co., First United Management Co., and First United Investment Co.

1987 WL 348635 (D.Kan.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Not Reported in F.Supp.2d                                                                Page 1
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

**C**
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.


United States District Court,
S.D. New York.

Edward KREINIK, Plaintiff,
v.
SHOWBRAN PHOTO, INC., et al, Defendants.

No. 02Civ.1172(RMB)(DF).

Oct. 14, 2003.


Former employee filed suit against employer seeking
to enforce rights under Employee Retirement Income
Security Act (ERISA) plan and also claiming right to
unpaid commissions under state law. After employee
amended complaint, employer counterclaimed,
asserting state tort and statutory claims. Employee
sought leave to amend complaint to add two new
claims alleging that assertion of counterclaims
constituted unlawful retaliation. Employer opposed
amendment on ground of futility. The District Court,
Freeman, United States Magistrate Judge, held that:
(1) ERISA covered post-employment retaliation; (2)
employee stated prima facie cases of retaliation for
exercise of ERISA and Labor Law rights sufficient to
survive motion to dismiss, such that amendment
would not be futile; and (3) allowing amendment
would not unduly delay suit or prejudice employer.

Motion granted.


West Headnotes

**[1] Labor and Employment** 🔑794
231Hk794
          (Formerly    255k30(6.10)          Master    and
Servant)

Prima facie case of retaliation against employee for
exercising rights under ERISA required proof that:
(1) employee was engaged in a protected activity; (2)
employer was aware of employee's participation in

the protected activity; (3) employer took adverse
employment action against employee;  and (4) a
causal connection existed between the protected
activity and the adverse action. Employee Retirement
Income Security Act of 1974, § 510, 29 U.S.C.A. §
1140.

**[2] Labor and Employment** 🔑796
231Hk796
          (Formerly    255k30(1.20)          Master    and
Servant)

Employee's attempt to assert his right to employee
benefits under ERISA plainly constituted protected
activity against which interference was prohibited.
Employee Retirement Income Security Act of 1974,
§ 510, 29 U.S.C.A. § 1140.

**[3] Labor and Employment** 🔑827
231Hk827
          (Formerly    255k30(6.10)          Master    and
Servant)

Section of ERISA prohibiting retaliation for exercise
of employee rights covered post-employment
retaliation.  Employee Retirement Income Security
Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[4] Labor and Employment** 🔑858
231Hk858
          (Formerly 255k39(1) Master and Servant)

Because of their apparent potential for adverse
impact on former employee's livelihood, allegations
made in employer's counterclaims in employee's
ERISA suit involved type of adverse employment
action sufficient for ERISA retaliation claim to
survive at pleading stage; employer's claims alleged
trade name infringement, unfair competition,
misappropriation, tortious interference with actual
and prospective business relations, and statutory
violations of business law   Employee Retirement
Income Security Act of 1974, § 510, 29 U.S.C.A. §
1140; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Labor and Employment** 🔑858
231Hk858
          (Formerly 255k39(1) Master and Servant)

Fact that tort claims based on post-employment
competition could have been asserted against former

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

Page 2

employee earlier, but were instead asserted only as counterclaims after the former employee had initiated ERISA claims seeking to vindicate his federal rights was sufficient at pleading stage to show causal element for ERISA retaliation claim based on those counterclaims. Employee Retirement Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[6] Labor and Employment** ☜858
231Hk858
     (Formerly 255k39(1) Master and Servant)

To state a claim under Labor Law for alleged retaliation by employer in response to former employee's assertion of right under state law to unpaid commissions, former employer was required to adequately plead that employee's counterclaims constituted an adverse employment action taken because of employee's complaints under the Labor Law. McKinney's Labor Law § 215.

**[7] Labor and Employment** ☜858
231Hk858
     (Formerly 255k39(1) Master and Servant)

Because of their apparent potential for adverse impact on former employee's livelihood, allegations made in employer's counterclaims for business torts in employer's suit to recover unpaid commissions involved type of adverse employment action that could support claim for retaliation at pleading stage under New York Labor Law; filing of complaint for unpaid commissions could be deemed motivating factor for counterclaims, because counterclaims closely followed complaint, even though they could have been raised earlier. McKinney's Labor Law § § 190, 215.

**[8] Federal Civil Procedure** ☜841
170Ak841

Allowing employee leave to amend complaint to assert claims of retaliation based on employee's exercise of right under ERISA and state labor law would not unduly delay suit or prejudice employer; claims, which related to employer's motivation for filing counterclaims, would not significantly prolong discovery or litigation, and forcing employee to institute new suit would have run counter to interests of judicial economy. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

MEMORANDUM AND ORDER

FREEMAN, Magistrate J.

*INTRODUCTION*

**\*1** Plaintiff Edward Kreinik ("Kreinik") has moved pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to amend his First Amended Complaint to add two new claims alleging that defendants' assertion of counterclaims in this action constitutes unlawful retaliation under (1) Section 510 of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et. seq.* ("ERISA"), and (2) Section 215 of the New York State Labor Law, and also to add new factual allegations in support of claims previously asserted. Defendants Showbran Photo, Inc., Showbran, Inc., Showbran, Inc. 401(K) Plan, and Showbran Photo, Inc. Atlantis Health Plan (collectively "Showbran"), oppose Kreinik's motion to the extent that Kreinik seeks to add new claims, on the ground that such amendments would be futile. For the reasons stated below, Kreinik's motion to amend is granted in its entirety.

*BACKGROUND*

On February 13, 2002, Kreinik filed a complaint against his former employer, Showbran Photo, Inc., seeking to enforce his rights under the terms of two employee benefit plans, [FN1] and also claiming, *inter alia,* that he was entitled to payment of unpaid commissions. In that initial pleading, Kreinik sought both damages and equitable relief under ERISA, the New York Labor Law § 190, *et seq.,* and state common law. (Complaint dated Feb. 13, 2002 (Dkt.1), ¶ ¶ 1-2.) Defendant Showbran Photo Inc., filed an Answer to the Complaint on March 26, 2002 (Dkt.4), but asserted no counterclaims at that time.

     FN1. The benefits plans at issue are: (1) a 401(K) Plan, which is a pension and welfare benefit plan available to Showbran employees administered by Showbran, Inc.; and (2) the Showbran Photo, Inc. Atlantis Health Plan, an additional welfare benefit plan provided to employees. (First Amended Complaint dated June 14, 2002 ("First Am. Compl.") (Dkt.14), ¶ ¶ 7-10.)

On June 14, 2002, after receiving documents regarding Showbran Photo, Inc.'s, benefit plans, Kreinik filed his First Amended Complaint, adding as defendants certain parties responsible for the plans at issue. (First Am. Compl.; Affidavit of Anne Clark

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

sworn to Nov. 14, 2002 ("Clark Aff.") (Dkt.22), ¶¶ 5, 8.) On July 16, 2002, Showbran answered the First Amended Complaint, asserting seven counterclaims against Kreinik demanding monetary and injunctive relief for: (1) trade name infringement, unfair competition, and misappropriation under New York State common law; (2) violations of New York Business Law § § 368-d, 133, and 349; (3) tortious interference with actual business relations; (4) tortious interference with prospective business relations; (5) misappropriation of proprietary information; (6) breach of contract; and (7) breach of implied covenants of good faith and fair dealing. (Answer to Amended Complaint dated July 16, 2002 (Dkt.15), ¶ ¶ 61-126.) The counterclaims are based on events that allegedly occurred during, as well as subsequent to, the time Showbran Photo, Inc., employed Kreinik. On August 7, 2002, Kreinik answered the counterclaims, asserting, as affirmative defenses, that the counterclaims constituted retaliation for his claims, in violation of ERISA and the Labor Law. (Answer to Defendants' Counterclaims dated Aug. 7, 2002 (Dkt.17), ¶¶ 135-36.)

On November 14, 2002, Kreinik moved to amend the First Amended Complaint to add new claims charging that Showbran's counterclaims had been asserted unlawfully, in retaliation for Kreinik's assertion of his rights, under ERISA and the Labor Law. (Proposed Second Amended Complaint dated Nov. 14, 2002 ("Proposed Second Am. Compl."), ¶¶ 57-62.) According to Kreinik, the retaliation claims pleaded in his Proposed Second Amended Complaint are supported by law, and permitting them at this juncture would not cause undue prejudice or delay. (Plaintiff's Memorandum of Law in Support of his Motion for Leave to Amend the Complaint ("Plaintiff's Mem.") (Dkt.21), dated Nov. 14, 2002, at 1.) Showbran, however, argues that the new retaliation claims do not satisfy the elements of a *prima facie* case under ERISA or New York Labor Law, and that the proposed amendments should therefore be denied as futile. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Amend ("Opp.Mem."), dated Dec. 11, 2002, at 2, 4.) Showbran adds that allowing the amendments would cause undue delay and prejudice, although it argues that the Court need not reach those issues because of the purported futility of the amendments. (Opp. Mem. at 2.)

*2 Kreinik also seeks to amend the factual allegations asserted in paragraphs 12, 14 and 26 of the First Amended Complaint, to conform those

paragraphs to deposition testimony. (Plaintiff's Mem. at 1.) Showbran does not oppose these proposed factual amendments. (Opp. Mem. at 11.)

