

FILED
U.S. DISTRICT COURT

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **MEMORANDUM IN SUPPORT OF SCO'S MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 15(a) AND 16(b)**<br>[Docket No. 323]<br><br>**(REFILED IN REDACTED FORM)**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

Plaintiff The SCO Group, Inc. ("SCO") respectfully submits this Memorandum in Support of SCO's Motion for Leave to File a Third Amended Complaint Pursuant to Federal Rules of Civil Procedure 15(a) and 16(b).[1]

## PRELIMINARY STATEMENT

SCO seeks leave to amend to assert a single, specific cause of action for copyright infringement based on IBM's unauthorized use of copyrighted SCO code in IBM's AIX for Power products.[2]  The Court should permit SCO's amendment for the following reasons:

- First, SCO recently discovered its new cause of action based on internal documents that IBM produced only in March and April of this year, after the time for amendment in this case had passed.  After discovering the basis for its claim through its review of IBM's voluminous production (which consisted of almost a million pages of documents and more than sixty CDs), SCO acted diligently in investigating and asserting the claim.

- Second, the addition of SCO's claim would not prejudice IBM in any way.  Indeed, IBM itself has asked the Court, through its Ninth Counterclaim, for relief that requires the litigation of all the issues raised by SCO's proposed amendment.  IBM's counterclaim seeks a declaratory judgment that "IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyright through the reproduction, improvement, and distribution of AIX and Dynix."  IBM's 2d Am. Countercl. ¶ 167 (emphasis added).  SCO's proposed new claim – which concerns IBM's infringement of SCO's copyrights in IBM's improvement of a particular version of AIX – is thus

---

[1] SCO's proposed Third Amended Complaint is attached as Exhibit 1 hereto.

[2] The sole proposed changes to SCO's Second Amended Complaint are the addition of SCO's Tenth Cause of Action, which is stated in paragraphs 216-41 of SCO's proposed Third Amended Complaint, the correction of the numbering of certain paragraphs, and changes to Paragraph 5 of the Prayer for Relief to conform to SCO's new copyright claim.

encompassed entirely within IBM's counterclaim. SCO's amendment merely asserts a claim for affirmative relief out of the factual showing that SCO would already make in defense to IBM's own counterclaim. Moreover, SCO will present the facts of IBM's misappropriation of SCO's code through Project Monterey in connection with and in support of SCO's existing and long-standing contract and related claims (which concern, among other things, IBM's development of the AIX program through IBM's reliance on SCO's proprietary material).

- Third, SCO's claim is based on clear and unmistakable evidence that IBM copied, without any legal right or authorization, SCO's UnixWare System V Release 4 ("SVR4") product.

Specifically, as SCO's new copyright claim alleges, and the evidence that SCO has recently uncovered reveals:

- IBM gained access to SCO's copyrighted SVR4 code through a joint-development arrangement called "Project Monterey" between SCO's predecessor-in-interest The Santa Cruz Operation, Inc. (unless otherwise specified, "SCO") and IBM.[3]

- Under Project Monterey, IBM and SCO were jointly to develop an "AIX for Itanium" product for use on a new hardware chip that Intel was developing, and pursuant to the parties' Joint Development Agreement and related documents (the "JDA"), IBM would

---

[3] IBM may attempt to argue that SCO did not obtain The Santa Cruz Operation's rights in the Project Monterey Joint Development Agreement because IBM purported to cancel that agreement in 2001. This matter need not detain the Court because SCO's proposed copyright claim in no way depends on SCO's ownership of those contract rights under the JDA. IBM's purported termination of the JDA could not, of course, impair The Santa Cruz Operation's transfer of the pertinent copyrights to SCO.

have access to SCO's SVR4 code <u>solely</u> for the purpose of developing the AIX for Itanium product.

- As a result of that access, and without any authorization to do so, IBM copied more than 200,000 lines of SCO's SVR4 source code into versions of IBM's "AIX for Power" product, which runs on IBM's Power PC chip.  IBM wanted SVR4 code in AIX for Power to make IBM's software mirror the "look and feel" of Sun Corporations' competing UNIX operating system, "Solaris."

- In the course of the project, IBM coordinated a pretextual release of a Project Monterey product in an attempt to manufacture a contractual rationalization for IBM's undisputed-but-already-perpetrated, as well as continued, copying of SCO's SVR4 source code into AIX for Power.

- The draft and commercially unviable Itanium product that IBM "released" in May 2001 could not have remotely entitled IBM to use any of SCO's SVR4 source code for any purpose other than Project Monterey.  It could not have done so for the improper, undisclosed use that IBM had already made of SCO's protected material in connection with IBM's development and distribution of AIX for Power, and it could not have done so for IBM's continued use of SCO's misappropriated code after IBM's pretextual "release" in May 2001.

SCO outlined this evidence for the Magistrate Court in its August 19, 2004 Supplemental Memorandum Regarding Discovery, and even IBM's opposition to that brief does not dispute in any way the merits of SCO's proof.

Before reviewing the almost one million pages of documents and more than 60 CDs of source code that IBM produced in March and April of this year, SCO did not know that IBM had

4

copied SCO's code into IBM's AIX for Power software. In that production, however, SCO uncovered a series of internal IBM e-mails revealing the above-described facts. Those facts – developed before any more specific discovery regarding Project Monterey – establish the basis for the allegations in SCO's new copyright claim.

