SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

RECEIVED CLERK
FILED
2005 SEP 26  P 9: 12

U.S. DISTRICT COURT
DISTRICT OF UTAH

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | IBM'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS ON SCO'S PRIVILEGE LOG |
| Plaintiff/Counterclaim Defendant, | |
| v. | (ORAL ARGUMENT REQUESTED) |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03-CV-0294DAK |
| | Honorable Dale A. Kimball |
| Defendant/Counterclaim Plaintiff. | Magistrate Judge Brooke Wells |

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in support of its motion to compel production of documents on SCO's privilege log that were created by or for third parties AT&T and its affiliates and subsidiaries ("AT&T"), UNIX System Laboratories ("USL"), Novell, Inc. ("Novell"), and The Santa Cruz Operation, Inc. ("Santa Cruz").[1]

### Preliminary Statement

In this case, SCO claims that documents created by or for four entirely different companies, AT&T, USL, Novell, and Santa Cruz, are privileged as to SCO. Although SCO has nowhere articulated the precise basis for such a claim, SCO apparently contends that it may assert an attorney-privilege belonging to other companies still in existence because these companies, like SCO, once owned certain of the UNIX assets at issue in this and other litigation.[2] SCO cannot properly claim attorney-client privilege over documents originating with other corporations and their attorneys. The transfer of assets from one entity to another does not transfer the attorney-client privilege as well. Instead, control of the entity possessing the privileges must pass to the purchaser for the privilege to pass. It is undisputed that SCO does not control any of the corporations—AT&T, USL, Novell, or Santa Cruz—whose privilege it now claims. To the extent documents that were once privileged as to these corporations have been transferred to SCO, any privilege in them has been waived. As set forth in further detail herein,

---

[1] This motion addresses only one of IBM's four categories of objections set forth in IBM's April 11, 2005 Objections to SCO's Privilege Log (Category Two, SCO's improper claim of privilege over documents that originated with the third parties that previously owned the UNIX assets). IBM is in the process of determining the extent to which SCO may have addressed IBM's other objections, but reserves the right to bring further motions should they prove necessary.

[2] SCO's and Novell's competing claims of ownership over certain UNIX assets, including UNIX copyrights, is the subject of litigation in The SCO Group, Inc. v. Novell, Inc., No. 2:04-CV-00139-DAK, pending before this Court. For purposes of this motion only, we assume that SCO currently owns all of the UNIX assets relating to the materials it claims are privileged. IBM reserves the right to challenge SCO's ownership claims over any and all UNIX assets, however, including the copyrights at issue in the Novell litigation.

IBM respectfully requests that this Court order SCO to produce to IBM all documents on its privilege log created by or for third parties.

### Facts

1. In the late 1960s and early 1970s, employees of Bell Telephone Laboratories ("Bell Labs"), an AT&T subsidiary, developed the UNIX operating system, and thereafter AT&T began to license rights in UNIX to other companies. (See Second Amended Complaint ¶¶ 1, 23, 63-64; see also Ex. 1 ("The Creation of the UNIX Operating System").)[3]

2. Beginning in 1990, UNIX System Laboratories ("USL"), a subsidiary of AT&T, assumed responsibility for AT&T's UNIX development and licensing activities. (See Ex. 2 (AT&T News Release, dated June 25, 1990).)

3. In 1993, AT&T sold USL and its associated UNIX assets to Novell. USL became a wholly-owned subsidiary of Novell. (See Ex. 3 (AT&T Press Release, dated June 14, 1993).) Novell continued UNIX product development and also developed UnixWare, a product based on UNIX and Novell's own product, NetWare. (Id.)

4. In 1995, Novell sold certain of its assets related to UNIX and UnixWare to Santa Cruz pursuant to an Asset Purchase Agreement (the "APA"). Under the APA, Novell both conveyed and retained certain rights and assets related to UNIX and UnixWare. (Ex. 4 (Novell-Santa Cruz Asset Purchase Agreement) §1.1.)[4]

5. In 2001, Santa Cruz sold certain of its assets related to UNIX, including assets encompassed by Santa Cruz's "Server Software" and "Professional Services" divisions, to Caldera, Inc. ("Caldera").[5] (See Ex. 5 (Santa Cruz News Release, dated May 4, 2001).)

---

[3] True and correct copies of all exhibits supporting this motion are attached to the Declaration of Amy F. Sorenson, submitted concurrently herewith, and are cited herein as "Ex. ___."

[4] Again, the precise nature and scope of this transaction is at issue in The SCO Group, Inc. v. Novell, Inc., No. 2:04-CV-00139-DAK, pending before this Court.

[5] Caldera Systems, Inc. was originally formed as Caldera, Inc., a Utah corporation, in October of 1994.

3

6. On May 8, 2001, Santa Cruz changed its name to Tarantella, Inc. ("Tarantella"). (See Ex. 6 (Santa Cruz News Release, dated May 7, 2001).) Tarantella and Sun Microsystems, Inc. ("Sun") recently announced that Sun will acquire Tarantella, which transaction is expected to be effective in 2006. (Ex. 7 (Tarantella News Release, dated May 10, 2005).)

