

FILED

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **DECLARATION OF TODD M. SHAUGHNESSY IN SUPPORT OF IBM'S OPPOSITION TO SCO'S RENEWED MOTION TO COMPEL**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke Wells |

I, Todd M. Shaughnessy, declare as follows:

1.        I represent Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") in the lawsuit brought by The SCO Group, Inc. ("SCO") against IBM, entitled The SCO Group, Inc. v. International Business Machines Corporation, Civil No. 2:03CV-0294 DAK (D. Utah 2003).  This declaration is submitted in support of IBM's Opposition to SCO's Renewed Motion to Compel.

2.        Attached hereto are true and correct copies of the following documents:

(a)        Exhibit 1 is the Declaration of Todd M. Shaughnessy dated May 3, 2005.

(b)        Exhibit 2 is a faxed letter from Peter Ligh to Ted Normand, dated July 5, 2005.  Attachment E to Exhibit 2 contains personal identifying information and is therefore being filed separately under seal.

(c)        Exhibit 3 is a letter from Edward Normand to David Marriott, dated July 14, 2005.

(d)        Exhibit 4 is a letter from Todd M. Shaughnessy to Brent O. Hatch, dated July 19, 2005.

(e)        Exhibit 5 is a letter from Todd M. Shaughnessy to Brent O. Hatch, dated August 8, 2005.

(g)        Exhibit 6 is the transcript of the December 5, 2003 hearing before Magistrate Judge Wells.

(h)        Exhibit 7 is IBM's Second Set of Interrogatories and Second Request for the Production of Documents, dated September 16, 2003.

3.      I declare under penalty of perjury that the foregoing is true and correct.

Executed: September 26, 2005.

Salt Lake City, Utah

Todd M. Shaughnessy

## CERTIFICATE OF SERVICE

I hereby certify that on the 26 day of September, 2005, a true and correct copy of the

foregoing was sent by U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Amy F. Sorenson

367170.1

**EXHIBIT 1**

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF** **TODD M. SHAUGHNESSY** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | Civil No. 2:03CV-0294 DAK |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |
| Defendant/Counterclaim-Plaintiff. | |

348736.1

I, Todd M. Shaughnessy, declare as follows:

1.      I represent International Business Machines Corporation ("IBM") in the above-entitled action brought by The SCO Group, Inc. ("SCO"). This declaration is submitted pursuant to the Court's January 18, 2005 Order Concerning SCO's Renewed Motion to Compel (the "Order").

2.      The Court ordered IBM to produce CMVC and RCS data relating to IBM's AIX and Dynix operating systems, including "all versions and changes to AIX and Dynix" (Order at 9-10), and to produce information regarding the 3,000 AIX and Dynix developers who "made the most contributions and changes to the development of AIX and Dynix". (Order at 16.) With respect to the source code produced from CMVC and RCS, the Court ordered IBM to submit an affidavit "specifying the efforts it took to deliver the code from the CMVC and RCS systems". (Order at 10.) With respect to information about the 3,000 AIX and Dynix programmers who "made the most contributions and changes to the development of AIX and Dynix" the Court ordered IBM to submit an affidavit "detailing the process by which the 3,000 were chosen". (Order at 17.)

3.      As described in more detail below, IBM has complied with the Court's Order, and has produced all responsive, non-privileged information located after an extensive search. As ordered by the Court, IBM produced from CMVC and from RCS all source code relating to the AIX and Dynix operating systems, including all versions and changes to the code. IBM also produced from CMVC and RCS all documentation related to the AIX and Dynix operating systems, including all programmer's notes, design documents, and white papers. IBM identified all the individuals who created or made changes to AIX or Dynix source code, as recorded by CMVC and RCS, prepared a list of those individuals, together with their login identifiers and contact information (for every person for whom IBM had that information), and provided that

2

list to counsel for SCO on May 3, 2005. As explained below, the number of individuals who contributed source code to AIX and Dynix (as recorded by CMVC and RCS) is less than 3,000; therefore, the individuals identified for SCO constitute all of the individuals that are identified in CMVC and RCS as having made changes to AIX or Dynix. IBM has produced, in the form of CMVC and RCS data, information that shows what changes to the source code were specifically made by each of these individuals. As provided for by the Court in its April 20, 2005 Order Concerning IBM's Motion for Reconsideration, IBM has not searched for and through the files of 3,000 individuals. In accordance with that April 20 Order, IBM will produce, by July 19, 2005, documents from the files of the 100 individuals who made the most contributions and changes to AIX and Dynix source code.

4.      IBM also undertook a reasonable search for programmer's notes, design documents, white papers and source code related to the AIX and Dynix operating systems that are not stored in CMVC or RCS and has completed its production of these documents to SCO.

5.      Complying with the Court's Order involved more than 4,700 hours of work from more than 400 IBM employees. This does not include the time spent by IBM's counsel and consultants on this project, which was likewise considerable. IBM produced a total of more than 80 GB of source code and other electronic data to SCO, and more than 900,000 pages of paper (which were scanned and produced in electronic form on CDs).

6.      Section I describes the steps IBM took to produce AIX source code, documentation (including programmer's notes, design documents, and white papers), and other information related to the AIX operating system from IBM's CMVC system. Section II describes the steps IBM took to produce Dynix source code, documentation (including programmer's notes, design documents, and white papers), and other information related to the Dynix operating system from IBM's RCS system. Section III describes the steps IBM took to

3

348736.1

search for, collect, and produce AIX source code, programmer's notes, design documents, and white papers outside of IBM's CMVC system. Section IV describes the steps IBM took to search for, collect, and produce Dynix source code, programmer's notes, design documents, and white papers outside of IBM's RCS system. Section V describes IBM's production of information concerning each of the individuals who made changes to AIX or Dynix, including the names and contact information for these individuals, and what changes each individual specifically made.

## I.   Production of AIX Code and Documents from CMVC

7.    CMVC is the source code revision system currently used by IBM's AIX development organization. CMVC has been used in AIX development since 1991. Other than the AIX source code stored in CMVC, IBM does not maintain revision control information for AIX prior to 1991. CMVC does not contain any source code or other information for the Dynix operating system.

8.    CMVC provides shared access to source files used in the development of the AIX operating system, allows IBM to keep track of changes that are made to source code files, and ensures that the files are available for viewing or updating only by those with the proper authorization.

9.    In accordance with the Court's January 18, 2005 Order, IBM identified and extracted from CMVC all of the source code, documentation, and other information related to the AIX operating system, built an AIX server loaded with the appropriate version of CMVC along with the source code and documentation related to the AIX operating system, tested the system to ensure it was functional, and delivered and installed the server to allow access by SCO.

10.    The server contained a fully functional version of the CMVC tool, one hundred percent (100%) of the source code in CMVC that is part of or related to AIX (including the

4

operating system itself, development tools, documentation, and test programs) and one hundred percent (100%) of the documentation in CMVC that is related to AIX, including programmer's notes and design documents. One CMVC design document was redacted to protect attorney-client privileged information. After redaction, IBM was unable to restore the document into the database in electronic form. IBM produced the redacted version of the document along with the CMVC server. The code and documentation that IBM produced from CMVC represent more than 62 GB of data.

11.     The particular CMVC server at IBM that contains source code and information related to AIX also contains a large amount of source code and material that is neither part of, nor related to, AIX. IBM did not produce source code or material in CMVC for components that are unrelated to AIX or its code, internal design, or methods. IBM excluded components containing design, manufacturing, and test information specific to IBM hardware products, such as hardware system designs, hardware test exercisers and other hardware test programs, and hardware manufacturing-related components. IBM also excluded firmware source code (machine-level code, distinct from the operating system, that is embedded into a computer hardware device or placed on a computer system to function at a level below the computer's operating system) and other software programs that are distinct from the operating system, such as middleware (software that provides support functions for software applications, such as application-to-application exchange of data, data storage management, and other services) and other applications.

12.     The source code that is part of or related to the AIX operating system is not segregated in a single location within CMVC, but rather is commingled with hundreds of thousands of other source code files that are not part of or related to the AIX operating system. A thorough review of the contents of the CMVC system was undertaken to determine which of

5

the thousands of separate "components" within CMVC are part of or related to the AIX operating system.

13.    A script—a small computer program—was written and executed to map each of the responsive components to the specific source code file names within CMVC. Using the list of file names and identifiers that had been generated, IBM then matched those file names and identifiers to corresponding Source Code Control System ("SCCS") files. These SCCS files are the files maintained by IBM that provide the file development history since 1991 (or the inception of the file) for the particular corresponding source code file in the AIX operating system or related source code. These SCCS files were produced by IBM and allow SCO to reconstruct every version and iteration of AIX since 1991.

14.    After all of the source code components for the AIX operating system were identified, the non-source code materials in CMVC that are related to the AIX operating system source code were similarly identified. This included programmer's notes, design documents, and data about version control, users, and change histories.

15.    CMVC programmer's notes reflect developer commentary concerning defects and enhancements to AIX, and sometimes contain confidential information from IBM's customers and vendors, or information covered by the attorney-client or work product privileges. If a CMVC programmer's note contained third-party confidential information, the name of the third party (or other information that would identify the third party) was redacted from the copy of the programmer's note to be produced to SCO. Reviewers also redacted privileged information from the copy of the note to be produced to SCO. All redacted information was marked with an appropriate legend. Out of 304,398 programmer's notes produced from CMVC, approximately 100 contain a redaction of customer names or privileged information.

6

16.    CMVC also contains more than 2,500 design documents related to AIX. These design documents were also produced to SCO. As noted above in paragraph 10, one design document was redacted to protect attorney-client privileged information and produced to SCO in redacted form.

17.    For each source code file produced to SCO, IBM reviewed the origin codes or copyright notices in the code to identify potentially confidential third-party material. IBM located a copy of the relevant confidentiality terms and notified the third party prior to production, when required.

18.    IBM obtained an AIX server with the hardware components necessary to produce the data from CMVC. An IBM team created a working copy of the CMVC source code revision system on the server. In order to retain CMVC database functionality that would allow SCO to search and query the code and documentation being produced, IBM copied the entire contents of the CMVC families that contained AIX-related content, and then removed the contents of the source files and programmer's notes that did not relate to AIX.

19.    The server, which contained all the information described above, was made available to SCO at the offices of Snell & Wilmer in Salt Lake City, Utah on March 18, 2005. SCO's outside counsel took possession of this server. Along with the server, IBM also has made available to SCO general AIX and CMVC user documentation and a custom README file that contains basic instructions on how to start and navigate the server, CMVC, the necessary IDs and passwords, and a script to instruct SCO how to determine the changes made by each person who contributed code to AIX, as recorded by CMVC. A copy of the README file is attached to this Declaration as Exhibit A. A copy of the script is attached to this Declaration as Exhibit B.

7

## II.     Production of Dynix Code and Documents from RCS

20.     Revision Control System ("RCS") is the source code revision system that was used by Sequent's and IBM's Dynix development organization. It also serves as a shared electronic repository for programmer's notes, design documents, and white papers. The source code revision information in RCS dates back to 1988. Other than the Dynix source code stored in RCS, IBM has searched for, but has not been able to locate, revision control information for Dynix prior to 1988. RCS does not contain any source code or other information for the AIX operating system.

21.     IBM has produced one hundred percent (100%) of the source code in RCS that is part of or related to Dynix (including the base operating system and layered products, development tools, and test programs). IBM also extracted, and produced to SCO, one hundred percent (100%) of the Dynix-related design documents, white papers, and programmer's notes that were stored in RCS.

22.     The RCS server at IBM that contains source code and information related to Dynix also contains source code and material that is neither part of, nor related to, Dynix. IBM has not produced source code or material in RCS for components that are unrelated to Dynix or its code, internal design, or methods. IBM excluded components containing design, manufacturing, and test information specific to IBM or Sequent hardware products, such as hardware system designs, hardware test exercisers and other hardware test programs, and hardware manufacturing-related components. IBM also excluded firmware source code (machine-level code, distinct from the operating system, that is embedded into a computer hardware device or placed on a computer system to function at a level below the computer's operating system), and other software programs that are distinct from the operating system, such as middleware (software that provides support functions for software applications, such as

8

application-to-application exchange of data, data storage management, and other services) and applications.

23.     Extracting the *source code that is part of or related to the Dynix operating system* required identification of the source code files that are not part of or related to the Dynix operating system.  A thorough review of the contents of the RCS system was undertaken by IBM to determine which files are part of or related to the Dynix operating system.

24.     Copies of both the source text file and the comma v file for each of the Dynix-related code files were extracted from RCS.  Comma v files are the files maintained by RCS that provide the file development history since 1988 (or the inception of the file) for the particular corresponding source code file in the Dynix operating system or related source code.  The copies were prepared in tape archive ("tar") format, and then compressed using a zip program to allow them to fit on the CDs.  The total amount of this Dynix source code produced from RCS represents more than 17 GB of uncompressed data.

25.     For each source code file produced to SCO, IBM reviewed the copyright notices in the code to identify potentially confidential third party material.  IBM located a copy of the relevant confidentiality terms and notified the third party prior to production, when required.

## III.    Production of AIX Design Documents, Programmer's Notes, White Papers and Code Outside CMVC

26.     IBM also searched for design documents, programmer's notes, white papers and AIX source code that are not stored in the CMVC database and has completed its production of these documents.  Certain AIX development teams keep a large portion of their work files and documents, other than what is required to be stored in CMVC, in shared electronic repositories.  To collect a large volume of AIX design documents, programmer's notes, whitepapers, and code, and to avoid redundancy, IBM collected potentially responsive documents from shared electronic repositories at a department, team, and project level.  These documents were reviewed for

9

responsiveness, third-party confidential information, and attorney-client privileged communications, and responsive, non-privileged documents have been produced to SCO.

