RECEIVED CLERK
**FILED**

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **DECLARATION OF AMY F. SORENSON IN SUPPORT OF IBM'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS ON SCO'S PRIVILEGE LOG** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV-0294 DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

I, Amy F. Sorenson, declare as follows:

1.      I represent IBM in the lawsuit brought by SCO against IBM, titled <u>The SCO</u>

<u>Group, Inc. v. International Business Machines Corporation</u>, Civil No. 2:03-CV-00294 DAK (D.

Utah 2003).  This declaration is submitted in support of IBM'S Motion to Compel Production of

Documents on SCO's Privilege Log.

2.      Submitted herewith are true and correct copies of the following documents:

(a)      Exhibit 1 is material printed from Bell Labs (Lucent Technologies) web

site, entitled "The Creation of the Unix Operating System", <u>available at</u>

http://www.bell-labs.com/history/unix/#;

(b)      Exhibit 2 is a copy of an AT&T News Release, dated June 25, 1990,

<u>available at</u> http://www.att.com/news/0690/900625.ula.html;

(c)      Exhibit 3 is a copy of an AT&T Press Release, dated June 14, 1993,

<u>available at</u> http://www.att.com/news/0693/930614.ulb.html;

(d)      Exhibit 4 is  a copy of the Asset Purchase Agreement between The Santa

Cruz Operation, Inc. and Novell, Inc., dated September 19, 1995, including schedules 1.1(a) and

1.1(b), but excluding all other schedules, amendments, and attachments;

(e)      Exhibit 5 is a copy of a News Release from The Santa Cruz Operation,

Inc., dated May 4, 2001, <u>available at</u> www.tarantella.com/news/releases/2001/6988.html;

(f)      Exhibit 6 is a copy of a News Release from The Santa Cruz Operation,

Inc., dated May 7, 2001, <u>available at</u> http://www.tarantella.com/news/releases/2001/6995.html;

(g)     Exhibit 7 is a copy of a News Release from The Santa Cruz Operation,

Inc., dated May 10, 2005, <u>available at</u> http://www.tarantella.com/news/releases/2005/9.html;

(h)     Exhibit 8 is a true and correct copy of a letter from Amy F. Sorenson to

Edward Normand, dated September 2, 2005;

(i)     Exhibit 9 is a copy of a letter from Edward Normand to Amy F. Sorenson,

dated September 16, 2005.

3.     I declare under penalty of perjury that the foregoing is true and correct.


Executed:  September 2th, 2005.

Salt Lake City, Utah

_____
                                    Amy F. Sorenson

365828.3

3

**EXHIBIT 1**

Home | Solutions and Products | Customer Support | Bell Labs | About Lucent |          Glossary

Search
[Go]
Advanced search



**Lucent Technologies**
Bell Labs Innovations

Bell Labs
Projects
People
History
Technology
Career Opportunities
Student Aid
Software Downloads
FAQs

# The Creation of the UNIX* Operating System

After three decades of use, the UNIX* computer operating system from Bell Labs is still rega of the most powerful, versatile, and flexible operating systems (OS) in the computer world. is due to many factors, including its ability to run a wide variety of machines, from micros to supercomputers, and its portability -- all of which led to its adoption by many manufacturers

Like another legendary creature whose name also ends in 'x,' UNIX rose from the ashes of a organizational effort in the early 1960s to develop a dependable timesharing operating syste

The joint effort was not successful, but a few survivors from Bell Labs tried again, and what a system that offers its users a work environment that has been described as "of unusual sir power, and elegance...."

The system also fostered a distinctive approach to software design -- solving a problem by interconnecting simpler tools, rather than creating large monolithic application programs.

Its development and evolution led to a new philosophy of computing, and it has been a neve source of both challenges and joy to programmers around the world.

Next: Before Multics there was chaos, and afterwards, too

---



The Creation of the UNIX* Operating System
An Overview of the UNIX* Operating System
Dennis Ritchie -- Biography
Ken Thompson -- Biography
Bell Labs' Early Contributions to Computer Science
Lucent's Contributions to Computer Science, Software and Data T
• For more information

Terms of use    Privacy statement    Agere
Copyright © 2002 Lucent Technologies. All rights reserved. *

**EXHIBIT 2**



# News Release

Dick Muldoon
201-829-7212 (office)
201-635-6699 (home)

## FOR RELEASE MONDAY, JUNE 25, 1990

MORRISTOWN, N.J. -- AT&T's UNIX Software Operation today was renamed UNIX System Laboratories, Inc.

The change in name follows the recent reincorporation of AT&T International's European and Asian UNIX(R) System business subsidiaries as wholly owned subsidiaries of UNIX System Laboratories, Inc. Relevant AT&T and UNIX Software Operation assets were assigned to the new company in November 1989.

"Today's announcement reflects the changes that have taken place in the way AT&T develops, markets and manages UNIX System V," said Larry Dooling, president of UNIX System Laboratories (USL). "USL is a separate business, committed to powering the Open Systems revolution by creating and providing our customers with the best system software, tools and services. We are committed, in concert with UNIX International and in accord with UI's UNIX System V Roadmap, to keep UNIX System V and other USL products at the heart of the worldwide Open Systems movement."

Peter Cunningham, president of UNIX International, said, "In the last 18 months AT&T has made good on its commitment to treat UNIX System V as the industry asset it is and to open the UNIX System V development process to the entire industry. We look forward to working with USL for years to come, managing the evolution of UNIX System V in the best interests of all vendors and customers who invest in Open Systems."

UNIX System Laboratories also announced an internal restructuring of the company into two business units: UNIX System V Software and Open Solutions Software.

The UNIX System V Software business unit, headed by Michael J. DeFazio, is responsible for the evolution of the UNIX System V base operating system. The Open Solutions Software business unit, headed by Joel A. Appelbaum, is responsible for system software that complements the base operating system. Such products include the C and C++ programming languages and network system software, such as the TUXEDO(TM) Transaction Processing System and the OSI Communications Platform.

UNIX System Laboratories Europe, Ltd., managed by Robert W. Mitze, is headquartered in London. UNIX System Laboratories Pacific, Ltd., managed by James L. Clark, is headquartered in Tokyo. Both operations were formerly subsidiaries of AT&T International.

The UNIX Software Operation was created as a separate business unit of AT&T in January 1989, in order to separate AT&T's UNIX System source code business from its computer systems business. UNIX System Laboratories, Inc., was incorporated as a separate subsidiary of AT&T in Delaware in November 1989.

UNIX International (UI) is a consortium of industry vendors and end users committed to UNIX System V as the base of the worldwide Open Systems movement. UI provides technical guidance to USL on the evolution of UNIX System V through the UNIX International UNIX System V Roadmap process.

## KEYWORDS:

News Online | Press Archive | Newsroom | Search Press Archive | Customer Service | FAQs

| Search AT&T →

Terms and Conditions. Privacy Policy
Copyright © 1998 AT&T. All rights reserved.

**EXHIBIT 3**



**News Release**

FOR RELEASE MONDAY, JUNE 14, 1993

# Novell completes acquisition of UNIX System Laboratories

PROVO, Utah -- Novell Inc. the computer networking company announced the completion of its acquisition of UNIX System Laboratories following a vote of approval Monday by the shareholders of USL.

Novell will exchange 11.1 million shares of its common stock for the outstanding shares of USL stock it does not already own. The tax-free exchange of shares is being accounted for as a pur- chase. As indicated in December 1992 when the transaction was first announced, Novell expects to incur a one-time write-off of purchased research and development of approximately $270 million, based on the valuation of the transaction.

This write-off will be reflected in Novell's financial results for its third fiscal quarter ending July 31, 1993. On a per share basis, this purchased R&D will represent a charge against Novell earnings of up to 85 cents in its third fiscal quarter.

USL has become a wholly owned subsidiary of Novell. Roel Pieper continues as president and chief executive officer of the USL subsidiary, reporting to Raymond J. Noorda chairman of Novell. Pieper also becomes an executive vice president at Novell. The Univel company, formed as a partnership between Novell and USL in December 1991, continues to operate from its headquarters in San Jose, California.

Completion of the acquisition follows the signing of a letter of intent between Novell and AT&T on Dec. 20, 1992. The companies reached a definitive agreement for the transaction on Feb. 16, 1993.

AT&T now holds approximately 9 million shares of Novell com- mon stock, or three percent of the outstanding shares, after ex- changing their 77 percent interest in USL for Novell stock. AT&T has indicated its intention to hold its shares of Novell as an investment.

