FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

OCT 2 1 2005

MARKUS B. ZIMMER, CLERK

BY _____
DEPUTY CLERK

ORIGINAL

| | |
|---|---|
| Brent O. Hatch (5715) | Robert Silver (admitted pro hac vice) |
| Mark F. James (5295) | Edward Normand (admitted pro hac vice) |
| HATCH, JAMES & DODGE | BOIES, SCHILLER & FLEXNER LLP |
| 10 West Broadway, Suite 400 | 333 Main Street |
| Salt Lake City, Utah 84101 | Armonk, New York 10504 |
| Telephone: (801) 363-6363 | Telephone: (914) 749-8200 |
| Facsimile: (801) 363-6666 | Facsimile: (914) 749-8300 |
| | |
| Stuart H. Singer (admitted pro hac vice) | Stephen N. Zack (admitted pro hac vice) |
| BOIES, SCHILLER & FLEXNER LLP | BOIES, SCHILLER & FLEXNER LLP |
| 401 East Las Olas Boulevard – Suite 1200 | Bank of America Tower – Suite 2800 |
| Ft. Lauderdale, Florida 33301 | 100 Southeast Second Street |
| Telephone: (954) 356-0011 | Miami, Florida 33131 |
| Facsimile: (954) 356-0022 | Telephone: (305) 539-8400 |
| | Facsimile: (305) 539-1307 |

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC. | **SCO'S MEMORANDUM IN** |
| Plaintiff/Counterclaim-Defendant, | **OPPOSITION TO IBM'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS ON SCO'S PRIVILEGE LOG** |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Case No. 2:03CV0294DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

Plaintiff, The SCO Group, Inc. ("SCO"), respectfully submits this memorandum in opposition to IBM's Motion to Compel the Production of Documents on SCO's Privilege Log.

## PRELIMINARY STATEMENT

SCO is the successor-in-interest to the UNIX business. In 1993 the original owner of the UNIX technology, AT&T, transferred the UNIX business to Novell, Inc. ("Novell"); in 1995 Novell sold the UNIX business to The Santa Cruz Operation ("Santa Cruz"); and in 2001, Santa Cruz sold that business to SCO, which was then named Caldera, Inc. ("Caldera"). Through this unbroken chain, SCO became the owner of the UNIX business.

IBM's motion turns on whether the transfer of control of a continuing business also transfers control of the attorney-client privilege attending that business. In seeking to sidestep the cases that have examined that question (answering it in the affirmative), IBM repeatedly describes the transactions that transferred the UNIX business to Santa Cruz and SCO as sales of mere assets that do not, either as a formal or practical matter, transfer control of a business.

The cases on which IBM relies are inapposite. Santa Cruz acquired from Novell, and SCO from Santa Cruz, not only the UNIX technology and related assets, but also a business that continued in operation through each transaction. SCO has properly asserted the privilege once held by its predecessors with respect to the UNIX business. The Court should deny IBM's motion.

## BACKGROUND

In the 1980s, AT&T owned the UNIX operating system, a seminal innovation that enjoyed unparalleled demand in the computer industry for its unique and powerful capabilities.

AT&T agreed to license UNIX to hundreds of the world's most sophisticated technology companies, including IBM. In late 1989, as UNIX continued to flourish, AT&T transferred ownership and operation of the UNIX business to its new wholly owned subsidiary, UNIX System Laboratories ("USL"). In 1991 AT&T spun off USL into an unaffiliated corporation but retained control of USL as the majority shareholder.

In June 1993, AT&T sold USL to Novell. Pursuant to a Reorganization and Merger Agreement, Novell Acquisitions, Inc., a wholly owned subsidiary of Novell, merged with and into USL. The surviving company was also named UNIX System Laboratories ("post-merger USL") and was a wholly owned subsidiary of Novell. Novell operated the UNIX business through that subsidiary until April 1994, when post-merger USL merged into Novell.

In September 1995, pursuant to an Asset Purchase Agreement ("APA"), Novell ("Seller") sold the UNIX business to Santa Cruz for over $100 million dollars in Santa Cruz stock, plus other consideration. Recital A of the APA describes the transferred business as follows:

> Seller is engaged in the business of developing a line of software products currently known as UNIX and UnixWare, the sale of binary and source code licenses to various versions of UNIX and UnixWare, the support of such products, and the sale of other products which are directly related to UNIX and UnixWare (collectively, the "Business").

Pursuant to the APA, Novell and Santa Cruz intended for Santa Cruz to "acquire certain of the assets of, and assume certain of the liabilities of Seller comprising the Business (the 'Acquisition')." APA Recital B (emphasis added). Accordingly, Novell sold the following assets (among others) to Santa Cruz:

- All of Novell's "right, title and interest in and to the assets and properties of Seller relating to the Business," APA Section 1.1(a);

- All of Novell's copyrights and trademarks "required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies," APA Amendment No. 2, Section A;

- "All obligations relating to the Business which arise subsequent to the Closing date" and all obligations "under the assigned contracts," see APA Section 1.1(b); Schedule 1.1(c);

- "All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business," Schedule 1.1(a); and

- "All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business." Id.

By 2000 Santa Cruz operated the UNIX business through its Server Software Division, which developed and marketed UNIX products, and its Professional Services Division, which supported those products. Santa Cruz also owned an unrelated Tarantella business. In 2001, pursuant to an Agreement and Plan of Reorganization ("APR"), Santa Cruz transferred its two UNIX-related divisions to Caldera in exchange for stock and other consideration. Santa Cruz's divestment of its UNIX business was so complete that it changed its name to Tarantella to reflect its retention of and concentration on the Tarantella business. Under the APR, Santa Cruz transferred the following assets (among others) to Caldera:

- All "rights and ownership of UNIX and UnixWare" including "all intellectual property rights appurtenant thereto," APR Exhibit 13.15A, Section 1;

- "All rights and obligations pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which [Santa Cruz] is a party or by which it is bound and which pertain to the Server Business," including third party "software license agreements and joint development agreements," "licensing agreements," and "services and support agreements," id. at Section 3;

- "Any assets relating to the Professional Services business," id. at Section 7;

- "All rights and obligations pertaining to the Professional Services business under any contracts or licenses," id.; and

- "All claims arising after the Closing Date against any parties relating to any right, property or asset" included in the transferred UNIX business. Id. at Section 9.

