SNELL & WILMER, LLP
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800



CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
  *International Business Machines Corporation*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim- Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>Defendant/Counterclaim- Plaintiff. | **DECLARATION OF**<br>**TODD M. SHAUGHNESSY**<br>**IN SUPPORT OF IBM'S REPLY**<br>**MEMORANDUM IN SUPPORT OF**<br>**MOTION TO COMPEL PRODUCTION OF**<br>**DOCUMENTS ON SCO'S PRIVILEGE**<br>**LOG**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke Wells |

376260.1

I, Todd M. Shaughnessy, declare as follows:

1.      I represent IBM in the lawsuit brought by SCO against IBM, entitled <u>The SCO Group, Inc. v. International Business Machines Corporation</u>, Civil No. 2:03CV-0294 DAK (D. Utah 2003).  This declaration is submitted in support of Defendant/Counterclaim-Plaintiff IBM's Reply Memorandum in Support of Motion to Compel Production of Documents on SCO's Privilege Log.

2.      Attached hereto are true and correct copies of the following documents:

(a)      Exhibit 1 is a copy of relevant excerpts from the transcript of the January 28, 1998 hearing before the Honorable Ronald N. Boyce in <u>Caldera, Inc. v. Microsoft Corp.</u> (No. 2:96-CV-00645B).

(b)      Exhibit 2 is a copy of Caldera, Inc.'s Memorandum In Opposition to Defendant's Motion to Compel Production of Documents Subject to Attorney-Client Privilege, dated Dec. 15, 1997, in <u>Caldera, Inc. v. Microsoft Corp.</u> (No. 2:96-CV-00645B).

(c)      Exhibit 3 is a copy of relevant excerpts from The SCO Group Inc.'s 2003 Annual Report (Form 10-K), dated Jan. 28, 2004.

(d)      Exhibit 4 is a copy of relevant excerpts from the Acquisition of the Server and Professional Services Groups of The Santa Cruz Operation, Inc. and the Reorganization of Caldera Systems, Inc., dated May 7, 2001.

(e)      Exhibit 5 is a copy of relevant excerpts from the transcript of the deposition of William Broderick, dated Nov. 30, 2005.

2

3.      I declare under penalty of perjury that the foregoing is true and correct.


Executed:  December **9** , 2005.

Salt Lake City, Utah

_____
                                    Todd M. Shaughnessy

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of December, 2005, a true and correct

copy of the foregoing was sent by U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Todd M. Shaughnessy

4

# EXHIBIT 1

ORIGINAL

CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

I I  AUG 98 AM II: I G

DISTRICT OF UTAH

BY:

DEPUTY CLERK

* * *

CALDERA, INC.                    )
                Plaintiff,       )
v.                               )    Case #96cv0645B
                                 )
MICROSOFT CORPORATION,           )
                Defendant.       )
                                 )

BEFORE THE HON. RONALD N. BOYCE

January 28, 1998

Motion to Amend, Motion to Compel
Production of Documents, Motion for Amendment
of the Protective Order

Reported by Michelle Mallonee, CSR, RPR

ALPHA COURT REPORTING
P.O. Box 510047
Salt Lake City, UT 84151-0047
Phone:  (801) 532-5645
Fax:  (801) 595-8190

File No. 012898M

1    force users to buy Microsoft's DOS, not a competitor's DOS.

2         THE COURT:  All right.  On this matter, since we

3    are dealing with essentially notice pleading and not a

4    heightened state pleading, this type of pleading is within

5    the Supreme Court's decision in Leatherman, and it requires a

6    relatively superficial expression of theory rather than

7    details of facts.  I think the provisions contained in the

8    pleadings are adequate to allow the amendment.  Whether the

9    contentions made by Microsoft as to whether a technological

10   benefit could be shown which could defeat the claim, which is

11   probably the law, if there is a technological benefit from

12   the joining of the two, then that would effectively eliminate

13   the claim regardless of what dominant purpose of that is.  I

14   think that has to await information in the form of a

15   challenge, either under Rule 56 or through some other

16   mechanism, so I'll allow the amendment of the complaint.

17        I don't think I really need argument on the

18   attorney-client privilege matter.  I've done a lot of work on

19   that, and I'm satisfied the claim of attorney-client

20   privilege is not valid.  When the Novell documents were

21   turned over to Caldera, that destroyed the privilege.

22   Caldera is not the alterego or successor in interest in the

23   legal context of those materials.  The analogies to the

24   Supreme Court's decision with regard to its successor of

25   interest, such as a Trustee in bankruptcy, are an imperfect

18

1    analogy.  That case simply does not apply.

2          It's a simple waiver situation.  You have separate

3    entities, and one entity hands over to the other all of the

4    technology and information and materials covered by an

5    attorney-client privilege.  Without some type of additional

6    protection that privilege is gone, and so the Motion to

7    Compel will be granted with regard to those documents.

8          MR. HILL:  Your Honor, on this point, we had made a

9    determination that we were going to concede the issue, but we

10   do have some questions regarding the manner of turning things

11   over, and if we could address those now.

12         THE COURT:  All right.

13         MR. HILL:  I think it might be helpful, first we

14   have wanted to clarify that the waiver only applies to

15   documents that have actually been delivered from Novell to

16   Caldera.

17         THE COURT:  As long as there are documents in

18   Novell's possession that have not otherwise been distributed

19   beyond the legitimacy of the attorney-client privilege, then

20   they are still protected.

21         MR. HILL:  Number two, this is an issue we haven't

22   presented facts before the Court on this because we didn't

23   think it was, strictly speaking, relevant to the motion, but

24   there are some documents constituting legal advice from at

25   least my law firm and Mr. Palumbo's predecessor law firm,

19

# EXHIBIT 2

STEPHEN D. SUSMAN
CHARLES R. ESKRIDGE III
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas   77002-5096
Telephone: (713) 651-9366

MAX D. WHEELER (A3439)
STEPHEN J. HILL (A1493)
RYAN E. TIBBITTS (A4423)
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801)521-9000

PARKER C. FOLSE III
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3180
Seattle, Washington  98101
Telephone: (206) 516-3880

RALPH H. PALUMBO
LYNN M. ENGEL
SUMMIT LAW GROUP
1505 Westlake Ave. Suite 300
Seattle, Washington  98109
Telephone: (206) 281-9881

RECEIVED CLERK
FILED
1997 DEC 15 P 5: 18
U.S. DISTRICT COURT
DISTRICT OF UTAH

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTER DIVISION

CALDERA, INC.

        Plaintiff

vs.

MICROSOFT CORPORATION

        Defendant.

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS SUBJECT TO ATTORNEY-CLIENT PRIVILEGE**

Case No.:  2:96CV 0645B

Judge Dee V. Benson

## INTRODUCTION

Defendant Microsoft Corporation has filed a motion to compel production of

documents which have been withheld by plaintiff Caldera, Inc. on the grounds of attorney-

client privilege.  In arguing the motion, Microsoft mischaracterizes both the nature of the



ORIGINAL

"assets" acquired by Caldera from Novell, and the relationship between Caldera and Novell. Although a simple sale of a tangible asset from a corporation may not automatically transfer the right to assert or waive attorney-client privileges associated with that asset, Caldera did not acquire such a simple asset; rather, it acquired a fully operational business division from Novell. This "DOS Business" previously had an independent existence as Digital Research, Inc. before its acquisition by Novell, and includes a wide variety of liabilities and assets, including outstanding contracts, good will, obligations, and causes of action, including the instant suit against Microsoft. The attorney-client privileges associated with the DOS Business are an integral and necessary part of the continued operation of the business, and, under well-established law, have been transferred to the new owners of that business.

