# Exhibit 1



Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)  
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

Page 1



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Klaus RENNER, Plaintiff
v.
CHASE MANHATTAN BANK, Michelino Morelli,
Townsend Financial Services Corp.,
Townsend Investment Fund, LLC, Gerald Townsend,
and Rabon Wolford, Defendants.
**No. 98 CIV. 926(CSH).**

Nov. 2, 2001.

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District J.

 **\*1** During the course of pre-trial discovery, counsel for the Townsend defendants have asserted claims of attorney-client privilege and attorney's work-product privilege with respect to a number of documents. [FN1] As directed by the Court in *Renner III,* 2001 WL 388044 at \*3, counsel for defendants prepared a Privilege Log identifying each document claimed to be privileged and the particular privilege or privileges asserted with respect to them. The documents were also given "Bates Numbers" falling within a series beginning with the designation "GTDC-00." For the sake of brevity, I will omit the initials in discussing the particular documents, contenting myself with the numbers.

> FN1. The background and circumstances of this case are stated in the Court's prior opinions, familiarity with which is assumed: *Renner I,* 1999 WL 47239 (S.D.N.Y. Feb. 3, 1999); *Renner II,* 2000 WL 781081 (S.D.N.Y. June 16, 2000); *Renner III,* 2001 WL 388044 (S.D .N.Y. Apr. 17, 2001); and *Renner IV,* 2001 U.S. Dist. LEXIS 9766 (July 11, 2001).

 Plaintiff makes three substantive arguments with respect to these documents. [FN2] First, he contends that communications between Gerald Townsend and his attorneys (principally Donald Clark) are not privileged if their purpose was to advance the business objectives of Townsend or his companies. As I observed in *Renner III,* 2001 WL 388044 at \*1, the Townsend defendants "have the burden of showing that communications to and from Clark were made solely for the purpose of the defendants seeking legal advice and its counsel rendering it, and not for the purpose of advancing a party's business ventures" (citations and internal quotation marks omitted).

> FN2. At the hearing on May 2, 2001, counsel for plaintiff raised the threshold issue of whether the Townsend defendants had entered into an attorney-client relationship with Clark and the law firms in which he was at one time or another a partner. *See* Transcript ("Tr.") at 9-11. The short answer is that the documents in question clearly establish the existence of that relationship.

 Second, plaintiff questions whether, in any event, the documents defendants list in their Privilege Log fall within either privilege.

 Third, plaintiff contends that even if these documents were covered by the attorney-client privilege, the crime-fraud exception applies to them, so that production to plaintiff must be made.

 While plaintiff perforce advances these contentions without having seen any of the documents listed in the Privilege Log, the questions he raises are appropriate. On the first two issues, defendants bear the burden of showing that a particular document is privileged. Plaintiff bears the burden of showing the applicability of the crime-fraud exception.

 For the reasons stated in *Renner IV,* the Court conducted an *in camera* review of the documents in question, and now announces its rulings.

I

 Preliminarily it may be noted that defendants' claims of privilege are frequently too broad.

 For example, and judging by their Privilege Log, defendants believe, or at least profess to believe, that any reference to any communication between Gerald Townsend and one of his attorneys on any document shields that entire document from disclosure, whether or not the document reveals communications made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)  
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

Page 2

by Townsend to his attorneys in confidence and for the purpose of obtaining legal advice. But such a showing is essential to assertion of the attorney-client privilege. "The practical consequence of the privilege is that there can be neither compelled nor voluntary disclosure by the attorney of matters conveyed to the attorney in confidence by a client for the purpose of seeking legal advice." Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* (Section of Litigation, American Bar Association, 4th ed.2001) (hereinafter *Epstein* ) at 2-3. The rationale justifying the privilege "is that an attorney may give reasonably informed professional advice only when information is given in confidence to the attorney by the client." *Id.* at 3. Consistent with that rationale, "[t]he privilege tends, in most instances, to be a two-way street, protecting from compelled disclosure what is said or written to or by an attorney to the client for the purpose of seeking legal counsel." *Id.* It follows that not all documentary references to attorney-client communications or that relationship fall within the privilege. "Thus, the date on which a privileged communication took place and the identity of the persons who participated in a meeting or, in the case of a document, the persons who received copies of it, are not generally regarded as privileged." *Epstein* at 66 (citing cases). Similarly, "Federal courts uniformly allow the identity of the client and matters regarding fee arrangements to be discovered, except in the very limited circumstances when that discovery would actually reach client confidences," *Id.* at 67; "it generally follows that the billing statements that attorneys submit to clients are equally discoverable." *Id.* at 72 (citing cases). If production of such documents "will necessarily reveal client confidences," then "redactions will be ordered to protect the privileged material while allowing discovery of the nonprivileged material." *Id.*

 **\*2** Similarly, "[t]he privilege does not extend to the general nature of the legal services the attorney was retained to perform or to the terms and conditions of the attorney's engagement." *Epstein* at 65. For that proposition *Epstein* cites *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 603 (8th Cir.1978), where the Eighth Circuit said:

> That memorandum contained no confidential information. It did no more than reveal the relationship between the parties, the purpose for which Law Firm had been engaged, and the steps which the Firm intended to take in discharging its obligation to Diversified. Such a document is not privileged.

The Eighth Circuit supported that assertion by citing *Colton v. United States,* 306 F.2d 633, 636 (2d Cir.1962) ("Those questions which pertain to the date and general nature of the legal services performed by the Colton firm for the Matters should be answered as they do not call for any confidential information."), *cert. denied,* 371 U.S. 951 (1963).

 Comparable restrictions exist with respect to the work-product privilege, now codified in civil cases under the caption "Trial Preparation: Materials" in Rule 26(b)(3), Fed.R.Civ.P. An attorney's work-product protection, which under the Rule comes into play only if the documents in question are "otherwise discoverable," is divided into two categories: "opinion" work product which reflects or reveals the attorney's mental processes, which the courts invariably protect; and "ordinary" work product, which "is subject to discovery upon a showing of need and hardship," *Epstein* at 481. In either event, however, following the wording of the Rule, "[t]he work-product privilege that has developed consequently applies not to all materials in an attorney's files, but only to those materials that were prepared in anticipation of litigation or for trial." *Epstein* at 502 (citing cases). Thus "there is no work-product protection for documents prepared in the regular course of business rather than for purposes of the litigation," *Epstein* at 531 (quoting Wright and Miller, *Federal Practice and Procedure* ¶ 2024, at 198-99 (1970); so too, "documents *prepared* for other purposes do not become protected as work product by being *examined* in anticipation of litigation." *Epstein* at 535.

 Applying these principles, I will first consider the Townsend defendants' claims of privilege with respect to the documents examined *in camera,* identified by their Bates Numbers. To the extent that documents are found to be privileged, I will then consider whether that privilege is trumped by the crime-fraud exception.

II

119-131.

 These documents consist of handwritten notes. The Privilege Log states that the author is "Doug Spaulding." Spaulding is one of the attorneys consulted by Gerald Townsend. The topic of the notes is described as "NASD," a reference to securities regulators who interested themselves in the business affairs of Townsend and the companies he controlled. To the extent that the notes are comprehensible to the uninitiated reader, they appear to reflect information received from Townsend, advice given to Townsend, and questions Spaulding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 3
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

was preparing to ask Townsend. But the notes are undated, and one cannot tell whether Spaulding wrote them during a face-to-face conversation with Townsend, or during a telephone conversation with him, or while Spaulding was reflecting in solitude. Defendants assert the attorney-client privilege. I provisionally sustain that claim of privilege, and these documents need not be produced to plaintiff at this time. But Spaulding must furnish to the Court *in camera* an affidavit stating the dates these notes were written and describing the circumstances under which they came to be written.

