# Exhibit 2





**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Utah, Central Division.
Phillip M. ADAMS and Phillip M. Adams &
Associates, L.L.C., Plaintiff(s),
v.
GATEWAY, INC., Defendant(s).
**No. 2:02-CV-106 TS.**

Dec. 30, 2003.

ORDER [FN1] GRANTING MOTION TO
COMPEL DOCUMENTS WITHHELD ON THE
BASIS OF
PRIVILEGE

FN1. This order will be filed in two
versions, one sealed and the other unsealed
with text redacted. The sealed order is
entitled Sealed Order Granting Motion to
Compel Documents Withheld On the Basis
of Privilege, while the unsealed order will be
entitled Order Granting Motion to Compel
Documents Withheld On the Basis of

Privilege. *The position of redacted text will
not be evident in the redacted unsealed
version.* Counsel for Gateway and Adams
will have an opportunity to specify their
view on appropriate redactions before the
redacted, unsealed version is filed.

NUFFER, Magistrate J.

**\*1** Adams, [FN2] a holder of patents to detect and
cure defects in floppy disk controllers used in
computers, filed this suit alleging that Gateway
infringed on his patents. [FN3] Adams also alleges
that Gateway breached a non-disclosure agreement
he and Gateway entered into in July 2000 during
business negotiations. [FN4] This order deals with
privilege claims made by Gateway in responding to
requests for production of documents.

FN2. While there are two plaintiffs in this
suit, Phillip M. Adams and Phillip M.
Adams & Associates, L.L.C., this order will
refer to Plaintiffs as "Adams."

FN3. Count I, Second Complaint, docket no.
39, filed April 17, 2003.

FN4. *Id.,* Count II.

Table of Contents

Nature of This Dispute .......................................................... 1

Procedural History of This Motion and Development of the Record ........... 2

Factual Setting ................................................................ 5

Discussion of Applicable Law and Documents in This Case .................... 9
        Overview of Discussion ................................................ 9
        General Discussion of Privileges ...................................... 9
                Basic Elements of Privileges .................................. 9
                Articulations of the Privileges .............................. 10
                        Work Product Privilege ............................... 10
                        Attorney-Client Privilege ............................ 14
                Summary of Privilege Standards ............................... 15
        Testing the Limits of the Privileges ................................. 16
        General Analysis in This Case ........................................ 20

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

```
            Attorney-Client Privilege .................................. 20
            Work Product Privilege .................................... 23
                    Method of Review .................................. 28
                        Substantial Need and Undue Hardship ........... 29

        List of Documents Submitted to the Court ..................... 31
        Analysis of Specific Documents ............................... 33
                Documents Regarding Computers Yet in ManufacturingExhibit Q .. 33
                Analysis of Exhibits A-F (Sample Documents) .................. 35
                Exhibits G Through N ........................................ 42


ORDER .............................................................. 46
        Preparing for Production ..................................... 46
        Completing the Record ........................................ 47
        Attorneys' Fees and Expenses ................................. 48
```

### Nature of This Dispute

Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege [FN5] was filed because Gateway, in response to Adams' various requests for production of documents, asserted privilege objections to the requests. Nearly 1,000 documents are withheld on claim of attorney-client and/or work product privilege. [FN6] The privilege logs presented are voluminous and Adams, with an equally thorough listing of objections to the claim of privilege, has contested almost every designation of protection. [FN7] Issues between these parties on the validity of privilege claims arose as early as June 2003, [FN8] well before this motion was filed in September 2003.

FN5. Docket no. 81, filed September 3, 2003.

FN6. Adams' Memorandum, page 6.

FN7. *See* privilege logs included as Exhibit A to Adams' Memorandum in Support of Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege, docket no. 82, filed September 3, 2003, ("Adams' Memorandum"). The exhibits to Adams' Memorandum were filed separately under seal as Exhibits in Support of Plaintiff's Motion to Compel Documents Improperly Withheld on the Basis of Privilege, as docket no. 83, on September 3, 2003.

FN8. Plaintiff's Memorandum in Support of Motion to Compel and Statement re Efforts to Resolve Discovery Dispute, docket no. 62, filed under seal June 3, 2003, pages 13-16.

Adams seeks to compel production of these documents, claiming that they are improperly withheld. The decision on this motion will determine whether that claim of privilege is valid and, if so, to what extent. The decision on privilege does not mean the documents are outside the scope of the protective order which protects trade secrets in this case. [FN9]

FN9. Docket no. 47, filed September 30, 2003.

### Procedural History of This Motion and Development of the Record

**\*2** Extraordinary caution has been exercised in the handling of this issue because of the nature of the privilege issue and its significance to each party. The court has attempted to give Gateway a full and complete opportunity to sustain its burden of proof on the claims of privilege, and this has necessitated in camera and ex parte delivery of some materials. Almost all materials submitted by both parties on this issue have been sealed because of the trade secrets involved.

Shortly after Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege [FN10] was filed, in a hearing on another motion, the parties were advised that the privilege motion would be heard Tuesday, October 21, 2003. The court directed Gateway to bring witnesses to that hearing. [FN11]

FN10. Docket no. 81, filed September 3, 2003.

FN11. Minute entry of September 15, 2003, docket no 91.

At the hearing Tuesday, October 21, 2003, Gateway did not present witnesses, but had filed three declarations of Mark Walker relating factual background from its viewpoint. [FN12] The court had reviewed the memoranda [FN13] filed by counsel and heard argument by counsel for the parties, Mr. Gregory Phillips for

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

Plaintiffs and Mr. John Posthumus for Defendant. At the hearing, the court orally gave its preliminary impressions as to the issues.

> FN12. Declaration of Mark Walker, dated June 27, 2003, filed as Exhibit 5 to Gateway's Opposition to Plaintiff's Motion to Compel, docket no. 69, filed under seal June 30, 2003; Supplemental Declaration of Mark Walker, dated August 27, 2003, not filed with the court, noted in the e-mail dated September 9, 2003, lodged in the file, but marked as Exhibit R on this motion; Declaration of Mark Walker, dated October 3, 2003, filed as Exhibit 1 to Defendant's Response to Motion to Compel Documents ("Gateway Memorandum"), docket no. 106, filed under seal October 14, 2003.

> FN13. Adams' Memorandum; Gateway Memorandum; and Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege, docket no. 109, filed October 20, 2003 ("Adams' Reply Memorandum").

In the course of the October 21st hearing, the court proposed a review of a sampling of documents. Documents were selected by Adams from the privilege log, provided to the court (and not to Adams) from the Gateway files, and marked as Exhibits AF for the hearing. Gateway then addressed each of those Sample Documents in support of its privilege claims, and also provided additional documents marked as Exhibits G and H to show the context of the Sample Documents.

At the conclusion of the hearing, the court directed that Gateway provide any further documents to the court which might support its claim of privilege for the Sample Documents. The court also allowed Gateway to provide a narrative proffer of the factual context of the documents and evidentiary support beyond the three declarations of Mark Walker, already on file. The parties were also ordered to reserve the dates of November 18 and 19, 2003, for further hearing. Gateway was ordered to secure the presence of Mark Walker, Dave Harrell, Mike Holstein, Ron Naves, and Thomas Stepp, as a further opportunity for Gateway to fulfill its burden of proof on its claims of privilege and to give Adams an opportunity to cross-examine. [FN14]

> FN14. Order, docket no. 110, filed October 22, 2003.

Gateway did provide further documents which support its claim of privilege for the Sample Documents. A list of

those additional documents, identifying them to the privilege log, was provided to Plaintiff. The documents, however, were not provided to Plaintiff. The documents were marked as Exhibits I--N.

Gateway also provided a narrative proffer of the factual context of the Sample Documents in the form of a letter dated October 31, 2003, marked as Exhibit O. A redacted copy was provided to Adams. It is marked as Exhibit P.

**\*3** By various e-mails in the first week of November, Gateway advised that it was unable to secure the attendance of Mr. Holstein and Mr. Naves at the contemplated November hearing; that Gateway did not intend to rely on testimony from two of the proposed witnesses; [FN15] and finally that Gateway believed its proof from these individuals was so interwoven with privileged matters that their testimony (or depositions in lieu of testimony) should occur outside the presence of Adams and Adams' counsel. Thus, the hearing set November 18 and 19, 2003, was stricken and Gateway was directed [FN16] to submit declarations supporting its privilege claims to the court, with supporting exhibits, for in camera review. Gateway and Adams were also allowed to file and serve further memoranda on this motion, with any supporting exhibits. [FN17]

> FN15. E-mails of November 7, 2003; November 11, 2003; and November 13, 2003, all lodged in the file.

> FN16. Order Regarding Motion to Compel Documents Withheld on the Basis of Privilege, docket no. 117, filed November 14, 2003.

> FN17. *Id.* There was, however, a further order extending time-frames, the Order Modifying Deadlines, docket no. 120, filed November 21, 2003.

