# Exhibit 14

Westlaw.

5/17/04 FORTUNE 88
5/17/04 Fortune 88
2004 WL 55184126

factiva

Fortune
Copyright (c) 2004 Bell & Howell Information and Learning Company. All rights
reserved.

Monday, May 17, 2004

Cover Story/SCO

Gunning for Linux The free operating system--backed by IBM, HP, and others-- is
breaking Microsoft's monopoly. But a lawsuit by SCO, which claims to own parts
of the code, could wreck the party.
Roger Parloff


In the ascetic waiting room of the SCO Group's Lindon, Utah, headquarters, the
only reading matter is a stack of beige, telephone- book-sized binders. They
are volumes I, II, III, and IV of the company's press clippings. For the
previous month. SCO (pronounced "skoe," to rhyme with "snow") is already
notorious in three insular communities. The first to appreciate its
significance were countercultural software developers, at least a few of whom
would like to transform society by reordering our approach to the protection of
intellectual property. Next to catch on were the pragmatic information
technology officers and risk-averse in-house lawyers who work for every company
this magazine writes about. Now the ripple effects are about to touch the rest
of us, and we need to know about SCO too.


SCO became infamous in March 2003, when it sued IBM alleging that the IT giant
had improperly dumped parts of SCO's confidential, enterprise-grade,
proprietary software code, called Unix, into Linux. Linux (rhymes with
"cynics") is a "free" or open-source operating system that can be downloaded
off the Internet for no charge. Such software is called free not because of its
price (there is no prohibition on charging for it, though most people don't)
but rather because its source code--the specialized language in which it is
written--is kept open to public view, enabling developers to freely comprehend
it, modify it, debug it, customize it, and distribute it. With proprietary
software, like Microsoft Windows, developers can typically do none of those
things, because of both legal prohibitions and technological barriers.


Though Linux began as a hobby of sorts among software developers, in recent
years IBM, Hewlett-Packard, NEC, Intel, Computer Associates, Fujitsu, Hitachi,
and others have come to see enormous commercial potential in it. These
companies believe they can make money indirectly off Linux by selling hardware
loaded with it, proprietary software that runs on top of it, or support
services that maintain and optimize it. Such companies, led by IBM, have
already invested more than $1 billion in upgrading Linux for general business,
data-center, and telecommunications purposes.


For some, the bet is paying off. IBM reported more than $2 billion in Linux-

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

related revenues last year, a gain of 50% over the previous year. Though it is still rare to see Linux running on desktop computers in American offices, it is now commonplace on network servers at FORTUNE 1,000 companies, universities, and government agencies. It accounted for 23.5% of the market for new server software shipments in 2002, running a very respectable second to Microsoft's 55%, according to market research firm IDC. (Unix was third, with 11%.) Many corporate CTOs and CIOs consider Linux more reliable, flexible, and transparent, not to mention cheaper, than proprietary alternatives. In addition, millions of consumer electronics devices--cellphones, PDAs, TiVos, and DVD players--are already running on stripped-down, "embedded" versions of Linux. Linux is even gaining in the desktop environment, where IDC estimates that shipments are increasing yearly at a 25% rate.

Because of Linux's increasingly important role, the SCO suit swiftly escalated from an arcane two-party licensing dispute into a whirlpool of litigation engulfing a widening circle of companies. The dispute stemmed from SCO's 2001 acquisition of Unix, an operating system developed by AT&T in the late 1960s for use on mainframes and minicomputers. Included in the purchase were some 30,000 licensing contracts that AT&T had entered into with about 6,000 universities, government agencies, and businesses, including IBM.

SCO's acquisition of Unix soon had repercussions for all Linux users, even those who had never licensed Unix. Linux had been designed to share some programming principles with Unix, so that developers who felt at home in the Unix environment could easily adapt. In May 2003, SCO announced that it had discovered other fragments of alleged Unix code in Linux--quite apart from anything IBM may have put there. It sent letters to every FORTUNE 1,000 and FORTUNE Global 500 company warning that end users of Linux were violating its copyrights. SCO demanded $699 per single-processor server running Linux to license whatever Unix code might be floating around inside.

Next, network software distributor Novell jumped into the vortex. Novell was then turning its business model inside out to embrace Linux--a decision for which it would be rewarded with a $50 million investment by IBM in November. In late May 2003, Novell announced that it actually owned all the crucial Unix rights that SCO had been asserting against IBM and Linux end users. Novell cited provisions of an impenetrably confusing 1995 contract in which Novell had sold certain Unix rights, while retaining others, to the company from which SCO had later acquired its Unix rights. In January, SCO sued Novell for "slandering its title" to the Unix assets.

Finally, this March, SCO sued two Linux end users, AutoZone and DaimlerChrysler, in state courts in Nevada and Michigan, forcing even the sleepiest of corporate counsels to take notice. Every business that had either switched to Linux or was contemplating doing so--and it was a rare company that didn't fall into one or the other category--now had to worry about becoming the next AutoZone. Some discovered that they were at least theoretically exposed to even worse doomsday scenarios. Suppose your company had shipped ten million cellphones, for example, and it later turned out that each one contained five lines of stray Unix gobbledygook mixed up among a million lines of embedded Linux gobbledygook. Could a court really order your company to recall all ten million devices just to tear out and rewrite a few lines of offending techno-

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

5/17/04 FORTUNE 88
5/17/04 Fortune 88
2004 WL 55184126

gibberish? Answer: yes.

Yet all this tumult still doesn't fully account for the towering stack of press clippings on the SCO waiting room's end table. The religious fervor of the backlash against SCO's suits reveals that this is no plain-vanilla licensing dispute. (One whole volume of January clippings was devoted to the MyDoom worm, which had primed infected computers worldwide to stage a crippling denial-of-service attack on SCO's website.) SCO's suits happen to be imperiling a movement. That movement teaches that software should be a public utility, not a product, and that free software is just one illustration of how a radically different, more communal approach to intellectual property will better serve the advancement of knowledge, innovation, and creativity.

Readers need not buy into the grander vision, however, to agree that what's at stake in the lawsuits is much bigger than SCO or even IBM. Even the stodgiest greed-is-good capitalist cannot deny that the loose-knit band of free-software enthusiasts has already succeeded where the U.S. Department of Justice and the European Commission have failed. These developers are right now, before our eyes, curbing the Microsoft Windows monopoly. They have created a genuine competitor to Windows--one that, because of its nonproprietary nature and diffuse authorship, Microsoft can neither acquire nor suppress. Explains Eben Moglen, a Columbia Law School professor and the chief lawyer for the Free Software Foundation: "The technical and business transactions which Microsoft has employed in the past to protect its franchise against commoditization have met a successful, irreversible commoditization movement. And the largest and best-funded competitor in the information technology industry"--IBM--"has figured out how to benefit from it."

Yet the source of Linux's strength in the market--that diffuse, communal authorship--is also its soft underbelly in the courtroom. Because it is continually cobbled together from informal contributions by thousands of developers scattered across the globe, there is no assurance that its many co-authors are all scrupulously donating only fragments that they have written themselves, as opposed to, for instance, lifting or paraphrasing--even unwittingly- -from copyrighted or patented code.

Even beyond questions of tainted pedigree, Linux is a morass of law-school exam questions waiting to be administered. In copyright terms, no one knows just what manner of beast it is. Is it a work of "joint authorship"? A "compilation"? A perpetually expanding series of "derivative works"? Without knowing the answers to those questions, lawyers can't pinpoint precisely who owns either the whole of Linux or any of its fragments. Lawyers don't even know what country's law should apply when trying to untangle any of those questions.

The SCO suits are in this sense more important for the structural vulnerability in Linux that they have exposed than for the specifics of the wrongdoing they assert. Those who hope to use open-source code in the commercial world will have to learn to protect such works--and themselves--from courtroom assault. They need to start today.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Surprisingly enough, the man who founded the whole free-software movement--the playful, eccentric, now-51-year-old Richard Stallman-- saw the problem coming and tried to head it off. In the early 1980s the MIT Artificial Intelligence Lab where Stallman worked installed a new, updated mainframe computer. It was a traumatic event for Stallman, for reasons he has described in his book of essays, Free Software, Free Society. For more than a decade Stallman and his colleagues had been writing and improving the software that had run on the predecessor machine. When the new computer arrived, all their work went up in smoke. The new machine came with its own proprietary operating system, whose source code was a carefully guarded trade secret. To his horror Stallman learned that he and his community of developers would no longer be permitted to tinker with it.

This approach was worse than infantilizing, in Stallman's view. It was "antisocial," "unethical," and "simply wrong." Stallman decided to devise his own operating system, whose source code would be free and open for all to examine and critique and modify. He would call it GNU, which stood for "GNU's Not Unix." (It's pronounced with a hard "g," and rhymes with "canoe.")

Stallman's GNU project produced many of the higher-level functions of an operating system, but as the 1990s dawned he had still not yet gotten down to the "kernel" --the lower-level functions that interact most directly with the hardware. Serendipitously, in 1991 a 19-year-old Finnish college student named Linus (pronounced "LEE-nus") Torvalds independently began composing his own operating system. Unlike Stallman, Torvalds began at the lowest levels. ("Lowest" in this culture is not pejorative but laudatory. The closer a developer gets to the machine, the greater the respect to which he or she is entitled.)

