Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE LLP
10 West Broadway, Suite 400
Salt Lake City, Utah  84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone:  (954) 356-0011
Facsimile:  (954) 356-0022

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:   (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **SCO'S OBJECTIONS TO ORDER GRANTING IN PART IBM'S MOTION TO LIMIT SCO'S CLAIMS**<br><br>**FILED IN REDACTED FORM [ORIGINAL FILED UNDER SEAL]**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ............................................................................. 1

II.  BACKGROUND ............................................................................ 3

    A.  The Nature of SCO's Contract and Copyright Claims ............................... 3

    B.  This Court's July 2005 Order Regarding "Specificity" ............................. 5

    C.  SCO's Compliance with the July 2005 Order ............................................ 6

    D.  IBM's Motion to Limit SCO's Claims ....................................................... 7

III.  THE MAGISTRATE JUDGE'S ORDER SHOULD BE REVIEWED
DE NOVO FOR COMPLIANCE WITH THE STRICT STANDARDS
REGARDING STRIKING OF CLAIMS AS A DISCOVERY SANCTION. ..... 13

IV.  SCO COMPLIED WITH THIS COURT'S DIRECTION TO IDENTIFY
"MISUSED MATERIAL" WITH "SPECIFICITY." ........................................... 15

    A.  The Magistrate Judge Clearly Erred in Concluding That the July 2005 Order
Required "Version, File & Line" Information for Methods and Concepts. 15

    B.  The Magistrate Judge Clearly Erred to the Extent the Order Is
Predicated on SCO's Responses to Past Discovery Orders or IBM
Interrogatories. .......................................................................................... 18

    C.  The Magistrate Judge Clearly Erred in Concluding That SCO's Past
Interrogatories and the Deposition Testimony of SCO's Chief
Technology Officer Support the Order's Interpretation of the Past
Orders. ....................................................................................................... 23

        1.  SCO's Past Discovery Requests .................................................... 24

        2.  Deposition Testimony of Sandeep Gupta ...................................... 28

        3.  Analogy to Deposit Requirement for Copyright Registration ...... 29

V.  THE MAGISTRATE JUDGE CLEARLY ERRED IN FINDING THAT
SCO WILLFULLY FAILED TO COMPLY WITH COURT ORDERS
REQUIRING SPECIFICITY. ................................................................... 30

A.     The Magistrate Judge Clearly Erred Because to Support a Discovery Sanction, an Order Must Clearly and Unambiguously State the Performance Required of a Party ............................................................................. 30

B.     There Is No Record Evidence That SCO Willfully Violated a Court Order Or Declined to Respond to Interrogatories ..................................... 32

VI.    THE MAGISTRATE JUDGE CLEARLY ERRED IN FAILING TO CONSIDER WHETHER SPECIFIC DISCLOSURES WERE ADEQUATE. .... 39

A.     The Failure to Provide Particularized Findings ......................................... 40

B.     The Failure to Consider the Adequacy of Disclosures on an Item-by-Item Basis ................................................................................................. 41

VII.   THE MAGISTRATE JUDGE CLEARLY ERRED IN FAILING TO REQUIRE IBM TO ESTABLISH PREJUDICE AND TO CONSIDER ALTERNATIVES TO THE SANCTION IMPOSED. ......................................... 45

A.     The Magistrate Judge Did Not Properly Consider the Issue of Supposed Prejudice Arising from SCO's Failure to Provide Source Code Identifiers for Each Item of Misused Material ................................. 46

B.     The Court Failed to Consider IBM's Own Responsibility for the Lack of Complete Source Code Identification. .................................................... 50

C.     The Magistrate Judge Clearly Erred in Failing to Consider Whether SCO Had Been Warned That Its Claims Were In Jeopardy. ................... 51

D.     The Magistrate Clearly Erred in Failing to Consider Alternatives to Limiting SCO's Claims. ............................................................................. 52

VIII.  CONCLUSION ................................................................................................. 53

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                    **<u>Page</u>**

<u>American Stock Exch. v. Mopex,</u>
   215 F.R.D. 87 (S.D.N.Y. 2002)............................................................ 13, 49

<u>Avicon Co. v. Gen Dynamics Corp.,</u>
   957 F.2d 555 (8th Cir. 1992).................................................................. 51

<u>Cardenas v. Dorel Juvenile Group, Inc.,</u>
   230 F.R.D. 611 (D. Kan. 2005).............................................................. 32

<u>Dorsey v. Academy Moving & Storage, Inc.,</u>
   423 F.2d 858 (5th Cir. 1970).................................................................. 52

<u>Ehrenhaus v. Reynolds,</u>
   965 F.2d 916 (10th Cir. 1992)................................................................ 15

<u>FTC v. Enforma Natural Prods., Inc.,</u>
   362 F.3d 1204 (9th Cir. 2004)............................................................ 14, 30

<u>In re Flag Telecom Holdings, Ltd. Secs. Litig.,</u>
   2006 WL 1072008 (S.D.N.Y. 2006) ...................................................... 32

<u>In re Westinghouse Electric Corporation Uranium Contracts Litigation,</u>
   563 F.2d 992 (10th Cir. 1977)................................................................ 38

<u>Gripe v. City of Enid,</u>
   312 F.3d 1184 (10th Cir. 2002).............................................................. 15

<u>Guinyard v. City of New York,</u>
   800 F. Supp. 1083 (E.D.N.Y. 1992)....................................................... 49

<u>Kropp v. Ziebarth,</u>
   557 F.2d 142 (8th Cir. 1977).................................................................. 32

<u>M.E.N. Co. v. Control Fluidics, Inc.,</u>
   834 F.2d 869 (10th Cir. 1987)................................................................ 14

<u>Miller v. Sprint Communications,</u>
   1997 WL 910426 (W.D. N.C. 1997)....................................................... 38

<u>Mobley v. McCormick,</u>
   40 F.3d 337 (10th Cir. 1994).................................................................. 15

Ocelot Oil Corp. v. Sparrow Indus.,
    847 F.2d 1458 (10th Cir. 1988) ................................................................. 13

Ortiz-Anglada v. Ortiz-Perez,
    183 F.3d 65 (1st Cir. 1999) ....................................................................... 51

Peterson v. Hantman,
    227 F.R.D. 13 (D.D.C. 2005) ..................................................................... 31

Procter & Gamble Co. v. Haugen,
    427 F.3d 727 (10th Cir. 2005) ............................................................. passim

R.W. Int'l Corp. v. Welch Foods, Inc.,
    937 F.2d 11 (1st Cir. 1991) ....................................................................... 31

Robson v. Hallenbeck,
    81 F.3d 1 (1t Cir. 1996) ................................................................. 14, 30, 40

S&S Communications v. Local Exh. Carriers Ass'n,
    2005 WL 2897045 (D.S.D. 2005) .............................................................. 49

Schanzer v. United Techs. Corp.,
    120 F. Supp. 2d 200 (D. Conn. 2000) ........................................................ 48

Searock v. Stripling,
    736 F.2d 650 (11th Cir. 1984) ................................................................... 46

Sithon Maritime, Co. v. Holiday Mansion,
    1998 WL 638372 (D. Kan. 1998) .............................................................. 33

Societe Internationale Pour Participations Industrielles Et Commerciales,
S.A. v. Rogers,
    357 U.S. 197 (1958) ..................................................................... 38, 39, 52

Sonnino v. Univ. of Kan. Hosp. Auth.,
    220 F.R.D. 633 (D. Kan. 2004) ................................................................. 32

Steil v. Humana Kansas City, Inc.,
    197 F.R.D. 445 (D. Kan. 2000) ................................................................. 33

T.N. Taube Corporation v. Marine Midland Mortgage Corp.,
    136 F.R.D. 449 (W.D.N.C. 1991) ............................................................. 31

Tracinda Corp. v. DaimlerChrysler AG,
    362 F. Supp. 2d 487 (D. Del. 2005) .......................................................... 49

<u>Unicure, Inc. v. Thurman,</u>
   97 F.R.D. 7 (W.D.N.Y. 1982) ......................................................................... 23

<u>Vandervest v. Wisconsin Cent., Ltd.,</u>
   172 F.R.D. 401 (E.D. Wis. 1997) ................................................................... 49

<u>Williams v. Sprint/United Mgmt. Co.,</u>
   230 F.R.D. 640 (D. Kan. 2005) ................................................................ 23, 30

<u>Zappala v. Albicelli,</u>
   954 F. Supp. 538 (N.D.N.Y. 1997) ............................................................... 33

**<u>Federal Rules</u>**

28 U.S.C. § 636(b)(1) .......................................................................................... 14

Fed.R.Civ.P. 37 .................................................................................................... 33

Federal Practice And Procedure § 3068.2 (2d ed. 2006) .................................... 13

Federal Rule of Civil Procedure 72(a) ................................................................. 14

Federal Rule of Civil Procedure 72(b) ................................................................. 13

## I.    INTRODUCTION

SCO seeks reversal of the Magistrate Judge's Order Granting in part IBM's Motion to Limit SCO's Claims (the "Order") which precludes SCO from pursuing its claims regarding over 180 technology disclosures made by IBM to the development of the Linux operating system.  This is an extraordinary Order that is improperly predicated on what the Magistrate Judge "believes" this Court has required and on incorrect inferences that SCO is withholding information.  The Magistrate Judge also failed to consider the specificity of the challenged items on an individualized basis, failed to hold an evidentiary hearing, and failed to make any specific findings on the challenged items.

The Magistrate Judge's extreme action is fundamentally improper for several reasons and should be reversed.

First, SCO fully complied with this Court's direction to identify "misused material" with "specificity," and to update its interrogatory answers.  One type of restricted material that SCO contends IBM misused by disclosing to the Linux development process is methods and concepts that IBM was obligated to hold in confidence under the terms of the software licensing agreements.  Most of the items challenged by IBM in its present motion are such methods and concepts.  However, contrary to IBM's accusations, in its December 22, 2005 Disclosure of Material Misused by IBM ("December Submission"), SCO identified the misused methods and concepts with specificity.  SCO specifically identified IBM's improper disclosures of "methods and concepts" by, in almost all cases, specifically referencing the entire disclosure made by IBM, and in most instances identifying the IBM developer making the disclosure, and the date and mode of disclosure.  Where a source code "patch" was provided as part of

IBM's disclosure in order to show the Linux community how to implement the method or concept in Linux, that code was specifically referenced in the disclosure report. This Court did not direct SCO and SCO did not believe it had been directed, to divine what source code IBM developers had in their minds when disclosing a method and concept without at the same time disclosing source code. Certainly, the Court did not make such a direction with anything approaching the clarity required to support a sanction order of this severity.

Second, there is no basis in the record for the Magistrate Judge's conclusion that SCO willfully – that is, intentionally – refused to provide the source code information IBM contends it was obligated to provide. To the contrary, the record evidence shows that SCO provided all the identifying information it had regarding the "misused materials" at issue, and there is no evidence SCO is holding anything back. SCO simply cannot be sanctioned when it is providing all of the information that it has. A willful violation occurs when a party decides not to produce documents or other information within its possession. SCO's December Submission, as well as the declaration of Marc Rochkind, the technology expert who largely prepared the submission, make clear that SCO is not hiding the ball or seeking to sandbag IBM with any new disclosures.

Third, the Magistrate Judge erred by entering the order without conducting an evidentiary hearing, considering on an item-by-item basis the specificity of the disclosures made and the claimed prejudice to IBM, and making specific findings regarding those items that would allow for appropriate review. SCO provides numerous examples below of technology disclosures that could not reasonably be found to be lacking in specificity when considered individually – including the very disclosure on

which IBM's expert focused in his opening declaration. Indeed, contrary to clear Tenth Circuit authority, the Magistrate Judge did not consider and make findings with respect to the relevant factors governing such a severe sanction.

