# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

CENTRAL DIVISION

THE S.C.O. GROUP, INC., )
a Delaware corporation, )
    Plaintiff, )
vs. ) CASE NO. 03-CV-294DK
INTERNATIONAL BUSINESS )
MACHINES, a New York )
corporation, )
    Defendant. )

BEFORE THE HONORABLE BROOKE C. WELLS

------------------------------------

February 6, 2004

Motion Hearing

1

A P P E A R A N C E S

For Plaintiff:    BRENT HATCH
    10 West Broadway
    Suite 400
    Salt Lake City, Utah

    MARK J. HEISE
    100 Southeast Second Street
    Suite 2800
    Miami, Florida

    KEVIN McBRIDE

For Defendant:    DAVID R. MARRIOTT
    Worldwide Plaza
    825 Eighth Avenue
    New York, New York

    TODD SCHAUGHNESSY
    CHRIS KAO
    AMY SORENSON
    15 West South Temple
    Suite 1200
    Gateway Tower West
    Salt Lake City, Utah

2

1   February 6, 2004                         10:00 a.m.

2                   P R O C E E D I N G S

3           THE COURT: Good morning, ladies and gentlemen.

4           MR. MARRIOTT: Good morning, Your Honor.

5           THE COURT: Going forward this morning in the

6   matter of S.C.O. versus I.B.M., and may I ask counsel for the

7   respective parties to make their appearances, please.

8           MR. HATCH: Your Honor, Brent Hatch and Mark Heise

9   and Kevin McBride for the plaintiffs, the S.C.O. Group.

10          MR. MARRIOTT: Your Honor, David Marriott for

11  I.B.M. With me are Todd Schaughnessy, Chris Chow and Amy

12  Sorenson.

13          THE COURT: Thank you.

14          Ladies and gentlemen, the record should reflect that

15  I requested to meet with counsel in chambers for the purposes

16  of determining those issues which would be addressed this

17  morning, and I believe we have successfully identified how we

18  are going to do that.

19          First it would be my request that we go forward to

20  hear argument as to whether or not S.C.O. has complied in

21  accordance with the Court order of December 12th, and what if

22  any measures need to be addressed or action taken with regard

23  to that.

24          Secondarily, we will address S.C.O.'s motions for

3

1   reciprocal discovery.

2           So, given that circumstance then, Mr. Marriott, do

3   you wish to go forward and address the issue of whether or not

4   S.C.O. has complied with the Court's order?

5           MR. MARRIOTT: Yes, Your Honor.

6           Thank you, Your Honor. The simple answer to Your

7   Honor's question as to whether the S.C.O. Group has complied

8   with the Court's order is that the S.C.O. Group has not

9   complied, Your Honor, as we lay out in the submissions that we

10  made to the Court yesterday afternoon.

11          As Your Honor knows the Court ordered S.C.O. by

12  January 12th to provide documents responsive to I.B.M.'s

13  document request and to provide full and detailed and complete

14  answers to I.B.M.'s interrogatories. There is I think no

15  dispute, Your Honor, that the S.C.O. Group has not provided

16  all of the documents that are responsive to I.B.M.'s discovery

17  requests, and that is reflected in correspondence between

18  counsel which is an attachment to our submission of yesterday.

19          Most notably perhaps, Your Honor, is that the S.C.O.

20  group has acknowledged that it has yet to produce documents

21  from approximately 20 of the custodians of responsive

22  documents, and to date in the case it is my understanding,

23  Your Honor, that the company has produced documents from the

24  files of only 20. So about half of the custodians have yet to

25  have their documents produced in the litigation.

4

1    So, yes, Your Honor, there is no question that

2    additional documents were produced. We do not dispute that.

3    We appreciate that. But as to whether or not the S.C.O. Group

4    has complied with the order I think the answer as to documents

5    is that it did not.

6        THE COURT:  Assuming that I were to find that it

7    had not, what are you suggesting should occur?

8        MR. MARRIOTT:  I think what Your Honor should do in

9    that regard is to, in consultation with S.C.O., determine by

10   what date I hope in the reasonable and imminent future they

11   can comply with the request and order them to do that by that

12   date.

13       Now, with respect to the interrogatories, Your

14   Honor, as you know when we were last here we explained that as

15   we understand and then understood the S.C.O. case, their

16   theory of the case was that I.B.M. had taken code from Unix

17   System Five and dumped that code into the Linux operating

18   system. We asked the Court to require them to identify by

19   file and line of code, what it is they say we took from Unix

20   System Five, and where it is exactly in Linux that they say

21   that we put that. Your Honor ordered them to do that.

22       In response to that order, S.C.O. does essentially

23   three things. First, Your Honor, they abandon any claim that

24   I.B.M. misappropriated any trade secrets. They fail to cite a

25   single trade secret allegedly misappropriated by I.B.M.

5

1    point in time touched the A.I.X. or Dynix operating system.

2        The notion is, Your Honor, that somehow I.B.M. is

3    prohibited from disclosing that code because it derives it in

4    someway from Unix System Five. What we asked for in our

5    responses is that they tell us, if that is the theory, exactly

6    where it is in Unix System Five that that code derives from.

7    Now, if it is the S.C.O. Group's position, Your Honor, that

8    the 17 or so files which they say we dumped from A.I.X. or

9    Dynix into Linux do not derive from Unix System Five, they are

10   not derivative works of Unix System Five, then they need

11   merely tell us and much of our concern with respect to this

12   issue will disappear. But it is not at least my

13   understanding, Your Honor, that that is their position.

14   Insofar as it is not their position we want to know exactly

15   what line of code these 17 files, or whatever files in the

16   future they identify, are supposed to have derived from.

17       In addition, Your Honor, the interrogatories that we

18   propounded asked S.C.O., and I think in very clear terms, and

19   this is in interrogatories 12 and 13, to identify exactly what

20   it is in Linux that they contend they have rights to.

21   Irrespective of whether or not I.B.M. is supposed to have

22   contributed this code to Linux, and that matters not just for

23   the case against I.B.M. but also for our counterclaims against

24   the S.C.O. Group. We asked them to identify that, Your Honor,

25   and what we have gotten is an answer that says, with respect

7

1    Second, they fail to identify a single line of Unix

2    System Five code which I.B.M. is alleged to have dumped into

3    Linux. Third, what they do is they clarify their theory of

4    the case. The theory of the case appears to be, Your Honor,

5    from the supplemental submissions, not that I.B.M. dumped code

6    from Unix System Five into Linux, but rather that I.B.M. took

7    code out of its flavor of Unix known as A.I.X. and Dynix, and

8    dumped that code into the Linux operating system.

9        Now, specifically S.C.O. identifies 17 files, parts

10   of 17 files, which it says were improperly contributed. With

11   respect to many of the lines of code in those 17 files they

12   properly identify which line it is they say we took from

13   A.I.X. or Dynix and where it is they say we put it in the

14   Linux operating system. With respect to many the disclosure

15   is I think sufficient. There are, nevertheless, a number of

16   files as to which they have not properly identified the lines

17   of code which they say were misappropriated, and we would like

18   to have them do that.

19       More fundamentally, Your Honor, we asked in our

20   interrogatories in at least seven different spots for them to

21   link up the A.I.X. Dynix code which they say we dumped into

22   Linux with the System Five code from which they say it is

23   derived. The theory here appears to be, Your Honor, that

24   I.B.M. cannot properly contribute code from A.I.X. or Dynix

25   even if it is its own home grown code, if it ever at some

6

1    to 17 files we own those and we may own some other ones, but

2    there might be all kinds of other code in Linux to which we

3    claim we have rights, but they won't tell us what that code

4    is. We don't have a definitive statement as to this open

5    operating system, Your Honor, which they have complete access

6    to. We don't have a statement that says those are the lines

7    of code that we own, and those are the only lines of code that

8    we own.

9        Instead what we have is a statement that says we own

10   these and we think we might own some other ones, and then we

11   get a list of a score of companies which they say might have

12   contributed code and, therefore, they may have additional

13   rights in Linux, but they won't tell us what those rights are.

14       We asked, Your Honor, that they categorically tell

15   us with respect to what they claim they have rights in in

16   Linux. Did we or did we not infringe that? We have been told

17   that we infringed some, but they will not and have not told us

18   but you don't infringe the rest, and we think we are entitled

19   to a statement as to an open operating system that either we

20   infringed the code in Linux or we don't, and if we do exactly

21   what code is it.

22       Furthermore, we asked that they tell us with respect

23   to all of the code in Linux to which they contend they have

24   rights, exactly whether they distributed the code or made it

25   available over the internet or gave it to somebody else, and I

8

2/5/2004 Motion Hearing February 6, 2004

1  think he get about two sentences which purport to describe the
2  extent to which they have disclosed it, and we don't think
3  that description even with its reference to some invoices is
4  enough.
5      Finally, Your Honor, what I would say is that what
6  is particularly troubling to us is that we are being told that
7  there are 17 files from A.I.X. or Dynix that we improperly
8  contributed. And yet as Your Honor I believe is aware and as
9  we lay out in our submission, the company C.E.O. is publicly
10  making statements to the effect that there are roughly a
11  million lines of code to which I.B.M. is tied, whatever
12  exactly that means. We want to know, Your Honor, if there is
13  anything other than those 17 files, which we're supposed to
14  have done something with, what exactly is it.
15      That, Your Honor, is not an exhaustive recitation of
16  the shortcomings in the response. Those are the most
17  important ones. The other ones can be found in the
18  correspondence with counsel.
19      I think what Your Honor should do with respect to
20  the interrogatories is to order the S.C.O. Group to again
21  within some I hope short term time frame provide the
22  additional information which we have requested. Certainly
23  with respect to the question of whether those lines of code
24  tie to Unix System Five, and if they contend that they do tell
25  us in unequivocal terms that the files that we're said to have

9

2/5/2004 Motion Hearing February 6, 2004

1  contributed do not derive from and are not derivative works of
2  Unix System Five.
3      Thank you, Your Honor.
4      THE COURT: Mr. Marriott, I am wondering if during
5  the remainder of the hearing if you could perhaps ask someone
6  with you to make a handwritten summary list of those things,
7  specifically.
8      MR. MARRIOTT: I can do that, Your Honor. Thank
9  you.
10      THE COURT: Thank you.
11      MR. HEISE: Good morning, Your Honor.
12      THE COURT: Good Morning.
13      MR. HEISE: Mark Heise, Boies, Schiller & Flexner
14  on behalf of the S.C.O. Group.
15      With respect to this first issue of compliance with
16  this Court's order requiring the supplemental interrogatories
17  and requests for production, at the last hearing virtually the
18  entire time was spent on the interrogatories so I am going to
19  focus my attention on the interrogatories.
20      We filed our interrogatory answers that supplemented
21  and they exhaustively detailed the improper contributions that
22  I.B.M. has made to Linux. On Monday I.B.M. sent to me a
23  letter detailing what they thought were deficiencies in it.
24  And on Wednesday I responded to that, both of which are in the
25  package that I.B.M. provided to you I believe it was

10

2/5/2004 Motion Hearing February 6, 2004

1  yesterday. In there we have detailed why it is what they are
2  asking for in this next round of supplemental answers is, A,
3  not what was asked for in the questions and, B, not at all
4  appropriate in light of what this case is about.
5      When they filed their responses or their report on
6  the compliance yesterday, it appeared to me that they were
7  abandoning their nitpicking points that they raised in their
8  letter, which I will be glad to address in detail because we
9  have in fact answered those questions. I did detail that in
10  our response dated February 4th.
11      THE COURT: You can choose to say whatever you wish
12  within your time constraints.
13      MR. HEISE: I understand, Judge. Thank you.
14      With respect to the overriding issue that I.B.M. has
15  presented to the Court, it is that S.C.O. has somehow failed
16  to identify line for line codes of System Five code that was
17  licensed to them that I.B.M. has put into Linux. That is not
18  and has not and will not be this case at this point.
19      As I started to allude to in chambers, Your Honor,
20  the fundamental reason why that information is not relevant
21  and is not provided is because of section 2.01 of the license
22  agreement. In 1985 I.B.M. made a commitment that they would
23  get this operating system called Unix System Five from AT&T
24  and they would agree to those terms. One of the most
25  significant terms of that is found in 2.01. It says that they

71

2/5/2004 Motion Hearing February 6, 2004

1  have the right to use Unix System Five and, in fact, they have
2  more than that. They have the right to modify it and they
3  have the right to create derivative works. I am reading from
4  the bottom part of 2.01 that is in bold. The important
5  limitation is that on that Unix System Five Code, on the
6  modifications to it and the derivative works to it, they must
7  treat it as part of the original software product.
8      And then the license agreement is very detailed as
9  to what they can or cannot do with the original System Five
10  code or their modifications or derivatives. Their
11  modifications and derivatives are called A.I.X. and Dynix.
12  They are required to keep them for their own internal business
13  purposes and keep them confidential and not give them away.
14      That is in fact what they have done as we have set
15  forth in the next page of the exhibit. They have taken their
16  modification or derivative known as A.I.X. or Dynix, and they
17  have contributed it to Linux allowing Linux to now become an
18  enterprise corporate use of this operating system. In the
19  absence of that it wouldn't have gotten there, but there can
20  be no question, and you have not heard I.B.M. come up here and
21  say, Judge, we have not contributed A.I.X. and we have not
22  contributed Dynix, They have in fact, and they have publicly
23  said they have done that, and we have provided line for line
24  copying of exact A.I.X. and exact Dynix code. They are
25  prohibited under this contract from doing so.

