# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

```
                           )
THE SCO GROUP, INC.,       )
                           )
                           )
                           )
           Plaintiff,      )
                           )
vs.                        )  Case 2:03-CV-294
                           )
                           )
INTERNATIONAL BUSINESS     )
MACHINES CORPORATION,      )
                           )
           Defendant.      )
```

BEFORE THE HONORABLE DALE A. KIMBALL

OCTOBER 7, 2005

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

Reported by: KELLY BROWN, RICKEN CSR, RPR, RM

1

A P P E A R A N C E S

FOR THE PLAINTIFFS: HATCH, JAMES & DODGE, PC

BY: MARK JAMES

Attorney at Law

10 West Broadway, Suite 400

Salt Lake City, Utah 84101

BOIES, SCHILLER & FLEXNER, LLP

BY: STUART H. SINGER

EDWARD J. NORMAND

SASHI C. BACH

Attorneys at Law

333 Main Street

Armonk, New York 10504

FOR THE DEFENDANT: SNELL & WILMER, LLP

BY: TODD M. SHAUGHNESSY

AMY SORENSON

Attorney at Law

15 West South Temple

Salt Lake City, Utah 84101

CRAVATH, SWAINE & MOORE LLP

BY: DAVID R. MARRIOTT

PETER LIGH

Attorney at Law

Worldwide Plaza

825 Eighth Avenue

New York, New York 10019

```
1    SALT LAKE CITY, UTAH, FRIDAY, OCTOBER 7, 2005
2              ******
3         THE COURT: Good morning, ladies and gentlemen.
4    And needless to say, I'm shorter here than I am in my own
5    courtroom, but we'll make do.
6         We're here this morning in the matter of the SCO
7    Group, Inc., vs. International Business Machines Corporation.
8    Although I do have the names and know the names of most of
9    you, I would ask that counsel who are at counsel table to,
10   please, identify themselves and all others who may be acting
11   in that capacity.
12        MR. JAMES: Your Honor, good morning. Mark James
13   from Hatch, James & Dodge. With me is Ted Normand from Boies,
14   Schiller & Flexner, along with Stuart Singer and also Sashi
15   Bach here with us, as well.
16        THE COURT: Thank you.
17        Mr. Marriott?
18        MR. MARRIOTT: Good morning. David Marriott and,
19   of course, Todd Shaughnessy and Peter Ligh and Amy Sorenson
20   and Herman H-O-Y-H. Good morning, Your Honor.
21        THE COURT: Good morning.
22        Ladies and gentlemen, I'd like to begin by
23   addressing SCO's renewed motion to compel, which is listed as
24   docket Number 366. In this particular motion, SCO seeks from
25   IBM all documents from its executives and board of directors
```

3

```
1    that mention or relate in any way to Linux; and, two,
2    witnesses for deposition who can speak to the full scope of
3    the topics SCO has noticed.
4         In this Court's order from January 18th of 2005,
5    the Court postponed -- I think that should be '04, the Court
6    postponed the decision regarding the production of documents
7    from top level management pending full briefing by the
8    parties.
9         Unfortunately, there was a docketing error
10   misinterpreting the Court's order deeming SCO's order granted
11   in part and denied in part. Notwithstanding this error, there
12   has been much discovery provided since the first of this year,
13   and Judge Kimball has heard arguments concerning the
14   deposition of Samuel Palmisano, IBM's CEO.
15        Given the possibility that some discovery provided
16   by IBM may address SCO's concerns in its renewed motion, I
17   would like SCO to review its original motion and file with the
18   Court a new motion removing those items it previously sought
19   which may have been provided by IBM in the intervening time.
20   And I would like SCO to file this new motion by Friday,
21   October 21st. IBM then can file in the opposition, and SCO
22   would reply. And then we will hear that motion along with
23   IBM's motion to compel production of documents on SCO's
24   privileged log later this year. And I would anticipate that
25   that would be set like the second week of December.
```

4

10/7/2005 Motion Hearing October 7, 2005

1       This should help clear up the record and prevent
2   any potential wasted resources by hearing issues which may now
3   be moot.
4       Does anyone have any opposition to handling that
5   particular motion in that way?
6       MR. NORMAND: Your Honor, Ted Normand for SCO. We
7   don't object, although we obviously would like to have the
8   motion heard as soon as possible.
9       THE COURT: Well, we will do that as soon as you've
10  had your opportunity to refile it and for IBM to respond.
11      Mr. Shaughnessy?
12      MR. SHAUGHNESSY: No objection, Your Honor.
13      THE COURT: All right. We can do that -- well,
14  let's set that at the conclusion of this hearing. But my
15  desire would be to set it in perhaps the second week of
16  December.
17      Next, I would like to turn to SCO's expedited
18  motion for leave to take additional depositions, which is
19  found at docket Number 508. I'd like first to hear any
20  objections that IBM may have. Or do you want -- go ahead and
21  argue it first since it's your motion, and then they'll
22  respond.
23      MR. SINGER: Your Honor, I don't know if the Court
24  is set on approaching it that way. If it was left to us, we
25  would prefer to argue the Linux related motion which we think

5

10/7/2005 Motion Hearing October 7, 2005

1   broadly relates to issues including depositions.
2       THE COURT: We can do that. If you want to, then
3   we'll start with that motion and allow you to argue it, and
4   then we'll go on to the other one.
5       MR. SINGER: Thank you.
6       THE COURT: That's fine.
7       MR. SINGER: In connection with that motion, we've
8   prepared several charts. With the Court's permission, I would
9   provide copies to the Court.
10      Your Honor, and I am Stuart Singer on behalf of the
11  SCO Group. I appreciate the opportunity to address the Court
12  this morning on this issue.
13      The motion here goes to the very heart of documents
14  that are relevant to this case. Our motion concerns the
15  failure of IBM to produce documents related to its Linux
16  contributions that have not been produced despite agreements
17  to do so and despite two orders of this Court that we believe
18  covers this.
19      THE COURT: Mr. Singer, let me stop you real
20  quickly and supplement the record by indicating this so that
21  you know. I have read the submissions of both SCO and IBM. I
22  have read the affidavit of Mr. Shaughnessy. I have read the
23  transcript of the original of the orders -- or the hearing
24  that resulted in the orders, and I have read each of the
25  orders themselves.

6

10/7/2005 Motion Hearing October 7, 2005

1       MR. SINGER: Thank you, Your Honor. I will bear
2   that in mind in my argument.
3       We made this motion because what we had seen from
4   IBM did not equate to what clearly must have been present for
5   a project of this scope in producing contributions to Linux.
6   And we filed a motion, which the Court is aware, and I won't
7   go over specifics, some of which have been marked confidential
8   by IBM, but there were a number of items which it was clear
9   you would expect to have in there that were not, source code
10  files, in fact, had appeared to have been removed from the
11  CMVC database that related to Linux database, of course,
12  previously ordered produced. One of the issues in the case
13  concerns the JFS, file system technology, which we believe has
14  been inappropriately provided to Linux, and there were
15  documents relating to that.
16      There are also the fact that documents which used
17  to be on a public website no longer are there because that
18  website has been closed down, and other issues which have been
19  identified in the bullet points from Pages 8, 9, 10 of our
20  additional motion.
21      The response to that motion from IBM including
22  specifically the declaration of Daniel Frei, who was the
23  senior executive in charge of Linux Technology Center, made
24  clear that these areas of concern were just the tip of the
25  iceberg and that IBM has essentially produced very little at

7

10/7/2005 Motion Hearing October 7, 2005

1   all in compliance with what we believe there was agreement to
2   do so and this Court's repeated orders to do so. And that
3   were dealing here with the failure to produce any of the
4   nonpublic or certainly all of the nonpublic Linux related
5   information concerning programmer notes, concerning drafts of
6   code that they submitted, concerning work plans, all the type
7   of information that is generated up to the point where
8   contribution is then publicly made to the Linux community.
9       IBM does not deny this. In fact, they state that
10  in Frei's declaration that they have not gathered that,
11  reviewed it or produced it, and that it might amount to
12  hundreds of thousands of documents. They say instead that
13  that was not called for, despite it clearly being in the
14  center of this case. The case is about whether the
15  contributions of Linux technology of IBM violates those
16  proprietary rights. And then they say it would be too
17  burdensome to provide it. With the Court's approval, I would
18  like to address those two issues.
19      First one. The documents were requested going back
20  to June 2003 in at least three of the initial requests in the
21  first request for production. Request Number 11 called for
22  all the contributions themselves which were made not limited
23  to source code, binary code, to open source development lab,
24  Linux, any other entity.
25      And then there was request 35 and 42. 35 called

8

**Page 9**

1  for all documents concerning, and concerning is broadly
2  defined, any contribution to Linux. 42 was all documents
3  concerning Linux contributions to development, specifically to
4  2.4 and 2.5 versions of the Linux Kernel. These weren't just
5  for code, these were for documents concerning their
6  contributions.
7      IBM initially objected. And then in the course of
8  the meet and confer process, which was carried out in writing,
9  IBM moved back off of its initial objections and indicated
10  that it would make substantial production with respect to
11  areas 35 and 42.
12      In a letter dated from IBM's counsel on
13  September 15th, 2003, IBM indicated that with request
14  Number 11 that IBM has undertaken to collect documents from
15  various members of the Linux Technology Center, the LTC, who
16  are responsible for work relating to open source contributions
17  to Linux. And in addition, they are collecting materials from
18  the Open Source Steering Committee, the group within IBM
19  responsible for approving and reviewing open source projects,
20  and that:
21      We intend to produce nonprivileged documents
22  identified in these files that relate to IBM open source
23  contributions to Linux.
24      In response Number 35, they again say:
25      We are undertaking to produce from the files

**Page 10**

1  of Linux Technology Center and the OSSC personnel
2  nonprivileged documents that relate to IBM's open
3  source contributions to Linux.
4      They didn't say they were just going to produce the
5  code contributions. They didn't say that what they were
6  arguing about was whether or not they should have to look at
7  the whole company and to open source beyond Linux, but they
8  said for Linux, we were looking at the Linux Technology Center
9  and that they would produce the documents that related to
10  their open source contributions.
11      Your Honor, this was reiterated in subsequent
12  correspondence in October of 2003 where IBM indicated that
13  this work was ongoing. With respect to request Number 11,
14  they said:
15      We have attempted to conduct a reasonable
16  search for documents that relate to IBM's open
17  source contributions. The vast majority are made
18  through the LTC. Some were through this OSSC.
19  And they stated, our searches have included
20  individuals in both of these groups as well as
21  other potential sources of documents relating to
22  IBM's contributions to Linux.
23      IBM went on to say that:
24      We are not limiting our searches to any
25  particular geographic area. Indeed, they have

**Page 11**

1  already included individuals residing in
2  Beaverton, Oregon, which is the headquarters for
3  Linux Technology Center; Austin, Texas, and a
4  variety of other IBM locations.
5      We learn now from Mr. Frei's declaration that, in
6  fact, they have not searched and gathered from these
7  locations, the Linux Technology Center, the documents that
8  would relate to Linux contributions. They say that these
9  efforts are ongoing.
10      Given these assurances, it is understandable that
11  the intentional motions to compel related to aspects of
12  discovery which IBM said they would not provide. There was
13  the issue in which the Court is aware of whether public
14  contributions that are already out there needed to be
15  provided, and there was an issue that was focussed on what is
16  in the files and individuals outside the Linux Technology
17  Center including senior executives, like Mr. Palmisano and
18  Mr. Wladawsky-Berger. And the Court after briefing held a
19  hearing on that in February of 2004, and it rendered an order
20  on March 3rd, 2004, on SCO's motion to compel.
21      In that motion -- or in that order, there are two
22  relevant paragraphs. Paragraph Roman Number II.2 dealt with
23  the issue of Linux contributions themselves. There the Court
24  indicated that the ones which were public SCO should use its
25  best efforts to obtain through public sources. The

**Page 12**

1  contributions that were nonpublic IBM is ordered to provide.
2      But then the Court went on to deal with the issue
3  of documents beyond the code contributions themselves, and
4  that is in Paragraph 3 of the Court's order. And there are
5  three occasions in IBM's opposition to the current motion,
6  Your Honor, where they quote this order. In none of those
7  three occasions do they ever mention Paragraph 3. Paragraph 3
8  begins by confiring in what we believe sweeping terms that
9  IBM has to produce documents to the heart of the case coming
10  out of the Linux project. The Court said:
11      IBM is to provide documents and materials
12  generated by and in possession of employees that
13  have been and that are currently involved in the
14  Linux project.
15      THE COURT: Mr. Singer, don't you see Paragraph 3
16  as an expansion of what is ordered in Paragraph 2?
17      MR. SINGER: Well, we think it goes beyond
18  Paragraph 2, certainly, and that it goes beyond that to the
19  extent that Paragraph 2 is the Linux contributions themselves
20  that are going out to the public. And then Paragraph 3 is
21  dealing with documents that IBM has that are broader than that
22  that relate to that process of contribution.
23      We think there's no legitimate basis on which in
24  the Linux Technology Center, which is the heart of the Linux
25  project, an employee can do a rough draft of code and that

1    doesn't fall within 3. Or that if you have a work plan or a
2    programming note, not privy to the public, but generated there
3    in the course of that contribution, a document that might be
4    exchanged between developers that say, let's use the Dynix
5    technology in making this contribution. All of that would be
6    documents generated by people in the Linux project and in the
7    possession of employees. And we think it follows from what
8    the Court says here that:
9        The Court finds these materials are relevant
10   because they may contain information regarding the use
11   or alleged misuse of source code by IBM in its
12   contributions to Linux.
13       Now, the fight at that time was focussed on the
14   senior executives, people outside the Linux Technology Center.
15   And the Court made clear that the scope mentioned includes
16   senior executives, includes Mr. Palmisano and
17   Wladawsky-Berger in another document that had been
18   specifically been dealt with. But those are terms not of
19   limitation on a principle obligation, but an example of what
20   is included within the scope of production. And certainly if
21   the executive materials are relevant because they may contain
22   information regarding the alleged misuse of source code, the
23   very documents being used every day in the Linux Technology
24   Center to create the contributions, their notes, their rough
25   drafts, their work plans definitely fall within this scope.

