**EXHIBIT 14**

FILED
U.S. DISTRICT COURT

16 SEP 03 AM 11: 52

DISTRICT OF UTAH

BY: _____
DEPUTY CLERK

*5/*

RECEIVED CLERK

SEP 1 5 2003

U.S. DISTRICT COURT

**SNELL & WILMER LLP**
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
15 West South Temple
Gateway Tower West
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

**CRAVATH, SWAINE & MOORE LLP**
Evan R. Chesler (admitted pro hac vice)
Thomas G. Rafferty (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

OFFICE COPY ENTERED

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

9/15/03

| | |
|---|---|
| THE SCO GROUP, | |
| Plaintiff/Counterclaim-Defendant, | **STIPULATED PROTECTIVE ORDER** |
| -against- | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV-0294 DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |

38

Whereas, the parties in the above-captioned action (the "Action") believe that discovery may involve the disclosure of confidential, trade secret, proprietary, technical, scientific, business, or financial information of a party or of a non-party;

Whereas, the parties desire to establish a mechanism to protect the disclosure of such information in this Action; and

Whereas, the Court, mindful both of the parties' interest in maintaining the confidentiality of sensitive information and of the public's interest in public access to the courts, wishes to manage this Action efficiently.

Therefore, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, **IT IS HEREBY ORDERED THAT**:

1.    **Definitions:** For purposes of this Protective Order, the following definitions shall apply:

A.    The term "DOCUMENT" shall include any writings, drawings, graphs, charts, photographs, phonorecords, records, exhibits, reports, samples, transcripts, oral testimony, video or audio recordings, affidavits, briefs, summaries, notes, abstracts, drawings, company records and reports, databases, version control systems, communications, letters, correspondence, e-mails and attachments thereto, source code and object code, answers to interrogatories, responses to requests for admissions, or motions, and/or any other document or thing which may be delivered from or on behalf of a Disclosing Party to another in connection with the Action including, without limitation, copies, or information stored on any storage device or computer.

B.    The term "DISCLOSING PARTY" is defined herein as any party or non-party who is requested to produce or produces DOCUMENTS or testimony through discovery in this Action.

2

265772.2

C.      The term "CONFIDENTIAL INFORMATION" is defined herein as information or DOCUMENTS or other materials that the DISCLOSING PARTY in good faith believes is not publicly known that would be valuable to third parties, including but not limited to the DISCLOSING PARTY's actual and potential competitors, and that the DISCLOSING PARTY would not normally reveal, and has not revealed, to third parties without an agreement to maintain it in confidence.

D.      "CONFIDENTIALITY LEGEND" is defined herein as a label placed upon material that contains CONFIDENTIAL INFORMATION and clearly designates the information as "CONFIDENTIAL", pursuant to the provisions of this Order. Such CONFIDENTIALITY LEGEND and any other mark or version control number (e.g., Bates number) added to DOCUMENTS shall not obscure or deface any information contained within the DOCUMENT.

E.      "COURT" is defined herein as encompassing the trial court that issued this Order and any appellate court that hears this Action on appeal.

F.      "SUPPORT STAFF" is defined herein as employees and independent contractors of counsel for the parties including experts or consultants and their staff retained by such counsel to assist in this Action, paralegals, clerical personnel and secretarial personnel, and employees of the parties specifically assigned to support counsel in this Action so long as those employed sign a declaration and acknowledgment in the form attached hereto as Exhibit A. Upon written request, counsel will provide copies of the declaration and acknowledgments signed by employees of the parties specifically assigned to support counsel in this Action.

G.      "LITIGATION SUPPORT SERVICES" is defined herein as encompassing copy services, document production services, exhibit-making services, translation services, coding services, scanning services, animation services, jury consultants and mock jurors.

3

2657772.2

**2.    Applicability of this Order:** All CONFIDENTIAL INFORMATION, and all copies, excerpts and summaries thereof and material containing information derived therefrom, filed with the Court, submitted to the Court in connection with a hearing or trial, or produced or served either by a party or by a non-party, to or for any of the other parties, shall be governed by this Protective Order and used only for the purposes of this Action and not for any other purpose or function, including without limitation any business, patent prosecution, competitive or governmental purpose or function. No person who prosecutes patents relating to the technology claimed in the patents in suit shall have access to CONFIDENTIAL INFORMATION. The terms of this Protective Order shall apply to all manner and means of discovery, including without limitation oral testimony, entry onto land or premises, and production and/or inspection of books, records, DOCUMENTS and tangible things.

**3.    Designating Information:** If, in the course of this Action, a DISCLOSING PARTY discloses information that the DISCLOSING PARTY in good faith contends is CONFIDENTIAL INFORMATION, that DISCLOSING PARTY may designate such information as such by applying to the material that contains the information the CONFIDENTIALITY LEGEND, which shall read "CONFIDENTIAL".

    **A.    If** any CONFIDENTIAL INFORMATION cannot be labeled with the CONFIDENTIALITY LEGEND, it shall be placed in a sealed envelope or other container that is in turn marked "CONFIDENTIAL" in a manner agreed upon by the disclosing and requesting parties.

    **B.    Initial Inspections of Materials:** In the event materials are to be subject to an initial inspection, e.g., in order for the requesting party to decide whether to copy all or only parts of a production, the materials shall be treated as containing CONFIDENTIAL

4

2657722

INFORMATION for purposes of the initial inspection, thereby limiting those who may conduct such an initial inspection to those permitted by Section 4 to view CONFIDENTIAL INFORMATION. After the initial inspection, the DISCLOSING PARTY may, if appropriate, prior to or contemporaneously with the copying of the materials, designate the inspected materials as CONFIDENTIAL INFORMATION.

  **C.** **Inspections of Property, etc.:** If a DISCLOSING PARTY believes in good faith that the inspection, measuring, testing, sampling, or photographing of its processes, products, equipment, premises, or other property, pursuant to Federal Rule of Civil Procedure 34, will reveal or disclose CONFIDENTIAL INFORMATION, then the DISCLOSING PARTY shall advise the requesting party that the inspection, measuring, testing, sampling, or photographing will be permitted only on a CONFIDENTIAL INFORMATION basis. In such an event, the inspection, measuring, testing, sampling, or photographing may only be performed by those permitted to have access to CONFIDENTIAL INFORMATION, under this Order, and information derived from such activities shall be treated as CONFIDENTIAL INFORMATION.

  **D.** **Depositions:** Counsel for the deponent or for a party may designate any part or all of a deposition as confidential by notifying all counsel of record prior to or during the deposition of the confidentiality designation. If a deposition concerns CONFIDENTIAL INFORMATION, counsel for the deponent or for a party shall have the right to exclude from the portion of the deposition concerning such information any person not authorized to have access to CONFIDENTIAL INFORMATION under this Protective Order. A party designating a portion of the testimony as CONFIDENTIAL INFORMATION may also request that the affected portions be bound separately from the rest of the transcript. In accordance with Section 14 of this Protective Order the non-designating party may request that the designating party review a

2657722

particular designation, in which event the designating party shall review the designation in question and shall have the option of changing it and shall give notice to the other party in writing if a change is made.

      **E.**    **Deposition Exhibits:**  An exhibit to a deposition shall be treated in accordance with the confidentiality designation already given to it or, if the exhibit has not been previously produced, given to it on the record at the time of the deposition. The designation of a deposition as CONFIDENTIAL INFORMATION or the de-designation of a deposition from CONFIDENTIAL INFORMATION shall not affect the confidentiality status of exhibits presented at the deposition.

      **F.**    **Inadvertent Failure to Designate:**  If a party to this Order inadvertently fails to designate information as CONFIDENTIAL INFORMATION such failure shall not constitute a waiver of the DISCLOSING PARTY's right to so designate such information. In the event that such an inadvertent failure occurs, the DISCLOSING PARTY shall upon discovery of the inadvertent failure promptly notify in writing all parties known to have received the information in question, and provide them with appropriately marked substitute copies of the affected information. Until a receiving party receives such notification, any disclosure made by that party of the information to those not permitted by this Order to have access to the information shall not constitute a violation of this Order. However, upon receiving such notification, the receiving party shall request all parties to whom the information was disclosed by the receiving party but who are not permitted to have access to such information under the terms of this Order to return the information to the DISCLOSING PARTY. The receiving party shall also destroy all copies of the incorrectly labeled information and replace them with the substitute copies provided by the DISCLOSING PARTY.

6

**4.** **Persons Permitted to Access Confidential Information:** Access to information that has been designated as CONFIDENTIAL INFORMATION shall be limited to the following persons:

**A.** The Court, and its support staff and other authorized Court personnel, and jurors and alternate jurors, if any;

**B.** Counsel (in-house and outside) for the parties to this Action and their SUPPORT STAFF;

**C.** Stenographers and videographers who take, record or transcribe testimony in this Action, either at deposition or at a hearing or trial, to the extent necessary to carry out their services;

**D.** LITIGATION SUPPORT SERVICES, as defined in Section 1, to the extent necessary to carry out their services

**E.** Any individual who previously had rightful access to the CONFIDENTIAL INFORMATION in question, as authorized by the DISCLOSING PARTY, in the form that the CONFIDENTIAL INFORMATION was produced by the DISCLOSING PARTY, in the ordinary course of business or employment, so long as the provision of CONFIDENTIAL INFORMATION under this paragraph is subject to the same limits set forth in paragraph 4.F;

**F.** A witness in the above-captioned case not otherwise authorized to view the CONFIDENTIAL INFORMATION in question, during that witness' testimony at a deposition, hearing, or trial in the above-captioned case, provided that: (1) the disclosure is made solely for the purpose of directly advancing the questioning party's claims or defenses, and for no other purposes whatsoever; (2) counsel for the questioning party endeavors in good faith to redact or handle the CONFIDENTIAL INFORMATION in such a manner as to disclose no more

7

265772.2

confidential information as is reasonably necessary in order to examine the witness; (3) the witness is not permitted to retain the CONFIDENTIAL INFORMATION after the witness is examined regarding the CONFIDENTIAL INFORMATION; and (4) the witness is explicitly informed that this Protective Order forbids him or her to disclose the CONFIDENTIAL INFORMATION except as permitted under this Protective Order and that he or she is subject to the Court's jurisdiction for the purposes of enforcing this Protective Order, and the witness signs the Declaration and Acknowledgement form that is attached hereto as Exhibit A. A deposition witness may review the entire deposition transcript and exhibits thereto in order to review and sign pursuant to Fed. R. Civ. P. 30(e); however, the DISCLOSING PARTY may object to the deponent further reviewing a CONFIDENTIAL deposition exhibit. If such an objection is raised, any party may seek relief from the Court, and the disclosure may not be made until the Court rules or the DISCLOSING PARTY withdraws its objection;

G.    A witness whose testimony at deposition, hearing, or trial has been formally noticed (but who is not otherwise authorized to view CONFIDENTIAL INFORMATION), provided that (1) the disclosure is made solely for the purpose of preparing the witness to testify; (2) the party that intends to make the disclosure provides written notice to the DISCLOSING PARTY, at least five business days in advance of the disclosure, specifying the documents to be disclosed and the person to whom the disclosure is to be made; and (3) the DISCLOSING PARTY has not objected, in writing, within five business days of receiving the notice of intended disclosure. If the DISCLOSING PARTY does object, any party may seek relief from the Court, and the disclosure may not be made until the Court rules or the DISCLOSING PARTY withdraws its objection;

2657722

H.   Other persons to whom the Court specifically allows disclosure, after application by the party seeking such disclosure and an opportunity to reply by the DISCLOSING PARTY OR PARTIES; and

I.   Other persons to whom the DISCLOSING PARTY specifically and in writing allows disclosure.

5.   **Storage and Custody:** Counsel for each party to this Protective Order shall use the same care and discretion to avoid disclosure of CONFIDENTIAL INFORMATION as the receiving party uses with its own similar information that it does not wish to disclose to prevent the unauthorized or inadvertent disclosure of any information designated as CONFIDENTIAL INFORMATION under this Protective Order.

6.   **Filing Under Seal:** Any information designated as CONFIDENTIAL INFORMATION that is included with, or its contents are in any way disclosed in, any pleading, motion, deposition transcript, or other papers filed with the Clerk of the Court shall be filed in sealed envelopes, or other appropriately sealed containers, prominently marked with the following notations:

A.   The style of the Action and case number (Civil No. 2:03CV-0294 DAK);

B.   The name of the filing party;

C.   An indication of the filing's contents, such as the title of the filing; and

D.   A statement substantially similar to the following:

CONFIDENTIAL INFORMATION – SUBJECT TO COURT ORDER THIS ENVELOPE SHALL NOT TO BE OPENED AND THE CONTENTS SHALL NOT BE DISPLAYED, COPIED OR REVEALED EXCEPT BY COURT ORDER OR BY THE WRITTEN AGREEMENT OF THE PARTIES.

265772.1

7.    **No Summaries:**  CONFIDENTIAL INFORMATION shall not be disclosed or summarized, either in writing or orally, to anyone other than persons permitted to have access to such information under this Order.  Notwithstanding the foregoing, nothing in this Order prohibits counsel for either party from advising their respective clients of the presence or absence of evidence supporting or refuting the claims or defenses in this Action.

8.    **Challenging a Designation:**  At any time, a party to this Order may challenge the designation of information as CONFIDENTIAL INFORMATION by notifying the DISCLOSING PARTY in writing of the information that the challenging party in good faith believes should not have been given a designation of CONFIDENTIAL INFORMATION.  The parties shall then confer within five (5) business days to try to resolve the matter, and if unable to resolve the matter, may thereafter seek the Court's assistance.  The burden of proof shall be on the DISCLOSING PARTY to show that the designation is appropriate under this Order.  Until the matter is resolved by the parties or the Court, the information in question shall continue to be treated according to its designation under the terms of this Order.  By failing to object to the designation of information upon its production, a party does not waive its right to object at a future time to that designation.

9.    **Designation by Non-Parties:**   A non-party to this Action that produces information to any party to this Action in connection with this Action, whether or not pursuant to a subpoena, may avail itself of the protections afforded by this Order, by placing a CONFIDENTIALITY LEGEND on such information.

10.    **Confidentiality Interests of Third Parties:**   A party may refuse to produce otherwise discoverable information pursuant to a subpoena, deposition question, or discovery request, if the party is under an obligation to a third party not to disclose such information.  In such an event, the objecting party shall:

10

265772.2

A.      Promptly provide to the person or entity whose confidentiality interests are implicated (i) notice of its intention to disclose the information in question and (ii) a copy of this Order; and

B.      Within thirty (30) business days of the notice sent pursuant to (A), produce the requested information in question in compliance with this Order, unless the request is otherwise objectionable, or the person or entity whose confidentiality interests are implicated moves for or obtains a protective order precluding such disclosure from this Court within that time.

11.     **No Waiver of Rights:**  This Order shall not be deemed (a) a waiver of any party's or producing entity's right to object to any discovery requests on any ground; (b) a waiver of any party's right to seek an order compelling discovery with respect to any discovery requests; (c) a waiver of any party's right to object to the admission of evidence on any ground; (d) a waiver of any party's or producing entity's right to use its own DOCUMENTS, testimony, transcripts, and/or other materials or things within its own discretion; (e) any waiver of the attorney-client privilege or protection of the work product doctrine; or (f) a waiver of any party's right to seek additional protection for certain materials or information. In the event that either party seeks such additional protection, that party shall first confer with the opposing party to reach agreement with respect to such additional protection.  If the parties are unable to reach agreement, the party seeking such additional protection shall, within 10 business days after the parties have conferred and failed to reach agreement, file a motion or application with this Court for an additional Protective Order.

12.     **Disclosure Beyond the Terms of this Order:**  Nothing shall prevent disclosure beyond the terms of this Protective Order if the party designating the information as

11

265772.2

CONFIDENTIAL INFORMATION consents to such disclosure in writing or on the record, or if the Court, after notice to all affected parties, orders such disclosure.

13.    **Inadvertent Disclosure:**  Should any designated information be disclosed, through inadvertence or otherwise, to any person or party in violation of this Order, then the party responsible for the inadvertent disclosure shall use reasonable efforts to bind such person to the terms of this Order, and shall (a) promptly inform such person of all the provisions of this Order, (b) request such person to sign the Declaration and Acknowledgement (attached hereto as Exhibit A), (and, if such person does not agree to sign the Declaration and Acknowledgement, use reasonable efforts to retrieve the designated information promptly); and (c) identify such person immediately to the DISCLOSING PARTY that designated the document as CONFIDENTIAL INFORMATION.  The executed agreement shall promptly be served upon the DISCLOSING PARTY.

14.    **Disclosure of a Party's Own Information:**  The terms of this Order shall in no way restrict a DISCLOSING PARTY's right to reveal or disclose to anyone any DOCUMENTS or information designated by that party as CONFIDENTIAL INFORMATION.

