2006 WL 1072008                                                         Page 6

--- F.R.D. ---, 2006 WL 1072008 (S.D.N.Y.)

**(Cite as: 2006 WL 1072008 (S.D.N.Y.))**

[information] that could bear on, any issue that is or may be in the case.' " *Sherwin-Williams Co. v. Spitzer,* No. 04 CV 185, 2005 WL 2128938, at *11 (N.D.N.Y. Aug. 24, 2005) (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)); *see Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Discovery is not limited to the issues raised in the pleadings. *Oppenheimer Fund,* 437 U.S. at 351, 98 S.Ct. 2380. Indeed many factual issues may arise during discovery that may not necessarily be related to the merits of the case. *Id.* "Discovery itself is designed to help define and clarify the issues." *Id.* However, discovery is not unlimited. "Discovery of matter not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1)." *Id.* at 351-52, 98 S.Ct. 2380.

*5 The underlying facts of this case are akin to the facts in *Nairobi Holding Ltd. v. Brown Bros. Harriman & Co.,* No. 02 Civ. 1230, 2005 WL 742617 (S.D.N.Y. Mar. 18, 2005). In that case, as in the case before this Court, plaintiffs were asserting 10b-5 claims which require a showing of scienter. *Id.* at *3. The court recognized that "[i]mplicit in this element is the need to show what the defendants knew at the time of the alleged misrepresentations." *Id.* It was therefore necessary to allow a broad time-frame for discovery purposes to determine if and when the defendants learned certain facts. *Id.* ("a time-frame for discovering defendants' knowledge of facts at issue must be sufficiently broad to reveal evidence of the facts as well as evidence of where defendants learned those facts").

Plaintiffs' remaining claims against the individual defendants are for violations of sections 11 and 12(a)(2) of the Securities Act of 1933. Specifically, plaintiffs allege that certain disclosures in Flag's Prospectus were false or misleading in order to increase pre-sales on a cable operating system the company was constructing. The initial contract for the cable operating system, which underlies plaintiffs' Complaint, was entered into in January of 1999. The time-frame for document production should therefore include the period from January 1,

1998 through December 31, 1998 to permit the discovery of any relevant evidence with respect to the individual defendants' knowledge of Flag's financial position. Plaintiffs other discovery requests are for documents related to the solvency and bankruptcy of FTHL and documents concerning the valuation of FTHL assets and liabilities and the actual or potential market prices of FTHL securities. In light of plaintiffs' allegations, these documents would clearly fall under the broad definition of "relevance" in Rule 26. Therefore, plaintiffs are entitled to discover the documents.

**V. *Completion of Initial Production by Date Certain***

Finally, plaintiffs request that the individual defendants complete their production of documents responsive to this motion within 90 days of the entry of this Court's Order. Individual defendants have indicated that they anticipated completion of discovery "within the next few weeks." (Defs. Mem. Opp. Mot. Compel at 23.) However, individual defendants note that there are "practical difficulties" that may arise as a result of this Order as FTGL is a large, foreign conglomerate and McCormack resigned from his current position with FTGL effective March 31, 2006. However, there have already been extensive delays in document production. At this stage in the litigation, with this action pending since 2002, the individual defendants have already had ample opportunity to determine which documents are responsive to the Request. In light of these considerations, we direct that the completion of the production of documents pursuant to this Order shall take place within 120 days from the entry of this Court's Order.

**CONCLUSION**

*6 For all of the foregoing reasons, the motion of plaintiffs Peter Loftin, Norman H. Hunter and Joseph Coughlin to compel discovery is granted. We direct that the completion of the production of documents pursuant to this Order shall take place within 120 days from the entry of this Court's Order.

SO ORDERED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1072008                                                                                                   Page 7

--- F.R.D. ----, 2006 WL 1072008 (S.D.N.Y.)

(Cite as: 2006 WL 1072008 (S.D.N.Y.))

FN1. FTHL became a nonparty following this Court's dismissal of them with prejudice by Opinion and Order dated January 12, 2005. *See In re Flag Telecom,* 352 F.Supp.2d 429. FTHL was created in 1999 and organized under the laws of Bermuda to serve as the holding company for several entities originally established by Verizon Communications, Inc. and other investors that operated in the international telecommunications market. *See Rahl v. Bande,* 316 B.R. 127, 129 (S.D.N.Y.2004) (Conner, J.) (related bankruptcy proceeding). After filing for Chapter 11 bankruptcy, FTHL was reorganized as FTGL effective October 9, 2002. *See id.* at 130. "In or about January 2004, FTGL was acquired by Reliance Gateway Net Limited, which is part of the Reliance Group of Companies, one of India's largest private sector enterprises." (McCormack Decl. ¶ 6.)

FN2. Plaintiffs caused a subpoena *duces tecum* to be issued against FTHL on May 3, 2005. (Friedman Decl., Ex. C.) Shearman & Sterling objected to the FTHL subpoena by letter dated May 19, 2005. ( *Id.,* Ex. D.) Specifically, the letter notes that "FTHL objects to the definitions of the terms 'FTHL,' the 'Company,' 'you,' and 'your' ..., and further objects to the instructions, to the extent that they purport to include parties other than FTHL (and are therefore overbroad and burdensome)." ( *Id.*) The letter further states that "[s]ubject to foregoing objections, FTHL has no documents responsive to the Subpoena." ( *Id.*)

FN3. As an initial matter, the subpoena is not at issue. Regardless, "the scope of discovery and the meaning of 'control' " under Rule 45 and Rule 34 are interpreted identically. *Dietrich v. Bauer,* No. 95 Civ. 7051, 2000 WL 1171132 at *2 n. 2 (S.D.N.Y. Aug. 16, 2000).

FN4. The individual defendants rely on this language from the Employee Handbook:
All documents, papers and property which contain confidential material or relate in any way to FLAG, its business (including prospective business) or affairs or of any of its customers, suppliers, agents, distributors or subcontractors, remains the property of FLAG whether it is prepared by you, or at your request, or acquire it in the course of your employment.
You are not permitted to take any papers or documents belonging to FLAG home with you when you leave at the end of the day except where this is necessary for the proper performance of your duties. Any unauthorised conduct in this respect which causes loss or damage to FLAG or to any customer will be regarded as serious misconduct for which you may be summarily dismissed should the circumstances warrant it.
(McCormack Decl., Ex. B; Defs. Mem. Opp. Mot. Compel at 12-15.)

FN5. Although McCormack has already resigned from his position at FTGL, noncompliance with the Employment Agreement may be regarded as "gross misconduct" which could affect the potential for a consultancy agreement with FTGL or severance benefits to which he may be entitled. (Defs. Mem. Opp. Mot. Compel at 14, n. 9.)

FN6. In *Dietrich,* the District Court was addressing defendants' argument that the Hague Convention must be followed despite their failure to identify considerations of comity and "instead simply asserting in a conclusory fashion that international discovery procedures are 'appropriate.' " 2000 WL 1171132, at *5. The court held "[t]here is no basis for concluding that [plaintiff] is required to pursue those avenues before resorting to the Federal Rules." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1072008                                                    Page 8

--- F.R.D. ----, 2006 WL 1072008 (S.D.N.Y.)

(Cite as: 2006 WL 1072008 (S.D.N.Y.))

> FN7. Throughout the Request, the "Relevant Time Period" for document production is from January 1, 1998 through the date of production. (Friedman Decl., Ex. B at 7.) Defendants apparently objected to producing documents prior to January 1, 1999.

--- F.R.D. ----, 2006 WL 1072008 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 7:02cv03400 (Docket) (May 1, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

*156 Fed.Appx. 96*                                Page 1

156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))
**(Cite as: 156 Fed.Appx. 96)**

**C**
Briefs and Other Related Documents
This case was not selected for publication in the
Federal Reporter.Please use FIND to look at the
applicable circuit court rule before citing this
opinion. Tenth Circuit Rule 36.3. (FIND CTA10
Rule 36.3.)
United States Court of Appeals,Tenth Circuit.
KERN RIVER GAS TRANSMISSION
COMPANY, a Texas general partnership,
Plaintiff-Appellee,
v.
6.17 ACRES OF LAND, MORE OR LESS, IN
SALT LAKE COUNTY, UTAH, Known as Kern
River Tracts 186.01W, 186.06W, 186.07W and
187AW; NU Team, a Utah corporation; Founders
Title, a Utah corporation and trustee named in a
trust deed of record; Caroline Stayman Edler, a
beneficiary named in a trust deed of record; Monte
C. Nelson, beneficiary, by assignment, of a trust
deed of record, trustee of the Monte Cannon Nelson
Trust; David M. Nelson, beneficiary, by
assignment, of a trust deed of record; Meridian
Title, a Utah corporation and trustee named in five
trust deeds of record; City Properties, a Utah
limited liability company and beneficiary named in
a trust deed of record; Gaius Crosby and Susan
Crosby Charitable Unitrust, a beneficiary named
under a single trust deed of record; Kenbar Family
Partnership Larsen, a beneficiary named under a
single trust deed of record; W. Bart Christenson, a
beneficiary named under a single trust deed of
record; Barbara Christenson, a beneficiary named
under a single trust deed of record; Katheryn
Hoopes Paxman, a beneficiary named under a single
trust deed of record; Oak Leaf Investments, a Utah
limited liability company and a Beneficiary by
assignment of a trust deed of record; Steffenson
Law Office; Brian W. Steffenson; C.A.T., LLC, a
Utah limited liability corporation; JMS Financial, a
Utah limited liability corporation; JS West
Associates, a Utah corporation; Watson Family, a
Utah limited liability corporation;
Wyoming-California Pipeline Company, a Colorado

general partnership and holder of an easement of
record, Defendants,
andJMS-Meadow, a Utah limited liability company,
Defendant-Appellant.
No. 04-4033.

Dec. 2, 2005.

**Background:** Gas utility brought action under the
Natural Gas Act against numerous property owners,
seeking to condemn certain property for an
interstate natural gas pipeline. The United States
District Court for the District of Utah excluded a
property owner from presenting expert testimony,
expert's report, or other documents at bench trial
and refusing to reopen trial to take additional
testimony. Property owner appealed.

**Holdings:** The Court of Appeals, Ebel, Circuit
Judge, held that:

1(1) District Court was within its discretion in
sanctioning property owner for failing to voluntarily
produce documents;

2(2) District Court did not abuse its discretion in
refusing to permit property owner to present expert
evidence at bench trial; and

3(3) District Court was within its discretion in
denying property owner's motion seeking relief for
fraud upon the court.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A ☞1636.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 96

156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))
(Cite as: 156 Fed.Appx. 96)

170AX(E) Discovery and Production of Documents and Other Tangible Things
    170AX(E)5 Compliance; Failure to Comply
        170Ak1636 Failure to Comply; Sanctions
            170Ak1636.1 k. In General. Most Cited Cases
District Court was within its discretion in sanctioning property owner for failing to voluntarily produce documents in gas utility's action to condemn certain property for an interstate natural gas pipeline, although rule requiring a party to provide initial disclosures "without awaiting a discovery request" did not require property owner to produce documents sought, where utility made informal requests for the documents, and property owner did not show that its violation of voluntary disclosure rule was either justified or harmless. Fed.Rules Civ.Proc.Rule 26(a)(1)(B), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
District Court did not abuse its discretion in refusing to permit property owner to present expert evidence at bench trial in gas utility's action to condemn certain property for an interstate natural gas pipeline, as sanction for property owner's failure to present a complete expert report, where property owner failed to show that its violation of rule governing disclosure of expert testimony was justified or harmless, and excluding the evidence properly avoided prejudice to utility, since permitting property owner to present the evidence at trial despite failing to disclose expert report would have inhibited utility's ability to prepare for trial. Fed.Rules Civ.Proc.Rule 26(a)(2), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞2654**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2651 Grounds

            170Ak2654 k. Fraud; Perjury. Most Cited Cases
District Court was within its discretion in denying property owner's motion seeking relief for fraud upon the court, in gas utility's action to condemn certain property for an interstate natural gas pipeline, absent evidence that gas utility, even if it made a misrepresentation to the court, had an intent to defraud.

**\*98** Stephen Kent Christiansen, Bradley M. Strassberg, Van Cott, Bagley, Cornwall & McCarthy, Martha Jean Amundsen, Kern River Gas Transmission Company, Salt Lake City, UT, for Plaintiff-Appellee.
Brian W. Steffensen, Steffensen Law Office, Salt Lake City, UT, for Defendants.

