# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Kansas.
Mark and Dian WORKMAN, Plaintiffs,
v.
AB ELECTROLUX CORPORATION, et al.
Defendant.
**No. 03-4195-JAR.**

Aug. 8, 2005.

Lynn Weddle Judkins, William Clayton Crawford, Foland Wickens Eisfelder Roper & Hofer PC, Kansas City, MO, Patrick R. Gareis, Grotefeld & Denenberg, LLC, Chicago, IL, for Plaintiffs.
Brian A. Mark, Overland Park, KS, Mary L. Barrier, Nathan James Meisgeier, Stinson Morrison Hecker LLP, Kansas City, MO, for Defendant.

*MEMORANDUM AND ORDER*
ROBINSON, J.
*1 Plaintiffs Mark and Dian Workman seek to hold defendant Electrolux Home Products, Inc. ("Electrolux"), incorrectly named herein as AB Electrolux Corporation, liable for causing a residential fire, under theories of negligence, strict liability and breach of implied warranty.[FN1] This matter is before the Court on three motions filed by Electrolux: (1) Motion to Dismiss Plaintiffs' Complaint, or in the Alternative, to Dismiss Plaintiffs' Insurance Subrogation Claim Based on Spoliation of the Evidence (Doc. 58); (2) Motion to Exclude Testimony of Plaintiffs' Experts (Doc. 56); and (3) Motion for Summary Judgment (Doc. 54). For the reasons set forth in detail below, Electrolux's motions are granted in part and denied in part.

> FN1. Plaintiffs have voluntarily dismissed defendant Sears, Roebuck and Co. and their claims that Electrolux violated the Kansas Consumer Protection Act.

I. Findings of Fact

Electrolux's motion to dismiss, *Daubert* motion and corresponding motion for summary judgment, and plaintiffs' response thereto, follow the summary judgment format prescribed by D. Kan. Rule 56.1.

Based on that record, the Court finds the following facts are undisputed:[FN2]

> FN2. In the context of a *Daubert* determination, the Court must make specific findings on the record. *Bitler v. A.O. Smith Corp.,* 391 F.3d 1114, 1119 (10th Cir.2004).

In October 2001, Mark Workman purchased a Sears Kenmore freezer, Model # 253.2110110, Serial No. 21101-11-2 (the "Freezer"). Electrolux manufactured the Freezer. The Freezer shell consists of an inner and outer steel casing. The area between the two casings is filled with polyurethane insulation. Attached to the interior of the rear wall of the Freezer is the evaporator, fan and fan motor, and associated wiring ("evaporator compartment"). The evaporator compartment is covered by a metal cover called the evaporator cover. Plaintiffs used the Freezer, which was located in the northwest corner of their garage. An unplugged clothes dryer was also kept in the garage; no other electrical devices were in the vicinity of the Freezer.

On January 4, 2002, Mark Workman parked his 1994 F-150 truck (the "Truck") in the south bay of the double car garage and closed the south garage door. Plaintiffs had purchased the Truck new and had no recent problems with it. Approximately 45 minutes later, Dian Workman left to pick up one of her children and took plaintiffs' car parked in the north bay of the garage. Forty-five minutes after she left, Mark Workman heard "popping" noises and discovered that the garage was on fire. He testified that it was his "hunch" that the northwest corner of the garage burned first.

*Shelter's Investigation*

Shelter Insurance Company ("Shelter") insured plaintiffs' residence and its contents, as well as plaintiffs' Truck. Shelter and its counsel assigned Larry Stemmerman to conduct a cause and origin investigation. Stemmerman is a fire investigator with over 30 years of experience in fire investigations; he investigates 100 to 150 fires per year and has instructed numerous fire investigation courses. On January 8, four days after the fire, Stemmerman conducted a cause and origin investigation at the fire

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10722   Page 3 of 16

Not Reported in F.Supp.2d                                                                                     Page 2
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

scene.

During his investigation process, Stemmerman followed NFPA 921, "Guide for Fire and Explosion Investigations ("NFPA 921"). NFPA 921 sets forth a six-step process in which a fire origin and cause investigator must: (1) recognize the need to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data (inductive reasoning); (5) develop a hypothesis based on that data; and (6) test the hypothesis (deductive reasoning). NFPA 921 also provides in part, concerning the examination and preservation of evidence:

*2 9.3.6.3 Efforts to photograph, document, or preserve evidence should apply not only to evidence relevant to an investigator's opinions, but also to evidence of reasonable alternate hypotheses that were considered and ruled out.

9.3.6.7 Once evidence has been removed from the scene, it should be maintained and not be destroyed or altered until others who have a reasonable interest in the matter have been notified.[FN3]

FN3. NFPA 921, 2001 Edition, p. 83.

At the time of Stemmerman's investigation, the 2001 edition of NFPA 921 was in effect.

Stemmerman interviewed plaintiffs; and Mark Workman informed him that he saw flames near the north end of the garage. Based on the information obtained from Mark Workman, Stemmerman excavated the north end of the garage where the Freezer was located and found spalling of concrete around the Freezer's pre-fire location.[FN4] Stemmerman also excavated the area around the Truck and found spalling beneath the Truck's engine compartment. Stemmerman discovered the Freezer door lying on the floor, covered with debris, and noted that the Freezer door exhibited very little fire damage. He testified that it was his opinion that the Freezer door had fallen off very early in the fire and was protected from burn damage by its location and falling debris. He further testified that the Freezer door fell off either because (1) falling debris knocked the door off its hinges, or (2) an internal fire in the Freezer burned off the door's hinges, although he admitted that he saw no evidence of the latter.

FN4. Concrete spalling is the chipping or pitting of concrete or masonry surfaces. Spalling may be caused by heat, freezing chemicals or abrasion and is linked to high temperatures that exist during fires. NFPA 921, § 4.6 (2004 Edition).

Stemmerman examined the Truck, its wiring and components and rejected it as a potential cause of the fire. Stemmerman concluded that the fire originated in the northwest corner of the garage in the area of the Freezer. He removed and preserved the Freezer, but not the Truck, which Shelter salvaged on or about January 23, nineteen days after the fire.

