Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE LLP
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON SCO'S THIRD CAUSE OF ACTION, FOR BREACH OF CONTRACT**<br><br>**FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF UNDISPUTED FACTS ...............................................................................1

ARGUMENT................................................................................................................................4

I. UNDER THE SEQUENT SOFTWARE AGREEMENT, IBM WAS PLAINLY REQUIRED TO KEEP CONFIDENTIAL ALL PARTS OF DYNIX/PTX...............................................................................................................6

    A. The Plain Language of the Sequent Software Agreement Required IBM to Keep Confidential All Parts of the Licensed UNIX Software Product......................................................................................................6

    B. The Plain and Unambiguous Language of the Sequent Software Agreement Required IBM to Keep Confidential All Parts of Any Modifications and Derivative Works That It Developed.................................7

    C. Dynix Is a Derivative Work or Modification Based on the Licensed UNIX Software Product Under the Sequent License Agreement.....................8

        1. Dynix/ptx is a "Derivative Work" Based on Earlier Iterations of Dynix/ptx Under the Sequent Software Agreement..........................8

        2. Dynix/ptx is a "Derivative Work" Based on UNIX System V..............9

            a. Dynix/ptx is a "Derivative Work" Under Section 2.01 of the Sequent Software Agreement ..........................................9

            b. The Undisputed Evidence Also Shows that Under a Copyright Definition, Dynix Is a Derivative Work of UNIX System V ............................................................................15

CONCLUSION ..........................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

Gates Rubber Co. v. Bando Chem. Indus., Ltd.,
   9 F.3d 823 (10th Cir. 1993) .................................................................................. 15

McDonnell v. Cardiothoracic & Vascular Surgical Assocs., Inc.,
   No. C2-03-0079, 2004 WL 1234138 (S.D. Ohio May 27, 2004) ........................ 4

McLane, Graf, Raulerson & Middleton, P.A. v. Rechberger,
   No. Civ. 97-398 JD, 1999 WL 813952, (D.N.H. Apr. 29, 1999) ....................... 14

Mitel, Inc. v. Iqtel, Inc.,
   124 F.3d 1366 (10th Cir. 1997) ............................................................................. 15

The Milligard Corp. v. E.E. Cruz/NAB/Fronier-Kemper,
   No. 99 Civ. 952 (LBS), 2003 WL 22741664 (S.D.N.Y. Nov. 18, 2003) ............... 5

Sterling Drug Inc. V. Bayer AG,
   792 F. Supp. 1357 (S.D.N.Y. 1992) ....................................................................... 5

Thompson v. United Transp. Union,
   No. 99-2288-JWL, 2000 WL 1929963 (D. Kan. Dec. 19, 2000) ........................... 5

United Bank & Trust Co. v. Kansas Bankers Sur. Co.,
   901 F.2d 1520 (10th Cir. 1990) ............................................................................... 5

Volkman v. United Transp. Union,
   73 F.3d 1047 (10th Cir. 1996) ................................................................................. 5

Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.,
   111 F. Supp. 2d 450 (S.D.N.Y. 2000) ..................................................................... 5

**Other**

11 J. Moore, Moore's Federal Practice ¶ 56.40[2] (3d ed. 1998) .................................... 5

Plaintiff, The SCO Group, Inc. ("SCO), respectfully submits this memorandum in support of its Motion for Partial Summary Judgment on Its Third Cause of Action, alleging that IBM breached one of its UNIX Software Agreements.

## PRELIMINARY STATEMENT

SCO moves for partial summary judgment on its claim that IBM breached the UNIX Software Agreement entered into in 1985 between AT&T (SCO's predecessor-in-interest) and Sequent Computer Systems, Inc. (which IBM subsequently acquired). Under the plain language of the Sequent Software Agreement, IBM was obligated to hold in confidence all parts of the licensed UNIX Software Product and all parts of any derivative work developed based on the UNIX Software Product. In addition, the undisputed facts establish that the Dynix/ptx operating system that Sequent developed with the UNIX Software Product, and that IBM acquired when it acquired Sequent, constitutes a derivative work based on the licensed UNIX Software Product within the meaning of the Sequent Software Agreement.[1]

