# EXHIBIT E

```
                                                                    1
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 2                    Case No. 2:03CV0294DAK
 3
     THE SCO GROUP,
 4
                  Plaintiff,
 5
          vs
 6
     INTERNATIONAL BUSINESS
 7   MACHINES CORPORATION,
 8                Defendant.
 9   _____
10
11
12
13       VIDEO DEPOSITION UNDER ORAL EXAMINATION OF
14                     GEOFFREY GREEN
15              DATE:   November 15, 2004
16     REPORTED BY:  CHARLENE FRIEDMAN, CSR, RPR, CRR
17
18
19
20
21
22            ESQUIRE DEPOSITION SERVICES
              90 Woodbridge Center Drive
23                    Suite 340
              Woodbridge, New Jersey  07095
24         (732) 283-1060 or (800) 247-8366
25   JOB #  42720
```

110

1    MR. ESKOVITZ: I'm talking about
2    AT&T's intent with respect to paragraph
3    1.04.
4    A    1.04 was focusing on what was
5    actually to be physically sent to the
6    licensee, and so that -- physical items
7    included the software itself and various
8    documents.
9    Q    Okay. Your understanding of what
10   software product meant was it was just the
11   actual physical items that were being given
12   to the licensee?
13   A    Yes.
14   Q    Okay. Is the definition of -- let
15   me just refer you down to 2.01, for example,
16   the first sentence of 2.01 where the
17   capitalized term software product is used.
18   That's the same -- software product means the
19   same thing in 2.01, for example, as it does
20   in 1.04; is that right?
21   A    Yes.
22   Q    Okay. Let's take 2.01. It says,
23   "AT&T grants to licensee a personal
24   non-transferrable and non-exclusive right to
25   use in the United States each software

111

1    product identified in the one or more
2    supplements hereto, solely for licensee's own
3    internal business purposes and solely on or
4    in conjunction with designated CPU's for such
5    software product."
6         What was AT&T's intent with respect
7    to the requirement that licensees only use
8    software products for their own internal
9    business purposes?
10   A    The intent was that the use of
11   would be for the licensee's own business
12   needs and not to provide some kind of service
13   for other people on the licensee's computers.
14   Q    Okay. Is that one of the reasons
15   why the sublicensing agreements were needed
16   for licensees to be able to distribute the
17   product in object code format to others?
18   A    It's one of the reasons, yes.
19   Q    Okay. And what was the reason for
20   the limitation on the use being only in
21   conjunction with designated CPU's for such
22   software product?
23   A    Most of the software agreements, as
24   I recall, had provisions for designating
25   CPU's on which the software could be used,

112

1    and the fees for use of the software were
2    based on how many designated CPU's there
3    were.
4    Q    So one of the reasons, at least,
5    one of the important reasons was to ensure
6    that AT&T was paid for the licensee's full
7    use of the licensed product?
8         MR. KAO: Objection to the form.
9    A    Yes.
10   Q    The next sentence of 2.01 says
11   that, "Such right to use includes the right
12   to modify such software product and to
13   prepare derivative works based on such
14   software product."
15        What was the intent, AT&T's intent,
16   with respect to that provision?
17        MR. FELTOON: To the portion that
18   you read?
19        MR. ESKOVITZ: Yes.
20   A    I think just what it says, that the
21   licensee could modify the product and prepare
22   works based on the product.
23   Q    And what is your understanding or
24   what was AT&T's intent -- strike that.
25        What was AT&T's intent with respect

113

1    to the meaning of the term "derivative
2    works"?
3    A    Something that was based on the
4    licensed product, and that would be
5    considered to probably be in a variation of
6    the product or would somehow include the
7    product or part of the product.
8    Q    Okay. And when you say include
9    part of the product, would you include in the
10   meaning of product the ideas, methods and
11   concepts of that product?
12   A    At some point in time, yes.
13   Q    As of 1985, was that true?
14   A    Probably, yes.
15   Q    And the next provision -- the next
16   clause of that -- the end of 2.01 says,
17   "Provided the resulting materials are treated
18   hereunder as part of the original software
19   product."
20        Let me just break it down. I want
21   to ask you about a couple different portions
22   of that. First of all, would you agree with
23   me that when the 2.01 refers to resulting
24   materials, that it's referring to the
25   derivative works or modifications that are

