# EXHIBIT H

# In The Matter Of:

## *THE SCO GROUP, INC., v.*
## *INTERNATIONAL BUSINESS MACHINES CORPORATION*

### *DAVID P. RODGERS*
*June 10, 2004*

# *LEGALINK MANHATTAN*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

RODGERS, DAVID P.



LEGALINK
A WORDWAVE COMPANY

Page 25

1 that you executed standard form agreements used by AT&T
2 Technologies.
3    A. Yes. AT&T provided a document, and -- which
4 is the document that's here under Tab 1, and they
5 represented it as the form that they used routinely with
6 all of their customers, all of their partners, to
7 provide access to the source code.
8    Q. Did anyone from AT&T at any point ever
9 communicate to you that they intended to treat their
10 licensees for Unix System V the same way?
11    MR. HEISE: Objection to form.
12    You may answer.
13    THE WITNESS: I don't recall that particular
14 content.
15    MR. KAO: Q. Turning now to paragraph 7 of
16 your declaration, can you read paragraph 7 --
17    A. Yes.
18    Q. -- for me, please.
19    A. "Section 2.01 of the Software Agreement
20    states that Sequent's 'right to use includes
21    the right to modify such SOFTWARE PRODUCT and
22    to prepare derivative works based on such
23    SOFTWARE PRODUCT, providing that the
24    resulting materials are treated hereunder as
25    part of the original SOFTWARE PRODUCT.' I

Page 26

1    did not understand this language to give AT&T
2    Technologies the right to assert ownership or
3    control over modifications or derivative
4    works prepared by Sequent, except to the
5    extent that the licensed Unix software
6    product was included in such modifications or
7    derivative works. I would never have signed
8    an agreement that would grant ownership or
9    control to AT&T Technologies over
10    modifications or derivative works prepared by
11    Sequent to the extent those modifications or
12    derivative works contained no part of the
13    Unix software product licensed from AT&T
14    Technologies."
15    Q. Are the statements that you make in
16 paragraph 7 of your declaration true and accurate?
17    A. They are.
18    Q. Can you -- well, first, let's look at the
19 document behind Tab 1, at the software agreement.
20    A. Yes.
21    Q. Is the language that you read from in your
22 declaration contained in Section 2.01 of this agreement
23 that's attached as Tab 1?
24    A. Yes, it is.
25    Q. And can you explain to me -- well, strike

Page 27

1 that.
2    You state that you did not understand this
3 language to give AT&T Technologies the right to assert
4 ownership or control over modifications or derivative
5 works prepared by Sequent, except to the extent that the
6 licensed Unix software product was included in such
7 modifications or derivative works.
8    Do you see that?
9    MR. HEISE: Objection; form.
10    You may answer.
11    MR. KAO: Q. Do you see that in your
12 declaration?
13    A. Yes, I do see that.
14    Q. Can you explain to me what you mean by that?
15    A. It would have been foolish of me, as an
16 officer of a venture finance start-up company, to give
17 away the rights to the company's core products in
18 perpetuity. I mean, I certainly would not have done
19 that. So my understanding -- and this was confirmed in
20 some phone calls -- my understanding was that what AT&T
21 wanted to hold private was their contribution, their
22 source code contribution, and that that work which had
23 already been created by Sequent and any work that in the
24 future was created by Sequent, not based upon that
25 source code, remained the property of Sequent.

Page 28

1    Q. Did you understand Section 2.01 of the
2 software agreement to impose any restrictions on
3 Sequent's use of code that Sequent developed on its own?
4    A. No, I did not.
5    Q. Even if that code was contained in a Dynix
6 product that had Unix System V code in it?
7    MR. HEISE: Objection to form.
8    You may answer.
9    THE WITNESS: Yes. My understanding of the
10 license is that the Unix System V code had to be
11 maintained as the AT&T private property and withheld
12 from disclosure but, if there were other elements of the
13 software product created by Sequent, that those were
14 Sequent's to dispose of as it chose.
15    MR. KAO: Q. If you can turn to page 4 of
16 your declaration, I'll have you read paragraph 8 of your
17 declaration, if you could. I guess, for the court
18 reporter's benefit and for the jury's benefit, if you
19 could take your time and read it slowly.
20    A. Certainly.
21    "As I understood the Software Agreement
22    between Sequent and AT&T Technologies,
23    Sequent was free to use, copy, distribute or
24    disclose any modifications or derivative
25    works developed by Sequent, provided that it

