# EXHIBIT M

Brent O. Hatch (5715)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, | Case No. 2:03CV0294DAK |
| Plaintiff, | Hon. Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | **DECLARATION OF IRA KISTENBERG** |
| Defendant. | |

I, Ira Kistenberg, declare as follows:

1. I submit this Declaration in connection with the lawsuit entitled <u>The SCO Group v. International Business Machines Corporation</u>, Civil Action No. 2:03CV-0294 DAK (D. Utah 2003).

2. I was an account executive at AT&T-related entities ("AT&T") from April 1984 through June 1988. I was responsible for the licensing of UNIX software and related materials to various licensees, including, among others, Sequent Computer Systems, Inc. ("Sequent").

3. During my tenure at AT&T, I gained first-hand knowledge of the terms and conditions of AT&T's UNIX System V software license agreements and of the scope of those licenses. I came to understand these matters through, among other things, my own reading of the licenses on the accounts for which I was responsible as well as training sessions and discussions with members of AT&T's UNIX licensing group and AT&T legal counsel, including attorneys Martin Pfeffer, Burt Levine, and Geoff Green.

4. I handled accounts for both commercial and educational UNIX System V licensees. Although AT&T's educational licenses differed from the commercial licenses in certain respects, both types of licenses imposed the same core protections for AT&T's technological innovations, including the restrictions that applied to licensees' use and disclosure of the licensed UNIX technology and of the derivative and modified products that licensees developed based on the original licensed UNIX product.

2

5. AT&T used standard written software agreements to provide legal protections in the course of AT&T's licensing of its UNIX product. Section 2.01 of AT&T's standard UNIX System V software license agreement (of which the Sequent software agreement is an example) granted AT&T's licensee the "right to modify" and "to prepare derivative works based on" the original licensed UNIX product, but required that each licensee treat any "resulting materials" from the exercise of that right (i.e., any modifications or derivatives) as if such materials were part of the original licensed product. AT&T intended that protected modifications and derivatives would include any product that contained any source code that had been copied verbatim from UNIX System V; any copied source code that was similar in substance to the original source code in UNIX System V; any structures, sequences, patterns, ideas, methods or concepts from UNIX System V; and any source code that the licensee developed with the benefit of exposure to the UNIX System V source code.

6. Aside from the requirements of Section 2.01, a separate confidentiality provision of the standard System V software license agreement (and Section 7.06(a) of the Sequent agreement) was intended to require licensees to hold in confidence for AT&T "all parts" of the UNIX property subject to the license agreement (which, as I explained in the previous paragraph, included any modifications or derivatives based on the original licensed UNIX product). Section 7.06(a) was further intended to prohibit the disclosure of "any or all" of such products to anyone, except to the employees of the licensee to whom such disclosure was necessary to the use for which AT&T granted rights under the license agreements.

3

7. During my tenure at AT&T, I often explained these above-described contractual protections to UNIX licensees and prospective licensees. During my tenure at AT&T, I neither participated in nor learned of any change, for any licensee, to any of these core protections.

8. I recall that during my tenure at AT&T, an issue arose concerning the ownership of modifications and derivative works that had been prepared by UNIX licensees. AT&T subsequently changed Section 2.01 of its standard agreement to state its position that AT&T would not claim ownership of any source code that a licensee developed entirely on its own. This ownership provision did not reduce or compromise the restrictions on use and disclosure that were set forth in the license agreements. I recall that in a *$ echo* newsletter AT&T announced that it would be coming out with a clarification to the license agreement relating to the question of ownership. The *$ echo* newsletter did not, and was not intended to, create binding contractual rights; only the written agreements themselves could do that.

9. Although AT&T generally employed standard license agreements, to the extent that any contractual language differed, AT&T intended for the rights and obligations of each licensee to be governed only by that licensee's particular written agreement and side letter(s), and not the contents of any other licensee's written agreement or side letter(s).

4

10. Furthermore, the policy of the UNIX licensing group was that any changes to a licensee's software agreement had to be in writing. I never verbally agreed with any licensee to modify its license in any way without memorializing the modification in writing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: November 12, 2004
Boynton Beach, Florida

Ira Kistenberg

5