# EXHIBIT O

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| THE SCO GROUP,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant. | ) | Case No. 2:03CV0294DAK<br><br>Hon. Dale A. Kimball<br>Magistrate Judge Brooke C. Wells<br><br>DECLARATION OF MITZI BOND |

I, Mitzi D. Bond, declare as follows:

1. I submit this Declaration in connection with *The SCO Group v. International Business Machines Corporation*, No. 2:03CV0294DAK (D. Utah 2003).

2. From 1983 to 1994, I was employed by AT&T (or one of its subsidiary or successor entities) in licensing the UNIX operating system. During that time, I worked in Greensboro, North Carolina, for various entities – including, from approximately 1983 to 1993, AT&T and then UNIX System Laboratories, Inc. ("USL"); and, from approximately 1993 to 1994, Novell.

3. During my tenure at AT&T and USL, I held several positions in the UNIX software sales and licensing group – including Contract Manager, Account Executive, Public Relations Associate, and Public Relations Specialist.

4. Shortly after I began working at AT&T, I was involved in the inception of the *$ echo* newsletter. I served as the editor of that newsletter for the duration of its existence. AT&T used the newsletter to disseminate information to subscribing licensees, including about the requirements of the UNIX software agreements. The newsletter was never intended or designed

to have any legal effect, on our licensees or on their license agreements with AT&T. To the contrary, if, for example, the *$ echo* newsletter announced language that AT&T intended to include in its standard agreement, such language would become part of a licensee's agreement with AT&T only if that licensee executed an agreement containing that language. As the license agreements themselves stated, each individual licensee's rights and obligations were governed by that particular licensee's signed license agreement.

5. In each of my capacities at AT&T and USL, and during my entire tenure with those companies, I was trained to understand the intent and meaning of the standard software agreements under which AT&T and USL licensed the UNIX software product, and I was called upon to communicate that understanding to UNIX licensees and prospective licensees.

6. I came to my understanding of the intent and meaning of the UNIX software license agreements through, among other things, formal training involving, among others, attorneys Marty Pfeffer and Burt Levine (who were our principal legal contacts) and supervisors Otis Wilson, Keith Tester, and David Frasure; as well as informal discussions with my fellow contract managers/account executives, including, among others, Steve Vuksanovich, Evelyn

Davis, and Chuck Greene. The UNIX licensing group regularly attended staff meetings, where we would discuss issues relating to the UNIX license agreements.

7. Based on the above-described training and discussions with my former colleagues, as well as my own reading of the UNIX software license agreements, I know that those agreements were designed and intended to safeguard AT&T's valuable tangible and intangible property rights in UNIX with strict contractual protections that went beyond safeguarding just the source code in the original licensed UNIX product. For example:

a. the license agreements covered any works that resulted from our licensees' exercise of their contractual right to prepare modifications or derivatives of the UNIX product;

b. the agreements protected all of the innovations embodied in the licensed UNIX software, including, among other things, the structures, sequences, patterns, ideas, methods, and concepts; and

c. the agreements required each licensee to treat any work prepared with the benefit of having been exposed to our product – regardless of how the

licensee further developed or changed that product – as if it were part of our original licensed product.

8. During my tenure at AT&T and USL, I regularly communicated these core contractual protections to UNIX licensees and prospective licensees, including, for example, when I dealt directly with such parties in my capacities as an Account Executive and Contract Manager. In communicating the contractual protections to such parties, I often relied on consultation with AT&T's attorneys.

9. In my experience, AT&T refused to compromise its core intellectual property protections – even in response to specific licensee requests and even at the expense of losing prospective licensees. I am not aware of any instance in which AT&T agreed (in any license agreement or any supplement, modification, or side letter thereto) to reduce AT&T's protection under a UNIX license so as to protect against the unauthorized use or disclosure of just source code.

10. Like many AT&T and USL Account Executives and Contract Managers, I handled educational licenses along with commercial and governmental licenses. The terms of all

of AT&T's UNIX license agreements – commercial, educational and governmental – contained substantially the same core protections for AT&T's technological innovations, and the training I received concerning those protections applied across the board to all of those types of licenses.

11. In November and December of 1992, in the case of Unix System Laboratories v. Berkeley Software Design, et al., I testified about the scope of the UNIX license agreement protections in connection with a lawsuit that USL had filed against one of our educational licensees. For example:

a. With respect to the treatment of modifications and derivative works under Section 2.01 of the UNIX license agreement, I testified to my understanding that the agreement required licensees to "treat the derivative or modified work they had created with the same care they would our own software product, meaning adhering to the same terms and conditions that were here." Transcript, p. 134.

b. I further testified: "I look at the modification as being anything that they have developed as a result of being exposed to our software product and

this could be something – not necessarily another operating system, but it could be, or could simply be another application, but anything that was developed as a result of exposure to our product then should be treated as our product." Transcript, p. 223.

c. Concerning the scope of Section 2.01, I also testified that "if a licensee is exposed to our code and that licensee develops a modification, a derivative work, an application or any type of software product as a result of seeing our code, then that product should be treated the same as our software product." Transcript, p. 224.

d. Similarly, I testified that the UNIX license agreement "doesn't necessary mean you have to have copied the exact code. You can also copy an idea or method or concept that you have presented in a different form, because there's going to be contamination, because if you have exposure to our software product, using the code or not using the code, but you have seen

our code, that makes me think that that still in a way contains part of our software product." Transcript, p. 219.

e. With respect to whether the agreement protected against only the copying of source code, I further testified: "You can prepare derivative work and you don't necessarily have to include code from our software product, but based on the fact it was based on our product you must have had to have some exposure to it and that work would be contaminated by our product." Transcript, pp. 220-21.

f. Concerning the views of my former colleagues in UNIX licensing, I testified that my understanding of the license agreements had been supported by conversations I had with Chuck Greene, Evelyn Davis, and Steve Vuksanovich; that Mr. Greene had specifically advised that "If they see our code and develop something, then they need to treat it like ours"; that Ms. Davis believed that if a licensee "developed a product, an application, after seeing our code," then the licensee "needed to protect the

product the same as our software product"; and that Mr. Vuksanovich "was in agreement" with "the fact that the licensee should treat that application the same as our software product." Transcript pp. 228-29, 231-32.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: 11/4/2004

Greensboro, North Carolina

Mitzi D. Bond