# EXHIBIT Q

Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Sean Eskovitz (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stephen N. Zack (admitted pro hac vice)
Mark J. Heise (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower, Ste. 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, | Case No. 2:03CV0294DAK |
| Plaintiff, | Hon. Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | DECLARATION OF EVELYN DAVIS |
| Defendant. | |

I, Evelyn Davis, declare as follows:

1. I submit this Declaration in connection with *The SCO Group v. International Business Machines Corporation*, No. 2:03CV0294DAK (D. Utah 2003).

2. I was employed in Greensboro, North Carolina, by AT&T or one of its subsidiary or successor entities from 1975 until 1994.

3. From approximately 1984 through 1994, I served as a UNIX Account Executive and Contract Manager. My primary responsibility was to license the UNIX operating system and to manage certain licensees' accounts. I received training to understand the intent and meaning of the standard software agreements under which AT&T and USL licensed the UNIX software product, and I regularly communicated that understanding to UNIX licensees and potential licensees.

4. I learned about the intent and meaning of the UNIX software license agreements through, among other things, formal training involving, among others, attorneys Marty Pfeffer and Burt Levine (who were our principal legal contacts) and supervisors Otis Wilson and David Frasure; as well as informal discussions with my fellow contract managers/account executives,

including, among others, Steve Vuksanovich and Mitzi Bond. As a member of the UNIX licensing group, I regularly attended staff meetings, where we would discuss issues relating to the UNIX license agreements.

5. In UNIX, AT&T had developed a seminal innovation that was in high demand in the computer industry. Prospective licensees (including leading computer hardware manufacturers) desired to license and use AT&T's UNIX operating system to avoid having to spend substantial time and money developing their own software products from scratch. In response to that demand, AT&T agreed to allow its licensees special access to its proprietary UNIX product by licensing the UNIX operating system to them, but complimented that special access with specially designed, and broad, protections in its license agreements that would safeguard the valuable UNIX asset.

6. Based on the above-described training and discussions with my former colleagues, as well as my own reading of the UNIX software license agreements, I know that those agreements were designed and intended to protect AT&T's valuable intellectual property rights in UNIX with strict contractual protections. The license agreements effected these

2

protections by restricting, among other things, the use, export, and disclosure of much more than just the literal lines of UNIX source code. For example:

    a.    the license agreements covered any works that resulted from our licensees' exercise of their contractual right to prepare modifications or derivatives of the UNIX product;

    b.    the agreements protected all of the innovations embodied in the licensed UNIX software, including, among other things, the structures, sequences, patterns, ideas, methods, and concepts; and

    c.    the agreements required each licensee to treat any work prepared with the benefit of having been exposed to our product – regardless of how the licensee further developed or changed that product – as if it were part of our original licensed product.

7.    Like many AT&T and USL Account Executives and Contract Managers, I handled commercial, educational and governmental licenses. The terms of all of AT&T's UNIX license agreements – commercial, educational and governmental – contained substantially the

3

same core protections for AT&T's technological innovations, and the training I received concerning those protections applied to all of those types of licenses.

8. In fact, it was my understanding that because these broad protections were so critical, AT&T decided against licensing the UNIX operating system in many foreign countries, where AT&T felt it was more difficult to ensure that the proprietary innovations of its UNIX product would be carefully guarded in accordance with the protections of its license agreements.

9. In my experience, AT&T was adamant in refusing to compromise its core intellectual property protections. Because our UNIX product was in such high demand, and AT&T's commitment to safeguarding that asset was so strong, it was not uncommon for Account Executives and Contract Managers to explain to potential licensees that our core intellectual property protections were not negotiable. I am not aware of any instance in which AT&T agreed (in any license agreement or any supplement, modification, or side letter thereto) to reduce its protection under a UNIX license so as to restrict the unauthorized use or disclosure of just the UNIX source code.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: __11/4/04__

Greensboro, North Carolina

_Evelyn Davis_
Evelyn Davis