SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff International Business Machines Corporation*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

THE SCO GROUP, INC.,

Plaintiff/Counterclaim-Defendant,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

Defendant/Counterclaim-Plaintiff.

**IBM'S REDACTED MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S INTERFERENCE CLAIMS (SCO'S SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION)**

**(ORAL ARGUMENT REQUESTED)**

Civil No. 2:03CV-0294 DAK

Honorable Dale A. Kimball

Magistrate Judge Brooke C. Wells

RECEIVED CLERK

2006 SEP 25 P 8: 19

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff International Business Machines Corporation*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

THE SCO GROUP, INC.,

Plaintiff/Counterclaim-Defendant,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

Defendant/Counterclaim-Plaintiff.

**IBM'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S INTERFERENCE CLAIMS (SCO'S SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION)**

**(ORAL ARGUMENT REQUESTED)**

**FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38**

Civil No. 2:03CV-0294 DAK

Honorable Dale A. Kimball

Magistrate Judge Brooke C. Wells

## Table of Contents

Page


Table of Authorities .......... iii

Preliminary Statement .......... 1

Statement of Undisputed Facts .......... 3

A. SCO's Complaints and Obfuscation. .......... 3

B. SCO's Deposition Disclosures .......... 7

C. SCO's Further Reversal of Position .......... 14

D. SCO's Failure of Proof. .......... 19

1. BayStar .......... 19

2. Computer Associates, Oracle and Intel .......... 21

3. Hewlett-Packard .......... 24

4. OpenSource Conference in Scottsdale, Arizona. .......... 26

5. Novell .......... 27

E. IBM's Purpose in Supporting Linux. .......... 29

F. SCO's Lack of Injury .......... 32

Argument .......... 35

I. WITH RESPECT TO NONE OF THE IDENTIFIED RELATIONSHIPS WAS THERE ANY INTERFERENCE .......... 36

A. BayStar .......... 37

B. Computer Associates, Oracle and Intel .......... 39

C. Hewlett-Packard .......... 41

D. OpenSource Conference in Scottsdale, Arizona. .......... 44

E. Novell .......... 45

Page


F. IBM Did Not Interfere With a "Unix-on-Intel Market". ....................47

II. IBM DID NOT ACT WITH AN IMPROPER PURPOSE OR BY IMPROPER MEANS AND IBM'S ALLEGED CONDUCT IS PRIVILEGED. ....................51

A. IBM's Alleged Acts Were Not Undertaken With an Improper Purpose. ....................52

B. IBM's Alleged Acts Were Not Undertaken By Improper Means. ....................55

C. IBM's Alleged Acts Are Privileged as They Advance IBM's Legitimate Competitive Interests. ....................57

III. THE ALLEGED ACTS OF IBM DID NOT CAUSE ANY INJURY TO SCO. ....................58

A. There Is No Connection Between Any Act of IBM and An Injury to SCO. ....................59

B. Any Deterioration in SCO's Business Was Caused By Factors Independent of IBM. ....................60

Conclusion ....................64

# Table of Authorities

Page(s)

## Cases

Atkin Wright & Miles v. Mountain States Tel. & Tel. Co., 709 P.2d 330 (Utah 1985) ..... 58

Bower v. Stein Eriksen Lodge Owners Ass'n., Inc., 201 F. Supp. 2d 1134 (D. Utah 2002) ..... 48, 49, 50, 51

Coronado Mining Corp. v. Marathon Oil Co., 577 P.2d 957 (Utah 1978) ..... 58

Forsman v. Forsman, 779 P.2d 218 (Utah 1989) ..... 35

Gull Labs., Inc. v. Diagnostic Tech., Inc., 695 F. Supp. 1151 (D. Utah 1988) ..... 57

L&M Enters., Inc. v. BEI Sensors & Systems Co., 231 F.3d 1284 (10th Cir. 2000) ..... 35

Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293 (Utah 1982) ..... passim

McNeil v. Security Benefit Life Ins. Co., 28 F.3d 891 (8th Cir. 1994) ..... 49

O'Neil v. Continental Ill. Nat'l Bank & Trust Co., No. 84 C 9398, 1985 WL 2710 (N.D. Ill. Sept. 25, 1985) ..... 50

Pratt v. Prodata, Inc., 885 P.2d 786 (Utah 1994) ..... 52

Sampson v. Richins, 770 F.2d 998 (Utah Ct. App. 1989) ..... 52

St. Benedict's Dev. Co. v. St. Benedicts Hosp., 811 P.2d 194 (Utah 1991) ..... 35, 52

State National Bank v. Academia, Inc., 802 S.W.2d 282 (Tex. Ct. App. 1990) ..... 49

Told v. Tig Premier Ins. Co., No. 03-4113, 2005 WL 1910796 (10th Cir. 2005) ..... 35

Top Serv. Body Shop, Inc. v. Allstate Ins. Co., 582 P.2d 1365 (Oregon 1978) ..... 55, 56

U.P.C., Inc. v. R.O.A. General, Inc., 990 P.2d 945 (Utah Ct. App. 1999) ..... 51

Westside Center Assocs. v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507 (Cal. Ct. App. 1996) ..... 49

Page(s)

**Statutes and Rules**

Fed. R. Civ. P. 56(e) .......... 35

**Other Authorities**

Restatement (Second) of Conflict of Laws (1971) § 145 .......... 35, 36

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in support of its motion for summary judgment on Plaintiff/Counterclaim-Defendant The SCO Group, Inc.'s ("SCO") interference claims (SCO's Seventh, Eighth and Ninth Causes of Action).[1]

## Preliminary Statement

SCO's Seventh, Eighth and Ninth Causes of Action allege that IBM has interfered with SCO's contracts and business relationships with customers, business partners and other entities. As shown in detail below, SCO's description of these claims has shifted throughout the pretrial proceedings, expanding, contracting, and again expanding (at times wildly), with the only constant being SCO's failure to provide any clear identification of the specific contracts or business relationships that were supposedly injured or the acts of IBM that allegedly caused such injury. Although it appeared that SCO was attempting simply to avoid disclosing its evidence (at least until trial), it is now clear that what SCO has been seeking to disguise is the lack of any support for these claims at all.

SCO has now identified at least 182 companies or entities with whose alleged contracts or relationships with SCO it alleges IBM interfered. With respect to only seven of these does SCO allege that IBM interfered by directly contacting or communicating with the companies or entities themselves. As to the other 175 identified companies or entities, the alleged interference by IBM is (at best) indirect, consisting entirely of IBM's alleged activities relating to Linux, which activities (according to SCO) interfered with no particular relationship with a SCO

[1] The undisputed and indisputable facts set out in this motion are supported by the declarations and documents submitted herewith, including those appended to the Declaration of Todd M. Shaughnessy, which are cited herein as "Ex. __".

customer or potential customer, but which allegedly affected a "UNIX-on-Intel market" generally.

SCO's claims with respect to all of these companies and entities fail as a matter of law. IBM is entitled to summary judgment on SCO's Seventh, Eighth and Ninth Causes of Action for three independent reasons.

First, SCO's allegations of interference with respect to the seven existing business relationships it ultimately identified are flatly denied by the companies or entities at issue and otherwise entirely without evidentiary support. In short, these claims are simply untrue. With respect to the potentially unlimited number of other companies that IBM is alleged to have interfered with in a "UNIX-on-Intel market", SCO does not (and could not) allege direct contact constituting interference. These claims fail because Utah (like other jurisdictions) simply does not recognize activities with respect to an entire market as a basis for recovery for "intentional" interference with contract or business relations. (See Section I below.)

Second, IBM's allegedly tortious acts were not undertaken with an improper purpose or by improper means, as required under Utah law. As to improper purpose, IBM did not act out of "ill will" toward SCO or a desire to harm SCO for its own sake. To the contrary, and as SCO's own experts recognize, IBM's support for Linux was motivated by compelling competitive reasons and undertaken for the purpose of protecting IBM's legitimate, long-range economic interests. As a result, that conduct is, as a matter of Utah law, privileged and cannot support a cause of action for tortious interference. As to improper means, the various "means" asserted by SCO are merely conclusory restatements of SCO's allegations of improper purpose,

unsupportable for reasons set forth in IBM's other motions for summary judgment and/or not recognized as improper means under Utah law. (See Section II below.)

Third, there is no causal link between any act of IBM and any specific injury to SCO. In fact, SCO has made no attempt to show either specific injury or any causal connection to any act of or contribution by IBM. SCO's experts fail to quantify or even to address the alleged damages allegedly caused by IBM's alleged interference. Moreover, SCO's own witnesses and documents show that any deterioration in SCO's business was caused by a variety of factors independent of IBM (including decisions made by SCO management). (See Section III below.)

For all of the foregoing reasons, and as is further discussed below, summary judgment should be entered in favor of IBM on SCO's Seventh, Eighth and Ninth Causes of Action and those claims dismissed with prejudice and as a matter of law.

## Statement of Undisputed Facts

The undisputed and indisputable facts material to this motion are set forth below, and in the memoranda in support of IBM's other motions for summary judgment, which are submitted herewith and incorporated herein by reference.[2]

A. SCO's Complaints and Obfuscation.

1. SCO's first complaint in this case, filed on March 6, 2003, included a claim for interference with contract. In it, SCO identified seven companies with whose contracts IBM is

---

[2] References to the memoranda in support of IBM's motions for summary judgment submitted herewith are cited as follows: IBM's motion for summary judgment on SCO's unfair competition claim as "UC. Br. __"; IBM's motion for summary judgment on SCO's copyright claim as "AIX Br. __"; IBM's motion for summary judgment on SCO's contract claims as "K Br. __"; IBM's motion for summary judgment for copyright infringement (IBM's Eighth Counterclaim) as Copyright Br. __"; and IBM's motion for summary judgment for a declaration of non-infringement (IBM's Tenth Counterclaim) as "DJ Br. __".

alleged to have interfered: The Sherwin-Williams Company ("Sherwin-Williams"), Papa John's Pizza, AutoZone, Inc. ("AutoZone"), Hewlett-Packard Company ("Hewlett-Packard"), Fujitsu Ltd., NEC and Toshiba Group. (Ex. 1 at 32.)

2. SCO's Amended Complaint, filed on July 22, 2003, also contained a claim for interference with contract, but this time listed only three companies with which IBM is alleged to have interfered: Sherwin-Williams, Papa John's Pizza and AutoZone. (Ex. 2 at 42.)

3. IBM propounded its first set of interrogatories on June 13, 2003, asking, in Interrogatory No. 8, that SCO, among other things, "identify all agreements with which plaintiff alleges IBM interfered and describe, in detail, each instance in which plaintiff alleges or contends that IBM interfered with those agreements, including but not limited to . . . all persons involved in the alleged interference . . . and . . . the specific trade secret or confidential or proprietary information, if any, involved in the alleged interference". (Ex. 11 at 4.)

