SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
 *International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>     Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>     Defendant/Counterclaim-Plaintiff. | **IBM'S UNSEALED MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S COPYRIGHT CLAIM (SCO'S FIFTH CAUSE OF ACTION)**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

RECEIVED CLERK

2006 SEP 25  P 8: 16

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **IBM'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S COPYRIGHT CLAIM (SCO'S FIFTH CAUSE OF ACTION)** <br><br> **(ORAL ARGUMENT REQUESTED)** <br><br> **FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38** <br><br> Civil No. 2:03CV-0294 DAK <br><br> Honorable Dale A. Kimball <br><br> Magistrate Judge Brooke C. Wells |

**Table Of Contents**

Page

Table Of Authorities ................................................................................................ ii

Preliminary Statement ............................................................................................... 1

Statement of Undisputed Facts ............................................................................... 5

      A.     UNIX, IBM, and Sequent. .............................................................. 6

      B.     Amendment No. X. ......................................................................... 9

      C.     SCO's Acquisition, Lawsuit, and Threatened Terminations. ............................... 15

      D.     SCO's Copyright Claim. ................................................................. 19

Standard of Decision ................................................................................................ 21

Argument .................................................................................................................. 22

I.      SCO CANNOT ESTABLISH A PREDICATE BREACH OF CONTRACT. ................. 22

II.     SCO CANNOT SHOW THAT IT PROPERLY TERMINATED IBM'S
       LICENSE. ........................................................................................ 27

      A.     IBM Has an Irrevocable License. ..................................................... 27

      B.     SCO Failed to Give IBM Proper Notice and an Opportunity to Cure, and
          to Exercise Its Good Faith Best Efforts to Avoid Termination. ........................... 34

III.    SCO CANNOT PROVE UNAUTHORIZED COPYING OR DISTRIBUTION
       BY IBM OF COPYRIGHTED WORKS OWNED BY SCO. ............................... 37

IV.    SCO HAS MISUSED ITS ALLEGED COPYRIGHTS. ................................... 40

Conclusion ................................................................................................................ 42

## **Table Of Authorities**

Page(s)

**Cases**

Alcatel USA, Inc. v. DGI Techs., Inc., 166 F.3d 772 (5th Cir. 1999) ........................................... 40

Aron v. Gillman, 128 N.E.2d 284 (N.Y. 1955) ............................................................................. 31

Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280 (N.Y. 1978) .................................................. 27, 28

Brought to Life Music, Inc. v. MCA Records, Inc., No. 02-1164, 2003 WL
   296561 (S.D.N.Y. Feb. 11, 2003) ............................................................................................ 37

Cambridge Elec. Corp. v. MGA Elec., Inc., 227 F.R.D. 313 (C.D. Cal. 2004)...................... 39, 40

Cary Oil Co., Inc. v. MG Refining & Mktg., Inc., 90 F. Supp. 2d 401
   (S.D.N.Y. 2000) ....................................................................................................................... 24

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................................ 21

Chimart Assocs. v. Paul, 66 N.Y.2d 570 (1986).......................................................................... 31

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
   Pierce, Fenner & Smith, Inc., 232 F.3d 153 (2d Cir. 2000) ..................................................... 33

Consumers Power Co. v. Nuclear Fuel Servs., Inc., 509 F. Supp. 201
   (W.D.N.Y. 1981)....................................................................................................................... 36

Fama v. Metro. Prop. & Cas. Ins. Co., 646 N.Y.S.2d 930 (Sup. Ct. 1996) ........................... 28, 29

Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513
   (2d Cir. 1989) ........................................................................................................................... 36

Fin. Tech. Int'l, Inc. v. Smith, 247 F. Supp. 2d 397 (S.D.N.Y. 2002)........................................... 25

Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284 (2d Cir. 1997)........................ 24, 26

Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823 (10th Cir. 1993) .............................. 37

Gen. Supply and Constr. Co. v. Goelet, 241 N.Y. 28 (1925) ....................................................... 37

Goldstein v. AccuScan, Inc., 815 N.E.2d 657 (N.Y. 2004) .......................................................... 30

Greenfield v. Philles Records, Inc., 780 N.E.2d 166 (N.Y. 2002)................................................ 30

ii

Page(s)

I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996) .......................................................... 21

In re Grandote Country Club Co., 252 F.3d 1146 (10th Cir. 2001) .............................................. 21

In re Indep. Serv. Orgs. Antitrust Litig., 964 F. Supp. 1469 (D. Kan. 1997) ............................... 40

In re the Estate of Stravinsky, 770 N.Y.S.2d 40 (App. Div. 2003) .............................................. 31

Int'l Fid. Ins. Co. v. County of Rockland, 98 F. Supp. 2d 400 (S.D.N.Y. 2000) ......................... 31

Int'l Gateway Exch., LLC v. Western Union Fin. Servs., 333 F. Supp. 2d 131
    (S.D.N.Y. 2004) ...................................................................................................................... 25

Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, No. 01-6600,
    2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005) ................................................................. 24, 25

Jacobsen v. Deseret Book Co., 287 F.3d 936 (10th Cir. 2002) ................................................... 37

Jean v. Bug Music Inc., No. 00-4022, 2002 WL 287786 (S.D.N.Y.
    Feb. 27, 2002) .......................................................................................................................... 21

Kolvek v. Ferrucci, 667 N.Y.S.2d 554 (App. Div. 1997) ............................................................ 37

Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970 (4th Cir. 1990) .......................................... 40, 41

Lauth v. McCollum, No. 03-8529, 2004 WL 2211620 (N.D. Ill. Sept.
    30, 2004) ............................................................................................................................ 39, 40

Lawrence v. IBP, Inc., No. 94-2027, 1995 WL 261144 (D. Kan. April 21,
    1995) .................................................................................................................................. 39, 40

Lovink v. Guilford Mills, Inc., 878 F.2d 584 (2d Cir. 1989) ...................................................... 24

MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285
    (S.D.N.Y. 2006) ................................................................................................................. 33, 34

Reda v. Eastman Kodak Co., 649 N.Y.S.2d 555 (App. Div. 1936) ............................................ 30

SAA-A, Inc. v. Morgan Stanley Dean Witter & Co., 721 N.Y.S.2d 640 (App.
    Div. 2001) ................................................................................................................................ 31

Sauer v. Xerox Corp., 17 F. Supp. 2d 193 (W.D.N.Y. 1998) ..................................................... 36

Scholastic Inc. v. Stouffer, 221 F. Supp. 2d 425 (S.D.N.Y. 2002), aff'd, 81
    Fed. Appx. 396 (2d Cir. 2003) ............................................................................................... 21

Page(s)

Signature Realty v. Tallman, 814 N.E.2d 429 (N.Y. 2004)...................................................... 30

Stone v. CGS Distributing Inc., No. 93-F-2188, 1994 WL 832021 (D. Colo.
    Aug. 18, 1994) ............................................................................................................. 39, 40

Trs. of the Bricklayers & Allied Craftworkers v. Charles T. Driscoll Masonry
    Restoration Co., Inc., 165 F. Supp. 2d 502 (S.D.N.Y. 2001).................................................. 34

U-Haul Intern., Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723 (E.D.
    Va. 2003)........................................................................................................................ 37

Vermont Teddy Bear Co., Inc., v. 538 Madison Realty Co., 807 N.E.2d 876
    (N.Y. 2004) ..................................................................................................................... 31

W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990) ..................... 27, 28, 32

Wechsler v. Hunt Health Sys., Ltd., 186 F. Supp. 2d 402 (S.D.N.Y. 2002) ............................... 25

Winfield Collection Ltd. v. Gemmy Indus. Corp., 311 F. Supp. 2d 611
    (E.D. Mich. 2004) ........................................................................................................... 21


**Statutes**

Fed. R. Civ. P. 56.............................................................................................................. 21

N.Y. Gen. Obl. L. § 15-301 ................................................................................................ 31


**Other Authorities**

The American Heritage College Dictionary (3d ed. 1993)..................................................... 28, 29

Black's Law Dictionary (8th ed. 2004).............................................................................. 28, 29

3 Arthur L. Corbin, Corbin on Contracts § 615 (1951) ............................................................ 31

4 Arthur L. Corbin, Corbin on Contracts § 946 (1951) ............................................................ 24

2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16 (1998).............................................. 24

Merriam-Webster Online Dictionary (http://www.merriam-
    webster.com/dictionary/perpetual) (2006) ........................................................................ 28, 29

The Random House Dictionary of the English Language (1st ed. 1966) ............................... 28, 29

Page(s)

Restatement (Second) of Contracts § 236 ............................................................... 24

Fenwick & West LLP, Technology Licensing and Online Legal Commerce
(1998) .................................................................................................................. 29

Software Council of Southern California, Understanding and Using Key
Licensing Terminology, www.scsc.org/resources/licensing
terminology.html ................................................................................................. 29

Webster's Third New International Dictionary of the English Language (17th
ed. 1976) ........................................................................................................ 28, 29

11 Richard A. Lord, Williston on Contracts § 1292 (3d ed. 1968) ............................. 24

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in support of its motion for summary judgment on the copyright claim of Plaintiff/Counterclaim-Defendant The SCO Group, Inc. ("SCO").[1]

## **Preliminary Statement**

Shortly after beginning this lawsuit (amidst much fanfare), SCO purported to terminate IBM's right to distribute its own AIX and Dynix/ptx ("Dynix") products. Because IBM did not shut down its AIX and Dynix businesses based on SCO's purported termination of IBM's rights, SCO amended its complaint to assert a claim against IBM for copyright infringement. SCO alleges that IBM has infringed and is infringing SCO's alleged UNIX System V copyrights by continuing the business in which it has been engaged for more than two decades, and that SCO is therefore entitled to billions of dollars in damages. SCO's allegations of infringement are untenable as a matter of law, and summary judgment should therefore be entered in favor of IBM.

More than two decades ago, IBM and Sequent Computer Systems ("Sequent"), which IBM subsequently acquired, entered into a series of licensing agreements (the "Agreements") under which they licensed AT&T's UNIX software and obtained, among other rights, the right to prepare modifications and derivative works of that software. As permitted by the Agreements, IBM and Sequent developed their own "flavors" of UNIX, known as AIX and Dynix. After acquiring Sequent, IBM ceased selling Dynix, but IBM continues to sell AIX, which is an important part of IBM's business. In fact, more than a decade ago, IBM made the decision to

---

[1] The undisputed and indisputable facts set out in this motion are supported by the declarations and documents submitted herewith, including those appended to the Declaration of Todd M. Shaughnessy, which are cited herein as "Ex. ___".

protect its AIX business by ensuring that its license to use AT&T's UNIX software would be irrevocable and perpetual. To that end, IBM entered into an amendment to the Agreements with Novell, Inc. ("Novell") and The Santa Cruz Operation, Inc. ("Santa Cruz"), which then shared ownership of AT&T's rights to the UNIX software, for a non-terminable license. Based in significant part on that amendment, which is known as Amendment No. X, IBM further invested in its AIX business.

