SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
   *International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **IBM'S REDACTED MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S UNFAIR COMPETITION CLAIM (SCO'S SIXTH CAUSE OF ACTION)** <br><br> **(ORAL ARGUMENT REQUESTED)** <br><br> Civil No. 2:03CV-0294 DAK <br><br> Honorable Dale A. Kimball <br><br> Magistrate Judge Brooke C. Wells |

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700



*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **IBM'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S UNFAIR COMPETITION CLAIM (SCO'S SIXTH CAUSE OF ACTION)** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **(ORAL ARGUMENT REQUESTED)** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | **FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38** |
| Defendant/Counterclaim-Plaintiff. | Civil No. 2:03CV-0294 DAK |
| | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

# **Table of Contents**

Page

Table of Authorities ................................................................................................ ii

Preliminary Statement ............................................................................................. 1

Statement of Undisputed Facts .............................................................................. 2

    A.   SCO's Unfair Competition Claim ................................................................. 2

    B.   SCO's Disclosures. ....................................................................................... 3

    C.   Project Monterey .......................................................................................... 6

    D.   SCO's Failure of Proof. .............................................................................. 10

Standard of Decision ............................................................................................. 11

Argument ............................................................................................................... 11

    I.    SCO'S UNFAIR COMPETITION CLAIM IS UNTIMELY. ..................... 11

          A.   The JDA's Two-Year Limitations Provision Is Enforceable and
              Applies to SCO's Unfair Competition Claim. ....................................... 12

          B.   SCO's Claim Was Not Timely Under the Two-Year Limitations
              Provision. ............................................................................................... 15

    II.   SCO HAS NO EVIDENCE OF UNFAIR COMPETITION BY IBM. ............ 17

          A.   IBM's Alleged Conduct Does Not Constitute Unfair Competition ....... 18

          B.   SCO Lacks Standing to Pursue its Claim. ............................................. 21

    III.  SCO'S CLAIM ALSO IS PREEMPTED BY FEDERAL COPYRIGHT
       LAW. ....................................................................................................... 23

Conclusion ............................................................................................................. 27

## Table of Authorities

Page(s)

**Cases**

Allen's Prods. Co. v. Glover, 414 P.2d 93 (Utah 1966) ............................................. 19

Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296 (2d Cir. 2004) .......................... 23, 24

Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................ 20

Cambridge Nutrition A.G. v. Fotheringham, 840 F. Supp. 299 (S.D.N.Y. 1994) ........................ 14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ......................................................... 11

Czech Beer Importers, Inc. v. C. Haven Imports, LLC, No. 04-2270, 2005 WL
     1490097 (S.D.N.Y. June 23, 2005) .......................................................... 20

Deer Crest Assocs. I. v. Deer Crest Resort Group, L.L.C., No. 04-220, 2006 WL
     722216 (D. Utah Mar. 16, 2006) ............................................................ 18, 19

Digital Envoy, Inc. v. Google, Inc., 319 F. Supp. 2d 1377 (N.D. Ga. 2004) ................................ 14

Durham Indus. v. Tomy Corp., 630 F.2d 905 (2d Cir. 1980) ................................................ 26

Ehat v. Tanner, 780 F.2d 876 (10th Cir. 1985) ......................................................... 23, 25, 26

Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 847 (10th Cir. 1993) ..................... 25

Harbor Court Assocs. v. Leo A. Daly Co., 179 F.3d 147 (4th Cir. 1999) ................................. 16

Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533 (10th Cir. 1996) ................. 23, 25

Incorp. Village of Saltaire v. Zagata, 720 N.Y.S.2d 200 (App. Div. 2001) ................................ 12

Ippolito v. Ono-Lennon, 526 N.Y.S.2d 877 (N.Y. Sup. Ct. 1988) ....................................... 26

Keating v. Baskin-Robbins USA, Co., No. 99-148, 2001 WL 407017 (E.D.N.C.
     Mar. 27, 2001) ................................................................................ 14

Kerry v. Southwire Co. & Affiliates Employee Benefits Plan, 324 F. Supp. 2d
     1225 (D. Utah 2004) .......................................................................... 12

Kregos v. Associated Press, 3 F.3d 656 (2d Cir. 1993) ................................................. 23

Lexmark Int'l. Inc. v. Static Control Components, Inc., 387 F.3d 522
    (6th Cir. 2004) .................................................................................................. 24

Louis Capital Mkts., L.P. v. REFCO Group Ltd., LLC, 801 N.Y.S.2d 490
    (Sup. Ct. 2005) ................................................................................................. 19

Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575 (S.D.N.Y. 2004) ......................... 18

Monsanto Co. v. McFarling, 302 F.3d 1291 (Fed. Cir. 2002) ........................................ 15

Oliver Res. PLC v. Int'l Fin. Corp., 62 F.3d 128 (5th Cir. 1995) ................................... 22

Oriskany Cent. Sch. Dist. v. Edmund J. Booth Architects, 615 N.Y.S.2d 160
    (App. Div. 1994) ............................................................................................. 15

Proctor & Gamble Co. v. Haugen, 222 F.3d 1262 (10th Cir. 2000) ................................. 19

Productivity Software Int'l, Inc. v. Healthcare Techs. Inc., No. 93-6949, 1995 WL
    437526 (S.D.N.Y. July 25, 1995) .................................................................. 18, 19

Rockwell Int'l Corp. v. Goss Graphic Sys., Inc., No. 00-8763, 2001 WL 293818
    (S.D.N.Y. Mar. 27, 2001) ................................................................................ 15

Ruder & Finn Inc. v. Seaboard Surety Co., 422 N.E.2d 518 (N.Y. 1981) .......................... 20

Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037 (2d Cir. 1980) ............................. 21

TeeVee Toons, Inc. v. Gerhard Schubert GmbH, No. 00-5189, 2006 WL 2463537
    (S.D.N.Y. Aug. 23, 2006) ................................................................................ 22

The Pizza Public Co. v. Tricon Global Restaurants, Inc., No. 99-12056, 2000 WL
    1404716 (S.D.N.Y. Sept. 25, 2000) .................................................................. 20

Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304 (2d Cir. 1994) .............................. 14

Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 155 F. Supp. 2d 1
    (S.D.N.Y. ) ..................................................................................................... 25

Vann v. Spak, 19 Fed.Appx. 668 (9th Cir. 2001) ..................................................... 22

Ward Enters., Inc. v. Bang & Olufsen Am., No. 02-7640, 2004 WL 830461
    (N.D. Ill. Apr. 15 2004) ................................................................................... 14

