

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
  *International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **IBM'S REDACTED MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S CONTRACT CLAIMS (SCO'S FIRST, SECOND, THIRD AND FOURTH CAUSES OF ACTION)** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **(ORAL ARGUMENT REQUESTED)** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Defendant/Counterclaim-Plaintiff. | Civil No. 2:03CV-0294 DAK |
| | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

FILED
U.S. DISTRICT COURT

2006 SEP 25 P 4 53

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S CONTRACT CLAIMS (SCO'S FIRST, SECOND, THIRD AND FOURTH CAUSES OF ACTION)**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>**FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

**Table of Contents**

Page

Preliminary Statement.................................................................................1

Statement of Undisputed Facts ....................................................................5

    A.    Development of the UNIX Operating System. ...........................5

    B.    Commercialization of the UNIX Operating System..................7

    C.    Basic Rights and Obligations of UNIX System V Licensees. ......................9

    D.    IBM/Sequent Negotiations of New UNIX Licenses...................14

    E.    IBM's and Sequent's License Agreements................................19

    F.    Parties' Intent as to Homegrown Material..................................23

    G.    AT&T's Assurances as to Homegrown Material. ......................26

    H.    IBM's and Sequent's Reliance. .................................................28

    I.    Continued Assurances and Reliance...........................................30

    J.    Wide Availability of UNIX Information. ...................................33

    K.    Development of the Linux Operating System. ...........................36

    L.    USL and Novell. .......................................................................37

    M.    Formation of SCO......................................................................40

    N.    Novell and Santa Cruz Share UNIX Interests. .........................41

    O.    SCO's Promotion of Linux and Acquisition of UNIX. .............45

    P.    SCO's Distribution of the Disputed Material. ...........................46

    Q.    SCO's Litigation. ......................................................................49

    R.    SCO's Touting and Obfuscation................................................51

    S.    Novell's Waiver of any Purported Breaches. ............................53

i

T.  SCO's Failure to Substantiate Its Claims. ................................................57

U.  SCO's Interim and Final Disclosures. ...............................................60

V.  SCO's Failure of Proof. ...............................................................63

W.  Specific Items of Alleged Misuse. .................................................66

   1. Journaled File System (JFS). ...........................................66

   2. Read-Copy Update. .........................................................69

   3. Testing Technologies. .....................................................70

   4. General Operating System Experience. ...........................71

X.  Implications of SCO's Theory. .....................................................73

Standard of Decision.............................................................................79

Argument .............................................................................................80

I.  SCO CANNOT ESTABLISH A BREACH OF THE AGREEMENTS, ................80

  A. The Plain Language of the Agreements Forecloses SCO's Theory. ..........81

   1. The Language of the Agreements. ....................................82

   2. The Unreasonableness of SCO's Claim..............................83

  B. The Extrinsic Evidence Precludes SCO's Claim. ........................91

II.  SCO IS ESTOPPED FROM PURSUING ITS THEORY OF BREACH..............94

  A. AT&T and Its Successors Communicated to IBM and Others for Nearly Two Decades that They Could Do as They Wished with Their Original Works...........................................................96

  B. IBM and Sequent Reasonably Relied on the Statements, Conduct and Inaction of AT&T and Its Successors. ...............................97

  C. IBM Would Be Prejudiced if SCO Were Allowed to Change Its Position After Two Decades .................................................100

III.  THE ALLEGED BREACHES HAVE BEEN WAIVED....................................101

ii

|     | A.  | AT&T and Its Successors Waived SCO's Theory of Breach Long Ago............................................................................................102 |
| --- | --- | --- |
|     | B.  | Novell Has Explicitly Waived the Alleged Breaches by IBM. ...............104 |
|     | C.  | Through Its Own Conduct, SCO Has Waived Its Purported Rights to Claim Breach of Contract. ...................................................................107 |
| IV. |     | SCO'S CLAIMS RELATING TO RCU ARE BARRED BY THE STATUTE OF LIMITATIONS...........................................................................111 |

## Table of Authorities

Page(s)

**Cases**

American Express Bank Ltd. v. Uniroyal, Inc., 562 N.Y.S.2d 613 (N.Y. App. Div. 1990) ................................................................................................... 81

AXA Global Risks U.S. Ins. Co. v. Sweet Assocs., Inc., 755 N.Y.S.2d 759 (N.Y. App. Div. 2003) ...........................................................................101-02

Banks v. Rite Aid Corp., No. 98-115, 2001 WL 1806857 (D. Utah Mar. 15, 2001) ................................................................................................................ 79

Besicorp Group Inc. v. Enowitz, 652 N.Y.S.2d 366 (N.Y. App. Div. 1997) ................... 95

Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590 (N.Y. 1957)....................... 105

Cambridge Elecs. Corp. v. MGA Elecs., Inc., 227 F.R.D. 313 (C.D. Cal. 2004) .............................................................................................................. 109

Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4 (N.Y. 1977) ................................................................................................................ 88

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153 (2d Cir. 2000)......................................... 93

Dolgoff Holophase, Inc. v. E.I. Du Pont de Nemours & Co., 622 N.Y.S.2d 769 (N.Y. App. Div. 1995), aff'd, 53 N.E.2d 241 (N.Y. 1944).......................... 111, 112

Elec. Distribs., Inc. v. SFR, Inc., 166 F.3d 1074 (10th Cir. 1999) .................................... 81

Elsky v. Hearst Corp., 648 N.Y.S.2d 592 (N.Y. App. Div. 1996).................................... 85

Farrell Lines, Inc. v. City of N.Y., 281 N.E.2d 162 (N.Y. 1972) ..................................... 83

G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469 (2d Cir. 1951) ................... 87

Gen. Motors Acceptance Corp. v. Clifton-Fine Central School Dist., 647 N.E.2d 1329 (N.Y. 1995)................................................................................. 101

Glezos v. Frontier Invs., 896 P.2d 1230 (Utah Ct. App. 1995) ......................................... 81

Heidi E. v. Wanda W., 620 N.Y.S.2d 665 (N.Y. App. Div. 1994).................................. 107

_In Re Estate of Flake_, 71 P.3d 589 (Utah 2003) .................................................... 102, 108

_In re Grandote Country Club Co._, 252 F.3d 1146 (10th Cir. 2001) .................................. 79

_In re Lipper Holdings, LLC_, 766 N.Y.S.2d 561 (N.Y. App. Div. 2003) ........................... 84

_Jacobson v. Sassower_, 489 N.E.2d 1283 (N.Y. 1985) ...................................................... 94

_Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc._, 323 F. Supp. 2d 525
    (S.D.N.Y. 2004) ........................................................................................ 87-88

_Johnson v. Werner_, 407 N.Y.S.2d 28 (N.Y. App. Div. 1978) ......................................... 94

_Kaiser-Francis Oil Co. v. Producer's Gas Co._, 870 F.2d 563 (10th Cir.
    1989) ......................................................................................................... 93

_Kearns v. Manufs. Hanover Trust Co._, 272 N.Y.S.2d 535 (N.Y. Sup.
    Ct. 1966) ............................................................................................ 95, 100

_Landers, Frary & Clark v. Universal Cooler Corp._, 85 F.2d 46 (2d Cir.
    1936) ....................................................................................................... 101

_Lauth v. McCollum_, No. 03-8529, 2004 WL 2211620 (N.D. Ill. Sept.
    30, 2004) ................................................................................................. 109

_Lawrence v. IBP, Inc._, No. 94-2027, 1995 WL 261144 (D. Kan. Apr.
    21, 1995) ................................................................................................. 108

_Leighton's Inc. v. Century Circuit, Inc._, 463 N.Y.S.2d 790 (N.Y. App.
    Div. 1983) ................................................................................................. 84

_Lemelson v. Carolina Enter., Inc._, 541 F. Supp. 645 (S.D.N.Y 1982) ........................... 111

_M & T Chems., Inc. v. International Business Machines Corp._, 403
    F. Supp. 1145 (S.D.N.Y. 1975) ................................................................... 112

_Mandelblatt v. Devon Stores, Inc._, 521 N.Y.S.2d 672 (N.Y. App.
    Div. 1987) ................................................................................................. 84

_Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574 (1986) ....................... 79

_McElroy v. Cudd Pressure Control, Inc_, No. 00-1162, 2000 WL 1838710
    (E.D. La. Dec. 13, 2000) ............................................................................ 109

_McManus v. Board of Educ. of Hempstead Union Free School Dist._,
    87 N.Y.2d 183 (N.Y. 1995) ........................................................................ 95

v

Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150 (10th
    Cir. 1999) ..................................................................................................... 91

Mopex, Inc. v. Am. Stock Exch., No. 02-1656, 2002 WL 342522
    (S.D.N.Y. Mar. 5, 2002) ............................................................................. 112

N.Y. State Guernsey Breeders' Co-op v. Noyes, 22 N.Y.S.2d 132 (N.Y.
    App. Div. 1940) ............................................................................................ 95

Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175
    (1982) ............................................................................................ 94, 95, 100

Oswego Falls Corp. v. City of Fulton, 265 N.Y.S. 436 (N.Y. Sup.
    Ct. 1933).......................................................................................................... 95

Purchasing Assocs., Inc. v. Weitz, 196 N.E.2d 245 (N.Y. 1963) ...................... 88

Quevedo v. Trans-Pac. Shipping Inc., 143 F.3d 1255 (9th Cir. 1998) ........................... 108

R/S Assoc. v. New York Job Dev. Auth., 771 N.E.2d 240 (N.Y. 2002) .......................... 81

Reape v. N.Y. News, Inc., 504 N.Y.S.2d 469 (N.Y. App. Div. 1986) .............................. 84

Reed, Roberts Assocs., Inc. v. Strauman, 353 N.E.2d 590 (N.Y. 1976) .......................... 88

Rehberger v. Richtberg, 744 N.Y.S.2d 477 (N.Y. App. Div. 2002).................................. 81

Rieter v. Tavella, 549 N.Y.S.2d 888 (N.Y. App. Div. 1990) ............................................ 94

Rothschild v. Title Guar. & Trust Co., 97 N.E. 879 (N.Y. 1912)..................................... 95

Sachs v. Cluett, Peabody & Co., 39 N.Y.S.2d 853 (N.Y. App.
    Div. 1943), aff'd, 53 N.E.2d 241 (N.Y. 1944)............................................. 111

Sassower v. Barone, 447 N.Y.S.2d 966 (N.Y. App. Div. 1982)....................................... 95

Sec. Indus. Automation Corp. v. United Computer Capital Corp.,
    723 N.Y.S.2d 668 (N.Y. App. Div. 2001) ........................................ 102, 111

Soter's Inc. v. Deseret Fed. Sav. & Loan Ass'n, 857 P.2d 935
    (Utah 1993) ................................................................................................. 102

Sporn v. MCA Records, 451 N.Y.S.2d 750 (N.Y. App. Div. 1982) ............................... 111

Stanley Tulchin Assocs, Inc. v. Vignola, 186 A.D.2d 183 (N.Y
    App. Div. 1992) ............................................................................................ 88

Stone v. CGS Distrib. Inc., No. 93-2188, 1994 WL 832021 (D. Colo.
   Aug. 18, 1994) ................................................................................................ 108

T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 01-900,
   2002 WL 1311648 (N.Y. Sup. Ct. Apr. 2 2002) ................................................. 102, 111

Terry v. Int'l Dairy Queen, Inc., 554 F. Supp. 1088 (N.D. Ind. 1983) ........................... 104

Topps Chewing Gum, Inc. v. Imperial Toy Corp., 686 F. Supp. 402
   (E.D.N.Y. 1988), aff'd, 895 F.2d 1410 (2d Cir. 1989) ................................. 103-04, 110

Traffas v. Bridge Capital Investors II, No. 90-1304, 1993 WL 339093
   (D. Kan. Aug. 23, 1993)................................................................................108-09

Westchester Resco Co. v. New England Reinsurance Corp., 818 F.2d 2
   (2d Cir. 1987) ................................................................................................. 94


**Statutes & Administrative Codes**

17 U.S.C.A. § 103(b) (West 2006) ................................................................................ 86

17 U.S.C.A. § 106 (West 2006) .................................................................................... 86

17 U.S.C.A. § 201(a) (West 2006)................................................................................ 86

35 U.S.C.A. § 112 (West 2006) .................................................................................. 112

N.Y. C.P.L.R. § 213 (2006 ) ....................................................................................... 111

Utah Code Ann. § 78-12-23 (2006) ............................................................................ 111


**Other**

Fed. R. Civ. P. 56(c) .................................................................................................. 79

Restatement (Third) of Unfair Competition § 41 ........................................................... 88

(

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM")
respectfully submits this memorandum in support of its motion for summary judgment on the
breach of contract claims of Plaintiff/Counterclaim-Defendant The SCO Group, Inc. ("SCO"). [1]

### Preliminary Statement

During the 1980s, IBM and Sequent Computer Systems ("Sequent") (which IBM
acquired in 1999) entered into licensing agreements with AT&T for the source code to the UNIX
System V operating system. Now, more than two decades later, SCO — which played no part in
negotiating the agreements but purports to have acquired rights to them — claims that IBM
breached the agreements by contributing its own original source code (not UNIX System V
source code) to the open source operating system known as Linux. SCO's contract claims
depend entirely on an unsupported (and unsupportable) reading of IBM's and Sequent's
agreements with AT&T and should be rejected as a matter of law.

