Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V

source code. (Ex. 135; Ex. 240 ¶ 30.) The letter states:

> [P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby
> directs SCO to waive any purported right SCO may claim to require IBM to treat
> IBM Code itself as subject to the confidentiality obligations or use restrictions of
> the Agreements. Novell directs SCO to take this action by noon, MST, on
> October 10, 2003, and to notify Novell that it has done so by that time.

(Ex. 135; Ex. 240 ¶ 32.)

     191.   In the letter, Novell informed SCO that its position that IBM's own homegrown

code "must be maintained as confidential and subject to use restrictions is contrary to the

agreements between AT&T and IBM, including Amendment X, to which Novell is a party".

(Ex. 135; Ex. 240 ¶ 33.)

     192.    According to Novell, the agreements between AT&T and IBM provide "a

straightforward allocation of rights":

> (1) AT&T retained ownership of its code from the Software Products ('AT&T
> Code'), and the Agreements' restrictions on confidentiality and use apply to the
> AT&T Code, whether in its original form or as incorporated in a modification or
> derivative work, but (2) IBM retained ownership of its own code, and the
> Agreements' restrictions on confidentiality and use do not apply to that code so
> long as it does not embody any AT&T Code.

(Ex. 135; Ex. 240 ¶ 33.) Novell concluded that any other interpretation "would defy logic as

well as the intent of the parties". (Ex. 135; Ex. 240 ¶ 31.)

     193.    After SCO failed to follow Novell's instruction, on October 10, 2003, Novell

expressly waived any purported right of SCO's to assert a breach of the IBM Software

Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V

source code. (Ex. 136; Ex. 240 ¶ 34.) Novell states in its letter to SCO:

> Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreements between AT&T and IBM, itself as subject to the confidentiality obligations or use restrictions of the Agreements.

(Ex. 136; Ex. 240 ¶ 34.)

194.    Additionally, on February 6, 2004, in a letter from Mr. LaSala to Mr. Tibbitts,

Novell further directed SCO to waive any purported right to assert a breach of the Sequent

Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX

System V source code. (Ex. 137; Ex. 240 ¶ 35.) The letter states:

> [P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license.
>
> Novell directs SCO to take this action by noon, MDT, on February 11, 2004, and to notify Novell that it has done so by that time.

(Ex. 137.)

195.    In the letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software

Agreement was misplaced, and stated that "SCO's interpretation of section 2.01 is plainly

contrary to the position taken by AT&T, as author of and party to the SVRX licenses".

(Ex. 137.)

196.    After SCO failed to follow Novell's instruction, on February 11, 2004, Novell

expressly waived any purported right of SCO to assert a breach of the Sequent Software

Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V

source code. (Ex. 138; Ex. 240 ¶ 36.) Novell states in its letter to SCO:

55

> Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license.

(Id.)

197.    Novell also waived any purported right of SCO to terminate the IBM Sublicensing Agreement. (See Ex. 139; Ex. 140; Ex. 240 ¶¶ 37-39.)

198.    On June 9, 2003, in a letter from Jack L. Messman to Darl McBride, Novell informed SCO that under the terms of Amendment No. X, SCO did not have the right to terminate any of IBM's rights under the Sublicensing Agreement to distribute its AIX software program. (Ex. 139; Ex. 240 ¶ 37.)  The letter states:

> Pursuant to Amendment No. X, however, Novell and SCO granted IBM the "irrevocable, fully paid-up, perpetual right" to exercise all of the rights under the IBM SVRX Licenses that IBM then held.  IBM paid $10,125,000 for the rights under Amendment No. X.  Novell believes, therefore, that SCO has no right to terminate IBM's SVRX Licenses, and that it is inappropriate, at best, for SCO to be threatening to do so.

(Ex. 139; Ex. 240 ¶ 37.)

199.    Novell further directed SCO to waive any purported right under its SVRX Licenses with IBM to terminate IBM's right to distribute AIX under the IBM Sublicensing Agreement:

> [P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM.  Novell directs SCO to take this action by noon, MDT, June 12, 2003, and to notify Novell that it has done so by that time.

(Ex. 139; Ex. 240 ¶ 38.)

56

200.   After SCO failed to follow Novell's instruction, on June 12, 2003, Novell

expressly waived any purported right of SCO to terminate IBM's rights under the IBM

Sublicensing Agreement. (Ex. 140; Ex. 240 ¶ 39.)  Novell states in its letter to SCO:

> Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement,
> Novell, on behalf of The SCO Group, hereby waives any purported right SCO
> may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to
> revoke any rights thereunder, including any purported rights to terminate asserted
> in SCO's letter of March 6, 2003 to IBM.

(Ex. 140; Ex. 240 ¶ 39.)

T.   <u>SCO's Failure to Substantiate Its Claims.</u>

201.   Following SCO's refusal to disclose the nature of its claims or its alleged

evidence, IBM served interrogatories on SCO asking it to describe in detail its allegations and

alleged evidence of misconduct by IBM. (Ex. 11.)

202.   For example, IBM asked SCO to: "[p]lease identify, with specificity (by product,

file and line of code, where appropriate) . . . any confidential or proprietary information that

plaintiff alleges or contends IBM misappropriated or misused". (Ex. 11 at Interrogatory No. 1.)

203.   IBM asked SCO: "For . . . any confidential or proprietary information identified

in response to interrogatory No. 1, [to] please identify . . . (b) the nature and source of [SCO's]

rights". (<u>See</u> Ex. 11 at Interrogatory No. 2.)

204.   At the same time, IBM also asked SCO to identify how IBM is alleged to have

violated SCO's rights. IBM asked SCO: "For . . .any confidential or proprietary information

identified in response to Interrogatory No. 1, [to] please describe, in detail . . . (a) the date of the

alleged misuse or misappropriation; (b) all persons involved in any way in the alleged misuse or

misappropriation; (c) the specific manner in which IBM is alleged to have engaged in misuse or

57

misappropriation; and (d) with respect to any code or method . . . the location of each portion of such code or method in any product, such as AIX, in Linux, in open source, or in the public domain." (Ex. 11 at Interrogatory No. 4.)

205.    Moreover, IBM asked SCO to: "(1) identify with specificity all the material in Linux to which it claims rights; (2) detail the nature of its alleged rights, such as whether and how the material in which SCO claims rights derives from UNIX; and (3) state whether IBM has infringed SCO's rights and, if so, detail how IBM infringes SCO's alleged rights. (See Ex. 12 at Interrogatory No. 12.)

206.    Further, IBM asked SCO: "For each line of code and other material identified in response to Interrogatory No. 12, [to] please state whether (a) IBM has infringed plaintiff's rights, and for any rights IBM is alleged to have infringed, describe in detail how IBM is alleged to have infringed plaintiff's rights". (Ex. 12 at Interrogatory No. 13.)

207.    SCO did not provide IBM with all of the information it requested, and IBM twice moved to compel meaningful responses on October 1, 2003 and November 6, 2003. (Ex. 62; Ex. 63.)

208.    Specifically, IBM asked the Court to require SCO to specify (1) all the material in Linux to which SCO claims rights (i.e., by kernel version $X$, file $Y$, and lines $1$-$2$-$3$); (2) the nature of SCO's alleged rights, including whether and, if so, how the material derives from the UNIX software (i.e., if SCO asserts contract, copyright or some other right to the identified code, and how the Linux code identified derives from UNIX version $A$, file $B$, lines $4$-$5$-$6$); and (3) whether IBM has infringed material to which SCO claims rights, and if so, the details of the alleged infringement (i.e., by copying Linux kernel version $X$, file $Y$, lines $1$-$2$-$3$, which are

58

copied or derived from UNIX version *A*, file *B*, lines *4-5-6*; or by distributing Linux kernel version *X*, file *Y*, lines *1-2-3*, the structure and sequence of which was copied from UNIX version *A*, file *B*, lines *7-8-9*; or by inducing others to copy (or distribute) Linux kernel version *X*, file *Y*, lines *1-2-3*, which are copied or derived from UNIX version *A*, file *B*, lines *4-5-6*). (See Ex. 63.)

209.    On December 12, 2003, the Court ordered SCO to provide this information on or before January 12, 2004. (See Ex. 55.) The Court ordered SCO to "identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM". (Ex. 55.)

210.    In an order dated March 3, 2004, the Court reiterated its December 2003 order, compelling SCO again to provide meaningful responses to IBM's interrogatories, this time on or before April 19, 2004. (See Ex. 56.) Specifically, the Court required SCO to "fully comply within 45 days of the entry of this order with the Court's previous order dated December 12, 2003". (Ex. 56.) Thus the Court required SCO to "respond fully and in detail to Interrogatory Nos. 12 and 13 as stated in IBM's Second Set of Interrogatories [which require SCO to specify (1) the material in Linux to which SCO claims rights; (2) the nature of SCO's alleged rights including whether and, if so, how the material derives from UNIX; and (3) whether IBM has infringed material to which SCO claims rights and, if so, the details of the alleged infringement]." (Ex. 55.)

211.    Despite the Court's orders, SCO again did not produce the information requested by IBM. (See Ex. 132.) While SCO identified more materials in Linux to which it claimed rights (albeit without the particularity ordered by the Court and without an adequate explanation as to why it did not provide all of these materials in response to the Court's first order), SCO still

did not detail the nature of its alleged rights or describe in detail how IBM was alleged to have infringed SCO's rights. (See Ex. 132.)

212.  Despite the Court's order, SCO did not identify a single version, file, or line of System V code, methods, or concepts allegedly misused by IBM.  SCO did not identify a single version, file, or line of AIX or Dynix code, methods or concepts allegedly misused by IBM. And, SCO did not link a single line of allegedly misused Linux code to any version, file, or line of AIX, Dynix or System V code. (See Ex. 132.)

213.  Based on SCO's continued failure to comply, IBM moved on May 18, 2004 for partial summary judgment. (Ex. 65 at 27.)

214.  On February 8, 2005, the Court expressed astonishment at SCO's failure of proof, but deferred a decision on the merits of IBM's summary judgment motion until after the close of discovery. (Ex. 57 at 10.)

215.  The Court set October 28, 2005 as the "Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material" and December 22, 2005 as the "Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material". (Ex. 58 at 4.) The Court required SCO "to Update Interrogatory Responses Accordingly". (Ex. 58 at 4; Ex. 418 at 56.)

U.     SCO's Interim and Final Disclosures.

216.  On October 28, 2005, pursuant to the Court's July 1, 2005, scheduling Order, SCO served its Interim Disclosures.  Like its prior discovery responses concerning the allegedly misused materials, SCO failed to describe all of the allegedly misused materials by version, file, and line of code. (Ex. 53.)

217.    Upon review of SCO's Interim Disclosures, IBM immediately notified SCO that it failed "to identify the allegedly misused material by version, file and line of code", "to identify and match up the allegedly infringing and allegedly infringed material by version, file and line of code", "to identify the material alleged to have been contributed improperly by version, file and line of code", and to identify, "to the extent the allegedly contributed material is not UNIX System V code, but *is in any sense alleged to have been based on or resulted from* UNIX System V code, the version, file and line of UNIX System V code from which the allegedly contributed material is alleged to derive or result." (Ex. 151 at 1.)

218.    IBM notified SCO that unless SCO complied with the specificity required by the Court's many orders, "IBM intends to ask the Court to preclude SCO from pursuing any claims regarding allegedly misused material not properly disclosed on or before December 22, 2005". (Ex. 151 at 2.)

