FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

**OCT 1 2 2006**

MARKUS B. ZIMMER, CLERK
BY
_____
DEPUTY CLERK

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **IBM'S REDACTED MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT (IBM'S TENTH COUNTERCLAIM)** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **(ORAL ARGUMENT REQUESTED)** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV-0294 DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

RECEIVED CLERK

200b SEP 25 P 8 19

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
 *International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **IBM'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT (IBM'S TENTH COUNTERCLAIM)** |
| Plaintiff/Counterclaim-Defendant, | |
| | **(ORAL ARGUMENT REQUESTED)** |
| v. | |
| | **FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| | Civil No. 2:03CV-0294 DAK |
| Defendant/Counterclaim-Plaintiff. | |
| | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

## Table of Contents

|  | Page |
|---|---|
| Table of Authorities | iv |
| Preliminary Statement | 1 |
| Statement of Undisputed Facts | 6 |
| A. Beginning of Linux | 6 |
| B. Novell, UNIX and Linux | 7 |
| C. Caldera and Linux | 10 |
| D. Santa Cruz, UNIX and Linux | 12 |
| E. Caldera Begins To Develop Linux for Business | 14 |
| F. The Linux Standard Base | 16 |
| G. 86Open and Ixrun | 19 |
| H. Caldera Spin-Off and Business Marketing | 20 |
| I. Santa Cruz's Infringement Analysis | 25 |
| J. IBM and Linux | 26 |
| K. Caldera Acquires Santa Cruz's UNIX Assets | 29 |
| L. UnitedLinux | 31 |
| M. SCO's Financial Difficulty and New Business Plan | 34 |
| N. SCO's Litigation and Threats of Litigation | 35 |
| O. SCO's Touting and Obfuscation | 37 |
| P. SCO's Continued Distribution of Linux | 39 |
| Q. SCO's Failure To Substantiate Its Claims | 41 |
| R. The Court's Summary Judgment and Scheduling Orders | 43 |
| S. SCO's Interim and Final Disclosures | 44 |

i

T.   Order Enforcing Court's Disclosure Requirements..................................................46

U.   Allegations of the Final Disclosures...............................................................48

V.   SCO's Failure of Proof...............................................................................50

W.   IBM Licenses............................................................................................51

    1.   The 1999 Caldera License. ......................................................................51

    2.   The GPL...............................................................................................53

    3.   Spec 1170.............................................................................................53

    4.   ELF. ...................................................................................................55

X.   Insignificance and Dissimilarity....................................................................55

Y.   Unprotectability of the System V Code............................................................58

    1.   Relationship to Externalities.....................................................................60

        (i)   Compatibility. ...............................................................................60

        (ii)   Standards.....................................................................................62

        (iii)   Programming Practice....................................................................63

        (iv)   Industry Demand..........................................................................64

    2.   Conceptual Nature of the Disputed Code. ....................................................65

    3.   Unoriginality of the Files.........................................................................67

Z.   Authorship/Ownership.................................................................................68

    1.   Cited Linux Files. ..................................................................................68

    2.   UNIX Files...........................................................................................69

    3.   The APA. .............................................................................................71

    4.   The UnitedLinux Agreements. ..................................................................72

Standard of Decision..........................................................................................74

ii

Argument ................................................................................................................75

I.    SCO CANNOT PROVE UNAUTHORIZED COPYING BY IBM OF
      COPYRIGHTED WORKS OWNED BY SCO...............................................76

II.   IBM HAS ONE OR MORE LICENSES TO THE DISPUTED CODE...........79

III.  SCO IS ESTOPPED FROM PURSUING ITS INFRINGEMENT CLAIMS. ..............81

IV.   SCO CANNOT SHOW SUBSTANTIAL SIMILARITY BETWEEN LINUX
      AND PROTECTABLE ELEMENTS OF THE SYSTEM V WORKS. ...........................88

      A.    None of the System V Code Is Protectable By Copyright. .............................89

            1.    The System V Code Was Dictated By Externalities. .......................................89

            2.    The System V Code Represents Mere Ideas or Merger Material. ...................90

            3.    The System V Code Lacks Even De Minimis Originality. ...............................93

      B.    Linux Is Not Substantially Similar to the System V Works, Even Assuming
            the Protectability of the System V Code. ...................................................93

V.    SCO HAS MISUSED ITS ALLEGED COPYRIGHTS...........................................95

Conclusion ................................................................................................................101

## Table of Authorities

Page(s)

**Cases**

Alcatel USA, Inc. v. DGI Tech., Inc., 166 F.3d 772 (5th Cir. 1999).........................................96, 99

Baystate Tech., Inc. v. Bentley Sys., Inc., 946 F. Supp. 1079 (D. Mass. 1996)............................92

Boisson v. Banian, Ltd., 273 F.3d 262 (2d Cir. 2001)...............................................................94

Brown Bag Software v. Symantec Corp., 960 F.2d 1465 (9th Cir. 1992)...............................88, 95

Buckward Digital Servs., Inc. v. Millar Instruments, No. 05-1728,
    2006 WL 1118003 (S.D. Tex. Apr. 26, 2006) .................................................................83, 85

Byron v. Chevrolet Motor Div. of Gen. Motors Corp., No. 93-1116,
    1995 WL 465130 (S.D.N.Y. Aug. 7, 1995) ........................................................................83

Calhoun v. Lillenas Publ'g, 298 F.3d 1228 (11th Cir. 2002) ......................................................77

Cambridge Elec. Corp. v. MGA Elec., Inc., 227 F.R.D. 313 (C.D. Cal. 2004)............................78

Capitol Records, Inc. v. Naxos of America, Inc., 262 F. Supp. 2d 204
    (S.D.N.Y. 2003) .............................................................................................................87

Cardinal Indus., Inc. v. Anderson Parrish Assocs., Inc., No. 83-1038,
    1986 WL 32732 (M.D. Fla. May 7, 1986) ..........................................................................83

Carson v. Dynegy, Inc., 344 F.3d 446 (5th Cir. 2003) ........................................................82, 86

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................................74

Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992)....................88, 89, 90, 91

Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220 F.3d 396
    (5th Cir. 2000)................................................................................................................90

Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280 (10th Cir. 1996)...........................93, 94

DeCarlo v. Archie Comic Publ'n, Inc., 127 F. Supp. 2d 497 (S.D.N.Y. 2001)............................85

Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905 (2d Cir. 1980).............................................94

Feist Publ'n v. Rural Tel. Serv. Co., 499 U.S. 340 (1991)........................................................93

Field v. Google Inc., 412 F. Supp. 2d 1106 (D. Nev. 2006)........................................ 82, 85, 86, 87

Fisher v. United Feature Syndicate, Inc., 203 F.3d 834, 2000 WL 135167
    (10th Cir. 2000).......................................................................................................... 88

Fisher v. United Feature Syndicate, Inc., 37 F. Supp. 2d 1213 (D. Colo. 1999),
    aff'd, 203 F.3d 834 (10th Cir. 2000)........................................................................ 94

Frybarger v. I.B.M. Corp., 812 F.2d 525 (9th Cir. 1987)........................................... 88, 95

Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823 (10th Cir. 1993)................... passim

Gemisys Corp. v. Phoenix Am., Inc., 186 F.R.D. 551 (N.D. Cal. 1999)........................... 95

Hadady Corp. v. Dean Witter Reynolds, Inc., 739 F. Supp. 1392 (C.D. Cal. 1990) ................... 87

HGI Assocs., Inc. v. Wetmore Printing Co., 427 F.3d 867 (11th Cir. 2005) ...................... 81, 86

I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996)....................................................... 79

In re Grandote Country Club Co., 252 F.3d 1146 (10th Cir. 2001).................................. 74

In re Indep. Serv. Orgs. Antitrust Litig., 964 F. Supp. 1469 (D. Kan. 1997) ................... 96

Interactive Network, Inc. v. NTN Comms., Inc., 875 F. Supp. 1398 (N.D. Cal. 1995) ............... 75

Jean v. Bug Music, Inc., No. 00-4022, 2002 WL 287786 (S.D.N.Y. Feb. 27, 2002).................... 75

Keane Dealer Servs., Inc. v. Harts, 968 F. Supp. 944 (S.D.N.Y. 1997) ....................... 85, 86

Larami Corp. v. Amron, No. 91-6145, 1993 WL 69581 (E.D. Pa. Mar. 11, 1993)...................... 75

Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970 (4th Cir. 1990) ....................... 95, 96, 99

Lauth v. McCollum, No. 03-8529, 2004 WL 2211620 (N.D. Ill. Sept. 30, 2004) ................ 78, 79

Lawrence v. IBP, Inc., No. 94-2027, 1995 WL 261144 (D. Kan. Apr. 21 1995)................... 78, 91

Lefler v. United Healthcare of Utah, Inc., 162 F. Supp. 2d 1310 (D. Utah 2001)........................ 75

Lopez v. Elec. Rebuilders, Inc., 416 F. Supp. 1133 (C.D. Cal. 1976)............................... 87

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990)................................................... 78

MiTek Holdings, Inc. v. Arce Eng'g Co., 89 F.3d 1548 (11th Cir. 1996).......................... 92

Mitel, Inc. v. Iqtel, Inc., 124 F.3d 1366 (10th Cir. 1997) ....................................... 89, 90, 93

Practice Mgmt. Info. Corp. v. Am. Med. Assoc., 121 F.3d 516 (9th Cir. 1997) ........................... 99

Productivity Software Int'l, Inc. v. Healthcare Tech., Inc., No. 93-6949,
    1995 WL 437526 (S.D.N.Y. July 25, 1995) ......................................................................... 95

qad. inc. v. ALN Assocs., Inc., 770 F. Supp. 1261 (N.D. Ill. 1991) .......................................... 100

Quinn v. City of Detroit, 23 F. Supp. 2d 741 (E.D. Mich. 1998) ...................................... 83, 86

RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747 (Fed. Cl. 1999) .......................... 79

Scholastic Inc. v. Stouffer, 81 Fed. App'x 396 (2d Cir. 2003) ................................................ 74

Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425 (S.D.N.Y. 2002), aff'd,
    81 Fed. App'x 396 (2d Cir. 2003) ........................................................................................ 75

Secure Servs. Tech., Inc. v. Time & Space Processing, Inc., 722 F. Supp. 1354
    (D. Va. 1989) ...................................................................................................................... 90

Stone v. CGS Distrib. Inc., No. 93-1288, 1994 WL 832021
    (D. Colo. Aug. 18, 1994) ........................................................................................ 78, 79, 91

Tamburo v. Calvin, No. 94-5206, 1995 WL 121539 (N.D. Ill. Mar. 171995) ........................... 99

Trevizo v. Adams, 455 F.3d 1155 (10th Cir. 2006) ................................................................. 78

U-Haul Int'l, Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723 (E.D. Va. 2003) ........................... 76

Warner Bros, Inc. v. Am. Broad. Co., 720 F.2d 231 (2d Cir. 1983) ......................................... 94

Winfield Collection Ltd. v. Gemmy Indus. Corp., 311 F. Supp. 2d 611
    (E.D. Mich. 2004) ............................................................................................................... 74

**Statutes and Rules**

17 U.S.C. § 102(b) .................................................................................................................. 90

Fed. R. Civ. P. 56(c) ............................................................................................................... 74

**Other Authorities**

3 Nimmer on Copyright § 13.03 ............................................................................................... 92

Defendant/Counterclaim Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in support of its motion for summary judgment on its claim for declaratory judgment of non-infringement with respect to IBM's Linux activities (the "Tenth Counterclaim") against Plaintiff/Counterclaim-Defendant The SCO Group, Inc. ("SCO").[1]

<u>Preliminary Statement</u>

After promoting the Linux operating system for nearly a decade, SCO changed management and launched a series of legal attacks against it. Despite the fact that SCO contributed to the development of Linux and induced many to use it, SCO threatened to sue Linux users, including IBM, for copyright infringement. While SCO refused to disclose its alleged evidence of infringement, it proclaimed publicly that Linux contained more than one million lines of code controlled by SCO and could not be used without infringing SCO copyrights.

