SECTION REDACTED

206.     Over the course of multiple SCO Linux product releases, SCO distributed all of the Linux Code (Ex. 215 (Ex. H)), to its customers, including IBM. Thus, IBM has a license to all of the Linux Code, foreclosing SCO's infringement claim. (Ex. 221 ¶¶ 68, 77, 111-14; Ex. 226 ¶ 12.)

2.       **The GPL.**

207.     SCO also granted IBM a license to the Linux Code pursuant to the GPL. (Ex. 221 ¶¶ 68, 77, 113-15.)

208.     SCO distributed its Linux products, which include the Linux Code, under the GPL. (Ex. 221 ¶¶ 77, 113-15; Ex. 176 ¶ 13.)

209.     The GPL provides that persons receiving code under the GPL "may copy and distribute verbatim copies of the Program's source code" and "modify [their] copy or copies of the Program or any portion of it". (Ex. 128 §§ 1, 2.)

210.     Thus, independent of the license SCO granted IBM in 1999 under the Strategic Business Agreement, IBM received a license from SCO under the GPL that precludes SCO's claims of infringement. (Ex. 221 ¶ 78.)

3.       **Spec 1170.**

211.     In the early 1990s, Novell participated in an industry consortium with other UNIX vendors, including IBM, to draft a single unified specification of UNIX system services. This effort led to a draft specification known as "Spec 1170". (Ex. 238 ¶ 8; Ex. 437.)

53

212.    Novell "grant[ed] to X/Open a non-exclusive, perpetual, world-wide, royalty-free, paid-up, irrevocable licence [sic] to prepare derivative works and to use, execute, reproduce, display and perform" Spec 1170. (Ex. 238 ¶ 11; Ex. 437 ¶ 1.) X/Open, in turn, granted all of the participants in X/Open (including IBM) "a non-exclusive, perpetual, world-wide, royalty-free, paid-up, irrevocable license to prepare derivative works and to use, execute, reproduce, display, and perform [Spec 1170] and such derivative works". (Ex. 238 ¶ 11; Ex. 437 ¶ 4.)

213.    SUS Material and some of the Streams Material and ELF Material are included in — indeed required by — Spec 1170 and its successors, such as the SUS (Items 152, 157, 183-184, 205-231). IBM therefore has a license to those materials. (Ex. 214 (Ex. 3).)

214.    IBM also has a license to the SUS Material in Spec 1170 pursuant to the Common API Materials Cross-License Agreement between HP, IBM, Sun and USL. (Ex. 482.) That agreement grants IBM (among the other parties), the following rights with respect to Spec 1170:

SECTION REDACTED

215.    Thus, USL granted IBM a license for all its intellectual property that was contained in Spec 1170, including the SUS Material and some of the Streams and ELF Material. (Ex. 214 (Ex. 3).)

54

4.    ELF.

216.    In the mid-1990s, IBM, Novell and Santa Cruz participated in a standards-setting consortium known as the Tool Interface Standards (TIS) Committee.  IBM has a license to the ELF Material pursuant to a grant of rights from Novell and Santa Cruz.  (Ex. 238 ¶ 6; Ex. 438 at i; Ex. 439 at iii; Ex. 215 ¶ 101.)

217.    The TIS Committee published two standards related to object file formats:  the Portable Formats Specification, version 1.1 (Ex. 438), and the ELF Specification, version 1.2 (Ex. 439).  Novell in 1993 granted the TIS Committee (which Novell joined prior to the version 1.2 publication) a license to implement all materials required by the ELF Specification. (Ex. 569; see Ex. 439.)  The first sentence following the cover page of these specifications states: "The TIS Committee grants you a non-exclusive, worldwide, royalty-free license to use the information disclosed in the Specifications to make your software TIS-compliant; no other license, express or implied, is granted or intended hereby."  (Ex. 438; Ex. 439.)

218.    All of the ELF Material is either literally included in the ELF Specification, or is otherwise designed to make Linux TIS-compliant.  (Ex. 214 ¶¶ 43-44, 47; Ex. 215 ¶¶ 99-100.)

219.    Accordingly, IBM has a license to the ELF Material from the TIS Committee. The TIS Committee granted IBM and others a license to use the information in these standards or specifications, which require all of the ELF Material.  (Ex. 238 ¶¶ 6-7.)

X.    Insignificance and Dissimilarity.

220.    The Final Disclosures do not show, and SCO cannot otherwise establish, that the Linux kernel is substantially similar to protectable elements of the System V Works.

55

221.    SCO cannot show substantial similarity between the Linux kernel and protectable elements of the System V Works because none of the System V Code is protectable by copyright.  (Ex. 215 ¶ 31.)

222.    Even if all of the System V Code were protectable by copyright, the Linux kernel is not substantially similar to Linux.  (Ex. 215 ¶ 45.)

223.    Quantitatively, only a tiny amount of code is claimed to have been copied. (Ex. 215 ¶¶ 31-46.)

224.    The 12 items relating to the Linux kernel identify 320 lines of UNIX System V code that is alleged to have been infringed.  These lines of code constitute less than five one-thousandths of a percent (.005%) of UNIX SVr4.2-ES-MP.  (Ex. 213 ¶ 96.)  The Linux Code does not constitute a significant portion of UNIX System V code considered in its entirety.  (See Ex. 215 ¶¶ 31-46; Ex. 213 ¶ 96.)

225.    The allegedly infringed code from UNIX System V constitutes less than one one-hundredth of a percent (.01%) of the Linux kernel.  (Ex. 213 ¶ 96.)  When material outside the kernel is taken into account, the allegedly infringing material represents only 4,779 lines of code in 53 files.  (Id. ¶ 97; Ex. 214 (Ex. 4).)  These lines are less than seven one-hundredths of a percent (.07%) of SVr4.2-ES-MP.  (Ex. 213 ¶ 97.)

226.    The 12 items relating to the Linux kernel identify 326 lines of Linux code in 12 files.  (Ex. 213 ¶ 98.)  These lines of code constitute much less than one one-hundredth of a percent (.01%) of the Linux kernel.  (Id.)  Likewise, the Linux Code constitutes less than five one-thousandths of a percent (.005%) of the allegedly infringed UNIX SVr4.2-ES-MP.  (Id.)

227.   When material outside the kernel is taken into account, the allegedly infringing material represents only 5,145 lines of code in 64 files.  (Ex. 213 ¶ 99; Ex. 214 (Ex. 4).)  This is well under one-tenth of one percent (.1%) of the lines in Linux version 2.6.14.  (Ex. 213 ¶ 99.)

228.   Qualitatively, there is no substantial similarity between the Linux kernel and protectable elements of the System V Works.  (See Ex. 215 ¶¶ 31-46.)

229.   SCO has not accused Linux of copying header files in general, memory management in general, or even the totality of the UNIX header files.  (Ex. 215 ¶ 36.)  Indeed, it alleges copying of only about 1,600 lines in 53 System V Release 4.0 files (only 326 of those lines are in the kernel).  (See id. ¶ 36.)  There are over 235,000 lines in 1,800 header files in the usr/uts directory of SVr4.2-ES-MP (excluding X11 files), so the accused code is well under one percent of the SVr4 interface.  (Id.)  It cannot be qualitatively significant simply on the grounds of being part of the interface, as it is such a small part of the interface.  (See id. ¶¶ 31-46.)

230.   The particular lines SCO has identified as allegedly copied are a scattered and fragmentary collection of define statements, data structures and function prototypes, not qualitatively different in form or character or content or their individual importance from the many thousands of other lines of interface code.  (Ex. 215 ¶ 37.)  Nor is there any apparent pattern, regularity, consistency, or cohesiveness to the accused code; it is scattered throughout the files, sometimes only a line or two in a file.  (Id.)

231.   Only two items (Items 185 and 272) involve implementation code, i.e., code that actually does something.  (Ex. 215 ¶ 41.)  Both items involving implementation deal with minor

pieces of behavior, set amongst the vast body of complex code that goes into an implementation. (Id.)

232.    Item 185 is a small addition to a piece of memory allocation code much of which is in the public domain, while the part of Item 272 code that is implementation is a collection of two dozen elementary functions for accessing ELF data structures.  (Ex. 215 ¶ 41.)

233.    The cited code is quantitatively a minuscule percentage of the SVr4 (or Linux) code, and is qualitatively inconsequential.  (See Ex. 215 ¶ 45.)  Thus, the cited code is not substantially similar.  (Id.)

234.    When considered both quantitatively and qualitatively, the System V Code is insubstantial.  An ordinary reasonable person could not possibly conclude that Linux is substantially similar to the System V Works.  (Ex. 212 ¶¶ 5, 19, 26-27, 30; Ex. 213 ¶¶ 91-102; Ex. 214 ¶ 12; 215 ¶¶ 31-46.)

Y.    Unprotectability of the System V Code.

235.    None of the System V Code is protectable by copyright law.  (Ex. 215 ¶ 122; Ex. 213 ¶¶ 103-04.)

236.    The System V Code:  (1) is dictated by externalities, such as standards, compatibility requirements and programming practices; (2) contains mere ideas, procedures, processes, systems, methods of operation or can be expressed in only a few meaningfully different ways; and/or (3) lacks originality.  (Ex. 213 ¶ 103.)

237.    With one exception (Item 185), the System V Code is composed of header files. (See Ex. 215 (Ex. H).)  While a portion of Item 272 is not composed of header files, all the Linux kernel material in Item 272 consists of header file code.  (Ex. 214 (Ex. 4); Ex. 215 (Ex. H).)

238.    A computer can be described in three layers typically:  (i) the hardware (e.g., an IBM ThinkPad), (ii) onto which is loaded an operating system (UNIX, Windows, etc.), and (iii) the set of application programs (e.g., a word processor, web browser, etc.).  (Ex. 215 ¶¶ 7-8 & Fig. 1.)  The entire purpose of an operating system's header files is to specify the interface to the operating system, i.e., the (metaphorical) set of dials, levers, and switches that an application can use to get the operating system to perform a service.  (Id. ¶¶ 39, 47.)

