SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
  *International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **IBM'S REDACTED MEMORANDUM IN OPPOSITION TO SCO'S MOTION FOR A PROTECTIVE ORDER** <br><br> Civil No. 2:03CV-0294 DAK <br><br> Honorable Dale A. Kimball <br><br> Magistrate Judge Brooke C. Wells |

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

NOV 0 7 2006

MARKUS B. ZIMMER, CLERK
BY_____
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S MEMORANDUM IN OPPOSITION TO SCO'S MOTION FOR A PROTECTIVE ORDER**<br><br>**FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

Dr. Jeffrey Leitzinger is a "professional witness" who for years has made a very good thing, financially, out of his well known willingness to testify with extreme flexibility to suit the convenience of his many litigation clients.

This is a strong statement. If true, it will be highly relevant to a jury's evaluation of Dr. Leitzinger's credibility as someone supposedly bringing the scientific tools of economic analysis to bear on the complex issues the jury is called upon to decide. The law is clear: IBM is entitled to test whether the financial facts fit this picture (as indeed they will), and if so to use them in cross-examination.

### I. IBM IS ENTITLED TO THE FACTS CONCERNING DR. LEITZINGER'S LITIGATION-RELATED INCOME.

SCO's arguments against providing the information sought rest entirely on citations to scattered state law—cases that do not apply the Federal Rules of Evidence or Civil Procedure. The federal precedent is all to the contrary. As recognized by courts in this Circuit, the earnings of a chronic expert witness are legitimate material for impeachment; "There is no question that a party has the right to cross-examine an expert witness about fees earned in prior cases". Baxter v. Navistar Int'l Corp., Civ. A. No. 85-2293, 1987 U.S. Dist. LEXIS 4374, at *2 (D. Kan. May 18, 1987) (attached as Ex. F hereto). Other courts agree. "A showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases." Collins v. Wayne Corp., 621 F.2d 777, 784 (5th Cir. 1980). Common sense suggests that the amount earned in past cases is relevant[1] to credibility because it may demonstrate the extreme extent to which the

---

[1] The relevance of this information to credibility easily clears the low threshold of "relevance" required for discoverability under Rule 26(b)(1):

> [A] request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action. . . .

professional expert witness is motivated to offer the "right" testimony, and courts recognize and accept this:

> [W]e reach our decision based on an appreciation of the fact that the financial advantage which accrues to an expert witness in a particular case can extend beyond the remuneration he receives for testifying in that case. A favorable verdict may well help him establish a "track record" which, to a professional witness, can be all-important in determining not only the frequency with which he is asked to testify but also the price which he can demand for such testimony.

Trower v. Jones, 520 N.E.2d 297, 300 (Ill. 1988); see also Collins v. Wayne Corp., 621 F.2d 777, 784 (5th Cir. 1980) (allowing cross-examination of expert witness on witness's income resulting from testimony for the previous eleven years); Hawkins v. South Plains Int'l Trucks Co., 139 F.R.D. 679, 682 (D. Col. 1991) ("Defendant does have the right to cross-examine an expert witness concerning fees earned in prior cases."); First State Bank v. Deere & Co., Civ. A. No. 86-2308-S, 1991 WL 46375, at *5 (D. Kan. March 15, 1991) (allowing discovery of financial records relating to compensation for expert witness testimony in past five years) (attached as Ex. G hereto).[2] Where, as here, the jury will no doubt be subjected to a "battle of the experts", impeachment evidence is <u>particularly</u> important.[3]

---

> Discovery is commonly allowed in which the discovering party seeks information with which to impeach witnesses for the opposition.

First State Bank v. Deere & Co., Civ. A. No. 86-2308-S, 1991 WL 46375, at *5 (D. Kan. Mar. 15, 1991) (internal citations and quotations marks omitted) (attached as Ex. G hereto); see also Gohler v. Wood, 162 F.R.D. 691, 694 (D. Utah 1995) ("The United States Supreme Court has interpreted this [portion of] [R]ule [26(b)(1)] broadly.") (citing Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

[2] IBM will be content with the more conservative five-year look-back approved by the First State Bank case.

[3] See, e.g., Trower v. Jones, 520 N.E.2d 297, 300 (Ill. 1988) ("We have long recognized that the principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship or financial interest.").

## II. DR. LEITZINGER'S FINANCIAL RELATIONSHIPS WITH ECON ONE.

Because Dr. Leitzinger is both owner and employee of Econ One (Leitzinger Dep. Tr. 6:24-7:12, Ex. A), the amount he personally has been "paid" over past years for his litigation consulting services falls far short of the financial benefit he has reaped as a result of his popularity in the market as a plaintiff's expert witness. On the contrary, the magic (as with law firms) is in the leverage.

