SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **IBM'S REDACTED MEMORANDUM IN OPPOSITION TO SCO'S MOTION REGARDING SPOLIATION** |
| Plaintiff/Counterclaim-Defendant, | |
| v. | **(ORAL ARGUMENT REQUESTED)** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | **[ORIGINALLY FILED UNDER SEAL]** |
| Defendant/Counterclaim-Plaintiff. | Civil No. 2:03CV-0294 DAK |
| | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

419765.1

RECEIVED CLERK

2006 NOV 10 P 4: 51

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., | **IBM'S MEMORANDUM IN OPPOSITION TO SCO'S MOTION REGARDING SPOLIATION** |
| Plaintiff/Counterclaim-Defendant, | **(ORAL ARGUMENT REQUESTED)** |
| v. | **FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38** |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil No. 2:03CV-0294 DAK |
| Defendant/Counterclaim-Plaintiff. | Honorable Dale A. Kimball |
| | Magistrate Judge Brooke C. Wells |

Defendant/Counterclaim Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in opposition to the motion regarding spoliation filed by Plaintiff/Counterclaim-Defendant The SCO Group, Inc. ("SCO").

## Preliminary Statement

After having hinted to the Court for months that the inadequacy of its final disclosures is somehow attributable to IBM's alleged destruction of evidence, SCO now sets forth — in two cursory paragraphs of a seven-page memorandum — the sum total of its spoliation allegations. In those paragraphs, SCO relies on an email concerning a project involving a small number of AIX developers, as well as (at best) ambiguous, out-of-context excerpts of deposition testimony from Daniel Frye, the individual in charge of IBM's Linux Technology Center ("LTC"). SCO claims that "IBM executives" made a deliberate decision in the wake of SCO's lawsuit to issue a "directive", applicable to programmers throughout the LTC, to intentionally destroy documents that allegedly would have shown IBM's improper reliance on AIX and Dynix source code in making contributions to Linux. In attempting to tell this story, SCO misconstrues the single email and the handful of deposition excerpts upon which it relies, none of which even approach supporting SCO's accusation.

SCO's motion should be denied for at least four reasons:

First, there was never an IBM "directive" to destroy source code, or anything else, as the very witness upon whom SCO relies testified repeatedly throughout his deposition. In addition, the "evidence" SCO claims is "lost" is, in fact, in SCO's possession. IBM simply did not destroy any evidence, let alone evidence relevant to SCO's claims.

Second, in light of the fact that no evidence was destroyed, SCO cannot show, as it must, that IBM acted in bad faith. On the contrary, the evidence shows that IBM acted in good faith and has produced to SCO enormous quantities of source code, including the very source code SCO claims has been "lost".

Third, SCO cannot show that it has been prejudiced.  IBM did not destroy the evidence SCO claims it did, but even if it had, SCO fails to show how this evidence would be relevant to any of its claims.

Fourth, SCO waived any claimed deficiency in IBM's document production on the last day of fact discovery in this case.  On March 17, 2006, SCO stipulated with IBM and represented to the Court that it had reviewed IBM's document production and had "no discovery dispute" with IBM concerning it.

In short, SCO presents nothing for the Court to remedy, and its motion regarding spoliation should be denied in its entirety.

### Factual Background

SCO accuses "IBM executives" of having directed "dozens" of Linux developers in the LTC and "at least ten" developers outside the LTC to delete AIX and Dynix/ptx ("Dynix") source code from their "sandboxes" or personal workstations in early April 2003.[1]  (SCO Br. at 3.)  SCO next claims that one LTC programmer, Paul McKenney, "expressly admitted" to destroying pre-March 2003 drafts of Linux source code that he had written "while referring to Dynix/ptx source code on his computer at the LTC".  (Id.)  As explained below, each of SCO's allegations is incorrect:

A.   IBM Did Not Direct AIX Developers To Destroy Evidence in Their "Sandboxes".

1.    In April 2003, IBM's Open Source Steering Committee ("OSSC") met as part of the first phase of the approval process for the Linux for PowerPC Project (the "Project").  The purpose of the Project was to improve Linux's ability to run on IBM's proprietary PowerPC

---

[1] References to SCO's Memorandum in Support of SCO's Motion Regarding Spoliation are cited as "SCO Br. ___".

hardware platform, and in particular to enable Linux to take advantage of new functionality in the PowerPC platform.  (R. Swanberg Decl. ¶ 4.)[2]

2.        Eight developers had been selected for the Project.  Each was a current AIX developer with experience working with IBM's PowerPC platform.  From roughly late 2002 until approximately July 2003, these developers worked internally on the development of newly-written, IBM hardware-specific code that would improve Linux's ability to run on the PowerPC platform.  (Id.)

3.        Randal Swanberg, Technical Staff Member in IBM's Systems and Technology Group, attended the OSSC meeting in his role as the strategic technical lead for the Project.  (Id. ¶ 4.)

