SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
Roger G. Brooks (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S REDACTED MEMORANDUM IN OPPOSITION TO SCO'S MOTION FOR SUMMARY JUDGMENT ON IBM'S SIXTH, SEVENTH AND EIGHTH COUNTERCLAIMS**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

RECEIVED CLERK

2006 NOV 10 ℗ 6: 35

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
Roger G. Brooks (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S MEMORANDUM IN OPPOSITION TO SCO'S MOTION FOR SUMMARY JUDGMENT ON IBM'S SIXTH, SEVENTH AND EIGHTH COUNTERCLAIMS**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>**FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

# **Table of Contents**

**Page**

Table of Authorities ..................................................................................................iii

Preliminary Statement..................................................................................................1

Material Facts Requiring Denial of SCO's Motion .......................................................2

      A.    The GNU General Public License ("GPL")..............................................2

      B.    IBM's Offer of a License to Its Copyrighted Works Under the GPL......................5

      C.    SCO's Acceptance of, and Promise to Abide by, the Terms and Conditions of the GPL Covering the IBM Copyrighted Works.......................................5

      D.    SCO's Repudiation and Blatant Violations of the GPL..............................7

      E.    The Termination of SCO's Rights to the IBM Copyrighted Works and Linux.................................................................................................8

Responses to SCO's Statement of "Undisputed" Facts ..............................................10

Standard of Decision..................................................................................................20

Argument ..................................................................................................................21

I.     SCO BREACHED THE GPL............................................................................21

      A.    The Plain and Unambiguous Language of the GPL Forecloses SCO's Interpretation...........................................................................................21

      B.    SCO Repeatedly Repudiated and Breached the GPL. ...........................25

           1.    SCO repeatedly repudiated the GPL, and continues to do so on this motion. ...................................................................................25

           2.    SCO violated the GPL by placing license restrictions on Linux licensees, including its own Linux customers, on terms prohibited by the GPL. ......................................................................................25

II.    SCO INFRINGED IBM'S COPYRIGHTS. .......................................................27

      A.    Because SCO Breached the GPL, its License to the IBM Copyrighted Works Terminated. ..................................................................................28

           1.    SCO's license to the IBM Copyrighted Works "automatically terminated" upon its breach. .............................................................28

           2.    SCO knew, or should have known, that its license to the IBM Copyrighted Works had terminated and that it was infringing IBM's copyrights. ..............................................................................29

      B.    SCO Continued Copying and Distributing the IBM Copyrighted Works without a License to do so. ......................................................................30

      C.    SCO's Attacks on the Enforceability of the GPL are Without Merit. ...................30

i

## Table of Contents
(continued)

| | | Page |
|---|---|---|
| III. | SCO's GPL VIOLATIONS HARMED, AND CONTINUE TO HARM, IBM. | 32 |
| | A.   SCO Financially Damaged IBM, and IBM is In Any Event Entitled to Nominal Damages. | 32 |
| | B.   IBM is Entitled to Injunctive and Declaratory Relief. | 33 |
| Conclusion | | 36 |

<u>**Table of Authorities**</u>

<u>Page(s)</u>

**Cases**

<u>Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.,</u>
   994 F.2d 1476 (10th Cir. 1993)......................................................................... 20, 35

<u>Bair v. Axiom Design LLC,</u>
   20 P.3d 388 (Utah 2001) ............................................................................................ 32

<u>Bourne v. Walt Disney Co.,</u>
   68 F.3d 621 (2d Cir. 1995)......................................................................................... 27

<u>Bowers v. Baystate Techs., Inc.,</u>
   320 F.3d 1317 (Fed. Cir. 2003)................................................................................. 29

<u>Carson v. Dynegy, Inc.,</u>
   344 F.3d 446 (5th Cir. 2003)..................................................................................... 27

<u>CBS Broad., Inc. v. EchoStar Comms. Corp.,</u>
   450 F.3d 505 (11th Cir. 2006).................................................................................. 34

<u>Celotex Corp. v. Catrett,</u>
   477 U.S. 317 (1986).................................................................................................... 20

<u>Cofield v. Ala. Public Service Comm'n,</u>
   936 F.2d 512 (11th Cir. 1991)................................................................................... 31

<u>Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,</u>
   843 F.2d 600 (1st Cir. 1988)............................................................................... 31, 34

<u>Country Kids 'N City Slicks, Inc. v. Sheen,</u>
   77 F.3d 1280 (10th Cir. 1996)................................................................................... 34

<u>Dow Chemical Co. v. United States,</u>
   226 F.3d 1334 (Fed. Cir. 2000)................................................................................. 25

<u>Fairborn Commercial, Inc. v. Am. Housing Partners, Inc.,</u>
   94 P.3d 292 (Utah 2004) ..................................................................................... 21, 22

<u>Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.,</u>
   807 F.2d 1110 (2d Cir. 1986)............................................................................... 29, 30

<u>Ford v. United States,</u>
   273 U.S. 593 (1927).................................................................................................... 22

<u>Gates Rubber Co. v. Bando Chem. Indus. Ltd.,</u>
   9 F.3d 823 (10th Cir. 1993)....................................................................................... 30

**Table of Authorities**
(continued)

Page(s)

In re Grandote Country Club Co.,
   252 F.3d 1146 (10th Cir. 2001) ........................................................... 20

Intel Corp. v. VIA Techs., Inc.,
   319 F.3d 1357 (Fed. Cir. 2003) ........................................................... 31

Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.,
   75 F. Supp. 2d 1290 (D. Utah 1999) .................................................... 20

J.R. Simplot Co. v. Sales King Int'l, Inc.,
   17 P.3d 1100 (Utah 2000) .................................................................... 21

Jacob Maxwell, Inc. v. Veeck,
   110 F.3d 749 (11th Cir. 1997) ............................................................. 29

Kahn v. New York Times Co.,
   503 N.Y.S.2d 561 (N.Y. App. Div. 1986) ........................................... 24

Kaye v. Grossman,
   202 F.3d 611 (2d Cir. 2000) ............................................................... 21

Kronos, Inc. v. AVX Corp.,
   612 N.E.2d 289 (N.Y. 1993) ............................................................... 32

Liveware Publ'g Inc. v. Best Software Inc.,
   Nos. 04-1788, 04-2028, 125 Fed. Appx. 428 (3d Cir. Mar. 8, 2005) ...................................... 35

MCA Television Ltd v. Public Interest Corp.,
   171 F.3d 1265 (11th Cir. 1999) ........................................................... 29

Metro. Opera Assoc. v. Local 100, No. 00-3613, 2005 WL 1712241 (S.D.N.Y.
   July 19, 2005) ..................................................................................... 33

N.A.S. Imp., Corp. v. Chenson Enters., Inc.,
   968 F.2d 250 (2d Cir. 1992) ............................................................... 29

Palmieri v. Allstate Ins. Co.,
   445 F.3d 179 (2d Cir. 2006) ............................................................... 23

Peirce v. Peirce,
   994 P.2d 193 (Utah 2000) .................................................................. 24

Pinkham v. Sara Lee Corp.,
   983 F.2d 824 (8th Cir. 1992) ............................................................... 30

Prairie Band Potawatomi Nation v. Wagnon,
   402 F.3d 1015 (10th Cir. 2005) ........................................................... 34

iv

**Table of Authorities**
(continued)

Page(s)

R/S Assocs. v. New York Job Dev. Auth.,
　771 N.E.2d 240 (N.Y. 2002) ........................................................................ 21

San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n,
　161 F.3d 1347 (Fed. Cir. 1999) .................................................................... 31

Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n,
　327 F.3d 1019 (10th Cir. 2003) .................................................................... 22

Silicon Image, Inc. v. Genesis Microchip Inc.,
　395 F.3d 1358 (Fed. Cir. 2005) .................................................................... 31

Spirit Airlines, Inc. v. Northwest Airlines, Inc.,
　431 F.3d 917 (6th Cir. 2005) ........................................................................ 33

Ticor Title Ins. Co. v. Cohen,
　173 F.3d 63 (2d Cir. 1999) ........................................................................... 35

Time Warner Entm't Co. v. Everest Midwest Licensee,
　381 F.3d 1039 (10th Cir. 2004) .................................................................... 23

Waddoups v. Amalgamated Sugar Co.,
　54 P.3d 1054 (Utah 2002) ............................................................................ 21

Wallace v. Free Software Found.,
　No. 05-0618, 2006 WL 2038644 (S.D. Ind. Mar. 20, 2006) ....................... 32

Wallace v. Int'l Bus. Mach. Corp.,
　No. 06-2454, – F.3d –, slip op. (7th Cir. Oct. 26, 2006) ............................. 31

Wallace v. Int'l Bus. Mach. Corp.,
　No. 05-678, 2006 WL 1344055 (S.D. Ind. May 16, 2006) ..................... 32, 35

Westmoreland Coal Co. v. Entech, Inc.,
　794 N.E.2d 667 (N.Y. 2003) ........................................................................ 22

Wingets, Inc. v. Bitters,
　500 P.2d 1007 (Utah 1972) .......................................................................... 24

**Table of Authorities**
(continued)

Page(s)

**Statutes and Rules**

17 U.S.C. § 501 ........................................................................................................... 30

Fed. R. Civ. P. 56(c) .................................................................................................... 20

**Other Authorities**

11 Williston on Contracts § 32:11 (4th ed. 1990) ....................................................... 24

3 Nimmer on Copyright § 12.11 (2005) ...................................................................... 27

Am. Heritage College Dictionary 96 (4th ed. 2004) .................................................. 28

Dennis M. Kennedy, A Primer on Open Source Licensing Legal Issues: Copyright Copyleft, and Copyfuture, 20 St. Louis U. Pub. L. Rev. 345 (2001) ........................ 28

Restatement (Second) of Conflict of Laws (1971) ...................................................... 21

Restatement (Second) of Contracts § 250 cmt. b (1981) ............................................ 25

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in opposition to the motion of Plaintiff/Counterclaim-Defendant The SCO Group, Inc. ("SCO") for partial summary judgment on IBM's Sixth, Seventh and Eighth Counterclaims.

## Preliminary Statement

Despite its dramatic public claims, SCO has failed to identify any code allegedly owned by SCO and copied by IBM into Linux. By contrast, undisputed facts establish that SCO literally copied, without alteration, hundreds of thousands of lines of code developed and copyrighted by IBM. Undisputed facts also establish that SCO repudiated and breached its only license to that IBM-owned material. Thus, IBM asserted the three claims at issue on this motion: (1) breach of the GNU Public License or "GPL" (Sixth Counterclaim), (2) promissory estoppel (Seventh Counterclaim), and (3) copyright infringement (Eighth Counterclaim).

