SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S REDACTED MEMORANDUM IN OPPOSITION TO SCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON IBM'S SECOND, THIRD, FOURTH AND FIFTH COUNTERCLAIMS**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

RECEIVED CLERK

2006 NOV 10  P 6: 35

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>    Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff. | **IBM'S MEMORANDUM IN OPPOSITION TO SCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON IBM'S SECOND, THIRD, FOURTH AND FIFTH COUNTERCLAIMS**<br><br>**FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

# TABLE OF CONTENTS

Page(s)

Preliminary Statement...................................................................................................1

Material Facts Requiring Denial of SCO's Motion ........................................................3

    A.    SCO's Business............................................................................................4

    B.    Failure of SCO's Business ...........................................................................5

    C.    SCO's Scheme .............................................................................................6

    D.    False Claims of Trade Secret Misappropriation ...........................................7

    E.    SCO's Disparagement of Linux.....................................................................7

    F.    SCO's Disparagement of AIX and Dynix ...................................................10

    G.    SCO's Misuse of Intellectual Property ........................................................11

    H.    Fact and Scope of Injury to IBM. ...............................................................14

    I.    IBM's Counterclaims..................................................................................15

Response to Plaintiff's Factual Allegations .................................................................17

Standard of Decision...................................................................................................20

Argument ....................................................................................................................20

I.    SCO'S MISCONDUCT IS NOT PRIVILEGED. ...............................................21

II.    SCO'S GOOD FAITH ARGUMENTS FAIL. ....................................................25

III.    IBM HAS PRESENTED SUFFICIENT EVIDENCE OF DAMAGES. ...................29

Conclusion ..................................................................................................................34

**Table of Authorities**

Page(s)

Cases

Allard v. Arthur Andersen & Co. (USA), 924 F. Supp. 488 (S.D.N.Y. 1996) .............................. 33

Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 411 (D.N.J. 2005) ............................... 23

Asay v. Hallmark Cards, Inc., 594 F.2d 692 (8th Cir. 1979) .......................................................... 25

Baltimore Orioles, Inc. v. Major League Baseball Players, 805 F.2d 663 (7th Cir. 1986) ....................................................................................................................... 32

Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc., 190 F. Supp. 2d 407 (S.D.N.Y. 2002) ............................................................................................................... 37

Brehany v. Nordstrom, Inc., 812 P.2d 49 (Utah 1991) .......................................................... 23, 24, 25

Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296 (2d Cir. 2004) ....................................... 32

Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear, Inc., 608 F. Supp. 1187 (S.D.N.Y. 1985) ................................................................................................................................ 22

Buckley v. Fitzsimmons, 509 U.S. 259 (1993) ............................................................................. 23

Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc., 438 F. Supp. 2d. 1288 (D. Colo. 2006) .................................................................................................................. 22

Car-Freshner Corp. v. Big Lots Stores, Inc., 314 F. Supp. 2d 145 (N.D.N.Y. 2004) .................. 33

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................................... 20

Claussen Immunotherapies, Inc. v. King Pharms. Inc., 403 F. Supp. 2d 451 (D. Md. 2005) ................................................................................................................ 22

DeBry v. Godbe, 992 P.2d 979 (Utah 1999) ............................................................................... 22

Edelson v. Ch'ien, 352 F. Supp. 2d 861 (N.D. Ill. 2005) ............................................................ 23

Genesco Entm't v. Koch, 593 F. Supp. 743 (S.D.N.Y. 1984) ..................................................... 31

Genesee Brewing Co. v. Stroh, 124 F.3d 137 (2d Cir. 1997) ..................................................... 31

Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. 1060 (S.D.N.Y. 1991) ...................... 31

Hogan v. Herald Co., 446 N.Y.S.2d 836 (App. Div. 1982)............................................ 36

Hutchinson v. Pfeil, 105 F.3d 562 (10th Cir. 1997) .................................................... 20

In re Grandote Country Club Co., 252 F.3d 1146 (10th Cir. 2001)............................... 20

ISCO Int'l Inc. v. Conductus, Inc., 279 F. Supp. 2d 489 (D. Del. 2003) ...................... 31

Johnson v. Riddle, 443 F.3d 723 (10th Cir. 2006)......................................... 20, 23, 24

Kennedy v. Cannon, 229 Md. 92 (1962) .................................................................. 23

Kiernan v. Williams, 2006 WL 2418861 (N.J. App. Div. Aug, 23, 2006).................... 25

Kleier Adver., Inc. v. Premier Pontiac, Inc., 921 F.2d 1036 (10th Cir. 1990)............. 22

Koppers Co. v. Krupp-Koppers GmbH, 517 F. Supp. 836 (W.D.Pa. 1981)................. 30

Laser Diode Array, Inc. v. Paradigm Lasers, Inc., 964 F. Supp. 90 (W.D.N.Y.
    1997) ........................................................................................................... 29

Lawrence v. Moss, 639 F.2d 634 (10th Cir. 1981)..................................................... 26

Lee v. City of Rochester, 663 N.Y.S.2d 738 (N.Y. Sup. Ct. 1997)............................. 23

Mennen Co. v. Gillette Co., 565 F. Supp. 648 (S.D.N.Y. 1983) ................................ 30

Metro. Opera Assoc. v. Local 100, No. 00-3613, 2005 WL 1712241 (S.D.N.Y.
    July 19, 2005)................................................................................................ 36

Muirhead v. Zucker, 726 F. Supp. 613 (W.D. Pa. 1989) ........................................... 23

Nash v. CBS, Inc., 704 F. Supp. 823 (N.D. Ill. 1989) ............................................... 32

Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d
    1143 (10th Cir. 2000)...................................................................................... 37

Noble Fiber Techs., LLC v. Argentum Med., LLC, No. 3:05-CV-01855, 2006 WL
    1793219 (M.D. Pa. June 27, 2006) ................................................................. 31

Novodzelsky v. Astor, Weiss & Newman, No. 94-2407, 1994 WL 665682 (E.D.
    Pa. Nov. 17, 1994) ......................................................................................... 23

Parfums Stern Inc. v. Int'l Trade and Export Co., Inc., No. 89- 2086, 1991 WL
    84757 (S.D.N.Y. May 13, 1991)...................................................................... 33

Procter & Gamble Co. v. Cheesebrough-Pond's, Inc., 747 F.2d 114 (2d Cir. 1984).................... 30

Russell v. Thomson Newspapers, 842 P.2d 896 (Utah 1992) ....................................... 26

SCO Group, Inc. v. Novell, Inc., 377 F. Supp. 2d 1145 (D. Utah 2005)............................... 26, 29

Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917 (6th Cir. 2005) ........................... 36

Spotless Enters., Inc. v. Carlisle Plastics, Inc., 56 F. Supp. 2d 274 (E.D.N.Y.
    1999) ................................................................................... 30

State by Lefkowitz v. Colorado State Christian Coll. of Inner Power, Inc., 346
    N.Y.S.2d 482 (Sup. Ct. 1973) ............................................................ 30

Zenith Elec. Corp. v. Exzec, Inc., 182 F.3d 1340 (Fed. Cir. 1999) ......................... 29, 32

Zoumadakis v. Uintah Basin Med. Ctr., Inc., 122 P.3d 891 (Utah 2005).................... 24

## Statutes & Administrative Codes

15 U.S.C. § 1117(a) ................................................................... 33

35 U.S.C. § 287 ....................................................................... 29

DUCivR 56-1(b) ...................................................................... 23

Fed. R. Civ. P. 56(c) ............................................................... 20, 23

N.Y. Gen. Bus. Law § 349 ........................................................... 28

Utah Code Ann. § 78-27-56 ......................................................... 33

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in opposition to the motion of Plaintiff/Counterclaim-Defendant The SCO Group, Inc. ("SCO") for partial summary judgment on IBM's Second, Third, Fourth, and Fifth Counterclaims.[1]

## **Preliminary Statement**

SCO has for years engaged in a campaign to create fear, uncertainty, and doubt about IBM's products and services.  As part of this campaign, SCO has disparaged IBM; made false and misleading statements to the press and IBM's customers about IBM's AIX, Dynix, and Linux products and/or services; and abused and misused its intellectual property rights.  To avoid responsibility for its misconduct, SCO seeks summary judgment on IBM's counterclaims for violation of the Lanham Act (Count 2), common law unfair competition (Count 3), tortious interference (Count 4), and violation of Section 349 of the New York General Business Law ("Section 349") (Count 5).  SCO's motion is contrary to both the facts and the law and should, therefore, be denied.  None of the arguments on which SCO relies in support of its motion bears scrutiny.

