Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN OPPOSITION TO IBM'S "MOTION FOR SUMMARY JUDGMENT ON SCO'S COPYRIGHT CLAIM (SCO'S FIFTH CAUSE OF ACTION)"** <br><br> **FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]** <br><br> Case No. 2:03CV0294DAK <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

## Table of Contents

Table of Authorities ................................................................................................................... i

Preliminary Statement ............................................................................................................. 1

SCO's Statement of Material Facts......................................................................................... 2

I.     IBM MATERIALLY BREACHED ITS UNIX AGREEMENTS..................................... 2

       A.    The Clear and Reasonable Scope of IBM's Agreements........................................ 2

       B.    IBM's Material Breaches of Its UNIX Agreements. ............................................... 3

II.    IBM'S UNIX AGREEMENTS WERE TERMINABLE. .................................................. 4

III.   SCO GAVE IBM PROPER NOTICE AND OPPORTUNITY TO CURE,
      AND SOUGHT TO RESOLVE IBM'S BREACHES IN GOOD FAITH......................... 7

IV.   SCO OWNS THE UNIX COPYRIGHTS. ...................................................................... 16

V.    IBM HAS DISTRIBUTED THE AIX DERIVATIVE WORK POST-
      TERMINATION........................................................................................................... 21

VI.   ACTING IN GOOD FAITH IN DISCOVERY, SCO HAS SPECIFIED
      THE BASIS FOR ITS INSTANT COPYRIGHT CLAIM.............................................. 21

Argument.................................................................................................................................. 22

I.     IBM MATERIALLY BREACHED ITS UNIX AGREEMENTS.................................... 22

II.    SCO PROPERLY TERMINATED IBM'S UNIX AGREEMENTS. ............................. 30

       A.    SCO Had the Right to Terminate the IBM Agreements. ....................................... 30

           1.    Any Finding of Ambiguity in the Agreements Defeats
               IBM's Argument for Summary Judgment. ............................................... 32

| | | | |
|---|---|---|---|
| | 2. | The Extrinsic Evidence Establishes That SCO Retained The Right to Terminate IBM's UNIX System V Agreement. | 34 |
| | B. | SCO Satisfied the Prerequisites to Termination of the IBM Agreements. | 35 |
| | C. | IBM's Conduct Established the Futility of Discussions. | 40 |
| III. | | IBM HAS VIOLATED SCO'S COPYRIGHTS. | 42 |
| | A. | SCO Owns the UNIX Copyrights. | 42 |
| | 1. | The APA Transferred Novell's Entire UNIX-Related Business, Including the UNIX Copyrights, to SCO. | 45 |
| | 2. | Amendment No. 2 to the APA Reaffirmed SCO's Ownership of the UNIX Copyrights. | 47 |
| | 3. | SCO's Contemporaneous Licensing of the UNIX Technology to Novell Further Evidences SCO's Ownership of the UNIX Copyrights. | 48 |
| | 4. | The Parties' Other Post-Sale Conduct Further Confirms SCO's Ownership of the UNIX Copyrights. | 51 |
| | 5. | The Sworn Testimony of the Principal Negotiators and Additional Testimony Shows SCO's Ownership of the UNIX Copyrights. | 53 |
| | B. | IBM's Unauthorized Distributions in Violation of SCO's Copyrights. | 58 |
| | 1. | SCO Has Satisfied the Statutory Prerequisites. | 58 |
| | 2. | SCO Has Demonstrated That IBM Has Improperly Copied SCO's Copyrighted Works Without Authorization. | 59 |

IV.    SCO HAS NOT MISUSED ITS COPYRIGHTS............................................................. 62

**CONCLUSION** ......................................................................................................................... 64

**Table of Authorities**

**Cases**

Advanced Safety Sys. NY, Inc. v Mfrs. & Traders Trust Co., 592 N.Y.S.2d 159
(App. Div. 1992) .......................................................................................................... 37

Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,
London, 136 F.3d 82 (2d Cir. 1998) ............................................................................ 33

Allbrand Discount Liquors v. Times Square Stores Corp., 399 N.Y.S.2d 700 (App.
Div. 1977) .................................................................................................................... 40

Alward v. Vail Resorts, No. 1:04-cv-00860, 2006 WL 894958 (D. Colo. Mar. 31,
2006) ............................................................................................................................ 27

Arthur Rutenberg Homes, Inc. v. Drew Homes, 29 F.3d 1529 (11th Cir. 1994) ......................... 43

Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283
(S.D.N.Y. 2005) .................................................................................................... passim

Blumenfeld v. R. H. Macy & Co., 92 Cal. App. 3d 38 (Ct. App. 1979) ...................................... 45

Bouzo v. Citibank, 96 F.3d 51 (2d Cir. 1996) ............................................................................ 32

Coan v. Estate of Chapin, 549 N.Y.S.2d 16 (App. Div. 1989)..................................................... 37

Consumers Power Co. v. Nuclear Fuel Servs., Inc., 509 F. Supp. 201 (W.D.N.Y.
1981) ............................................................................................................................ 37

Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435 (7th Cir. 1993)............................... 33

Correspondent Servs. Corp. v. J.V.W. Inv. Ltd., 173 F. Supp. 2d 171 (S.D.N.Y.
2001) ............................................................................................................................ 26

De Shazer v. Nat'l RV Holdings, Inc., 391 F. Supp. 2d 791 (D. Ariz. 2005) .............................. 36

Dean v. Burrows, 732 F. Supp. 816 (E.D. Tenn. 1989)................................................................ 42

i

Dick Corp. v. SNC-Lavalin Constructors, Inc., No. 04 C 1043, 2004 WL 2967556
(N.D. Ill. Nov. 24, 2004)..........................................................................................43, 44

DSC Communications Corp. v. Pulse Communications, Inc., 170 F.3d 1354 (Fed.
Cir. 1999) .........................................................................................................................51

Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) ......................................43

Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513 (2d
Cir. 1989) ...................................................................................................................37, 38

Financial Technologies International, Inc. v. Smith, 247 F. Supp. 2d. 397
(S.D.N.Y. 2002) ................................................................................................................27

First Nat'l Bank of Omaha v. Three Dimension Sys. Prods., 130 F. Supp. 2d 1098
(D. Neb. 1999) ..................................................................................................................40

Food Consulting Group, Inc. v. Azzalino, 270 F.3d 21 (9th Cir. 2001).......................52

Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284 (2d Cir. 1997)............28

Friedman v. Stacey Data Processing Servs., No. 89 C 4444, 1990 WL 172586
(N.D. Ill. Nov. 1, 1990).....................................................................................................44

Garza v. Mar. Trans. Lines, Inc., 861 F.2d 23 (2d Cir. 1988) ......................................31

Gates Rubber Co. v. Bando Chem. Ind., Ltd., 9 F.3d 823 (10th. Cir. 1993)..............21, 22, 58, 59

Gen. Supply & Construction Co. v. Goelet, 241 N.Y. 28 (1925) ............................37, 38

Gomez v. Am. Elec. Power Serv. Corp., 726 F.2d 649 (10th Cir. 1984) ......................33

Grant v. Pratt & Lambert, 65 N.Y.S. 486 (App. Div. 1900)..........................................37

Hartford Acc. & Indem. Co. v. Wesolowski, 350 N.Y.S.2d 895 (1973)........................33

