REDACTED

SCO has thus further shown that IBM's breaches went to the "root" of its obligations, and therefore constituted a material breach of those obligations.

## II.     SCO PROPERLY TERMINATED IBM'S UNIX AGREEMENTS.

IBM's assertion that there are no genuine issues of material fact on the issue of whether SCO properly terminated IBM's Agreements fails on the grounds that (1) SCO had the right to terminate the Agreements (Part A, below), (2) SCO satisfied the prerequisites to termination of the Agreements (Part B, below), and (3) IBM's conduct established the futility of the discussions and thereby eliminated any obligation on SCO's part to continue the discussions in any event (Part C, below).

### A.     SCO Had the Right to Terminate the IBM Agreements.

Santa Cruz clearly retained the right to terminate the IBM Agreements pursuant to Amendment No. X. In referring to IBM's "fully paid up" right to exercise its rights under the Agreements without having to pay any "additional royalty fee," Amendment No. X plainly was not referring to IBM's rights under its source code Agreement. IBM had no obligation at the time to pay any "royalty fee" under its source code Agreement. In addition, to the extent Amendment No. X is read to refer to the IBM source code Agreement, the amendment made clear that Santa Cruz retained the right to terminate the agreement for breach.

30

It is well established that no contractual provisions be rendered superfluous, and that contractual provisions are read so as not to conflict with one another.  See Garza v. Mar. Trans. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988); Ronnen v. Ajax Elec. Motor Corp., 88 N.Y.2d 582, 589 (1996); Merrill Lynch v. Adler, 651 N.Y.S.2d 38, 39 (App. Div. 1996); Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 178 (App. Div. 1995); Robshaw v. Health Mgmt., Inc., 470 N.Y.S.2d 226, 227 (App. Div. 1983).

IBM ignores the difference, but the distinction between "perpetual, irrevocable" rights and "non-terminable" rights is well-established in the software industry, plainly reflected in Amendment No. X, and borne out by the extrinsic evidence.  As an initial matter, relevant commentary on software licensing confirms that an "irrevocable" and "perpetual" right is different from a non-terminable right:

> Especially in cases where the licensed subject matter will be used by the licensee in a context where it will make significant investments in reliance on the continued ability to exercise rights in the licensed subject matter or where the transaction is more akin to an actual assignment of the relevant rights, the license contains terms that provide that it is irrevocable or perpetual.  We understand these terms to mean that, insofar as the parties can create this situation by contract without offending overriding public policy norms, the license cannot be terminated by the licensor or otherwise ended except for breach by the licensee.

R. Nimmer & J. Dodd, Modern Licensing Law § 9:16 (2005) (emphasis added);

REDACTED

The plain text of Amendment No. X confirms this distinction.  After establishing IBM's "perpetual, irrevocable and fully paid up" right, Amendment No. X further provides in Section 1:

> Notwithstanding the above, the irrevocable nature of the above rights will in no way be construed to limit Novell's or SCO's rights to enjoin or otherwise prohibit IBM from violating any and all of Novell's or SCO's rights under this Amendment No. X, the Related Agreements, or under general patent, copyright, or trademark law.

Section 1 thus contemplates that "to enjoin" IBM was only one way to prohibit IBM from violating its Agreements; the right to terminate – an obvious means of prohibiting IBM from breaching the Agreements – was thereby permitted.

The term "non-terminable" does not appear in Amendment No. X. (IBM Ex. 124.) In contrast, in 1995, less than a year before entering into Amendment No. X with IBM, Novell and Santa Cruz had entered into a Technology License Agreement which stated, in Section II.A: "Effective upon the Closing Date and in connection with the transfer of the Assets by Novell to SCO pursuant to the Asset Purchase Agreement, Novell hereby retains, with the consent of SCO and, shall have a non-exclusive, <u>non-terminable</u>, world-wide, fee-free license" to undertake certain activities. (IBM Ex. 48 (emphasis added).) Novell clearly knew the difference between "irrevocable" and "non-terminable" and chose the appropriate word for Amendment No. X so as not to extinguish the licensor's right to terminate licenses in the event of a breach. (<u>See also</u> IBM Ex. 585 at 271-72.)

1. Any Finding of Ambiguity in the Agreements
Defeats IBM's Argument for Summary Judgment.

In the event the Court determines there is any ambiguity on the issue of terminability, that determination alone would preclude summary judgment for IBM on the issue. Courts applying New York law, as well as the Tenth Circuit, have repeatedly held that "in a contract dispute, summary judgment may be granted <u>only</u> where the language of the contract is unambiguous." <u>Nowak v. Ironworkers Local 6 Pension Fund</u>, 81 F.3d 1182, 1192 (2d Cir. 1996). That is, courts may <u>not</u> resort to extrinsic evidence in order to resolve contractual ambiguities as a matter of law. <u>See</u> <u>Bouzo v. Citibank</u>, 96 F.3d 51, 58 (2d Cir. 1996); <u>Seiden Assocs., Inc. v. ANC Holdings,</u>

32

Inc., 959 F.2d 425, 428 (2d Cir. 1992); State v. Home Indem. Co., 66 N.Y.2d 669, 671 (1985);

Hartford Acc. & Indem. Co. v. Wesolowski, 350 N.Y.S.2d 895, 898 (1973); Ruttenberg v.

Davidge Data Sys. Corp., 626 N.Y.S.2d 174 (App. Div. 1995); accord Gomez v. Am. Elec.

Power Serv. Corp., 726 F.2d 649, 651 (10th Cir. 1984); Met. Paving Co. v. City of Aurora, Colo.,

449 F.2d 177, 181 (10th Cir. 1971).[7]

This rule reflects the Court's obligation under Rule 56 to construe all evidence on a

motion for summary judgment – including ambiguous contractual terms – in the light most

favorable to the non-moving party.  Thus, if a contract is ambiguous, there necessarily exists a

genuine issue of fact concerning the parties' intended meaning:

> If the court must resort to extrinsic evidence to ascertain the correct and intended
> meaning of a term, material questions of fact necessarily exist.  If the language is
> susceptible to different reasonable interpretations, and where there is relevant
> extrinsic evidence of the parties' actual intent, then the contract's meaning
> becomes an issue of fact precluding summary judgment.

Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d

82, 86 (2d Cir. 1998) (emphasis added).  Because ascertaining the meaning of an ambiguous

contract necessarily involves drawing inferences from, and determining the credibility of,

extrinsic evidence, see Hartford, 350 N.Y.S.2d at 898, permitting a court to resolve such matters

on a motion for summary judgment "would greatly curtail the prerogatives of juries and trial

judges."  Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1439 (7th Cir. 1993)

(Posner, J.) (recognizing that "to infer meaning from disparate bits of evidence, some textual,

---

[7]     See also Restatement (Second) of Contracts § 212(2) (1981) ("A question of interpretation of an
integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic
evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence."); Wright,
Miller & Kane, Federal Practice and Procedure: Civil 2d § 2730.1, at 273-75 (2d ed. 1983); Farnsworth,
supra, § 7.14, at 538-39 (2d ed. 1990).

some testimonial, none contested in themselves but the aggregate forming a confused mosaic" is

"a task more appropriate for a trier of fact").

