**Appendix A**

**Response to IBM's Statement of Facts**[17]

A.   UNIX, IBM, and Sequent.

1.     In 1969, Bell Laboratories, then the research division of AT&T Corp. ("AT&T"), developed a computer operating system that came to be known as the UNIX operating system. (See Ex. 3 ¶¶ 1, 23; Ex. 5 ¶¶ 1, 8; Ex. 64 ¶ 1.)

Undisputed.

2.     AT&T developed many different versions of its UNIX operating systems, including UNIX System V, the version of UNIX developed by AT&T during the early 1980s. (See Ex. 5 ¶ 9; Ex. 297 at 32.)

Undisputed.

3.     Over the years, through various business units and subsidiaries, including AT&T Technologies, Inc. and UNIX System Laboratories, Inc. ("USL"), AT&T licensed its UNIX operating systems, both in source code and object code form, to many thousands of persons and entities for their use. (See Ex. 3 ¶¶ 23-24; Ex. 5 ¶ 9; Ex. 64 ¶ 2.)  AT&T also licensed many companies to distribute their own UNIX operating systems, such as Hewlett-Packard Co.'s "HP-UX" operating system. (See Ex. 3 ¶¶ 24-27; Ex. 64 ¶ 3.)

Undisputed.

4.     Among AT&T's licensees were IBM and Sequent, which IBM acquired in 1999. (See Ex. 3 ¶¶ 62-69; Ex. 5 ¶¶ 12, 15.)  IBM and Sequent entered into their UNIX licensing agreements with AT&T (collectively, the "Agreements") in early 1985. (See Ex. 5 ¶¶ 12, 15; Ex. 3 ¶¶ 62-69.)  The Agreements are governed by New York law. (See, e.g., Ex. 492 § 7.13.)

Undisputed.

5.     Both companies entered into software agreements, which set forth the terms under which they could use AT&T's UNIX software, as well as sublicensing agreements, which set forth the terms under which software programs "based on" UNIX System V could be distributed. (Ex. 492; Ex. 119; Ex. 120; Ex. 121; Ex. 282 ¶¶ 6-8; Ex. 182 ¶ 15.)  IBM also entered into a side letter with AT&T (the "Side Letter") that further defined their relationship. (Ex. 122.)

---

[17] In citing its basis for disputing an IBM statement of fact, SCO cites herein either the paragraphs in SCO's Statement of Facts above, the paragraphs in SCO's Statement of Facts in its Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims (as "Contracts ¶ ___"), or to specific exhibits.

Disputed to the extent the statement suggests that the Side Letter defined the contractual relationship between AT&T and Sequent. (Contracts Mem. ¶¶ 88-89.)

6.      While the Agreements placed restrictions on what IBM and Sequent could do with AT&T's UNIX software, they did not restrict what IBM and Sequent could do with their original works. IBM and Sequent were free under the Agreements to do as they wished with their original works, whether or not they were included in a modification or derivative work of UNIX System V, so long as they protected AT&T's UNIX software. (See Ex. 492 § 2.01; Ex. 122 ¶ A.2; Ex. 182 ¶¶ 18, 20.)

Disputed to the extent the statement suggests that IBM and Sequent did not enter into written agreements requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (Contracts Mem. ¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreements, the parties did not intend to exclude any previous oral discussion from the agreements the parties had reached. (Contracts Mem. ¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts in Support of IBM's Motion for Summary Judgment on SCO's Contract Claims ¶ 50.)

7.      The Agreements were primarily designed to protect any trade secrets embodied in UNIX System V source code provided by AT&T or USL. (See Ex. 281 ¶ 31.) AT&T "did not intend to impose a confidentiality obligation beyond what [it] could enforce under trade secret law". (Id.)

Disputed. AT&T intended to impose a confidentiality obligation beyond what it could enforce under trade secret law, and that confidentiality obligation was a core aspect of AT&T's UNIX license agreements. (Contracts Mem. ¶¶ 63-96.) In fact, AT&T sought the broadest protections possible under the Agreements. (¶ 81.)

2

8.    IBM's and Sequent's rights under the Agreements could not be terminated except for material breach.  (See Ex. 492 § 6.03; Ex. 120 § 3.03; Ex. 122 ¶ A.5; Ex. 119 § 6.03; Ex. 260 at 247-48.)

Disputed to the extent the statement states a legal conclusion and to the extent the statement purports to summarize the terms of either IBM's or Sequent's written agreements, in that the Sequent Agreement sets forth no requirement of materiality and the IBM Side Letter provides that IBM's rights could be terminated for what AT&T considered to be material breach. (¶¶ 13-14.) Disputed to the extent the statement suggests that the Side Letter defined the contractual relationship between AT&T and Sequent. (Contracts Mem. ¶¶ 88-89.)

9.    AT&T did not consider a breach material unless it presented a significant violation of its core intellectual property rights.  (See Ex. 260 at 247.)  Michael DeFazio, the head of AT&T's UNIX licensing efforts, has testified that AT&T's purpose was "to ensure that immaterial or trivial violations of confidentiality would not be judged to be a breach of the [Agreements]".  (Id.; Ex. 182 ¶ 1.)

Depending on the meaning of the term "its core intellectual property rights," disputed in that substantial evidence shows (and easily permits the inference) that among the core protections in AT&T's standard UNIX license agreement was the requirement that the licensee hold in confidence "all parts" of its modifications or derivative works based on the licensed UNIX software product. (Contracts Mem. ¶¶ 63-163.) Disputed in that Mr. DeFazio had not drafted and did not have the authority to modify or negotiate away the terms of AT&T's standard UNIX license agreements, and was only one of many individual responsible for interpreting and enforcing the agreements. (Contracts Mem. ¶ 63-163.)

10.    AT&T's goal in implementing its licensing agreements was not to have "gotcha's" with its licensees on minor violations, but to protect the core of its intellectual property.  AT&T focused, therefore, on substance and materiality from a business perspective.  (See Ex. 260 at 248.)  As Michael DeFazio stated, "[AT&T's] goal was not here to implement a lot of agreements and then have what I'll call 'gotcha's' with all our licensees on insignificant or minor or trivial violations.  We [AT&T] were concerned about protecting the core of our

3

intellectual property, and that meant substance and materiality is what we were focused on from a business side." (Id.)

