Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>    Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff. | **PLAINTIFF/COUNTERCLAIM-DEFENDANT SCO'S MEMORANDUM IN OPPOSITION TO IBM'S MOTION FOR SUMMARY JUDGMENT ON SCO'S UNFAIR COMPETITION CLAIM (SCO'S SIXTH CAUSE OF ACTION)**<br><br>**FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]**<br><br>Case No. 2:03CV0294DAK<br>Honorable Dale A. Kimball<br>Magistrate Judge Brooke C. Wells |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

SCO'S STATEMENT OF ADDITIONAL MATERIAL FACTS .................................... 3

A.   SCO's Strong Position in the 1990's in the Increasingly Important
      UNIX-on-Intel Market .................................................................... 3

B.   IBM Is Attracted to SCO's Technical Expertise and Strong Position in the
      UNIX-on-Intel Market .................................................................... 4

C.   IBM Is Attracted to the SVR4 Technology Base of SCO's UNIX Operating
      System ......................................................................................... 6

D.   Project Monterey Is Announced ...................................................... 6

E.   SCO and IBM Enter the Joint Development Agreement ...................... 7

F.   IBM Acknowledges Its Duties to SCO As a Partner .......................... 8

G.   IBM Secretly Abandons Project Monterey and Transitions Support to Linux ....... 9

H.   IBM Engaged In This Ruse In an Effort to Legitimize Its Use in AIX of
      SCO's SVR4 Code ........................................................................ 13

I.    IBM's "Solution" Is More Deception:  A Sham PRPQ of the Project Monterey
      Operating System ......................................................................... 18

J.    IBM Conceals Its Intent to Object to the Acquisition of the UNIX Business
      by Caldera .................................................................................... 23

K.   Caldera Acquires the UNIX Business, Including the Misappropriated SVR4
      Code and Pre-Existing Legal Claims Relating to That Code ............... 25

L.    SCO Was Not Aware of IBM's Deception in March 2001 ................... 25

M.   IBM Continued to Cover Its Tracks Well Into 2002 .......................... 27

N.   SCO Was Injured By IBM's Deception ........................................... 28

ARGUMENT ..................................................................................................................... 30

I.       SCO TIMELY FILED ITS UNFAIR COMPETITION CLAIM ..................................... 30

         A.       The Continuing Tort Doctrine Defeats IBM's Motion ......................................... 30

         B.       The Two-Year Provision Applies Only to Breach of Contract Claims ............... 32

                  1.       Limitations Shortening Provisions Are Strongly Disfavored ................... 32

                  2.       Section 22.3 Has No Relevance to Unfair Competition Claims ............... 34

                  3.       At Most, the JDA Relates Only to an IBM Defense to SCO's
                           Unfair Competition Claim ....................................................................... 35

         C.       Even If Applicable, the Two-Year Period Did Not Start Prior to April 2001 ...... 35

II.      SCO HAS STRONG EVIDENCE OF UNFAIR COMPETITION BY IBM.................... 39

         A.       IBM's Alleged Conduct Constitutes Actionable Unfair Competition .................. 39

                  1.       IBM Misstates the Independent Tort Doctrine ........................................ 40

                  2.       The Tort of Unfair Competition Includes More Than "Palming Off"
                           and "Misappropriation" ............................................................................ 45

                  3.       In Any Event, SCO Has Ample Proof of Misappropriation .................... 46

                  4.       SCO Has Overwhelming Proof that IBM Acted in Bad Faith ................. 47

         B.       SCO Has Standing to Sue IBM For Unfair Competition ..................................... 45

III.     SCO'S UNFAIR COMPETITION CLAIM IS NOT PREEMPTED .............................. 49

IV.      SCO'S UNCHALLENGED ALLEGATIONS PRECLUDE SUMMARY
         JUDGMENT ON THE NON-MONTEREY UNFAIR COMPETITION CLAIMS ........ 51

CONCLUSION ................................................................................................................. 54

APPENDIX A .................................................................................................................. 55

# TABLE OF AUTHORITIES

Page

## CASES

Allen v. First Wallstreet Settlement Corp.,
130 A.D.2d 824, 514 N.Y.S.2d 726 (3d Dept.1987) ....................................44

American Exp. Financial Advisors, Inc. v. Topel,
38 F.Supp. 2d 1233 (D. Colo. 1999) ...........................................................39

Anderson v. State Farm Fire & Cas. Co.,
583 P.2d 101 (Utah 1978) ...........................................................................33

Apple Records, Inc. v. Capitol Records, Inc.,
137 A.D.2d 50, 529 N.Y.S.2d 279 (1st Dept.1988)....................................44

Astroworks, Inc. v. Astroexhibit, Inc.,
257 F. Supp. 2d 609 (S.D.N.Y. 2003)....................................................47, 48

Backus v. Nationwide Mut. Ins. Co.,
392 N.Y.S.2d 765 (2d Dept. 1977) .............................................................33

Butcher v. Gilroy,
744 P.2d 311 (Utah Ct. App. 1987) ............................................................38

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,
70 N.Y. 2d 382, 521 N.Y.S. 2d 653 (1987) ...............................................44

CMAX/Cleveland, Inc. v. UCR, Inc.,
804 F. Supp. 337 (M.D.Ga. 1992) ..............................................................54

Computer Associates Intern., Inc. v. Altai, Inc.,
982 F.2d 693 (2d Cir.1992)..........................................................................53

Culp Constr. Co. v. Buildmart Mall,
795 P.2d 650 (Utah 1990)............................................................................45

Data Gen. Corp. v. Grumman Sys. Support Corp.,
36 F.3d 1147 (1st Cir.1994).........................................................................55

Dep't of Soc. Serv. v. Higgs,
656 P.2d 998 (Utah 1982)............................................................................48

Derrick Mfg. Corp. v. Southwestern Wire Cloth,
    934 F. Supp. 796 (S.D.Tex. 1996) .................................................................32

Dime Sav. Bank of N.Y. v. Skrelja,
    227 A.D. 2d 372, 642 N.Y.S. 2d 84 (2d Dept. 1996) ..............................43

Doty v. Elias,
    733 F.2d 720 (10th Cir. 1984) ......................................................................38

Dundes v. Fuersich,
    No. 602314104 2006 WL 2956005 (N.Y.Sup. Ct. 2006) ..........................38

Dunlop Tire & Rubber Corp. v. Ryan,
    108 N.W.2d 84 (Neb.1961).............................................................................34

Durham Indust., Inc. v. Tomy Corp.,
    630 F.2d 905 (2d Cir. 1980).............................................................................55

Ehat v. Tanner,
    780 F.2d 876 (10th Cir.1985) .........................................................................54

Equilease Corp. v. State Fed. Sav. and Loan Ass'n,
    647 F. 2d 1069 (10th Cir. 1981) .....................................................................45

Frank Management, Inc v. Weber,
    145 Misc.2d 995, 549 N.Y.S.2d 317 (N.Y.Sup.Ct. 1989) .........................44

Fuller v. Favorite Theaters Co. of Salt Lake,
    230 P. 2d 335 (Utah. 1951)..............................................................................50

Gates Rubber Co. v. Bando Chem. Indus., Ltd.,
    9 F.3d 823 (10th Cir.1993) ..................................................................... passim

General Stencils, Inc. v. Chiappa,
    219 N.E.2d 169 (N.Y. 1966)............................................................................37

Greenlight Capital, Inc. v. GreenLight (Switz.) S.A.,
    No. 04-Civ.-3136, 2005 WL 13682 (S.D.N.Y. Jan. 3, 2005) ...............31, 33

Hafen v. Strebeck,
    338 F.Supp.2d 1257 (D.Utah 2004) ..............................................................38

Hammer v. Amazon.com,
    No. CV 03-4238 2005 WL 2467046 (E.D.N.Y. Sept. 27 2005)................42

iv

Hargrave v. Oki Nursery, Inc.,
   636 F. 2d 897 (2d Cir. 1980)..........................................................42, 43

Harline v. Campbell,
   728 P.2d 980 (Utah 1986)..........................................................38

Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.,
   82 F.3d 1533 (10th Cir. 1996) ..........................................................52, 53, 54

Hauer Const. Co. v. City of New York,
   85 N.Y.S.2d 42 (N.Y. Sup. Ct. 1948) ..........................................................34

Huckshold v. HSSL, L.L.C.,
   344 F.Supp.2d 1203 (E.D.Mo. 2004)..........................................................54

In re Britton,
   288 B.R. 170 (Bankr. N.D.N.Y. 2002) ..........................................................49

In re Hoopiiaina Trust,
   ___ P.3d ___, 2006 WL 2669933 (Utah Sept. 19, 2006)..........................................................37, 40

In re Piccillo,
   797 N.Y.S.2d 236 (4th Dept.. 2005) ..........................................................38

In re Penn Central Transp. Co.,
   391 F. Supp. 1404 (E.D. Pa. 1975) ..........................................................33

In re Shulman Trans. Enter., Inc.,
   744 F.2d 293 (2d Cir. 1984) ..........................................................39

Ippolito v. Ono-Lennon,
   526 N.Y.S.2d 877 (N.Y. Sup.Ct. 1988) ..........................................................55

Keating v. Baskin-Robbins USA Co.,
   No. 5:99-CV-148 2001 WL 407017 (E.D.N.C. 2001)..........................................................35

Kilpatrick v. Wiley, Rein & Fielding,
   909 P.2d 1283 (Utah App. Ct. 1996) ..........................................................45

Kindergartners Count, Inc. v. Demoulin,
   171 F. Supp.2d 1183 (D.Kan. 2001) ..........................................................53, 54, 55

Kwan v. Schlein,
   441 F. Supp.2d 491 (S.D.N.Y. 2006) ..........................................................30

Lewis v. Hopper,
    295 P.2d 93 (Cal.App.1956) ...........................................................................33

LNC Inv. Inc. v. Rep. of Nicar.,
    No. 96-6360, 1999 WL 92603 (S.D.N.Y. Feb. 19, 1999)..............................49

M/S Bremen v. Zapata Off-Shore Co.,
    407 U.S. 1 (1972)..........................................................................................34

Meridien Intern. Bank Ltd. v. Government of the Republic of Liberia,
    23 F.Supp.2d 439 (S.D.N.Y. 1998).................................................................37

Mobius Mgmt. Sys, Inc. v. Fourth Dimension Software, Inc.,
    880 F. Supp. 1005 (S.D.N.Y. 1994)...............................................................47

Morelli v. Tiffany & Company,
    2002 WL 991017 (E.D.Pa. 2002) ..................................................................32

Nassau Chapter Civil Serv. Employees Ass'n, Local 830 v. County of Nassau,
    585 N.Y.S.2d 966, 970 (Sup.Ct.1992), aff'd, 612 N.Y.S.2d 880 (App.Div.1994) ....................34

