## **APPENDIX A**

## **RESPONSE TO IBM'S "STATEMENT OF UNDISPUTED FACTS"**

1.  IBM ALLEGED FACT: SCO filed its original Complaint, which included a claim for unfair competition, on March 6, 2003. (Ex. 1.) SCO's unfair competition claim repeated the allegations of its other causes of action, including a claim for misappropriation of trade secrets, but labeled those same allegations as "unfair competition". (Ex. 1 ¶ 118-19.)

SCO RESPONSE: Undisputed that the Complaint was filed on that date. Disputed to the extent it implies that the unfair competition claim merely repeated other allegations. (IBM Ex. 1.)

2.  IBM ALLEGED FACT: On July 22, 2003, SCO filed an Amended Complaint. (Ex. 2.) In the Amended Complaint, SCO again asserted a claim for unfair competition, and again based that claim on the same alleged conduct that supported each of its other causes of action. (Ex. 2 ¶¶ 147-53.)

SCO RESPONSE: Undisputed that the Amended Complaint was filed on that date. Disputed to the extent it implies that the unfair competition claim merely repeated other allegations. (IBM Ex. 2.)

3.  IBM ALLEGED FACT: SCO thereafter sought, and was granted, permission to file a Second Amended Complaint. (Ex. 3.)

SCO RESPONSE: Undisputed.

4.  IBM ALLEGED FACT: SCO's Second Amended Complaint, filed on February 27, 2004, again included an unfair competition claim (the sixth cause of action), which remained an amalgamation of its other claims relabeled as "unfair competition". (Ex. 3 ¶¶ 181-188.) In its Second Amended Complaint, SCO abandoned its claim for misappropriation of trade secrets altogether. (Ex. 3.) In fact, at a hearing on December 5, 2003, SCO acknowledged that there are no trade secrets in UNIX System V. Counsel for SCO stated: "There is no trade secret in UNIX system [V]. That is on the record. No problem with that." (Ex. 414 at 46:2-3.)

SCO RESPONSE: Undisputed that the Second Amended Complaint was filed on that date and that it did not include a trade secrets claim. Disputed to the extent it implies that the unfair competition claim merely repeated other allegations. (IBM Ex. 3.)

5. IBM ALLEGED FACT: SCO then sought leave to file a Third Amended Complaint to add a tenth cause of action. (Ex. 10 ¶¶ 217-41.) SCO's proposed tenth cause of action asserted that "IBM misappropriated, and used in its own 'AIX for Power' operating system, substantial copyrighted source code relating to UnixWare System V Release 4 [SVr4']". (Ex. 10 ¶ 217.) SCO further alleged that "IBM obtained access to the copyrighted UnixWare SVr4 code through 'Project Monterey'". (Ex. 10 ¶ 217.)

SCO RESPONSE: Undisputed.

6. IBM ALLEGED FACT: In a decision dated July 1, 2005, this Court denied SCO's motion to add a cause of action based upon IBM's alleged copying of code obtained through Project Monterey into AIX. The Court held that SCO had unduly delayed seeking leave to add the proposed cause of action because it appeared that "SCO – or its predecessor – either knew or should have known about the conduct at issue before it filed its original Complaint". (Ex. 58 at 4.)

SCO RESPONSE: Undisputed that the Court denied SCO's motion on that date. Disputed that the quoted statement was a holding, and disputed to the extent it implies anything at all about whether SCO or its predecessor knew or should have known about the state of SCO's knowledge in March 200<u>1</u> rather than March 200<u>3</u> (when the original Complaint was filed).

B.  SCO's Disclosures.

7. IBM ALLEGED FACT: IBM served interrogatories asking SCO to describe in detail its allegations and alleged evidence of misconduct by IBM. (Ex. 11.)

SCO RESPONSE: Undisputed.

8. IBM ALLEGED FACT: With respect to SCO's unfair competition claim, IBM asked SCO to "describe, in detail, each instance in which plaintiff alleges that IBM engaged in unfair competition, including but not limited to: (a) the dates on which IBM allegedly engaged in unfair competition; (b) all persons involved in the alleged unfair competition; and (c) the specific manner in which IBM is alleged to have engaged in unfair competition". (Ex. 11 at Interrogatory No. 7.)

