Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300


Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN OPPOSITION TO IBM'S MOTION FOR SUMMARY JUDGMENT ON SCO'S INTERFERENCE CLAIMS (SCO'S SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION)** <br><br> **FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]** <br><br> Case No. 2:03CV0294DAK <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

SCO'S STATEMENT OF MATERIAL FACTS ........................................................4

    A.    Santa Cruz's Strong Position In The Unix-On-Intel Market ..................4

    B.    IBM Recognized SCO's Strong Position In The Unix On Intel Market...............5

    C.    IBM's Tortious Interference With SCO's Business Relations In The Unix-On-Intel Market....................................................................................6

    D.    SCO Did Not Encourage Its Customers Or Partners To Use Linux Instead Of Unix..........................................................................................7

    E.    IBM's Threats And Efforts To Prevent SCO From Asserting Intellectual Property Rights............................................................................8

    F.    Specific Impacts On SCO's Key Partners And Investors ....................13

    G.    IBM's Interference With Novell ...........................................................19

    H.    SCO Properly Disclosed Its Tortious Interference Claims ..................25

    I.    IBM Blocked Key Discovery On Key Topics Relating To SCO's Tortious Interference Claims, And Now Purports To Introduce Evidence On Those Very Topics ..........................................................27

SUMMARY JUDGMENT STANDARD ................................................................ 27

ARGUMENT .......................................................................................................... 27

    I.    SCO'S RESPONSE TO IBM'S STATEMENT OF ALLEGED UNDISPUTED FACTS ........................................................................27

    II.    CIRCUMSTANTIAL EVIDENCE FROM WHICH TORTIOUS INTERFERENCE MAY BE INFERRED PRECLUDES SUMMARY JUDGMENT ........................................................................27

    III.    A MATERIAL ISSUE OF DISPUTED FACT EXISTS PRECLUDING SUMMARY JUDGMENT ON SCO'S SEVENTH AND NINTH CAUSES OF ACTION...........................................................................................31

A.    IBM Intentionally Interfered with SCO's Business Relations in the Unix on Intel Market. ...................................................................................................31

       1.    IBM's Interference with the Unix-On-Intel Market Was Intentional ..............................................................................32

       2.    IBM Interfered with the Unix-on-Intel Market Through Improper Means..............................................................................39

       3.    IBM's Interference with the Unix-On-Intel Market Injured SCO ..............................................................................43

IV.    SCO'S COMPLAINT AND THE EVIDENCE SUBMITTED ESTABLISH A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH SPECIFIC BUSINESS RELATIONSHIPS (SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION)..............................................................................46

A.    IBM Tortiously Interfered With SCO's Business Relations with Hewlett Packard, Oracle, Intel, and Computer Associates. ...............................................47

B.    IBM Tortiously Interfered With SCO's Business Relations with Novell. ..........50

C.    IBM Tortiously Interfered With SCO's Business Relations with Baystar. .........53

CONCLUSION ...................................................................................................55

APPENDIX A...................................................................................................56

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

Bower v. Stein Eriksen Lodge Owners Association, Inc.,
   201 F. Supp. 2d 1134 (D. Utah 2002) ........................................................37, 38, 41

Cherberg v. Peoples Nat'l Bank of Washington,
   564 P.2d 1137, 1143 (Wash. 1977) ..............................................................................33

Danjanovich v. Robbins,
   2006 WL 1348204 (D. Utah May 15, 2006)...............................................................54

Frontier Refining, Inc. v. Gorman-Rupp Company,
   136 F. 3d. 695 (10th Cir. 1998) ...................................................................................54

Leigh Furniture and Carpet Co. v. Insom,
   657 P.2d 293 (Utah 1982)..................................................................................*passim*

Madison v. Deseret Livestock Co.,
   574 F.2d 1027 (10th Cir. 1978) ...................................................................................32

Malek v. Martin Marietta Corp.,
   859 F. Supp 458 (D. Kan. 1994)...........................................................................53, 54

McCorvey v. Utah State Dep't of Transp.,
   868 P.2d 41 (Utah 1993) ..............................................................................................48

McNeil v. Security Benefit Life Ins. Co.,
   28 F.3d 891 (8th Cir. 1994)..........................................................................................40

Motley v. Marathon Oil Co.,,
   71 F. 3d 1547 (10th Cir. 1995) ...................................................................................54

Mumford v. ITT Commercial Finance Corp.,
   858 P.2d 1041 (Ut. Ct. App. 1993) .................................................................35, 36, 38

O'Neil v. Cont'l Ill. Nat'l Bank & Trust Co.,
   No. 84-9398, 1985 WL 2710 (N.D. Ill. Sept. 25, 1985) .............................................39

Perez v. Volvo Car Corp.,
   247 F. 3d 303 (1st Cir. 2001)........................................................................................53

Perkins v. Chris Hunt Water Hauling Contractor,
   2002 WL 1753177 (10th Cir. July 29, 2002) ..............................................................32

Ricks v. Xerox Corp.,
    877 F. Supp 1468 (D. Kan. 1995) ........................................................................54

Sampson v. Richins,
    770 P.2d 998, (Ct. App. Utah 1989) ............................................................*passim*

State National Bank v. Academia, Inc.,
    802 S.W.2d 282 (Tex. Ct. App. 1990) ................................................................39

Steffensen v. Smith's Mgmt. Corp.,
    820 P.2d 482 (Utah Ct. App. 1992) .....................................................................48

United States v. Bald Eagle Realty,
    21 F. Supp.2d 1332 (D. Utah 1998) ..............................................................*passim*

U.S.v. First Sec. Bank of Utah, N.A.,
    208 F.2d 424 (10th Cir. 1953) .........................................................................  48

Westside Center Assocs. v. Safeway Stores 23, Inc.,
    42 Cal. App. 4th 507 (Cal. Ct. App. 1996) ........................................................40

Plaintiff, The SCO Group ("SCO") submits the following Memorandum in Opposition to Defendant IBM's Memorandum in Support of its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth, and Ninth Causes of Action) dated September 25, 2006 (the "Interference Motion").

## PRELIMINARY STATEMENT

IBM has moved for summary judgment on SCO's seventh, eighth and ninth causes of action, all of which arise from IBM's tortious interference with SCO's prospective and existing business relations. IBM's motion for summary judgment on these causes of action should be denied because SCO has adduced evidence sufficient to create a genuine factual dispute on each element of its tortious interference claims. SCO's claims for tortious interference turn in part on the same conduct that forms the basis for SCO's other causes of actions: namely, IBM's wrongful conduct in executing its Linux strategy, including breach of contract, misrepresentation of its rights and actions, copyright infringement and unfair competition. Through this wrongful conduct, IBM interfered with SCO's business relations in the Unix-on-Intel market, which SCO had undisputedly dominated. In its simplest terms, IBM gave SCO's most significant asset—its protected intellectual property—to the Linux community, and thereby facilitated the development of a free UNIX clone that displaced SCO's UNIX products in a market they had previously dominated. IBM then directly undermined support for SCO with SCO's partners and an investor, in order to isolate SCO and remove its funding so that SCO could not protect its intellectual property.

In arguing that summary judgment is appropriate, IBM misapprehends the law applicable to SCO's tortious interference claims and misstates (or ignores altogether) critical evidence that creates, at a minimum, genuine issues of material fact precluding the relief

requested.  IBM posits (at 2-3) three principal bases for summary judgment:  (1) that the seven businesses that SCO contends were interfered with "flatly den[y]" any interference and that Utah law does not recognize an "entire market" basis for recovery; (2) IBM's acts are privileged because they were not taken with an improper purpose; and, (3) SCO has not demonstrated a "causal link between any act of IBM and any specific injury to SCO."  In each instance, however, IBM is simply incorrect.

In making its first point, IBM overstates the evidence it relies upon in support of the Motion and neglects to identify the existence of significant and material contrary evidence that demonstrates, without equivocation, that summary judgment is inappropriate.  By example, IBM threatened SCO that it would cut off all of SCO's business ties and instruct other IBM business partners to do the same.  Further, contrary, to the assertion of IBM that Utah law does not recognize a cause of action for interference with SCO's business relations in the "Unix-on-Intel market", the Utah Supreme Court's decision in <u>Leigh Furniture and Carpet Co. v. Insom,</u> 657 P.2d 293 (Utah 1982), proves to the contrary.  As such, the first argument proffered by IBM provides no basis for the grant of summary relief.

IBM's second basis for summary judgment is equally without merit.  In arguing that the Motion should be granted, IBM dispenses with the totality of Utah law on tortious interference, arguing instead that SCO must prove that IBM acted with improper purpose.  In actuality, Utah law provides for recovery where the interference was undertaken with an improper purpose or through the use of improper means.  A plaintiff is only required to prove one or the other, not both.  The record evidence adduced in this case clearly shows that IBM employed improper means in interfering with SCO's business relationships by, among other things, (1) improperly placing technology that SCO controlled into Linux, which technology SCO had the right to

insist not be publicly disclosed; (2) misrepresenting to the public the derivation of some of that technology; (3) violating SCO copyrights; and (4) committing the common law tort of unfair competition as it abandoned its Project Monterey partnership with SCO in favor of Linux.[1] These acts, taken together with IBM's other wrongful conduct in encouraging IBM partners like Hewlett Packard, Intel, Oracle, Computer Associates, Baystar, and Novell to terminate their business relationships with SCO, demonstrate that this is a quintessential example of a case not appropriate for summary judgment.

The last argument in support of IBM's Motion is that SCO failed to show a "causal link" between any act of IBM and specific injury to SCO. IBM essentially asks this Court to reject record evidence from which such a link can be found in favor of several conclusory, self-serving declarations from the very companies with which IBM is alleged to have successfully interfered—and, incidentally, companies that substantially benefited from IBM's Linux strategy. In making this quantum leap in logic, IBM requires this Court to weigh the credibility of witness testimony and completely discount contrary evidence, both of which are improper at this stage of the proceeding. SCO's executives and employees have testified regarding the detrimental impact of IBM's acts of interference on its business, which testimony must be construed in the light most favorable to SCO as the non-moving party, creating triable issues of fact for a jury.

