## APPENDIX A

### RESPONSE TO IBM'S "STATEMENT OF UNDISPUTED FACTS"

SCO's Statement of Material Facts, set forth above, raises genuine issues of material fact that preclude summary judgment on SCO's tortious interference claims in its seventh, eighth and ninth causes of action. Following is a specific response to the facts that IBM contends are undisputed.

**A.    SCO Response to IBM Section "SCO Complaints and Obfuscation"**

1.    IBM ALLEGED FACT:  SCO's first complaint in this case, filed on March 6, 2003, included a claim for interference with contract.  In it, SCO identified seven companies with whose contracts IBM is alleged to have interfered:  The Shenvin-Williams Company ("Sherwin-Williams"), Papa John's Pizza, AutoZone, Inc. ("AutoZone"), Hewlett-Packard Company ("Hewlett-Packard"), Fujitsu Ltd., NEC and Toshiba Group. (Ex. 1 at 32.)

SCO RESPONSE:  Disputed.  SCO's first complaint in this case, filed on March 6, 2003, alleged SCO has contracts with customers around the world for the licensing of UNIX software, and that IBM induced SCO's customers and licensees to breach their corporate licensing agreements with SCO.  (IBM Ex. 1 at 32, ¶¶ 123, 124.)  SCO then named, as *examples* of the companies with whom IBM interfered, the customers listed by IBM.  (Id.) SCO was pursuing discovery, and did not limit its interference claims to those companies.

2.    IBM ALLEGED FACT:  SCO's Amended Complaint, filed on July 22, 2003, also contained a claim for interference with contract, but this time listed only three companies with which IBM is alleged to have interfered:  Sherwin-Williams, Papa John's Pizza and AutoZone. (Ex. 2 at 42.)

SCO RESPONSE:  Disputed.  SCO's second complaint in this case, filed on July 22, 2003, alleged that SCO has contracts with customers around the world for the licensing of SCO OpenServer and UnixWare (SCO's UNIX operating systems), and that IBM induced SCO's customers and licensees to breach their contracts.  (IBM Ex. 2 at 42, ¶¶155, 157.)  SCO then named, as *examples* of the companies with whom IBM interfered, the

customers named by IBM.   (Id.)   SCO was pursuing discovery, and did not limit its interference claims to those companies.

       3.    IBM ALLEGED FACT:  IBM propounded its first set of interrogatories on June 13, 2003, asking, in Interrogatory No. 8, that SCO, among other things, "identify all agreements with which plaintiff alleges IBM interfered and describe, in detail, each instance in which plaintiff alleges or contends that IBM interfered with those agreements, including but not limited to . . . all persons involved in the alleged interference . . . and . . . the specific trade secret or confidential or proprietary information, if any, involved in the alleged interference". (Ex. 11 at 4.)

       SCO'S RESPONSE:  Undisputed that IBM served its first set of interrogatories on June 13, 2003.

       4.    IBM ALLEGED FACT:  On August 4, 2003, SCO responded to IBM's Interrogatory No. 8 only with stock objections, stating that "discovery has just begun and [SCO] has not received responsive discovery from IBM that would allow it to fully answer this question because part of this information is peculiarly within the knowledge of IBM".  (Ex. 31 at 12.)

       SCO RESPONSE:  Undisputed that SCO informed IBM, in its initial response to Interrogatory No. 8 on August 4, 2003, that SCO had not yet received responsive discovery from IBM and that SCO would provide responsive documents to IBM once a confidentiality order was entered.  (IBM Ex. 31 at 12).

       5.    IBM ALLEGED FACT:  On October 1, 2003, IBM filed a motion to compel SCO to provide complete responses to its interrogatories, including Interrogatory No. 8. (Ex. 62.)

       SCO RESPONSE:  Undisputed that IBM filed a motion to compel responses to interrogatories on October 1, 2003.  This was surprising in that it was prior to the date that the parties had agreed that SCO would supplement its interrogatory responses.  (IBM Ex. 254, SCO's 10/23/2003 Memorandum of Law In Opposition to IBM's Motion to Compel Discovery.)  Also, in this Motion, IBM does not even mention Interrogatory Number 8, which is the interrogatory related to SCO's claims for tortious interference.

6.   IBM ALLEGED FACT: On October 23, 2003, the same day it filed an opposition to IBM's motion to compel, SCO served IBM with a Supplemental Response to IBM's First Set of Interrogatories. (Ex. 32 at 32.) In it, SCO claimed that IBM had interfered with SCO's contracts or prospective relationships with 12 entities – Sherwin-Williams, AutoZone, Target Corporation ("Target"), The Kroger Company ("Kroger"), Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerd Corporation/CVS Pharmacy ("Eckerd/CVS"), Safeway, Inc. ("Safeway"), Hewlett-Packard, Intel Corporation ("Intel") and Computer Associates International, Inc. ("Computer Associates") – nine of whom had never before been identified by SCO. (Id.)

SCO RESPONSE:   Undisputed that on October 23, 2003, SCO filed its opposition to IBM's Motion to Compel and, as the parties had previously agreed, its Supplemental Response to IBM's First Set of Interrogatories. (IBM Ex. 32 at 32.) IBM's description of SCO's response is disputed. In SCO's response, while pointing out that discovery had still not been received from IBM, SCO explained its claim for interference with its business relationships in the Unix-on-Intel market. Specifically, SCO stated that from 2000 to present, IBM had induced or attempted to induce breach of agreements between SCO and some of its customers by encouraging them to switch from SCO's UnixWare to Linux and to use UnixWare applications on Linux. (Id.) SCO then named the nine customers referenced by IBM as *examples* of the companies in SCO's market with whom IBM's conduct had interfered. (Id.) SCO did not limit its interference claims to those companies. SCO further explained in this response that IBM executives Karen Smith and Dan Frye approached SCO partners during LinuxWorld in January 2003 and induced such partners to stop doing business with SCO. (Id.) SCO named Hewlett Packard, Intel, and Computer Associates as *examples* of the companies with which IBM interfered at LinuxWorld, but explained that its investigation was still ongoing. (Id.)

7.   IBM ALLEGED FACT: On December 12, 2003, Magistrate Judge Wells granted IBM's motions to compel, and ordered SCO "[t]o respond <u>fully and in detail</u> to Interrogatory Nos. 1-9 as stated in IBM's First Set of Interrogatories" on or before January 12, 2004. (Ex. 55 at 2 (emphasis added).)

SCO RESPONSE: Undisputed that Magistrate Judge Wells granted IBM's First and Second Motions to Compel on December 12, 2003.

8.   IBM ALLEGED FACT: After the January 12, 2004, deadline, SCO submitted its "Revised Supplemental Response to Defendant's First and Second Set of Interrogatories" on January 15, 2004. In it, SCO claimed that IBM had interfered with SCO's contracts or prospective relationships with seven – not 12 – entities: Sherwin-Williams, AutoZone, Target, Hewlett-Packard, Intel, Computer Associates and Oracle Corporation ("Oracle"). (Ex. 33 at 50-56.) (SCO dropped Krogers, Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerd's/CVS and Safeway, and added Oracle for the first time.)

SCO RESPONSE: Undisputed that SCO filed supplemental responses to IBM's interrogatories on January 15, 2004. IBM's new assertion that SCO's responses (almost three years ago) were three days "late" under Magistrate Judge Wells' prior order is disputed and not material. IBM had never previously raised any claim based on the supposed lateness of these responses, and Magistrate Judge nevertheless held on March 3, 2004 that SCO had answered IBM's interrogatories in "good faith." (IBM Ex. 56 at 3).

9.   IBM ALLEGED FACT: The next month, SCO filed a Second Amended Complaint, dated February 27, 2004, and the list of companies shrank further. There, SCO's Seventh Cause of Action again alleged interference with contract, this time identifying only two companies (Sherwin-Williams and AutoZone) with which IBM is alleged to have interfered. SCO's Ninth Cause of Action – claiming interference with business relations – identified only one company (Hewlett-Packard) with whose business relationship IBM is alleged to have interfered. Finally, a new Eighth Cause of Action claimed that IBM had interfered with the Asset Purchase Agreement between Novell, Inc. ("Novell") and The Santa Cruz Operation, Inc. ("Santa Cruz"). (Ex. 3 at 55-61.) Thus, as of February 27, 2004, the four companies involved in SCO's interference claims were Sherman-Williams, AutoZone, Hewlett-Packard and Novell.

