Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Devan V. Padmanabhan (admitted pro hac vice)
John J. Brogan (admitted pro hac vice)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN OPPOSITION TO IBM'S MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT (IBM'S 10TH COUNTERCLAIM)** <br><br> **FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]** <br><br> Case No. 2:03CV0294DAK <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................9

STATEMENT OF DISPUTED MATERIAL FACTS ...............................................12

STATEMENT OF FACTS....................................................................................12

    A.    UNIX Is Developed and Licensed By AT&T...............................................12

    B.    Linux Is UNIX-Like..................................................................................15

    C.    Linux Developers Had Access to Copyrighted Material .........................16

    D.    Linux Is Substantially Similar to Copyrighted Material ........................17

        1.    No externalities in creating UNIX SVr4 ..................................................18

        2.    There are many ways to implement the various aspects of UNIX SVr4............19

        3.    The UNIX SVr4 Material Incorporated Into Linux Is Significant ......................20

    E.    SCO Now Owns the UNIX Copyrights.......................................................21

        1.    UnitedLinux Joint Development Contract and General Public License Do Not Give IBM a License ...........................................................................28

    F.    IBM Copies, Contributes To and Encourages the Reproduction, Distribution, and Preparation of Derivative Works Based on Linux ...................32

    G.    IBM Has No License To The Disputed Material In Linux...................................33

        1.    Strategic Business Agreement Does Not Give IBM License .....................33

        2.    SCO Granted No Rights Under Open Linux Or The GPL............................34

        3.    Facts Relating to "Spec 1170" and the Common API Agreement .........................36

        4.    Facts Relating to the TIS Specification ............................................................38

   H.    Facts Relating to IBM's Equitable Estoppel Claim ..............................................39

ARGUMENT ..............................................................................................................................49

   A.    SCO's Copyrighted Works Are Valid And Were Copied By IBM ......................49

        1.    SCO's Copyrights Are Valid and Enforceable ...........................................49

             a.    SCO Obtained The Copyrights To UNIX From Novell ...............49

             b.    SCO Did Not Transfer Its Copyrights In The Disputed Material
                   To UnitedLinux ...............................................................................50

        2.    IBM Copied The Infringing Material ..........................................................52

             a.    Linux Infringes SCO's Copyrights................................................53

             b.    IBM's Linux Activities Infringes SCO's Copyrights....................54

        3.    Copying Is A Fact Issue Inappropriate For Summary Judgment .........55

   B.    Linux Is Substantially Similar To UNIX SVr4 .....................................................55

        1.    Linux Infringes SVr4 As A Collective Work................................................56

        2.    Linux Infringes Non-literal Elements Of SVr4 ...........................................58

        3.    Linux Infringes Literal Elements Of SVr4 ..................................................59

   C.    IBM Does Not Have A License To The Infringing Material.................................67

        1.    IBM Does Not Have A License Under The Strategic Business Alliance...............67

        2.    IBM Does Not Have A License Under The GPL.........................................68

        3.    IBM Does Not Have A License Under Spec 1170 or the Common API
              Materials Cross-License Agreement .........................................................70

             a.    IBM Does Not Have A License Under Spec 1170.........................70

      b.     IBM Does Not Have A License Under The Common APIMaterials Cross License Agreement ................................................................71

    4.  IBM Does Not Have A License Under The TIS .................................72

D.    **SCO IS NOT ESTOPPED FROM PURSUING ITS INFRINGEMENT CLAIMS** ...................................................................................74

    1.  Equitable Estoppel Is Not A Basis Upon Which Declaratory Judgment Of Non-Infringement May Be Predicated .....................................75

    2.  IBM Did Not Reasonably Rely On Caldera's Linux ActivityIn Deciding To Invest In Linux ..................................................................76

        a.     IBM Could Not Reasonably Rely on Caldera's Linux Activities At a Time When Caldera Did Not Own the UNIX Copyrights .....................76

        b.     IBM's Unfair Acts in Project Monterey Preclude any Estoppel Defense Regarding Santa Cruz ..............................................78

        c.     No Estoppel Arises After Caldera Intl's 2001 Acquisition of UNIX Assets .....................................................................79

        d.     IBM's Acts to Strengthen Linux in Violation of SCO Licensing Agreements Preclude an Estoppel Defense ..............................81

    3.  Even if IBM's Initial Reliance Was Reasonable, Its Continued Distribution Of Linux Is Not Justified .......................................83

    4.  IBM Cannot Invoke Estoppel Because It Was Not Ignorant of the True Facts Regarding the Identity of the Copyright Holder ....................84

E.    **SCO Did Not Waive Its Copyrights In The Disputed Material** ............86

F.    **IBM's Copyright Misuse Claim Fails** .............................................86

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Althin CD Medical v. W. Suburban Kidney Ctr.,*
    874 F.Supp. 837 (N.D. Ill. 1994) ....................................................72

*American Dental Ass'n. v. Delta Dental Plans Ass'n.,*
    126 F.3d 977 (7th Cir. 1997) ........................................................64

*Apple Computer, Inc. v. Franklin Computer Corp.,*
    714 F.2d 1240 (3d Cir. 1983) ...................................................61, 63

*Apple Computer, Inc. v. Microsoft Corp.,*
    35 F.3d 1435 (9th Cir. 1994) .......................................................49

*Arica Institute, Inc. v. Palmer,*
    970 F.2d 1067 (2d Cir.1992) ........................................................54

*Atari Games Corp. v. Oman,*
    888 F.2d 878 (D.C. Cir. 1989) .....................................................64

*Autoskill, Inc. v. National Education Support System, Inc.,*
    994 F.2d 1476 (10th Cir. 1993) ....................................................49

*Baystate Technologies, Inc. v. Bentley Systems, Inc.,*
    946 F.Supp. 1079 (D. Mass. 1996) ..................................................63

*Boisson v. Banian, Ltd.,*
    273 F.3d 262 (2d Cir. 2001) ........................................................65

*Boothroyd Dewhurst, Inc. v. Poli,*
    783 F.Supp. 670 (D. Mass. 1991) ...................................................81

*Brown Bag Software v. Symantec Corp.,*

1

960 F.2d 1465 (9th Cir. 1992) ................................................................................................64

*Cardinal Indus. v. Anderson Parrish Assocs.,*

    No. 83-1038-Civ-T-13, 1986 WL 32732 (M.D. Fla. May 6, 1986) ................................74

*CCC Information Services, Inc. v. MacLean Hunter Market Reports, Inc.,*

    44 F.3d 61 (2d Cir. 1994) .........................................................................................64

*CDN Inc. v. Kapes,*

    197 F.3d 1256 (9th Cir. 1999) ..................................................................................64

*Country Kids N City Slicks, Inc. v. Sheen,*

    77 F.3d 1280 (10th Cir. 1996) ..................................................................................65

*Dallal v. New York Times,*

    386 F.Supp. 2d 319 (S.D.N.Y. 2005)........................................................................74

*DeCarlo v. Archie Comic Publics,*

    127 F.Supp. 2d 497 (S.D.N.Y. 2001)........................................................................74

*Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.,*

    307 F.3d 197 (3d Cir. 2002).....................................................................................66

*Eastman Kodak Co. v. Rakow,*

    739 F.Supp. 116 (W.D.N.Y. 1990)...........................................................................76

*Educational Testing Servs. v. Katzman,*

    793 F.2d 533 (3d Cir. 1986).................................................................................56, 61

*Engineering Dynamics, Inc. v. Structural Software, Inc.,*

    46 F.3d 408 (5th Cir. 1995) ......................................................................................58

*Feist Publications, Inc. v. Rural Telegraph Service Co.,*

    499 U.S. 340 (1991).............................................................................................56, 58

*Gasser Chair Company, Inc. v. Infanti Chair Manufacturing,*

    60 F.3d 770 (2d Cir. 1995)..................................................................................75

*Gates Rubber Co. v. Bando Chemical Ind., Ltd.,*

    9 F.3d 823 (10th Cir. 1993) ......................................................................... passim

*Georgia Television Co. v. TV News Clips of Atlanta, Inc.,*

    Civ. A. No. 1:88-CV2207JTC, 1991 WL 204425 (N.D. Ga. May 29, 1991)...................87

