had no objection, IBM vehemently demanded that SCO halt the program.  Ex. 165 ¶ 4.

142.    As relations between SCO and IBM became increasingly strained, SCO's CEO

had a number of contacts with upper management at IBM.  During the course of this contact, Mr.

McBride recounts that:

> Also in January of 2003, I learned from Karen Smith of IBM that
> IBM had looked into the question of SCO's ownership of the
> UNIX copyrights, and had concluded that SCO had not acquired
> the copyrights from Novell.  Ms. Smith stated that IBM lawyers
> had examined the APA.  She also implied that IBM had sought
> assurance from Novell that the APA had not transferred the
> copyrights to SCO.  This exchange occurred in the context of and
> followed my notification to her that SCO was contemplating suing
> IBM for the breach of its licensing agreement.

Ex. 165 ¶ 12.  Shortly thereafter, SCO filed this lawsuit.

**F.    Other Material Facts**

143.                                    REDACTED

144.    In its Second Amended Counterclaim, IBM seeks a declaration that all Linux

activities, including those of third parties, do not infringe SCO's copyrights.  IBM Ex. 4 ¶ 173.

145.                                    REDACTED

146.    Prior to IBM's contributions to Linux, it was essentially a hobbyist machine, not

capable of handling enterprise workloads.  IBM systematically identified and set about

correcting these deficiencies as part of its Linux strategy.  Ex. 287 at 31-32.

147.


**REDACTED**


148.    In his sworn declaration, Robert Bench, former Chief Financial Officer for SCO, states, "SCO did not make any conscious decision to allow Linux users and developers to use SCO's copyrighted core UNIX technology, and, in my view, it would not be accurate to say that SCO ever waived any of its core UNIX System V copyrights with respect to the use and development of Linux.  Any such broad waiver of UNIX System V copyrights would have also required Board involvement and approval, and that never happened."  Ex. 6 ¶ 14.

149.    In his sworn declaration, Ralph Yarro, the Chairman of the Board of Directors for the SCO Group, states "Caldera International never made any decision, let alone a conscious decision, to permit IBM to use UNIX-related intellectual property to develop open-source contributions for Linux or otherwise in violation of its license agreements, or to permit the use or distribution of Linux where that operating system might have violated Caldera International's UNIX rights.  Ex. 269 ¶14.

150.    Furthermore, Caldera, Inc. which was formed in 1994, and Caldera Systems Inc. did not have any rights to the UNIX copyrights.  IBM Ex. 221.

151.    Caldera International formed in 2001 and became the parent company of Caldera Systems, Inc. ("CSI") as part of a holding company reverse merger transaction (the "Merger Transaction").  IBM Ex. 221.

152.    The Santa Cruz Operation, Inc. ("Santa Cruz") formed in 1978.  Concurrently with the Merger Transaction in 2001, Santa Cruz sold certain stock and assets, including the copyrights at issue in this case.  Santa Cruz was not a party to the Merger Transaction, rather the acquisition of certain stock and assets from Santa Cruz by Plaintiff was distinct from the Merger Transaction.  Ex. 351 ¶ 2.

153.    In 2002, Caldera International changed its name to The SCO Group, Inc.  For the court's reference, Caldera International, The SCO Group, Inc., and Plaintiff refer to the same company.  Ex. 269 ¶ 7.

## ARGUMENT

**A.**     **SCO's Copyrighted Works Are Valid and Were Copied By IBM**

      **1.**     **SCO's Copyrights Are Valid and Enforceable**

As the party seeking declaratory judgment on its Tenth Counterclaim, IBM bears the

burden of proof. Steiner Sales Co. v. Schwartz Sales Co., 98 F.2d 999, 1011 (10th Cir. 1938);

Wuv's International, Inc. v. Love's Enterprises, Inc., No. 78-F-107, 1980 WL 30296 (D. Colo.

Nov. 4, 1980) (attached hereto as Exhibit A).  It is undisputed that SCO holds registration

certificates in certain versions of UNIX, including SVr4.[4] (¶ 14).  "By presenting a registration

certificate a party establishes the validity of the copyright prima facie and the burden to dispute

the validity of the copyright then shifts to the party challenging it."  Autoskill, Inc. v. Nat'l

Educ. Support Sys., Inc., 994 F.2d 1476, 1487 (10th Cir. 1993) (citing Harris Market Research v.

Marshall Mktg. & Communications, Inc., 948 F.2d 1518, 1526 (10th Cir. 1991)).

      **a.**     **SCO Obtained the Copyrights To UNIX From Novell**

IBM improperly attempts to shift the burden of ownership onto SCO, claiming that it is

entitled to summary judgment "because SCO has failed to adduce adequate evidence of

ownership."  IBM Mem. at 76.  IBM has not challenged the validity of SCO's registrations.

Instead, it argues that "Novell retained the UNIX copyrights, and did not transfer them to Santa

Cruz, pursuant to the APA."  IBM Mem. at 77.  IBM's attempt to muddy SCO's chain of title is

disingenuous; at best, it creates a disputed issue of material fact.

---

[4]    SCO's copyright registrations in these UNIX operating systems allow it to bring a copyright
infringement claim that covers copyrightable material that was originally introduced in prior AT&T
UNIX versions and later incorporated into the operating systems covered by such registrations.  See
Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 283-84 (4th Cir. 2002); Apple Computer, Inc. v.
Microsoft Corp., 35 F.3d 1435, 1446-47 (9th Cir. 1994).

In fact, IBM is not entitled to challenge the chain of title at all, as this is the subject of a pending case between Novell and SCO that will resolve the matter, and IBM has no standing to challenge it. See e.g., Lyrick Studios, Inc. v. Big Idea Prods., Inc., 420 F.3d 388, 394 (5th Cir. 2005) ("[C]ourts are hesitant to allow an outside infringer to challenge the timing or technicalities of the copyright transfer."); Sunham Home Fashions, LLC v. Pem-American, Inc., 2002 WL 31834477 at * 7 (S.D.N.Y. Dec. 17, 2002) (attached hereto as Exhibit B) (a third-party defendant does not have the right to challenge supposed defects in an agreement transferring copyrights to a plaintiff); Hart v. Sampley, Civ. A. No. 91-3068 (CRR), 1992 WL 336496 at * 1 (D.D.C. June 24, 1991) (attached hereto as Exhibit C) ("Even if, as defendants suggest, the transfer was in some way defective, the defendants would not have standing to challenge the validity of the transfer because they were not parties to the agreement.").

However, even if IBM does have standing to contest SCO's ownership of these copyrights, its argument must fail. Facts establishing SCO's ownership of copyright are set forth in the Statement of Facts above. (¶¶ 48-70). The arguments based on these facts and the law in SCO's Response to IBM's Motion for Summary Judgment on Copyright Infringement, where IBM makes the same argument, are not repeated here, but are incorporated by reference.

### b.    SCO Did Not Transfer Its Copyrights In the Disputed Material To UnitedLinux

In addition to its argument that SCO never obtained copyrights to UNIX from Novell, IBM argues alternatively that SCO transferred its copyrights in the disputed material to UnitedLinux under the Joint Development Contract ("JDC"). The JDC was an agreement entered into between four companies—SuSE, TurboLinux, Connectiva and SCO—to form an LLC and develop a uniform Linux distribution. (¶ 70). IBM is not a party to the JDC. Id. The

JDC only conferred on the parties' rights to                    REDACTED

Because the UNIX technology at issue falls into neither of these categories, IBM's JDC argument fails. The parties did not intend that SCO give up its most valuable asset, from which SCO derived over 90% of its revenue, as the price for participation in this modest venture; in fact, at the time no one even knew that any proprietary UNIX technology was in Linux. (¶ 149).

The copyrighted code at issue in this case was pre-existing at the time the JDC was signed.                    REDACTED

IBM

(¶ 75). None of the disputed code is listed in Exhibit C, and this means SCO did not transfer it. This conclusion is even clearer in light of the undisputed evidence that another LLC member, SUSE, specifically asked SCO to include certain UNIX technology in Exhibit C, and SCO expressly declined, with the comment that SCO might reconsider later in the context of a separate agreement. (¶ 76).

During the course of the project, SuSE again asked SCO to contribute some UNIX code (evidencing SuSE's recognition that the code had not been contributed under the JDC), and SCO again declined, much to SuSE's disappointment. (¶ 77). Thus, while the plain language of the JDC forecloses IBM's argument, the extrinsic evidence is even clearer. At the least, there is a fact issue as to the parties' intent.

REDACTED

(¶ 73)

51

(emphasis added). The development of UnitedLinux began with the Linux 2.4 kernel, which was not developed pursuant to the JDC. (¶ 71-72). Accordingly, the JDC could not have conveyed any intellectual property interest in the Linux 2.4 kernel, which was outside of the control of the parties to the JDC.

