Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Robert Silver (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart H. Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard – Suite 1200
Ft. Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
Bank of America Tower – Suite 2800
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

*Attorneys for The SCO Group, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **SCO'S MEMORANDUM IN OPPOSITION TO IBM'S MOTION FOR SUMMARY JUDGMENT ON SCO'S CONTRACT CLAIMS** <br><br> **FILED IN REDACTED FORM [ORIGINALLY FILED UNDER SEAL]** <br><br> Case No. 2:03CV0294DAK <br> Honorable Dale A. Kimball <br> Magistrate Judge Brooke C. Wells |

## Table of Contents

Table of Authorities ............................................................................................................ i

Preliminary Statement ....................................................................................................... 1

Statement of Material Facts .............................................................................................. 5

I.      OVERVIEW ............................................................................................................ 5

II.     THE PLAIN SCOPE OF THE AGREEMENTS ......................................................... 8

        A.      The Plain Scope of the IBM and Sequent Agreements ........................................... 8

        B.      The Plain Scope of the IBM Side Letter ............................................................... 10

III.    THE PLAIN TERMS OF THE AGREEMENTS REASONABLY
       PROTECTED THE VALUE OF UNIX. ....................................................................... 13

        A.      The Context of the Development of the UNIX Operating System. ....................... 13

        B.      The Popular and Valuable UNIX Ecosystem in 1985. ......................................... 14

        C.      The Significant Advantage Offered by the UNIX Head-Start ............................. 17

        D.      The Parties' Commercially Reasonable Protection of Their
               Interests. ............................................................................................................... 19

IV.    THE EXTRINSIC EVIDENCE CONFIRMS THE SCOPE OF THE
       UNIX LICENSE AGREEMENTS. .............................................................................. 24

        A.      Contemporaneous and Subsequent Licensing Documents. .................................. 24

        B.      The Testimony of Relevant Witnesses. ................................................................ 31

        C.      IBM's and Sequent's Acknowledgement of the Restrictive Scope
               of the Agreements. ............................................................................................... 52

i

V.      SANTA CRUZ'S ACQUISITION OF THE UNIX BUSINESS. ............................... 55

        A.      The Parties' Intent in the Asset Purchase Agreement............................ 55

        B.      The Parties' Intent in Amendments Nos. 1 and 2 to the APA. ............................ 58

        C.      Amendment No. X. ............................................................................ 59

VI.     IBM'S CONTRIBUTIONS TO LINUX IN BREACH OF ITS
        AGREEMENTS. .................................................................................. 61

VII.    SCO PROPERLY SOLD LICENSES FOR ITS INTELLECTUAL
        PROPERTY TO LINUX USERS. ........................................................... 63

        A.      SCO's Efforts to Protect Its Rights in UNIX. ..................................... 63

        B.      SCO's Distribution of Linux. ............................................................ 64

VIII.   IBM DESTROYS RELEVANT EVIDENCE AND ILLEGALLY
        HACKS INTO SCO'S WEBSITE IN PURSUIT OF EVIDENCE. ......................... 65

        A.      IBM Destroys Relevant Evidence Shortly After SCO Brings Suit....................... 65

        B.      IBM Illegally Hacks into SCO's Website to Try to Find Evidence. ................... 68

IX.     SCO REASONABLY UNDERTAKES TO END ITS LINUX
        BUSINESS. ......................................................................................... 69

        A.      SCO's Suspension of Its Distribution of Linux. ..................................... 69

        B.      SCO's Protection of Information on Its Website..................................... 70

X.      SCO HAS PROCEEDED IN GOOD FAITH IN DISCOVERY AND
        HAS DISCLOSED IBM'S MISCONDUCT IN DETAIL. ........................... 73

        A.      SCO's Good-Faith Efforts in Discovery............................................... 73

        B.      IBM's Intransigence in Discovery. ..................................................... 79

C.      SCO's December 2005 Final Disclosures...........................................................81

XI.   **NOVELL IMPROPERLY PURPORTS TO "WAIVE" SCO'S
      RIGHTS.** .......................................................................................................83

**Standard of Decision**.................................................................................................89

**Argument**....................................................................................................................89

I.    **SCO HAS ESTABLISHED A BREACH OF THE AGREEMENTS.** ......................91

A.      The Plain Language of the Agreements Prohibits  IBM's
        Disclosures from AIX and Dynix/ptx. ...................................................92

        1.      The Plain Language of the Sequent Agreement .......................98

        2.      The Plain Language of the IBM Agreement, Side Letter, and
                Amendment No. X. .........................................................100

B.      Any Contractual Ambiguity, as Well as the Extrinsic Evidence,
        Precludes IBM's Motion on the Meaning of the Agreements. ...........106

        1.      The Core Requirement of Confidentiality. ............................111

        2.      The UNIX Licensing Group. ................................................112

        3.      Methods and Concepts.........................................................112

        4.      Confidentiality Over Derivative Works..................................113

        5.      The IBM Side Letter. ..........................................................116

        6.      Integrated Agreements. .......................................................117

C.      The Restrictions in the Agreements on Disclosures from Derivative
        Works Is Reasonable..............................................................................118

        1.      The Parties' Shared Control Rights Under the Agreements. ...118

2. The Agreements Properly Reflect Copyright Law. ................................ 120

3. The Agreements Are Consistent with Public Policy............................... 121

4. The Scope of the Agreements Has Always Been Reasonable............... 126

    a. The Significant Advantage of the UNIX Head-Start in the UNIX in Ecosystem That Developed...................................... 126

    b. The Parties' Commercial Interests Regarding UNIX. ................ 128

    c. AT&T's UNIX Licenses Made Good Economic Sense. ............ 128

**II.** **THE SUBSTANTIAL EVIDENCE AND THE NEW YORK LAW OF EQUITABLE ESTOPPEL PLAINLY ALLOW SCO TO PURSUE ITS CLAIMS FOR BREACH OF CONTRACT. ........................................ 133**

  A. New York Law Does Not Support IBM's Estoppel Argument. ........................ 134

  B. IBM's Estoppel Argument Is Based on Sharply Disputed Facts. ....................... 143

    1. The Analyses of the Parties' Experts Defeat IBM's Version of Events.................................................................................................... 143

    2. Substantial Evidence Defeats IBM's Claim of Reliance. ....................... 144

    3. Amendment No. X Defeats IBM's Claim of Reliance. .......................... 147

    4. The Few Documents Regarding UNIX Flavors Also Are No Basis for Summary Judgment. ............................................................... 147

    5. The Fact of IBM's Investment in AIX Also Is No Basis for Summary Judgment. .......................................................................... 151

**III.** **THE SUBSTANTIAL EVIDENCE AND THE NEW YORK LAW OF WAIVER PLAINLY ALLOW SCO TO PURSUE ITS CLAIMS FOR BREACH OF CONTRACT. ........................................................................... 152**

A.    IBM's Primary Waiver Argument Is Based on Disputed Facts and
      An Incorrect View of the Law. .......................................................... 153

B.    Novell Does Not Have the Waiver Rights IBM Claims. .................................... 157

      1.    IBM's Interpretation of APA Section 4.16(b) Is Inconsistent
            With the Language, Purpose, and Intent of the APA. ............................. 158

            a.    IBM Misinterprets the Term "SVRX License". .......................... 160

            b.    IBM's Interpretation of 4.16(b) Would Defeat the
                  Whole Purpose of the APA. ......................................... 161

            c.    IBM's Interpretation of Section 4.16(b) Directly
                  Conflicts with Other Key Provisions of the APA. ...................... 162

            d.    IBM Improperly Disgregards Amendment No. 2. ...................... 163

      2.    The Extrinsic Evidence Directly Refutes IBM's Interpretation
            Of the Parties' Intent. ............................................... 165

C.    SCO's Linux Activities Do Not Constitute a Waiver. ......................................... 168

      1.    SCO Has Not "Waived" Its Contract Claims by Distributing
            Limited Linux Products. .......................................... 170

      2.    SCO Has Not Made "Publicly Available" Source Code That
            IBM Misappropriated. ............................................ 173

IV.   **SCO HAS TIMELY ASSERTED ITS CLAIMS RELATING TO
      RCU.** ....................................................................................... 174

**CONCLUSION** ...................................................................................... 177

## Table of Authorities

## Cases

67 Wall St. Co. v. Franklin Nat'l Bank, 37 N.Y.2d 245 (1975) ................................................ 109

Adobe Sys. Inc. v. One Stop Micro, Inc., 84 F. Supp. 2d 1086 (N.D. Cal. 2000)...................... 121

Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82 (2d Cir. 1998)........................................................................................................ 107

Alfin, Inc. v. Pac. Ins. Co., 735 F. Supp. 115 (S.D.N.Y. 1990).................................................. 109

Apollo Stell Corp. v. Sicolo and Massaro, 752 N.Y.S.2d 493 (App. Div. 2002) ....................... 154

Arcadian Phosphates v. Arcadian Corp., 884 F.2d 69 (2d Cir. 1989) ........................................ 138

Armstrong Virgin Records, Ltd., 91 F. Supp. 2d 628 (S.D.N.Y. 2000) ..................................... 151

Automatic Sys. Developers, Inc. v. Sabratek Corp., No. 93 Civ. 7149 (VLB), 1993 WL 535670 (S.D.N.Y. Dec. 22, 1993)............................................................................................. 138

Bank of N.Y. v. Murphy, 645 N.Y.S.2d 800 (App. Div 1996).................................................... 157

Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 5 Cal. 4th 854 (Ct. App. 1993) .......................................................................................................................................... 165

Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283 (S.D.N.Y. 2005) ................................................................................................................ 105, 106

Bennett v. U.S. Lines, Inc., 64 F.3d 62 (2d Cir. 1995) .............................................................. 134

Besicorp v. Enowitz, 652 N.Y.S.2d 366 (App. Div. 1997) ........................................................ 134

Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183 (10th Cir. 2000)........................................................................................................................... 89

i

Blumenfeld v. R. H. Macy & Co., 92 Cal. App. 3d 38 (Ct. App. 1979) .................................... 166