*DISCUSSION*
I. *APPLICABLE LEGAL STANDARDS*

Because Kreinik already amended his Complaint once as a matter of right, he must obtain leave of the Court for any further amendment. Fed.R.Civ.P. 15(a). Although leave to amend "shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), a motion to amend should be denied for reasons " 'such as undue delay, bad faith or dilatory motive ..., undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment .' " *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (interpreting Fed.R.Civ.P. 15(a)); *The Randolph Found. v. Duncan,* No. 00 Civ. 6445, 2002 WL 32862, at *1 (S.D.N.Y. Jan.1, 2002). The Court has broad discretion in determining whether to grant a motion to amend. *Local 802, Associated Musicians of Greater New York v. Parker-Meridien Hotel,* 145 F.3d 85, 89 (2d Cir.1998).

Where a party opposes a motion to amend a complaint based on futility, the proposed pleading may be reviewed for adequacy. *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). The amendment will be deemed futile, and the motion to amend denied, where the amendment would be subject to "immediate dismissal" for failure to state a claim upon which relief can be granted, or would be subject to dismissal on some other basis. *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Housing Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979); *see Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d. Cir.1993) (upholding denial of motion where "granting leave to amend is unlikely to be productive"); *Whimsicality, Inc. v. Battat,* 27 F.Supp.2d 456, 465 (S.D.N.Y.1998) (denying the motion where proposed claim would fail in any event). If, however, there are " 'at least colorable grounds for relief, justice ... require[s]' ' that the motion to amend be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir.1984) (quoting *S.S. Silberblatt,* 608 F.2d at 42); *Schwimmer v. Guardian Life Ins. Co.,* No. 93 Civ. 0428, 1996 WL 146004, at *3 (S.D.N.Y. Apr. 1) (allowing amendment where "it is not so frivolous or outlandish to render it futile"), *aff'd,* 104

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
Page 4
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

F.3d 354 (2d Cir.1996); *Weg v. Macciarola,* 729
F.Supp. 328, 341 (S.D.N.Y.1990) (motion should be
granted unless amendment is frivolous or facially
insufficient).

Determining whether the amendment states
"colorable grounds for relief" mandates an inquiry
into the sufficiency of the proposed pleading
comparable to that required by Fed.R.Civ.P. 12(b)(6).
*Barrett v. United States Banknote Corp.,* 806 F.Supp.
1094, 1098 (S.D.N.Y.1992); *CBS, Inc. v. Ahern,* 108
F.R.D. 14, 18 (S.D.N.Y.1985). Thus, as both parties
acknowledge (*see* Plaintiff's Mem. at 6; Opp Mem. at
2), the standard for evaluating Showbran's opposition
to the amendment, on the ground that it would be
futile, requires the Court to examine whether
Kreinik's proposed retaliation claims could withstand
a Rule 12(b)(6) motion to dismiss. *See Nettis v.
Levitt,* 241 F.3d 186, 194 n. 4 (2d Cir.2001)
("Determinations of futility are made under the same
standards that govern Rule 12(b)(6) motion to
dismiss."); *Finley v. Simonovitch,* No. 97 Civ. 1455,
1997 WL 746460, at *4 (S.D.N.Y. Dec. 2, 1997)
(citing cases).

**\*3** A Rule 12(b)(6) motion is decided solely on the
pleadings. *See, e.g., Allen v. WestPoint-Pepperell,
Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *CBS, Inc.,* 108
F.R.D. at 18. The Court must accept all factual
allegations in the complaint as true and "draw
inferences from those allegations in the light most
favorable to the plaintiff." *Jaghory v. New York State
Dep't of Ed.,* 131 F.3d 326, 329 (2d Cir.1997) (citing
*Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807,
127 L.Ed.2d 114 (1994)); *see Rotter v. Leahy,* 93
F.Supp.2d 487, 497 (S.D.N.Y.2000) (citing *Mills v.
Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d
Cir.1993)). A claim may not be dismissed under Rule
12(b)(6) unless " 'it appears beyond doubt that
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief.' " *Valmonte
v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting
*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2
L.Ed.2d 80 (1957)). The task of the Court is " 'merely
to assess the legal feasibility of the complaint, not to
assay the weight of the evidence which might be
offered in support thereof." ' *Connell v. City of New
York,* No. 00 Civ. 6306, 2002 WL 22033, at *2
(S.D.N.Y. Jan.8, 2002) (quoting *Sims v. Artuz,* 230
F.3d 14, 20 (2d Cir.2000)); *Coffey v. Cushman &
Wakefield, Inc.,* No. 01 Civ. 9447, 2002 WL
1610913, at * 1 (S.D.N.Y. July 22, 2002). These
standards will be applied to Kreinik's proposed
amended claims of retaliation under ERISA and New
York Labor Law to determine whether his motion

should be granted.

**II. *KREINIK'S PROPOSED RETALIATION CLAIM
UNDER ERISA***

**[1]** Section 510 of ERISA makes it unlawful for an
employer to retaliate against an employee for, *inter
alia,* "exercising any right to which [the employee] is
entitled under the provisions of an employee benefit
plan...." 29 U.S.C. § 1140. To prove unlawful
retaliation for the assertion of rights under ERISA,
the employee must establish that the employer's
action was at least partially motivated by the specific
intent to engage in the prohibited retaliatory conduct.
[FN2] *Dister v. Continental Group, Inc.,* 859 F.2d
1108, 1111 (2d Cir.1988). Because direct evidence of
intent is often scarce or non-existent in this context,
the Court evaluates retaliation claims under Section
510 of ERISA using the same analytical framework
applied to similar claims under Title VII of the Civil
Rights Act of 1964 ("Title VII") and other civil rights
statutes, where direct evidence of discriminatory
intent is often equally unavailable. *Id.* at 1112. [FN3]
Thus, the burden-shifting framework established by
the Supreme Court in *McDonnell Douglas Corp. v.
Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668
(1973), which allows a plaintiff to prevail with
indirect proof of intent, applies to claims brought
pursuant to Section 510 of ERISA. *Id.*

> FN2. It is not necessary that retaliation for
> the protected activity was the sole cause of
> the adverse action, but only that the
> retaliatory motive played "a part" in the
> motivation behind that action. *Grant v.
> Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d
> Cir.1980); *Titch v. Reliance Group, Inc.,*
> 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd,*
> 742 F.2d 1441 (2d Cir.1983).

> FN3. The courts have frequently relied on
> interpretations of the anti-retaliatory
> provisions in federal labor statutes
> interchangeably, given that such provisions
> in Title VII, the Americans with Disabilities
> Act ("ADA"), the Age Discrimination in
> Employment Act ("ADEA"), the National
> Labor Relations Act ("NLRA"), the Fair
> Labor Standards Act ("FLSA"), and ERISA
> are modeled on one another or are similarly
> worded, thus assuming parallel
> congressional intent with respect to
> meaning. *See, e.g., Robinson v. Shell,* 519

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (noting that the NLRA, FLSA and Title VII all share a "primary purpose" of "maintaining unfettered access to statutory remedial mechanisms"); *Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 330 (D.C.Cir.1991) (comparing parallel retaliation provisions in the ADEA and Title VII and noting that "cases interpreting the latter are frequently relied upon in interpreting the former"); *Patterson v. McCarron*, No. 99 Civ. 11078, 2001 WL 1488122, at *3 (S.D.N.Y. Nov.21, 2001) (employing Title VII analysis in ERISA retaliation case).

Under this framework, Kreinik would first have to establish a *prima facie* case of retaliation by showing that: (1) he was engaged in a protected activity; (2) Showbran was aware of Kreinik's participation in the protected activity; (3) Showbran took adverse employment action against Kreinik; and (4) a causal connection existed between the protected activity and the adverse action. [FN4] *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993); *Patterson v. McCarron*, No. 99 Civ. 11078, 2001 WL 1488122, at *3 (S.D.N.Y. Nov.21, 2001). Kreinik's claim of retaliation will survive a motion to dismiss if, after construing all reasonable inferences and implications of the allegations in the complaint liberally in his favor, the Court determines that he has pleaded facts sufficient to support the elements of a *prima facie* case, as set out above. *See Coffey*, 2002 WL 1610913, at *4-5; *Mendelsohn v. Univ. Hosp.*, 178 F.Supp.2d 323, 329 (E.D.N.Y.2002); *Connell*, 2002 WL 22033, at *4; *E.E.O.C. v. Die Fliedermaus*, 77 F.Supp.2d 460, 471-72 (S.D.N.Y.1999).

FN4. Neither party disputes that this is the appropriate test for establishing a *prima facie* case, although Kreinik articulates the test in an alternative manner that combines the first two elements, requiring him to have been "engaged in a protected activity known to defendants." (Plaintiff's Reply Memorandum of Law in Support of his Motion for Leave to Amend the Complaint dated Dec. 18, 2002 ("Reply Mem.") (Dkt.23), at 2); *see, e.g., Quinn v. Green Tree Credit*, 159 F.3d 759, 769 (2d Cir.1998) (identifying three elements of *prima facie* case).