SCO therefore has "good cause" to amend, and there would be no prejudice at all (much less undue prejudice) to IBM resulting from the amendment. Where, as here, the plaintiff first discovers the evidence underlying the proposed amendment from documents produced during discovery and proposes its amendment after a reasonable investigation, the plaintiff proposes a timely and good-faith amendment – even if the time for amendment of pleadings has passed. In addition (and notwithstanding the existing delays in the production of other discovery in this case), several months remain before the fact-discovery period closes, the parties have just begun to take depositions, and trial is not scheduled to begin for over a year. As noted above, moreover, all of the facts concerning IBM's misappropriation of SCO's code are already at issue in the case, including because IBM's Ninth Counterclaim expressly covers the precise subject matter of SCO's proposed amendment.

Finally, SCO recognizes that the parties' JDA for Project Monterey contains a forum-selection clause for New York courts. In asserting its broad Ninth Counterclaim in this case, however, IBM has indisputably encompassed SCO's claims arising out of Project Monterey and thereby waived any right to have such issues adjudicated in a New York court. In addition, given the scope of the Ninth Counterclaim, the adjudication of SCO's new copyright claim in this Court would promote judicial economy and the efficient resolution of closely related claims. Instead of filing a separate action in New York, SCO believes it essential that this Court be presented with all elements of the challenged course of conduct. IBM should not be heard to

5

object, having expressly availed itself of this forum for the matters presented, and relief sought, by IBM's Ninth Counterclaim.

## PROCEDURAL BACKGROUND

SCO commenced this action on March 3, 2003. Under the Scheduling Order that Magistrate Judge Nuff entered on June 20, 2003, the cut-off date to amend the pleadings was October 1, 2003. SCO amended its Complaint on July 22, 2003. On August 6, 2003, IBM asserted ten counterclaims against SCO. On September 25, 2003, IBM amended its counterclaims. On September 26, 2003, this Court granted SCO's Motion for Enlargement of Time to Amend Pleadings and gave SCO until February 4, 2004, to file any amended pleadings. On February 27, 2004, the Court granted SCO's February 4 Motion for Leave to File a Second Amended Complaint.

On March 29, 2004, IBM amended its counterclaims again, to assert for the first time counterclaims seeking broad declarations of non-infringement of copyrights. In its Ninth Counterclaim, IBM seeks a declaratory judgment that "IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyright through the reproduction, improvement, and distribution of AIX and Dynix, and that some or all of SCO's purported copyrights in UNIX are invalid and unenforceable." IBM's 2d Am. Countercl. ¶ 167. In March 2004, IBM produced to SCO approximately 334,656 pages of documents and 62 CDs of AIX and Dynix source code. In April 2004, IBM produced to SCO approximately 571,773 pages of documents and 2 additional CDs of source code.

In reviewing IBM's voluminous production over the course of months, SCO uncovered numerous internal IBM e-mails discussing Project Monterey and related issues. SCO determined that such evidence directly supported SCO's requests (then, and now, pending before the

6

Magistrate Court) for additional discovery to prove SCO's claims and to oppose IBM's Ninth

Counterclaim.  Accordingly, on August 19, SCO submitted a "Supplemental Memorandum" to

the Magistrate Court describing (and attaching) several of the e-mails and explaining their

relevance to SCO's requests for additional discovery.  The parties subsequently filed a series of

briefs regarding SCO's Supplemental Memorandum, and Magistrate Judge Wells is scheduled to

hear all of SCO's pending requests for additional discovery on October 19.

Given (among other factors) the parties' extended briefing of discovery-related issues

throughout this past summer, the parties have not taken discovery specific to Project Monterey.

On October 4, 2004, SCO noticed the depositions of two IBM employees, William Sandve and

David Bullis, regarding Project Monterey.  Those depositions are expected to take place in

November.  The cut-off for fact discovery under the current Scheduling Order is February 11,

2005.  Trial is scheduled to begin on November 1, 2005.

## FACTUAL BACKGROUND

In or about October 1998, SCO and IBM entered into a joint-development arrangement to

develop a new software product. 3d Am. Compl. ¶ 222.  The product, an operating system, was

first known as "IA-64" and later known as "AIX5L for Itanium." Id. ¶ 223.  The IA-64/AIX5L

for Itanium product included portions of both IBM's AIX software and SCO's copyrighted

SVR4 product. Id.  The term "AIX for Itanium" derived from the new 64-bit hardware chip,

called "Itanium 64" (or "IA-64") that Intel was developing at the time. Id. ¶¶ 222-23.  IA-

64/AIX5L for Itanium was designed to run only on Intel's new IA-64 chip. Id. ¶ 222.  The joint-

development project was known as "Project Monterey." Id.

During the same period of time, but as a separate and distinct project, IBM was also

developing a new version of its AIX software known as "AIX for Power." Id. ¶ 224.  The term

7

"AIX for Power" derived from IBM's own proprietary hardware chip, known alternately as "Power PC," "PPC" or just "Power." Id. ¶ 228. AIX for Power was designed to run only on IBM's Power PC chip. Id.