7. On March 6, 2003, "Caldera Systems, Inc. d/b/a the SCO Group" commenced this litigation against IBM. On July 22, 2003, Caldera filed a First Amended Complaint as "The SCO Group Inc. f/k/a Caldera Systems, Inc." and has since proceeded in this litigation as "The SCO Group, Inc." ("SCO").[6]

8. On March 10, 2005, the parties filed their respective privilege logs with the Court, identifying documents withheld from production on the basis of attorney-client privilege or work product protection.

9. On April 11, 2005, IBM filed objections to SCO's privilege log. Among other things, IBM objected to SCO's claim that documents created by or for third party corporations and their attorneys, including AT&T, USL, Novell, and Santa Cruz, were privileged as to SCO.

10. In an attempt to meet and confer with SCO on this issue, IBM requested that SCO provide its basis for withholding such documents by letter dated September 2, 2005. (Ex. 8 (Sorenson Letter, dated September 2, 2005).) In response, SCO stated that only it had "properly" made claims of privilege over the AT&T, USL, Novell, and Santa Cruz documents identified on its log. (Ex. 9 (Normand Letter, dated September 16, 2005).)

---

[6] In this lawsuit, SCO has repeatedly, if inconsistently, confused the distinction between it and Santa Cruz, which company was commonly known as "SCO" and used both the "SCO" brand name and the "sco.com" domain name, both of which are now used by The SCO Group, Inc. For example, the Second Amended Complaint does not distinguish between The SCO Group, Inc. and Santa Cruz when describing the background of this dispute, even though many of the events alleged therein necessarily involve only Santa Cruz. (See Second Am. Compl. ¶¶ 37-39, 50-51.) To minimize this carefully orchestrated confusion, IBM refers to the plaintiff herein as "SCO" and The Santa Cruz Operation, Inc. as "Santa Cruz."

4

## Argument

SCO cannot properly claim privilege over documents created by or for attorneys who represented AT&T, USL, Novell, or Santa Cruz on the ground that these companies once owned some portion of the UNIX assets that SCO now claims. SCO, then known as Caldera, acquired certain UNIX assets from Santa Cruz through an asset purchase in 2001. But SCO did not acquire the attorney-client privilege belonging to companies which previously owned (or continue to own) the UNIX assets—AT&T, USL, Novell, or Santa Cruz—because SCO never acquired control of any of those companies. SCO cannot assert a privilege that, if it exists at all over these old and much-disseminated documents relating to the UNIX assets, belongs only to entirely different corporations. To the extent documents that once may have been privileged as to AT&T, USL, Novell, and Santa Cruz were transferred to SCO, any privilege in them has been waived. SCO should be ordered to immediately produce all such documents to IBM.

Under settled principles of corporate law, "privilege resulting from communications between corporate officers and corporate attorneys . . . belongs to the corporation and not to the officer." Intervenor v. United States, 144 F.3d 653, 658 (10th Cir. 1998). "When control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985). But when a corporation merely sells or transfers assets to another corporation, without transferring control of the corporation, the attorney-client privilege does not also pass to the purchasing company. See, e.g., In re Grand Jury Subpoenas, 734 F.Supp. 1207, 1211 n.3 (E.D. Va. 1990) ("A transfer of assets . . . is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass."), aff'd in relevant part, 902 F.2d 244 (4th Cir. 1990); Federal Deposit Ins. Corp. v. McAtee, 124 F.R.D. 662, 664 (D. Kan. 1988) ("The transfer of assets from one entity to another does not generally transfer the attorney-client privilege."). Instead, "the power to invoke or

5

waive a corporation's privileges is an incident of control of the corporation." In re In-Store Advertising Securities Litigation, 163 F.R.D. 452, 458 (S.D.N.Y. 1995) (citations and quotations omitted). "Where confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying the assets, the privilege is waived as to those communications." Id.

In Zenith Electronics Corporation v. WH-TV Broadcasting Corporation, 2003 WL 21911066 (N.D. Ill.), attached hereto as Exhibit A, the district court correctly refused to recognize a transfer of the attorney-client privilege between the buyer and the seller of assets relating to a substantial corporate division of Zenith Electronics Corporation ("Zenith"). Id. at *1. The court found that the transfer of Zenith's privileged documents to the buyer waived any privilege in the documents: "The court disagrees that the attorney-client privilege is a corporate asset that can be sold. . . . [M]ere transfer of some assets from one corporation to another — as was done in this case — does not transfer the attorney-client privilege." Id. (citations omitted).[7]

Here, SCO's claim that communications in its hands between AT&T, USL, Novell, and Santa Cruz and their respective lawyers are privileged as to SCO is improper because, at most, SCO acquired only whatever assets Santa Cruz acquired from these companies. SCO and the entity it from which it obtained the UNIX assets, Santa Cruz, never obtained corporate control of the entity from whom they acquired the assets, and the privilege therefore was waived. With the exception of USL, which was owned by AT&T and later merged into Novell, all of these companies continued to operate after the sale of the assets.[8]

---

[7] Even contractual language intending to transfer the privilege does not prevent waiver of the privilege where disclosure to a third party occurred in the course of a sale. Otherwise, such a rule "would allow anyone to evade waiver of the privilege [by] merely agreeing to transfer the privilege and accepting consideration for it." Zenith, 2003 WL 21911066, at *2.