27.     IBM also located, from shared electronic repositories and from some data tapes, some source code for the AIX operating system. Although it is likely that this code is duplicative of the AIX source code already produced to SCO on the CMVC server as discussed in Paragraphs 7-19, IBM was unable to confirm that the code is duplicative, and therefore has produced this AIX source code to SCO, on CDs.

28.     As I have noted above, IBM does not maintain revision control information for AIX source code pre-dating 1991. To the extent that any code for the AIX operating system (that did not duplicate the code already being produced in CMVC) was found during the search described in Paragraphs 26-27 above, it was produced. Paragraphs 29-31 below describe additional search efforts IBM undertook to locate pre-1991 versions of AIX code. No versions of AIX pre-dating 1991 were found.

29.     In the 1980s and early 1990s, IBM prepared vital records backups of AIX source code and transferred them to a remote storage location. At some point in the 1990s, the AIX vital records tapes were transferred to Austin, Texas. In late 2000, the tapes were determined to be obsolete, and were not retained.

30.     The AIX development organization contacted other IBM employees who were known or believed to have been involved with the development or product release of AIX versions prior to 1991. In addition, IBM managers and attorneys asked current members of the AIX development organization whether they were aware of the location of pre-1991 releases of AIX source code. No one asked was aware of any remaining copies of pre-1991 AIX source code.

10

31.     Source code archives retained by the IBM group responsible for filing IBM copyright registrations and maintaining some of the IBM copyright records were transferred to IBM's Austin site in 2000. IBM searched those archives; all of the source code in the archives are duplicative of AIX versions and changes already produced on the CMVC server as discussed in Paragraphs 7-19.

## IV.    Production of Dynix Design Documents, Programmer's Notes, White Papers and Code Outside RCS

32.     RCS is the shared electronic repository that was used by Dynix developers to store design documents, programmer's notes, and white papers. As discussed above, IBM collected responsive code and documents from RCS. In addition, IBM searched for and retrieved potentially responsive materials from archived Sequent records. These documents were reviewed for responsiveness, third-party confidential information, and attorney-client privileged communications, and all responsive, non-privileged documents have been produced to SCO.

33.     As noted above, IBM searched for, but was unable to locate, revision control information for Dynix prior to 1988. IBM did locate some pre-1988 copies of archived Dynix source code files (without revision control information), which were produced to SCO on CDs.

## V.    Contributors to AIX and Dynix

34.     As IBM previously noted in response to SCO's Interrogatory 5, the list of 7,200 individuals who have or have had access to AIX or Dynix source code are the people who work or worked on developing AIX and Dynix. Not all of these individuals, however, have made contributions or changes to AIX or Dynix source code; for example, a development supervisor may have access to CMVC or RCS, but may have never personally made any changes to the code. In response to the Court's order that IBM provide information as to which persons made contributions or changes to AIX or Dynix source code, IBM has identified the names, user IDs,

11

and contact information (to the extent IBM has such information in its records) for all of the individuals recorded by CMVC and RCS as having created or made changes to AIX or Dynix or related source code files, and has produced all such information to SCO.

35.     The total number of individuals who are recorded by CMVC or RCS as having made contributions or changes to AIX or Dynix or related source code files is 2,704. This number, while less than the 3,000 individuals contemplated by the Order, includes all individuals who are recorded by CMVC and RCS as having made contributions and changes to AIX or Dynix.

36.     The list of AIX contributors contains 2,234 names. These names were obtained by using CMVC tools to determine which CMVC users have ever created or modified AIX or related source code since CMVC versioning was initiated in 1991. This list includes all of the persons who are recorded by CMVC as having made changes to AIX source code. The list was examined manually to merge the data for users who had multiple IDs or name changes.

37.     IBM has also produced to SCO the user IDs for all of the individuals who made changes or contributions to Dynix, as recorded by RCS. The list contains 470 user IDs and identifies the number of files created or modified by each user ID. IBM reconstructed and reviewed archived Sequent records and questioned former Dynix developers, and has provided to SCO all of the corresponding employee names and contact information that were obtained.

38.     The CMVC and RCS revision control data produced by IBM include complete information (to the extent such information is recorded by CMVC or RCS) as to which individuals made which specific contributions or changes to AIX or Dynix source code, as well as when each such change was made.

39.     For AIX, the contributions and changes made by each person can be determined by running a simple script, a copy of which was produced to SCO along with the CMVC system

12

on March 18, 2005. A copy of the script is also attached to this Declaration as Exhibit B. Using the script, SCO can type in any individual user ID, and the script will produce as its output a detailed list of all of the contributions and changes made by that user.

40. For Dynix, information about each change made to each file in the Dynix source code, including the date and time the change was checked-in to the RCS system, who checked-in the change, the number of lines of code added and deleted from the previous revision of the file, and a log message entered by the person who checked-in the change can be ascertained using standard RCS tools, such as the "rlog" command. For example, to determine the change history of the base_callback.c,v file in the 4.6.1 version of the Dynix base operating system, SCO can type "rlog base_callback.c.,v", which results in the following output:

```
$ rlog base_callback.c,v

RCS file:       base_callback.c,v;  Working file:    base_callback.c
head:           1.4
branch:
locks:          ; strict
access list:
symbolic names: v4_6_1p: 1.4.3;  v4_6_1: 1.4;  v4_6_0p: 1.4.2;  v4_6_0: 1.4;
comment leader: " * "
total revisions: 6;    selected revisions: 6
description:
base_callback.c
----------------------------
revision 1.4
date: 97/09/29 18:20:23;  author: mjs;  state: Exp;  lines added/del: 7/9
branches:  1.4.2;  1.4.3;
Made appropriate use of SYMUSED lint directive in this file.
PR #230499 / SCN rto1031.
----------------------------
revision 1.3
date: 95/11/03 03:08:44;  author: mjs;  state: Exp;  lines added/del: 5/2
lint fix.
----------------------------
revision 1.2
date: 95/11/03 02:01:20;  author: mjs;  state: Exp;  lines added/del: 20/2
Added lint ref for base_callback.
----------------------------
revision 1.1
date: 95/11/02 20:14:52;  author: mcneil;  state: Exp;
Initial revision
----------------------------
revision 1.4.3.1
date: 20/1./3. 6.:0.:6.;  author: hbeare;  state: Exp;  lines added/del: 6/2
Branch for v4_6_1p
----------------------------
revision 1.4.2.1
date: 20/0./9. 5.:8.:1.;  author: breazile;  state: Exp;  lines added/del: 6/2
Branch for v4_6_0p
=======================================================================
```

13

41.     I declare under penalty of perjury that the foregoing is true and correct.

Executed:  May 3, 2005

Salt Lake City, Utah

_____
Todd M. Shaughnessy

14

## CERTIFICATE OF SERVICE

I hereby certify that on the __3/2__ day of May, 2005, a true and correct copy of the

foregoing was sent by U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Todd M. Shaughnessy

15

348736.1

**EXHIBIT 2**

# CRAVATH, SWAINE & MOORE LLP

GEORGE J. GILLESPIE, III
THOMAS R. BROME
ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN W. WHITE
JOHN E. BEERBOWER
EVAN R. CHESLER
PATRICIA GEOGHEGAN
D. COLLIER KIRKHAM
MICHAEL L. SCHLER
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
NEIL P. WESTREICH
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.

JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
W. CLAYTON JOHNSON
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
WILLIAM B. BRANNAN
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
JOHN T. GAFFNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER

JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS

ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO

SPECIAL COUNSEL
SAMUEL C. BUTLER
THOMAS D. BARR

OF COUNSEL
ROBERT ROSENMAN
CHRISTINE BESHAR

WORLDWIDE PLAZA
825 EIGHTH AVENUE
New York, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

———

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1397

July 5, 2005

Dear Ted:

       Enclosed please find a revised version of Attachment E to IBM's Responses and Objections to SCO's First Set of Interrogatories. This updates the contact information of the listed persons, such as email addresses that may have been used by IBM employees to make Linux contributions (including email addresses without an "ibm" in the domain name).

       As you know, IBM previously produced material that it offered unsuccessfully to Linux that may not be publicly available (because it was not included in Linux). Those materials were identified in our April 19, 2004 response to SCO's Interrogatory No. 6. We updated that production last week, on July 1, 2005. For your convenience, following is a listing of the bates numbers of the documents reflecting IBM's "non-public Linux contributions": 1710089569-1710089572; 1710089869-1710089875; 1710127757-1710128552; 1710132518-1710134552; 1710137835-1710138245; 181595356-181595400; 181595402-181595428; 181595497-181595499; 181595555-181595561; 181595664-181595734; 181595736-181595767; 181595769-181595770; 181595837-181595853; 181595867-181595868; 181595980-181596088; 181596760-181596769; 181596825-181596861; 181596873-181596980; 181596985-181596996; 181596999-181597185; 181597315-181597317; 181597575-181597587; 181597686-181597744; 181597747-181597820; 181597750-181597820; 181607890-181607892; 181609501; 181609861; 181610175-181610176; 181610232-181610243; 181610250-181610262; 181610413-181610419; 181610422-181610425; 181610428-181610484; 181610489-181610502; 181610600-181610608; 181617209-181617221; and 1710262769-1710263151.

Please let me know if you have any questions about these or any of our other productions.

Very truly yours,

Peter Ligh

Ted Normand, Esq.
   Boies, Schiller & Flexner LLP
      333 Main Street
         Armonk, NY 10504

Encl.

BY FAX AND FEDERAL EXPRESS

# ATTACHMENT E TO EXHIBIT 2

This document contains personal identifying information and is therefore
being filed separately under seal.

**EXHIBIT 3**

July 14, 2005

By Facsimile and First-Class Mail
David Marriott, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

     Re:    SCO v. IBM, Civil No. 2:03CV-0294DAK

Dear David:

I write to identify deficiencies in the production of the CMVC (AIX) database (the "CMVC/AIX Production") that IBM has made in response to the Magistrate Court's Order Regarding SCO's Renewed Motion to Compel Discovery dated January 18, 2005 (the "January 18 Order").

As an initial matter, IBM has not produced any AIX source code prior to 1991. Todd Shaughnessy has asserted that "CMVC has been used in AIX development since 1991. Other than the AIX source code stored in CMVC, IBM does not maintain revision control information for AIX prior to 1991." Affidavit of Todd Shaughnessy (May 3, 2005) ("Shaughnessy Aff.") ¶ 7. That might be true, but irrespective of the availability of revision control information prior to 1991, SCO has asked IBM to produce AIX code prior to 1991, in whatever format IBM has stored such code, and the Court has ordered IBM to produce it. Our information is that IBM does possess the source code for all versions of AIX prior to 1991. Please let me know by July 19 whether IBM will produce all code, notes and revision history for AIX prior to 1991.

Similarly, SCO asked IBM to identify the contributions that IBM has made to Linux, the specific identity of the contributors, and the specific contributions that each contributor made. Although IBM claims to have identified IBM's non-public contributions to Linux and the contributors (as set forth in Peter Ligh's July 5 letter to me), IBM has not identified the specific contributions that each contributor made. Nor has IBM identified the specific contributions that each contributor made with respect to IBM's public contributions to Linux. Under the Magistrate Court's March 2003, January 2005, and April 2005 Orders, IBM must produce that category of information. Please let me know by July 19 whether and when IBM will identify the specific IBM contributions (both public and non-public) to Linux that each contributor has made.

In addition, based on our review of the CMVC/AIX Production and as detailed below, we disagree with Mr. Shaughnessy's assertion that the CMVC/AIX Production contains "one hundred percent (100%) of the source code in CMVC that is part of or

BOIES,   SCHILLER & FLEXNER   LLP

David Marriott, Esq.
July 14, 2005
Page 2

related to AIX (including the operating system itself, development tools, documentation,
and test programs)." *Shaughnessy Aff.* ¶ 10.

<u>Approximately 245,325 Missing Files</u>

We have identified approximately 245,325 entries in the CMVC database for
which no file exists in the file trees associated with AIX (the "Missing Files").[1]  Most of
the Missing Files are marked "non-responsive." Since "non-responsive" is not a term
used in software programming, we infer that IBM removed the files marked "non-
responsive" because IBM concluded that the files were not responsive to the January 18
Discovery Order. Please promptly advise me if our conclusion is inaccurate.
Notwithstanding the designation of "non-responsive," a large number of the file names
associated with the Missing Files relate to AIX kernel code, AIX shared libraries, and
AIX compilers – source code that clearly is at issue in the litigation.[2]  It appears, for
example, that at least 450 of the Missing Files relate to the Journaling File System (JFS).[3]
As SCO has explained to the Court, IBM contributed JFS to Linux without modification,
and JFS is one of the components of AIX centrally at issue in this litigation.

Mr. Shaughnessy has stated that in preparing its CMVC/AIX Production, IBM
"removed the contents of the source files and programmer's notes that did not relate to
AIX." *Shaughnessy Aff.* ¶ 18.  As the foregoing files are part of or relate to AIX, we
hereby request that you promptly produce all of the Missing Files and any and all other
files related to AIX otherwise not produced.  We also request that you produce the log
history showing the "contents" of the source files and programmer's notes that IBM
removed from the CMVC/AIX Production so that we may verify the extent to which
AIX-related files may have been removed.  The Court ordered IBM to produce "<u>ALL</u>
AIX information" on CMVC, January 18 Order at 10; our request for the log is a logical
and appropriate extension of IBM's discovery obligation.