USL, based in Summit, N.J., develops and markets the UNIX* System V operating system, the TUXEDO* Enterprise Transaction Processing System, the C++ Programming Language System and other standards-based system software products to the worldwide com- puter industry. USL also provides education and management con- sulting for UNIX systems and related technologies.

Univel develops and markets UnixWare*, an easy-to-use UNIX system that is tightly linked to network services provided by Novell's NetWare* system software. UnixWare is an advanced 32-bit operating system for computers using industry standard Intel microprocessors.

Novell Inc. is the computer networking company, developer of network services and specialized and general purpose operating system products, including NetWare, UnixWare and Novell DOS. Novell's NetWare network computing products manage and control the sharing of services, data and applications

among computer workgroups, departmental networks and across enterprise-wide in- formation systems.

---

* UNIX is a registered trademark in the United States and elsewhere, licensed exclusively through X/Open Company Ltd. NetWare and TUXEDO are registered trademarks of Novell Inc. UnixWare is a trademark of Univel.

---

**For information about UNIX system, visit Novell's website http://www.novell.com/.**

---

**For information about the services AT&T offers, customers should visit:**

AT&T Business Services
AT&T Wireless Services
AT&T PrePaid Card Center
AT&T Consumer Catalog
AT&T Small Business Catalog

---

**KEYWORDS:**

---

News Online | Press Archive | Newsroom | Search Press Archive | Customer Service | FAQs

| Search AT&T ➜

Terms and Conditions. Privacy Policy
Copyright © 1998 AT&T. All rights reserved.

**EXHIBIT 4**

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

THE SANTA CRUZ OPERATION, INC.

AND

NOVELL, INC.

Dated as of September 19, 1995

3PHPA1\RB\0147981.06
09/19/95

# TABLE OF CONTENTS

Page

**ARTICLE I**

THE ACQUISITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
1.1   Purchase of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
1.2   Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
1.3   Transfer of Customers . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
1.4   Non-Assignment of Certain Items . . . . . . . . . . . . . . . . . . .   4
1.5   Transitional Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
1.6   License Back of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
1.7   Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

**ARTICLE II**

REPRESENTATIONS AND WARRANTIES OF SELLER . . . . .   6
2.1   Organization, Standing and Power . . . . . . . . . . . . . . . . . . .   6
2.2   Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
2.3   Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
2.4   Compliance with Law . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
2.5   No Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
2.6   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
2.7   Absence of Certain Changes . . . . . . . . . . . . . . . . . . . . . . . .   8
2.8   Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
2.9   Tax Returns and Reports . . . . . . . . . . . . . . . . . . . . . . . . . .   9
2.10   Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
2.11   Title to Properties; Absence of Liens and Encumbrances . . . . . . . . . .   11
2.12   Governmental Authorizations and Licenses . . . . . . . . . . . . . . . . . .   12
2.13   Environmental Matters . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
2.14   Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
2.15   Proprietary Information and Inventions and Confidentiality
        Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
2.16   Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
2.17   Investment Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
2.18   Reliance Upon Seller's Representations . . . . . . . . . . . . . . . . . . .   13
2.19   Receipt of Information . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
2.20   Accredited Investor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
2.21   Restricted Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
2.22   Legends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
2.23   No Implied Representations . . . . . . . . . . . . . . . . . . . . . . . . .   14

## ARTICLE III

REPRESENTATIONS AND WARRANTIES OF BUYER ..... 14
3.1 Organization, Standing and Power ........................... 15
3.2 Authority ................................................. 15
3.3 Capitalization ............................................. 16
3.4 SEC Documents; Buyer Financial Statements ................... 16
3.5 Compliance with Law ...................................... 17
3.6 No Defaults ............................................... 17
3.7 Litigation ................................................. 17
3.8 Absence of Certain Changes ................................ 17
3.9 Agreements ............................................... 18
3.10 Tax Returns and Reports ................................... 18
3.11 Technology ............................................... 19
3.12 Governmental Authorizations and Licenses .................... 19
3.13 Environmental Matters .................................... 19
3.14 Proprietary Information and Inventions and Confidentiality
Agreements ............................................... 19
3.15 Status of Shares ........................................... 19
3.16 No Implied Representations ................................ 19

## ARTICLE IV

CERTAIN COVENANTS ............................... 20
4.1 Conduct of Business of Seller .............................. 20
4.2 Conduct of Business of Buyer .............................. 20
4.3 No Solicitation ............................................ 21
4.4 Access to Information ..................................... 21
4.5 Confidentiality ............................................ 21
4.6 Expenses ................................................. 21
4.7 Public Disclosure ......................................... 22
4.8 Consents ................................................. 22
4.9 Commercially Reasonable Efforts ........................... 22
4.10 Notification of Certain Matters ............................. 22
4.11 Delivery of Schedules ..................................... 22
4.12 Additional Documents and Further Assurances ................ 23
4.13 Treatment of Employees of the Business ..................... 23
4.14 Tax Returns .............................................. 23
4.15 Bulk Sales ............................................... 24
4.16 SVRX Licenses ........................................... 24
4.17 Audited Financials ........................................ 25
4.18 Development of Merged Product ............................ 25
4.19 License of Networking Services .............................. 25

ARTICLE V

            CONDITIONS TO THE ACQUISITION . . . . . . . . . . . . . . . . .  25
    5.1    Conditions to Obligations of Each Party to Effect the Acquisition  . . .  25
    5.2    Additional Conditions to Obligations of Seller . . . . . . . . . . . . . . . . .  26
    5.3    Additional Conditions to the Obligations of Buyer . . . . . . . . . . . . . .  27

ARTICLE VI

            CERTAIN CORPORATE GOVERNANCE MATTERS . . . . . . .  27
    6.1    Nomination of Director to Buyer's Board of Directors . . . . . . . . . . . .  27
    6.2    Right to Maintain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
    6.3    Right of First Refusal on Change of Control . . . . . . . . . . . . . . . . . . .  28
    6.4    Registration Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

6.5    Standstill Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
            Standstill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
            Exceptions to Standstill Provision . . . . . . . . . . . . . . . . . . . . . . . . . .  39
    (c)    Notice of Securities Purchases and Sales . . . . . . . . . . . . . . . . . . . . .  39
    (d)    Acts in Concert with Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
    (e)    Restrictions on Transfer of Securities . . . . . . . . . . . . . . . . . . . . . . .  39

        Buyer's Right of First Refusal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

ARTICLE VII

            TERMINATION, AMENDMENT AND WAIVER . . . . . . . . . . .  42
    7.1    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42
    7.2    Effect of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43
    7.3    Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43
    7.4    Extension; Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

ARTICLE VIII

            INDEMNIFICATION
    8.1    Survival of Representations, Warranties and Agreements . . . . . . . . . .  44
    8.2    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44
    8.3    Procedure for Indemnification with Respect to Third-Party Claims . . .  44

ARTICLE IX

            GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . .  45
    9.1    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45
    9.2    Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

| 9.3 | Interpretation | 47 |
|---|---|---|
| 9.4 | Counterparts | 47 |
| 9.5 | Entire Agreement | 47 |
| 9.6 | Severability | 47 |
| 9.7 | Other Remedies | 47 |
| 9.8 | Governing Law | 47 |
| 9.9 | Rules of Construction | 47 |

## INDEX OF EXHIBITS

**Exhibit**                     **Description**

Exhibit 5.1.(c)                 Form of Proposed Operating Agreement, including Exhibit A
                                and Exhibit B thereto and Eiger Development.

## INDEX OF SCHEDULES

Schedule 1.1(a)          Assets

Schedule 1.1(b)          Excluded Assets

Schedule 1.1(c)          Assumed Liabilities

Schedule 1.2(b)          Royalties relating to UnixWare product

Schedule 6.3(a)          Change of Control Parties

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of September 19, 1995 by and between The Santa Cruz Operation, Inc., a California corporation ("Buyer") and Novell, Inc., a Delaware corporation ("Seller").

## RECITALS

A.     Seller is engaged in the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare (collectively, the "Business").

B.     The Boards of Directors of each of Seller and Buyer believe it is in the best interests of each company and their respective stockholders that Buyer acquire certain of the assets of, and assume certain of the liabilities of Seller comprising the Business (the "Acquisition").

C.     In connection with the Acquisition Buyer will issue to Seller 6,127,500 shares of Common Stock of Buyer (the "Shares").

D.     In connection with the acquisition by Seller of the Shares, Buyer and Seller desire to set forth certain agreements with respect to the governance of Buyer following the closing of the Acquisition.