In sum, Novell and Santa Cruz transferred not only the UNIX technology and related assets, see APA Schedule 1.1(a); APR Exhibit 13.15A, Section 1, but also the business that developed, marketed, and licensed that technology, including licenses and other agreements; rights, liabilities, and claims related to the business; customer, supplier, and vendor relationships; employees; and leaseholds, office space, and tangible property. See APA Sections 1.3 (a), 2.11, and 4.13; APA Schedule 1.1(a); APR Schedule 13.15A; Declaration of William M. Broderick ("Broderick Decl.") ¶¶ 10-14 (Exh. A).

Santa Cruz and Caldera each continued the operations of the existing business. Each continued development of the UNIX technology, serviced the same contracts, collected revenues under those contracts, and supported the same customers. See, e.g., Broderick Decl. ¶¶ 10-15. Each took over management and operation of the business from its predecessor. See, e.g., Id.

In 2003 Caldera changed its name to The SCO Group, Inc. SCO is thus the successor to the UNIX business that was transferred from AT&T to Novell to Santa Cruz to Caldera.

On March 10, 2005, SCO and IBM filed their respective privilege logs identifying the documents they each withheld on the basis of the attorney-client privilege. In its log, SCO properly asserted the privilege over the UNIX-related documents at issue in the instant motion. SCO continues to review the documents to identify any non-privileged documents.

## ARGUMENT

As the successor to the UNIX business, SCO is also a successor to the attorney-client privilege attending that business.  SCO therefore has properly asserted the privilege over documents related to that business that were privileged in the hands of its predecessors AT&T, USL, Novell, and Santa Cruz.

IBM argues that SCO may not assert the privilege because it and Santa Cruz "never obtained corporate control of the entity from whom they acquired" the UNIX assets.  IBM Mem. at 6.  That premise misstates the law.  A change of control is sufficient to transfer the privilege, but it is not necessary.  See Tekni-Plex, Inc. v. Meyner & Landis, 674 N.E.2d 663, 668 (N.Y. 1996) (whether the privilege transfers "turns on the practical consequences rather than the formalities of the particular transaction").

The sale of assets that constitute a continuing business also transfers the attorney-client privilege attendant to that business.  See id. at 669 (privilege transferred with assets because the business "remained unchanged, with the same products, clients, suppliers and non-managerial personnel"); Soverain Software LLC v. Gap, Inc., 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004) ("If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well.").[1]

---

[1] See also In re I Successor Corp., 321 B.R. 640, 653 (S.D.N.Y. 2005) ("But if Intrepid had purchased assets as an ongoing entity, then it would have acquired the attorney-client privilege of Interliant as to the assets it acquired and would continue to operate."); Pilates, Inc. v. Georgetown Bodyworks Deep Muscle Massage Ctrs., Inc., 201 F.R.D. 261, 263-64 (D.C. 2000) (recognizing that sale of substantial assets transfers the privilege); R.G. Egan Equip., Inc. v. Plymag Tek, Inc., 758 N.Y.S.2d 763, 769 (N.Y. Sup. Ct. 2002) (stating that "the practical consequences of the transaction must show that the pre-existing operation of a business entity is continued in order for the attorney-client relationship to transfer to the new owners of the business or the assets").

Even the sale of some assets, if they make up a continuing business, transfers the privilege. Soverain, 340 F. Supp. 2d at 763 (rejecting "bright-line rule" that transfer of "some assets" precludes the transfer of the privilege); Graco Children's Prods. v. Regalo Int'l LLC, No. CIV.A.97-6885, 1999 WL 553478, at *4 (E.D. Pa. July 29, 1999) (buyer of only some of seller's assets had "the authority to assert the attorney client privilege" because the lawyer's former representation of seller "was in the interest of" those assets) (Exh. B).

In Soverain Amazon argued that Soverain could not assert the privilege because it had purchased three patents – "a small portion" of the sellers' assets – and therefore was not the "corporate successor" to the sellers. 340 F. Supp. 2d at 762. Soverain countered that it had acquired a "software business" that was "the commercial embodiment of the patents." Id. Noting that Soverain continued to operate that business by servicing the same customers and contracts and relying on the same engineers and consultants, the court concluded that Soverain was "a successor to the Transact business and the attorney-client privilege that attended that business." Id. at 763.

Similarly, Santa Cruz and SCO succeeded to the UNIX business. Each company acquired from its predecessor not only the UNIX technology and related assets, but also control of a commercial enterprise, including licenses and other agreements; rights, liabilities, and claims related to UNIX; customer, supplier, and vendor relationships; office space, leaseholds, and tangible property; personnel; and more. See, e.g., Broderick Decl. ¶¶ 10-15. The employees who followed the business kept doing the same work, with the same people, from the same offices, developing and delivering the same products and services to the same customers. Id. Moreover, Santa Cruz and SCO each took over management and operation of the business. Id.

Thus, the practical consequence of each acquisition was the transfer of control of the UNIX business and the continuation of that business under new management. Therefore, Santa Cruz and SCO also succeeded to the attorney-client privilege that attended that business.