In addition, Caldera is not an unrelated third party as to Novell's attorney-client relationships, and so disclosure of Novell's privileged documents to Caldera does not operate as a waiver of Novell's (and now Caldera's) privilege. The documents at issue were created in the course of Novell's and DRI's conduct of the business now owned by Caldera, and, indeed, most of the documents at issue in this motion were actually generated during Novell's efforts to investigate and prepare many of the claims which are now part of Caldera's action here. As Novell and Caldera are defending the same legal interests, they are entitled to share information regarding those interests without waiving any privilege.

One important aspect of the DOS Business acquired by Caldera is the legal rights which Caldera seeks to vindicate through this lawsuit. The value of these claims depends, of

- 2 -

course, on Caldera's ability to effectively litigate them, which in turn requires that Caldera have access to the legal advice and work product of the attorneys who investigated and prepared these claims on behalf of Caldera's predecessor.  Caldera's ability to effectively vindicate these rights also now depends upon its ability to protect the privileged nature of that advice.

## BACKGROUND

DRI was originally organized in 1976, and was in the business of developing operating system software for 15 years as an independent corporate entity.  On October 28, 1991, DRI merged with Novell through a stock buy-out.

On July 23, 1997, Caldera acquired from Novell its so-called "DOS Business" pursuant to the terms of an Asset Purchase Agreement ("Agreement").  This Agreement, attached to Microsoft's Memorandum as Exhibit "A," transferred from Novell to Caldera the entire DOS business that Novell acquired from DRI.  As stated in the Agreement, the transfer included the following:

(a)  "[S]pecified assets and liabilities comprising the DOS Business including the products associated with the DOS Business"  The DOS Business is defined by the Agreement to include "the business of developing, marketing, and distributing the DOS Products."  Agreement, §§ 1.3, 2.5.

(b)  DOS Products, including DR DOS, Novell DOS, and ten other listed software products, all of which were acquired by Novell from DRI.  Trademarks, patents, and

- 3 -

documentation associated with these products are included.  Agreement, §§ 1.3, 2.14, 2.6,
3.1.

(c)  "Technology" related to DOS Products, whether owned by Novell or licensed by
it.  This technology includes "existing enhancements, designs, technology, improvements,
inventions, works of authorship, trade secrets, formulas, processes, routines, subroutines,
techniques, concepts, methods, ideas, algorithms, source code, object code, flow charts,
diagrams, coding sheets, source code listings and annotations, programmers' notes, work
papers, and work product."  Agreement, §§ 3.1, 2.14, 2.11.

(d)  *Software contracts, including* "(a) *licenses from third parties (development and/or*
marketing), (b) licenses from third parties (internal use only); (c) development contracts,
work-for-hire agreements, and consulting and employment agreements; (d) distributorships,
dealerships, franchises, and manufacturer's representative contracts; (e) licenses and
sublicenses to others; and (f) maintenance, support, or enhancement agreements."  Agreement,
§§ 3.1, 2.12

(e)  Revenues "associated with the DOS Business" accruing after the date of the
Agreement.  Agreement, §3.1

(f)  "All of Novell's right, title, and interest in and to any and all claims or causes of
action held by Novell at the Closing Date and associated directly or indirectly with any of the
DOS Products or Related Technology. . ."  *Id.*

- 4 -

(g) All documentation related to the DOS Business, including "all accounting and legal records directly related to the abuse or enforcement of any right or interest in the Transferred Assets." Agreement, §2.4, 2.14

As required under the Agreement, Novell assigned to Caldera approximately 100 active contracts with customers for the license of DR DOS products. These included contracts with independent retailers, value added resellers, original equipment manufacturers (OEMs), and major accounts. Declaration of Bryan Sparks, ¶3. (attached as Exhibit "A")

Following the assignment of these contracts, Caldera assumed all of Novell's rights and obligations arising out of the DOS Business. These included the right to ongoing royalties and the obligation to provide product support (*e.g.*, fixing bugs and deficiencies), account management (*e.g.*, providing cross promotional and marketing activities), and sales support. Declaration of Bryan Sparks, ¶4.

On September 16, 1996, Novell's General Counsel and Senior Vice President, David R. Bradford, authorized Novell's attorneys to make available to Caldera all documents related to the DOS Business, based upon his understanding that all privileges associated with such documents would be preserved. Bradford Letter, attached as Exhibit "B."

## ARGUMENT

Both in the conduct of the DOS Business and in the litigation of the claims raised in this lawsuit, Caldera must stand in the shoes of Novell. Caldera is obligated to support the software developed by Novell, and is further required to fulfill the contractual obligations associated with that business which Novell negotiated and executed. Acceptance of those

obligations requires Caldera to have access to the corporate records of Novell associated with its business, along with the necessary privileges associated with those records. Indeed, in this lawsuit, Microsoft will certainly seek to require that Caldera defend Novell's actions in developing and marketing its DOS products. Yet, by this motion, Microsoft seeks access to privileged material which was prepared by Novell in order to meet the very challenge which Caldera now faces. Caldera's ability to effectively vindicate the legal rights accompanying the DOS Business it acquired requires it to effectively evaluate the facts underlying Novell's conduct of the DOS Business and their legal significance. These facts and the applicable law were extensively investigated and evaluated by attorneys retained by Novell, and Caldera must now rely on that same legal work. Caldera is entitled to exercise the privileges associated with that legal work, and so Microsoft's Motion to Compel should be denied.

**1. Caldera Purchased the Entire DOS Business from Novell, and Thereby Acquired the Right to Exercise Privileges Associated with That Business.**

In *Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986 (1985), the Supreme Court reiterated the general rule regarding the transfer of a corporation's attorney-client privilege: whenever control over the entity is passed on, the authority to assert the privilege passes as well. *Id*. at 349-50. In applying that rule, the Court held that since a trustee in bankruptcy has the power to operate the business, even in the course of a liquidation, the ability to control the business' privileges should be vested in the trustee. *Id*. at 352-53. It has since been clearly recognized that the Court "established a functional test" to determine whether a successor is entitled to control privileges, looking to the entity which controls the relevant business operations, regardless of whether the corporate structure remains

- 6 -

the same, or even whether the business is an operational entity or is merely in the process of being liquidated. *See, e.g., Maleski v. Corporate Life Ins. Co.*, 641 A.2d 1, 3 (Pa. 1994).

In this case, the entire, distinct DOS Business was transferred from Novell to Caldera, and control of the privileges associated with that business are a necessary component of it. As with any ongoing business, the advice of counsel related to the operation of the DOS Business is an important aspect of the business. As such, those documents were expressly included as part of the transfer of the business to Caldera. *See* Agreement, §§2.4, 2.14 (Transferred Assets includes "all accounting and legal records directly related to the abuse or enforcement *of any right or interest in the Transferred Assets*").