  132-136

 **\*3** These documents consist for the most part of handwritten notes. "Don Clark" [Donald O. Clark], Townsend's principal attorney in connection with the pertinent matters, is identified as the author. NASD is the subject. The attorney-client privilege is asserted. Document 132 has stapled to it the business cards of H. Dandridge Campbell III and Robert W. Lough, on the staff of the Atlanta, Georgia office of the United States Securities and Exchange Commission ("SEC"). Document 132 also contains the handwritten notation, to the right of these business cards: "Voluntary meeting with SEC in Atl. 9/13/96-- 9:15-3:00." These features suggest that Clark made these notes during a meeting attended by Townsend, Clark, and the two SEC representatives. If that is so, no attorney-client privilege can attach, since the utterances of Townsend and Clark took place in the presence of third parties, thereby waiving the privilege. Accordingly I provisionally reject the claim of privilege. If the circumstances of these notes' creation is different from what I have assumed, Clark is directed to submit an affidavit describing those circumstances and their privileged status will be reconsidered.

  137-138

 Gerald Townsend is the author of these two documents dated December 30, 1995, which he sent to Clark at Clark's then law firm, under date of December 30, 1995.

 Document 137 is a letter from Townsend to Clark enclosing a check in the amount of $10,000 "for your fees in providing us with tax planning and tax advice," together with a xeroxed copy of the check, dated December 30, 1995. Under the principles stated in Part I, this communication is not privileged.

 Document 138, a letter from Townsend to Clark also dated December 30, 1995, refers to his meeting with Clark the day before and expresses Townsend's understanding that "you will be doing the following for us." Four particular areas of legal activity are then described. I have considered whether this letter and the legal activities it describes relate solely to the purpose of advancing Townsend's business ventures, which would take the letter out of the attorney-client privilege. But I conclude that the privilege applies. See [SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 513 (D.Conn.1976)](#) ("The privilege need not be limited to legal consultations between corporations in litigation situations, however. Corporations should be encouraged to seek legal advice in planning their affairs to avoid litigation as well as in pursuing it.") (Newman, D.J.); [In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037- 38 (2d Cir.1984)](#) (attorneys rendered privileged legal advice, rather than unprivileged business advice, when they gave corporate client "tax advice" and "legal advice concerning the mechanics and consequences of alternative business strategies.").

 Document 138 must also be considered within the context of the crime-fraud exception, discussed in Part III.

  139-141

 The attorney-client privilege is asserted with respect to three pages of handwritten notes which the Privilege Log says were authored by Gerald Townsend. No recipient is listed. The Log states the dates of composition as January 3, 1996 for document 139; January 8, 1996 for document 140; and April 25, 1996 for document 141.

 **\*4** I am unable to discern any privileged material in these notes. Townsend apparently kept a book of notations of conversations and reflections. The dates of the conversations or other entries appear in the right-hand margin. All three pages include entries made on dates other than those specified in the Privilege Log. No privilege can be claimed with respect to such entries.

 The Privilege Log lists "Don Clark" as the topic of documents 139 and 140. In 139, the only reference to Don Clark for January 3, 1996, the date specified in the Log, appears as one of several bullet points under the caption "Ray Wolford," from which I infer that during a conversation between Townsend and Wolford, Clark was mentioned. No privilege attaches to that. In 140, the only reference to Clark on the indicated date, January 8, 1996, is "Don Clark--good

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

lawyer," which I take to be an evaluation someone else gave to Townsend, or Townsend gave to someone else, or Townsend jotted down as a personal reflection; [FN3] no privilege attaches in any event. The Privilege Log lists the topic of document 141 as "conference Don Clark re SEC," which certainly conveys an aura of privilege; but the sole entry for the specified date, April 25, 1996, under the caption "Donald Clark," says only: "Send him what I sent the SEC." From this I infer that during a conversation on that date, Clark asked Townsend to send to him material that Townsend had previously sent to the SEC. That communication reveals no confidences, and is not privileged.

> FN3. In document 140 the date "1-8-96" appears next to the name "Dr. Susse," and the reference to Clark quoted in text appears below that name and prior to the next noted date of "1-9-96," which would seem to refer to another conversation between Townsend and Wolford. Therefore it is possible that Clark's name was mentioned during a conversation on January 8, 1996 between Townsend and Susse, but document 140 does not permit that conclusion to be drawn with any certainty.

Based on a review of these documents, one could plausibly imagine that a paralegal was instructed to review Townsend's notebook and remove as privileged any page that made any reference to Donald Clark. But the proper application of the attorney-client privilege requires a more demanding analysis than that.

142-146

This is a letter dated April 25, 1996 from Townsend to Clark about the SEC. It falls within the attorney-client privilege.

147-152

These documents consist of a fax cover sheet dated April 25, 1996 that Townsend sent to Clark together with copies of letters and notices Townsend had sent to NASD and SEC regulators on January 16, 1996. These documents are not privileged.

153

The Privilege Log identifies this single-page document as Townsend's handwritten notes made on April 29, 1996 on the topic of "conference Don Clark re Chase and Renner." The attorney-client privilege is asserted. The privilege covers the last entry, under the caption "Don Clark," but does not extend to the prior entries. Defendants must therefore produce a redacted copy of the document.

This resolution will be adopted with respect to a number of other documents, discussed *infra.* As an Appendix to this Opinion (which will not be furnished to plaintiff), the Court will indicate on copies of the documents which portions may be redacted and which must be produced.

154

The Privilege Log identifies this single-page document as Townsend's handwritten notes made on May 1, 1996 on the topic of "conference Don Clark re Morelli, SEC, Renner and Gulf." The asserted attorney-client privilege covers some of the entries but not others. A redacted copy must be produced.

155-161

**\*5** The Privilege Log characterizes these documents as "correspondence" from Townsend to Clark on the topic of "Hampstead." The attorney-client privilege is asserted. In point of fact, the documents comprise a fax cover sheet from Townsend to Clark bearing the text "for your information," and forwarding copies of letters and agreements generated by Gulf Capital Resources, S.A. and Hampstead. There is nothing in these documents that falls within the privilege. I reject the assumption, implicit in defendants' presentation, that documents for which no claim of privilege could be asserted become cloaked with privilege solely because Townsend sent them to his attorney. *See In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1037 (2d Cir.1984) ("[I]t is important to bear in mind that the attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that that disclosure would reveal confidential communications."). The Gulf and Hampstead documents constitute "information" of possible relevance to the underlying issues in the case; and Townsend's brief fax forwarding those documents to Clark does not reveal any confidential attorney-client communications. As pointed out in *Epstein,* at 48:

> Clients and their attorneys often assume, erroneously, that merely conveying something to an attorney will cloak the underlying facts from disclosure. It will not.

*See also Draus v. Healthtrust, Inc.,* 172 F.R.D. 384,

Not Reported in F.Supp.2d     Page 5
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

393 (S.D.Ind.1997) ( "The cover letter is protected by the attorney-client privilege. The attached agreement is not."); *Pacamar Bearings, Inc. v. Minebea Co.,* 918 F.Supp. 491, 511 (D.N.H.1996) ("Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged merely by attaching them to a communication with the attorney."); *P & B Marina, L.P. v. Logrande,* 136 F.R.D. 50, 56 (E.D.N.Y.1991) ("Merely attaching ... documents to attorney-client communications does not constitute a basis for assigning the privilege. To permit this result would abrogate the well established rule that only the communication, not the underlying facts, are privileged.") (citations and internal quotation marks omitted) (opinion by Azrack, Mag. J., affirmed by Weinstein, D.J.). Indeed, transmittal documents themselves are not privileged unless they reveal the client's confidences. *See P & B Marina,* 136 F.R.D. at 54 ("Such transmittal letters or acknowledgments of receipt that do not include legal advice nor disclose privileged matters are not subject to the attorney-client privilege.").