In this time frame, the court issued its sealed ex parte order which reflected the court's analysis of the issues to that point in time, with the court's preliminary views on the privilege claims. [FN18] Much of that order is repeated, but modified, in this order.

> FN18. Docket no. 116, filed November 14, 2003.

Adams filed Plaintiffs' Supplemental Submission Re Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege ("Adams' Supplemental Memorandum"). [FN19] Gateway faxed the court copies of the Fourth Declaration of Mark Walker, the Declaration of Mike Holstein, and the Declaration of Ron Naves, and filed its Ex Parte Supplemental Brief in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 4
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

Response to Court's Sealed Order Regarding Motion to Compel Documents Withheld on the Basis of Privilege ("Gateway Supplemental Brief"). [FN20] A redacted version was served on other counsel. Gateway also submitted a binder entitled "November 2003 Gateway Privileged Documents for *In Camera* Review" containing numerous additional exhibits.

FN19. Docket no. 123, filed December 3, 2003.

FN20. Docket no. 124, filed December 3, 2003.

Factual Setting

The most concise explanation of the factual setting is provided in Walker's third Declaration: [FN21]

FN21. Declaration of Mark Walker, dated October 3, 2003, filed as Exhibit 1 to Gateway Memorandum.

4. From about May 2000 to about March 2001, the Gateway Legal Department conducted an investigation pertaining to sale of Gateway branded computers (referred to as the "Gateway Legal Investigation").

* * *

6. Specifically, at the time the Gateway Legal Investigation was commenced, the Gateway Legal Department was aware of published news reports of the Toshiba settlement, other qui tam and class action lawsuits against other computer manufacturers,.

7. On May 10, 2000, Dr. Adams' counsel, Greg Phillips, called me and indicated that Dr. Adams wished to meet with Gateway about licensing his patents to Gateway and serving as a consultant to Gateway.... On May 16, 2000, I sent a summary of my conversation with Mr. Phillips to Ron Naves, the head of the litigation management group at that time, and Teigue Thomas, an in-house litigator who reported to Mr. Naves at that time..

* * *

8. Mr. Naves and I were responsible for overseeing the Gateway Legal Investigation. This Investigation was conducted in order to obtain information that was used by the Gateway Legal Department to provide legal advice to Gateway executives in anticipation of legal action.

**4** * * *

9. During the Gateway Legal Investigation Mike Holstein was the lead person as to the technical investigation necessary to ascertain the information necessary to complete the Gateway Legal Investigation, and was assisted by four Gateway Non-Attorney Personnel.

10. One aspect of the Gateway Legal Investigation comprised assessing computers that Gateway was preparing to launch....

11. As a part of the Legal Investigation, Gateway also assessed the computers that Gateway had previously sold....

* * *

13. All of the Gateway Non-Attorney Personnel as well as the non-attorney staff in the Gateway Legal Department worked under the ultimate direction and supervision of the Gateway Legal Department in connection with the Gateway Legal Investigation.

Gateway lists ten attorneys, eight non-attorney legal staff members, and 52 non-attorney personnel who were involved in this effort. [FN22]

FN22. Exhibit A-1, November 2003 Gateway Privileged Documents for *In Camera* Review.

Gateway's characterization of what it calls the "Gateway Legal Investigation" clearly attempts to fit the structure of its efforts into the case law of attorney-client and work product privilege. Attorneys were at the apex of the Gateway effort.

Gateway met with Adams in Salt Lake City in July 2000 and in San Diego in February 2001. [FN23] Those dates mark the beginning and end of business negotiations between the parties to this suit. That is the same time frame as the so-called Gateway Legal Investigation. Thus, some documents as to which privilege is claimed reflect negotiation strategy concerns separate and apart from litigation.

FN23. Adams' Memorandum, 3-4.

In its most recent filings, Gateway makes a concentrated effort to place its investigation in a litigation context.

Gateway claims these facts mean that the issues investigated in 2000-2001 were not "real world" issues important to Gateway retail sales, product reliability and consumer satisfaction, but were only relevant in a scenario created by Adams. [FN24]

FN24. *Id.* at 8.

Gateway never viewed the alleged FDC defect as a product liability issue. Rather, Gateway has viewed the alleged FDC defect as a litigation issue ... [FN25]

FN25. *Id.* at 10. [Citations omitted.]

Gateway's conclusory assertions are not verified by its own record. As will be seen later,; and Gateway's Chief Technical Officer was consulted on the issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 Gateway's Supplemental Brief and the most recent declarations provide more detail about multiple pending lawsuits in the industry and the litigation threats [FN26] Gateway faced when it began its investigation. Gateway expands on its knowledge of Adams' involvement in that litigation [FN27] and its internal reactions after contact from Adams' attorney and the intensive involvement of its legal staff and outside counsel in managing the project. [FN28] The thrust of Gateway's factual development is to build an overwhelming sense of "litigation preparation" as opposed to "product development."

    FN26. *Id.* at 4-6.

    FN27. *Id.* at 7-8.

    FN28. *Id.* at 7-8.

 Regardless of the instigation and collateral context, the investigation had at its core the diagnosis and resolution of potential problems. The reliability of Gateway's retail computer products were at issue. It may have been that Gateway became aware of the FDC issues by hearing about litigation possibilities but, Gateway's self-interest as a retailer of computer products motivated its investigation.

 **\*5** Adams cites a letter from Gateway to its suppliers and a letter from Gateway's outside counsel to Adams' counsel to show that Gateway had a significant business purpose in its response to the FDC issue. The letters state:
    Gateway is committed to providing products that meet the highest levels of quality and need you [Gateway suppliers] to verify that the FDC components provided by you to Gateway operate according to specifications. [FN29]

    FN29. Exhibit 1 to Adams' Supplemental Memorandum.

 Gateway continues to strive to provide its customers with the best products and services in the industry. To that end, the company is always interested in improving its technology and addressing customer issues as they arise. [FN30]

    FN30. Exhibit 2 to Adams' Supplemental Memorandum.

Discussion of Applicable Law and Documents in This Case Overview of Discussion
This order will first examine the elements of the claimed privileges, their articulations in case law, and the limits of the privileges. Then, the general setting of the FDC Assessment Investigation will be analyzed by those principles, followed by determination of the validity of the privilege claims as to specific documents. Finally, the order concludes with disposition of this motion and a procedure for implementation.

General Discussion of Privileges
Basic Elements of Privileges:

 Gateway asserts that the documents at issue are protected by the attorney-client privilege, the work product privilege, or both. The attorney-client privilege applies where the following elements are met:
    (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. [FN31]

    FN31. 8 John Henry Wigmore, *Evidence,* § 2292 (McNaughton rev.1961).

 The work product doctrine was first enunciated in *Hickman v. Taylor* [FN32] and is now codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. The work product doctrine protects (1) documents and tangible things prepared in anticipation of litigation or for trial, (2) by or for another party or his representative, (3) unless the party seeking discovery can show both a substantial need for the materials, and that he is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. [FN33] Work product includes "[s]ubject matter that relates to the preparation, strategy, and appraisal of the strengths and weaknesses of an action, or to the activities of the attorneys involved, rather than to the underlying evidence." [FN34]

    FN32. 329 U.S. 495 (1947).

    FN33. Fed.R.Civ.P. 26(b)(3).

    FN34. *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989,* 133 F.R.D. 515, 519 (N.D.Ill.1990)(quoting 4 *Moore's Federal Practice* ¶ 26.64[1] (1989).

Articulations of the Privileges:

Work Product Privilege
 The fountainhead case on the work product privilege is *Hickman v. Taylor.* [FN35] *Hickman* concerned a boat

accident, in which the tug J.M. Taylor sank while helping to tow a car float. Five of nine crew members drowned in the accident. The tug owners employed a law firm, which included attorney Fortenbaugh, to defend against potential lawsuits by representatives of the deceased crew members and to sue for damages to the tug. As part of his investigation, Mr. Fortenbaugh interviewed the survivors and took signed statements from them. In addition, he interviewed other people thought to have information about the accident and prepared memoranda of what they told him. Subsequently, the petitioner, a representative of one of the deceased crew members, sued the tug owners. [FN36]

FN35. 329 U.S. 495 (1947).

FN36. *Id.* at 498.

**\*6** During the course of discovery, the petitioner filed a number of interrogatories. At issue was the 38th interrogatory which read:

State whether any statements of the members of the crews of the Tugs "J. M. Taylor" and "Philadelphia" or of any other vessel were taken in connection with the towing of the car float and the sinking of the Tug "John M. Taylor." Attach hereto exact copies of all such statements if in writing, and if oral, set forth in detail the exact provisions of any such oral statements or reports. [FN37]

FN37. *Id.* at 498-99.