Torvalds posted his work-in-progress on the Internet, inviting comment. To his surprise, his posting garnered considerable interest, as well as insightful suggestions from sophisticated developers around the world. From that point forward the project proceeded quickly and communally, with Torvalds or his delegates making the final determinations about which suggestions to incorporate. Many open-source enthusiasts believe that this communal approach intrinsically results in more reliable, bug-free software than proprietary code.

Eventually Stallman's upper-level GNU functions were placed on top of Torvalds's kernel, and the operating system was complete. The whole is now typically referred to as Linux.

But there was a crucial legal difference between the portion of the project led by Stallman and that led by Torvalds. The difference stems from Stallman's rather fanatical notion of "free"--which extends beyond the conventional notion of merely allowing people to do what they want. Stallman foresaw that some people might want to take free software, modify it, and claim the modifications as their own property. He did not want that to happen. To him it was fundamental that if he was going to let others see and play with what he had created, the others had to reciprocate. He embodied this peculiarly controlling notion of freedom in an unusual license he wrote himself, known as the General

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

5/17/04 FORTUNE 88                                                    Page 5
5/17/04 Fortune 88
2004 WL 55184126

Public License (GPL).

Stallman's controlling view of freedom extends to press freedom, which is why
he is not directly quoted in this article. As a precondition to being
interviewed, Stallman insists that reporters agree to certain usage rules
regarding the phrase "free software"-- he abhors the more popular term "open
source"--and that they pledge to refer to Linux in their stories as GNU/Linux--
a name that, he feels, better acknowledges his own contributions to it. FORTUNE
declined.

In a nutshell, the GPL allows users of GNU software to copy, modify, and
distribute it as long as they permit others to do the same with the
modifications they make. It's a little like a reverse copyright. A friend of
Stallman's famously called the GPL "copyleft- -all rights reversed."

Many people have mistakenly assumed that the free-software movement is at odds
with copyright law. On the contrary, it depends upon it. The GPL is not a
conventional contract, and its enforceability, most lawyers believe, hinges on
copyright laws (see box). Stallman was therefore scrupulous about keeping his
copyrights in good order. In 1984, for instance, he quit MIT to ensure that the
university could not claim ownership of the software he wrote under the so-
called work-for-hire doctrine that governs many employer- employee
relationships. He also required that any contributor to the GNU project
formally assign his or her copyrights to the Free Software Foundation in a pen-
and-paper document, and likewise provide a signed acknowledgment from his or
her own employer waiving any possible work-for-hire claims. He further insisted
that contributors indemnify the Free Software Foundation if it later turned out
that their contributions were not their own and therefore infringed someone
else's copyright.

Although Torvalds elected to use Stallman's GPL license to cover the Linux
kernel, he never instituted any of Stallman's scrupulous methods of ensuring
that copyrights were assigned to a central entity, nor did he try to police
contributors to ensure that they weren't donating code that didn't belong to
them. Torvalds was just a college kid, after all, pursuing a then-noncommercial
labor of love. In any event, why would a Finn, collaborating with quasi-
anonymous e-mailers from Germany, Sweden, Mexico, or places literally unknown,
break his back to comply with U.S. copyright law?

Nevertheless, the consequence today of Torvalds's understandable omission is
that the kernel at the heart of Linux--upon which companies like IBM are now
staking their futures and challenging the Microsoft behemoth--is legally
radioactive.

The much-loathed would-be Linux slayer we know today as SCO has its roots in a
secret, visionary unit of Novell that was set up in the early 1990s to--of all
things--develop a commercial-grade version of Linux. In 1994, Novell dumped the
project, and the unit's leaders left to form their own company, Caldera. In
March 2000, Caldera went public. At that point, then-CEO Ransom Love recalls,
Linux had progressed to the stage where it was well suited for the branch

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

offices of a national business--like, say, an AutoZone outlet- -though such businesses might still need to run Unix at their headquarters. Love thought that if he could acquire the rights to Unix, he could better meet customers' needs and meld Unix and Linux into a single environment.

Caldera had another motive for acquiring Unix, Love adds--one that is ironic in light of how events would play out. Love understood that Linux's potential Achilles' heel was its mongrel intellectual-property pedigree. "If Microsoft was ever going to attack," Love says, "they would do it through fear and uncertainty and doubt around the intellectual-property issue." Love also knew that, given Linux's provenance, the most likely source of illicit contributions into Linux was Unix. "By purchasing Unix, we felt like we could actually provide indemnification" to Linux end users-- i.e., pledges to protect them from potential copyright suits by people claiming to own fragments of Linux.

AT&T had created Unix in 1969 as a unifying operating system that would run on a wide variety of hardware. It licensed Unix to different customers on different terms. Universities were often allowed to see and modify the source code as long as they did not use it for commercial purposes. Commercial licensees received the code on more restrictive terms.

Many hardware manufacturers--including IBM, Silicon Graphics, Hewlett-Packard, and Sun Microsystems--were allowed to see and modify the source code and then redistribute the software (but not its source code) preloaded on their hardware. In exchange, they paid royalties on the redistributed code and promised to keep confidential the source code for both Unix and their "derivative" works. Over time, many manufacturers developed their own "flavors" of Unix--Sun's was Solaris, for instance, while IBM's was AIX--as did some universities. All these variants cross-pollinated over the years. For this reason, identifying the correct copyright holder of any one stretch of code in any one flavor of Unix--and the precise terms under which that copyright holder originally licensed it--can be a daunting challenge. The best genealogy of Unix is illustrated in a comically unfathomable chart provided by French software historian Eric Levenez on his website at  www.levenez.com. That family tree prints out across 17 eight-by 11-inch pages. (See excerpt at right.)

Novell bought the Unix business from AT&T in 1993, but then, after a management change, sold most of the Unix assets to a small company called Santa Cruz Operation in 1995. In May 2001, Caldera's Love bought those Unix assets from Santa Cruz. He bought the Santa Cruz name too, announcing that Caldera would become the SCO Group in summer 2002.

Meanwhile, the tech economy was falling apart, throwing the company into turmoil. In addition, in 2001 IBM suddenly withdrew from a joint venture with Santa Cruz--known as Project Monterey-- that Caldera had banked on as an important revenue source.

In June 2002, Love was replaced as CEO by Darl McBride, a former Novell executive who had been selected because of his expertise in marketing through a reselling channel. McBride had opened Novell's Japan operation in 1990--he

Copr. ° West 2004 No Claim to Orig. U.S. Govt. Works

speaks fluent Japanese, which he learned on a Mormon mission during college--
and had taken that unit to $150 million in revenues in about three years.

McBride is a blunt, unnuanced man with a fireplug build. (He lettered in four
sports in high school.) He is old school, and not easily swept up by visionary
rhetoric. And he is not one to back down from a fight. About a week after he
joined SCO, some IBM officials came to visit him, he says. "They were out here
talking about how important this Linux thing is. I was talking about, well,
Linux is interesting, but we have this other thing called Unix, which is where
we make all of our money. They came back very strongly with, 'The operating
system must be free.' Okay, that's their game plan, fine. But what they're
trying to do is impose that standard on the world."

While McBride was figuring out what to do with the company, customers began
approaching him with a proposition. Users of SCO's Unix systems that were
switching to Linux had discovered that their old Unix applications would run
seamlessly on Linux if they merely copied certain critical SCO Unix files--
known as run-time libraries- -into Linux. Aware that such copying might violate
their licenses with SCO, these customers wanted SCO to license them just those
files. At the same time, SCO learned that other, less prudent customers were
copying those libraries without asking permission. McBride decided to set up a
division, SCOsource, to license the libraries to Linux users and--um, er--to
remind others of their obligations when it came to copying SCO's Unix-related
intellectual property.

McBride started bouncing this idea off "big time" players and business
partners, he recalls, like Oracle, HP, and Red Hat. "The reactions were neutral
to positive," McBride claims. "Except in IBM's case. Which was a violent
reaction. Their response back to me was very simple: We cannot let customers
even have an inkling that there might be intellectual-property problems inside
of Linux. For any reason."

With tension between SCO and IBM rising--IBM's withdrawal from Project Monterey
was still a simmering issue--SCO announced the launch of the licensing unit at
a LinuxWorld conference in January 2003. It also signed up the most
credentialed litigator in America, David Boies, as the unit's enforcer. At the
same conference Steve Mills, the head of IBM's software group, unwittingly
exacerbated tensions in his exuberant keynote. According to one news account,
Mills stated that while Linux lagged behind Unix at the moment, IBM would
exploit its expertise with AIX to bring it up to speed. "The pathway to get
there is an eight-lane highway," he reportedly said. Asked whether Linux would
eventually replace AIX--IBM's flavor of Unix--Mills implied that it would. A
few minutes later Dell's CIO, Ron Mott, displayed a slide to the same audience
and read aloud its conclusion: "Unix is dead."

In this and earlier public statements, IBM implied that it was grafting
sophisticated code from AIX onto Linux to accelerate Linux's commercial
upgrade. McBride believed IBM couldn't do that, since all AIX code constituted,
in his view, a Unix "derivative" whose source code IBM had to keep secret under
its licenses.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

5/17/04 FORTUNE 88
5/17/04 Fortune 88
2004 WL 55184126

In March 2003, SCO sued IBM, and--as Moglen aptly analogizes--it was as if Gavrilo Princip had assassinated the Archduke Franz Ferdinand.