SCO sets forth in detail below the relevant background to the Order and then a detailed analysis of each of the foregoing points. SCO makes its objections under Fed. R. Civ. P. 72(b) and seeks a de novo review of the Magistrate Judge's ruling because, as IBM's motion requested, the Magistrate Judge dismissed many claims, which clearly has the effect of a dispositive ruling in this litigation.

## II.    BACKGROUND

### A.    The Nature of SCO's Contract and Copyright Claims

SCO brings claims for both breach of contract and copyright infringement. SCO's contract claims are based upon the license agreements signed by AT&T, SCO's predecessor in interest, with both IBM and Sequent (which IBM later acquired). These agreements allowed for UNIX source code, methods, and concepts to be used by IBM and Sequent in the development of their own UNIX operating systems but made the source code and methods and concepts in such "derivative" or "modified" systems subject to nondisclosure requirements. SCO's principal contention in this case is that IBM violated these contractual restrictions by taking both source code and methods and concepts from such derivative systems, specifically the AIX operating system developed at IBM and the Dynix/ptx ("Dynix") operating system developed at Sequent, and disclosing or contributing these valuable technologies to the Linux community for the purpose of transforming Linux from a hobbyist tool into a powerful, reliable operating

system for business use that could compete with proprietary UNIX and non-UNIX operating systems.[1]

Unlike the contract claims, SCO's copyright claims in the case (as well as IBM's counterclaim seeking a clean bill of health for Linux) do not involve methods and concepts. The copyright claims concern literal and non-literal copying – from duplication of structural elements by essentially building a UNIX clone in Linux down to specific system calls and other items copied directly in code as is explained in detail in SCO's expert reports. This distinction is important because methods and concepts are treated by the Order as though they were the subject of SCO's copyright claims, and thus must be presented in source code. They are not.[2]

Only the contract claims involve both source code contributions and disclosures of methods and concepts. The contributions of source code are just that – patches of code that can be as large as a whole system (such as the Journaling File System) or a few critical lines in a patch. IBM's motion principally contested the specificity of the

---

[1] Although the Magistrate Judge suggested that SCO changed its claims from code to methods and concepts, SCO's claims have been based in part on IBM's misuse of methods and concepts from the inception of this case. In SCO's original complaint, SCO alleged that the redesign of Linux would not have been possible at the enterprise level without "access to UNIX code, methods and concepts." (Complaint at ¶ 84) (emphasis added). SCO further alleged that IBM's contributions to Linux included "unauthorized misuse of UNIX methods, concepts, and know-how." (Id. at ¶ 96) (emphasis added). SCO also made allegations regarding IBM's misuse of methods in its now operative complaint, the Second Amended Complaint.

[2] For some reason the Magistrate Judge skipped over SCO's allegation that IBM has violated SCO's contracts in setting up the background for her ruling and focused on the copyright allegations even though the two are different. Order at p. 3. It appears from the ruling that the Magistrate Judge applied a copyright analysis to all of SCO's 293 disclosures which appears to be inconsistent with a prior order. In the Magistrate Judge's January 18, 2005 Order (at 7-8), she recognized: "From the foregoing, it is clear that the contracts and their interpretations are central to the disputes in this case. In fact, the contract claims may have a more important role in the outcome of this case than the copyright claims. Other courts have determined that "contractual alternatives to copyright may give an owner of computer software more protection than copyright would."

identification of method and concept items, not source code contributions.  The

disclosure of methods and concepts to the Linux community by IBM occurred through

emails, articles, discussions at conferences, and elsewhere.  At times, these disclosures

were accompanied by a patch file indicating how the method or concept could be

implemented in Linux.  In most of the method and concept disclosures, however, source

code was not part of the disclosure; the IBM emails, while admitting that the source of

the contribution was Dynix or AIX, often did not indicate the source code in the Dynix or

AIX operating system that may relate to the method or concept being disclosed.  SCO has

in effect been sanctioned for failing to divine the source code coordinates that IBM

developers had in mind when disclosing a method or concept – from a derivative

operating system that IBM had written or modified.

     **B.**     <u>**This Court's July 2005 Order Regarding "Specificity"**</u>

As recited in the Order, there have been a number of interrogatories promulgated

by both sides seeking information regarding the technologies in dispute, and orders

entered on those discovery requests.  (These are discussed in detail below.)  There has

not, however, been any order or interrogatory directing SCO to provide more specificity

for methods and concepts than IBM used in making the disclosure itself.  Nor has there

been any order, until now, finding that SCO has failed to comply with its discovery

obligations or has acted in anything but good faith in discovery.

SCO's initial complaint was filed in March 2003.  IBM provided minimal

discovery at the outset, declining to produce numerous versions of AIX and DYNIX or

their revision history.  The CMVC and RCS systems, which store historical versions and

other information regarding AIX and Dynix source code, were ordered to be produced by

IBM in February 2005, and began to be received by SCO in May 2005.  The February 2005 Order also required framing a new pre-trial schedule.

This Court's Order of July 1, 2005 set forth new deadlines for completion of discovery, for exchange of expert reports, for filing of dispositive motions, for completion of pre-trial stipulations and witness and exhibit lists, and, ultimately, for a five-week jury trial set to begin on February 26, 2007.  At IBM's request, the Court also included deadlines for the parties to "identify" all allegedly "misused material" with "specificity," and to update interrogatory answers.  The interim deadline for this identification was October 28, 2005, and the final deadline was December 22, 2005.  This Court declined to adopt IBM's proposed language for that deadline, which stated that line, version, and file of source code must be provided.  The fact that this Court declined to adopt IBM's proposed language for that Order should be enough to overturn the June 28 Order.

### C.      SCO's Compliance with the July 2005 Order

SCO timely and fully complied with both the interim October and final December deadlines.  In October, SCO identified 204 items of "misused material," and provided source code references for source code disclosures and specific references to the method and concept disclosures at issue.  On December 5, 2005, little more than two weeks before the final submissions were due, IBM wrote SCO a letter claiming that the October disclosures were not specific enough and threatening to move to preclude SCO from pursuing any claims regarding allegedly misused material that IBM believed was not properly disclosed.  As SCO's plan and effort was to provide as much specificity in its December Submission as possible, and as SCO informed IBM at the time, that

Submission, which SCO believed fully conformed to the Order and went well beyond what was required in many areas, was viewed as the response to IBM's letter.

The December Submission consisted of a 466-page principal document organized around 294 items of misused material. The Submission provided identification of the person(s) making the disclosure; a description identifying the nature of the improperly disclosed code, method or concept; a summary of the improper disclosure or use; a reference to specific supporting files or documents listed as "sources"; and a list of Linux files believed to contain or to be related to the improperly disclosed materials. For most methods and concepts, all or critical parts of the communication comprising the disclosure were reproduced in the "summary" section of the disclosure. Where IBM provided a patch file of code along with the disclosed method (which showed the Linux community how the method or concept might be implemented in Linux), such code was included or the link to the file which IBM identified as containing the code was noted. Along with this principal document, SCO provided many thousands of pages of referenced sources which constituted code files, articles, or copies of the full communications through which the improper disclosure was made. SCO also provided IBM and the Court with a CD containing the December Submission, with all backup material hyperlinked to each disclosure item so that all source information identified in each disclosure could readily be viewed by clicking on the name of the hyperlinked source file.

     **D.**     **IBM's Motion to Limit SCO's Claims**

On February 13, 2006, IBM filed its Motion to Limit SCO's Claims Relating to Allegedly Misused Material. The accompanying ten-page memorandum accused SCO generally of failing to comply with the July 2005 Order by failing to provide version, file

and line coordinates for all of the items.  Only two items were specifically discussed.
One was a catch-all category of information (Item No. 294) which, upon further
consideration, SCO withdrew.  The other was certain AIX and Dynix patented
technology (Item No. 271) that IBM had decided to open-source; this item was defended
by SCO in its opposition memorandum (at 6-17) and not further addressed by IBM, or by
the Magistrate Judge, but is among the items struck.

SCO responded to IBM's motion in a memorandum filed March 7, 2006, arguing
that SCO had provided disclosures with the specificity required by the Court's July 2005
Order, and discussing how the disclosures provided were sufficiently detailed for various
code and method and concept items.  (IBM subsequently withdrew its objection to two of
those contested items – Item No. 2 involving Read-Copy-Update code and Item No. 204,
demonstrating that Dynix was based on UNIX System V – but did not specifically
address almost any of the other challenged items.  The Magistrate Judge struck almost all
of these items without specific discussion.

IBM filed a reply memorandum on April 4, 2006, repeating that the disclosures
were fatally deficient because they did not provide source code coordinates for each
disclosure, or for its destination in Linux, and repeating the assertion that identification of
all the related code would be like looking for a needle in a haystack and prevented
formulation of a defense.  IBM also cited one method and concept (No. 146, Exh. 1,
Decl. of Mark James)[3] to support its position by way of example.  It further tendered an
expert declaration (which it did not do in connection with its original motion) from an
expert in artificial intelligence (not UNIX programming) named Randall Davis ("Davis

---

[3] All exhibits to SCO's Objections to Order Granting in Part IBM's Motion to Limit SCO's
Claims are attached to the Declaration of Mark James and will be henceforth referred to simply
by the "Exh. No."

Declaration"). Professor Davis also dealt with only one disclosure specifically (No. 146); he claimed that it would take an enormous amount of time and manpower to link up code to the referenced items, and repeated the unsupported IBM refrain that SCO has failed to provide "even the most basic information" relating to the 198 items then at issue.

Prior to the hearing, in response to the Davis Declaration, SCO sought leave to file a declaration from Marc Rochkind, an expert in computer science and specifically in UNIX Operating Systems.[4]  The Magistrate Judge received the declaration but gave IBM the opportunity, post-oral argument, to file a responsive declaration from Professor Davis ("Davis Rebuttal Declaration").

In his declaration (Exh. 2), Mr. Rochkind offers his opinion (at paragraph 7) that SCO's Submission "identified the technology in issue with specificity."  For code disclosures, Mr. Rochkind explained (at paragraph 8) that disclosure consisted of "specific identification of the code that was wrongfully disclosed by IBM."  For methods and concepts, Mr. Rochkind explained (at paragraph 9) that the items "are specifically identified in the December submissions not only by summarizing the method or concept, but also, in almost all cases, by identifying the actual written communication that constitutes the disclosure."  Mr. Rochkind (at paragraph 10) "strongly disagreed" with Professor Davis' opinion that version, file and line of source code must be provided to identify a method and concept and to prepare a defense to an allegation of misuse.  Mr. Rochkind stated (at paragraph 10):  "Where IBM disclosed methods and concepts from the Dynix and Dynix/ptx operating systems without providing source code in the disclosures, for example, it is often not possible and certainly not necessary to cite to

---

[4] Mr. Rochkind is the author of "Advanced UNIX Programming," Addison-Wesley, 1985 (First Edition) and 2004 (Second Edition).

specific source code in identifying the disclosure." Mr. Rochkind went on to explain (at paragraph 11) that for many of the challenged items in the December Submission, code is either cited in the item or a reference is given to the internet site at which the code is located.  Mr. Rochkind also prepared a chart (Rochkind Decl., Exh. B Exh. 2) showing how for the overwhelming majority of the challenged items, there were express admissions in the material cited that the method and concept was taken from Dynix or AIX.  The chart also showed that the files in Linux relating to the disclosed item were identified for almost all of the items.

Mr. Rochkind addressed (at paragraph 13) the one example cited by Professor Davis (Item No. 146, Exh. 1) which was the disclosure of a method and concept called "differential profiling" from IBM developer Paul McKenney.  SCO's disclosure on the item referenced a technical paper by Mr. McKenney explaining the method and concept, and provided a URL (internet) reference to scripts from Dynix, as well as Linux destination files.  The URL addresses presumably contained the source code, but as Mr. Rochkind explained, they referred to an IBM server to which neither SCO nor he had access, so no further identification was possible.  (Item No. 146, without discussion in the Order, is one of the items struck for lack of specificity.)