12

```
 1        If Your Honor thinks of it as a ladder with the
 2   first ten steps being Unix System Five, because let there be
 3   no doubt, there are over 1,000 files in A.I.X. that are
 4   attributable to AT&T. So in that A.I.X. core there is that
 5   platform, those first ten rungs of the ladder. What they have
 6   done is they have created their flavor of their version of
 7   that operating system called A.I.X. or Dynix, and that is now
 8   rungs 11 through 20. They are saying in rung 16 you're not
 9   showing me the Unix System Five Code. That is not what this
10   case is about. This case is exactly about what is set forth
11   in 2.01. You can't take the System Five code and you can't
12   take your derivatives or your modifications.
13        If they want to come in here and say, but those
14   derivatives or modifications came from somewhere else and they
15   were wholly created by us, then you know what, they have to
16   prove it. It is not good enough for big blue to come in and
17   say that.
18        THE COURT: Mr. Heise, I think you're arguing the
19   merits more than the scope of this hearing.
20        MR. HEISE: The reason I am maybe going more into
21   the merits than I probably should in front of Your Honor, is
22   it directly ties into the adequacy of these interrogatory
23   answers. The interrogatory answers detail exhaustively the
24   contributions of A.I.X. and Dynix that were made in there.
25   There is no dispute about that.
```

```
 1   have publicly acknowledged that they have contributed, they
 2   have laid out how it is that they have contributed it, and it
 3   was a part of A.I.X. or Dynix, and what they are saying is
 4   show us the lines. That is the equivalent of saying I am not
 5   going to show you the book that contains all of these lines of
 6   code, therefore, all we can do is say it is from A.I.X. or
 7   Dynix and you have said it is and we have identified how it is
 8   and why we believe it is in fact from A.I.X. or Dynix. But to
 9   sit here and say to us when they have not given us their
10   source code, and their source code is what is matched up --
11        THE COURT: This is about your response and
12   compliance with the Court order.
13        MR. HEISE: I understand that.
14        We have given the technology based upon the
15   information we have. The answers to interrogatories that they
16   are complaining say, yes, but for those given technologies you
17   have not identified the specific lines. What we have said in
18   our answers to interrogatories is we can't identify those
19   specific lines because it comes from your confidential code
20   which we don't have access to yet.
21        THE COURT: Mr. Heise, this is the problem. The
22   problem is that unless you identify those codes, which was
23   required by the Court order --
24        MR. HEISE: Which we did.
25        THE COURT: -- then I.B.M. is not in a position
```

```
 1   They then in this letter that they wrote earlier
 2   this week said, well, you didn't identify the line for line
 3   matching in every single place. There are two times when we
 4   did not do that in our answers to interrogatories. One is in
 5   table A of our interrogatories which we identified eight
 6   different files and we said the copying is complete
 7   throughout. We are not matching up the lines and I gave an
 8   example of that in the demonstrative aides when it says
 9   copying of Dynix slash into Linux, and you can see the red on
10   the right is exactly the same as the red on the left, and that
11   is line for line copying. So that is the one instance in our
12   interrogatory answers where we admittedly said in there it is
13   throughout. We are not identifying lines here.
14        The other place where we did not identify the line
15   for line copying are for certain technologies known as
16   asynchronous input output and for scatter gather input and
17   output. There is a very fundamental reason. because to be
18   able to do the line for line matching we need to have their
19   source code. They have given us zero A.I.X. and two C.D.'s of
20   Dynix.
21        THE COURT: But the requirement of the Court is
22   that you provide those source codes.
23        MR. HEISE: I think there is a fundamental
24   misunderstanding and let me explain why.
25        With respect to these other technologies that they
```

```
 1   necessarily to respond, the way I see it. So we are at an
 2   impasse and we can't be at an impasse and have the case remain
 3   at a standstill. That is why there is an order in place that
 4   S.C.O. has been required to comply with, so that I might then
 5   address what I.B.M. has to comply with.
 6        MR. HEISE: But I'm trying to stay focussed on our
 7   compliance.
 8        I guess maybe a way to explain it, is in the
 9   technologies that they have contributed, let's say in rungs 15
10   and 16, that is not from us. That is not our Unix System Five
11   code. That is A.I.X. or Dynix. We don't have that source
12   code to be able to identify the lines, because they are
13   quibbling about the fact that we have not identified the lines
14   of a couple of technologies. We don't have the source code
15   for 15 and 16. They do.
16        If they give it to us we'll supplement it further,
17   but in the absence of that it is literally impossible to
18   identify the lines. We have identified the technology, we
19   just cannot identify the lines because we don't have their
20   derivative modification source code. That is why and that is
21   what I am trying to get across.
22        THE COURT: Well, you have made your point, I am
23   just not certain I agree with it.
24        MR. HEISE: Fair enough.
25        As I detailed in the February 4th letter that Your
```

1   Honor has we have addressed everything. All we are talking
2   about is whether it is a derivative or whether it is a
3   modification. As you pointed out when I kept going down that
4   path, that is the merits of the case. That is not appropriate
5   on a discovery motion.
6         With respect to the production of documents, we have
7   in this case gone to every office, gone into peoples'
8   individual offices, gone into peoples' home offices, and we
9   have gathered and collected more than a couple million pages
10   of documents. We have produced over a million pages of
11   documents. We have produced 400 million lines of Unix code,
12   most of which I fail to see how it has any relevance. We have
13   produced 300 million lines of Linux code, and we have gone
14   through exhaustively to provide them with documents in the
15   order they wanted it, and they wanted it from the top
16   executives down. As we indicated earlier there were technical
17   difficulties when going through it. Some of the third party
18   vendors didn't process materials because they were so focussed
19   on the other. We have made every effort to correct that.
20         I understand from our discussions before that we
21   should have filed a motion for enlargement rather than explain
22   it by affidavit. I take full responsibility for that. That
23   was error on our part. But we have literally undertaken these
24   Herculean efforts to provide them with every document that we
25   can get our hands on.

1         And throughout the course of this case, Your Honor,
2   there will be more documents. There will be more documents by
3   them and there will be more documents by us. That is just the
4   nature of discovery.
5         THE COURT: How much time do you need to provide
6   these additional things that have yet to be supplied? And if
7   I order an absolute strict compliance to the previous order,
8   and/or some of the items that I.B.M. is indicating, I want you
9   to state for me a reasonable and rapid date on which those
10   could be provided.
11         MR. HEISE: With respect to the supplemental
12   documents that have been collected and that we are trying to
13   gather and provide to them, I would anticipate it being done
14   in two weeks. But to give myself, so I don't have to come
15   back before you and file a motion for enlargement, I would
16   rather say four weeks and go with that.
17         THE COURT: All right. Do you have anything else?
18         MR. HEISE: With respect to our compliance, no,
19   Your Honor.
20         As I said, you know, I am sure we'll be here talking
21   about this document is missing and that document is missing.
22   That is just the nature of the beast.
23         Thank you very much, Your Honor.
24         THE COURT: Thank you.
25         Mr. Marriott, do you have any response to this? And

1   I have a question for you as well.
2         MR. MARRIOTT: I do, Your Honor.
3         I believe that Mr. Heise said, Your Honor, was that
4   the reason that we had not been given all of the line for line
5   match-up that we had asked for is because the only way that
6   they can do that is for us to give them discovery. When I
7   stood, Your Honor, ten minutes ago and described to you the
8   principal failing, it is not that they have not identified all
9   of the lines of code in A.I.X. and Dynix, which they have no reason
10   dumped into Linux, it is the lines of code in Unix System
11   Five. That is the product they purport to have acquired from
12   AT&T and it is in their possession, and there is no reason
13   that they can't do that, or state categorically that it is not
14   the case and that they are derivatives of System Five. You
15   didn't hear Mr. Heise say that.
16         That is my only response, Your Honor.
17         THE COURT: Mr. Marriott, my question for you is,
18   do you acknowledge or not acknowledge that S.C.O. is in
19   substantial compliance with the previous order?
20         MR. MARRIOTT: Well, that is a very hard question,
21   Your Honor. We were provided with a lot of documents and we
22   were given certainly a lot more specificity than we had been
23   provided previously.
24         The difficulty is that since in our judgment without
25   getting to the merits, but in our judgment the question here

1   is whether the code they say we have dumped into Linux can be
2   linked to Unix System Five. They have a different view. We
3   won't argue the merits of that. Certainly we are entitled to
4   discovery as to whether that is the case. I would refer Your
5   Honor to our interrogatory numbers one, two, four, six, nine
6   and 13.
7         In one we ask for confidential information misused.
8   In two we ask for the nature and the source of the rights. In
9   four we ask for the manner of misuse. In six the origin of
10   the code and the products upon which it is based. I mean, the
11   list goes on, Your Honor. One of which, in fact, 12 asks
12   specifically whether the code was derived from Unix System
13   Five. So whether or not we have the same view on the merits
14   as S.C.O. as to the contracts, which clearly we do not,
15   certainly we are entitled to discovery as to our understanding
16   of the way the contract works. We have clearly asked for
17   that. This is a case that to my mind is about whether Unix
18   System Five in one fashion or another, either directly or
19   because some derivative of it has been dumped into Linux has
20   been adequately provided and we don't have that.
21         To be asked when they have given us a lot, Your
22   Honor, it is --
23         THE COURT: Maybe that is a determination for me
24   and not for you.
25         Do you have anything else on this?

1      MR. MARRIOTT: I do not, Your Honor.

2      THE COURT: Thank you.

3      I will take that under advisement, but let's go

4    forward now on the issue of S.C.O.'s motion for discovery from

5    I.B.M.

6      MR. HEISE: Thank you, Your Honor.

7      With respect to S.C.O.'s motion to compel, in this

8    case I.B.M. prior to the Court entering the stay on December

9    5th had produced approximately 150,000 pages. They have

10   produced two C.D.'s of Dynix source code and zero C.D.'s of

11   A.I.X. source code.

12     First and foremost, they have repeatedly stated

13   throughout this case that they would provide the A.I.X. and

14   Dynix source code and we just have not gotten it.

15     THE COURT: Well, that may be the result of this

16   order which said hold on, we are stopping this until those

17   source codes were revealed.

18     MR. HEISE: Your Honor, there had been numerous,

19   repeated promises of delivery of that source code prior to

20   December 5. It had nothing to do with the stay that this

21   Court entered. Numerous times we were told we would get it.

22   What we then were told is we can't provide it to you because

23   we have not gotten these third party notifications done. What

24   that means is that within the source code some third party

25   also has their source code and they need to make sure that

21

1    they are okay on that.

2      That is a process that has literally dragged out for

3    months, and I am still getting contacted by third party

4    vendors of theirs that are saying how can we work this out? I

5    have immediately responded and worked it out and it is still

6    not happening.

7      The other critical deficiency in the production of

8    documents and interrogatory answers, is that there is nothing

9    from any of the highest levels of the company. As you saw

10   when I.B.M. was filing their motion to compel they kept asking

11   for Don McBride, the C.E.O., Chris Sontag, senior vice

12   president, all of the top key people and kind of working their

13   way down the ladder.

14     What we have gotten from I.B.M. is working its way

15   up the ladder, despite the fact that on October 28th and other

16   occasions I have spoken with representatives of I.B.M. and

17   said we want the documents and materials from Sam Palmisano,

18   from Irving Wladawsky-Berger, the key executives that are

19   intimately involved in the Linux project.

20     In our reply memo in support of this motion to

21   compel we in fact provided an article from the New York Times

22   where Mr. Palmisano is identified as the leader of moving

23   I.B.M. into the Linux movement. Mr. Wladawsky-Berger is a

24   core, critical person and they are not mentioned in any of

25   their interrogatory answers and we have gotten no documents

22

1    from them.