1    So we think its clear that those materials both,
2    quote, related to the Linux contributions so IBM had committed
3    by agreement to produce them, and also that they were the
4    subject of Paragraph II.3 of the Court's order.
5        Now, what did IBM do in response to that? They
6    assured the Court that full production had been made. If IBM
7    was uncertain as to the scope of that obligation, they had the
8    ability to ask for clarification. They had the ability to
9    provide qualifications in the declaration that they filed
10   requiring compliance. We believe this Court asked for such
11   declarations precisely to avoid this type of issue coming up
12   later on.
13       THE COURT: Do you acknowledge that SCO has the
14   same obligation if it is unsure as to the meaning of an order?
15       MR. SINGER: Yes. We think that a party has an
16   obligation to comply in good faith and if you are uncertain,
17   it has a duty to seek clarification from the Court to disclose
18   limitations on what they are producing.
19       And that IBM did not do so in this case. That even
20   if there was an argument, which we don't think there is, and
21   somehow the Court, if they read this thought, well, we only
22   have to produce documents from the files of our senior
23   executives, not the very people at the heart of the project in
24   the Linux Technology Center, they could have asked the Court
25   to clarify Paragraph 3. They didn't do so. They could have

1    stated in their declaration of compliance in Paragraph 5, we
2    produced the senior executive documents, but we take the
3    position that somehow that doesn't extend to the documents in
4    the Linux Technology Center that relate to these
5    contributions. They did neither.
6        THE COURT: Then let me indicate to you that I'm
7    going to want you to address what appears to be SCO's failure
8    to clarify or ask for clarification on issues related to the
9    Linux contributions. In my review of the transcript of the
10   initial hearing, I read it closely and find no mention made by
11   Mr. McBride of any of the new requests you are now saying are
12   covered by the order. So be prepared to address that.
13       MR. SINGER: Yes. If I'm -- I mean, our position
14   with respect to our current motion is we're not saying that in
15   the February hearing or in the hearing on AIX and Dynix
16   contributions that the issue was these Linux materials. Our
17   position is, we believe that IBM had said they would produce
18   this.
19       THE COURT: But the order does not address that,
20   and it does not address it because it was not raised at the
21   time of the hearing.
22       MR. SINGER: I understand, Your Honor. Our
23   position is it was not raised with the Court at the time of
24   the hearing expressly because of the assurance in the letters
25   which we have shown you that are resolving document Request 35

1    and 42 and others saying that IBM will search the files of the
2    Linux Technology Center, and IBM will produce documents that,
3    quote, relate to its Linux contributions.
4        THE COURT: Well, that's why I go back to what the
5    responsibility of each side is, to seek court clarification
6    when something is unclear.
7        MR. SINGER: If we believe that IBM -- or let me
8    put it this way, Your Honor. If we thought IBM was not
9    producing documents at the heart of the case despite saying,
10   we produced documents that relate to Linux contributions, that
11   certainly would have been expressly raised. We believe it is
12   very hard for IBM to take the position that they're taking
13   here, that despite the language of these orders, despite an
14   order we'll get to in a moment that deals with the production
15   of the programmer notes, the history, the revisions in AIX, in
16   Dynix, that the Court could possibly admit that even more
17   central documents relating directly to the Linux contributions
18   themselves did not have to be produced.
19       In this assurance on April 2004, IBM simply said
20   that they undertook a reasonable search for and has produced
21   all nonprivileged, responsive documents including those from
22   the files of Mr. Palmisano and Mr. Wladawsky-Berger, which
23   is, of course, the subject of the other motion which has now
24   been deferred at this time, but this includes all the section
25   of 2.3 of the order.

1      After this, the discovery fight focused on the

2  issue of AIX and Dynix code because that, IBM said, they were

3  not going to produce the revision control information for,

4  CMVC database, RCS database. They weren't going to respond

5  specifically to interrogatory Number 5, all for specific

6  identification of contributions made in programmers who made

7  those with respect to AIX to Dynix and to Linux.

8      As the Court is well aware, there was extensive

9  briefing on this issue, and there was argument, following

10  which in January of this year, the Court entered its order

11  which said that because of the contract theory, the broad

12  scope of discovery, IBM needs to produce that information.

13  The Court ordered it produced. The Court ordered that

14  programming information, related documents from files of 3,000

15  IBM programmers who contributed to AIX and Dynix be produced.

16      IBM filed a motion for reconsideration from that.

17  And they said that is too burdensome. And the Court's

18  response to that said, well, for the present time, it will

19  defer, not remove that obligation from the 3,000 employees who

20  made the most contributions to the AIX and Dynix, but to defer

21  that, and only as a first step require compliance for 100

22  individuals who made the most contributions.

23      In the course of discussions leading to that motion

24  for reconsideration, statements by IBM to us indicated that

25  they were not interpreting that to include as well Linux

1  information had not previously been produced. And so in our

2  opposition to IBM's motion for reconsideration, that was

3  expressly addressed to the Court at that time.

4      And it's indicated that in many instances, there's

5  been a development process which runs from IBM or Sequent

6  programmers immersed in SCO's proprietary UNIX code between

7  the selection of AIX and Dynix material for Linux and the

8  actual contributions to Linux. SCO requires access to that

9  development history including both code and related

10  documentation for exactly the same reason this Court has held

11  that:

12      SCO needed access to the material evidencing the

13      developers and development process of Dynix and AIX

14      themselves.

15      IBM did not respond directly to this other than to

16  say, we're not obligated to produce information that's public.

17  Were just obligated to produce information that's nonpublic,

18  and this should not be ordered.

19      The nonpublic information that they were

20  withholding they never stated in that response includes all

21  the materials relating to that development process.

22      The Court did not limit in any way IBM's

23  obligation. The Court in its order dated April 19, 2005 -- I

24  should say the Court did not limit these obligations relating

25  to Linux. The Court, as I've mentioned and as the Court is

1  aware limited the obligations for the time being on the number

2  of AIX and Dynix files that it needed to review.

3      However, with respect to Linux, the Court's order

4  had no limitation and, we think, made it as clear as it could

5  be that IBM was required to produce all the nonpublic Linux

6  contribution information that it had not previously produced.

7  The Court, this is not our emphasis in underscoring where it

8  says, "all nonpublic Linux contribution information," that's

9  the Court's emphasis.

10      Now, we believe that the face of these two orders

11  and IBM's earlier agreement to produce this information that

12  IBM has wilfully failed to comply. How can IBM take the

13  position that an internal work plan as to how they're going to

14  make a certain contribution is not a document that, quote,

15  relates to that contribution? How can IBM fairly take the

16  position that a document such as that when it's generated in

17  the Linus Technology Center is not within the scope of

18  documents that are generated by employees in the Linux

19  project? How is that not part of nonpublic Linux contribution

20  information? This is not limited just to the contributions,

21  but the information. It goes to the very core, we submit,

22  Your Honor, of the documents in this case.

23      But even beyond the plain language of the Court's

24  order, we don't believe that the position that IBM apparently

25  is taking can make any sense and be understood as having a

1  rooting in this. First of all, IBM has taken the position

2  that all or virtually all of their contributions to Linux are

3  publicly made. That being the case, if the Court's order were

4  construed as just dealing with contributions themselves,

5  they're virtually a nullity because if contributions

6  themselves are public, that we agree, the publicly accessible

7  information we get publicly. If the Court's orders mean

8  anything, they mean that the nonpublic information that

9  surrounds the public contributions are to be produced.

10      Furthermore, IBM has to know that the Court in its

11  reasoning and its order saying that AIX and Dynix development

12  history is relevant and needs to be produced could not

13  possibly intend to exclude Linux development history,

14  documents relating to the Linux contributions which are even

15  more at the core and the center of the case that concerns

16  whether those contributions were made in violation of our

17  proprietary rights.

18      THE COURT: But, Mr. Singer, I again ask you if in

19  the discussions with IBM you are not receiving these, then why

20  didn't SCO accept the obligation which you appear to accept to

21  ask for clarification?

22      MR. SINGER: Well, Your Honor, as IBM says in its

23  opposition papers, they produced some of the documents. They

24  produced they say tens of thousands of documents that are

25  responsive to this. We don't know how they selected those.

1   We don't know why they produced tens of thousands of documents
2   if they believed they had no obligation or why if they
3   produced that many they didn't produce all of them. So we are
4   receiving along the way certain information.
5       We did raise these issues with IBM, we submit, when
6   we pushed them on item Number 35 back in 2003, and they say,
7   we are producing these. We are going through the Linus
8   Technology Center. We are producing the files that relate to
9   these contributions.
10      We did push them again when in connection with this
11  motion for reconsideration, and in this spring they made the
12  argument that they were not required to detail their Linux
13  contributions. We said, we want to make clear that the
14  Court's order included the Linux contributions. And they
15  refused to do that. We then raised that with the Court, as
16  I've just indicated, in our memorandum dated February 28th,
17  2005. And we believe that any uncertainty in IBM's mind was
18  then clarified by the Court's order that said, all nonpublic
19  information was to be produced. So we believe we have reacted
20  to that.
21      What they have done meanwhile is they never told us
22  they never did what they said they would do and search the
23  files of Linus Technology Center and produce related
24  information. They have presented declarations that said that
25  they produced everything when they now say they haven't even

1   searched for that material.
2       IBM is the party that knows what's in their files.
3   We can draw some inferences from what they are producing to
4   us, but we don't know that full scope. IBM at all times knows
5   exactly what is in their files, and they know exactly what
6   they have produced and what they have not produced.
7       Furthermore, Your Honor, there is another statement
8   by IBM that bears on this. In their responsive brief which
9   they submitted to this Court on this very motion, IBM stated
10  that they should not be required to do this because it would
11  be difficult if not impossible to separate out the
12  contributions from the development history information.
13      And if the Court accepts that, I ask, well, what
14  basis, then, has IBM even been able to confirm to the Court
15  that it's complied with the order to produce nonpublic
16  contribution information if they haven't at least gathered the
17  development information and reviewed that, which they said
18  they haven't done? They have been making judgments,
19  apparently, that none of this information is under these court
20  orders, when, according to Mr. Frei's declaration, they
21  haven't gone about gathering it from the field, reviewing it
22  and making any determinations. You could have documents in
23  the hands of Linus Technology Center employees that
24  specifically say, we are looking to incorporate here
25  technology from Dynix, a derivative product of UNIX System V,

1   in the Linux because it will work better, or admissions of
2   that type. And IBM not only would haven't produced it, but
3   based on the Frei declaration, they would not have even
4   conducted the necessary and thorough search to provide it.
5       The other point ISM makes, Your Honor, is they
6   argue that the Linux information would be too burdensome at
7   this point to produce. And it was in that connection that
8   Mr. Frei's declaration is submitted. We believe the short
9   answer to that is IBM said they would do that search of Linus
10  Technology Center in September of 2003 and produce all
11  documents related to the Linux contributions. So that is
12  something they said they would do over approximately two years
13  ago but they have not done.
14      And further, we think that a statement by IBM of
15  the burden of reviewing files of 300 approximate number of
16  developers is not something which can be viewed as inordinate
17  and burdensome under any case. It is hard to understand that
18  they would be defending this case in the first place without
19  having gathered and reviewed the information that directly
20  relates to how the Linux contributions were prepared and made.
21  Yet, they have not done so.
22      THE COURT: You required them to defend against
23  this case by filing suit against them.
24      MR. SINGER: That's right. Our point is that these
25  documents, Your Honor, go right to the heart of that suit.

1   For them to say they have never gathered and reviewed the
2   documents that show how Linux development has occurred, the
3   rough drafts, the internal work plans, programming notes, that
4   all of that you would think would be the first thing that IBM
5   would look to along with the contributions themselves.
6       IBM can gather information from 300 individuals
7   very easily. They can start by sending an e-mail to those 300
8   individuals which says, send us the development information,
9   all the documents that, in fact, do relate to their Linux
10  contributions.
11      We assume that IBM has taken the necessary and
12  appropriate steps to preserve that information upon the
13  commencement of this suit. We submit that that information
14  should be produced in a manner they should work with us that
15  requires the least adjustment, if any, to the discovery
16  schedule in place. For example, we have a number of
17  depositions of programmers coming up, and they should give us
18  an advance of those programmers' depositions the files
19  indicating what it is those programmers were working on.
20      Instead, we have a situation where they're saying,
21  you take blindly these depositions of the programmers. You
22  can ask them what work they did in a deposition, but you
23  shouldn't get the benefit of the files of their desk top or
24  their server which would indicate what work they did in
25  preparing the contribution.

1   Clearly that material is very relevant and is at
2   the heart of this case. And even if it were not the subject
3   of these earlier orders and the earlier agreement by IBM, it
4   should be produced.
5        IBM said that 300 people are spread throughout 10
6   countries. They don't indicate how many of those, in fact,
7   work at the headquarters in Beaverton or in Austin, Texas,
8   but no matter how many places there are, in this day and age,
9   e-mail goes out, and documents come back in from whatever
10  locations that IBM has engaged in.
11       When we asked Dan Frei in his deposition had he
12  turned over everything, his response in his deposition whether
13  he complied with the document request, the file request, he
14  said, I turned over everything. Clearly that's not the case
15  in so far that he has in his possession documents that relate
16  to the contributions made to Linux.
17       Your Honor, one further argument. To the extent
18  that IBM is taking the position that this was not, in fact,
19  called for by Request 35 and Request 42 among others, that is
20  inconsistent with their recently received responses to our
21  Seventh request for production. IBM once it became clear this
22  summer that they have not produced a lot of information
23  because we weren't seeing it regarding Linux development, some
24  examples of which are in our motion, we sent out a Seventh
25  request for production. We tried to deal with it with as

25

1   great specificity as we could as opposed to general categories
2   of documents relating to Linux contributions, documents
3   relating to 2.4, 2.7 development, we sent out a Seventh
4   request of production that had scores of specific requests.
5   All documents concerning contributions to specific Linux
6   projects, development work, listing specific projects,
7   development work on the contributions to the 2.7 Kernel.
8   Documents relating to the development trees. These are just a
9   few examples.
10       In response to those requests and many other
11  similar requests, IBM stated that these were duplicative of
12  SCO's earlier document requests, including request Number 11
13  and 35. And we submit that suggests, you know very well that
14  SCO 35 which asked for all documents concerning Linux
15  contribution included the very thing that they have not
16  produced despite their agreement to produce all documents
17  relating to Linux.
18       They should have produced this a long time ago,
19  Your Honor. We submit that they have an order to produce it
20  forthwith. And we submit further if the Court agrees with us
21  respectfully that their action has not been appropriate in
22  this regard, and the Court should consider sanctions, as well.
23       THE COURT: Thank you, Mr. Singer.
24       MR. SINGER: Your Honor, this was not in the book.
25  It's a smaller photocopy of this particular chart. It is

26

1   available.
2        MS. MARRIOTT: Good morning, Your Honor. David
3   Marriott for IBM.
4        THE COURT: Good morning.
5        MS. MARRIOTT: If I may, I'll just take this down.
6        THE COURT: Sure.
7        MR. MARRIOTT: Your Honor, SCO's motion is premised
8   on the proposition that IBM has by way of Mr. Shaugnessey's
9   declaration and its interaction with counsel in this case and
10  the Court effectively misled the Court with respect to the
11  scope of IBM's production pursuant to the Court orders. And I
12  want to be perfectly clear from the outset that that is
13  absolutely false. We have endeavored, Your Honor, throughout
14  the course of this litigation to conduct ourselves according
15  to the highest of standards of professional conduct, and I
16  believe respectfully, Your Honor, that we have. And we've
17  endeavored to comply with Your Honor's orders in so far as
18  we've understood them as best we could and in all respects.
19  And, in fact, Your Honor, in some instances we have, I think
20  it can fairly be said, gone above and beyond what Your Honor
21  has ordered.
22       Mr. Singer mentioned in the Court's requirement
23  that IBM search for files from 100 developers of AIX and Dynix
24  code. IBM searched for and to the extent it found, Your
25  Honor, produced documents from 150 AIX and Dynix developers.