15.    **Final Disposition:**  Unless counsel agree otherwise in writing, within sixty (60) calendar days of the final disposition of this Action, the attorneys for the parties and experts and consultants shall return promptly, to the DISCLOSING PARTY or witness from whom they were obtained, all DOCUMENTS, other than attorney work-product, that have been designated CONFIDENTIAL INFORMATION or certify in writing that they have destroyed or deleted the same, including all DOCUMENTS or copies provided by a receiving party to any other person and all copies made thereof.  Notwithstanding the foregoing, outside counsel for the parties shall be permitted to retain one copy of (1) materials created during the course of the Action, including

12

265772.2

attorney annotations and other work product; (2) work product of non-testifying consultants/experts; (3) materials made part of the Court record, or which have been filed under seal with the Clerk of the Court; (4) all depositions and Court transcripts, including exhibits; and (5) summaries of depositions. Such file copies must be maintained subject to the terms of this Order. **Use of CONFIDENTIAL INFORMATION at Trial:** If a trial is scheduled, the parties shall confer in good faith to determine a method for introducing at trial material which has been designated as "Confidential." The parties shall submit their proposed method to the Court for approval. At trial, no party, witness or attorney shall refer in the presence of the jury to this Protective Order or to any confidentiality designation made pursuant to this Order unless the Court first provides the jury with a brief explanation of the nature and purpose of the Order. In no event shall any party, witness or attorney argue or suggest in the presence of the jury that a DISCLOSING PARTY acted wrongfully in designating material as CONFIDENTIAL.

16. **Modification, Relief and Retention of Jurisdiction:** This Order will remain in full force and effect unless modified by an order of the Court or by the written stipulation of the parties hereto filed with the Court. The parties to this Action reserve all rights to apply to the Court at any time, before or after termination of this Action, for an order: (i) modifying this Protective Order, (ii) seeking further protection against discovery or use of designated information, or (iii) seeking further production, discovery, disclosure, or use of claimed designated information or other DOCUMENTS or information in this Action. Without limiting the foregoing, this Order survives and remains in full force and effect, and this Court shall retain jurisdiction to enforce all provisions of this Order, after termination of this Action.

17. **No Liability for Innocent Disclosures:** It is understood that no person or party shall incur liability with respect to any disclosure by the receiving party of CONFIDENTIAL

13

265772.1

INFORMATION that was inadvertently disclosed without proper designation by the DISCLOSING PARTY, provided the disclosure by the receiving party occurred prior to the receipt by the receiving party of a notice of the inadvertent disclosure without proper designation.

18.    **No Effect on Other Litigation:**  The existence or nonexistence of a designation under this Protective Order shall have no effect or bearing on any other litigation.

19.    **No Admissions:**   Unless the parties stipulate otherwise, the designation or acceptance of any information designated pursuant to this Protective Order shall not constitute an admission or acknowledgment that the material so designated is in fact proprietary, confidential or a trade secret

20.    **No Effect on Existing Confidentiality Restrictions:**    A designation of CONFIDENTIAL INFORMATION under this Protective Order shall have no effect on existing confidentiality restrictions governing information previously exchanged between the Parties. Existing confidentiality restrictions, if any, that govern use and/or disclosure of information previously exchanged between the parties shall take precedence over this Protective Order when the terms of the former are less restrictive than those of the latter.

14

265772.2

**STIPULATION**

Dated: **September 15**, 2003

HATCH, JAMES & DODGE, P.C.

By _____

A member of the Firm

Attorneys for The SCO Group
10 West Broadway, Suite 400
Salt Lake City, UT 84101

SNELL & WILMER L.L.P.

By _____

A member of the Firm

Attorneys for International
Business Machines Corporation
15 West South Temple
Gateway Tower West
Salt Lake City, UT 84101-1004

**ORDER**

DATED September 16, 2003 _____

Hon. Dale A. Kimball
United States District Court Judge

265772.2

**EXHIBIT 15**

2/24/2006 Motion Hearing February 24, 2006

```
 1            IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 3   THE SCO GROUP,                    )
 4                                     )
 5                                     )
 6                                     )
 7                Plaintiff,           )
 8                                     )
 9        vs.                          )    Case 2:03-CV-294
10                                     )
11                                     )
12   INTERNATIONAL BUSINESS MACHINES   )
13   CORPORATION,                      )
14                                     )
15        Defendant/Counterclaim-Plaintiff )
16           BEFORE THE HONORABLE DALE A. KIMBALL
17                   FEBRUARY 24, 2006
18         REPORTER'S TRANSCRIPT OF PROCEEDINGS
19                   MOTION HEARING
20        Reported by: KELLY BROWN, NICKEN CSR, RPR, RMR
```

2/24/2006 Motion Hearing February 24, 2006

```
 1                A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:  HATCH, JAMES & DODGE, P.C.
 3                        BY: BRENT O. HATCH
 4                            MARK JAMES
 5                            Attorneys at Law
 6                            10 West Broadway, Suite 400
 7                            Salt Lake City, Utah 84101
 8   FOR THE DEFENDANT:   SNELL & WILMER, LLP
 9                        BY: TODD M. SHAUGHNESSY
10                            CURTIS DRAKE
11                            Attorneys at Law
12                            15 West South Temple, Suite 1200
13                            Salt Lake City, Utah 84101
14   FOR INTEL:           PERKINS COIN
15                        BY: ANTHONY MARES
16                            Attorney at Law
17                            2901 North Central Avenue
18                            Suite 2000
19                            Phoenix, Arizona 85012
```

2/24/2006 Motion Hearing February 24, 2006

```
 1          SALT LAKE CITY, UTAH, FRIDAY, FEBRUARY 24, 2
 2         *     *     *     *     *
 3            THE COURT: Calling now the case of SCO Group,
 4   Incorporated, vs. International Business Machines Corporation.
 5   I'm going to in a moment ask counsel to state their
 6   appearances for the record, as it looks like we have some new,
 7   different or additional counsel for purposes of this hearing.
 8            I would indicate before we begin that I did ask
 9   counsel to come to side bar for the purpose of handling some
10   housekeeping matters related to some orders that need to be
11   prepared and, as well, to indicate that there is a further
12   motion that will be scheduled before me for hearing at a later
13   date. And I've notified counsel as to which orders and what
14   hearing that will be.
15            Counsel, if you'll state your appearances, please.
16            MR. HATCH: Your Honor, Brent Hatch and Mark James
17   for SCO Group. With us is our client, Darwin McBride.
18            MR. SHAUGHNESSY: Good afternoon, Your Honor. Todd
19   Shaughnessy and Curtis Drake for IBM.
20            THE COURT: Thank you, gentlemen.
21            As I indicated at side bar, I'd like to begin with
22   the issue related to the depositions, particularly SCO's
23   motion for leave to take prospective depositions, and that's
24   found at docket Number 607. I have with regard to this motion
25   as well as the other motion reviewed all the submissions from
```

2/24/2006 Motion Hearing February 24, 2006

```
 1   both parties and am prepared to hear your arguments at this
 2   time.
 3            Mr. Hatch?
 4            MR. HATCH: Thank you very much, Your Honor. And
 5   as I understand it, when the motions were originally filed,
 6   there were some issues regarding which particular depositions
 7   would be at issue today here. And as I understand it, we have
 8   reached either through previous hearings with Your Honor or
 9   through agreement of the parties the handling of the
10   depositions of Messrs. Wessman, Chatlos, Wilson and Kennedy.
11   So what we're talking about today are the 30(b)6 depositions
12   of Intel, Oracle and the Open Group.
13            THE COURT: That's correct.
14            MR. HATCH: Your Honor, our position -- this has
15   somewhat been I think unfortunately recast by counsel for IBM
16   and also counsel for Intel, who has made an appearance, as a
17   motion to extend the discovery cutoff. And we, of course, do
18   not believe that that is really what this motion is. We
19   believe this motion came about because we actually did
20   properly subpoena each of these three parties prior to the
21   discovery cutoff date; And the issues relating to that will
22   go to I think timing and some other issues. But what we are
23   seeking from the Court is the ongoing permission to complete
24   these depositions for which there is either a dispute as to
25   whether the parties should show up or frankly just a refusal
```

1  to appear.

2       THE COURT: Mr. Hatch, before you go on, let me

3  indicate for purposes of the record and so that you may

4  address this, my concern in this regard is the order of, I

5  think it was October 12th, wherein, it states:

6       The Court hereby increases the number of

7       allowable depositions by 10 as to each side.

8       However, all depositions must be completed by the

9       applicable discovery cutoff date as set forth in

10      Judge Kimball's July 1st, 2005, order. To the

11      extent that such depositions cannot be completed

12      within that period of time, they must be foregone.

13      The Court will not entertain any motion for an

14      extension of time to complete depositions. IBM's

15      request for additional time to depose SCO's

16      witnesses is denied. Both sides are required to

17      adhere to the current rules on additional

18      deposition days.

19       MR. HATCH: Right. I'm very familiar with that

20  order, Your Honor. And I think the answer to that is frankly

21  somewhat simple. Your Honor knows her order better than

22  anyone, but I think it is not inconsistent with orders on any

23  discovery cutoff date or anything that is provided under the

24  rules.

25      What we are alleging here is that we did properly

6

1  them?

2      MR. HATCH: The original, these original subpoenas

3  were served on January 12th with the deposition notices on

4  January 13th.

5      THE COURT: And weren't they defective in some

6  manner?

7      MR. HATCH: Yes, they were.

8      THE COURT: So when were the subpoenas that you

9  would argue were properly served served and for what day?

10     MR. HATCH: Well, I think, Your Honor -- I think I

11  know where you're going. I think the final service properly

12  put together subpoenas was essentially a day before the cutoff

13  date. But what isn't said in that and I think is said well in

14  the case we've cited from the Fifth Circuit in the Eastern

15  District of Pennsylvania, and there really haven't been

16  contrary cases cited by the other side, is that particularly

17  when you're dealing with the corporation and people knowing

18  what is going on, that these folks had the notice of the

19  subpoenas well within a time period in which they could make

20  the arrangements to appear. And largely what they were

21  complaining about in this situation were technical

22  deficiencies and ongoing discussions going on with the parties

23  to resolve these.

24      But I think it goes a lot towards them

25  understanding trying to take your order in a very, very rigid

7

1  notice up depositions that should have been taken in that time

2  period, but for reasons related to these parties those

3  depositions did not occur. And if the order was to be viewed

4  in a hard-and-fast way, that for reasons that are outside of

5  my client's control and out of my control, these depositions

6  don't get taken, that would insert into this litigation or any

7  litigation kind of an odd policy, which would be a motivation

8  that would be provided to the other party and certainly to

9  third parties to not cooperate in discovery with the hopes

10  that a discovery date would be able to come and go.

11     And as a matter of fact, we met that here. And

12  without casting aspersions on anybody, as the date got a

13  little closer, we started to get those types of discussions

14  from particularly third parties where magically they became

15  unavailable until March.

16     And, you know, it wasn't a loss on us the fact that

17  these people weren't being able to find dates in February and

18  the fact that it had been become publicly known, one, your

19  order; and, two, the date by which things had to be completed

20  under your order. And I think if we took a very hard-and-fast

21  look that even if it were third parties that caused this

22  problem that that date was going to be held to, that provides

23  a motivation to witnesses not to cooperate in discovery. And

24  I don't think that was --

25      THE COURT: When were the subpoenas served upon

6

1  interpretation, because --

2      THE COURT: How do you interpret, Mr. Hatch, my

3  order anything other than how it's phrased? It says, they

4  must be foregone if they're not completed.

5      MR. HATCH: Let me give you an example, Your Honor.

6  I mean, largely the types of things that they were objecting

7  to in this particular instance were technical things like a

8  check wasn't given with the original subpoena or that the

9  topics were with the deposition notice and not with the

10  subpoena itself. They weren't saying, we don't know about the

11  dates. They weren't saying, we don't know what the topics

12  dates. They weren't saying, we don't know what the topics

13  are. They weren't saying it made any difference to them one

14  way or the other to get the $40, or whatever it is in this

15  district nowadays. They were putting up a fight because they

16  know there is a date. And if they put it off long enough,

17  know there is a date. And if they put it off long enough,

18  then they're going to have an argument, we don't have to show

19  at all.

20     Now, if I take that to an extreme, we have just got

21  a very onerous request for a lot of depositions, a lot of

22  which I can complain on the same basis which they complain

23  about the depositions that we've noticed, and as I to take it

24  that the next discovery deadline is a hard-and-fast thing so

25  if people are going to be out of town or just can't make it

26  that they're out of luck? And I don't think so. And I think

27  that's why parties are asked to cooperate in discovery in this

8

1  matter.

2       And Intel, in particular, I think this is a telling

3  example, Your Honor, that if you read, for instance, in

4  Intel's brief closely here, because they're the ones who filed

5  a brief as a third party complaining about this. And it's

6  interesting to me that Intel, a third party, even, you know,

7  picked up on this notion that there was even a cutoff because

8  typically a third party that is in litigation, you know,

9  they're just dealing with the subpoena and whether or not

10  they're going to produce people because that's what they're

11  obligated to. It isn't usually, we're going to fight you on

12  the discovery cutoff because we don't want you to get

13  discovery.

14       But in their own brief, in complaining about the

15  fact that the original deposition notice in this case was

16  faxed to them on January 12th -- now that's 15 days before the

17  discovery cutoff. And in this district, at least in the

18  practice as long as I've been here, that's considerably enough

19  time before a deposition is taken to give notice.

20       THE COURT: Did you note, and I'm sure you have,

21  the case, and I don't remember from what circuit, that said

22  30 days was insufficient?

23       MR. HATCH: I think it's a case by case. But, Your

24  Honor, I know -- I think the practice in this district in both

25  state and federal court for a long, long time has been it can

9

1  be less than 10 days. Certainly 10 days is more than

2  adequate. And so they certainly cited nothing from this

3  district, and it certainly isn't the practice of anyone I know

4  in this district.

5       But what's more interesting here is, you know, they

6  complain about not having discussions with us and about this

7  12th day, which is 15 days before. But what's more telling to

8  me here is they say SCO's counsel had dealt with specific

9  Intel outside counsel on these very matters as recently as

10  45 days earlier.

11       Well, they weren't raising it for that point. They

12  were raising that for another point. But that's a very

13  telling point, because what that says is they've admitted that

14  SCO had been working with them since late November, because

15  45 days prior to January 12th would be late November, trying

16  to get their deposition and talking to them about, and they

17  say, these specific matters, in other words, the matters that

18  are in the deposition notice, which are the topics, since

19  November. So we didn't wait until the last minute. But

20  they're trying to characterize these in a way, and that's why

21  I find it quite interesting that now they try to cast this as

22  we're trying to move the discovery date.

23       We're not trying to move the discovery date. We're

24  trying to get discovery that we were seeking to get properly

25  and were thwarted from getting by third parties, by IBM

10

1  potentially within the time period you set for us. We were

2  ready, we were willing, and we wanted to take those.

3       Now, IBM, you know, to try to make this sound like

4  it's our fault to Your Honor, and I take some umbrage of this,

5  is they bring up the other depositions that we've now worked

6  out. And they bring it up in a context, well, you know, SCO

7  was asking for all of these other depositions outside the

8  period.

9       Well, that's just simply not true. And that's

10  couched in a way to make it look like SCO is really trying to

11  do something that it's not here, because, for instance, in the

12  context of the Novell witnesses, Mr. Chatlos and Mr. Messman,

13  they came to us and said, we can't do it in the time period.

14  And we told them, we've got a deadline. If IBM is agreeable,

15  we're willing to accommodate you.

16       That isn't us asking to extend the deadline, as IBM

17  has cast it is we saying, if it's okay

18  with IBM and it can be stipulated with the Court, we will

19  accommodate you, witnesses, third-party witnesses, but we have

20  an obligation here.

21       Now, IBM was willing to do that. But I take some

22  umbrage that they now cast that as that was our request,

23  because it was not our request.

24       There are other issues regarding IBM witnesses,

25  Mr. Wilson and Mr. Kennedy, but we didn't ask for those to be

11

1  taken outside the period. IBM has agreed to produce them

2  outside the period for reasons that were unique to Mr. Wilson

3  and Mr. Kennedy. So at no time have we tried to cast this

4  motion as one that we need additional time. We do expect

5  witnesses to show up when they're properly noticed inside that

6  time period.

7       Now, you've identified the one small issue that,

8  yes, when Bois Schiller filed these subpoenas originally,

9  there were defects in them. But the Fifth Circuit and the

10  District of Pennsylvania, which is the only case cited in this

11  matter before you now found that technical defect that will

12  not keep you from -- because the question, the only issue, the

13  only real question is, did they have adequate notice? And

14  they had that. They were raising technical defects toward

15  discovery. And the purpose of the federal rules is not to

16  thwart discovery, but it is to encourage discovery.

17       THE COURT: But if I accept your arguments,

18  Mr. Hatch, the rules and court orders have no enforceable

19  meaning. They mean nothing if they are intended to be bent or

20  broken.