Before EBEL, HARTZ, and McCONNELL, Circuit Judges.

ORDER AND JUDGMENT [FN*]

> FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.EBEL, Circuit Judge.

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiff Kern River Gas Transmission Co. filed an action under the Natural Gas Act, 15 U.S.C. § 717f(h), to condemn certain property in Utah, including property owned by defendant JMS-Meadow, for an interstate natural gas pipeline. The district court granted immediate occupancy of the JMS-Meadow property to Kern River, and later held a bench trial to determine the value of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 96

156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))
(Cite as: 156 Fed.Appx. 96)

Page 3

easement. JMS-Meadow appeals the district court's decisions excluding it from presenting expert testimony, the expert's report, or other documents at the bench trial and refusing to reopen the trial to take additional testimony. We affirm.[FN1]

> FN1. At this court's request, the parties briefed whether this court has jurisdiction to consider this appeal. In their memoranda briefs, the parties agree that this court now has jurisdiction pursuant to 28 U.S.C. § 1291. Although the case was not final at the time of appeal, the district court later entered a proper final judgment under Fed.R.Civ.P. 54(b). See *Stockman's Water Co., LLC v. Vaca Partners, L.P.,* 425 F.3d 1263, 1264 (10th Cir.2005) (describing requirements for Rule 54(b) certification). The notice of appeal therefore ripened on the date of the Rule 54(b) certification, thereby permitting us to accept jurisdiction pursuant to the savings provision of Fed. R.App. P. 4(a)(2). *See United States v. Brown,* 348 F.3d 1200, 1206 (10th Cir.2003).

The relevant facts are largely undisputed. The parties scheduled a Fed.R.Civ.P. 26(f) attorney's planning meeting on November 18, 2002. When JMS-Meadow did not send a representative, Kern River **\*99** postponed the meeting and allowed JMS-Meadow to participate by telephone. After the parties set dates at the meeting, Kern River agreed, at JMS-Meadow's request, to adjust those dates back one month. On January 22, 2003, Kern River filed the Attorneys' Planning Meeting Report with the district court, explaining that JMS-Meadow failed to sign the report despite Kern River making *several requests for it to do so.* The report stated that the parties would make initial disclosures by February 3, submit expert reports by February 28, and complete discovery by May 30.

JMS-Meadow failed to meet the Fed.R.Civ.P. 26(a) initial disclosures date of February 3. It ignored Kern River's later requests for initial disclosures. JMS-Meadow still had not met the initial disclosures requirements by February 26, the date

of the initial pretrial conference. At that conference, the magistrate judge extended the time for JMS-Meadow to provide its initial disclosures to March 31. The magistrate judge also ordered disclosure of JMS-Meadow's expert reports by April 30, a date two months beyond the time agreed by the parties. The magistrate judge left May 30 as the discovery cut-off date and set August 7 as the trial date.

JMS-Meadow did not provide initial disclosures by the new date of March 31. Nor did it request an extension of time to do so. In response to an April 10 request by Kern River for initial disclosures, JMS-Meadow, on April 16, sent an initial disclosures pleading with no documents attached. On April 22, Kern River requested the documents *referred to in the initial disclosures,* but JMS-Meadow did not produce them.

Although the magistrate judge had ordered disclosure of the expert reports by April 30, JMS-Meadow again failed to comply. On May 12, Kern River agreed to allow JMS-Meadow until May 16 to provide its initial disclosures documents and its expert report. But Kern River clarified that in light of the May 30 discovery deadline, it would not agree to any further extensions and would seek to exclude any evidence not produced by May 16. It noted that the discovery cut-off date was three weeks away, and JMS-Meadow's actions were to the point of prejudicing Kern River. On May 16, JMS-Meadow provided Kern River a letter from its appraiser, William Lifferth, indicating that he had done a "preliminary investigation," but not an appraisal or report. Aplt.App., Vol. I at 184 O2, 184 O4. JMS-Meadow also provided a letter from Scott Turville, the manager of JMS-Meadow, criticizing Kern River's expert report.

**\*\*2** On May 28, Kern River sent notice to JMS-Meadow that it would take depositions on May 30, the last day of the discovery period, of JMS-Meadow's designated fact witnesses, Mr. Turville and Hal Rosen, its accountant, and of its expert, Mr. Lifferth. JMS-Meadow sought an extension of time from Kern River, which was denied. JMS-Meadow then failed to produce these persons for deposition. On the May 30 ending date

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))
**(Cite as: 156 Fed.Appx. 96)**

for discovery, Kern River filed, pursuant to Fed.R.Civ.P. 37, a motion to exclude JMS-Meadow's evidence at trial or to compel and for sanctions, arguing that no documents had been produced during discovery as required by Rule 26(a)(1)(B) and (C), JMS-Meadow's witnesses had not appeared for depositions, JMS-Meadow did not provide an expert report complying with Rule 26(a)(2), the discovery period had ended, and the trial date was two months away. JMS-Meadow countered with a motion for protective order asserting that it had not received sufficient time before the depositions were to be taken, and Kern River *100 refused to permit an extension. JMS-Meadow, for the first time in its reply in support of its motion for protective order, indicated that Mr. Turville, who allegedly was the only person who could act on JMS-Meadow's behalf, was dealing with family and personal health issues.

The magistrate judge granted Kern River's motion and denied JMS-Meadow's motion. The magistrate judge ordered JMS-Meadow to produce its two fact witnesses for deposition and precluded, pursuant to Rule 37, JMS-Meadow from introducing at the trial any expert evidence or documents not produced during discovery. The magistrate judge found that JMS-Meadow had failed to comply with the scheduling order and receiving numerous extensions and that Kern River would be prejudiced by further delay.

JMS-Meadow appealed to the district court arguing that Rule 26(a)(1)(B) only requires identification and not production of documents; Kern River did not make a Fed.R.Civ.P. 34 document request; there was no Rule 26(a) failure to produce documents; even if there had been a Rule 26(a) violation, there was no prejudice to Kern River; JMS-Meadow should have been given an opportunity to cure; there was still time to cure; JMS-Meadow did not act in bad faith; and Mr. Lifferth's report was only technically deficient. The district court upheld the magistrate judge's order.

Thereafter, the district court held a bench trial on the issue of just compensation for the land taking. The evidence showed that based on Kern River's

easement, JMS-Meadow would lose 67 townhouse units from the total 465 housing units that West Valley City, Utah had approved for JMS-Meadow's townhouse and condominium development. Gary Free, Kern River's expert witness, testified that any alterations to the approved plan would require another approval by West Valley City, but that Steve Pastorik of the city planning department had told Mr. Free that any revision would be done administratively and would not require a public hearing process. Aplt.App., Vol. II at 558, 565 (trial testimony); Aplee App. at 220 (expert report). Mr. Turville countered by testifying about the difficulty of reconfiguring all 67 units and in receiving approval from West Valley City for any changes. He specifically denied that it would be possible to obtain approval administratively. The district court, however, recognized that because neither side presented a city witness specifically addressing the reconfiguration issue, all testimony was speculative.

**\*\*3** After the trial, JMS-Meadow filed a motion to reopen to present testimony specifically relating to Mr. Free's testimony about West Valley City's approval process and Mr. Pastorik. JMS-Meadow contended that if Mr. Pastorik could testify he would contradict Mr. Free's trial testimony. In a supporting declaration, Mr. Pastorik stated that he did not remember any details of a conversation he may have had with Mr. Free or someone in his office about the JMS-Meadow property and that, if he did have such a conversation, he never would have said it would be easy to reconfigure the plat or possible to do so administratively without a public hearing.

The district court entered findings of fact and conclusions of law adopting Mr. Free's appraisal and awarded compensation of \$436,000. The district court also denied the motion to reopen, recognizing that (1) it was tardy; (2) JMS-Meadow failed throughout the litigation to meet court-ordered deadlines; and (3) JMS-Meadow failed to justify its request that additional evidence be received at such a late date. JMS-Meadow appealed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 96

156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))
(Cite as: 156 Fed.Appx. 96)

### *101 ANALYSIS

#### I. Production of Documents

JMS-Meadow argues the district court abused its discretion in sanctioning it pursuant to Rule 37 for failing to voluntarily produce documents. According to JMS-Meadow, Rule 26(a)(1)(B) did not require it to produce documents; that rule only required it to describe and identify the documents. Also, JMS-Meadow argues that Kern River did not request production of the documents pursuant to Rule 34, as Kern River allegedly was required to do after JMS-Meadow had described the documents.

Rule 26(a)(1) requires a party to provide initial disclosures "without awaiting a discovery request" of

(B) a copy of, or a description by category and location of, all documents, data compilations, and *tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims and defenses, unless solely for impeachment;*

(C) a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered[.]

Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial ... any witness or information not so disclosed." The district court has discretion both to impose sanctions for discovery abuses under Rule 37 and to decide whether any Rule 26(a) violation was justified or harmless. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 992-93 (10th Cir.1999); *Orjias v. Stevenson,* 31 F.3d 995, 1005 (10th Cir.1994). In reviewing for an abuse of discretion, "we examine the totality of the circumstances involved in the case." *Olcott v. Del. Flood Co.,* 76 F.3d 1538, 1557 (10th Cir.1996).

**4 [1] It is true, as JMS-Meadow argues, that Rule 26(a)(1)(B) did not require JMS-Meadow to produce documents. *See* Fed.R.Civ.P. 26(a)(1) advisory committee note (1993 amendments). Since JMS-Meadow provided only a description, Kern River was expected to obtain the documents under Rule 34 or through informal requests. *Id.* Although Kern River never made a formal Rule 34 motion, it did make informal requests for the documents, and the magistrate judge ordered that those documents be produced during discovery. JMS-Meadow, however, failed to produce a single document. We therefore reject JMS-Meadow's argument that it was not required to produce any documents.

JMS-Meadow further argues that, even if it was required to produce the documents, the law did not favor the harsh sanction of denying admission of the documents at trial, especially where (1) there was no prejudice to Kern River; (2) JMS-Meadow *should have been given an opportunity to cure;* (3) there was time to cure; and (4) JMS-Meadow did not act in bad faith, but instead was hampered by Mr. Turville's and his mother's health problems. [FN2] In construing Rule 37(c)(1), we have held that:

> FN2. Kern River contends that JMS-Meadow did not make most of these arguments to the magistrate judge, and, instead, first made them when appealing the magistrate judge's order to the district court. Because the district court did not decline to consider the arguments, we too address them on their merits.

*102 [a] district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.
*Woodworker's Supply,* 170 F.3d at 993 (citation omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 96                                                                 Page 6

156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))
(Cite as: 156 Fed.Appx. 96)

Under the totality of the circumstances presented here, JMS-Meadow did not show that its violation of Rule 26(a) was either justified or harmless. JMS-Meadow's behavior prejudiced Kern River in its ability to conduct discovery, prepare for trial and cross-examine JMS-Meadow's witnesses. In light of the many extensions of time it received, JMS-Meadow had ample opportunities to cure, but it failed to do so. JMS-Meadow first asserted Mr. Turville's family problems after the discovery deadline had passed, At no time has Kern River argued that JMS-Meadow acted in bad faith. Even without bad faith, the totality of the circumstances show no abuse of discretion.

### II. Expert Evidence

JMS-Meadow argues that the district court abused its discretion in excluding its expert report from the bench trial. Although JMS-Meadow admits Mr. Lifferth's report is deficient, it contends that any flaws were minor, and it should have been permitted to supply the missing information. JMS-Meadow also argues that the district court abused its discretion in precluding Mr. Lifferth's expert testimony at the bench trial.

A party must disclose the written report of its expert witness. Fed.R.Civ.P. 26(a)(2)(B). The report shall contain *a complete statement of all opinions to be expressed* and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

**\*\*5** *Id.* (emphasis added). Rule 26(a)(2)'s requirements "are mandatory and self-executing." *Lohnes v. Level 3 Commc'ns, Inc.,* 272 F.3d 49, 59 (1st Cir.2001). Again, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure

is harmless, permitted to use as evidence at trial ... any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1).