In his Expert Report, Stemmerman stated that the cause of the fire was undetermined:
The cause of the fire is undetermined pending a later complete examination of the freezer unit.
It is the opinion of this investigator that the fire originated in the garage. Indications were observed that the point of origin of the fire was near the west wall of the garage at a point where the Kenmore freezer had been located.

In his deposition, Stemmerman testified that he initially intended to offer an opinion at trial that the fire originated near or at the location of the Freezer and that he would not offer any opinions regarding the fire's ignition source. He subsequently testified that he concurred with Carl Martin's opinions attributing the cause of the fire to the Freezer, but conceded that if Martin's opinions proved incorrect, then his concurrence would be incorrect as well.

With Shelter's approval, Stemmerman had requested Carl Martin to examine the Freezer to determine if it caused the fire. Stemmerman discussed the case with Martin and reviewed photographs of the scene. Martin did not perform any investigation of the scene. Martin first examined the freezer on January 18, fourteen days after the fire. His examination of the Freezer's evaporator compartment revealed a melted conductor ("wire") attached to what Martin believed to be the interior steel casing of the rear, exterior Freezer wall.

*3 Martin testified that he also investigated the fire in accordance with protocol set forth in the NFPA 921, to the extent it was applicable. Martin examined the burn patterns in the garage and on the Freezer, finding conditions consistent with intense heat damage and an internal fire in the Freezer. After reviewing fire scene photographs as well as a preliminary examination of the Freezer, Martin hypothesized that the fire was caused by a malfunction of the Freezer compressor unit and/or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10723   Page 4 of 16

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

controls. He therefore conducted a destructive examination of the Freezer to test this hypothesis on July 5, 2002, about six months after the fire. Martin's examination of the compressor revealed that it did not malfunction or experience an internal source of heat; and he ruled out the compressor as a cause of the fire. Further examination of the Freezer revealed that an internal fan motor had experienced conditions consistent with a malfunction and the internal generation of heat. This condition existed near the location where an internal power conductor had experienced a short circuit condition and melted copper spatter had been distributed on the inside surface of the Freezer housing, which represented an internal source of heat and fire. Martin eliminated an exterior source of fire, which could not have caused the internal heat and fire damage within the Freezer, as such an external fire would have terminated the electrical power to the Freezer thereby preventing the short circuit condition. Based on the conditions found in the Freezer, Martin concluded that the cause of the fire was the result of an internal malfunction within the Freezer involving the overheating of the fan motor and related internal short circuit condition. This resulted in the door of the Freezer separating from the Freezer casing and falling to the floor of the garage early in the fire's progression.

In his Rule 26 report, Martin offered the following opinion:
I. The refrigeration unit experienced an internal malfunction that caused internal heat to be generated that ignited internal combustible materials. This resulted in the freezer door separating from the freezer and the progression of the fire from the freezer unit.
II. The internal malfunction involved the overheating of a fan motor. This resulted in the generation of heat and internal short circuiting to occur. Melted copper spatter from the short circuit condition occurred and the combination of these conditions resulted in the ignition of combustible materials within the freezer.

At his deposition, Martin testified that he did not know the location of the wire or how it was routed. He did not consult any literature or schematics concerning the Freezer and its wiring. Martin cannot identify the defect that caused the wire to separate, including any installation defect or manufacturing defect. He believes that the fan motor may have caused a vibration that prompted the wire to separate. This vibration, according to Martin, could have been caused by the fan seizing up. He examined the fan motor and could not identify any defect in the fan motor that could have caused the wire to separate; nor could he determine whether the fan motor seized up. He testified that he is unaware whether the fan motor has an internal safety device that would prevent the fan motor from generating vibrations or heat in the event it seized up. In fact, the fan motor on the Freezer is equipped with a safety device that prevents the motor from vibrating and it will not generate heat in the event it seizes up.

*Electrolux's Investigation*

*4 Sears received notice of the fire from Shelter and its counsel by letter dated January 21, 2002 sent to Sears' third-party administrator, Helmsman Management Services, Inc., in which Shelter invited Sears to participate in the investigation with a requested response date of February 1, 2002. Shelter did not notify Sears of its intent to salvage the Truck.

Electrolux received notice of the fire on or about January 28, 2002. Bob Sampey of Engineering Systems Inc. ("ESI") conducted a cause and origin investigation on Electrolux's behalf on February 4, about 30 days after the fire. When Sampey arrived, both the Freezer and the Truck had been removed from the scene. Sampey examined: the burn patterns in the garage, including burn patterns evident on a propane cylinder and dryer located in the garage at the time of the fire; the spalling of concrete beneath the Truck; Stemmerman's photographs; and the testimony of plaintiffs' daughter that she saw fire under the Truck. Based on this, Sampey determined that the fire originated in the vicinity of the Truck and moved to the northwest, towards the Freezer. Sampey's examination of Stemmerman's photographs of the Truck indicated uniform burn damage to the Truck consistent with what he would expect if the Truck caused the fire. The presence of black smoke described by the Workman children is also consistent with the type of smoke that usually results from a vehicle fire. Sampey believed that the extensive burn damage to the Truck's dashboard and engine compartment required further examination of the Truck's components to determine if the Truck had caused the fire. It is Sampey's opinion that the lack of any burn damage to the Freezer door indicates that it was knocked off its hinges by a blunt force caused by the collapsing roof, not by an internal fire in the Freezer that would have burned off the door's hinges.

On July 1, about six months after the fire, Tom Bajzek of ESI examined the Freezer on behalf of Electrolux. Bajzek opines that the damage to the

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10724   Page 5 of 16

Not Reported in F.Supp.2d                                                                                                  Page 4
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

Freezer, including but not limited to the burn patterns and the remains of the Freezer's internal components, is consistent with an attack on the Freezer by an external fire and that there is no evidence of any electrical activity, that is, a short circuit, in the Freezer. Specifically, melted copper wiring in the Freezer's interior compartment is consistent with damage from an external fire.