## STATEMENT OF UNDISPUTED FACTS

1. The UNIX Software Agreement that AT&T entered into with Sequent, in April 1985, contains provisions governing the licensee's rights to use the licensed software product and to prepare modifications and derivative works based on that software product. These

---

[1] SCO further submits that the facts show that IBM similarly breached its own UNIX Software Agreement with AT&T by failing to keep confidential all parts of the IBM operating system, AIX, constituting a derivative work based on the licensed UNIX Software Product. In contrast to Sequent's obligations, however, the terms of IBM's license are also governed by a separate side letter that IBM executed with AT&T at the same time that it licensed UNIX under the standard agreement and by a subsequent amendment. Although the evidence as a whole will clearly show that the side letter and amendment did not materially change the terms of IBM's standard UNIX license, SCO does not seek summary judgment on the issue of the plain meaning of those documents.

provisions are contained in Section 2.01 of the Agreement (Exh. A), which states (emphasis added):

> "AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE'S own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, <u>provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT.</u>"

2. Section 1.04 of the Agreement defines "SOFTWARE PRODUCT" as "materials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS." "SOFTWARE PRODUCT" thus includes the licensed UNIX System V source code. (Id.)

3. The term "derivative works based on such SOFTWARE PRODUCT" is not defined in the Sequent Agreement. The term includes, at a minimum, any product containing licensed UNIX System V source code. (Deposition of David Frasure (6/8/04) at 178 (Exh. C); Deposition of David Frasure (12/8/92) at 113, 121 (Exh. D); Deposition of Geoffrey Green (11/15/04) at 113, 130-31 (Exh. E); Deposition of Burton Levine (1/19/05) at 38, 40-41, 47, 268) (Exh. F); Deposition of Otis Wilson (8/25/06) at 120 (Exh. G); Deposition of David Rodgers (6/10/04) at 27, 31-32, 138 (Exh. H); **REDACTED** Deposition of Thomas Cronan (12/14/04) at 40 (Exh. J); Deposition of Jeffrey Mobley (1/24/06) at 50 (Exh. K); **REDACTED** Declaration of Ira Kistenberg (11/12/04) ¶ 5 (Exh. M); Deposition of Michael DeFazio (1/13/05) at 223 (Exh. N); Declaration of Mitzi Bond (11/4/04) ¶ 11(e) (Exh. O) **REDACTED**

2

**REDACTED**     Declaration of Evelyn Davis (11/4/04) ¶ 6(c) (Exh. Q);

**REDACTED**

4.  The Dynix/ptx operating system constitutes a derivative work based on UNIX System V under the foregoing definition.

**REDACTED**

Dynix/ptx also constitutes a derivative work of UNIX System V within the meaning of that term under the Copyright Act.

**REDACTED**

5.  Section 7.06(a) of the Agreement states in relevant part:

"LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T. LICENSEE further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder."

6.  Section 7.06(b) of the Agreement states in relevant part:

"Notwithstanding the provisions of Section 7.06(a), LICENSEE may distribute copies of a SOFTWARE PRODUCT, either in modified or unmodified form, to third parties having licenses of equivalent scope herewith from AT&T (or a corporate affiliate thereof) for the same SOFTWARE PRODUCT, provided that LICENSEE first verifies the status of any such third party in accordance with specific instructions issued by AT&T."

7.  Section 7.06(b) of the Agreement states in relevant part:

"LICENSEE may also obtain materials based on a SOFTWARE PRODUCT subject to this Agreement from such a third party and use such materials pursuant to this Agreement, provided that LICENSEE treats such materials as if they were part of such SOFTWARE PRODUCT."

3

8.  Section 7.10 of the Agreement states: "Except as provided in Section 7.06(b), nothing in this agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part."

9.  Section 7.13 of the Agreement contains a New York choice-of-law provision.

10. The Agreement also contains a merger clause, in Section 4:

"This Agreement and its Supplements set forth the entire agreement and understanding between the parties as to the subject matter hereof and merge all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. No provision appearing on any form originated by LICENSEE shall be applicable unless such provision is expressly accepted in writing by an authorized representative of AT&T."