**Page 130**

1  MR. ESKOVITZ: I'm trying to
2  understand it.
3      Q   Can you explain how that's
4  consistent with your testimony before about
5  methods and concepts having been protected
6  with respect to definitive works?
7      A   Well, I think methods and concepts
8  is a different subject in that even without
9  anybody developing derivative works, there
10 could be methods and concepts that could be
11 disclosed that at some point would have
12 created a breach of the agreement, but as
13 time progressed, the idea that there were
14 methods and concepts in software that could
15 be protected as trade secrets, particularly
16 with the UNIX software, became questionable.
17     Q   I see. So in terms of
18 understanding the extent of the derivatives
19 and modifications protection, if a licensee
20 took the original UNIX code, studied it, and
21 created a modification in which it
22 paraphrased or copied everything about the
23 concepts, the ideas, the structure, the
24 organization, the methods from the original
25 licensed product but did not copy, literally

**Page 131**

1  copy the source code in the original licensed
2  product, is it your view that that would not
3  have been covered under the license
4  agreement?
5      A   Again, I would say that depends on
6  when that was done.
7      Q   Okay. As of April 1985 if that was
8  done?
9      A   I think at that time we would have
10 considered that that would be a violation of
11 the agreement if somebody had done that or
12 such -- such a product would have been
13 covered by the agreement.
14     Q   Right. And at what point did that
15 kind of a product no longer receive the
16 protection of the agreement?
17     A   I can't -- I can't put down a point
18 in time.
19     Q   Okay. Was it before the middle of
20 1986 when you left Greensboro?
21     A   I can't pin that down.
22     Q   Do you have any way of identifying
23 by reference in documents or anything else
24 when that happened?
25     A   I don't remember when the language

**Page 132**

1  was changed in the agreement that took it
2  out. It was taken out of the IBM agreement
3  in the side letter, but eventually, it was
4  taken out of the agreement itself, but I'm
5  not sure when that happened.
6      Q   But it wasn't taken out of the
7  Sequent agreement that you're looking at
8  here?
9      A   I don't believe so. The language
10 is still in the Sequent agreement.
11     Q   So the derivative or modification
12 that we discussed where source code would not
13 have been literally copied would have been
14 protected under the Sequent agreement?
15         MR. KAO: Objection to the form.
16     A   If it would show you can use
17 methods and concepts that were present in the
18 original software product, yes.
19     Q   And not just methods or concepts,
20 but also any kind of know-how or structure or
21 sequence or organization?
22         MR. KAO: Objection to the form.
23     A   I think that was all included in
24 methods and concepts.
25     Q   Okay. Let me show you the end of

**Page 133**

1  Mr. Pfeffer's -- paragraph 6 in his
2  declaration where it says, "Accordingly,
3  under section 2.01, if a licensee created a
4  modification or derivative work based on the
5  original licensed product, then the agreement
6  treated the resulting work as if it had been
7  part of the original software product, and
8  any further modifications or derivatives of
9  that resulting work would be treated in the
10 same manner."
11         Do you agree with that statement?
12     A   No.
13     Q   What is it that you disagree with
14 about that statement?
15     A   This may have applied earlier when
16 we still considered that modification of a
17 derivative work would have to include a
18 portion of the software product, but when we
19 became more aware of the fact that that
20 wasn't always the case, then -- so it's
21 really not clear with respect to what
22 happened over time.
23     Q   Let me just make sure -- maybe you
24 misspoke. I just want to make sure I'm
25 clear.