Page 29

1  did not copy, distribute or disclose any
2  portion of the licensed Unix software product
3  source code (except as otherwise permitted by
4  the licensing agreements)."
5  Q. Are the statements that you make in
6  paragraph 8 of your declaration --
7  A. They are.
8  Q. -- true and accurate?
9  And can you tell me what you base your
10 understanding of the software agreement on?
11 A. A combination of reading of the document and
12 conversations with my staff and the AT&T parties to the
13 agreement.
14 Q. And when you say "my staff," can you --
15 A. Principally, Roger Swanson and Bob Beck and
16 others.
17 Q. And is that the understanding you had when you
18 executed these agreements?
19 A. Yes, it is.
20 Q. I'll ask you to now read paragraph 9 into the
21 record, if you could. Take your time.
22 A. "It is my understanding that Sequent's
23     Dynix products might include some small parts
24     of the licensed Unix System V source code,
25     although I don't [sic] personally know

Page 30

1      whether it does or not. I also do not know
2      whether Dynix is so similar to Unix System V
3      that it may be" -- "may properly be viewed as
4      a 'derivative work' based on Unix System V,
5      particularly in light of the fact that Dynix
6      was originally created using Berkeley
7      Software Design" -- parenthetically --
8      "('BSD') Unix as a base and not AT&T
9      Technologies' Unix System V. In any event,
10     as I understood the Sequent Agreements,
11     Sequent was free to use, copy, distribute, or
12     disclose Dynix (including source code),
13     provided that it did not copy, distribute or
14     disclose any Unix System V source code that
15     might be contained therein (except as
16     otherwise permitted by the licensing
17     agreements)."
18 Q. Mr. Rodgers, are the statements that you make
19 in paragraph 9 of your declaration true and accurate?
20 A. Yes, they are.
21 Q. Now, in paragraph 9 you discuss the fact
22 that -- well, strike that.
23     Do you know -- do you have any personal
24 knowledge as to what Unix System V code is contained in
25 Dynix?

Page 31

1  A. I do not.
2  Q. Do you have any personal knowledge as to what
3  BSD Unix code is contained in Dynix?
4  A. A substantial portion, but I couldn't claim to
5  know what proportion.
6  Q. What is your understanding of what the term
7  "derivative work" means?
8  A. A derivative work is something that contains
9  all or part of some other piece of work.
10 Q. Do you have an understanding of what the term
11 "modifications" mean?
12 A. "Modifications" means either an augmentation,
13 meaning an additional function, or a change to
14 accommodate some other factor.
15 Q. And by "augmentation," do you mean adding --
16 well, how do you augment something?
17     MR. HEISE: Objection; form.
18     You may answer.
19     MR. KAO: Q. You could answer.
20 A. "Augmentation" means an additional function.
21     If I can use an example, based on the earlier
22 description, the Unix operating environment, as
23 conceived both by Berkeley and by AT&T, had no notion of
24 multiple processors and the need to preserve the content
25 of a cache memory system in order to improve

Page 32

1  performance. So an augmentation that exists in Dynix is
2  so-called processor affinity. It's the ability of a
3  program to say: I would like to continue running on the
4  processor that I was running on before so that I can
5  preserve those dynamic memory contents and, as a result,
6  operate at a higher speed.
7      So an augmentation that exists in Dynix is
8  processor affinity. It's a system call that doesn't
9  exist in another version of Unix, that specifically
10 allows for a program to get higher execution speed.
11 Q. And is an augmentation implemented through new
12 source code?
13 A. It's completely new source code.
14 Q. Now, you also mentioned, in your understanding
15 of the word "modification," that it could include
16 changes.
17 A. That's right.
18 Q. Can you explain to me what you mean by that?
19 A. Certainly. For example, the compilers that
20 were used to build the Dynix operating system are the
21 Berkeley-derived compilers, and there are subtle
22 differences in the way symbols are treated. And so it
23 might be necessary, if you wanted to compile, without
24 adding additional function, a System V source module to
25 make a modification that was really cosmetic or had no