4. On August 4, 2003, SCO responded to IBM's Interrogatory No. 8 only with stock objections, stating that "discovery has just begun and [SCO] has not received responsive discovery from IBM that would allow it to fully answer this question because part of this information is peculiarly within the knowledge of IBM". (Ex. 31 at 12.)

5. On October 1, 2003, IBM filed a motion to compel SCO to provide complete responses to its interrogatories, including Interrogatory No. 8. (Ex. 62.)

6. On October 23, 2003, the same day it filed an opposition to IBM's motion to compel, SCO served IBM with a Supplemental Response to IBM's First Set of Interrogatories. (Ex. 32 at 32.) In it, SCO claimed that IBM had interfered with SCO's contracts or prospective relationships with 12 entities — Sherwin-Williams, AutoZone, Target Corporation ("Target"),

The Kroger Company ("Kroger"), Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerd Corporation/CVS Pharmacy ("Eckerd/CVS"), Safeway, Inc. ("Safeway"), Hewlett-Packard, Intel Corporation ("Intel") and Computer Associates International, Inc. ("Computer Associates") — nine of whom had never before been identified by SCO. (Id.)

7. On December 12, 2003, Magistrate Judge Wells granted IBM's motions to compel, and ordered SCO "[t]o respond fully and in detail to Interrogatory Nos. 1-9 as stated in IBM's First Set of Interrogatories" on or before January 12, 2004. (Ex. 55 at 2 (emphasis added).)

8. After the January 12, 2004, deadline, SCO submitted its "Revised Supplemental Response to Defendant's First and Second Set of Interrogatories" on January 15, 2004. In it, SCO claimed that IBM had interfered with SCO's contracts or prospective relationships with seven — not 12 — entities: Sherwin-Williams, AutoZone, Target, Hewlett-Packard, Intel, Computer Associates and Oracle Corporation ("Oracle"). (Ex. 33 at 50-56.) (SCO dropped Krogers, Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerd's/CVS and Safeway, and added Oracle for the first time.)

9. The next month, SCO filed a Second Amended Complaint, dated February 27, 2004, and the list of companies shrank further. There, SCO's Seventh Cause of Action again alleged interference with contract, this time identifying only two companies (Sherwin-Williams and AutoZone) with which IBM is alleged to have interfered. SCO's Ninth Cause of Action — claiming interference with business relations — identified only one company (Hewlett-Packard) with whose business relationship IBM is alleged to have interfered. Finally, a new Eighth Cause

of Action claimed that IBM had interfered with the Asset Purchase Agreement between Novell, Inc. ("Novell") and The Santa Cruz Operation, Inc. ("Santa Cruz"). (Ex. 3 at 55-61.) Thus, as of February 27, 2004, the four companies involved in SCO's interference claims were Sherman-Williams, AutoZone, Hewlett-Packard and Novell.

10. With respect to its claim that IBM interfered with its relationship with Novell, SCO alleges in its Second Amended Complaint:

> [C]ommencing on or about May 2003, Novell began falsely claiming that Novell, not SCO, owned the copyrights relating to UNIX System V. On information and belief, IBM had induced or otherwise caused Novell to take the position that Novell owned the copyrights — a position that is flatly contradicted by the Asset Purchase Agreement.

(Ex. 3 at 58.) SCO also alleges:

> IBM intentionally and improperly interfered with the Asset Purchase Agreement by inducing or otherwise causing Novell to violate the Asset Purchase Agreement by claiming Novell could waive and was waiving breaches of license agreements by various licensees, including IBM. Specifically, with the IBM Termination Date looming only days away, Novell wrote to SCO claiming that either SCO must waive its right to terminate IBM's license based upon IBM's numerous breaches thereof or else Novell would purportedly waive SCO's right to terminate the license and otherwise excuse IBM's numerous breaches of the license agreements.

(Id.) Finally, SCO states that after inducing Novell to take these actions, "IBM has contributed $50 million dollars to Novell so that Novell can complete the purchase of SuSE, the largest Linux distributor in Europe". (Id. at 60.)

11. By Order dated March 3, 2004, the Court reiterated its December 2003 Order, compelling SCO again to provide meaningful responses to IBM's interrogatories, this time on or before April 19, 2004. (Ex. 56.) Specifically, the Court required SCO to "fully comply within

45 days of the entry of this order with the Court's previous order dated December 12, 2003". (Id. at 2.)

12. On January 22, 2005, IBM propounded its sixth set of interrogatories, including Interrogatory No. 24, which states:

> For each of the claims asserted by plaintiff in this lawsuit, please describe in detail all of the alleged damages to plaintiff that were proximately caused by IBM, including, but not limited to; (a) the amount of the alleged damages; (b) the basis for the alleged damages; (c) the precise methodology by which the damages were calculated; documents or other materials relied upon or considered in determining the alleged damages; and (d) all efforts undertaken by plaintiff to mitigate the alleged damages.

(Ex. 17 at 3.)

13. On April 21, 2005, at a hearing before the Court, counsel for SCO stated:

> IBM has served interrogatories on SCO, and SCO is under an obligation to respond to those interrogatories. We will do so as soon as we can. If it arises that IBM is of the view that it has not received our responses to their interrogatories in enough time to complete discovery, that is an issue to raise with the Court at that point. The Court is full of arsenal (sic) of measures it can take to allow more time or to preclude us from using evidence if we haven't produced responses to those interrogatories in time.

(Ex. 417 at 95:20-96:4.)

14. On July 1, 2005, the Court entered a Revised Scheduling Order, setting October 28, 2005, as the "Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material" and December 22, 2005, as the "Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material". (Ex. 58 at 4.) The Court required SCO to update interrogatory responses accordingly, including its response to Interrogatory No. 8. (Id.)

B. SCO's Deposition Disclosures.

15. Having received no further update to its response to Interrogatory No. 8 despite the three Court orders, on September 2, 2005, IBM served SCO with a Rule 30(b)(6) deposition

notice, asking that SCO designate a corporate representative to testify about SCO's relationships, and IBM's alleged interference, with the 13 entities identified in all of SCO's interrogatory responses to that point (Sherwin-Williams, AutoZone, Target, Kroger, Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerds/CVS, Safeway, Hewlett-Packard, Intel, Computer Associates and Oracle), as well as with Novell. (Ex. 20 at 5-6.)

16. SCO designated Jeff Hunsaker, Senior Vice-President and General Manager of SCO's UNIX division and former Vice-President of Worldwide Sales, to testify about SCO's business relationships with the 14 entities listed in IBM's notice. SCO also designated Ryan Tibbitts, SCO's general counsel, to testify about the remaining subtopics, including "the date, nature and particulars of any conduct by IBM interfering with the relationship" and "the impact on SCO of IBM's conduct". (Ex. 47.)

17. On October 7, 2005, at a hearing before the Court, counsel for SCO committed to supplementing SCO's responses to IBM's interrogatories, including its response to Interrogatory No. 8, by December 22, 2005, as required by the Court in its July 1, 2005, Order:

> Counsel for SCO: Now, with respect to material that has been produced, Judge Kimball ordered us by October 24th to provide our interim disclosures of the technology and supplement that with the final disclosure in December. We are working on that and. We intend to fully comply with the order, which is the current order we understand we are operating under with respect to those mentioned by identification.
>
> The Court: Does that encompass interrogatory Number 13?
>
> Counsel for SCO: It would encompass supplementing interrogatories to SCO which have asked for information relating to the nature of what we believe has been misappropriated. I don't have 13 in front of me, Your Honor, if that's such the interrogatory that would include that.

(Ex. 418 at 56:1-14.)

18. At his deposition on November 10, 2005, Mr. Hunsaker could name no companies other than the 14 listed in IBM's 30(b)(6) notice as having relationships with SCO with which IBM allegedly interfered:

SECTION REDACTED

19.

Counsel for IBM requested that "the records that Mr. Hunsaker has referred to that he reviewed regarding revenue products and other information for the [14] Subject Companies be produced to [IBM], and if it already has been produced, that it be specifically identified". (Ex. 312 at 159:17-23.)

20. On November 30, 2005, counsel for IBM wrote to counsel for SCO, requesting that SCO produce the "financial and other information dating from 1996 and pertaining to SCO customers, revenues and product sales" that Mr. Hunsaker testified he had reviewed. (Ex. 209 at 3.) Counsel for IBM stated, "It became readily apparent that IBM was seeking reasonably detailed and specific information with respect to the Subject Companies. Mr. Hunsaker was not prepared to provide this type of information". (Id. at 4.)

21. On December 1, 2005, SCO produced two documents to IBM.

SECTION REDACTED

22. The next day, IBM deposed Darl McBride, SCO's President and CEO. When Mr. McBride was asked to confirm that the 13 companies identified in the documents were the only companies with which IBM was alleged to have interfered, he declined to do so and instead went on to identify ten new "sets" of relationships, constituting at least 43 entities, with which he claimed IBM interfered. (Ex. 317 at 63:12-83:24.) The ten "sets" identified by Mr. McBride were:

SECTION REDACTED

At his deposition, Mr. McBride could not identify all of the members of these groups. (Ex. 317 at 67:19-68:9.)

23.

SECTION REDACTED

24. On December 5, 2005, counsel for IBM sent SCO's counsel a letter, objecting to Mr. McBride's testimony and the expansion of SCO's interference claims. (Ex. 52.) Counsel for IBM stated:

> It is difficult to view Mr. McBride's testimony as anything other than a misguided attempt by SCO to gain an unfair tactical advantage by expanding the scope of its interference and unfair competition claims and trying to force an extension of the discovery schedule. If SCO were allowed to expand its claims by Mr. McBride's assertions, which (like most of his testimony) lacked any basis in personal knowledge, then IBM would be required to undertake substantial additional third-party discovery at great expense, burden and prejudice to IBM.

(Id.) Counsel for IBM also requested that SCO confirm that SCO's interference claims were limited to IBM's alleged interference with only the persons or entities listed in its interrogatory responses, at its Rule 30(b)(6) depositions and in the two documents produced the day before Mr. McBride's deposition. (Id.)

25. In response, counsel for SCO stated that IBM's objections to Mr. McBride's testimony were "mistaken", that Mr. Tibbitts would testify on behalf of the company on the remainder of IBM's Rule 30(b)(6) subtopics regarding SCO's interference claims, including the identity of all companies with whom IBM is alleged to have interfered, and that "SCO's supplemental interrogatory responses . . . will be consistent with SCO's 30(b)(6) testimony on the same topics as the interrogatory responses." (Ex. 60.)

26. IBM took the Rule 30(b)(6) deposition of Mr. Tibbitts as to SCO's interference claims the following week, on December 16, 2005. During Mr. Tibbitts' deposition, SCO produced a spreadsheet describing "the interferences that [SCO is] alleging and currently investigating". (Ex. 319 at 43:9-14, 44:3-9.) This spreadsheet, marked as Exhibit 90 to Mr. Tibbitts's deposition, identifies some 250 entities in at least seven countries. (Ex. 61.) Exhibit

90 provides virtually no meaningful information concerning the nature of SCO's claim, IBM's alleged misconduct, SCO's relationships with the companies identified, SCO's historical or prospective business with the companies or SCO's alleged damages. (Id.)