Until SCO filed this lawsuit, IBM and Sequent had sold AIX and Dynix without challenge from AT&T or from any of its successors in interest, including SCO. None of them ever challenged IBM's or Sequent's ownership of AIX or Dynix, or, after Amendment No. X, IBM's non-terminable right to sell AIX. In fact, they repeatedly recognized that IBM and Sequent owned AIX and Dynix, and that they could exercise their rights of ownership (so long as they protected AT&T's UNIX software). The first time AT&T or any of its successors challenged IBM's right to distribute AIX or Dynix was in the letter SCO sent IBM with its original complaint, purporting to terminate IBM's perpetual and irrevocable license on the supposed ground that IBM had breached the Agreements by contributing portions of its AIX and Dynix code to Linux.

As with most of SCO's allegations in this case, SCO revealed none of the particulars of its infringement claim (such as exactly what code SCO alleges has been infringed), even in the face of three court orders requiring it to do so. SCO simply asserts that IBM improperly contributed certain AIX and Dynix material to the Linux operating system in violation of its contractual obligation to AT&T, thereby permitting SCO to terminate IBM's license to use AIX and Dynix. Thus, SCO says, IBM's continued distribution of AIX and Dynix infringes SCO's

alleged copyrights relating to UNIX System V.  However, IBM has not sold Dynix since before SCO's purported termination, which is by itself fatal to SCO's allegations relating to Dynix. IBM has continued to sell AIX, but, unless SCO properly terminated IBM's license (which is non-terminable), IBM has done so with permission.  Thus, SCO's infringement claim depends on whether it can show that SCO properly terminated IBM's license to AIX.  SCO cannot make that showing.

Based on the undisputed facts, SCO's infringement allegations lack merit, and IBM is entitled to summary judgment, for at least four independent reasons:

First, SCO's infringement claim is untenable, because SCO cannot establish a predicate breach of contract — i.e., a material breach sufficient to justify termination of IBM's rights to UNIX System V.  SCO's infringement claim fails unless IBM committed a material breach of the Agreements by contributing code, methods, and concepts from its AIX product to Linux.  As we explain in IBM's accompanying motion for summary judgment on SCO's contract claims, which we incorporate here by reference, SCO's claims for breach of contract fail as a matter of law for at least four reasons.[2]  Moreover, even if the alleged breach were in fact a breach of contract — and it is not — it would be immaterial as a matter of law, and therefore could not serve as a predicate to termination of IBM's AIX license.  It could not possibly be a material breach of IBM's UNIX licensing agreements for IBM to contribute its own copyrighted code to Linux, as SCO alleges.  (See Section I.)

---

[2] Specifically:  (1) SCO's contract claims are unsupported by the plain language of the Agreements, the relevant parol evidence and common sense; (2) SCO is estopped from pursuing its theory of breach, by which it seeks to control millions of lines of code written and owned by IBM; (3) SCO's theory of breach has been waived by SCO and its alleged predecessors; and (4) SCO's claim is barred by the statute of limitations as it relates to RCU technology.

Second, even if (contrary to fact) SCO could establish a material breach of contract by IBM, SCO's infringement claim fails because SCO cannot show that it properly terminated IBM's license to market and distribute AIX based on the alleged breach. IBM has a perpetual and irrevocable license to AIX that cannot be terminated under any circumstances. The plain language of Amendment No. X and the relevant parol evidence demonstrate that IBM's license to distribute AIX is non-terminable. Moreover, even if (contrary to fact) IBM's AIX license were terminable, the license could not be terminated except following: (1) notice and a reasonable opportunity to cure the alleged basis of the claimed breach; and (2) SCO's "good faith best efforts to resolve any alleged breach" prior to termination. The undisputed evidence shows that SCO failed to give IBM adequate notice or a reasonable opportunity to cure the alleged breach, which was the only basis for the purported termination, and that SCO failed to exercise its good faith best efforts to avoid termination. (See Section II.)

Third, SCO cannot establish unauthorized copying or distribution by IBM of copyrighted works owned by SCO, because SCO failed to disclose its allegations and evidence as required by the Court. From the beginning of this case, IBM asked SCO to disclose its allegations and evidence of alleged infringement by IBM, and, from the beginning of this case, SCO declined to do so. The Court entered two separate orders requiring SCO to disclose its allegations and evidence with specificity. SCO failed to comply, requiring the Court to enter an order setting a final disclosure deadline. Even in the face of that order, SCO failed again to describe in any meaningful way — let alone in detail, as specified by the Court — its allegations and evidence of unauthorized copying or distribution by IBM of copyrighted works owned by SCO. SCO has not, for example, identified a single line of allegedly infringing AIX code. Having failed to

4

substantiate its allegations as ordered by the Court, SCO's claims of infringement necessarily fail.  (See Section III.)

Fourth, SCO cannot enforce its alleged copyrights because it has misused them, further precluding its infringement claim.  Copyright misuse is an equitable doctrine applied by courts to prevent a copyright holder from enforcing a copyright it has misused.  A copyright holder misuses its copyright when it extends the scope of its limited copyright grant to secure an exclusive right or limited monopoly not granted by the Copyright Office, or otherwise uses the copyright contrary to public policy.  SCO has misused its alleged copyrights by:  (1) claiming ownership over code for which SCO has no copyright; (2) effectively asserting that its alleged copyrights extend to all of Linux; (3) claiming its alleged copyrights give it control of IBM's own copyrighted code (i.e., AIX and Dynix); (4) claiming its alleged copyrights include material not protectable by copyright; and (5) seeking to enforce its alleged copyrights in ways that are unenforceable.  (See Section IV.)

## Statement of Undisputed Facts

The undisputed and indisputable facts material to this motion are set forth below, and in the memoranda in support of IBM's other motions for summary judgment, which are submitted herewith and incorporated herein by reference.[3]

---

[3] References to the memoranda in support of IBM's motions for summary judgment submitted herewith are cited as follows:  IBM's motion for summary judgment on SCO's unfair competition claim as "UC Br. __"; IBM's motion for summary judgment on SCO's contract claim as "K Br. __"; IBM's motion for summary judgment on SCO's interference claims as "Interference Br. __"; IBM's motion for summary judgment for copyright infringement (IBM's Eighth Counterclaim) as "Copyright Br. __"; and IBM's motion for summary judgment for a declaration of non-infringement (IBM's Tenth Counterclaim) as "DJ Br. __".

A.    UNIX, IBM, and Sequent.

1.    In 1969, Bell Laboratories, then the research division of AT&T Corp. ("AT&T"), developed a computer operating system that came to be known as the UNIX operating system. (See Ex. 3 ¶¶ 1, 23; Ex. 5 ¶¶ 1, 8; Ex. 64 ¶ 1.)

2.    AT&T developed many different versions of its UNIX operating systems, including UNIX System V, the version of UNIX developed by AT&T during the early 1980s. (See Ex. 5 ¶ 9; Ex. 297 at 32.)

3.    Over the years, through various business units and subsidiaries, including AT&T Technologies, Inc. and UNIX System Laboratories, Inc. ("USL"), AT&T licensed its UNIX operating systems, both in source code and object code form, to many thousands of persons and entities for their use. (See Ex. 3 ¶¶ 23-24 ; Ex. 5 ¶ 9; Ex. 64 ¶ 2.) AT&T also licensed many companies to distribute their own UNIX operating systems, such as Hewlett-Packard Co.'s "HP-UX" operating system. (See Ex. 3 ¶¶ 24-27; Ex. 64 ¶ 3.)

4.    Among AT&T's licensees were IBM and Sequent, which IBM acquired in 1999. (See Ex. 3 ¶¶ 62-69; Ex. 5 ¶¶ 12, 15.) IBM and Sequent entered into their UNIX licensing agreements with AT&T (collectively, the "Agreements") in early 1986. (See Ex. 5 ¶¶ 12, 15; Ex. 3 ¶¶ 62-69.) The Agreements are governed by New York law. (See, e.g., Ex. 492 § 7.13.)

5.    Both companies entered into software agreements, which set forth the terms under which they could use AT&T's UNIX software, as well as sublicensing agreements, which set forth the terms under which software programs "based on" UNIX System V could be distributed. (Ex. 492; Ex. 119; Ex. 120; Ex. 121; Ex. 282 ¶¶ 6-8; Ex. 182 ¶ 15.) IBM also entered into a side letter with AT&T (the "Side Letter") that further defined their relationship. (Ex. 122.)

6

6.      While the Agreements placed restrictions on what IBM and Sequent could do with AT&T's UNIX software, they did not restrict what IBM and Sequent could do with their original works. IBM and Sequent were free under the Agreements to do as they wished with their original works, whether or not they were included in a modification or derivative work of UNIX System V, so long as they protected AT&T's UNIX software. (See Ex. 492 § 2.01; Ex. 122 ¶ A.2; Ex. 182 ¶¶ 18, 20.)

7.      The Agreements were primarily designed to protect any trade secrets embodied in UNIX System V source code provided by AT&T or USL. (See Ex. 281 ¶ 31.) AT&T "did not intend to impose a confidentiality obligation beyond what [it] could enforce under trade secret law". (Id.)

8.      IBM's and Sequent's rights under the Agreements could not be terminated except for material breach. (See Ex. 492 § 6.03; Ex. 120 § 3.03; Ex. 122 ¶ A.5; Ex. 119 § 6.03; Ex. 260 at 247-48.)

9.      AT&T did not consider a breach material unless it presented a significant violation of its core intellectual property rights. (See Ex. 260 at 247.) Michael DeFazio, the head of AT&T's UNIX licensing efforts, has testified that AT&T's purpose was "to ensure that immaterial or trivial violations of confidentiality would not be judged to be a breach of the [Agreements]". (Id.; Ex. 182 ¶ 1.)

10.     AT&T's goal in implementing its licensing agreements was not to have "gotcha's" with its licensees on minor violations, but to protect the core of its intellectual property. AT&T focused, therefore, on substance and materiality from a business perspective. (See Ex. 260 at 248.) As Michael DeFazio stated, "[AT&T's] goal was not here to implement a

7

lot of agreements and then have what I'll call 'gotcha's' with all our licensees on insignificant or minor or trivial violations. We [AT&T] were concerned about protecting the core of our intellectual property, and that meant substance and materiality is what we were focused on from a business side." (Id.)