Warner & Swasey Co. v. Salvagnini Transferica S.p.A., 633 F. Supp. 1209
    (W.D.N.Y. 1986) ............................................................................................. 15

Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231 (2d Cir. 1983) ............................................. 25

Welding v. Bios Corp., 353 F.3d 1214 (10th Cir. 2004) ................................................................. 10

Wilson v. Electro Marine Sys., Inc., No. 83-5863, 1986 WL 12604 (N.D. Ill. Oct.
    30, 1986) ............................................................................................................................ 12

X-IT Prods. L.L.C. v. Walter Kidde Portable Equip., Inc., 227 F. Supp. 2d 494
    (E.D. Va. 2002) ................................................................................................................... 12

YWCA v. HMC Entm't, Inc., No. 91-7943, 1992 WL 279361 (S.D.N.Y. Sept. 25,
    1992) .................................................................................................................................. 14

**Statutes & Rules**

17 U.S.C. § 106 ............................................................................................................................ 23, 24

17 U.S.C. §§ 102, 103 ....................................................................................................................... 23

17 U.S.C.A. § 301 (West ) ................................................................................................................. 23

N.Y. C.P.L.R. 201 (McKinney 2006) ................................................................................................. 12

**Other Authorities**

Fed. R. Civ. P. 56(c) ......................................................................................................................... 10

Fed. R. Civ. P. 56(e) ......................................................................................................................... 10

Restatement (Second) of Conflict of Laws § 145 ............................................................................... 12

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum of law in support of its motion for summary judgment on the unfair competition claim (Count Six) of Plaintiff/Counterclaim-Defendant The SCO Group, Inc. ("SCO").[1]

## **Preliminary Statement**

SCO's unfair competition claim is a mix of SCO's other causes of action and separate allegations of misconduct regarding Project Monterey ("Monterey"), which was a joint development project between IBM and The Santa Cruz Operation, Inc. ("Santa Cruz") beginning in 1998. To the extent SCO's unfair competition claim concerns Monterey — which appears to be its focus — the claim is untenable for at least three independent reasons: (1) it is untimely; (2) SCO cannot show that IBM engaged in unfair competition regarding Monterey; and (3) the claim is preempted by federal copyright law. To the extent the claim is based on the alleged misconduct underlying SCO's other claims, it is untenable for the reasons set out in IBM's motions for summary judgment with respect to those claims, which are incorporated herein by reference, as well as the reasons set out herein. Thus, IBM respectfully submits that summary judgment should be entered in its favor on SCO's unfair competition claim.

---

[1] The undisputed and indisputable facts set out in this motion are supported by the declarations and documents submitted herewith, including those appended to the Declaration of Todd M. Shaughnessy, which are cited herein as "Ex. __".

## Statement of Undisputed Facts

The undisputed and indisputable facts material to this motion are set forth below, and in the memoranda in support of IBM's other motions for summary judgment, which are submitted herewith and incorporated by reference.[2]

A.  SCO's Unfair Competition Claim.

1.  SCO filed its original Complaint, which included a claim for unfair competition, on March 6, 2003.  (Ex. 1.)  SCO's unfair competition claim repeated the allegations of its other causes of action, including a claim for misappropriation of trade secrets, but labeled those same allegations as "unfair competition".  (Ex. 1 ¶ 118-19.)

2.  On July 22, 2003, SCO filed an Amended Complaint.  (Ex. 2.)  In the Amended Complaint, SCO again asserted a claim for unfair competition, and again based that claim on the same alleged conduct that supported each of its other causes of action.  (Ex. 2 ¶¶ 147-53.)

3.  SCO thereafter sought, and was granted, permission to file a Second Amended Complaint.  (Ex. 3.)

4.  SCO's Second Amended Complaint, filed on February 27, 2004, again included an unfair competition claim (the sixth cause of action), which remained an amalgamation of its other claims relabeled as "unfair competition".  (Ex. 3 ¶¶ 181-188.)  In its Second Amended Complaint, SCO abandoned its claim for misappropriation of trade secrets altogether.  (Ex. 3.)  In

---

[2] References to the memoranda in support of IBM's motions for summary judgment submitted herewith are cited as follows: IBM's motion for summary judgment on SCO's contract claims as "K. Br. __"; IBM's motion for summary judgment on SCO's copyright claim as "AIX Br. __"; IBM's motion for summary judgment on SCO's interference claims as "Interference Br. __"; IBM's motion for summary judgment for copyright infringement (IBM's Eighth Counterclaim) as "Copyright Br. __"; and IBM's motion for summary judgment for a declaration of non-infringement (IBM's Tenth Counterclaim) as "DJ Br. __".

fact, at a hearing on December 5, 2003, SCO acknowledged that there are no trade secrets in UNIX System V.  Counsel for SCO stated:  "There is no trade secret in UNIX system [V].  That is on the record.  No problem with that."  (Ex. 414 at 46:2-3.)

5.      SCO then sought leave to file a Third Amended Complaint to add a tenth cause of action.  (Ex. 10 ¶¶ 217-41.)  SCO's proposed tenth cause of action asserted that "IBM misappropriated, and used in its own 'AIX for Power' operating system, substantial copyrighted source code relating to UnixWare System V Release 4 ['SVr4']".  (Ex. 10 ¶ 217.)  SCO further alleged that "IBM obtained access to the copyrighted UnixWare SVr4 code through 'Project Monterey'".  (Ex. 10 ¶ 217.)

6.      In a decision dated July 1, 2005, this Court denied SCO's motion to add a cause of action based upon IBM's alleged copying of code obtained through Project Monterey into AIX.  The Court held that SCO had unduly delayed seeking leave to add the proposed cause of action because it appeared that "SCO — or its predecessor — either knew or should have known about the conduct at issue before it filed its original Complaint".  (Ex. 58 at 4.)

B.      SCO's Disclosures.

7.      IBM served interrogatories asking SCO to describe in detail its allegations and alleged evidence of misconduct by IBM.  (Ex. 11.)

8.      With respect to SCO's unfair competition claim, IBM asked SCO to "describe, in detail, each instance in which plaintiff alleges that IBM engaged in unfair competition, including but not limited to: (a) the dates on which IBM allegedly engaged in unfair competition; (b) all persons involved in the alleged unfair competition; and (c) the specific manner in which IBM is alleged to have engaged in unfair competition".  (Ex. 11 at Interrogatory No. 7.)

9.      Following SCO's failure fully to disclose its allegations and evidence of IBM's alleged misconduct, the Court entered three different orders requiring SCO to provide detailed responses to IBM's Interrogatories. (See Ex. 55; Ex. 56; Ex. 58.) In the final of those three orders, the Court set December 22, 2005, as the "final deadline for [SCO] to identify with specificity all allegedly misused material" and update its interrogatory responses accordingly. (Ex. 58 at 4.)