SCO has asserted four separate contract claims against IBM relating to the UNIX
System V licensing agreements that IBM and Sequent executed with AT&T in 1985. These
licensing agreements are in the form of a "Software Agreement", which sets forth the terms
under which UNIX System V source code can be used and disclosed, and a "Sublicensing
Agreement", which sets forth the terms under which software based on UNIX System V code
can be distributed (collectively, the "Agreements"). IBM and Sequent performed under, and
organized their businesses around, the Agreements for nearly two decades, without any dispute

---

[1] The undisputed and indisputable facts set forth in this motion are supported by the
declarations and documents submitted herewith, including those appended to the Declaration of
Todd M. Shaughnessy, which are cited herein as "Ex. __".

with AT&T or its successors, until SCO changed management and asserted that the Agreements give it the right to control tens of millions of lines of original IBM source code.

For years, SCO perpetuated the illusion that it had evidence that IBM took confidential source code (including methods and concepts) from UNIX System V and "dumped" it into Linux. However, SCO does not have — and never has had — any such evidence. SCO has not identified any UNIX System V source code (including methods or concepts) that IBM is alleged to have contributed to Linux. Nor has SCO identified any modification or derivative work of UNIX System V that IBM is alleged to have contributed to Linux. It is undisputed and indisputable that IBM has not contributed to Linux any UNIX System V source code (including methods or concepts) or any modification or derivative work of UNIX System V. To the extent that IBM has contributed source code, methods, and concepts to Linux, those contributions have been original or homegrown IBM works or the works of third parties other than SCO created independent of UNIX System V.

SCO's contract claims thus turn on the proposition that the Agreements somehow give SCO the right to control IBM's and others' original works. SCO argues that IBM's AIX and Dynix/ptx ("Dynix") products, which are comprised of many tens of millions of lines of source code and are indisputably owned by IBM, include some UNIX System V material and are therefore modifications and derivative works of UNIX System V.[2] According to SCO, the Agreements forbid IBM from contributing its own original works to Linux if they were ever part

---

[2] AIX 5.1.G for Power, for example, includes more than 160 million lines of source code. The vast majority of code in AIX and Dynix is original IBM code, written or created independent of AT&T's UNIX System V or any other third party code.

2

of AIX or Dynix.  SCO *further claims that any IBM representative who worked in AIX or Dynix*
*is forbidden from working on Linux.*

SCO's theory of the case is wrong as a matter of law, and IBM is entitled to summary
judgment on SCO's contract claims, for at least four reasons.

First, the Agreements do not preclude IBM from using and disclosing its own original
works, even if they were once (or in the future might be) part of AIX or Dynix:

1.      By their terms, the Agreements place limits on what IBM can do with
AT&T's UNIX System V software and modifications and derivative works of UNIX
System V software.  But they do not limit what IBM can do with its own original works,
so long as it protects AT&T's UNIX System V software.  Interpreting the licenses as
SCO does would be patently unreasonable and lead to absurd results.  (See Section I.A.)

2.      The individuals who executed the licenses and were involved in their
negotiation, on behalf of both AT&T and IBM, have offered unequivocal testimony that
the agreements were not intended and should not be understood to preclude IBM's use
and disclosure of its original works, and contemporaneous documents reflect this
interpretation of the licenses.  (See Section I.B.)

Second, even if (contrary to fact) the Agreements could be read as SCO contends, SCO
would be estopped from pursuing its theory of the case.  AT&T and its successors repeatedly
*told their licensees, including IBM and Sequent, that they could do as they wished with their
own original works,* whether or not they were part of a modification or derivative work of UNIX
System V.  Moreover, AT&T's licensees, including IBM and Sequent, took AT&T and its
successors at their word and used their original works as they wished for nearly two decades,

3

without any objection from AT&T or its successors. IBM and Sequent reasonably relied, to their detriment, on the representations, conduct, and inaction of AT&T and its successors. They built AIX and Dynix businesses based on the belief that they, not SCO and its successors, control their original works. IBM and Sequent would experience severe prejudice if SCO were allowed to reverse course and claim control of IBM's and Sequent's work after more than two decades of contrary practice. Thus, as a matter of basic fairness, SCO's theory of the case is untenable.

Third, even if the Agreements could be read to give SCO control of more than 100 million lines of original IBM code, and even if SCO were not estopped from pursuing its theory of breach, the alleged breaches have been waived — by AT&T and its successors (including SCO), by Novell, Inc. on behalf of SCO, and by SCO itself:

1. For the same reasons SCO is estopped from asserting its contract claims against IBM, SCO and its predecessors waived SCO's interpretation of the Agreements by communicating for nearly two decades that they would not enforce the Agreements in the way SCO now seeks to enforce them. (See Section II.A.)

2. Novell, which at one time owned all rights in the Agreements, retained the right to waive alleged breaches of the Agreements, and Novell has exercised that right to effect a waiver of the alleged breaches in this case. (See Section II.B.)

3. SCO itself sold or otherwise made available to its customers and the public much, if not all, of the material it claims IBM should not have revealed. By its own conduct, therefore, SCO has waived any right to claim that IBM acted improperly by contributing its code to Linux. (See Section II.C.)

4

<u>Fourth</u>, SCO's contract claims relating to at least some of the allegedly misused material (i.e., RCU) are barred by the statute of limitations. The statute of limitations for breach of contract is six years under New York law, which governs SCO's contract claims. IBM publicly disclosed the allegedly misused material relating to RCU in connection with a patent application and the resulting patent, which issued in 1995, more than six years prior to the date that SCO filed its lawsuit. Thus, SCO's claims relating to RCU are barred by the statute of limitations.

For these reasons, summary judgment should be entered on behalf of IBM on SCO's claims for breach of contract (SCO's First, Second, Third and Fourth Causes of Action).

**<u>Statement of Undisputed Facts</u>**

The undisputed and indisputable facts material to this motion are set forth below, and in the memoranda in support of IBM's other motions for summary judgment, which are submitted herewith and incorporated herein by reference.[3]

A.       <u>Development of the UNIX Operating System.</u>

1.       In the 1960s, MIT, AT&T's Bell Labs, and General Electric collaborated on a project, known as *Multics*, to create a computer operating system that would allow for the simultaneous access by multiple users to a single computer. (Ex. 487 at 26-27; Ex. 384; Ex. 230 ¶ 5.)

---

[3] References to the memoranda in support of IBM's motions for summary judgment submitted herewith are cited as follows: IBM's motion for summary judgment on SCO's unfair competition claim as "UC. Br. ___"; IBM's motion for summary judgment on SCO's copyright claim as "Copyright Br. ___"; IBM's motion for summary judgment on SCO's interference claims as "Interference Br. ___"; IBM's motion for summary judgment for copyright infringement (IBM's Eighth Counterclaim) as "AIX Br. ___"; and IBM's motion for summary judgment for a declaration of non-infringement (IBM's Tenth Counterclaim) as "Non-Infringement Br. ___".

2.      Multics resulted in an operating system that could accommodate simultaneous users, but the operating system could not support many multiple users and was expensive to operate, and Bell Labs withdrew from the project.  (Ex. 384; Ex. 385; Ex. 386; Ex. 230 ¶ 6.)

3.      After Bell Labs withdrew from Multics, one of its developers, Ken Thompson, undertook to design an alternative operating system, drawing on the work done in Multics. (Ex. 386.)  With others at Bell Labs, including Dennis Ritchie, Mr. Thompson developed an operating system they called Unics.  (Ex. 487 at 9; Ex. 387.)  At the suggestion of another Bell Labs developer, Brian Kernighan, the name of the operating system was eventually changed to "UNIX".  (Ex. 388.)

4.      In the years that followed, AT&T developed numerous versions of UNIX and made it widely available to universities and businesses, as well as to the United States government.  (Ex. 389.)  AT&T permitted licensees, including the University of California at Berkeley ("UC Berkeley"), to develop and add their own features to UNIX and to distribute those features.  (Ex. 488 at *1-2, 18; Ex. 275 ¶ 13; Ex. 230 ¶ 8; Ex. 389.)

5.      By the end of the 1970s, UNIX had grown in popularity.  Universities throughout the world, including UC Berkeley, began offering educational courses and sponsoring research projects involving UNIX.  (Ex. 487 at 119-33; Ex. 389; Ex. 230 ¶ 10.)

6.      Numerous manuals, articles and papers were written about UNIX, including no less than seven editions of the "UNIX PROGRAMMER'S MANUAL", which was distributed by Bell Labs with its UNIX operating systems, and the Lions' Commentary on UNIX 6th Edition, written by John Lions.  (Ex. 487 at 43, 130; Ex. 385; Ex. 491; Ex. 230 ¶ 11.)

6

B.     Commercialization of the UNIX Operating System.

7.     In 1982, AT&T entered into a consent decree with the U.S. Federal Trade Commission, which provided for the spin-off of the regional Bell operating companies and freed AT&T to enter the computer industry, from which it had previously been barred.  (Ex. 487 at 190; Ex. 230 ¶ 19.)

8.     As a result, AT&T developed and sold a commercial version of the UNIX operating system known as UNIX System III.  This release met with limited success, however. Many universities and companies had utilized their rights under the AT&T licenses to create their own versions of UNIX, creating confusion and competition in the marketplace.  Moreover, companies like Western Electric, a subsidiary of AT&T, continued to sell older UNIX versions. (Ex. 391.)

9.     In an attempt to end confusion concerning the differing versions of the UNIX operating system, AT&T in 1983 combined various versions of UNIX developed at universities and other companies into UNIX System V, Release 1.  (Ex. 391.)  Later, AT&T released other versions, including System V Release 2.0, System V Release 3.0, and System V Release 4.0. (See Ex. 297 at 32:2-13.)

10.     Over the years, through various business units and subsidiaries, including AT&T Technologies, Inc. and UNIX System Laboratories, Inc. ("USL"), AT&T licensed various versions of its UNIX operating system, both in source code and object code form.  (See Ex. 3 ¶¶ 23-24; Ex. 5 ¶ 9; Ex. 64 ¶ 2.)

11.     AT&T generally licensed its UNIX operating system pursuant to standard form agreements.  A software agreement granted the licensee the right to use and modify the source

code of the operating system. A sublicensing agreement granted the licensee the right to furnish sublicensed products based on UNIX System V to customers in object code format. And, a substitution agreement provided that the software agreement and, if applicable, the sublicensing agreement replaced earlier agreements relating to UNIX System V software. (Ex. 282 ¶ 6.)

12.    The head of the AT&T division responsible for licensing AT&T UNIX software during this time was Otis Wilson. Mr. Wilson led the UNIX licensing negotiations for AT&T and either personally signed, or authorized the signing of, almost all, if not all, of AT&T's UNIX licensing agreements. (See Ex. 281 ¶ 5; Ex. 282 ¶ 3; Ex. 301 at 41:4-14, 42:7-43:6.)

13.    Mr. Wilson reported to Michael DeFazio, who was then the head of the overall AT&T organization responsible for the UNIX software, including product management, marketing and licensing. (See Ex. 182 ¶ 1.) As head of the organization, Mr. DeFazio had ultimate responsibility for the terms and conditions of AT&T's UNIX licensing agreements. (See id. ¶¶ 6-7.)

14.    Reporting to Mr. Wilson was, among others, David Frasure, who was AT&T's national sales and licensing manager for its UNIX products. (See Ex. 190 ¶ 5; Ex. 302 at 8:1-22.) Mr. Frasure participated in negotiating many of AT&T's UNIX System V licenses, and on occasion signed the agreements on Mr. Wilson's behalf. (See Ex. 302 at 8:13-9:6.)

15.    Under the direction of Messrs. DeFazio, Wilson and Frasure, AT&T and its subsidiaries licensed UNIX source code, including UNIX System V source code, to hundreds of licensees. AT&T also licensed many companies to distribute their own UNIX operating systems, such as Hewlett-Packard Co.'s "HP-UX" operating system. (See Ex. 3 ¶¶ 24-27; Ex. 64 ¶ 3.)

8

C.      Basic Rights and Obligations of UNIX System V Licensees.

16.     The standard software agreements that AT&T used to license UNIX System V

source code and related materials set forth the various rights given to licensees and the

restrictions imposed on the licensees with respect to such materials.  (Ex. 282 ¶ 6.)