219.    Thereafter SCO expressly stipulated and agreed with IBM that its claims would not exceed the Final Disclosures. In a Stipulation Re Scheduling Order filed with the Court on December 7, 2005, the parties stipulated and agreed as follows:

> 1. Both parties are required to identify with specificity any and all material that each party contends the other has misused no later than December 22, 2005; ...

> (c) Neither party shall be permitted to use [the period for discovery relating to the Final Disclosures] for the purpose of identifying additional misused material not disclosed by the December 22, 2005, deadline.

(Ex. 481.)

61

220.    On December 22, 2005, SCO served its Final Disclosures, again largely failing to describe all of the allegedly misused materials by version, file, and line of code and to update its interrogatory responses. (Ex. 54.)

221.    Based on SCO's failure to follow the court's orders requiring it to identify all of the allegedly misused materials by version, file, and line of code, IBM moved on February 13, 2006 to preclude certain of SCO's claims. (Ex. 66.)

222.    *Pending the disposition of IBM's motion, SCO served several expert reports* seeking to challenge additional allegedly misused materials that were not identified in its Final Disclosures. IBM then made another motion (which has been fully briefed but not yet argued) to confine and limit the scope of SCO's claims to those materials identified in its Final Disclosures. (Ex. 67.)

223.    In an order dated June 28, 2006, the Court granted, in part, IBM's February 13, 2006 motion to preclude certain of SCO's claims — striking from the case SCO's Final Disclosure Item Nos.: 3-22, 24-42, 44-89, 91-93, 95-112, 143-49, 165-82, 193, 232-71, 279-93. (Ex. 59 at 36-38.)

224.    In granting IBM's motion in part, the Court held that "SCO should have supplied not only line but version and file information for whatever claims form the basis of SCO's case against IBM". (Ex. 59 at 28.)

225.    The Court held further that "SCO has had ample opportunity to articulate, identify and substantiate its claims against [IBM]. [SCO's] failure was intentional and therefore willful based on SCO's disregard of the court's orders and failure to seek clarification. In the view of the court it is almost like SCO sought to hide its case until the ninth inning in hopes of gaining

an unfair advantage despite being repeatedly told to put 'all evidence . . . on the table.'" (Ex. 59 at 32.)

226.    Finally, the Court held that SCO's conduct prejudiced IBM in that "[r]equiring IBM to engage in an analysis of millions of lines of code to figure out which code is at issue in hopes of answering such questions is patently unfair given the fact that it was SCO's duty to provide more detailed code in the first place." (Ex. 59 at 35.)

227.    Following the Court's order the following "Items" relating to SCO's allegations of IBM's breach of contract relating to the AIX and Dynix operating systems remain in the case: Items 1, 2, 23, 43, 90, 94 113-42, and 186-92.

V.    SCO's Failure of Proof.

228.    Despite three orders of the Court, SCO has not adduced any evidence that IBM breached the Agreements. (See Ex. 54.)

229.    SCO's Final Disclosures identify 294 Items of allegedly misused material. However, only a subset of these Items concerns SCO's claims of breach of contract. (Ex. 54.)

230.    As a result of the Court's order of June 28, 2006, only 43 of the Items relating to SCO's contract claims remain in the case. (Items 1, 2, 23, 43, 90, 94, 113-42 and 186-92.) These Items concern allegations of misuse relating to AIX and Dynix. (See Ex. 54; Ex. 59.)

231.    Only one of the remaining 43 Items, Item 1, concerns allegations of misuse relating to AIX. Item 1 concerns IBM's Journaled File System (JFS). (Ex. 54; Ex. 291 ¶ 6.)

232.    The remaining 42 Items concern allegations of misuse relating to Dynix. Item 2 concerns Read-Copy Update (RCU); Items 113-42 concern testing technologies; and Items 23,

63

43, 90, 94 and 186-92 concern "negative know-how" or "exposure" to Dynix. (Ex. 54; Ex. 291 ¶ 7.)

233.    Only one of the remaining 43 Items (Item 1) identifies any UNIX System V source code. That Item identifies 17 lines of code from one version of a UNIX System V file. (See Ex. 54 Item 1, Tab 425; Ex. 291 ¶ 8.) SCO's experts do not address this file in their expert reports. (See generally Ex. 285; Ex. 286 ¶¶ 84-122.) SCO does not allege that IBM publicly disclosed this file to Linux or otherwise. (See Ex. 54.)

234.    Only two of the remaining 43 Items (Items 1 and 2) identify any AIX or Dynix source code. Thirty of the remaining 43 Items (Items 113-42) identify code from Sequent's SPIE Test Suites as well as code from the Linux Test Project. (See Ex. 54.) None of that testing code is part of either the Dynix or Linux operating systems. (Ex. 287 ¶ 41; Ex. 288 ¶¶ 25, 29; Ex. 291 ¶ 9.)

235.    While the remaining 43 Items do identify Linux kernel source code files or Linux Test Project files, 11 of those Items (Items 23, 43, 90, 94, and 186-92) do not identify any versions or lines of code in the Linux kernel or any versions, files or lines of source code from UNIX System V, AIX or Dynix. SCO simply lists a number of Linux kernel files (without version or line information) for each of those Items and does not offer any evidence (expert or otherwise) that these files contain any code methods or concepts from UNIX System V, AIX, or Dynix. (See Ex. 54; Ex. 291 ¶ 10.)

236.    SCO has not specifically identified, in the Final Disclosures or elsewhere, a single line of UNIX System V material that IBM is alleged to have misused in violation of its contractual obligations. Nor has it specifically identified any evidence that IBM misused any

UNIX System V code. (Ex. 54; Ex. 291 ¶ 5.) When IBM raised with SCO its failure to disclose UNIX System V material, SCO stated that "IBM keeps insisting on something that is not part of SCO's claims, so it should come as no surprise that files or lines of code in System V have not been identified". (Ex. 134 at 2.)

237.   None of the material IBM is alleged to have misused is, or contains, UNIX System V code, methods or concepts, or is, or contains, a modification or derivative work of UNIX System V. (See Ex. 54; Ex. 291 ¶ 11; Ex. 181 ¶¶ 11-50.)

238.   All of the material IBM is alleged to have misused in the remaining Items (Items 1-2, 23, 43, 90, 94, 113-42, and 186-92) is original IBM work or the work of third parties other than SCO and independent of System V. (Ex. 162. ¶ 5; Ex. 248 ¶ 5; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 168 ¶ 6; Ex. 258 ¶¶ 4-5; Ex. 231 ¶¶ 7-8; Ex. 292 ¶ 4; Ex. 507 at 40, 57, 199-200, 225-26, 228; Ex. 293 ¶ 4; Ex. 173 ¶ 4; Ex. 196 ¶ 5; Ex. 235 ¶ 5; Ex. 237 ¶ 5; Ex. 211 ¶ 5; Ex. 216 ¶ 5; Ex. 246 ¶ 4; Ex. 210 ¶ 6; Ex. 263 ¶ 5; Ex. 222 ¶ 5; Ex. 206 ¶¶ 4-5; Ex. 274 ¶ 4; Ex. 161 ¶ 4; Ex. 225 ¶ 5; Ex. 188 ¶ 5.)

239.   None of the AIX or Dynix material that IBM is alleged to have misused was written by referencing UNIX System V. (Ex. 291 ¶ 11.)

240.   SCO has identified 25 persons as having been involved with the allegedly improper disclosures: Barry Arndt, Ben Rafanello, Dave Kleikamp, Mark Peloquin, Steve Best, Dipankar Sarma, Paul McKenney, Martin Bligh, Tim Wright, Pat Gaughen, Wayne Boyer, John George, Haren Babu Myneni, Hien Nguyen, Jim Keniston, Larry Kessler, Hal Porter, Vivek Kashyap, Nivedita Singhvi, Shirley Ma, Venkata Jagana, Jay Vosburgh, Mike Anderson, Mike Mason, Ruth Forester. (Ex. 291 ¶ 12.)

65

241.    None of these individuals referred to or otherwise used non-public UNIX System V source code, methods, or concepts in making the challenged Linux contributions. (Ex. 291 ¶ 13; Ex. 162. ¶ 5; Ex. 248 ¶ 5; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 168 ¶ 6; Ex. 258 ¶¶ 4-5; Ex. 231 ¶¶ 7-8; Ex. 292 ¶ 4; Ex. 507 at 40, 57, 199-200, 225-26, 228; Ex. 293 ¶ 4; Ex. 173 ¶ 4; Ex. 196 ¶ 5; Ex. 235 ¶ 5; Ex. 237 ¶ 5; Ex. 211 ¶ 5; Ex. 216 ¶ 5; Ex. 246 ¶ 4; Ex. 210 ¶ 6; Ex. 263 ¶ 5; Ex. 222 ¶ 5; Ex. 206 ¶¶ 4-5; Ex. 274 ¶ 4; Ex. 161 ¶ 4; Ex. 225 ¶ 5; Ex. 188 ¶ 5.)

242.    In making the challenged contributions, the alleged wrongdoers identified by SCO relied on their own creativity and general experience. (Ex. 291 ¶ 13; Ex. 162 ¶ 5; Ex. 248 ¶ 5; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 168 ¶ 6; Ex. 258 ¶¶ 4-5; Ex. 231 ¶ 7; Ex. 292 ¶ 4; Ex. 507 at 109-10; Ex. 293 ¶ 4; Ex. 173 ¶ 6; Ex. 196 ¶ 5; Ex. 235 ¶ 5; Ex. 237 ¶ 5; Ex. 211 ¶ 5; Ex. 216 ¶ 5; Ex. 246 ¶ 4; Ex. 210 ¶ 6; Ex. 263 ¶ 5; Ex. 222 ¶ 5; Ex. 206 ¶ 5; Ex. 274 ¶ 4; Ex. 161 ¶ 5; Ex. 225 ¶ 5; Ex. 188 ¶ 5.)

W.    Specific Items of Alleged Misuse.

243.    The remaining Items of allegedly misused material all concern original IBM works that can be described in four categories:  (1) IBM's Journaled File System (JFS) contribution; (2) IBM's Read Copy-Update (RCU) contribution; (3) IBM's Linux Test Project (LTP) contributions; and (4) general operating system experience or "negative know how".  (Ex. 291 ¶ 14.)

1.    Journaled File System (JFS).

244.

SECTION REDACTED

66

SECTION REDACTED

245.    The allegedly misused JFS material does not concern or include any UNIX System V code, methods, or concepts; it is not a modification or derivative work of UNIX System V; and it was not based on or created with reference to UNIX System V. (Ex. 291 ¶ 16.)

246.    SCO has not specifically identified any UNIX System V material (by version, file or line of code, or otherwise) that it alleges is contained in the allegedly misused JFS material. (Ex. 291 ¶ 17l; see also Ex. 54, Item 1.)

SECTION REDACTED

247.

The allegedly misused JFS material did not contain any UNIX System V code and none of these individuals identified by SCO used or referred to UNIX System V source code in developing JFS. (Ex. 291 ¶ 18; Ex. 168 ¶ 6; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 248 ¶ 5; Ex. 162 ¶ 5.)

248.    The JFS code that IBM contributed to the Linux JFS was originally ported from IBM's OS/2 operating system, not AIX, or was written specifically for the Linux JFS. (Ex. 291 ¶ 19; Ex. 168 ¶¶ 4-5.)