To put an end to the fear, uncertainty and doubt created by SCO's allegations, IBM sought a declaration from this Court that the Linux kernel, the core of the operating system, does not infringe copyrights owned by SCO. SCO refused for more than a year to provide IBM any specific information about its allegations, leading this Court to express astonishment that SCO had no admissible evidence supporting its allegations and to establish a final deadline for SCO to reveal its evidence. The deadline came and went, however, and SCO's allegations remain unsupported. As a result, summary judgment should be entered in favor of IBM on the Tenth

---

[1] The undisputed and indisputable facts set out in this motion are supported by the declarations and documents submitted herewith, including those appended to the Declaration of Todd M. Shaughnessy, which are cited herein as "Ex. __".

Counterclaim, declaring that its activities concerning the Linux kernel do not infringe any SCO copyright.

In its final disclosures (the "Final Disclosures"), SCO identified 294 Items of allegedly misused material. However, only 68 of them concern allegations of infringement relating to Linux, and only 52 of those survived the Court's June 28, 2006, order limiting SCO's proof. The 52 items at issue (the "Items") identify four allegedly infringed UNIX copyrights (UNIX System V Release 3.2, UNIX System V Release 4.0, UNIX System V Release 4.2, and UNIX System V Release 4.2-ES-MP) (the "System V Works"). The Items also identify three types of allegedly infringing material: (1) header file code that is either dictated by the Single UNIX Specification (the "SUS Material") or relates to a technology known as Streams (the "Streams Material")[2]; (2) code relating to the ELF Specification (the "ELF Material"); and (3) less than 25 lines of memory allocation code, which were removed from Linux before IBM filed its Tenth Counterclaim.

Most of this material is not even in the Linux kernel, which is the subject of the Tenth Counterclaim and this motion. In fact, only 12 of the Items relate to the Linux kernel. Those 12 items concern 326 lines of Linux code (the "Linux Code") that are alleged to infringe 320 lines of UNIX code (the "System V Code") from the System V Works (collectively, the "Disputed Code"). In short, despite SCO's public claims of there being more than one million lines of infringing code in Linux, the Final Disclosures identify no more than 326 lines of

---

[2] A "header file" is a computer-readable text file that describes how information is to be shared among components of a program and/or between a program and other programs. Header files are created for the purpose of communicating information in a standardized way to allow interoperability.

supposedly infringing code in the kernel. The Disputed Code represents less than five one-thousandths of a percent (.005%) of the System V Works.[3]

SCO's claims of infringement fail as a matter of law for at least five independent reasons, any one of which justifies the entry of summary judgment in favor of IBM.

First, SCO cannot establish unauthorized copying by IBM of copyrighted works owned by SCO. From the beginning of this case, IBM asked SCO to disclose its allegations and evidence of alleged infringement, and from the beginning of this case, SCO declined. The Court entered two separate orders requiring SCO to disclose its allegations and evidence with specificity. Even then, SCO failed to do so, requiring the Court to enter an order setting a final disclosure deadline. Even in the face of that order, SCO failed to describe in any meaningful way — let alone in detail, as specified by the Court — its allegations and evidence of infringement by IBM. SCO cannot establish that it owns copyrights in the System V Code. Nor can it show that IBM copied the System V Code without authorization. Nowhere, in fact, has SCO ever specified or substantiated its allegations that IBM's Linux activities infringe SCO copyrights — not in its Final Disclosures, not in its interrogatory answers, nowhere. Having failed to substantiate its claims as ordered by the Court, SCO cannot make out its claims of infringement and IBM is entitled to summary judgment. (See Part I below.)

Second, IBM has a license to use all of the Linux Code and, as to much of it, multiple licenses. In 1999, SCO's predecessor in interest, Caldera Systems, Inc. ("Caldera Systems"),

---

[3] This motion is limited to the allegedly misused material specifically identified by SCO in the Final Disclosures. We do not separately address the materials struck by the Court's order of June 28, 2006. Nor do we address the materials specifically identified by SCO for the first time in its expert reports. The Court has made clear that these items are not part of the case.

expressly granted IBM a license to the material in its Linux products as part of a Strategic Business Agreement. Caldera also granted IBM a license to the material in its Linux products, pursuant to the GNU General Public License (the "GPL"). All of the Linux Code is included in one or more of SCO's Linux products, giving IBM a license to all of it. Moreover, even earlier in the 1990s, two of SCO's other alleged predecessors in interest, Novell, Inc. ("Novell") and The Santa Cruz Operation, Inc. ("Santa Cruz"), granted IBM licenses to most of the UNIX code. Novell granted IBM a license to all of the SUS Material, and Novell and Santa Cruz granted IBM a license to all of the ELF Material. Thus, IBM has a complete defense to all of SCO's claims of infringement. (See Part II below.)

Third, SCO is estopped from pursuing its infringement claim. The Linux Code has been in Linux since long before the commencement of this case. Some of it has been in Linux from its inception in 1991. SCO and its predecessors not only knew the Linux Code was in Linux, they are responsible for much of it being there. Knowing that the Linux Code was in Linux, SCO promoted Linux and urged IBM and others to embrace it, with the intent and expectation that they would do so. Not knowing that SCO would change its position and declare war on Linux after nearly a decade of promoting it, IBM built a part of its business around the operating system. Allowing SCO now to reverse course would result in severe damage to IBM and countless others. Under basic principles of equity, SCO is estopped from pursing its claims of infringement, which it also abandoned and waived long ago. (See Part III below.)

Fourth, SCO cannot prove substantial similarity between the Linux kernel and the System V Works, which is equally fatal to any claim of copyright infringement. SCO cannot establish a claim of copyright infringement absent a showing that the Linux Code makes Linux

4

substantially similar to protectable elements of the System V Works. None of the System V Code is protectable by copyright. Among other things, it (1) represents mere ideas, processes, systems, methods of operation, concepts, principles or discoveries; (2) can be expressed in only one or a few ways; and (3) is dictated by externalities such as hardware standards, software standards, compatibility requirements, computer manufacturer design standards or industry programming practices. Even if (contrary to fact) all of the System V Code were protectable by copyright, it could not render the Linux kernel substantially similar to the System V Works because the Disputed Code represents a trivial portion — less than five one-thousandths of one percent (.005%) — of the most cited of the System V Works and is qualitatively insignificant. No reasonable trier of fact could find that the Linux kernel is substantially similar to the System V Works. (See Part IV below.)

Fifth, SCO cannot enforce its alleged copyrights in the System V Works because it has misused them, further precluding its infringement claim. A copyright holder cannot enforce a copyright that it has misused. A copyright holder misuses its copyright when it exceeds the scope of rights granted by the copyright. SCO exceeded the scope of the allegedly infringed copyrights by: (1) claiming ownership over code for which SCO has no copyright, (2) effectively asserting rights to all of Linux, (3) claiming control of IBM's own copyrighted code, (4) claiming ownership over material not protectable by copyright, and (5) seeking to enforce the copyrights in the System V Works in ways in which they are unenforceable. (See Part V below.)

5

<u>**Statement of Undisputed Facts**</u>

The undisputed and indisputable facts material to this motion are set forth below, and in the memoranda in support of IBM's other motions for summary judgment, which are submitted herewith and incorporated herein by reference.[4]

A.     <u>Beginning of Linux.</u>

1.     In 1991, an undergraduate student at the University of Helsinki by the name of Linus Torvalds, set out to create a new, free operating system, which later became known as "Linux". (Ex. 272 ¶ 3; Ex. 398 at SCO1355598.)

2.     Mr. Torvalds began developing the core of the operating system, known as the "kernel", and some months later posted news of his project to Internet newsgroups, inviting volunteers to assist him in his efforts. (Ex. 272 ¶ 4; Ex. 398 at SCO1355598.)

3.     With the Internet providing for a distributed collaboration, other programmers joined to create code making up the kernel. (Ex 272 ¶ 5; Ex. 398 at SCO1355598.) Mr. Torvalds directed the collaboration to a version 1.0 release of the Linux kernel in 1994 and has continued to maintain the kernel development since. (Ex. 272 ¶ 5; Ex. 398 at SCO1355598.)

---

[4] References to the memoranda in support of IBM's motions for summary judgment submitted herewith are cited as follows: IBM's motion for summary judgment on SCO's contract claims as "K Br."; IBM's motion for summary judgment on SCO's unfair competition claim as "UC. Br. __"; IBM's motion for summary judgment on SCO's copyright claim as "AIX Br. __"; IBM's motion for summary judgment on SCO's interference claims as "Interference Br. __"; and IBM's motion for summary judgment for copyright infringement (IBM's Eighth Counterclaim) as Copyright Br. __".

6

4.      In the years that followed, thousands of developers, including developers at SCO, contributed to the further development of Linux. (See Ex. 5 ¶ 45; Ex. 364; Ex. 105 at 15, 22, 26.)

5.      Linux is an "open source" program, which means, among other things, that its source code is publicly available, royalty-free and users have the freedom to run, copy, distribute, study, adapt and improve the software. (Ex. 272 ¶ 6; Ex. 5 ¶ 22; Ex. 221 ¶ 7.)

6.      Linux not only adheres to open standards, but is also built and maintained by a worldwide group of engineers who share the common goal of making open systems and open source ubiquitous. (Ex. 272 ¶ 7; Ex. 106 at 3; Ex. 221 ¶ 8.)

7.      Anyone can freely download Linux and many Linux applications and modify and redistribute them with few restrictions. (Ex. 272 ¶ 8; Ex. 107 at 5; Ex. 221 ¶ 9.)

8.      The Linux kernel is distributed under the GPL, which provides that a person receiving code under the GPL "may copy and distribute verbatim copies of the Program's source code" and "modify [their] copy or copies of the Program or any portion of it". (Ex. 272 ¶ 9; Ex. 128 §§ 1, 2; Ex. 107 at 24; Ex. 221 ¶ 10.)

B.      Novell, UNIX and Linux.

9.      In 1993, not long after the advent of Linux, Novell purchased from AT&T its remaining interest in UNIX System Laboratories ("USL"), which then held AT&T's rights to the UNIX operating system. Among the assets acquired by Novell were certain UNIX copyrights, including the System V Works. (Ex. 240 ¶ 9; Ex. 108 at 2.)

7

10.     After the acquisition, Novell participated in an industry consortium with other UNIX vendors, including IBM, to draft a single unified specification of the UNIX operating system. (Ex. 238 ¶ 8.) The consortium was called X/Open, now owned by the "The Open Group" to which Novell granted exclusive control of the UNIX trademark in 1994. (Ex. 382; Ex. 437.)

11.     As a member of X/Open, Novell helped to draft a UNIX specification called "Spec 1170" (Ex. 238 ¶ 10), which was published in 1994 by The Open Group as the "Single UNIX Specification, Version 1". The Single UNIX Specification ("SUS") is a comprehensive set of operating system-related application programming interface specifications adopted by the The Open Group as the single definition for UNIX systems. (Ex. 382.)