239.    Slightly more technically, those dials and levers are interface code of three sorts: definition statements that give values to names (e.g., #define EPERM 1, which indicates simply that the name EPERM will have the value 1), structure declarations that indicate how to group together several pieces of data into a bundle, and function prototype statements that indicate how to ask the operating system to perform a service, indicating the information to be supplied to the operating system (the inputs) and the information it will return (the output). (Ex. 215 ¶¶ 58-64.)

240.    None of these statements actually tell the computer to do anything; they are not executable code.  (Ex. 215 ¶¶ 39, 47.)  They are simply specifying information that enables application programs to communicate with the operating system.  (Id. ¶¶ 39, 42.)  They specify only the communication channel, not what is to happen when communication is received.  (Id. ¶¶ 39, 47.)

59

1.      Relationship to Externalities.

241.    Nearly all of the System V Code consists of lines of code from header files (Items 183-84, 150-64, 205-31, and 272 (partially)). (See Ex. 215 (Ex. H).) All of this material, as well as the non-header file material, is dictated by externalities such as compatibility requirements, standards, programming practices and industry demands. (Ex. 213 ¶¶ 44, 103; Ex. 215 ¶ 5; see Ex. 214 ¶ 96 (quoting Ex. 175 at 82).)

(i)      Compatibility.

242.    The System V Code was dictated by compatibility requirements. (Ex. 213 ¶¶ 44-45, 103.)

243.    The header files for a new version of UNIX cannot be varied in ways that are incompatible with what the installed base of UNIX applications expects from the common interface. (Ex. 215 ¶¶ 51-52.) The header files must supply all the details of the interface expected by application programs, or the application programs simply will not work and there will be almost no use for the new system. (See Ex. 213 ¶¶ 26-30, 45, 48; Ex. 215 ¶ 14.)

244.    At the time SVr4 was created, there were approximately 1.2 million UNIX systems in use, with thousands of application programs running on them. (Ex. 483 at 3.)

245.    The header files for SVr4 had to be consistent with this installed base of application programs in order to allow those application programs to continue to be run. The structure and content of the header files was thus dictated by the nature of the programs with which they were designed to interact. (Ex. 215 ¶ 53.) The previous versions of UNIX had

60

header files containing the same three sorts of interface code described below (definition statements, structure declarations and function prototype statements). (Id. ¶ 32.)

246.    Software compatibility also presents the very reason for the existence of the allegedly infringed ELF Material. The purpose of the ELF Specification, including the ELF Material, has always been to create an industry standard to promote software portability and interoperability and increase the efficiency of software production. Cross-platform compatibility cannot be achieved without using precisely the interface structures and values set out in these specifications. (Ex. 214 ¶ 58.)

247.    The large installed base of previous versions of UNIX was a second source of compatibility requirements. (Ex. 215 ¶¶ 24, 29, 53.) To keep existing applications running on a new UNIX version like SVr4, the System V Code had to be the same as material used in previous versions of UNIX. "Once a standard [like UNIX] becomes widely accepted, the economic impact of incompatible change becomes so large that change is almost unthinkable." (Ex. 214 ¶ 31 (quoting Ex. 484 at 6).)

248.    The System V Code was dictated by the need for compatibility with older versions of UNIX that were already installed in customer offices. (Ex. 214 ¶ 32; see Ex. 215 ¶¶ 20-24.)

249.    Linux was intended from the beginning to run UNIX-compatible software, and to adhere to the same industry standards and practices that UNIX does. (Ex. 265 at 4.)

250.    Hence the implementers of any UNIX-compatible operating system are not free to make choices about a long list of details concerning the interface; those decisions were made

61

years (and sometimes decades) ago, and the legacy interface and behavior must be maintained. (Ex. 215 ¶ 21.)

(ii)     Standards.

251.    Another external force dictating the content of the System V Code was industry standards. (See Ex. 213 ¶ 103.)

252.    At the time SVr4 was created, there was already in place a substantial body of formal industry standards and numerous textbooks specifying a wide variety of details for any UNIX implementation. (Ex. 215 ¶¶ 19-24, 55-57, 86-87.) The standards included, among others, (a) the /usr/group standards effort that began in 1984, (b) the System V Interface Definition (SVID), (c) the X/Open Portability Guide, and (d) the POSIX Standard (1988). (Ex. 213 ¶ 50; Ex. 215 ¶ 55.) Rochkind's Advanced UNIX Programming (1985) and Tanenbaum's Operating Systems Design and Implementation (1987) are two examples of textbooks with substantial detail, including many of the details of the UNIX interface found in header files. (Ex. 215 ¶ 55.)

253.    Industry standards also came from the U.S. Government, which required in Federal Information Processing Standard 151-1 (April 1989) that UNIX-like systems developed or acquired for government use be POSIX compatible. (See Ex. 213 ¶ 52.)

254.    AT&T (which owned UNIX at the time of SVr4's creation) was an active participant in the standards setting and standard promulgation process. (Ex. 215 ¶¶ 24-26.) For example, the System V Interface Definition (1985) indicates "AT&T considers its participation

62

in the /usr/group effort to be an important activity and many of the ideas exchanged in that forum are reflected in this document". (Id. ¶ 55.)

255.    De facto standards have arisen from published documents dating to the earliest days of UNIX. (Ex. 215 ¶ 57.) For example, errno.h and signal.h (two of the items in question) date from the early to mid 1970s and had been published in many different sources (e.g., UNIX Programmer Manuals, published first by Bell Labs and subsequently by various commercial publishers) in addition to the universally available header files. (Id. ¶ 57.)

(iii)Pr    ogramming Practice.

256.    The System V Code was further dictated by programming practice. (Ex. 213 ¶ 103.)

257.    Standard programming practice indicates, for example, that names used in code ought to be brief and mnemonic (to make the code easy to read); that values used in a sequence of defined statements should be sequential small numbers, or sequential powers of 2 (1, 2, 4, 8, etc.); that function signatures specify the function name, number and types of inputs and the type of the output; and that data structure should group meaningful collections of data. All of these programming practices are evident in the System V Code. (See Ex. 213 ¶¶ 44-49.)

258.    The memory allocation code claimed by SCO is dictated by the programming practice of implementing a well-known "first-fit" memory allocation algorithm. (Ex. 175 at 82; Ex. 214 ¶ 94.)

63

(iv)     Industry Demand.

259.    The System V Code was dictated by industry demand.  (Ex. 215 ¶¶ 50-53, 86-87, 99-122.)

260.    The UNIX customer base consists of both those who simply use UNIX and the application programs that run on it, and those whose business is to develop new application programs.  (Ex. 106 at 2-3.)

261.    Those who use applications require that their existing applications continue to work.  The same group also demands consistency across header files in different versions of UNIX in order to avoid significant complications.  (Ex. 215 ¶¶ 13-14, 52-56 & n.5.)

262.    Those developing new applications produced their own industry demand. (Ex. 215 ¶¶ 13-14, 21, 42, 50, 52.)  In order to create application programs that run on UNIX, developers must have access to the header file material they need in a familiar form that is easy to use.  (Id. ¶ 74.)

263.    This demand from industry has a direct consequence for the header files of any new version of UNIX (like SVr4 in 1989): those header files must be consistent with the header files that have been used in previous versions of UNIX.  (Ex. 215 ¶¶ 52-56.)  In other words, header files with the form and content found in SVr4 must be made available in order to enable third parties to write applications that can run on it.  (Id. ¶ 74.)

264.    The developers of SVr4 did not decide on their own either the form or content of the header files; they had to supply what was needed by developers, and they had to supply it in a form that developers would find familiar and convenient to use.  (Ex. 215 ¶¶ 20-23, 51-53.)  That

form and content had long been established through decades of prior UNIX development and it was manifest in the header files of earlier UNIX versions. (Id. ¶ 21.)

265.

SECTION REDACTED

266.

SECTION REDACTED

2.    Conceptual Nature of the Disputed Code.

267.

SECTION REDACTED

268.   The nature of the System V Code is such that it can only be expressed in at most a few ways. (Ex. 213 ¶ 60.)

269,   The System V Code is inextricably linked to the ideas that underlie it. (Ex. 215 ¶¶ 21-25, 33.)

270.   The ideas expressed by header files are, given the limits of the C programming language and the need for compatibility, expressible in at most only a few ways. (Ex. 213 ¶ 60.) It is as if SCO did not claim the actual idea of the mathematical function "division", but did claim the name of the function as well as the parameters (A + B = C). Just as there are only a

65

few practical ways to express and name "division", there are at most a few ways to express and name the claimed materials in the header files at issue. (Ex. 213 ¶ 60; Ex. 214 ¶ 90.) All of the header file names at issue are merged with the files' functions, such as "errno.h", which assigns error numbers; "strings.h", which manipulates "strings" of characters (the universal computer term for sequences of text); and "ipc.h", which facilitates inter-process communications. (Ex. 226 ¶ 8.)

271.   Leaving aside specific choices of names and numbers, there is really only one way of defining names to stand for numbers. Practically speaking, names have to be short, meaningful and easy to remember, while the values usually have to be small consecutive integers or powers of two (i.e., 1, 2, 4, 8, …) for efficiency of processing and memory use. (Ex. 214 ¶ 90.)

272.   The memory allocation code claimed by SCO is an implementation of a well-known algorithm for allocating and freeing blocks of memory. (Ex. 214 ¶ 95; Ex. 215 ¶ 116.)