Notwithstanding that Econ One on its website boasts ten "Senior Economists", twelve "Economists", and twenty "Analysts", Dr. Leitzinger testified that he and members of his family are together "majority shareholders" of Econ One. (Id.) On any given expert retention, he will no doubt receive payment as an employee in some relation to fees billed for his time on the matter. But substantial additional profits will accrue to Econ One (and thus to Dr. Leitzinger as its owner) from time billed for work done by supporting staff economists and analysts.

Hence, the information relevant to Dr. Leitzinger's incentives to be over-flexible to suit his client's litigation needs is neither limited to his income from the present case (for the reasons discussed in the caselaw cited above), nor limited to his own fees or salary for any particular case, as it is quite likely (and IBM is entitled to determine) that a large portion—even the majority—of his personal enrichment from any particular engagement results from time spent on the matter by other Econ One staff, and flows to Dr. Leitzinger (or his family) by virtue of his equity ownership, not in fees or salary.

Nor is the financial information relevant to Dr. Leitzinger's incentives and credibility limited to those litigation engagements of Econ One in which he himself was to be the testifying witness. As indicated, Dr. Leitzinger and his family are the majority shareholders of a company which he has built up, arguably based on its willingness and ability to provide the testimony that clients desire. If Dr. Leitzinger were to damage that reputation by failing to testify congenially

-4-

to SCO in the present case, there is little doubt that this would be a "business development" problem not just for him, but for his company. It is Dr. Leitzinger's litigation-derived income, however it flows to him, that is the relevant figure for cross-examination purposes.

### III. SCO HAS SOUGHT AND OBTAINED MORE EXTENSIVE FINANCIAL INFORMATION FROM AN IBM EXPERT WITNESS.

Counsel for SCO's instruction not to answer—and the existence of this motion—are ironic given the scope of income-related questions SCO asked of IBM's expert Andrew Morton just two days before the deposition of Dr. Leitzinger. Apparently considering any financial link between Mr. Morton and Linux or IBM—however tenuous—to be potentially useful for cross-examination purposes, SCO demanded that he disclose his entire personal salary over several periods, from several employers. IBM counsel followed the proper procedure, objecting to the questions, designating the testimony as confidential, and permitting the witness to answer. (See Morton Dep. Tr. 79:24-81:3; 88:13-90:20; 91:19-93:24, Ex. B.) SCO should have done—and should be required to do—the same.

As a matter of fact, the potential financial incentives which could make income relevant to credibility and cross-examination are considerably weaker in the case of Mr. Morton than those incentives of Dr. Leitzinger discussed above.

First, Mr. Morton has never before served as an expert witness (id. at 8:11-12), and SCO cites no evidence (there is none) that he has the slightest interest in cultivating such a career. Thus, he does not face the incentives to "please" which (as the cases cited above recognize) face professional expert witnesses.

Second, SCO's attempt to portray Mr. Morton as beholden to IBM is false, and in any event their questioning went beyond that rationale. Mr. Morton's employment history is

-5-

accurately reviewed in his deposition testimony, and mis-described in SCO's brief. To summarize:

- Mr. Morton became an employee of Rearden Steel (a fanciful name for a technology company) in 2000. He did Linux-related work there. (Id. at 79:14-21.) There is no evidence in the record that any other company bore any part of the cost of his salary.

- Mr. Morton became an employee of Digeo Interactive ("Digeo") when Digeo acquired Rearden Steel in 2001. Digeo paid his salary from that time through August, 2006, and he did not receive income from any other entity. (See id. at 82:18-24; 85:18; 86:15-87:13; 90:3-20.)

- In 2003 Digeo entered into a contract with the Open Source Development Laboratory ("OSDL") under which OSDL paid Digeo some sum unknown to Mr. Morton for "kernel services" performed by Mr. Morton upon the Linux kernel. (Id. at 87:2-87:18; Morton Rpt. ¶ 5, Ex. C.) This contractual relationship between Digeo and the OSDL continued until Mr. Morton left Digeo in August, 2006. Mr. Morton never received any income from the OSDL (Morton Dep. Tr. 86:15-87:13, Ex. B).

- In August, 2006, Mr. Morton left Digeo and became an employee of Google Inc. (See id. at 64:7-9.) His salary is paid by Google, and SCO cites no evidence (and we are aware of none) that any other entity pays or reimburses Google for any portion of his salary, directly or indirectly. (See id. at 90:21-93:22.)