4.        Following the meeting, on April 8, 2003, Mr. Swanberg sent an email to a group of IBM managers and team leads (a copy of which is attached as Exhibit G to SCO's memorandum).[3]  Mr. Swanberg sought to ensure that the developers working on the Project no longer had access to copies of old AIX source code that may have been on their workstations as the result of their prior work with AIX for PowerPC.  He did so because this old AIX source code was not necessary for the work these developers were doing on the Project, and to avoid any misperceptions, however misplaced, that might be created if these developers continued to have access to AIX while writing code for Linux.  (11/18/05 D. Frye Dep. at 72:1-24; R. Swanberg

---

[2]    A copy of the Swanberg Declaration is appended hereto as Exhibit A.

[3]    The individuals to whom the email was sent – Amir Simon, Tom Mathews, Kaena Freitas, Randy Greenberg, Kumar Nallapati, Robert Ruyle, Rakesh Sharma, and Michael Lyons – were managers or team leads and not developers.  Of those to whom it was sent, Mr. Swanberg intended only Mr. Simon, the Project's business manager, Mr. Greenberg, manager of the eight developers at issue, and Mr. Lyons, the Project's Team Lead, to communicate information regarding access to copies of old AIX source and "sandboxes."  Neither Mr. Swanberg nor any of the individuals who received the email worked on or developed any code for the Project, (R. Swanberg Decl. ¶ 6), and SCO does not (and cannot) claim that any of these individuals deleted any source code in response to the email.

Decl. ¶ 10.)[4]  Accordingly, Mr. Swanberg's email informed the managers responsible for those developers that the developers should not have "old AIX source" on their personal workstations, including in their "sandboxes".  (R. Swanberg Decl. ¶ 5.)  Neither Mr. Swanberg nor any individual to whom he sent the email is an IBM executive.  (11/18/05 D. Frye Dep. at 68:22-68:3.)

5.     An AIX "sandbox" is a development environment used by AIX developers.  A sandbox allows an AIX developer to work on a copy of a portion of AIX code without importing all of the millions of lines of AIX source code onto his or her personal workstation, usually for the purposes of bug-fixing, testing code, or writing code with new functionality.  Some AIX developers use their department's servers for their development work and do not use sandboxes on their personal workstations at all.  A sandbox may contain links to certain parts of the AIX source code and, potentially, a local copy of a portion of AIX source code a developer made using those links.  Further, all code changes developed in a sandbox that are incorporated into AIX are available in CMVC.[5]  (Id. ¶ 8.)  Sandboxes are used only by AIX developers for development work on AIX.  Sandboxes are not used in Linux development.  (Id. ¶ 9.)

6.     Mr. Swanberg believed that if any of the eight developers had sandboxes on their workstations, those sandboxes might have contained:  (a) an exact copy of source code that the developer created that subsequently had been incorporated into CMVC; (b) a copy of AIX source code to which the developer had not made any changes, and which would therefore be identical to the AIX source code in CMVC; or (c) a copy of AIX source code to which the developer had

---

[4]   Copies of the cited portions of the 11/18/05 and 1/12/05 depositions of Daniel Frye are appended hereto as Exhibits B and C respectively.

[5]   CMVC (or Configuration Management Version Control) is the source code revision system utilized by IBM's AIX development organization.  It provides shared access to source code files used in the development of AIX, tracks changes to the source code files, and ensures that only those with proper authorization are allowed to access or update the material in the database.  (5/3/05 T. Shaughnessy Decl. ¶¶ 7-8 (Docket # 441).)

made or had attempted to make certain changes, but which changes did not work, or the need for which no longer existed, and which, as a result, never became a part of AIX at all.  (Id. ¶ 11.)

7.     The eight developers assigned to the Project were Linda Xie, Michael Strosaker, Nathan Lynch, John Rose, David Altobelli, Matthew Fleming, Nathan Fontenot, and Jacob Moilanen.  Mr. Swanberg's statement regarding removing old copies of AIX source code in sandboxes applied only to these eight individuals.  (Id. ¶ 7.)

8.     Four of the eight developers involved in the Project did not delete any code – in sandboxes or otherwise – as a result of Mr. Swanberg's email.  (L. Xie Decl. ¶ 3; N. Fontenot Decl. ¶ 3; M. Fleming Decl. ¶ 3; M. Strosaker Decl. ¶ 3.)  The four remaining developers are unable to recall whether they may have deleted any leftover AIX code in their sandboxes, but each has testified that, if they had, all such code would have been a copy of what is contained in IBM's CMVC database.  (D. Altobelli Decl. ¶ 3; J. Moilanen Decl. ¶ 3; J. Rose Decl. ¶ 3; N. Lynch Decl. ¶ 3.)[6]  IBM produced the CMVC database to SCO in March 2005, and with it verbatim copies of any code that may have been in any of these developers' sandboxes.  (5/3/05 T. Shaughnessy Decl. ¶ 19.)