SCO's motion for summary judgment as to these claims depends almost entirely on a single premise: SCO did not violate the GPL. But the premise is false. SCO did breach the GPL, blatantly and repeatedly. Indeed, SCO repudiated the GPL. For that reason, SCO's motion against IBM's counterclaims for breach of the GPL (Sixth Counterclaim) and promissory estoppel (Seventh Counterclaim) fails. (See Section I.)

Similarly, SCO's motion against IBM's counterclaim for copyright infringement (Eighth Counterclaim) fails because SCO's only license to the IBM Copyrighted Works automatically terminated when SCO breached the GPL. From that point on, SCO lacked a license to the IBM

Copyrighted Works, and SCO's continued distribution of the IBM Copyrighted Works infringed IBM's copyrights.[1]  (See Section II.)

Finally, SCO is wrong in asserting that it is entitled to summary judgment on IBM's claims for breach of the GPL (Sixth Counterclaim) and promissory estoppel (Seventh Counterclaim) because IBM has not incurred compensable harm.  SCO financially damaged IBM, and IBM is in any event entitled to nominal damages for SCO's repeated violations of the GPL.  Moreover, IBM seeks injunctive and declaratory relief in addition to damages on these claims.  (See Section III.)

<u>**Material Facts Requiring Denial of SCO's Motion**</u>

IBM has set forth in detail the undisputed and indisputable facts material to its counterclaim for copyright infringement (Eighth Counterclaim) in its Memorandum in Support of Its Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim).[2]  IBM relies on and incorporates by reference the facts detailed there, which also are material to its Sixth and Seventh Counterclaims, and provides only a summary overview here.  (See IBM Copy. Br. ¶¶ 1-47.)

A.    <u>The GNU General Public License ("GPL").</u>  (See IBM Copy. Br. ¶¶ 1-16.)

1.    Under the so-called "Free Software" model of software development, copyright owners make their source code available to others to use, modify, and distribute on a royalty-free

---

[1] Indeed, for the reasons set forth in IBM's Memorandum in Support of Its Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim), the Court should instead grant summary judgment that SCO is liable for copyright infringement on IBM's Eighth Counterclaim, and the Court should enjoin SCO from any further infringement of IBM's copyrights.

[2] IBM herein refers to its Memorandum in Support of Its Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim) (Docket No. 784) as "IBM Copyright Counterclaim Brief" or "IBM Copy. Br."

basis, in exchange for the reciprocal right to use, modify and distribute any additions or improvements contributed by those licensees and sublicensees, on the same royalty-free basis. (IBM Copy. Br. ¶¶ 1-5.)

2.     The most widely used legal license agreement that makes the Free Software model possible is the GNU Public License or "GPL".[3]  (IBM Copy. Br. ¶¶ 6-7; Exs. 128, 129.)

3.     The intent of those who offer or accept licenses to software under the GPL is clearly stated in its Preamble. (Ex. 128, Preamble; Ex. 129, Preamble.)  At its simplest level, the GPL provides that anyone may copy, modify or distribute the work on a royalty-free basis, provided they agree to distribute that work – and to license any derivative works – only under the terms of the GPL. (Ex. 128 §§ 2, 4-6; see also Ex. 129 §§ 2, 8-10.)  As the Preamble to the GPL states, in part:

> [T]he GNU General Public License is intended to guarantee your freedom to share and change free software – to make sure the software is free for all its users. Our General Public Licenses are designed to make sure that you have the freedom to distribute copies of free software (and charge for this service if you wish), that you receive source code or can get it if you want it, that you can change the software or use pieces of it in new free programs; and that you know you can do these things.  To protect your rights, we need to make restrictions that forbid anyone to deny you these rights . . . . These restrictions translate to certain responsibilities for you if you distribute copies of the software, or if you modify it.  For example, if you distribute copies of [a program licensed under the GPL] . . . you must give the recipients all the rights that you have. (Ex. 128, Preamble; see also Ex. 129, Preamble.)

4.     Section 1 of the GPL grants every licensee ("you") the right to "copy and distribute verbatim copies of the [Program's] source code as you receive it". (Ex. 128 § 1; Ex. 129 § 1.) Section 1 of the GPL permits a GPL licensee such as SCO to collect a fee to cover the

---

[3] A variant of the GPL, the "Lesser General Public License" ("LGPL"), controls certain of IBM's Copyrighted Works, but is not different from the GPL in any way relevant to the present motion.  It is explained more fully at IBM Copy. Br. ¶ 7.  "GPL" is used herein to refer collectively to the GPL and/or the LGPL.

cost of "the physical act of transferring a copy", and permits a licensee to charge fees for service and warranty protection.  (Ex. 128 § 1; Ex. 129 § 1.)  It authorizes no other type of license fee. (Id.)

      5.     Section 2 of the GPL also authorizes a GPL licensee such as SCO to "copy and distribute" modifications of a GPL-licensed program "under the terms of Section 1" provided SCO also meets certain additional conditions, including:

> You must cause any work that you distribute or publish, that in whole or in part contains or is derived from the Program or any part thereof, to be licensed as a whole <u>at no charge</u> to all third parties under the terms of this License.  (Ex. 128 § 2(b) (emphasis added); <u>see also</u> Ex. 129 § 2(c).)

      6.     Section 6 of the GPL provides that each time a GPL licensee redistributes "the Program (or any work based on the Program), the recipient automatically receives a license from the original licensor to copy, distribute or modify the Program".  (Ex. 128 § 6; <u>see also</u> Ex. 129 § 10.)  Section 6 prohibits a licensee such as SCO from imposing on other GPL licensees, including its customers and any other Linux licensees, "further restrictions on the recipients' exercise of rights granted" under the GPL.  (Id.)

      7.     Section 4 of the GPL states:

> You may not copy, modify, sublicense, or distribute the Program except as expressly provided under this License.  Any attempt otherwise to copy, modify, sublicense or distribute the Program is void, and will <u>automatically terminate your rights</u> under this License.  (Ex. 128 § 4 (emphasis added); <u>see also</u> Ex. 129 § 8.)

      8.     The intellectual property rights of GPL licensees or others may not be used to "overwrite" or create an exception to the restrictions of the GPL.  (Ex. 128 § 7; Ex. § 129 & 11.) Section 7 of the GPL expressly states:

> If, as a consequence of a court judgment or allegation of patent infringement or for any other reason (not limited to patent issues), conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, <u>they do not excuse you from the conditions of this License.  If you cannot distribute so as to satisfy simultaneously your obligations under this</u>

4

<u>License and any other pertinent obligations, then as a consequence you may not</u> <u>distribute the Program at all.</u>  (Ex. 128 § 7 (emphasis added); Ex. 129 § 11.)

 B. <u>IBM's Offer of a License to Its Copyrighted Works Under the GPL.</u>  (<u>See</u> IBM Copy. Br. ¶¶ 23-28.)

 9. IBM's extensive contributions to Linux on which IBM holds valid registered copyrights include the works listed in Table 1 of IBM's Copyright Counterclaim Brief (collectively, the "IBM Copyrighted Works").  (IBM Copy. Br. ¶¶ 24-25; <u>see</u> Ex. 167 ¶¶ 5-7; Ex. 5 ¶¶ 20, 108.)

 10. IBM offered licenses to the IBM Copyrighted Works only under the GPL, by posting the IBM Copyrighted Works on the Internet as part of the Linux development process.  (Ex. 167 ¶ 7.)  Subsequently, each of IBM's Copyrighted Works was incorporated into SCO's Linux products, as indicated in Table 1 of the IBM Copyright Counterclaim Brief.  (Ex. 167 ¶ 7; IBM Copy. Br. ¶ 26.)

 11. Linux, including the IBM Copyrighted Works in Linux, is distributed under the GPL.  (IBM Copy. Br. ¶¶ 19-21; Ex. 272 ¶ 9.)

 C. <u>SCO's Acceptance of, and Promise to Abide by, the Terms and Conditions of the</u> <u>GPL Covering the IBM Copyrighted Works.</u>  (<u>See</u> IBM Copy. Br. ¶¶ 29-39.)

 12. SCO was founded in 1994 under the name Caldera, Inc., as a commercial distributor of Linux products.  (IBM Copy. Br. ¶¶ 22, 29.)  Over the years, SCO has developed and marketed a number of software products containing Linux code, including Caldera Network Desktop, OpenLinux and SCO Linux.  (IBM Copy. Br. ¶¶ 22, 29.)

 13. For most of its existence, SCO conducted its business under the GPL.  (Ex. 221 ¶¶ 21-27.)  The GPL affected significant aspects of SCO's business, and SCO's executives understood that the GPL granted SCO the right to copy, modify and distribute Linux and set the terms according to which SCO was required to treat the Linux kernel.  (Ex. 221 ¶ 23.)  Indeed,

5

SCO recognized that it was required to abide by the terms of the GPL if SCO wanted to copy, modify or distribute Linux, and SCO appears to have adhered to the terms of the GPL through June 2002. (Ex. 221 ¶ 24.)

14.     In November 2002, SCO began distributing a product it called "SCO Linux Server 4.0, powered by UnitedLinux". (IBM Copy. Br. ¶ 30.) SCO Linux Server 4.0 contained, verbatim, the entirety of each IBM Copyrighted Work, with the exception of IBM's copyrighted "Omni Print Driver". (IBM Copy. Br. ¶ 30.) SCO also distributed a product it called "OpenLinux 3.1.1 Asia", which contained, verbatim, the entirety of IBM's' "Omni Print Driver". (IBM Copy. Br. ¶ 31; Ex. 406; Ex. 69 ¶ 13.)

15.     By copying and distributing the IBM Copyrighted Works in Linux, SCO voluntarily accepted a license to those works under the terms of the GPL. As Section 5 of the GPL states:

> You are not required to accept this License, since you have not signed it. However, nothing else grants you permission to modify or distribute the Program or its derivative works. These actions are prohibited by law if you do not accept this License. Therefore, by modifying or distributing the Program (or any work based on the Program), you indicate your acceptance of this License to do so, and all its terms and conditions for copying, distributing or modifying the Program or works based on it. (Ex. 128 § 5; see also Ex. 129 § 9.)

16.     In addition to distributing Linux, SCO made representations to its partners in the development community (commercial and non-commercial) and to prospective customers that SCO would not copy, modify, or distribute the Linux kernel (including the code contributed by IBM) except on the terms set out in the GPL. (Ex. 221 ¶ 25.) SCO also made clear and unambiguous representations or promises not to assert rights to other programs distributed by Caldera under the GPL except on the terms set out in the GPL. (Ex. 221 ¶ 25.) SCO reinforced those representations with its conduct, including by making contributions of code to Linux under the GPL. Every Linux product SCO ever used or distributed included code made available to

SCO only through the GPL. (Ex. 221 ¶ 26.) And every Linux product that SCO distributed

included a notice that the Linux kernel and various other components were being made available

to others under the GPL. (Ex. 221 ¶ 26.)