First, SCO argues that it is shielded from liability for its misconduct based on an absolute litigation privilege and an unidentified, qualified privilege.  However, SCO bases these arguments upon a mischaracterization of IBM's counterclaims, which are not limited to the conduct described by SCO in its motion (i.e., baseless litigation and statements about that litigation).  IBM's counterclaims focus upon an extensive pattern of disparagement and

---

[1] The facts set forth in this memorandum are supported by the documents and declarations submitted herewith or incorporated herein, including those appended to the September 25, 2006, and November 10, 2006, declarations of Todd M. Shaughnessy, which are cited herein as "Ex. __ ".

misrepresentation, waged by SCO through the press and meetings with IBM customers and prospective customers, of which baseless litigation and statements about it are but a part. SCO has failed to carry its burden of establishing the applicability of either privilege, and a proper examination of the actual substance of IBM's counterclaims demonstrates that, in any event, neither privilege could apply to SCO's misconduct. (See Section I.)

Second, SCO argues that good faith is a defense to each of IBM's counterclaims and that the undisputed evidence establishes SCO's good faith. SCO is wrong on both points. Here again, SCO has failed to introduce evidence sufficient to meet its burden to establish the purported defense. The evidence on which SCO relies does not support its assertion of good faith as to the challenged misconduct. Moreover, the record reflects ample evidence of SCO's bad faith, which, at a minimum, creates a material factual dispute precluding the entry of summary judgment. Finally, even were there no dispute as to SCO's state of mind, good faith is not a defense to IBM's Lanham Act and Section 349 claims. (See Section II.)

Third, SCO claims that IBM has failed to offer any evidence of damages. SCO makes this claim despite the existence of clear evidence offered by IBM of numerous categories of damages that IBM has suffered as a result of SCO's misconduct, including, for example, lost profits and mitigation costs associated with defending against SCO's claims. (See Section III.)

For these reasons, IBM respectfully submits that SCO's motion for summary judgment on the counterclaims at issue should be denied.

## <u>Material Facts Requiring Denial of SCO's Motion</u>

In support of its motion, SCO relies on eight paragraphs of allegedly undisputed facts, which are addressed in the section that follows.[2]  (SCO Br. at 1-3.)  SCO fails to mention the facts set out in the motions for summary judgment filed by IBM on September 25, 2006.  Those facts, which are undisputed, are relevant to this motion and incorporated in their entirety herein by reference.

Of particular importance are the facts set out in the following paragraphs of the following motions:[3]

| Motion | Relevant Paragraphs |
|---|---|
| IBM's Unfair Competition Brief | ¶¶ 7-15, 35 |
| IBM's Contract Brief | ¶¶ 16-106, 114-27, 134-294 |
| IBM's Interference Brief | ¶¶ 1-54, 67 |
| IBM's Non-infringement Brief | ¶¶ 9-139, 146-78, 192-308 |

---

[2] Citations to "SCO Br. at ___" refer to SCO's Memorandum of Law in Support of Its Motion For Summary Judgment on IBM's Second, Third, Fourth, and Fifth Counterclaims, dated September 25, 2006.

[3] References to the memoranda in support of IBM's motions for summary judgment submitted on September 25, 2006, are cited as follows:  IBM's motion for summary judgment on SCO's unfair competition claim as "UC Br. ___"; IBM's motion for summary judgment on SCO's contract claim as "K Br. ___"; IBM's motion for summary judgment on SCO's interference claims as "Interference Br. ___"; IBM's motion for summary judgment on SCO's copyright claims as "AIX Br. ___"; IBM's motion for summary judgment for copyright infringement (IBM's Eighth Counterclaim) as "Copyright Br. ___"; and IBM's motion for summary judgment for a declaration of non-infringement (IBM's Tenth Counterclaim) as "DJ Br. ___".

Moreover, the following additional facts are relevant to counterclaims at issue and the misconduct described therein.[4]

A.      SCO's Business

1.      SCO was founded as Caldera, Inc. in 1994 (Ex. 105 at 29-31; Ex. 221 ¶ 16), approximately 25 years after the beginning of the development of the UNIX operating system and three years after Linus Torvalds began the development of the Linux operating system. (Ex. 272 ¶ 3; Ex. 398 at SCO 135598.)

2.      SCO began its business as a developer and distributor of the Linux operating system.  (Ex. 105 at 29-31; Ex. 221 ¶ 17; Ex. 107 at 6, 31; Ex. 193 ¶ 7; Ex. 242 ¶ 6.)  By 2001, according to SCO, it had the world's largest Linux channel with more than 15,000 resellers worldwide.  (Ex. 470 at 12-13; Ex. 221 ¶ 92.)

3.      SCO has developed and marketed software based on the Linux operating system and provided related services that enable the development, deployment, and management of Linux-specialized servers.  (Ex. 221 ¶ 17; Ex. 107 at 6, 31; Ex. 193 ¶¶ 7-11; Ex. 176 ¶ 4-5.)

4.      In addition to distributing Linux products, SCO facilitated the adoption of Linux by providing education programs designed to help its customers to develop, deploy, and administer Linux systems (Ex. 5 ¶ 35; Ex. 107 at 4; Ex. 221 ¶ 62), and joined with other Linux vendors to form UnitedLinux, LLC ("UnitedLinux"), an initiative to streamline Linux

---

[4] Given the narrow focus of SCO's motion, we do not set out here all of the facts that support IBM's counterclaims, only those necessary to demonstrate that summary judgment would be inappropriate.

development and certification around a global, uniform distribution of Linux for business.  (Ex. 5 ¶ 35; Ex. 221 ¶¶ 94-96; Ex. 348.)

B.      Failure of SCO's Business

5.      Although it completed an initial public offering, SCO has failed to establish a successful business around Linux.  (Ex. 5 ¶ 49; Ex. 110 at 26; Ex. 221 ¶¶ 79-80; Ex. 186 ¶¶ 63-71.)  In fact, SCO's Linux business has never generated a profit.  (Ex. 5 ¶ 49; Ex. 106 at 10.)

6.      In an attempt to revive its faltering Linux business, SCO acquired from The Santa Cruz Operation, Inc. ("Santa Cruz") certain rights to UNIX operating systems originally developed by Bell Laboratories and undertook the unification of the UNIX and Linux operating systems.  (Ex. 5 ¶¶ 1, 8, 50; Ex. 3 ¶¶ 1, 23; Ex. 64 ¶ 1; Ex. 221 ¶¶ 85-87.)

7.      Following its acquisition of these UNIX assets, SCO described its business plan as being to integrate its Linux-based products and services with its UNIX-based products and services as a way of encouraging businesses to adopt the open-source, Linux-based operating systems.  (Ex. 221 ¶ 87; Ex. 347.)

8.      In pursuit of this strategy, SCO designed SCO Linux to permit existing UNIX-based users to migrate to Linux.  (Ex. 106 at 5; Ex. 221 ¶ 87.)  In addition, SCO marketed and sold a number of UNIX products, including UnixWare, SCO OpenServer, Reliant HA, and Merge, and SCO's Global Professional Services assisted customers in developing and deploying unified UNIX and Linux solutions through consulting and custom engineering services.  (Ex. 31 at Response No. 11; Ex. 5 ¶ 33.)