Holtzbrinck Pub. Holdings, L.P. v. Vyne Communications, Inc., No. 97 Civ. 1082
(KTD), 2000 WL 502860 (S.D.N.Y. Apr. 26, 2000)........................................................52

Huang v. BP Amaco Corp., No. Civ. A. 00-1290, 2002 WL 84459 (E.D. Pa. Jan. 22, 2002) .................................................................................................................... 36

Huthwaite, Inc. v. Randstad Gen. Partners (US), L.L.C., No. 06-C-1548, 2006 WL 3065470 (N.D. Ill. Oct. 24, 2006)........................................................................ 63

Int'l Gateway Exch., LLC v. W. Union Fin. Servs., 333 F. Supp. 2d 131 (S.D.N.Y. 2004) ..................................................................................................................... 28

Internet Law Library, Inc. v. Southridge Capital Mgmt., Inc., No. 01-6600, 2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005) ..................................................................... 28

Johnson v. Tuff-N-Rumble Mgmt., Inc., No. CIV.A.99-1374, 2000 WL 1145748 (E.D. La. Aug. 14, 2000) .......................................................................................... 44

Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc., 690 F. Supp. 298 (S.D.N.Y. 1988) ...................................................................................................................... 43

Kolvek v. Ferrucci, 667 N.Y.S.2d 554 (App. Div. 1997) ............................................. 37

Mackinder v. Schawk, Inc., No. 00 Civ. 6098 (DAB), 2005 WL 1832385 (S.D.N.Y. Aug. 2, 2005) ........................................................................................... 26

Maytag v. U.S. Pac. Corp., No: 4:02-CV-10626, 2004 WL 1175130 (S.D. Iowa May 18, 2004)............................................................................................................ 36

McClean v. Buffalo Bills Football Club, Inc., 301 N.Y.S.2d 872 (App. Div. 1969) ................... 28

Merrill Lynch v. Adler, 651 N.Y.S.2d 38 (App. Div. 1996) ......................................... 31

Met. Paving Co. v. City of Aurora, Colo., 449 F.2d 177 (10th Cir. 1971)...................................... 33

Mid-West Conveyor Co. v. Jervis B. Webb Co., 92 F.3d 992 (10th Cir. 1996).......................... 52

Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle, 356 F. Supp. 2d 515 (E.D. Pa. 2005) ................................................................................................................. 44

New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101 (2d Cir. 2006) ...................................................................................................................... 26

iii

Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182 (2d Cir. 1996) ................................ 32

Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33
(1968)........................................................................................................................................ 44

Radio Television Espanola S.A. v. New World Entertainment, Ltd., 183 F.3d 922
(9th Cir. 1999)......................................................................................................................... 42

Real Estate Data, Inc. v. Sidwell Co., 809 F.2d 366 (7th Cir. 1987)........................................... 44

Relational Design & Tech., Inc. v. Brock, No. 91-2452-EEO, 1993 WL 191323
(D. Kan. May 25, 1993)............................................................................................................ 46

Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 923 F. Supp.
1231 (N.D. Cal. 1995).............................................................................................................. 59

Robshaw v. Health Mgmt., Inc., 470 N.Y.S.2d 226 (App. Div. 1983)........................................ 31

Ronnen v. Ajax Elec. Motor Corp., 88 N.Y.2d 582 (1996).......................................................... 31

Rottlund Co. v. Pinnacle Corp., No. Civ. 01-1980 DSD/SRN, 2004 WL 1879983
(D. Minn. Aug. 20, 2004) ........................................................................................................ 44

Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174 (App. Div. 1995) ..................... 31, 33

Sauer v. Xerox Corp., 17 F. Supp. 2d 193 (W.D.N.Y. 1998)................................................. 37, 38

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir. 1992)................................. 43

Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992)................................... 33

Shugrue v. Cont'l Airlines, Inc., 977 F. Supp. 280 (S.D.N.Y. 1997)..................................... 46, 51

So. Cal. Edison v. Super. Ct., 37 Cal. App. 4th 839 (Ct. App. 1995)........................................... 45

State v. Home Indem. Co., 66 N.Y.2d 669 (1985) ....................................................................... 33

Tepedino v. City of Long Beach, 640 N.Y.S.2d 591 (App. Div. 1996) ....................................... 36

Ushodaya Enters., Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d 329 (S.D.N.Y. 1999) ...................... 59

Valley Nat'l Bank v. Abdnor, 918 F.2d 128 (10th Cir. 1990) ..................................................... 26

Wechsler v. Hunt Health Systems, Ltd., 186 F. Supp. 2d 402 (S.D.N.Y. 2002) ......................... 27

Weschler v. Hunt Health Sys., Ltd., 198 F. Supp. 2d 508 (S.D.N.Y. 2002) ................................ 28

Weschler v. Hunt Health Sys., Ltd., No. 94 Civ. 8294, 1999 WL 397751
(S.D.N.Y. June 16, 1999)............................................................................................................ 27

Wolf v. Super. Ct., 114 Cal. App. 4th 1343 (Ct. App. 2004) ...................................................... 45

Wolff & Murnier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003 (2d Cir.
1991) ........................................................................................................................................... 40

Zilg v. Prentice-Hall, Inc., 515 F. Supp. 716 (S.D.N.Y. 1981) .................................................. 36

Statutes

17 U.S.C. § 101.......................................................................................................................... 50

17 U.S.C. § 106..................................................................................................................... 50, 58

17 U.S.C. § 410.......................................................................................................................... 58

17 U.S.C. § 501.......................................................................................................................... 58

N.Y. Gen. Oblig. Law § 15-1501.............................................................................................. 28

**Other Authorities**

23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 1990) ....................................... 26, 28

Calamari & Perillo, The Law of Contracts § 11-18(a) (3d ed. 1987).......................................... 26

E. Allan Farnsworth, Contracts (2d ed. 1990). .................................................................... 28, 33

Nimmer on Copyright ................................................................................................ 43, 44, 46, 51

R. Nimmer & J. Dodd, Modern Licensing Law § 9:16 (2005).......................................................... 31

Restatement (Second) of Contracts § 212(2) (1981) ...................................................................... 33

Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2730.1 (2d ed.
1983) ............................................................................................................................................. 33

Plaintiff, the SCO Group, Inc. ("SCO"), respectfully submits this Memorandum in Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright Claim (SCO's Fifth Cause of Action)."[1]

### Preliminary Statement

In its Motion, IBM does not dispute that its AIX operating system is a derivative work based on UNIX System V, that IBM was authorized to distribute AIX as such only pursuant to its UNIX System license agreement with SCO, that IBM has continued to distribute AIX even though SCO sent IBM a notice of termination of that license agreement in June 2003, or that SCO disclosed in discovery its view that SCO's Fifth Cause of Action under the Copyright Act is addressed to the foregoing conduct. Indeed, each of the foregoing facts is indisputable.

Instead, IBM brings its Motion on other grounds, most of which are particularly fact-based, and none of which is a basis for the summary judgment IBM seeks:

- SCO specifically identified, and IBM understood, SCO's claim that IBM had breached its Agreements by contributing source code from AIX to the development of the Linux operating system;

- The plain language of the Agreements, and substantial extrinsic evidence, demonstrates that IBM's breaches went to the root of those Agreements; and

- The only sensible interpretation of the transfer documents at issue, and the overwhelming extrinsic evidence on the issue, is that The Santa Cruz Operation, Inc. acquired the System V copyrights in 1995 and SCO owns them today.