        2.      The Extrinsic Evidence Establishes That SCO Retained
                The Right to Terminate IBM's UNIX System V Agreement.

In addition to the foregoing precedent, the substantial extrinsic evidence shows that IBM

is wrong, and that SCO retained the right to terminate the agreement for breach.  (¶¶ 13-22.)

- <u>Larry Bouffard</u>, Novell's representative in the negotiations of Amendment No. X, has now clarified his previous declaration to confirm that Novell did not intend to make IBM's UNIX System V agreements non-terminable. (Ex. 50 ¶¶ 36-38.)

REDACTED

Accordingly, on the additional basis of the foregoing evidence, summary judgment is

unwarranted on the issue of the terminability of IBM's Agreements.

34

The background for the negotiation of Amendment No. X is also relevant. The negotiation and execution of Amendment No. X among IBM, Novell and Santa Cruz came about as a result of an earlier agreement between only IBM and Novell that Novell had purported to enter into on behalf of Santa Cruz, and in which IBM had purported to enter into a buy-out of its existing UNIX royalty obligation. (IBM Ex. 345.) When Santa Cruz learned about that buyout,

REDACTED

Accordingly, based on all of the foregoing evidence, there is no proper basis on which to find as a matter of law that the IBM Agreements could not be terminated.

B.     SCO Satisfied the Prerequisites to Termination of the IBM Agreements.

Under the IBM Agreements and Side Letter, AT&T represented that it would not terminate for breaches that it considered to be immaterial. (¶¶ 13-14.) The evidence shows that SCO concluded that IBM had materially breached its Agreements, and that SCO provided proper notice and opportunity to cure, and that it exercised its good faith best efforts to avoid termination at all times. (¶¶ 15-50.)

35

The question of whether a party to a contract has given its counterparty reasonable notice and an opportunity to cure is a fact-based question inappropriate for resolution on summary judgment. See, e.g., De Shazer v. Nat'l RV Holdings, Inc., 391 F. Supp. 2d 791,798 (D. Ariz. 2005) (question of whether opportunity to cure was reasonable created disputed issue of material fact between parties); Maytag v. U.S. Pac. Corp., No: 4:02-CV-10626, 2004 WL 1175130, at *4 (S.D. Iowa May 18, 2004) (whether communications between parties qualify as "notice" is a question for jury) (Ex. J). The issue of whether communications between the parties constitute adequate notice and opportunity to cure is a "classic question of material fact which needs to be addressed by a finder of fact." Huang v. BP Amaco Corp., No. Civ. A. 00-1290, 2002 WL 84459, at *3 (E.D. Pa. Jan. 22, 2002) (disputes over whether a letter between the parties was adequate notice and whether an appropriate opportunity was given to cure made summary judgment inappropriate) (Ex. E). The question of whether the various letters, court filings and discussions between the parties here constitute adequate notice and opportunity to cure is a question for the jury.

Similarly, the question of whether a party made "good faith" efforts to resolve a contractual dispute is for a jury. "Certainly, a party's good faith, which necessitates examination of a state of mind, is not an issue which is readily determinable on a motion for summary judgment." Bear, Stearns, 361 F. Supp. 2d at 294 (quotations and citation omitted); accord Zilg v. Prentice-Hall, Inc., 515 F. Supp. 716, 719 (S.D.N.Y. 1981); Tepedino v. City of Long Beach, 640 N.Y.S.2d 591, 592 (App. Div. 1996); Advanced Safety Sys. NY, Inc. v Mfrs. & Traders

Trust Co., 592 N.Y.S.2d 159, 160 (App. Div. 1992); Coan v. Estate of Chapin, 549 N.Y.S.2d 16,

18 (App. Div. 1989); Grant v. Pratt & Lambert, 65 N.Y.S. 486, 491 (App. Div. 1900). [8]

In January 2003, SCO informed IBM that it should consider the extent to which IBM's

publicly reported contributions to Linux development from AIX might constitute a violation of

UNIX license agreement, and that SCO's view was that it owned that license agreement. IBM's

response was not to disavow its contributions to Linux from AIX or to represent that it would not

make any further such contributions, but rather to say that it the view of IBM's counsel that SCO

did not even possess the right to enforce the contract. IBM did not even suggest that it was

willing to remove from the Linux kernel any material that it had contributed to Linux

development from AIX. (¶¶ 24-27, 31.)[9]

---

[8]     IBM's support for the premise that the issue of adequate notice may be resolved by summary
judgment is noticeably weak. Two of the cases cited by IBM (at 36, 37) were resolved by trial, not at the
summary judgment stage. See Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d
513, 514 (2d Cir. 1989) (bench trial); Gen. Supply & Construction Co. v. Goelet, 241 N.Y. 28, 37 (1925)
(noting that the case had gone to trial for the second time). In a third case (cited at 36), Consumers Power
Co. v. Nuclear Fuel Services., Inc., 509 F. Supp. 201 (W.D.N.Y. 1981), the Court denied summary
judgment. Id. at 212. There, unlike in this case, the party seeking termination argued that the language
of the contract did not require any condition precedent be satisfied before termination. Id. at 211. The
Court held that the provision in question, one that required the parties to "attempt to agree on an equitable
adjustment" before termination, should not be considered a "walk away clause" that permitted the parties
to terminate at their discretion. Id. It noted that at trial, the defendant remained free to "demonstrate that
it did in fact attempt to arrive at an 'equitable adjustment'" as required by the contract. Unlike the
defendant in Consumers Power, SCO presents undisputed evidence that it made repeated efforts to
resolve its dispute with IBM. In Kolvek v. Ferrucci, 667 N.Y.S.2d 554, 555 (App. Div. 1997) (cited at
37), the Court denied summary judgment, because there was a "triable question of fact" concerning
whether the notices of default and termination that were required by the contract were sent out. IBM's
attempt to use this case to argue that SCO has the burden of proving compliance at this stage are simply
incorrect. In Kolvek, the burden was correctly placed on the party seeking summary judgment, which in
that case was the party subject to the condition precedent. Id. Here, where IBM is seeking summary
judgment, they have the burden of establishing as a matter of law that SCO has not met the condition
precedent. See id.

[9]     Unlike the plaintiff in Sauer v. Xerox Corp., 17 F. Supp. 2d 193 (W.D.N.Y. 1998), a case cited by
IBM (at 36), SCO did not seek to terminate the agreements before they were breached. In Sauer, the
court granted summary judgment because Sauer had "failed to wait for an Event of Default to occur" as

In early March 2003, before SCO filed its lawsuit, IBM called SCO to ask about rumors that SCO was going to sue IBM. When SCO asked for the earliest opportunity to discuss what SCO described as "big problems," IBM suggested that the parties meet three months later, in June, and declined to schedule an earlier date to meet. SCO informed IBM that the issue needed to be addressed in hours and days, not weeks and months, but IBM took no action to address the issues SCO had raised. (¶¶ 32-33.) SCO subsequently filed its initial Complaint on March 6, 2003, stating that IBM had improperly made contributions from AIX, such as JFS, and highlighting the impropriety of IBM's statements – in repudiation of contractual obligations – that it intended to contribute any part of AIX that IBM or the Linux community saw fit for contribution. (¶¶ 34-38.) SCO formally noticed IBM of its intent to avail itself of the termination provision in the contract unless IBM cured the breach within 100 days.[10] (¶ 34.)