Depending on the meaning of the terms "gotcha's," "minor violations," and "the core of its intellectual property," disputed in that substantial evidence shows (and easily permits the inference) that among the core protections in AT&T's standard UNIX license agreement was the requirement that the licensee hold in confidence all parts of its modifications or derivative works based on the licensed UNIX software product. (Contracts Mem. ¶¶ 63-163.) Disputed to the extent the statement suggests that Mr. DeFazio had drafted or had the authority to modify or negotiate away the terms of AT&T's standard UNIX license agreements, as he was only one of several individual responsible for interpreting and enforcing the agreements. (Contracts Mem. ¶¶ 63-163.)

11.     Even in the event of a material breach, the Agreements could only be terminated after 100 days notice (for AIX) or 60 days notice (for Dynix) and an opportunity to cure any breach. Furthermore, the Side Letter required AT&T to exercise its "good faith best efforts to resolve any alleged breach" prior to termination. (Ex. 492 § 6.03; Ex. 121 § 3.03; Ex. 122 ¶ A.5.)

Disputed to the extent the statement states a legal conclusion and purports to summarize the termination provisions of the IBM and Sequent Agreements and the IBM Side Letter.

12.     Pursuant to the Agreements, and with the understanding that they could do as they wished with their original works, IBM and Sequent further developed and distributed their own "flavors" of UNIX software – IBM's was known as AIX, and Sequent's as Dynix. (See Ex. 492 § 2.01; Ex. 122 ¶ A.2; Ex. 119; Ex. 121.) SCO concedes that IBM owns AIX and Dynix. (See Ex. 44.)

Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (Contracts Mem. ¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their

written agreement, the parties did not intend to exclude any previous and subsequent oral

discussion from the agreement the parties had reached. (Contracts Mem. ¶¶ 19, 91-92.) "The

IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the

terms under which UNIX System V could be used and disclosed by them and under which they

could distribute software programs "based on" UNIX System V." (IBM Statement of

Undisputed Facts ¶ 50.)  Depending on the meaning of the term "their original works," disputed

in that there is substantial evidence showing (and easily permitting the inference that) IBM and

Sequent believed they were obligated to hold in confidence all parts of their UNIX flavors.

(Contracts Mem. ¶¶ 63-163.)  Disputed in that SCO owns the licensed UNIX software product in

AIX and Dynix/ptx. (Contracts Mem. ¶¶ 76-96.)

     13.    Both AIX and Dynix, which IBM owns, consist of millions of lines of code, including code written by IBM and Sequent software engineers (or outside contractors retained by them), and also code written by third parties and licensed to IBM or Sequent for inclusion in AIX or Dynix. (See Ex. 236 ¶¶ 4-5; Ex. 269 ¶¶ 3-5; Ex. 414 at 22.) By contrast, the material SCO claims in its December 22, 2005 Final Disclosures of Material Allegedly Misused by IBM ("Final Disclosures") that IBM has misused constitutes only a negligible proportion of this code. (See K Br. ¶ 231.) For example, AIX 5.1.G for Power consists of more than 160 million lines of source code, while the "Journaled File System" ("JFS") material allegedly misused by IBM amounts to only 11,170 lines of code from AIX – i.e., less than 0.01% of AIX 5.1.G. for Power. (See Ex. 181 (Ex. C), (Ex. G); K Br. ¶ 231.)

     Disputed in that the cited material does not identify what lines of code in AIX or Sequent

were written by developers without exposure, reference or access, or experience based on such

exposure, reference or access, to the licensed UNIX System V software product.

REDACTED

B.      Amendment No. X.

14.      In 1993, AT&T sold USL, which then held all of AT&T's UNIX-related assets, to Novell, which sold some, but not all, of AT&T's UNIX assets to Santa Cruz in 1995. Among other things, Novell retained all of AT&T's UNIX copyrights pursuant to an Asset Purchase Agreement ("APA") dated as of September 19, 1995. (See Ex. 123 Art. I.1(a), Sched. I.1(b).)

Disputed. Novell sold the UNIX copyrights to Santa Cruz under the APA. (¶¶ 51-70.)

15.      In 1996, IBM approached Novell about amending its UNIX licensing agreements for the purpose of acquiring non-terminable rights to distribute AIX. (See Ex. 160 ¶¶ 7-16; Ex. 163 ¶¶ 5-7.) IBM wanted to invest further in AIX and develop its AIX business, but it did not wish to do so without ensuring that it had a non-terminable right to use AIX. (See Ex 256 ¶ 13.)

Disputed. Novell's and IBM's intent in the transaction at issue was to permit IBM to

buy-out its obligation to pay binary royalties on its distributions of AIX, not to give IBM a non-

terminable right to use AIX. (¶¶ 13-22.) Amendment No. X specifically states that the purpose

of the amendment is to "simplify the royalty obligations." (IBM Ex. 124.)

16.      IBM sought to amend the Agreements in order to:  effect a royalty buy-out, thereby eliminating the need to maintain a team to audit the required annual royalty payments; make IBM's rights under the Agreements irrevocable, fully paid-up, and perpetual; make it easier to redistribute licensed source code to contractors and customers for limited purposes; and loosen the confidentiality restrictions in the Agreements. (See id. ¶ 8; Ex. 172 ¶ 19; Ex. 163 ¶ 6.)

Depending on IBM's intended meaning of the term "irrevocable, fully paid up, and

perpetual," disputed to the extent the statement suggests that IBM's, Novell's and Santa Cruz's

intent in the transaction at issue was to give IBM a non-terminable right to use AIX. (¶¶ 13-22.)

17.      Novell was represented by A. Allison Amadia and Lawrence A. Bouffard in the negotiations leading to the modification of IBM's UNIX Licensing Agreements. (Ex. 160 ¶ 9; Ex. 172 ¶ 18.) IBM was represented by William Sandve, Kenneth Stokes, and Paul D. Vineis. (See Ex. 256 ¶ 9.) To the extent Santa Cruz expressed its views during the negotiations, it was by and through Novell. (See Ex. 163 ¶¶ 8, 10; Ex. 160 ¶¶ 7, 19, 27-29.)