Niagara Mohawk Power Corp. v. Freed,
    733 N.Y.S.2d 828 (N.Y. App.Div. 2001) .......................................................38

Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.,
    1992 WL 121726 (N.D.N.Y. 1992) ...............................................................39

Nobel Ins. Co. v. City of New York,
    00-CV-1328 2006 WL 2848121 (S.D.N.Y. 2006)..........................................34

Penato v. George,
    383 N.Y.S.2d 900 (2d Dept. 1976) ...............................................................39

Pravin Banker Assoc., LTD. v. Banco Popular De Peru,
    109 F. 3d 850 (2d Cir. 1997).........................................................................49

Productivity Software Int'l, Inc. v. Healthcare Techs. Inc.,
    No. 93-6949, 1995 WL 437526 (S.D.N.Y. July 25, 1995)........................42, 43

Roslyn Associates v. Incorporated Village of Mineola,
    443 N.Y.S.2d 424 (2d Dept.) ........................................................................51

Russell Packard Development, Inc. v. Carson,
    108 P.3d 741 (Utah 2005) .............................................................................37

Russello v. U.S.,
   464 U.S. 16 (1983) .................................................................................................51

SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assoc., Inc.,
   28 P. 3d 669 (Utah 2001) ......................................................................................50

Stump v. Gates,
   211 F.3d 527 (10th Cir. 000) ................................................................................38

Sun Trust Bank v. Sun International Hotels, Ltd.,
   184 F.Supp.2d 1246 (S.D.Fla. 2001) ...................................................................34

Telex Corp. v. IBM,
   367 F. Supp. 258 (D. Okl. 1973), aff'd in part, rev'd in part on other grounds,
   510 F.2d 894 (10th Cir.), cert. dismissed, 423 U.S. 802 (1975) ........................31

Too, Inc. v. Kohl's Dep't Stores,
   210 F. Supp. 2d 402 (S.D.N.Y. 2002) .................................................................47

Towers Fin. Corp. v. Dun & Bradstreet, Inc.,
   803 F. Supp. 820 (S.D.N.Y 1992) .......................................................................47

Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.,
   155 F.Supp.2d 1 (S.D.N.Y. 2001) .......................................................................55

Underwater Storage, Inc. v. U.S. Rubber Co.,
   371 F.2d 950 (D.C. Cir. 1966) .............................................................................30

Warner Bros. Inc. v. American Broad. Co., Inc.,
   720 F.2d 231 (2d Cir. 1983) .................................................................................55

Zulawski v. Taylor,
   2005 WL 3823584 (N.Y.Sup.Ct. 2005) ..............................................................38

## STATUTES AND OTHER CITES

18 Am. Jr. 2d Copyright and Literary Property § 6 ..................................................... 52

R. Nimmer, Law of Computer Technology § 3:61 ......................................................54

U.C.A. 1953 §13-5a-102-4(a) .....................................................................................48

Utah Code § 78-12-25 ..................................................................................................33

Utah Code § 78-12-25 (1) .............................................................................................33

Utah Code § 78-12-25 (3) ..................................................................................................................33

## PRELIMINARY STATEMENT

As a result of IBM's deceptive, unlawful and unfair competition with SCO, IBM generated billions of dollars in revenue for itself while greatly reducing the value of SCO's UNIX code and SCO's business as the recognized leader of the UNIX-on-Intel market. SCO's claim is not time-barred, is not a "transmuted" breach of contract claim, is not preempted, and is supported by more than ample evidence to support a jury finding in SCO's favor.

IBM's improper and unfair competition permeated Project Monterey,[1] which was supposed to be a joint IBM-SCO project to develop a UNIX-based operating system and related products for a new Intel chip:

First, the evidence demonstrates that, during the Project Monterey joint venture relationship, IBM made a conscious decision to abandon the project, concentrate instead on a competing Linux solution, and keep SCO in the dark about this decision. To obtain an unfair competitive advantage, IBM led SCO to believe that IBM intended to continue the project, market a jointly developed Project Monterey Operating System for the Intel 64-bit chip, and create a family of products that would compliment that operating system to the benefit of both partners, IBM and SCO. This deprived SCO of the opportunity to find other partners, to upgrade its UNIX products to compete with Linux, and to avoid wasting the company's resources on the venture.

Second, by stringing SCO along to believe that it was committed to Project Monterey and that it intended to release a working Project Monterey Operating System and a family of products to compliment that product, IBM deceptively obtained access to SCO's valuable SVR4

---

[1] IBM's motion is directed solely at the Project Monterey aspects of SCO's claim and does not affect SCO's other unfair competition claims. See Part IV infra.

source code and then used that source code to improve IBM's own, competing AIX 5L for Power operating system.  IBM then attempted to cover-up its scheme by making a non-functional, sham version of the Monterey operating system.

Had IBM been honest with its joint venture partner, SCO would not have given IBM access to its valuable source code and would not have invested its time and resources on the project.  It was not until IBM issued a sham version of a Monterey product in May 2001 and then summarily terminated Project Monterey in June 2001 that SCO had any reason to suspect that IBM did not have any intention to market in good faith the Project Monterey product or to partner with SCO in the UNIX on Intel market.

While SCO and IBM undoubtedly had a contractual relationship which defined the general parameters of Project Monterey, it is not that contractual relationship but IBM's deceptive and unfair conduct which abused the access and the trust that SCO reposed in IBM that caused the Monterey-related damage of which SCO complains in Count Six.

## SCO'S STATEMENT OF ADDITIONAL MATERIAL FACTS

A.    **SCO's Strong Position in the 1990's in the Increasingly Important UNIX-on-Intel Market**

1.    Plaintiff's predecessor, the Santa Cruz Operation ("SCO" or "Santa Cruz")[2] was founded in 1979, and in 1983 it delivered the first packaged UNIX System for Intel processor-based PCs. (Ex. 250 at 1.) SCO's UNIX operating systems, UnixWare and OpenServer, run on the 32-bit Intel IA-32 microprocessor or "chip." (Ex. 214 at 181047252, ("SCO is the clear leader in providing UNIX operating systems on the IA-32 architecture.").)

2.    As one industry analyst described it, "SCO established the market for advanced operating systems on industry-standard Intel platforms in the 1980s, pioneering such features as a full 32-bit implementation, security, and multiprocessing." (Ex. 244 at 6.) At least as far back as 1989, SCO was described as "the largest vendor of Unix-like operating systems on Intel-based computers." (Ex. 246 at 1.)

3.    SCO sold its UNIX-on-Intel operating systems to major corporate customers located throughout the world including NASDAQ, McDonalds, Sherwin Williams, Papa Johns, Daimler Chrysler, BMW and Lucent Technologies. SCO's UnixWare product was certified for and sold on a wide variety of OEM IA-32 systems including those from Compaq, HP, Unisys, NCR, Data General, Siemens Nixdorf, FujitsuICL, Olivetti and IBM. (Ex. 354, ¶ 7; Ex. 362, ¶ 7.)

---

[2] The Santa Cruz Operation was historically referred to as "SCO" and many documents in this action use the term "SCO" in reference to that entity. In May 2001, Santa Cruz transferred its UNIX assets to plaintiff, which was then called Caldera International (Caldera). Immediately after the sale, Santa Cruz changed its name to Tarantella. Caldera International remained Caldera after the transaction but later, in 2002, changed its name to The SCO Group, Inc., the plaintiff in this action, in order to leverage the UNIX assets and business it had acquired. The term "SCO" is used herein, as it is in many documents, to refer to the entity in possession of the UNIX assets, although that entity changed from Santa Cruz to The SCO Group, previously Caldera, in May 2001.

3

4.      In 1998, SCO was the worldwide UNIX market leader in terms of unit shipments, with roughly 40 percent of total market unit sales. (Ex. 214 at 181047252 and n. 2.) In terms of revenue, SCO dominated what is referred to as the "UNIX-on-Intel market" to an even greater extent, with an 80% market share.  (Ex. 204 at 1710117641.)

5.      At that time, the processing capacity of the Intel processor chip was increasing rapidly.  By 1995, Intel began to target its chips to be used in high-performance desktops and servers, and new UNIX servers based on 32-bit Intel chips began to compete against UNIX systems based on the far more expensive RISC chip, which until then had been the preferred chip for enterprise-critical systems.  From 1995 to 1999, shipments of servers based on Intel architecture approximately tripled and, by 2000, servers based on Intel architecture began to dominate the UNIX market.  (Ex. 284 at 18-20.)

6.      By 1998, Intel was developing the first commercial 64-bit chip, called Itanium, with the code name Merced.  (Ex. 214 at 181047251-52; Ex. 249 at 1.)  Capitalizing on its substantial expertise with the Intel IA-32, SCO began work on porting its operating systems to the Itanium, IA-64 chip.  (Ex. 354, ¶ 8; Ex. 362, ¶ 8.)

7.      The strength of SCO's market position at this time is described in detail in the expert reports of Dr. Gary Pisano and Dr. Jeffrey Leitzinger, and those findings are incorporated herein by reference.  (Ex. 284 at 40-47, Ex. 281 at 9-20, respectively.)

**B.      IBM Is Attracted to SCO's Technical Expertise and Strong Position in the UNIX-on-Intel Market**

8.      In contrast to SCO, IBM in 1998 had almost no presence in the market for UNIX-based operating systems on Intel chips.  Instead, IBM had focused its efforts on its operating system called AIX for Power, which ran on servers using IBM's RISC-type Power processor.  (Ex. 214 at 181047252; Ex. 166 at 8:11-9:17.)

4

9.      Accordingly, IBM began considering the benefits of partnering with SCO to gain footing in the increasingly important Intel market.  A May 6, 1998 internal IBM document recommended:

REDACTED

10.      In a July 30, 1998 summary of IBM's UNIX Strategy, addressed to IBM's CEO Lou Gerstner, IBM recognized            REDACTED

Lou Gerstner was informed:

REDACTED

11.      On August 5, 1998, IBM executives again presented Mr. Gerstner with a

REDACTED                         Specifically, Gerstner was informed:    REDACTED

REDACTED

REDACTED                    IBM further explained that    REDACTED

REDACTED

12.      In addition, IBM identified for Gerstner            REDACTED

REDACTED                    For instance, IBM recognized that

REDACTED

REDACTED

### C.   IBM Is Attracted to the SVR4 Technology Base of SCO's UNIX Operating System

13.     SCO's technology was also attractive to IBM for another reason:  SCO's UnixWare operating system was based on UNIX System V Release 4 ("SVR4") technology, the most recent version of UNIX.  (Ex. 354, ¶ 9; Ex. 362, ¶ 9.)  In contrast, IBM's AIX operating system was based on the earlier UNIX System V Release 3.2 ("SVR3.2") technology.  (Ex. 205 at 181017195.)  SCO owned the UNIX source code.  (Ex. 227 at 181472999.)  IBM had opted not to buy from SCO an upgrade of its UNIX license to the SVR4 code base.  (Id.)