SCO RESPONSE: Undisputed.

9. IBM ALLEGED FACT: Following SCO's failure fully to disclose its allegations and evidence of IBM's alleged misconduct, the Court entered three different orders requiring SCO to provide detailed responses to IBM's Interrogatories. (See Ex. 55; Ex. 56; Ex. 58.) In the final of those three orders, the Court set December 22, 2005, as the "final deadline for [SCO] to

54

identify with specificity all allegedly misused material" and update its interrogatory responses accordingly. (Ex. 58 at 4.)

SCO RESPONSE: Undisputed that the orders attached as IBM Ex. 55, IBM Ex. 56, and IBM Ex. 58 were entered. Disputed that SCO failed to fully disclose its allegations and evidence of IBM's alleged misconduct. SCO answered all of IBM's discovery requests to the best of its ability, based on the information available at the time.

10. IBM ALLEGED FACT: Initially, SCO defined its unfair competition claim as a combination of each of its other causes of action, including its breach of contract claims, its tortious interference claims and its copyright claims. (See Ex. 31 at Interrogatory Response No. 7; Ex. 32 at Interrogatory Response No. 7; Ex. 33 at Interrogatory Responses No. 7 and 8; Ex. 46 at Interrogatory Response No. 8.)

SCO RESPONSE: Undisputed that SCO filed the discovery responses attached as IBM Ex. 31, IBM Ex. 32, IBM Ex. 33, and IBM Ex. 46. Disputed as to the argumentative and out-of-context characterizations of those responses.

11. IBM ALLEGED FACT: SCO eventually focused its unfair competition claim upon allegations related to Monterey. Specifically, SCO alleges that:

    a. IBM made and continued to make investments in the development of Linux, and secretly advanced and promoted development of Linux without disclosing such activities to SCO, during and at a time when IBM was under a duty to deal fairly with and disclose such competing activities to SCO pursuant to its contractual obligations to SCO under Project Monterey and otherwise. (Ex. 32 at Interrogatory Response No. 7.)

    b. IBM's unfair competition arose from the relationship it established with SCO as a result of the joint effort between SCO and IBM known as "Project Monterey". (Ex. 33 at Interrogatory Response No. 7.)

    c. As a result of the formal agreement between SCO and IBM and the numerous representations made by IBM that were calculated to be relied upon by SCO, IBM had a fiduciary obligation to SCO that required IBM to be forthright and truthful in all affairs related to the partnership agreement. (Ex. 33 at Interrogatory Response No. 7.)

    d. IBM . . . unfairly took advantage of its partnership relations with SCO, unfairly gained access to SCO's business relationships, and unfairly and knowingly diverted SCO's resources away from competition with IBM and toward the purposes of the relationship. (Ex. 33 at Interrogatory Response No. 7.)

55

   e. During a substantial part of 1999 IBM was secretly developing plans to cease its planned strategic relationship with SCO . . . and to begin supporting Linux. (Ex. 33 at Interrogatory Response No. 7.)

  SCO RESPONSE: Undisputed that SCO made the quoted statements in IBM Ex. 33. Disputed as to the argumentative and out-of-context characterizations of those responses. Disputed to the extent the term "focused" is intended to imply that SCO abandoned its other unfair competition claims.

  12. IBM ALLEGED FACT: SCO alleges that "[b]ecause IBM has been developing its plan to replace UnixWare support with Linux support, and because it knew SCO had dedicated its entire enterprise resources to the IBM/UnixWare joint relationship, IBM had a fiduciary obligation to inform SCO of its Linux-related plans long before its Linux public announcement in December 1999." (Ex. 33 at Interrogatory Response No. 7.) In fact, IBM made a public announcement of its intention to support Linux at LinuxWorld in March 1999. (Ex. 21 at 4; Ex. 259 at 38.)