---

[1] See SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims (SCO's First, Second, Third and Fourth Causes of Action); SCO'S Memorandum in Opposition to IBM's Motion for Summary Judgment on its Claim for Declaratory Judgment of Non-infringement (IBM's 10th Counterclaim; SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claims (SCO's Sixth Cause of Action).

## SCO'S STATEMENT OF MATERIAL FACTS

**A.    Santa Cruz's Strong Position In The Unix-On-Intel Market**

1.    Santa Cruz Operation (hereinafter "SCO") was founded 1979 as a UNIX system porting and consulting company.  (Ex. 250.)[2]  In 1983, SCO delivered the first packaged UNIX System for Intel processor-based PCs, and continued to focus on UNIX systems on Intel processors (referred to as Intel architecture or simply, IA).  (Id.)

2.    As one industry analyst described it, "SCO established the market for advanced operating systems on industry-standard Intel platforms in the 1980s, pioneering such features as a full 32-bit implementation, security, and multiprocessing."  (Ex. 244.)

3.    At least as far back as 1989, SCO was described as "the largest vendor of Unix-like operating systems on Intel-based computers."  (Ex. 246.)

4.

REDACTED

5.                          REDACTED

6.    The strength of SCO's market position at this time was described in detail in the expert reports of Dr. Gary Pisano and Dr. Jeffrey Leitzinger, and those findings are incorporated herein by reference. (Ex. 284 at 40-46; Ex. 281 at 9-20.)

---

[2] The documents, declarations, and depositions supporting SCO's response are appended to the November 8, 2006 Declaration of Brent Hatch, and are cited herein as "Ex. __." Where exhibits attached to IBM's September 25, 2006 Declaration of Todd M. Shaughnessy are referenced herein, they are cited as "IBM Ex. __."

**B.**     **IBM Recognized SCO's Strong Position In The Unix On Intel Market**

7.

REDACTED

8.

REDACTED

9.     In addition, IBM identified for Gerstner SCO's key market segments, customers, and applications.  (Id. at 1710136590-91.)

REDACTED

10.

REDACTED

5

**C.    IBM's Tortious Interference With SCO's Business Relations In The Unix-On-Intel Market**

11.    In early 2000, IBM began disclosing proprietary UNIX technologies to Linux for the purpose of commercially hardening Linux for use in core enterprise functions. (Ex. 284 at 31-34, 50; Ex. 281 at 45-48.)

12.    The competitive reasons for IBM's strategy are discussed in detail in the reports of Drs. Pisano and Leitzinger, as well as Dr. Avner Kalay, and those discussions are incorporated herein by reference. (Ex. 284 at 58; Ex. 286 at 40-42; 49; Ex. 281 at 28-45; Ex. 279 at 29-35.)

13.    The impact of IBM's disclosures on SCO's business was direct, immediate and profound.  (Ex. 286 at 20; Ex. 281 at 56-58; 62-69; Ex. 279 at 12, 27.)

REDACTED

SCO's revenues dropped as customers migrated to the Linux operating system, as noted by both industry analysts and SCO distributors. (Ex. 286 at 25-26.)

14.    The reason for this swift impact on SCO's business was that IBM's disclosures to the Linux community enabled Linux to be used within corporations for the same functions as SCO's UNIX operating systems.  (Ex. 284 at 52; Ex. 286 at 31, 39; Ex. 281 at 54-56.)

REDACTED

15.    In 1999, prior to IBM's disclosures, Linux had not been used for these functions and did not compete with SCO's UNIX operating systems. (Ex. 284 at 43; Ex. 286 at 19, 26; Ex. 281 at 22-24.)

16.

REDACTED

17.     In 2000, even before the disclosures were implemented in Linux but after they were made, the expectation of such implementation impacted customers' buying patterns and drove buyers away from SCO's UNIX products to Linux. (Ex. 284 at 47-49; Ex. 286 at 48.)

18.     The details of IBM's commercial hardening of Linux are discussed in detail in the expert reports of Marc Rochkind and Evan Ivie, and those discussions are incorporated herein by reference. (Ex. 287 at 25-36; Ex. 277 at 32-33, 43-46, 56-58, 62.) SCO's experts conclude that, but for IBM's disclosures to Linux, Linux would not have been in a position to compete for the same functions with the same customers as SCO's UNIX operating systems. (Ex. 286 at 39; Ex. 281 at 52-54.)

**D.     SCO Did Not Encourage Its Customers Or Partners To Use Linux Instead Of Unix**

19.     Contrary to IBM assertions at paragraph 50 of the Motion, and elsewhere, SCO did not encourage its partners or its customers to use or support Linux instead of Unix.  Rather, SCO consistently positioned Linux as a complimentary solution to UNIX, and something that could be used in addition to (not in place of) UNIX.  (Ex. 1 ¶ 3; Ex. 369 ¶ 3.)

20.

REDACTED

21.    Consistent with this message, and contrary to IBM assertions at paragraph 50 of the Motion, SCO did <u>not</u> encourage Oracle, Computer Associates, or Intel to support Linux instead of UNIX.  To the extent SCO was involved in Linux activities with these customers, it was only after these companies had decided to support Linux.   This was an effort to preserve some revenue in connection with these companies after they made a decision adverse to SCO's UNIX business, i.e., an effort to mitigate its losses.  (Ex. 1 ¶11; Ex. 369 ¶¶ 7, 19.)

22.

REDACTED

E.    **IBM's Threats And Efforts To Prevent SCO From Asserting Intellectual Property Rights**

23.    In late 2002 and early 2003, SCO began researching the intellectual property surrounding Linux.  At this time, SCO discovered that customers were using its proprietary UNIX libraries with Linux – which was not permissible.  (Ex. 165 ¶ 3.)  SCO also ultimately discovered that Linux violated its System V copyrights and that IBM had disclosed proprietary UNIX technology to the Linux community in violation of its software licensing

agreements with SCO.  <u>See</u> <u>SCO's Memorandum in Opposition to IBM's Motion for Summary</u> <u>Judgment on SCO's Contract Claims (SCO's First, Second, Third and Fourth Causes of</u> <u>Action); SCO'S Memorandum in Opposition to IBM's Motion for Summary Judgment on its</u> <u>Claim for Declaratory Judgment of Non-infringement (IBM's 10th Counterclaim)</u>.

24.    In response to such discoveries and customer requests, SCO attempted to implement a strategy in late 2002 and early 2003 (after the improper disclosures were already made and in an effort to mitigate its damages) by which customers could license from SCO the right to use SCO's proprietary UNIX libraries with Linux.  (Ex. 165 ¶ 3.)  SCO later devised a license by which customers could legitimately use Linux more broadly, without violating SCO's intellectual property rights. (<u>Id.</u>)

25.    SCO presented its library licensing plan to multiple partners, including Oracle, Intel, Computer Associates, and was met with favorable response.  (Ex. 9 ¶ 4.)  Until IBM, no company objected to the plan or expressed disapproval.  (<u>Id.</u>)

26.

REDACTED

REDACTED

       d)     IBM ultimately persuaded SCO to delay its press release until January 2003, allegedly because IBM was concerned that the release would impact its ability to reach its December Linux-revenue numbers.  (Ex. 165 ¶ 5.) Based upon the representations made by IBM, SCO agreed to push the release and the initiation of the program back to January 2003.  (Id.)

       e)     IBM again expressed negativity about SCO's efforts to protect its intellectual property in a call in mid-January 2003.  This call included Mr. McBride and IBM executives Karen Smith and Bob Butler.  (IBM Ex. 164 at 49:6 – 50:2.)  While IBM again sought to dissuade SCO from issuing a press release about its plan, Mr. McBride, in that meeting or later, never gave any assurances to IBM that the press release would not go out.  (Ex. 165 ¶ 6.).

       f)     On January 22, 2003, SCO issued its press release announcing the formation of its new business division, SCOsource, to manage the licensing of its intellectual property.  (Ex. 201) The press release further explained that SCO had retained the law firm of Boies, Schiller and Flexner "to help research and advise SCO on the company's intellectual property."  (Id. at 1.)

10

REDACTED

REDACTED

REDACTED

REDACTED

27.    Just a day later, Ms. Smith began to execute on her threat that IBM would discontinue its business relationships with SCO:

REDACTED

11

REDACTED


REDACTED


REDACTED


28.     IBM also conveyed its negativity about SCO's plan to protect its rights to other SCO partners.                    REDACTED


29.     IBM engaged with SCO partners at a meeting or meetings referred to in the press as the "Chicago Seven Meetings":

a)     In July of 2003, representatives from seven different companies engaged or involved in the Linux business community met in Chicago. (IBM Ex. 164 at

78:12).  The participants represented IBM, Novell, Computer Associates, Oracle, Dell, Intel and HP.  (Id. at 83:9-84:17.)

b)      The meeting was motivated by, at least in part, concerns shared by Linux distributors arising from SCO's claims against IBM. (Ex. 256.)

REDACTED

c)      The ostensible purpose of the "Chicago Seven" meeting was to discuss a distribution of Linux to which all of the partners would contribute (and, of course, benefit). (Ex. 256.)  According to IBM's vice president, the group discussed the respective investments each was making in the Open Source Development Labs ("OSDL"), including certification and testing of Linux.  OSDL, notably, was not invited to participate in this discussion with the "Chicago Seven." (Ex. 256.)

F.      **IBM's Interference With SCO's Key Partners And Investors**

        **Hewlett Packard**

        30.     SCO's relationship with HP began in the early 1980's.  (IBM Ex. 312 at 35:20-21)  HP works with SCO as a Tier 2 vendor, an IHV, and an independent hardware vendor.  (Ex. 1, ¶ 13.)  HP does not consume SCO's products directly; rather, they certify their hardware on SCO operating systems and various peripheral drivers.  (IBM Ex. 312 at 35:21-

REDACTED

33.    When SCO first proposed its SCOSource library licensing program to HP, the proposal was received without opposition. (Ex. 9 ¶ 4.)