SCO RESPONSE: Undisputed that SCO filed its Second Amended Complaint on February 27, 2004, and pled three causes of action for IBM's tortious interference with SCO's business relations. IBM's characterization that, "as of Feburary 27, 2004, the four companies involved in SCO's interference claims were Sherman-Williams, AutoZone, Hewlett-Packard and Novell" is disputed. SCO's Seventh Cause of Action alleged that IBM induced

SCO's customers and licensees to breach their corporate licensing agreements, and specifically states that the customers impacted <u>include</u> "Sherwin Williams, AutoZone, <u>and others</u>." (IBM Ex. 3 at 56, ¶ 190) (emphasis added.)   SCO's Eighth Cause of Action alleged that IBM interfered with Novell.   SCO's Ninth Cause of Action alleged that IBM intentionally interfered with its "existing or potential economic relationships <u>with a variety of companies in the computer industry, including but not limited to</u> Hewlett Packard."   (<u>Id.</u>) (emphasis added.) SCO did not limit its interference claims to the companies named.

        10.    IBM ALLEGED FACT:  With respect to its claim that IBM interfered with its relationship with Novell, SCO alleges in its Second Amended Complaint:

> [C]ommencing on or about May 2003, Novell began falsely claiming that Novell, not SCO, owned the copyrights relating to UNIX System V.  On information and belief, IBM had induced or otherwise caused Novell to take the position that Novell owned the copyrights – a position that is flatly contradicted by the Asset Purchase Agreement.

(Ex. 3 at 58.)  SCO also alleges:

> IBM intentionally and improperly interfered with the Asset Purchase Agreement by inducing or otherwise causing Novell to violate the Asset Purchase Agreement by claiming Novell could waive and was waiving breaches of license agreements by various licensees, including IBM.  Specifically, with the IBM Termination Date looming only days away, Novell wrote to SCO claiming that either SCO must waive its right to terminate IBM's license based upon IBM's numerous breaches thereof or else Novell would purportedly waive SCO's right to terminate the license and otherwise excuse IBM's numerous breaches of the license agreements.

(<u>Id.</u>)  Finally, SCO states that after inducing Novell to take these actions, "IBM has contributed $50 million dollars to Novell so that Novell can complete the purchase of SuSE, the largest Linux distributor in Europe". (<u>Id.</u> at 60.)

        SCO RESPONSE:  Undisputed except to say that SCO's Eighth Cause of Action in its Second Amended Complaint is a written document that speaks for itself and contains allegations other than those set forth by IBM.  SCO's claims and evidence regarding IBM's interference with Novell are set forth more fully in paragraphs 65-83 <u>supra</u>.

11.    IBM ALLEGED FACT:   By Order dated March 3, 2004, the Court reiterated its December 2003 Order, compelling SCO again to provide meaningful responses to IBM'S interrogatories, this time on or before April 19, 2004.  (Ex. 56.)  Specifically, the Court required SCO to "fully comply within 45 days of the entry of this order with the Court's previous order dated December 12, 2003".  (Id. at 2.)

SCO RESPONSE:  Undisputed that Magistrate Judge Wells entered an order on March 3, 2004 that compelled both SCO and IBM to provide further discovery to each other. The Magistrate Court further observed that SCO had made "good faith efforts to comply with the Court's prior order."  (IBM Ex. 56 at 3).

12.    IBM ALLEGED FACT:  On January 22, 2005, IBM propounded its sixth set of interrogatories, including Interrogatory No. 24, which states:

> For each of the claims asserted by plaintiff in this lawsuit, please describe in detail all of the alleged damages to plaintiff that were proximately caused by IBM, including, but not limited to; (a) the amount of the alleged damages; (b) the basis for the alleged damages; (c) the precise methodology by which the damages were calculated; documents or other materials relied upon or considered in determining the alleged damages; and (d) all efforts undertaken by plaintiff to mitigate the alleged damages.

(Ex. 17 at 3.)

SCO RESPONSE:  Undisputed.

13.    IBM ALLEGED FACT:   On April 21, 2005, at a hearing before the Court, counsel for SCO stated:

> IBM has served interrogatories on SCO, and SCO is under an obligation to respond to those interrogatories.  We will do so as soon as we can.  If it arises that IBM is of the view that it has not received our responses to their interrogatories in enough time to complete discovery, that is an issue to raise with the Court at that point.  The Court is full of arsenal (sic) of measures it can take to allow more time or to preclude us from using evidence if we haven't produced responses to those interrogatories in time.

(Ex. 417 at 95:20-96:4.)

SCO RESPONSE:  Undisputed.

14.    IBM ALLEGED FACT:  On July 1, 2005, the Court entered a Revised Scheduling Order, setting October 28, 2005, as the "Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material" and December 22, 2005, as the "Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material".  (IBM Ex. 58 at 4.)  The Court required SCO to update interrogatory responses accordingly, including its response to Interrogatory No. 8. (Id.)

SCO RESPONSE:  Undisputed.

**B.     SCO Response to IBM Section "SCO's Deposition Disclosures"**

15.    IBM ALLEGED FACT:   Having received no further update to its response to Interrogatory No. 8 despite the three Court orders, on September 2, 2005, IBM served SCO with a Rule 30(b)(6) deposition notice, asking that SCO designate a corporate representative to testify about SCO's relationships, and IBM's alleged interference, with the 13 entities identified in all of SCO's interrogatory responses to that point (Sherwin-Williams, AutoZone, Target, Kroger, Advanced Auto, Shaw's Supermarkets, State of Maine (Department of Labor), Eckerds/CVS, Safeway, Hewlett-Packard, Intel, Computer Associates and Oracle), as well as with Novell . (Ex. 20 at 5-6.)

SCO RESPONSE:  Undisputed that IBM served a Notice of 30(b)(6) deposition

on September 2, 2005 that sought information about the companies that had been named by

SCO as targets of IBM's interference, as well as "any other company or entity whose

relationship with SCO IBM has allegedly interfered with." (IBM Ex. 20).

16.    IBM ALLEGED FACT:  SCO designated Jeff Hunsaker, Senior Vice-President and General Manager of SCO's UNIX division and former Vice-President of Worldwide Sales, to testify about SCO's business relationships with the 14 entities listed in IBM'S notice.  SCO also designated Ryan Tibbitts, SCO's general counsel, to testify about the remaining subtopics, including "the date, nature and particulars of any conduct by IBM interfering with the relationship" and "the impact on SCO of IBM's conduct". (Ex. 47.)

SCO RESPONSE:  Undisputed.

17.    IBM ALLEGED FACT:  On October 7, 2005, at a hearing before the Court, counsel for SCO committed to supplementing SCO's responses to IBM's interrogatories, including its response to Interrogatory No. 8, by December 22, 2005, as required by the Court in its July 1, 2005, Order:

> Counsel for SCO:  Now, with respect to material that has been produced, Judge Kimball ordered us by October 24th to provide our interim disclosures of the technology and supplement that with the final disclosure in December.  We are working on that

and.   We intend to fully comply with the order, which is the
current order we understand we are operating under with respect
to those mentioned by identification.

The Court:  Does that encompass interrogatory Number 13?

Counsel   for   SCO:      It   would   encompass   supplementing
interrogatories to SCO which have asked for information relating
to the nature of what we believe has been misappropriated.   I
don't have 13 in front of me, Your Honor, if that's such the
interrogatory that would include that.

(Ex. 418 at 56:1-14.)

SCO   RESPONSE:     Disputed.     The   excerpted   comment   pertained   to

Interrogatory 13 and identification of the material IBM misappropriated, not Interrogatory 8 or

SCO's tortious interference claims.  (IBM Ex. 418 at 56:1-14).