*Gilliam v. ABC Inc.,*

    538 F.2d 14 (2d Cir. 1976)..................................................................................72

*HGI Associates v. Wetmore Printing,*

    427 F.3d 867 (11th Cir. 2005) ............................................................................74

*Hadady Corp. v. Dean Witter Reynolds,*

    739 F.Supp. 1392 (C.D. Cal. 1990) ....................................................................74

*Hampton v. Paramount Pictures Corp.,*

    279 F.2d 100 (9th Cir. 1960) ..........................................................................75, 84

*Harper & Row Pub. Inc v. Nation Enterprises,*

    471 U.S. 539 (1985)...........................................................................................66

*Harris Market Research v. Marshall Marketing & Communications, Inc.,*

    948 F.2d 1518 (10th Cir. 1991) ..........................................................................49

*Hart v. Sampley,*

    Civ. A. No. 91-3068 (CRR), 1992 WL 336496 (D.D.C. June 24, 1991) ......................50

*Henderson v. Henderson,*

    No. 3:05cv445-WHA, 2006 WL 3075711 (M.D. Ala. Oct. 30, 2006) ............................74

*qad, Inc. v. ALN Associates, Inc.,*

3

770 F. Supp. 1261 (N.D. Ill. 1991) ............................................................... 87

*In re Independent Service Organizations Antitrust Litigation,*

964 F. Supp. 1479 (D. Kan. 1997) ............................................................... 87

*Jacobsen v. Deseret Book Co.,*

No. 2:99-CV-893k, 2001 WL 1806858 (D. Utah Jan. 12, 2001) ................... 65, 66, 74-75

*Keane Dealer Servs., Inc. v. Harts,*

968 F.Supp. 944 (S.D.N.Y. 1997) ............................................................... 74

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.,*

12 F.3d 527 (5th Cir. 1994) ............................................................... 54, 58

*Kraft v. Cohen,*

32 F.Supp. 821 (E.D. Pa. 1940) ............................................................... 83-84

*Kregos v. Associated Press,*

937 F.2d 700 (2d Cir. 1991) ............................................................... 58

*Legislator 1357 Ltd. v. MGM,*

No. 04 Civ. 3951 (MGC), 2006 WL 2709783 (S.D.N.Y. Sept. 22, 2006) ...................... 74

*Lotus Development Corp. v. Borland International, Inc.,*

49 F.3d 807 (1st Cir. 1995) ............................................................... 63

*Lowry's Reports, Inc. v. Legg Mason, Inc.,*

271 F.Supp. 2d 737 (D. Md. 2003) ............................................................... 84

*Lyrick Studios, Inc. v. Big Idea Products, Inc.,*

420 F.3d 388 (5th Cir. 2005) ............................................................... 50

*MGE UPS System, Inc. v. Fakouri,*

422 F Supp. 2d 724 (N.D. Tex. 2006) ............................................................... 74

4

*MGM Studios v. Grokster,*

    545 U.S. 913 (2005) ............................................................53, 55

*MLB Prod. Corp. v. Colour Tex., Inc.,*

    729 F.Supp. 1035 (D. N.J. 1990) ............................................72

*Markham v. A.E. Borden Co.,*

    206 F.2d 199 (1st Cir. 1953)....................................................57

*Micro Star v. Formgen, Inc.,*

    154 F.3d 1107 (9th Cir. 1998) ................................................61

*Mitel, Inc. v. Iqtel, Inc.,*

    124 F.3d 1366 (10th Cir. 1997) ....................................... passim

*Newman v. Checkrite California, Inc.,*

    912 F.Supp. 1354 (E.D. Cal. 1995).........................................76

*Nichols v. Universal Pictures Co.,*

    45 F.2d 119 (2d Cir. 1930)......................................................58

*Peer International Corp. v. Luna Records, Inc.,*

    887 F.Supp. 560 (S.D.N.Y. 1995)...........................................83

*Positive Software Solutions, Inc. v. New Century Mortgage Corp.,*

    259 F.Supp. 2d 531 (N.D. Tex. 2003) ....................................61

*Pyrodyne Corp. v. Pyrotronics Corp.,*

    847 F.2d 1398 (9th Cir. 1988) ................................................75

*Quinn v. City of Detroit,*

    23 F.Supp. 2d 741 (E.D. Mich. 1998)......................................74

*Ranchers Expl. & Development v. Anaconda Co.,*

248 F.Supp. 708 (D. Utah 1965).................................................................78

*Recursion Software, Inc. v. Interactive Intel., Inc.,*

425 F.Supp. 2d 756 (N.D. Tex. 2006) ........................................................74

*Repp v. Webber,*

132 F.3d 882 (2d Cir. 1997)........................................................................55

*Roy Expert Co. v. CBS,*

503 F.Supp. 1137 (S.D.N.Y. 1980).............................................................72

*SAS Institute v. Practicingsmarter, Inc.,*

2006 WL 1888565 (M.D.N.C. July 6, 2006) ..............................................74

*Schoolhouse Inc. v. Anderson,*

No. 99-1214 DSD/JMM, 2001 WL 1640081 (D. Minn. Nov. 8, 2000) .........87

*Shamrock Development v. City of Concord,*

656 F.2d 1380 (9th Cir. 1981) ....................................................................74

*Stallone v. Anderson,*

No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. April 25, 1989) ...........61

*Steinberg v. Columbia Pictures Indus., Inc.,*

663 F.Supp. 706 (S.D.N.Y. 1987)...............................................................83

*Steiner Sales Co. v. Schwartz Sales Co.,*

98 F.2d 999 (10th Cir. 1938) ......................................................................49

*Stenograph L.L.C. v. Bossard Associate, Inc.,*

144 F.3d 96 (D.C. Cir. 1998).......................................................................55

*Sunham Home Fashions, LLC v. Pem-American, Inc.,*

No. 02 Civ. 6284(JFK), 2002 WL 31834477 (S.D.N.Y. Dec. 17, 2002) .......50

6

*Transwestern Publishing Co. LP v. Multimedia Marketing Associates, Inc.*,

    133 F.3d 773 (10th Cir. 1997) ................................................................56

*Triangle Pubs., Inc. v. Knight-Ridder Newspapers, Inc.*,

    626 F.2d 1171 (5th Cir. 1980) .........................................................56-57

*Twin Peaks Products, Inc. v. Publics International, Ltd.*,

    996 F.2d 1366 (2d Cir. 1993) .......................................................54, 58

*United Park City Mines Co. v. Stitching Mayflower Mountain Fonds*,

    No. 20040943, 2006 WL. 1528607 (Utah Sup. Ct. June 6, 2006) ...................86

*Vault Corp. v. Quaid Software Ltd.*,

    847 F.2d 255 (5th Cir. 1988) ................................................................55

*Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*,

    797 F.2d 1222 (3d Cir. 1986) ...............................................................65

*Wuv's International, Inc. v. Love's Enterprises, Inc.*,

    No. 78-F-107, 1980 WL 30296 (D. Colo. Nov. 4, 1980) ...............................49

*Xoom, Inc. v. Imageline, Inc.*,

    323 F.3d 279 (4th Cir. 2002) ...............................................................49

## STATE CASES

*Rohr v. Rohr*,

    709 P.2d 382 (Utah 1985) ...................................................................78

*Tremonton Investment Co. v. Horne*,

    202 P. 547 (Utah 1921) ......................................................................78

*Utah State Building Commission, for Use and Benefit of Mountain States Supply Co.
v. Great American Indemnity Co.*,

140 P.2d 763 (Utah 1943)................................................................77

## FEDERAL STATUTES

17 U.S.C. § 102(b).........................................................................58

17 U.S.C. § 106.......................................................................53, 55, 61

28 U.S.C. § 2201..........................................................................32

Plaintiff, the SCO Group, Inc. ("SCO"), respectfully submits this memorandum in opposition to IBM's motion for summary judgment on its Tenth Counterclaim.