Finally, even if the JDC could somehow be interpreting as requiring all members of UnitedLinux to contribute their intellectual property rights in all of the code contained in UnitedLinux 1.0—albeit unwittingly—IBM proffers no evidence that SCO ever made such a transfer.            REDACTED

SCO never made such a transfer, neither did any other member, and no one ever requested such an assignment. (¶ 148, 149, 78, 79).

## 2.      **IBM Copied the Infringing Material**

As an initial matter, although IBM seeks to "put an end to the fear, uncertainty and doubt created by SCO's allegations" by seeking a "declaration from this Court that the Linux kernel . . . does not infringe copyrights owned by SCO," it makes no attempt to prove up that claim. IBM Mem. at 1. The substance of IBM's motion focuses only on the literal source code copying identified in SCO's disclosures of December 22, 2005, and principally argues that IBM has a license to that material. In effect, IBM seeks a clean bill of health for the entirety of Linux, including each of its approximately 11,717 individual files and 5 million lines of code. However, without cataloguing the literal and non-literal elements of Linux as to which IBM seeks a declaration of non-infringement, IBM cannot possibly meet its burden of proof on its sweeping counterclaim.

IBM copied material from SCO's protected works if it infringes SCO"s exclusive rights to use, copy, distributed and prepare derivative works of its copyrighted material. See Gates Rubber Co. v. Bando Chem. Ind., Ltd., 9 F.3d 823, 832 n. 6 (10th Cir. 1993). If Linux infringes SCO's copyrights and IBM copied, contributed to, or induced the reproduction, distribution, and preparation of derivative works based on Linux, it is liable for infringement. 17 U.S.C. § 106(1)-(3); MGM Studios v. Grokster, 545 U.S. 913, (2005). IBM concedes that it has done so through its use, development, and extensive marketing for sale of Linux. (¶ 83).

### a.    Linux Infringes SCO's Copyrights

Copying can be proven either by direct evidence of copying or indirectly by establishing (1) that the Linux authors had access to the infringed work, and (2) that probative similarities indicative of copying exist between Linux and SVr4. Gates Rubber Co., 9 F.3d at 832-33. IBM concedes that Linux intended to copy the salient features of UNIX. (¶ 23). Furthermore, the principal developer and architect of Linux concedes that he had access to, and copied the infringed SVr4 material from, publicly available manuals and textbooks. (¶ 17). With access to these materials, Linux copied UNIX at both a literal level (e.g., the source code or object code) and at a non-literal level (e.g., "the organization of the program into modules and subroutines, and the interrelationships among them"). Ex. 98 at 5, n.5. The comprehensive expert reports of Thomas Cargill establish such copying and constitutes evidence sufficient to create a triable issue of fact on these points. (¶ 31).

Given the substantial probative similarities between the SVr4 and Linux material, including numerous instances of non-literal copying as well as segments of identical and nearly-identical source code, there is at least a disputed issue of material fact as to whether indirect

copying occurred.[5]  In fact, one of IBM's experts concedes that similarities in the English comments, useless code, and data structures between two works are highly probative of copying. *See* Randall Davis, The Nature of Software and its Consequences for Establishing and Evaluating Similarity, 5 Software L.J. 299, 317-20 (1992).  Despite recognizing the utility of such an approach, IBM's expert was instructed not to consider these similarities. (¶26, 27, 30).

IBM's experts do not dispute that the infringing Linux material was copied from one or more of the many widely-distributed documents that reproduce or intimately describe the literal and non-literal elements of the infringed SVr4 material.  (¶ 28).  Rather, IBM and its experts attempt to characterize such copying as "independent creation." See IBM Mem. at 77-78, ¶¶ 283, 285; (¶ 28).  However, copying protected material from reference texts is legally equivalent to copying directly from SVr4 source code.  See Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 522-23 (5th Cir. 1994) ("Copying a copy of copyrighted materials is a cognizable contravention of the Copyright Code.") (citing Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1074 (2d Cir. 1992)); Twin Peaks Prods., Inc. v. Pubs. Int'l., Ltd., 996 F.2d 1366, 1372-73 (2d Cir. 1993) (detailed description of non-literal elements constitutes copying of such elements).

### b.   IBM's Linux Activities Infringes SCO's Copyrights

IBM copies Linux onto its machines and contributes to the Linux code base.  (¶ 83). Such activities constitute "copying" of the infringed SVr4 material that was previously copied

---

[5]   A high degree of similarity between the infringing and infringed material permits an inference of copying even where access is not demonstrated.  Gates Rubber, 9 F.3d at 833, n. 9.  Conversely, where a high degree of access is shown, a lesser degree of similarity is needed to show copying.  Id.; see also Engineering Dynamics, Inc. v. Structural Software, Inc., 46 F.3d 408, 410 (5th Cir. 1995) (Less overall similarity between works is required where constituent elements of works are reproduced with great similarity.).

into Linux. 17 U.S.C. § 106; <u>Gates Rubber</u>, 9 F.3d at 832 n. 6; <u>Stenograph L.L.C. v. Bossard</u> <u>Assoc., Inc.</u>, 144 F.3d 96, 100 (D.C. Cir. 1998) (interpreting the Copyright Act as holding that loading copyrighted material onto a computer constitutes "copying"); <u>Vault Corp. v. Quaid</u> <u>Software Ltd.</u>, 847 F.2d 255, 260 (5th Cir. 1988). Furthermore, IBM's provision of Linux products and services, along with its advertisement of the same, constitutes knowing inducement and contribution to the reproduction and distribution of Linux by third parties, which also infringes on SCO's exclusive rights as the copyright holder. <u>See</u> <u>MGM Studios</u>, 545 U.S. (2005); <u>Gates Rubber</u>, 9 F.3d at 832 n. 6.

### 3.   Copying Is a Fact Issue Inappropriate For Summary Judgment

Whether or not the infringed SVr4 material was copied into Linux is a question of fact and the proper subject of expert testimony. <u>Gates Rubber</u>, 9 F.3d at 832; <u>Repp v. Webber</u>, 132 F.3d 882, 890-91 (2d Cir. 1997) (reversing grant of summary judgment due to conflicting expert testimony regarding whether allegedly-infringing work was copied from allegedly-infringed work). IBM's only reference to its expert reports on this issue are to support its misguided "independent creation" argument. <u>See</u> IBM Mem. at 77-78, ¶¶ 283, 285; (¶ 28). In fact, IBM's experts do not even opine whether the infringing Linux material was likely copied from the infringed SVr4 material. (¶ 26, 27). SCO's expert has opined that such copying has occurred, thus presenting a triable issue. (¶ 29).

### B.   Linux Is Substantially Similar To UNIX SVr4

IBM's motion and contention that Linux is not substantially similar to SVr4 must be denied for three reasons. <u>First</u>, IBM has never addressed, either in its motion or its expert reports, SCO's legal theory that Linux infringes SVr4 as a collective work. Under that theory, it

does not matter if any particular element is protectible under the copyright law because SCO still has a property interest in the selection, arrangement and coordination of those elements. <u>Second</u>, IBM has never addressed, and instructed its experts not to consider, non-literal elements of comparison between Linux and SVr4 as required under <u>Gates Rubber</u>. Specifically, IBM instructed its experts not to perform the abstraction portion of the abstraction-filtration-comparison test adopted by the Tenth Circuit in <u>Gates Rubber</u>. <u>Third</u>, as to literal comparisons, IBM applies the incorrect legal standard for filtering SCO's protected material. These omissions in IBM's motion—each discussed below—are, in themselves, sufficient to deny its motion for summary judgment.

### 1.   Linux Infringes SVr4 As a Collective Work

SCO's copyrights in SVr4 cover both the component elements of SVr4 and the original manner in which those elements were selected, arranged, and coordinated as a collective work. (¶ 14). SCO's copyrights in the System V works are compilations that embody original selection, arrangement, and coordination of component elements that are independently protected works under copyright law. <u>Transwestern Publishing Co. LP v. Multimedia Marketing Assocs., Inc.</u>, 133 F.3d 773, 780 (10th Cir. 1997) ("A collective work for copyright purposes is still a compilation, but one 'in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.'"); <u>Feist Publications, Inc. v. Rural Tel. Service Co.</u>, 499 U.S. 340 (1991). As the owners of copyrights in System V materials, SCO may recover damages for infringement of the collective work as well as the individual component. <u>Educational Testing Servs. v. Katzman</u>, 793 F.2d 533, 539 (3d Cir. 1986); <u>Triangle</u>

<u>Pubs., Inc. v. Knight-Ridder Newspapers, Inc.</u>, 626 F.2d 1171, 1174 n. 8 (5th Cir. 1980);

<u>Markham v. A.E. Borden Co.</u>, 206 F.2d 199, 202 (1st Cir. 1953).