Boston Concessions Group v. Criterion Ctr. Corp., 606 N.Y.S.2d 696 (App. Div. 1994) ......... 152

Bouzo v. Citibank, 96 F.3d 51 (2d Cir. 1996) .......................................................................... 107

Boyer v. Bd. of County Comm'rs of Johnson County, 922 F. Supp. 476 (D. Kan. 1996) ........... 89

Brock v. Baskin Robbins, USA, Co., No. 5:99-CV-274, 2003 WL 21309428 (E.D. Tex. Jan. 17, 2003).............................................................................................................................. 137

Chase Manhattan Bank v. New Hampshire Ins. Co., 749 N.Y.S.2d 632 (Sup. Ct. 2002) .......... 125

City of N.Y. v. State, 40 N.Y.2d 659 (1976) ............................................................................. 153

Civil Serv. Employees Ass'n, Inc. v. Newman, 450 N.Y.S.2d 901 (App. Div. 1982) ............... 155

Compagnie Financiere de CIC et de L'Union Europeenne v. Merril Lynch, 232 F.3d 153 (2d Cir. 2000)............................................................................................................... 108

Computer Assocs. v. State St. Bank & Trust, 789 F. Supp. 470 (D. Mass. 1992) ..................... 121

Comvest Consulting, Inc. v. W.R.S.B. Dev. Co., 698 N.Y.S.2d 807 (App. Div. 1999) ............ 155

Cooper v. Mart Assocs., 225 Cal. App. 2d 108 (Ct. App. 1964)............................................... 163

Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435 (7th Cir. 1993)............................ 108

County of Marin v. Assessment Appeals Bd., 134 Cal. Rptr. 349 (Ct. App. 1976) ........... 161, 162

Creative Computing v. GetLoaded.com LLC, 386 F.3d 930 (9th Cir. 2004)............................. 174

David v. City & County of Denver, 101 F.3d 1344 (10th Cir. 1996)........................................... 89

Davison v. Kless, 280 N.Y. 252 (1939).................................................................................... 169

Dolgoff Holophase, Inc. v. E.I. Du Point de Nemours & Co., 212 N.Y.S.2d 769 (App. Div. 1995) ............................................................................................................................... 175

Dunlop-McCullen v. Pascarella, No. 97 Civ. 0195 (PKL) (DFE), 2002 WL 31521012 (S.D.N.Y. Nov. 13, 2002) ...................................................................................................... 134

EMI Music Mktg. v. Avatar Records, Inc., 317 F. Supp. 2d 412 (S.D.N.Y. 2004) ...................... 93

EOTT Energy Corp. v. Storebrand Int'l Ins. Co., A/S, 45 Cal. App. 4th 565 (Ct. App. 1996) ......................................................................................................................................... 165

EPN Ingenieria S.A. de C.V. v. Gen. Elec. Co., No. 92 Civ. 1563 (KMW), 1996 WL 531867 (S.D.N.Y. Sept. 19, 1996) ............................................................................................. 110

ESS & Vee Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc., 702 N.Y.S.2d 38 (App. Div. 2000) .......................................................................................................................... 172

Fashion Bug No. 2100 of Batavia, Inc. v. 425 W. Main Assocs., 10 Misc. 3d 1053(A) (N.Y. Sup. Ct. 2005) ........................................................................................................................ 141

G. & V. General Contractors, Inc. v. Goode, No. 86-7408, 1990 WL 79436 (E.D. Pa. June 7, 1990) .................................................................................................................................... 137

Garza v. Mar. Trans. Lines, Inc., 861 F.2d 23 (2d Cir. 1988) ...................................................... 92

Gebbia v. Toronto-Dominion Bank, 762 N.Y.S.2d 38 (App. Div 2003) ..................................... 137

Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85 N.Y.2d 232 (1995) .......... 169

Gilbert Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966 (1988) ...................................................... 172

Gomez v. Am. Elec. Power Serv. Corp., 726 F.2d 649 (10th Cir. 1984) .................................... 107

Harm v. Frasher, 181 Cal. App. 2d 405 (Ct. App. 1960) .................................................... 164, 168

Hartford Acc. & Indem. Co. v. Wesolowski, 350 N.Y.S.2d 895 (1973) ..................................... 107

Heidi E. v. Wanda W., 620 N.Y.S.2d 665 (App. Div. 1994) ........................................................ 153

Heidlebaugh v. Miller, 271 P.2d 557 (Cal. Ct. App. 1954) ........................................................ 162

Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc., 674 F. 2d 1336 (9th Cir. 1982) ........... 123

Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am., 933 F. Supp. 254 (S.D.N.Y. 1996) .................................................................................................................... 109

Heston v. Farmers Ins. Group, 160 Cal. App. 3d 402 (Ct. App. 1984) ...................................... 164

Hicks v. City of Watonga, 942 F.2d 737 (10th Cir. 1991) ........................................................... 89

Holloway v. King, 161 Fed. Appx. 122 (2d Cir. 2005) ............................................................... 136

Holm v. C.M.P. Sheet Metal, Inc., 455 N.Y.S.2d 429 (App. Div. 1982) ........................... 135, 138

HotSamba, Inc. v. Caterpillar Inc., No. 01 C 5540, 2004 WL 609797 (N.D. Ill. Mar. 25, 2004) ...................................................................................................................... 102, 122

I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc., 307 F. Supp. 2d 521 (S.D.N.Y. 2004) ...................................................................................................................... 174

IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581 (7th Cir. 2002) ...................................... 122, 124

Imperator Realty Co. v. Tull, 228 N.Y. 447 (1920)..................................................................... 139

In re Caldor, Inc., 217 B.R. 121 (Bankr. S.D.N.Y. 1998) .......................................................... 152

In re Ellison Assocs., 13 B.R. 661 (Bankr. S.D.N.Y. 1981)........................................................ 140

In re Indep. Serv. Orgs. Anti-Trust Litig., 964 F. Supp. 1469 (D. Kan. 1997).......................... 151

In re Sanders-Langsam Tobacco Co., 224 B.R. 1 (Bankr. E.D.N.Y. 1998) .............................. 153

In re Vebeliunas, 252 B.R. 878 (Bankr. S.D.N.Y. 2000) ........................................................... 140

Int'l Bus. Mach. Corp. v. Medlantic Healthcare Gp., 708 F. Supp. 417 (D.D.C. 1989) ............ 136

Int'l Chimney Corp. v. 26 W. Spring St. Assocs., 561 N.Y.S.2d 933 (App. Div. 1990) ... 138, 139

Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions, Inc., 732 F.Supp. 370 (S.D.N.Y. 1989)...................................................................................................................... 122

Jackson Jordan, Inc. v. Plasser Am. Corp., 219 U.S.P.Q. 922 (E.D. Va. 1983)........................ 150

Jacobsen v. Deseret Book Co., 287 F.3d 936 (10th Cir. 2002) .................................................. 150

Jacobson v. Sassower, 66 N.Y.2d 991 (1985) ............................................................................ 109

Jellinick v. Joseph J. Naples & Assocs., Inc., 296 A.D.2d 75 (App. Div. 2002).......................... 92

K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 827 F. Supp. 985 (S.D.N.Y. 1993)............... 170

Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563 (10th Cir. 1989).......................... 109

Kerns v. Mfrs. Hanover Trust Co., 272 N.Y.2d 535 (Sup. Ct. 1966)......................................... 134

Kling v. Hallmark Cards Inc., 225 F.3d 1030 (9th Cir. 2000)................................................... 150

Kysar v. Amoco Prod. Co., 379 F.3d 1150 (10th Cir. 2004)........................................................ 89

Leibowitz v. Elsevier Sci., Ltd., 927 F. Supp. 688 (S.D.N.Y. 1996).......................................... 170

Leo F. Piazza Paving Co. v. Found. Constructors, Inc., 128 Cal. App. 3d 583 (Ct. App.
1981) ......................................................................................................................................... 161

Mackinder v. Schawk, Inc., No. 00 Civ. 6098 (DAB), 2005 WL 1832385 (S.D.N.Y.
Aug. 2, 2005) ........................................................................................................................... 106

MacLean Assocs., Inc. v. Wm. W. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769 (3d
Cir. 1991).................................................................................................................................. 150

Madison-Oneida-Herkimer Consortium v. N. Am. Admins., 765 N.Y.S.2d 184 (Sup. Ct.
2003) ......................................................................................................................................... 170

Matter of Irving O. Farber, PLLC v. Kamalian, 791 N.Y.S.2d 609 (App. Div. 2005)................ 93

McDarren v. Marvel Entm't Group, Inc., No. 94 Civ. 0910 (LMM), 1995 WL 214482
(S.D.N.Y. Apr. 11, 1995)................................................................................................... 152, 169

McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825 (2d Cir. 1988).......... 110

McManus v. Board of Educ. of Hempstead Union Free Sch. Dist., 87 N.Y.2d 183
(1995).................................................................................................................................. 139, 141

v

Merrill Lynch v. Adler, 651 N.Y.S.2d 38 (App. Div. 1996) ........................................................ 92

Met. Paving Co. v. City of Aurora, Colo., 449 F.2d 177 (10th Cir. 1971)................................. 107

Miller v. Cont'l Ins. Co., 40 N.Y.2d 675 (1976) ........................................................ 125

Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150 (10th Cir. 1999)............... 108

N.Y. State Guernsey Breeders' Co-op v. Noyes, 22 N.Y.S.2d 132 (App. Div. 1940)....... 135, 139

Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175 (1982).................. 134, 139

Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc., 991 F.2d 426 (8th Cir. 1993)........ 121

Nat'l Envmtl. Serv. Co. v. Ronan Eng'g Co., 256 F.3d 995 (10th Cir. 2001)............................ 110

Navillus Tile, Inc. v. Turner Constr. Co., 770 N.Y.S.2d 3 (App. Div. 2003)............................. 172