*4 If a plaintiff's retaliation claim survives the pleading stage, then, either at trial or on a motion based on the evidence, the plaintiff would have to prove its *prima facie* case, the defendant would then need to articulate a legitimate reason for its allegedly retaliatory conduct, and the plaintiff would ultimately bear the burden of demonstrating that the stated reason was pretextual. *See Dister*, 859 F.2d at 1115; *Patterson*, 2001 WL 1488122, at *3; *see also Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 444-45 (2d Cir.1999) (on summary judgment motion, parties must meet their burdens under the complete burden-shifting analysis); *Cosgrove*, 1999 WL 163218, at *23 (same); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995) (same).

At this stage, the Court need not look beyond the question of whether Kreinik has sufficiently pleaded facts which identify and support a *prima facie* case of retaliation. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (to survive a motion to dismiss, an employment discrimination complaint need not specifically establish every fact proving a *prima facie* case under the *McDonnell-Douglas* framework, as long as the complaint gives defendant fair notice of the claim and on what grounds it is based as required by the federal pleading rules); *Coffey*, 2002 WL 1610913, at *5 (complaint alleging retaliation under the ADEA was sufficient to withstand a motion to dismiss, where defendant was placed on notice of the nature and basis of the claim). This, therefore, is the question to which both parties have addressed their arguments. (Reply Mem. at 2-7; Opp. Mem. at 4-7.)

A. *The First and Second Elements of a* Prima Facie *Case: Kreinik's Protected Activity and Showbran's Awareness of that Activity*

[2] Showbran does not dispute that Kreinik's proposed ERISA retaliation claim, as pleaded, would satisfy the first and second elements of a *prima facie* case. (Opp. Mem. at 4.) With respect to the first element, Kreinik's attempt to assert his right to employee benefits under the statute plainly constitutes a protected activity against which interference is prohibited. *See* 29 U.S.C. § 1140. More specifically, ERISA expressly empowers individuals to enforce their rights under the terms of their employee benefit plans by bringing civil actions. 29 U.S.C. § 1132(a)(1)(a).

As to the second element, there is no question that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

Showbran was fully aware of Kreinik's involvement in a protected activity, given that Showbran has appeared in and defended this suit. (Opp. Mem. at 4.)

B. *The Third Element of a* Prima Facie *Case: Showbran's Alleged Adverse Action Against Kreinik*

Showbran does challenge Kreinik's ability to demonstrate that counterclaims, asserted after the termination of a plaintiff's employment, can constitute the type of "adverse employment action" required to meet the third element of a *prima facie* case of retaliation. (Opp. Mem. at 4.) In evaluating Kreinik's argument on this point, the first inquiry is whether *former* employees can be protected under ERISA against retaliatory action by their *former* employers. *See, e.g., Straus v. Prudential Employment Sav. Plan,* 253 F.Supp.2d 438, 447-48 (E.D.N.Y.2003) (analyzing whether non-employee beneficiaries are entitled to Section 510 protection). The second inquiry is whether the challenged action can be considered "adverse" in relation to the plaintiff's employment. *See Wannamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (noting that "because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse' "); *see also Ginsberg v. Valhalla Anesthesia Assoc.,* 971 F.Supp. 144, 148-49 (S.D.N.Y.1997) (analyzing the extent to which the alleged retaliatory conduct had some impact on plaintiff's employment or prospective employment); *Yankelevitz v. Cornell Univ.,* No. 95 Civ. 4593, 1996 WL 447749, at *5 (S.D.N.Y. Aug.7, 1996) (discussing whether the adverse action was related to the "terms, privileges, duration, or conditions of the plaintiff's employment").

1. *ERISA's Coverage of Former Employees*

**\*5** **[3]** Although the law is not well-settled as to whether "post-employment" retaliation is actionable under Section 510 of ERISA, the Supreme Court has articulated a broad rationale behind anti-retaliation provisions in federal labor statutes, stating that the primary purpose of such provisions is to maintain "unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). In *Robinson,* the Court noted that the exclusion of former employees from the protection of Title VII's retaliatory provisions would undermine the effectiveness of that statute by allowing the threat of post-employment retaliation to deter victims of discrimination from complaining and by providing "a perverse incentive for employers to fire employees who might bring ... claims." *Id.* The Court therefore reasoned that the best approach would be to include former employees within the scope of protected "employees." *Id.* at 345.

This reasoning, combined with the case law in this circuit as it has developed with respect to this issue in various statutory contexts, supports Kreinik's position that Section 510 should be read to cover post-employment retaliation. *See, e.g., Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979) (post-employment blacklisting falls within the scope of retaliatory provisions of Title VII), *rev'd on other grounds,* 477 U.S. 807, 814 n. 17 (1980); *Patchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1055 (2d Cir.1978) (finding that Title VII "prohibits discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct"); *Straus,* 253 F.Supp.2d at 447-48 (noting that while the Second Circuit hasn't spoken squarely on this issue, "[i]t seems only logical that former employees and beneficiaries, who in many instances have as strong an interest in the pension rights as their employee counterparts, receive some protection from alienation of those rights under § 510 of ERISA"); *Patel v. Lutheran Med. Ctr.,* 753 F.Supp. 1070, 1073 (S.D.N.Y.1991) (noting that a claim for retaliation under the ADEA is cognizable even where the employment relationship had been terminated before the alleged adverse action occurred).

Further, the text of Section 510 itself suggests that post-employment retaliation is actionable under the statute. *See Straus,* 253 F.Supp.2d at 447-48 (accepting the textual argument that protection under Section 510 includes former employees and beneficiaries); *see also Mattei v. Mattei,* 126 F.3d 794, 801 (6th Cir.1997) (Section 510 specifically covers "participants" and "beneficiaries," which are defined as including both employees and former employees); *Choi v. Mass. Gen. Physicians Org.,* 66 F.Supp.2d 251, 254 (D.Mass.1999) (for the purposes of retaliation claims under Section 510 of ERISA, an adverse employment action need not relate to a current employer-employee relationship because the statute specifically protects "participants," which includes former employees).

**\*6** For these reasons, the Court concludes that Kreinik's proposed retaliation claim under ERISA is not barred merely because he no longer had an employment relationship with Showbran at the time

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the counterclaims were asserted.

### 2. *The Adverse Effect of the Counterclaims*

[4] The next question is whether Showbran's counterclaims, by their nature, can constitute an "adverse employment action." On this point, Kreinik argues that his proposed claim is sufficient because the allegations made in the counterclaims may have the effect of marring his reputation as a businessman and jeopardizing his future business relations. (Plaintiff's Reply Mem. at 4- 6.) Showbran argues that the allegations fail to assert an adverse employment action because the alleged retaliation lacks any "nexus" to Kreinik's employment. (Opp. Mem at 5.)

Although an adverse employment action is generally one that affects the terms, privileges, duration, or conditions of a plaintiff's employment, reprisals less flagrant than job termination or reduced wages can constitute adverse employment actions that warrant statutory protection. *Wannamaker*, 108 F.3d at 466; *Yankelevitz*, 1996 WL 447749, at *5 (claims of retaliation are not limited " 'only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer or demotion' ") (quoting *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 331 (D.C.Cir.1991)); *Dortz v. New York*, 904 F.Supp. 127, 156 (S.D.N.Y.1995). Indeed, retaliatory actions injurious to a plaintiff's ability to secure future employment are actionable. *See, e.g., Wannamaker*, 108 F.3d at 466 (a retaliation claim could be maintained where a former employer sullies a plaintiff's reputation, thereby affecting "tangible *future* employment objectives") (emphasis in original); *see also Silver*, 602 F.2d at 1090 (finding that post-employment blacklisting falls within the scope of retaliatory provisions of Title VII); *Patchenko*, 581 F.2d at 1055 (finding that a refusal to provide an employee with an employment reference, allegedly in retaliation for filing a claim against the employer, constituted an adverse employment action); *Gonzalez v. Police Comm'r Bratton*, 147 F.Supp.2d 180, 196 (S.D.N.Y.2001) ("[R]etaliatory conduct that would naturally create major obstacles for a former employee in obtaining employment in her field ... is actionable under [Title VII]."), *aff'd*, No. 01 Civ. 7826, 2002 WL 31317871 (2d Cir. Oct.16, 2002); *E.E.O.C. v. Die Fliedermaus, L.L.C.*, 77 F.Supp.2d 460, 472 (S.D.N.Y.1999) (finding that public distribution of derogatory flyers in response to the filing of a charge with the E.E.O.C. constituted retaliation under Title VII where the flyers could affect plaintiffs' ability to find jobs).

Specifically, with regard to allegedly retaliatory counterclaims, this Court has expressly refused "to adopt a rule stating that ... counterclaims, or any other legal cause of action, cannot, as a matter of law, constitute retaliation in violation of the employment discrimination laws." *Yankelevitz*, 1996 WL 447749, at *4. The plaintiff in *Yankelevitz* was a doctor, and the defendant's counterclaim was based on the plaintiff's alleged failure to conform with professional practice procedures. *Id.* The court found that the counterclaim at issue was actionable because it "shed a negative light on plaintiff's professionalism and ethics ... mar[red] plaintiff's professional reputation ... [and] could have an adverse impact on plaintiff's employment prospects." *Id.* at *5.