IBM needed SCO's expertise for Project Monterey because SCO had successfully developed and sold UNIX-based operating systems that operated on Intel 32-bit processors, whereas IBM had very little experience or success in this area. Id. ¶ 222. At the time the JDA was executed, IBM had a license to use certain System V Release 3 software ("SVR3"), an earlier version of SCO's SVR4 software that did not contain certain functionality available in SVR4. Id. ¶ 224. When IBM and SCO executed the JDA, and thereafter, IBM wanted access to SCO's SVR4 source code. Id. ¶¶ 224, 227. IBM also wanted SVR4 code for use in its AIX for Power operating system software, which competed with Sun Corporation's UNIX product, "Solaris." Id. ¶ 224. Because Solaris was based on SVR4, not SVR3, IBM wanted access to SVR4 code in order to make its software mirror the "look and feel" of the Solaris operating system so as to entice Solaris customers to switch over to IBM's AIX for Power. Id.

Despite the similarity in names between AIX for Power and AIX5L for Itanium, (which was IBM's choice), SCO had involvement only in the IA-64/AIX5L for Itanium development effort. Id. ¶ 226. SCO had nothing to do with, and indeed was shielded from, IBM's internal effort to develop AIX for Power. Id. ¶ 227.

SCO contributed certain SVR4 code to the joint development effort but the JDA provided that such code would be used solely for purposes of that effort, and any license to use the code on other projects would be the subject of a separate agreement. Id. ¶ 228. SCO owns the copyrights in the SVR4 code, and numerous copyright registrations issued by the United States Copyright Office cover these materials. Id. ¶¶ 219-20. IBM logged and maintained SCO's code

on IBM's Configuration Management Version Control ("CMVC") system. Id. ¶ 239. IBM also maintained its proprietary AIX for Power source code on its CMVC system. Id. Although IBM's AIX-for-Power engineers were thus given access to SCO's SVR4 code and SCO's engineers were allowed access to the IA-64/Itanium-related files on CMVC, SCO's engineers were not allowed access to the AIX for Power-related files on CMVC, were shielded from IBM's internal development of AIX for Power, and were not able to monitor what code IBM was using in that development. Id.

SCO had delivered its SVR4 code to IBM pursuant to a document entitled "Project Supplement B," which governed the IA-64/AIX for Itanium product-development efforts under Project Monterey. Project Supplement B restricted IBM's use of SCO's code to only IA-64/AIX for Itanium development and required the agreement of the parties for any additional uses. Id. ¶ 226. At IBM's request, the parties sought to negotiate a Project Supplement C, which would have allowed IBM to use SCO's code in AIX for Power. Id. ¶ 227. But the parties never reached terms on that Project Supplement C or on any other agreement that would have allowed IBM to use SCO's SVR4 code in AIX for Power. Id. ¶ 228.

In March and April 2004, IBM produced in this case almost one million pages of documents (including e-mails and various inter-company exchanges related to IBM's IA-64/AIX for Itanium development effort), and 64 CDs of source code (including source code for AIX for Power versions 5.1 and 5.2). Id. ¶ 238. Upon review of the AIX for Power source code, SCO first discovered that more than 200,000 lines of its SVR4 code had been copied verbatim into each of at least two versions of IBM's AIX for Power products. Id. ¶¶ 231-34. SCO concluded and has asserted, and IBM has not disputed, that SCO's SVR4 code is included in every copy of AIX for Power that IBM has released since October 2000. Id. ¶ 231.

9

The documents IBM produced show that IBM ignored the restrictions on its use of SCO's

SVR4 code and, as early as October 2000, began placing substantial portions of that code into

IBM's AIX for Power releases. Id. ¶ 229.  On May 11, 2000, Bill Sandve (IBM's Itanium

Project Director) wrote about IBM's potential use of SCO's SVR4 and UnixWare 7 ("UW7")

code in IBM's AIX for Power (which Mr. Sandve refers to as "AIX base") software:

> "We will need to re-negotiate the rights to ship SVR4 and UW7 capabilities in the
> AIX base, or remove the code.  Actually, shipping it with AIX is the preferred
> direction, because it helps us with Solaris compatibility issues."  Exh. 2 (emphasis
> added).

But IBM never did "renegotiate the rights to ship the SVR4 code," as Mr. Sandve admitted IBM

was required to do.

SCO's analysis of the AIX source code that IBM has produced reveals that IBM's AIX

for Power releases after September 2000 contain substantial literal (verbatim) and non-literal

(derived) copying of SCO's SVR4 code.  3d Am. Compl. ¶ 231.  IBM copied into AIX for

Power (Version 5.1.0) at least the following lines of SCO's SVR4 code (id. ¶ 232):

| | Lines of Verbatim Copied Code | Lines of Derived Code | Total lines of Copied and Derived Code | Total number of files with Copied and Derived Code |
|---|---|---|---|---|
| Package and Installation Tools | 46,104 | 3,787 | 49,891 | 188 |
| Truss | 3,954 | 3,695 | 7,649 | 16 |
| Print Subsystem | 122,089 | 3,743 | 125,832 | 606 |
| Administrative commands | 8,159 | 504 | 8,663 | 32 |
| Header files | 39,774 | 115 | 39,889 | 275 |
| /proc | | 13,102 | 13,102 | 13 |
| **Total** | **220,080** | **24,946** | **245,026** | **1,130** |