[8] This is true for all of the transactions pursuant to which ownership of the UNIX assets has changed hands, with the exception of the 1993 Novell-USL transactions. There, Novell acquired USL, a wholly-owned subsidiary of AT&T. From that point forward, all of the transactions have involved the sale of assets, not the sale of an entire company. In 1995, for example, Novell sold

6

SCO's claims of privilege over Novell documents is particularly striking given that SCO and Novell are adverse parties in litigation pending before this Court — litigation concerning ownership of the UNIX assets that SCO apparently believes permit it to assert privilege over communications between Novell and Novell's lawyers. Nor does SCO have any right to claim privilege over communications between Santa Cruz and its lawyers. While SCO purchased certain UNIX assets from Santa Cruz and has subsequently worked to create the appearance that it and Santa Cruz are one and the same entity, SCO did not acquire control of that company. That Caldera changed its name to "The SCO Group, Inc." and now uses the "SCO" brand and the "SCO.com" internet domain name, as Santa Cruz once did, does not give SCO the right to exercise a legal privilege that belonged to Santa Cruz and which has been waived by that company's revealing those communications to Caldera.

For example, Entry No. 340 on SCO's privilege log describes a "discussion among client representatives" which reflect an "attorney's legal advice regarding IBM contract discussions." The attorney identified in the entry, however, is Steve Sabbath, in-house counsel for Santa Cruz and later Tarantella.[9] Moreover, Mr. Sabbath represented Santa Cruz during a time when its interests were <u>adverse</u> to SCO, namely during the sale of its UNIX assets to SCO. For the reasons set forth above, IBM is aware of no basis for SCO to claim privilege over Mr. Sabbath's

---

only certain of its assets related to UNIX and UnixWare to Santa Cruz pursuant to an asset purchase agreement. Under the APA, Novell both conveyed and retained certain rights and assets related to UNIX and UnixWare. Under such circumstances, Santa Cruz could not be said to have obtained control of Novell or any entity in connection with such purchase, and therefore whatever formerly privileged communications may have been transferred to Santa Cruz in connection with such purchase did not maintain the privilege. Likewise, when Santa Cruz sold the UNIX assets to Caldera in 2001, Caldera acquired the UNIX assets, and Santa Cruz contined in business under the Tarantella name.

[9] On April 11, 2005, IBM also objected to SCO's failure to identify the involvement of a SCO attorney or attorneys in every privilege log entry. While SCO has since made an effort to name <u>an</u> attorney for many of its entries, the vast majority of those named never represented for SCO. Rather, virtually all of the purported "SCO Attorneys" are or were inside or outside counsel for AT&T, USL, Novell, or Santa Cruz.

advice to Santa Cruz. There is even less reason to do so for advice provided to Santa Cruz when it was in an adverse posture with SCO. Similarly, Entry No. 1580 describes an April 28, 1994 email as an "[a]ttorney edit of document reflecting legal advice regarding Draft letter from Novell to IBM regarding UnixWare." While the entry identifies attorney Burton Levine as the email's recipient, Mr. Levine only represented AT&T and later USL and Novell, but never SCO, or, for that matter, Santa Cruz, as far as IBM is aware. In short, the privilege claim at issue in Entry No. 1580 and the scores of entries just like it simply are not SCO's to make.

These are only two of literally hundreds of entries in SCO's privilege log that claim privilege over documents that were created by or for attorneys representing AT&T, Novell, USL, or Santa Cruz. SCO's log improperly claims privilege with respect to more than a dozen AT&T and USL documents, nearly a hundred Novell documents, and over a thousand Santa Cruz documents. SCO's log also identifies several hundred documents that, based on the limited information provided (i.e., date, attorney, or description) almost certainly are documents that were created for or by one of those entities.[10]

While SCO might be able to withhold communications between it and its own attorneys made for the purpose of receiving legal advice, it cannot withhold such communications made by another company to its lawyers simply because such documents may have been given to SCO in connection with its purchase of certain assets. And even if SCO were capable of establishing that its purchase of the UNIX assets it bought from Santa Cruz could somehow qualify as a change in corporate control of Santa Cruz, which it cannot, it also cannot show that the

---

[10] Given the confusion created by SCO's claims of privilege over third-party documents, IBM objects to log entries that fail to identify the corporation or business entity from which a document originated, if this fact is not evident from the entry. SCO has made no revisions or corrections to its log based on this objection. SCO's failure to do so, by itself, should be deemed a waiver of any privilege for those documents. Atteberry v. Longmont United Hospital, 221 F.R.D. 644, 648 (D. Colo. 2004) ("production of an inadequate privilege log may be deemed a waiver of the privilege asserted").

documents were passed from company to company over a period of decades pursuant to an unbroken chain of transfer of control of each seller to each buyer. To the extent documents once privileged as to AT&T, USL, Novell, or Santa Cruz are now in SCO's hands, any privilege in them has been waived. Consequently, SCO should immediately produce all documents in its possession that were created by or for AT&T, USL, Novell, Santa Cruz, or any other third parties.

## Conclusion

Based on the foregoing, IBM respectfully requests that this Court order SCO to immediately produce all documents created by or for AT&T, USL, Novell, or Santa Cruz.

DATED this 26th day of September, 2005.

SNELL & WILMER L.L.P.