---

[1] The file trees associated with AIX in CMVC are */family/aix/vc/* and */family/aix/admin/*.

[2] For example, the file marked as "Non-responsive5742" corresponds to 252 files in the directory
src/bos/kernel/base/.  The file marked "Non-responsive575" corresponds to 32 files in the
directory src/bos/kernel/fs/.  The file marked "Non-responsive5760" corresponds to 3 files in the
directory src/bos/kernel/init/.  The file marked "Non-responsive5761" corresponds to 3 files in
the directory src/bos/kernel/lib/libcsys/, and 4 files elsewhere in src/bos/kernel/lib/.  The file
marked "Non-responsive5765" corresponds to 41 files in the directory src/bos/kernel/mm/.  The
file marked "Non-responsive5768" corresponds to 23 files in the directory
src/bos/kernel/lib/libcnet/.

[3] The Missing Files related to JFS were identified by a search for files whose names contain the
characters "jfs".

B O I E S   S C H I L L E R   &   F L E X N E R   L L P

David Marriott, Esq.
July 14, 2005
Page 3

### Approximately 152,887 Un-Catalogued Files

We have identified approximately 152,887 files that do appear in the AIX file tree, but do not have a corresponding indexed entry in the CMVC database (the "Un-Catalogued Files"). IBM uses the CMVC database entries to provide ready access to, and navigation of, the files in CMVC. Without the corresponding CMVC database entries, it is impossible to access or review the Un-Cataloged Files in the way that IBM has maintained them in the ordinary course of business. In addition, barring an exhaustive manual examination of these files, it is very difficult for us to determine to which AIX components each file belongs, and it is usually impossible for us to know the name of each file. We therefore request prompt production of the CMVC database entries that correspond properly to the 152,997 Un-Catalogued Files, and any and all database entries related to AIX otherwise not produced.

### Removal of CMVC Change-Log History

Upon exit of any command-line shell in AIX, the system apparently retains an annotated history of commands run by the user. We have reviewed the user history archive of the copy of AIX produced in the CMVC/AIX Production and have identified (among others) the following commands that IBM appears to have run in preparing the CMVC/AIX Production:

- rm bash_history. This command removes the history of past events. Such history is useful for repeating past commands. We request that you promptly produce all shell history resulting from your preparation of the CMVC/AIX Production so that we may identify more precisely the acts taken to prepare the CMVC database for production. This request includes the bash_history for all root users as well as all administrators.

- rm log. This command removes the log file. The log demonstrates a proper history of commands run against the operating system. We request that you promptly produce all log files related to your preparation of the CMVC/AIX Production so that we may identify more precisely the acts taken to prepare the CMVC database for production. This request includes the file log for all root users as well as all administrators.

Thank you for your prompt attention to these issues. As I am sure you appreciate, IBM's complete production of all of the AIX-, CMVC-, and Linux-related material that

B O I E S,   S C H I L L E R   &   F L E X N E R   L L P

David Marriott, Esq.
July 14, 2005
Page 4

SCO has requested and that the Court has repeatedly ordered IBM to produce is a
prerequisite to SCO's compliance with the Court's revised scheduling order.

Sincerely,

Edward Normand

cc:    Brent Hatch
       Todd M. Shaughnessy

**EXHIBIT 4**

# Snell & Wilmer
### — L.L.P. —
#### LAW OFFICES

15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
(801) 257-1900
Fax: (801) 257-1800
www.swlaw.com

Todd M. Shaughnessy
801-257-1937
tshaughnessy@swlaw.com

SALT LAKE CITY, UTAH

PHOENIX, ARIZONA

TUCSON, ARIZONA

IRVINE, CALIFORNIA

DENVER, COLORADO

LAS VEGAS, NEVADA

July 19, 2005

*VIA FACSIMILE AND U.S. MAIL*

Brent O. Hatch
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Re:     *SCO v. IBM; IBM v. SCO*

Dear Brent:

I write in response to Ted Normand's July 14, 2005 letter to David Marriott.

First, Ted's concern that IBM has withheld pre-1991 AIX source code is unfounded. To the extent there is AIX source code in CMVC that was written prior to 1991 and maintained in CMVC, we have produced it. We have repeatedly searched for, but have been unable to find, any pre-1991 AIX source code or revision control information other than that which may be in CMVC. Please provide us with the basis for Ted's statement: "Our information is that IBM does possess the source code for all versions of AIX prior to 1991". If you have any specific information about where source code for versions of AIX prior to 1991 are located within IBM, let us know and we will follow up on it.

Second, with respect to IBM's Linux contributions, the Court expressly ruled in an Order dated March 3, 2004 (and reaffirmed in its April 19, 2005 Order) that IBM is not required to produce to SCO information concerning IBM's Linux contributions insofar as such information is publicly available. The Court only ordered IBM to produce "all non-public Linux contribution information". (April 19, 2005 Order at 5-6.) As detailed in Peter Ligh's July 5 letter to Ted, IBM has fully complied with that obligation.

The issues you raise under the headings of "Approximately 245,325 Missing Files", "Approximately 152,887 Un-Catalogued Files", and "Removal of CMVC Change-Log History" require more investigation and analysis. Because some of the people at IBM who were involved in preparing the CMVC data for production to SCO several months ago are currently on vacation, I am unable to provide a response to those issues at this time. We will provide you with responses to those issues as soon as we can.

358874.1

# Snell & Wilmer
#### L.L.P.

Brent O. Hatch
July 19, 2005
Page 2

Very truly yours,

Todd M. Shaughnessy

TMS:dw

cc:  Edward Normand
     David Marriott
     Peter Ligh
     Amy Sorenson

358874.1

**EXHIBIT 5**

# Snell & Wilmer
### L.L.P.
#### LAW OFFICES

15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
(801) 257-1900
Fax: (801) 257-1800
www.swlaw.com

Todd M. Shaughnessy
801-257-1937
tshaughnessy@swlaw.com

SALT LAKE CITY, UTAH

PHOENIX, ARIZONA

TUCSON, ARIZONA

IRVINE, CALIFORNIA

DENVER, COLORADO

LAS VEGAS, NEVADA

August 8, 2005

*VIA FACSIMILE AND U.S. MAIL*

Brent O. Hatch
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

  *Re:* *SCO v. IBM; IBM v. SCO*

Dear Brent:

  I write to follow up on my July 19, 2005 letter to you, responding to Ted Normand's July 14, 2005 letter to David Marriott.

  <u>First</u>, with respect to the issues raised under the heading "Approximately 245,325 Missing Files," Ted's letter does not identify, and we have been unable to determine, how he arrived at the number 245,325. However, as I stated in my May 3, 2005 declaration, we did not produce to SCO any components in CMVC that are unrelated to AIX or its code, internal design, or methods, such as code and information relating to IBM hardware, firmware, manufacturing-related components, and middleware and other software applications. Components that were withheld were replaced with a "non-responsive" placeholder. As we have repeatedly informed you, the CMVC server at IBM that contains source code and information related to AIX also contains a large amount of source code and other material that is neither part of, nor related to, AIX. Furthermore, directory names such as "src/bos/kernel/base" that are recorded in the CMVC database are directory names that do not necessarily correspond to the AIX operating system. We have investigated each of the specific "non-responsive" components identified in Ted's letter, and have confirmed that these components are neither part of nor related to the AIX operating system, and were thus properly withheld from production. If you have a reasonable basis to believe that any other specific "non-responsive" files contain information related to the AIX operating system, please identify these files and why you believe they may be related to AIX. As for Ted's request that we provide a "log history showing the 'contents' of the source files and programmer's notes that IBM removed from the CMVC/AIX Production," IBM is not obligated to produce such information. Nor, in any event, have we maintained such a comprehensive "log history."

361000.1

**Snell & Wilmer**
———— L.L.P. ————

Brent O. Hatch
August 8, 2005
Page 2

Second, with respect to the issues raised under the heading "Approximately 152,887 Un-catalogued Files," Ted's letter does not identify, and we have been unable to determine, how he arrived at the number 152,887 (or, as stated later in the letter, 152,997). Based on Ted's description of these "Un-Catalogued Files," however, it appears that he is referring to instances in which there is a source code file without any corresponding entry in the CMVC database describing that source code file. As you may know, CMVC consists of two separate layers: the underlying source code files (SCCS files), and a database directory of those files. We believe that during normal development activity, operations such as creating a new file and then undoing the create can leave behind an SCCS file, with no corresponding information in the CMVC database directory. In preparing the CMVC server for production, we used the database to identify which CMVC components were neither part of nor related to AIX, and removed the corresponding source code files. We believe the "Un-Catalogued Files" likely include both AIX-related files, and non-AIX-related files. However, because the "Un-Catalogued Files" did not have database entries allowing us to determine whether they were or were not part of or related to AIX, we did not delete any of the underlying source code files, and produced the entirety of these "Un-Catalogued Files" to SCO. In short, the CMVC data we produced was, if anything, overinclusive.

Third, with respect to Ted's request that IBM produce all shell histories and log files related to our preparation of the CMVC server for production, IBM does not have a comprehensive collection of the shell histories and log files. In any case, IBM is not obligated to produce such information, nor was it ordered by the Court to do so.

Very truly yours,

Todd M. Shaughnessy

TMS:dw
cc:     Edward Normand
        David Marriott
        Peter Ligh
        Amy Sorenson

361000.1

**EXHIBIT 6**

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

In re:                          )
                                )
SCO GROUP,                      )
                                )
                Plaintiff,      )
                                )
v.                              )      Case No. 2:03-cv-294
                                )
INTERNATIONAL BUSINESS MACHINES,)
                                )
                Defendant.      )
_____)


BEFORE THE HONORABLE BROOKE C. WELLS

December 5, 2003


Transcript of Motion to Compel


Dawn E. Brunner-Hahn, RPR      ALPHA COURT REPORTING SERVICE
120503DB                       P.O. BOX 510047
                               SALT LAKE CITY, UT 84151-0047
                               Phone:  (801) 532-5645
                               Fax:    (801) 595-8910

1    APPEARANCES OF COUNSEL:

2

     For the Plaintiff:              HATCH, JAMES & DODGE
3                                    BY:  Brent O. Hatch
                                          Attorney at Law
4                                    10 West Broadway
                                     Suite 400
5                                    Salt Lake City, Utah  84101

6                                    Kevin P. McBride
                                     Attorney at Law
7

     For the Defendant:             CRAVATH, SWAINE & MOORE
8                                    BY:  David R. Marriott
                                          Attorney at Law
9                                    Worldwide Plaza
                                     825 Eighth Avenue
10                                   New York, NY  10019-7475

11                                   SNELL & WILMER, L.L.P.
                                     BY:  Todd M. Shaughnessy
12                                        Attorney at Law
                                     15 West South Temple
13                                   Suite 1200
                                     Salt Lake City, Utah  84101

14

15

16

17

18

19

20

21

22

23

24

25

1    Salt Lake City, Utah, Friday, December 5, 2003, 10:00 a.m.

2                            (Proceedings)

3            THE COURT:  Good morning, ladies and gentlemen.

4            MR. MARRIOTT:  Good morning, Your Honor.

5            THE COURT:  Let's go forward in the matter of the

6    SCO Group versus International Business Machines

7    Corporation.  The record should reflect that plaintiff SCO

8    is represented today by Mr. Brent Hatch and Mr. Kevin

9    McBride.  Defendant IBM is represented at counsel table by

10   Mr. David Marriott and Mr. Todd Shaughnessy.

11           Gentlemen, let me indicate, as we begin, that I

12   have reviewed your submissions, I have reviewed what I

13   believe to be the pertinent case law in this matter and I

14   have reviewed the affidavit that was submitted by Mr.

15   Shaughnessy.  And I've also taken note of the statements

16   that are included in the submissions which indicate that

17   certain representations have been made by SCO to the media.

18           Based upon my review of those items, I would tell

19   you what my intention is today so that we can then focus the

20   argument towards that particular end.  As I've stated, and

21   based upon my review of those items mentioned, it would be

22   my intention to grant defendant IBM's motion to compel

23   answers as to both sets of interrogatories, and to require

24   plaintiff SCO to file responses to these interrogatories or

25   affidavits indicating that they are unable to do so and why

                                  3

```
 1    within 30 days of the entry of this order.  I would further
 2    intend on directing that IBM's responses should correct
 3    those deficiencies that are set forth in the defendant's
 4    addendum which was filed on 11-4 of this year, and that is
 5    to include answers to Interrogatories No. 12 and 13.  Now,
 6    in the interim, it would also be my intention to otherwise
 7    postpone all other discovery until such filings have been
 8    and compliance has been achieved.
 9              Let me ask counsel first, is there a protective
10    order in place?
11              MR. MARRIOTT:  There is a protective order.
12              MR. MCBRIDE:  Yes, Your Honor.
13              THE COURT:  All right, that answers that question
14    then.  All right, given that as my intended plan today, then
15    I would ask counsel to focus your arguments as to why or why
16    not I should not implement that plan.
17              MR. MCBRIDE:  Would you prefer that I go first,
18    Your Honor?
19              THE COURT:  Well, we --
20              MR. MCBRIDE:  Mr. Marriott's pretty much got the
21    day so far, it would appear.
22              THE COURT:  It's up to you, counsel.  You both
23    have matters.  Maybe, Mr. McBride, it does make some sense
24    for you to go forward.
25              MR. MARRIOTT:  That's acceptable, Your Honor.
```

4

1     THE COURT: All right.

2     MR. MCBRIDE: Thank you, Your Honor.

3     Frankly, we can appreciate the intention of the

4 Court based on the submissions and understand the basis for

5 it. We think, Your Honor, however, that in a few minutes

6 this morning we can convince you that the more appropriate

7 path is to follow a rule or an outline of the rule in Rule

8 33 that basically says that because the issues involved in

9 this discovery involve a complex interplay between facts and

10 law, that instead of granting the motion, what the Court

11 should simply do is put the motion on hold until very

12 specific discovery has been identified and produced and then

13 make a ruling. And before I address this -- yes, Your

14 Honor?

15     THE COURT: No. What I was going to say, Mr.

16 McBride, is that in reviewing all the submissions and

17 reviewing the pertinent case law, it appears to me that what

18 is happening is somewhat circular in that defendant

19 indicates that it cannot answer plaintiff's interrogatories

20 until plaintiff has identified the source codes, et cetera,

21 but the manner in which those have been submitted make it, I

22 believe, unduly burdensome on the defendants and so we go

23 'round and 'round. And I find also that it appears to me

24 that if there's any argument to be made on the failure to

25 confer under Rule 37 that -- that there has been a good

1    faith effort to comply, but that because we can't get off

2    the ground because of this circular problem, that I would

3    not find that a sufficient basis for, you know, further

4    postponing.