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the parties agree as follows:

## ARTICLE I

## THE ACQUISITION

1.1     Purchase of Assets.

(a)     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and Buyer will purchase and acquire from Seller on the Closing Date (as defined in Section 1.7), all of Seller's right, title and interest in and to the assets and properties of Seller relating to the Business (collectively the "Assets") identified on

Schedule 1.1 (a) hereto. Notwithstanding the foregoing, the Assets to be so purchased shall not include those assets (the "Excluded Assets") set forth on Schedule 1.1 (b):

      (b)    Assumption of Liabilities. At the Closing, Buyer shall assume those obligations and liabilities of Seller set forth on Schedule 1.1(c) hereto (collectively, the "Assumed Liabilities").

      (c)    Liabilities Not Assumed. Other than the Assumed Liabilities, Buyer shall not assume, nor shall Buyer or any affiliate of Buyer be deemed to have assumed or guaranteed, any other liability or obligation of any nature of Seller, or claims of such liability or obligation, whether accrued, matured or unmatured, liquidated or unliquidated, fixed or contingent, known or unknown arising out of (i) acts or occurrences related to any of the Assets, prior to the Closing Date, or (ii) any other liability or obligation of Seller which is not an Assumed Liability (collectively, the "Unassumed Liabilities"). Seller will remain responsible for all Unassumed Liabilities.

    1.2    Payments.

      (a)    Consideration for Assets: Stock. On the terms and subject to the conditions set forth in this Agreement, as full payment for the transfer of the Assets by Seller to Buyer, at the Closing Buyer shall assume the Assumed Liabilities and issue to Seller 6,127,500 shares of fully paid and nonassessable shares of Common Stock of Buyer (the "Shares" or the "Purchase Price").

      (b)    Royalties. Buyer agrees to collect and pass through to Seller one hundred percent (100%) of the SVRX Royalties as defined and described in Section 4.16 hereof. Seller agrees to pay Buyer an administrative fee of five percent (5%) of the SVRX Royalties. Seller and Buyer further acknowledge and agree that Seller is retaining all rights to the SVRX Royalties notwithstanding the transfer of the SVRX Licenses to Buyer pursuant hereto, and that Buyer only has legal title and not an equitable interest in such royalties within the meaning of Section 541(d) of the Bankruptcy Code. For purposes of administering the collection of SVRX Royalties, the parties acknowledge that the royalties shall continue to be recognized as royalties by Seller on an ongoing basis and the parties shall take such commercially reasonable steps as may be necessary to effectuate the foregoing for financial accounting and tax purposes. In addition, Buyer agrees to make payment to Seller of additional royalties retained by Seller in respect of the transfer of UnixWare and on account of Buyer's future sale of UnixWare products. The amounts and timing of additional royalties to be paid in connection with Buyer's sale of the UnixWare products are identified in detail on Schedule 1.2(b) hereto. Seller shall be entitled to conduct periodic audits of Buyer concerning all royalties and payments due to Seller hereunder or under the SVRX Licenses, provided that Seller shall conduct such audits after reasonable notice to Buyer and during normal business hours and shall not be entitled to more than two (2) such audits per year. The cost of

any such audit shall be borne by Seller, unless such audit reveals a payment shortfall in excess of 5% of amounts due hereunder in which case the cost of such audit shall be borne by Buyer.

(c)    Allocation of Purchase Price.  Within 45 days following the Closing Buyer shall prepare and deliver to Seller, subject to Seller's approval, an allocation of the Purchase Price plus any other consideration properly allocable among the Assets (the "Allocation").  The parties agree that all tax returns and reports (including Internal Revenue Service ("IRS") Form 8594) and all financial statements shall be prepared in a manner consistent with (and the parties shall not otherwise take a position inconsistent with) the Allocation unless required by the IRS or state taxing authority.  The Allocation shall be prepared in a manner consistent with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and the income tax regulations promulgated thereunder.

(d)    Transfer Taxes.  Buyer shall pay and promptly discharge when due the entire amount of any and all sales and use tax ("Sales Taxes") imposed or levied by reason of the sale of the Assets to Buyer.  The parties shall cooperate with each other to the extent reasonably requested and legally permitted to minimize any such Sales Taxes.

13      Transfer of Customers.

(a)    Transfer of Customers.

(i)     Intent.  It is the intent of parties hereto that all of the Business and all of Seller's backlog, if any, relating to the Business be transferred to Buyer.  Accordingly, all parties agree to facilitate the transfer of customers of the Business from Seller to Buyer following the Closing.

(ii)    Purchase Order Data.  Seller shall make available to Buyer, upon request (A) a list of all outstanding written customer orders, purchase orders and other customer commitments from the current customers of the Business (the "Current Customers"), (B) the names of all current Customers, and (C) data regarding Seller's standard cost of sales for the items covered by such orders, and shall provide upon request such other information as is (AA) relevant to profitability on such items, (BB) available to Seller without incurring undue effort or expense and (CC) requested by Buyer.

(iii)   Transfer of Orders: Assignments.  Prior to the Closing, Seller and Buyer agree to cooperate with each other in conducting joint contacts with the Current Customers (as appropriate) for the purpose of attempting to obtain such customers' consent to transfer orders from Seller to Buyer (or to issue new orders to

Buyer for the same or similar items) and to assign Seller's rights and benefits under the contracts included in the Assets to Buyer as of the Closing.

(iv)     Assumption of Obligation. To the extent that an order is transferred or assigned to Buyer or that Buyer accepts a new purchase order from a Current Customer, Buyer agrees to assume and perform all obligations thereunder.

1.4     Non-Assignment of Certain Items. Notwithstanding anything to the contrary in this Agreement, to the extent that the assignment or license hereunder of any of the Assets shall require the consent of any other party (or in the event that any of the Assets shall be nonassignable), neither this Agreement nor any action taken pursuant to its provisions shall constitute an assignment or license or an agreement to assign or license such Assets if the requisite consents are not obtained and such assignment or license or attempted assignment or license would constitute a material breach or result in the loss or diminution thereof; provided, however, that Seller shall, at its own expense, use reasonable commercial efforts to obtain all third party consents necessary to assign or license the Assets to Buyer, and Seller hereby consents to Buyer using such efforts as it deems necessary or appropriate to effect the same. In the event that notwithstanding the efforts of Seller and Buyer all assignments or licenses needed to assign or license the Assets to Buyer cannot be provided to Buyer, Seller shall negotiate an alternative assignment or license as to such Assets so as to afford Buyer, to the extent practicable, the same or similar benefits and rights as if such assignment or license had occurred.

1.5     Transitional Contracts. The parties acknowledge that it may not be practical or advisable to assign or terminate certain contracts (such as Seller's Master License Agreements ("MLAs")) pursuant to which Seller has granted third parties rights to sell, distribute, obtain support and/or maintain Seller's UnixWare products (such contracts to be referred to hereinafter collectively as the "Transitional Contracts"). In such cases, Seller and Buyer will use diligent efforts to transition such business (concerning the Business only) and the customer relationship relating to such business to Buyer such that any new agreements concerning the Business will be entered into by, and support and maintenance will be provided by, Buyer, except where Buyer is unable to do so. In any event, Buyer shall be entitled to the revenue and benefits received by Seller reasonably attributable to support or maintenance of the products pursuant to the Transitional Contracts (even if prepaid before Closing) net of Seller's identifiable direct expenses of support and maintenance related specifically thereto and documented to Buyer. Seller may retain such units of inventory of products as it deems reasonably necessary solely to satisfy customers under Transitional Contracts in accordance with this paragraph if Buyer is unable to do so. Following the Closing, Seller shall not enter into any new Transitional Contracts nor extend the term of any existing contract. Except for revenue from MLAs, Buyer and Seller shall negotiate a mutually acceptable arrangement to afford Buyer the benefits of ongoing licenses which are intended to be assigned

hereunder as part of the Assets but which cannot be assigned due to third party objections.

1.6   License Back of Assets.  Concurrent with the Closing, Buyer shall execute a license agreement under which it shall grant to Seller a royalty-free, perpetual, worldwide license to (i) all of the technology included in the Assets and (ii) all derivatives of the technology included in the Assets, including the "Eiger" product release (such licensed back technology to be referred to collectively as "Licensed Technology"). Seller agrees that it shall use the Licensed Technology only (i) for internal purposes without restriction or (ii) for resale in bundled or integrated products sold by Seller which are not directly competitive with the core products of Buyer and in which the Licensed Technology does not constitute a primary portion of the value of the total bundled or integrated product. The license agreement shall include reasonable provisions concerning Buyer's obligation to provide documentation and support for the Licensed Technology.  The license agreement shall also provide Seller with an unlimited royalty-free, perpetual, worldwide license to the Licensed Technology upon the occurrence of a Change of Control of Buyer described in Section 6.3(c) hereof.  In the event of a Change of Control of Seller (as defined in Section 6.6 hereof), the license granted pursuant to the license agreement shall be limited to Seller's products either developed or substantially developed as of the time of the Change of Control.