IBM's concession that the privilege did transfer with AT&T's sale of USL to Novell highlights the weakness of IBM's position. See IBM Mem. at 6 n.8. As detailed above, the UNIX business that Novell acquired did not differ in substance from the UNIX business that it sold to Santa Cruz and that Santa Cruz sold to SCO. Novell operated the UNIX business as a subsidiary from June 1993 to April 1994. According to IBM, Novell's transfer of the UNIX assets to Santa Cruz during that period would have transferred the privilege, but the transfer of those very same assets in an asset sale in September 1995 did not. The courts have expressly rejected such subservience to form over substance. See, e.g., Tekni-Plex, 674 N.E.2d at 668-69; Soverain, 340 F. Supp. 2d at 762-63.

IBM cites inapposite or distinguishable cases that in any event are consistent with, and in several instances even support, SCO's position. IBM first cites Intervenor v. United States, 144 F.3d 653 (10th Cir. 1998), and Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343 (1985). Respectively, those cases state that the privilege belongs to the corporation and not its officers, and that the privilege passes to new management with a change of control. IBM Mem. at 5. They do not address, much less conclude, that a transfer short of a change of control, such as an asset sale, fails to pass the privilege. Those cases in fact support SCO's analysis of the case law. They demonstrate that the privilege attaches to the legal and economic interests embodied by the business, not to the persons running the business. Thus, when the business is transferred, the attorney-client relationship follows. See, e.g., Tekni-Plex, 674 N.E.2d at 669

(because the asset purchaser "possessed all of the rights, privileges, liabilities and obligations," the privilege "that it might need to defend against these liabilities or pursue any of these rights" was transferred).

Next, seeking to contrast a change of control with a transfer of assets, IBM says: "But when a corporation merely sells or transfers assets to another corporation, without transferring control of the corporation, the attorney-client privilege does not also pass." IBM Mem. at 5. IBM then cites In re Grand Jury Subpoenas, 734 F. Supp. 1207 (E.D. Va. 1990). Neither that case, nor the others in IBM's brief, states that a change of control is necessary for the privilege to pass.

IBM not only cites Grand Jury Subpoenas for a proposition it does not state, but also misquotes that case in the parenthetical to its citation. The quoted excerpt should read, "A transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." (Emphasis added.) Quoted in full, that statement reflects the court's recognition that a transfer of assets (with "more") will also transfer the privilege. If this were not the case, then the words "without more" would lack meaning.[2]

Having drawn the unsupported conclusion that a transfer of assets is insufficient and a change of control necessary to transfer the privilege, IBM purports to illustrate that conclusion

---

[2] IBM then seeks to build on that omission by misquoting In re In-Store Advertising, 163 F.R.D. 452 (S.D.N.Y. 1995), out of context. IBM quotes the opinion to say, "Where confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying the assets, the privilege is waived as to those communications." In fact, the first word in that sentence is "Therefore," and that sentence follows a quotation to the very same excerpt from Grand Jury Subpoenas that IBM quotes. Thus, even In-Store advertising recognizes that only "a transfer of assets, without more" fails to transfer the privilege. In any event, because the assets transferred in In-Store Advertising did not constitute a continuing business, the misquoted statement is dictum and that case is distinguishable.

by citing inapposite cases.  Like <u>Grand Jury Subpoenas</u> and <u>In-Store Advertising</u>, those cases involve the sale of "mere assets, without more" – not assets constituting a business enterprise. Thus, such cases do not address, much less conflict with, the case law recognizing that the transfer of a continuing business entity through an asset sale also transfers the privilege.  <u>See e.g.</u>, <u>Soverain</u>, 340 F. Supp. 2d at 763 (because the buyer continued to operate the same business it acquired by purchasing some of the seller's assets, the transaction did not amount to "a mere transfer of assets").  By way of further example, IBM cites <u>Zenith Elecs. Corp. v. WH-TV Broad. Corp.</u>, No. 01C4366, 2003 WL 21911066 (N.D. Ill. Aug. 7, 2003), for the proposition that "a mere transfer of some assets from one corporation to another – as was done in this case – does not transfer the attorney-client privilege."  IBM Mem. at 6.  In that case, however, the proponent of the privilege did not argue, and the court did not find, that the transferred assets constituted a business.

Finally, IBM quotes <u>Federal Deposit Insurance Corp. v. McAtee</u>, 124 F.R.D. 662, 664 (D. Kan. 1988), for the proposition that "the transfer of assets from one entity to another does not <u>generally</u> transfer the attorney-client privilege."  IBM Mem. at 5 (emphasis added).  As the qualifier implies, the court recognized that there are instances when the sale of assets transfers the privilege.  Indeed, even a cursory review of the opinion suggests that the Court would have found that the FDIC did succeed to the privilege had it maintained (as opposed to liquidated) "the pre-existing entity, managing its affairs." <u>McAtee</u>, 124 F.R.D. at 664.  <u>McAtee</u> thus also recognizes that the issue turns on whether control of a continuing business changed hands.

In sum, as the cases that SCO cites demonstrate, the attorney-client privilege attaches to and passes with the transfer of the business enterprise.  Those are the transfers by which SCO owns the UNIX business enterprise.

## CONCLUSION

SCO respectfully requests, for the foregoing reasons, that the Court deny IBM's Motion to Compel Production of Documents on SCO's Privilege Log.

DATED this 21st day of October, 2005.