In order to make their argument in support of this motion, Microsoft has mischaracterized the transaction between Novell and Caldera as a simple transfer of particular assets, ignoring the nature of the assets which have been transferred. This was not a mere sale of software; the intent and effect of the Agreement is to transfer an ongoing business--indeed, a business that was totally separate and thriving when owned by DRI before its merger with Novell--with all of its accompanying assets, liabilities, contracts, and legal rights. When the DOS Business was transferred to Caldera, the documents and their associated privileges relevant to the management of that business were transferred to the new owners.

In *In re Grand Jury Subpoenas, 89-3 and 89-4*, 902 F.2d 244 (4th Cir. 1990), the court considered a situation in which an unincorporated division of a corporation was independently incorporated as a formal subsidiary, and then later sold. The court held that the subsidiary controlled the privileges associated with documents related to the subsidiary's business, even

- 7 -

though they were created while the subsidiary was still an unincorporated subdivision of the larger corporation.

> When [the corporation] established Subsidiary, . . . caus[ing] the management of Subsidiary to change from that of a true subsidiary to that of an independent corporation, there was a change of management in the normal course of business.  The attorney-client or work-product privilege attaching to any of the papers involved in this case . . . became Subsidiary's to waive, should it be so advised.

902 F.2d at 248.

The fact that the DOS Business at issue in this case was sold to a third party instead of being independently incorporated prior to being sold does not alter the analysis:  the issue is one of deciding where the management control of the DOS Business lies, not in an artificial analysis of the nature of the formal corporate structure.  A change in control of the privilege can result from any shift in management over the operations of the business, whether it is "a takeover, merger, loss of confidence of shareholders, or simply normal succession."  *Weintraub, supra*, 471 U.S. at 349.  "When ownership of a corporation changes hands, whether the attorney-client relationship transfers as well to the new owners turns on the practical consequences rather than the formalities of the particular transaction."  *Tekni-Plex, Inc. v. Meyner and Landis*, 651 N.Y.S.2d 954, 959 (N.Y. App. 1996).  In this case, the "practical consequences" of the transaction was to transfer the control and management of an ongoing business to Caldera, along with all of that business' rights and obligations.

This is true even if the transfer is designated as a "sale of assets."  In *Tekni-Plex, supra*, an existing entity ("old Tekni-Plex") was merged into a new corporation ("new Tekni-Plex") by means of an asset sale.  As in this case, the argument was made that since the

- 8 -

transaction involved a sale of assets, the attorney-client privileges held by the old Tekni-Plex did not transfer to new Tekni-Plex. The court considered the implications of the Supreme Court's holding in *Weintraub*, and found that although a "mere" transfer of assets does not ordinarily transfer an attorney-client relationship, if the asset sale is in reality the sale of an ongoing business, the privileges also transfer. *Id.* at 959-60. Under the terms of the asset sales agreement at issue in that case, the new Tekni-Plex was to acquire "all of the rights, privileges, liabilities and obligations of old Tekni-Plex, in addition to its assets." The court held that such an asset sale does, in fact, transfer the right to control the attorney-client privileges associated with the acquired business: "Certainly new Tekni-Plex is entitled to access to any relevant pre-merger legal advice rendered to old Tekni-Plex that it might need to defend against these liabilities or pursue any of these rights." *Id.* at 960.

Caldera has likewise acquired "all of the rights, privileges, liabilities, and obligations" associated with the DOS Business, and its ability to "defend against these liabilities or pursue any of these rights" requires it to rely on the prior legal work and advice of the business' attorneys, and to retain the privileges associated with that advice. The explicit transfer of these claims to Caldera makes it especially clear that Caldera is entitled to control the attorney client privilege associated with the acquired business. These claims constitute

> assets and liabilities as to which the need for post-sale access to pre-sale legal advice may be expected in the ordinary course of business. For example, questions may arise after the sale regarding . . . a continuing contract on which pertinent legal advice was obtained prior to the sale. Sale of the stock of the subsidiary also assumes the ability *of successor management to exercise normal management prerogatives. Those* prerogatives include control over the privileges of the corporation.

*In re Sealed Case*, 120 F.R.D. 66, 70 (N.D. Ill. 1988).  Likewise, Caldera acquired

contractual obligations associated with the DOS Business as to which access to the pre-sale

legal advice would be expected in the ordinary course of business.  *See also Medcom Holding*

*Co. v. Baxter Travenol Laboratories, Inc.*, 689 F.Supp. 841, 842 (N.D.Ill. 1988) ("[P]arties

who negotiate a corporate acquisition should expect that the privileges of the acquired

corporation would be incidents of the sale, subject to the terms of any special agreements.").

The cases cited by Microsoft in fact confirm this analysis.  In each of them, the court

simply considered whether the acquiring entity, whether another corporation or a bankruptcy

trustee, had merely acquired a simple asset, or whether it had actually taken over an existing

business with the responsibility or right to continue that business.  Thus, the distinction is

drawn between the Federal Deposit Insurance Corporation (FDIC) acting as a receiver, with

the responsibility to run the business, or the FDIC acting on its own behalf in acquiring some

corporate asset.  In the former case, the FDIC would also acquire any attorney-client

privileges held by the acquired entity, for the simple reason that such privileges would be

necessary to protect legal interests associated with the enterprise.  In the latter case, when the

FDIC, acting as an independent corporation simply purchases an asset, there is no right or

responsibility to operate the defunct business, and there is no such need for a transfer of

privileges in order for it to perform its function.  *Federal Deposit Ins. Co. v. Amundson*, 682

F.Supp. 981, 987 (D.Minn. 1988) ("There is no thought or effort to reconstitute the entity or

to run it at all.  There is only an effort to sift the ashes, selling off what is valuable or

collecting on its receivables."); *Federal Deposit Ins. Co. v. McAtee*, 124 F.R.D. 662, 664

- 10 -

(D.Kan. 1988) (transfer of assets to FDIC did not transfer privileges: "Such purchase does not place plaintiff FDIC in the role of client of the former attorneys of the bank."). *Compare Odmark v. Westside Bancorporation, Inc.*, 636 F.Supp. 552, 555 (W.D.Wash. 1986) (FSLIC acting as receiver of a savings and loan controls its privileges "because FSLIC functions as a manager/trustee" of the entity).

Because Caldera is the successor to the Novell's entire DOS Business--including all of its assets, obligations, and rights--the attorney-client privileges associated with that business are also transferred to Caldera.

**2. Novell's Transfer of Privileged Documents to Caldera Does Not Constitute a Waiver.**

Quite apart from the above-stated rule that corporate-owned evidentiary privileges are transferred to the new management of a business, the transfer to Caldera of the legal claims related to the DOS Business which have been raised in this action gives Caldera the right to exercise any attorney-client privilege arising out of DRI's and Novell's investigation and preparation for these claims.

The general rule, of course, is that disclosure of communications protected by the attorney-client privilege to an *unrelated* third party operates as a waiver of the privilege. "The privilege is not, however, waived if a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication." *Hodges, Grant & Kaufmann v. U.S. Government*, 768 F.2d 719, 721 (5th Cir. 1985).