Were the rule otherwise, a party could shield quantities of highly relevant and fully discoverable documentary evidence through the simple expedient of conveying copies to his attorney. In *SCM Corp. v. Xerox,* 70 F.R.D. 508, 514 (D.Conn.1976), District Judge Newman (as he then was) put it thus: "Legal departments are not citadels in which public, business or technical information may be placed to defeat discovery and thereby ensure confidentiality."

162-163

**\*6** This two-page letter dated May 2, 1996 from Townsend to Clark on the topic of "Hampstead" falls within the attorney-client privilege.

174-176 [FN4]

> FN4. In this Opinion I follow the order in which the Privilege Log lists the documents in question, although that order departs on occasion from the Bates Numbers sequence.

The Privilege Log describes these documents as "correspondence" dated May 5, 1996 from Townsend to Clark on the topic of "Dr. Susse and Mr. Renner." The attorney-client privilege is asserted. Document 174 is a fax cover sheet dated May 5, 1996 from Townsend to Clark which contains comments by Townsend about the other two documents, 175 and 176, which were attached to the fax. Document 174 falls within the attorney-client privilege. Documents 175 and 176 are copies of two communications from Paul Renner, each dated May 5, 1996, one to Susse and the other to Townsend. Neither of these documents is privileged.

164-167

These four documents are comprised of Townsend's handwritten notes, as to which the attorney-client privilege is asserted. The Privilege Log says they were written on May 17, 1996 for document 164; May 22, 1996 for document 165; and May 23, 1996 for documents 166 and 167. The specified topics are "conference Don Clark re SEC (164), "Don Clark" (165), and "conference Don Clark re Gulf" (166-167). Portions of these notes are privileged and may be redacted. The remaining entries must be produced.

168-173

The Privilege Log characterizes this group of documents as "correspondence" from Townsend to Clark dated May 28, 1996 on the topic of "SEC." The attorney-client privilege is asserted.

Documents 168 and 169 comprise a two-page letter from Townsend to Clark which falls within the privilege. Documents 170 and 171 are handwritten lists of documents which Campbell of the SEC requested Townsend to furnish to him. They are not privileged. Document 172 is a copy of a letter dated May 21, 1996 Townsend sent to Gloria Russo at Hampstead in Monte Carlo, Monaco. It is not privileged. Document 173 is a copy of a fax Townsend sent to Paul Renner. It is not privileged.

177-179

The Privilege Log characterizes these documents as "correspondence" dated June 5, 1996 from Townsend to Clark on the topic of "SEC." Document 177 serves the function of a fax cover sheet from Townsend to Clark. It requests legal advice and falls within the asserted attorney-client privilege. Documents 178 and 179, forwarded by Townsend to Clark with document 177, are respectively a list of documents Townsend gave to Campbell of the SEC and a list of documents Campbell asked Townsend to send to him. Neither of these documents is privileged.

180-181

The Privilege Log characterizes these documents as "correspondence" dated June 7, 1996 from Townsend

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

Page 6

to Clark on the topic of "Gulf Capital Resources." The documents comprise a letter which falls within the asserted attorney-client privilege.

182

Document 182 is a page from Gerald Townsend's handwritten notebook. The Privilege Log asserts the attorney-client privilege with respect to entries made on July 3, 1996 on the topic of "conference Don Clark re Morelli, SEC and Susse." Some of the entries on document 182 fall within that description and are privileged. Other entries do not and are not. This document may be redacted before production to plaintiff.

183-188

**\*7** The Privilege Log characterizes these documents as "correspondence" dated July 16, 1996 from Townsend to Clark on the topic of "Dr. Susse and Felix Renner." The attorney-client privilege is asserted. Documents 183 and 184 comprise a two-page letter from Townsend to Clark which is privileged. The documents forwarded with that letter, 185-188, were sent by Townsend to third parties or received by Townsend from third parties, and are not privileged.

189

The Privilege Log characterizes document 189 as Townsend's handwritten notes of a conference on July 17, 1996 with Clark on the topic of "Wolford and Morelli." The notations falling within that description are privileged, but the document contains other entries for July 16, 1996 which are not privileged. The document may be redacted before it is produced.

190-192

The Privilege Log characterizes these documents as "correspondence" dated July 29, 1996 from Townsend to Clark on the topic of "United Carolina Bank." Document 190, a letter from Townsend to Clark, falls within the asserted attorney-client privilege. Documents 191 and 192, copies of communications between banks in Italy and the United States, are not privileged.

193

The Privilege Log characterizes document 193 as handwritten notes Townsend wrote on August 8, 1996 about a "conference Don Clark re SEC," and also notes written by Townsend on August 15, 1996 on the topic of "Don Clark."

I accept that the August 8 entry describes a conversation between Townsend and Clark. It falls within the asserted attorney-client privilege. It is not clear that the August 15 entry refers to a conversation or other communication between Townsend and Clark. The phrasing of the Privilege Log suggests the contrary. I conclude provisionally that this entry is not privileged, subject to a clarifying affidavit from Townsend.

Document 193 contains entries for other days which are not privileged. Accordingly the document may be redacted before production to plaintiff.

194-196

The Privilege Log characterizes these documents as "correspondence" dated August 12, 1996 from Townsend to Clark on the topic of "Hampstead." Document 194, a letter bearing that date from Townsend to Clark, falls within the asserted attorney-client privilege. Documents 195 and 196, communications from Hampstead to Townsend, are not privileged.

197-203

Documents 197 and 198 comprise a two-page letter dated August 12, 1996 which Townsend sent to Clark. Townsend enclosed with that letter copies of a faxed letter from Klaus Renner to Townsend bearing that date, documents 199-201, and two documents sent by Hampstead to Renner, documents 202 and 203. Townsend's letter to Clark, 197 and 198, falls within the asserted attorney-client privilege. The other documents are not privileged.

204

Document 204, a letter dated October 9, 1996 from Townsend to Clark, falls within the asserted attorney-client privilege.

205

Document 205 is a letter from Townsend to Clark dated October 15, 1996. The letter advises Clark of the addresses of four individuals that Clark wanted. Townsend's letter says nothing more. While the point is close, I will extend the attorney-client privilege to the letter because it could be read as an indirect

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 7
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

reflection of information Townsend gave to Clark in confidence.

206-222

*8 These documents consist of copies of (a) billing records generated by Clark's law firm Keck, Mahin & Cate, with respect to legal services rendered to the Townsend entities between September 30, 1996 and November 10, 1996, (b) letters from Townsend to Clark forwarding payment of the firm's invoices, together with copies of the checks. Although the Privilege Log describes the billing records as containing a "detailed description of legal services rendered," in fact they constitute a relatively terse chronological recitation, and give no details with respect to the contents of communications between Townsend and Clark or other attorneys at the firm. As noted in Part I, billing records that attorneys submit to clients are generally discoverable, unless production will necessarily reveal client confidences. These documents do not do that, and they are not privileged.

223-224

These documents comprise a two-page letter dated January 13, 1997 from Townsend to Clark, which falls within the asserted attorney-client privilege.

225

This document is the first page of a letter dated April 8, 1997 that Townsend sent to Clark (who had moved to another law firm, Reed Smith Shaw & McClay of Washington, D.C., which now represents Townsend and his companies). The Privilege Log describes the topic of the letter as "NASD Complaint." While the first page of this letter suggests that the entire document falls within the asserted attorney-client privilege, no conclusion can be reached until the full letter is submitted to the court for *in camera* review. Defendants will be directed to do that.

226-229

These four one-page letters, written by Townsend to Clark on April 18, April 25, May 22, and May 30, 1997, fall within the attorney-client privilege.

However, the April 25 letter, document 227, recites that it encloses "a copy of the letter I received from George Lunganoiu in Charleston, S.C. concerning the $500,000 Demand Note between Hampstead and Townsend Financial Group, Ltd." That document was not included in the material submitted for *in camera* review. It is plain from the document's description that it is not privileged. Therefore the Lunganoiu letter should be produced to plaintiff, if that production has not already been made during discovery.