While admitting that he had taken statements from the survivors, attorney Fortenbaugh refused to provide the statements on the ground that they were privileged material obtained in preparation for litigation. The district court held that the material was not privileged and ordered Fortenbaugh, as counsel for the tug owners, to produce all written statements of the witnesses, to state in substance all facts learned through his oral interviews of the witnesses, and to produce all of Mr. Fortenbaugh's memoranda containing statements of fact by the witnesses. The Third Circuit reversed, holding that the information sought was part of the "work product of the lawyer" which was privileged under the Federal Rules of Civil Procedure. [FN38]

FN38. *Id.* at 499-500.

In considering whether the material should be produced, the Supreme Court noted that the witnesses were available to the party seeking discovery, stating "[Petitioner] has sought discovery as of right of oral and written statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired." [FN39]

The court further noted that "petitioner was free to examine the public testimony of the witnesses taken before the United States Steamboat Inspectors." [FN40]

FN39. *Id.* at 508.

FN40. *Id.* at 509.

The Supreme Court characterized the discovery as an invasion, without necessity.

We are thus dealing with an attempt to secure the production of written statements and mental impressions contained in the files and the mind of the attorney Fortenbaugh without any showing of necessity or any indication or claim that denial of such production would unduly prejudice the preparation of petitioner's case or cause him any hardship or injustice. [FN41]

FN41. *Id.*

The Court noted that the essence of what the petitioner was seeking either had already been revealed to him or was available to him directly from the witnesses. [FN42]

FN42. *Id.*

The Court then outlined the policy reasons for an attorney work product privilege:

In performing his various duties, ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways--aptly though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served. [FN43]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN43. *Id.* at 510-11 (citation omitted).

**\*7** The Court stated the protection it recognized was limited by the discovery rules:

> We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration. And production might be justified where the witnesses are no longer available or can be reached only with difficulty. Were production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning. [FN44]

FN44. *Id.* at 511-12.

The Third Circuit's opinion also articulated limitations on what might have protection in an attorney's files:

> [O]ne is tempted to say that the lawyer's files are impregnable against any inquiry from outside. But that depends upon what the lawyer puts in them. A piece of a machine which has hurt someone, a document needed to show a fact, many things required in a lawsuit find their way from client's hands to lawyer's file and are not to be concealed until the day of the trial for that reason. But here we are dealing with intangible things, the results of the lawyer's use of his tongue, his pen, and his head, for his client. [FN45]

FN45. *Hickman v. Taylor,* 153 F.2d 212, 223 (3d Cir.1945).

*Hickman* protected an attorney's assembly of information from exposure to the adversary. The sources of the information were third parties, available to the adversary. The content of the information was pre-existing fact. *Hickman* recognized that information in the possession of an attorney might be discoverable, but prevented invasion of the attorney's mind, which is the attorney's workplace, and its products. *Hickman* prevented an adversary from unjustly benefitting from the attorney's efforts in the litigation arena. As Justice Jackson stated in his concurring opinion, "a common law trial is and always should be an adversary proceeding. Discovery was hardly

intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary ." [FN46]

FN46. *Id.* at 516.

Attorney-Client Privilege

*Upjohn Co. v. United States* [FN47] is the current leading statement of the federal common law on attorney-client privilege in the corporate setting. *Upjohn* rejected the rule limiting the privilege to a corporate "control group." The case illustrates application of the attorney-client privilege in a complex corporate setting like that presented here.

FN47. 449 U.S. 383 (1981).

The Upjohn Company undertook an internal investigation of possibly improper foreign payments. The investigation was initiated by a letter prepared by counsel, but sent out over the Chairman's signature. The letter announced counsel's authority to conduct the "highly confidential" investigation and requested that managers make certain specific inquiries, respond to a questionnaire, and direct all responses to counsel. Counsel also conducted interviews of managers and other employees. [FN48]

FN48. *Id.* at 386-87.

**\*8** The Supreme Court protected the attorney questionnaires and other information related to the investigation. Alternative availability of the information was key in the court's holding:

> Application of the attorney-client privilege to communications such as those involved here ... puts the adversary in no worse position than if the communications had never taken place. [FN49]

FN49. *Id.* at 395.

The Court specifically noted that all the employees who communicated with counsel were available to be deposed on the very subjects of the communications with counsel.

> Here the Government was free to question the employees who communicated with Thomas and outside counsel. Upjohn has provided the IRS with a list of such employees, and the IRS has already interviewed some 25 of them. While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney-client privilege. [FN50]

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

FN50. *Id.* at 396.

*Upjohn* also found work product protection in addition to attorney-client protection:

> The notes and memoranda sought by the Government here ... are work product based on oral statements. If they reveal communications, they are, in this case, protected by the attorney-client privilege. To the extent they do not reveal communications, they reveal the attorneys' mental processes in evaluating the communications. [FN51]

FN51. *Id.* at 401.

### Summary of Privilege Standards

Attorney-client privilege protects communications to and from attorneys in furtherance of obtaining legal advice. It protects opinions, advice, and direct communications to facilitate opinions and advice.

Work product privilege protects an attorney's subjective analysis and substantive efforts in, or in anticipation of, litigation from use by the adverse party. It protects trial preparation efforts on behalf of a client.

Neither privilege is intended to protect underlying or independent facts.

### Testing the Limits of the Privileges

Hard issues arise, testing the limits of these privileges:

Litigation worldview: Some parties argue that "litigation is an ever-present possibility in American life," [FN52] so that risk reduction with a view to litigation pervades all business activities and cloaks them with privilege.

FN52. *Wikel v. Wal-Mart Stores,* 197 F.R.D. 493, 495 (N.D.Okla.2000)(quoting *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.,* 967 F.2d 980, 984-85 (4th Cir.1992)).

Increased Lawyer Presence: Lawyers have increased presence in all parts of business life. Increased regulation and risks, and perhaps an overabundance of law school graduates, and the increased desire for multi-disciplinary solutions, mean that more lawyers are present in more places other than the traditional law office. In the corporate setting, lawyers have responsibilities outside traditional lawyering.

> [I]nhouse attorneys can serve multiple functions within the corporation. In-house counsel may be involved intimately in the corporation's day to day business activities and frequently serve as integral players in business decisions or activities. Accordingly, communications involving in-house counsel might well pertain to business rather than legal matters. The privilege does not protect an attorney's business advice. Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys. [FN53]

FN53. *United States v. ChevronTexaco Corp.,* 241 F.Supp.2d 1065, 1076 (N.D.Cal.2002)(citing *In re Fischel,* 557 F.2d 209, 211 (9th Cir.1977)).

**\*9** Expert technical work done for attorneys: In the course of litigation, more expert technical work is performed to meet the needs of more complex cases. This accustoms courts and lawyers to finding privilege for work totally unrelated to law school curriculum. Some of this work may, however, also be necessary for reasons independent of litigation.

*In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989* [FN54] illustrates the application of the privileges in a modern factual situation. After a DC-10 crash resulting in many deaths, lawsuits were filed immediately, beginning the day after the crash. "General Electric assigned attorneys overall responsibility for everything concerning the accident," making evaluation of work product claims difficult. [FN55] The court noted that General Electric's view of the effect of lawyer supervision would protect all documents in General Electric's investigation.

FN54. 133 F.R.D. 515 (N.D.Ill.1990).

FN55. *Id.* at 520.

The question then is whether a written communication between General Electric employees (either not sent through an attorney, or sent with a copy to an attorney) or simply a memorandum written for the file as are some of the documents in question, concerning some aspect of the accident investigation, becomes work product because the ultimate findings of the employees will be conveyed to the attorneys who are in charge of the litigation. If that is the case, it is hard to imagine what documents, other than the public NTSB Report, General Electric would be required to produce concerning its findings as to the cause of the accident, given the timing of the first lawsuit (and even if it had been later, the near certainty that any large air crash will result in lawsuits). [FN56]

FN56. *Id.* at 520 (footnotes omitted).

The court also noted that "General Electric almost

certainly had more than one purpose in preparing many of the documents in question" including "defense of lawsuits resulting from the crash," "the NTSB investigation," and "a desire 'to improve its aircraft products, to protect future pilots and passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts for production of said aircraft." '  [FN57]

> FN57. *Id.* at 519-20 (quoting *Soeder v. General Dynamics Corp.,* 90 F.R.D. 253, 255 (D.Nev.1980)).

This last issue, a mixed purpose for preparation of documents, has led a district judge in this court to make work product protection available only if "the primary motivating purpose behind the creation of the [materials was] to assist in pending or impending litigation"  [FN58] This test restrains the work product privilege to its intended area--the attorney's workplace, in litigation preparation and strategy. It is consistent with the limitations on the privilege recognized in *Hickman,* and the paradigm that the "scope of the privilege should be 'strictly confined within the narrowest possible limits." ' [FN59]

> FN58. *McEwen v. Digitran Sys. Inc.,* 155 F.R.D. 678, 682 (D.Utah 1994)(quoting *United States v. Gulf Oil Corp.,* 760 F.2d 292, 296 (Temp.Emer.Ct.App.1985)). *See also United States ex rel. [Redacted] v. [Redacted],* 209 F.R.D. 475 (D.Utah 2001).