The Linux community was naturally skeptical about SCO's claims and became more so when SCO initially refused to say precisely which segments of Linux code it was claiming title to. Since Linux developers were offering to rip out and replace anything that might infringe, it appeared to SCO's critics that SCO was more interested in gouging Linux users than in protecting Unix code. (SCO maintained that it could not publicly identify any filched source code without waiving the very confidentiality rights that it was trying to protect and enforce.)

There were other reasons to be suspicious of SCO's good faith. SCO's stock price rose sharply in the wake of the suits' announcement--from $1.09 in mid-February to $20.50 in October--and some officers and directors were regularly selling chunks of stock. Though McBride was not among them, he did receive almost $1 million in cash compensation in 2003--an extraordinary sum for the CEO of a microcap.

In addition, very shortly after filing the IBM suit, SCO corralled $25.8 million in what were characterized as licensing agreements with Microsoft and Sun. They were widely interpreted as efforts by Microsoft and Sun to bankroll the legal assault upon Linux.

The bounty-hunting terms of SCO's retainer agreement with Boies are yet another cause for raised eyebrows. Boies's firm and the others working with him are billing SCO at discounted hourly rates, but in return they stand to receive 20% of any judgments or settlements that result. What's unusual, though, is that the contracts specify that if SCO is acquired during the litigation-- imagine, say, IBM buying SCO to make it go away --SCO's lawyers will take 20% of the company's sale price. The lawyers even receive 20% of any financings SCO receives during the litigation. For instance, when SCO got a $50 million private placement in October 2003, SCO's law firms immediately banked more than $8.9 million, including $1 million cash. One of the law firms working with Boies's 178-lawyer firm on the case and, therefore, sharing in the booty, is Los Angeles solo practitioner Kevin McBride--CEO McBride's brother. How does Boies's firm split the money with Kevin McBride and the others? The "lion's share" goes to the Boies firm, Kevin McBride says.

We've reached the point in the narrative where some brute legal analysis can no longer be postponed. We'll make it brief. The challenge in writing about the SCO suits--and inevitably fattening SCO's next volume of press clippings--is that even the most skeptical account tends to advance SCO's cause. Fear of lawsuits, even meritless ones, can spur companies to shy away from switching to Linux or to pay SCO the toll it seeks. This is the power of sowing FUD--fear, uncertainty, and doubt--which is a strategy of long standing in the computer industry. Certainly there are reasons to be skeptical of SCO's legal claims. Though SCO's key original claim against IBM was dramatic and easy to empathize with--the claim that IBM dumped Unix code into Linux--it has subsequently become clear through courtroom give-and-take that SCO's claim is actually more

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

attenuated. The crux, as McBride concedes in an interview, is really that IBM
dumped into Linux AIX code that IBM wrote itself but that SCO says is
"derivative" of Unix and therefore covered by the confidentiality provisions of
IBM's original license with AT&T. It's not a preposterous reading of the
license, but it's an aggressive one.

By far the greatest potential obstacle for SCO is the astoundingly confusing
September 1995 sales contract whereby Novell transferred some but not all of
its Unix rights to Santa Cruz, and thence to SCO. If Novell's reading of that
contract turns out to be right--i.e., that Novell retains control of all the
crucial rights SCO is now asserting--SCO's whole post-McBride business model is
annihilated.

SCO insists that the 1995 deal was exactly what the outside world then thought
it was--a sale by Novell to Santa Cruz of Novell's "Unix business" and "Unix
intellectual property," as the companies' joint press release described it at
the time. Nevertheless--and at least in part because the smallish Santa Cruz
could not have afforded the Unix business otherwise--the actual contract
specifies that Novell is to continue to receive 95% of the royalty income from
the existing Unix licenses, and that it retains veto power over the enforcement
of those licenses. (The contract anticipates that Santa Cruz would eventually
release a next-generation Unix, whose royalties would be entirely its own.)
What the contract leaves unclear is whether Novell's veto power also extends to
the non- royalty-yielding source-code licenses, including the one that now
forms the crux of SCO's case against IBM.

The other huge question mark left by the same contract revolves around the Unix
copyrights, which are SCO's sole basis for demanding licenses from Linux end
users. Notwithstanding the claims of the press release heralding the deal, a
critical appendix to the contract states that "all copyrights" are excluded
from the sale. SCO claims that this was a typo--a whopping typo, to be sure--
that was corrected in an amendment a year later. But the amendment itself is
confusing and vague.

The one advantage SCO might have in this absolutely critical dispute with
Novell is that McBride was present when the sales contract was being
negotiated--though he happened to be on the Novell side of the table back then.
By contrast, none of Novell's current top management were. "I was in the staff
meetings," McBride protests. "We [at Novell] were selling Unix. We were exiting
the business. I've gone back and talked to all of those guys. We have
statements from them. We know what they're going to say as this goes through."
(The two signatories to the contract declined to comment.)

As if those issues aren't knotty enough, SCO is also inviting Linux end users
into a litigation tar pit when it comes to its claims about the Unix fragments
in Linux. Many of the files SCO alleges are infringing are "header" files,
containing names, data, and other information that many copyright specialists
doubt are copyrightable at all. In addition, SCO is complaining not just about
verbatim copying but also about the purloining of its code's "structure,
sequence, and/or organization"--another notion that probes the outer reaches of
what is copyrightable. The last time the U.S. Supreme Court grappled with such

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

questions was in 1996, in a would-be landmark dispute in which the justices
wrestled themselves to a 4-4 draw. In sum, even if SCO is bluffing, it will be
an exceedingly expensive bluff to call.

It's not about SCO. It's not about SCO. It's not about SCO." Daniel Egger, a
lawyer, software developer, and venture capitalist, has pored over SCO's legal
claims and found them wanting. What Egger does believe, however, is that the
SCO suits have exposed a "structural" problem with open-source software that
has staying power. In fact, Egger believes that so strongly that he has joined
the growing ranks of entrepreneurs who now offer consulting services and
proprietary software to help commercial users of open source minimize their
legal risks.

Other business lawyers share Egger's view that there is a structural problem.
Though copyright suits like SCO's get most of the press, attorney Irwin Gross
remarks, patent suits are an even greater threat. "There's a lot of roadkill
out here," he says, referring to all the Silicon Valley startups that failed
and whose only remaining assets are their patents. "There's a lot of patent
applications floating around in the hands of people who don't have an interest
in anything other than asserting them."

Though Hewlett-Packard, Novell, and others have begun offering
"indemnification" to their open-source customers, the guarantees are comforting
only until you read the fine print, according to Egger. The protections
typically vanish if the customer modifies the software--the raison d'etre of
open source--while some apply only to suits by SCO, others have liability caps,
and on it goes.

Although proprietary software is also vulnerable to copyright or patent claims,
its end users have some assurance that their vendors will go to bat for them if
there should be a problem--if not because of indemnification contracts, then
just as a matter of business self- interest. Until now, open-source end users
have had no analogous "sugar daddy" to turn to, as Gross puts it.

Egger hopes his startup, Open Source Risk Management, will serve such a role.
In time he aims to sell open-source insurance policies. In the shorter term,
three Linux promoters--IBM, Intel, and MontaVista Software--have already ponied
up $3 million to seed a legal defense fund for Linux end users sued by SCO.

The gathering array of alliances and opportunistic businesses rallying to the
legal rescue of open-source suggests that as long as corporate behemoths like
IBM and HP see a stake in making open source survive, it will. "If SCO shows
anything," says Gross, "it shows the phenomenon of how many big players are now
inextricably intertwined with Linux. And it shows how reviled you're going to
be if you pursue the Linux community."

That it does.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

5/17/04 FORTUNE 88                                          Page 11
5/17/04 Fortune 88
2004 WL 55184126

FEEDBACK rparloff@fortunemail.com

Microsoft "has met a successful, irreversible commoditization movement."

While SCO might turn out to be bluffing, it will be a very expensive bluff to call.

LINUX BECOMES BIG BUSINUX

AUGUST 1991 Linus Torvalds releases Linux Version 0.01.

OCTOBER 1994 Red Hat and Caldera release first commercial Linux distribution.

AUGUST 2000 Hewlett-Packard, IBM, Intel, and NEC form Open Source Development Lab.

DECEMBER 2000 IBM says it will invest $1 billion in Linux.

JUNE 2001 Microsoft CEO Steve Ballmer calls Linux a "cancer."

DECEMBER 2002 Linux's share of new server shipments is 23.5%, second to Microsoft's 55%, according to IDC market research.

JANUARY 2003 IBM says it will increase its Linux investments 35% annually through 2006.

JANUARY 2004 IBM reports more than $2 billion in Linux revenues for 2003.

THE EVOLUTIONARY STEW OF UNIX

The 17-page chart draped over McBride (below) is the convoluted 35-year development of Unix as traced by software historian Eric Levenez. A look at a single year reveals the complex interminglings of the many "flavors" of Unix.