Turning to the more general IBM objection, Mr. Rochkind, who had the largest role in assembling the December Submissions, stated (at paragraph 17):

> For each of the 294 items, I did everything I could to ensure that everything we had was disclosed and that it was organized in the most accessible possible manner.  Counsel to SCO made it very clear that this was what they wanted me to do.  I made sure that every Tab containing a publicly available email included the complete URL.

10

Mr. Rochkind further definitively stated (at paragraph 17) that he "**made sure**" that "**versions, lines and files be cited where available**."  (Mr. Rochkind also noted (at paragraph 17) that there were some candidate items that did not meet his professional standards for completeness, clarity and specificity, which he recommended be excluded, and that in all cases that was done.)  No evidentiary hearing was held on the IBM Motion, and there is no finding in the Order, or any analysis, that any part of Mr. Rochkind's declaration testimony is unfounded or unreliable in any way.

At the argument before the Magistrate Judge, SCO stressed three points:  <u>First</u>, SCO had identified the disputed items with "specificity" by providing virtually the whole disclosure made by IBM developers to the Linux community; if code was part of the disclosure it was specifically identified.  Virtually all of the challenged items included written evidence specifically stating that the method or concept came from a UNIX or derivative system, generally Dynix.  Also, file locations in Linux were provided for virtually all of the disputed items.  <u>Second</u>, IBM had failed to establish any willful failure to comply with a court order.  If source code information was not provided for certain items it is because source code was not part of the disclosure, SCO did not know specifically which lines of AIX, Dynix or UNIX code the disclosure was referring to, and that the disclosure as it was made constitutes a breach of contract.  Since the disclosed items were methods and concepts being disclosed by an IBM developer and came from an operating system that IBM (or Sequent) developers wrote or modified (although subject to contractual limitations on disclosure), it was reasonable to expect IBM to obtain such information – if it were available and relevant – from its own developers who made the disclosure.  <u>Third</u>, SCO argued that if the court were to proceed further on

IBM's motion, an evidentiary hearing was necessary for an item-by-item determination of whether the disclosures were sufficient.  That would also allow for consideration of expert reports which were soon forthcoming.

After the argument, IBM submitted the Davis Rebuttal Declaration, which contained new evidence and, somewhat surprising for an artificial intelligence expert, legal arguments not previously offered by IBM and not raised by the Rochkind Declaration even though IBM assured the Magistrate Judge they would limit the rebuttal declaration to matters raised by the Rochkind Declaration.  Professor Davis posited, for the first time, that the discovery SCO was obligated to provide to IBM was somehow dictated by:  (1) a definition contained in SCO's early discovery requests to IBM and (2) the deposition testimony of a SCO employee.  SCO moved to strike this rebuttal declaration for introducing new points beyond the Rochkind Declaration, or in the alternative, to allow SCO an opportunity to respond.  The Magistrate Judge denied this motion.

On June 28, 2006, the Magistrate Judge entered an Order Granting in part IBM's Motion to Limit Claims.  The Magistrate Judge found that SCO had willfully violated court orders by failing to provide version, file and line information for all technology that IBM misused.  Notwithstanding the 497 pages of detailed disclosures and supporting source exhibits, the Magistrate Judge analogized SCO to a person accusing someone of shoplifting but refusing to say what goods were taken.  The Magistrate Judge speculated that SCO must be seeking to sandbag IBM only to spring additional evidence in the "ninth inning."  What the Order characterized as the "most important" factor in the Magistrate Judge's finding that SCO knew it had to provide source code coordinates for

all items – and could do so – was how SCO had defined "identify" in a discovery request served at the outset of the case.  This argument appeared for the first time in the Davis Rebuttal Declaration to which SCO was not allowed to respond.  The Magistrate Judge did not address SCO's request for an evidentiary hearing and for item-by-item consideration of the specificity of the disclosures provided.  The Order proceeded to strike from SCO's case 187 of the 198 disputed items.

III.    **THE MAGISTRATE JUDGE'S ORDER SHOULD BE REVIEWED <u>DE NOVO</u> FOR COMPLIANCE WITH THE STRICT STANDARDS REGARDING STRIKING OF CLAIMS AS A DISCOVERY SANCTION.**

Under Federal Rule of Civil Procedure 72(b), this Court reviews de novo a magistrate judge's orders with respect to dispositive matters.  Any order (including one imposing a discovery sanction) having the "identical effect" to an order on summary judgment resolves a dispositive matter within the meaning of Rule 72(b).  <u>Ocelot Oil Corp. v. Sparrow Indus.</u>, 847 F.2d 1458, 1462 (10th Cir. 1988); <u>accord</u> 12 Wright, Miller & Marcus, <u>Federal Practice And Procedure</u> § 3068.2 (2d ed. 2006).  By granting – with respect to 187 out of 198 challenged items – an IBM motion that expressly requests the Court to "Limit SCO's Claims," the Magistrate Judge's Order has dispositive effect.  <u>See e.g.</u>, <u>American Stock Exch. v. Mopex</u>, 215 F.R.D. 87, 92 (S.D.N.Y. 2002) (finding where plaintiff had asserted numerous patent claims of the patent at issue under one cause of action, the Magistrate Judge's order precluding evidence on one of the claims within a patent constituted a dispositive ruling, even though the plaintiff could still pursue other

patent claims which were covered by the overall cause of action.)  Accordingly, this Court should perform a de novo review.[5]

The Court's consideration of the Order should begin with whether SCO did not comply with a clear order of the Court regarding discovery.  See, e.g., Robson v. Hallenbeck, 81 F.3d 1, 4 (1st Cir. 1996) (vacating the district court's imposition of sanctions and emphasizing the need for "a clear preexisting requirement"); see also Part V, below.  In seeking sanctions, the moving party has the burden of showing non-compliance with "a specific and definite order of the court."  FTC v. Enforma Natural Prods., Inc., 362 F.3d 1204, 1211 (9th Cir. 2004) (emphasis added) (reversing contempt sanctions).

Only if there is a finding of non-compliance with an unambiguous order should the Court consider whether the noncompliance was willful.  A party's non-compliance with a court order is sufficient grounds for the "harsh sanction" of dismissal of a claim "only when it is the result of willfulness, bad faith, or some fault of petitioner rather than inability to comply."  M.E.N. Co. v. Control Fluidics, Inc., 834 F.2d 869, 872 (10th Cir. 1987) (quotations omitted).  Willful failure is "any intentional failure as distinguished from involuntary noncompliance."  Id. at 872-73.

A court's discretion to impose a discovery sanction is "further limited in that the chosen sanction must be both just and related to the particular claim which was at issue in

---

[5] Judge Well's Order exceeded the authority under the Order of Reference (Docket 35) under 28 U.S.C. § 636(b)(1)(A).  Under the Order of Reference, the Magistrate was authorized to hear and determine only "nondispositive pretrial matters."  The District Judge did not give the Magistrate Judge a reference under 28 U.S.C. § 636(b)(1)(B) to hear dispositive matters.  Thus, the Order should be taken as a Report and Recommendation which the District Court is obligated to review de novo.  In any event, SCO respectfully submits, as explained below, that the Order would also fail under a "clearly erroneous or contrary to law" standard under Fed. R. Civ. P. 72(a), for review of non-dispositive orders.

the order to provide discovery." Procter & Gamble Co. v. Haugen, 427 F.3d 727, 738

(10th Cir. 2005) (quotations omitted) (citing Ehrenhaus v. Reynolds, 965 F.2d 916, 920

(10th Cir. 1992)).  When evaluating a sanction, a court should bear in mind the judicial

system's "strong predisposition to resolve cases on their merits."  Id.  Where, as here, a

sanction involves preclusion of a claim, "a district court should ordinarily evaluate the

following factors on the record:  (1) the degree of actual prejudice to the other party; (2)

the amount of interference with the judicial process; (3) the culpability of the litigant; (4)

whether the court warned the party in advance that dismissal of the action would be a

likely sanction for noncompliance; and (5) the efficacy of lesser sanctions."  Gripe v. City

of Enid, 312 F.3d 1184, 1187 (10th Cir. 2002) (quotations, brackets, and ellipses omitted)

(citing Ehrenhaus, 965 F.2d at 921).  An analysis of these five factors (the "Ehrenhaus

Factors") allows the appellate courts to engage in "meaningful review" of the imposition

of a sanction.  Procter & Gamble, 427 F.3d at 738 (citing Mobley v. McCormick, 40 F.3d

337, 341 (10th Cir. 1994)).  A court's failure to consider the Ehrenhaus Factors on the

record generally "amounts to an abuse of discretion."  Id. at 738-39.

**IV.     SCO COMPLIED WITH THIS COURT'S DIRECTION TO IDENTIFY
         "MISUSED MATERIAL" WITH "SPECIFICITY."**

> **A.     The Magistrate Judge Clearly Erred in Concluding That the July
>          2005 Order Required "Version, File & Line" Information for
>          Methods and Concepts.**

The July 2005 Order required the parties "to identify with specificity all allegedly

misused material," which is what SCO did in its December Submission:  for misused

source code SCO identified the lines of code, and for misused methods and concepts

SCO specifically identified the method and concept that was disclosed.  Where the

method and concept contributed by IBM identified source code, such as a code patch, a

specific reference to that code was provided. Destination files in Linux source code for virtually all the items in the December Submission were provided.

What SCO did not do, and did not believe it had to do, was provide a source code identifier for a method and concept where source code (either written as a patch for Linux or an example from a Dynix or other IBM system) was not provided as part of the IBM disclosure to Linux. When the contribution itself did not consist of source code, how can SCO be required to define it by source code? Where IBM included a reference to a Dynix or AIX file as part of the disclosure, SCO did designate that reference. SCO is essentially being sanctioned here for not having deduced the source code that IBM developers had in mind when they disclosed a method and concept without using source code, but expressly stated that the contribution came from Dynix or another UNIX derivative system. With respect to the destination in Linux of such contributions, SCO identified files in Linux it believed were impacted by the contribution, which was the most specific level of information SCO was able to determine after expert investigation by December 2005.

This level of specificity, especially when coupled with precise and complete descriptions of the method or concept – usually by verbatim quoting of the IBM communication constituting the disclosure – complies with this Court's July 2005 Order. SCO agrees that it would have been insufficient for SCO to have "generally" identified methods and concepts, such as just by saying IBM disclosed methods and concepts regarding Read-Copy-Update or NUMA. SCO did not do this. It provided highly specific descriptions, with citation, for virtually all of the methods and concepts in question. If SCO provided the detail of the disclosure that was sufficient for the Linux

developers to make use of the method or concept as IBM witnesses and documents admit, it certainly should be deemed specific enough for the discovery obligations in this case and for IBM to prepare its defense.

The July 2005 Order required no more.  The Order plainly did not state that the "version, file and line" in source code must be provided so as to identify the item with specificity.  (The Magistrate Judge does not say that was what the Order stated, but rather acknowledges that this meaning is what the Magistrate Judge "believes" the Court intended.)

IBM had proposed language that would have expressly required version, file, and line identification for each technology item; that language was not adopted in the Court's Order.  Specifically, IBM's proposed scheduling order included a footnote that provided:

> For this purpose, allegedly misused material must be identified by version, file, and line of code.  For example, to the extent a party contends the other party has infringed its copyrights, the accusing party must identify and match up the allegedly infringing and allegedly infringed material by version, file, and line of code.  To the extent a party contends that the other party has breached its contractual obligations by contributing code to Linux, the accusing party must identify the material alleged to have been contributed improperly by version, file and line of code and to the extent the allegedly contributed material is not Unix System V code, but is in any sense alleged to have been based on or resulted from Unix System V code, the version, file and line of Unix System V code from which the allegedly contributed material is alleged to derive or result.