2      But in terms of going to the specifics of the

3    request for production, we have asked for in items two and

4    three of our requests for production, all A.I.X. and Dynix

5    versions and iterations. As I said, we have gotten zero from

6    A.I.X. and we have gotten two C.D.'s of Dynix. What was laid

7    out in I.B.M.'s response to this motion to compel, in part was

8    that would be unduly burdensome. At the last hearing they

9    told you that that could be up to 40 million pages of code and

10   how could we possible undertake that extravagant exercise to

11   get that.

12     In the limited discovery that we have gotten from

13   them it is clear why no affidavit or no supporting proof was

14   given as to this and why it is allegedly burdensome.

15     If may hand this to Your Honor?

16     THE COURT: Okay.

17     MR. HEISE: What I am handing you is a document

18   from I.B.M. that has been marked as confidential. It is

19   regarding an item called the C.M.V.C. which stands for

20   Configuration Management Version Control. As you can see,

21   Your Honor, it says in the beginning it is used by the A.I.X.

22   development organization, and through the highlighted portions

23   of the document it identifies that configuration management is

24   a process of identifying, managing and controlling software

25   modules as they change over time.

23

1      In other words, so that we would be able to get

2    every version, every iteration, and that version control is

3    the storage of multiple versions in a single file along with

4    information about each version. Then it gives a simplified

5    description at the bottom saying what it basically does is it

6    boils down to that all levels of all files are stored on a

7    central server and are available for viewing and/or updating

8    by those with proper authority.

9      They can get us the A.I.X. It is clear as a bell we

10   are entitled to it and they said they would give it to us and

11   we just have not gotten it.

12     With respect to request or production number 11 and

13   interrogatory number five, they are directed towards all of

14   I.B.M.'s contributions to Linux. From A.I.X. to Dynix,

15   anything that you have done, any work that you have done for

16   Linux, provide it to us. With respect to the request for

17   production the response I.B.M. has made is, quote, I.B.M. has

18   made a lot of contributions so it is going to be a daunting

19   task. I.B.M. has made a lot of contributions. That is not a

20   reason why they are not required to produce them.

21     That is a core issue to this case, as I kind of went

22   off track before under 2.01. What did you do with this

23   material that we said that you were not allowed to make

24   public? They are required to identify that. And what is a

25   critical follow up to the production of all of what they have

24

1  produced is interrogatory 11, which specifically requires that
2  they identify who worked on it and what they did. They say
3  there are hundreds of people and that is an onerous task.
4  Well, it is a critical task. That is exactly what this
5  interrogatory is designed to do, is for us to know who at
6  I.B.M. worked on it and what they did. Because at the end of
7  the day if we get a list of their 300 people that they have
8  identified already or approximately in that range, and a
9  person has made one contribution over here and this other
10  person has made 50 contributions, the deposition is more
11  likely to be taken of the person who has made 50.
12      If I just get a random list of names I have no idea
13  of how to weigh who it is I should be focussing my attention
14  on. That is why it is critical that the interrogatory be
15  answered fully and completely.
16      With respect to interrogatory number two, we asked
17  for all persons with knowledge. They limited it in their
18  answers to just I.B.M. people. They voluntarily have agreed
19  that they will in fact provide the identity of all persons
20  with knowledge and with information in this case. The only
21  thing I would reiterate here is it has to be inclusive. They
22  can't exclude top management because they are very important
23  executives. Sam Palmisano is a critical witness in this case.
24  The fact that he is the C.E.O. of I.B.M. does not make him
25  somebody who is not to be put on this list.

1  and match it up and see where it begins and ends, but we can't
2  be left to the guessing game. It is a technical issue but it
3  is something that can presumably be corrected, and it
4  certainly needs to be done on a going forward basis.
5      That is the gist of our motion to compel, Your
6  Honor. I appreciate your time this morning.
7      THE COURT: Thank you.
8      Mr. Marriott.
9      MR. MARRIOTT: Thank you, Your Honor.
10      The S.C.O. Group propounded 57 document requests
11  and/or interrrogatories, Your Honor. 52 document requests and
12  there were five interrogatories. S.C.O.'s motion to compel
13  concerns only six of those requests, three document requests
14  and three interrogatories. The requests, Your Honor, break
15  down into roughly four categories. There are, I would submit
16  really, only two issues that deserve argument, that is
17  argument as to two categories of the four. That is because if
18  Your Honor looks at our opposition to their motion to compel,
19  I think in part this is a motion that makes much ado about
20  nothing, because we either have indicated that we will provide
21  or have provided much of the information requested.
22      For example, Mr. Heise makes reference to desiring
23  to know the identity of the people who have contributed in
24  some way to A.I.X. or Dynix. Well, there is provided as an
25  exhibit to our response, Your Honor, a list of about 8,000

1      There is that New York Times article that was
2  attached to our reply memo, it identifies and there was a ten
3  page report that he and Mr. Wladawsky-Berger and a couple of
4  others put together in deciding whether I.B.M. should shift
5  gears and go to Linux. We don't have that ten page report and
6  it is a critical document. Those are the things that we have
7  asked for. We have had specific conversations with Christine
8  Arena at Cravath asking specifically for Mr. Palmisano stuff,
9  for Mr. Wladawsky-Berger, Paul Horn, Nick Bowen, those
10  peoples' information. We have not gotten it.
11      Throughout these they have not provided the contact
12  information so that we would not be able to locate these
13  people, and that is just clearly information that needs to be
14  put in there.
15      The final point is more of a housekeeping matter,
16  and that is in the production that we have received to date,
17  we will get a C.D. and it will say there are two documents on
18  it. The two documents will be 4,000 pages long. Clearly that
19  is not the case. When S.C.O. has been producing C.D.'s it has
20  identified where each document begins and ends. We have asked
21  them, you have to identify where the documents begin and end.
22  Put a source log with the C.D. Otherwise it is impossible to
23  know how these documents were kept in the ordinary course of
24  business as is required under Rule 34(b).
25      Certainly on some documents you can figure it out

1  people who made contributions. So the notion that somehow we
2  have not done that is absolutely incorrect.
3      Let me focus, if I may, Your Honor's attention on
4  the two points on which I think we do have a genuine dispute.
5  The S.C.O. Group has asked for the production of all Dynix and
6  A.I.X. code during the relevant period, every iteration, every
7  version known to man or woman. They have also, Your Honor,
8  and this is the other category, asked for every contribution
9  that I.B.M. has ever made of any kind, however irrelevant to
10  this case, to Linux or to the open source community. Let me
11  take each of those in turn.
12      With respect, Your Honor, to the request that we
13  produce every conceivable version or iteration of A.I.X., the
14  only theory, Your Honor, disclosed by the S.C.O. Group as to
15  how it is that I.B.M. breached its contracts with AT&T, is
16  that somehow I.B.M. has disclosed code from A.I.X. and Dynix
17  into Linux. Having production of every iteration and version
18  of A.I.X. and Dynix is entirely irrelevant, Your Honor, to the
19  determination as to whether or not those products are
20  improperly contributed. The theory is they are somehow
21  derived from Unix System Five.
22      If I may, Your Honor, referring to the S.C.O.
23  Group's exhibits in connection with this hearing, if you look
24  at page 2, which they call defendant's improper contributions
25  to Linux, and they are not numbered, Your Honor, but I believe

1    it is page 2, substantive page two.

2          Their theory, Your Honor, is that we have taken some

3    code from here and we have dumped it into Linux. One does not

4    need to know and does not need to have production of every

5    version and iteration of A.I.X. and Dynix in order to figure

6    out whether the contribution of these 17 files is somehow

7    improper.

8          One determines, Your Honor, whether a contribution

9    is a derivative work of Unix System Five and therefore under

10   their theory improper, simply by comparing the 17 files that

11   were disclosed that they have identified to Unix System Five,

12   to determine whether they are a derivative of Unix System

13   Five. If they are then under their theory there might be a

14   problem. Under our theory, and we have a different theory

15   from them, but under their theory there might be a problem.

16   But one does not need the code at this level to figure that

17   out. The case law is absolutely that you figure out whether a

18   work is a derivative work by comparing level C here to level

19   A, not by looking at the millions of lines of source code that

20   they want at this level.

21         THE COURT: What case are you relying on for that

22   proposition?

23         MR. MARRIOTT: I would refer the Court, for

24   example, to the Computer Associates decision out of the Second

25   Circuit, which is one of the leading cases on copyright

29

1    infringement, wherein the nature in which a derivative work is

2    determined is laid out. If you will permit me --

3          THE COURT:    That is fine. You can provide it at a

4    later time.

5          MR. MARRIOTT:  Put aside the case law, Your Honor,

6    and just look at the next page in the S.C.O. Group's book.

7    This is the page in which they say others have complied with

8    the requirements of licensing agreement. What you see is the

9    S.C.O. Group reflecting itself at the top and representing

10   that they have relationships with H.P and I.B.M. and Sequent

11   and Sun, indicating, according to this chart, that somehow

12   Sequent and I.B.M. have improperly made contributions, the 17

13   files we referred to.

14         Then referring to H.P. and Sun and saying H.P. and

15   Sun have not made any contributions to be concerned about,

16   they have complied with the licensing agreement. How do they

17   figure that out, Your Honor, that H.P. and Sun complied? I

18   would submit to you that H.P. and Sun have not produced

19   millions of lines of source code to them so that they can do

20   this comparison that they represent is so critical to the

21   Court. That is absolutely not the case.

22         They have figured it out and they have reached the

23   conclusion that they are willing to announce publicly, that

24   these other companies don't somehow infringe their rights

25   without reference, I would submit, to a single line of the

30

1    code from H.P.U.X. or Solaris. If they have used that code

2    then they should have produced it in discovery to us because

3    our request would have called for it and we don't have it.

4          If that is not enough, Your Honor, take a look if

5    you would, please, at a document which I can only describe

6    generally because it has been marked by the S.C.O. Group as --

7          May I approach, Your Honor?

8          THE COURT: Certainly.

9          MR. MARRIOTT: This document has been marked as

10   confidential so I'm limited in what I can say about the

11   document, Your Honor.

12         But if you will look at this you'll see that it is a

13   letter from S.C.O. to H.P. If you take a look at the last

14   paragraph of the document, Your Honor, you'll see that in

15   order to reach the conclusion they reach here, they didn't

16   rely upon, and I would submit that they won't tell you that

17   they did, the production of millions of lines of code from

18   H.P. or from Sun or from anybody else. That is because that

19   code is not required for them to reach the conclusions they

20   reach as to why it is I.B.M. has supposedly breached its

21   agreement with AT&T.

22         Their own documents, Your Honor, damn the notion

23   that they somehow require the production of millions and

24   millions of lines of source code in order to figure out

25   whether I.B.M. has breached its agreements with AT&T.

31

1    Your Honor, we are nevertheless, however irrelevant

2    I believe that the production of this code is, we are

3    nevertheless prepared to produce a substantial amount of code.

4    We have produced already significant lines of code from Dynix,

5    and we are prepared to produce, and the reason we have not

6    produced it, by the way, Your Honor, is because you ordered us

7    not to. You put in place a stay and the production of the

8    code that Mr. Heise complains about would have put us in

9    violation of the order of the Court. We thought it prudent

10   not to do that.

11         If you look, Your Honor, at what we are willing to

12   produce it is a substantial amount of code. We either have

13   produced or will produce three million pages of paper of

14   source code. It isn't every conceivable iteration of these

15   products. It is, however, about 232 products.