27

1   In fairness, Your Honor, I think that our approach to
2   discovery has gone above and beyond that, I hope in the few
3   minutes that I have to demonstrate that to Your Honor.
4        At the risk understating the point, Your Honor,
5   SCO's present motion is to us nothing short of astonishing.
6   In a nutshell, Your Honor, it argues that we agreed from the
7   beginning of the case to effectively produce every document in
8   the company relating to Linux, despite the fact that they've
9   never asked for it. They argue that Your Honor ordered us to
10  produce every document in the company relating to Linux,
11  despite the fact they didn't move for and apparently we'd
12  already agreed to do it. And then they argue, Your Honor,
13  that in effect, we thumbed our nose at the Court's order. We
14  said that we produced everything that we said we would
15  produce, and then, in fact, we did not, despite the fact that
16  later they're apparently saying in Mr. Frei's declaration
17  exactly what we did do.
18       Your Honor, early in this litigation, SCO made what
19  I think can fairly be characterized as a grandiose public
20  statements about the scope of its case and the breadth and the
21  depth of its evidence. In his February 9 order, Judge Kimball
22  said, quote:
23       viewed against the backdrop of SCO's plethora of
24       public statements concerning IBM's and others
25       infringement SCO's purported copyrights to the UNIX

28

1    software, it is astonishing that SCO is not offering
2    any competent evidence to create a disputed fact.
3        Your Honor, in so far as SCO distorts the record on
4    this motion and faults IBM for not complying, which I believe
5    I can show Your Honor to be revisionist versions of Your
6    Honor's orders, its approach here as I would submit in
7    Judge Kimball's words, nothing less than astonishing.
8        I would like, if I may, to make three points. The
9    first of those points is contrary to what Mr. Singer says, IBM
10   did not at any point agree to provide, as SCO suggests, every
11   document in the IBM company relating to Linux or even every
12   document relating to IBM's Linux contributions or the
13   development of Linux. SCO propounded, Your Honor, a very
14   small set of discovery request earlier in this case relating
15   to Linux.
16       And if I may borrow your charts, counsel.
17       MR. SINGER: Sure.
18       MR. MARRIOTT: I think, Your Honor, that SCO says
19   it well in its own chart. In document request Number 11, in
20   document request Number 5:
21       Seek documents relating to contributions to Linux.
22       Contributions to the open source development lab, Linus
23       Torvald, Red Hat.
24       From the beginning of the case, their requests were
25   focused on Linux contributions. Requests don't ask for

1    documents relating to the development of Linux, and they don't
2    ask for every document in the company that relates in any way
3    to Linux.
4        That notwithstanding, Your Honor, when we received
5    these requests we objected to them. And we objected to them
6    because we found that even as they related only to
7    contributions, they were overbroad and unduly burdensome and
8    would require the production of materials not reasonably
9    calculated to lead to admissible evidence. And we set out our
10   objections in our responses and objections to SCO's requests.
11       And if I may approach, Your Honor, we have a binder
12   which I hope -- may I -- which I hope will be of some
13   assistance to the Court. It's in part oriented toward the
14   other motion that has now been put off, Your Honor, but some
15   of the materials here may be useful, and I'll come to them as
16   they do.
17       The point is, Your Honor, in response to the SCO
18   requests, IBM propounded objections because the requests in
19   our mind were broad. For example, Your Honor, as we made
20   clear to SCO from the beginning, IBM's contributions, as
21   anyone's contributions, to Linux are public. Linux is a
22   publicly developing operating system. The contributions
23   themselves are by definition in the public domain.
24       There is one sort of wrinkle, Your Honor, and in
25   one sense in which a contribution which I think isn't a

1    contribution might be said not to be in the public domain. If
2    a person attempts to make a contribution of code to Linux, it
3    sends an e-mail, for example, to Linus Torvalds. Mr. Torvalds
4    looks at the e-mail and decides the contribution is of no real
5    value, and it doesn't make it into Linux. That I would
6    characterize as an unsuccessful Linux contribution that didn't
7    make it into Linux. Most successful contributions, Your
8    Honor, do make it into the public domain because a person
9    generally contributes to Linux by offering up a contribution
10   on its public website for the world to see those, for the
11   world to evaluate whether the code makes sense to include it
12   or not, and then Linux itself is actually developed in the
13   public domain over the Internet.
14       So there is a very small set of documents, Your
15   Honor, that one would call nonpublic contributions. To the
16   extent IBM made contributions through some indirect means,
17   nonpublic means, and they didn't make it into Linux, which
18   would make them public, we looked for those documents pursuant
19   to Your Honor's order, and we produced it. And to the extent
20   that any in the future are made, that they don't make it into
21   the public domain system because someone within IBM sends it
22   to Linus Torvalds, we will search for them, and if he rejects
23   it and it doesn't make it into the Linux Kernel, we will make
24   those documents available to SCO.
25       Now, Your Honor, let me just pause for a minute and

1    drop the Court a footnote. Though IBM objected to SCO's
2    requests with respect to producing Linux contributions because
3    we thought for the reasons I said, that they were overbroad
4    and burdensome, we did not refuse altogether to search for
5    documents. Your Honor will remember that at the beginning of
6    the case the allegations of the complaint left, we thought we
7    unsure as to what this case was about. And that's what
8    precipitated the set of motion practice about figuring out how
9    we would receive the discovery. And Your Honor set up
10   protocol, as I think of it, by which SCO would identify the
11   code at issue in the case. Once identified, IBM would then
12   provide discovery with respect to that. That is as we
13   understand it has been the protocol in the case.
14       So the footnote is we have provided substantial
15   discovery relating to those very requests. They didn't just
16   find out that we somehow had not, and I will show Your Honor
17   that to be the case. And I will come back to the particulars
18   of what we produced, if I may, shortly, Your Honor.
19       But the point is we never indicated that we would
20   provide, as they suggest in their papers though they back off
21   it a little here this morning, every piece of paper in the
22   company relating either to Linux or even the development of
23   Linux. We indicated that we would undertake a reasonable
24   search for responsive documents based on the allegations of
25   the complaint as we understood them. And the letters that

1  Mr. Shaughnessy that you have displayed here say nothing more

2  than that. IBM will undertake a reasonable search. We did

3  that, and we produced a substantial number of documents, Your

4  Honor.

5     We produced -- just to give Your Honor an example,

6  we produced documents from 70 or so custodians, whose

7  documents related essentially only to Linux. And to the

8  extent those custodians had in their files of documents

9  related to Linux, those documents if responsive to these

10  requests were produced. They amount, Your Honor, not to tens

11  of thousands of pages of papers, as Mr. Singer suggests, but

12  they're hundreds of thousands of pages of paper.

13     And with every production, Your Honor, in this

14  case, we have given SCO a log identifying whose documents we

15  were producing and the number of pages of documents being

16  produced. Pursuant to interrogatories early in the case, they

17  asked who the players were, who were making contributions.

18  You've heard different numbers of 7,000 and hundreds of

19  developers being mentioned. They knew exactly what we were

20  doing, Your Honor, all along because the log is a record of

21  exactly whose files we produced it from. So the suggestion

22  that somehow we promised to do a reasonable search and then

23  reneged on that only from their position to give them nothing

24  which they just found out, is frankly not true.

25     Back to the first point after that long footnote.

1  Your Honor. We did not agree to give them every document in

2  the company relating to Linux. We simply did not. The

3  parties met and conferred over a course of days for a total of

4  several hours about these original requests, Your Honor. None

5  of the lawyers sitting at this table were involved in any of

6  those negotiations. Mr. Shaughnessy was, and Mr. Ligh was.

7  And they tell me that they made perfectly clear to SCO that we

8  were not turning IBM upside down to produce pieces of paper

9  from every single person in the company that might have a

10  document related to Linux.

11     We also made clear, despite what Mr. Singer

12  suggests, Your Honor, throughout the case in our papers that

13  we were not doing that. Not just the production logs, but we

14  made it abundantly clear in this litigation what we were

15  doing.

16     And, Your Honor, the suggestion here that we agreed

17  to do this sometime ago is a suggestion that comes for the

18  very first time in a litigation two and a half years old in a

19  reply brief. That reply brief is in stark opposition to what

20  SCO said in its moving papers on the very same subject. And I

21  point Your Honor to Page 5 of their opening brief in which

22  they say, quota:

23     IBM has persistently denied SCO this discovery.

24     And that's absolutely right. We have persistently

25  declined to turn the company upside down to provide every

1  scrap of paper that might relate to Linux. Your Honor, Linux

2  is a pervasive thing. It is like saying to the computer

3  company, give us every document that relates to computers.

4  The notion that they asked for that and we would agree to that

5  is frankly absurd.

6     My second point, Your Honor, is that contrary to

7  what counsel for SCO suggests, we do not believe that Your

8  Honor's orders required IBM to produce documents in any way,

9  shape or form relating to Linux from all of the people in IBM

10  as their papers suggest, although again this morning they back

11  off of that, we're now talking about hundreds of people. Just

12  so there's no doubt, Your Honor, in describing the Court's

13  orders, I do not presume to speak for you or tell you what you

14  intended. I'm comfortable that Your Honor will tell us what

15  these words in your mind meant, and we will all live by it.

16  But what I do want to communicate is what we understood the

17  orders to mean, and what we understood them to mean, Your

18  Honor, not in our fanciful imaginations, but from the language

19  used by the Court and from the context in which the Court used

20  that language.

21     Chronology, Your Honor, and context here are

22  important. They're important because these orders did not

23  issue against a blank slate. They issued against a set of

24  discovery disputes and prior hearings and prior orders. And

25  without going into all the detail, I want to tell Your Honor a

1  little bit about that. Well, it takes more time than I would

2  like. I think it's important to our understanding of the

3  these orders.

4     The first order, Your Honor, that SCO suggests in

5  its papers and here again today that IBM has violated

6  throughout the course of discovery is the Court's March 3,

7  2004, order.

8     And again if I may borrow this chart. May I

9  counsel?

10    MR. SINGER: Certainly.

11    MR. MARRIOTT: As I suggested, Your Honor, you will

12  recall that at the beginning of this litigation, there was a

13  dispute among the parties as to how discovery should proceed.

14  And in IBM's view, the SCO complaint failed to disclose with

15  requisite particularity what the case was about such that we

16  were left perplexed as to how precisely we were to go about

17  producing documents relating to a subject like Linux like

18  computers without knowing more specifically what the case was

19  about. And we asked Your Honor to require them to provide

20  some details.

21     About the same time that we moved, they made a

22  competing motion to compel, which is the motion we're

23  effectively here on in a renewed fashion today. Your Honor

24  said at the outset that you were going to hold their request

25  for production in abeyance. You said, I want you to go first,

1  Paragraph 3 swept broadly to require the production of
2  everything related to Linux or everything related to the
3  development of Linux is impossible to reconcile with
4  Paragraph 2, under which Your Honor said quite plainly we are
5  not required to produce every document in Linux. If their
6  interpretation that this is right, Paragraph 2 would be
7  meaningless.
8      Moreover, the footnote, which is not -- it is up
9  there. The footnote makes specific reference again to
10  Mr. Haigh's pitch to the Court that we ought not be omitting
11  documents related to -- from the files of executives, and we
12  ought to be looking for documents related to that strategy.
13      We did that, Your Honor. Not for a minute did we
14  consider that the Court was by that provision saying, forget
15  the protocol of the months past, forget that SCO's to go first
16  and tell us what's at issue and IBM with respect to what's
17  been disclosed come forward and give us a little bit, give us
18  discovery as to that, or we are going to go from broad to
19  narrow until we reach a point where we have an issue we might
20  actually try.
21      Never for a minute did we think that was completely
22  out the window, because now SCO had, never having asked for
23  it, never having moved on it, an order that said, IBM, produce
24  everything in the company that's related to the Linux. And
25  that, Your Honor, is how they read this clause.