21       MR. HATCH: But, again, I think that misses the

22  point, Your Honor, because that is casting it as though we are

23  responsible for missing that deadline. Now, maybe I can help

24  by addressing one other issue, because maybe one of the things

25  you're looking at, and you raised this earlier, is why did we

12

**2/24/2006 Motion Hearing February 24, 2006**

1  wait so late, okay.
2      Now, I don't think by doing it in a time period --
3  and I know Your Honor is a practicing attorney, as well.
4  We've all done it, there are depositions for whatever reason
5  that get put to the end of the period. There's always going
6  to be one or two depositions that are at the end of the
7  period. That's just the way it works. I've yet to meet the
8  lawyer that gets it all done four months in advance. And
9  usually that can't be the case because just the way the case
10  develops, and particularly a case that is as complex and as
11  hard fought as this case is.
12      So I don't think you can -- I really don't think
13  you can ever be thwarted from taking discovery that you got
14  properly noticed inside the time period. I think your order
15  would take affect if you tried something outside the time
16  period.
17      But in this case, even if we assume that in your
18  mind the question is, why couldn't you have done these a
19  little bit earlier, I don't think it's necessarily the right
20  question, but even if we address those, there were -- there
21  are a couple things that happened here. One is, just a few
22  days before the discovery cutoff, IBM produced to us, and
23  without getting into the reasons because I'm sure both of us
24  will probably blame each other for this, but we received
25  approximately 340,000 documents a couple days before the

13

**2/24/2006 Motion Hearing February 24, 2006**

1  discovery cutoff. Well, it's hard to believe that that late
2  in the process we can receive which what are relevant
3  documents, and Mr. Shaughnessy may get up here and tell you,
4  well, we don't think they're relevant, but we turned them
5  over. But the standard is you're turning over relevant
6  documents. We believe they were relevant. It would be hard
7  to believe that you can't take any discovery on those simply
8  because a party thwarted the discovery that you fought long
9  and hard for, in some cases over a year, they turned over a
10  couple days before the discovery period.
11      THE COURT: But didn't you say that you had known
12  about, been in discussions with the representatives of the
13  deponents as early as November?
14      MR. HATCH: Yes.
15      THE COURT: So, you know, where does that leave
16  you? It's not as though you weren't on notice that these were
17  individuals who needed to be deposed in advance of the cutoff
18  time.
19      MR. HATCH: I understand that. And like I said, we
20  noticed them in advance of the cutoff period. But what you're
21  saying is, we're trying -- you're asking us to apply policies
22  that would be truly, would truly penalize people who try to
23  conduct discovery in a humane manner, because we contacted
24  them and said -- and tried to work this out. And when we
25  finally run out of time working with them, we get the notices

14

**2/24/2006 Motion Hearing February 24, 2006**

1  on records so that we can get those depositions taken. If we
2  can't do that in discovery, have discussions with the other
3  party and attempt to work these things out, which, again, in
4  Mr. Wagner's brief, that's one of the things he complained
5  about. And I think he probably was not aware of, because he's
6  counsel that just came into the case lately, that these
7  discussions were going on. But you remember he discussed in
8  his brief in the Northern District you have a responsibility
9  to try to work it out with the other party.
10      We understand that. We're supposed to do that
11  here. It's just a matter of common courtesy. And I find it
12  hard to believe that the Court would penalize us for trying to
13  work something out with the other side before going full
14  blown. If we had just filed something there, and Mr. Wagner
15  surely would have said, well, under Northern District you
16  haven't tried to work it out.
17      So we proceed under the rules as we understand
18  them. And I think, you know, one way or another, you know, I
19  don't think we can get penalized for doing what I think we're
20  supposed to do.
21      And so under that regard, I think it would be --
22  you know, and I think the important thing here, Your Honor, is
23  no party has really come to you, at least in the briefs, and
24  said that the information they sought isn't relevant and
25  isn't, in fact, highly relevant. As a matter of fact, as Your

15

**2/24/2006 Motion Hearing February 24, 2006**

1  Honor knows, the parties did have to come to the Court and
2  seek an opportunity to do additional depositions than were
3  originally asked for in the case, and that was granted. Part
4  of that was because the complex nature of the case and a
5  number of issues that had to come before Your Honor. But as a
6  result of that, there's no question, some of those depositions
7  were taken a little later in the game.
8      And I will point out that one of those,
9  Mr. Palmisano, who was just taken in January, there were
10  issues that came out in that case that were important in his
11  deposition. Now, that's just at the same time that these
12  subpoenas were being filed that are relevant to Intel and
13  extremely relevant to Intel. Also, these documents we talked
14  about in the brief, starting with UDG-PI, those only came out
15  in the last month or two.
16      So a lot of these issues are issues because of
17  documents produced and because of information that has been
18  obtained from depositions that came later in the game. And
19  Mr. Palmisano, as you know, his deposition came later in the
20  game because of hard-fought motions in this court to allow us
21  to take it and was -- we were not able to take that until
22  later in the game.
23      And so now, so that we can take the deposition on
24  issues that came out later in the game, we would be truly
25  prejudiced if it was said, well, you should have taken it

16

**2/24/2006 Motion Hearing February 24, 2006**

1  earlier in the game, when we couldn't have asked about these
2  things that we know about now. And that's why some parties
3  pick some depositions to come later than others. And I would
4  put to you that if it wasn't Intel and Open Group and Oracle,
5  it would have been someone else, because there is always some
6  depositions that come at the end of the game by definition.
7      So I would ask Your Honor to grant our motion, to
8  be able to take these depositions that were noticed. They
9  were put on notice, they had adequate notice, more than 15
10  days, before the discovery cutoff period. I think one of the
11  reasons we filed the motion in kind of the odd way we did is
12  because we understood that at some level this issue will need
13  to be addressed in the Northern District of California by
14  Magistrate Judge Zimmerman, who I've been in front of in
15  another case and is a very competent judge. But I think he
16  will be looking in large part for your guidance today, as
17  well, for his ruling. Thank you very much.
18      THE COURT: Thank you, Mr. Hatch.
19      Mr. Shaughnessy?
20      MR. SHAUGHNESSY: Thank you, Your Honor.
21      I need to, since Mr. Hatch mentioned this issue
22  during his argument, I do need to inform the Court, with
23  respect to the documents that Mr. Hatch seems to be suggesting
24  were produced to them right on the eve of the close of
25  discovery, what Mr. Hatch neglected to tell the Court is that

17

**2/24/2006 Motion Hearing February 24, 2006**

1  SCO served upon IBM a document request, the return date for
2  which was, in fact, the day after discovery. So we were
3  producing documents in response to a document request timely.
4  There were also additional documents that were produced that
5  are the subject of the other motion that you will hear today.
6  So I don't want the Court to be left with the impression that
7  we have somehow waited until the last minute to dump a bunch
8  of materials on SCO that it should not have been expecting to
9  be receiving by the time.
10      With respect to the motion that's before the Court
11  now, Your Honor, SCO in its opening memo, very short brief, it
12  said that it served each of these three companies with
13  subpoenas requiring them to appear for depositions, but the
14  companies, quote, simply and improperly decline to do so.
15      That, Your Honor, is not true. SCO did not, and it
16  now acknowledges begrudgingly in its reply and Mr. Hatch has
17  now acknowledged before you, it did not properly serve these
18  companies. Now Intel, as I think is clear from its brief,
19  filed this brief precisely because the memorandum that SCO
20  filed in this case suggested pretty strongly that Intel and
21  Oracle and the Open Group had simply snubbed their nose at a
22  court order. Now, if I were representing Intel, I would have
23  done the same thing I would have felt it important to make
24  sure that you understand that that is not, in fact, the case.
25      Your Honor, it is undisputed that these defendants

18

**2/24/2006 Motion Hearing February 24, 2006**

1  were not served with a proper subpoena until the afternoon of
2  January 26th. That subpoena required, purported to require
3  these defendants to produce documents, apparently substantial
4  volumes of documents, to prepare a 30(b)6 witness or series of
5  witnesses to testify, and to do all of that by 9:00 a.m. the
6  next morning. That, Your Honor, under any standard, under any
7  standard of the amount of time that is reasonable to give
8  notice of a subpoena is flawed. And I think Mr. Hatch would
9  agree with that.
10      And that is why, Your Honor, that SCO really
11  doesn't at the end of the day contend that the subpoenas that
12  they served on January 26th for a deposition on January 27th
13  were operative or they required any of these defendants to
14  appear. Instead what SCO argues is that they sent a flurry of
15  paper to these defendants earlier in the month, none of which
16  was proper subpoenaed, none of which remotely complied with
17  any of the requirements of the rules, and that that somehow
18  served as a place holder. That sending out a flurry of paper
19  not complying with the rules is now a place holder. And that
20  allows SCO to wait until the day before the deposition to
21  actually and properly serve these defendants.
22      Now, Your Honor, I do not represent Intel, I don't
23  represent Oracle, and I don't represent Open Group. And I do
24  not purport to speak on their behalf, and I do not purport to
25  raise the arguments and the objections that they may have to

19

**2/24/2006 Motion Hearing February 24, 2006**

1  these subpoenas they will, if they determine it necessary to
2  do so, should Your Honor allow these depositions to proceed,
3  they will raise those issues before you or before the court
4  that issued these subpoenas.
5      But it is abundantly clear, Your Honor, that the
6  subpoenas or the purported subpoenas that were sent were not
7  remotely close to complying with the rules. These are not
8  technical defects, as Mr. Hatch characterizes them. These are
9  the most fundamental defects that you can possibly have in a
10  subpoena. Fundamentally, a subpoena at its most basic level
11  has to tell you, the recipient of the subpoena, who it is that
12  is supposed to testify; what documents, if you're supposed to
13  produce documents, are they; and where the person is supposed
14  to be. Where am I supposed to go for this deposition?
15      Each and every one of these subpoenas failed on
16  each and every one of those fronts. SCO served subpoenas that
17  required the production of documents with nothing attached to
18  those subpoenas to indicate what documents were required. SCO
19  served subpoenas requiring parties to designate witnesses to
20  testify on topics without identifying what those topics were.
21  SCO served subpoenas requiring the witnesses in
22  Northern California to travel 2000 miles to New York. Rule 45
23  says that a subpoena, quote, shall be quashed if it requires
24  travel of more than 100 miles.
25      For that reason alone, Your Honor, each and every

20

1  one of these subpoenas was invalid. It's not a technical
2  defect. That is a requirement of the rules. SCO knows the
3  rules. It had the ability to comply with the rules. It
4  simply chose not to do so.
5           But that's not all. SCO served these notices by
6  fax. The rules require, the cases uniformly require you
7  cannot serve a subpoena by fax. You have to personally serve
8  a subpoena. There's no exception to that rule. That's not a
9  technical defect. That is the fundamental rule.
10          SCO sent faxes to the, quote, legal department of
11 these various companies. That's not service, Your Honor.
12 These are large companies. When you send something to the
13 legal department or you send something to somewhere else, who
14 knows where it's going to go? The requirement is you serve
15 the subpoena, that the subpoena tells you what it is you have
16 to do, and you serve that subpoena on the registered agent,
17 because these companies have procedures, so that they know,
18 okay, we've got a subpoena. Here's what we need to do with
19 it. You simply can't send a flurry of faxes to any possible
20 person in the company and then somehow expect that these
21 companies are supposed to comply.
22          The problems, Your Honor, didn't end there. Two of
23 the subpoenas that were issued from the Northern -- two of the
24 subpoenas were issued from the Northern District of
25 California. The local rules in the Northern District of

1  California require SCO to meet and confer after the service of
2  the subpoena with respect to the scheduling of the deposition.
3  SCO was required to comply with the rules of the Northern
4  District of California. According to the papers that have
5  been filed by Intel in this case and by Oracle in the motion
6  that it's filed in the Northern District of California, SCO
7  made no effort, no effort to comply with that rule.
8           And the subpoenas failed to include witness fees.
9  Now, Mr. Hatch says this is a technical defect, that nobody
10 should really worry about. But that's not what the
11 Ninth Circuit says. The Ninth Circuit has held that failing
12 to include a witness fee is grounds for quashing a subpoena,
13 period. That's not a technical defect.
14          But more importantly, Your Honor, this doesn't
15 occur on a blank slate, as Your Honor correctly pointed out.
16 SCO has had two and a half years to take these depositions.
17 SCO has identified these companies in discovery responses more
18 than a year ago. And most importantly, as Your Honor pointed
19 out, you could not have made it clearer to SCO what it was
20 that they were required to do should they desire to take these
21 depositions.
22          And finally, Your Honor, we believe, as we've
23 indicated in our papers, that the taking of these depositions
24 is, in fact, precisely that, that what SCO is asking the Court
25 to do is to essentially lift -- to modify the scheduling order

1  to allow them to take depositions, that they could have and
2  should have taken prior to the cutoff.
3           But beyond that, Your Honor, we had a conversation
4  with SCO, which Mr. Hatch alludes to, with regard to a couple
5  of these depositions. We were told by SCO that the two
6  depositions that were at issue, Mr. Messman and Mr. Chatlos,
7  that those were unique circumstances, those individuals were
8  truly unavailable. And that this, we understood, was it.
9  These were the only witnesses we were going to see who were
10 going to come after cutoff.
11          The Court granted -- we did not oppose the motion.
12 We said we would not oppose the motion. We made it clear to
13 SCO, however, that we believed the Court's order required them
14 to get your permission to do that. But we said we wouldn't
15 oppose the motion, if those were the conditions.
16          Well, that's not what happened, because six days
17 later in a telephone conference with Your Honor and myself and
18 other counsel, they suddenly bring up five more depositions
19 that they want to take.
20          Your Honor, it is abundantly clear to me that SCO
21 had the ability, they had the resources, they have the
22 sophisticated legal counsel who knows the rules, who knows
23 what to do, and they simply chose not to do it. And they
24 simply chose instead to impose the burdens on these third
25 parties. And I think Your Honor should not allow the

1  depositions to proceed on that basis.
2           THE COURT: Thank you, Mr. Shaughnessey.
3           Mr. Hatch, did you want to respond?
4           MR. HATCH: Yes. I'm not clear whether you'll
5  allow Mr. Wagner to argue at all for Intel. I prefer to go
6  after him, if you are. But I think Mr. Shaughnessey has made
7  his argument. It should have been one or the other.
8           THE COURT: Do either counsel object?
9           MR. SHAUGHNESSEY: I have no objection, Your Honor.
10          THE COURT: All right, then. If you want to speak,
11 go ahead.
12          MR. MARKS: Thank you, Your Honor. I appreciate
13 the opportunity to appear here. I'm Anthony Marks, and I
14 represent Intel Corporation.
15          Intel felt compelled to respond to the motion that
16 was filed even though in most senses they really have no dog
17 in the fight. And they felt compelled to do that because they
18 were accused of being a bad corporate citizen and unfair
19 litigant. Whatever degree of that took place before has been
20 amplified today. The motion has been made that Intel
21 conspired in a sense to thwart the discovery in this case by
22 raising unfair objections. And I'm not sure whom Intel is
23 alleged to conspired with, but there is a suggestion that
24 Intel has done something unfair and improper.
25          Intel takes its reputation as a good corporate

1   citizen, as a fair litigant whether it's a third party,
2   whether it's a plaintiff or defendant, very serious. So those
3   charges are very serious and warrants some discussion.
4           The notion that -- there's a bit of blaming the
5   victim here. The notion that all of these things happened
6   beyond my client's control, I heard SCO's lawyer say. There
7   wasn't much that happened as far as Intel is concerned that
8   was beyond SCO counsel's control.
9           I have a timeline, if I may approach. I don't
10  really wish to discuss it much, but if I may hand that.
11          THE COURT: Have you provided copies to counsel?
12          MR. MARKS: I will. I have copies for all.
13          Your Honor, I'm not going to talk about this in
14  detail. The salient point, which SCO's counsel has
15  acknowledged already, is that no effective subpoena of Intel
16  was served until the afternoon before the deposition was to
17  take place.
18          The notion that it was beyond SCO's control is
19  really quite simply false. First of all, the timing of the
20  service. The various defects that were made during the course
21  of the subpoena proceedings were as a matter of law not to
22  render the subpoenas a nullity. Intel responded not only
23  promptly but early to the original thing that had been faxed
24  to Intel was not, in fact, a subpoena at all and told SCO's
25  counsel that there were some defects that they needed to

25

1   remedy. Notwithstanding that, SCO's counsel chose to wait
2   five days before attempting to correct that and then not
3   correcting even all of the issues that had been identified
4   in it.
5           So that brought us to the 25th January. Here we
6   are two days before the deposition, still defects. We
7   promptly, I personally on behalf of Intel notified SCO's
8   counsel that there were still errors. They served another
9   subpoena on the afternoon of the 26th.
10          I will avow to the Court that I was unaware of the
11  Court's order. I knew that there was a discovery cutoff
12  because SCO's lawyer had told me that. So I was aware that
13  there was a discovery cutoff, but I had no idea about your
14  order. There's some suggestion here that I or Intel has tried
15  to take advantage of the Court's order. Other than being
16  aware that there was a discovery cutoff because SCO's lawyer
17  mentioned it, we were unaware of that.
18          So we know that there was no valid subpoena served.
19  There's some discussion in the timeline about the many defects
20  in this. So the notion that these are beyond SCO's control is
21  really quite simply false. Not only were they within SCO's
22  control, but Intel could tell them specifically what the issues were
23  and how to fix them.
24          Second, let's assume for the sake of argument about
25  this notion of notice and that notice would have been

26

1   effective. The cases don't, in fact, say that. The cases
2   deal typically with subpoenas for a single deposition and for
3   documents, or in some cases -- I can't recall whether any
4   cases like this or for both. But they are not, as was this
5   particular subpoena, calling for a deposition on six
6   enumerated topics, which in turn had several subsections to
7   them.
8           I also had -- I apologize for not knowing this.
9   But I have the document requests and the scheme of topics.
10  Does the Court have that in its file?
11          THE COURT: Yeah.
12          MR. MARKS: All right. Suffice it to say that
13  Intel has investigated and determined that somewhere between
14  three and nine Intel employees would need to be deposed to
15  respond appropriately to the 30(b)6 notice that was served on
16  Intel, and I don't think we determined how many people would
17  need to be searched, but it would probably be somewhat more
18  than 10. So this is not a small imposition on Intel. This is
19  a significant Intel imposition.
20          Add to that to the fact, and there was some
21  discussion to this and I want to come back to it, the fact
22  that there have been two previous subpoenas served on Intel by
23  SCO, one by IBM. Mr. Hatch I think inadvertently suggested
24  that there had been some discussion with SCO's counsel about
25  this subpoena as much as 30 or 45 days before.