[2] JMS-Meadow never argues that its expert report was complete; it admits the report was only a preliminary report. Thus, the report did not comply with Rule 26(a)(2). *See Salgado ex rel. Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir.1998) ("Expert reports must not be ... preliminary in nature."). The Rule 26(a) violation was neither justified nor harmless. Permitting JMS-Meadow to present expert evidence at trial despite failing to disclose the expert report would have inhibited Kern River's ability to prepare for trial; Kern River would have had no pre-trial opportunity to learn the substance of the expert's direct examination testimony. *See* \*103*Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 953 (10th Cir.2002). Excluding the evidence properly avoided prejudice to Kern River. *Id.* at 953-54. Accordingly, we conclude the district court did not abuse its discretion in refusing to permit JMS-Meadow to present expert evidence at the bench trial.

### III. Fraud on the Court

Lastly, JMS-Meadow argues that Kern River committed a fraud on the court by allowing Mr. Free to testify about a purported conversation with Mr. Pastorik. JMS-Meadow argues the district court should have reopened the trial to permit JMS-Meadow to present evidence disputing this alleged conversation.

"[A] finding of fraud on the court permits the severe consequence of allowing a party to overturn the finality of a judgment." *Zurich N. Am. v. Matrix Serv., Inc.,* 426 F.3d 1281, 1291 (10th Cir.2005); *see also Robinson v. Audi Aktiengesellschaft,* 56 F.3d 1259, 1265 (10th Cir.1995) ("Any request to set aside a judgment must be viewed in light of a fundamental principle of the finality of duly entered judgments: namely, where a reasonable opportunity has been afforded to the parties to litigate a claim before a court having jurisdiction, and the court has finally decided the controversy, the interests of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 96

Page 7

156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))
(Cite as: 156 Fed.Appx. 96)

public and of the parties require that the validity of the claim and any issue actually litigated in the action shall not be litigated again by them.").

Thus, we have described fraud on the court strictly: "Fraud on the court ... is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. It has been held that allegations of nondisclosure in pretrial discovery will not support an action for fraud on the court. It is thus fraud ... where the impartial functions of the court have been directly corrupted."

**6 *United States v. Buck,* 281 F.3d 1336, 1342 (10th Cir.2002) (quoting *Bulloch v. United States,* 763 F.2d 1115, 1121 (10th Cir.1985)). Clear and convincing evidence is needed to prove fraud on the court. *Id.* "Intent to defraud is an 'absolute prerequisite' to a finding of fraud on the court." *Zurich N. Am.,* 426 F.3d at 1291 (quoting *Robinson,* 56 F.3d at 1267).

[3] JMS-Meadow has failed to sufficiently allege or provide any evidence to show that Kern River had an intent to defraud. Even if Kern River made a misrepresentation to the court through Mr. Free's testimony, there is not a sufficient ground to set aside the district court's judgment based on fraud on the court without an intent to deceive. *See Robinson,* 56 F.3d at 1267. Because the record fails to show any fraud on the court, we conclude the district court did not abuse its discretion in denying relief on that basis. *See Buck,* 281 F.3d at 1342 (reviewing denial of relief for fraud on court for abuse of discretion).

Nor did the district court abuse its discretion by denying the motion to reopen. *See Morsey v. Chevron, USA, Inc.,* 94 F.3d 1470, 1477 (10th Cir.1996) (reviewing denial of motion to reopen for abuse of discretion). JMS-Meadow could have, but did not, participate in discovery. It did not depose either Mr. Pastorik or Mr. Free, even though Mr. Free clearly noted in his disclosed expert report that Mr. Pastorik told him that any alteration to the previously approved plan would be handled administratively without a public hearing. Aplee. App. at 220. JMS-Meadow did not subpoena Mr.

Pastorik or another West Valley City planning department employee to testify on its own behalf at trial. Because JMS-Meadow failed to properly *104 prepare for trial, the district court did not abuse its discretion in denying reopening.

The judgment of the district court is AFFIRMED.

C.A.10 (Utah),2005.
Kern River Gas Transmission Co. v. 6.17 Acres of Land, More or Less, in Salt Lake County, Utah
156 Fed.Appx. 96, 2005 WL 3257509 (C.A.10 (Utah))

Briefs and Other Related Documents (Back to top)

• 2005 WL 441630 (Appellate Brief) Appellant's Opening Brief (Jan. 25, 2005) Original Image of this Document with Appendix (PDF)
• 04-4033 (Docket) (Feb. 26, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1988 WL 142413 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.
Gregory C. KING, Plaintiff,
v.
G.G.C., INC., d/b/a Enterprise Company,
Defendant.
No. 86-6009-C.

Dec. 12, 1988.

### MEMORANDUM AND ORDER

CROW, District Judge.

*1 This case comes before the court on plaintiff's motion to review the magistrate's order filed November 1, 1988. Plaintiff takes issue with that portion of the order allowing discovery of plaintiff's means of support, specifically any inheritance or monies received by plaintiff or his wife as a result of the death of plaintiff's father-in-law. Defendant has filed no response to plaintiff's motion.

Fed.R.Civ.P. 72(a) provides that a district court " shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law." As to nondispositive pretrial matters, the district court reviews the magistrate's order under a clearly erroneous or contrary to law standard. 28 U.S.C. § 636(b)(1)(A); *Ocelot Oil Corp. v. Sparrow Industries,* 847 F.2d 1458, 1462 (10th Cir.1988).

Plaintiff's citations establish that evidence of inheritance or other related funds is not relevant in the calculation of lost wages in a personal injury action. This evidence could become relevant for impeachment purposes if plaintiff testified or portrayed his economic condition after the accident as greatly impoverished. Notwithstanding, this remote potential for relevance does not tip the sensitive balance towards discovery of the personal finances of plaintiff or his wife. Defendant's

mitigation of damages defense is not furthered by this evidence.

The trial court can adequately accommodate discovery of those facts, assuming they become relevant as impeachment evidence. Otherwise, this evidence of inheritance and other related funds should be a matter appropriately treated in an order in limine.

Because the rationale for discovery of this evidence is tenuous and would sustain discovery of many areas of personal finance of plaintiff's family, the court reverses that portion of the magistrate's order allowing such discovery.

IT IS THEREFORE ORDERED that the magistrate's order of November 1, 1988, is reversed and vacated only as to that portion allowing discovery of inheritance or settlement resulting from the death of plaintiff's father-in-law.

D.Kan.,1988.
King v. G.G.C., Inc.
Not Reported in F.Supp., 1988 WL 142413 (D.Kan.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2002 WL 32506294 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

ℍ
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Carrie KING-HARDY, Plaintiff,
v.
BLOOMFIELD BOARD OF EDUCATION, et al.,
Defendants.
**No. Civ.3:01CV979 (PCD).**

Dec. 8, 2002.

Kimberly A. Graham, Paul Mpande Ngobeni,
Hartford, CT, for Plaintiff.
Brett Michael Szczesny, Stephen P. Fogerty,
Halloran & Sage, Westport, CT, James M. Sconzo,
Halloran & Sage, Hartford, CT, for Defendants.

*RULINGS ON MOTION TO WITHDRAW
ADMISSIONS, MOTION TO PRECLUDE
DOCUMENTARY EVIDENCE AND EXPERT
WITNESSES, AND MOTION TO VACATE TRIAL
PREPARATION ORDER*

DORSEY, J.
**\*1** Plaintiff moves pursuant to Fed. R. Civ. P. 36(b)
to withdraw her admissions. Defendants move to
preclude documentary evidence pursuant this
Court's discovery order of October 12, 2001.[FN1]
For the reasons set forth herein, plaintiff's motion to
withdraw admissions is denied, defendants' motion
to preclude documentary evidence and expert
witnesses is granted, and defendants' motion to
vacate the Trial Preparation Order is denied.

> FN1. Defendants provide as alternative
> bases for this motion Fed. R. Civ. P. 26, 34
> and 37 and D. Conn. L. Civ. R. 9. D.
> Conn. L. Civ. R. 9 provides that "[n]o
> motion pursuant to Rules 26 through 37,
> Fed.R.Civ.P., shall be filed *unless* counsel
> making the motion has conferred with
> opposing counsel and discussed the

discovery issues in detail in a good faith
effort to eliminate or reduce the area of
controversy, and to arrive at a mutually
satisfactory resolution." As defendants did
not confer with plaintiff prior to filing their
motion to preclude, they may not resort to
these rules.

### I. PLAINTIFF'S MOTION TO WITHDRAW ADMISSIONS

Plaintiff argues that she is entitled to withdraw
admissions because she could not respond properly
without conducting discovery and requiring her to
do so would force her to concede incorrect facts.
Defendants respond that plaintiff's failure to
respond to or object to the requests within thirty
days constitutes admission pursuant to Fed. R. Civ.
P. 36(b).

Plaintiff argues the following in support of her
motion. On August 1, 2001, she received a request
for admissions from defendants before discovery
had commenced. Plaintiff's personnel file, which
was required to fashion a proper response to the
requests, was requested on September 4, 2001, and
not received until October 16, 2001.[FN2] Plaintiff
also had not received the requested minutes of a
special board meeting at which she was terminated
as of October 16, 2001. She sought an extension of
time "some time after August 1, 2001," but
opposing counsel could not be reached. Family
illnesses in the families of both plaintiff's counsel
and co-counsel further added to the delay.

> FN2. The date of the request itself would
> be untimely, notwithstanding any
> subsequent delays in processing the
> request.

Pursuant to *Fed. R. Civ. P.* 36(a), "[t]he matter
[within the request] is admitted unless, within 30
days after service of the request ... the party to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

*Not Reported in F.Supp.2d, 2002 WL 32506294 (D.Conn.)*
**(Cite as: Not Reported in F.Supp.2d)**

whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter." Fed. R. Civ. P. 36(b) permits the withdrawal of an admission when (1) "the presentation of the merits of the action will be subserved thereby" and (2) "the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits."

Plaintiff's justifications for the failure to respond to defendants' requests are inadequate. There is no question that plaintiff failed to respond to defendants' requests for admission within thirty days as required by Fed. R. Civ. P. 36(a). Plaintiff's argument that "[i]n order to respond to some of the requests, it was necessary for [her] to conduct discovery" is addressed by Fed. R. Civ. P. 36(a), which allows a party to respond with "lack of information or knowledge" when such response is appropriate. The circumstances plaintiff provides as justifying the delay are similarly addressed by Fed. R. Civ. P. 36(a), which affords extensions of the thirty-day period "as the court may allow or as the parties may agree to in writing." Plaintiff's single unsuccessful attempt to contact defendants and failure to move for an extension cannot be interpreted as a diligent effort conforming to the requirements of Fed. R. Civ. P. 36.

*2 Notwithstanding these deficiencies, plaintiff's motion fails utterly to convey what matters are deemed admitted by her failure to respond, instead placing the burden on defendants to prove that they would not be prejudiced were the motion granted. Although a party objecting to the withdrawal of admissions may be required to establish prejudice, *see Westmoreland v. Triumph Motorcycle Corp.,* 71 F.R.D. 192, 193 (D.Conn.1976), the burden in the first instance is not on the party objecting to the withdrawal. Fed. R. Civ. P. 36(b), providing that " the court may permit withdrawal or amendment," makes allowances for, rather than entitles, a party to withdraw an admission. Assuming, arguendo, that the moving party establishes that merits will be served and that the opposing party will not be prejudiced, there is no requirement that the withdrawal be granted. *See Carney v. IRS (In re Carney),* 258 F.3d 415, 419 (5th Cir.2001) ("Even

when these two factors are established, a district court still has discretion to deny a request for leave to withdraw or amend an admission."); *United States v. Kasuboski,* 834 F.2d 1345, 1350 n. 7 (7th Cir.1987). Such a request to withdraw admissions will be granted "[u]nder compelling circumstances." *Moosman v. Joseph Blitz, Inc.,* 358 F.2d 686, 688 (2d Cir.1966). In light of plaintiff's failure to seek extensions to conform to statutory time periods, failure to articulate precisely what admissions have been made, and failure to articulate how the merits will not be subserved thereby, there is no basis on which to grant her motion.[FN3] The motion is denied.

> FN3. Defendants claim they have established a litigation strategy based on the admissions and would be severely prejudiced in time and expense if required to change directions at this point. No opinion is made as to whether this claimed prejudice is sufficient under Fed. R. Civ. P. 36(b).