Both Sampey and Bajzek reviewed data from the National Highway Transportation and Safety Administration (NHTSA) and Alldata that revealed the following history of problems that could lead to a fire in the Truck: (1) failure of electrical wiring of the driver's seat; (2) shorting of the wiring harness near the master cylinder; (3) failure of the light switch assembly; (4) alternator malfunctioning/discharge and damage of plastic connector; (5) other possible wiring shorting locations; and (6) malfunctioning catalytic converter or dual tank crossover switch. After reviewing this recall data, and based on the physical evidence reviewed at the scene, Sampey and Bajzec concurred that the destruction of the Truck before they could examine it prevented them from ruling the Truck in or out as a cause of the fire.

*Warnings*

*5 Neither Stemmerman nor Martin offered any opinion regarding Electrolux's duty to warn plaintiffs about the use of the freezer or any dangers involved therein. In her deposition, Dian Workman did not identify any warning that should have been provided by Electrolux. In his deposition, Mark Workman stated that he did not remember ever receiving any warnings from Electrolux, nor could he identify any warnings he thought would have prevented the fire.

II Analysis

A. Motion to Dismiss for Spoliation of Evidence

Electrolux moves for dismissal of plaintiffs' complaint, or in the alternative, dismissal of plaintiffs' insurance company's subrogation claims from this matter. In addition, in its motion to exclude expert testimony, Electrolux requests that plaintiffs' experts be precluded from testifying due to the spoliation of evidence. In support of its argument, Electrolux argues that plaintiffs and their insurance company's spoliation of crucial evidence critically impairs its ability to defend itself in this litigation.

"Federal courts possess inherent powers necessary 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " [FN5] Among those inherent powers is the power to impose sanctions for the spoliation of evidence.[FN6] Electrolux's motion is a request for the ultimate sanction of dismissal for plaintiffs' alleged spoliation of evidence. The appropriate sanction is a discretionary decision by the court and should be exercised with the view toward choosing the "least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." [FN7] "A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient sanction is available." [FN8] Sanctions that may be appropriate for the destruction of evidence include: (1) outright dismissal of claims; (2) exclusion of countervailing evidence; or (3) a jury instruction on the spoliation inference, which permits the jury to assume that destroyed evidence would have been unfavorable to the position of the offending party.[FN9]

FN5. *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.,* 139 F.3d 912, 1998 WL 68879, *3 (10th Cir. Feb.20, 1998) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

FN6. *Id.*

FN7. *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994).

FN8. *Baliotis v. McNeil,* 870 F.Supp. 1285, 1289 (M.D.Pa.1994) (citation omitted).

FN9. *Howell v. Maytag,* 168 F.R.D. 502, 505 (M.D.Pa.1996) (citing *Schmid,* 13 F.3d at 78)).

When deciding whether to sanction a party for the spoliation of evidence, courts consider two primary factors: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party.[FN10] The Court will address each factor in turn.

FN10. *Jordan F. Miller,* 1998 WL 68879, at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 5
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

*4; *Schmid.,* 13 F.3d at 79.

*Degree of Culpability*

A litigant has a duty to preserve evidence that he knows or should know is relevant to imminent or ongoing litigation.[FN11] This duty is heightened for an insurer because it is a sophisticated entity experienced in litigation.[FN12] Such preservation may not be "selective," saving only the evidence supporting a theory of liability and impeding the examination of another theory.[FN13]

FN11. *Jordan F. Miller,* 1998 WL 68879, at *5 (citing *Dillon v. Nissan Motor Co.,* 986 F.2d 263, 268-69 (8th Cir.1993)).

FN12. *Northern Assur. Co. v. Ware,* 145 F.R.D. 281, 284 (D.Me.1993).

FN13. *Id.*

*6 It is apparent that Shelter was aware of a potential subrogation claim immediately after receiving the cause and origin report of Stemmerman, wherein he opined that the cause of the fire was undetermined, but appeared to have originated in the garage near the Freezer. At that point, a duty was imposed upon Shelter to preserve the evidence relevant to the cause and origin of the fire, including the Truck. While the scope of the duty to preserve evidence is not boundless, at a minimum, an opportunity for inspection should be afforded a potentially responsible party before relevant evidence is destroyed.[FN14] Plaintiffs maintain that they did preserve the relevant evidence, that is, the Freezer. Thus, plaintiffs contend, the destruction of the Truck should be excused because they preserved the "putative defective product or item." The Court disagrees. While such evidence may serve to ameliorate the prejudice to Electrolux, plaintiffs cannot refute the assertion that demolition of the Truck resulted in destruction of otherwise relevant evidence.

FN14. *Baliotis,* 870 F.Supp. at 1290-91 (quotation omitted).

In this case, the litigants are plaintiffs as well as their insurance company, Shelter. Stemmerman examined the Truck, after finding spalling underneath its bed. Shelter salvaged the truck prior to giving notice of the fire to Sears and Electrolux. When the Truck was salvaged, Shelter had not yet identified the cause of the fire. Under these circumstances, the Court finds that plaintiffs and Shelter should have known that the Truck was relevant to potential litigation, and thus had a duty to preserve the Truck until the defendant had the opportunity to examine it.

*Prejudice*

"Before a sanction for destruction of the evidence is appropriate, however, there must also be a finding that the destruction prejudiced the opposing party."[FN15] Electrolux contends that it has been "extremely" prejudiced by the destruction of the Truck. Based on photographic evidence and inspection of the scene where the Truck was located during the fire, Electrolux's experts opine that the fire likely originated in the area of the Truck, rather than the Freezer. Their inability to examine the Truck arguably prevents Electrolux's experts from conclusively ruling the Truck in or out as the cause of the fire.

FN15. *Dillon,* 986 F.2d at 267.

A manufacturer of a product that is allegedly responsible for causing a fire is prejudiced if it cannot have its own cause and origin expert inspect the fire scene for other potential causes.[FN16] However, the Freezer, which plaintiffs believe to be the cause of the fire, was preserved. Electrolux has had the ability to defend its product by having its experts examine the Freezer to refute plaintiffs' assertion that it was the cause of the fire. Electrolux's experts, Sampey and Bajzek, have examined the Freezer and provided their opinions that the Freezer was not the cause of the fire and that it was not defective. Moreover, Electrolux has not presented any affidavits that it is unable to present expert witness evidence on the cause and origin of the fire. Electrolux's experts were able to examine the fire scene as well as photographs of the Truck taken by Stemmerman. Accordingly, a defense of this action has not been rendered impossible by plaintiffs' failure to preserve the Truck.