## ARGUMENT

Under Federal Rule of Civil Procedure 56, a "party seeking to recover on a claim . . . may . . . move . . . for a summary judgment in the party's favor upon . . . any part thereof." The Advisory Committee Notes to the 1946 amendment to Rule 56 state: "The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This type of adjudication . . . serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Accord McDonnell v. Cardiothoracic & Vascular Surgical Associates, Inc., No. C2-03-0079, 2004 WL 1234138, at *1 (S.D. Ohio May 27, 2004) (Exh. 1).

"[I]t is now well established that a court may 'grant' partial summary 'judgment' that establishes the existence or nonexistence of certain facts, even though no actual judgment is

4

entered on a claim." 11 J. Moore, Moore's Federal Practice ¶ 56.40[2] at 56-279 (3d ed. 1998) (footnote omitted). "A partial summary judgment ruling may dispose of only a single issue relevant to a claim . . . . In availing itself of the ability granted by Rule 56 to issue orders which resolve significant questions, a court can focus the litigation on the true matters in controversy." Id. at 56-280 to 56-281.

Summary judgment is appropriate where the plain language of a contract is unambiguous. Thompson v. United Transp. Union, No. 99-2288-JWL, 2000 WL 1929963, at *6 (D. Kan. Dec. 19, 2000) (citing Volkman v. United Transportation Union, 73 F.3d 1047, 1050 (10th Cir. 1996)) (Exh. 2). Under the applicable procedural and substantive law on this Motion, IBM cannot in opposition merely rely on extrinsic evidence. See United Bank & Trust Co. v. Kansas Bankers Surety Co., 901 F.2d 1520, 1522 & n.1 (10th Cir. 1990) (holding that under general principles of contract law, where a contract is complete and unambiguous, its plain language is the "only legitimate evidence of the parties' intent."); The Milligard Corp. v. E.E. Cruz/NAB/Fronier-Kemper, No. 99 Civ. 952 (LBS), 2003 WL 22741664, at *3 (S.D.N.Y. Nov. 18, 2003) (holding that under New York law, only when the language of the contract is ambiguous may a court turn to extrinsic evidence of the parties' intent) (Exh. 3); accord Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc., 111 F. Supp. 2d 450, 455 (S.D.N.Y. 2000); Sterling Drug Inc. v. Bayer AG, 792 F. Supp. 1357, 1366 (S.D.N.Y. 1992); Volkman, 73 F.3d at 1050.

I. **UNDER THE SEQUENT SOFTWARE AGREEMENT, IBM WAS PLAINLY REQUIRED TO KEEP CONFIDENTIAL ALL PARTS OF DYNIX/PTX**

   A. **The Plain Language of the Sequent Software Agreement Required IBM to Keep Confidential All Parts of the <u>Licensed UNIX Software Product.</u>**

The Sequent Software Agreement placed significant constraints on Sequent's rights as a result of its access and exposure to the licensed UNIX software product. The minimum set of those constraints are set forth in the plain language of the Agreement, imposing strict requirements on licensees' use, export, transfer, and disclosure of the UNIX software. The two cornerstone protections are found in Sections 2.01 and 7.06 of the Agreement:

<u>Internal Business Use (Section 2.01)</u>: "AT&T grants [Sequent] a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in one or more Supplements hereto, solely for [Sequent's] own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT."

<u>Non-Disclosure (Section 7.06(a))</u>: "[Sequent] agrees that it shall hold all parts of the SOFTWARE PRODUCT subject to this Agreement in confidence for AT&T. [Sequent] further agrees that shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder."

6

The Agreement thus plainly extended those protections not only to the literal source code in which the UNIX innovations had been originally expressed, but also to methods and concepts that were embodied in UNIX.

### B. The Plain and Unambiguous Language of the Sequent Software Agreement Required IBM to Keep Confidential All Parts of Any Modifications and Derivative Works That It Developed.