Page 137

1 embodying or containing Unix System V, that it was
2 subject at least to this confidentiality restriction
3 that we've been discussing?
4     A. Those portions --
5     MR. KAO: Objection to form.
6     THE WITNESS: -- which were derived from
7 System V, yes.
8     MR. HEISE: Q. And we've already discussed
9 about how you would, at least according to you, go about
10 and identify those, quote, portions of Dynix.
11    A. Yes.
12    Q. Why is it that you believe it only restricts
13 those portions as opposed to Dynix/ptx?
14    A. Because in my interpretation, the restrictions
15 apply to those things which are owned by AT&T and do not
16 apply to those things which are owned by Sequent.
17    Q. And according to the way that you're
18 interpreting this, only if you found actual System V
19 source code, that's the only thing that could not be --
20 that had to be treated confidentially?
21    A. Essentially. We've talked earlier about the
22 methods and procedures issue as well.
23    Q. We're going to get to that, but I'm trying to
24 just follow the format of your --
25    A. Yeah.

Page 138

1     Q. Okay. When you state that you don't know
2 whether Dynix is a derivative work based on Unix
3 System V, what's preventing you from being able to make
4 that determination?
5     A. And you're now saying Dynix or Dynix/ptx?
6     Q. Well, I'm going to -- I'll clarify it as
7 Dynix/ptx.
8     A. Okay.
9     Q. And I guess what I should do -- I'll let you
10 answer the question as to Dynix/ptx; then I'll ask you
11 another question.
12    A. Okay. Dynix/ptx is almost certainly a
13 derivative work of Unix System V.
14    Q. In paragraph 8 of your declaration, sir, you
15 start the sentence with "As I understood the Software
16 Agreement between Sequent and AT&T Technologies . . . ,"
17 and then you continue on. I just want to focus on your
18 first part there of --
19    A. Yes.
20    Q. -- "as I understood . . . ."
21       Is that from your reading of the agreement
22 only, or is that from some other sources?
23    A. It relies upon my conversations with the AT&T
24 individuals.
25    Q. In paragraph 9 is when you first used the word

Page 139

1 "Dynix." So I know you talked about this a little bit
2 earlier, so I just want to see if I can make sure the
3 record's clear.
4        Dynix starts out, and then after Unix System V
5 is licensed, Dynix/ptx is created, but at the same time,
6 they're both being sold. And eventually, does Dynix
7 cease or does it just -- what happens?
8     MR. KAO: Objection to form.
9     THE WITNESS: Both products continue on.
10 Ultimately, the marketplace for Dynix/ptx was larger
11 than the marketplace for Dynix for Sequent.
12    MR. HEISE: Q. Given that statement, that the
13 Dynix/ptx became the larger marketplace, did there come
14 a point in time when Dynix just stopped being worked on
15 or sold and that it was strictly Dynix/ptx?
16    MR. KAO: Objection to form.
17    THE WITNESS: I don't know that from own
18 knowledge. I can't speculate. I don't know.
19    MR. HEISE: Q. In terms of just trying to
20 give us a broad view of Dynix and Dynix/ptx, when
21 Dynix/ptx is where the marketplace was going for the
22 high-end business computing, what is the relative ratio
23 between how much of Sequent was devoted to Dynix/ptx
24 versus its former product of Dynix?
25    MR. KAO: Objection to form.

Page 140

1     THE WITNESS: Certainly within development,
2 the bulk of the resources would have been working on
3 Dynix/ptx because it was under development.
4     MR. HEISE: Q. Right.
5     A. And Dynix itself would have been getting, of
6 course, bug fixes and customer support attention from
7 development and probably enhancement. As I've
8 previously described, the hardware platform evolved over
9 time. So with each new hardware platform, then Dynix
10 would get revisited to test it, make it compatible, take
11 advantage of any new hardware.
12    Q. Would it be fair to say that more than
13 50 percent of the company's revenues, expenses,
14 resources, and the like were devoted to Dynix/ptx once
15 that was the product line that was being developed by --
16    MR. KAO: Objection.
17    MR. HEISE: Q. -- Sequent?
18    MR. KAO: Excuse me. Objection to form.
19    THE WITNESS: After some period of time, I
20 would say yes to revenues. Expenses, I would say no to.
21 SG&A was always bigger. And so it depends.
22    MR. HEISE: Q. Okay. That's a fair response.
23 But I think you've made clear Dynix/ptx was on the
24 upswing and Dynix without the ptx was on the downswing.
25 Is that --