27. Although counsel for SCO stated to counsel for IBM that Exhibit 90 would "assist [Mr. Tibbitts] in answering these questions" (Ex. 319 at 43:16-17), when asked to provide information beyond what was represented on the chart, Mr. Tibbitts testified that

SECTION REDACTED

28. When asked whether he could provide any additional information about any of the entities listed in Exhibit 90, Mr. Tibbitts testified,

SECTION REDACTED

29. Even where Mr. Tibbitts purported to provide additional information beyond what appeared on the face of Exhibit 90, his testimony was frequently based on mere speculation.

SECTION REDACTED

SECTION REDACTED

30. Although many of the entries on Exhibit 90 contain the identical allegations that "IBM's sales representatives persuad[ed] SCO's customers that SCO has no viability" (Ex. 61) and that there was "direct pressure from IBM to stop dealing with SCO" (id.), Mr. Tibbitts was unable to substantiate or clarify these allegations in any way.

SECTION REDACTED

31. Mr. Tibbitts, SCO's Rule 30(b)(6) witness on SCO's relationship with BayStar, also testified that all he knew about IBM's alleged interference with BayStar was as briefly stated in SCO's Exhibit 90:

SECTION REDACTED

32. The next week, on December 20, 2005, counsel for IBM spoke with counsel for SCO regarding Mr. McBride's and Mr. Tibbitts' testimony and SCO's expansion of its interference claims. (Ex. 70 ¶ 2.) Counsel for SCO stated that SCO had now determined to limit

the number of companies for which SCO was claiming interference to ten, and possibly to five, and that SCO would provide an updated interrogatory response reflecting this as soon as possible. (Id. ¶ 3.) In response, counsel for IBM stated that if such a response was not promptly provided, IBM was prepared to bring the matter to the attention of the Court. (Id.)

33. On December 22, 2005, SCO served its Final Disclosures, but failed to update its interrogatory responses, including its response to Interrogatory No. 8. (Ex. 54.)

34. On December 28, 2005, counsel for SCO informed counsel for IBM that the number of companies at issue would in fact be only six; that they would be BayStar Capital Management, LLC ("BayStar"), Hewlett-Packard, Oracle, AutoZone, Intel and Novell; and that SCO would promptly supplement its interrogatory answers accordingly. (Ex. 70 ¶ 4.)

C. SCO's Further Reversal of Position.

35. On January 13, 2006, after the December 22, 2005, deadline for finally submitting its Final Disclosures and updated interrogatory responses, SCO served a revised Supplemental Response to Interrogatory No. 8 (Ex. 46 (the "Supplemental Response")).

36. Despite SCO's commitment to limit its interference claims to approximately six companies, the Supplemental Response identifies over 150 entities whose relationship with SCO IBM allegedly interfered with. The Supplemental Response also identifies six companies or entities with which SCO claims IBM interfered through various direct contacts with the companies: BayStar, Hewlett-Packard, Computer Associates, Oracle and Intel, as well as an "OpenSource Conference" in Scottsdale, Arizona. (Ex. 46 at 2-7.)

37. As to these, SCO makes the following allegations:

(a) BayStar: SCO alleges that, following BayStar's investment in SCO in October 2003, "IBM on one or more occasions communicated with BayStar in order to induce BayStar to threaten litigation against SCO and to terminate its business relationship with and/or withdraw or reduce its investment in SCO" and that "[a]s a proximate result of IBM's communications with BayStar, BayStar terminated its business relationship with SCO in May 2004". (Id. at 2-3.)

(b) Computer Associates, Oracle and Intel: SCO alleges "[o]n information and belief" that IBM contacted Computer Associates, Oracle and Intel during or shortly after the LinuxWorld 2003 convention and informed them that IBM was "cutting off all business ties with SCO" and that IBM wanted each of them to do the same. (Id. at 4.)

(c) Hewlett-Packard: SCO alleges that "Ms. Smith [of IBM] contacted Rick Becker of Hewlett-Packard during or shortly after the LinuxWorld 2003 convention and stated that IBM was cutting off all business ties with SCO and wanted Hewlett-Packard to do the same". (Id.) SCO relies entirely on the deposition testimony of Mr. Becker, that at the LinuxWorld 2003 convention, Karen Smith of IBM '

SECTION REDACTED

SCO also alleges that, although Hewlett-Packard and SCO "still have a good business relationship, Hewlett-Packard has provided SCO with significantly less support than it did in 2002". (Id.)

(d) OpenSource Conference in Scottsdale, Arizona: SCO alleges that Darl McBride "entered into an oral business relationship with John Terpstra, who was hosting an OpenSource Conference in Scottsdale, Arizona, in the spring of 2004, to speak at the conference." (Id. at 7.) SCO further claims that IBM thereafter "contacted Mr. Terpstra and informed him that IBM did not want Mr. McBride to speak at the conference, and intimated that IBM would withdraw its participation in the conference if Mr. McBride did speak". (Id.)

38. The Supplemental Response also alleges that IBM "encourag[ed] and improperly enabl[ed] numerous companies to migrate to or to use an enterprise-hardened Linux platform operating on Intel-based hardware rather than use SCO's UnixWare or OpenServer products", thereby interfering with SCO's prospective business relationships with 19 "former SCO customers who migrated to an enterprise-hardened Linux platform" (Actual Systems, Advantage Business Computers, AmCom Software, AutoZone, Avaya, Avnet, Bebe, Frazee Paints, Kmart, Prime Clinical, Radical System, Safeway, Save Mart, Shaw's Supermarkets, Sherwin Williams, Shopper's Drug Mart, Snyder Drug Stores, Target Pharmacies and West Communications) and 156 "other Linux users who chose an enterprise-hardened Linux platform". (Id. at 7-13.)

39. The Supplemental Response says nothing about IBM's alleged interference with the Novell/Santa Cruz Asset Purchase Agreement, despite the fact that Interrogatory No. 8 expressly seeks the identification of "all agreements with which plaintiff alleges IBM interfered" and a detailed description of "each instance in which plaintiff alleges . . . that IBM interfered with those agreements." (Ex. 11 at 4.)

40. On June 28, 2006, the Magistrate Judge Wells issued an Order Granting in Part IBM's Motion to Limit SCO's Claims. In the Order, Judge Wells states:

> In an order signed by Judge Kimball on July 1, 2005, both SCO and IBM were given two important dates, October 28, 2005 and December 22, 2005 respectively. These dates were court ordered deadlines for the parties "to disclose with specificity all allegedly misused material'. With the October date being the interim deadline and the December date being the final deadline. Pursuant to this same order, the parties were also ordered to "update interrogatory responses."

(Ex. 59 at 14-15.)

41. Because Mr. Tibbitts was unable to provide meaningful information about SCO's claims at his December 16, 2005, deposition, and because SCO's claims continued to evolve, IBM deposed Mr. Tibbitts a second time in his capacity as SCO's Rule 30(b)(6) witness on the interference claims on June 30, 2006.

42. At this deposition, SCO confirmed that the Supplemental Response sets forth "the complete and accurate" response to IBM's Interrogatory No. 8 as it understood it to date, that it "supersede[s]" and "replace[s]" SCO's prior responses to Interrogatory No. 8, and that — at least as to pages one through ten of SCO's Supplemental Response — SCO has "no plan to update anything" therein. (Ex. 345 at 9:10-10:1, 22:24-23:21.)

43. Mr. Tibbitts further acknowledged that SCO was "abandoning" its tortious interference claims with respect to five of the 19 "former SCO customers" identified in the Supplemental Response — Avnet, Frazee Paints, Save Mart, Snyder Drug Stores and Target — because these companies had not switched to a Linux platform at all. (Id. at 24:23-26:22.)

44. As set out in the Supplemental Response and Mr. Tibbitts' testimony, SCO now asserts its Seventh, Eighth, and Ninth Causes of Action with respect to:

(a) Seven identified contractual or existing business relationships with which IBM allegedly interfered by specific conduct or communication to the companies or persons with whom SCO had the relationships: BayStar, Hewlett-Packard, Computer Associates, Oracle, Intel, the OpenSource Conference and Novell.

(b) Possible business relationships that allegedly might have been established with companies in a second group, consisting of the 14 "former SCO customers" and 156 "other Linux users." SCO "is not alleging that IBM contacted any one of these companies individually and somehow wrongfully induced them to switch to Linux on that basis"; instead, the alleged acts consists of IBM's alleged activites relating to Linux affecting the marketplace in general. (Ex. 345 at 29:16-30:10.) SCO has characterized this claim as one for "indirect" interference or interference with "the UNIX on Intel market as a whole". (Ex. 317 at 67:22-25; Ex. 345 at 26:19-22, 35:4-11.) SCO asserts that, but for IBM's alleged interference, these companies and entities "foreseeably would have chosen a SCO platform" rather than a Linux platform. (Ex. 46 at 7-13.) SCO also does not claim that the more than 150 "other Linux users" were SCO customers or that SCO necessarily had any direct contact or communication with them. In fact, during Mr. Tibbitts' June 30, 2006, Rule 30(b)(6) deposition, counsel for SCO admitted that SCO generated the list of the 156 companies by lifting companies named in an IBM document which purports to identify certain companies as "Linux wins". (Ex. 345 at 42:6-11.) In

its Supplemental Response, SCO expressly states that the claims as to these 156 companies are made only "on information and belief". (Ex. 46 at 11.)

D. SCO's Failure of Proof.

45. SCO has not identified any evidence of improper conduct by IBM that interfered with any of its contracts or business relationships and it cannot do so, for at least the reasons explained below.

1. BayStar.

46. No one from IBM ever communicated with any representative of BayStar concerning SCO or BayStar's investment in SCO.

(a) In a sworn declaration, Larry Goldfarb, managing member of BayStar, states: "No one from IBM ever had any communications with me or, to my knowledge, anyone at BayStar relating to SCO." (Ex. 165 ¶ 4.)

(b) Mr. Goldfarb also states: "No one from IBM ever contacted me or anyone else at BayStar about SCO, BayStar's investment in SCO, or anything else." (Id. ¶ 16.)

47. BayStar's threats of litigation against SCO and its decision to terminate or reduce its business relationship with SCO were not induced or caused by any action or communication by IBM.

(a) BayStar's Mr. Goldfarb states: "BayStar terminated its relationship with SCO for multiple reasons. BayStar's decision to terminate its relationship with SCO had nothing whatsoever to do with any communications with or conduct of IBM." (Id. ¶ 4.)

(b) Mr. Goldfarb further states: "BayStar's decision to redeem its shares in SCO and retire its investment in SCO had nothing whatsoever to do with IBM or any representative of IBM." (Id. ¶ 16.)