11.     Even in the event of a material breach, the Agreements could only be terminated after 100 days notice (for AIX) or 60 days notice (for Dynix) and an opportunity to cure any breach. Furthermore, the Side Letter required AT&T to exercise its "good faith best efforts to resolve any alleged breach" prior to termination. (Ex. 492 § 6.03; Ex. 121 § 3.03; Ex. 122 ¶ A.5.)

12.     Pursuant to the Agreements, and with the understanding that they could do as they wished with their original works, IBM and Sequent further developed and distributed their own "flavors" of UNIX software — IBM's was known as AIX, and Sequent's as Dynix. (See Ex. 492 § 2.01, 122 ¶ A.2.; Ex. 119; Ex. 121.) SCO concedes that IBM owns AIX and Dynix. (See Ex. 44.)

13.     Both AIX and Dynix, which IBM owns, consist of millions of lines of code, including code written by IBM and Sequent software engineers (or outside contractors retained by them), and also code written by third parties and licensed to IBM or Sequent for inclusion in AIX or Dynix. (See Ex. 236 ¶¶ 4-5; Ex. 269 ¶¶ 3-5; Ex. 414 at 22.) By contrast, the material SCO claims in its December 22, 2005 Final Disclosures of Material Allegedly Misused by IBM ("Final Disclosures") that IBM has misused constitutes only a negligible proportion of this code. (See K Br. ¶ 231.) For example, AIX 5.1.G for Power consists of more than 160 million lines of source code, while the "Journaled File System" ("JFS") material allegedly misused by IBM

amounts to only 11,170 lines of code from AIX — i.e., less than 0.01% of AIX 5.1.G. for Power. (See Ex. 181 (Ex. C), (Ex. G); K Br. ¶ 231.)

B.      Amendment No. X.

14.      In 1993, AT&T sold USL, which then held all of AT&T's UNIX-related assets, to Novell, which sold some, but not all, of AT&T's UNIX assets to Santa Cruz in 1995.  Among other things, Novell retained all of AT&T's UNIX copyrights pursuant to an Asset Purchase Agreement ("APA") dated as of September 19, 1995.  (See Ex. 123 Art. I.1(a), Sched. I.1(b).)

15.      In 1996, IBM approached Novell about amending its UNIX licensing agreements for the purpose of acquiring non-terminable rights to distribute AIX.  (See Ex. 160 ¶¶ 7-16; Ex. 163 ¶¶ 5-7.)  IBM wanted to invest further in AIX and develop its AIX business, but it did not wish to do so without ensuring that it had a non-terminable right to use AIX.  (See, Ex. 256 ¶ 13.)

16.      IBM sought to amend the Agreements in order to:  effect a royalty buy-out, thereby eliminating the need to maintain a team to audit the required annual royalty payments; make IBM's rights under the Agreements irrevocable, fully paid-up, and perpetual; make it easier to redistribute licensed source code to contractors and customers for limited purposes; and loosen the confidentiality restrictions in the Agreements.  (See id. ¶ 8; Ex. 172 ¶ 19; Ex. 163 ¶ 6.)

17.      Novell was represented by A. Allison Amadia and Lawrence A. Bouffard in the negotiations leading to the modification of IBM's UNIX Licensing Agreements.  (Ex. 160 ¶ 9; Ex. 172 ¶ 18.)  IBM was represented by William Sandve, Kenneth Stokes, and Paul D. Vineis. (See Ex. 256 ¶ 9.)  To the extent Santa Cruz expressed its views during the negotiations, it was by and through Novell.  (See Ex. 163 ¶¶ 8, 10; Ex. 160 ¶¶ 7, 19, 27-29.)

18.     IBM made clear during the negotiations that it wanted a non-terminable license. (Ex. 163 ¶ 7.)  In IBM's view, it made no sense to undertake significant further investment in AIX absent the assurance that no one could terminate its rights to use AT&T's software, and thereby hold hostage IBM's AIX business.  (See Ex. 256 ¶ 13; Ex. 160 ¶ 14.)

19.     IBM stated that in order to justify a $10,125,000 non-refundable payment for what was, even in 1996, very old software, IBM's rights under the Agreements could never be terminated under any circumstances.  (See Ex. 256 ¶ 13; Ex. 160 ¶ 14.)

20.     Novell understood IBM's proposal to mean that neither Novell nor Santa Cruz (nor their successors or assigns) could:  terminate IBM's rights under the Agreements; demand any additional royalty payments beyond the agreed-upon amount in connection with IBM's distribution of its AIX operating system product on specified architectures (and, after five years, other sublicensed products); or interfere with the proper exercise of IBM's rights under the Agreements.  (See Ex. 256 ¶ 13; Ex. 160 ¶ 14; Ex. 182 ¶ 51.)

21.     Initially, Novell declined IBM's request for a non-terminable license.  However, IBM persisted in the request, and Novell ultimately agreed to grant IBM a non-terminable license.  (Ex. 160 ¶¶ 11, 18; Ex. 172 ¶ 21; Ex. 163 ¶ 8.)

22.     The only limitation on its rights to which IBM would agree was that Novell would retain the right to enjoin or otherwise prohibit IBM from violating Novell's rights under the amendment, the Agreements, or under general patent, copyright, or trademark law.  (Ex. 160 ¶ 14; Ex. 163 ¶ 13; Ex. 182 ¶ 51.)

23.     On April 26, 1996, IBM and Novell (on behalf of itself and Santa Cruz) entered into an amendment to IBM's UNIX licensing agreements (the "April 1996 Amendment").  The

10

April 1996 Amendment, among other things, provided IBM a non-terminable license.  (See Ex. 256 ¶ 20; Ex. 160 ¶¶ 10, 20-22; Ex. 172 ¶ 22; Ex. 582 at 1.)

24.     Section 1 of the April 1996 Amendment stated that, upon payment of the consideration contemplated in the Agreement, IBM would have the "irrevocable, fully paid-up, perpetual right to exercise all of its rights under the [Agreements] . . .".  (Ex. 582 at 1.)  IBM and Novell intended and understood the April 1996 Amendment to render IBM's UNIX licenses non-terminable.  (Ex. 160 ¶ 35; Ex. 256 ¶ 22.)

25.     Santa Cruz raised no objections during the negotiation of the April 1996 Amendment, but after it was executed, Santa Cruz objected, on the grounds that the Amendment constituted a breach by Novell of the APA, and was an improper exercise of Novell's authority. (Ex. 583; Ex. 172 ¶ 23.)

26.     Novell disagreed with Santa Cruz's objection, but undertook to resolve Santa Cruz's concerns, since Novell believed it had authority to execute the April 1996 Amendment. (See Ex. 256 ¶ 26; Ex. 172 ¶ 23.)

27.     Pursuant to a "standstill agreement" with Santa Cruz, IBM and Novell therefore agreed to refrain from acting under certain sections of the April 1996 Amendment for a period of thirty days.  The standstill agreement was extended several times pending negotiations with Santa Cruz.  (See Ex. 256 ¶ 26.)

28.     Novell negotiated separately with IBM and with Santa Cruz to resolve Santa Cruz's concerns.  (See id.; Ex. 172 ¶ 25.)  IBM did not deal directly with Santa Cruz during the negotiations.  Santa Cruz authorized Novell to act on its behalf.  (See Ex. 256 ¶ 26.)

11

29.     During this round of negotiations, IBM continued to insist on non-terminable rights, and Novell continued to assure IBM that there would be no change in that part of the parties' agreement.  (See Ex. 256 ¶¶ 29-30.)

30.     Santa Cruz sought to revise the language of the irrevocability provision by, among other things, making it "subject to the provisions of this Amendment".  (Id. ¶ 27; Ex. 163 ¶ 9.)  IBM, however, rejected this proposal, and Santa Cruz ultimately agreed to let the irrevocability provision stand as written in the April 1996 Amendment.  (Ex. 256 ¶ 30.)

31.     At no point after this did Novell suggest that IBM's license would be terminable.  (Ex. 163 ¶ 9.)  At no point in the negotiations did IBM indicate a willingness to back off of the position that it must have a non-terminable license.  (Id.; see Ex. 256 ¶¶ 8-14, 17, 29-30.)

32.     Santa Cruz also sought to:  (i) impose right-to-use fees on IBM contractors and customers who were provided licensed source code; and (ii) prevent IBM employees who had gained access to licensed source code from memorializing concepts, know-how, or techniques embodied in that code.  (Ex. 256 ¶ 29.)

33.     While IBM rejected both of these proposals, it ultimately did agree to a provision limiting its right to provide contractors and customers with copies of licensed source code to a specified number of copies (fifty) at a time.  (Id.)  In exchange for IBM's concession, Novell agreed to accept $350,000 less than it otherwise was entitled to as royalty payments, pursuant to an October 16, 1996 Letter Agreement between IBM and Novell.  (Id. ¶ 30; Ex. 172 ¶ 26; Ex. 143.)

34.     On October 17, 1996, Novell, Santa Cruz, and IBM executed Amendment No. X, which was substantially similar to, but replaced, the April 1996 Amendment. (Ex. 124 at 1; <u>see</u> Ex. 163 ¶ 11.)

35.     Amendment No. X specifically acknowledged that, as part of the sale by Novell of its UNIX assets to Santa Cruz, "SCO purchased, and Novell retained, certain rights with respect to" the agreements IBM entered into with AT&T, including "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended". (Ex. 124 at 1.)

36.     Under Section 1 of Amendment No. X, Novell and Santa Cruz agreed to grant IBM the following rights, in exchange for a payment of $10,125,000:

> <u>No Additional Royalty.</u>  Upon payment to SCO of the consideration in the section entitled "Consideration", IBM will have the irrevocable, fully paid-up, perpetual right to exercise all of its rights under the [Agreements] beginning January 1, 1996 at no additional royalty fee . . . .  Notwithstanding the above, the irrevocable nature of the above rights will in no way be construed to limit Novell's or SCO's rights to enjoin or otherwise prohibit IBM from violating any and all of Novell's or SCO's rights under this Amendment No. X, the [Agreements], or under general patent, copyright, or trademark law.

(<u>Id.</u> §§ 1, 4.)

37.     Section 1 of Amendment No. X superseded the term and termination provisions of the Agreements. (<u>See, e.g.</u>, Ex. 492 § VI; Ex. 120 § III; Ex. 122 ¶ A.5.; <u>see</u> Ex. 256 ¶ 22; <u>see also</u> Ex. 124 § 11 (providing that the terms and conditions of the Agreements will remain in effect "[e]xcept as modified herein").)