10.     Initially, SCO defined its unfair competition claim as a combination of each of its other causes of action, including its breach of contract claims, its tortious interference claims and its copyright claims. (See Ex. 31 at Interrogatory Response No. 7; Ex. 32 at Interrogatory Response No. 7; Ex. 33 at Interrogatory Responses No. 7 and 8; Ex. 46 at Interrogatory Response No. 8.)

11.     SCO eventually focused its unfair competition claim upon allegations related to Monterey. Specifically, SCO alleges that:

a.      IBM made and continued to make investments in the development of Linux, and secretly advanced and promoted development of Linux without disclosing such activities to SCO, during and at a time when IBM was under a duty to deal fairly with and disclose such competing activities to SCO pursuant to its contractual obligations to SCO under Project Monterey and otherwise. (Ex. 32 at Interrogatory Response No. 7.)

b.      IBM's unfair competition arose from the relationship it established with SCO as a result of the joint effort between SCO and IBM known as "Project Monterey". (Ex. 33 at Interrogatory Response No. 7.)

c.     As a result of the formal agreement between SCO and IBM and the numerous representations made by IBM that were calculated to be relied upon by SCO, IBM had a fiduciary obligation to SCO that required IBM to be forthright and truthful in all affairs related to the partnership agreement. (Ex. 33 at Interrogatory Response No. 7.)

d.     IBM . . . unfairly took advantage of its partnership relations with SCO, unfairly gained access to SCO's business relationships, and unfairly and knowingly diverted SCO's resources away from competition with IBM and toward the purposes of the relationship. (Ex. 33 at Interrogatory Response No. 7.)

e.     During a substantial part of 1999 IBM was secretly developing plans to cease its planned strategic relationship with SCO . . . and to begin supporting Linux. (Ex. 33 at Interrogatory Response No. 7.)

12.     SCO alleges that "[b]ecause IBM has been developing its plan to replace UnixWare support with Linux support, and because it knew SCO had dedicated its entire enterprise resources to the IBM/UnixWare joint relationship, IBM had a fiduciary obligation to inform SCO of its Linux-related plans long before its Linux public announcement in December 1999." (Ex. 33 at Interrogatory Response No. 7.) In fact, IBM made a public announcement of its intention to support Linux at LinuxWorld in March 1999. (Ex. 21 at 4; Ex. 259 at 38.)

13.     SCO also alleges that IBM engaged in unfair competition by copying into IBM's AIX operating system code from the UNIX System V Release Four ("SVr4") operating system that had been included in Santa Cruz's UnixWare 7 product. (Ex. 33 at Interrogatory Response No. 7.) According to SCO, IBM obtained that code during the course of Monterey and its use of that code exceeded the scope permitted by the Monterey joint development agreement (the "JDA"). (Ex. 33 at Interrogatory Response No. 7.)

14.     Santa Cruz was aware of the allegedly improper inclusion of Santa Cruz code in AIX for Power by August 2000. (Ex. 227 ¶ 16; <u>see also</u> Exhibits to the Declaration of Todd M.

Shaughnessy in support of IBM's opposition to SCO's Motion for Leave to File a Third

Amended Complaint (Docket # 345).)

15.     In interrogatory responses, SCO has named a slightly later date, alleging that IBM

began copying Santa Cruz code obtained through Project Monterey into AIX in October 2000.

(See Ex. 41 at Interrogatory Response No. 8.)


SECTION REDACTED



C.     Project Monterey.

16.     In 1994, Intel and Hewlett-Packard (HP) announced their collaboration to create a

new 64-bit processor architecture design, known as IA-64. (Ex. 27.) Intel and HP, along with

various others, believed that IA-64 would move Intel systems into higher-end server applications

and quickly become the industry leader in that area. (Ex. 27.)

17.     In or around 1998, IBM began negotiating with Santa Cruz to undertake a joint

development project for, among other things, a UNIX-like operating system that would run on the

IA-64 platform. This project subsequently came to be known as "Project Monterey". (Ex. 24;

Ex. 25; Ex. 123; Ex. 86 ¶ 54; Ex. 259 at 30-31.) At that time, Santa Cruz sold two UNIX

products that ran exclusively on Intel's existing 32-bit hardware platform: UnixWare and

OpenServer. (Ex. 1 ¶¶ 26, 47; Ex. 115 at 5-8.)

6

18.     Both IBM and Santa Cruz were interested in attempting to leverage and strengthen their existing UNIX-like operating system products as part of Project Monterey.  The goal was to develop and market a "family" of UNIX-like operating system products, including a "Monterey/64" version for the IA-64 Intel processor, a version to run on IBM's proprietary "Power" processor architecture and a version to run on the IA-32 architecture.  (Ex. 23; Ex. 24; Ex. 25; Ex. 245.)

19.     On October 26, 1998, IBM and Santa Cruz entered into the JDA, whereby Santa Cruz and IBM agreed to provide resources and technology to pursue these goals.  (Ex. 245.)

20.     In furtherance of IBM and Santa Cruz's intention to create a compatible family of products, both companies granted licenses to the other.  (Ex. 245.)  For its part, IBM granted Santa Cruz a royalty-free license to certain AIX source code for Santa Cruz's use in its UnixWare product for the existing 32-bit Intel processor.  (Ex. 245 §2.0(c)(2).)  In turn, Santa Cruz granted IBM a royalty-free license to certain UnixWare source code for IBM's use in its AIX operating system tailored to run on IBM's Power architecture processor.  (Ex. 245 §2.0(d)(2); Ex. 227 ¶ 16.)  Each party also granted the other a license to use any code supplied during Project Monterey for the development of the operating system that would be marketed for use on the forthcoming IA-64 product.  (Ex. 245 §§ 2.0(c)(2), 2.0(d)(2).)

21.     In the JDA, IBM also stated its intention to engage in certain marketing activities to "market, promote and sell the UnixWare and IA-32 Product on IBM systems in 1999".  (Ex. 245 Attachment A, §I.)

22.     IBM also agreed to make certain middleware available for the UnixWare 7 and

IA-32, subject to IBM's determination of commercial considerations.  IBM's plan included

Tivoli, WebSphere and DB2.  (Ex. 245 Attachment A, §II.)