17.     Among the provisions in AT&T's early software agreement (including in the IBM

Software Agreement and the Sequent Software Agreement) were the following:

- Section 2.01: "AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes."

- Section 2.05: "No right is granted by this Agreement for the use of SOFTWARE PRODUCTS directly for others, or for any use of SOFTWARE PRODUCTS by others."

- Section 4.01: "LICENSEE agrees that it will not, without the prior written consent of AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the United States."

- Section 7.06(a): "LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T."

- Section 7.10: "Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part."

(Ex. 282 ¶ 12; Ex. 119; Ex. 492.)

18.     These provisions concern the UNIX System V source code and related materials

— the "SOFTWARE PRODUCT" or "SOFTWARE PRODUCTS" — that AT&T provided to its

licensees. The Agreements define "SOFTWARE PRODUCT" as "materials such as

COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and

documentation relating to the use of COMPUTER PROGRAMS"; "COMPUTER PROGRAM"

9

is defined as "any instruction or instructions, in source-code or object-code format, for controlling the operation of a CPU". (Ex. 119; Ex. 492.) The provisions do not, by their terms, place restrictions on what licensees can do with their own original works. (Ex. 282 ¶ 12; Ex. 119; Ex. 492.)

19.   As Messrs. Wilson, DeFazio, and Frasure understood and discussed the provisions with licensees, they do not, and were not intended to, restrict a licensee's right to use, export, disclose or transfer its own products and source code, so long the licensee did not use, export, disclose or transfer AT&T's UNIX System V source code along with it. AT&T's *software agreements were not intended to place any restrictions on licensees' use of their own original work.* (Ex. 282 ¶ 12; Ex. 182 ¶ 17; Ex. 189 ¶¶ 14-16.)

20.   AT&T's standard software agreements granted licensees the right to modify UNIX System V source code and to prepare derivative works based upon the code. Section 2.01 of AT&T's early software agreement included the following language:

> Such right to use includes the right to modify such SOFTWARE PRODUCT and to *prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT.*

(Ex. 281 ¶ 13; Ex. 182 ¶ 16; Ex. 189 ¶ 15; Ex. 190 ¶ 14.)

21.   As Messrs. Wilson, DeFazio, Frasure and other AT&T representatives communicated to AT&T's licensees, this provision was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement. *Any source code developed by or for a licensee and included in a*

10

modification or a derivative work would not constitute "resulting materials" to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein.  (Ex. 282 ¶ 14; Ex. 182 ¶ 16; Ex. 190 ¶ 14.)

22.     AT&T and USL did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works.  Although the UNIX System V source code contained in a modification or derivative work continued to be owned by AT&T or USL, the code developed by or for the licensee remained the property of the licensee, and could therefore be used, exported, disclosed or transferred freely by the licensee.  (Ex. 282 ¶ 15; Ex. 182 ¶ 17; Ex. 190 ¶ 16.)

23.     Messrs. Wilson, DeFazio, Frasure and other AT&T representatives did not believe that licensees would have been willing to enter into the software agreement if they had understood Section 2.01 to grant AT&T or USL the right to own or control source code developed by the licensee or provided to the licensee by a third party.  They understood that many of AT&T's licensees invested substantial amounts of time, effort and creativity in developing products based on UNIX System V, and they did not intend Section 2.01 to appropriate for AT&T the technology developed by AT&T's licensees.  (Ex. 282 ¶ 16; Ex. 182 ¶ 17; Ex. 190 ¶ 29.)

24.     Some licensees sought to clarify that, under the agreements, the licensee, not AT&T or USL, would own and control modifications and derivative works prepared by or for the licensee (except for any original UNIX System V source code provided by AT&T or USL

11

and included therein).  Messrs. Wilson, DeFazio, Frasure, and other AT&T representatives provided such clarification when asked because that is what they understood the language in the standard software agreement to mean.  In some cases, they provided this clarification orally.  In other cases, they provided it in writing, such as in a side letter.  (Ex. 282 ¶ 17; Ex. 182 ¶ 18; Ex 189 ¶ 14; Ex. 190 ¶¶ 17-18.)

      25.    It was Mr. Wilson's view at the time that AT&T could not claim any rights to non-UNIX System V code source (as SCO does here) without raising serious antitrust issues.  In light of the divestiture of AT&T in the early 1980s, AT&T as a company was concerned with the potential anticompetitive effects of its actions.  As a result, one of the reasons Mr. Wilson made clear to AT&T's licensees that its UNIX System V software agreements did not impose any restrictions on the use or disclosure of their own original code, except insofar as it included UNIX System V code, was to avoid any appearance of any impropriety.  (Ex. 282 ¶ 18.)

      26.    Because AT&T and USL intended to distribute the UNIX System V source code and related information widely, AT&T understood that it would be difficult to require that the code and related information be kept confidential.  Since AT&T believed that its licensees held the same view, its standard UNIX software agreements provided that a licensee would not be required to keep a software product confidential if it became available without restriction to the general public.  (Ex. 282 ¶ 29.)

      27.    The exception is set forth in Section 7.06(a) of the standard software agreement:

> If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE'S obligations under this section shall not apply to such information after such time.

(Ex. 119 § 7.06(a).) The licensee was free to disclose, without any restriction whatsoever, any information that became available without restriction to the general public by acts not attributable to that particular licensee. (Ex. 281 ¶ 30.)

28.     This exception was intended to ensure that the confidentiality restriction applied only to information that needed to be protected — specifically, any trade secrets embodied in UNIX System V source code provided by AT&T or USL. If part or all of the source code were not entitled to be protected as a trade secret, then such software product (or portion of a software product) would be "available without restriction to the general public" within the meaning of the agreements, and no longer protected by any confidentiality restriction. AT&T did not intend to impose a confidentiality obligation beyond what it could enforce under trade secret law. (Ex. 281 ¶ 31.)

29.     AT&T never attempted to list all the ways in which source code could become "available without restriction to the general public" within the meaning of the software and related agreements. But AT&T, including Mr. Wilson and other representatives, believed that the UNIX System V source code (or any part thereof) would be available without restriction to the general public if, for example, it were (1) published by a party other than the licensee in question; (2) accessible outside the limits of a confidentiality agreement, such as for download from the internet; (3) available because its owner failed, even if by inadvertence or simple negligence, to take sufficient precautions to ensure that it would remain confidential; (4) distributed so widely that contractual confidentiality restrictions would be insufficient to maintain confidentiality; (5) made available to a third party who had the right to disclose the

13

software product (or any part thereof); or *(6) distributed under an open-source license like the GNU General Public License (the "GPL")*. (Ex. 281 ¶ 32.)

30.     Some licensees requested side letters clarifying or amending AT&T's standard terms or including most-favored customer provisions. AT&T agreed to issue side letters in some circumstances as an accommodation to the licensee, but it nevertheless intended to hold all licensees to the same basic standard. (Ex. 281 ¶¶ 22-26, 43.)

31.     Although not all of AT&T's licensees had a side letter or most-favored customer provision, AT&T interpreted its license agreements in light of the collective body of UNIX license agreements. For example, the UNIX licensing group used the entire body of side letters *to provide its guidance to AT&T's UNIX licensees. AT&T's policy was to deal with a licensee that did not have a most-favored customer provision in a side letter (like Sequent) in the same manner as a licensee that had a side letter with such a provision (like IBM).* (Ex. 281 ¶ 43.)

**D.    IBM/Sequent Negotiations of New UNIX Licenses.**

32.     IBM and Sequent (like many other companies) entered into negotiations with AT&T in the mid-1980s, to replace their existing UNIX licenses with new ones for UNIX System V. Those negotiations led ultimately to execution of the Agreements, which SCO now contends IBM has breached. (See Ex. 178 ¶¶ 4-5; Ex. 190 ¶¶ 6-7; Ex. 217 ¶ 4; Ex. 228 ¶¶ 4-9; Ex. 233 ¶ 4; Ex. 252 ¶ 2; Ex. 266 ¶ 13; Ex. 275 ¶¶ 7-8; Ex. 282 ¶¶ 7-8.)

33.     While Messrs. Wilson, DeFazio, and Frasure had primary responsibility for the negotiation and execution of the new IBM and Sequent UNIX licensing agreements, Mr. Steve Vuksanovich and Mr. Ira Kistenberg also participated in the negotiations. (See Ex. 275 ¶ 7; Ex. 217 ¶ 4.) Mr. Vuksanovich was the AT&T account representative assigned to the IBM

14

account. (See Ex. 275 ¶ 8.) Mr. Kistenberg was the AT&T account representative specifically assigned to the Sequent account. (See Ex. 217 ¶¶ 3-5.)

34.     IBM was represented in the negotiation of its UNIX licensing agreements by, among others, Messrs. Richard McDonough, Thomas Cronan, and Jeffrey Mobley. Mr. McDonough was the Division Counsel for IBM's System Products Division. (Ex. 228 ¶ 4.) Mr. Cronan was an attorney in IBM's System Products Division. (See Ex. 178 ¶¶ 4-5.) Mr. Mobley was a member of IBM's corporate Commercial & Industry Relations staff. (See Ex. 233 ¶¶ 1, 3-4.)

35.     Sequent was represented in the negotiation of its UNIX licensing agreements by, among others, Messrs. David Rodgers and Roger Swanson. Mr. Rodgers was Sequent's Vice President of Engineering. (See Ex. 252 ¶ 2.) Mr. Swanson was Sequent's Director of Software Engineering. (See Ex. 266 ¶¶ 2-3.)

36.     The AT&T representatives insisted on licensing its UNIX System V software and related materials pursuant to a standard set of license agreements. They stated that AT&T intended to license and distribute UNIX System V software and related materials broadly and, for the sake of efficiency and ease of administration, wanted to avoid having to draft different agreements with each of its licensees. In addition, they made clear that AT&T wished to license UNIX System V software and related materials evenhandedly; they said they expected to treat all of their licensees the same. (Ex. 178 ¶ 7; Ex. 217 ¶¶ 6-7; Ex. 228 ¶¶ 5-6; Ex. 252 ¶ 6; Ex. 266 ¶ 6; Ex. 275 ¶ 10.)

37.     Mr. Wilson and his staff explained that the proposed agreements controlled what licensees could and could not do with the UNIX System V software products. They stated that

15

the proposed agreements did not allow AT&T to control licensees' use, export, disclosure, or transfer of any software products or source code that licensees developed themselves that did not contain any UNIX System V code. (Ex. 178 ¶ 9; Ex. 228 ¶ 12; Ex. 233 ¶¶ 8-9; Ex. 252 ¶ 7; Ex. 266 ¶ 10.)

38.     Both IBM and Sequent made clear during their respective negotiations that they could not and would not enter into any agreement that did not give them ownership and control of their own original works. The IBM and Sequent negotiators insisted that they had to own and control their own original works, even if they were included in a modifications and derivative work of UNIX System V. (Ex. 178 ¶¶ 13-14; Ex. 228 ¶ 13; Ex. 233 ¶¶ 6, 8; Ex. 252 ¶ 7; Ex. 266 ¶¶ 10-11.)

39.     The AT&T negotiators separately advised both the IBM and Sequent negotiators that AT&T did not seek to preclude ownership and control of their original or homegrown works. In fact, the AT&T negotiators assured IBM and Sequent that the purpose of the restrictions imposed by the AT&T Agreements was to protect AT&T's original code and that IBM and Sequent could do whatever they wanted with their own code so long as they did not use, export, disclose, or transfer AT&T's original code (unless otherwise permitted by the AT&T Agreements). (Ex. 178 ¶ 19; Ex. 228 ¶ 15; Ex. 233 ¶ 16; Ex. 252 ¶ 8; Ex. 266 ¶ 12.)

40.     The IBM negotiating team would never have agreed to give AT&T the right to own or control IBM's original works. To do so would have represented a dramatic departure from IBM's practices regarding the licensing of third-party code and would have required IBM to change the way it developed products to ensure that it not allow any IBM or third-party code to be introduced into the source code base containing the UNIX System V code (however

16

briefly) unless IBM was prepared forever to yield control of that code to AT&T.  (Ex. 178 ¶ 9; Ex. 228 ¶ 18; Ex. 233 ¶ 17.)

41.   So that there would be no confusion, the IBM negotiators told the AT&T representatives with whom they negotiated that IBM intended to include portions of AT&T's UNIX System V code in products with IBM code and to make changes to the AT&T code (such as by adding to it) and thus IBM had to ensure that the parties agreed that IBM had the right to do so, without forfeiting any rights (including the right to control) to such IBM products and code.  (Ex. 178 ¶ 19.)