249.    OS/2 did not include any UNIX System V code, and was not based on UNIX System V. (Ex. 291 ¶ 19; Ex. 168 ¶ 7.)

250.    Some OS/2 based JFS material was later shipped in IBM's AIX product. For this reason, the JFS material that IBM contributed to Linux is sometimes mistaken as having originated from AIX. (Ex. 291 ¶ 20; Ex. 168 ¶ 5.)

67

251.

SECTION REDACTED

252.

253.    SCO has identified thirty files in AIX that contain "origin codes" which, SCO

claims, indicate that the files were based on UNIX System V, Release 2 or earlier. (Ex. 54;

Ex. 286 ¶ 95; Ex. 291 ¶ 21.) For these files, the Final Disclosures do not identify a single line of

source code in AIX that is alleged to be identical to or substantially similar to any source code in

UNIX System V. (Ex. 291 ¶ 21.) In any event, origin codes are not necessarily indicators of

whether a file contains System V material. (Ex. 291 ¶ 21; Ex. 181 ¶ 61, n.12.)

254.    The Final Disclosures draw no connection with any lines of code in UNIX System

V and the JFS code that IBM contributed.

SECTION REDACTED

255.

68

SECTION REDACTED

    2.    <u>Read-Copy Update (RCU).</u>

256.

SECTION REDACTED

257.    IBM's Linux RCU contributions, and the earlier Sequent implementation of RCU in Dynix, do not include any UNIX System V code; they are not modifications or derivative works of UNIX System V; and they were not based on or created with reference to UNIX System V. They are original IBM work created independent of UNIX System V. (Ex. 231 ¶ 8; Ex. 258 ¶ 5; Ex. 291 ¶ 24.)

258.    SCO has not specifically identified any UNIX System V material (by version, file, or line of code, or otherwise) that it alleges is contained in RCU. (<u>See</u> Ex. 54 Item 2.)

259.

SECTION REDACTED

69

260.

SECTION REDACTED

261.    Sequent engineers Paul McKenney and John Slingwine filed a patent application

for RCU on July 19, 1993, and the patent was granted on August 15, 1995.  (Ex. 231 ¶ 5; see Ex.

498.)  The implementation of RCU in Dynix and the challenged implementation of RCU in

Linux are implementations of the same general concept that is embodied in U.S. Patent #

5,442,758.  (Ex. 231 ¶¶ 4-5; Ex. 291 ¶ 27; Ex. 268 at 117-21.)

        3.    Testing Technologies.

262.

SECTION REDACTED

263.    The allegedly misused testing technology material does not include any UNIX

System V code; it is not a modification or derivative work of UNIX System V; and it was not

based on or created with reference to UNIX System V.  It was original Sequent work created

independent of UNIX System V.  (Ex. 196 ¶ 5; Ex. 173 ¶ 4; Ex. 291 ¶ 29.)

264.

SECTION REDACTED

SECTION REDACTED

265.   SCO fails to identify anyone at IBM or Sequent as involved in misconduct

relating to the SPIE Test Suits.

SECTION REDACTED

266.   SCO identifies no UNIX System V code, methods, or concepts in connection with

Items 113-142.  (Ex. 291 ¶ 30.)

267.   The SPIE tests were not part of the Dynix or Dynix/ptx operating systems.

(Ex. 208 ¶ 102; Ex. 288 ¶¶ 25, 29; Ex. 173 ¶ 3; Ex. 196 ¶ 4; Ex. 291 ¶ 30.)

        4.      General Operating System Experience.

268.

269.                                    SECTION REDACTED

works created independent of UNIX System V.  (Ex. 291 ¶ 33.)

71

270.    SCO identifies no UNIX System V code, methods or concepts (by version, file or line of code or otherwise) in connection with these Items.  SCO identifies no Dynix/ptx code, methods, or concepts (by version, file, or line of code) in connection with these Items.  (See Ex. 54; Ex. 291 ¶ 34.)

271.    SCO lists Linux files in connection with these Items, but does not identify which versions or which lines of code in these files contain the allegedly misused material.  SCO also lists whole directories in Linux without providing any version, file, and line information.  (See Ex. 54; Ex. 291 ¶ 35.)

272.

SECTION REDACTED

273.    For all of these Items, the programmers allegedly making the disclosure either (a) did not make any contributions to the files or directories listed or (b) did not base their contributions to the listed files or directories on UNIX System V or refer to UNIX System V in making the challenged contributions.  (Ex. 291 ¶ 37; Ex. 292 ¶ 4; Ex. 507 at 40, 57, 199-200, 225-26, 228; Ex. 293 ¶ 4; Ex. 235 ¶¶ 3-5; Ex. 237 ¶¶ 4-5; Ex. 211 ¶¶ 3-5; Ex. 216 ¶¶ 3-5; Ex. 246 ¶¶ 4-6; Ex. 210 ¶¶ 4-7; Ex. 263 ¶¶ 4-6; Ex. 222  ¶¶ 4-6; Ex. 206 ¶¶ 4-5; Ex. 274 ¶¶ 3-4; Ex. 161 ¶¶ 4-5; Ex. 225 ¶¶ 4-5; Ex. 188 ¶¶ 4-5.)

274.    In some cases (Items 186, 187, 190 and 191), the programmers allegedly making the disclosure did not have experience in Dynix in the particular technology area cited by SCO. (Ex. 291 ¶ 38; Ex. 235 ¶ 3; Ex. 237 ¶ 4; Ex. 211 ¶ 3; Ex. 274 ¶ 3; Ex. 188 ¶ 4; Ex. 225 ¶ 4.)

275.    In some cases (Items 187, 188) the cited technology did not even exist in Dynix.
(Ex. 291 ¶ 38; Ex. 246 ¶ 6; Ex. 210 ¶ 7; Ex. 263 ¶ 6; Ex. 222 ¶ 6; Ex. 206 ¶ 6.)

276.

                          SECTION REDACTED



X.    Implications of SCO's Theory.

277.    In a nutshell, SCO claims the right to control the code, methods and concepts of
any modification or derivative work of System V, even where the code, methods, or concepts do
not include or reveal any System V material or were not written or created by SCO or any of its
predecessors in interest.  (Ex. 43 at 7-8.)


                          SECTION REDACTED



278.    SCO's claim depends on the proposition that SCO's alleged predecessor (AT&T)
acquired the right to control modifications and derivatives of System V pursuant to its System V
licensing agreements.  The argument appears to be that SCO has the right to control not only
System V, but also the code, methods and concepts of other flavors of UNIX, like AIX and
Dynix.  In fact, SCO seems to claim that it has the right to control any code, methods, and
concepts ever associated with System V.  (Ex. 181 ¶ 52.)

73

279.    When informed of the interpretation of the IBM and Sequent Software Agreements that SCO is advancing in this case, the individuals from AT&T who were involved in negotiating the agreements state unequivocally that SCO is wrong. (Ex. 217 ¶ 24; Ex. 189 ¶¶ 27-28; Ex. 281 ¶ 28; Ex. 182 ¶ 31; Ex. 275 ¶ 30.)

280.    According to Mr. Wilson, any claim that the IBM Software Agreement and the Sequent Software Agreement prohibit the use, export, disclosure or transfer of any code other than UNIX System V code is clearly wrong. Not only did Mr. Wilson and others at AT&T not intend the agreements to be read that way, but they also went out of their way to assure AT&T's licensees that that is not what the agreements meant. (Ex. 282 ¶ 30.)

281.    SCO's interpretation of the Agreements is impossible to reconcile with what Mr. Frasure (and, he believes, others at AT&T) understood the Software Agreements to mean. Mr. Frasure never suggested, nor would have thought to suggest, to AT&T's customers that the Agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose any UNIX System V code. Moreover, Mr. Frasure did not believe that AT&T's customers (particularly large ones like IBM) would have entered into agreements that placed restrictions of the kind SCO seeks to impose on their use of code that they developed. In fact, some, including IBM, specifically said so. (Ex. 189 ¶¶ 18-26.)

282.    According to Mr. DeFazio, SCO's claims are inconsistent with the provisions of the Agreements. He does not believe that anyone at AT&T, USL, or Novell intended the Agreements to be construed as SCO construes them. In all cases, according to Mr. DeFazio, modifications and licensees' contributions to derivative works are not subject to the confidentiality and other restrictions contained in the license agreements (except for any

74

protected UNIX System V source code actually included therein) because they are owned by the licensees. (Ex. 182 ¶ 31.)

283.     Despite the fact that SCO's theory is contrary to the plain language of the Agreements and the intent of the individual who negotiated them, it would, if accepted, have far-reaching, negative implications. (Ex. 181 ¶ 51.)

284.     If SCO had such a right to control modifications and derivative works of System V, then it would have extraordinary — indeed, seemingly limitless — control over the software industry. AT&T and its successors widely disseminated information about the code, methods, and concepts of System V.  System V alone has been licensed for redistribution to thousands of entities worldwide.  These licensees have combined the code, methods, and concepts of System V software with hundreds of millions of lines of original non-AT&T code and many thousands of original, non-AT&T methods and concepts.  For example, certain versions of AIX include more than 100 million lines of non-AT&T code, methods and concepts.  Thus, if SCO had the right to control modifications and derivative works of System V, then it would control vast quantities of others' property.  (Ex. 181 ¶ 53.)

285.     The viral quality of SCO's claim would give it control rights well beyond the life of the System V rights that the "control rights" are purported to protect.  The apparent purpose of the "control rights" claimed by SCO seems to be to ensure, among other things, the confidentiality of AT&T System V code, methods, and concepts.  The argument seems to be prophylactic in nature:  by retaining control of its licensees' code, methods, and concepts, SCO can retain control of any System V code, methods, and concepts that might be included therein. Even where the code, methods, and concepts of System V are no longer confidential, SCO would

have the right to control the original works of its licensees. System V could become freely available and SCO's right to control others' works would (under its theory) persist. (Ex. 181 ¶ 54.)

286.    From a practical standpoint, if SCO had the right to control the code, methods, and concepts of all flavors of UNIX, the owners of those products would be limited in their ability to support or even market them. To support and market an operating system, it is often necessary to reference and disclose the code, methods, and concepts of the operating system. If SCO, as opposed to IBM, had the right to control what IBM could say publicly about the non-System V code, methods and concepts of AIX, for example, then IBM could not provide installation and technical assistance without the cooperation of SCO (an IBM competitor). (Ex. 181 ¶ 55.)

287.    Moreover, if, as it contends, SCO's "control rights" extend to experience and know-how (positive or negative), then it could control the employment of a significant sector of the computer industry. Many hundreds of thousands of people have been exposed to the code, methods, and concepts of System V and other flavors of UNIX. SCO and its predecessors have disseminated such information to many, many, thousands of persons and entities. Assuming the truth of SCO's claims about the scope of its control rights, it would appear to have the ability to control the employability of these persons. (Ex. 181 ¶ 56.)

288.    At the same time, SCO would have little information about the scope of its rights. It could not, as a practical matter, know to what extent its licensees have associated their own original code, methods, and concepts with System V code, methods, and concepts. It could know even less about the extent to which software developers have relied upon public

76

information about the code, methods, and concepts of System V.  Thus, if SCO had the right to control modifications and derivative works, there would be widespread uncertainty about the scope of SCO's rights, including the identity of the persons whose employability it claims to have controlled.  (Ex. 181 ¶ 57.)