12.     Nearly all of the SUS Material was included in this first version of the SUS (Items 183-84, 207-31), which later evolved to include all of the SUS Material in its second version. (Ex. 214 (Ex. 3).)

13.     Like other X/Open members, Novell held intellectual property rights in the SUS ("Spec 1170") but "grant[ed] to X/Open a non-exclusive, perpetual, worldwide, royalty-free, paid-up, irrevocable licence [sic] to prepare derivative works and to use, execute, reproduce, display and perform" the SUS. (Ex. 238 ¶¶ 10-11; Ex. 437.)

14.     X/Open, in turn, granted all of the participants in X/Open, including IBM, "a non-exclusive, perpetual, worldwide, royalty-free, paid-up, irrevocable license to prepare derivative works and to use, execute, reproduce, display and perform [the SUS] and such derivative works".

8

Thus, IBM has a license to those materials identified in the SUS, and such derivative works as subsequent versions, including all of the SUS Material. (Ex. 238 ¶ 11; Ex. 437.)

15.     At approximately the same time, Novell participated in another UNIX standards setting committee, the Tool Interface Standards ("TIS") Committee, along with IBM and Santa Cruz, among others. (Ex. 238 ¶ 6; Ex. 439 at iii; Ex. 215 ¶ 101.)

16.     In May 1995, the TIS Committee published "The Executable and Linking Format (ELF) Specification, version 1.2". (Ex. 439; Ex. 238 ¶ 6.) The ELF Specification created a standard format for compiled binary files, by explicitly requiring the particular organization and layout of the information in the files. (Ex. 214 ¶¶ 35-36.)

17.     All of the ELF Material is either included in the ELF Specification, or an implementation of the ELF format pursuant to the ELF Specification. (Ex. 214 ¶¶ 43-44, 47; Ex. 215 ¶¶ 99-100.)

18.     The TIS Committee, of which Novell was a member, granted to all a royalty-free license to use the information disclosed in the specification. The ELF Specification provides: "The TIS Committee grants you a non-exclusive, worldwide, royalty-free license to use the information disclosed in the Specification to make your software TIS-compliant". Thus, IBM has a license to all of the ELF Material. (Ex. 238 ¶ 7; Ex. 438 at i; Ex. 439.)

19.     In the same spirit, Novell, in or around 1994, became involved with Linux. Novell undertook a project known as "Corsair" to create an Internet-friendly desktop operating system using Linux as its core to allow its customers to better and more easily integrate and manage network access on its networking software. (Ex. 221 ¶ 14; Ex. 440.)

9

20.     During the Corsair project, Novell worked to develop a commercially supported desktop distribution of Linux bundled with commercial components that would compete with Microsoft Windows. (Ex. 221 ¶ 15.) During its development, the members of the Corsair project team started to work with Linux, contributing code back to the Linux development team and to other projects related to Linux. (Ex. 440.)

21.     During the Corsair project, members of the team conceived of the idea of developing a commercially supported desktop distribution of Linux bundled with commercial components that would compete with Microsoft Windows. (Ex. 221 ¶ 15; Ex. 440.) However, the project was terminated before the members of Corsair could realize the goal of creating such a desktop Linux operating system. (Ex. 221 ¶ 15.)

C.     Caldera and Linux.

22.     Shortly after Novell terminated Corsair, participants in the project, including Ransom Love, left Novell to form Caldera, Inc., one of SCO's predecessors. (Ex. 221 ¶ 16; Ex. 107; Ex. 440; Ex. 193 ¶ 6.)

23.     Caldera, Inc. was formed to develop and market software based on the Linux operating system and to provide related services enabling the development, deployment and management of Linux-specialized servers. (Ex. 221 ¶ 17; Ex. 107 at 6, 31; Ex. 193 ¶¶ 7-11; Ex. 176 ¶ 4.)

24.     Caldera, Inc. was the first company to invest heavily in the establishment of Linux as an acceptable business solution. (Ex. 221 ¶ 18; Ex. 441.)

10

25.     Continuing the work done by Novell on Project Corsair, Caldera, Inc. developed a Linux desktop operating system, which it called "Caldera Network Desktop", and delivered it to market in 1995. (Ex. 221 ¶ 19; Ex. 107 at 8; Ex. 193 ¶ 8; Ex. 242 ¶ 6.)

26.     Caldera Network Desktop was based on the Linux 1.2.13 kernel and was distributed under the GPL. (Ex. 221 ¶ 20.) The GPL provides in part:

> You may modify . . . [Linux] or any portion of it . . . and copy and distribute such modifications or work . . . provided that you . . . cause any work that you distribute or publish, that in whole or in part contains or is derived from [Linux] . . . to be licensed as a whole at no charge to all third parties under the terms of this License.
>
> Each time you redistribute [Linux] . . . the recipient automatically receives a license from the original licensor to copy, distribute or modify [Linux] subject to these terms and conditions. (Ex. 128 §§ 2, 6.)

27.     The 1.2.13 Linux kernel on which Caldera Network Desktop was based included SUS Material, Streams Material and ELF Material claimed by SCO, including code from all but three of the files that contain the Linux Code (Items 150-53, 156-57, 159, 160-64, 183-84, 208-10, 212, 218, 220-21, 223, 228, 230-31, 272). (Ex. 226 ¶ 17.)

28.     In addition, Caldera, Inc. helped and encouraged independent software vendors and manufacturers to move their programs to the Caldera Linux operating system environment in an attempt to provide the types of software that had been unavailable for Linux up to that point. (Ex. 221 ¶¶ 31, 33; Ex. 442.)

29.     To facilitate the porting of Linux to applications written primarily for UNIX-based operating systems, Caldera, Inc. worked to make its Linux products compliant with various UNIX standards, including the X/Open brand for UNIX 95 and the POSIX.1

11

specification.  (Ex. 221 ¶ 32; Ex. 442.)  POSIX ("Portable Operating System Interface") is a joint effort of the IEEE and The Open Group and defines a standard UNIX system interface.  (Ex. 213 ¶ 51.)

30.    Caldera, Inc. sought to make Linux and its Linux products as UNIX-like as it could in order to encourage use by UNIX enthusiasts.  (Ex. 221 ¶ 34; Ex. 242 ¶¶ 9-11; Ex. 169 ¶ 13; Ex. 193 ¶ 11.)

31.    To achieve compliance with UNIX standards for its Linux products, Caldera, Inc. hired software developers who had both UNIX and Linux experience.  (Ex. 221 ¶ 35; Ex. 442.)

32.    Caldera, Inc. also acquired key technologies, such as certain of the SUS APIs (Application Programming Interfaces) and certain UNIX test suites, from Lasermoon of Wickham, England, to achieve certification for its Linux products on the X/Open brand for UNIX 95.  Lasermoon was a Linux company that had pioneered Linux's migration towards X/Open standards and other UNIX certifications.  (Ex. 221 ¶ 36; Ex. 442.)

33.    Caldera, Inc. announced to the Linux community that it was "striving for UNIX certification for Linux by 1997", which it believed would "definitely help Linux on the road to success".  (Ex. 221 ¶ 38; Ex. 442.)

D.    Santa Cruz, UNIX and Linux.

34.    Soon after Caldera, Inc. began its Linux business, Novell entered into an Asset Purchase Agreement, dated September 19, 1995 (the "APA"), with Santa Cruz, another of SCO's alleged predecessors in interest.  (Ex. 239 ¶¶ 5-6; Ex. 123.)

12

35.     Under the APA, Novell sold, and Santa Cruz acquired, certain of Novell's UNIX assets, but, as provided in Schedule 1.1(b) of the APA, Novell retained "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare". (Ex. 123; Ex. 239 ¶ 10.)

36.     Although SCO claims that a subsequent "Amendment No. 2" to the APA eventually transferred the retained copyrights, that amendment was at most a promise to assign whatever copyrights might be necessary for SCO to exercise its rights under the APA. (Ex. 444; Ex. 199 at 5-8.)

37.     Amendment No. 2 does not identify any copyrights as necessary for SCO to exercise its rights under the APA.  Nowhere does this amendment identify what copyrights are necessary under the APA. (Ex. 444.)

38.     SCO asked Novell to transfer ownership of the retained copyrights to it prior to the commencement of this case.  Novel declined to transfer the copyrights to SCO. (Ex. 239 ¶¶ 13-14.)

39.     At no point did SCO ever notify Novell that it needed any particular copyrights to exercise its rights under the APA.  Novell never provided, and SCO never received, an assignment of the copyrights. (Ex. 123; Ex. 444; see Ex. 239 ¶¶ 14-15.)

40.     Like Novell, Santa Cruz promoted an open UNIX systems platform.  It worked with the The Open Group to assure continued conformance to open systems standards and participated in the TIS Committee. (Ex. 109 at 4.)

41.     While Santa Cruz was not a Linux company, it was aware of the development of Linux as a UNIX-like operating system. (Ex. 227 ¶ 21; Ex. 207 ¶ 22.) Santa Cruz recognized

13

that Linux presented promising opportunities and decided to develop technologies to provide interoperability between Linux and its UnixWare and OpenServer operating systems.  (Ex. 227 ¶¶ 21-32; Ex. 207 ¶ 23.)

E.     Caldera Begins To Develop Linux for Business.

42.     In 1996 Caldera, Inc. began shipping its second Linux-based operating system, a new 32-bit, Linux 2.x-based platform for extending local area networks ("LANs") to the home, branch office, remote user, Inter/intranet and embedded systems.  (Ex. 221 ¶ 39; Ex. 445.)

43.     Caldera, Inc. designed Caldera OpenLinux to be compliant with certain UNIX standards, including the X/Open brand for UNIX 95 and the POSIX.1 specification.  (Ex. 221 ¶ 32; Ex. 442; Ex. 262 at SCO1269185-86.)

44.     The X/Open brand for UNIX 95 (which requires SUS conformance) and the POSIX.1 specification together required all of the SUS header files and two of the Streams header files (Items 152, 157, 183-84, 205-31).  (Ex. 214 (Ex. 3); Ex. 446.)

45.     In its first version of OpenLinux, Caldera included much of the Linux Code. Caldera OpenLinux eventually included, aside from one file (Item 185), every line of the Linux Code.  (Ex. 215 (Ex. H); Ex. 226 ¶ 11.)  Additionally, the Caldera OpenLinux products contained all of the SUS Material (Items 183-84, 205-31), all of the ELF Material from elf.h (Item 272), and code from every single allegedly infringed Streams file (Items 150-64). Therefore, much of the Linux Code has been distributed in SCO's Linux products for nearly a decade.  (Ex. 214 (Ex. 3); Ex. 446.)

14

46.     Like Caldera Network Desktop, Caldera OpenLinux was distributed under the GPL.  (Ex. 221 ¶ 41; Ex. 284 ¶ 9.)

47.     Caldera, Inc. continued to promote and develop its Linux products as a high-end operating system appropriate for business use.  For example, Caldera not only added features to OpenLinux, but also included a wider range of bundled proprietary business software applications.  (Ex. 221 ¶ 42; Ex. 445.)

48.     In fact, Caldera, Inc. marketed its Linux products as "an inexpensive alternative to UNIX-based systems", and "a complete networking solution" for "small- to medium-sized businesses and enterprises".  (Ex. 221 ¶ 43; Ex. 447.)

49.     To make Linux more UNIX-like, Caldera proposed that Streams technology, originally developed for use in UNIX operating systems, be included in Linux.  Caldera, Inc. required Linux Streams support in order to be able to run its Netware for Linux product. (Ex. 221 ¶ 44; Ex. 193 ¶¶ 15-16.)