SECTION REDACTED


273.   SCO claims copyright protection for a function that simply copies characters from a source to a destination.


66

274.   Item 185 in SCO's Final Disclosures concerns code that had been distributed in versions of UNIX (e.g., 32V) that are in the public domain. (Ex. 214 ¶¶ 94-96; Ex. 215 ¶¶ 116-17.)

3.   Unoriginality of the Files.

275.   The System V Code lacks even de minimis originality. The System V Code is without creativity. (See Ex. 214 ¶¶ 55, 88; Ex. 213 ¶¶ 39-43, 68-69.)

276.   With one exception, the System V Code is composed of header files (See Ex. 215 (Ex. H.)), which consist of three mechanisms:  #define statements, function prototypes and structure declarations. (Ex. 213 ¶¶ 27-28.)

277.   The function prototypes do not provide any information about how the function is implemented, and implementations are likely to differ on different systems. (Ex. 213 ¶¶ 33, 43.) SCO claims function prototypes whose names and parameters are determined by the procedures or processes that they invoke. (See id. ¶¶ 40, 43.)

278.   The header files at issue contain #define statements that routinely pair a set of mnemonic names with sequentially incremental values. (See Ex. 213 ¶¶ 39-40.) The #define statements specify significant values, conventions, shorthands, abbreviations and the like, which will be utilized in other processes. (See id. ¶¶ 28, 40.) The names cited in the SUS Material are shorthands or abbreviations for values or conditions that an operating system or a program might have to process. (Id. ¶ 39.) The name has only mnemonic significance for programmers. (Id.) Each occurrence of the name anywhere in a source program is replaced by the numeric value during compilation. Virtually all of the numeric values in the header files cited by SCO are

67

sequences of consecutive integers, often beginning at 0 or 1, or they are sequential bit patterns (i.e., consecutive powers of two) that permit combinations of information to be compactly encoded. (Id. ¶ 40.)

279.   Few of the structure declaration files contain more than a dozen members and the majority of them have fewer than six. (Ex. 213 ¶ 42.) The names of the structures and their members are shorthand and the comments elaborate them. Particular expressions are common in the kinds of structures at issue. (Id.) It is very common for such structures to include elements like message types, message lengths and message contents. (Id.)

280.   The header files that are not in the Linux kernel are no more expressive than those in the kernel. (Ex. 213 ¶¶ 39-43, 76-77; Ex. 214 ¶ 59.) The ELF files (including those not in the Linux kernel) represent one of only a handful of possible implementations of a few rudimentary functions (Item 272). (Ex. 213 ¶ 77.)

281.

SECTION REDACTED.

Z.   Authorship/Ownership.

1.   Cited Linux Files.

282.   The Linux Code is found in 12 files. (See Ex. 214 (Ex. 4).)

283.   Those files were created independently of the System V Code.  (Ex. 215 ¶¶ 69-79, 90-92, 106, 122 (Ex. A).)

284.   SCO has not offered any evidence that the individuals who developed the Linux Code copied code from UNIX System V in writing the disputed files.  Nor has it offered any evidence that they had access to System V code when the files in question were authored.

285.   The evidence indicates that Linux Code was written or created independently of SCO and its alleged copyrights, and therefore independently of the System V Works.  (Ex. 215 ¶¶ 70-73, 90-93.)

2.   UNIX Files.

286.   IBM propounded an interrogatory asking SCO to disclose the identity of the authors of the allegedly infringed files and the facts relating to their creation.  SCO did not offer any meaningful response; it stated only that they were created by SCO or its predecessors in interest.  (See Ex. 43 at 16-18.)

287.   Some of the System V Code plainly was not created by SCO or its predecessors or derived from their UNIX code.  (Ex. 215 ¶¶ 79, 92.)

288.   In 1994, USL, SCO's alleged predecessor in interest, and Berkeley Software Design Inc. ("BSD"), settled a lawsuit in which USL had alleged that BSD's version of UNIX violated USL's copyrights.  (Ex. 485 at 2.)  Under the express terms of the Settlement Agreement, certain UNIX files alleged by SCO to be infringed, specifically header files strings.h, syslog.h and utmpx.h, were declared to be copyrighted by BSD, not USL.  (Id. at 8-9 (Ex. C at 5, 14, 16).)  Among the files declared to be owned by BSD are files that SCO claims it

69

owns and that it claims IBM somehow infringes (Items 217-18, 223, 229-30). (Ex. 43 at 17-18; Ex. 215 (Ex. H).)

289.    Additionally, lines of code claimed by SCO in 26 of the 29 SUS Material items and 13 of the 15 Streams Material items appeared in BSD's product "4.4BSD-Lite" (Items 150-54, 156-57, 159-64, 183-84, 205-12, 214-24, 226, 228-31). (Ex. 215 (Ex. H).) 4.4BSD-Lite was published shortly after the settlement of its litigation with USL resulting in "a new, unencumbered version" of the previously-contested BSD UNIX product. (Ex. 485 at 11 (Ex. D at 1).)

290.    Products derived from BSD's 4.4BSD-Lite product have continued to evolve (see, e.g., Ex. 393), and are outside the control of SCO and its alleged predecessors.

291.    A recent BSD product, FreeBSD 6.0 (released in 2005) (Ex. 393), included lines of code from all but one item concerning the SUS Material, and all but one of the Streams Material items (Items 150-54, 156-64, 183-84, 205-24, 226-31). (Ex. 215 (Ex. H).)

292.    SCO even alleges infringement of code that appeared in BSD products that pre-date the creation of System V Release 4.2 and 4.2-ES-MP, the copyrights alleged to be infringed by the SUS Material. (Ex. 377.) Code from more than half (16 out of 29) of the items concerning the SUS Material and all but two of the Streams Material items appeared in BSD net/2 (Items 150-53, 156-64, 208-12, 214, 218, 220-21, 223, 226, 228, 230-31). (Ex. 215 (Ex. H).) None of these files was removed from BSD products following the settlement of BSD's litigation with USL. (Ex. 215 (Ex. H).)

293. SCO's allegations of misuse with regard to specification documents (Items 273-78) lay claim to material that is not owned by SCO. (See Ex. 213 ¶ 64.)

294. The allegedly infringed specification document material includes 239 segments of material relating to the X Windows System, which SCO neither owns nor controls. (Ex. 213 ¶ 64; Ex. 214 (Ex. 5).)

295. The X Windows System is currently owned by and has its origins in work done at M.I.T. in the early 1980s. The 1985 license for X Windows (Version 10) states:

> Permission to use, copy, modify and distribute this documentation for any purpose and without fee is hereby granted, provided that the above copyright notice appears in all copies and that both that copyright notice and this permission notice appear in supporting documentation, and that the name of M.I.T. not be used in advertising or publicity pertaining to distribution of the software without specific, written prior permission. M.I.T. makes no representations about the suitability of the software described herein for any purpose. It is provided "as is" without express or implied warranty. This software is not subject to any license of the American Telephone and Telegraph Company or of the Regents of the University of California. (Ex. 213 ¶ 64 & n.9.)

3.    The APA.

296. In the APA between Santa Cruz and Novell, Novell sold some but not all of its UNIX assets to Santa Cruz. (Ex. 239 ¶ 10.) For example, Novell sold and Santa Cruz acquired certain source code and binaries to Novell's UNIX and UnixWare products and all technical, design, development, installation, operation, and maintenance information concerning UNIX and UnixWare. (Ex. 123 (Schedule 1.1(a) at 1).)

297. However, under Schedule 1.1(b) of the APA, Novell retained "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare", "[a]ll [p]atents", and "[a]ll

right, title and interest to the SVRx Royalties, less the 5% fee for administering the collection thereof". (Ex. 239 ¶ 10; Ex. 123 (Schedule 1.1(b) at 2).)

298.    On October 16, 1996, Novell and Santa Cruz executed Amendment No. 2 to the APA. (Ex. 239 ¶ 6.) Amendment No. 2 modifies Section V.A of Schedule 1.1(b) to provide that Excluded Assets include: "All copyrights and trademarks, except for the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." (Ex. 444.) Amendment No. 2 did not transfer the copyrights. (Ex. 199 at 5-8; Ex. 163 ¶ 17.)

299.    Neither Amendment No. 2 nor the APA identifies "the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies". (See Ex. 123; Ex. 444; Ex. 163 ¶ 18.)

300.    Neither Amendment No. 2 nor the modified APA contains any language concerning a grant, transfer, or assignment of copyrights. (See Ex. 123; Ex. 444; Ex. 163 ¶ 18.)

301.    Section 1.1(a) of the APA provides that certain assets "will" be transferred. (Ex. 123.) Neither Amendment No. 2 nor the modified APA provides a date for any purported transfer of copyrights. (See Ex. 123; Ex. 444.)

4.    The UnitedLinux Agreements.

302.    In May 2002, Caldera International joined with other Linux vendors, Conectiva, Inc., SuSE Linux AG and Turbolinux, to form UnitedLinux. (Ex. 221 ¶ 94; Ex. 106 at 4; Ex. 348.)

72

303.

304.

SECTION REDACTED

305.

306.

307.

- 
- 
- 
- 

73

**SECTION REDACTED**

308.   Therefore, under the terms of the JDC that created UnitedLinux, SCO did not
retain ownership over any of the materials created by UnitedLinux, including the UnitedLinux
1.0 release that was based on the Linux 2.4 kernel and that contained the Linux Code. (Ex. 221
¶ 102.)

### Standard of Decision

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled to a judgment as a matter of law".
Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); In re Grandote
Country Club Co., 252 F.3d 1146, 1149 (10th Cir. 2001). Claims seeking a declaration of non-
infringement are susceptible to resolution on a motion for summary judgment. See, e.g.,
Winfield Collection Ltd. v. Gemmy Indus. Corp., 311 F. Supp. 2d 611, 617 (E.D. Mich. 2004);
Scholastic Inc. v. Stouffer, 81 Fed. App'x 396, 397-98 (2d Cir. 2003) (Ex. A hereto).