Thus, SCO's assertion that "OSDL . . . pays Mr. Morton's salary"—the only distinction that it can think of between Mr. Morton's situation and that of Dr. Leitzinger—is just wrong, as they know.[4]

Nevertheless, at Mr. Morton's deposition, counsel for SCO demanded testimony as to:

1.  Mr. Morton's salary and other income while an employee of Rearden Steel (id. at 79:24-25);

2.  Mr. Morton's salary and other income while employed by Digeo during the period of the Digeo-OSDL contract relating to the Linux kernel services provided by Mr. Morton (id. at 88:13-16); and

---

[4] SCO's assertion that IBM "largely manages and controls the OSDL" (SCO Mem. ¶ 8) is also false, and not supported by the record evidence it cites. The OSDL is funded by some seventy member entities (see OSDL Member Roster, Ex. D) including, during at least part of the relevant period, SCO itself (under its prior name Caldera) (see Caldera Contr. Mem. Reg. Form, Ex. E).

-6-

      3.     Mr. Morton's salary and other income—as well as stock options—received from Google (id. at 89:2-90:20; 91:19-93:24).

Whether SCO will be able to wring any useful and legitimate impeachment material from Mr. Morton's employment and income information is extremely doubtful—but they were entitled to probe the subject to find out, and (subject to confidentiality under the protective order) Mr. Morton answered the questions. Dr. Leitzinger's history of litigation-derived income is likely to provide considerably more fertile grounds for impeachment, and IBM is entitled to probe and find out. Even if the governing law cited above were not decisive (as it is), the time-honored principle of "sauce for the goose" should carry the day.

SCO waves the banner of burden and "intrusiveness" (SCO Mem. ¶ 9), but it is no more burdensome for Dr. Leitzinger to disclose his personal income than it was for Mr. Morton. No doubt the scale of Dr. Leitzinger's income will be rather different, and unlike that of Mr. Morton it will be largely litigation-derived—but then, that's the point.

### Conclusion

For the reasons stated above, the Court should deny SCO's motion for a protective order, and should instead direct either (a) that SCO make Dr. Leitzinger available for a continuation of his deposition solely on the topic of litigation-derived income he has received through Econ One or otherwise within the last five years; or (b) that SCO provide by affidavit a statement separately identifying, for each of the last five years:

(i) any salary, fees, or other payments received by Dr. Leitzinger explicitly linked to hours he personally spent on litigation-related engagements;

(ii) any other payments received by Dr. Leitzinger as an employee of Econ One;

    (iii) any income, benefit, or other value received by Dr. Leitzinger (or family members or family trusts) by virtue of his position (or their positions) as shareholder(s) in Econ One, and derived from litigation-related engagements of Econ One.[5]

DATED this 7th day of November, 2006.

               Respectfully submitted,

               SNELL & WILMER L.L.P.

               /s/ Alan L. Sullivan

               Alan L. Sullivan
               Todd M. Shaughnessy
               Amy F. Sorenson

               CRAVATH, SWAINE & MOORE LLP
               Evan R. Chesler
               Roger G. Brooks
               David R. Marriott

               *Attorneys for Defendant/Counterclaim-Plaintiff*
               *International Business Machines Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff International Business Machines Corporation*

---

[5] It appears that litigation-related engagements make up at least the majority of the activities of Econ One. (See Leitzinger Dep. Tr. 7:5-7, Ex. A (" REDACTED ").) To the extent that Dr. Leitzinger wishes to and is able to exclude from his disclosure any Econ One income that is not derived from litigation-related engagements of Dr. Leitzinger or Econ One, IBM has no objection to such exclusion.

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November, 2006, a true and correct copy of the foregoing was served by U.S. Mail, postage pre-paid, to the following:

>Brent O. Hatch
>Mark F. James
>HATCH, JAMES & DODGE, P.C.
>10 West Broadway, Suite 400
>Salt Lake City, Utah 84101

>Stephen N. Zack
>Mark J. Heise
>BOIES, SCHILLER & FLEXNER LLP
>100 Southeast Second Street, Suite 2800
>Miami, Florida 33131

Todd M. Shaughnessy

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of November, 2006, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

>Brent O. Hatch
>Mark F. James
>HATCH, JAMES & DODGE, P.C.
>10 West Broadway, Suite 400
>Salt Lake City, Utah 84101
>
>Stephen N. Zack
>Mark J. Heise
>BOIES, SCHILLER & FLEXNER LLP
>100 Southeast Second Street, Suite 2800
>Miami, Florida 33131

/s/ Todd M. Shaughnessy

## INDEX TO EXHIBITS

Exhibit A:   Deposition Transcript of Dr. Jeffrey J. Leitzinger

Exhibit B:   Deposition Transcript of Andrew Morton

Exhibit C:   Report and Declaration of Andrew K. Morton

Exhibit D:   OSDL Member Companies and Affiliates

Exhibit E:   OSDL Member Registration Form and OSDL Member Agreement

Exhibit F:   *J. Allen Baxter v. Navistar International Corporation*, 1987 U.S. Dist. Lexis 4374 (D. Kan.)

Exhibit G:   *First State Bank of Junction City, Kansas v. Deere and Company*, 1991 WL 46375 (D. Kan.)