9.     Not one of these eight developers used or relied upon any old AIX code to which they may have had access to make any contributions to Linux.  (L. Xie Decl. ¶ 4; N. Fontenot Decl. ¶ 4; M. Fleming Decl. ¶ 4; M. Strosaker Decl. ¶ 4; N. Lynch Decl. ¶ 4; D. Altobelli Decl. ¶ 4; J. Moilanen Decl. ¶ 4; J. Rose Decl. ¶ 4.)  Not one of these eight developers has been identified by SCO as having made allegedly improper contributions to Linux.  (11/10/06 T. Shaughnessy Decl. ¶ 2.)[7]

---

[6]   The declarations of Xie, Fontenot, Fleming, Strosaker, Lynch, Altobelli, Moilanen, and Rose are appended hereto as Exhibits D through K.

[7]   The 11/10/06 Declaration of T. Shaughnessy is appended hereto as Exhibit L.

10.     In sending the email, Mr. Swanberg had no intent whatsoever to destroy or to cause the destruction of evidence or other material that might be relevant to the lawsuit.  (R. Swanberg Decl. ¶ 10.)

B.     <u>IBM Did Not Direct Developers in the Linux Technology Center to Destroy Evidence.</u>

11.     Daniel Frye, IBM's Vice President, Open Systems Development – the person in charge of the LTC – testified throughout his deposition that Mr. Swanberg's email regarding sandboxes pertained only to the eight developers working on the Project, that these eight developers were not part of the LTC, and that Mr. Swanberg's email did not pertain to programmers in the LTC.[8]  For example:

REDACTED

(11/18/05 D. Frye Dep. at 55:7-19; <u>see also</u> <u>id.</u> at 66:7-10, 67:2-7, 68:22-69:3, 83:5-9.)  He again confirms this fact in the declaration filed with this memorandum.  (D. Frye Decl. ¶ 5.)[9]

12.     Dr. Frye repeatedly testified that IBM did <u>not</u> issue a directive to developers within the LTC to delete AIX or Dynix source code from their machines:

---

[8]   In his deposition, Dr. Frye testified that the number of developers working on the Project was "on the order of ten"; in fact, there were eight.  (D. Frye Decl. ¶ 5.)

[9]   A copy of the Frye Declaration is appended hereto as Exhibit M.

REDACTED

(11/18/05 D. Frye Dep. at 56:2-7.)

* * * *

REDACTED

(Id. at 83:16-24.).

13.     Dr. Frye again confirms in the declaration filed herewith that IBM never instructed members of the LTC to delete or to destroy source code or any other evidence.  (D. Frye Decl. ¶ 7.)  On the contrary, IBM took steps to ensure that members of the LTC preserved documents after this lawsuit was filed:

REDACTED

REDACTED

(1/12/05 D. Frye Dep. at 91:7-19; <u>see also</u> D. Frye Decl. ¶ 7.).

14.    Dr. Frye's testimony regarding "dozens" of members of the LTC had nothing to do with deleting or destroying documents, source code, or anything else.  (D. Frye Decl. ¶ 6; 11/18/05 D. Frye Dep. at 100:13-101:18; 1/12/05 D. Frye Dep. at 90:15-91:19.).  It also had nothing to do with Mr. Swanberg's email concerning sandboxes.  (D. Frye Decl. ¶ 6.)   Instead, it related only to his attempt to estimate the number of LTC developers who may have had any remaining ability to <u>access</u> AIX or Dynix removed following the lawsuit:

REDACTED

REDACTED

(1/12/05 D. Frye Dep. at 90:15-91:19 (emphasis added); <u>see also</u> Frye Decl. ¶ 6.)  Any access that may have existed at that time was removed because AIX and Dynix source code was not necessary, and to avoid any misperceptions, however misplaced, that might be created if LTC

developers continued to have access to AIX and Dynix while writing code for Linux.  (11/18/05 D. Frye Dep. at 101:15-20; 102:12-19.)

15.    In his declaration, Dr. Frye notes that in the portions of his testimony cited by SCO, he was asked questions about three different subjects:  (1) Mr. Swanberg's email concerning the Project, and the AIX sandboxes of developers involved in that Project (which was not part of the LTC); (2) the decision to remove any remaining access LTC programmers may have had to AIX or Dynix source code repositories; and (3) efforts by IBM to collect documents from members of the LTC in connection with SCO's discovery requests.  As a result, it was not always clear to Dr. Frye which of these three subjects SCO was inquiring about — each of which occurred years before his depositions were taken — and as a result some of his testimony on these three subjects is at times imprecise.  (D. Frye Decl. ¶ 4.)