17.     In developing SCO Linux Server 4.0, SCO also made certain modifications and

additions to the Linux 2.4.19 kernel, such that SCO Linux Server 4.0 is a derivative work of the

Linux 2.4.19 kernel within the meaning of the GPL. (IBM Copy. Br. ¶¶ 12, 35; Ex. 474 at

SCO1170557-558; Ex. 617; Ex. 128 § 2(b).)

D.     <u>SCO's Repudiation and Blatant Violations of the GPL.</u> (<u>See</u> IBM Copy. Br.
       ¶¶ 40-47.)

18.     As early as August 2003, SCO began publicly declaring that the GPL was

unenforceable, and thereby repudiated the GPL. (IBM Copy. Br. ¶ 41.)

19.     In this litigation, SCO has repeatedly repudiated the GPL in its pleadings and

discovery responses. (IBM Copy. Br. ¶ 42.)

20.     By May of 2003, SCO began overtly and explicitly asserting rights over Linux

inconsistent with SCO's rights and obligations under the GPL, including by seeking license fees

from users of Linux and imposing restrictions on users of Linux that are prohibited by the terms

of the GPL. (IBM Copy. Br. ¶ 43.) SCO took the position that use of Linux (which SCO had

both received and distributed under the terms of the GPL) was not authorized without a paid

license from SCO, and began threatening and initiating litigation against companies that used

Linux. (IBM Copy. Br. ¶ 43.)

21.     As a result of this campaign of fear, uncertainty and doubt, SCO succeeded in

actually collecting license fees from a number of Linux users, in excess of the specific and

limited fees permitted by the GPL to be collected. (IBM Copy. Br. ¶ 44.) SCO claimed that this

license was necessary for "commercial use of the Linux 2.4 and later versions". For example,

SCO sold Everyone's Internet, Ltd. what SCO representatives described as a "Linux license" or "Linux IP license". (IBM Copy. Br. ¶ 44.) These license fees violated the GPL.

22.     In its "SCO Intellectual Property License for Linux" SCO purported to prohibit the use, modification, or distribution of the Linux source code. (IBM Copy. Br. ¶ 45.) This restriction violated the GPL.

23.     SCO purported to prohibit its Linux "licensees" under the "SCO Intellectual Property License for Linux" from further sublicensing or distributing Linux. (Ex. 578 § 3.2; Ex. 403; IBM Copy. Br. ¶ 46.) This restriction violated the GPL.

24.     Also by May of 2003, SCO began offering its <u>own</u> Linux customers an agreement whereby SCO "agreed to hold its Linux customers harmless from any SCO intellectual property issues regarding Linux". (Ex. 284 ¶ 8 & Exs. B, D.)


## SECTION REDACTED


These restrictions violated the GPL.

E.     <u>The Termination of SCO's Rights to the IBM Copyrighted Works and Linux.</u>

25.     SCO's violations of the GPL automatically terminated SCO's license to the IBM Copyrighted Works pursuant to Section 4 of the GPL. (Ex. 128 § 4; Ex. 129 § 8.) This termination of SCO's rights to the IBM Copyrighted Works was effective immediately upon SCO's violations. (Ex. 128 § 4; Ex. 129 § 8.)

26.     As a long-time participant in the Linux market, member of UnitedLinux, and both licensor and licensee under the GPL, SCO understood that under GPL Section 4, SCO's rights

8

under the GPL would terminate automatically if SCO violated the GPL.  (Ex. 221 ¶¶ 23-24.)  As

SCO explained in a SCO "white paper":

> [A]ny individual or company can package products that are licensed under the
> GPL, and charge a nominal fee for the distribution media and packaging, but they
> must still make the source code to the product available.  Anyone who buys the
> product is free to recopy, alter, or redistribute, <u>so long as the GPL is followed.</u>
> (Ex. 262 at SCO 1269182.)

27.     Despite the automatic termination of SCO's rights to the IBM Copyrighted

Works, however, SCO continued to make available copies of the IBM Copyrighted Works, each

of which explicitly stated that it was licensed under the terms of the GPL.  (IBM Copy. Br. ¶ 47.)

All told, SCO distributed or made Linux files publicly available for almost four years.  SCO

distributed SCO Linux 4.0 for at least a year and a half, from November 19, 2002 until May 31,

2004.  (Ex. 284 ¶ 4.)  SCO also continued to post Linux files on its own Internet website until as

recently as August 2006, and made those Linux files publicly available to others to copy at will.

(Ex. 215 ¶ 100; Ex. 226 ¶¶ 13-16; IBM Copy. Br. ¶ 37.)

28.     SCO's repeated repudiation and breach of the GPL has harmed IBM.  As a

foreseeable consequence of SCO's repudiation and breach of the GPL, among other wrongs by

SCO,

> **SECTION REDACTED**
                              (Ex. 589 ¶¶ 21-23; Ex. 591 ¶¶ 1.A, 36.)  These costs are

ongoing.  (<u>Id.</u>)  IBM has also incurred quantifiable damages under the methodology of SCO's

own experts.  (Ex. 591 ¶¶ 1.C, 33-34.)  Further facts material to the scope of IBM's injury are set

forth in detail in IBM's Memorandum in Opposition to SCO's Motion for Partial Summary

Judgment on IBM's Second, Third, Fourth and Fifth Counterclaims.

## Responses to SCO's Statement of "Undisputed" Facts

To avoid any ambiguity and pursuant to DUCivR 56-1(c), IBM further responds as follows to SCO's "Statement of Undisputed Facts":

1.  *IBM's Sixth Counterclaim, for breach of the GNU General Public License, alleges that SCO has breached the GPL by "among other things, copying, modifying, sublicensing or distributing programs licensed under the GPL, including IBM contributions, on terms inconsistent with the GPL, and seeking to impose additional restrictions on the recipients of programs licensed under the GPL, including IBM contributions, distributed by SCO." (IBM's 2d Am. Counterclaims ¶ 145.)  The counterclaim also alleges that SCO's license under the GPL "terminated" because of this alleged breach. (IBM's 2d Am. Counterclaims ¶ 146.)*

IBM does not dispute that the quoted language is accurate but disputes that paragraph 1 provides a complete or accurate statement of IBM's Sixth Counterclaim.  IBM refers to its Second Amended Counterclaims ¶¶ 142-147 for their contents and what IBM "alleges" in its Sixth Counterclaim.  (Ex. 4.)

2.  *IBM's Seventh Counterclaim, for promissory estoppel, seeks to recover damages resulting from IBM's reliance on SCO's promise not to breach the GPL. (IBM's 2d Am. Counterclaims ¶¶ 148-53.)*

IBM disputes that the paraphrase in paragraph 2 provides a complete or accurate statement of IBM's Seventh Counterclaim.  For example, the relief sought includes declaratory and injunctive relief.  IBM refers to its Second Amended Counterclaims ¶¶ 148-153 for their contents and what IBM "seeks" in its Seventh Counterclaim.  (Ex. 4.)

3.  *IBM's Eighth Counterclaim, for copyright infringement, alleges that SCO has infringed upon IBM's copyrights by "copying, modifying, sublicensing and/or distributing Linux products except as expressly provided under the GPL." (IBM's 2d Am. Counterclaims ¶ 159.)*

IBM does not dispute that the quoted language is accurate but disputes that paragraph 3 sets forth a complete or accurate statement of IBM's Eighth Counterclaim.  IBM refers to its Second Amended Counterclaims ¶¶ 154-161 for their contents and what IBM "alleges" in its Eighth Counterclaim.  (Ex. 4.)

4.      *Section 0 of the GPL (Ex. A) provides: "Activities other than copying, distribution and modification are not covered by this license; they are outside of its scope."*

IBM does not dispute that the quoted language appears in Section 0 of the GPL.  IBM

refers to the text of Section 0 of the GPL for what it "provides" in full.

5.      *Section 0 further states: "This License applies to any program . . . which contains a notice placed by the copyright holder saying it may be distributed under the terms of this General Public License." It is undisputed that IBM placed such a notice with respect to the code it added to Linux, and that SCO never placed such a notice on any code in Linux.*

IBM does not dispute that the quoted language appears in Section 0 of the GPL.  IBM

refers to the text of Section 0 for what it "states" in full.  IBM disputes that "SCO never placed

such a notice on any code in Linux" in that SCO distributed its Linux product "SCO Linux

Server 4.0 powered by UnitedLinux" with GPL notices.  (Ex. 226 ¶ 10; Ex. 278 ¶ 6; Ex. 221 ¶

77; Ex. 176 ¶¶ 12-13.)

6.      *Under the GPL, a licensee may charge a fee for its distribution of GPL licensed software. (GPL Preamble ¶¶ 2, 4; GPL § 1.)*

IBM does not dispute that GPL licensees may charge a fee for "the physical act of

transferring a copy" of GPL licensed software.  (See ¶¶ 3-4.[4])  The GPL only permits a "fee for

the physical act of transferring a copy" and "warranty protection in exchange for a fee".

(Ex. 128 § 1; Ex. 129 § 1.)

7.      *Section 1 of the GPL authorizes the general public to copy and distribute verbatim copies of the source code of the licensed program, subject to certain notice publication requirements. (GPL § 1.) SCO complied with all of these requirements in all of its Linux distributions. (Hughes Decl. ¶ 9; (Ex. B); Hughes Dep. (5/11/04) at 67 (Ex. C); Sontag Dep (5/12/04) at 211 (Ex. D).)*

IBM disputes that SCO's purported paraphrase and characterization of Section 1 of the

GPL in the first sentence of this paragraph is an accurate and complete statement of what

---

[4] Relevant paragraph number(s) in the foregoing Material Facts Requiring Denial of SCO's Motion are cited in this Response and in the Argument that follows as "¶ __".

11

Section 1 "authorizes". Section 1 authorizes, inter alia, licensees to "charge a fee for the physical act of transferring a copy" and to "offer warranty protection in exchange for a fee". (Ex. 128 § 1; Ex. 129 § 1.) IBM refers to the text of Section 1 for what it "authorizes". IBM further disputes this paragraph in that GPL Section 1 authorizes certain actions not to the "general public", but to "each licensee" under the GPL. (Ex. 128 §§ 0, 1; Ex. 129 §§ 0, 1.) The license is <u>offered</u> to all (the "general public"), but must be accepted by each prospective licensee. (Ex. 128 §§ 0, 5; Ex. 129 §§ 0, 9.) IBM further disputes that SCO complied with the requirements of Section 1. SCO sought to impose and did impose licensing fees through its "SCO Intellectual Property License for Linux" other than fees for the physical act of transferring a copy or for warranty protection. (Ex. C to Ex. 284.)