9.      Like SCO's original Linux business, however, this enterprise failed.  (Ex. 5 ¶ 49; Ex. 106 at 10.)

C.      SCO's Scheme

10.      With no other prospects, SCO shifted its business model again — this time undertaking to create fear, uncertainty, and doubt in the marketplace, from which it hopes to profit, in regard to IBM's products and services.  (Ex. 283 ¶ 125.)

11.      Recognizing that there is little value in its purported rights to the UNIX technology (Ex. 221 ¶ 85), SCO undertook to create the false perception that its alleged UNIX rights permit it also to control IBM's AIX and Dynix operating systems and Linux.  (See Ex. 5 ¶ 64; Ex. 362; Ex. 366.)

12.      In addition to pursuing baseless litigation against IBM and others, SCO: (1) misrepresented and disparaged IBM as having misappropriated SCO's trade secrets and dumped those trade secrets into Linux, thereby destroying the value of UNIX (see, e.g., Ex 1; Ex. 367; Ex. 368; Ex. 369); (2) misrepresented and disparaged Linux as infested with gargantuan amounts of infringing SCO code (see, e.g., Ex. 5 ¶ 64; Ex. 362; Ex. 480); (3) misrepresented and disparaged AIX as unlawful and an unauthorized derivative owned by SCO (see, e.g., Ex. 246; Ex. 601; Ex. 602; Ex. 603); and (4) misused SCO's alleged intellectual property rights regarding UNIX (see, e.g., Ex. 5 ¶ 64; Ex. 362; Ex. 213 ¶ 48; Ex. 122; Ex. 123; Ex. 124; DJ Br. ¶¶ 198-219, 235-85).

6

D.    False Claims of Trade Secret Misappropriation

13.    SCO falsely accused IBM of misappropriating SCO trade secrets in UNIX System V and dumping them into Linux.  (See, e.g., Ex. 1; Ex. 367; Ex. 368; Ex. 369.)

14.    In a March 7, 2003, interview, for example, SCO, through its CEO Darl McBride, stated that "IBM has taken our valuable trade secrets and given them away to Linux".  (Ex. 605.)

15.    SCO also included its baseless claim of trade secret theft in a succession of complaints against IBM.  (Ex. 1; K. Br. ¶¶ 172-75.)

16.    In fact, there are no trade secret rights with respect to UNIX System V, as counsel for SCO acknowledged during a hearing in December 2003.  (Ex. 414 at 46:2-3.)

17.    Moreover, as the purported owner of UNIX System V, SCO knew or reasonably should have known that there are no trade secrets in UNIX System V at the time it made its statements.  UNIX System V has been widely available for over 20 years, was distributed by SCO's alleged predecessors in interest without any confidentiality restrictions, and was detailed in hundreds, if not thousands, of published books, articles, internet websites, and other materials. (K. Br. ¶¶ 96-106.)

E.    SCO's Disparagement of Linux

18.    SCO publicly misrepresented its rights and IBM's products and services by falsely claiming that IBM dumped "gargantuan" amounts of infringing UNIX code into Linux. (See, e.g., Ex. 5 ¶ 64; Ex. 362; Ex. 480.)

19.     For example:

(a)     In May 2003, SCO sent letters to 1,500 of the world's largest corporations claiming that Linux infringed SCO's UNIX intellectual property rights.  (See, e.g., Ex. 141.)

(b)     In an interview with CNet News.com in August 2003, SCO, through its CEO Darl McBride, claimed that SCO had found a "mountain of code" improperly contributed to Linux and that the "DNA of Linux is coming from UNIX".  (Ex. 367 at 1.)

(c)     In a teleconference with analysts and reporters on May 30, 2003, SCO, through its CEO Darl McBride, stated:  "Everybody's been clamoring for the code — show us two lines of code.  We're not going to show two lines of code, we're going to show hundreds of lines of code.  And that's just the tip of the iceberg of what's in this." (Ex. 368 at 1.)

(d)     In May or June 2003, in an interview with Computerworld reporter Patrick Thibodeau, SCO, through its Senior Vice President Chris Sontag, stated that the number of lines of code in the Linux kernel that were a direct copyright violation is "very extensive".  (Ex. 478.)

(e)     In June 2003, in an interview with CNET News, SCO, through its CEO Darl McBride, stated:  "We're not talking about just lines of code; we're talking about entire programs.  We're talking about hundreds of thousands of lines of code."  (Ex. 479 at 3.)

(f)     In July 2003, in an interview with Business Week, SCO, through its CEO Darl McBride, stated that the amount of Linux code infringing on SCO's intellectual property rights is "gargantuan", and that any attempt to replace the allegedly infringing code with non-infringing code would be a "major challenge". (Ex. 480.)

(g)     On August 18, 2003, at its SCO Forum in Las Vegas, SCO, through its Senior Vice President Chris Sontag, stated that it had uncovered "more than a million lines" of improperly copied UNIX code in Linux. (Ex. 383 at 1.)

(h)     In September 2003, in an interview with Infoconomy, SCO, through its CEO Darl McBride, stated "we counted over a million lines of code that we allege are infringed in the Linux kernel today out of a total code base of five million . . . . The vast majority of that did, in fact, come from IBM." (Ex. 604.)

20.     In fact, in its final disclosures, SCO identified only 326 lines of allegedly infringing UNIX System V code contained in the Linux kernel, a stark contrast to its repeated public assertions that Linux contains a "gargantuan" amount of infringing code. (Ex. 54; Ex. 213 ¶ 98.)

21.     As the Court correctly observed earlier in this case, "[v]iewed against the backdrop of SCO's plethora of public statements concerning IBM's and others' infringement of SCO's purported copyrights in UNIX software, it is astonishing that SCO has not offered any competent evidence to create a disputed fact regarding whether IBM has infringed SCO's alleged copyrights through IBM's Linux activities". (Ex. 57 at 10.)

F.       SCO's Disparagement of AIX and Dynix

22.      SCO's misrepresentations extended to IBM's proprietary UNIX-based operating systems, AIX and Dynix.  (See, e.g., Ex. 247; Ex. 601; Ex. 602; Ex. 603.)

23.      For example, SCO has falsely claimed that it owns and controls AIX and has the right and authority to revoke, and has effectively revoked, IBM's right to use AIX.

(a)      On March 6, 2003, in an interview with eWeek, SCO, through its CEO Darl McBride, stated "IBM has been happily giving part of the AIX code away to the Linux community, but the problem is that they don't own the AIX code".  (Ex. 601.)

(b)      On March 7, 2003, in an interview with eWeek, SCO, through its CEO Darl McBride stated "we do have pretty strong ownership of the AIX code base".  (Ex. 615.)

(c)      On April 24, 2003, in an interview with CRN, SCO, through its CEO Darl McBride, stated "[w]e're the source of AIX . . . It all comes from us." (Ex. 602.)

(d)      In May 2003, in an interview with IDG News Service, SCO, through its Senior Vice President Chris Sontag, stated "[w]e have the ability to withdraw or pull the AIX license on June 13".  (Ex. 603.)

(e)      On June 16, 2003, in a press release, SCO, through its CEO Darl McBride, stated "IBM no longer has the authority to sell or distribute AIX and customers no longer have the right to use AIX software".  (Ex. 247.)

24.      In fact, IBM owns and controls AIX and Dynix; SCO neither owns nor controls any non-UNIX System V parts of AIX or Dynix.  (See Ex. 122; Ex. 124; Ex. 282 ¶¶ 19-20; Ex.

10

189 ¶ 14; Ex. 182 ¶ 18; Ex. 275 ¶¶ 15-16; Ex. 228 ¶¶ 13-14; Ex. 178 ¶¶ 13-16; Ex. 233 ¶¶ 10-13.)