Accordingly, as SCO demonstrates in detail below, the Court should deny IBM's instant Motion for Summary Judgment.

---

[1]    The title of IBM's Motion inaccurately suggests that SCO's claims in this case include only one relating to "copyright." By virtue of prior Court Order, SCO also has claims that Linux violates SCO's copyright in Unix System V, Version 4.

<u>SCO's Statement of Material Facts</u>[2]

**I.      IBM MATERIALLY BREACHED ITS UNIX AGREEMENTS.**

   A.     <u>The Clear and Reasonable Scope of IBM's Agreements.</u>

   1.      Under the plain language of the standard UNIX source code license and sublicensing agreements that AT&T entered into with IBM in 1985 (the "UNIX Agreements"), IBM was obligated to hold in confidence all parts of the licensed UNIX System V software product, as well as all parts of any modifications or derivative works that IBM developed based on the software product.  (¶¶ 13-29.)

   2.      AT&T and IBM entered into a Side Letter that clarified and amended parts of the standard license agreement, but under that Side Letter, IBM remained obligated to hold in confidence all parts of any modifications or derivative works that IBM developed based on the software product.  (¶¶ 87-89.)

   3.      In 1996, IBM entered into an Amendment No. X with The Santa Cruz Operation, Inc. ("Santa Cruz"), a successor-in-interest to the AT&T UNIX license agreements and copyrights, and Novell, Inc. ("Novell").  Under Amendment No. X, IBM remained obligated to hold in confidence all parts of any modifications or derivative works that IBM developed based on the licensed UNIX software product.  (¶ 94.)

   4.      The licensee's obligation to treat its derivative works just like – in fact, "as part of" – the licensed UNIX software product was, as the plain text of the requirement makes clear, an important, core protection of the license agreement.  (¶¶ 76-96.)  These same confidentiality

---

[2]      The nature and scope of the license agreements at issue are addressed in detail in SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims. Accordingly, for efficiency, in this Statement of Facts SCO frequently cross-references by paragraph numbers its Statement of Facts in the foregoing Opposition Memorandum.

restrictions remained in the standard UNIX license agreements that AT&T's successors-in-interest to the UNIX business used in the many years that followed the execution of IBM's UNIX System V license agreement. (¶¶ 63-96.)

5.    IBM developed a derivative work based on the licensed UNIX software product called AIX. (¶ 192.) As IBM concedes in its Motion for Summary Judgment on SCO's Contract Claims, IBM owns that part of AIX that is not the licensed UNIX System V software product. (See also Ex. 140.)[3]

6.    Over the course of its time as a UNIX System V licensee, the facts show (and easily permit the inference) that no one represented to IBM that its license agreement had a different scope than as set forth above, and IBM considered itself obligated to hold AIX in confidence under its license agreement. (¶¶ 63-163.)

7.    Given the seminal and valuable innovation that AT&T held in UNIX System V, the demand among licensees to have access to the UNIX source code, the significant advantage offered by the UNIX head-start with respective to the development of any UNIX-like operating system, and the business interests of the parties at the time, the restrictive scope of IBM's UNIX license agreement and Side Letter made good economic sense for the parties. (¶¶ 32-64.)

B.    IBM's Material Breaches of Its UNIX Agreements.

8.

REDACTED

---

[3]    The documents, declarations, and depositions supporting SCO's response are appended to the November 10, 2006 Declaration of Brent O. Hatch, and are cited herein as "Ex. __." Where exhibits attached to IBM's September 25, 2006 Declaration of Todd M. Shaughnessy are referenced herein, they are cited as "IBM Ex. __."

     9.     Among the technology from AIX that IBM publicly disclosed was the Journaling

File System (JFS).                 REDACTED


     10.                  REDACTED


     11.     Although Novell, Inc. ("Novell") has purported to waive IBM's breaches of its

UNIX System V license agreement with respect to AIX, Novell in fact does not possess any such

rights of waiver.  (¶¶ 279-93.)

     12.     SCO has never waived its right to pursue IBM's breaches, and has never

represented otherwise to IBM.  (SCO's Contracts Brief, Part III.)

## II.    IBM'S UNIX AGREEMENTS WERE TERMINABLE.

     13.     The IBM source code license agreement states in Section 6.03:

> If LICENSEE fails to fulfill one or more of its obligations under this Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than (2) months' written notice to LICENSEE specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination LICENSEE shall immediately discontinue use of and return or destroy all copies of SOFTWARE PRODUCTS subject to this Agreement.

(IBM Ex. 492 § 6.03.)  The IBM sublicensing agreement sets forth the same terms and

conditions with respect to the "SUBLICENSED PRODUCT" distributed by "LICENSEE" or

any one of the "DISTRIBUTORS" of the SUBLICENSED PRODUCT.  (IBM Ex. 120 §§ 2.07,

3.03.)

14.     In the IBM Side Letter, AT&T states:

Regarding Section 6.03 of the Software Agreement and Sections 2.07 and 3.03 of
the Sublicensing Agreement, we will not terminate your rights for breach, nor will
we give notice of termination under such Sections, for breaches we consider to be
immaterial. We agree to lengthen the notice period referenced in such Sections
from two (2) months to one hundred (100) days. If a breach occurs that causes us
to give notice of termination, you may remedy the breach to avoid termination if
you are willing and able to do so. In the event that a notice of termination is
given to you under either of such Sections and you are making reasonable efforts
to remedy the breach but you are unable to complete the remedy in the specified
notice period, we will not unreasonably withhold our approval of a request by you
for reasonable extension of such period. We will also consider a reasonable
extension under Section 2.07 of the Sublicensing Agreement in the case of a
DISTRIBUTOR who is making reasonable efforts to remedy a breach.

We will consider arbitration if a dispute arises on payments.

In any event our respective representatives will exert their mutual good faith best
efforts to resolve any alleged breach short of termination.

(IBM Ex. 122 ¶ A.5.)

15.     Amendment No. X provides in Section 1: "Upon payment to SCO of the

consideration in the section entitled 'Consideration', IBM will have the irrevocable, fully paid-up,

perpetual right to exercise all of its rights under the Related Agreements beginning January 1,

1996 at no additional royalty fee." (IBM Ex. 124.)

16.     The recitals to Amendment No. X specify that the purpose of the amendment is to

simplify the royalty provisions. (IBM Ex. 124.)

17.     Amendment No. X further provides in Section 1: "Notwithstanding the above,

the irrevocable nature of the above rights will in no way be construed to limit Novell's or SCO's

rights to enjoin or otherwise prohibit IBM from violating any and all of Novell's or SCO's rights

under this Amendment No. X, the Related Agreements, or under general patent, copyright, or

trademark law." (IBM Ex. 124.)

5

18.     The term "non-terminable" does not appear in Amendment No. X.  (IBM Ex. 124.)  In contrast, in 1995, less than a year before entering into Amendment No. X with IBM, Novell and Santa Cruz had entered into a Technology License Agreement which stated, in Section II.A:  "Effective upon the Closing Date and in connection with the transfer of the Assets by Novell to SCO pursuant to the Asset Purchase Agreement, Novell hereby retains, with the consent of SCO and, shall have a non-exclusive, <u>non-terminable</u>, world-wide, fee-free license" to undertake certain activities.  (Ex. 48 (emphasis added).)