The parties then exchanged a series of letters in which SCO reiterated its view that IBM's contributions had constituted a material breach of IBM's license agreement, and IBM communicated its view that its contributions from AIX did not constitute a breach of the contract

was required by the lease agreement between the parties. Id. at 196-97. As described in detail in above (¶¶ 1-23), SCO has ample evidence that IBM has breached its UNIX agreements with SCO.

[10]    There is no question that SCO attempted to comply with the notice and opportunity to cure requirement, which is in complete contrast to the situation presented in two of the cases IBM argues are applicable to their claim. In Filmline, 865 F.2d at 516, cited by IBM (at 36), the Court (at a bench trial) specifically found that the defendants terminated the contract in the same letter where they first noticed the possibility of termination and thus included no opportunity for plaintiff "to cure, correct or remedy its asserted defaults." Id. at 516. Here, the plain language of SCO's letter placed IBM on notice that it had 100 days to cure its breaches before SCO would terminate the agreement, a fact that IBM cannot dispute. In General Supply and Construction Co., 241 N.Y. at 37, a 1925 case also cited by IBM (at 37), the only condition precedent to termination that the defendant had not waived was a provision that allowed termination of the building contract if the project's architect certified that construction delays were unreasonable. Id. at 33-34. At trial, the defendant was found to have not obtained such a certificate and therefore had not met the condition. Here, SCO has raised material questions of fact concerning whether they have met the contractual conditions.

and declined to retract its statement that it intended to contribute to Linux any part of AIX that IBM or the Linux community saw fit for contribution. Again, IBM did not even suggest that it was willing to remove from the Linux kernel any material that it had contributed to Linux development from AIX. (¶¶ 39-45.)

IBM took the position in that correspondence that SCO was obligated to identify exactly what material IBM had contributed to AIX, but of course without access to the AIX source code SCO could not have answered that question beyond what it had already done, and in even posing the question IBM declined to address the contributions (such as JFS) that SCO had already identified. In addition, given IBM's refusal to retract its statement that it intended to contribute anything it wanted from AIX, IBM's request for further details from SCO can hardly be regarded as having been made in good faith. (¶¶ 39-45.)

Considering IBM's undisputed disclosures of significant material from AIX into Linux, IBM's refusal to say that it was willing to remove any such material contributed from AIX, IBM's unreasonable demands for specificity regarding material that the parties both knew and understood had been contributed to Linux, and IBM's failure ever to say that it would stop contributing material from AIX to Linux, which IBM had already announced it was willing to do, SCO terminated IBM's UNIX System V license agreement. (¶ 46.) The notice provision in the agreements in no way requires the specificity demanded by IBM. The agreement requires that SCO simply "specify the breach," which it did.

These facts establish gave more than reasonable notice and opportunity to cure, and that SCO used its good-faith best efforts based on the information it possessed to have IBM cure its

apparent breaches of contract and evident intent to continue to breach the contract as SCO more than reasonably interpreted it.

C.    IBM's Conduct Established the Futility of Discussions.

The evidence further shows that the negotiations between SCO and IBM during the 100-day termination period were simply futile. Where the conduct of one party to purported "good faith" discussions regarding termination establishes that further discussions would be futile, the court need not even examine the full scope of the discussions between the parties. See Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) (where contractual condition requiring two days notice was a "useless gesture," party terminating agreement was "excused from performing a futile act"); First Nat'l Bank of Omaha v. Three Dimension Sys. Prods., 130 F. Supp. 2d 1098, 1101 (D. Neb. 1999) (party's claim that prior repudiation of contract eliminated contractual notice and opportunity provisions rendered summary judgment on the issue inappropriate); Allbrand Discount Liquors v. Times Square Stores Corp., 399 N.Y.S.2d 700, 701 (App. Div. 1977) ("Once it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent.").

IBM's conduct establishes the foregoing "futility" standard. As a fundamental threshold matter, IBM's admittedly "unequivocal" position from the outset of the lawsuit was that its Agreement "cannot be terminated." (¶ 39.) IBM told the SCO representatives as much in the letters and during the meetings following the filing of the lawsuit. (¶¶ 40-46.) It follows that with respect to SCO's notice of termination, from IBM's perspective, there was literally nothing to discuss. Similarly, since January 2003, IBM, as echoed by Novell, has taken the unequivocal

view that SCO did not even own the UNIX copyrights.  It strains credulity, based on those undisputed facts, for IBM now to argue that SCO failed to engage in "good faith" discussions regarding a notice of termination that IBM unequivocally regarded as having no effect whatsoever, and as providing no basis for liability against IBM post-termination.

In addition, well before March 2003, IBM had publicly announced to the open-source community that it believed it could and was willing to open-source "any part of AIX" that the community considered valuable.  (Ex. 1 ¶ 35.)  IBM clearly did not possess the right to do so under its agreement, but until the summer of 2005, never retracted the statement.  Accordingly, even standing alone, IBM's announcement of its intention to disclose potentially all parts of AIX meant that SCO was not even obligated to give IBM notice and an opportunity to cure.

Indeed, the parties' fixed disagreement regarding the scope of the IBM Agreement was a feature of the parties' discussions from the outset.  IBM argues (incorrectly) that SCO failed to identify with specificity the material that IBM had contributed to Linux in breach of its Agreement, but does not dispute that SCO had identified IBM's contribution of JFS from AIX as a breach.  IBM never even suggested to SCO that it accepted SCO's view that contributions from AIX were impermissible: IBM gave no indication that it would seek to remove AIX from Linux or otherwise seek to address that contribution, and gave no indication that it would not continue to make contributions to Linux from AIX as it had announced it would do.  (¶¶ 34-50.)

In sum, at no time during the parties' discussions in the 100-day period did IBM state or otherwise suggest (a) that IBM was retracting its statement that it was willing to open-source any part of AIX (a statement that years later IBM did retract), (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its

41

UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM

believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not determine

from its own employees what contributions they had made to Linux, including from AIX and

Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example,

JFS from Linux.  (¶¶ 34-50.)

The record thus establishes that, given IBM's unequivocal position, the discussions

between the parties during the 100-day period prior to termination were futile, and therefore

SCO was not even obligated to continue the discussions for as long as it did.

## III.    IBM HAS VIOLATED SCO'S COPYRIGHTS.

The evidence demonstrates that (1) SCO owns the UNIX copyrights (Part A, below), and

(2) IBM violated those copyrights by distributing AIX after SCO properly terminated IBM's

Agreements (Part B, below).