Disputed to the extent the statement suggests that the specifically referenced individuals

were the only ones involved in the negotiations or whose intent reflects the intent of the parties.

(¶¶ 13-22.)

18.     IBM made clear during the negotiations that it wanted a non-terminable license.
(Ex. 163 ¶ 7.)  In IBM's view, it made no sense to undertake significant further investment in
AIX absent the assurance that no one could terminate its rights to use AT&T's software, and
thereby hold hostage IBM's AIX business.  (See Ex. 256 ¶ 13; Ex. 160 ¶ 14.)

Disputed.  IBM's, Novell's and Santa Cruz's intent in the transaction at issue was not to

give IBM a non-terminable right to use AIX.  (¶¶ 13-22.)

19.     IBM stated that in order to justify a $10,125,000 non-refundable payment for
what was, even in 1996, very old software, IBM's rights under the Agreements could never be
terminated under any circumstances.  (See Ex. 256 ¶ 13; Ex. 160 ¶ 14.)

Disputed in that there is substantial evidence showing (and easily permitting the

inference) that IBM made no such statement in the course of the negotiations.  (¶¶ 13-22.)

Disputed to the extent the statement purports to describe the intent of the parties.  (¶¶ 13-22.)

20.     Novell understood IBM's proposal to mean that neither Novell nor Santa Cruz
(nor their successors or assigns) could terminate IBM's rights under the Agreements; demand
any additional royalty payments beyond the agreed-upon amount in connection with IBM's
distribution of its AIX operating system product on specified architectures (and, after five years,
other sublicensed products); or interfere with the proper exercise of IBM's rights under the
Agreements.  (See Ex. 256 ¶ 13; Ex. 160 ¶ 14; Ex. 182 ¶ 51.)

Disputed in that IBM's, Novell's and Santa Cruz's intent in the transaction at issue was

not to give IBM a non-terminable right to use AIX.  (¶¶ 13-22.)  Disputed in that the parties'

intent was not preclude Santa Cruz from terminating IBM's rights under the Agreements upon

what Santa Cruz determined to be a material breach of the Agreements.  (¶¶ 13-22.)

21.     Initially, Novell declined IBM's request for a non-terminable license.  However,
IBM persisted in the request, and Novell ultimately agreed to grant IBM a non-terminable
license. (Ex. 160 ¶¶ 11, 18; Ex. 172 ¶ 21; Ex. 163 ¶ 8.)

Disputed.  IBM was not given a non-terminable right to use AIX.  (¶¶ 13-22.)

22.     The only limitation on its rights to which IBM would agree was that Novell would retain the right to enjoin or otherwise prohibit IBM from violating Novell's rights under the amendment, the Agreements, or under general patent, copyright, or trademark law.  (Ex. 160 ¶ 14; Ex. 163 ¶ 13; Ex. 182 ¶ 51.)

Disputed.  IBM was not given a non-terminable right to use AIX.  (¶¶ 13-22.)

23.     On April 26, 1996, IBM and Novell (on behalf of itself and Santa Cruz) entered into an amendment to IBM's UNIX licensing agreements (the "April 1996 Amendment").  The April 1996 Amendment, among other things, provided IBM a non-terminable license.  (See Ex. 256 ¶ 20; Ex. 160 ¶¶ 10, 20-22; Ex. 172 ¶ 22; Ex. 582 at 1.)

Disputed.  IBM was not given a non-terminable right to use AIX.  (¶¶ 13-22.)  Disputed

to the extent the statement suggests that the April 1996 Amendment uses the term "non-

terminable," which it does not.

24.     Section 1 of the April 1996 Amendment stated that, upon payment of the consideration contemplated in the Agreement, IBM would have the "irrevocable, fully paid-up, perpetual right to exercise all of its rights under the [Agreements]…".  (Ex. 582 at 1.)  IBM and Novell intended and understood the April 1996 Amendment to render IBM's UNIX licenses non-terminable.  (Ex. 160 ¶ 35; Ex. 256 ¶ 22.)

Disputed.  IBM was not given a non-terminable right to use AIX.  (¶¶ 13-22.)

25.     Santa Cruz raised no objections during the negotiation of the April 1996 Amendment, but after it was executed, Santa Cruz objected, on the grounds that the Amendment constituted a breach by Novell of the APA, and was an improper exercise of Novell's authority.  (Ex. 583; Ex. 172 ¶ 23.)

Disputed in that Santa Cruz objected during the negotiations.  (Exs. 330, 357, 358, 359.)

26.     Novell disagreed with Santa Cruz's objection, but undertook to resolve Santa Cruz's concerns, since Novell believed it had authority to execute the April 1996 Amendment.  (See Ex. 256 ¶ 26; Ex. 172 ¶ 23.)

Disputed in that there is substantial evidence showing (and easily permitting the

inference) that Novell did not believe after the April 1996 Amendment that it had authority to

execute the April 1996 Amendment, including Amendment No. 2 to the APA. (¶¶ 13-22; IBM

Ex. 44; Ex. 50 ¶¶ 29-33.)

27.     Pursuant to a "standstill agreement" with Santa Cruz, IBM and Novell therefore agreed to refrain from acting under certain sections of the April 1996 Amendment for a period of thirty days. The standstill agreement was extended several times pending negotiations with Santa Cruz. (See Ex. 256 ¶ 26.)

Undisputed.

28.     Novell negotiated separately with IBM and with Santa Cruz to resolve Santa Cruz's concerns. (See id.; Ex. 172 ¶ 25.) IBM did not deal directly with Santa Cruz during the negotiations. Santa Cruz authorized Novell to act on its behalf. (See Ex. 256 ¶ 26.)

Disputed to the extent the statement suggests that Santa Cruz agreed to accept whatever

terms Novell wanted to negotiate with IBM, which statement the cited material does not support,

and which statement is not accurate. (IBM Ex. 585 at 13.)