14.     Like SCO's UnixWare, Sun Microsystems' UNIX operating system, Solaris, was based on SVR4 code.  (Ex. 205 at 181017194.)

15.     IBM perceived Sun Microsystems ("Sun") as one of its most significant competitors, and believed that incorporation of SVR4 code into AIX would help it compete against Sun, whose Solaris product had steadily been gaining market share at the expense of IBM's AIX.  (Ex. 285 at 76-77; Ex. 216 at 181677477-79; see also paragraph 42, infra, for details on IBM's interest in obtaining the SVR4 code to compete with Sun.)

### D.   Project Monterey Is Announced

16.     In October 1998, a partnership between IBM, SCO, Sequent, and Intel was announced, and this partnership came to be known as Project Monterey.  (Ex. 240; Ex. 354, ¶ 9; Ex. 362, ¶ 9; Ex. 17 ¶ 9).  Project Monterey was described by IBM as a "major UNIX operating system initiative" (Ex. 214 at 181047251) that would deliver a "single UNIX operating system

product line that runs on IA-32, IA-64 and IBM microprocessors, in computers that range from entry- level to large enterprise servers."  (Ex. 240 at 1.)

17.     In the press release announcing Project Monterey, IBM proclaimed: "We're extending into broader markets with our award-winning AIX software that delivers the reliability and security required of an enterprise-class operating system . . . . Working with these companies, we're capitalizing on the base of proven leadership technologies to deliver the world's best UNIX on Power microprocessor and high-volume Intel microprocessor systems." (Ex. 240 at 1-2.)

### E.     SCO and IBM Enter the Joint Development Agreement

18.     The agreement between SCO and IBM was consummated in the Joint Development Agreement ("JDA"), signed by the parties in October 1998.  (IBM Ex. 245, at 1710141492; Ex. 214 at 181047251.)

19.     In the JDA, the parties agreed to jointly develop an operating system that would run on Intel's forthcoming 64-bit chip.  This operating system was defined as the "IA-64 Product" (sometimes referred to herein as the "Project Monterey Operating System").  The "IA-64 Product" was to be the cornerstone of a "family of products" that would be sold by both IBM and SCO.  (IBM Ex. 245, at Preamble and § 1.10 (JDA); Ex. 166 at 21:6-9; Ex. 214 at 181047252; Ex. 191 at 1710013164.)

20.     The agreement contemplated that SCO would continue to sell its 32-bit operating systems and would also be able to upgrade or migrate its customers to the jointly-developed Project Monterey Operating System on the 64-bit chip.  (IBM Ex. 245 at Preamble and §§ 1.9 and 9.0-9.4 (JDA); Ex. 214 at 181047252-53; Ex. 176 at 181441556.)

21.     The agreement further specified that, after a "generally available" "Release 1" of the IA-64 Product, IBM would earn a license to use any SVR4 source code

contained in Release 1 in its existing products, such as AIX for Power. This would make it easier for customers to migrate from AIX and the Power microprocessor to the Project Monterey Operating System and the 64-bit processor. (IBM Ex. 245 at § 2(d)2 (JDA); Ex. 81at § 4 (JDA Supplement B); Ex. 85 at 1710013964 (JDA Amendment 5); Ex. 214 at 181047252-53; Ex. 17 at ¶ 9.)

22.     Thus, the ultimate goal was that both SCO customers (those using Santa Cruz's UnixWare operating system software on computers with Intel's 32-bit processors) and IBM customers (those using IBM's AIX for Power operating system software on computers with IBM's Power processor) would upgrade to the jointly developed Project Monterey Operating System software (the IA-64 Product), which was to be compatible with computers using either the 32-bit or the 64-bit Intel chip or the IBM Power chip. (Ex. 214 at 181047252-53; Ex. 176 at 181441556

REDACTED


**F.     IBM Acknowledges Its Duties to SCO As a Partner**

23.     The JDA was an agreement to create an enterprise for profit; it provided for mutual contributions of property and other resources; it called for a measure of joint control over the enterprise; and it required sharing of profits and losses. (IBM Ex. 245 (JDA) at Preamble and §§ 2.0(a), 4.0, 5.1, 8.0-8.11, 11.3, 12.0-12.5; Ex. 81 (JDA Supplement B) at § 4 and Attachments 3 and 4.)

24.     Consistent with that arrangement, IBM repeatedly referred to SCO as a "partner" during the course of Project Monterey:

REDACTED

       b)    In 2S000, one IBM employee cautioned:

REDACTED

       c)    Even as late as 2002, IBM discussed internally that

REDACTED

## G.    IBM Secretly Abandons Project Monterey and Transitions Support to Linux

25.    As the evidence cited in the following paragraphs will show, IBM, in disregard of its partnership and confidentiality obligations to SCO, secretly transitioned its efforts and focus away from Project Monterey – while continuing the pretext of support and publicly proclaiming its continued commitment to the project.  This was because, after entering into Project Monterey, IBM decided that a competing system, Linux, rather than the Project Monterey Operating System, offered a more profitable entryway for IBM into the UNIX-on-Intel market.  Yet IBM could not overtly withdraw from Monterey without raising legal issues and forfeiting the opportunity to obtain needed SVR4 code for free.

26.

REDACTED

27.

REDACTED

REDACTED

28.

REDACTED

29.     In March of 1999, IBM publicly announced its support of Linux at the

LinuxWorld event (IBM Ex. 21 at 4) – a fact which IBM admits in its brief (at ¶12).

30.     However, what IBM <u>omits</u> in its brief is that it continued to tell SCO and announce publicly that it was <u>also</u> fully supporting Monterey as its enterprise level operating system.  For instance, in an August 10, 1999 article about IBM's support of both Linux and Project Monterey, IBM assuaged concerns:

> IBM's John Prial said Big Blue is comfortable with many operating systems under its roof, and that AIX today and Monterey tomorrow will sell in a different area than Linux. "We're very comfortable having many operating systems," he said. "Monterey will be popular in high business-value transactional systems and heavy-duty business intelligence," Prial said.  Linux, on the other hand, currently is popular in Web servers, file and print servers, and other smaller-scale computers, though that could change two or three years down the line.

(Ex. 252 at 2.)


REDACTED


31.     SCO believed IBM's representations.  (Ex. 351, ¶¶ 17-18; Ex. 17 ¶ 10; Ex. 351 ¶ 17.)  In an August 19, 1999 article about IBM's support of Trillian (the IA-64 project for Linux), SCO CEO Doug Michels was quoted as follows:

> "<u>IBM is not looking at Trillian as an alternative to Monterey</u>.  The real interest in Linux is coming from all the software companies that sell databases and transaction based tools because they are frustrated that Microsoft moreorless gives these things away as part of the Back Office bundle. So they say 'if you give us a free OS, we'll make money from it'."
>
> <u>But Trillian is not intended to make Linux an enterprise class OS and there are no real efforts elsewhere to do so either</u>, he claimed.

(Ex. 253 at 1-2) (emphasis added); (Ex. 351 ¶18.)

32.

REDACTED

REDACTED

a)

REDACTED

33.

REDACTED

REDACTED

34.

REDACTED

35.

REDACTED

**H.     IBM Engaged In This Ruse In an Effort to Legitimize Its Use in AIX of SCO's SVR4 Code**

36.     Even as IBM was publicly stating its support for Monterey but internally transitioning away from Monterey to Linux, IBM obtained SCO's SVR4 code through the partnership and used it in its non-Intel AIX for Power product.

37.     On October 24, 2000, IBM placed SCO's SVR4 source code into a PRPQ (IBM's internal name for a beta test version), "early adopters" of AIX for Power (named AIX 5L

13

for Power 5.0), which was intended for certified software developers and "not intended for general production use." (Ex. 289.)

38.     Then, on May 4, 2001, IBM included SCO's code in the first "generally available" version (AIX 5L for Power 5.1). (IBM Ex. 229 at 30:12-15, 30:22-31:10, 33:8-23, 107:21-32; Ex. 229; Ex. 82 at 3-4.)

39.     The SVR4 code IBM placed in AIX for Power was valuable to IBM's strategy for competing with Sun's Solaris operating system.  This was achieved through IBM's use of SRV4 code to enhance the affinity between AIX and both Solaris and Linux.  In addition, IBM used SRV4 code and expertise obtained from SCO through Project Monterey to mature Linux into a commercially hardened operating system capable of handling mission-critical workloads. (Ex 286 at 36-43, 76-77; Ex. 287 at 9, 37-38.)

40.     IBM has continued to use SCO's code in every subsequent version of this product.  Indeed, IBM is still distributing AIX 5L for Power, which continues to contain SVR4 code, to this day.  (IBM Ex. 229 at 30:12-15, 30:22-31:10, 33:8-23, 107:21-32.)

41.     IBM fully recognized that this SVR4 code it was using had come to IBM from SCO via Project Monterey:

REDACTED

REDACTED

42.    As discussed above at ¶15, this SVR4 code was fundamental to IBM's ability to establish greater affinity between its AIX operating system and Sun's SVR4-based Solaris operating system, and thus, lure Sun's customers to IBM.  It was highly valuable to IBM for that reason.  (Ex. 286 at 76-77.)  The value and necessity of SCO's SVR4 code to IBM's strategy to compete against Solaris is reflected in IBM documents detailing how it used SVR4 code it gained access to in Project Monterey to create "Solaris Affinity" in AIX for Power. (Ex. 225 at 181472943; Ex. 373 at 181473004; Ex. 229 at 181473018-19; Ex. 230 at 181473042-43; Ex. 372 at 181473052-53.)

43.    AIX 5L for Power, which ran on RISC – not Intel – architecture was not the "IA-64 Product" under development in Project Monterey, and SCO could not collect any royalties or other benefit from its sales.  (IBM Ex. 245 at §12 (JDA provision setting forth that royalties are only to be paid to SCO for IBM's distribution of Release 1 of the IA-64 product)).  Thus, SCO would benefit and IBM would obtain the right and license to use SCO's SVR4 code it obtained through Project Monterey in AIX for Power <u>only</u> if IBM in good faith completed and released a working, generally available Project Monterey Operating System (the IA-64 Product):

REDACTED

REDACTED

44.     Notably, IBM acknowledged SCO's intellectual property rights in SVR4 when it twice sought – but failed – to obtain from SCO – the right to use SVR4 code in AIX for Power without a Release 1 of the IA-64 Product.

a)     In March 1999, IBM proposed an Amendment 2 to the JDA, which would have given IBM the right, among other things, to use SVR4 source code without royalties (and without a Release 1 of the IA-64 Product) in AIX for Power.  However, this proposed amendment was never signed as the parties could never agree upon final terms.  (Ex. 94.)

REDACTED

SCO viewed the draft Supplement C and the nature of the negotiations as an "end around" SCO's right to certain royalties for the IA-64 Product.  (Ex. 299 at SCO1234593; Ex.