  SCO RESPONSE: Undisputed that SCO made the quoted statement in IBM Ex. 33, and that IBM announced in March 1999 that it would support Linux. Disputed that IBM's public statements revealed IBM's true Linux strategy, which included the abandonment of Project Monterey, the duping of Santa Cruz and Caldera, and the misuse of SCO's SVR4 code. (¶¶ 25-75). Moreover, even after the 1999 announcement, IBM deceived Santa Cruz into believing that it would continue to support Project Monterey. (¶¶ 25-74.)

  13. IBM ALLEGED FACT: SCO also alleges that IBM engaged in unfair competition by copying into IBM's AIX operating system code from the UNIX System V Release Four ("SVr4") operating system that had been included in Santa Cruz's UnixWare 7 product. (Ex. 33 at Interrogatory Response No. 7.) According to SCO, IBM obtained that code during the course of Monterey and its use of that code exceeded the scope permitted by the Monterey joint development agreement (the "JDA"). (Ex. 33 at Interrogatory Response No. 7.)

  SCO RESPONSE: Undisputed, except to the extent it implies that SCO's unfair competition claim concerning Project Monterey is merely for "use of code outside the scope of a license." SCO has alleged and has evidence of a broad array of fraudulent and deceptive conduct by IBM in connection with Project Monterey. (¶¶ 25-74.)

56

14. **IBM ALLEGED FACT:** Santa Cruz was aware of the allegedly improper inclusion of Santa Cruz code in AIX for Power by August 2000. (Ex. 227 ¶ 16; <u>see also</u> Exhibits to the Declaration of Todd M. Shaughnessy in support of IBM's opposition to SC0's Motion for Leave to File a Third Amended Complaint (Docket # 345).)

SCO RESPONSE: Disputed. Neither Santa Cruz nor SCO knew, or had reason to know, that Santa Cruz's code had been included in AIX for Power prior to 2004, or at the least not prior to March 2001. (¶¶ 70-72.)

15. **IBM ALLEGED FACT:** In interrogatory responses, SCO has named a slightly later date, alleging that IBM began copying Santa Cruz code obtained through Project Monterey into AIX in October 2000. (<u>See</u> Ex. 41 at Interrogatory Response No. 8.)

REDACTED

SCO RESPONSE: Undisputed that IBM began distributing the SCO code copied into AIX for Power beginning in October 2000, although the October 2000 distribution was a beta test primarily limited to certified software developers, with no public "generally available" distribution until May 2001. (¶¶ 37-38.) Disputed to the extent it implies that SCO had knowledge of the copying in October 2000 or any other time prior to March 2001. (¶¶ 70-72.)

C. <u>Project Monterey.</u>

16. **IBM ALLEGED FACT:** In 1994, Intel and Hewlett-Packard (HP) announced their collaboration to create a new 64-bit processor architecture design, known as IA-64. (Ex. 27.) Intel and HP, along with various others, believed that IA-64 would move Intel systems into higher-end server applications and quickly become the industry leader in that area. (Ex. 27.)

SCO RESPONSE: Undisputed that IBM Ex. 27 supports the statement "[i]n 1994 Intel and Hewlett-Packard (HP) announced their collaboration to create a new 64-bit processor architecture design." Disputed that this exhibit supports the statement that the new architecture would be "known as IA-64", as that term does not appear therein. Disputed that the

exhibit supports the statement "Intel and HP, along with various others, believed that IA-64 would move Intel systems into higher-end server applications and quickly become the industry leader in that area", as the exhibit does not mention servers and states only that "the intent of the technology agreement is to have a single architecture that will replace all others from either company."

    17.    IBM ALLEGED FACT: In or around 1998, IBM began negotiating with Santa Cruz to undertake a joint development project for, among other things, a UNIX-like operating system that would run on the IA-64 platform. This project subsequently came to be known as "Project Monterey". (Ex. 24; Ex. 25; Ex. 123; Ex. 86 ¶ 54; Ex. 259 at 30-31.) At that time, Santa Cruz sold two UNIX products that ran exclusively on Intel's existing 32-bit hardware platform: UnixWare and OpenServer. (Ex. 1 ¶¶ 26, 47; Ex. 115 at 5-8.)

    SCO RESPONSE: Undisputed.