**Oracle**

34.    Oracle and SCO's business relationship began in approximately 1996. (IBM Ex. 312 at 61:21-62:1.)

35.    Oracle is an independent software vendor (ISV), meaning that they provided software, such as database and other solutions, to their customers.  For many years, Oracle would certify its software to run on SCO platforms such that customers using SCO's operating systems could use Oracle's software on those operating systems.  (IBM Ex. 312 at 34:20-35:16; Ex. 369 ¶ 14a.)

36.    Oracle certifications on SCO operating systems benefited SCO.  While SCO made little revenue from Oracle directly, the Oracle certifications were important to both existing and prospective customers.  (Ex. 369 ¶ 14)

REDACTED

14

REDACTED

37.     After Linux became commercially hardened by IBM's improper disclosures of SCO's proprietary technology, Oracle decided to support only Linux on the Intel platform, and to forego its support for SCO's Unix on Intel operating systems.  (Ex. 369 ¶ 17.)

REDACTED

38.     When SCO first proposed its SCOSource library licensing program to Oracle, the proposal was received without opposition. (Ex.9 ¶4; IBM Ex. 330 at 105:17-106:8.)

39.     In the 2000 to 2001 time frame, after IBM had begun hardening Linux with SCO's intellectual property, Oracle began to focus its efforts on Linux.  (IBM Ex. 322 at 321:8-20; Ex. 369 ¶ 17.)

40.     SCO's business relationship with Oracle dwindled in the following years, as Oracle refused to certify on SCO's UNIX operating systems.  (Ex. 369 ¶ 20.)

REDACTED

Oracle only began taking this position after it had largely moved its business to enterprise Linux, which would not have been possible if IBM had not wrongfully advanced Linux to the point where it was a viable alternative for Oracle and others, as set forth above.

41.    In 2003, Oracle withdrew OpenUnix8 certification. (Ex. 369 ¶ 20.) Although the parties once had a close working relationship,

REDACTED

42.

REDACTED

**Intel**

43.    REDACTED                    SCO's UNIX operating systems run on Intel architecture and Intel is the "foundation" of these operating systems.  (IBM Ex. 312 at 32:1-6.)

44.    SCO's relationship with Intel began in 1979 as SCO "offered one of the first UNIX-like systems on Intel platforms for multi users and multitasking." (IBM Ex. 312 at 64:9-12.)

45.

REDACTED

16

46.

REDACTED

47.     However, from 2001-2003, Intel only supported a limited number of servers on UnixWare.                     REDACTED


**Computer Associates**

48.     SCO's relationship with Computer Associates ("CA") began in the mid-to early 1990's.  (IBM Ex. 312 at 25:5-8)                     REDACTED

REDACTED

'various solutions that work on [SCO] operating systems, such as ARC Serve and Unicenter, Ingress . . . ."

REDACTED

34:2-8.)  CA certification of their products and services on SCO operating systems would create revenue for SCO from other joint CA and SCO customers. (Ex. 369 ¶ 12.)

49.     Computer Associates' certification to SCO's products has declined since 2003.  (Ex. 369 ¶ 12.)

**Baystar**

50.     Baystar invested $50 million in SCO in October 2003.  The investment had been made through a preferred stock transaction. (Ex. 165 ¶ 27.)

51.     SCO sought the investment from Baystar to fund its ongoing operations, which included continuing development and marketing of its UNIX and other products,

protection of its intellectual property, and its lawsuits against IBM and other companies.  (Ex. 165 ¶ 27).

    52.           REDACTED

    53.

           REDACTED

    54.     Nevertheless, on April 15, 2004, Baystar sought redemption of its SCO shares.        REDACTED

18

55.     However, Baystar never could substantiate, or even fully explain, the nature of its claims of breach against SCO.

REDACTED

56.     SCO originally believed that Mr. Goldfarb's erratic behavior was attributable to an interest he expressed to Mr. McBride early in his investment.  Mr. Goldfarb stated: "Look, Darl I'm a trader, and I don't really care whether your stock goes up or down, I just need it volatile because I can make money if it goes up and I can make money if it goes down."  (IBM Ex. 319 at 31:1-32:1; Ex. 165 ¶ 28.)  Based on this comment, SCO suspected that Mr. Goldfarb's difficult and troubling behavior was simply an attempt on his part to manipulate the stock of his company to his own advantage.  (Id.).

57.     However, following settlement of the dispute with Baystar, SCO learned that Mr. Goldfarb's conduct and ultimate redemption of his shares had been spurred by the extreme pressure put on him from IBM.  Mr. Goldfarb expressly stated to Mr. McBride that IBM had been "on him, on him, on him" to retract his support from SCO.  (Ex. 165 ¶ 29.)

58.     In the partial redemption of Baystar's investment, SCO lost a significant source of funding for its ongoing operations and protection of its intellectual property. In April of 2004, SCO settled Baystar's request for the return of its investment with a $13 million cash payment, and the issuance of approximately 2.1 million shares of common stock.  In return, Baystar relinquished its preferred stock.  The value of the cash and stock issued to Baystar pursuant to this resolution amounted to $20 million from SCO (Ex. 165 ¶ 30.)

## G.     IBM's Interference with Novell

59.     In 1995, Novell sold its entire UNIX-related business to SCO's predecessor-in-interest The Santa Cruz Operation, Inc. (also referred to herein as "SCO").  See

19

Asset Purchase Agreement dated Sept. 19, 1995 between Novell and SCO ("APA") Recital A, §§ 1.1(a), 1.3(a)(i), Schedule 1.1(a) (Ex. 38.)

      60.    The extrinsic evidence confirms that Santa Cruz bought the business REDACTED (Ex. 136)  Extrinsic evidence confirms that SCO obtained Novell's UNIX copyrights through the APA.  (Ex. 39 ¶¶ 6-12; Ex. 40 ¶¶ 5-10, 12-16; Ex. 59.)

      61.    The contemporaneous documents confirm Novell's view that Santa Cruz had acquired the full scope of the UNIX business and licenses including its intellectual property rights

REDACTED

(Ex. 136 (emphasis added))  The document thus plainly confirms Novell's view that Santa Cruz had acquired the full scope of the UNIX business including the UNIX copyrights.

      62.    Moreover, Amendment No. 2 to the APA, which was executed on October 16, 1996, confirms that the APA transferred to SCO "the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies."  (Ex. 41 ¶ A.)

      63.    There was one limited exception to the wholesale transfer of Novell's UNIX business to SCO:  Novell retained the right to continue to receive and protect royalties paid by then-existing UNIX System V ("SVRX") licensees for their ongoing distribution of binary products based on their UNIX flavors pursuant to SVRX sublicensing agreements (the "binary royalty stream").  (Ex. 38 §§ 1.2(a)-(b), 4.16(a); Id. Schedule 1.1(b), Item VIII

20

(excluding from asset sale "All right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16 hereof").)   Otherwise, pursuant to the other provisions in the APA, SCO received complete ownership and control of all UNIX source code, including the exclusive right to license the source code for SCO's own benefit and the right to enforce intellectual-property protections against licensees of the source code.  (Ex. 39 ¶¶ 9-10; Ex. 40 ¶ 11; Ex. 42 ¶ 6; Ex. 41.)

64.     The SVRX binary royalties were part of the consideration paid to Novell for the transfer of the UNIX assets to SCO.  (Ex. 38 § 1.2(a)-(b))  The parties agreed to this limited exception because Santa Cruz was not able to pay up-front what Novell regarded as the value of the business; the future binary royalty stream bridged the price gap.  (Ex. 39 ¶¶ 7, 9, 13; Ex. 40 ¶¶ 6, 9, 10.)

65.     Near the end of 2002, SCO and Novell began communicating about the APA and SCO's acquisition of the UNIX copyrights.  Mr. McBride called Novell executive Greg Jones in November 2002 to discuss the intent of the APA and, specifically, the fact that the copyrights to Unix and Unixware had been transferred to SCO.  Mr. Jones agreed with Mr. McBride.  Mr. McBride then asked whether Mr. Jones had any paperwork confirming the parties' understanding of the APA.  Mr.. Jones committed to check and get back to him.  (Ex. 165 ¶ 8; Ex. 9 ¶ 6.)

66.     In December 2002 or early January 2003, Mr. Jones called Mr. McBride and explained that the documents relating to the APA were in storage and would be difficult to access.  Instead, Mr. Jones proposed that someone at Novell simply sign a statement or letter confirming their mutual understanding that SCO had acquired the UNIX copyrights, rather

than trying to find the old documents in storage. Mr. McBride agreed with this proposal. (Ex. 165 ¶ 9; Ex. 9 ¶ 7.)

67.    At no time in these conversations did Mr. Jones state or imply that SCO did not own the Unix and Unixware copyrights, and in fact consistently agreed with Mr. McBride's statements that the copyrights had transferred to SCO. (Ex. 165 ¶ 10; Ex. 9 ¶ 11.)

68.    However, Novell reversed course when IBM began speaking to Novell in early 2003. According to Novell's CEO, Jack Messman, IBM and Novell had "multiple discussions" in the first four or five months of 2003. (Ex. 145 at 165:3-9) These discussions occurred shortly after SCO informed IBM that it intended to take steps to protect its intellectual property improperly included in Linux. (Ex. 165 ¶¶ 11, 12.)

69.    In January 2003 – after IBM had been speaking to Novell – Mr. Jones called Mr. McBride and informed them that Novell would not issue the clarification they had previously discussed and agreed would be issued. Mr. Jones explained that it was not that Novell did not agree with SCO's position, but that they did not want to be involved or to take any position. Mr. Jones explained that Novell was nonetheless "not interested in Unix anymore." (Ex.165 ¶ 11; Ex.9 ¶ 12.)

70.    On January 22, 2003, shortly after Mr. Jones refused to issue the clarification, Karen Smith of IBM informed Mr. McBride that IBM had "researched" SCO's ownership of the UNIX copyrights, and "concluded" that SCO had not acquired the copyrights from Novell. (Ex. 165 ¶ 12.)