18.      IBM ALLEGED FACT:  At his deposition on November 10, 2005, Mr.
Hunsaker could name no companies other than the 14 listed in IBM's 30(b)(6) notice as having
relationships with SCO with which IBM allegedly interfered:

REDACTED

SCO RESPONSE: Disputed.  The portion of Mr. Hunsaker's answer quoted by

IBM is incomplete, and therefore misleading.  Mr. Hunsaker's complete response, with the

portion omitted by IBM in bold, was:

REDACTED

63

(IBM Ex. 312 at 19:10-17.)  Mr. Hunsaker was referring here to SCO's claim for interference with its business relations in the Unix-on-Intel market.  Further, this question was outside the scope of the topic for which Mr. Hunsaker had been designated, which was only the business relationships with certain companies, and this restriction on the scope of Mr. Hunsaker's testimony was clear from the inception of the questioning.  (IBM Ex. 312 at 11:17-12:14)

REDACTED

SCO RESPONSE:  Undisputed.

20.     IBM ALLEGED FACT:  On November 30, 2005, counsel for IBM wrote to counsel for SCO, requesting that SCO produce the "financial and other information dating from 1996 and pertaining to SCO customers, revenues and product sales" that Mr. Hunsaker testified he had reviewed.  (Ex. 209 at 3.)  Counsel for IBM stated, "It became readily apparent that IBM was seeking reasonably detailed and specific information with respect to the Subject Companies.  Mr. Hunsaker was not prepared to provide this type of information".  (Id. at 4.)

SCO RESPONSE:  Undisputed.

REDACTED

SCO RESPONSE:  Undisputed.

22.     IBM ALLEGED FACT:  The next day, IBM deposed Darl McBride, SCO's President and CEO.  When Mr. McBride was asked to confirm that the 13 companies identified in the documents were the only companies with which IBM was alleged to have interfered, he declined to do so and instead went on to identify ten new "sets" of relationships, constituting at least 43 entities, with which he claimed IBM interfered.  (Ex. 317 at 63:12-83:24.)  The ten "sets" identified by Mr. McBride were:

REDACTED

REDACTED                              At his deposition, Mr.
McBride could not identify all of the members of these groups.  (Ex. 317 at 67:19-68:9.)

SCO RESPONSE:  Undisputed that Mr. McBride was deposed on December 2,

2005 and that identified ten sets of entities with which he believed IBM had interfered.  Mr.

McBride named multiple specific entities with which IBM interfered,

REDACTED


23.    IBM ALLEGED FACT:
REDACTED


SCO RESPONSE:

REDACTED




24.    IBM ALLEGED FACT:  On December 5, 2005, counsel for IBM sent
SCO's counsel a letter, objecting to Mr. McBride's testimony and the expansion of SCO's
interference claims. (Ex. 52.) Counsel for IBM stated:

> It is difficult to view Mr. McBride's testimony as anything other than a
> misguided attempt by SCO to gain an unfair tactical advantage by
> expanding the scope of its interference and unfair competition claims and
> trying to force an extension of the discovery schedule.  If SCO were
> allowed to expand its claims by Mr. McBride's assertions, which (like
> most of his testimony) lacked any basis in personal knowledge, then
> IBM would be required to undertake substantial additional third-party
> discovery at great expense, burden and prejudice to IBM.

(Id.) Counsel for IBM also requested that SCO confirm that SCO's interference claims

were limited to IBM's alleged interference with only the persons or entities listed in its

interrogatory responses, at its Rule 30(b)(6) depositions and in the two documents produced

the day before Mr. McBride's deposition. (Id.)

SCO RESPONSE:  Undisputed that counsel for IBM sent SCO's counsel the referenced letter.  (IBM Ex. 52).

25.    IBM ALLEGED FACT:  In response, counsel for SCO stated that IBM's objections to Mr. McBride's testimony were "mistaken", that Mr. Tibbitts would testify on behalf of the company on the remainder of IBM's Rule 30(b)(6) subtopics regarding SCO's interference claims, including the identity of all companies with whom IBM is alleged to have interfered, and that "SCO's supplemental interrogatory responses . . . will be consistent with SCO's 30(b)(6) testimony on the same topics as the interrogatory responses."  (Ex. 60.)

SCO RESPONSE:  Undisputed that counsel for IBM sent SCO's counsel the referenced letter.  However, IBM's incomplete characterization of SCO counsel's response is disputed.  More completely, SCO counsel explained:

> Mr. Hunsaker was not designated to testify as a 30(b)(6) witness on the topic of IBM's interference with SCO's business relationships underlying SCO's claims for tortious inference with contract and/or unfair competition.  As per SCO's objection at the time that IBM questioned Mr. Hunsaker (which objection you do not acknowledge in your December 5 letter), any question about the scope of SCO's interference or unfair competition claims "exceeds the scope of the topic, the designation, for the witness." Hunsaker Dep. at 18:22-24.

(IBM Ex. 60 at 5.)  SCO counsel further reminded IBM counsel that SCO had designated Ryan Tibbitts "to testify for SCO as to the remaining issues in Topic 10 - including the identity of any company or entity 'whose relationship with SCO IBM has allegedly interfered with,'" and that IBM counsel had acknowledged previously that Mr. Tibbitts might testify to more companies and relationships than those on the list.  (Id.)  Finally, counsel for SCO stated:

> As I am sure will be the case with IBM, SCO's supplemental interrogatory responses (both parties specified that their initial interrogatory responses were necessarily preliminary) will be consistent with SCO's 30(b)(6) testimony on the same topics as the interrogatory responses.

(Id.)

66

26.     IBM ALLEGED FACT:  IBM took the Rule 30(b)(6) deposition of Mr. Tibbitts as to SCO's interference claims the following week, on December 16, 2005.  During Mr. Tibbitts' deposition, SCO produced a spreadsheet describing "the interferences that [SCO is] alleging and currently investigating".  (Ex. 319 at 43:9-14, 44:3-9.)  This spreadsheet, marked as Exhibit 90 to Mr. Tibbitts's deposition, identifies some 250 entities in at least seven countries.  (Ex. 61.)  Exhibit 90 provides virtually no meaningful information concerning the nature of SCO's claim, IBM's alleged misconduct, SCO's relationships with the companies identified, SCO's historical or prospective business with the companies or SCO's alleged damages.  (Id.)

SCO RESPONSE:  Undisputed that Mr. Tibbitts was deposed as a 30(b)(6) witness on December 16, 2005, and that Exhibit 90 (IBM Ex. 61) was produced at his deposition.  Exhibit 90 contained both those interferences that SCO was alleging, and also those that SCO was still investigating.  Disputed that the document provided "no meaningful information"; the document provided information reasonably available to SCO on the enumerated companies, including the nature of the interference and the nature of the loss to SCO.

27.     IBM ALLEGED FACT:

REDACTED

SCO RESPONSE:  Disputed.

REDACTED

28.     IBM ALLEGED FACT:

REDACTED

REDACTED

SCO RESPONSE:   Disputed.

REDACTED

29.    IBM ALLEGED FACT:

REDACTED

SCO RESPONSE:    Disputed.    Mr. Tibbitts provided specific additional information about numerous companies listed on Exhibit 90.  (Id.)

30.    IBM ALLEGED FACT:  Although many of the entries on Exhibit 90 contain the identical allegations that "IBM's sales representatives persuad[ed] SCO's customers that SCO has no viability" (Ex. 61) and that there was "direct pressure from IBM to stop dealing with SCO" (id.), Mr. Tibbitts was unable to substantiate or clarify these allegations in any way.

REDACTED

68

REDACTED

SCO RESPONSE:  Disputed. Mr. Tibbitts had at this point in the deposition already provided specific information regarding exhibit 90:

REDACTED

31.    IBM ALLEGED FACT:  Mr. Tibbitts, SCO's Rule 30(b)(6) witness on SCO's relationship with BayStar, also testified that all he knew about IBM's alleged interference with BayStar was as briefly stated in SCO's Exhibit 90:    REDACTED

REDACTED

SCO RESPONSE:  Disputed.  Mr. Tibbitts provided substantial additional information about Baystar (over 30 pages of deposition testimony), aside from the portion quoted by IBM. (IBM Ex. 319 at 7:18-41:22).