## PRELIMINARY STATEMENT

IBM's Tenth Counterclaim seeks a sweeping declaration that the Linux kernel does not infringe on SCO's copyrights. Conspicuously absent from IBM's lengthy submission is the most material fact: Literal and non-literal elements of UNIX SVr4—along with the selection, arrangement, and coordination of those elements—are present in Linux. Neither IBM nor its experts dispute this fact.

While IBM's motion repeats the tired refrain that SCO has "failed to substantiate its claims," IBM Mem. at 2, IBM ignores the substantial, competent evidence set forth by Professor Thomas Cargill in his Reports. Professor Cargill discusses the copying into Linux from UNIX System V, Release 4 ("SVr4") of protected expression regarding

REDACTED

Instead of proving noninfringement—which clearly is a matter of disputed material fact—IBM argues that it is entitled to use the material from UNIX SVr4 in Linux because it was

9

"authorized" to do so.  IBM contends that SCO: (1) does not have the rights to this material; (2) if it ever had them, gave away those rights through licenses; and (3) is estopped from enforcing them.  Each of these arguments is based on a mischaracterization of the operative facts or law or both.

Ⅎ First, in claiming that SCO does not have rights to this material, IBM relies on language from the Asset Purchase Agreement ("APA") between Novell and SCO that is contrary to express language in the original agreement and Amendment 2 evidencing a full transfer of all rights relating to the UNIX and UNIXWare business from Novell to SCO.  The intent to transfer the copyrights is further reflected in the statements of the key parties to the transaction as well as IBM, and it is the only interpretation that makes any business sense.

Ⅎ Second, in an effort to cobble a supposed license to the disputed material, IBM cherrypicks pieces of various contracts:  (1) Under the Strategic Business Agreement, which does not even relate to the disputed material, IBM claims a license from an entity that—at that time, prior to its merger with the Santa Cruz Operation—did not have the rights that IBM purports to have obtained; (2) Although IGM is not a party to UnitedLinux, IBM claims rights from this brief and since abandoned venture even though SCO never contributed any disputed UNIX material and did not release any distributed material under the GPL; (3) Regarding "Spec 1170," even though IBM's claim ignores that the grant of rights to use and create derivative works to X/Open was limited to the specification and did not include a right to use SCO's code to create a competing operating system; and (4) Regarding the TIS Specifications, IBM ignores that the TIS Specifications are only a license for software developers on non-UNIX systems to

develop applications that are TIS-compliant and do not license copying of code from the specification to develop a competing operating system.

Third, SCO is not estopped from pursuing its infringement claim. Estoppel is a personal equitable defense to a claim of infringement and is not a basis upon which a declaration of noninfringement, such as the one IBM seeks here, can be granted to IBM—let alone the rest of the world. Defenses of estoppel and waiver are inherently fact-bound and inappropriate for summary judgment. Here, there are numerous disputed factual issues. IBM could not reasonably rely on the Linux activities of Caldera Systems, Inc. when that company did not own the UNIX intellectual property. Because Santa Cruz, the owner of UNIX copyrights at the time IBM decided to embark on its Linux strategy, had no involvement with Linux, IBM could not have reasonably relied on third-party Linux activities as a basis for entering the market. Moreover, the documentary record produced by IBM shows no concern whatever with Linux activities of Caldera at any time. After Caldera acquired Santa Cruz's UNIX rights, Caldera (renamed SCO) acted reasonably in investigating and bringing claims concerning the copyrights, while suspending its Linux activities. From 2001, when Linux 2.4 was first released, through March 2003, when SCO filed suit, there is no competent evidence that IBM paid any attention to SCO at all in its Linux decision-making. Indeed, the limited attention IBM paid to SCO was devoted to how to misappropriate SCO's code through Project Monterey—inequitable conduct that would independently preclude this equitable defense.

Throughout its papers, IBM fails to correctly analyze the disputed material under the applicable law of the Tenth Circuit. Absent from IBM's motion is any discussion of Linux's infringement of UNIX as a collective work. Also absent is an analysis of the non-literal

11

comparisons between Linux and UNIX. When IBM does address the literal elements copied in

Linux, it misapplies the law, using the incorrect legal standard to filter and compare the disputed

material. IBM's motion for summary judgment on its Tenth Counterclaim must be denied.

## STATEMENT OF DISPUTED MATERIAL FACTS

It is telling that in all of IBM's 308 material facts, new declarations, and even a new

expert report (submitted in the form of a declaration as IBM Ex. 226), IBM claims that not a

shred of it, construed most favorably to SCO, is in dispute. That all or most of these "facts" must

break IBM's way for it to meet its burden on summary judgment suggests the enormity of the

burden IBM faces in seeking summary judgment on intrinsically factual matters.

Many of IBM's supposed facts are, in actuality, legal arguments or conclusions that

contravene the local rules of this District. DUCivR 56-1(b). At Appendix A (incorporated here

by reference), SCO states its position with respect to each of IBM's purported undisputed

material facts. The facts set forth below identify supported facts which more than suffice to deny

IBM's motion for summary judgment on its Tenth Counterclaim.

## STATEMENT OF FACTS

**A.    UNIX Is Developed and Licensed By AT&T**

1.    In 1969, SCO predecessor-in-interest, Dennis Ritchie and Ken Thompson of

AT&T, created the UNIX computer operating system ("UNIX"). Ex. 274 ¶ 8.[1]

2.    An operating system is a computer program that is installed on a computer.

---

[1]    The documents, declarations, and depositions supporting SCO's response are appended to the
November 11, 2006 Declaration of Brent Hatch, and are cited herein as "Ex. __." Where exhibits
attached to IBM's September 25, 2006 Declaration of Todd M. Shaughnessy are referenced herein,
they are cited as "IBM Ex. __."

Ex. 274 at 10.

3.      Operating systems are useful when application programs (e.g., word processor programs) are written to run on them.  The operating system mediates between the hardware that forms a computer (e.g., the processor, memory, monitor, and keyboard) and the application program.  Ex. 274 at 6, 10.

4.      The original versions of UNIX were used primarily for internal research purposes at AT&T.  Ex. 274 at 7.

5.      Even though it was apparent that the value of UNIX was immense, AT&T was prohibited under the consent decree from becoming an operating system vendor.  Ex. 274 at 7.

6.      In this time period, AT&T licensed UNIX to educational institutions and a limited number of commercial entities.  Ex. 274 at 7.

7.      Under these license agreements, AT&T had certain rights to the modifications (e.g., derivations or improvements) to the source code.  Ex. 274 at 7.

8.      As licensees made changes to the source code, numerous versions of UNIX began to emerge.  These versions of UNIX are referred to as "flavors."  Ex. 274 at 8.

9.      Some of the most prominent licensees included Sun Microsystems, Inc. ("Sun"), Hewlett-Packard, Inc. ("HP"), Microsoft, and the University of California-Berkeley.  Ex. 274 at 8.

10.     There were many versions of the UNIX operating system as developed by AT&T. These included Version 6, Version 7, Version 32V, System III, and System V.  Ex. 274 at 8.

11.     In 1985, IBM licensed UNIX System V (a version of UNIX).  IBM then devised its AIX operating system.  IBM Ex. 4 ¶ 13.  Similarly, Sequent also obtained a license to UNIX

System V and then devised its Dynix/ptx ("Dynix") operating system.  Id. ¶ 16.  See also Ex. 276

at 36.  AIX is a derivative of the UNIX System V Operating System.  Ex. 11 ¶ 18.