IBM did not even address SCO's collective work claim in its motion, although it has previously moved to exclude Dr. Cargill's references in his expert report on the grounds that it was not in the December 22, 2005, Disclosures ("December Disclosures"). As SCO has responded, IBM's position erroneously presumes that SCO was required to articulate its legal theories in the December Disclosures. Those legal theories are embodied in the Tenth Circuit's copyright test, which requires that a court in a software copyright case "compare the whole works" at issue.[6] <u>Gates Rubber</u>, 9 F.3d at 832 n.7. As an amicus in <u>Gates Rubber</u>, IBM argued that the test for substantial similarity requires that "the trier of fact . . . examine the work as a whole." Ex. 98 at 4. In fact, according to IBM, this holistic comparison is essential to avoid the piecemeal undercutting that IBM has attempted in its summary judgment motion:

> The failure . . . to examine and compare works as a whole as part of a determination of substantial similarity is one of the most striking shortcomings of [the <u>Computer Associate</u> Court's] approach. By specifying that works are compared only after all unprotectible elements have been filtered out, the court permits no opportunity to view the entire work.
>
> The danger of this approach becomes even more evident when extrapolated to a work, like a purely factual compilation, all elements of which are individually unprotectible. After the court's filtration step, nothing would remain, so there would be nothing to compare. . . . The interrelationships that constitute selection and

---

[6]    SCO's collective work theory flows from its December Disclosures; IBM concedes that the header files, Streams, and ELF were all disclosed. IBM Mem. at 49, ¶ 182. IBM elected not to dispute any of the facts related to the collective work theory as to those pieces, which would apply even if IBM obtained a license to the pieces themselves. The fact that IBM chose not to respond to at least those portions of SCO's claim means that IBM cannot meet its burden of showing that no material facts are in dispute, and its motion should be denied.

> arrangement simply disappear when the individual unprotected
> elements are isolated and removed.

Ex. 98 at 13-14. Clearly, a comparison of the whole work is essential. The composite work theory is properly advanced in SCO's expert reports and constitutes an independent basis of liability for infringement that IBM must counter before being in a position to prevail on its Tenth Counterclaim.

### 2. Linux Infringes Non-literal Elements Of SVr4

Copyright law does not protect abstract ideas or concepts. Gates Rubber, 9 F.3d at 836-37; 17 U.S.C. § 102(b). However, copyright protection for literary works is not limited to literal, textual expression, "else a plagiarist would escape by immaterial variations." Nichols v. Universal Pictures Co., 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.), cert. denied, 282 U.S. 902 (1931). Copyright also protects non-literal expression, such as the selection, coordination, and arrangement of elements that make up the structure, sequence, or plot of a computer program. Gates Rubber, 9 F.3d at 836-37; see also Feist, 499 U.S. 340, 357 (1991); Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 535-37 (5th Cir. 1994); Twin Peaks, 996 F.2d at 1372-73; Kregos v. Associated Press, 937 F.2d 700, 704-05 (2d Cir. 1991) (original selection of 9 baseball statistics to include in pitching forms constitutes protectible expression).

IBM instructed its experts not to perform the non-literal analysis required by Gates Rubber, which directly contradicts the viewpoint it previously espoused as an amicus. (¶ 30). In Gates Rubber, IBM's amicus brief conceded that, "The issue in this appeal is not whether non-literal elements of programming expression are protected by copyright-they are." Ex. 98 at 3. In fact, IBM was very clear that, "[T]he expression in non-literal elements of computer programs—

elements beyond the literal source or object code—are protectible under copyright law."
Ex. 98 at 5.

In spite of the fact that SCO's expert performed extensive non-literal comparisons between UNIX SVr4 and Linux, IBM does not address these points. Instead, IBM confines its argument to the literal source code copied from SVr4 into Linux, which is a sufficient basis to deny its motion as a matter of law. By contrast, SCO submits ample evidence demonstrating that non-literal aspects of the infringed SVr4 material were copied into Linux and that such material is protectible. (¶ 31). IBM's failure to address this aspect of the case, in spite of the fact that it previously advocated for the very law it now seeks to avoid, creates a question of material fact that precludes summary judgment.

3.    **Linux Infringes Literal Elements Of SVr4**

Having skipped the abstraction step of the abstraction-filtration-comparison test, IBM attempts to filter all of the literal copying of source code from SVr4 on the theory that it (1) is unprotectible under the *scenes a' faire* doctrine, (2) constitutes mere abstract ideas or is merged with ideas, (3) is unoriginal, and (4) represents an insubstantial amount of code. In doing so, IBM applies the law incorrectly.

First, IBM argues that the infringed SVr4 material is unprotectible under the *scenes a' faire* doctrine, which denies copyright protection if the protected expression is dictated by external constraints at the time it was created by the author of such material. Mitel, Inc. v. Iqtel, Inc., 124 F.3d 1366, 1375 (10th Cir. 1997). IBM claims that the infringed SVr4 code was dictated by "(1) compatibility requirements, (2) industry standards, (3) programming practice,

and (4) industry demand, as is described in the expert reports and declarations of Professors Brian Kernighan and Randall Davis." IBM Mem. at 89.

IBM and its experts apply the law improperly by relying on externalities that constrained the choice of expression in the _infringing_, rather than _infringed_, work and fail to specify what elements of the infringed SVr4 material were supposedly dictated by the cited "external constraints." (¶ 32). In fact, the infringed SVr4 material was _not_ dictated by any external constraints at the time it was created. (¶ 33).

Whether external constraints affected Linux's decision to copy material is irrelevant to whether such material is protectible under the _scenes a' faire_ doctrine. Mitel, 124 F.3d at 1375. Instead, the expression should only be filtered if it was dictated by external constraints or the nature of the subject matter, or was stock, standard, or common, _at the time the author of the work created such expression_. Id. This is due, at least in part, to the fact that the _scenes a' faire_ doctrine is grounded in the originality doctrine. Where a purported "author" uses expression that is dictated by external constraints or otherwise inherent in the subject matter, such expression can hardly be deemed "original" to the author, because the author has no real choice in the matter. See Gates Rubber, 9 F.3d at 838.

On that basis, "industry demand" for Linux to be compatible with application programs written for SVr4 does not justify Linux's copying:

> The Court confesses some puzzlement with the apparent attractiveness of this commercial compatibility argument in the computer software copyright arena. It is not an argument that would even be attempted in the traditional areas of copyright. ("In order to sell colored pieces of cardboard, market factors required that I duplicate the appearance of Pokemon/Yu-Gi-Oh/Magic Cards in order to be successful").

60

Positive Software Solutions, Inc. v. New Century Mortgage Corp., 259 F.Supp.2d 531, 536 n. 9 (N.D. Tex. 2003); see also Educational Testing Servs., 793 F.2d 533, 540 (3d Cir. 1986); Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1253 (3d Cir. 1983). Even governmental regulations requiring use of copyrighted expression do not make such expression outside copyright protection under the *scenes a' faire* doctrine. See CCC Information Servs., Inc. v. MacLean Hunter Market Reports, Inc., 44 F.3d 61, 73 (2d Cir. 1994).

IBM also argues that because AT&T was constrained when programming SVr4 by the need to maintain compatibility with expression previously created by AT&T, incorporated into prior AT&T UNIX versions, and published in other documents, the material in SVr4 is unprotectible under the *scenes a' faire* doctrine. IBM Mem. at 89.

This argument is flawed. It would deprive the right of a copyright holder to create derivative works, such as a sequel, based on the success of the earlier work. This outcome would be contrary to the express language of the Copyright Act, which protects sequels and derivative works. 17 U.S.C. 106(2); Micro Star v. Formgen, Inc., 154 F.3d 1107, 1112 (9th Cir. 1998); Stallone v. Anderson, No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. April 25, 1989) (attached hereto as Exhibit D).

Even if IBM had applied the correct law, IBM fails to specify what specific elements of SVr4 are dictated by which specific externalities.                **REDACTED**

Accordingly, IBM's motion should be denied because there are genuine issues of material fact for trial.

Second, IBM argues that the disputed material constitutes ideas, or merges with ideas, that would preclude protection under the copyright law. IBM Mem. at 90-92. At a literal level, IBM's argument fails. As a matter of law, source code is almost always considered expression rather than an idea. Gates Rubber, 9 F.3d at 836.[7] Although, IBM does not address the disputed material at a non-literal level, the Gates Rubber test also recognizes that non-literal elements such as structure, architecture, modules, algorithms, and data structures may constitute protectible expression as well. Id. Since IBM has not addressed the non-literal comparisons at all, there is a genuine issue of material fact as to whether the non-literal structures identified by SCO in its expert report constitute ideas or expressions.