NetTech Solutions, L.L.C. v. ZipPark.com, No. 01 Civ. 2683, 2001 WL 1111966
(S.D.N.Y. Sept. 20, 2001)........................................................................................................ 152

New England Mut. Life Ins. Co. v. Caruso, 73 N.Y.2d 74 (1989)............................................ 125

Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182 (2d Cir. 1996) ............................ 107

Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33 (1968)............. 165

Peck v. Peck, 649 N.Y.S.2d 22 (App. Div. 1996) .................................................................... 155

Pfoh v. Elec. Ins. Co., 788 N.Y.S.2d 441 (App. Div. 2005)...................................................... 125

Prof'l Staff Cong.-City Univ. of N.Y. v. N.Y. State Pub. Employee's Union, -- N.E.2d -
-, 2006 WL 2945367 (N.Y. Oct. 17, 2006)............................................................................... 153

Ramming v. Barnard, No. E030334, 2002 WL 393118 (Cal. Ct. App. Mar. 13, 2002)............. 165

RMLS Metals, Inc. v. Int'l Bus. Mach. Corp., 874 F. Supp. 74 (S.D.N.Y. 1995) ..................... 110

Robshaw v. Health Mgmt., Inc., 470 N.Y.S.2d 226 (App. Div. 1983)........................................ 93

Rocky 116 L.L.C. v. Weston, 717 N.Y.S.2d 823 (App. Div. 2000).......................................... 155

Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002).................................................. 89

Ronnen v. Ajax Elec. Motor Corp., 88 N.Y.2d 582 (1996)............................................... 92

Rose v. Spa Realty Assocs., 42 N.Y.2d 338 (1977) .................................................... 93

Rothschild v Title Guar. & Trust Co., 204 N.Y. 458 (1912) ........................................... 139

Rotterdam Square v. Town of Rotterdam, 717 N.Y.S.2d 473 (N.Y. Sup. 2000) ...................... 157

Ruttenberg v. Data Davidge Sys. Corp., 215 A.D.2d 191 (N.Y. App. Div. 1995).................... 107

Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174 (App. Div. 1995) ........................ 93

S&H Computer Sys., Inc. v. SAS Inst., Inc., 568 F. Supp. 416 (M.D. Tenn. 1983) ................. 120

Sassower v. Barone, 447 N.Y.S.2d 966 (App. Div. 1982) .......................................... 134

Schering v. Home Ins. Co., 712 F.2d 4 (2d Cir. 1983)...................................... 109, 110

Schock v. United States, 21 F. Supp. 2d 115 (D.R.I. 1998) ...................................... 150

Secs. Indus. Automation Corp. v. United Computer Capital Corp., 723 N.Y.S.2d 668
(App. Div. 2001).................................................................................. 152

Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992)............................ 107

Slayko v. Sec. Mut. Ins. Co., 98 N.Y.2d 289 (2002) ............................................. 125

So. Cal. Edison v. Super. Ct., 37 Cal. App. 4th 839 (Ct. App. 1995)........................... 166

State v. Home Indem., 66 N.Y.2d 669 (1985) .................................................. 107

Stoneybrook Realty, L.L.C. v. Cremktco, Inc., 675 N.Y.S.2d 749 (App. Term. 1998)............. 155

Structural Dynamics Research Corp. v. Eng'g Mechanics Research Corp., 401 F. Supp. 1102 (D. Mich. 1975) .................................................................................................. 123

T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 2001-900 KC, 2002 WL 1311648 (N.Y. App. Term. Apr. 2, 2002) ................................................................. 153

Tehan v. Thos. C. Peters Printing Co., 421 N.Y.S.2d 465 (App. Div. 1979) ............................ 155

Thayer v. Dial Indus. Sales, Inc., 85 F. Supp. 2d 263 (S.D.N.Y. 2000) ...................................... 137

Theofel v. Farey-Jones, 359 F.3d 1066 (9th Cir. 2004) ................................................................ 174

Towers Charter & Marine Corp. v. Cadillac Ins. Co., 708 F. Supp. 612 (S.D.N.Y. 1989) .......... 93

Towne Gardens v. McDonalds Corp., No. 04-CV-292S, 2005 WL 2406004 (W.D.N.Y. Sept. 29, 2005) ............................................................................................................ 137, 148

Trainor v. Apollo Metal Specialities, Inc., 318 F.3d 976 (10th Cir. 2002) ................................... 91

United Commodities-Greece v. Fid. Int'l Bank, 64 N.Y.2d 449 (1985) ...................................... 153

Viacao Aerea Sao Paulo, S.A. v. Int'l Lease Fin. Corp., 859 F.2d 924, 1988 WL 103286 (9th Cir. 1988) ......................................................................................................... 161

Wechsler v. Hunt Health Sys., 216 F. Supp. 2d 347 (S.D.N.Y. 2002) ....................................... 125

Westchester Resco Co., L.P. v. New England Reinsurance Corp., 818 F.2d 2 (2d Cir. 1987) .................................................................................................................... 109

Whelan Assocs. v. Jaslow Dental Lab., 609 F. Supp. 1307 (E.D. Pa. 1985) .............................. 120

White v. LaDue & Fitch, 303 N.Y. 122 (1951) ........................................................................... 139

Windsor Plumbing Supply Co. v. Windsor Showroom, Inc., 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ............................................................................................................ 140

Wolf v. Super. Ct., 114 Cal. App. 4th 1343 (Ct. App. 2004) ..................................................... 165

World Trade Ctr. Props. v. Hartford Fire Ins. Co., 345 F.3d 154 (2d Cir. 2003) ...................... 165

_Wyeth v. King Pharmaceuticals, Inc._, 396 F. Supp. 2d 280 (E.D.N.Y. 2005) ........................... 152

_Zep Mfg. Co. v. B. Harthcock_, 824 S.W.2d 654 (Tex. Ct. App. 1992)...................................... 123

**Cases**

_67 Wall St. Co. v. Franklin Nat'l Bank_, 37 N.Y.2d 245 (1975) .................................................. 109

_Adobe Sys. Inc. v. One Stop Micro, Inc._, 84 F. Supp. 2d 1086 (N.D. Cal. 2000)...................... 121

_Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London_,
136 F.3d 82 (2d Cir. 1998)......................................................................................................... 107

_Alfin, Inc. v. Pac. Ins. Co._, 735 F. Supp. 115 (S.D.N.Y. 1990).................................................. 109

_Apollo Stell Corp. v. Sicolo and Massaro_, 752 N.Y.S.2d 493 (App. Div. 2002) ....................... 154

_Arcadian Phosphates v. Arcadian Corp._, 884 F.2d 69 (2d Cir. 1989) ....................................... 138

_Armstrong Virgin Records, Ltd._, 91 F. Supp. 2d 628 (S.D.N.Y. 2000) ..................................... 151

_Automatic Sys. Developers, Inc. v. Sabratek Corp._, No. 93 Civ 7149 (VLB), 1993 WL
535670 (S.D.N.Y. Dec. 22, 1993)............................................................................................... 138

_Bank of N.Y. v. Murphy_, 645 N.Y.S.2d 800 (App. Div 1996)..................................................... 157

_Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co._, 5 Cal. 4th 854 (Ct. App.
1993) .......................................................................................................................................... 165

_Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc._, 361 F. Supp. 2d 283
(S.D.N.Y. 2005) ................................................................................................................ 105, 106

_Bennett v. U.S. Lines, Inc._, 64 F.3d 62 (2d Cir. 1995) .............................................................. 134

_Besicorp v. Enowitz_, 652 N.Y.S.2d 366 (App. Div. 1997) ......................................................... 134

_Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co._, 214 F.3d 1183
(10th Cir. 2000)............................................................................................................................ 89

Blumenfeld v. R. H. Macy & Co., 92 Cal. App. 3d 38 (Ct. App. 1979) .................................... 166

Boston Concessions Group v. Criterion Ctr. Corp., 606 N.Y.S.2d 696 (App. Div. 1994)......... 152

Bouzo v. Citibank, 96 F.3d 51 (2d Cir. 1996) .......................................................................... 107

Boyer v. Bd. of County Comm'rs of Johnson County, 922 F. Supp. 476 (D. Kan. 1996)........... 89

Brock v. Baskin Robbins, USA, Co., No. 5:99-CV-274, 2003 WL 21309428 (E.D. Tex. Jan. 17, 2003)......................................................................................................................... 137

Chase Manhattan Bank v. New Hampshire Ins. Co., 749 N.Y.S.2d 632 (Sup. Ct. 2002).......... 125

City of N.Y. v. State, 40 N.Y.2d 659 (1976) ............................................................................ 153

Civil Serv. Employees Ass'n, Inc. v. Newman, 450 N.Y.S.2d 901 (App. Div. 1982)............... 155

Compagnie Financiere de CIC et de L'Union Europeenne v. Merril Lynch, 232 F.3d 153 (2d Cir. 2000)................................................................................................................ 108

Computer Assocs. v. State St. Bank & Trust, 789 F. Supp. 470 (D. Mass. 1992) .................... 121

Comvest Consulting, Inc. v. W.R.S.B. Dev. Co., 698 N.Y.S.2d 807 (App. Div. 1999) ............ 155

Cooper v. Mart Assocs., 225 Cal. App. 2d 108 (Ct. App. 1964)................................................ 163

Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435 (7th Cir. 1993).............................. 108

County of Marin v. Assessment Appeals Bd., 134 Cal. Rptr. 349 (Ct. App. 1976)........... 161, 162

Creative Computing v. GetLoaded.com LLC, 386 F.3d 930 (9th Cir. 2004)............................. 174

David v. City & County of Denver, 101 F.3d 1344 (10th Cir. 1996).......................................... 89

Davison v. Kless, 280 N.Y. 252 (1939)................................................................................... 169

Dolgoff Holophase, Inc. v. E.I. Du Point de Nemours & Co., 212 N.Y.S.2d 769 (App. Div. 1995) .......................................................................................................................... 175

x

Dunlop-McCullen v. Pascarella, No. 97 Civ. 0195 (PKL) (DFE), 2002 WL 31521012 (S.D.N.Y. Nov. 13, 2002) .................................................................................................. 134