*7 For a counterclaim to be actionable as retaliatory, however, it must, as in *Yankelevitz*, have "some impact on [the] plaintiff's employment or prospective employment." *Ginsberg*, 971 F.Supp. at 148 (finding that a doctor had not stated a claim for retaliation based on the assertion of a breach-of-contract counterclaim that did not reflect negatively on her ethical or professional reputation); *see also Jetter v. Knothe Corp.*, 200 F.Supp.2d 254, 267 (S.D.N.Y.2002) (plaintiff failed to demonstrate that his former employer's communication to clients of plaintiff's retirement rose to the level of adverse), *aff'd*, 324 F.3d 73 (2d Cir.2003); *Patel*, 753 F.Supp. at 1074 (former employer's alleged tortious interference was not an adverse employment action because, where the employee had not worked for the employer for two years and was not even undertaking to find a new job when the alleged act occurred, the challenged action did not impact on the employee's attempt to secure future employment). Thus, for Kreinik's proposed retaliation claim to withstand a motion to dismiss, the claim as pleaded must sufficiently suggest that Showbran's counterclaims could have a direct, adverse impact on Kreinik's present employment or future employment prospects.

In this case, Showbran's counterclaims allege that Kreinik engaged in trade name infringement, unfair competition, and misappropriation under state common law; violations of New York Business Law § § 368-d, 133, and 349; tortious interference with actual business relations; tortious interference with prospective business relations; misappropriation of proprietary information; breach of contract; and breach of implied covenants of good faith and fair dealing. (Answer to Amended Complaint, ¶ ¶ 61- 126.) These counterclaims go beyond what Showbran characterizes as "simple breach of contract and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

Page 8

related claims." (Opp. Mem. at 6.) The counterclaims challenge Kreinik's ability to compete fairly and to exhibit good faith in his business relationships. Accepting all factual allegations in the Proposed Second Amended Complaint as true and drawing all inferences in the light most favorable to Kreinik, it is reasonable to assume that Showbran's counterclaims could impact on Kreinik's personal and professional reputation and on his ongoing efforts to create and maintain his own business. (Proposed Second Am. Compl. ¶ ¶ 28, 57-59.) Furthermore, Kreinik is apparently seeking to compete with Showbran and to share the same clientele. (Plaintiff's Reply Mem. at 4.) In these circumstances, the ancillary consequences of litigation, such as the potential need for customers to testify, could have a detrimental effect on Kreinik's future business relationships.

Even if, as Showbran argues, the likelihood is not great that the counterclaims will have an actual, adverse effect on Kreinik's business, the apparent potential for an adverse impact to his livelihood is sufficient for the retaliation claim to survive at the pleading stage. *See, e.g., Mendelsohn, 178 F.Supp.2d at 329* (finding that a description of the employment duties that diminished after filing a complaint under Title VII was sufficient to plead an adverse employment action); *Connell, 2002 WL 22033, at *4* (the allegation that pension board members "commenced actions to arbitrarily deprive [plaintiff] of a [pension], as retribution for seeking complaints against their peers," sufficiently alleged a *prima facie* case of retaliation to withstand a motion to dismiss); *Coffey, 2002 WL 1610913, at * 4-5* (despite the fact that plaintiff did not specify what the adverse action was, the allegations in the complaint sufficiently placed the defendant on notice of the nature and basis of the retaliation claim); *Die Fliedermaus, 77 F.Supp.2d at 471-72* (adverse employment action identified where plaintiffs alleged that defendants had publicly distributed derogatory flyers about employees who had filed of charges of discrimination).

*8 The Court therefore concludes that Kreinik's proposed allegations are sufficient, for pleading purposes, to satisfy the third element of a *prima facie* case of retaliation under ERISA.

*C. The Fourth Element of a Prima Facie Case: Causal Connection Between the Protected Activity and the Adverse Action*

[5] Finally, the "causal connection" between (a) Kreinik's assertions of his rights through the

commencement of this suit, and (b) the challenged counterclaims, can be inferred from the circumstances of the case. In the Title VII context, the Second Circuit has held that evidence of a causal connection between a protected activity and an adverse employment action may be established indirectly, by showing that the adverse action or discriminatory treatment occurred shortly following the protected activity. *See Davis v. State Univ. of New York, 802 F.2d 638, 642 (2d Cir.1986); see also, e.g., Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998)* (finding a causal connection between the protected activity and the retaliatory conduct where the adverse action occurred less than two months after the filing of a complaint); *Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995)* (causal element of retaliation met where adverse action occurred three months after the protected activity); *DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d. Cir.1986)* (firing plaintiff "within one year" of a Title VII action may be probative of an indirect causal connection).

Applying this reasoning, this Court has permitted a plaintiff to challenge a defendant's counterclaims as retaliatory, where, as here, the claims could have been asserted earlier, but were instead asserted only after the plaintiff had initiated the action seeking to vindicate his federal rights. *See Yankelevitz, 1996 WL 447749, at *6* (further noting that the fact that asserted counterclaims might have been compulsory did not *per se* negate the retaliatory animus). Indeed, Showbran does not contest that this element is likely satisfied in this case "as the counterclaims were filed after the instant complaint." (Opp. Mem. at 4.) Thus, Kreinik has established that a causal connection could exist between the assertion of rights and the adverse action, satisfying the fourth element of the *prima facie* case.

Overall, regardless of whether Kreinik's ERISA retaliation claim will ultimately stand, Kreinik has stated a *prima facie* case for retaliation and has shown that the claim would not be subject to "immediate dismissal" for failure to state a claim. There is therefore no basis for the Court to reject the proposed amendment on the ground of futility.

III. *NEW YORK LABOR LAW*

[6] Kreinik also seeks leave to amend his First Amended Complaint to assert a retaliation claim under New York Labor Law Section 215. (Proposed Second Am. Compl., ¶ ¶ 1, 60-62.) In relevant part, this state statute provides that an employer may not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

"discharge, penalize, or in any other manner discriminate against any employee because such employee has made a complaint ... or because such employee has caused to be instituted a proceeding under or related to this chapter...." N.Y. Labor Law § 215(1). Section 215 is analogous to Section 510 of ERISA, in that it covers claims for retaliation against employees who make complaints under the state Labor Law. *See Jacques v. DiMarzio,* 200 F.Supp.2d 151, 162 (E.D.N.Y.2002) (evaluating claim of retaliation under New York Labor Law § 215); *Warden v. E.R. Squibb & Sons, Inc.,* 840 F.Supp. 203, 208 (E.D.N.Y.1993) ("[Section 215] provide[s] a right of action to an employee who has been subjected to retaliation."); *Kelly v. Xerox Corp.,* 681 N.Y.S.2d 322, 256 A.D.2d 311 (2d Dep't 1998). To state a claim under Section 215, Kreinik must adequately plead that Showbran's counterclaims constitute an adverse employment action taken because of Kreinik's complaints under the Labor Law. *Jacques,* 200 F.Supp. at 162; *Shaw v. Baldowski,* 747 N.Y.S.2d 136, 145, 192 Misc.2d 635, 646 (Sup.Ct. Albany Co.2002).

**\*9** [7] Under New York law, as under federal law, an alleged adverse employment action need not rise to the level of improper discharge, demotion, or reduction in pay, in order to be actionable as retaliatory. *See Shaw,* 747 N.Y.S.2d at 145, 192 Misc.2d at 646 (non-traditional employment actions may be sufficient to sustain a claim under Section 215); *cf. In the Matter of Electchester Housing Project, Inc. v. Rosa,* 639 N.Y.S.2d 848, 849, 225 A.D.2d 772, 773 (2d Dep't 1996) (under analogous provision of New York Executive Law, defendant's contesting of former employee's unemployment benefits, in response to the filing of a complaint with the State Division of Human Rights, constituted retaliation). This Court has recognized that counterclaims can be used as a retaliatory practice, with a concrete, adverse impact on the plaintiff. *See Jacques,* 200 F.Supp.2d at 162 ("The Court is deeply troubled by [defendant employer's counterclaim], which appears to be nothing more than a naked form of retaliation [against the employee]."). Here, as discussed above, Kreinik has alleged facts sufficient to infer that the counterclaims asserted against him could harm his reputation in his industry and negatively affect his prospective employment or business opportunities. (Proposed Second Am. Compl. ¶ ¶ 28, 60-62.) Kreinik's assertions, if proven, could lead a trier of fact to view the counterclaims as an adverse employment action under Section 215. *Cf. Shaw,* 747 N.Y.S.2d at 146, 192 Misc.2d at 647 (dismissing a claim of retaliation

under Section 215 where a potential adverse impact could not be fairly inferred from the facts as alleged).

In addition, Kreinik's First Amended Complaint alleged violations of Section 190, *et seq.,* of New York Labor Law (*see* First Am. Compl., ¶ ¶ 1-2, 32-36), and Showbran's counterclaims, which could have been raised earlier, instead closely followed the assertion of those claims. For this reason, Kreinik's allegations sufficiently plead that his labor law complaints were a motivating factor for Showbran's adverse action. *See Jacques,* 200 F.Supp.2d at 162 (finding that a close connection in time between the complaint and termination indicated that labor law complaints could have been a motivating factor for the employee's discharge).

Therefore, for essentially the same reasons discussed above in connection with Kreinik's proposed ERISA retaliation claim, Kreinik's proposed amendment to add a claim under Section 215 may not be rejected as futile.