IBM also copied into AIX for Power (Version 5.2.0) at least the following lines of SCO's SVR4 code (id. ¶ 233):

| | Lines of Verbatim Copied Code | Lines of Derived Code | Total lines of Copied and Derived Code | Total number of files with Copied and Derived Code |
|---|---|---|---|---|
| Package and Installation Tools | 46,076 | 4,660 | 50,736 | 188 |
| Truss | 3,947 | 6,492 | 10,439 | 20 |
| Print Subsystem | 122,409 | 4,458 | 126,867 | 616 |
| Administrative commands | 7,569 | 9,757 | 17,326 | 55 |
| Header files | 39,775 | 213 | 39,988 | 275 |
| /proc | | 15,419 | 15,419 | 15 |
| **Total** | **219,776** | **40,999** | **260,785** | **1,169** |

Furthermore, IBM copied into AIX for Power the "man pages" from SCO's copyrighted materials (electronic UNIX user documentation, or manual, that is included on the CDs used to deliver binary code and that describe how to use the code), consisting of tens of thousands of words in dozens of separate files. Id. ¶ 234.

SCO has also determined from IBM's internal e-mails and other documents (such as Exhibit 2, above) that by October 2000 – many months before even IBM's pretextual product "release" in April 2001 – IBM had copied SCO's SVR4 code into AIX for Power Version 5.0. A further example is an internal IBM chart dated October 27, 2000, titled "AIX dependency on SCO licensed material" states (among other things):

> "• Some code originated in Unixware 7, some was contributed as project work
> • Some SCO licensed material is shipping in AIX 5L Version 5.0 (Power)". Exh. 3.

11

The document goes on to list the "Primary components affected." Id. Yet SCO cannot specify the misappropriated SVR4 code, because although IBM has produced to SCO AIX for Power Versions 5.1 and 5.2 (the versions IBM released after its pretextual April 2001 "release" for Project Monterey), IBM has refused to produce Version 5.0.

IBM intended to, and did, make a pretextual release of a Project Monterey product in an attempt to justify IBM's past and continued copying of SCO's SVR4 source code into AIX for Power. Id. ¶ 236. The Itanium product that IBM "released," in May 2001, did not satisfy the conditions of a "Product Release" entitling IBM to use any of SCO's SVR4 code for any purposes other than Project Monterey. Id. The draft product did not even have a functioning "compiler" (as described below), which is absolutely crucial to computer operation. Id. At the time IBM released the product, moreover, because the Itanium 64 chip itself was still in development, there was no commercially available Itanium hardware on the market on which the draft Product Monterey Itanium product could run. Id. In addition, IBM has itself acknowledged, in an internal e-mail dated November 6, 2002, the miniscule scope of the April 2001 "PRPQ" (Product Request for Pricing Quote, or draft) product release, and the fact that IBM decided to release such a product as a result of its strategic choice in the midst of Project Monterey (to focus on Linux):

> "As you know, when we changed strategic direction, we made Monterey a PRPQ.
>
> We distributed 32 copies of the PRPQ in 2001, resulting in only $256 in royalties paid to SCO." Exh. 4 (emphasis added).

Although IBM understood that this "release" was of no commercial use and had no functionality, IBM publicly maintained otherwise in order to carry out its scheme. 3d Am. Compl. ¶ 237.

Several e-mails make the point. In an e-mail dated January 27, 2001, Warren Washington, IBM's AIX PDT Team Leader, refers to the draft "PRPQ" product, and IBM's need for its "GA" (general availability), but notes that the draft product for proposed release in April does not include a "compiler." Computers operate on binary language requiring commands to be translated into zeros and ones. The compiler is the program that reads the statements written by the programmer in a human-readable programming language and translates the statements into a machine-readable executable program in binary code, and is thus obviously crucial to the operating system. Mr. Washington states:

> "Release AIX5.1 for IA-64 is an I-Listed PRPQ on the planned April schedule .... Compilers are not included in the PRPQ. Follow-up with a June GA based on interlock on Intel production level hardware schedule." Exh. 5 (emphasis added).

Rose Ann Roth, an IBM Project Manager, replied to this e-mail by explaining that IBM had to include a compiler of some sort to maintain the pretext of a functioning product:

> "I think the compiler MUST be available in some form or the whole thing just doesn't make sense (i.e., SCO won't buy it)." Id. (emphasis added).

In its Itanium release, however, IBM included a compiler that (as IBM knew) was not even minimally acceptable for use on any commercial basis, and would not compile (if at all) at a minimally acceptable speed on Intel's Itanium processor. 3d Am. Compl. ¶ 237. IBM nevertheless claimed to have released a functional product. Id. ¶ 238.

An e-mail dated April 4, 2001, from Helene Armitage, a senior IBM executive to Bill Sandve, also refers to the "PRPQ" Project Monterey draft product. Ms. Armitage describes the need to label what is a draft product (PRPQ) a "GA" (general availability):

> "Bill,
>
> I'm concerned that your words define a delayed GA to 2H01 for the AIX product,

and do not call the PRPQ GA, <u>so I have taken a stronger hand in stating our</u>
<u>delivery</u>.  (<u>As you know, we need to GA this PRPQ to gain rights to SCO code we</u>
<u>want for our base AIX product delivery - and every[one] is rather tired of me</u>
<u>remaining and harping on this point</u>.)" Exh. 6 (emphasis added).

In other words, IBM needed to designate the draft Itanium software as a "generally available"

product, notwithstanding its lack of functionality, in order to "gain the rights to SCO code."