_____
Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott
*Attorneys for Defendant/Counterclaim-Plaintiff International Business Machines Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000
*Attorneys for Defendant/Counterclaim-Plaintiff International Business Machines Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of September, 2005, a true and correct copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

Amy F. Sorenson

366901.3

# EXHIBIT A

**ZENITH ELECTRONICS CORPORATION, Plaintiff/Counter-Defendant, v. WH-TV BROADCASTING CORPORATION, Defendant/Counter-Plaintiff.**

**01 C 4366**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 13816*

**August 6, 2003, Decided**
**August 7, 2003, Docketed**

**PRIOR HISTORY:** *Zenith Elecs. Corp. v. WH-TV Broad. Corp., 2003 U.S. Dist. LEXIS 11037 (N.D. Ill., June 25, 2003)*

**DISPOSITION:** [*1] Defendant WH-TV's motion to compel production of documents against Motorola, Inc.and General Instrument granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For ZENITH ELECTRONICS CORPORATION, plaintiff: Michael D. Sher, Lawrence Mitchell Benjamin, David A. Eide, Dan J. Hofmeister, Jr., Neal, Gerber & Eisenberg, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, plaintiff: Ramon Coto-Ojeda, Coto Malley & Tamargo LLP, San Juan, PR.

For WH-TV BROADCASTING CORPORATION, defendant: Sheldon Davidson, Marc David Janser, James B. Sloan, Thomas F. Sax, Kimberly J. Stone, Stanley Carlylle Sneeringer, Pedersen & Houpt, P.C., Robert Gerald Foster, Pedersen & Houpt, Chicago, IL.

For WH-TV BROADCASTING CORPORATION, defendant: Edgar Cartagena-Santiago, Ramon E Dapena, Goldman Antonetti & Cardova, P.S.C., San Juan, PR.

For CRAIG CHAMBERS, MARINO LAMANTIA, respondents: Robert Radasevich, Lawrence Mitchell Benjamin, David A. Eide, Neal, Gerber & Eisenberg, Chicago, IL.

For MOTOROLA, INC, GENERAL INSTRUMENT CORPORATION, third-party defendants: Michael R. Dockterman, David M. Simon, Vilia Maria Drazdys, Melissa Suzanne Skilken, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For WH-TV BROADCASTING CORPORATION, counter-claimant: [*2] Sheldon Davidson, Marc David Janser, Thomas F. Sax, Kimberly J. Stone, Pedersen & Houpt, P.C., Chicago, IL.

For WH-TV BROADCASTING CORPORATION, counter-claimant: Edgar Cartagena-Santiago, Ramon E Dapena, Goldman Antonetti & Cardova, P.S.C., San Juan, PR.

For ZENITH ELECTRONICS CORPORATION, counter-defendant: Michael D. Sher, Lawrence Mitchell Benjamin, David A. Eide, Dan J. Hofmeister, Jr., Neal, Gerber & Eisenberg, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, counter-defendant: Ramon Coto-Ojeda, Coto Malley & Tamargo LLP, San Juan, PR.

For MOTOROLA INC, GENERAL INSTRUMENT CORPORATION, counter-defendants: David M. Simon, Vilia Maria Drazdys, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For MOTOROLA INC, counter-defendant: Melissa Suzanne Skilken, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, cross-claimant: Michael D. Sher, Lawrence Mitchell Benjamin, David A. Eide, Dan J. Hofmeister, Jr., Neal, Gerber & Eisenberg, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, cross-claimant: Ramon Coto-Ojeda, Coto Malley & Tamargo LLP, San Juan, PR.

For GENERAL INSTRUMENT CORPORATION, cross-defendant: Michael R. Dockterman, [*3] David M. Simon, Vilia Maria Drazdys, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For WH-TV BROADCASTING CORPORATION, third-party plaintiff: Sheldon Davidson, Thomas F. Sax, Kimberly J. Stone, Pedersen & Houpt, P.C., Chicago, IL.

For WH-TV BROADCASTING CORPORATION, third-party plaintiff: Edgar Cartagena-Santiago, Ramon E Dapena, Goldman Antonetti & Cardova, P.S.C., San Juan, PR.

**JUDGES:** George W. Lindberg, Senior U.S. District Judge.

**OPINIONBY:** George W. Lindberg

**OPINION:**

### MEMORANDUM OPINION AND ORDER

WH-TV Broadcasting Corporation ("WH-TV") moves to compel the production of documents identified by Motorola, Inc. ("Motorola") and General Instrument ("GI") as protected by the attorney-client privilege or work product doctrine. The court has reviewed Motorola's and GI's privilege log and, where necessary, has conducted an in camera review of documents referenced in the log. n1 For the following reasons, WH-TV's motion is granted in part and denied in part.

---

n1 WH-TV has withdrawn its motion as to Group 2 (attached non-privileged e-mails); Group 6, Entry 9 (attached non-privileged e-mails); and Groups 23, 49, and 61.