5              MR. MCBRIDE:  May I have a few minutes to try to

6    convince you otherwise, Your Honor?

7              THE COURT:  Absolutely.

8              MR. MCBRIDE:  All right.  And I simply set this

9    out at the beginning because this is what I think we can

10   convince you of in a few minutes this morning.  And what I

11   think we can convince you of is that rather than entering an

12   order, what really should happen is specified discovery

13   should be identified, we should have time to take that

14   discovery, then we should revisit this and respond more

15   fully to the interrogatories submitted by IBM.  Now, I would

16   like to explain why.

17             This case, Your Honor, at a very fundamental

18   level, involves infringement.  Infringement is a very

19   broadly defined category in the law.  It can include

20   copyright infringement, trade secrets infringement or plain

21   old confidential information that's taken without

22   permission.  Those are all very differently defined areas of

23   the law that all have very differently defined rules of

24   proof.  The -- what we need to get our arms around

25   collectively, on our side and on IBM's side, is a clear

1    definition of what source code is at issue, what source code

2    is potentially an infringement.  Before we discuss whether

3    it's a trade secret or a copyright or anything else, the

4    most important thing is for both of us to come to grips with

5    the universe of source code, the documentation and methods

6    and concepts that we believe are at issue so we can argue

7    about them.  And once we have an understanding of what that

8    universe is, the very complex rules -- this is a complex

9    case, Your Honor.  There's going to be some of this code and

10   some of these methods that are trade secrets, and some are

11   going to be copyright and some are going to be contract

12   violations and some are going to be nothing.  I submit, Your

13   Honor, that's the very first step that needs to take place

14   before we start worrying about whether there is trade secret

15   burdens met or not met.

16          Certainly, Your Honor, the cases cited by the

17   defendant in this case with respect to trade secrets and the

18   need to make some affirmative representation of what those

19   are, that makes complete sense.  We have no argument with

20   that general proposition of law.  What we are simply saying

21   is this case involves deeper level complexities than the

22   cases cited by the defendant.  This is not the Muna case.

23   This is not a case where we're talking about identity of

24   employee records or customer records that you would normally

25   see in a trade secrets case.  This involves an

7

 1   interrelationship between, as I said, copyright, trademark

 2   and contract law.

 3        Now, Your Honor, I would like to proffer a case

 4   for the Court's review that is a pretty well known case but

 5   it's not in our briefs.  It is Sun against Microsoft, a

 6   Ninth Circuit case decided in 1999, and the reason -- would

 7   it be appropriate to. . .

 8        THE COURT:  Certainly.

 9        MR. MCBRIDE:  The reason --

10        THE COURT:  Excuse me, Mr. McBride.

11        MR. MCBRIDE:  Yes.

12        THE COURT:  Do you have an extra copy of that?

13        MR. MCBRIDE:  Oh, sorry, Your Honor.

14        THE COURT:  Hand it to Mr. Willey.  He's the

15   brains behind this operation.

16        MR. MCBRIDE:  The reason this is an interesting

17   case is because it underscores the point that I just made to

18   the Court.  The -- there are some paragraphs here worth

19   reading, but the -- and I'll get to those in just a moment.

20   The case in Sun against Microsoft involved claims of

21   misappropriation of derivative works.  A derivative work is

22   a work that was licensed from one party to another party,

23   and then the other party made some improvements to it.  In

24   copyright law that's a derivative work.  And in the Sun

25   against Microsoft case, Sun licensed Microsoft its Java

8

```
 1    technology, Microsoft made a bunch of changes to it, which

 2    is derivative work, and then there was an argument about how

 3    that should be used.

 4              The reason this is an important case and an

 5    interesting case is the Court goes right to the issue of --

 6    that we are -- this particular case is in the intersection

 7    between contract law and copyright law that is a frontier,

 8    literally, of judicial interpretation.  Even for the Ninth

 9    Circuit in 1999, this was deemed a case of first impression

10    insofar as identifying the interrelationship between

11    contracts and copyrights.  That -- and the language in this

12    case, for example, if I could turn the Court's attention to

13    page 5.  It's not 5 in the case.  It's five on the printed

14    page up in the upper right-hand corner.  I simply would like

15    to read a little language to underscore the points just

16    made.  In the bottom left-hand corner, the Ninth Circuit,

17    upon review of the issues, says, in affect, five lines up

18    from the bottom of the page, We agree with Microsoft that

19    the issue turns upon whether the terms Microsoft allegedly

20    breached were limitations on scope of the license, which

21    would mean there is copyright infringement by acting outside

22    the scope, or whether the terms were merely separate

23    contract covenants, which would make this a contract

24    dispute.

25              Now, the Court -- the Ninth Circuit goes on, and
```

9

1   I'll ask the Court to kindly turn to page 6, the following

2   page, for additional highlighting.  The bottom right-hand

3   corner at the very -- at the top of the sentence, the Ninth

4   Circuit continues to explain, Whether this is a copyright or

5   a contract case turns on whether the compatibility

6   provisions help define the scope of the license.

7           And one last reference I would like the Court to

8   consider, and then I'll leave this case, is further on page

9   7, bottom left-hand corner, picking up in headnote no. 8,

10  The enforcement of a copyright license raises issues that

11  lie at the intersection of copyright and contract law, an

12  area of law that is not yet well developed.  We must decide

13  an issue of first impression, whether -- and the Court goes

14  on to explain what the issue of first impression is.

15  Essentially, it has to do with licensing a derivative work,

16  whether it's a copyright or contract case and what are the

17  issues that flow therefrom.

18          Now, Your Honor, we would submit that if this was

19  a case of first impression for the Ninth Circuit, it

20  underscores -- this is an undeveloped area of law that turns

21  on issues of law and fact and they're intertwined.  That's

22  getting us back to the Rule 33 question that we were making.

23          I would like to give the Court a little bit of the

24  background of the licensing relationship between our parties

25  that relates to the Sun against Microsoft case.

```
 1              May I move to that or does the Court have any
 2     particular questions?
 3              THE COURT:  Certainly.  Go ahead.
 4              MR. MCBRIDE:  Thank you.  May I put up a chart
 5     here?
 6              THE COURT:  If you can find a place to put that
 7     chart up, go for it.
 8              MR. MCBRIDE:  I'll tell you what I have.
 9              MR. WILLEY:  We have an easel right here if you
10     want, sir.
11              MR. MCBRIDE:  Would you mind. . .
12              THE COURT:  We are spacially challenged.  We just
13     do the best we can.
14              MR. MCBRIDE:  Well, that's all right.
15              THE COURT:  And, counsel, if you wish to move
16     around --
17              MR. MCBRIDE:  Your Honor, I have a smaller,
18     obviously --
19              THE COURT:  Nonetheless, feel free and you need
20     not ask permission to move, even up behind the bench area if
21     you wish to in order to be able to see.
22              MR. MCBRIDE:  May I, Your Honor?
23              THE COURT:  Yes.  Certainly.
24              MR. MARRIOTT:  Thank you, Your Honor.
25              MR. MCBRIDE:  This case is an interesting and
```

11

1    important case because it involves, really, the genesis of

2    computer software for large corporations.  You can judge

3    somewhat by the fact that we have a variety of people in the

4    audience here, none of whom, I believe, are affiliated with

5    either party, but are people who have general interest in

6    the area.  And that really speaks to this issue, Your Honor.

7            In the beginning of the corporate software world,

8    there was AT&T.  AT&T created Unix.  Unix is the corporate

9    operating system of choice that all corporations use at the

10   Fortune 1000 level and significantly below that.  It just

11   works better than Microsoft Windows when you have a large

12   distributed environment.  So companies have used Unix for 20

13   years or more.  AT&T made all this stuff.

14           Then AT&T wanted to create larger markets for it

15   and licensed Mr. Marriott's client, IBM, and a number of

16   other companies, Hewlett Packard and all those large

17   software vendors, allowing each company to create its own

18   derivative work based on top of Unix.  And so, thus, we have

19   in the chart, Your Honor, in the upper left-hand side just a

20   really description that points out that IBM software product

21   that we're trying to get produced in this case and that is

22   at issue in this case is part stuff that came from AT&T and

23   part stuff that it made by itself.  The derivative work is

24   stuff it made by itself.

25           Now, under the contract with IBM, and now SCO --

12

1    actually, we have two roles in this relationship, but in the

2    particular law I'm talking about now SCO's in the shoes of

3    AT&T.  We have acquired all of AT&T's rights of license and

4    copyrights relating to Unix.  And so we now have a situation

5    where the contract we have with International Business

6    Machines provides the following, in the scope clause, the

7    clause that the Court in Sun against Microsoft addresses,

8    the scope clause was really the clause that identifies what

9    you can use the software for.  It is the heart of the

10   intended and allowed use for the software.  The scope clause

11   of our license, that is to say AT&T -- SCO's license to IBM

12   says the following:  You may use this software product.  You

13   may modify it.  You may create derivative works based

14   thereon provided that your derivative works are treated as

15   part of the original software product.

16          Now, Your Honor, that becomes a very interesting

17   question.  Is that a contract interpretation that this Court

18   will ultimately have to make?  Is it a copyright issue?  But

19   the bottom line is this, IBM is obligated to maintain some

20   confidentiality under some law, copyright, contract and

21   trade secrets, with respect to not just the Unix that

22   licensed -- was licensed from AT&T but also the derivative

23   work that IBM created on top of that.  IBM owns the

24   derivative work.  We don't contend anything to the contrary.

25   But what we do contend is that we have a license agreement

1    that says even though you own your derivative work, you

2    don't own Unix, you don't own the stuff we licensed to you

3    and you can't use your stuff in ways that violate our

4    license scope.  And our license scope says the following:

5    You have to use it for internal business purposes only.  You

6    cannot use it for the benefit of others.  You can't let

7    others use it for their benefit.  You can use it for

8    yourself.  You can make money on it.  You can license it.

9    And that's what its intended use is, but the second you step

10   outside that license scope and you use this for other

11   people, you've violated the scope of this license.  That's

12   what this case is rooted in, fundamentally.  That's the

13   beginning point of this case, Your Honor.

14             Now, that leads us to a very interesting point.

15   Do we have again -- and I'll only do this once more and I

16   won't repeat it after that -- do we then have a contract

17   case?  Do we have trade secrets?  Do we have confidential

18   information which is neither a trade secret or a copyright?

19   And if so, what proportion do those fall out or shake out in

20   and how is the Court going to deal with that?  Your Honor,

21   that is precisely the interrelated issue of law and fact

22   that ought to be addressed appropriately under Rule 33 and

23   should not -- should not be allowed -- this discovery needs

24   to be framed -- in the Court's wisdom and appropriate

25   oversight, this discovery needs to be framed in a way that

14

1    allows us to identify just first what is all this stuff that

2    IBM put into Linux?  And I'll explain this in just a

3    minute.  We will need to identify all the -- everything

4    that's at issue before we start giving it a legal label.

5    That's why this Rule 33 ruling that we are requesting is

6    appropriate in this case.

7            Now, we go to the question of, okay, IBM licensed

8    a software.  What's this -- and agreed, you know, that they

9    would keep it confidential and they wouldn't use it for

10   other people and would only use it internally.  What those

11   words mean, Mr. Marriott and I or other lawyers are going to

12   be arguing about ad nauseam.  That should not be the inquiry

13   today.  We know -- and the reason this case got launched in

14   the first place, we know IBM gave a lot of source code,

15   development methods and sequences of source code usage into

16   Linux.  Linux is a free operating system that's distributed

17   free of charge and is literally undermining, totally, the

18   entire operating system environment for Unix users in the

19   corporate world of Fortune 1000 and thereabouts.  And Linux,

20   as I'm sure the Court knows from general knowledge, is

21   developed under an open source model where many people

22   contribute, many people make wonderful improvements.  And,

23   again, I'm willing to guess that a number of the people in

24   the audience are probably software developers who have a

25   very intense interest in this case being decided rightly,

15

1    because there are many people who like the Linux model, like

2    participating in a community and -- a development community,

3    and that's kind of a big issue that's underlying this case.