1.7   Closing.

(a)   Closing.  Unless this Agreement is earlier terminated pursuant to Article VII, the closing of the transactions contemplated by this Agreement (the "Closing") shall be held at the offices of Wilson, Sonsini, Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304, at 10:00 a.m. on the date which is two business days following satisfaction or waiver of the last of the conditions to Closing as set forth in the Article IV hereof, or on such other time and/or date as the parties agree (the actual date on which the Closing occurs is referred to herein as the "Closing Date").

(b)   Delivery.  At the Closing:

(i)   Buyer shall deliver to Seller an instrument of assumption of liabilities by which Buyer shall assume the Assumed Liabilities as of the Closing;

(ii)   Buyer shall deliver to Seller a certificate or certificates representing the Shares;

(iii)   Seller shall deliver to Buyer all bills of sale, endorsements, assignments, consents to assignments to the extent obtained and other instruments and documents as Buyer may reasonably request to sell, convey, assign, transfer and deliver to Buyer Seller's title to all the Assets; and

(iv)      Seller and Buyer shall deliver or cause to be delivered to one another such other instruments and documents necessary or appropriate to evidence the due execution, delivery and performance of this Agreement.

(c)      Taking of Necessary Action; Further Action.  If, at any time after the Closing Date, any further action is necessary or desirable to carry out the purposes of this Agreement the parties agree to take, and will take, all such lawful and necessary and/or desirable action.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as described with reasonable particularity in the Seller Disclosure Schedule (which shall cross-reference to the particular section below to which such description applies) delivered by Seller to Buyer simultaneously with the execution of this Agreement, as such Seller Disclosure Schedule may be updated and/or amended pursuant to Section 4.11 hereof (the "Seller Disclosure Schedule"), Seller represents and warrants to Buyer that:

2.1      Organization, Standing and Power.  Seller is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has all requisite corporate power and authority to own, operate and lease its properties and to carry on its business as now being conducted.  Seller is duly qualified as a foreign corporation and is in good standing in each jurisdiction in which the failure to so qualify reasonably would be expected to have a material adverse effect on the Business Condition of the Business.  (As used in this Agreement, "Business Condition" with respect to any corporate entity, group of corporate entities or the Business shall mean the business, financial condition, results of operations and assets of such corporate entity, group of corporate entities or the Business, as the case may be.)  Seller has made available to Buyer complete and correct copies of the Certificate of Incorporation and Bylaws of Seller, as amended to the date hereof.

2.2      Authority.  Seller has all requisite corporate power and authority to enter into this Agreement and, to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement, the performance by Seller of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Seller, and have been approved by the Board of Directors of Seller.  No other corporate proceeding on the part of either Seller is necessary to authorize the execution and delivery of this Agreement by Seller or the performance of Seller's obligations hereunder or the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Seller and constitutes a legal, valid and binding

obligation of Seller enforceable against Seller in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought.  Subject to satisfaction or waiver of the conditions set forth in Article V the execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with or result in any violation of any statute, law, rule, regulation, judgment, order, decree, or ordinance applicable to Seller, or its properties or assets that, individually or in the aggregate, reasonably would be expected to have a material adverse effect on the Business Condition of the Business, or conflict with any provision of the Certificate of Incorporation or Bylaws of Seller or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of a lien or encumbrance on any of the properties or assets of Seller pursuant to any agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license to which Seller is a party or by which Seller or its properties or assets may be bound that would reasonably be expected, either individually or in the aggregate, to have a material adverse effect on the Business Condition of the Business).  No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency, commission, regulatory authority or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity"), is required by or with respect to Seller in connection with the execution and delivery of this Agreement or the consummation by Seller of the transactions contemplated hereby, except for (i) the filing of a pre-merger notification report under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) those required to be made or obtained by Buyer or any of its affiliates, (iii) such consents, approvals, orders, authorizations, registrations, declarations and filings as would not have a material adverse effect on the ability of Seller to transfer the Assets to Buyer at the Closing.

     2.3   Financial Statements.  Seller has furnished Buyer with unaudited financial information concerning the Business as of July 31, 1995  (the foregoing financial information is referred to collectively as the "Business Financial Information").  The Business Financial Information has been prepared in accordance with generally accepted accounting principles consistently applied (except as may be indicated in the notes thereto) and fairly present, in all material respects, the financial position of the Business as at the dates thereof and the results of operations for the periods then ended.  There has been no material change in Seller's accounting policies during such periods relating to the Business.

     2.4   Compliance with Law.  Seller has conducted the Business so as to comply in all material respects with all laws, rules and regulations, judgments, decrees or orders of any Governmental Entity applicable to its operations except where the failure so to comply reasonably would not be expected to have a material adverse effect on the

Business Condition of the Business. As of the date hereof, there are no judgments or orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency or by arbitration) against Seller with any continuing effect that reasonably would be expected to have a material adverse affect on the Business Condition of the Business. To the knowledge of Seller, there is no investigation by any Governmental Entity with respect to Seller pending against Seller which is reasonably likely to have a material adverse effect on the Business Condition of the Business.

2.5     No Defaults. To the knowledge of Seller, Seller is not, nor has it received written notice that it would be with the passage of time, (i) in violation of any provision of its Certificate of Incorporation or Bylaws or (ii) in default or violation of any term, condition or provision of (A) any judgment, decree, order, injunction or stipulation applicable to the Business or (B) any agreement, note, mortgage, indenture, contract, lease or instrument, permit, concession, franchise or license to which Seller is a party (with respect to the Business) or by which the Business may be bound, in any such case in a manner that reasonably would be expected to have a material adverse effect on the Business Condition of the Business.

2.6     Litigation. There is no action, suit, proceeding, claim or governmental investigation pending or, to the knowledge of Seller, threatened, against Seller that reasonably would be expected to have a material adverse effect on the Business Condition of the Business. There is no action, suit, proceeding, claim or governmental investigation pending against Seller as of the date hereof that in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

2.7     Absence of Certain Changes. Since July 31, 1995, Seller has conducted the Business in the ordinary course and, except for the execution, delivery and performance of this Agreement or as required hereby, there has not occurred: (a) any material adverse change in the Business Condition of the Business; (b) any entry into any material commitment or transaction by Seller relating to the Business, other than in the ordinary course of business; (c) any damage, destruction or loss, whether covered by insurance or not, materially and adversely affecting the Business Condition of the Business; (d) any acquisition or disposition of a material amount of property or assets of Seller relating to the Business outside of the ordinary course of business; (e) any transfer or grant by Seller of a right under any Seller Intellectual Property Rights (as defined in Section 2.10 hereof), other than those transferred or granted in the ordinary course of business.

2.8     Agreements. With respect to the Business, Seller is not a party to, and the Business is not subject to:

(a)     Any union contract or any employment contract or arrangement providing for future compensation, written or oral, with any officer,

consultant, director or employee which is not cancelable by Seller on 30 days' notice or less without penalty or obligation to make payments related to such termination, other than (A) (in the case of employees other than executive officers of Seller) such agreements as are not materially different from standard arrangements offered to employees generally in the ordinary course of business consistent with Seller's past practices and (B) such agreements as may be imposed or implied by law;

(b)     Any plan, contract or arrangement, the obligations under which exceed $100,000, written or oral, providing for bonuses, pensions, deferred compensation, severance pay or benefits, retirement payments, profit-sharing, or the like;

(c)     As of the date hereof, any existing OEM agreement, distribution agreement, volume purchase agreement, or other similar agreement in which the annual amount paid or received by Seller during the twelve-month period ended July 31, 1995 exceeded $1,500,000 or pursuant to which Seller has granted most favored nation pricing provisions or exclusive marketing rights related to any product, group of products or territory to any person;

(d)     Any lease or month-to-month tenancy for real or personal property in which the amount of payments which Seller is required to make on an annual basis exceeds $100,000;

(e)     Any contract containing covenants purporting to limit Seller's freedom to compete in any line of business in any geographic area; or

(f)     Any license to a third party involving Seller Intellectual Property Rights (as such term is defined in Section 2.10 hereof) source or binary code which includes a right to sublicense such source or binary code without additional payment.