Respectfully submitted,

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

By _____

*Counsel for The SCO Group, Inc.*

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, Inc., hereby certifies that a true and correct copy of the

foregoing Memorandum in Opposition to IBM's Motion to Compel Production of Documents on

SCO's Privilege Log was served on Defendant International Business Machines Corporation on

the 21st day of October, 2005:

By U.S. Mail and Facsimile:

David Marriott, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York 10604

Todd Shaughnessy, Esq.
Snell & Wilmer LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, Utah 84101-1004

_Laura Chaves._

# EXHIBIT A

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah  84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone:  (954) 356-0011
Facsimile:   (954) 356-0022

*Attorneys for The SCO Group, Inc.*

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:   (305) 539-1307

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>    Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff. | **DECLARATION OF WILLIAM M.<br>BRODERICK IN SUPPORT SCO'S<br>MEMORANDUM IN OPPOSITION TO<br>IBM'S MOTION TO COMPEL<br>PRODUCTION OF DOCUMENTS ON<br>SCO'S PRIVILEGE LOG**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

1. I am Director of Software Licensing for The SCO Group, Inc. ("SCO"). My office is located in Murray Hill, New Jersey.

2. Unless otherwise noted or evident from context, this Declaration is based on my personal knowledge.

3. I submit this Declaration in support of SCO's Memorandum in Opposition to IBM's Motion to Compel Production of Documents on SCO's Privilege Log.

4. Since December 1991, I have been continuously employed managing contracts for the successive companies that have owned the UNIX technology and business.

5. From December 1991 to June 1993, I was the Manager of Sales Operation for UNIX System Laboratories ("USL"), a company that owned and operated the UNIX business that AT&T originally created.

6. When AT&T sold USL to Novell, Inc. ("Novell") in June 1993, I remained with the UNIX business as a Novell employee performing substantially the same work as at USL. During most of my time at Novell, my title was Contract Manager.

7. When Novell sold the UNIX business to The Santa Cruz Operation ("Santa Cruz") in 1995, I remained with the UNIX business as a Santa Cruz employee performing substantially the same work as at Novell. During my employment at Santa Cruz, my title was Manager, Law and Corporate Affairs.

8. When Santa Cruz sold the UNIX business to Caldera, Inc. ("Caldera") in 2001, I remained with the UNIX business as a Caldera employee performing substantially the same work as at Santa Cruz. For a short period after the sale to Caldera, my official title

remained the same, but it later changed to my current title, Director of Software Licensing. In 2003, Caldera changed its name to SCO.

9.  In sum, my career has followed the UNIX business as it has been transferred successively from AT&T/USL to Novell to Santa Cruz to Caldera (now SCO). I personally witnessed and experienced the transition of the business from one owner to the next.

10. In each instance (USL to Novell, Novell to Santa Cruz, and Santa Cruz to Caldera), the company selling the UNIX technology also transferred control of the commercial enterprise that developed, marketed, and licensed that technology (the UNIX business). In each instance, the makeup and operation of the UNIX business continued as constituted through and after each transition.

11. In each instance, the transferred UNIX business included without limitation the UNIX source code, binary code, and intellectual property; licenses and other agreements; and the rights, liabilities, and claims related to that business. That is, without exception, I and everyone whom I knew and dealt with on both sides of each transaction understood, and operated without disturbance under the belief, that such tangible and intangible assets were transferred to the buyer in each instance.

12. In each instance, the transferred UNIX business also included all or many of the people who managed and operated the business, including senior-level managers, engineers, sales people, support staff, and other employees. It also included customer, supplier, and vendor relationships.

13. In each instance, the transferred UNIX business also included office space, leaseholds, furniture, and equipment.

2

14. In short, through and after each transaction, my colleagues and I almost universally kept doing the same work, with the same people, from the same offices and buildings, developing and delivering the same UNIX products and services to the same customers. We also continued to develop the same technology, service the same contracts, and collect revenues under those contracts.

15. In each instance, after each transaction, neither the seller nor its employees remained involved in managing or operating the business. The buyer (mainly through its newly acquired employees) took over those responsibilities.

16. As stated, AT&T/USL, Novell, and Santa Cruz each successively transferred the continuing UNIX technology and business to its respective successor. Even though the transfer from AT&T to Novell was structured as a merger and the subsequent transfers from Novell to Santa Cruz and from Santa Cruz to Caldera were structured as asset purchases, the transactions did not differ except as to form. The same continuing UNIX enterprise, including all the assets listed in paragraphs 10-14 above and more, changed hands in all three transactions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

October 21, 2005

_William M. Broderick_
William M. Broderick

3

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                                                        Page 1
Not Reported in F.Supp.2d, 1999 WL 553478 (E.D.Pa.)
**(Cite as: 1999 WL 553478 (E.D.Pa.))**

☞

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
GRACO CHILDREN'S PRODUCTS, INC., Plaintiff,
v.
REGALO INTERNATIONAL LLC, Defendant.
**No. CIV. A. 97-6885.**

July 29, 1999.

MEMORANDUM

KELLY.

*1 Currently before the Court is Defendant Regalo International LLC's ("Regalo") Motion for Reconsideration of the Court's Order disqualifying Mr. Frederick Tecce ("Tecce") as Regalo's attorney. This Court held oral argument on June 24, 1999, and after reviewing Regalo's Memorandum in Support of its Motion, and Plaintiff Graco Children's Products Incorporated's ("Graco") response thereto, Regalo's Motion for Reconsideration is denied.

*BACKGROUND*

On December 13, 1993, Graco filed a civil action alleging that playyards sold by Century Products Company ("Century Products") infringe Graco's U.S. Patent No. 4,811,437 (the " '437 patent"). Century Products denied infringement and challenged the validity and enforceability of the '437 patent on several grounds.

On December 5, 1995, after a sixteen-day trial, the jury found that Century Products had infringed the '437 patent under the doctrine of equivalents and awarded Graco $2,100,000 in lost profit damages. Tecce represented Century Products in the prior '437 patent litigation with Graco, including the appeal and the resulting Settlement Agreement.