> A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest

- 11 -

may be distinct legal entities from the client receiving the legal advice and may be a non-party to any anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial.

*Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp 1146, 1172 (D.S.C. 1974). *See also*

*Rayman v. American Charter*, 148 F.R.D. 647, 653-54 (D.Neb. 1993) (disclosure of

privileged communications to third party in merger negotiations does not waive privilege

because the third party would eventually be presented with the same legal problems).

Caldera, Novell, and DRI have all shared the exact same legal interest in the advice

obtained from attorneys with regard to the claims asserted in this lawsuit. The disclosure of

those attorney communications to Caldera was accomplished as part of the transfer of the DOS

Business and its legal claims to Caldera, and does not constitute a waiver of the privileges

associated with that business.

**3. Transfer of this Claim to Caldera Transfers Control of Privileges Associated with the Claim.**

As a result of its agreement with Novell, Caldera acquired all rights to the claims

asserted in this lawsuit. The general rule is that when a legal claim is assigned from one party

to another, regardless of the relationship between the parties, the assignee stands in the shoes

of the assignor for all purposes, including control over any privileges otherwise controlled by

the assignor.

For example, in *Dome Petroleum Limited v. Employers Mut. Liability Ins. Co.*, 131

F.R.D. 63 (D.N.J. 1990), the court considered whether an entity which acquired the rights of

another entity in a lawsuit against a third party may control the attorney-client privileges of the

original owner of the claim. The court analogized to the position of a bankruptcy trustee

- 12 -

pursuing claims of the debtor, and found that as a "successor in interest" to the claims, the new owner of the claim would be in a position to control the privileges arising out of communications regarding those claims between its predecessor and the third party. *Id.*, 131 F.R.D. at 68. *See also Glacier General Assurance Co. v. Superior Ct. of Los Angeles*, 157 Cal. Rptr. 435, 436, 95 Cal. App. 3d 836, 839 (1979) ("Such an assignment carries with it all the rights of the assignor in whose shoes the assignee is said to stand"); *Catino v. Travelers Ins. Co.*, 136 F.R.D. 534, 537 (D. Mass 1991); *Central Nat. Ins. Co. v. Medical Protective Co.*, 107 F.R.D. 393, 395 (E.D. Mo. 1985); *Simpson v. Motorists Mut. Ins. Co.*, 494 F.2d 850, 855 (7th Cir. 1974).

Indeed, by obtaining all documents relevant to the claims it acquired from Novell, including corporate records containing privileged communications, Caldera has simply fulfilled its duty to put itself in the same position with regard to discovery in this lawsuit as Novell would have been. *See The Bank of New York v. Meridien Biao Bank Tanzania, Ltd.*, 171 F.R.D. 135, 147-49 (S.D.N.Y. 1997) (an assignee of claims is required to obtain access to documents from the assignor in order to comply with anticipated discovery requirements). In *The Bank of New York*, the court held that privileged communications of the assignor's employees were not subject to disclosure, even though they were then in the possession of the assignee, which had listed the documents in its privilege log. *Id.* at 154. Similarly, the transfer of legal claims associated with the DOS Business to Caldera necessitates that Caldera have access to all documents and information relevant to those claims, and that Caldera have the right to exercise privileges associated with those documents.

## CONCLUSION

For the foregoing reasons, Microsoft's Motion to Compel Production of Documents

Subject to Attorney-Client Privilege should be denied.

DATED this ⟨15⟩ day of December, 1997.

SNOW, CHRISTENSEN & MARTINEAU

By ⟨signature⟩
MAX D. WHEELER
STEPHEN J. HILL
RYAN E. TIBBITTS
Attorneys for Plaintiff

N:\19135\1\SKW\COMPEL2.OPP

- 14 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of MEMORANDUM IN OPPOSITION TO

DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS SUBJECT TO

ATTORNEY-CLIENT PRIVILEGE (Case Number 2:96CV 0645B, U.S. District Court, Central

Division) were via Federal Express to:

Richard J. Urowsky
Steven L. Holley
Richard C. Pepperman, II
SULLIVAN & CROMWELL
125 Broad Street
New York, NY 10004

William H. Neukom
Thomas W. Burt
David A. Heiner, Jr.
MICROSOFT CORPORATION
One Microsoft Way
Building 8
Redmond, WA 98052

James R. Weiss
PRESTON, GARES ELLIS & ROUVELS
   MEEDS
1735 New York Avenue, N.W.
Washington, D.C. 20006

and hand-delivered to:

James S. Jardine
Mark M. Battilyon
RAY, QUINNEY & NEBEKER
79 South Main, #500
Post Office Box 45385
Salt Lake City, Utah 84145

DATED this 15th day of December, 1997.

Melissa A. Larson

A

STEPHEN D. SUSMAN
CHARLES R. ESKRIDGE III
THOMAS W. PATERSON
STUART J. DOW
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas  77002-5096
Telephone: (713) 651-9366

MAX D. WHEELER (A3439)
STEPHEN J. HILL (A1493)
RYAN E. TIBBITTS (A4423)
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh
Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801)521-9000

PARKER C. FOLSE III
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3120
Seattle, Washington  98101
Telephone: (206) 516-3880

RALPH H. PALUMBO
LYNN M. ENGEL
SUMMIT LAW GROUP
1505 Westlake Ave. Suite 300
Seattle, Washington  98109
Telephone: (206) 281-9881

Attorneys for Plaintiff.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CALDERA, INC.<br><br>          Plaintiff<br><br>     vs.<br><br>MICROSOFT CORPORATION<br><br>          Defendant. | DECLARATION OF BRYAN W. SPARKS<br><br><br>Case No.:  2:96CV 0645B<br><br>Judge Dee V. Benson |

I, Bryan W. Sparks, declare as follows:

1.    I am President and CEO of the plaintiff, Caldera, Inc.

2.    On July 23, 1996, Caldera acquired its DOS Business from Novell, Inc., pursuant to an Asset Purchase Agreement.

3.    As required under the Asset Purchase Agreement, Novell assigned to Caldera approximately 100 active contracts with customers for the license of DR DOS products.  These included contracts with independent retailers, value added resellers, original equipment manufacturers (OEMs), and major accounts.

4.    Following the assignment of these contracts, Caldera assumed all of Novell's rights and obligations.  These included the right to ongoing royalties and the obligation to provide product support (e.g., fixing bugs and deficiencies), account management (e.g., providing cross promotional and marketing activities), and sales support.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 15, 1997.

_____
Bryan W.  Sparks

Novell, Inc.
1555 North Technology Way
Orem, UT 84057-2399
Phone 801 222-6000
Web: http://www.novell.com



**Novell.**

September 16, 1996

Stephen Hill
C/O Snow, Christensen & Martineau
#10 Exchange Place
Newhouse Building, Floor 10
Salt Lake City, UT 84111

Sturgis Sobin
C/O Ablondi, Foster, Sobin & Davidow
1130 Connecticut Ave., N.W. #500
Washington, D.C. 20036

**Re: Transfer of DOS Business to Caldera**

Gentlemen:

As you are aware, effective July 23, 1996, Novell entered into an agreement with Caldera, Inc. to transfer to Caldera substantially all of the assets and ongoing business of Novell's DOS business. This transfer specifically included transfer to Caldera of "all of Novell's right, title, and interest in and to any and all claims or causes of action held by Novell" related to the DOS business. The agreement also calls for Novell to transfer to Caldera legal records "directly related to the abuse or enforcement of any right or interest" in the DOS business. As you are also aware, Caldera has filed suit against Microsoft for injury to the DOS Business ("the DOS litigation").