230

This is a one page letter dated July 8, 1997 from Townsend to Douglas Spaulding, an attorney at the Reed Smith firm. The letter does no more than transmit a copy of an NASD complaint. It is not privileged.

231-236

These documents comprise a letter dated July 14, 1997 from Spaulding to Townsend, enclosing a draft of a letter the Reed Smith firm prepared for transmission by it to Alan Wolper, an NASD attorney, relevant to the NASD's complaint against Townsend Financial Services Corp. The attorney-client privilege is asserted.

This is a draft of a letter to be sent to a third party, and "the fact that the document is to be sent to a third party ordinarily removes the cloak of confidentiality necessary for protection under the attorney-client privilege." *U.S. Postal Service v. Phelps Dodge Refining Co.,* 852 F.Supp. 156, 163 (E.D.N.Y.1994). Drafts of documents "may be considered privileged if they were prepared for the purpose of obtaining legal advice and/or contain information a client considered but decided not to include in the final version"; the privilege may also attach if the party asserting it shows that "a confidential communication was eliminated from the final document." *Id.* at 163. Defendants, whose burden it is to sustain the privilege, make no such showings. These documents are not privileged.

237-239

*9 These documents comprise a two-page letter dated July 17, 1997 from Spaulding to Townsend, documents 237 and 238, enclosing a copy of a faxed letter dated July 16, 1997 from Alan Wolper at the NASD to Spaulding, document 239. Documents 237 and 238 fall within the attorney-client privilege. Document 239 does not.

240

This is a one-page letter dated July 22, 1997 from

Not Reported in F.Supp.2d         Page 8
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

Spaulding to Townsend. The letter recites that attached to it is "a copy of Corrective Action which I have prepared for your consideration in connection with the settlement of the above-referenced NASD complaint." The attachment is not included in defendants' *in camera* submission. Given the authorities cited *supra,* it would appear that neither the transmittal letter nor the draft of a document to be given to a third party are privileged. Defendants are directed to submit the attachment to the Court for *in camera* review.

241

This document is an e-mail sent on August 14, 1997 by Townsend to Clark. It falls within the attorney-client privilege.

242-246 [FN5]

> FN5. For these documents and all documents discussed hereafter, defendants assert both the attorney-client privilege and the attorney's work-product privilege, except as indicated otherwise in the text.

These documents comprise a letter dated August 18, 1997 from Townsend to David Ober, another attorney at the Reed Smith firm (document 242), forwarding to Ober for his attention two letters from George Lunganoiu to Townsend (documents 243-244 and 245), the latter attaching a copy of a $500,000 demand note signed by Townsend as president of Townsend Financial Group, Inc. (document 246). Townsend's letter to Ober is nothing more than a transmittal letter, and reveals no confidences. That letter is not covered by the attorney-client privilege, and neither are the documents enclosed with it. None of these documents was prepared in anticipation of litigation or for trial, and so the work-product privilege does not apply.

247

The Privilege Log characterizes this document as Townsend's handwritten notes of a conference on October 1, 1997 with Clark on the topic of "grand jury investigation." Only the attorney-client privilege is invoked. The entry for that day under the caption "Don Clark" is covered by the privilege. The other entries on document 247 are not. The document may be redacted before it is produced to plaintiff.

248-257

The Privilege Log characterizes these documents as "correspondence" dated October 24, 1997, authored by Townsend and sent to Clark and Ober. Document 248 is a fax transmittal form. Neither asserted privilege applies to it. The remaining documents in this group accompanied 248. Documents 249-250 comprise a letter dated October 24, 1997 from Townsend to Clark. It falls within the attorney-client privilege. Documents 251-257 are copies of a summons and complaint served upon Townsend and other defendants in the United States District Court for the District of South Carolina, Charleston Division, by George Lunganiou, together with copies of the $500,000 demand note executed by Townsend and wire instructions Townsend received from Hampstead. These documents are not covered by either privilege.

258-263

**\*10** These documents comprise a transmittal letter dated October 31, 1997, from Ober to Thomas S. Tisdale, Jr., Esq., an attorney in Charleston, S.C., who was retained to represent Townsend in the Lunganiou action referred to in the preceding paragraph of this Opinion, and copies of the other documents described therein. These documents are not covered by either privilege.

264

This letter dated November 5, 1997 from Tisdale to Ober falls within the work-product privilege because it reveals an attorney's mental processes.

265

This letter dated November 12, 1997 from Ober to Townsend falls within the work-product privilege because it reveals an attorney's mental processes. However, Ober's letter begins: "Enclosed please find copies of documents we received from George Lunganiou's counsel ." Those documents are not provided to the Court, and so document 265 is incomplete. Defendants are directed to submit them to the Court for *in camera* review.

266-268

These documents comprise a transmittal letter dated November 17, 1997 from Tisdale to Ober forwarding a copy of a consent order extending Townsend's time to answer the Lunganiou complaint. These documents are not covered by either privilege.

Not Reported in F.Supp.2d                                                                                                                             Page 9
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

269

This status letter dated December 3, 1997 from Tisdale to Ober is covered by the work-product privilege.

270-271

This two-page letter dated December 17, 1997 from Townsend to Ober falls within the attorney-client privilege.

272-340

These documents consist of letters between Ober, Tisdale and Townsend concerning the drafting and filing of papers (a memorandum of law and an affidavit by Townsend) in support of a motion by Townsend to dismiss the Lunganiou complaint. The attorney-client privilege is not implicated, with the sole possible exception of changes Townsend made in his draft affidavit. To the extent that the attorney-client privilege does not apply, all these documents are covered by the work-product privilege.

341

This status letter dated January 30, 1998 from Tisdale to Ober falls within the work-product privilege.

342-346

Documents 342 and 345-346, a status letter dated February 3, 1998 from Ober to Townsend and a fax cover sheet, fall within the work-product privilege. Its enclosure, a copy of the district court's scheduling order (documents 343-344), was not prepared by an attorney, is a public document, and is not privileged.

347-351

Document 347, a status letter dated February 13, 1998 from Ober to Townsend, and document 351, its fax cover sheet, fall within the work-product privilege. Its enclosure, a copy of Lunganiou's memorandum in opposition to Townsend's motion to dismiss the complaint (documents 348-50), was not prepared by an attorney representing Townsend, is a public document, and is not privileged.

352

The Privilege Log characterizes this document as Townsend's handwritten notes of conferences on February 18, 1998, on the topic of "SEC," and on February 19, 1998, on the topic of the Lunganiou case. On inspection, it is clear that the entries for both dates reflect Ober's reports to Townsend about the district court hearing on Townsend's motion to dismiss the Lunganiou complaint. During the February 18 conversation, Ober described to Townsend the arguments of counsel and the district judge's apparent reaction to them. In the February 19 conversation, Ober advised Townsend that the court had dismissed the complaint. Nothing in these notes falls within the attorney-client privilege, but they are all covered by the work-product privilege.

353

*11 The Privilege Log characterizes this document as Townsend's handwritten notes of conferences with Ober on February 20, February 25, and March 2, 1998. The notes indicate that Townsend had been served with Renner's complaint. Townsend and Ober discussed that suit during these three conversations. These notes fall in part within the attorney-client privilege; and, to the extent they do not, the notes reflect Ober's advice and mental processes with regard to defending against the Renner suit, and fall within the work-product privilege.

354-360

These documents consist of status letters during the period March 4-11, 1998, from Tisdale to Ober and Ober to Townsend relative to the district court's order dismissing the Lunganiou complaint. They all fall within the work-product privilege, except for documents 359-360, which comprise a copy of District Judge Norton's order dated and filed February 17, 1998, [FN6] a public document which is not privileged.

> FN6. Apparently Tisdale and Ober did not become aware of Judge Norton's order until two days after it had been filed. *See* discussion *supra* concerning document 352.