> FN59. *Air Crash,* 133 F.R.D. at 518 (quoting *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983))(quoting 8 *Wigmore, Evidence* § 2291 (McNaughton rev.1961)).

When the privilege shelters important knowledge, accuracy declines. Litigants may use secrecy to cover up machinations, to get around the law instead of complying with it. Secrecy is useful to the extent it facilitates the candor necessary to obtain legal advice. The privilege extends no further. [FN60]

> FN60. *Id.* (quoting *Matter of Feldberg,* 862 F.2d 622, 627 (7th Cir.1988)).

**\*10** Gateway argues that the "primary motivating purpose" test is not an accurate reformulation of the requirement of Rule 26(b)(3) that a document protected by the work product privilege be prepared "in anticipation of litigation." Gateway prefers the "because of" test espoused by some courts.   [FN61] The "primary

motivating purpose" test generally results in non-privileged status for documents prepared in support of a business transaction when those documents analyze potential litigation outcomes as a part of the "due diligence" in structuring a deal. For example, application of the "primary motivating purpose" test would deny protection to a legal analysis of a potential IRS challenge to a merger structure because the analysis was performed to determine viability of the merger, not because there was an actual, present threat of litigation.  [FN62] The "primary motivating purpose" for the analysis was the merger, not the litigation itself. But the "because of" test protects the document, since the document was prepared "because of" the potential for litigation. Similarly, the "primary motivating purpose" test might deny protection to an analysis of potential litigation prepared for a commercial transaction, or a merger or joint undertaking, or a financial reserve analysis, though the documents were surely prepared "because of" the possibility of litigation. [FN63]

> FN61. *United States v. Adlman,* 134 F.3d 1194 (2d Cir.1998).

> FN62. *Id.* at 1195.

> FN63. *Id.* at 1199-1200.

These test semantics really miss the point. The case cited by Gateway is clear that the *content* of the documents is determinative, not the *cause* for their preparation:

> We see no basis for adopting [the primary motivating purpose] test under which *an attorney's assessment of the likely outcome of litigation* is freely available to his litigation adversary merely because the document was created for a business purpose rather than for litigation assistance.
> \* \* \*
> Conversely, it should be emphasized that the "because of" formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been created in *essentially similar form irrespective of the litigation.* It is well established that work-product privilege does not apply to such documents. [FN64]

> FN64. *Id.* at 1200-02 (emphasis added).

For a document to be protected under the work product privilege, it must be within the province protected in *Hickman;* it must reflect the thinking of the attorney by being an expression from her, or, if a communication to her, it must reflect back her inquiry. If there is an independent sound reason for the document's creation--a business purpose--and the document does not reflect the

Not Reported in F.Supp.2d                                                                                                          Page 10
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

assembly and sifting of information by counsel, or preparation and legal strategy, then there should be no "work product" protection.

### General Analysis in This Case

The analysis Gateway makes is almost entirely a *structural* analysis, ignoring *content* and *purpose* of documents. Gateway structured its efforts to resemble statements in case law pertaining to attorney-client and work product privileges, but these privileges do not embrace all of the large-scale corporate activities Gateway undertook.

### Attorney-Client Privilege

**\*11** The factual scenario as represented by Gateway does not lend itself to a finding of broad protection by the attorney-client privilege. There is simply too much horizontal activity in Gateway's projects which had significant purposes independent of legal considerations.

In *Upjohn*, the communications to and from attorneys were specifically focused on gathering critical information, and rendering legal advice, based on that information. The communications were channeled in very limited paths. The scenario in this case is not of that nature. This appears to be a broad-based technical project in which lawyers participated and as to which their insight, advice and even opinions were probably sought. *Lawyer oversight* was advisable in a complex business challenge, fraught with legal implications. That does not make a communication or document attorney-client privileged. *Lawyer input* may have been sought and given on factual scenarios and technical solutions. That also does not make a communication or document attorney-client privileged. There may have been communications of "legal advice" or communications of factual material essential to such advice in the interface between the Gateway Legal Investigation. Those communications would be attorney-client privileged, but most of the documents listed in the privilege logs do not appear, by their subject matter and listed parties, to be that sort of communication.

Gateway claims that attorney-client privilege protection can be given to communications between non-attorney employees, citing cases . [FN65] This is true, within the limits of the case law. Consistent with the attorney-client protection granted to factual communications from the client to the attorney, communications between non-attorney corporate employees "for the purpose of obtaining legal advice" . [FN66] will be protected. However, "the purpose of obtaining legal services must be present." [FN67]

FN65. Gateway Supplemental Brief, page 18.

FN66. *Cuno, Inc., v. Pall Corp.,* 121 F.R.D. 198, 203 (E.D.N.Y.1988). Gateway quotes extensively from an unpublished decision in *AT & T Corp. v. Microsoft Corp.,* No. 02-0164, 2003 WL 21212614 (N.D.Cal. Aug. 18, 2003) because its broad language appears to protect any "[c]ommunications containing information compiled by corporate employees for the purpose of seeking legal advice and later communicated to counsel." *Id.* at \*3. This statement in the opinion notwithstanding, that court only protected documents with "analysis and discussion of AT & T's patents;" a memorandum comparing patents written "after a meeting with corporate counsel," and a document relating to facts discussed at that meeting. *Id.* The language in the opinion that Gateway relies on is broader than the court's orders. *Cuno's* language is more precise and reflective of the result in the case. *IBJ Whitehall Bank & Trust Co. v. Cory & Assoc.,* No. 97 C 5827, 1999 WL 617842 (N.D.Ill. Aug. 12, 1999) was consistent with *Cuno* in denying protection to "[c]ommunications from a client that neither reflect the lawyer's thinking nor are made for the purpose of eliciting the lawyer's professional advice or other legal assistance." *Id.* at \*4 (quoting *United States v. Frederick,* 182 F.3d 496, 500 (7th Cir.1999)).

FN67. *Cuno,* 121 F.R.D. at 203.

The presence of that purpose is determined from inspection of the document. Where "an inspection of the document itself fails to support a finding that the primary purpose of the document was to seek legal advice or services" the privilege will be denied. *Id.* For a communication between non-attorney employees to be held privileged, it must be "apparent that the communication from one employee to another was for the purpose of the second employee transmitting the information to counsel for advice" or the document itself must "reflect the requests and directions of counsel." [FN68]

FN68. *Id. See also Santrade, Ltd., v. General Elec. Co.,* 150 F.R.D. 539, 545 (E.D.N.C.1993):
A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds. First, in instances where the client is a corporation, documents subject to the privilege may be transmitted between non-attorneys to relay

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

information requested by attorneys. Second, documents subject to the privilege may be transmitted between non-attorneys (especially individuals involved in corporate decision-making) so that the corporation may be properly informed of legal advice and act appropriately. (Citations omitted). The court declined to protect communications "made for the primary purpose of communicating business or technical information." *Id.* at 544.

In other words, a document passed between non-attorneys must reflect its integration into the legal advice communication chain to be eligible for attorney-client privilege protection. This requirement is no different than the rule for communications between attorneys and clients, and must be applied to evaluate all communications for which Gateway claims attorney-client protection. The presence or absence of attorney or non-attorney recipients is not determinative. We must see if the document itself (a) shows that the communication was for the purpose of transmitting information to counsel for advice or (b) reveals the requests and directions of counsel. Even when a document is originated by a lawyer, if "a lawyer mixes legal and business advice the communication is not privileged unless 'the communication is designed to meet problems which can fairly be characterized as predominantly legal." ' [FN69] Other than the fact that attorneys were ostensibly at the head of this project, many of the documents reviewed do not show their integration into the giving of legal advice.

FN69. *Cuno,* 121 F.R.D. at 204 (citing 2 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 503(a)(1)(01) at 503-22).

### Work Product Privilege
**\*12** The work product privilege would also appear to be generally inapplicable. Gateway claims it began the Gateway Legal Investigation with general knowledge of floppy disk controller litigation. Gateway says its Legal Investigation, chaired by lawyers, was all undertaken in anticipation of litigation. Therefore, Gateway says, the materials prepared in the Investigation are the protected, privileged efforts of counsel and their representatives.

It is possible to say that every action taken has implications of litigation preparation or avoidance. Driving on a freeway, designing a refrigerator, writing text for a parking lot sign, laying concrete for a sidewalk all have potential litigation and legal consequences. No one in any sophisticated setting takes action without considering applicable legal standards and litigation and regulatory risks. But like the *Air Crash* investigation, the Gateway efforts had mixed purposes. Fundamental to

those efforts was the resolution of the essential business and technical issue -. Gateway's Investigation was not undertaken with the primary motivating purpose of litigation preparation. There were legal and litigation concerns, but the technical integrity of the Gateway product was the principal motivation.