HOW THE GENERAL PUBLIC LICENSE WORKS

Richard Stallman's GNU General Public License (GPL), which is the legal mechanism for ensuring that free software stays free, is not a conventional contract. When you download free software, for instance, you are not asked to "click" your agreement to the terms of the GPL the way you must for most

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

5/17/04 Fortune 88
2004 WL 55184126

proprietary code. For that reason, among others, many lawyers doubt that the
GPL is enforceable as a contract.

What actually gives the GPL its teeth--though this may come as a shock to some
free-software champions--is the copyright laws. The GPL gives unilateral
permission to copy, modify, and distribute the software that it accompanies.
Performing any of these acts without the GPL's permission would violate the
rights of the code's copyright holder. In the case of the GNU software inside
Linux (though not the Linux kernel itself), the copyrights have been assigned
to the Free Software Foundation--a nonprofit Stallman set up.

The permission granted by the GPL dissolves by its own terms if the recipient
fails to reveal the source code of any modifications he makes to the free
software. Accordingly, if someone modifies GNU software and then tries to keep
those modifications secret, the Free Software Foundation can sue that person
for copyright infringement.

The foundation's general counsel, Eben Moglen, says he regularly pursues those
who flout the GPL's terms. All prospective defendants so far, he says, have
chosen to open-source their modifications rather than litigate.

: See also additional image(s) in Cover Image file and Table of Contents of
same issue.

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

COLOR PHOTO: GREGG SEGAL SCO CEO Darl McBride with a printout of Unix's many
variants. He claims Unix code has been written into Linux. The colored bands
mark products that SCO distributes. COLOR PHOTO: ADAM FRIEDBERG ATTORNEY EBEN
MOGLEN likens SCO's suit to the shooting of Archduke Franz Ferdinand. COLOR
PHOTO: ZUMA PRESS/NEWSCOM FOUNDER of the free-software movement, Richard
Stallman foresaw suits like SCO's and tried to head them off. TWO COLOR PHOTOS
THIS PORTION of the Unix evolution is enlarged at left. COLOR PHOTO

---- INDEX REFERENCES ----

COMPANY:          SCO Group Inc (CALSMS); International Business Machines
                  Corp (IBM); Microsoft Corp (MCROST); Red Hat Inc (RHAT)

NEWS SUBJECT:     (Legal/Judicial (C12); Corporate/Industrial News (CCAT);
                  Science/Technology (GSCI); Page-One Story (NPAG);
                  Political/General News (GCAT); Content Types (NCAT))

INDUSTRY:         (Computers/Electronics (I3302); Systems Software (I3302020);
                  Applications Software (I3302021); Software (I330202);
                  Computing (ICOMP))

           Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

5/17/04 FORTUNE 88                                                Page 13
5/17/04 Fortune 88
2004 WL 55184126


REGION:              (United States (USA); North American Countries (NAMZ))


LANGUAGE:            EN


OTHER INDEXING:      SCN; LWS; Cover; SCIENCE & TECHNOLOGY; LAWSUITS; Technology;
                     Computers; Corporations; Lawsuit; Darl McBride; Richard
                     Stallman; Linus Torvalds; SCO Group; IBM; Unix; Linux;
                     General Public License (GPL); Stallman, Richard; Love,
                     Ransom; McBride, Darl; Boies, David; Egger, Daniel; IBM
                     Corp; Microsoft Corp; American Telephone & Telegraph
                     Corporation; Novell Inc; Caldera Inc; IBM; MSFT; NOVL; 00-
                     136-8083; 08-146-6849; 03-778-7298


Word Count: 5811

5/17/04 FORTUNE 88

END OF DOCUMENT


Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# Exhibit 18



847 F.2d 1458                                                                                                    Page 1
847 F.2d 1458, 11 Fed.R.Serv.3d 283
**(Cite as: 847 F.2d 1458)**

▷

United States Court of Appeals,
Tenth Circuit.
OCELOT OIL CORPORATION, et al., Plaintiffs-
Appellants,
v.
SPARROW INDUSTRIES, et al., Defendants-
Appellees.
No. 85-2883.

May 31, 1988.

Plaintiffs appealed from decision of the United
States District Court for the District of Kansas, Frank
G. Theis, J., overruling objections to magistrates
order that struck plaintiffs' pleadings as to two
defendants and imposed attorney fees as sanctions for
abuse of discovery process.  The Court of Appeals,
Seymour, Circuit Judge, held that:  (1) order striking
plaintiffs' pleadings was beyond power of magistrate,
and (2) plaintiffs' failure to contest specific amount of
attorney fees to be awarded as sanction at time of
arguments on motion for sanction was a waiver of
their right to be heard on amount of attorney fees.

Affirmed in part, reversed in part and remanded.

West Headnotes

**[1] United States Magistrates** 🖘17
394k17 Most Cited Cases

**[1] United States Magistrates** 🖘27
394k27 Most Cited Cases
Order striking plaintiffs' pleadings as sanction for
abuse of discovery process constituted involuntary
dismissal of the action, and thus was beyond power
of magistrate to order; when plaintiffs objected to the
order, district court was required to make de novo
determination of basis for the order.  28 U.S.C.A. §
636(b)(1)(A).

**[2] United States Magistrates** 🖘27
394k27 Most Cited Cases
District court's review of magistrate's order did not
satisfy de novo standard required for involuntary
dismissal, where district court accorded considerable
deference to magistrate's order.  28 U.S.C.A. §
636(b)(1)(A).

**[3] Federal Civil Procedure** 🖘1827.1

170Ak1827.1 Most Cited Cases
(Formerly 170Ak1827, 170Ak2721)
Factors which should be considered by district courts
in making their findings on issue of fault, in support
of sanction of dismissal for plaintiff's noncompliance
with court order, include actual prejudice to
defendant, amount of interference with judicial
process and culpability of the litigant.

**[4] United States Magistrates** 🖘26
394k26 Most Cited Cases

**[4] United States Magistrates** 🖘29
394k29 Most Cited Cases
Magistrate's imposition of attorney fees as
nondispositive discovery sanctions is reviewed by
district court under standard of clearly erroneous or
contrary to law.  28 U.S.C.A. §  636;  Fed.Rules
Civ.Proc.Rule 37(b), 28 U.S.C.A.

**[5] Constitutional Law** 🖘317(1)
92k317(1) Most Cited Cases
Although due process requires fair notice and
opportunity to be heard before attorney fees are
imposed, it need not necessarily require both an oral
hearing on whether attorney fees should be imposed
and separate oral hearing on amount of such fees.
U.S.C.A. Const.Amend. 14.

**[6] Federal Civil Procedure** 🖘2828
170Ak2828 Most Cited Cases
(Formerly 170Ak2721)
Plaintiffs' failure to contest specific amount of
attorney fees to be awarded as sanction at time of
arguments on motion for sanction was a waiver of
their right to be heard on amount of attorney fees.
*1459 Thomas J. Kimmell (John M. Cogswell, with
him on the brief), of Cogswell and Wehrle, Denver,
Colo., for plaintiffs-appellants.

Robert B. Sullivan (Steven C. Willman, with him on
the brief), of Shughart, Thomson & Kilroy, P.C.,
Overland Park, Kan., for defendants-appellees.

Before SEYMOUR and MOORE, Circuit Judges,
and PHILLIPS, [FN*] District Judge.

FN* The Honorable Layn R. Phillips,
United States District Judge, Western
District of Oklahoma, sitting by designation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.2d 1458
847 F.2d 1458, 11 Fed.R.Serv.3d 283
(Cite as: 847 F.2d 1458)

Page 2

SEYMOUR, Circuit Judge.

Plaintiffs Ocelot Oil Corporation and Oil Resources, Inc. (Ocelot) appeal from a district court decision overruling objections to a magistrate's order that struck Ocelot's pleadings as to defendants Bonnie Brown and Larry Brown and imposed attorney's fees on Ocelot, as Rule 37 sanctions for abuse of the discovery process. We affirm as to the attorney's fees, but we reverse and remand as to the striking of the pleadings because the district court reviewed that portion of the magistrate's order under the wrong standard.

I.

This case stems from the sale in August 1980 of corporate stock and interests in oil and gas properties and leases. Ocelot was the buyer. In June 1983, Ocelot filed suit in several jurisdictions against the former owners of the properties and leases. In this case in Kansas federal court, Ocelot seeks $20,000,000 in damages on various grounds not material to this appeal. Bonnie and Larry Brown, the operators of a small oil and gas business, constitute one group of defendants. We limit our recital of the facts to those relevant to the Browns.

Discovery did not proceed smoothly. The magistrate below characterized Ocelot's conduct as "t[aking] a cavalier approach with regard to defendants' efforts to discover the particulars of the allegations of the Complaint and proceed[ing] to *1460 thwart defense counsel's efforts to proceed with orderly discovery. This is particularly true with regard to the Browns and the efforts of their counsel to proceed with discovery." Rec., vol. I, Doc. # 207, Magistrate's Memorandum and Order at 6 (Nov. 23, 1984). In particular, the Browns attempted without success to depose the chief executive officer of Ocelot's parent company. Further, Ocelot failed for several months to inspect documents which the Browns made available to it in response to Ocelot's Request for Production of Documents. Although the record reflects other instances of similar breakdowns of orderly discovery, we discuss only these two in detail, in reverse order.