(IBM's Proposed Amended Scheduling Order (Mar. 25, 2005), at 2, n.2).  The Court omitted IBM's proposed footnote from its final order.  It is clear error for  SCO to be sanctioned so severely for failing to meet the standard that this Court itself rejected in its Order.

Further, while it was within the Court's authority to implement this additional discovery deadline and process, it should nevertheless be recognized that interim and final submissions to identify "allegedly misused material" are not part of a standard discovery process under the Federal Rules of Civil Procedure.  There is no "standard" way to prepare an interim and final identification of misused material – there is no established level of specificity, no federal rule of procedure to guide the process nor case precedent to rely upon.  Where a unique discovery process such as this is employed, reasonable berth in implementing those processes is appropriate, particularly where, as here, a declaration is filed under oath asserting full effort to comply and there is no evidence a party withheld evidence in its possession.

In addition, SCO cannot be faulted for not providing more detail than the particular item disclosed allows.  Certainly, for source code contributions IBM made verbatim from a UNIX derivative system, such information can be provided – and has been.  Where the method and concept is not associated with source code, the contribution cannot be identified by source code and such is not required to uphold SCO's claim.

**B.   The Magistrate Judge Clearly Erred to the Extent the Order Is Predicated on SCO's Responses to Past Discovery Orders or IBM Interrogatories.**

Although the focus of IBM's opening brief was on the December Submission's alleged noncompliance with the July 2005 Order, in the Magistrate Judge's Order, SCO's interrogatory responses became the central concern.

The Magistrate Judge's December 2003 Order required SCO, in relevant part, to respond to IBM Interrogatory Nos. 1 through 9, 12 and 13, and to "to identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM."  (December 2003 Order, at 2).  The Magistrate Judge's March 2004 Order

recognized that SCO had made "good faith efforts to comply with the Court's prior order," and further required SCO, in relevant part to:  (1) "provide and identify all specific lines of code that IBM is alleged to have contributed to Linux"; (2) "provide and identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived; (3) "provide and identify with specificity all lines of code in Linux that it claims right to"; and (4) "provide and identify with specificity the lines of code that SCO distributed to other parties."

None of these orders or interrogatories says what the Magistrate Judge now holds was required – that all misused material of any type, even material that did not include source code, must be identified by "version, file and line of code."  Specifically, the December 2003 Order compelled SCO to respond to IBM interrogatories.  In the Magistrate Judge's current analysis of this Order, the focus is on Interrogatory Nos. 1, 4, 12, and 13, but none of these interrogatories in fact supports the conclusion reached.

IBM Interrogatory No. 1 states:

Please identify, with specificity (by product, file and line of code, *where appropriate*) all of the alleged trade secrets and any confidential or proprietary information that plaintiff alleges or contends IBM misappropriated or misused, including but not limited to as alleged in ¶ 105 of the Complaint.

(Exh. 3).  (Emphasis added.)  The limiting language "where appropriate" is critical.  In some cases misused information is appropriately identified by product, file and line of code.  This type of identification would be appropriate for source code that was misused by IBM; however, such identification would not be appropriate for methods or concepts that were misused by way of a disclosure of the method or concept without a disclosure of related source code.  (See Rochkind Decl. ¶¶ 8-10, Exh. 2 (comparing the appropriate

19

mechanisms to identify misused source code versus misused methods and concepts).)

SCO complied with this interrogatory request by identifying misused material by product, file and line of code, where appropriate.  Furthermore, IBM's inclusion of the limiting phrase "as appropriate" in this interrogatory constitutes recognition even with respect to other requests that such source code identification is not always appropriate.

Interrogatory No. 4 states, in pertinent part:

> Please describe, in detail, each instance in which plaintiff alleges or contends that IBM misappropriated or misused the alleged trade secret or confidential or proprietary information, including but not limited to:  . . . (d) with respect to any code or method plaintiff alleges or contends that IBM misappropriated or misused, the location of each portion of such code or method in any product, such as AIX, in Linux, in open source or in the public domain.

(Exh. 3).  This interrogatory thus requests the "location" of "each portion" of misused "code or method" in "any product, such as AIX, in Linux, in open source or in the public domain."  "Location" is certainly not synonymous with "version, file and line of code."  SCO complied with this request by identifying the "location" of misused material as it did, with the most specific information available – including references to the verbatim disclosures that admitted the particular method or concept came from Dynix or AIX.  Interrogatory Nos. 12 and 13[6] request the identification of material "with specificity (by

---

[6] Interrogatory No. 12 requested:

> Please identify, with specificity (by file and line of code), (a) all source code and other material in Linux (including but not limited to the Linux kernel, any Linux operating system and any Linux distribution) to which plaintiff has rights; and (b) the nature of plaintiff's rights, including but not limited to whether and how the code or other material derives from UNIX.

Interrogatory No. 13 requested:

> For each line of code and other material identified in response to Interrogatory No. 12, please state whether (a) IBM has infringed plaintiff's rights, and for any rights IBM is alleged to have infringed, describe in detail how IBM is alleged to have infringed

file and line of code) in Linux to which SCO claims that it "has rights." To the extent that SCO can provide such identification by line it has done so, and otherwise it has complied by identifying the files relating to the method or concept. There has been, prior to this ruling, no Order that such a level of identification is inadequate, and that SCO must do more – our could do more – or face the striking of its claims.

The Magistrate Judge's March 2004 order also arose out of IBM seeking, in relevant part, more specific answers to these same interrogatories. Thus, like the December 2003 Order, this Order is understood against the backdrop of the interrogatories. However, even if the order could be read as going beyond IBM's interrogatories, SCO complied with the order to the greatest extent possible. The part of the March 2004 Order quoted and relied on by the Magistrate Judge focused on the direction that SCO identify those "specific lines of code" from AIX, Dynix and Unix System V that IBM is alleged to have contributed to Linux. In compliance with this order, SCO did identify for IBM those specific lines of code that it contends IBM disclosed improperly to Linux, and provided file locations in Linux where identification of lines was not possible.

Neither order required SCO to identify for IBM the specific lines of code that comprised the method that was disclosed, when those lines of code had not even been part of the disclosure by IBM, and were not reasonably available to SCO. Such an interpretation of the court's orders would have been most unreasonable since they would essentially be requiring SCO to identify, for IBM, code that was solely in the mind of the

---

plaintiff's rights; and (b) whether plaintiff has ever distributed the code or other material or otherwise made it available to the public, as part of a Linux distribution or otherwise ….

(Exh. 4).

IBM developer at the time he or she made the disclosure.  Counsel for SCO is aware of no instance in which a party has been sanctioned – let alone substantive portions of its case dismissed – for failure to identify in discovery information that was not reasonably available to it and was more readily available to the other party.  (See Part V, below.)

In addition, IBM's own conduct undercuts the Magistrate Judge's reliance on previous court orders and interrogatories as a basis for sanctions.  In February 2006, several weeks after SCO had served its December Submission, IBM served its Interrogatory No. 23, asking SCO to provide additional information regarding the December Submission.  In subsection (b) of Interrogatory No. 23, IBM asked SCO to "state with specificity" with respect to each "method and concept" identified by SCO "whether it appears in Linux and, in particular, the Linux kernel and, if so, which version(s) of Linux, and which files and lines of such version(s)."  (Exh. 5.)  IBM's service of that interrogatory obviously undercuts the argument that SCO had previously been obligated to provide such source code coordinates, either in response to any previous IBM discovery request or in order to comply with any court order.  It would have been redundant and, thus, improper for IBM to have served such an interrogatory.

After filing its underlying motion to limit SCO's claims, however, IBM withdrew just subsection (b) of Interrogatory No. 23.  In withdrawing that request in the interrogatories, counsel for IBM admitted that the request "is confusing in any case." (Exh. 6.)  IBM's admission that the foregoing request "is confusing" directly undercuts any argument that either the IBM discovery requests or any court order clearly and unambiguously required SCO to produce Linux source code coordinates for methods and concepts that IBM contributed to Linux.  However, the issuance of the interrogatory in

the first place is inconsistent with the premise that all such information was required by prior requests.  In short, the Magistrate Judge's prior discovery orders did not clearly require and IBM's interrogatories did not ask SCO to identify the version, file and line information for each and every item of misused material.[7]

   C.   **The Magistrate Judge Clearly Erred in Concluding That SCO's Past Interrogatories and the Deposition Testimony of SCO's Chief Technology Officer Support the Order's Interpretation of the Past Orders.**

The Magistrate Judge found that her interpretation of the July 2005 Order "really should come as no surprise" to SCO, on the basis of a definition contained in SCO's early discovery requests to IBM and the deposition testimony of Sandeep Gupta, a SCO employee.  These arguments were not included in IBM's briefing on the Motion, but rather were raised for the first time in the Davis Rebuttal Declaration, to which SCO was denied an opportunity to respond.  Neither of these secondary sources provides support for the Magistrate Judge's conclusion about how SCO must have interpreted the July 2005 Order.  These issues, as presented by Professor Davis, are taken seriously out of context, as explained below.  The Magistrate Judge also draws an analogy to the deposit requirements for copyright registration in support of the conclusion reached, which also was not briefed and has no bearing here.

---

[7] The Magistrate Judge appeared to reason that SCO could have moved to clarify the precise meaning of this Court's July 2005 Order, but she does not cite any precedent suggesting that SCO's failure to file such a motion supports any imposition of sanctions.  To the contrary, see, e.g., Williams v. Sprint/United Mgmt. Co., 230 F.R.D. 640, 656 (D. Kan. 2005) (declining to impose sanctions where there was an "arguable ambiguity in the Court's prior rulings," see also Unicure, Inc. v. Thurman, 97 F.R.D. 7 (W.D.N.Y. 1982) (refusing to impose sanction of dismissal where the discovery order was "somewhat ambiguous").

1.      SCO's Past Discovery Requests

Professor Davis asserted in his Rebuttal Declaration:  "Note that the Court's

orders required no more of SCO than SCO required of IBM."  (Davis Rebuttal Decl.

¶ 19.)  He then explained that SCO defined "identify" in its First Request for Production

of Documents and First Set of Interrogatories as:

> including but not limited to an identification of the specific lines and
> portions of code claimed as trade secrets or confidential or proprietary
> information, and the location (by module name, file name, sequence
> number or otherwise) of those lines of code within any larger software
> product or property.

Id.  He then stated:  "SCO subsequently incorporated this identical definition in eight

additional document requests, five additional sets of interrogatories, seven 30(b)(6)

deposition notices, and three requests for admission . . . ."  (Id.)  Professor Davis

attached SCO's First Request for Production of Documents and First Set of

Interrogatories (also attached hereto as Exh. 7), which included the definition, but did not

attach any of the other referenced discovery requests, or IBM's responses.  The fact is

that the context of SCO's discovery requests and IBM's responses shows that SCO's

discovery requests have no relevance whatsoever to the issue at hand.

While SCO did not have an opportunity to respond to and correct Professor

Davis' misleading argument about SCO's early discovery requests, the Magistrate Judge

seized on his argument – and even labeled it (at 27) as "most important to the court" in

reaching her decision.  Furthermore, apparently without ever having seen IBM's

responses to SCO's discovery requests (which were not provided by Professor Davis), the

Magistrate Judge concluded (at 28):

Given SCO's track record in this case, the court is certain that if IBM had simply provided line information without version and file information for 'methods,' SCO would have filed motions to compel complaining about IBM's lack of specificity.

As a threshold matter, the Magistrate Judge misunderstood the nature of SCO's discovery request. While the language cited by Davis was a <u>definition</u> used in SCO's discovery requests (not a stand-alone request), the Magistrate Judge wrote (at 27) that: "SCO itself sought this level of specificity by asking for 'identification of the specific lines and portions of code' for all alleged trade secrets or confidential or proprietary information, <u>whether computer code, methods or otherwise</u>." Because this language is a definition, not a stand-alone discovery request, the language is only properly understood in the context of the specific discovery requests that use the defined term "identify."