16         If I may approach?

17         THE COURT: Certainly.

18         MR. MARRIOTT: Now, again, I think the production

19   of this material is entirely uncalled for, Judge, but we are

20   prepared to do it to put to rest this notion that somehow

21   I.B.M. is somehow hiding the ball with respect to the

22   production of source code. This amounts to well over 100

23   million lines of source code and we are prepared to produce

24   that. We said we were prepared to produce that in our

25   opposition papers. This is the releases of A.I.X. and Dynix

32

2/6/2004 Motion Hearing February 6, 2004

1  and the released products during the relevant time periods
2  that they are concerned about.
3       What we are not willing to do, Your Honor, is to
4  produce every conceivable draft and iteration and version of
5  this stuff that might exist in the files of the company that
6  has more than 100,000 employees, with respect to products that
7  were developed over decades, and as to which 8,000 different
8  individuals worked on.
9       To state it, Your Honor, is to express its
10 absurdity. We are willing to produce far more than they ever
11 had. I would submit again that they had no lines of code from
12 H.P. and Sun and they were able to reach the conclusion that
13 they are perfectly compliant. We are willing to give them
14 more than 100 million lines of code but that is not good
15 enough. What they say they have to have is every single
16 conceivable version of a product worked on by thousands of
17 people, and if there is a draft of this line or that line, if
18 it exists in this database to which Mr. Heise refers. He
19 wants us to dump on him a database that would be, I would
20 submit among other things, horribly burdensome to do and for
21 which there is simply no cause.
22      We are prepared to produce these lines of code, Your
23 Honor, and that ought to be enough I think for any case,
24 certainly in view of what seems to be sufficient with respect
25 to other persons who were in no different situation for this

33

2/6/2004 Motion Hearing February 6, 2004

1  purpose than is I.B.M. That is the first category, Your
2  Honor, and there is no reason for an order to compel of any
3  kind. As we said in our opposition papers, we will provide
4  them with the information and we are happy -- we are not
5  happy, Your Honor, we are willing to do that.
6       With respect to the next category that I think
7  merits mention, they have requested again I think in an
8  overreaching fashion, for every conceivable contribution that
9  I.B.M. has said to have made or may have made to Linux or to
10 the open source community. We have already produced or agreed
11 to produce approximately three million pages of paper. We
12 have produced documents from approximately 90 separate
13 custodians, Your Honor, located in various parts of the
14 country.
15      We have not withheld from the production of those
16 materials a contribution that a person may have made to the
17 open source community. We are not running through and pulling
18 out contributions. What we are saying is that it is entirely
19 unrealistic and uncalled for and unduly burdensome to expect
20 that we would produce every conceivable contribution. Why is
21 that the case? That is the case because as you may remember
22 from our last hearing before Your Honor, when we handed Your
23 Honor the open source development lab chart which shows the
24 way in which Linux was developed, the contributions to Linux,
25 Your Honor, are public. This is a public affair. They know

34

2/6/2004 Motion Hearing February 6, 2004

1  what they are.
2       Anyone can find out what they are simply by looking
3  in the public record. There is no reason to have me have to
4  run around and interview hundreds of people to figure out
5  whether they may have made a contribution, whether it may
6  still be in their files, when all the S.C.O. Group has to do
7  is get on the internet and find the contributions. How after
8  all did they get the information that they provided in
9  response to the interrogatories? They got it off the
10 internet.
11      Your Honor, I would, if I may, again wish to show
12 you two documents which I am constrained from describing in
13 any detail because they are marked as confidential under the
14 productive order.--
15      May I --
16      THE COURT: Certainly, and you need not ask.
17      MR. MARRIOTT: Thank you.
18      These, Your Honor, are e-mails produced in the
19 litigation by the S.C.O. Group. If you look at them what you
20 will see is and, again, I will not describe them in any great
21 detail, you will see that they fully understand that the
22 documents that they are interested in about I.B.M.'s
23 contributions are available on the internet. They can get
24 them and find them for themselves.
25      I don't have much more to add, Your Honor, than that

35

2/6/2004 Motion Hearing February 6, 2004

1  I think it a silly exercise to require us to produce to them
2  that which is already publicly available. Indeed, that is not
3  a proposition without support in the case law. Rule 26 itself
4  expressly provides, and I quote, and this is 26(b)(2), the
5  frequency or extent of use of the discovery methods otherwise
6  permitted under these rules shall be limited by the Court if
7  it determines that the discovery sought is obtainable from
8  some other source that is more convenient, less burdensome and
9  less extensive.
10      There are two decisions, the Ebers case from the
11 District of North Dakota, which is 2003 WestLaw, 22097788, in
12 which the Court there grants a protective order for discovery
13 that sought information that was available to the public by
14 calling the court, for example. In another case, American
15 Medical Systems versus National Union Fire, which is 1999
16 WestLaw, 562738, where the court denied a request of a party
17 to compel discovery with respect to documents that were
18 available under F.O.I.A.
19      These documents are publicly available and we
20 shouldn't have to run around collecting them. There is ample
21 support for the proposition, Your Honor, that nebulous
22 requests for all kinds of contributions can't be the basis of
23 massive discovery.
24      THE COURT: Assume, Mr. Marriott, that I am going
25 to require I.B.M. to comply in some fashion. What period of

36

```
 1   time reasonably after receipt of continued discovery that I
 2   may order to be supplied by S.C.O. will it take?
 3        MR. MARRIOTT: Are you referring specifically to
 4   the request for production of contributions, Your Honor?
 5        THE COURT: Yes. Well, just everything.
 6        MR. MARRIOTT: With respect to the code, we are in
 7   a position to produce the code within 14 business days of the
 8   lifting of the stay.
 9        THE COURT:- All right.
10        MR. MARRIOTT: By the way, when I say produce the
11   code I am referring to the code on this list of 232 products,
12   not every conceivable iteration known to man or woman. That
13   would take many, many months and I don't even want to think
14   how long it would take to compile that information. But as to
15   this list, hundreds of millions of lines of code, this can be
16   done within 14 business days, Your Honor, of the lifting of
17   the stay.
18        With respect to the contributions, all conceivable
19   contributions, it would take months to identify, collect,
20   review for privilege, send to a vendor and get produced onto a
21   C.D. that information. It would be done I think at
22   extraordinary expense.
23        THE COURT: Thank you, Mr. Marriott.
24        Mr. Heise?
25        MR. SCHAUGHNESSY: Your Honor, may I just give you
```

37

```
 1   the cite to the case you asked for?
 2        THE COURT: Certainly. Why don't you just hand it
 3   to --
 4        MR. MARRIOTT: This is probably a better cite than
 5   the Computer Systems case, although that is a leading case on
 6   copyright infringement.
 7        MR. SCHAUGHNESSY: It is a case from the Ninth
 8   Circuit, Litchfield versus Spielberg, 736 F2nd, 1352, a 1984
 9   case from the Ninth Circuit.
10        THE COURT: Thank you.
11        MR. HEISE: Thank you, Your Honor. Very briefly
12   because I know you have a busy day.
13        The vast, vast majority of what you heard was
14   argument relating to the merits of this case and not about
15   what is at the core of any inquiry on a motion to compel,
16   which is are we entitled to relevant information, information
17   that tends to prove a fact one way or the other? I.B.M. has
18   spent the better part of today trying to say that A.I.X. and
19   Dynix are not derivative works. They say that and then they
20   say we are not going to give you any proof to be able to prove
21   otherwise.
22        So if they are going to come up here and say A.I.X.
23   and Dynix are derivative works, that may obviate the need for
24   some of this discovery. But in fact we have asked them in a
25   request for admission, which we have provided to you as a part
```

38

```
 1   of our notice of filing, admit A.I.X. and Dynix are derivative
 2   works of Unix System Five. They say we don't know what you
 3   mean by A.I.X., and we don't know what you mean by derivative
 4   works, and we don't know what you mean by Unix System Five and
 5   there are multiple versions so we can't answer this so,
 6   therefore, it is denied.
 7        They can't talk out of one side of their mouth and
 8   say it is not a derivative work, and then turn around and talk
 9   out of the other side of their mouth and say we are not going
10   to give you any of the source code for you, S.C.O., to be able
11   to disprove our contention that in fact A.I.X. and Dynix are
12   derivatives and modifications of System Five.
13        We know from the little bit of discovery that we do
14   have that there is over 1,000 files of AT&T that are within
15   A.I.X. That is going to make it a modification for a
16   derivative work. They are not entitled to continue to sit
17   here and say, one, it is not a derivative work and, two, we
18   are not going to give you any evidence to be able to disprove
19   that.
20        With respect to this contention regarding how did
21   they know this regarding Hewlett Packard and that Hewlett
22   Packard complied with the license agreement? Well, there is a
23   fundamental difference between Hewlett Packard and Sun and
24   virtually every other licensee out. They have not all gone
25   around and said, great news, we are taking our derivative
```

39

```
 1   work, our modifications, and we are contributing it to Linux.
 2   H.P. has specifically not done that.
 3        These other companies are setting up Chinese walls
 4   and they are not taking that modification or that derivative
 5   work, and in the case of H.P. it is called H.P.U.X., and they
 6   are not taking bits and pieces of H.P.U.X. and dumping it into
 7   Linux. That is what I.B.M. is doing and they are not allowed
 8   to do that under the terms of their agreement. It is a very
 9   simple proposition as to why that statement can be made
10   comfortably by the company.
11        With respect to this notion that they don't have to
12   identify their contributions to I.B.M. because it is public,
13   not every contribution that they have made is public. Not
14   everything that they have done to put into Linux is public.
15   Unless somebody is going to come up here and say that, and
16   maybe a way to limited it, is show us everything that is not
17   on the web site. But the fact that some of the information is
18   public does not make it a complete disclosure of everything
19   that I.B.M. did. I.B.M. is obligated in this case to answer
20   this very straightforward question that goes to the core of
21   this case. What contributions did you make to Linux? What
22   work did you provide to Linux?
23        At the end of the day they can say, do you know
24   what, this thing we did here that is not a violation of the
25   agreement. This thing we did over here, that is not a
```

40

1  violation of the agreement. But until we see what it is that
2  they are acknowledging and that they must under the rules of
3  discovery, then we are entitled to that information. but they
4  don't get to just say some of this may be public and,
5  therefore, we don't have an obligation to respond.
6       They have got all these versions and iterations
7  on a central server. They make it available to all of their
8  employees. I fail to understand how it can be on a central
9  server at I.B.M. available to all I.B.M. employees to track
10 all versions and all iterations of A.I.X, but we can't have
11 access to that in their responses to litigation. It is not
12 what the rules provide. They have got easy access. There has
13 been no affidavit or other evidence of the allegedly
14 burdensome nature of this. In fact, this document belies such
15 an argument.
16      As a result we are clearly entitled to the
17 information that we have asked for, and particularly the
18 contributions. and the source code that they have agreed to
19 give us, and they have to have these employees identify which
20 employees made which contributions to this, so that when
21 discovery progresses we don't look at a list of 300 or 8,000
22 and have to guess which ones we should start with.
23      Thank you very much for your time, Your Honor.
24      THE COURT: Mr. Marriott?
25      MR. MARRIOTT: May I just briefly respond, Your

41

1  concerns code well beyond the A.I.X. code base.
2       Moreover, the notion that somehow we are unallowed
3  to contend that it would be burdensome for us to comply with
4  these requests because we have not submitted an affidavit is
5  entirely inconsistent with the law that governs in this
6  circuit.
7       I would refer the Court to the Aikens decision at
8  217 F.R.D. 533, the Bradley decision at 2001 WestLaw, 1249339,
9  and the Pulsecard case at 1996 WestLaw, 397567. Affidavits
10 are not required, Your Honor, to show over breadth or undue
11 burden where the details are provided in the briefs or that
12 the over breadth is obvious.
13      I would submit to Your Honor that asking us to
14 produce what would amount to a billion lines of code, if we
15 were to produce every conceivable iteration, is on its face
16 overly burdensome.
17      Thank you, Your Honor.
18      THE COURT: Counsel, while it is somewhat unusual
19 in a discovery matter to take something under advisement, I
20 think that based upon the somewhat complex nature of the
21 requests that I will issue a written order as to both of the
22 issues before the Court. We'll try to do so within the next
23 week.
24      Mr. Marriott?
25      MR. MARRIOTT: May I inquire, Your Honor, you had

43

1  Honor?
2       THE COURT: Certainly.
3       MR. MARRIOTT: I don't think, Your Honor, that we
4  have suggested this morning that we are giving them no source
5  code. What we have said is we are going to give them hundreds
6  of millions of line of source code. So I think it is
7  inaccurate to say or suggest that they should somehow figure
8  this out without the production of any source code.
9       As to the notion that H.P. is somehow different,
10 Your Honor, it is a matter of public record what H.P. makes
11 significant contributions to Linux. Under Mr. Heise's theory,
12 Your Honor, there is absolutely no way that he could know
13 whether these contributions were proper or improper or from
14 their Unix product or not, unless under his theory he had all
15 of their source code. So it is impossible to distinguish H.P.
16 under some notion that somehow they are not making
17 contributions to Linux. It simply is not true, and there
18 would be no way under his theory for him to know whether or
19 not the contribution was a problem unless he had the millions
20 of lines of source code which he has not been provided, which
21 he didn't tell you he has been provided but which we have said
22 we are willing to provide to them.
23      The C.M.V.C. database, Your Honor, is not a database
24 that can simply be produced, Your Honor, and turned over. It
25 is not a database that concerns solely A.I.X. code. It

42

1  asked whether I could have someone prepare a summary of our --
2       THE COURT: Yes.
3       MR. MARRIOTT: It is not very pretty, and if I
4  might, we have I just didn't bring it a prettier version of
5  this which I would be happy to send to you this afternoon, or
6  I can hand you this.
7       THE COURT: I am happy to take that, but if you'll
8  give that to Ms. Pehrson she can make a copy of that for Mr.
9  Heise and for me.
10      MR. HEISE: The only thing I was going to suggest,
11 is their criticisms and our responses are laid out in the
12 letters of January 3rd and February 4.
13      THE COURT: I understand that. All right
14      With that we'll be in recess on this matter and we
15 will get that order out as quickly as possible.
16      Thank you.
17      (Proceedings concluded.)