                                                        41

1  Such materials -- produce such materials from Linux
2  strategy or provide documents in the Linux project.
3      Which presumably they read to mean Linux. Produce
4  any materials related to Linux.
5      Your Honor, not only would that reading entirely
6  make irrelevant Paragraph 2 of Your Honor's order and not only
7  would it totally gut the protocol which I understood the Court
8  to put into place, but it would have been impossible to do.
9  IBM is a company of 320,000 people. That's more people than
10  there are in the city of Salt Lake City. The motion that we
11  were going to somehow without bounds, which they're trying to
12  now put to read this to say, search for files from
13  everywhere -- and by the way, searching for files by last
14  check did not in their view amount to simply sending an
15  e-mail. Not to argue the motion Mr. Shaughnessy intends to
16  argue, Your Honor, but you remember that we've been faulted
17  for affidavits which have all sorts of apparent deficiencies
18  according to them. Those affidavits were generated following
19  a very careful and comprehensive search of people's files, not
20  by sending an e-mail. Do you think for a minute if we just
21  sent an e-mail they would be content with that production? I
22  would submit to you, Your Honor, they wouldn't.
23      The way you collect documents as a general matter
24  is to identify the people whose files deserve a search, to
25  undertake, to communicate to them what the nature of the

                                                        42

1  documents we're looking for, in many cases interview them, to
2  collect the documents which result from that and appear that
3  they may be responsive, to carefully review them for privilege
4  and for responsiveness, to segregate out the privileged
5  documents, to take those documents, and if they are responsive
6  put them on a log, to prepare the other documents for
7  production, and to have CDs cut and produce them. It is not a
8  trivial process.
9      According to SCO, Your Honor, though I don't
10  believe the Court's order actually says how much time we have
11  to do what's ordered here, according to the SCO letter sent to
12  us following this order, they expect a compliance in 45 days.
13  So they're now telling you we were supposed to go to the files
14  of everybody or just take the argument that is being advanced
15  today, to 300, and we were supposed to search the files in a
16  meaningful way of 300 people and produce all of the documents
17  that related in any way to Linux, and we were supposed to do
18  it in 45 days. Your Honor, it strains credulity to think that
19  that's what we reasonably could have understood this order to
20  mean.
21      Let me just add, Your Honor, let there be no doubt
22  what we understood this order to mean. When we got it, we
23  sent a letter to SCO, and we said to them, this is the way we
24  understand Paragraph 3. We understand Paragraph 3 to require
25  us to search the files of the executives, and we understand it

                                                        43

1  to be calling for documents relating to what Your Honor says
2  in the order, the IBM documents.
3      They responded. They expressed some concern, and
4  these letters are in the book, which I provided to the Court.
5  They responded. And in their response, Dexter Goodstone,
6  another lawyer for SCO, expresses some concern that perhaps
7  IBM is trying to say that it's only going to search in the
8  files of its executives for documents relating to that. And
9  we responded and said, no. We understand that this particular
10  provision to be responsive to Mr. Haigh to be saying, make the
11  documents related to the decision from the files available and
12  don't omit the files of executives. But we understood your
13  other requests of SCO. We are not omitting from our
14  production documents which otherwise might be responsive
15  merely because they don't relate to that document.
16      And again, we haven't done that. We have produced
17  files from 216 custodians. By contrast SCO has produced 65.
18  We have produced documents in the order of millions of pages
19  of paper. At least hundreds of thousands of them, I'm told
20  roughly 788,000, relate to Linux and Linux development and the
21  like.
22      Your Honor, we have done the best we can do with
23  what we have from them with respect to what we are supposed
24  to -- with respect to what this case is about. And I will
25  remind you, that with respect to what in Linux they have

                                                        44

1  rights to, you remember we asked and propounded in
2  Interrogatory 13. Your Honor twice ordered them to respond to
3  it. We still don't have what we believe is an adequate
4  response. That's the interrogatory in which they say, here
5  are the contributions that are a problem. We own them.
6  Here's our right to them. Here's how you violated it. We
7  still don't have the answer to that. Yet, they say, under
8  Your Honor's order, the trivial discovery we did do. Yet, in
9  their view, they now have an order which conveniently they're
10  interpreting to say, forget all of that. Give it all to them.
11  We now have carte blanche for every piece of paper in the
12  company. And if you don't produce it, they suggest today, we
13  will contend that you improperly failed to retain responsive
14  documents because you didn't produce every document in the
15  company, which is what Mr. Singer's reference, I believe, was
16  about.
17      The bottom line, Your Honor, is in our judgment,
18  one cannot reasonably read these orders as requiring the
19  production of every document in the company related to Linux
20  or even every document related to the development of Linux.
21  There are hundreds of people within IBM's Linux Technology
22  Center, 300 or so developers. We produced documents from at
23  least 50 of those developers and 70 people overall that we
24  believed to have information relating to the development of
25  Linux. That alone is more than the entire set of the

46

1  custodians from whom SCO has produced documents in the case.
2      Let me, if I may, Your Honor, just move briefly to
3  the last of the Court's order, which is alleged that IBM
4  violated. That is the April 19 order. As Mr. Singer has
5  properly said, that order arose out of a dispute among the
6  parties with respect to AIX, and in particular, whether IBM
7  should be required to produce all of the development history
8  for those UNIX products, not for Linux. And as Your Honor
9  knows, we took the position that we shouldn't have to, Your
10  Honor disagreed with us and ordered us to do it, and we did.
11      In the context of that order, we understood some of
12  the Court's language to perhaps suggest that we were supposed
13  to search the files of 3,000. That concerned us. We raised
14  that with counsel for SCO, who rather than saying, well, we
15  understand that's not what we suspect the Court meant, but
16  what's in it for us? Rather than say that, rather than
17  express the alarm that now has been suggested was expressed
18  about our saying that we were not going to also produce Linux
19  because the order has nothing to do with that, so declined, we
20  raised in our opening brief this issue. SCO responded in its
21  reply in its opposition, and it was further addressed in our
22  reply.
23      In Your Honor's order, what the Court did, as I
24  understand it, and in the orders in the booklet that we
25  provided to the Court, Your Honor basically said, I reiterate

46

1  what I said before. IBM produce its nonpublic Linux
2  contributions. And Your Honor went on to say, because here we
3  were talking about an interrogatory that IBM should make sure
4  that if there were people who made these contributions whose
5  identity isn't abundantly clear, you should identify those
6  people and provide contact information. And we did that.
7      The word "information," Your Honor, was then
8  introduced into the equation. And SCO then seized upon the
9  use of the word "information" in that order to say, ah-hah,
10  the Court's not just requiring the production of Linux
11  contributions, it's saying contribution information. And what
12  that must mean is IBM has to produce everything in the company
13  relating to Linux or at a minimum, the development of Linux.
14      And again, Your Honor, we would submit that the
15  Court's order, which we thought was clearly reiterating what
16  had been done before, if it intended to require IBM to produce
17  documents from the files of hundreds if not thousands of
18  people related to Linux, it would have said so, especially
19  when in context Your Honor was saying in that order, for now
20  just produce documents from 100.
21      Yet, their position is, you're saying it
22  simultaneously, produce from just 100 from AIX and Dynix,
23  which we've now had lots of oral argument on, motions and
24  other documents squarely been focused on. That is limited to
25  100, but they contend we were simultaneously nearly

47

1  subsequential ordered to produce everything under the sun,
2  again, they say, relating to Linux. And I respectfully
3  submit, Your Honor, that that interpretation does not survive
4  scrutiny.
5      The last point, Your Honor, and I will sit down, is
6  simply that independent of the Court's order, Your Honor,
7  which, again, we don't -- we've never read and don't believe
8  require the production of the kind that is suggested by SCO,
9  we don't respectfully believe there is any reason to require
10  the production of this information. Again, the Court's
11  protocol was quite clear. SCO produces. IBM then goes from
12  there. We still don't have a detailed response to our
13  argument to Article 13.
14      What we have produced rather than saying, forget
15  it. We're giving you nothing because we don't have a response
16  to your Article 13, we have gone out in so far as we can
17  determine is a bound for a reasonable search and produced
18  files from -- we've produced documents from the files of
19  people in Linux Technology Center. And respectfully, they
20  aren't just figuring this out. They deposed some of these
21  people. They have the logs that say it. There is no mystery
22  about it.
23      Your Honor, in addition, we do believe -- and I
24  won't burden the Court with this point, these arguments have
25  been made before, and I think they stand true today -- there's

48

1  no reason for the production now given the protocol Your Honor
2  has set out for this information. We have produced the
3  contributions that are available. To the extent there were
4  nonpublic things that really didn't qualify as contributions
5  but were failed effort, they have been made available. We
6  have produced, you know, the equivalent of billions of lines
7  and literally hundreds of millions of lines of AIX and Dynix
8  code, all of the development information from that
9  information.
10      What you don't see, Your Honor, in anything before
11  the Court today is any use of that information. What you
12  don't see is SCO saying, you know, they produced all of this.
13  Here's now what we know. We can define and focus the issues.
14      We have produced millions of pages of paper that
15  apparently are of absolutely no value to SCO. At a minimum,
16  they are not moving this towards a solution. The closer we
17  get to the close of the case, the more questions we have, the
18  more discovery apparently is needed. And we'll deal with I
19  suppose further, Your Honor, with a request for depositions.
20      Finally, it would be an enormous burden to produce
21  these materials. We have produced in the case today as I said
22  from 200-and-I-believe-16 custodians. SCO has produced 65.
23  That has taken two and a half years. Now as if it's done in
24  weeks, counsel for SCO suggests that we should be required in
25  the briefs they say everyone in the company, which one can't

49

1  believe they really mean. They say 100 people within the
2  Linus Technology Center. That is not a small undertaking. It
3  would be an expensive and all, frankly, Your Honor, for
4  essentially no gain because they have already all that is
5  required.
6      Thank you, Your Honor.
7      THE COURT: Thank you, Mr. Marriott.
8      Mr. Singer, I'll give you 10 minutes if you want to
9  respond.
10      MR. SINGER: Thank you.
11      First, Your Honor, these requests are not directed
12  to everything in the company. The particular focus of this
13  that we are asking the Court to rule either has already been
14  required or should be required forthwith are the documents
15  created by the Linus Technology Center that have not been
16  produced to date, that are nonpublic and they relate to IBM
17  contributions that have actually been made to the outside
18  world.
19      Now, to the extent there are documents that are in
20  the public domain, that's not included. To the extent there
21  was work on dead ends that didn't actually result in
22  contributions, that's not included. To the extent that it
23  includes people outside the Linus Technology Center, that one
24  can debate about, but there should be no debate about within
25  the Linus Technology Center or the Open Source Steering

50

1  Committee, those two groups, because that's what they said
2  they would review going all the way back to the beginning of
3  the case.
4      The second point I would like to make, Your Honor,
5  is that the Linux development that occurs in the public does
6  not obviate the need for this information. There's no
7  question that a lot of Linux development does occur in public.
8  There is also no question that IBM has not just out of thin
9  air created these contributions and then presented them to the
10  public or produced to the public all the underlying memos,
11  e-mails, drafts, work plans that go into the creation of those
12  contributions. That's what we're talking about. But if the
13  contribution is relevant, if we're deposing a programmer about
14  the contribution and what they relied on in making that
15  contribution, so clearly relevant and fell within the scope of
16  these orders and their earlier agreement to get those files
17  from those several hundred people in the center.
18      Now, on that Mr. Marriott says, well, we have given
19  you information from 50 developers, to which I say, how were
20  they selected? If they didn't have this obligation at all,
21  how did they pick 50 developers? What did they select from
22  those 50 developer files to give us and not give us?
23      Mr. Frei's declaration simply says in sweeping
24  terms that, we would have to go to hundreds of developers and
25  produce all of their information. And he suggests none of

51

1  that has already been done. Has then been done completely for
2  50 developers? Why then not the other Linus Technology Center
3  developers? In September of 2003, Your Honor, they did not
4  make such a distinction.
5      Now, I'd like to briefly respond on each of the
6  particular orders of things that we have not previously
7  covered. Request Number 11 dealt with the actual code, the
8  contributions. Request Number 35 and 42 go beyond that.
9  35 talks about documents concerning those contributions, as
10  does 42. That is broader than the contributions themselves.
11      Mr. Marriott did not respond to the fact that if
12  this request is the Court's subsequent order only means
13  contributions themselves and the contributions are made
14  public, then all of this is essentially a nullity. It has to
15  be nonpublic information. And for those contributions, what
16  IBM said they would do would be review the documents in the
17  Linus Technology Center and that they would produce the
18  documents that relate to those contributions. That was clear
19  in the September 15th and in the October letters. We had the
20  right to ask what IBM's counsel said in that regard. Not
21  that they were searching the whole company, not that they were
22  giving us every document, but that they were going to the
23  Linus Technology Center and the Open Source Committee and that
24  they were producing documents that related to the actual

52

1  contributions that they had made, not to every open source
2  project, but to Linux. And no protocol ever trumped that
3  obligation.
4       Now, with respect to the February 4th hearing,
5  we've acknowledged the focus of that hearing was on the issues
6  of public versus nonpublic code and executive files. We do
7  not believe this was an issue. The Court's order, however,
8  went beyond that. We believe, I mean, the Court will know
9  what it meant by its order. We're only dealing with the plain
10  language of that order. And the plain language of that order
11  is broader than simply the executives. That includes
12  materials from the executives but not limited. And to the
13  extent the Court is telling IBM that information may be
14  included which shows the misuse of source code by IBM and its
15  contributions to Linux, what's more clearly is at the center
16  of that the people at the Linux Technology Center itself.
17  Maybe IBM right now its reasonable argument if it needed to
18  search people throughout the company outside the Linux
19  Technology Center, but how can they make the argument with
20  respect to the people inside of the Linux Technology Center
21  whose job is to come up with those contributions and when
22  we're talking about the actual contributions that they made
23  from that center to the public?
24       And then there's the issue of the January 18th
25  order that deals with AIX and Dynix. We have heard no

1  explanation as to how IBM could reasonably believe that the
2  Court could find relevant and require the production of AIX
3  and Dynix programmer's notes, source, drafts, work papers and
4  the like, but that that is not included with respect to Linux
5  itself.
6       THE COURT: Because hasn't Mr. McBride argued
7  throughout that it related to AIX and Dynix? He did not
8  broaden the argument.
9       MR. SINGER: Your Honor, our argument -- accepting
10  that Mr. McBride did not broaden that argument, we submit that
11  they -- given the fact that they knew they had said they
12  reviewed the Linux Technology Center and produced related
13  documents and knowing that if the Court says this range of
14  documents at AIX and Dynix is relevant, how could -- we submit
15  that IBM could not reasonably believe that the Linux was not
16  included.
17       But we did raise that before the Court in
18  opposition to the motion for reconsideration this spring. And
19  IBM at that point only talked about the nonpublic versus
20  public issue. The Court's order at that time says, all,
21  nonpublic Linux contribution information. Again, were
22  dealing just with the language of that. To us, "all" means
23  all, and the information means any code itself, especially
24  when the code they say has all publicly been contributed.
25       The Court also noted below that the production is

1  to be specific in nature including any code contributed that
2  is otherwise not publicly known.
3       Your Honor, the Court will know what it intended,
4  and we can go by these orders. The argument we submit is that
5  this was within the scope of what was agreed to be produced as
6  reflected in the objections to the Seventh request where IBM
7  said, what you're asking for now is included in the scope of
8  Request 35. They can't have it both ways. They can't say,
9  you didn't request this, it's not related to Linux
10  contribution; and then say, we are duplicating an earlier
11  request.
12       So in our view, Your Honor, the Court should either
13  find that this information was called for or should clearly
14  find it's relevant. There's no serious argument that its not
15  relevant. It goes to the very core of what these programmers
16  are doing. We should not be required to depose a programmer
17  about his contribution -- his or her contributions to Linux
18  without having the file from that programmer which shows the
19  notes, the e-mails, the work plans used to create that
20  contribution.
21       With respect to the burden, we do not believe that
22  300 people at the core of the project, 50 of whom apparently
23  have already gathered some undefined set of material from
24  Linux is unreasonable for IBM to be ordered to provide. That
25  is at the very core of this case.