27

1           In fact, that's not true. I am the lawyer who has
2   represented Intel during the course of the last subpoena, and
3   the discussion that was held related to a different subpoena
4   that asked for a discrete subset of documents and upon which
5   Intel responded 30 to 45 days earlier. There has been no
6   discussion about this particular set of topics. The time the
7   deposition would take place, the time for compliance, et
8   cetera, nothing of substance has ever been communicated on
9   that subject until after the subpoenas were served and,
10  indeed, after the motion was brought.
11          THE COURT: Mr. Marks, let me just ask you because
12  I haven't noticed. Are you officed locally?
13          MR. MARKS: No, I'm not. I'm officed in Arizona.
14          THE COURT: Where?
15          MR. MARKS: Arizona.
16          THE COURT: Arizona.
17          MR. MARKS: So it's important to understand that
18  there has not been discussion about these very matters. But
19  it is also important to understand that Intel's presence could
20  not have possibly gone unnoticed to the SCO lawyers, having
21  served two subpoenas on them, or IBM's lawyers who have served
22  one.
23          It is also important, as I suggested, to look at
24  the topics for deposition and topics for documents. They
25  include such topics as, all of Intel's communications with

28

1  SCO. All of Intel's communications with IBM. It can't
2  possibly have escaped -- if that was the subject that really
3  needed discovery, it could not have possibly escaped the
4  attention of fine counsel that SCO have that they ought to
5  have discovery on that. I don't know whether it is or is not
6  relevant. I don't know enough about the underlying case. But
7  I do know that it would not possibly -- that's not the sort of
8  topic that comes up the last minute.
9           So the two points that I, the first of which I
10  think we talked about and has not been disputed is the notion
11  that there was no valid subpoena. The Ninth Circuit law and
12  the law of other circuits recognizes that absent a valid
13  subpoena which includes personal service, which includes a
14  witness fee, which includes that there be a subpoena as
15  opposed to just a deposition notice if you're a third party, a
16  third party has no obligation to respond.
17           Notwithstanding that, Intel responded, told SCO the
18  problem, and they didn't fix it, and they didn't fix it until
19  the afternoon before. Intel obviously couldn't produce the
20  half dozen witnesses and all of those documents the next day,
21           More important, even if one regards the original
22  subpoena, which, in fact, is a notice and not a subpoena, as
23  notice in some sense of the word, in two weeks allotted for
24  that, Intel could not have possibly complied with, certainly
25  not by the date in time required by Your Honor's order by the

1  discovery cutoff. SCO should presumably have noticed that by
2  the breadth of the topics they raise.
3           So I'll close by suggesting there really is a
4  problem. I dealt with -- it doesn't sound like a very
5  glamorous job, but one of the things I do as Intel's counsel
6  from time to time is deal with subpoenas, and I've noticed a
7  habit on those third-party subpoenas somebody sends a
8  brand-new lawyer fresh out of law school down to the library
9  to draft a whole bunch of third-party subpoenas and sends them
10  out to third parties without giving any thought to what is
11  required in the case, what sort of an imposition they're
12  imposing on third parties, what the discovery deadlines are,
13  et cetera.
14           That seems to have happened here, because if you
15  look at the topics, they're so terribly broad that no one
16  could reasonably have expected them to comply in two weeks.
17           The second part of the theme that is consistent
18  with that is the notion that -- I have mis-served subpoenas or
19  made those technical errors myself. But there were a really
20  large number of them here. And notwithstanding receiving a
21  gratuitous road map from Intel that says, you need to do this
22  to fix it, it never happened.
23           So the reason Intel decided to file a brief and
24  send me up here and spend their money dealing with this is not
25  because they have a dog in this fight and not because they

1  side with IBM or they side with SCO or they care about those
2  sorts of issues, they decided to spend that money because they
3  had been impugned, and it was bad enough in the briefs. It
4  was frankly offensive to me here today.
5           The notion that Intel is somehow conspiring to
6  thwart discovery is simply false, and the record certainly
7  reflects that. I appreciate it.
8           THE COURT: Thank you for your comments, Mr. Marks.
9           MR. HATCH: Thank you, Your Honor.
10           A couple points were raised by both astute counsel
11  for both of the parties. First I would point out that the
12  timeline produced by Intel is somewhat significant to me. It
13  shows a couple things. As you'll notice, this isn't the first
14  time we've had issues with Intel. You'll notice from his own
15  timeline, he talks about documents that were being subpoenaed
16  in November of 2004. We had ongoing discussions with them
17  including discussions between senior officials of the two
18  companies to try to get them to comply with that subpoena and
19  do what we needed to do.
20           And you'll notice by their own timeline they had
21  not produced documents to us even to our second subpoena,
22  which I think is the first, as well, until, let's see,
23  December 20th of 2005, nearly a year later.
24           You'll also notice that even IBM was subpoenaing
25  documents from them in January of 2005. And Mr. Shaughnessy

1  just got up and said, why couldn't we have done this a lot
2  earlier? I could say the same thing to them. But I assume --
3  I didn't accuse them of that because I assume, like us, as
4  discovery went forth, things became understandable to us as
5  relevant information that was required from Intel as late as
6  that period of time. And I think we have the right every bit
7  as much as IBM did to get discovery as late a period it
8  becomes obvious that they had relevant discovery to give us.
9           Secondly, I would note that neither counsel
10  addressed the case law that we addressed. As I indicated in
11  my opening argument, we were the only party who cited case law
12  that was to the effect that the issue here is not -- for the
13  Court is not technical compliance, but it is notice to the
14  party. And neither of them cited another case, and neither of
15  them addressed those cases.
16           And let me -- one of the reason I think why is
17  particularly if you look at the, just as an example, look at
18  the Kuprits case. In that case, the lawyers really messed up
19  big in that case. They first -- they filed a subpoena in the
20  Southern District of Georgia when the guy was actually
21  residing in the Eastern District of Pennsylvania. So they
22  completely missed the right court. Eventually when they got
23  it corrected, they served the subpoena not the day before, but
24  they served it 15 minutes after the scheduled deposition time
25  was to start, which under any circumstances would be certainly

1 worse than the day before.
2 And the Court gave the following -- essentially the
3 analysis was the following five points. They found the
4 subpoena adequate on the following grounds. One, that the
5 deponent was fully aware of the scheduled deposition.
6 Well, neither IBM nor Intel have argued that they
7 weren't aware of the date. They're complaining about, you
8 know, some of the technical details, but they don't say they
9 weren't aware that they had been noticed up for January 27th
10 of 2006.
11 THE COURT: They had 12 or 14 hours notice,
12 something like that.
13 MR. HATCH: Oh, no. Of that point -- they had
14 notice as of January 12th of that point. That, I think, is a
15 very significant issue. That's the difference between why the
16 Court focuses on what's the notice, not the actual technical
17 detail.
18 THE COURT: I understand.
19 MR. HATCH: And so I always have to look at the
20 Kuprits court. They said, just as here, they had actual
21 notice of when it was going to take place.
22 The second point in Kuprits, never indicated there
23 was a change to the schedule date. There wasn't any here,
24 either. There was ample time to prepare for the deposition.
25 Here in this district, 15 days is presumed that. But we

33

1 certainly -- you know, it wasn't the day that they
2 represented. They had notice of the topics since the 12th, at
3 least.
4 And I would point out, Your Honor, that I think
5 Mr. Shaughnessy got his facts just a little wrong. He said
6 that the subpoenas were faxed. The subpoenas were actually
7 served by process servers. It was the deposition notices that
8 were faxed. But they had those with the topics as early as
9 the 12th or 13th, as well. So they had plenty of time and
10 notice of that.
11 What I referred to, I think -- I misplaced -- here
12 it is. When they said they didn't know the topics, until
13 January 12th they didn't know the topics, I didn't
14 specifically say, as counsel for Intel indicated, that they
15 had had specific discussions about the depositions. I just
16 quoted their exact language out of the brief. It says:
17 SCO's counsel had dealt with specific Intel
18 outside counsel on these very matters.
19 In other words, they just got done talking about
20 being faxed the deposition notice with what was going to
21 happen at the deposition.
22 And then he says that they dealt with these very
23 matters at least 45 days earlier. Now, the reason he's trying
24 to split a hair is because the deposition notice had the same
25 matters as we had been discussing on document productions and

34

1 other things. The general topic areas are the same. One is a
2 document production, and one is a request for actual people to
3 show up and give deposition testimony. So they've been aware
4 of this for along period of time.
5 As the Eastern District said, there was no motion
6 in that case to quash ever filed in any court. Intel never
7 filed a motion to quash in the Northern District. They sent
8 us an objection. That is an important factor in the Eastern
9 District.
10 And the second subpoena corrected the possible
11 defects. And then the Court went on to say, he said:
12 That subpoena was valid as to issuance and
13 service. There was not a timely motion to quash.
14 If there was, the only problem is whether the
15 subpoena served at 1:45 p.m. for a deposition to
16 commence at 1:30 p.m. on the same day is unreasonable
17 as to notice.
18 In other words, he's looking at the issue the way a
19 court does, and reasonable notice, not the technicalities.
20 He said:
21 Ordinarily, of course, it would be self-evident
22 that it failed to provide adequate notice. Here,
23 however, there was no question that Mr. Lowry had
24 such prior notice by the defective subpoena. He had
25 adequate notice by the defective subpoena served on

35

1 January 3rd, 1994, and by the communications with
2 counsel. He could have complied, albeit he might
3 have been a few minutes late. Instead of complying,
4 he filed as promptly as possible on the same day, a
5 motion to quash.
6 So in this case, he filed a motion to quash. We
7 didn't even have that here. So they didn't address the case
8 law because the case law is not good for them because they
9 actually had adequate notice. And instead of dealing with the
10 substance of the discovery request, they choose to fight on
11 technical grounds.
12 Now, it's interesting to me to hear Intel coming in
13 here and complain about the discovery cutoff date because
14 that's not particularly relevant as to them. To them, it
15 should be only, we're going to have to produce witnesses, and
16 when will we do it? But instead of coming to us and saying,
17 look, we might need a little more than 15 days, they did not
18 cooperate with us one iota. They didn't say, we're going to
19 need, like they have today in front of Your Honor, three to
20 nine people. They just said, no, you've got technical
21 problems. You've got a cutoff date. So bad; so sad. And
22 that is not the way it ought to have worked.
23 And we would have certainly have accommodated them.
24 IBM has shown it's willing to accommodate witnesses that for
25 whatever reason were not able to appear before the cutoff

36

1 date, because that's what we did when their own witnesses
2 couldn't show up before, and that's what we did when Novell
3 witnesses couldn't show up before.
4 So I would put to Your Honor that the objections
5 raised by IBM and Intel are not sufficient to keep us from
6 getting what is really relevant discovery, and that we should
7 be allowed to take these three depositions. And we're willing
8 to work with them and with IBM on an appropriate time to take
9 those.
10 THE COURT: Thank you, Mr. Hatch.
11 MR. HATCH: Thank you very much.
12 THE COURT: Counsel, I'm prepared to rule in this
13 matter.
14 Looking at this case individually on its particular
15 set of facts, I find that the subpoenas on January 26th gave
16 inadequate notice and also gave inadequate time for the
17 deponents to prepare.
18 I find that the subpoenas of January 12th were
19 defective both in substance and service and would have
20 constituted, even if not technically defective, would have
21 also likely provided inadequate notice in time to prepare.
22 I also note and find that the parties failed to
23 comply -- or SCO failed to comply with the meet-and-confer
24 requirement of the Northern District of California.
25 And finally, I find and will deny the motion of SCO

37

1 to allow these additional depositions, finding that the
2 requirements of the October 12th order were clear and could
3 not -- or were not the subject of unilateral decisions to
4 violate. It was clear. It said, to the extent that such
5 depositions could not be completed within that period of time,
6 they must be foregone.
7 And SCO should have noticed them up earlier and at
8 minimum overseen the preparation of those subpoenas such that
9 the argument would be that they were effective on
10 January 12th. Nonetheless, they weren't.
11 So that would be the ruling. And, Mr. Shaughnessy,
12 if you'll prepare an order as to that decision.
13 MR. SHAUGHNESSY: I will, Your Honor. Thank you.
14 THE COURT: All right. Now let's address the
15 remaining motion, which is the motion to compel. This is also
16 SCO's motion.
17 As I indicated -- Mr. McBride, let me ask you,
18 please, to pay attention here. I know you need to speak, but
19 it's distracting and it keeps us from moving forward.
20 Mr. Hatch, this is SCO's motion. As I indicated at
21 the bench before we began, I have some preliminary types of
22 questions that I would like to pose. They may address various
23 portions of the motion, but let me pose them first, and then
24 you may address them and make your argument.
25 MR. HATCH: I'll be happy to. Mr. James was going

38

1 to handle this part of this, but if you want to address
2 questions to me, I'll make an attempt, as well.
3 THE COURT: No, that's fine. I didn't know who was
4 going to handle them. Mr. James, if you're willing to, I will
5 do that. Do you want me to pose those questions now?
6 MR. JAMES: If that's Your Honor's preference,
7 sure.
8 THE COURT: All right. First, I'm on notice that
9 and it's been acknowledged today that IBM has made a recent
10 discovery production. I want to know what impact that
11 particular production may have on these motions to compel. In
12 other words, has it resolved anything? All right?
13 Specifically, what specific items is SCO still
14 seeking, and why do you need them?
15 Noting that at the outset of this case or prior to
16 its filing, it was expressed to the media and others that SCO
17 possessed evidence regarding the misappropriation of source
18 code. At this point, don't you have enough evidence to go
19 forward in that regard or, to be candid about it, does it
20 constitute fishing at this point?
21 If I were to grant your motion to compel, what
22 would be the effect upon the scheduling deadlines in this
23 case?
24 And then finally, if you will address in more
25 detail what information you have regarding the location in

39

1 North Carolina that you allege houses pre-1991 AIX source
2 code.
3 With those questions in mind, Mr. James, go ahead.
4 MR. JAMES: Okay. Thank you, Your Honor. And I'll
5 do the best I can to respond to your questions. I'm going to
6 try and weave my answers to those questions into
7 THE COURT: I don't mean to mess up your argument
8 as you may have prepared for it, as long as you address those
9 questions at some point.
10 MR. JAMES: Thank you, Your Honor. And I
11 appreciate that.
12 There's been a suggestion that I heard for the
13 first time when counsel for IBM addressed the Court that
14 340,000 documents that have been produced were produced as a
15 result of a recent document request served by SCO on IBM. And
16 I find that to be a very, very curious assertion, Your Honor.
17 And the reason for that is you will see that we filed our
18 motion to compel on, I believe it was December 29th.
19 And if you look at the specific requests that we
20 address in that, you will see, Your Honor, that many of the
21 document requests for which we contend there has been
22 insufficient production dated back some into 2004, others in
23 2005. And you'll see in our memorandum, in particular our
24 opening memorandum, that we address those dates or gave those
25 dates to Your Honor. And so the suggestion I think to the