## II. RULING ON DEFENDANTS' MOTION TO PRECLUDE

Defendants argue that plaintiff's failure to comply with a discovery order [FN4] establishing deadlines for responses to requests for production and disclosure of her expert witness requires that unproduced documents and expert witnesses be precluded from introduction at trial. Plaintiff responds that she has satisfied the requests for production of documents to the extent feasible and that she does not intend to call an expert witness.

> FN4. The parties mischaracterize the order as an order compelling discovery. The order was issued to impose requirements on discovery as a result of issues identified at a pretrial conference, not in response to a motion to compel discovery.

The relevant background for this motion is as follows. On October 12, 2001, a discovery order issued setting forth specific deadlines. All

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 3

Not Reported in F.Supp.2d, 2002 WL 32506294 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

depositions were to be completed by October 16, 2001. Plaintiff was ordered to respond to all outstanding interrogatories and requests for production by October 30, 2001, "to include disclosure of expert witnesses, and the production of all medical records relating to the plaintiff's physical condition (excluding gynecological records) for the past ten years, and records of any treatment for psychological or psychiatric conditions which plaintiff intends to relate to her claims in this case." On October 30, 2001, plaintiff provided documents in response to defendants' outstanding discovery requests. The responses to twenty-six requests for production included fifteen objections for the stated reason "[d]efendants are in possession of any such documents." Plaintiff also responded that the following requests were vague, ambiguous or called for speculation:

*3 "Produce any and all documents that relate or refer to the plaintiff's medical condition as having any adverse impact on her ability to perform her job as a school psychologist."

"Produce any and all documents the plaintiff believes she would have introduced at the 10-151 hearing in opposition to the administration's case that were excluded at the hearing panel."

"Produce any and documents that refer to when plaintiff first learned that her physical condition was having an adverse impact on her job performance."

"Produce any and documents that relate or refer to when the plaintiff first became impaired in her ability to perform the essential functions of her job."

"Produce any and all documents that relate or refer to any stresses in the plaintiff's life besides her health, including but not limited to the health and welfare of her family members and/or any financial difficulties the plaintiff was under from January 1, 1997 to date."

"Produce any and all documents that relate or refer to plaintiff's claim that her alleged disability had an effect on and/or explains the deterioration in her job performance."

"Produce a copy of any diary or other document maintained by plaintiff covering the period from January 1, 1997 or when she was first advised that she had multiple sclerosis, which ever [sic] is earlier, to date."

Plaintiff responded that "documents will be

forwarded under separate cover" to one request. In total, of twenty-six requests only three resulted in the production of documents.

Sanctions for violation of a pretrial order are made " upon motion or the judge's own initiative" pursuant to Fed. R. Civ. P. 16(f). The rule provides that "[i]f a party or party's attorney fails to obey a ... pretrial order, the judge ... may make such orders with regard thereto as are just." Id. Fed. R. Civ. P. 16(f) incorporates the sanctions available under Fed. R. Civ. P. 37. Hernandez v. Conriv Realty Assoc., 116 F.3d 35, 40 (2d Cir.1997). Thus, a party failing to produce documents which are the subject of a discovery order may be precluded from presenting the same at trial. Smith v. Rowe, 761 F.2d 360, 366 (7th Cir.1985); Rabb v. Amatex Corp., 769 F.2d 996 (4th Cir.1985). Although preclusion is "strong medicine," it is necessary under the appropriate circumstances to ensure compliance with the rules of discovery. Daval Steel Prods., v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir.1991). "Modern instruments of discovery serve a useful purpose ... together with pretrial procedures [to] make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." United States v. Procter & Gamble, 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958).

The relevant question is whether plaintiff has violated the pre-trial order. Reviewing the requests for production and responses by plaintiff thereto, the inescapable conclusion is that plaintiff has violated the order. Much of plaintiff's failure to produce documents exhibits a misapprehension of the broad scope of permissible discovery. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The only proscriptions imposed on discovery apply to requests that are irrelevant, "unreasonably cumulative or duplicative," overly "burdensome ... [or] expensive" or "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2002 WL 32506294 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

**\*4** The majority of plaintiff's objections were on the ground that "[d]efendants are in possession of any such documents." This is not an acceptable response to the requests for production. Fed. R. Civ. P. 34(a) requires production of any documents " which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served." "[A]n assertion that [the party of whom the request is made] is in possession of the information ... sought ... is not a sufficient ground for denying [the request]." *Civil Aeronautics Bd. of Civil Aeronautics Auth. v. Can. Colonial Airways, Inc.,* 41 F.Supp. 1006, 1008 (S.D.N.Y.1940). Failure to produce documents or provide an acceptable response or objection is a violation of the pretrial order and sanction is appropriate. Plaintiff is therefore precluded from introducing documents that could be considered responsive to these requests at trial.

Plaintiff's response to one request for production that "documents will be forwarded" is similarly unacceptable. The discovery order required that plaintiff respond to all requests by October 30, 2001. Plaintiff's response is dated October 30, 2001, but the response indicates the documents will be produced at a later date. This directly violates the pre-trial order. She will be precluded from introducing the documents at trial if not yet produced on the date of this order.

Plaintiff's objection that requests for production are vague is similarly deficient. *See Burns v. Imagine Films Entm't, Inc.,* 164 F.R.D. 589, 592-93 (W.D.N.Y.1996). "Such pat, generic, non-specific objections, intoning the same boilerplate language, are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure." *Obiajulu v. City of Rochester, Dep't of Law,* 166 F.R.D. 293, 295 (W.D.N.Y.1996). The response must clearly articulate the specifics of the objection and how the objection relates to documents requested. *Id.* The burden is on the objecting party to justify with particularity its refusal to comply with the request. *Id.* Fed. R. Civ. P. 34(b) requires only that a request be made with "reasonable particularity." The requests claimed to be vague or ambiguous or speculative on their face are reasonably particular.

Plaintiff argues that defendants, in requesting "any and all documents the plaintiff believes she would have introduced at the 10-151 hearing," ambiguously used the term "believes" thus improperly calling for speculation as to what she would have introduced had she been permitted. This ambiguity cannot seriously be propounded, as plaintiff cannot "speculate" as to something she herself was denied the right to present at the hearing. The hearing date has passed, and presumably certain documents were admitted and potentially some were not. Plaintiff was obliged to produce those documents if such documents exist.

**\*5** The remaining objections are of a similar vein. A request for production is to be afforded a reasonable construction, *see Adolph Coors Co. v. Am. Ins. Co.,* 164 F.R.D. 507, 518 (D.Colo.1993), rather than straining to find ambiguity when there is none. The remaining requests are not ambiguous on their face, and plaintiff's arguments to the contrary are without merit. Plaintiff is therefore precluded from presenting evidence at trial not produced in response to the documents requests claimed to be vague.

Defendants also argue that expert testimony should be precluded for plaintiff's failure to identify an expert witness. Plaintiff responds that she "has no intention of calling an expert witness and that is why such a witness was not disclosed. Plaintiff does intend to call the plaintiff's physician as she is a fact witness. Plaintiff's treating physician prepared reports and correspondence addressed to the defendant."

Parties are required to "disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed. R. Civ. P. 26(a)(2)(A). The substance of the disclosure must meet the requirements of Fed. R. Civ. P. 26(a)(2)(B),(C). A party who fails to disclose its expert witness in accordance with Fed. R. Civ. P. 26(a) will not be permitted to use that witness at trial. Fed. R. Civ. P. 37(c)(1). Plaintiff will not be permitted to call an expert witness at trial, having failed to disclose the same.[FN5] The motion to preclude documents and expert witnesses is granted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2002 WL 32506294 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

FN6                                              • 3:01CV00979 (Docket) (May. 31, 2001)

                                                 END OF DOCUMENT

> FN5. Provided the substance of her
> testimony is confined to matters within her
> personal knowledge, plaintiff's treating
> physician most likely would not be
> considered an expert witness triggering the
> Fed. R. Civ. P. 26 disclosure requirements.
> *See Patel v. Gayes,* 984 F.2d 214, 217 (7th
> Cir.1993). It would be another matter if the
> physician testifies to matters not within her
> personal knowledge or to knowledge
> acquired in anticipation of litigation. *Id.*

> FN6. Defendants also move for a monetary
> sanctions against plaintiff. It is not
> apparent that plaintiff's actions were
> flagrant or wilful, evincing more than a
> misunderstanding of the rules of discovery.
> As such, no monetary sanctions will be
> awarded.

### III. CONCLUSION

Plaintiff's motion to withdraw admissions (Doc. 46)
is denied, defendants' motion to preclude
*documentary evidence and expert witnesses*
(Docs.49, 52) is granted, and defendants' motion to
vacate the Trial Preparation Order (Doc. 58) is
denied. The deadlines for the Trial Preparation
Order are modified as follows: Section A: April 1,
2002; Section B: April 12, 2002; April 26, 2002. If
a motion for summary judgement is to be filed,
compliant with the Supplemental Order such will be
served on the opposing party by February 11, 2002,
the opposition brief shall be served by March 4,
2002, and the motion, opposition and any reply
thereto filed in court by March 11, 2002.

SO ORDERED.

D.Conn.,2002.
King-Hardy v. Bloomfield Bd. of Educ.
Not Reported in F.Supp.2d, 2002 WL 32506294
(D.Conn.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                      Page 1

Slip Copy, 2005 WL 2991730 (D.Colo.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Colorado.
William M. LEE, Plaintiff,
v.
Gary WAKINS, and The Attorney General of the
State of Colorado, Defendants.
**No. 03-MK-72(PAC).**

Nov. 7, 2005.

William M. Lee, Limon, CO, pro se.
Roger Griffin Billotte, Attorney General's Office,
Denver, CO, for Defendants.

OPINION AND ORDER OVERRULING
OBJECTIONS, ADOPTING
RECOMMENDATION, AND DENYING
PETITION

KRIEGER, J.
*1 THIS MATTER comes before the Court
pursuant to the Petitioner's Objections (# 53, as
supplemented # 54, 56) to the August 30, 2004
Recommendation (# 52) of United States Magistrate
Judge Patricia A. Coan that the Petition (# 3) for a
writ of *habeas corpus* be denied. The Respondents
did not file any response to the Objections.

### BACKGROUND

Although many of the details described herein were
and are disputed by William Lee, the Petitioner,
(hereinafter "Mr. Lee"), the Court has reviewed the
entire record in this matter and finds the
background facts as follows.

### A. The Offense

On the night June 13, 1992, an altercation arose at a
Thornton, Colorado nightclub between members of

the "Gangsters of Love" and the "Crips" street
gangs. After police broke up the dispute, Mr. Lee,
his brother Brian Lee ("Brian"), Aaron Qualls, and
Eric Lightner, all members of the Gangsters of
Love, returned to Denver together. During that
drive, the four discussed taking revenge on the
Crips for events during the altercation. At some
point, the four came upon a vehicle being driven by
Damon Roberts, a member of the Crips. Brian
stated that he wanted to show the Crips "what a real
gang-bangin' is," and the four drove to Brian's
house (the "Lee residence") to retrieve a Tec-9
semi-automatic pistol and a .357 millimeter pistol.
Mr. Lee advised Qualls that they were "about to do
some dirt," and Brian advised Qualls that "[t]here is
going to be a murder tonight son, you don't need to
get involved." Qualls exited the car, and Mr. Lee,
Brian, and Lightner returned to the area where they
had seen Roberts' car.

At the time they encountered Roberts again, Roberts
was driving with three passengers: Tiffany Locke in
the front seat; James McGregor in the rear seat,
driver's side; and Robert McGregor in the rear seat,
passenger's side. The Lee vehicle pulled alongside
the driver's side of Roberts' vehicle, words were
exchanged between the occupants of the cars, then
shots were fired from the Lee vehicle towards the
Roberts vehicle. Roberts was shot in the leg,[FN1]
and James McGregor was killed by the gunfire. The
tires of the Roberts vehicle were also shot out, and
the car came to rest on the median. The Lee vehicle
left the scene. When police officers arrived at the
scene, Locke identified Mr. Lee and Brian by name
to the officers, and told the officers where Mr. Lee
and his brother lived.

> FN1. Roberts survived the incident, but
> was killed prior to trial in an unrelated
> shooting.