FN16. *Schmid,* 13 F.3d at 80.

*7 Electrolux's defense, however, has been hampered by the destruction of the Truck. As stressed by Electrolux, plaintiffs are proceeding on a product liability theory, under which they must present, *inter alia,* evidence eliminating other reasonable secondary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sources for the fire. In this case, plaintiffs have presented evidence from Stemmerman eliminating the Truck as an ignition source, but Electrolux has been deprived of the means to test this assertion. Thus, plaintiffs have prejudiced the defense of this action by failing to preserve the Truck.

*Appropriate Sanction*

The Tenth Circuit has indicated that as a general rule, the "bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." [FN17] The court also states that, because only the bad faith loss or destruction of a document will "support an inference of consciousness of a weak case," no adverse inference should arise from spoliation that is merely negligent.[FN18] The Tenth Circuit does not impose a similar requirement of bad faith when considering other sanctions for spoliation, however.[FN19]

FN17. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir.1997) (citing *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir.1985)).

FN18. *Id.* (citing *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir.1975)).

FN19. *Jordan F. Miller Corp.*, 1998 WL 68879, at *4.

While there is no evidence in the record of bad faith supporting spoliation inference instruction, the Court will reserve ruling on this issue until trial. As to other sanctions, the Court finds that although dismissal of the case is not warranted under the circumstances, the lesser sanction of excluding expert testimony is appropriate. Accordingly, the Court shall bar plaintiff from introducing evidence arising from the visual inspection of the Truck, including expert testimony by Larry Stemmerman, who omitted the Truck as a potential source of the fire. Such a sanction will "level the playing field" and cure the prejudice to Electrolux.

**B. Motion to Exclude Expert Witnesses**

Defendant argues that the Court should exclude the testimony of plaintiffs' experts because (1) their causation theories are blatant conjecture and (2) plaintiffs and their insurance companies spoliated crucial evidence that critically impairs defendant's ability to defend in this litigation. For the reasons discussed above, the Court declines to impose the sanction of wholesale exclusion of the testimony of plaintiffs' experts based on spoliation, and instead, focuses on the remaining issue.

1. Legal Standard

The Court has broad discretion in deciding whether to admit expert testimony.[FN20] Fed.R.Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." [FN21]

FN20. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir.1996) (citation omitted).

FN21. Fed.R.Evid. 702.

*8 The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." [FN22] In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony ... has 'a reliable basis in the knowledge and experience of his discipline." [FN23] Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand." [FN24]

FN22. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir.1999).

FN23. *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir.2005) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10727   Page 8 of 16

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

FN24. *Id.* (quoting *Daubert, 509 U.S. at 597).*

A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issues at hand to warrant a determination that it has relevan[ce] ... FN25

FN25. *Bitler,* 391 F.3d at 1121.

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert.*FN26 The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.FN27 In this case, the parties have agreed that a hearing is not necessary, and rest on their written submissions. The Court has carefully reviewed the exhibits filed with Electrolux's motion and believes this review is sufficient to render a decision upon the motion to exclude without conducting an oral hearing.

FN26. *Goebel v. Denver and Rio Grande Western R.R. Co.,* 215 F.3d 1083, 1087 (10th Cir.2000).

FN27. *Id.*

2. Analysis

*Carl Martin*

a) Reliability

Electrolux does not take issue with Martin's background and qualifications as a mechanical engineer. Rather, it asserts that Martin's opinions are not reliable and therefore not admissible. Specifically, defendant contends that: (1) Martin could not identify or describe the supposed defect in the Freezer; (2) Martin's opinions are not based on any methodology; (3) Martin failed to test his theory; and (4) Martin's opinions lack the requisite peer review, known rate of error or acceptance by the scientific community. Electrolux contends that in similar cases, courts have excluded similar expert opinions.

While Martin's qualifications are not in dispute, the Court notes that he is qualified to render mechanical engineering testimony related to the source of electrical heat energy that caused the fire. Martin is a professional engineer with a bachelor's degree in mechanical engineering from University of Missouri Rolla and a masters degree in engineering management from the University of Kansas. Martin has practiced as a licensed engineer since 1979 and in forensic engineering services for over 16 years, for Engineering Perspectives, Inc. Martin has provided forensic engineering consultation in approximately 51 cases, 17 of which involved trial testimony. Of those, six involved fires.

*Failure to Identify Specific Defect*

**\*9** As stated above, Martin's theory of causation is that an internal malfunction in the Freezer caused a wire within the evaporator compartment to separate from its connection. Once disconnected, this wire became affixed to the inner lining of the Freezer's rear wall. At that time, a short circuit condition occurred and the electrical activity generated enough heat to ignite polyurethane insulation located in between the casings of the Freezer's rear wall. At his deposition, Martin theorized that a defect could have occurred either during the manufacturing process or the installation of the component parts, but he could not identify or describe the specific defect. Electrolux asserts that Martin's inability to identify a specific defect renders his causation theory nothing more than blatant speculation, which is inherently unreliable and inadmissible. The Court disagrees in part. Electrolux's criticism that Martin has not identified a specific defect, while relevant to cross-examination or a motion for summary judgment, does not in and of itself render his testimony inadmissible under *Daubert.* However, as discussed below, any opinion Martin should offer as to a specific defect would be speculative, and thus inadmissible.

*Methodology*

Electrolux argues that Martin should not be able to testify about the cause and origin of the fire because his methodology was insufficient. Specifically, Electrolux contends that Martin reached his conclusions based solely on his visual observations. Stemmerman told Martin that he believed the fire

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10728   Page 9 of 16

Not Reported in F.Supp.2d                                                                              Page 8
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

originated in the garage at or near the Freezer. Martin viewed the interior of the Freezer evaporator compartment that revealed the melted wire and assumed that this melted wire short circuited and caused the fire. Electrolux characterizes this as Martin jumping to the conclusion that the Freezer suffered from a defect and that this defect caused the fire. Because Martin could not identify a defect, he could not subject his opinions to peer review, nor could the potential or known error rate in his hypothesis be evaluated or calculated. Further, Martin admitted that he did not know the location or function of the wire that came loose and that he did not examine any wiring diagrams or schematics regarding the Freezer. Lacking knowledge of the design of the Freezer's interior components and their wiring, Electrolux contends that Martin cannot demonstrate that his theory regarding the cause of the fire is accepted in the scientific community.