AT&T also permitted its licensees to rely on the innovations in UNIX to develop modifications and derivatives of the UNIX product, "provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT." (Sequent Agreement § 2.01.) Under this provision, if a licensee exercised its right to rely on the original UNIX product in preparing modifications or derivatives based on that software, then the licensee had to afford such "resulting materials" all of the same strict protections required by the software agreement for the original UNIX product itself. Thus, pursuant to Section 2.01, all of the use, transfer, export, and confidentiality restrictions that applied to the original UNIX product (and, of course, the literal source code in which it was written) also covered any such modifications or derivative works.[2]

Indeed, the Agreement's protections expressly go further, to provide greater protection than copyright law (which would have applied without any agreement, and which is not designed to provide exclusive protection where, as here, one party is providing full access to confidential

---

[2] Licensees executed separate sublicensing agreements, which gave them the right to distribute their resulting products in object code format only, a format that is not readable by human beings. (See Sequent Sublicensing Agreement § 2.01 (Exh. B).) The sublicensing agreements are consistent with strict protections against disclosure of the source code in modifications and derivative works, inasmuch as their terms contradict IBM's position that AT&T granted licensees the unfettered right to distribute and disclose their modifications and derivative works in source code format – even though the sublicensing agreements required that such works be distributed only in object code format at a per copy fee.

7

material embodied in source code). Specifically, the Agreement expressly creates a framework in which each modification and derivative successively becomes "treated hereunder as part of the original SOFTWARE PRODUCT." (Sequent Software Agreement § 2.01.) The plain language of the Sequent Software Agreement thereby ensures that the result of Sequent access to and use of UNIX System V in its development process remains protected from disclosure. Any product that is derived from or reflects the modification of, not just the "original product" (i.e., UNIX System V), but also what must be "treated as" the "original product" (i.e., the most recent iteration of Dynix/ptx) is made subject to the internal protections of the Sequent Software Agreement (including internal business use and confidentiality).

**C. Dynix Is a Derivative Work or Modification Based on the Licensed UNIX Software Product Under the Sequent License Agreement.**

As a result of these plain language protections, Dynix/ptx is subject to the Agreement's confidentiality requirements.

   1. Dynix/ptx is a "Derivative Work" Based on Earlier Iterations of Dynix/ptx Under the Sequent Software Agreement.

By requiring a licensee to protect all modifications and derivatives "as part of the original SOFTWARE PRODUCT," the Sequent Software Agreement provided that any time a licensee used UNIX System V to create a product of its own, the resulting product and any further iterations of that product would be protected. No party disputes that Sequent used UNIX System V in developing Dynix/ptx. Under any plausible definition of the terms "modification" or "derivative work," Dynix/ptx was a modification of or derivative work based on UNIX System V. (See also Part C.2.b, below (admissions from Sequent employees that Dynix/ptx is a derivative of UNIX System V).) And under the plain language of the Sequent Software

Agreement, each time Sequent created a new iteration of Dynix/ptx from an older version, Sequent was obligated to treat that new iteration of Dynix/ptx as part of UNIX System V under Section 2.01. Similarly, no party disputes that the Dynix/ptx from which IBM misappropriated intellectual property into Linux was part of the chain of development of new iterations of Dynix/ptx. Under the plain meaning of the term, Dynix is clearly a "derivative work" that is derived from UNIX System V or from a derivative of UNIX System V.

### 2. Dynix/ptx is a "Derivative Work" Based on UNIX System V.

Even apart from the Sequent Software Agreement's protection for a licensee's chain of development, however, the undisputed extrinsic evidence of what the parties intended by the term "derivative work" demonstrates that Dynix/ptx constitutes a derivative work. In addition, to the extent the term "derivative work" is given the meaning of that term under the copyright law, the undisputed evidence is that Dynix/ptx constitutes such a work.

#### a. Dynix/ptx is a "Derivative Work" Under Section 2.01 of the Sequent Software Agreement.

Witnesses from all three relevant parties – AT&T, IBM and Sequent – have testified that the derivative works contemplated by the license agreements include products that were "based on" or contained any UNIX source code, ideas, structures, sequences, organizations, methods, or concepts. Although the testimony of some witnesses differs on the precise scope of protected derivative works, all relevant witnesses' overlapping definitions of "derivative work" confirm that Dynix/ptx constitutes such a work.