48. BayStar's decision to redeem its investment in SCO was caused by reasons having nothing to do with IBM.

(a) Shortly after BayStar made the investment in SCO, SCO's stock price, financial performance and the viability of its UNIX products all appeared to be in decline. Mr. Goldfarb states: "SCO's stock price declined . . . I was also very concerned about SCO's high cash burn rate and whether its UNIX products were viable in the marketplace." (Id. ¶¶ 10, 11.)

(b) Microsoft's conduct suggested that it might not guarantee BayStar's investment in SCO as it had promised to Mr. Goldfarb. Mr. Goldfarb states: "Mr. Emerson [Microsoft's senior vice president of corporate development and strategy] and I discussed a variety of investment structures wherein Microsoft would 'backstop,' or guarantee in some way, BayStar's investment. . . . Microsoft assured me that it would in some way guarantee BayStar's investment in SCO." (Id. ¶ 7.) Mr. Goldfarb states that, after BayStar made the investment, "Microsoft stopped returning my phone calls and emails, and to the best of my knowledge, Mr. Emerson was fired from Microsoft." (Id. ¶ 10.)

(c) When BayStar's concerns about SCO's business were not adequately addressed by SCO, BayStar decided to retire its investment in SCO. Mr. Goldfarb states:

SECTION REDACTED

SECTION REDACTED

Mr. Goldfarb further states: "Having received no satisfactory response from SCO, I determined BayStar's obligations to its investors required the Fund to get out of the investment. I negotiated the terms of the deal to retire the investment on behalf of BayStar." (Id. ¶ 14.)

2. Computer Associates, Oracle and Intel.

49. Neither Karen Smith (IBM's then Vice President of Linux Strategy and Market Development, and one of IBM's LinuxWorld 2003 attendees) nor any other IBM representative ever stated to Computer Associates, Oracle or Intel that IBM was cutting off its business ties with SCO or that IBM wanted them to cut off their business ties with SCO.

(a) In a sworn declaration, Samuel Greenblatt, Senior Vice President and Strategic Technical Advocate for Computer Associates' Linux Technology Group, states:

> I attended the LinuxWorld 2003 convention. At no time did Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with The SCO Group, Inc. ("SCO") or that IBM wanted CA to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed CA that IBM had decided to terminate its relationship with SCO or asked CA to stop doing business with SCO.

> To the best of my knowledge, CA has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(Ex. 177 ¶¶ 2-4.)

(b) In a sworn declaration, Monica Kumar, Principal Manager of Oracle's Linux Program Office, states:

> I attended the Linux World 2003 convention. At no time did Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with The SCO Group, Inc. ("SCO") or that IBM wanted Oracle to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed Oracle that IBM had decided to terminate its relationship with SCO or asked Oracle to stop doing business with SCO.
>
> To the best of my knowledge, Oracle has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(Ex. 241 ¶¶ 2-4.)

(c) In a sworn declaration, Luann Gulesarian, Intel's Strategic Relationship Manager in its Sales and Marketing Group, states:

> I attended the Linux World 2003 convention in New York, New York in January 2003. At no time did anyone named Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with SCO or that IBM wanted Intel to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed Intel that IBM had decided to terminate its relationship with SCO or asked Intel to stop doing business with SCO.
>
> To the best of my knowledge, Intel has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(Ex. 204 ¶¶ 2-4.)

(d) Ms. Smith likewise confirms that she had no such conversations with Computer Associates, Oracle or Intel. In a sworn declaration, Ms. Smith states: "I did

not have any contacts with Intel, Computer Associates, or Oracle, during or after the LinuxWorld 2003 conference, in which I advised them that IBM was cutting off its business relationship with SCO, or suggested that these companies not do business with SCO." (Ex. 205 ¶ 5.) In addition, regardless of whether such statements were made, she did not do anything that caused these companies not to do business with SCO. (Id. ¶ 4.)

50. SCO supported the migration of Computer Associates, Oracle and Intel products to Linux, partnering with each of these companies to provide Linux solutions to their end users.

(a) SCO's Gregory Anderson, a former SCO employee responsible for SCO's relationships with its technology partners, agreed that "any change in the relationship between SCO/Caldera and Computer Associates . . . had to do with SCO's [alleged] decision not to continue to distribute Linux products". (Ex. 305 at 149:6-19.)

(b)

SECTION REDACTED

(c) SECTION REDACTED

To the extent that there was a change in the relationship between SCO and Intel, it is attributable to SCO allegedly "ceasing to distribute a Linux operating system and Linux products more so". (Ex. 305 at 142:11-23.)

3. Hewlett-Packard.

51. Karen Smith of IBM recalls a brief conversation with Rick Becker of Hewlett-Packard at the LinuxWorld 2003 convention, but does not recall stating and does not believe she stated to Mr. Becker that IBM was going to cut off all business ties with SCO and that IBM wanted Hewlett-Packard to do the same. Regardless, Ms. Smith never took any steps that caused SCO harm. (See Ex. 205 ¶¶ 4, 6.)

52. In any case, the statements allegedly made by Ms. Smith to Mr. Becker had no impact on the relationship between Hewlett-Packard and SCO. At his deposition, Mr. Becker testified:

SECTION REDACTED

53. Hewlett-Packard has confirmed that to the extent its business relationship with SCO has changed, it is for reasons having nothing to do with IBM. Joseph Beyers, Hewlett-Packard's Vice President of Intellectual Property, states in a sworn declaration:

> HP has done business with The SCO Group, Inc. ("SCO"), or its predecessor, The Santa Cruz Operation, Inc., since the mid-1980s. HP continues to do business with SCO, and has a variety of business relationships with SCO, ranging from licensing SCO's intellectual property, including UNIX, to joint marketing and promotions activities.
>
> To the extent HP may have reduced or altered its business relationship with SCO, HP has not in any way reduced or altered its relationship with SCO because of any statements or actions of IBM or any representatives of IBM.

(Ex. 597 ¶¶ 2, 3.)

54. Moreover, by SCO's own admission, the relationship between SCO and Hewlett-Packard did not decline after the LinuxWorld 2003 convention and continues to be strong today:

(a) According to SCO's Mr. Anderson, who had responsibility for SCO's relationships with its technology partners, including Hewlett-Packard, the business relationship between SCO and Hewlett-Packard was "very good" from January 2003, during the LinuxWorld event, until at least May 2003, when he left SCO. (Ex. 305 at 145:12-23.)

(b) According to Mr. Hunsaker, Senior Vice-President and General Manager of SCO's UNIX division and former Vice-President of Worldwide Sales,

SECTION REDACTED

(c) SCO and Hewlett-Packard have had a mutual "longstanding presence" at SCO Forum and HP World and their "close relationship" has resulted in "billions of dollars" of Hewlett-Packard products running SCO software. (Ex. 170.) Concerning the current business relationship between Hewlett-Packard and SCO, SCO's website states:

> ***The SCO-HP Relationship: How HP and The SCO Group Can Help You***
>
> SCO and HP have been partners in leading edge technology since the mid-1980s, when most PCs were single-task, single-user systems and the term 'server' was unknown. The HP/SCO partnership harnessed the latent power of microcomputers with SCO UNIX to bring mainframe and minicomputer capabilities like multi-user and multi-tasking to the desktop. SCO was the first to bring these features to market, leveraging the superior reliability and stability of HP systems.
>
> The SCO/HP partnership is reflected in a longstanding presence at SCO Forum and HP World. This close relationship has resulted in billions of dollars of HP hardware running SCO software worldwide. HP and SCO have a considerable presence in such vertical markets as Financial, Health Care, Manufacturing, and Transaction Processing. HP continues to support SCO operating systems across its server lines and has recently extended support to HP advanced storage technologies such as the MSA1000 and MSA1500.

(Id.)

(d) SCO's website also names Hewlett-Packard as the only "Platinum Sponsor" of its 2006 SCOForum event, the highest level of sponsorship among the eighteen sponsors listed, while displaying Hewlett-Packard's logo in connection with the event. (Ex. 192.)

4. OpenSource Conference in Scottsdale, Arizona.

55. John Terpstra's decision to rescind the invitation to Darl McBride to speak at the OpenSource Conference in Scottsdale, Arizona, was the result of complaints from other participants of the OpenSource Conference, not IBM.

(a) Mr. Terpstra states:

> Although I asked representatives from IBM to participate in the Open Source Open Standards Conference multiple times, no one from IBM was willing to commit to speak at the conference or to participate in it in any way, at any time.
>
> At no time did anyone from IBM tell me that it did not want Mr. McBride to speak at or participate in the conference. At no time did anyone from IBM tell me that it would not participate in the conference unless Mr. McBride did not speak. At no time did anyone from IBM tell me that it would withdraw its participation in the conference if Mr. McBride did speak — as set forth above, IBM never committed to participate in the conference at all. At no time did anyone from IBM pressure me in any way to ask Mr. McBride or SCO not to speak at or participate in the conference.

(Ex. 267 ¶¶ 4, 5.)

(b) Mr. Terpstra further states:

> Other potential participants in the conference did inform me, however, that they would not participate in the conference if Mr. McBride were to be a speaker or if SCO were present in any manner. I was able to secure their attendance only after offering assurance that Mr. McBride and SCO would not be present and that a list of attendees would not be made public.
>
> As a result, I called Mr. McBride sometime before the conference was to occur, and explained to him that overall feedback from potential participants in the Open Source Open Standards Conference was prejudicial to sustaining the invitation for Mr. McBride to speak and for SCO to be present at this event.

(Id. ¶¶ 6, 7.)

5. Novell.

56. In 1995, Novell entered negotiations with Santa Cruz concerning the sale of certain Novell assets relating to its UNIX and UnixWare software products. (Ex. 239 ¶ 4.)

57. On September 19, 1995, Novell and Santa Cruz executed an Asset Purchase Agreement (the "APA"). (Ex. 123.)

58. After SCO filed this lawsuit, Novell sent a series of letters to SCO that directed SCO to waive or explicitly waived the purported breaches of contract SCO has asserted IBM committed. (See Exs. 135-138.)

59. In asserting ownership of the UNIX copyrights and exercising its rights under the APA, Novell acted in its own interests and independently of IBM. IBM did not induce Novell to assert ownership of the UNIX copyrights; nor did it cause Novell to breach any of its obligations under the APA. In a sworn declaration, Joseph LaSala, Jr., Senior Vice President and General Counsel at Novell, states:

> Contrary to SCO's claim, Novell asserted ownership of the UNIX copyrights and exercised its rights under the APA because Novell owns the copyrights, because it has a right of waiver under the APA, and because it was in Novell's interest to exercise these rights. IBM did not have the ability to require Novell to take the steps about which SCO complains and did not force or pressure Novell to do so. Novell acted independently of IBM.

(Ex. 240 ¶ 42.)

60. Novell's decision to assert its contractual rights under the APA was in no way caused or influenced by the $50 million investment made by IBM in connection with Novell's acquisition of SuSE. Mr. LaSala states:

> Novell's decision to assert its contractual rights under the APA and Amendment X was in no way caused or influenced by IBM's $50 million investment. Novell would have taken the same actions even if it did not receive the $50 million investment, and the $50 million was never conditioned on Novell taking such actions.