13

38.     In granting IBM an irrevocable and perpetual license, Amendment No. X gave IBM a non-terminable license.  IBM's license under the Agreements cannot be terminated for any reason.  (See Ex. 256 ¶ 33; Ex. 160 ¶ 35.)

39.     Although Novell and Santa Cruz retained the right to enjoin or otherwise prohibit any conduct in violation of the amended Agreements, or under general patent, copyright, or trademark law (as long as they could meet the standards for obtaining that relief), neither Novell, Santa Cruz, nor anyone else had the right to terminate IBM's rights under the Agreements. (Ex. 256 ¶ 33; Ex. 160 ¶ 35; Ex. 163 ¶ 14.)

40.     After Amendment No. X, Novell and Santa Cruz could no longer terminate IBM's rights to copy and furnish sublicensed products that included material from UNIX System V Release 3.2 and previous releases, such as AIX, if IBM were to improperly disclose the licensed source code in breach of the Agreements.  However, Novell or Santa Cruz could attempt to enjoin improper disclosures.  (Ex. 256 ¶ 33; Ex. 160 ¶ 35; Ex. 163 ¶ 14.)

41.     All of the persons who negotiated Amendment No. X on behalf of IBM and Novell agree that the parties intended for IBM to obtain a non-terminable license.  (See Ex. 256 ¶¶ 13, 35; Ex. 160 ¶¶ 14, 37; Ex. 172 ¶ 28.)

42.     IBM and Novell intended and understood that Amendment No. X was to effect a royalty buy-out for a lump sum payment, and thereby give IBM rights that could not be revoked or terminated for any purpose.  (See Ex. 160 ¶ 35; Ex. 256 ¶ 33.)  No one ever communicated any contrary intent to IBM or Novell.  (See Ex. 160 ¶ 35; Ex. 256 ¶ 33.)

43.     Any argument that IBM's rights are terminable is inconsistent with the language of Amendment No. X and the understanding of the people who negotiated the April 1996

14

Amendment and Amendment No. X.  Termination is no longer a remedy under the Agreements. (Ex. 256 ¶¶ 13, 35; Ex. 160 ¶¶ 14, 37; Ex. 172 ¶ 28; Ex. 182 ¶ 52.)

44.    When advised that SCO, which was not involved in negotiating the April 1996 Amendment or Amendment No. X, had threatened to terminate IBM's rights under the Agreements based on alleged breaches by IBM of the Agreements, Ms. Amadia stated that she did not believe that IBM's rights under the Agreements were terminable.  She stated that, to her mind, any argument that IBM's rights were terminable was inconsistent with the language of Amendment No. X, and the understanding of the parties who negotiated the April 1996 Amendment and Amendment No. X.  Because the termination right was contracted away in both the April 1996 Amendment and Amendment No. X, termination was no longer a remedy. (Ex. 160 ¶ 37.)

C.    SCO's Acquisition, Lawsuit, and Threatened Terminations.

45.    In 2001, approximately five years after Amendment No. X, Caldera International ("Caldera") acquired most, if not all, of the UNIX assets owned by Santa Cruz.  After failing to make a profit, Caldera switched management, changed its name to SCO, and adopted a business model based upon litigation.  (See Ex. 123.)

46.    On March 6, 2003, SCO commenced this lawsuit against IBM, alleging in general terms that IBM improperly "dumped" UNIX source code into the publicly available Linux operating system.  (See Ex. 1 ¶¶ 82-103.)

47.    Linux is an "open source" program, which means, among other things, that its source code is publicly available and royalty-free, and that users have the freedom to run, copy,

15

distribute, study, adapt, and improve the software.  (See Ex. 5 ¶ 22; Ex. 64 ¶ 8.)  Indeed, the

source code for Linux is publicly available for download on the Internet.  (See Ex. 5 ¶ 23.)

      48.    At the same time SCO served its complaint, SCO sent a letter to IBM threatening

to terminate its rights to distribute AIX and Dynix based on IBM's alleged breach of its licensing

agreements.  (Ex. 153.)  In a March 7, 2003 press release, SCO publicized the letter, and publicly

repeated its threat to terminate IBM's rights.  (Ex. 592.)

      49.    SCO similarly sought to terminate Sequent's rights to use and distribute Dynix.

By way of a letter dated May 29, 2003, SCO purported to notify Sequent of the alleged breaches,

and gave Sequent until September 2, 2003 to remedy any alleged breaches.  Without waiting

until September 2, 2003, SCO later sent a purported letter of termination dated August 11, 2003,

and claimed that the Dynix licenses had been terminated as of July 30, 2003.  (See Ex. 154;

Ex. 155.)

      50.    Neither SCO's letters nor its complaint described SCO's specific allegations of

misconduct by IBM in any detail.  (See Ex. 1; Ex. 2 at 153.)  As a result, SCO did not give IBM

reasonable notice of SCO's claims, or a reasonable opportunity to cure.  (See Ex. 492 § 6.03;

Ex. 120 §§ 2.07, 3.03; Ex. 122 ¶ A.5.)

      51.    SCO's purported termination letter referred only to breaches of "trade secret"

confidentiality.  (Ex. 153.)  SCO, however, amended its complaint to eliminate any trade secret

claims, and later admitted that it had no colorable trade secret claims: "There is no trade secret

in UNIX System [V] files.  That is on the record.  No problem with that."  (Ex. 414 at 46.)

      52.    In order to give IBM an opportunity to cure, IBM asked SCO to identify the

alleged breaches of the Agreements, both in person through counsel on June 2, 2003, and via

letters of April 2, 2003, May 5, 2003, June 13, 2003, and August 14, 2003.  (See Ex. 580; Ex. 156; Ex 157; Ex. 158; Ex. 159.)

53.     In a letter dated April 2, 2003, IBM asked SCO to provide IBM with meaningful details about its allegations, and to state what SCO wanted IBM to do to cure the alleged breaches.  (Ex. 580.)  IBM asked SCO to inform IBM specifically what SCO contended IBM had done in violation of its obligations to SCO.  (Id. at 2.)

54.     IBM also informed SCO that "IBM does not believe that the license rights granted under the agreements are terminable".  (Ex. 580 at 1.)  IBM noted that SCO had filed its complaint without notifying IBM, and that SCO's purported notification of IBM's alleged breach of the Agreements "do[es] not specify IBM's alleged misconduct".  (Id.)

55.     IBM therefore asked SCO to specify:

(1) any products, code, files, trade secrets and/or confidential information that SCO believed IBM had improperly used, transferred, disposed of or disclosed;

(2) the ways and specific instances in which SCO alleged IBM had improperly used, transferred, disposed of or disclosed any products, code, files, trade secrets and/or confidential information; and

(3) the steps that SCO believed IBM was required to take to cure the alleged breaches and injuries about which SCO complained.

(Id. 1-2.)

56.     SCO, however, refused to provide IBM with this information, and instead wrote to IBM and stated that, "If you would like further written information regarding IBM's past and continuing violations, we need more information from you."  (Ex. 581 at 1.)

57.     IBM reiterated its request for specifics by letter of May 5, 2003, stating that none of SCO's letters to date had given IBM sufficient notice of alleged breaches, as required.  IBM

17

reminded SCO that, even if the AIX-related Agreements permitted termination of its rights, they required, in addition to 100 days specific written notice, SCO's "good faith best efforts" to resolve any alleged breach. IBM also informed SCO that the specific information it requested was required in order for IBM to cure any alleged breach. (See Ex. 156.)

58.    Counsel for SCO and IBM met on June 2, 2003, some eighty-eight days into SCO's purported 100-day cure period. (Ex. 158 at 1.) Despite IBM's request, SCO did not provide the information requested in IBM's April 2, 2003 letter. (Id.)

59.    By letter of June 12, 2003, SCO informed IBM that it would seek to terminate the license permitting IBM to use and distribute AIX on June 13, 2003. (Ex. 157 at 4.)

60.    On June 13, 2003, IBM informed SCO:

> Your [March 6, 2003] letter provided virtually no information beyond its conclusory assertions. We promptly requested such support . . . but received nothing more prior to the June 2 meeting, 88 days into the purported 100 day "cure" period. At that meeting, your counsel did no more than repeat your accusations, refer us to particular paragraphs of your complaint and show us a handful of notes from a website that does not, in fact, demonstrate any violation of protected license rights. Thus, to this day, you have not provided IBM with any factual support for your accusations. That is precisely what we informed you and your colleagues at the June 2 meeting, when we expressed our disappointment with the lack of information received from you.

(Ex. 158 at 1.)

61.    After IBM received SCO's letter of August 11, 2003, which purported to terminate the Dynix licenses as of July 30, 2003, IBM advised SCO on August 14, 2003 that SCO had never given IBM notice of any possible July 30, 2003 termination date in its letter. (Ex. 155; Ex. 159 at 1.) IBM also made yet another request for specific notice of the alleged breaches, in order that it might attempt a cure: "I write to ask that you inform IBM specifically

18

what SCO contends IBM has done in violation of its obligations to SCO, and what you contend IBM should do to cure such violations." (Ex. 159 at 1.) SCO declined to respond.

D.     SCO's Copyright Claim.

62.     By letter dated June 12, 2003, SCO purported to terminate IBM's AIX license as of June 13, 2003. In a letter dated August 11, 2003, SCO also purported to have terminated IBM's Dynix license as of July 30, 2003. (Ex. 155; Ex. 157.) SCO did so without using its good faith best efforts to resolve the alleged breach prior to termination. (See Ex. 122 ¶ A.5; Ex. 581; Ex. 156; Ex. 158.)

63.     IBM had ceased selling Dynix source code prior to SCO's purported termination, and IBM has not sold it since. (See Ex. 229 at 60-62.) However, IBM has continued to sell AIX, as it has for more than two decades. (See Ex. 229 at 45; Ex. 256 ¶¶ 1, 33.)

64.     In February 2004, SCO amended its complaint to add a claim for copyright infringement. (See Ex. 3 ¶¶ 173-80.) By that claim, SCO alleges that IBM has infringed, induced the infringement of, and contributed to the infringement of, certain UNIX copyrights allegedly owned by SCO. (See id.)

65.     SCO, however, does not own the allegedly infringed copyrights, because Novell retained them under the APA. An amendment to the APA, Amendment No. 2, addressed certain UNIX copyrights, but did not actually transfer them. (Ex. 444.)