23.     Section 15.2 of the JDA, which is entitled "Change of Control", provides:

> Notwithstanding Section 15.1, IBM shall have the right to terminate this
> Agreement immediately upon the occurrence of a Change of Control of
> SCO which IBM in its sole discretion determines will substantially and
> adversely impact the overall purpose of the cooperation set forth by this
> Agreement and applicable Project Supplements or will create a significant
> risk or material and adverse exposure of IBM's confidential and/or
> technical proprietary information (which is subject to, and to the extent of,
> confidentiality restrictions) ("Information").  For the purposes of this
> Agreement, control shall be deemed to be constituted by rights, contract or
> any other means which, either separately or jointly and having regard to
> the consideration of fact or law involved, confer the possibility of
> exercising decisive influence (other than by an entity currently exercising
> such influence or any entity controlled by or controlling such entity) on
> SCO by: (1) owning more than half the equity, capital or business assets,
> or (2) having the power to appoint more than half of the members of the
> supervisory board, board of directors or bodies legally representing SCO,
> or (3) having the right to directly manage SCO's business activities.  (Ex.
> 245.)

24.     Section 22.12 of the JDA, which is entitled "Assignment", provides, in relevant

part: "Neither party may assign, or otherwise transfer, its rights or delegate any of its duties or

obligations under this Agreement without the prior written consent of the other party."  (Ex. 245.)

25.     Section 22.3 of the JDA, which is entitled "Choice of Law/Venue", provides:

> This Agreement shall be governed by, and the legal relations between the parties
> hereto shall be determined in accordance with, the substantive laws of the State of
> New York, without regard to the conflict of law principles of such State, as if this
> Agreement was executed and fully performed within the State of New York.
> Each party hereby waives any right to a trial by jury in any dispute arising under
> or in connection with this Agreement, and agrees that any dispute hereunder shall
> be tried by a judge without a jury.  Any legal or other action related to a breach of
> this Agreement must be commenced no later than two (2) years from the date of
> the breach in a court sited in the State of New York.  (Ex. 245.)

26.     Although development of the Project Monterey IA-64 operating system proceeded throughout 1999 and 2000, the project encountered substantial difficulties due to delays in Intel's IA-64 processor development schedule.   Intel's release of the initial Intel IA-64 processor, code-named "Merced" and officially named Itanium, was substantially delayed.  In 1995 and 1996, executives of Itanium co-developer HP hinted that the processor was well underway, and might ship as early as 1997.  That date came and went, and eventually 1999 was stated as the target.  But that date also came and went.  Itanium did not end up shipping until mid-2001.  (Ex. 22; Ex. 186 ¶ 57; Ex. 394.)

27.     Once Itanium did arrive, it performed poorly relative to alternatives in the marketplace.  As a result, Intel and HP re-positioned it as primarily an evaluation and development platform, a precursor to the second-generation Itanium 2 "McKinley" release that would enable true production deployments.  Neither IBM nor Santa Cruz had any involvement in — or control over — the development of the Itanium processor.  (Ex. 26; Ex. 28; Ex. 186 ¶ 58.)

28.     In addition to creating development difficulties, these delays caused a substantial decrease in market interest and confidence in the forthcoming IA-64 product and thereby the IA-64 operating system then under development by IBM and Santa Cruz.  (Ex. 26; Ex. 28; Ex. 186 ¶ 59.)

29.     Despite the delays in the launch of the IA-64 processor, in late April 2001, IBM and Santa Cruz announced the first release of AIX 5L for the IA-64 processor on May 4, 2001.  (Ex. 593; Ex. 594; Ex. 595.)  That release occurred as scheduled.  (Ex. 10 ¶ 236; Ex. 259 at 44.)

30.     In May 2001, Santa Cruz finalized the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera International ("Caldera"), ending its investment in and support of the Monterey development effort. (Ex. 111 at 52; Ex. 244.)

31.     Santa Cruz did not obtain IBM's prior written consent to an assignment of the JDA. Instead, Santa Cruz informed IBM of the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera in a letter dated June 6, 2001. (Ex. 244.)

32.     IBM declined to consent to the assignment of Santa Cruz's rights and obligations under the JDA. Pursuant to Section 22.12 of the JDA, IBM's consent was necessary for such assignment to take effect. On the contrary, IBM invoked its right to cancel the JDA under Section 15.2 in a letter dated June 19, 2001. (Ex. 220.)

33.     Caldera did not acquire Santa Cruz, which continued in business, albeit changing its corporate name to "Tarantella". (Ex. 244.)

34.     After the start of this litigation, Caldera changed its name to "The SCO Group, Inc." (Ex. 113 at 4.)

D.      SCO's Failure of Proof.

35.     SCO has not adduced — and cannot adduce — any evidence to show that IBM engaged in unfair competition, despite three orders of the Court requiring SCO to disclose all such evidence.

## **Standard of Decision**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law".  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Welding v. Bios Corp., 353 F.3d 1214, 1217 (10th Cir. 2004).  To survive summary judgment, SCO must provide admissible evidence — not mere allegations or suppositions — that at least raises a genuine issue of fact sufficient to satisfy the elements of its unfair competition claim.  See Fed. R. Civ. P. 56(e).

## **Argument**[3]

## I.    **SCO'S UNFAIR COMPETITION CLAIM IS UNTIMELY.**

As stated, while SCO's unfair competition claim is an amalgamation of its other causes of action, it is focused on IBM's alleged misconduct related to Project Monterey.  SCO asserts that IBM unfairly competed with SCO by "secretly developing plans to cease its strategic relationship with SCO" (¶ 11(e)), and by using SVr4 code obtained through Monterey in IBM's AIX for Power operating system (¶¶ 13-15).  However, in resting its unfair competition claim upon obligations and conduct relating to Monterey, SCO ignores a critical fact: the Monterey JDA states that "[a]ny legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach".  (¶ 25.)  This provision bars SCO's claim, which is indisputably "related to" an alleged breach of the JDA.

---

[3] The undisputed facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing "Statement of Undisputed Facts".

A.     The JDA's Two-Year Limitations Provision Is Enforceable and Applies to SCO's Unfair Competition Claim.

It is well-established that the parties to a contract "may agree to limit the period of time within which an action must be commenced to a shorter period of time than that provided by the applicable Statute of Limitations". Incorp. Village of Saltaire v. Zagata, 720 N.Y.S.2d 200, 200 (App. Div. 2001); see also N.Y. C.P.L.R. 201 (McKinney 2006); Kerry v. Southwire Co. & Affiliates Employee Benefits Plan, 324 F. Supp. 2d 1225, 1227 (D. Utah 2004) ("It is true that contractual limitations on the time to bring suit if reasonable are valid, binding and enforceable." (internal quotations omitted)). Provisions limiting the period within which to file suit to periods far less than two years have been found reasonable. See, e.g., Incorp. Village of Saltaire, 720 N.Y.S.2d at 201 (finding 90-day limitations provision enforceable)[4].