42.   Similarly, the Sequent negotiators would never have agreed to give AT&T the right to own or control their original works.  (Ex. 252 ¶ 7; Ex. 266 ¶¶ 10-11.)  As a small company at the time, it would not have made any sense for Sequent to have entered into an agreement that gave AT&T control over the source code that Sequent developed for its own software products.  (Ex. 266 ¶ 11.)  Sequent's original or homegrown source code was one of the key assets of the company, and to compromise Sequent's ownership of or control over the code would have required the approval of Sequent's board of directors.  (Ex. 295 at 47:9-49:19.)

43.   Messrs. Wilson, Frasure and DeFazio understood that neither IBM nor Sequent would have entered into the proposed UNIX licensing agreements if AT&T had sought and insisted on the right to control any product or code that might in the future be associated with UNIX System V code, except insofar as it might include UNIX System V code.  (Ex. 182 ¶ 17; Ex. 190 ¶ 29; Ex. 282 ¶ 16.)  No one involved in the negotiation of the Agreements ever suggested that they would give AT&T (or anyone else other than IBM or Sequent) the right to

17

control IBM or Sequent original code.  (Ex. 178 ¶¶ 11-12; Ex. 228 ¶ 19; Ex. 233 ¶ 9; Ex. 252 ¶ 7; Ex. 266 ¶ 10.)

44.   Based at least in part on AT&T's assurances, IBM and Sequent made the decision to execute licensing agreements that AT&T represented to reflect its standard terms.  Sequent agreed to sign the agreements as is, whereas IBM agreed to sign them subject to clarifications and amendments set out in a contemporaneous side letter.  IBM wanted to make sure there would be no question that, among other things, AT&T's licensees, not AT&T, would own and control the source code that was developed by the licensee or developed for the licensee by a third party.  (Ex. 178 ¶¶ 13-17; Ex. 228 ¶¶ 13-14, 18; Ex. 233 ¶¶ 10-13; Ex. 252 ¶ 7; Ex. 266 ¶ 12.)

45.   The AT&T negotiators agreed to provide IBM with a side letter, including, among other things, a most-favored customer provision, but stated that a side letter was not necessary because, among other reasons, AT&T did not wish to assert ownership or control over any modifications and derivative works prepared by or for IBM, or by any other of AT&T's licensees for that matter, except to the extent that those portions of the modifications or derivative works contained licensed UNIX System V source code.  (Ex. 178 ¶ 16; Ex. 228 ¶¶ 13-14; Ex. 233 ¶¶ 12-13; Ex. 182 ¶¶ 18, 20; Ex. 189 ¶¶ 14-16; Ex. 281 ¶ 17.)

46.   AT&T made clear that — side letter or not — AT&T intended to treat all of its licensees the same.  Messrs. Wilson, DeFazio Frasure, Kistenberg, and Vuksanovich intended to hold all licensees to the same basic standard.  AT&T's stated policy was to treat all of its licensees essentially the same.  (Ex. 182 ¶¶ 18, 20; Ex. 189 ¶¶ 14-16; Ex. 217 ¶¶ 21-22; Ex. 275 ¶¶ 26-27; Ex. 281 ¶ 17.)  All were free to do as they wished with their original or homegrown

18

works, so long as they protected AT&T's UNIX software. (See Ex. 182 ¶ 18; Ex. 190 ¶ 26; Ex. 217 ¶ 12; Ex. 275 ¶ 29; Ex. 282 ¶ 28.)

E.    IBM's and Sequent's License Agreements.

47.    IBM and Sequent completed negotiations relating to their UNIX System V licensing agreements beginning in early 1985. (Ex. 119; Ex. 120; Ex. 122; Ex. 492.)

48.    IBM executed its agreements with AT&T, including its side letter, on February 1, 1985 (collectively, the "IBM Agreements"). The IBM Agreements were executed by Mr. Frasure on behalf of Mr. Wilson for AT&T and by Mr. McDonough for IBM. (Ex. 120; Ex. 122; Ex. 492.)

49.    Sequent executed its agreements with AT&T on April 18, 1985 and January 28, 1986 (collectively the "Sequent Agreements"). The Sequent Agreements were executed by Mr. Wilson for AT&T and Mr. Rodgers for Sequent. (Ex. 119; Ex. 121.)

50.    The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V. (Ex. 119; Ex. 492; Ex. 282 ¶ 6; Ex. 182 ¶ 15.)

51.    The Agreements included the following provisions from AT&T's standard Software Agreements, each of which SCO accuses IBM of breaching:

**Section 2.01:**

AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE

19

PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT.

## Section 2.05

No right is granted by this Agreement for the use of SOFTWARE PRODUCTS directly for others, or for any use of SOFTWARE PRODUCTS by others.

## Section 4.01

LICENSEE agrees that it will not, without the prior written consent of AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the United States.

## Section 6.03

If LICENSEE fails to fulfill one or more of its obligations under this Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than two (2) months' written notice to LICENSEE specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination LICENSEE shall immediately discontinue use of and return or destroy all copies of SOFTWARE PRODUCTS subject to this Agreement.

## Section 7.06(a)

LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T.  LICENSEE further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder. . . . If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE's obligations under this section shall not apply to such information after such time.

## Section 7.10

Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part.

(Ex. 492; Ex. 119.)

52.     On their face, the allegedly breached provisions (Sections 2.01, 2.05, 4.01, 6.03, 7.06(a) and 7.10) pertain to AT&T's "SOFTWARE PRODUCT", which is defined by the Agreements as:

> [M]aterials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS. Materials available from AT&T for a specific SOFTWARE PRODUCT are listed in the Schedule for such SOFTWARE PRODUCT.

(Ex. 492 § 1.04; Ex. 119 § 1.04.)

53.     The various schedules attached to the IBM and Sequent Software Agreements *identify the specific "SOFTWARE PRODUCT" or "SOFTWARE PRODUCTS", and related* materials, that AT&T provided under the terms of the agreements. (Id.) The particular "SOFTWARE PRODUCT" at issue in this case is "UNIX System V". (See, e.g., Ex. 125; Ex. 126).)

54.     The IBM Side Letter clarified Section 2.01 as follows:

> Regarding Section 2.01, we agree that that modifications and derivative works prepared by or for [IBM] are owned by [IBM]. However, ownership of any portion or portions of *SOFTWARE PRODUCTS* included in any such modification or derivative work remains with [AT&T].

(Ex. 122 at 2; Ex. 282 ¶¶ 19-20; Ex. 189 ¶ 14; Ex. 182 ¶ 18; Ex. 275 ¶¶ 15-16; Ex. 228 ¶¶ 13-14; Ex. 178 ¶¶ 13-16; Ex. 233 ¶¶ 10-13.) This language clarified that IBM (like all AT&T licensees) owned and controlled its original or homegrown works. (Ex. 282 ¶¶ 19-20; Ex. 189 ¶ 14; Ex. 182 ¶ 18; Ex. 275 ¶¶ 15-16; Ex. 228 ¶¶ 13-14; Ex. 178 ¶¶ 13-16; Ex. 233 ¶¶ 10-13.)

55.     In addition, the Side Letter, as well as subsequent Amendment No. X, amended

Section 7.06(a) of the IBM Software Agreement to provide as follows:

> LICENSEE agrees that it shall hold SOFTWARE PRODUCTS subject to this
> Agreement in confidence for AT&T.  LICENSEE further agrees that it shall not
> make any disclosure of such SOFTWARE PRODUCTS to anyone, except to
> employees of LICENSEE to whom such disclosure is necessary to the use for
> which rights are granted hereunder. . . . Nothing in this Agreement shall prevent
> LICENSEE from developing or marketing products or services employing ideas,
> concepts, know-how or techniques relating to data processing embodied in
> SOFTWARE PRODUCTS subject to this Agreement, provided that LICENSEE
> shall not copy any code from such SOFTWARE PRODUCTS into any such
> product or in connection with any such service. . . .  If information relating to a
> SOFTWARE PRODUCT subject to this Agreement at any time becomes
> available without restriction to the general public by acts not attributable to
> LICENSEE or its employees, LICENSEE's obligations under this section shall
> not apply to such information after such time.

(Ex. 122 ¶ A.9; Ex. 124 ¶ 6.)  This language clarified, among other things, that IBM (like all

AT&T licensees) had no obligation of confidentiality regarding UNIX software that becomes

available without restriction to the general public by acts not attributable to IBM.

56.     Consistent with AT&T's policy to treat all licensees the same, Paragraph A.12 of

the IBM Side Letter provides:

> We agree that all SOFTWARE PRODUCTS, including enhancements to or new
> versions of existing SOFTWARE PRODUCTS, generally available under the
> Software Agreement will be made available to you at the fees and under terms,
> warranties and benefits equivalent to those offered to other licensees.

(Ex. 122 ¶ A.12.)  This language meant that if any other licensee was offered or obtained terms

more favorable to the licensee than those contained in the IBM Agreements, then IBM would

have the advantage of such more favorable terms as if they had been set forth in the IBM

Agreements.  (Ex. 281 ¶ 43.)

22

F.     Parties' Intent as to Homegrown Material.

57.     All of the individuals who executed and negotiated the Agreements, as well as

Mr. DeFazio, who had ultimate responsibility for them (collectively, the "Involved Persons"),

agree that the Agreements were not intended to, and do not, restrict in any manner the use or

disclosure of any original code written by, or for, IBM and Sequent.  (See Ex. 178 ¶ 18; Ex. 182

¶¶ 17-18; Ex. 189 ¶¶ 13-16, 24-29; Ex. 217 ¶ 9; Ex. 228 ¶¶ 11-19; Ex. 233 ¶ 9; Ex. 252 ¶¶ 7-9;

Ex. 266 ¶ 8; Ex. 275 ¶ 12; Ex. 282 ¶¶ 14-15, 27-30.)

58.     None of the Involved Persons understood the Agreements to give AT&T or its

successors the right to assert ownership or control over all of the source code of any

modifications or derivative works based on UNIX System V.  To the contrary, they understood

that IBM and Sequent owned, and were permitted to use however they wanted, any

modifications or derivative works that they created (or that others created for them) based on

UNIX System V software, except for the UNIX System V material that might be contained

within their modifications or derivative works.  (See Ex. 178 ¶ 17; Ex. 182 ¶ 20; Ex. 190 ¶¶ 14-

15; Ex. 217 ¶¶ 10-11; Ex. 228 ¶¶ 13, 15; Ex. 233 ¶¶ 8-9; Ex. 252 ¶ 7; Ex. 266 ¶¶ 10-12; Ex. 275

¶ 13; Ex. 282 ¶ 15.)

59.     As the Involved Persons understood the Agreements, they impose no restrictions

on IBM's or Sequent's use, export, disclosure or transfer of those portions of any modifications

or derivative works of UNIX System V that were created by or for IBM or Sequent and do not

contain any UNIX System V source code.  (See Ex. 178 ¶ 18; Ex. 182 ¶ 18; Ex. 190 ¶ 24; Ex.

217 ¶ 12; Ex. 228 ¶ 16; Ex. 233 ¶ 6; Ex. 252 ¶ 18; Ex. 266 ¶ 12; Ex. 275 ¶ 12; Ex. 282 ¶ 27.)

Under the Agreements, IBM and Sequent are free to use however they want any AIX or Dynix

23

source code, except for the UNIX System V source code or other licensed software products provided by AT&T that may be contained therein (except as otherwise permitted by the AT&T Agreements). (See Ex. 178 ¶ 19; Ex. 182 ¶ 18; Ex. 190 ¶ 26; Ex. 217 ¶ 12; Ex. 228 ¶ 15; Ex. 233 ¶ 14; Ex. 252 ¶ 13; Ex. 266 ¶ 13; Ex. 275 ¶ 29; Ex. 282 ¶ 28.)

60.     According to the Involved Persons, SCO's theory of the case — that IBM has breached the Agreements by improperly using, exporting, disclosing or transferring AIX and Dynix source code, irrespective or whether IBM has improperly used, exported, disclosed or transferred any protected UNIX System V source code — is inconsistent with the provisions of the Agreements and with the parties' intentions. (See Ex. 178 ¶ 21; Ex. 182 ¶ 31; Ex. 190 ¶ 27; Ex. 217 ¶ 24; Ex. 228 ¶ 17; Ex. 233 ¶ 16; Ex. 275 ¶ 30; Ex. 282 ¶ 29; Ex. 310 at 116:18-118:4.) The Agreements were not intended to limit IBM's or Sequent's freedom of action with respect to their original source code, methods, or concepts and were intended merely to protect AT&T's interest in its own UNIX System V source material. (See Ex. 178 ¶ 22; Ex. 182 ¶ 22; Ex. 190 ¶ 12; Ex. 228 ¶ 18; Ex. 233 ¶ 17; Ex. 276 ¶ 3; Ex. 282 ¶ 12; Ex. 310 at 80:15-19, 117:14-118:4; 124:12-21.)