289.    Based in part on the assurances of AT&T and its successors about what UNIX licensees could do with their original works, IBM and Sequent invested heavily in the development of AIX and Dynix. (Ex. 257 ¶¶ 3-5; Ex. 310 at 29:8-31:5, 56:11-57:5, 62:20-63:17, 119:16-120:2, 127:15-128:1  (Ex. 257 ¶¶ 3-5, 10; Ex. 283 ¶ 87.)  IBM assigned thousands of people to AIX projects. (Ex. 257 ¶¶ 3-5, 10; Ex. 283 ¶ 87.)

SECTION REDACTED

Sequent devoted hundreds of person-years to developing Dynix.  (Ex. 596 ¶ 4.)  Both companies invested at least tens of millions of dollars in developing their businesses around AIX and Dynix. (Ex. 257 ¶¶ 7, 10; Ex. 283 ¶ 87; Ex. 596 ¶¶ 3-4.)

290.    Both companies added significant quantities of original code to the operating systems.  To give an example, the original AT&T SVR2.0 source code totaled 896,204 lines of code. (Ex. 181 Ex. G.)  The AIX Version 5.1.G for Power contains 160,198,865 lines of code. (Id.)  SCO does not and could not allege that AIX or Dynix incorporate all of any version of System V. (See Ex. 285 at 22-25.)

291.    Since the initial introduction of the original versions of AIX in 1987, IBM has incorporated new technology and improvements, including Virtual Resource Manager, a Journaled File System, a Logical Volume Manager, an Object Data Manager, a System Management Interface Tool and a Network Install Manager, and others. (Ex. 257 ¶ 8; Ex. 283 ¶¶

81-85.) Subsequent AIX versions integrated even more enhancements, including a Web-based System Manager, an IBM Java Development Kit, an AIX Workload Manager, and many other developments. (Ex. 257 ¶ 8; Ex. 283 ¶¶ 81-85.)

292.    AIX code has been employed in other IBM products, including servers, printers, and multi-protocol routers. (Ex. 257 ¶ 9; Ex. 283 ¶ 89.)

293.    Each of these developments stands on its own right and is comprised of non-UNIX source code. Some of them can even be considered stand-alone products. If IBM had believed that these additions to UNIX would have subjected the code to the confidentiality provisions of the licensing agreements, it would not have packaged them with AIX. Similarly, AIX code has been employed in other IBM products, including servers, printers, and multi-protocol routers. If IBM ever believed that the IBM code included with AIX in these IBM products would be subject to the confidentiality provisions of the licensing agreements, AIX would not have been used in these products. (Ex. 257 ¶ 9.)

294.    In sum, if AT&T or its successors had ever expressed the position SCO asserts in this lawsuit, IBM and Sequent would have directed the vast amount of financial and human resources they spent on AIX and Dynix quite differently. (Ex. 257 ¶ 6, 9; Ex. 596 ¶¶ 3-4.)

## **Standard of Decision**

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to a judgment as a matter of law." In re Grandote Country Club Co., 252 F.3d 1146, 1149 (10th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)); see also Banks v. Rite Aid Corp., No. 98-115, 2001 WL 1806857, at *1 (D. Utah Mar. 15, 2001) (Ex. A hereto).

Although the Court must view the record in the light most favorable to the non-moving party, the non-moving party cannot rely on unsupported conclusory allegations to create a genuine issue of fact. See In re Grandote, 252 F.3d at 1149. "To withstand summary judgment, the nonmoving party 'must come forward with specific facts showing that there is a genuine issue for trial'". Id. at 1150 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Here, summary judgment is appropriate with respect to SCO's contract claims for at least four reasons:  (1) SCO cannot establish that IBM breached the Agreements, which do not restrict what IBM does with its original software products (see Section I below); (2) SCO is estopped from asserting a claim for misuse of IBM's own software, because SCO and its predecessors represented for nearly two decades that SVRX licensees could do as they wished with their own software and they did so without objection by AT&T or its successors (see Section II below); (3) the alleged breaches have been waived — by AT&T and its successors years ago, by Novell pursuant to Section 4.16(b) of the APA, and by SCO based on its own Linux activities (see

79

Section III, below); and (4) SCO's claims relating to RCU are barred by the statute of limitations (see Section IV below).

### Argument[4]

## I.     SCO CANNOT ESTABLISH A BREACH OF THE AGREEMENTS.

SCO's claims (Counts 1-4) concern a set of licensing agreements for the UNIX System V operating system and seek redress for a laundry list of alleged breaches.[5] (¶¶ 176-82.) The claims depend ultimately upon the proposition that the Software Agreements preclude IBM from contributing its own original software to Linux. (¶¶ 178-79.) That proposition is untenable as a matter of law, and as a result, summary judgment should be entered in favor of IBM.

By their terms, the Software Agreements limit the circumstances under which IBM can use and disclose, and thus contribute to Linux, materials from the "SOFTWARE PRODUCT" that IBM licensed from AT&T — UNIX System V. (¶¶ 17, 18.) They also limit the circumstances under which IBM can use and disclose modifications and derivative works of UNIX System V. (¶¶ 17-21.) However, it is undisputed that IBM has not contributed to Linux any material (source code, methods or concepts) from UNIX System V. (¶¶ 228-37.) Although SCO alleges that IBM has taken certain material from its AIX and Dynix products and improperly contributed it to Linux, it is also undisputed that IBM has not contributed its entire AIX and Dynix programs (which SCO claims to be modifications and derivative works of UNIX

---

[4] The undisputed facts are cited in this Part as "¶ __", referring to the relevant paragraph number(s) in the foregoing "Statement of Undisputed Facts".

[5] SCO's claims for breach of the Sublicensing Agreements are merely derivative of and depend entirely upon its claims relating to the Software Agreements. (¶¶ 180-181.)

System V) to Linux. (¶¶ 229-39.) Thus, SCO's claims turn on whether the Software

Agreements preclude IBM from contributing original or homegrown IBM material to Linux

because that material was once part of AIX or Dynix or from allowing developers who worked

on AIX or Dynix to work on Linux.

As is discussed below, the Software Agreements do not, as a matter of law, preclude IBM

from contributing *its or Sequent's original or homegrown material to Linux*. The plain language

of the agreements, the extrinsic evidence of the meaning of the agreements and general

principles of public policy support only one conclusion — that IBM owns and is free to disclose

any material that it or Sequent created, so long as that material does not contain UNIX System V

material. Accordingly, summary judgment should be entered in favor of IBM on SCO's contract

claims.

A.     The Plain Language of the Agreements Forecloses SCO's Theory.

Under New York law (which governs the Agreements),[6] when a contract's language is

"clear, unequivocal and unambiguous, the contract is to be interpreted by its own language".

R/S Assoc. v. New York Job Dev. Auth., 771 N.E.2d 240, 242 (N.Y. 2002). It is the Court's

role, as a matter of law, to interpret unambiguous contracts. See American Express Bank Ltd. v.

Uniroyal, Inc., 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990); Rehberger v. Richtberg, 744

N.Y.S.2d 477, 478 (N.Y. App. Div. 2002). Based upon the plain language of the Software

---

[6]   As SCO's contract claims are before this Court based on diversity jurisdiction, Utah
choice of law rules determine the applicable law. See Elec. Distribs., Inc. v. SFR, Inc., 166 F.3d
1074, 1083 (10th Cir. 1999). Utah law provides that the parties' choice of law in a contract
should be respected. See id. at 1083-84; see also Glezos v. Frontier Invs., 896 P.2d 1230, 1234
(Utah Ct. App. 1995).

81

Agreements, IBM is entitled to judgment as a matter of law on SCO's contract claims. While the Agreements place restrictions on IBM's use and disclosure of UNIX System V and on modifications and derivative works of System V, they do not preclude IBM from contributing its own original works to Linux, even if they relate to or were once part of AIX or Dynix.

      1.    <u>The Language of the Agreements.</u>

By their terms, the provisions of the Software Agreements that IBM is alleged to have breached — Sections 2.01, 2.05, 4.01, 6.03, 7.06(a), and 7.10 — pertain to "SOFTWARE PRODUCT[S]". (¶ 51.) The term "SOFTWARE PRODUCT", relates to the UNIX System V computer program (and certain related materials, such as product documentation, that are identified in the Schedules attached to the agreements). (¶¶ 52-56.) SCO has not identified (and cannot identify) any UNIX System V code or related materials that IBM has improperly used, exported, or disclosed in violation of Sections 2.01, 2.05, 4.01, 6.03, 7.06(a) or 7.10. (¶¶ 229-39.) In fact, when IBM raised with SCO its failure to disclose its alleged evidence, SCO stated that it does not even contend that IBM misused any UNIX System V Software: "IBM keeps insisting on something that is not part of SCO's claims, so it should come as no surprise that files or lines of code in System V have not been identified". (¶ 236.)

In the absence of any evidence that IBM misused any of AT&T's Software Products, SCO grounds its allegations of breach on a single clause in Section 2.01 of the Software Agreements. As originally drafted, Section 2.01 grants licensees "the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT". (¶ 20.) SCO argues that AIX and Dynix are modifications and

derivative works of AT&T's UNIX System V Software (i.e., "resulting materials") and that they must therefore be treated like UNIX System V Software. According to SCO, IBM may not use or disclose any portion of AIX or Dynix, including original IBM works (created independent of UNIX System V), except with SCO's permission, even if the original IBM works are no longer part of AIX or Dynix. (¶¶ 178-79.) SCO goes so far as contend that any IBM developer ever exposed to AIX or Dynix is precluded from using his/her experience in working on any other operating system including Linux.

SCO's construction finds no support in the plain language of the Software Agreements. While Section 2.01 requires that modifications and derivative works (AIX and Dynix as a whole, according to SCO) be treated like UNIX System V, it does not foreclose IBM from doing as it wishes with its original works simply because they might have once been (or in the future might be part of) a modification or derivative work of UNIX System V. (¶¶ 20-21.) Likewise, Section 2.01 offers no support for the proposition that anyone ever exposed to AIX or Dynix is forever precluded from working on another operating system or using his/her operating system experience. The restrictions that SCO seeks to impose on IBM's original works are a figment of SCO's wishful thinking.

### 2.   The Unreasonableness of SCO's Claim.

SCO's interpretation of Section 2.01 not only finds no support in the text of the Agreements, but also it is patently unreasonable and therefore untenable.

The "rules of construction of contracts require, whenever possible, that an agreement should be given a 'fair and reasonable interpretation'". Farrell Lines, Inc. v. City of N.Y., 281 N.E.2d 162, 165 (N.Y. 1972). "[A] contract should not be interpreted to produce a result that is

absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) (internal citations omitted); see also Leighton's Inc. v. Century Circuit, Inc., 463 N.Y.S.2d 790, 792 (N.Y. App. Div. 1983) (Fein, J., dissenting) ("An unreasonable interpretation or an absurd result is to be avoided."); Reape v. N.Y. News, Inc., 504 N.Y.S.2d 469, 470 (N.Y. App. Div. 1986) ("[W]here a particular interpretation would lead to an absurd result, the courts can reject such a construction in favor of one which would better accord with the reasonable expectation of the parties."). Indeed, it is "against the general policy of the law" to interpret a contract in a way that would produce "an unreasonable result" or "would, in effect, place one party to the contract at the mercy of the other". Mandelblatt v. Devon Stores, Inc., 521 N.Y.S.2d 672, 675 (N.Y. App. Div. 1987).