50.     Caldera was unable to persuade the Linux community to include Streams technology in the Linux kernel.  (Ex. 221 ¶ 45; Ex. 193 ¶ 15; Ex. 201 ¶ 4.)  But it made a significant contribution to the project that made Streams a loadable module for use with the Linux operating system.  (Ex. 221 ¶ 45; Ex. 193 ¶ 16; Ex. 201 ¶ 5.)

51.     Caldera, Inc.'s Streams support resulted in the Linux Streams ("LiS") optional package (Ex. 221 ¶ 46), which contains all of the Streams header files (Items 150-164) (Ex. 215 (Ex. H)).  Caldera is one of the few Linux companies that distributed some of the material that it

15

challenges from outside the kernel, such as the Streams Material and certain of the ELF Material. (Ex. 215 ¶ 95; Ex. 207 ¶ 35.)

52.     In addition to participating in the LiS project, which led to the availability of the Streams Material for Linux, Caldera, Inc. made the Streams Material freely available for download on its website. Indeed, the online announcement of Linux Streams' availability read: "LiS STREAMS is now available. It is referenced to kernel version 2.0.24. It can be obtained from Caldera's FTP site as follows: ftp.caldera.com:/pub/stuff/LiS-2.0.24.tar.gz". (Ex. 221 ¶ 47; Ex. 448.)

F.     The Linux Standard Base.

53.     To encourage commercial acceptance of Linux, Caldera, Inc. championed the standardization of Linux. Caldera believed that the biggest deterrent to commercial acceptance of Linux was the resource expenditure by independent software vendors associated with porting their software products to multiple versions of Linux. (Ex. 221 ¶ 30; Ex. 449.)

54.     The creation of standards for Linux was important for Caldera and other Linux distributors because it permitted Linux to interact with other programs and encouraged beneficial competition and cooperation. (Ex. 221 ¶ 29; Ex. 214 ¶ 21.)

55.     Operating system vendors profit in general from standards because standards make it easy for those developing application programs (e.g., word processors, spreadsheets, Web browsers, etc.) to create applications that run on that operating system. Standards allow application developers to avoid creating several different versions of their applications for

16

various different systems. And the more applications that are compatible with a particular

operating system, the more attractive it will be to customers. (Ex. 221 ¶ 33; Ex. 214 ¶¶ 21-22.)

56.     Caldera, Inc. was the first corporate signer of the 1998 document proposing the

Linux Standard Base ("LSB"). "[T]he Linux Standard Base (LSB) Project [was] an attempt to

define the common core of components that can be expected to be found in any 'Linux' system".

(Ex. 221 ¶ 48; Ex. 450; Ex. 207 ¶ 30; Ex. 242 ¶ 11; Ex. 251 ¶ 7; Ex. 176 ¶ 8.)

57.     The main objective of the LSB was to solve the problem facing every commercial

independent software vendor ("ISV"), namely, the resource expenditure associated with porting

their software products to multiple versions of the many Linux products and distributions

currently in the marketplace. (Ex. 221 ¶ 50; Ex. 449 at 2; Ex. 227 ¶ 45.)

58.     In addition to its own support of the LSB, Caldera exhorted all members of the

Linux community to support the LSB and Linux standardization:

> Linux is at a crossroads, and the path seems clear. All Linux providers
> must give up some immediate and transitory gains today so that the Linux
> Standard Base can be allowed to establish unifying software porting
> standards. A long-term vision of the Linux opportunity should encourage
> all providers to move toward LSB. (Ex. 221 ¶ 53; Ex. 449 at 3-4.)

59.     Santa Cruz also supported the standardization movement with regard to Linux.

Santa Cruz encouraged adoption of the LSB and saw compliance with standards as vital to the

future success and adoption of Linux. (Ex. 221 ¶ 52; Ex. 227 ¶ 19; Ex. 207 ¶ 30.)

60.     As David McCrabb, the President of Santa Cruz's Server Software Division, put it

in an interview: "With our investments throughout the Linux Community, [Santa Cruz] care[s]

about the success of the Linux market more than ever. This being the case, we are very

17

concerned about fragmentation. This is why we stand whole-heartedly behind the Linux Standard Base." (Ex. 227 ¶ 20.)

61. The LSB explicitly required the inclusion in Linux of material from all but three of the allegedly infringed SUS header files. (Items 183-84, 205-18, 221-24, 226-29, 231). (Ex. 214 (Ex. 3); see Ex. 166 ¶ 19.) Much of the Linux Code is in Linux as a result (in part) of SCO's efforts to bring Linux into compliance with the LSB. (Ex. 207 ¶ 34.)

62. The LSB also incorporates by reference requirements of common UNIX standards such as the SUS and POSIX, which require the inclusion in Linux of material from all of the allegedly infringed SUS header files, including that not explicitly required by the LSB. (Ex. 221 ¶ 49; Ex. 215 ¶ 115; Ex. 169 ¶ 11; Ex. 214 (Ex. 3).)

63. In addition to participating in the LSB project, Caldera, Inc. and/or Santa Cruz also participated in the following community projects directed at creating uniform standards for Linux:

(a) the Linux Professional Institute, an independent organization dedicated to the establishment of professional certification standards for Linux professionals (Ex. 107 at 13);

(b) the Linux Internationalization Group (a voluntary Linux community working group, which Caldera helped to found, dedicated to addressing interoperability, internationalization and localization of Linux applications in the international context) (Ex. 111 at 10, 14);

18

(c)      the IA64 Linux Project, an Intel-sponsored initiative to port the Linux kernel to the Intel Itanium processor (Id.); and

(d)      the Open Source Development Lab (the goal of which was to "foster and support the development of additional open-source and Linux enhancements") (Id.).

(Ex. 221 ¶ 54.)

G.      86Open and lxrun.

64.      In August 1997, a group of developers in the Intel-compatible UNIX market met at Santa Cruz's headquarters to form a group called "86Open". The stated goal of 86Open was to create a common programming and binary interface for all variants of UNIX-on-Intel operating systems. (Ex. 452; Ex. 207 ¶ 17; Ex. 184 ¶ 3.)

65.      By this date, Linux had implemented the TIS Committee ELF format as its programming and binary interface. (Ex. 184 ¶ 4.)

66.      Leading members of 86Open included the Caldera CEO at that time, Bryan Sparks, and Santa Cruz employee Dion Johnson. Nearly half (13 out of 30) of 86Open's full membership consisted of Caldera and Santa Cruz employees, including Michael Davidson (Santa Cruz) and Ron Record (Santa Cruz). (Ex. 453.)

67.      As part of the initial 86Open standardization effort, Linus Torvalds proposed creating a new binary format ("Spec 150") that would replace the TIS Committee ELF format that was then implemented in Linux. (Ex. 454; Ex. 207 ¶ 19.)

68.      However, Santa Cruz opposed Torvalds' new Spec 150 format, and instead proposed that the 86Open members retain the ELF format as the Linux standard because there

19

SECTION REDACTED

(Ex. 455 at SCO1820604.)

69.    Santa Cruz's proposal was made possible by a utility it had created, called lxrun, which permitted Linux ELF binaries to run on UNIX systems — thereby dispensing with the need for a common programming and binary interface between UNIX and Linux.  (Ex. 215 ¶ 112; Ex. 454.)

70.    Santa Cruz's creation of lxrun and its advocacy for the ELF implementation resulted in its adoption as the 86Open binary standard and as the de facto standard for Linux. (Ex. 184 ¶ 5; Ex. 454.)

71.    The ELF implementation includes all of the ELF Material (Items 272-78).  Lxrun uses and requires knowledge of much of the Linux Code, in that it includes all of the Linux kernel ELF Material described in Item 272.  (Ex. 214 ¶ 52.)

H.    Caldera Spin-Off and Business Marketing.

72.    In 1998, in an effort to streamline its Linux business, Caldera, Inc. split and placed its assets relating to its business of developing and marketing Linux software into Caldera Systems, a newly formed corporation.  (Ex. 221 ¶ 55; Ex. 107 at 31-32.)

73.    Unlike Caldera, Inc., which maintained both a Linux business and a business line that was not engaged in developing and marketing Linux software, Caldera Systems was dedicated solely to the development and marketing of Linux-based business solutions. (Ex. 221 ¶ 56; Ex. 107 at 31-32.)

20

74.     Caldera Systems continued to upgrade its Linux products, for which it received numerous awards and recognition, including Internetweek's Best of the Best, The Linux Show's Best Distribution of Millennium, Linux Journal's Product of the Year award at Comdex and Network Computing's Well-Connected Award for Best Network Operating System.  (Ex. 221 ¶ 57; Ex. 110 at 40.)

75.     Caldera Systems not only continued to market its Linux products as suitable for business, but also represented them as a replacement for UnixWare and OpenServer.  For instance, in 1998, Ransom Love, the President and CEO of Caldera Systems, stated:  "Linux does a better job than SCO UNIX, has better scalability and will run most applications written for SCO UNIX without modification." (Ex. 221 ¶ 58; Ex. 456.)

76.     Caldera Systems accurately described itself and its Linux products and services as follows:

- "Caldera Systems Inc. is a 'Linux for eBusiness' technology leader in developing and marketing successful Linux-based business solutions" (Ex. 457);

- "Caldera has chosen, integrated, and tested key open source and commercial software to create a predictable business quality server that meets your needs now and [sic] years to come" (Ex. 458);

- 

- 

SECTION REDACTED

- 

21

SECTION REDACTED

(Id.).

(Ex. 221 ¶ 81.)

77.     Caldera Systems also continued the work of Caldera, Inc. by driving Linux community projects directed at creating uniform standards for Linux, including the LSB, the Linux Professional Institute, the Linux Internationalization Group, the IA64 Linux Project and the Open Source Development Lab. (Ex. 221 ¶ 59; Ex. 449; Ex. 107 at 13; Ex. 111 at 10-11, 14.)

78.     Caldera Systems consistently contributed to the Linux and Open Source community by, among other things:

- "provid[ing] engineering assistance and specifications for the IPX kernel development";

- "help[ing] with the development of SPX in the kernel";

- "contribut[ing] to the development of DOSEMU";

- "participat[ing] in the development of WINE, supporting WABI";

- being an "early sponsor and architect of the Redhat Package Manager (RPM)";

- "help[ing] sponsor the development of WABI and extensions";

- "contribut[ing] equipment and funding for the SMP project";

- being "an early contributor to the development of various kernel drivers, including Ethernet and Frame Relay";

- "help[ing] incorporate some NT drivers for the XFree Organization";

- "help[ing] fund the development of the K Desktop Environment (KDE)";

- "help[ing] make patches to streams available to the Open Source community";

22

- "help[ing] fund the initial porting of Netscape for Linux and Fast-Track for Linux";

- "develop[ing], then open-sourced Novell's Netware Client for Linux";

- "fund[ing] work on NFS for Linux";

- "co-sponsor[ing] the initial porting of WordPerfect to Linux";

- "help[ing] finance the development of StarOffice with Star Division";

- "GPL[ing] COAS, the Caldera Open Administration System";

- being "among the very first Linux distributors to work with commercial developers, promoting the porting of many important software works to Linux";

- "GPL[ing] [its] Linux Wizard, Lizard"; and

- "continu[ing] to provide manpower and funding to vendor-neutral initiatives such as Linux Standard Base and the Linux Professional Institute".

(Ex. 461; Ex. 221 ¶ 60.)

79.     Caldera Systems also expanded its Linux technical training, certification and support, and began partnering with more schools and training centers throughout the world to offer its courses.  (Ex. 221 ¶ 61; Ex. 462.)