IBM is entitled to summary judgment of non-infringement if "at least one element of the
alleged [copyright] infringement cannot be proven", in that either there is no "ownership of a

valid copyright", or there is no "copying of constituent elements of the work that are original".

Jean v. Bug Music, Inc., No. 00-4022, 2002 WL 287786, at *4 (S.D.N.Y. Feb. 27, 2002) (Ex. B

hereto); see also Scholastic, Inc. v. Stouffer, 221 F. Supp. 2d 425, 433, 438-39 (S.D.N.Y. 2002),

aff'd, 81 Fed. App'x 396 (2d Cir. 2003).[5]

### Argument

For more than three years, SCO has made far-reaching claims about its supposed right to

preclude IBM's (and everyone else's) Linux activities.  Despite SCO's grandiose descriptions of

its alleged evidence of IBM's infringement, it is now clear that SCO does not have (and never

has had) any such evidence.  In fact, despite three orders of the Court requiring SCO to disclose

its evidence, it has adduced no evidence that IBM's Linux activities infringe copyrights owned

by SCO.  As a result, the Court should enter summary judgment in favor of IBM.[6]

---

[5] While IBM bears the burden to point out the absence of evidence supporting a finding of
infringement, SCO bears the burden to establish a genuine issue as to each element of
infringement, as these are matters as to which it would bear the burden of persuasion at trial.
See, e.g., Lefler v. United Healthcare of Utah, Inc., 162 F. Supp. 2d 1310, 1315 & n.6
(D. Utah 2001) (The party moving on an issue on which it does not bear burden of persuasion at
trial must show an absence of evidence, which shifts the burden onto the nonmovant to produce
evidence to establish a genuine issue of fact.); Interactive Network, Inc. v. NTN Comms., Inc.,
875 F. Supp. 1398, 1403 (N.D. Cal. 1995) (Because the burden of proof is on the party claiming
infringement, "[s]ummary judgment of noninfringement for the alleged infringer…must be
granted unless [the alleged copyright holder] can demonstrate a genuine issue of material fact as
to whether a reasonable jury could conclude that the two works are substantially similar in both
ideas and expression".); Larami Corp. v. Amron, No. 91-6145, 1993 WL 69581, at *3
(E.D. Pa. Mar. 11, 1993) (In a declaratory judgment action, the patent holder retains the burden
of proof of infringement at trial, and therefore must establish genuine issue of fact in response to
a motion for summary judgment.) (Ex. C hereto).

[6] The undisputed facts are cited in this Part as "¶ __", referring to the relevant paragraph
number(s) in the foregoing "Statement of Undisputed Facts".

## I. SCO CANNOT PROVE UNAUTHORIZED COPYING BY IBM OF COPYRIGHTED WORKS OWNED BY SCO.

To establish a claim of copyright infringement, SCO must prove (1) ownership of a valid copyright, and (2) copying by IBM of protected components of the copyrighted material. See Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823, 831 (10th Cir. 1993). Absent admissible evidence of unauthorized copying by IBM of copyrighted materials owned by SCO, its allegations of infringement fail and IBM is entitled to summary judgment. See U-Haul Int'l, Inc. v. WhenU.com, Inc., 279 F. Supp. 2d 723, 726-30 (E.D. Va. 2003).

From the beginning of this case, IBM asked SCO to disclose its allegations and evidence of alleged infringement by IBM and, from the beginning of this case, SCO declined to do so. (¶ 177.) The Court entered two separate orders requiring SCO to disclose its allegations and evidence with specificity. (¶ 157.) SCO failed to do so, requiring the Court to enter an order setting interim and final disclosure deadlines. (¶ 178.) Even in the face of that order, SCO failed to disclose in any meaningful way — let alone in detail, as specified by the Court — its allegations and evidence of unauthorized copying by IBM of SCO's copyrighted works. (¶¶ 168-69, 192-97.) Nowhere, in fact, has SCO ever described in detail its allegations and evidence that IBM's Linux activities infringe copyrights owned by SCO — not in its Final Disclosures, not in its interrogatory answers, nowhere. Thus, IBM is entitled to summary judgment.

First, IBM is entitled to summary judgment because SCO has failed to adduce adequate evidence of ownership. The Final Disclosures identify the System V Code from four allegedly infringed copyrights, the System V Works. (¶ 181.) They do not, however, disclose adequate evidence that SCO owns the copyrights in the System V Works. (¶ 195.) The undisputed

76

evidence shows that Novell retained the UNIX copyrights, and did not transfer them to Santa Cruz, pursuant to the APA. Schedule 1.1(b) of the APA expressly provides that Novell retained "all copyrights and trademarks, except for the trademarks UNIX and UnixWare", and Amendment No. 2 to the APA did not transfer the copyrights. (¶¶ 35, 297.) Thus, SCO could not have acquired the copyrights to the System V Works in its acquisition of UNIX assets from Santa Cruz, and it cannot sustain a claim against IBM for infringing them. That is plainly why SCO asked Novell to transfer the copyrights to it prior to the commencement of this case. (¶¶ 38, 129.) Moreover, even if (contrary to fact) Santa Cruz had acquired the copyrights to the System V Works from Novell, SCO transferred any ownership it had in the Disputed Code to UnitedLinux as part of its support for that project. SCO transferred ownership of its intellectual property rights in its UnitedLinux product (except in respects not relevant here), including the Linux Code, to UnitedLinux. (¶¶ 114, 302-08.) Thus, SCO cannot establish ownership of copyrights covering the System V Works for this additional reason.

Second, IBM is entitled to summary judgment because SCO has failed to adduce adequate evidence of unauthorized copying by IBM. In addition to not disclosing any evidence of ownership, the Final Disclosures and SCO's interrogatory responses reveal no evidence — none — of unauthorized copying by IBM of the System V Code. (¶¶ 146-57.) Indeed, they do not show that anyone copied the System V Code in writing Linux, which was created independently.[7] (¶¶ 282-85.) Notably, neither the Final Disclosures nor SCO's interrogatory

---

[7] Independent creation is a complete defense to copyright infringement. See Calhoun v. Lillenas Publ'g, 298 F.3d 1228, 1232-33 (11th Cir. 2002) (affirming district court's grant of summary judgment to defendant where plaintiff "did not offer any evidence to contradict [defendant's] testimony" supporting independent creation, and the court held this

responses even allege improper copying by IBM of the System V Code.[8] (¶¶ 192-97.)  SCO

cannot sustain its claims or avoid summary judgment based on assertion alone.  See Trevizo v.

Adams, 455 F.3d 1155, 1159 (10th Cir. 2006) ("Conclusory allegations unsupported by specific

evidence will be insufficient to establish a genuine issue of fact." (quoting Lujan v. Nat'l

Wildlife Fed'n, 497 U.S. 871, 902 (1990)).

In the absence of evidence that SCO owns the System V Code and that IBM copied it

without authorization, SCO cannot sustain its claims of infringement.  A party cannot survive

summary judgment if it fails to produce, during discovery, evidence supporting a necessary

element of its opposition.  See, e.g., Lawrence v. IBP, Inc., No. 94-2027, 1995 WL 261144, at *7

(D. Kan. Apr. 21, 1995) (Ex. D hereto); Stone v. CGS Distrib. Inc., No. 93-1288, 1994 WL

832021, at *6 (D. Colo. Aug. 18, 1994) (Ex. E hereto); see also Lauth v. McCollum, No. 03-

8529, 2004 WL 2211620, at *4 (N.D. Ill. Sept. 30, 2004) (Ex. F hereto); Cambridge Elec. Corp.

v. MGA Elec., Inc., 227 F.R.D. 313, 325 (C.D. Cal. 2004).  Courts enter summary judgment in

these circumstances, see, e.g., Lawrence, 1995 WL 261144, at *7, *13; Stone, 1994 WL 832021,

at *6, and this Court should do so here.  See Cambridge, 227 F.R.D. at 325 (granting summary

judgment where plaintiff "failed to discharge its affirmative burden" of establishing a genuine

---

"uncontradicted evidence...fully negate[d] any claim of infringement") (internal quotation
omitted).

[8] SCO accuses IBM of copyright infringement with respect to its inclusion of Project
Monterey code into AIX for Power, despite the fact that the Court declined to allow SCO to add
a claim for copyright infringement relating to that conduct.  (¶ 197.)  We address this issue,
which does not concern Linux, in IBM's motion for summary judgment on SCO's unfair
competition claim (by which SCO seeks to end run the Court's order).  See UC, Br.

issue of material fact with an opposition based on evidence that was "not disclosed to defendants in plaintiff's deficient interrogatory answers").[9]

## II.    IBM HAS ONE OR MORE LICENSES TO THE DISPUTED CODE.

The existence of a license to use an allegedly infringed work is a defense to a claim of copyright infringement. See I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996); RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747, 754-55, 760 (Fed. Cl. 1999). IBM has one or more licenses to the Disputed Code and is therefore entitled to summary judgment independent of SCO's failure of proof as to the essential elements of copyright infringement.

First, to encourage IBM to embrace Linux, SCO granted IBM a license in 1999, under the parties' Strategic Business Agreement, to use the materials included in SCO's Linux products. (¶¶ 89, 95-96.) Specifically, SCO granted IBM

SECTION REDACTED

(¶ 93.)

included SCO's Linux products. (¶ 201.) SCO included the Linux Code in multiple SCO Linux

---

[9] See also Lauth, 2004 WL 2211620, at *4, *6 (granting summary judgment over plaintiff's opposition that was supported by facts that were "never identified . . . in [plaintiff's] answer to Defendants' interrogatories"); Stone, 1994 WL 832021, at *6 (granting summary judgment against plaintiff who, in response to defendant's deposition questions and interrogatories, "could have [but did not] name[] businesses he contacted regarding employment", doing so only on opposition to summary judgment, thereby failing to satisfy plaintiff's evidentiary burden on mitigation of damages).

products, which it distributed to thousands of customers, including IBM. (¶ 206.) Thus, IBM has a license to the Disputed Code.