C.    Paul McKenney Did Not Destroy Evidence.

16.    During LTC programmer Paul McKenney's deposition, he was asked whether, since March of 2003, he had overwritten any drafts of source code that he wrote for Linux while referring to Dynix source code.  As he explains in his declaration, he misunderstood the question, and believed that SCO's attorney had asked him whether since March of 2003 he had overwritten drafts of Linux source code _without_ reference to Dynix source code.[10]  (P. McKenney Decl. ¶ 5.) As a result, Dr. McKenney answered that he had.[11]

---

[10]  A copy of the McKenney Declaration is appended hereto as Exhibit N.

[11]  The fact that Dr. McKenney misunderstood the question is understandable given the manner in which SCO's counsel inquired on this topic.  Immediately before the exchange upon which SCO relies, Dr. McKenney was asked almost the identical question, and correctly answered that he did not write Linux code while referring to Dynix:

17.     The fact that he misunderstood the question is made clear by Dr. McKenney's answers to SCO's attorney's next questions.

REDACTED

(Id. at 254:12-16; P. McKenney Decl. ¶ 6.)  Although these pages of his deposition immediately follow those cited by SCO, SCO chose not to attach these pages to its motion.

---

REDACTED

(P. McKenney Dep. at 252:20-253:3.)  Apparently dissatisfied with this answer, SCO's counsel asked the same question again:

REDACTED

(Id. at 253:15-17.)  Dr. McKenney reasonably assumed that SCO's counsel would not be asking him the same question twice in a row, and therefore thought SCO's counsel was asking REDACTED                                                                                            (Id. at 253:18.)  As explained above, the testimony that follows this exchange clearly demonstrates, and Dr. McKenney's declaration confirms, he misunderstood SCO's question, which had just been asked and answered.

[12]  A copy of the cited portions of Dr. McKenney's deposition are appended hereto as Exhibit O.

18.     Contrary to SCO's claims, and as he testified at his deposition, Dr. McKenney did not write source code for Linux while referring to or looking at Dynix source code, and he therefore did not destroy, and could not have destroyed, any drafts of source code he wrote for Linux while looking at or referring to Dynix source code.  (P. McKenney Decl. ¶ 7.)

19.     Dr. McKenney also testified that sometime around March 2003, he removed any Dynix source code trees remaining on his personal workstation from his prior work in Dynix, as well as certain tests that were used strictly to validate Dynix kernel functionality that are not themselves Dynix source code.  (P. McKenney Dep. at 244:20-245:3, 245:17-20, 249:8-15; P. McKenney Decl. ¶ 4.)  However, these Dynix source trees were not drafts of code that Dr. McKenney had written; instead, they were verbatim copies of portions of Dynix source code, which are available in IBM's RCS database.  (P. McKenney Decl. ¶ 4.)  Moreover, the tests removed from his laptop were not Dynix source code at all, but unrelated software that is not at issue in this lawsuit.  IBM produced its RCS database to SCO in March 2005, and with it verbatim copies of any code that may have been on Dr. McKenney's personal workstation.  (5/3/05 T. Shaughnessy Decl. ¶¶ 3, 21.)

20.     Finally, Dr. McKenney did not use the Dynix source code trees and test code he removed from his workstation at all in connection with any of his work in Linux.  Instead, these source code trees and tests were simply remnants of long-terminated projects from his prior work in Dynix.  (P. McKenney Decl. ¶ 7.)

D.     IBM Provided SCO the "Evidence" It Claims IBM Destroyed.

21.     IBM has produced billions of lines of source code from AIX and Dynix, together with huge volumes of programmer's notes, design documents, and white papers.  IBM produced to SCO the entirety of the AIX source code on its CMVC system, together with more than 300,000 programmer's notes and more than 2,500 design documents.  (5/3/05 Shaughnessy Decl.

¶¶ 9-10, 14-16.)  As explained above, this includes any and all AIX source code that may have been on the workstations of the eight developers involved in the Project.

22.    IBM also searched a wide variety of electronic repositories outside of CMVC for AIX design documents, programmer's notes, white papers, source code, and responsive, non-privileged materials were produced to SCO.  (Id. ¶ 26.)

23.    IBM also produced to SCO the entirety of the Dynix source code on its RCS system, together with design documents, white papers, and programmer's notes.  (Id. ¶ 21.)  As explained above, this includes any and all Dynix source code that may have been on Dr. McKenney's personal workstation.

24.    IBM also provided SCO with the names and contact information (where available) for the more than 2,700 individuals who were identified as having made contributions or changes to AIX or Dynix.  (Id. ¶¶ 35-36.)  The efforts described in paragraphs 21 to 24 alone involved more than 4,700 hours of work from more than 400 IBM employees.  (Id. ¶ 5.)

25.    IBM also undertook a reasonable search for any non-public, proposed Linux contributions from 20 IBM developers, selected by SCO, and produced these as well.  (11/10/06 T. Shaughnessy Decl. ¶ 3.)

26.    In total, IBM's in-house and outside counsel spent thousands of hours collecting documents from more than 260 separate custodians and reviewing them for production to SCO. Ultimately, IBM produced to SCO more than 3.3 million pages of documents.  (Id. ¶ 4.)