8.      *Section 2 of the GPL states that if a licensee modifies the licensed work, the modified work must be licensed at no charge. (GPL § 2.) SCO never modified any of IBM's contributions to Linux. (Sontag Decl. (Ex. E) ¶ 31.) In contrast to Section 2 (which authorizes the copying of modified works), Section 1 (which authorizes verbatim copying) does not require no-charge licensing. (GPL §§ 1-2.)*

IBM disputes that SCO's purported paraphrase and characterization of Section 2 of the GPL is an accurate and complete statement of what Section 2 "states" and what Sections 1 and 2 "authorize". IBM refers to the text of Sections 1 and 2 for what those sections "state" and "authorize". IBM further disputes this paragraph in that IBM's copyrighted works are licensed subject to the GPL both individually and as component parts of the larger Linux operating system work. (¶ 10.) IBM further disputes this paragraph in that SCO did modify the Linux work, which included the IBM Copyrighted Works, in the course of creating SCO Linux 4.0, powered by UnitedLinux and SCO Open Linux 3.1.1 Asia, and so was fully subject to the provisions of Section 2 of the GPL. (¶ 17.)

9.      *Section 3 of the GPL authorizes the general public to copy and distribute verbatim copies of the licensed program in object code or executable form, subject to the condition that it be accompanied by the source code or by an offer to provide the source code.*

*(GPL § 3.) SCO complied with these conditions in all of its Linux distributions. (Hughes Decl. ¶ 9; Hughes Dep. (5/11/04) at 67; Sontag Dep. at 211.)*

IBM does not dispute that Section 3 imposes certain conditions on each licensee but disputes that SCO's purported paraphrase and characterization of Section 3 of the GPL is an accurate and complete statement of what Section 3 "authorizes". IBM refers to the text of Section 3 for what that section "authorizes". IBM further disputes this paragraph in that Section 3 authorizes certain actions not to the "general public", but to "each licensee" under the GPL. (Ex. 128 §§ 0, 3; Ex. 129 §§ 0, 3.) The license is <u>offered</u> to all (the "general public"), but must be accepted by each prospective licensee. (Ex. 128 §§ 0, 5; Ex. 129 §§ 0, 9.)

IBM further disputes that SCO complied with the conditions of Section 3. Section 3 provides that a licensee "may copy or distribute the Program (or a work based on it, under Section 2) in object code or executable form under the terms of Sections 1 and 2". (Ex. 128 § 3.) SCO has collected, or attempted to collect, royalties or licensing fees from Linux licensees in excess of the fees permitted under the GPL for the "physical act of transferring" a copy of code or for warranty protection. (¶¶ 18-24; Ex. 128 §§ 1-3; Ex. 129 §§ 1, 2, 4.) And SCO purports to restrict Linux licensees to object code only and to prohibit further licensing and sublicensing of Linux. (¶¶ 23-27.)

10.    *Nothing in the GPL prohibits the licensing of other intellectual property that may pertain to the Program. In fact, Section 7 of the GPL contemplates that "the Program" may implicate other intellectual property rights. (GPL § 7.)*

IBM disputes this paragraph in that the GPL expressly prohibits a GPL licensee from licensing intellectual property in a manner that imposes "further restrictions on the recipients' exercise of the rights granted hereunder". (Ex. 128 § 6; ¶ 6.) The GPL also prohibits a GPL licensee from copying, modifying, sublicensing, or distributing the Program "except as expressly provided under this License". (Ex. 128 § 4; ¶ 7.) IBM further disputes this paragraph in that

13

GPL Section 7 does not "contemplate" that a GPL licensee such as SCO would attempt to use its purported intellectual property to impose on other GPL licensees restrictions that violate the GPL.  IBM refers to ¶ 8 above for what Section 7 "contemplates".

11.     *Section 3 of the GPL does not prohibit a licensee from charging "royalty or licensing fees" on the licensed works. Section 3 does not mention fees or royalties. (GPL § 3.)*

IBM does not dispute that the words "royalty or licensing fees" do not appear in the text of Section 3, but IBM disputes this paragraph in that Section 3 provides in part that "you may copy and distribute the Program (or a work based on it, under Section 2) in object code or executable form <u>under the terms of Sections 1 and 2 provided that you also do one of the following</u>".  (Ex. 128 § 3 (emphasis added).)  Accordingly, Section 3 "mentions" fees to the extent that Section 3 is subject to Sections 1 and 2.  Section 1 permits a licensee only to "charge a fee for the physical act of transferring a copy" and to "offer warranty protection for a fee".  (Ex. 128 § 1.)  Section 2 permits no fees at all.  (Ex. 128 § 2(b); ¶ 5.)

12.     *Section 3 of the GPL requires that a party who distributes copies of works subject to the GPL in executable form, provide the customer "with the complete corresponding machine-readable source code" on a "medium customarily used for software interchange" or with an offer to provide the code at cost. (GPL § 3.)*

IBM does not dispute that Section 3 includes the quoted language.  IBM refers to the text of Section 3 of the GPL for what that section "requires".

13.     *Section 4 of the GPL states that a licensee's use of licensed material beyond the scope of the License will "automatically terminate" the licensee's rights under the License, but it does not say when such a termination becomes effective, and it provides no mechanism by which the licensee is put on notice of an alleged unauthorized use of the licensed material. (GPL § 4.)*

IBM does not dispute that, pursuant to Section 4 of the GPL, a licensee's use of licensed material beyond the scope of the license will "automatically terminate" the licensee's rights under the license.  IBM disputes that SCO's purported paraphrase and characterization of Section

14

4 of the GPL is an accurate and complete statement of what Section 4 "states". IBM refers to the text of Section 4, quoted in full above, for what it "states". (Ex. 128 § 4; ¶ 7.)

IBM further disputes that the GPL "does not say when such a termination becomes effective, and it provides no notice of an alleged unauthorized use". The phrase "automatically terminates" indicates that termination becomes effective at the time of "any attempt otherwise to copy, modify, sublicense or distribute the Program". (¶ 7.) Notice of unauthorized use is provided by the GPL itself, which clearly sets forth the terms and conditions for use. Any other use is unauthorized. (¶ 7.)

14.     *GPL Section 6 states that each time a licensee redistributes "the Program (or any work based on the Program), the recipient automatically receives a license from the original licensor to copy, distribute or modify the Program subject to these terms and conditions. [The licensee] may not impose any further restrictions on the recipients' exercise of the rights granted herein." (GPL § 6.)*

IBM does not dispute that GPL Section 6 includes the quoted language. IBM refers to the text of Section 6 for what it "states" in full.

15.     *SCO copied and distributed the Linux kernel and other related Linux software for years prior to 2003, when SCO discovered that IBM and others had misappropriated SCO's copyrighted UNIX code by contributing it to Linux without SCO's approval. On May 14, 2003, SCO suspended all sales and marketing of its entire Linux product line. (Hughes Decl. ¶ 3; Hughes Dep. (3/2/06) at 179, 186 (Ex. F); Hughes Dep. (5/11/04) at 16, 37, 48, 51.)*

IBM disputes this paragraph in that SCO has not identified, in this paragraph or elsewhere, any SCO copyrighted UNIX code that has been "misappropriated" by IBM. (See Ex. 54; see also IBM's Mem. in Support of its Motion for Summary Judgment on SCO's Contract Claims (SCO's First, Second, Third and Fourth Causes of Action) ¶¶ 237-238.) Nor has IBM misappropriated any SCO code. IBM does not dispute that SCO copied and distributed the Linux kernel and other related Linux software, including the IBM Copyrighted Works, prior to 2003. However, SCO allowed its pre-existing customers to purchase Linux-related products after May 14, 2003. (Ex. 284 ¶ 3; ¶ 27.) SCO continued to sell Linux products until at least May

31, 2004. (Ex. 284 ¶ 4; ¶ 27.) SCO continued to post Linux files on its own Internet website as recently as August 2006 and made them available to others to copy at will. (Ex. 215 ¶ 110; Ex. 226 ¶¶ 13-16; ¶ 27.)

16.      *In light of the legal issues arising from the misappropriation, SCO began offering its Intellectual Property License for UNIX (the "UNIX License") for sale beginning on August 5, 2003. (Hughes Decl. ¶ 6.) The UNIX License is a license of SCO's UNIX software, not a license or sublicense of Linux or of any IBM-copyrighted work. (Hughes Dep. (3/2/06) at 181-82; Sontag Decl. ¶ 30.)*

IBM does not dispute that SCO began offering a license for sale on August 5, 2003, but IBM disputes this paragraph in that the license SCO began offering for sale on August 5, 2003 was the "SCO Intellectual Property for Linux". (Ex. C to Ex. 284; ¶¶ 21-22.) The "SCO Intellectual Property License for Linux" is a run-time license for the use, in binary form only, of certain unspecified code contained in Linux, and SCO claimed that this license was necessary for "commercial use of the Linux 2.4 and later versions". (IBM Copy. Br. ¶ 44; ¶ 21.) It is a Linux license, and Linux includes the IBM Copyrighted Works. (Ex. C to Ex. 284; ¶¶ 9-11; 21-24.)

17.      *SCO has never attempted to license or sublicense Linux or any IBM copyrighted work, or any other GPL-licensed source code. (Sontag Decl. ¶ 30.) SCO offered its UNIX License, beginning in August 2003, because SCO believes IBM had misappropriated SCO's proprietary material and contributed that material into Linux. (Hughes Decl. ¶ 6.)*

IBM disputes this paragraph in that SCO attempted to, and did, license or sublicense Linux. (¶¶ 21-24.) Linux is distributed under the GPL. (¶ 11.) In its "SCO Intellectual Property License for Linux", SCO purported to license the use of Linux only in object code format, thus prohibiting the use, modification, or distribution of the Linux source code. (¶ 21; IBM Copy. Br. ¶ 44; Ex. 284 ¶ 6 and Ex. C.) SCO purported to prohibit Linux "licensees" under the SCO Intellectual Property License for Linux from further sublicensing and distributing Linux. (¶ 23.) SCO also licensed or attempted to license its own customers who used SCO Linux products. (¶ 24.)

18.      *SCO has not sought to collect royalties or licensing fees for any of IBM's allegedly copyrighted works. (Hughes Decl. ¶ 9; Sontag Decl. ¶ 30.)*

IBM disputes this paragraph in that SCO has sought to collect, and has collected, from Linux users licensing fees through its SCO Intellectual Property License for the use of Linux in binary form, as stated in response to the previous paragraph. IBM's copyrighted works are included in Linux. (¶¶ 9-11.)