G.     SCO's Misuse of Intellectual Property

25.     SCO has used its alleged rights to exert control beyond the scope of those rights and to extract un-owed royalties from IBM and others in at least the following ways:

(a)     SCO has claimed the right, and taken steps, to control more than one million lines of code in Linux (see, e.g., Ex. 5 ¶ 64; Ex. 362; Ex. 480), but it has rights to no more than 326 lines of code in the Linux kernel according to its own Final Disclosures (see Ex. 54; Ex. 213 ¶ 98).

(b)     SCO has claimed ownership and control of AIX and Dynix (see, e.g., Ex. 247; Ex. 601; Ex. 602; Ex. 603), despite the fact that it neither owns nor controls AIX or Dynix (see Ex. 122; Ex. 124; Ex. 282 ¶¶ 19-20; Ex. 189 ¶ 14; Ex. 182 ¶ 18; Ex. 275 ¶¶ 15-16; Ex. 228 ¶¶ 13-14; Ex. 178 ¶¶ 13-16; Ex. 233 ¶¶ 10-13).

(c)     SCO has claimed certain Linux code infringes its alleged copyrights (e.g., Open Group Header Files) (DJ Br. ¶¶ 282-285), but the intellectual property in that code is owned by third parties such as Berkley Software Design, Inc. ("BSD"), UnitedLinux, and IBM, among others.  (DJ Br. ¶¶ 286-308; Copyright Br. ¶¶ 23-28).

(d)     SCO has claimed certain Linux code infringes its alleged copyrights (see Ex. 54; Ex. 213 ¶ 98), but SCO licensed the code to IBM (DJ Br. ¶¶ 198-219); it is unprotectable by copyright (DJ Br. ¶¶ 235-81); and SCO is estopped from pursuing a claim of infringement relating to it (K Br. at 94-101).

26.   In fact, SCO knew that it did not have the right to control more than one million lines of Linux code because, among other things:

(a)   Novell owns the UNIX copyrights, as indicated by the Asset Purchase Agreement between Novell and Santa Cruz, and the fact that SCO's CEO, Darl McBride, repeatedly asked Novell to transfer the copyrights to SCO, which Novell declined to do (Ex. 123; Ex. 239 ¶¶ 4-16; DJ Br. ¶¶ 34-39);

(b)   SCO transferred its intellectual property rights in most of the code in the Linux kernel to UnitedLinux, as is clear from the face of the UnitedLinux agreements (Ex. 221 ¶¶ 94-100; DJ Br. ¶¶ 114-16);

(c)   SCO's predecessor, Santa Cruz, studied Linux and, according to Michael Davidson, one of Santa Cruz's senior software engineers, Santa Cruz found no evidence of copyright infringement (Ex. 399 at SCO 1272238);

(d)   SCO (then operating under the name Caldera) expressly warranted to IBM in a July 1999 "Strategic Business Agreement" that IBM would be protected against claims of infringement relating to material in SCO's Linux products, and promised that it would hold harmless and indemnify IBM from third party intellectual property rights claims (Ex. 221 ¶¶ 75-76; Ex. 466 at 1710023486; DJ Br. ¶¶ 88-102);

(e)   SCO promoted Linux and urged IBM and others to use it subject to the terms of the GNU General Public License (K Br. ¶¶ 151-70);

(f)   SCO and its predecessors expressly granted IBM and others a license to use Linux and the allegedly infringing code (DJ Br. ¶¶ 88-95); and

12

(g)

**SECTION REDACTED**

27.     SCO knew that it did not own and control AIX because, among other things:

(a)     The plain language of the AT&T UNIX licensing agreements, which SCO purports to own and possess, makes clear that IBM owns its AIX and Dynix products (Ex. 119; Ex. 120; Ex. 121; Ex. 122; Ex. 124; K Br. ¶¶ 16-71);

(b)     AT&T and its successors made clear to IBM that it could do as it wished with its homegrown code (Ex. 119; Ex. 120; Ex. 121; Ex. 122; Ex. 124; K Br. ¶¶ 16-71, 82-95, 114-27, 143, 147);

(c)     SCO and its predecessors waived the right to assert the rights SCO now asserts (K Br. ¶¶ 82-89, 119, 138-43, 156-70, 190-200);

(d)     IBM owns copyrights in its AIX product (AIX Br. ¶¶ 4-44; K. Br. ¶¶ 16-95).

28.     At the same time, SCO failed to disclose the particulars of the alleged infringement, leading to fear, uncertainty, and doubt in the marketplace.  (Ex. 283 ¶ 108.) Indeed, SCO rebuffed requests by the open source community for evidence of the alleged infringement, which would have permitted a potential work-around (Ex. 480; Ex. 608 at 4), and simultaneously capitalized on the marketplace fear, uncertainty, and doubt by selling licenses for the use of Linux (see, e.g., Ex. 224).

H.    Fact and Scope of Injury to IBM

29.    Contrary to SCO's contentions, the conduct underlying IBM's counterclaims has resulted in injury to IBM.  Thus, IBM has sought declaratory and injunctive remedies and damages. (Ex. 4 at 45-47.)

30.    SCO's conduct has resulted in at least three types of damages to IBM:  (1) damages to IBM's Linux business; (2) damages to IBM's AIX business; and (3) mitigation damages. (Ex. 589 ¶¶ 2, 25-26; Ex. 591 ¶ 34-36; Ex. 614 ¶¶ 3-6.)

31.    SCO's actions, including widely representing Linux as an unauthorized derivative of UNIX, threatening to sue (and suing) Linux end users, and attempting to extract a license fee for the use of Linux, have affected the marketplace adoption of Linux.  IBM has made Linux a large part of its business strategy; therefore, decreased adoption of Linux has decreased sales and profits of IBM. (Ex. 589 ¶ 25.)

32.    For instance, SCO, through its CEO Darl McBride, has stated that 20% of customers planning to deploy Linux "slowed down" because of the SCO lawsuit and associated actions.  Furthermore, several industry surveys reveal that SCO's actions have directly impacted IT decisions, with one survey reporting that 4% of respondents in 2003 had stopped Linux deployment plans until the legal issues raised by SCO were resolved. (Ex. 589 ¶ 26.)

33.

SECTION REDACTED

34.                   **SECTION REDACTED**

35.      In addition to resulting in lost IBM profits, SCO's conduct has caused IBM to

incur significant losses to defend itself in the marketplace and in court.  (Ex. 589 ¶ 22-23; Ex.

614.)  Those damages are significant.  (Ex. 614 ¶¶ 4-6.)

I.      IBM's Counterclaims

36.      In response to SCO's scheme, IBM has asserted a number of counterclaims

against SCO, including the four counterclaims at issue in this motion, seeking various forms of

relief including compensatory and punitive damages, injunctive relief, and attorney's fees.  The

counterclaims at issue allege:  (1) violations of the Lanham Act (Count 2); (2) unfair competition

(Count 3); (3) intentional interference with prospective economic relations (Count 4); and (4) a

violation of Section 349 of the New York General Business Law (Count 5).  (Ex. 4; Ex. 589 ¶

11.)

37.      *Lanham Act Violation.*  IBM alleges that SCO has made material false

representations regarding AIX, Dynix, and IBM's Linux-related products and services, some or

all of which have affected customers' decision whether to purchase these products and services.

Specifically, IBM alleges that SCO has publicly misrepresented the legitimacy of these products and services, first, by falsely representing that IBM no longer has the right, authority, and license to use, produce, and distribute these products and, second, by misrepresenting SCO's own rights in and to UNIX, AIX, Dynix, and Linux.  IBM also alleges that SCO has published its false statements in a series of widely-distributed press releases, press interviews, and other streams of commerce as part of its campaign to discredit IBM's products and services in the marketplace, to increase the perceived value of SCO's limited rights to UNIX, and to promote SCO's own UNIX operating systems, UnixWare and Open Server.  (Ex. 4 ¶¶ 119-24; Ex. 589 ¶ 13.)