19.     Larry Bouffard, Novell's representative in the negotiations of Amendment No. X, has now clarified his previous declaration to confirm that Novell did not intend to make IBM's UNIX System V agreements non-terminable.  (Ex. 50 ¶¶ 36-38.)

20.

REDACTED

21.

REDACTED

22.

REDACTED

6

REDACTED

### III.   SCO GAVE IBM PROPER NOTICE AND OPPORTUNITY TO CURE, AND SOUGHT TO RESOLVE IBM'S BREACHES IN GOOD FAITH.

23.     In 2000, Robert LeBlanc, IBM's Vice President for "Software Strategy," publicly

stated to the Linux community that IBM was "willing to open source any part of AIX that the

Linux community considers valuable."  (IBM Ex. 1 ¶¶ 92-93.)

24.     After investigating the issues in late 2002, SCO gave notice to IBM in January

2003 that SCO believed IBM had breached its UNIX license agreements.  At IBM's request,

SCO's Chief Executive Officer, Darl McBride, attended a breakfast meeting with Karen Smith,

an IBM Vice-President involved with Linux.  (IBM Ex. 317 at 164.)

25.     Ms. Smith questioned Mr. McBride about a recently released article in The Wall

Street Journal, which reported that SCO had hired counsel and was considering legal recourse to

protect its intellectual property rights.  (Ex. 54.)  Ms. Smith began by telling Mr. McBride how

upset IBM was over SCO's press statement and investigation of potential intellectual-property

problems in Linux, asking that SCO retract the public statements.  Mr. McBride explained

SCO's reasons for the press statement, particularly its need to protect the value of the company's

UNIX asset.  (IBM Ex. 317 at 165.)

26.     Ms. Smith then raised the subject of litigation, observing that SCO had retained

counsel, and asked Mr. McBride whom SCO could sue.  Ms. Smith opined that SCO could sue

neither developers nor customers for tactical reasons, and could not sue IBM because IBM is not

a distributor of Linux.  (IBM Ex. 317 at 166.)  Specifically flagging IBM's contributions to

7

Linux, Mr. McBride asked Ms. Smith: Have you looked at your AIX contract lately? Do you understand that your AIX contract is held by SCO? (IBM Ex. 317 at 166-67.)

27.    In response, acknowledging that IBM understood SCO to be concerned about IBM's contributions to Linux from AIX, Ms. Smith replied that counsel for IBM had looked at the agreements and was "not worried" about SCO because IBM's counsel had concluded that SCO did not own the intellectual property rights, including the UNIX copyrights. (IBM Ex. 317 at 167; Ex. 165 ¶ 12.) Ms. Smith further suggested the possibility of a settlement involving a minor licensing deal with SCO. Ms. Smith told Mr. McBride that unless SCO dropped its investigation of Linux and the library licensing program, IBM would cut off all business from SCO, and would encourage SCO's business partners to do the same. (IBM Ex. 317 at 164.) And the evidence shows that is exactly what she did:

28.    That afternoon Ms. Smith met with HP Executive Richard Becker. This meeting was shortly after Ms. Smith's breakfast meeting with Mr. McBride. (Ex. 310 at 147:15-19.) Mr. Becker recalls what transpired in his meeting with Ms. Smith. "She indicated to me that IBM was going to withdraw all their business activities from SCO, and that in the interest of the best outcome for our joint Linux initiatives that she was going to suggest that HP, and I was representing HP, and following me, Intel should do the same." (IBM Ex. 118 at 54.)

29.    Just a day later, Ms. Smith began to execute on her threat that IBM would discontinue its business relationships with SCO. A January 24, 2003 internal IBM email stated: "We have received direction from Karen Smith who is responsible for IBM's Linux Strategy & Market Development. Because of recent public announcements from SCO (a Linux distributor) around intellectual property, we in RSS [Retail Stores Solution] have been asked to discontinue

any plans to work with SCO and avoid any association with SCO in our development, sales & marketing efforts." (Ex. 202 at 181008215-16.)

30.     In an internal IBM email, one IBM employee questioned whether – aside from the "political" issue that "potential IP actions may occur at a future time" – this "freeze" on SCO business was financially advisable for IBM. (Ex. 203 at 181354373-74.) Specifically, he warned: "If we don't get our head straight as a solutions provider and figure out how to work with SCO on this, than we should understand very clearly that our competitors are happy to work with SCO . . . ." (Id. at 181354370.)

31.     As to Ms. Smith's and Mr. McBride's discussions, IBM's response was not to disavow its contributions to Linux from AIX or to represent that it would not make any further such contributions, but rather to say that IBM's conclusion was that SCO did not even possess the right to enforce the contract or the UNIX copyrights. Nor did IBM even suggest that it was willing to remove from the Linux kernel any material that it had contributed from AIX. (IBM Ex. 317 at 164-65.)

32.     IBM understood that SCO disagreed with IBM's views regarding SCO's supposed lack of rights. On or around March 4, 2003, Tony Befi of IBM called Mr. McBride and asked about rumors that SCO was going to sue IBM. Mr. Befi had previously identified himself as the representative of SCO's issues to the Chief Executive Officer of IBM, Samuel Palmisano. Mr. Befi claimed to have a personal connection to Mr. Palmisano, and told Mr. McBride that he was the appropriate person to whom SCO should express its issues with IBM. (IBM Ex. 317 at 212.)

9

33.     Mr. Befi asked Mr. McBride about a recent article about SCO's pursuit to preserve its intellectual property, observing that SCO's attention was focused on IBM; Mr. McBride confirmed the accuracy of the article and alluded to his previous discussion with Ms. Smith of IBM. (Ex. 165 ¶ 18.) Mr. McBride requested a meeting at the earliest opportunity to discuss what he described as "big problems." (IBM Ex. 317 at 187.) When Mr. Befi offered to arrange a meeting for three months later, in June 2003, Mr. McBride conveyed that the time within which SCO wanted a meeting was better measured in hours and minutes, not weeks. (Ex. 165 ¶ 18.) Mr. Befit nevertheless declined to schedule an earlier date to meet. (Id.)

34.     Accordingly, after repeated discussions between the parties over many weeks (IBM Ex. 317 at 185, 213), on March 6, 2003, SCO sent a letter to Mr. Palmisano. (IBM Ex. 153.) Collectively identifying the materials to be kept confidential under IBM's UNIX license and sublicensing agreements as the "UNIX trade secrets," the letter advised that IBM had breached the software agreement by disclosing and transferring such material and by encouraging others in the Linux community to do the same. SCO formally noticed IBM of its intent to avail itself of termination unless IBM cured the breach within 100 days. (IBM Ex. 153.)

35.     SCO also filed its Complaint on March 6, 2003. (IBM Ex. 1.) Among the allegations in the Complaint were the following:

- IBM is precluded by its agreements with SCO from disclosing its UNIX-derivative AIX source code to the Linux development community. (Id. ¶¶ 91-94.)

- IBM had stated that it was "willing to open source any part of AIX that the Linux community considers valuable." (Id. ¶¶ 92-93.)