### A.    SCO Owns the UNIX Copyrights.

The documents and evidence below not only show that Novell did in fact transfer to SCO

the Unix copyrights, as the parties intended, but that the transfer complies with Section 204 of

the Copyright Act.[11]

Under that standard, no "magic words" are required to effect a copyright transfer, Radio

Television Espanola S.A. v. New World Entertainment, Ltd., 183 F.3d 922, 927 (9th Cir. 1999) –

not even the word "copyright." See, e.g., Dean v. Burrows, 732 F. Supp. 816, 823 (E.D. Tenn.

1989) (an endorsed check, with no mention of the word copyright, "complies with the

---

[11]    In addition, IBM does not even have standing to assert this issue, and SCO incorporates by
reference those authorities cited in response to IBM's other motions on this issue.

42

requirements of 17 U.S.C. § 204(a)"); <u>Dick Corp. v. SNC-Lavalin Constructors, Inc.</u>, No. 04 C

1043, 2004 WL 2967556, at *4 (N.D. Ill. Nov. 24, 2004) ("Under Section 204(a), a writing need

not use the term 'copyright' to effectuate a valid transfer.") (Ex. B); <u>Kenbrooke Fabrics, Inc. v.</u>

<u>Soho Fashions, Inc.</u>, 690 F. Supp. 298, 301 (S.D.N.Y. 1988) (short letter transferring ownership

of certain products but never mentioning copyrights and invoice showing payment sufficient to

satisfy Section 204(a)); <u>see also</u> <u>Effects Assocs., Inc. v. Cohen</u>, 908 F.2d 555, 557 (9th Cir.

1990) (to satisfy section 204(a), "a one-line pro forma statement will do").  Moreover, any

writing may satisfy section 204(a) – even a non-contemporaneous document written after the

parties entered into their sale agreement.  <u>See, e.g.</u>, <u>Nimmer on Copyright</u> § 10.03[3] ("[I]f a

prior oral grant is subsequently confirmed in writing, it validates the grant <u>ab initio</u> as of the time

of the oral grant."); <u>Arthur Rutenberg Homes, Inc. v. Drew Homes</u>, 29 F.3d 1529, 1532 (11th Cir.

1994) ("[T]he requirements of 17 U.S.C. § 204(a) can be satisfied by an oral assignment later

ratified or confirmed by a written memorandum of the transfer.").

     In applying section 204, courts should interpret agreements between the parties to avoid

the nonsensical and inefficient situation created by divided ownership of tangible and non-

tangible property.  <u>See</u> <u>Schiller & Schmidt, Inc. v. Nordisco Corp.</u>, 969 F.2d 410, 413 (7th Cir.

1992) (court should not interpret agreement to divide ownership of property from ownership of

copyrights for that property; such divided ownership creates "diseconomies" because a "stand

off" would ensue between the property holder, whose ability to exploit the property he owns is

significantly curtailed, and the copyright holder, who of course cannot exploit the copyright

without the tangible property).

43

Further, for purposes of section 204(a), any ambiguity in a writing may be resolved by resort to extrinsic evidence. See, e.g., Real Estate Data, Inc. v. Sidwell Co., 809 F.2d 366, 376 (7th Cir. 1987) ("Parol evidence may be admitted to establish the original intentions of the parties with respect to copyright ownership."); Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle, 356 F. Supp. 2d 515, 526 (E.D. Pa. 2005) (considering extrinsic evidence in assessing intent regarding copyright license); Dick Corp., 2004 WL 2967556, at *5 (noting relevance of extrinsic evidence to analysis of copyright transfer); Rottlund Co. v. Pinnacle Corp., No. Civ. 01-1980 DSD/SRN, 2004 WL 1879983, at *10 (D. Minn. Aug. 20, 2004) (considering extrinsic evidence in assessing parties' intent to transfer copyrights) (Ex. L); Johnson v. Tuff-N-Rumble Mgmt., Inc., No. CIV.A.99-1374, 2000 WL 1145748, at *6 (E.D. La. Aug. 14, 2000) (Ex. H) ("To the extent that the notation is deemed ambiguous as to the copyrights transferred, the Court may consider extrinsic or parol evidence."); Friedman v. Stacey Data Processing Servs., No. 89 C 4444, 1990 WL 172586, at *5 (N.D. Ill. Nov. 1, 1990) (Ex. C) (same). As in contract interpretation generally, the "overarching principle" under Section 204(a) is to effectuate the intent of the contracting parties. See Nimmer, supra, § 10.08.

In addition, California law governs the interpretation of the APA. (¶ 51.) Under that law, the Court is to consider the relevant extrinsic evidence of the contracting parties' intent further demonstrates that Novell transferred the UNIX copyrights to Santa Cruz under the APA and as clarified in Amendment No. 2. See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 37 (1968) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of

the instrument is reasonably susceptible."); <u>Wolf v. Super. Ct.</u>, 114 Cal. App. 4th 1343, 1351,

1357 (Ct. App. 2004) ("Where the meaning of the words used in a contract is disputed, the trial

court must provisionally receive any proffered extrinsic evidence which is relevant to show

whether the contract is reasonably susceptible of a particular meaning"; indeed, "it is reversible

error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's

own conclusion that the language of the contract appears to be clear and unambiguous on its

face."); <u>So. Cal. Edison v. Super. Ct.</u>, 37 Cal. App. 4th 839, 848 (Ct. App. 1995) ("Whether the

contract is reasonably susceptible to a party's interpretation can be determined from the language

of the contract itself or from extrinsic evidence of the parties' intent."); <u>accord Blumenfeld v. R.</u>

<u>H. Macy & Co.</u>, 92 Cal. App. 3d 38, 45 (Ct. App. 1979)

1.      The APA Transferred Novell's Entire UNIX-Related Business,
        <u>Including the UNIX Copyrights, to SCO.</u>

In 1995, Novell sold its entire UNIX-related business to SCO's predecessor-in-interest

The Santa Cruz Organization, Inc. (hereinafter "SCO"), through the APA. The APA transferred

to SCO "all of Seller's right, title and interest in and to the assets and properties of Seller relating

to [Seller's] Business (collectively the 'Assets') identified on Schedule 1.1(a) hereto."[12] (IBM

Ex. 123 § 1.1(a).) Schedule 1.1(a), in turn, included the entirety of Novell's UNIX business:

"<u>All rights and ownership of UNIX and UnixWare including but not limited to</u>," among other

things, the following:

- "all versions of UNIX and UnixWare and all copies of UNIX and UnixWare
  (including revisions and updates in process)," (<u>id.</u> § I);

---

[12]     The APA defined Novell's "Business" as "the business of developing a line of software products currently known as Unix and UnixWare, the sale of binary and source code licenses to various versions of Unix and UnixWare, the support of such products and the sale of other products which are directly related to Unix and UnixWare." APA, Recital A.

45

- "all technical, design, development, installation, operation and maintenance information concerning UNIX and UnixWare, including source code," (id.);

- "UNIX Source Code Products," (id.);

- "Binary Product Releases," (id.);

- "Products Under Development," (id.);

- "All of Seller's claims arising after the Closing Date against any parties relating to any right, property or asset included in the Business," (id. § II); and

- "All of Seller's rights pertaining to UNIX and UnixWare under any software development contracts, licenses and any other contracts to which Seller is a party or by which it is bound and which pertain to the Business (to the extent that such contracts are assignable)," (id. § III);

- "All copies of UNIX and UnixWare, wherever located, owned by Seller," (id. § IV).