29.     During this round of negotiations, IBM continued to insist on non-terminable rights, and Novell continued to assure IBM that there would be no change in that part of the parties' agreement. (See Ex. 256 ¶¶ 29-30.)

Disputed in that the evidence shows (and easily permits the inference) that IBM had not

insisted on or obtained non-terminable rights in the April 1996 Amendment, Novell did not

believe that IBM had obtained such rights in the April 1996 Amendment, and Novell did not

represent to IBM that it would obtain such rights in the subsequent negotiations. (Ex. 50 ¶¶ 29-

38.) Disputed to the extent the statement suggests that the April 1996 Amendment uses the term

"non-terminable," which it does not.

30.     Santa Cruz sought to revise the language of the irrevocability provision by, among other things, making it "subject to the provisions of this Amendment". (Id. ¶ 27; Ex. 163 ¶ 9.) IBM, however, rejected this proposal, and Santa Cruz ultimately agreed to let the irrevocability provision stand as written in the April 1996 Amendment. (Ex. 256 ¶ 30.)

Disputed to the extent the statement suggests that the "irrevocability provision" in

Amendment No. X afforded IBM "non-terminable" rights in its Agreement, or that Novell or

Santa Cruz believed the "irrevocability provision" afforded IBM any such right. (¶¶ 13-22.)

31.    At no point after this did Novell suggest that IBM's license would be terminable. (Ex. 163 ¶ 9.) At no point in the negotiations did IBM indicate a willingness to back off of the position that it must have a non-terminable license. (Id.; see Ex. 256 ¶¶ 8-14, 17, 29-30.)

Disputed. IBM was not given a non-terminable right to use AIX. (¶¶ 13-22.) Disputed

to the extent the statement suggests that the April 1996 Amendment uses the term "non-

terminable," which it does not. Disputed to the extent the statement suggests that Santa Cruz had

lacked the rights to enforce the Agreements. (Contracts Mem. ¶¶ 169-82.)

32.    Santa Cruz also sought to: (i) impose right-to-use fees on IBM contractors and customers who were provided licensed source code; and (ii) prevent IBM employees who had gained access to licensed source code from memorializing concepts, know-how, or techniques embodied in that code. (Ex. 256 ¶ 29.)

Undisputed.

33.    While IBM rejected both of these proposals, it ultimately did agree to a provision limiting its right to provide contractors and customers with copies of licensed source code to a specified number of copies (fifty) at a time. (Id.) In exchange for IBM's concession, Novell agreed to accept $350,000 less than it otherwise was entitled to as royalty payments, pursuant to an October 16, 1996 Letter Agreement between IBM and Novell. (Id. ¶ 30; Ex. 172 ¶ 26; Ex. 143.)

Undisputed.

34.    On October 17, 1996, Novell, Santa Cruz, and IBM executed Amendment No. X, which was substantially similar to, but replaced, the April 1996 Amendment. (Ex. 124 at 1; see Ex. 163 ¶ 11.)

Depending on the meaning of "substantially similar," disputed to the extent the statement

suggests that, as reflected in the two documents, there were no material differences between the

two documents, or that either of them gave IBM "non-terminable" rights in the event of a breach.

10

35.     Amendment No. X specifically acknowledged that, as part of the sale by Novell of its UNIX assets to Santa Cruz, "SCO purchased, and Novell retained, certain rights with respect to" the agreements IBM entered into with AT&T, including "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended". (Ex. 124 at 1.)

Undisputed.

36.     Under Section 1 of Amendment No. X, Novell and Santa Cruz agreed to grant IBM the following rights, in exchange for a payment of $10,125,000:

> No Additional Royalty.  Upon payment to SCO of the
> consideration in the section entitled "Consideration", IBM will
> have the irrevocable, fully paid-up, perpetual right to exercise all
> of its rights under the [Agreements] beginning January 1, 1996 at
> no additional royalty fee . . . . Notwithstanding the above, the
> irrevocable nature of the above rights will in no way be construed
> to limit Novell's or SCO's rights to enjoin or otherwise prohibit
> IBM from violating any and all of Novell's or SCO's rights under
> this Amendment No. X, the [Agreements], or under general patent,
> copyright, or trademark law.

(Id. §§ 1, 4.)

Undisputed.

37.     Section 1 of Amendment No. X superseded the term and termination provisions of the Agreements.  (See, e.g., Ex. 492 § VI; Ex. 120 § III; Ex. 122 ¶ A.5; see Ex. 256 ¶ 22; see also Ex. 124 § 11 (providing that the terms and conditions of the Agreements will remain in effect "[e]xcept as modified herein").)

Disputed in that Amendment No. X did not modify the termination provisions of the IBM

source code Agreement.  (¶¶ 13-22.)

38.     In granting IBM an irrevocable and perpetual license, Amendment No. X gave IBM a non-terminable license.  IBM's license under the Agreements cannot be terminated for any reason.  (See Ex. 256 ¶ 33; Ex. 160 ¶ 35.)

Disputed.  Amendment No. X did not give IBM a non-terminable license.  (¶¶ 13-22.)

39.     Although Novell and Santa Cruz retained the right to enjoin or otherwise prohibit any conduct in violation of the amended Agreements, or under general patent, copyright, or trademark law (as long as they could meet the standards for obtaining that relief), neither Novell,

Santa Cruz, nor anyone else had the right to terminate IBM's rights under the Agreements. (Ex. 256 ¶ 33; Ex. 160 ¶ 35; Ex. 163 ¶ 14.)

Disputed in that Amendment No. X did not give IBM a non-terminable license (¶¶ 13-22), and disputed in that Novell did not retain the aforementioned rights (Contracts Mem. ¶¶ 169-82). Undisputed to the extent the statement acknowledges that Santa Cruz could "otherwise" prohibit IBM's breach of the Agreements by terminating them.

40.     After Amendment No. X, Novell and Santa Cruz could no longer terminate IBM's rights to copy and furnish sublicensed products that included material from UNIX System V Release 3.2 and previous releases, such as AIX, if IBM were to improperly disclose the licensed source code in breach of the Agreements. However, Novell or Santa Cruz could attempt to enjoin improper disclosures. (Ex. 256 ¶ 33; Ex. 160 ¶ 35; Ex. 163 ¶ 14.)