298 at SCO1234593; Ex. 297 at 181506932.)  Again, this agreement was never signed because the parties could not agree upon the terms.  (Ex. 354 at ¶¶ 10-11 and Ex. A thereto).

45.    Once IBM used the SVR4 code in AIX for Power, it fully recognized that it could not legitimately back out of Monterey (as some IBM executives had urged) while keeping the code.

REDACTED

46.    Similarly, in June 2000, the IBM Academy of Technology OS Consultancy cautioned:                                  REDACTED

(emphasis added.)

47.    IBM was also interested in using SCO's code to advance its Linux initiatives:

REDACTED

17

REDACTED

48.     Because of its interest in the SCO code and its legal concerns, IBM ignored the recommendations of IBM executives to terminate Monterey, and instead strung the project and SCO along in order to legitimize its use of the SVR4 code.

REDACTED

I.      **IBM's "Solution" Is More Deception:  A Sham PRPQ of the Project Monterey Operating System**

49.     IBM's "solution" to the problem of the SVR4 code was to put out a pretextual, non-functional PRPQ of the Monterey product, and then quickly terminate the Monterey agreement, leaving IBM with the valuable code and SCO with nothing, as set forth below.  Contrary to JDA § 3.0, and for the purpose of sowing confusion, IBM unilaterally branded the so-called Monterey product "AIX 5L for IA-64" or "AIX 5L for Itanium."

50.

REDACTED

51.

REDACTED

52.     Nevertheless, on April 17, 2001, IBM announced the pretextual availability of AIX 5L for Itanium as an I-Listed PRPQ, and made it "available" on May 4, 2001. (Ex. 89 at 181015076; Ex 97 at 181014956.)  Unlike the PRPQ of AIX 5L for Power in October 2000, the PRPQ of AIX 5L for Itanium was so spurious it did not even have a compiler to make it work                      REDACTED                              Moreover, the PRPQ was offered free of charge, without support.  (Id.)

53.    A compiler is a program that takes an application and processes it, or "translates" it, to allow it to run on specific computer architecture. (Ex. 72 at 142:23-143:1.) As IBM executive Anthony Befi admitted: "If a compiler wasn't available there wouldn't be applications to run on it, so you wouldn't sell very many." (Id. at 159:4-17.)

54.

REDACTED

55.

REDACTED

56.    In short, this pretextual PRPQ was not the functional, generally available Release 1 contemplated in Project Monterey, and IBM recognized this.

REDACTED

57.    Nevertheless, IBM shrewdly developed its external positioning on this product in order to try to maximize its appearance of satisfying the Monterey requirements. On

REDACTED

REDACTED

58.     This positioning understandably sparked confusion within IBM.

REDACTED

59.

REDACTED

REDACTED

60.

REDACTED

Outside observers similarly noted that "AIX for Itanium never went beyond beta."  (Ex. 67 at 2.)

## J.   IBM Conceals Its Intent to Object to the Acquisition of the UNIX Business by  Caldera

61.     Caldera International (plaintiff SCO) closed its acquisition of the UNIX

assets of Santa Cruz on May 7, 2001, three days after the sham PRPQ of the Project Monterey

Operating System.  (Ex. 141 at 1710137001.)  This acquisition was originally publicly

announced on about August 1, 2000.  (Ex. 113; Ex. 142.)

62.     Several weeks before the public announcement, Santa Cruz complied with

Section 16.1 of the JDA and provided IBM with a detailed notice of the proposed transaction and

an opportunity to tender a counteroffer within 15 days, pursuant to Section 16.2 of the JDA.  (Ex.

206 (6-21-00 Santa Cruz's notice to IBM of Caldera offer).)

63.     Although IBM thus had notice of the pending transaction for almost a

year, IBM never told Santa Cruz or Caldera that it would not consent to the assignment of the

JDA from Santa Cruz to Caldera.  IBM's consent was important because, under Section 15.2 of

the JDA, IBM was able to cancel the JDA in the event of a change of control.  IBM led Santa

Cruz and Caldera to believe that it would not cancel their joint efforts and, in fact, IBM sought

23

and obtained assurances from Ransom Love and David McCrabb, the named CEO and COO of the new company, that they would continue to support Project Monterey. (Ex. 290, Ex. 334 at 181671481; Ex. 354, ¶¶ 12-13; Ex. 362, ¶¶ 10-11; Ex. 356 ¶ 6.)

      64.

REDACTED

      65.     Moreover, long after the announcement of the transaction, IBM reiterated its "strong commitment" to Project Monterey.

REDACTED

      66.     Before the transaction was closed, Caldera met with IBM representatives, who affirmatively discussed plans for continuing with Project Monterey.  IBM's team never suggested that IBM intended to terminate the Project or that they thought the Project would not or should not continue once Santa Cruz sold its UNIX assets to Caldera.  (Ex. 356 ¶ 6; Ex. 6 ¶ 15.)  Caldera's representatives were led to believe that IBM would continue the project after the closing.  (Id.)

      67.     IBM timed the May 4, 2001 sham PRPQ of the Project Monterey Operating System to occur just three days before the May 7 closing of the Santa Cruz-Caldera

24

transaction. (Ex. 89.)  On the same day, IBM released the first "generally available" version of the SRV4-enhanced AIX 5L for Power.  (Ex. 82.)

REDACTED

68.     In light of IBM's pre-closing conduct, IBM's cancellation was a major shock and disappointment to Caldera, since the joint venture with IBM was critically important to Caldera's decision to acquire SCO's UNIX assets and Caldera had fully expected to proceed with IBM on Project Monterey.  (Ex. 362, ¶ 13; Ex. 269, ¶ 8; Ex. 356 ¶ 6; Ex. 6 ¶ 15.)

### K.    Caldera Acquires the UNIX Business, Including the Misappropriated SVR4 Code and Pre-Existing Legal Claims Relating to That Code

69.     As part of the May 2001 transaction in which Caldera/SCO acquired the UNIX business and assets, Santa Cruz assigned to SCO all of Santa Cruz's "right, title, and interest" in the Contributed Assets, which consisted of Santa Cruz's entire UNIX business, including the SVR4 code that IBM misappropriated into AIX for Power.  (Ex. 113 at § 1.4; Ex. 114 at ¶¶ 1-9; Ex 30 at ¶ 2; Ex. 115 at § 1).   SCO also acquired all of Santa Cruz's "rights and privileges pertaining to" this intellectual property, including all "rights to enforce confidentiality or similar obligations" in relation to the code, "the right, if any, to sue or bring other actions for past, present and future infringement thereof," and "any and all other forms of intellectual property right or proprietary right recognized anywhere in the world."  (Ex. 115 (IP Assignment) at §§ 1(v)-(vii).

### L.    SCO Was Not Aware of IBM's Deception in March 2001

70.     SCO was not aware of IBM's duplicity in March 2001.  (Ex. 354 ¶¶ 16-18; Ex. 362 ¶ 15).  At this time, SCO's management did not know, and had no reason to know, that IBM had placed SCO's SVR4 code into AIX 5L for Power.  SCO also did not know then

that IBM had abandoned Project Monterey, that IBM had no intent of issuing a generally

available Monterey product, or that IBM was solely interested in deceptively securing the rights

to SCO's SVR4 code for other products.  SCO had no reason to suspect IBM's malfeasance until

April-June 2001, when IBM announced and delivered both its first "generally available" release

of AIX 5L for Power containing SVR4 code and the premature PRPQ of the Project Monterey

Operating System, promptly followed by the cancellation of the JDA.  (Ex. 354, ¶¶ 16-18; Ex.

362, ¶ 15; Ex. 351 at ¶ 16; Ex. 17 at ¶ 10).

       71.    IBM incorrectly asserts that SCO was aware of the allegedly improper

inclusion of the SVR4 code in AIX for Power by August 2000.

REDACTED

26

REDACTED

        e)    Finally, SCO had no knowledge of the industry reports IBM points to, which were not widely circulated at the time and were not sent to SCO.  (Ex. 354, ¶ 19; Ex. 362, ¶ 16.)

        72.    Furthermore, even if SCO knew by March 2001 that its SVR4 code had been used in IBM's PRPQ beta test release of AIX 5L for Power 5.0 in October 2000, this alone would not have been cause for concern or suspicion, because it was expected that IBM would fulfill its obligations and earn the contingent license to use the SCO code in its other products. In fact, it was expected that an SVR4-enhanced AIX 5L for Power would be a part of the Monterey "family" of operating systems.  SCO certainly did not know in March 2001 that IBM had no intent to fulfill the obligations that would have legitimized its use of that code.  SCO did not actually learn of IBM's use of SVR4 code until 2004, during discovery in this case.  (Ex. 57; Ex. 354, ¶¶ 19-20; Ex. 362, ¶ 15, Ex. 351, ¶ 17.)

## M.    IBM Continued to Cover Its Tracks Well Into 2002

        73.    IBM was still grappling with its Monterey positioning – in response to a query from SCO – in late 2002, over a year after it terminated the project.       REDACTED

REDACTED

74.

REDACTED

75.

REDACTED

**N.      SCO Was Injured By IBM's Deception**

76.     SCO was damaged by IBM's concealment of its intention to cancel Project

Monterey, from IBM's misappropriation of the SVR4 code, and the subsequent cover up and

IBM benefited greatly from that misconduct.  SCO expert Marc Rochkind has described the

substantial SVR4 technology that IBM misappropriated and put into its AIX for Power operating system. (Ex. 287 at 152). IBM's improper actions, which enhanced AIX for Power and gave rise to a free-of-charge Linux operating system that directly competed with SCO's own proprietary operating systems, greatly harmed SCO's business and its ability to compete. (Ex. 281 at 62-68; Ex. 284 at 47-56; Ex. 286 at 20-26.) SCO's damages from IBM's wrongful action are set forth in detail in the expert report and rebuttal report of Christine Botosan (Ex. 270 at 3-4, 10-12; Ex. 272 at 8-9, 24-25) and the rebuttal report of Gary Pisano (Ex. 286 at 76-77), which are incorporated herein by reference.

77. SCO incorporates by reference the facts set forth in SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Eighth Counterclaim, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Interference Claims, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Tenth Counterclaim, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim, and SCO's Memorandum in Opposition to IBM's Motion for Summary on SCO's Copyright Claim.

78. Based on the evidence and reasons set forth in the attached Appendix A, SCO disputes each of the allegations of IBM's "Statement of Undisputed Facts," except to the extent set forth in Appendix A. All material facts which would support the relief IBM seeks are disputed.

## ARGUMENT

## I.    SCO TIMELY FILED ITS UNFAIR COMPETITION CLAIM

IBM first asserts that the portion of SCO's unfair competition claim relating to Project Monterey[3] is barred by a two-year limitations provision in the Joint Development Agreement ("JDA") between Santa Cruz and IBM.  IBM is wrong for several reasons.  First, the "continuing tort" doctrine applies to unfair competition claims, and SCO's claim is timely under this doctrine, because IBM continues to use the misappropriated SCO code to this day.  Second, the provision cited by IBM applies only to breach of contract claims, not to unfair competition and other tort and statutory claims.  Third, the cause of action did not accrue until April-June 2001, when the deceptive scheme was executed, or at least the limitations period was tolled until then due to IBM's concealment.