    18.    IBM ALLEGED FACT: Both IBM and Santa Cruz were interested in attempting to leverage and strengthen their existing UNIX-like operating system products as part of Project Monterey. The goal was to develop and market a "family" of UNIX-like operating system products, including a "Monterey/64" version for the IA-64 Intel processor, a version to run on IBM's proprietary "Power" processor architecture and a version to run on the IA-32 architecture. (Ex. 23; Ex. 24; Ex. 25; Ex. 245.)

    SCO RESPONSE: Undisputed, except to the extent it implies that the parties contemplated the use of SCO's expertise and technology, particularly its SVR4 and UW7 codes, for development of an operating system "version to run on IBM's proprietary 'Power' processor architecture." The JDA only contemplated the use of SCO's expertise and technology, particularly its SVR4 and UW7 codes, for development of the defined "IA-32 Product" and an "IA-64 Product." (IBM Ex. 245 at §§ 1.9 and 1.10.)

    19.    IBM ALLEGED FACT: On October 26, 1998, IBM and Santa Cruz entered into the JDA, whereby Santa Cruz and IBM agreed to provide resources and technology to pursue these goals. (Ex. 245.)

    SCO RESPONSE: Undisputed that the parties entered into the JDA on that date. Disputed to the extent it implies that the parties agreed only to provide resources and technology. The JDA gave imposed broader duties and obligations and created a joint venture (¶¶ 18-24.)

58

20.     IBM ALLEGED FACT: In furtherance of IBM and Santa Cruz's intention to create a compatible family of products, both companies granted licenses to the other. (Ex. 245.) For its part, IBM granted Santa Cruz a royalty-free license to certain AIX source code for Santa Cruz's use in its UnixWare product for the existing 32-bit Intel processor. (Ex. 245 §2.0(c)(2).) In turn, Santa Cruz granted IBM a royalty-free license to certain UnixWare source code for IBM's use in its AIX operating system tailored to run on IBM's Power architecture processor. (Ex. 245 §2.0(d)(2); Ex. 227 ¶ 16.) Each party also granted the other a license to use any code supplied during Project Monterey for the development of the operating system that would be marketed for use on the forthcoming IA-64 product. (Ex. 245 §§ 2.0(c)(2), 2 .0(d)(2).)

SCO RESPONSE: Undisputed, except to the extent it implies that IBM Ex. 245 §2.0(d)(2) was the final agreement between the parties on this point.

REDACTED

21.     IBM ALLEGED FACT: In the JDA, IBM also stated its intention to engage in certain marketing activities to "market, promote and sell the UnixWare and IA-32 Product on IBM systems in 1999". (Ex. 245 Attachment A, §I.)

SCO RESPONSE: Undisputed, except to the extent it omits the statement's continuation: "with a minimum cumulative funding of Five Million Dollars in the first year" which backs the opening phrase "IBM intends to engage in at least the following marketing activities," after which ten specific activities are listed. [CITE]

22.     IBM ALLEGED FACT: IBM also agreed to make certain middleware available for the UnixWare 7 and IA-32, subject to IBM's determination of commercial considerations. IBM's plan included Tivoli, Websphere and DB2. (Ex. 245 Attachment A, §II.)

SCO RESPONSE: Undisputed that IBM agreed to make certain middleware available for the UnixWare 7 and IA-32 Product platforms. Disputed to the extent it overstates

the breadth of the qualifier "based on IBM's own determination of commercial considerations" and concomitantly omits the subsequent sentence which reads: At a minimum, however, IBM plans to make the following middleware available for the IA-32 or UnixWare 7 Product:

- MQ-series
- DB2
- eNetwork Directory
- Net.Data
- IBM Websphere
- Commserver
- Tivoli Management Software
- Network Station Manager

    23.    **IBM ALLEGED FACT**: Section 15.2 of the JDA, which is entitled "Change of Control", provides:

> Notwithstanding Section 15.1, IBM shall have the right to terminate this Agreement immediately upon the occurrence of a Change of Control of SCO which IBM in its sole discretion determines will substantially and adversely impact the overall purpose of the cooperation set forth by this Agreement and applicable Project Supplements or will create a significant risk or material and adverse exposure of IBM's confidential and/or technical proprietary information (which is subject to, and to the extent of, confidentiality restrictions) ("Information"). For the purposes of this Agreement, control shall be deemed to be constituted by rights, contract or any other means which, either separately or jointly and having regard to the consideration of fact or law involved, confer the possibility of exercising decisive influence (other than by an entity currently exercising such influence or any entity controlled by or controlling such entity) on SCO by: (1) owning more than half the equity, capital or business assets, or (2) having the power to appoint more than half of the members of the supervisory board, board of directors or bodies legally representing SCO, or (3) having the right to directly manage SCO's business activities.

(Ex. 245.)

    **SCO RESPONSE**: Undisputed that the JDA contains this provision. Disputed to the extent it implies that IBM did not deceive Santa Cruz and SCO into believing that it would not invoke this provision and would continue the Monterey venture after the closing of the Santa Cruz-SCO transaction. (¶¶ 61-68.)

24.     IBM ALLEGED FACT: Section 22.12 of the JDA, which is entitled "Assignment", provides, in relevant part: "Neither party may assign, or otherwise transfer, its rights or delegate any of its duties or obligations under this Agreement without the prior written consent of the other party." (Ex. 245.)

SCO RESPONSE: Undisputed that the JDA contains this provision. Disputed to the extent it implies that IBM did not deceive Santa Cruz and SCO into believing that it intended to consent to the assignment and continue the Monterey venture with Caldera after the closing of the Santa Cruz-Caldera transaction. (¶¶ 61-68.)

25.     IBM ALLEGED FACT: Section 22.3 of the JDA, which is entitled "Choice of Law/Venue", provides:

> This Agreement shall be governed by, and the legal relations between the parties hereto shall be determined in accordance with, the substantive laws of the State of New York, without regard to the conflict of law principles of such State, as if this Agreement was executed and fully performed within the State of New York. Each party hereby waives any right to a trial by jury in any dispute arising under or in connection with this Agreement, and agrees that any dispute hereunder shall be tried by a judge without a jury. Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York. (Ex. 245.)

SCO RESPONSE: Undisputed that the JDA contains this provision. Disputed to the extent it implies that this provision has any relevance to SCO's unfair competition claims. (Part I.B, supra.).

26.     IBM ALLEGED FACT: Although development of the Project Monterey IA-64 operating system proceeded throughout 1999 and 2000, the project encountered substantial difficulties due to delays in Intel's IA-64 processor development schedule. Intel's release of the initial Intel IA-64 processor, code-named "Merced" and officially named Itanium, was substantially delayed. In 1995 and 1996, executives of Itanium co-developer HP hinted that the processor was well underway, and might ship as early as 1997. That date came and went, and eventually 1999 was stated as the target. But that date also came and went. Itanium did not end up shipping until mid- 2001. (Ex. 22; Ex. 186 ¶ 57; Ex. 394.)

SCO RESPONSE: Undisputed that there were delays in the release of the Intel IA-64 processor. Disputed to the extent it implies that these delays justified IBM's concealment

61

of its decision to drop the UNIX-based Monterey solution in favor of its Linux strategy, its breaches of fiduciary duties, or IBM's misappropriation of SCO's SVR4 code. (¶¶ 25-74.)

27.  IBM ALLEGED FACT: Once Itanium did arrive, it performed poorly relative to alternatives in the marketplace. As a result, Intel and HP re-positioned it as primarily an evaluation and development platform, a precursor to the second-generation Itanium 2 "McKinley" release that would enable true production deployments. Neither IBM nor Santa Cruz had any involvement in – or control over – the development of the Itanium processor. (Ex. 26; Ex. 28; Ex. 186 ¶ 58.)

SCO RESPONSE: Undisputed that the Itanium processor initially did not perform as well as expected. Disputed to the extent it implies that such performance deficiencies justified IBM's concealment of its decision to drop the UNIX-based Monterey solution in favor of its Linux strategy, its breaches of fiduciary duties, or IBM's misappropriation of SCO's SVR4 code. (¶¶ 25-74.)