71.    In 2003, Novell sent SCO a series of letters purporting to waive SCO's right to enforce its UNIX license agreements against IBM. IBM general counsel was carbon

22

copied on the correspondence. (Ex. 139; Ex. 140.)  Novell also made public announcements to the effect that Novell, not SCO, held the UNIX copyrights. (Ex. 165 ¶ 13.)

72.     On June 3, 2003, Mr. McBride called Mr. Messman.   Mr. McBride informed Mr. Messman's that Novell's public statements about the UNIX copyright ownership were false, and asked Mr. Messman if he had read Amendment 2 to the APA.  Mr. Messman responded that he was not aware of Amendment 2.  (Ex. 165 ¶ 13.)

73.     Mr. McBride faxed Amendment 2 to Mr. Messman; Mr. Messman called Mr. McBride back shortly after receiving it.  In this call, Mr. Messman agreed that – contrary to Novell's public statements – Amendment 2 confirmed that Novell had transferred the Unix and UnixWare copyrights to SCO.  (Ex. 165 ¶ 14.)

74.     Mr. McBride explained to Mr. Messman that Novell's false statements had caused injury to SCO and its shareholders.  He then asked Mr. Messman if Novell and IBM had a conversation regarding Novell's public statements about its ownership of the UNIX assets. (Ex. 145 at 18-24.)  Mr. Messman initially answered evasively:  "We talked with IBM about a lot of things" – an answer Mr. Messman acknowledges would not have been satisfying to Mr. McBride.  (Id.)  When Mr. McBride pressed him to be more specific, Mr. Messman responded that he should not talk further about IBM's involvement without an attorney present. (Ex. 165 ¶ 15.)

75.     Thereafter, Novell issued a press release which recanted Mr. Messman's prior statement claiming Novell owned UNIX copyrights, stating "[t]he amendment [to the APA] appears to support SCO's claim that ownership of certain copyrights for UNIX did transfer to SCO in 1996."  (Ex. 332.)  Novell thus admitted that it does not own the copyrights

at issue and acknowledged the relevance of Amendment No. 2 on the question of copyright ownership.

76. Despite its public concession, Novell's retraction was short-lived.

REDACTED

77.

REDACTED

78. Notably, all the while, IBM was simultaneously increasing its relationship with Novell in the Linux area. (Ex. 131 at 230:22-231:2.)

REDACTED

79. At the time it purposed to direct SCO to waive its rights, Novell was seeking to promote business interests entirely separate from any rights it retained under the APA.

REDACTED

80.     IBM's financial and other support of Novell during this period were patently designed to create a rift in the relationship between SCO and Novell and to induce Novell to claim rights that it knew (and previously acknowledged) it did not have.

81.     When SCO initially introduced its SCOsource licenses, also called IP Compliance Licenses, there was a flurry of activity. (IBM Ex. 324 at 182:19-21.)

82.     However, once Novell falsely asserted that SCO had not actually acquired the UNIX copyrights, customer interest in the SCOsource licenses fell off and SCOsource sales dwindled until, in 2004, SCO had to stop even marketing the licenses.

83.     After Novell made its false assertions,


REDACTED


H.     **IBM Blocked Discovery On a Key Topic Relating To SCO's Tortious Interference Claims, And Now Purports To Introduce Evidence On This Very Topic**

84.     IBM blocked key discovery in a key area – IBM's communications with Novell—and now presents one-sided evidence on the issue.

85.     In support of the Motion, IBM submitted the declaration of Joseph LaSala, general counsel for Novell, in an effort to show that IBM did not interfere with SCO's business relationship with Novell. (IBM Ex. 240.)

86.     To that end, Mr. LaSala states in his declaration: "Novell informed representatives of IBM of the actions it took with respect to the UNIX copyrights. However, at

no time did any representative of IBM request or express a desire that Novell breach, or take any action contrary to, the APA, Amendment X, or any other agreement between Novell and Santa Cruz or Novell and SCO." (IBM Ex. 240 at 42.)  Notably, Mr. LaSala does not say that IBM and Novell did not discuss the APA; nor does he state that IBM did not ask Novell to assert the right of waiver.  Rather, he says that IBM did not "request or express a desire that Novell breach, or take any action contrary to, the APA."  (IBM Ex. 240 at 42:4.)  Of course, since it is Novell's position that it is not breaching or taking action contrary to the APA (and SCO's position that Novell is), this statement does not indicate that IBM did not ask Novell to assert the right of waiver. Nor does the declaration address any of the myriad of other statements that IBM could have made that would have, as SCO alleges, interfered with its business relationship with Novell.

87.     Mr. LaSala goes on to state generally: "Novell's decision to assert it contractual rights under the APA and Amendment X was in no way caused or influenced by IBM's $50 million investment."  Again, the declaration does not state that its decisions were unrelated to other conduct of IBM and, indeed, in narrowly tailored to deal with only specific statements, with the hope that this Court will extrapolate further.

88.     On August 15, 2005, SCO submitted a Rule 30(b)(6) notice directly seeking information on these discussions between IBM and Novell:

> 18.     IBM's reasons and/or incentives for investing approximately $50 million in Novell, Inc. in or about March 2004.
> 19.     IBM's communications with Novell, Inc. regarding (a) Novell's asserted rights to direct SCO to waive its rights against IBM, including but not limited to the correspondence that Novell sent to SCO in which Novell claimed those rights, and (b) the pending lawsuit between SCO ad Novell in the United States District Court, District of Utah, Case No. 2:04CV00139.

(Ex. 304.)

89.     IBM unilaterally narrowed the scope of the topic and then designated Scott Handy as the witness on the topics. (Ex.309 at 2.)

90.     At his deposition, Mr. Handy testified that he had not researched or asked any IBM attorneys about their communications with Novell. (Ex.306 at 20:19-25, 21:2-19, 22:7-11)  Furthermore, Todd Shaughnessy revealed that IBM was, in any event, asserting a "common interest privilege" over such communications. (Ex. 306 at 59:4-12.)

## I.    SCO'S RESPONSE TO IBM'S STATEMENT OF ALLEGED UNDISPUTED FACTS

91.     In addition to the material facts set forth in the above section, SCO has included additional material facts in the attached Appendix A that further support the denial of the Motion.  At bottom, it is clear that there is sufficient record evidence in dispute to preclude summary judgment and SCO respectfully requests that the Motion be denied.

### SUMMARY JUDGMENT STANDARD

SCO has set forth the applicable summary judgment standard in its contemporaneously filed briefs and incorporates the same herein by reference.[3]

### ARGUMENT

## II.    CIRCUMSTANTIAL EVIDENCE FROM WHICH TORTIOUS INTERFERENCE MAY BE INFERRED PRECLUDES SUMMARY JUDGMENT.

The tort of intentional interference with economic relations has three elements a plaintiff must prove under Utah law: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."  Sampson v. Richins, 770 P.2d 998, 1003 (Ct. App. Utah 1989) (quoting Leigh Furniture and Carpet Co. v. Insom, 657 P.2d 293, 304 (Utah 1982)).

---

[3]  SCO's Opposition to Summary Judgment on SCO's Contract Claims, "Standard of Decision."

To meet its burden on the first element, plaintiff need only show that defendant's intentional conduct interfered with existing or prospective business relationships; thus, plaintiff is not required to identify specific contractual relationships with which defendant interfered. See Leigh Furniture, 657 P.2d at 302. In evaluating the types of relationships that warrant protection, Utah law recognizes that actionable business relationships include plaintiff's actual or potential customers, suppliers, and business associates. Id. at 306 ("Driving away an individual's existing or potential customers is the archetypical injury this cause of action was devised to remedy.").

The second element may be proven either by proof that the defendant engaged in conduct with the "pursuit of an improper objective of harming plaintiff or the use of wrongful means that in fact caused injury to plaintiff's contractual or business relationship . . . ." Leigh Furniture, 657 P.2d at 304. In its Motion, IBM fails to acknowledge that improper means are sufficient without an improper motive to create liability for this tort. Thus, upon a finding of either improper purpose *or* means, the court need not even consider the alternative. See Sampson, 770 P.2d at 1004 (sustaining trial court's entry of judgment for plaintiff).

To sustain a cause of action based on improper purpose, plaintiff must demonstrate that the defendant's purpose to injure the plaintiff predominated over all other purposes, including long-ranges economic goals. See id. at 311. Improper means, on the other hand, may be shown by defendant's violations of statutes, regulations, or common-law rules." See id. By itself, a breach of contract will not generally satisfy plaintiff's burden, but a deliberate breach for the purpose of injuring the plaintiff—even if that is not the predominate purpose—will satisfy this element of the tort. See id. at 309-10. Examples of conduct constituting improper means include the misrepresentation to third parties of a plaintiff's entitlement to a proprietary

interest; false statements regarding a plaintiff's right to a proprietary interest; and disclosure of confidential information obtained in the course of a relationship with plaintiff  (See Sampson, 770 P.2d at 1004.)  Other acts found to constitute improper means under Utah law is preventing the plaintiff from consummating *potentially* advantageous business associations; interruption of sales activities; breach of contract with an intent to injure the plaintiff; and even unreasonable or onerous demands for documentation.  See Leigh Furniture, 657 P.2d at 311.

Plaintiff may prove causation with defendant's acts that, by themselves, would not otherwise satisfy plaintiff's burden, if the cumulative effect causes injury to the plaintiff. See Leigh Furniture, 657 P.2d at 306 (noting that while none of defendant's actions alone would establish the intentional interference element of the tort, "in total . . . [defendant's] acts cross the threshold beyond what is incidental and justifiable to what is tortuous.").  Thus, a defendant may not escape liability by adducing proof that a plaintiff's loss were caused by his own business decision, so long as the evidence supports a reasonable inference that defendant's tortious interference and harassment would have likely continued to injure plaintiff's business. See id. at 307.  Similarly, evidence that plaintiff's business was in decline or facing difficulty even prior to defendant's interference will not defeat an inference of causation provided that plaintiff survived those difficulties before defendant's interference.  See Sampson, 770 P.2d at 1006.  Given that the above is the clear state of the law in Utah on tortious interference, SCO believes that there is no legal basis to grant the Motion.