32.    IBM ALLEGED FACT:  The next week, on December 20, 2005, counsel for IBM spoke with counsel for SCO regarding Mr. McBride's and Mr. Tibbitts' testimony and SCO's expansion of its interference claims.  (Ex. 70 ¶ 2.)  Counsel for SCO stated that SCO had now determined to limit the number of companies for which SCO was claiming interference to ten, and possibly to five, and that SCO would provide an updated interrogatory response reflecting this as soon as possible.  (Id. ¶ 3.)  In response, counsel for IBM stated that if such a response was not promptly provided, IBM was prepared to bring the matter to the attention of the Court.  (Id.)

69

SCO RESPONSE: Disputed.  On or around December 20, 2005 (following the

30(b)(6) deposition of Ryan Tibbitts), counsel for IBM and counsel for SCO did discuss SCO's

interference claims.  However, in that conversation, counsel for SCO made it clear that SCO

was limiting its claims regarding interference with specific companies to five to ten companies

– not the SCO was so limiting its claims for IBM's interference with SCO's business

relationships in the Unix-on-Intel market.  (Ex. 3 ¶.)

33.    IBM ALLEGED FACT:  On December 22, 2005, SCO served its Final
Disclosures, but failed to update its interrogatory responses, including its response to
Interrogatory No. 8.  (Ex. 54.)

SCO RESPONSE:    Undisputed, but immaterial because SCO updated its

interrogatory response to Interrogatory No. 8 on January 13, 2006 (IBM Ex. 46), just over

three weeks later, following discussions with IBM counsel about the scope of those claims.

(Ex. 3 ¶ 2.)

34.    IBM ALLEGED FACT:  On December 28, 2005, counsel for SCO
informed counsel for IBM that the number of companies at issue would in fact be only six; that
they would be BayStar Capital Management, LLC ("BayStar"), Hewlett-Packard, Oracle,
AutoZone, Intel and Novell; and that SCO would promptly supplement its interrogatory
answers accordingly.  (Ex. 70 ¶ 4.)

SCO RESPONSE: Disputed.  On December 28, 2004, SCO counsel represented

that SCO was limiting its claims based on IBM's specific interference to six companies:

Baystar Capital, Management, LLC ("Baystar"); Hewlett Packard; Oracle; AutoZone; Intel,

and Novell.  SCO counsel did not suggest that SCO was dropping its broader claim against

IBM for tortious interference with SCO's business relationships in the Unix-on-Intel market.

(Id. ¶ 2.)

C.    **SCO Response to IBM Section "SCO's Further Reversals of Position"**

35.    IBM ALLEGED FACT:  On January 13, 2006, after the December 22,
2005, deadline for finally submitting its Final Disclosures and updated interrogatory responses,

SCO served a revised Supplemental Response to Interrogatory No. 8 (Ex. 46 (the "Supplemental Response")).

> SCO RESPONSE: Undisputed that SCO updated its interrogatory responses on January 13, 2006. (IBM Ex. 46.) Prior to that time, counsel for SCO and IBM were engaged in discourse over the scope of those claims. (Ex. 3 ¶ 2).

36. **IBM ALLEGED FACT:** Despite SCO's commitment to limit its interference claims to approximately six companies, the Supplemental Response identifies over 150 entities whose relationship with SCO IBM allegedly interfered with. The Supplemental Response also identifies six companies or entities with which SCO claims IBM interfered though various direct contacts with the companies: BayStar, Hewlett-Packard, Computer Associates, Oracle and Intel, as well as an "OpenSource Conference" in Scottsdale, Arizona. (Ex. 46 at 2-7.)

> SCO RESPONSE: Disputed. The additional entities identified by SCO were representative of business relationships or prospective business relationships in the UNIX-on-Intel market impacted by IBM's improper conduct. SCO never represented that it was dropping that claim. (Id.)

37. **IBM ALLEGED FACT:** As to these, SCO makes the following allegations:

(a) <u>BayStar</u>: SCO alleges that, following Baystar's investment in SCO in October 2003, "IBM on one or more occasions communicated with BayStar in order to induce BayStar to threaten litigation against SCO and to terminate its business relationship with and/or withdraw or reduce its investment in SCO and that "[a]s a proximate result of IBM's communications with BayStar, BayStar terminated its business relationship with SCO in May 2004". (Id. at 2-3.)

(b) <u>Computer Associates, Oracle and Intel</u>: SCO alleges "[o]n information and belief" that IBM contacted Computer Associates, Oracle and Intel during or shortly after the LinuxWorld 2003 convention and informed them that IBM was "cutting off all business ties with SCO" and that IBM wanted each of them to do the same. (Id. at 4.)

(c) <u>Hewlett-Packard</u>: SCO alleges that "Ms. Smith [of IBM] contacted Rick Becker of Hewlett-Packard during or shortly after the LinuxWorld 2003 convention and stated that IBM was cutting off all business ties with SCO and wanted Hewlett-Packard to do the same". (Id.) SCO relies entirely on the deposition testimony of Mr. Becker, that at the LinuxWorld 2003 convention, Karen Smith of IBM

REDACTED

71

REDACTED

SCO also alleges that, although Hewlett-Packard and SCO "still have a good business relationship, Hewlett-Packard has provided SCO with significantly less support than it did in 2002". (Id.)

      (d)    OpenSource Conference in Scottsdale, Arizona: SCO alleges that Darl McBride "entered into an oral business relationship with John Terpstra, who was hosting an OpenSource Conference in Scottsdale, Arizona, in the spring of 2004, to speak at the conference." (Id. at 7.) SCO further claims that IBM thereafter "contacted Mr. Terpstra and informed him that IBM did not want Mr. McBride to speak at the conference, and intimated that IBM would withdraw its participation in the conference if Mr. McBride did speak". (Id.)

SCO RESPONSE: Undisputed that these are the allegations set forth in SCO's supplemental interrogatory response. As to part (d), in light of Mr. Terpstra's declaration submitted in support of IBM motion for summary judgment, SCO is not pursuing this aspect of its claim.

      38.    IBM ALLEGED FACT: The Supplemental Response also alleges that IBM "encourag[ed] and improperly enabl[ed] numerous companies to migrate to or to use an enterprise-hardened Linux platform operating on Intel-based hardware rather than use SCO's UnixWare or OpenServer products", thereby interfering with SCO's prospective business relationships with 19 "former SCO customers who migrated to an enterprise-hardened Linux platform" (Actual Systems, Advantage Business Computers, AmCom Software, AutoZone, Avaya, Avnet, Bebe, Frazee Paints, Kmart, Prime Clinical, Radical System, Safeway, Save Mart, Shaw's Supermarkets, Sherwin Williams, Shopper's Drug Mart, Snyder Drug Stores, Target Pharmacies and West Communications) and 156 "other Linux users who chose an enterprise-hardened Linux platform". (Id. at 7-13.)

SCO RESPONSE: Undisputed.

      39.    IBM ALLEGED FACT: The Supplemental Response says nothing about IBM's alleged interference with the Novell/Santa Cruz Asset Purchase Agreement, despite the fact that Interrogatory No. 8 expressly seeks the identification of "all agreements with which plaintiff alleges IBM interfered" and a detailed description of "each instance in which plaintiff alleges . . . that IBM interfered with those agreements." (Ex. 11 at 4.)

SCO RESPONSE: Undisputed; however, SCO's January 13, 2006 updated interrogatory response expressly stated that it identifying the scope of SCO's claims for Interference with Contract (Seventh Cause of Action) and Interference with Business Relationships (Ninth Cause of Action). (IBM Ex. 46 at 2.) SCO had fully already fully explained IBM's interference with Novell in prior interrogatory responses (Ex 3; IBM Ex. 36

at 29-31). SCO expressly incorporated this prior interrogatory response into its answer. (IBM

Ex. 46 at 1, n1.)

40.    IBM ALLEGED FACT: On June 28, 2006, the Magistrate Judge Wells issued an Order Granting in Part IBM's Motion to Limit SCO's Claims. In the Order, Judge Wells states:

In an order signed by Judge Kimball on July 1, 2005, both SCO and IBM were given two important dates, October 28, 2005 and December 22, 2005 respectively. These dates were court ordered deadlines for the parties "to disclose with specificity all allegedly misused material'. With the October date being the interim deadline and the December date being the final deadline. Pursuant to this same order, the parties were also ordered to "update interrogatory responses."