      12.    AT&T created UNIX System V Release 4 ("SVr4") in an attempt to bring into

one operating system the best aspects of the various "flavors" of UNIX then in existence.  These

various "flavors" were the derivations and improvements made by the licensees of AT&T to the

UNIX source code as well as AT&T's own improvements and additions to its code.  The

following excerpt from Goodheart & Cox's The Magic Garden, summarizes SCO expert Dr.

Cargill's understanding of how System V Release 4 unified the various UNIX derivatives:

> SVR4 merges four of the most popular derivatives of the
> UNIX system into a single standard operating system that provides
> backward compatability of all four versions.  The four operating
> systems are: Berkeley Software Distribution 4.3 (4.3BSD), AT&T
> UNIX System V Release 3, SunOS and Microsoft XENIX System
> V.
>
> SVR4's power and flexibility is what makes it unique
> amongst operating systems.  It has evolved by the efforts of both
> commercial and academic interests, and has taken more than two
> decades in the making.

Ex. 274 at 8-9.

      13.

REDACTED

14

14.     Copyrights have been registered with the United States Copyright Office for the following UNIX versions: 5th Edition, 6th Edition, 7th Edition, 32V, SVr3.0, SVr3.2, SVr4.0, SVr4.1, SVr4.1ES, SVr4.2.  *See* Copyright Reg. Nos.  TXU-510-028, TXU-511-236, TXU-516-704, TXU-516-705, TX 5-750-269, TX 5-750-271, TX 5-750-268, TX 5-76-217, TX 5-762-234, TX 5-705-356, and TX 5-762-235.  Exs. 258-68.

**B.     <u>Linux Is UNIX-Like</u>**

15.     Linux is a UNIX-like computer operating system.  The two versions of Linux at issue in this case are Linux 2.4 and Linux 2.6.  Ex. 274 at 64-65; Ex. 22 at 135:4-6.

16.     In 1991, Linus Torvalds began developing Linux.  IBM Ex. 272.

17.     As set forth below, Linux was developed through systematic copying of SCO's copyrighted material.  Mr. Torvalds started with Minix, which he describes as a "UNIX variant." Ex. 169 at 61.  Mr. Torvalds then referred to the manuals for the Sun Microsystems version of UNIX, who was a licensee: "That's how early development was done.  I was reading the standards from either the Sun OS manual or various books, just picking off system calls one by one and trying to make something that worked." <u>Id</u>. at 82.  The origin of Linux supports the evidence that over time Linux became closer to UNIX SVr4.  Ex. 274 at 64, 68.

18.         REDACTED

19.         REDACTED

20.         REDACTED

15

21.       REDACTED

**C.**      <u>Linux Developers Had Access To Copyrighted Material</u>

22.       REDACTED

23.       REDACTED

24.       REDACTED

25.    In creating Linux, UNIX SVr4 material was copied directly from UNIX SVr4 or from sources that copied from SVr4.  Ex. 276 at 23.

26.    IBM's own experts did not consider the relevant indicia of copying in forming

16

their opinions. In fact, when asked about the likelihood that the nearly identical code was independently created rather than copied, Brian Kernighan replied that he didn't know, that he had "no way to assess that." Ex. 22 at 125: 3-7, 268:13-269:13.

27.     IBM's expert Brian Kernighan admits that he was instructed not to "assess the substantive . . . nature of the code." Ex. 22 at 284:5-7. In fact, his only basis for determining substantial similarity was by considering a numerical count of the lines copied. Id. at 284:9-18.

28.              REDACTED

29.     Dr. Thomas Cargill concluded that "it would be an astonishing coincidence if the selection, arrangement, and coordination of elements in Linux was developed independently from the remarkably similar selection, arrangement, and coordination of elements in SVr4." Ex. 274 at 64.

**D.     Linux Is Substantially Similar To Copyrighted Material**

30.     IBM's experts entirely failed to consider non-literal elements, such as selection, arrangement, and coordination of elements, in their substantial similarity analysis. Brian

Kernighan concedes that he limited his study to certain literal elements: "I was asked to compare the highlighted sections of the code in the items. So I did not examine the work as a whole." Ex. 22 at 279:13-15. See also Ex. 22 at 13:10-21; 14:7-13, 277:12-278:13, 279:9-12.

31.     SCO's expert, however, performed extensive non-literal comparisons.

.

REDACTED

1.     No Externalities In Creating UNIX SVr4

32.     IBM experts analyzed the constraints in creating Linux—the infringing work— rather than external constraints on expression in the original work of UNIX.     REDACTED

; Ex. 22 at 191:12-25, 198:13-20.

33.                                        REDACTED

18

REDACTED

2.      **There Are Many Ways To Implement the Various Aspects Of UNIX SVr4**

34.

35.

REDACTED

36.      Even IBM's expert concedes that there are many choices in naming a system call. Ex  22 at 76:18-20.

37.      IBM's experts apply an arbitrary standard to judge the creativity of names in header files.  In fact, when pressed to articulate the standard he uses, Dr. Kernighan replied, "I do not believe there is a precise standard.  I believe it's a matter of opinion, expert opinion."  Ex. 22 at 206:23-207:6.

38.

REDACTED

REDACTED

39.

**REDACTED**

40.

41.

42.

**3.    The UNIX SVr4 Material Incorporated Into Linux Is Significant**

43.

**REDACTED**

44.     The significance of a system call is dependent in part on the role it plays with regard to a particular application program.

**REDACTED**

**REDACTED**

45.

46.     IBM's expert, Mr. Kernighan, claims not to have engaged in a qualitative analysis of the code because he "was not asked to assess the qualitative significance." Ex. 22 at 280:2-3.

47.     SCO's expert, however, performed an extensive qualitative analysis of the infringing material.

**REDACTED**

**E.     SCO Now Owns the UNIX Copyrights**

48.     Through a series of corporate acquisitions, as set forth below, SCO now owns all right, title, and interest in and to UNIX operating system source code, software, licensing agreements, and any legal claims arising out of those agreements. SCO also owns copyrights and additional licensing rights in and to UNIX.

21

49.     Specifically, SCO owns copyright registrations for the following UNIX versions: 5th Edition, 6th Edition, 7th Edition, 32V, SVr3.0, SVr3.2, SVr4.0, SVr4.1, SVr4.1ES, SVr4.2. See Copyright Reg. Nos.  TXU-510-028, TXU-511-236, TXU-516-704, TXU-516-705, TX 5-750-269, TX 5-750-271, TX 5-750-268, TX 5-76-217, TX 5-762-234, TX 5-705-356, TX 5-762-235.  Exs. 258-268.

50.     Prior to November 1, 1989, AT&T owned the UNIX operating system, including copyrights. Ex. 353 at 1.

51.     In late 1989, AT&T transferred ownership and operation of the UNIX business to its new wholly owned subsidiary, UNIX System Laboratories ("USL").  This transfer included copyright rights in the UNIX operating system, including UNIX SVr4.  Ex. 353 at 1, Appendix A.

52.     In June 1993, AT&T sold USL to Novell.  Pursuant to a Reorganization and Merger Agreement, Novell Acquisitions, Inc., a wholly owned subsidiary of Novell, merged with and into USL.  The surviving company was also named UNIX System Laboratories and was a wholly owned subsidiary of Novell.  Novell operated the UNIX business through that subsidiary until April 1994, when post-merger USL merged into Novell.  Ex. 382 at 1-2; Ex. 383.

53.     Novell, Inc. and The Santa Cruz Operation, Inc. ("Santa Cruz")[2] entered into the Asset Purchase Agreement ("APA") as of September 19, 1995.  Contrary to IBM's assertion, the APA and associated documents granted Santa Cruz the UNIX copyrights, as set forth below.

---

2   The Santa Cruz Operation was historically referred to as "SCO" and many documents in this action use the term "SCO" in reference to that entity.  Accordingly, for clarity Santa Cruz Operation is sometimes referred to herein as "SCO."

IBM Mem. ¶ 35.