IBM is also incorrect in its assertion that the infringed SVr4 material is unprotectible under the merger doctrine because the ideas expressed in the infringed SVr4 source code may be expressed in only a few ways "given the limits of the C programming language and the need for compatibility." IBM Mem. at 91. This is factually incorrect. The number of different choices available to a C programmer in naming a system call or a structure, although not technically infinite, is very, very large. (¶ 35). IBM's own expert concedes this is the case. (¶ 36). As IBM noted in its amicus brief in Gates, "[T]he range of possible expression in computer programming

---

[7]   IBM contends that SCO failed to meet an obligation to provide discovery regarding what aspects of the copied SVr4 material constitutes expression, as opposed to mere ideas. IBM Mem. at 91. This is wrong for three reasons. First, it is IBM's burden to show that the protected material should be filtered; SCO does not need to prove that its expression is, in fact, expression. Second, IBM points to no discovery that it sought on this issue that SCO failed to respond to. Third, IBM cites no relevant authority for its apparent proposition; the Americans With Disabilities Act law it cites is inapposite. Fourth, SCO submitted expert reports extensively detailing where the copied aspects of SVr4 lay on the abstraction spectrum and whether they constitute protectible expression. (¶ 31). This use of expert testimony to identify where computer program elements lay on the idea/expression spectrum is precisely the procedure contemplated by the Tenth Circuit in Gates Rubber. 9 F.3d at 834-35.

is vast—as numerous courts have held." Ex. 98 at 11. The C programming language does not limit the possible expression, only the form by which it is expressed.

IBM's second argument, that the expressive choices are limited by "the need for compatibility" is, again, legally erroneous for the same reasons that industry demand is not an externality. See Apple, 714 F.2d at 1253 ("Franklin may wish to achieve total compatibility with independently developed application programs written for the Apple II, but that is a commercial and competitive objective which does not enter into the somewhat metaphysical issue of whether particular ideas and expressions have merged.").[8] IBM's contention that the expression in the disputed material is merged with idea is based on incorrect law and has been factually disputed by SCO's experts, precluding summary judgment. Previously, in a written amicus submission, IBM urged the Tenth Circuit to reject the position that it advocates here:

> [N]either the efficiency of programming nor the need to interact with other hardware or software necessarily indicates that idea and expression have merged. . . . Nor is it appropriate to conclude that a program's function and its *expression* of that function are the same. Copyright, of course, does not protect functions or ideas in a computer program—or in any work—but the "technical" expression of that function or idea is protectible like all other expression, absent a showing that the expression and idea have merged.

Ex. 98 at 11-12.

---

[8]   The case law cited by IBM, in addition to being factually distinguishable, has been expressly rejected by the Tenth Circuit. IBM cites Baystate Technologies, Inc. v. Bentley Systems, Inc., 946 F.Supp. 1079, 1088 (D. Mass. 1996), for the proposition that a file name, such as one containing the word, "color," is unprotectible. The court in Baystate relied on Lotus Development Corp. v. Borland Int'l, Inc., 49 F.3d 807 (1st Cir. 1995), which has been explicitly rejected by the Tenth Circuit on this issue. Mitel, 124 F.3d at 1472.

Third, IBM argues that a small portion of the disputed material, the #define statements, are not original. IBM Mem. at 93. IBM's argument is, again, factually and legally deficient. "Originality in the field of copyright requires that the work be independently created by the author and that it possess a minimal degree of creativity." Gates Rubber, 9 F.3d at 837 (emphasis added). Material is sufficiently creative to be considered original if the author applies thought, intellectual production, conception, and/or judgment in creating the expression. See Mitel, 124 F.3d at 1374 (citing Feist, 499 U.S. at 362). In fact, even numbers can constitute original expression if they are the product of the author's original judgment. Mitel, 124 F.3d at 1374; CDN Inc. v. Kapes, 197 F.3d 1256, 1259-62 (9th Cir. 1999); CCC Information Servs., Inc. v. MacLean Hunter Market Reports, Inc., 44 F.3d 61, 67-69 (2d Cir. 1994); American Dental Association v. Delta Dental Plans Association, 126 F.3d 977, 979-81 (7th Cir. 1997).

IBM argues that the #define names copied from SVr4 into Linux are not original because they are largely mnemonic abbreviations assigned to sequentially increasing integers. IBM cites no authority that mnemonic abbreviations lack the minimal degree of creativity required to be considered "original" as a matter of law. No such law exists. Nor does it argue that the grouping of the #defines fails to demonstrate at least a minimal degree of creativity. Atari Games Corp. v. Oman, 888 F.2d 878, 883-84 (D.C. Cir. 1989) (grouping of simple shapes protectible); Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1476 n.4 (9th Cir. 1992).

In fact, IBM's experts do not assert that the copied #define names were not the result of a programmer's thought or judgment. Rather, they apply a subjective, arbitrary, and undefined standard, with no basis in legal precedent, to arrive at the conclusion that the copied #define names are not "original." (¶ 37). Dr. Cargill's report submitted evidence demonstrating that

64

such #define names are original based on memorable, often quirky choices made by the programmers that selected them. (¶ 38). This alone raises a material issue of fact that cannot be resolved on summary judgment.

Fourth, IBM argues that the disputed material is qualitatively and quantitatively insubstantial. IBM Mem. at 93-94. IBM routinely applies the wrong law to the wrong facts. Determining whether copied material is sufficiently "substantial" to give rise to copyright infringement liability presents "a classic jury question." Jacobsen v. Deseret Book Co., 287 F.3d 936, 943 (10th Cir. 2002) (quoting 4 Nimmer on Copyright § 13.03[A][2], at 13-46 and n.96 (2001)).

IBM then proceeds to incorrectly apply  the "ordinary lay observer" standard from Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280, 1288 (10th Cir. 1996), in support of its motion. IBM Mem. at 94. To begin with, this standard is inappropriate for cases dealing with computer software. See, e.g., Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222, 1249 (3d Cir. 1986). The Tenth Circuit has recognized the appropriate test with respect to computer software "must necessarily be an ad hoc determination of whether the infringed portion is a significant or important part of the plaintiff's code." Gates Rubber, 9 F.3d at 839 n.15 (citing Whelan, 797 F.2d at 1245) (emphasis added). Even if the Country Kids standard was appropriate, the literal source code copied into Linux is sufficiently blatant that even a casual observer could recognize it. (¶ 39).

IBM also asserts that an ordinary observer must be "more discerning" and remove elements before determining substantiality, citing Boisson v. Banian, Ltd., 273 F.3d 262, 272 (2d Cir. 2001). IBM Mem. at 94. On the contrary, Gates Rubber requires consideration of the two

65

works as a whole in determining substantiality and the extent of copying.  Gates Rubber, 9 F.3d

at 839 n.15. Indeed, in its amicus submission IBM recognized the correctness of this position:

> [A] court "should be careful not to lose sight of the forest for the trees" when comparing works for substantial similarity.  For example, extirpating all of the facts from a factual compilation before comparing it to an accused work will render the exercise meaningless, since nothing will remain to compare.  The test for substantial similarity must allow examination of the whole work.

Ex. 98 at 7 (internal citations omitted and emphasis added).

IBM's focus on quantity distorts Gates Rubber, since the test "is primarily a qualitative

rather than a purely quantitative analysis."[9]  Gates Rubber, 9 F.3d at 839; see also Dun &

Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 208 (3d Cir. 2002) (27

lines of source code out of 550,000 is not irrelevant as a matter of law); Deseret Book, 287 F.3d

at 945 ("'[N]o plagiarist can excuse the wrong by showing how much of his work he did not

pirate.'") (citing Harper & Row Pub., Inc. v. Nation Enterprises, 471 U.S. 539, 565 (1985)).

The disputed material is unquestionably important as a qualitative matter.

REDACTED

Furthermore, IBM's

---

[9]  IBM's expert's tangential assertion that the literal copying is qualitatively insignificant is so superficial that its expert, Dr. Brian Kernighan, apparently forgot during his deposition that he performed any qualitative analysis of the infringed SVr4 material at all and subsequently sought to correct the errata sheet to reflect this fact.  (¶ 46).  By contrast, a significant portion of SCO's expert reports is devoted to a comparison of the substantiality of the two works under the correct legal standard.  (¶ 47).  Given that there is a disputed issue of material fact, IBM's motion should be denied.

quantitative analysis fails to take into account <u>any</u> of the non-literal material copied from SVr4 into Linux, which by itself constitutes a significant quantitative and qualitative portion of the infringing and infringed works. (¶ 30).

**C.   IBM Does Not Have a License To the Infringing Material**

    **1.   IBM Does Not Have a License Under the Strategic Business Alliance**

IBM does not have a license to the disputed material under the Strategic Business Alliance ("SBA") for at least four reasons. First, even if the SBA could be construed as a broad license to the copyrights in OpenLinux, the grant was void <u>ab initio</u>. In 1999, Caldera Systems, Inc. ("CSI") was not part of Santa Cruz and was not in the chain of title that granted copyrights from Bell Labs to SCO. (¶¶ 68-69, 150-153). CSI did not become part of the chain of title until 2001. <u>Id</u>. Therefore, IBM could never have obtained copyrights under the SBA because CSI did not have them to give. SCO certainly never gave any such rights. (¶¶ 69, 153).