EMI Music Mktg. v. Avatar Records, Inc., 317 F. Supp. 2d 412 (S.D.N.Y. 2004) ..................... 93

EOTT Energy Corp. v. Storebrand Int'l Ins. Co., A/S, 45 Cal. App. 4th 565 (Ct. App. 1996) ............................................................................................................................... 165

EPN Ingenieria S.A. de C.V. v. Gen. Elec. Co., No. 92 Civ. 1563 (KMW), 1996 WL 531867 (S.D.N.Y. Sept. 19, 1996) ............................................................................... 110

ESS & Vee Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc., 702 N.Y.S.2d 38 (App. Div. 2000) ................................................................................................... 172

Fashion Bug No. 2100 of Batavia, Inc. v. 425 W. Main Assocs., 10 Misc. 3d 1053(A) (N.Y. Sup. Ct. 2005) ....................................................................................................... 141

G. & V. General Contractors, Inc. v. Goode, No. 86-7408, 1990 WL 79436 (E.D. Pa. June 7, 1990) ................................................................................................................. 137

Garza v. Mar. Trans. Lines, Inc., 861 F.2d 23 (2d Cir. 1988) ........................................................ 92

Gebbia v. Toronto-Dominion Bank, 762 N.Y.S.2d 38 (App. Div 2003) ...................................... 137

Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85 N.Y.2d 232 (1995) .......... 169

Gilbert Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966 (1988) ........................................................ 172

Gomez v. Am. Elec. Power Serv. Corp., 726 F.2d 649 (10th Cir. 1984) ..................................... 107

Harm v. Frasher, 181 Cal. App. 2d 405 (Ct. App. 1960) .................................................... 164, 168

Hartford Acc. & Indem. Co. v. Wesolowski, 350 N.Y.S.2d 895 (1973) ...................................... 107

Heidi E. v. Wanda W., 620 N.Y.S.2d 665 (App. Div. 1994) ........................................................ 153

Heidlebaugh v. Miller, 271 P.2d 557 (Cal. Ct. App. 1954) .......................................................... 162

Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc., 674 F. 2d 1336 (9th Cir. 1982) ........... 123

xi

Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am., 933 F. Supp. 254 (S.D.N.Y. 1996) ................................................................................................................................ 109

Heston v. Farmers Ins. Group, 160 Cal. App. 3d 402 (Ct. App. 1984) ...................................... 164

Hicks v. City of Watonga, 942 F.2d 737 (10th Cir. 1991) .......................................................... 89

Holloway v. King, 161 Fed. Appx. 122 (2d Cir. 2005) .............................................................. 136

Holm v. C.M.P. Sheet Metal, Inc., 455 N.Y.S.2d 429 (App. Div. 1982) ........................... 135, 138

HotSamba, Inc. v. Caterpillar Inc., No. 01 C 5540, 2004 WL 609797 (N.D. Ill. Mar. 25, 2004) ........................................................................................................................... 102, 122

I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc., 307 F. Supp. 2d 521 (S.D.N.Y. 2004) ...................................................................................................................... 174

IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581 (7th Cir. 2002) ...................................... 122, 124

Imperator Realty Co. v. Tull, 228 N.Y. 447 (1920) .................................................................... 139

In re Caldor, Inc., 217 B.R. 121 (Bankr. S.D.N.Y. 1998) .......................................................... 152

In re Ellison Assocs., 13 B.R. 661 (Bankr. S.D.N.Y. 1981) ....................................................... 140

In re Indep. Serv. Orgs. Anti-Trust Litig., 964 F. Supp. 1469 (D. Kan. 1997) ........................... 151

In re Sanders-Langsam Tobacco Co., 224 B.R. 1 (Bankr. E.D.N.Y. 1998) ................................ 153

In re Vebeliunas, 252 B.R. 878 (Bankr. S.D.N.Y. 2000) ............................................................ 140

Int'l Bus. Mach. Corp. v. Medlantic Healthcare Gp., 708 F. Supp. 417 (D.D.C. 1989) ............ 136

Int'l Chimney Corp. v. 26 W. Spring St. Assocs., 561 N.Y.S.2d 933 (App. Div. 1990) ... 138, 139

Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions, Inc., 732 F.Supp. 370 (S.D.N.Y. 1989) ...................................................................................................................... 122

Jackson Jordan, Inc. v. Plasser Am. Corp., 219 U.S.P.Q. 922 (E.D. Va. 1983) ........................ 150

xii

Jacobsen v. Deseret Book Co., 287 F.3d 936 (10th Cir. 2002) .................................................. 150

Jacobson v. Sassower, 66 N.Y.2d 991 (1985) .......................................................................... 109

Jellinick v. Joseph J. Naples & Assocs., Inc., 296 A.D.2d 75 (App. Div. 2002).......................... 92

K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 827 F. Supp. 985 (S.D.N.Y. 1993).............. 170

Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563 (10th Cir. 1989).......................... 109

Kerns v. Mfrs. Hanover Trust Co., 272 N.Y.2d 535 (Sup. Ct. 1966)......................................... 134

Kling v. Hallmark Cards Inc., 225 F.3d 1030 (9th Cir. 2000)..................................................... 150

Kysar v. Amoco Prod. Co., 379 F.3d 1150 (10th Cir. 2004)........................................................ 89

Leibowitz v. Elsevier Sci., Ltd., 927 F. Supp. 688 (S.D.N.Y. 1996).......................................... 170

Leo F. Piazza Paving Co. v. Found. Constructors, Inc., 128 Cal. App. 3d 583 (Ct. App.
1981) ..................................................................................................................................... 161

Mackinder v. Schawk, Inc., No. 00 Civ. 6098 (DAB), 2005 WL 1832385 (S.D.N.Y.
Aug. 2, 2005) ........................................................................................................................ 106

MacLean Assocs., Inc. v. Wm. W. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769 (3d
Cir. 1991) .............................................................................................................................. 150

Madison-Oneida-Herkimer Consortium v. N. Am. Admins., 765 N.Y.S.2d 184 (Sup. Ct.
2003) ..................................................................................................................................... 170

Matter of Irving O. Farber, PLLC v. Kamalian, 791 N.Y.S.2d 609 (App. Div. 2005)................. 93

McDarren v. Marvel Entm't Group, Inc., No. 94 Civ. 0910 (LMM), 1995 WL 214482
(S.D.N.Y. Apr. 11, 1995)................................................................................................. 152, 169

McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825 (2d Cir. 1988).......... 110

McManus v. Board of Educ. of Hempstead Union Free Sch. Dist., 87 N.Y.2d 183
(1995)................................................................................................................................ 139, 141

Merrill Lynch v. Adler, 651 N.Y.S.2d 38 (App. Div. 1996) ........................................................ 92

Met. Paving Co. v. City of Aurora, Colo., 449 F.2d 177 (10th Cir. 1971).................................. 107

Miller v. Cont'l Ins. Co., 40 N.Y.2d 675 (1976) ........................................................ 125

Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150 (10th Cir. 1999).............. 108

N.Y. State Guernsey Breeders' Co-op v. Noyes, 22 N.Y.S.2d 132 (App. Div. 1940) ....... 135, 139

Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175 (1982).................. 134, 139

Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc., 991 F.2d 426 (8th Cir. 1993)........ 121

Nat'l Envmtl. Serv. Co. v. Ronan Eng'g Co., 256 F.3d 995 (10th Cir. 2001)........................... 110

Navillus Tile, Inc. v. Turner Constr. Co., 770 N.Y.S.2d 3 (App. Div. 2003)............................. 172

NetTech Solutions, L.L.C. v. ZipPark.com, No. 01 Civ. 2683, 2001 WL 1111966
(S.D.N.Y. Sept. 20, 2001)........................................................................................................ 152

New England Mut. Life Ins. Co. v. Caruso, 73 N.Y.2d 74 (1989)............................................ 125

Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182 (2d Cir. 1996) ............................ 107

Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33 (1968)............. 165

Peck v. Peck, 649 N.Y.S.2d 22 (App. Div. 1996) ..................................................................... 155

Pfoh v. Elec. Ins. Co., 788 N.Y.S.2d 441 (App. Div. 2005)...................................................... 125

Prof'l Staff Cong.-City Univ. of N.Y. v. N.Y. State Pub. Employee's Union, -- N.E.2d -
-, 2006 WL 2945367 (N.Y. Oct. 17, 2006)............................................................................. 153

Ramming v. Barnard, No. E030334, 2002 WL 393118 (Cal. Ct. App. Mar. 13, 2002)............. 165

RMLS Metals, Inc. v. Int'l Bus. Mach. Corp., 874 F. Supp. 74 (S.D.N.Y. 1995) .................... 110

Robshaw v. Health Mgmt., Inc., 470 N.Y.S.2d 226 (App. Div. 1983)...........................................93

Rocky 116 L.L.C. v. Weston, 717 N.Y.S.2d 823 (App. Div. 2000)..........................................155

Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002)............................................................89

Ronnen v. Ajax Elec. Motor Corp., 88 N.Y.2d 582 (1996)........................................................92

Rose v. Spa Realty Assocs., 42 N.Y.2d 338 (1977) ...................................................................93

Rothschild v Title Guar. & Trust Co., 204 N.Y. 458 (1912) .....................................................139

Rotterdam Square v. Town of Rotterdam, 717 N.Y.S.2d 473 (N.Y. Sup. 2000) .......................157

Ruttenberg v. Data Davidge Sys. Corp., 215 A.D.2d 191 (N.Y. App. Div. 1995)....................107

Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174 (App. Div. 1995) ............................93

S&H Computer Sys., Inc. v. SAS Inst., Inc., 568 F. Supp. 416 (M.D. Tenn. 1983) .................120

Sassower v. Barone, 447 N.Y.S.2d 966 (App. Div. 1982) ........................................................134

Schering v. Home Ins. Co., 712 F.2d 4 (2d Cir. 1983) .......................................................109, 110