### IV. *UNDUE PREJUDICE AND DELAY*

[8] Kreinik additionally maintains that his proposed amended complaint will not cause undue delay or prejudice and, therefore, that his motion should not be denied on this basis. (Plaintiff's Mem. at 5-6; Reply Mem. at 1). Showbran does not offer any meaningful opposition to Kreinik's argument, stating only that the amendments would also cause delay and prejudice, but that the "Court need not reach these[ ] issues because the proposed claims are in any case futile." (Opp. Mem. at 2.) The Court has nonetheless reviewed these issues, and concludes that granting the motion to amend will not inordinately delay the proceedings or unduly prejudice Showbran.

**\*10** Mere delay, absent a showing of bad faith or undue prejudice, does not provide a basis to deny a motion to amend. *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993) (citing *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981)). In determining whether a party's interests will be unduly prejudiced by an amendment, this Court must consider "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute...." *Id.* (citations omitted).

Here, although the deadline for completion of discovery has passed and the amendments may result in a slight delay, Kreinik asserts that additional

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22339268 (S.D.N.Y.)
(Cite as: 2003 WL 22339268 (S.D.N.Y.))

discovery will be minimal, and Showbran has not shown to the contrary. (Plaintiff's Mem. at 5-6, n. 3.) Moreover, the mere fact that discovery has concluded does not provide a reason for denying leave to amend. *Cemar Tekstil Ithalat Ihracat San ve Tic. A.S. v. Joinpac, Inc.,* No. 91 Civ. 8408, 1993 WL 126890, at *1 (S.D.N.Y. Apr.16, 1993) (allowing amendment to add a counterclaim where discovery had already closed). This is especially true where the proposed amendment arises from the same set of operative facts as the original claims, or from events closely related to those originally pleaded. *Fluor Corp.,* 654 F.2d at 856; *see, e.g., Harrison v. New York City Admin. for Children's Servs.,* 02-Civ. 0947, 2002 WL 2022932, *1 (S.D.N.Y. Sept.3, 2002); *Union Carbide Corp. v. Siemens Westinghouse Power Corp.,* No. 99 Civ. 12003, 2002 WL 31387269, *3 (S.D.N.Y. Oct.23, 2002). Even if discovery were to be prolonged, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *United States v. Continental Ill. Nat'l Bank & Trust Co.,* 889 F.2d 1248, 1255 (2d Cir.1989) (citation omitted). In this case, the proposed new claims relate to the defendants motivation and intent in asserting their counterclaims, a subject on which the parties should not need substantial additional discovery. Thus, allowing the amendments will not call for a great expenditure of resources or significantly prolong the dispute.

Showbran also has not alleged any bad faith on Kreinik's part. Showbran does not contest Kreinik's assertions that he had good reasons for failing to raise his new claims sooner, nor does Showbran contest that it was on notice of these claims for some time . [FN5] Nor has Kreinik asserted these claims on the eve of trial in an attempt to "sandbag" Showbran.

> FN5. For instance, Showbran does not contest that it took some time to respond to Kreinik's counsel's inquiries as to whether Showbran would consent to the proposed amendments, and that Showbran requested that counsel hold off in filing the proposed amendments in order to explore a resolution of the claims. (*See* Clark Aff. at ¶¶ 14-19.)

Finally, forcing Kreinik to institute a new action against Showbran would run counter to the interests of judicial economy. Kreinik's proposed retaliation claims are related to his original claims and are also tied to his affirmative defense of unclean hands and

retaliation, which he pleaded in reply to Showbran's counterclaims. (Answer to Defendant's Counterclaims ¶¶ 128, 135-36.) Allowing all of the claims and counterclaims to be litigated in a single action would avoid unnecessary duplication of effort by counsel, ultimately reduce litigation costs, and save time. *See Expoconsul Int'l, Inc. v. A/E Sys., Inc.,* 145 F.R.D. 336, 339 (S.D.N.Y.1993) (granting motion to amend, even though five years had passed and over 5600 pages of deposition testimony had been taken, because the amendment did not add to the complexity of the case or to discovery, and a separate lawsuit would have resulted in duplicative efforts and might have resulted in consolidation in any event).

**\*11** Thus, in the circumstances presented, concerns about undue delay and prejudice are insufficient to warrant denial of the motion to amend.

*CONCLUSION*

For all of the foregoing reasons, Kreinik's motion to amend his First Amended Complaint is granted in its entirety.

2003 WL 22339268 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 1:02CV01172_____(Docket) (Feb. 13, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

1999 WL 6364                                                                                          Page 1
1999 WL 6364 (S.D.N.Y.), 1999 A.M.C. 889
**(Cite as: 1999 WL 6364 (S.D.N.Y.))**

⯈

United States District Court, S.D. New York.

In the Matter of the Complaint of: RATIONIS
ENTERPRISES, INC. OF PANAMA, as
Owner, and Mediterranean Shipping Co. S.A. of
Geneva, as Bareboat Charterer of
the M/V "MSC Carla" for Exoneration from or
Limitation of Liability,

**No. 97 CV 9052(RO).**

Jan. 7, 1999.

*MEMORANDUM AND ORDER*

OWEN, J.

*\*1* In November of 1997, the 289-meter *M/V MSC Carla* departed from Le Havre on a fully-laden westbound voyage to the United States. The ship had a cargo capacity of 2858 TEUs, [FN1] and her eight cargo holds carried more than sixteen hundred shipping containers--including such items as cheese, ceramic tile, razor blades, heavy machinery, beer, perfume, automobile parts, furniture, porcelain dishes, limestone and personal effects--destined for various ports and consignees. On November 24, 1997, the *Carla* hit heavy weather on the high seas and broke in two pieces north of the Azore Islands. Although both pieces initially remained afloat and salvage tugs began towing them, the bow section sank on November 30. The stern section was eventually towed to Las Palmas, Canary Islands. Experts and attorneys representing various interests inspected the remains of the vessel at Las Palmas in *December of 1997, and again in January of 1998.* The remains were then sold as salvage.

> FN1. A TEU is a twenty-foot equivalent unit of ocean container.

This case is a limitation proceeding under 46 U.S.C.App. § § 181 *et seq.* That statute provides an admiralty procedure for all claims to be filed in a special limitation proceeding so that a single court may determine the facts and liability and possibly limit the shipowner's exposure to the salvage value of the vessel plus the amount of freight pending. *See* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law,* § 15-1 at 299 (2d ed.1994). The original statute was first enacted in 1851 "for the purpose of putting American shipping upon an equality with that of other maritime nations." *The Main v. Williams,* 152 U.S. 122, 128 (1894). In *Hartford Accident & Ind. Co. v. Southern Pacific Co. (The Bolikow),* 273 U.S. 207, 216 (1927), Chief Justice Taft described the limitation proceeding as being

> equitable in nature, partaking in a way of the features of a bill to enjoin a multiplicity of suits, a bill in the nature of an interpleader, and a creditor's bill. It looks to the complete and just disposition of a many-cornered controversy, and is applicable to proceedings in rem against the ship as well as to proceedings in personam against the owner, the limitation extending to the owner's property as well as to his person.

This case is nothing if not a "many-cornered controversy." I earlier established the filing deadline for claims in this limitation proceeding as December 1, 1998, and claims of more than $130 million [FN2] by hundreds of claimants. In addition, twenty-nine related cases have been filed.

> FN2. MSC uses a figure of $130 million in claims, while POL/ACL's figure is that the claims are in excess of $160 million.

On December 4, 1998, I held a conference regarding the Korean forum selection clause contained in Hyundai Merchant Marine Co. Ltd.'s ("Hyundai") bills of lading. Hyundai is a vessel-owner who contracts with a cargo owners to ship their cargoes under its bills of lading. Hyundai and Mediterranean Shipping Company ("MSC"), the owner of the *Carla,* are parties to a Vessel Sharing Agreement ("VSA") which allows competing carriers to ship cargo on each other's vessels in order to make more effective use of their separate services and allow a greater frequency of sailings of the parties' various vessels. Thus, each vessel operator accepts containerized cargo which is moving under various bills of lading, regardless of which VSA partner was the issuer. A consignor, therefore, will not necessarily know whose ship will actually carry its cargo. If cargo is damaged, the cargo owner may pursue the bill of lading issuer and/or the vessel operator. The VSA

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1999 WL 6364                                                                                          Page 2
1999 WL 6364 (S.D.N.Y.), 1999 A.M.C. 889
(Cite as: 1999 WL 6364 (S.D.N.Y.))

requires the bill of lading issuer to appear and defend the vessel operator so that each carrier deals with its own customers. Under the VSA, any subsequent claims between the bill of lading issuer and the vessel operator is subject to arbitration in London. Hyundai has already agreed to submit all of its indemnity claims against MSC to London arbitration.

**\*2** Hyundai's bills of lading (its contracts with its cargo interests) contain a Korean forum clause providing that any disputes are to be adjudicated in court in Seoul, Korea. Hyundai here seeks to enforce this clause. However, cargo interests claim that Hyundai has waived this forum clause by appearing in this limitation proceeding--an action inconsistent with the Korean forum clause--and should therefore be subject to suit in this Court. The cargo claimants, not unreasonably, do not want to proceed in a Korean forum because of the substantial additional expense and inconvenience and arguable duplication, and prefer all the claims to be adjudicated in this proceeding in New York.