IBM sought to make a pretextual general release of an Itanium product for the additional

reason that IBM had decided in the early stages of Project Monterey (without telling SCO) that

IBM did not intend to go through with the project in earnest, but instead would devote its efforts

and resources to a competing operating system, Linux.  3d Am. Compl. ¶ 230.  In May 2000,

over a <u>year</u> before the pretextual product release, Bill Sandve said in an e-mail:

> "If <u>the goal of canceling Monterey</u> is to speed up work on Linux, I can take much
> more action in parallel with a <u>slower move off Monterey</u>." Exh. 2 (emphasis
> added).

In other words, Mr. Sandve wanted IBM to delay telling SCO that IBM was abandoning Project

Monterey for Linux.

In an e-mail dated July 21, 2001, Mr. Sandve confirmed that internally IBM had decided

that Project Monterey was "dead" but externally maintained it was still committed to the project:

> "<u>The net internal position: AIX/IA64 is dead</u> . . . .  Do not encourage                **REDACTED**
>                 to consider AIX5L on an XSeries [Intel/Itanium] box since it is not    **AT IBM'S REQUEST**
> going to happen.
>
> <u>The external position: Although Saulnier and mktg team do not want to distribute</u>
> <u>any formal statement, even internally, here's what we've been saying</u>:
>
> . . . <u>The AIX5L for Itanium I-PRPQ remains available for evaluation use as may</u>
> <u>be appropriate</u>.  (It is available only as-is without support, as is the VA compiler it
> was built with)." Exh. 7 (emphasis added).

IBM thus concealed from SCO that IBM was using SCO's copyrighted code and other materials in IBM's AIX for Power products even after it had decided that it would not go forward with the joint project for which that code was intended. 3d Am. Compl. ¶ 230.

Although SCO understood that the Project Monterey product IBM "released" did not permit IBM to use SCO's SVR4 code, SCO did not know and could not reasonably have determined that IBM had nevertheless used the code, and could not have learned the other facts reflected in IBM's internal e-mails, until SCO obtained the discovery in March and April 2004 containing some versions of IBM's AIX for Power Software and the various (and other) internal IBM documents described herein. Id. ¶ 238. Until IBM's production, SCO did not have and could not reasonably have gained access to either IBM's AIX for Power source code or any internal IBM e-mails. Id. ¶ 239.

## ARGUMENT

Under Fed. R. Civ. P. 15, which governs the amendment of pleadings, "leave shall be freely given when justice so requires." "The liberal granting of motions for leave to amend reflects the basic policy that pleadings should enable a claim to be heard on its merits." Calderon v. Kansas Dep't of Soc. and Rehab. Servs., 181 F.3d 1180, 1185-86 (10th Cir. 1999) (citing Foman v. Davis, 371 U.S. 178, 182-83 (1962)). The liberal standard governing amendments is intended to "safeguard a plaintiff's opportunity to test" its "claims on the merits." Bauchman v. W. High Sch., 132 F.3d 542, 559 (10th Cir. 1997) (citing Foman, 371 U.S. at 182). The Court should grant leave to amend unless the non-moving party shows that the proposed amendment is unduly and inexplicably delayed, prompted by bad faith, would unduly prejudice the opposing party, or would be futile. Foman, 371 U.S. at 182; accord Las Vegas Ice and Cold Storage Co. v. Far W. Bank, 893 F.2d 1182, 1185 (10th Cir. 1990).

15

Where the court has entered a cut-off date for amendment pursuant to Federal Rule of

Civil Procedure 16, and a party moves for leave to amend after the cut-off, the party must also

(and first) show "good cause" under Rule 16(b). See Procter & Gamble Co. v. Haugen, 179

F.R.D. 622, 630 (D. Utah 1998), rev'd on other grounds, 222 F.3d 1262 (10th Cir. 2000).[4]

## I.     THIS COURT HAS GOOD CAUSE TO PERMIT SCO TO AMEND

SCO easily satisfies this Court's "good cause" standard. "The primary measure of Rule

16's 'good cause' standard is the moving party's diligence in attempting to meet the case

management order's requirements." Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir.

2001). SCO need only show that some of the evidence needed to assert its claim "did not surface

until after the amendment deadline." In re Lone Star Indus., Inc., Nos. 93-1505, 93-1506, 1994

WL 118475, at *11 (4th Cir. Apr. 7, 1994) (Exh. A); see also Forstmann v. Culp, 114 F.R.D. 83,

86 (M.D.N.C. 1987) (finding good cause where "plaintiff uncovered previously unknown facts

during discovery that would support an additional cause of action"); cf. Proctor & Gamble, 179

F.R.D. at 630-31 (denying leave to amend where plaintiff P&G "essentially admits that the

factual allegations that support its newly proposed legal theories were known at the time P&G

filed its third amended complaint"). The lack of prejudice to the defendant is also relevant. See,

e.g., Pfeiffer v. Eagle Mfg. Co., 137 F.R.D. 352, 355 (D. Kan. 1991) (permitting discovery after

period for fact-discovery in scheduling order where the case was "not on the 'eve of trial'" and

there was no indication that the non-moving party "has suffered any prejudice").

SCO did not know (and could not reasonably have determined) that IBM had improperly

converted SCO's SVR4 code and incorporated that code into IBM's AIX for Power product

before IBM's document production in March and April of this year. IBM produced those

---

[4] The Tenth Circuit has not addressed the interplay between Rules 15(a) and 16(b).

materials, which consisted of almost one million pages of documents and 64 CDs of source code, after the cut-off date for amending pleadings. The facts were unavailable to SCO until after IBM produced its documents.