---

[*4]

### I. Attorney-Client Privilege

Where legal advice of any kind is sought from a professional legal adviser in his or her capacity as such, communications relating to that purpose, made in confidence by the client, are protected by the attorney-client privilege, unless the privilege is waived. *United States v. White, 950 F.2d 426, 430 (7th Cir. 1991)*. The purpose of the attorney-client privilege is "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States, 524 U.S. 399, 403, 141 L. Ed. 2d 379, 118 S. Ct. 2081 (1998)* (quoting *Upjohn Co. v. United States, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981)).* "Because the privilege is in derogation of the search for the truth, it is construed narrowly." *United States v. Evans, 113 F.3d 1457, 1461 (7th Cir. 1997)*. The party claiming the privilege bears the burden of proving its essential elements. *Vardon Golf Co. v. Karsten Mfg. Corp., 213 F.R.D. 528, 531 (N.D. Ill. 2003).*

**A. Zenith** [*5] **Documents Predating Common Interest**

Zenith sold certain assets of its Network Systems Division to GI in August 2000, and transferred its documents relating to that division to GI and Motorola at that time. GI and Motorola claim the attorney-client privilege as to privileged Zenith documents that it received in the asset purchase. WH-TV argues that GI and Motorola cannot claim the attorney-client privilege as to privileged Zenith documents that predate any common interest between Zenith and GI and Motorola. Motorola and GI respond that the Asset Purchase Agreement that governed the asset purchase provided that GI purchased from Zenith "all intangible personal property to the extent used or held for use in the conduct of the Business (including, without limitation, ... all rights, *privileges,* claims, causes of action and options relating to or pertaining to the Business or the Assets) ..." (emphasis added).

The court disagrees that the attorney-client privilege is a corporate asset that can be sold. "When control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349, 85 L. Ed. 2d 372, 105 S. Ct. 1986 (1985).* [*6] However, the mere transfer of some assets from one corporation to another - as was done in this case - does not transfer the attorney-client privilege. See, e.g., *In re In-Store Advertising Sec. Litig., 163 F.R.D. 452, 458 (S.D.N.Y. 1995); 124 F.R.D. 662, 664; Sobol v. E.P. Dutton, Inc., 112 F.R.D. 99, 103 (S.D.N.Y. 1986).*

GI and Motorola contend that *In re In-Store Advertising Secs. Litig.* is distinguishable because in that case, unlike here, there was no indication that the parties contractually agreed to transfer the attorney-client privilege. The court finds this distinction unconvincing. GI's and Motorola's position would allow anyone to evade waiver of the privilege, despite the transfer of privileged documents to a third party, merely by agreeing to transfer the privilege and accepting consideration for it.

Nor is the court persuaded by GI's and Motorola's reliance on *Rhode Island Depositors Econ. Prot. Corp. v.*

*Mapleroot Dev. Corp., 710 A.2d 167 (R.I. 1998)*. In that case, the Rhode Island Supreme Court considered the right of the Rhode Island Depositors Economic Protection Corporation (DEPCO) to invoke the attorney-client [*7] privilege of a credit union, whose assets DEPCO had purchased under an agreement that transferred the credit union's privileges to DEPCO. *Id. at 168-69*. The court held that DEPCO had acquired the credit union's attorney-client privilege in the transaction. *Id. at 171*. However, unlike in this case, DEPCO was established by state legislation, and the court construed DEPCO's enabling legislation to allow DEPCO to acquire failed lenders' attorney-client privileges in order to accomplish its statutory mission of aiding failed institutions in making prompt payments to depositors. See *id. at 170-71*.

The court concludes that Zenith's attorney-client privilege simply was not a property right that could be sold. Accordingly, the court finds that GI and Motorola cannot invoke the attorney-client privilege for the following Zenith documents that were transferred to GI and Motorola: Group 9, Entry 1 (6/29/00 e-mails from Tom Hagensick to Peter Slate); the first two e-mails in Group 9, Entry 2 (two 6/29/00 e-mails from Hagensick to Slate); the first two e-mails in Group 9, Entry 3 (two 6/29/00 e-mails from Hagensick to Slate); Group 35 (2/23/99 draft [*8] contract with notes); and Group 72 (6/14/00 e-mail from Hagensick to Slate).

**B. Communications Not Directed to an Individual**

WH-TV also contests GI's and Motorola's claim that certain communications from attorneys to their files are protected by the attorney-client privilege, even though the communications were not directed to an individual. A memorandum prepared as a record of a communication between an attorney and a client, where the communication was for the purpose of rendering legal advice, is protected by the attorney-client privilege, just as is the underlying communication. See *Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd., 1996 U.S. Dist. LEXIS 258*, No. 95 C 673, *1996 WL 732522*, at *5 (N.D. Ill. 1996). However, an attorney's memorandum to file that does not record such an attorney-client communication is not protected by the attorney-client privilege. n2 *Id.*

---

n2 Such communications could be protected by the work product doctrine. However, GI and Motorola do not claim that the work product privilege applies to these documents, and accordingly that privilege is waived.

[*9]

The court finds that the following attorney communications to file are protected by the attorney-client privilege, as they record confidential conversations between attorney and client: Group 74 (5/9/00 notes of Paul Fleck regarding discussion with Dick Smith); and Group 76 (Fleck's notes regarding discussion with Smith). The court finds that, in the notes contained in Group 75, only the line referencing a conference with Lee Zimmerman and Smith is protected by the attorney-client privilege; the court directs GI and Motorola to produce the remainder of the notes, in redacted form.

GI and Motorola claim that certain draft agreements containing handwritten notes are protected by the attorney-client privilege. "Drafts [of agreements] prepared by or commented upon by an attorney necessarily contain legal advice from the attorney as to the wording of the contracts for the benefit of the client, and thus are privileged." *McCook Metals L.L.C. v. Alcoa Inc., 192 F.R.D. 242, 255* (N.D. [degree] . 2000). The court finds that Groups 96-98, 100-01, 106, and 114 (draft agreements with notes) are protected by the attorney-client privilege, since they are drafts of agreements [*10] prepared by, or commented upon by an attorney.