4           We don't have issue with the non-infringement part

5    of it.  This particular case has to do with IBM's

6    infringement.  IBM, by its own admission -- and what I would

7    like to do, if I may, Your Honor, just so you know I'm not

8    making this stuff up, or at least I am not making it up new,

9    because there are numerous references in the complaint that

10   I think are appropriate to just generally address.

11          I'm sorry.  This is my copy.  If you don't mind

12   I'll trade you.

13          THE COURT:  Have you got two?  Give them to me,

14   please.

15          MR. MCBRIDE:  Yes, Your Honor.

16          Now, where we are so far, in at least my line of

17   reasoning, is I want to walk the Court through enough of our

18   complaint to help the Court understand that IBM clearly did

19   contribute a lot of the Unix-related information into

20   Linux.  We just don't know what it is.  And I would refer

21   the Court, to start with, to paragraph 51 -- no.  I'm

22   sorry.  We are going to back track to that -- paragraph,

23   please, 95.  Actually it's 96.  Now, the reason I'm using

24   this complaint is we've included in the complaint news

25   articles published about IBM's contributions into Linux and

1    quotes attributed to IBM about its involvement into Linux.

2    So we're not guessing here.  We're not making this story up

3    that IBM has put a lot of Unix information into Linux.  IBM

4    had told everybody they've done that.

5              THE COURT:  But isn't SCO also saddled with, for

6    lack of a better term, having made public statements itself

7    concerning this case?  I mean, it's not just IBM making

8    comments about the contributions to Linux.

9              MR. MCBRIDE:  Right.

10             THE COURT:  Isn't it also SCO making comments

11   about trade secrets and what it would show in court?

12             MR. MCBRIDE:  There is -- yes.  Certainly.

13             THE COURT:  I guess, Mr. McBride, my only concern

14   about this is I acknowledge that this is here, but I want to

15   focus you back on to the question of whether or not motions

16   to compel should be granted.

17             MR. MCBRIDE:  Well, if the Court wouldn't mind,

18   I'll try to hurry up my chain of reasoning here that I think

19   gets me to where I think the appropriate ruling is and I'll

20   try to do it more quickly.  If I might, just very briefly,

21   in paragraph 96, there's a quote here attributed to an IBM

22   executive that for the purposes of this hearing certainly is

23   sufficient for discovery to go forward on the issue, that

24   IBM admits -- and I've grown a little older since I was last

25   looking at this and need my glasses.


17

1          THE COURT:  I understand.

2          MR. MCBRIDE:  In the bold in paragraph 96, it

3    simply says, While they admit Linux has a long way to go

4    before it can compete with the functions available on many

5    flavors of Unix --

6              (Whereupon, the reporter asked Mr. McBride to slow

7              down.)

8          MR. MCBRIDE:  I'm sorry.  While they admit Unix

9    still has a way to go before it can compete with the

10   functions available on many flavors of Unix, IBM officials

11   said Linux can prove more cost effective.

12         And the next paragraph says, We are happy and

13   comfortable that Linux can become the successor, not just

14   for AIX but for all Unix operating systems.

15         Now, there's only one last quote I would like to

16   refer to and that's in paragraph 97, Your Honor.  The quote

17   was attributed to a senior executive vice-president, Mr.

18   Steven Mills at IBM, who in the bold stated in January 2003,

19   IBM will exploit its expertise in AIX to bring Linux up to

20   par with Unix.

21         Then continuing in the bold only, Mills

22   acknowledged Linux lags behind Unix in scalability, SMP

23   support, failover capabilities and reliability but not for

24   long.  The pathway to get there is an eight-lane highway,

25   Mills said, noting that IBM's deep experience with AIX and

18

```
 1    its 250-member open source development team will be applied
 2    to make the Linux kernel as strong as that of Unix.  The
 3    road to get there is well understood.
 4           Now, SCO has made public statements about Unix and
 5    I'm not suggesting we want a moratorium on all of these
 6    interrogatories.  And perhaps what I should do is address it
 7    in much more specificity right now.  The things that we have
 8    said, or that our executives have said, or quotes attributed
 9    to our executives, we have to live with just the way IBM
10    does, and we're happy and willing to do that.  But I
11    believe, Your Honor, those issues are most appropriately
12    included in Interrogatories No. 12 and 13, and if I read
13    them correctly, where in Interrogatory 12 IBM requests all
14    of the contributions made by other people, not IBM, into
15    Linux.  And in paragraph 13 -- in Interrogatory 13 IBM
16    requests -- and I'm sorry.  I may not be saying it precisely
17    right.  But IBM wants the universe of all contributions made
18    to Linux inappropriately that we allege and then wants us to
19    specify which of those are attributed to IBM, and I think
20    that's a fair characterization of Interrogatories 12 and 13.
21           And, Your Honor, if you want us to answer those,
22    Interrogatory No. 12, and that appears to be a fair thing to
23    do, we'll do that.  We'll do that.  It, to us, appears that
24    it's not part of this case, but if in fairness of putting
25    everything in front of this Court, we'll certainly do that.
```

19

 1            I'm more focused on Interrogatories No. 1, 2 and 4

 2    that IBM has submitted to us, because those go to the heart

 3    of my arguments over here.  We need, Your Honor, to have Mr.

 4    Marriott produce all versions of AIX.  We need them to

 5    produce all the development notes of their developers from

 6    AIX.  Then we will have the capability of being able to

 7    compare what IBM's contributions are lined up against our

 8    codes, and then we'll make a very clear specification of

 9    where the violations are, and then we'll end up at that

10    point arguing about what kind of violations they are.  This

11    becomes really important because of, we're back to now legal

12    definitions, the Copyright Act allows companies or any

13    copyright holder to copyright expressions that are written

14    down on paper, expressions, including in the computer

15    software world sequences, structure and organization.  The

16    Copyright Act does not allow anyone to copy a method or an

17    idea or a concept.  That's specifically outside the realm of

18    copyright law.

19            Well, back to the beginning, Your Honor, AT&T

20    recognized this, and in the Unix agreement that was licensed

21    to everybody else, although IBM has its own deal a little

22    different, but Sequent has the standard agreement, IBM made

23    every company hold methods and concepts as confidential

24    information, recognizing that that was not protectable by

25    copyright law, but they wanted to make sure they had it in

```
 1    the contract law.  So what I'm saying, Your Honor, is if IBM
 2    will produce and answer our discovery, staying the discovery
 3    I think will do tremendous injustice.  It really gives IBM
 4    an advantage to strategically pursue motions that would be
 5    dispositive without a full vetting of our ability to be able
 6    to then explain to the Court what's what and why.
 7              Now, Your Honor, let's take the area of
 8    confidential information, and I'll explain to you why I
 9    think that is the case.
10              THE COURT:  Before we do that, Mr. McBride, you
11    know, tell me why the rulings in the cases of Utah Medical
12    Products, decided, you know, from this District Court and
13    the Leucadia versus Applied Extrusion Technologies case,
14    decided out of the District of Delaware, should not apply to
15    this circumstance which indicates that the burden is on the
16    plaintiff to prove the existence of the trade secrets
17    assuming that that's part of it, all right, and that it is
18    appropriate to postpone discovery in those circumstances
19    until such time as the plaintiffs have acknowledged what the
20    trade secrets may be, and otherwise this Court cannot
21    determine, as the other party cannot determine, what is
22    relevant as to future discovery.
23              MR. MCBRIDE:  Thank you.  Yes.  I will, Your
24    Honor.
25              THE COURT:  None of us know.
```

21

```
 1              MR. MCBRIDE:  Right.  And future discovery is up
 2      in the air because it's in one of the three categories.  The
 3      Medical Products case that Your Honor is referring to, in my
 4      reference, was a summary judgment case, not at the beginning
 5      of the case but at the end of the case.  The Leucadia case
 6      the Court is referencing, specifically I would call the
 7      Court's attention to, says that trade secrets do not embody
 8      a Rule 9 kind of specificity requirement.  It is, in fact,
 9      notice pleading required under trade secrets law.  That's
10      what the Leucadia Court said.  So I'm saying there's give
11      and take in both of those cases because neither of those
12      cases addresses our specific facts.  The facts of our case
13      go deeper than both those cases, number one, and, number
14      two, both of those cases were decided at a different moment
15      in the case than ours.  And what I believe is a very correct
16      statement, Your Honor, is we won't know what part is trade
17      secrets, what part is contract, what part is copyright until
18      we've seen all of IBM's contributions.  And I can explain
19      why, unless you want to stop on that for a minute.
20              THE COURT:  No.  Go ahead.
21              MR. MCBRIDE:  The reasons why, Your Honor,
22      remember the explanation I gave about IBM's preparation of
23      its derivative works.  IBM owns those derivative works.  We
24      don't dispute that.  Not for a second.  What we argue is
25      they can't give them away, the contract -- the terms of the
```

22

```
 1    contract, and that's a decision that at some point summary
 2    judgment will be brought on to interpret.  No question about
 3    it.  And we are simply saying, Your Honor, because IBM only
 4    was involved in preparing that derivative work and we
 5    weren't, we don't know what they've prepared.  And part of
 6    what they've prepared is going to be confidential
 7    information, mandated to be kept secret under the license
 8    agreement and a breach of the scope clause, according to us,
 9    but we don't know what they've done with the derivative work
10    so we can't point out what we don't know.
11           Now, I'll go to the trade secrets, but you can
12    talk if you have anything on that.  I'll go to trade secrets
13    specifically because that's a different set of facts.
14                THE COURT:  No.  Go ahead.
15                MR. MCBRIDE:  The cases the Court is referring to,
16    and the cases that IBM cite, aren't trade secret cases.
17    That is the thrust of that case.  I'm saying our case is
18    more -- it's an infringement case that may be one of three
19    different.  And by the way, Your Honor, I will proffer to
20    the Court that we are filing a second amended complaint that
21    has copyright infringement claims, and will be filed within
22    the coming few days or no less than a week.  And we'll put
23    then fully in front of the Court the three buckets we have
24    outlined here, contract, trade secrets and copyright.  But I
25    would like to the address trade secrets for a minute and
```

23

```
 1   explain to you what is the genesis of our trade secrets
 2   claim.  And at that point, I think most of my argument is
 3   going to come back to some sort of a summary.
 4              THE COURT:  Let's do that because we need to be
 5   finished by --
 6              MR. MCBRIDE:  All right.
 7              THE COURT:  -- before 12.
 8              MR. MCBRIDE:  All right.
 9              THE COURT:  Giving all parties ample time to
10   argue.
11              MR. MCBRIDE:  If -- I'm going to use just as an
12   aid, again, the complaint, because this helps set out the
13   issues.  In paragraphs 50 -- starts at 51.  Now, what I'm
14   about to refer to here really is only information addressing
15   the trade secret -- well, I guess that's not even true.
16   This addresses all the areas, but it really does go to the
17   heart of trade secrets, and, I believe, explains why the
18   Court should rule according to the way I'm requesting as
19   opposed to entering a motion that Mr. Marriott is
20   requesting.  Paragraph 51 through paragraph 57 -- and I will
21   just generally characterize those for the Court.  This
22   explains a background information that goes to the heart of
23   our trade secrets claim.  And if we have not done a good job
24   of articulating that, then I guess shame on us and we better
25   do it better.  But our trade secrets claim really is
```

1    embodied in and arises out of the joint development

2    agreement between our two companies that started in the 1997

3    time frame.

4           Now, Your Honor, IBM, as I mentioned, prepared its

5    derivative work of Unix that it calls AIX, but SCO also

6    prepared its own derivative work of Unix that it calls

7    Unixware.  And so we have two distinct positions in this

8    case, number one, we're in the shoes of AT&T as the original

9    licensor, but, number two, we were a licensee of AT&T.  We

10   prepared a version of Unix which was designed to run on

11   Intel-based machines, which is the kind of stuff that is in

12   pretty much all of our offices are Intel-based processors,

13   the cheap processors that make our computers much more

14   inexpensive to run.  Intel processors are compared to what

15   are called RISC, R-I-S-C, processors, which are much more

16   expensive and those are the processors used by large

17   corporations and they pay a lot more money for them.

18          SCO, in the early days, carved out a little niche

19   in the Unix world that it would develop a version of Unix

20   only for Intel processors.  Nobody else wanted that space

21   because Intel's processing power wasn't very good back

22   then.  But Intel's processing power got better and better,

23   and lo and behold, in about 1995, SCO found itself in a

24   really great position.  Intel was now being -- Intel chips

25   were now becoming powerful enough that corporations actually

1    wanted to use them for large functions.  And here we were at

2    SCO, lo and behold, the only company that had an operating

3    system running on Intel.  And so, Your Honor, the SCO

4    Company, as it delineated in paragraph 51, from and after

5    September 1995 spent a lot of money, for us.  I've heard the

6    numbers 30 to 50 million, and I can't remember which, so I

7    better not represent too much.  But for a small company,

8    this company spent a lot of money in making sure that its

9    version of Unix would run very, very well on Intel-based

10   machines.  IBM had none of that information, none

11   whatsoever.

12        The other thing that our little company did was to

13   make our version, SCO's version, of Unix called Unixware,

14   run on 64-bit Intel processors.  Now, the stuff we all use

15   right now is a 32-bit Intel processor, and that's really not

16   that complicated a thing.  It's just that if you envision a

17   pipe that water flows through, or in the computer world bits

18   flow through, a bit that our computers all use -- or, excuse

19   me, the processor, the Intel processors, that our computers

20   all use, can process 32 bits of data at a time.  And so it

21   stands to reason that if you have a 64-bit processor, you

22   just have twice as wide a pipe through which water can flow

23   and you can do stuff a lot faster.