Each agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license and commitment listed in the Seller Disclosure Schedule pursuant to this Section is valid and binding on Seller, and is in full force and effect, and Seller has not breached any provision of, nor is it in default under the terms of, any such agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license or commitment except for such failures to be valid and binding or in full force and effect and such breaches or defaults as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business.

2.9     Tax Returns and Reports.

(a)     Definition of Taxes. For the purposes of this Agreement, "Tax" or "Taxes" refers to any and all federal, state, local and foreign taxes, assessments

and other governmental charges, duties, impositions and liabilities relating to taxes, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts and any obligations under any agreements or arrangements with any other person with respect to such amounts and including any liability for taxes of a predecessor entity.

(b)    Tax Returns and Audits.  Except as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business:

(i)    Seller has timely filed all federal, state, local and foreign returns, estimates, information statements and reports ("Returns") relating to Taxes required to be filed by it, except such Returns which are not material to the Business, and has paid all Taxes shown to be due on such Returns or is contesting them in good faith.

(ii)    Seller has withheld with respect to its employees all federal and state income taxes, FICA, FUTA and other Taxes required to be withheld.

(iii)    Seller has not been delinquent in the payment of any Tax nor is there any Tax deficiency outstanding, proposed or assessed against Seller, nor has Seller executed any waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

(iv)    No audit or other examination of any Return of Seller is presently in progress, nor has Seller been notified of any request for such an audit or other examination.

(v)    None of the Assets are treated as "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(vi)    Seller is not, and has not been at any time, a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

2.10    Technology.  To the knowledge of Seller, as of the date hereof, Seller owns, co-owns or is licensed or otherwise entitled to use rights to all patents, trademarks, trade names, service marks, copyrights, mask work rights, trade secret rights, and other intellectual property rights and any applications therefor, and all maskworks, net lists, schematics, technology, source code, know-how, computer software programs and all other tangible information or material, that are used in the Business as currently conducted (the "Seller Intellectual Property Rights").

The Seller Disclosure Schedule lists, as of the date hereof, (i) all patents, registered copyrights, trademarks, service marks, mask work rights, and any applications therefor, included in the Seller Intellectual Property Rights; (ii) the jurisdictions in which each such Seller Intellectual Property Right has been issued or registered or in which an application for such issuance and registration has been filed, including the respective registration or application numbers; and (iii) which, if any, of such products have been registered for copyright protection with the United States Copyright Office and any foreign offices. The Seller Disclosure Schedule also sets forth a list of license agreements which, to Seller's knowledge, constitutes all license agreements under which Seller licenses as licensee the intellectual property rights of third parties relating to technology or software which is incorporated in existing products of the Business for which products Seller has received revenues in excess of $2,000,000 in the twelve-month period ended July 31, 1995. To Seller's knowledge, Seller is not in material violation of any such license agreement.

With respect to the Business, Seller is not a party to nor is the Business subject to (i) any joint venture contract or arrangement or any other agreement that involves a sharing of profits with other persons other than the payment or receipt of royalties by Seller; (ii) any agreement pursuant to which Seller was obligated to make payment of royalties in the twelve-month period ended July 31, 1995 of $1,000,000 or more; or (iii) any agreement pursuant to which Seller utilizes the intellectual property rights of others in any products currently marketed by Seller and which is either non-perpetual or terminable by the licensor thereunder in the event of the Acquisition and which, if terminated, reasonably would be expected to have a material adverse effect on the Business Condition of the Business.

No claims with respect to the Seller Intellectual Property Rights have been communicated in writing to Seller (i) to the effect that the manufacture, sale or use of any product of the Business as now used or offered by Seller infringes on any copyright, patent, trade secret or other intellectual property right of a third party or (ii) challenging the ownership or validity of any of the Seller Intellectual Property Rights, any or all of which claims reasonably would be expected to have a material adverse effect on the Business Condition of the Business. To the knowledge of Seller, as of the date hereof, all patents and registered trademarks, service marks and registered copyrights held by Seller in connection with the Business are valid and subsisting except for failures to be valid and subsisting that reasonably would not be expected to have a material adverse effect on the Business Condition of the Business. Seller does not know of any unauthorized use, infringement or misappropriation of any of the Seller Intellectual Property Rights by any third party that reasonably would be expected to have a material adverse effect on the Business Condition of the Business.

2.11   Title to Properties; Absence of Liens and Encumbrances.

(a)    The Seller Disclosure Schedule sets forth a list of all real property owned or, as of the date hereof, leased by Seller for use in connection with the Business and the aggregate annual rental or mortgage payment or other fees payable under any such lease or loan.

(b)    Seller has good and valid title to, or, in the case of leased properties and assets, valid leasehold interests in, all of the tangible properties and assets, real, personal and mixed, which are material to the conduct of the Business, free and clear of any liens, charges, pledges, security interests or other encumbrances, except for such of the foregoing as (A) are reflected in the Seller Financial Statements, or (B) arise out of taxes or general or special assessments not in default and payable without penalty or interest or the validity of which is being contested in good faith by appropriate proceedings, or (C) such imperfections of title and encumbrances, if any, which are not substantial in character, amount or extent, and which do not materially detract from the value, or interfere with the present use, of the property subject thereto or affected thereby.

2.12    _Governmental Authorizations and Licenses_.  Seller is the holder of all licenses, authorizations, permits, concessions, certificates and other franchises, or of any Governmental Entity required to operate the Business, the failure to hold which reasonably would be expected to have a material adverse effect on the Business Condition of the Business (collectively, the "Licenses"). The Licenses are in full force and effect.  There is not now pending, or to the knowledge of Seller is there threatened, any action, suit, investigation or proceeding against Seller before any Governmental Entity with respect to the Licenses, nor is there any issued or outstanding notice, order or complaint with respect to the violation by Seller of the terms of any License or any rule or regulation applicable thereto, except in any such case as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business.

2.13    _Environmental Matters_.  To Seller's knowledge, Seller has at all relevant times with respect to the Business been in material compliance with all environmental laws, and has received no potentially responsible party ("PRP") notices or functionally equivalent notices from any governmental agencies or private parties concerning releases or threatened releases of any "hazardous substance" as that term is defined under 42 U.S.C. 9601(14).

2.14    _Customers_.  The Seller Disclosure Schedule sets forth each customer of the Business that paid Seller royalties and licensee fees in an aggregate amount in excess of $1,000,000 during the twelve-month period ended July 31, 1995.

2.15    _Proprietary Information and Inventions and Confidentiality Agreements_.  To the knowledge of Seller, each employee, consultant, and officer of Seller (exclusively with respect to the Business) has executed a proprietary information and inventions and confidentiality agreement, copies of which have been made available

(a)    The Seller Disclosure Schedule sets forth a list of all real property owned or, as of the date hereof, leased by Seller for use in connection with the Business and the aggregate annual rental or mortgage payment or other fees payable under any such lease or loan.

(b)    Seller has good and valid title to, or, in the case of leased properties and assets, valid leasehold interests in, all of the tangible properties and assets, real, personal and mixed, which are material to the conduct of the Business, free and clear of any liens, charges, pledges, security interests or other encumbrances, except for such of the foregoing as (A) are reflected in the Seller Financial Statements, or (B) arise out of taxes or general or special assessments not in default and payable without penalty or interest or the validity of which is being contested in good faith by appropriate proceedings, or (C) such imperfections of title and encumbrances, if any, which are not substantial in character, amount or extent, and which do not materially detract from the value, or interfere with the present use, of the property subject thereto or affected thereby.

2.12    Governmental Authorizations and Licenses. .Seller is the holder of all licenses, authorizations, permits, concessions, certificates and other franchises of any Governmental Entity required to operate the Business, the failure to hold which reasonably would be expected to have a material adverse effect on the Business Condition of the Business (collectively, the "Licenses"). The Licenses are in full force and effect. There is not now pending, or to the knowledge of Seller is there threatened, any action, suit, investigation or proceeding against Seller before any Governmental Entity with respect to the Licenses, nor is there any issued or outstanding notice, order or complaint with respect to the violation by Seller of the terms of any License or any rule or regulation applicable thereto, except in any such case as reasonably would not be expected to have a material adverse effect on the Business Condition of the Business.

2.13    Environmental Matters. To Seller's knowledge, Seller has at all relevant times with respect to the Business been in material compliance with all environmental laws, and has received no potentially responsible party ("PRP") notices or functionally equivalent notices from any governmental agencies or private parties concerning releases or threatened releases of any "hazardous substance" as that term is defined under 42 U.S.C. 9601(14).