On November 10, 1997, Graco brought the instant patent litigation against Regalo, alleging infringement of the '437 patent and seeking injunctive relief and monetary damages. On April 13, 1998,

Regalo's original counsel in this action withdrew from representation and Tecce entered his appearance on Regalo's behalf. The following June, Graco purchased certain assets and liabilities of Century Products. These assets related to Century Products' infant care products business including its car seat, car seat stroller, infant carriers and playyard product lines. As a result of this purchase, the newly acquired assets and product lines were formed into the Century Products Division of Graco ("Century Products Division"). Tecce is now, in effect, defending the same patent against the interests of the client he represented in the prior litigation.

On October 20, 1999, Graco filed a Motion to Disqualify Tecce asserting that, as a result of Graco's purchase of certain of Century Products assets and Tecce's prior representation of Century Products, Tecce represented a competitor of Graco and its Century Products Division in an infringement action that is substantially related to the instant action. Upon review of the parties' briefs and supplements, and after hearing oral argument on the issue, this Court granted Graco's Motion and ordered Tecce to remove himself from the current litigation. Tecce now seeks the Court's reconsideration of the said Order.

*STANDARD*

"The United States Court of Appeals for the Third Circuit has held that '[t]he purpose of a motion of reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.' " *Cohen v. Austin,* 869 F.Supp. 320, 321 (E.D.Pa.1994) (citing *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986)); *Drake v. Steamfitters Local Union No. 420,* No. CIV.A.97-585, 1998 WL 564486, at *3 (E.D.Pa.Sept. 3, 1998). Accordingly, a district court will grant a party's motion for reconsideration in any of three situations: (1) the availability of new evidence not previously available, (2) an intervening change in controlling law, or (3) the need to correct a clear error of law or to prevent manifest injustice. *Reich v. Compton,* 834 F.Supp. 753, 755 (E.D.Pa.1993) (citing *Dodge v. Susquehanna Univ.,* 796 F.Supp. 829, 830 (M.D.Pa.1992)). It is not sufficient for the Defendant to simply express his/her dissatisfaction with the Court's decision, for this does not present a proper basis for reconsideration. *See Glendon Energy Co. v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 1999 WL 553478 (E.D.Pa.)
**(Cite as: 1999 WL 553478 (E.D.Pa.))**

_Borough of Glendon,_ 836 F.Supp. 1109, 1122 (E.D.Pa.1993). In this case, Plaintiffs contend that reconsideration is warranted to correct a clear error of law, to prevent manifest injustice, and because new evidence exists. I shall begin my analysis with a discussion of the clear error of law and manifest injustice issues. [FN1]

> FN1. For purposes of clarity and efficiency, both issues will be addressed together. Regalo's arguments regarding clear error and manifest injustice are not mutually exclusive, in that, both hinge on the argument that no conflict exists. I am confident in my decision and remain unpersuaded by Regalo's argument that Graco seeks a tactical advantage in seeking disqualification. I granted the Motion to Disqualify because I found that there was a conflict of interest and disqualification was the means to cure such conflict. As I am now forced to justify my decision, I am doing so in a manner that will serve, not only as the method of clarifying any confusion that may exist as a result of my Order disqualifying Mr. Tecce, but also as quasi-reconsideration of that same Order. Although I do not believe that the Motion to Reconsider should be granted as a matter of law, I am utilizing this Memorandum as a manifestation of any "reconsideration" that I have done in the privacy of my chambers as a matter of fact.

A. _Clear Error of Law and Manifest Injustice:_ [FN2]

> FN2. Although, it appears that Regalo's position is simply that it does not agree with the Court's decision, it raises such discontent under the notion that the Court committed clear error of law, or in the alternative, a manifest injustice.

*2 Regalo asserts that the "record provides no basis in law or logic to allow Graco to cloak itself in the identity of a separate, distinct and independent corporate entity for its own personal gain." Regalo represents to the Court that it is, at the least, "at a complete loss to understand the basis for the disqualification of Mr. Tecce." [FN3] Although not addressed in the Order at issue here, the Court is compelled to discuss the reason for it's decision to disqualify Tecce. Regalo believes that, as a matter of law, there is no conflict present and that this argument raises the issue that the law was improperly or incorrectly applied.

> FN3. During oral argument, counsel for Tecce stated: "I have no reservation in stating to the court ... and I apologize when I said in my brief, in a sense that I'm baffled by why that order should be entered. I personally remain baffled...." (Tr. at 38-39, June 24, 1999).

Regalo contends that Century Products is a separate and distinct entity from Graco or Graco's unincorporated Century Products Division. The basis of this argument comes from Regalo's notion that Tecce formerly represented Century Products, a Delaware Corporation having no right, title or interest in the '437 Patent. Regalo further contends that the sale of certain assets does not mean that the corporate structure and independent identity of the corporation itself has changed or disappeared. Thus, according to Regalo, Century Products is Tecce's former client, and it continues to exist as a corporate entity having no interest in this lawsuit. However, on June 16, 1998, Century Holding Company [FN4] sold the Century Products Unit of Century Products Company as an ongoing business entity with physical assets, intangible property, such as trademarks and contract rights, and associated good will to Graco as the acquiring subsidiary of Rubbermaid Inc. Graco argues that as a result of Graco's acquisition of these assets, it should be considered Tecce's "former client." [FN5]

> FN4. Century Holding Company is the sole stockholder of Century Products Company.

> FN5. Graco contends that it is the successor-in-interest to Century Products' interests and rights under the November 21, 1996 Settlement Agreement and Exchange of Release between and among Century Products Company, Century Holding Company, and Graco.

The decision to disqualify a competent lawyer, freely chosen by a party, is of serious concern to the Court. "[E]thical questions cannot be resolved by a scientific application of principles and precedents because '[n]o code of ethics could establish unalterable rules governing all possible eventualities.' " _Fed. Deposit Ins. Corp. v. Amundson, et al._ 682 F.Supp. 981, 985 (citing _Black v. State of Mo.,_ 492 F.Supp. 848, 861 (W.D.Mo.1980)(citing _Cannon v. U.S. Acoustics Corp.,_ 398 F.Supp. 209, 215 (N.D.Ill.1975), _modified_

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 553478 (E.D.Pa.)