Pursuant to the terms of the July 23 Agreement, I authorize you to make available to Caldera, Inc. and/or any counsel or consultants representing Caldera all documents, materials, and information, including privileged materials, in your possession relating to Novell's DOS business, including specifically all documents and materials relating to or obtained in conjunction with the FTC's and Department of Justice's investigations of Microsoft. It is my understanding that any privilege of Novell applicable to these materials transfers with the DOS Business to Caldera and will be preserved. In this regard, you are also authorized to engage in discussions with Caldera or its counsel regarding all aspects of the above referenced subjects. I understand that confidentiality of these materials similarly will be preserved in this transfer.

Consistent with the terms of the agreement, I also authorize you and any other counsel representing Caldera in the DOS litigation, to the extent necessary to enforce Caldera's rights in the DOS Business, to contact any current or former Novell employees who were related to the DOS Business. In the event that you desire to contact current Novell employees, I ask that you coordinate such contacts with my office and that you minimize any disruption to their ongoing responsibilities.

Novell, Inc.
1555 North Technology Way
Orem, UT 84057-2399
Phone 801 222-6000
Web: http://www.novell.com



**Novell.**

Finally, this letter will serve to confirm that Novell is aware of no conflicts of interest that it believes would be grounds to prevent you and your law firms from representing Caldera in the DOS litigation, and agrees to waive any past or present claim of conflict. Moreover, should any unforeseen conflict arise in the future, Novell will make every effort to insure that the issue is resolved without disqualification of you or your firm in the DOS litigation.

Sincerely,

David R. Bradford
Sr. Vice President
and General Counsel

# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

(Mark
One)

**ANNUAL REPORT PURSUANT TO SECTION 13 OR15(d)OFTHE SECURITIESEXCHANGE
ACT OF 1934**

For the fiscal year ended October31, 2003

**TRANSITION REPORT PURSUANT TO SECTION 13
OR15(d)OFTHESECURITIESEXCHANGE ACT OF 1934**

For the transition period fromto .

Commission file number: 0-29911

# THE SCO GROUP,INC.
(Exact name of registrant as specified in its charter)

**Delaware**
(State of incorporation)
**355 South 520 West
Lindon, Utah 84042**
(Address of principal executive
offices, including zip code)

**87-0662823**
(I.R.S. Employer Identification No.)
**(801)765-4999**
(Registrant's telephone
number, including area code)

Securities pursuant to Section12(b) of the Act: None
Securities registered pursuant to Section12(g) of the Act:

**Title of Each Class
Common Stock, par value $.001 per share**

Indicate by check mark whether the Registrant (1)has filed all reports required to be filed by Section13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12months (or for such shorter period that the Registrant was required to file such reports), and (2)has been subject to such filing requirements for the past 90days.Yes  No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of RegulationS-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference on PartIII of this Form10-K or any amendment to this Form10-K.

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule12b-2 of the Act).Yes  No

The aggregate market value of the common stock held by non-affiliates of the Registrant was approximately $20.6million based on the reported last sale price of common stock on April30. 2003, which is the last business day of the Registrant's most recently completed second fiscal quarter. The number of shares of the Registrant's common stock outstanding as of January27, 2004, was 14,306,640.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's proxy statement to be filed pursuant to Regulation14A in connection with its annual meeting of stockholders are incorporated by reference into PartIII of this Form10-K.

© 2004.  EDGAR Online, Inc.

UNIX operating system in favor of promoting the Linux operating system, of which it has been a major backer. Based on these alleged breaches, we delivered to IBM notice of termination of our license agreement with IBM that permitted IBM's use of our UNIX source code in developing its AIX operating system. We describe our legal action against IBM and its procedural status in more detail below under PartI, Item 3 of this Form10-K.

Additionally, as part of our SCOsource initiatives, in fiscal year 2003, we entered into two significant vendor license agreements with Sun Microsystems ("Sun") and Microsoft Corporation ("Microsoft"). We will continue pursuing our SCOsource initiatives in fiscal year 2004, seeking to obtain additional vendor licensing agreements similar to the Sun and Microsoft agreements and pursuing our SCOsource IP license initiative with Linux end users. We also plan to continue to pursue our litigation against IBM, and have announced that we expect in the near term to commence our first legal action against an end user violating our intellectual property or contractual rights. On January20, 2004, we brought suit against Novell,Inc. ("Novell") for slander of title seeking relief for Novell's alleged bad faith efforts to interfere with our copyrights related to our UNIX source code and derivative works and our UnixWare product. We describe our legal action against Novell in more detail below under PartI, Item 3 of this Form10-K.

### Historical Information

We originally incorporated as Caldera Systems,Inc., a Utah corporation ("Caldera Systems"), in August1998, and reincorporated as a Delaware corporation in March2000, when we completed an initial public offering of our common stock. In May2001, we formed a new holding company in Delaware under the name of Caldera International,Inc. ("Caldera International") to acquire substantially all of the assets and operations of the server and professional services groups of The Santa Cruz Operation, now known as Tarantella,Inc. In connection with this acquisition, Caldera Systems became a wholly-owned subsidiary of Caldera International. Former holders of shares and options to purchase shares of Caldera Systems received an equal number of shares and options to purchase shares in Caldera International.

On May16, 2003, our stockholders approved our corporate name change from Caldera International,Inc. to The SCO Group,Inc. As used herein, the "Company" or "us," "we," "ours," or similar terms refer to The SCO Group,Inc. and our operating subsidiaries.

### *UNIX-Based Products and Services Business*

### Background

Our core business focus is to serve the needs of small-to-medium sized businesses, including branch offices and franchisees of Fortune 1000 companies, by providing reliable, cost effective UNIX operating systems and software products to power computers running Intel architecture. We also provide a full range of pre and post sale technical support for all of our products, primarily focusing on OpenServer and UnixWare. Additionally, we provide UNIX-based professional consulting and custom software development services.

Our largest source of revenue for our core UNIX business is derived from our worldwide, indirect, leveraged channel of partners, which includes distributors and independent solution providers (collectively, "resellers"). We have local offices in a number of countries that provide support and services to customers and resellers in those geographic areas. The other principal channel for selling and marketing our products is through large corporations which have a large number of branch offices or franchisees. We access these corporations through their information technology or purchasing departments with our direct sales team in the United States and through our reseller channel in countries outside the United States. In addition, we also sell our operating system products to original

4

© 2004.   EDGAR Online, Inc.

# EXHIBIT 4

**FILED UNDER SEAL**

# EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

------------------------------------------x

THE SCO GROUP,                       

          Plaintiff/Counterclaim Defendant,


                             Civil Action No.