361

This is a letter dated April 1, 1998 from Ober to Townsend enclosing the final invoice of Tisdale's firm after the Lunganiou litigation had been terminated by Judge Norton's order of dismissal. It does not fall within either privilege.

362

Not Reported in F.Supp.2d   Page 10
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

The Privilege Log characterizes this document as Townsend's handwritten notes of conversations on March 11, March 25, and April 14, 1998 with Spaulding and/or Ober on the topic of "Renner v. Townsend," litigation that was pending on those dates. Both privileges are invoked. The relevant entries are partially covered by the attorney-client privilege, and to the extent they are not, are covered by the work-product privilege.

363

The Privilege Log characterizes this document as Townsend's handwritten notes on June 4, 1998 on the topic of "Reed Smith--Doug Spaulding, David Ober and Don Clark." That designation of topic contains the entire text of the document, which accordingly reveals no confidential communication and does not fall within the attorney-client privilege, the only privilege invoked.

                              III
It is now necessary to consider whether any of the documents to which the attorney-client or work-product privilege would otherwise attach fall within the crime-fraud exception, a subject discussed in *Renner III,* 2001 WL 388044 at *2.

  A. *The Governing Law*

To recapitulate Second Circuit authority, application of the crime-fraud exception requires a two-pronged showing. "A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of contemplated or ongoing criminal or fraudulent conduct." *United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir.1997). "Probable cause" in this context means a factual basis sufficient to "strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *Jacobs,* 117 F.3d at 87 (citations and internal quotation marks omitted).

**\*12** With respect to the second necessary showing, that a particular document is in furtherance of a crime or fraud, the Second Circuit has rejected a "relevant evidence" test, that is to say, an inquiry limited to "whether the material sought might provide evidence of a crime or fraud." *In re Richard Roe, Inc.,* 168 F.3d 69, 71 (2d Cir.1999) (citing and quoting *In re Richard Roe, Inc.,* 68 F.3d 38, 40-41 (2d Cir.1995)). Instead, the Second Circuit imposes the more stringent requirement that

  there be (i) a determination that the client communication was *itself* in furtherance of the crime or fraud and (ii) probable cause to believe that the particular communication with counsel or attorney work product was *intended* in some way to facilitate or conceal the criminal activity.

*Richard Roe,* 168 F.3d at 71 (citation and internal quotation marks omitted; emphases in original); *see also Jacobs,* 117 F.3d at 88 ("It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must actually *have been made with intent to further an unlawful act.*" (quoting *United States v. White,* 887 F.2d 267, 271 (D.C.Cir.1989) (Ruth Bader Ginsburg, J.) (emphasis in original)).

Guided by these authorities, I must consider, first, whether the record evidence independent of the communications asserted to be privileged furnishes probable cause to believe that Townsend committed fraud against Renner; and second, whether any of Townsend's communications with his attorneys were in furtherance of that fraud, contemplated or ongoing.

  B. *Did Townsend Engage in Fraudulent Conduct Against Renner?*

There is no question that the evidence adduced during discovery compels the inference that Dr. Gustav Susse defrauded plaintiff Klaus Renner of $3 million. While counsel for the Townsend defendants stop just short of formally admitting Susse's fraud, there is no genuine question about it. But Susse's fraud is not the focal point of the inquiry into whether Townsend's communications with his attorneys fall within the crime-fraud exception. The question posed by the applicability of the crime-fraud exception is whether the record evidence furnishes probable cause to believe that Townsend, knowing of Susse's fraudulent conduct, acted with the purpose of furthering that fraud as a participant or an aider and abettor. [FN7] For the reasons that follow, I answer that question in the affirmative.

> FN7. The elements of a claim of aiding and abetting fraud are the existence of a fraud, the defendant's knowledge of the fraud, and the defendant's substantial assistance to advance the fraud. See *Wight v. Bankamerica Corp,* 219 F.3d 79, 91 (2d Cir.2000) (applying New York law); *see also Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983) (stating elements of claim of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 679-16   Filed 05/05/06   PageID.7631   Page 12 of 18

Not Reported in F.Supp.2d                                                                                                    Page 11
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

aiding and abetting securities law violation under federal law).

Before becoming associated with Gustav Susse, Gerald Townsend, in the words of his counsel at the May 2, 2001 hearing, "was a small broker-dealer and had virtually no custody of customer funds or securities and as such had a very minimal net capital requirement under the NASD rules." Tr. 44-45. Counsel continued:

> With his involvement in this trading program of Dr. Susse's and the notion that he [Townsend] would be asked to hold customer funds, particularly customer funds in the magnitude of $5 million, for example, *with the Gulf money,* it became necessary, it became very clear to him and he embarked upon discussions with the NASD regulators as to what he needed to do to satisfy that obligation.

**\*13** Tr. 45 (emphasis added).

Counsel's reference to $5 million of "the Gulf money" is significant for reasons that will shortly appear. First, however, one must consider the document that evidences the beginning of Townsend's association with Susse: an "Asset Management Agreement" dated August 24, 1995. Pl.Ex. I.A in Support of Plaintiff's Present Motion. [FN8] That agreement identified Hampstead Trust Limited ("Hampstead"), an entity controlled by Susse, as the "Client" and Townsend Financial Services Corp. ("Townsend Financial"), an entity controlled by Gerald Townsend, as the "Asset Manager." The preamble recited, *inter alia,* that "the Asset Manager has the ability and expertise with regard to managing and arranging financial transactions as referred to herein." The agreement provided that Hampstead would open an account with Townsend Financial; that Townsend Financial would open "operative accounts under its name" in the United States; and that Hampstead as Client "shall transfer sufficient funds, collaterals et., [sic] to his account to enable Asset Manager [Townsend Financial] to effect the transactions instructed by Client." Pl.Ex. I.A at ¶¶ 4.1-6. The agreement also provided that as between Townsend Financial and Hampstead, "Asset Manager shall only act for and on behalf of the Client and can not be made responsible and/or liable for any losses or damages caused by the Client's instructions." *Id.* at ¶ 7.1. Whatever effect that provision might have with respect to the liabilities of Hampstead and Townsend Financial *inter se,* there is no basis for suggesting that it binds third parties, such as investors attracted by Hampstead.

> FN8. Subsequent references are to exhibits from the same source unless otherwise stated.

1. *The Gulf Transaction*

Hampstead did indeed attract investors. Plaintiff Klaus Renner was one of them; but Renner was preceded in that capacity by a Luxembourg entity called Gulf Capital Ressources [*sic* ], S.A. ("Gulf"). Hampstead and Gulf entered into a "Project Financial Agreement" dated November 17, 1995, another document drafted by Susse. Pl.Ex. I.B. That agreement referred to Hampstead as "Lender" and Gulf as "Borrower"; recited, *inter alia,* that "Lender is proprietor of a business-mechanism, which includes the necessary know-how to arrange credit-lines for project-financing"; that "Borrower has a project to be financed"; and that "Lender agrees to finance the project to Borrower for a total amount of $25,000,000 (twenty-five million U.S. dollars) through work-product progress payments," in accordance with a payment schedule appearing in Addendum Two. The agreement identified "Townsend Financial Serv. Corp." as the Lender's "Security House." Addendum One.

The agreement between Hampstead and Gulf made it plain that the Hampstead financial pump, purportedly able to generate a stream of "work-product progress payments" totalling $25 million payable *to Gulf,* had to be primed by a $5 million payment *from Gulf.* Thus Addendum One to the agreement provided in pertinent part that Gulf, acting through two designated individuals [FN9]

> FN9. Messrs. Didier des Cressonniers and Jean-Claude Pittet.