The drug manufacturer G.D. Searle claimed that documents prepared in its risk management department were protected by the work product privilege. But they were permitted to be discovered.

[W]e do not believe it can be said that the risk management documents were prepared for purposes of litigation.... The risk management department was not involved in giving legal advice or in mapping litigation strategy in any individual case. The aggregate reserve information in the risk management documents serves numerous business planning functions, but we cannot see how it enhances the defense of any particular lawsuit. Searle vigorously argues that its business is health care, not litigation, but that is not the point. Searle's business involves litigation, just as it involves accounting, marketing, advertising, sales, and many other things. A business corporation may engage in business planning on many fronts, among them litigation. [FN70]

FN70. *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 401 (8th Cir.1987).

*G.D. Searle* draws a distinction between *general legal* concerns and *specific litigation* concerns. The work product doctrine does not protect material prepared with legal concerns; but protects material relevant to an "individual case" or a "particular lawsuit."

Gateway was evaluating and developing solutions for computers. It was doing so to ensure the integrity of its products, and wanted to do so in a way to avoid patent infringement, liability to consumers, and governmental liability. There was a *potential* for litigation, and those considerations were the duties of the Gateway attorneys, but Gateway's interest in soundness of its products was the foundation of its efforts. If resolved, the litigation risks greatly diminished, but that does not mean the potential for litigation was the sole or principal reason to investigate and resolve.

**\*13** Gateway will argue that it never would have made any inquiry without Adams' provocation and the threat of litigation. However, this is belied by Gateway's communications to its suppliers, stating its investigation was intended "to [provide] products that meet the highest levels of quality ... to verify that the FDC components provided by you to Gateway operate according to

specifications." [FN71] Gateway's letter to Adams said, "Gateway continues to strive to provide its customers with the best products and services in the industry. To that end, the company is always interested in improving its technology and addressing customer issues as they arise." [FN72] Thus it appears the Investigation was undertaken as an implementation of a business concept. "[D]ocuments that reflect only the logistics or mechanics of implementing business concepts will not, on their face, reflect reasoning about the anticipated litigation and do not appear to be informed by concerns about that litigation." [FN73] Such documents are not protected by the work product privilege.

> FN71. Exhibit 1 to Adams' Supplemental Memorandum.

> FN72. Exhibit 2 to Adams' Supplemental Memorandum.

> FN73. *ChevronTexaco Corp.,* 241 F.Supp.2d at 1084.

Further, the fact that a large and technical effort is *instigated* by an adverse inquiry or litigation should not enable that effort to be shrouded in privilege. *Hickman* made clear that the privilege runs counter to liberal discovery policy. Giving protection to Gateway's effort would run counter to the more basic policy favoring availability of evidence to those who have a claim of harm.

Gateway argues that compilations of facts, distant from the attorney thought process, may be protected work product. [FN74] The portion of the case cited was characterized by the court as nothing more than its "brief observations ... which may be relevant." [FN75] This dictum was offered in a case which considered the "Government's effort to compel the testimony of [an] Attorney on her recollection of her client's statements during the course of her representation of the client." [FN76] Those facts do not support the dictum and are as far from this case as they are close to *Hickman.*

> FN74. Gateway Supplemental Brief at 24.

> FN75. *In re Grand Jury Subpoena,* 282 F.3d 156, 161 (2d. Cir.2002).

> FN76. *Id.* at 158.

Another case Gateway cites for the same proposition that purely factual material is protected work product considered a report prepared by a consultant at a lawyer's request. [FN77] That single document was delivered directly to the attorney, who was concerned about an OSHA investigation and suit by an employee. This document clearly fell within the limited "zone of privacy" contemplated by *Hickman.* [FN78]

> FN77. *Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252 (3rd Cir.1993).

> FN78. *Id.* at 1265 (concurring opinion).

Gateway's underlying technical response is not privileged nor protected, and should not be, for sound policy reasons. Work of that nature is not within the protection envisioned by *Hickman.* It is much more "information" than "work-product." It is not reflective of attorney thought processes, but is formulated by technical concerns. It is not pre-existing factual data assimilated, refined, and molded by counsel in such a way as to reveal litigation strategy.

More importantly in this case, the Investigation is the event which gives rise to Adams' infringement allegations. The Gateway Investigation was a technical effort. Adams claims that Gateway infringed on his patents which detect and resolve defects in floppy disk controllers.

**\*14** If the Investigation received attorney work product protection, then any effort to develop a product in an area where patents existed would begin with an organizational structure as Gateway used here. Lawyers would supervise the project, on the hypothesis that litigation might result, making legal supervision and analysis appear necessary to avoid litigation. The documents for the project would be liberally stamped with notations of privilege, as has happened here, and the claim of privilege would be then be asserted in litigation. If successfully asserted, the effect of the privilege would be to protect all the potentially infringing activity from discovery.

That scenario is far removed from the facts of *Hickman,* and from the language of Rule 26(b)(3). It would encourage a view of life as "trial preparation" and extend the privilege far from the attorney's trial strategy sanctuary.

There was undoubtedly a level in Gateway at which attorney analysis and direction was exercised in a way that work product protection is justified. There were certainly communications among counsel and between counsel and technical staff which are entitled to protection. How is the line drawn between the technical activities and the protected communications and work product? There was no line-drawing in Gateway's mind. Documents were contemporaneously blanketed with

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

designations of protection, and nearly a thousand are now designated in the privilege logs. Gateway understandably wanted to protect the entire process. Therefore, we cannot rely on Gateway's designations.

## Method of Review

Gateway, as "the party seeking to invoke the privilege has the burden of establishing all of its essential elements.... [A] claim of privilege must be established on a document by document basis." [FN79]

> FN79. *Air Crash Disaster,* 133 F.R.D. at 518 (quoting *Lawless,* 709 F.2d at 487).

We must look at each document to see if it is a protected communication or if it qualifies as work product. Generally, this documentation will fall into two categories:
- Documentation showing concrete litigation-related preparation, direction or response will be protected work product.
- Documentation showing technical efforts and results, which does not reveal litigation concerns or is not shown to be directly responsive to such concerns, is not protected work product.

Each of these initial tests has some qualification. It is possible that even facially technical material may be prepared in such tight response to litigation-motivated direction that it reveals attorney thought process or strategy related to litigation. Therefore, some context for the technical documents may be needed to evaluate privilege claims. [FN80] If an attorney asked a specific question intended to evaluate a litigation claim, such as the number of computers sold to a potential claimant, then a reply analyzing sales summary data might be protected. However, consistent with *Hickman* and *Upjohn*, the sender of the reply might be deposed as to that same information and required to disclose the underlying documentary evidence. And some documents containing privileged work product may also have discoverable technical contents. Finally, the fact that attorneys were or were not recipients or originators of documents is not a definitive test. [FN81]

> FN80. This is consistent with the *Air Crash* analysis which did not require production of a document where:
> the subject matter of the document concerns preparation or strategy, or the appraisal of the strengths or weaknesses of General Electric's case, or the activities of the attorneys in preparing their case, or is at least "primarily concerned with legal assistance," and not simply underlying evidence (unless communicated to an

attorney in a privileged attorney-client communication).
> *Air Crash Disaster,* 133 F.R.D. at 520.

> FN81. *Air Crash Disaster,* 133 F.R.D. at 520.
> [S]ince Rule 26 clearly protects party, and not just attorney, preparation, the fact that a particular communication may not go to an attorney does not prevent its being work product. At the same time, if an attorney is simply a "mail drop" for the purposes of trying to create a screen against discovery, and the content of the document indicates it is neither work product nor a communication subject to the attorney-client privilege, the fact that a document is sent through an attorney cannot prevent its having to be produced.

*15 There is another important factor. Gateway was negotiating with Adams at the same time it was making its investigation. Gateway's good faith negotiations with Adams show Gateway had significant business interests which were at issue in the investigation. These issues may have been similar to those in potential litigation. Documents showing business or negotiation strategy are not matters of litigation strategy protected by the work product privilege.

## Substantial Need and Undue Hardship

Even if a document is protected factual work product, Adams' "substantial need of the materials" and inability "without undue hardship to obtain the substantial equivalent of the materials by other means" may entitle him to production. [FN82] The facts of this case mean these elements may be more easily satisfied than in some cases. Documents from the Gateway efforts are the essence of the Investigation *and* the core of Adam's complaint, which alleges that Gateway's diagnosis and cure infringed on Adams' patents. What Gateway has designated as documents relating to the Gateway Legal Investigation may be evidence of the wrongs alleged in this litigation, or evidence of Gateway's exoneration.

> FN82. Fed.R.Civ.P. 26(b)(3).

This case is not like *Hickman.* Each party does not have equal access to independently obtainable pre-existing facts. Adams is not seeking to convert Gateway's diligence in trial preparation to his own use, but he has substantial need of the materials which are the substance of the alleged infringing acts.