Ocelot served a Request for Production of Documents on the Browns on October 26, 1983. After initially informing Ocelot that the requested documents did not exist, the Browns determined that several of their files did come within the Request. In February 1984, they advised Ocelot of the documents' existence, and made them available on numerous occasions when Ocelot's counsel was

scheduled to be in the area. Ocelot did not examine the documents until after the Browns' motion for sanctions had been heard and the magistrate had indicated he was likely to grant it.

In contrast, Ocelot refused to produce J. Verne Lyons, the chief executive officer of Ocelot's parent company, for deposition. Other defendants not involved in this appeal first attempted to depose Lyons in January 1984. In a previous deposition in a related case in Colorado, Lyons had described Larry Brown as the mastermind behind the transaction underlying this litigation and had given some details as to Larry Brown's conduct. Nevertheless, Ocelot's counsel orally objected to producing Lyons for the deposition noticed in January 1984, primarily on the grounds that Lyons had no personal knowledge of the facts in the allegations made in the complaint.

On March 2, Ocelot filed a motion for a Protective Order, asserting that Lyons' deposition had already been taken in the Colorado case. Although the other defendants in this Kansas suit were also parties to the Colorado suit, the Browns were not. Thus they did not have an opportunity to question Lyons at his previous deposition. Ocelot's motion did not bring this fact to the court's attention. The motion also admitted that Lyons did have personal knowledge of the facts in Ocelot's allegations covering most of the time period during which the Browns were involved in the transaction. On March 16, the court ordered Ocelot to produce Lyons for deposition.

In April 1984, the Browns noticed Lyons' deposition for May 13. They made clear in a letter to Ocelot that they would in no event agree to a continuance of that deposition. Four days before the deposition date, Ocelot again filed a motion for a Protective Order, this time in order to secure a postponement of Lyons' deposition. The basis for the motion was that on May 3, Ocelot had executed a written settlement agreement with a third-party defendant, and that settlement of the entire case was likely to take place shortly thereafter. In fact whatever agreement was reached on May 3 was only tentative; it was contingent on the third-party defendant reaching an independent settlement agreement with some of the non-Brown defendants in a case related to the instant one. Moreover, none of the fourteen defendants were party to the agreement, some of the defendants had extensive counter-claims and third-party claims, and most significantly, Ocelot had previously rejected the Browns' request to be dismissed from the suit. While Ocelot left open the possibility that it would dismiss the suit against the Browns if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

settlement negotiations proved successful, the Browns had warned that they would in all likelihood ask for attorney's fees if Ocelot rejected their request. Lyons did not appear for his deposition.

The Browns moved for sanctions against Ocelot. Oral argument on Ocelot's motion for a Protective Order and the Browns' motion for sanctions took place in June in front of a magistrate. The magistrate found that Ocelot had made its May 10 motion for a Protective Order in bad faith, that its earlier conduct with regard to its *1461 motion of March 2 "smacks of bad faith, if not outright deceptiveness," that "delay, procrastination and complete disregard of the Browns being parties to this case" had marked Ocelot's conduct of discovery, that Ocelot had thwarted every attempt by the Browns to discover the details of their allegedly fraudulent conduct, and that the financial burden on the Browns of this slow-paced and obstacle-laden discovery was substantial. Rec., vol. I, Doc. # 207, Magistrate's Memorandum and Order at 6, 11, 15, 18-22. It further found that Ocelot had waived its right to a hearing on the amount of attorney's fees. *Id.* at 18. The magistrate denied Ocelot's motion for a Protective Order and granted the Browns' motion to strike Ocelot's pleadings as to them. It granted the Browns's fees in the amount of $6,467.55.

Ocelot appealed to the District Court for the District of Kansas, which reviewed the magistrate's order under the clearly erroneous standard of review rather than *de novo.* The court adopted the magistrate's order in its entirety, after interpreting it as having stricken Ocelot's claims with prejudice. It is this decision which is now on appeal under 28 U.S.C. § 1291.

## II.

Ocelot contends that the district court reviewed the magistrate's order under the wrong standard, that the order is based in part on an *ex parte* communication between the Browns' counsel and the magistrate, that dismissal was too harsh a sanction, and that Ocelot was improperly denied a hearing on the amount of attorney's fees. The Browns contest these arguments, and argue that even if the district court was wrong as to the proper standard of review, the actual review conducted by the district court satisfies statutory and constitutional requirements.

#### A. The District Court's Review of the Magistrate's Order Dismissing the Action as a Sanction

1. The Standard of Review

Magistrates are appointed by and serve under the supervision of district court judges. 28 U.S.C. § 631(a) (1982 & West Supp.1987). The term of office of full-time magistrates is eight years, *id.* § 631(e), and their salary is protected by statute against reduction, *id.* § 634(b), rather than by the Constitution. They are thus not Article III judicial officers. The jurisdiction and powers of magistrates are governed by 28 U.S.C. § 636, and limited by the Constitution, U.S. Const. art. III, § 1.

28 U.S.C. § 636(b) establishes that magistrates may hear and determine any pretrial matters pending before the court, save for eight excepted motions. [FN1] These eight motions are generally referred to as "dispositive" motions. Magistrates may issue orders *1462 as to non-dispositive pretrial matters, and district courts review such orders under a "clearly erroneous or contrary to law" standard of review. 28 U.S.C. § 636(b)(1)(A). While magistrates may hear dispositive motions, they may only make proposed findings of fact and recommendations, and district courts must make *de novo* determinations as to those matters if a party objects to the magistrate's recommendations. *Id.* § 636(b)(1)(B), (C).

> FN1. Section 636(b) provides in relevant part:
> "(b)(1) Notwithstanding any provision of law to the contrary--
> (A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, *except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.* A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.
> (B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)....
> (C) the magistrate shall file his proposed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.2d 1458
847 F.2d 1458, 11 Fed.R.Serv.3d 283
(Cite as: 847 F.2d 1458)

Page 4

findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions."
(Emphasis added).

In this case, the magistrate's order struck plaintiff Ocelot's pleadings as to the Browns as a Rule 37 sanction for abuse of the discovery process. Discovery is clearly a pretrial matter, and magistrates thus have general authority to order discovery sanctions. They may not do so, however, if those sanctions fall within the eight dispositive motions excepted in subsection (A). The eighth of those motions is "a motion ... to involuntarily dismiss an action." Id. § 636(b)(1)(A).

[1] The striking of Ocelot's pleadings with prejudice means that Ocelot can no longer sue the Browns. This sanction has the effect of dismissing Ocelot's action, contrary to Ocelot's wishes, and operates as res judicata. We conclude that the order constitutes the involuntary dismissal of Ocelot's action within section 636(b)(1)(A), and is thus beyond the power of a magistrate to order. See Zises v. Department of Social Services, 112 F.R.D. 223, 226 (E.D.N.Y.1986). The fact that the striking of the pleadings was ordered as a discovery sanction does not change its effect. See 7 J. Moore, Moore's Federal Practice ¶ 72.04[2.-4] at 72-51 (1987) ("Sanctions may be either dispositive or non-dispositive, and hence the treatment of them by the magistrate and the district judge varies with the severity of the penalty being considered.").

We find support for our reading of subsection (A) in Rule 72 of the Federal Rules of Civil Procedure. Rule 72 specifies the procedures to be used by magistrates with regard to pretrial matters. [FN2] The Rule reflects the division in section 636(b) between matters as to which magistrates may issue orders and matters as to which magistrates may make

only proposed findings of fact and recommendations. Significantly, the Rule does not list the specific motions which fall into each category, but simply refers to matters as either "dispositive" or "not dispositive" of a claim or defense. Fed.R.Civ.P. 72. As to any dispositive matter, magistrate authority is limited and the district court must use the de novo standard of review. Id. 72(b). The notes to Rule 72 explicitly tie the two categories used in Rule 72 to referrals under either subsection (A) or subsection (B) of section 636. See Fed.R.Civ.P. 72 advisory committee note. Because Rule 72 became law subsequent to the relevant amendment to section 636, we read the notes as confirming our interpretation of the section: motions not designated on their face as one of those excepted in subsection (A) are nevertheless to be treated as such a motion when they have an identical effect. See Zises, 112 F.R.D. at 226.

FN2. Rule 72 provides:
"(a) Nondispositive Matters. A magistrate to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter. The district judge to whom the case is assigned shall consider objections made by the parties, provided they are served and filed within 10 days after the entry of the order, and shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law.

"(b) Dispositive Motions and Prisoner Petitions. A magistrate assigned without consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party ... shall promptly conduct such proceedings as are required.... The magistrate shall enter into the record a recommendation for disposition of the matter, including proposed findings of fact when appropriate...."

"... The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.2d 1458
847 F.2d 1458, 11 Fed.R.Serv.3d 283
(Cite as: 847 F.2d 1458)

Page 5

magistrate with instructions."

**\*1463** This dispositive/non-dispositive distinction is foreshadowed by the legislative history of the amendment to section 636 that gave magistrates authority to hear the eight motions listed in subsection (A). The House Report, for instance, refers to the motions throughout as dispositive motions. H.R.Rep. No. 94-1609, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Admin.News 6162.