Notably, in SCO's First Request for Production of Documents and First Set of Interrogatories (Exh. 7) (where the definition of "identify" at issue appears), all of SCO's "identify" interrogatories (Nos. 1, 3, 4 and 5) are directed at "persons." Naturally, "identify," when used in the context of "persons," was defined differently by SCO. None of the interrogatories in this initial request requires IBM to identify methods by line of code. The Magistrate Judge also suggested (at 25) that SCO's first motion to compel (filed November 4, 2003) incorporated the above definition of "identify." To the contrary, that motion was based only on IBM's failure to respond to these initial discovery requests, did not reference this definition, and certainly did not seek identification of methods and concepts by "the specific lines and portions of code."

It was not until SCO's Second Set of Interrogatories (served December 4, 2003) that SCO propounded an interrogatory request that implicated the above definition of "identify." In Interrogatory No. 6, SCO stated:

> Please <u>identify</u>, with specificity (by product, file in light [sic] of code, <u>where appropriate</u>) all of the alleged <u>contributions</u> to Linux made by IBM, included but not limited to those claimed in paragraphs 108, 115 and 120 of IBM's Amended Counterclaims.

(Exh. 8).  Emphasis added.  Importantly, as in IBM's request, this request for files and code was qualified by the language "<u>where appropriate</u>."  In other words, the first time SCO requested line and file information of code contributed to Linux, SCO qualified the request to say that methods should only be identified by specific lines or portions of code "where appropriate" – just as IBM did in its first such request.  That is all SCO contends it was obligated to do in responding to IBM, and is what SCO <u>did do</u> – identify files and code "<u>where appropriate</u>."

Moreover – contrary to the Magistrate Judge's assumption that "if IBM had simply provided line information without version and file information for 'methods,' SCO would have filed motions to compel complaining about IBM's lack of specificity" – IBM did not provide <u>any</u> "methods" or code in response to this request, let alone identification of methods it contributed to Linux by "specific lines or portions of code," and no Motion to Compel was filed on this.  Rather, IBM's sole response to this request was an objection that the request was vague, overbroad, and unduly burdensome; a statement that its contributions are a matter of public record; and a reference to a lengthy list of produced documents.  (IBM Response to SCO's Second Set of Interrogatories and Second Request for Production of Documents, Exh. 9).  In short, contrary to the Magistrate Judge's assumption, IBM <u>did not</u> provide "specific lines or portions of code" in response to SCO's discovery request, and SCO certainly did not ask the Court to compel IBM to identify the methods it disclosed by "specific lines or portions of code" when the method was not disclosed to the Linux community with that level of specificity.

The definition of "identify" was also implicated in SCO's Fifth Set of Interrogatories.  In Interrogatory 23, SCO requested IBM to "identify" IBM's reliance on UNIX in its contributions to Linux.  (Exh. 10).  Again, in its response to Interrogatory 23, IBM did not identify any methods on which it relied, let alone identify them via specific lines of code.  Rather, IBM stated that SCO's request was vague, ambiguous, overbroad, and unduly burdensome.  Further, IBM admitted (without providing any specific information) that:

> "IBM has, in making Linux contributions, used or relied upon source code that may also be found in AIX or Dynix.  IBM has used or relied upon source code also found in AIX or Dynix by offering the actual code to Linux and/or considering the code in creating new code."

(Exh. 11).  In short, contrary to the Magistrate Judge's assumption, IBM's response to SCO's request that IBM identify its reliance on UNIX products, including IBM and Sequent's use of UNIX methods or concepts, in developing source code that IBM contributed to Linux, was vastly less specific than SCO's identification of misappropriated methods and concepts in its December Submission.  Furthermore, SCO never sought from IBM more specific identification of the methods that it had disclosed, when those methods had not been disclosed by reference to specific code.  However, such code would have been considerably easier for IBM to provide than SCO, since it is code IBM developers had in mind when disclosing a method or concept to the Linux community without mentioning the specific code in the disclosure.[8]

---

[8] The only other discovery request in which SCO's definition of "identify" (in relation to "methods") is implicated in SCO's Third Set of Interrogatories (Exh. 12), directed at IBM's patent counterclaims.  IBM subsequently dropped its patent claims, which in any event were entirely different than SCO's breach of contract claims, and subject to different types of proof.  As such, the discovery appropriate on a patent claim was entirely different than the discovery appropriate on the breach of contract claim.

In addition, even if the SCO requests for discovery were exactly as characterized by Professor Davis, and as accepted by the Magistrate Judge, the use of an expansive definition in an early discovery definition – where parties regularly ask for as much information as possible – hardly constitutes support for the concept that for a specific subset of technology at issue (methods and concepts) source code is always available to be provided and court orders requiring identification of "misused materials" must be so interpreted.

The Magistrate Judge's reliance on this point as the most important factor in support of the June 28 Order is clearly in error.

2.    Deposition Testimony of Sandeep Gupta

In his Rebuttal Declaration, Davis also relied (for the first time) on the deposition of Sandeep Gupta, SCO's Chief Technology Officer.  He opined that Mr. Gupta testified concerning the importance of having version, file and line information with respect to methods and concepts, and he quoted a portion of that deposition.  Although Mr. Gupta's deposition was not attached to the Rebuttal Declaration (nor even the entire relevant portion of the deposition), and although SCO never had an opportunity to respond to this introduction of new testimony to the record, the Magistrate Judge relied on it (at 28) "as further support of this court's finding that version, file, and line information was the required level of specificity."

The Magistrate Judge quoted (at 28) only a portion of the testimony that had been quoted in the Davis Rebuttal:

> A.    Okay, how would you determine whether a particular description was specific enough to describe an aspect of System V as a method?
> A.    I have to look at the source code.
> Q.    Okay.  What would you do if you looked at the source code?

28

A.   I look at various steps that are taken, specific for that particular method.

Q.   Okay.  So in order to determine what a particular method or concept is, you would actually have to look at the source code?

A.   In some cases, yes.

.  .  .  .  .

Q.   .  .  .  would you have to look at the source code to be able to accurately describe a method or concept in UNIX?

A.   That's my opinion, yes.

This testimony does not support IBM's position that coordinates in source code are always available and always needed.  Mr. Gupta testified that one would need to look at the source code of a particular method to identify it only "in some cases."

In addition, Mr. Gupta's testimony neither establishes that court orders had to be understood as requiring SCO to ascertain what source code IBM developers were thinking of when making their method and concept contributions to Linux or that SCO had the ability to provide such information even if it were ordered.  It would be most extraordinary for deposition testimony to bear on the interpretation of a court order.

In sum, neither the July 2005 Order nor other orders required SCO to do more than what it has done – provide identification with "specificity" of the materials allegedly misused by IBM, and when source code is the basis of SCO's claim, to provide identification by source code coordinates.

3.   Analogy to Deposit Requirement for Copyright Registration

The Magistrate Judge also drew an analogy to the deposit requirements for copyright registration.  This argument was never advanced by IBM and SCO never was given an opportunity to respond.  From these deposit requirements, the Magistrate Judge concluded that "even the copyright law, from which SCO seeks protection, prefers the production and identification of specific source code."  (Order at 29-30).  The deposit requirements for copyright registration have no relevance to the interpretation of past

court orders or SCO's reasonable understanding of those orders.  Copyright law includes

these deposit requirements because it protects "expression."  The items the Magistrate

Judge purports to strike from SCO's case in actuality are parts of SCO's claim for breach

of contract – not copyright infringement.  SCO is seeking protection (and damages for the

disclosure) of these items under contract law – not copyright law.  Moreover, even if such

source code is "preferred" as the Magistrate opined, that does not mean that it is

"required" or always available.  Therefore, the deposit requirements for a copyright

registration can have no possible relevance to the conclusion for which it is offered.

## V.   THE MAGISTRATE JUDGE CLEARLY ERRED IN FINDING THAT SCO WILLFULLY FAILED TO COMPLY WITH COURT ORDERS REQUIRING SPECIFICITY.

### A.   The Magistrate Judge Clearly Erred Because to Support a Discovery Sanction, an Order Must Clearly and Unambiguously State the Performance Required of a Party.

The Magistrate Judge says that "it really should come as no surprise" to SCO that

she infers the meaning she does from the July 2005 Order.  That is no basis for a

discovery sanction which requires clear notice of what is required.  A party cannot be

sanctioned for failing to comply with an ambiguous court order that is later interpreted

contrary to the party's own interpretation.  See Robson, 81 F.3d at 3-4 (vacating the

district court's imposition of sanctions and emphasizing the factor of "a clear preexisting

requirement").  In seeking sanctions, the moving party has the burden of showing non-

compliance with "a specific and definite order of the court."  Enforma, 362 F.3d at 1211

(emphasis added) (reversing contempt sanctions).  Where there is an "arguable ambiguity

in the Court's prior rulings," even where the court subsequently interprets the order

against the non-moving party, there is no proper basis for sanctioning a party for failing

to produce the material at issue.  Williams, 230 F.R.D. at 656 (finding no basis to impose

sanctions); <u>cf.</u> Peterson v. Hantman, 227 F.R.D. 13, 18 (D.D.C. 2005) (finding no basis to impose sanctions for non-production of certain material: "If there is an absence of controlling authority, and the issue presented is one not free from doubt and could engender a responsible difference of opinion among conscientious, diligent but reasonable advocates, then the opposing positions taken by them are substantially justified." (citation and quotations omitted)).

Indeed, the same principles apply even where – in sharp contrast to the facts here – a party has withheld material that a court later determines should have been produced by court order.  <u>See</u> R.W. Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 17 (1st Cir. 1991) (stating that "when a court issues a broad-form discovery order, and the party to whom it is addressed complies with it somewhat less than fully, withholding documents arguably outside the order's scope, the district court cannot dismiss without first entering an order commanding production of the specific materials").  The necessity of a clear requirement also applies with respect to responses to interrogatories.  <u>See, e.g.</u>, T.N. Taube Corp. v. Marine Midland Mortgage Corp., 136 F.R.D. 449, 456-57 (W.D.N.C. 1991) (declining to impose sanctions based on defendant's responses and opposition to certain interrogatories because "[a]lthough the Court has determined that Defendant failed to comply with the provisions of Rule 33(c), the question is not so clear as to render Defendant's opposition substantially unjustified").

Thus the fact that the Magistrate Judge now interprets court orders to require a certain level of specificity does not render SCO's actions sanctionable.  Given that the Magistrate Judge is relying on what she "believes" this Court's July 2005 Order meant, rather than what it expressly said, and then upon such secondary materials as inferences

31

from SCO's own discovery requests and a witness's deposition, the standard of clarity to support a sanction is not met here.  The fact that the Magistrate Judge had to refer to unanalyzed discovery requests, incomplete deposition testimony and copyright registration procedures to explain what the court found should have been no surprise to SCO about the unstated meaning of July 2005 Order defeats the very point they were meant to support.