44

2/6/2004  Motion Hearing February 6, 2004

```
 1    STATE OF UTAH          )
                             )
 2                           )
                             )
 3    COUNTY OF SALT LAKE    )

 4              I, R. Edward Young, do hereby certify that I am an

 5    Official Court Reporter for the United States District Court

 6    for the District of Utah;

 7              That as such Reporter I attended the hearing of the

 8    foregoing matter on _____2-6-04_____ and thereat

 9    reported in Stenotype all of the testimony and proceedings

10    had, and caused said, notes to be transcribed into

11    typewriting; and the foregoing pages numbered from __1__

12    to __44__ constitute a full, true and correct report of the

13    same.

14         Dated at Salt Lake City, Utah, this ___9th__ day of

15    __Feb.__ 2004.

16                            /s/ R. Edward Young

17                       R. Edward Young, U.S. Court Reporter
```

45

# EXHIBIT 5

DEC-12-2003 FRI 03:34 PM US DISTRICT COURT        FAX NO. 8015281175        P. 02

**FILED**
CLERK, U.S. DISTRICT COURT

**12 DEC 03 PM 3: 30**

DISTRICT OF UTAH

BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| THE SCO GROUP INC. | : | Case No. 2:03cv00294 DK |
| Plaintiff, | : | |
| | : | |
| vs. | : | ORDER GRANTING INTERNATIONAL BUSINESS MACHINE'S MOTIONS TO COMPEL DISCOVERY AND REQUESTS FOR PRODUCTION OF DOCUMENTS |
| INTERNATIONAL BUSINESS MACHINES CORP. | | |
| Defendant. | | |

Defendant/Couterclaim-Plaintiff International Business Machines Corporation's (IBM's) First and Second Motions to Compel Discovery having come before this Court, and the Court having read the corresponding memoranda submitted by both parties, and having heard oral argument on pertinent matters at a hearing on December 5, 2003, hereby enters the following Order

The Court, finding good cause shown, ~~GRANTS~~ IBM's First and Second Motions to Compel Discovery.

1

In accordance with the Court's order Plaintiff/Counterclaim-Defendant The SCO Group, Inc. (SCO) is hereby ORDERED:

1.  To respond fully and in detail to Interrogatory Nos. 1-9 as stated in IBM's First Set of Interrogatories.

2.  To respond fully and in detail to Interrogatory Nos. 12 and 13 as stated in IBM's Second Set of Interrogatories.

3.  IBM is to provide SCO a list of requested documents as stated in IBM's First and Second Requests for the Production of Documents and SCO is to produce all requested documents.

4.  To identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM.  This is to include identification of all Bates numbered documents previously provided.

5.  To the extent IBM's requests call for the production of documents or are met by documents SCO has already provided, SCO is to identify with specificity the location of responsive answers including identification of the Bates numbered documents previously provided if applicable.

6.  If SCO does not have sufficient information in its possession, custody, or control to specifically answer any of IBM's requests that are the subject of this order, SCO shall provide an affidavit setting forth the full nature of its efforts, by whom they were taken, what further efforts it intends

to utilize in order to comply, and the expected date of compliance.

SCO is required to provide such answers and documents within thirty days from the date of this order.

All other discovery, including SCO's Motion to Compel is hereby STAYED until this Court determines that SCO has fully complied with this Order.

The Court will hold a hearing on the forgoing issues January 23, 2004 at 10:00 a.m.

DATED this 12th day of December, 2003.

BY THE COURT:

BROOKE C. WELLS
United States Magistrate Judge

3

# EXHIBIT 6

FILED
U.S. DISTRICT COURT

-3 MAR 04 AM 11: 04

DISTRICT OF UTAH

BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| THE SCO GROUP INC. | : | Case No. 2:03cv00294 DK |
| | : | |
| Plaintiff, | : | |
| | : | ORDER REGARDING SCO'S |
| vs. | | MOTION TO COMPEL DISCOVERY |
| | | AND IBM'S MOTION TO COMPEL |
| INTERNATIONAL BUSINESS MACHINES | | DISCOVERY |
| CORP. | | |
| | | |
| Defendant. | | |

On February 6, 2004, the Court heard arguments regarding SCO Group Incorporated's (SCO) compliance with the Court's prior order of December 12, 2003.  The Court also heard argument on SCO's Motion to Compel Discovery.  SCO was represented by Mark Heise, Brent Hatch and Kevin McBride.  International Business Machines Corporation (IBM) was represented by David Marriot, Todd Schaughnessy, Chris Chow and Amy Sorenson.

The Court having heard argument, having read the parties' memoranda, having considered relevant case law, and finding good cause shown, hereby enters the following Orders:



109

## I. SCO

Plaintiff/Counterclaim-Defendant SCO is hereby ORDERED:

1. To fully comply within 45 days of the entry of this order with the Court's previous order dated December 12, 2003. This is to include those items that SCO had difficulty in obtaining prior to the Court's previously ordered deadline of January 12, 2004.

2. As previously ordered, SCO is to provide and identify all specific lines of code that IBM is alleged to have contributed to Linux from either AIX or Dynix. This is to include all lines of code that SCO can identify at this time.

3. SCO is to provide and identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived.

4. SCO is to provide and identify with specificity all lines of code in Linux that it claims rights to.

5. SCO is to provide and identify with specificity the lines of code that SCO distributed to other parties. This is to include where applicable the conditions of release, to whom the code was released, the date and under what circumstances such code was released.

## II.   IBM

In light of what the Court considers SCO's good faith efforts to comply with the Court's prior order, the Court lifts the discovery stay it previously imposed.

Rule 26(b)(1) of the Federal Rules of Civil Procedure states in relevant part: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . .   The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  This rule has been interpreted broadly by the United States Supreme Court.  See Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380 (1978).  "[A]t the discovery stage, the concept of relevance should be construed very broadly."  Gohler, IRA, et al. v. Wood et al., 162 F.R.D. 691, 695 (D. Utah 1995).  However, a court may limit discovery where "the discovery sought is . . . obtainable from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(i).  A court may also limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(iii).

Based on the Court's decision to lift the discovery stay and because relevance should be construed broadly at the discovery

3

stage, IBM is hereby ORDERED:

1.   To provide the releases of AIX and Dynix consisting of
"about 232 products" as was represented by Mr. Marriott at the
February 6, 2004 hearing.  The releases are to be provided within
45 days of the entry of this order.  Following this production,
SCO is to provide additional memoranda to the Court indicating if
and how these files support its position and how they are
relevant.  The memorandum is to include with specificity, and to
the extent possible, identification of additional files SCO
requests and the reasons for such requests.  The Court will then
consider ordering IBM to produce more code from AIX and Dynix.
See American Medical Systems, Inc. v. National Union Fire Ins.
Co., 1999 WL 562738, p. 2-3 (ordering a party to first "procure
relevant documents" and then reconsidering the discovery request
for the production of more documents).

2.   Pursuant to Rule 26(b), SCO should use its best efforts
to obtain relevant discovery from the Linux contributions that
are known to the public, including those contributions publicly
known to be made by IBM.  IBM, however, is hereby ordered to
provide to SCO any and all non-public contributions it has made
to Linux.

3.   IBM is to provide documents and materials generated by,
and in possession of employees that have been and that are

4

currently involved in the Linux project.[1] IBM is to include materials and documents from executives including inter alia, Sam Palmisano and Irving Wladawsky-Berger. Such materials and documents are to include any reports, materials or documents from IBM's "ambitious Linux Strategy." Steve Lohr, <u>A Mainstream Gian Goes Countercultural; I.B.M.'s Embrace of Linux Is a Bet That It Is the Software of the Future</u>, N.Y. Times, March 20, 2000, Business/Financial Desk. The Court finds these materials are relevant because they may contain information regarding the use or alleged misuse of source code by IBM in its contributions to Linux.

5. IBM is ordered to provide further responses to SCO's interrogatory numbers two, five and eleven. These responses are to include relevant information from all sources including top level management.

6. SCO seeks the proper identification of approximately 7,200 potential witness identified by IBM. IBM in its memoranda suggested that the parties might be able to reach some sort of an agreement as to the most important prospective trial witnesses and then IBM would provide the full contact information for these individuals. The Court orders IBM to properly identify a

---

[1] Although not part of SCO's official written motion, SCO raised these discovery issues at oral argument and also alleged in its written memoranda that IBM failed to adequately respond to interrogatories and document requests that are the subject of these discovery items.

representative sample of the potential witnesses that is to
include a 1000 of the most important prospective trial witnesses
as agreed upon by SCO and IBM.  Following the production of this
information, the Court will consider the need for the proper
identification of additional witnesses.

### III.   Both Parties

At the hearing on February 6, 2004, SCO represented that IBM
failed to provide source logs that identify how documents were
kept in the ordinary course of business pursuant to Rule 34(b).
The Court orders both SCO and IBM to provide source logs
according to Rule 34(b) for those materials produced in
discovery.

Both SCO and IBM are to provide to the Court an affidavit
detailing their respective efforts in complying with this order.
These affidavits should also contain a statement that the
respective answers and materials provided are given to the best
of each parties' knowledge and are complete, detailed and
thorough.

In light of the Court's order granting SCO's motion to file
an amended complaint, and IBM's answer to SCO's second amended
complaint, the Court hereby orders:

Both SCO and IBM are to file additional memoranda with the
Court addressing the impact, if any, of the second amended

complaint and IBM's subsequent answer on IBM's Motion to Strike the 5th, 15th, and 19th Affirmative Defenses asserted by the SCO Group in its Answers to IBM' Amended Counterclaims. Because this is IBM's motion, IBM is to file its initial memoranda with the Court within 60 days of the entry of this order. SCO will then have 15 days to respond after IBM's filing. IBM will have 7 days following SCO's response to file a reply. Following the additional briefing, the Court will contact the parties to schedule a hearing regarding IBM's motion to strike SCO's affirmative defenses.

DATED this _3rd_ day of March, 2004.

BY THE COURT:

BROOKE C. WELLS
United States Magistrate Judge

7

blk

United States District Court
for the
District of Utah
March 3, 2004


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:03-cv-00294


True and correct copies of the attached were either mailed, faxed or e-mailed
by the clerk to the following:

        Brent O. Hatch, Esq.
        HATCH JAMES & DODGE
        10 W BROADWAY STE 400
        SALT LAKE CITY, UT  84101
        EMAIL

        Stephen Neal Zack, Esq.
        BOIES SCHILLER & FLEXNER
        100 SE 2ND ST STE 2800
        MIAMI, FL  33131
        EMAIL

        David K. Markarian, Esq.
        BOIES SCHILLER & FLEXNER
        100 SE 2ND ST STE 2800
        MIAMI, FL  33131

        Mark J. Heise, Esq.
        BOIES SCHILLER & FLEXNER
        100 SE 2ND ST STE 2800
        MIAMI, FL  33131
        EMAIL

        Evan R. Chesler, Esq.
        CRAVATH SWAINE & MOORE
        825 EIGHTH AVE
        NEW YORK, NY  10019

        Thomas G. Rafferty, Esq.
        CRAVATH SWAINE & MOORE
        825 EIGHTH AVE
        NEW YORK, NY  10019

        David R. Marriott, Esq.
        CRAVATH SWAINE & MOORE
        825 EIGHTH AVE
        NEW YORK, NY  10019
        EMAIL

        Mr. Alan L Sullivan, Esq.