1       Now, with respect to material that has been
2  produced, Judge Kimball ordered us by October 24th to provide
3  our interim disclosures of the technology and supplement that
4  with the final disclosure in December. We are working on that
5  and. We intend to fully comply with the order, which is the
6  current order we understand we are operating under with
7  respect to those mentioned by identification.
8       THE COURT: Does that encompass interrogatory
9  Number 13?
10       MR. SINGER: It would encompass supplementing
11  interrogatories to SCO which have asked for information
12  relating to the nature of what we believe has been
13  misappropriated. I don't have 13 in front of me, Your Honor,
14  if that's such the interrogatory that would include that.
15       Thank you, Your Honor.
16       THE COURT: Thank you.
17       MR. MARRIOTT: May I make a suggestion, Your Honor,
18  without any further argument? Again -- well, with further
19  argument, We really do believe these materials are
20  irrelevant. As I said, we've produced files from the
21  documents of 216, and a significant number of them are Linux
22  distributors. What I heard Mr. Singer say is what he
23  really wants is to have the documents for the developers he's
24  going to depose.
25       We are agreeable, Your Honor, if SCO wants to give

1  us a list of the 20 developers that they think they've got to
2  depose and they want to give us a fair opportunity to meet
3  with these people and to collect the documents and if we could
4  put this to rest, we will go to -- they choose the people,
5  because I don't want them to complain that we chose the wrong
6  people later on, they know who the people are. They know who
7  they want to depose. They told the Court recently in an order
8  they had a pretty good sense of what they were going to do by
9  way of deposition. We will go to the files of those 20
10 people, and to the extent documents are there that haven't
11 been produced from whomever they select, we will provide them.
12     Thank you, Your Honor.
13     THE COURT: Thank you, Counsel, I'm ready to rule
14 with regard to this in general terms.
15     The Court finds that based upon what's before me,
16 the memorandums, the review of the transcripts, the
17 affidavits, the correspondence, I find from that as well as
18 from the argument of counsel that IBM did not agree as argued
19 by SCO to provide the information related to Linux.
20     Further, I find that the issue of discovery as SCO
21 now argues should be included in the order as it relates to
22 Linux was not raised before the Court. It was not understood
23 by the Court as part of the request. It was not contemplated
24 in the orders that have been prepared by the Court. And IBM
25 has appropriately interpreted the Court's orders. And that I

1  find specifically that SCO's interpretation of the orders
2  takes out of context the Court's what I believe to be clear
3  meaning.
4      And I also find that Mr. Shaughnessy's affidavits
5  are sufficiently in compliance with the requirements of the
6  Court to explain those efforts made and those documents not
7  produced.
8      So I find that IBM has, in fact, complied with the
9  orders of the Court, and I would deny except as has been now
10 acknowledged will be provided SCO's motion to compel.
11     I also want to address this issue with regard to
12 SCO's compliance with -- it is Interrogatory Number 13, isn't
13 it, about the source code? Now, that's why I asked you the
14 question, Mr. Singer, why has that not been complied with?
15     MR. SINGER: Your Honor, we understand the Court's
16 order that set forth the two specific dates, one interim and
17 one final, to be dates by which we are to supply specific
18 information about what technology has been misappropriated and
19 to update the responses to interrogatories, and we fully
20 intend to do so by those dates. We are working on that. We
21 have not reached a final determination here, but we believe
22 that the order gives us until October 24th to comply with that
23 request.
24     THE COURT: Any comment on that, Mr. Marriott?
25     MR. MARRIOTT: No, Your Honor.

1      THE COURT: All right. Then that will be required.
2      All right. We have the other matter that relates
3  to the depositions that we need to address.
4      MR. SINGER: May I approach?
5      THE COURT: Certainly.
6      MR. SINGER: Your Honor --
7      THE COURT: I'm reminded by Mr. Willey that there's
8  been discussion about the dismissal of the patent claims and
9  that that may affect this question of depositions. So if you
10 would address that, please.
11     MR. SINGER: I will, Your Honor.
12     Your Honor, this is our motion seeking an
13 additional 25 depositions beyond the existing 40 that both
14 parties have in the existing order.
15     As of the present time, SCO has taken 18
16 depositions and has noticed 14 additional depositions, which
17 when completed would bring that to 32 of the 40. IBM for its
18 part has currently taken 16 depositions and has noticed 17
19 additional depositions be taken, which would bring that to 33.
20     We are raising this motion now rather than waiting
21 until the 40 depositions are exhausted because it's necessary
22 to plan our discovery schedule with that in mind what that
23 total will be. This is a complex case with many issues, and
24 even with IBM's dropping of patent claims that could have been
25 dropped a long time ago before a lot of work was done because

1  clearly their reason for dropping it as they say SCO didn't
2  have many sales there is the information that they would have.
3  But be that as it may, they decided this week to withdraw
4  these claims.
5      Your Honor, that does not eliminate the need for
6  additional depositions. The chart that I've given you that
7  lists in five columns different individuals is taken from
8  IBM's response to an interrogatory where they sought to
9  identify those witnesses as having knowledge of various
10 subjects. This list I believe which we've reproduced here
11 excludes individuals that have already been deposed, and it
12 shows that IBM's own response to interrogatories, there's
13 about 80 names on this list, there are numerous individuals,
14 go well beyond the 40 that IBM itself has identified as having
15 material information on these topics.
16     The patent claims amounts to about nine of that
17 list of 80. There are many issues in this case beyond patent
18 claims. And while that reduces the need somewhat, it does not
19 really get to the core of the fact that every issue has been
20 contested by IBM. They have produced declarations from
21 individuals going back to the source code, licenses, when they
22 were entered into in 1985. We have taken depositions of those
23 declarants. There's issues regarding copyright ownership that
24 involves people not only at IBM but people at Novell. There
25 are issues regarding the Linux development, the AIX

10/7/2005 Motion Hearing October 7, 2005

1    development. In a case of this scope, a request for 65
2    depositions we submit is not unreasonable. This is not a case
3    where IBM has just taken 10 depositions and they said, how can
4    we need more than 40? They will be at 33, and we will be at
5    32 after we complete just the depositions that are currently
6    noticed.
7         In addition to this information, Your Honor, we
8    have produced two other lists here which is work taken from
9    discovery the Courts previously have ordered as well as other
10   work to try to identify individuals who are programmers who
11   have made contributions to Linux and at the same time
12   previously worked on Dynix and have knowledge of a derivative
13   product which is within the scope of our protected technology.
14   That list of 16 identifies individuals, which while there's
15   some overlap on these lists, but for the most part goes beyond
16   it.
17        Then there were other individuals which are listed
18   in the list of 20 which are individuals who have experience in
19   AIX or more generally in Dynix and who have made Linux
20   contributions of particular types of this in the third column.
21        We think the initial motion gives a particular
22   sufficient basis for why we need more depositions, and it
23   certainly if that did not in supplemental information shows
24   why it would be appropriate for the Court to expand to 60 or
25   65 the number of depositions which party should take.

81

10/7/2005 Motion Hearing October 7, 2005

1    We are not asking for any modification of the
2    discovery deadlines. There are numerous lawyers involved on
3    both sides of this case, and we have months remaining within
4    those deadlines to take this discovery. It can be done within
5    the existing scope of discovery provided by the current
6    schedule.
7         IBM in its response, Your Honor, says that if we
8    get additional depositions, then for every additional
9    deposition we get they should be allowed a second day to take
10   a deposition of one of SCO's witnesses, and we don't see how
11   that at all follows. If they needed more time to depose one
12   of our witnesses beyond the seven hours provided, and the
13   current order says each side can designate two witnesses that
14   can be deposed for two days, but if they needed more time than
15   seven hours, they should ask for it on its own right. If they
16   don't need it, the mere fact that we need to depose more than
17   40 witnesses does not give them the right to take a longer
18   deposition than they need of our witnesses. Those two are not
19   going to follow, and we assume that IBM doesn't intend to
20   simply harrass our witnesses by deposing them for two days if
21   one day would suffice. If they need two days, they should
22   make that request on it own basis.
23        But, Your Honor, we do need these additional
24   depositions. Even with the witnesses that are currently
25   listed, we are at 32 out of 40. There are many other

82

10/7/2005 Motion Hearing October 7, 2005

1    witnesses who have material knowledge of this, and we suggest
2    it is an appropriate modification of the order.
3         THE COURT: Thank you, Mr. Singer.
4         MR. MARRIOTT: Thank you, Your Honor. I will be
5    brief. The rules -- I will really try to be brief.
6         The rules presumptively, Your Honor, give the
7    parties each 10 depositions. We agreed early in the case this
8    is a case in which more will probably be required. We came to
9    the agreement of 40. And from our perspective, there is no
10   reason why 40 shouldn't suffice. In earlier papers before the
11   Court, SCO told Judge Kimball that on the patent side of the
12   case it requires as much as 65 depositions on patent issues.
13   In its moving papers here, Your Honor, SCO suggests this
14   morning it's now nine witnesses.
15        And as of yesterday, Your Honor, IBM for reasons
16   set out in the paper -- in our opposition papers withdrew IBM
17   patent claims. With the patent claims gone, Your Honor, it's
18   hard to see a need for any more depositions. Indeed, arguably
19   less depositions are required. We aren't proposing to the
20   Court to lower the limit of depositions. There seems to be no
21   additional basis for that. That showing hasn't been made
22   here. There is no reason for us to have any more than 40 in
23   this case. That is an extraordinary number, four times the
24   presumptive limit.
25        As to the idea, Your Honor, that the number of

83

10/7/2005 Motion Hearing October 7, 2005

1    depositions that are proposed can be conducted on the current
2    schedule, I think that's simply at odds with the party's
3    experience in the case. By our count, SCO has taken 16
4    depositions of its allotted 40, not 18. Over the course of
5    the case, Your Honor, the parties have taken on average a
6    deposition a month. In the busiest of months, there were 10
7    depositions. Under the SCO proposal, as we say in our
8    opposition papers, it would be necessary to have 25
9    depositions a month in the four months that remain. And
10   that's assuming that IBM reserves 10 for defensive discovery
11   and SCO reserves five for defensive discovery. So the motion
12   I think as a practical matter that a request for 65
13   depositions a side for a total of 130 depositions when the
14   rules presumptively allow 20, I think it's unrealistic to
15   think that's not going to have a negative impact on the
16   schedule in the case.
17        SCO has suggested in the piece of paper provided,
18   Your Honor, that there are 20 persons who are, it seems
19   apparent, important to their presentation. He proposes to
20   depose those 20 and it's perhaps from these 20 that would
21   extend -- the documents haven't been provided, ask to be
22   provided in discovery. But I don't believe there is any need
23   for additional depositions.
24        We do propose in our suggestion that if the Court
25   is inclined to give anything, in fairness IBM should be

84

1  allowed additional days with existing SCO witnesses rather
2  than just additional deposition. That's not why we're trying
3  to have extra -- things in an uneven way, but rather because
4  as SCO says in its papers, there are a lot more IBM people to
5  depose than SCO people. There are fewer SCO people who have
6  more information which will take longer to develop. And for
7  that reason, we request the motion be denied. Thank you.
8      MR. SINGER: Very briefly, Your Honor. The 40
9  depositions per side figures were arrived at before any
10  counterclaims were asserted by IBM. They asserted at least
11  10. The withdrawal of three patent counterclaims does not
12  deal with the fact that they've asserted additional
13  counterclaims dealing with copyright and other things which
14  expanded beyond the original 40. We believe we've made a
15  specific showing, and the material will be provided as to why
16  we need additional depositions.
17      The fact that a lot of depositions haven't been
18  taken in the front end reflects the normal course of
19  litigation if you're wanting to review the documents before
20  you take the depositions. And most of those documents are
21  documents that have been produced within the last several
22  months. There is no reason why the Court should not extend
23  the number of depositions since we are not extending the time
24  in which the depositions should be complete.
25      THE COURT: I am going to increase the number of

65

1      THE COURT: What is the cut-off date for
2  depositions?
3      MR. SINGER: Currently it is January 27th of 2006.
4  I should say, there are two dates. There's January 27th,
5  2006, for general fact discovery; there's an additional period
6  that runs to I believe March 17th for discovery relating to
7  each party's defenses. I think it's a little unclear to us,
8  Judge, what is encompassed and limiting to that period between
9  January 27th and March 17th.
10      THE COURT: All right. I'm going to just require
11  you to set your depositions for the people that may be
12  affected by this information before the cut-off deadline but
13  after IBM has been required to comply. And it will be 60 days
14  from today.
15      MR. MARRIOTT: If we can do it faster, Your Honor,
16  we will. I just want to make sure we don't promise a date we
17  can't deliver.
18      THE COURT: Now, additionally with regard to the
19  requirement that SCO renew the motion that is still pending,
20  let's set a date for that in December. And I'd say the second
21  week of December. Is there any conflict there?
22      MR. SINGER: None here.
23      MR. SHAUGHNESSY: I don't think so, Your Honor.
24      THE COURT: Mr. Pehrson?
25      (Discussion held off the record.)

67

1  allowable depositions by 10 as to each side with this
2  requirement, that they are to be completed within the allotted
3  cut-off day. To the extent that they cannot be, they must be
4  foregone because we will not entertain any motion for an
5  extension of time to complete depositions.
6      Additionally, Mr. Marriott, I'm going to deny your
7  request for additional time with them and hold both sides to
8  the seven-hour requirement.
9      All right. Now, is there anything further of a
10  substantive nature that we need to address?
11      MR. MARRIOTT: None here, Your Honor.
12      MR. SINGER: None here, Your Honor.
13      THE COURT: All right. I think we need to talk
14  about the dates.
15      Mr. Marriott, with regard to the -- or
16  Mr. Shaugnessy, whoever's going to deal with this, with regard
17  to the 20 developers whose information you're going to
18  provide, how much time do you reasonably need to provide that?
19      MR. MARRIOTT: I think if we had 60 days, Your
20  Honor, we could do that. And if it is the people who are on
21  the list that we already have, it would be useful to know that
22  now because we could begin immediately on that.
23      MR. SINGER: Well, we'll need to look at the list
24  and see which 20, since that's the number which is provided,
25  the ones that are most significant.