40

2/24/2006 Motion Hearing February 24, 2006

1    extent it was intended to indicate that all of these documents
2    were suddenly produced this late in response to or because of
3    a very recent document request is just unfair and inaccurate.
4              Now, Your Honor has asked, what impact does the
5    production have? And we do believe it moots many of the
6    issues. We're still attempting to complete our review of
7    those documents, however. And, in fact, IBM has represented
8    in its briefing that there will be additional documents
9    forthcoming in response to requests that we have made.
10   Therefore, it's a little bit difficult for me to stand before
11   Your Honor right now and tell you specifically what has been
12   mooted because that process of reviewing the 340,000
13   documents, while it has been a very intense and aggressive
14   process on our part, is not completed. And we are expecting
15   additional documents. But I think quite clearly a number of
16   the issues have been mooted.
17             And I guess, Your Honor, what I can say best in
18   that regard is while we hope not the need to come back on many
19   of the issues, there is some chance we may need to re-address
20   some more narrow issues based on when we're able to conclude
21   our document review. There were a few areas where we still
22   are very concerned. And based on the review that we've been
23   able to do, we believe that the document production is not
24   complete.
25             And, in fact, there has been some ongoing

2/24/2006 Motion Hearing February 24, 2006

1    correspondence recently between counsel in an effort to kind
2    of sort out what's still left in light of the recent
3    production. We have identified just recently several areas
4    that we think are still an issue that have not been produced,
5    and we've identified those to IBM. Those include IBM's global
6    market view database as it pertains to Linux and Unix. IBM's,
7    it's either FIWC or FIW-C database as it pertains to AIX.
8    IBM's IBC service tracker and documents evidencing the Linux
9    related financial materials that were copied to IBM senior
10   executives.s
11             We think these documents, Your Honor, and this in
12   part I think goes in answer to the second question you asked
13   relating to evidence of misappropriation, all of these
14   documents, we believe, goes to the damages issue as opposed to
15   evidence of misappropriation. My understanding, and I'll
16   represent to the Court, is, yes, we do have evidence of
17   misappropriation of the source code.
18             I would say, though, in that regard that
19   irrespective of what quantity of evidence we may have or may
20   not have in that regard, to the extent there are relevant
21   documents in IBM's possession or control that go to that issue
22   that have been requested and not produced, they ought to be
23   produced because those are the rules of the game. And there
24   never comes a point, to my knowledge, in litigation where the
25   Court or a party says, you now have an enough. You don't need

2/24/2006 Motion Hearing February 24, 2006

1    any more, irrespective of whether the opposing party has
2    additional information or documents in that regard.
3              But again, Your Honor, many of the documents at
4    issue are damage-related documents that are unrelated to
5    misappropriation, although I'm going to talk a little bit
6    about misappropriation issues, a couple of issues still. And
7    so hopefully I've at least somewhat answered a couple of the
8    questions that Your Honor has asked.
9              We've talked about the Project Monterey.. You've
10   heard about that, and we've talked about it. And IBM has now
11   come back and represented, as far as we can tell, that they've
12   given us everything. We're still reviewing the documents.
13   And if they've given us everything, then that's all we can
14   expect.
15             Again, however, we may be back, Your Honor, after
16   we complete our review and based on our review saying to Your
17   Honor, based on what we have found, we still think there's
18   this area missing. We hope that's not the case. But
19   certainly that issue has been narrowed. And IBM has made
20   representations that they believe they've now produced
21   everything within their possession and control on
22   Project Monterey. That's my understanding of it now.
23             With respect to documents predating 2001, let me
24   talk about that for a minute, because IBM has objected
25   routinely and imposed a 2001 deadline for producing documents.

2/24/2006 Motion Hearing February 24, 2006

1    And you'll see, Your Honor, we address that on Page 6 of our
2    reply memo. It's unclear to us where that 2001 deadline comes
3    from and why IBM feels it has the right to unilaterally impose
4    that deadline on us. In fact, our contentions are that IBM's
5    activities in breach of their agreements with SCO date back
6    before 2001 into the 1998 time frame.
7              In addition, you may recall that IBM is basically
8    in its counterclaim in this case asked the Court for a clean
9    bill of health with respect to al_ of its conduct relating to
10   Linux activities. Therefore, if there are Linux activities of
11   IBM that predate 2001 and IBM has documents that are
12   responsive to the documents we've asked for before 2001, they
13   ought to produce those documents.
14             Yet, IBM has routinely objected to the documents
15   saying that before 2001 for whatever reason that we don't
16   understand, the claim is irrelevant. And we don't think
17   that's appropriate. And if they have pre-2001 documents, they
18   ought to produce those documents relating to IBM's plans and
19   efforts to market, promote or advertise Linux-related products
20   and services.
21             So we think that is still an issue that's out
22   there, although again, we're continuing to review the
23   documents, and we're near completing that. And if there are
24   more specific areas, then we'll certainly call those to
25   Your Honor's attention.

2/24/2006 Motion Hearing February 24, 2006

1            Let me talk about the AIX versions prior to 1990,
2  and I think this is the area where Your Honor was referring
3  with respect to the location in North Carolina. IBM has told
4  us that they have now produced everything they have and that
5  they can't find certain pre-1990 AIX related documents.
6            And our position in that regard is if IBM has now
7  looked everywhere that they know of to look and looked in
8  areas where we've suggested that they look and are
9  representing to the Court that they don't have anything, then
10  we accept that representation. But we want to be absolutely
11  clear that that is IBM's position, that, in fact, they have
12  looked everywhere reasonable that both we've suggested and
13  they've suggested and that there are no more documents
14  responsive in that regard.
15            Again, we've been quite surprised that we get
16  340,000 documents this late in the game, many of which, even
17  according to IBM's contentions, moot our motion to compel.
18  And they clearly do.
19            THE COURT: Well, that raises this question, and
20  maybe I should have asked it sooner. Based upon that, should
21  this hearing be continued until such time as you have had the
22  opportunity to review those documents so that we can narrow
23  the issues and aren't wasting people's time today?
24            MR. JAMES: The answer to your question in my
25  opinion is yes, however, we didn't feel like we were in the

45

2/24/2006 Motion Hearing February 24, 2006

1  position, Your Honor, to ask for that continuance because we
2  were concerned that IBM would come and say the deadline is
3  over. You should have asked for this and done this sooner and
4  you didn't. And, therefore, you've lost the opportunity.
5            But I think you're absolutely right.
6            THE COURT: Well, let me ask Mr. Shaughnessy and
7  Mr. Drake to respond to that right now because there's no
8  point in us going forward.
9            MR. SHAUGHNESSY: Your Honor, respectfully, I think
10  this motion needs to be denied. I will --
11            THE COURT: The motion to compel?
12            MR. SHAUGHNESSY: The motion to compel needs to be
13  denied.
14            THE COURT: Well, I understand --
15            MR. SHAUGHNESSY: We don't need to have another
16  hearing after they've had more time to look at the documents.
17  They have had plenty of time.
18            THE COURT: When were those documents produced?
19            MR. SHAUGHNESSY: I'm not sure exactly what
20  documents counsel is referring to.
21            MR. JAMES: The 340,000 that you just produced.
22            THE COURT: The 340,000.
23            MR. SHAUGHNESSY: We produced, and I'm prepared to
24  explain to you in detail, the financial information that
25  apparently Mr. James is referring to and the two depositions

46

2/24/2006 Motion Hearing February 24, 2006

1  that they took with respect to that financial information and
2  the follow-up information that we provided in response to
3  their requests and the further information we provided as
4  early as Tuesday of this week and my conversation with
5  Mr. Normand yesterday on this very subject. There's nothing
6  to produce.
7            THE COURT: I want to be fair about this and hear
8  from both sides. So, Mr. James, go ahead.
9            MR. JAMES: Okay. Let me now just address, if I
10  could, Your Honor, and this is an area where we do not believe
11  documents have been produced based on what we've been able to
12  see and do so far, and that is we had requested that IBM
13  produce documents and, in fact, a witness relating to IBM's
14  interpretation of language used in AIX and Dynix licenses.
15  IBM's response has been, well, you can read those licenses.
16  You don't need to have anyone from our side testify and tell
17  you what we think those mean.
18            The reason those are important, Your Honor, is
19  because much or at least some of the critical language in the
20  AIX and Dynix licenses of IBM is very similar to the language
21  in the SCO licenses that are at the heart of this case. And
22  we have made a request through letter to IBM stating, IBM, if
23  it is your position that the language of your contracts is
24  clear and unambiguous and can be interpreted as a matter of
25  law by the Court, fine, we accept that.

47

2/24/2006 Motion Hearing February 24, 2006

1  Not surprising, IBM has not been willing to
2  acknowledge that that is the case. And we believe, Your
3  Honor, that we are entitled to have IBM's evidence on what the
4  language in their licenses that is very similar to the
5  language in the license in our case how they interpret that
6  language and what it means. It's clear relevant, yet IBM
7  stonewalls and refuses to produce anyone and says it is not
8  relevant. And that is just untrue. And I do not understand
9  how a party can claim that the language at issue in a license
10  agreement of their own that is very similar to the language at
11  issue in this case is irrelevant when we ask them how they
12  interpret that language.
13            Finally, let me just address briefly the
14  Chicago 7 issue. Chicago 7 is a group of seven companies.
15  They call it the Chicago 7 because they met in Chicago. We
16  received some documentation from IBM that very strongly
17  suggested that these were a group of companies dealing with
18  Linux and, in fact, that were talking about sponsoring a
19  company that would compete against SCO.
20            When we asked for a 30(b)6 deposition on that
21  subject, they agreed to produce a witness. They did produce a
22  witness, Karen Smith. However, IBM unilaterally limited her
23  deposition or narrowed her deposition to IBM's definition of
24  the topic and absolutely refused to allow Karen Smith to
25  testify or answer questions that went to our designation and

48

1 that went beyond the limited designation that IBM had
2 provided.
3         IBM does not have the right, Your Honor, to
4 unilaterally narrow or change our deposition topics. And
5 moreover, in the context of a deposition, an attorney does not
6 have -- it is improper to instruct a witness not to answer
7 based on the fact that allegedly the testimony being requested
8 goes beyond the narrowed subject provided by the firm or the
9 company that's being deposed.
10         And in this case, that's exactly what happened.
11 And we ought to have the right, Your Honor, to get the
12 documents and take whatever testimony is appropriate based on
13 our designation of the subject matter from a Chicago 7
14 witness, and that has not happened. And so that is still an
15 issue that remains.
16         Under the circumstances, it's a little difficult,
17 as I indicated, to tell you specifically what remains because
18 we're still reviewing the documents. And I agree if Your
19 Honor is suggesting we ought to be back that we can do this
20 more quickly and narrow it some. But based on those --
21         THE COURT: Answer the question, Mr. James, about
22 how long it would take you.
23         MR. JAMES: To complete? I think within a couple
24 more weeks we're done on our review.
25         Thank you, Your Honor.

49

1         THE COURT: Thank you.
2         MR. SHAUGHNESSY: Did Your Honor have questions,
3 specific questions that you want me to address?
4         THE COURT: I do.
5         MR. SHAUGHNESSY: Okay.
6         THE COURT: You allege that much of SCO's motion
7 relating to the 30(b)6 testimony has been designated. What
8 topics have they been designated on and when are the
9 deposition dates?
10         Second question. When IBM renews its summary
11 judgment motion, is there any information which has not yet
12 been provided to SCO that IBM will use in support of its
13 motion? For example, let's say IBM does not produce any
14 documents related to IBM customers who migrated to Linux from
15 other operating systems. Is IBM, therefore, going to point to
16 SCO's failure to analyze this type of market information in
17 its support of summary judgment? Obviously what I don't want
18 is either side to use information that has been withheld in
19 support of a summary judgment motion or in support of their
20 case at trial, all evidence needing to be on the table for the
21 other party to analyze and take a look at.
22         Will IBM file an affidavit stating that they will
23 not use information that has not been provided to SCO in
24 support of its motion for summary judgment or at trial?
25         Third question. Previously I ordered IBM to

50

1 produce all versions and changes to AIX and Dynix. This
2 included the code found within the CMVC and RCS system. But
3 does IBM have a depository containing pre-1991 AIX source code
4 anywhere else? This goes to that issue of a possible location
5 in North Carolina. In other words, is IBM prepared to file an
6 affidavit saying it's produced all versions and changes to AIX
7 and Dynix pursuant to this Court's order, whether or not the
8 code is found in CMVC or RCS?
9         Fourth, IBM recently subpoenaed Hewlitt-Packard,
10 Sun, Microsoft and Maystar Capital. How does the information
11 that you are seeking from these parties differ from SCO's
12 request for testimony to test the credibility of IBM's
13 interpretation of the Unix license? Aren't you seeking to
14 test the licenses between those entities in the hopes to
15 defend its own licensing activities from SCO?
16         And those are the questions posed.
17         MR. SHAUGHNESSY: Thank you. Thank you, Your
18 Honor. That is helpful.
19         I think what I'd like to do, Your Honor, if I may,
20 is give you a little bit of background on what I think is the
21 big issue that is before the Court, and that has to do with
22 the financial information that SCO has requested and that IBM
23 has produced that I really think is at the heart of this
24 motion, at least of the motion that was originally filed.
25         Your Honor, IBM spent months, literally months

51

1 collecting documents regarding IBM's revenue, expenses and
2 profits for AIX, Dynix and Linux. That is the heart of the
3 motion as it was filed. And even in the reply memorandum that
4 was filed, that is really the heart of the motion. An
5 individual at IBM, William Sandve, headed up that effort along
6 with a number of consultants and attorneys who are involved.
7 Mr. Drake from my office was involved in that effort. We
8 gathered -- Mr. Sandve himself spoke with more than 50 IBM
9 employees to gather information and documents. We gathered
10 documents and information from across all of IBM's brands and
11 divisions. We gathered documents and information from a
12 variety of IBM financial marketing databases. Mr. Sandve,
13 consultants and others spent over 1,000 hours talking to
14 people, collecting information, putting the documents together
15 and putting the documents together in an organized fashion so
16 they would be easily understandable to SCO.
17         After they had been collected, we produced to SCO
18 more than 23,000 pages of documents responsive to these
19 requests. We produced with these 23,000 pages of documents
20 summaries and overviews, sort of a higher level view of the
21 information, and then all of the supporting and backup
22 information behind all of those numbers.
23         We then agreed -- SCO had asked for a 30(b)6
24 deposition on this subject. We agreed to put up Mr. Sandve
25 for that deposition, the purpose of which was to have

52

1   Mr. Sandve sit down and explain to SCO the information,
2   explain to them what was there, what it means, where it came
3   from, all those sorts of issues. We shipped sets of these
4   documents down to Austin for Mr. Sandve's deposition. We
5   prepare detailed summaries and indices of all of this
6   information so that if a question was asked, you know, about P
7   series revenue in a particular year, we would have an index
8   with the Bates number so we could go right to that page of the
9   document and show them exactly what it is we're talking about.
10  Mr. Sandve himself spent 300 hours in this effort.
11          Mr. Sandve appeared at his deposition. Mr. Drake
12  defended his deposition. We were prepared, Mr. Sandve was
13  prepared to walk SCO through that information to make sure
14  they understood it, to make sure that it was complete, to make
15  sure that there were not things that they said that we had not
16  produced. That was purpose of the deposition. Mr. Sandve
17  spent an entire day with SCO's lawyers, the purpose of which
18  was to explain to them this information.
19          Now, the reality, unfortunately, as it turned out
20  is that SCO's lawyers seemed to have no interest whatsoever in
21  the financial information of the documents. They had no
22  interest in having him explain these documents and how they
23  work and the indexes and everything so they would have a full,
24  thorough understanding. And they spent all day talking about
25  other issues. They get to the end of the day and they said,

1   this is unfair. You've given us all of these documents at his
2   deposition. We haven't had time to review them.
3           We disagreed. We said, we think that was the
4   purpose of this deposition, was to have this witness available
5   so that he could explain these documents to you. But
6   nevertheless, we'll put him up again. We'll allow you to take
7   his deposition again. So Mr. Sandve's deposition was taken
8   for a second day, Tuesday of this week.
9           Shortly before his deposition, SCO, one of the
10  lawyers for SCO, not Mr. Hatch or Mr. James, wrote a letter to
11  me in which they said that 24,000 pages of documents were
12  unusable. It was too much. How in the world are they
13  supposed to be able to understand 24,000 pages of documents?
14  We should produce it to them in electronic form, and we should
15  give it to them by February 17th.
16          On February 17th, we delivered it to them that same
17  information, all of those documents in electronic form,
18  exactly as they requested. They sent another letter. They
19  said there were other issues that they thought that we needed
20  to follow up on in connection with Mr. Sandve's deposition.
21  We tracked those down, spent substantial amount of time doing
22  that, tracking all of those issues down, gathering up all of
23  this information and sending it down so that Mr. Sandve would
24  be prepared to deal with all of these issues at his deposition
25  earlier this week.

1           He spent another full day in his deposition, again
2   prepared to walk SCO through all of this information to make
3   sure their lawyers understood, to make sure that they
4   understood that it was thorough, to make sure that they
5   understood the basis and rationale, how the information was
6   put together, how it answered all of their questions.
7           Your Honor, we spent an extraordinary amount of
8   time and money and resources in collecting this information,
9   producing this, information to them. Now I want to contrast
10  that, if I may, Your Honor, with what we got from SCO on the
11  same subject.
12          We asked SCO for similar kinds of financial
13  documents. They delivered the documents to us, and they
14  delivered the documents to us in electronic form. We asked
15  for a witness, similar 30(b)6 witness, Mr. Hunsaker.
16  Mr. Hunsaker, it turns out, had spent less than an hour
17  talking to other people about the subject of his testimony.
18  Mr. Sandve spent hundreds of hours. Mr. Hunsaker, it turned
19  out had maybe talked to a couple people in total. Mr. Sandve
20  personally talked to more than 80 people to prepare for his
21  deposition.
22          Mr. Hunsaker's most consistent answer during his
23  deposition was, I don't know. You really have to ask Mr. X.
24  So when we would ask, did you talk to Mr. X about this? No, I
25  didn't.