In the meantime, Mr. Lee, Brian, and Lightner had
returned to the Lee residence, where Brian told

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

Qualls that they had shot some people and that Mr. Lee did the shooting. Shortly thereafter, police arrived at the Lee residence and apprehended Mr. Lee, Brian, and Lightner. Mr. Lee, Brian, and Lightner were each charged with eleven crimes: First Degree Murder of James McGregor after deliberation; First Degree Murder of James McGregor by extreme indifference; three counts of attempted First Degree Murder after deliberation of the three other passengers; three counts of attempted First Degree Murder by extreme indifference of the three other passengers; Second Degree Assault against Roberts; conspiracy to commit First Degree Murder; and conspiracy to commit First Degree Assault.

### B. The Trial

**\*2** A joint trial of Mr. Lee, Brian, and Lightner commenced on or about April 21, 1993 in Colorado District Court, Denver County. The prosecution first presented Denver police officer Charles Martinez, who was the first officer to arrive at the scene of the shooting. He testified that he had briefly examined vehicle and found no weapons inside or in the area near the vehicle. He further testified that Tiffany Locke identified Mr. Lee and Brian by name as the people involved in the shooting and where they lived. With this information, Officer Martinez placed a radio call to other police units in the area of the Lee residence regarding the shooting. He then searched the area and recovered fourteen shell casings and ten bullet fragments at the scene.

The prosecution then called then-16 year old Tiffany Locke. She described an incident that occurred upon leaving the club in Thornton, in which Roberts' car was searched by the Thornton police for weapons. Locke also described a separate incident occurring that same evening, but before the events at issue here, in which "Mexican guys" had followed the Roberts vehicle from the club in Thornton and fired shots at it. Locke testified, however, that no bullets hit the car during this encounter. Locke then testified that she knew Mr. Lee because his girlfriend, Nakia Gilmore, was Locke's best friend, and that she had seen Brian, but

did not know him. (Locke later testified that she had known Brian "for quite some time.") Describing the altercation between Mr. Lee's and Roberts' vehicles, Locke testified that she heard gunfire from the direction of Mr. Lee's car, but could not identify where in the car it came from. During direct examination, she denied having told the police at the scene that she knew who had been involved with the shooting, or indeed, even that she was able to identify any of the occupants of the other car. The trial court granted the prosecution permission to lead Locke in eliciting her testimony, noting that "[s]he is clearly a hostile witness at this point." Locke continued to deny having implicated the defendants. She also denied that she had been threatened by Gilmore for identifying Mr. Lee and Brian. Locke admitted that she gave a videotaped statement to the police the morning following the incident, but claimed not to remember implicating Mr. Lee and Brian in that statement. Locke repeatedly insisted she did not remember as the prosecution described her videotaped statements identifying Mr. Lee and Brian, their car, their clothing, the manner in which Mr. Lee held the gun during the shooting, and the process by which Locke accompanied the police to the Lee residence to positively identify Mr. Lee and Brian the morning after the shooting. The prosecution also reviewed numerous details of similar testimony Locke had given during a preliminary hearing, but Locke maintained that she could not remember anything about that prior testimony.

Locke was cross-examined by each of the defendants' attorneys. Although she was relatively cooperative with regard to testifying about the events occurring at the club and the encounter with the "Mexican guys," she remained reticent to answer most questions relating directly to the shooting or the aftermath. Locke denied that she took weapons to another individual's house to hide them at Roberts' request after the incident. She also denied telling Mr. Lee's investigator that she had been intoxicated at the time of the events, including the time of her videotaped statement to police. After defense counsel concluded their cross-examination, the prosecution conducted a brief re-direct examination, and defense counsel each stated they had no further questions. At that time, the Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

excused Locke from the witness stand, but directed her to remain "in 492," which this Court interprets to refer to a room or area in or near the courthouse, until the trial was completed.

*3 The prosecution then sought to introduce the videotaped statement given by Locke. Over defense objections, the trial court admitted the tape pursuant to C.R.S. § 16-10-201, which allows the introduction of a prior inconsistent statement as substantive evidence, if the witness is first given an opportunity to explain any inconsistency between the prior statement and the witness' trial testimony. The foundation for the videotape was laid by police officer Robert Widmayer, who testified that he interviewed Locke when she was brought to the police station the morning following the shooting. He described her demeanor as friendly and "more than cooperative." He requested and obtained her permission to take a videotaped statement, and proceeded to then conduct the half-hour recorded interview. On cross-examination, Widmayer clarified that police department procedures did not require him to obtain parental permission before taking a statement from an underage witness like Locke, and that parental permission was only required before taking statements from underage suspects. The videotaped statement was then played for the jury.[FN2]

> FN2. Neither Locke's videotaped statement nor that of Aaron Qualls, discussed later, were transcribed in the record supplied to this Court. The Court assumes that the contents of the statement are largely consistent with the representations made by the prosecution in cross-examining each witness at trial, as well as consistent with the representations of counsel in this case as to what may be found on them.

A series of police officers then testified as to the circumstances of the arrests of the defendants. Other police officers gave additional testimony about responding to the crime scene, or about certain events occurring at the club in Thornton.

The prosecution then called Dr. Thomas Henry, a forensic pathologist. Dr. Henry testified that James McGregor was killed by a gunshot wound to the chest, and that the bullet entered his chest from the front and proceeded slightly downward, traveling from his left to right, piercing his aorta. Dr. Henry acknowledged that the position of the entry wound indicated that James McGregor was facing the direction from which the bullet came, not turned away from it. Dr. Henry testified that James McGregor would have died no more than ten minutes after sustaining the wound, but that he would have been mobile up until the time of death. Dr. Henry observed that the wound was irregular, possibly suggesting that the bullet had been deflected before entering the body.

At the close of trial that day, the judge informed the counsel that Locke had apparently tendered some sort of document to court personnel after her testimony. The trial court advised counsel " Gentlemen, this is Miss Locke's most recent version. You might be interested in it." Although the contents of the document were not read into the record, the parties here do not dispute that the document read, in pertinent part:

This morning during cross-examination I was asked by one of the defense lawyers if the night of Jams McGregor's murder I was intoxicated. I answered the question saying no. Well your honor that is not true. Yes I was intoxicated the night of the murder. I was afraid to admit it because I am under age and at the time I was 15 years old. Your honor I was smoking marijuana drinking alcohol and also took 1 hit of acid (LSD). I apologize sincerely for lying in court today. This is so hard on me both ends. I have no family or friend support. I'm in this alone. Please understand how I feel and what I'm going through ... And please don't make me get back on the witness stand that's what scares me the most. Also I did not want to take that video my mom was not present and they made me take it. Please exclude the video. I truly don't remember any of that really.

*4 The trial court inquired whether anyone wanted Locke to be present the following day. Mr. Lee's counsel requested that Locke be present, and the Court apparently instructed the prosecution to have her there the following morning. The next morning, over the prosecution's objection, the trial court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 4

Slip Copy, 2005 WL 2991730 (D.Colo.)
**(Cite as: Slip Copy)**

decided to permit Locke to be re-called during the prosecution's case and subjected to additional cross-examination regarding the contents of her letter. However, by this time, Locke had disappeared. Mr. Lee's counsel requested that the trial court strike Locke's testimony in its entirety, on the grounds that she was admittedly incompetent at the time of the events. The trial court denied that request, and directed that police personnel attempt to locate Locke and return her to the court.

The prosecution's next witness was Aaron Qualls, Mr. Lee and Brian's cousin. Qualls testified that after he was arrested, he was brought to the police station where he was accompanied by his mother and grandmother, and was read his *Miranda* rights. Qualls testified that before he signed the *Miranda* waiver, Officer Widmayer "mentally mistreated" him, albeit in the presence of Qualls' mother and grandmother. Qualls did not describe the form this intimidation took, other than to say that Officer Widmayer was "somewhat" yelling. Thereafter, Qualls gave a videotaped statement. The prosecution elicited an admission from Qualls that his videotaped statement differed from his trial testimony regarding whether he returned from the club in Thornton with Mr. Lee and Brian (as he said in the taped statement), or whether he got a ride in another vehicle (as he had testified at trial), and Qualls stated that that variance was because, at the time he gave the statement, he "was afraid of getting 40 years in the penitentiary." He contended that Officer Widmayer had supplied him with details about the events of the evening in a conversation prior to the interview, and that Qualls, during the recorded session, merely recited those details that Widmayer had given him. Explaining other comments he made during the recorded statement, including details about Brian and Mr. Lee discussing their plans to obtain a gun and find Roberts, Qualls testified that he "just made it up." As with Locke, the prosecution then explored various comments made by Qualls on the videotape, with Qualls contending that he could not remember having made such comments, or stating that he just made up the comments at the time. Qualls acknowledged that he, accompanied by an attorney his mother had hired for him, watched the videotape with prosecution investigators just prior to the

preliminary hearing in the case, and at that time, he did not make any assertion that his statements on the tape were coerced or fabricated. Qualls admitted that he was reluctant to testify at the preliminary hearing out of fear that members of the Crips might see him and think that he was involved in the incident. He acknowledged that his psychiatrist had *written to the prosecution stating that Qualls feared* retribution from the Gangsters of Love, although Qualls contended that his psychiatrist has misunderstood him.

**\*5** On cross-examination, Qualls stated that heard Mr. Lee, Brian, and Lightner discussing having been involved in a shooting when they returned to the Lee residence after the incident, but he persisted that he had had no contact with them that evening until after the shooting had happened. He partially recanted his direct testimony that he had "made up" the fact that a Tec-9 had been involved, that Mr. Lee had shot at another car, and that that car was left stopped in the street, admitting on cross that he had overheard the defendants mention these facts in their post-shooting conversation. (Later in the cross-examination, Qualls recanted his admission to having overheard a statement that Mr. Lee had been doing the shooting.) When examined by Mr. Lee's attorney, Qualls admitted that he may have told police that Mr. Lee was wearing a shirt similar to one that Qualls had been wearing that evening, in an attempt to explain away Locke's identification of a person wearing that shirt in the Lee car during the shooting.

The prosecution also called Armedia Gordon, a supervisor in the Denver police department homicide unit. She observed Locke talking to Officer Widmayer at the police department, and considered Locke's demeanor to be friendly and cooperative and Officer Widmayer to be professional and courteous towards Locke. Gordon confirmed that police procedures do not require police to contact the parents of a juvenile witness before taking a statement. She also observed Qualls at the police station, noting his demeanor as quiet and somber, but cooperative. She denied that Officer Widmayer pressured Qualls. Gordon also participated in a search of the Lee residence. No weapons were found in or about the property. Two

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

Page 5

cars were towed from the property to the police station, where Gordon obtained a warrant to search the interior of the cars. Inside the trunk of a yellow Pontiac (a vehicle which was not alleged to have been involved in the incident), Gordon found a Tec-9 pistol and insurance papers belonging to " William Lee." Gordon acknowledged that she did not know whether the insurance papers belonged to Mr. Lee or his father, both of whom share the same name. She also testified that, during her discussions with Locke, Locke claimed that Roberts was her brother and that she never saw Mr. Lee firing during the incident.

The prosecution's ballistics expert, Frank Kerber, testified that the shell casings and bullet jackets recovered from the site of the shooting, as well as a bullet fragment recovered from the tire of Roberts' car, were fired from the Tec-9 pistol found by Gordon, but that the bullet found in James McGregor's chest was not fired by that weapon. Kerber could not conclusively identify the type of weapon that fired the bullet found in James McGregor, but observed that it was a .9 millimeter weapon with either a .357 or .38 caliber, likely a Smith & Wesson revolver. Kerber also opined that although a bullet fragment recovered from Roberts' thigh could not be positively matched with the bullet in James McGregor's chest, both bullets had the same class characteristics. This lead Kerber to conclude that they were fired from the same gun. Kerber noted that a black sweatshirt, said to belong to Roberts, was also found to have a bullet fragment in its fabric, as well as a hole indicating that the bullet entered through the chest of the sweatshirt. Kerber did not believe that the bullet came from the Tec-9, and opined that, given it coming to rest inside the fabric of the sweatshirt, it may have struck some other object before coming to rest.

*6 The prosecution then called Robert Sestrich, an investigator with the Denver police. He testified as to a meeting with Locke, Locke's mother, Locke's attorney, and the District Attorney, in which they discussed why Locke's testimony at the preliminary hearing had retreated from her earlier identification of the defendants. According to Sestrich, Locke claimed that her friend Nakia Gilmore had told her " it was fucked that she had told the police who had

done this," and that Locke claimed she was intimidated by the number of family members and friends of the defendants in the courtroom gallery at the time.