In support of its argument, Elextrolux relies on the Eighth Circuit decision in *Weisgram v. Marley Co.*[FN28] In that case, the court held that an expert in fire investigation was free to testify on the origin of the fire, but was not qualified to offer an opinion as to whether a baseboard heater, the purported cause of the fire, had malfunctioned.[FN29] The court stated that the fire investigator had "run away" with his own unsubstantiated theories as to the cause of the fire "by relying on inferences that have absolutely no record support." [FN30] In other words, there was no foundation nor basis in the record to support the opinions on causation offered by the fire investigator.

   FN28. 169 F.3d 514 (8th Cir.1999), *aff'd* 528 U.S. 440, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

   FN29. *Id.* at 519.

   FN30. *Id.*

*10 The Court recognizes that the proponent of expert testimony must show a grounding in the methods and procedures of science that must be based on actual knowledge and not subjective belief or unaccepted speculation.[FN31] To determine whether Martin used reliable methodology, the Court considers: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community.[FN32] These factors are not a definitive checklist or test, and the Court's inquiry into reliability must be tied to the facts of the particular case.[FN33] Expert opinions may be based on the expert's education, training and experience, combined with reliance on reports, depositions or other information related to the particular circumstances, but the expert must also explain factually why and how he reached those conclusions.[FN34]

   FN31. *Daubert,* 509 U.S. at 592-93; *Kumho Tire, Ltd. v. Carmichael,* 526 U.S. 137, 149-50, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Mitchell v. Gencorp, Inc.,* 165 F.3d at 780.

   FN32. *Daubert,* 509 U.S. at 593-94.

   FN33. *Kumho Tire,* 526 U.S. at 137.

   FN34. *Hilt v. SFC Inc.,* 170 F.R.D. 182, 185 (D.Kan.1997).

After reviewing the parties' submissions, the Court is satisfied that plaintiffs have established that Martin's methodology was reliable. Unlike the expert in *Weisgram,* Martin developed his opinions based on the methodology set forth in NFPA 921, which represents the national standard with regard to appropriate methodology for investigation by fire science experts.[FN35] This included his initial tactile examination of the Freezer and the testing of his hypothesis by conducting a destructive engineering evaluation of it while it was fully disassembled in the presence of Electrolux's investigators. Martin appears to have painstakingly examined the Freezer and described in his deposition the layer by layer examination he made of the fire damage before he discovered the damage to the fan motor and the related short-circuit condition. Moreover, Martin eliminated an exterior source of fire, which could not have caused the internal heat and fire damage within the Freezer, as such an external fire would have terminated the electrical power to the Freezer thereby preventing the short circuit condition. Thus, this is not a situation as in *Weisgram,* where the expert expressed his opinion based on his subjective belief with no foundation. Martin followed the NFPA 921 methodology and applied it to the facts of this case based on his own detailed destructive examination of the Freezer.

   FN35. *See McCoy,* 2003 WL 1923016, at *3 (D.Kan. Apr.16, 2003) (citation omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Independent Testing/Peer Review*

Electrolux also takes issue with Martin's failure to test his theory of wire separation and ignition of the insulation. But *Daubert* does not require an expert to perform testing before his opinion is admissible. Rather, *Daubert* requires that the expert's methodology be established, scientifically sound, and subject to testing and peer review. That is the case with Martin's opinion, as he testified that he employed the fire origin methodology set forth in NFPA 21, which many courts have recognized as "a peer review and generally accepted standard in the fire investigation community." [FN36] Moreover, as plaintiffs assert, the concepts necessary for corroborating Martin's conclusions include such widely accepted principles such as energized conductors being capable of short circuiting events, the electrical conductivity of metal, and the capacity of short-circuit events to start fires. "[I]ndependent testing is not the *sine qua non* of admissibility under *Daubert*." [FN37] Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of independent testing may "go to the weight, not the admissibility" of the testimony.[FN38]

> FN36. *Tunnell v. Ford Motor Co.,* 330 F.Supp.2d 707, 725 (W.D.Va.2004) (quoting *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d 360, 366 (D.Conn.2001).
>
> FN37. *McCoy,* 2003 WL 1923016, at *3.
>
> FN38. See *Zuchowicz v. United States,* 140 F.3d 381, 387 (2d. Cir.1998) (quotation omitted).

*Conclusion*

*11 Based on the criteria set forth in *Daubert* and Fed.R.Evid. 702, the Court finds that Martin's testimony that the fire originated inside the Freezer as a result of a short circuit in the evaporator compartment qualifies as reliable testimony. Of course, at trial Electrolux may challenge the degree of credibility the jury ought to accord Martin's conclusion and may present counter-evidence to refute the veracity of Martin's hypothesis. Accordingly, Martin may testify that the fire was caused by an internal malfunction within the Freezer involving the overheating of the fan motor and related internal short circuit condition. For the reasons stated below, however, he may not go so far as to theorize that the fan overheating and resulting short-circuit was the result of a manufacturing or installation defect.

As previously noted, Martin's Rule 26 report does not mention or describe a defect in the Freezer, other than a reference to an internal malfunction involving the overheating of a fan motor and resulting short-circuit event. However, Martin was questioned at his deposition about his opinion as to what caused the malfunction and short-circuit event. Martin theorized that such an event was due to a manufacturing or installation defect, but ultimately admitted that he could not say with scientific certainty that there was a manufacturing or installation defect, nor could he could find evidence of a defect in the fan motor.