- According to Geoffrey Green, an AT&T attorney who participated in drafting the operative agreements, a product would be considered a modification or derivative if it contained the "concepts, the ideas, the structure, the organization, the methods from

9

the original licensed product," even if it did not contain the "source code in the original licensed product." Green Dep. at 130-31. Mr. Green noted that "something that was based on the licensed product" or "a variation of the product" would fall within the definition of a derivative work. Id. at 113.

- Burton Levine, another AT&T attorney who oversaw UNIX licensing, testified that "the resulting materials are the end result of preparing derivative works and modifications, and derivative works, in my view, are works that are crated by the licensee after having access to the software product." Levine Dep. at 268. He admitted that "if any part of a software product is used by the licensee to create another product, that product is a resulting material even if Unix System V code that was contained in the original product is not present in the product that the licensee makes." Id. at 38. Mr. Levine further testified that "if a licensee, by virtue of being exposed or having access to this code, learns about a particular structure, a particular portion of the licensed item, uses that structure to develop a product that is going to be similar to but not containing any of the Unix code, that is the derivative work, that is treated as a software product." Id. at 40-41. Mr. Levine admitted that, as a result, "if a product included only one line of Unix code and potentially, you know, millions of lines of other code" then that product "would be a software product." Id. at 47.

- Otis Wilson, who supervised the UNIX licensing department and signed the UNIX license agreement with Sequent on behalf of AT&T, testified to his understanding of derivative work during his tenure: "Anything that you create, or modify, or change,

or alter or create using the software product would be a derivative work." Wilson Dep. (8/25/06) at 120.

- David Rodgers, who represented Sequent in negotiating the UNIX license agreement in 1985, admitted that the software agreements protected even modifications comprised of "completely new source code." Rodgers Dep. at 31-32. Mr. Rodgers acknowledged that products created entirely by Sequent would be covered by the software agreements if they were based on the UNIX product. Mr. Rodgers testified that only "work which had already been created by Sequent" before licensing UNIX and "work that in the future was created by Sequent, <u>not based upon that source code</u>, remained the property of Sequent." Id. at 27 (emphasis added).

- 

### REDACTED

- Thomas Cronan, an IBM attorney involved in the execution of the UNIX license agreements, differentiated between modifications and derivative works, contending that the term 'modification' as used in Section 2.01 was "a fairly broad term" that "was intended by the licensing language to be broad." Cronan Dep. at 40. He elaborated that such a product could even include "a whole set of new code that modified and changed the source code tree for System V." Id. Regarding a modification, Mr. Cronan admitted that "anything you do that changes the source

11

code tree a programmer would consider a modification even if it didn't touch the original code." Id.

- 

  **REDACTED**

- Jeffrey Mobley, who represented IBM's Corporate Commercial and Industry Relations interests in negotiating the UNIX license agreements, testified that in order to qualify as a modification or derivative work as contemplated by the UNIX license agreements, a product should fit the general description of being "a work that is, to some degree, based upon or including the – you know, the base work." Mobley Dep. at 50.

- David Frasure, who managed the national sales and licensing department for AT&T in 1985, also acknowledged that a licensee's product would be considered a protected "derivative work" under the UNIX license agreements if it met one of several possible descriptions: "Derivative work means that it was based on Unix. It was, in other words it was derived from, from Unix. It also could be that it worked with Unix, but it may not have specific Unix code in it. But the software itself that would be written by a licensee could not have been written, if you will, without Unix existing." Frasure Dep. (6/8/04) at 178. Mr. Frasure also admitted that a modification of the licensed software meant "changing a line of code, it could be adding a line or lines, or it could be deleting lines of code," and that included a product that the licensee created even if "they added a completely original line of code that they

12

developed themselves to the existing source code" and even if the addition was "one line of code or a thousand line of code or ten thousand." Frasure Dep. (12/8/92) at 113, 121.