(Id. ¶ 44.)

61. IBM never requested or expressed a desire that Novell breach the APA, Amendment X or any other agreement between Novell and Santa Cruz or Novell and SCO. Mr. LaSala states:

> Novell informed representatives of IBM of the actions it took with respect to the UNIX copyrights. However, at no time did any representative of IBM request or express a desire that Novell breach, or take any action contrary to, the APA, Amendment X or any other agreement between Novell and Santa Cruz or Novell and SCO.

(Id. ¶ 42.)

E. IBM's Purpose in Supporting Linux.

62. IBM's Linux strategy was undertaken in good faith and was motivated entirely by competitive reasons. In supporting Linux, IBM harbored no malice or ill will directed towards SCO nor any intent to harm SCO. Dan Frye, co-founder of and Vice President responsible for managing IBM's Linux Technology Center, states:

> IBM undertook its Linux business strategy, and made contributions to Linux, in the good faith belief that these activities were permissible. IBM did not undertake its Linux activities with an intent to harm SCO and those activities were not motivated by any spite or ill will toward SCO. On the contrary, IBM undertook its Linux strategy for competitive reasons.

(Ex. 586 ¶ 5.)

63. SCO's own experts believe that competitive forces created market pressures that led IBM to support Linux:

(a)

SECTION REDACTED

(b)

(c)

(d)

(e)

SECTION REDACTED

(f)

64.

(a)

(b)

(c)

SECTION REDACTED

65.

(a)

F. SCO's Lack of Injury.

66. SCO cannot specifically identify any damages resulting from any acts of alleged interference by IBM, as explained below.

(a)

SECTION REDACTED

(b)

(c) With regard to SCO's claim for interference with the "Unix on Intel market", Mr. Tibbitts testified that SCO's "theory is not company/company specific" (Ex. 345 at 34:25-35:11)

SECTION REDACTED

Thus,

SCO is "not allocating a specific dollar amount to each of [those entities] anyway" because SCO's "tortious interference claim . . . is more of a tortious interference perspective, business relationships for the Unix on Intel market as a whole". (Ex. 345 at 26:17-22.)

(d) Similarly, as to the seven existing relationships with which SCO alleges IBM interfered, SCO does not claim any discrete damages resulting from IBM's alleged interference. For example, as to BayStar, Mr. Tibbitts testified:

> [W]e don't have a discreet (sic) claim about BayStar with a damage number associated with that. The BayStar story is part of our overall story about how IBM dealt with us . . . I think it's just part of the story and we're not going to say the damages related to BayStar are X dollars, but . . . it's part of the story that leads to the damages that have been submitted in our damage reports.

(Ex. 345 at 14:17-15:9.)

(e) Not one of SCO's experts attempts to quantify or even address the alleged damages allegedly caused by IBM's alleged tortious interference with SCO's contractual or business relationships.

67. There were problems adversely affecting SCO's business from at least 1999 onward that were independent of any actions of IBM.

(a) SCO was not "successful in getting new customers" at a time when "[Linux] hadn't established itself, didn't have the credentials" and "was relatively new and unproven". (Ex. 304 at 67:16-68:4, 68:23-70:12.)

(b)

SECTION REDACTED

SECTION REDACTED

(c) From January 2000 to the acquisition by Caldera Systems, Inc. ("Caldera"), of Santa Cruz's UNIX business in May 2001, SCO's marketing efforts for its UNIX products were declining. (Ex. 305 at 108:25-109:22.)

(d)

SECTION REDACTED

(e) After the acquisition by Caldera of SCO's UNIX business in 2001, SCO was "focused on maintaining the existing customers as opposed to approaching new customers" of UnixWare and OpenServer. (Ex. 308 at 47:22-48:18.)

(f) SCO's Linux products were more expensive than the Linux products of its competitors, so SCO was "having trouble getting the business a lot of times on the price point". (Id. at 26:12-24.) SCO's Linux products were kept at "a comparative price with [SCO's] UNIX [products] because we would devalue our UNIX business". (Id. at 26:17-19.)

(g)

SECTION REDACTED

SECTION REDACTED

## Argument[3]

To survive summary judgment, SCO must provide evidence, not mere allegations or suppositions, that raises a genuine issue of fact sufficient to satisfy each of the three necessary elements of intentional interference with contract or economic relations. See Fed. R. Civ. P. 56(e). Unsupported and conclusory allegations, including allegations "on information and belief", are to be disregarded. See Told v. Tig Premier Ins. Co., No. 03-4113, 2005 WL 1910796, at *3 (10th Cir. Aug. 10, 2005) ("Information and belief have no place in an affidavit supporting a motion for summary judgment or a response thereto.") (Ex. A hereto); L&M Enters., Inc. v. BEI Sensors & Systems Co., 231 F.3d 1284, 1287 (10th Cir. 2000) ("The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue of fact.").

The tort of intentional interference with economic relations protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract. St. Benedict's Dev. Co. v. St. Benedicts Hosp., 811 P.2d 194, 200 (Utah 1991).[4] In Leigh Furniture & Carpet Company v. Isom, 657 P.2d 293, 304 (Utah 1982), the

[3] The undisputed facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing "Statement of Undisputed Facts".

[4] Utah law applies to SCO's Seventh, Eighth and Ninth Causes of Action. In determining which state's substantive law applies in tort actions, Utah courts apply the "most significant relationship" analysis as described in section 145 of the Restatement (Second) of Conflict of Laws (1971) (the "Restatement"). See Forsman v. Forsman, 779 P.2d 218, 219-20 (Utah 1989).

Utah Supreme Court established three requirements for a plaintiff to sustain a claim for intentional interference with economic relations: "(1) . . . the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff".

IBM is entitled to summary judgment on SCO's Seventh, Eighth and Ninth Causes of Action in SCO's Second Amended Complaint because (1) IBM did not interfere with any of SCO's existing or prospective relationships; (2) IBM's support for Linux was not undertaken with an improper purpose or by improper means and, in any event, is privileged; and (3) the alleged acts of IBM did not cause any injury to SCO.

## I. WITH RESPECT TO NONE OF THE IDENTIFIED RELATIONSHIPS WAS THERE ANY INTERFERENCE.

SCO's Seventh, Eighth and Ninth Causes of Action each should be dismissed as a matter of law because SCO cannot show any unlawful interference by IBM at all. With respect to the seven existing business relationships that IBM is alleged to have interfered with directly, SCO has not adduced and cannot adduce admissible evidence of improper interference by IBM. In fact, the undisputed facts squarely refute SCO's allegations of interference. As to the numerous

---

For most torts, the place of injury generally is accorded more weight than the place of the alleged conduct. See Restatement § 145, cmt. e. The place of injury "plays an important role in the selection of the state of the applicable law . . . provided that the injury occurred in a single, clearly ascertainable state". Id. "The effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business." Id. § 145, cmt. f. Here, the alleged injuries occurred (if at all) in Utah, where SCO's headquarters and principal place of business are located. Moreover, even if one assumes that SCO is alleging injury caused by behavior occurring in multiple states, the Restatement is clear that "the place of the plaintiff's domicile, or on occasion his principal place of business, is the single most important contact for determining the state of the applicable law" as to most issues "involving multistate publication of matter that injures plaintiff's reputation . . . or causes him financial injury . . ." Id. § 145, cmt. e.

other companies that IBM is alleged to have interfered with, SCO does not (and could not) allege direct interference. That alone is fatal to SCO's claim. The law does not recognize indirect interference as a basis for recovery.

A. BayStar.

SCO claims that IBM "on one or more occasions" contacted BayStar in order to "induce" BayStar to terminate its business relationship with SCO and to reduce or withdraw its investment in SCO. (¶¶ 37(a).) SCO further alleges that, as a "proximate result" of IBM's communications, BayStar "terminated its relationship with SCO in May 2004". (Id.) The only thing SCO's Rule 30(b)(6) witness could say with respect to this claim was that BayStar's principal, Mr. Goldfarb

SECTION REDACTED

Other than this inadmissible hearsay on hearsay, SCO has no evidence that IBM interfered with SCO's relationship with BayStar.

BayStar, on the other hand, tells a very different story. In reality, IBM had absolutely nothing to do with BayStar's decision to terminate its relationship with SCO. Mr. Goldfarb states:

> I am informed that SCO claims that IBM interfered with SCO's business relationship with BayStar by communicating with BayStar in order to induce BayStar to threaten litigation against SCO and terminate its business relationship with or reduce its business relationship with SCO. These allegations are not true.
>
> No one from IBM ever had any communications with me or, to my knowledge, anyone at BayStar relating to SCO. As I discuss below, BayStar terminated its relationship with SCO for multiple reasons. BayStar's decision to terminate its relationship with SCO had nothing whatsoever to do with any communications with or conduct of IBM.
>
> . . . .

> BayStar's decision to redeem its shares in SCO and retire its investment in SCO had nothing whatsoever to do with IBM or any representative of IBM. No one from IBM ever contacted me or anyone else at BayStar about SCO, BayStar's investment in SCO, or anything else.

(¶¶ 46-48.)

Shortly after BayStar made the investment, Mr. Goldfarb became concerned about: (i) SCO's financial performance, including its "high cash burn rate" (¶ 48(a)); (ii) SCO's declining stock price (id.); (iii) whether SCO's "UNIX products were viable in the marketplace" (id.); and (iv) Microsoft's conduct that suggested that it might not guarantee BayStar's investment in SCO as promised (¶ 48(b)). Mr. Goldfarb decided to redeem BayStar's investment because SCO failed to adequately address his concerns. He states:

SECTION REDACTED

> Having received no satisfactory response from SCO, I determined BayStar's obligations to its investors required the Fund to get out of the investment. I negotiated the terms to retire the investment on behalf of BayStar.

(¶ 48(c).)

Given that "no one" from IBM ever contacted BayStar about SCO, and that BayStar's decision to terminate the investment had "nothing whatsoever" to do with any communications with or conduct of IBM, SCO's claim of tortious interference fails as a matter of law.

B. Computer Associates, Oracle and Intel.

SCO alleges "on information and belief" that during or shortly after the LinuxWorld 2003 convention IBM contacted certain unidentified representatives of Computer Associates, Oracle and Intel, stating that it was "cutting off all business ties with SCO" and that it wanted each of these companies to do the same. (¶¶ 37(b).)

The persons actually involved, however, confirm that no such contact occurred. (¶ 49.) In a sworn declaration, Samuel Greenblatt, Senior Vice President and Strategic Technical Advocate for Computer Associates' Linux Technology Group, states:

> I attended the LinuxWorld 2003 convention. At no time did Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with The SCO Group, Inc. ("SCO") or that IBM wanted CA to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed CA that IBM had decided to terminate its relationship with SCO or asked CA to stop doing business with SCO.
>
> To the best of my knowledge, CA has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(¶ 49(a).)