66.     Despite the fact that SCO does not own the allegedly infringed copyrights, SCO now claims: that IBM breached its UNIX licensing agreements by contributing AIX and Dynix code to Linux; that SCO terminated IBM's licenses under the agreements based on its alleged

breaches; and that distribution of AIX and Dynix after the purported termination infringes SCO's alleged copyrights. (See Ex. 3 ¶¶ 173-86.)

67.     IBM propounded a series of discovery requests asking SCO to disclose its allegations and evidence of copyright infringement. (Ex. 11; Ex. 12.)  SCO declined to provide IBM with the information it requested, forcing IBM to make two separate motions to compel, on October 1, 2003 and November 6, 2003.  (Ex. 62; Ex. 63.)

68.     The Court entered three separate orders, dated December 12, 2003, March 3, 2004, and July 1, 2005, requiring SCO to describe in detail its allegations of infringement. (Ex. 55 ¶ 4; Ex. 56 ¶¶ I.1-5; Ex. 58 III.)  The Court required SCO to respond to IBM's interrogatories, and to identify all allegedly misused material, by version, file, and line of code, including all allegedly infringed and allegedly infringing material, not later than December 22, 2005, in its Final Disclosures.  (Ex. 55 ¶ 4; Ex. 56 ¶¶ I.1-5; Ex. 58 III.)

69.     Despite the Court's orders, SCO has never described by version, file, and line of code any material allegedly infringed by IBM's post-termination AIX and Dynix activities.  (See Ex. 151; Ex. 53; Ex. 54; Ex. 66; Ex. 59 at 28, 32, 35-38.)  Moreover, SCO has declined to provide the full and detailed responses to IBM's interrogatories directed at SCO's allegations of unauthorized copying.  (Ex. 151; Ex. 53; Ex. 54.)  Nowhere in its interrogatory responses served with its interim disclosures did SCO provide any specific allegations or evidence of any conduct by IBM constituting unauthorized copying.  (See Ex. 151; Ex. 53.)

**Standard of Decision**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); In re Grandote Country Club Co., 252 F.3d 1146, 1149 (10th Cir. 2001). Claims for alleged copyright infringement are susceptible to resolution on a motion for summary judgment. See, e.g., Scholastic Inc. v. Stouffer, 221 F. Supp. 2d 425, 433, 438-39 (S.D.N.Y. 2002), aff'd, 81 Fed. Appx. 396, 397-98 (2d Cir. 2003); Winfield Collection Ltd. v. Gemmy Indus. Corp., 311 F. Supp. 2d 611, 617 (E.D. Mich. 2004).

IBM is entitled to summary judgment of non-infringement if at least one element of the alleged copyright infringement cannot be proven — i.e., if there is either no "ownership of a valid copyright", or there is no "copying [or distribution] of constituent elements of the work that are original". Jean v. Bug Music Inc., No. 00-4022, 2002 WL 287786, at *4 (S.D.N.Y. Feb. 27, 2002) (Ex. A hereto); see also I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996); Scholastic, Inc., 221 F. Supp. 2d at 433, 438-39.

Here, summary judgment is appropriate with respect to SCO's copyright claim for at least four reasons:  (1) SCO cannot establish the predicate breach of contract necessary to SCO's infringement claim; (2) SCO cannot show that it properly terminated IBM's license — both because IBM's license is irrevocable, and because SCO:  (a) denied IBM proper notice and an opportunity to cure any alleged breaches; and (b) failed to exercise its good faith best efforts to avoid termination; (3) SCO cannot prove unauthorized copying by IBM of copyrighted works

owned by SCO, because SCO failed to disclose its allegations and evidence as required by the

Court; and (4) SCO has misused its alleged copyrights, and therefore cannot enforce them.

### Argument

SCO has publicly claimed the right to shut down IBM's AIX and Dynix businesses for

more than three years. But it has never disclosed to IBM, let alone described with specificity, its

allegations and evidence that IBM's continued distribution of AIX and Dynix infringes SCO's

alleged copyrights. That is so, despite three orders of the Court requiring SCO to disclose its

evidence. In any event, SCO's claim fails because: SCO cannot establish a predicate breach of

contract; IBM has a non-terminable license; and SCO has misused its alleged copyrights. Thus,

SCO's allegations cannot survive scrutiny.[4]

## I.  SCO CANNOT ESTABLISH A PREDICATE BREACH OF CONTRACT.

SCO's claim for copyright infringement depends on its establishing a material breach of

the Agreements that would (according to SCO) justify its terminating IBM's right to distribute

AIX and Dynix. SCO does not, and cannot, dispute that it could not terminate IBM's right to

distribute AIX and Dynix absent a material breach of the Agreements. SCO cannot establish a

material breach of the Agreements. Thus, its infringement claim is untenable.

SCO contends that IBM breached the Agreements by contributing portions of its own

AIX and Dynix products to Linux. (¶¶ 46, 66.) SCO concedes that IBM owns AIX and Dynix,

but claims that it has the right, by way of the Agreements, to control what IBM does with AIX

and Dynix. (¶ 12; K Br. ¶¶ 178-99.) According to SCO, by contributing portions of AIX and

---

[4] The undisputed facts are generally cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing "Statement of Undisputed Facts".

Dynix to Linux, IBM materially breached the Agreements and empowered SCO to terminate IBM's rights under the Agreements. (¶¶ 48-49, 66; K Br. ¶¶ 180-81.) Thus, says SCO, any distribution of AIX and Dynix by IBM after the purported termination of its rights infringes SCO's alleged UNIX copyrights. (¶¶ 48-49, 66; K Br. ¶ 200.) SCO is wrong.

Because IBM has not licensed Dynix source code since before SCO's purported termination of IBM's license, the only alleged breach relevant to SCO's copyright claim relates to AIX. (¶ 63.) The Final Disclosures identify only one item allegedly relating to AIX. (K Br. ¶ 231.) That is Item No. 1, which relates to IBM's Journaled File System ("JFS"). (Id.) SCO's claims for breach of contract relating to JFS are untenable as a matter of law:

(1)     SCO's contract claims assume that the JFS material identified in SCO's Item 1 was contributed to Linux from AIX. That is incorrect. The contribution was of material from IBM's OS/2 Operating System, and later modifications of that OS/2 code. Even if the disputed JFS item had been contributed to Linux from AIX, however, SCO could not establish that the contribution represents a breach of the Agreements. The Agreements place no restraints on IBM's use of its own code (so long as it protects AT&T's code). The JFS contribution at issue was written by IBM and non-SCO developers independent of AT&T's UNIX Software and is indisputably owned by IBM and third parties other than SCO. IBM was free to do with it as it wished. (¶ 12; K Br. ¶¶ 47-93, 244-255.)

(2)     SCO is, in any case, estopped from pursuing a claim for breach of contract based on the alleged disclosure by IBM of its own code. AT&T and its successors made clear to IBM and other UNIX licensees that they could do as they wished with their own code, methods and concepts for more than a decade. Moreover, IBM and other UNIX licensees exercised control over the AIX and Dynix code, methods and concepts owned by them for more than two decades without any objection by AT&T or its successors. SCO cannot now, two decades after IBM and Sequent executed the Agreements, change course to the detriment of IBM and others who took AT&T and its successors at their word. (See K Br. ¶¶ 160-70; DJ Br. ¶¶ 88-102.)

(3)     SCO's contract claims have also been waived because: (a) SCO's predecessors, including in particular AT&T and Novell, voluntarily

23

> relinquished the right to assert rights to their licensee's code, methods and
> concepts; (b) Novell exercised its right under the APA to waive IBM's
> alleged breaches of contract; and (c) SCO itself waived any claims as to
> JFS by shipping the material in its own Linux products under the GNU
> General Public License with the understanding that it came from AIX.
> The waiver is underscored by the fact that SCO expressly granted IBM a
> license to use any material included in its Linux products.  (See
> DJ Br. ¶¶ 88-102, 123.)

These flaws in SCO's contract claims relating to JFS are described in IBM's motion for

summary judgment on SCO's contract claims, which we incorporate here by reference.  Suffice

it to say here that each is independently dispositive of SCO's copyright claims.

    Putting aside the fatal flaws described in IBM's motion for summary judgment on SCO's

contract claims, SCO cannot establish a predicate breach of contract because the alleged breach

is immaterial as a matter of law.  Under New York law, which governs the Agreements (¶ 4), a

contract cannot be terminated except for a material breach.  Cary Oil Co., Inc. v. MG Refining &

Mktg., Inc., 90 F. Supp. 2d 401, 409 n.29 (S.D.N.Y. 2000) (applying New York law) ("if the

breach is not material . . . the breach is deemed partial, and the contract remains in force") (citing

2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16 (1998); Restatement (Second) of

Contracts § 236, cmt. b.); Lovink v. Guilford Mills, Inc., 878 F.2d 584, 586 (2d Cir. 1989) ("A

total breach justifies termination of the contract and damages for complete failure of

performance; a partial breach does not.") (citing 11 Richard A. Lord, Williston on Contracts

§ 1292 at 8-11 (3d ed. 1968); 4 Arthur L. Corbin, Corbin on Contracts § 946 at 809-13 (1951)).[5]

---

[5] Under New York law, whether a breach of contract is material is an issue of law for the
court to decide.  See Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir.
1997) (holding that "[w]hether Austin materially breached the [contract] is a question of law");
Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, No. 01-6600, 2005 WL 3370542,
at *5 n.23 (S.D.N.Y. Dec. 12, 2005) (stating that, under New York law, materiality of a breach is
a question of law for the court to decide) (Ex. B hereto); Int'l Gateway Exch., LLC v. Western

Moreover, the IBM Agreements themselves provided that IBM's rights could not be terminated for immaterial breaches. (¶ 8.) As Michael DeFazio, who was the overall head of AT&T's UNIX licensing effort, and ultimately responsible for AT&T's UNIX licensing agreements, put it at his deposition: "[AT&T's] goal was not here to implement a lot of agreements and then have what I'll call 'gotcha's' with all our licensees on insignificant or minor or trivial violations. We were concerned about protecting the core of our intellectual property, and that meant substance and materiality is what we were focused on from a business side." (¶ 10.) In short, AT&T's purpose was "to ensure that immaterial or trivial violations of confidentiality would not be judged to be a breach of the agreement". (¶ 9.)

SCO does not allege that IBM contributed any UNIX System V material (code, methods, or concepts) to Linux. (K Br. ¶ 212.) Instead, SCO faults IBM for allegedly disclosing its own original works to Linux, on the theory that they were in and are also part of AIX and Dynix, which SCO contends to be modifications to or derivative works of UNIX System V. (K Br. ¶¶ 178-79.) Even if there were merit to SCO's theory — and there is not — it could not possibly result in a <u>material</u> breach of the Agreements. (¶¶ 7-10.)