Section 22.3 of the JDA applies to SCO's unfair competition claim. Section 22.3 expressly governs "[a]ny legal or other action related to a breach of this Agreement", and SCO's unfair competition claim is directly "related to" such an alleged breach. SCO specifically asserts that "[a]s a result of the formal agreement between SCO and IBM and the numerous

_____

[4] Throughout this brief, IBM cites to both Utah and New York law, which is in accord on all issues discussed herein. For most torts, the place of injury generally is accorded more weight than the place of the alleged conduct. See Restatement (Second) of Conflict of Laws § 145, cmt. e (1971). It is primarily for this reason that, as IBM explains in its Memorandum of Law in Support of its Motion For Summary Judgment on SCO's Interference Claims, Utah law governs those claims. However, for the tort of unfair competition, which regulates conduct, the place of that conduct is of paramount importance, suggesting that New York law may be applicable to this claim. See, e.g., Restatement (Second) of Conflict of Laws § 145, cmt. e (1971); Wilson v. Electro Marine Sys., Inc., No. 83-5863, 1986 WL 12604, at *3 (N.D. Ill. Oct. 30, 1986) (Ex. A hereto); X-IT Prods. L.L.C. v. Walter Kidde Portable Equip., Inc., 227 F. Supp. 2d 494, 494 (E.D. Va. 2002). Since the result would be the same under both New York and Utah law, the Court need not reach the choice of law issue to determine the instant motion.

representations made by IBM that were calculated to be relied upon by SCO, IBM had a fiduciary obligation to SCO that required IBM to be forthright and truthful in all affairs related to the partnership relationship". (¶ 11(c).)  Thus, SCO itself identifies the basis of its unfair competition claim as IBM's alleged breach of a duty that purportedly arose from the JDA.

Indeed, not only are the alleged representations upon which SCO bases its claim "related" to the JDA, they are explicitly contained in the JDA.  In its interrogatory responses, SCO asserts that IBM's fiduciary duty arose from IBM's representations that it would:

1.   Port its family of enterprise applications to SCO's existing 32-bit version of UnixWare, including Lotus/Domino, Tivoli, WebSphere and DB2;

2.   Publish its own list price for SCO's existing 32-bit version of UnixWare, and market 32-bit UnixWare within its own customer base;

3.   Market SCO's existing 32-bit version of UnixWare within IBM's ISV channels, encourage IBM's ISV partners to port their applications to UnixWare, and invite SCO marketing representatives on joint marketing calls to IBM's ISV partners for these purposes; and

4.   Expand IBM's family of products so that SCO's existing 32-bit version of UnixWare and AIX would jointly operate in a combined environment for RISC and Intel Processors.  (See ¶ 11(c).)

With respect to the first representation alleged, IBM specifically stated (in Section II of Attachment A of the JDA) its intent to make certain middleware, including the middleware products listed by SCO, available for the UnixWare product, subject to IBM's own determination of commercial considerations.  (¶ 22.)  With respect to the second and third representations, IBM represented in Section I of Attachment A to the JDA that it intended to "market, promote and sell the UnixWare and IA-32 product on IBM systems" in various ways, including many of those listed in points two and three above.  (¶ 21.)  Finally, with respect to the fourth representation, the intention to create a shared family of products was the core purpose of

13

the JDA. (¶ 18.) Thus, the representations upon which SCO relies are explicitly contained in the contract, and SCO's allegation that IBM breached duties allegedly arising from those representations therefore "relates to a breach" of the JDA.

Likewise, to the extent SCO's unfair competition claim rests on its allegations that IBM improperly used Santa Cruz code obtained through Project Monterey in IBM's AIX for Power operating system, SCO does not dispute that IBM was entitled to access to that code and licensed to use it for certain purposes; the thrust of SCO's (erroneous) allegation is that IBM breached its obligations under the JDA by using the code outside the authorized consent. (¶¶ 13, 20.) Again, this claim is intimately "related to" an allegation of a breach of the JDA.

Courts routinely have construed language such as the "related to" language of Section 22.3 to include non-contractual claims comparable to SCO's unfair competition cause of action. See, e.g., Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994) (holding "arising out of or relating to" language to apply to tort as well as contract claims); Ward Enters., Inc. v. Bang & Olufsen Am., No. 02-7640, 2004 WL 830461, at *2 (N.D. Ill. Apr. 15, 2004) (finding that "the scope of 'relating to' language is broad and is intended to cover a much wider scope of disputes, not just those arising under the agreement itself" (internal quotation omitted)) (Ex. B hereto); Cambridge Nutrition A.G. v. Fotheringham, 840 F. Supp. 299, 300-02 (S.D.N.Y. 1994) (applying forum selection clause referring to "any claim, dispute or controversy relating to this Agreement" to tort claim for unfair competition).[5]

---

[5] See also Digital Envoy, Inc. v. Google, Inc., 319 F. Supp. 2d 1377, 1380-81 (N.D. Ga. 2004) (applying forum selection clause to claims for misappropriation of trade secrets and unfair competition where clause covered "[a]ny lawsuit regarding this Agreement"); Keating v. Baskin-Robbins USA, Co., No. 99-148, 2001 WL 407017, at *8 (E.D.N.C. Mar. 27, 2001) (finding that

Indeed, various courts have interpreted language far more restrictive than that contained in Section 22.3 to encompass non-contractual claims. See, e.g., Monsanto Co. v. McFarling, 302 F.3d 1291, 1294-96 (Fed. Cir. 2002) (holding patent claims subject to forum selection clause applicable to "all disputes arising under" contract); Rockwell Int'l Corp. v. Goss Graphic Sys., Inc., No. 00-8763, 2001 WL 293818, at *1-2 (S.D.N.Y. Mar. 27, 2001) (applying forum selection clause using "arising out of this Agreement" language to copyright claim because resolution of claims "relate to the interpretation of the Agreement") (Exhibit E hereto); Warner & Swasey Co. v. Salvagnini Transferica S.p.A., 633 F. Supp. 1209, 1211-12 (W.D.N.Y. 1986) (finding "on the basis of an alleged breach" language in forum selection clause applicable to claim for patent infringement).