61.     Section 2.01 of the Software Agreements, as understood by the Involved Persons, was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement. (See Ex. 178 ¶ 11; Ex. 182 ¶ 16; Ex. 190 ¶ 14; Ex. 228 ¶ 12; Ex. 233 ¶ 8; Ex. 282 ¶ 14; Ex. 584 at 176:2-18; Ex. 310 at 30:17-31:5.) Any source code developed by or for a licensee and included in a

24

modification or a derivative work would not constitute "resulting materials" to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein. (See Ex. 178 ¶ 11; Ex. 182 ¶ 16; Ex. 190 ¶ 14; Ex. 217 ¶ 11; Ex. 228 ¶ 12; Ex. 233 ¶ 8; Ex. 252 ¶ 7; Ex. 282 ¶ 14; Ex. 584 at 173:3-174:8.)

62.     None of the Involved Persons intended the Agreement to permit AT&T and USL to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. (See Ex. 178 ¶ 15; Ex. 182 ¶ 20; Ex. 190 ¶¶ 14-15; Ex. 217 ¶ 22; Ex. 228 ¶ 13; Ex. 233 ¶ 8; Ex. 252 ¶ 7; Ex. 266 ¶ 10; Ex. 275 ¶ 27; Ex. 282 ¶ 15.) They intended that the code developed by or for the licensee would remain the property of the licensee, and could therefore be used, exported, disclosed or transferred freely by the licensee. (See Ex. 178 ¶ 18; Ex. 182 ¶ 20; Ex. 190 ¶¶ 14-15; Ex. 217 ¶ 23; Ex. 228 ¶ 15; Ex. 233 ¶ 9; Ex. 252 ¶¶ 8-9; Ex. 266 ¶¶ 10, 12; Ex. 275 ¶ 27; Ex. 282 ¶ 15.)

63.     Whether or not AT&T entered into a side letter or other agreements with its licensees to clarify the treatment of modifications and derivative works, or altered the language of Section 2.01, AT&T's and USL's intent was always the same. It never intended to assert ownership or control over any portion of a modification or derivative work that was not part of the original UNIX System V source code provided by AT&T or USL. The licensee was free to use, copy, distribute or disclose its modifications and derivative works, provided that it did not use, copy, distribute or disclose any portions of the original UNIX System V source code

25

provided by AT&T or USL except as permitted by the license agreements. (See Ex. 182 ¶ 20; Ex. 190 ¶ 24; Ex. 217 ¶ 22; Ex. 275 ¶ 27; Ex. 282 ¶ 27.)

G.    AT&T's Assurances as to Homegrown Material.

64.    At about the same time that IBM and Sequent executed the Agreements, other licensees and prospective licensees sought clarification that AT&T and USL did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of any material portions of the original UNIX System V source code provided by AT&T or USL and included in such modifications and derivative works. (See Ex. 217 ¶ 13; Ex. 275 ¶ 17.)

65.    Because of the numerous inquiries it received from licensees, AT&T further clarified the meaning of Section 2.01 of its software license agreements at seminars organized for licensees and in its "$ echo" publication. $ echo was a newsletter that AT&T published for all UNIX System V licensees to keep them informed of AT&T's policies with respect to UNIX System V. AT&T intended the guidance provided in the newsletter to apply to all of its UNIX System V licensees. (See Ex. 190 ¶ 19; Ex. 217 ¶¶ 14-15; Ex. 275 ¶¶ 18-19; Ex. 282 ¶ 21.)

66.    The April 1985 edition of $ echo describes presentations made by a member of Mr. Wilson's licensing group, Mr. Frasure, outlining changes that AT&T intended to make to the licensing and sublicensing agreements as a result of discussions that Mr. Wilson and others in his group had with AT&T's licensees. (See Ex. 190 ¶ 20; Ex. 217 ¶ 16; Ex. 275 ¶ 20; Ex. 282 ¶ 22.)

67.    As discussed in the newsletter, among the changes AT&T decided to implement, and which were announced at the seminars by Mr. Frasure, were "[l]anguage changes . . . to clarify ownership of modifications or derivative works prepared by a licensee". (See Ex. 190 ¶

26

20; Ex. 217 ¶ 17; Ex. 275 ¶ 21; Ex. 282 ¶ 23.)  The August 1985 edition of *S echo* describes

these changes in detail.  With respect to Section 2.01, the newsletter states:

> Section 2.01 ~ The last sentence was added to assure licensees that AT&T will claim no
> ownership in the software that they developed — only the portion of the software
> developed by AT&T.

(See Ex. 190 ¶ 21; Ex. 217 ¶ 18; Ex. 275 ¶ 22; Ex. 282 ¶ 24.)

68.     This change was not intended to alter the meaning of the software agreements, but

was meant only to clarify the original intent of Section 2.01.  AT&T intended only to make clear

to its licensees that AT&T, and later USL, did not claim any right to the licensees' original work

contained in modifications or derivatives of UNIX System V.  (See Ex. 182 ¶ 20; Ex. 190 ¶ 21;

Ex. 217 ¶ 18; Ex. 275 ¶ 22; Ex. 282 ¶ 24.)

69.     The new language is reflected, for example, in Section 2.01 of a software

agreement between AT&T Information Systems Inc. and The Santa Cruz Operation, Inc. entered

into in May 1987.  That agreement includes the following language:

> Such right to use includes the right to modify such SOFTWARE PRODUCT and to
> prepare derivative works based on such SOFTWARE PRODUCT, provided that any such
> modification or derivative work that contains any part of a SOFTWARE PRODUCT
> subject to this Agreement is treated hereunder the same as such SOFTWARE
> PRODUCT. AT&T-IS claims no ownership interest in any portion of such a
> modification or derivative work that is not part of a SOFTWARE PRODUCT.

(Ex. 127 § 2.01 (emphasis added)).

70.     As AT&T communicated at its seminars and in its newsletters to UNIX System V

licensees, this new language was intended only to clarify the language in the original Section

2.01, *not change its meaning*.  Mr. Wilson's licensing group interpreted the language of the

27

original Section 2.01 and thus revised Section 2.01 in exactly the same way. (See Ex. 190 ¶ 22; Ex. 217 ¶ 20; Ex. 275 ¶ 24; Ex. 282 ¶ 25.)

71.     Although AT&T made "specimen copies" of the revised software agreement available to its licensees, it did not require that its licensees enter into new agreements. AT&T intended for all of AT&T's UNIX System V licensees to receive the benefit of the changes and clarifications it outlined at its seminars and in the newsletter. (See Ex. 190 ¶ 23; Ex. 217 ¶ 21; Ex. 275 ¶ 26; Ex. 282 ¶ 26.)

H.     IBM's and Sequent's Reliance.

72.     Based in important part on the Agreements and AT&T's repeated and consistent explanations of them, IBM continued the development of and distributed a flavor of the UNIX operating system known as AIX (see Ex. 5 ¶ 13), and Sequent (which IBM acquired in 1999) continued the development of and distributed a flavor of the UNIX operating system known as Dynix (see id. ¶ 16).

73.     Both IBM and Sequent invested in the development of AIX and Dynix based on the understanding — reinforced by the repeated assurances of AT&T representatives — that AT&T claimed no interest whatsoever in IBM's and Sequent's original works, even if they might be included in a modification or derivative work of UNIX System V. (Ex. 257 ¶¶ 3-5; Ex. 310 at 29:8-31:5, 56:11-57:5, 62:20-63:17, 119:16-120:2, 127:15-128:1.)

74.     IBM devoted hundreds of millions of dollars and tens of thousands of person-hours to the development and marketing of AIX, including writing many millions of lines of original source code for AIX. Similarly, Sequent spent tens of millions of dollars and hundreds of person-hours in the development and marketing of Dynix, including writing millions of lines

28

of original source code for Dynix/ptx. (Ex. 257 ¶¶ 7-10; Ex. 252 at 97:25-98:20, 140:12-21; Ex. 181, Ex. G; Ex. 596 ¶¶ 3-4.)

75.     AIX and Dynix are comprised of code from numerous sources, including code written by IBM and Sequent software engineers (or outside contractors retained by IBM or Sequent) and also code written by third parties and licensed to IBM or Sequent for inclusion in AIX or Dynix. (See Ex. 270 ¶¶ 4-5; Ex. 236 ¶¶ 4-5.)

76.     The overwhelming majority of the code in AIX and Dynix is original IBM or Sequent work, written or created independent of UNIX System V. (Ex. 181, Ex. C, Ex. G.)

77.     For example, AIX 5.1.G for Power is comprised of 123,821 files and 160,198,865 lines of source code. (Ex. 181, Ex. G.) The Final Disclosures identify          lines of System V code in any version of AIX. (Ex. 54, Item 1, Tab 425.)          SECTION REDACTED

78.     The base operating system of Dynix/ptx 4.6.1 alone is comprised of 36,096 files and 10,238,823 lines of source code. (Ex. 181, Ex. G.) Here again, the Final Disclosures identify          lines of System V code in any version of Dynix. (Ex. 54, Item 204, Tab 220.)

79.                              SECTION REDACTED


80.     Among the original IBM works in AIX are Virtual Resource Manager, Logical Volume Manager, Object Data Manager, System Management Interface Tool, Network Install Manager, Web-based System Manager, IBM Java Development Kit, AIX Workload Manager,

Dynamic Logical Partitioning, Capacity On Demand, Cluster Systems Management, and many other developments. (Ex. 257 ¶ 8; Ex. 283 ¶ 85.)

81.     Among the original Sequent works in Dynix are Read-Copy Update, Symmetric Multiprocessing and Non-Uniform Memory Access capabilities, and functionality for Transmission Control Protocol/Internet Protocol (TCP/IP) networking protocols on parallel computers. (Ex. 283 ¶ 86.)

I.      Continued Assurances and Reliance.

82.     Following execution of the Agreements, AT&T and USL communicated with licensees on a regular basis and frequently explained their intent, view, and understanding as to their licensees' rights to their own original materials. (Ex. 191 ¶ 11; Ex. 250 ¶ 4; Ex. 271 ¶¶ 3-4; Ex. 276 ¶¶ 4-5; Ex. 280 ¶¶ 3-4.)

83.     AT&T and USL representatives communicated to licensees, including IBM and Sequent, that they owned and could do as they wished with their own original works, even if those works might be included in a modification or derivative work of UNIX System V, so long as they protected AT&T's UNIX System V source code. (Ex. 183 ¶ 5; Ex. 191 ¶¶ 4-6; Ex. 250 ¶¶ 3-4; Ex. 271 ¶¶ 3-4; Ex. 276 ¶¶ 4-5; Ex. 280 ¶¶ 3-5.)

84.     Some licensees sought to clarify that, under the agreements, they, not AT&T or USL, would own and control modifications and derivative works prepared by or for the licensees (except for any original UNIX System V source code provided by AT&T or USL and included therein). (Ex. 182 ¶ 18; Ex. 189 ¶ 17; Ex. 275 ¶¶ 15-17; Ex. 281 ¶¶ 12-16.)

85.     Mr. Wilson and members of this staff stated, orally and in writing, that AT&T's licensees, not AT&T or USL, would own and control modifications and derivative works

30

prepared by or for the licensee (except for any original UNIX System V source code provided by AT&T or USL and included therein).  (Ex. 182 ¶ 18; Ex. 189 ¶¶ 17-22; Ex. 271 ¶¶ 3-5; Ex. 275 ¶ 25; Ex. 280 ¶¶ 3-5; Ex. 282 ¶ 17.)

86.    For example, Mr. Frasure, who continued to work with and for Mr. Wilson until he retired, was in daily communication with UNIX licensees.  He personally communicated with them both in writing and orally, and participated in conferences that clarified AT&T's position regarding ownership of code that licensees developed themselves.  Mr. Frasure assured licensees that they owned any code they developed themselves, or that third parties developed on their behalf and that they could disclose their code to whomever they wanted, just as long as they kept UNIX System V source code confidential.  (Ex. 191 ¶¶ 4-6.)

87.    Similarly, Mr. DeFazio, who remained head of the overall AT&T/USL/Novell organization responsible for UNIX software until 1997, made sure licensees understood they could do as they wished with their original works, even if they might have been included in a modification or derivative work of UNIX System V, and that AT&T and USL had no interest in maintaining the confidentiality of code their customers developed.  (Ex. 183 ¶¶ 4-5.)

88.    In addition to dealing with licensees on a daily basis regarding the Agreements, AT&T and USL communicated with their licensees at users conferences, such as USENIX (an organization that supports the development of UNIX variants), and in other public presentations.  Representatives of AT&T and USL emphasized that their licensees, including IBM and Sequent, could do as they wished with their own original material.  (Ex. 255 ¶¶ 6-7.)