### a. SCO's Theory Is Inconsistent with IBM's Ownership Rights.

SCO does not and cannot dispute that IBM owns both AIX and Dynix, including the material that SCO contends IBM has misused. Under SCO's theory, however, it has the right to control every single one of the many millions of lines of code that have ever been put into (and that will ever be put into) AIX or Dynix by IBM or Sequent. (¶¶ 178-79.) SCO's interpretation would allow it to co-opt decades of work in developing and improving AIX and Dynix — by continually adding new capabilities and functionalities — simply because those programs contain, or even once contained, some source code, no matter how negligible, from UNIX System V. SCO's interpretation would also mean that SCO has the right to control code that was written by third parties and licensed to IBM, even if such third parties have no relationship at all with SCO. According to SCO, just because a third party licenses code — that it expended its

own resources developing — to IBM, and IBM includes such code in AIX or Dynix, SCO may forever dictate the use and disclosure of that third party's code by IBM.

At the same time, SCO would have little information about the scope of its rights. (¶ 288.) It could not, as a practical matter, know to what extent its licensees have associated their own original code, methods, and concepts with System V code, methods, and concepts. It could know even less about the extent to which software developers have relied upon public information about the code, methods, and concepts of System V software. Thus, if SCO had the right to control modifications and derivative works of System V software, there would be widespread uncertainty about the scope of SCO's rights, including the identity of the persons whose employability it claims to have controlled.[7] (¶ 288.) Thus, SCO's reading of the Agreements would not only effectively nullify IBM's ownership of AIX and Dynix; it would effectively expand SCO's ownership rights exponentially. (¶ 285.) Such an interpretation is plainly untenable. See Elsky v. Hearst Corp., 648 N.Y.S.2d 592, 593 (N.Y. App. Div. 1996) (holding that contract should not be interpreted to lead to a "commercially unreasonable restriction").

### b.    SCO's Theory Is Inconsistent with Copyright Law.

As further evidence of the unreasonableness of SCO's theory, SCO's interpretation of the Agreements is at odds with the basic principles underlying federal copyright law.

---

[7] Under SCO's theory, it has the right to control the work of the hundreds of UNIX System V licensees who at any time used some source code from UNIX System V in one of its own computer programs. This would mean that SCO has the right to control, for example, all of the source code for all of the different functionalities in Hewlett Packard's HP-UX operating system and SGI's IRIX operating system, among others. (See ¶ 284.)

Under the copyright law, the right to copyright a work, and the attendant benefits, "vests initially in the author or authors of the work". 17 U.S.C.A. § 201(a) (West 2006). The holder of a copyright on a particular work "has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; [and] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending. . . ." 17 U.S.C.A. § 106 (West 2006). Thus, when IBM, or any other person or entity, writes its own computer code, it automatically gains the exclusive right to copy and distribute that code.

This same principle applies even with respect to derivative works, although the copyright law makes clear that the "copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material". 17 U.S.C.A. § 103(b) (West 2006). The copyright in such derivative work "is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material". Id. (emphasis added).

Under the copyright law, therefore, it is well settled that the author of a derivative work has the right to copyright (and thus control the copying and distribution of) any of its own original materials in the derivative work, but has no rights with respect to the preexisting materials. It is also settled that the author of the preexisting materials does not have any rights in the newly created derivative work, except to the extent of the preexisting materials contained therein. As a leading treatise puts it:

86

> If the copyright owner of a pre-existing or underlying work limits his consent for its use in a derivative work to a given medium (e.g., opera), the copyright owner of the derivative work may not exploit such derivative work in a different medium (e.g., motion pictures) to the extent the derivative work incorporates protectible material from the underlying work. However, <u>the new matter added by the author of the derivative work, if not combined with the underlying material, may be used in any media without restriction.</u>

1 David Nimmer, <u>Nimmer on Copyright</u> § 3.07 (<u>citing</u> <u>G. Ricordi & Co. v. Paramount Pictures, Inc.</u>, 189 F.2d 469, 472-73 (2d Cir. 1951) (emphasis added)).

SCO's interpretation of the Agreements is not consistent with these basic copyright principles. As SCO reads the agreements, the author of a preexisting work (here SCO, allegedly) has the right to control all parts of AIX and Dynix (which SCO claims to be IBM and Sequent derivative works), including those original materials contributed by IBM and Sequent. This is an unreasonable interpretation of the language of the Agreements, which gives no indication that it is meant to deprive either party of its rights under the copyright laws.

         c.     <u>SCO's Theory Is Contrary to Public Policy.</u>

SCO's claim is not limited to controlling IBM's original works.

SECTION REDACTED

Thus, SCO seeks to control the employment and employability of anyone who ever worked on Dynix.

Under New York law "'negative covenants restricting competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness'". <u>Johnson Controls,</u>

87

Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004) (quoting Reed,

Roberts Assocs., Inc. v. Strauman, 353 N.E.2d 590, 592 (N.Y. 1976)). As the New York Court

of Appeals has stated, "'powerful considerations of public policy . . . militate against sanctioning

the loss of a man's livelihood.' Indeed, our economy is premised on the competition engendered

by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an

employee's right to apply to his own best advantage the skills and knowledge acquired by the

overall experience of his previous employment". Reed, Roberts, 353 N.E.2d at 593 (internal

citations omitted) (quoting Purchasing Assocs., Inc. v. Weitz, 196 N.E.2d 245, 247 (N.Y. 1963)).

Restrictive covenants "will be enforced only if reasonably limited temporally and geographically

and then only to the extent necessary to protect the employer from unfair competition which

stems from the employee's use or disclosure of trade secrets or confidential customer lists."

Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4, 6 (N.Y. 1977) (internal

citations omitted) (holding unenforceable a restrictive covenant requiring that an employee "not

divulge any other information that he has or shall have acquired during his period of

employment" because it did "no more than baldly restrain competition").[8]

---

[8] See also Stanley Tulchin Assocs., Inc. v. Vignola, 186 A.D.2d 183, 185 (N.Y App. Div.
1992) (holding unenforceable that portion of a restrictive covenant requiring the employee to
treat the "'Know- How' he gained as an employee as confidential and . . . neither use nor
disclose such 'Know-How' to third parties for a period of three years after his employment");
Reed, Roberts, 353 N.E.2d at 593 (holding a restrictive covenant unenforceable where "[a]
contrary holding would make...specialists in certain aspects of an enterprise virtual hostages of
their employers"); Restatement (Third) of Unfair Competition § 41 cmt. a (2006) ("[A]
nondisclosure agreement that encompasses information that is generally known or in which the
promisee has no protectable interest, such as a former employee's promise not to use information
that is part of the employee's general skill and training (see § 42, Comment d), may be
unenforceable as an unreasonable restraint of trade.")

If, as it contends, SCO's "control rights" extend to experience and know-how (positive or negative), then it could control the employment of a significant sector of the computer industry. Many hundreds of thousands of people have been exposed to the code, methods and concepts of System V and other flavors of UNIX. (¶ 287.) SCO and its predecessors have disseminated such information to many, many, thousands of persons and entities. (¶¶ 284, 287.) Assuming the truth of SCO's claims about the scope of its control rights, it would appear to have the ability to control the employability of these persons. Given the strong public policy against such restrictions on employees' use of their general experience, SCO's theory of "mental contamination" is unreasonable and unenforceable.

        d.     <u>SCO's Theory Leads to an Absurd Result.</u>

Finally, SCO's theory, if accepted, would generally have far-reaching negative implications. If SCO had the right to control all software into which some System V code was ever included, then it would have extraordinary — indeed, seemingly limitless — control over the software industry. AT&T and its successors widely disseminated information about the code, methods and concepts of System V. (¶ 284.) System V alone has been licensed for redistribution to thousands of entities worldwide. (¶ 284.) These licensees have combined the code, methods and concepts of System V software with hundreds of millions of lines of original non-AT&T code and many thousands of original, non-AT&T methods and concepts. For example, certain versions of AIX include more than 100 million lines of non-AT&T code, methods and concepts. (¶ 77.) Thus, if SCO had the right to control modifications and derivative works of System V (as it seems to claim), then it would control vast quantities of others' property.

89

The viral quality of SCO's claim would give it control rights well beyond the life of the System V rights that its supposed control rights are purported to protect. (¶ 285.) The apparent purpose of the control rights claimed by SCO seems to be to ensure, among other things, the confidentiality of AT&T System V code, methods and concepts. (¶ 285.) The argument seems to be prophylactic in nature: by retaining control of its licensees' code, methods and concepts, SCO can retain control of any System V code, methods and concepts that might be included therein. (¶ 285.) Even where the code, methods and concepts of System V software are no longer confidential, SCO would have the right to control the original works of its licensees. System V software could become freely available and SCO's right to control others' works would (under its theory) persist.[9] (¶ 285.)

From a practical standpoint, if SCO had the right to control the code, methods and concepts of all flavors of UNIX, the owners of those products would be limited in their ability to support or even market them. (¶ 286.) To support and market an operating system, it is often necessary to reference and disclose the code, methods and concepts of the operating system. (¶ 286.) If SCO, as opposed to IBM, had the right to control what IBM could say publicly about the non-System V code, methods and concepts of AIX, for example, then IBM could not provide installation and technical assistance without the cooperation of SCO (an IBM competitor). (¶ 286.)

---

[9] This is not an academic concern. UNIX System V is generally available without restriction to the general public and therefore freely available under the terms of the Agreements.

90

B.      The Extrinsic Evidence Precludes SCO's Claim.

As stated, the Software Agreements are unambiguous and plain on their face. Applying SCO's allegations to the language of the Software Agreements shows that IBM is entitled to summary judgment. However, even if the Court were to find the Software Agreements to be ambiguous, SCO's claims still fail as a matter of law. The relevant extrinsic evidence regarding the proper interpretation of the Software Agreements supports the view that IBM and Sequent may do as they wish with their original works so long as they treat UNIX System V as required by the Agreements. Where, as here, the "evidence so clearly weighs in one direction that there is no genuine issue of material fact left", summary judgment is appropriate. Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150, 1173 (10th Cir. 1999).

IBM and Sequent made clear to AT&T during the negotiations resulting in the Agreements that they must retain ownership and control of their original works, whether or not those works were part of a modification or derivative work of UNIX System V. (¶ 38.) None of the AT&T representatives involved in the negotiations expressed any disagreement as to who would own and control IBM's and Sequent's original works. (¶ 37.) In fact, the AT&T negotiatiors explicitly stated that they shared IBM's and Sequent's intent and did not seek to assert ownership or control over their original works. (¶ 37.) They indicated that AT&T required only that its licensees protect AT&T's UNIX System V material. (¶ 39.) The AT&T negotiators did not believe that AT&T licensees would have entered into their licensing agreements if they believed AT&T's agreements would give it ownership control over the licensees' original works. (¶ 43.)

91

Moreover, the Agreements were executed on behalf of AT&T by Messrs. Wilson and Frasure. (¶ 48.) Mr. McDonough executed the Agreements for IBM, and Mr. Rogers executed them for Sequent. (¶¶ 48, 49.) All agree that they were not intended to restrict IBM's use of its original works — whether or not they were or might become part of a modification or derivative work of UNIX System V. (¶ 57.) In addition, Mr. DeFazio, the overall head of UNIX licensing, and the other individuals who actually and actively negotiated the Agreements, Messrs. Vuksanovich and Kistenberg, likewise agree that the Agreements were not intended to restrict IBM's use of its original works, even if they were or might become part of a modification or derivative work of UNIX System V. (¶¶ 57-59.)