80.  .  Caldera Systems' educational programs were designed to help its customers develop, deploy and administer Linux systems.  (Ex. 221 ¶ 62; Ex. 107 at 4.)

81. ·    Caldera Systems was at the forefront of Linux development and promotion.  But for its efforts, Linux would not have progressed as rapidly as it did to become an enterprise-ready operating system.  (Ex. 221 ¶ 63.)

82.    Caldera received numerous awards and significant recognition for its work in promoting Linux.  During 1999 and 2000 alone, Caldera received the following awards and recognition:

- CNET Editor's Choice Award (October 2000);

- Network World Blue Ribbon Award (September 2000);

- Linux Magazine's Emperor Award (May 2000); PC ONLINE Testsieger's (April 2000);

- Listing in Upside Magazine's Millennium 2000 eBusiness 150 (March 2000);

- Andover.net Dave Central's Best of Linux winner (February 2000); Linux Magazine's Cool Product Award (February 2000);

- PC Direct (Ziff-Davis) Best Buy 2000 award (January 2000);

- Internetweek's Best of the Best award for best software for 1999 (December 1999);

- The Linux Show's Best Distribution of Millennium (December 1999);

- Linux Journal's Product of the Year award at Comdex (November 1999);

- Listing in PC Magazine's Top 100 Technology Companies That Are Changing the World (October 1999);

- Linuxworld Editor's Choice Award:  Best Client and Distribution (August 1999);

- Highest Rated Linux Distribution by VarBusiness in 2000 Annual Report Card;

- Network Computing's Well-Connected Award for Best Networked Operating System (May 1999); and

- MikroPC's Product of the Year Award (1999).

(Ex. 221 ¶ 64; Ex. 107 at 11.)

83.    Substantially all of Caldera Systems' revenue was derived from sales of Linux products and services.  (Ex. 221 ¶ 65; Ex. 106 at 16.)

I.     Santa Cruz's Infringement Analysis.

84.     The success of Linux, and its structural and functional similarity to UNIX
operating systems, led some at Santa Cruz to question whether Linux included code improperly
copied from UNIX System V.  (See Ex. 221 ¶ 82.)

85.     Santa Cruz commissioned a study by Bob Swartz in 1999 to compare certain
UNIX and Linux code.  The Swartz study concluded that "there can be no doubt that parts of the
Linux distribution were derived from UNIX" (Ex. 399; Ex. 463), including some of the Linux
Code (Items 209-10, 221-23, 231) (Ex. 463).

86.     Although SCO now claims "this memo shows that there are problems with
Linux", following the study's conclusion in 1999, Santa Cruz did not take any legal action
against Linux or Linux users.  (Ex. 463 at SCO1777093.)

87.     Instead, Santa Cruz continued to pursue the development of Linux-related
products and services.  For example, Santa Cruz:

- Announced to its OEMs and partners that it was developing a Linux distribution for
  servers;

- Took people who were experienced in writing UNIX code and put them to work
  writing code for Linux;

- Continued to make contributions to various open source projects, including to the
  GNU C compiler collection and other open source components found in Linux;

- Offered a free Open Source Software Supplement CD that included many Open
  Source technologies and a comprehensive set of Linux and Open Source-related
  professional services for use in its UNIX products, including the KDE desktop,
  Apache and Squid web/proxy servers, GNU development tools, Perl and Python,
  cdrecord, and Samba.

(Ex. 463; Ex. 331 at 86:16-20; Ex. 464; Ex. 465; Ex. 227.)

J.     IBM and Linux.

88.     Meanwhile, Caldera Systems continued forging strategic alliances with other companies, including IBM, that it sought to involve in Linux, such as by promoting Linux and furthering its Linux business.  (Ex. 221 ¶ 66.)

89.     Caldera Systems approached IBM about entering into a business relationship relating to Linux.  In July 1999, the companies entered into a "Strategic Business Agreement" relating to Linux.  (Ex. 221 ¶¶ 66-67; Ex. 466 at 1710023483-87.)

90.     By that time, Linux already was appropriate for business use because of its comprehensive Internet functionality, flexibility and customizability, high scalability, stability, interoperability with multiple systems and networks, multiappliance capability, including Internet access devices, low acquisition and maintenance costs and compliance with technical and communications standards.  (Ex. 221 ¶ 66; Ex. 445 at 5-6.)

91.     The Linux products that Caldera provided to IBM to ship were based on the Linux kernel and included Linux Code.  (Ex. 467.)

92.     As part of their Strategic Business Agreement, Caldera granted IBM a license to use the material in Caldera Systems' Linux products, including the Linux Code.  (Ex. 221 ¶ 68; Ex. 466 at 1710023483, 1710023486-87; Ex. 467 at 1710023509, 1710023515.)

93.     Specifically, Caldera granted IBM

SECTION REDACTED

26

SECTION REDACTED

(Ex. 466 at 1710023486-87; Ex. 467 at 1710023509.)

94.    IBM's license applied, and was intended to apply, to future versions of Caldera's Linux products, including what would eventually be released as SCO Linux 4.0. (Ex. 221 ¶ 71; Ex. 466; Ex. 467.) SCO Linux 4.0 was licensed to IBM under the Strategic Business Agreement. (Ex. 221 ¶ 71; Ex. 466; Ex. 467.) The contract was intended to grant IBM a license that would protect it against a claim of infringement relating to the material in Caldera's Linux products. (Ex. 221 ¶ 74; Ex. 466; Ex. 467.)

95.    Furthermore, in the Strategic Business Agreement, Caldera expressly warranted to IBM that IBM would be protected against claims of infringement relating to the material in Caldera's Linux products, and promised that it would hold harmless and indemnify IBM from third party intellectual property rights claims. (Ex. 221 ¶¶ 75-76; Ex. 466 at 1710023486.)

96.    Following the execution of the Strategic Business Agreement, and based in part on the conduct of Caldera, Inc., Santa Cruz and Caldera Systems, and their promotion of and representations about the Linux operating system, IBM made the decision to expand its support of and "embrace" Linux in December 1999. (Ex. 194 ¶ 5; see Ex. 3 ¶ 89; Ex. 586 ¶¶ 4-7.)

97.    In its marketing materials and SEC filings, SCO and its predecessors repeatedly urged IBM and others to use and rely on Linux. (Ex. 106 at 3-5; Ex. 111 at 4-11; Ex. 114 at 1, 4-6; Ex. 115 at 1, 4-6; Ex. 221 ¶¶ 115-16; Ex. 340 at 57:12-25; 58:1-8; 88:2-24.) The role of SCO and its predecessors in improving Linux and shaping the Linux marketplace, especially through SCO's work with the LSB and UnitedLinux, LLC (see ¶¶ 111-20 below), influenced IBM's

27

decision to invest in Linux. In making its decision to embrace Linux, IBM relied, at a minimum, on the fact that SCO had never identified a single line of infringing code in Linux. But for SCO's silence and inaction, IBM would not have made Linux an important part of its business so quickly. (Ex. 586 ¶¶ 4-7; Ex. 167 ¶¶ 3-5.)

98.     IBM placed greater emphasis on the importance of Linux to its business and made a significant contribution to the development of Linux, requiring a significant expenditure of time and money at the expense of other opportunities. For example, IBM developed many Linux-related products: mainframes and servers that run Linux; memory solutions for Linux environments; a broad range of software offerings; services that include deployment of Linux-based e-business environments, migration of database applications and data to Linux systems, support for Linux-based cluster computing, server consolidation and a 24-hour technical engineering support line. (Ex. 586 ¶¶ 4-7; Ex. 194 ¶ 7; see Ex. 4 ¶ 44.)

99.     Moreover, IBM has made significant and valuable contributions to the Linux kernel and the Linux environment. (Ex. 208 ¶¶ 69-75.) SCO has admitted that it included over 783,000 lines of IBM code in SCO Linux 4.0 (id. ¶ 66 (citing Ex. 45)), demonstrating that IBM contributed a significant amount of source code to Linux (not at issue here) that was useful enough that SCO included it in its own product. (Ex. 208 ¶ 68.)

100.    SCO intended that its Linux activities be acted on, and SCO acted such that IBM had a right to believe they were so intended. (Ex. 221 ¶¶ 25-27, 115-16.)

28

101.    Not knowing that SCO would change its position and declare war on Linux after years of promoting it, IBM (and others) built a part of its business around the operating system. (Ex. 586 ¶¶ 4-7.)

102.    IBM has conducted its Linux activities in the good faith belief — supported by years of reinforcement — that they were permissible.  Allowing SCO to reverse course now would result in severe damage to IBM and others.  (See Ex. 586 ¶¶ 2-7.)

K.    Caldera Acquires Santa Cruz's UNIX Assets.

103.    On the strength of its Linux business, Caldera Systems went public on March 21, 2000. (Ex. 110 at 26.)  Santa Cruz supported the move in January 2000 by collaborating with Sun Microsystems, Inc., Novell and several other groups on a $30 million investment in Caldera Systems. (Ex. 221 ¶ 79; Ex. 469.)

104.    On May 7, 2001, using most of the proceeds from its initial public offering, *Caldera Systems undertook to expand and enhance its Linux business by acquiring the Server Software and Professional Services divisions of Santa Cruz, including its UNIX assets.*  Caldera Systems completed the transaction through a newly formed subsidiary, known as Caldera International, Inc. ("Caldera International"), which then functioned as the operating company of Caldera Systems. (Ex. 221 ¶ 80; Ex. 106 at 16.)

105.    One of the primary purposes of the acquisition was to acquire a distribution channel for SCO's Linux products.  As Caldera announced at LinuxWorld in August 2000:

> Business customers tell us that they'd be more aggressive in the adoption of Linux if they could purchase and obtain support through the same distribution channel that they use for everything else.  The SCO acquisition gives us more than 15,000 knowledgeable, trained resellers,

29

ISVs and support staff worldwide. This infrastructure would have taken us millions of dollars and years to develop. (Ex. 470 at 12-13.)

(Ex. 221 ¶ 92.)

106.    Caldera International purchased the UNIX assets of Santa Cruz with an eye toward open-sourcing its UNIX technology to improve Linux. (Ex. 221 ¶ 85; Ex. 471.) Caldera CEO Ransom Love stated that Santa Cruz's UNIX assets were rapidly losing their value, that the market was moving toward Linux, and that "UNIX on Intel is dead, except as a value add to Linux". (Ex. 221 ¶ 85; Ex. 472 at 2.)

107.    Caldera International continued to distribute Santa Cruz's UnixWare and OpenServer products following the acquisition in 2001, but it positioned its Linux products ahead of its UNIX products. (Ex. 221 ¶ 91; Ex. 340 at 31:20-25, 33:12-25, 34:1-12; 55:4-15; Ex. 472.) For example, Caldera encouraged ISVs and OEMs, such as Oracle, to focus on the certification and support of its Linux products, to the detriment of its UNIX products. (Ex. 221 ¶ 91; Ex. 340 at 57:12-25, 58:1-25, 59:1-5; Ex. 472; Ex. 473.)

108.    Caldera Systems knew that some at Santa Cruz had had concerns that UNIX source code had been included in Linux improperly. (Ex. 221 ¶ 82.) But Caldera did not care whether UNIX source code had been included in Linux improperly and did not publicly disclose any potential problem with Linux. (Id. ¶ 83.) Instead, Caldera chose further to stake its future on Linux. (Id. ¶ 115.)

109.    Caldera recognized that pursuing litigation against Linux would be bad for business and made the decision not to attack the operating system that it had promoted for nearly

30

a decade.  (Ex. 221 ¶ 84.)  At no point did Caldera publicly disclose that there might be any

problem with Linux.  (Id. ¶ 83.)