Second, SCO granted IBM a license to the Linux Code pursuant to the GPL. (¶ 207.) SCO distributed its Linux products, which (as stated) include the Linux Code, under the GPL. (¶ 208.) As discussed more fully in IBM's Memorandum in Support of its Copyright Infringement Counterclaim, the GPL provides that a person receiving code under the GPL "may copy and distribute verbatim copies of the Program's source code" and "modify [its] copy or copies of the Program or any portion of it". (¶ 209.) Thus, independent of the license SCO granted IBM under the Strategic Business Agreement, IBM received a license from SCO under the GPL that precludes SCO's claims of infringement.

Third, in the early 1990s, when Novell owned all of AT&T's UNIX assets, it helped to establish "Spec 1170". (¶ 211.) As part of that effort, Novell "grant[ed] to X/Open a non-exclusive, perpetual, world-wide, royalty-free, paid-up, irrevocable licence [sic] to prepare derivative works and to use, execute, reproduce, display and perform" Spec 1170. (¶ 212.) X/Open, in turn, granted IBM, "a non-exclusive, perpetual, world-wide, royalty-free, paid-up, irrevocable license to prepare derivative works and to use, execute, reproduce, display and perform [Spec 1170] and such derivative works". (¶ 212.) Moreover, USL granted IBM a separate license to the material in Spec 1170 pursuant to the Common API Materials Cross-License Agreement. (¶ 214.) All of the SUS Material and some of the Streams and ELF Material is included in — indeed, required by — Spec 1170. (¶ 213.) IBM therefore has two additional licenses to those materials.

80

Fourth, IBM received a license to the ELF Material from the TIS Committee. (¶216.) In the mid-1990s, IBM, Novell and Santa Cruz participated in a standards-setting consortium known as the TIS Committee. (¶216.) The TIS Committee published two standards related to object file formats: the Portable Formats Specification, version 1.1, and the Executable and Linking Format (ELF) Specification, version 1.2. (¶217.) The TIS Committee in turn granted IBM and others a license to use the information in these standards or specifications, which require all of the ELF Material. (¶¶217-18.) The first sentence following the cover page of these specifications states: "The TIS Committee grants you a non-exclusive, worldwide, royalty-free license to use the information disclosed in the Specifications to make your software TIS-compliant; no other license, express or implied, is granted or intended hereby". (¶217.) Thus, IBM has multiple licenses to use the ELF Material.

In sum, IBM has one or more licenses to the Disputed Code. For this reason alone, SCO's infringement allegations lack merit.

## III.   SCO IS ESTOPPED FROM PURSUING ITS INFRINGEMENT CLAIMS.

Putting aside the fact that SCO failed to substantiate its allegations of infringement (in the face of three court orders requiring it to do so) and putting aside the fact that IBM has multiple licenses to the Linux Code, SCO is estopped from pursuing its infringement allegations.

A copyright holder is estopped from asserting a claim of infringement where: (1) the copyright owner knew the facts of the infringement; (2) the copyright owner intended its conduct to be acted upon or the copyright owner acted such that the alleged infringer has a right to believe it was so intended; (3) the alleged infringer is ignorant of the true facts; and (4) the alleged infringer relies on the copyright owner's conduct to his detriment. *HQI Assocs., Inc. v.*

81

Wetmore Printing Co., 427 F.3d 867, 875 (11th Cir. 2005); see Carson v. Dynegy, Inc.,

344 F.3d 446, 453 (5th Cir. 2003); Field v. Google Inc., 412 F. Supp. 2d 1106, 1116

(D. Nev. 2006). The undisputed evidence establishes each element of estoppel.

First, SCO knew the facts of the alleged infringement — that is, that the Linux Code was

in Linux.[10] (¶ 123.) The Linux Code has been in Linux since before SCO commenced this

lawsuit. (¶ 123.) All of the SUS Material has all been in Linux since 2000 and some of it has

even been in Linux since its inception in 1991. (¶ 186.) The ELF Material has been in Linux for

more than a decade, since version 1.0. (¶ 188.) While it has never been part of the Linux kernel

and is thus outside the scope of the relief IBM seeks, the Streams Material has been publicly

available for use with Linux for nearly a decade. (¶ 187.)

The undisputed evidence shows that SCO knew the Linux Code was in Linux well before

it filed suit. For example:

- SCO was founded as a Linux company and, as one of its founders put it, SCO staked
  its future on Linux. SCO contributed code to Linux, fixed bugs in the system, trained
  customers in how to use it and educated customers about its features. Like any Linux
  company, SCO knew what was in Linux. (¶¶ 23-24, 108.)

- SCO played an important role in the standardization of Linux, through the LSB
  project. As a general matter, standardizing any operating system requires a detailed
  understanding of its code base. Here, the LSB required the inclusion in Linux of
  much of the Linux Code, including, in particular, the SUS Material. (¶¶ 53-63.)

- SCO included the Linux Code in its Linux products, including "OpenLinux" and
  "SCO Linux 4, powered by UnitedLinux 1.0". (¶¶ 118-19, 142.) SCO distributed
  those products, including the Linux Code, for years before it filed suit. SCO

---

[10] The first element of estoppel is satisfied if the plaintiff knows of the conduct underlying
the alleged infringement; the plaintiff need not know that such conduct constitutes infringement.
See Carson, 344 F. 3d at 455 n.9 (holding that there is no requirement "that plaintiff be aware
that the defendant's actions constituted infringement as a matter of law").

82

distributed some of the Linux Code for nearly a decade.  (¶¶ 187-88.)  In all, SCO sold the Linux Code to thousands of customers worldwide.  (¶ 145.)

- SCO made the Linux Code available for download from its website.  Anyone in the world could have copied it.  (¶¶ 141, 144.)

- *SCO granted IBM a license to the Linux Code in its Linux products under the 1999 Strategic Business Agreement, licensed the material under the GPL and assigned ownership to almost all, if not all, of it to UnitedLinux.* (¶¶ 89-108.)

- *SCO developed Linux-related products, including in particular an application known as lxrun, that use and require knowledge of much of the Linux Code.* (¶¶ 64-71.)

- SCO's predecessor (Santa Cruz) commissioned a study (of which SCO was aware but that it ignored) to investigate whether Linux contained material that was similar to UNIX.  The study not only revealed that much of the Linux Code was in Linux but also, according to SCO, that it was impermissibly similar to material in UNIX operating systems.  The study went so far as to conclude that "there can be no doubt that parts of the Linux distribution were derived from UNIX".  (¶¶ 85-87.)

SCO representatives, including senior management, knew and understood that the Linux Code was in Linux long before SCO filed suit.  (¶ 123.)  Indeed, SCO appears to have been one of the few Linux companies that distributed some of the material.[11]  (¶¶ 142-43.)

---

[11] Courts have found knowledge of the facts of infringement sufficient to establish estoppel in less compelling circumstances.  *See* Byron v. Chevrolet Motor Div. of Gen. Motors Corp., No. 93-1116, 1995 WL 465130, at *10 n.11 (S.D.N.Y. Aug. 7, 1995) (finding that plaintiff knew of defendants' infringement where plaintiff "admitted viewing the [allegedly infringing] Chevrolet commercial in 1986") (Ex. G hereto); Cardinal Indus., Inc. v. Anderson Parrish Assocs., Inc., No. 83-1038, 1986 WL 32732, at *4 (M.D. Fla. May 7, 1986) (holding that even after plaintiff informed defendants of its interest in protecting its copyrights, plaintiff's "active persuasion of [the defendants] to incorporate [plaintiff's work] into the plans…certainly indicated knowledge on the part of Cardinal that its incorporated suggestions infringed on Cardinal designs") (Ex. H hereto); Buckward Digital Servs., Inc. v. Millar Instruments, No. 05 1728, 2006 WL 1118003, at *4 (S.D. Tex. Apr. 26, 2006) (finding that plaintiff knew of defendants' unauthorized use of the copyrighted work since plaintiff delivered a copy of the work to defendant) (Ex. I hereto); Quinn v. City of Detroit, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998) (finding that plaintiff knew of defendant's unauthorized use where plaintiff granted permission to defendant to use the copyrighted work).

<u>Second</u>, SCO intended that its Linux activities be acted on, and SCO acted such that IBM had a right to believe they were so intended. (¶ 100.) SCO did not stake its future on Linux to be ignored. (¶ 108.) SCO undertook its Linux activities intending others to act upon them. (¶ 100.) In fact, it went to great lengths to convince the Linux community that it was a true supporter of Linux. (¶¶ 111-22.) At an absolute minimum, IBM (and others in the Linux community) had a right to believe SCO intended its statements and conduct regarding Linux to be relied upon. (¶¶ 88-102.) SCO's Linux activities, by their nature, demonstrate that it intended that they be relied upon. For example:

- Founding a business on a single product communicates that it is not an illegal and unauthorized work.

- Promoting the standardization of an operating system conveys an intent that others will conform to the standard, and in the case of Linux and the LSB, that developers include the Linux Code in Linux.

- Offering Linux products for sale, and selling them, invites customers and potential customers to use and rely upon the products.

- Licensing a product, especially under the GPL, communicates awareness of what is being licensed.

Here again, SCO representatives, including senior management, intended others to rely upon its promotion and support of Linux. (¶ 110.)