## Argument

To prevail on its motion, SCO must first show that relevant evidence was lost or destroyed.  See, e.g., Rowe v. Albertsons, Inc., 116 Fed. Appx. 171, 174 (10th Cir. 2004) (the "doctrine of spoliation refers to improper intentional destruction of evidence relevant to a case"); Baker v. Randstad N. Am., L.P., 151 Fed. Appx. 314, 318 (5th Cir. 2005) ("spoliation is a specific doctrine that requires the party invoking it to show, inter alia, that his adversary

destroyed or misplaced the evidence in bad faith").  If relevant evidence has been lost or destroyed, the Court must then consider two factors in determining whether to sanction IBM for spoliation:  "(1) the degree of culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice to the other party." Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc., No. 97-5089, 1998 U.S. App. LEXIS 2739 at *13 (10th Cir. Feb. 20, 1998). (Exhibit P hereto.)  The Tenth Circuit is clear that "[m]ere negligence in losing or destroying records is not enough" in order to impose sanctions for spoliation.  Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997).  Instead, any "adverse inference must be predicated on the bad faith of the party destroying the records." Id.

Moreover, in undertaking this analysis, "[t]he burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the [lost material] would have produced evidence favorable to his cause". Gates Rubber Co. v. Bando Chem. Indus., 167 F.R.D. 90, 104 (D. Colo. 1996) (internal citations omitted).

Here, SCO's motion should be denied because it cannot show that any evidence (let alone relevant evidence) was lost or destroyed, it cannot show that IBM acted in bad faith, and it cannot show that it has been prejudiced.  In addition, SCO's motion also should be denied because it has expressly waived, by stipulation, any concerns with IBM's document production, including any concerns about IBM's alleged destruction of source code.

## I.   SCO CANNOT SHOW THAT IBM DESTROYED ANYTHING.

SCO has not, and cannot, identify a single piece of evidence that was lost or destroyed by IBM.  In its misplaced attempt to do so, SCO conflates the Swanberg email, which was applicable only to an eight-member group of non-LTC programmers, with IBM's decision following the inception of this lawsuit to ensure that programmers in the LTC no longer had the ability to access stored repositories of AIX and Dynix source code — which decision was made

both because LTC programmers had no need to access such source code in order to work in Linux and to avoid any misperceptions, however ill-founded, that might be created if developers continued to have some ability to access AIX or Dynix while writing code for Linux.[13] (¶ 14.)

Mr. Swanberg's email did not pertain to the LTC or its programmers, and was not intended to — and did not result in — the destruction of any documents at all. IBM simply never issued a directive or any other communication to the LTC to destroy documents of any kind. And finally, Dr. McKenney did not write Linux code while referring to Dynix code, and therefore did not destroy, and could not have destroyed, drafts of such code either.

First, contrary to SCO's claims, Mr. Swanberg's email concerning certain AIX developers' sandboxes pertained only to eight, not ten, and certainly not "dozens" of developers. (¶¶ 7, 11.) Four of the eight developers have submitted sworn testimony that they did not delete anything in response to the Swanberg email. (¶ 8.) The four remaining developers cannot recall whether they may have deleted any leftover AIX code in their sandboxes more than three years ago, but each has testified that, if they had, all such code would have been a copy of what is otherwise available in IBM's CMVC database. (Id.) And, as the Court is aware, IBM produced the CMVC database to SCO in March 2005, a year before the close of fact discovery. (Id.) Thus, the net outcome of the Swanberg email — the centerpiece of SCO's motion — is either that the developers in question deleted nothing whatsoever, or, at worst, that perhaps four developers may have deleted copies of code that is present in identical form in IBM's CMVC database, and which has been in SCO's possession for over a year and a half.

Second, SCO contends that "IBM executives" issued a "directive" to "dozens" of its developers in the LTC to delete any AIX or Dynix code on their personal workstations.[14] (SCO

---

[13] References to Factual Background are cited as "¶ __".

[14] As Dr. Frye explained in his deposition, neither Mr. Swanberg nor any of individual to whom he sent the email in question are IBM executives, and SCO offers no evidence whatsoever to support its claim that "IBM executives" directed developers to delete source code. (¶ 4.)

Br. at 3.)  In order to make this claim, SCO stitches together a handful of out-of-context excerpts of deposition testimony from Dr. Frye taken on three different dates over the course of a year.  In the cited portions of his testimony, counsel for SCO asked Dr. Frye questions about three different subjects:  (1) Mr. Swanberg's email concerning the Project and the AIX sandboxes of the eight developers involved in the Project; (2) the decision to remove any remaining access LTC programmers may have had to AIX or Dynix source code repositories; and (3) efforts by IBM to collect documents from members of the LTC in connection with SCO's discovery requests.  In his declaration submitted herewith, Dr. Frye explains that during these depositions, it was not always clear to him which of these three subjects SCO was inquiring about — each of which occurred years before the depositions were taken — and as a result some of his testimony on these three subjects is at times imprecise.  (¶ 15.)