19.      *SCO has not attempted to sell a UNIX License to anyone who received a Linux distribution from SCO. (Hughes Decl. ¶ 8.)*

IBM disputes this paragraph to the extent that anyone who received a Linux distribution from SCO paid a fee for the use of SCO Linux. (Ex. 284 ¶¶ 2, 4, 5, 7.) SCO "agreed to hold its Linux customers harmless from any SCO intellectual property issues" (Ex. 284 ¶ 8), and provided a compliance license to its customers already using SCO Linux (Ex. 303 at 287:25-288:19) in partial consideration for the fees SCO already charged for its Linux products. Thus, SCO distributed Linux subject to an agreement pertaining to SCO intellectual property rights and not as expressly provided in the GPL. (Ex. 284 ¶ 8.)

20.      *SCO distributed SCO Linux Server 4.0 for less than six months, from November 19, 2002, until May 14, 2003. (Hughes Decl. ¶¶ 2-3; Hughes Dep. (3/2/06) at 186; Hughes Dep. (5/11/04) at 16, 37, 57.) Once SCO arrived at the conclusion that Linux was tainted with misappropriated material, SCO suspended its sales of Linux products pending clarification of the intellectual property issues. (Hughes Decl. ¶ 3; Hughes Dep. (3/2/06) at 179, 186; Sontag Dep. (5/12/04) (Ex. E) at 208-09.) After May 14, 2003, SCO entered into no further obligations to sell SCO Linux Server 4.0 or any other Linux product. (Hughes Decl. ¶ 3; Hughes Dep. (5/11/04) at 53.) SCO made limited post-May 14 sales to customers in consideration of its obligations to its customers. (Hughes Decl. ¶¶ 3-5; Hughes Dep. (3/2/06) at 188-89; Hughes Dep. (5/11/04) at 72-73; Sontag Decl. ¶¶ 12-14; Sontag Dep. (5/12/04) at 221-23.) The last sale of Linux Server 4.0 was on May 31, 2004. (Hughes Decl. ¶ 4; Hughes Dep. (11/1/05) at 60 (Ex. G).) All of SCO's Linux distributions (both prior to and after May 2003) were made under the GPL, with no charge of any nature for royalties or licensing fees. (Hughes Decl. ¶ 9.)*

IBM does not dispute that SCO distributed Linux for the months November 2000 through May 2003. However, SCO distributed Linux or made Linux files publicly available for almost four years. (¶ 27.) SCO continued to post Linux files on its own Internet website for at least an

additional two years and three months after May 2003, until as recently as August 2006, and made those Linux files available to others to copy at will.  (¶ 27.)

IBM further disputes that "all of SCO's Linux distributions (both prior to and after May 2003) were made under the GPL, with no charge of any nature for royalties or licensing fees". SCO's distributions of Linux to its own customers, both prior to and after May 2003, were made subject to SCO's agreement "to hold its Linux customers harmless from any SCO intellectual property issues regarding Linux".  (Ex. 284 ¶ 8, ¶¶ 24.)  That agreement is not a term or condition of the GPL.  (See Ex. 128.)  Therefore, SCO's distribution of Linux to its own customers was not "under the GPL".  (See Ex. 128.)  Similarly, SCO's licensing of Linux to non-SCO customers using Linux through the "SCO Intellectual Property License for Linux" includes terms and conditions that are not part of the GPL.  (¶¶ 21-23; Ex. 128.)  Therefore, SCO's licensing of non-SCO customers using Linux also was not "under the GPL".  (See Ex. 128.)

21.     *In accordance with its obligations, SCO continued to provide its Linux customers with internet access to files containing Linux source code and enhancements thereto. SCO stored these files on its computers, which its customers could access via the internet. In accordance with its agreement with the UnitedLinux consortium, SCO provided customers who purchased SCO Linux Server 4.0 with a password to enter at a log-in screen on SCO's download site so that only they would have access. (Hughes Dep. (3/2/06) at 195; Hughes Dep. (11/1/05) at 37-38; Sontag Decl. ¶¶ 17-19.)*

IBM disputes this paragraph in part.  IBM does not dispute that SCO continued to copy and distribute Linux source code after May 2003, including the IBM Copyrighted Works.  As recently as August 2006, SCO had posted Linux files on its own Internet website and made those files available to others to copy at will.  (¶ 27.)  No password was necessary for access to these files in August 2006; they were available from SCO's publicly accessible online server.  (¶ 27.)

22.     *SCO permitted access to Linux source code files via its website after August 5, 2003, because of SCO's pre-existing contractual obligations with its customers and with the UnitedLinux consortium. (Hughes Dep. (3/2/06) at 190-91, 194; Sontag Decl. ¶ 17-19.) SCO complied by making the source code available to its customers on its website. SCO removed all Linux-related code from its website promptly after expiration of the last of its contractual*

18

*commitments, on December 31, 2004. (Hughes Decl. ¶ 11; Hughes Dep. (3/2/06) at 191, 194; Hughes Dep. (11/1/05) at 37-38, 121; Sontag Decl. ¶ 17.)*

IBM does not dispute that SCO continued to copy and make available Linux source code files after August 5, 2003. IBM disputes this paragraph in that SCO "removed all Linux-related code" from its website in December 2004 in that as recently as August 2006, SCO had posted Linux files on its own Internet website and made those files available to others to copy at will. (¶ 27.) No password was necessary for access to these files in August 2006; they were available from SCO's publicly accessible online server. (¶ 27.)

23. *SCO suspended its Linux distribution activities in May 2003 (Hughes Decl. ¶ 3; Hughes Dep. (3/2/06) at 186,), months before it began selling the UNIX License in August of 2003. (Hughes Decl. ¶ 6.) This suspension was also months before IBM registered any of the sixteen alleged copyrights. (IBM Mem. in Supp. of IBM's Mot. for Partial Summ. J. on Its Eighth Counterclaim (8/16/04) ¶ 8.)*

IBM disputes this paragraph in that SCO distributed SCO Linux 4.0 until May 31, 2004. (Ex. 284 ¶ 4). SCO continued to post Linux files on its own Internet website for at least an additional two years and three months beyond that date, until as recently as August 2006, and made those Linux files available to others to copy at will. (¶ 27.) The IBM Copyrighted Works were registered within five years of the first publication of the relevant work. (Ex. 167 ¶ 5; IBM Copy. Br. ¶ 25.)

24. *Prior to the filing of its Counterclaim on August 6, 2003, IBM never provided SCO with any notice of its claim that SCO's rights under the GPL had terminated or that SCO was infringing its copyrights. (Hughes Decl. ¶ 12.)*

IBM disputes this paragraph in that IBM made its IBM Copyrighted Works available to SCO and others only under the terms and conditions of the GPL. (Ex. 167 ¶ 7.) The GPL provides, inter alia, that "any attempt otherwise to copy, modify, sublicense or distribute the Program is void and will automatically terminate your rights under the License". (Ex. 128 § 4.) The GPL itself, therefore, provided notice to SCO that "any attempt" by it to license Linux other

than as provided in the GPL would automatically terminate its rights under the GPL and result in the infringement of IBM's copyrights.  (¶ 7; Response to ¶ 13.)

   25. *SCO never repudiated the GPL, and it always endeavored to comply with its GPL obligations. (Hughes Decl. ¶ 9; Hughes Dep. (3/2/06) at 200-01; Sontag Dep. (5/12/04) at 211.)*

   IBM disputes this paragraph in that SCO repeatedly repudiated and breached the GPL. (¶¶ 18-24.)

### **Standard of Decision**

   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); In re Grandote Country Club Co., 252 F.3d 1146, 1149 (10th Cir. 2001).  On this motion, the Court must view the record "in the light most favorable to the nonmoving party", IBM.  Grandote Country Club, 252 F.3d at 1149 (citation and internal quotation marks omitted).

   To prevail on a claim of copyright infringement, a copyright holder must establish (1) that it owns the copyright to the copyrighted work, and (2) that the alleged infringer violated one or more of the holder's exclusive rights.  See Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc., 994 F.2d 1476, 1487 (10th Cir. 1993); Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc., 75 F. Supp. 2d 1290, 1292 (D. Utah 1999).

**Argument**

## I.    SCO BREACHED THE GPL.

SCO first seeks summary judgment against IBM's Sixth and Seventh Counterclaims on

the ground that "SCO did not breach the GPL".[5]  (SCO Br. at 9.)  Specifically, SCO asserts that

it did not breach the GPL because that license governs only SCO's actions vis-à-vis its own

customers, and that SCO never violated the GPL <u>in its dealings with its own customers</u>.  That is,

SCO argues that it only sought to impose a Linux license that violates the GPL on <u>non</u>-SCO

customers – the vast majority of the Linux-using world.  (SCO Br. at 11.)  The argument is too

clever by half, and wrong.  Not only did SCO violate the GPL in its dealings with its own

customers, but SCO's own license under the GPL was in any case conditioned on SCO's GPL

compliance with respect to <u>all</u> Linux licensees.  Instead of complying with its GPL obligations,

SCO violated and repudiated them repeatedly.

### A.    The Plain and Unambiguous Language of the GPL Forecloses SCO's Interpretation.

Because the language of the GPL is unambiguous, the Court need not look beyond the

"four corners" of the license to determine its meaning.  <u>See</u> <u>Fairborn Commercial, Inc. v. Am.</u>

<u>Housing Partners, Inc.</u>, 94 P.3d 292, 295 (Utah 2004); <u>R/S Assocs. v. New York Job Dev. Auth.</u>,

771 N.E.2d 240, 242 (N.Y. 2002).[6]  The Court should "consider each provision in relation to all

---

[5] SCO does not argue that there is an absence of issues of material fact with respect to any element of promissory estoppel.  <u>See, e.g.</u>, <u>J.R. Simplot Co. v. Sales King Int'l, Inc.</u>, 17 P.3d 1100, 1107 (Utah 2000) (stating elements under Utah law); <u>Kaye v. Grossman</u>, 202 F.3d 611, 615 (2d Cir. 2000) (stating elements under New York law).  Even with respect to this Seventh Counterclaim, SCO's argument is that it did not breach the GPL.  (<u>See</u> SCO Br. at 7.)

[6] Utah courts apply the "most significant relationship" analysis described in the Restatement (Second) of Conflict of Laws (1971) to determine the choice of law in contract and other cases.  <u>See</u> <u>Waddoups v. Amalgamated Sugar Co.</u>, 54 P.3d 1054, 1059 (Utah 2002).  On this motion, however, the Court need not reach the choice of law issue because Utah law and New York law are in accord on the issues that must be reached to address SCO's sole argument on this motion,

21

of the others, with a view toward giving effect to all and ignoring none". <u>Fairborn</u>, 94 P.3d at

295 (citations and quotation marks omitted); <u>see Westmoreland Coal Co. v. Entech, Inc.</u>, 794

N.E.2d 667, 670 (N.Y. 2003) (reading contract "as a harmonious and integrated whole").