38.     *Unfair Competition.*  IBM alleges that SCO has intentionally, knowingly, wrongfully, and in bad faith engaged in a public pattern of conduct aimed at depriving IBM of the value of its AIX, Dynix, and Linux-related products and services.  IBM asserts that SCO has misappropriated these products and services for the benefit of SCO's UNIX licensing business as well as SCO's competing UNIX operating systems.  (Ex. 4 ¶¶ 125-29; Ex. 589 ¶ 14.)

39.     *Intentional Interference with Prospective Economic Relations.*  IBM alleges that SCO has intentionally interfered with its relationships with numerous companies and individuals to whom IBM has sold and/or licensed products and services and/or to whom IBM seeks to sell and/or license products and services, as well as with business and individual members of the Linux and open-source software development, distribution, service, and computing communities. SCO interfered with these IBM relationships by making false and misleading statements to IBM's prospective customers that IBM no longer has the right, authority, and license to use, produce, and distribute AIX, Dynix, and Linux-related products; by falsely and publicly accusing IBM of inserting "truckloads" of SCO's intellectual property into the Linux kernel and related

16

software; and by misrepresenting SCO's own rights relating to these operating systems.  (Ex. 4 ¶¶ 130-35.)

40.     *Unfair and Deceptive Trade Practices.*  IBM alleges that SCO has engaged in unfair and deceptive trade practices in violation of Section 349 by, among other things, falsely representing that IBM no longer has the right, authority, and/or license to use, produce, and/or distribute AIX, Dynix, and Linux-related products; misrepresenting SCO's and IBM's rights relating to these operating systems; and publishing false and disparaging statements about AIX, Dynix, and Linux.  (Ex. 4 ¶¶ 136-41.)

## Response to SCO's Factual Allegations

Pursuant to DUCivR 56-1(c), IBM responds as follows to SCO's "Statement of Undisputed Facts" (with citations to SCO's statements omitted):

1.      *On March 6, 2003, SCO filed its original Complaint against IBM.*

IBM does not dispute the allegations in paragraph 1, except states that they do not entitle SCO to the relief it seeks.

2.      *SCO filed an Amended Complaint on July 22, 2003, and a Second Amended Complaint on February 27, 2004.*

IBM does not dispute the allegations in paragraph 2, except states that they do not entitle SCO to the relief it seeks.

3.      *SCO subsequently filed a legal complaint against a Linux user.*

IBM does not dispute the allegations in paragraph 3, except states that they do not entitle SCO to the relief it seeks.

    4.      *There exists, at a minimum, a good faith basis for SCO to have believed, alleged in court filings, and made statements that IBM contributed code, methods and concepts to Linux in violation of SCO's contractual rights.*

IBM disputes the allegations in paragraph 4 and states that they do not in any respect entitle SCO to the relief it seeks. The cited evidence does not support SCO's assertions of good faith, which, in any case, pertain only to portions of IBM's counterclaims. Moreover, the evidence detailed in the previous section – in particular paragraphs 12 to 27 – and in IBM's pending motions for summary judgment (which are incorporated herein by reference), supports the conclusion that SCO acted in bad faith.

    5.      *There exists, at a minimum, a good faith basis for SCO to have believed, alleged in court filings, and made statements that Linux violates one or more copyrights held by SCO.*

IBM disputes the allegations in paragraph 5 and states that they do not in any respect entitle SCO to the relief it seeks. The cited evidence does not support SCO's assertions of good faith, which, in any case, pertain only to portions of IBM's counterclaims. Moreover, the evidence detailed in the previous section – in particular paragraphs 12 to 27 – and in IBM's pending motions for summary judgment (which are incorporated herein by reference), supports the conclusion that SCO acted in bad faith.

    6.      *There exists, at a minimum, a good faith basis for SCO to have believed, alleged in court filings, and made statements that IBM's AIX and Dynix licenses have validly been terminated.*

IBM disputes the allegations in paragraph 6 and states that they do not in any respect entitle SCO to the relief it seeks. The cited evidence does not support SCO's assertions of good

faith, which, in any case, pertain only to portions of IBM's counterclaims.  Moreover, the evidence detailed in the previous section – in particular paragraphs 22 to 24 – and in IBM's pending motions for summary judgment (which are incorporated herein by reference), supports the conclusion that SCO acted in bad faith.

7.      *There exists, at a minimum, a good faith basis for SCO to have believed, alleged in court filings, and made statements that Novell had no right to "waive" IBM's contractual breaches.*

IBM disputes the allegations in paragraph 7 and states that they do not in any respect entitle SCO to the relief it seeks.  The cited evidence does not support SCO's assertions of good faith, which, in any case, pertain only to portions of IBM's counterclaims.  Moreover, the evidence detailed in the previous section – in particular paragraphs 25 and 26 – and in IBM's pending motions for summary judgment (which are incorporated herein by reference), supports the conclusion that SCO acted in bad faith.

8.      *There is no competent evidence that IBM sustained any compensable damages as a result of SCO's lawsuit or related statements.  To the contrary, IBM executives and the chief executive of the Open Source Development Laboratories (OSDL) have publicly stated and testified that IBM's business has not been negatively impacted by SCO's actions.*

IBM disputes the allegations in paragraph 8 and states that they do not in any respect entitle SCO to the relief it seeks.  The cited evidence does not support SCO's contention that IBM cannot establish damages, which, in any case, pertains only to portions of IBM's counterclaims.  Moreover, the evidence detailed in the previous section – in particular

19

paragraphs 29 to 35 – and in IBM's pending motions for summary judgment (which are incorporated herein by reference), supports the conclusion that SCO caused damage to IBM.

## Standard of Decision

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); In re Grandote Country Club Co., 252 F.3d 1146, 1149 (10th Cir. 2001). Where, as here, a movant seeks summary judgment dismissal of a claim asserted against it based at least in part on an affirmative defense, the movant has the initial burden of demonstrating that no disputed material fact exists regarding the affirmative defense asserted. See Johnson v. Riddle, 443 F.3d 723, 725 n.1 (10th Cir. 2006) (holding that "[w]here, as here, the defendant is seeking summary judgment on the basis of an affirmative defense, [t]he defendant . . . must demonstrate that no disputed material fact exists regarding the affirmative defense asserted"); Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997) (same). The non-movant can defeat such a motion by identifying any material disputed fact. See Johnson, 443 F.3d at 725 n.1; Hutchinson, 105 F.3d at 564.

## Argument[5]

SCO raises three arguments in support of its motion for partial summary judgment as to the counterclaims at issue. As demonstrated below, each of SCO's arguments misrepresents the nature of IBM's counterclaims, ignores or misstates the evidence in support of IBM's

---

[5] The undisputed facts are cited in this Part as "¶__", referring to the relevant paragraph number(s) in the forgoing Material Facts Requiring Denial of SCO's Motion.

counterclaims, and/or misconstrues the relevant burden of proof and substantive law.  Thus, SCO's motion should be denied.

## I.   SCO'S MISCONDUCT IS NOT PRIVILEGED.

SCO first seeks to avoid liability for its misconduct by arguing that it is immune from suit under either an absolute litigation privilege and/or an unidentified, qualified privilege.  SCO essentially claims that a party to a lawsuit is privileged freely and publicly to disparage another without limitation.  SCO is wrong.