10

- IBM had recently and publicly released parts of AIX for contributions into Linux. (Id. ¶¶ 95.)

- IBM had recently and expressly promised to exploit its expertise in AIX to bring Linux up to par with UNIX and then to obliterate UNIX. (Id. ¶ 98.)

- A large number of the IBM employees devoted to Linux development have, or have had, access to the UNIX source code. (Id. ¶ 100.)

- IBM's Linux Technology Center ("LTC") was launched in 2001 with the advertised intent and foreseeable purpose of transferring and otherwise disposing of all or part of UNIX, including its concepts, ideas, and know-how, into an open-source Linux environment. (Id. ¶ 102(a).)

36.     Citing IBM's own statements regarding the valuable contributions that IBM had made to Linux, including from AIX, SCO's allegations in the Complaint further made clear what was obvious – namely, that IBM knew what contributions to Linux it had made, including from AIX. (Id. ¶ 92.)

37.     These and other allegations thus made clear that the conduct of IBM's LTC in making contributions or disclosures to Linux development was at the heart of the lawsuit. The Complaint specifically identified the journaling file system (JFS) from AIX as material that IBM had been reported as contributing to Linux. (IBM Ex. ¶ 92.)

38.     Among the pending causes of action that SCO brought based on such allegations were its claims that IBM had engaged in unfair competition, based in part on IBM's "Violation of confidentiality provisions running to the benefit of plaintiff" (id. ¶ 118(b)); and breach of contract, based on IBM's contributions to Linux development of source code, methods, and

11

concepts that IBM had promised to keep confidential, but instead had subjected to "unrestricted disclosure," "unauthorized transfer and disposition," and "unauthorized use" (id. ¶¶ 129-36).

39.     As IBM has expressly acknowledged, its "unequivocal" position from the outset of the lawsuit was that its Agreements could not be terminated. (Ex. 25.) IBM repeatedly told SCO as much. (IBM Exs. 580, 156, 158, 159.) IBM had also asserted its view, echoed by Novell's subsequent public assertions, that SCO did not even own the UNIX copyrights. (IBM Ex. 317 at 167.) In addition, confirming that it understood SCO's interpretation of the Agreements, IBM took the position throughout the 100-day period that it simply disagreed with SCO's interpretation. (IBM Exs. 580, 158.)

40.     On April 2, 2003, IBM responded in writing to SCO's letter of March 6, 2003, challenging SCO's letter and the Complaint as notice sufficient to start the 100-day period, and asserting its belief that none of its actions breached any obligations it had to SCO. The letter further requested that SCO identify the specific code, files, or confidential information it believed IBM had disclosed and transferred; and the ways and specific instances in which IBM had transferred or disclosed such code and files. IBM did not address the contributions, such as JFS, that SCO had referenced in its Complaint or IBM's public statements regarding its contributions to Linux. (IBM Ex. 580.)

41.     In its letter of April 2, 2003, IBM did not state or otherwise suggest (a) that IBM was retracting its statement that it was willing to open-source any part of AIX (a statement that years later IBM did retract), (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or

Dynix/ptx source code, (e) that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS from Linux. (IBM Ex. 580.)

  42. Mr. McBride responded on April 24, 2003, in a letter addressed to IBM's general counsel. (IBM Ex. 581.) IBM's request for specific references to code and files transferred or disclosed by IBM surprised Mr. McBride. Where SCO and the rest of the industry knew at that time that IBM had publicly touted its contributions of AIX code into Linux and where SCO did not have access to the AIX source code, SCO sought to clarify IBM's position and request in IBM's letter: it had been SCO's understanding, from the correspondence and Mr. McBride's discussion with IBM executives, that IBM was disputing SCO's interpretation of the agreements and assertion that IBM's contributions to Linux breached those agreements, not whether such contributions had in fact been made. (Ex. 165 ¶ 19.) Accordingly, Mr. McBride explained that "we need to know whether IBM is questioning if donating AIX code to Linux is a violation of the agreements." (IBM Ex. 581.)

  43. Almost two weeks would pass before IBM's general counsel would respond on May 5, 2003, once again claiming that the 100-day notice period had not been triggered and reiterating the demand that SCO identify the code, file, and manner of disclosure IBM had made. IBM refused to address the heart of the matter: that it was SCO's view of the Agreements that IBM's contributions of code from AIX to Linux constituted a breach. (IBM Ex. 156.) IBM did not address the contributions, such as JFS, that SCO had referenced in its Complaint or IBM's public statements regarding its contributions to Linux. (IBM Ex. 156.)

44.     In its letter of May 5, 2003, IBM did not state or otherwise suggest (a) that IBM was retracting its statement that it was willing to open-source any part of AIX, (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS from Linux. (IBM Ex. 156.)

45.     At IBM's request, on June 2, 2003, Mr. McBride and SCO counsel met with counsel from IBM. At this meeting, SCO representatives emphasized that IBM's breach arose from contributing methods, concepts and code from AIX and Dynix to Linux. (Ex. 165 ¶ 20.) SCO specified AIX's JFS, as identified in the Complaint, and AIX's enterprise volume management system (EVMS). (Id.) SCO showed the IBM representatives exchanges between IBM technicians, associated with the Linux Technology Center, providing insight to others in the Linux community and making reference to the specific AIX technology. (Id.) IBM representatives reacted with little interest and asked no follow-up questions, but promised to contact SCO in the near future. (Id.) No offer to cure or even any acknowledgement of the problem was forthcoming from IBM.

46.     During the June 2, 2003, meeting, IBM did not state or otherwise suggest (a) that IBM was retracting its statement that it was willing to open-source any part of AIX, (b) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX to Linux, (c) that IBM believed SCO had access to AIX or Dynix/ptx source code, (d) that IBM could not

14

determine from its own employees what contributions they had made to Linux, or (e) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS from Linux. (Id. ¶ 21.) After the meeting on June 2, 2003, SCO heard nothing from IBM. (Id. 22.) Considering all of the foregoing, on June 12, 2003, SCO issued a letter notifying IBM that the Agreements had been terminated. (IBM Ex. 157; Ex. 165 ¶ 22.)

47.      In the meantime, after having claimed to own the UNIX copyrights, Novell received from SCO a copy of Amendment No. 2, which Novell inexplicably did not have in its files and had not reviewed. (Ex. 165 ¶ 13.) After receiving the document, Novell stated in a press release dated June 6, 2003:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO. To Novell's knowledge, this amendment is not present in Novell's files. The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996.

(Ex. 338.) Novell thus admitted that it does not own the copyrights at issue and acknowledged the relevance of Amendment No. 2 on the question of copyright ownership.

48.      As to IBM in the interests of continued discussions, Mr. McBride thereafter contacted Mr. Palmisano and suggested a meeting. (Ex. 165 ¶ 23.) Mr. Palmisano agreed, and the two subsequently met (each with an attorney). (Id.)

49.      During the meeting, Mr. Palmisano observed that SCO's conduct had not affected IBM's stock price, and stated that he lacked any incentive to negotiate with SCO unless and until that occurred. Mr. McBride reiterated that because IBM had helped to build Linux by disclosing material from AIX and Dynix, IBM had violated its Agreements. (Id.) Mr. Palmisano did not request any details regarding the disclosures, but instead requested an additional ninety (90) days to resolve the dispute with a settlement, conditioned on any monetary award not coming directly

15

from IBM. (Id.) Mr. Palmisano requested that SCO not make any public statements regarding any intellectual-property issues in Linux. (Id.)