This language clearly expressed the parties' intention that Novell transferred the copyrights in UNIX and UnixWare to SCO. See Shugrue v. Cont'l Airlines, Inc., 977 F. Supp. 280, 285-86 (S.D.N.Y. 1997) ("In a non-consumer setting such as this, a transfer of all right, title and interest to computer programs and software can only mean the transfer of the copyrights as well as the actual computer program or disks."); Relational Design & Tech., Inc. v. Brock, No. 91-2452-EEO, 1993 WL 191323, at *6 (D. Kan. May 25, 1993) (transfer of "all rights to the completed program with no licensing or royalties fees due" included copyright) (Ex. K); see also Nimmer, supra, § 10.03[2] ("As with all matters of contract law, the essence of the inquiry here is to effectuate the intent of the parties. Accordingly, even though a written instrument may lack the terms 'transfer' and 'copyright,' it still may suffice to evidence their mutual intent to transfer the copyright interest." (collecting cases)). The eight-page document titled "Selling Copyrights in Product(s) of Business," which was Attachment E to Novell's Seller Disclosure Schedule,

46

specified those UNIX-related copyrights – those "that are used in the Business as currently conducted," APA § 2.10(i), and that "cover[] product(s) relating to the Business," Seller Disclosure Schedule, § 2.10(i).

Moreover, the Bill of Sale the parties executed on the date of closing (December 6, 1995) provides that all of the assets sold through the APA were to be transferred as of that date:

> In accordance with Article 1.1(a) of the Agreement, Seller, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, <u>does hereby transfer, convey, sell, assign and deliver to Buyer, without recourse, representation or warranty except as otherwise expressly provided in the Agreement, all of the Assets.</u> Excepted from the transfer of Assets pursuant to the preceding sentence are the rights reserved by Seller pursuant to that certain Technology License Agreement between Seller and Buyer dates as of December 6, 1995.[13]

(Ex. 30 (emphasis added).) The evidence shows that, following the closing of the APA, SCO obtained the assets otherwise identified in the APA (including UNIX copyrights). (Exs. 258-68; <u>see also</u> Ex. 333 ¶ 9; Ex. 355 ¶ 9.)

### 2. Amendment No. 2 to the APA Reaffirmed SCO's Ownership of the UNIX Copyrights.

IBM now purports to read one clause of the APA's "Excluded Assets" Schedule to suggest that the sale had excluded <u>all</u> of Novell's copyrights, as opposed to only Novell's copyrights in its own non-Unix-related products, such as NetWare, which Novell was clearly retaining and to which most of the "Excluded Assets" Schedule is devoted. IBM's reading is inconsistent with the entire structure, meaning, and intent of the APA. In any event, the parties' October 1996 Amendment No. 2 to the APA puts that interpretation to rest. Amendment No. 2

---

[13] The license rights that were expressly excepted from the Bill of Sale provide further support for the conclusion that SCO owns the UNIX copyrights.

revised Schedule 1.1(b) of the APA to clarify that the "Excluded Assets" was not intended to apply to any "copyrights and trademarks owned by Novell as of the date of the Agreement [the APA] required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." (Ex. 444 ¶ A.)[14]

Novell has publicly acknowledged this plain reading of Amendment No. 2. (¶ 47.) After having claimed to own the UNIX copyrights, Novell received from SCO a copy of Amendment No. 2, which Novell inexplicably did not have in its files and had not reviewed. After receiving the document, Novell stated in a press release dated June 6, 2003:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase Agreement was sent to Novell last night by SCO. To Novell's knowledge, this amendment is not present in Novell's files. The amendment appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996.

(Ex. 338.) This press release (however Novell has tried to downplay it) is (1) an admission that Novell does not own the copyrights at issue; and (2) an admission regarding the relevance of Amendment No. 2 on the question of copyright ownership. (It is also evidence that Novell acted recklessly by claiming ownership of the copyrights without first reviewing the relevant contract documents.)

      3.     SCO's Contemporaneous Licensing of the UNIX Technology to Novell
              Further Evidences SCO's Ownership of the UNIX Copyrights.

The parties' contemporaneous license agreement provides yet additional support for the unavoidable conclusion that Novell intended to sell, and sold, to SCO the UNIX-related

---

[14]      The parties also reiterated in Amendment No. 2 that Novell had no "right to increase any SVRX licensee's rights to SVRX source code," no "right to grant new SVRX source code licenses," and no right to "prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement." (Ex. 444 ¶ B.5.)

copyrights. Paragraph 1.6 of the APA (aptly titled "License Back of Assets") expressly

contemplated and described that license in detail:

> Concurrent with the Closing, Buyer [SCO] shall execute a license agreement
> under which it shall grant to Seller [Novell] a royalty-free, perpetual, worldwide
> license to (i) all of the technology included in the Assets and (ii) all derivatives of
> the technology included in the Assets . . . (such licensed back technology to be
> referred to collectively as "Licensed Technology"). Seller [Novell] agrees that it
> shall use the Licensed Technology only (i) for internal purposes without
> restriction or (ii) for resale in bundled or integrated products sold by Seller which
> are not directly competitive with the core products of Buyer and in which the
> Licensed Technology does not constitute a primary portion of the value of the
> total bundled or integrated product. The license agreement shall include
> reasonable provisions concerning Buyer's obligation to provide documentation
> and support for the Licensed Technology. The license agreement shall also
> provide Seller with an unlimited royalty-free, perpetual, worldwide license to the
> Licensed Technology upon the occurrence of a Change of Control of Buyer
> described in Section 6.3(c) hereof. In the event of a Change of Control of Seller
> (as defined in Section 6.6 hereof), the license granted pursuant to the license
> agreement shall be limited to Seller's products either developed or substantially
> developed as of the time of the Change of Control.

(IBM Ex. 123.) As provided by the APA, SCO thus "licensed back" to Novell, at the time of the

closing, the right to use the technology covered by the UNIX and UnixWare copyrights through

a Technology License Agreement that tracks the terms described in the APA.

The parties' post-closing licensing arrangement further evidences SCO's ownership of

the UNIX license in a number of ways. <u>First</u>, entirely consistently with the transfer of the UNIX

copyrights to SCO (through the APA and as later clarified by Amendment No. 2), the

Technology Licensing Agreement specified, in a section titled "Ownership," that

> As between Novell and SCO:
> (3)    <u>Ownership of Licensed Technology shall reside in SCO.</u>
> (4)    Ownership of any modifications made to Licensed Technology pursuant to
>        the licenses specified in Section II above shall reside in Novell.

(Ex. 48 (emphasis added).)