Disputed in that Amendment No. X did not give IBM a non-terminable license (¶¶ 13-22), and disputed in that Novell did not retain the aforementioned rights (Contracts Mem. ¶¶ 169-91).

41.     All of the persons who negotiated Amendment No. X on behalf of IBM and Novell agree that the parties intended for IBM to obtain a non-terminable license. (See Ex. 256 ¶¶ 13, 35; Ex. 160 ¶¶ 14, 37; Ex. 172 ¶ 28.)

Disputed. (¶¶ 13-22.) Disputed to the extent the statement suggests that Santa Cruz did not participate in the negotiations and to the extent the statement suggests as a legal conclusion that, as a party to Amendment No. X, Santa Cruz's understanding and intent with respect to Amendment No. X is irrelevant.

42.     IBM and Novell intended and understood that Amendment No. X was to effect a royalty buy-out for a lump sum payment, and thereby give IBM rights that could not be revoked or terminated for any purpose. (See Ex. 160 ¶ 35; Ex. 256 ¶ 33.) No one ever communicated any contrary intent to IBM or Novell. (See Ex. 160 ¶ 35; Ex. 256 ¶ 33.)

Disputed in that in Amendment No. X IBM and Novell did not intend to give IBM a non-terminable license. (¶¶ 13-22.) Disputed to the extent the statement suggests that Santa Cruz did

not participate in the negotiations and to the extent the statement suggests as a legal conclusion

that, as a party to Amendment No. X, Santa Cruz's understanding and intent with respect to

Amendment No. X is irrelevant.

43.     Any argument that IBM's rights are terminable is inconsistent with the language of Amendment No. X and the understanding of the people who negotiated the April 1996 Amendment and Amendment No. X. Termination is no longer a remedy under the Agreements. (Ex. 256 ¶¶ 13, 35; Ex. 160 ¶¶ 14, 37; Ex. 172 ¶ 28; Ex. 182 ¶ 52.)

Disputed. Amendment No. X does not give IBM a non-terminable license: it does not

use that language, and substantial evidence confirms that IBM's license could be terminated for

breach. (¶¶ 13-22.)

44.     When advised that SCO, which was not involved in negotiating the April 1996 Amendment or Amendment No. X, had threatened to terminate IBM's rights under the Agreements based on alleged breaches by IBM of the Agreements, Ms. Amadia stated that she did not believe that IBM's rights under the Agreements were terminable. She stated that, to her mind, any argument that IBM's rights were terminable was inconsistent with the language of Amendment No. X, and the understanding of the parties who negotiated the April 1996 Amendment and Amendment No. X. Because the termination right was contracted away in both the April 1996 Amendment and Amendment No. X, termination was no longer a remedy. (Ex. 160 ¶ 37.)

Disputed in that in Amendment No. X does not give IBM a non-terminable license. (¶¶

13-22.) Disputed in that the facts that IBM's rights are terminable is consistent with the

understanding of people who negotiated the April 1996 Amendment and Amendment No. X. (¶¶

13-22.) Disputed to the extent the statement suggests that Santa Cruz did not participate in the

negotiations and to the extent the statement suggests as a legal conclusion that, as a party to

Amendment No. X, Santa Cruz's understanding and intent with respect to Amendment No. X is

irrelevant. Disputed to the extent the statement suggests that the word "non-terminable" appears

in the April 1996 Amendment or Amendment No. X, which it does not.

C.     SCO's Acquisition, Lawsuit, and Threatened Terminations.

13

45.     In 2001, approximately five years after Amendment No. X, Caldera International ("Caldera") acquired most, if not all, of the UNIX assets owned by Santa Cruz.  After failing to make a profit, Caldera switched management, changed its name to SCO, and adopted a business model based upon litigation.  (See Ex. 123.)

Disputed in that the cited material does not support the second part of the statement.

Disputed in that SCO's business model was not based upon litigation; rather, SCO was

attempting to protect its intellectual property just as IBM and many companies do.  (Ex. 165 ¶¶

31-37.)

46.     On March 6, 2003, SCO commenced this lawsuit against IBM, alleging in general terms that IBM improperly "dumped" UNIX source code into the publicly available Linux operating system.  (See Ex. 1 ¶¶ 82-103.)

Disputed in that the statement does not accurately summarize SCO's allegations in its

Complaint and in that the cited material does not support the statement..

47.     Linux is an "open source" program, which means, among other things, that its source code is publicly available and royalty-free, and that users have the freedom to run, copy, distribute, study, adapt, and improve the software.  (See Ex. 5 ¶ 22; Ex. 64 ¶ 8.)  Indeed, the source code for Linux is publicly available for download on the Internet.  (See Ex. 5 ¶ 23.)

Undisputed.

48.     At the same time SCO served its complaint, SCO sent a letter to IBM threatening to terminate its rights to distribute AIX and Dynix based on IBM's alleged breach of its licensing agreements.  (Ex. 153.)  In a March 7, 2003 press release, SCO publicized the letter, and publicly repeated its threat to terminate IBM's rights.  (Ex. 592.)

Depending on the meaning of the term "threat" and "threatening" disputed to the extent

the statement draws a legal conclusion in suggesting that SCO was outside its rights in sending

the letter and issuing the press release.

49.     SCO similarly sought to terminate Sequent's rights to use and distribute Dynix. By way of a letter dated May 29, 2003, SCO purported to notify Sequent of the alleged breaches, and gave Sequent until September 2, 2003 to remedy any alleged breaches.  Without waiting until September 2, 2003, SCO later sent a purported letter of termination dated August 11, 2003,

and claimed that the Dynix licenses had been terminated as of July 30, 2003. (See Ex. 154; Ex. 155.)

Disputed in that in the letter dated May 29, 2003, SCO stated that "we will provide you two (2) months to remedy all violations of the AT&T/Sequent Agreements," and two months from May 29, 2003, was July 29, 2003. Disputed to the extent the statement suggests that SCO was obligated to provide more than two (2) months notice under the Sequent Agreements.