### A.    The Continuing Tort Doctrine Defeats IBM's Motion

Unfair competition is a continuing tort, and thus each use by IBM of the misappropriated SCO property is a separate tort with its own separate limitations period.  <u>Underwater Storage, Inc. v. U.S. Rubber Co.</u>, 371 F.2d 950, 955 (D.C. Cir. 1966).  SCO's claim is therefore "not time-barred because unfair competition occurring over a period of time can give rise to liability as a continuing tort."  <u>Kwan v. Schlein</u>, 441 F. Supp.2d 491, 503 (S.D.N.Y. 2006).  <u>See Greenlight Capital, Inc. v. GreenLight (Switz.) S.A.</u>, No. 04-Civ 3136, 2005 WL 13682, **7-8 & n. 9 (S.D.N.Y. Jan. 3, 2005) <u>(Ex. B)</u>.

IBM itself successfully invoked the continuing tort doctrine to avoid a time-bar defense to its own unfair competition counterclaim in <u>Telex Corp. v. IBM</u>, 367 F. Supp. 258, 359-60 (D. Okl. 1973), <u>aff'd in part</u>, <u>rev'd in part on other grounds</u>, <u>510 F.2d 894</u> (10th Cir.), <u>cert. dismissed</u>,

---

[3] IBM acknowledges, (Opp. at 1,) that SCO's unfair competition claim includes other factual allegations but fails to address them.  <u>See</u> Part IV <u>infra</u>.

423 U.S. 802 (1975). In that case, Telex sued IBM for alleged antitrust violations, and IBM

counterclaimed against Telex for alleged unfair competition, theft of trade secrets and copyright

infringement. IBM claimed, and the court found, that Telex had engaged in unfair competition

by inducing present and former IBM employees to breach their duty of loyalty by revealing trade

secrets and other confidential information about IBM's business. Id. at 357-58. The court

rejected Telex's statute of limitations defense under the continuing tort doctrine:

> I am of the opinion that IBM's misappropriation counterclaim is
> not time barred also because it involves a continuing wrongful
> course of action pursued to within two years of the filing of the
> counterclaim-the shortest limitations period contended for by
> Telex and applicable to tort claims in general …. [T]he gist of the
> claim is the use of the trade secrets, not necessarily their
> acquisition, and in this sense the statute would not commence to
> run prior to any such use and, with the period renewed by its
> continuance.

Id. at 359-60. Accord, Morelli v. Tiffany & Co. Civ. A. 00-99662002 WL 991017, at *1 (E.D.

Pa. 2002) (Ex. G) (unfair competition is continuing tort); Derrick Mfg. Corp. v. Southwestern

Wire Cloth, 934 F. Supp. 796, 808 (S.D.Tex. 1996) (each sale of an item marked with plaintiff's

trademark or product number was a separate cause of action, so unfair competition claim not

time-barred as to sales within the limitations period).

Here, it is undisputed that, to the present day, IBM is selling and intends to continue

selling AIX 5L for Power with SCO's SVR4 code. (¶¶ 38-40.) Thus, at the very least, SCO is

entitled to sue for damages on all of IBM's sales from March 2001 (two years prior to the March

2003 filing date). This includes virtually every sale at issue in this case, because IBM did not

make a "generally available" release of the SVR4-enhanced AIX 5Lfor Power product  until

May 2001 (the same date as the sham PRPQ of the Monterey product, which IBM confusingly

named AIX 5L for Itanium, which never was "generally available") (¶ 38.) The prior, October

2000 release of AIX 5L for Power 5.0 was an "early adopters," beta test PRPQ release not intended for the public. (¶ 37.) IBM's statute of limitations argument should therefore be rejected.

### B.   The Two-Year Provision Applies Only to Breach of Contract Claims

IBM does not contend that any portion of SCO's unfair competition claim is time-barred if the normal statutory limitations period applies.[4]   Instead, IBM relies on Section 22.3 of the JDA, which states that any "action related to a breach of this Agreement" must be filed no later than two years from the date of the breach."  However, unfair competition is an independent tort action, not an "action related to the breach of" the JDA, and thus the two-year provision is inapplicable.

#### 1.    Limitations Shortening Provisions Are Strongly Disfavored

Most jurisdictions, including New York and Utah, allow parties to agree to a reasonable shortening of a statutory limitations period by agreement, but shortening provisions "are viewed with caution by the courts and are construed strictly against the party invoking the shorter period."  Backus v. Nationwide Mut. Ins. Co., 392 N.Y.S.2d 765, 766 (2d Dept. 1977). "[C]ontractual limitations of the time in which to bring actions … are looked upon with disfavor."  Anderson v. State Farm Fire & Cas. Co., 583 P.2d 101, 103 (Utah 1978).[5]  Indeed, in

_____

[4] SCO agrees with IBM that SCO's unfair competition claim is governed by Utah or New York law, and we also have not found any material differences between the two for purposes of this motion.  Under New York law, the statute of limitations for unfair competition is 3 or 6 years.  Greenlight Capital, supra. Although we did not find a case on point, under Utah law the statute of limitations for an unfair competition claim is at least three years.  Utah Code § 78-12-25(1) (four years for an action on an "obligation, or liability not founded upon an instrument in writing"); ; id. § 78-12-26(4) (three years for statutory claims); id. § 78-12-25(3) (three years for claims not provided for otherwise).
[5] See also, e.g., In re Penn Central Transp. Co., 391 F. Supp. 1404, 1407 (E.D. Pa. 1975); Lewis v. Hopper, 295 P.2d 93, 95 (Cal.App.1956); Hauer Const. Co. v. City of New York, 85 N.Y.S.2d 42, 44 (N.Y. Sup. Ct. 1948).

some jurisdictions, limitations-shortening provisions are totally void as contrary to public policy. See, e.g., Dunlop Tire & Rubber Corp. v. Ryan, 108 N.W.2d 84, 88 (Neb.1961).

One recent case applied these principles to a provision shortening the time for filing an action "against the City by the Contractor upon any claims based upon this Agreement." Nobel Ins. Co. v. City of New York, 00-CV-1328 2006 WL 2848121, at *18 (S.D.N.Y. 2006)(Ex. I) (quoting Nassau Chapter Civil Serv. Employees Ass'n, Local 830 v. County of Nassau, 585 N.Y.S.2d 966, 970 (Sup.Ct.1992), aff'd, 612 N.Y.S.2d 880 (App.Div.1994)). The court deemed this clause inapplicable to a claim by a subrogee who stood in the shoes of subcontractors, because a "party to a contract does not surrender his right to resort to the Courts, with all of their safeguards, unless he has agreed, in writing, to do so, by clear language. Further, an agreement to do so will not be extended by construction or implication." Id.

With one exception, every case cited by IBM in support of its argument that JDA 22.3 applies to an unfair competition claim does not even involve a limitations shortening provision. Instead, IBM cites cases involving forum selection clauses, where the opposite presumption applies: such clauses are "strongly favored." Sun Trust Bank v. Sun International Hotels, Ltd., 184 F. Supp.2d 1246, *1260 n.5 (S.D.Fla. 2001); see M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9-10 (1972). Because a forum selection clause does not cut off a statutorily granted right to file an action, IBM's cases are inapposite.

In the only case that IBM cites that does involve limitations, IBM misquotes the pertinent contractual language. Although IBM asserts (Opp. at 14 n. 5) that the clause in Keating v. Baskin-Robbins USA Co., 2001 WL 407017, *8 (E.D.N.C. 2001) (Ex. E) applied to "[a]ny and all claims and actions arising out of or relating to [the parties'] agreement," IBM omits the language further extending the clause to actions arising out of or relating to "the relationship of

franchisee, Baskin-Robbins or the franchisee's operation of the retail unit." Id. Thus, the clause unambiguously included the entirety of the parties' relationship.

> 2.   Section 22.3 Has No Relevance to Unfair Competition Claims

Here, in contrast to the clause at issue in Baskin-Robbins, JDA 22.3 does not encompass claims relating to "the relationship," and it does not even include actions that relate to "the agreement" as a whole. Instead, it only covers actions that relate to "a breach of this Agreement," in which case suit must be filed within "two years from the date of the breach." Under any reasonable interpretation, the "breach" terminology plainly limits the provision to contractual actions, as a breach is not an essential or even an ordinary element of an unfair competition claim. And given the required strict construction against shortening, IBM cannot seriously contend that Section 22.3 "clearly and unambiguously" applies to SCO's unfair competition claim.

> 3.   At Most, the JDA Relates Only to an IBM Defense to SCO's Unfair Competition Claim

SCO's unfair competition does not "relate to" any breach of contract. It arises from IBM's concealment and deception, false and misleading statements, misappropriation of code, and other conduct in breach of its (common law and statutory) fiduciary and confidentiality duties to its partner SCO. Nothing in the JDA says, "IBM shall not deceive SCO" or "IBM shall not misappropriate SCO's confidential code." At most, the contract relates not to a breach, but to an IBM defense (that IBM was entitled to use SCO's SVR4 code in AIX 5L for Power, even though SCO received no benefit in exchange, on the basis of the contingent license in the JDA).

It is undisputed that SCO owns the SVR4 code that IBM placed in AIX for Power. (¶ 13.) In the absence of a license or some other form of authorization, IBM's use of SCO's code is improper, regardless of whether such use is a breach of any contract. IBM cannot shorten the

statute of limitations by pleading a <u>defense</u> (license) that relates to the contract.  There is no indication in the JDA, let alone the requisite "clear and unambiguous" statement, that the parties intended JDA 22.3 to apply to defenses.  IBM's statute of limitations argument lacks merit and should be denied.

### C.    Even If Applicable, the Two-Year Period Did Not Start Prior to April 2001

Even if the two-year provision applies to SCO's unfair competition claim, the claim was still timely because, in light of IBM's concealment and deception, the two-years did not start to run until, at the very earliest, April-June 2001, which is less than two years from the date (March 6, 2003) when SCO filed suit.  The cause of action accrued only when IBM's deceptive scheme was executed with the pretextual PRPQ of the IA-64 Product, the simultaneous first "generally available" release of the SVR4-enhanced AIX 5L for Power, and the surprise cancellation of the JDA.  (¶¶ 38, 49-60, 62-68.)  SCO before then did not know and did not have any basis to suspect that IBM had done anything improper (¶¶ 70-72) so, even if the cause of action somehow accrued earlier, the running of limitations was tolled at least until then.