28.  IBM ALLEGED FACT: In addition to creating development difficulties, these delays caused a substantial decrease in market interest and confidence in the forthcoming IA-64 product and thereby the IA-64 operating system then under development by IBM and Santa Cruz. (Ex. 26; Ex. 28; Ex. 186 ¶ 59.)

SCO RESPONSE: Undisputed that the delays caused some decrease in market interest. Disputed to the extent it implies that such performance deficiencies justified IBM's concealment of its decision to drop the UNIX-based Monterey solution in favor of its Linux strategy, its breaches of fiduciary duties, or IBM's misappropriation of SCO's SVR4 code. (¶¶ 25-74.)

29.  IBM ALLEGED FACT: Despite the delays in the launch of the IA-64 processor, in late April 2001, IBM and Santa Cruz announced the first release of AIX 5L for the IA-64 processor on May 4, 2001. (Ex. 593; Ex. 594; Ex. 595.) That release occurred as scheduled. (Ex. 10 ¶ 236; Ex. 259 at 44.)

SCO RESPONSE: Disputed. This so-called "release" of a product with no compiler and no support was a mere pretext by which IBM attempted to deceive Santa Cruz and

SCO into believing that IBM had earned the right to use SVR4 code in AIX for Power. (¶¶ 49-60.)

    30.     IBM ALLEGED FACT: In May 2001, Santa Cruz finalized the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera International ("Caldera"), ending its investment in and support of the Monterey development effort. (Ex. 111 at 52; Ex. 244.)

    SCO RESPONSE: Undisputed.

    31.     IBM ALLEGED FACT: Santa Cruz did not obtain IBM's prior written consent to an assignment of the JDA. Instead, Santa Cruz informed IBM of the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera in a letter dated June 6, 2001. (Ex. 244.)

    SCO RESPONSE: Undisputed that IBM never gave written consent. Disputed to the extent it implies that IBM did not deceive Santa Cruz and SCO into believing that it would consent. (¶¶ 61-68.)

    32.     IBM ALLEGED FACT: IBM declined to consent to the assignment of Santa Cruz's rights and obligations under the JDA. Pursuant to Section 22.12 of the JDA, IBM's consent was necessary for such assignment to take effect. On the contrary, IBM invoked its right to cancel the JDA under Section 15.2 in a letter dated June 19, 2001. (Ex. 220.)

    SCO RESPONSE: Undisputed that IBM never gave written consent and that it cancelled the JDA. Disputed to the extent it implies that IBM did not deceive Santa Cruz and Caldera into believing that it would consent and would continue with Project Monterey. (¶¶ 61-68.)

    33.     IBM ALLEGED FACT: Caldera did not acquire Santa Cruz, which continued in business, albeit changing its corporate name to "Tarantella". (Ex. 244.)

    SCO RESPONSE: Undisputed, except to the extent it implies that SCO did not transfer to Caldera its SVR4 code and its unfair competition claims against IBM. (¶ 69.)

    34.     IBM ALLEGED FACT: After the start of this litigation, Caldera changed its name to "The SCO Group, Inc." (Ex. 113 at 4.)

    SCO RESPONSE: Undisputed.

D. <u>SCO's Failure of Proof.</u>

35. **IBM ALLEGED FACT**: SCO has not adduced – and cannot adduce – any evidence to show that IBM engaged in unfair competition, despite three orders of the Court requiring SCO to disclose all such evidence.

**SCO RESPONSE**: Disputed. SCO has come forward with more than ample evidence that IBM engaged in unfair competition. (¶¶ 25-74.)

## **CERTIFICATE OF SERVICE**

Plaintiff, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing Redacted SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) was served on Defendant International Business Machines Corporation on the 27th day of December, 2006, by the CM/ECF system to:

> David Marriott, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, New York 10019
>
> Todd Shaughnessy, Esq.
> Snell & Wilmer LLP
> 1200 Gateway Tower West
> 15 West South Temple
> Salt Lake City, Utah 84101-1004

/s/ Brent O. Hatch