Indeed, summary judgment is improper where the evidence demonstrates *any* dispute of material fact, drawing all reasonable inferences in favor of the non-moving party.  A plaintiff may meet his burden with circumstantial evidence, even where direct evidence is offered by the moving party, as this Circuit has recognized that "inferences from circumstantial facts may

frequently amount to full proof of a given theory, and may on occasion even be strong enough to overcome the effect of direct testimony to the contrary." Madison v. Deseret Livestock Co., 574 F.2d 1027, 1036-37 (10th Cir. 1978) (noting further that "summary judgment should not be based on the deposition or affidavit of an interested party. . . as to facts known only to him a situation where demeanor evidence might serve as real evidence to persuade a trier of fact to reject his testimony."); see also Perkins v. Chris Hunt Water Hauling Contractor, Inc., 46 Fed. App. 903, 2002WL 1753177, at *5 (10th Cir. Jul 29, 2002)[4] (reversing summary judgment order where plaintiff advanced circumstantial evidence supporting its claim).  This result is particularly appropriate where, as here, the relied upon testimony offered through certain declarations is extremely narrow and references only very specific statements by IBM.  The declarations are devoid of testimony regarding the myriad of other IBM statements or conduct that could support the claims here and, thus, the declarations must be limited to their contents, without inference in IBM's favor.

Issues of intent and knowledge in particular are appropriately proven through circumstantial evidence.  See, e.g., Cherberg v. Peoples Nat'l Bank of Washington, 564 P.2d 1137, 1143 (Wash. 1977) (upholding verdict where evidence supported an inference that defendant breached its contractual obligation for an improper purpose, thereby satisfying plaintiff's tort claim).  Similarly, whether or not causation has been proven is a question of fact.  See Sampson, 770 P.2d at 1006.  SCO believes that the material facts set forth in this response support its claims and, ultimately, liability on the part of IBM.  At worst, however, they are sufficient to establish that materials facts exist such that the claims should be submitted to the jury.  This result is even more compelling given that questions regarding

---

[4] A copy of this unpublished opinion is attached pursuant to local rule 7.2 as Ex. B.

IBM's intent and the import of its conduct is within the unique province of the jury where there are facts in dispute. As such, SCO believes the Motion should be denied.

### III. A MATERIAL ISSUE OF DISPUTED FACT EXISTS PRECLUDING SUMMARY JUDGMENT ON SCO'S SEVENTH AND NINTH CAUSES OF ACTION.

#### A. IBM Intentionally Interfered with SCO's Business Relations in the Unix-on-Intel Market.

IBM interfered with SCO's business relations in the UNIX on Intel market by wrongfully disclosing SCO's UNIX proprietary technology. IBM did this to develop Linux into a software platform capable of competing with SCO's UNIX products and, as result, compete more effectively with Microsoft and Sun.  These improvements to Linux directly and foreseeably caused Linux to displace SCO's UNIX operating systems in the Intel market; indeed, that was the desired result.  IBM took these actions with full knowledge of the advantageous position occupied by SCO in the Intel market; appreciation of SCO's right to prevent disclosure of the technology to Linux; and knowledge of the detrimental impact its actions would necessarily have on SCO's market positions. (See, e.g., Ex. 129).  Even as IBM made its wrongful disclosures to Linux in breach of SCO's contracts and in violation of SCO's copyrights, IBM made false statements about the derivation of that technology, and engaged in unfair competition in relation to its Project Monterey partnership with SCO. These issues are more fully addressed in SCO's other briefs.[5]  The impact of IBM's actions on SCO was devastating and immediate; SCO's revenue and market value plummeted following IBM's wrongful conduct, and SCO's UNIX business continues to struggle as a result.

---

[5] SCO's Opposition to IBM Motion for Summary Judgment on SCO's Unfair Competition Claims

1.     IBM's Interference with the Unix-On-Intel Market
       Was Intentional.

IBM contends (at 48) that SCO's tortious interference claim must fail as a matter of law because Utah does not recognize a claim for "indirect" interference, or "interference with the market."  Interestingly, IBM fails to cite any authority for this position; instead, IBM appears to impose this limitation on the claim by misreading the first element, *e.g*, that defendant's conduct be "intentional." That is not the law, however. As one Utah court observed:

> The tort of interference with economic relations is an intentional
> tort.  However, even if the defendant does not act for the purpose
> of interfering or does not desire it but knows that the interference
> is substantially certain to occur as a result of defendant's action
> and is a necessary consequence thereof, the interference is
> intentional.

Mumford v. ITT Commercial Fin. Corp., 858 P.2d 1041, 1044 (Ut. Ct. App. 1993).

IBM's improper Linux activities literally decimated SCO's competitive position in a market that it had previously dominated.  The evidence here shows that before its improper Linux activities, IBM knew that SCO dominated the Unix-on-Intel market; knew the strength of SCO's customer and partner relationships and the reasons those relationships were strong; and knew the expected future size of that market.  Accordingly, the actions IBM took were intentional.

For example, in 1997, before its improper Linux conduct, IBM sang the praises of SCO's UnixWare operating system:

REDACTED

32

(Ex. 243.)

REDACTED

IBM acknowledged the compelling reasons for the very business relationships with SCO with which it later interfered;

REDACTED

Fully aware of SCO's position in the UNIX-on-Intel market, IBM embarked on its initiative to make Linux the operating system of choice for commercial users, and specifically targeted the market segment served by SCO more than by any other provider.  This evidence is more than sufficient to satisfy the "intentional" element of the tort under Utah law.  See Mumford, 858 P.2d at 1044.

IBM claims (at 48) that SCO's claim for interference with the UNIX-on-Intel market does not satisfy the requirement that the interference be "intentional" because SCO has not

33

shown that IBM directly contacted or communicated with any of the companies impacted by IBM's actions. In <u>Leigh Furniture</u>, 657 P.2d at 302, 306, the Utah Supreme Court recognized that actionable business relationships include plaintiff's actual or potential customers, suppliers, and business associates. The fact that the number of potential customers with whom SCO would have completed a transaction, but for IBM's interference, exceeds the number that SCO can possibly identify, makes IBM's improper conduct no less actionable. IBM assumes that the success of SCO's claims depend on its ability to specifically identify the third parties who, as a result of IBM's wrongful conduct, withdrew their interest in SCO and chose not to purchase SCO's UNIX products. <u>Leigh Furniture</u> makes clear that that is not the standard.

In <u>Leigh Furniture</u>, the focus of the court's concern was the unidentified customers who were driven away from the plaintiff's store. Thus, although the court mentions interference with two named businesses, the damages in that case were not linked specifically to the interference with only the two identified business partners. The Court observed: "Driving away an individual's existing or potential customers is the archetypical injury this cause of action was devised to remedy." <u>Leigh Furniture</u>, 657 P.2d at 306. This is precisely what IBM did to SCO's business relations in the Unix-on-Intel market.

REDACTED

IBM cites (at 48) the case <u>Bower v. Stein Eriksen Lodge Owners Asso', Inc.</u>, 201 F. Supp.2d 1134 (D. Utah 2002) for the proposition that SCO has not shown that the interference was "intentional" under Utah law. (<u>Id.</u> at 1143.) Bower is inapposite, however. In <u>Bower</u>, the

claim of tortious interference was premised on the plaintiffs' contention that an "obstructed view" caused by the defendant's construction "lowers both the fair market value and the rentability of their condominium, and therefore, interferes with *prospective* economic relations." (Id.) Unlike SCO, the plaintiffs in that case failed to provide *any* evidence that the defendant intended to injury them when it completed the construction, or that they had suffered any injury from defendant's conduct. (Id.) For these reasons, the court concluded that the claim was speculative. (Id.)

In stark contrast to the facts in <u>Bower</u>, SCO has identified significant evidence that IBM knew of the strength of SCO's business relations in the Intel market and the nature of those relationships. There is likewise more than ample evidence that IBM was proceeded with its improper Linux strategy in the face of these business relationships; it cannot be reasonably disputed that this evidence is sufficient to show that IBM's actions were intentional and, therefore, summary judgment is inappropriate.

IBM's proposed construction of the "intentional" prong would impose an additional burden SCO that is not present under Utah law. There is simply no authority for IBM's position that for conduct to be deemed intentional, the defendant must have acted with the "improper purpose" of harming the plaintiff's business relationships. The intentional requirement relates merely to whether IBM knew that its conduct, whether taken for an improper purpose or through use of an improper means, would cause SCO harm.    As noted above, a defendant's actions are "intentional" when the defendant "knows that the interference is substantially certain to occur as a result of defendant's action and is a necessary consequence thereof . . . ." <u>Mumford</u>, 858 P.2d at 1044. The evidence shows that IBM assuredly knew the consequences of its actions, which fulfills the element of intent under Utah law.

Furthermore, unlike the plaintiffs in Bower, SCO has adduced evidence of substantial and direct harm to its business relationships. Thus, SCO's claims are not speculative in that regard. Notably, the cases cited by defendant for its contention that SCO's claims are too indirect to be actionable are not from this jurisdiction, and accordingly they are neither controlling nor persuasive. The cases relied upon by IBM (at 49) are actually contrary to Utah law. Specifically, Defendant relies on State Nat'l Bank v. Academia, Inc., 802 S.W.2d 282 (Tex. Ct. App. 1990), for the proposition that tortious interference requires contact by the defendant with an identifiable third party with whom plaintiff had a business relationship. Decided under Illinois law, the court applied an approach explicitly rejected by the court in Leigh Furniture.[6] Under Illinois law, a plaintiff must demonstrate that the defendant's conduct was directed towards a third party with whom defendant had actual contact. See State Nat'l Bank, 802 S.W.2d at 297.[7]

Utah courts, conversely, have recognized that a cause of action may lie even where no such contact is alleged. In Mumford, 858 P.2d 1041 (Ut. Ct. App. 1993), the trial court granted summary judgment in favor of a defendant accused of tortiously interfering with plaintiff's business relations by denying plaintiff access to property necessary for plaintiff to perform its hauling contracts. The court of appeals reversed, observing that the evidence advanced raised a material issue of disputed fact. See id. at 1044. Though the defendant submitted affidavits asserting that it was not even aware of plaintiff's contracts with which it allegedly interfered, and did not intend to so interfere, the court found that plaintiff's affidavit alleging that

---

[6] See Leigh Furniture, 657 P.2d at 303 & n.7 (listing the jurisdictions which apply some variation of the Restatement formulation of the tort, Illinois among them).