(Ex. 59 at 14-15.)

SCO RESPONSE: Undisputed. However, the findings and conclusions in the

Magistrate Court Order are the subject of objections filed by SCO (Ex. 255), and heard by this

Court on October 24, 2006.

41.    IBM ALLEGED FACT: Because Mr. Tibbitts was unable to provide meaningful information about SCO's claims at his December 16, 2005, deposition, and because SCO's claims continued to evolve, IBM deposed Mr. Tibbitts a second time in his capacity as SCO's Rule 30(b)(6) witness on the interference claims on, June 30, 2006.

SCO RESPONSE: Undisputed that Mr. Tibbitts was deposed in his Rule

30(b)(6) capacity on June 30, 2006. As set forth above, SCO disputes that SCO and Mr.

Tibbitts did not previously provide "meaningful information" on SCO's claims for tortious

interference.

42.    IBM ALLEGED FACT: At this deposition, SCO confirmed that the Supplemental Response sets forth "the complete and accurate" response to IBM's Interrogatory No. 8 as it understood it to date, that it "supersede[s]" and "replace[s]" SCO's prior responses to Interrogatory No. 8, and that – at least as to pages one through ten of SCO's Supplemental Response – SCO has "no plan to update anything" therein. (Ex. 345 at 9:10-10:1, 22:24-23:21.)

SCO RESPONSE: Disputed. Cited material does not support the proposition.

43.   IBM ALLEGED FACT:  Mr. Tibbitts further acknowledged that SCO was "abandoning" its tortious interference claims with respect to five of the 19 "former SCO customers" identified in the Supplemental Response – Avnet, Frazee Paints, Save Mart, Snyder Drug Stores and Target – because these companies had not switched to a Linux platform at all. (Id. at 24:23-26:22.)

SCO RESPONSE:  Undisputed.

44.   IBM ALLEGED FACT:  As set out in the Supplemental Response and Mr. Tibbitts' testimony, SCO now asserts its Seventh, Eighth, and Ninth Causes of Action with respect to:

(a)   Seven identified contractual or existing business relationships with which IBM allegedly interfered by specific conduct or communication to the companies or persons with whom SCO had the relationships:  BayStar, Hewlett-Packard, Computer Associates, Oracle, Intel, the OpenSource Conference and Novell.

(b)   Possible business relationships that allegedly might have been established with companies in a second group, consisting of the 14 "former SCO customers" and 156 "other Linux users."  SCO "is not alleging that IBM contacted any one of these companies individually and somehow wrongfully induced them to switch to Linux on that basis"; instead, the alleged acts consists of IBM's alleged activities relating to Linux affecting the marketplace in general. (Ex. 345 at 29:16-30:10.) SCO has characterized this claim as one for "indirect" interference or interference with "the UNIX on Intel market as a whole".  (Ex. 317 at 67:22-25; Ex. 345 at 26:19-22, 35:4-11.)  SCO asserts that, but for IBM's alleged interference, these companies and entities "foreseeably would have chosen a SCO platform" rather than a Linux platform.  (Ex. 46 at 7-13.)  SCO also does not claim that the more than 150 "other Linux users" were SCO customers or that SCO necessarily had any direct contact or communication with them.   In fact, during Mr. Tibbitts' June 30, 2006, Rule 30(b)(6) deposition, counsel for SCO admitted that SCO generated the list of the 156 companies by lifting companies named in an IBM document which purports to identify certain companies as "Linux wins". (Ex. 345 at 42:6-11.)  In its Supplemental Response, SCO expressly states that the claims as to these 156 companies are made only "on information and belief". (Ex. 46 at 11.)

SCO RESPONSE:  Disputed in part for the reasons set forth below:

a)   Undisputed.  However, SCO's claims for interference with these business relations are set forth more fully in SCO's Supplemental Response to IBM's Interrogatory No. 8, at 2-7.  (IBM Ex. 46).

b)   Disputed.  IBM has misstated SCO's claims based on interference with SCO's business relations in the Unix-on-Intel market.  This claim is explained fully in

SCO's Supplemental Response to IBM's Interrogatory No. 8, at 7-13.  (IBM Ex. 46.)  The companies that SCO named in that response were representative of the type of customer and partner relationships in the UNIX-on-Intel market impacted by IBM's improper conduct.

### D.   SCO Response to IBM Section "SCO's Failure of Proof"

45.   IBM ALLEGED FACT:   SCO has not identified any evidence of improper conduct by IBM that interfered with any of its contracts or business relationships and it cannot do so, for at least the reasons explained below.

SCO RESPONSE: Disputed for the reasons set forth below.

### 1.   BayStar.

46.   IBM ALLEGED FACT:  No one from IBM ever communicated with any representative of BayStar concerning SCO or BayStar's investment in SCO.

(a)   In a sworn declaration, Larry Goldfarb, managing member of BayStar, states:  "No one from IBM ever had any communications with me or, to my knowledge, anyone at BayStar relating to SCO." (Ex. 165 ¶ 4.)

(b)   Mr. Goldfarb also states:  "No one from IBM ever contacted me or anyone else at BayStar about SCO, Baystar's investment in SCO, or anything else." (Id. ¶ 16.)

SCO RESPONSE:  Disputed.  Larry Goldfarb, managing member of BayStar specifically told Darl McBride that IBM had pressured him to discontinue its support of and investment in SCO.  (Ex. 165 ¶ 29; IBM Ex. 319 at 86:16-19.)  These facts are more fully set forth above.  Parts (a) and (b) are disputed for the same reasons.

47.   IBM ALLEGED FACT:  Baystar's threats of litigation against SCO and its decision to terminate or reduce its business relationship with SCO were not induced or caused by any action or communication by IBM.

(a)   BayStar's Mr. Goldfarb states:   "BayStar terminated its relationship with SCO for multiple reasons.  BayStar's decision to terminate its relationship with SCO had nothing whatsoever to do with any' communications with or conduct of IBM." (Id. ¶ 4.)

(b)   Mr. Goldfarb further states:  "BayStar's decision to redeem its shares in SCO and retire its investment in SCO had nothing whatsoever to do with IBM or any representative of IBM." (Id. ¶ 16.)

SCO RESPONSE:  Disputed.  As set forth in more detail at paragraphs 50-58 supra, Baystar's actions, including threatening litigation against SCO, and withdrawing its investment from SCO, were caused by IBM pressuring Larry Goldfarb, as Mr. Goldfarb told Mr. McBride. (Ex. 165 ¶ 29.)

     48.    IBM ALLEGED FACT:  BayStar's decision to redeem its investment in SCO was caused by reasons having nothing to do with IBM.

     (a)    Shortly after BayStar made the investment in SCO, SCO's stock price, financial performance and the viability of its UNIX products all appeared to be in decline. Mr. Goldfarb states: "SCO's stock price declined . . . I was also very concerned about SCO's high cash burn rate and whether its UNIX products were viable in the marketplace." (Id. ¶¶ 10, 11.)

     (b)    Microsoft's conduct suggested that it might not guarantee BayStar's investment in SCO as it had promised to Mr. Goldfarb. Mr. Goldfarb states: "Mr. Emerson [Microsoft's senior vice president of corporate development and strategy] and I discussed a variety of investment structures wherein Microsoft would 'backstop,' or guarantee in some way, BayStar's investment. . . . Microsoft assured me that it would in some way guarantee BayStar's investment in SCO." (Id. ¶ 7.) Mr. Goldfarb states that, after BayStar made the investment, "Microsoft stopped returning my phone calls and emails, and to the best of my knowledge, Mr. Emerson was fired from Microsoft." (Id. ¶ 10.)

     (c)    When BayStar's concerns about SCO's business were not adequately addressed by SCO, BayStar decided to retire its investment in SCO. Mr. Goldfarb states:

REDACTED

     Mr. Goldfarb further states: "Having received no satisfactory response from SCO, I determined Baystar's obligations to its investors required the Fund to get out of the investment.  I negotiated the terms of the deal to retire the investment on behalf of BayStar." (Id. ¶ 14.)