54.     Section 1.1 of the APA provides that:

> On the terms and subject to the conditions set forth in this
> Agreement, Seller will sell, convey, transfer, assign and deliver to
> Buyer and Buyer will purchase and acquire from Seller on the
> Closing Date (as defined in Section 107), all of Seller's right, title
> and interest in and to the assets and properties of Seller relating to
> the Business (collectively the "assets") identified on Schedule
> 1.1(a) hereto.  Notwithstanding the foregoing, the Assets to be so
> purchased shall not include those assets (the "Excluded Assets")
> set forth on Schedule 1.1(b).

IBM Ex. 123 at 1-2.

55.     Schedule 1.1(a) of the APA provides that:

> All rights and ownership of UNIX and UNIXWare, including but
> not limited to all versions of UNIX and UNIXWare and all copies
> of UNIX and UNIXWare (including revisions and updates in
> progress), and all technical, design, development, installation,
> operation and maintenance information concerning UNIX and
> UNIXWare, including source code, source documentation, source
> listings and annotations, appropriate engineering notebooks, test
> data and test results, as well as all reference manuals and support
> materials normally distributed by Seller to end-users and potential
> end-users in connection with the distribution of UNIX and
> UNIXWare . . .

IBM Ex. 123, Schedule 1.1(a) at 1.  The material transferred under Schedule 1.1(a) necessarily

includes the copyrights.

56.     Novell and Santa Cruz agreed to Amendment No. 2 to confirm that the UNIX

copyrights had transferred to SCO.  Amendment No. 2 of the APA provides:

> With respect to Schedule 1.1(b) of the Agreement, titled "Excluded
> Assets", Section V, Subsection A shall be revised to read:
>
> All copyrights and trademarks, <u>except for the copyrights</u> and
> trademarks owned by Novell as of the date of the Agreement
> <u>required for SCO to exercise its rights with respect to the</u>

23

> acquisition of UNIX and UNIXWare technologies. However, in
> no event shall Novell be liable to SCO for any claim brought by
> any third party pertaining to said copyrights and trademarks.

IBM Ex. 444 (emphasis added).

57.     Extrinsic evidence surrounding the APA further confirms that SCO obtained

Novell's UNIX copyrights through the APA.  (Ex. 39 ¶¶ 6-12; Ex. 40 ¶¶ 5-10; 12-16; Ex. 59).

Novell's internal documents also confirm that Santa Cruz had bought all of the UNIX business:

> We are obligated to give SCO [Santa Cruz] all information,
> contracts, assets etc. pertaining to the UNIXWare business and the
> old UNIX source code business.  They have bought it lock, stock
> and barrel.  Once the transaction is closed (Nov.-Dec.) we will
> have no more involvement with this business.  . . . If a contract is
> for UNIXWare and lets [sic] say NetWare, the UNIXWare part is
> theirs.

Ex. 136. (emphasis added).

58.     Near the end of 2002, SCO and Novell began discussing the Asset Purchase

Agreement and SCO's acquisition of the UNIX copyrights.  In these conversations,

representatives of Novell never stated or implied  that SCO did not own the UNIX and

UNIXware copyrights.  In fact, Novell  consistently agreed with SCO's statements that the

copyrights had transferred to SCO.  Ex. 165 ¶ 8-10.

59.     Moreover, SCO sent Novell a copy of Amendment No. 2, which Novell did not

have in its files and had not reviewed when it made these statements), Novell stated in a press

release dated June 6, 2003:

> Amendment #2 to the 1995 SCO-Novell Asset Purchase
> Agreement was sent to Novell last night by SCO.  To Novell's
> knowledge, this amendment is not present in Novell's files.  The
> amendment appears to support SCO's claim that ownership of
> certain copyrights for UNIX did transfer to SCO in 1996.

Ex. 332. Novell thus admitted that it does not own the copyrights at issue and acknowledged the

relevance of Amendment No. 2 on the question of copyright ownership.

     60.    In addition, paragraph 1.6 of the APA (aptly titled "License Back of Assets")

expressly contemplated the fact that Novell had transferred the copyrights to UNIX and

UNIXWare to SCO:

> Concurrent with the Closing, Buyer [Santa Cruz] shall execute a
> license agreement under which it shall grant to Seller [Novell] a
> royalty-free, perpetual, worldwide license to (i) all of the
> technology included in the Assets and (ii) all derivatives of the
> technology included in the Assets . . . (such licensed back
> technology to be referred to collectively as "Licensed
> Technology").  Seller [Novell] agrees that it shall use the Licensed
> Technology only (i) for internal purposes without restriction or (ii)
> for resale in bundled or integrated products sold by Seller which
> are not directly competitive with the core products of Buyer and in
> which the Licensed Technology does not constitute a primary
> portion of the value of the total bundled or integrated product.  The
> license agreement shall include reasonable provisions concerning
> Buyer's obligation to provide documentation and support for the
> Licensed Technology.  The license agreement shall also provide
> Seller with an unlimited royalty-free, perpetual, worldwide license
> to the Licensed Technology upon the occurrence of a Change of
> Control of Buyer described in Section 6.3(c) hereof.  In the event
> of a Change of Control of Seller (as defined in Section 6.6 hereof),
> the license granted pursuant to the license agreement shall be
> limited to Seller's products either developed or substantially
> developed as of the time of the Change of Control.

IBM Ex. 123 § 1.6.

     61.    Consistent with the transfer of the UNIX copyrights to Santa Cruz (through the

APA and as later clarified by Amendment No. 2), the Technology License Agreement ("TLA")

specified, in a section titled "Ownership," that:

> As between Novell and SCO:
> (1)    Ownership of Licensed Technology shall reside in SCO.
> (2)    Ownership of any modifications made to Licensed

> Technology pursuant to the licenses specified in Section II above
> shall reside in Novell.

Ex. 48 § III (emphasis added).

62.     Shortly after the closing of the APA, Santa Cruz obtained physical possession of UNIX copyrights; those copyrights remain in SCO's possession to this day.  Exs. 258-268.

63.     Ed Chatlos, the principal negotiator for Novell in the Novell-Santa Cruz transfer confirms that Novell and Santa Cruz both intended for the 1995 Asset Purchase Agreement to convey Novell's entire UNIX business, specifically including the UNIX copyrights, to SCO.  Ex. 39 ¶ 7.  In addition, Mr. Chatlos confirmed those facts during his deposition in this case.  Ex. 76 at 41:12-17.

64.     Santa Cruz's principal negotiator, Jim Wilt, also confirms that SCO intended to acquire the UNIX copyrights through the APA.  Ex. 40 ¶ 9.  Ms. Madsen of Santa Cruz and Mr. Bouffard of Novell further confirm that the parties must have intended to transfer the UNIX copyrights through the APA.  Ex. 50 ¶ 30; Ex. 38 ¶ 16.

REDACTED

65.     R. Duff Thompson, who was directed by Novell Chairman and CEO Robert Frankenberg to sell the complete UNIX business and related assets, testified that it was his understanding and intent, as the Novell executive responsible for the negotiation of the transaction, that the UNIX copyrights were transferred to Santa Cruz as part of the transaction that was closed in December 1995.  To that end, he signed on behalf of Novell the TLA with

Santa Cruz Operations in December 1995 which, among other things, granted Novell the right, with certain limitations set forth therein, to use the technology that we had just sold to Santa Cruz. If Novell had retained the UNIX copyrights as it now claims, there would have been no need for the TLA; indeed, Novell would have needed to grant Santa Cruz a license to the technology. Ex. 18 ¶¶ 4, 8.

66.    Moreover, during the course of the negotiations, and in his meetings with representatives of Santa Cruz, Mr. Thompson never represented that Novell was retaining the copyrights. Mr. Thompson did, however, inform the Santa Cruz team, including Mr. Mohan, that they were getting all of the assets except for three assets (none having to do with the UNIX copyrights). Because Santa Cruz was buying the entire UNIX business, including the source code, it was clear that they were getting the copyrights to that source code. Ex. 18 ¶ 9.