Second, the SBA grants IBM no copyright license in the disputed material. The SBA simply makes IBM a conduit through which CSI could sell its OpenLinux software. (¶ 87, 89).

REDACTED

Nothing in the SBA provides that IBM act as anything more than a conduit for the OpenLinux software; in fact, the SBA expressly states that IBM         REDACTED

(¶ 89). The SBA never granted, under the Statement of Work ("SOW") any right for IBM to use or copy the disputed material.[10]  <u>Id</u>.

---

[10]   IBM points to language in the SBA regarding "Pre-Existing Materials" to argue that it has unlimited rights with respect to the disputed material. IBM Mem. at 26, ¶ 93. This language does not apply, as

Third, the SBA and SOW explicitly eliminated any relationship between IBM, as the conduit, and the end users with respect to the OpenLinux software. (¶ 89). The software was licensed directly to the end users and IBM played no role in licensing or overseeing the licenses of that software. Id. As such, IBM had no reason to acquire any rights to the underlying source code in OpenLinux. In fact, IBM's reluctance to take any responsibility for the Linux code suggests that it knew that the Linux code was encumbered.

REDACTED

The SBA is, at most, a limited grant to use OpenLinux on those systems and cannot be construed as a perpetual, unrestricted license for IBM to use the intellectual property contained in OpenLinux for any purpose in the future.

## 2.   **IBM Does Not Have a License Under the GPL**

IBM does not have a license to the disputed material under the General Public License (GPL), which is a popular "open source" licensing scheme used in the software industry. IBM's supposed license is based on Caldera Systems, Inc.'s distribution of OpenLinux. IBM Mem. at 80. As discussed above, CSI was not the copyright holder of the disputed UNIX material when it distributed OpenLinux and could not have transferred any copyright interest in that material.

SCO's distribution of OpenLinux did not grant IBM a license to the disputed code under the GPL for at least three reasons. First, in order to license code under the GPL, the copyright holder must place a notice on the code saying that it may be distributed under the terms of the GPL. (¶ 96). The true copyright holder, SCO, never contributed any of the System V code at issue under the GPL. (¶ 100). In fact, IBM has not even suggested that Caldera contributed the

---

"otherwise specified" in the SOW. (¶ 91).

disputed material at issue.  Instead, IBM contends that because Caldera distributed a version of Linux that contained the disputed code, it granted a license to code improperly taken by others and released under the GPL.  The language of the GPL does not support such a claim.  Because SCO, as the copyright owner, did not contribute the disputed material, its presence in Linux does not constitute a basis upon which IBM, or any other party, gains any rights to its use.  (¶ 94, 99).  Furthermore, IBM's claim hinges on the tenuous implication that SCO's subsequent distribution of Linux somehow cures the prior misappropriation of its intellectual property.  The GPL supports no such claim, and IBM cites no authority for such a proposition.

Second, SCO's distribution of the Linux kernel did not provide IBM a license to the source code under the GPL.  The GPL is clear that distributing one program under the GPL does not bring other programs distributed at the same time within the scope of the GPL.  (¶ 98).  Therefore, SCO's distribution of some code under the OpenLinux brand, even if it was distributed under the GPL, cannot mean that IBM obtains a license to all the code distributed as OpenLinux.

Third, even assuming that the disputed material was standardized by SCO or distributed under the GPL, the license is void for failure to properly mark SCO's proprietary material.  The GPL requires that source code contain conspicuous notices identifying the owner of the copyright.  (¶ 97).  The disputed code contained in Linux does not have the appropriate notices required by the GPL.  (¶ 101).  No code contained in the Linux 2.4 and 2.6 kernels attributes any code in Linux to SCO or Santa Cruz.  Id.  This fact both emphasizes that SCO did not contribute the disputed code and that the failure to properly attribute the disputed material to SCO invalidates the GPL as to that code.  (¶ 99).

69

3.   **IBM Does Not Have a License Under Spec 1170 Or the Common API Materials Cross-License Agreement**

a.   **IBM Does Not Have a License Under Spec 1170**

SCO did not grant IBM a license to the disputed material under the "Letter Agreement concerning the X/Open Fast Track Process for the Common APIs for UNIX-based Operating Systems ('Spec 1170') for two reasons.[11]  First, Spec 1170 only governs the use, copying, and creation of derivative works related to the Specification itself.  The agreement expressly provides that its intent is "to grant X/Open sufficient rights to modify, print and distribute the Specification . . ." (¶ 103).  The purpose of the agreement was to derive the X/Open Specifications for UNIX-based systems.  (¶ 104).  Nothing in this agreement authorizes Linux, as a non-licensee operating system, to copy the information from the Specification.  The remainder of Spec 1170 is consistent with this view in that it makes clear that the phrase "derivative work" refers to derivations of the Specification, not to deriving and copying code from the Specification.  (¶ 107).

The fact that Spec 1170 was not intended to transfer any interest in the underlying copyrighted materials that helped form the Specification is confirmed in the agreement.  Spec 1170 did not grant, and in fact explicitly excluded, any grant of copyright in the intellectual property contained in the Specification.  (¶ 106).  Spec 1170 granted no rights for Linux to copy header files from UNIX SVr4.

---

[11]   IBM does not provide a copy of the Specification at issue and does not identify what disputed items, if any, it received a license to under Spec 1170.  IBM should not be permitted to wait to a reply to address these issues.

70

### b.   IBM Does Not Have a License Under the Common API Materials Cross License Agreement

Unlike Spec 1170, the API Agreement facilitates the use and distribution of portions of the parties' operating system programs between licensees of the UNIX copyrights. (¶ 107-108). However, by its terms, the API Agreement is a limited license to create "a base set of API's for UNIX-based operating systems." (¶ 107). In fact, the API Agreement specifically provides that the purpose of the agreement is to enable each party "to more quickly and efficiently develop and commercialize its UNIX-based operating system(s)." (¶ 108). IBM claims a license to the disputed material under § 3.5 of the API Agreement. IBM Mem. at 80; IBM Mem. at 54, ¶ 212. That grant is expressly limited, however, by the language contained in § 3.10, which governs the "Scope of Licenses." (¶ 109). That section specifically provides that the scope of the license is limited to code or derivative works that are "a functional part of a software program which contains a substantial part of the Code of the licensee Party's release of a UNIX-based operating system." Id. The API Agreement is limited in scope to the licensed UNIX variants of HP, IBM, and Sun. It does not grant a license to IBM for its infringing activities with respect to an unlicensed, competing operating system, nor does it authorize IBM to give such a license.

Furthermore, IBM's motion for summary judgment on the API Agreement must be denied because there are fact issues regarding whether the agreement remains in effect. For instance, § 7.1 of the agreement provides for an effective termination date of June 30, 1994, which would suggest that the API Agreement has expired. (¶ 110). Under § 7.4, relating to surviving provisions, Article 3 would appear to survive; however, there is language in this copy of the agreement that suggests it is not the final draft. (¶ 111). This conclusion is further bolstered by the fact that this draft of the agreement is unsigned and the signature page may

71

relate to a different version of the agreement. (¶ 112). There are issues of fact relating to whether Article 3 survives termination and whether this agreement is, in fact, the one that was executed, both of which preclude summary judgment.

### 4. **IBM Does Not Have a License Under the TIS**

IBM does not have a license to ELF under the TIS Specifications for at least five reasons. First, Novell never transferred any interest in the ELF source code to the TIS Committee. Rather, Novell granted the TIS Committee certain rights "with respect to the ELF Specification." (¶ **113**). That is, Novell never transferred a license to the TIS Committee to copy or create derivative works of the ELF source code, only portions of the TIS Specification as contained in the SVABI. Id. In fact, the Novell letter explicitly limits its license to "use, copy, display, publish, modify, and create derivative works or have derivative works created and sublicense such specification." (¶ **114**). The Novell letter grants no rights to use or copy the disputed ELF source code contained in Linux.

Second, the supposed license contained in the TIS Specifications is void for exceeding the scope of the grant in the Novell letter. MLB Prod. Corp. v. Colour Tex., Inc., 729 F.Supp. 1035 (D. N.J. 1990) (invalidating copyright sublicense based on licensee exceeding the scope of the grant); Althin CD Med. v. W. Suburban Kidney Ctr., 874 F.Supp. 837 (N.D. Ill. 1994); Gilliam v. ABC Inc., 538 F.2d 14 (2d Cir. 1976); Roy Expert Co. v. CBS, 503 F.Supp. 1137, 1153 (S.D.N.Y. 1980).