Schock v. United States, 21 F. Supp. 2d 115 (D.R.I. 1998) .....................................................150

Secs. Indus. Automation Corp. v. United Computer Capital Corp., 723 N.Y.S.2d 668
(App. Div. 2001).......................................................................................................................152

Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992) ...............................107

Slayko v. Sec. Mut. Ins. Co., 98 N.Y.2d 289 (2002) ...............................................................125

So. Cal. Edison v. Super. Ct., 37 Cal. App. 4th 839 (Ct. App. 1995).......................................166

State v. Home Indem., 66 N.Y.2d 669 (1985) ..........................................................................107

Stoneybrook Realty, L.L.C. v. Cremktco, Inc., 675 N.Y.S.2d 749 (App. Term. 1998).............155

Structural Dynamics Research Corp. v. Eng'g Mechanics Research Corp., 401 F. Supp. 1102 (D. Mich. 1975)....................................................................................................... 123

T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 2001-900 KC, 2002 WL 1311648 (N.Y. App. Term. Apr. 2, 2002) ................................................................... 153

Tehan v. Thos. C. Peters Printing Co., 421 N.Y.S.2d 465 (App. Div. 1979) ............................ 155

Thayer v. Dial Indus. Sales, Inc., 85 F. Supp. 2d 263 (S.D.N.Y. 2000) ..................................... 137

Theofel v. Farey-Jones, 359 F.3d 1066 (9th Cir. 2004)............................................................. 174

Towers Charter & Marine Corp. v. Cadillac Ins. Co., 708 F. Supp. 612 (S.D.N.Y. 1989).......... 93

Towne Gardens v. McDonalds Corp., No. 04-CV-292S, 2005 WL 2406004 (W.D.N.Y. Sept. 29, 2005) ................................................................................................... 137, 148

Trainor v. Apollo Metal Specialities, Inc., 318 F.3d 976 (10th Cir. 2002) ................................... 91

United Commodities-Greece v. Fid. Int'l Bank, 64 N.Y.2d 449 (1985) ..................................... 153

Viacao Aerea Sao Paulo, S.A. v. Int'l Lease Fin. Corp., 859 F.2d 924, 1988 WL 103286 (9th Cir. 1988)............................................................................................ 161

Wechsler v. Hunt Health Sys., 216 F. Supp. 2d 347 (S.D.N.Y. 2002) ....................................... 125

Westchester Resco Co., L.P. v. New England Reinsurance Corp., 818 F.2d 2 (2d Cir. 1987) ............................................................................................................................... 109

Whelan Assocs. v. Jaslow Dental Lab., 609 F. Supp. 1307 (E.D. Pa. 1985)............................... 120

White v. LaDue & Fitch, 303 N.Y. 122 (1951) ......................................................................... 139

Windsor Plumbing Supply Co. v. Windsor Showroom, Inc., 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ..................................................................................................... 140

Wolf v. Super. Ct., 114 Cal. App. 4th 1343 (Ct. App. 2004) ..................................................... 165

World Trade Ctr. Props. v. Hartford Fire Ins. Co., 345 F.3d 154 (2d Cir. 2003) ....................... 165

Wyeth v. King Pharmaceuticals, Inc., 396 F. Supp. 2d 280 (E.D.N.Y. 2005) ............................ 152

Zep Mfg. Co. v. B. Harthcock, 824 S.W.2d 654 (Tex. Ct. App. 1992) ...................................... 123

**Other Authorities**

31 C.J.S. Estoppel § 133 ..................................................................................................... 138

57 N.Y. Jur. 2d Estoppel, Ratification & Waiver § 43 ........................................................ 138

Contracts § 7.14 (2d ed. 1990) ........................................................................................... 107

Federal Practice and Procedure: Civil 2d § 2730.1 (2d ed. 1983) ..................................... 107

Nimmer on Law of Computer Technology § 3:37 (2006) .................................................... 123

Restatement (Second) of Contracts § 212(2) (1981) .......................................................... 107

The Law of Contracts § 11-18(a) (3d ed. 1987) ................................................................. 106

Williston, On Contracts (4th ed. 2002) ....................................................................... 106, 123

Plaintiff, the SCO Group, Inc. ("SCO"), respectfully submits this Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims.

### Preliminary Statement

IBM moves for summary judgment on the grounds that the Court should dismiss SCO's contract claims as a matter of law on the basis of only part of the contradictory testimony of only a few of many relevant witnesses and documents. SCO shows below that each of IBM's factual predicates are disputed by competent and overwhelming evidence and that IBM's legal arguments are similarly unfounded.

First, IBM argues briefly otherwise, but the plain language of the standard AT&T UNIX license agreement required the licensee to hold in confidence all parts of the modifications and derivative works the licensee developed based on the licensed UNIX software product. IBM does not dispute that it developed such a derivative work, AIX, and acquired another such derivative work, Dynix/ptx, when it acquired Sequent Computer Systems, Inc. in the late 1990s. IBM also does not dispute that it made hundreds of contributions or disclosures of technology to Linux development from AIX and Dynix/ptx. There is no reading of the agreement to support IBM's theory that the source code, methods and concepts it developed fall outside the confidentiality restrictions when they were created as part of or added to such derivative works.

Second, although IBM entered into a side letter with AT&T that amended aspects of its standard UNIX license agreement, none of those amendments permitted IBM openly to disclose the source code of a product, such as AIX, into which IBM had indisputably copied UNIX source code. In addition, as stated by the clear language of the AT&T's UNIX license agreements, the amendments of the IBM Side Letter did not affect the terms of the standard

UNIX license agreement into which Sequent had entered. The vast majority of contributions to Linux that SCO challenges here were made from Sequent's Dynix/ptx derivative work.

Third, in addition to the fact that any contractual ambiguity in the agreements at issue precludes summary judgment under New York law, IBM's reliance on only selected extrinsic evidence is improper. IBM disregards the sworn testimony of numerous witnesses responsible for negotiating, overseeing, interpreting and enforcing the UNIX license agreements for decades and contemporaneous documents contradicting the position that IBM and selected declarants now advance. That evidence underscores the narrow sample of evidence on which IBM relies in its Motion and easily permits the inference that the testimony IBM does cite is unreliable. In addition, the parties' respective businesses and economic incentives at the time of contracting – evidence supported by SCO expert witness Dr. Gary Pisano and that IBM concedes to be relevant in the event of ambiguity in the Agreements – bears out the reasonable scope of the Agreements as SCO has explained them.

Fourth, in addition to the substantial number of relevant witnesses whose testimony IBM's Motion fails to account for or reconcile, the selected witnesses on whom IBM does rely have given other testimony belying IBM's arguments.

Otis Wilson. Mr. Wilson testifies that AT&T decided in the mid-1980s to "abandon" protecting its methods and concepts in UNIX and that a licensee had to keep confidential only the UNIX source code, but fourteen years ago he testified that AT&T always sought to protect its methods and concepts and that a licensee was obligated to keep confidential any derivative work it created with "exposure" to UNIX or by using "contaminated" programmers.

David Frasure. Mr. Frasure gives much the same testimony now as Mr. Wilson, but he gave testimony in the same case as Mr. Wilson fourteen years ago and gave much the same testimony then as Mr. Wilson did – testimony that is almost the exact opposite of what they claim now.

Ed Chatlos. Mr. Chatlos worked for Novell, Inc. in 1995 when, as he has confirmed in this case, Novell intended to and did sell its UNIX business and copyrights to SCO's predecessor-in-interest The Santa Cruz Operation, Inc. IBM met with him and drafted a declaration for his signature, but the declaration bore so little resemblance to what Mr. Chatlos had told IBM that he declined to sign any version of it.

> "Q:    Would you have signed that declaration if it accurately reflected what you had discussed with counsel for IBM?
>
> A.    Yes.
>
> Q.    Why didn't you sign the declaration?
>
> A.    It didn't accurately reflect what was -- what I said."

Ira Kistenberg. IBM met with and drafted a declaration for Mr. Kistenberg's signature regarding his work for AT&T in the 1980s, but when SCO approached him and explained what IBM was using his declaration to say, Mr. Kistenberg signed a new declaration clarifying that AT&T always sought to protect its UNIX methods and concepts, that it required its licensees to keep confidential their derivative works based on the licensed UNIX software product, and that he never represented otherwise to anyone from Sequent (or any other licensee). He then confirmed those views at deposition.

Larry Bouffard. IBM met with and drafted a declaration for Mr. Bouffard's signature regarding his work for Santa Cruz in the late 1980s and for Novell in the 1990s,

3

but when SCO approached Mr. Bouffard and explained what IBM was using his

declaration to say, Mr. Bouffard signed a new declaration clarifying that AT&T and

successors-in-interest did not intend to permit IBM to use its derivative works to create

unlicensed UNIX clones, as IBM has done with Linux, and that neither IBM nor Novell

enjoy the rights that IBM claims they do.

Such evidence reveals a pattern whereby witnesses have signed declarations, drafted by IBM,

that turn out not to reflect the witnesses' true understanding of or intent in the agreements and

transactions at issue, or that plainly contradict testimony the witnesses have previously given or

contradict contemporaneous documents that IBM simply chooses to ignore.  The clarifications of

declarations as they have been drafted or used by IBM underscores the need for the trier of fact

to reach conclusions and draw inferences from those disputed facts.

Fifth, IBM's arguments for "estoppel" and "waiver" suffer from the same defects of

unambiguous contractual language, contradictory extrinsic evidence, and improper inference.

IBM further argues that Novell had the right to and did "waive" SCO's claims against IBM by

virtue of mid-1990s agreements between Novell and Santa Cruz, but substantial, relevant

evidence of those transactions – including the language of the agreements and amendments

thereto and the testimony of all of the principal negotiators on both sides of the transactions –

contradicts IBM's "facts" and arguments.  Both Mr. Chatlos and Mr. Bouffard, for example,

explain why IBM is wrong.