Our Supreme Court has observed that foreign forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Company,* 407 U.S. 1, 10 (1972); *New Moon Shipping Co. Ltd. v. MAN B & W Diesel AG,* 121 F.3d 24 (2d Cir.1997). The burden is thus on the cargo interests to demonstrate that giving effect to the clause here is unreasonable. The Second Circuit has held that "a mandatory forum-selection clause does not 'oust the jurisdiction' of the court, but rather requires the court to determine whether the party resisting enforcement of the clause has shown the clause to be unreasonable or unfair under the circumstances." *Evolution Online Systems, Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505, 510 (2d Cir.1998); *Allen v. Lloyd's of London,* 94 F.3d 923 (4th Cir.1996). A forum selection clause is "unreasonable" if:

(1) [its] incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party "will for all practical purposes be deprived of his day in court" due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state.

*Roby v. Lloyd's of London,* 996 F.2d 1353, 1363 (2d Cir.1993).

The first and third factors are not applicable here because there is no contention either that the forum selection clause was the result of fraud or overreaching or that some aspects of Korean law will deprive plaintiff of a remedy. Rather, the cargo interests argue that enforcement of the Korean forum clause here is unreasonable because: a) it would cause serious inconvenience by forcing all Hyundai's cargo claimants to litigate the same claims in two separate forums; b) because of the substantial additional costs involved to maintain a Korean lawsuit; c) because of the inequity in carving off certain claimants in a limitation proceeding of this size; and that in any event, d) Hyundai waived its forum clause by initially filing a claim in the limitation proceeding. [FN3]

> FN3. The cargo interests also argue that the Korean jurisdiction clause is part of a bill of lading, an "adhesion" contract. However, there "is no merit to the plaintiff's claim that the Court should invalidate the forum selection clause because the bill of lading in which it appears is a contract of adhesion. The Supreme Court upheld a foreign arbitration clause even though it appeared in a 'standard form bill of lading." ' *Silgan Plastics Corp. v. M/V Holland,* 1998 AMC 2163 (S.D.N.Y.1998) (citing *Sky Reefer,* 515 U.S. at 530).

At oral argument, counsel for the cargo interests argued that Hyundai has waived its forum enforcement clause by filing in the limitation proceeding and by taking advantage of this Court's discovery orders, so it is subject to cross claims. There is some confusion regarding Hyundai's filings within the limitation proceeding. A claim was filed in the limitation proceeding on behalf of Hyundai's cargo container underwriter on June 12, 1998. Papers to amend this claim were prepared by the attorneys on July 27, 1998, but they were inadvertently not filed with the Court. Subsequently, the attorneys, belatedly wishing to avoid the appearance of waiver, sent me an exparte Notice of Dismissal pursuant to Rule 41 of the Federal Rules of Civil Procedure--but addressed to the Amended Claim, which was attached as Exhibit A. On September 4, 1998, I signed it. The Dismissal did not address the original claim, and the cargo interests contend that they never received notice of either the Amended Claim or the Notice of Dismissal. In October, 1998, the first cross-claim was asserted against Hyundai within the

1999 WL 6364
1999 WL 6364 (S.D.N.Y.), 1999 A.M.C. 889
(Cite as: 1999 WL 6364 (S.D.N.Y.))

Page 3

limitation proceeding. The cargo interests maintain that since the Amended Claim was never filed, the Notice of Dismissal did not remove Hyundai from this action. I need not reach this issue, however, because Hyundai Merchant Marine (America) Inc. filed its own claim. *See* Rule F Statement, Claim # 604. [FN4] According to *In re Deleas Shipping Ltd.,* 1996 AMC 434 (W.D.Wash.1995), a "forum selection clause will be deemed waived if the party invoking it has taken actions inconsistent with it, or delayed its enforcement, and other parties would be prejudiced."

> FN4. Although a Stipulation dated June 12, 1998 notes that Hyundai's claim is "strictly without prejudice to the enforceability of the Korean foreign forum selection clause contained in its bill of lading as between HMM and ... any third parties," Hyundai has submitted itself to this Court's jurisdiction by filing within the limitation proceeding.

*3 Here, MSC has properly availed itself of the limitation proceeding in an attempt to control what has become more than $130 million in claims by hundreds of claimants. The unusual size and complexity of this matter render arguments of judicial economy and equity particularly strong in this case. "The purpose of a limitation proceeding is not merely to limit liability but to bring all claims into concourse and settle every dispute in one action." *The Quarrington Court,* 102 F.2d 916, 918 (2d Cir.1939). The Supreme Court has "given the statute a very broad and equitable construction for the purpose of carrying out its purpose, and for facilitating a settlement of the whole controversy [FN5] as are comprehended within it, and that all the ease with which rights can be adjusted in equity is intended to be given to the proceeding." *Hartford Accident & Ind. Co.,* 273 U.S. at 215-16. [FN6]

> FN5. [Footnote by this Court] Given the myriad global origins of the shipments of cargo, not every conceivable claim between various parties flowing from this sinking can be drawn into this proceeding. *See generally, Oceanic Steam Navigation Company Ltd. v. Mellor,* 233 U.S. 718, 732-33 (1914) *(The Titanic).* It is, however, manifestly the Supreme Court's preferential view, flowing as it does from a common-sense appraisal of the situation and the

conservation of international judicial resources, that the goal of settling "the whole controversy" is to be pursued where possible.

> FN6. Hyundai cites *Afram Carriers, Inc. v. Moeykins,* 145 F.3d 298 (5th Cir.1998) in support of the proposition that the policy behind a limitation proceeding does not overcome the right to enforcement of a foreign forum clause. That case involved a questioned out-of-court settlement of a wrongful death claim in Peru, and the Fifth Circuit found that the two policies behind a limitation proceeding--protecting American shipowners and equitable resolution of disputes--appeared to be "at loggerheads," 145 F.3d at 302, and therefore canceled each other out. I do not find that approach applicable here.

Hyundai argues, however, that *Vimar Seguros y Reaseguros S.A. v. M/V Sky Reefer,* 515 U.S. 528 (1995) mandates that this Court *must* enforce the forum clause. I do not, however, see *Sky Reefer* holding more than that "foreign *arbitration* clauses in bills of lading are not invalid under COGSA *in all circumstances." * 515 U.S. at 541 (emphasis added). The instant motion deals with a foreign jurisdiction clause, rather than a foreign arbitration clause. In her concurrence, Justice O'Connor specifically noted that "the District Court ... retained jurisdiction over [*Sky Reefer* ] while the arbitration proceeds, [so] any claim of lessening of liability that might arise out of the arbitrators' interpretation of the bill of lading's choice of law clause ... is premature." 515 U.S. 528 at 542; *see also Union Steel America Co. v. M/V Sanko Spruce,* 14 F.Supp.2d 682 (D.N.J.1998) (noting that "the crucial distinction between foreign arbitration clauses and foreign forum selection clauses" is what led the Supreme Court to dismiss petitioner's argument in *Sky Reefer* ). The safeguard of retained jurisdiction is therefore not applicable here because this case involves a foreign jurisdiction clause.

While Hyundai has enforced this very forum clause before other courts, [FN7] those cases did not involve limitation proceedings of this size and complexity. They, like *Fireman's Fund Insurance Company v. Cho Yang Shipping Co. Ltd.,* 1998 AMC 583 (9th Cir.1997), or *Bison Pulp & Paper Ltd. v. M/V Pergamos,* 1996 AMC 2022 (S.D.N.Y.1995), essentially involved simple breaches of contract or

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1999 WL 6364

Page 4

1999 WL 6364 (S.D.N.Y.), 1999 A.M.C. 889
**(Cite as: 1999 WL 6364 (S.D.N.Y.))**

single claimants. Unjustifiably giving effect to all of the various forum clauses in a cargo situation of this complexity and global magnitude would fragment this case beyond recognition. [FN8] Furthermore, after filing its own claims in the limitation proceeding, Hyundai cannot now avoid the Court's jurisdiction. *See Oceanic Steam Navigation Company Ltd. v. Mellor (The Titanic),* 233 U.S. 718, 732-33 (1914) ("The question is not whether the owner of the Titanic by this proceeding can require all claimants to come in, and can cut down rights vested under English law, as against, for instance, Englishmen living in England who do not appear. It is only whether those who do see fit to sue in this country are limited to their recovery irrespective of English law.").

> FN7. *See, e.g., International Marine Underwriters CU v. M/V Kasif Kalkavan,* 989 F.Supp. 498 (S.D.N.Y.1998); *Hyundai Corp. (U.S.A.), Inc. v. M/V An Long Jiang,* 1998 AMC 854 (S.D.N.Y.1998); *TradeArbed, Inc. v. M/V Agia Sofia,* 1997 AMC 2838 (D.N.J.1997).

> FN8. Indeed, to do so would be to act with the arbitrary despotism of Poseidon, rather than in accordance with the more thoughtful dictates of justice and equity.

*4 In sum, I decline to enforce Hyundai's Korean forum clause for the reasons set forth above.

The foregoing is so ordered.

1999 WL 6364 (S.D.N.Y.), 1999 A.M.C. 889

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Slip Copy
2004 WL 946894 (D.Kan.)
**(Cite as: 2004 WL 946894 (D.Kan.))**

Page 1

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.