In the months following IBM's production, SCO revealed the documents produced and, upon finding the materials discussed herein, promptly investigated the relevant facts. After sufficiently investigating the issues, SCO prepared and brought this motion. Under the circumstances – and particularly in light of the absence of any cognizable, much less undue prejudice to IBM, from SCO's amendment, see Part II.C, below – SCO obviously was unable to comply with the Court's Scheduling Order.

## II.   JUSTICE REQUIRES THAT SCO HAVE LEAVE TO AMEND

SCO's motion also satisfies the liberal standard for amendment under Rule 15(a). SCO's proposed amendment is timely and brought in good faith, and would neither prejudice IBM nor be futile. In addition, SCO's amendment will greatly promote judicial economy.

### A.   SCO's Proposed Amendment Is Timely

SCO does not propose its amendment after any "delay," let alone the excessive delay that is required to justify denial of a proposed amendment. Under Rule 15(a), the lapse of time between the original and amended complaint is justified if the plaintiff uncovered the basis for the amendment only during discovery. Journal Publ'g Co. v. Am. Home Assurance Co., 771 F. Supp. 632, 637 (S.D.N.Y. 1991) (three-and-a-half year lapse of time was justified where "plaintiffs' proposed amended complaint is based, at least in part, on facts that came to light during discovery"); Koch v. Koch Indus., 127 F.R.D. 206, 211 (D. Kan. 1989) ("There is no undue delay in seeking leave to amend if plaintiffs acquire knowledge of the facts behind the new claim only through recent discovery and after conducting a reasonable investigation of that

17

information.'"). Indeed, "parties have been permitted to assert new claims long after they acquired the facts necessary to support such claims, and have even been permitted to amend a complaint on the eve of trial." Journal Publ'g, 771 F. Supp. at 637.

SCO shows above that it did not learn the facts underlying its proposed new copyright claim until it had begun the time-consuming review of the documents and CDs IBM produced in March and April 2004 (after the cut-off for amendment of pleadings). On this basis alone, SCO's proposed amendment is not unduly delayed (or "delayed" at all). In addition, as shown above, IBM took affirmative steps to prevent SCO from learning that IBM had copied SCO's code into IBM's versions of AIX for Power, such as by preventing SCO engineers from viewing the information about AIX for Power on IBM's CMVC System.

In addition, SCO was not responsible for the timing of IBM's March and April production of documents. SCO first requested those documents in June 2003. See SCO's First Request for the Production of Documents (June 24, 2003), Request No. 2. After IBM asked the Court to order SCO to produce certain documents before IBM met its own production obligations, the Court entered an Order on December 12, 2003, requiring IBM to make its production on April 16, 2004. Accordingly, SCO could not learned the facts necessary to assert its new copyright claim before the cut-off date for amendment of pleadings.

**B.     SCO Proposes Its Amendment in Good Faith**

When a "proposed amendment is apparently based on information obtained by the plaintiffs through discovery," the amendment is proffered in good faith. Hampton Bays Connections, Inc. v. Duffy, 212 F.R.D. 119, 124 (E.D.N.Y. 2003). Rule 15(a) is meant to enable a party to assert matters that were unknown at the time of the original complaint. See id. (citing Smiga v. Dean Witter Reynolds, Inc., 766 F.2d 698, 703 (2d Cir. 1985)). SCO shows above that

18

its new copyright claim is predicated on information SCO obtained only during discovery. Accordingly, SCO proposes its amendment in good faith.

### C.    SCO's Amendment Will Not Prejudice IBM

"*The party opposing the amendment has the burden of showing prejudice.*" Acker v. Burlington N. & Santa Fe Ry. Co., 215 F.R.D. 645, 654 (D. Kan. 2003); accord Sithon Maritime Co. v. Holiday Mansion, 177 F.R.D. 504, 508 (D. Kan. 1998). The requisite prejudice is "undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party." Sithon, 177 F.R.D. at 508 (citing Deakyne v. Comm'rs of Lewes, 416 F.2d 290, 300 (3d Cir. 1969)); accord FDIC v. Renda, Civ. A. No. 85-2216-0, 1987 WL 348635, at *7 (D. Kan. Aug. 6, 1987) (Exh. B). There may be prejudice where the moving party proposes the amendment on the eve of trial, or offers a new claim or theory months or years after factual discovery has closed. See e.g., McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1130 (10th Cir. 1998). At the same time, even the "mere fact that discovery has concluded does not provide a reason for denying leave to amend." Kreinik v. Showbran Photo, Inc., No. 02 Civ. 1172 (RMB)(DF), 2003 WL 22339268, at *10 (S.D.N.Y. Oct. 14, 2003) (Exh. C); accord Hampton Bays, 212 F.R.D. at 123. "Even if discovery were to be prolonged, 'the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.'" Kreinik, 2003 WL 22339268, at *10 (quoting United States v. Cont'l Ill. Nat'l Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir. 1989)).

In this case, IBM cannot credibly claim (far less demonstrate) any prejudice from SCO's proposed amendment. Notwithstanding the existing delays in the production of other discovery in this case, several months remain for fact discovery, depositions in this case have just begun, and trial is not scheduled to begin for over a year.