**C. Documents Distributed Outside Control Group**

WH-TV next contends that GI and Motorola waived the attorney-client privilege as to certain documents by circulating them too widely. When a corporate document is shown to employees outside the company's "control group," the attorney-client privilege is either inapplicable or is waived. See *Trustmark Ins. Co. v. General & Cologne Life Re of Am., 2000 U.S. Dist. LEXIS 18917*, No. 00 C 1926, *2000 WL 1898518*, at *4 (N.D. Ill. Dec. 20, 2000). An employee is a member of the control group if the employee "is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority [degree] ...." *Consolidation Coal Co. v. Bucyrus-Erie Co., 89 Ill. 2d 103, 432 N.E.2d 250, 255, 59 Ill. Dec. 666 (Ill. 1982)*. Thus, "an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion ... is properly within the control group." *Id. at 258*. WH-TV concedes [*11] that the following individuals were members of the Motorola/GI control group: William Luehrs, Tom Hagensick, Don Landise, Don Alexander, Chuck Sindelar, Tom Lynch, and Doug Means.

The court finds that the attorney-client privilege is inapplicable or waived as to the following documents, because they were directed to or shown to individuals whom Motorola and General Instrument have failed to

establish are a member of a control group: Group 24, Entries 1-3 (e-mail chain beginning with 3/14/01 e-mail and attached draft letter from Matthew Gettinger to Luehrs) n3; Group 52, Entry 1 (1/02/01 e-mail from Brian Zorc to Charles Fish) n4; Group 52, Entry 2 (1/10/01 e-mail chain) n5; Group 52, Entry 3 (1/02/01 e-mail from Zorc to Gettinger) n6; Group 56, Entry 1 (9/27/02 e-mails from Joe Sullivan to Gettinger, and Gettinger to Sullivan) n7; Group 56, Entry 2 (9/27/02 e-mails from Sullivan to Gettinger, and Gettinger to Sullivan, 10/1/01 e-mails from Sullivan to Gettinger) n8; Group 56, Entry 4 (9/27/02 e-mail from Sullivan to Gettinger) n9; Group 78 (5/9/00 memorandum from Sue J. Hodges to "GI Motorola"); Group 81 (5/23/00 draft agreement from Winston & Strawn to "GI Motorola").

   n3 These e-mails were copied to an individual with the title "Motorola Manager Technology/Engineering Project." Motorola and GI do not identify the role this employee played.

[*12]

   n4 The e-mail was copied to individuals with the titles "Motorola Manager Technology/Engineering Project" and "Motorola Manager, Engineering." Motorola and GI do not identify the roles these employees played.

   n5 The e-mail was copied to individuals with the titles "Motorola Manager Technology/Engineering Project" and "Motorola Manager, Engineering." Motorola and GI do not identify the roles these employees played.

   n6 The e-mail was copied to an individual with the title "Motorola Manager, Engineering." Motorola and GI do not identify the role this employee played.

   n7 These e-mails were copied to an individual with the title "Manager, Finance." Motorola and GI do not identify the role this employee played.

   n8 These e-mails were copied to an individual with the title "Manager, Finance." Motorola and GI do not identify the role this employee played.

   n9 This e-mail was copied to an individual with the title "Manager, Finance." Motorola and GI do not identify the role this employee played.

Nor are the documents in Group 92 protected by the attorney-client privilege. GI's and [*13] Motorola's privilege log inaccurately describes these documents as a June 21, 2000 communication from attorney Lee Zimmerman to file, containing draft contract schedule, with notes. In fact, Group 92 contains a June 21, 2000 memorandum from Zenith attorney Peter Slate to Zimmerman and attorney K. Michael Garrett, attaching revised disclosure schedules. The memorandum is copied to three individuals who are not identified in the privilege log. The copied individuals include Jackie Petrovic, who is not listed in GI's and Motorola's schedule that identifies the title and position of individuals in the privilege log. GI and Motorola are ordered to produce the documents in Group 92.

The privilege log also describes the documents in Group 95 inaccurately. The log similarly states that these documents are a June 8, 2000 communication from Zimmerman to file, containing draft contract schedules, with notes. In reality, Group 95 contains a June 8, 2000 memorandum from Slate to Zimmerman and Garrett, attaching revised disclosure schedules. As with Group 92, the memorandum is copied to Petrovic, who is not identified in the privilege log or schedule. GI and Motorola are ordered to produce the [*14] documents in Group 95.