24        Our little company in 1997 and 1998 had spent 18

25   months, as outlined in our allegations in the complaint,

26

1    developing the technology for 64-bit Unix processing on

2    Intel.  IBM had none of that technology.  IBM had no ability

3    to convert anything from its operating system onto an

4    Intel-based machine.  They had no available technology.

5    They couldn't do it.  And yet Intel processors were becoming

6    the thing every company wanted to run their systems on.  So

7    IBM was being left out in the cold without an operating

8    system that they could sell.

9            Well, in traditional IBM fashion, they came to us

10   and asked us to partner, because that's what they do with

11   companies, they partner and that makes a lot of sense.  But

12   in the process of this partnership, things went awry.  We

13   gave IBM all of our knowledge that we had spent 16 months

14   developing about how to run Unix on Intel processors.  We

15   had that.  That's trade secret stuff.  IBM didn't have any

16   of that.  We gave it all to them in the joint development

17   project.  And at the same time, IBM is developing Linux

18   without telling us.  So we sail along.  We give them all

19   this trade secret information.  This is the core of our

20   trade secrets case, the joint development agreement between

21   the companies that started in the 1997 time frame called

22   Project Monterey.  We gave them more knowledge than they had

23   as a company about how to run Unix on Intel processors.

24   They needed that.  They took that from us.  They then went

25   and said, Thank you very much.  We decided not to do the

27

1     joint development project.  Have a nice life.  Took all of

2     our technology and gave it to Linux.  IBM now is marketing

3     this great new Linux product, that 64-bit Linux, and it's

4     the greatest thing ever.  They got that from us.  That's a

5     heart -- that's at the heart of our trade secrets

6     violation.  That's in the complaint and, again, we're back

7     to the problem that, technically, we've already produced it,

8     Your Honor, because we gave them the source code of Unixwork

9     so it's in there.

10          THE COURT:  Didn't you give it to them in hundreds

11    of thousands of pieces of paper, though, without

12    specifically identifying it?

13          MR. MCBRIDE:  I'm quite certain we fixed all

14    that.  If we haven't, we'll do it in sooner than 30 days.

15    And, Mr. Marriott, do you know?  Have we not given that to

16    you in machine readable format?

17          MR. MARRIOTT:  I'm not sure that was Your Honor's

18    question.  The question, Your Honor, is has the SCO Group

19    identified the specific trade secrets they say we've stolen

20    and dumped into the open source?  The answer is absolutely

21    not and I'll address that when I have the opportunity.

22          MR. MCBRIDE:  That is correct.  We haven't

23    specific -- I admit that.  There's no question we haven't

24    done that.  And I'll tell you why and then I'll sit down and

25    let Mr. Marriott have his say.

28

```
 1              We're saying this is sufficient for the Court to
 2    assume or view that trade secrets are involved in this case.
 3    But the trade secrets are so interrelated with the other
 4    code you can't separate out one.  You can't do it.  You have
 5    to have the discovery of the universe, then we can argue
 6    about where the code falls in what bucket.  That's the way
 7    to proceed in this case, we believe, Your Honor, and that's
 8    why a ruling under -- and I'll finish this by reading it and
 9    then I'll sit down.  What we are asking the Court to do is
10    under Rule 33(b) -- I'm sorry.  It's at the end of Rule
11    32(c), it simply says, An interrogatory that relates to
12    facts or applications of law or fact, the Court may order
13    that such an interrogatory need not be answered until after
14    designation of discovery has been completed or until
15    pretrial conference. The reason for this ruling is really
16    explained in the -- or this rule is explained in the
17    advisory committee notes on the following page, that since
18    -- it says very practically, Since interrogatories
19    involving mixed questions of law and fact may create
20    disputes between the parties which are best resolved after
21    much or all of the other discovery has been completed, the
22    Court is expressly authorized to defer an answer.  We're
23    asking the Court to defer an answer until we have had enough
24    discovery to be able to say what is what in the trade
25    secret, confidential information, copyright arena and then
```

```
 1    we'll fully answer and live with whatever the answer is.
 2    And that relates to, really, Interrogatories 1, 2 and 4.
 3    Interrogatories 12 and 13, Your Honor, we'll answer those as
 4    best as we can, if that's what the Court wants us to do.
 5              THE COURT:  Thank you, Mr. McBride.
 6              MR. MCBRIDE:  Thank you, Your Honor.
 7              Excuse me, Dave, you don't need this, do you?
 8              MR. MARRIOTT:  No.  It's all yours.
 9              Good morning, Your Honor.
10              THE COURT:  Good morning.
11              MR. MARRIOTT:  We appreciate the direction that
12    Your Honor has given us, and let me, if I may, in the few
13    moments that I have do three things.  First, Your Honor, let
14    me say just a little bit, because I think it's helpful to
15    the Court and important to the issues, about operating
16    systems and source codes.  Those are sort of fundamental to
17    what we're talking about on these motions.  Second, let me
18    tell you what is at issue and that I think what you have
19    tentatively ruled is exactly the right ruling.  And, three,
20    let me describe for you just briefly some of the
21    shortcomings of the responses we have received from the SCO
22    Group.  I won't take you through all the detail but I would
23    like to describe at least some of them.
24              If I may approach, Your Honor, we have a couple of
25    exhibits, like the SCO Group, that I think may facilitate
```

1    the discussion.

2              THE COURT:   Thank you.

3              MR. MARRIOTT:   All right.   So, first, Your Honor,

4    by way of a little background, it is important, I think, to

5    understand the issues presented here to understand a little

6    bit about operating systems.   And if you'll take a look at

7    page 1 of our book, you'll see a little table which

8    undertakes to describe that.   Without its software, Your

9    Honor, a computer is essentially a useless lump of metal.

10   With its software, however, an operating system can do a lot

11   of important things.

12             There are basically two types of programs.   There

13   are systems programs and there are application programs.

14   The most important of the systems programs is the operating

15   system.   And it's the program which controls the functioning

16   and the operation of the hardware itself.   It controls the

17   resources of the machine, and it is the base on which the

18   applications sit.   So when Your Honor sits down at her desk

19   and when you write a letter, you communicate with the

20   hardware via the operating system.   You might use a program

21   like Microsoft Word or Word Perfect to write the letter.

22   Those are applications which sit on top of the operating

23   system.

24             Computer programs, Your Honor, and operating

25   systems are written in a language called source code.

31

1    Source code is a set of statements with comments that

2    represent the instructions that are ultimately translated by

3    a device called the compiler into ones and zeroes that the

4    computer executes.  And if you take a look at pages 2

5    through 9 in this book, what you'll see, Your Honor, is a

6    sample of source code.  In fact, this is source code from a

7    particular file in the 2.5.69 version of the Linux operating

8    system.  What you'll see in red are the comments,

9    programer's notes, and what you'll see in black are the set

10   of programming statements which are actually ultimately

11   translated into ones and zeroes that can be executed by the

12   machine.  Essentially, Your Honor, the programer writes the

13   language and saves it to a file.  The file is like the

14   chapter in a much larger book of source code.  This is one

15   little chapter in a much larger book of source code.

16           Unix is a family of operating systems.  It was

17   developed originally by AT&T.  Linux also is an operating

18   system.  Linux was pioneered in 1991 by an undergraduate

19   student at the University of Helsinki by the name of Linus

20   Torvalds.  He posted a note on the internet saying, I'm

21   writing an operating system, and solicited help.  What has

22   followed, Your Honor, is a massive collaborative exercise by

23   which thousands of developers worldwide have written this

24   operating system.  And if you take a look at page 10 of the

25   exhibits, Your Honor, you'll see a brief diagram which

32

1    describes the process by which the Linux operating system is

2    developed.  Developers worldwide make contributions.  They

3    make the contributions to expert developers known as

4    subsystem maintainers.  Those individuals review -- subject

5    the code to a massive process of peer review.  Thousands of

6    developers have input, and when the subsystem maintainers

7    are satisfied that the code is in an acceptable form, it's

8    passed up the hierarchy to Mr. Torvalds himself and another

9    developer by the name of Andrew Morton.  Those individuals

10   then make judgments about what should be in the production

11   version of Linux and what should be in the development

12   version of Linux and eventually it gets to the market place.

13         What Your Honor needs to understand here is that

14   whereas many operating systems are developed behind closed

15   doors and the source code is secret, with respect to the

16   Linux source code, it has been developed publicly.  It is,

17   essentially, Your Honor, developed on the internet.  Your

18   Honor can log on to any number of web-sites at which you

19   will see the Linux operating system being written before

20   you.  We have included, as the next exhibit in the book,

21   Your Honor, at page 11, an e-mail that was sent from a

22   developer of the SCO Group to the mailing list by which

23   contributions are made to Linux.  This is the way the

24   operating system is built.  Individuals make -- write

25   codes.  They suggest it for inclusion in the Linux operating

33

1   system.  It's passed through a rigorous process of peer

2   review, all public, Your Honor.  And as a result of this

3   process, if the contribution is deemed acceptable, it's

4   included into the operating system right before everyone's

5   eyes.

6           What you ought to know here as well, Your Honor,

7   is that the plaintiff here began in 1994 as a Linux

8   distributor and has, over the course of the approximately

9   last 10 years, distributed thousands of Linux products.

10  Now, having said that, let me tell you the second thing I

11  want to make sure you understand, which is what really, I

12  think, is at issue in this case.  The crux of SCO's case,

13  Your Honor, is set up at paragraph 101 of their complaint.

14  And we've replicated it here in the book.  What they say at

15  paragraph 101 is the following:  They say IBM is

16  affirmatively taking steps to destroy all value of Unix by

17  improperly extracting and using the confidential and

18  proprietary information it acquired from Unix and dumping

19  that information into the open source community.  That is

20  the case in its essence, Your Honor.  They say we took

21  something out of a Unix book over here, a secret Unix book,

22  and we dumped it over here into the Linux public book.

23          And if I may, Your Honor, approach, what I'm

24  handing you is a collection of source code.

25          MR. MCBRIDE:  Is this AIX you're finally producing

34

1    us?

2           MR. MARRIOTT:  Let me tell you what you have here,

3    Your Honor.  You have two books.  The little book, which is

4    highly confidential under the terms of the protective order

5    in the case, is Unix source code.  This is the -- this is an

6    example of the secret book that we are alleged to have taken

7    parts of and dumped into the open source community.  The

8    other file that you have, the larger book, is a single file,

9    a single file of thousands of Unix source code.  What we're

10   said to have done is to have taken something out of this

11   little skinny book and dumped it into this book right here.

12   That's the essence of this case.

13          Now, we asked the SCO Group in discovery, Your

14   Honor, to tell us very simply what it was, specifically,

15   that we took out of this book and that we dumped into this

16   book.  We asked them the basics of their case.  We asked

17   them for the evidence that they have that we've done what

18   they allege in their complaint that we've done.  Now, SCO

19   objected to the requests.  They said that we didn't need to

20   know what they took from here and what we put into here

21   because we did it, after all, we should know.  That's the

22   first objection.  Then they say to us, You don't need to

23   know, IBM, because we are going to produce to you millions

24   of pages of paper and you can figure out for yourself where

25   in those millions of pages of paper what it is you

35

1    supposedly took from here and supposedly put into here is

2    found.  They tell us that we took methods, Your Honor.  They

3    tell us that we took trade secrets from here, but they won't

4    tell us precisely where they are.  We get that response

5    despite the fact that in order to file its complaint they

6    had to have the evidence they allege to have.  We get that

7    response despite the fact that the case law is abundantly

8    clear that the order of things is that a plaintiff first

9    tell the defendant what the trade secret at issue is, and

10   then the defendant provides the discovery.

11        If Your Honor takes a look at page 13 of the book,

12   we summarize here the upshot, essentially, of the case law

13   and the rules, which is that you may not dump on a party

14   undifferentiated documents and expect them to find from

15   those documents the answers.  And at paragraph -- at page 14

16   you see some of the cases, Your Honor, which address the

17   question of what the proper order of proceedings is here.

18   In the Porous case, Your Honor, for example, which case

19   concerned canisters, the Court there granted a motion to

20   compel specificity in answers.  The Court said that failure

21   to identify trade secrets with sufficient specificity

22   renders the Court -- and that was what the Court was

23   referring to earlier -- powerless to enforce any trade

24   secret claim.  The same is true in the Lynchval case, and

25   the same is true in the Xerox case.  The Court in the Xerox

1    case, Your Honor, said the defendant is entitled to know the

2    basis for the plaintiff's charges against it.  The burden's

3    on the plaintiff to specify the charges.  It's not on the

4    defendant to guess what they are.

5         Now, we move to compel, Your Honor, after trying

6    unsuccessfully for four months to get answers to our

7    questions.  Following our motion, we received supplemental

8    responses.  Those supplemental responses respectfully give

9    the impression of compliance.  They are in no way compliant

10   with what it is we requested.  I am going to lay that out

11   for Your Honor here momentarily.  Basically what SCO says,

12   Your Honor, is that in this giant haystack of code over

13   here, there are some trade secrets which we took and we

14   dumped over here, but they won't tell us where in this

15   haystack it is, and they won't show us where in this

16   haystack that it's found.

17        If you take a look, Your Honor, at page 15 of the

18   book, now, what you need to know is a little bit about the

19   size of the haystack and how small the needles are.  And at

20   the risk of mixing my metaphors, let me go back to the book

21   metaphor.  In this Unix book, Your Honor, this is actually

22   not the Unix book.  This is just a chapter in the book.