2.14    Customers. The Seller Disclosure Schedule sets forth each customer of the Business that paid Seller royalties and licensee fees in an aggregate amount in excess of $1,000,000 during the twelve-month period ended July 31, 1995.

2.15    Proprietary Information and Inventions and Confidentiality Agreements. To the knowledge of Seller, each employee, consultant, and officer of Seller (exclusively with respect to the Business) has executed a proprietary information and inventions and confidentiality agreement, copies of which have been made available

to counsel to Buyer, and it is Seller's policy that such agreements be executed by each new employee, consultant, officer and director of Seller in the ordinary course of Seller's business.

2.16    Inventory.  The Seller Disclosure Schedule sets forth the estimated amount of UnixWare inventory (as defined thereon), including pre-paid royalties, that was held by Seller's resellers as of the date of this Agreement.

2.17    Investment Intent.  The purchase of the Shares pursuant to this Agreement is for the account of Seller for the purpose of investment and not with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act") and the rules and regulations promulgated thereunder, and that Seller has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, Seller further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Shares.

2.18    Reliance Upon Seller's Representations.  Seller understands that the Shares are not registered under the Securities Act on the ground that the sale provided for in this Agreement and the issuance of the Shares hereunder is exempt from registration under the Securities Act pursuant to section 4(2) thereof, and that Buyer's reliance on such exemption is predicated on Seller's representations set forth herein. Seller realizes that the basis for the exemption may not be present if, notwithstanding such representations, Seller has in mind merely acquiring the Shares for a fixed or determinable period in the future, or for a market rise, or for sale if the market does not rise.  Seller presently does not have any such intention.

2.19    Receipt of Information.  Seller believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Shares. Seller further represents that it has had an opportunity to ask questions and receive answers from Buyer regarding the terms and conditions of the offering of the Shares and the business, properties, prospects and financial condition of Buyer and to obtain additional information (to the extent Buyer possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to it or to which it had access. The foregoing, however, does not limit or modify the representations and warranties of the Buyer in Article III of this Agreement or the right of Seller to rely thereon.

2.20    Accredited Investor.  Seller is an "accredited investor" within the meaning of Securities and Exchange Commission ("SEC") Rule 501 of Regulation D, as presently in effect.

2.21   <u>Restricted Securities</u>. Seller understands that the Shares may not be sold, transferred, or otherwise disposed of without registration under the Securities Act or an exemption therefrom, and that in the absence of an effective registration statement covering the Shares or an available exemption from registration under the Securities Act, the Shares must be held indefinitely. In particular, Seller is aware that the Shares may not be sold pursuant to Rule 144 promulgated under the Securities Act unless all of the conditions of that Rule are met.

2.22   <u>Legends</u>. To the extent applicable, each certificate or other document evidencing any of the Shares shall be endorsed with the legends set forth below, and Seller covenants that, except to the extent such restrictions are waived by Buyer, Seller shall not transfer the shares represented by any such certificate without complying with the restrictions on transfer described in the legends endorsed on such certificate:

(a)   The following legend under the Securities Act:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED ABSENT AN EFFECTIVE REGISTRATION THEREOF UNDER SUCH ACT OR COMPLIANCE WITH RULE 144 PROMULGATED UNDER SUCH ACT, OR UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED."

2.23   <u>No Implied Representations</u>. It is the explicit intent of each party hereto that Seller is not making any representation or warranty whatsoever, express or implied, except those representations and warranties of Seller contained in this Agreement or in the Seller Disclosure Schedule.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF BUYER

Except as described with reasonable particularity in the Buyer Disclosure Schedule (which shall cross-reference to the particular section below to which such description applies) delivered by Buyer to Seller simultaneously with the execution of this Agreement, as such Buyer Disclosure Schedule may be updated and/or amended pursuant to Section 4.11 hereof (the "Buyer Disclosure Schedule"), and except as

disclosed in Buyer's SEC Documents (as defined in Section 3.4), Buyer represents and warrants to Seller that:

      3.1    <u>Organization, Standing and Power</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has all requisite corporate power and authority to own, operate and lease its properties and to carry on its business as now being conducted.  Buyer is duly qualified as a foreign corporation and is in good standing in each jurisdiction in which the failure to so qualify would reasonably be expected to have a material adverse effect on the Business Condition of Buyer.  Buyer has made available to Seller complete and correct copies of the Certificate of Incorporation and Bylaws of Buyer, as amended to the date hereof.

      3.2    <u>Authority</u>.  Buyer has all requisite corporate power and authority to enter into this Agreement and, to consummate the transactions contemplated hereby. The execution and delivery of this Agreement, the performance by Buyer of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Buyer, and have been approved by the Board of Directors of Buyer.  No other corporate proceeding on the part of either Buyer is necessary to authorize the execution and delivery of this Agreement by Buyer or the performance of Buyer's obligations hereunder or the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Buyer and constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought.  Subject to satisfaction or waiver of the conditions set forth in Article V, the execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, conflict with or result in any violation of any statute, law, rule, regulation, judgment, order, decree, or ordinance applicable to Buyer, or its properties or assets that, individually or in the aggregate, reasonably would be expected to have a material adverse effect on the Business Condition of Buyer, or conflict with any provision of the Certificate of Incorporation or Bylaws of Buyer or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of a lien or encumbrance on any of the properties or assets of Buyer pursuant to any agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license to which Buyer is a party or by which Buyer or its properties or assets may be bound that would reasonably be expected to have a material adverse effect on the Business Condition of Buyer.  No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or the consummation by

Buyer of the transactions contemplated hereby, except for (i) the filing of a pre-merger notification report under the HSR Act, (ii) those required to be made or obtained by Seller or any of its affiliates, (iii) filings following the Closing under federal and state securities laws relating to issuance of the Shares; and (iv) such consents, approvals, orders, authorizations, registrations, declarations and filings as would not have a material adverse effect on the ability of Buyer to issue the Shares to Seller and assume the Assumed Liabilities at the Closing.

3.3 <u>Capitalization</u>. The authorized capital stock of Buyer consists of 100,000,000 shares of Common Stock, no par value, and 20,000,000 shares of Preferred Stock, no par value, of which there were issued and outstanding as of the close of business on September 18, 1995, 30,791,674 shares of Common Stock and no shares of Preferred Stock. There are no other outstanding shares of capital stock or voting securities of Buyer other than shares of Buyer Common Stock issued after September 18, 1995 upon the exercise of options issued under the Buyer's Amended and Restated 1987 Stock Option Plan (the "Buyer Stock Option Plan"). All outstanding shares of the Common Stock of Buyer have been duly authorized, validly issued, fully paid and are nonassessable and free of any liens or encumbrances other than any liens or encumbrances created by or imposed upon the holders thereof. As of the close of business on September 18, 1995, Buyer has reserved 9,665,665 shares of Common Stock for issuance to employees, directors and independent contractors pursuant to the Buyer Stock Option Plan and the Buyer Employee Stock Purchase Plan, of which 5,256,108 shares are subject to outstanding, unexercised options. Other than this Agreement, there are no other options, warrants, calls, rights, commitments or agreements of any character to which Buyer is a party or by which it is bound obligating Buyer to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any shares of the capital stock of Buyer, or obligating Buyer to grant, extend or enter into any such option, warrant, call, right, commitment or agreement. The shares of Buyer Common Stock to be issued pursuant to this Agreement will be duly authorized, validly issued, fully paid, and non-assessable.

3.4 <u>SEC Documents; Buyer Financial Statements</u>. Buyer has made available to Seller a true and complete copy of each statement, annual, quarterly and other report, and definitive proxy statement filed by Buyer with the Securities and Exchange Commission ("SEC") since September 30, 1993 (the "Buyer SEC Documents"), which are all the documents (other than preliminary material) that Buyer was required to file with the SEC since such date. As of their respective filing dates, the Buyer SEC Documents complied in all material respects with the requirements of the Securities Exchange Act of 1934 (the "Exchange Act") or the Securities Act of 1933 (the "Securities Act"), as the case may be, and none of the Buyer SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. The financial statements of Buyer included in the Buyer SEC Documents (the "Buyer Financial Statements") comply as to form in all

material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) and fairly present the consolidated financial position of Buyer and its consolidated subsidiaries at the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal, recurring audit adjustments). Since September 30, 1994, there has been no material change in Buyer's accounting policies except as described in the notes to Buyer's Financial Statements.