**(Cite as: 1999 WL 553478 (E.D.Pa.))**

on other grounds, 532 F.2d 1118 (7th Cir.1976))). A district court, in exercising its discretionary power,

> should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions.

United States v. Miller, 624 F.2d 1198, 1201(3d Cir.1980). "The party seeking to disqualify opposing counsel bears the burden of clearly showing that continued representation would be impermissible." Cohen v. Oasin, 844 F.Supp. 1065, 1067 (E.D.Pa.1994)(citing Commercial Credit Business Loans, Inc. v. Martin, 590 F.Supp. 328, 335-36 (E.D.Pa.1984)). However, any doubts as to the existence of a violation of the rules should be resolved in favor of disqualification. See International Business Mach. Corp. v. Levin, 579 F.2d 271, 283 (3d Cir.1978).

**\*3** The United States District Court for the Eastern District of Pennsylvania recognizes the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania as the standards for professional conduct that attorneys appearing before this court must comply with. Commonwealth Ins. Co. v. Graphix Hot Line, Inc., 808 F.Supp. 1200, 1203 (E.D.Pa.1992). Rule 1.9 of the Pennsylvania Rules of Professional Conduct states the following:

> A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after full disclosure of the circumstances and consultation.

When analyzing an attorney disqualification issue based on prior representation, the court should focus, not on whether the relationship at issue is "in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship 'for purposes of triggering inquiry into the potential conflict ...' " Ramada Franchise System, Inc. v. Hotel of Gainsville Assoc., 988 F.Supp. 1460, 1463 (N.D.Ga.1997)(citing Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 749 (2d Cir.1981) (citations omitted)). Therefore, it is not the adverse interest of a client (in the traditional sense) at stake. Id.; Marshall v. State of New York Div. of State Police, 952 F.Supp. 103, 108 (N.D.N.Y.1997).

Neither party rebuts the fact that Century Products was a former client of Tecce's. Clearly, an attorney-client relationship existed between them. [FN6] Thus, it is the job of this Court to decide whether or not the attorney-client relationship passed to Graco's Century Division when Graco purchased Century Products' assets.

> FN6. If the moving party is able to meet the burden of showing that an attorney-client relationship exists, and that the prior representation was "substantially related" to the current litigation, the court will make an irrebuttable presumption that relevant confidential information was disclosed during the former period of representation. Ramada Franchise, 988 F.Supp. at 1463; Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 646 F.2d 1020, 1028 (5th Cir.), cert. denied, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981).

1. Attorney-Client Relationship:

The authority to assert and waive the corporation's attorney-client privilege follows the passage of control of the corporation. Id.; Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). "The right to assert the attorney client privilege is an incident of control of the corporation and remains with the corporation as it undergoes mergers, takeovers, and name changes." Id.; NCL Corp. v. Lone Star Bldg. Ctrs., Inc., 144 B.R. 170, 174 (S.D.Fla.1992). Other courts have found that assignees of most or all of a corporation's assets could assert the corporation's attorney-client privilege. Id. at 1464; In re Financial Corp. of Am., 119 B.R. 728 (Bankr.C.D.Cal.1990)(holding that the authority to assert the corporation's attorney-client privilege passes with the transfer of substantially all of the corporation's assets and liabilities). In In re Crescent Beach Inn, 37 B.R. 894 (Bankr.D.Me.), the court suggested that the issue of whether or not a successor entity could invoke the attorney-client privilege should be interpreted in light of the surrounding circumstances. Ramada Franchise, 988 F.Supp. at 1464; Crescent Beach, 37 B.R. at 896.

**\*4** My decision to grant Graco's Motion to Disqualify was made in significant part because of the circumstances surrounding Graco's purchase of Century Products assets. Graco submits that the assets that it purchased, while not all of Century Products assets, were those pertaining to the accused

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 553478 (E.D.Pa.)
(Cite as: 1999 WL 553478 (E.D.Pa.))

product in the prior litigation. Graco purchased certain assets and liabilities relating to its infant care products business including its car seat, car seat stroller, infant carriers and playyard product lines. The agreement included the purchase of Century Products' operations in Canton, Macedonia, and Twinsburg, all in Ohio, and in Mexico along with working capital and brand names. The '437 Patent at issue in the prior and current litigation is for Graco's travel playpen, or "foldable playyard." *Graco Children's Products, Inc. v. Century Products Company, Inc.,* No. CIV.A.93-6710, 1996 WL 421966, at * 1 (E.D.Pa. July 23, 1996). When Graco purchased the assets that it did from Century Products (i.e., those relating to infant playyard product lines), it purchased assets that were directly relevant in the prior litigation. I believe that Tecce's representation in the prior litigation was in the interest of those assets that Graco has in its possession now. Therefore, while it is not evident just how much, or what percentage of Century Products assets were transferred, it is my belief that the purchase gave Graco the authority to assert the attorney client privilege. [FN7] As far as the current litigation involves the '437 Patent, and as a result of Graco's purchase of the assets involved in the previous case involving the validity of that patent, I find that the right to assert the attorney-client privilege does pass to Graco.

> FN7. The privilege should be limited to confidences regarding Century Products' previous representation involving infant playyard product lines.