          -against-                2:03 CV-294 (DAK)

INTERNATIONAL BUSINESS MACHINES

CORPORATION,


          Defendant/Counterclaim Plaintiff.

------------------------------------------x

                November 30, 2005

                10:00 a.m.


     Videotaped deposition of WILLIAM BRODERICK,
taken by Defendant, pursuant to Notice, at the
offices of Boies Schiller & Flexner, 150 John F.
Kennedy Parkway, Short Hills, New Jersey, before
Georgette K. Betts, a Certified Shorthand Reporter
and Notary Public within and for the States of New
Jersey and New York.

LEGALINK®
A WORDWAVE COMPANY

LegaLink Manhattan
420 Lexington Avenue, Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

|  | 1 | Broderick |
| 10:04:01 | 2 | Perkin-Elmer Data Systems Group.   It's a |
| 10:04:05 | 3 | computer manufacturing company.   And I was with |
| 10:04:08 | 4 | them until I left in -- from '80 to I think it |
| 10:04:15 | 5 | was December '91 when I joined USL and I had |
| 10:04:20 | 6 | financial and marketing and business planning |
| 10:04:23 | 7 | positions at Perkin-Elmer who subsequently spun |
| 10:04:29 | 8 | off and became the Concurrent Computer |
| 10:04:32 | 9 | Corporation. |
| 10:04:32 | 10 | Q.   Thanks.   A little bit about your |
| 10:04:35 | 11 | schooling, you said you graduated from Santa |
| 10:04:36 | 12 | Clara University with an MBA.   What was your |
| 10:04:39 | 13 | undergraduate degree in? |
| 10:04:40 | 14 | A.   Business degree from William |
| 10:04:41 | 15 | Paterson College here in New Jersey. |
| 10:04:44 | 16 | Q.   So you didn't go to law school, is |
| 10:04:45 | 17 | that correct? |
| 10:04:46 | 18 | A.   No. |
| 10:04:47 | 19 | Q.   Obviously then you're not an |
| 10:04:48 | 20 | attorney? |
| 10:04:49 | 21 | A.   No, I'm not. |
| 10:04:50 | 22 | Q.   Lucky you sometimes probably. |
| 10:04:53 | 23 | I guess with that then, you're not |
| 10:04:55 | 24 | prepared or able to give any legal opinions then |
| 10:04:58 | 25 | based on the transactions that occurred that you |

|          |    |                              |
|----------|----|------------------------------|
|          | 1  | Broderick                    |
| 10:05:00 | 2  | discuss in your declaration, is that correct? |
| 10:05:03 | 3  | MR. STONE:  Object to the form |
| 10:05:03 | 4  | of the question, but you can answer |
| 10:05:05 | 5  | it. |
| 10:05:05 | 6  | A.    That's true. |
| 10:05:12 | 7  | Q.    What did you do to prepare for |
| 10:05:14 | 8  | your deposition today? |
| 10:05:19 | 9  | MR. STONE:  Hold on a second. |
| 10:05:22 | 10 | Sorry. |
| 10:05:23 | 11 | MR. WHEATLEY:  You want to take |
| 10:05:23 | 12 | a break? |
| 10:05:24 | 13 | MR. STONE:  No, I just need to |
| 10:05:25 | 14 | finish -- |
| 10:05:27 | 15 | MR. WHEATLEY:  Finish eating. |
| 10:05:28 | 16 | MR. STONE:  -- this so I can say |
| 10:05:30 | 17 | something. |
| 10:05:33 | 18 | I just want to put something on |
| 10:05:35 | 19 | the record at this point it makes |
| 10:05:37 | 20 | sense to put it on.  Mr. Broderick had |
| 10:05:41 | 21 | originally prepared as a 30(b)(6) |
| 10:05:44 | 22 | witness for today, that is what we had |
| 10:05:46 | 23 | been advised he was going to be |
| 10:05:50 | 24 | questioned on topic 1, 5, 9 -- |
| 10:05:57 | 25 | actually 5, 9, and 23 from IBM's |

|            |    |                                              |
|------------|----|----------------------------------------------|
|            | 1  | Broderick                                    |
| 10:13:59   | 2  | can answer.                                  |
| 10:14:00   | 3  | A.    I've been with the UNIX                 |
| 10:14:01   | 4  | organization from Unix System Laboratories    |
| 10:14:04   | 5  | onward and I was an employee at each one of the |
| 10:14:10   | 6  | transactions where the UNIX business was sold. |
| 10:14:12   | 7  | And this is my -- this is what I know is what  |
| 10:14:15   | 8  | happened.                                     |
| 10:14:17   | 9  | Q.    Based on being with the UNIX            |
| 10:14:20   | 10 | System, is that what you mean?                |
| 10:14:23   | 11 | A.    Based on being the UNIX Systems         |
| 10:14:24   | 12 | and working with the people.                  |
| 10:14:28   | 13 | Q.    What is -- why don't you define         |
| 10:14:30   | 14 | UNIX System for me as you used it there?       |
| 10:14:32   | 15 | A.    The UNIX System would be the UNIX       |
| 10:14:36   | 16 | business.                                     |
| 10:14:37   | 17 | Q.    Which is -- go ahead.                   |
| 10:14:38   | 18 | A.    Which is UNIX is an operating           |
| 10:14:42   | 19 | system and it started with Western Electric   |
| 10:14:46   | 20 | which became AT&T and it's been progressively |
| 10:14:50   | 21 | developed through the years and it's been     |
| 10:14:52   | 22 | licensed and supported and that's what I would |
| 10:14:57   | 23 | refer to as the UNIX business.                |
| 10:15:10   | 24 | Q.    Let's go down to paragraph 4.  It       |
| 10:15:13   | 25 | says "Since December 1991," you state that    |

|          |    |                                              |
|----------|----|----------------------------------------------|
|          | 1  | Broderick                                    |
| 10:15:16 | 2  | you've been continuously employed managing   |
| 10:15:18 | 3  | contracts for successive companies that have |
| 10:15:21 | 4  | owned the UNIX technology and business, correct? |
| 10:15:23 | 5  | A.     That's correct.  But continuously     |
| 10:15:25 | 6  | employed there was a seven month period late |
| 10:15:32 | 7  | 2002 early 2003 where I wasn't a full-time   |
| 10:15:37 | 8  | employee of the company.  I did work on a    |
| 10:15:40 | 9  | contract basis and then I was rehired in April |
| 10:15:42 | 10 | of 2003.                                     |
| 10:15:44 | 11 | Q.     By the SCO Group?                     |
| 10:15:45 | 12 | A.     Yes.                                  |
| 10:15:46 | 13 | Q.     Did you work for somebody else at     |
| 10:15:47 | 14 | that time as well?                           |
| 10:15:48 | 15 | A.     For a, I believe it was a four        |
| 10:15:51 | 16 | month period I worked for another company.   |
| 10:15:53 | 17 | Q.     Which company was that?               |
| 10:15:54 | 18 | A.     AIG.                                  |
| 10:15:55 | 19 | Q.     What did you do for AIG?              |
| 10:15:57 | 20 | A.     Contracts.                            |
| 10:15:58 | 21 | Q.     Same thing?                           |
| 10:15:58 | 22 | A.     Uh-huh.                               |
| 10:16:01 | 23 | Q.     Why was there that break there,       |
| 10:16:02 | 24 | that seven month break?                      |
| 10:16:04 | 25 | A.     I was laid off.                       |