**\*14** hereby give to the Security House Townsend Financial Serv. Corp. this irrevocable instruction to issue, against our down-payment amounting to $5,000,000 (five million USD) a "custody receipt confirmation" duly signed by two bank officers ...
Furthermore, we instruct the Security House Townsend Financial Ser. Corp. to enable Hampstead Trust Ltd. to leverage 1x5 the down-payment, in order to issue a documentary letter of credit, amounting to $25,000,000 (twenty-five million USD) in favor of Golf [*sic* ] Capital Ressources, S.A.

In short, the Hampstead-Gulf agreement was designed to make Gulf believe that Hampstead's proprietary "business-mechanism" would transform

Not Reported in F.Supp.2d    Page 12
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

Gulf's "down-payment" of $5 million into $25 million in "work-progress payments" that Hampstead would make to Gulf. The shadowy figure of the medieval alchemist comes irresistibly to mind. [FN10]

> FN10. "Alchemist: One who studies or practices alchemy." "Alchemy: a medieval chemical science and philosophy aiming to achieve the transmutation of the base metals into gold." *Webster's New Collegiate Dictionary* (1976) at 27. I do not mean to suggest that $5 million in U.S. currency constitutes a "base metal," but the thought association seems fair enough.

The record shows that on November 22, 1995, Townsend received a $5 million wire transfer from Hampstead. *See* Ex. C to plaintiff's brief dated April 18, 2001. It is common ground that this amount was furnished to Hampstead by Gulf as the "down-payment" called for by the Hampstead-Gulf agreement.

In these circumstances, I cannot accept Mr. Spaulding's submission at the May 2 hearing that this $5 million in the Gulf transaction differed materially from the $3 million transaction involving plaintiff Renner because "in the case of the Gulf transaction, the funds were Hampstead's money," that "could be dealt with by Hampstead however it felt it wanted to." Tr. 40. That argument exalts form over substance. The $5 million Townsend received on November 22, 1995 from Hampstead was Gulf's money, and Gerald Townsend knew it. That knowledge is reflected by Townsend's letter to Susse dated April 24, 1996, Pl.Ex. III.C. Gulf had received nothing from Hampstead; and Townsend had received inquiries from one Marc Shafran of the SEC, who was conducting an investigation "centered around the handling by us [Townsend] of customer funds" and "whether or not Hampstead was engaging in 'Prime Bank Fraud." ' Townsend advised Susse in his April 24, 1996 letter that Shafran had demanded "a copy of the transfer of the $5,000,000 *from Gulf* as well as the Gulf-Hampstead contract," and that Shafran "is already aware that Gulf has not been repaid *their $5,000,000* yet" (emphasis added). Townsend's letter to Susse goes on to say:

> Mr. Cressonnieres just called me, while I was typing this letter. He said that you told him *his $5,000,000* would be transferred today. He was very angry when I informed him that I had not sent *his funds* back.

(emphasis added).

I conclude from this evidence that Mr. Spaulding had it right when, in his oral submission on May 2, 2001, he referred to Townsend's involvement "with the Gulf money."

The record indicates that Gerald Townsend was familiar with the Gulf-Hampstead contract at the time Townsend Financial received the $5 million on November 22, 1995, and knew that this amount related to that contract. Accordingly Townsend knew that Hampstead had encouraged Gulf to believe that its $5 million "down-payment" would be leveraged into a $25 million bank letter of credit in Gulf's favor. But what did Townsend do with that $5 million? Ex. C--a Townsend-generated document--gives the answer. The $5 million was initially wired to a Townsend account at the United Carolina Bank. From that account, on November 29 Townsend distributed $2 million to Amalia Carver Paszkowski and $200,000 to Wolford Brothers. On December 4 Townsend distributed $100,000 to Alex Penly, paid himself the $50,000 retainer called for by his agreement with Hampstead, and distributed $200,000 to one of the Townsend companies. That left $2.4 million of the $5 million left in the United Carolina Bank. On December 8 Townsend transferred that amount to the Chase Bank. He then distributed all those funds to a similarly eclectic group of distributees: on December 14, $540,000 to Karl Linder; and on December 28, $500,000 to Peter Susse (a brother of Gustav Susse), $50,000 to Richard E. Morrison, and $300,000 to the most colorful recipient of all, the "Knights of Malta."

**\*15** So Gulf's $5 million "down-payment" was entirely dissipated, and it is difficult to believe that these distributions reflect a good faith effort to leverage the funds into bank letters of credit for Gulf's benefit, in the amount of $25 million or any other. The evidence compels the inference that Susse defrauded Gulf; but, as noted, I must focus upon Townsend. I accept for the purpose of this analysis that Townsend made these distributions on Susse's instructions or (in the case of the two distributions to the Townsend interests) with Susse's authority. But I conclude without difficulty that the evidence furnishes probable cause to believe that Townsend knew Susse, through the medium of Hampstead, was defrauding Gulf, and that Townsend knowingly participated in or aided and abetted that fraud. This remarkably varied collection of distributees ran up too many red flags.

Although Renner, not Gulf, is the plaintiff in this

Not Reported in F.Supp.2d                                                                                                    Page 13
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

action, I have discussed the Gulf transaction at some length because I think it is probative of the manner in which Gustav Susse and Gerald Townsend dealt with each other and with other people's money. I am inclined to the view--although I need not decide the point at this time--that at the trial of the Renner case, plaintiff would be entitled to offer evidence of the Gulf transaction as proof of Townsend's "motive, opportunity, intent, preparation, plan, knowledge, ... or absence of mistake or accident," F.R. Evid. 404(b).

2. *The Renner Transaction*

I turn now to the record evidence concerning the transaction between Hampstead Trust Limited and Klaus Renner.

Hampstead and Renner entered into a "Management Agreement" dated February 7, 1996, a document prepared in Susse's distinctive graphic style. Ex. A to Defendants' Answer to Plaintiff's Omnibus Discovery Report. That agreement referred to Hampstead as "Supplier" and Renner as "Client"; recited, *inter alia,* that "Supplier is proprietor of a business-mechanism, which includes the necessary know-how to execute each purchase and sell transaction of 'medium term bank debentures' "; and that "Client has available funds, amounting to $3,000,000 (three million U.S.D.) ready for transfer by swift wire"; [FN11] and that "Supplier will pay to Client a weekly profit-sharing amounting to 3% (three percent) from the amount of $3,000,000 (three million U.S.D.)--40 business weeks per annum, with monthly payments." Addendum One, signed for Hampstead by Susse and Alex Penly as "director," and by Renner on his own behalf, identified Townsend Investment Funds LLC as Supplier's "Security House," and recited Renner's giving to Townsend an "irrevocable instruction to receive swift funds by swift wire, amounting to $3,000,000 (three million U.S.D.) ... and to cause the issue of a 'custody receipt confirmation' duly signed by Chase Manhattan Bank N.A., New York." Addendum One also provided:

> FN11. According to the allegations of his amended complaint, in February 1996 Renner, "who had invented a snow-removing machine, was seeking capital to manufacture and sell the invention." *Renner II,* 2000 WL 781081 at *2. Susse touted the Hampstead agreement to Renner as a means of raising that capital. *Id.*

Furthermore, we instruct you to enable Hampstead Trust Ltd.--as Supplier--to purchase directly from the top 25 West European issuing banks, medium term bank debentures on a "payment versus delivery" basis, at a pre-fixed price, and to resell the same bank instruments, at a pre-fixed price, on a "delivery versus payment" basis--only in case of a net profit of 3% (three percent)--40 (forty) business weeks per annum.

*16 Whatever this language may mean, it appears intended to describe the manner in which Hampstead would generate for Renner the 120% profits per annum (3% per week times 40 weeks) that Renner would receive on his $3 million investment. To complete this documentary blandishment, Addendum One also provided:

> The present instructions also provide that the invested sum of $3,000,000 (three million U.S.D.) has to return free and without any deduction after the period of 365 (three hundred and sixty-five) days, without demand, to the bank coordinates as per annex "two."