Adams could be denied the factual work product documents, and be forced to depose each of the individuals identified, and to rely on their recollections of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

Page 14

highly technical matters, but depositions would be a comparatively lengthy and expensive effort, with results of doubtful value compared to contemporaneous documentary evidence. Most of the documents they created are not work product. As to any work product items which are "factual" work product, substantial need and undue hardship will probably be present by the inherent nature of the technical project Gateway undertook.

Of course, documents showing legal direction or analysis of the efforts and results might be highly protected as "opinion" work product not discoverable simply by showing substantial need and undue hardship.

List of Documents Submitted to the Court [FN83]

FN83. The exhibits marked for purposes of this motion as Exhibits A-- R were filed under seal as docket no. 118, on November 17, 2003. Concurrent with the filing of this order, the court is filing an unsealed Index of Exhibits AR.

At the conclusion of the October 21, 2003, hearing, the court received various exhibits. The following documents were selected by Adams from the privilege log, provided to the court (and not to Adams) from the Gateway files, and marked as exhibits for the hearing:

| Exh. No. | Date | Description |
|----------|----------|---------------------------------------------|
| A | 8/1/00 | E-mail Dave Harrell to Chris Wetzel et al. |
| B | 7/31/00 | E-mail Chris Wetzel to Hassan Karimian et al. with enclosure |
| C | 7/31/00 | E-mail Mark Walker to Bill Elliott et al. with enclosure |
| D | 11/13/00 | Gateway Floppy Disk Controller Test |
| E | 1/29/01 | E-mail Salah Din to Mike Holstein et al. with attachments/other documents |
| F | 1/31/01 | E-mail Mike Holstein to Ron Naves et al. with attachments |

**\*16** In support of its privilege claims, Gateway addressed each of the above-listed documents in turn at the hearing, and also provided the following documents which were marked at the hearing:

| Exh. No. | Date | Description |
|----------|----------|---------------------------------------|
| G | 6/22/00 | E-mail Ron Naves to Mark Walker et al. |
| H | 11/22/00 | E-Mail Mike Holstein to Ron Naves et al. |

Gateway claims that the latter list of documents shows the context of the former listed documents, supporting its claims of privilege. By the court's October 22, 2003, order, Gateway provided further documents which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                      Page 15
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

support its claim of privilege for the documents marked as Exhibits A through F. A list of those documents, identifying them to the privilege log, was provided to Plaintiff. The documents, however, were not provided to

Plaintiff. The documents are:

```
Exh. No.  Date     Description

--------  -------  -------------------------------------------

I         5/16/00  E-mail Walker to Naves
          5/17/00  E-mail Thomas to Zdrojeski et al.
          5/17/00  E-mail Naves to Thomas et al.

J         7/17/00  E-Mail Naves to Walker

K         7/21/00  E-mail Kammin to Naves
          7/24/00  E-mail Naves to Elliot et al.

L         11/8/00  E-mail Naves to Ashkin et al.

M         11/9/00  E-mail Holstein to Din et al.

N         2/26/01  Holstein summary of meeting between Holstein
                   and counsel
```

 Gateway also provided a narrative proffer of the factual context of the documents and support beyond the three declarations of Mark Walker, already received. That letter dated October 31, 2003, is marked as Exhibit O. A redacted copy was provided to Adams. It is marked as Exhibit P.

Analysis of Specific Documents
 This section of the order will examine specific documents under the criteria outlined in this order.

Documents Regarding Computers Yet in
ManufacturingExhibit Q
 As Walker's declaration (cited above) notes, Gateway separately assessed "the computers Gateway was preparing to launch" [FN84] and "exposure for computers that Gateway had previously sold." [FN85]

FN84. Gateway Memorandum, page 3.

FN85. *Id.,* page 4.

 Gateway admits that some documents relating to the Investigation are not protected by any privilege. Gateway claims to have produced all documents "that concern business and technical issues" of assessment of computers Gateway was preparing to launch. [FN86] Adams asserts

that the documents he received in this category are "approximately seventy pages of correspondence that Gateway exchanged with its suppliers," [FN87] and that he has received none of the internal Gateway documents related to this effort. [FN88]

FN86. *Id.,* pages 5-6.

FN87. Adams' Memorandum, page 5.

FN88. *Id.,* page 1.

 One document which Gateway claims is in this category was listed in the privilege logs but produced, Gateway says, "despite the attorney-client privilege designation." [FN89] It is a series of e-mails from July 31, 2000, through August 1, 2000, [FN90] The series of e-mails apparently had several attachments at some time in their delivery, but only one attachment is included with the compilation produced for Adams. That attachment declares it "is protected under the Attorney/Client privilege." [FN91] The title of the first e-mail refers to a major component of the new computers, the "Brookings board." The e-mail series and attachment are marked as Exhibit Q.

FN89. Gateway Memorandum, page 5.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN90. This compilation of materials is marked as Exhibit C to Adams' Memorandum filed separately under seal as Exhibits in Support of Plaintiff's Motion to Compel Documents Improperly Withheld on the Basis of Privilege, docket no. 83, filed September 3, 2003.

FN91. *Id.,* page 8.

**\*17** Recipients of Exhibit Q included persons at MSI, a supplier of components (including the floppy disk controller) to Gateway; technical staff at Gateway; and Mark Walker and Ron Naves, legal counsel at Gateway. The three pages of e-mail and five pages of enclosure are largely technical discussion.

Under the criteria in this order, Exhibit Q is not attorney-client privileged. The e-mail and attachment are not communications of legal opinions, nor questions and answers between counsel and responsive information elicited to facilitate legal advice. Exhibit Q is not work-product privileged because the documents do not show concrete litigation-related preparation, direction or response so focused that it reveals direction. They show technical efforts and results. The documents were also provided to third parties at a Gateway supplier. [FN92]

FN92. *See* e-mail headers including an address at msi.com.tw and various salutations to MSI in the e-mail series.

Gateway mis-designated Exhibit Q as protected; however, Gateway now apparently recognizes that documents of its nature are not protected. Gateway should review and redesignate any similar documents.

Analysis of Exhibits A-F (Sample Documents)
Gateway also admitted that two documents selected for sampling at the October 21 hearing are not privileged, even though they were listed in the privilege logs. [FN93] Examination of these documents, designated Exhibits A and B, illustrates positions Gateway has taken on privilege, demonstrates the changes in Gateway's position on privilege, and provides a comparison with the criteria in this order.

FN93. *See* Letter, October 31, 2003, submitted by Gateway and marked as Exhibit P.

Exhibit A is an e-mail dated August 1, 2000, from Dave Harrell to Chris Wetzel, entitled "daily run rates for Brookings and other data." It had an attachment, but that attachment is not part of Exhibit A. Ron Naves and Mark Walker, both attorneys, are among the recipients of that e-

mail. The e-mail deals with delivery dates and production schedules for the new product discussed in Exhibit Q. This document "concern[s] business and technical issues", and should be in the category of documents Gateway says it produced. [FN94] But it was designated as privileged and was not produced.

FN94. Gateway Memorandum, pages 5-6.

Because Gateway admitted Exhibit A should be produced, Gateway did not offer any context to show it was integral to a larger litigation preparation effort. Under the criteria in this order, it should be produced. It is purely a communication on business and technical issues and was not solicited or prepared to enable formulation of a legal opinion or advice, nor does it reflect any anticipation of litigation.

Exhibit B is an e-mail dated July 31, 2000, from Chris Wetzel to Harran Karimian, with an attached enclosure The e-mail thus deals with the same subject as Exhibits A and Q, and is chronologically close to them. Some of the text of the Exhibit B e-mail is identical with some of the text of Exhibit Q. The Exhibit B e-mail deals with technical and production issues,. Gateway properly decided this document is not privileged, even though it refers to contact with lawyers for Gateway and another computer manufacturer.

**\*18** Gateway does claim privilege as to the attachment to Exhibit B, principally based in the references in Exhibit B to lawyers. [FN95] This is a strange position to take--that the document referring to lawyers is *not* privileged while the "attachment" containing no reference to lawyers *is* privileged.

FN95. Gateway Supplemental Brief, page 28.

The attachment document was apparently authored by YC Woon, a Gateway engineer. It contains four pages of text, two pages of diagrams, and 12 pages of test data print-outs..

Gateway also claims that this document is work product because it was prepared pursuant to a plan launched by Exhibit C, which will be examined next. Further, "Gateway asserts that the Woon report also constitutes 'fact' or 'ordinary' work product because Woon drafted this document as a direct result of the [Gateway] legal investigation," [FN96] apparently basing this assertion on the internal references to lawyers in the non-privileged Exhibit B.