Our interpretation is further confirmed by the requirement that we read section 636 so as to avoid constitutional problems, where such a reading is fairly possible. *See Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). The Constitution requires that Article III judges exercise final decisionmaking authority. *See United States v. Raddatz,* 447 U.S. 667, 683, 100 S.Ct. 2406, 2416, 65 L.Ed.2d 424 (1980); *cf. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 62, 102 S.Ct. 2858, 2866, 73 L.Ed.2d 598 (1982) (plurality opinion) (judicial power of the United States must be vested in Article III courts). Dismissal with prejudice is undoubtedly a final decision with respect to the claims against the Browns. Section 636 may not be read to confer more power on magistrates than the Constitution permits. [FN3]

> FN3. The Browns rely on *Devore & Sons, Inc. v. Aurora Pacific Cattle Co.,* 560 F.Supp. 236, 238-39 (D.Kan.1983), for the proposition that magistrate authority to resort to the sanction of dismissal is vital to their ability to manage discovery. We note that district courts are in disagreement on this point. *Compare Singh v. Superintending School Committee,* 593 F.Supp. 1315, 1318 (D.Me.1984) *and Devore,* 560 F.Supp. at 239 *with Zises,* 112 F.R.D. 226 *and Donovan v. Gingerbread House, Inc.,* 106 F.R.D. 57, 58-59 (D.Colo.1985).

Finally, other courts have also recognized that motions other than those explicitly listed in subsection (A) are dispositive within the context of section 636, and have consequently limited

magistrate authority to decide them. *See* 7 J. Moore, *supra,* ¶ ¶ 72.04[2.-4], [2.-6] (citing categories of dispositive motions and citing cases).

In short, then, we hold that the striking of pleadings with prejudice, whether as a discovery sanction or for some other reason, constitutes the involuntary dismissal of an action within the meaning of section 636(b)(1)(A). When Ocelot objected to the magistrate's order, the district court was required to make a *de novo* determination of the basis for the order.

**2. The District Court's Actual Review of the Order**

The Browns argue that the review actually carried out by the district court satisfies the *de novo* standard. *Raddatz* establishes what that standard requires:

"Congress focused on the potential for Art. III constraints in permitting a magistrate to make decisions on dispositive motions.... [I]n providing for a 'de novo determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations....
"....
"... [T]he magistrate acts subsidiary to and only in aid of the district court. Thereafter, the entire process takes place under the district court's total control and jurisdiction.
"....
"... [T]hat delegation does not violate Art. III so long as the ultimate decision is made by the district court."

*Raddatz,* 447 U.S. at 676, 681, 683, 100 S.Ct. at 2412, 2415, 2416.

The Browns quote a portion of the district court's Memorandum and Order as evidence that the court made the "ultimate adjudicatory determination" :

"The Court has laboriously poured over the massive stack of briefs and exhibits that the parties have generated concerning this motion. The Court is convinced that on the record before it the sanction of striking the plaintiffs' claims as to the **\*1464** Browns is entirely appropriate in light of the repeated abusive conduct by the plaintiffs towards the Browns."

Rec., vol. I, Doc. # 236, Memorandum and Order at 3 (Feb. 22, 1985). The Browns claim further that a remand to the district court would serve no purpose, as "the judge would only be required to do that which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.2d 1458
847 F.2d 1458, 11 Fed.R.Serv.3d 283
**(Cite as: 847 F.2d 1458)**

Page 6

he has already done." Brief of Appellees at 18.

As we are well aware, however, the difference between a *de novo* review of a record and a review under the clearly erroneous standard is significant. In order to conduct a *de novo* review a court "should make an independent determination of the issues ...; [it] 'is not to give any special weight to the [prior] determination'...." *United States v. First City Nat. Bank,* 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151 (1967). "The district judge is free to follow [a magistrate's recommendation] or wholly to ignore it, or, if he is not satisfied, he may conduct the review in whole or in part anew." *Mathews v. Weber,* 423 U.S. 261, 271, 96 S.Ct. 549, 554, 46 L.Ed.2d 483 (1976). The clearly erroneous standard, on the other hand, requires that the reviewing court affirm unless it "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

[2] In this case, it is clear that the district court accorded considerable deference to the magistrate's order. The court stated that "this Court will refuse to substitute its judgment on the best manner in which to manage the discovery in this case for that of Magistrate Wooley's.... [A]ny reasonable measures thought by him to be necessary and appropriate shall not be overruled by this Court." Rec., vol. I, Doc. # 236, Memorandum and Order at 4 (Feb. 22, 1985). Moreover, the portion of the district court's Memorandum and Order quoted to us by the Browns follows immediately after the court's statement of the *United States Gypsum Co.* clearly erroneous standard. *Id.* at 3. Although we realize that the district court has already reviewed the record thoroughly, we believe that it has done so constrained by the assumption that the magistrate's order must be affirmed absent clear error.

In sum, while the district court is free, on remand, to place whatever reliance on the magistrate's recommendation its merit justifies, the court must review the record in light of its own independent judgment.

### 3. The Propriety of Dismissal as a Sanction

As we have recently had occasion to reiterate, dismissal with prejudice is a drastic sanction, *see Meade v. Grubbs,* 841 F.2d 1512, 1520 & n. 6 (10th Cir.1988); *M.E.N. Co. v. Control Fluidics, Inc.,* 834 F.2d 869, 872 (10th Cir.1987); *Smith v. United*

*States,* 834 F.2d 166, 171 (10th Cir.1987), and one that must be grounded in some fault on the part of or binding upon the party, *M.E.N. Co.,* 834 F.2d 869 (remanding where parties argued they were not personally at fault); *Smith,* 834 F.2d 166 (holding client bound by lawyer's trial strategy).

Consequently, we have upheld dismissals and defaults where the parties themselves neglected their cases or refused to obey court orders, *see, e.g., Sheftelman v. Standard Metals Corp.,* 839 F.2d 1383, 1387 (10th Cir.1987) (opinion on rehearing); *Gates v. United States,* 752 F.2d 516 (10th Cir.1985); *Mertsching v. United States,* 704 F.2d 505 (10th Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370 (10th Cir.), *cert. denied,* 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978), or where counsel engaged in deliberately dilatory tactics or other trial strategy intended to inure to the benefit of the client, *see Smith,* 834 F.2d 166; *Norman v. Young,* 422 F.2d 470 (10th Cir.1970); *see also National Hockey League,* 427 U.S. at 643, 96 S.Ct. at 2781 (dismissal warranted in light of counsel's bad faith and "callous disregard" of duties); *Link v. Wabash R.R.,* 370 U.S. 626, 630-33, 82 S.Ct. 1386, 1388-90, 8 L.Ed.2d 734 (1962) (dismissal appropriate where there is reasonable inference of deliberately dilatory conduct). We have reversed dismissals and defaults, *1465 or remanded for more specific findings on the parties' responsibility, where inadvertence or simple neglect were the basis of the court's decision. In such cases, the deterrent effect of a default or dismissal is likely to be substantially achieved through lesser sanctions. We have therefore been reluctant to affirm on the basis of isolated instances of noncompliance or where the district court's findings did not make specific reference to fault by the parties or intentional conduct by their attorneys, and did not explain why lesser sanctions would be ineffective. *See, e.g., M.E.N. Co.,* 834 F.2d 869; *Woodmore v. Git-N-Go,* 790 F.2d 1497 (10th Cir.1986); *Hollis v. United States,* 744 F.2d 1430 (10th Cir.1984); *cf. Taylor v. Illinois,* 484 U.S. ——, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (approving refusal to permit witness to testify in criminal case as sanction for willful delay designed to gain tactical advantage); *Braley v. Campbell,* 832 F.2d 1504 (10th Cir.1987) (en banc) (court may impose sanctions on attorney for frivolous, multiplicious, or vexation litigation); *In re Sanction of Baker,* 744 F.2d 1438 (10th Cir.1984) (en banc) (affirming imposition of fine on attorneys for pattern of negligence), *cert. denied,* 471 U.S. 1014, 105 S.Ct. 2016, 85 L.Ed.2d 299 (1985).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.2d 1458
847 F.2d 1458, 11 Fed.R.Serv.3d 283
(Cite as: 847 F.2d 1458)

Page 7

[3] We recognize, however, that it is not always easy to determine whether a course of conduct is the result of mere inattention by counsel or is a matter of strategy on their part.  Under the rule laid down in *In re Sanction of Baker,* 744 F.2d 1438, which requires that the impact of the sanction be lodged where the fault lies, *id.* at 1442, a number of factors should be considered by the district courts in making their findings on the issue of fault.  Those factors include "(1) the degree of actual prejudice to the defendant ...;  (2) the amount of interference with the judicial process ...;  and (3) the culpability of the litigant." *Meade,* 841 F.2d at 1520 n. 7;  *see also Hollis,* 744 F.2d at 1433;  *Joplin v. Southwestern Bell Tel. Co.,* 671 F.2d 1274, 1276 (10th Cir.1982) (per curiam);  *cf. Brinkman v. Dallas County Deputy Sheriff Abner,* 813 F.2d 744, 749 (5th Cir.1987) (listing factors to be considered before ordering default or dismissal);  *Shea v. Donohoe Constr. Co.,* 795 F.2d 1071, 1074-79 (D.C.Cir.1986) (same);  *Poulis v. State Farm Fire & Cas. Co.,* 747 F.2d 863, 868-70 (3d Cir.1984) (same).   "Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on the merits ..., is dismissal an appropriate sanction." *Meade,* 841 F.2d at 1520 n. 7.