> **B.**     **There Is No Record Evidence That SCO Willfully Violated a Court Order Or Declined to Respond to Interrogatories**

Only willful noncompliance with a court order could support a sanction as severe as the one imposed here.  (See Part III, above).  The Magistrate Judge's Order does not state otherwise.  However, there is no evidence presented by IBM or cited by the Magistrate Judge that SCO intentionally refused to provide source code information that it possessed.  It is well established that if a party cannot comply with an order, its failure cannot be deemed willful and cannot support a sanction.  A party can be ordered to produce on pain of sanction only material that the party possesses.  See Cardenas v. Dorel Juvenile Group, Inc., 230 F.R.D. 611, 620 (D. Kan. 2005) ("The Court cannot compel the production of documents that do not exist or that are not in the possession, custody or control of a party."); accord Sonnino v. Univ. of Kan. Hosp. Auth., 220 F.R.D. 633, 640 (D. Kan. 2004); Steil v. Humana Kansas City, Inc., 197 F.R.D. 445, 448 (D. Kan. 2000).  A party "possesses" material if it physically has the material in hand or if it has "control" of the material, and a party does not have control of material if it otherwise does not have "the practical ability" to obtain the material.  In re Flag Telecom Holdings, Ltd. Secs. Litig., No. 02 Civ. 3400 (WCC), 2006 WL 1072008, at *2 (S.D.N.Y. Apr. 19, 2006) (attached hereto as Exh. A, Decl. of Mark James); see, e.g., Kropp v. Ziebarth, 557 F.2d

32

142, 147 (8th Cir. 1977) (reversing dismissal as sanction for failure to answer interrogatories where "review of the record reveals that there is some merit to Kropp's position that he was unable to respond more fully to the defendants' interrogatories than he did," and holding:  "Dismissal is not authorized under Fed.R.Civ.P. 37 when the failure to comply is the result of inability rather than willfulness or bad faith.").  Sithon Maritime Co. v. Holiday Mansion, No. Civ. A. 96-2262-EEO, 1998 WL 638372, at *4 (D. Kan. Sept. 14, 1998) (declining to impose sanctions with respect to responses to discovery requests for production of documents where "plaintiff has provided no evidence of deliberate and purposeful withholding of documents") (attached hereto as Exh. B, Decl. of Mark James).  Zappala v. Albicelli, 954 F. Supp. 538, 548 (N.D.N.Y. 1997) (declining to impose sanctions where "the record indicates that the Defendants have made a good faith effort to comply with the Plaintiffs' voluminous discovery requests" and that "the Defendants have not 'failed' to answer the interrogatories").

The Magistrate Judge stated that "There is no evidence before the Court to indicate that SCO lacked the ability to comply with the Court's Orders."  In the first place, there was no evidence to establish a willful violation, and thus, to establish that SCO could provide source code information that it was simply failing to turn over. Moreover, SCO presented evidence that it could not comply with such an order.  Marc Rochkind, SCO's expert witness filed a declaration explaining:  "Where IBM disclosed methods and concepts from the Dynix and Dynix/ptx operating systems without providing source code in the disclosures, for example, it is often not possible and certainly not necessary to cite to specific source code in identifying the disclosure." (Rochkind Decl. ¶ 10, Exh. 2 (emphasis added).)  Mr. Rochkind also testified that he

"**made sure**" that "**versions, lines and files be cited where available**."  (Rochkind Decl. ¶ 17, Exh. 2 (emphasis added).)

Even if it were theoretically possible to match up every method or concept with source code implementing the method, as Professor Davis contends, it does not follow that SCO was able to do so.  The items in the December Submission for which such source code information was not provided were methods and concepts where IBM did not identify the source code implementing the method in Dynix or AIX, but did definitively state that Dynix or AIX was the operating system from which the technology came.[9]  In these situations, IBM is asking the Court to sanction SCO for not ascertaining what lines of code an IBM software engineer may have pointed to if asked to identify where in Dynix or AIX the method or concept is implemented.  The operating system from which the overwhelming majority of method and concepts were taken is an IBM system (such as Dynix or AIX) written or modified by IBM developers (or Sequent employees now working at IBM).  While these operating systems are derivative products of UNIX System V, subject to the restrictions on disclosure and use contained in licensing agreements, Dynix and AIX are operating systems created and maintained at IBM, not at SCO.  If, as Professor Davis opines, it is an "impossible burden" (¶ 21) requiring an extraordinary number of man-years (¶ 16) to identify the code related to such disclosures, it would take SCO even longer, as it would not have the aid of the IBM developers who actually wrote the code and made the disclosures.

---

[9] Thus, to fall back on the Magistrate Judge's Neiman Marcus example, SCO's allegations of IBM's improper disclosure begin with IBM's admissions of its own guilt.  Yet in the face of IBM's admissions of guilt, the magistrate judge would ask SCO to not only show the evidence of theft (which it has done) but to entirely recreate the crime scene.  As it stands, the Magistrate Judge's Order creates the remarkable result that the fact-finder should not even be permitted to see IBM's admissions of its own contributions of confidential methods and concepts.

This fact – that IBM has control and the ability to locate the information at issue to a significantly greater extent than SCO – is directly relevant, and inexplicably ignored by the Magistrate Judge.  In basing her Order on SCO's failure to produce evidence that SCO does not "control," the Magistrate Judge committed clear error.

Moreover, Mr. Rochkind's testimony goes further and establishes that where SCO did have source code coordinates, it was provided.  There are roughly 100 items not challenged by IBM that are largely source code disclosures.  In addition, "for many of the challenged items in the December Submission, there is code imbedded in the disclosure email or other document, or found at a referenced URL (internet website) address." (Rochkind Decl. ¶ 11, Exh. 2.)  For example, Item No. 3 (Exh. 13) is NUMA/ptx locking routines contributed to Linux.  The December Submission states (at 5) that the "code in the 4 associated source code files appeared in a patch for the 2.4.6 kernel" and provides an internet address for the patch.  Inexplicably, items such as this and others of similar nature have been struck.

Mr. Rochkind's declaration is irreconcilable with a finding of willful violation by SCO.  He says that he played the largest role in assembling the disclosures, and that "For each of the 294 items, I did everything I could to ensure that *everything we had was disclosed* and that it was organized in the most accessible manner."  (Rochkind Decl. ¶ 17, Exh. 2).

The Magistrate Judge's Order goes so far as to strike SCO submissions where the code associated with a particular method and concept is cited in the Report, but cannot be accessed because it resides in an IBM server to which only IBM has access.  This is true, for example, of Item No. 146, involving differential profiling.  (Rochkind Decl. ¶¶ 13-15,

Exh. 2.)  This was in fact the only misused method that IBM's expert discussed.

Rochkind explained that the disclosed method includes a URL to Dynix source code that

SCO could not access:  "The URL referencing the Dynix/ptx scripts is for an internal

IBM server to which neither SCO nor I have access.  It is part of the Linux development

materials that SCO sought from IBM, but that appear not to have been produced.

Accordingly, the actual code cannot be present in Item No. 146, although IBM has access

to it."  (Rochkind Decl. n.3 at 6, Exh. 2) (emphasis added).)  In stating that there was "no

evidence" before her of SCO's inability to comply with the July 2005 Order as she

interpreted it, the Magistrate Judge thus ignored the foregoing expert testimony and

compounded her erroneous decision not to consider such evidence with respect to the

Items individually.

With respect to the identification of locations in Linux where the disclosed

method and concept may have had an impact, there also is no showing by IBM that SCO

is withholding any information.  As indicated in Rochkind's declaration, and an attached

chart, and as can be seen by perusing the December Submissions, for virtually every

item, files in Linux are identified where the contribution, if source code, would be found,

or if a method and concept or other know-how, would most likely have an effect.  (SCO

does not contend that every disclosure has already manifested itself in Linux but that does

not negate a breach for the unauthorized disclosure itself.)  (See Rochkind Decl. Exh. B,

Column D, Exh. 2.)[10]  There is no finding by the Magistrate Judge, and no basis for such

a finding, that SCO willfully violated judicial orders by having the ability to provide line

references within Linux files, but not doing so.

_____

[10] Rochkind's declaration also makes clear that while versions of Linux are not expressly
indicated in the December Submission, "the files referenced can be found, in most cases, in any
version of Linux issued after the disclosure."  (Rochkind Decl. at 5 n.2, Exh. 2).

Lacking any direct support for finding a willful violation, the Magistrate Judge drew an inference from SCO public statements about the case that such information was present. In 2003, SCO said at that time that it possessed evidence of lines of source code misappropriated into Linux. Those statements do not mean that SCO possessed such evidence regarding the 198 methods at issue in IBM's motion, and the Magistrate Judge made no effort whatsoever to link any statement to any Item. The statements in fact were based on SCO's knowledge of technologies pertaining to many Items that were not at issue in IBM's motion, including Items 150-164, 183-185 and 205-231. The point-by-point defense provided in Appendix A to this Memorandum shows that the statements were accurate. Indeed, the items in the December Submissions involving source-code contributions show that the statements by SCO executives in 2003 were, if anything, understated. SCO would have made these points to the Magistrate Judge if the question of SCO's public statements had even been made a subject of the motion by IBM. The fact is that SCO's experts identified in 2005, well after SCO made the statements cited by the Magistrate Judge, all or almost all of the 187 methods and concepts the Court dismissed.

The record below establishes that SCO believed its December Submission was in full compliance with the July 2005 Order, and that SCO had certified its discovery responses as complete. With respect to the Magistrate Judge's reference to SCO not having sought "clarification," her finding overlooks the well-established law that where there is a "genuine dispute" between the parties regarding the scope of the court order or discovery request at issue, sanctions for noncompliance is unwarranted – regardless of

whether the responding party sought clarification of an order that, in retrospect, could be interpreted in a different way.  (See Part IV, above.)

In Societe Internationale Pour Participations Industrielles et Commercials, S.A. v. Rogers, 357 U.S. 197, 210 (1958), the plaintiff failed to comply with a discovery order, where compliance would have constituted a violation of Swiss law and where the plaintiff had unsuccessfully sought to obtain a waiver from that law.  The district court and court of appeals concluded that sanction in the form of the dismissal of the plaintiff's complaint were appropriate for the non-compliance.  The Supreme Court reversed, answering in the affirmative "the question whether Fifth Amendment due process is violated by the striking of a complaint because of a plaintiff's inability, despite good-faith efforts, to comply with a pretrial production order."  As the Tenth Circuit subsequently explained in In re Westinghouse Electric Corporation Uranium Contracts Litigation, 563 F.2d 992 (10th Cir. 1977), the operative facts in Rogers were that the plaintiff "had made a good faith and diligent effort to comply with the local discovery order, and had tried to secure a waiver from the foreign government."  Id. at 998.  Presented with similar facts regarding Canadian regulations, the Westinghouse court held that sanctions for non-compliance were unwarranted where third-party Rio Algom "has made diligent effort to produce materials not subject to the Canadian regulation," and "has sought a waiver from the Canadian authorities."  Id.

The decision in Rogers (and Westinghouse) broadly establish that a party cannot be sanctioned for non-compliance with a discovery order or request where despite its diligent, good-faith efforts, the party is unable to comply or respond.  See, e.g., Miller v. Sprint Communications, No. 3:97CV156-P, 1997 WL 910426, at *2-3 (W.D.N.C. Dec.

31, 1997) (citing <u>Rogers</u> and imposing sanctions only where "Plaintiff has acted in bad faith" by failing to appear for deposition and failing to offer any explanation.)  (Attached hereto as Exh. C, Decl. of Mark James).  The record below shows that SCO and its experts made such good-faith efforts, and that the Magistrate Judge failed to take account of the extent of those efforts.  The foregoing precedent applies with particular force where SCO does not assert, and need not assert to support the merits of its claims or requests for relief, that all of the methods and concepts disclosed have yet been implemented in Linux.

In short, there is neither the clarity required of a court order to support a severe sanction such as this nor direct or even indirect support that SCO acted willfully in violating such an order by withholding any information regarding source code locations for the disputed items.

## VI.   THE MAGISTRATE JUDGE CLEARLY ERRED IN FAILNG TO CONSIDER WHETHER SPECIFIC DISCLOSURES WERE ADEQUATE.

SCO requested a hearing to have the Magistrate Judge address SCO's Items individually and to hold an evidentiary hearing to allow SCO's experts to address the particular facts regarding each of them.  (Hearing Transcript (Apr. 14, 2006) at 52-56, 79-82, Exh. 14).  The Magistrate Judge did not address SCO's request and did not hold an evidentiary hearing.  The Magistrate Judge thus did not allow for a process where the parties could address the identification of the misused material item-by-item, and present testimony regarding the specificity of the disclosure made, the alleged inadequacy of the disclosure, whether additional information concerning the item was available, and the prejudice claimed by IBM with respect to its ability to prepare a defense.