SNELL & WILMER LLP
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT  84101
EMAIL

Todd M. Shaughnessy, Esq.
SNELL & WILMER LLP
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT  84101
EMAIL

Amy F. Sorenson, Esq.
SNELL & WILMER LLP
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT  84101
EMAIL

Mr. Kevin P McBride, Esq.
1299 OCEAN AVE STE 900
SANTA MONICA, CA  90401

# EXHIBIT 7

FILED
CLERK, U.S. DISTRICT COURT

2005 FEB -9 A 9 04

DISTRICT OF UTAH
BY: _____
DEPUTY CLERK

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| **THE SCO GROUP, INC.,** | |
| **Plaintiff/Counterclaim-Defendant,** | **MEMORANDUM DECISION AND ORDER** |
| **v.** | |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION,** | **Case No. 2:03CV294 DAK** |
| **Defendant/Counterclaim-Plaintiff.** | |

This matter is before the court on (1) Plaintiff/Counterclaim-Defendant The SCO Group's ("SCO") Corrected Motion to Dismiss or to Stay Count Ten of Counterclaim-Plaintiff IBM's Second Amended Counterclaims Against SCO; (2) Defendant/Counterclaim-Plaintiff International Business Machines Corporation's ("IBM") Cross-Motion for Partial Summary Judgment on Its Claim for Declaratory Judgment of Non-Infringement (hereinafter IBM's "Motion for Partial Summary Judgment on Its Tenth Counterclaim"); (3) SCO's Rule 56(f) Motion; and (4) IBM's Motion to Strike Materials Submitted by SCO in Opposition to IBM's Cross-Motion for Partial Summary Judgment.

A hearing on the motions was held on September 15, 2004.[1] At the hearing, SCO was

---

[1] Subsequently, on October 19, 2004, the Magistrate Judge heard oral argument on SCO's Renewed Motion to Compel. SCO's motion requested production of information that SCO contends is necessary to respond to IBM's Motion for Partial Summary Judgment on Its

1

*398*

represented by Brent O. Hatch, Mark F. James, Robert Silver, and Frederick Frei. IBM was

represented by Evan R. Chesler, David R. Marriott, Todd Shaughnessy, and Chris Kao. Before

the hearing, the court considered carefully the memoranda and other materials submitted by the

parties. Since taking the motions under advisement, the court has further considered the law and

facts relating to these motions. Now being fully advised, the court renders the following

Memorandum Decision and Order.

I.   **SCO'S MOTION TO DISMISS OR TO STAY COUNT TEN OF
     COUNTERCLAIM-PLAINTIFF IBM'S SECOND AMENDED
     COUNTERCLAIMS AGAINST SCO**

SCO has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

("FRCP") for dismissal of, or, in the alternative, to stay, Count Ten of IBM's Second Amended

Counterclaims against SCO. IBM, in its Tenth Counterclaim, seeks declaratory judgment "that

IBM does not infringe, induce infringement of, or contribute to the infringement of any SCO

copyright through its Linux activities, including its use, reproduction and improvement of Linux,

and that some or all of SCO's purported copyrights in UNIX are invalid and unenforceable."

IBM's Second Am. Countercls. ¶ 173.

_____

Tenth Counterclaim. The hearing on the motion to compel had initially been scheduled for
argument on September 14, 2004, the day prior to this court's hearing on the above-listed
dispositive motions. On September 3, 2004, the court granted SCO's Ex Parte Motion for Leave
to File a Supplemental Memoranda Regarding Discovery. On September 10, 2004, IBM filed a
motion to continue the September 14, 2004 hearing so that it could respond to SCO's
supplemental memorandum. On the same day, the Magistrate Judge vacated the September 14,
2004 hearing date to allow both parties time to adequately brief the issues before the court, and
she reset the hearing for October 19, 2004. On January 18, 2005, the Magistrate Judge issued
her opinion on SCO's Renewed Motion to Compel Discovery, granting in part and denying in
part SCO's motion.

SCO's reason for seeking dismissal or a stay of the Tenth Counterclaim transformed during the course of briefing its motion. SCO initially argued that "[t]his precise issue will be litigated in a case filed by SCO against AutoZone in federal district court in Nevada." SCO's Mem. in Supp. of Mot. to Dismiss or to Stay at 2. In the *AutoZone* lawsuit, SCO has alleged that AutoZone "has infringed and will continue to infringe SCO's copyrights in and relating to Copyrighted Materials by using, copying, modifying, and/or distributing parts of the Copyrighted Materials, or derivative works based on the Copyrighted Materials in connection with its implementations of one or more versions of the Linux operating system, inconsistent with SCO's exclusive rights under the Copyright Act." *SCO v. AutoZone*, Case No. CV-S-04-0237-RCJ (LRL) (D. Nev) Compl. ¶ 21.

In comparison, SCO argues that the only copyright claim SCO has asserted against IBM is "primarily" for IBM's continuing use of AIX or Dynix after SCO terminated IBM's UNIX licenses. SCO contends that it has not alleged a claim against IBM for copyright infringement arising out of IBM's use, reproduction, or improvement of Linux. *See* SCO's Mem. in Supp. at 3, 4; *see also* Decl. of John Harrop in Supp. of SCO's Opp'n to IBM's Mot. for Partial Summ. J. at 4. Thus, SCO claims that IBM's Tenth Counterclaim is redundant and unnecessary because the copyright issues are the crux of the *Autozone* litigation. Therefore, SCO contends, "the need for IBM's Tenth Counterclaim seeking such declaratory judgment is nil." SCO's Mem. in Supp. at 3.

However, SCO subsequently abandoned the argument that this court should dismiss or stay the Tenth Counterclaim to allow the *Autozone* court to decide the issue, presumably because

3

the United States District Court for the District of Nevada, the court in which the *AutoZone* suit is pending, stayed that action pending resolution of the instant action.  As a result, SCO now argues that the court should exercise its discretion to decline to exercise jurisdiction over what it characterizes as a permissive counterclaim.  SCO claims that the Tenth Counterclaim will unduly complicate this action because it encompasses new and burdensome issues that do not remotely arise out of the transactions that underlie SCO's claims in this action.

IBM disagrees, claiming that its Tenth Counterclaim is a compulsory counterclaim that IBM must bring in this action or be barred by the doctrine of *res judicata* from litigating this claim in a separate action.   Furthermore, IBM argues that, even if this court disagrees that the counterclaim is compulsory, the court should permit IBM to litigate this claim because (1) it is essentially the mirror-image of SCO's claims against IBM, and (2) SCO has publicly accused IBM and others of infringing SCO's copyrights through their use of and contributions to Linux, which, IBM contends, is "part and parcel of SCO's campaign to foster and maintain fear, uncertainty and doubt in the marketplace about Linux in general and IBM's products and services in particular."  IBM's Mem. in Opp'n at 2.

Despite the parties' disagreement concerning whether IBM's Tenth Counterclaim is permissive or compulsory, this court need not decide the issue because the court will retain jurisdiction over the Tenth Counterclaim in any event.  Whether the claim is compulsory or not, there is no question that it overlaps to some extent with the claims brought by SCO.

Notwithstanding SCO's puzzling denial in its briefing that it has not alleged a claim against IBM for copyright infringement arising out of its use, reproduction, or improvement of Linux, it clearly has alleged such a claim.  For example, in its Second Amended Complaint, SCO

4

alleges that IBM has infringed SCO's copyrights by "incorporating (and inducing, encouraging, and enabling others to incorporate) SCO's proprietary software into Linux open source software offerings." Second Am. Compl. at ¶ 6 (c).  In addition, SCO alleges that "a significant amount of UNIX protected code and materials are currently found in Linux 2.4, 2.5x and Linux 2.6 releases in violation of SCO's . . . copyrights." *Id.* ¶ 79.  It also alleges that IBM is "improperly extracting and using the confidential and proprietary information it acquired from UNIX and dumping that information into the open source community." *Id.* ¶ 110.  Finally, it has alleged that IBM has "infringed, [has] induced the infringement of, and [has] contributed to the infringement of, copyright registrations of SCO and its predecessors." *Id.* ¶ 179.   Thus, while IBM's Tenth Counterclaim appears to be broader in scope than SCO's claims, there is clearly significant overlap between the claims.

Moreover, from a judicial economy and fundamental fairness perspective, it makes sense to litigate the Tenth Counterclaim in the instant action for a variety of reasons, including that: (1) to dismiss or stay this claim would unnecessarily delay resolution of this important issue; (2) taken to their logical conclusion, SCO's arguments about the expansiveness and complexity of this claim, would, for all intents and purposes, unfairly preclude any entity from ever challenging SCO's public accusations about Linux containing SCO's allegedly copyrighted UNIX code; (3) the *Red Hat* and *AutoZone* cases have been stayed pending resolution of the instant action, which is much further along in the litigation process than either of the other two actions; (4) SCO's barrage of public statements about pursuing alleged infringers of its alleged intellectual property

rights justifies IBM's attempt to resolve this claim as quickly as possible;[2] and (5) there is little merit to SCO's claim that IBM's Tenth Counterclaim will add undue complexity to this litigation, given SCO's public statements on the issue and the fact that it brought a lawsuit against AutoZone based–in SCO's words–on this "precise issue." *See* SCO's Mem. in Supp. at 2. The court assumes that SCO was prepared to prosecute its claim in the *AutoZone* case or it would not have filed suit. Indeed, in light of SCO's lawsuit against AutoZone and SCO's public statements during the last two years, which have essentially invited this claim, it is incomprehensible that SCO seeks to postpone resolution of this claim. Accordingly, SCO's Motion to Dismiss or to Stay Count Ten of Counterclaim-Plaintiff IBM's Second Amended Counterclaims Against SCO is denied.

## II.   IBM'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS TENTH COUNTERCLAIM AND SCO'S 56(F) MOTION

As stated above, IBM's Tenth Counterclaim, alleges that "IBM does not infringe, induce infringement of, or contribute to the infringement of any SCO copyright through its Linux

---

[2]   IBM, in its briefs supporting its Motion for Partial Summary Judgment on Its Tenth Counterclaim, has detailed some of SCO's many public assertions of copyright infringement. For example, in May 2003, SCO sent letters to Fortune 1000 companies (including IBM) asserting that "Linux infringes on our UNIX intellectual property and other rights." IBM's Mem. in Supp. of Mot. for Partial Summ. J., Ex. 10 at 2. Also in May 2003, SCO issued a press release charging that "Linux is an unauthorized derivative of UNIX and that legal liability for the use of Linux may extend to commercial users." According to SCO, the press release was "based on [SCO's] findings of illegal inclusions of SCO UNIX intellectual property in Linux." *Id.* Ex. 12 at 1. In August 2003, SCO issued a press release concerning the *Red Hat* case, reaffirming its claims that "Linux includes source code that is a verbatim copy of UNIX and carries with it no warranty or indemnification." *Id.* Reply Ex. 14 at 1. In December 2003, SCO sent letters to every member of Congress claiming that "Linux software contains significant UNIX software code that has been inappropriately, and without authorization, placed in Linux," and enclosing its "Open Letter" to the community asserting the "widespread presence of our copyrighted UNIX code in Linux." *Id.* Reply Ex. 16 at 2.

activities, including its use, reproduction and improvement of Linux, and that some or all of SCO's purported copyrights in UNIX are invalid and unenforceable." ¶ 173.   IBM now seeks summary judgment on its Tenth Counterclaim.[3]

## A. IBM'S MOTION PURSUANT TO FRCP 56

### 1. Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);  *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In reviewing the factual record, we construe all facts and make reasonable inferences in the light most favorable to the non-moving party. *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir.1998).

### 2. IBM's Arguments

Although the instant summary judgment motion was filed just shortly after IBM asserted the claim in its Second Amended Counterclaims and well before the close of discovery, IBM contends that no additional discovery is necessary on this counterclaim.  IBM's assertion is based on SCO's public statements that it has significant evidence of copyright infringement. IBM recounts, among other examples, the following statements made by SCO regarding its

---

[3]  To prove copyright infringement, SCO must establish (1) that SCO owns valid copyrights in the UNIX software, and (2) that IBM has copied protectable elements of the allegedly copyrighted UNIX software. *See Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1370 (10th Cir. 1997); *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996). "'Copying' is regularly used as a shorthand to refer to the infringement of a copyright holder's exclusive rights under a copyright." *Id.* n.2

copyright claims:

In April 2003, SCO's Senior Vice President Chris Sontag stated that, "We are using objective third parties to do comparisons of our UNIX System V source code and Red Hat [Linux] as an example. We are coming across many instances where our proprietary software has simply been copied and pasted or changed in order to hide the origin of our System V code in Red Hat. This is the kind of thing that we will need to address with many Linux distribution companies at some point." IBM's Reply Ex. 18 at 2.

Also in May 2003, SCO's spokesman Blake Stowell stated that, "We had hired some outside consultants to compare code from the Linux kernel to our Unix System 5 source code, which is the base Unix source code that is used for a lot of different products. In doing the comparison, there were instances where they found line-by-line copies–direct copy and pasting of code–and other instances where the code had been obfuscated. [It was] changed to look like it was different, but in reality it was the same code." *Id.* Ex. 19 at 1-2.