66

1      THE COURT: We'll hear any outstanding motions,
2  then, including -- does IBM have a motion to compel that's
3  outstanding?
4      MR. MARRIOTT: We do, Your Honor. We have the
5  privilege of --
6      THE COURT: We'll hear that, as well.
7      MR. NORMAND: Your Honor, Ed Normand for SCO.
8  Is it possible to do it later than the second week
9  in December?
10      (Discussion held off the record amongst court personnel.)
11      THE COURT: I'm reminded that I'm on the criminal
12  rotation calendar the week of the 5th and the following week.
13  So we're going to need to set it the week of the 19th.
14  Obviously people have plans around there. So let's set it
15  either on the 19th or 20th. Is that a problem?
16      MR. SINGER: No, Your Honor.
17      MR. SHAUGHNESSY: That's fine.
18      THE COURT: How about the 20th, then? Tuesday, the
19  20th, at 10 o'clock?
20      MR. NORMAND: That's fine, Your Honor.
21      MR. SINGER: That's fine.
22      THE COURT: All right. We're going to verify that.
23  We can access our calendar here.
24      MR. SINGER: Your Honor, may I raise one additional
25  issue with respect to --

68

10/7/2005 Motion Hearing October 7, 2005

1        THE COURT: Just a second. Does it relate to --

2        MR. SINGER: It relates to the point before this,

3    not the setting of the dates.

4        (Time lapse.)

5        THE CLERK: That hearing will be set for

6    December 20th at 10:00 a.m.

7        And that will be in what courtroom?

8        THE COURT: Our courtroom is just so small it's

9    hard to accommodate counsel, much less all of this. So we'll

10   leave a note upstairs. We'll make certain you know which

11   courtroom. We may possibly use this courtroom or

12   Judge Campbell's courtroom.

13       Mr. Singer?

14       MR. SINGER: Your Honor, there's one issue as we

15   think about the interaction of these different dates. If we

16   produce, just immediately produce the list of 20 developers

17   and they produce development information and that takes 60

18   days for IBM to produce, we're already somewhere deep probably

19   into December. That both leaves until January 27th, a limited

20   period of time for those depositions, and we also have the

21   interim order -- or not the interim order, but the final date

22   for disclosure of technology that is in December. We would

23   request that IBM seek to produce this information on a rolling

24   basis so that we can set some of these depositions earlier,

25   and that perhaps that would not require a full 60 days for

                                                        69

10/7/2005 Motion Hearing October 7, 2005

1    complete production.

2        MR. MARRIOTT: We're happy to try to do that, Your

3    Honor.

4        THE COURT: All right. We'll include that,

5    Mr. Singer, in the order.

6        Counsel, may I see one counsel from each side at

7    the bench for just a moment, please, or two? It doesn't

8    matter.

9        (Discussion held off the record at the bench.)

10       THE COURT: At the bench, I've asked counsel for

11   IBM to prepare the order in this matter, or these matters, and

12   that proposed order will be reviewed as to form by SCO and

13   presented to me probably on Wednesday or no later than

14   Wednesday of next week for signature.

15       All right. Is there anything else we need to

16   address with regard to any matters this morning?

17       MR. MARRIOTT: None here, Your Honor.

18       THE COURT: All right.

19       MR. SINGER: No, Your Honor.

20       THE COURT: All right. Thank you. We'll be in

21   recess.

22       (Whereupon, the court proceedings were concluded.)

23            *      *      *      *      *

**EXHIBIT 10**

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

RECEIVED CLERK

**FILED**

2005 MAY -3  P 7 02

U.S. DISTRICT COURT
DISTRICT OF UTAH

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>                Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>                Defendant/Counterclaim-Plaintiff. | **DECLARATION OF**<br>**TODD M. SHAUGHNESSY**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

348736.1

I, Todd M. Shaughnessy, declare as follows:

1.      I represent International Business Machines Corporation ("IBM") in the above-entitled action brought by The SCO Group, Inc. ("SCO").  This declaration is submitted pursuant to the Court's January 18, 2005 Order Concerning SCO's Renewed Motion to Compel (the "Order").

2.      The Court ordered IBM to produce CMVC and RCS data relating to IBM's AIX and Dynix operating systems, including "all versions and changes to AIX and Dynix".(Order at 9-10), and to produce information regarding the 3,000 AIX and Dynix developers who "made the most contributions and changes to the development of AIX and Dynix".  (Order at 16.)  With respect to the source code produced from CMVC and RCS, the Court ordered IBM to submit an affidavit "specifying the efforts it took to deliver the code from the CMVC and RCS systems". (Order at 10.)  With respect to information about the 3,000 AIX and Dynix programmers who "made the most contributions and changes to the development of AIX and Dynix" the Court ordered IBM to submit an affidavit "detailing the process by which the 3,000 were chosen". (Order at 17.)

3.      As described in more detail below, IBM has complied with the Court's Order, and has produced all responsive, non-privileged information located after an extensive search.  As ordered by the Court, IBM produced from CMVC and from RCS all source code relating to the AIX and Dynix operating systems, including all versions and changes to the code.  IBM also produced from CMVC and RCS all documentation related to the AIX and Dynix operating systems, including all programmer's notes, design documents, and white papers.  IBM identified all the individuals who created or made changes to AIX or Dynix source code, as recorded by CMVC and RCS, prepared a list of those individuals, together with their login identifiers and contact information (for every person for whom IBM had that information), and provided that

2

list to counsel for SCO on May 3, 2005. As explained below, the number of individuals who contributed source code to AIX and Dynix (as recorded by CMVC and RCS) is less than 3,000; therefore, the individuals identified for SCO constitute all of the individuals that are identified in CMVC and RCS as having made changes to AIX or Dynix. IBM has produced, in the form of CMVC and RCS data, information that shows what changes to the source code were specifically made by each of these individuals. As provided for by the Court in its April 20, 2005 Order Concerning IBM's Motion for Reconsideration, IBM has not searched for and through the files of 3,000 individuals. In accordance with that April 20 Order, IBM will produce, by July 19, 2005, documents from the files of the 100 individuals who made the most contributions and changes to AIX and Dynix source code.

4.      IBM also undertook a reasonable search for programmer's notes, design documents, white papers and source code related to the AIX and Dynix operating systems that are not stored in CMVC or RCS and has completed its production of these documents to SCO.

5.      Complying with the Court's Order involved more than 4,700 hours of work from more than 400 IBM employees. This does not include the time spent by IBM's counsel and consultants on this project, which was likewise considerable. IBM produced a total of more than 80 GB of source code and other electronic data to SCO, and more than 900,000 pages of paper (which were scanned and produced in electronic form on CDs).

6.      Section I describes the steps IBM took to produce AIX source code, documentation (including programmer's notes, design documents, and white papers), and other information related to the AIX operating system from IBM's CMVC system. Section II describes the steps IBM took to produce Dynix source code, documentation (including programmer's notes, design documents, and white papers), and other information related to the Dynix operating system from IBM's RCS system. Section III describes the steps IBM took to

3

348736.1

search for, collect, and produce AIX source code, programmer's notes, design documents, and white papers outside of IBM's CMVC system. Section IV describes the steps IBM took to search for, collect, and produce Dynix source code, programmer's notes, design documents, and white papers outside of IBM's RCS system. Section V describes IBM's production of information concerning each of the individuals who made changes to AIX or Dynix, including the names and contact information for these individuals, and what changes each individual specifically made.

## I.  Production of AIX Code and Documents from CMVC

7.     CMVC is the source code revision system currently used by IBM's AIX development organization. CMVC has been used in AIX development since 1991. Other than the AIX source code stored in CMVC, IBM does not maintain revision control information for AIX prior to 1991. CMVC does not contain any source code or other information for the Dynix operating system.

8.     CMVC provides shared access to source files used in the development of the AIX operating system, allows IBM to keep track of changes that are made to source code files, and ensures that the files are available for viewing or updating only by those with the proper authorization.

9.     In accordance with the Court's January 18, 2005 Order, IBM identified and extracted from CMVC all of the source code, documentation, and other information related to the AIX operating system, built an AIX server loaded with the appropriate version of CMVC along with the source code and documentation related to the AIX operating system, tested the system to ensure it was functional, and delivered and installed the server to allow access by SCO.

10.    The server contained a fully functional version of the CMVC tool, one hundred percent (100%) of the source code in CMVC that is part of or related to AIX (including the

4

operating system itself, development tools, documentation, and test programs) and one hundred percent (100%) of the documentation in CMVC that is related to AIX, including programmer's notes and design documents. One CMVC design document was redacted to protect attorney-client privileged information. After redaction, IBM was unable to restore the document into the database in electronic form. IBM produced the redacted version of the document along with the CMVC server. The code and documentation that IBM produced from CMVC represent more than 62 GB of data.

11.     The particular CMVC server at IBM that contains source code and information related to AIX also contains a large amount of source code and material that is neither part of, nor related to, AIX. IBM did not produce source code or material in CMVC for components that are unrelated to AIX or its code, internal design, or methods. IBM excluded components containing design, manufacturing, and test information specific to IBM hardware products, such as hardware system designs, hardware test exercisers and other hardware test programs, and hardware manufacturing-related components. IBM also excluded firmware source code (machine-level code, distinct from the operating system, that is embedded into a computer hardware device or placed on a computer system to function at a level below the computer's operating system) and other software programs that are distinct from the operating system, such as middleware (software that provides support functions for software applications, such as application-to-application exchange of data, data storage management, and other services) and other applications.

12.     The source code that is part of or related to the AIX operating system is not segregated in a single location within CMVC, but rather is commingled with hundreds of thousands of other source code files that are not part of or related to the AIX operating system. A thorough review of the contents of the CMVC system was undertaken to determine which of

5

348736.1

the thousands of separate "components" within CMVC are part of or related to the AIX operating system.

13.     A script—a small computer program—was written and executed to map each of the responsive components to the specific source code file names within CMVC. Using the list of file names and identifiers that had been generated, IBM then matched those file names and identifiers to corresponding Source Code Control System ("SCCS") files. These SCCS files are the files maintained by IBM that provide the file development history since 1991 (or the inception of the file) for the particular corresponding source code file in the AIX operating system or related source code. These SCCS files were produced by IBM and allow SCO to reconstruct every version and iteration of AIX since 1991.

14.     After all of the source code components for the AIX operating system were identified, the non-source code materials in CMVC that are related to the AIX operating system source code were similarly identified. This included programmer's notes, design documents, and data about version control, users, and change histories.

15.     CMVC programmer's notes reflect developer commentary concerning defects and enhancements to AIX, and sometimes contain confidential information from IBM's customers and vendors, or information covered by the attorney-client or work product privileges. If a CMVC programmer's note contained third-party confidential information, the name of the third party (or other information that would identify the third party) was redacted from the copy of the programmer's note to be produced to SCO. Reviewers also redacted privileged information from the copy of the notes to be produced to SCO. All redacted information was marked with an appropriate legend. Out of 304,398 programmer's notes produced from CMVC, approximately 100 contain a redaction of customer names or privileged information.

6

348736.1

16.     CMVC also contains more than 2,500 design documents related to AIX.  These design documents were also produced to SCO.  As noted above in paragraph 10, one design document was redacted to protect attorney-client privileged information and produced to SCO in redacted form.

17.     For each source code file produced to SCO, IBM reviewed the origin codes or copyright notices in the code to identify potentially confidential third-party material.  IBM located a copy of the relevant confidentiality terms and notified the third party prior to production, when required.

18.     IBM obtained an AIX server with the hardware components necessary to produce the data from CMVC.  An IBM team created a working copy of the CMVC source code revision system on the server.   In order to retain CMVC database functionality that would allow SCO to search and query the code and documentation being produced, IBM copied the entire contents of the CMVC families that contained AIX-related content, and then removed the contents of the source files and programmer's notes that did not relate to AIX.

19.     The server, which contained all the information described above, was made available to SCO at the offices of Snell & Wilmer in Salt Lake City, Utah on March 18, 2005.  SCO's outside counsel took possession of this server.  Along with the server, IBM also has made available to SCO general AIX and CMVC user documentation and a custom README file that contains basic instructions on how to start and navigate the server, CMVC, the necessary IDs and passwords, and a script to instruct SCO how to determine the changes made by each person who contributed code to AIX, as recorded by CMVC.  A copy of the README file is attached to this Declaration as Exhibit A.  A copy of the script is attached to this Declaration as Exhibit B.

348736.1

## II.   Production of Dynix Code and Documents from RCS

20.     Revision Control System ("RCS") is the source code revision system that was used by Sequent's and IBM's Dynix development organization. It also serves as a shared electronic repository for programmer's notes, design documents, and white papers. The source code revision information in RCS dates back to 1988. Other than the Dynix source code stored in RCS, IBM has searched for, but has not been able to locate, revision control information for Dynix prior to 1988. RCS does not contain any source code or other information for the AIX operating system.

21.     IBM has produced one hundred percent (100%) of the source code in RCS that is part of or related to Dynix (including the base operating system and layered products, development tools, and test programs). IBM also extracted, and produced to SCO, one hundred percent (100%) of the Dynix-related design documents, white papers, and programmer's notes that were stored in RCS.

22.     The RCS server at IBM that contains source code and information related to Dynix also contains source code and material that is neither part of, nor related to, Dynix. IBM has not produced source code or material in RCS for components that are unrelated to Dynix or its code, internal design, or methods. IBM excluded components containing design, manufacturing, and test information specific to IBM or Sequent hardware products, such as hardware system designs, hardware test exercisers and other hardware test programs, and hardware manufacturing-related components. IBM also excluded firmware source code (machine-level code, distinct from the operating system, that is embedded into a computer hardware device or placed on a computer system to function at a level below the computer's operating system), and other software programs that are distinct from the operating system, such as middleware (software that provides support functions for software applications, such as

8

348736.1

application-to-application exchange of data, data storage management, and other services) and applications.

23.    Extracting the source code that is part of or related to the Dynix operating system required identification of the source code files that are not part of or related to the Dynix operating system. A thorough review of the contents of the RCS system was undertaken by IBM to determine which files are part of or related to the Dynix operating system.

24.    Copies of both the source text file and the comma v file for each of the Dynix-related code files were extracted from RCS. Comma v files are the files maintained by RCS that provide the file development history since 1988 (or the inception of the file) for the particular corresponding source code file in the Dynix operating system or related source code. The copies were prepared in tape archive ("tar") format, and then compressed using a zip program to allow them to fit on the CDs. The total amount of this Dynix source code produced from RCS represents more than 17 GB of uncompressed data.

25.    For each source code file produced to SCO, IBM reviewed the copyright notices in the code to identify potentially confidential third party material. IBM located a copy of the relevant confidentiality terms and notified the third party prior to production, when required.