1           Your Honor, that is the contrast between the
2   lengths to which we have gone to answer their questions as
3   opposed to what we have gotten from SCO in return on the exact
4   same subject.
5           Now, with respect to this motion and the issues
6   before this motion, I began having conversations with
7   Mr. Normand a week ago today on the subject of this motion,
8   what was at issue on this motion, did we really need to have
9   this motion, because in our view we had produced all of this
10  information. I don't mean to disadvantage Mr. James because
11  he was not involved in those calls. But we started having
12  those conversations. And we had conversations precisely
13  because I needed to understand from him what was at issue.
14  Why are we appearing at this hearing on Friday? What's at
15  issue? Tell me what it is that you claim that we haven't
16  produced.
17          We had conversations every couple of days on this
18  subject, and every couple of days the answer was, I don't
19  know. The last time we spoke was yesterday morning. We had
20  the same conversation again. I asked Mr. Normand, why are we
21  appearing at this hearing? We walked through their reply
22  memorandum category by category by category. I
23  explained to Mr. Normand how we had responded, how we had
24  produced all the documents responsive to each category, how
25  Mr. Sandve in his deposition was prepared to give SCO whatever

1    additional information they may need with respect to all of
2    these categories.
3            And as of yesterday morning, Mr. Normand, and I
4    posed the question to him, what's missing? Why are we
5    appearing at this hearing tomorrow? What's missing? His
6    answer to me yesterday morning was, I don't know. I don't
7    know. I don't know what it is that we're going to go before
8    the Court tomorrow and ask Judge Wells to order. I don't
9    know.
10           Now, the second reason I started having these
11   conversations with Mr. Normand, Your Honor, was I was
12   concerned I was going to get sandbagged at this hearing, that
13   I was going to show up with no idea what it is that SCO was
14   complaining about and here for a hearing for the first time
15   that IBM has supposedly not produced. That was my other
16   reason for having these conversations.
17           So last night at 7 o'clock, I get an e-mail from
18   Mr. Normand and again an e-mail at 10 o'clock this morning.
19   And he identifies in this e-mail, Your Honor, these very four
20   items that Mr. James has just mentioned in his arguments.
21   This e-mail is the very first time, very first time we are
22   ever told that these items have not been produced, that these
23   items are missing from our production, that these items are
24   the subject of a motion to be heard the next day. And quite
25   frankly, Your Honor, there was no attempt by counsel for SCO,

57

1    and I fault him. I fault him, not Mr. James, there was no attempt
2    by him despite my repeated requests to meet and confer with me
3    about the claimed deficiencies in IBM's production.
4            THE COURT: Let me stop you for a minute and say
5    something, and that relates to the communication issues
6    between counsel. We have different counsel appearing at
7    different times. We have counsel located in different areas,
8    and that's for both parties. And I don't have a great deal of
9    patience with an excuse that is based upon lack of
10   communication between parties or counsel for either side. You
11   are expected to know what your other counsel is doing and
12   saying. And I think that's been a problem in the past. And
13   as I indicated, I don't have a great deal of patience with
14   counsel who come before the Court who may not be aware of what
15   other counsel have said or done.
16           MR. SHAUGHNESSY: And, Your Honor, I should tell
17   the Court, I have a very good working relationship with
18   Mr. Normand.
19           THE COURT: I'm not saying that.
20           MR. SHAUGHNESSY: A tremendous amount of respect
21   for him.
22           THE COURT: I'm just indicating --
23           MR. SHAUGHNESSY: Tremendous amount of respect for
24   these counsel.
25           THE COURT: -- that counsel for both sides are

58

1    expected to have communicated fully and be prepared to make
2    representations that are known to all.
3            MR. SHAUGHNESSY: Okay. I appreciate that, Your
4    Honor.
5            But my problem is that I have been trying for some
6    time to find out what it is that is supposed to be the subject
7    of this hearing so that we can intelligently address you. And
8    I said, you know, earlier in the week, I said, look, if there
9    are items that are not on the table, we need to let the Court
10   know so the Court doesn't spend time reading briefs and
11   looking at issues that aren't really ripe, that aren't really
12   before the Court. And, you know, I understand everybody in
13   this case, myself included, have been extraordinarily busy with
14   respect to not just these issues but any number of issues in
15   this case.
16           But the bottom line, Your Honor, is that we have
17   produced the documents that they have requested that are
18   sufficient to tell them all of the information they need with
19   respect to revenues, expenses and costs, the very thing that
20   is the heart of this motion today.
21           THE COURT: Now, you indicated earlier that you
22   produced documents in a timely fashion pursuant to their
23   request for documents. When were those produced? This
24   340,000 page submission that we're talking about, how long ago
25   was that produced?

59

1            MR. SHAUGHNESSY: I don't have the exact timing,
2    Your Honor. And I hope I was clear when I mentioned this
3    before. It is not my understanding, and I hope I didn't
4    represent to the Court, that each of those 340,000 pages were
5    documents that were produced in response to the set of
6    discovery requests that they had served 30 days earlier.
7            THE COURT: What I'm trying to find out is how much
8    time has SCO had to review the submissions that do not allow
9    them -- and, Mr. James, you answer this -- that doesn't allow
10   you to narrow the issues today? So he can answer that if you
11   don't know, Mr. Shaughnessy.
12           MR. SHAUGHNESSY: Okay. And all I can say on that
13   particular subject is that the document productions that were
14   going on in the month of January were document productions
15   that were responsive to, you know, document requests that they
16   had just served. We were also -- and they understood this
17   because we had a lot of discussions about it. We were
18   also supplementing our prior discovery, as we are required to
19   do. So we were in the process of supplementing our prior
20   discovery and producing that information to them. And in
21   addition, we produced to them these financial documents, this
22   financial information.
23           So the problem, Your Honor, is that I find out last
24   night at 7 o'clock for the first time about these four
25   databases that they contend should have been produced, which

60

2/24/2006 Motion Hearing February 24, 2006

1    I've never heard about before, which is not in a brief before
2    you, which we've not had an opportunity to address, for which
3    there's been no meet and confer. And the argument really is
4    ironic because I don't hear and have not heard SCO argue even
5    in the papers that they filed and in Mr. James' comments
6    today, I don't hear SCO arguing to you that, we don't have
7    information that we need to prove our claims. They don't
8    argue that in the brief that they filed about, you know, we
9    need this information. They don't say, we need this
10   information because we can't prove damages, or, you haven't
11   adequately told us what your revenues and expenses and profits
12   and all of those things are.
13        We certainly and clearly have done that, Your
14   Honor. We have given them that information in excruciating
15   detail in documents, in summaries, in indices, in witnesses,
16   in every way imaginable that I can think of. SCO is instead
17   arguing that they simply want more. They simply want more
18   documents. They want more databases. They want us to produce
19   documents from these databases.
20        I mean, Mr. James did not mention during his
21   argument this issue of transaction level data, which occupied
22   so much of their brief. I'm assuming based on his failure to
23   discuss that today that SCO is not asking us to produce
24   transaction level data. If that's not the case, Your Honor,
25   then we need to discuss that, because the reality is, as I

61

2/24/2006 Motion Hearing February 24, 2006

1    think my affidavit explains, and I won't go through it again,
2    but the reality is producing that transaction level data would
3    present a problem of enormous magnitude in this case. I
4    can't, Your Honor, even tell you how long that would take.
5        THE COURT: Well, I've noticed how long it took to
6    address it in the brief, so I think I understand on some level
7    the magnitude.
8        MR. SHAUGHNESSY: The magnitude is huge. Mr. James
9    has not addressed it, so I'm assuming that issue is off the
10   table.
11        The point, Your Honor, is we have given them the
12   information that they've asked for. We've given it to them.
13   We made it simple for them. We've given them witnesses to
14   help explain the information. And I am at a loss as to why
15   we're here this close to the end of the case with SCO saying,
16   we really haven't had enough time to look at it. We really
17   don't know what we want.
18        It would appear, Your Honor, that this motion to
19   compel was filed simply as a place over. They filed a motion
20   to compel. They included a whole bunch of broad categories,
21   and then they were going to decide at some point down the line
22   what it is that supposedly hadn't been produced.
23        And what I'm hearing today suggests to me that is
24   exactly what is going on. What they want to do is have this
25   motion to compel hanging out there as a place holder so that

62

2/24/2006 Motion Hearing February 24, 2006

1    they can come back to you at some point in time and ask you to
2    fish through, to order us to produce something so that they
3    can fish and get more information.
4        I think if you're going to bring a motion to
5    compel, you bring a motion to compel because you are able to
6    identify information that has not been produced. And you
7    respond to it, and the information is either produced or not
8    produced. I don't think you float a motion to compel out
9    there as a place over so that you can later on raise various
10   challenges to it.
11        I understood that Mr. James and SCO were abandoning
12   most of the other topics that were the subject of the motion
13   to compel. We talked about Project Monterey materials. We
14   have informed SCO that we have produced documents concerning
15   the process, procedures and guidelines for making a GA and
16   FRPQ release of a product, which is what they asked for.
17   That's what we produced to them. And SCO in its reply
18   memorandum concedes that with that representation, the motion
19   is over with respect to that issue. On that basis, I'm
20   assuming that issue is dead.
21        They asked about pre-2001 Linux marketing
22   materials. Mr. James briefly mentioned that. In our view,
23   Your Honor, documents before 2001 are totally irrelevant.
24   Documents after 2001 on this particular subject are
25   irrelevant. Nevertheless, we have conducted a reasonable

63

2/24/2006 Motion Hearing February 24, 2006

1    search for Linux marketing materials. We have produced
2    thousands of pages of materials, and we have produced
3    documents that predate 2001. And we know that SCO has them
4    because they have used them in depositions. They have marked
5    them as exhibits in depositions and asked witnesses questions
6    about them. So they have the information. In our view, that
7    is a dead issue.
8        Pre-1991 AIX source code. I want to make sure I
9    answer all of the Court's questions in this regard to the
10   extent I am able to do so.
11        THE COURT: And I'm basing that question on the
12   previous order which required IBM without limit to provide it.
13        MR. SHAUGHNESSY: They do, Your Honor. And without
14   getting into too much detail, if I can summarize for you what
15   we've done.
16        We have produced to SCO the CMVC database and the
17   equivalent RCF database, which is the database for the Dynix
18   operating system. That endeavor, as I think I have explained
19   in an affidavit I filed with the Court, involved 400 employees
20   and 4,000 hours of work. That database goes back to 1991.
21   The database does not go back further than that. That's when
22   the database begins. We have made an exceedingly reasonable
23   and thorough search for pre-1991 source code to see if it
24   exists anywhere.
25        SCO has asked for a 30(b)6 witness to testify on

64

1  this subject. She has had her deposition taken. SCO has been
2  able to ask her every question they could think of about
3  pre-1991 source code, where it could possibly be. We've made
4  an effort to look for it.
5       Your Honor, you need to understand that by the time
6  this lawsuit was filed in 2003, this source code had been
7  obsolete for more than a decade. This was not information
8  that IBM, and certainly SCO has never suggested that there is
9  any standard, any rule, any regulation, anything that required
10 IBM to keep decades of old obsolete material lying around
11 somewhere.
12      Now, I received a letter from Mr. Normand on this
13 subject. Mr. Normand told me, has IBM checked these data
14 recovery centers located in various parts of the country? In
15 response to that letter, we checked. We looked into these
16 data centers. These data centers don't really keep IBM data.
17 They tend to keep customer data, and they don't keep source
18 data, but we checked. We did what they asked. We went out
19 and looked.
20      THE COURT: Is that North Carolina?
21      MR. SHAUGHNESSY: No. The North Carolina is a
22 different issue.
23      But we checked these data recovery centers. We
24 told them what we found. We gave them a detailed explanation
25 of what these recovery centers are, why they don't have any

66

1  put on other computers before those mainframes were ever moved
2  to Raleigh, North Carolina. But even if it had been on those
3  mainframes when they were moved to Raleigh, North Carolina,
4  the actual disk drives, the disks that the material would have
5  been on would by now be basically obsolete and unusable. So
6  that even if they had been on them and they had been
7  transferred, there simply is no plausible reason to believe
8  that they would still be there.
9       Now, you know, can I stand here and tell you that
10 IBM has checked every single computer of every single employee
11 in every closet in every single IBM location in 160 countries
12 in the world, all 320,000 people? No, I can't. We haven't.
13 We're not required to do that. We have done more than what is
14 required to rule out the possibility that this pre-1991 source
15 code may be somewhere.
16      Does the Court have questions about that? Is there
17 anything I can help you with on that subject?
18      THE COURT: No. Thank you, Mr. Shaughnessy.
19      MR. SHAUGHNESSY: All I can say, Your Honor, is we
20 have tried very, very hard to make sure that we have followed
21 up on issues, issues we think are kind of crazy, but they
22 raised these issues. We followed them up. We give them the
23 information. We tell them what we found. And in this case,
24 we followed up. We have not been able to find something that
25 was 10 years obsolete before this lawsuit was ever even filed.

67

1  information, why we weren't able to find it.
2       And during the deposition of Ms. Thomas,
3  Joan Thomas, who was the witness on the issue of pre-1991
4  source code, she testified at length about all the work she
5  had done to try to find, all the people she talked to,
6  everyone she'd gone to, people who were involved in the
7  project, everyone she could think of that may have an idea of
8  where this information is, was unable to find anything.
9       There was a period of time when the AIX source code
10 was stored on a mainframe computer in Austin. And as I
11 recall, Your Honor, don't hold me to this that closely because
12 I wasn't actually at her deposition, but my recollection is
13 that during her deposition she testified that she was aware
14 that one of the mainframes or computers or some of the
15 mainframe computers that could possibly have at one time had
16 AIX source code on it had been moved from Austin to Raleigh,
17 North Carolina; the actual hardware, the iron had been moved
18 from Austin to Raleigh, North Carolina. She testified in her
19 deposition, I believe, that she had no idea whether the AIX
20 source code was on those machines at the time that they were
21 moved. She simply knew that those machines had been moved.
22      SCO raised this issue. Have you looked in
23 North Carolina? We have. We have attempted to determine, my
24 understanding, our best estimate -- our best understanding is
25 that the AIX source code was removed from those mainframes and

68

1  30(b)6 topics. As I understand Mr. James'
2  argument, the only 30(b)6 -- strike that. He is raising
3  issues with respect to 30(b)6 topics. Let me deal first with
4  this Chicago meeting that Mr. James references. He said a
5  whole bunch of things about the Chicago meeting. And again, I
6  apologize, because this is a conversation I had with
7  Mr. Normand to which Mr. James was not a party, yesterday.
8  Mr. Normand told me yesterday that if this July 7 meeting
9  about which IBM's witness testified was the only meeting that
10 occurred, then in his view, there was nothing further to
11 pursue, and this motion was a dead letter. That's what he
12 told me yesterday.
13      I've gone back. I've checked Ms. Smith's
14 deposition. I've got a copy of it here. She testified in her
15 deposition that this was the meeting, this was the only
16 meeting with this particular group of people on this
17 particular subject. So that the Court understands the context
18 here, SCO has somehow got in its mind that these people all
19 got together with the idea that they were going to meet and
20 talk about SCO.
21      What Ms. Smith testified to is, yeah, these people
22 got together. SCO never came up. No one ever mentioned SCO,
23 and they never got together again.
24      They've had a 30(b)6 witness testify on the
25 subject. They've asked her questions. Your Honor, when the

69

1    lawyer who was asking those questions, after she had gone
2    through everything that Karen Smith could possibly have
3    testified about with respect to this meeting including whether
4    there were follow-up meetings, she concluded by saying, that's
5    all the questions I have. She didn't say, as Mr. James says
6    now, look, I'm reserving my right to bring you back because I
7    think you've improperly interpreted the context, or, I think
8    you have not answered questions you should have answered.
9    None of those kinds of questions. She concluded her
10   examination at the deposition, and she said, that's it. I'm
11   done.
12          Mr. Normand told me yesterday that if there was not
13   a follow-up meeting to this July 7 meeting, this was not an
14   issue. This is a dead letter, it is over with. There was
15   nothing, Your Honor. There is nothing to talk about with
16   respect to this issue.
17          Finally, Your Honor, this issue of interpreting AIX
18   licenses and putting up 30(b)6 witnesses to talk about AIX
19   licenses. Now, just so that the Court is clear on this, what
20   SCO would like IBM to do is to put up a witness to talk about
21   IBM's AIX license agreements with companies other than SCO,
22   license agreements that don't have anything to do with the
23   claims -- license agreements that are not part of this case.
24   There's no claim in the case that relates to any of these
25   license agreements.