The prosecution then recalled Officer Widmayer. He discussed the nature of his preliminary contact with Qualls at the police department, and denied having threatened or coerced Qualls or that he had coached Qualls with any details of the incident. Officer Widmayer also conducted the search of the Lee vehicle after it was taken into police custody. He found papers in the vehicle relating to both Mr. Lee and Brian, as well as to Tamara Fields, the registered owner of the car. He observed that there were no bullet holes in the body or glass of the car. Before cross-examination of Officer Widmayer, the prosecution played the videotape of Qualls' statement. When defense counsel concluded their cross-examination of Officer Widmayer, the prosecution rested.

The defense called several witnesses to establish various facts, including: that tests did not establish that any of the defendants had gunpowder residue on their hands at the time of their arrests; that both vehicles contained metals that might be indicative of gunpowder residue; that no fingerprints were recovered from the Tec-9; that, contrary to his statement to police, Qualls got a ride home with friends other than the defendants; that Lightner had a recent hand injury that interfered with his ability to grip a weapon; that gloves worn by James McGregor at the time of the incident were found to have gunpowder residue on them; and that two ballistics expert believe that, at some indeterminate time, a bullet was fired from inside the Roberts vehicle and passed through the door going outward. The defense also sought to establish that Roberts was known to have a weapon in his possession at the time, as he had threatened another person at the Thornton club with it before hiding it behind the dashboard of his car. Other witnesses corroborated Locke's testimony that unknown people in a sports car had shot at Roberts' car after it left the club, but before the incident in question.

The defense also called Nakia Gilmore. She testified that she left the club with Mr. Lee in her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 6

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

car and crossed paths with a vehicle driven by Brian. She stated that Mr. Lee got out of her car and into Brian's car, and that she followed Brian's car down Martin Luther King Boulevard. She said Roberts' vehicle appeared and its occupants shot at Brian's car. She ducked until the shooting was over, then approached Roberts' car. She spoke to Roberts and Locke, and Roberts said words to the effect that "I hope we got them." On cross-examination, Gilmore confirmed that Brian, Mr. Lee, and Lightner were the occupants of Brian's car immediately before the shooting. She stated that Roberts' vehicle turned left onto the street, in between her car and the Brian vehicle, and approached the left side of the Brian vehicle. She saw flashes coming from the driver's side of Roberts' vehicle. At this point, she claims she stopped her car and ducked, although she also testified that occupants of Brian's car returned fire. After calling one final witness, the defense rested.

*7 Mr. Lee moved for a mistrial, arguing that the prosecution had been unable to locate Locke after she had delivered her note. Mr. Lee's counsel pointed out that, during her testimony, Locke had been asked by the prosecution if she had used alcohol or drugs on the evening in question, and that she had denied doing so, contrary to the claim in her note. He pointed out that Locke was the only witness who positively identified Mr. Lee as being present and holding a gun at the time of the shooting, and stated that her absence "denies me the right to cross-examine her." He requested a mistrial, or, alternatively, the striking of Locke's testimony based upon a finding by the trial court "declar[ing] her incredible as a matter of law," continuation of the trial until she could be found, or admission of her letter.[FN3] The trial court opined that the letter was a deliberate attempt by Locke to cause a mistrial. In denying the motion for mistrial, the trial court found that Locke had been extensively cross-examined and had offered shifting versions of her story; that the germane portion of her letter concerns her being intoxicated at the time she gave her statement and that the jury was able to assess her condition when reviewing the videotape; and that the court believed it was apparent to the jury that Locke was undoubtedly lying at some point, and that the information they already had before

them made it possible for them to resolve which version of events was most accurate. The trial court refused to admit the letter as an alternative, noting that it was hearsay and that to do so would deprive the prosecution of the opportunity to cross-examine Locke on its contents. The judge opined that, in light of Locke's lack of credibility, the letter would have no effect whatsoever on the jury's deliberations in the case.

> FN3. Defense counsel also requested a mistrial due to the failure of witness Lawrence Lightner (no relation to defendant Eric Lightner) to appear for trial after being subpoenaed and told to return at a particular time. The defense proffered that Lightner would testify that Locke requested that he dispose of two pistols she had in her possession. The apparent defense theory was that such pistols were used by occupants of the Roberts vehicle to shoot at the defendants the night of the incident. The trial court refused to declare a mistrial.

The court then conducted a charging conference. The substantive discussion on instructions is not part of the record, but at its conclusion, Mr. Lee's counsel, after reserving objections with regard to the mistrial motion, stated that he had no objection to the proposed instructions or verdict forms.

The jury deliberated for approximately one day before returning with a verdict. All three defendants were convicted of First Degree Murder by extreme indifference; of three counts of attempt to commit murder in the first degree against Roberts, Locke, and Robert McGregor; were of Second Degree Assault upon Roberts; of conspiracy to commit assault in the first degree; and of conspiracy to commit menacing. All three defendants were acquitted on the charge of conspiracy to commit murder in the first degree. The court denied a defense motion challenging that the acquittal on the murder conspiracy charge and the conviction on the substantive murder and attempted murder counts were inconsistent, finding that "what the jury found was that they conspired to commit a first degree

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 7

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

assault and in so doing killed this young man in extreme indifference. I don't see anything the least bit inconsistent about that." Each defendant was sentenced to a mandatory life term on the First Degree Murder count, and to a total of 50 additional years on the remaining counts.

### C. Mr. Lee's direct appeals

*8 Mr. Lee appealed his conviction to the Colorado Court of Appeals on five grounds: (i) that the trial court erred in failing to suppress evidence seized from certain vehicles; (ii) that Mr. Lee's Sixth Amendment right to confront when Locke disappeared after sending a note recanting her testimony; (iii) that the trial court should have granted a mistrial when Lawrence Lightner could not be located; (iv) that the jury's verdicts were inconsistent, in the sense that Mr. Lee was convicted of First Degree Murder and attempted murder premised upon extreme indifference, but that the assault convictions required proof of specific intent; and (v) that there was insufficient evidence to support the verdict of murder by extreme indifference.

By unpublished order dated July 27, 1995, the Court of Appeals affirmed Mr. Lee's conviction in part, and vacated it in part. The Court held that: (i) the trial court did not err in refusing to suppress the vehicle searches, citing to its ruling on the same issue in Brian's appeal, *People v. Lee*, 914 P.2d 441, 445-46 (Colo.App.1995); (ii) the failure of Lawrence Lightner to appear and testify was not grounds for a mistrial; (iii) there was sufficient evidence to support the convictions; and (iv) all of the convictions could be logically reconciled, with the exception of the conviction for attempted extreme indifference murder of Roberts and the convictions for conspiracy and assault involving Roberts. To remedy the inconsistency, the Court of Appeals vacated the attempted murder conviction as against Roberts for the reasons stated in *Lee*, 914 P.2d at 447-48. The issue with regard to Locke was not addressed in one version of the Court of Appeals' ruling that is included in the record, but another copy of that order in the record, identical but for the addition of an interstitial section

concerning Locke, rejects Mr. Lee's argument on this point for primarily the reasons stated by the trial court.

Both the prosecution and Mr. Lee sought rehearing by the Court of Appeals, and both requests were denied. Mr. Lee then sought certiorari to the Colorado Supreme Court, raising the same five issues that he raised before the Court of Appeals. On April 8, 1996, the Colorado Supreme Court denied certiorari, rendering his conviction final.

### D. Mr. Lee's collateral attacks in state court

At some point in or about April 1997, Mr. Lee filed a post-conviction motion with the Colorado District Court pursuant to Col. R.Crim. P. 33 and 35(c).[FN4] The Colorado District Court apparently held a series of hearings, and ultimately denied the motion. In May 1999, Mr. Lee appealed the denial of that motion to the Colorado Court of Appeals, raising two issues: (i) that there was newly-discovered evidencenamely, three new witnesses suggesting that Roberts and others in his car had weapons and fired at the Lee vehicle first, and that James McGregor was shot during a struggle with another person in the Roberts vehicle during a struggle over a weapon; and (ii) that the trial court gave an erroneous jury instruction on the issue of complicity. On December 2, 1999, the Court of Appeals affirmed the denial of the motion, agreeing that none of the newly-discovered witnesses would have offered evidence that would likely have led to Mr. Lee's acquittal. In addition, the Court of Appeals conducted a plain error review of the un-objected-to complicity instruction. Although appellate decisions after the trial had found the pattern jury instruction on complicity used at Mr. Lee's trial to be erroneous, the Court of Appeals concluded that because both Mr. Lee and his co-defendants had been convicted of the underlying substantive offenses, any defect in the complicity instruction did not affect substantial rights.

FN4. As best this Court can determine, that motion is not included in the record here.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 8

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

\*9 Mr. Lee again sought certiorari to the Colorado Supreme Court, raising the same two issues, but on April 24, 2000, the Supreme Court denied certiorari.

On or about June 30, 2000, Mr. Lee filed another Rule 35 motion in Colorado District Court, this time *pro se*.[FN5] As best the Court can determine, Mr. Lee alleged that: (i) the trial court utilized defective jury instructions which deprived him of the presumption of innocence; (ii) the trial court erred in not giving a cautionary instruction when publishing photo evidence of James McGregor's body; (iii) the verdict forms failed to direct the jury to separate the principals from conspirators; and (iv) Mr. Lee had received ineffective assistance of counsel through trial, appeal, and the prior Rule 35 proceedings. The motion was apparently denied as " repetitive," and Mr. Lee appealed the denial to the Colorado Court of Appeals, first *pro se*, and later, with the assistance of counsel. In his appeal, Mr. Lee argued: (i) that the District Court erred in denying the motion without conducting a hearing or making factual findings; and (ii) that Mr. Lee received ineffective assistance of counsel at trial, in that the proffered theory of the case instruction essentially implicated Mr. Lee in the charged conspiracy.

> FN5.  The motion is apparently not included in the record.

On April 11, 2002, the Court of Appeals affirmed the denial of Mr. Lee's second Rule 35 motion. Specifically, the court found that the theory of the case instruction reflected a strategic decision by Mr. Lee's trial counsel to dispute the prosecution's *mens rea* element on the complicity charges and to highlight the prosecution's burden of proof, and that such a strategic choice was within the broad range of professional competence. In addition, the Court of Appeals concluded that there was sufficient evidence against Mr. Lee and thus, any error by his counsel did not prejudice him. Mr. Lee sought certiorari to the Colorado Supreme Court on the issue of whether the failure to conduct a hearing on the motion was error, and on whether the Court of Appeals decision on the merits of the motion was error. The Colorado Supreme Court denied

certiorari on July 31, 2002.

E. The instant *habeas* petition

On January 3, 2003, Mr. Lee commenced the instant action *pro se* in this Court pursuant to 28 U.S.C. § 2254. Initially, the Petition (# 3) raised seven issues: (i) that the trial court's failure to declare a mistrial following Locke's note deprived Mr. Lee of his right to confront adverse witnesses in violation of the Sixth Amendment; (ii) that there was insufficient evidence to support Mr. Lee's conviction of First Degree Murder; (iii) that the complicity instruction was flawed and deprived him of a fundamentally fair trial in violation of the Due Process clause; (iv) that the theory of the case instruction was flawed, resulting in Mr. Lee forfeiting the presumption of innocence in violation of the Due Process clause; (v) that the trial court erred in supplying verdict forms which did not require the jury to differentiate between principals and conspirators in violation of the Due Process clause; (vi) that the convictions against Mr. Lee are logically inconsistent, in violation of the Due Process clause; and (vii) that Mr. Lee received ineffective assistance of counsel, in violation of the Sixth Amendment, in that his trial counsel approved a defective theory of the case instruction, a defective complicity instruction, and failed to request the trial court to have its charge to the jury put on the record.