In contrast, Martin testified that he could state with a reasonable degree of scientific certainty that the Freezer malfunctioned, causing a conductor to separate, which in turn caused a short-circuit event that ignited insulation materials in the Freezer, causing the fire; and Martin may so testify. If asked at trial, however, he may not opine that this separation resulted from a manufacturing or installation defect relative to the Freezer or the fan motor, however, because any such opinion is speculative.

b) Helpfulness to the Jury

The touchstone of Rule 702 is helpfulness of the expert testimony, a condition that goes primarily to relevance.[FN39] Thus, the Court must determine whether the proffered evidence would be helpful to the trier of fact. [FN40] In so doing, the Court examines specific subject areas of proposed expert testimony to ascertain whether each is sufficiently tied to the facts of the case so that it will be helpful to the trier of fact.[FN41] Any doubts should be resolved in favor of admissibility.[FN42]

> FN39. See *BioCore, Inc. v. Khosrowshahi,* 183 F.R.D. 695, 699 (D.Kan.1998) (quoting *Miller v. Heaven,* 922 F.Supp. 495, 501 (D.Kan.1996)).
>
> FN40. *Id.*
>
> FN41. *Id.*
>
> FN42. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10730   Page 11 of 16

Not Reported in F.Supp.2d                                                                                            Page 10
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

Thus, the Court must determine whether the "proposed testimony is sufficiently, 'relevant to the task at hand.'" [FN43]

FN43. *Bitler,* 391 F.3d at 1121 (quoting *Daubert,* 509 U.S. at 597).

A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevan[ce] ... [FN44]

FN44. *Id.*

*12 The cause of the fire in this case is clearly a material issue. Martin's testimony has a tendency to make the cause of the fire more or less probable than it would be without his testimony. Thus, under the definition of "relevance" provided under Fed.R.Evid. 401, as well as that set forth in *Daubert,* the Court believes the proposed testimony as to the cause and origin of the fire is sufficiently relevant to be admitted.

*Larry Stemmerman*

In his Rule 26 report, Stemmerman stated that "[t]he cause of the fire was undetermined, pending a later, complete examination of the freezer unit." In his deposition, Stemmerman first testified that he only intended to offer an opinion at trial that the fire originated near or at the location of the Freezer and that he would not offer any opinions regarding the fire's ignition source. Stemmerman later testified that he concurred with Martin's opinions attributing the cause of the fire to the Freezer, but if Martin's opinions proved incorrect, then his concurrence in Martin's opinions would be incorrect as well. Thus, admissibility of Stemmerman's opinion is contingent on that of Martin. Because the Court has admitted Martin's testimony, to the extent described above, Electrolux's objection to Stemmerman's testimony is also overruled.

C. Summary Judgment

1. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN45] A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[FN46] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party." [FN47] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law." [FN48]

FN45. Fed.R.Civ.P. 56(c).

FN46. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN47. *Id.*

FN48. *Id.* at 251-52.

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[FN49] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." [FN50] The burden may be met by showing that there is no evidence to support the nonmoving party's case.[FN51] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." [FN52] When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[FN53]

FN49. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

FN50. *Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir.2003) (citing *Celotex Corp.,* 477 U.S. at 325)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10731   Page 12 of 16

Not Reported in F.Supp.2d                                                                                  Page 11
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

FN51. *Id.*

FN52. *Id.*

FN53. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. Analysis

Electrolux argues that it is entitled to summary judgment because plaintiffs have not identified a specific defect that is necessary to establish a prima facie case of liability under the Kansas Products Liability Act ("KPLA"). Electrolux also seeks summary judgment because plaintiffs have not presented a claim for *res ipsa loquitur*.

a) KPLA

*13 Plaintiffs bring their claims on a theory of products liability. The KPLA [FN54] applies to all product liability claims regardless of the substantive theory of recovery.[FN55] Under the KPLA, all legal theories of recovery, including negligence, strict liability, and failure to warn, are to be merged into one legal theory called a "product liability claim." [FN56] Thus, the KPLA's provisions "apply to actions based on strict liability in tort as well as negligence, breach of express or implied warranty, and breach of or failure to discharge a duty to warn or instruct." [FN57]

FN54. K.S.A. § 60-3301 *et seq.*

FN55. *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 795 P.2d 915 (1990).

FN56. *McCroy ex rel. v. Coastal Mart, Inc.*, 207 F.Supp.2d 1265, 1270 (D.Kan.2002) (citing *Savina*, 247 Kan. at 126, 795 P.2d at 931).

FN57. *Id.*

Kansas law recognizes three ways in which a product may be defective: (1) a manufacturing defect; (2) a warning defect; and (3) a design defect.[FN58] A product is considered defective under Kansas law if: (1) a flaw is present in the product at the time it is sold; (2) the producer or assembler of the product fails to adequately warn of a risk or hazard related to the way the product was designed; or (3) the product, although properly manufactured, contains a defect that makes it unsafe.[FN59] Plaintiffs assert that Electrolux is liable for all three types of defect.[FN60]

FN58. *Savina*, 247 Kan. at 127, 795 P.2d at 931.

FN59. See *Delaney v. Deer and Co.*, 268 Kan. 769, 774, 999 P.2d 930, 934, 936 (2000).

FN60. Pretrial Order, pp. 12-13. Plaintiffs' claim for negligence asserts Electrolux breached its duty to design, manufacture and warn; their claim for strict liability asserts that Electrolux failed to manufacture the Freezer without defect.

b) Specific Defect

Although plaintiffs' expert has identified a short circuit in the Freezer as the cause of the fire, he was unable to identify the specific defect that caused the energized conductor to separate from its connection resulting in the short-circuit event. Martin testified that this was due, in part, to the extensive fire damage to the component parts. Indeed, the Court has ruled that Martin may not go so far as to theorize that the fan overheating and resulting short-circuit was the result of a manufacturing or installation defect. Nonetheless, plaintiffs argue that they are entitled to utilize circumstantial evidence and the fact that the conductor separated in itself is enough to establish a defect in the Freezer. The Court will discuss this argument in the context of plaintiffs' claims for strict liability, breach of implied warranty, negligence and failure to warn.

*Strict Liability*

To succeed on a strict liability claim, a plaintiff must prove: " '(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control." ' [FN61] A product is in a defective condition if it has a defect in manufacturing, warning or design, and such defect existed at the time the product left the manufacturer's or seller's hands.[FN62] General assertions regarding a product's alleged defective nature are insufficient; instead, Kansas law requires plaintiff to establish the existence of a specific defect to prevail on a defective

product claim.[FN63] Plaintiffs' strict liability claim asserts that Electrolux failed to properly manufacture the Freezer without defects.[FN64]

---

FN61. *McCroy,* 207 F.Supp.2d at 1271 (quoting *Jenkins v. Amchem Prods., Inc.,* 256 Kan. 602, 630, 888 P.2d 869, 886 (1994)).