- Ira Kistenberg, the AT&T Account Manager who negotiated the UNIX license agreement ultimately executed with Sequent, explained that "AT&T intended that protected modifications and derivatives would include any product that contained any source code that had been copied verbatim from UNIX System V; any copied source code that was similar in substance to the original source code in UNIX System V; any structures, sequences, patterns, ideas, methods or concepts from UNIX System V; and any source code that the licensee developed with the benefit of exposure to the UNIX System V source code." Kistenberg Decl. (11/12/04) ¶ 5.

- Michael DeFazio, a supervisor for AT&T's UNIX licensing division, acknowledged that "the term resulting materials and derivative work I use kind of interchangeably . . . that it's the integrated collection of UNIX system technology and customer value added, put together as a customer derived operating system product." DeFazio Dep. at 223.

- 

**REDACTED**

13

- Evelyn Davis, another AT&T Account Executive, has testified that "the agreements required each licensee to treat any work prepared with the benefit of having been exposed to our product – regardless of how the licensee further developed or changed that product – as if it were part of our original licensed product." Davis Decl. ¶ 6(c).

**REDACTED**

The Court may properly enter summary judgment on the basis of undisputed expert evidence. See, e.g., Hubbard v. Twin Oaks Health and Rehab. Ctr., 408 F. Supp. 2d 923, 930 (E.D. Cal. 2004) (entering summary judgment on the basis of "undisputed" expert testimony); McLane, Graf, Raulerson & Middleton, P.A. v. Rechberger, No. Civ. 97-398 JD, 1999 WL 813952, at *3 (D.N.H. Apr. 29, 1999) (same) (Exh. 4).

Indeed, **REDACTED**

there is other evidence from discovery confirming that Dynix/ptx is a derivative work based on UNIX System V.

**REDACTED**

David Rodgers, who represented Sequent in negotiating the UNIX license agreement in 1985, testified that "Dynix/ptx is almost certainly a derivative work of Unix System V." Rodgers Dep. at 138.

Accordingly, based on the extrinsic evidence of the meaning of the undefined term "derivative work" in the UNIX license agreements, Dynix/ptx indisputably qualifies as a derivative work based on UNIX System V.

          b.      The Undisputed Evidence Also Shows that Under a Copyright Definition, Dynix Is a Derivative Work of UNIX System V.

Moreover, if the copyright definition of "derivative work" were applied to that phrase in the agreements, as IBM's experts argue, the undisputed expert evidence establishes that Dynix/ptx is a "derivative work" under the applicable abstraction-filtration-comparison test set forth in Gates Rubber Co. v. Bando Chemical Industries, Ltd., 9 F.3d 823 (10th Cir. 1993), and Mitel, Inc. v. Iqtel, Inc., 124 F.3d 1366 (10th Cir. 1997).

Under the foregoing test, Dynix/ptx is substantially similar to and a derivative work of UNIX System V.

**REDACTED**

## CONCLUSION

SCO respectfully submits, for the reasons set forth above, that the Court should grant SCO's Motion for Partial Summary Judgment on SCO's Third Cause of Action.

DATED this 25th day of September, 2006.

> HATCH, JAMES & DODGE, P.C.
> Brent O. Hatch
> Mark F. James
>
> BOIES, SCHILLER & FLEXNER LLP
> Robert Silver
> Stuart H. Singer
> Stephen N. Zack
> Edward Normand
>
> By_____
> *Counsel for The SCO Group, Inc.*

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing Redacted SCO's Memorandum in Support of SCO's Motion for Partial Summary Judgment on SCO's Third Cause of Action, for Breach of Contract was served on Defendant International Business Machines Corporation on the 27th day of September, 2006, by CM/ECF to the following:

    David Marriott, Esq.
    Cravath, Swaine & Moore LLP
    Worldwide Plaza
    825 Eighth Avenue
    New York, New York 10019

    Donald J. Rosenberg, Esq.
    1133 Westchester Avenue
    White Plains, New York 10604

    Todd Shaughnessy, Esq.
    Snell & Wilmer LLP
    1200 Gateway Tower West
    15 West South Temple
    Salt Lake City, Utah 84101-1004


    /s/   Brent O. Hatch