Likewise, Monica Kumar, Principal Manager of Oracle's Linux Program Office, states:

> I attended the Linux World 2003 convention. At no time did Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with The SCO Group, Inc. ("SCO") or that IBM wanted Oracle to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed Oracle that IBM had decided to terminate its relationship with SCO or asked Oracle to stop doing business with SCO.

> To the best of my knowledge, Oracle has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(¶ 49(b).)

Similarly, Luann Gulesarian, Intel's Strategic Relationship Manager in the Sales and Marketing Group, states:

> I attended the Linux World 2003 convention in New York, New York in January 2003. At no time did anyone named Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with SCO or that IBM wanted Intel to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed Intel that IBM had decided to terminate its relationship with SCO or asked Intel to stop doing business with SCO.
>
> To the best of my knowledge, Intel has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representative of IBM.

(¶ 49(c).)

Finally, Ms. Smith states:

> I did not do anything to cause any of these companies not to do business with SCO, at any time.
>
> I did not have any contacts with Intel, Computer Associates, or Oracle, during or after the LinuxWorld 2003 conference, in which I advised them that IBM was cutting off its business relationship with SCO, or suggested that these companies not do business with SCO.

(¶ 49(d).)

Each of the representatives who attended the LinuxWorld 2003 convention on behalf of Computer Associates, Oracle and Intel clearly state that no one from IBM made the alleged statements and, even if they had, none of these companies have altered their relationships with

SCO in any way because of any statements or conduct by IBM or its representatives. Ms. Smith confirms that she had no such conversations with these companies. Thus, SCO's claims of tortious interference with respect to Computer Associates, Oracle and Intel must be dismissed.

C. Hewlett-Packard.

SCO also claims IBM interfered with its business relationship with Hewlett-Packard at or after the LinuxWorld 2003 convention. SCO alleges that Karen Smith of IBM contacted Rick Becker of Hewlett-Packard informing him that IBM was "cutting off all business ties with SCO" and wanted Hewlett-Packard to do the same. (¶¶ 37(c).) As a result, although SCO admits that the companies "still have a good business relationship", SCO claims that Ms. Smith's alleged statements caused Hewlett-Packard to provide SCO with "significantly less support than it did in 2002". (Id.)

Although Ms. Smith denies having made such statements, it is undisputed that even if she had, the alleged statements had no effect on SCO's relationship with Hewlett-Packard.[5] Mr. Becker himself confirmed that his alleged conversation with Ms. Smith had no effect on Hewlett-Packard's business relationship with SCO:

SECTION REDACTED

[5] Ms. Smith does not believe she made the statements SECTION REDACTED but also confirms that she never took any steps that caused SCO harm. (¶ 51.)

However, even assuming that she stated to Mr. Becker a desire that Hewlett-Packard cut off its business ties with SCO, merely asking that someone not patronize another business is not intentional interference as a matter of law. See Leigh Furniture, 657 P.2d at 303 (rejecting a formulation of the intentional interference tort that would make actionable "all sorts of contemporary examples of otherwise legitimate persuasion, such as efforts to persuade others ... not to deal with certain entities.").

SECTION REDACTED

Hewlett-Packard has likewise confirmed IBM has had no impact on its relationship with SCO. Joseph Beyers, Hewlett-Packard's Vice President of Intellectual Property, states in a sworn declaration:

> HP has done business with The SCO Group, Inc. ("SCO"), or its predecessor, The Santa Cruz Operation, Inc., since the mid-1980s. HP continues to do business with SCO, and has a variety of business relationships with SCO, ranging from licensing SCO's intellectual property, including UNIX, to joint marketing and promotions activities.
>
> To the extent HP may have reduced or altered its business relationship with SCO, HP has not in any way reduced or altered its relationship with SCO because of any statements or actions of IBM or any representatives of IBM.

(¶ 53.)

Furthermore, SCO's own officers and employees also admit that Ms. Smith's alleged statements had no impact on the relationship between Hewlett-Packard and SCO. Mr. Anderson, a former SCO employee responsible for SCO's relationships with its technology partners, including Hewlett-Packard, testified that, in his view, the relationship between Hewlett-Packard and SCO continued to be "very good" from January 2003 at least until he left SCO in May 2003. (¶ 54(a).) Likewise, in his capacity as a Rule 30(b)(6) witness on this topic, Mr. Hunsaker, Senior Vice-President and General Manager of SCO's UNIX division and former Vice-President

of Worldwide Sales, testified,

SECTION REDACTED

SCO's own website touts the closeness and strength of its relationship with Hewlett-Packard, including their mutual "longstanding presence" at SCO Forum and HP World and the resulting "billions of dollars" of Hewlett-Packard products running SCO software. (¶ 54(c).) SCO's website states:

> ***The SCO-HP Relationship: How HP and The SCO Group Can Help You***
>
> SCO and HP have been partners in leading edge technology since the mid-1980s, when most PCs were single-task, single-user systems and the term 'server' was unknown. The HP/SCO partnership harnessed the latent power of microcomputers with SCO UNIX to bring mainframe and minicomputer capabilities like multi-user and multi-tasking to the desktop. SCO was the first to bring these features to market, leveraging the superior reliability and stability of HP systems.
>
> The SCO/HP partnership is reflected in a longstanding presence at SCO Forum and HP World. This close relationship has resulted in billions of dollars of HP hardware running SCO software worldwide. HP and SCO have a considerable presence in such vertical markets as Financial, Health Care, Manufacturing, and Transaction Processing. HP continues to support SCO operating systems across its server lines and has recently extended support to HP advanced storage technologies such as the MSA1000 and MSA1500.

---

[6] Mr. Hunsaker further testified:

SECTION REDACTED

(Id.) SCO's website also identifies Hewlett-Packard as the only "Platinum Sponsor" of its 2006 SCOForum event, the highest level of sponsorship among the eighteen sponsors listed, while displaying Hewlett-Packard's logo in connection with the event. (¶ 53(d).)

Even assuming for purposes of argument that Ms. Smith indeed "suggested" to Mr. Becker that Hewlett-Packard no longer do business with SCO, and further assuming that such a suggestion is actionable, SCO's relationship with Hewlett-Packard was entirely unaffected and its claim therefore fails as a matter of law.

D. OpenSource Conference in Scottsdale, Arizona.

In its Supplemental Response, SCO further alleges that IBM contacted John Terpstra and convinced him to rescind an invitation to Mr. McBride to speak at an OpenSource conference in Scottsdale, Arizona, thereby interfering with SCO's ability to "generate potential new business and establish goodwill in the open source community". (¶¶ 37(d).) Setting aside the fact that SCO identifies no potential new business that would have been generated from the speech (and the irony of suggesting that SCO wished to "establish goodwill in the open source community"), the alleged conduct simply never occurred.

In a sworn declaration, Mr. Terpstra states:

> Although I asked representatives from IBM to participate in the Open Source Open Standards Conference multiple times, no one from IBM was willing to commit to speak at the conference or to participate in it in any way, at any time.
>
> At no time did anyone from IBM tell me that it did not want Mr. McBride to speak at or participate in the conference. At no time did anyone from IBM tell me that it would not participate in the conference unless Mr. McBride did not speak. At no time did anyone from IBM tell me that it would withdraw its participation in the conference if Mr. McBride did speak — as set forth above, IBM never committed to participate in the conference at all. At no time did anyone from IBM pressure me in any

> way to ask Mr. McBride or SCO not to speak at or participate in the conference.

(¶ 55(a).)

Mr. Terpstra further has explained that his decision to rescind Mr. McBride's invitation in fact had to do with the complaints of other conference-goers regarding participation by SCO:

> Other potential participants in the conference did inform me, however, that they would not participate in the conference if Mr. McBride were to be a speaker or if SCO were present in any manner. I was able to secure their attendance only after offering assurance that Mr. McBride and SCO would not be present and that a list of attendees would not be made public.
>
> As a result, I called Mr. McBride sometime before the conference was to occur, and explained to him that overall feedback from potential participants in the Open Source Open Standards Conference was prejudicial to sustaining an invitation for Mr. McBride to speak and for SCO to be present at this event.

(¶ 55(b).)

Because IBM did nothing to cause Mr. Terpstra to rescind Mr. McBride's invitation to speak at the OpenSource Conference (and SCO did), SCO's claim for tortious interference with respect to the OpenSource Conference must be dismissed.

E. Novell.

SCO alleges that IBM interfered with its contract with Novell by causing or inducing Novell to take certain actions in breach of the 1995 Asset Purchase Agreement entered into between Novell and Santa Cruz. Specifically, SCO alleges: (i) "[C]ommencing on or about May 23, Novell began falsely claiming that Novell, not SCO, owned the copyrights relating to UNIX System V. On information and belief, IBM had induced or otherwise caused Novell to take the position that Novell owned the copyrights — a position that is flatly contradicted by the Asset Purchase Agreement" and (ii) "IBM intentionally and improperly interfered with the Asset

Purchase Agreement by inducing or otherwise causing Novell to violate the Asset Purchase Agreement by claiming Novell could waive and was waiving breaches of license agreements by various licensees, including IBM". (¶ 10.) SCO also suggests that "IBM has contributed $50 million dollars to Novell" in connection with Novell's acquisition of SuSE in order to induce Novell to take these actions. (Id.)

SCO's interference claims as to Novell first should be dismissed because SCO has never properly identified Novell as an entity with whose relationship with SCO IBM is alleged to have interfered. Despite the fact that Interrogatory No. 8 expressly seeks the identification of "all agreements with which plaintiff alleges IBM interfered" and a detailed description of "each instance in which plaintiff alleges . . . that IBM interfered with those agreements", and that SCO was required by three orders of the Court to respond fully and in detail to Interrogatory No. 8, SCO failed properly to disclose its allegations and evidence about Novell in its interrogatory responses, including in its Supplemental Response. (¶¶ 3, 4, 6, 7, 8, 11, 13, 14, 17, 39, 40.)

Moreover, SCO's "information and belief" allegations are flatly refuted by Novell. In a sworn declaration, Joseph LaSala, Jr., Senior Vice President and General Counsel at Novell, states:

> Contrary to SCO's claim, Novell asserted ownership of the UNIX copyrights and exercised its rights under the APA because Novell owns the copyrights, because it has a right of waiver under the APA, and because it was in Novell's interest to exercise these rights. IBM did not have the ability to require Novell to take the steps about which SCO complains and did not force or pressure Novell to do so. Novell acted independently of IBM.

(¶ 59.)

Moreover, Novell further explains that IBM's investment in connection with Novell's acquisition of SuSE had no effect on or relationships to Novell's decision to waive the alleged breaches of the license agreements asserted by SCO:

> Novell's decision to assert its contractual rights under the APA and Amendment X was in no way caused or influenced by IBM's $50 million investment. Novell would have taken the same actions even if it did not receive the $50 million investment, and the $50 million was never conditioned on Novell taking such actions.

(¶ 60.)