Under New York law, a breach of contract is not material unless it "go[es] to the root of the agreement between the parties", and "is so substantial that it defeats the object of the parties in making the contract". <u>Frank Felix Assocs.</u>, 111 F.3d at 289 (internal quotation marks

---

<u>Union Fin. Servs.</u>, 333 F. Supp. 2d 131, 143 (S.D.N.Y. 2004) (holding that the "determination of the materiality of a breach is, of course, an issue of law for the [c]ourt"); <u>Fin. Tech. Int'l, Inc. v. Smith</u>, 247 F. Supp. 2d 397, 412 (S.D.N.Y. 2002) (holding that "[w]hether a breach is material or not is a question of law"); <u>Wechsler v. Hunt Health Sys., Ltd.</u>, 186 F. Supp. 2d 402, 413 (S.D.N.Y. 2002) ("[I]t is beyond cavil that a preliminary determination must be made that the breach at issue is material. Under New York law, this issue is a question of law for the [c]ourt to decide.").

omitted).  Precluding IBM and Sequent from disclosing their own original works plainly does not go to the root of the Agreements.  (¶¶ 6, 9-10; K Br. ¶¶ 116-18, 101-06, 277-88.)[6]  Nor would the disclosure by them of their original works defeat the object of the parties in making the contracts.  (¶¶ 6, 9-10; K Br. ¶¶ 117-18, 101-06.)  Even if that were not so, the allegedly misused material represents a trivial portion of AIX and Dynix, which is each comprised of millions of lines of code.  (¶ 13.)  For example, AIX 5.1.G for Power consists of more than 160 million lines of source code, while the allegedly misused JFS material amounts to only 11,170 lines of code from AIX — i.e., less than 0.01% of AIX 5.1.G. for Power.  (Id.)

Notably, it was not even a basic purpose of the Agreements to preclude IBM from disclosing any part of the software product.  (¶¶ 6-7, 12; K Br. ¶¶ 116-20.)  And even if (contrary to fact) protecting against the disclosure of UNIX software had been a primary object of the Agreements, the purpose of the Agreements' disclosure provision was to protect the confidentiality of any trade secrets embodied in the UNIX software.  AT&T "did not intend to impose a confidentiality obligation [under the Agreements] beyond what [it] could enforce under trade secret law".  (¶ 7.)  SCO, however, does not claim that the alleged breach committed by IBM disclosed any trade secrets whatsoever — "There is no trade secret in UNIX System [V] files."  (¶ 51.)  Therefore, the alleged breach could not possibly have been material.  See Frank Felix Assocs., 111 F.3d at 289.

---

[6] The only conceivable interest that AT&T could have had in seeking to prevent a licensee from disclosing its own original works was as a prophylactic protection against the disclosure of UNIX System V material.  AT&T could have had no interest in precluding the disclosure of its licensees' original works in their own right.  (¶ 6.)

**II.     SCO CANNOT SHOW THAT IT PROPERLY TERMINATED IBM'S LICENSE.**

Even if (contrary to fact) SCO could establish a predicate breach of the Agreements,

SCO's infringement claim also lacks merit because it depends on SCO's showing that it properly

terminated the Agreements.  As we discuss below, SCO cannot show that it properly terminated

IBM's license relating to AIX, for at least two independent reasons:  (1) IBM has a perpetual and

irrevocable license to distribute AIX, so SCO had no right whatsoever to terminate IBM's

license; and (2) even assuming (contrary to fact) the contract allowed termination, SCO:  (a)

denied IBM proper notice and an opportunity to cure the alleged breaches of its UNIX licensing

agreements; and (b) failed to exercise its good faith best efforts to avoid termination.

      A.     IBM Has an Irrevocable License.

To protect against the very sort of claim at issue, IBM took steps during the mid-1990s to

acquire a perpetual and irrevocable license to distribute AIX.  (¶¶ 15-33.)  On October 17, 1996,

IBM executed Amendment No. X to the Agreements with Novell and Santa Cruz, which then

shared ownership of AT&T's UNIX rights.  (¶ 34.)  Amendment No. X granted IBM a non-

terminable right to distribute AIX.  (¶¶ 34-44.)  The plain language of Amendment No. X and the

relevant parol evidence foreclose any claim to the contrary.

           1.     The plain language.

Under New York law, which governs Amendment No. X, the agreement must be

interpreted according to its plain language.  See W.W.W. Assocs., Inc. v. Giancontieri, 566

N.E.2d 639, 642 (N.Y. 1990) (citations omitted).  "It is axiomatic that a contract is to be

interpreted so as to give effect to the intention of the parties as expressed in the unequivocal

language employed."  Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978) (citation

27

omitted).  A court may not make a contract for the parties, or vary the terms of a contract, even

to accomplish its own "notions of abstract justice or moral obligation".[7]  Id.

Under the plain language of Amendment No. X, IBM has a perpetual and irrevocable

right to distribute AIX.  Amendment No. X provides as follows:

> No Additional Royalty.  Upon payment to SCO of the consideration in the section
> entitled "Consideration", IBM will have the irrevocable, fully paid-up, perpetual
> right to exercise all of its rights under the [Agreements] beginning January 1,
> 1996 at no additional royalty fee . . . .  Notwithstanding the above, the irrevocable
> nature of the above rights will in no way be construed to limit Novell's or SCO's
> rights to enjoin or otherwise prohibit IBM from violating any and all of Novell's
> or SCO's rights under this Amendment No. X, the [Agreements], or under general
> patent, copyright, or trademark law.

(¶ 36 (emphasis added).)[8]

Here, the terms of Amendment No. X are plain and commonly understood.  "Irrevocable"

means "not to be revoked or recalled; unable to be repealed or annulled".[9]  Similarly, "perpetual"

means "continuing or enduring forever".[10]  See Fama v. Metro. Prop. & Cas. Ins. Co., 646

---

[7] Whether a writing is equivocal or ambiguous is a question of law to be decided by the court.  W.W.W. Assocs., 566 N.E.2d at 642.  Contractual language is unambiguous when it has a "definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion".  Breed, 385 N.E.2d at 1282 (citation omitted).

[8] This provision superseded both the term and termination provisions of the Agreements. (¶ 37; see also Ex. 124 (Amendment No. X) § 11 (providing that the terms and conditions of the Agreements will remain in effect "[e]xcept as modified herein") (emphasis added).)

[9] The Random House Dictionary of the English Language 754 (1st ed. 1966); see also Black's Law Dictionary 848 (8th ed. 2004) ("Unalterable; committed beyond recall."); Webster's Third New International Dictionary of the English Language 1196 (17th ed. 1976) ("incapable of being recalled or revoked : past recall : UNALTERABLE"); The American Heritage College Dictionary 719 (3d ed. 1993) ("Impossible to retract or revoke:  an irrevocable decision.").

[10] Random House Dictionary 1074 (1st ed. 1966); see also Merriam-Webster Online Dictionary (http://www.merriam-webster.com/dictionary/perpetual) (2006) ("1. a. : continuing

28

N.Y.S.2d 930, 934 (Sup. Ct. 1996) (finding dictionary definitions to be "useful guideposts" to

courts interpreting contracts). These meanings hold both in common parlance and in the trade

usage of the software licensing field. See, e.g., Software Council of Southern California,

Understanding and Using Key Licensing Terminology, www.scsc.org/resources/licensing

terminology.html ("An irrevocable license is most often understood as a license that cannot be

terminated under any circumstances, including for breach of the license itself by the licensee.").[11]

By contrast, however, "terminate" means "to bring to an end [or] put an end to: [e.g.,] to

terminate a contract". Random House Dictionary 1465 (1st ed. 1966); see also Black's 1511 (8th

ed. 2004) ("1. To put an end to; to bring to an end. 2. To end; to conclude"); Webster's 1884

(17th ed. 1976) ("1.a. to bring to an ending or cessation in time, sequence, or continuity : CLOSE.

b. : to form the ending or conclusion of; c. : to end formally and definitely (as a pact, agreement,

contract") (see also "termination — 4 : the act of terminating : act of setting bounds or bringing

to an end or concluding; syn. see END"); American Heritage 1399 (3d ed. 1993) ("1. to bring to

an end or a halt. 2. to occur at or form the end of; conclude; 3. to discontinue the employment

of; dismiss. int. 1. to come to an end. 2. to have as an end or a result"). Thus, Amendment

---

forever : EVERLASTING; b. (1): valid for all time (2): holding (as an office) for life or for an
unlimited time"); Webster's 1684-85 (17th ed. 1976) ("1. a. : continuing forever : EVERLASTING,
ETERNAL, UNCEASING : dedicated to be valid for all time (2) : holding (as an office) for life or for
an unlimited time"); American Heritage 1018 (3d ed. 1993) ("1. Lasting for eternity. 2.
Continuing or lasting for an indefinitely long time. 3. Instituted to be in effect or have tenure for
an unlimited duration: perpetual friendship. 4. Continuing without interruption.").

[11] See also Fenwick & West LLP, Technology Licensing and Online Legal Commerce
(1998) at 6 ("Rights of early termination also present potentially strategic issues for licensor and
licensee. At one extreme, there are licenses that allow for the licensor to terminate without cause
(i.e., for convenience). At another extreme there are irrevocable licenses that cannot be
terminated even due to a material default by the licensee.").

No. X modified the term and termination provisions in the Agreements, and prevented SCO from attempting to terminate the Software and Sublicensing Agreements with IBM.

As they are employed in Section 1 of Amendment No. X, the terms "irrevocable" and "perpetual" are absolute and all-encompassing, and are not accompanied by qualifying language that would allow SCO to terminate IBM's license.  A court may not imply qualifications or limitations upon express terms such as "irrevocable" or "perpetual" in their absence.  See, e.g., Goldstein v. AccuScan, Inc., 815 N.E.2d 657, 657 (N.Y. 2004); Signature Realty v. Tallman, 814 N.E.2d 429, 430 (N.Y. 2004); Reda v. Eastman Kodak Co., 649 N.Y.S.2d 555, 557 (App. Div. 1936).  Indeed, "the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation".  Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 172 (N.Y. 2002).  No such burden could be borne as to termination in Amendment No. X.  Section 1 of Amendment No. X does include a "notwithstanding" clause, but this clause makes no mention whatsoever of the preservation of any right to early termination; instead, this clause provides only for measures whereby Novell or SCO may seek to enjoin or otherwise prohibit any conduct that violates their rights — a situation not implicated here.  (¶ 22.)