B.      SCO's Claim Was Not Timely Under the Two-Year Limitations Provision.

Because the JDA includes a two-year limitations provision, the only remaining question is whether SCO's unfair competition claim was timely when filed in March 2003. Section 22.3 specifically provides that Santa Cruz was required to initiate its action "no later than two (2) years from the date of the breach". (¶ 25.) Courts routinely enforce contractual provisions that not only limit the time to bring suit, but also establish when a cause of action accrues. See Oriskany Cent. Sch. Dist. v. Edmund J. Booth Architects, 615 N.Y.S.2d 160, 161 (App. Div.

---

one-year contractual limitation period, which stated that it applied to "[a]ny and all claims and actions arising out of or relating to [the parties'] agreement", barred claims for unfair and deceptive trade practices, fraud and negligent misrepresentation) (Ex. C hereto); YWCA v. HMC Entm't, Inc., No. 91-7943, 1992 WL 279361, at *1, 4 (S.D.N.Y. Sept. 25, 1992) (holding claim seeking declaratory judgment with respect to potential unfair competition, trademark infringement misappropriation and unfair competition claims "arises under this agreement" and, thus, was subject to forum selection clause) (Ex. D hereto).

1994) (ruling that contract provision prescribing "when the period of limitations will commence

. . . will govern in the absence of duress, fraud or misrepresentation" (internal citations omitted));

Harbor Court Assocs. v. Leo A. Daly Co., 179 F.3d 147, 151 (4th Cir. 1999) (finding accrual

provision valid and applicable, noting that "the only courts to consider a contractual accrual date

provision have all enforced it" (citing cases)).  As demonstrated below, if Santa Cruz had an

unfair competition claim, it accrued when IBM purportedly breached the JDA by engaging in the

alleged misconduct related to Project Monterey, which SCO alleges occurred more than two

years before SCO filed its complaint.

First, under SCO's own theory of the case, IBM engaged in a course of conduct related to

Monterey constituting unfair competition that culminated in December 1999.  SCO asserts that

"[b]ecause IBM had been developing its plan to replace UnixWare support with Linux support,

and because IBM knew that SCO had dedicated its entire enterprise resources to the

IBM/UnixWare joint relationship, IBM had a fiduciary obligation to inform SCO of its Linux-

related plans long before its Linux public announcement of December 1999".  (¶ 11.)  In fact,

IBM publicly announced its support for Linux as early as March 1999.  (¶ 12.)  SCO thus was

required to file suit based upon that conduct within two years of December 1999 at the latest, and

its March 2003 filing was substantially late.

Second, SCO asserts that IBM engaged in unfair competition by copying into IBM's AIX

operating system code from the SVr4 operating system that had been included in Santa Cruz's

UnixWare 7 product.  (¶ 13.)  Santa Cruz itself, however, was aware of IBM's inclusion of SCO

code in AIX for Power by August 2000 (¶ 14), and in this litigation SCO asked its expert

Christine A. Botosan to calculate damages for SCO's unfair competition claim beginning on

October 1, 2000. (¶ 15.)  As a result, it is clear that even if (contrary to fact) IBM did engage in

unfair competition by misusing code provided in Project Monterey, that alleged breach occurred

no later than October 2000, based on SCO's own assertion.  Because SCO failed to file its action

prior to October 2002, Section 22.3 bars SCO's claim for unfair competition.

      Based upon the foregoing, SCO's unfair competition claim is "related to a breach" of the

JDA.  Because SCO did not assert that claim within the relevant contractual limitations period, it

is barred and IBM is entitled to summary judgment in its favor on SCO's sixth cause of action.

## II.    SCO HAS NO EVIDENCE OF UNFAIR COMPETITION BY IBM.

      Even were SCO's unfair competition claim timely, IBM would still be entitled to

summary judgment in its favor because there is no evidence that could support a finding that

IBM engaged in unfair competition against SCO.

      To the extent (if any) that SCO seeks to support its unfair competition claim based upon

its allegations of copyright infringement, tortious interference, or breach of the IBM and Sequent

Licensing Agreements (K. Br. ¶¶ 177-181), IBM demonstrates the legal baselessness of each of

those claims in its separate motions for partial summary judgment against Claims I through IV,

and VII through IX, submitted herewith and incorporated by reference, and those allegations fail

as a basis for an unfair competition claim for the reasons discussed therein (as well as herein).

      Nor can SCO's tactical refocusing of its unfair competition claim upon Monterey save

this claim, because SCO has no evidence that could support a finding that IBM's conduct in

connection with Project Monterey (or any other conduct, for that matter) constituted unfair

competition against SCO (even if there were no limitations period barrier).  This is so for two

independent reasons: First, the conduct SCO alleges, even if true, would not constitute unfair

competition.  (See Section II.A.)  Second, SCO was never party to and does not have standing to

assert a claim related to a breach of the Monterey JDA.  (See Section II.B.)  It is also true, but

not relied on as a basis for this motion, that IBM did not in fact breach any obligations relating to

Monterey.

     A.     IBM's Alleged Conduct Does Not Constitute Unfair Competition.

First, as set out previously (see Section I.A), SCO's Monterey-related allegations

fundamentally allege a breach of contract.  Such claims may not be transmuted into a tort claim

such as unfair competition.  "A charge of misappropriation of confidential information, as a tort

claim, must spring from circumstances extraneous to, and not constituting elements of, the

contract, although it may be connected with and dependant upon the contract."  Productivity

Software Int'l, Inc. v. Healthcare Techs. Inc., No. 93-6949, 1995 WL 437526, at *8 (S.D.N.Y.

July 25, 1995) (internal quotations and citations omitted) (Ex. F hereto);  Medinol Ltd. v. Boston

Scientific Corp., 346 F. Supp. 2d 575, 607 (S.D.N.Y. 2004) (holding that misappropriation claim

"raised in a case that stems from a breach of contract [must] be sufficiently distinct from the

breach of contract claim in order to be legally sufficient" (internal citations omitted)).  Indeed, a

court in this district recently granted summary judgment against a misappropriation

counterclaim, finding that "because of the express contract provision dealing with [the issue of

misappropriation], there is no independent duty created here which would create a tort apart from

the contractual obligations between the parties".  Deer Crest Assocs. I. v. Deer Crest Resort

Group, L.L.C., No. 04-220, 2006 WL 722216, at *3 (D. Utah Mar. 16, 2006) (Ex. G hereto).