31

89.     AT&T and its representatives intended for their licensees to rely upon their statements and assurances about what licensees could and could not do with their original works. (Ex. 183 ¶ 6; Ex. 191 ¶ 7; Ex. 250 ¶¶ 4-5; Ex. 271 ¶ 5; Ex. 276 ¶¶ 4-5;.)

90.     Taking Mr. Wilson and his colleagues at their word, IBM, Sequent and other UNIX licensees exercised ownership and control over their original works, despite the fact that those works had been part of a modification and derivative work of UNIX System V or had been associated in some respect with UNIX System V code, such as by publicly disclosing them. (Ex. 508; Ex. 509; Ex. 510; Ex. 511; Ex. 512; Ex. 559; Ex. 560; Ex. 561; Ex. 562; Ex. 563; Ex. 564; Ex. 565; Ex. 566; Ex. 567; Ex. 568; Ex. 569; Ex. 570; Ex. 571.)

91.     For example, IBM publicly disclosed — in open and candid fashion — code, methods and concepts of AIX in AIX Operating System: Programming Tools and Interfaces (1989) (Ex. 560). IBM also disclosed AIX methods and concepts in patent applications and in the resulting patents, such as Patent No. 4,742,447 (Ex. 509), Patent No. 4,742,450 (Ex. 510), Patent No. 4,918,653 (Ex. 511), and Patent No. 5,032,979 (Ex. 512).

92.     Mr. Wilson, his staff, and other AT&T representatives were aware and understood that AT&T's licensees were exercising ownership and control over, and disclosing, code, methods and concepts from their flavors of UNIX, including AIX and Dynix. At no point did AT&T or USL take any steps to preclude their licensees from doing as they wished with their original works. (Ex. 183 ¶¶ 6-7; Ex. 191 ¶ 8; Ex. 250 ¶¶ 6-7; Ex. 271 ¶¶ 5-6; Ex. 276 ¶¶ 6-7.)

93.     Based on their understanding of the Agreements, the representations of AT&T representatives and AT&T's failure to take any action to preclude licensees from doing as they

32

wished with their original works, IBM and Sequent (like other licensees) continued to develop their flavors of UNIX. (Ex. 257 ¶¶ 3-10; Ex. 310 at 29:8-31:5, 56:11-57:5, 62:20-63:17, 119:16-120:2, 127:15-128:1.)

94.                    SECTION REDACTED

                                        During this time Sequent likewise invested heavily in the development and marketing of Dynix and wrote millions of lines of original source code. (Ex. 257 ¶ 10; Ex. 252 at 67:21-68:11; 97:25-98:20, 140:12-21; Ex. 181, Ex. G; Ex. 596 ¶¶ 3-4.)

95.    Neither IBM nor Sequent would have invested in AIX and Dynix as they did if they had believed that AT&T or its successors, instead of IBM and Sequent, owned and had the right to control IBM's or Sequent's original works, whether or not they were part of a modification or derivative work of UNIX System V. (Ex. 257 ¶ 6; Ex. 295 at 27:2-25.)

J.    Wide Availability of UNIX Information.

96.    Over the years, AT&T made the source code to its UNIX operating systems available to many thousands of persons and entities, without necessarily requiring that the code be kept confidential. AT&T's view was that a large number of UNIX-knowledgeable programmers would help foster the adoption of UNIX System V as an industry standard within the information technology marketplace. (Ex. 182 ¶ 37; Ex. 281 ¶¶ 33-37.)

97.    Because AT&T and USL intended to distribute the UNIX System V source code and related information widely, they understood that it would be difficult to require that the code and related information be kept confidential. (Ex. 182 ¶ 36; Ex. 189 ¶¶ 35-36; Ex. 279 ¶ 9; Ex. 281 ¶ 29.)

33

98.　AT&T licensed its UNIX source code to universities worldwide on very favorable terms, to encourage use by professors and students alike. AT&T sought to promote the widespread adoption of UNIX operating systems by ensuring that UNIX System V ideas, concepts, know-how, methods, and techniques would be widely known and understood by future programmers. (Ex. 182 ¶¶ 36-37; Ex. 281 ¶ 34.)

99.　AT&T knew that some universities made the source code available to individual students who were not bound by confidentiality obligations. AT&T also knew that such students often took copies of the source code with them when they graduated. AT&T's practice was not to take action regarding such breaches of the license agreements unless the students sought to commercialize the software, in which case it would require the students to enter into license agreements and pay royalties. (Ex. 281 ¶ 34.)

100.　AT&T's commercial licensing practices also resulted in the wide availability of UNIX source code. AT&T licensed the source code to hundreds of licensees, who in turn (with AT&T's permission) made it available to tens of thousands of individuals, such as professional software developers that AT&T knew would become knowledgeable about its source code. (Ex. 281 ¶ 33.)

101.　AT&T expressly granted IBM the right to disclose UNIX System V ideas, concepts, know-how, methods, and techniques embodied in UNIX System V (Ex. 122 ¶ 9) and then afforded the same right to its licensees, which AT&T endeavored to hold to the same standard (Ex. 281 ¶¶ 13-17). At approximately the same time, AT&T "abandoned" (to use Mr. Wilson's term) an early interest in protecting the methods and concepts of its UNIX operating systems. (Ex. 346 at 62:23-25, 84:8-13, 86:4-18, 264:8-265:8.)

34

102.    In an effort to make UNIX an "open" operating system, meaning that customers would not be locked in with a particular hardware vendor or a particular operating system vendor, AT&T itself published information concerning the interface of the operating system. For example, AT&T published a System V Interface Definition ("SVID"), which provided a complete interface specification that could even be used by AT&T's competitors to develop independently their own UNIX-like operating systems. (Ex. 281 ¶ 36; Ex. 182 ¶ 37.)

103.    AT&T and its successors authorized, or at least did not prevent, the publication of hundreds, if not thousands, of books, articles, internet web-sites and other materials regarding UNIX, many of which provide detailed information regarding the design and implementation of the UNIX operating system. (Ex. 181 ¶¶ 58-59 & Ex. E; Ex. 281 ¶¶ 37-38; 182 ¶¶ 37-38.)

104.    Between 1985 and 1996, AT&T Capital Corporation, then a subsidiary of AT&T, sold thousands of used or discontinued AT&T computer systems, hundreds of them from Bell Labs, without imposing any confidentiality restrictions on the purchasers. Some of the computers included UNIX System V, Release 3, and Release 4 source code. (Ex. 174 ¶¶ 10-16; Ex. 223 ¶¶ 4-10; Ex. 253 ¶¶ 3-5; Ex. 281 ¶ 39; Ex. 189 ¶ 32.)

105.    AT&T recognized that its goal of promoting the widespread adoption of UNIX System V was inconsistent with its general desire to preserve the confidentiality of the source code. However, AT&T was more concerned with promoting the widespread adoption of UNIX System V, and collecting the associated royalties, than it was with protecting the confidentiality of its source code. (Ex. 281 ¶ 35; Ex. 190 ¶ 25.)

106.    The code, methods, and concepts of UNIX System V are available without restriction to the general public within the meaning of 7.06(a), as the provision was intended by

35

AT&T.  (Ex. 181 ¶¶ 58-59 & Ex. E; Ex. 122 ¶ 14; Ex. 125 § 2; Ex. 207 ¶¶ 11-13; Ex. 281 ¶¶ 33-39; Ex. 219.)

K.    Development of the Linux Operating System.

107.    In 1991, an undergraduate student at the University of Helsinki, named Linus Torvalds, set out to create a new, free operating system, which later became known as "Linux". (Ex. 272 ¶ 3; Ex. 398 at 1-5.)

108.    Torvalds began developing the core of the operating system, known as the "kernel", and some months later posted news of his project to Internet newsgroups, inviting volunteers to assist him in his efforts.  (Ex. 398 at 1-5; Ex. 272 ¶ 4.)

109.    With the Internet providing for a distributed collaboration, other programmers joined to create code making up the kernel.  (Ex. 398 at 1-5; Ex. 272 ¶ 5.)  Torvalds directed the collaboration to a version 1.0 release of the Linux kernel in 1994 and has continued to maintain the kernel development since.  (Ex. 398 at 1-5; Ex. 272 ¶ 5.)

110.    In the years that followed, thousands of developers, including developers at SCO, contributed to the further development of Linux.  (See Ex. 5 ¶ 45; Ex. 364 (identifying SCO contributions to Linux); Ex. 105 at 15, 22, 26; Ex. 194 ¶ 5.)

111.    Linux is an "open source" program, which means, among other things, that its source code is publicly available, royalty-free, and users have the freedom to run, copy, distribute, study, adapt, and improve the software.  (Ex. 5 ¶ 22; Ex. 272 ¶ 6; Ex. 221 ¶ 7; Ex. 64 ¶ 8.)

112.    Linux not only adheres to open standards, but also is built and maintained by a worldwide group of engineers who share the common goal of making open systems and open

source ubiquitous. (Ex. 106 at 3; Ex. 272 ¶ 7; Ex. 221 ¶ 8.) Anyone can freely download Linux and many Linux applications and modify and re-distribute them with few restrictions. (Ex. 107 at 5; Ex. 272 ¶ 8; Ex. 221 ¶ 9.)

113.    The Linux kernel is distributed under the GNU General Public License ("GPL"). The GPL provides that a person receiving code under the GPL "may copy and distribute verbatim copies of the Program's source code" and "modify [their] copy or copies of the Program or any portion of it". (Ex. 272 ¶ 9; Ex. 128 §§ 1, 2; Ex. 107 at 24; Ex. 221 ¶ 10.) The GPL also provides that a person receiving code under the GPL receives "a license from the original licensor to copy, distribute or modify the Program". (Ex. 128 § 6.)

L.    *USL and Novell.*

114.    At approximately the same time Mr. Torvalds began the development of Linux, Novell acquired (in 1991) an interest in USL, which held all of AT&T's UNIX-related assets, including AT&T's UNIX licensing agreements and copyrights. (Ex. 5 ¶ 10; Ex. 182 ¶ 8.) In 1993, Novell acquired all of the UNIX assets held by USL. (Ex. 240 ¶ 9.)

115.    As an owner of AT&T's UNIX assets, Novell assumed AT&T's rights and obligations under its UNIX licenses, including AT&T's UNIX licensing agreements with IBM and Sequent. Like AT&T and USL before it, Novell managed UNIX licensing agreements by, among other things, interpreting, explaining, and enforcing their terms. (Ex. 240 ¶ 10.)

116.    In acquiring AT&T's rights to the Agreements, Novell understood them to place restrictions on the extent to which AT&T's licensees could use UNIX System V. Novell did not understand the UNIX licenses to confer on AT&T or Novell (as AT&T's successor) any rights to the code, methods or concepts of AT&T's and Novell's licensees — whether or not the

37

licensees' code, methods or concepts were or had been part of a modification or derivative work of AT&T's UNIX software product. (Ex. 240 ¶¶ 11-23.)

117.  Novell understood that UNIX licensees could do as they wished with any non-UNIX portions of their modifications and derivative works of the UNIX software product. That is how Novell understood its own UNIX license with AT&T. AT&T made it clear to Novell, and Novell to AT&T, that Novell, as an AT&T licensee, could do as it wished with its own code, methods, and concepts. AT&T stated that it asserted no rights to Novell material, even if included in a modification or derivative work of UNIX software. (Ex. 240 ¶¶ 11-23.)

118.  Novell shared its view of its licenses with its new (and AT&T's former) licensees, with whom Novell (like AT&T) had frequent dealings. Like AT&T, Novell intended for its licensees to rely on its statements and assurances about what licensees could do and not do with their original works. (Ex. 183 ¶¶ 5-6; Ex. 240 ¶¶ 11-23.)

119.  Novell representatives made clear to Novell's licensees, including IBM and Sequent, that Novell asserted no rights to the licensees' code, methods and concepts and that they could do with them as they wished, whether or not they were included in modifications or derivative works of UNIX software products. To the extent Novell ever had any right to its licensees' code, methods, and concepts, Novell relinquished it. (Ex. 240 ¶¶ 11-23.)

120.  Just as they had before Novell acquired USL, IBM, Sequent and other UNIX licensees exercised ownership and control over their original works, despite the fact that those works were (or had been) part of a modification and derivative work of UNIX System V or were (or had been) associated in some respect with UNIX System V, such as by publicly disclosing them. (Ex. 561; Ex. 562; Ex. 563; Ex. 567; Ex. 568; Ex. 569; Ex. 571.)

38

121.    Put differently, Novell's UNIX licensees publicly disclosed code, methods, and concepts from their flavors of UNIX after Novell acquired AT&T's UNIX assets. (Ex. 561; Ex. 562; Ex. 563; Ex. 567; Ex. 568; Ex. 569; Ex. 571.)