Finally, during the course of performing under the Agreements, representatives of AT&T and its successors repeatedly stated, over many years, that licensees, including IBM and Sequent, could do as they wished with their original works. (¶¶ 82-88, 119, 143.) Following execution of the Agreements, AT&T and USL communicated with licensees on a daily basis and frequently explained their intent, view and understanding as to their licensees' rights to their own original materials. (¶¶ 82-88.) AT&T and USL representatives communicated to licensees, including IBM and Sequent, that they owned and could do as they wished with their own original works, even if those works might be included in a modification or derivative work of UNIX System V, so long as they protected AT&T's UNIX System V source code. (¶ 83.) In addition to dealing with licensees on a daily basis regarding the Agreements, AT&T and USL communicated with their licensees at users' conferences, such as USENIX (an organization that supports the development of UNIX variants), and in other public presentations. (¶ 88.) Representatives of AT&T and USL emphasized that their licensees, including IBM and Sequent, could do as they

92

wished with their own original material. (¶ 88.) AT&T and its representatives intended for their licensees to rely upon their statement and assurances about what licensees could do and could not do with their original works. (¶ 89.) Taking Mr. Wilson and his colleagues at their word, IBM, Sequent and other UNIX licensees exercised ownership and control over their original works, despite the fact that those works had been part of a modification and derivative work of UNIX System V or had been associated in some respect with UNIX System V code, such as by publicly disclosing them. (¶ 90.) Based on their understanding of the Agreements, the statements of AT&T representatives and AT&T's failure to take any action to preclude licensees from doing as they wished with their original works, IBM and Sequent (like other licensees) continued to develop their flavors of UNIX. (¶ 93.)

Taken together, the extrinsic evidence in this case "is so one-sided . . . that no rational trier of fact" could conclude that the IBM and Sequent Software Agreements prohibit IBM's disclosure of code, such as the code IBM allegedly contributed to Linux, that does not contain any licensed UNIX System V code. See Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563, 569 (10th Cir. 1989). Accordingly, summary judgment should be granted in IBM's favor on SCO's breach of contract claims even if the Court finds the language of the agreements to be ambiguous. See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 159 (2d Cir. 2000) (holding that a court "may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable fact-finder could decide contrary to one party's interpretation" (internal citations omitted)).

93

Summary judgment is especially appropriate in this case, where any ambiguity must be construed against SCO, because AT&T — SCO's alleged predecessor-in-interest — drafted and prepared the standard form agreements used to license UNIX System V. (¶ 36.) See Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it.") (emphasis added); see also Westchester Resco Co. v. New England Reinsurance Corp., 818 F.2d 2, 3 (2d Cir. 1987) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established contra proferentem principle requires that the ambiguity be construed against that party.").[10]

## II.    SCO IS ESTOPPED FROM PURSUING ITS THEORY OF BREACH.

Even if SCO's reading of the Agreements were correct — and it is not — SCO is estopped from pursuing its theory of breach. Equitable estoppel is a doctrine imposed "to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought". Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184 (1982). The effect of estoppel is to "foreclose[] one from denying his own expressed or implied admission which has

---

[10]    See also Johnson v. Werner, 407 N.Y.S.2d 28, 31 (N.Y. App. Div. 1978) (noting that ambiguities in a form contract must be resolved against the author); Rieter v. Tavella, 549 N.Y.S.2d 888, 889 (N.Y. App. Div. 1990) (same).

in good faith and in pursuance of its purpose been accepted and acted upon by another". N.Y.

State Guernsey Breeders' Co-op v. Noyes, 22 N.Y.S.2d 132, 139 (N.Y. App. Div. 1940).[11]

Equitable estoppel "rests largely on the facts and circumstances of the particular case;

consequently, any attempted definition usually amounts to no more than a declaration of an

estoppel under those facts and circumstances". Sassower, 447 N.Y.S.2d at 971 (quoting N.Y.

Jur. 2d Estoppel, Ratification and Waiver § 15). But grounds for estoppel exist where (1) a party

undertakes a course of action that defines its position with regard to a contractual provision; (2)

the opposing party acts in reliance on that position; and (3) the opposing party would suffer

damages should the initial party seek to assert a contrary position to the one already taken. See

Nassau Trust Co., 56 N.Y.2d at 184.[12]

---

[11] See also McManus v. Board of Educ. of Hempstead Union Free School Dist., 87 N.Y.2d 183, 186-187 (N.Y. 1995) (Estoppel is a bar that "precludes a party from denying a certain [] state of facts exists to the detriment of another party who was entitled to rely on such facts and had acted accordingly."); Sassower v. Barone, 447 N.Y.S.2d 966, 971 (N.Y. App. Div. 1982) ("The doctrine of equitable estoppel 'prohibits a person, upon principles of honesty and fair and open dealing, from asserting rights, the enforcement of which would, through his omissions or commissions, work fraud and injustice.'" (quoting Rothschild v. Title Guar. & Trust Co., 97 N.E. 879 (N.Y. 1912)).

[12] See also Besicorp Group Inc. v. Enowitz, 652 N.Y.S.2d 366, 369 (N.Y. App. Div. 1997) (Under equitable estoppel, "a party is 'precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that the will suffer injury if the former is allowed to repudiate the conduct.'") (quoting Black's Law Dictionary 538 6th ed. 1990)); Kearns v. Manufs. Hanover Trust Co., 272 N.Y.S.2d 535 (N.Y. Sup. Ct. 1966) ("An equitable estoppel in pais has been defined as the effect of the voluntary conduct of a party, whereby he is absolutely precluded, both in law and in equity, from asserting rights which might have otherwise existed, either of property, or of contract, or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his condition for the worse, and who, on his part, acquires some corresponding right, either of property or contract, or of remedy." (quoting Oswego Falls Corp. v. City of Fulton, 265 N.Y.S. 436, 443 (N.Y. Sup. Ct. 1933)).

Here, the undisputed facts support a finding of estoppel. For almost two decades, AT&T and its successors represented to their licensees, including IBM and Sequent, that they could do as they wished with their own works, so long as they did not disclose any original UNIX software. (¶¶ 82-88, 119, 143.) AT&T's licensees, including IBM and Sequent, took AT&T and its successors at their word and made public disclosures of their original works — without objection by AT&T or its successors. (¶¶ 90, 120-23, 144-45.) IBM and Sequent reasonably relied to their detriment on the statements and conduct of AT&T and its successors, such as by building their businesses on the idea that they could do as they wished with their original works. (¶¶ 73-75, 79, 94-95, 125-27, 148-50.) IBM and Sequent would experience severe prejudice if it were forced suddenly to stop those businesses in their tracks.

### A.  AT&T and Its Successors Communicated to IBM and Others for Nearly Two Decades that They Could Do as They Wished with Their Original Works.

As discussed, in negotiating the Agreements, IBM and Sequent were insistent on the right to do as they wished with their original works, and AT&T assured them that AT&T had no interest in its licensees' original works. Putting aside the negotiations leading up to the Agreements, AT&T and its successors made perfectly clear to their licensees, including IBM and Sequent, that they could do as they wished with their original works as long as they protected their UNIX Software Product.

First, AT&T and its successors told their licensees that they could do as they wished with their original works. (¶¶ 83-95, 119, 143.) AT&T and its successors dealt with their licensees on a regular basis regarding the Agreements. (¶¶ 82, 88.) In those dealings, licensees frequently raised issues concerning their rights, and AT&T and its successors frequently advised their

96

licensees that could do as they wished with their original or homegrown code, *so long as they protected AT&T's UNIX System V software.* (¶ 83.) AT&T and its successors also communicated with their licensees at users' conferences, such as USENIX, and in other public presentations. (¶ 88.) Publicly, too, AT&T representatives emphasized that their licensees, including IBM and Sequent, *could do as they wished with their own original works.* (¶ 88.) SVRX licensees took AT&T and its successors at their word and freely used and disclosed their original works without objection. (¶¶ 90-95; 125-27; 148-50.)

Second, taking AT&T and its successors at their word, IBM, Sequent and other UNIX licensees used their original works as they wished. More to the point, they did the very things about which SCO now complains: publicly disclosed the code, methods and concepts of their original works. (¶¶ 90, 120-23, 144-45.) For example, IBM disclosed AIX source code in books, including <u>AIX Operating System: Programming Tools and Interfaces</u> (1989) and <u>The Advanced Programmer's Guide to AIX 3.x</u> (1994). (¶¶ 91, 122.) AT&T and its successors were aware and understood that their licensees were exercising ownership and control of the code, methods and concepts of their flavors of UNIX, including AIX and Dynix. (¶¶ 92, 124, 146.) At least until SCO changed management and filed this lawsuit (nearly twenty years after the execution of the Agreements), neither AT&T nor any of its successors took steps to preclude IBM or Sequent from doing as they wished with their original works. (¶¶ 93, 124, 146.)

     **B.**    <u>IBM and Sequent Reasonably Relied on the Statements, Conduct and Inaction of AT&T and Its Successors.</u>

Putting aside the fact that neither IBM nor Sequent would have entered into the Agreements if they had believed the Agreement would give AT&T or its successors the right

97

forever to control what IBM and Sequent could do with their original works, IBM and Sequent relied on AT&T's assurances about their rights.

Based in part on the assurances of AT&T and its successors about what UNIX licensees could do with their original works, IBM and Sequent invested heavily in the development of AIX and Dynix. (¶ 289.) Sequent assigned hundreds, and IBM thousands, of people to AIX and Dynix projects. (¶ 289.)

SECTION REDACTED

Both companies added significant quantities of original code to the operating systems. To give an example, the original AT&T SVR2.0 source code totaled 896,204 lines of code. (¶ 290.) The AIX Version 5.1.G for Power contains 160,198,865 lines of code. (¶ 290.) IBM never would have invested the time, money and resources into expanding upon UNIX if it had believed that it would not have ownership and control over the resulting additions and enhancements. (¶¶ 289-94.)

Since the initial introduction of the original versions of AIX in 1987, IBM has incorporated a broad array of new technology and quality improvements into all aspects of the system design and implementation. These include such innovations such as Virtual Resource Manager, a Journaled File System, a Logical Volume Manager, an Object Data Manager, a System Management Interface Tool and a Network Install Manager, among countless other developments. (¶ 291.) Subsequent AIX versions integrated even more enhancements,

including a Web-based System Manager, an IBM Java Development Kit, an AIX Workload Manager, and many other developments. (¶ 291.)

Each of these developments stands on its own right and is comprised of non-UNIX source code. (¶ 293.) Some of them can even be considered stand-alone products. (¶ 293.) Yet because they were packaged with some UNIX System V code, each of them falls within the scope of SCO's complaints. Similarly, AIX code has been employed in other IBM products, including servers, printers and multi-protocol routers. (¶ 292.) If IBM had believed that these additions to UNIX would have subjected the code to the confidentiality provisions of the licensing agreements, it certainly would not have packaged them with AIX. (¶ 293-94.)

IBM and Sequent also relied upon the inaction of AT&T and its successors. Not only did AT&T and its successors repeatedly tell UNIX licensees that they could do as they wished with their original works, but also they took no steps to prevent them from exercising ownership and control over their original works. (¶¶ 73-75, 93-95, 125-27, 148-50.) If AT&T and its successors had expressed concern about IBM's and Sequent's use of their original works, then the companies could have and would have done business differently. Neither IBM nor Sequent would have developed, added to, or marketed and sold AIX and Dynix as they did if they had not believed that they had the right to do as they wished with their original works. (¶ 294.)