    110.    Like Caldera Systems before the acquisition, Caldera International:

- Expended development funds to promote Linux products (Ex. 106 at 4);

- Represented Linux as a product that could be used to power the Internet and software
  needs of businesses, academics and technical institutions around the world (Id. at 3);

- Represented the benefits of Linux specifically to include comprehensive Internet
  functionality, flexibility, customizability and stability, interoperability with multiple
  systems and networks, low acquisition and maintenance costs, and compliance with
  technical and communication standards (Id.); and

- Provided a full range of pre- and post-sales technical support for SCO Linux (Id. at
  6).

(Ex. 221 ¶ 93.)

L.    UnitedLinux.

    111.    Rather than pursue litigation related to Linux, in May 2002 Caldera International

joined with other Linux vendors, Conectiva, Inc., SuSE Linux AG and TurboLinux, to form a

Joint Development Limited Liability Company called UnitedLinux, LLC ("UnitedLinux").  (Ex.

221 ¶ 94; Ex. 106 at 4; Ex. 348; Ex. 474.)

    112.    UnitedLinux was formed to streamline Linux development and certification

around a global, uniform distribution of Linux for business.  By developing a single Linux

distribution, Caldera International and the other members of UnitedLinux endeavored to give

businesses a reliable, tested, and supportable version of Linux.  (Ex. 221 ¶¶ 96-97; Ex. 106 at 4.)

    113.    Caldera International's CEO, Ransom Love, was a driving force behind

UnitedLinux and was the signatory for Caldera to the Joint Development Contract ("JDC") and

31

Master Transaction Agreement ("MTA") that created UnitedLinux.  (Ex. 221 ¶ 95; Ex. 474; see Ex. 176 ¶ 18.)

114.    To achieve a single Linux distribution, each member assigned to UnitedLinux ownership over all of their intellectual property rights in any UnitedLinux product, with the exception of specifically retained "Pre-Existing Technology and Enhancements".  (Ex. 221 ¶¶ 98-100; Ex. 474.)

115.    Caldera intended to assign and did assign ownership of the intellectual property rights in all UnitedLinux products (other than Caldera's Pre-Existing Technology and Enhancements) to UnitedLinux.  (Ex. 221 ¶ 100.)

116.    This assignment of ownership included all of the allegedly infringing Linux kernel files (Items 183-85, 209-10, 212, 214, 224, 225, 228, 231, 272).  (Ex. 215 (Ex. H); Ex. 474.)

117.    UnitedLinux released its first Linux distribution, UnitedLinux Version 1.0, in November 2002.  (Ex. 349.)  UnitedLinux Version 1.0 was marketed and sold by each of the partners in UnitedLinux, including Caldera International, under its own brand name.  (Id.)

118.    SCO's release of UnitedLinux 1.0 was called "SCO Linux 4.0". SCO Linux 4.0 was based on the Linux 2.4 kernel and was distributed under the GPL.  (Ex. 349; Ex. 106 at 5; Ex. 475; Ex. 226 ¶ 10; see Ex. 278 ¶ 6.)  Every line of the Linux Code is included in SCO Linux 4.0, powered by UnitedLinux.  (Ex. 215 (Ex. H); Ex. 226 ¶ 10; Ex. 208 ¶ 65; see Ex. 166 ¶ 32; Ex. 278 ¶ 20.)  Furthermore, SCO Linux 4.0 included all but one line of the SUS Material (Items 183-84, 205-31), all of the memory allocation code (Item 185), all of the ELF material from elf.h

(Item 272), and much of the Streams Material (Items 150, 152-55, 157-59, 160-64).  (Ex. 226

¶ 10; Ex. 215 (Ex. H).)

119.    Caldera International marketed and sold SCO Linux 4.0 to businesses around the

world, representing among other things:

- "SCO Linux 4.0 is a high-quality Linux operating system designed for mission-critical business applications, with guaranteed stability, security and worldwide support from SCO."  (Ex. 349.)

- "SCO Linux has it all...SCO is a perfect fit for most application server environments."  (Ex. 475.)

- "Talk to us, and we will help you configure a solution including SCO Linux to meet your every requirement."  (Id.)

- "SCO Linux 4.0, powered by UnitedLinux provides customers with the base UnitedLinux operating system as well as the additional software, support and services from SCO that customers need to successfully run Linux in business environments."  (Ex. 349.)

- "SCO is uniquely qualified to make the UnitedLinux platform viable for business because of its proven track record in successfully building, deploying and supporting stable operating platforms for more than 23 years."  (Id.)

- "SCO Linux 4.0 is built upon SCO's traditional combination of top OS platform technology, and support and service features that customers can rely on to support critical business environments."  (Id.)

- "With SCO's recent introduction of a Retail Hardened Linux for Point of Sale (POS), SCO is providing retail companies opportunities to reap the benefits of the power of Linux while being able to rejuvenate their legacy POS investments."  (Ex. 476.)

- "SCO's business class Linux product is powered by UnitedLinux, the culmination of the might and expertise of 4 leading Linux vendors, SCO, SuSE, Turbolinux and Conectiva."  (Id.)

- "SCO's efforts to spearhead the creation of a new level of enterprise class Linux product is changing the industry."  (Id.)

- "As a result customers can now choose SCO Linux, confident they have access to the widest array of certified applications and hardware backed up by SCO's world renowned expert services." (Id.)

120.    To coincide with this release of UnitedLinux and SCO Linux 4.0, SCO enlisted strategic partners in November 2002, such as Hewlett-Packard, IBM, Computer Associates, Oracle, BEA, BakBone, Fujitsu, Fujitsu Siemens, NEC, Toshiba, Progress and AMD to help promote UnitedLinux. (Ex. 106 at 6.) SCO also allied with numerous solution providers who wrote and developed custom applications to run on SCO's Linux operating system. (Id. at 6-7.)

121.    Caldera International also continued to distribute earlier versions of its Linux products, including "OpenLinux Server 3.1.1" and "OpenLinux Workstation 3.1.1" products, which were released in January 2002. Both included the Linux 2.4 kernel. (Ex. 350; Ex. 351.)

122.    SCO's Linux products collectively included code from every allegedly infringing Linux kernel file. (Ex. 215 ¶¶ 109-13; Ex. 215 (Ex. H); Ex. 226 ¶ 12.)

123.    SCO knew that the Linux Code was in Linux. (Ex. 193 ¶¶ 11-13; Ex. 176 ¶ 20; Ex. 166 ¶ 33; Ex. 232 ¶ 5; Ex. 278 ¶ 14.) The Linux Code has been in Linux since before SCO commenced this lawsuit, with some included as far back as 1991, and much included for over a decade. (Ex. 166 ¶ 18; Ex. 278 ¶ 12.)

M.    SCO's Financial Difficulty and New Business Plan.

124.    Despite its success in promoting Linux and its Linux products, SCO was unable to run a profitable business. (Ex. 106 at 10.)

125.    At no point prior to its acquisition of UNIX assets from Santa Cruz did SCO (Caldera International or Caldera, Inc.) have a profitable year. (Ex. 106 at 10.)

126. While it obtained a lot of cash in its IPO in 2001, the company spent most of the money on its acquisition of Santa Cruz's UNIX assets, which had been declining in value since Santa Cruz acquired them from Novell in 1995. (Ex. 221 ¶¶ 79-80; Ex. 227 ¶¶ 34-35.)

127.                          SECTION REDACTED

(Ex. 539 at SCO1633821.) Like its Linux business, SCO's UNIX business was losing money. (Ex. 186 ¶¶ 63-71.)

128. Under the direction of a new CEO, Darl McBride, SCO made the decision to pursue by litigation the profits it was unable to generate in the computer business. (See, e.g., Ex. 1; Ex. 141; Ex. 142; Ex. 423; Ex. 427.) Revisiting the results of the Swartz study, which both Santa Cruz and Caldera International had dismissed (Ex. 221 ¶¶ 82-83), Mr. McBride made the decision to wage legal warfare on the operating system on which SCO had once staked its future. (Ex. 221 ¶ 115; Ex. 113 at 9-10.)

129. Because Novell, not SCO, owned the UNIX System V copyrights, SCO asked Novell several times over the course of several months to transfer the UNIX System V copyrights to SCO and participate with SCO in a legal campaign against Linux. (Ex. 239 ¶ 13; Ex. 240 ¶ 25; Ex. 330 at 286:4-24.)

130. Novell repeatedly rejected SCO's requests to transfer the copyrights or participate in a legal campaign against Linux. (Ex. 239 ¶¶ 13-14; Ex. 477.)

N. SCO's Litigation and Threats of Litigation.

131. On March 6, 2003, SCO sued IBM for allegedly "dumping" into Linux certain unspecified code from the UNIX software SCO acquired from Santa Cruz. (Ex. 1.) Despite the

35

fact that SCO's initial complaints against IBM did not include a claim for copyright infringement, and despite the fact that SCO does not own the copyrights to the System V Works, SCO repeatedly accused IBM and others publicly of infringing the UNIX System V copyrights and threatened imminent litigation concerning IBM's Linux activities:

(a)     In May 2003, SCO sent letters to 1,500 of the world's largest corporations, including IBM, threatening litigation. (See, e.g., Ex. 141.) In its letters, SCO stated: "We believe that Linux infringes on our UNIX intellectual property and other rights." (Ex. 141 at 2.) SCO further stated: "We intend to aggressively protect and enforce these rights" against not only the companies involved with "the Linux development process" but also "the end user" companies using any Linux technology. (Id. at 2.)

(b)     In a press conference on July 21, 2003, SCO stated that taking out a license with SCO was the "alternative to legal enforcement against Linux end-users". (Ex. 423 at 2.)

(c)     On November 18, 2003, during a teleconference sponsored by SCO, Mr. McBride, stated that SCO "will be looking...to identify a defendant" in "the near term" and such defendant will be "a significant user that has not paid license fees and is in fact using the proprietary and copyrighted material". (Ex. 427 at 5.)

(d)     In connection with a December 22, 2003, press release, SCO released a template of a letter, dated December 19, 2003, that it sent to "Linux Users". (Ex. 142.) In that letter, SCO wrote that "the use of the Linux operating system in a commercial setting violates our rights under the United States Copyright Act". (Id. at 1.)

36

132.    In response to SCO's threats of copyright infringement, IBM asserted a counterclaim against SCO on March 29, 2004, seeking a declaration of non-infringement with respect to IBM's Linux activities. (See Ex. 4 ¶¶ 168-73.)

133.    IBM seeks a declaration that its activities relating to the Linux kernel, which is the core of the operating system, do not infringe copyrights owned by SCO. (See Ex. 4 ¶¶ 168-73.)

O.    SCO's Touting and Obfuscation.

134.    From the beginning of this litigation, SCO touted its claims and the strength of its alleged evidence. (See, e.g., Ex. 367; Ex. 368; Ex. 369.)

135.    According to SCO, the issues presented here are the most important issues faced by the software industry in ten years and the future of the industry — indeed, the future of the global economy — hangs in the balance:

(a)    In an article for Salon.com, Sam Williams quotes Mr. McBride as saying, in reference to this case: "There really is no middle ground....The future of the global economy hangs in the balance." (Ex. 370 at 1.)

(b)    In an article from KSL.com, Jed Boal quotes Mr. McBride as saying, in reference to this case: "It has become the biggest issue in the computer industry in decades....The stakes are extremely high. The balance of the software industry is hanging on this." (Ex. 371 at 1.)