Even if (contrary to fact) SCO had not intended its Linux activities to be relied on, it acted such that IBM and others had the right to believe that SCO intended its conduct to be relied on. SCO conducted its Linux activities for nearly a decade before suing IBM. (¶¶ 88-102, 111-23.) SCO repeatedly urged IBM and others, in its marketing materials and SEC filings, to use and rely on Linux. (¶ 97.) Some of the Linux Code is in Linux as a result (in part) of SCO's efforts to bring Linux into compliance with the LSB. (¶ 61.) Moreover, as part of their Strategic

84

Business Agreement, Caldera expressly warranted to IBM that IBM would be protected against claims of infringement relating to the material in Caldera's Linux products, and promised that it would hold harmless and indemnify IBM from third party intellectual property rights claims.[12] (¶ 95.)

Third, IBM was unaware of SCO's allegations of infringement. (¶ 162.) IBM knew nothing of SCO's allegations about the Linux Code until after SCO launched its attack on Linux. (¶ 162.) SCO did not specifically identify the Linux Code, despite two orders of the Court requiring it to do so, until SCO submitted its Final Disclosures, years after SCO commenced suit.[13] (¶¶ 146-57, 170-78.) Even then, SCO failed to disclose any evidence of unauthorized copying by IBM. (¶¶ 146-57, 170-78.) Moreover, IBM had no reason to believe that SCO considered the Linux Code to infringe copyrights owned by SCO. (¶ 162.) Among other things,

---

[12] Here again, courts have found that a copyright holder intended its actions to be relied on and acted such that the alleged infringer had a right to believe it was so intended in comparatively less compelling circumstances. See e.g., Keane Dealer Servs., Inc. v. Harts, 968 F. Supp. 944, 947-48 (S.D.N.Y. 1997) (finding that "Lehman's silence in the face of this knowledge [of the facts of infringement] coupled with its willingness to assist Smith Barney when the latter had questions regarding the [infringing] software constitutes conduct on which Smith Barney was entitled to rely"); Buckward, 2006 WL 1118003, at *4 (finding intent in plaintiff's delivery of the allegedly infringing product to defendant for defendant's use and that defendant knew plaintiffs believed "that they were entitled to copy and distribute" the materials); see also DeCarlo v. Archie Comic Publ'n. Inc., 127 F. Supp. 2d 497, 510 (S.D.N.Y. 2001) (holding that plaintiff's intention to prompt reliance by defendant was demonstrated where plaintiff "never so much as voiced his discontent to [defendant] about its use of the [alleged infringing material], nor said anything to [defendant] regarding the existence of his alleged ownership rights" until filing suit).

[13] Knowledge of the "true facts" requires that IBM knew that SCO believed it had a copyright over the disputed material and objected to IBM's allegedly infringing conduct. See Field, 412 F. Supp. 2d at 1117 (upholding estoppel defense where defendant was unaware that plaintiff objected to the conduct underlying the alleged infringement); Buckward, 2006 WL 1118003, at *4 (estoppel demonstrated where "[d]efendants were unaware, for at least two and a half years after receiving the tapes, that [plaintiff] claimed copyrights in the tapes"); see also DeCarlo, 127 F. Supp. 2d at 510.

SCO promoted Linux; advocated adoption of the LSB, which required inclusion of most of the Linux Code in Linux; distributed a number of Linux products, despite the fact that they included the Linux Code; and granted IBM a license to use the material.[14] (¶¶ 22-33, 42-83, 88-102.)

Finally, IBM embraced Linux based in part on SCO's promotion of, and representations about, the operating system. (¶¶ 96-102.) SCO played an important role in shaping the Linux marketplace, especially through its work with the LSB and UnitedLinux. (¶¶ 53-65, 111-23.) That work improved Linux and influenced IBM's decision to invest in it. (¶¶ 96-102.) On SCO's initiative, for example, IBM entered into a contract with SCO relating to Linux. (¶ 89.) More important still, IBM relied on SCO's silence and inaction. (¶ 97.) As stated, SCO made no mention of the Linux Code until well after the commencement of this lawsuit. (¶ 162.) In making its decision to embrace Linux, IBM relied on the fact that SCO had never identified a single line of infringing code in Linux. (¶ 97.) But for SCO's silence and inaction, IBM would not have made Linux an important part of its business as quickly as it did. (¶¶ 93, 97-98.) IBM has made a significant contribution to the development of Linux, requiring a significant expenditure of time and money at the expense of other opportunities.[15] (¶ 98.)

---

[14] In HGI Associates, 427 F.3d at 875, the court held that the defendant was ignorant of infringement where plaintiffs "were silent when [defendant] asserted [to plaintiffs] its belief that it would not need a license". In Carson, 344 F.3d at 453-54, the court held there was no factual dispute as to defendant's ignorance of infringement where the record contradicted plaintiff's assertion that his ownership of the disputed material was "widely known", and there was evidence that plaintiff actively encouraged adaptation and modification of the disputed material for defendant's employees.

[15] See, e.g., Field, 412 F. Supp. 2d at 1117 (finding detrimental reliance where "if Google had known of Field's preference, it would not have presented 'Cached' links to Field's pages"); Quinn, 23 F. Supp. 2d. at 753 (finding detrimental reliance in that the "City came to rely on its use of [the copyrighted work] and abandoned…its prior data management system"); Keane Dealer Servs., 968 F. Supp. at 947-48 (finding detrimental reliance where defendants

In sum, SCO knew (indeed, the whole Linux community knew) that the Linux Code was in Linux long before SCO filed this lawsuit. Some of the Linux Code has been in Linux for more than a decade; some of it is there because of SCO. (¶¶ 118, 123, 141-44.) Knowing that the Linux Code was in Linux, SCO promoted Linux and urged IBM and others to embrace it, with the intent and expectation that they would do so. (¶¶ 111-23.) Not knowing that SCO would change its position and declare war on Linux after years of promoting it, IBM (and others) built a part of its business around the operating system. (¶ 101.) Allowing SCO to reverse course now would result in severe damage to IBM and others,[16] (¶ 102.) Under basic principles of equity, SCO is estopped from pursuing its allegations of infringement.

The same facts that support a finding of estoppel support a finding that SCO abandoned and waived the right to pursue its allegations of infringement. See Lopez v. Elec. Rebuilders, Inc., 416 F. Supp. 1133, 1135 (C.D. Cal. 1976) ("[A]bandonment occurs when the proprietor engages in some overt act which manifests his purpose to surrender his rights and to allow the public to copy his work."); Capitol Records, Inc. v. Naxos of America, Inc., 262 F. Supp. 2d 204, 211 (S.D.N.Y. 2003) (A claim of copyright waiver requires "proof of an intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it") (internal quotation omitted). SCO has abandoned and waived its copyright protection and cannot pursue its claim for copyright infringement.

---

"introduced undisputed evidence that had they known they were violating a copyright they could have easily negotiated a license agreement with Lehman or created a program of their own").

[16] See Field, 412 F. Supp. 2d at 1117 (citing the proposition that ensuing litigation establishes prejudice to defendant, and stating that "[h]ad Field communicated his preferences to Google, the parties would have avoided the present lawsuit entirely" (citing Hadady Corp. v. Dean Witter Reynolds, Inc., 739 F. Supp. 1392, 1400 (C.D. Cal. 1990)).

## IV.  SCO CANNOT SHOW SUBSTANTIAL SIMILARITY BETWEEN LINUX AND PROTECTABLE ELEMENTS OF THE SYSTEM V WORKS.

SCO's allegations of infringement also fail because it cannot establish substantial similarity between Linux and protectable elements of the System V Works. SCO cannot establish a claim of copyright infringement without demonstrating substantial similarity between protectable elements of an allegedly infringed work and an allegedly infringing work. See Fisher v. United Feature Syndicate, Inc., 203 F.3d 834, 2000 WL 135167, at *2 (10th Cir. 2000) (holding that the court must compare "protected elements" of the copyrighted work "to the allegedly copied work to determine if the two works are substantially similar to the plaintiff's copyrightable material") (Ex. J hereto); Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 701 (2d Cir. 1992) (holding that to show copyright infringement plaintiff had to show "that defendant's work [was] substantially similar to the plaintiff's copyrightable material").[17]

SCO cannot show substantial similarity between the Linux kernel and protectable elements of the System V Works for two independent reasons:  (1) none of the System V Code is protectable by copyright; and (2) even if (contrary to fact) all of the System V Code were protectable, the Linux Code is too insignificant to render Linux substantially similar to the System V Works.

---

[17] See also Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1472 (9th Cir. 1992) (holding that "[s]ummary judgment for a defendant accused of copyright infringement is appropriate when the plaintiff fails to show a genuine issue regarding whether the ideas and expressive elements of the works are substantially similar"); Frybarger v. I.B.M. Corp., 812 F.2d 525, 528 (9th Cir. 1987) (holding that "summary judgment for defendant is appropriate when plaintiff fails to make a sufficient showing that the ideas and expressive elements of the works are substantially similar after defendant has properly identified in a motion for summary judgment that plaintiff has failed to do so").

A.    None of the System V Code Is Protectable By Copyright.

Not all expression is protectable by copyright. *See Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 834 (10th Cir. 1993); *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1371 (10th Cir. 1997). Expression is unprotectable, and cannot form the basis of a claim for copyright infringement, if it is (1) *scenes a faire* material; (2) an idea, procedure, process, system, method of operation or one of only a handful of possible expressions of the underlying idea; or (3) unoriginal. *See Gates Rubber*, 9 F.3d at 836-38; *Mitel*, 124 F.3d at 1371, 1373-74. The System V Code is unprotectable as a matter of law for these reasons.

1.    The System V Code Was Dictated By Externalities.

The *scenes a faire* doctrine excludes from copyright protection expressions that are "standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting". *Gates Rubber*, 9 F.3d at 838. In the context of a computer program, expression is *scenes a faire* material if it is dictated by externalities such as: hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, industry programming practices, and practices and demands of the industry being serviced. *Mitel*, 124 F.3d at 1375; *Gates Rubber*, 9 F.3d at 838; *Computer Assocs.*, 982 F.2d at 709-10.