Nevertheless, and despite SCO's claims to the contrary, Dr. Frye repeatedly testified during his depositions that Mr. Swanberg's email regarding sandboxes pertained <u>only</u> to the small group of developers working on the Project, who were not then part of the LTC.  (¶ 11.) Dr. Frye was further clear that the number of developers working on the Project was "on the order of ten" — in fact, there were eight.  (¶¶ 7, 11.)  Finally, and most important, Dr. Frye testified that IBM did <u>not</u> issue a "directive" (or any other communication) to developers within the LTC to delete AIX and/or Dynix source code from their machines.  (¶¶ 11-13.)  As set forth in detail above, the testimony he provided regarding "dozens" of members of the LTC reflected only his attempt to estimate the number of LTC developers who may have had any ability to access AIX or Dynix source code repositories removed following the inception of SCO's lawsuit.  (¶ 14.)  Dr. Frye's reference to "dozens" of members of the LTC had nothing to do with the Swanberg email, and it had nothing to do with destroying or deleting documents, source code, or anything else.  (<u>Id.</u>)

Dr. Frye also testified about efforts directed by IBM's counsel to collect documents from members of the LTC. This involved collecting both electronic and hard copy documents and turning them over to counsel. It did not involve deleting AIX or Dynix source code. (¶¶ 11-14.) In short, there was no "directive" — from "IBM executives" or anyone else — to delete code or documents within the LTC.

Finally, as "evidence" of this nonexistent directive, SCO incorrectly contends that one LTC developer, Paul McKenney, "expressly admitted to destroying pre-March 2003 drafts of source code he had written for Linux while referring to Dynix/ptx source code on his computer at the LTC . . . as well as Dynix/ptx source code and tests from his computer". (SCO Br. at 3.) In fact, while Dr. McKenney did testify to deleting certain Dynix source code trees from his prior work in Dynix, as well as certain tests that were used strictly to validate Dynix kernel functionality (and that are not themselves Dynix source code) from his laptop, these source trees were verbatim copies of Dynix source code modules that are available in IBM's RCS database. (¶ 19.) IBM has produced the RCS database to SCO, and it therefore has in its possession any source code that may have been on Dr. McKenney's computer.[15] (Id.)

During his deposition, Dr. McKenney also was asked

REDACTED

asked Dr. McKenney the same question again. Dr. McKenney misunderstood the question, and instead believed that SCO's attorney had asked

REDACTED

— a fact that the questions and answers immediately following the portion of his deposition testimony on which SCO relies make abundantly clear — and which resulted in Dr. McKenney's answering the question

---

[15] Moreover, the tests removed from his laptop were not Dynix source code at all, but unrelated software that is not at issue in this lawsuit. (¶ 19.)

affirmatively.  (¶¶16, 17.)  For example, when asked

<center>REDACTED</center>

<div align="right">SCO's counsel further</div>

asked Dr. McKenney whether          <center>REDACTED</center>

Far from showing that an IBM engineer "expressly admitted to destroying pre-March 2003 drafts of source code he had written for Linux while referring to Dynix/ptx source code", Dr. McKenney's deposition testimony makes perfectly clear that he never wrote source code for Linux while referring to or looking at Dynix source code in the first place, and that he never destroyed any drafts of source code written for Linux while looking at or referring to Dynix source code.  (Id. ¶ 18.)

SCO's inability to support its spoliation claim has not been for lack of effort — much of SCO's discovery in this case has centered around trying to show that IBM deleted or destroyed evidence.  But as the foregoing demonstrates, and despite SCO's dogged efforts, it can identify nothing that has been destroyed.  Indeed, the very evidence SCO claims has been "lost" has been in SCO's possession for over a year and a half.  SCO's motion should be denied for this reason alone.

## II.     SCO CANNOT SHOW THAT IBM ACTED IN BAD FAITH.

The relief SCO seeks — an adverse inference instruction — "must be predicated on the bad faith of the party destroying the records".  Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997).  Because no evidence was lost or destroyed, SCO obviously cannot show that IBM has acted in bad faith, or that it is in any way culpable.  Indeed, far from acting in bad faith,

IBM took appropriate steps to preserve documents, and it has made a comprehensive and complete production of source code and documents to SCO.

IBM did not, as SCO claims, direct employees to destroy evidence. On the contrary, after this lawsuit was filed, IBM instructed its employees to preserve documents, including electronic documents, that otherwise might have been deleted in the ordinary course of business. (¶ 13.) Thereafter, IBM's in-house and outside counsel spent thousands of hours collecting documents from more than 260 separate custodians and reviewing them for production to SCO. Ultimately, IBM produced to SCO more than 3.3 million pages of documents. (¶ 26.)