Ignoring these principles, SCO bobs and weaves through a selective reading of the GPL

to construct an "interpretation" that would nullify the whole structure and plainly expressed

intent of that license.  Specifically, SCO would have this Court rule that under the terms of the

GPL, SCO was permitted to demand license fees from the whole world of Linux users, while

itself continuing to enjoy and make use of the no-charge license to Linux (including the IBM

Copyrighted Works) that SCO obtained only pursuant to the GPL. [7]  That is not what the GPL

says. [8]

---

namely, that SCO did not breach the GPL.  Throughout this brief, IBM cites to both Utah law
and New York law.

[7] As set forth in the immediately following section, SCO's statement that it did not offer a
license to anyone who received Linux from SCO (SCO Br. at 11) is factually false.

[8] SCO's statement that, in effect, it is "dangerous" to interpret the GPL only by looking
within its four corners and considering each provision in relation to the others not only flies in
the face of the unambiguous language of the GPL and standard rules of contract interpretation, it
also is not supported by the very cases on which SCO relies.  (SCO Br. at 12.)  In each case SCO
cites – both of which involve the construction of a treaty or statute, not interpretation of a
contract – the court looked to the intent of the document at issue and concluded that application
of the canon of statutory construction "expressio unius est exclusio alterius" was unwarranted
where it led to a result inconsistent with the clear intent of the document.  <u>See Ford v. United
States</u>, 273 U.S. 593, 612-613 (1927) (concluding canon inapplicable because of "palpable
incongruity" of resulting interpretation with intent of treaty); <u>Seneca-Cayuga Tribe of Okla. v.
Nat'l Indian Gaming Comm'n</u>, 327 F.3d 1019, 1034-35 (10th Cir. 2003) (concluding canon
inapplicable because "canon is not particularly useful where legislative history clearly evinces
congressional intent").  The intent of the GPL, as expressed in the unambiguous language of that
license, is that fees and restrictions not set out in that license are barred.  (¶¶ 1-8.)

The overarching intent of the GPL is clearly stated in its Preamble:[9] the GPL "is intended to guarantee your freedom to share and change free software–to make sure the software is free for all its users". (Ex. 128, Preamble ¶ 1; ¶ 3.) The Preamble also emphasizes that the GPL is "designed to make sure that you [the licensee] have the freedom to distribute copies of free software", to access the source code of the licensed software, and to "change the software or use pieces of it in new free programs". (Ex. 128, Preamble ¶ 2; ¶ 3.) And the Preamble states that the GPL protects this freedom by imposing restrictions on the licensee "if you distribute copies of the software, or if you modify it". (Ex. 128, Preamble ¶ 3; ¶ 3.)

The specific, numbered sections of the GPL implement this intent, granting rights to GPL licensees such as SCO – provided they comply with its prohibitions against imposing restrictions on the exercise of those rights by other GPL licensees:

- Section 1 grants to <u>every</u> licensee or sublicense under the GPL the right to "copy and distribute verbatim copies of the [Program's] source code as you receive it". (Ex. 128 § 1; Ex. 129 § 1; ¶ 4.) SCO's Linux licensing program purported to prohibit users of SCO's Linux distribution, as well as other Linux licensees, from further "copying and distributing" the Linux source code.

- Section 2 grants a licensee such as SCO the right to create and distribute derivative works (as SCO did in creating the SCO Linux distributions around the licensed Linux Kernel) – <u>provided that</u> the derived work "as a whole" (which in this case included the Linux Kernel) must be "licensed as a whole at no charge <u>to all third parties</u> under the terms of this license". (Ex. 128 § 2(b) (emphasis added); Ex. 129 § 2(c); ¶ 5.) Yet SCO sought to impose on all users of the Linux Kernel license fees and restrictions <u>incompatible</u> with "the terms of this [GPL] license".

---

[9] Preambles and other prefatory language in a contract may aid its interpretation. <u>See, e.g.</u>, <u>Time Warner Entm't Co. v. Everest Midwest Licensee</u>, 381 F.3d 1039, 1048 (10th Cir. 2004) (applying Kansas law and looking to "premises" section for purpose of agreement); <u>Palmieri v. Allstate Ins. Co.</u>, 445 F.3d 179, 188 (2d Cir. 2006) (applying New York law and concluding that if insurance contract were ambiguous, "all doubts would be removed by the preamble to the Agreement").

23

- Section 4 states that a licensee such as SCO may not "copy, modify, sublicense, or distribute the Program except as expressly provided under this license".[10] (Ex. 128 § 4 (emphasis added); see Ex. 129 § 8; ¶ 7.) Yet SCO purported to sublicense on, and to impose on Linux sublicensees, terms different (and far more restrictive and burdensome) than those "expressly provided under this license".

- Section 6 emphasizes that each sublicensee under the GPL "automatically receives a license from the original licensor to copy, distribute or modify the Program subject to these [GPL] terms and restrictions", and provides that one claiming rights under the GPL ["You"] "may not impose any further restriction on the recipient's exercise of the rights granted herein". (Ex. 128 § 6; see Ex. 129 § 10; ¶ 6.) Yet, SCO did purport to impose further restrictions on the rights of Linux licensees.

We review SCO's violations in more detail below.[11]

---

[10] SCO argues that because Section 4 of the GPL "effectively ratifies sublicenses granted prior to the alleged breach, IBM cannot complain that the initial grant was unauthorized". (SCO Br. at 10) Section 4 does no such thing. Section 4 simply provides that SCO's breaches of its obligations under the GPL do not deprive its sublicensees of their own rights under the GPL. This follows from the fact that, by operation of the unambiguous language of the GPL, SCO's Linux "licensees" receive their license to Linux and the IBM Copyrighted Works from IBM itself and others who originally licensed Linux and its component parts under the GPL: "Each time you redistribute the Program (or any work based in the Program), the recipient automatically receives a license from the original licensor to copy, distribute or modify the Program subject to these terms and conditions." (Ex. 128 § 6 (emphasis added); see Ex. 129 § 10.)

[11] SCO's interpretation of the GPL as permitting it to charge and restrict all Linux licensees should be rejected for another reason: "a fair and equitable result will be preferred over a harsh and unreasonable one", and "an interpretation that will produce an inequitable result will be adopted only where the contract so expressly and unequivocally so provides that there is no other reasonable interpretation to be given it". Peirce v. Peirce, 994 P.2d 193, 198 (Utah 2000) (citation and quotation marks omitted); see Wingets, Inc. v. Bitters, 500 P.2d 1007, 1010 & n.8 (Utah 1972) (collecting cases); Kahn v. New York Times Co., 503 N.Y.S.2d 561, 566 (N.Y. App. Div. 1986) (rejecting defendant's interpretation as "not only unsupported by the contract language" but "highly inequitable as well"). See generally 11 Williston on Contracts § 32:11 (4th ed. 1990). It would be particularly harsh and unreasonable to interpret the GPL in such a way as to render SCO a "super Linux licensee", able to gain the benefits of the free use of Linux under the GPL while ignoring its conditions and saddling the rest of the Linux world licensed under the GPL with SCO's fees and restrictions.

B.    SCO Repeatedly Repudiated and Breached the GPL.

1.    SCO repeatedly repudiated the GPL, and continues to do so on this motion.

A stated intention to challenge "the viability and life of the license itself" constitutes a "distinct and unequivocal refusal to perform under the license, thus causing a material breach, or repudiation, of the contract". Dow Chemical Co. v. United States, 226 F.3d 1334, 1345 (Fed. Cir. 2000).[12]  SCO has challenged – and continues to challenge on this motion – the "validity and life" of the GPL.

SCO decided to repudiate the GPL at least as early as August 20, 2003, according to the testimony of its president Mr. Darl McBride.  (¶ 18.)  In this litigation, SCO has repeatedly repudiated the GPL by asserting, for example, that the GPL is "unenforceable, void/and or voidable" and "violates the U.S. Constitution together with copyright, antitrust and export control laws".  (¶ 19.)  Indeed, even in its brief on this motion, SCO continues to repudiate the GPL by arguing that the GPL is an illegal restraint of trade and might be per se illegal under the antitrust laws.  (See SCO Br. at 13-14.)

2.    SCO violated the GPL by placing license restrictions on Linux licensees, including its own Linux customers, on terms prohibited by the GPL.

Once the unambiguous language of the GPL has been accurately parsed, SCO's multiple breaches of that license are clear.  As set forth in the IBM Copyright Counterclaim Brief, SCO violated the GPL by charging prohibited licensing fees for Linux, imposing an "object code only" restriction on Linux licensees (including, but not limited to, Linux licensees who received

---

[12] See also Restatement (Second) of Contracts § 250 cmt. b (1981) (stating that "language that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation") (quoting Comment 2 to Uniform Commercial Code § 2-610).

Linux from SCO[13]), and purporting to prohibit Linux licensees (including, but not limited to, SCO's own customers) from further sublicensing or distributing Linux. (IBM Copy. Br. at 19-20 & ¶¶ 43-46; ¶¶ 23-24, above.) Each of these restrictions violates the unambiguous language of the GPL:

- SCO sought to sell, and did sell, "SCO Intellectual Property Licenses for Linux" to Linux licensees who received Linux from distributors other than SCO. (¶¶ 21-24; IBM Copy. Br. ¶¶ 43-44.) Charging licensing fees for Linux – including components of Linux – is prohibited by GPL Sections 4 and 2(b). SCO, as a GPL licensee, may only charge other GPL licensees fees "for the physical act of transferring a copy" or for "warranty protection". (Ex. 128 § 1, ¶ 4.) The fees imposed by SCO's "SCO Intellectual Property License for Linux" are fees charged "other than as expressly provided" under the GPL. (Ex. 128 §§ 2(b), 4; ¶¶ 5, 7.)[14]

- SCO purported to limit Linux licensees to only the object code (i.e., machine readable) format. (¶ 22.) SCO purported to impose this restriction on SCO licensees,

  **SECTION REDACTED**

  and on other Linux licensees intimidated into accepting a "SCO Intellectual Property License for Linux" (¶¶ 21-23). This restriction violates Sections 4 and 6 of the GPL because all GPL licensees are entitled to use, modify, and distribute Linux source code. (Ex. 128 §§ 1-4, 6; ¶¶ 3-8.) Moreover, SCO purportedly retained for itself the rights to the source code. (¶ 22.) This violates the same provisions, and is inconsistent with the intent of the GPL. As the Preamble to the GPL emphasizes, "if you distribute copies of such a program, whether gratis or for a fee, you

---

[13] Even if SCO had exempted its own customers from these restrictions (which it did not), SCO would not have escaped a clear violation of the GPL. Among other reasons, Section 2(b) clearly states that when a GPL licensee such as SCO distributes software subject to the GPL, it must license that software under the GPL terms to "all third parties", not simply those that receive the code directly from the distributing party.