As an initial matter, SCO's privilege arguments are based on a distortion of IBM's counterclaims.  In an effort to pigeonhole IBM's claims, SCO represents them as limited to challenging "SCO's lawsuits and press statements about its claims".  (SCO Br. at 1.)  None of IBM's counterclaims is so limited.  All concern conduct outside the course of litigation.  To list just some of SCO's misconduct, IBM's counterclaims challenge:  (1) SCO's statements to the press and to IBM's customers that IBM misappropriated SCO trade secrets in UNIX System V to the kernel of Linux, when there are no trade secrets in UNIX System V (¶¶ 13-17); (2) SCO's representations to the press and IBM's customers and prospective customers that SCO owns and controls AIX, when it in fact does not (¶¶ 22-24); and (3) SCO's misuse of its alleged intellectual property to collect royalties from IBM to use its own and others' intellectual property (¶ 25(c)).  In short, IBM's counterclaims challenge a variety of non-litigation misconduct waged through press releases, interviews with print and internet journalists, analyst calls, publicly distributed letters, and SCO conferences.  (¶¶ 10-28.)

Once SCO's mischaracterizations are stripped away, it is clear that neither of the asserted privileges bars IBM's counterclaims.  To fall within the absolute litigation privilege, a statement

must be made during or in the course of a judicial proceeding.  <u>DeBry v. Godbe</u>, 992 P.2d 979, 983 (Utah 1999).  Statements made to the press are <u>not</u> protected.  <u>Kleier Adver., Inc. v. Premier Pontiac, Inc.</u>, 921 F.2d 1036, 1043-44 (10th Cir. 1990) (citing several authorities for the proposition that statements to newspapers concerning a case are not part of judicial proceeding and not absolutely privileged).[6]  And, to the extent the case law cited by SCO supports the existence and applicability of a qualified privilege to certain statements to the press, those cases concern only circumstances (different from those here) where a party to a litigation simply reports the facts of that litigation and a basic overview of the claims at issue therein to the press.[7]

Moreover, even if (contrary to fact) SCO's privilege arguments were not based on a distortion of IBM's counterclaims, SCO's motion fails because it has not met its burden to prove that any of the challenged conduct falls within the scope of these privileges.  The alleged privileges are affirmative defenses as to which SCO, not IBM, bears the burden of proof.

---

[6] <u>See also</u> <u>Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear, Inc.</u>, 608 F. Supp. 1187, 1195 (S.D.N.Y. 1985) (finding that "to stimulate press coverage and wide publicity of a complaint with its allegedly false and malicious statements is beyond the pale of [judicial privilege] protection" as it no way aids a party in furthering its case); <u>Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.</u>, 438 F. Supp. 2d. 1288, 1294-95 (D. Colo. 2006) (holding that statements contained in press releases and brochures released to general public are not subject to absolute privilege); <u>Claussen Immunotherapies, Inc. v. King Pharms. Inc.</u>, 403 F. Supp. 2d 451, 460 (D. Md. 2005) (holding the "privilege does not attach to extrajudicial publications, related to the litigation, which are made outside the purview of the judicial proceeding." (internal quotations and citations omitted)); <u>Kennedy v. Cannon</u>, 229 Md. 92, 99 (1962) (holding that litigants who try their cases through the press proceed "at [their] own risk").

[7] <u>See</u> <u>Muirhead v. Zucker</u>, 726 F. Supp. 613, 616 (W.D. Pa. 1989) (applying qualified privilege to one press release stating fact of litigation); <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 277 (1993) (applying governmental immunity to statements made by prosecutor at one press conference); <u>Arista Records, Inc. v. Flea World, Inc.</u>, 356 F. Supp. 2d 411, 427 (D.N.J. 2005) (applying qualified privilege under New Jersey law to one press release); <u>Edelson v. Ch'ien</u>, 352 F. Supp. 2d 861, 870 (N.D. Ill. 2005) (same); <u>Lee v. City of Rochester</u>, 663 N.Y.S.2d 738, 751 (N.Y. Sup. Ct. 1997) (applying governmental immunity to statement by a police officer at a single press conference); <u>Novodzelsky v. Astor, Weiss & Newman</u>, No. 94-2407, 1994 WL 665682, at *1 (E.D. Pa. Nov. 17, 1994) (applying qualified privilege to plaintiff's forwarding of complaint to news media) (Ex. A hereto).

Johnson v. Riddle, 443 F.3d 723, 725 n.1 (10th Cir. 2006); see also Brehany v. Nordstrom, Inc., 812 P.2d 49, 58-59 (Utah 1991) (holding that qualified privilege is an affirmative defense); Zoumadakis v. Uintah Basin Med. Ctr., Inc., 122 P.3d 891, 893 (Utah 2005) (holding that a "qualified or conditional privilege is an affirmative defense to defamation").  To establish its privilege defenses, SCO was required to set out in its opening brief undisputed facts sufficient to establish each of the supposed defenses.  See Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); DUCivR 56-1(b) ("The memorandum in support of a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which movant contends no genuine issue exists.").  In support of its motion, SCO points to only eight allegedly undisputed facts, not one of which comes close to establishing the affirmative defenses of privilege.

Thus, SCO has neither met its burden of establishing the applicability of any legally recognized privilege, nor has it cited any legal authority even suggesting that the fact of a pending litigation between two parties gives one party a privilege to flood the media and the market with false and disparaging claims about the other.  See Asay v. Hallmark Cards, Inc., 594 F.2d 692, 698 (8th Cir. 1979) (holding that "while a defamatory pleading is privileged, that pleading cannot be a predicate for dissemination of the defamatory matter to the public or third parties not connected to the litigation.  Otherwise, to cause great harm and mischief a person need only file false and defamatory statements as judicial pleadings and then proceed to

republish the defamation at will under the cloak of immunity.") (quoted in Kiernan v. Williams, 2006 WL 2418861, at *7 (N.J. App. Div. Aug., 23, 2006) (Ex. B hereto)).

Finally, SCO's argument that it is protected by an unidentified, qualified privilege is untenable for two additional reasons.  First, the protection of the qualified privilege is lost through excessive publication, which occurs when an otherwise privileged statement is published to more persons than have a legally justified reason for receiving that statement.  Brehany v. Nordstrom, Inc., 812 P.2d 49, 58 (Utah 1991).  Indeed, SCO itself recently argued to this Court that "the defense of qualified privilege does not extend to a publication to the general public". (See SCO's Mem. in Opp. to Novell, Inc.'s Motion to Dismiss SCO's Amended Complaint in SCO Group, Inc. v. Novell, Inc..)  Here, the undisputed evidence establishes that SCO made numerous statements over an extended period of time disparaging IBM, IBM's products and services, and Linux to the general public through the press.  (¶¶ 10-28.)  As a result, there is, at a minimum, a material dispute as to the issue of excessive publication, and SCO's motion for summary judgment should be denied.  See SCO Group, Inc. v. Novell, Inc., 377 F. Supp. 2d 1145, 1154 (D. Utah 2005) (Kimball, J.) (holding that issue of excessive publication implicates questions of fact and thus is not a question for summary judgment).

Second, the protection of a qualified privilege is also lost when a statement is made with malice, which exists either where the publisher has an improper motive, such as a desire to do harm or ill-will, or where the publisher does not honestly believe his statements to be true.  See Russell v. Thomson Newspapers, 842 P.2d 896, 905 (Utah 1992).  The facts concerning SCO's state of mind are discussed in Section II below.  Those facts provide, at a minimum, sufficient evidence to submit to a jury on the question of bad faith.  As this Court recently held, the issue of

malice calls into question the state of mind of the publisher and, therefore, "does not lend itself readily to summary judgment". <u>Novell</u>, 377 F. Supp. 2d at 1153 (<u>quoting Lawrence v. Moss</u>, 639 F.2d 634, 639 (10th Cir. 1981)). Indeed, in <u>Novell</u>, this Court denied a motion to dismiss based upon the qualified privilege when presented with nearly identical claims of misconduct but far less evidence of bad faith. <u>Novell</u>, 377 F. Supp. at 1153.