      50.     During the meeting, neither Mr. Palmisano nor his counsel stated or otherwise suggested (a) that IBM was retracting its statement that it was willing to open-source any part of AIX, (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS or EVMS from Linux. (Id. ¶ 24.)

## IV.    SCO OWNS THE UNIX COPYRIGHTS.

      51.     In 1995, Novell entered into an Asset Purchase Agreement ("APA") with Santa Cruz. (IBM Ex. 123.) The APA contains a California choice-of-law provision. (Id. § 9.8.)

      52.     In the APA, Novell transferred "all of Seller's right, title and interest in and to the assets and properties of Seller relating to [Seller's] Business (collectively the 'Assets') identified on Schedule 1.1(a) hereto." (Id. § 1.1(a).) The APA defined Novell's "Business" as "the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare." (Id., Recital A.)

      53.     Schedule 1.1(a), in turn, included "<u>All rights and ownership of UNIX and UnixWare including but not limited to</u>," among other things:

- "all versions of UNIX and UnixWare and all copies of UNIX and UnixWare (including revisions and updates in process)," (<u>id.</u>, Schedule 1.1(a) § I);

- "all technical, design, development, installation, operation and maintenance information concerning UNIX and UnixWare, including source code," (<u>id.</u>);

- "UNIX Source Code Products," (<u>id.</u>);

- "Binary Product Releases," (<u>id.</u>);

- "Products Under Development," (<u>id.</u>);

- "All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business," (<u>id.</u> § II); and

- "All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business (to the extent that such contracts are assignable)," (<u>id.</u> § III);

- "All copies of UNIX and UnixWare, wherever located, owned by Seller," (<u>id.</u> § IV).

54.     The Bill of Sale (Ex. 30) the parties executed on the date of closing (December 6,

1995) provides that all of the assets sold through the APA were to be transferred as of that date:

> In accordance with Article 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby transfer, convey, sell, assign and deliver to Buyer, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, all of the Assets. Excepted from the transfer of Assets pursuant to the preceding sentence are the rights reserved by Seller pursuant to that certain Technology License Agreement between Seller and Buyer dates as of December 6, 1995.

55.     The parties' October 1996 Amendment No. 2 to the APA revised Schedule 1.1(b)

of the APA to clarify that the "Excluded Assets" language was not intended to apply to any

"copyrights and trademarks owned by Novell as of the date of the Agreement [the APA] required

for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare

17

technologies." (IBM Ex. 444 ¶ A.) Novell thus confirmed its retention of its NetWare

copyrights.

    56.    Paragraph 1.6 of the APA (aptly titled "License Back of Assets") expressly

contemplated and described that license in detail:

> Concurrent with the Closing, Buyer [Santa Cruz] shall execute a license
> agreement under which it shall grant to Seller [Novell] a royalty-free, perpetual,
> worldwide license to (i) all of the technology included in the Assets and (ii) all
> derivatives of the technology included in the Assets . . . (such licensed back
> technology to be referred to collectively as "Licensed Technology"). Seller
> [Novell] agrees that it shall use the Licensed Technology only (i) for internal
> purposes without restriction or (ii) for resale in bundled or integrated products
> sold by Seller which are not directly competitive with the core products of Buyer
> and in which the Licensed Technology does not constitute a primary portion of
> the value of the total bundled or integrated product. The license agreement shall
> include reasonable provisions concerning Buyer's obligation to provide
> documentation and support for the Licensed Technology. The license agreement
> shall also provide Seller with an unlimited royalty-free, perpetual, worldwide
> license to the Licensed Technology upon the occurrence of a Change of Control
> of Buyer described in Section 6.3(c) hereof. In the event of a Change of Control
> of Seller (as defined in Section 6.6 hereof), the license granted pursuant to the
> license agreement shall be limited to Seller's products either developed or
> substantially developed as of the time of the Change of Control.

    57.    As provided by the APA, Santa Cruz thus "licensed back" to Novell, at the time

of the closing, the right to use the technology covered by the UNIX and UnixWare copyrights

through a Technology License Agreement ("TLA") that tracks the terms described in the APA.

(Ex. 48.)

    58.    Consistently with the transfer of the UNIX copyrights to Santa Cruz (through the

APA and as later clarified by Amendment No. 2), the TLA specified, in a section titled

"Ownership," that

> As between Novell and SCO:
> (1)    <u>Ownership of Licensed Technology shall reside in SCO</u>.

(2)     Ownership of any modifications made to Licensed Technology pursuant to
        the licenses specified in Section II above shall reside in Novell.

(Ex. 48 (emphasis added).)

59.     Shortly after the closing of the APA, Santa Cruz obtained physical possession of

UNIX copyright registrations from Novell; those copyright registrations remain in SCO's

possession to this day.  (Exs. 258-68.)

60.     SCO has a certificate of registration for the UNIX copyrights from the Register of

Copyrights, including for UNIX System V Release 4.0 ("SVR4"), Certificate of Registration No.

TX-5-776-217.  (Ex. 258.)

61.     After 1995, Santa Cruz shipped its UnixWare product with "Santa Cruz"

copyright notices. (Ex. 370 ¶¶ 2-3.)  Since 1995, Santa Cruz and its successors-in-interest have

entered into hundreds of license agreements for UNIX products that not only contain express

representations and warranties of SCO's right, title, and ownership interest intellectual property

rights required to provide the licensed product, but also indemnify licensees against any third-

party claims for copyright infringement.  (See, e.g., Exs. 124, 127; Ex. 333 ¶ 28.)

62.


                                        REDACTED



63.     In addition, from the time of the closing of the APA in 1995 until after SCO

asserted legal claims concerning its Linux-related rights in 2003, Novell never contested SCO's

ownership of the UNIX copyrights.  (Ex. 333 ¶ 7; Ex. 355 ¶ 7.)

64. At the time of the APA, Ed Chatlos was a Senior Director working on UNIX Strategic Partnerships and Business Development issues within Novell's Strategic Relations and Mergers and Acquisitions organization. (Ex. 39 ¶ 4.) In 1995, Mr. Chatlos was assigned the responsibility of negotiating and completing the deal to sell Novell's UNIX business to Santa Cruz, and in or about June 1995, Mr. Chatlos became the lead negotiator for Novell in the negotiations with Santa Cruz. (Id. ¶ 6.)

65. In that capacity, Mr. Chatlos held the day-to-day responsibility for the potential deal and acted as the principal interface with SCO on the business negotiations for Novell. (Id.) During the Novell-Santa Cruz negotiations, Mr. Chatlos met regularly with Santa Cruz representatives, sometimes several times a week, from June to September 1995. (Id. ¶ 7.)

66. Mr. Chatlos confirms that Novell and Santa Cruz both intended for the 1995 Asset Purchase Agreement to convey Novell's entire UNIX business, specifically including the UNIX copyrights, to SCO. (Id.) In addition, Mr. Chatlos confirmed those facts during his deposition in this case. (Ex. 76 at 35-42, 45, 50, 53, 90-94, 100-10, 187, 189.)