49

Second, and perhaps most obviously, if SCO were not the rightful owner of the UNIX and UnixWare copyrights, there would have been no need for the Technology License Agreement; Novell would not have needed a "License Back of Assets" (in the words of the APA). Novell's Chairman, President, and CEO has more recently claimed (in September 2004) that Novell owns the copyrights and took out a license from SCO "As a real belt-and-suspenders approach." (Ex. 346.) This claim – coming from the very person who publicly acknowledged in June that Amendment No. 2 supports SCO's claim to ownership of the UNIX copyrights – is incredible on its face. The terms of the license that SCO gave Novell also directly undermines Novell's recent position, as described immediately below.

Third, and contrary to Novell's CEO's "belt-and-suspenders" claim, the license that SCO granted Novell gave Novell only a limited right to use UNIX and UnixWare. Novell could use UNIX and UnixWare only for internal purposes, and only in bundled products insofar as a material part of the bundled product did not compete with SCO's UnixWare business. This limited right in UNIX and UnixWare is utterly inconsistent with Novell's new-found claims of ownership of the copyrights. Under the Copyright Act, copyright ownership consists of exclusive rights to, among other things, reproduce, prepare derivative works, and distribute a work, 17 U.S.C. § 106, and "transfer of copyright ownership" is defined as: "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101 (emphasis added). In other words, a transfer of copyright ownership entails the alienation of exclusive rights; a nonexclusive license involves no such compliance.

50

This point is underscored by a comparison of the language of the writings under which SCO obtained its right to UNIX and the language of the Technology License Agreement under which SCO licensed back to Novell certain limited rights to UNIX.  As described above, SCO obtained under the APA all "right and interest" in UNIX-related source and binary code and ancillary products.  Moreover, under Amendment No. 2, the parties clarified that SCO owned "the copyrights and trademarks owned by Novell as of the date of the [APA] required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." This language plainly contemplates exclusive rights in the receiving party (SCO).  In direct contrast, the parties' license expressly limited in significant ways, Novell's right to use the UNIX and UnixWare technologies.  See Shugrue, 977 F. Supp. at 286 (recognizing that in a non-consumer setting involving the transfer of "all right, title and interest" to computer programs and software, "If the parties to such a transaction intend to transfer just a license to use the program, with the transferor retaining the copyrights, the parties surely would spell that out."); DSC Communications Corp. v. Pulse Communications, Inc., 170 F.3d 1354, 1361-62 (Fed. Cir. 1999) (ownership claim in software rejected where licensing agreement severely limited rights of licensee with respect to use of software in ways inconsistent with the rights normally enjoyed by owners of software).  The strained interpretations IBM and Novell advance here turn this authority inside out.

4.    The Parties' Other Post-Sale Conduct Further Confirms
SCO's Ownership of the UNIX Copyrights.

The parties' other conduct immediately after, and for many years following, the closing of the APA further evidences SCO's acquisition of the UNIX copyrights.  See Nimmer, supra, § 10.08 (recognizing the relevance, in interpreting written copyright

conveyance of "the manner in which they [the contracting parties] conducted themselves after the contract was entered"); Mid-West Conveyor Co. v. Jervis B. Webb Co., 92 F.3d 992, 993, 1001 (10th Cir. 1996) (relying on evidence of parties' post-agreement conduct to determine their intent in executing license agreement); see also Food Consulting Group, Inc. v. Azzalino, 270 F.3d 21, 828-32 (9th Cir. 2001) (noting relevance of "course of conduct" in assessing nature of copyright license); Holtzbrinck Pub. Holdings, L.P. v. Vyne Communications, Inc., No. 97 Civ. 1082 (KTD), 2000 WL 502860, at *4 (S.D.N.Y. Apr. 26, 2000) (Ex. D) (same). The evidence reveals the parties' understanding of the agreement:

- Shortly after the closing of the APA, SCO obtained physical possession of the UNIX copyright registrations; those copyrights remain in SCO's possession to this day. (Exs. 258-68.)

- Since 1995, SCO has shipped countless UNIX-related products with copyright notices affixed to them. (Ex. 370 ¶¶ 2-3.)

- Since 1995, SCO has entered into hundreds of license agreements for UNIX products that not only contain express representations and warranties of SCO's right, title, and ownership interest intellectual property rights required to provide the licensed product, but also indemnify licensees against any third-party claims for copyright infringement. (See, e.g., Exs. 124, 127; Ex. 333 ¶ 28.)

-

REDACTED

- From the time of the closing of the APA in 1995 until after SCO asserted legal claims concerning its Linux-related rights in 2003, Novell never contested SCO's ownership of the UNIX copyrights. (Ex. 333 ¶ 7; Ex. 335 ¶ 7.)

Accordingly, Novell and Santa Cruz (and then SCO) engaged in a course of conduct entirely consistent with SCO's ownership of the UNIX copyrights.

> 5.    The Sworn Testimony of the Principal Negotiators and Additional Testimony Shows SCO's Ownership of the UNIX Copyrights.

The sworn testimony of Ed Chatlos, Novell's chief negotiator for the APA, further confirms that Novell's new-found copyright ownership claims are baseless. At the time of the APA, Mr. Chatlos was a Senior Director working on UNIX Strategic Partnerships and Business Development issues within Novell's Strategic Relations and Mergers and Acquisitions organization. In 1995, Mr. Chatlos was assigned the responsibility of negotiating and completing the deal to sell Novell's UNIX business to SCO, and in or about June 1995, Mr. Chatlos became the lead negotiator for Novell in the negotiations with SCO. In that capacity, Mr. Chatlos held the day-to-day responsibility for the potential deal and acted as the principal interface with SCO on the business negotiations for Novell. During the Novell-SCO negotiations, Mr. Chatlos met regularly with SCO representatives, sometimes several times a week, from June to September 1995. (¶¶ 2-14.)

Mr. Chatlos's sworn Declaration confirms that Novell and SCO both intended for the 1995 Asset Purchase Agreement to convey Novell's entire UNIX business, specifically including the UNIX copyrights, to SCO. According to Mr. Chatlos's sworn testimony:

- Under the APA, "SCO acquired all right, title, and interest in and to the UNIX and UnixWare business, operating system, and source code. In the transaction, it was my intent – and to my understanding was Novell's intent – to sell the entire UNIX business to SCO, including the UNIX source code and all associated copyrights."

- "It was always my understanding and intent, on behalf of Novell, that the UNIX source code and its copyrights were part of the assets SCO purchased. I do not

53

recall anyone else ever suggesting that Novell would retain any copyright relating to UNIX, nor was I present for any discussions, general or specific, during the negotiations that contradicted my understanding of the transaction described herein. None of my superiors at Novell ever informed me that Novell was not transferring the UNIX copyrights to SCO."

- "Likewise, I never communicated to SCO in any way that the UNIX copyrights were not being sold to SCO. Nor am I aware of any instance in which anyone from Novell ever informed SCO in any way that the UNIX copyrights were not being sold to SCO as part of this transaction."

- "Given my central role in the negotiations, I believe I would have known if the parties had agreed that Novell would retain any UNIX copyrights. My intent and understanding as the lead negotiator for Novell was that Novell was transferring the copyrights to SCO in the APA. At the time the transaction was signed and closed, I did not observe anyone at Novell or SCO stating or acting as if Novell had retained any UNIX copyrights. If they had, it would have been contrary to the intent and structure of the deal as I understood it and communicated with SCO."