50.     Neither SCO's letters nor its complaint described SCO's specific allegations of misconduct by IBM in any detail. (See Ex. 1; Ex. 2 at 153.) As a result, SCO did not give IBM reasonable notice of SCO's claims, or a reasonable opportunity to cure. (See Ex. 492 § 6.03; Ex. 120 §§ 2.07, 3.03; Ex. 122 ¶ A.5.)

Disputed. The letters and Complaint together described in detail the general conduct that constituted a breach of the Agreements and gave those specific examples that SCO had been able to uncover. (¶¶ 23-50.) SCO thus gave IBM reasonable notice of SCO's claims and a reasonable opportunity to cure. Disputed to the extent the statement draws a legal conclusion. Disputed to the extent the statement suggests that IBM ever suggested in any way after the filing of the lawsuit that the Agreements or terminable and therefore that the company had any obligation "to cure" at all. (¶¶ 23-50.) Disputed to the extent the statement suggests as a legal conclusion that the several discussions and meetings SCO had with IBM to discuss the problems that SCO had with IBM's conduct before the filing of the lawsuit are irrelevant with respect to the reasonable notice of SCO's claims and a reasonable opportunity to cure.

51.     SCO's purported termination letter referred only to breaches of "trade secret" confidentiality. (Ex. 153.) SCO, however, amended its complaint to eliminate any trade secret claims, and later admitted that it had no colorable trade secret claims: "There is no trade secret in UNIX System [V] files. That is on the record. No problem with that." (Ex. 414 at 46.)

Disputed in that the statement does not accurately summarize SCO's termination letter or the complaint that was filed at the same time, or the prior discussions between the parties.

Disputed to the extent the statement suggests that SCO's termination letter did not give IBM

notice of SCO's view that IBM had breached its Agreements, and to the extent the statement

draws a legal conclusion.

52.    In order to give IBM an opportunity to cure, IBM asked SCO to identify the
alleged breaches of the Agreements, both in person through counsel on June 2, 2003, and via
letters of April 2, 2003, May 5, 2003, June 13, 2003, and August 14, 2003.  (See Ex. 580; Ex.
156; Ex. 157; Ex. 158; Ex. 159.)

Disputed in that IBM's "unequivocal" position was that the Agreements could not be

terminated, such that IBM did not believe it had any obligation "to cure" at all.  (¶¶ 23-50.)

Disputed to the extent the statement suggests that SCO had not informed IBM and that IBM did

not understand SCO's interpretation of the Agreements and how SCO believed IBM had

breached them, and to the extent the statement suggests that IBM had not decided that it simply

disagreed with SCO's interpretation of the Agreements.  (¶¶ 23-50.)  Disputed to the extent the

statement suggests that in any letter or during any meeting IBM ever stated or otherwise

suggested (a) that IBM was retracting its statement that it was willing to open-source any part of

AIX, (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt,

(c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from

AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or Dynix/ptx source

code, (e) that IBM could not determine from its own employees what contributions they had

made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its

breaches by somehow removing, for example, JFS or EVMS from Linux.  (¶¶ 23-50.)

53.    In a letter dated April 2, 2003, IBM asked SCO to provide IBM with meaningful
details about its allegations, and to state what SCO wanted IBM to do to cure the alleged
breaches.  (Ex. 580.)  IBM asked SCO to inform IBM specifically what SCO contended IBM had
done in violation of its obligations to SCO.  (Id. at 2.)

Disputed in that IBM's "unequivocal" position was that the Agreements could not be

terminated, such that IBM did not believe it had any obligation "to cure" at all. (¶¶ 23-50.)

Disputed to the extent the statement suggests that SCO had not informed IBM and that IBM did

not understand SCO's interpretation of the Agreements and how SCO believed IBM had

breached them, and to the extent the statement suggests that IBM had not decided that it simply

disagreed with SCO's interpretation of the Agreements. (¶¶ 23-50.)  Disputed to the extent the

statement suggests that in the letter IBM stated or otherwise suggested (a) that IBM was

retracting its statement that it was willing to open-source any part of AIX, (b) that IBM denied

that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a

violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d)

that IBM believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not

determine from its own employees what contributions they had made to Linux, including from

AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing,

for example, JFS or EVMS from Linux. (¶¶ 23-50.)

54.     IBM also informed SCO that "IBM does not believe that the license rights granted
under the agreements are terminable". (Ex. 580 at 1.)  IBM noted that SCO had filed its
complaint without notifying IBM, and that SCO's purported notification of IBM's alleged breach
of the Agreements "do[es] not specify IBM's alleged misconduct". (Id.)

Disputed to the extent the statement suggests that the Agreements were non-terminable,

that SCO had not informed IBM and that IBM did not understand SCO's interpretation of the

Agreements and how SCO believed IBM had breached them, or that IBM had not decided that it

simply disagreed with SCO's interpretation of the Agreements. (¶¶ 23-50.)  Disputed to the

extent the statement suggests that in the letter IBM stated or otherwise suggested (a) that IBM

was retracting its statement that it was willing to open-source any part of AIX, (b) that IBM

denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS or EVMS from Linux. (¶¶ 23-50.)

    55.    IBM therefore asked SCO to specify:

> (1) any products, code, files, trade secrets and/or confidential information that SCO believed IBM had improperly used, transferred, disposed of or disclosed;

> (2) the ways and specific instances in which SCO alleged IBM had improperly used, transferred, disposed of or disclosed any products, code, files, trade secrets and/or confidential information; and

> (3) the steps that SCO believed IBM was required to take to cure the alleged breaches and injuries about which SCO complained.

(Id. 1-2.)

    Disputed to the extent the statement suggests that SCO had not informed IBM and that IBM did not understand SCO's interpretation of the Agreements and how SCO believed IBM had breached them, or that IBM had not decided that it simply disagreed with SCO's interpretation of the Agreements. (¶¶ 23-50.) Disputed to the extent the statement suggests that in the letter IBM stated or otherwise suggested (a) that IBM was retracting its statement that it was willing to open-source any part of AIX, (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM believed

18

SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS or EVMS from Linux. (¶¶ 23-50.)