"[T]here are two situations in which an equitable discovery rule will operate to toll a statute of limitations:  (1) where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct, and (2) where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust."  In re Hoopiiaina Trust, ___ P.3d ___, 2006 WL 2669933, at *10 (Utah Sept. 19, 2006) (Ex. D) (quoting Russell Packard Development, Inc. v. Carson, 108 P.3d 741, 747 (Utah 2005)) (quotation marks omitted.)

A plaintiff may utilize the concealment version of the discovery rule to toll the statute of limitations if he demonstrates that he "neither discovered nor reasonably should have discovered the facts underlying the cause of action before the limitations period expired" due to the

defendant's concealment, in which case the statute of limitations will not commence running "until the date the plaintiff possessed actual or constructive knowledge of the facts forming the basis of his or her cause of action." Id. Accord, General Stencils, Inc. v. Chiappa, 219 N.E.2d 169, 171 (N.Y. 1966); Meridien Intern. Bank Ltd. v. Government of the Republic of Liberia, 23 F.Supp.2d 439, 446 (S.D.N.Y. 1998).

The discovery rule applies with additional force where, as here, the defendant has breached a fiduciary duty or otherwise abused a special relationship of trust and confidence. In such a case, the defendant has a duty to fully disclose all pertinent facts, and the statute of limitations is tolled even if he has not made any affirmative misrepresentations. In re Piccillo, 797 N.Y.S.2d 236, 237-38 (4th Dept.) ("well settled" that where a fiduciary relationship exists and there are allegations of concealment, "equitable estoppel may be applied to toll the statute of limitations"); Niagara Mohawk Power Corp. v. Freed, 733 N.Y.S.2d 828, 830 (N.Y. App.Div. 2001) (if fiduciary duty exists, estoppel may be applied even "without an actual misrepresentation"); Butcher v. Gilroy, 744 P.2d 311, 314 (Utah Ct. App. 1987) (limitations tolled if defendant concealed a misappropriation of property and misled plaintiffs into believing that he was still performing a settlement agreement).[6]

---

[6] IBM's brief acknowledges, but does not dispute, SCO's allegations of a fiduciary and confidential relationship that arose from the Project Monterey joint venture. IBM Memo. at 5, 13, 16. If IBM attempts to dispute this for the first time in its reply brief, this Court should not allow it. DUCivR 7-1(b)(3); Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000). In any event, there is ample evidence from which a jury could find that Project Monterey gave rise to a fiduciary relationship between the parties. IBM repeatedly referred to SCO as a partner and even a "tight partner." (¶¶ 23-24.) The project was a joint venture because the parties agreed to jointly "design and further develop an IA-32 Product and IA-64 Product" as a for-profit enterprise, JDA, preamble, they provided for mutual contributions of property and other resources, JDA 4.0, 5.1, they agreed to a measure of joint control over the enterprise, JDA 2.0(a), 8.0-8.11, and they required sharing of profits and losses, JDA 11.3, 12.0-12.5. Dundes v. Fuersich, No. 602314104 2006 WL 2956005, at *9 (N.Y.Sup. Ct. 2006) (Ex. A) ; Harline v. Campbell, 728 P.2d 980, 983 (Utah 1986). Joint venturers and partners owe each other fiduciary duties. Zulawski v. Taylor, 2005 WL 3823584 at, *4 5 (N.Y.Sup. Ct. 2005) (Ex. K) ; Hafen v. Strebeck, 338 F. Supp.2d 1257, 1267 (D.Utah 2004). Although the JDA contains a provision disclaiming an intent to form a joint

Under these authorities, the statute of limitations was tolled at least until April-June 2001, the first time when SCO could have had reason to suspect any wrongdoing by IBM. Until then, when IBM made its pretextual PRPQ and then promptly terminated the JDA, SCO had every reason to believe that IBM was being a faithful partner. (¶¶ 70-72.) Until that date, and even after IBM publicly announced its Linux initiatives in March and December 1999, IBM had assured Santa Cruz that the Linux initiative would not conflict with Project Monterey and that IBM intended to continue with the venture. (¶¶ 35, 63-66.) Secretly, however, IBM planned to "drop Monterey," switch resources and support from Monterey to Linux, and withdraw from the joint project, all while executing its plan to misappropriate SCO's technology and then cover its tracks. (¶¶ 24-34.) When informed of the forthcoming transfer of the UNIX business from Santa Cruz to SCO, IBM did not indicate any objection. (¶ 63-66.)

In accordance with the JDA, Santa Cruz gave IBM access to confidential code and other materials that IBM had a fiduciary and common law confidentiality duty to use solely for Project Monterey purposes, at least until IBM earned a license by making a good faith, generally available Release 1 of the IA-64 Product. (¶ 43.) Nevertheless, IBM used SCO's confidential, copyrighted SVR4 code in its October 2000 developmental, beta test release of AIX 5L for Power 5.0. (¶ 37.) SCO has come forward with evidence that IBM did not tell Santa Cruz it had done so, and Santa Cruz had no reason to know of it, at least not as of March 2001, two years prior to the filing of suit. (¶¶ 70-71.) As of March 2001, IBM had not yet made its first

---

venture, the courts look to economic realities and disregard labels when the agreement as a whole and surrounding facts show an intent to create such a relationship. Doty v. Elias, 733 F.2d 720, 723 (10th Cir. 1984); In re Shulman Trans. Enter., Inc., 744 F.2d 293, 295 (2d Cir. 1984); American Exp. Finan. Advisors, Inc. v. Topel, 38 F.Supp. 2d 1233, 1241 (D. Colo. 1999). Moreover, a fiduciary relationship arises "in all cases in which influence has been acquired and abused," even if the business relationship is less than a joint venture. Penato v. George, 383 N.Y.S.2d 900, 905-06 (2d Dept. 1976); Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp., 1992 WL 121726, at *21 (N.D.N.Y. 1992)(Ex. H) (fact issue whether fiduciary relationship existed between owner and contractor.)

"generally available" release of AIX 5L for Power containing SCO code (¶ 38), IBM had not made its sham PRPQ of the Project Monterey Operating System (¶¶ 49-60) , and both Santa Cruz and SCO reasonably believed that IBM intended to continue Project Monterey after closing of the Santa Cruz-SCO transaction. (¶¶ 35, 63-66.) At the least, there are fact issues as to SCO's and Santa Cruz's knowledge as of March 2001, and these fact issues foreclose IBM's effort to obtain summary judgment on its limitations argument.[7]

Furthermore, even if Santa Cruz had known or suspected by March 2001 of IBM's use of the SVR4 code, it would have had no grounds for concern prior to April 2001. It was then expected that IBM would perform and earn the right to use the SVR4 code in other products. SCO also then reasonably anticipated that the SVR4-enhanced AIX for Power would be a part of the "family of products" contemplated by Project Monterey. (¶ 72.) IBM would have earned the right to a license to use the SVR4 code in AIX for Power if it had fulfilled its duties and completed a valid, commercially viable Release 1 of the IA-64 Product, and prior to May 2001 IBM falsely represented that it was "strongly committed" to Monterey and diligently working towards a "generally available" Release 1, without disclosing its intent to make only a sham PRPQ and then terminate the venture. (¶¶ 35, 63-66.)

Only when IBM made the May 2001 sham PRPQ of the IA-64 Product, a PRPQ that had no compiler, no support, and was so clearly bogus that Santa Cruz should have arguably become

---

[7] SCO actually did not know, and had no reason to know, of IBM's use of the SVR4 code until 2004, in the course of discovery in this case. (¶¶ 70-72.) The Court in its July 2005 order commented that it "appear[ed]" that SCO or its predecessor knew or should have known of this by March 2003, but the issue here is what they knew or should have known as of March 2001. Moreover, the comment was in the context of a ruling on SCO's motion for leave to amend its complaint, a matter within the court's discretion. For statute of limitations purposes, the question of when a plaintiff should reasonably have discovered the facts sufficient to establish a cause of action and whether a plaintiff acted reasonably under the circumstances are both fact-intensive inquiries and preclude summary judgment "in all but the clearest of cases." Hoopiiaina Trust, supra at *11.

suspicious (¶¶ 49-60), along with the simultaneous release of the first "generally available"

release of AIX 5L for Power containing SVR4 code (¶ 38), followed shortly by IBM's June 2001

surprise termination of the JDA (¶¶ 61-68), thus making it apparent that there would never be a

"family of products," could anyone at SCO have connected the dots and had even the slightest

reason to suspect IBM's deception.  Only then did SCO's cause of action accrue.

IBM's prior representations and concealment of its true intentions tolled the limitations

period until at least April-June 2001 or, at the very least, there is a genuine factual issue as to

whether SCO or Santa Cruz should have known prior to March 2001.  Under the discovery rule

and the equitable tolling doctrine, SCO's unfair competition claim is timely even if the two-year

period is applied, and IBM's limitations argument must be rejected.

## II.   SCO HAS STRONG EVIDENCE OF UNFAIR COMPETITION BY IBM

IBM seeks summary judgment on the non-Monterey portion of SCO's unfair competition

claim[8] because this claim is a "transmuted" contract claim, because unfair competition is limited

to palming off and misappropriation, and because SCO lacks standing.  IBM is wrong on both

the facts and the law.

### A.   IBM's Alleged Conduct Constitutes Actionable Unfair Competition

#### 1.   IBM Misstates the Independent Tort Doctrine

IBM begins by asserting that "a charge of misapplication of confidential information, as a

tort claim, must spring from circumstances extraneous to, and not constituting elements of, the

contract, although it may be in connection with and dependant upon the contract."  Productivity

Software Int'l, Inc. v. Healthcare Techs. Inc., No. 93-6949, 1995 WL 437526, at *8 (S.D.N.Y.

July 25, 1995) (Ex. J) .  Although some New York cases suggest that a plaintiff may not

---

[8] IBM acknowledges, Opp. at 1, that SCO's unfair competition claim includes other factual allegations
unrelated to Project Monterey but fails to address them.  See Part IV infra.

"transmogrify" a contract claim into one for tort, this is limited to instances where "the only interest at stake is that of holding the defendant to a promise." Hargrave v. Oki Nursery, Inc., 636 F. 2d 897, 899 (2d Cir. 1980); Hammer v. Amazon.com, No. CV 03-4238 2005 WL 2467046 (E.D.N.Y. Sept. 27, 2005.) (Ex. C)  That, however, is not this case.

As IBM itself concedes, tort claims are sufficiently independent even if they are "connected with" and "dependant" upon the contract, e.g., the claims need not spring from wholly divergent circumstances. Productivity, 1995 WL 437526 (Ex. J), at *8. Here, SCO is not seeking to hold IBM to a promise. Indeed, IBM never expressly promised not to deceive or not to misappropriate code. Nothing in the JDA expressly required IBM to inform SCO of its intent to string the project along. SCO complains are not about a contractual breach, but of IBM's pattern of deceptive and unfair conduct that exploited the access that the Project Monterey relationship provided to SCO's intellectual property. With full knowledge that its conduct would harm SCO (¶ 33(d)), IBM deceived Santa Cruz and SCO about its intentions regarding both Project Monterey and Linux (¶¶ 25-35, 61-68), fraudulently made a sham PRPQ of the IA-64 Product (¶¶ 49-60), deprived Santa Cruz and Caldera of other partnership and business opportunities by pretending to support Monterey and the Santa Cruz-Caldera transaction long after it had decided to terminate the project (¶¶ 35, 61-68), and misappropriated code for use in both Linux and AIX for Power.  (¶¶ 36-48.)