[7] For the same reasons, the unpublished opinion in O'Neil v. Cont'l Ill. Nat'l Bank & Trust Co., No. 84-9398, 1985WL2710 (N.D. Ill. Sept. 25, 1985), is inapplicable to this or any other case decided under Utah law. A copy of that unpublished opinion is attached as Ex. A.

defendant intentionally prevented him for accessing his property was sufficient to create a jury question as to whether defendant's conduct constituted intentional interference with plaintiff economic relations. See id.

IBM's remaining cases are also easily distinguished. Westside Center Assocs. v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507 (Cal. Ct. App. 1996), involved the solitary sale of a parcel of real estate, which parcel was artificially depreciated by defendant's conduct, depriving plaintiff of the opportunity to determine its true market value. The court concluded that without an existing relationship with an identifiable buyer, there was insufficient evidence from which to infer whether defendant's actions actually had any impact on the sale price. See id. at 527. The court's conclusion is understandable in light of the nature of the business with which defendant was alleged to have interfered: because real estate is unique, its value is determined only by what a particular purchaser is willing to pay for it. Thus, without evidence that a prospective buyer was influenced by defendant's conduct in offering a lower price or retracting an attractive bid following defendant's actions, the plaintiff had no way of proving causation or injury. Again, that is not this case. SCO has adduced undisputed evidence of a strong market position, a high demand for its products, and a precipitous fall in revenue following IBM's tortious conduct. The facts and evidence here are archetypal examples of those that this business tort was designed to address. To find otherwise would allow IBM to improperly benefit for its egregious and intentional conduct, which is inconsistent with Utah law.

Defendant's reliance on McNeil v. Security Benefit Life Ins. Co., 28 F.3d 891 (8th Cir. 1994), is surprising in light of the court's observation in that case that conduct similar to that alleged against IBM here was found to be tortious, though not actionable due to plaintiff's

failure to show injury.   See id. at 894-95 ("[Defendant] made false statements to other insurance companies about the McNeills, told policyholders the McNeills were misinterpreting the policies, refused to provide the McNeills with information regarding their clients' policies, and urged policyholders 'to ignore the McNeills as their agent and to continue their relationship with SBL.'").  The record evidence shows that the conduct of IBM was tortious, but, at a minimum, creates a material issue of fact precluding the granting of IBM's Motion.

The only case IBM cites applying Utah law is both mis-cited and factually distinguishable.  The court in Bower v. Stein Eriksen Lodge, granted summary judgment in defendant's favor, deciding without discussion that plaintiff failed to meet its burden of proof. 201 F. Supp.2d 1134 (D. Utah 2002.)  Plaintiff's theory of recovery was prospective: namely, that the defendant's construction would injure its future economic relations.  SCO has not relied on such a prospective theory of what might happened but, rather, has introduced sufficient competent evidence that IBM's conduct did in fact cause a significant loss of SCO's business relationships.  Thus Bower is simply inapplicable to the present case.

Bower cannot be read as fairly supporting IBM's contention (at 48) that "SCO must show that IBM had knowledge of each relationship and that IBM intended to interfere specifically with each relationship."  The court recited the movant's argument, observing that the movant contended that plaintiff failed to prove intent, injury, damage, or any third party with whom the defendant allegedly interfered.  Agreeing only that the plaintiff's claim was too speculative, the court granted summary judgment, but expressed no opinion as to the necessity of plaintiff to specifically identify a third party with whom it contended defendant interfered. See id.

2.      IBM Interfered with the Unix-on-Intel Market Through
        Improper Means.

IBM claims (at 53-57) that SCO has not shown that IBM interfered with its business relations in the Unix-on-Intel market and that, even if it had, IBM's actions are "privileged" because they advanced IBM's legitimate, competitive interests.  SCO has shown that, in executing its Linux initiative, IBM (1) disclosed technology to Linux that SCO had a right to insist not be publicly disclosed; (2) misrepresented to the public its own right to disclose that technology and the derivation of that technology; (3) violated SCO copyrights by making disclosures to and encouraging the use of Linux; and, (4) committed the common law tort of unfair competition when it put out a pre-textual release of the Project Monterey operating system while covertly switching its efforts to Linux.  This evidence, as well as the other evidence cited herein, evince of pattern of tortious conduct supporting relief.

IBM correctly asserts that the resolution of this claim in part turns on the resolution of IBM's other motions for summary judgment.  Thus, IBM's conduct is likewise improper for the reasons set forth in <u>SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims (SCO's First, Second, Third and Fourth Causes of Action)</u>; <u>SCO'S Memorandum in Opposition to IBM's Motion for Summary Judgment on its Claim for Declaratory Judgment of Non-infringement (IBM's 10th Counterclaim)</u>; and <u>SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claims (SCO's Sixth Cause of Action)</u>.

IBM further asserts (at 57) that its breaches of the Software Licensing Agreements cannot constitute "improper means" for tortious interference under Utah law.  IBM is correct that, as a general matter, breaches of a contract, without more, cannot constitute "improper means."  When combined with a motive to injure the plaintiff, however, such conduct may

support a tort claim.  See Leigh Furniture, 657 P.2d at 309.  In addition, IBM's total conduct in the aggregate can be considered to support tortious interference.  See Sampson v. Richins, 770 P.2d at 1004 (finding that defendant's separate acts, including misrepresenting information about plaintiff's right to reimbursement and disclosure of plaintiff's confidential information, taken together, constituted improper means).

Here, IBM misrepresented the derivation of the technology: IBM announced that its JFS technology was derived from its non-UNIX derived OS/2 operating system, when in fact, as SCO's experts have shown, the technology came from IBM's UNIX-derived operating system AIX.  (Ex. 344)  A jury may reasonably infer that this intentional misrepresentation demonstrates not only consciousness of guilt, but an intentional attack on SCO's UNIX business strategy.

Contrary to IBM's assertions (at 57), IBM's improper Linux actions were not "privileged" under Utah law.  IBM seems to believe that, even if its means were improper, as described above, the fact that it was acting in its own economic interest in engaging in this improper activities renders its actions privileged.  This turns Utah's improper purpose or improper means rule on its head.  The law in Utah is that the conduct is privileged if the defendant was exercising a "legal right."  See Leigh Furniture, 657 P.2d at 305 n.8.  There is no "legal right" to compete through improper means – as IBM did.  Thus, if it is concluded that IBM used improper means in executing its Linux initiative, IBM's conduct cannot be privileged just because IBM was acting in its own economic self-interest.  The privilege requested by IBM would effectively reverse the improper purpose or improper means rule set forth in Leigh Furniture.

On a related point, IBM relies on language from Leigh Furniture for the proposition that a defendant may not be held liable for its "efforts to persuade others not to . . . deal with certain entities." 657 P.2d at 293. Its reliance is misplaced. The above quotation is drawn from the court's discussion of the "prima facie tort approach," and its recognition that such an approach would cast too broad a net, creating liability for otherwise legitimate examples of persuasion. Id. For this reason, the court rejected that approach and observed the additional requirement that plaintiff show interference by either improper purpose or means. Thus, Leigh Furniture does not, as IBM suggests, give blanket approval for persuading a party not to deal with a particular entity. Rather, if coupled with either improper purpose or means, Leigh Furniture recognizes that a refusal to deal (or inducement of a refusal to deal) may be the basis for liability.

Leigh Furniture presented a case of first impression for the Supreme Court of Utah. In deciding that Utah does recognize the tort of intentional interference of prospective economic relationships beyond those reduced to a contract (and those not expected to be reduced to contract), the court observed that there is no majority position on the definition of the elements of the tort. See Leigh Furniture, 657 P.2d 303. The court considered the Restatement (Second) of Torts, and rejected its approach as too burdensome on the plaintiff. See Leigh Furniture, 657 P.2d at 303-04. Instead, the court adopted Oregon's approach, which the court characterized as a "middle ground," requiring "the plaintiff to allege and prove more than the prima facie tort, but not to negate all defenses of privilege." See id. at 304.

The court summarized a plaintiff's burden as follows:

> In summary, such a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means.

(Id.)

The plaintiff in that case entered into a contract with the defendant for the purchase of defendant's furniture business. The contract further provided for a lease with an option to buy the building where the business was located. The contract imposed obligations on the plaintiff to pay rent and to maintain a certain minimum inventory. When defendant decided it would be more advantageous to sell the property than lease it to plaintiff, defendant and his family began a campaign to agitate plaintiff enough to quit the building and breach the lease. See id. at 297. Defendant and his wife visited the plaintiff's store on numerous occasions, disrupting his ability to service his customers. The frequent visits were "demoralizing and upsetting" to plaintiff and his employees, reducing their productivity and ability to conduct their business. See id. When plaintiff sought to exercise his option to buy the property, defendant refused to appoint an independent appraiser to determine the fair value of the property, as the contract required him to do. See id. at 300.

Defendant forced plaintiff to defend himself in two baseless lawsuits, one initiated by the defendant, another by a contractor whom defendant refused to pay for services that the contract established were defendant's responsibility. Ultimately, plaintiff filed bankruptcy as a result of defendant's conduct. See id. at 301. Noting that the only contract in evidence was the one between plaintiff and defendant, the court held that plaintiff could nonetheless sue for tortious interference with "advantageous economic relations." See id. The same conclusion should be reached here based upon the record evidence.

3.    <u>IBM's Interference with the Unix-On-Intel Market Injured SCO</u>.