     SCO RESPONSE: Disputed.

     a)    Mr. Goldfarb's testimony on this point is again directly refuted by contemporaneous statements he made to Mr. McBride that, as a trader, SCO's stock volatility was important to him – not whether SCO's stock went up or down. (Ex. 165 ¶ 28.)  It also

contradicts contemporaneous statements made by Mr. Goldfarb about the reasons for his investment. For instance, shortly after the investment, Mr. Goldfarb was quoted as stating: "BayStar Capital looks to invest in growth-oriented firms with strong management, substantial market opportunity and solid, comprehensive business plans, and we believe all of those fundamentals are in place for SCO to succeed." (Ex. 248)

        b)     Disputed. Microsoft did not guarantee BayStar's investment in SCO. Microsoft has denied any involvement in the investment by Baystar. (Ex. 326).

REDACTED

        c)     Disputed.     Following the investment, Mr. Goldfarb was asked by reporters if Microsoft had any involvement in the investment, and he stated publicly that Microsoft had no involvement whatsoever in the investment. Goldfarb explained the investment:

> We loved the history of what SCO had going back to [incarnation as] Caldera. The stock price had gone up a lot. We thought, regardless of litigation issues, . . . for two or three years we could see some real EPS growth and some cash growth. But we saw a company that could use more cash than it had. So that was the genesis of how we began conversations with Darl.

(Ex. 245).

    2.    <u>Computer Associates, Oracle and Intel</u>.

       49.    IBM ALLEGED FACT:  Neither Karen Smith (IBM's then Vice President of Linux Strategy and Market Development, and one of IBM's LinuxWorld 2003 attendees) nor any other IBM representative ever stated to Computer Associates, Oracle or

Intel that IBM was cutting off its business ties with SCO or that IBM wanted them to cut off their business ties with SCO.

(a)    In a sworn declaration, Samuel Greenblatt, Senior Vice President and Strategic Technical Advocate for Computer Associates' Linux Technology Group, states:

> I attended the LinuxWorld 2003 convention.  At no time did Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with The SCO Group, Inc. ("SCO") or that IBM wanted CA to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed CA that IBM had decided to terminate its relationship with SCO or asked CA to stop doing business with SCO.
>
> To the best of my knowledge, CA has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(Ex. 177 ¶¶ 2-4.)

(b)    In a sworn declaration, Monica Kumar, Principal Manager of Oracle's Linux Program Office, states:

> I attended the Linux World 2003 convention.  At no time did Karen Smith or any other IBM representative communicate to me that IBM was terminating its business relationship with The SCO Group, Inc. ("SCO') or that IBM wanted Oracle to stop doing business with SCO.
>
> To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed Oracle that IBM had decided to terminate its relationship with SCO or asked Oracle to stop doing business with SCO.
>
> To the best of my knowledge, Oracle has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(Ex 241 ¶¶ 2-4.)

(c)    In a sworn declaration, Luann Gulesarian, Intel's Strategic Relationship Manager in its Sales and Marketing Group, states:

> I attended the Linux World 2003 convention in New York, New York in January 2003.  At no time did anyone named Karen Smith or any other IBM representative communicate to me that IBM was terminating its

business relationship with SCO or that IBM wanted Intel to stop doing business with SCO.

To the best of my knowledge, neither Ms. Smith nor any other IBM representative ever, directly or indirectly, informed Intel that IBM had decided to terminate its relationship with SCO or asked Intel to stop doing business with SCO.

To the best of my knowledge, Intel has not in any way altered its relationship with SCO because of any statements or actions by IBM or any representatives of IBM.

(Ex. 204 ¶¶ 2-4.)

        (d)    Ms. Smith likewise confirms that she had no such conversations with Computer Associates, Oracle or Intel. In a sworn declaration, Ms. Smith states: "I did not have any contacts with Intel, Computer Associates, or Oracle, during or after the LinuxWorld 2003 conference, in which I advised them that IBM was cutting off its business relationship with SCO, or suggested that these companies not do business with SCO." (Ex. 205 ¶ 5.) In addition, regardless of whether such statements were made, she did not do anything that caused these companies not to do business with SCO. (Id. ¶ 4.)

        SCO RESPONSE: Disputed, and subparts (a), (b), (c), and (d) are also disputed.

As set forth in more detail in paragraphs 26-27 supra

REDACTED

        Not long thereafter, companies including Computer Associates, Oracle, and Intel, further reduced their support for SCO. (Ex. 1 ¶ 12; Ex.369 ¶¶ 12, 20.)

     50.    IBM ALLEGED FACT: SCO supported the migration of Computer Associates, Oracle and Intel products to Linux, partnering with each of these companies to provide Linux solutions to their end users.

     (a)    SCO's Gregory Anderson, a former SCO employee responsible for SCO's relationships with its technology partners, agreed that "any change in the relationship between SCO/Caldera and Computer Associates . . . had to do with SCO's [alleged] decision not to continue to distribute Linux products". (Ex. 305 at 149:6-19.)

     (b)

REDACTED

REDACTED

     (c)

     To the extent that there was a change in the relationship between SCO and Intel, it is attributable to SCO allegedly "ceasing to distribute a Linux operating system and Linux products more so". (Ex. 305 at 142:11-23.)

SCO RESPONSE: Disputed. As set forth in more detail in paragraphs 19-22 supra, it was never SCO's strategy for its partners to replace UNIX products; rather, Linux was always presented as a complimentary solution.

     a)    Disputed. Computer Associates decreased its support of SCO before SCO terminated its distribution of Linux (Ex. 369 ¶ 12.) Further, when SCO initially presented its SCOsource plan to Computer Associates, Computer Associates did not react negatively to the initiative. (Ex. 9 ¶ 4.)

     b)    Disputed. In recent years, Oracle has phased out support for SCO's UNIX products. (Ex. 369 ¶ 17.) After Oracle communicated its decision to embrace Linux, SCO encouraged Oracle to certify its products on the Linux Kernel Personality so that SCO would not lose all the Oracle business. (Id.) SCO only embarked on this strategy after

Oracle had decided to support Linux instead of UNIX. (Id.) Further, when SCO initially presented its SCOsource plan to Oracle, Oracle did not react negatively to the initiative. (Ex. 9 ¶ 4.) Finally, SCO's experts reached the conclusion that Linux's replacement of SCO's UNIX products was made possible by IBM's improvements, which enabled Linux to function for the same uses as SCO's UNIX products. (Ex. 286 at 32-37, 41, 44-45; Ex. 281 at 56-58, 63; Ex. 283 at 42-45.) Thus, but for the improper disclosures of IBM, Oracle could not have transferred its support from UNIX to Linux.

c)      Disputed.   Intel decreased its support of SCO before SCO terminated its distribution of Linux (Ex. 369 ¶ 24.) Further, when SCO initially presented its SCOsource plan to Intel, Intel did not react negatively to the initiative. (Ex. 9 ¶ 4.)

3.      Hewlett-Packard.

51.     IBM ALLEGED FACT:    Karen Smith of IBM recalls a brief conversation with Rick Becker of Hewlett-Packard at the LinuxWorld 2003 convention, but does not recall stating and does not believe she stated to Mr. Becker that IBM was going to cut off all business ties with SCO and that IBM wanted Hewlett-Packard to do the same. Regardless, Ms. Smith never took any steps that caused SCO harm. (See Ex. 205 ¶¶ 4, 6.)

SCO RESPONSE: Disputed for the reasons set forth above in paragraph 49.

52.     IBM ALLEGED FACT:  In any case, the statements allegedly made by Ms. Smith to Mr. Becker had no impact on the relationship between Hewlett-Packard and SCO. At his deposition, Mr. Becker testified:

REDACTED

SCO RESPONSE:   Disputed.

REDACTED

53.   IBM ALLEGED FACT:   Hewlett-Packard has confirmed that to the extent its business relationship with SCO has changed, it is for reasons having nothing to do with IBM.   Joseph Beyers, Hewlett-Packard's Vice President of Intellectual Property, states in a sworn declaration:

> HP has done business with The SCO Group, Inc. ("SCO"), or its predecessor, The Santa Cruz Operation, Inc., since the mid-1980s.  HP continues to do business with SCO, and has a variety of business relationships with SCO, ranging from licensing SCO's intellectual property, including UNIX, to joint marketing and promotions activities.