67.    Notably, IBM's own internal documents confirm that IBM considered Santa Cruz to be the owner of the UNIX copyrights.

REDACTED

Ex. 133 (emphasis added).

68.    In May 2001, Caldera International, Inc. ("Caldera International"), purchased from Santa Cruz its Professional Services and Server divisions and its UNIX-related assets.

27

IBM Ex. 221 ¶¶ 80, 106.  Santa Cruz had acquired these assets in 1995 from Novell.  IBM Ex.

123.  Novell, in turn, had purchased its rights from AT&T in 1993.  Ex. 4 ¶ 10.

69.     In the 1990s, and until May 2001, Caldera, Inc. and Caldera Systems, Inc. did not

have any rights to UNIX copyrights.  Ex. 269. ¶ 9.

1.     **UnitedLinux Joint Development Contract and General Public License Do Not Give IBM a License**

70.     In May 2002, Caldera International entered into a Joint Development Contract

("JDC") with Connectiva, Inc., SuSE Linux AG and Turbolinux to form UnitedLinux.  IBM Ex.

474 at SCO1170520.  IBM is not a party to the JDC.  Id.

71.                              REDACTED

72.                              REDACTED

73.                              REDACTED

74.     None of the disputed code was "developed pursuant to" the JDC.  All of the

disputed code was pre-existing at the time the JDC was signed in 2002.  Under the JDC, no pre-

existing code was to be contributed to the venture, except as specifically set forth in JDC Exhibit

28

C

75.     Under Exhibit C, Caldera's obligation to contribute pre-existing technology to the

Software was expressly limited to the following items:

**REDACTED**

IBM Ex. 474, Exhibit C at SCO1170569-70. Thus, all of the disputed code was pre-existing, and

Caldera International did not contribute any disputed code to the UnitedLinux project.

76.     In his sworn declaration, Andy Nagle, Product Manager of The SCO Group, Inc.,

states that:

> As stated, given my position on the Board of Managers, I had
> frequent and numerous interactions with representatives of the
> other Members.  One such representative was Markus Rex, who
> had helped negotiate the UL agreements for SuSE and was its Vice
> President of Engineering.  On several occasions during the course

of the project, Mr. Rex complained to me about Caldera's
unwillingness to contribute any UNIX technology. He told me that
during the negotiations SuSE had asked Caldera to contribute
certain UNIX technologies, but Caldera had refused, saying that it
might reconsider in the future under the terms of a separate
agreement. In my conversations with Mr. Rex during the course of
the project, I conveyed to him that Caldera's position had not
changed. Mr. Rex then expressed his displeasure at (as he viewed
it) Caldera's intransigence in refusing to make any UNIX
contributions. In those conversations, it was always clear that
SuSE understood that Caldera had not contributed any rights to its
UNIX technology under the JDC. If SuSE had known about and
sought authorization to use the UNIX technology that
unbeknownst to Caldera was already in Linux, then SuSE would
not have asked for contributions and complained about Caldera's
refusal to list any such technology in Exhibit C.

Ex. 233 ¶ 13.

77.    In his sworn declaration, Andy Nagle, Product Manager of The SCO Group, Inc.,

states that:

Based on my interactions with member representatives, all the
Members understood that Caldera did not agree to, did not intend
to, and in fact did not contribute any rights to its UNIX technology
to the UnitedLinux project. In my experience, the Members
understood that the UL [United Linux] agreements reflected
Caldera's decision not to contribute its UNIX technology. In the
time that I was involved with UnitedLinux, no one communicated
or manifested to me a different view. For example, neither the
Board of Managers nor the development engineers incorporated
into the project any Caldera pre-existing technology other than the
items specifically listed in Exhibit C. Indeed, despite Mr. Rex's
appeals for the UNIX technology, SUSE did not receive any UNIX
technology from Caldera.

Ex. 233 ¶ 14.

78.    The United Linux Agreement states that intellectual property in the Software

developed pursuant to the JDC "shall be assigned" to the LLC. However, to the extent, if any,

that the joint development effort gave rise to any assignable intellectual property, no member,

30

including Caldera International, ever executed any documents assigning such rights, and no such

assignments were ever requested:

> Other than specified Pre-Existing Technology, which was listed in
> Exhibit C of the JDC, and the Jointly Developed Technology,
> which was developed pursuant to the UnitedLinux project, the
> intellectual property that each Member separately owned was not
> intended to be assigned, and was not assigned, to the LLC or any
> of its Members.  That is, each Member fully retained its
> intellectual property rights in all its pre-existing technology (such
> as Caldera [International's] UNIX technology) not listed in Exhibit
> C of the JDC.  In face, neither SCO nor any other Member ever
> executed any type of assignment to the LLC.  Nor did any other
> Member ever even request any assignment from another Member.

Ex. 233 ¶ 15.

79.     This conclusion is confirmed by Ralph Yarro, who states in his declaration that,

"After Caldera International acquired the UNIX divisions in 2001 until Mr. Love left, the

company did not act to waive or otherwise relinquish any rights or protections to the core UNIX

intellectual property it acquired from Santa Cruz.  No authority or approval was granted by the

Board of Directors to do so at any time."  Ex. 269 ¶ 18.

80.     SCO distributed UnitedLinux from November 19, 2002, into early 2003, with

some carryover of support for existing Linux customers.  Ex. 233 ¶¶ 9, 16-17.

81.     SCO made no modifications or contributions to the disputed material that it

received from SuSE and merely redistributed that material without modification.  Ex. 233 ¶ 9.

82.     The material distributed by SCO under the UnitedLinux brand was contained on a

separate CD from the Linux kernel and was subject to its own End User License Agreement:

> More specifically, SCO distributed SCO Linux Server 4.0 in three
> compact disks.  SCO received two of those disks from SuSE and
> redistributed them without changing their content.  The third disk,
> received from SuSE as a template, was designated by UL [United

31

> Linux] as a value-add disk for each UL [United Linux] member,
> and it was on this disk that SCO included some additional
> packages. The entire Linux 2.4.19 kernel was included in the two
> unmodified disks.

Ex. 233 ¶ 11.

**F.**  **IBM Copies, Contributes To and Encourages the Reproduction, Distribution, and**
**Preparation Of Derivative Works Based On Linux**

83.    IBM has engaged in, induced, and contributed to the reproduction, distribution,

and preparation of derivative works based on the infringing Linux material, residing both in and

outside the Linux kernel. IBM has developed many Linux-related products, mainframes and

servers that run Linux; memory solutions for Linux environments; a broad range of software

offerings; providing Linux-related services that include deployment of Linux based e-business

environments, migration of database applications and data to Linux systems, support for Linux-

based cluster computing, server consolidation and a 24-hour technical engineering support line,

and otherwise encouraging third-parties to use the infringing Linux material. *See* Ex. 257; IBM

Ex. 586 at ¶ 4-6.

84.    In addition, IBM admits that it has made significant and valuable contributions to

the Linux kernel and the Linux environment." IBM Mem. at ¶ 99.

85.    Despite its extensive Linux activities, IBM seeks incredibly broad relief in its

Tenth Counterclaim, stating that:

> IBM is entitled to a declaratory judgment pursuant to 28 U.S.C. §
> 2201 that IBM does not infringe, induce the infringement of, or
> contribute to the infringement of any SCO copyright through its
> Linux activities, including its use, reproduction and improvement
> of Linux, and that some or all of SCO's purported copyrights in
> UNIX are invalid and unenforceable.

32

IBM Ex. 4 ¶ 173. In effect, IBM seeks a declaration from the Court "that the Linux kernel, the core of the operating system, does not infringe any copyrights owned by SCO." IBM Mem. at 1.

**G.     IBM Has No License To the Disputed Material In Linux**

       **1.     Strategic Business Agreement Does Not Give IBM a License**

86.

87.

REDACTED

88.

89.

90.

33

91.