The Novell letter grants no license to the TIS Committee to allow it to authorize others to "use the information disclosed in the Specifications to make . . . software TIS-compliant." (¶ 115). In fact, the Novell letter expressly limits how the information in the TIS Specifications

may be used in that it expressly requires that the TIS Specifications not "be used as a substitute for the USL ABI documents." (¶ 114). The USL ABI documents, including the SVABI and the SVABI Intel Supplement, govern the use of ELF in UNIX System V derivatives, which would include Linux. The Novell license to TIS explicitly limited its scope to non-UNIX systems, such as Windows™, which were not based on System V.

Third, to the extent the TIS Specifications grant any license to the ELF material at all, the grant is limited to making end user software TIS-compliant. (¶ 115). The TIS Specifications do not grant any right to copy the literal and non-literal elements of the ELF system and incorporate them into a competitive operating system.

Fourth, the TIS Specifications require that USL be given appropriate copyright recognition as part of the Novell letter. (¶ 114). Although the TIS Specifications contain a vague attribution of copyright, the corresponding Linux code contains no such attribution. (¶ 116-117). This suggests that AT&T did not release its copyright in the code contained in the TIS Specifications to the committee or, at the very least, that Linux's use is void for failure to properly mark its code.

Fifth, even assuming that Linux does have a license to the disputed material, the code in Linux was not derived from the TIS Specifications. The disputed code in Linux contains source code, not present in the TIS Specifications, that could only have come from the UNIX System V source code. (¶ 118). Accordingly, Linux was not acting under the auspices of the TIS Specifications in putting ELF into Linux and the material in Linux infringes SCO's copyrights.

73

**D.   SCO Is Not Estopped From Pursuing Its Infringement Claims**

The defense of equitable estoppel is, by its very nature, fact intensive. As a result, "equitable estoppel ordinarily presents an issue of fact," and summary judgment is almost never appropriate. Shamrock Dev. v. City of Concord, 656 F.2d 1380, 1386 (9th Cir. 1981); see also, e.g., MGE UPS Sys., Inc. v. Fakouri, 422 F.Supp. 2d 724, 736 (N.D. Tex. 2006) ("The inference [supporting equitable estoppel] is one that only a fact-finder can draw.").[12] In fact, most of the cases relied upon by IBM involved bench trials where the courts made express factual determinations.[13] A court invites being overturned where, as here, it would be required to make factual determinations on equitable defenses. See Jacobsen v. Deseret Book Co., 287 F.3d 936,

---

[12]   For example, each of the following cases—all of which were decided in 2006 *alone*—deny a motion summary judgment on equitable estoppel because of outstanding issues of material fact: Henderson v. Henderson, No. 3:05cv445-WHA, 2006 WL 3075711 (M.D. Ala. Oct. 30, 2006); Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc., No. 04 Civ. 3951 (MGC), 2006 WL 2709783 (S.D.N.Y. Sept. 22, 2006); Recursion Software, Inc. v. Interactive Intel., Inc., 425 F.Supp. 2d 756, 771 (N.D. Tex. 2006) (same); Fakouri, 422 F.Supp. 2d at 736; SAS Inst. v. Practicingsmarter, Inc., No. 1:03CV01063, 2006 WL 1888565 (M.D.N.C. July 6, 2006); Dallal v. New York Times, No. 05-29, 2006 WL 463386 (2d Cir. Feb. 17, 2006) (reversing grant of summary judgment based on equitable estoppel). Indeed, there are only a handful of published cases in which the district court granted summary judgment on equitable estoppel grounds. One was summarily reversed. Dallal v. New York Times, 386 F.Supp. 2d 319 (S.D.N.Y. 2005), rev'd., No. 05-29, 2006 WL 463386 (2d Cir. Feb. 17, 2006) (finding genuine issues of material fact precluded summary judgment). Most of the others take pains to note just how unusual such relief is. DeCarlo v. Archie Comic Pubs., 127 F.Supp. 2d 497, 511 n. 81 (S.D.N.Y. 2001) (noting that, "[t]hough a defense of equitable estoppel often raises issues of fact," summary judgment may be granted "[i]f there is no evidence upon which a trier of fact could reasonably find for the plaintiff") (emphasis added); Hadady Corp. v. Dean Witter Reynolds, 739 F.Supp. 1392, 1400 (C.D. Cal. 1990) (noting that "summary judgment on equitable estoppel is inappropriate unless only one conclusion can be reached on the undisputed facts") (citing Shamrock, 656 F.2d at 1386); Keane Dealers v. Harts, 968 F.Supp. 944, 948 (S.D.N.Y. 1997) ("Estoppel is a drastic remedy and must be utilized sparingly.").

[13]   Quinn v. City of Detroit, 23 F.Supp. 2d 741 (E.D. Mich. 1998) ("A bench trial . . . was held during the week of September 7, 1998."); HGI Assocs. v. Wetmore Printing, 427 F.3d 867 (11th Cir. 2005) ("After a bench trial, the district court found . . . ."); Cardinal Indus. v. Anderson Parrish Assocs., No. 83-1038-Civ-T-13, 1986 WL 32732 (M.D. Fla. May 6, 1986) ("This action for alleged copying . . . was tried before the Court . . . .").

949 (10th Cir. 2002) reversing 2001 WL 1806858 at *4 (D. Utah) (attached hereto as Exhibit E) (reversing district court's holding that "the facts regarding laches and equitable estoppel are to be determined by the court" on summary judgment); Gasser Chair Company, Inc. v. Infanti Chair Mfg., 60 F.3d 770, 774 (2d Cir. 1995).

The fact-intensive nature of the defense is seen in the four-part legal test that IBM must satisfy: (1) that SCO knew the facts of infringement; (2) that SCO intended its conduct to be acted upon; (3) that IBM was ignorant of the true facts; and (4) that IBM relied on SCO's conduct to its detriment.  IBM Mem. at 81; Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960).  These are factual, as well as legal, obstacles that IBM has not overcome.

### 1.   Equitable Estoppel Is Not a Basis Upon Which Declaratory Judgment Of Non-Infringement May Be Predicated

IBM's Tenth Counterclaim expressly seeks a judicial determination that the Linux kernel does not infringe any of SCO's copyrights.  (¶ 85).  This, by its terms, requires a determination of the merits of infringement.  By definition, estoppel is an equitable defense to an action brought for infringement; it is not a legal basis upon which a summary judgment of non-infringement may be awarded.  Indeed, all of the case law on estoppel cited by IBM arises in situations where estoppel is raised as a defense to an infringement action.  IBM neither pled in its Tenth Counterclaim a request for a declaratory judgment of estoppel—if there is such a thing— nor provides a legal basis for the court to create one.

This follows from the well-established maxim that estoppel is a personal defense, to be considered in the context of a particular defendant, that defendant's activities, and the copyright holder's action with respect to that party.  Pyrodyne Corp. v. Pyrotronics Corp., 847 F.2d 1398, 1402 (9th Cir.1988) ("Equitable defenses are personal defenses which do not attack the validity

75

of a mark's registration."); <u>Newman v. Checkrite California, Inc.</u>, 912 F.Supp. 1354, 1376 (E.D. Cal. 1995). An equitable defense cannot result in a plaintiff's loss of rights as against the rest of the world. <u>Eastman Kodak Co. v. Rakow</u>, 739 F.Supp. 116, 120 n.2 (W.D.N.Y. 1990) ("Laches and estoppel by acquiescence are personal defenses which result in a loss of rights as against one defendant."). As such, estoppel cannot serve as a basis for the "clean bill of health" that IBM seeks on behalf of the Linux kernel.

### 2. IBM Did Not Reasonably Rely On Caldera's Linux Activity In Deciding To Invest In Linux

#### a. IBM Could Not Reasonably Rely On Caldera's Linux Activities At a Time When Caldera Did Not Own the UNIX Copyrights

IBM made the decision to embrace Linux in 1999. (¶¶ 86, 124). IBM could not possibly have relied upon the Linux activities of Caldera International (now SCO) at that time because Caldera International did not acquire Santa Cruz, which owned the UNIX copyrights, until 2001. (¶¶ 68-69). It is no more reasonable for IBM to rely—if, in fact, it did—on Caldera's pre-merger Linux activity as a basis for its reliance than on a host of third-party Linux distributions, none of whom owned UNIX.

In its brief, IBM relies extensively on the conduct and statements of individuals who worked for the entities Caldera, Inc. and Caldera Systems, Inc. IBM Mem. at 82-83. Neither of these entities is in the chain of title that holds the UNIX copyrights. (¶¶ 68-69). Only Caldera International, which was formed as the result of a reverse triangular merger with the Santa Cruz Operation in 2001, ever had rights to the copyrights for UNIX and UnixWare. (¶¶ 68-69).

IBM inaccurately refers in its brief to numerous actions of "SCO" that it contends created reliance. IBM Mem. at 84. It then cites to paragraphs in its fact statements that refer to Caldera

Systems, Inc. or merely Caldera. *See, e.g.*, IBM Mem. at 26-27 ¶¶88, 89, 91-95.  In 1999, IBM

was well aware that Caldera and SCO were separate entities because it entered into the Strategic

Business Agreement ("SBA") with Caldera and was working on Project Monterey with SCO.