SCO's evidence creates genuine disputes over every assertedly material fact that IBM

relies upon for its Motion, or there is simply no genuine support for IBM's position.  SCO

4

respectfully submits, for the reasons summarized above and set forth in detail below, that the Court should deny IBM's Motion.

## Statement of Material Facts

### I.    OVERVIEW

1.      In the 1960s and 1970s, Bell Laboratories and AT&T developed the seminal and valuable innovation of the UNIX computer operating system.  AT&T licensed the UNIX source code to numerous universities and companies for their internal use, requiring those entities to keep the source code, and the methods and concepts embodied therein, confidential.

2.      In the early 1980s, AT&T decided to commercialize in earnest its UNIX asset, which AT&T had developed into its "UNIX System V" software product.  AT&T began to enter into updated and new UNIX license agreements with numerous companies, giving the companies the right to use the licensed software product to create modifications and derivative works based on the licensed software product.

3.      Under AT&T's standard UNIX license agreement, the companies were entitled to distribute in binary format their modifications and derivative works, or UNIX "flavors," and were obligated to pay AT&T a royalty for each such distribution.  In a market in which UNIX flavors were in high demand, the licensees benefited substantially from the arrangement by receiving a multi-year head-start in their ability to distribute a UNIX operating system to increase their hardware sales significantly.

4.      In exchange for the highly valuable head-start and increased hardware sales the UNIX System V licensees thus realized, as set forth in the plain terms of the standard agreement, the licensees were obligated treat their modifications and derivative works as if they were part of

5

the licensed UNIX System V software product – that is, to hold in confidence for AT&T not only the licensed UNIX System V software product (including the methods and concepts embodied therein), but also all parts of the licensees' modifications and derivative works (including the methods and concepts therein).

5.      The standard arrangement made sense from the perspective of both AT&T and its licensees. AT&T sought to protect its business of licensing the source code of its UNIX software product to create binary royalty streams.  The licensees, in turn, were in the business of creating competitive UNIX flavors to increase their hardware sales – not the business of competing with AT&T by licensing UNIX or UNIX-flavor source code to create their own binary royalties or by trying to develop unlicensed, royalty-free UNIX clones.

6.      On occasion AT&T clarified and even amended its standard agreement in writing, such as it did with IBM in 1985.  In no instance, however, did AT&T abandon the core protections for its licensing business.  Indeed, in the 1980s, IBM's business model was notoriously "closed," and IBM had and expressed no desire to reserve for itself the right to develop an unlicensed, royalty-free UNIX clone.  In addition, as the plain language of the agreements also made clear, any amendments for IBM applied only to IBM.

7.      Sequent, like IBM, was among the companies who entered into UNIX System V license agreements with AT&T in 1985, and who proceeded to develop modifications and derivative works based on the licensed UNIX System V software product.  IBM called its UNIX flavor AIX, and Sequent called its flavor Dynix, and eventually Dynix/ptx.

8.      AIX and Dynix/ptx are derivative works of UNIX System V within the meaning of AT&T's UNIX license agreements, as well as within the meaning of that term under the

copyright law.  IBM has acknowledged as much internally.  IBM has also repeatedly acknowledged internally since 1985 that it is obligated to hold AIX in confidence for AT&T.

9.      IBM has contributed to Linux, however, a wealth of source code, methods, concepts, techniques, know-how and other such technology taken from AIX and Dynix/ptx.  The technology that IBM contributed from those UNIX flavors was a very substantial factor in Linux's development into a commercially hardened operating system appropriate for use by large companies.

10.     After SCO came generally to understand the process that IBM had followed and the technology that IBM had used in significantly advancing Linux into a commercially hardened operating system at the expense of the historical UNIX business, SCO raised the issues with IBM to resolve the issues amicably.  When IBM denied any culpability and threatened to retaliate against SCO or else simply put SCO off, SCO filed this lawsuit.  After IBM continued to refuse to discuss any meaningful solutions and the parties were unable to resolve their differences, SCO terminated IBM's UNIX agreements.

11.     Given the significant improvements to Linux from the initial IBM contributions in 2000, IBM's continued contributions from AIX and Dynix/ptx,  and the perception among prospective Linux users of the importance of IBM's role in developing Linux based on its experience with UNIX flavors, the development of Linux caused a precipitous fall in Santa Cruz's revenues from its UNIX products, and in SCO's UNIX revenues after it (as Caldera International, Inc.) acquired Santa Cruz's UNIX assets in 2001.

12.     IBM, in sharp contrast, has proceeded to generate billions of dollars in Linux-related revenues for itself since 2000, as a result of the conversion of Linux into a commercially hardened operating system.

## II.     THE PLAIN SCOPE OF THE AGREEMENTS

### A.     The Plain Scope of the IBM and Sequent Agreements.

13.     The identical license agreements that AT&T entered into with IBM in February 1985 and with Sequent in April 1985 contain provisions governing the licensee's rights to use the licensed software product and to prepare modifications and derivative works based on that software product.  These provisions are contained in Section 2.01 of the Agreements (IBM Ex. 119, IBM Ex. 492)[1], which states:

> AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE'S own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT.  Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT.

14.     Section 1.04 of the Agreements defines "SOFTWARE PRODUCT" as "materials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS."  (IBM Ex. 119, IBM Ex. 492.)  The "SOFTWARE PRODUCT" includes UNIX System V source code, methods, and concepts.  (§7.06(a).)

---

[1]     The documents, declarations, and depositions supporting SCO's response are appended to the November 11, 2006, Declaration of Brent O.Hatch and are cited herein as "Ex. __."  Where exhibits attached to IBM's September 25, 2006, Declaration of Todd M. Shaughnessy are referenced herein, they are cited as "IBM Ex. __."

15.     Section 7.06(a) of the Agreement states in relevant part:

LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS
subject to this Agreement in confidence for AT&T.  LICENSEE further agrees
that it shall not make any disclosure of any or all of such SOFTWARE
PRODUCTS (including methods or concepts utilized therein) to anyone, except to
employees of LICENSEE to whom such disclosure is necessary to the use for
which rights are granted hereunder.

16.     Section 7.06(b) of the Agreements states in relevant part:

Notwithstanding the provisions of Section 7.06(a), LICENSEE may distribute
copies of a SOFTWARE PRODUCT, either in modified or unmodified form, to
third parties having licenses of equivalent scope herewith from AT&T (or a
corporate affiliate thereof) for the same SOFTWARE PRODUCT, provided that
LICENSEE first verifies the status of any such third party in accordance with
specific instructions issued by AT&T.

17.     Section 7.10 of the Agreements states:  "Except as provided in Section 7.06(b),

nothing in this agreement grants to LICENSEE the right to sell, lease or otherwise transfer or

dispose of a SOFTWARE PRODUCT in whole or in part."

18.     Section 7.13 of the Agreements contains a New York choice-of-law provision,

and the Agreements also contain a merger and integration clause in Paragraph 4:

This Agreement and its Supplements set forth the entire agreement and
understanding between the parties as to the subject matter hereof and merge all
prior discussions between them, and neither of the parties shall be bound by any
conditions, definitions, warranties, understandings or representations with respect
to such subject matter other than as expressly provided herein or as duly set forth
on or subsequent to the date of acceptance hereof in writing and signed by a
proper and duly authorized representative of the party to be bound thereby.  No
provision appearing on any form originated by LICENSEE shall be applicable
unless such provision is expressly accepted in writing by an authorized
representative of AT&T.

19.     AT&T permitted licensees to use UNIX System V to develop modifications and

derivative works based on the UNIX System V software product, "provided the resulting

materials are treated hereunder as part of the original SOFTWARE PRODUCT." (§ 2.01.)   All

9

of the use, transfer, export, and confidentiality restrictions that applied to the original UNIX software product also covered any such modifications or derivative works. The Agreement further specifies: "Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part." (§ 7.10.) The Agreement thus again prohibits the licensee from disclosing any "part" of the "resulting materials." (§§ 2.01; 7.06(a); 7.10.)

20.     Licensees executed separate sublicensing agreements, which gave them the right to distribute their modifications and derivative works in object code format only, not readable by human beings. (IBM Ex. 121 § 2.01.) The sublicensing agreements precluded the licensees from distributing and disclosing their modifications and derivative works in source code format.

21.     AT&T's standard agreement created a framework in which each modification and derivative successively becomes "treated hereunder as part of the original SOFTWARE PRODUCT." (§ 2.01.)

B.      The Plain Scope of the IBM Side Letter.

22.     In addition to its own Agreement, IBM entered into a Side Letter with AT&T. (IBM Ex. 122.) Paragraph 3 of the Side Letter confirms IBM's obligation to keep the "resulting materials" confidential. In the Side Letter, AT&T acknowledges: "You have requested that contractors be permitted to use SOFTWARE PRODUCTS pursuant to the referenced Software Agreement." (IBM Ex. 122 ¶ 3.) AT&T agrees that, subject to certain conditions, "the rights granted in Section 2.01 of the Software Agreement be extended to permit you to provide access to and allow use of SOFTWARE PRODUCTS by your contractors." (IBM Ex. 122 ¶ 3.) One of the conditions is that IBM must secure from each such contractor an agreement that shall

"provide that, when a contractor's work for you is completed, all copies of the SOFTWARE PRODUCT and <u>any software derived from or developed with the use of a SOFTWARE PRODUCT</u> shall be returned to you by such contractor and any such contractor shall erase any such software from any storage element or apparatus." (IBM Ex. 122 ¶ 3 (emphasis added).)

23.     The Side Letter also states: "Regarding Section 2.01, we agree that modifications and derivative works prepared by or for you are owned by you. However, ownership of any portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work remains with us." (IBM Ex. 122 ¶ 2.)

24.     The opening language of Paragraph 9 of the Side Letter says that the right to "develop" at issue is one that applies only internally to IBM: IBM "agrees that it shall not make any disclosure of such SOFTWARE PRODUCTS to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder." (IBM Ex. 122 ¶ 9.)