B-S STEEL OF KANSAS, INC., Plaintiff,
v.
TEXAS INDUSTRIES, INC., et al., Defendants.
CHAPARRAL STEEL MIDLOTHIAN, L.P.,
Plaintiff,
v.
B-S STEEL OF KANSAS, INC., Defendant

**No. 01-2410-JAR, 03-2664-JAR.**

April 28, 2004.

James R. Eiszner, Shook, Hardy & Bacon L.L.P.,
Kansas City, MO, for Plaintiff.

David A. Rameden, Jerrod A. Westfahl, Shook,
Hardy & Bacon L.L.P., Overland Park, KS, Dennis
D. Palmer, Shughart Thomson & Kilroy, PC, Kansas
City, MO, for Plaintiff and Defendants.

George E. Leonard, Shughart Thomson & Kilroy,
PC, Kansas City, MO, for Defendants.

*MEMORANDUM AND ORDER DENYING MOTION
TO DISMISS*

ROBINSON, J.

**\*1** This matter comes before the Court on defendant
B-S Steel of Kansas, Inc.'s (B-S Steel) Motion to
Dismiss (Doc. 3) plaintiff Chaparral Steel
Midlothian, L.P.'s (Midlothian) Petition for Order
Confirming Arbitration Award (Doc. 1) filed in Case
No. 03-2664. B-S Steel argues dismissal is warranted
pursuant to Fed.R.Civ.P. 12(h)(3) for lack of subject
matter jurisdiction and Fed.R.Civ.P. 12(b)(3) for
improper venue. For the reasons stated below, B-S
Steel's motion is denied.

A. Procedural History

On August 15, 2001, B-S Steel filed suit in Case No.
01-2410, naming as defendants Texas Industries, Inc.
and Chaparral Steel Company. B-S Steel filed an
amended complaint on December 6, 2001, naming as
additional defendants Chaparral Steel Texas, Inc. and
Midlothian. By its Order dated September 4, 2002,
this Court referred B-S Steel's claims against
Midlothian, which were based on transactions
occurring before April 3, 2001, to arbitration
pursuant to the Conditions of Sale Contract between
B-S Steel and Midlothian. This Court found in its
Order that the Conditions of Sale Contract signed on
February 26, 1997 and effective with invoices after
July 1, 1996 was "valid and enforceable."

In a likely attempt to avoid arbitration and following
this Court's Order compelling arbitration, B-S Steel
voluntarily dismissed Midlothian from Case No. 01-
2410 on September 17, 2002. On that same day, B-S
Steel informed Midlothian by letter that it was
unwilling to proceed to arbitration. Subsequently,
Midlothian filed a Demand for Arbitration with the
American Arbitration Association seeking an order
declaring that Midlothian was not liable to B-S Steel
on its claims against Midlothian. On November 6,
2002, B-S Steel filed in the arbitration counterclaims
against Midlothian, which were based on the same
transactions and representations that the original
claims in B-S Steel's Amended Complaint were based
upon. A three member panel of arbitrators was
appointed, and after a nine day hearing and the
designation of over six hundred exhibits, the
arbitrators issued a reasoned award.

Midlothian sought to confirm the reasoned award by
filing a Motion for Order Confirming Arbitration
Award in Case No. 01-2410. In its response, B-S
Steel argued that because Midlothian had already
been dismissed from the lawsuit, it could not bring a
motion to confirm without first filing a new action
and paying its filing fees. Perhaps recognizing it was
no longer a party, Midlothian voluntarily dismissed
its Motion for Order Confirming Arbitration Award
and filed a new action. In the new action, Case No.
03-2664, Midlothian sought only a Petition for Order
Confirming Arbitration Award, which was nearly a
verbatim recitation of its previously filed Motion to
Confirm in Case No. 01-2410. B-S Steel then filed
the Motion to Dismiss Midlothian's Petition for lack
of subject matter and improper venue. Subsequently,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
2004 WL 946894 (D.Kan.)
(Cite as: 2004 WL 946894 (D.Kan.))

Case Nos. 01-2410 and 03-2664 were consolidated and the Motion to Dismiss is now pending before this Court.

B. *Lack of Subject Matter Jurisdiction*

*2 B-S Steel argues that Midlothian's Petition must be dismissed for lack of subject matter jurisdiction because pursuant to § 9 of the Federal Arbitration Act [FN1] (FAA) and the forum selection clause entered into by B-S Steel and Midlothian, any motion to confirm the arbitration award must be brought in the Northern District of Texas.

FN1. 9 U.S.C. § 9.

Although not mentioned in either party's briefs to the Court, the Tenth Circuit has articulated a standard for determining whether a court has subject matter jurisdiction to confirm an arbitration award. [FN2] The inquiry is twofold: first, because the FAA does not create any independent federal-question jurisdiction, there must be diversity of citizenship or some other independent basis for federal jurisdiction before a federal court can act under the FAA. [FN3] Additionally, the parties must have "agreed, explicitly or implicitly, that any eventual arbitration award shall be subject to judicial confirmation." [FN4]

FN2. *See P & P Indus., Inc. v. Sutter Corp.,* 179 F.3d 861, 866 (10th Cir.1999).

FN3. *Id.*

FN4. *Id.* at 866-67.

There is no question that diversity jurisdiction is present. [FN5] Nor is there any doubt that the parties agreed that any arbitration award would be subject to judicial confirmation. The Conditions of Sale Agreement, which this Court has already determined is valid, provides *inter alia:*

FN5. The Pretrial Order in Case No. 01-2410 provides that "subject matter jurisdiction is invoked under ... 28 U.S.C. § 1332 ... and is not disputed."

Any controversy or claim arising out of or related to these Conditions of Sale or any other transactions between Buyer and Seller shall be resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and judgment upon the award rendered by the arbitrator(s) may be entered in any court having competent jurisdiction thereof.

Because an independent basis for subject matter jurisdiction in the form of diversity of citizenship exists and because B-S Steel and Midlothian agreed that any arbitration award could be confirmed, this Court concludes it has subject matter jurisdiction over the parties.

B-S Steel's contention that this Court's subject matter jurisdiction is somehow implicated by the forum selection clause and § 9 of the FAA defies reason. It is well settled that a motion to dismiss based on a forum selection clause is treated not as a motion to dismiss for *lack of subject matter jurisdiction,* but rather as a motion to dismiss for *improper venue* under Fed.R.Civ.P. 12(b)(3). [FN6] Indeed, this Court in interpreting the 'exclusive jurisdiction' clause which B-S Steel refers to, has already determined that the clause is a "forum selection clause" and should be analyzed under the Fed.R.Civ.P. 12(b)(3) standard. [FN7] Moreover, the FAA provisions which B-S Steel claims mandate dismissal for lack of subject matter jurisdiction, have been described by the Supreme Court as "venue provisions." [FN8] Consequently, the Court will analyze B-S Steel's remaining jurisdictional arguments under the standards for improper venue.

FN6. *United Int'l. Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207, 1222 (10th Cir.2000) ("We disagree with the premise underlying this argument--that forum selection or choice of law issues implicate a court's subject matter jurisdiction. Forum selection issues raise concerns not of subject matter jurisdiction but of improper venue or failure to state a claim on which relief may be granted."); *K & V Scientific Co., Inc., v. BMW,* 314 F.3d 494, 497 (10th Cir.2002).

FN7. *See B-S Steel of Kansas, Inc., v. Texas Indus., Inc.,* 229 F.Supp.2d 1209, 1227 (D.Kan.2002).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

> FN8. *Cortez Byrd Chips, Inc., v. Bill Harbert Constr. Co.*, 529 U.S. 193, 195, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000).

C. Improper Venue

B-S Steel contends that the forum selection clause and § 9 of the FAA make venue in the District of Kansas improper. In response, Midlothian contends that venue is proper because B-S Steel initially chose this forum when it filed suit and has since waived any right to object to lack of proper venue, the forum selection clause does not apply, and § 9 of the FAA states that any court with jurisdiction and venue may confirm arbitration awards.

*1. Forum Selection Clause*

**\*3** Quite disingenuously, B-S Steel argues that venue is improper due to the forum selection clause; yet, it was B-S Steel that originally chose this forum when it filed suit in the District of Kansas in Case No. 01-2410. It is well settled that a plaintiff's choice of forum should rarely be disturbed. [FN9] But, rather than admitting that it originally chose this forum, B-S Steel engages in a game of smoke and mirrors. B-S Steel argues that the issue raised by its motion to dismiss is "this Court's jurisdiction to hear Case No. 03- 2664. This action is not a continuation of Case No. 01-2410 ... it is a brand new action filed by Midlothian...." B-S Steel has *not* forgotten the reason Midlothian was forced to file a new action to confirm the arbitration award. After this Court compelled arbitration, *B-Steel voluntarily dismissed Midlothian* from Case No. 01-2410, most likely in an attempt to avoid arbitration and the Court's Order entirely. Moreover, Case No. 03-2664 has been substantively consolidated with Case No. 01-2410 so any argument that the cases should be treated separately is moot. [FN10]

> FN9. *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir.1992); *B-S Steel of Kansas, Inc.*, 229 F.Supp.2d at 1222.

> FN10. *See* Memorandum and Order dated April 14, 2004, in Case No. 03-2664 (Doc. 14).