19

As an independent matter, moreover, all of the facts and issues presented by SCO's new copyright claim are already in this case. <u>First</u>, SCO will present the facts of IBM's misappropriation of SCO's code through Project Monterey in support of SCO's long-pending contract claims. In support of those claims, SCO will show that IBM derived and modified its AIX product from SCO's UNIX code and then improperly dumped that code in violation of its contractual obligations. In establishing that IBM's AIX product derives from SCO's copyrighted materials, SCO will show that IBM not only misappropriated source code in AIX that IBM had <u>licensed</u> (by distributing and disclosing that code without authorization), but also misappropriated source in AIX that it had <u>not</u> licensed (by copying it into AIX in the first place). Indeed, in response to an interrogatory that SCO served on IBM on June 13, 2003, in order to gather information for its then-pending contract claims, IBM identified nineteen Project Monterey witnesses as "who may have knowledge concerning <u>certain issues in this lawsuit</u>," and specifically identified "Project Monterey" as those persons' "<u>Subject Area of Knowledge</u>." IBM's First Supplemental Responses and Objections to SCO's First Set of Interrogatories & Attachment A thereto, October 10, 2003 (emphasis added).[5]

<u>Second</u>, IBM's own Ninth Counterclaim directly encompasses the subject matter of SCO's proposed new copyright claim. IBM's Ninth Counterclaim – which IBM added to this case on March 29, 2001, after SCO's deadline for amending its pleadings had passed – seeks a declaratory judgment that "IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyright through the reproduction, improvement, and distribution of AIX and Dynix." IBM's 2d Am. Countercl. ¶ 167. SCO's amendment thus merely asserts an

---

[5] IBM has since supplemented that response to identify more than twenty-five such witnesses. <u>See</u> IBM's Third Supplemental Responses and Objections to SCO's First Set of Interrogatories & Attachment A thereto, August 4, 2004 (emphasis added).

affirmative claim out of the factual showing that SCO would make in defense to IBM's own

claim. SCO's amendment does not raise any new issues foreign to this litigation. See

LeaseAmerica Corp. v. Eckel, 710 F.2d 1470, 1474 (10th Cir. 1983) (no prejudice where the

amended complaint referred "to the same chattels, the same consideration, and the same

transaction" already at issue in the case); Kreinik, 2003 WL 22339268, at *10 (the plaintiff's

amendment would not cause the defendant any prejudice where those claims relate to the

defendant's counterclaims); see also Atiya v. Salt Lake County, 988 F.2d 1013, 1018 (10th Cir.

1993) (affirming district court's decision granting leave to amend where the amendment "did not

occur on the eve of trial and did not delay a determination of the dispute"); Decorative Ctr. of

Houston, L.P. v. Direct Response Pubs., Inc., 208 F. Supp. 2d 719, 725 (S.D. Tex. 2002)

(defendant suffered "no unfair prejudice from the amendment because the proposed changes to

the claims do not significantly alter the nature of this case"). SCO illustrated for IBM (in its

Supplemental Memorandum submitted to the Magistrate Court) over two months ago that Project

Monterey documents are directly relevant to IBM's Ninth Counterclaim, and thereby put IBM on

clear and direct notice of the relevance in this case of the subject matter of SCO's amendment.

**D.    SCO's Amendment Is Not Futile**

Under Rule 15(a), an amendment is futile "if the proposed amendment could not have

withstood a motion to dismiss or otherwise failed to state a claim." Schepp v. Fremont County,

Wy., 900 F.2d 1448, 1451 (10th Cir. 1990); accord Hampton Bays, 212 F.R.D. at 123. Under

the Rule 12(b)(6) standard that controls, a proposed amendment is futile only if "it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." Beckett ex rel. Cont'l W. Ins. Co. v. United States, 217 F.R.D. 541, 543

(D. Kan. 2003); <u>accord</u> <u>Sutton v. Utah State Sch. for Deaf & Blind</u>, 173 F.2d 1226, 1236 (10th Cir. 1999)).  SCO's new copyright claim easily satisfies Rule 12(b)(6).

In order to prevail on its copyright claim, SCO must show that (1) it owns a valid copyright, and (2) IBM copied SCO's copyrighted material without authorization.  <u>See</u> <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 942 (10th Cir. 2002); <u>Gates Rubber Co. v. Bando Chem. Indus., Ltd.</u>, 9 F.3d 823, 831 (10th Cir. 1993).  In its proposed Third Amended Complaint, SCO alleges that (1) it owns the copyright to the SVR4 code, <u>id.</u> ¶¶ 218-20; and (2) IBM copied in excess of 250,000 lines of that code into IBM's "AIX for Power" products, <u>id.</u> ¶¶ 230-33, and did so without authorization, <u>id.</u> ¶¶ 224-29.  SCO's allegations easily state a claim for copyright infringement.