### D. Other Claims of Attorney-Client Privilege

The court finds that the following constitute attorney-client privileged communications: Group 2 (5/25/01 e-mail from Luehrs to Beverly Wyckoff) n10; Group 3 (4/9/01 e-mail from Luehrs to Gettinger); Group 7, Entry 1 (12/15/00 e-mail from Hagensick to Luehrs); the first document in Group 7, Entry 2 (12/15/00 e-mail from Hagensick to Luehrs); fourth e-mail in Group 9, Entry 3 (11/10/00 e-mail from Luehrs to Richard Vitkus); Group 12 (6/29/01 e-mail from Luehrs to Gettinger); Group 18, Entry 3 (11/28/01 e-mail chain); Group 28, Entries 1-3 (6/27/01 e-mail chain; 6/28/01 e-mail chain; 6/28/01 draft letter); first four e-mails in Group 28, Entry 8 (6/28/01 e-mail from Don Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28, Entry 9 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28, Entry 10 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); [*15] Group 39 (6/13/01 memorandum from Luehrs to Lawrence Benjamin); Group 41 (6/7/01 memorandum from Luehrs to Benjamin); Group 57, Entries 1 and 2 (5/17/01 and 10/24/02 e-mail chains); Group 104 (5/25/00 e-mail from Marc Tayer to Zimmerman); Group 105 (5/30/00 e-mail from Tayer to Zimmerman); Group 112 (3/9/00 e-mail from Christine Foh to Don McLellan).

n10 WH-TV has withdrawn its motion as to the attached non-privileged e-mails in Group 2.

The court finds that the following documents do not contain communications related to seeking legal advice, and therefore are not protected by the attorney-client privilege: second document in Group 7, Entry 2 (Hagensick notes); third e-mail in Group 9, Entry 2 (11/10/00 e-mail from Hagensick to Luehrs); third e-mail in Group 9, Entry 3 (11/10/00 e-mail from Hagensick to Luehrs); Group 11, Entry 1 (6/22/01 e-mail from Hagensick to Douglas Means); Group 11, Entry 2 (6/01 e-mail from Luehrs to Means); Group 11, Entry 3 (6/22/01 e-mails from Means to Hagensick, and from Hagensick [*16] to Means); Group 11, Entry 4 (6/22/01 e-mails from Ly Tran to Means, from Means to Hagensick, and from Hagensick to Means); Group 11, Entry 5 (6/22/01 e-mails from Hagensick to Means, and from Means to Hagensick); Group 11, Entry 6 (6/25/01 e-mail from Hagensick to Means; 6/22/01 e-mails from Hagensick to Means, and from Means to Hagensick); Group 11, Entry 7 (6/25/01 e-mail from Hagensick to Means); Group 11, Entry 8 (6/25/01 e-mails from Means to Hagensick, and from Hagensick to Means; 6/22/01 e-mails from Hagensick to Means, and from Means to Hagensick); Group 12, Entry 3 (11/28/01 e-mail from Landise to John Ryan); Group 21, Entries 1-4 (8/7/01 e-mails from Wyckoff to Gettinger, from Gettinger to Landise, from Landise to Gettinger, and from Gettinger to Wyckoff); fifth e-mail in Group 28, Entry 8 (7/2/01 e-mail from Gettinger to Landise); fifth and sixth e-mails in Group 28, Entry 9 (7/2/01 e-mails from Gettinger to Landise, and Landise to Gettinger); fifth through seventh e-mails in Group 28, Entry 9 (7/2/01 e-mails from Gettinger to Landise, and Landise to Gettinger); Group 48 (1/19/01 e-mail from Ron Van Kovering to Fish); Group 50 (12/12/01 e-mail from Landise to Gettinger); [*17] final e-mail in Group 56, Entry 2 (10/1/02 e-mail from John Hewitt to Sullivan); second e-mail in Group 56, Entry 4 (9/30/02 e-mail from Landise to Ronald Stelzner); and Group 73 (11/10/00 e-mail from Hagensick to Gettinger).

## II. Work Product Doctrine

The work product doctrine, codified in *Federal Rule of Civil Procedure 26(b)(3)*, protects from disclosure documents and tangible things prepared in anticipation of litigation or for trial, by or for a party, or by or for a party's attorney. *Fed. R. Civ. P. 26(b)(3)*. Generally, because "prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced[,] ... the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation." *Binks Mfg. Co. v. National Presto Indus., Inc., 709 F.2d 1109, 1118-19 (7th Cir. 1983)* (citation omitted). "The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege ... 'The work product [*18] rule does not come into play merely because there is a remote prospect of future litigation.'" *Id. at 1118* (quoting *Diversified Indus. v. Meredith, 572 F.2d 596, 604 (8th Cir. 1977))*. Because litigation may be anticipated when almost any incident occurs, "a substantial and significant threat of litigation is required before a discovery opponent's anticipation will be considered a reasonable and justifiable motivation for production of a document." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 145 F.R.D. 84, 87 (N.D. Ill. 1992)*.

Motorola and GI state that they anticipated litigation on September 12, 2000, when they received an e-mail from WH-TV. The e-mail stated that WH-TV was seeking cash, set-top boxes, and solutions to all outstanding problems by December 1, 2000. The e-mail further stated:

> We would rather solve matters this way, quickly, and get on with development plans. We also believe that this is far better for you than what the board was recommended to do by the outside experts.

Motorola and GI contend that this e-mail conveyed a substantial and significant threat of litigation. The court disagrees. [*19] The e-mail does not indicate what the alternative recommendation was, and litigation is not the only inference one can draw.

Motorola and GI next state, in conclusory fashion, that "WHTV continued its demands and threats of litigation (as discussed in great detail in the pending summary judgment motions) at the November 6, 2000 Philadelphia meeting with Zenith and Motorola, and in other correspondence in 2000 and the first several months of 2001." Motorola and GI do not cite to any correspondence or other evidence in support of this conclusion, or to any specific portion of the voluminous summary judgment record. This is insufficient to meet Motorola's and GI's burden of establishing when they began to anticipate litigation; it is not the role of the court to sift through the record to make that determination. Accordingly, the court will use the date this suit was filed -- June 11, 2001 -- as the date by which Motorola and GI must have begun to anticipate litigation.