23   Unix System 5, which is the set of code which they say is at

24   issue in this case, consists of multiple releases and

25   multiple sub-release.  Release 4.2, release 3.2, release

```
 1    4.0, those books of codes are immense.  Each of those books,

 2    Your Honor, consists of many chapters.  It's not just one

 3    chapter here we're talking about.  Unix 4.0, for example,

 4    has 14,548 chapters.  This is a chapter.  This isn't the

 5    book.  14,548 chapters, files in these releases.  Within,

 6    Your Honor, the files in a given release, there are millions

 7    of lines of source code.  If you look here, Your Honor, you

 8    will see a number on the left margin of the code.  In this

 9    particular file, there are 11,891 lines of code, in one of

10    the files, in one of the chapters of which there are 14,548

11    in just one release, just one release of Unix.

12              The same, Your Honor, is true with respect to

13    Linux, and, indeed, there are actually many more books of

14    Linux than there are books of Unix.  Linux has multiple

15    versions.  There is version 2.5, there's version 2.4.

16    Within each of those versions there are multiple releases.

17    Versus 2.5, for example, has 76 different releases, from

18    2.5.0 to 2.5.75.  In other words, the book is enormous.

19    Within those books, Your Honor, in Linux, just as in Unix,

20    there are multiple chapters.  Each release includes a large

21    number of files.  If you look only at 2.5.69, Your Honor,

22    there are 14,086 files.  This is one of the files.  This is

23    one chapter in this immense Linux book which has been

24    written effectively over the internet into which we're

25    supposed to have dumped code that they won't identify for
```

1    us.  In these files, Your Honor, collectively, there are

2    millions and millions and millions of lines of code.  This

3    is one chapter in the book.  In this chapter, Your Honor,

4    there are 31,597 lines of code.  Where is the secret?  Is it

5    line 17,656?  What is it about it that's secret?  That's

6    what our discovery requests, Your Honor, are all about.

7             Now, what makes SCO's responses here -- let me say

8    this, what do we have from SCO by way of responses?  We

9    asked them to tell us where over here, Your Honor, lies the

10   material that we put into Linux.  There are many books, all

11   right.  They have identified for us not a single Unix book,

12   not a single book.  There are thousands of chapters of Unix

13   from which we're supposed to have taken things.  They

14   haven't identified for us a single Unix chapter, not a

15   single one.  There are millions of lines of code.  We've

16   asked for them.  They haven't identified a single Unix code

17   -- piece of code that we're supposed to have taken from

18   here and put over here.  With respect to Linux, they have

19   not told us in which -- from which -- into which Linux book

20   we are supposed to have taken this Unix material and placed

21   their secrets.  We don't know what book it is though there

22   are hundreds of books at issue.

23            As to the chapters, they told us, finally, Your

24   Honor, in their supplemental responses that there are 591

25   Linux files, Linux chapters, into which we can find some

39

```
 1    secret, which they won't identify, which comes from over
 2    here, which secret they've took and they put over here in
 3    591 files.  Now, 591 files, the 591 they've identified, Your
 4    Honor, aren't associated with any book, so we don't know
 5    into which of the more than a hundred books or potential at
 6    issue those 591 files reside.  And even if we did, even if
 7    we knew that it was 2.5.69, Your Honor, even if we knew
 8    that, there are 335,000 lines of code in the files they've
 9    identified.  They haven't identified for us a single line of
10    code.  Worse still, Your Honor, what they say in their
11    supplemental responses is, We may or may not have trade
12    secrets in those files.  Figure it out for yourself.  If you
13    read their supplemental responses carefully, they don't say,
14    These are our trade secrets and I swear under oath that
15    those are trade secrets.  What they say is, They might be in
16    there.  We'll let you know later whether they are or whether
17    they aren't in there.  That is not, Your Honor, I submit,
18    what it is the rules here require of a plaintiff in a case
19    of this kind.
20             Now, what makes SCO's approach to discovery here
21    particularly troubling is that from the beginning of the
22    case they have touted far and wide their evidence against
23    IBM, the strength of their case.  And I refer the Court,
24    just by way of example, to pages 16 and 17.  The additional
25    book I've just given Your Honor is back up for these
```

40

1    statements and for more statements.  Let me just focus you

2    on the four that are included here in this exhibit.  The CEO

3    of the SCO Group, Mr. McBride's brother, who's in the

4    courtroom today, has said, Your Honor, far and wide, there

5    is line by line code in Linux that is matching up to our

6    Unixware code.  In other words, We got you.  We found the

7    code in here.  It matches up to the code in here, but we're

8    not going to tell you what it is.  He says, We feel very

9    good about the evidence that's going to show up in court.

10   We'll be happy to show the evidence at the appropriate time.

11   The appropriate time, Your Honor, was four months ago when

12   they received our responses which were submitted to them in

13   June.  It's now been five months.

14        If you look at the next bullet point, IBM has

15   donated some of their high-end technologies into open

16   source.  We have examples of code being lifted verbatim.

17   Not just a line or two, it's an entire section and in some

18   cases an entire program.  Where is the code, Your Honor?  We

19   haven't seen it.  It's not in their discovery responses.

20        The next bullet, Portions of derivative works of

21   Unix System 5 code are found in Linux.  We have begun the

22   process of showing parts of the violating code to

23   appropriate parties under nondisclosure agreements.  That's

24   June 6th.  That's before we served our discovery responses.

25   We haven't seen that code, Your Honor.  We shouldn't have to

41

1    have a non -- we have a protective order in this case.  We

2    ought to be able to have at least access to what it is

3    everybody else is supposedly seeing.

4            If you look at the last bullet point, Your Honor,

5    The month of June is show and tell time.  We're not going to.

6    show just two lines of code.  We're going to show hundreds

7    of lines of code and that's just the tip of the iceberg.

8            Take a look, if you would, please, Your Honor,

9    back at page 14 of our book, alleged misappropriated trade

10   secrets or confidential information must, under the case

11   law, be specified.  The Lynchval case concerned computer

12   programs.  The Court there affirmed a decision of the

13   magistrate judge to strike an expert report because the

14   plaintiff in the case had failed to adequately disclose the

15   trade secrets.  The trade secrets there are disclosed with

16   more particularity than are the trade secrets here.  The

17   plaintiff in that case said to the defendant, There are four

18   documents.  In those four documents there are 40 functions

19   of the computer.  Nineteen of those 40 are ours.  Figure it

20   out yourself.  The Court in this case said that's

21   unacceptable.  By comparison here, Your Honor, we've been

22   given haystacks of millions of lines of code and been told

23   to figure it out for ourselves.  We know, after all, they

24   say, we're the bad guy.  We supposedly dumped their Unix

25   property into Linux.  But they won't tell us what it is.

42

1            Notably, Your Honor, notwithstanding the case

2      cited by Mr. McBride, the SCO Group has not cited a single

3      case to contradict these cases.  The case to which Mr.

4      McBride refers from the Ninth Circuit does not contradict

5      these principals.  Indeed, it's a copyright case, which at

6      present at least is entirely irrelevant to the SCO Group's

7      claims against IBM that they've asserted no copyright claim,

8      and even when they do, as they're now apparently going to

9      do, the copyright law has absolutely no bearing, Your Honor,

10     on whether or not they are required to tell us what the

11     supposed trade secret here is.

12            Now, why does this matter so much to IBM?  Putting

13     aside the fact that we need to know what it is that we

14     supposedly did so that we can defend ourselves, the SCO

15     Group's activities are not limited, Your Honor, to telling

16     the world how great their case is.  They are threatening

17     Linux users with lawsuits.  It's like they're standing

18     outside the Barnes and Noble, Your Honor, and a customer

19     walks out having purchased a new Linux book, and the SCO

20     Group says, Wait a minute.  Stop right there.  That Linux

21     book includes our Unix property.  You pay us or we're going

22     to sue you, and if you have a problem with it, go talk to

23     IBM.  They know what they did.  They took the secrets out of

24     Unix and they stuck them into Linux.  Take it up with them.

25     We showed them what the evidence is.

1              Your Honor, they haven't showed us what the

2      evidence is.  That's what these motions are about.  Your

3      tentative ruling, I think, is right on the mark and we would

4      urge you to endorse it as your final ruling.

5              I don't contemplate, Your Honor, walking through

6      the shortcomings of each of SCO's requests.  I think they're

7      laid out adequately in our briefs.  Let me say simply this,

8      according to SCO's CEO, in a November 12th television

9      interview with KSL, This is, he says, the biggest issue in

10     the computer industry in decades.  The balance of the

11     software industry is hanging on this.  This, Your Honor, is,

12     as you can read for yourself, one of many statements made by

13     this company about its great evidence against IBM, and yet

14     it refuses to give us the evidence on which it's based its

15     present business model.  Some of the responses give the

16     impression of providing specificity.  In fact, they don't

17     provide any.  The rules don't permit this approach to

18     discovery, Your Honor, and it is particularly troubling to

19     us, since SCO's CEO has publicly stated that he's glad to

20     see the case drag on since, in his view, delay merely

21     increases the SCO Group's damages against IBM.

22             It is undisputed that we're entitled to the

23     information that we've requested here.  SCO hasn't even

24     argued otherwise, Your Honor.  The only question on these

25     motions is whether they've given us what we've asked for,

1    and the answer to that is they have not.  And I would

2    submit, Your Honor, that no reasonable person could

3    conclude, in view of our requests and their responses, that

4    they've given us what we've asked for.  We think their

5    allegations are meritless.  We don't believe they had any

6    evidence at the time they filed this case, and we don't

7    think they have any evidence now.  And we submit we're

8    entitled to hear from them what it is they think they have

9    that IBM has done.  If they're not required, Your Honor, now

10   to provide the answers to these questions, then we're going

11   to be in the dark as to what the case is about, we're not

12   going to be in a position to defend ourselves and we're not

13   going to advance this case to a just and a prompt

14   resolution.

15              THE COURT:  I understand your position.

16              MR. MARRIOTT:  Thank you, Your Honor.

17              THE COURT:  Thank you for you comments.

18              Mr. McBride, I'll give you 10 minutes.

19              MR. MCBRIDE:  Thank you, Your Honor.

20              I think my rebuttal is going to be a best effort

21   in open court to answer the questions posed by Mr. Marriott

22   at the broad level, and I believe that if I do this at the

23   broad level, I think that the requests that we are seeking

24   of fact and the methods that we are seeking is going to come

25   clear and that that should be the basis for the Court's

45

1   ruling.

2           There is no trade secret in Unix system files.

3   That is on the record.  No problem with that.  There are

4   trade secrets from Unixware, which is SCO's version of Unix

5   that was given to IBM in the joint development project.

6   Now, this may not be as much detail as we all need to get

7   into, but I'll clearly say that System 5 is in the book that

8   Mr. Marriott referred to and properly so.  There's nothing

9   secret in there.  There may be copyrighted code in there and

10  we assert that there is, but that's not trade secret.  Their

11  trade secrets are in Unixware that emanate from the joint

12  development project.  And as we move forward in discovery,

13  we should focus our efforts on the trade secret claims

14  relating to that joint activity between our companies that

15  started in 1997 and ended abruptly in 2000.

16          Now, confidential information, Your Honor, is a

17  very different animal.  Confidential information is not

18  treated as a trade secret, necessarily, under the law.  We

19  have a unique case here.  The confidential information we're

20  talking about is stuff that Mr. Marriott's client created

21  but we didn't ever get to see.

22          THE COURT:  The protective order addresses that.

23  There's a protective order in place.

24          MR. MCBRIDE:  No, Your Honor, excuse me.  The

25  confidential information is in the derivative works prepared

1   by Mr. Marriott's client that we hope to receive under the
2   -- under the -- our discovery requests but we haven't seen
3   one word of yet. We hope to see that. And once we see AIX
4   and all versions of it, then we will be in a position to be
5   able to say, Huh, you know what? This stuff you did in
6   derivative works, you own it, but you contributed to Linux
7   improperly, and, therefore, we have a claim in state law
8   contract for breach of confidential information, which is
9   completely separate from trade secrets. So it's just really
10  important that we get a scalpel here and understand what we
11  are looking for. Trade secrets, nothing in Unix System 5
12  that exists in Unixware with respect to the joint
13  development project. Confidential information emanates from
14  IBM's own development of AIX that we never got to see, but
15  we, nevertheless, have the contractual right to control the
16  use of in very limited instances, which is involved in this
17  particular case. So, hopefully that clarifies, and maybe
18  even for Mr. Marriott's arguments, if we haven't done a good
19  job of putting that information to him.
20          Now, if -- we're spending a few more minutes on
21  public statements made by our executives. And, Your Honor,
22  there are other companies that have contributed code to
23  Linux, the biggest one of which is Silicon Graphics.
24  Silicon Graphics Company has taken direct lines of Unix
25  System 5 code, not a derivative work code, Unix System 5 and

47

1   distributed it to Linux.  I'll represent to the Court in

2   just broad terms that SGI has, at some level, acknowledged

3   that occurred.  I won't characterize SGI's own writing, but,

4   in fact, wrote an open letter acknowledging, at some level,

5   that that occurred.