  3.5   Compliance with Law.   Buyer has conducted its business so as to comply in all material respects with all laws, rules and regulations, judgments, decrees or orders of any Governmental Entity applicable to its operations except where the failure so to comply reasonably would not be expected to have a material adverse effect on the Business Condition of Buyer. As of the date hereof, there are no judgments or orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency or by arbitration) against Buyer with any continuing effect that reasonably would be expected to have a material adverse affect on the Business Condition of Buyer. To the knowledge of Buyer, there is no investigation by any Governmental Entity with respect to Buyer pending against Buyer which is reasonably likely to have a material adverse effect on the Business Condition of Buyer.

  3.6   No Defaults. To the knowledge of Buyer, Buyer is not, nor has received written notice that it would be with the passage of time, (i) in violation of any provision of its Certificate of Incorporation or Bylaws or (ii) in default or violation of any term, condition or provision of (A) any judgment, decree, order, injunction or stipulation applicable to Buyer or (B) any agreement, note, mortgage, indenture, contract, lease or instrument, permit, concession, franchise or license to which Buyer is a party or by which Buyer may be bound, in any such case in a manner that reasonably would be expected to have a material adverse effect on the Business Condition of Buyer.

  3.7   Litigation.   There is no action, suit, proceeding, claim or governmental investigation pending or, to the knowledge of Buyer, threatened, against Buyer which reasonably would be expected to have, a material adverse effect on the Business Condition of Buyer. There is no action, suit, proceeding, claim or governmental investigation pending against Buyer as of the date hereof which in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the transactions contemplated hereby.

  3.8   Absence of Certain Changes. Since June 30, 1995, Buyer has conducted its business in the ordinary course and, except for the execution, delivery and performance of this Agreement or as required hereby, there has not occurred: (a) any material adverse change in the Business Condition of Buyer; (b) any entry into any

material commitment or transaction by Buyer, other than in the ordinary course of business; (c) any damage, destruction or loss, whether covered by insurance or not, materially and adversely affecting the Business Condition of Buyer; or (d) any acquisition or disposition of a material amount of property or assets of Buyer outside of the ordinary course of business.

       3.9    Agreements. Each agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license and commitment that is an Exhibit to Buyer's most recent Form 10-Q is valid and binding on Buyer, and is in full force and effect, and Buyer has not breached any provision of, nor is it in default under the terms of, any such agreement, contract, mortgage, indenture, plan, lease, instrument, permit, concession, franchise, arrangement, license or commitment except for such failures to be valid and binding or in full force and effect and such breaches or defaults as reasonably would not, be expected to have a material adverse effect on the Business Condition of Buyer.

       3.10   Tax Returns and Reports. Except as reasonably would not be expected to have a material adverse effect on the Business Condition of Buyer:

           (i)    Buyer has timely filed all federal, state, local and foreign returns, estimates, information statements and reports (Returns) relating to Taxes required to be filed by it, except such Returns which are not material to Buyer, and has paid all Taxes shown to be due on such Returns or is contesting them in good faith.

           (ii)   Buyer has withheld with respect to its employees all federal and state income taxes, FICA, FUTA and other Taxes required to be withheld.

           (iii)   Buyer has not been delinquent in the payment of any Tax nor is there any Tax deficiency outstanding, proposed or assessed against Buyer, nor has Buyer executed any waiver of any statute of limitations on or extending the period for the assessment or collection of any Tax.

           (iv)   No audit or other examination of any Return of Buyer is presently in progress, nor has Buyer been notified of any request for such an audit or other examination.

           (v)   None of Buyer's assets are treated as "tax-exempt use property" within the meaning of Section 168(h) of the Code.

           (vi)   Buyer is not, and has not been at any time, a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

3.11   Technology.  To the knowledge of Buyer, as of the date hereof, Buyer owns, co-owns or is licensed or otherwise entitled to use rights to all patents, trademarks, trade names, service marks, copyrights, mask work rights, trade secret rights, and other intellectual property rights and any applications therefor, and all maskworks, net lists, schematics, technology, source code, know-how, computer software programs and all other tangible information or material, that are used in its business as currently conducted (the "Buyer Intellectual Property Rights").

3.12   Governmental Authorizations and Licenses.  Buyer is the holder of all licenses, authorizations, permits, concessions, certificates and other franchises of any Governmental Entity required to operate its business, the failure to hold which reasonably would be expected to have a material adverse effect on the Business Condition of Buyer (collectively, the "Buyer Licenses"). The Buyer Licenses are in full force and effect. There is not now pending, or to the knowledge of Buyer is there threatened, any action, suit, investigation or proceeding against Buyer before any Governmental Entity with respect to the Buyer Licenses, nor is there any issued or outstanding notice, order or complaint with respect to the violation by Buyer of the terms of any Buyer License or any rule or regulation applicable thereto, except in any such case as reasonably would not be expected to have a material adverse effect on the Business Condition of Buyer.

3.13   Environmental Matters.  To Buyer's knowledge, Buyer has at all relevant times been in material compliance with all environmental laws, and has received no PRP notices or functionally equivalent notices from any governmental agencies or private parties concerning releases or threatened releases of any "hazardous substance" as that term is defined under 42 U.S.C. 9601(14).

3.14   Proprietary Information and Inventions and Confidentiality Agreements.  To the knowledge of Buyer, each employee, consultant, and officer of Buyer has executed a proprietary information and inventions and confidentiality agreement, copies of which have been made available to counsel to Seller, and it is Buyer's policy that such agreements be executed by each new employee, consultant, officer and director of Buyer in the ordinary course of Buyer's business.

3.15   Status of Shares.  When issued to Seller at the Closing, the Shares will be duly authorized, validly issued, fully paid and nonassessable, free and clear of any and all liens and encumbrances of any kind, except as may be imposed by Seller.

3.16   No Implied Representations.  It is the explicit intent of each party hereto that Buyer is not making any representation or warranty whatsoever, express or implied, except those representations and warranties of Buyer contained in this Agreement or in the Buyer Disclosure Schedule.

## ARTICLE IV

## CERTAIN COVENANTS

4.1   Conduct of Business of Seller.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement and the Closing Date, Seller agrees (except to the extent that Buyer shall otherwise consent in writing), to carry on the Business in the usual, regular and ordinary course in substantially the same manner as heretofore conducted, including sales of products in a manner and on terms consistent with past practices, to pay or perform other obligations when due, and use all reasonable efforts consistent with past practice and policies to preserve intact the Business, keep available the services of its present officers and key employees and preserve their relationships with customers, suppliers, distributors, licensors, licensees, and others having business dealings with it, all with the goal of preserving unimpaired the Business at the Closing Date.  Except as contemplated by this Agreement, Seller shall not, with respect to the Business, without the prior written consent of Buyer (which shall be given, or reasonably withheld, within one business day after receipt of written request therefor) (a) enter into any commitment or transaction not in the ordinary course of business; or (b) enter into any strategic alliance or joint marketing arrangement or agreement.

4.2   Conduct of Business of Buyer.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement and the Closing Date, Buyer agrees (except to the extent that Seller shall otherwise consent in writing), to carry on its business in the usual, regular and ordinary course in substantially the same manner as heretofore conducted, to pay or perform other obligations when due, and use all reasonable efforts consistent with past practice and policies to preserve intact its business, keep available the services of its present officers and key employees and preserve their relationships with customers, suppliers, distributors, licensors, licensees, and others having business dealings with it, all with the goal of preserving unimpaired its business at the Closing Date.  Except as contemplated by this Agreement, Buyer shall not, without the prior written consent of Seller (which shall be given, or reasonably withheld, within one business day after receipt of written request therefor) (a) enter into any commitment or transaction not in the ordinary course of business; (b) enter into any strategic alliance or joint marketing arrangement or agreement; (c) declare or pay any dividends on or make any other distributions (whether in cash, stock or property) in respect of any of its capital stock, or split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of capital stock of Buyer, or repurchase, redeem or otherwise acquire, directly or indirectly, any shares of its capital stock (or options, warrants or other rights exercisable therefor); (d) except for the issuance of shares of capital stock of Buyer upon exercise or conversion of options granted to employees, issue, deliver or sell or authorize or propose the issuance, delivery

or sale of, or purchase or propose the purchase of, any shares of its capital stock or securities convertible into, or subscriptions, rights, warrants or options to acquire, or other agreements or commitments of any character obligating it to issue any such shares or other convertible securities; or (e) cause or permit any amendments to its Certificate of Incorporation or Bylaws.