*2. Substantial Relationship:*

The next phase of our analysis is the "substantial relationship" inquiry. To perform a "substantial relationship" analysis under Rule 1.9, a court must first examine the nature and scope of the present lawsuit against the former client. *Brennan v. Independence Blue Cross,* 949 F.Supp. 305, 308 (E.D.Pa.1996), See also *INA Underwriters Ins. Co. v. Nalibotsky,* 594 F.Supp. 1199, 1206 (E.D.Pa.1984). Clearly, the nature and scope of the current litigation is similar to that of the former litigation. Both cases are patent infringement actions initiated by Graco involving the same '437 Patent. Tecce's representation in the former litigation assisted Century Products in defending against Graco's charges of infringement on the '437 patent. Graco asserts that there can be no doubt that the two cases involve the same subject matter and thus, the cases are sufficiently similar, if not, identical. Again,

simply because both cases involve the same patent, notwithstanding the fact that the same defenses are being raised by Tecce in the current litigation (i.e., the validity and enforceability of the '437 Patent), this Court finds that the nature of the present lawsuit is very similar to past one involving Century Products.

**\*5** Next, the court must inquire whether "[i]n the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?" *Nablitosky,* 594 F.Supp. at 1206. The Court must decide whether the client may have disclosed confidences to his attorney which could be relevant to the present action, and if so, could any such confidences be detrimental to the former client in the current litigation.

In *Realco Servs., Inc., v. Holt,* 479 F.Supp. 867 (E.D.Pa.1979), the court stated that a lawyer "might have acquired" substantially related information in issue if:

> (a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship.

*Id.* at 871-72. Tecce has been unable to sufficiently counter Graco's arguments in support of disqualification. I have the discretion to grant or deny a Motion to Disqualify and I have decided to do so under the notion that a conflict does exist. Throughout the hearings on this issue, the Court has been open to review evidence of specific confidences that may preclude Tecce's representation of Regalo in this matter. However, it is not necessary to find specific examples to justify disqualification. Under the "substantial relationship" inquiry, the Court needs only to find the possibility of disclosure; and the Court is not required to inquire into whether actual confidences were disclosed. *Ramada Franchise,* 988 F.Supp. at 1463; *Dodson v. Floyd,* 529 F.Supp. 1056, 1060 (N.D.Ga.1981). Graco has alleged that Tecce "might have acquired" certain confidences, the disclosure of which would certainly have an adverse impact on Graco's Century Division (i.e., Tecce's former client in this regard). Tecce's time records devoted to the previous litigation indicate that he spent 379 hours in two months working on preparation for the trial. This Court believes--and Graco correctly asserts-- that it can be inferred that Tecce obtained and has control over information that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 553478 (E.D.Pa.)
(Cite as: 1999 WL 553478 (E.D.Pa.))

is adverse to Graco's Century Division. This is enough to satisfy the second prong of the substantial relationship test, however, it does not stand alone.

3. *The Settlement Agreement in the Prior Litigation:*

The Comment to Rule 1.9 of the Pennsylvania Rules of Professional Conduct instructs the following:

When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited.... The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

*6 Perhaps most important in the disqualification of Tecce is the fact that the previous litigation involved a confidential settlement agreement. This settlement agreement is the "specific transaction" that should warrant attorney disqualification. Both parties in this litigation have referred to Paragraph 8 of the Settlement agreement in arguing the issue of disqualification. At oral argument, counsel for Graco clarified that Paragraph 8 of the Settlement Agreement states that "Century will refrain from using the information gathered or obtained in the aforementioned action, to cooperate with other parties attacking the validity and/or enforceability of the '437 Patent, or for any other purpose whatsoever." (Tr. at 40, June 24, 1999). Regalo argues that this paragraph of the Settlement Agreement is the only paragraph that has any relevance to this case. Regalo asserts that it was agreed that Century would refrain from using information gathered or obtained to attack the validity of the patent, and that because validity was taken out of the case, no conflict exists pursuant to any settlement provisions. [FN8]

FN8. Both parties have suggested that an amicable means of settling this issue would come from Regalo's withdrawal of any of its defenses as to the validity and enforceability in return for Graco's withdrawal of its Motion to Disqualify. However, no agreement of this sort ever emerged and Regalo has not yet taken the validity issue out of the case.

Graco counters this by referencing that not only had Century agreed to refrain from using such information to attack the validity of the patent, but Century was to refrain from using such information "for any other purpose whatsoever." Tecce was privy

to the Settlement Agreement, was involved in its negotiations, and therefore was bound by its terms pursuant to the attorney-client relationship that existed. It "[i]s well settled that a district court has jurisdiction to enforce a settlement agreement entered into by parties to a case pending before the court." *Lawrence v. Birmingham Township*, No. CIV.A.89-2096, 1991 WL 8877, at *2 (E.D.Pa. Jan. 25, 1991); *Pugh v. Super Fresh Food Markets, Inc.*, 640 F.Supp. 1306, 1307 (E.D.Pa.1986); *Rosso v. Foodsales, Inc.* 500 F.Supp. 274, 276 (E.D.Pa.1980). "Such jurisdiction is founded on the policy that favors the amicable adjustment of disputes and the avoidance of costly and time-consuming litigation." *Id.; Pugh*, 640 F.Supp. at 1307. I will not ignore the policy behind Rule 1.9, and I will not undermine the importance of the settlement process by allowing Tecce's continued representation of Regalo. [FN9]

FN9. While I have given the essential reasons for granting Graco's Motion to Disqualify, I find that other considerations lead to disqualification. Specifically, Tecce was: (a) involved in confidential meetings where sensitive business information was reviewed for the previous trial; (b) active in the entire trial and participated in all areas of trial preparation; (c) preparation for the appeal.