|          |    |                                          |
|----------|----|------------------------------------------|
|          | 1  | Broderick                                |
| 10:24:18 | 2  | lawyer, but I don't know his name.  I think |
| 10:24:22 | 3  | Sandy Tannenbaum was in charge of legal. |
| 10:24:26 | 4  | Q.    Did you work with these            |
| 10:24:27 | 5  | individuals?                             |
| 10:24:27 | 6  | A.    Yes, from time to time.            |
| 10:24:39 | 7  | MR. STONE:  Excuse me for just           |
| 10:24:40 | 8  | one second.                              |
| 10:24:41 | 9  | MR. WHEATLEY:  Take a quick              |
| 10:24:42 | 10 | break?                                   |
| 10:24:43 | 11 | MR. STONE:  Just 10 seconds.             |
| 10:24:45 | 12 | THE VIDEO OPERATOR:  Go off the          |
| 10:24:45 | 13 | record, it is now 10:24.  We'll go off   |
| 10:24:48 | 14 | the video record.                        |
| 10:24:52 | 15 | (Recess.)                                |
| 10:25:03 | 16 | THE VIDEO OPERATOR:  It is now           |
| 10:25:03 | 17 | 10:24, we'll now go back on the video    |
| 10:25:07 | 18 | record.                                  |
| 10:25:15 | 19 | BY MR. WHEATLEY                          |
| 10:25:15 | 20 | Q.    Do you know why AT&T spun off USL  |
| 10:25:19 | 21 | as a separate entity?                    |
| 10:25:21 | 22 | A.    No.                                |
| 10:25:22 | 23 | Q.    You weren't around when that       |
| 10:25:23 | 24 | occurred, is that correct?               |
| 10:25:24 | 25 | A.    That's correct.                    |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | Broderick                                              |
| 10:28:09 | 2  | Q.    To determine what the customer                   |
| 10:28:10 | 3  | wanted or needed?                                      |
| 10:28:11 | 4  | A.    To determine what the customer --                |
| 10:28:14 | 5  | demonstrate the product, work with the customer,       |
| 10:28:17 | 6  | make sure that was the product that they wanted.       |
| 10:28:21 | 7  | Q.    What was the product management,                 |
| 10:28:22 | 8  | is that a group?                                       |
| 10:28:24 | 9  | A.    Yes.                                             |
| 10:28:25 | 10 | Q.    What did they do?                                |
| 10:28:28 | 11 | A.    Each product had a product manager               |
| 10:28:30 | 12 | assigned to it who worked with a product to make       |
| 10:28:36 | 13 | sure it included the functionality that that           |
| 10:28:39 | 14 | product management -- manager determined that          |
| 10:28:41 | 15 | would be an area that you'd have to talk to            |
| 10:28:44 | 16 | product management about.                              |
| 10:28:46 | 17 | Q.    But you didn't -- okay.                          |
| 10:28:59 | 18 | I'm just going go ask you for each          |
| 10:29:01 | 19 | one of these transactions that occurred, the           |
| 10:29:03 | 20 | sale of the assets I'm going to ask you a set of       |
| 10:29:05 | 21 | questions on each one.  It will probably go            |
| 10:29:08 | 22 | fairly quickly.                                        |
| 10:29:09 | 23 | Again we're looking at paragraph 6         |
| 10:29:11 | 24 | again in your declaration where you talk about         |
| 10:29:15 | 25 | AT&T selling USL to Novell.  And I just want to        |

```
                1              Broderick
10:29:19        2    know what was your role in that sale.
10:29:22        3          A.    I was told shortly I'd be getting
10:29:24        4    new business cards.
10:29:26        5          Q.    After the fact?
10:29:27        6          A.    Yes.
10:29:29        7          Q.    So is it fair to say you didn't
10:29:30        8    have any involvement in it?
10:29:32        9          A.    I had no involvement.
10:29:33       10          Q.    No one consulted you about it?
10:29:35       11          A.    No.
10:29:36       12          Q.    No one asked for your
10:29:38       13    recommendations, your opinion about it?
10:29:39       14          A.    No.
10:29:41       15          Q.    You weren't involved in the
10:29:43       16    negotiations?
10:29:44       17          A.    No.
10:29:46       18          Q.    Do you know what the purpose was
10:29:48       19    of the transaction?
10:29:51       20          A.    Novell was to acquire the UNIX
10:29:54       21    technology, UNIX business from AT&T.
10:29:56       22          Q.    And you're basing that on what?
10:30:02       23          A.    Discussions that we had when the
10:30:04       24    deal was explained to us and reviewing the
10:30:10       25    agreement.  It was actually a merger agreement
```

1            Broderick

10:48:25   2   Operation in '95 you remained on with the UNIX

10:48:28   3   business as a Santa Cruz employee performing

10:48:31   4   substantially the same work as at Novell, is

10:48:33   5   that correct?

10:48:33   6         A.     Yes.

10:48:34   7         Q.     Your title looks like it changed

10:48:35   8   to manager of law and corporate affairs, is that

10:48:38   9   correct?

10:48:38   10         A.     Yes.

10:48:39   11         Q.     What were your duties and

10:48:40   12   responsibilities?

10:48:41   13         A.     I was a contract manager.

10:48:42   14         Q.     Just different title?

10:48:43   15         A.     Just different title.  The

10:48:45   16   department was law and corporate affairs, so

10:48:48   17   they called us managers law and corporate

10:48:50   18   affairs.

10:48:54   19         Q.     I'm going to ask you about some

10:48:55   20   questions about that sale between -- again,

10:48:58   21   we're looking at paragraph 7, Novell sold the

10:49:02   22   business to Santa Cruz Operation?  You see that?

10:49:05   23         A.     Yes.

10:49:06   24         Q.     What was your involvement in the

10:49:08   25   sale?