Thus Susse persuaded Renner to expect that Renner would receive in one year, on his investment of $3 million, interest in the amount of $3.6 million (3% per week times 40 weeks), and the return of the $3 million principal at the end of the year.

What actually occurred, according to the allegations of the amended complaint, is recited in *Renner II,* 2000 WL 781081 at *2-*3. I briefly reiterate them here. On February 13, 1996, the Chase branch in Mount Vernon, New York received $3 million from Renner by wire transfer. On that date, Michelino Morelli, the branch manager and initially a defendant in this case, advised Townsend of the receipt of those funds. On February 15, Morelli advised Townsend by fax that Renner's $3 million had been deposited in the Townsend Fund account. Thereafter Townsend, on Susse's instruction, directed Morelli at Chase to wire $718,000 from the Townsend Fund account to an account in an Italian bank. Chase complied. On February 23, Townsend instructed Morelli to wire an additional $2.7 million from the Townsend Fund account to a Monaco account belonging to Gloria Russo, Susse's common law wife. Susse and Russo used that money to purchase a villa in France. On February 27, Townsend arranged for Morelli to wire $100,000 out of the Townsend Fund to an Arab bank account in Geneva belonging to Alexander Penly, who signed Hampstead's agreement with Renner as a Hampstead director. On March 4, responding to inquiries from Renner's bank in Switzerland, Townsend falsely stated that Renner's money continued to be held in an account at Chase, whereas in fact it had been diverted as described above. On April 3, 1996, in response to Renner's continued

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 14
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

inquiries and demands, Townsend wired $80,000 to Renner. This is apparently the only portion of the $3 million Renner wired to Chase that he recovered through the Chase/Morelli/Townsend apparatus.

This narrative, particularly its chronology, plainly suggests a scheme devised by Susse to defraud Renner, in which Townsend participated or aided and abetted. However, the narrative is drawn from the allegations in Renner's amended complaint; *Renner II* decided the several defendants' motions to dismiss the complaint for legal insufficiency under Rule 12(b)(6), Fed.R.Civ.P. [FN12] Ordinarily one might question whether the showing necessary to invoke the crime-fraud exception can be derived from allegations in a pleading. In the case at bar, however, other circumstances are present. At the May 2, 2001 hearing, counsel for Townsend did not dispute the chronology of the payments in and out of the Chase and Townsend Fund accounts previously described.

> FN12. Certain claims were dismissed, but the Townsend defendants' motion to dismiss was "denied as to the first and eighth causes of action, namely for fraud and commercial bad faith." *Renner II,* 2000 WL 781081 at *24.

*17 Moreover, Townsend's prior submissions in this case include references to a criminal prosecution Renner instituted against Susse and Russo in France. *See* Townsend Defendants' Answer to Plaintiff's Omnibus Discovery Report and Ex. F. thereto. That filing states that "Susse and Russo were tried before a French Court in Nice on May 5, 2000," both were "found guilty of civil and criminal wrongdoing," each was given a criminal sentence, and "each was adjudged to be civilly liable to Renner for $3,784,000, the amount of damages he had claimed were due his [*sic* ] as a result of the fraud Susse had perpetrated on him." *Id* at 7.

Ex. F to this submission is a copy in translation of the criminal judgment dated June 2, 2000 of the Nice Law Court. This 16-page document contains a detailed statement of the facts found by the three-judge panel of the Nice Court to have been proven during the trial (at which Renner and Russo, among others, testified; Susse apparently defaulted in appearance), and concludes with the judgment that Susse and Russo were guilty of the offense of "complicity to fraud." Susse was sentenced to five years' imprisonment and fined; an arrest warrant was issued for him. Russo was given a suspended sentence and fined. As noted in defendants' submission, both Susse and Russo were adjudged liable to Renner for fraud in an amount in excess of $3 million.

The findings and conclusions of the Nice Court give some additional details with respect to the $2.7 million which Morelli at Chase, acting on Townsend's instructions, wired to Gloria Russo to use in purchasing a villa in Monaco. At one point during the criminal investigation in France, Susse appeared before the Examining Magistrate. Ex. F at 12. [FN13] The Nice Court's judgment, basing its findings upon proof adduced before it and Susse's statements to the Examining Magistrate, states in pertinent part:

> FN13. "Examining magistrate" is the English translation for the French title *Juges d'instruction,* judicial officers "who receive in cases of criminal offenses the complaints of the parties injured, and who summon and examine witnesses under oath, and, after communication with the *procureur imperial,* draw up the forms of accusation." *Black's Law Dictionary* (4th ed.1951) at 941.

It became obvious in this case that TOWNSEND had transferred the amount of 2,700,000 $ by order of SUSSE on February 23rd, 1996, to the "Credit Foncier de MONACO." During the hearing concerning this file document, SUSSE specified that this money was to be used for the purchase of a guarantee related to a letter of credit from the Dubai Bank.
Before the Examining Magistrate, SUSSE declared: "As the money was available at the Credit Foncier de MONACO, I used it to buy a villa for my wife, as my personal funds were blocked due to future financial investment operations.
Ex. F at 12 (document references omitted). [FN14]

> FN14. The Nice Court's judgment, after discussing in detail the incorporation of Hampstead Trust Limited and Susse's relation to it, went on to say: "A second company participated in this type of operation, i.e., the TOWNSEND INVESTMENT FUNDS company." Ex. F at 9. At the May 2, 2001 hearing, counsel for Renner argued from this language that the French Court "found that there was a fraud and that Townsend was a member of it." Tr. 12. I do not read the judgment of the Nice Court as going that far; Townsend does not deny that his company "participated" in

Not Reported in F.Supp.2d                                                                                                    Page 15
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

Susse's operations, and Townsend was not on trial before the Nice Court. But I think that I can consider the Nice Court proceedings in determining whether Renner has made the requisite showing in this Court to invoke the crime-fraud exception.

Given this record evidence, I conclude that plaintiff Klaus Renner has shown there is probable cause to believe that Townsend participated in, or aided and abetted, a fraud perpetrated by Gustav Susse upon Renner.

I think it is only fair to stress that the foregoing should not be read as expressing or intimating any opinion on the part of this Court as to whether Gerald Townsend or any of his companies did in fact defraud Renner. Townsend denies that charge, and consequently it is for the jury at the end of the trial to decide whether or not Renner has proved it. I have engaged in this probable cause analysis because that is what the governing law requires me to do.

C. *Were Any Communications between Townsend and His Attorneys in Furtherance of that Fraud?*

**\*18** Document 138 is a letter dated December 30, 1995 that Gerald Townsend sent to Donald Clark at the Keck, Mahin firm. The letter begins:

Charley, Mike and I enjoyed our meeting with you yesterday and appreciate the time you spent with us.
Based on our meeting, our understanding is that you will be doing the following for us:

There follows a four-paragraph recitation of the several legal services that "Charley, Mike" and Townsend contemplated Clark and his firm would render to them.

Details about who was involved and the circumstances of this December 29, 1995 meeting may be gleaned from the affidavit of Charles Weaver, Pl.Ex. II.A on this motion. Weaver is a businessman in Raleigh, as is Townsend. In "mid 1995" Weaver, Townsend, and one Michael Atkins "discussed forming an investment group, the Townsend Financial Group, which was to offer to investors a high yield investment program." Weaver Affidavit at 2. Donald Clark had been Weaver's attorney for some 14 years, and Weaver had preliminary consultations with Clark "with regard to the formation of the Townsend Financial Group." *Id.* Weaver, Atkins and Townsend then "received an invitation to meet with Gustav Susse at his home in Monte Carlo to discuss a business relationship between the Townsend Financial Group and Susse's group, the Hampstead Partnership." *Id* . In September 1995, Weaver, Atkins and Townsend traveled together to Monaco to meet with Susse "and discuss this business arrangement ." *Id.* Following the trio's return to the United States, Weaver introduced Townsend to Clark, "so that Townsend could discuss with Clark how the Townsend Financial Group could represent Susse in the United States," and Clark could advise Townsend "about the appropriate structure for the Townsend Financial Group to do business with Hampstead overseas." *Id.* at 2-3. As document 138 shows, Weaver, Atkins and Townsend all met with Clark on December 29, 1995 to discuss these matters. While Weaver had understood that he and Atkins would be shareholders in Townsend Financial Group, in fact they never received shares in that venture. *Id.* at 3.