FN96. Exhibit O, page 3.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
(Cite as: 2003 WL 23787856 (D.Utah))

Exhibit C is a compilation of three e-mails, dated July 28 through 31, 2000, and an enclosure. Two of the e-mails have a header declaring "ATTORNEY-CLIENT PRIVILEGE AND CONFIDENTIAL." Each of the e-mails has an attorney recipient, and the latest e-mail is drafted by Mark Walker, an attorney. The initial e-mail in the series was drafted by Mike Holstein, who Gateway asserts "was the lead person as to the technical investigation necessary to ascertain the information necessary to complete the Gateway Legal Investigation." [FN97] That initial e-mail attaches a one-page "Work Plan" describing work to be performed at MSI Monday, July 31, 2000. The e-mails and attached document are therefore integral to the technical response to the technical issues. The e-mails and attachment are entirely technical in nature,. They are not different in content or purpose from Exhibits A or Q.

FN97. Declaration of Mark Walker dated October 3, 2003, filed as Exhibit 1 to Gateway Memorandum, ¶ 9.

Gateway's most recent effort to protect Exhibit C actually reveals the technical nature of this document and its relative detachment from legal concerns:

Gateway does claim that this technical material was necessary so "that the Law Department could assess future products," and that even though it is a "compilation of facts" it is "properly protected under the work product doctrine." [FN98]

FN98. Id.

First of all, a claim of privilege in this area is inconsistent with Gateway's prior assertion that it has produced all documents "that concern business and technical issues". [FN99] This is the subject matter area of Exhibit Q, produced by Gateway, discussed previously.

FN99. Id., pages 5-6.

Second, Gateway's claim of privilege attempts to fit the factual material of Exhibit C in that category of factual information that is so tightly connected with an attorney's inquiry that it effectively reflects the attorney's thought, strategy or analysis. This is just not the case.

It does not appear, from any of the documents offered by Gateway to provide a context for the "Legal Investigation," that the Exhibit C e-mails and attachment and the attachment portion of Exhibit B are integrally responsive to any inquiry or direction from counsel acting as such, to provide opinions, legal advice or litigation strategy. They are generally responsive to a massive technical project which had legal implications, but they are at the far end of the spectrum in that project, reflecting a relatively neutral technical effort which Adams alleges infringes on his rights.

*19 The attachment to Exhibit C is the Work Plan, drafted by a non-lawyer. The attachment to Exhibit B, prepared by a non-lawyer, is the summary of the activity outlined in the work plan. These items may have been prepared under the ultimate direction of lawyers at Gateway, and reported to those lawyers, but the documents are neither attorney-client privileged nor work product. They are remote to the legal analysis Gateway was performing and are in their substance a business and technical study. If these documents were "fact" or "ordinary" work product, Adams' substantial need and undue hardship in obtaining the information through other means, such as depositions, and the substantially inferior quality of such alternative evidence would require production of them.

Exhibit D is a document which on its face appears to be purely technical. It is dated November 13, 2000.. There is no suggestion of privilege on its face, except for two notations that it is confidential, for Gateway internal use only. It describes itself as produced by Advance Engineering, Consumer Desktop Development, and bears copyright notation.

In the court's view, Exhibit D is the classic example of what is not privileged in this case. It has no appearance of relationship to litigation or attorney direction. It is a procedure to test computers. Gateway says it was "created to provide a basis for the final report to the Law Department." [FN100] It was reportedly drafted by Salah Din, a Gateway engineer, in response to a request from Mike Holstein. [FN101]

FN100. Gateway Supplemental Brief, page 31.

FN101. Exhibit O, page 4.

The "request" to which Gateway refers is Exhibit H, an e-mail drafted by Mike Holstein, dated November 22, 2000. Exhibit H appears to 'charter' a technical effort resulting in analysis and issuance of "a joint recommendation to Legal." The Exhibit H e-mail states that "Holstein (CTO) will lead the technical effort with support from Salah Din (Consumer desktops)," and that Salah Din will "[d]efine and document a recommended test plan/process." [FN102] Exhibit H provides further support for the view that Exhibit D is a technical document,. The result of the plan in Exhibit H was to be a final report to the legal team, but there is no legal analysis in Exhibit D, only a technical working guide.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
(Cite as: 2003 WL 23787856 (D.Utah))

FN102. Exhibit H, page 1.

Exhibit E is dated January 29, 2001, and is an e-mail from Salah Din to Mike Holstein and others with technical material attachments, some of which are handwritten and some of which are pre-printed. Gateway says it contains "only technical considerations" and was not "directly sent or received by attorneys," but that "the purpose of [the] technical work product was ... to discover factual information in anticipation of litigation." [FN103]

FN103. Gateway Supplemental Brief, pages 31-32.

While an understanding of the technical documents is beyond the court's ability, they all appear to relate to systems diagnosis and testing. The e-mail deals entirely with technical considerations. The documents are not directed to or produced by attorneys, and are not marked with any confidential designation.

*20 This exhibit is not privileged. It had purpose, value and motivation for Gateway independent of litigation in Gateway's self-described efforts to "meet the highest levels of quality[;] to verify that the FDC components provided by [suppliers] to Gateway operate according to specifications," [FN104] "to provide its customers with the best products and services in the industry," and improv[e] its technology and address[ ] customer issues as they arise ." [FN105] Exhibit E also documents the Gateway technical project. If it were work product, it would be producible to Adams because of the substantial need and undue hardship he would face without it.

FN104. Exhibit 1 to Adams' Supplemental Memorandum.

FN105. Exhibit 2 to Adams' Supplemental Memorandum.

Exhibit F is an e-mail dated January 31, 2001, from Mike Holstein to Ron Naves and others, with two attachments. The e-mail header states the subject is "ATTORNEY/CLIENT PRIVILEGE AND CONFIDENTIAL." The e-mail places its attachments in the context of "strategy" for the "meeting with Dr. Adams," and encloses a "draft summary."

One attachment is a narrative, with a header that it is "ATTORNEY/CLIENT PRIVILEGE AND CONFIDENTIAL." Its three pages of small print precisely detail the issues, tests and results. The document contains a twenty-word sentence reflecting legal analysis, and two paragraphs outlining the negotiation contacts with Adams. The twenty-word sentence should be redacted, but the balance of the document should be produced. Neither the one sentence nor the header make the entire document work product or attorney-client communication. Again, if the document were work product, Adams' substantial need and the undue hardship of obtaining information through alternative means would require its production, redacted.

The second attachment is simply a spreadsheet which lists all computers manufactured by Gateway and the supplier of parts. It appears to be the sort of list that would exist in any manufacturer's records, apart from any connection to the Investigation. Nothing in the e-mail or narrative attachment make the listing attachment appear privileged, though Gateway claims it was necessary "to complete its legal investigation." [FN106]

FN106. Exhibit O, page 4.

Gateway insists that though "the underlying factual information contained in the document may be discoverable ... the document itself is protected work product." [FN107] This document is another example of Gateway's misconception of the value of the heirarchal *structure* of its "Investigations" as a defensive shield against any inquiry. Gateway itself admits the entire contents of the document are discoverable but seeks to protect it from discovery.

FN107. Gateway Supplemental Brief, page 33.

Summary of Decision on Exhibits A--F
Of the six exhibits selected by Adams for judicial review on this motion,
• Exhibit A and the cover e-mail in Exhibit B were admitted by Gateway to be non-privileged, contrary to Gateway's listing on the privilege logs;
• The attachment to Exhibit B, Exhibit C and its attachment, Exhibit D, and Exhibit E are not privileged in any degree and are clearly and solely technical documents addressing a business issue.
*21 • Exhibit F (except for a one-sentence redaction) and its attachments are not privileged.

Exhibits G Through N
Gateway also submitted eight exhibits to show the context of Exhibits A through F, in support of its privilege claims. These additional exhibits, G through N, are also listed on the privilege logs. Each of them, except Exhibit N, contains internal privilege labeling. This section of the order will consider the impact of these documents, and their status as privileged or not.

Exhibit G, an e-mail series in June 2000, exclusively

between Gateway attorneys, was written at the early end of the chronology and contains analysis of legal risks and litigation strategy. It is clearly inter-attorney work product and analysis. It does not, however, support the conclusion that any part of Exhibits A through F are so integral to that analysis that they are privileged. One cannot see, looking at Exhibit G, that Exhibits A through F are responsive to litigation strategy and analysis. Exhibit G also contains paragraphs simply describing technical issues and negotiation postures, which would probably not be privileged if they were in any other document.

Exhibit H is an e-mail of November 22, 2000, written by the lead technical person on the FDC Assessment Investigation to attorneys and technical staff. It was described above in the discussion of Exhibit D. Exhibit H is largely similar to the narrative enclosure in Exhibit F and with similar redaction could be produced.

Exhibit I is an e-mail series in May 2000 near the time of the first contact between Adams and Gateway. As an exchange exclusively between Gateway's attorneys, with purely strategic content, it is protected.

Exhibit J is an e-mail between legal staff at Gateway (attorneys and a paralegal) and outside counsel, with high-level planning, strategizing and risk analysis. It is, like Exhibit I, classic work product.