On remand, the district court should make its independent review in light of these considerations.  If it decides that dismissal is the appropriate sanction, it should disclose its reasoning in support of the selection of this particularly drastic penalty.  We therefore remand on this issue. [FN4]

> FN4. Our resolution of this issue makes it unnecessary for us to address Ocelot's contention that the magistrate's order of dismissal is tainted by an *ex parte* communication between Brown's counsel and the magistrate.

**B. The District Court's Review of the Order Granting Attorney's Fees as a Sanction**

**1. Standard of Review**

[4] Ocelot also challenges the imposition of attorney's fees as a sanction.  The merits of this issue are properly before us because magistrates have the authority to impose such fees as non-dispositive discovery sanctions under 28 U.S.C. § 636, and the standard of clearly erroneous or contrary to law used by the district court to review those fees was therefore appropriate.   *See* 7 J. Moore, *supra,* ¶ 72.04[2.-4] at 72-52 (where Rule 37(b) motion seeks

variety of sanctions, magistrate may grant non-dispositive fee aspect and recommend treatment of dispositive sanction requested).

**2. The Need for a Hearing on Amount of Attorney's Fees**

[5] Ocelot's challenge to the award of fees is limited to an assertion that due process required the magistrate to afford Ocelot a separate hearing on the amount of fees.   Although due process requires fair notice and an opportunity to be heard before **\*1466** attorney's fees are imposed, *see Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980), it may not necessarily require both an oral hearing on whether attorney's fees should be imposed and a separate oral hearing on the amount of such fees.   *See Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 799 F.2d 1510, 1522 (11th Cir.1986) (per curiam) (due process satisfied where parties have opportunity to argue propriety of sanctions and submit affidavits on amount);  *Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 784 (9th Cir.1983) (due process satisfied where party waived opportunity to challenge reasonableness of amount);  *Hayden Stone, Inc. v. Brode,* 508 F.2d 895, 897 (7th Cir.1974) (per curiam) (due process satisfied where decision on propriety of sanctions made on documents submitted and hearing available on amount);  *Hartman v. Caplan,* 115 F.R.D. 599, 602 (N.D.Ill.1987) (same);  *Persson v. Faestel Investments, Inc.,* 88 F.R.D. 668, 669-70 (N.D.Ill.1980) (same);  *cf. McFarland v. Gregory,* 425 F.2d 443, 449-50 (2d Cir.1970) (due process requires hearing on scope and cost of attorney's fees where amount of fees imposed based on "relatively unitemized affidavit";  unclear whether hearing given on propriety of fees).

The precise process through which attorney's fees were imposed on Ocelot is unfortunately unclear.  The parties have not briefed the relevant facts in any detail and transcripts of the sanction hearings were not included in the record on appeal.   We do know that the Browns filed their motion for sanctions on May 17, 1984.  On June 1, they filed a supplement to their memorandum that stated the amount of attorney's fees sought.   A further supplementary letter dated June 13, a copy of which was mailed to Ocelot's counsel, did the same.   The total amount of attorney's fees claimed was $41,581.83.   Argument was heard June 1 and June 14.   Ocelot submitted letters to the magistrate on June 8 and June 20.  Although a brief submitted by Ocelot to the district court states that the magistrate indicated at the June 1

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

847 F.2d 1458
847 F.2d 1458, 11 Fed.R.Serv.3d 283
(Cite as: 847 F.2d 1458)

hearing his inclination to strike Ocelot's pleadings and impose sanctions, Rec., vol. III, Doc. # 220, Plaintiffs' Objections to November 23 Order and Appeal Brief at 13, filed Jan. 10, 1985, at no time did Ocelot contest the amount of the proposed award. [FN5] Under these circumstances, the magistrate found that Ocelot waived the right to a separate hearing on the amount of the award. The magistrate also found that the greater part of the fees claimed did not flow from sanctionable conduct by Ocelot, listed the date, hours, substance, and amount of each item that did flow from such conduct, and awarded the Browns $6,467.55 in attorney's fees in its Memorandum and Order of November 23, 1984.

> FN5. Ocelot first challenged the amount of attorney's fees in its objections submitted to the district court.

[6] Ocelot thus had two opportunities to argue the amount of fees to be awarded as well as the opportunity to file a memorandum in opposition. The magistrate gave careful and critical consideration to the fees and expenses listed, disallowed the greater part of them, and set out those he allowed in detail. These facts are nearly identical to those of *Pesaplastic.* The Eleventh Circuit's reasoning is instructive.

"We read the Court's language [in *Roadway Express* ] to require the district court to hold a hearing before the sanction of attorney's fees may be imposed. This requirement is clearly satisfied, however, by the kind of hearing that was held in this case, namely, a hearing on the motion for sanctions, at which both sides are entitled to present arguments as to the propriety and type of sanctions to be awarded. Contrary to the appellant's suggestion, therefore, a separate hearing to determine the amount and scope of fees to be awarded is not required. Rather, due process is afforded where, as here, the parties have an opportunity to present their arguments as to the propriety of sanctions, [and] submit affidavits on the amount of such fees and costs, with an opportunity for the *1467 sanctioned party to file a motion challenging such affidavits."

*Pesaplastic, 799 F.2d at 1522.* Ocelot has received greater process than the appellant in *Pesaplastic.* The amount of attorney's fees to be awarded was in issue at the time of the arguments on the Browns' motion for sanction, and Ocelot therefore had the opportunity not only to file a motion in opposition, but also to contest the specific amount orally. Its failure to do so is a waiver of its right to be heard on

the issue of the amount of attorney's fees.

### III.

The judgment dismissing the action against the Browns with prejudice is reversed, and the action is remanded to the district court for further proceedings. The award of attorney's fees to the Browns is affirmed.

AFFIRMED IN PART, REVERSED IN PART, REMANDED FOR FURTHER PROCEEDINGS.

847 F.2d 1458, 11 Fed.R.Serv.3d 283

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 19

Westlaw.

197 F.R.D. 439                                                                                      Page 1
197 F.R.D. 439
(Cite as: 197 F.R.D. 439)

C

Motions, Pleadings and Filings


United States District Court,
D. Colorado.
Sundanz WASHINGTON and Harriet McAdams,
Plaintiffs,
v.
ARAPAHOE COUNTY DEPARTMENT OF
SOCIAL SERVICES, et al., Defendants.
No. Civ.A. 00-B-196.

Oct. 30, 2000.

On defendants' motion to strike plaintiffs' expert
witnesses, the District Court, Boland, United States
Magistrate Judge, held that: (1) failure of plaintiffs to
timely provide written report of their accounting
expert did not warrant striking the expert, and (2) no
expert reports were required from treating health care
professionals whose testimony would be limited to
areas of "diagnosis and prognosis."

Motion denied.

West Headnotes

[1] Federal Civil Procedure ☞1278
170Ak1278 Most Cited Cases

[1] Federal Civil Procedure ☞1938.1
170Ak1938.1 Most Cited Cases
Standard for striking an expert based upon a late
designation in violation of a scheduling order
considers: (1) the prejudice or surprise in fact of the
party against whom the expert will testify; (2) the
ability of that party to cure the prejudice, (3) the
extent to which waiver of the rule against calling
unlisted witnesses would disrupt the orderly and
efficient trial of the case or of other cases in court,
and (4) bad faith or willfulness in failing to comply
with the court's order. Fed.Rules Civ.Proc.Rule
16(b), 28 U.S.C.A.

[2] Federal Civil Procedure ☞1278
170Ak1278 Most Cited Cases

[2] Federal Civil Procedure ☞1938.1
170Ak1938.1 Most Cited Cases

Failure of plaintiffs to timely provide written report
of their accounting expert in compliance with
scheduling order did not warrant striking the expert,
where there was no undue prejudice to the
defendants, inasmuch as there was adequate time to
allow extensions so that the expert disclosures and
discovery could be completed well in advance of
trial; moreover, the plaintiffs' conduct was not
sufficiently willful as to justify exclusion of their
expert. Fed.Rules Civ.Proc.Rules 16(b), 26(a)(2)(B),
28 U.S.C.A.

[3] Federal Civil Procedure ☞1274
170Ak1274 Most Cited Cases
Expert report which complies with discovery rule is
only required in the case of treating physician if the
treating physician offers expert testimony concerning
matters which are not based on his or her
observations during the course of treating the party
designating them. Fed.Rules Civ.Proc.Rule
26(a)(2)(B), 28 U.S.C.A.

[4] Federal Civil Procedure ☞1274
170Ak1274 Most Cited Cases
Where plaintiffs' expert disclosure stated that the
testimony of treating health care professionals would
be limited to the areas of "diagnosis and prognosis,"
no expert reports were required. Fed.Rules
Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.
*439 John L. Wheeler, Antonio, Bates, & Bernard,
P.C., Denver, CO, for plaintiffs.

Robin Elizabeth Cochran, Arapahoe County
Attorney's Office, Littleton, CO, for defendants.

ORDER

BOLAND, United States Magistrate Judge.

This matter is before me on defendants' Motion to
Strike Plaintiffs' Expert Witnesses (*440 the
"Motion to Strike"), filed October 10, 2000. The
plaintiffs have filed a response in opposition. The
Motion to Strike is DENIED.