Instead, the Magistrate Judge discussed (at 36-38) a few categories of disclosed items. For eleven items, the "court agrees that they were disclosed with sufficient specificity to survive the current motion." (Order at 36.) For the others, SCO is left with nothing more than the court's assurance that it has individually reviewed all of the disputed items and that, without any specific reasons being given, "SCO failed to support its alleged misappropriated items with the specificity required by the court's orders."

This process and decision constitutes clear error. First, the Order fails to comply with the legal requirement of particularized findings to support a severe sanction order of this type. Second, the Order's general determination that SCO's other disclosures "failed to meet the level of specificity required by the Court's Orders" cannot be squared with the record regarding those items.

### A.     The Failure to Provide Particularized Findings

In considering a motion for sanctions, a court must evaluate and make findings with respect to each instance in which the non-moving party has allegedly failed to comply with the court order at issue. Here, there must be "detailed" and "specific" findings regarding the court's reasons for excluding each of the disclosures. Haugen, 427 F.3d at 742; see also Robson, 81 F.3d at 3 (vacating the district court's imposition of sanctions for several alleged instances of failure to comply with a court order and remanding where "factual disputes exist over the extent of the misconduct, including excuses offered as to each of the episodes, that have never been resolved by the district court" and "there are no findings to resolve the matter"). Where "the district court has not expressed any view on the matter that would permit us to provide effective review," the appellate court must vacate and remand for appropriate, specific fact-findings as to each alleged instance of non-compliance with the court order at issue. Robson, 81 F.3d at

5.  No less should be required in a determination by a federal magistrate judge.  In failing to address the individual scope and nature of each of the disclosures (and instead only concluding without explanation that many of the disclosures lacked sufficient specificity), the Magistrate Judge thus committed clear error.  SCO assumes that the Magistrate Judge's decision to exclude disclosures was not "off the cuff," Haugen, 427 F.3d at 742, but the fact is that the record precludes SCO and this Court from evaluating the decision on any reasoned basis.

### B.  The Failure to Consider the Adequacy of Disclosures on an Item-by-Item Basis

The failure to have particularized findings is magnified in light of the record of the detailed information provided by SCO on items that were struck.  The Magistrate Judge compared SCO's disclosures to a shoplifter being told by an officer simply that "you know what you stole I'm not telling" or being given a catalog of Neiman Marcus' entire inventory and saying "its in there somewhere, you figure it out."  (Order at 34.)  With all due respect, these analogies are so far afield from the actual detail provided in SCO's disclosures that they indicate all the more reason that a particularized item-by-item consideration, and an evidentiary hearing, should have been held.

In the briefing, SCO – and Mr. Rochkind in his declaration – specifically addressed the one item that Professor Davis discussed in his initial Declaration ("differential profiling" in Item No. 146, Exh. 1), pointing out that while specific code was written to illustrate the method disclosed by IBM Dynix developer Paul McKenney, it was located on a server accessible to IBM, but not to SCO.  This was not refuted by IBM – but then was not addressed by the Magistrate Judge.  Nor did the Magistrate Judge address the examples of specific identification discussed by SCO at argument.  Item No.

53 concerned the disclosure of the method used in Dynix to handle semaphores (which are used in "locking" to restrict access to shared resources in a multiprocessing environment). (See. Hr. Tr. at 53-54, Exh. 14).  IBM developer Tim Wright expressly told non-IBM Linux developers about locking techniques "that are not currently used in Linux," then stated "the classic coding style in Dynix/ptx is ...," followed by specific source code.  SCO also identified Linux files relating to this method and concept. Moreover, Mr. Wright, at his deposition (Wright (11/05/05) Dep. Tr. 153:15-154:10, Exh. 15) admits

## REDACTED

IBM has never said one word about Item 53, yet without any discussion or findings, it is struck from SCO's case by the Order.[11]  Item 38, discussed at argument, involved the disclosure of a method and concept that goes back to UNIX System V relating to an automatic method of checking for updates in memory.  (See Hr. Tr. at 54-55, Exh. 14).  An IBM employee, William Irwin, made this disclosure and the Minutes from the February 21, 2003 teleconference during which the disclosure was made are referenced, as are the specific Linux files involved.  Without discussion or findings, this item has been struck for lack of specificity.  The same was true of other items where the specificity of the disclosure was presented at Argument (see Item Nos. 32 (Tab 22) and 23, discussed at Hr. Tr. at 55).  These examples were presented to the Court not as an exhaustive listing, but to demonstrate the need for an item-by-item consideration, and an evidentiary hearing, before SCO's claims were struck for lack of specificity.

---

[11] These materials, all found in SCO's December Submission and presented to the Magistrate Judge at argument, as well as a number of other examples, are attached as Appendix B hereto.

The following and others listed in Appendix C are additional examples of the items that the Magistrate Judge has struck from SCO's case, without specific discussion, let alone testimony. The examples show that the existing identification is adequate, that more precise identifying information was unavailable, that such information was at least as available if not more readily available to IBM, and that IBM was not unduly prejudiced in preparing a defense.

One major area of method and concept disclosure by IBM was "locking." Item Nos. 279 and 280 demonstrate methods IBM developer Rick Lindsley contributed to improving Linux in the technology area of locking after he had been exposed to Dynix/ptx locking techniques. (Attached as Exhs. 16 and 17, respectively.) Like Item Nos. 186-192, which the Order found were sufficient, Item Nos. 279 and 280 are supported by deposition testimony admissions from Lindsley himself (Exhs. 18 and 19.) Lindsley admitted:  **REDACTED**

(Lindsley Dep. (12/1/05), 100:20-24; 20-204:4, Exh. 19);

**REDACTED**

(Lindsley Dep. (12/1/05) 222:133-13, Exh. 18). In addition to the deposition testimony, Item Nos. 279 and 280 (Exhs. 16 and 17) contain significant specificity identifying the material misused by IBM, including the source code patches contributed by IBM to Linux that consist of hundreds of lines of source code identified by file, version and line. (Attached as Exhs. 20-23). Item Nos. 279-280 were struck without any specific discussion by IBM and without findings. Another example, Item No. 46 (Exh. 24), is a February 26, 2003 email

43

exchange between IBM developers Martin Bligh, James Cleverdon and a public Linux mailing list in which Bligh and Cleverdon describe a "bug fix" Bligh made to Linux and how it was based on the method from Dynix/ptx.[12]  In the December Submission, SCO actually cited the files and lines where this code occurs in Linux.[13]  Subsequently, during **REDACTED** Bligh's deposition on January 16, 2006, he admitted **REDACTED** . (Bligh (1/16/06) Depo. Tr. 73:22-75:17, Exh. 26).  Moreover, these same lines of Linux source were included in the patch Bligh disclosed to Linux, which SCO included as December Submission Item 236 (Exh. 27). Nonetheless, IBM, without any showing that it did not know and could not ask its own employee, Bligh, what he was talking about – indeed, without any specific discussion at all of these Items – IBM has achieved their removal from SCO's case.

The above examples (and additional Items described in Appendix C) are illustrative of information that would properly be considered at a hearing focused on the adequacy of item-by-item disclosures whether additional information not disclosed was in SCO's possession, whether IBM had ready access to additional information if available because it employed the individuals making these disclosures, and whether and to what extent IBM experienced any prejudice in defending.  If the arguments above,

---

[12] "James Cleverdon ... he was involved in this with PTX, and gave me some pointers to hair-restorer during the Linux timeframe... the four writes to ESR is still enshrined in Dynix/PTX's APIC error handler, and will remain a hidden testimony to this bug for as long as IBM maintains PTX support." (Attached as Exh. 25).

[13] "[A]arch/i386/kernel/apic.c, line 331-336" and "arch/x86_64/kernel/apic.c, line 284-289." (Attached as Exh. 24).  The lines of code are the following:

```
/* Pound the ESR really hard over the head with a big hammer – mbligh */
If (esr_disable) {
        apic_write (APIC_ESR, 0);
        apic_write (APIC_ESR, 0);
        apic_write (APIC_ESR, 0);
        apic_write (APIC_ESR, 0);
```

given the lack of proof of willful noncompliance, were not in themselves sufficient to warrant denial of IBM's motion, the correct and necessary course is to have an item-by-item hearing, allowing as well for testimony on these points, followed by specific findings.

The Magistrate Judge also, without discussion in the Order, rejected SCO's express invitation to await the upcoming filing of expert reports, which would aid in understanding the disclosures.  SCO's expert reports were submitted in May, including specifically the report of Marc Rochkind, the report of Dr. Evan Ivie, a former professor of computer science at Brigham Young University and UNIX expert, who also opined the IBM disclosed substantial protected technology.[14]

Given the technological complexity of these issues, it would also be appropriate for a technology expert (not affiliated with any party or side of this dispute) to be retained as an expert to the court, or appointed as a special master for the purpose of reporting on these technical issues.  A generalized conclusion that SCO simply told IBM – like the hypothetical shoplifter at Neiman Marcus referenced by the Magistrate Judge – to figure out itself what was taken is simply incorrect, and cannot substitute for the type of particularized consideration and findings that must precede a decision to limit SCO's case.

## VII.   THE MAGISTRATE JUDGE CLEARLY ERRED IN FAILING TO REQUIRE IBM TO ESTABLISH PREJUDICE AND TO CONSIDER ALTERNATIVES TO THE SANCTION IMPOSED.

Following a determination that a clear order of the court has been violated, that the violation has been willful, and the making of specific findings regarding the

---

[14] These reports are on file in connection with yet another IBM motion, one to exclude certain items from SCO's Expert Reports.

insufficiency of the information provided (none of which is present here), it is still incumbent upon the Court to consider additional factors before entering a severe sanction effectively dismissing a large part of SCO's breach of contract claim.

> **A.**   **The Magistrate Judge Did Not Properly Consider the Issue of Supposed Prejudice Arising from SCO's Failure to Provide Source Code Identifiers for Each Item of Misused Material.**

This Court must consider the extent of any "prejudice" to IBM. <u>Haugen</u>, 427 F.3d at 740-41. That consideration must include whether the material at issue was available to the <u>moving</u> party and whether the moving party took steps to obtain that material. In <u>Searock v. Stripling</u>, 736 F.2d 650 (11th Cir. 1984), for example, the court of appeals reversed sanctions imposed by the district court on the ground that the district court had abused its discretion in sanctioning the defendant, Stripling, for failing to produce certain materials to the plaintiff, Allied Marine. The court noted that:

> although the district court found that these documents were essential to Allied Marine's defense of counterclaim, the record in this case does not reflect that Allied Marine took any action to attempt to secure these crucial documents itself. Clearly, Allied Marine had the ability to subpoena these documents by taking the deposition of the custodians of the records of the companies concerned; however, the record does not reflect any such attempt by Allied Marine. Since Allied Marine also could have obtained the required documents – if they were then in existence – and failed to attempt to do so, it does not appear that Allied Marine's preparation for trial was substantially prejudiced by Stripling's failure to obtain and produce them.

<u>Id.</u> at 654. This reasoning directly applies here, because IBM has made <u>no</u> assertion that it asked any of its <u>own</u> <u>programmers</u> who made the disclosures at issue (1) what Unix, Dynix, or AIX code they had in mind when they made the disclosure of the method or concept, or (2) the source-code coordinates of any version of Linux in which the disclosed method or concept might have been embodied.