In June 2003, a SCO spokesman stated that SCO had hired three teams of experts, including a group from the MIT math department, to analyze Linux and UNIX code for similarities. "All three found several instances where our Unix source code had been found in Linux." *Id.* Ex. 5 at 2.

In August 2003, SCO's CEO Darl McBride stated that pattern-recognition experts hired by SCO "have already found a mountain of code." "The DNA of Linux is coming from Unix." *Id.* Ex. 20. That same month, Chris Sontag stated that, "In fact, SCO knows exactly which version of Unix System V the code came from and which licensee was responsible for illegally contributing it to Linux." *Id.* Ex. 22.

In November 2003, Robert Bench, SCO's Chief Financial Officer, stated that, "Along the way, over the last several months, once we had the copyright issue resolved where fully we had clarity around the copyright ownership on UNIX and System V source code, we have gone in and done a deep dive into Linux. We have compared the source code of Linux with UNIX every which way but Tuesday. We've come out with a number of violations that relate to those copyrights." *Id.* Ex. 6 at 4.

Chris Sontag stated in November 2003 that, "There are other literal copyright infringements that we have not publicly provided, we'll save those for court." *Id.* Ex. 21 at 6. He further stated that "there are over one million lines of code that we have identified that are derivative works by IBM and Sequent that have been contributed into Linux that we have identified . . . ." *Id.* Similarly, in June 2004, SCO represented to the Red Hat court that, "SCO has discovered significant instances of line-for-line and 'substantially similar' copying of code from Unix System V into Linux." *Id.* Ex. 10 at 2.

Moreover, IBM claims that SCO has had at its ready access since the beginning of this case all the information necessary to determine whether and how Linux infringes its purported copyrights–the UNIX source code to which SCO purports to hold copyrights and the source code for Linux, which is available to anybody on the Internet.

IBM contends, however, that despite SCO's public statements and notwithstanding the fact that SCO has access to all the information relevant to this claim, SCO has "fail[ed] altogether to show how IBM's Linux activities infringe SCO's alleged copyrights concerning the UNIX software." IBM's Mem. in Supp. of Mot. for Partial Summ. J. at 6. Thus, IBM maintains that it is entitled to summary judgment on this claim.

9

### 3. SCO's Arguments

Despite SCO's 91-page opposition memorandum and 70-plus pages of affidavit testimony, SCO essentially argues that IBM's motion is premature because the discovery period is not over, and SCO has been unable to obtain from IBM the necessary discovery. SCO has filed several affidavits which purport to explain why SCO needs more discovery, the efforts it has made to obtain the discovery it needs, and what SCO believes it can obtain from further discovery.

### 4. Discussion

Viewed against the backdrop of SCO's plethora of public statements concerning IBM's and others' infringement of SCO's purported copyrights to the UNIX software, it is astonishing that SCO has not offered any competent evidence to create a disputed fact regarding whether IBM has infringed SCO's alleged copyrights through IBM's Linux activities.[4] Further, SCO, in its briefing, chose to cavalierly ignore IBM's claims that SCO could not create a disputed fact regarding whether it even owned the relevant copyrights.

Nevertheless, despite the vast disparity between SCO's public accusations and its actual evidence—or complete lack thereof—and the resulting temptation to grant IBM's motion, the court has determined that it would be premature to grant summary judgment on IBM's Tenth

---

[4] SCO asserts that Mr. Sandeep Gupta, in his declaration, describes "several routines and several groupings of code for which SCO has copyright protection that were copied into the Linux operating system." Gupta Dec. ¶ 3. SCO claims in its opposition brief that the alleged facts set forth in Mr. Gupta's declaration "show copying of material from UNIX into Linux" and "are themselves sufficient to create genuine issues of material fact." SCO's Mem. in Opp'n at 85. However, as an example of one of many internal inconsistencies in SCO's briefing, SCO then concedes that Mr. Gupta's declaration "does not discuss whether any of the Linux code he observed infringes any of SCO's copyrights." SCO's Mem. in Opp'n to IBM's Mot. to Strike at 7. Rather, SCO claims, Mr. Gupta's declaration was offered not to show IBM's copyright infringement of SCO's protected UNIX code," but rather for the narrow purpose of supporting SCO's request for 56(f) relief. *Id.* at 1.

Counterclaim.  This determination is based on several factors.

First, the court is not persuaded that the only materials necessary to conduct a substantial similarity analysis are the Linux kernel and the UNIX code.[5]  Similarly, the court is not persuaded that discovery concerning IBM's AIX and Dynix programs is irrelevant to the question of whether code in Linux is substantially similar to code in the UNIX software.  Thus, the court agrees with SCO that granting summary judgment would be premature given that SCO–at the time the instant motion was briefed–had not obtained from IBM the AIX and Dynix code that SCO has been requesting.[6]

Second, the court is mindful that, "unless dilatory or lacking in merit, [a Rule 56(f)]

_____

[5]  To make this perhaps overly simplistic argument, IBM appears to assume, for purposes of this motion, that it will prevail on SCO's breach of contract claims.  IBM ignores the possibility that copyright infringement could result from improper use of derivative works, *see e.g., Liu v. Price Waterhouse LLP*, 182 F. Supp. 2d 666 (N.D. Ill. 2001), and that its Tenth Counterclaim depends, at least in part, on the resolution of SCO's contract claims.  It appears to the court that this motion must be decided either contemporaneously with or subsequent to resolution of SCO's breach of contract claims.

[6]  In essence, the court agrees with the conclusions reached by the Magistrate Judge in her Order Pertaining to SCO's Renewed Motion to Compel, dated January 18, 2005.  The court has reviewed all of the briefing filed in connection with the hearing held before the Magistrate Judge on October 19, 2004, and has reviewed the transcript of that hearing.  In making this determination, however, the court does not intend to foreclose entirely IBM's ability to object to the Order.

In connection with this procedural quagmire, the court notes that IBM has decided to file a motion for reconsideration of the Magistrate Judge's Order instead of filing an objection with this court.  *See* IBM's Ex Parte Motion for Extension of Time to Submit Objections to Discovery Order.  IBM has requested permission to object, within ten days, to any Order issued by the Magistrate Judge on IBM's Motion for Reconsideration.  On February 1, 2005, the court issued an order agreeing to this process.  *See* Order Granting IBM's Ex Parte Motion for Extension of Time to Submit Objections to Discovery Order.  Thus, the parties now know that the court is in general agreement with the Magistrate Judge regarding her Order of January 18, 2005, but the parties are not precluded from filing objections to any Order issued by the Magistrate Judge on IBM's yet-to-be-filed Motion for Reconsideration to preserve the issues for appeal to seek review of specific aspects of the Order.

11

motion should be liberally treated." *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992) (internal quotations omitted). "Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented." *Id.* The Tenth Circuit has explained that "[t]his includes identifying the probable facts not available and what steps have been taken to obtain these facts." *Id.* Further, "[i]n this circuit, the nonmovant also must explain how additional time will enable him to rebut [the] movant's allegations of no genuine issue of fact." *Id.* (internal quotations omitted). The court finds that the affidavits submitted by SCO were timely filed and fulfill the requirements set forth by the Tenth Circuit.

Third, at the time that the instant action was argued to the court, SCO had filed a Renewed Motion to Compel discovery, which sought, among other things, all versions of AIX and Dynix, including the names of the individuals who contributed to AIX and Dynix. SCO claimed, in its motion to compel, that this information was necessary to defend against IBM's Tenth Counterclaim and to prove its breach of contract claims. As set forth above, *see footnote* 1, SCO's Renewed Motion to Compel was initially scheduled to be argued the day prior to the hearing on the instant motion. However, in an effort to ensure that the parties had a fair opportunity to address the issues and each others' positions, the hearing was vacated and heard on October 19, 2004.

Thus, at the time of the briefing and oral argument on the instant motion, the court did not have the benefit of the Magistrate Judge's ruling on SCO's discovery motion. Even without considering the Magistrate Judge's decision on SCO's motion to compel, however, it would be improvident of the court to grant summary judgment on IBM's Tenth Counterclaim at this time. Simply put, regardless of the merits, the granting of summary judgment would be very unlikely

12

to survive an appeal when a Rule 56(f) motion has been filed and a motion to compel production of arguably relevant information remains pending.

Fourth, the Magistrate Judge's recent decision on SCO's motion to compel further confirms that the grant of summary judgment to IBM would be entirely premature. *See* January 18, 2005 Order Pertaining to SCO's Renewed Motion to Compel at 9-10 (ordering IBM to provide in readily accessible format all versions and changes to AIX and Dynix).

Accordingly, for all the foregoing reasons, the court cannot grant summary judgment to IBM given the posture of this case at the present time. However, IBM is free to renew or refile its motion on its Tenth Counterclaim after the close of discovery.

## B.  IBM's Motion Pursuant to FRCP 37(b)(2)

Rule 37(b)(2) generally provides that, if a party fails to obey an order to provide or permit discovery, the court "may make such orders in regard to the failure as are just." *See* Fed. R. Civ. P. 37(b)(2).  IBM argues that, because of SCO's repeated failure to comply with the court's orders, the fact of IBM's non-infringement should simply be established against SCO, and SCO should not be allowed to adduce evidence on this issue under Rule 37(b)(2). SCO, on the other hand, claims that it has complied with its discovery obligations in good faith and that IBM's request for this extreme sanction lacks any legal basis.

It is well settled that dismissal of a claim or establishment of certain facts is an extreme sanction appropriate only in cases of willful misconduct. *See Ehrenhaus v. Reynolds*, 965 F.2d 916, 920-21 (10th Cir. 1992); *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1182 n.6 (10th Cir. 1999) (noting that deeming the establishment of certain facts under FRCP 37(b)(2)(A) can be tantamount to a default judgment).  In this case, entering summary judgment on IBM's Tenth Counterclaim would be tantamount to a dismissal of at least part of SCO's action.

13

Before entering such an extreme sanction, the court must consider a number of factors, including (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that summary judgment would be a likely sanction of noncompliance; and (5) the efficacy of lesser sanctions. *See Ehrenhaus*, 965 F.2d at 921 (quotations and internal citations omitted).

Even assuming that SCO has violated a discovery order, which is far from evident, there is no evidence of willfulness or bad faith to justify the draconian sanction requested by IBM. There is no indication from the Magistrate Judge's Orders that she agrees with IBM's perception or that she has warned SCO that such a sanction could result from SCO's conduct in this litigation. The fact that the Magistrate Judge is in a much better position to evaluate such accusations and has not noted any such misconduct is fatal to IBM's request. Indeed, in her Order of January 18, 2005, the Magistrate Judge noted that "[t]here have been abundant accusations of stonewalling in this case by both parties. While the court assumes the good faith of all litigants before it, the court, nevertheless, urges both sides to renew their efforts in cooperating with each other." Order Pertaining to SCO's Renewed Motion to Compel at 11.

Accordingly, the court rejects IBM's request that the court grant summary judgment on its Tenth Counterclaim as a sanction against SCO.

## III.   IBM'S MOTION TO STRIKE THE MATERIALS SUBMITTED BY SCO IN OPPOSITION TO IBM'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

IBM contends that the materials submitted by SCO in opposition to IBM's motion are inadmissible for a variety of reasons, including that the declarations of Sandeep Gupta, Chris Sontag, and John Harrop are not made based on personal knowledge and constitute improper

14

opinion testimony.  IBM also argues that many of the exhibits relied on by SCO constitute inadmissible hearsay.

SCO, on the other hand, argues that the declarations were submitted for the sole purpose of providing the court with Rule 56(f) facts that attempt to demonstrate that SCO, despite its best efforts, has not yet obtained the discovery it needs to respond to IBM's Cross-Motion on the merits, and, that given adequate opportunity for discovery, SCO would likely find evidence that raises genuine issues of material fact that would preclude the granting of summary judgment.

Because the declarations do not pertain to the merits of IBM's motion, the court declines to strike them.  In addition, the court has not relied on the allegedly inadmissible exhibits in reaching its decision.  Although the affidavits might be inadmissible for purposes of creating a genuine issue of material fact, they are not inadmissible for purposes of FRCP 56(f).  Moreover, the court would have denied summary judgment even without relying on the Gupta, Sontag, and Harrop declarations.

Thus, IBM's Motion to Strike the Materials Submitted by SCO in Opposition to IBM's Motion for Partial Summary Judgment is denied.