## III.    Production of AIX Design Documents, Programmer's Notes, White Papers and Code Outside CMVC

26.    IBM also searched for design documents, programmer's notes, white papers and AIX source code that are not stored in the CMVC database and has completed its production of these documents. Certain AIX development teams keep a large portion of their work files and documents, other than what is required to be stored in CMVC, in shared electronic repositories. To collect a large volume of AIX design documents, programmer's notes, whitepapers, and code, and to avoid redundancy, IBM collected potentially responsive documents from shared electronic repositories at a department, team, and project level. These documents were reviewed for

9

responsiveness, third-party confidential information, and attorney-client privileged communications, and responsive, non-privileged documents have been produced to SCO.

27.     IBM also located, from shared electronic repositories and from some data tapes, some source code for the AIX operating system. Although it is likely that this code is duplicative of the AIX source code already produced to SCO on the CMVC server as discussed in Paragraphs 7-19, IBM was unable to confirm that the code is duplicative, and therefore has produced this AIX source code to SCO, on CDs.

28.     As I have noted above, IBM does not maintain revision control information for AIX source code pre-dating 1991. To the extent that any code for the AIX operating system (that did not duplicate the code already being produced in CMVC) was found during the search described in Paragraphs 26-27 above, it was produced. Paragraphs 29-31 below describe additional search efforts IBM undertook to locate pre-1991 versions of AIX code. No versions of AIX pre-dating 1991 were found.

29.     In the 1980s and early 1990s, IBM prepared vital records backups of AIX source code and transferred them to a remote storage location. At some point in the 1990s, the AIX vital records tapes were transferred to Austin, Texas. In late 2000, the tapes were determined to be obsolete, and were not retained.

30.     The AIX development organization contacted other IBM employees who were known or believed to have been involved with the development or product release of AIX versions prior to 1991. In addition, IBM managers and attorneys asked current members of the AIX development organization whether they were aware of the location of pre-1991 releases of AIX source code. No one asked was aware of any remaining copies of pre-1991 AIX source code.

348736.1

31.      Source code archives retained by the IBM group responsible for filing IBM copyright registrations and maintaining some of the IBM copyright records were transferred to IBM's Austin site in 2000.  IBM searched those archives; all of the source code in the archives are duplicative of AIX versions and changes already produced on the CMVC server as discussed in Paragraphs 7-19.

## IV.   Production of Dynix Design Documents, Programmer's Notes, White Papers and Code Outside RCS

32.      RCS is the shared electronic repository that was used by Dynix developers to store design documents, programmer's notes, and white papers.  As discussed above, IBM collected responsive code and documents from RCS.  In addition, IBM searched for and retrieved potentially responsive materials from archived Sequent records.  These documents were reviewed for responsiveness, third-party confidential information, and attorney-client privileged communications, and all responsive, non-privileged documents have been produced to SCO.

33.      As noted above, IBM searched for, but was unable to locate, revision control information for Dynix prior to 1988.  IBM did locate some pre-1988 copies of archived Dynix source code files (without revision control information), which were produced to SCO on CDs.

## V.    Contributors to AIX and Dynix

34.      As IBM previously noted in response to SCO's Interrogatory 5, the list of 7,200 individuals who have or have had access to AIX or Dynix source code are the people who work or worked on developing AIX and Dynix.  Not all of these individuals, however, have made contributions or changes to AIX or Dynix source code; for example, a development supervisor may have access to CMVC or RCS, but may have never personally made any changes to the code.  In response to the Court's order that IBM provide information as to which persons made contributions or changes to AIX or Dynix source code, IBM has identified the names, user IDs,

11

and contact information (to the extent IBM has such information in its records) for all of the individuals recorded by CMVC and RCS as having created or made changes to AIX or Dynix or related source code files, and has produced all such information to SCO.

35.     The total number of individuals who are recorded by CMVC or RCS as having made contributions or changes to AIX or Dynix or related source code files is 2,704. This number, while less than the 3,000 individuals contemplated by the Order, includes all individuals who are recorded by CMVC and RCS as having made contributions and changes to AIX or Dynix.

36.     The list of AIX contributors contains 2,234 names. These names were obtained by using CMVC tools to determine which CMVC users have ever created or modified AIX or related source code since CMVC versioning was initiated in 1991. This list includes all of the persons who are recorded by CMVC as having made changes to AIX source code. The list was examined manually to merge the data for users who had multiple IDs or name changes.

37.     IBM has also produced to SCO the user IDs for all of the individuals who made changes or contributions to Dynix, as recorded by RCS. The list contains 470 user IDs and identifies the number of files created or modified by each user ID. IBM reconstructed and reviewed archived Sequent records and questioned former Dynix developers, and has provided to SCO all of the corresponding employee names and contact information that were obtained.

38.     The CMVC and RCS revision control data produced by IBM include complete information (to the extent such information is recorded by CMVC or RCS) as to which individuals made which specific contributions or changes to AIX or Dynix source code, as well as when each such change was made.

39.     For AIX, the contributions and changes made by each person can be determined by running a simple script, a copy of which was produced to SCO along with the CMVC system

12

on March 18, 2005. A copy of the script is also attached to this Declaration as Exhibit B. Using the script, SCO can type in any individual user ID, and the script will produce as its output a detailed list of all of the contributions and changes made by that user.

40.     For Dynix, information about each change made to each file in the Dynix source code, including the date and time the change was checked-in to the RCS system, who checked-in the change, the number of lines of code added and deleted from the previous revision of the file, and a log message entered by the person who checked-in the change can be ascertained using standard RCS tools, such as the "rlog" command. For example, to determine the change history of the base_callback.c,v file in the 4.6.1 version of the Dynix base operating system, SCO can type "rlog base_callback.c.,v", which results in the following output:

```
$ rlog base_callback.c.v
RCS file:        base_callback.c,v;   Working file:   base_callback.c
head:            1.4
branch:
locks:           ; strict
access list:
symbolic names:  v4_6_1p: 1.4.3;  v4_6_1: 1.4;  v4_6_0p: 1.4.2;  v4_6_0: 1.4;
comment leader:  " * "
total revisions: 6;    selected revisions: 6
description:
base_callback.c
----------------------------
revision 1.4
date: 97/09/29 18:20:23; author: mjs; state: Exp; lines added/del: 7/9
branches: 1.4.2; 1.4.3;
Made appropriate use of SYMUSED lint directive in this file.
PR #230499 / SCR rtc1031.
----------------------------
revision 1.3
date: 95/11/03 03:08:44; author: mjs; state: Exp; lines added/del: 5/2
list fix.
----------------------------
revision 1.2
date: 95/11/03 02:01:20; author: mjs; state: Exp; lines added/del: 20/2
Added lint ref for base_callback.
----------------------------
revision 1.1
date: 95/11/02 20:14:52; author: mcneil; state: Exp;
Initial revision
----------------------------
revision 1.4.3.1
date: 20/1./3. 6.:0.:6.; author: hbears; state: Exp; lines added/del: 6/2
Branch for v4_6_1p
----------------------------
revision 1.4.2.1
date: 20/0./9. 8.:8.:1.; author: breaxile; state: Exp; lines added/del: 6/2
Branch for v4_6_0p
============================================================
```

13

41.    I declare under penalty of perjury that the foregoing is true and correct.

Executed: May 3, 2005

Salt Lake City, Utah

_____

Todd M. Shaughnessy

14

### CERTIFICATE OF SERVICE

I hereby certify that on the **3ʳᵈ** day of May, 2005, a true and correct copy of the

foregoing was sent by U.S. Mail, postage prepaid, to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101
>
> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131
>
> Robert Silver
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

Todd M. Shaughnessy

15

348736.1

**EXHIBIT 11**

# Snell & Wilmer
### L.L.P.
#### LAW OFFICES

15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
801.257.1900 P
801.257.1800 F
swlaw.com

Todd M. Shaughnessy
801-257-1937
tshaughnessy@swlaw.com

DENVER

IRVINE

LAS VEGAS

PHOENIX

SALT LAKE CITY

TUCSON

December 5, 2005

*VIA FACSIMILE AND U.S. MAIL*

Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

   *Re:    SCO v. IBM; IBM v. SCO*

Dear Ted:

         We have completed a preliminary analysis of SCO's interim disclosures
and supplemental interrogatory responses pursuant to the Court's order of July 1, 2005.
As stated in IBM's memorandum in opposition to SCO's objection to Magistrate Judge
Wells' order dated October 12, 2005, SCO's disclosures and interrogatory responses fall
far short of SCO's obligations. We ask that SCO remedy these shortcomings no later
than December 22, 2005, when it submits its final disclosures and updates its
interrogatory responses.

         As you know, IBM's discovery requests, and the Court's orders called for
SCO to disclose the allegedly misused material with specificity. For example, SCO was
required to identify the allegedly misused material by version, file and line of code. In
addition, to the extent SCO contends IBM has infringed its copyrights, SCO was required
to identify and match up the allegedly infringing and allegedly infringed material by
version, file and line of code. To the extent SCO contends that IBM has breached its
contractual obligations by contributing code to Linux, SCO was required to identify the
material alleged to have been contributed improperly by version, file and line of code,
and to the extent the allegedly contributed material is not Unix System V code, but is in
any sense alleged to have been based on or resulted from Unix System V code, the
version, file and line of Unix System V code from which the allegedly contributed
material is alleged to derive or result.

         Despite IBM's requests and the Court's orders, SCO's interim disclosures
and interrogatory responses fail to specifically disclose all of the allegedly misused
material as required. For most of the allegedly misused material, SCO still fails to

375675.1

# Snell & Wilmer
### ———— L.L.P ————

Ted Normand
December 5, 2005
Page 2

disclose (1) files and lines of code in Linux; (2) files and lines of code in AIX or Dynix; and (3) files and lines of code in UNIX System V. Furthermore, in the few instances where SCO does identify specific lines of Linux, AIX, or Dynix code as allegedly contributed material, SCO generally fails adequately to provide any identification of the lines of Unix System V code from which the allegedly contributed material is alleged to derive or result. Any such linkage to Unix System V code should be done in an unambiguous manner—for example, through tables listing and matching up file names and line numbers between the allegedly misused non-Unix System V code, and Unix System V code.

Moreover, SCO's interim disclosures and supplemental interrogatory responses are unclear as to how they relate to SCO's prior interrogatory responses. It is not clear, for example, whether SCO's latest disclosures are cumulative or merely supplement its prior disclosures, especially since there are inconsistencies among SCO's various responses. SCO's interim disclosures are likewise unclear as to how the allegedly misused material relates to SCO's different causes of action for example, it is unclear whether certain of the allegedly misused material relates to SCO's contract claims, SCO's copyright claims, IBM's claim seeking a declaration of noninfringement, or a combination of these claims.

To avoid confusion, comply with the Court's orders and avoid unnecessary motion practice, SCO should (1) provide the requisite specificity in its final disclosures; (2) make its final disclosures and updated interrogatory responses cumulative; and (3) make clear to which of the claims the allegedly misused material relates. As IBM understands the Court's orders, SCO may not challenge any allegedly misused material not properly disclosed in SCO's final disclosures. IBM intends to ask the Court to preclude SCO from pursuing any claims regarding allegedly misused material not properly disclosed on or before December 22, 2005.

Finally, we reiterate our previous request that SCO provide its disclosures in a usable electronic format, just as it did with its privilege log. We do not believe there is any reason it cannot do so and would prefer not to have to raise this issue with the Court at the December 13 hearing.

# Snell & Wilmer
### L.L.P.

Ted Normand
December 5, 2005
Page 3


Sincerely,

Todd M. Shaughnessy

TMS:dw
cc:    Brent Hatch
       David Marriott
       Peter Ligh
       Amy Sorenson

375675.1

**EXHIBIT 12**



Use Forbes.com Attaché for
your industry news and
information on your desk top

# Forbes

Legal
# SCO Claims IBM Destroyed Crucial Evidence
Daniel Lyons, 07.20.06, 6:10 PM ET

The **SCO Group** versus IBM lawsuit is growing ever more desperate--and ever more weird.

The latest twist: Buried in a new filing from SCO is a claim that International Business Machines destroyed evidence by ordering its programmers to delete copies of software code that could have helped SCO prove its case.

SCO alleges this happened in 2003, yet the company has never talked about it in public before.

However, an attorney for SCO says the code deletion is one reason why the Lindon, Utah, software maker has been unable to comply with a demand that it produce examples of allegedly stolen code.

"It's kind of hard for us to do that," says Brent Hatch, an attorney with Hatch, James & Dodge in Salt Lake City, "because we don't have it. It was destroyed before it could be given to us."

SCO sued IBM in March 2003, claiming IBM took code from Unix, for which SCO holds some copyrights, and put it into Linux, which is distributed at no cost.

The case is scheduled for trial in 2007 and could have huge implications for the popular Linux operating system, which is promoted by Red Hat, Novell, Hewlett-Packard and others.

Last month, SCO suffered a setback when Magistrate Judge Brooke C. Wells of the U.S. District Court in Utah tossed out two-thirds of SCO's claims against IBM, because SCO had refused, after repeated requests, to provide specific details about which lines of code were stolen.

Now SCO has filed an objection asking the judge overseeing the case, Dale A. Kimball, to overturn the Wells ruling.

Toward the end of its objection, SCO claims IBM deleted copies of two versions of Unix called Dynix and AIX, which could have helped SCO prove its case.

SCO claims the move was "egregious" and represents "spoliation of evidence," a potentially serious charge.

"Weeks after SCO filed its lawsuit, IBM directed 'dozens' of its Linux developers...to delete the AIX and/or Dynix source code from their computers," SCO's objection claims.

"One IBM Linux developer has admitted to destroying source code and tests, as well as pre-March 2003 drafts of source code he had written for Linux while referring to Dynix code on his computer," SCO says.

Hatch, SCO's attorney, says SCO learned about the destruction of code when it took depositions from IBM programmers. This is the first time SCO has made the allegation in public, though Hatch says the claim was part of a memorandum SCO filed in March 2006, which has remained sealed.

Hatch says the allegation has become relevant now, because it helps explain why SCO could not meet demands to cite source code.

IBM declined to comment, citing a policy of not discussing ongoing litigation.

In her sharply worded ruling, Wells criticized SCO's conduct in the case and seemed to indicate she was annoyed with the company. "I don't know if that's true or not, but that's a question I'm asking myself," Hatch says.

Hatch concedes the Wells ruling represented a setback for SCO. But he says SCO still has a strong case.

"If the judge had thrown out the case, that would be a real downer. But the claims are still there. The damages are still there," Hatch says.