69

1          But the problem, Your Honor, is broader than that,
2    because they don't tell us what contracts they're talking
3    about. They don't identify for us, we want you to put up a
4    witness to talk about this contract with this date with this
5    company. I mean, we can't even begin -- I don't even know how
6    we could even begin to designate a witness to talk about a
7    contract that SCO hasn't even bothered to tell us what it is.
8    Beyond that, Your Honor, they haven't bothered to tell us what
9    provision in what contract they're interested in having
10   someone talk about.
11          It is impossible, Your Honor, for us to identify
12   and to prepare a witness to talk about something on such a
13   vague and morphous topic. Rule 30(b)6 requires a party to
14   describe with reasonable particularity what it is the witness
15   is required to testify to. They haven't done that. But more
16   importantly, Your Honor, this is not, the testimony that they
17   seek in this context is not a proper subject of Rule 30(b)6
18   testimony, and SCO has conceded that earlier in this case.
19          SCO propounded almost the same 30(b)6 topic on IBM
20   asking IBM to designate a witness to testify about the
21   contracts that are at issue in this case, not these unrelated
22   contracts, but actually the contracts that are at issue in
23   this case. We objected. We said, that's not an appropriate
24   30(b)6 topic. If you want to take the depositions of the
25   people who signed those contracts or negotiated those

70

1    contracts, you can do that. But you can't take a 30(b)6
2    deposition on the company's interpretation of a contract.
3          We raised the objection, and what did SCO do? They
4    abandoned the topic. They did not further pursue it. They
5    haven't further pursued it since that time.
6          Your Honor, I fail to understand how SCO could
7    possibly say that we should be required to put up a 30(b)6
8    witness to talk about contracts that are not at issue in this
9    case and that have nothing to do with this case when they have
10   not required us to put up a 30(b)6 witness to talk about the
11   contracts that are at issue in this case. It's not a subject
12   that's appropriate for 30(b)6 testimony.
13          Now, let me just look and make sure that I've
14   answered, I've answered your questions.
15          With respect to producing documents, I believe that
16   parties are required to produce documents before they rely on
17   them at summary judgment or at trial. That runs both ways.
18   Parties can't come up -- parties can't intentionally withhold
19   a document and then suddenly parade it up and say, here you
20   go. We win.
21          We have absolutely no intention of doing that. We
22   assume that SCO has no intention of doing that. They're bound
23   by the same standards.
24          The only other item that you mentioned, Judge, that
25   I want to make sure we address and Mr. James didn't, but you

71

1    talked about this list of customers who moved from Linux to
2    other operating systems. I don't know if that's an issue
3    still. Mr. James hasn't talked about it.
4          The short answer to that, Your Honor, is that IBM
5    does not systematically maintain that kind of information. We
6    don't systematically maintain information that says, okay,
7    this customer bought this particular product, And in doing
8    so, they move from something else. So we don't have the
9    ability to give them a list of these customers and the
10   products from which they moved.
11          So that's the short answer to that particular
12   issue. We've given them the information that we can. They've
13   identified customers who moved to Linux. They're welcome to
14   call those people. They're welcome to depose those people and
15   they can ask them. But we can't be asked to create something
16   we don't have the data to create.
17          Thank you, Your Honor.
18          THE COURT: Thank you, Mr. Shaughnessy.
19          Go ahead, Mr. James.
20          MR. JAMES: I'll be very brief, Your Honor. Let me
21   just hit on a couple things, if I could.
22          Counsel has indicated he doesn't know why we're
23   here, that it's-s unclear to him what's still at issue. And
24   that's something we have struggled with because, Your Honor,
25   we filed our motion. We outlined the areas that we think are

72

2/24/2006 Motion Hearing February 24, 2006

1  at issue. We tell you the document requests where we don't
2  think we've had documents produced. Soon thereafter, and my
3  understanding is the last week of January in answer to your
4  question about when the majority of these documents were
5  produced, we get 340,000 documents. And we're diligently
6  going through those.

7         And IBM tells us in their opposition memorandum,
8  Your Honor, we've now produced a lot of the documents, of
9  additional documents, and we anticipate producing even some
10  additional documents that we haven't seen yet. And as a
11  result, the great majority of the complaint that SCO has is
12  mooted.

13         And I've tried to be candid with Your Honor, and
14  I've indicated that may be the case. Many of the areas we
15  believe likely are mooted. The problem that we have is we
16  don't know yet if there are still some clear areas that aren't
17  mooted. And we think it is a bit unfair for IBM to come in
18  and say, hey, now we've produced all of these documents, and
19  it is a moot issue, and you ought to just deny their motion
20  across the board, because we're diligently looking through
21  those documents, and if there are areas where documents that
22  should have been produced and they haven't been, we want the
23  right to be able to address those issues with Your Honor, and
24  we anticipate doing so.

25         That's why I feel like I'm put at somewhat of a

73

2/24/2006 Motion Hearing February 24, 2006

1  disadvantage when they come in and say, Gees, they can't even
2  tell us now after all of these discussions over the last
3  couple weeks specifically what's still at issue --
4         THE COURT: Let me ask you this, though. You've
5  indicated four areas that you said they have not provided
6  discovery. But how do you know that if you haven't gone
7  through everything?
8         MR. JAMES: There are four areas we think they have
9  not produced based on --
10        THE COURT: You're not even sure of that?
11        MR. JAMES: We're not 100-percent certain, because
12  originally, Your Honor, when you do these huge document
13  reviews, you try to take an initial cut and get a sense of
14  what's there. But it is just a gross review of the documents.
15  And then you go from that. You do your detailed review, and
16  we're doing that. And as I indicated, my understanding is
17  we'll complete that in a couple more weeks. And that's why
18  it's very, very difficult for us to be able to still come in
19  and say in response to IBM's response, it's all moot, because
20  we produced all of this stuff now, for us to say, we agree or
21  disagree.
22        And we have pointed out several areas, Your Honor,
23  where we are concerned. Now, it's an interesting thing. And
24  I suppose maybe where I can hit the nail most closely on the
25  head, perhaps, is to just talk for a moment about a statement

74

2/24/2006 Motion Hearing February 24, 2006

1  that the Honorable Magistrate Boyce frequently used in
2  response to these type of arguments. And I heard it. It was
3  used on my behalf, and it was used against me by him on a
4  number of different occasions. And what he would say is,
5  unless the burden of producing the documents requested exceeds
6  the effort required to clean the -- and I'll slaughter the
7  word -- the Augean stables, you know the Hercules myth,
8  produce the documents.
9        THE COURT: He had a tendency for animal analogies.
10        MR. JAMES: He did.
11        And, Your Honor, what this is about is not what IBM
12  has done, and they stood up and told you everything they've
13  done and we could stand up and tell you everything we've done.
14  The issue is, are there relevant documents in this case within
15  IBM's possession and control that we've requested that they
16  haven't produced? That's what we're trying to get at.
17        There is no point that I'm aware of in discovery
18  where you say, well, we may have another 10,000 documents that
19  are relevant that we can produce to you reasonably. But
20  because we've already given you a whole bunch, we don't need
21  to give those to you. And, Your Honor, that is what I think
22  I'm hearing.
23        Your Honor asked the question, with respect to the
24  pre-1991 AIX versions. Can you submit or sign an affidavit
25  that says you've made your searches, and it doesn't exist as

75

2/24/2006 Motion Hearing February 24, 2006

1  far as you can tell?
2        You know what, if they'll just provide that
3  affidavit, we're happy. That's all -- all they can do is what
4  they can do. But telling you what they've done doesn't answer
5  the question about what they haven't done.
6        And on the Chicago 7 -- and, Your Honor, I'm
7  sensitive to Your Honor's comments about knowing what counsel
8  has discussed, and I apologize for not knowing exactly the
9  content of the conversation that apparently occurred
10  yesterday.
11        My understanding with respect to the Chicago 7
12  issue is, again, our request went to, we want to know what
13  discussions have occurred among that group relating to
14  Linux-related activities, AIX-related activities, SCO and a
15  couple other things.
16        THE COURT: But when you had the opportunity to
17  address that during the deposition, it apparently was not
18  addressed.
19        MR. JAMES: No. My understanding was different.
20  Maybe I misunderstood what Mr. Shaughnessy said. What I
21  understood him to say, and, in fact, what my understanding is
22  when it was attempted to be addressed during the deposition,
23  that line of questioning was cut off with an objection, we're
24  not going to allow the witness to answer those questions. And
25  then at the end of the deposition, the lawyer for SCO asking

76

1   the questions did not say, we want to come back and reserve
2   this and keep it open. And I view that as two very different
3   issues, Your Honor.
4         THE COURT: All right.
5         MR. JAMES: Let me lastly say, and then I'll sit
6   down, that the standard that governs obviously in this case is
7   Rule 26, and that is, do they have documents that are relevant
8   or may lead to the discovery of additional relevant documents?
9   We're concerned about some areas. But because of what I've
10  talked about at length before, I can't answer that question
11  entirely, other than the areas I've hit. And I don't know
12  what more I can say about that.
13        THE COURT: How can I order them to provide
14  something that they say they've already provided but you don't
15  know if they've provided?
16        MR. JAMES: Well, and that's the point, Your Honor.
17  Your Honor indicated at the start, and when I started, are we
18  going to be back here in some period of time to address
19  anything that's still out there? And my response was, in
20  fact, we probably should in light of the very late production
21  of documents that they provide.
22        THE COURT: Wasn't that, as Mr. Shaughnessy said,
23  didn't that comport with your timeline for request of those
24  documents?
25        MR. JAMES: No, Your Honor. And the reason I say

1   that is because if you look at our motion to compel and look
2   at the document request that are at issue, many of those
3   document requests date back to 2004. And they didn't produce
4   those documents until the last week of January in this case.
5   And then they come in and say, hey, we've now produced all of
6   these documents. It's moot. Accept our representation.
7        THE COURT: Let's address this issue that is of
8   some concern to me, and that is that your motion to compel is
9   dated December 29, before the due date of some of those
10  documents. How do you address Mr. Shaughnessy's argument that
11  this motion was intended as a place over?
12        MR. JAMES: Because my response is when you look at
13  the documents that we complain about in our motion to compel,
14  those documents or those requests, areas where we specified
15  our motion address document requests, not that we're served
16  two or three days later, but were served months and months and
17  maybe over -- well over a year before the motion to compel was
18  filed.
19        If Your Honor has any other questions, I'll do my
20  best to answer them.
21        THE COURT: I do not. What I would intend to do
22  now, Mr. Shaughnessy, unless you have something in particular
23  you want to address, is I'm going to take a recess and decide
24  how to address these issues. Do you have anything you want to
25  say?

1        MR. SHAUGHNESSY: That's fine, Your Honor.
2        THE COURT: All right. We'll be in recess for a
3   few moments. And let's see if Judge Kimball has gone home or
4   we need to go somewhere else.
5        (Recess.)
6        THE COURT: I'm going to rule now on the motion to
7   compel.
8        And I'm going to deny SCO's motion to compel at
9   this time. I'm going to deny that without prejudice. And I'm
10  going to allow you 30 days in which to file a renewed motion.
11  Should you file such a renewed motion, however, it must
12  clearly and narrowly define those areas which are not
13  addressed in the documents that you've been presented and
14  which cannot be resolved through some additional
15  meet-and-confer requirements. All right?
16        MR. SHAUGHNESSY: So then will the motion then be
17  limited to this production in January and the deficiencies --
18        THE COURT: Yes. Yes.
19        Are there any other questions that need to be posed
20  or should be posed and answers given, or is that clear?
21        MR. SHAUGHNESSY: I think that's clear. Would you
22  like me to prepare an order on that, as well?
23        THE COURT: Yes. Yes.
24        MR. JAMES: I'm sorry, Your Honor. If you don't
25  mind, I want to make sure that I'm absolutely clear because I

1   don't want to have any quarreling, I suppose, with opposing
2   counsel about issues that may come up as far as relating to
3   the January production. And that is, there are a number of
4   issues that we have already identified in our motion but that
5   I wasn't able to clearly articulate whether they're satisfied
6   or not because I haven't been able to -- you know, we haven't
7   completed our review. We'll be able to raise those issues,
8   won't we, if we can narrowly address them?
9        THE COURT: Yes.
10        MR. JAMES: Okay. Thank you.
11        THE COURT: Is that understood?
12        MR. SHAUGHNESSY: So then it's whatever items that
13  are in the motion, the currently pending motion, if any?
14        THE COURT: Yes.
15        MR. SHAUGHNESSY: And then deficiencies in the
16  January production?
17        MR. JAMES: That's my understanding.
18        THE COURT: Yes. And that's what I intended.
19        MR. SHAUGHNESSY: And I expect the Court would
20  require the parties to meet and confer, obviously before that
21  motion is filed.
22        THE COURT: Yes. I'm going to require that.
23        All right. Is there anything further we need to
24  address this afternoon?
25        Thank you, counsel. We'll be in recess.

2/24/2006 Motion Hearing February 24, 2006

1          MR. JAMES: Thank you, Your Honor.

2          MR. SHAUGHNESSY: Thank you, Your Honor.

3          (Whereupon, the court proceedings were concluded.)

4                    *          *          *          *

81

2/24/2006  Motion Hearing February 24, 2006

1     STATE OF UTAH          )

2                            ) ss>

3     COUNTY OF SALT LAKE ) )

4               I, KELLY BROWN RICKEN, do hereby certify that I am

5     a certified court reporter for the State of Utah;

6               That as such reporter, I attended the hearing of

7     the foregoing matter on March 7, 2005, and thereat reported in

8     Stenotype all of the testimony and proceedings had, and caused

9     said notes to be transcribed into typewriting; and the

10    foregoing pages number from 1 through 42 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this    17th day

15    of March 2006.

16                    KELLY BROWN RICKEN, CSR, RPR, RMR

82

**EXHIBIT 16**

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Nathan E. Wheatley (9454)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | |
| Plaintiff/Counterclaim-Defendant, | **STIPULATION RE DISCOVERY** |
| v. | Civil No.: 2:03CV-0294 DAK |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Honorable Dale A. Kimball |
| Defendant/Counterclaim-Plaintiff. | Magistrate Judge Brooke C. Wells |

The parties, by and through their counsel of record, hereby stipulate and agree as follows:

1.       The Court's Scheduling Order, dated July 1, 2005, shall remain in force and effect, except that certain deadlines shall be modified as follows:

| | |
|---|---|
| Initial Expert Reports | May 12, 2006 |
| Opposing Expert Reports | June 9, 2006 |
| Rebuttal Expert Reports | July 7, 2006 |
| Dispositive Motions | August 4, 2006 |

2.       All fact discovery is closed as of March 17, 2006, except that the depositions, as noticed, of (a) Messrs. Messman, Wilson, Lemon, Prosser, MacKay, Negris, Young, Spencer, and Bawa; (b) the Rule 30(b)(6) depositions described below, and (c) the depositions of Sun, Microsoft, HP, and Baystar/Goldfarb to the extent of subpoenas already served on those parties, shall not be precluded based on the close of fact discovery.

3.       IBM shall produce Mr. Sandve for two additional hours of Rule 30(b)(6) deposition testimony pursuant to Topics 6, 7 and 12 of SCO's Notice of December 23, 2005; subject to the reservation of objections set forth therein, SCO shall produce 30(b)(6) witnesses as described in Ted Normand's email to Todd Shaughnessy dated March 9, 2006; and IBM will make a reasonable effort to produce that discovery set forth in the first paragraph of Ted Normand's email to Todd Shaughnessy dated March 17, 2006, if it can do so without undue burden.

4.       The parties have reviewed one another's document productions, met and conferred, and agree that, except as stated below, there are no discovery disputes between them, subject to the following representations.

-2-

a.     IBM represents that it has taken reasonable steps to supplement its document production, except that IBM will undertake a reasonable search for additional documents from the files of the individuals identified in Ted Normand's letter of February 23, 2006, to Todd Shaughnessy;

b.     SCO represents that it has taken reasonable steps to supplement its document production, except that SCO will undertake a reasonable search, after consultation with IBM concerning some of those requests, for those categories of documents in Ted Normand's March 10, 2006, letter to Todd Shaughnessy as to which SCO has not concluded a reasonable search;

c.     The parties agree that relevant documents produced by any party in the SCO v. Novell litigation shall be provided to counsel for the parties in this case.

5.     The parties shall not pursue motions to compel against one another, including the motion to compel allowed by the Court at the February 24, 2006, hearing, except as follows:

a.     If the parties are unable to resolve their differences, SCO may pursue a motion to compel against IBM regarding Topics 9 and 10 of SCO's Notice of Deposition dated November 11, 2005.

b.     If the parties are unable to resolve their differences, IBM may pursue a motion to compel against SCO regarding issues identified in Ted Normand's letter of March 10, 2006, to Todd Shaughnessy as to which SCO has not yet concluded a reasonable search for responsive documents; Topics 5 and 18 of IBM's March 19, 2005, Rule 30(b)(6) deposition notice; and Topic 23 of IBM's February 14, 2006, Rule 30(b)(6) deposition notice.