\*10 This Court directed that counsel be appointed (# 22) for Mr. Lee, and on January 21, 2004, counsel for Mr. Lee filed a Supplemental Memorandum of Authorities (# 32). That supplemental filing slightly recharacterized Mr. Lee's claims as follows: (i) the mid-trial disappearance of Locke and refusal of the trial court to grant a mistrial violated Mr. Lee's Fifth and Sixth Amendment rights; (ii) the failure of the trial court to read Locke's note to the jury violated Mr. Lee's Fifth and Sixth Amendment rights; (iii) Mr. Lee's Sixth Amendment rights were violated by his trial counsel's ineffective assistance in tendering the theory of the case instruction; (iv) Mr. Lee's Sixth Amendment and Due Process rights were violated by his counsel's not requesting that Mr. Lee be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 9
Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

present for the charging conference; (v) Mr. Lee's Due Process rights were violated by the erroneous complicity instruction; (vi) Mr. Lee's Due Process rights were violated by the inconsistent verdicts as between the conviction on the charge of murder and the acquittal on the charge of conspiracy to commit murder; and (vii) Mr. Lee's Due Process rights were violated in that there was insufficient evidence to convict him of the charges.

On August 30, 2004, Magistrate Judge Coan issued a Recommendation (# 52) that the Petition be denied. First, Judge Coan found that Mr. Lee had failed to exhaust his claim relating to not being present at the charging conference, failed to present the claim of inconsistency between the murder conviction and the conspiracy acquittal as a federal claim and thus failed to exhaust it, and failed to exhaust his claim that there was insufficient evidence to convict him on any of the counts other than extreme indifference murder. As a result, *Judge Coan recommended that these claims (or parts of claims) be dismissed as unexhausted.*

Turning to the merits, Judge Coan found that: with regard to Locke, Mr. Lee had had adequate opportunity to cross-examine her with regard to her credibility during the trial and that the additional cross-examination sought would have been merely cumulative, that the trial court did not err in refusing to read Locke's note to the jury, and that under *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), any error regarding Locke was harmless. Judge Coan also found that the state courts' conclusions that there was sufficient evidence in the record to support Mr. Lee's conviction on the substantive murder count and the conspiracy to commit murder counts were not unreasonable, nor were the state courts' rulings on the defective complicity instruction. Finally, Judge Coan found that the state courts' findings that Mr. Lee was not prejudiced by the alleged ineffectiveness of his trial counsel in tendering a theory of the case instruction were not unreasonable. FN6

FN6. The Magistrate Judge did not address the state courts' finding that Mr. Lee's

counsel's performance was not ineffective.

On September 7, 2004, Mr. Lee filed timely Objections (# 53) to the Recommendation. Specifically, Mr. Lee objects to: (i) the findings that he failed to exhaust certain claims, and states that he "relies upon his previous filed pleadings regarding those issues"; (ii) the conclusion of both the Magistrate Judge and state courts that Locke's credibility was so damaged that additional cross-examination regarding her note would have been cumulative; (iii) the Magistrate Judge's conclusion that it was not necessary for the jury to determine who actually shot the weapon that killed James McGregor; (iv) the finding that the complicity instruction need not require the jury to identify a principal and the finding that the legal error in that instruction did not constitute plain error; (v) the finding that Mr. Lee's trial counsel provided effective assistance, even though counsel did not tender an instruction highlighting Mr. Lee's contention that the weapon that killed James McGregor was never found.

### JURISDICTION

*11 The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

### ANALYSIS

#### A. Standard of Review

Where a party files timely objections to a Magistrate Judge's Recommendation, the Court reviews the objected-to portion of the Recommendation *de novo.* Fed.R.Civ.P. 72(b).

Pursuant to 28 U.S.C. § 2254(d), *habeas* relief is appropriate only where the state court unreasonably applied clearly established federal law or reached a decision based on an unreasonable determination of the facts. Mr. Lee bears the burden of demonstrating by clear and convincing evidence that the trial court's factual findings are erroneous. 28 U.S.C. § 2254(e)(1); *Trice v. Ward,* 196 F.3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 10

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

1151, 1169-70 (10th Cir.1999).

### B. Exhaustion

Before pursuing *habeas* relief, a petitioner must
first exhaust his available state court remedies. 28
U.S.C. § 2254(b); *Rose v. Lundy,* 455 U.S. 509,
520, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).
Exhaustion must be pursued through every available
state court means, including a request for review
before a court-such as the Colorado Supreme
Court-whose appellate jurisdiction is discretionary.
*O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119
S.Ct. 1728, 144 L.Ed.2d 1 (1999). The failure of a
petitioner *to fully exhaust a particular claim,*
coupled with the expiration of the time permitted to
raise such a claim under state procedural law,
results in a procedural default of that claim.
*Coleman v. Thompson,* 501 U.S. 722, 732-33, 111
S.Ct. 2546, 115 L.Ed.2d 640 (1991). Federal *habeas*
review of a defaulted claim is prohibited unless Mr.
Lee can show both cause for the default and
prejudice resulting from the alleged constitutional
violation; in the alternative, a petitioner can show
that the court's refusal to consider the claims will
result in a fundamental miscarriage of justice.
*Coleman,* 501 U.S. at 750.

The Magistrate Judge found that Mr. Lee failed to
exhaust his claim arising from not being present at
the charging conference, his claim that
inconsistency between the verdicts convicting him
of murder but acquitting him of conspiracy to
commit murder amounted to a deprivation of
federal rights, and his claim that there was
insufficient evidence to support the assault
convictions. Mr. Lee's Objections note his
disagreement with these findings, but he does not
present any new and focused argument against
them. Instead, Mr. Lee merely refers the Court to
his prior briefing.

Ordinarily, a failure to specify the grounds on which
an objection to a Recommendation is made is
insufficient to preserve that objection. *U.S. v. 2121
E. 30th St.,* 73 F.3d 1057, 1060 (10th Cir.1996).
The case of *2121 E. 30th St.* involves a situation
similar to the one presented here. There, the party

objecting to the Magistrate Judge's recommendation
merely noted its disagreement with the conclusion
reached by the Magistrate Judge and pointed the
District Court to its prior briefs. *Id.* The 10th
Circuit found that such objections "were not
sufficiently specific to preserve any issue for
appellate review." *Id.* The same result is appropriate
here. The Court deems Mr. Lee to have waived
further consideration of the validity of the claims
found unexhausted by Judge Coan.[FN7]

> FN7. Were the Court to consider the
> substantive arguments on these issues, it
> would nevertheless reach the same
> conclusion as the Magistrate Judge.
> Complete exhaustion requires presentation
> of the issue to the Colorado Supreme
> Court in a petition for discretionary
> review. None of Mr. Lee's petitions for
> certiorari to the Colorado Supreme Court
> present these issues.

*12 Mr. Lee has not argued that good cause exists
for failing to raise these issues to the Colorado
Supreme Court. Accordingly, the Court overrules
Mr. Lee's Objections and adopts that part of the
Magistrate Judge's Recommendation that the Fourth
Claim (that Petitioner was not present during the
charging conference), the Sixth Claim (that the
guilty verdict on the murder count and the acquittal
on the conspiracy to murder count were
inconsistent), and that portion of the Seventh Claim
that asserts that there was insufficient evidence to
convict Mr. Lee of any crimes other than extreme
indifference murder, be dismissed as unexhausted.

### C. Ability to confront Locke

Mr. Lee's First and Second Claims both raise
Confrontation Clause issues with the trial court's
handling of Locke's disappearance. The Sixth
Amendment's Confrontation Clause provides that, "
[i]n all criminal prosecutions, the accused shall
enjoy the right ... to be confronted with the
witnesses against him." *U.S. Const.,* Am. 6. The
clause applies in both federal and state
prosecutions. *Crawford v. Washington,* 541 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 11

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). It entitles an accused to "see[ ] the witness face to face, and [subject] him to the ordeal of a cross-examination." *Id.* at 57, *quoting Mattox v. U.S.,* 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

There is no dispute that Mr. Lee had a full opportunity to cross-examine Locke on the testimony she gave at trial, including her competence to give the videotaped statement. It was only after Mr. Lee concluded that cross-examination, when Locke's note was disclosed, that he desired an additional opportunity to examine her. For analytical purposes, this is akin *to a situation in which a witness completes testifying and leaves the stand, then later recants* that testimony.

The majority of cases examining the situation involve recantation occurring some time after the trial has concluded, but at least one court has faced the situation presented here. In *Bagby v. Kuhlman,* 932 F.3d 131, 133-34 (2d Cir.1991), the prosecution called a witness, Mann, who testified that the defendant had access to an apartment where controlled substances were found. The day after her testimony, Mann contacted defense counsel and stated that she wished to recant her testimony. *Id.* at 133. When defense counsel recalled Mann in his own case, she invoked her Fifth Amendment privilege and refused to answer any questions.[FN8] *Id.* at 133-34. The Second Circuit rejected the defendants argument under the Confrontation Clause because Mann's recantation and subsequent refusal to testify occurred *"after* Bagby had vigorously and pointedly cross-examined her about every material aspect of her direct testimony." *Id.* at 135 (emphasis in original). The question, as framed by the Second Circuit, was "whether Bagby was improperly precluded from questioning Mann about her recantation and thereby denied an opportunity to test the truth of Mann's direct testimony." *Id.* at 136. After examining the various circumstances of the recantation, the Second Circuit ultimately concluded that "the purported recantation was not trustworthy and, therefore, did not necessitate any additional cross-examination," and that "Bagby had adequate opportunity to cross-examine Mann and

[we] are unpersuaded that Mann's assertion of the Fifth Amendment on recall deprived Bagby of a meaningful opportunity to test the truth of Mann's direct testimony." *Id.*

> FN8. Curiously, the Court notes that had the trial court been successful in locating Locke, it would likely have ensured that Locke first have an opportunity to consult counsel, as she, like the witness in *Bagby,* faced a possible charge of perjury based on her recantation. One can assume that, after consultation with an attorney, Locke might very well have invoked her Fifth Amendment privilege.

**\*13** Thus, *Bagby* indicates that the Confrontation Clause issue in these circumstances requires analysis of two separate questions: whether the recantation was sufficiently trustworthy to warrant additional cross-examination, and whether the defendant had an adequate opportunity to test the truth of the witness' actual trial testimony. In considering these questions, this Court is mindful that it must defer to factual findings by the trial court unless Mr. Lee shows by clear and convincing evidence that such findings are in error. 28 U.S.C. § 2254(d)(2); *Trice,* 196 F.3d at 1169-70.

The trial court here found that Locke's recantation was not trustworthy. When her recantation was first discussed the morning after Locke's note, the trial court stated that "She is one of the most transparent liars I have ever seen in my life. There is nothing surprising about it." [FN9] Trial Record, v. 15 at 15-16 (April 23, 1993). On the following day, Mr. Lee's counsel moved for a mistrial or various alternative relief because of Locke's disappearance. At that time, the trial court observed that Locke's behavior was "a deliberate attempt to cause a mistrial ... a transparent, calculated attempt to cause a mistrial. I don't know who these individuals think they're trying to fool, but this is not the first time I have seen a stunt like this pulled." Trial Record, v. 16 at 42-43 (April 28, 1993). Later, the trial court again discussed Locke, observing that "I'm sure the jury is thoroughly convinced this woman at some point in time is a liar." *See* Trial Record, v. 16 at 57

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

(April 28, 1993). More to the point, the trial court observed that the only relevant assertion in the note was Locke's claim that she was under the influence of alcohol and drugs at the time she gave her statement. With regard to that claim, the trial court stated that "the jury has before it the videotape of her being interviewed at the Police Department, which I viewed, which clearly demonstrates she is not intoxicated." *Id.* But perhaps the most telling indication that the trial court did not consider Locke's recantation to be trustworthy is its statement that "do I think this letter, if it's given to the jury will have any effect whatsoever in the outcome of this case, and my answer to that is no, I don't think it does or will have." *Id.* at 58. From these statements, the trial court found Locke's recantation of her testimony to be untrustworthy.

> FN9. The trial court repeated the observation that Locke was "one of the most obvious liars I have ever seen" on the final day of the trial. *See* Trial Record, v. 16 at 41 (April 28, 1993).

The trial court also found that Mr. Lee had availed himself of his opportunity to fully cross-examine Locke as to the truth of the testimony she gave. Denying Mr. Lee's request for a mistrial, the trial court stated that "Miss Locke was cross-examined at great length throughout the trial," Trial Record, v. 16 at 56; see also *id.* at 57. The trial court's findings are consistent with the facts shown by the trial transcript. Mr. Lee's counsel devoted a substantial portion of his cross-examination of Locke to addressing whether she had drunk alcohol the night of the incident. His counsel intimated in his questions that Locke had admitted to Mr. Lee's investigator that she had had numerous drinks that night. *See* Trial Record, vol. 14 at 101-104 (April 22, 1993). Although Locke denied any alcohol use and denied having told Mr. Lee's investigator otherwise, the issue was clearly raised for the jury's consideration, and the videotape of Locke-in her allegedly intoxicated state-was played for the jury shortly after her testimony finished.