FN62. *Id.; see* PIK 3d Civil 128, 17.

FN63. *Jenkins,* 256 Kan. at 635, 886 P.2d at 889.

FN64. Pretrial Order, p. 13.

---

Plaintiffs are raising in effect, a "nonspecific defect" or "malfunction theory," wherein a malfunction of the product during normal operation is proof of a defect. Plaintiff's position finds support in *Mays v. Ciba-Geigy Corporation,*[FN65] where the Kansas Supreme Court recognized the viability of a so-called "nonspecific manufacturing defect" claim.[FN66] In *Mays,* the court recognized that the elements of a strict liability claim

---

FN65. 233 Kan. 38, 661 P.2d 348 (1982).

FN66. *Id.* at 50, 661 P.2d at 358.

---

*14 may be proven inferentially, by either direct or circumstantial evidence. For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from a mere possibility. While plaintiff is not normally required to prove his case at the summary judgment stage, he must present some facts to support the elements of his claim.[FN67]

---

FN67. *Id.* at 54, 661 P.2d at 360. *See also Voelkel v. Gen. Motors Corp.,* 846 F.Supp. 1468, 1476 (D.Kan.1994) (quoting *Mays,* 233 Kan. at 54, 661 P.2d at 348). The Court notes that, although the *Mays* court was faced with a manufacturing defect claim, as opposed to a design defect claim, the Kansas Supreme Court has stated that "[i]t would appear that either a design defect or a manufacturing defect can be proven by circumstantial evidence." *Jenkins,* 256 Kan. at 635, 886 P.2d at 889.

---

Plaintiffs' position also finds support in *Weir v. Federal Insurance Co.,*[FN68] where the Tenth Circuit addressed the issue of circumstantial proof of a defect in a clothes dryer that had been severely damaged in a fire. Defendant in that case asserted that there was no evidence of how a particular defect in the dryer caused the fire and that the district court erred in denying its motion for directed verdict.[FN69] The court disagreed, holding that the inference of a defect is permissible whenever the plaintiff has introduced evidence that would exclude other causes of the accident.[FN70]

---

FN68. 811 F.2d 1387 (10th Cir.1987).

FN69. *Id.* at 1392.

FN70. *Id.*

---

Electrolux contends that plaintiffs' position, as a result of their failure to identify a specific defect in the Freezer or its warnings, represents the "classic product liability tautology: the alleged defect caused the fire, and the fire is a proof of a defect." Kansas courts have rejected this circular position. In *Jenkins v. Achem Products, Inc.,*[FN71] the plaintiff filed a products liability suit against the defendants alleging that his long-term use of an herbicide caused or contributed to his development of cancer.[FN72] The trial court ruled that if the plaintiff proved that defendants' products cause cancer, plaintiff would have established a prima facie strict liability claim without having to prove a more specific defect.[FN73] The Kansas Supreme Court reversed, specifically rejecting the notion that "the mere fact of an injury implies a design defect."[FN74]

---

FN71. 256 Kan. 602, 886 P.2d 869 (1994).

FN72. *Id.* at 604, 886 P.2d 869.

FN73. *Id.*

FN74. *Id.* at 635, 886 P.2d 869, 886 P.2d at 869; *see Voelkel,* 846 F.Supp. at 1477.

---

Thus, the question before the Court is whether the plaintiffs have come forward with sufficient evidence, drawing all reasonable inferences in their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

Page 13

favor, as to justify a reasonable conclusion, couched in probability and not mere possibility, to support an inference that the Freezer was defective when it left Electrolux's control and that the defect caused the fire.[FN75] In this case, although Carl Martin could not identify a specific defect in the Freezer, he did conclude with a reasonable degree of scientific certainty that the Freezer had internally malfunctioned, causing a conductor to separate, which in turn caused a short-circuit event that ignited insulation materials in the Freezer, causing the fire. This conclusion was reached after a destructive examination of the Freezer, at which time Martin eliminated other sources of the fire in the Freezer itself, isolating the location of the malfunction to the evaporator compartment. Martin also testified that the burn patterns in the garage and the Freezer indicated the fire had originated in the Freezer and that he eliminated an external source of fire because of the extensive internal damage and the fact that an external fire would have terminated the electrical power to the freezer, preventing an internal short circuit event. Martin also characterized the condition and location of the Freezer door as consistent with an internal fire.

FN75. See *Mays,* 233 Kan. at 54, 661 P.2d at 360.

*15 Contrary to the tautology characterized by Electrolux, the Court concludes that plaintiffs have presented both direct and circumstantial evidence sufficient to negate other reasonable causes of the fire and support an inference of probability that the Freezer was defective. Evidence offered by Electrolux that is contrary to the evidence offered by the plaintiff creates a question for the jury.[FN76] Moreover, because the record does not suggest any misuse of the Freezer by the plaintiffs, plaintiffs have presented evidence sufficient to show the manufacturing defect could have existed in the Freezer when it left Electrolux's custody and control. Summary judgment is denied on this claim.

FN76. *Weir,* 811 F.2d at 1387.

*Breach of Implied Warranty*

To establish a breach of implied warranty of merchantability, a buyer must show that the product was defective or unfit for its ordinary purpose and the defect existed at the time of the sale.[FN77] A claim for breach of implied warranty of merchantability may also be proved by circumstantial evidence.[FN78] For the reasons discussed above with respect to plaintiffs' strict liability claim, summary judgment is denied on this claim as well.

FN77. *Miller v. Lee Apparel Co., Inc.,* 19 Kan.App.2d 1015, 1031, 881 P.2d 576, 588 (1994).

FN78. *Black v. Don Schmid Motor, Inc.,* 232 Kan. 458, 467, 657 P.2d 517, 525 (1983) (citation omitted).