Finally, Mr. LaSala confirms that "at no time did any representative of IBM request or express a desire that Novell breach, or take any action contrary to, the APA, Amendment X or any other agreement between Novell and Santa Cruz or Novell and SCO". (¶ 61.)

Thus, Novell's actions were in no way caused or improperly induced by IBM. In deciding to exercise its rights under the APA, Novell acted independently of IBM. Moreover, IBM never requested or expressed a desire that Novell breach the APA, Amendment X or any other agreement between Novell and Santa Cruz or Novell and SCO. SCO's claim with respect to Novell must be dismissed.

F. <u>IBM Did Not Interfere With a "UNIX-on-Intel Market".</u>

In its Supplemental Response, SCO also alleges that IBM interfered with its prospective business relationships with 14 "former SCO customers" and 156 "other Linux users", and potentially numerous other unidentified companies, through IBM's alleged activities relating to Linux that purportedly affected a "Unix-on-Intel marketplace" in general. (¶¶ 38, 44(b).) SCO has characterized this claim as one for "indirect" interference or interference with the "UNIX on

Intel market". (¶ 44(b).) As to these companies, SCO does not claim that IBM directly contacted or communicated with any of them. (Id.)

"Indirect" interference or "interference with the market" is simply not a cognizable claim under Utah law. Under the first element of Leigh Furniture, the plaintiff must establish that the defendant "intentionally interfered" with the plaintiff's "existing or potential economic relations". 657 P.2d at 304.

SECTION REDACTED

SCO, of course, cannot claim that it had an "existing or potential economic relation" with an entire market, including every conceivable customer in that market. (¶ 66(c) (emphasis added).)

But even as to the 14 "former SCO customers" and 156 "other Linux users" that SCO has identified, SCO's claim of "indirect" or "market" interference must be rejected. To establish that IBM's conduct with respect to Linux "intentionally interfered" with its existing or prospective relationships, SCO must show that IBM had knowledge of each relationship and that IBM intended to interfere specifically with each relationship. In Bower v. Stein Eriksen Lodge Owners Association, Inc., the plaintiffs' claim was "premised on their contention that the obstructed view [caused by defendant's neighboring construction] lowers both the fair market value and the rentability of their condominium, and therefore, interferes with prospective economic relations". 201 F. Supp. 2d 1134, 1143 (D. Utah 2002) (emphasis in original). Thus, the alleged interference was indirect, based entirely on defendant's conduct that allegedly impaired plaintiffs' ability to market their property in general, to any — but no particular — lessee. Applying Utah law, the court agreed that the plaintiff "fail[ed] to establish the existence of a third party with whom [the defendant] intentionally interfered" and that the defendant could

not "intentionally interfere with a third party without any knowledge or notice of a third party relationship". (Id. (emphasis in original).) As a result, the court concluded that the plaintiff's allegations of interference were "too speculative" and entered summary judgment in favor of the defendant. Id.

Courts in other jurisdictions have expressly rejected interference claims based on theories of "indirect interference" or "interference with the market". For example, in State National Bank v. Academia, Inc., the court explained:

> Illinois courts have stated that tortious interference with prospective business relations requires some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff. . . . In the present case, . . . the [counterclaim defendant's] conduct was directed only against [counterclaim plaintiff] and its business assets. There was no direct contact with, or interference involving, the relevant third parties. All of the [counterclaim defendant's] actions secondarily affected the third party business relations only to the extent that they prevented [the counterclaim plaintiff] from continuing its business and remaining in a position to maintain those relations. We hold that the evidence was legally and factually insufficient to show any direct interference . . .

802 S.W.2d 282, 296-97 (Tex. Ct. App. 1990) (emphasis added); see also Westside Center Assocs. v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507, 527 (Cal. Ct. App. 1996) ("[plaintiff's] 'interference with the market' theory is but a variation of the discredited 'lost opportunity' theory" that "likewise fails to provide any factual basis upon which to determine whether the plaintiff was likely to have received the expected benefit"); McNeil v. Security Benefit Life Ins. Co., 28 F.3d 891, 893-95 (8th Cir. 1994) (affirming dismissal on summary judgment of tortious interference claim where there was no evidence that the defendant had acted "for the purpose of interfering with the [plaintiff's] independent relationships" and "any effect on those relationships is incidental and may not constitute tortious interference") (emphasis in original); O'Neil v.

Cont'l Ill. Nat'l Bank & Trust Co., No. 84-9398, 1985 WL 2710, at *8 (N.D. Ill. Sept. 25, 1985) (dismissing tortious interference claim on summary judgment and holding that "[t]he plaintiff must plead and prove acts by the defendant directed towards a third party and for the purpose of interfering with plaintiff's prospective gain" and "[t]here is no such thing as a cause of action for interference which is only negligently or consequentially effected") (citations omitted) (Ex. B hereto).

As in Bower, SCO's claims with respect to the 14 "former SCO customers" and 156 "other Linux users" is not based on any direct contact or communications by IBM but on IBM's alleged conduct that allegedly impaired SCO's general "ability effectively to market and sell" its products. (Ex. 46 at 8.) However, SCO has no evidence — and does not claim — that IBM was even aware of any of SCO's purported relationships with the 14 "former SCO customers" and 156 "other Linux users" or that IBM intended to interfere with any of these purported relationships. To the contrary, SCO admits that its UNIX-on-Intel market interference "theory is not company/company specific" and "is more of a tortious interference perspective, business relationships for the Unix on Intel market as a whole". (¶ 66(c) (emphasis added).) Furthermore, SCO acknowledges that it "is not alleging that IBM contacted any one of these companies individually and somehow wrongfully induced them to switch to Linux on that basis".[7] (¶ 44(b).) SCO cannot establish IBM's knowledge of a particular relationship with a

---

[7] In fact, during Mr. Tibbitts' June 30, 2006, Rule 30(b)(6) deposition, counsel for SCO admitted that SCO generated the list of the 156 companies not as the result of, for example, verifying sales leads that SCO lost to Linux, but by lifting companies named in an IBM document which purports to identify certain companies as "Linux wins". (¶ 44(b).) In its Supplemental Response, SCO expressly states that the claims as to these 156 companies are made only "on information and belief". (Id.)

third party or the required intention to interfere as required under Leigh Furniture and Bower, and its claims based on "indirect" interference or "interference with the market" therefore must be dismissed.

Moreover, SCO's claims with respect to the 14 "former SCO customers" and the 156 "other Linux users" are untenable because SCO failed to disclose its allegations and evidence as requested in IBM's Interrogatory No. 8 and as ordered (no less than three times) by the Court. Despite the Court's order of July 1, 2005, that SCO disclose with specificity its allegations and evidence of interference by December 22, 2005, SCO declined to do so. (¶¶ 3, 4, 6, 7, 8, 11, 13, 14, 17, 33, 35, 40.) In fact, SCO has never done so. (Id.) SCO's allegations of interference remain vague and unsubstantiated.

* * *

Summary judgment in favor of IBM should be granted on the Seventh, Eighth, and Ninth Causes of Action because SCO cannot identify any actionable interference with respect to any of the companies identified by SCO in support of those claims.

## II. IBM DID NOT ACT WITH AN IMPROPER PURPOSE OR BY IMPROPER MEANS AND IBM'S ALLEGED CONDUCT IS PRIVILEGED.

None of the alleged acts of interference was motivated by an "improper purpose" or constitutes "improper means" sufficient to satisfy either element of Leigh Furniture.[8] Moreover, the challenged conduct is privileged as a matter of law.

[8] In Leigh Furniture, the Utah Supreme Court advised that, because of the difficulties often presented in proving improper purpose in the commercial context, discussed below, commercial conduct should "for the most part" be regulated by the improper means alternative. Leigh Furniture, 657 P.2d at 307; see also U.P.C., Inc. v. R.O.A. General, Inc., 990 P.2d 945, 957 (Utah Ct. App. 1999). Although we submit that the undisputed facts present no such analytical difficulties in this case, we nevertheless address both elements herein.

A. IBM's Alleged Acts Were Not Undertaken With an Improper Purpose.

To establish an improper purpose under Utah law, SCO must show that IBM acted with "ill will" toward SCO amounting to "a desire to do harm to [SCO] for its own sake", Sampson v. Richins, 770 P.2d 998, 1003 (Utah Ct. App. 1989), and that such "ill will predominated over all legitimate economic motivations." Pratt v. Prodata, Inc., 885 P.2d 786, 788 (Utah 1994). Even "[a]n immediate intent to injure a competitor may be motivated and outweighed by a legitimate long-range interest in furthering one's own economic condition." St. Benedict's, 811 P.2d at 201; Leigh Furniture, 657 P.2d at 311 ("To satisfy the alternative of improper purpose, the defendant's purpose to injure the plaintiff must predominate over all other purposes, including the long-range purpose of achieving some personal economic gain.").

The Utah Supreme Court explains this requirement as follows:

> Because it requires that the improper purpose predominate, this alternative takes the long view of the defendant's conduct, allowing objectionable short-run purposes to be eclipsed by legitimate long-range economic motivation. Otherwise, much competitive commercial activity, such as a businessman's efforts to forestall a competitor in order to further his own long-range economic interests, could become tortious. In the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal gain. The law offers no remedy for those damages — even if intentional — because they are an inevitable byproduct of competition.

657 P.2d at 307.

As to SCO's allegations of direct interference, because IBM never contacted BayStar, Computer Associates, Oracle, Intel or John Terpstra about SCO, it obviously could not have acted for an improper purpose. With respect to Hewlett-Packard, even if (contrary to fact) Ms. Smith spoke with Hewlett-Packard about IBM's intentions and "suggested" that Hewlett-Packard do the same, SCO has no evidence this was done with the predominant intent of harming SCO,

rather than an attempt to further IBM's and Hewlett-Packard's mutual business interests.[9] Similarly, even if (contrary to fact) IBM had induced Novell improperly to assert contractual rights vis a vis SCO, SCO cannot establish that IBM desired to harm SCO for its own sake, rather than acting to protect its own legitimate economic interests.

It is undisputed that as to SCO's allegations concerning indirect interference with a "Unix-on-Intel market", IBM undertook to support Linux in good faith — not out of ill will toward SCO or a desire to harm SCO for its own sake. Dan Frye, co-founder of and Vice President responsible for managing the IBM's Linux Technology Center, states:

> IBM undertook its Linux business strategy, and made contributions to Linux, in the good faith belief that these activities were permissible. IBM did not undertake its Linux activities with an intent to harm SCO and those activities were not motivated by any spite or ill will toward SCO. On the contrary, IBM undertook its Linux strategy for competitive reasons.

(¶ 62.) Thus, to the extent IBM has contributed to the development of Linux, including by encouraging others to migrate to or use Linux, it has been for IBM's legitimate business purposes. IBM has supported and continues to support Linux for business and competitive reasons, not out of ill will or a desire to harm SCO.