Interpreting the terms "irrevocable" and "perpetual" to mean anything other than "non-terminable" would, in the context of Amendment No. X, lead to an absurd result.  It would have made no sense for IBM to pay over $10 million for a license that SCO could terminate without any obligation to refund the license fee.  (¶¶ 19, 36.)  If SCO's interpretation were correct (and it is not), then Novell or Santa Cruz could have terminated IBM's rights within days of Amendment No. X, and retained the entirety of IBM's fully paid-up royalty.  That is non-

30

sensical.  Under New York law, the court should "examine the entire contract and consider the relation of the parties and the circumstances under which [the contract] was executed".  In re the Estate of Stravinsky, 770 N.Y.S.2d 40, 45 (App. Div. 2003); see also Aron v. Gillman, 128 N.E.2d 284, 288 (N.Y. 1955).  Absent compelling reason to do so, courts do not adopt contract interpretations that make no economic sense.  See Int'l Fid. Ins. Co. v. County of Rockland, 98 F. Supp. 2d 400, 422 (S.D.N.Y. 2000).  There is no such reason here.

Courts applying New York law are especially loathe to look beyond the "four corners" of agreements, where, as here:  (1) the parties were sophisticated, well-counseled business entities, dealing at arms' length, see Vermont Teddy Bear Co., Inc., v. 538 Madison Realty Co., 807 N.E.2d 876, 879 (N.Y. 2004); (2) the agreements were reduced to deliberately prepared and executed written instruments, see Chimart Assocs. v. Paul, 66 N.Y.2d 570, 574 (1986) ("[T]here is a heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties . . . and a correspondingly high order of evidence is required to overcome that presumption") (citations and internal quotation marks omitted); see also 3 Arthur L. Corbin, Corbin on Contracts § 615 (1951), at 745-46; and (3) the agreements contain explicit merger clauses that prohibit oral modification (i.e., Ex. 492 at 1, ¶ 4; Ex. 120 at 1, ¶ 4), see SAA-A, Inc. v. Morgan Stanley Dean Witter & Co., 721 N.Y.S.2d 640, 642 (App. Div. 2001) (noting that, where a contract requires that any amendments be evidenced by a writing subscribed by the parties, oral modification is prohibited by N.Y. Gen. Obl. L. § 15-301).

In sum, SCO could not properly terminate IBM's right to distribute AIX; IBM still has a license to distribute AIX; and SCO's infringement claim necessarily fails.

31

2.      The relevant parol evidence.

The Court need not — indeed, should not — look beyond the four corners of

Amendment No. X to conclude that SCO could not properly terminate IBM's license to

distribute AIX.  New York law dictates that where, as here, the Court is faced with unambiguous

and commonly used terms such as "irrevocable" and "perpetual", the Court should look no

further than the "four corners" of the Amendment and Agreements to adjudge the rights of the

respective parties.  See W.W.W. Assocs., 566 N.E.2d at 642.  Even if this Court were to look to

the parol evidence, however, the result would be the same.  The relevant parol evidence supports

the conclusion that IBM's license is not terminable.

IBM approached Novell about amending its UNIX licensing agreements for the purpose

of acquiring non-terminable rights to distribute AIX.  (¶¶ 15-18.)  IBM wanted to invest further

in AIX and develop its AIX business, and did not wish to do so without ensuring that it had a

non-terminable right to use AIX.  (¶¶ 15-18.)  In IBM's view, it made no sense to undertake

enormous further investment in AIX absent the assurance that no one could terminate its rights to

use AT&T's software and thereby hold hostage IBM's AIX business.  (¶ 18.)  IBM made clear to

Novell that it wanted a non-terminable license; Novell understood IBM wanted a non-terminable

license; and IBM and Novell (on behalf of itself and Santa Cruz) entered into the April 1996

Amendment, which provided IBM a non-terminable license.  (¶¶ 15-23.)

When Santa Cruz objected to the April 1996 Amendment, Novell negotiated separately

with IBM and Santa Cruz to reach the understanding resulting in Amendment No. X.  (¶¶ 28-30.)

IBM reaffirmed its insistence on non-terminable rights to AIX during these subsequent

negotiations.  (¶ 29.)  Novell understood and agreed that IBM's rights would be non-terminable.

32

(¶¶ 20, 21, 29.)  Santa Cruz initially proposed to revise the language of the irrevocability provision by making it "subject to the provisions of this Amendment".  (¶ 30.)  IBM, however, rejected this proposal, and Santa Cruz ultimately agreed to let the irrevocability provision stand as written.  (Id.)

At no point in the negotiations did IBM indicate a willingness to back off of the position that it must have a non-terminable license.  (¶ 31.)  At no point did Novell suggest that IBM's license would be terminable.  (Id.)

Amendment No. X was negotiated by IBM on its own behalf, and by Novell on behalf of Novell and Santa Cruz.  (¶ 17.)  William Sandve participated in the negotiations for IBM, and Allison Amadia and Lawrence Bouffard of Novell participated in the negotiations on behalf of Novell and Santa Cruz.  (Id.)  To the extent Santa Cruz expressed its views during the negotiations, it was by and through Novell, which was authorized to act on behalf of Santa Cruz.  (¶¶ 17, 28.)  The IBM and Novell participants in the negotiations have offered unrebutted and unrebuttable testimony that the parties intended for IBM to receive a non-terminable license.  (¶¶ 41-44.)

Courts have held that where, as here, the relevant parol evidence overwhelmingly supports one view of a contract, summary judgment is appropriate.  See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 161 (2d Cir. 2000) (affirming grant of summary judgment on contract interpretation where "the overwhelming weight of the extrinsic evidence supports plaintiffs' contention"); MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285, 302-03 (S.D.N.Y. 2006) (granting summary judgment where the "extrinsic evidence before the Court is so one-sided as to dispel

33

any dispute of the parties' intent"); <u>Trs. of the Bricklayers & Allied Craftworkers v. Charles T.</u>

<u>Driscoll Masonry Restoration Co., Inc.</u>, 165 F. Supp. 2d 502, 510-13 (S.D.N.Y. 2001) (granting

summary judgment on contract interpretation upon consideration of extrinsic evidence).

     As the only relevant and admissible parol evidence unequivocally supports what the plain

language of Amendment No. X clearly indicates — <u>i.e.</u>, that IBM had a non-terminable

license — summary judgment should be granted.

    B.    <u>SCO Failed to Give IBM Proper Notice and an Opportunity to Cure, and to</u>
           <u>Exercise Its Good Faith Best Efforts to Avoid Termination.</u>

     Even if, contrary to fact, the Agreements could actually be terminated, SCO could still

not establish that it properly terminated them here.  SCO failed to give IBM the requisite notice

and reasonable opportunity to cure the alleged breaches before the purported termination.  SCO

also failed to exercise its good faith best efforts to avoid termination.  Thus, SCO's infringement

claim lacks merit for these additional reasons.

     With or without Amendment No. X, SCO could not terminate the Agreements absent

100 days notice in the case of AIX.  (¶¶ 11, 57.)  Nor could SCO terminate before giving IBM a

reasonable opportunity to cure its alleged breaches.  (¶¶ 11, 57.)  The Agreements further

required the parties to "exert their mutual good faith best efforts to resolve any alleged breach

short of termination".  (¶¶ 11, 57.)  SCO purports to have given IBM notice of its breaches and

an opportunity to cure, and to have exerted its good faith best efforts to resolve the alleged

breaches.  SCO purports to have done so by way of the letter that SCO sent IBM at the same

time it served its complaint on March 6, 2003, and by way of the communications that followed.

(¶¶ 48, 50-51, 56, 58-59, 61.)  SCO is wrong.

SCO's purported "termination" letter of March 6, 2003 comes nowhere close to giving IBM notice of SCO's claims or an opportunity to cure. This letter refers only to breaches of "trade secret" confidentiality — claims that are indisputably no longer in this case. (¶¶ 48, 50-51.) SCO amended its complaint to eliminate any trade secret claims, and SCO admitted that it has no colorable trade secret claims whatsoever: "There is no trade secret in UNIX System [V] files. That is on the record. No problem with that." (¶ 51.) Thus, the March 6, 2003 letter gave IBM no notice whatsoever of the nature of the alleged material breach that SCO claimed allowed it to terminate the agreement. It would not have been possible for any licensee to even attempt to cure such concealed alleged breaches on the basis of this letter. At the very least, this letter could not have started the 100-day clock running on the cure period, such that the June 13, 2003 notice of termination could have been effective. (See ¶¶ 48, 50-51, 59.)

IBM repeatedly informed SCO that it needed more information if it were to attempt to remedy any alleged breaches. (¶¶ 52-61.) SCO repeatedly refused to provide the information IBM requested. (¶¶ 52-61.) SCO in effect told IBM that IBM knew what it had done to violate the Agreements, such that it needed nothing from SCO, and SCO offered IBM nothing other than vague generalities about its alleged misconduct. (¶¶ 52-61.) At no point prior to the purported termination of IBM's rights did SCO identify a single version, file, or line of allegedly misused material, or provide IBM any specific indication of what SCO wanted IBM to do to cure the alleged breaches. (¶¶ 52-61.) The reason is plain: SCO had no interest in permitting IBM to cure the alleged breaches. SCO simply sought to "hold up" IBM's AIX business for ransom.

Putting aside the fact that SCO plainly did not afford IBM proper notice or an opportunity to cure, SCO did not exert its "good faith best efforts to resolve any alleged breach

35

short of termination". (¶ 11.) When all is said and done, SCO did nothing to try to resolve the alleged breach short of termination, except to send IBM highly publicized letters purporting to terminate IBM's licenses at the same time that it sued IBM based on the alleged breaches. (¶¶ 48-51, 59, 61.) SCO met once with IBM representatives to discuss its allegations, but offered no more detail about its claims than was provided in its complaint. (¶ 58.) SCO made no meaningful effort to resolve the dispute, because its entire strategy, quite plainly, was to publicly pressure IBM into paying it off to avoid the risk of SCO shutting down its AIX business, and that strategy could not work if SCO put forward its best efforts to resolve the supposed breaches. (¶ 62.) No reasonable trier of fact could find that SCO's conduct amounted to good faith best efforts.