SCO's assertions that IBM improperly copied code obtained during Project Monterey

into its AIX operating system fall squarely within this rule.  Under the JDA, IBM had a license to

use the SVr4 code obtained through Monterey.  (¶ 19-20.)  SCO does not allege that IBM was

not entitled to use the SVr4 code provided by Santa Cruz during Monterey for any purpose —

only that the <u>way</u> in which IBM used that code violated the terms of its license.  Thus, SCO is in

fact asserting a quintessential claim for breach of contract.  Irrespective of whether SCO could

demonstrate a breach of the JDA itself or any other breach of contract (it cannot), SCO certainly

does not have any evidence that IBM's use of the SVr4 code in its AIX operating system or any

other IBM conduct violated any duty unrelated to its contractual obligations to SCO.  As a result,

SCO's tort claim fails.  See <u>Productivity Software</u>, 1995 WL 437526, at *8 ("[A] simple breach

of contract is not to be considered a tort unless a duty independent of the contract itself has been

violated." (internal citations omitted)) (Ex. F hereto); <u>Deer Crest</u>, 2006 WL 722216 at *3 (same)

(Ex. G hereto).

     <u>Second</u>, the alleged misconduct is not of the type that can constitute "unfair competition".

"Unfair competition" is not, as SCO would have it, a catch-all remedy for any and all

commercial misconduct.  Rather, "unfair competition" is "considered . . . primarily in the context

of palming off and misappropriation of goodwill.  Both 'palming off' and 'misappropriation of

goodwill' involve situations in which a company attempts to profit from the reputation of its

competitor by selling one its own products as that of its competitor or misappropriating a

trademark belonging to its competitor." <u>Proctor & Gamble Co. v. Haugen</u>, 222 F.3d 1262, 1280

(10th Cir. 2000) (refusing to extend tort of unfair competition beyond the scope of the tort as

defined by Utah state courts); <u>see also</u> <u>Allen's Prods. Co. v. Glover</u>, 414 P.2d 93 (Utah 1966);

<u>Louis Capital Mkts., L.P. v. REFCO Group Ltd., LLC</u>, 801 N.Y.S.2d 490, 490 (Sup. Ct. 2005).

Some courts have permitted a claim for unfair competition absent specific allegations of palming

off or misappropriation of a trademark, but only upon proof of the "bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods". Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 300 (S.D.N.Y. 2003) (internal quotations omitted). Thus, even in this somewhat broader form, misappropriation that is likely to cause customer confusion remains the "cornerstone" of a claim of unfair competition. See Ruder & Finn Inc. v. Seaboard Surety Co., 422 N.E.2d 518, 522 (N.Y. 1981).[6] Absent proof of either palming off or misappropriation, SCO's unfair competition claim cannot survive.

Since SCO is clearly not accusing IBM of "palming off" IBM products as those of SCO (or anyone else), SCO's unfair competition claim, if it is anything at all, must be based upon misappropriation. It is not. Instead, as demonstrated above, SCO's claim is nothing more than a claim for a breach of the JDA and other contracts that SCO strains to mask as a tort. Nor is there a scintilla of evidence that IBM's alleged conduct in connection with Project Monterey, its AIX for Power operating system or otherwise caused any "customer confusion" of a type that enabled IBM to "profit by the reputation of SCO". See Brockmeyer, 248 F. Supp. 2d at 300. SCO has been ordered by this Court to identify any allegations and adduce any evidence that would support its unfair competition claim on three separate occasions; it has completely failed to do so. (¶¶ 9, 35.) As a result, SCO's unfair competition claim must fail.

---

[6]   See also The Pizza Public Co. v. Tricon Global Restaurants, Inc., No. 99-12056, 2000 WL 1404716, at *3 (S.D.N.Y. Sept. 25, 2000) (rejecting unfair competition claim "[b]ecause there are no facts indicating that Tricon misappropriated PPCL's property, PPCL cannot sustain a claim for unfair competition under New York law.") (Ex. H hereto); Czech Beer Importers, Inc. v. C. Haven Imports, LLC, No. 04-2270, 2005 WL 1490097, at *7 (S.D.N.Y. June 23, 2005) (same) (Ex. I hereto).

Third, SCO cannot establish the element of bad faith necessary to support a claim for unfair competition based upon misappropriation.  See Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) (holding that the "essence of an unfair competition claim" is the misappropriation of the labors and expenditures of another, and that "[c]entral to this notion is some element of bad faith" (internal citation omitted)).  As previously noted, IBM indisputably had a license to access the Santa Cruz code and to use it in AIX for Power, albeit allegedly subject to certain conditions.  (¶ 20.)  Likewise, it is undisputed that the publicly known delays in Intel's release of the IA-64 chip created some difficulties for the business goals of Project Monterey.  (See ¶¶ 26-28.)  Thus, even if it could be shown that IBM violated any provision of the license it received under the JDA (which it did not), or any of its other obligations under the JDA or any other contract, despite three orders from this Court requiring SCO to identify any evidence supporting its claim, SCO has not adduced any evidence that IBM acted in bad faith. For this additional reason, IBM is entitled to summary judgment on SCO's unfair competition claim.

B.        SCO Lacks Standing to Pursue its Claim.

SCO's unfair competition claim also cannot survive for the independent reason that SCO was never a party to and does not have standing to assert a claim related to a breach of the JDA. While it is probably for this reason that SCO attempts to cast its Monterey claim as one for unfair competition rather than breach of contract, SCO cannot help itself to claims it never owned by the simple expedient of claiming that IBM's alleged breaches of contract amounted to breaches of a fiduciary duty arising out of the contract.

21

Project Monterey began in 1998 as a joint development effort between IBM and Santa Cruz — a corporation that was not and never has been affiliated with the company presently known as SCO.  (¶ 19; see also ¶¶ 30-33.)  In 2001, Santa Cruz agreed to sell its Server Software and Professional Services division (which included its UNIX assets) to Caldera International, and thus terminated its support of Monterey.  (¶ 30.)  Caldera subsequently changed its name to the "The SCO Group, Inc." (¶ 34), perhaps precisely to muddy these waters.  Santa Cruz informed IBM of this sale in a letter dated June 6, 2001.  (¶ 31.)

However, Section 22.12 of the JDA, which is entitled "Assignment", provides that "[n]either party may assign, or otherwise transfer, its rights or delegate any of its duties or obligations under this Agreement without the prior written consent of the other party".  (¶ 24.) In a letter dated June 19, 2001, IBM invoked Section 22.12 and its right to cancel the agreement under Section 15.2.  (¶ 32.)  As a result, SCO never was a party to the JDA, nor did it acquire any of Santa Cruz's rights under the JDA.  (¶¶ 19, 30-33.)  It does not, therefore, have standing to enforce any of those rights, no matter how it labels its claim.  See TeeVee Toons, Inc. v. Gerhard Schubert GmbH, No. 00-5189, 2006 WL 2463537, at *3 (S.D.N.Y. Aug. 23, 2006) (holding that because plaintiff was neither party to the relevant contract, nor an intended third-party beneficiary, plaintiff lacked standing both to enforce the contract and assert a tort claim related to a breach of that contract) (Ex. J hereto); Vann v. Spak, 19 Fed.Appx. 668 (9th Cir. 2001) ("Dismissal was proper because [plaintiff] was not a party to the contract and did not have standing to bring suit for tortious conduct arising from breach of the contract."); see also Oliver Res. PLC v. Int'l Fin. Corp., 62 F.3d 128, 132 (5th Cir. 1995) (holding that putative assignee of rights under joint venture did not have standing to assert breach of contract claim because

22

original party to joint venture had not consented to assignment of rights or obligations under that contract).