122.    For example, IBM published <u>The Advanced Programmer's Guide to AIX 3.x</u>, which contained source code, methods and concepts from AIX (Ex. 493), and disclosed AIX methods and concepts in patent applications and issued patents including Patent No. 5,202,971 (Ex. 567), Patent No. 5,175,852 (Ex. 495), Patent No. 5,421,011 (Ex. 496), and Patent No. 5,428,771 (Ex. 497). Likewise, Sequent disclosed methods and concepts in patent applications and issued patents including Patent No. 5,442,758 (Ex. 498), and Patent No. 5,185,861 (Ex. 499).

123.    IBM and Sequent were not alone in disclosing the code, methods, and concepts of their flavors of UNIX. For example, Sun Microsystems, Inc. ("Sun") disclosed source code from Solaris, its UNIX flavor, in <u>Solaris Porting Guide</u> (1995) (Ex. 561 at 228), and <u>Solaris Multithreaded Programming Guide</u> (Ex. 562).

124.    Like AT&T and USL before it, Novell was aware and understood that its licensees were exercising their full rights of ownership and disclosing the code, methods and concepts of their flavors of UNIX. (Ex. 183 ¶¶ 6-7; Ex. 250 ¶¶ 6-7; Ex. 271 ¶¶ 5-6; Ex. 276 ¶¶ 6-7.) Yet, Novell took no steps to stop its licensees from doing as they wished with their original works. (Ex. 183 ¶¶ 6-7; Ex. 250 ¶¶ 6-7; Ex. 271 ¶¶ 5-6; Ex. 276 ¶¶ 6-7.)

125.    Based on its understanding of the Agreements, the statements of Novell representatives and Novell's failure to take any action to preclude licensees from doing as they wished with their original works, IBM continued to develop its flavor of UNIX. Similarly,

Sequent, having received no indication of a different interpretation of the Agreements from Novell, continued to develop its own Dynix operating system. (Ex. 257 ¶¶ 3-5; Ex. 252 at 67:21-68:11; 97:25-98:20, 140:12-21; Ex., 596 ¶¶ 2-4.)

126.              SECTION REDACTED          . Sequent likewise invested tens of millions of dollars in the development and marketing of Dynix and wrote millions of lines of original source code. (Ex. 257 ¶ 10; Ex. 252 at 67:21-68:11; 97:25-98:20, 140:12-21; Ex. 181, Ex. G; Ex. 596 ¶¶ 3-4.)

127.    Neither IBM nor Sequent would have continued to invest in AIX and Dynix as they did if they had believed that Novell (instead of IBM and Sequent) owned and had the right to control their original works, whether or not they were included in a modification or derivative work of UNIX System V. (Ex. 257 ¶ 6; Ex. 295 at 27:2-25).)

M.    Formation of SCO.

128.    After Novell announced the termination of a project related to Linux, members of Project Corsair (as it was known) left Novell to form Caldera, Inc. ("Caldera), a predecessor of SCO, in 1994. (Ex. 107; Ex. 440; Ex. 193 ¶ 6; Ex. 221 ¶ 16.)

129.    Caldera was formed to develop and market software based on the Linux operating system and to provide related services enabling the development, deployment, and management of Linux-specialized servers. (Ex. 221 ¶ 17; Ex. 107 at 6, 31; Ex. 193 ¶ 7; 242 ¶ 6.) In fact, Caldera was the first company to invest heavily in the establishment of Linux as an acceptable business solution. (Ex. 221 ¶ 18; Ex. 441.)

40

130.    Caldera continued the work done by Novell on Project Corsair to develop a Linux desktop operating system and eventually delivered a product called "Caldera Network Desktop" in 1995. (Ex. 221 ¶ 19; Ex. 440; Ex. 107 at 8; Ex. 283 at 33; Ex. 193 ¶ 8; Ex. 242 ¶ 7.)

131.    Caldera also made code contributions to Linux and helped and encouraged independent software vendors and manufacturers to port their programs to its Linux products in an attempt to provide the types of software that had been unavailable for Linux to that time. (Ex. 440; Ex. 442; Ex. 221 ¶ 31.)

132.    To facilitate the porting of Linux to the existing applications in the market that were written primarily for UNIX-based operating systems, Caldera worked on making its Linux products compliant with various UNIX standards, including the X/Open brand for UNIX 95, and the POSIX.1 specification. (Ex. 221 ¶ 32; Ex. 442.)

133.    To achieve compliance with UNIX standards with its Linux products, Caldera hired software developers that had both UNIX and Linux experience to work on making Linux compliant with UNIX standards. (Ex. 221 ¶ 35; Ex. 442.)

N.    Novell and Santa Cruz Share UNIX Interests.

134.    In 1995, as Caldera was beginning its Linux business, Novell entered negotiations with The Santa Cruz Operation, Inc. ("Santa Cruz") concerning the sale of certain Novell assets relating to its UNIX and UnixWare software products. (Ex. 239 ¶ 4; Ex. 123.)

135.    On September 19, 1995, Novell and Santa Cruz executed an Asset Purchase Agreement ("APA"). (Ex. 239 ¶ 5.) The parties entered into two Amendments to the APA: Amendment No. 1 on December 6, 1995, and Amendment No. 2 on October 16, 1996. (Ex. 239 ¶ 6; Ex. 502; Ex. 444; Ex. 123.)

41

136.    Santa Cruz did not have the financial capacity to pay the purchase price contemplated by Novell for its UNIX assets. (Ex. 182 ¶ 43; Ex. 254 ¶ 10; Ex. 239 ¶ 8.)  To bridge the price gap and consummate the transaction, Novell and Santa Cruz agreed that Novell would receive Santa Cruz stock and retain certain UNIX rights. (Ex. 123; Ex. 239 ¶ 8.)

137.    Under the APA and its Amendments, Santa Cruz obtained a variety of assets, including hundreds of contracts and licenses, various trademarks, source code and binaries to UnixWare products, and physical assets such as furniture and personal computers. (Ex. 123; Ex. 444; Ex. 502; Ex. 239 ¶ 7.)

138.    Novell retained the right to receive royalty payments under System V Release X ("SVRX") licenses, prior approval rights relating to new SVRX licenses, and amended SVRX licenses, the right to direct Santa Cruz to take certain actions relating to SVRX licenses and the right to conduct audits of the SVRX license programs. (Ex. 123 § 4.16; Ex. 239 ¶ 8.)

139.    Santa Cruz assumed responsibility for administering the collection of royalty payments from SVRX licenses.  The APA provided that Santa Cruz would collect and pass through to Novell 100% of the SVRX royalties.  In return, Novell agreed to pay Santa Cruz an administrative fee of 5% of those royalty amounts.  Santa Cruz also agreed to pay additional royalties relating to other products. (Ex. 123 § 4.16(a); Ex. 239 ¶ 9.)

140.    As specified by Section V.A of Schedule 1.1(b) of the APA, it excluded from the transfer and Novell retained "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare".  Amendment No. 2 to the APA addressed copyrights but did not effect the transfer of any copyrights to Santa Cruz. (Ex. 123 § 1.1(b); Ex. 444; Ex. 239 ¶ 10.)

141.    Novell also retained rights to supervise Santa Cruz's administration of SVRX

licenses. (Ex. 239 ¶ 11.) Section 4.16(b) of the APA provides that:

> Buyer shall not, and shall not have the authority to, amend, modify or waive any
> right under or assign any SVRX License without the prior written consent of
> Seller. In addition, at Seller's sole discretion and direction, Buyer shall amend,
> supplement, modify or waive any rights under, or shall assign any rights to, any
> SVRX License to the extent so directed in any manner or respect by Seller. In the
> event that Buyer shall fail to take any such action concerning the SVRX Licenses
> as required herein, Seller shall be authorized, and hereby is granted, the rights to
> take any action on Buyer's own behalf. (Ex. 123 § 4.16(b).)

142.    Novell, therefore, retained the "sole discretion" to direct Santa Cruz to amend,

supplement, modify, waive, or assign any rights under or to the SVRX licenses; if Santa Cruz

fails to take any such action, the APA specifically granted Novell the right to take these actions

on behalf of Santa Cruz. (Ex. 123 § 4.16(b); Ex. 239 ¶ 8) Santa Cruz recognized this right in

Amendment X to IBM's Software and Sublicensing Agreements, to which Novell was a party,

and which noted that "Novell retained... certain rights with respect to" the agreements IBM

entered into with AT&T, including "Software Agreement SOFT-00015 as amended" and

"Sublicensing Agreement SUB-00015A as amended". (Ex. 124 at 1.)

143.    While Novell and Santa Cruz shared ownership of AT&T's UNIX assets (from

1995 to 2001), representatives of Novell and Santa Cruz told SVRX licensees that they could do

as they wished with their original code. They told licensees they were free to do as they wished

with their own code, modifications and derivative works, so long as the code, modifications, and

derivative works did not contain System V code. (Ex. 227 ¶¶ 8-11; Ex. 266 ¶¶ 6-13.)

144.    IBM, Sequent and other SVRX licensees continued to use the non-SVRX portions

of their flavors of UNIX as they wished. (Ex. 564; Ex. 565.)

43

145.    For example, IBM publicly disclosed AIX methods and concepts in AIX/6000: Internals and Architecture (1996), which included an entire chapter on the Journaled File System (Ex. 503 at 55-65), and Hewlett-Packard disclosed the methods and concepts behind the Journaled File System in its version of UNIX called HP-UX in a book titled HP-UX; Tuning and Performance (2000) (Ex. 565).

146.    Representatives of Novell and Santa Cruz were aware and understood that its licensees were exercising their full rights of ownership and disclosing the code, methods and concepts of their flavors of UNIX.  Neither company took any steps to preclude them from doing as they wished with their original works.  (Ex. 183 ¶¶ 6-7; Ex. 250 ¶¶ 6-7; Ex. 271 ¶¶ 5-6; Ex. 276 ¶¶ 6-7; Ex. 227 ¶ 8-11.)

147.    Santa Cruz representatives, including David McCrabb, the President of Santa Cruz's Server Software Division, told System V licensees that they were free to do as they wished with their own code, modifications and derivative works, so long as the code, modifications, and derivative works did not contain System V code.  Santa Cruz representatives, including Mr. McCrabb, told licensees that it interpreted the license agreements in this manner. (Ex. 227 ¶ 8.)

148.    Based on its understanding of the Agreements, the representations of Novell and Santa Cruz representatives and Novell's failure to take any action to preclude licensees from doing as they wished with their original works, IBM continued to develop its flavor of UNIX. Similarly, Sequent, having received no indication of a different interpretation of the Agreements from Santa Cruz, continued to develop its own Dynix operating system. (Ex. 257 ¶¶ 3-5; Ex. 252 at 67:21-68:11; 97:25-98:20, 140:12-21; Ex. 596 ¶¶ 2-5.)

44

149.          SECTION REDACTED

Up to the time it was acquired by IBM, Sequent likewise invested tens of millions of dollars in the development and marketing of Dynix and wrote millions of lines of original source code. (Ex. 257 ¶ 10; Ex. 596 ¶¶ 2-4.)

150.   Neither IBM nor Sequent would have continued to invest in AIX and Dynix as they did if they had believed that Novell or Santa Cruz (instead of IBM and Sequent) owned and had the right to control their original works, whether or not they were part of a modification and derivative work of UNIX System V. (Ex. 257 ¶ 6; Ex. 596 ¶¶ 3-4.)

O.     SCO's Promotion of Linux and Acquisition of UNIX.

151.   While Novell and Santa Cruz shared an interest in UNIX System V software and related assets, Caldera continued to develop and promote Linux. (Ex. 106 at 2-5.)

152.   To expand and enhance its Linux business, Caldera acquired the Server Software and Professional Services divisions of Santa Cruz and its UNIX-related assets on May 7, 2001. (Ex. 106 at 16; Ex. 221 ¶ 80.)

153.   Caldera purchased the UNIX assets of Santa Cruz with an eye toward open-sourcing the UNIX technology to improve Linux. (Ex. 221 ¶ 85; Ex. 471.) Because the UNIX assets were rapidly losing their value and because the market was moving toward Linux, Caldera's CEO, Ransom Love, stated that "UNIX is dead, except as a value add to Linux". (Ex. 221 ¶ 85; Ex. 472.)

154.   Although Caldera ultimately did not contribute all of its UNIX assets to Linux and distributed certain UNIX products, Caldera positioned its Linux products ahead of its UNIX products. (Ex. 340 at 31:20-25, 33:12-25, 34:1-12; 55:4-15; Ex. 472.)