It was perfectly reasonable for IBM and Sequent to rely upon AT&T's and its successors' assurances that they would have complete ownership and control over their homegrown code. IBM and Sequent made clear during negotiations that they would need to control their own code. (¶ 38.) AT&T even provided IBM a clarification, in the form of a side letter, that IBM would own and control its own code. (¶ 31.) AT&T made public statements at various USENIX

99

conferences and in newsletters expressing its view that its licensees could disclose their homegrown code. (¶ 88.) Finally, IBM, Sequent and other UNIX licensees publicly disclosed their code, methods and concepts of their original works for nearly two decades without objection . (¶¶ 90-91, 120-23, 144-45.) Courts have found reliance on much less convincing assurances than those given by AT&T and its successors to IBM and Sequent. See, e.g., Nassau Trust Co., 56 N.Y.2d at 184 (finding plaintiff's reliance on defendant's past course of conduct to be justifiable, even where that conduct contravened the terms of the agreement); Kearns, 272 N.Y.S.2d at 541.

### C. IBM Would Be Prejudiced if SCO Were Allowed to Change Its Position After Two Decades.

Finally, no question exists as to whether IBM would be injured if SCO were allowed to ignore nearly two decades of assurances and practice allowing UNIX licensees to do as they wished with their original source code, methods and concepts. Allowing SCO to pursue its theory would not only undermine the plain language and clear intent of the Agreements, but it would also strip IBM of control of its original works in AIX and Dynix. Those works are the result of an extraordinary investment of human and other resources, the value of which would be destroyed. SCO, not IBM, would control more than one hundred million lines of original IBM works. IBM would lose the value associated with control of its original works.

IBM and Sequent developed much of their businesses around the belief that they had complete control and ownership over any improvements to the original code they licensed from AT&T. (¶ 289-94.) If AT&T or its successors had ever expressed the position SCO asserts in this lawsuit, IBM and Sequent would likely have built their businesses around different operating

100

systems or developed one completely on their own. (¶ 294.) The vast amount of financial and

human resources — resources that can never be recouped — that IBM and Sequent used in

developing AIX and Dynix would have been allocated differently. (¶ 294.) The clock cannot be

turned back: AIX now pervades many facets of IBM's business. Courts have found that

building a business around the assumption that one party will not object constitutes harm

sufficient to establish estoppel. See Landers, Frary & Clark v. Universal Cooler Corp., 85 F.2d

46, 49 (2d Cir. 1936) (holding that defendant's large expenditures in developing and advertising

a brand name in reliance that plaintiff would not assert trademark infringement satisfied the

injury prong of estoppel, and noting that "[w]hen for eight years one plan[s] one's business on

the assumption that one may use a mark, it is a grave dislocation of the business to stop its use;

the whole selling organization must be recast and the market re-educated; nobody can estimate

what the losses may be").

## III.    THE ALLEGED BREACHES HAVE BEEN WAIVED.

Even if SCO's theory of the case were not foreclosed by the Agreements, and even if

SCO were not estopped from pursuing it, the alleged breaches have been waived, and SCO's

contract claims are therefore untenable for yet another reason.

Under New York law, "[c]ontractual rights may be waived if they are knowingly,

voluntarily and intentionally abandoned. Such abandonment 'may be established by affirmative

conduct or by failure to act so as to evince an intent not to claim a purported advantage'".

Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P. 850 N.E.2d 653, 658,

(N.Y. 2006) (quoting Gen. Motors Acceptance Corp. v. Clifton-Fine Central School Dist., 647

N.E.2d 1329, 1331 (N.Y. 1995)); see also AXA Global Risks U.S. Ins. Co. v. Sweet Assocs.,

Inc., 755 N.Y.S.2d 759, 760 (N.Y. App. Div. 2003) ("Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable".)[13]  A court may find waiver as a matter of law "when it is proved by the express declaration of the party charged with waiver, or by undisputed words or conduct so inconsistent with a purpose to stand upon the contractual right allegedly waived as to leave no possibility of any reasonable inference to the contrary". 13 Richard A. Lord, Williston on Contracts § 39:21 (4th ed. 2006); see Sec. Indus. Automation Corp. v. United Computer Capital Corp., 723 N.Y.S.2d 668 (N.Y. App. Div. 2001); T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 01-900, 2002 WL 1311648 (N.Y. Sup. Ct. Apr. 2, 2002) (Ex. B hereto).

Here, the alleged breaches have been waived for at least three reasons:  (1) AT&T and its successors, including Novell, Santa Cruz and SCO, expressly waived SCO's theory of breach over the course of nearly two decades; (2) Novell waived the alleged breaches by IBM, on SCO's behalf, pursuant to Section 4.16(b) of the APA; and (3) SCO itself waived any right to assert claims against IBM relating to IBM's and Sequent's original works based on its own Linux activities.

### A.   AT&T and Its Successors Waived SCO's Theory of Breach Long Ago.

As discussed above, AT&T and its successors represented to their licensees for many years that they would not assert control over the original works of their licensees, even if those works were at some point included in a modification or derivative work of AT&T's UNIX

---

[13]  Under Utah law:  "A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence and an intention to relinquish it." In Re Estate of Flake, 71 P.3d 589, 599 (Utah 2003) (quoting Soter's Inc. v. Deseret Fed. Sav. & Loan Ass'n, 857 P.2d 935, 942 (Utah 1993)).

software. (¶¶ 82-88, 119, 143.) IBM and Sequent reasonably relied on those representations to their detriment, so that SCO is estopped from pursuing its theory of the case. (See Section II.) These same facts, which are undisputed, support the conclusion that SCO's breach of contract theory has been waived by its alleged predecessors. "While the doctrines of waiver and estoppel are generally distinguishable, where a party waives a requirement of a contract and the other party changes his or her position to his or her injury in reasonable reliance upon that waiver, the elements of both doctrines are present." 13 Richard A. Lord, Williston on Contracts § 39:16 (4th ed. 2006).

While IBM does not believe AT&T or its successors ever had control over their licensees' original works, if they did, as SCO contends, they knowingly, intentionally and voluntarily abandoned the right by telling their licensees, including IBM and Sequent, that they could do as they wished with their original works so long as they protected AT&T's UNIX software. (¶¶ 82-88, 119, 143.) Representatives of AT&T and its successors repeatedly told SVRX licensees, including IBM and Sequent, on numerous occasions, that they could do as they wished with their original works, even if the works were included in a modification or derivative work of UNIX System V. (Id.)

Courts have found waiver as a matter of law in similar cases in which one party to the contract has unambiguously expressed its intention to abandon its contractual benefits. See, e.g., Topps Chewing Gum, Inc. v. Imperial Toy Corp., 686 F. Supp. 402, 408 (E.D.N.Y. 1988), aff'd, 895 F.2d 1410 (2d Cir. 1989) (stating that waiver may be established as a matter of law with "the express declaration of the [contracting] party, or by (its) undisputed acts or language so inconsistent with (its) purpose to stand upon (its) rights as to leave no opportunity for a

103

reasonable inference to the contrary", and ruling on summary judgment that the purported breach had been waived by defendant who stated, in essence, "there had been no breach by [plaintiff]", and acted contrary to the intent to claim breach); Terry v. Int'l Dairy Queen, Inc., 554 F. Supp. 1088, 1095-96 (N.D. Ind. 1983) (finding waiver based on, inter alia, "uncontradicted evidence" that plaintiff-licensees had acted contrary to an alleged license prohibition without objection from and with knowledge of defendant-licensors' predecessors-in-interest).

> B.    Novell Has Explicitly Waived the Alleged Breaches by IBM.

In addition to the fact that Novell waived SCO's theory of breach long ago, it also waived the alleged breach, on SCO's behalf, after the commencement of this case pursuant to Section 4.16(b) of the APA.

Novell retained certain rights to AT&T's UNIX System V licenses (including IBM's and Sequent's) when it sold UNIX to Santa Cruz (from whom SCO eventually acquired its purported rights to the licenses). (¶¶ 138-42.) In particular, under the parties' 1995 Asset Purchase Agreement, Novell retained the right "at [its] sole discretion" to direct Santa Cruz to "amend, supplement, modify, or waive any rights under . . . any SVRX License", and to take any such actions on Santa Cruz's behalf if Santa Cruz failed to do so. (¶ 141 (emphasis added).) Indeed, Santa Cruz recognized as much in Amendment No. X to IBM's Software and Sublicensing Agreements, to which Novell was a party, and which specifically noted that "Novell retained . . . certain rights with respect to" the agreements IBM entered into with AT&T, including particularly "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended". (¶ 142 (emphasis added).)

104

The language of the APA setting forth Novell's continuing rights to AT&T's UNIX System V agreements is plain and unambiguous and can therefore be understood based on its terms alone.  No parol evidence is needed to explain the parties' intent.  Indeed, it is axiomatic that under New York contract law a court is prohibited from considering extrinsic evidence when faced with clear and unambiguous contract language.  See Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590, 593 (N.Y. 1957).  Therefore, the interpretation of Section 4.16(b) of the APA is a question of law suitable for summary adjudication without reference to any other materials.  See id.  There is no question that Novell retained the right to waive any rights under the UNIX System V licenses entered into by IBM and Sequent, including specifically the IBM Software Agreement and the Sequent Software Agreement.

There is also no question that Novell invoked its rights.  On October 7, 2003, after SCO commenced this lawsuit against IBM, Novell informed SCO by letter that its interpretation of the Software Agreement was incorrect.  (¶ 191.)  Consistent with the plain language of the contracts, and the extensive extrinsic evidence reviewed above, Novell stated in its letter that the agreements between AT&T and IBM provide "a straightforward allocation of rights":

> (1) AT&T retained ownership of its code from the Software Products ("AT&T Code"), and the Agreements' restrictions on confidentiality and use apply to the AT&T Code, whether in its original form or as incorporated in a modification or derivative work, but (2) IBM retained ownership of its own code, and the Agreements' restrictions on confidentiality and use do not apply to that code so long as it does not embody any AT&T Code.

(¶ 192.)  In accordance with the rights it retained to AT&T's UNIX System V licenses, Novell therefore directed SCO "to waive any purported right SCO may claim to require IBM to treat

IBM Code itself as subject to the confidentiality obligations or use restrictions of" the IBM Agreements. (¶ 190.)

After SCO failed to follow Novell's instruction, on October 10, 2003, Novell sent a letter to SCO that expressly "waive[d] any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T . . .[,] as subject to the confidentiality obligations or use restrictions of the Agreements". (¶ 193.)

On February 6, 2004, Novell further directed SCO to waive any purported right to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (¶ 194.) In its letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software Agreement was misplaced, and stated that "SCO's interpretation of section 2.01 is plainly contrary to the position taken by AT&T, as author of and party to the SVRX licenses". (¶ 195.)

After SCO failed to follow Novell's instruction, on February 11, 2004, Novell expressly "waive[d] any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license". (¶ 196.)

Novell's letters to SCO establish as a matter of law that even if SCO had the right under the IBM and Sequent Software Agreements to prevent IBM from disclosing its or Sequent's original code, Novell explicitly waived such right.