136.    SCO's public statements concerning its alleged evidence were no less grandiose.

37

(a)     In an interview with CNet News.com in August 2003, Mr. McBride claimed that SCO had found a "mountain of code" improperly contributed to Linux. (Ex. 367 at 1.)

(b)     In a teleconference with analysts and reporters on May 30, 2003, Mr. McBride stated: "Everybody's been clamoring for the code — show us two lines of code. We're not going to show two lines of code, we're going to show hundreds of lines of code. And that's just the tip of the iceberg of what's in this." (Ex. 368 at 1.)

(c)     In an interview in LinuxWorld.com, Mr. McBride claimed that a "truckload of code" was improperly contributed to Linux. (Ex. 372 at 1.)

(d)     In May or June 2003, in an interview with Computerworld reporter Patrick Thibodeau, SCO, through its Senior Vice President Chris Sontag, stated that the number of lines of code in the Linux kernel that were a direct copyright violation is "very extensive". (Ex. 478.)

(e)     In June 2003, in an interview with CNET News, SCO, through Mr. McBride, stated: "We're not talking about just lines of code; we're talking about entire programs. We're talking about hundreds of thousands of lines of code." (Ex. 479 at 3.)

(f)     In July 2003, in an interview with Business Week, SCO, through Mr. McBride, stated that the amount of Linux code infringing on SCO's intellectual property rights is "gargantuan". (Ex. 480.)

38

(g)     On August 18, 2003, at its SCO Forum in Las Vegas, SCO, Mr. Sontag,

*stated that it had uncovered "more than a million lines" of improperly copied UNIX code*

*in Linux.* (Ex. 383 at 1.)

137.    At the same time, SCO refused to disclose the particulars of its claims and alleged

evidence. (See, e.g. Ex. 32; Ex. 33; Ex. 34; Ex. 55; Ex. 56; Ex. 57; Ex. 58; Ex. 132.) It was the

company's strategy to obfuscate its alleged evidence. (See Ex. 374; Ex. 375.) SCO's

unsubstantiated claims that its copyrights extend to Linux created fear, uncertainty and doubt

about Linux, making it impossible for Linux users fairly to evaluate SCO's copyright claims.

(Ex. 283 ¶ 125.)

138.    For example, SCO's counsel indicated in an interview with Maureen O'Gara of

LinuxGram in March 2003, at the beginning of the case, that SCO "doesn't want IBM to know

what [SCO's substantive claims] are". (Ex. 374.)

139.    Further, SCO Vice President Gregory Blepp stated in a published interview in

April 2004 that "you don't put everything on the table at the start, but instead you bring out

arguments and evidence piece by piece". (Ex. 375.)

P.      SCO's Continued Distribution of Linux.

140.    More than two months after filing suit against IBM, SCO purported to suspend its

distribution of Linux on May 14, 2003. It did so on the ground that Linux was an "unauthorized

derivative of UNIX". (Ex. 284 (Ex. B).)

141.    Despite its purported termination of its Linux distributions (Ex. 353; Ex. 284

(Ex. B)), however, SCO continued to sell Linux products to SCO customers after May 14, 2003.

SCO has admitted that it "made Linux source code available for download by its customers on its website...[through] the end of 2004". (Ex. 45 at 3.)

142.    SCO distributed OpenLinux 3.1.1 until at least January of 2004 (Ex. 486; see Ex. 284 ¶ 5), including every line of SUS Material and material from every Streams file and every ELF file (Items 150-64, 183-84, 205-31, 272) (Ex. 215 (Ex. H); Ex. 226 ¶ 11). Aside from one file (Item 185), all of the Linux Code appears in Caldera OpenLinux 3.1.1. (Ex. 226 ¶ 11.)

143.    SCO distributed "SCO Linux Server 4.0 powered by UnitedLinux 1.0" until at least May 31, 2004 (Ex. 486; see Ex. 284 ¶¶ 4, 7; Ex. 296 at 92:1-22), including every line of the Linux Code (Ex. 215 (Ex. H.); Ex. 226 ¶ 10). This product also included all but one line of the SUS Material, most of the Streams Material and ELF Material, and the less than 25 lines of memory allocation code claimed by SCO (Items 150-64, 183-185, 205-31, 272). (Ex. 215 (Ex. H); Ex. 226 ¶ 10.)

144.    SCO made available and continued to make available (as recently as August 11, 2006) the Linux 2.4.12 kernel and the 0.7.0 version of libelf for download from its website, including code from all but three of the files containing Linux Code, plus other SUS Material, Streams Material and ELF Material (Items 150-53, 156-59, 160-64, 183-84, 208-10, 212, 218, 220-21, 223, 225, 228, 230-31, 272), such that anyone with an internet connection could have accessed it. (Ex. 215 ¶ 110; Ex. 226 ¶¶ 13-15.)

145.    In all, SCO distributed the Linux Code to thousands of customers worldwide over the course of many years. (See Ex. 111 at 11; Ex. 397; Ex. 505.)

40

Q.    <u>SCO's Failure To Substantiate Its Claims.</u>

146.    Following SCO's refusal to disclose the nature of its claims or its alleged evidence, IBM served interrogatories on SCO asking it to disclose its allegations and evidence of infringement relating to Linux.  (<u>See</u> Ex. 11; Ex. 12.)

147.    For example, IBM's Interrogatory No. 12 states: "Please identify, with specificity (by file and line of code), (a) all source code and other material in Linux (including but not limited to the Linux kernel, any Linux operating system and any Linux distribution) to which plaintiff has rights; and (b) the nature of plaintiff's rights, including but not limited to whether and how the code or other material derives from UNIX."  (Ex. 12 at 2.)

148.    Likewise, IBM's Interrogatory No. 13 states: "For each line of code and other material identified in response to Interrogatory No. 12, please state whether (a) IBM has infringed plaintiff's rights, and for any rights IBM is alleged to have infringed, describe in detail how IBM is alleged to have infringed plaintiff's rights."  (Ex. 12 at 2.)

149.    SCO did not, in response to IBM's interrogatories, identify with any degree of specificity the material in Linux in which it supposedly has rights or the nature of those rights, or describe in detail SCO's claims of copyright infringement.  (<u>See</u> Ex. 33.)

150.    IBM filed two motions to compel, seeking meaningful responses to its interrogatories.  (<u>See</u> Ex. 62; Ex. 63.)  Specifically, IBM asked the Court to require SCO to specify (1) all the material in Linux to which SCO claims rights (<u>i.e.</u>, by kernel version $X$, file $Y$, and lines $1$-$2$-$3$); (2) the nature of SCO's alleged rights, including whether and, if so, how the material derives from the UNIX software (<u>i.e.</u>, if SCO asserts contract, copyright or some other

41

right to the identified code, and how the Linux code identified derives from UNIX version A, file B, lines 4-5-6); and (3) whether IBM has infringed material to which SCO claims rights, and if so, the details of the alleged infringement (i.e., by copying Linux kernel version X, file Y, lines 1-2-3, which are copied or derived from UNIX version A, file B, lines 4-5-6; or by distributing Linux kernel version X, file Y, lines 1-2-3, the structure and sequence of which was copied from UNIX version A, file B, lines 7-8-9; or by inducing others to copy (or distribute) Linux kernel version X, file Y, lines 1-2-3, which are copied or derived from UNIX version A, file B, lines 4-5-6). (See Ex. 12; Ex. 63.)

151.    In an order dated December 12, 2003, the Court ordered SCO to disclose its allegations and evidence of infringement on or before January 12, 2004. (See Ex. 55.)

152.    For example, the Court ordered SCO to "respond fully and in detail to Interrogatory Nos. 12 and 13 as stated in IBM's Second Set of Interrogatories", which required SCO to specify: (1) all the material in Linux to which SCO claims rights; (2) the nature of SCO's alleged rights, including whether and, if so, how the material derives from UNIX; and (3) whether IBM has infringed material to which SCO claims rights and, if so, the details of the alleged infringement. (Ex. 55 ¶ 2; see Ex. 12.)

153.    Despite the Court's order, SCO did not provide meaningful responses to IBM's interrogatories. (See Ex. 33.) SCO did not, in response to the Court's order, describe (let alone detail) how IBM's Linux activities infringe copyrights owned by SCO related to the UNIX software. (See id.)

42

154.    After again trying unsuccessfully to persuade SCO to provide the information requested, IBM advised the Court that SCO had failed to comply with IBM's requests and the Court's order. (See Ex. 411; Ex. 415.)

155.    The Court again ordered SCO to provide meaningful responses to IBM's interrogatories, this time on or before April 19, 2004. (See Ex. 56.) Specifically, the Court required SCO to "fully comply within 45 days of the entry of this order with the Court's previous order dated December 12, 2003". (Id. ¶ 1.)

156.    Hence, the Court again ordered SCO, among other things, to "respond fully and in detail to Interrogatory Nos. 12 and 13 as stated in IBM's Second Set of Interrogatories", requiring SCO to specify (1) the material in Linux to which SCO claims rights; (2) the nature of SCO's alleged rights including whether and, if so, how the material derives from UNIX; and (3) whether IBM has infringed material to which SCO claims rights and, if so, the details of the alleged infringement. (Ex. 55 ¶ 2; see Ex. 56 ¶¶ 1-5.)

157.    Notwithstanding the fact that the Court entered two separate orders requiring SCO to disclose its allegations and evidence with specificity (Ex. 55; Ex. 56), SCO still did not detail the nature of its alleged rights or describe in detail how IBM was alleged to have infringed SCO's rights. (See Ex. 36.)

R.    The Court's Summary Judgment and Scheduling Orders.

158.    Based on SCO's continued failure to comply with the Court's orders, IBM moved on May 18, 2004, for partial summary judgment on its Tenth Counterclaim, which seeks a declaration of non-infringement with respect to IBM's Linux activities. (Ex. 65 at 27.)

43

159.    In an order dated February 8, 2005, the Court deferred summary judgment, but stated that "[v]iewed against the backdrop of SCO's plethora of public statements concerning IBM's and others' infringement of SCO's purported copyrights to the UNIX software, it is astonishing that SCO has not offered any competent evidence to create a disputed fact regarding whether IBM has infringed copyrights owned by SCO through IBM's Linux activities". (Ex. 57 at 10.)

160.    On July 1, 2005, the Court issued an order adopting IBM's proposal to set deadlines for the disclosure of all allegedly misused material. (Ex. 58.)

161.    The Court set October 28, 2005, as the "Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material" and December 22, 2005, as the "Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material". (Ex. 58 at 4.) The Court required the parties to update their interrogatory responses accordingly". (Ex. 58 at 4; Ex. 418 at 58:11-25, 59:1.)

162.    Prior to the filing of this suit, IBM was completely unaware of SCO's allegations of infringement. IBM knew nothing of SCO's allegations about the Linux Code until after SCO launched its attack on Linux. (Ex. 586 ¶¶ 4-8.) IBM had no reason to believe that SCO considered the Linux Code to infringe copyrights owned by SCO. (Id. ¶¶ 4-7.)

S.      SCO's Interim and Final Disclosures.

163.    On October 28, 2005, SCO served its Interim Disclosures pursuant to the Court's July 2005 order. (Ex. 53.) Like its prior discovery responses concerning the allegedly misused

44

materials, SCO's Interim Disclosures did not describe all of the allegedly misused materials by version, file and line of code. (See id.)