The System V Code was dictated by numerous externalities, any one of which is sufficient to render it uncopyrightable. (¶¶ 236, 241-66.) Specifically, the System V Code was dictated by (1) compatibility requirements, (2) industry standards, (3) programming practice, and (4) industry demand, as is described in the *expert reports and declarations of* Professors Brian Kernighan and Randall Davis. (¶¶ 236, 241-66.)

89

Courts have found allegedly infringed material to be dictated by externalities in similar circumstances. *See, e.g., Computer Assocs.,* 982 F.2d at 715 (finding elements of a "common system interface" unprotectable by copyright because their design was "dictated by the nature of other programs with which it was designed to interact"); *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.,* 220 F.3d 396, 402 (5th Cir. 2000) (finding functions of picture frame manufacturing software to be dictated by industry requirements and therefore "not subject to copyright protection"); *Secure Servs. Tech., Inc. v. Time & Space Processing, Inc.,* 722 F. Supp. 1354, 1362 (D. Va. 1989) (denying copyright protection to a fax protocol that was dictated by industry standards); *Mitel,* 124 F.3d at 1375 (finding some programming descriptions and values unprotectable because they were dictated by common programming conventions).

### 2. The System V Code Represents Mere Ideas or Merger Material.

In addition to being unprotectable because it was dictated by externalities, the System V Code is unprotectable because it represents mere ideas and merger material.

Copyright law limits the scope of copyright protection by providing that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, [or] method of operation...regardless of the form in which it is described, explained, illustrated, or embodied". 17 U.S.C. § 102(b). The distinction that copyright protection extends to an "author's original expression and not to the ideas embodied in that expression" has been described by the Tenth Circuit as "one of copyright law's fundamental distinctions". *Mitel,* 124 F.3d at 1371 (quoting *Gates Rubber,* 9 F.3d at 836). Similarly, "[u]nder the merger doctrine, copyright protection is denied to expression that is inseparable from or merged with the ideas...underlying the expression". *Gates Rubber,* 9 F.3d at 838.

90

IBM propounded an interrogatory asking SCO to identify the ideas, procedures, processes, systems, or methods of operations it claimed were infringed in Linux. Specifically, IBM's Interrogatory No. 16 stated: "For each line of code and other material identified…please state…whether it constitutes expression protectable under copyright law." (¶ 167.) SCO failed to offer a meaningful response, simply stating that

SECTION REDACTED

(¶ 167.) Thus, in light of SCO's failure to provide discovery on this issue, SCO cannot support the contention that the System V Code represents more than mere ideas and processes. See, e.g., Lawrence v. IBP, Inc., No. 94-2027, 1995 WL 261144, at *7 (D. Kan. Apr. 21, 1995); Stone v. CGS Distrib. Inc., No. 93-1288, 1994 WL 832021, at *6 (D. Colo. Aug. 18, 1994).

In any event, the System V Code is so inextricably linked to the ideas that underlie it that it is unprotectable under the doctrine of "merger". See Gates Rubber, 9 F.3d at 838. With one exception (Item 185), the System V Code is composed of header files. (¶ 237.) The ideas expressed by those files are, given the limits of the C programming language and the need for compatibility, expressible in at most only a few ways. (¶ 270.) It is as if SCO did not claim the actual idea of the mathematical function "division", but did claim the name of the function as well as the parameters (A ÷ B = C). (¶ 270.) Just as there are only a few practical ways to express and name "division", there are at most a few ways to express and name the claimed materials in the header files at issue. (¶ 270.) To afford protection to the System V Code would be to allow SCO to appropriate the ideas in the unclaimed code (e.g., the idea of "division"). See Computer Assocs., 982 F.2d at 708 (explaining that when efficiency concerns in the computer

91

program context suggest "that there are only a very limited number of file structures available", then the "expression represented by the programmer's choice of a specific [structure] has merged with [its] underlying ideal and is unprotect[able]" (quoting, in part, 3 Nimmer on Copyright § 13.03)).

Courts have applied § 102(b) and the merger doctrine to deny protection to expression that is inseparable from the ideas underlying the expression. In Baystate Technologies, Inc. v. Bentley Systems, Inc., the court held that where the name of a file, contained the word "color", the name merged with the idea or function of the file, which was "to create a color". 946 F. Supp. 1079, 1088 (D. Mass. 1996). All of the header file names at issue are similarly merged with the files' function, such as "errno.h", which assigns error numbers; "strings.h", which manipulates "strings" of characters (the universal computer term for sequences of text); and "ipc.h", which facilitates inter-process communications. (¶ 270.) In MiTek Holdings, Inc. v. Arce Engineering Company, Inc., the court found aspects of a computer program unprotectable under the merger doctrine making the comparison "to a mathematical formula that may be expressed in only a limited number of ways; to grant copyright protection to the first person to devise the formula effectively would remove that mathematical fact from the public domain", 89 F.3d 1548, 1557 n.20 (11th Cir. 1996) (quoting Gates Rubber, 9 F.3d at 838). Similarly, to grant copyright protection to functions like those claimed by SCO (that simply copies characters from a source to a destination) would remove basic functions from the public domain — crippling the computer industry. (¶ 273.)

92

### 3.   The System V Code Lacks Even De Minimis Originality.

Finally, the System V Code is unprotectable for an additional reason:  it lacks even de

minimis originality.  (¶ 275.)  In order for a work to be protected by copyright law, it must be the

original, creative expression of an idea, rather than an arbitrary decision.  "Original, as the term

is used in copyright, means only that the work was independently created by the author…and

that it possesses at least some minimal degree of creativity."  Feist Publ'n v. Rural Tel. Serv.

Co., 499 U.S. 340, 345 (1991).  The System V Code lacks even a minimal degree of creativity.

(¶ 275.)  For example, the header files at issue (e.g., Items 183 and 184) contain "define

statements" that routinely pair a set of mnemonic names with sequentially incremental values

(see Items 183 and 184).  (¶¶ 257, 278.)  This is precisely the type of expression courts have

found to be unoriginal and therefore uncopyrightable.  See, e.g., Mitel , 124 F.3d at 1374 (finding

that the concept of descriptions matched with sequentially incremental values is unoriginal).

### B.   Linux Is Not Substantially Similar to the System V Works, Even Assuming the Protectability of the System V Code.

Even if (contrary to fact) all of the System V Code were protectable by copyright, SCO

could not show substantial similarity between Linux and protectable elements of the System V

Works.  (¶ 221.)  Absent a showing of substantial similarity between Linux and the System V

Works, SCO's claims of infringement must be rejected as a matter of law.

"The traditional test for substantial similarity is whether the accused work is so similar to

the plaintiff's work that an ordinary reasonable person would conclude that the defendant

unlawfully appropriated the plaintiff's protectable expression by taking material of substance and

value."  Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280, 1288 (10th Cir. 1996)

(internal quotations omitted).  Where parts of an allegedly infringed work are unprotected by

copyright, there is a "need for an ordinary observer to be 'more discerning'" by removing from consideration any similarities between unprotectable portions of the work. Boisson v. Banian, Ltd., 273 F.3d 262, 272 (2d Cir. 2001). After the court has "distill[ed] the nonprotected area from protected expression" the court "may compare plaintiff's and defendant's works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity".[18]

The Linux Code represents only 326 lines of code from 12 files in the Linux kernel. (¶ 226.) That material is alleged to infringe 320 lines of code, the System V Code, from the System V Works. (¶ 224.) Even before the unprotectable elements of the System V Code are filtered from the analysis, it constitutes less than five one-thousandths of a percent (.005%) of the version of UNIX System V most cited by SCO (i.e., SVr4.2-ES-MP). (¶ 224.) Moreover, there is no qualitative substantial similarity between the Linux kernel and the allegedly protectable elements of the System V Works. The Linux Code does not constitute "a significant or important part of the plaintiff's code, considered as a whole" (¶ 224). See Gates Rubber, 9 F.3d at 839 n.15 (emphasis added). An ordinary reasonable person could not possibly conclude that Linux is substantially similar to the System V Works. (¶ 234.) See Country Kids, 77 F.3d at 1288.

---

[18] Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 912, 918 (2d Cir. 1980) (internal quotations omitted); see Warner Bros. Inc. v. Am. Broad. Co., 720 F.2d 231, 245 (2d Cir. 1983) (noting that "the essence of the claims could be determined by inspection of only the works in question" and affirming the district court's grant of summary judgment to defendants); Fisher v. United Feature Syndicate, Inc., 37 F. Supp. 2d 1213, 1224 (D. Colo. 1999), aff'd, 203 F.3d 834 (10th Cir. 2000) (holding that a court may find non-infringement as a matter of law where "no reasonably jury could find that the two works were substantially similar").

Courts have entered summary judgment based on insufficient similarity (between allegedly infringed and allegedly infringing works) in similar circumstances. See Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1472, 1478 (9th Cir. 1992) (affirming summary judgment dismissing copyright infringement claim where "[p]laintiff [] failed to meet its evidentiary burden on [its assertions of substantial similarity]"); Fryberger v. I.B.M. Corp., 812 F.2d 525, 529 (9th Cir. 1987) (affirming district court decision on summary judgment that with respect to "the expressive elements in the works . . . no reasonable jury could find them substantially similar"); Gemisys Corp. v. Phoenix Am., Inc., 186 F.R.D. 551, 563 (N.D. Cal. 1999) (holding that because "Gemisys has not presented any evidence that [the Phoenix software] is substantially similar to [the allegedly infringed Gemisys software]...the Court grants summary judgment in favor of Phoenix on Gemisys' copyright infringement claim"); Productivity Software Int'l, Inc. v. Healthcare Tech., Inc., No. 93-6949, 1995 WL 437526, at *7 (S.D.N.Y. July 25, 1995) (holding that because "[p]laintiff has not identified any basis for finding that an average lay observer would recognize Defendants' program as having been appropriated from Plaintiff's copyrighted work [and] any similarity between the two programs relates only to non-copyrightable features...Defendants' motion for summary judgment on Plaintiff's copyright claim is granted") (Ex. K hereto).