With respect to source code — the "evidence" SCO wrongly claims has been destroyed — IBM's contributions to Linux are, of course, publicly available. But IBM also undertook a reasonable search for any non-public, proposed contributions that 20 IBM developers, selected by SCO, may have made to Linux and produced these as well. (¶ 25.) IBM also produced billions of lines of source code from AIX and Dynix, together with huge volumes of programmer's notes, design documents, and white papers. IBM produced to SCO the entirety of the AIX source code on its CMVC system, together with more than 300,000 programmer's notes and more than 2,500 design documents. (¶ 21.) IBM also searched a wide variety of electronic repositories outside of CMVC for AIX design documents, programmer's notes, white papers and source code, and responsive, non-privileged materials were produced to SCO. (¶ 22.) IBM also produced to SCO the entirety of the Dynix source code on its RCS system, together with design documents, white papers, and programmer's notes. (¶ 23.) IBM also provided SCO with the names and contact information (where available) for the more than 2,700 individuals who were identified as having made contributions or changes to AIX or Dynix. (¶ 24.) This effort alone involved more than 4,700 hours of work from more than 400 IBM employees. (¶ 24.)

Additionally, the Swanberg email itself is not evidence of bad faith. On the contrary, Mr. Swanberg sent the email not in an effort to destroy evidence, but because any old AIX source

code that may have been on these eight developers' workstations was not necessary for the Project. (¶ 4.) It also was sent in an effort to avoid the very misperception that SCO now seeks to attribute to a developer having access to AIX source code while writing code for Linux. (Id.) And finally, as Mr. Swanberg testifies in his declaration, he never intended to destroy evidence that might be relevant to this lawsuit. (¶ 10.) In the face of this, SCO offers no evidence whatsoever of bad faith on the part of IBM.

In short, far from acting in bad faith, IBM has spent enormous amounts of time and money to ensure that its production of source code to SCO in this case is complete and thorough. SCO's motion should be denied for this additional reason.

## III.   SCO CANNOT SHOW THAT IT SUFFERED ANY PREJUDICE.

To prevail, SCO must demonstrate the existence of "a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the [lost material] would have produced evidence favorable to [its] cause". Gates Rubber Co. v. Bando Chem. Indus., 167 F.R.D. 90, 104 (D. Colo. 1996) (internal citations omitted). But, even SCO admits that it can only "speculate" on this point (SCO Br. at 6); speculation that is driven, no doubt, by a "fertile imagination". SCO merely asserts that evidence helpful to its case must have been lost in the face of an alleged directive to "dozens" of developers to destroy code. As SCO puts it, "[t]he Court will never know how much additional probative evidence existed but has been destroyed showing that developers were relying on AIX and [Dynix] source code in making their contributions to Linux development". (Id. at 7.) But even if SCO could show (contrary to fact) that IBM lost or destroyed evidence, and even if SCO could show (contrary to fact) that IBM somehow acted in bad faith, it cannot show that it has been in any way prejudiced.

SCO makes no effort to show that the allegedly deleted AIX or Dynix code had anything to do with Linux, or with IBM's contributions to Linux, because in reality they did not.

<u>First</u>, as to the Swanberg email, four of the eight developers to whom the email applied have testified that they did not destroy code at all, and the other four do not recall doing so, but if they did, they did not delete anything that is not currently in SCO's possession.  (¶ 8.)  Even if none of the foregoing were true, however, each of the eight developers confirm that he or she

<p style="text-align: center">REDACTED</p>

(¶ 9.)  As a result, that information could never have shown what SCO insists it must — reliance on AIX or Dynix in making Linux contributions.

<u>Second</u>, as he repeatedly testified at deposition, Dr. McKenney simply did not write draft source code for Linux while referring to or looking at Dynix source code.  (¶¶ 17, 18.)  As a result, he never destroyed any drafts of source code he wrote for Linux while looking at or referring to Dynix source code, contrary to SCO's claim.  (<u>Id.</u>)  Dr. McKenney also did not use the Dynix source code trees and test code he removed from his workstation at all in connection with any of his work in Linux — these were simply all that remained of long-terminated projects from his prior work in Dynix.  (¶ 20.)  But even if the information did somehow relate to Dr. McKenney's Linux contributions, it has been in SCO's possession for over a year and a half.

In short, even assuming — incorrectly — that the destruction of unique code took place, none of the nine developers (eight Project developers plus Dr. McKenney) to whom SCO's motion applies destroyed anything that related to any of their work in Linux.  Because there was no directive within the LTC to destroy code (or anything else), as SCO contends, SCO's alleged prejudice begins (and ends) with these nine developers alone.[16]  As SCO's invitation to the Court to "speculate" about potential evidence it may have lost makes clear, SCO cannot show any

---

[16]  In its motion, SCO asserts that "[t]he individuals receiving the instruction to delete the AIX and PTX code from their workspaces are precisely the same engineers involved in the Linux technology contributions at issue".  (SCO Br. at 5, 6.)  However, of the nine developers to whom the motion conceivably pertains, SCO identified only one, Dr. McKenney, in its disclosures.  None of the information Dr. McKenney removed from his workstation, however, related to any of his work in Linux.  (¶¶ 19-20.)

prejudice at all, and it certainly cannot show that IBM destroyed material that would have "produced evidence favorable to [its] cause." Gates Rubber Co., 167 F.R.D. at 104. For this additional reason, SCO's motion should be denied.