[14] SCO states that Section 7 of the GPL "expressly contemplates and warns" that Linux is not "beyond the reach of patents, copyrights or other intellectual property". (SCO Br. at 11.) That may be true, but is irrelevant. That the GPL "contemplates" the existence of other intellectual property does not excuse SCO's breach of the conditions to its GPL license. Indeed, Section 7 states that notwithstanding any conditions imposed on a GPL licensee by intellectual property, those conditions "do not excuse you from the conditions of this License". (¶ 8.) It further states, "If you cannot distribute so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not distribute the Program at all." (¶ 8.) SCO cannot both breach the GPL and remain licensed under the GPL.

must give the recipients all the rights that you have". (Ex. 128, Preamble; ¶ 3.)

- SCO also purported to prohibit its own Linux sublicensees and other Linux licensees from further sublicensing or distributing Linux. (¶¶ 23-24.) This restriction also violates the GPL – including Sections 4 and 6 – because all GPL licensees are entitled to sublicense and distribute Linux. (Ex. 128 §§ 1-3, 6; ¶¶ 3-8.)

These indisputable violations of the GPL establish that SCO's motion against IBM's counterclaim for breach of the GPL (Sixth Counterclaim) and promissory estoppel (Seventh Counterclaim) must fail. On the contrary, summary judgment as to liability should be granted in IBM's favor on these counterclaims.

## II.     SCO INFRINGED IBM'S COPYRIGHTS.

SCO seeks summary judgment on IBM's copyright infringement counterclaim (Eighth Counterclaim), on the theory that it was licensed to use, copy, distribute and sublicense IBM's Copyrighted Works, by virtue of the GPL. But once SCO repudiated and breached the GPL, it had no rights under that license, and it never had any rights to the IBM Copyrighted Works from any other source. [15] IBM indisputably owns the copyrights to the IBM Copyrighted Works. (IBM Copy. Br. at 17.) As a result – and as summarized below and laid out in more detail in the

---

[15] SCO's frontal attack on the GPL is ironic and self-defeating: If it were true (and it is not) that the GPL is void, then SCO never had a license to Linux or IBM's Copyrighted Works, and was infringing IBM's copyrights for the entire time period that SCO copied and distributed the IBM Copyrighted Works. As the GPL states, "You are not required to accept this License . . . . However, nothing else grants you permission to modify or distribute the [IBM Copyrighted Works] or [their] derivative works." (Ex. 128 § 5; Ex. 129 § 9; ¶ 15.)

Indeed, because IBM has licensed the IBM Copyrighted Works only pursuant to the GPL (¶ 10), it would be SCO's burden to prove that a license authorizing its use of the IBM Copyrighted Works exists if the GPL were void (as it is not). See Carson v. Dynegy, Inc., 344 F.3d 446, 451 n. 5 (5th Cir. 2003) (noting that because existence of license is affirmative defense, defendant "bears the burden of proving that such a license exists"); Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995) (stating where issue is whether license is held by accused infringer, "it is sensible to place upon [accused infringer] the burden of coming forward with evidence of a license"). See also 3 Nimmer on Copyright § 12.11 (2005). SCO offers no evidence of a license to the IBM Copyrighted Works other than the GPL.

IBM Copyright Counterclaim Brief – SCO's violation of IBM's copyrights follows inescapably from SCO's repudiation and breaches of the GPL.  (See IBM Copy. Br. at 20-21.)

    A.    <u>Because SCO Breached the GPL, its License to the IBM Copyrighted Works Terminated.</u>

        1.    SCO's license to the IBM Copyrighted Works "automatically terminated" upon its breach.

The language of the GPL is unambiguous with respect to termination of rights.  Section 4 provides that "any attempt" to "copy, modify, sublicense or distribute the Program", "except as expressly provided" under the GPL, "is void, and will automatically terminate your rights under this License".[16]  (Ex. 128 § 4; ¶ 7.)  The word "automatic" means "acting or operating in a manner essentially independent of external influence or control" or "self-regulating".  <u>Am. Heritage College Dictionary</u> 96 (4th ed. 2004).  The phrase "automatically terminates", therefore, indicates that termination becomes effective at the time of "any attempt otherwise to copy, modify, sublicense or distribute the Program", without requiring or being contingent on any further action by the licensors.  Because SCO violated the terms of the GPL in material (and indeed central) ways, any rights it previously had to the IBM Copyrighted Works "automatically terminated" at the time of the violation.[17]  (¶¶ 4, 25-27.)

---

[16] <u>See</u> Dennis M. Kennedy, <u>A Primer on Open Source Licensing Legal Issues: Copyright, Copyleft, and Copyfuture</u>, 20 St. Louis U. Pub. L. Rev. 345, 360 (2001) (noting that a party's rights under the GPL automatically terminate if it attempts to sublicense works subject to the GPL on terms other than those "expressly provided under the GPL").  (Ex. 576.)

[17] The pair of Eleventh Circuit cases cited by SCO – which apply Florida law – are inapposite for at least two reasons.  (SCO Br. at 10.)  <u>First</u>, the cases do not involve licenses with automatic termination provisions.  SCO's rights automatically terminated pursuant to GPL § 4 when SCO repudiated and breached the GPL.  No additional action by IBM was required to terminate the license.  (¶¶ 4, 25-27.)  <u>Second</u>, the recoveries sought by plaintiffs in the cited cases bear no relation to the recovery sought by IBM.  In each Florida case, the breach was a failure to pay fees owed, and the plaintiff sought both to recover those fees under the contract and to recover damages for copyright infringement for the same period.  Both courts recognized that use of the copyrighted work absent or outside the scope of the license would have supported a claim for copyright damages.  <u>See</u> <u>MCA Television Ltd v. Public Interest Corp.</u>, 171 F.3d

2.  SCO knew, or should have known, that its license to the IBM Copyrighted Works had terminated and that it was infringing IBM's copyrights.

SCO suggests in its statement of "undisputed" fact no. 24 that SCO lacked notice of its copyright infringement prior to IBM's filing its counterclaim. On the contrary, SCO was on notice that it was infringing because it knew, or should have known, that its rights under the GPL automatically terminated at the time it violated the GPL.

SCO is an experienced participant in the software industry and historically – until some time after it launched this lawsuit – a Linux company. (¶¶ 12-13.) And it is indisputable that SCO had copies of the GPL and regularly licensed software to others under the terms of the GPL prior to 2003. (¶ 13.) Given these facts, SCO cannot credibly assert that it lacked notice that it had violated the GPL and that violating the GPL would terminate its rights under that license. Cf. N.A.S. Imp., Corp. v. Chenson Enters., Inc., 968 F.2d 250, 253 (2d Cir. 1992) (concluding more likely than not that seller of handbags "in a market rife with knock-offs" knew the bags were counterfeit); Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., 807 F.2d 1110, 1115 (2d Cir. 1986) (concluding that because of position in publishing market as experienced publisher, publisher had constructive notice of his own willful copyright infringement). Certainly, the contrary inference is amply sufficient to defeat summary judgment. SCO,

---

1265, 1275 (11th Cir. 1999) ("Of course copyright protections remain in the background to ensure that licensees do not use materials in ways that exceed the scope of their licenses."); Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 753-54 (11th Cir. 1997) ("This is not a case where payment of JMI's costs and public recognition of authorship were made conditions precedent to the granted right to play. In such a case, absent performance of the conditions, the 'license' would not have issued and the Miracle's public performances of the song would have violated JMI's copyright." (citation omitted)). These courts merely sought to avoid a double recovery on the facts before them, and IBM seeks no double recovery. Furthermore, even if it were true that IBM's contract and copyright claims present a risk of double recovery (as they do not), that would affect the entry of IBM's damage award in the final judgment, not SCO's liability. See Bowers v. Baystate Techs., Inc., 320 F.3d 1317, 1327 (Fed. Cir. 2003) (concluding "entirely appropriate" for district court to permit jury separately to consider and award damages on contract and copyright claims, and affirming reduction of final damage award to prevent double recovery).

therefore, knew or should have known that it was distributing IBM's Copyrighted Works without a license to do so, and was thus infringing IBM's copyrights in those works (as well as copyrights held by many others in other works contributed to and comprising parts of Linux).

 **B.**   <u>SCO Continued Copying and Distributing the IBM Copyrighted Works without a License to do so.</u>

Copyright infringement consists of the unauthorized performance of acts (such as copying, modifying, and sublicensing) that the copyright holder has the exclusive right to perform. 17 U.S.C. § 501; <u>Gates Rubber Co. v. Bando Chem. Indus. Ltd.</u>, 9 F.3d 823, 831-32 (10th Cir. 1993). There is no dispute that SCO has repeatedly copied the IBM Copyrighted Works. (¶ 14.) Nor is there any legitimate dispute that SCO continued to copy the IBM Copyrighted Works after it breached the GPL and thus after its license under the GPL had terminated. (¶¶ 14, 27.) Indeed, SCO continued to copy and distribute Linux on the Internet as recently as August of this year.[18] (¶ 27.)

 **C.**   <u>SCO's Attacks on the Enforceability of the GPL are Without Merit.</u>

SCO's assertions that the GPL is unenforceable are without merit.

<u>First</u>, SCO submits that "public policy" favors protecting intellectual property rights and encouraging settlements. (SCO Br. at 13.) This is true but irrelevant. "Protecting intellectual property" in no way weighs against letting intellectual property owners such as IBM license their property to all at no charge subject to terms such as those provided by the GPL, for the purpose of promoting Free Software – any more than it precludes patent holders from permitting industry

---

[18] SCO's infringement is not excused by SCO's purported "obligations to its customers" (as SCO suggests in its statement of "undisputed" facts Nos. 20-22). <u>Why</u> a copyright infringer infringes simply is not relevant to determining liability. <u>See</u> <u>Pinkham v. Sara Lee Corp.</u>, 983 F.2d 824, 829 (8th Cir. 1992) (explaining that "the defendant's intent is simply not relevant"); <u>Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.</u>, 807 F.2d 1110, 1113 (2d Cir. 1986) ("Even an innocent infringer is liable for infringement.").

participants to practice their inventions on a royalty-free basis, subject to restrictions, for the purpose of promoting industry standards.[19]  Nor does the public policy favoring "settlements" empower SCO to create an artificial dispute, and then "settle" that dispute by charging license fees and imposing restrictions in violation of the GPL.  Public policy certainly does not favor <u>all</u> "settlements".  <u>See, e.g.</u>, <u>Cofield v. Ala. Public Service Comm'n</u>, 936 F.2d 512, 516 (11th Cir. 1991) (affirming district court dismissal of suit by pro-se litigant found to be "a con-artist who sought to use the legal system to extort settlements from unsuspecting parties").