## II.   SCO'S GOOD FAITH ARGUMENTS FAIL.

SCO next contends that IBM's counterclaims fail because SCO acted in good faith. According to SCO, good faith is a "substantive defense" to IBM's second, third, fourth, and fifth counterclaims, and SCO has satisfied this defense as to each of these claims. (SCO's Br. at 7.) Here again, SCO is wrong.

<u>First</u>, SCO has failed to carry its burden to demonstrate good faith. Rather than adduce evidence demonstrating the absence of a material factual dispute as to SCO's state of mind, SCO simply asserts in conclusory fashion that it acted in good faith. (SCO Br. at 2, ¶¶ 4-7.) But none of the four sentences on which SCO relies establishes that the conduct challenged by IBM (as opposed to SCO's narrow reformulation of it) was done in good faith. The mere fact that one or more of SCO's experts has offered support for elements of SCO's case does not in any way demonstrate that SCO acted in good faith with respect to all of the challenged conduct — much of which is neither part of SCO's case against IBM nor addressed by SCO's experts. For example, even if SCO could establish that certain lines of code of Linux infringe its alleged copyrights — and it cannot — SCO could never justify its many public statements about the scope of the supposed problem with Linux, which SCO's experts do not even attempt to support.

_Second_, whereas SCO has failed to provide any admissible evidence of its purported good faith beyond a conclusory assertion, there is ample undisputed evidence that SCO acted in bad faith.  As stated, SCO has made a plethora of false public statements about IBM, AIX, and Linux, such as that IBM stole SCO's alleged trade secrets in UNIX System V, that SCO owns and controls AIX, and that Linux contains a "gargantuan" amount of allegedly infringing code dumped into Linux by IBM.  (¶¶ 13-24.)  However, ample evidence indicates that (1) there are no trade secrets in UNIX System V (¶ 16); (2) IBM owns and controls AIX (¶ 24); and (3) there is no infringing code in Linux, let alone a gargantuan amount of it (¶¶ 21, 25(c), 25(d)).  Ample evidence also indicates that SCO knew that its statements were false and its conduct unjustified.  For example:

- SCO knew or should have known that there were no trade secrets in UNIX System V because it is the purported owner of the UNIX System V technology, and System V technology has been publicly available for many years, as reflected in an extensive body of literature. (¶ 17);

- SCO knew that it did not have the right to control more than one million lines of Linux code because, among other things:

  (1) Novell owns the UNIX copyrights, as indicated by the Asset Purchase Agreement between Novell and Santa Cruz, and the fact that SCO's CEO, Darl McBride, repeatedly asked Novell to transfer the copyrights to SCO, which Novell declined to do (¶ 26(a));

  (2) SCO transferred its intellectual property rights in most of the code in the Linux kernel to UnitedLinux, as is clear from the face of the UnitedLinux agreements (¶ 26(b));

  (3) SCO's predecessor, Santa Cruz, studied Linux and, according to Michael Davidson, one of Santa Cruz's senior software engineers, Santa Cruz found no evidence of copyright infringement (¶ 26(c));

  (4) SCO (then operating under the name Caldera) expressly warranted to IBM in a July 1999 "Strategic Business Agreement" that IBM would be protected against claims of infringement relating to material in SCO's

26

Linux products, and promised that it would hold harmless and indemnify IBM from third party intellectual property rights claims (¶ 26(d));

(5) SCO promoted Linux and urged IBM and others to use it subject to the terms of the GNU General Public License (¶ 26(e));

(6) SCO and its predecessors expressly granted IBM and others a license to use Linux and the allegedly infringing code (¶ 26(f));

(7)

### SECTION REDACTED

(8) While claiming massive infringement by Linux, SCO refused to identify the allegedly infringing code so as to permit the community to examine SCO's claims and remedy the alleged problem (¶ 28).

- SCO knew it did not own and control AIX because, among other things:

    (1) The plain language of the AT&T UNIX licensing agreements, which SCO purports to own and possess, make clear that IBM owns AIX (¶ 27(a));

    (2) AT&T and its successors made clear to IBM that it could do as it wished with its homegrown code (¶ 27(b));

    (3) SCO and its predecessors waived the right to assert the rights SCO now asserts (¶ 27(c)); and

    (4) IBM has copyrights in its AIX products (¶ 27(d)).

In sum, substantial evidence shows that SCO knew or reasonably should have known that the challenged statements were false when made and that its conduct was improper.  As this Court recently held, the state of mind of a party "does not lend itself readily to summary judgment", Novell, 377 F. Supp. 2d at 1153, and the available evidence forms a sufficient basis from which a reasonable jury could find bad faith.  See, e.g., Zenith Elec. Corp. v. Exzec, Inc., 182 F.3d 1340, 1354 (Fed. Cir. 1999) ("[S]tatements to the effect that a competitor is incapable of designing around the patent are inherently suspect."); Laser Diode Array, Inc. v. Paradigm

Lasers, Inc., 964 F. Supp. 90, 94 (W.D.N.Y. 1997) (finding bad faith where defendant knew its patent did not cover plaintiff's products); Koppers Co. v. Krupp-Koppers GmbH, 517 F. Supp. 836, 852 (W.D. Pa. 1981) (holding that defendant went "beyond proper competitive means" when it asserted ownership over material in public domain).

Third, good faith is not a defense to at least two of the four counterclaims at issue in this motion:  the Lanham Act claim and the Section 349 claim.  See Spotless Enters., Inc. v. Carlisle Plastics, Inc., 56 F. Supp. 2d 274, 278 (E.D.N.Y. 1999) ("The Lanham Act has created a scheme of strict liability with regard to false advertising claims."); Procter & Gamble Co. v. Cheesebrough-Pond's Inc., 747 F.2d 114, 119 (2d Cir. 1984) (holding that "proof of good faith does not immunize a defendant" from Lanham Act false advertising claim); Mennen Co. v. Gillette Co., 565 F. Supp. 648, 655 (S.D.N.Y. 1983) ("[T]o establish a claim under [Section 349] intention to deceive need not be shown."); State by Lefkowitz v. Colorado State Christian Coll. of Inner Power, Inc., 346 N.Y.S.2d 482, 489 (Sup. Ct. 1973) (holding that "[t]he good or bad faith of the advertiser is legally irrelevant" in a Section 349 case).[8]

Not one of the authorities cited by SCO relieves SCO of liability on IBM's Lanham Act or Section 349 counterclaims based on a finding of good faith.  Most of the authorities cited by SCO concern common law claims of unfair competition or tortious interference and are therefore irrelevant to these claims.  None of the cases SCO cites relate to Section 349, and the only case it cites regarding the Lanham Act, Noble Fiber Techs., LLC v. Argentum Med., LLC, No. 3:05-

---

[8] See also Genesee Brewing Co. v. Stroh, 124 F.3d 137, 149 (2d Cir. 1997) ("[A] plaintiff may recover for unfair competition in violation of federal law without a showing of bad faith." (emphasis in original)); Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991) (same) (citations omitted); Genesco Entm't v. Koch, 593 F. Supp. 743, 751 (S.D.N.Y. 1984) ("In keeping with [its] deterrent purposes, section 349 has been construed to allow recovery even in the absence of a showing of intent to deceive.").

CV-01855, 2006 WL 1793219, at *5 (M.D. Pa. June 27, 2006) (Ex. C hereto), is easily distinguished.  The Noble court held that good faith was a defense to a certain Lanham Act claim, but that case (and the cases on which it relies) turned on a privilege rooted in the patent laws that is inapplicable here.  See Noble, 2006 WL 1793219 at *5; ISCO Int'l Inc. v. Conductus, Inc., 279 F. Supp. 2d 489, 504 (D. Del. 2003) (noting that a Lanham Act claim involving patent rights requires showing of bad faith because of tension with patent laws); Zenith Elec. Corp. v. Exzec, Inc., 182 F.3d 1340, 1354 (Fed. Cir. 1999) (requiring bad faith for Lanham Act claim related to patent rights because of "privileged right" that is "statutorily rooted in the patent laws at 35 U.S.C. § 287").[9]  No case has imposed a similar requirement for a Lanham Act claim — such as that presented here — that is based upon a widespread pattern of public misrepresentation and product disparagement.