67. Santa Cruz's principal negotiator, Jim Wilt, also confirms that SCO intended to acquire the UNIX copyrights through the APA. (Ex. 40 ¶¶ 3-16.)

68. REDACTED and Lawrence Bouffard of Novell (Ex. 50 ¶¶ 29-30) further confirm the parties's intent to transfer the UNIX copyrights via the APA.

69. Others at Santa Cruz understood following the execution of the APA that "Novell had retained no rights in SVRX source code under the Purchase Agreement." (Ex. 360 ¶ 11.)

70.     Duff Thompson, the Novell executive responsible for the sale of the UNIX business and assets for Novell, confirms that the UNIX copyrights were transferred to SCO through the APA. (Ex. 18 ¶¶ 4-11.)

## V.     IBM HAS DISTRIBUTED THE AIX DERIVATIVE WORK POST-TERMINATION.

71.                         REDACTED

(applying Gates Rubber Co. v. Bando Chem. Ind., Ltd., 9 F.3d 823, 832 n. 7 (10th. Cir. 1993); Ex. 11 ¶ 18;                         REDACTED

72.     After SCO terminated IBM's Agreement in 2003, as IBM openly acknowledges in its Motion and as it advertises, IBM has continued to distribute the AIX derivative work. (See IBM Ex. 229 at 32-33, 45, 53; see also Exs. 363, 364, 365, 366.)

## VI.    ACTING IN GOOD FAITH IN DISCOVERY, SCO HAS SPECIFIED THE BASIS FOR ITS INSTANT COPYRIGHT CLAIM.

73.     SCO has at all times acted in good faith in discovery. SCO has diligently complied with its discovery obligations and has conscientiously endeavored to respond to all of IBM's discovery requests. SCO has provided IBM with detailed answers, to the extent the information was available to SCO, to all of IBM's interrogatories and other requests, specifically including IBM's requests for detailed information about the source code in Linux on which SCO bases its claims in this case. (¶¶ 234-93)

74.     Where SCO could not produce information because it was not available to SCO or because IBM had not provided needed discovery (including earlier versions of AIX and Dynix and information concerning IBM's contributions and contributions to Linux), SCO so indicated in its responses. (¶¶ 234-93.)

21

75.

REDACTED

76.     When it has suited its purposes, IBM has argued for broad copyright protection

for computer programs, arguing that full copyright protection for computer programs, as

mandated by Congress, is essential to the continued growth of the software industry. (Ex. 37.)

77.     In pleading its Fifth Cause of Action for the first time in its Second Amended

Complaint, SCO repeatedly identified AIX as a derivative of UNIX System V.  For example:

> SCO has therefore terminated IBM's right to use any part of the UNIX System V
> source code, including its derivative AIX, effective as of June 13, 2003 (the "AIX
> Termination" date).

(IBM Ex. 3 ¶ 11 (emphasis added).)

## Argument[4]

### I.     IBM MATERIALLY BREACHED ITS UNIX AGREEMENTS.

SCO addresses in great detail (as noted above) the nature and scope of the license

agreements at issue here in its Memorandum in Opposition to IBM's Motion for Summary

Judgment on SCO's Contract Claims.  SCO incorporates that Memorandum by reference and

summarizes below the principal aspects of that Memorandum that are relevant here.  IBM's

motion for summary judgment on the grounds that there are no genuine issues of material fact on

---

[4]     SCO cites herein either the paragraphs in SCO's Statement of Facts above, the paragraphs in
SCO's Statement of Facts in its Memorandum in Opposition to IBM's Motion for Summary Judgment on
SCO's Contract Claims (as "Contracts ¶ __"), or to specific exhibits.  SCO sets forth the Standard of
Decision in the foregoing Memorandum.

the issue of whether SCO has established a predicate breach of contract must fail for the following principal reasons:

First, the plain language of the IBM UNIX license agreement, Side Letter and Amendment No. X establish that IBM was obligated to hold in confidence all parts of IBM's derivative works based on the licensed UNIX System V software product. This plain language alone precludes IBM's request for summary disposition of the meaning of IBM's UNIX license agreement, Side Letter, and Amendment No. X. IBM's proposed interpretation of the relevant language renders key terms meaningless or surplusage. The clear language of the Agreements defeats IBM's motion. (See SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims (Nov. 11, 2006) ("SCO's Contracts Mem."), Part A.1.)

Second, if the Court were to conclude that the meaning of the IBM UNIX license agreement, Side Letter, and Amendment No. X were ambiguous, that decision alone would preclude summary disposition of the meaning of IBM's UNIX license agreement. In addition, the abundant extrinsic evidence supporting SCO's interpretation of the meaning of those documents independently precludes such summary disposition. (See SCO's Contracts Mem., Part I.B.)

Third, although IBM does not appear to claim otherwise, it bears repeating that IBM's AIX operating system is a derivative work based on the licensed UNIX System V software product under the copyright law. Any challenge to that conclusion that IBM might now choose to make would be no basis for summary judgment against SCO. (See SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Tenth Counterclaim (Nov. 11, 2006).)

Fourth, there is abundant evidence establishing that no one at AT&T or any of its successors in interest to the UNIX business ever represented or could have represented to anyone from IBM that IBM was free to disclose from a derivative work based on the licensed UNIX System V product what IBM calls its "homegrown" material. In fact, the principal witness on whose testimony IBM relies, Otis Wilson, is contradicted by his own prior sworn testimony; his reinterpretation of event in conflict with his own prior testimony and documents is hardly a basis for summary resolution of the intent of the company and individuals for and with whom he worked. Such evidence precludes summary disposition against SCO as to whether such representations had been made, and the significance vel non of representations or inaction for purposes of applying the doctrine of equitable estoppel is improper for summary resolution. (See SCO's Contracts Mem., Part I.B.)

Fifth, there is abundant evidence establishing (as well as easily permitting the inference) that no one at AT&T or any of its successors in interest to the UNIX business ever waived or intended to waive the right to preclude UNIX licensees from disclosing any part of any derivative work based on the licensed UNIX System V product that any licensee had developed. There is also substantial evidence establishing (as well as easily permitting the inference) that no one at Caldera or SCO ever waived or intended to waive the right to preclude IBM from making contributions to Linux development from AIX. Such evidence precludes summary disposition against SCO as to whether such a waiver had occurred. (See SCO's Contracts Mem., Part III.A, C.) In addition, Although Novell, Inc. ("Novell") has purported to waive IBM's breaches of its UNIX System V license agreement with respect to AIX, Novell in fact does not possess any such rights of waiver. (See Contracts Mem., Part III.B.)

24

Sixth, IBM's breaches were material, and there is no basis for the issue to be resolved in IBM's favor on summary judgment.

REDACTED

A contract breach is "material" if it goes to the "root of the agreement between the parties." Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) (quotations and citation omitted).  Under the plain language of its license agreement, Side Letter, and Amendment No. X, IBM was obligated to keep all parts AIX confidential because IBM was required to treat a derivative work like AIX "as part of" the licensed UNIX software product.  (Contracts Mem. ¶¶ 13-29, 82-86.)  That language alone, by definition, proves that AT&T regarded confidentiality surrounding derivative works to be as important as the confidentiality for the licensed UNIX software product.