- "In fact, from the time the APA transaction closed in 1995 until this day, it has been my understanding and belief that Novell sold the UNIX copyrights to SCO as of the time of the closing in 1995."

- "I have reviewed Schedule 1.1(b), Excluded Assets of the APA (the "Excluded Assets Schedule") with attention to the question of whether Novell was to retain any UNIX copyrights. In my opinion the word "copyrights" in Paragraph V.A. refers – and was intended by the parties to refer – to Novell copyrights other than those relating to UNIX and UnixWare, including the NetWare assets specifically referenced in Paragraphs I, II, and IV of the Excluded Assets Schedule."

- "Pursuant to a Technology Licensing Agreement signed by the parties in early December 1995, Novell licensed from SCO the use of the UNIX source code. I believe this licensing arrangement was consistent with SCO's ownership of the copyrights upon the closing of the APA."

(¶¶ 2-14.) In addition, Mr. Chatlos confirmed each of the foregoing points during his deposition in this case. (¶ 66.)

REDACTED

If (contrary to the law) more were needed to preclude IBM's motion for summary judgment on the question of copyright ownership, SCO's principal negotiator, Jim Wilt, confirms that SCO intended to acquire the UNIX copyrights through the APA:

- "During the negotiations, I met regularly with Novell representatives, sometimes several times a week, from approximately August to September 1995. I met primarily with Ed Chatlos of Novell during those negotiations. I understood Mr. Chatlos to be Novell's chief negotiator during the negotiations."

- "It was my understanding and intent during those negotiations that SCO would acquire Novell's entire UNIX and UnixWare business including the copyrights. I do not recall, and do not believe that there ever was, any instance in which anyone at SCO or Novell ever stated or exhibited any contrary intent or understanding, to me or anyone else."

- "As a result of those negotiations, Novell and SCO entered into the Asset Purchase Agreement ('APA') dated as of September 19, 1995, through which Novell received shares of SCO common stock and other consideration, and received rights to certain binary product royalty payments to be collected by SCO. SCO acquired all right, title, and interest in and to the UNIX and UnixWare business, operating system, and source code. It was my intent on behalf of SCO to acquire through the APA Novell's entire UNIX and UnixWare business, including the UNIX and UnixWare source code and all associated copyrights, and I believed then (as now) that Novell's intent was to sell all of those assets and rights."

(¶ 67.) Mr. Wilt's additional testimony further confirms that SCO owns the UNIX copyrights, contrary to the premise of IBM's instant Motion.

The testimony of other participants in the negotiations further confirms that Novell transferred the copyrights to Santa Cruz in the APA:

REDACTED

55

REDACTED

Lawrence Bouffard worked for Novell from 1993 until 1996 as an account manager and was, by IBM's own account, the Novell representative charged with interpreting the APA for purposes of its implementation.  It was Mr. Bouffard's view that Novell had sold the UNIX business "lock, stock and barrel." (Ex. 50 ¶ 29.)  He now says that "it would not have made sense as a business arrangement for Novell to have sold Santa Cruz the UNIX business, including the UNIX technology and license agreements, but not the UNIX copyrights." (Id. ¶ 30.)  Confirming what should be obvious, Mr. Bouffard says:

> In conjunction with the APA Novell and Santa Cruz entered into a Technology
> License Agreement ("TLA") whereby Santa Cruz licensed back to Novell the
> UNIX technology transferred to Santa Cruz under the APA.  If Novell had
> retained the UNIX copyrights, as I understand it now claims, Santa Cruz would
> have been licensing the technology from Novell, not the other way around.

(Id. ¶ 30.)  On this additional basis, with respect to the Novell side of the transaction, there is no basis for IBM's motion for summary judgment as to the APA.

Duff Thompson was Novell's Senior Vice President of Business Development and Strategic Relations in 1995. (Ex. 18 ¶ 2.)  His charge at that time was "to sell the complete UNIX business and related assets so the company could focus on its flagship product NetWare, cut the related UNIX costs and thereby increase shareholder values for the company." (Id. ¶ 4;

56

<u>see also</u> <u>id.</u> ¶¶ 4-13.)                                        REDACTED

              ·, Mr. Thompson explains that "it was my understanding and intent, as

the Novell executive responsible for the negotiation of the transaction, that the UNIX copyrights

were transferred to Santa Cruz as part of the transaction that was closed in December 1995." (<u>Id.</u>

¶ 8.) He confirms: "If Novell had retained the UNIX copyrights as it now claims, there would

have been no need for the TLA; indeed, Novell would have needed to grant Santa Cruz a license

to the technology. (<u>Id.</u> ¶ 8.) He emphasizes: "Because Santa Cruz was buying the entire UNIX

business, including the source code, it was clear that they were getting the copyrights to that

source code." (<u>Id.</u> ¶ 9.) Mr. Thompson specifically disagrees with Mr. DeFazio to the extent he

states that Novell retained the UNIX copyrights. (<u>Id.</u> ¶ 10.) Mr. Thompson also specifically

disagrees with the testimony of Greg Jones on that point. (<u>Id.</u> ¶ 13.)




                                        REDACTED




        In the face of this collective evidence, IBM lacks any basis for judgment as a matter of

law in its favor on the grounds that SCO does not own the UNIX copyrights.


                                        57

B.    IBM's Unauthorized Distributions in Violation of SCO's Copyrights.

Under the Copyright Act, "anyone who violates one of the exclusive rights of the copyright owner . . . is an infringer of copyright." 17 U.S.C. § 501(a).  Among the exclusive rights of the copyright owner are the right to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work to the public.  Id. § 106(1)-(3).

In order to establish copyright infringement, the plaintiff must demonstrate ownership of a valid copyright and the defendant's unauthorized copying of the copyrighted work.  Gates Rubber, 9 F.3d at 831.  The question of unauthorized copying involves two separate inquiries: whether the defendant copied portions of the plaintiff's copyrighted work; and whether those elements of the work that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.  Id.  "Copying" in this context refers to a violation of any of the copyright holder's exclusive rights.  Id. at 831 n.6.

1.    SCO Has Satisfied the Statutory Prerequisites.

SCO has a certificate of registration from the Register of Copyrights for UNIX System V Release 4.0 ("SVR4"), Certificate of Registration No. TX-5-776-217.  (Ex. 267.)  The certificate, obtained more than five years after the publication of SVr4, constitutes evidence that the copyright in SVr4 is valid.  See 17 U.S.C. § 410(c).[15]  The federal courts regularly afford a presumption of validity to copyrighted works that have been registered more than five years after publication.  See Ushodaya Enters., Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d 329, 340 (S.D.N.Y.

---

[15]    SCO has also obtained a certificate of registration from the Register of Copyrights for UnixWare 7.1.3, Certificate of Registration No. TX-5-787-679, obtained within five years of publication. (¶ 59.) The Certificate states that SCO is the author, and thus constitutes prima facie evidence of the validity of the copyright and the fact that SCO is the owner of the copyright.  17 U.S.C. § 410(c).