56.    SCO, however, refused to provide IBM with this information, and instead wrote to IBM and stated that, "If you would like further written information regarding IBM's past and continuing violations, we need more information from you." (Ex. 581 at 1.)

Disputed to the extent the statement suggests that SCO had not informed IBM and that IBM did not understand SCO's interpretation of the Agreements and how SCO believed IBM had breached them, or that IBM had not decided that it simply disagreed with SCO's interpretation of the Agreements. (¶¶ 23-50.) Disputed to the extent the statement suggests that SCO possessed such information but declined to provide it to IBM, and to the extent the statement suggests that SCO could have known or provided such information without the information SCO sought from IBM. (¶¶ 23-50; Ex. 165 ¶ 37.)

57.    IBM reiterated its request for specifics by letter of May 5, 2003, stating that none of SCO's letters to date had given IBM sufficient notice of alleged breaches, as required.  IBM reminded SCO that, even if the AIX-related Agreements permitted termination of its rights, they required, in addition to 100 days specific written notice, SCO's "good faith best efforts" to resolve any alleged breach.  IBM also informed SCO that the specific information it requested was required in order for IBM to cure any alleged breach.  (See Ex. 156.)

Disputed in that IBM's "unequivocal" position was that the Agreements could not be terminated, such that IBM did not believe it had any obligation "to cure" at all. (¶¶ 23-50.) Disputed to the extent the statement suggests that SCO had not informed IBM and that IBM did not understand SCO's interpretation of the Agreements and how SCO believed IBM had breached them, or that IBM had not decided that it simply disagreed with SCO's interpretation of the Agreements. (¶¶ 23-50.) Disputed to the extent the statement suggests that SCO possessed

19

such information but declined to provide it to IBM, and to the extent the statement suggests that

SCO could have known or provided such information without the information SCO sought from

IBM. (¶¶ 23-50.) Disputed to the extent the statement draws a legal conclusion. Disputed to the

extent the statement suggests that in the letter IBM stated or otherwise suggested (a) that IBM

was retracting its statement that it was willing to open-source any part of AIX, (b) that IBM

denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it

was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to

Linux, (d) that IBM believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM

could not determine from its own employees what contributions they had made to Linux,

including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by

somehow removing, for example, JFS or EVMS from Linux. (¶¶ 23-50.)

58.    Counsel for SCO and IBM met on June 2, 2003, some eighty-eight days into
SCO's purported 100-day cure period. (Ex. 158 at 1.) Despite IBM's request, SCO did not
provide the information requested in IBM's April 2, 2003 letter. (Id.)

Disputed to the extent the statement suggests that SCO had not informed IBM and that

IBM did not understand SCO's interpretation of the Agreements and how SCO believed IBM

had breached them, or that IBM had not decided that it simply disagreed with SCO's

interpretation of the Agreements. (¶¶ 23-50.) Disputed to the extent the statement suggests that

SCO possessed such information but declined to provide it to IBM, and to the extent the

statement suggests that SCO could have known or provided such information without the

information SCO sought from IBM. (¶¶ 23-50.) Disputed to the extent the statement draws a

legal conclusion. Disputed to the extent the statement suggests that during the meeting IBM

stated or otherwise suggested (a) that IBM was retracting its statement that it was willing to

20

open-source any part of AIX, (b) that IBM denied that it had made contributions to Linux from

AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute

source code from AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or

Dynix/ptx source code, (e) that IBM could not determine from its own employees what

contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was

willing "to cure" its breaches by somehow removing, for example, JFS or EVMS from Linux.

(¶¶ 23-50.)

     59.    By letter of June 12, 2003, SCO informed IBM that it would seek to terminate the
license permitting IBM to use and distribute AIX on June 13, 2003. (Ex. 157 at 4.)

Disputed in that the cited material does not support the statement. Disputed to the extent

the statement suggests that SCO had not previously given IBM notice that SCO would terminate

the license permitting IBM to use and distribute AIX. (¶¶ 23-46.)

     60.    On June 13, 2003, IBM informed SCO:

> Your [March 6, 2003] letter provided virtually no information beyond its
> conclusory assertions. We promptly requested such support . . . but
> received nothing more prior to the June 2 meeting, 88 days into the
> purported 100 day "cure" period. At that meeting, your counsel did no
> more than repeat your accusations, refer us to particular paragraphs of
> your complaint and show us a handful of notes from a website that does
> not, in fact, demonstrate any violation of protected license rights. Thus, to
> this day, you have not provided IBM with any factual support for your
> accusations. That is precisely what we informed you and your colleagues
> at the June 2 meeting, when we expressed our disappointment with the
> lack of information received from you.

(Ex. 158 at 1.)

Disputed to the extent the statement suggests the accuracy of the internal statements

quoted from the cited material. (¶¶ 23-46.) Disputed to the extent the statement suggests that in

the letter IBM stated or otherwise suggested (a) that IBM was retracting its statement that it was

willing to open-source any part of AIX, (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS or EVMS from Linux. (¶¶ 23-50.)

61.     After IBM received SCO's letter of August 11, 2003, which purported to terminate the Dynix licenses as of July 30, 2003, IBM advised SCO on August 14, 2003 that SCO had never given IBM notice of any possible July 30, 2003 termination date in its letter. (Ex. 155; Ex. 159 at 1.) IBM also made yet another request for specific notice of the alleged breaches, in order that it might attempt a cure: "I write to ask that you inform IBM specifically what SCO contends IBM has done in violation of its obligations to SCO, and what you contend IBM should do to cure such violations." (Ex. 159 at 1.) SCO declined to respond.