In Hargrave, the Second Circuit explicitly noted that "tort liability is imposed on the basis of some social policy that disapproves the infliction of a specified kind of harm irrespective of any agreement." Id. (further noting that "if in addition there is an interest in protecting the plaintiff from other kinds of harm, the plaintiff may recover in tort whether or not he has a valid claim for breach of contract."). The evidence of IBM's deceptive and unfair conduct extends far

beyond a contractual breach.  Thus, as a matter of law and public policy, SCO's unfair competition claims are actionable.

Tort claims for unfair competition are appropriate where, as here, the conduct at issue supports the availability of different remedies and causes of action.  Productivity, at *8 (Ex. J). If anything, it is IBM that is trying to "transmogrify" a series of egregious commercial torts into a claim for breach of contract, not the other way around.  As discussed above in Part I.B.3, the unfair competition claim relates at most not to a breach, but to an IBM defense (that IBM was entitled to use SCO's SVR4 code in AIX 5L for Power, even though SCO received no benefit in exchange, on the basis of the contingent license in the JDA).

IBM would have this Court believe that a party surrenders the right to bring an unfair competition claim just because there is a contract governing certain issues between parties.  That is simply not the law.  For example, in Dime Sav. Bank of N.Y. v. Skrelja, where a mortgagor signed a provision waiving his rights under his contract, he did not forbear the right to sue for breach of a fiduciary duty.  227 A.D. 2d 372, 642 N.Y.S. 2d 84 (2d Dept. 1996) ("[t]he same conduct which constitutes a breach of a contractual obligation may also constitute the breach of a duty arising out of the contract relationship which is independent of the contract itself.").  Thus, if a legal duty independent of the contract itself has been violated, then a breach of that duty may be pled as a tort claim.[9]

---

[9] The "mere fact that a breach of fiduciary duty is actionable in tort, Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 55-57, 529 N.Y.S.2d 279 (1st Dept. 1988), does not preclude a cause of action in contract as well and 'if alternative theories can arguably support a claim, and any one of them carries a limitation period which would keep the claim alive, the claim should be sustained as timely'", Allen v. First Wallstreet Settlement Corp., 130 A.D.2d 824, 826, 514 N.Y.S.2d 726 (3d Dept. 1987)." See Frank Management, Inc v. Weber, 145 Misc.2d 995, 549 N.Y.S.2d 317 (N.Y.Sup.Ct. 1989).  Thus, the law favors allowing any viable claims to proceed, this is true despite the fact that the applicable limitations period may have run on one type of claim but not on others.

It is well settled that a misappropriation of confidential information claim may be *connected* with and *dependant* on the contract. Id. See also e.g., Clark-Fitzpatrick, Inc. v. Long Island R. R Co., 70 N.Y. 2d 382, 521 N.Y.S. 2d 653 (1987) ("[t]his legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependant upon the contract."). Thus, despite the fact that SCO's unfair competition claim is, in certain respects, *related* to the contract (as opposed to related to a *breach* of the contract), the claim is actionable because, in view of the joint venture relationship, IBM has independent fiduciary and common law confidentiality duties that are distinct and wholly separate from the contract.[10] IBM also has an independent duty under unfair competition law to refrain from committing unfair and anti-competitive acts. Therefore, SCO is not precluded from bringing an unfair competition claim just because IBM committed its improper acts and breached its independent duties in the course of a relationship created by a contract.

As in New York, Utah law is also clear that "in some cases the acts constituting a breach of contract may also result in breaches of duty that are independent of the contract and may give rise to causes of action in tort. Statutory requirements that give rise to independent causes of action under various unfair practices acts may also give rise to independent tort actions." Culp Constr. Co. v. Buildmart Mall, 795 P.2d 650, 654-55 (Utah 1990) (quotations deleted). Thus, the Culp court reversed the grant of summary judgment because of material factual issues as to whether the defendant owed plaintiff a non-contractual duty of disclosure. Id. at 655. See also Kilpatrick v. Wiley, Rein & Fielding, 909 P.2d 1283, 1289 (Utah App. Ct. 1996) (clients

---

[10] IBM's brief acknowledges, but does not dispute, SCO's allegations of a fiduciary and confidential relationship that arose from the Project Monterey joint venture. IBM Memo. at 5, 13, 16. If IBM attempts to dispute this for the first time in its reply brief, this Court should not allow it. In any event, there is ample evidence from which a jury could find that Project Monterey gave rise to a fiduciary relationship between the parties. See note 6, supra.

wronged by their lawyers may sue for "breach of contract, breach of fiduciary duty, or negligence").

Here, IBM had duties independent of the contract to refrain from deceiving Santa Cruz and SCO about its intentions, misappropriating SCO's source code and committing the other wrongful acts alleged by SCO, and the JDA merely created the opportunity for IBM to do so. Under these circumstances, IBM's behavior is wholly actionable in tort. Equilease Corp. v. State Fed. Sav. and Loan Ass'n, 647 F. 2d 1069 (10th Cir. 1981) ("where a contract is mere inducement creating the state of things that furnishes the occasion for the tort, the tort, not the contract, is the basis of the action [and] if a duty to take care arises from the relation of the parties irrespective of the contract, the action is one of tort.") (citations and quotations omitted). In view of IBM's independent duties under fiduciary, confidentiality, and unfair competition law, IBM's motion lacks merit and should be denied.

2.    The Tort of Unfair Competition Includes More Than "Palming Off" and "Misappropriation"

IBM incorrectly asserts (Memo. at 19) that, under New York law, unfair competition is limited to "palming off and misappropriation of goodwill." Quite the contrary, the tort broadly encompasses all forms of "commercial immorality." Too, Inc. v. Kohl's Dep't Stores, 210 F. Supp. 2d 402, 405 (S.D.N.Y. 2002) ("[u]nfair competition may be based on a wide variety of illegal practices, including misappropriation and other forms of commercial immorality); Mobius Mgmt. Sys, Inc. v. Fourth Dimension Software, Inc., 880 F. Supp. 1005, 1023 n.11 (S.D.N.Y. 1994) (same); Towers Fin. Corp. v. Dun & Bradstreet, Inc., 803 F. Supp. 820, 823 (S.D.N.Y 1992) (unfair competition claim requires allegation that defendant engaged in "commercial immorality"). Here, IBM's actions are textbook examples of the types of "commercial immorality" found to constitute unfair competition.

43

In Astroworks, Inc. v. Astroexhibit, Inc., the court held that, in determining whether a particular conduct constitutes unfair competition, the ultimate issue is whether the conduct is "fair or unfair." 257 F. Supp. 2d 609, 619 (S.D.N.Y. 2003) ("[a]lthough unfair competition may take many forms, the pivotal question is always the same: whether the conduct complained of is "fair or unfair.") (internal citation and quotation marks omitted). In the present situation, IBM's conduct is most certainly "unfair" and thus fully actionable. At a minimum, however, it is a fact question that should be answered by a jury given the significant material factual issues here.[11]

### 3.    In Any Event, SCO Has Ample Proof of Misappropriation

Even if this tort were limited in the manner suggested by IBM, SCO has alleged and has evidence that, among other things, IBM misappropriated its confidential and proprietary information, including source code. (¶¶ 36-48.) "The gravamen of a misappropriation claim is that a defendant has seized for his own benefit something of value that the plaintiff had built up through time, money, or effort, which is then generally used to compete against the plaintiff." Astroworks, supra. SCO has strong evidence that IBM misappropriated SCO's confidential and proprietary information and then used it to compete against SCO. (¶ 76.) Thus, SCO has a viable unfair competition claim even if (contrary to fact) this tort were limited to misappropriation and palming off.

### 4.    SCO Has Overwhelming Proof that IBM Acted in Bad Faith

---

[11] In 2004, Utah statutorily clarified its unfair competition law to make certain that it encompasses more than palming off and misappropriation. The statute specifically provides a damages remedy for the unlawful, unfair or fraudulent infringement of a copyright or the violation of a software license. U.C.A. 1953 §13-5a-102-4(a)). Even if even if applied only prospectively, IBM is liable under the statute for SCO's post-2004 damages, because unfair competition is a continuing tort and each sale of AIX for Power is an independent cause of action. See Part I.A.1 supra. Moreover, the statute may be applied retroactively, because, as an addition to the previously existing Unfair Practices Act, it clarified existing law. Dep't of Soc. Serv. v. Higgs, 656 P.2d 998, 1001 (Utah 1982.).

IBM also contends (Memo. at 21) that SCO has no evidence that IBM acted in bad faith. However, despite IBM glib attempt to dismiss its misconduct as the result of "some difficulties" resulting from Intel's delay in releasing the IA-64 chip, SCO has come forward with powerful evidence, including IBM internal emails and deposition testimony, of IBM's bad faith. As set forth above, IBM intentionally and repeatedly deceived and harmed its partner for its own sole benefit and profit (¶¶ 25-76), with full knowledge that its tactics would be harmful to its partner SCO. (33(d)). IBM's motion must therefore be denied.

**B.   SCO HAS STANDING TO SUE IBM FOR UNFAIR COMPETITION**

IBM next contends that because SCO was not a party to the JDA between Santa Cruz and IBM and that agreement contains a non-assignment provision, SCO lacks standing to pursue its unfair competition claim. Unfortunately for IBM, neither the law nor the facts support this conclusion. IBM flatly ignores the distinction between the assignment of contractual performance rights and the assignment of legal causes of action. This distinction is fatal to IBM's standing argument.

It is undisputed that the JDA prohibited the assignment of certain *contract rights*, e.g., those related to performance under the contract. However, the non-assignment provision does not reference the assignment of any *litigation rights* against IBM, let alone assignments of any non-contractual actions, such as unfair competition. Under New York law, "only *express* limitations on assignability are enforceable." In re Britton, 288 B.R. 170, 173 (Bankr. N.D.N.Y. 2002) (emphasis in original); Pravin Banker Assoc., LTD. v. Banco Popular De Peru, 109 F. 3d 850, 856 (2d Cir. 1997) (same); LNC Inv. Inc. v. Rep. of Nicar., No. 96-6360, 1999 WL 92603, at *5 (S.D.N.Y. Feb. 19, 1999)(Ex. F) . Here, there is no express inclusion of litigation rights in the assignment provision; indeed, the only "express limitation" on assignment relates to performance

of the contract, not the assignment of a cause of action.  Thus, under New York law, Santa Cruz

was not prohibited from assigning any legal claims it possessed against IBM to SCO.