IBM argues (at 58-63) that, with respect to the claim for interference with the Unix-on-Intel market, SCO cannot establish that it was injured nor can it show a causal relationship between any injury and the acts of IBM.

As noted above, SCO's UNIX operating systems occupied a strong competitive position in 1999, prior to IBM's improper Linux activities.

REDACTED

In his August 28, 2006 Report, Gary Pisano concluded that SCO's UNIX License revenues for its UNIX operating systems increased under SCO's direction and management from 1995 to 1999. (Ex. 286, Response to the Reports and Decl. of IBM Experts by Gary Pisano, Ph.D, dated August 28, 2006, at 11 (hereinafter "Pisano Reb. Rep.").)

REDACTED

Dr. Pisano further concluded that, absent IBM's wrongful conduct, SCO would have continued to compete and grow in the Intel market. (Ex. 284, Pisano Rep. at 54-57.)

Prior to IBM's improper technology disclosures, Linux lacked crucial reliability and functionality to compete with SCO UNIX for mission critical workloads, and Linux was not a viable competitor to SCO UNIX in 1999 for commercial workloads. (Ex. 286, Pisano Reb. Rep. at 30-31; Ex. 288, Rochind Reb. Report at 56-57.)

REDACTED

43

REDACTED                          Ex. 277, Expert Report of Evan

Ivie, dated May 19, 2006, at 6; Ex 276 at 33-34.)  That was clearly by design as IBM knew

precisely the areas that needed to be improved if it was to fulfill its Linux strategy.

Once IBM began disclosing proprietary technology to Linux, Linux rapidly displaced

SCO's UNIX operating systems in the Intel market.

REDACTED

In the face of this evidence, IBM claims (at 60-63) that the deterioration of SCO's

business was indisputably caused by factors independent of IBM.  In this section of its

memorandum, IBM asks this Court to make factual and credibility determinations that are

wholly inappropriate for resolution on summary judgment.  IBM advances the argument that

SCO's revenue losses were caused by its own business strategies, including its support and

promotion of Linux, and its failure to support and advance its UNIX products.  IBM's evidence

on this point at best demonstrates the existence of material issue of disputed fact and is proof

positive that summary judgment is not appropriate.  Nonetheless, IBM's evidence in support of

this argument is contradicted by SCO employees with personal knowledge of SCO's business

decisions, as well as competent expert testimony.

By example, Janet Sullivan, who is presently SCO's developer program manager, but

previously held the positions of OEM licensing manager; product marketing manager; channel

REDACTED

44

partners manager; and strategic alliance manager, disagrees with IBM's statements that SCO focused on Linux in favor of UNIX during the time-period of 2001-2003. (Ex. 369 ¶¶ 1a., 2b.) Erik Hughes, Senior Director of Product Management & Strategic Alliances, similarly disagrees. (Ex. 1 ¶ 2.) Rather, SCO presented Linux as a complimentary or additional product to UNIX, and viewed Linux as appropriate for simple and dedicated functions, not as a general purpose operating system platform for running a business or for running mission critical applications (Ex. 369 ¶ 2b, 4; Ex.. 1¶ 5.)  SCO did not encourage any of its customers to switch from UNIX to Linux, but did provide support to those customers who chose to switch platforms (Ex. 369 ¶ 5; Ex. 1 ¶ 7.)  Nor did SCO encourage its partners Oracle and Computer Associates to support Linux, or port to Linux instead of UNIX (Ex. 369 ¶ 9, 13; Ex. 1 ¶ 9.) There is no credible evidence that such was the case.

Moreover, while IBM would impose on SCO the burden of proving that its tortious conduct was the sole cause of SCO's losses, the law does not impose any such obligation. Rather, SCO's evidence is sufficient to reach a jury so long as IBM's wrongful conduct caused any part of SCO's losses. See U.S. v. First Sec. Bank of Utah, N.A., 208 F.2d 424, 429 (10th Cir. 1953) (noting that when concurrent causes exist and when each is a proximate cause, then the injury may be attributed to all or any of the causes); McCorvey v. Utah State Dep't of Transp., 868 P.2d 41, 45 (Utah 1993) (stating that there can be more than one proximate cause, or substantial causative factor, but it is sufficient to prove the conduct of one is the proximate cause); Steffensen v. Smith's Mgmt. Corp., 820 P.2d 482, 486 (Utah Ct. App. 1992) (noting that when establishing the element of proximate cause "there can be more than one proximate cause of an injury so long as each is a concurrent contributing factor in causing the injury").

45

IBM also contends that SCO bears the burden of proving that its losses are attributable to IBM's interference with existing contracts SCO had with third parties. This Court, however, has previously rejected the argument defendant now advances and refused to limit a plaintiff's recovery of lost profits in a claim for tortious interference, finding that it was a question properly decided by the jury, "provided that such damages can be proven with reasonable certainty and are a reasonably foreseeable consequence of the defendant's act." United States v. Bald Eagle Realty, 21 F. Supp.2d 1332, 1334-35 (D. Utah 1998).

While SCO's experts do not set forth a separate damages model for the interference with the Unix-on-Intel market, that is not necessary in these circumstances. SCO's injuries from IBM's interference with its relations in the UNIX on Intel market are subsumed within and overlap with the injuries caused by IBM's breach of contract and copyright infringement. With regard to proving the specific amount of its damages, SCO's burden is much lower than IBM avers. "Once a defendant has been shown to have caused a loss, the reasonable level of certainty required to establish the *amount* of a loss is generally lower than that required to establish the *fact* or *cause* of a loss." Sampson v. Richins, 770 P.2d 998, 1007 (Ct. App. Utah 1989) (emphasis in original). SCO has adduced sufficient evidence of its injury to create a jury question as to the amount of its losses attributable to IBM's tortious interference and nothing in IBM's Motion negates this fact.

## IV. SCO'S COMPLAINT AND THE EVIDENCE SUBMITTED ESTABLISH A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH SPECIFIC BUSINESS RELATIONSHIPS (SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION).

In addition to IBM's broader interference with the Unix-on-Intel market, SCO alleges specific acts of interference with certain companies. IBM's interference induced SCO partners Intel, Oracle, Computer Associates, and HP to decrease or end their support of SCO; induced

the SCO investor Baystar to partially redeem its investment and threaten litigation against SCO; and induced Novell to assert false rights to the UNIX copyrights, to the detriment of SCO's intellectual property licensing program.   All of these actions constitute tortious interference.

In early 2003, SCO began to discover that IBM was disclosing proprietary UNIX technology to Linux – technology that SCO had a right to demand be held in confidence by IBM.  (Ex. 165 ¶¶ 3,12,18.)  SCO brought its concerns about the intellectual property in Linux to IBM's attention, and IBM reacted with antagonism to SCO's concerns.  (Ex. 9, 165.)  IBM's efforts to prevent SCO's protection of its intellectual property took several forms.

### A.   IBM Tortiously Interfered With SCO's Business Relations with Hewlett Packard, Oracle, Intel, and Computer Associates.

IBM's improper course of action against SCO is exemplified by the Linux World conference in January of 2003.  First, IBM executive Karen Smith threatened SCO CEO Darl McBride that if SCO did not desist in endeavoring to protect its intellectual property in Linux, IBM would instruct SCO's partners and customers that IBM was no longer doing business with SCO and that those partners should do the same.  (¶ 23(g) supra).  When Mr. McBride refused to acquiesce, Ms. Smith carried out her threat that afternoon with HP executive Richard Becker, as admitted by Mr. Becker himself.  (¶¶ 23(h)-(k), 24 supra).  SCO has introduced evidence that support from its partners and customers, including HP, Oracle, Computer Associates, and Intel fell off after IBM threatened that it would force these customers and partners to stop doing business with SCO.  Though IBM contends (at 39-44) that the alleged tortious interference with these companies did not occur, SCO has presented circumstantial evidence from which a jury could reasonably conclude that it did, which is sufficient to satisfy SCO's burden.

With respect to HP, IBM acknowledges (at 53 n9) the existence of contradictory evidence regarding whether the alleged conduct occurred, but contends (at 52-53) that the interference could not have been for an improper purpose.

REDACTED

(Ex. 118 at 55:6-11.)  Standing alone this evidence is sufficient to preclude summary judgment.

IBM attempts to legitimize its threat by characterizing it as a suggestion that HP withdraw all business activities with SCO "in the interest of the best outcome for [IBM and HP's] joint Linux activities," concluding thus that IBM's conduct could not have been for an improper purpose.  The conflict in the evidence is sufficient for a jury to conclude that IBM's purpose – as Ms. Smith made perfectly clear at her breakfast that morning with Darl McBride – was to dissuade SCO from protecting its intellectual property rights, and, failing that, to isolate and injure SCO. (See ¶¶ 25, 26, supra).

This direct evidence of IBM's interference with SCO's relationship with HP, combined with the direct evidence of Ms. Smith's threat to Mr. McBride that IBM would destroy SCO's partner support, is circumstantial evidence from which the jury may conclude that Ms. Smith, IBM's representative and agent, communicated to the executives of SCO's other partners at Linux World IBM's desire that they discontinue support for SCO as it had with HP.  Standing alone, the evidence of IBM's interference with HP is sufficient to overcome SCO's burden of proof at the summary judgment standard.

48

IBM also contends (at 59) that SCO has not established damages or causation from its interference with these partners. In fact, SCO's experts identified SCO's loss of partner support as a significant contributory cause of SCO's revenue losses and injury. (Ex. 286 at 50-51). The loss of partner support was caused, as shown above, by IBM's unfair competition, breach of contract, and other wrongful acts comprising this claim for tortious interference; additionally, IBM's wrongful contributions to Linux, which developed Linux from a hobbyist tool to a commercially viable operating system, made it possible for SCO's once loyal partners to migrate away from its UNIX products to a Linux system.