> To the extent HP may have reduced or altered its business relationship with SCO, HP has not in any way reduced or altered its relationship with SCO because of any statements or actions of IBM or any representatives of IBM.

(Ex. 597 ¶¶ 2, 3.)

SCO RESPONSE:   Disputed, for the reasons stated in paragraphs 51 and 52.

Also, notably, Hewlett Packard was also a participant in the Chicago Seven meeting described

at paragraph 88.

54.   IBM ALLEGED FACT:   Moreover, by SCO's own admission, the relationship between SCO and Hewlett-Packard did not decline after the LinuxWorld 2003 convention and continues to be strong today:

(a)   According to SCO's Mr. Anderson, who had responsibility for SCO's relationships with its technology partners, including Hewlett-Packard, the business relationship between SCO and Hewlett-Packard was "very good" from January 2003, during the LinuxWorld event, until at least May 2003, when he left SCO.  (Ex. 305 at 145:12-23)

82

        (b)     According to Mr. Hunsaker, Senior Vice-President and General Manager of SCO's UNIX division and former Vice-President of Worldwide Sales.

REDACTED

        (c)     SCO and Hewlett-Packard have had a mutual "longstanding presence" at SCO Forum and HP World and their "close relationship" has resulted in "billions of dollars" of Hewlett-Packard products running SCO software. (Ex. 170.) Concerning the current business relationship between Hewlett-Packard and SCO, SCO's website states:

> ***The SCO-HP Relationship:  How HP and The SCO Group Can Help You***
>
> SCO and HP have been partners in leading edge technology since the mid-1980s, when most PCs were single-task, single-user systems and the term 'server' was unknown.  The HP/SCO partnership harnessed the latent power of microcomputers with SCO UNIX to bring mainframe and minicomputer capabilities like multi-user and multi-tasking to the desktop.  SCO was the first to bring these features to market, leveraging the superior reliability and stability of HP systems.
>
> The SCO/HP partnership is reflected in a longstanding presence at SCO Forum and HP World.  This close relationship has resulted in billions of dollars of HP hardware running SCO software worldwide.  HP and SCO have a considerable presence in such vertical markets as Financial, Health Care, Manufacturing, and Transaction Processing.  HP continues to support SCO operating systems across its server lines and has recently extended support to HP advanced storage technologies such as the MSA1000 and MSA1500.
>
> (Id.)

        (d)     SCO's website also names Hewlett-Packard as the only "Platinum Sponsor" of its 2006 SCOForum event, the highest level of sponsorship among the eighteen sponsors listed, while displaying Hewlett-Packard's logo in connection with the event.  (Ex. 192.)

SCO RESPONSE:  Disputed.  While Hewlett Packard and SCO do have a healthy and even "good" ongoing relationship, SCO's relationship with Hewlett Packard did decline from what it was previously, as described in ¶ 52.

a)      Undisputed.

b)      Undisputed.

c)      Undisputed.

d)      Undisputed.

4.      <u>Open Source Conference in Scottsdale, Arizona</u>

55.     IBM ALLEGED FACT:   John Terpstra's decision to rescind the invitation to Darl McBride to speak at the OpenSource Conference in Scottsdale, Arizona, was the result of complaints from other participants of the OpenSource Conference, not IBM.

a)      Mr. Terpstra states:

Although I asked representatives from IBM to participate in the Open Source Open Standards Conference multiple times, no one from IBM was willing to commit to speak at the conference or to participate in it in any way, at any time.

At no time did anyone from IBM tell me that it did not want Mr. McBride to speak at or participate in the conference.  At no time did anyone from IBM tell me that it would not participate in the conference unless Mr. McBride did not speak.  At no time did anyone from IBM tell me that it would withdraw its participation in the conference if Mr. McBride did speak – as set forth above, BM never committed to participate in the conference at all.  At no time did anyone from IBM pressure me in any way to ask Mr. McBride or SCO not to speak at or participate in the conference.

(Ex. 267 ¶¶ 4, 5.)

b)      Mr. Terpstra further states:

Other potential participants in the conference did inform me, however, that they would not participate in the conference if Mr. McBride were to be a speaker or if SCO were present in any manner.  I was able to secure their attendance only after offering

84

assurance that Mr. McBride and SCO would not be present and that a list of attendees would not be made public.

As a result, I called Mr. McBride sometime before the conference was to occur, and explained to him that overall feedback from potential participants in the Open Source Open Standards Conference was prejudicial to sustaining the invitation for Mr. McBride to speak and for SCO to be present at this event.

(Id. ¶¶ 6, 7.)

SCO RESPONSE:  In light of Mr. Terpstra's declaration, SCO is not pursuing this aspect of its claim.

5.    Novell

56.    IBM ALLEGED FACT:  In 1995, Novell entered negotiations with Santa Cruz concerning the sale of certain Novell assets relating to its UNIX and UnixWare software products.  (Ex. 239 ¶ 4.)

SCO RESPONSE:  Undisputed.

57.    IBM ALLEGED FACT:  On September 19, 1995, Novell and Santa Cruz executed an Asset Purchase Agreement (the "APA").  (Ex. 123.)

SCO RESPONSE:  Undisputed.

58.    IBM ALLEGED FACT:  After SCO filed this lawsuit, Novell sent a series of letters to SCO that directed SCO to waive or explicitly waived the purported breaches of contract SCO has asserted IBM committed.  (See Exs. 135-138.)

SCO RESPONSE:  Undisputed.

59.    IBM ALLEGED FACT:  In asserting ownership of the UNIX copyrights and exercising its rights under the APA, Novell acted in its own interests and independently of IBM. IBM did not induce Novell to assert ownership of the UNIX copyrights; nor did it cause Novell to breach any of its obligations under the APA.  In a sworn declaration, Joseph LaSala, Jr., Senior Vice President and General Counsel at Novell, states:

Contrary to SCO's claim, Novell asserted ownership of the UNIX copyrights and exercised its rights under the APA because Novell owns the copyrights, because it has a right of waiver under the APA, and because it was in Novell's interest to exercise these rights.  IBM did not have the ability to require Novell to take the steps about which SCO complains and did not

85

force or pressure Novell to do so.  Novell acted independently of IBM.

(Ex. 240 ¶ 42.)

SCO RESPONSE:  Disputed.  As set forth in more detail in paragraphs 59-83, IBM induced Novell to assert rights under the Asset Purchase Agreement that it did not possess, to the great detriment of SCO.  Further, as discussed in more detail in paragraphs 84-86, the declaration of Joseph LaSala should not be considered on the subject of the communications between IBM and SCO because IBM previously asserted a joint interest privilege regarding such communications and prohibited SCO from seeking discovery on such communications.

60.    IBM ALLEGED FACT:  Novell's decision to assert its contractual rights under the APA was in no way caused or influenced by the $50 million investment made by IBM in connection with Novell's acquisition of SuSE.  Mr. LaSala states:

> Novell's decision to assert its contractual rights under the APA and Amendment X was in no way caused or influenced by IBM's $50 million investment.  Novell would have taken the same actions even if it did not receive the $50 million investment, and the $50 million was never conditioned on Novell taking such actions.

(Id. ¶ 44.)

SCO RESPONSE:  Disputed, for the reasons stated in ¶ 59.

61.    IBM ALLEGED FACT:  IBM never requested or expressed a desire that Novell breach the APA, Amendment X or any other agreement between Novell and Santa Cruz or Novell and SCO.  Mr. LaSala states:

> Novell informed representatives of IBM of the actions it took with respect to the UNIX copyrights.  However, at no time did any representative of IBM request or express a desire that Novell breach, or take any action contrary to, the APA, Amendment X or any other agreement between Novell and Santa Cruz or Novell and SCO.

(Id. ¶ 42).

86

SCO RESPONSE: Disputed, for the reasons stated in ¶ 59. According to Jack

Messman, Novell's decision to purchase Suse, and IBM's assistance in funding that purchase,

flowed from a meeting known as the "Chicago 7," described more fully at paragraph 87. Mr.