**REDACTED**

92.    In 1999, Caldera Systems did not have any rights in UNIX System V, and as such it could not have given IBM any right to UNIX System V.  Ex. 269 ¶ 9.

**2.    SCO Granted No Rights Under OpenLinux Or The GPL**

93.    Caldera, Inc. distributed a product called OpenLinux.  IBM Mem. ¶ 43.

94.    The Engineering Program Manager for Caldera was not aware of and did not authorize the inclusion in any Caldera Linux distribution of any UNIX materials or any notice or other language indicating that Caldera granted any rights to those materials under the GPL or under any other "open source" license.  Ex. 233 ¶ 6.

95.    The Engineering Program Manager's job was to review and authorize for Caldera the inclusion of such materials and language, and it would have been incumbent on the engineering project managers at Caldera to seek the Engineering Program Manager's authorization.  Ex. 233 ¶ 6.

96.     The GPL only applies to material knowingly and properly licensed under the GPL by the copyright holder.  Specifically, § 0 of the GPL provides that, "This License applies to any program or other work which contains a notice <u>placed by the copyright holder</u> saying that it may be distributed under the terms of this General Public License." IBM Ex. 128 at 3.

97.     One of the limitations of the GPL requires that, "You may copy and distribute verbatim copies of the Program's source code . . . provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice and disclaimer of warranty . . ." IBM Ex. 128, § 1.

98.     The GPL further provides that, "[M]ere aggregation of another work not based on the Program with the Program (or with a work based on the Program) on a volume of a storage or distribution medium does not bring the other work under the scope of this License." IBM Ex. 128, § 2.

99.     Failure to comply with the limitations of the GPL terminates the license: "You may not copy, modify, sublicense, or distribute the Program except as expressly provided under this License.  Any attempt otherwise to copy, modify, sublicense or distribute the Program is void, and will automatically terminate your rights under this License." IBM Ex. 128, § 4 at 5. Section 7 of the GPL further provides that, "If you cannot distribute so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not distribute the program at all." IBM Ex. 128, § 7.

100.    Linux does not contain the appropriate copyright notices from the copyright owners because they were never provided.  Andy Nagle states in his declaration that:

> In my position as Engineering Program Manager for Caldera, I was
> not aware of, nor did I authorize, the inclusion in any Caldera

> Linux distribution of any UNIX materials or any notice or other
> language indicating that Caldera granted any rights to those
> materials under the GPL or under any other "open source" license.
> It would have been my job to review and authorize for Caldera the
> inclusion of such materials and language, and it would have been
> incumbent on the engineering project managers at Caldera to seek
> my authorization.  Furthermore, the inclusion of UNIX materials
> or such language would have violated Caldera's policy prohibiting
> the open sourcing of UNIX technology.

Ex. 233 ¶ 6.

101.    Consistent with Mr. Nagle's testimony, Dr. Cargill reviewed the history of Linux kernel patches from Linux 1.0 to Linux 2.6.17 searching for any language indicating that The Santa Cruz Operation, Inc. issued a license to material under the GNU General Public License ("GPL") or any other "open source" license prior to May 2001, or that Caldera International, Inc. or The SCO Group, Inc. released material under the GPL or any other "open source" license after May 2001.  Dr. Cargill found no such language in any Linux files.  Dr. Cargill feels that, had such language been incorporated into Linux files, he would have discovered such language.  Ex. 11 ¶ 17.

### 3.    "Spec 1170" and the Common API Agreement Give IBM No Rights

102.    Spec 1170 is a specification that governs certain "Common APIs for UNIX-based Operating Systems."  IBM Ex. 437.

103.    The license to X/Open was "intended to grant X/Open sufficient rights to modify, print and distribute the Specification."  IBM Ex. 437.

104.    The license specifically granted rights "all for the purpose of facilitating the X/Open Fast Track Process for Spec 1170 and to derive the X/Open Specifications therefrom."  IBM Ex. 437.

36

105.    Spec 1170 provides that, "Nothing in this Letter Agreement grants any right to claim that any derivative work of an X/Open specification is the official X/Open Specification without the express written consent of X/Open." IBM Ex. 437 § 4.

106.    Spec 1170 also provides that, "The Copyright Licensors and their third party suppliers retain ownership of all intellectual property in the Specification and nothing herein transfers or assigns any ownership therein to X/Open." IBM Ex. 437, § 1 (emphasis added).

107.    The API agreement is between IBM, HP, Sun, and Novell. IBM Ex. 482 at SCO1178200. It provides that "Whereas, the Parties have participated in an X/Open initiative to formulate a common API specification known as 'Spec 1170' for consideration by X/Open's membership for potential adoption as an official X/Open public specification for a base set of API's for UNIX-based operating systems . . ." Id.

108.    The API Agreement further provides that "each Party desires to obtain rights to use and distribute such portions of other Parties' operating system programs, to enable it to more quickly and efficiently develop and commercialize versions of its UNIX-based operating system(s) which comply with Spec 1170, to the benefit of its customers and the industry . . ." IBM Ex. 482 at SCO1178200.

109.    Section 3.10 governs the scope of the license granted under § 3.5. A subsection to that provision provides that:

> to the extent necessary to exercise the copyright licenses granted
> by the licensor Party as to the Code of the licensor Party's
> deliverables or Derivative Works substantially based upon such
> code, and solely in connection with the exercise of such copyright
> licenses; but only to the extent that (a) such Code or such
> Derivative Work is a functional part of a software program which
> contains a substantial part of the Code of the licensee Party's
> release of a UNIX-based operating system and (b) such Code of

37

> the licensor Part's deliverables would have infringed the same
> claim or claims of the same patent.

IBM Ex. 482 at § 3.10(a)(i).

110.    Section 7.1 of the API Agreement provides that, "The term of this Agreement
shall begin on the Effective Date and shall expire on June 30, 1994, unless earlier terminated as
provided below." IBM Ex. 482 at § 7.1.

111.    Section 7.4 of the API Agreement contains the following language regarding what
provisions of the agreement survived expiration, which suggests that the version of the
agreement relied upon by IBM is either not the final version or was not properly executed:
"[**NOTE:** need to check these sections near final draft] . . ." IBM Ex. 482 at § 7.4 (emphasis in
original).

112.    The API Agreement relied upon by IBM is not executed.  IBM Ex. 482 at
SCO1178216.  The exhibit contains what appears to be an incomplete facsimile transmission that
does not reproduce a complete executed version of the agreement.  Id. at SCO1178218-21.

### 4.    Facts Relating To the TIS Specification

113.    By letter agreement dated November 30, 1993, Novell transferred certain rights to
the TIS Committee.  IBM Ex. 569 at SCO1818388-89.  Specifically, the letter provides that,
"UNIX System Laboratories (USL) Inc. hereby grants to the TIS Committee and the TIS
Committee hereby accepts the following, with respect to the ELF Specification as specified in
appropriate sections of the following USL ABI documents:

- the System V Application Binary Interface, Third Edition, and

- the System V Application Binary Interface, Intel® Architecture Processor
  Supplement"

38

IBM Ex. 569 at SCO1818388 (emphasis added).

114.    The letter further provides that:

> A fully paid up world-wide, non-transferable, irrevocable,
> perpetual license under USL's intellectual property copyrights to
> use, copy, display, publish, modify, and create derivative works or
> have derivative works created and sublicense such specification.
> The information contained in the ABI documents may be used by
> the TIS Committee providing USL is given appropriate copyright
> recognition. The TIS specification shall not be made a commercial
> revenue generating publication nor can it be used as a substitute for
> the USL ABI documents. Fees not to exceed the cost of copying
> and handling may be charged by the TIS Committee for
> distribution of its specifications[.]

IBM Ex. 569 at SCO1818388.

115.    The TIS Specifications provide that, "The TIS Committee grants you a non-exclusive, worldwide royalty-free license to use the information disclosed in the Specifications to make your software TIS-compliant; no other license, express or implied, is granted or intended hereby." IBM Ex. 438 at 2; IBM Ex. 439 at 2.