(¶¶ 86, 119-121).  IBM was also a licensee of the UNIX copyrights for its AIX and Dynix/ptx

operating systems and paid royalties to SCO under those agreements.  (¶ 11).

 Moreover, because of its involvement with Santa Cruz in Project Monterey, IBM knew

very well that Santa Cruz owned the UNIX copyrights in 1999.  (¶¶ 119-**123**).  Santa Cruz was

not involved in any Linux distribution or promotion. (¶ 123).  While it is true that Santa Cruz did

not initiate a copyright infringement action against IBM or other parties over Linux,[14] inaction

does not constitute an estoppel.  Utah State Building Commission, for Use and Benefit of

Mountain States Supply Co. v. Great American Indemnity Co., 140 P.2d 763, 772 (Utah 1943)

(mere silence in the absence of an affirmative duty to speak or willfulness does not rise to level

of estoppel).  There is no evidence of any assurance provided by Santa Cruz to IBM that Linux

was non-infringing.  Indeed, given that IBM and Santa Cruz were in a partnership over UNIX

development, IBM had every opportunity to investigate and request such assurance were it

interested in obtaining that comfort before embarking on its Linux business.  IBM did not do so.

(¶¶ 125-131).

---

[14] IBM argues that SCO knew of the disputed material in Linux as a result of a study it commissioned in 1999 ("the Swartz memo").  IBM Mem. at 83.  The Swartz memo, however, was developed <u>after</u> IBM made a move to support Linux in early 1999.  (¶ 133)  In fact, IBM has not submitted <u>any</u> evidence showing actions undertaken by Santa Cruz prior to IBM's March 1999 decision to begin its Linux activities on which IBM could have relied. (¶ 134).  Indeed, even after Santa Cruz received the Swartz memo, sources show conflicting understandings among SCO employees regarding whether Linux contained any copyrighted UNIX material. (¶ 133).  At the very least, this creates a disputed issue of fact as to whether and when SCO had knowledge of infringing material in Linux.

**b.**   **IBM's Unfair Acts In Project Monterey Preclude Any Estoppel Defense Regarding Santa Cruz**

On the contrary, IBM's deceptive and unfair activity with respect to the Project Monterey venture would justify a change in Santa Cruz's position—even if it had provided such initial assurances to IBM.

**REDACTED**

As established by the extensive evidence set forth in opposition to IBM's motion for summary judgment on SCO's unfair competition claim (incorporated here by reference), IBM misled SCO about its commitment to continue with Project Monterey.  IBM ultimately abandoned Project Monterey to focus on turning Linux—without Santa Cruz's permission—into an enterprise-hardened operating system using Santa Cruz's intellectual property.  Moreover, IBM cannot engage in such wrongful action and then seek to impose an equitable defense such as estoppel.  *Rohr v. Rohr*, 709 P.2d 382, 384 (Utah 1985) ("It is generally accepted that equity refuses to lend its aid to a party whose conduct is inequitable"); see also Tremonton Inv. Co. v. Horne, 202 P. 547, 550 (Utah 1921); Ranchers Expl. & Dev. v. Anaconda Co., 248 F.Supp. 708, 727 n.60 (D. Utah 1965).

### c.     No Estoppel Arises After Caldera International's 2001 Acquisition of UNIX Assets

Nor can Caldera International's (SCO's) Linux activity after acquiring UNIX assets in 2001 be a basis upon which an estoppel can be constructed.  By the time Caldera inherited the then-diminished, if not destroyed, UNIX assets, its initial decision to continue with a Linux strategy was not unreasonable.  Caldera proceeded in late 2002 to investigate whether the Santa Cruz copyrights and licenses it had acquired were being infringed by Linux activity, and upon discovering a legal basis, acted expeditiously in offering a SCO source licensing program for libraries that implicated UNIX intellectual property rights.  (¶ 141).  Soon thereafter, in March 2003, SCO brought this action against IBM.

There is, at a minimum, a genuine factual dispute over whether IBM's Linux activities were affected in any way by Caldera not filing suit until March 2003.  IBM committed to a Linux strategy long before 2001, including its opening of the Linux Technology Center to make technical contributions to Linux.  (¶ 124).  Any assertion by IBM that its conduct would have differed if suit had been brought by SCO in 2001, when it first acquired the UNIX business of Santa Cruz, belies the historical record.  In 2003, after it was sued, IBM continued with its Linux activities notwithstanding full knowledge of SCO's position.  On the contrary, when confronted by SCO's claims in early 2003, IBM (through Karen Smith) responded to Darl McBride, that IBM was unconcerned with SCO's claims because it did not believe that SCO owned UNIX copyrights.  (¶ 142).  What none of the contemporary documents submitted indicate is a reliance on SCO's continued distribution of Linux after acquiring UNIX as a basis upon which IBM relied in continuing with its Linux business.

Nor does the factual support offered by IBM for its estoppel defense create such a basis. IBM asserts that based "in part" on the conduct of Caldera and Santa Cruz "IBM made the decision to expand its support of and embrace Linux in December 1999." IBM Mem. ¶ 96. Of course, at this time, IBM knew that Santa Cruz, not Caldera, owned UNIX copyrights and—as indicated above—there is no basis in Santa Cruz activities on which IBM could reasonably rely as an estoppel.

REDACTED

**d.    IBM's Acts to Strengthen Linux In Violation Of SCO Licensing Agreements Preclude an Estoppel Defense**

Moreover, as with Santa Cruz, SCO would have had good cause to change its position in light of IBM's improper contributions to Linux.  In its other briefs, SCO has catalogued IBM's contributions to Linux and how those contributions turned Linux from a hobbyist system into an enterprise-hardened platform.  (¶ 146).  Given IBM's role in changing the competitive nature of Linux, IBM should be precluded from asserting an equitable estoppel defense.  The law is clear that a change in business conditions may cause a plaintiff to bring a claim that it had not previously chosen to bring:

> Defendant's alleged infringing activities were, from plaintiff's perspective, minimal if annoying, and plaintiff might reasonably have judged that it was not worth the cost of bringing suit. Aukerman, supra; Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 592 F.2d 651, 655 n. 4 (2d Cir. 1978) (plaintiff's delay in asserting rights no ground for estoppel and laches defense when enforcing rights was not worth the cost of litigation). Viewing the record in the light most favorable to plaintiff, defendant's infringing activities escalated, and for the first time presented a commercial threat, when he agreed to license his DFA methodology to Sapphire.  In sum, on this record, the Court is not convinced that plaintiff's delay in bringing suit was unreasonable

Boothroyd Dewhurst, Inc. v. Poli, 783 F.Supp. 670, 680-81 (D. Mass. 1991).

As in Boothroyd, SCO and Santa Cruz knew about the various versions of Linux during the late 1990s, but at that time it was focused on creating a UNIX operating system with IBM for the Intel 64-bit chip market (called Project Monterrey).  (¶ 119-121).  Ex. 17 ¶ 9; Ex. 351 ¶ 14. Santa Cruz believed that Project Monterrey represented a valuable opportunity to SCO.  Ex. 17 ¶ 9; Ex. 351 ¶ 13.

At that time, in response to Santa Cruz's concerns regarding IBM's support of Linux,

IBM assured SCO that its substantial revenues from UNIX on Intel market would not be affected

by Linux. (¶ 136).

**REDACTED**

Given IBM's

representations in support of Project Monterey and its characterization of Linux as not being a

business threat at that time, Santa Cruz elected not to focus on Linux.  (¶ 136).

This situation shifted dramatically in June 2001, when IBM terminated Project Monterey

and threw its considerable weight behind Linux.  (¶ 139).  According to Mr. Bench, Caldera

Systems CFO, "SCO's management was very surprised and upset about IBM's decision [to

terminate Project Monterey].  The termination by IBM was, in the view of SCO's management,

an act contrary to everything that IBM had said and done up to that point as it related to Project

Monterey and SCO's future plans."  Ex. 6 ¶ 15.  Prior to IBM's termination, Caldera

International "fully expected to be able to proceed with the ongoing Project Monterey joint

venture that Santa Cruz had entered with IBM.  In addition to the UNIX business already moving

through the Santa Cruz sales channel, Caldera International hoped it could move Linux products through the channel as well." (¶ 140). Effectively, IBM's actions helped make Linux a competitive threat to SCO, and its actions dissuaded SCO from taking any action against Linux.

As part of the UNIX business, in 2002 and 2003, SCO began researching methods to license its UNIX assets. (¶ 141). In March 2003, based on IBM's actions, SCO filed this lawsuit. Id. SCO's actions were based on the change in the competitive nature of Linux. The law recognizes such change as a valid reason to delay bringing a lawsuit. Moreover, in this case, it was IBM's actions that precipitated SCO's defense of its intellectual property rights. Having rocked the boat, IBM cannot complain of the ensuing waves.