25.     Section 7.06(b) of the IBM Agreement states in its last sentence: "LICENSEE may also obtain materials based on a SOFTWARE PRODUCT subject to this Agreement from such third party and use such materials pursuant to this Agreement, provided that LICENSEE treats such materials as if they were part of such SOFTWARE PRODUCT." (IBM Ex. 492.) Paragraph 10 of the Side Letter clarifies that Section 7.06(b) "covers the situation where one of our licensees wishes to furnish its modified version of our source code for a SOFTWARE PRODUCT to another of our licensees for the same product." (IBM Ex. 122 ¶ 10.)

26.     The Side Letter "amends" Section 7.06(a) of the Agreement by "replacing" that Section with a different "7.06(a)." (IBM Ex. 122 ¶ 9.) IBM "agrees that it shall hold

11

SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T" and "further agrees that it shall not make any disclosure of such SOFTWARE PRODUCTS to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder." (IBM Ex. 122 ¶ 9 (emphasis added).)

27.    Paragraph 9 then affords IBM a limited right to "develop or market" certain products that the Agreement and Sublicensing Agreement do not permit IBM to "develop or market" – namely, products that are not modifications or derivative works based on the SOFTWARE PRODUCT, but that employ ideas, concepts, know-how or techniques embodied in the SOFTWARE PRODUCTS.  (IBM Ex. 122 ¶ 9.)

28.    The second half of Paragraph 9 first provides:  "Nothing in this agreement shall prevent LICENSEE from developing or marketing products or services employing ideas, concepts, know-how or techniques relating to data processing embodied in SOFTWARE PRODUCTS subject to this agreement . . . ."  (IBM Ex. 122 ¶ 9.)  Paragraph 9 then specifies that IBM may exercise such special rights to develop or market certain products and services only "provided that LICENSEE shall not copy any code from such SOFTWARE PRODUCTS into any such product or in connection with any such service and employees of LICENSEE shall not refer to the physical documents and materials comprising SOFTWARE PRODUCTS subject to this Agreement when they are developing any such products or service or providing any such service."  (IBM Ex. 122 ¶ 9.)

29.    Accordingly, under the Agreement and Side Letter, where IBM (1) has copied non-public code from the SOFTWARE PRODUCT into a "product" or (2) has referred to the physical documents or materials comprising the SOFTWARE PRODUCTS in developing a

12

"product," then IBM may not "market" that product in source-code form. Instead, IBM must treat that product pursuant to those obligations that otherwise obtain – that is, the obligation to keep confidential for AT&T the SOFTWARE PRODUCT and any modification or derivative work based on the SOFTWARE PRODUCT. Paragraph 9 of the Side Letter thus refers only to IBM's right to develop or market products that are not modifications or derivative works based on the SOFTWARE PRODUCT.

## III.   THE PLAIN TERMS OF THE AGREEMENTS REASONABLY PROTECTED THE VALUE OF UNIX.

### A.   The Context of the Development of the UNIX Operating System.

30.   In the computer industry before UNIX, vendors such as IBM delivered computer hardware, operating systems, software applications, and services in a vertically integrated manner, as a "closed" system that generated large profit streams through proprietary "lock-in." That is, a customer who purchased computer hardware from IBM was often locked-in to using IBM's operating system, software applications and services as well. It was very difficult for the customer to modify the system or to switch to systems provided by other vendors, thereby limiting the flexibility and options available to customers. (Ex. 284 at 7 & n.9; Ex. 50 ¶¶ 3-16; Ex. 286 at 80.)

31.   This approach meant not only that customers had to change their software every time they changed their hardware, but also that programmers had to learn about and write for each hardware system separately. IBM liked this approach because it gave IBM control over IBM customers. Once a customer opted for IBM's hardware, that customer was for the most part

locked into choosing IBM's associated software and services as well.  (Ex. 286 at 80 & nn.157 & 158; Ex. 50 ¶¶ 3-16.)

     B.     <u>The Popular and Valuable UNIX Ecosystem in 1985.</u>

     32.     UNIX became popular and its use spread rapidly in the 1970s because it could run on any hardware platform and enabled software programs to run more easily across many hardware platforms.  (Ex. 284 at 7 & n.10; Ex. 50 ¶¶ 3-16.)  Such features allowed customers to use UNIX on hardware from many different vendors with greater flexibility in choosing software applications to run on the hardware and OS.  (Ex. 284 n.11; Ex. 50 ¶¶ 3-16.)  UNIX was thus considered an "open," "cross platform" operating system (where "open" meant that UNIX provided greater flexibility, in contrast to "closed" systems that effectively locked-in users).  (Ex. 284 at 8; Ex. 50 ¶¶ 3-16.)

     33.     UNIX was thus revolutionary, because it endeavored to be a commercially hardened operating system that worked across hardware platforms.  As a result, end-users could separate their hardware and software decisions, playing vendors off one another and benefiting from the resulting competition.  Programmers, meanwhile, could learn one operating system and then use that knowledge to produce programs that would run on a wide variety of hardware platforms.  This also increased competition, by increasing the number of programmers who were able to participate in any given hardware market.  UNIX thus made possible a vibrant and competitive ecosystem:  a community comprising users, programmers, and programs, all attracted to UNIX not only because of its innate qualities as an operating system but also because of the efficiencies that its cross-platform flexibility made possible.  (Ex. 286 at 80-81 & n.159; Ex. 12 ¶¶ 3-7; Ex. 50 ¶¶ 3-16.)

34.     Until 1983, AT&T licensed UNIX primarily to universities and researchers, along with the source code, for teaching purposes as well as internal use on specific central processing units (or "CPUs"). UNIX customers at that time did not have the right to re-distribute UNIX. Instead, to run UNIX on more than one machine or CPU, a customer had to obtain an additional license or licenses. (Ex. 284 at 8.)

35.     Starting in 1983, AT&T sought in earnest to capture the commercial value of UNIX by licensing UNIX to large computer-systems vendors such as Sun, Hewlett Packard ("HP"), Silicon Graphics Inc. ("SGI"), Digital Equipment Corporation ("DEC"), and IBM. These licensees typically bundled their modifications, derivatives and enhancements of UNIX with their own proprietary hardware. (Ex. 284 at 8; Ex. 12 ¶¶ 3-7.)

36.     AT&T's new approach included the separate sublicensing agreement that allowed the license to become a "distributor" of UNIX. Licensees could distribute their own modified, derived and enhanced versions of UNIX to customers in binary form. (Ex. 284 at 8; Ex. 12 ¶¶ 3-7.) The licensees had to pay a significant upfront fee for this right to distribute UNIX. (Ex. 284 n.12; Ex. 12 ¶¶ 3-7.) In addition, licensees were required to pay for each binary copy they distributed; those payments were in the form of a royalty. (Ex. 284 at 9; Ex. 12 ¶¶ 3-7.) The licensees could not distribute the modifications or derivative work in source code format, except to AT&T licensees who had licensed the same version of UNIX. (Ex. 284 at 9; Ex. 286 at 81-82 see also ¶¶ 82-86, below.)

37.     As a result of the revolutionary advantages offered by UNIX, a large number of users, programs, and programmers did and were expected to favor UNIX over competing operating systems. Accordingly, hardware providers in the 1980s became increasingly interested

in offering versions of UNIX that would perform well on their hardware. AT&T recognized this landscape and developed a business plan under which AT&T would help hardware providers achieve this aim. (Ex. 286 at 81; Ex. 4 ¶ 5; Ex. 5 at 26-28; Ex. 12 ¶¶ 3-7.)

38.     UNIX provided a valuable head-start for licensees. By 1983 UNIX was not only a mature and robust operating system resulting from fourteen years of development, but also was the foundation technology for an entire network of skilled software developers, experienced IT services staff, and end users. (Ex. 284 at 9; Ex. 138 ¶¶ 3-4; Ex. 12 ¶¶ 3-7; Ex. 50 ¶¶ 3-16; see also IBM Ex. 310 at 27, 38.) The UNIX user base began to grow rapidly in the mid-1980s as AT&T began to commercialize UNIX. (Ex. 284 n.13.) From the 45,000-user install base when AT&T announced the first supported version, System V, UNIX grew to approximately 1.2 million installed users by 1989. (Ex. 284 n.14.)

39.     With the right to modify and enhance UNIX and then distribute those modifications and enhancements with UNIX to customers, licensees had the incentive to develop innovations that used the UNIX head-start. (Ex. 284 at 9; Ex. 50 ¶¶ 3-16; Ex. 12 ¶¶ 3-7; see also IBM Ex. 310 at 27, 38.) The head-start would allow licensees to capitalize on the years of software development, significant expense and huge popularity of UNIX in the enterprise-computing arena. Licensees would thus reap the benefits from their investments by fulfilling customer demand with a differentiated "flavor" of UNIX that augmented their own proprietary hardware, other software, and services. (Ex. 284 at 9; Ex. 50 ¶¶ 3-16; Ex. 138 ¶¶ 3-4; Ex. 12 ¶¶ 3-7; see also IBM Ex. 310 at 27, 38.) IBM acknowledges that

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

C.      The Significant Advantage Offered by the UNIX Head-Start.

40.     AT&T's business model was thus to allow other firms to purchase a head-start toward involvement in the UNIX ecosystem.  What AT&T sold to each hardware firm was the right to use the UNIX foundation to jumpstart the firm's entry into the community of UNIX end-users, UNIX programs, and UNIX programmers.  The hardware firm would as a result be able to take part in the UNIX ecosystem quickly and at reasonable cost, thereby avoiding strategically infeasible alternatives like developing a UNIX-compatible operating system from scratch.  (Ex. 138 ¶¶ 3-4; Ex. 50 ¶¶ 3-16; Ex. 286 at 81-82; Ex. 116 at 99; Ex. 12 ¶¶ 3-7; IBM Ex. 310 at 38.)