Even more disingenuous, if possible, is B-S Steel's

contention that it was "duped into adding Midlothian" and surprised by the forum selection clause, "of which B-S Steel was unaware." This, B-S Steel contends, is how more than two years post-filing, it has yet to waive the defense of improper venue. Far from being "duped," BS-Steel voluntarily filed a motion to amend its complaint to add Midlothian. B-S Steel now claims it was unaware of the Conditions of Sale agreement containing the forum selection clause, however, the agreement was signed by B-S Steel's president. This Court wonders how a party could be tricked into amending its complaint and claim ignorance of a document signed by its president, unless that party failed to conduct adequate discovery before amending its complaint in the first instance. [FN11] Furthermore, if B-S Steel was indeed deceived into adding Midlothian, it had ample opportunity to voluntarily dismiss Midlothian as soon as it became aware of the forum selection clause and before the Court compelled arbitration. Instead of dismissing Midlothian right away, B-S Steel delayed until after the Court's September 3, 2002 Order, and only following the Court's Order, which was not favorable to B-S Steel, did B-S Steel seek to dismiss Midlothian.

> FN11. *See* Fed.R.Civ.P. 11(b) ("By presenting to the court ... a pleading ... an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.)

B-S Steel argues that it has not waived venue because after it was duped into adding Midlothian, it "was placed in a responsive position so it was not obligated to argue either jurisdiction or venue." Interestingly though, when Midlothian originally sought dismissal based on improper venue, BS-Steel asserted that venue was proper in Kansas and stated:

Midlothian's improper venue argument is flawed and incorrect. The Conditions of Sale agreement has a narrow forum selection clause for claims to enforce or interpret them or for breach of contract claims. Nothing in Plaintiff's Amended Complaint alleges facts that implicate the Conditions of Sale or could be interpreted as a breach of contract

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4
2004 WL 946894 (D.Kan.)
**(Cite as: 2004 WL 946894 (D.Kan.))**

claim against Defendants. *This forum selection clause cannot, therefore, serve as the basis for dismissal on venue grounds* .

*4 Thus, B-S Steel *was in a position to argue venue* and argued that venue was proper. Additionally, the Pretrial Order entered on December 22, 2003, which serves as the final and binding pleading in the case, contains no mention of B-S Steel's alleged venue objection . [FN12] B-S Steel chose this forum when it filed suit in the District of Kansas in August 2001 and cannot now claim that venue is improper.

> FN12. It is settled that "[t]he pretrial order controls the subsequent course of the action, and the trial court need not consider any matter that is not embodied in it." *Gardner v. Safeway Stores, Inc.*, 99 F.R.D. 258, 260 (D.Kan.1983).

*Midlothian further argues that even if B-S Steel has not waived venue, the forum selection clause does not apply.* Because the Court has determined that B-S Steel long ago waived venue by filing this lawsuit and remaining silent, the Court need not address this argument.

*2. § 9 of the FAA*

B-S Steel argues that venue is improper [FN13] under § 9 of the FAA because the Conditions of Sale agreement selects the Northern District of Texas as the exclusive forum for interpreting and enforcing the agreement. Midlothian responds that § 9 of the FAA is a permissive, not a mandatory venue provision, such that venue is proper in the District of Kansas

> FN13. B-S Steel's argument is actually titled a subject matter jurisdiction argument, not an improper venue one. But, as discussed earlier, the portion of § 9 of the FAA at issue is a venue, rather than a jurisdictional provision.

Section 9 of the FAA governs venue for the confirmation of arbitration awards. [FN14] Pursuant to § 9:

> FN14. *Cortez Byrd Chips, Inc.*, 529 U.S. at 197.

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. [FN15]

> FN15. 9 U.S.C. § 9.

In *Cortez Byrd Chips,* the Supreme Court interpreted § 9. The court explained that only by giving § 9 a *permissive, rather than mandatory effect could it avoid* "plac[ing] § 3 and § § 9-11 of the FAA in needless tension." [FN16] Section 3 provides that any court in which an action "referable to arbitration under an agreement in writing" is pending "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." [FN17] The court noted that, "[i]f an arbitration were then held outside the district of that litigation, under a restrictive reading of § § 9-11 a subsequent proceeding to confirm, modify, or set aside the arbitration award could not be brought in the district of the original litigation (unless that also happened to be the chosen venue in a forum selection agreement)." [FN18] Such an interpretation clashes with established precedent that a court with the power to stay the action under § 3 has the further power to confirm any ensuing arbitration award. [FN19] Thus, the court concluded that § 9 is permissive not restrictive, permitting a motion to confirm, vacate, or modify an arbitration award to be brought either where the award was made or in any district proper under the general venue statute. [FN20]

> FN16. *Cortez Byrd Chips, Inc.*, 529 U.S. at 201.

> FN17. 9 U.S.C. § 3.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5
2004 WL 946894 (D.Kan.)
**(Cite as: 2004 WL 946894 (D.Kan.))**

FN18. *Cortez Byrd Chips, Inc.,* 529 U.S. at 202; *P & P Indus.,* 179 F.3d at 869 (noting that to give § 9 a restrictive interpretation, would render § 3 meaningless. If a court had no power to confirm the award, then it should dismiss the action, not stay the proceedings pursuant to § 3, because the court would have no power to take further action in the case).

FN19. *Cortez Byrd Chips, Inc.,* 529 U.S. at 202; *Denver & Rio Grande W. R.R. Co., Union Pac. R.R. Co.,* 868 F.Supp. 1244, 1250 (D.Kan.1994) (quoting *Smiga v. Dean Witter Reynolds Inc.,* 766 F.2d 698, 706 (2d Cir.1985), *cert. denied* 475 U.S. 1067, 106 S.Ct. 1381, 89 L.Ed.2d 607 (1986) ("Once a federal court has subject matter jurisdiction over an action, it may confirm an arbitration award even though it was not the district where the award was granted.")

FN20. *Cortez Byrd Chips, Inc.,* 529 U.S. at 204.

**\*5** B-S Steel argues that the Conditions of Sale agreement dictates that the arbitration award can be confirmed only in the Northern District of Texas. The agreement states, *inter alia:*

In any proceeding to enforce or interpret these conditions of sale, buyer expressly consents to the exclusive jurisdiction of the state and federal courts of the State of Texas and venue shall be proper in Ellis County.

Additionally, the agreement provides that "judgement upon the [arbitration] award may be entered in any court having jurisdiction thereof." B-S Steel asserts that the permissive aspects of § 9 "only come into play if no court is specified in the arbitration agreement" and that because the parties chose Texas as their forum, only Texas may confirm the award.

B-S Steel's assertion, however, ignores the reasoned analysis of the Supreme Court. Under B-S Steel's view, § 3 and § 9 would be very much in conflict. This Court has already determined that it has jurisdiction to stay the proceedings pursuant to § 3 and refer the case to arbitration; indeed, the Court has already done just that. To suggest now that the Court cannot confirm the award under § 9 mirrors the reasoning considered and rejected in *Cortez Byrd*

*Chips* . Moreover, it is well-settled that a party who elects to sue in a federal district court that stays his suit under the FAA consents to the filing of a motion to confirm an arbitration award under § 9 in that district. [FN21] Because the Court has already determined that jurisdiction and venue are proper, § 9 is a permissive, not a mandatory venue provision, and B-S Steel impliedly consented to the filing of the motion to confirm by choosing this venue, B-S Steel's motion to dismiss must be denied.

FN21. *Id.* at 202; *T & R Enter., Inc. v. Cont'l Grain Co.,* 613 F.2d 1272, 1279 (5th Cir.1980) ("[T]he power of the federal court in the Northern District of Alabama was invoked by T & R when they initially filed the complaint on these contracts in that jurisdiction. We conclude that, once invoked, the power of that court to enter a judgment on the arbitrator's award which was an outgrowth of the original action was sufficient to satisfy the jurisdictional requirements.") (citing *Marine Transit Corp. v. Dreyfus,* 284 U.S. 263, 276-77, 52 S.Ct. 166, 76 L.Ed. 282 (1931)); *Smart v. Sunshine Potato Flakes, L.L.C.,* 307 F.3d 684, 685 (8th Cir.2002) ("The district court initially had diversity jurisdiction over this action. After it entered a stay pending arbitration under 9 U.S.C. § 3, the court had the further power to confirm any ensuing arbitration award.")

IT IS THEREFORE ORDERED BY THE COURT that B-S Steel's Motion to Dismiss (Doc. 3) originally filed in Case No. 03-2664, which has been consolidated with Case No. 01-2410, shall be DENIED.

IT IS SO ORDERED.

2004 WL 946894 (D.Kan.)

Motions, Pleadings and Filings (Back to top)

- 2:03CV02664 (Docket) (Dec. 31, 2003)

- 2:01CV02410 (Docket) (Aug. 15, 2001)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 946894 (D.Kan.)
(Cite as: 2004 WL 946894 (D.Kan.))

Page 6

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant IBM on the 6th day of July, 2005 by U.S. Mail to:

David Marriott, Esq.
CRAVATH SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Donald Rosenberg, Esq.
1133 Westchester Avenue
White Plains, NY 10604

Todd Shaughnessy, Esq.
SNELL & WILMER LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, UT 84101-1004