In addition, SCO's claim for copyright infringement did not even accrue until (at the earliest) March 2004.  "A claim accrues under the Copyright Act when the copyright holder knows or reasonably should have known of the infringement."  <u>In re Indep. Serv. Orgs. Antitrust Litig.</u>, 85 F. Supp. 2d 1130, 1174 (D. Kan. 2000) (citing cases); <u>accord</u> <u>Bridgeport Music, Inc. v. Diamond Time, Ltd.</u>, 371 F.3d 883, 889 (6th Cir. 2004); <u>Hotaling v. Church of Jesus Christ of Latter-Day Saints</u>, 118 F.3d 199, 202 (4th Cir. 1997); <u>Roley v. New World Pictures, Ltd.</u>, 19 F.3d 479, 481 (9th Cir. 1994); <u>Fisher v. United Feature Syndicate, Inc.</u>, 37 F. Supp. 2d 1213, 1216 (D. Colo. 1999).  SCO alleges in detail the facts showing why SCO did not know, and could not reasonably have known, of IBM's copyright infringement until after IBM made its production of documents and CDs in this past March and April.  3d Am. Compl. ¶¶ 237-38.

### E.  SCO's Amendment Promotes Judicial Economy

In the interests of judicial economy, this Court should address SCO's proposed new copyright claim because it arises directly out of the subject matter of IBM's Ninth Counterclaim.

22

As noted above, SCO merely proposes to bring an affirmative claim out of the factual showing

that SCO would make in defense to IBM's own claim.  If the Court were to deny the motion,

SCO could bring its claim only through a separate lawsuit, involving the same parties, the same

witnesses, the same software, and the same legal issues (that is, copyright infringement relating

to AIX).  Such a scenario would be an inefficient use of the parties' and courts' resources.

SCO's proposed amendment promotes judicial economy and a full and fair resolution of the

parties' dispute on the merits.

The JDA for Project Monterey contains a forum selection clause for New York courts.

IBM effectively waived any right to invoke the clause by adding the Ninth Counterclaim to this

case.  It is well settled that "a forum selection clause will be deemed waived if the party invoking

it has taken actions inconsistent with it."  In Re Rationis Enters., Inc., No. 97 CV 9052(RO),

1999 WL 6364, at *2 (S.D.N.Y. Jan. 7, 1999) (Exh. D).  A party's pursuit of litigation in one

forum constitutes a clear waiver of that party's ability to enforce a forum selection clause for

another forum.  See, e.g., B-S Steel of Kan., Inc. v. Tex. Indus., Inc., No. 01-2410-JAR, 03-

2664-JAR, 2004 WL 946894, at *3 (D. Kan. Apr. 28, 2004) (Exh. E) (party's pursuit of litigation

in one forum waives forum clause for another jurisdiction); In re Am. Freight Sys., Inc.,

236 B.R. 47, 51 (D. Kan. 1999) (same); see also Unity Creations, Inc. v. Trafcon Indus., Inc.,

137 F. Supp. 2d 108, 111 (E.D.N.Y. 2001) ("When a party disregards a forum selection clause

and sues on a contract in an unauthorized forum, it waives the forum selection clause on the

claims it pursues."); accord Licensed Practical Nurses v. Ulysses Cruises, 131 F. Supp. 2d 393,

410 (S.D.N.Y 2000).  By seeking a categorical declaration of non-infringement for all of the

development of AIX in this Court through its Ninth Counterclaim, IBM plainly waived any right

23

to contend that New York courts are the exclusive jurisdiction for SCO's claim that IBM has violated SCO's copyrights in developing AIX.

Furthermore, as an independent matter, the interests of judicial economy, particularly in favor of pending litigation, can override a forum selection clause. See, e.g., Steward v. Up N. Plastics, 177 F. Supp. 2d 953, 959 (D. Minn. 2001) (refusing to transfer litigation to designated forum, despite forum selection clause, pointing to pending litigation in the unauthorized forum, preferring to have "both cases can be adjudicated simultaneously before a Court that is intimately familiar with the issues in this case"). That is, "each case must be considered based on its particularized facts" before a claim is transferred on the basis of a forum selection clause. Id. The discovery that SCO must pursue to defend against IBM's Ninth Counterclaim includes the precise Project Monterey activities underlying SCO's proposed amendment. This Court already is, and will become even more, intimately familiar with the complex issues of this case; to remove SCO's Project Monterey claims from this case would thus be to ignore the interests of judicial economy and the issues that this Court already faces.

## CONCLUSION

SCO respectfully submits, for the reasons set forth above, that this Court should grant

SCO's request for leave to file its Third Amended Complaint.

DATED this 14th day of October, 2004.

Respectfully submitted,

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stephen N. Zack
Mark J. Heise
Edward Normand
Sean Eskovitz

By

*Counsel for Plaintiff/Counterclaim Defendant*

25

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and

correct copy of the foregoing *Plaintiff's Memorandum in Support of its Motion for Leave to File*

*Third Amended Complaint* was served by mail on Defendant International Business Machines

Corporation on the 14th day of October, 2004, by U.S. Mail to:

> David Marriott, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, New York  10019

> Donald J. Rosenberg, Esq.
> 1133 Westchester Avenue
> White Plains, New York  10604

and HAND-DELIVERED to:

> Todd Shaughnessy, Esq.
> Snell & Wilmer LLP
> 1200 Gateway Tower West
> 15 West South Temple
> Salt Lake City, Utah 84101-1004

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant IBM on the 28th day of July, 2005, by U.S. Mail to:

> David Marriott, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, New York  10019
>
> Donald J. Rosenberg, Esq.
> 1133 Westchester Avenue
> White Plains, New York  10604
>
> Todd Shaughnessy, Esq.
> Snell & Wilmer LLP
> 1200 Gateway Tower West
> 15 West South Temple
> Salt Lake City, Utah 84101-1004