The court finds that Motorola and GI have failed to establish that the following documents were prepared in anticipation of litigation, and that they therefore deserve protection under the work product doctrine: Group [*20] 5, Entry 5 (draft letter dated "after 3/8/01"); second document in Group 7, Entry 2 (Hagensick notes) Group 8, Entries 1-3 (10/31/00 e-mail from Hagensick to Luehrs); Group 9, Entries 1-3 (6/29/00 e-mail chain; 11/10/00 e-mail chains); Group 21, Entries 1-4 (8/7/01 e-mails from Wyckoff to Gettinger, from Gettinger to Landise, from Landise to Gettinger, and from Gettinger to Wyckoff); Group 56, Entries 1, 2, and 4 (9/27/02, 10/1/02, and 9/30/02 e-mail chains); and Group 73 (11/10/00 e-mail from Hagensick to Gettinger).

The court finds that the following documents are protected under the work product doctrine: Group 1, Entries 1-4 (6/11/01 e-mail and attached annotations document from Landise to Gettinger); Group 28, Entries 11-12 (6/20/01 draft letters); Group 53, Entries 1, 3-5 (9/23/02 e-mail chains); Group 54, Entries 2-5 (10/24/02 and 10/25/02 e-mail chains); and Group 65, Entries 1 and 2 (8/26/02 e-mails from Ryan to "SBNS East Eng Staff" and from Tom Pennacchia to Ryan).

Finally, WH-TV argues that documents protected by the work product doctrine may nevertheless be discoverable "if they contain admissions by hostile, testifying witnesses that may be used for impeachment purposes. [*21] " *Federal Rule of Civil Procedure 26(b)(3)* provides that materials protected under the work product doctrine, other than an attorney's mental processes, may nevertheless be subject to disclosure if the party seeking discovery shows a substantial need for the materials, and an inability to obtain the substantial equivalent of the information by other means. To obtain the benefit of this exception to the work product doctrine, however,

> a party must present more than speculative or conclusory statements that the [material] will contain invaluable impeachment material. And, the impeachment value must be substantial because every prior statement has some impeachment value and otherwise the exception would swallow the rule.

*Duck v. Warren, 160 F.R.D. 80, 83 (E.D. Va. 1995)*; see also 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure 2d § 2025 (2d ed. 1994) (quoting *Hauger v. Chicago R.I. & P.R. Co., 216 F.2d 501, 508 (7th Cir. 1954))* ("A court is not justified in ordering a litigant to permit his adversary to inspect witness statements, which he has procured in preparing for trial, upon the adversary's [*22] mere surmise or suspicion that he might find impeaching material in the statements.").

While the burden of making this showing may be a relatively light one, given that WH-TV can only speculate as to the contents of the documents at issue, WH-TV has offered nothing to show a substantial need. Accordingly, the court denies WH-TV's request that the court review documents protected by the work product doctrine to determine whether they nevertheless should be produced.

**ORDERED:** WH-TV's Motion to Compel Production Against Motorola and General Instrument [525-1] is granted in part and denied in part.

The motion is granted as to the following documents: Group 5, Entry 5; Group 7, Entry 2 (notes only); Group 8; Group 9, Entries 1-2; first through third e-mails in Group 9, Entry 3 (two 6/29/00 e-mails from Hagensick to Slate; 11/10/00 e-mail from Hagensick to Luehrs); Group 11; Group 21, Entries 1-4; Group 24, Entries 1-3; fifth e-mail in Group 28, Entry 8 (7/2/02 e-mail from Gettinger to Landise); fifth and sixth e-mails in Group 28, Entry 9 (7/2/01 e-mails from Gettinger to Landise, and Landise to Gettinger); fifth through seventh e-mails in Group 28, Entry 10 (7/2/01 e-mails from [*23] Gettinger to Landise, and Landise to Gettinger); Group 35; Group 48; Group 50; Group 52; Group 56, Entries 1-2, 4; Groups 72-73; portion of Group 75 that does not specifically reference conference with Zimmerman and Smith; Group 78; Group 81; Group 92; and Group 95.

The motion is denied as to the following documents: Group 1, Entries 1-4; Groups 2-3; Group 7, Entry 1; Group 7, Entry 2 (12/15/00 e-mail only); fourth e-mail in Group 9, Entry 3 (11/10/00 e-mail from Luehrs to Vitkus); Group 12; Group 18, Entry 3; Group 28, Entries 1-3; first four e-mails in Group 28, Entry 8 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28, Entry 9 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28, Entry 10 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); Group 28, Entries 11-12; Group 39; Group 41; Group 53, Entries 1, 3-5; Group 54, Entries 2-5; Group 57, Entries 1-2; Group 65, Entries 1-2; Group 74; the [*24] portion of Group 75 that specifically references conference with Zimmerman and Smith; Group 76; Groups 96-98; Groups 100-01; Groups 104-06; Group 112; and Group 114.

ENTER:

George W. Lindberg

Senior U.S. District Judge

DATED: AUG 06 2003