6          The evidence that our executives have talked about

7   in the public has had to do with Unix System 5 code

8   contributed by Silicon Graphics.  Has nothing to do with

9   IBM.  Now, the evidence against IBM that our executives have

10  talked about, Your Honor, that we know IBM has contributed

11  into Linux, specifically, and we've talked about this,

12  relate to the code that came from Dynix, that is the NUMA

13  code and the RCU code.  IBM advertises the fact that they

14  contributed this.  We have produced those files in discovery

15  saying, We think you contributed.  We know you contributed

16  NUMA and RCU.  We think it's a violation.  Now, whether it

17  is a violation or not is not of moment in this particular

18  hearing.  That's something that we will argue about at a

19  different day and a different time.  But, Your Honor, just

20  at least in support of the statements made by our

21  executives, that's what they have talked about is that IBM

22  has taken the Dynix code and wholesale contributed very

23  important parts of it relating to multiprocessor code, and

24  IBM has taken the methods learned and really improved the

25  multiprocessing capabilities of Linux in a way that violates

1     either the confidential information or some copyrighted

2     code.  That's what we've been saying all along, and that's

3     consistent with what we continue to say.

4              So, I don't know if my 10 minutes are up, but

5     here's what I think, Your Honor, is the appropriate order

6     that we would request is entered, that we, in fact, take a

7     scalpel out, and we -- and, Your Honor, just for fun here, I

8     brought the last CD's produced by both sides in this

9     particular case of information.  Ours is numbered 126 and

10    theirs is numbered 21.  This morning we actually received 22

11    and 23, as I understand it.  Which is simply to say we've

12    produced a hundred more CD's of documents than they have.

13    What we want and what we need is all versions of AIX, all

14    versions of Dynix.  We have repeatedly asked for it since

15    June.  We have not seen one line of any of that until,

16    apparently, this morning two CD's of a version of Dynix were

17    produced.  So the appropriate order, Your Honor, is simply

18    this, that first of all, IBM produces all of the Dynix and

19    AIX, and we then compare it with our Unixware code to be

20    able to draw more concrete allegations, more concrete

21    answers to the interrogatories, and that once IBM has

22    produced its code so we can compare it, and we have 30 days

23    to do that, we'll take another crack at answering the

24    interrogatories in another fashion.  But we just think

25    that's the fair way of doing this, and, Your Honor, to stop

49

```
 1    discovery would be absolutely unjust in this case because

 2    then, again, remember, the derivative works, we never saw

 3    them in the first case.  We're not saying they're trade

 4    secret.  We're saying IBM had a contractual obligation to

 5    not disclose those, so it would tie our hands, absolutely

 6    improperly, and give IBM strategic advantages that would be

 7    not right in this case, as far as how discovery should

 8    proceed.  So that's our request in terms of how this ought

 9    to be handled, Your Honor.

10              THE COURT:  Thank you, Mr. McBride.

11              Mr. Marriott, anything in brief response?

12              MR. MARRIOTT:  Sure, Your Honor.

13              Unless the Court wishes, I won't respond in full

14    to SCO's motion to compel IBM except, Your Honor, to say

15    this, IBM has produced what amounts to the equivalent of

16    more than a million pages of paper.  We have not refused to

17    provide discovery.  We have said the discovery must be

18    tailored to the allegations in the complaint.  We've

19    provided the discovery that we think can fairly be provided

20    in view of their allegations.  We have provided Dynix code

21    as of last night.  We would have provided it earlier, Your

22    Honor, but for the third party notice process that's

23    required.  We intend to provide AIX code to them.  We intend

24    to provide the code when the process of third party

25    notification is compete.
```

```
 1              What we don't intend to do, unless this Court
 2    makes us do it, is to produce every conceivable iteration
 3    and version of AIX and Dynix.  As we lay out in our papers,
 4    that amounts to somewhere in the order of 40 million pages
 5    of paper.  There's no cause for that.  It bears no relevance
 6    to the case as we presently know it.  And we would
 7    respectfully ask that the Court adhere to its tentative
 8    rulings, grant IBM's motions in their entirety and either
 9    deny or hold in abeyance the SCO motion.
10              Thank you, Your Honor.
11              MR. MCBRIDE:  One very brief sur-reply, Your
12    Honor?  We want the 40 million pages.  We'll digest it.
13              THE COURT:  Are you yourself going to review them
14    by Sunday, Mr. McBride?
15              MR. MCBRIDE:  Your Honor, if we have it in
16    computer readable form, our experts can analyze it.  Unless
17    we have it from IBM, we can never know the ways they've
18    improperly taken their derivative work code and made Unix
19    better in violation of our contract.  That would be an
20    injustice, Your Honor.
21              MR. MARRIOTT:  May I just --
22              THE COURT:  Last word.
23              MR. MARRIOTT:  -- respond briefly to that one,
24    Your Honor?  If you take a look at the little book that we
25    provided Your Honor of the Linux development process, what
```

51

1    makes this -- independent of the fact that there are no case

2    -- there is no case law authority for what Mr. McBride

3    suggests, independent of that, if you take a look, Your

4    Honor, at the chart, you will see that the Linux development

5    process is an open process. That's what makes Linux great.

6    It Mr. McBride and any of the SCO executives want to know

7    what anybody's contributed to the Linux operating system,

8    they can find it out for themselves by getting on the

9    internet at any one of the number of sites that exist there

10   and doing a search for IBM.

11          Thank you, Your Honor.

12          THE COURT: Counsel, I am ready to rule in this

13   matter. I think it is essential to get the ball rolling in

14   this circumstance, and I'm convinced that my initial

15   intended order is appropriate in this case. And I say that,

16   acknowledging, Mr. McBride, that at the conclusion of what

17   will be required of SCO, then we will visit your issues to

18   determine the breadth and specificity that will be allowed

19   you. We're going to do this both ways.

20          At this time, however, I will grant defendant

21   IBM's motion to compel answers to both sets of

22   interrogatories, and that would include, I think, 12 and 13,

23   if those are the ones that are questionable. SCO is to file

24   its responses within 30 days of the entry of this order, and

25   if, for some reason, it is in good faith unable to obtain a

 1   particular portion of that, then it must file the

 2   appropriate affidavits indicating why it cannot.  It is to

 3   respond -- it should file its discovery and respond in order

 4   to comport with the -- or correct the deficiencies that are

 5   set forth in the defendant's addendum that's filed November

 6   the 4th.

 7          Mr. Marriott, I would ask you, if you are able to

 8   at this time, to identify those particular documents which

 9   you are requesting.  Are you able to do that?

10          MR. MARRIOTT:  I can begin that, sure, Your Honor.

11          THE COURT:  All right, let me just indicate

12   further that those responses are to identify, with

13   specificity, the source codes that you are claiming form the

14   basis for your action.

15          Now, with regard to the documents.

16          MR. MARRIOTT:  Your Honor, I'm happy to, by way of

17   supplement, to provide a full list.  We have a number of

18   document requests, somewhere in the order of 50.  Of course,

19   we want answers to all of those.  The principal problem here

20   has not been that SCO has objected to providing them.  It's

21   said that it would provide them, but it simply hasn't done

22   it.  We think that the process is being gamed in the sense

23   that we're told, Well, we're in a rolling production.

24   You'll get them eventually.  We know there are important

25   documents that are missing, and let me try to itemize them

1      for the Court, if I may, some of those.

2                 MR. MCBRIDE:  Do you have a list?

3                 THE COURT:  I don't want to take -- perhaps if

4      they're in written form, you can provide that to Mr. McBride

5      and --

6                 MR. MARRIOTT:  I'm happy to do that, Your Honor.

7                 THE COURT:  -- the same requirement will be

8      enforced.  In the meantime, all other discovery is

9      postponed.  And the -- you -- both parties will be expected

10     to abide by the protective order that is currently in place.

11     I will set this matter for a hearing.

12                Mr. Marriott, I would ask that you prepare the

13     order in this matter and submit it to me no later than

14     Wednesday of next week.  Assuming that it is an appropriate

15     order, then your 30 days would begin to run, Mr. McBride,

16     from that period of time.  We will set a hearing, then, for

17     approximately two weeks thereafter, so we are talking about

18     the middle of January, all right.  Does anybody have a

19     period of time, let's say, in the week of January 12th when

20     you could not be present for a morning hearing?

21                MR. MARRIOTT:  No, Your Honor.

22                THE COURT:  All right.  Does that give you

23     sufficient time?  I am holding you to the 30 days, but if we

24     get this order signed by Wednesday of next week, let's make

25     it even the fourth week of January, which is after the

```
 1    19th.  Why don't we do it Friday, then, the 23rd at 10

 2    o'clock, again, and then we will address the remaining

 3    motions of SCO, all right.

 4              MR. MCBRIDE:  So Your Honor is not ruling on our

 5    motions at this point in time; is that correct?

 6              THE COURT:  No.  I'm not ruling on your motions,

 7    and that is inherent in my order that further discovery be

 8    postponed.

 9              MR. MCBRIDE:  Very good, Your Honor.

10              THE COURT:  We'll address them then.

11              MR. MCBRIDE:  So and we'll, in this next -- the

12    January hearing then we will address the -- our pending

13    motions as well?

14              THE COURT:  Yes.

15              MR. MCBRIDE:  Thank you, Your Honor.

16              THE COURT:  All right.  That's with the assumption

17    that the discovery that SCO is to complete has been

18    completed, all right, and with the required specificity.  So

19    what my intention is, then, is to then address the motions

20    of SCO.

21              MR. MCBRIDE:  Just -- I'm just thinking

22    procedurally whether we will have time to actually brief and

23    agree upon whether we -- the specificity is required in

24    advance of the hearing or whether we will be doing that at

25    the hearing.
```

55

1          THE COURT:  No.  I would think that should be in

2     place prior to the hearing.  If you want a date later than

3     that, that's fine.  I don't care.

4          MR. MCBRIDE:  Let's hold that date for the time

5     being, and then if, for whatever reason, it appears

6     problematic, we'll notify the Court.  Does that seem

7     appropriate?

8          THE COURT:  It does.

9          MR. MARRIOTT:  That's fine by us, Your Honor.

10          THE COURT:  If there's nothing further, counsel,

11     we'll be in recess in this matter.

12          (Whereupon, the hearing was concluded.)

13

14                    *      *      *

15

16

17

18

19

20

21

22

23

24

25

56

```
 1    STATE OF UTAH          )

 2                           ) ss

 3    COUNTY OF SALT LAKE )

 4

 5

 6

 7

 8              I, Dawn E. Brunner-Hahn, Registered Professional

 9    Reporter, within and for the county of Salt Lake, State of

10    Utah do hereby certify:

11              That the foregoing proceedings were taken before

12    me at the time and place set forth herein, and were taken

13    down by me in shorthand and thereafter transcribed into

14    typewriting under my direction and supervision;

15              That the foregoing pages contain a true and

16    correct transcription of my said shorthand notes so taken.

17              In Witness Whereof, I have subscribed my name this

18    9th day of December, 2003.

19

20

21

22

23                         DAWN E. BRUNNER-HAHN
                           REGISTERED PROFESSIONAL REPORTER
24

25
```

**EXHIBIT 7**

SNELL & WILMER LLP
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
15 West South Temple
Gateway Tower West
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
Thomas G. Rafferty (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>Defendant. | **DEFENDANT IBM'S SECOND SET<br>OF INTERROGATORIES AND<br>SECOND REQUEST FOR<br>PRODUCTION OF DOCUMENTS**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball |

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure,

defendant International Business Machines Corporation ("IBM") submits this Second Set

of Interrogatories and Second Request for the Production of Documents to plaintiff The

SCO Group, Inc. ("plaintiff").

Plaintiff is directed to give answers to the written interrogatories separately, fully, in writing, under oath, and in accordance with the following definitions and instructions.  Plaintiff is requested to produce the documents and things in its possession, custody or control pursuant to the document requests.

Answers to the interrogatories, and all documents and things responsive to the document requests must be served on the undersigned attorneys for IBM at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY 10019 within 30 days of service of these interrogatories and document requests.

### Interrogatories

**INTERROGATORY NO. 12**:

Please identify, with specificity (by file and line of code), (a) all source code and other material in Linux (including but not limited to the Linux kernel, any Linux operating system and any Linux distribution) to which plaintiff has rights; and (b) the nature of plaintiff's rights, including but not limited to whether and how the code or other material derives from UNIX.

**INTERROGATORY NO. 13**:

For each line of code and other material identified in response to Interrogatory No. 12, please state whether (a) IBM has infringed plaintiff's rights, and for any rights IBM is alleged to have infringed, describe in detail how IBM is alleged to have infringed plaintiff's rights; and (b) whether plaintiff has ever distributed the code or other material or otherwise made it available to the public, as part of a Linux distribution or otherwise, and, if so, the circumstances under which it was distributed or otherwise made available, including but not limited to the product(s) in which it was distributed or made available, when it was distributed or made available, to whom it was distributed or made

available, and the terms under which it was distributed or made available (such as under the GPL or any other license).

## Document Requests

### REQUEST NO. 74:

All documents relating to SCO Forum 2003.

### REQUEST NO. 75:

All documents relating to the information requested in Interrogatory Nos. 12-13.

## Instructions and Definitions

Defendant IBM hereby incorporates by reference all instructions, definitions and rules contained in Rule 33 and Rule 34 of the Federal Rules of Civil Procedure and the local rules or individual practices of this Court and supplements them with the definitions and instructions set out in Defendant IBM's First Set of Interrogatories and First Request for the Production of Documents, which are incorporated herein by reference.

DATED this 16th day of September, 2003.

SNELL & WILMER LLP

Alan L. Sullivan
Todd M. Shaughnessy

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Thomas G. Rafferty
David R. Marriott

*Counsel for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

266983.1

3

Of counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York  10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*