4.3     No Solicitation.  Until the earlier to occur of (i) the Closing Date and (ii) the date of termination of this Agreement pursuant to its terms, as the case may be, Seller will not (nor will Seller permit any of Seller's officers, directors, agents, representatives or affiliates to) directly or indirectly, take any of the following actions with any party other than Buyer and its designees: solicit, encourage, initiate or participate in any negotiations or discussions with respect to, any offer or proposal to acquire all or any portion of the Business.  Until the earlier to occur of (i) the Closing Date and (ii) the date of termination of this Agreement pursuant to its terms, as the case may be, and except to the extent the Board of Directors of Buyer believes (after consultation with outside legal counsel) it necessary to comply with its fiduciary duties, Buyer will not (nor will Buyer permit any of Buyer's officers, directors, agents, representatives or affiliates to) directly or indirectly or indirectly take any of the following actions with any party other than Seller and its designees: solicit, encourage, initiate or participate in any negotiation or discussions with respect to, any offer or proposal to acquire all or any portion of the business of Buyer.

4.4     Access to Information.  Seller and Buyer shall each afford the other and its accountants, counsel and other representatives, reasonable access during normal business hours during the period prior to the Closing Date to (a) all of its properties, books, contracts, commitments and records, and (b) all other information concerning the business, properties and personnel (subject to restrictions imposed by applicable law) of it as the other may reasonably request (it being understood that access to information concerning Seller shall pertain only to the Business).

4.5     Confidentiality.  Each of the parties hereto hereby agrees to keep such information or knowledge obtained in any investigation pursuant to Section 4.4 confidential; provided, however, that the foregoing shall not apply to information or knowledge which (a) a party can demonstrate was already lawfully in its possession prior to the disclosure thereof by the other party, (b) is generally known to the public and did not become so known through any violation of law or this Agreement, (c) became known to the public through no fault of such party, (d) is later lawfully acquired by such party from other sources, (e) is required to be disclosed by order of court or government agency with subpoena powers or (f) which is disclosed in the course of any litigation between any of the parties hereto.

4.6     Expenses.  Whether or not the Acquisition is consummated, all fees and expenses incurred in connection with the Acquisition including, without limitation, all legal, accounting, financial advisory, consulting and all other fees and expenses of

SPHPA1\R8\0147981.06
09/19/95                                    21.

third parties ("Third Party Expenses") incurred by a party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective party incurring such fees and expenses.

4.7    Public Disclosure.  Buyer and Seller shall issue a joint press release with respect to the subject matter of this Agreement.

4.8    Consents.  Seller shall use commercially reasonably efforts to obtain all necessary consents, waivers and approvals under any of the contracts of the Business as may be required in connection with the Acquisition so as to transfer to Buyer all rights of Seller thereunder as of the Closing.

4.9    Commercially Reasonable Efforts.  Subject to the terms and conditions provided in this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations: to consummate and make effective the transactions contemplated hereby, to obtain all necessary waivers, consents and approvals and to effect all necessary registrations and filings, and to remove any injunctions or other impediments or delays, legal or otherwise, in order to consummate and make effective the transactions contemplated by this Agreement.

4.10    Notification of Certain Matters.  Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which is likely to cause any representation or warranty of Seller or Buyer, respectively, contained in this Agreement to be untrue or inaccurate at or prior to the Closing Date and (ii) any failure of Seller or Buyer, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that subject to Section 4.11, the delivery of any notice pursuant to this Section shall not limit or otherwise affect any remedies available to the party receiving such notice.

4.11    Delivery of Schedules.  It is understood that the Seller Disclosure Schedule and the Buyer Disclosure Schedule may not be complete as of the date hereof. Because of this, the parties agree that until 5:00 California time on October 15, 1995, Seller and Buyer shall each be permitted to amend its respective Disclosure Schedule so as to qualify the representations and warranties of such party contained in this Agreement (as each may be so amended, the "Subsequent Seller Disclosure Schedule" and the "Subsequent Buyer Disclosure Schedule", respectively).  It is further understood that, to the extent that this Agreement is not terminated pursuant to Section 7.1 (d) or 7.1(e) after delivery of any such Subsequent Disclosure Schedule, the representations and warranties in this Agreement of the party delivering such Subsequent Disclosure

Schedule shall be qualified in their entirety by the modified or supplemented disclosures contained therein.

      4.12   Additional Documents and Further Assurances. Each party hereto, at the request of another party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of this Agreement and the transactions contemplated hereby.

      4.13   Treatment of Employees of the Business. Following the execution and delivery of this Agreement and prior to Closing, the person(s) responsible for the hiring of Buyer's personnel and the person(s) responsible for the hiring of Seller's personnel shall agree upon an employee benefits package (the "Benefits Package") which in their mutual opinion shall be sufficiently enticing to attract and retain a number of existing employees of the Business as new employees of Buyer. The Benefits Package shall credit Seller's employees who become employees of Buyer with all years of service accrued by such employee with Seller or any predecessor of Seller or the Business. Buyer shall offer employment consistent with the terms of the Benefits Package to any of the employees of the Business it shall so choose. Seller will use reasonable commercial efforts to assist Buyer to encourage such employees to become employees of Buyer and to support an orderly and successful transition. Except as may be agreed between Buyer and Seller in accordance with the preparation of the Benefits Package, Buyer shall not be required to assume any obligation of Seller with respect to liabilities relating to such employees, including without limitation, obligations for accrued vacation time, severance arrangements, workers' compensation or any liability for any insurance, medical or other welfare benefits, other than under Buyer's plans. In addition, all welfare or benefit claims relating to the period prior to midnight on the Closing Date shall be the responsibility of Seller. Buyer agrees to have completed all hiring of employees pursuant to this Section 4.13 prior to February 29, 1996.

      Seller's employees shall continue to be employees of Seller through the Closing and through the Closing Seller shall continue in force all employee benefits and salaries in place as of the date of this Agreement, subject to such changes as may occur in the ordinary course of Seller's business.

      Seller agrees to use its reasonable commercial efforts to support the transition of the Business to Buyer, including without limitation, cooperation between Seller's sales and field service personnel and Buyer's sales and field service personnel to help assure an orderly transition of customer accounts.

      4.14   Tax Returns. Seller shall be responsible for and pay when due (i) all of Seller's Taxes attributable to or levied or imposed upon the Assets relating or pertaining to the period (or that portion of any period) ending on or prior to the Closing Date, except for Sales Taxes, if any, which are the responsibility of Buyer pursuant to

Section 1.2(d) hereof, and (ii) all Taxes attributable to, levied or imposed upon, or incurred in connection with the Seller's business operations, other than the Business, following the Closing Date.

   4.15   Bulk Sales.  Buyer hereby agrees to waive the requirement, if any, that Seller comply with any bulk transfer law which may be applicable to the transactions contemplated by this Agreement; provided, that Seller agrees to indemnify and hold harmless Buyer with respect to any noncompliance with such laws and Buyer's waiver with respect thereto.

   4.16   SVRX Licenses.

      (a)   Following the Closing, Buyer shall administer the collection of all royalties, fees and other amounts due under all SVRX Licenses (as listed in detail under item VI of Schedule 1.1(a) hereof and referred to herein as "SVRX Royalties"). Within 45 days of the end of each fiscal quarter of Buyer, Buyer shall deliver to Seller or Seller's assignee 100% of any SVRX Royalties collected in the immediately preceding quarter.  Buyer shall diligently seek to collect all such royalties, funds and other amounts when due (and shall investigate and perform appropriate auditing and enforcement under such licenses at Buyer's cost including auditing two (2) SVRX licensees identified by Seller during each quarter in which SVRX Royalties are collected).  In consideration of such activities described in the preceding sentence, Seller shall pay to Buyer within 5 days of receipt of SVRX Royalties from Buyer as set forth in the preceding sentence, an administrative fee equal to 5% of such SVRX Royalties.

      (b)   Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller.  In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.  In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller shall be authorized, and hereby is granted, the rights to take any action on Buyer's own behalf.  Buyer shall not, and shall have no right to, enter into future licenses or amendments of the SVRX Licenses, except as may be incidently involved through its rights to sell and license the Assets or the Merged Product (as such term is defined in the proposed Operating Agreement, attached hereto as Exhibit 5.1(c)) or future versions thereof of the Merged Product.

      (c)   Seller further covenants that immediately following the Closing Date neither it, nor any of its officers, directors or employees shall (i) take any material action designed to promote the sale of SVRX products or (ii) provide material compensation to any employee designed and intended to incentivize such employee to promote the sale of SVRX products, except for actions incidental to unrelated business activities of Seller.