The United States Court of Appeals for the Third Circuit has stated the reasons for prohibiting an attorney from representing adverse interests in the same or substantially related litigation. In *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157,162 (3d Cir.1984), the Third Circuit explains:

It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second the rule is important for the maintenance of public confidence in the integrity of the bar. Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

*7 In granting Graco's Motion to Disqualify, I believe that I was following the interest of this Circuit and preventing exactly what Rule 1.9 provides protection from. [FN10] Therefore, no error of law was committed or needs to be corrected, and as a result, no manifest injustice exists. [FN11]

FN10. Although Graco submitted adequate evidence of a conflict, it should not go unsaid that my decision to grant the Motion

to Disqualify was also motivated by the fact that an appearance of impropriety exists. Such impropriety stems from the same evidence that has been discussed previously.

FN11. My conclusion that there is no manifest injustice here stems from the basic notion that, in allowing Tecce to proceed with his representation in this litigation, an injustice could manifest itself later in the proceedings. Again, I granted the Motion to Disqualify to avoid such a manifestation of injustice (i.e., to avoid attorney-client confidences between Tecce and his former client that may have an adverse effect on Graco's Century Products Division and Graco--two entities that do not exist independent of each other).

B. *Existence of New Evidence:*

On October 26, 1998, the first oral argument on the disqualification issue was held. Regalo contends that since that argument, "new evidence" has been identified. The new evidence included a specific agreement by counsel for Graco to withdraw the Motion for Disqualification. Regalo claims that they never had time to fully address that agreement prior to the Court's disqualification Order, nor has Graco's counsel ever been required to address the reason why he allegedly abandoned the agreement. Regalo argues that fundamental fairness requires that both sides be given the opportunity to address this evidence.

Regalo also asserts that further new evidence concerning the settlement process has arisen since the prior hearing. In arguing this, Regalo contends that the record contains further evidence that Graco has not approached this litigation in good faith, but rather, has merely sought to gain by a war of attrition what it could not gain on the merits of the case. Regalo asks, "[w]hat other explanation could there be when each time that Defendant effectively agreed to Plaintiff's settlement demands, the demand was changed?" (Def.['s] Reply Mem. in Supp. of its Mot. for Recons. at 3).

This Court is unable to distinguish between the two pieces of evidence that have been addressed by Regalo. Both, independent of each other, relate to settlement negotiations regarding the disqualification issue. Both parties have represented to the Court that there was a possibility that the issue would be settled, however, it is clear that this is not the case. While I acknowledge that Regalo has made several attempts

to settle this matter, Graco has appeared reasonable in its attempts at settling the issue as well. As the Court understands the situation, while both parties contemplated settlement, Graco offered certain stipulations that were not anticipated by Regalo, and as a result, Regalo asserts that Graco does not intend to settle the issue, but rather to harass the opposition.

During the June, 1999 oral argument, Graco explained that the stipulations that were asked for in order to settle the matter, all requested specific recitals from Regalo that they understood what claims could not be raised later. In sum, Graco asserts that it and the Graco Century Products Division, may have a legal claim against Tecce for breach of the Settlement Agreement. The stipulations sought by Graco during settlement negotiations were to prevent any potential waiver on its part regarding the possible action pending against Tecce. The Court accepts Graco's reasons for adding the stipulations to the negotiations, and will not conclude that this is new evidence for purposes of Regalo's Motion for Reconsideration. I believe that Graco has sufficiently shown that it has made good faith efforts to settle this case, and in light of the fact that I do believe that a conflict of interest exists, I will not consider the stipulations or any part of the settlement negotiations as "new evidence."

*8 Therefore, for the reasons stated above, Regalo's Motion for Reconsideration will be denied.

C. *Certification of Appealability:*

In the event that this Court denied the Motion for Reconsideration, and in light of the fact that it has denied the Motion, Regalo seeks to have the disqualification Order certified for immediate appeal pursuant to 28 U.S.C. § 1292(b). Regalo's request for certification is denied.

In *Richardson-Merrell v. Kohler,* 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985), the United States Supreme Court held that "orders disqualifying counsel in civil cases ... are not collateral orders subject to appeal as 'final judgements.' " *Richardson-Merrell,* 472 U.S. at 440. The Supreme Court's holding applies to all orders disqualifying counsel, thus limiting the appealability of disqualification orders.

However, Section 1292(b) provides that a district court may certify an order for appeal if it concludes that the Court's decision to disqualify involves (1) a controlling question of law as to which there is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 553478 (E.D.Pa.)
**(Cite as: 1999 WL 553478 (E.D.Pa.))**

substantial ground for difference of opinion and (2) that an immediate appeal from the Order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). None of the issues discussed above involve controlling question of law as to which there is substantial ground for difference of opinion. The Order granting disqualification was based on well-settled principals of law and the application of that law to the specific facts of this case. Therefore, the issue does not reach the threshold for certification under Section 1292(b). *See Decora Inc. v. DW Wallcovering, Inc.,* 901 F.Supp. 161, 165, (S.D.N.Y.1995). Since there exist no controlling questions of law as to which there is substantial ground for difference of opinion, and considering that an immediate appeal from the Order would only serve to delay, rather than advance the ultimate termination of the litigation, the Motion for Certification is denied.

*CONCLUSION*

Accordingly, for the reasons stated herein, and for those stated regarding the prior Order disqualifying counsel for Regalo, the Motion for Reconsideration is denied. The Motion for Certification pursuant to 28 U.S.C. § 1292(b) is also denied.

An appropriate Order follows.

ORDER

AND NOW, this day of July, 1999, upon consideration of Defendant Regalo International LLC's Motion for Reconsideration of the Court's Order disqualifying Mr. Frederick Tecce as Regalo's attorney, and Plaintiff Graco Children's Products, Incorporated's response thereto:

1. It is hereby ORDERED that the Motion for Reconsideration is DENIED.

2. Regalo International LLC's Motion for Certification pursuant to 28 U.S.C. § 1292(b) is also DENIED.

Not Reported in F.Supp.2d, 1999 WL 553478 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:97cv06885 (Docket) (Nov. 10, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.