|          |    |                                              |
|----------|----|----------------------------------------------|
|          | 1  | Broderick                                    |
| 10:49:08 | 2  | A.    I was told I was going to be           |
| 10:49:10 | 3  | getting new business cards.                  |
| 10:49:11 | 4  | Q.    Again.  Is it fair to say you          |
| 10:49:14 | 5  | didn't have involvement in the sale?         |
| 10:49:16 | 6  | A.    No.                                    |
| 10:49:16 | 7  | Q.    You weren't consulted?                 |
| 10:49:18 | 8  | A.    No.                                    |
| 10:49:18 | 9  | Q.    Did you offer any recommendations?     |
| 10:49:20 | 10 | A.    No.                                    |
| 10:49:21 | 11 | Q.    Anybody ask for your opinion about     |
| 10:49:22 | 12 | the sale?                                    |
| 10:49:23 | 13 | A.    No.                                    |
| 10:49:25 | 14 | Q.    Beside your coworkers, I guess.  I     |
| 10:49:30 | 15 | sense the hesitancy there.                   |
| 10:49:32 | 16 | So do you recall any discussions             |
| 10:49:36 | 17 | about the sale from Novell to Santa Cruz?    |
| 10:49:39 | 18 | A.    Yes.                                   |
| 10:49:40 | 19 | Q.    And why don't you tell me about        |
| 10:49:42 | 20 | those specific conversations that you recall?|
| 10:49:45 | 21 | MR. STONE:  I instruct you not               |
| 10:49:46 | 22 | to answer to the extent that those           |
| 10:49:48 | 23 | discussions were with counsel, but you       |
| 10:49:50 | 24 | can answer other than that.                  |
| 10:49:54 | 25 | A.    Most of my discussions were            |

|          | 1  | Broderick |
|----------|----|-----------|
| 10:58:09 | 2  | use that technology. |
| 10:58:13 | 3  | Q.    Did Novell purport to retain any |
| 10:58:18 | 4  | of the other assets, the UNIX assets that you're |
| 10:58:20 | 5  | aware of? |
| 10:58:23 | 6  | A.    The assets, not that I'm aware of. |
| 10:58:26 | 7  | Q.    What about any part of the |
| 10:58:26 | 8  | business, the UNIX business? |
| 10:58:31 | 9  | MR. STONE:  Can I hear that |
| 10:58:33 | 10 | question? |
| 10:58:37 | 11 | (Record read.) |
| 10:58:38 | 12 | MR. STONE:  Can I hear the |
| 10:58:39 | 13 | question before that. |
| 10:58:55 | 14 | (Record read.) |
| 10:58:56 | 15 | MR. STONE:  I object to form. |
| 10:58:57 | 16 | You can answer. |
| 10:59:02 | 17 | A.    What's the question on the table? |
| 10:59:07 | 18 | Q.    Are you aware of Novell, did they |
| 10:59:10 | 19 | retain any of the part of the business, the UNIX |
| 10:59:14 | 20 | business? |
| 10:59:18 | 21 | A.    Novell retained a right to certain |
| 10:59:23 | 22 | royalty payments that were for the System V |
| 10:59:26 | 23 | product. |
| 10:59:27 | 24 | Q.    Is that part of the business? |
| 10:59:29 | 25 | MR. STONE:  Object to form. |

|          |    |                                          |
|----------|----|------------------------------------------|
|          | 1  | Broderick                                |
| 10:59:30 | 2  | Also object to the extent it calls for   |
| 10:59:32 | 3  | a legal conclusion, but you can          |
| 10:59:34 | 4  | answer, if you know.                     |
| 10:59:36 | 5  | A.    It's payment for sublicensed       |
| 10:59:39 | 6  | products that are based on UNIX System V.|
| 10:59:43 | 7  | Q.    Would you consider that any part   |
| 10:59:45 | 8  | of the business though?                  |
| 10:59:47 | 9  | MR. STONE:  Same objection.              |
| 10:59:51 | 10 | A.    Personally, I would consider that  |
| 10:59:52 | 11 | part of the business.                    |
| 10:59:57 | 12 | Q.    What else, did they retain any     |
| 11:00:00 | 13 | other part of the business that you're aware of, |
| 11:00:01 | 14 | any of the intellectual property, any of the |
| 11:00:06 | 15 | rights?                                  |
| 11:00:07 | 16 | A.    No.                                |
| 11:00:16 | 17 | Q.    Not that you're aware of?          |
| 11:00:16 | 18 | A.    Not that I'm aware of.             |
| 11:00:16 | 19 | Q.    Again, what are you basing your    |
| 11:00:16 | 20 | knowledge on as it pertains to those questions I |
| 11:00:16 | 21 | just asked you, just recently asked you? |
| 11:00:18 | 22 | A.    Discussions when we were told      |
| 11:00:19 | 23 | about the sale, discussions with people from |
| 11:00:23 | 24 | Novell and people from Santa Cruz and the |
| 11:00:27 | 25 | agreements and amendments.               |

|  |  |  |
|---|---|---|
|  | 1 | Broderick |
| 11:21:25 | 2 | substantially the same work as at Santa Cruz, is |
| 11:21:28 | 3 | that correct? |
| 11:21:28 | 4 | A.    Yes. |
| 11:21:38 | 5 | Q.    A few questions about that.  What |
| 11:21:40 | 6 | was your role in the sale of the UNIX business |
| 11:21:43 | 7 | from Santa Cruz to Caldera? |
| 11:21:46 | 8 | A.    Was told I'd be getting new |
| 11:21:48 | 9 | business cards. |
| 11:21:49 | 10 | Q.    Are you keeping all these old |
| 11:21:51 | 11 | business cards? |
| 11:21:51 | 12 | A.    My mother is. |
| 11:21:55 | 13 | Q.    Were you consulted? |
| 11:21:56 | 14 | A.    No. |
| 11:21:57 | 15 | Q.    Any involvement then? |
| 11:21:58 | 16 | A.    No. |
| 11:22:00 | 17 | Q.    Asked for your recommendations? |
| 11:22:02 | 18 | A.    No. |
| 11:22:03 | 19 | Q.    Asked for your opinion about it? |
| 11:22:05 | 20 | A.    No. |
| 11:22:09 | 21 | Q.    What was your reaction to the sale |
| 11:22:10 | 22 | from Novell -- let's back up, from Novell to |
| 11:22:14 | 23 | Santa Cruz first? |
| 11:22:17 | 24 | A.    My reaction was let's see what |
| 11:22:21 | 25 | happens.  It's happened before. |

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | Broderick                                          |
| 11:22:23 | 2  | Q.    Yeah.  And how about from Santa              |
| 11:22:25 | 3  | Cruz to Caldera then?                              |
| 11:22:29 | 4  | A.    See what happens.                           |
| 11:22:30 | 5  | Q.    Kind of roll with the punches               |
| 11:22:32 | 6  | then?                                             |
| 11:22:32 | 7  | A.    I'm flexible.                               |
| 11:22:34 | 8  | Q.    Sounds like it.                             |
| 11:22:39 | 9  | When were you informed about the                  |
| 11:22:41 | 10 | sale from Santa Cruz to Caldera?                  |
| 11:22:46 | 11 | A.    I don't remember the -- it would            |
| 11:22:47 | 12 | have been about the time that they made the       |
| 11:22:49 | 13 | announcement, they gathered the employees and     |
| 11:22:51 | 14 | told them what was going on.                      |
| 11:22:53 | 15 | Q.    Did you review any contracts or             |
| 11:22:54 | 16 | any agreements dealing with the sale prior to     |
| 11:22:57 | 17 | it, prior to it happening?                        |
| 11:22:59 | 18 | A.    No.                                         |
| 11:23:01 | 19 | Q.    How about at Novell, when Novell            |
| 11:23:02 | 20 | sold it to Santa Cruz, did you review any         |
| 11:23:05 | 21 | contracts dealing with the sale of the UNIX       |
| 11:23:08 | 22 | business prior to it happening?                   |
| 11:23:09 | 23 | A.    No.                                         |
| 11:23:12 | 24 | Q.    What's your understanding of what           |
| 11:23:13 | 25 | was sold from Santa Cruz to Caldera?              |