In these circumstances, I attach a particular significance to one of the paragraphs in Townsend's December 30, 1995 letter to Clark, summarizing the legal services that Clark would perform. That paragraph reads:

Making it clear what the "Account Instructions" on agreements between Hampstead and their clients need to say in order to make it clear that Hampstead's clients are asking us to follow exactly any and all instructions we receive from Hampstead and for us to avoid any potential liability to Hampstead's clients for following Hampstead's instructions to us.

Prior to December 30, 1995, the date of that letter, Townsend, by virtue (if that is the appropriate word) of following Hampstead's instructions, had both received Gulf's $5 million, intended by Gulf for investment purposes, and parceled out the entire amount to a group of distributees who were highly suspicious, to put it charitably. It is plausible to suppose that Townsend, contemplating further comparable adventures with Susse and Hampstead, would want the underlying documents drafted so as "to avoid any potential liability to Hampstead's clients [such as Gulf and Renner] for following Hampstead's instructions to us." Legal advice sought for the purpose of insulating Townsend from liability in fraud to Hampstead/Susse clients would further any fraudulent conduct on the part of Townsend by both facilitating and concealing that conduct, as well as indirectly furthering Susse's fraudulent conduct.

**\*19** Accordingly, I conclude that document 138 falls within the crime-fraud exception to the attorney-client privilege, and must be produced.

Not Reported in F.Supp.2d                                                                                         Page 16
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

No other documents which I have examined *in camera* fall within the crime-fraud exception. While some documents could be read in such a way as to constitute evidence of fraud, that is not sufficient under the Second Circuit rule to bring them within the exception.

                                    IV.

The Court's rulings following its *in camera* inspection of the documents claimed by defendants to be privileged are summarized below.

The following documents are not privileged and must be produced:
  119-31 (provisional-defendants must produce affidavit), 132-36 (provisional-defendants must produce affidavit if Court's assumption is wrong), 137, 139-41, 147-52, 155-61, 170-73, 175-76, 178-79, 185-88, 191-92, 195-96, 199-203, 206- 22, enclosure to 227, 230-36, 239, 242-46, 248, 251-63, 266-68, 343-44, 348-50, 359-61, 363.

The following documents are privileged in part and must be produced after redaction:
  153-54, 164-67, 182, 189, 193 (provisional-defendants must produce affidavit if Court's assumption is wrong), 247.
The material that may be redacted is specified in Appendix A to this Opinion (which will be distributed only to counsel for defendants).

The following documents are privileged and need not be produced:
  142-46, 162-63, 168-69, 174, 177, 180-81, 183-84, 190, 194, 197-98, 204-05, 223-24, 226-29, 237-38, 241, 249-50, 264-65, 269-342, 345-47, 351-58, 362.

The following document must be produced pursuant to the crime-fraud exception:
  138

Decision is reserved as to the privileged status of the following documents:
  225 (defendants must submit entire letter *in camera*), 240 (defendants must submit attachment *in camera*), enclosures to 265 (defendants must submit enclosures *in camera*).

Defendants are directed to send copies of the unprivileged documents and partially privileged documents (redacted) to plaintiff no later than 10 business days from the date of this Opinion. Defendants shall provide to Chambers an identical copy of all redacted documents sent to plaintiff.

Furthermore, defendants are directed to submit to court chambers the affidavits and additional documents identified above no later than 10 business days from the date of this Opinion.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23951764 (Trial Motion, Memorandum and Affidavit) Defendant Jpmorgan Chase Bank's Memorandum of Law in Opposition to Plaintiff's Application for Entry of Final Judgment Pursuant to F.R. Civ. P. 54(b) (Feb. 07, 2003)

• 2002 WL 32769152 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff's Memorandum and Factual Showing That Reed Smith Should be Disqualified from Further Representation of the Defendant Gerald Townsend (Mar. 29, 2002)

• 2002 WL 32769151 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum and Factual Showing That Reed Smith Should be Disqualified from Further Representation of the Defendant Gerald Townsend (Mar. 05, 2002)

• 2002 WL 32769150 (Trial Motion, Memorandum and Affidavit) Defendants' Second Supplemental Memorandum Regarding Palintiff's Motion to Disqualify Defendant Gerald Townsend's Counsel (Feb. 28, 2002)

• 2001 WL 34727855 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum Regarding Plaintiff's Motion to Disqualify Defendant Gerald Townsend's Counsel (Dec. 07, 2001)

• 2001 WL 34727854 (Trial Motion, Memorandum and Affidavit) Plaintiff's Summary Memorandum in Support of the Crime-Fraud Exception (Jun. 18, 2001)

• 2001 WL 34727853 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum Regarding Plaintiff's Cross-Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (May. 17, 2001)

• 2001 WL 34727745 (Trial Pleading) Plaintiff's Analysis of Defendant's Submission (May. 02, 2001)

Not Reported in F.Supp.2d                                                                                                    Page 17
Not Reported in F.Supp.2d, 2001 WL 1356192 (S.D.N.Y.)
**(Cite as: 2001 WL 1356192 (S.D.N.Y.))**

• 2001 WL 34727742 (Trial Pleading) Defendants' Reply to Plaintiff's Submission in Opposition to the Defendants' Claims to Restrict Discovery Based on the Attorney Client Privilege and in Support of the Applicability of the Crime-Fraud Exception (May. 01, 2001)

• 2001 WL 34727743 (Trial Pleading) Plaintiff's Submission in Opposition to the Defendant's Claims to Restrict Discovery Based on the Attorney Client Privilege and in Support of the Applicability of the Crime-Fraud Exception (May. 01, 2001)

• 2001 WL 34727852 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiff's Cross-Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (Apr. 27, 2001)

• 2001 WL 34727850 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Plaintiff's Cross Motion for a Ruling by the Court Regarding the Applicability of the Crime-Fraud Exception (Apr. 19, 2001)

• 2001 WL 34727739 (Trial Pleading) Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd, and Gerald Townsend's Memorandum of Law in Support of Their Motion for Sanctions (Apr. 17, 2001)

• 2001 WL 34727851 (Trial Motion, Memorandum and Affidavit) Memorandum of Law Regarding Advice Provided to Defendants by Donald O. Clark, Esquire (Apr. 2001)

• 2001 WL 34727737 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend Answer to Plaintiff's Omnibus Discovery Report (Mar. 13, 2001)

• 2001 WL 34727735 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend Answer to Plaintiff's Second Amended Complaint (Feb. 08, 2001)

• 2001 WL 34727733 (Trial Pleading) Second Amended Complaint (Feb. 05, 2001)

• 2001 WL 34727738 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, Townsend Financial Group, Ltd and Gerald Townsend's Response to Plaintiff's Omnibus Discovery Report (2001)

• 2000 WL 34474989 (Trial Pleading) Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend Answer to Plaintiff's Amended Complaint (Jul. 05, 2000)

• 1999 WL 33919733 (Trial Pleading) Amended Complaint (Apr. 16, 1999)

• 1998 WL 34311486 (Trial Pleading) Answer and Affirmative Defenses of Defendants Townsend Financial Services Corp., Townsend Investment Fund, LLC, and Gerald Townsend (Apr. 20, 1998)

• 1998 WL 34311485 (Trial Pleading) Complaint (Feb. 09, 1998)

• 2:98cv00926 (Docket) (Feb. 09, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.