Exhibit K is a two e-mail compilation in July 2000. The first e-mail is from a Gateway business manager to Ron Naves, counsel, with purely factual information. The second e-mail is among legal staff discussing business strategy, with a single reference to litigation issues. Redaction of the second paragraph in the July 24, 2000, e-mail would enable the document to be produced.

Exhibit L is a single e-mail dated November 8, 2000, from Ron Naves to various technical and legal staff noting legal implications of the FDC Assessment Investigation. As such, it is a protected document, under attorney work product and attorney-client privileges. Of the documents marked on this motion, it is the best *Upjohn*-like example of an attorney-client communication.

Exhibit M is a single e-mail from Mike Holstein, the technical lead on the FDC Assessment Investigation, to various other technical staff, with "cc" copies to legal staff. While it refers to an attachment, none is included with this exhibit. The e-mail provides assignments in the technical task at hand. Gateway admits the information contained in it is discoverable, but contends the document itself is not. [FN108] The document does not refer to nor reflect an integral connection with the e-mail of a day

before, Exhibit L. Exhibit M illustrates the dividing line between what the court regards as protected and not protected in this case. There were legal concerns, reflected in Exhibit L. But they were an outcome of a larger practical and technical concern,. Exhibit M is directed to that larger practical and technical concern. Further, the subject matter of Exhibit M,. is the subject matter of the infringement claim in this suit. Exhibit M is not privileged.

FN108. Gateway Supplemental Brief, page 35.

**22** Exhibit N does not designate its authorship, but Gateway proffers it as "Holstein's final report on the technical aspect of the legal investigation" submitted to inside and outside counsel in February 2001. [FN109] While the majority of the report pertains to business strategy, it is interwoven with legal, litigation and investigatory implications. It is work product and attorney-client privileged.

FN109. Exhibit O, page 4.

While Exhibits G through N were offered to buttress the claims of privilege for the other Exhibits, they do not provide anything more than a general context--that lawyers were supervising a project of an overwhelmingly technical nature,. There were legal implications, as there always are in business, and there were litigation possibilities, but the sample documents Exhibits A through F do not fall into the "attorney's workplace" intended to be protected by the work product privilege, and few of them are really attorney-client communications, though that designation was apparently sprinkled across them when they were created.

ORDER
IT IS HEREBY ORDERED that Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege [FN110] is GRANTED.

FN110. Docket no. 81, filed September 3, 2003.

Preparing for Production
IT IS FURTHER ORDERED that Gateway shall, consistent with the standards set forth in this order, re-evaluate its privilege claims as to the documents now listed on its privilege logs.

IT IS FURTHER ORDERED that Gateway will produce on or before January 5, 2004, [FN111]

FN111. Without separate order of the court, this deadline shall not be stayed by any objection or appeal of this order, to ensure that this already

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lengthy process is not further prolonged.

a. to Adams, all documents as to which Gateway no longer claims privilege;

b. to the court, two copies of all documents as to which this order denies privilege protection, including, to the extent not produced under subparagraph a., the attachment to Exhibit B, Exhibits C--E, Exhibits F and H (with a one sentence redaction), Exhibit K (with redaction of the second paragraph of the July 24 e-mail) and Exhibit M, as those exhibits are identified in the Sealed Exhibits Related to Sealed Order Regarding Motion to Compel Documents Withheld on the Basis Of Privilege;  [FN112]

> FN112. Docket no. 118, filed November 17, 2003.

c. to the court, two copies of all remaining documents as to which Gateway believes it is entitled to claim privilege under the terms of this order, with any narrative argument. A redacted copy of the argument should be simultaneously provided to Adams' counsel; and

d. to the court and Adams, a list of all documents in each of the foregoing categories, with a complete description of the documents, so that the list of documents compiled under subparagraph c. is a sufficient privilege log.  [FN113]

> FN113. See _AT & T Corp. v. Microsoft Corp.,_ 2003 WL 21212614 at *2 quoting _In re Community Psychiatric Centers,_ 1993 WL 497123 at *4 (C.D.Cal.).

The second copy of the documents listed in subparagraph b. will be available for Adams' counsel to retrieve from the court when this order is no longer subject to objection before the district judge. The magistrate judge will review the documents listed in subparagraph c. and issue a later ruling thereon.

### Completing the Record

IT IS HEREBY ORDERED that Gateway shall file, under seal, for in camera review only, executed copies of the Fourth Declaration of Mark Walker, the Declaration of Mike Holstein, and the Declaration of Ron Naves.

**\*23** IT IS FURTHER ORDERED that Gateway shall within ten days file, under seal, a copy of the redacted version of Defendant's Ex Parte Supplemental Brief in Response to Court's Sealed Order Regarding Motion to Compel Documents Withheld on the Basis of Privilege. [FN114] That version was served on other counsel and should be in the record.

> FN114. Docket no. 124, filed December 3, 2003.

IT IS FURTHER ORDERED that Gateway shall prepare, file and serve an index to the exhibits in the binder entitled "November 2003 Gateway Privileged Documents for _In Camera_ Review" within ten (10) days. The index shall relate each document in the binder to the privilege log. The court is concurrently filing an Index of Exhibits AR, referred to in this order. [FN115]

> FN115. Gateway also designated an "Exhibit R" in its binder entitled "November 2003 Gateway Privileged Documents for _In Camera_ Review." The court has re-designated that Exhibit R in the binder (an e-mail from Mark Walker to Ron Naves, dated May 31, 2000) as "Exhibit R-1," and asks that Gateway refer to it as such in its index to the binder.

IT IS FURTHER ORDERED that the binder now in the possession of the court shall be filed, under seal, for in camera review only.

IT IS FURTHER ORDERED that this Sealed Order shall only be served on counsel for Adams and Gateway. A proposed unsealed, redacted version of this order is sent to Adams and Gateway concurrent with the filing of this order. IT IS FURTHER ORDERED that Gateway and Adams shall, on or before December 29, 2003, return this document via fax or e-mail to the magistrate judge, with a copy to each other, with clear markings on any portions they believe should be redacted so that the final redacted version may be filed and served on other parties.

### Attorneys' Fees and Expenses

IT IS FURTHER ORDERED that Adams' counsel shall file and serve, on or before December 29, 2003, an Affidavit of Attorneys Fees and Expenses incurred in making this motion. Any response by Gateway to the Affidavit should be filed and served on or before January 9, 2003.

Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)

### Motions, Pleadings and Filings (Back to top)

• 2006 WL 813117 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Plaintiffs' Motion to Strike Gateway's Six Motions for Summary Judgment (Including DKT Nos. 446, 447, 448, 458, 459, 449, 450, 451, 452, 453, 454, 455, 456, AND 457) for Violating the 25-PAGE Limit Set Forth In DUCivR 56(1)(b)  Docket No. 474  (Feb. 23, 2006)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23787856 (D.Utah)
**(Cite as: 2003 WL 23787856 (D.Utah))**

• 2006 WL 813116 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Motion to Strike Gateway's Six Motions for Summary Judgment (Including DKT Nos. 446, 447, 448, 458, 459, 449, 450, 451, 452, 453, 454, 455, 456, and 457) for Violating the 25-Page Limit Set Forth In DUCivR 56(1)(b ) (Feb. 22, 2006)

• 2006 WL 813115 (Trial Motion, Memorandum and Affidavit) Reply to Plaintiffs' Opposition to Gateway's Motion to Compel Dr. Adams Expert Report and Deposition or, Alternatively, to Exclude Adams' Expert Testimony (Feb. 15, 2006)

• 2006 WL 813114 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Gateway's Motion to Compel DR. Adams Expert Report and Deposition or, Alternatively, to Exclude Adams' Expert Testimony (Feb. 3, 2006)

• 2005 WL 3197926 (Trial Motion, Memorandum and Affidavit) Non-Party National Semiconductor Corporation's Partial Objection to the Proposed Order on the Joint Stipulation and Motion Regarding Certain Discovery Issues, Filed October 19, 2005 (Oct. 24, 2005)

• 2005 WL 1990503 (Trial Motion, Memorandum and Affidavit) Non-Party National Semiconductor Corporation's Memorandum in Support of Its Motion to Intervene and Oppose Plaintiff Adams' Request to Modify the Stipulated Confidentiality Protective Order (Apr. 11, 2005)

• 2005 WL 1990500 (Trial Motion, Memorandum and Affidavit) Non-Party National Semiconductor Corporation's Memorandum in Support of Its Motion for a Protective Order Under Fed. R. Civ. P. 26(c) and 45(c) Precluding Further Discovery By Adams (Mar. 31, 2005)

• 2005 WL 1990495 (Trial Pleading) Amended Answer and Counterclaim to Second Amended Complaint in Compliance with Order Granting Motion to Amend in Part (Jan. 14, 2005)

• 2005 WL 1990498 (Trial Pleading) Amended Answer and Counterclaim to Second Amended Complaint in Compliance With Order Granting Motion to Amend in Part (Jan. 14, 2005)

• 2:02cv00106 (Docket) (Feb. 05, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.