The Scheduling Order that was entered in this case
on June 13, 2000, contains the following disclosure
requirement with respect to plaintiffs' experts:
   Plaintiffs shall designate all experts (including all
   treating health care providers who will testify as
   experts on causation and/or prognosis) and provide

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 F.R.D. 439
197 F.R.D. 439
(Cite as: 197 F.R.D. 439)

Page 2

opposing counsel with all information specified in Fed.R.Civ.P. 26(a)(2) on or before September 30, 2000.

Consistent with the Scheduling Order, the plaintiffs made a timely disclosure of accounting and health care experts. The accounting expert disclosure includes a resume and a list of cases in which the expert has offered testimony, but it does not include the "written report prepared and signed by the witness" required by Fed.R.Civ.P. 26(a)(2)(B). Instead, the disclosure states:

Mr. Campbell is an expert in accounting and has been retained to render opinions concerning: (1) the amount of back and future wages due to the plaintiffs, including benefits and PERA; and (2) the amount of any offset to said wages base on plaintiff's employment since her termination.

Discovery has only recently commenced, and when plaintiffs receives (sic) appropriate information from defendants confirming wage and benefit amounts, this expert will produce either a written report or a summary of his opinions, and plaintiffs will further disclose those opinions.

The plaintiffs' disclosed four health care providers-- Michael Parra, M.D.; Gary L. Post, M.D.; Kaiser Permanente; and Littleton Health and Wellness Clinic. The disclosure states that these witnesses will provide "factual testimony as to the course of health care treatment" and "testify as to their opinions ... regarding plaintiffs' diagnosis and prognosis." None of the information specified in Fed.R.Civ.P. 26(a)(2) is provided, however, based on the following explanation:

The opinions expressed by these expert witnesses and the documents upon which each expert relies are fully set forth in their medical records which will be produced by plaintiffs.

Plaintiffs' health care providers have been compensated in the course of providing health care benefits to plaintiffs by plaintiffs' health care insurer and/or examinations, but have not been otherwise compensated by plaintiffs.

Documentation of qualifications, publications and previous testimony by these health care experts, if necessary, is available upon request.

The defendants have moved to strike all of the designated experts, arguing that the plaintiffs' disclosure does not meet the requirements of Fed.R.Civ.P. 26(a)(2) because, among other things, there is no written report containing a complete statement of the expert's opinions.

**The Accounting Expert**

The plaintiffs have failed to comply with that portion of the Scheduling Order which requires not only the designation of their experts by name on or before September 30, 2000, but also that they "provide opposing counsel with all information specified in Fed.R.Civ.P. 26(a)(2)" by that date. Scheduling Order, p. 7. Rule 26(a)(2)(B) requires, among other things, that an expert disclosure include:

[A] written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications or the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and the testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed.R.Civ.P. 26(a)(2)(B).

Rule 16(b), Fed.R.Civ.P., provides that a deadline established in a scheduling order, *441 such as the deadline to designate experts and make Rule 26(a)(2) disclosures at issue here, may be extended only "upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." In this case, the plaintiff sought no such extension, and none was granted. Numerous courts have noted, and I emphasize today, that a "Scheduling Order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Widhelm v. Wal-Mart Stores, Inc.*, 162 F.R.D. 591, 593 (D.Neb.1995) (quoting *Gestetner Corp. v. Case Equipment Co.*, 108 F.R.D. 138, 141 (D.Me.1985)). To the contrary, a scheduling order is an important tool necessary for the orderly preparation of a case for trial. *Widhelm*, 162 F.R.D. at 593. The consequence of the plaintiffs' failure to supply the Rule 26(a)(2) information as scheduled already has been realized--defendants have filed a Motion for Extension of Time to Designate Expert Witnesses, seeking an extension of 30 days from the date plaintiffs provide a written report within which to complete their disclosure.

The plaintiffs' remedy in the event they could not supply the information required by Rule 26(a)(2) was not unilaterally to state that they would supply the information when it became available, but to seek an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 F.R.D. 439
197 F.R.D. 439
(Cite as: 197 F.R.D. 439)

Page 3

extension of the expert disclosure deadline upon a showing of good cause. Then the entire schedule can be modified as necessary to assure that the case is prepared in an orderly way.

[1] The plaintiffs' failure to comply with the scheduling order notwithstanding, the standard for striking an expert based upon a late designation is set out in *Summers v. Missouri Pacific Railroad System, 132 F.3d 599, 604 (10th Cir.1997)*:

> The decision to exclude evidence is a drastic sanction. Because district courts are given wide latitude in this area, we reverse only for abuse of discretion.
> Even according appropriate deference, we find reversible error in this case [where an extension of time for the late designation of an expert witness was denied]. Our determination turns on four factors:
> "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order."

[2] In this case, there is no undue prejudice to the defendants as a result of the late designation of the plaintiffs' accounting expert, and any prejudice which may exist is easily cured. The case is set for trial commencing November 26, 2001. Consequently, there is adequate time to allow extensions so that the expert disclosures and discovery can be completed well in advance of trial. Nor will those extensions disrupt the trial of this case or the court's trial docket. Finally, I do not find the plaintiffs' conduct sufficiently willful as to justify exclusion of their expert. Consequently, I do not believe that the facts presented justify an order striking plaintiffs' accounting expert.

**Health Care Experts**

[3] Rule 26(a)(2)(A), Fed.R.Civ.P., requires a party to disclose the identity of all expert witnesses. Plaintiffs did this. [FN1] The defendants move to strike the testimony of the health care experts because no further information, beyond identity, was disclosed.

> FN1. Rule 26(a)(2)(A), Fed.R.Civ.P., requires a party to disclose "the identity of any person who may be used at trial to

present [expert] evidence...." Although the defendants have not raised the issue, the designation of Kaiser Permanente and Littleton Health and Wellness Clinic does not satisfy the requirement of the rule. The plaintiffs must identify the particular person at those entities who will offer expert testimony.

Written reports are only required of those experts "who [are] retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." Fed.R.Civ.P. 26(a)(2). Defendants' motion to strike the health care experts fails to address the fact that they are the plaintiffs' *442 treating physicians, and also fails to address the rule established in *Baker v. Taco Bell Corp., 163 F.R.D. 348, 349 (D.Colo.1995)*:

> The issue as to whether a treating physician is an expert pursuant to Rule 26(b)(4)(C) continues to be a problem. Treating physicians are not retained for purposes of trial. Their testimony is based upon their personal knowledge of the treatment of the patient and not information acquired from outside sources for the purpose of giving an opinion in anticipation of trial. They are witnesses testifying to the fact of their examination, diagnosis and treatment of a patient. It does not mean that the treating physicians do not have an opinion as to the cause of an injury based upon their examination of the patient or to the degree of injury in the future. These opinions are a necessary part of the treatment of the patient. Such opinions do not make the treating physicians experts as defined by Rule 26(b)(4)(C).

*See* Christopher W. Dyer, Note, "Treating Physicians: Fact Witnesses or Retained Expert Witnesses In Disguise? Finding a Place for Treating Physician Opinions in the Iowa Discovery Rules," 48 *Drake L.Rev.,* 719, 727-31 (2000) ( "The majority of federal courts considering the issue of whether treating physicians are subject to reporting requirements when presented to provide opinion testimony on prognosis, causation, or standard of care, have concluded treating physicians are not subject to these requirements, so long as the opinions stem from treatment").

The rationale for not requiring written reports from treating physicians is clearly stated in *Sprague v. Liberty Mutual Ins. Co., 177 F.R.D. 78, 81 (D.N.H.1998)*:

> A principle purpose of Rule 26(a)(2) is to permit a "reasonable opportunity to prepare for effective

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 F.R.D. 439
197 F.R.D. 439
**(Cite as: 197 F.R.D. 439)**

cross examination and ... arrange for expert testimony from other witnesses." The unretained experts, who formed opinions from pre-litigation observation, invariably have files from which any competent trial attorney can effectively cross-examine. The retained expert, who under the former interrogatory rule frequently provided sketchy and vague answers, has no such files and is thus required to provide the report to enable effective cross-examination. This reading puts unretained experts, because of their historical file, and retained experts, because of the required report, on equal footing for cross-examination purposes.
(Citations omitted.)

If a treating physician offers expert testimony concerning matters which are not based on his or her observations during the course of treating the party designating them, however, an expert report which complies with the requirements of Rule 26(a)(2)(B) is required. *Bucher v. Gainey Transportation Service of Indiana, Inc.,* 167 F.R.D. 387, 390 (M.D.Pa.1996). Thus, "Rule 26 focuses not on the status of the witness, but rather on the substance of the testimony." *Id.*

[4] In this case, the plaintiffs' expert disclosure states that the testimony of the treating health care professionals will be limited to the areas of "diagnosis and prognosis." Plaintiffs' Disclosure of Expert Testimony, p. 1. This is within the realm of opinions formed by these experts through their observations of the plaintiffs during the course of treatment, and no Rule 26(a)(2)(B) reports are required.

For these reasons, I DENY the Motion to Strike.

197 F.R.D. 439

**Motions, Pleadings and Filings (Back to top)**

• 1:00CV00196 (Docket) (Jan. 31, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.