In the June 28 Order, the Magistrate Judge, in effect, decided that whether IBM's conduct breached its contracts with SCO could be resolved even before summary judgment.  SCO does not and need not assert that it "owned" the methods and concepts; the non-disclosure restrictions on IBM were independent of any question of ownership. See generally SCO's Mem. in Opp. to IBM's Motion for Summary Judgment on SCO's Breach-of-Contract Claims (Nov. 30, 2004).  The Magistrate Judge thus compounded the error in the improper interpretation of the July 2005 Order through a misplaced summary-judgment-like, and thus dispositive, assessment of disclosures in SCO's December Submission.  Assessing a presentation given by Richard Moore of IBM's Linux Technology Center in June 2005, the Magistrate Judge stated (at 35):

> While it discusses Kernel patches, thread locks and NUMA there is nothing that links these back to being originally owned by SCO.  And even with a related "smoking gun" email there is once again little connection back to what is allegedly owned by SCO.  This simply is not enough specificity under the court's orders.

This analysis and conclusion is in clear error.  SCO need not show that it "owned" the material disclosed, only that restrictions in the license agreements govern those methods and concepts which it has done.

The Magistrate Judge engaged in no particularized consideration on an item-by-item basis of how IBM was prejudiced in the absence of source code coordinates where IBM's own programmers did not feel they were needed to convey the method or concept. The Magistrate Judge did not address the issue except by hypothetical examples of where she believed such information would be important.

First, the Magistrate Judge stated:  "Is the code that comprised the method or concept still in use in Linux?  If not, then damages may become nominal instead of in the

billions." (Order at 34.)  There was nothing in the record to support such speculation.  It will be SCO's obligation to prove damages at trial.  SCO has identified the file locations in Linux where its experts believe the particular method or concept either had an impact or may have an impact in the future (injunctive relief is also requested in this case). There is no showing that SCO has but is not telling what particular lines of code in those files are impacted.  Nor is there anything in the record which establishes that IBM cannot work with the file level information as to Linux in evaluating, as will SCO's experts, whether the disclosure of a method or concept, or negative knowhow (so as to avoid a blind alley) contributed to Linux.

Second, the Magistrate Judge stated that "it may be possible that the code comprising a method or concept was already disclosed pursuant to some other license such as the BSD license."  (Order at 34.)  This, too, is pure speculation, unsupported by any record of prejudice, let along tied to particular technology items.  Dynix, the principal breeding ground for the methods and concepts at issue, is a UNIX System V derivative developed at Sequent.  There is nothing in the record to suggest that Dynix source code has been released into the public, under a BSD license or otherwise.  Nor is there anything in this record that establishes IBM could not investigate whether the method and concept was publicly known by looking for the method and concept itself in articles, books, and other texts.

Although a court may preclude either party from "sandbagging" the other by declining to produce evidence during discovery and then later seeking to use it, where there is no evidence of such activity, sanctions are inappropriate.  See, e.g., Schanzer v. United Techs. Corp., 120 F. Supp. 2d 200, 206 (D. Conn. 2000) (finding that Rule 37

does not apply where the facts are "not a case of 'sandbagging' an adversary at trial with newly disclosed evidence"); <u>Vandervest v. Wisconsin Cent., Ltd.</u>, 172 F.R.D. 401, 402-03 (E.D. Wis. 1997) (declining to impose sanctions for alleged failure to provide certain discovery under Rule 26 where the plaintiffs' counsel sought but did not have the information requested, and therefore "the plaintiffs did not improperly withhold discoverable information"); <u>cf.</u> <u>Tracinda Corp. v. DaimlerChrysler AG</u>, 362 F. Supp. 2d 487, 506-07 (D. Del. 2005) (declining to exclude proposed expert testimony that was not materially different from the expert's earlier report).  That is equally true with respect to an alleged violation of a court order or an alleged failure to respond to interrogatories.  As one court has said of Rules 26 and 37, the "purpose of these rules is to avoid 'surprise' or 'trial by ambush.'"  <u>American Stock Exch., LLC v. Mopex, Inc.</u>, 215 F.R.D. at 93 (citing cases).

Indeed, even where (unlike here) the prospect of surprise <u>is</u> presented, courts have emphasized that the "drastic sanction of preclusion should only be used in cases where the late disclosure occurs at the 'eleventh hour' on the eve of trial." <u>S&S Communications v. Local Exh. Carriers Ass'n</u>, No. Civ. 02-1028, 2005 WL 2897045, at *4 (D.S.D. Nov. 3, 2005).  (Attached hereto as Exh. D, Decl. of Mark James).  In basing her Order on the mistaken proposition that SCO possesses evidence that it simply declined to produce, the Magistrate Judge committed clear error.  <u>See</u>, <u>e.g.</u>, <u>Guinyard v. City of New York</u>, 800 F. Supp. 1083, 1086 (E.D.N.Y. 1992) (denying defendants' motion to sanction plaintiffs for allegedly inadequate interrogatory responses, as ordered by the court, where those responses "set forth plaintiffs' theory and evidence to support it").

In short, the Magistrate Judge's hypothetical instances of prejudice do not substitute for a particularized determination of actual prejudice, especially given that the methods and concepts at issue are identified by IBM's own employees as coming from derivative products subject to SCO's licensing rights.[15]

## B.    The Court Failed to Consider IBM's Own Responsibility for the Lack of Complete Source Code Identification.

Even after the Court ordered the source code to be produced, IBM failed to produce all versions of its AIX code, claiming that they cannot be located.  Even more egregious was IBM's spoliation of evidence.  Weeks **after** SCO filed its lawsuit, IBM directed "dozens" of its Linux developers within its LTC and at least ten of its Linux developers outside the LOC to delete the AIX and/or Dynix source code from their computers.  (SCO Opp. Memo. (3/7/06) at 3.)  One IBM Linux developer has admitted to destroying Dynix source code and tests, as well as pre-March 2003 drafts of source code he had written for Linux while referring to Dynix code on his computer.  (Id. at 3-4.)

---

[15] IBM's developers made these methods and concepts disclosures without disclosing related source code and they knew that such method and concept disclosures were extremely valuable to the Linux development community.  In fact, IBM has publicly boasted that their AIX and Dynix developers have contributed expertise and ideas that have improved Linux.  IBM claims that 80% of its contributions are actually accepted into Linux.  See Exh. 28.  For example, in a *Computerworld* interview, IBM executive Steve Mills answered this question, "To what degree is IBM involved in the development of the Linux kernel?" by answering:, "We have our Linux Technology Center, and we have a team of people that are involved with the Linux community on Linux development and have … since '98 or '99.  We don't have any people that are literally part of the core team.  We play an influencer role in terms of what we work on, suggestions that we make, code samples that we offer up.  We're trying to encourage a particular set of improvements to Linux.  Obviously, our interest tend to relate to things that our large corporate customers are most interested in.  They worry about robustness, scalability, fail-over, so that's a direction that we have an interest in.  We've had very good success in having ideas that we've been working on become accepted by the community and incorporated into the kernel."  (Exh. 29).  In another example, during an interview with *Linux Magazine* about the state of the Linux kernel in 2001, IBM programmer Patricia Gaughen stated that Linux was "not where the proprietary Unixe[s] are yet, but we are making much faster progress due to the experienced Dynix/IRIX/AIX/SN1/Yalnix/  hackers."  (Exh. 30).  After claiming that its disclosures from AIX and Dynix/ptx improved Linux, IBM cannot argue that specific identification of the same disclosures is insufficient.

Clearly, any effort to link up methods and concepts with specific source code from Dynix or AIX would have been assisted by the information that was intentionally discarded by IBM after the filing of the suit.  At argument, however, the Magistrate Judge believed that this issue was irrelevant to the matter before the court, and did not address it in the Order.  SCO intends to raise the issue of IBM's spoliation of evidence before this Court at the appropriate time.  However, in light of IBM's present Motion, the issue of IBM's spoliation of evidence has become immediately relevant and the Magistrate Judge should have considered it in assessing responsibility for the problem if, as the judge concluded, SCO was obligated to identify source code coordinates for all method and concept disclosures.

### C.   The Magistrate Judge Clearly Erred in Failing to Consider Whether SCO Had Been Warned That Its Claims Were In Jeopardy.

An additional factor required to be considered under Tenth Circuit authority is whether a party had been warned by the court that it faced dismissal or striking of claims.  A court can impose a sanction as serious as the exclusion of claims only where the sanctioned party has previously been given notice that sanctions will follow from a failure to comply with the court order at issue.  See Haugen, 427 F.3d at 741; see also Ortiz-Anglada v. Ortiz-Perez, 183 F.3d 65, 67 & n.4 (1st Cir. 1999) (reversing district court's imposition of sanctions, in the form of dismissal, where district court had failed to give plaintiff any reason to suspect that her case was at risk); Avionic Co. v. Gen. Dynamics Corp., 957 F.2d 555, 558 (8th Cir. 1992) (requiring a prior order so as to "give the party failing to comply with discovery adequate notice of what is required and an opportunity to contest the discovery sought prior to the imposition of sanctions").

Here, there is no consideration at all in the Order of the fact that SCO had never been warned that it faced limitation of claims. There had been no prior sanction order against SCO in this case. Indeed, the Magistrate Judge had previously found, in March 2004, that SCO had acted "in good faith" in its efforts to provide information to IBM's requests. This process was the first consideration of the adequacy of SCO's submissions in response to this Court's July 2005 Order – and yet the Magistrate Judge jumped immediately to striking SCO's claims on the challenged items.

### D. The Magistrate Clearly Erred in Failing to Consider Alternatives to Limiting SCO's Claims.

The record shows no consideration of any alternatives to the sanction imposed. SCO, for example, repeatedly pointed out at argument that the remedy for a belief that one party is sandbagging the other is for a party to object at the time the evidence not previously produced is sought to be used. SCO objects to the Magistrate Judge's statement that it "is almost like SCO sought to hide its case until the ninth inning" to gain some tactical surprise. But if SCO seeks to rely on misused technology disclosures not identified in the December Submission, the appropriate remedy would be not to allow such new disclosures to be introduced at time of trial. Indeed, orders restricting the introduction of evidence not properly disclosed in discovery are the usual and more appropriate remedy for deficiencies in interrogatories or other discovery. See Rogers, 357 U.S. at 212-213; Dorsey v. Academy Moving & Storage, Inc., 423 F.2d 858, 860-861 (5th Cir. 1970); see also 4A Moore, Federal Practice, P 37.03(2.-3) (2d ed. rev. 1976).

A second alternative, to the extent the Court is convinced that certain of the information at issue is within SCO's ability to feasibly provide – which is a necessary predicate to the sanction ordered here – would be to order the providing of more

complete source code information and extending IBM's time for discovery. Given this Motion has occasioned the first consideration of the specificity required for method and concept disclosures, and the first examination of the adequacy of the voluminous December Submission by SCO, this is far more equitable than the preemptory limiting of claims by the Magistrate Judge's Order.

A third alternative would be to deny the IBM Motion without prejudice to IBM seeking, after expert discovery has been completed, to exclude specific items of technology on the grounds that the disclosures for those items are not specific enough to permit a defense. Then, the Court could consider, potentially with the aid of an independent expert appointed by the court, such technology disputes in the context of a complete record including expert reports and expert depositions.

Because the Magistrate Judge failed to consider any such alternatives, or others, its Order cannot stand.

## VIII.   CONCLUSION

For the reasons stated above, the Order Granting In Part IBM's Motion to Limit Claims should be reversed.

DATED this 13th day of July, 2006.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand

By:   _____

*Counsel for The SCO Group, Inc.*

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing Objections to Order Granting In Part IBM's Motion to Limit SCO's Claims was served on Defendant International Business Machines Corporation on the 13th day of July, 2006, by U.S. Mail, first class postage prepaid, to the following:

David Marriott, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York 10604

Todd Shaughnessy, Esq.
Snell & Wilmer LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, Utah 84101