## IV.    IBM'S REMAINING MOTIONS

IBM has filed two other motions for partial summary judgment.  The motions are not fully briefed and consequently have not yet been argued.  Specifically, IBM has filed a Motion for Partial Summary Judgment on SCO's Breach of Contract Claims, and IBM has filed a Motion for Partial Summary Judgment on Its Claim of Copyright Infringement (Eighth Counterclaim).  IBM's reply briefs on the two motions are due on February 25, 2005.

Regarding IBM's motion concerning SCO's breach of contract claims, SCO has filed a Rule 56(f) motion, and the Magistrate Judge's Order of January 18, 2005 compels the disclosure

15

of a significant amount of information that bears on this motion. Thus, the court declines to entertain this motion until after the close of discovery. Furthermore, it also appears that IBM's Eighth Counterclaim would be more efficiently resolved after the close of discovery and the resolution of other motions.

Having reviewed not only the instant motions, but also the parties' recent briefs on discovery issues, the Magistrate Judge's Order of January 18, 2005, and the briefing filed to date on IBM's pending motions, it has become clear to the court that many of the claims and counterclaims are dependent on the resolution of other claims and that judicial economy is not served in this action by entertaining dispositive motions prior to the close of discovery. At this point, it is apparent that complete discovery is necessary prior to the just resolution of any claim.[7] Thus, the court denies IBM's Motion for Partial Summary Judgment on SCO's Breach of Contract Claims and on IBM's Motion for Partial Summary Judgment on Its Claim for Copyright Infringement (Eighth Counterclaim) without prejudice to renew or refile the motions after the close of discovery. After discovery is complete, IBM may file a motion to renew the motions, in which case its already-filed motions and supporting memoranda will be reactivated, and SCO may then file new opposition memoranda–or IBM may start again by filing new motions and supporting memoranda.

On a related matter, having become more familiar with the nature of the motions and the discovery sought in this case, and although it is contrary to the court's general practice, the court hereby orders that no dispositive motions may be filed until after the close of discovery. Thus,

---

[7] However, the court will entertain a dispositive motion prior to the close of discovery if the parties stipulate that the claim or issue is ripe for decision. Otherwise, no other dispositive motions may be filed until after the close of discovery.

the court's Order of September 30, 2004, to the extent that it grants permission to file dispositive motions prior to the close of discovery, is vacated.

## CONCLUSION

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that:

(1)     Plaintiff/Counterclaim-Defendant SCO's Motion to Dismiss or to Stay Count Ten of Counterclaim-Plaintiff IBM's Second Amended Counterclaims Against SCO [docket # 144-1, 144-2] is DENIED;[8]

(2)     Defendant/Counterclaim-Plaintiff IBM's Cross-Motion for Partial Summary Judgment on Its Claim for Declaratory Judgment of Non-Infringement [Docket # 152-1] is DENIED without prejudice to renew or refile after discovery is completed;

(3)     SCO's Rule 56(f) Motion [Docket # 195-1] is MOOT based on the court's denial of IBM's Motion for Partial Summary Judgment;

(4)     IBM's Motion to Strike Materials Submitted By SCO in Opposition to IBM's Cross-Motion for Partial Summary Judgment [Docket # 246] is DENIED;

(5)     IBM's Motion for Partial Summary Judgment on SCO's Breach of Contract Claims [Docket # 225] is DENIED without prejudice to renew or refile after discovery is complete;

(6)     IBM's Motion for Partial Summary Judgment on its Eighth Counterclaim for Copyright Infringement [Docket #233] is DENIED without prejudice to renew or refile after discovery is complete.

(7)     The Court's Order Dated September 30, 2004 [Docket # 313] is VACATED to the extent

_____

[8] For clarity of the record, SCO's original motion to dismiss [docket # 142 -1; 142-2] is moot due to SCO's filing of its corrected motion to dismiss [docket # 144].

17

that it grants permission to file dispositive motions prior to the close of discovery.  The court will not entertain any dispositive motions until after discovery is complete, unless both parties stipulate that resolution of the motion is possible prior to the close of discovery.

DATED this 8th day of February, 2005.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

18

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., <br><br>        **Plaintiff/Counterclaim-** <br>        **Defendant,** <br><br> **vs.** <br><br> **INTERNATIONAL BUSINESS** <br> **MACHINES CORPORATION,** <br><br>        **Defendant/Counterclaim-** <br>        **Plaintiff.** | **ORDER** <br><br><br> **Case No.  2:03CV294 DAK** |

This matter is before the court on (1) Plaintiff The SCO Group, Inc.'s ("SCO") Motion to Compel IBM to Produce Samuel J. Palmisano for Deposition, (2) SCO's Motion for Leave to File Third Amended Complaint, and issues pertaining to the parties' proposed Amended Scheduling Orders.  A hearing on the motions was held on April 21, 2005.  The court also heard brief argument on IBM's Motion for Entry of Order Limiting Scope of IBM's Ninth Counterclaim, which was not set for argument, but which is related to SCO's Motion for Leave to File Third Amended Complaint.  At the hearing, IBM was represented by David R. Marriott and Todd M. Shaughnessy.  SCO was represented by Sean Eskovitz, Edward Normand, and Brent O. Hatch.  Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties.  Since taking the motions under advisement, the court has further considered the law and facts relating to the motions.  The court has also considered the

letter dated April 25, 2005, sent to the court from SCO's counsel and also the letter dated April 28, 2005, sent to the court from IBM's counsel in response to SCO's April 25, 2005 letter. Now being fully advised, the court renders the following Order.

## I. SCO's MOTION TO COMPEL IBM TO PRODUCE SAMUEL J. PALMISANO FOR DEPOSITION

SCO Seeks to Compel IBM to Produce its Chairman and Chief Executive Officer, Samuel J. Palmisano, for Deposition. IBM argues that SCO has failed to demonstrate that Mr. Palmisano has unique personal knowledge of the claims in the instant suit and that the information sought by SCO is available from other sources.

The court finds that Mr. Palmisano could have unique personal knowledge related to the claims in this action. Thus, IBM must produce Mr. Palmisano for a deposition. To minimize the disruption of IBM's operations, SCO has agreed to depose Mr. Palmisano in New York. Although SCO seeks a seven-hour deposition, the court imposes a limit of four hours, not including any breaks taken during the deposition.

## II.   SCO's MOTION TO FILE THIRD AMENDED COMPLAINT AND IBM's MOTION TO LIMIT SCOPE OF NINTH COUNTERCLAIM

In its Ninth Counterclaim, IBM seeks declaratory judgment that "IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyright through the reproduction, improvement, and distribution of AIX and Dynix." IBM, however, seeks to limit the scope of the Ninth Counterclaim, arguing that it intended to seek only a declaration that because IBM has not breached IBM's license agreements with AT&T, and because SCO's purported termination of those licenses is invalid, IBM's continued distribution of AIX and

2

Dynix products does not infringe SCO's alleged copyrights.   In seeking a narrow interpretation of its Ninth Counterclaim, IBM contends, among other things, that the Ninth Counterclaim must be read in the context in which it was asserted.  At that time, SCO had sued IBM for copyright infringement with respect to its continued distribution of AIX and Dynix, but it had not sued IBM for copyright infringement with respect to other non-Linux activities.  IBM asserts that SCO had not even threatened to sue IBM for copyright infringement with respect to non-Linux activities other than IBM's "post-termination" distribution of AIX and Dynix.  Thus, IBM claims, it did not have a reasonable apprehension of being sued by SCO, thus there was not a case or controversy, and IBM could not have properly sued SCO for a declaration of non-infringement with respect to IBM's non-Linux activities, other than the "post-termination" distribution of AIX and Dynix.  Moreover, IBM argues that it should not be required to litigate a claim it did not intend to make, does not believe it asserted, and has no reason to pursue.

SCO, on the other hand, claims that IBM is attempting to recharacterize its Ninth Counterclaim now that SCO has found clear evidence that IBM infringed SCO's copyrights. Based on this purported evidence, SCO seeks not only to defend against IBM's Ninth Counterclaim, but to add a claim for affirmative relief.  Specifically, SCO seeks to assert a cause of action for copyright infringement based on IBM's alleged unauthorized use of copyrighted SCO code in IBM's AIX for Power products.

The court will permit IBM to narrow the scope of its Ninth Counterclaim.  In the context in which the Ninth Counterclaim was asserted, the court finds that IBM did not intend for the counterclaim to be interpreted as broadly as it has been interpreted.  Having determined that the Ninth Counterclaim was not intended to sweep so broadly, SCO's proposed amendment is no

3

longer the mirror-image of IBM's Ninth Counterclaim.  To permit the proposed amendment

would expand this already sizable and complex litigation and would serve only to delay its

resolution.   Furthermore, SCO has twice amended its Complaint during this litigation, and the

deadline for seeking leave to further amend has long-since passed.  SCO has not demonstrated

the "extremely compelling circumstances" required by this court's June 10, 2004 Order.  In

addition, it has not demonstrated "good cause" under Rule 16(b) of the Federal Rules of Civil

Procedure, and the court finds that SCO has unduly delayed seeking leave to assert the proposed

cause of action.  It appears that SCO–or its predecessor–either knew or should have known about

the conduct at issue before it filed its original Complaint.  Accordingly, the court declines to

permit the filing of a Third Amended Complaint.

## III.   REVISED SCHEDULING ORDER

Having considered the parties' proposed Amended Scheduling Orders and the briefing

related to the proposed Orders, the court sets forth the following deadlines:

| EVENT | DEADLINE |
|---|---|
| IBM's Complete Production of Discovery Pursuant to the Order of April 20, 2005 | August 1, 2005 |
| Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material Identified to Date and to Update Interrogatory Responses Accordingly | October 28, 2005 |
| Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material | December 22, 2005 |

| | |
|---|---|
| Close of All Fact Discovery Except As to Defenses to Claims Relating to Allegedly Misused Material | January 27, 2006 |
| Close of All Remaining Discovery (i.e., Fact Discovery As to Defenses to Any Claim Relating to Allegedly Misused Material) | March 17, 2006 |
| Initial Expert Reports | April 14, 2006 |
| Opposing Expert Reports | May 19, 2006 |
| Rebuttal Expert Reports | June 16, 2006 |
| Final Deadline for Expert Discovery | July 10, 2006 |
| Dispositive Motions | July 28, 2006 |
| Oppositions to Dispositive Motions | September 1, 2006 |
| Reply Briefs on Dispositive Motions | September 29, 2006 |
| Rule 26(a)(3) Disclosures | January 12, 2007 |
| Final Pretrial Order | January 19, 2007 |
| Deadline for Exchanging Proposed Jury Instructions[1] | January 22, 2007 |
| Motions in Limine | January 26, 2007 |
| Special Attorney Conference and Settlement Conference | January 30, 2007 |

---

[1] Approximately six weeks prior to trial, the court will send to the parties a Trial Order that sets forth deadlines regarding the exchange of jury instructions between the parties, filing of stipulated instructions and proposed instructions to which the parties could not agree, objections to proposed instructions, and responses to the objections. In the Trial Order, the court will also provide deadlines for filing proposed voir dire and proposed special verdict forms.

| Oppositions to Motions in Limine | February 5, 2007 |
|---|---|
| Reply Briefs on Motions in Limine | February 9, 2007 |
| 5-week Jury Trial | February 26, 2007 |

## IV.    UNSEALING OF DOCUMENTS

The parties have been in the process of unsealing various documents.  To ease the burden on the Clerk's Office, the court requests that the parties comply with the following procedure for all papers that are unsealed in the future.

If a party seeks to unseal an entire document, that party shall file only a Notice that sets forth the name and docket number of the document to be unsealed.  The Clerk's Office will then unseal that document.  The parties shall not refile the entire document.

If, however, only parts of a document are to be unsealed (i.e., various exhibits from an appendix containing many exhibits), that party shall file a Notice indicating each specific paper to be unsealed, the docket number of the document containing the papers, and actual copies of each paper to be unsealed.

### CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that (1) SCO's Motion to Compel IBM to Produce Samuel J. Palmisano for Deposition is GRANTED; (2) SCO's Motion for Leave to File Third Amended Complaint is DENIED, (3) International Business Machines Corp.'s ("IBM") Motion for Entry of Order Limiting Scope of IBM's Ninth Counterclaim is

6

GRANTED. IBM is directed to file a proposed Order that restates its Ninth Counterclaim.[2] An

Amended Scheduling Order is set forth above, as is a procedure to follow when unsealing

documents that were previously filed under seal.

DATED this 1st day of July, 2005.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

---

[2] IBM has previously submitted a proposed Order on this issue, but the language of the proposed Order is less than clear. Thus, the court directs IBM to file another proposed Order that clarifies the scope of the Ninth Counterclaim.