In appealing the Wells ruling, SCO is claiming that Wells made decisions on things that are not part of her responsibility "We're saying she overstepped her bounds," Hatch says.

Linux fans cheered the Wells ruling, viewing it as a sign that SCO's case is doomed. Hatch says they're celebrating too soon.

"You can't read big things into all these little wars," Hatch says. "It's like saying the North didn't win the Civil War just because a couple of battles were bad for us."

**The World's Best Big Companies**

# EXHIBIT 13



Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101
Telephone:  (801) 363-6363
Facsimile:  (801) 363-6666

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER L.L.P.
100 Southeast Second Street
Suite 2800
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:  (305) 539-1307

*Attorneys for Plaintiff The SCO Group, Inc.*

---

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br>a Delaware corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, a New York corporation,<br><br>Defendant. | **PLAINTIFF'S MEMORANDUM<br>OF LAW IN OPPOSITION TO<br>IBM'S MOTION TO COMPEL<br>DISCOVERY**<br><br>Case No. 03-CV-0294<br><br>Hon: Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

---

        The SCO Group ("SCO") submits this memorandum of law in opposition to International

Business Machines Corporation's ("IBM") Motion to Compel Discovery.

## INTRODUCTION

It has been said that things have both an ostensible and a real reason. Ostensibly, IBM filed its Motion to Compel to force SCO to answer interrogatories and produce documents because it had failed to do so. The reality, however, is that SCO not only timely responded to IBM's discovery requests, it then engaged in weeks of lengthy conversation, correspondence, and emails to resolve and clarify discovery issues and ultimately agreed to supplement its responses. But supplemental responses were not all that IBM was seeking. If that were the case, IBM would have waited until today, when supplemental responses were promised and were in fact served. No, what IBM really desired was a forum within which it could construct its stilted and inaccurate mischaracterization of SCO's claims, behind which it could hide its own failure and refusal to provide meaningful discovery responses. As detailed below, IBM's motion is without merit and should be denied.

At its core, IBM's Motion to Compel Discovery asks for answers to interrogatories that fit its own mischaracterized theories of the case, rather than answers that relate to the actual allegations made by SCO in the Complaint. IBM's baseless arguments begin as an effort to smear SCO and end with a newly created justification of why IBM has failed to provide any meaningful discovery responses itself. While IBM's improper litigation tactics are discussed in detail below, the Motion to Compel can be denied on the simple basis that SCO has actually provided supplemental answers, pursuant to earlier agreement, and this motion is therefore moot.

## THE LAWSUIT

Contrary to IBM's efforts to recast SCO's Amended Complaint as one limited to trade secret violations, the Amended Complaint contains six counts—the first three counts are for IBM's numerous breaches of licensing agreements. The remaining counts, including Count VI for

2

misappropriation of trade secrets, flow from this transgression and are ancillary to the breach of the license agreements. Thus, notwithstanding IBM's mischaracterization, trade secret misappropriation is not the gravaman of the Complaint (IBM Mem., p. 2), but it is merely one count that recasts one aspect of the injuries caused by IBM's breach. These injuries would exist even in the absence of any trade secret misappropriation.

In its Amended Complaint, SCO alleged that IBM and Sequent (now part of IBM and hereinafter collectively referred to as IBM) were licensees of UNIX System V source code ("UNIX"). As part of this license grant, IBM was given certain rights and also agreed to certain restrictions upon its use of UNIX. IBM agreed, for example, that UNIX code and methods would be solely for its own internal business purposes (§ 2.01),[1] that UNIX code and methods would not be used for others or by others (§ 2.05), and that IBM would maintain the code and methods related thereto in confidence (§ 7.06). Similarly, IBM further agreed it would not sell or otherwise dispose of UNIX in whole or in part (§ 7.10). Significantly, IBM also agreed that any modifications or derivative works of UNIX prepared by IBM, would be treated by IBM "as part of the original Software Product." (§ 2.01). Thus, all of the foregoing restrictions on UNIX also apply equally to any modifications or derivative works created by IBM.[2]

Pursuant to these restrictions, IBM agreed that AIX, IBM's "own version of UNIX" (IBM Mem., p. 2 n.1), and Dynix, Sequent's version of UNIX, would be used solely for internal business purposes, would be maintained in confidence, and would not be disposed of in whole or in part. IBM, contrary to these clear and unambiguous limitations on its use of UNIX, including

---

[1] All references are to the Software Agreement executed by IBM and attached to the Amended Complaint as Exhibit A.

[2] These restrictions are fundamental to any license for software. In the absence of such restrictions and the ability to enforce them, a licensee can simply modify or rewrite code and then give it away thereby eliminating any value of the original source code. Thus, there can be little doubt that the gravaman of SCO's Complaint arises out of these critical restrictions on the use of the software and modifications and derivative works thereof.

3

modifications and derivatives thereof, has publicly touted its contributions of AIX and Dynix into Linux, the free, "open source" operating system that IBM has heavily supported, both financially and technologically.[3]  Specifically, IBM improperly contributed these protected UNIX materials into the Linux 2.4 and 2.5 kernels (in lay terms, the "brain" of the operating system)—a decidedly public disposition of these protected materials.     This action is a clear breach of IBM's obligations under the agreements with SCO governing the use of UNIX, and derivatives such as AIX and Dynix.

## IBM'S MOTION

IBM's Motion begins with a seven page "preliminary" statement that makes unfounded attacks on SCO and its counsel.  This gratuitous commentary was inserted by IBM in the apparent hope that innuendo and sniping may add weight to its motion.    IBM begins by claiming "SCO has obfuscated its claims to foster fear, uncertainty and doubt about its rights and the rights of others." (IBM Mem., p. 3).  In fact, SCO has done nothing other than assert its contractual and legal rights.[4]  IBM then incorrectly attributes as a purported quote from SCO's counsel that SCO "doesn't want IBM to know what they [SCO's substantive claims] are." Even a casual review of the article IBM relies upon (IBM Mem., Exh. C) reveals that no such statement was made by SCO's counsel. Indeed, the one paragraph "article" is nothing more than a gripe by a reporter who failed to obtain information from counsel about the case.  More importantly, SCO's counsel,

---

[3] The Amended Complaint details IBM's repeated boasting of how it has contributed the protected materials to Linux. *See, e.g.,* Amended Complaint, ¶¶ 91, 93-97.

[4] It is particularly rich irony to witness IBM complain about the sowing of "fear, uncertainty, and doubt," given that the term originated from IBM's tactics.  "Defined by Gene Amdahl after he left IBM to found his own company: 'FUD is the fear, uncertainty, and doubt that IBM sales people instill in the minds of potential customers who might be considering Amdahl products.' The idea, of course, was to persuade buyers to go with safe IBM gear rather than with competitors' equipment. This implicit coercion was traditionally accomplished by promising that Good Things would happen to people who stuck with IBM, but Dark Shadows loomed over the future of competitors' equipment or software." From The Jargon File available at http://catb.org/~esr/jargon/html/F/FUD.html.

through communication with IBM's counsel and through its Amended Complaint, has made perfectly clear to IBM what its substantive claims are. That IBM chooses to ignore the statements and the actual claims detailed in the Amended Complaint does not give rise to a motion to compel.[5]

The "Preliminary Statement" repeats over and over that SCO purportedly has failed to answer the series of questions arising from the "trade secrets and any confidential or proprietary information that Plaintiff alleges or contends IBM misappropriated or misused." SCO, however, previously provided appropriate answers. Nonetheless, SCO has filed supplemental answers to interrogatories, served today consistent with its agreement to do so, which specify the source code files that contain the information IBM and Sequent agreed to maintain as confidential and proprietary. Much of this information was developed by IBM and Sequent and, pursuant to their license agreements with SCO, both IBM and Sequent agreed it would be held as confidential. As a result, some of the information IBM requested will be known only to IBM, so the specifics of who at IBM was involved with improperly contributing this code to the public, how they did so, and the like will not be known until SCO gets the information from IBM, the party who contributed the protected materials in violation of its contractual obligations.

Such a situation does not create grounds to grant a motion to compel. As the court explained in a case cited by IBM, *O'Connor v. Boeing N. Am., Inc.* 185 F.R.D. 272, 281 (C.D. Cal. 1999), a toxic tort case, "the clear inference from the response is that [respondents] do not yet

---

[5] Indeed, in the conference calls with counsel that lasted hours, IBM's counsel was told repeatedly about the basis of the claims. In fact, when directed to the pertinent allegations of the Complaint detailing IBM's improper contributions to Linux, the response was that IBM's counsel lacked the technical proficiency to determine if the answers were sufficient. The answers are sufficient. The Amended Complaint and the prior answers detail the critical contributions by IBM to Linux, including NUMA (Non-Uniform Memory Access) and RCU (Read Copy Update). These technologies improperly contributed to Linux by IBM allowed Linux to make the quantum leap into high-end corporate enterprise use; a place it did not and could not occupy before IBM's unlawful contributions.

know exactly how they were exposed to contaminants, but exposure occurred. When additional information is known to [respondents], they must supplement their response under Rule 26(e)." Likewise, SCO is presently attempting to ascertain, through the interrogatories and requests for production it has propounded to IBM, the associated background information and details that it needs to prepare its case as well as to fulfill IBM's request. Thus, to the extent certain portions of the answers are not currently available, they can be supplemented upon receiving the information from IBM, the party that improperly made the contributions to Linux in violation of its obligations to SCO and the party that presumably can identify who at IBM made the unlawful contributions to Linux, to whom they were made, when they were made, and other related details. To date, however, IBM has failed to provide this information, despite its agreement and obligation to do so.

As noted earlier, because SCO long ago indicated it would supplement its answers to interrogatories, IBM's motion should be denied as premature. Having provided the supplemental answers, IBM's motion is also rendered moot. Under these circumstances, normally there would be no further reason to address any of the remaining statements in IBM's memorandum. Here, however, IBM has advanced two arguments that so egregiously distort the facts and circumstances of this case that SCO is forced to respond.

1. **IBM's Characterization of the Presentation at the SCO Trade Show is False and Misleading.**

Throughout its memorandum, IBM makes repeated reference to SCO's trade show and a particular presentation about SCO's contractual rights made at that trade show. IBM incorrectly asserts that during that presentation, SCO identified "four categories of alleged 'misappropriation' by IBM: (1) literal copying; (2) derivative works; (3) obfuscation; and (4) non-literal transfers." (IBM Mem., p. 6)(parentheticals omitted). The slides from the SCO Forum trade show relied

upon by IBM (IBM Mem., Exhibit F), corroborate that SCO has not publicly made any such allegation against IBM. Slide 8, which is the only one to contain the terms "literal copying," "derivative works," "obfuscation," and "non-literal transfers" does not mention IBM, or indeed anyone else. In fact, Slide 8 does not mention trade secrets at all, but rather illustrates SCO's bases for a potential copyright infringement action. What makes IBM's use of this trade show material particularly misleading to this Court is that the code in question identified by SCO at the trade show and elsewhere was code from a licensee other than IBM. In fact, it was widely reported after the trade show that the example of improperly contributed code was from SGI, which has since publicly acknowledged its improper contribution It is inconceivable that IBM is unaware that the code identified by SCO in its presentation was from SGI, not IBM. In any event, as code contributed by another licensee, it should be obvious to IBM that, despite its demands for this code, the identity of such code is not responsive to any of IBM's interrogatories

   2.   **IBM's Claim It Will Not Respond to Discovery Until It Receives Supplemental Answers Is Belated and Improper.**

   Most problematic is IBM's claim that it cannot respond to discovery until SCO supplements its answers to interrogatories. SCO's discovery requests directed to IBM have been outstanding for four months. Raised for the first time in this motion, IBM's manufactured excuse for failing to respond is absurd and contrary to its previous representations that it will provide the discovery requested.

   Now, after mischaracterizing the breadth of SCO's complaint as detailed above, IBM suddenly claims "[w]hether a given document ultimately will be responsive to SCO's extensive requests turns on which trade secrets SCO identifies as being at issue in this case." (IBM Mem., p 18). No, it does not. The example used by IBM to support its recently created excuse for not

7

providing any additional documents since October 2, 2003, makes clear that whatever may be a trade secret does not limit IBM's obligations to provide full and fair discovery responses. Specifically, IBM points to SCO's Document Request number 11 and claims it needs guidance on the trade secret issue before it can respond. Request 11 is as follows: "All contributions made without confidentiality restrictions by IBM or anyone under its control including, but not limited to, source code, binary code, derivative works, methods and modifications to Open Source Development Lab, Linus Torvalds, Red Hat or any other entity." There is nothing on the issue of trade secrets that this Court needs to "clarify" for IBM to produce this information. As noted earlier, IBM contractually agreed to maintain certain information as confidential and proprietary. That includes all of UNIX System V, UnixWare, IBM's version of UNIX, called AIX, and Sequent's version of UNIX, called Dynix. IBM cannot unilaterally alter SCO's claims by pretending the clear and unambiguous allegations in the Complaint and contractual obligations detailed therein do not exist. IBM must provide the requested documents and cannot avoid or alter its production obligation through the filing of a Motion to Compel that improperly seeks to alter the claims as pleaded by SCO.

## CONCLUSION

Based on the fact that SCO voluntarily supplemented its answers and that IBM's Motion to Compel is premature and wholly inaccurate, SCO respectfully requests that this Court deny IBM's Motion to Compel.

Respectfully submitted,

DATED this 23rd day of October, 2003.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER, L.L.P.
Stephen N. Zack
Mark J. Heise

By:

*Counsel for Plaintiff/Counterclaim defendant*

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, Inc. hereby certifies that a true and correct copy of

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO IBM'S MOTION TO**

**COMPEL DISCOVERY** was served on Defendant International Business Machines Corporation

on this 23rd day of October, 2003, by hand delivery and U.S. Mail, first class, postage prepaid, on

their counsel of record as indicated below:

    Copies by Hand Delivery:

    Alan L. Sullivan, Esq.
    Todd M. Shaughnessy, Esq.
    Snell & Wilmer L.L.P.
    15 West South Temple, Ste. 1200
    Gateway Tower West
    Salt Lake City, Utah 84101-1004

    Copies by U.S. Mail to

    Evan R. Chesler, Esq.
    David R. Marriott, Esq.
    Cravath, Swaine & Moore LLP
    Worldwide Plaza
    825 Eighth Avenue
    New York, NY 10019

    Donald J. Rosenberg, Esq.
    1133 Westchester Avenue
    White Plains, New York 10604

*Nedelka Hadasladen*