382594.1

-3-

    c.      If the parties are unable to resolve their differences, either party may pursue a motion to compel with respect to the fact and Rule 30(b)(6) depositions that have not yet occurred identified in paragraphs 2 and 3 above.  With respect to the deposition of Bill Sandve referred to in paragraph 3 above, any such motion shall be limited to objections or instructions made at the time of that deposition.

    d.      The parties reserve the right to bring motions to compel regarding the sufficiency of their respective privilege logs and/or documents claimed as privileged, or other privilege issues.

    6.      The parties shall exchange responses to one another's Requests For Admission on or before May 1, 2006; all existing deadlines to respond to Requests for Admissions shall be extended to May 1, 2006.

**DATED this 17th day of March, 2006.**

Snell & Wilmer L.L.P.

/s/ Nathan E. Wheatley
Alan L. Sullivan
Todd M. Shaughnessy
Nathan Wheatley

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

DATED this 17th day of March, 2006.

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER, LLP
Stuart H. Singer

By   /s/ Stuart H.Singer
        *Counsel for Plaintiff*
(*e-filed with authorization of counsel*)

-5-

383594.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of March, 2006, a true and correct copy of the

foregoing was sent by email to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, UT 84101
bhatch@hjdlaw.com
mjames@hjdlaw.com

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, FL 33131
szack@bsfllp.com
mheise@bsfllp.com

and by U.S. Mail, postage prepaid, on March 20, 2006 to:

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

/s/ Nathan E. Wheatley

-6-

**Exhibit 17 Filed Under Seal Pursuant to Protective Order**

**Exhibit 18 Filed Under Seal Pursuant to Protective Order**

**EXHIBIT 19**

RECEIVED CLERK

2005 MAR 25  P 5: 30

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple
Gateway Tower West
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **MEMORANDUM ATTACHING AND IN SUPPORT OF IBM'S PROPOSED SCHEDULING ORDER** <br><br> **(ORAL ARGUMENT REQUESTED)** <br><br> Civil No. 2:03CV-0294 DAK <br><br> Honorable Dale A. Kimball <br><br> Magistrate Judge Brooke C. Wells |

Pursuant to the Court's January 18, 2005 Order, defendant/counterclaim-plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum attaching and in support of its proposed scheduling order.

### Preliminary Statement

In its January 18 Order, the Court directed the parties to meet and confer and to submit a proposed scheduling order on or before March 25, 2005. The parties met and conferred and reached agreement on elements of a proposed schedule.[1] Because the parties have been unable to agree in all respects, however, they are submitting competing scheduling proposals. We respectfully submit that the Court should enter IBM's proposed scheduling order, attached as Exhibit A, as the final scheduling order in the case.[2]

SCO objects to only one substantive feature of IBM's proposal: that the Court set deadlines for both parties to disclose the particulars of their claims (first by an interim deadline and then by a final deadline) before the close of all fact discovery. IBM proposes that the parties disclose the precise contours of their claims at a time when they will be able to take discovery with respect to those claims and properly prepare them for trial. SCO, by contrast, insists on a

---

[1] During several lengthy phone conversations, local counsel for IBM and local counsel for SCO discussed each of the scheduling deadlines, making clear they would need to confer with their respective co-counsel before finally agreeing. Local counsel reached a tentative agreement on everything other than the four issues addressed in this memorandum. Local counsel for IBM then contacted counsel for SCO and informed him that these tentative deadlines were acceptable to IBM. This afternoon, counsel for SCO informed us that SCO would not agree to these tentative deadlines. The proposed scheduling order submitted herewith includes the tentative deadlines, and though we do not know what SCO finds objectionable about them, they represent a compromise and we respectfully submit they are reasonable.

[2] In the event the Court were to deny IBM's motion for reconsideration of the January 18 Order and require IBM to provide discovery from the files of thousands of individuals or to grant SCO's motion to amend its complaint yet again and allow SCO to expand the case, IBM's proposed schedule would obviously have to be modified. In such circumstances, the proposed deadlines would need to be extended.

2

schedule that would allow it to keep IBM in the dark about its claims and deny IBM the right to prepare its defenses to those claims.  SCO's proposal, if accepted, would result in further unnecessary disputes and delay.

IBM objects to three of the provisions SCO seeks to include in the scheduling order. SCO seeks to include provisions that would (1) foreclose IBM's motion for reconsideration without substantive review by the Court; (2) re-open the pleadings more than one year after expiration of the deadline for amending pleadings; and (3) require the parties and the Court to participate in monthly status conferences — on no particular subject — that would merely invite unnecessary disputes.  There is no need for the provisions SCO proposes.  In fact, they would operate merely to short circuit existing orders and procedures that are already in place.  SCO's proposed provisions should not be included in the scheduling order.

<u>**Argument**</u>

**I.   <u>THE COURT SHOULD ENTER A SCHEDULING ORDER IMPOSING A DEADLINE FOR THE PARTIES TO IDENTIFY ALLEGEDLY MISUSED MATERIAL.</u>**

From the beginning of this litigation, IBM has endeavored to learn the specific identity of the material (including source code, methods, concepts and so on) that IBM is alleged to have misused.  To that end, IBM has met and conferred with SCO and filed two motions to compel, resulting in discovery orders requiring SCO to disclose its alleged evidence.  Yet, as the Court recognized in its February 9 Order, SCO has failed to adduce any evidence that IBM has infringed SCO's alleged copyrights.  (See 2/9/05 Memorandum Decision and Order at 10 ("it is astonishing that SCO has not offered any competent evidence to create a disputed fact regarding whether IBM has infringed SCO's alleged copyrights through IBM's Linux activities").)  That is so despite SCO's repeated public statements that it has mountains of evidence of IBM's alleged misconduct.  (Id. at 8-9 (listing certain of SCO's public statements about its alleged evidence).)

3

As a result, IBM has long been concerned that, absent a final, court-imposed deadline for the parties specifically to identify the materials they contend one another misused (the "Allegedly Misused Material"), SCO will not disclose the identity of the Allegedly Misused Material until it is too late for IBM to prepare a defense with respect to that material. SCO reinforced our concern by refusing to agree to a schedule that would require either an interim or a final disclosure of the Allegedly Misused Material. Although the parties met and conferred regarding their respective proposals, SCO did not offer a reason for its objection to IBM's proposal. There is not, we submit, any good reason for not imposing firm deadlines, in advance of the close of all fact discovery, for the parties to disclose the Allegedly Misused Material.[3]

If and when SCO properly identifies the Allegedly Misused Material, IBM will obviously need to take discovery with respect to that material. For example, if SCO were to identify Linux code that it contends is derived from AIX, Dynix, or UNIX System V and was improperly contributed to Linux, then IBM would need to take discovery to determine the facts relating to the code in question, including but not limited to (i) who wrote the code, when, how, and why, (ii) whether and to what extent it is in the public domain and (iii) whether and to what extent it is protectable by contract or copyright. Unless the Court imposes a deadline by which the parties must identify the Allegedly Misused Material, then they may not learn the identity of the material they are alleged to have misused until after the close of fact discovery and potentially even expert discovery when it would be too late to prepare a defense to claims relating to the material.

---

[3] IBM's proposal imposes a reciprocal disclosure obligation. We are not suggesting that the Court impose on SCO an obligation that would not also be imposed on IBM. The reason SCO is uninterested in IBM being required to disclose the material it alleges SCO has misused is that IBM has already done so with great particularity.

Under IBM's proposal, the parties would be required specifically to identify the Allegedly Misused Material on a staged basis before the close of all discovery.[4]  Specifically, IBM proposes an interim deadline of June 11, 2005, by which the parties would identify the Allegedly Misused Material known to them as of that date, and a final deadline of August 11, 2005, by which the parties would identify any and all material that the other party is alleged to have misused.  All fact discovery would close on August 11, 2005, except as to defenses to claims relating to the Allegedly Misused Material.  The only fact discovery that would be permitted thereafter would be fact discovery relating to defenses to claims relating to the Allegedly Misused Material.  No party could contend that another party misused material not identified by the August 11 deadline; no expert could opine as to the misuse of material not identified by the deadline.

Imposing an interim deadline, as IBM's proposal does, allows the parties to undertake discovery relating the Allegedly Misused Material as soon as possible, without having to wait until the final deadline for disclosing Allegedly Misused Material.  There is no reason to defer discovery relating to the parties' defenses, which cannot reasonably be undertaken until the Allegedly Misused Material has been identified, any longer than necessary.  Imposing a final deadline, before the close of all fact discovery, for the parties to disclose all of the Allegedly

---

[4]  For this purpose, the Allegedly Misused Material must be identified by version, file and line of code.  For example, to the extent a party contends the other party has infringed its copyrights, the accusing party must identify and match up the allegedly infringing and allegedly infringed material by version, file and line of code.  To the extent a party contends that the other party has breached its contractual obligations by contributing code to Linux, the accusing party must identify the material alleged to have been contributed improperly by version, file and line of code, and to the extent the allegedly contributed material is not Unix System V code, but is any sense alleged to have been based on or resulted from Unix System V code, the version, file and line of Unix System V code from which the allegedly contributed material is alleged to derive or result.

Misused Material, ensures that the parties learn what each other's case is about at a time when they can take fact discovery necessary to prepare a defense. If the Court does not impose a real deadline by which the parties must disclose the Allegedly Misused Material and then allow discovery with respect to the material disclosed, then IBM will remain in the dark as to the particulars of SCO's claims and be denied the opportunity to take discovery regarding the material that IBM is alleged to have misused.

Moreover, requiring the parties to disclose the Allegedly Misused Material before the close of all fact discovery will allow the parties to engage in meaningful expert discovery and refine the issues in dispute for summary adjudication. The parties may or may not require the assistance of experts to identify the material they contend one another misused. If they do, then their experts can assist them in making their disclosures. Expert discovery is not the time, however, for identifying the Allegedly Misused Material. It should be done in advance of expert reports so that the parties' experts can focus on what is really in dispute. It would make no sense, and would plainly be unfair, to allow either party to identify the Allegedly Misused Material for the first time by way of the report of one of its experts.

In sum, the Court should set deadlines for both parties to disclose the particulars of their claims (first by an interim deadline and then by a final deadline) before the close of all fact discovery. It is difficult to imagine how such a requirement could prejudice SCO, particularly since SCO has been ordered (twice) to provide this information to IBM.

## II.   THE PROVISIONS SCO SEEKS TO INSERT INTO THE SCHEDULE ARE EITHER UNNECESSARY OR INAPPROPRIATE.

As stated, SCO's proposal includes three provisions not included in IBM's proposal. Those provisions seek to (1) deny IBM the relief sought by its motion for reconsideration of the Court's January 18 Order; (2) re-open the pleadings more than one year after the expiration of

6

the deadline for amending pleadings; and (3) require monthly status conferences — on no particular subject — that would merely encourage unnecessary disputes. None of these provisions is either necessary or appropriate.

First, SCO includes in its proposal a provision requiring IBM to complete on or before May 3, 2005 production of the discovery ordered by the Court on January 18, 2005. There is already an order in place requiring IBM to complete that production (insofar as it is not the subject of IBM's motion for reconsideration) by May 3, 2005. (See 3/17/05 Order Re IBM's Motion for 45-Day Extension to Comply with 1/18/05 Order.) There is therefore no reason for the scheduling order to address the issue as well. SCO failed to offer any reason for this redundant provision during the parties' meet-and-confer; we assume, however, that SCO seeks this provision solely to secure an order requiring IBM to produce the discovery at issue in IBM's motion for reconsideration. The Court already has addressed that issue as well, however. In its March 17, 2005, order, the Court expressly ruled that "IBM shall not be required to produce [the discovery at issue on its motion for reconsideration] until the Court has ruled on that motion". (Id.) Accordingly, there is no reason for the scheduling order to include a provision requiring IBM to complete production of the discovery required by the January 18 Order on or before May 3, 2005.

Second, SCO seizes upon the Court's request that the parties submit a new scheduling order as an opportunity to reopen the pleadings. The deadline for amending the pleadings passed more than one year ago, without any request by SCO to extend it. Yet SCO proposes that the parties be allowed until June 17, 2005, to submit new pleadings. In an Order dated June 10, 2004, the Court ruled that it would not change the scheduling order in the case "absent extremely compelling circumstances". There is no reason — and certainly there are not extremely compelling circumstances — for the Court to reopen the deadline for amending the pleadings.

7

That is especially so since SCO clearly seeks this adjustment solely as a means to gain an advantage in connection with its pending — and untimely — motion for leave to file an amended complaint.[5] At this stage, the case should be getting smaller, not bigger.

Third, SCO seeks to require the Court and the parties to participate in monthly status conferences. During the parties' meet-and-confer, SCO offered no valid reason for including such a requirement. IBM is willing to participate in status conferences if the Court believes they are necessary, but we respectfully submit there is no reason for monthly status conferences. If SCO wishes to bring an issue to the Court's attention, it can do so by filing an appropriate motion after satisfying its obligation to meet and confer with IBM. Requiring the parties to participate in monthly status conferences would merely invite unnecessary disputes. Indeed, we believe, respectfully, that a monthly status conference would multiply not decrease discovery issues — inviting the parties to raise issues with the Court without first properly propounding discovery requests, conferring in good faith regarding disagreements, and submitting appropriate briefing.

---

[5] As is explained in IBM's opposition to SCO's motion to amend, if SCO wishes to bring the claim it seeks to assert against IBM, then it can seek to assert the claim in the Court in which it is contractually bound to proceed (a New York court).

## Conclusion

For the foregoing reasons, IBM respectfully requests that the Court enter IBM's proposed schedule as the final scheduling order in the case.

DATED this 25th day of March, 2005.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

Of counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

9

## CERTIFICATE OF SERVICE

I hereby certify that on the 25 day of March, 2005, a true and correct copy of the foregoing was served by U.S. Mail, postage prepaid, on the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
Sean Eskovitz
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

Amy F. Sorenson

SLC042960

10



RECEIVED CLERK
MAR 2 4 2003
U.S. DISTRICT COURT

Brent O. Hatch (5715)
Mark F. James (5295)
Mark H. Richards (9018)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>    Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff. | **SCO'S PROPOSED AMENDED<br>SCHEDULING ORDER**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

Pursuant to this Court's Order dated January 18, 2005 (the "Order"), Plaintiff The SCO

Group, Inc. ("SCO") respectfully submits the following proposed schedule in connection with

the above-referenced matter[1]:

| EVENT | DEADLINE |
|---|---|
| IBM's complete production of discovery pursuant to the Order[2] | May 3, 2005 |
| Amendments to Pleadings | June 17, 2005 |
| Fact Discovery Closes | October 28, 2005 |
| Monthly Discovery Status Conference | First Monday of each month beginning June 6, 2005; July 5, 2005; August 1, 2005; September 6, 2005; and October 3, 2005 |
| Initial Expert Reports | November 11, 2005 |
| Opposing Expert Reports | December 9, 2005 |
| Rebuttal Expert Reports | January 6, 2006 |
| Expert Discovery Closes | February 24, 2006 |
| Dispositive Motions | March 6, 2006 |
| Oppositions to Dispositive Motions | April 7, 2006 |
| Reply Briefs on Dispositive Motions | April 28, 2006 |
| Rule 26(a)(3) Disclosures and Exchange of Proposed Jury Instructions | June 2, 2006 |
| Attorney Conference | June 5, 2006 |
| Filing of Agreed and Disputed Jury Instructions | June 23, 2006 |
| Final Pretrial Conference | June 26, 2006 |
| 6-week jury trial | As soon after June 26, 2006 as the Court's schedule permits |

SCO intends to submit a brief memorandum in support of its proposed schedule (and to

address IBM's proposed schedule) by no later than April 1, 2005.

---

[1] The parties did meet and confer in an attempt to resolve their differences with respect to the scheduling matters herein, but were unable to reach agreement on a significant number of issues.
[2] All of the dates proposed herein are predicated on IBM's full compliance with its discovery obligations, including those imposed by the Order.

2

Respectfully submitted,

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James
Mark H. Richards

BOIES, SCHILLER & FLEXNER LLP
Robert Silver
Stuart H. Singer
Stephen N. Zack
Edward Normand
Sean Eskovitz

By

*Counsel for The SCO Group, Inc.*

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of foregoing to be mailed by U.S. Mail, first class postage paid, and emailed on this 25th day of March, 2005, to the following:

Alan L. Sullivan, Esq.
Todd M. Shaughnessy, Esq.
Snell & Wilmer L.L.P.
15 West South Temple, Ste. 1200
Gateway Tower West
Salt Lake City, Utah 84101
Email: tshaughnessy@swlaw.com

and mailed by U.S. Mail. First class postage prepaid, to:

Evan R. Chesler, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York. New York 10019

Donald J. Rosenberg, Esq.
1133 Westchester Avenue
White Plains, New York 10604