*14 Thus, the trial court made factual findings regarding both factors to be considered under

*Bagby.* Mr. Lee has not shown those findings to be erroneous by clear and convincing evidence, and this Court must therefore adopt them. Consequently, guided by *Bagby,* this Court finds that the trial court's denial of a mistrial based on Locke recantation did not deprive Mr. Lee of his rights under the Confrontation Clause.

Mr. Lee raises several arguments in his Objections with regard to Locke. First, he notes her importance to the case, in that she was the only witness who positively identified him as holding a gun at the time of the shooting. Undoubtedly, such testimony was crucial to the case, just as the testimony of the witness in *Bagby* was critical to the case against him. However, the court in *Bagby* observed that importance of the testimony was just a threshold issue; the primary inquiry was whether the defendant was deprived of a meaningful opportunity to test the witness' credibility. *Id.* at 135. For the reasons stated above, this Court agrees with the trial court's finding that Mr. Lee was not deprived of a meaningful opportunity to test Locke's credibility.

Mr. Lee also cites to *Crawford* for the proposition that "statements taken by police officers in the course of interrogations are also testimonial." 541 U.S. at 52. The precise significance of this citation is not apparent to the Court. *Crawford* deals with the admissibility of testimonial hearsay, such as witness statements taken by police. It has no apparent application to the admissibility *vel non* of Locke's unsworn note,[FN10] or her prior testimony that was subject to cross-examination. Although *Crawford* might have some relevance to whether the trial court should have admitted Locke's videotaped statement in the absence of live testimony, that issue is not raised here.

> FN10. If anything, *Crawford,* which holds that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," 541 U.S. at 59, would have required that the trial court refuse to admit Locke's note, as the prosecution had not had an opportunity to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 13

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

cross-examine Locke with regard to its contents.

Mr. Lee also contends that he did not have an opportunity to call Locke in his case-in-chief, and that he "is not aware of any case that says that you should lay all your cards on the table in the prosecution's case because the witnesses might disappear on you and you may not get a chance to examine them later." It is not clear how this argument bears on the Confrontation Clause issue. Nevertheless, Mr. Lee's belief, that is a risk that defense counsel in both civil and criminal litigation face every day, and for which strategic planning is essential. In any event, it is not clear what "cards" Mr. Lee kept in his hand, as the key issue in Locke's note-her competence at the time of her videotaped statement—was a subject that Mr. Lee took the opportunity to address fully on Locke's cross-examination.[FN11]

FN11. Interestingly, despite Locke's note, delivered early in the prosecution's case, the defense did not explore the issue of Locke's allegedly impaired state with any of the numerous police officers and civilian witnesses who interacted with Locke that evening. In fact, the defense did not even raise the issue with Gilmore, a witness friendly to the defense, who had spoken with Locke immediately after the shootings, at a time when Locke's ability to perceive was most critical.

Mr. Lee also argues that "Ms. Locke provided new and damaging information to the prosecution's case during the middle of trial and then disappeared[;] Mr. Lee should have been given an reasonable opportunity to investigate the new information and its impact." There is no indication from the record that Mr. Lee did not have an opportunity to "investigate" Locke's claim of intoxication. After her tender of the note to the court, trial continued for several more days, including an intervening weekend, allowing Mr. Lee plenty of opportunity to develop a strategy to highlight Locke's condition at the time of her statement. Mr. Lee had reasonable basis to believe that Locke might not return for

additional testimony as early as the same day her note was tendered, as Locke disregarded the trial court's instructions to stay in the building, and instead, failed to contact her probation officer as she had represented she would do.

*15 Thus, because the trial court's refusal to grant a mistrial or otherwise seek to remedy Locke's purported recantation and subsequent disappearance did not violate Mr. Lee Confrontation Clause rights, the First and Second Claims in the Petition are without merit and are denied.

D. The Theory of the Case Instruction

Next, Mr. Lee contends that his trial counsel was ineffective in proffering a theory of the case instruction that allegedly implicated Mr. Lee.

Under *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court analyzes claims of ineffective assistance of counsel using a two-part test: (i) Mr. Lee must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (ii) that he suffered prejudice as a result.

Mr. Lee claims that his counsel's theory of the case jury instruction admitted that Mr. Lee was present in the Lee vehicle at the time of the shooting, and strongly implied that Mr. Lee was aware of the intentions of his co-defendants:

It is the [Petitioner's] theory of the case that he did not shoot any weapon during the early morning hours of June 14, 1992. Specifically, any shots fired from the blue Cutlass were discharged by other individuals within that vehicle over whom [Mr. Lee] had no control, or for which he can be held accountable, unless proof beyond a reasonable doubt is presented that would establish that he either conspired with, or was a complicitor with, any of the other individual (sic) as defined by these instructions.

In addition, [Mr. Lee] contends that any shots fired from the blue Cutlass were a result of shots first being fired at that vehicle by the occupants within the vehicle driven by Damon Roberts. Specifically,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 14

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

any shots discharged were defensive in nature and were not intended to cause any injury or death to any occupant within Damon Roberts' vehicle, and were discharged in an attempt to prevent any further shooting from the occupants within Damon Roberts' vehicle. Finally, any shots fired from the weapon which caused the death of James McGregor came from a weapon that was not within the possession or control of [Mr. Lee].

The quoted instruction does not actually concede any facts, particularly the fact that Mr. Lee was in the Lee vehicle at the time. However, it emphasizes the argument that Mr. Lee did not have the requisite *mens rea* for any of the murder-related charges, or that, in the alternative, that he was merely acting in self-defense. This appears to have been a strategic decision made by Mr. Lee's counsel based on the evidence in the case. Strategic decisions made by counsel after full investigation of the law and facts are virtually unchallengeable under *Strickland,* and entitled to a "heavy measure of deference." 466 U.S. at 690-91. The question for this Court is whether this decision was reasonable under the circumstances.

The Court finds that it was. At least three witnesses gave testimony that suggested that Mr. Lee was in the Brian vehicle at the time. Locke testified that she personally observed Mr. Lee in the vehicle. Gilmore testified that, immediately before the shooting, she let Mr. Lee out of her car and he got into the Lee vehicle, and moments later, the Roberts vehicle approached and shots were exchanged. Qualls testified that Mr. Lee and Brian left together, expressing an intent to go kill Roberts. In light of this testimony particularly the testimony of Gilmore, Mr. Lee's girlfriend and in the absence of any alibi testimony establishing Mr. Lee's presence elsewhere at the time, the Court cannot say that Mr. Lee's counsel's decision to emphasize theories other than his absence from the vehicle was unreasonable. Rather than lose credibility with the jury by asking it to find that Mr. Lee was not present despite compelling evidence to the contrary, Mr. Lee's counsel's decision to focus on other defenses reflects the type of strategic, informed choice that falls within the broad range of professional conduct.

Mr. Lee's arguments of inadequate *mens rea* and, to a lesser extent, self-defense, appeared to be more fruitful areas based on the evidence.

*16 In his Objection, Mr. Lee specifically asserts that his counsel should have highlighted for the jury that the bullet that killed James McGregor was found to come from a weapon that was never recovered, a weapon that even Locke did not accuse Mr. Lee of having. Although the Court agrees that this, too, was a valid theory of the case that could have been pressed by Mr. Lee's counsel, the failure to do so does not reflect ineffective assistance. Notably, such a defense might exculpate Mr. Lee from the substantive crime of murdering James McGregor, but it would do little to acquit him of the conspiracy to murder and assault claims. In other words, although such an argument might have convinced the jury that Mr. Lee did not fire the shot that killed James McGregor, it would not prevent them from finding that Mr. Lee shared a common plan with the individual who did fire the fatal shot, thus potentially allowing Mr. Lee to be convicted of the conspiracy to murder charge instead.[FN12] More importantly, the record indicates that Mr. Lee's counsel *did* discuss the issue, albeit briefly, in his closing argument:

> FN12. The Court does not consider the fact that the jury ultimately acquitted Mr. Lee of the conspiracy to murder charge. The assessment of the reasonableness of counsel's decisions cannot be made in hindsight after learning of the jury's verdict.

The district attorney goes in, excuse me, into ditching the gun ... I'm wondering when the district attorney is going to tell you who held which gun and shot which gun? The evidence is in. Argument is just argument. To say a person had this or that is a guess, and nowhere in those instructions does it say that you can guess.
The point I think I was making, the district attorney said to you, because again, I was waiting for the answer at some point, what happened to the other gun, or guns? Because if you remember Detective Kerber he couldn't say if these bullets were recovered from Mr. McGregor or Mr. Roberts came

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 15

Slip Copy, 2005 WL 2991730 (D.Colo.)
(Cite as: Slip Copy)

from the same gun.
Finally, you get an answer from the district attorney
that nowhere is it to be found in the evidence they
ditched that gun and kept the other gun for
sentimental value. Where did that come from? That
pre-supposes that they knew that was a gun they
needed to ditch.

Trial Record, v. 16 at 117.

Because Mr. Lee's counsel chose to highlight a
theory of defense that was reasonably supported by
the evidence, the Court finds that his performance
was within the broad range of acceptable
professional conduct, and thus, was not ineffective.
The Court need not reach the second *Strickland*
prong of prejudice. Mr. Lee's Objections to the
Recommendation are overruled, and the Court
adopts the Recommendation that Claim Three be
denied.

### E. The Complicity Instruction

Mr. Lee contends that the improper complicity
instruction given by the Court deprived him of Due
Process. The jury instructions given by the trial
court were not transcribed in the record, but Mr.
Lee's brief to the Colorado Court of Appeals on this
issue indicates that the following instruction was
given:
A person is guilty of an offense committed by
*another person if he is a complicitor. To be guilty as*
a complicity, the following must be established
beyond a reasonable doubt:
*17 1. A crime must have been committed.
2. Another person must have committed *all or part
of* the crime.
3. The defendant must have had knowledge that the
other person intended to commit *all or part of* the
crime.
4. The defendant did intentionally aid, abet, advise,
or encourage the other person in the commission or
planning of the crime.

*See Docket # 14, Attachment M at 9 (emphasis
added).

Several years after Mr. Lee's trial concluded, the

Colorado Supreme Court held that the "all or part of
" language in the above-quoted pattern instruction is
erroneous. *People v. Rodriguez*, 914 P.2d 230, 276
(Colo.1996). Without engaging in extended analysis
of the issue, the Colorado Supreme Court in
*Rodriguez* agreed with the defendant's contention
that, because of the "all or part of" language, the
instruction permitted the jury to convict the
defendant of the substantive crime under a
complicity theory even though it found that the
defendant was complicit in only *some* of the
elements; in *Rodriguez'* s case, the defendant argued
that the defective instruction could permit a
conviction for first degree murder on a complicity
theory even though the jury found that he had only
agreed with the principal to assault the victim. *Id.*

The Colorado Supreme Court revisited the "all or
part of" language of the instruction the following
year in *Bogdanov v. People*, 941 P.2d 247, 255-56
(Colo.1997). Acknowledging that *Rodriguez*
characterized the "all or part of" language as error,
the court in *Bogdanov* retreated from that blanket
assertion, recognizing circumstances in which the "
all or part of" language is appropriate. The court
cited an example in which two persons conspire to
engage in the crime of robbery, which has two
elements: (i) the taking of property from another,
and (ii) the use of violence. *Id.* at 256. In the court's
example, two people conspire to rob a victimonc
person assaults the victim with a knife while the
other steals the victim's money. In this
circumstance, the court observed that neither person
has committed every element of the crime of
robbery; rather, each person has committed only "
part of" the crime. In this circumstance, it would be
appropriate to use the "all or part of" language in a
complicity instruction, as complicity requires only
that all of the elements of the crime be committed,
not that any single person has done so. *Id.* By
contrast, in cases where two persons conspire to
commit a crime, and one of the two commits *all* of
the elements of the crime and the other does not
commit *any* of the elements, a complicity
instruction containing the "all or part of" language
is error. *Id.*

In ruling on Mr. Lee's argument on this issue, the
Colorado Court of Appeals found that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.