*Negligence/Res Ipsa Loquitur*

Plaintiffs assert that they are entitled to recovery upon the theories of negligence and *res ipsa loquitur.* The doctrine of *res ipsa loquitur* has been construed and applied by Kansas courts under many different factual scenarios. The phrase is commonly understood to mean "the thing stands for itself."[FN79] It is intended to operate solely as a rule of evidence rather than as substantive law.[FN80] The doctrine recognizes that some circumstances give rise to an inference of negligence even in the absence of direct proof of a negligent act. Essential to the application of the doctrine of *res ipsa loquitur* is that (1) it must be shown that the thing or instrumentality causing the injury or damage was within the exclusive control of the defendant; (2) the occurrence must be of such kind or nature as ordinarily does not occur in the absence of someone's negligence; and (3) the occurrence must not have been due to contributory negligence of the plaintiff.[FN81] "The rationale behind the doctrine is said to be that when the defendant has exclusive control of the instrumentality he has it within his power to produce evidence of the cause of the injury, while the plaintiff is without such knowledge and must therefore rely on proof of the circumstances."[FN82]

FN79. *Chandler v. Anchor Serum Co.,* 198 Kan. 571, 42 P.2d 82 (1967).

FN80. *Bias v. Montgomery Elevator Co. of Kansas, Inc.,* 216 Kan. 341, 343, 532 P.2d 1053, 1055 (1975) (citing *Chandler,* 198 Kan. 571, 426 P.2d 82.

FN81. *Id.* (citing *Vieyra v. Eng'g Inv. Co., Inc.,* 205 Kan. 775, 473 P.2d 44 (1970); *Blue Stem Feed Yards, Inc. v. Craft,* 191 Kan. 605, 383 P.2d 540 (1963)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 2:03-cv-00294-DN   Document 819-4   Filed 09/27/06   PageID.10734   Page 15 of 16

Not Reported in F.Supp.2d                                                                                         Page 14
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

FN82. *Id.* (citing *Worden v. Union Gas System, Inc.,* 182 Kan. 686, 324 P.2d 501 (1958).

Electrolux argues that plaintiffs cannot rely on the doctrine of *res ipsa loquitur* due to their lack of proof that a defect in the Freezer was the cause of the fire. Contrary to defendant's assertions, the court finds that questions of material fact remain preventing a granting of summary judgment on the applicability of the *res ipsa loquitur* doctrine. In order to make the doctrine of *res ipsa loquitur* applicable, plaintiffs must show, among other things, that their losses occurred only because of negligence on the part of defendant.[FN83] As discussed above, plaintiffs have produced evidence of attendant circumstances, including the fact that the Freezer caught fire while used in an ordinary manner, from which it could be inferred that the fire occurred solely due to Electrolux's negligence.

FN83. See *Wehkamp v. City of Garden City,* 187 Kan. 310, 316, 356 P.2d 826, 832 (1960).

*16 Although the Court is denying Electrolux's motion for summary judgment on the *res ipsa loquitur* doctrine, this should not be interpreted by the parties as a finding that the doctrine is indeed applicable in this case. The Court is mindful of the general reluctance by courts to apply an inference of negligence from the starting of fires for the reason that they are frequent occurrences and in many cases result without negligence on the part of anyone.[FN84] Moreover, the parties fail to cite any Kansas cases specifically addressing the issue of whether *res ipsa* is applicable in product liability cases governed by the KPLA. The Court's review of the law in other jurisdictions reveals the law surrounding this issue to be unsettled, to say the least. The Court's ruling today is merely that plaintiffs have produced sufficient attendant circumstances to prevent entry of summary judgment at this time. Whether a theory of recovery based on the doctrine of *res ipsa loquitur* should be submitted to the jury will have to be determined at trial.

FN84. See *Trent v. Sellers,* 1 Kan.App.2d 267, 563 P.2d 1106 (1977).

*Failure to Warn*

A manufacturer has a duty to warn when it knows or has reason to know that its product is or is likely to be dangerous during normal use.[FN85] Electrolux contends that plaintiffs' experts did not proffer any opinions on the warnings, or alleged lack thereof, given to plaintiffs by Electrolux. In his deposition, Martin specifically declines to discuss the adequacy of warnings provided by defendant. In addition, Electrolux contends that plaintiffs fail to identify any warnings that would have prevented the fire. Plaintiffs do not controvert these facts nor respond to this argument. Because the plaintiffs have not offered any evidence regarding the alleged warning defects, summary judgment is granted on this claim.

FN85. *Deines v. Vermer Mfg. Co.,* 755 F.Supp. 350, 353 (D.Kan.1990).

IT IS THEREFORE ORDERED BY THE COURT that Electrolux's motion to dismiss for spoliation of evidence (Doc. 58) is DENIED in part;

IT IS FURTHER ORDERED that Electrolux's motion to exclude expert testimony (Doc. 56) is GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that Electrolux's motion for summary judgment (Doc. 54) is GRANTED with respect to plaintiffs' claims of defective warning, and DENIED in all other respects.

IT IS FURTHER ORDERED that plaintiffs' motion to amend/correct response (Doc. 75) is GRANTED.

IT IS SO ORDERED.

D.Kan.,2005.
Workman v. AB Electrolux Corp.
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 561292 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendant Electrolux Home Products, Inc's Motion in Limine (Jan. 30, 2006) Original Image of this Document (PDF)
• 2004 WL 3608619 () (Partial Testimony) (Dec. 15, 2004) Original Image of this Document (PDF)
• 2004 WL 3608618 () Deposition of Larry William Stemmerman (Jun. 10, 2004) Original Image of this Document (PDF)
• 2004 WL 3826222 () (Report or Affidavit) (Mar. 8,

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2005 WL 1896246 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

2004) Original Image of this Document (PDF)
• 5:03cv04195 (Docket) (Oct. 27, 2003)
• 2003 WL 23735439 (Trial Pleading) Complaint (2003) Original Image of this Document (PDF)
• 2003 WL 23735442 (Trial Pleading) Defendant Electrolux Home Products, Inc.'s Answer and Jury Demand (2003) Original Image of this Document (PDF)
• 2003 WL 23735444 (Trial Pleading) Defendant Sears Roebuck and Co.'s Answer and Jury Demand (2003) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.