SECTION REDACTED

[9] Although Ms. Smith denies having made the statements,

SECTION REDACTED

SECTION REDACTED

SECTION REDACTED

Not only is there no evidence of "a purpose to injure [SCO] that predominate[s] over all other purposes," there is no evidence that IBM had any intention to injure SCO at all. Leigh Furniture, 657 P.2d at 311.

SECTION REDACTED

B. IBM's Alleged Acts Were Not Undertaken By Improper Means.

To establish intentional interference by improper means, plaintiff must show that "the means used to interfere with a party's economic relations are contrary to the law, such as violations of statutes, regulations, or recognized common-law rules." Leigh Furniture, 657 P.2d at 308. Moreover, " '[c]ommonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood", or the violation of "an established standard of a trade or profession"'. Id. (quoting Top Serv. Body Shop, Inc. v. Allstate Ins. Co., 582 P.2d 1365, 1371 & n. 11 (Or. 1978).)

SCO has not alleged any improper means as a matter of law with regard to the direct interference claims. SCO claims only that IBM contacted BayStar, Hewlett-Packard, Oracle, Intel, Computer Associates and John Terpstra and asked those companies not to do business with SCO. (SCO makes no express claim regarding improper means with respect to Novell at all.) Such requests (even assuming, contrary to fact, they were made) simply do not constitute

violence, threats, deceit, bribery, unfounded litigation, defamation, disparaging falsehood or the violation of an established standard of a trade or profession at all, as the law requires. Id. Even if that were not the case, the Utah Supreme Court has stated that "efforts to persuade others . . . not to deal with certain entities" is, in fact, an example of "legitimate persuasion". Leigh Furniture, 457 P.2d at 303.

As to SCO's claim of interference by IBM with its relationships with the 14 "former SCO customers" and 156 "other Linux users", SCO asserts the following means: (i) "conduct designed to intentionally mislead SCO of IBM's intentions regarding serving the volume UNIX-on-Intel market"; (ii) "conduct designed . . . to stall and undermine SCO's marketing and sales efforts that would have otherwise captured a large percentage of that market"; (iii) "conduct designed . . . to develop Linux as a viable alternative targeted to that market"; (iv) "common law unfair competition, as . . . set forth in SCO's responses to other interrogatories"; (v) "IBM's unauthorized copying of SCO's SVR4 source code in AIX for Power constitut[ing] violation of the Copyright Act"; and (vi) "IBM's use and distribution of AIX and Dynix/ptx source code in contributions to Linux constitut[ing] a violation of IBM's agreements with SCO." (Ex. 46 at 8, 10.)

SCO's first, second, and third asserted means in fact are merely conclusory restatements of SCO's allegations of improper purpose with regard to IBM's alleged activities with respect to Linux, which allegations therefore fail as set forth above. SCO's fourth and fifth asserted means — unfair competition and copyright infringement — must be rejected for all the reasons set forth in IBM's Memorandum in Support of its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) and IBM's Memorandum in Support of its

Motion for Summary Judgment on its Claim for Declaratory Judgment of Non-Infringement (IBM's Tenth Counterclaim). In short, IBM did not compete unfairly or infringe SCO's copyrights as a matter of law.

SCO's sixth asserted improper means, the alleged breach of the AT&T licensing agreements, fails for all the reasons set forth in IBM's Memorandum in Support of its Motion for Summary Judgment on SCO's Contract Claims (SCO's First, Second, Third and Fourth Causes of Action). Moreover, even if SCO were able to prove the facts establishing a breach of contract here, breach of contract does not constitute improper means under Leigh Furniture. 657 P.2d at 309 ("A deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an 'improper means.'"). Instead, the Utah Supreme Court in Leigh Furniture reasoned that "[b]ecause the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in tort . . . ". Id.[10]

C. IBM's Alleged Acts Are Privileged as They Advance IBM's Legitimate Competitive Interests.

Although the Utah courts often discuss "the competition privilege" while analyzing the issue of improper purpose, the protection and advancement of legitimate competitive interests in itself is a complete, affirmative defense to a claim of tortious interference. See Gull Labs., Inc. v. Diagnostic Tech., Inc., 695 F. Supp. 1151, 1155 (D. Utah 1988) ("Competition is a major privilege justifying interference with economic advantage, and competitors are not liable for

[10] A deliberate breach of contract only constitutes improper means when it is coupled with an improper purpose to inflict injury which "predominate[s]" over a legitimate economic end. Leigh Furniture, 657 P.2d at 309. SCO has not — and cannot — show such a purpose here, as discussed above.

interference with contract if the interference advances the competitors' own interest and is not otherwise unlawful."); Leigh Furniture, 657 P.2d at 305 n. 8 ("The exercise of a legal right constitutes justification and is a complete defense to an action of tortious intervention of contractual rights") (quoting Coronado Mining Corp. v. Marathon Oil Co., 577 P.2d 957 (Utah 1978)); Atkin Wright & Miles v. Mountain States Tel. & Tel. Co., 709 P.2d 330, 337 (Utah 1985) ("Conduct is not actionable, however, if the defendant only acted to protect his own legitimate interests"). IBM's activities were undertaken to further its own competitive interests

SECTION REDACTED

* * *

Therefore, since IBM's alleged activities with respect to Linux were neither undertaken with an improper purpose nor by an improper means and because such activities are privileged under Utah law, summary judgment in favor of IBM should be granted on the Seventh, Eighth, and Ninth Causes of Action with respect to all claims based upon IBM's activities concerning Linux.

## III. THE ALLEGED ACTS OF IBM DID NOT CAUSE ANY INJURY TO SCO.

Summary judgment on SCO's claims of tortious interference also is warranted because IBM's conduct did not "caus[e] injury to the plaintiff". Leigh Furniture, 657 P.2d at 304. SCO must establish both the fact of injury and a causal relationship between that injury and the acts of IBM. SCO can do neither.

A. There Is No Connection Between Any Act of IBM and An Injury to SCO.

As to the fact of injury, SCO has produced no evidence of damages specific to its interference claims with respect to BayStar, Hewlett-Packard, Computer Associates, Oracle, Intel, John Terpstra's OpenSource Conference and Novell. (¶ 66(b).) And SCO admits that it is "not allocating a specific dollar amount" to its interference claims with respect to any of the 14 "former SCO customers" and 156 "other Linux users" listed in its Supplemental Response, apparently because "[SCO's] theory is not company/company specific". (¶ 66(c).) Instead, the alleged impact on SCO of IBM's conduct "is more of a tortious interference perspective, business relationships for the Unix on Intel market as a whole". (Id. (emphasis added).)

SECTION REDACTED

However, SCO has not attempted to quantify any of these factors, even in the aggregate. Indeed, despite IBM's Interrogatory No. 24 requesting detailed descriptions of "all of the alleged damages to plaintiff that were proximately caused by IBM, including, but not limited to. . . the amount of the alleged damages . . . the basis for the alleged damages . . . [and] the precise methodology by which the damages were calculated . . ." and the three orders of the Court requiring SCO to respond fully and in detail to IBM's interrogatories, none of SCO's experts calculate or even address damages resulting from IBM's alleged interference. (¶¶ 12, 66(e).)

SCO similarly abdicates its burden with respect to causation. SCO claims that IBM interfered with the "Unix on Intel market", including certain of its former customers, by making allegedly improper unspecified contributions to Linux. (¶¶ 38, 44(b).) Yet IBM's Interrogatory No. 8 specifically required SCO to, among other things, identify, "the specific trade secret or

confidential or proprietary information, if any, involved in the alleged interference". (¶ 3.) Despite the three orders of the Court to respond fully and in detail to Interrogatory No. 8, and despite SCO's representations that its Supplemental Response is "complete" and "accurate", SCO nowhere identifies the "specific trade secret or confidential or proprietary information" involved in the alleged interferences. (¶ 3, 7, 42.) In fact, SCO does not identify any specific feature of Linux — " a specific trade secret or confidential or proprietary information" belonging to SCO and allegedly incorporated into Linux by IBM — that caused any of these companies to decide to use or support Linux.

There is no evidence that IBM's alleged conduct "cause[d] injury to the plaintiff," Leigh Furniture, 657 P.2d at 304; accordingly, SCO's claims fail as a matter of law.

B. Any Deterioration in SCO's Business Was Caused By Factors Independent of IBM.

No doubt SCO will point to the deterioration of its business and claim that some (or perhaps all) of this decline is somehow due to IBM's alleged "interference". There is no question that numerous of SCO's customers have left its UNIX platform for Windows, Linux or other competing operating systems, that SCO has had little success attracting new customers, and that SCO lost the financial support of one of its biggest investors. What SCO ignores in attempting to lay blame for this decline at IBM's feet, however, is that the failure of SCO's business not only was not caused by IBM, but was affirmatively caused by strategic decisions made by SCO's management, and by that of its predecessors.

SCO alleges that it was injured to the extent that partners such as Hewlett-Packard, Oracle, Computer Associates and Intel pursued Linux over SCO's UNIX platform. However, SCO collaborated over time with each of these companies on joint Linux projects, accelerating

their product migration to Linux. SCO's relationships with its partners naturally changed when SCO made the decision to stop supporting Linux and threatened suit against all Linux users. Such a decision predictably alienated SCO's partners who (with SCO's encouragement) had made major investments in Linux and were still pursuing Linux strategies.

SECTION REDACTED

With respect to Computer Associates, Mr. Anderson, a former SCO employee responsible for SCO's relationships with its technology partners, agreed that "any change in the relationship between SCO/Caldera and Computer Associates . . . had to do with SCO's [alleged] decision not to continue to distribute Linux products". (¶ 50(a).)

SECTION REDACTED According to Mr. Anderson, any change in SCO's relationship with Intel was caused by SCO allegedly "ceasing to distribute a Linux operating system and Linux products more so". (Id.) And as discussed above, SCO's relationship with Hewlett-Packard did not decline after the LinuxWorld 2003 convention and continues to be strong to this day. (See Section I.C.)

SCO also lost old customers and had difficulty gaining new customers because of the shortcomings of its products and its own strategic decisions.

SECTION REDACTED

SECTION REDACTED

Even at a time when SCO considered Linux to be "relatively new and unproven", SCO was unsuccessful in attracting new customers to its UNIX products. (¶ 67(a).)

SECTION REDACTED

SCO also made a tactical decision to cease pursuing new customers in favor of cultivating its installed base of customers, "focus[ing] on maintaining the existing customers as opposed to approaching new customers" of UnixWare and OpenServer. (¶ 67(e).)

SECTION REDACTED

## Conclusion

For the foregoing reasons, summary judgment should be entered in favor of IBM and against SCO on SCO's tortious interference claims.

DATED this 25th day of September, 2006.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff International Business Machines Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff International Business Machines Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of September, 2006, a true and correct copy of the foregoing was served by U.S. Mail, postage pre-paid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Todd M. Shaughnessy

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of September, 2006, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

and by U.S. Mail, postage pre-paid to:

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

/s/ Todd M. Shaughnessy