As SCO failed to comply with the conditions precedent to its supposed but non-existent right of termination, its purported termination was ineffective, even if (contrary to fact) the Agreements had been terminable. It is well-established under New York law that, where, as here, a contract specifies conditions precedent to the right of cancellation, such as notice, opportunity to cure, and the exercise of good faith best efforts to resolve a breach prior to termination, such conditions must be satisfied before any purported cancellation may be effective. See Consumers Power Co. v. Nuclear Fuel Servs., Inc., 509 F. Supp. 201, 211 (W.D.N.Y. 1981); see also Sauer v. Xerox Corp., 17 F. Supp. 2d 193, 197 (W.D.N.Y. 1998) ("[w]here . . . the parties have agreed to provide notice and an opportunity to cure prior to suing for performance or asserting termination rights under a contract, those covenants must be adhered to"); Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 518 (2d Cir. 1989) (finding that, where defendant did not give timely notice and opportunity to cure

36

as required under agreement, its attempt to terminate agreement was ineffective, as it "did not conform to the [a]greement") (citing Gen. Supply and Constr. Co. v. Goelet, 241 N.Y. 28, 34 (1925)).  As the party that sought to terminate the Agreements, SCO has the burden of proving that it complied with the contractual provision requiring it to give notice of default and an opportunity to cure, and requiring it to use its good faith best efforts to resolve the alleged breach short of termination.  See Kolvek v. Ferrucci, 667 N.Y.S.2d 554, 554 (App. Div. 1997).  SCO has not borne, nor can it bear, this burden.

**III.   SCO CANNOT PROVE UNAUTHORIZED COPYING OR DISTRIBUTION BY IBM OF COPYRIGHTED WORKS OWNED BY SCO.**

Putting aside the fact that SCO cannot establish a predicate breach of the Agreements, and putting aside the fact that IBM has a non-terminable license that SCO could not have terminated, SCO's infringement claim also lacks merit because SCO failed to disclose its allegations and evidence as required by the Court.

To establish a claim of copyright infringement, SCO must prove:  (1) ownership of a valid copyright; and (2) unauthorized copying or distribution by the defendant of protected components of the copyrighted material.  See Jacobsen v. Deseret Book Co., 287 F.3d 936, 942 (10th Cir. 2002); Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 831 (10th Cir. 1993).  Absent admissible evidence of unauthorized copying or distribution by IBM of copyrighted materials owned by SCO, SCO's allegations of infringement fail, and IBM is entitled to summary judgment.  See U-Haul Intern., Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723, 726-30 (E.D. Va. 2003); Brought to Life Music, Inc. v. MCA Records, Inc., No. 02-1164, 2003 WL 296561, at *1 (S.D.N.Y. Feb. 11, 2003) (Ex. C hereto).

From the beginning of this case, IBM has asked SCO to disclose its allegations and evidence of alleged infringement by IBM, and from the beginning of this case, SCO has declined to do so. (¶¶ 50-61.) The Court entered two separate orders requiring SCO to disclose with specificity its allegations and evidence. (¶ 68.) SCO failed to do so, requiring the Court to enter an order setting a final disclosure deadline. (Id.) Even in the face of that order, SCO failed to disclose in any meaningful way — let alone in detail, as required by the Court — its allegations and evidence of unauthorized copying or distribution by IBM of copyrighted works owned by SCO. (¶ 69.) Nowhere, in fact, has SCO ever described in detail its allegations and evidence of how IBM's continued distribution of AIX and Dynix infringes SCO's alleged copyrights — not in its Final Disclosures, not in its interrogatory answers, nowhere. (¶¶ 50-61, 67-69; DJ Br. ¶¶ 178-96.) Thus, IBM is entitled to summary judgment based on SCO's failure of proof, for two independent reasons:

First, IBM is entitled to summary judgment because SCO has failed to adduce adequate evidence of ownership. The Final Disclosures identify "Allegedly Infringed Material" from four "Allegedly Infringed Works". (DJ Br. ¶¶ 178-96.) They do not, however, disclose any evidence that SCO owns the copyrights in the Allegedly Infringed Works. (DJ Br. ¶¶ 178-96.) The evidence shows that Novell retained the UNIX System V copyrights, and did not transfer them to Santa Cruz, pursuant to the APA. (¶ 14; DJ Br. ¶¶ 296-301.) Schedule 1.1(b) of the APA expressly provides that Novell retained "all copyrights and trademarks, except for the trademarks UNIX and UnixWare", and Amendment No. 2 to the APA did not transfer the copyrights. (¶ 14; DJ Br. ¶¶ 297-98.) Thus, SCO could not have acquired the copyrights to the Allegedly Infringed Works in its acquisition of UNIX assets from Santa Cruz, and SCO cannot sustain a

claim against IBM for infringing these copyrights. That is plainly why SCO asked Novell to transfer the copyrights to it prior to the commencement of this case. (DJ Br. ¶ 38.)

Second, IBM is entitled to summary judgment because SCO has failed to adduce adequate evidence of unauthorized copying or distribution by IBM. In addition to not disclosing any evidence of ownership, the Final Disclosures and SCO's interrogatory responses reveal no evidence of unauthorized copying by IBM. (¶ 69; DJ Br. ¶¶ 178-96.) Nowhere, in fact, has SCO ever disclosed with the specificity required by the Court its allegations and evidence that IBM's continued distribution of AIX and Dynix infringes SCO's alleged copyrights. (¶¶ 67-69; DJ Br. ¶¶ 178-96.) While the Final Disclosures accuse certain lines of code in Linux of infringing UNIX copyrights, and certain "Project Monterey" code of having been improperly included in AIX, they do not identify a single copyright that IBM is alleged to have infringed by continuing to distribute AIX or Dynix after SCO's purported termination of IBM's rights. (DJ Br. ¶¶ 178-96.) Moreover, the Final Disclosures do not identify a single version, file, or line of code that IBM is alleged to have infringed by continuing to distribute AIX or Dynix after SCO's purported termination of IBM's right to do so. (¶ 69.) In short, SCO has failed to reveal to IBM even the most basic facts underlying its allegations of infringement.

A party cannot survive summary judgment if it fails during discovery to produce evidence supporting a necessary element of its opposition. See, e.g., Cambridge Elec. Corp. v. MGA Elec., Inc., 227 F.R.D. 313, 325 (C.D. Cal. 2004), Lauth v. McCollum, No. 03-8529, 2004 WL 2211620, at *4 (N.D. Ill. Sept. 30, 2004) (Ex. D hereto), Lawrence v. IBP, Inc., No. 94-2027, 1995 WL 261144, at *7 (D. Kan. Apr. 21, 1995) (Ex. E hereto); Stone v. CGS Distrib. Inc., No. 93-1288, 1994 WL 832021, at *2 (D. Colo. Aug. 18, 1994) (Ex. F hereto). Courts enter

39

summary judgment in these circumstances, see, e.g., Lawrence, 1995 WL 261144, at \*7, 13 (Ex.

E hereto); Stone, 1994 WL 832021, at \*2 (Ex. F hereto), and this Court should do so here.  See

Cambridge, 227 F.R.D. at 325 (granting summary judgment where plaintiff "failed to discharge

its affirmative burden" of establishing a genuine issue of material fact because it relied upon

evidence that was "not disclosed to defendants in plaintiff's deficient interrogatory answers").[12]

## IV.    SCO HAS MISUSED ITS ALLEGED COPYRIGHTS.

Finally, SCO's infringement claim should be rejected because SCO has misused the

allegedly infringed copyrights, and therefore it is not entitled to enforce them.

A copyright holder may not enforce a copyright that it has misused.  See Lasercomb Am.,

Inc. v. Reynolds, 911 F.2d 970, 972 (4th Cir. 1990) (copyright misuse is an equitable defense

that "bars a culpable plaintiff from prevailing on an action for infringement of the misused

copyright").  A copyright holder misuses a copyright when it seeks to extend the scope of its

limited monopoly to gain control over material outside the monopoly, or otherwise uses the

copyright contrary to public policy.  Id.; see also In re Indep. Serv. Orgs. Antitrust Litig., 964 F.

Supp. 1469, 1477 (D. Kan. 1997) ("An alleged infringer can establish copyright misuse by

showing . . . that . . . the defendant illegally extended its monopoly beyond the scope of the

copyright or violated the public policies underlying the copyright laws."); Alcatel USA, Inc. v.

DGI Techs., Inc., 166 F.3d 772, 792 (5th Cir. 1999) (the doctrine of copyright misuse "forbids

---

[12] See also Lauth, 2004 WL 2211620, at \*4, \*6 (granting summary judgment over
plaintiff's opposition, which was supported by facts that were "never identified . . . in
[plaintiff's] answer to [d]efendants' interrogatories") (Ex. D hereto); Stone, 1994 WL 832021, at
\*6 (granting summary judgment against plaintiff who, in response to defendant's deposition
questions and interrogatories, "could have [but did not] name[] businesses he contacted
regarding employment", but did so only on opposition to summary judgment, and thereby failed
to satisfy his evidentiary burden as to mitigation of damages) (Ex. F hereto).

the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the

[Copyright] Office and which is contrary to public policy to grant") (alterations in original)

(quoting <u>Lasercomb</u>, 911 F.2d at 976).

 As stated, SCO has not offered any evidence that it owns the allegedly infringed

copyrights, despite the Court's orders. (¶¶ 67-69.) Even if SCO could show that it owns the

copyrights, however, it has misused them in at least five independent ways, each of which is

sufficient to foreclose SCO from further prosecuting its infringement claim against IBM:

 (1) SCO claimed ownership over code for which SCO has no copyright;

 (2) SCO effectively asserted that its alleged copyrights extend to all of Linux;

 (3) SCO claimed its alleged copyrights give it control of IBM's own copyrighted code (<u>i.e.</u>, AIX and Dynix);

 (4) SCO claimed its alleged copyrights include material not protectable by copyright; and

 (5) SCO is seeking to enforce its alleged copyrights in ways that are unenforceable.

SCO's misuse of its alleged copyrights is described in detail in the memorandum in support of

IBM's motion for summary judgment on its Tenth Counterclaim. (DJ Br. at 94-99.) Rather than

repeat that discussion here in full, we incorporate it by reference.

## Conclusion

For the foregoing reasons, summary judgment should be entered in favor of IBM and against SCO on SCO's copyright claim.

DATED this 25th day of September, 2006.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, NY 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

42

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of September, 2006, a true and correct copy of the foregoing was served by U.S. Mail, postage pre-paid, to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101
>
> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131
>
> Robert Silver
> Edward Normand
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

Todd M. Shaughnessy

### CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2006, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101
>
> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131

and by U.S. Mail, postage pre-paid to:

> Robert Silver
> Edward Normand
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

/s/ Todd M. Shaughnessy