## III.   SCO'S CLAIM ALSO IS PREEMPTED BY FEDERAL COPYRIGHT LAW.

Even if SCO's unfair competition claim were not barred by the JDA's limitations provision, and were not an improper attempt to transform a contract claim into a tort which SCO could have no standing to assert in any case, IBM still would be entitled to the entry of summary judgment on this claim.  The only one of SCO's unfair competition allegations that even arguably could satisfy the requirement for alleging "misappropriation" is its claim that IBM "misus[ed] code provided in Project Monterey to strengthen IBM's proprietary AIX product". (¶ 15.)[7]   That claim is preempted by federal copyright law.

Section 301 of the Copyright Act "preempts a state common law or statutory claim if: '(1) the work is within the scope of the subject matter of copyright as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106.'"[8]  Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1542-43 (10th Cir. 1996) (applying 17 U.S.C.A. § 301); see also Ehat v. Tanner, 780 F.2d 876, 878 (10th Cir. 1985); Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993).

Courts employ a two-prong test to determine whether a state law cause of action is preempted by the Copyright Act.  See Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d

---

[7] In fact, this allegation, too, falls short, as it does not allege a type of misappropriation likely to cause customer confusion.  (See Section II.A.)

296, 305 (2d Cir. 2004). "The first prong of this test is called the 'subject matter requirement,' and the second prong is called the 'general scope requirement.'" Briarpatch, 373 F.3d at 305 (citations omitted). SCO's claim that IBM misappropriated SVr4 code provided during Monterey satisfies both prongs of this test.

First, "[t]he subject matter requirement is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works". Id. It is well established that computer programming code may be protected under copyright law. See, e.g., Lexmark Int'l. Inc. v. Static Control Components, Inc., 387 F.3d 522, 533 (6th Cir. 2004). Here, SCO's charge is that IBM misappropriated SVr4 code from SCO's UnixWare 7 Product by reproducing it in the AIX for Power product; that allegedly misappropriated code falls within the subject matter of federal copyright law, as SCO itself has argued. (¶¶ 5-6.)

Indeed, any argument by SCO that its unfair competition claim based upon IBM's alleged inclusion of SVr4 code in AIX is not equivalent to a copyright claim would contradict its own prior positions. Earlier in this litigation, SCO requested leave to amend its complaint to assert a cause of action for copyright infringement based upon that very same conduct. SCO's proposed tenth cause of action asserted that "IBM misappropriated, and used in its own 'AIX for Power' operating system, substantial copyrighted source code relating to UnixWare System V Release 4". (¶ 5.) SCO further alleged that "IBM obtained access to the copyrighted UnixWare SVr4 code through 'Project Monterey'". (¶ 5.) SCO thus asserted that the SVr4 source code that now

_____

[8] Section 106 of the Copyright Act grants to the copyright owner the exclusive rights to: (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the

24

forms the basis for its Monterey unfair competition claim is copyrighted, and asserted a claim under federal law for IBM's alleged infringement of SCO's copyrights.  This Court, however, denied SCO's motion to add that cause of action, not on the grounds that the material was not subject to copyright, but rather that SCO's proposed amendment came to late.  In a decision dated July 1, 2005, the Court ruled that SCO had unduly delayed seeking leave to add the proposed cause of action because it appeared that "SCO — or its predecessor — either knew or should have known about the conduct at issue before it filed its original Complaint".  (¶ 6.)

Second, under the general scope requirement, "federal law will preempt 'a state-created right if that right may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' established by federal law".  Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 847 (10th Cir. 1993).  In determining whether the state law claim at issue asserts rights equivalent to those specified in section 106 of the Copyright Act, the court will "compare the elements of the causes of action, not the facts pled to prove them".  Harolds Stores, Inc., 82 F.3d at 1543 (emphasis added).  Applying this test, courts routinely have concluded that copying-based unfair competition claims are preempted by federal copyright law.  See, e.g., Ehat v. Tanner, 780 F.2d 876, 878 (10th Cir. 1985) (holding that unfair competition claim under Utah law based upon alleged misappropriation of copyrightable literary work was preempted by copyright law); Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 155 F. Supp. 2d 1, 24-25 (S.D.N.Y.) (dismissing unfair competition claim based upon misappropriation claims as preempted by copyright law); Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 247 (2d Cir. 1983) (noting that "state law claims that rely on the misappropriation branch of unfair

---

work; (4) perform the work publicly; and (5) display the work publicly. 17 U.S.C. § 106.

competition [as distinguished from the passing off branch] are preempted"); Durham Indus. v. Tomy Corp., 630 F.2d 905, 918 (2d Cir. 1980) (same); Ippolito v. Ono-Lennon, 526 N.Y.S.2d 877, 883 (N.Y. Sup. Ct. 1988) (same).

As the foregoing establishes, SCO is precluded from asserting a state law unfair competition claim based upon IBM's alleged misappropriation of SVr4 code obtained through Project Monterey. That claim, absent valid defenses, is governed by the federal copyright law. It is not only preempted, it is the very claim that this Court already refused to allow into this litigation. SCO cannot avoid the Court's ruling precluding its claim for copyright infringement by now recharacterizing those same allegations as a claim for unfair competition. See Ehat, 780 F.2d at 876 ("[Plaintiff] 'cannot achieve by an unfair competition claim what [he] failed to achieve under [his] copyright claim.' (quoting Durham Indus., Inc., 630 F.2d at 918)).

26

## Conclusion

For the foregoing reasons, summary judgment should be entered in favor of IBM and against SCO on SCO's claim for unfair competition.

DATED this 27th day of September, 2006.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson


CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*


Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000


*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of September, 2006, a true and correct copy of the foregoing was served by U.S. Mail, postage pre-paid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Todd M. Shaughnessy

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2006, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101

> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131

and by U.S. Mail, postage pre-paid to:

> Robert Silver
> Edward Normand
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

/s/ Todd M. Shaughnessy