45

155.    At the time Caldera acquired Santa Cruz's UNIX assets, Santa Cruz did not believe it was selling, and Caldera did not believe it was buying, the right to control what all UNIX System V licensees could do with their original works. (Ex. 227 ¶¶ 37-38; Ex. 221 ¶¶ 107-09.)

P.      SCO's Distribution of the Disputed Material.

156.    In May 2002, SCO formed a partnership, known as UnitedLinux, with three other Linux distributors, to streamline Linux development and certification around a global, uniform distribution of Linux designed for business. (Ex. 348; Ex. 221 ¶¶ 94-96.)

157.    In a November 2002 launch event co-sponsored by IBM, UnitedLinux released its first Linux distribution, "UnitedLinux Version 1.0". (Ex. 407.) In January 2003, IBM joined UnitedLinux as a technology partner to, among other things, help promote the recently released product. (Ex. 408.) UnitedLinux Version 1.0 was marketed and sold by each of the partners in UnitedLinux under its own brand name. (Ex. 407.) SCO's release of UnitedLinux was called "SCO Linux 4". (Ex. 349.)

158.    SCO Linux 4 included the very code and technologies that SCO claims IBM improperly contributed to Linux. (See Ex. 33 at 43; Ex. 44 at 3-22.) This material includes JFS (Item 1), RCU (Item 2) and certain "negative know how" (Items 23 and 90). (See id.) For the remaining Items of allegedly misused material, SCO indicates that it has "not presently determined" whether the material is included in its UnitedLinux distribution. (Id.)

159.    In its Revised Response to IBM's interrogatories, SCO stated that the allegedly misused material "is included in any product that contains the Linux kernel 2.4 and above, which is sold or distributed by hundreds of entities around the world", including by SCO. (Ex. 33

46

¶ 43.) In particular, SCO conceded that its "SCO Linux Server 4.0" products contain such code. (Id.)

160.    Although not identified by SCO in its interrogatory responses, SCO's earlier Linux distributions also contain code SCO claims IBM improperly contributed to Linux. (See Ex. 350; Ex. 351.) Among other products, SCO's "OpenLinux Server 3.1.1" and "OpenLinux Workstation 3.1.1" products, which were released in January 2002, both include the Linux 2.4 kernel. (See Ex. 350 at 2; Ex. 351 at 2; Ex. 296 at 16:18-23.)

161.    In fact, SCO specifically advertised to its customers that its distributions of Linux included some of the very technology it now complains IBM should not have contributed to Linux. (See Ex. 350; Ex. 351; Ex. 352; Ex. 396; Ex. 353.)

162.    For example, in its product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO specifically advertised that the products included new features such as "journaling file system support". (Ex. 350 at 2; Ex. 351 at 2.)

163.    Similarly, in its November 2002 product announcement for "SCO Linux Server 4.0", which was based on UnitedLinux Version 1.0, SCO noted that "[t]he core of SCO Linux Server 4.0 is the 2.4.19 Linux kernel. New features include broadened USB support, Logical Volume Manager, improved journaling file system support". (Ex. 352 (emphasis added).)

164.    Likewise, SCO's Technical Overview of SCO Linux 4.0 emphasized that its product included "JFS (Journaling File System Developed by IBM)". (Ex. 396 (emphasis added).)

165.    Although SCO claims to have "discontinued" distributing any products containing the source code it claims IBM should not have disclosed, it continued to do so after it

47

filed this lawsuit. (See Ex. 44; Ex. 45; Ex. 296 at 92:1-22; 353; 33 at Tab 121; Ex. 505; Ex. 486.)

166. For example, SCO released its "SCO Linux Server 4.0 for the Itanium Processor Family" distribution on April 14, 2003, after SCO filed its original Complaint. (See Ex. 353; Ex. 1.) In the product announcement, SCO touted the new features of this release, including "improved journaling file system support". (Ex. 353 at SCO1269793.)

167. SCO has also produced invoices and other documentation reflecting SCO's continued distribution of its OpenLinux 3.1.1 and Linux Server 4.0 products until at least January 2004. (See Ex. 33 at Tab 121; Ex. 505; Ex. 296; Ex. 486.)

168. Moreover, SCO made available to the public as recently as the end of 2004 the Linux 2.4 kernel for download from its website. (See Ex. 45 at 3; Ex. 167 ¶ 11.) The version of Linux available from SCO's website includes code SCO claims IBM disclosed in violation of its contracts. (See Ex. 44; Ex. 45; Ex. 33 at 43; Ex. 167 ¶¶ 5, 11.)

169. In addition, SCO has admitted that it made available to the public for download material that SCO claims IBM improperly contributed to Linux. (See Ex. 44 at 3-22.) This material includes JFS (Item 1), RCU (Item 2) and certain "negative know how" (Items 23 and 90). (See id.) For the remaining Items of allegedly misused material, SCO indicates that it has "not presently determined" whether it made the material available to the public for download. (Id.)

170. SCO distributed source code for the Linux 2.4 kernel, which is contained in SCO's OpenLinux Server 3.1.1, OpenLinux Workstation, and Linux Server 4.0 products, under

48

the terms of the GPL. (Ex. 128; Ex. 296 at 75:9-12.) *The terms of the GPL permit licensees freely to use, copy, distribute and modify whatever code is provided thereunder.* (Ex. 128.)

Q.    SCO's Litigation.

171.    Following its acquisition of Santa Cruz's UNIX assets, Caldera was unable to make a profit, switched management, changed its name to SCO, and adopted a new business model focused on litigation. (See, e.g., Ex. 1; Ex. 141; Ex. 142; Ex. 423; Ex. 427.)

172.    SCO filed its original Complaint, which featured a claim for the misappropriation of trade secrets, on March 6, 2003. (Ex. 1.) In that Complaint, SCO, among other things, alleged that IBM had breached its UNIX System V license by "subject[ing] SCO's UNIX trade secrets to unrestricted disclosure, unauthorized transfer and disposition, unauthorized use, and has otherwise encouraged others in the Linux development community to do the same". (Id. ¶ 135.)

173.    In the Complaint, SCO did not identify with any specificity what "UNIX trade secrets" it claimed were at issue. (See Ex. 1.) SCO instead described its trade secrets only as "unique know how, concepts, ideas, methodologies, standards, specifications, programming, techniques, UNIX Software Code, object code, architecture, design and schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability and security". (Id. ¶ 105.) SCO did not identify any specific UNIX code upon which it based its claim. (See id.)

174.    SCO filed an Amended Complaint on July 22, 2003. (Ex. 2.) The Amended Complaint did not identify in any greater detail the trade secrets allegedly misappropriated by IBM. (See id.) Again, SCO described its trade secrets only as "unique know how, concepts, ideas, methodologies, standards, specifications, programming, techniques, UNIX Software Code,

49

object code, architecture, design and schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability and security". (Id. ¶ 161.)

175.    SCO thereafter sought, and was granted, permission to file a Second Amended Complaint. (Ex. 3.)  In its Second Amended Complaint, filed on February 27, 2004, SCO abandoned its claim for misappropriation of trade secrets altogether.  (See id.)  In fact, at a hearing on December 5, 2003, SCO acknowledged that there are in fact no trade secrets in UNIX System V.  Counsel for SCO stated:  "There is no trade secret in UNIX system [V].  That is on the record.  No problem with that."  (Ex. 414 at 46:2-3.)

176.    In its Second Amended Complaint, SCO asserts four separate breach of contract claims, all of which rest on the underlying allegation that IBM breached its licenses for the UNIX System V software product. (Ex. 3 ¶¶ 110-72.)

177.    SCO's First and Third Causes of Action allege that IBM misused source code subject to the IBM and Sequent Software Agreements by contributing such code to Linux. (Ex. 3 ¶¶ 110-36, 143-66.)  Specifically, SCO alleges that IBM and Sequent breached Sections 2.01, 2.05, 4.01, 6.03, 7.06(a) and 7.10 of the Software Agreements.  (Ex. 3 ¶¶ 112-25.)

178.    SCO's claims rest on the proposition that "[t]he AIX work as a whole and the Dynix/ptx work as a whole are modifications of, or are derived from [UNIX] System V". (Ex. 132 at 2.)  Under SCO's theory of the case, all of the tens of millions of lines of code ever associated with any technology found in AIX or Dynix, even if that code does not contain any UNIX System V code, is subject to the restrictions of the IBM and Sequent Software Agreements.  (See id.)

50

179.    SCO made this position clear in its opposition to IBM's motion for partial summary judgment on IBM's Tenth Counterclaim. (Ex. 64.) In that brief, SCO argued: "SCO's contract claims do not depend on any proof that IBM contributed original source code from UNIX to Linux. Rather, the theory of SCO's case — which is based on the plain, unambiguous meaning of the Software Agreements — is that IBM breached those agreements by contributing code from AIX and Dynix." (Id. ¶ 21.)

180.    SCO's Second and Fourth Causes of Action allege that IBM breached the IBM and Sequent Sublicensing Agreements by continuing to distribute AIX and Dynix after SCO's purported termination of those agreements on June 13, 2003. (See Ex. 3 ¶¶ 137-42, 167-72.)

181.    These two causes of action ultimately depend on SCO's allegation that IBM "fail[ed] to fulfill one or more of its obligations under the Software Agreement[s]". (Ex. 3 ¶¶ 128, 158.) SCO contends that because IBM breached the IBM and Sequent Software Agreements, SCO had the right unilaterally to terminate the IBM and Sequent Sublicensing Agreements. (See id.) Absent breach of the Software Agreements, therefore, there is no breach of the Sublicensing Agreements.

182.    The construction and performance of the IBM and Sequent Software Agreements and the IBM and Sequent Sublicensing Agreements are governed by New York law. (See Ex. 492 § 7.13; Ex. 119 § 7.13; Ex. 120 § 6.05; Ex. 121 § 6.05.)

R.    SCO's Touting and Obfuscation.

183.    From the beginning of this litigation, SCO has touted its claims and the strength of its alleged evidence. (See, e.g., Ex. 367; Ex. 368; Ex. 369.)

51

184.    According to SCO, the issues presented here are the most important issues faced by the software industry in ten years and the future of the industry — indeed, the future of the global economy — hangs in the balance:

a.    In an article for Salon.com, Sam Williams quotes SCO's CEO Darl McBride as saying, in reference to this case: "There really is no middle ground…The future of the global economy hangs in the balance." (See Ex. 370.)

b.    In an article from KSL.com, Jed Boal quotes McBride as saying, in reference to this case: "It has become the biggest issue in the computer industry in decades…The stakes are extremely high.  The balance of the software industry is hanging on this." (See Ex. 371.)

185.    SCO's public statements concerning its alleged evidence are no less grandiose:

a.    In an interview with CNet News.com in August 2003, McBride claimed that SCO had found a "mountain of code" improperly contributed to Linux. (See Ex. 367.)

b.    In a teleconference with analysts and reporters on May 30, 2003, McBride stated: "Everybody's been clamoring for the code — show us two lines of code.  We're not going to show two lines of code, we're going to show hundreds of lines of code.  And that's just the tip of the iceberg of what's in this." (See Ex. 368.)

c.    In an interview in LinuxWorld.com, McBride claimed that a "truckload of code" was improperly contributed to Linux. (See Ex. 372.)

d.    In July 2003, *in an interview with* <u>Business Week</u>, McBride stated that the amount of LINUX code infringing on SCO's intellectual property rights is "gargantuan". (Ex. 480.)

e.    On August 18, 2003, at its SCO Forum in Las Vegas, SCO, through its Senior Vice President Chris Sontag, stated that it had uncovered more than a million lines of improperly copied UNIX code in Linux. (Ex. 383.)

186.    At the same time, SCO refused to disclose the particulars of its claims and alleged evidence. (<u>See</u> Ex. 32; Ex. 33; Ex. 132; Ex. 34.) As a SCO representative stated, it was the company's strategy to obfuscate its alleged evidence. (<u>See</u> Ex. 374; Ex. 375.)

187.    *For example, SCO's counsel indicated in an interview with Maureen O'Gara of* <u>LinuxGram</u> in March 2003, at the beginning of the case, that SCO "doesn't want IBM to know what they [SCO's substantive claims] are". (Ex. 374.)

188.    Further, SCO Vice President Gregory Blepp stated in a published interview in April 2004 that "you don't put everything on the table at the start, but instead you bring out arguments and evidence piece by piece". (Ex. 375.)

S.    Novell's Waiver of any Purported Breaches.

189.    After SCO filed suit, Novell sent a series of letters to SCO that explicitly waived the purported breaches of contract SCO has asserted IBM committed. (<u>See</u> Ex. 135; Ex. 136; Ex. 137; Ex. 138; Ex. 240 ¶ 29.)

190.    On October 7, 2003, in a letter from Joseph A. LaSala, Jr. to Ryan Tibbitts, Novell directed SCO to waive any purported right to assert a breach of the IBM Software