106

C.    <u>Through Its Own Conduct, SCO Has Waived Its Purported Rights To Claim Breach Of Contract.</u>

Even if SCO's interpretation of the IBM and Sequent Software Agreements were correct (which it is not), SCO itself has also waived any alleged breach by IBM relating to the code IBM is alleged to have improperly contributed to Linux. Under New York law, waiver "may be established . . . by acts and conduct manifesting an intent and purpose not to claim the alleged advantage or from which an intention to waive may reasonably be inferred". <u>Heidi E. v. Wanda W.</u>, 620 N.Y.S.2d 665, 665 (N.Y. App. Div. 1994) (<u>quoting</u> N.Y. Jur. 2d Estoppel, Ratification and Waiver § 81.).[14]

In this case, SCO's acts and conduct are plainly inconsistent with an intention to assert a breach of contract against IBM based on the disputed material. Both before and even after SCO sued IBM, SCO sold to customers and made publicly available on the Internet — pursuant to the GPL — the material that it claims IBM improperly contributed to Linux. (¶¶ 156-68.) Indeed, that material was still available on SCO's website as recently as the end of 2004. (¶ 168.) SCO cannot on the one hand market and sell the source code IBM contributed to the Linux operating system, and on the other hand claim that IBM was prohibited by its licensing agreements from contributing that code to Linux.

For many years prior to its filing this lawsuit, SCO's principal business was the distribution of the Linux operating system, the development and marketing of software based on Linux, and the provision of Linux-related services to customers. (¶¶ 128-33, 151-70.) In fact, in

107

2002, SCO formed the UnitedLinux partnership with three other Linux distributors with the intention of creating a single uniform Linux distribution designed for business use. (¶ 156.) Just two months before SCO brought suit against IBM, in January 2003, UnitedLinux signed IBM as a technology partner to, among other things, jointly promote UnitedLinux's first Linux distribution, UnitedLinux Version 1.0. (¶ 157.)

SCO does not dispute that its own Linux distributions, including UnitedLinux Version 1.0 (distributed by SCO as "SCO Linux Server 4.0"), which it sold or otherwise made available before bringing this suit against IBM, contain code upon which SCO's claims are based. (¶ 158.) SCO, in fact, either admits that SCO Linux Server 4.0 included, and SCO made available for download on its website, the exact Items that it claims IBM misappropriated (including JFS (Item 1), RCU (Item 2) and certain negative know-how claims (Items 23 and 90), or states, despite three court orders requiring SCO to disclose its allegations and evidence, that it has "not presently determined" whether or not such material was included in SCO's product. (¶ 158.) Having failed in the face of three court orders to reveal whether certain of the allegedly misused material is included in its Linux products, SCO is foreclosed from arguing that they are not in SCO's products. See, e.g., Quevedo v. Trans-Pac. Shipping Inc., 143 F.3d 1255, 1258 (9th Cir. 1998); Lawrence v. IBP, Inc., No. 94-2027, 1995 WL 261144, at *7 (D. Kan. Apr. 21, 1995) (Ex. C hereto); Stone v. CGS Distrib. Inc., No. 93-2188, 1994 WL 832021, at *6 (D. Colo. Aug. 18, 1994) (Ex. D hereto); Traffas v. Bridge Capital Investors II, No. 90-1304, 1993 WL 339093,

---

[14] See also In Re Estate of Flake, 71 P.3d 589, 599 (Utah 2003) (holding that waiver occurs under Utah law when a party intentionally acts in a manner inconsistent with its contractual rights).

at *6 (D. Kan. Aug. 23, 1993) (Ex. E hereto); see also Lauth v. McCollum, No. 03-8529, 2004 WL 2211620, at *4 (N.D. Ill. Sept. 30, 2004) (Ex. F hereto); Cambridge Elecs. Corp. v. MGA Elecs., Inc., 227 F.R.D. 313, 321-25 (C.D. Cal. 2004); McElroy v. Cudd Pressure Control, Inc, No. 00-1162, 2000 WL 1838710, at *3 (E.D. La. Dec. 13, 2000) (Ex. G hereto).

SCO specifically touted to its customers that its distributions of Linux included some of the very technology it now complains IBM improperly contributed to Linux. (¶¶ 161-64.) For example, in its January 2002 product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO advertised that the products included new features such as "journaling file system support". (¶ 162.) Likewise, its November 2002 product announcement for "SCO Linux Server 4.0" stated that the "core of SCO Linux Server 4.0 is the 2.4.19 Linux kernel" and that "[n]ew features" include "improved journaling file system support". (¶ 163.) SCO's Technical Overview of SCO Linux 4.0 even emphasized that its product included "JFS (Journaled File System Developed by IBM)". (¶ 164 (emphasis added).)

Moreover, as a member of UnitedLinux, SCO gave up any intellectual property rights that it might have had in most of its UnitedLinux products (SCO Linux 4.0), including the allegedly misused material. In May 2002, Caldera joined with other Linux vendors to form UnitedLinux. (¶ 156.) Pursuant to the terms of the UnitedLinux Joint Development Contract ("JDC") and the Master Transaction Agreement ("MTA"), the members of UnitedLinux, including SCO, assigned to UnitedLinux (with exceptions not relevant here) ownership of all the intellectual property rights held by the members in software developed by UnitedLinux. (¶ 251.) Hence, SCO has expressly relinquished its intellectual property rights over the pertinent content of SCO Linux 4, including the IBM contributions thereto that allegedly violated the Agreements.

Case 2:03-cv-00294-DN   Document 832-2   Filed 09/29/06   PageID.11474   Page 57 of 63

SCO's knowing and intentional abandonment of its alleged claim to materials that IBM contributed to Linux demonstrates that SCO has waived its breach of contract claims based on such materials. <u>Topps Chewing Gum</u>, 686 F. Supp. at 408 (finding waiver on summary judgment based on "undisputed acts or language [of defendant] inconsistent with [its] purpose to stand upon [its] rights").

Finally, although SCO claims to have "discontinued" distributing any products containing the source code it claims IBM improperly disclosed, SCO continued to do so <u>after</u> it filed this lawsuit. (¶¶ 165-69.) For example, SCO released its "SCO Linux Server 4.0 for the Itanium Processor Family" product on April 14, 2003, after SCO filed its original Complaint. As with its earlier release of SCO Linux Server 4.0, SCO's product announcement proclaimed that the new features of this product included "improved journaling file system support". (¶ 166.) Invoices and other documentation produced by SCO to date for its Linux products further reflect SCO's distribution of products containing the code SCO claims IBM improperly contributed to Linux until at least January 2004. (¶ 167.) Likewise, SCO continued to make the Linux 2.4 kernel available for download from its website well after it commenced this lawsuit. (¶ 168.) This code was still available on SCO's website as recently as the end of 2004. (¶ 168.) The version of Linux available from SCO's website includes code it claims IBM disclosed in violation of its contracts. (¶ 168.)

Given SCO's extensive promotion and sale of Linux, and of the specific code contributed by IBM therein, before commencing this suit against IBM and even after, SCO has waived any right to claim that IBM breached its contracts by disclosing such code. SCO cannot openly accept the benefits of IBM's contributions to Linux, and then claim that such contributions were

110

improper. SCO's claims therefore fail as a matter of law for this reason also. See, e.g., Sec. Indus. Automation Corp. v. United Computer Capital Corp., 723 N.Y.S.2d 668, 669 (N.Y. App. Div. 2001) (affirming grant of plaintiff's cross-motion for summary judgment where defendant's conduct demonstrated waiver of contract claim); T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 01-900, 2002 WL 1311648, at *1 (N.Y. App. Term Apr. 2, 2002) (granting defendant's cross-motion for summary judgment after finding waiver of contract claim based on plaintiff's conduct) (Ex. B hereto).

## IV.    SCO'S CLAIMS RELATING TO RCU ARE BARRED BY THE STATUTE OF LIMITATIONS.

Both New York and Utah apply a six year statute of limitations for breach of written contract actions. N.Y. C.P.L.R. § 213 (McKinney 2006); Utah Code Ann. § 78-12-23 (West 2006). "A cause of action for damages for breach of a nondisclosure agreement accrues on the date that the protected information was disclosed, and it does not continuously accrue upon subsequent disclosures". Dolgoff Holophase, Inc. v. E.I. Du Pont de Nemours & Co., 622 N.Y.S.2d 769, 770 (N.Y. App. Div. 1995) (holding that breach of nondisclosure agreement was barred by the statute of limitations) (citing Sachs v. Cluett, Peabody & Co., 39 N.Y.S.2d 853, 857 (N.Y. App. Div. 1943), aff'd, 53 N.E.2d 241 (N.Y. 1944) (per curiam); Sporn v. MCA Records, 451 N.Y.S.2d 750, 751 (N.Y. App. Div. 1982).[15]

---

[15] See also Lemelson v. Carolina Enter., Inc., 541 F. Supp. 645, 660 (S.D.N.Y 1982) ("If the basis for the theory of continuing wrong lies in the fear that 'continuing use of a trade secret constitutes continuous jeopardy to the rightful owner's protection (because) the wrongful user might tend to make the secret generally known,' . . . full-scale disclosure through the issuance of a patent renders the continuing tort theory inapplicable to the instant case. Hence, the issuance of the -059 patent totally destroyed any value the trade secret might have had, and the only action available to plaintiff was one for misappropriation and complete destruction of the secret

111

Sequent publicly disclosed RCU more than six years prior to the commencement of the case (in March 2003), and SCO's claim relating to RCU is therefore barred by the statute of limitations. Sequent filed a patent application for RCU on July 19, 1993, and the patent issued on August 15, 1995. (¶ 261.) The Linux RCU and the Dynix RCU are, as IBM's Paul McKenney testified, implementations of the same general concepts embodied in that patent. (¶ 261.) By filing the patent, Sequent ceased holding RCU "in confidence for AT&T" (¶ 17) as SCO contends (incorrectly) it was required to do, and thus breached the Software Agreement according to SCO's mistaken theory. Pursuant to law, the RCU patent provided a "written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and . . . set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C.A. § 112 (West 2006).

Courts have found claims barred by the statute of limitations in similar circumstances. See Mopex, Inc. v. Am. Stock Exch., No. 02-1656, 2002 WL 342522, at *11 (S.D.N.Y. Mar. 5, 2002) (plaintiffs' claim of breach of confidentiality agreement was barred by six-year statute of limitations where defendant disclosed plaintiffs' trade secrets in an application to the SEC in 1994, but plaintiff failed to bring claim for breach of that agreement until 2001) (Ex. H hereto); Dolgoff Holophase, 622 N.Y.S.2d at 770 (plaintiff's claim for breach of nondisclosure

---

upon such issuance and not for any future or continued use by defendants.") (quoting M & T Chems., Inc. v. International Business Machines Corp., 403 F. Supp. 1145, 1149 (S.D.N.Y. 1975)).

agreement was time-barred where defendant disclosed alleged confidential information in a patent application and through the publication of a hologram).

## Conclusion

For the foregoing reasons, summary judgment should be entered in favor of IBM and

against SCO on SCO's claims for breach of contract (SCO's First, Second, Third and Fourth

Causes of Action).

DATED this 25th day of September, 2006.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson


CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-
Plaintiff International Business Machines
Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

114

## CERTIFICATE OF SERVICE

I hereby certify that on the 25ᵗʰ day of September, 2006, a true and correct copy of the

foregoing was sent by U.S. Mail, postage prepaid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Amy F. Sorenson

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2006, a true and correct copy of the

foregoing was sent by U.S. Mail, postage pre-paid to the  following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Todd M. Shaughnessy