164.    Upon review of SCO's Interim Disclosures, IBM notified SCO on December 5, 2005, that it failed "to identify the allegedly misused material by version, file and line of code", "to identify and match up the allegedly infringing and allegedly infringed material by version, file and line of code", "to identify the material alleged to have been contributed improperly by version, file and line of code", and to identify, "to the extent the allegedly contributed material is not UNIX System V code, but is in any sense alleged to have been based on or resulted from UNIX System V code, the version, file and line of UNIX System V code from which the allegedly contributed material is alleged to derive or result". (Ex. 151 at 1.)

165.    IBM notified SCO that unless SCO complied with the specificity required by the Court's orders, "IBM intends to ask the Court to preclude SCO from pursuing any claims regarding allegedly misused material not properly disclosed on or before December 22, 2005". (Ex. 151 at 2.)

166.    Thereafter, SCO expressly stipulated and agreed with IBM that its claims would not exceed the Final Disclosures. In a Stipulation Re Scheduling Order filed with the Court on December 7, 2005, the parties stipulated and agreed as follows:

> 1.  Both parties are required to identify with specificity any and all material that each party contends the other has misused no later than December 22, 2005;
>
> ...
>
> 2. (c) Neither party shall be permitted to use [the period for discovery relating to the Final Disclosures] for the purpose of identifying additional

misused material not disclosed by the December 22, 2005, deadline.
(Ex. 481 at 2-3.)

167.    IBM propounded an interrogatory asking SCO to identify the ideas, procedures,

systems, or methods of operations it claimed were infringed in Linux, specifically Interrogatory

No. 16, which stated "for each line of code and other material identified…please state…whether

it constitutes expression protectable under copyright law". (Ex. 43 at 16.) SCO failed to provide

a meaningful response, and declined even to identify "in what specific respect" the alleged

materials were covered by copyright, "the origin of the material, including its author(s) and the

circumstances of its creating" and "whether it has been published or distributed without a

copyright notice". (Id.) SCO's response merely stated that:

SECTION REDACTED

(See id. at 17-18.)

168.    Also, on December 22, 2005, SCO served its Final Disclosures, again largely

failing to describe all of the allegedly misused materials by version, file, and line of code and to

update its interrogatory responses. (See Ex. 54.) SCO failed altogether to disclose its allegations

and evidence of infringement by IBM. (See Ex. 54; Ex. 55; Ex. 56; Ex. 57; Ex. 58; Ex. 59.)

169.    SCO failed to disclose in any meaningful way — let alone in detail, as specified

by the Court — its allegations and evidence of unauthorized copying by IBM of SCO's

copyrighted works. (See Ex. 53; Ex. 55; Ex. 56; Ex. 57; Ex. 58; Ex. 59.)

T.    Order Enforcing Court's Disclosure Requirements.

170.    Based on SCO's failure to follow the Court's orders requiring it to identify all of

the allegedly misused materials by version, file and line of code, IBM moved on February 13,

46

2006, to limit SCO's proof regarding certain of the allegedly infringing items in the Final Disclosures. (Ex. 66.)

171.    Pending the disposition of IBM's motion, SCO served several expert reports, including one relating to its allegations of infringement (from one Thomas Cargill) (Ex. 175), seeking to challenge additional allegedly misused materials that were not identified in its Final Disclosures. (See, e.g., Ex. 175; Ex. 285; Ex. 286.)

172.    IBM then made another motion, which has been fully briefed (but not decided), to confine and limit the scope of SCO's claims to those materials specifically identified in its Final Disclosures. (Ex. 67.)

173.    In an order dated June 28, 2006, Magistrate Judge Wells granted, in part, IBM's February 13, 2006, motion to preclude certain of SCO's claims (Ex. 66), limiting SCO's proof regarding SCO's Items: 3-22, 24-42, 44-89, 91-93, 95-112, 143-49, 165-82, 193, 232-71, 279-93. (Ex. 59 at 36-38.)

174.    In granting IBM's motion in part, the Court held that "SCO should have supplied not only line but version and file information for whatever claims form the basis of SCO's case against IBM". (Ex. 59 at 28.)

175.    The Court further held:

> SCO has had ample opportunity to articulate, identify and substantiate its claims against SCO. [SCO's] failure was intentional and therefore willful based on [its] disregard of the court's orders and failure to seek clarification. In the view of the court it is almost like SCO sought to hide its case until the ninth inning in hopes of gaining an unfair advantage despite being repeatedly told to put "all evidence...on the table." (Ex. 59 at 32.)

47

176.   Finally, the Court held that SCO's conduct prejudiced IBM in that "[r]equiring IBM to engage in an analysis of millions of lines of code to figure out which code is at issue in hopes of answering such questions is patently unfair given the fact that it was SCO's duty to provide more detailed code in the first place". (Ex. 59 at 35.)

177.   From the beginning of this case, IBM asked SCO to disclose its allegations and evidence of alleged infringement by IBM, and from the beginning of this case, SCO declined to do so.

178.   SCO did not specifically identify the Linux Code, despite two orders of the Court requiring it to do so, before SCO submitted its Final Disclosures, years after SCO commenced suit. (Ex. 55 ¶ 4; Ex. 56 ¶¶ I.1-I.4.; Ex. 54.)

U.     _Allegations of the Final Disclosures._

179.   Of the 294 Items of allegedly misused material identified in the Final Disclosures, 79 items allege copyright infringement: Items 38, 112, 149-75, 177, 180, 183-85, 194-231 and 272-78. (Ex. 43 at 14.)

180.   Only 68 of the 294 Items concern allegations of infringement regarding Linux: Items 38, 112, 149-75, 177, 180, 183-85, 205-31, and 272-78. (Ex. 213 ¶ 13.) And only 52 of those 68 items survived the Court's June 28, 2006, order limiting SCO's proof: Items 150-64, 183-85, 205-31, and 272-78. (See Ex. 59 at 36-38.)

181.   With respect to the 52 items at issue that concern alleged infringement relating to Linux and that survived the June 28 order, SCO identified only four copyrighted operating system works: System V Release 3.2, System V Release 4.0, System V Release 4.2 and

48

System V Release 4.2-ES-MP (Ex. 54 at Items 150-64, 183-85, 205-31 and 272-78.) System V Release 4.0, System V Release 4.2 and System V Release 4.2-ES-MP are collectively referred to herein as "SVr4".

182.    The 52 items at issue concern material of three types:  (1) header file code that is either dictated by the Single UNIX Specification (the SUS Material) (Items 183-84, 205-31) or relates to a technology known as Streams (the Streams Material) (Items 150-64); (2) code relating to the ELF Specification (the ELF Material) (Items 272-78); and (3) memory allocation code apparently contributed to Linux by Silicon Graphics but removed from the kernel before IBM submitted its Tenth Counterclaim (Item 185). (Ex. 214 ¶ 93; see Ex. 215 (Ex. H).)

183.    Most of the Items (45 of 52) concern header files (Items 150-64, 183-84, 205-31, 272 (partially)) (see Ex. 215 (Ex. H)); all but one of the Items relating to the Linux kernel concern header files (Items 183-84, 209-10, 212, 214, 224, 225, 228, 231, 272) (see id.).

184.    A "header file" is a computer-readable text file that describes how information is to be shared among components of a program. (Ex. 213 ¶ 18.) Header files are created for the purpose of communicating standard information to allow interoperability. (Id. ¶ 26.)

185.    The header files in Items 183-84 and 205-31 are standard header files required by the SUS. (Ex. 213 ¶ 24.) The header files in Items 150-64 concern a networking technology called "Streams". (Id. ¶ 25.)

186.    Approximately a third of the SUS Material is in the Linux kernel (Items 183-84, 209-10, 212, 214, 224-25, 228, 231). (See Ex. 215 (Ex. H).) All of the SUS Material has been in Linux since 2000, and some of it has even been in Linux since its inception in 1991. (Ex. 221

49

¶ 111; Ex. 273 ¶ 11; Ex. 232 ¶ 5; Ex. 193 ¶¶ 13-14; Ex. 242 ¶¶ 14-15; Ex. 166 ¶ 18; Ex. 278 ¶ 12.)

187.    None of the Streams Material is in the Linux kernel (Ex. 215 ¶ 82; Ex. 221 ¶ 111), and the Streams Material has been publicly available for use with Linux for nearly a decade (Ex. 221 ¶ 111; Ex. 278 ¶ 12; Ex. 169 ¶ 15).

188.    Seven of the 52 items at issue (272-78) concern the ELF Specification.  (Ex. 213 ¶ 19; see Ex. 215 (Ex. H).)  The ELF Material has been in Linux for more than a decade, since version 1.0.  (Ex. 221 ¶ 111; Ex. 273 ¶ 11; Ex. 169 ¶ 15; Ex. 166 ¶ 18; Ex. 278 ¶ 12.)

189.    Only one of the Specification items relates to the Linux kernel (Item 272).  (See Ex. 215 (Ex. H).)  Of the 19 files claimed in this one item, only one file (elf.h) is in the Linux kernel.  (Ex. 214 (Ex. 4); Ex. 215 (Ex. H).)

190.    One Item (185) concerns a small number of lines of memory allocation code. (Ex. 214 ¶ 91.)

191.    In total, only 12 items concern Linux code contained in the Linux kernel (the Linux Code).  (See Ex. 215 (Ex. H).)  The remaining items, including the majority of the header files and the specifications, relate to materials that are not part of the Linux operating system kernel.  (See Id.)

V.    SCO's Failure of Proof.

192.    Despite SCO's public assertions that IBM's Linux activities infringe SCO's alleged UNIX copyrights (see Ex. 141; Ex. 142; Ex. 3 ¶¶ 173-79), the Final Disclosures do not substantiate its claims (see Ex. 32; Ex. 33; Ex. 132; Ex. 34; Ex. 54).

193.   The Final Disclosures contain no specific allegations or evidence of copyright infringement by IBM relating to Linux. (See Ex. 54.)

194.   The Final Disclosures do not specifically allege or include any evidence of unauthorized copying of System V code in Linux by IBM, unauthorized distribution of Linux by IBM or unauthorized preparation of derivative works by IBM relating to Linux. (See Ex. 54.)

195.   The Final Disclosures also do not contain adequate evidence that SCO owns the allegedly infringed copyrights. (See Ex. 54.)

196.   Nowhere, in fact, has SCO ever described in detail its allegations and evidence that IBM's Linux activities infringe SCO's alleged copyright — not in its Final Disclosures, not in its interrogatory answers, nowhere.

197.   The Final Disclosures appear to accuse IBM of copyright infringement with respect to IBM's inclusion into AIX for Power of code from a project known as Project Monterey, but the Court declined to allow SCO to add a claim for copyright infringement relating to that conduct and it has nothing to do with Linux. (Ex. 58 at 2-4; Ex. 54 at Items 194-204.)

W.   **IBM Licenses.**

198.   IBM has a license to use and distribute all of the Disputed Code and, as to much of it, multiple licenses. (See generally Ex. 466; Ex. 467; Ex. 128; Ex. 437; Ex. 438; Ex. 439.)

1.   **The 1999 Caldera License.**

199.   To encourage IBM to embrace Linux, Caldera granted IBM an express license in 1999 to use the materials included in SCO's Linux products. (Ex. 221 ¶ 68; Ex. 466.)

51

200.

SECTION REDACTED

201.

SECTION REDACTED

202.

203.

204.          SECTION REDACTED

· Caldera's OpenLinux products

included the Linux 2.4 kernel. (Ex. 350; Ex. 351; Ex. 352.) OpenLinux was later renamed SCO

Linux 4.0. (Ex. 221 ¶ 71; see Ex. 352.)

205.    Caldera warranted in the Strategic Business Agreement that:

SECTION REDACTED