## V.    SCO HAS MISUSED ITS ALLEGED COPYRIGHTS.

SCO's infringement claim should also be rejected because SCO has misused the copyrights and therefore is not entitled to enforce them.

A copyright holder may not enforce a copyright that it has misused. See Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 972, 878 (4th Cir. 1990) (copyright misuse is an equitable

defense that "bars a culpable plaintiff from prevailing on an action for infringement of the misused copyright").[19]  A copyright holder misuses a copyright where it seeks to extend the scope of its limited monopoly to gain control over material outside the monopoly, or otherwise "attempt[s] to use its copyright in a manner adverse to the public policy".  Id. at 976-78; see also In re Indep. Serv. Orgs. Antitrust Litig., 964 F. Supp. 1469, 1477 (D. Kan. 1997) ("An alleged infringer can establish copyright misuse by showing...that...the defendant illegally extended its monopoly beyond the scope of the copyright or violated the public policies underlying the copyright laws."); Alcatel USA, Inc. v. DGI Tech., Inc., 166 F.3d 772, 792 (5th Cir. 1999) (the doctrine of copyright misuse "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant" (alterations in original) (quoting Lasercomb, 911 F.2d at 976)).

As stated, SCO has not offered any evidence that it owns the copyrights, despite the Court's orders.  (¶ 195.)  Even if SCO could show that it owns the copyrights, however, it has misused them in at least five independent ways, each of which is sufficient to foreclose SCO from further pursuing its infringement claims.

First, SCO misused the copyrights by claiming infringement of material that it does not own.  SCO was a founding member of UnitedLinux.  (¶ 111.)  Under the terms of the agreements that created UnitedLinux, SCO assigned to UnitedLinux ownership of all of its intellectual property rights in most of the material in SCO Linux 4.0, including the Disputed Code therein.

---

[19] The Lasercomb court explained the rationale behind the doctrine of copyright misuse by differentiating between the beneficial social progress stimulated by protecting an author's legitimate ownership of an original creation and the progress inhibiting effects of permitting "an exclusive right or limited monopoly" over materials that were not part of the original expression. Id. at 977 (internal quotations omitted).

(¶¶ 115-18, 302-08.)  Similarly, in 1993, USL settled a lawsuit against BSD in which it had alleged that BSD's version of UNIX violated USL's copyrights.  (¶ 288.)  Under the express terms of the settlement agreement, USL acknowledged that the allegedly infringed header files strings.h, syslog.h and utmpx.h were in fact owned by BSD.  (¶ 288.)  Thus, SCO does not own any copyrights covering the Linux Code.  Yet, SCO has accused IBM of infringing its purported copyrights in that material and a million lines more.  (¶¶ 131, 136.)  In so doing, SCO has misused the copyrights by unlawfully extending their scope to include material over which it has no copyright.

Second, SCO has misused the copyrights by asserting them against all of Linux, although it does not, and could not possibly, have rights to all of Linux.  SCO has claimed broad rights to, and extensive infringement by, Linux.  (¶ 136.)  For example, SCO asserted that there is "more than a million lines" of improperly copied UNIX code in Linux; that Linux is an "unauthorized derivative of UNIX"; and sued or threatened to sue Linux end users who refused to buy a SCO Linux license.  (¶¶ 131, 136, 140.)  At the same time, SCO failed to proffer any evidence in support of its claims of infringement.  (¶ 137.)  As the Court recognized in its order dated February 9, 2005, in response to an IBM motion for summary judgment, SCO offered no "competent evidence to create a disputed fact regarding whether IBM has infringed copyrights owned by SCO through IBM's Linux activities".  (¶ 159.)  SCO's unsubstantiated claims that its copyrights extend to Linux created fear, uncertainty and doubt about Linux, making it impossible for Linux users fairly to evaluate SCO's copyright claims.  (¶ 137.)

Third, SCO misused the copyrights at issue by attempting to leverage them through an expansive application of its SCO's UNIX licensing agreements (which relate to UNIX System V

97

only) to exercise control over copyrighted works owned by IBM (i.e., AIX and Dynix ptx ("Dynix")). SCO concedes that IBM owns AIX and Dynix but contends that because AIX and Dynix allegedly contain, or at one point had contained, some source code from UNIX System V, SCO can prohibit IBM from disclosing or using any of the other millions of lines of unrelated code in AIX or Dynix. SCO therefore claims to be able to control IBM's use of AIX and Dynix material that is unrelated to SCO's alleged UNIX copyrights. In this way, SCO is unlawfully leveraging the copyrights in an effort to control material owned by IBM that is beyond the scope of its alleged copyright grant.[20]

Fourth, SCO misused the copyrights by asserting them as to material that is not protectable by copyright as a matter of law. As is explained above, none of the System V Code is protectable by copyright, because, among other things, the System V Code represents mere ideas and merger material excluded from copyright protection, can be expressed in only one or a few ways and is dictated by externalities such as compatibility requirements. (¶¶ 235-81.) For example, Item 185 in SCO's Final Disclosures concerns code that had been distributed in versions of UNIX (e.g., 32V) that are in the public domain, and that performs a basic function of allocating memory blocks in an unoriginal, unprotectable "first-fit" manner. (¶¶ 232, 258, 281.) As SCO's own expert, Dr. Cargill, concedes,

**SECTION REDACTED**

---

[20] See generally IBM's memoranda in support of its motion for summary judgment on SCO's contract claims (K Br.) and in support of its motion for summary judgment on SCO's claim for copyright infringement (AIX Br.).

SECTION REDACTED                    (¶ 281.) Thus, SCO has again misused the

copyrights by extending their scope to include material not protectable by copyright.

Fifth, SCO misused the copyrights by seeking to enforce them against IBM in ways in

which they are unenforceable. This is true for at least three reasons: (1) IBM has one or more

licenses to all of the Disputed Code including licenses from SCO itself (¶¶ 93-94, 198-215);

(2) SCO is estopped from asserting an infringement claim against IBM for using Linux based on,

among other things, SCO's own Linux activities — which are the reason some of the Linux

Code (e.g., the Streams Material) is even in Linux (¶¶ 49-71); and (3) SCO abandoned and

waived the right (assuming SCO ever had it) to enforce the copyrights as to the System V Code

in Linux (¶¶ 84-87, 108-23, 140-45). These grounds for non-enforcement are detailed above.

(¶¶ 49-71, 84-87, 108-23, 140, 198-219.)

Courts have found copyright misuse and barred a copyright holder from enforcing its

copyright under similar circumstances. See e.g., Alcatel, 166 F.3d at 793-94 (finding misuse

where a copyright holder attempted to prevent copying of the allegedly infringed operating

system for purposes of inhibiting the development of compatible products, and thereby gain

commercial control over the market for compatible products, in which the plaintiff has no

copyright); Tamburo v. Calvin, No. 94-5206, 1995 WL 121539, at *7 (N.D. Ill. Mar. 17, 1995)

(finding misuse where a copyright holder used its licensing agreement to extend the holder's

monopoly beyond the limited scope afforded by copyright law) (Ex. L hereto); Lasercomb,

911 F.2d at 978 (finding copyright misuse where the plaintiff attempted to extend its copyright

control to uncopyrighted material through the use of expansive licensing agreements); Practice

Mgmt. Info. Corp. v. Am. Med. Assoc., 121 F.3d 516, 520-21 (9th Cir. 1997) (upholding a

misuse defense where the terms of the licensing agreement were deemed anticompetitive and the copyright holders used its copyright "in a manner violative of the public policy embodied in the grant of copyright").

The district court decision in <u>qad, inc. v. ALN Assocs., Inc.</u>, 770 F. Supp. 1261 (N.D. Ill. 1991), illustrates why SCO's misuse precludes it from enforcing its alleged copyrights. In that case, qad claimed ownership over, and infringement of, material actually owned by Hewlett-Packard that qad had copied into its own software product. <u>See id.</u> at 1262-66. When defendant ALN Associates, Inc. ("ALN") integrated qad's software into its own software, qad sued for copyright infringement and included the material it copied from Hewlett-Packard as part of the allegedly infringed material. <u>See id.</u> ALN asserted the defense of copyright misuse, arguing that qad misused its copyright by extending its scope "to gain control over material for which it has no copyright". <u>Id.</u> Finding qad's claim of ownership to the Hewlett-Packard material to be "egregious", the court granted ALN summary judgment on its misuse defense, and held:

> [qad's] copyright misuse extended [its] copyright privilege beyond the scope of the grant and violated the very purpose of a copyright, which is to give incentive for authors to produce. After all, the creation of original writings is inhibited — not promoted — when a possessor of a copyright commits the kind of misuse evident here. This Court should not and will not offer its aid to a copyright holder whose actions run contrary to the purpose of the copyright itself. <u>Id.</u> at 1267, 1270.

Like qad, SCO is also claiming infringement of, and control over, material it does not own. Therefore, SCO should be barred from further prosecuting its infringement claim against IBM.

## Conclusion

For the foregoing reasons, summary judgment should be entered in favor of IBM and against SCO on IBM's claim for declaratory judgment of non-infringement with respect to IBM's Linux activities.

DATED this 25th day of September, 2006.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson


CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of September, 2006, a true and correct copy of the foregoing was served by U.S. Mail, postage pre-paid, to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504


Todd M. Shaughnessy

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2006, a true and correct copy of the foregoing was sent by U.S. Mail, postage pre-paid to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101
>
> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131
>
> Robert Silver
> Edward Normand
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504

Todd M. Shaughnessy