## IV. SCO HAS WAIVED ANY ARGUMENT CONCERNING THE SUFFICIENCY OF IBM'S DOCUMENT PRODUCTION.

On March 17, 2006, the last day for the parties to conduct fact discovery in this case, SCO expressly stipulated that "[t]he parties have reviewed one another's document productions, met and conferred, and agree that . . . there are no discovery disputes between them".[17] (Stipulation re Discovery, Docket # 651) SCO executed this stipulation months — and, in at least one case, more than a year — after obtaining the testimony on which it relies in its motion, and almost two and a half years after receiving the Swanberg email from IBM in discovery. (See SCO Br. at 3.)

Moreover, in the days and weeks preceding the execution of this stipulation, the parties met and conferred repeatedly in an attempt to identify and, where possible, resolve, any outstanding issues between them relating to discovery, including document retention and production. (11/10/06 Shaughnessy Decl. ¶ 5.) At no time during this lengthy meet and confer process did counsel for SCO raise any concern about IBM's document production as now articulated in SCO's motion, much less attempt to preserve any ability to do so in the parties' stipulation. (Id.) Waiver is "the intentional relinquishment of a known right", Barnes v. Wood, 750 P.2d 1226, 1230 (Utah Ct. App. 1988), and it applies equally to agreements and stipulations made by a party through counsel in the course of pending litigation. See FMC Corp. v. Aero Indus., Inc., 998 F.2d 842, 845 (10th Cir. 1993) (defendant waived right to jury trial where counsel signed a pretrial order stating that the case was to be tried to the judge and participated in

---

[17] Although the stipulation carves out a limited number of open discovery issues between the parties, none of the exceptions relate to SCO's motion.

the bench trial); <u>McCarthy v. Wynne</u>, 126 F.2d 620, 623 (10th Cir. 1942) (parties' stipulation to the withdrawal of certain claims and defenses was "binding upon the parties throughout the proceeding" and finding no reason that the agreement "should not have been enforced"). SCO, despite having long since taken the depositions on which it relies, despite having received the email on which its motion is based years earlier, and despite having made spoliation an issue throughout discovery, made no attempt to raise any alleged concern regarding IBM's retention of documents before the close of fact discovery on March 17, 2006. To the contrary, SCO elected to execute a stipulation on that date which expressly provides that "[t]he parties have reviewed one another's document productions . . . and agree that . . . there are no discovery disputes between them". (¶ 28 (emphasis added).)

If SCO genuinely holds the belief that IBM's document production is inadequate due to the alleged destruction of documents, it should have expressly contended as much as of March 17, 2006, the date the parties signed the stipulation. SCO instead chose to wait to file this motion until after both fact and expert discovery concluded, thereby limiting the options available both to the Court and IBM to address it. By failing to raise this issue at the time of the March 17, 2006, stipulation, SCO waived any and all of its current arguments, and SCO's motion should be denied for this additional reason.

## Conclusion

For the foregoing reasons, IBM respectfully submits that the Court should deny SCO's motion regarding spoliation.

DATED this 10th day of November, 2006.

SNELL & WILMER L.L.P.

_____
Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of November, 2006, a true and correct copy of the foregoing was served by electronic mail, pursuant to agreement of the parties, on the following:

Brent O. Hatch
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
bhatch@hjdlaw.com

Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
tnormand@bsfllp.com

_____

419671

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of November, 2006, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

/s/ Todd M. Shaughnessy

## Index to Exhibits

**Exhibit A:**  Declaration of Randal Swanberg

**Exhibit B:**  Deposition of Dan Frye dated 11/18/05

**Exhibit C:**  Deposition of Dan Frye dated 1/12/05

**Exhibit D:**  Declaration of Linda Xie

**Exhibit E:**  Declaration of Nathan Fontenot

**Exhibit F:**  Declaration of Matthew Fleming

**Exhibit G:**  Declaration of Michael Strosaker

**Exhibit H:**  Declaration of Nathan Lynch

**Exhibit I:**  Declaration of David Altobelli

**Exhibit J:**  Declaration of Jacob Moilanen

**Exhibit K:**  Declaration of John Rose

**Exhibit L:**  Declaration of Todd M. Shaughnessy

**Exhibit M:**  Declaration of Daniel Frye

**Exhibit N:**  Declaration of Paul McKenney

**Exhibit O:**  Deposition of Paul McKenney dated 12/2/05

**Exhibit P:**  Unpublished opinion