 <u>Second</u>, SCO suggests (as it has previously claimed explicitly) that the GPL violates the antitrust laws.  (<u>See</u> SCO Br. at 13-14; ¶¶ 18-19.)  The Seventh Circuit recently rejected SCO's position and concluded: "The GPL and open-source software have nothing to fear from the antitrust laws".  <u>Wallace v. Int'l Bus. Mach. Corp.</u>, No. 06-2454, – F.3d –, slip op. at 5-6 (7th Cir. Oct. 26, 2006) (Ex. A hereto) (rejecting arguments that the GPL restrains trade and constitutes illegal "price fixing").  The only other U.S. courts that have spoken to the competitive implications of the GPL, including the district court affirmed in <u>Wallace</u>, similarly have rejected SCO's position.  Those courts concluded that the GPL "encourages, rather than discourages, free competition" and benefits consumers.  <u>Wallace v. Free Software Foundation</u>, No. 05-0618, 2006

---

 [19] <u>See, e.g.</u>, <u>Silicon Image, Inc. v. Genesis Microchip Inc.</u>, 395 F.3d 1358, 1359 (Fed. Cir. 2005) (describing patent owner who granted limited royalty-free license to patent claims necessarily infringed by anyone practicing industry standard in order to "foster and develop the standard and have it adopted industry-wide"); <u>Intel Corp. v. VIA Techs., Inc.</u>, 319 F.3d 1357, 1359 (Fed. Cir. 2003) (noting that Intel granted a limited royalty-free cross-license "to all those interested in complying with" an Intel-promulgated industry standard).

 Neither case cited by SCO offers any comfort to SCO's attempt to find shelter in a public policy favoring the protection of intellectual property rights – after its blatant disregard of the intellectual property rights of IBM.  <u>See</u> <u>San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n</u>, 161 F.3d 1347, 1363 (Fed. Cir. 1999); <u>Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 612 (1st Cir. 1988) (It is "virtually axiomatic that the public interest can only be served by upholding copyright protections" (citation and quotation marks omitted).).  (<u>See</u> IBM Copy. Br. at 22.)

WL 2038644, at * 3 (S.D. Ind. Mar. 20, 2006) (Ex. B hereto); see Wallace v. Int'l Bus. Mach.

Corp., No. 05-678, 2006 WL 1344055, at * 2 (S.D. Ind. May 16, 2006) (Ex. C hereto).

Moreover, SCO cites no evidence – expert or otherwise – that would permit summary judgment

in its favor on this basis.

### III.   SCO'S GPL VIOLATIONS HARMED, AND CONTINUE TO HARM, IBM.

Finally, SCO is wrong in asserting that IBM was not damaged by SCO's conduct – and

that SCO is thus entitled to summary judgment on IBM's Sixth Counterclaim (breach of the

GPL) and Seventh Counterclaim (promissory estoppel).  (See SCO Br. at 5 n.1; SCO's Mem. in

Support of Its Motion for Summary Judgment on IBM's Second, Third, Fourth, and Fifth

Counterclaim at 12-15.)

A.   SCO Financially Damaged IBM, and IBM is In Any Event Entitled to Nominal Damages.

SCO's GPL violations entitle IBM to at least nominal damages on the Sixth

Counterclaim for breach of the GPL.  See Bair v. Axiom Design LLC, 20 P.3d 388, 392 (Utah

2001) (explaining that it is "well settled" that nominal damages are recoverable upon breach of

contract); Kronos, Inc. v. AVX Corp., 612 N.E.2d 289, 292 (N.Y. 1993) ("Nominal damages are

always available in breach of contract action".).  Thus, SCO's footnoted damages argument is no

basis for summary judgment as to liability.  Moreover, IBM has proffered expert evidence that it

was financially damaged by SCO's violations of the GPL.

First, as IBM expert Professor J. R. Kearl will testify at trial, under the methodology of

SCO's own experts (offered in support of SCO's affirmative case), IBM has suffered

quantifiable damages resulting from SCO's wrongful conduct, including its GPL violations.  (¶

28; Ex. 591 ¶¶ 1.C, 33-34.)

Second, it is the opinion of Professor Kearl, based upon the detailed analysis presented in his reports,

Professor Kearl has determined, and will opine at trial using the methodology set out in his expert reports,

### SECTION REDACTED

These opinions, together with the facts and data upon which they are based, and the other opinions expressed by Professor Kearl, present a reasonable and reliable opinion that is sufficient to create a genuine issue of material fact as to IBM's damages.  This is especially so when this evidence is considered in the light most favorable to IBM, as it must be on SCO's motion for summary judgment.  See, e.g., Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917, 931 (6th Cir. 2005).[21]

B.     IBM is Entitled to Injunctive and Declaratory Relief.

Furthermore, even if it were true (as it is not) that IBM has suffered no damage as a result of SCO's GPL violations, summary judgment on these counterclaims would not be appropriate because IBM seeks injunctive and declaratory relief in addition to damages on its Sixth and Seventh Counterclaims.  To obtain injunctive relief, IBM must establish: "(1) actual success on

---

[20] As IBM argues elsewhere, attorney fees can constitute compensatory damages when incurred to mitigate the harm caused by a defendant's actionable misconduct.  See, e.g., Metro. Opera Assoc. v. Local 100, No. 00-3613, 2005 WL 1712241, at *5-6 (S.D.N.Y. July 19, 2005) (Ex. D hereto) (concluding fees generated during course of mitigating harm from defendant's defamation recoverable notwithstanding "the American Rule" against recovery of attorney fees).

[21] IBM further discusses the financial harm wrought by SCO's actions in its Memorandum in Opposition to SCO's Motion for Partial Summary Judgment on IBM's Second, Third, Fourth and Fifth Counterclaims.

33

the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury

outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if

issued, will not adversely affect the public interest." Prairie Band Potawatomi Nation v.

Wagnon, 402 F.3d 1015, 1019 (10th Cir. 2005) (internal quotation marks omitted).  IBM has

satisfied all four of these factors.

     First, IBM has established actual success on the merits by showing that SCO has

blatantly and repeatedly repudiated and breached the GPL, and has violated IBM's copyrights by

continuing to copy and distribute Linux.  (¶¶ 25-28.)

     Second, SCO's continued copying of IBM Copyrighted Works – as recently as August of

this year – demonstrates a likelihood that SCO will continue to breach the GPL and infringe

IBM's copyrights.  (¶ 27.)  Where the wrong is copyright infringement, irreparable harm absent

an injunction is presumed upon such a showing.  See Country Kids 'N City Slicks, Inc. v. Sheen,

77 F.3d 1280, 1288-89 (10th Cir. 1996) (presuming irreparable harm at preliminary injunction

stage); see also Concrete Machinery Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611

(1st Cir. 1988) (same); CBS Broad., Inc. v. EchoStar Comms. Corp., 450 F.3d 505, 517 n.25

(11th Cir. 2006) (presuming irreparable harm at permanent injunction stage).

     Moreover, even if SCO were to establish on this motion (as it cannot) that IBM has not

demonstrated compensable harm, that would be so only because the damages flowing from

SCO's GPL violations are difficult to measure.  SCO's violations have cast fear, uncertainty and

doubt on the GPL and thereby upended the foundation of IBM's (and other GPL licensors' and

licensees') Linux-related businesses, which are built on the free availability of Linux under the

GPL.  Thus, "irreparable harm" to IBM is established by the fact that it would be difficult to

measure the harm or to fashion an adequate remedy at law.  See Ticor Title Ins. Co. v. Cohen,

173 F.3d 63, 69 (2d Cir. 1999) (irreparable harm found where "it would be very difficult to calculate monetary damages that would successfully redress the" loss of business wrought by breach of non-compete agreement); Liveware Publ'g Inc. v. Best Software Inc., Nos. 04-1788, 04-2028, 125 Fed. Appx. 428, 431-433 (not precedential) (3d Cir. Mar. 8, 2005) (Ex. E hereto) (defendant caused irreparable harm to plaintiff's business relationships by threatening plaintiff's business partners and end users with copyright infringement litigation, and actually suing one such partner).

Third, the threatened injury to IBM outweighs the harm that an injunction may cause SCO. Indeed, SCO states no facts on this motion indicating that it would suffer any harm from an injunction. Furthermore, because SCO has violated the GPL – its only license to the IBM Copyrighted Works – any "injury" that SCO might suffer if enjoined from further breach of that license should be given no weight at all. See Autoskill, 994 F.2d at 1498 (even "devastating" impact on infringer's business would merit little consideration, as infringer "cannot be permitted to construct its business around infringement" (internal quotation omitted)).

Fourth, an injunction will advance, not harm, the public interest. The GPL protects not just the copyrights of IBM and other GPL licensors, but also GPL licensees and end users of software developed under the Free Software model. (See ¶¶ 1-2.) The public interest factor, therefore, weighs in favor of the issuance of an injunction because an injunction will (1) uphold copyright protections, see Autoskill, 994 F.2d at 1499, and (2) protect the public interest in the GPL and Free Software, cf. Wallace v. Free Software Foundation, No. 05-0618, 2006 WL 2038644, at * 3 (noting benefits to consumers of GPL); Wallace v. Int'l Bus. Mach. Corp., No. 05-678, 2006 WL 1344055, at * 2 (same).

## Conclusion

For the foregoing reasons, SCO's motion for partial summary judgment dismissing IBM's Sixth, Seventh, and Eighth Counterclaims must be denied.

DATED this 10th day of November, 2006.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Roger G. Brooks
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff International*
*Business Machines Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of November, 2006, a true and correct copy of the foregoing was served by electronic mail, pursuant to the agreement of the parties, on the following:

>Brent O. Hatch
>HATCH, JAMES & DODGE, P.C.
>10 West Broadway, Suite 400
>Salt Lake City, Utah 84101
>bhatch@hjdlaw.com
>
>Edward Normand
>BOIES, SCHILLER & FLEXNER, LLP
>333 Main Street
>Armonk, New York  10504
>TNormand@BSFLLP.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of November, 2006, a true and correct copy

of the foregoing was electronically filed with the Clerk of the Court and delivered by

CM/ECF system to the following:

        Brent O. Hatch
        Mark F. James
        HATCH, JAMES & DODGE, P.C.
        10 West Broadway, Suite 400
        Salt Lake City, Utah 84101

        Stephen N. Zack
        Mark J. Heise
        BOIES, SCHILLER & FLEXNER LLP
        100 Southeast Second Street, Suite 2800
        Miami, Florida 33131

                                  /s/ Todd M. Shaughnessy