## III.    IBM HAS PRESENTED SUFFICIENT EVIDENCE OF DAMAGES.

Finally, SCO contends that it is entitled to summary judgment on the grounds that IBM has "sustained no damages" from SCO's misconduct and that "IBM has no competent evidence to the contrary".  (SCO Br. at 12.)  Like SCO's other arguments, this contention fails as a matter of law and fact.

---

[9] The distinction between the patent cases cited by SCO and the circumstances presented here is further illustrated by the fact that, in the patent context, a bad faith requirement is sufficient to defeat preemption of a state law claim by the patent laws.  See Zenith, 182 F.3d at 1353.  In contrast, courts routinely have held that bad faith is not sufficient to preclude the preemption of a state law claim by the Copyright Act.  See, e.g., Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004); Baltimore Orioles, Inc. v. Major League Baseball Players, 805 F.2d 663, 678 (7th Cir. 1986); Nash v. CBS, Inc., 704 F. Supp. 823, 831 (N.D. Ill. 1989).  The distinction lies with the explicit statutory right vested to a patentee by the patent act to make certain forms of public statements.

To defeat SCO's motion, IBM need only raise a question of fact that it was injured as a result of SCO's misconduct; it need not provide an exact dollar figure for damages.  See, e.g., Allard v. Arthur Andersen & Co. (USA), 924 F. Supp. 488, 491 (S.D.N.Y. 1996) (holding that "a plaintiff [need not] provide an exact dollar figure for his damages before trial; the plaintiff need show only that he did in fact suffer some damages."); Parfums Stern Inc. v. Int'l Trade and Export Co., Inc., No. 89-2086, 1991 WL 84757, at *2 (S.D.N.Y. May 13, 1991) (denying summary judgment because a claimant "need not prove the exact amount of its damages" and can create an issue of fact by "provid[ing] a certification and supplemental certification from [an expert]") (Ex. D hereto).  Even nominal damages will suffice.  See, e.g., Car-Freshner Corp. v. Big Lots Stores, Inc., 314 F. Supp. 2d 145, 154 (N.D.N.Y. 2004) (denying summary judgment dismissal of unfair competition claim because even "absent any proof of actual damages, [plaintiff's alleging unfair competition] would be entitled to nominal damages").

There is more than enough evidence to show that IBM was in fact injured by SCO's misconduct.  As is explained in the declarations of Professor J. R. Kearl and William Sandve, SCO's conduct injured IBM's business.

**SECTION REDACTED**

SECTION REDACTED

Although proof of the exact amount of damages is not required, there is ample evidence that IBM suffered significant damages due to SCO's conduct. According to SCO's Darl McBride, the challenged conduct caused a 20% decline in the Linux market. (¶ 32.)

SECTION REDACTED

IBM has actively defended its product, both in court and in the marketplace. (Id.) This has not, however, come without costs to IBM.

SECTION REDACTED

Ignoring the evidence of damage caused by its conduct, SCO claims that it is entitled to summary judgment because its actions have "helped Linux rather than harmed the Linux business". (SCO Br. at 12.) As stated, however, IBM's damages are not limited to its Linux business: SCO caused injury to IBM's AIX business, which SCO's motion completely ignores.

31

Moreover, the statements on which SCO relies from Messrs. Stallings, Frye, and Cohen do not in any way establish that SCO's conduct resulted in no damage to IBM's Linux business. They merely offer a lay perspective on the general impact of SCO's lawsuit as of certain points in time. The statements do not concern all of the challenged conduct and do not cover the full period of SCO's misconduct. The statements were not intended to be and are not determinative of IBM's damages. Mr. Cohen is not even employed by IBM.

SCO further argues that Professor Kearl's testimony about lost Linux profits is weak and that his reference to attorneys' fees and time spent by IBM employees is legally invalid. (See SCO Br. at 13-15.) But SCO's attack on Professor Kearl's testimony is no more availing than its reliance on the statements of Messrs. Stallings, Frye, and Cohen. To begin, IBM's damages case is not dependent on Professor Kearl's expert testimony. IBM can establish damages by way of fact witnesses like Mr. Sandve alone. Moreover, SCO's attack on Professor Kearl is focused on his testimony about IBM's Linux business. However, Professor Kearl offers extensive testimony unrelated to IBM's Linux business, which is more than adequate to create a question as to the fact of injury. Furthermore, that SCO considers Professor Kearl's testimony to be weak is not a basis for the entry of summary judgment. Even if Professor Kearl's testimony were weak — and it is not — the alleged weakness of the testimony goes to its weight, not its admissibility. See Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917, 931 (6th Cir. 2005) ("[I]f the opposing party's expert provides a reliable and reasonable opinion with factual support, summary judgment is inappropriate").

Contrary to SCO's contentions, attorney's fees are available as compensatory damages when incurred, as here, to mitigate the harm caused by the defendant's actionable misconduct.

See, e.g., Metro. Opera Assoc. v. Local 100, No. 00-3613, 2005 WL 1712241, at *5-6 (S.D.N.Y. July 19, 2005) (rejecting argument that "recover[y] [of] attorney's fees under such a theory [of mitigation damages] would violate the American Rule") (internal quotation marks omitted) (Ex. E hereto); Hogan v. Herald Co., 446 N.Y.S.2d 836, 843 (App. Div. 1982) (holding on plaintiff's libel claim that plaintiff's claim for special damages of "legal fees of $1,500.00" "sufficiently [stated a] claim [for] actual injuries").

Although SCO claims that "Dr. Kearl does not attempt to separate any of the fees and employee time that resulted from the alleged wrongdoing from the fees and time that IBM would have incurred anyway", Dr. Kearl's reports make clear that he does. (¶ 35.)  Mr. Sandve likewise provides a basis by which a fact finder could reasonably conclude that IBM's fees and time resulted from SCO's misconduct.  (Id.)  Therefore, under the relevant law, IBM is entitled to receive its litigation costs as mitigation damages, and SCO's motion for summary judgment must fail for this additional, independent reason.[10]

---

[10] In addition to its mitigation damages, IBM is also entitled to a statutory award of its attorney's fees.  With respect to IBM's Lanham Act counterclaim, a court may award reasonable attorney's fees to a party prevailing on a Lanham Act claim in "exceptional cases", such as those involving malicious conduct. 15 U.S.C. § 1117(a);  see also Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d 1143, 1146 (10th Cir. 2000).  Further, Utah law also permits the award of attorney's fees should the trier of fact find that SCO has acted in bad faith.  See Utah Code Ann.  § 78-27-56 ("In civil actions, the court shall award reasonable attorney's fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith.").  Similarly, under NY General Business Law § 349(h) (Count V), a court may award reasonable attorney's fees to a plaintiff who prevails on his statutory deceptive and unfair trade practices claim.  Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc., 190 F. Supp. 2d 407, 421 (S.D.N.Y. 2002).  As discussed above in section II, SCO has acted in bad faith, and IBM is therefore entitled to an award of its fees.

## Conclusion

For the foregoing reasons, SCO's motion for partial summary judgment dismissing

IBM's second, third, fourth, and fifth counterclaims must be denied.

DATED this 10th day of November, 2006.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff International*
*Business Machines Corporation*

34

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of November, 2006, a true and correct copy of the foregoing was served by electronic mail, pursuant to the agreement of the parties, on the following:

> Brent O. Hatch
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101
> bhatch@hjdlaw.com
>
> Edward Normand
> BOIES, SCHILLER & FLEXNER, LLP
> 333 Main Street
> Armonk, New York  10504
> TNormand@BSFLLP.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of November, 2006, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

/s/ Todd M. Shaughnessy