SCO has also demonstrated why such restrictions were integral and reasonable under the circumstances, and how they served to protect the value of the UNIX asset and business. (Contracts Mem. ¶¶ 30-62.)  SCO has also demonstrated that the same core confidentiality protections for the licensed UNIX System V software product and their derivative works remained in the UNIX System V license agreements through the successive sales and transfers of

25

the UNIX business and licenses. (¶¶ 63-75.)

REDACTED

On these bases alone, SCO submits, the Court could not properly find as a matter of law that IBM's breaches were immaterial.

In addition to the plain language, extrinsic evidence confirms that the confidentiality provisions go to the root of the Agreements. Where, as here, the question of breach itself turns on disputed issues of fact concerning the parties' intent, it necessarily follows that the question of material breach cannot be resolved as a matter of law. Indeed, "in most cases, the question of materiality of breach is a mixed question of fact and law – usually more of the former and less of the latter – and thus is not properly disposed of by summary judgment." Bear, Stearns, 361 F. Supp. 2d at 395 (citing numerous cases and substantial other authority); accord Mackinder v. Schawk, Inc., No. 00 Civ. 6098 (DAB), 2005 WL 1832385, at *9 (S.D.N.Y. Aug. 2, 2005) (Ex. I); Calamari & Perillo, The Law of Contracts § 11-18(a) (3d ed. 1987); 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 1990); see also New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 119 (2d Cir. 2006) (holding that any "appropriate resolution" of the plaintiff's contract claims "required findings as to several facts, including . . . whether the breach by the [plaintiff] was material"); Correspondent Servs. Corp. v. J.V.W. Inv. Ltd., 173 F. Supp. 2d 171, 178 (S.D.N.Y. 2001) ("in order for summary judgment to be proper, it must be clear at the outset that there are no genuine issues of material fact as to the cause of the breach and whether it rose to the appropriate level of materiality to justify termination of the contract").[5]

---

[5]     Tenth Circuit holdings concur with New York law on this issue. See Valley Nat'l Bank v. Abdnor, 918 F.2d 128, 130 (10th Cir. 1990) ("[t]he trial court's finding of a material breach of contract is a question of fact"); Alward v. Vail Resorts, No. 1:04-cv-00860, 2006 WL 894958, at *4 (D. Colo. Mar.

26

"Treating materiality as primarily a question of fact, best resolved by the jury, is consistent with the 'wavering and blurred' line that divides the material breach from the trivial." Bear, Stearns, 361 F. Supp. at 296 (citation omitted).

IBM's cases do not support its assertion that the question of materiality is a question of law. In Financial Technologies International, Inc. v. Smith, 247 F. Supp. 2d. 397, 412 (S.D.N.Y. 2002), the court noted, in the same sentence that IBM quotes in its brief (at 25 n.5), that "[w]hether a breach is material or not is question of law, but whether a breach has occurred at all depends, in this case, on disputed questions of fact." Id. at 412 (citation omitted). The actual holding of the opinion, contrary to IBM's parenthetical description, was that "whether defendants committed a material breach also cannot be determined without a trial." Id. IBM also cites Wechsler v. Hunt Health Systems, Ltd., 186 F. Supp. 2d 402, 413 (S.D.N.Y. 2002), as a basis for its assertion that the Court should decide the question of materiality. In that ruling, in which refused to reconsider an earlier denial of summary judgment, the Court specifically declined to find on the question of materiality, making the passage cited by IBM complete dicta. See id. (stating that "this Court declined to consider the issue at the summary judgment stage" and refusing to do so on reconsideration); see also Weschler v. Hunt Health Sys., Ltd., No. 94 Civ. 8294, 1999 WL 397751, at *6 (S.D.N.Y. June 16, 1999) (on motion for summary judgment that preceded the motion to reconsider, the Court declined to decide the issue of materiality) (Ex. M). Two months after the ruling that IBM cites, the Wechsler court once again refused to grant summary judgment on the issue of materiality, holding that the evidence "does present a genuine

---

31, 2006) (holding that "whether a breach is material is a question of fact, normally for a jury to decide") (Ex. A).

dispute of material facts regarding the materiality of this breach." <u>Weschler v. Hunt Health Sys.,</u>

<u>Ltd.,</u> 198 F. Supp. 2d 508, 523 (S.D.N.Y. 2002).

IBM also cites (at 24) the Williston and Farnsworth treatises, which both clearly provide

that the question of a breach's materiality is a question of fact and not one of law. <u>See</u> 23 Lord,

<u>supra</u>, § 63:3 (4th ed. 1990) ("The determination whether a material breach has occurred is

generally a question of fact."); E. Allan Farnsworth, <u>Contracts</u> § 8.16 (2d ed. 1990) ("Whether a

breach is material is a question of fact, with the answer depending on circumstances similar to

those used to determine whether performance has been substantial.") (citing <u>McClean v. Buffalo</u>

<u>Bills Football Club, Inc.,</u> 301 N.Y.S.2d 872, 874 (App. Div. 1969). In addition, three of the

cases cited by IBM present unique factual situations that have no bearing on the issues presently

before this Court. <u>See Int'l Gateway Exch., LLC v. W. Union Fin. Servs.,</u> 333 F. Supp. 2d 131,

143 (S.D.N.Y. 2004) (inclusion of warranty disclaimers in the contract led the Court to reject

plaintiff's assertion that the denial of a single credit transaction would be a material breach);

<u>Internet Law Library, Inc. v. Southridge Capital Mgmt., Inc.,</u> No. 01-6600, 2005 WL 3370542, at

*6 (S.D.N.Y. Dec. 12, 2005) (finding that "in light of the peculiarities of this case," de minimus

activity involving "shorting" of stocks was not a material breach) (Ex. G); <u>Frank Felix Assocs.,</u>

<u>Ltd. v. Austin Drugs, Inc.,</u> 111 F.3d 284 (2d Cir. 1997) (question of whether a party could sue

for breach of an "executory accord" pursuant to N.Y. Gen. Oblig. Law § 15-1501, a term edited

out by IBM in its parenthetical, was resolved by finding that the breach of the accord was

immaterial and therefore the accord prevented the plaintiff from suing for breach of the

underlying contract).

In this case, over a dozen witnesses charged with negotiating, overseeing, interpreting and enforcing the UNIX license agreements in the 1980s, 1990s and 2000s have confirmed that the confidentiality protections over modifications and derivative works are a fundamental, core aspect of the agreements. (Contracts Mem. ¶¶ 76-96 & Argument, Part I.B.)[6]  In addition, IBM's breaches lead to the very harm that AT&T had precluded in its UNIX System V license agreements, such that as the successor to those agreements, SCO was deprived of "the benefit of the bargain." Bear, Stearns, 361 F. Supp. 2d at 297.  That is, by publicly disclosing parts of its UNIX System V derivative work, IBM significantly helped to develop an unlicensed, UNIX-clone operating system in which the owner of UNIX System V and its license agreements had no royalty interest, and which proceeded to destroy the owner's own UNIX business. (See SCO's Contracts Mem., Statement of Facts, Part VI.)  As one of IBM's own declarants now acknowledges, for example, the Agreements did not permit licensees to develop such royalty-free clones. (Ex. 50 ¶¶ 19-26.)

REDACTED

---
[6]

REDACTED

29