1999) (awarding the presumption of validity to a copyrighted work registered more than five years after publication); <u>Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.</u>, 923 F. Supp. 1231, 1242 (N.D. Cal. 1995) (same). In addition, SCO has demonstrated that SVr4 is an original work. (<u>See</u> SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Tenth Counterclaim (Nov. 11, 2006).)

SCO has also demonstrated the chain of title of the SVr4 copyright since Novell's sale of those copyrights (detailed above) to SCO's predecessor-in-interest The Santa Cruz Organization, Inc.

REDACTED

With respect to protected expression over the literal source code that IBM has copied are written in computer source code. Source code "will almost always be found to be protectable expression." <u>Gates Rubber</u>, 9 F.3d at 833. With respect to IBM's distribution of AIX as a derivative work, SCO has demonstrated that the portions of SVr4 that IBM has copied is protectable expression. (<u>See</u> SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Tenth Counterclaim (Nov. 11, 2006).)

> 2.    SCO Has Demonstrated That IBM Has Improperly Copied
>        <u>SCO's Copyrighted Works Without Authorization.</u>

IBM accuses SCO (at 39) of failing "to adduce adequate evidence of unauthorized copying or distribution by IBM." The sole basis of IBM's argument is that SCO's Final Disclosures "do not identify a single version, file, or line of code that IBM is alleged to have infringed by continuing to distribute AIX or Dynix after SCO's purported termination of IBM's right to do so." IBM's argument is no basis for the summary judgment it seeks.

59

IBM has violated SCO's copyrights by distributing AIX, a derivative work of SVr4, after its license was terminated.  SCO clearly articulated that legal theory in SCO's pleadings and otherwise during discovery.

REDACTED

---

[16]     IBM vaguely acknowledges (at 39) SCO's identification of these lines of code by stating that the Final Disclosures "accused" certain "Project Monterey code of having been improperly included in AIX, but they do not identify a single copyright that IBM is alleged to have infringed by continuing to distribute AIX or Dynix after SCO's purported termination of IBM's rights." IBM's implication that the SVR4 code in AIX is irrelevant to the copyright infringement claim is without merit.  Nothing in the Scheduling Order or in the Court's discovery orders required that SCO match each line of code with the copyright that it infringes upon.  Further, SCO has identified not only SVR4 copyrights but also other UNIX copyrights that IBM has infringed.  (See IBM Ex. 3 ¶ 176 (Fifth Cause of Action); SCO's Responses to IBM's Interrogatories.)  In addition, SCO's copyright registrations are prima facie evidence that SCO owns the copyrights to the SVR4 code in question; if IBM believes that the code is not covered by SCO's registrations, the burden is on IBM to show that the copyrights does not cover the code.

REDACTED

The record indisputably establishes, moreover, as IBM admits in its own Motion, that IBM continued to distribute AIX with the foregoing UNIX System V source code after SCO terminated IBM's Agreements in June 2003.  (See IBM Ex. 229 at 32-33, 45, 53; see also Exs. 363, 364, 365, 366.)  SCO has thus adduced more than adequate evidence of IBM's infringement through AIX.  IBM's Motion should rejected on this basis alone.

IBM has been on notice of SCO's position from early in the case.  In pleading its Fifth Cause of Action in its Second Amended Complaint, SCO repeatedly identified AIX as a derivative of System V source code.  For example:

> SCO has therefore terminated IBM's right to use any part of the UNIX System V source code, including its derivative AIX, effective as of June 13, 2003 (the "AIX Termination" date).

(IBM Ex. 3 ¶ 11 (emphasis added).)  Then, in setting forth its Fifth Cause of Action, SCO specifically accused IBM of misusing both UNIX "derivative works" and "code" in violation of SCO's copyrights to UNIX "code" and "derivative works":

> Despite termination of such Agreements, IBM has continued to reproduce, prepare derivative works of, and distribute UNIX software, source code, object code, programming tools, and documentation related to UNIX operating system technology, and has induced others to do the same.

(Id. ¶¶ 175-76 (emphasis added).)  SCO made clear that it "is the owner of copyright rights to UNIX software, source code, object code, programming tools, documentation related to UNIX operating system technology, and derivative works thereof."  (Id. (emphasis added.)

61

Accordingly, there is no basis for IBM to claim either that SCO has failed to show a violation of its copyrights by virtue of the continued distribution of AIX or that IBM was unaware of the basis for the claim.

## IV.  SCO HAS NOT MISUSED ITS COPYRIGHTS.

In asserting (at 40) that "SCO has misused the allegedly infringed copyrights," IBM relies on and incorporates by reference its argument for copyright misuse in its memorandum in support of IBM's motion for summary judgment on its Tenth Counterclaim.  SCO also relies on and incorporates by reference its arguments in opposition to IBM's invocation of copyright misuse in SCO's memorandum in opposition to IBM's foregoing motion.  In general:

First, SCO has submitted both in discovery in response to IBM's motions for summary judgment substantial evidence proving that it owns the UNIX System V copyrights.  That and other evidence also demonstrates that SCO has a good-faith belief that it owns those copyrights.

Second, SCO has submitted both in expert discovery and in response to IBM's motions for summary judgment substantial evidence proving that Linux is an unauthorized derivative work of UNIX System V Release under the controlling precedent, and that SCO owns the copyright in SVr4.

Third, SCO has submitted both in expert discovery and in response to IBM's motions for summary judgment substantial evidence proving that AIX and Dynix/ptx are derivative works not only within the meaning given that term under IBM's UNIX System V license agreements, but also within the meaning of that term under the copyright laws.

(See SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Tenth Counterclaim (Nov. 11, 2006).)  With respect to the focus of IBM's argument, moreover, it bears emphasis that "the mere filing of a copyright infringement lawsuit is not grounds for a copyright misuse claim."  Huthwaite, Inc. v. Randstad Gen. Partners (US), L.L.C., No. 06-C-1548, 2006 WL 3065470, at *8 (N.D. Ill. Oct. 24, 2006) (Ex. F) (citing cases).  Given the foregoing evidence as applied to the well-established and controlling precedent, there is no basis for IBM's claim of "copyright misuse."

## CONCLUSION

SCO respectfully submits, for all of the reasons stated above and as set forth in Appendix

A hereto, that this Court should deny IBM's Motion for Summary Judgment on SCO's

Copyright Claim (SCO's Fifth Cause of Action).


DATED this 11th day of November, 2006.

By _____

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Stuart H. Singer (admitted pro hac vice)
Edward Normand (admitted pro hac vice)


*Attorneys for The SCO Group, Inc.*

## CERTIFICATE OF SERVICE

Plaintiff, the SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing Redacted SCO's Memorandum in Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright Claim (SCO's Fifth Cause of Action)" was served on Defendant International Business Machines Corporation on this 20th day of December, 2006 by the CM/ECF system:

> David Marriott, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, New York 10019
>
> Todd Shaughnessy, Esq.
> Snell & Wilmer LLP
> 1200 Gateway Tower West
> 15 West South Temple
> Salt Lake City, Utah 84101-1004

/s/ Brent O. Hatch