Disputed to the extent the statement suggests the accuracy of the internal statements quoted from the cited material. (¶¶ 23-46.) Disputed in that IBM's "unequivocal" position was that the Agreements could not be terminated, such that IBM did not believe it had any obligation "to cure" at all. (¶¶ 23-50.) Disputed to the extent the statement suggests that SCO had not informed IBM and that IBM did not understand SCO's interpretation of the Agreements and how SCO believed IBM had breached them, or that IBM had not decided that it simply disagreed with SCO's interpretation of the Agreements. (¶¶ 23-50.) Disputed to the extent the statement suggests that SCO possessed such information but declined to provide it to IBM, and to the extent the statement suggests that SCO could have known or provided such information without the information SCO sought from IBM. (¶¶ 23-50.) Disputed to the extent the statement draws a legal conclusion. Disputed to the extent the statement suggests that in the letter IBM stated or

otherwise suggested (a) that IBM was retracting its statement that it was willing to open-source any part of AIX, (b) that IBM denied that it had made contributions to Linux from AIX and Dynix/pt, (c) that IBM thought it was a violation of its UNIX Agreements to contribute source code from AIX or Dynix/ptx to Linux, (d) that IBM believed SCO had access to AIX or Dynix/ptx source code, (e) that IBM could not determine from its own employees what contributions they had made to Linux, including from AIX and Dynix/ptx, or (f) that IBM was willing "to cure" its breaches by somehow removing, for example, JFS or EVMS from Linux. (¶¶ 23-50.)

D.      SCO's Copyright Claims.

62.     By letter dated June 12, 2003, SCO purported to terminate IBM's AIX license as of June 13, 2003. In a letter dated August 11, 2003, SCO also purported to have terminated IBM's Dynix license as of July 30, 2003. (Ex. 155; Ex. 157.) SCO did so without using its good faith best efforts to resolve the alleged breach prior to termination. (See Ex. 122 ¶ A.5; Ex. 581; Ex. 156; Ex. 158.)

Disputed to the extent the statement draws a legal conclusion. Disputed to the extent the statement suggests that SCO did not so terminate the licenses or, in the context of IBM's refusal to give any indication it intended to cure its breach, did not use its good faith best efforts to have the problems solved. (¶¶ 23-50.)

63.     IBM had ceased selling Dynix source code prior to SCO's purported termination, and IBM has not sold it since. (See Ex. 229 at 60-62.) However, IBM has continued to sell AIX, as it has for more than two decades. (See Ex. 229 at 45; Ex. 256 ¶¶ 1, 33.)

Undisputed.

64.     In February 2004, SCO amended its complaint to add a claim for copyright infringement. (See Ex. 3 ¶¶ 173-80.) By that claim, SCO alleges that IBM has infringed, induced the infringement of, and contributed to the infringement of, certain UNIX copyrights allegedly owned by SCO. (See id.)

Disputed to the extent the statement suggests that SCO's claims in this case include only one relating to "copyright." (See note 1, above.) Disputed to the extent the statement suggests that SCO does not own the referenced copyrights. (¶¶ 51-70; Contracts Mem. ¶¶ 169-82.)

65.     SCO, however, does not own the allegedly infringed copyrights, because Novell retained them under the APA. An amendment to the APA, Amendment No. 2, addressed certain UNIX copyrights, but did not actually transfer them. (Ex. 444.)

Disputed. (¶¶ 51-70; Contracts Mem. ¶¶ 169-82.)

66.     Despite the fact that SCO does not own the allegedly infringed copyrights, SCO now claims: that IBM breached its UNIX licensing agreements by contributing AIX and Dynix code to Linux; that SCO terminated IBM's licenses under the agreements based on its alleged breaches; and that distribution of AIX and Dynix after the purported termination infringes SCO's alleged copyrights. (See Ex. 3 ¶¶ 173-86.)

Disputed in that SCO owns the referenced copyrights. (¶¶ 51-70; Contracts Mem. ¶¶ 169-82.) Disputed to the extent the statement purports to summarize the cited material.

67.     IBM propounded a series of discovery requests asking SCO to disclose its allegations and evidence of copyright infringement. (Ex. 11; Ex. 12.) SCO declined to provide IBM with the information it requested, forcing IBM to make two separate motions to compel, on October 1, 2003 and November 6, 2003. (Ex. 62; Ex. 63.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith (¶¶ 73-79), and to the extent the statement suggests that IBM did not understand that SCO based its copyright claim at issue on the grounds that AIX is a derivative work of UNIX System V within the meaning of the copyright laws (¶¶ 77-79).

68.     The Court entered three separate orders, dated December 12, 2003, March 3, 2004, and July 1, 2005, requiring SCO to describe in detail its allegations of infringement. (Ex. 55 ¶ 4; Ex. 56 ¶¶ I.1-5; Ex. 58 III.) The Court required SCO to respond to IBM's interrogatories, and to identify all allegedly misused material, by version, file, and line of code, including all allegedly infringed and allegedly infringing material, not later than December 22, 2005, in its Final Disclosures. (Ex. 55 ¶ 4; Ex. 56 ¶¶ I.1-5; Ex. 58 III.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith (¶¶ 73-79), and to the extent the statement suggests that SCO did not specify or that IBM did not understand that SCO based its copyright claim at issue on the grounds that AIX is a derivative work of UNIX System V within the meaning of the copyright laws (¶¶ 77-79). Disputed to the extent the statement suggests that the Court had ordered, clearly or otherwise, SCO "to describe all of the allegedly misused materials by version, file, and line of code." (Contracts Mem. ¶¶ 234-93.)

69.     Despite the Court's orders, SCO has never described by version, file, and line of code any material allegedly infringed by IBM's post-termination AIX and Dynix activities. (See Ex. 151; Ex. 53; Ex. 54; Ex. 66; Ex. 59 at 28, 32, 35-38.) Moreover, SCO has declined to provide the full and detailed responses to IBM's interrogatories directed at SCO's allegations of unauthorized copying. (Ex. 151; Ex. 53; Ex. 54.) Nowhere in its interrogatory responses served with its interim disclosures did SCO provide any specific allegations or evidence of any conduct by IBM constituting unauthorized copying. (See Ex. 151; Ex. 53.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith (¶¶ 73-79), and to the extent the statement suggests that SCO did not specify or that IBM did not understand that SCO based its copyright claim at issue on the grounds that AIX is a derivative work of UNIX System V within the meaning of the copyright laws (¶¶ 77-79). Disputed to the extent the statement suggests that the Court had ordered, clearly or otherwise, SCO "to describe all of the allegedly misused materials by version, file, and line of code." (Contracts Mem. ¶¶ 234-93.)