In addition, New York's General Obligations Law Section 13-101 titled <u>Transfer of</u>

<u>Claims</u> states:

> Any claim or demand can be transferred, except in one of the
> following cases:
>
>> 1) Where it is to recover damages for a personal injury;
>>
>> 2) Where it is founded upon a grant, which is made void by
>> a statute of the state; or upon a claim to or interest in real
>> property, a grant of which, by the transferrer [sic], would
>> be void by such a statute;
>>
>> 3) Where a transfer thereof is expressly forbidden by: (a) a
>> statute of the state, or (b) a statute of the United States, or
>> (c) would contravene public policy.

Since the transfer of the Santa Cruz's litigation rights do not fall within one of the above

exceptions, under New York law it was entitled to transfer its litigation rights to SCO in the

context of the acquisition.

The result is the same under Utah law:  a non-assignment provision does not affect a

party's right to assign legal claims.  <u>Fuller v. Favorite Theaters Co. of Salt Lake</u>, 230 P. 2d 335,

336 (Utah 1951) ("provision prohibiting the assignability of the contract itself does not affect

the assignability of a cause of action which has arisen from the breach."); <u>SME Indus., Inc. v.</u>

<u>Thompson, Ventulett, Stainback & Assoc., Inc.</u>, 28 P. 3d 669, 674 (Utah 2001) ("[a]s a general

rule, a contract provision prohibiting the assignment of the contract itself, or of rights and

privileged under the contract, does not, unless a different intention is manifested, prohibit the

assignment of a claim for damages on account of the breach of contract.").

Thus, both Utah and New York law make clear that a party may assign litigation rights even where there is a provision prohibiting assignment of a related contract. Such a result only makes sense given that the policy behind a non-assignment provision is to ensure that a contracting party is not forced to do business with an unknown entity or to otherwise receive performance from a party with whom there is no relationship or experience. That policy argument is not present where the issue is merely the assignment of litigation rights.

Santa Cruz assigned to SCO all of its "right, title and interest" in the transferred assets, which included the SVR4 code that IBM misappropriated into AIX for Power. (¶ 69.) SCO also acquired all of Santa Cruz's "rights and privileges pertaining to" this intellectual property, including all "rights to enforce confidentiality or similar obligations" in relation to the code, "the right, if any, to sue or bring other actions for past, present and future infringement thereof," and "any and all other forms of intellectual property right or proprietary right recognized anywhere in the world." (Id.) See also Russello v. U.S., 464 U.S. 16, 21 (1983) ("interest" is the "most general term that can be employed to denote a right, claim, title or legal share in something"); Roslyn Associates v. Incorporated Village of Mineola, 443 N.Y.S.2d 424, 425 (2d Dept.. 1981) (transfer of all right, title and interest in property presumably included pre-existing damages claims). Other than the assignment argument dispensed with above, IBM has not raised any issue regarding the validity of the transfer of the litigation rights here to SCO. Therefore, IBM's argument lacks merit and should be rejected.

### III.   SCO'S UNFAIR COMPETITION CLAIM IS NOT PREEMPTED

IBM finally contends that the portion of SCO's unfair competition claim relating to IBM's unauthorized use of SCO's code in AIX for Power[12] is barred by federal preemption. Incredibly, IBM fails even to mention the "extra element" test that the Tenth Circuit and other courts have adopted for copyright preemption analysis. Under this test, SCO's claim is not preempted, because it has the requisite "extra element" that makes it qualitatively different from a copyright claim.

It is settled that if "a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action." Harolds Stores, Inc. v. Dillard Dept. Stores, Inc., 82 F.3d 1533, 1543 (10th Cir. 1996) (quoting Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 847 (10th Cir.1993)). Thus, a state cause of action is preempted if it imposes liability for the mere "act of reproduction, performance, distribution, or display," but if an extra element is required, "instead of or in addition to such acts, "there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright-infringement claim." 18 Am. Jur. 2d Copyright and Literary Property § 6.

Where the state claim "entails the additional element of the wrongful possession of the tangible embodiment of a work," there is no preemption. Id. Thus, there is no preemption of "unfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets." Computer Assoc. Intern., Inc. v. Altai, Inc., 982 F.2d 693,

---

[12] IBM acknowledges, (Opp. at 1,) that SCO's unfair competition claim includes other factual allegations but fails to address them. See Part IV infra.

717 (2d Cir.1992) (cited with approval by the Tenth Circuit in both <u>Harolds Stores</u> and <u>Gates Rubber</u>).

This is precisely the case here. Utah and New York unfair competition law do not impose liability for mere copying or distribution of another's work, and SCO's unfair competition claim is not based on mere copying or distribution. Instead, it is based on IBM's misappropriation of the SCO code used in AIX for Power by a fraudulent, deceptive scheme involving a sham PRPQ of the IA-64 Product, concealment and affirmative deception in breach of common law, fiduciary and contractual duties of confidentiality, loyalty and candor, and the duping of SCO into believing that IBM intended to partner with SCO in the development of a Monterey "family of products." (¶¶ 25-76.)[13]

Directly on point is <u>Kindergartners Count, Inc. v. Demoulin</u>, 171 F. Supp.2d 1183 (D. Kan. 2001), where the plaintiff and defendants were parties to consulting and marketing agreements, under which the defendants obtained "confidential and proprietary information" about plaintiff's work. When plaintiff sued for unfair competition on the grounds that defendants "obtained confidential and proprietary information through their respective confidential relationships" and "used that protected information in developing [a competing] program," defendants argued that the unfair competition claim was preempted.

The court rejected the preemption argument without hesitation: "Proof of a confidential relationship and its breach are extra elements that distinguish this unfair competition claim from the copyright infringement claim." <u>Id.</u> at 1192. <u>Accord, e.g., CMAX/Cleveland, Inc. v. UCR,</u>

---

[13] IBM's brief acknowledges, but does not dispute, SCO's allegations of a fiduciary and confidential relationship that arose from the Project Monterey joint venture. (IBM Memo. at 5, 13, 16.) If IBM attempts to dispute this for the first time in its reply brief, this Court should not allow it. In any event, there is ample evidence from which a jury could find that Project Monterey gave rise to a fiduciary relationship between the parties. <u>See</u> note 6, <u>supra</u>.

Inc., 804 F. Supp. 337, 359 (M.D.Ga. 1992) (trade secret claims "not preempted because they involve the additional element of a breach of confidentiality, which was owed to [plaintiff] under the license agreement and the common law"); Huckshold v. HSSL, L.L.C., 344 F.Supp.2d 1203, 1208 (E.D.Mo. 2004) (allegation that defendant "permitted a third party, Miller, to copy the Software in violation of their agreement" was sufficient extra element to avoid preemption); R. Nimmer, Law of Computer Technology § 3:61 ("Allegations that a contract or a confidence has been breached clearly fall beyond the allegations necessary for copyright infringement").

As the Kindergartners court expressly recognized, a breach of duty distinguishes a claim such as SCO's from pre-Harolds Stores and Gates Rubber decisions such as Ehat v. Tanner, 780 F.2d 876 (10th Cir. 1985), upon which IBM relies. Ehat's stolen work "found its way" to defendants, who had "no part" in the theft and no relationship with Ehat. Id. at 877. Here, in contrast, IBM had a relationship with SCO and had direct participation in the theft and misuse of the code.

Similarly, in every other case cited by IBM, the defendants misappropriated publicly available works, and there was no relationship between the parties.[14] In light of the recognized breach of duty exception, statements in such cases are clearly overbroad to the extent they suggest that every case involving the "misappropriation branch of unfair competition" is preempted. Gates Rubber, supra (breach of a duty of trust or confidence "qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely on copying"); Kindergartners, supra (distinguishing Ehat); Data Gen., Corp. v.

---

[14] See Twentieth Century Fox Film Corp. v. Marvel Enterp. Inc., 155 F. Supp.2d 1, 25 (S.D.N.Y. 2001) (comic book characters); Warner Bros. Inc. v. American Broad. Co., Inc., 720 F.2d 231, 247 (2d Cir. 1983) (Superman character); Durham Indust., Inc. v. Tomy Corp., 630 F.2d 905, 918-19 (2d Cir. 1980) (Disney characters); Ippolito v. Ono-Lennon, 526 N.Y.S.2d 877, 883 (N.Y. Sup.Ct. 1988) (concert performance).

Grumman Sys. Support Corp., 36 F.3d 1147, 1165 (1st Cir.1994) ("participation in the breach of a duty of confidentiality-an element that forms no part of a copyright infringement claim-represents unfair competitive conduct qualitatively different from mere unauthorized copying").

Accordingly, since SCO's unfair competition claim focuses on IBM's fraudulent and deceptive breaches of its fiduciary and confidentiality duties, IBM's preemption argument must be rejected.

## IV.  SCO'S UNCHALLENGED ALLEGATIONS PRECLUDE SUMMARY JUDGMENT ON THE NON-MONTEREY UNFAIR COMPETITION CLAIMS

While acknowledging that SCO has other allegations and evidence in support of its unfair competition claim, IBM focuses its motion entirely on SCO's Project Monterey allegations. IBM states only that, to the extent the unfair competition claim "is based on the alleged misconduct underlying SCO's other claims, it is untenable for the reasons set forth in IBM's motions for summary judgment (at 1) with respect to those claims."  However, while SCO submits that all of IBM's motions lack merit, the "reasons set forth" in IBM's other motions have nothing to do with unfair competition.  For example, a finding that a certain act did not breach a contract or infringe a copyright does not preclude a finding that the act constituted unfair competition.  IBM's motion should therefore be denied with respect to SCO's non-Monterey theories.

Furthermore, the arguments made by IBM in the present motion do not apply at all to much of SCO's non-Monterey evidence.  For example, SCO's unfair competition allegations and evidence include IBM's interference with SCO's contractual relationships.  Both before and after SCO's original complaint was filed, IBM spitefully induced various customers to stop doing business with SCO.  See SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Interference Claims.  This conduct constituted unfair competition because it

51

was "commercially immoral," and IBM's statute of limitations, "transmutation," standing, and preemption arguments are patently irrelevant to this conduct.

IBM's arguments do not even apply to the entirety of SCO's case concerning Project Monterey. For example, IBM's preemption section concerns only SCO's claim that IBM wrongfully used SCO's code in AIX for Power. IBM has not contended, and cannot credibly contend, that preemption precludes the remainder of SCO's Monterey claim, such as the concealment of IBM's decision to abandon Project Monterey in favor of a competing Linux product.

## CONCLUSION

For the reasons set forth above, IBM's motion to dismiss SCO's unfair competition claims should be denied.

DATED this 11th day November, 2006.

Respectfully submitted,

By _____

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Stuart H. Singer (admitted pro hac vice)
Edward Normand (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*