Finally, IBM claims (at 60) that the loss of support by these companies was caused by SCO's own actions rather than IBM's wrongful conduct. SCO did not, as IBM alleges, encourage its customers to switch back and forth between UNIX and Linux platforms. (Ex. 369 ¶ 4-6; Ex. 1 ¶ 9.) Rather, SCO supported its customers' use of Linux as a compliment or addition to its UNIX operating systems, but only at the customer's request, not at SCO's encouragement. (Ex. 369 ¶ 6, 9, 13, 14; Ex. 1 ¶ 7.) UNIX remained SCO's primary focus even through the time period that it supported its customer's use of Linux (Ex. 1 ¶ 2.)

This notwithstanding, even if IBM's account of SCO's business strategy was accurate, it would not negate IBM's role in SCO's injury. The explanation advanced by IBM was considered and rejected by Professor Gary Pisano in his Rebuttal Report, wherein he observed that SCO's business strategy was based on facts available to the management at the time, and was premised on certain assumptions about the sanctity of their intellectual property rights. (Pisano Reb. Rep. at 52.) As has been shown above and in SCO's other responses filed contemporaneously herewith, SCO did not immediately discover IBM's breach or the dilution

of its intellectual property. Professor Pisano illustrated the fallacy of IBM's argument as follows:

> One can also argue convincingly that SCO should have followed a very different strategy had it known that its IP was going to be violated. However, with IBM's alleged actions, SCO's strategy was logical. It is only after the alleged actions, in hindsight, that the strategy can be questioned.

(Ex. 286, Pisano Reb. Rep. at 54.) If SCO's assumptions about its intellectual property rights had been accurate, its plan to offer Linux as a complimentary product would have only strengthened its relationship with its customers, without compromising its UNIX business strategy. (Ex. 1 ¶ 6.) Sufficient evidence of SCO's losses resulting from IBM's tortious conduct has been adduced and it is properly for a jury to determine the amount attributable to this cause of action.     That being the case, this argument fails as well.

### B.    IBM Tortiously Interfered With SCO's Business Relations with Novell.

Beginning in 2003, IBM induced Novell to assert publicly that Novell, and not SCO, owned the UNIX copyrights at the heart of SCO's dispute with IBM.  (SCO's Eighth Cause of Action.)

IBM contends (at 45) that the alleged tortious interference with Novell did not occur. Notably, IBM relies heavily on Joseph LaSala, Jr.'s declaration, which is not based on personal knowledge and should not be considered. (IBM Ex. 240.)[9]   Moreover, when SCO sought

---

[9] The Court should further disregard Exhibit 240 because it contains inadmissible evidence. The declarant is Joseph A. LaSala, Jr. "on behalf of Novell, Inc." Mr. LaSala identifies himself as "Senior Vice President and General Counsel at Novell, Inc." Although not mentioned in the declaration, Mr. LaSala was hired by Novell in 2001.  See http://www .novell.com/company/bios/jlasala.html.  Mr. LaSala makes no assertion that he has personal knowledge of any matter contained in the declaration. To the contrary, he asserts that the declaration is "based on Novell's knowledge and understanding of the matters described herein," and that he is authorized to submit the declaration "on behalf of Novell."

discovery related to the very issue Mr. LaSala addresses in his declaration, counsel for IBM asserted a "common interest privilege." (See ¶ 90, supra). IBM should not be permitted to assert the privilege as both sword and shield. See, e.g., Frontier Refining, Inc. v. Gorman-Rupp Co., 136 F. 3d 695 (10th Cir. 1998) (work product); Motley v. Marathon Oil Co., 71 F.3d 1547 (10th Cir. 1995) (attorney client). Indeed, in both the cases, the Tenth Circuit held that a party that prohibited discovery on a particular subject could not then benefit from the use of such evidence at some other point in the proceedings. Under the circumstances, the LaSala declaration should be stricken and not considered in the determination of this motion. See Danjanovich v. Robbins, 04CV-623 2006 WL 1348204 (D. Utah May 15, 2006).[10]

IBM contends (at 53) that – if IBM induced Novell "improperly to assert contractual rights vis a vis SCO" – IBM was not acting with an improper purpose because it was "acting to protect its own legitimate economic interests." Here IBM again turns Utah law on its head. Somehow IBM is of the mistaken belief that if a defendant induces a company to make false contractual assertions, to the detriment of plaintiff, it is absolved from the tort of interference

---

(IBM Ex. 240 ¶ 4.) Federal Rule of Civil Procedure 56(e) states that affidavits in support of summary judgment motions are required to "be made on personal knowledge." Only in paragraphs 30-36 of the declaration does Mr. LaSala make statements that are based on his personal knowledge. Where the deficiencies in an affidavit make it impossible for the Court to determine "which facts it can accept as based on personal knowledge and which must be rejected as being conjecture or belief," the Court should disregard the entire affidavit. Malek v. Martin Marietta Corp., 859 F. Supp. 458, 460-61 (D. Kan. 1994). Those statements regarding occurrences prior to Mr. LaSala's joining Novell in 2001 were clearly not made upon personal knowledge, constitute inadmissible hearsay, and should be disregarded by the Court. See Perez v. Volvo Car Corp., 247 F. 3d 303, 316 (1st Cir. 2001) (where record made clear that events in question occurred prior to affiant's hiring, parts of affidavit concerning those events "cannot properly be considered"). Additionally, to the extent the entire declaration purports to relay Novell's "understanding" of matters, it should be disregarded as not in accordance with Rule 54(e). See Malek, 859 F. Supp. at 460 ("It is the plaintiff's personal knowledge and not his beliefs, opinions, rumors or speculation, that are admissible at trial and the proper subject of any affidavit."); accord Ricks v. Xerox Corp., 877 F. Supp. 1468, 1470 n.1 (D. Kan. 1995).
[10] Though decided in the context of assertion of the witness's Fifth Amendment privilege, its reasoning is analogous. A copy of this unpublished opinion is attached.

because it actions were motivated by economic self interest.  As discussed above, this is not the law.

In any event, the question of what motivated IBM's conduct is for a jury to decide. SCO has adduced evidence that, when construed most favorably to SCO, supports the conclusion that IBM induced Novell to make false public assertions regarding SCO's ownership of the UNIX copyrights to cut off SCO's revenue from its SCOsource licenses, which were an important source of funding for SCO.  A reasonable inference may be drawn that IBM's "research" into SCO's ownership rights, which Karen Smith mentioned to Darl McBride in January of 2003, would have entailed direct contact with Novell on this subject – the only other party to the APA, by which Novell transferred the UNIX copyrights to Santa Cruz, SCO's predecessor. (Ex. 165 at 12.)  In fact, it was Mr. McBride's impression that Ms. Smith implied that someone from IBM had asked Novell whether Novell, or SCO, held the copyrights. (Id.)

Novell's position regarding SCO's ownership of those copyrights flipped completely following this conversation and Ms. Smith's threat to Mr. McBride that IBM would disrupt SCO's partner support if SCO pursued its library licensing program.  The success of that initiative ("SCOsource") depended not only on SCO's ownership of the UNIX copyrights but its ability to substantiate its claim of ownership in the market.  While SCO and Novell had always conducted business under the mutual understanding that SCO, not Novell, held the copyrights, Mr. McBride recognized the importance of SCO's ability to evidence its ownership of the copyrights if challenged upon the initiation of the licensing program.  (Ex 165 at ¶ 7.)

Though Novell executive Greg Jones admitted to Mr. McBride and to Chris Sontag that he shared their understanding that the APA had effectuated the transfer of copyrights to Santa

Cruz, and even agreed to execute a letter confirming this fact, he later refused to follow through on his agreement. (Ex. 165 at 10-11; Ex. 9 at 11-12.) Mr. Jones indicated that his change in position was not a reflection that Novell disagreed with SCO regarding its rights under the agreement, but rather that Novell just did not want to be involved or take a position on the matter. (Ex. 165 ¶ 11; Ex. 9 ¶ 12.)

Nonetheless, Novell did take a position, announcing publicly that Novell, not SCO, held the UNIX copyrights. When confronted with the indisputable evidence that the APA had in fact transferred the copyrights to SCO (Ex. 41 ¶ A), Mr. Jones conceded that this evidence was conclusive. Mr. McBride explained that Novell's public denouncement of SCO's right to enforce the UNIX copyrights had seriously injured the SCOsource initiative and asked Mr. Jones what involvement IBM had had in Novell's decision to make such an announcement. Mr. Jones implied that Novell had discussed the issue with IBM, but he would not directly answer Mr. McBride's question, and ultimately refused to say anything about the matter without an attorney present. (Ex. 165 ¶ 15). A jury can reasonably that IBM caused Novell's change in position with regard to SCO's ownership of the copyrights.

This inference is corroborated by the fact that Novell's Chairman and CEO, Jack Messman, carbon-copied IBM's general counsel on its correspondence with SCO

REDACTED


## C.   IBM Tortiously Interfered With SCO's Business Relations with BayStar.

BayStar invested at a critical time in SCO's history, following initiation of this suit and SCO's efforts to protect its intellectual property. Shortly after its investment in SCO, in

October of 2003, BayStar partner Larry Goldfarb began a course of disruptive, almost abusive, conduct towards SCO, including publicly criticizing its management, and ultimately demanding return of its investment. Mr. Goldfarb claimed SCO had breached its agreement but failed to ever identify any specific breach. Long after settlement had been reached between these parties, Mr. McBride learned the reason for Mr. Goldfarb's inexplicably erratic demands: he had been under pressure from IBM. (Ex. 165 ¶ 29.)

SCO's injury arising from IBM's interference with BayStar is not limited to the partial redemption of preferred stock or cash payment, totaling approximately $20 million, but also includes the damage to SCO's reputation and lost customers. (Ex. 165 ¶ 30.) Both losses were foreseeable to IBM when it pressured Mr. Goldfarb to disengage from SCO and the existence of record evidence supporting SCO allegations preclude the granting of the Motion at issue. Rather, as with the other arguments raised by IBM, the only conclusion that can be drawn is there is ample competing evidence, which, ultimately, should be presented to a jury.

**CONCLUSION**

IBM's Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh,

Eighth, and Ninth Causes of Action) should be denied.

DATED this 11th day November, 2006.

Respectfully submitted,

By _____

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Stuart H. Singer (admitted pro hac vice)
Edward Normand (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*

55