Messman acknowledged that the meeting was prompted by the negative impact SCO's lawsuit

against IBM was having on the Linux market. Following this meeting, attended by all the

leading players in the Linux market, Novell announced its intent to purchase SUse Linux with

IBM's assistance. (Ex. 256)

### E.    SCO Response to IBM Section "IBM's Purpose in Supporting Linux"

62.    IBM ALLEGED FACT: IBM's Linux strategy was undertaken in good
faith and was motivated entirely by competitive reasons. In supporting Linux, IBM harbored
no malice or ill will directed towards SCO nor any intent to ham SCO. Dan Frye, co-founder
of and Vice President responsible for managing IBM's Linux Technology Center, states:

> IBM undertook its Linux business strategy, and made
> contributions to Linux, in the good faith belief that these
> activities were permissible. IBM did not undertake its Linux
> activities with an intent to harm SCO and those activities were
> not motivated by any spite or ill will toward SCO. On the
> contrary, IBM undertook its Linux strategy for competitive
> reasons.

(Ex. 586 ¶ 5).

SCO RESPONSE:    Disputed.    While IBM had competitive reasons for

embarking on its Linux strategy, IBM's initiation of its Linux strategy was inextricably linked

to IBM's unfair competition in conducting and terminating its Project Monterey relationship

with SCO, as set forth in SCO's Memorandum in Opposition to IBM's Motion for Summary

Judgment on SCO's Unfair Competition Claims (SCO's Sixth Cause of Action). Furthermore,

by 2003, when SCO endeavored to assert its intellectual property rights with regard to Linux,

IBM acted quickly to isolate SCO in the market and cut off its support, as evidenced by IBM

executive

REDACTED

      63.    IBM ALLEGED FACT:  SCO's own experts believe that competitive forces created market pressures that led IBM to support Linux:

REDACTED

      SCO RESPONSE:  Undisputed.  Subparts (a) through (f) are also undisputed.

REDACTED

REDACTED

SCO RESPONSE:  Undisputed.  Subparts (a) through (c) are also undisputed.

65.

REACTED

SCO RESPONSE:  Undisputed, except that SCO's experts never concluded that

IBM's competition was "on the merits."  Subpart (a) is undisputed.

**F.      SCO Response to IBM Section "SCO's Lack of Injury"**

66.     IBM ALLEGED FACT:  SCO cannot specifically identify any damages resulting from any acts of alleged interference by IBM, as explained below.

REDACTED

89

REDACTED

c)     With regard to SCO's claim for interference with the "Unix on Intel market", Mr. Tibbitts testified that SCO's "theory is not company/company specific" (Ex.

REDACTED       Thus, SCO is "not allocating a specific dollar amount to each of [those entities] anyway" because SCO's "tortious interference claim . . . is more of a tortious interference perspective, business relationships for the Unix on Intel market as a whole". (Ex. 345 at 26: 17-22.)

d)     Similarly, as to the seven existing relationships with which SCO alleges IBM interfered, SCO does not claim any discrete damages resulting from IBM's alleged interference.  For example, as to BayStar, Mr. Tibbitts testified:

> [W]e don't have a discreet (sic) claim about BayStar with a damage number associated with that. The BayStar story is part of our overall story about how IBM dealt with us . . . I think it's just part of the story and we're not going to say the damages related to BayStar are X dollars, but . . . it's part of the story that leads to the damages that have been submitted in our damage reports.

(Ex. 345 at 14:17-15:9.)

e)     Not one of SCO's experts attempts to quantify or even address the alleged damages allegedly caused by IBM's alleged tortious interference with SCO's contractual or business relationships.

SCO RESPONSE:  Disputed.  SCO's damages for IBM's acts of interference are subsumed within and coterminous with SCO's damages for its breach of contract claims.  With that context, subparts (a) through (d) are undisputed.  Subpart (e) is disputed for the same reason as stated above: SCO's damages for IBM's acts of interference are subsumed within and coterminous with SCO's damages for its breach of contract claims, and those damages were addressed by SCO's experts.

    67.    IBM ALLEGED FACT:  There were problems adversely affecting SCO's business from at least 1999 onward that were independent of any actions of IBM.

        a)    SCO was not "successful in getting new customers" at a time when "[Linux] hadn't established itself, didn't have the credentials" and "was relatively new and unproven". (Ex. 304 at 67:16-68:4, 68:23-70:12.)

REDACTED

        c)    From January 2000 to the acquisition by Caldera Systems, Inc. ("Caldera"), of Santa Cruz's UNIX business in May 2001, SCO's marketing efforts for its UNIX products were declining. (Ex. 305 at 108:25-109:22.)

REDACTED

        e)    After the acquisition by Caldera of SCO's UNIX business in 2001, SCO was "focused on maintaining the existing customers as opposed to approaching new customers" of UnixWare and OpenServer. (Ex. 308 at 47:22-48:18.)

        f)    SCO's Linux products were more expensive than the Linux products of its competitors, so SCO was "having trouble getting the business a lot of times on the price point". (Id. at 26:12-24.)  SCO's Linux products were kept at "a comparative price with [SCO's] UNIX [products] because we would devalue our UNIX business". (Id. at 26:17-19.)

REDACTED

    SCO RESPONSE: Disputed.  SCO's experts concluded that Santa Cruz's UNIX business grew its revenue 1995 to 1999, and that it occupied a strong market position in 1999. (Ex. 286 at 12-18)  Following IBM's improper conduct and the resulting precipitous decline of revenue from Santa Cruz's UNIX operating systems, the company suffered from the impact of

91

the loss of that revenue, including lack of funding issues.  (Ex. 286 at 50; Ex. 281 at 62-63).

Such issues, SCO's experts concluded, were attributable to IBM's wrongful conduct and not an

independent cause of SCO's losses.

a)      Disputed, for the reasons set forth above.

b)      Disputed.  To the extent there were complaints about SCO's

products, SCO's experts concluded that it was attributable to the revenue losses caused by

IBM's improper disclosures to Linux.  (Ex. 286, Pisano rebuttal at 50-51)

c)      Disputed.  The cited material does not support the proposition

that SCO's marketing efforts were declining **from** January 2000.  In fact, the employee to

whom IBM cites testified that marketing funds decreased from the "period" when he came to

the company in January 2000 to the acquisition of the UNIX assets by Caldera in 2001.  (IBM

Ex. 305 at 108:25-109:22)   In other words, the funds were less in 2001 than when the

employee joined the company in January 2000.

REDACTED

Further, SCO's experts concluded that, to the extent SCO's marketing efforts declined in this

period, that decline was attributable to the revenue losses caused by IBM's improper

disclosures to Linux.  (Ex. 286 at 52-53)

d)      Disputed.  The document cited by IBM (Ex. 203) was generated

by an outside analyst retained for the purpose of identifying SCO's potential growth strategies

shortly after Darl McBride became CEO.  (Ex 165.)   SCO executive Eric Hughes testified that

REDACTED

REDACTED

Mr. Jenkins, who was new to both the software industry generally and to SCO business specifically, created this presentation early in his process of investigating the company and analyzing the business. (Ex 165.)

e)　　　Disputed.  The cited material does not support the proposition. The former SCO employee cited stated that **his** focus was on selling to his existing customers; he was not referring to SCO more broadly.  (IBM Ex. 308, 47:22-48:18).

f)　　　Disputed, in so far as the cited testimony does not support IBM's contention that problems adversely affecting SCO's business were independent of any action of IBM.  The cited quotations are accurate but removed from their context.

REDACTED

g)

REDACTED

REDACTED

## CERTIFICATE OF SERVICE

Plaintiff, The SCO Group, Inc., hereby certifies that a true and correct copy of the

foregoing Redacted SCO's Memorandum in Opposition to IBM's Motion for Summary

Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action)

was served on Defendant International Business Machines Corporation on the 27th day of

December, 2006, by the CM/ECF system to:

> David Marriott, Esq.
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, New York 10019
>
> Todd Shaughnessy, Esq.
> Snell & Wilmer LLP
> 1200 Gateway Tower West
> 15 West South Temple
> Salt Lake City, Utah 84101-1004

/s/  Brent O. Hatch