116.                        REDACTED

117.                        REDACTED

118.    Portions of the ELF code in Linux could only have come from System V and not the TIS Specifications. Ex. 276 at 10, 14; Ex. 22 at 202:14-203:3.

**H.    Facts Relating To IBM's Equitable Estoppel Claim**

119.    In or around 1998, IBM began negotiating with Santa Cruz to undertake a joint

development project for, among other things, a UNIX-like operating system that would run on the IA-64 platform. This project subsequently came to be known as "Project Monterey". IBM Exs. 24, 25, 123, 86 ¶ 54, 259 at 30-31.

120.    Both IBM and Santa Cruz were interested in attempting to leverage and strengthen their existing UNIX-like operating system products as part of Project Monterey. The goal was to develop and market a "family" of UNIX-like operating system products, headed by a jointly developed "Monterey/64" operating system for the IA-64 Intel processor, which would run on IBM's proprietary "Power" processor architecture and on the IA-32 architecture. IBM Exs. 23, 24, 25, 245. For further technical details of Project Monterey, see SCO's Memorandum In Opposition To IBM's Motion For Summary Judgment On SCO's Unfair Competition Claim at ¶¶16-78.

121.    On October 26, 1998, IBM and Santa Cruz entered into the Joint Development Agreement ("JDA"), whereby Santa Cruz and IBM agreed to enter into a joint venture to pursue these goals. IBM Ex. 245; See SCO's Memorandum In Opposition To IBM's Motion For Summary Judgment On SCO's Unfair Competition Claim at ¶¶16-78.

122.

**REDACTED**

123.

124.    In March of 1999, during the course of the IBM-Santa Cruz joint Project

Monterey venture, IBM publicly announced its decision to embrace Linux at the LinuxWorld event. IBM Ex. 21 at 4. Soon thereafter, IBM opened the Linux Technology Center to make technical contributions to Linux. Ex. 104 at 30:5-7; Ex. 2 at 24:5 - 25:15. At the time, Santa Cruz owned UNIX and had no connection with Caldera, which did then distribute Linux.

125.    Mr. Frye, founder and head of the Linux Technology Center, states in his declaration that, IBM decided to invest in Linux due, at least in part, to the existence and activity of SCO [apparently referring to Caldera, not Santa Cruz] and other commercial Linux distributors. IBM Ex. 586 ¶ 6. IBM then argues, based in part on this statement in Mr. Frye's declaration, that IBM believed SCO had waived its intellectual property rights with respect to Linux. IBM Mem. at 84. However, the then-owner of UNIX (Santa Cruz) had no involvement with Linux at that time, and IBM knew it because, as Santa Cruz's partner in Project Monterey, IBM was well aware that Santa Crux had no intention of waiving its proprietary rights. Ex. 17 ¶ 9; See SCO's Memorandum In Opposition To IBM's Motion For Summary Judgment On SCO's Unfair Competition Claim at ¶¶16-78.

126.         REDACTED

127.    Mr. Frye also states in his declaration that IBM undertook its Linux business strategy, and made contributions to Linux, in the "good faith belief that these activities were permissible." IBM Ex. 586 ¶ 5. This unsupported assertion is similarly undercut by Mr. Frye's

deposition testimony.

128.

REDACTED
129.

130.

131.

132.        REDACTED

133.        REDACTED

134.        REDACTED

135.    At the time when the Swartz memo was developed, Santa Cruz was not involved in the then-fledgling Linux business.  IBM has not submitted <u>any</u> evidence showing that Santa Cruz did anything prior to IBM's March 1999 decision to begin its Linux activities upon which IBM could have relied. *See* IBM Mem. ¶¶ 40-41, 54, 59-60, 63, 66, 69-71, 85-87.

136.    Despite being informed about the possibility that Linux code was derived from UNIX, Santa Cruz elected not to initiate any legal action, in substantial part because IBM assured SCO that Linux was not an economic threat and the two companies were developing Project Monterey.  IBM falsely assured Santa Cruz that it was "strongly committed" to Project Monterey and that is Linux initiative was no threat to the joint project, because Linux would be positioned for "low end" users while the Monterey operating system would be for enterprise-

43

REDACTED                                    See SCO's Memorandum In Opposition To

IBM's Motion For Summary Judgment On SCO's Unfair Competition Claim ¶¶ 16-78.  See also

Ex. 386 ¶ 10.

137.    In fact, however, IBM was secretly planning to terminate Monterey and to harden

Linux for use by "high end" enterprise users.  IBM strung Santa Cruz along and paid lip service

to Monterey because it did not have a license for Santa Cruz's SVr4 UNIX code, which it needed

to enhance Linux and its own AIX for Power operating system, which was losing market share to

Sun's Solaris (which was based on SVr4, the most recent version of UNIX, because Sun, unlike

IBM, had paid Santa Crux for a license to use SVr4).  See SCO's Memorandum In Opposition

To IBM's Motion For Summary Judgment On SCO's Unfair Competition Claim ¶¶16-78.

138.    During this time, Linux's capabilities began to expand under the tutelage of IBM.

The first test release of the Linux 2.4 kernel occurred on May 25, 2000.  Ex. 352 at 1.  IBM

continued to enhance both Linux and AIX for Power with SVr4 code obtained from Santa Cruz,

even thought IBM well knew that it was not permitted to use this code except for development of

the Monterey operating system.  See SCO's Memorandum In Opposition To IBM's Motion For

Summary Judgment On SCO's Unfair Competition Claim at ¶¶ 16-78.

139.    Under the Monterey JDA, as amended, IBM would earn a license to use SVr4

code in its other products if, but only if, it released a functional, generally available version of

the Project Monterey operating system.  IBM needed and wanted to keep the SVr4 code it had

misappropriated, but it also wanted to terminate Monterey and focus on Linux.  Thus, it covertly

executed a malicious ruse.  IBM knew that Santa Cruz was selling the UNIX to Caldera, and it

duped both Caldera and Santa Cruz into believing that IBM would consent to the transfer, as

44

required by the JDA.  Then, even though the Project Monterey operating system was still totally

non-functional and did not even include a compiler (an essential part of a computer operating

system, IBM decided to render a sham PRPQ (limited access, beta test version for software

developers) of the product as a pretext to claim a license to use SCO's SVr4 code.

REDACTED

On the same day, IBM purported to make available the first "generally

available" version of the SVr4-enhanced AIX 5L for Power.  Ex. 82.  Then, shortly after the

closing, and contrary to its prior conduct, IBM invoked and cancelled the JDA.  Ex. 207; See

SCO's Memorandum In Opposition To IBM's Motion For Summary Judgment On SCO's Unfair

Competition Claim ¶¶ 16-78.

140.    In light of IBM's pre-closing conduct, IBM's cancellation was a major shock and

disappointment to Caldera, since the joint venture with IBM was critically important to Caldera's

decision to acquire SCO's UNIX assets and Caldera had fully expected to proceed with IBM on

Project Monterey.  Ex. 269 ¶ 8; Ex. 362 ¶ 13; Ex. 386 ¶¶ 10-11.

141.    In the wake of IBM's pull-out from Project Monterey, Caldera (the new owner of

the UNIX assets) began to retrench in order to preserve its UNIX intellectual property assets in

the face of mounting competition from IBM-backed Linux.[3]  In 2002, the year after the UNIX

acquisition, this new threat was crystallized by the fact that, "[c]ustomers were using . . .

proprietary UNIX libraries with Linux."  Ex. 165 ¶ 3.  SCO embarked upon an initiative to

license these customers under its UNIX rights.  Ex. 165 ¶ 3.  Although other major companies

---

[3] Although Caldera, unlike Santa Cruz, was a Linux distributor, Caldera took care to distinguish its two
distinct lines of business (proprietary UNIX and open sourced Linux) and protect its proprietary
UNIX rights.  IBM Ex. 324 at 63:13-64:11