### 3.   Even If IBM's Initial Reliance Was Reasonable, Its Continued Distribution Of Linux Is Not Justified

Even if IBM's pre-suit reliance was reasonable, IBM has continued copying, distributing, and preparing derivative works based on the infringed material and inducing others to do the same long after it received notice of SCO's claims of copyright in the form of the present action. IBM's continued infringement after receiving undeniable notice of SCO's claims cannot be excused by IBM's professed ignorance of SCO's claims and raises a triable issue of fact as to whether IBM's prior infringing actions were truly based on reliance. Peer Int'l Corp. v. Luna Records, Inc., 887 F.Supp. 560, 567 (S.D.N.Y. 1995) ("[Defendant] cannot escape that fact that [it] continued to make and distribute the infringing phonorecords for at least six months after suit was filed, when any claim of detrimental reliance should have ended."); Steinberg v. Columbia Pictures Indus., Inc., 663 F.Supp. 706, 715-16 (S.D.N.Y. 1987); Kraft v. Cohen, 32 F.Supp. 821, 825 (E.D. Pa. 1940) ("[D]efendants persisted in the publication after [plaintiff's] attorney wrote

them…to refrain, and any defense of acquiescence available prior to that date would not be available subsequent thereto."), rev'd on unrelated grounds 117 F.2d 579 (3d Cir. 1941).

### 4.   IBM Cannot Invoke Estoppel Because It Was Not Ignorant Of the True Facts Regarding the Identity of the Copyright Holder

As discussed above, there are disputes of material fact as to whether IBM was ignorant of the true facts.  IBM knew[15] that unauthorized UNIX System V technology might have been incorporated into Linux and that Santa Cruz was the copyright holder.

**REDACTED**

Without ELF, Linux would not be able to run UNIX programs.  Given the importance of ELF to Linux and IBM's knowledge that SCO owned ELF, IBM cannot credibly assert that it was ignorant of these facts.

IBM's alleged reliance is also unjustified given its experience with both UNIX System V and Linux code.  IBM developed its AIX operating system based on UNIX System V code.

---

[15] Furthermore, even if IBM did not have actual knowledge, its supposed reliance is not reasonable where IBM had ample reason and opportunity to inquire as to SCO's rights in UNIX and Linux.  See Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp.2d 737, 747 (D. Md. 2003) ("Equitable estoppel is an equitable remedy.  The party asserting estoppel must 'use due care and not fail to inquire as to its rights where that would be the prudent course of conduct.'") (emphasis in original); Hampton, 279 F.2d at 104-05 (unwarranted reliance on third party assertions regarding copyright unjustified and does not "erase the duty of due care").

(¶ 11).  In supporting Linux, it has access to the Linux code, which contains no copyright notices from Santa Cruz Operations, Inc., Caldera Int'l, Inc., or the SCO Group relating to the code at issue in this case.  (¶ 100).  Given that the copyright owner's notice is not on the UNIX code within Linux, IBM knew or should have known that such code was not properly released under the GPL.  IBM is a sophisticated entity that is extremely knowledgeable about enforcing its intellectual property rights.  Having had access to both the infringed and infringing work, its claim that it did not know is disingenuous.

Furthermore, IBM's own internal documents confirm that IBM considered Santa Cruz to be the owner of the UNIX copyrights.

REDACTED

Ex. 59 (emphasis added).  IBM knew SCO to be the copyright owner.  In July 1999, IBM entered into the SBA with Caldera Systems.  (¶ 86).  In that agreement, IBM agreed to be a conduit for Linux products.  (¶ 87).  IBM knew at that time that Caldera Systems was not the UNIX copyright owner and sought to expressly disclaim liability in that agreement.  (¶¶ 89).  That IBM was not relying on SCO's actions in developing its Linux strategy is confirmed by internal documents at IBM, which make clear that IBM knew SCO would not be interested in

abandoning UNIX in favor of Linux.  (¶ 147).  Consequently, IBM cannot credibly claim that it was ignorant of the true facts.

**E.      SCO Did Not Waive Its Copyrights In the Disputed Material**

IBM's arguments relating to waiver and abandonment fail for the reasons set forth above. Waiver requires "[1] an existing right, benefit, or advantage, [2] a knowledge of its existence, and [3] an intention to relinquish it."  United Park City Mines Co. v. Stitching Mayflower Mountain Fonds, No. 20040943, 2006 WL 1528607 (Utah Sup. Ct. June 6, 2006) (attached hereto as Exhibit G).  Copyright "[a]bandonment occurs only if there is an intent by the copyright proprietor to surrender rights in his work.  There is, moreover, strong authority holding that an overt act evidencing such an intent is necessary to establish abandonment."  4 Nimmer on Copyright § 13.06 at 13.278.  Caldera's pre-May 2001 activities are not considered because it was not the copyright owner.  Since the merger, "SCO did not act to waive or otherwise relinquish any rights or protections to the core UNIX intellectual property it acquired from Santa Cruz." Ex. 269 ¶ 18.  Waiver, like estoppel, is inherently a fact-bound issue and not susceptible to summary resolution.

**F.      IBM's Copyright Misuse Claim Fails**

The bulk of IBM's copyright misuse claim hinges on arguments addressed above, and SCO does not reiterate them here.  IBM raises one additional argument that merits a response: It contends that SCO is engaging in copyright misuse because it seeks to leverage its copyrights over material to which it has no ownership rights, including material owned by BSD, IBM, and unidentified members of the Linux community.  IBM Mem. at 96-98, 99-100.  IBM's argument fails for three reasons.

86

First, IBM ignores SCO's collective work theory, which argues that SVr4 is a collective work that includes material created by its predecessors as well as its licensees, including among others, BSD and IBM. To the extent that SCO is seeking copyright protection for literal and non-literal components of SVr4 that were created entirely by others, it only does so to the extent that those components are derived from System V code or were selected, arranged and coordinated in SVr4. As such, SCO has a good faith basis for bringing the claim and copyright misuse is inapplicable. See Schoolhouse Inc. v. Anderson, No. 99-1214 DSD/JMM, 2001 WL 1640081, at *7 (D. Minn. Nov. 8, 2000) (claim based on good faith, albeit mistaken, belief that defendant was infringing is not misuse) (attached hereto as Exhibit F); In re Independent Service Organizations Antitrust Litigation, 964 F.Supp. 1479, 1491 (D. Kan. 1997) (dismissing misuse defense with respect to infringement claims that were not "objectively meritless").

Second, to the extent IBM's misuse theory hinges on SCO's out-of-court characterizations of its case, such statements are irrelevant to this issue. The misuse doctrine does not extend to good faith allegations of infringement, let alone to out-of-court characterizations regarding the basis for the infringement claim. Georgia Television Co. v. TV News Clips of Atlanta, Inc., Civ. A. No. 1:88-CV2207JTC, 1991 WL 204425 (N.D. Ga. May 29, 1991); qad, Inc. v. ALN Assocs., Inc., 770 F.Supp. 1261, 1266 (N.D. Ill. 1991).

Third, SCO's comparison of UNIX to the whole of Linux, AIX, and Dynix/ptx is appropriate. As discussed above, the Gates Rubber case makes clear that under the Tenth Circuit law, literal and non-literal elements of a software work are protected by copyright law. Furthermore, Gates Rubber states that the works **should** be compared as a whole. Gates Rubber, 9 F.3d at 832 n.7. The expert reports of Tom Cargill apply this law to the facts in this case and

ı

87

provide ample support for SCO's allegations that Linux as a whole infringes SCO's UNIX copyrights. (¶¶ 31, 33, 39, 47). After IBM's license to the UNIX copyrights were terminated, IBM could not license its AIX and Dynix/ptx operating systems since those systems are based on UNIX System V. (¶ 11). Furthermore, Dr. Cargill applied the Tenth Circuit's copyright test and concluded that these two operating systems are derivative works of the copyright UNIX System V code. *Id.* Given this evidence, the propriety of SCO's allegations is clear and IBM's copyright misuse defense must fail.

## CONCLUSION

SCO respectfully submits, for all of the reasons stated above and as set forth in Appendix A hereto, that this Court should deny IBM's Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim).

DATED this 11th day of November, 2006.

By _____

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Stuart H. Singer (admitted pro hac vice)
Edward Normand (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*

## CERTIFICATE OF SERVICE

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant/Counterclaim-Plaintiff, International Business Machines Corporation, on this 6th day of February 2007, via CM/ECF to the following:

David Marriott, Esq. (dmarrriott@cravath.com)
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Todd Shaughnessy, Esq. (tshaugnessy@swlaw.com)
Snell & Wilmer LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, Utah 84101-1004

/s/ Edward Normand