41.     AT&T provided a foundation of UNIX code that licensees could build upon and modify.  (Ex. 138 ¶¶ 3-4; Ex. 12 ¶¶ 3-7; Ex. 50 ¶¶ 3-16.)  AT&T encouraged and indeed fully expected licensees to add their own code to and integrate it with the original code.  What AT&T brought to the table was the foundation.  It was up to the licensee to move forward from there, tailoring UNIX to accentuate that particular firm's hardware strengths.  Over time, most licensees would add large amounts of code to their UNIX flavor and a great percentage of the resulting Unix code would therefore be code written by the licensee.  Even at that point, however, the dynamic would be the same:  AT&T would continue to earn revenue based on the resulting UNIX flavor, because the licensee developed that flavor in reliance on AT&T's initial head-start contribution.  (Ex. 286 at 81-82; Ex. 12 ¶¶ 3-7; see also IBM Ex. 310 at 27, 38.)

42.     In other words, while AT&T in fact delivered specific lines of code to its clients, what it really licensed was the head-start that the code made possible.  Firms were not obligated to purchase a head-start from AT&T.  A firm could, for example, attempt to develop a UNIX-compatible operating system entirely from scratch.  (Ex. 138 ¶¶ 3-4; Ex. 50 ¶¶ 3-16; Ex. 12 ¶¶ 3-

7; Ex. 278 ¶¶ 81-86.)  However, a firm that took advantage of the head-start could not then escape its royalty and confidentiality obligations just because the head-start had worked and the firm had as a result been able to successfully develop even a substantially further developed UNIX variant.  (Ex. 286 at 83; Ex. 12 ¶¶ 3-7.)

      43.     AT&T had success with its business model.  Indeed, between 1985 and 1995, nearly every major hardware firm, including IBM, HP, Sun, Data General, Unisys, NCR, and Compaq, licensed AT&T's UNIX code.  (Ex. 286 at 83 & nn.161-67.)

      44.     AT&T's perception in the mid-1980s of the prospective value of UNIX was further borne out in the years that followed.  By the mid-to-late 1980s, there had been an enormous growth in the number of UNIX systems vendors and applications among large businesses and law firms, and an increasing number of corporate users turned to UNIX for their mission-critical computing needs and independent software vendors (or "ISVs") developed numerous business-related applications for use with it.  (Ex. 281 n.9.)

      45.     By the 1990s, UNIX was one of the most successful operating systems in the world, particularly in the area of commercial computing applications.  (Ex. 281 at 3-4.)  By that time, UNIX was commanding the enterprise (or commercial) space, due to its reputation as the operating system of choice for mission-critical, high-availability applications.  (Ex. 281 n.11.)

REDACTED

      46.     As increasing numbers of corporate users turned to UNIX for their mission-critical computing needs, independent software vendors (or "ISVs") developed numerous business-related applications for use with it.  (Ex. 281 n.32.)  That development served in turn to

make UNIX even more attractive to commercial customers.  (Ex. 281 n.33.)  In short, in the 1990s, customers widely adopted UNIX.  (Ex. 284 n.39.)

47.      By the late 1990s, UNIX was the leading server operating system worldwide in terms of license revenues, generating $2.5 billion in annual license revenues, more than half of the total server operating environment (or "SOE") license revenues across all major server operating systems.  (Ex. 281 n.39.)  Several of the leading UNIX suppliers were also server manufacturers that sold flavors of UNIX that were optimized to their own servers.  (Ex. 281 nn. 42 & 43.)

D.      The Parties' Commercially Reasonable Protection of Their Interests.

48.      The broad protections afforded to AT&T under its UNIX licenses agreements, as reflected in the plain language of those agreements, therefore served reasonably to protect the value of UNIX to AT&T in the ecosystem that had developed.  (Ex. 286 at 85-96; Ex. 12 ¶¶ 3-11; Ex. 278 ¶¶ 81-86.)

49.      AT&T's UNIX strategy involved licensing its UNIX foundation to hardware firms and in that way providing them with a head-start toward developing an operating system that would appeal to the UNIX community.  (Ex. 138 ¶¶ 3-4; Ex. 12 ¶¶ 3-11; Ex. 50 ¶¶ 3-16; Ex. 278 ¶¶ 81-86.)  AT&T earned its UNIX-related revenues from these licenses.  AT&T's UNIX business was thus enabling companies to develop licensed UNIX operating systems.  (Ex. 286 at 86, 88; Ex. 12 ¶¶ 3-11; Ex. 50 ¶¶ 3-16.)  In contrast, as of 1985, neither Sequent nor IBM was involved in any business, such as developing an unlicensed UNIX clone that would have given them any cause to loosen the core protections of AT&T's UNIX license.  (Ex. 286 at 83-84; Ex. 12 ¶¶ 3-11; Ex. 50 ¶¶ 3-16.)

50.     IBM was investing in a number of operating system projects, including its licensed work on AIX, its own development of OS/2, and its continued efforts to develop operating systems that worked only with specific IBM hardware.  None of these projects, however, was designed to yield an operating system that (a) would have fit into the UNIX ecosystem in terms of accepting UNIX programs and allowing UNIX programmers to apply their full experience and training but (b) would not have required IBM to pay royalties to AT&T. Indeed, IBM at that point was not particularly excited about UNIX at all, let alone interested in developing an unlicensed UNIX-like operating system.  (Ex. 286 n.168; Ex. 50 ¶¶ 13-16.)  In short, IBM was not trying to build a UNIX system from scratch, without the benefit of AT&T's head-start.  (Ex. 286 at 84; Ex. 50 ¶¶ 13-16.)

51.     Indeed, although IBM licensed UNIX from AT&T in 1985, it was not until the 1990s that IBM fully embraced UNIX.  (Ex. 284 n.16; Ex. 50 ¶¶ 13-16.)  Until then, significant IBM revenue and profitability depended upon its proprietary computer-system business.  That business consisted primarily of selling mainframe computing hardware, associated software, services, and peripherals compatible with this hardware.  (Ex. 284 at 2; Ex. 50 ¶¶ 13-16.)

52.     IBM customers were thus forced to buy a bundled system consisting of hardware, an operating system, associated software, and peripherals, as well as services from IBM-related staff.  (Ex. 284 n.23; Ex. 50 ¶¶ 13-16.)  Each of these other IBM businesses (software, support services, and financial services) depended upon mainframe sales for their revenue, so that when IBM mainframe sales declined so did IBM's combined sales.  (Ex. 284 n.24.)  IBM market share fell from approximately 37% to 28% between 1985 and 1991 while the overall market grew.  (Ex. 284 n.5.)  IBM turned to the near-term, stop-gap effort of slashing prices on closed operating

20

system mainframes, but that was not sustainable for the long-term because it involved substantial revenue losses. (Ex. 284 n.26.)

53.     Over time, in place of IBM mainframes, customers began to purchase individual parts of an overall IT solution from companies selling pieces of the computing environment.  IT solutions that allow software and hardware from diverse vendors to work with other vendors' software and hardware are described as conforming to "open standards" or an "open" architecture. (Ex. 284 n.27.)  In contrast, as noted, IBM's mainframes were "closed," proprietary-architecture systems. (Ex. 284 n.28; Ex. 50 ¶¶ 13-16.)  Open architectures enabled many competitors to enter market segments traditionally dominated by IBM. (Ex. 284 n.29.)  Critically, customers also found that IBM's competitors provided alternatives at a fraction of the price of IBM's proprietary solutions. (Ex. 284 n.30.)

54.     At the same time, a new form of computing was taking hold:  network-based "distributed" computing. As computers became connected to networks, open-standard computing became increasingly important. (Ex. 284 n.31.) According to the CEO of IBM at the time, Louis Gerstner, in this environment IBM faltered. (Ex. 284 n.32.)  "IBM was slow, very slow in delivering distributed computing, and many small companies moved in to fill the gap." (Ex. 284 n.33.)

55.     Indeed, IBM's strategy to control the proprietary "stack" jeopardized its performance and almost crippled the company. (Ex. 284 n.34; Ex. 50 ¶¶ 13-16.)  That was because UNIX conflicted with IBM's proprietary system strategy. (Ex. 284 n.35.)  By the 1990s, however, IBM began to embrace the UNIX operating platform, which allowed buyers to combine the offerings of multiple vendors. (Ex. 284 nn.37 & 38; Ex. 50 ¶¶ 13-16.)

21

56.     Accordingly, by the time IBM did fully embrace it, UNIX offered IBM two decades of development and community adoption as a head-start when compared to developing a completely new operating system from the ground up.  IBM had been in the operating-system business for many years, yet it did not have a ready-made or close-to-complete operating system for an open-architecture server system, which is what UNIX was.  Clearly, however, it would be much more difficult to develop a new operating systems from scratch than building on the head-start of UNIX.  (Ex. 284 at 10 & n.17; Ex. 50 ¶¶ 13-16.)

57.     Sequent also was not pursuing in the mid-1980s an unlicensed UNIX clone. Sequent was an AT&T licensee even before 1985, paying AT&T for the right to build on a combination of AT&T code and code from Berkeley Software Development.  Like IBM, Sequent again signed up to build on AT&T's head-start, and Sequent again was given access to additional AT&T code.  Both before 1985 and in 1985, Sequent thus had only one UNIX strategy, and that strategy involved developing a UNIX flavor fully licensed by AT&T.  (Ex. 286 at 84-85; Ex. 12 ¶¶ 3-11; see also IBM Ex. 310 at 27, 38.)

58.     In sharp contrast to the absence of any compelling reason for IBM or Sequent to loosen the core protections of the AT&T standard UNIX license agreement, AT&T had an overriding interest in protecting the value of its UNIX asset.  (Ex. 286 at 85-96; Ex. 12 ¶¶ 3-11; Ex. 41 ¶¶ 2-9.)  If AT&T had granted its licensees the right to take source code, methods and concepts from a licensed UNIX flavor and publicly disclose that material, such as to use that material to subsidize the development of a competing, unlicensed UNIX clone, such a grant would have threatened AT&T's ability profitably to license its UNIX foundation.  (Ex. 12 ¶ 6.) At the same time, neither IBM nor Sequent would have considered that right to be particularly