valuable, because neither had any interest in pursuing a UNIX operating system beyond the licensed flavors they were developing.  (Ex. 286 at 85; Ex. 50 ¶¶ 3-16.)

59.     In other words, from an economic perspective, if AT&T allowed IBM to use the code it developed based on the licensed UNIX source code (or "added-on code") to create or help develop an unlicensed UNIX clone, IBM would be able to destroy AT&T's intellectual property.  AT&T's licensees would migrate from AT&T's UNIX ecosystem to IBM's because IBM could offer the same ecosystem at a lower price, thanks to its exploitation of AT&T's head-start.  (Ex. 286 at 95-96; Ex. 12 ¶¶ 3-11.)

60.     The operation of AT&T's standard UNIX license agreement reflected these basic considerations.  AT&T's UNIX licensees were permitted to use the AT&T UNIX foundation internally.  They were also permitted to package it with hardware in object code format and to produce flavors that could be sold to equivalent-scope licensees.  None of these rights threatened AT&T's UNIX business.  The internal use of UNIX could not include the sale of an operating system to third parties, and sales to equivalent-scope licensees at worst would result in disclosure only to parties who already bought from AT&T permission to see source code and thus have already agreed to abide by the above restrictions and confidentiality.  AT&T thus protected its UNIX business while leaving licensees with broad rights to pursue their legitimate businesses as well.  (Ex. 286 at 87 & nn.172-76; Ex. 12 ¶¶ 3-11; Ex. 375 ¶¶ 12-13; Ex. 50 ¶¶ 3-26.)

61.     IBM and Sequent had no compelling reason to object to these provisions, and the terms of the licenses to which they agreed show that they in fact did not object.  (Ex. 286 at 87-88 & nn.177-78; Ex. 12 ¶¶ 3-11.)

62.     Indeed, at the time, in their business models, neither IBM nor Sequent would have considered it a valuable right even to be able to distribute source code, methods and concepts from their UNIX flavors only to equivalent-scope AT&T licensees.  Such distributions would only serve to permit the equivalent-scope licensees to develop their own UNIX flavors to sell with their own hardware, thereby hurting IBM's and Sequent's sale of their hardware on which their UNIX flavors operated.  (Ex. 286 at 95-96; Ex. 12 ¶¶ 3-11; Ex. 50 ¶¶ 3-16.)

## IV.     THE EXTRINSIC EVIDENCE CONFIRMS THE SCOPE OF THE UNIX LICENSE AGREEMENTS.

### A.     Contemporaneous and Subsequent Licensing Documents.

63.     Although AT&T entered into educational license agreements for UNIX System V, the company specifically designed and enforced those licenses to protect the commercial value of AT&T's UNIX business, and in doing so set forth and enforced protections that went far beyond just the licensed UNIX source code.  In 1986, for example, Otis Wilson of AT&T (who has signed a declaration for IBM) described the scope of AT&T's standard UNIX System V educational license to Harvard University:  "We remind you that commercially motivated research and development activity may not be pursued with an educational license agreement (such as your Agreement E-Soft-00162) even if the resulting product does not contain any UNIX System V code."  (Ex. 117 (emphasis added).)

64.     Jeanette Tilley of UNIX System Laboratories ("USL") (who has signed a declaration for IBM) signed letters to UNIX licensees confirming that USL had obtained and expected much greater protection from its licensee than protection for just literal UNIX System V source code .  On March 20, 1992, for example, Ms. Tilley signed a letter on behalf of USL to

Sequoia Systems, Inc., stating:  "We remind you that your obligations (and those of your
employees and subsidiaries) of confidentiality pursuant to Section 7.06 shall survive and
continue after any termination of rights under this Agreement."  (Ex. 118.)  Section 7.06 of
Sequoia's UNIX license agreement (Oct. 3, 1986), in turn, contained the following language:
"LICENSEE further agrees that it shall not make any disclosure of any or all of such
SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to
employees and contractors of LICENSEE  to whom such disclosure is necessary to the use for
which rights are granted hereunder."  (Ex. 119 (emphasis added).)

      65.     Mr. Wilson has testified that as of the time of IBM's UNIX license agreement, on
February 1, 1985, AT&T had decided that it would no longer seek to protect its methods and
concepts from disclosure by its UNIX licensees.  Yet more than a year and half later, in October
1986, AT&T entered into the license agreement with Sequoia requiring the company to keep the
methods and concepts confidential.  (Ex. 119.)  And over _seven_ years after the alleged
suspension of AT&T's efforts to protect the UNIX methods and concepts, Ms. Tilley sent
Sequoia a letter reminding the company that it remained obligated to keep the methods and
concepts confidential after the termination of its license agreement.  (Ex. 118.)

      66.     In March 1990, Mr. Wilson signed a "Software Attachment" with an "Order for
Supplies or Services" from the National Institute of Health.  The Attachment was for "Provisions
Relating to Rights to Use Certain Software Products for Inclusion in Contracts Between AT&T
Information Systems Inc. and Agencies of the U.S. Government."  The Attachment contained the
same core protections as set forth in AT&T's standard UNIX license agreement from 1985,
namely:

>Such right to use includes the right to modify such SOFTWARE PRODUCT and
>to prepare derivative works based on such SOFTWARE PRODUCT, provided
>that any such modification or derivative work that contains any part of a
>SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same
>as such SOFTWARE PRODUCT.
>
>. . . the Government's agreement under such clauses not to provide or otherwise make
>available SOFTWARE PRODUCT to any third party shall also be considered agreement
>not to disclose methods and concepts utilized in SOFTWARE PRODUCT to any third
>party without the written approval of Contractor.

(Ex. 120 §§ 5, 13.)  Mr. Wilson also signed letter agreements in June and August 1990 directing

the licensees:  "You will not provide access to any copy of the source code of the SOFTWARE

PRODUCT (including methods and concepts contained therein), in whole or in part, to anyone

other than your organization's employees who have a need to know."  (Ex. 27; Ex. 28; Ex. 29.)

67.     Another, similar example is the

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

68.     The same documents contradict any suggestion that AT&T successor-in-interest

Novell, Inc. had abandoned the protection over UNIX methods and concepts, or over the

modifications and derivative works the licensees developed based on the licensed UNIX

software product.  In February 1992, for example, USL entered into a UNIX System V license

agreement with Micro Resources, Inc.  Again, seven years after the alleged suspension of efforts

to protect the UNIX methods and concepts or the entirety of the UNIX licensees' modifications

and derivative works, the agreement contained the same core protections as set forth in AT&T's standard UNIX license agreement from 1985, namely:

> Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT.

> LICENSEE further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees and contractors of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder.

(Ex. 122 §§ 2.01, 7.05(a).)  The same core protections appeared in USL's December 1993 agreement with the United States Department of Commerce.  (Ex. 123 §§ 2.01, 7.05(a).)

      69.    In June, August, and October 1994, Novell entered into UNIX System V license agreements with Green Hills Software, Inc., Computational Logic Inc., and Loral Federal Systems, Inc.  Now <u>nine years</u> after the alleged suspension of efforts to protect the UNIX methods and concepts or the entirety of the UNIX licensees' modifications and derivative works, each agreement contained the same core protections as set forth in AT&T's standard UNIX license agreement from 1985, namely:

> Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT.

> LICENSEE further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees and contractors of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder.

(Ex. 34; Ex. 125; Ex. 126 §§ 2.01, 7.05(a).)

70.     Similarly, after Santa Cruz had acquired the UNIX business and copyrights from Novell, Santa Cruz continued to implement the same protections.  In November 1997, for example, Santa Cruz entered into a UNIX System V license agreement with Samsung Electronics Co., Ltd.  Now twelve years after the alleged suspension of efforts to protect the UNIX methods and concepts or the entirety of the UNIX licensees' modifications and derivative works based on the licensed UNIX software product, the agreement contained the same core protections as set forth in AT&T's standard UNIX license agreement from 1985, namely:

> Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT.

> LICENSEE further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees and contractors of SAMSUNG to whom such disclosure is necessary to the use for which rights are granted hereunder.

(Ex. 127 §§ 2.01, 7.05(a).)  The same protections are also set forth, for example, in the Educational Software License Agreement that Santa Cruz entered into with the California Institute of Technology in November 1997.  (Ex. 128.)

71.     Since AT&T developed its standard UNIX System V license agreement, AT&T and its successors-in-interest (USL, Novell, and Santa Cruz) have made explicit in their license agreements the following:

> This Agreement and its Supplements set forth the entire agreement and understanding between the parties as to the subject matter hereof and merge all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby.

28

(See, e.g., IBM Ex. 492; Ex. 122; Ex. 123; Ex. 34; Ex. 125; Ex. 126; Ex. 127; Ex. 128.)

72.    William Murphy, who signed the agreements in paragraph 70 on behalf of Santa Cruz, was involved in overseeing the UNIX license agreements from the 1970s, when he was with AT&T, until 2002, when he retired from SCO.  He confirms that it was always his understanding (from AT&T to USL to Novell to Santa Cruz to SCO) that the agreements required licensees to keep confidential not only the UNIX System V methods and concepts, but also the entirety of the licensees' derivative works based on the licensed UNIX System V software product.  (Ex. 337 ¶¶ 2-15.)

73.    Indeed, the evidence shows, by way of further example, that in 1997 Santa Cruz included contractual protections for its UNIX methods and concepts even in licenses other than its source-code licenses.  In May 1997, for instance, Santa Cruz and Lucent Technologies, Inc. entered into a "SCO UnixWare OEM Reseller Source for Support Agreement," pursuant to which Lucent obtained the right to use UnixWare source code to correct bugs in the binary distributions and distribute those fixes in binary form, and which included the following language:

> LICENSEE agrees that it shall hold all parts of SCO UNIXWARE SOURCE
> PRODUCT(s) subject to this Agreement in confidence for SCO.  LICENSEE
> further agrees that it shall not make any disclosure of any or all of such SCO
> UNIXWARE SOUR PRODUCT(s) (including methods or concepts utilized
> therein) to anyone, except to employees and contractors of LICENSEE to whom
> such disclosure is necessary to the use for which rights are granted hereunder.

(Ex. 124 § 15.)  This document again contradicts any assertion that Santa Cruz was not seeking to protect the disclosure of UNIX methods and concepts.

29

74.     IBM also submits declarations claiming that AT&T never intended to exert "control" over the "homegrown material" in their licensees' modifications and derivative works based on the licensed UNIX software product, but contemporaneous documents contradict that assertion. Only months before AT&T entered into its license agreement and Side Letter with IBM, for example, Mr. Wilson made clear in a side letter to DEC that it had to keep all of its modifications and derivative works confidential, even those parts that Digital owned:

> If such derivative work does include any of our code or embody any of our methods and concepts you may have a property right in such derivative work to the extent of any modifications that you have added, but the exercise of that property right is subject to the terms of the Software and Sublicensing Agreements, including to the restrictions on the use of the SOFTWARE PRODUCTS (for example, it must be kept in confidence).

(Ex. 36.) Mr. Wilson thus made AT&T's view clear: the derivative work "must be kept in confidence." The same clear distinction was drawn in a side letter with DEC executed <u>after</u> the IBM Side Letter. (Ex. 26.)

75.     If AT&T intended that its side letters with some of its licensees would reflect AT&T's view of the scope its agreements with all of its licensees, the foregoing side letter (as just one example) confirms that all licensees were obligated to keep confidential their modifications and derivative works. Indeed, where IBM's argument is taken to its logical conclusion, side letters such as the one between SCO and Siemens AG in June 1998 would establish that all licensees would have access to the licensed source code only if none of the licensees' employees were "working on the design and/or development of product in direct competition with" SCO's operating system products. (Ex. 130.)

30

B.     The Testimony of Relevant Witnesses.

76.     AT&T used a standard UNIX license agreement in commercially licensing its UNIX software product in the 1980s.  (Ex. 41 ¶¶ 2-9; Ex. 8 ¶ 9; Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 138 ¶¶ 3-10; Ex. 12 ¶¶ 8-16; Ex. 71 at 87; Ex. 69 at 15.)

77.     The standard commercial UNIX license agreement contained the same confidentiality protections as AT&T's educational and governmental UNIX license agreements. (Ex. 10 ¶ 4; Ex. 5 at 68, 240; Ex. 8 ¶ 5; Ex. 14 ¶ 10; Ex. 4 ¶ 7; Ex. 138 ¶¶ 3-10; Ex. 71 at 225; Ex. 69 at 34, 38.)

78.     AT&T entered into the commercial UNIX license agreements because it wanted to encourage the widespread acceptability of UNIX as an industry standard, because the more UNIX was used, the more license fees that AT&T would collect, in a domino effect.  (Ex. 41 ¶¶ 2-9; Ex. 12 ¶¶ 3-7; Ex. 71 at 168; IBM Ex. 261 at 144-45.)

79.     There was nothing inherent in AT&T's UNIX licensing program that would result in disclosures of the protected material in the public domain.  If all licensees honored their obligations, there would be no such disclosures, except to whatever extent AT&T decided to make that information public without restriction.  (Ex. 12 ¶ 6; Ex. 333 ¶ 15; IBM Ex. 261 at 144-45; Ex. 375 ¶ 6; Ex. 278 ¶ 86; Ex. 71 at 176-77; see also IBM Ex. 260 at 96.)

80.     In its standard UNIX license agreement, AT&T and its successors-in-interest intended and required that the licensee keep confidential all parts of the licensed UNIX software product, including the source code, methods, concepts, techniques, know-how and ideas therein. The UNIX licensors never abandoned those protections.  (Ex. 10 ¶ 5; Ex. 5 at 149-50; Ex. 41 ¶¶ 2-9; Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 138 ¶¶ 3-10; Ex. 375 ¶¶ 4-32; Ex. 5 at 106, 130-31,

141-43; Ex. 10 ¶¶ 5-6; Ex. 8 ¶ 9-10; Ex. 14 ¶¶ 7(b), 11(d); Ex. 12 ¶¶ 8-16; Ex. 4 ¶¶ 5, 6(b); Ex.

19 at 37, 45-46, 147-148; Ex. 5 at 130-31; Ex. 26 at 2; Ex. 27-29; Ex. 38 ¶¶ 2-4, 21-25; Ex. 8 ¶

10; Ex. 71 at 87-89, 97-98, 101; Ex. 69 at 44; Ex. 337 ¶¶ 5-8; Ex. 333 ¶¶ 11-13; see also IBM Ex.

252 ¶ 12; IBM Ex. 295 at 159; IBM Ex. 260 at 49, 102, 162-63; IBM Ex. 260 at 108-08; IBM Ex.

261 at 48-49, 57-59, 75, 93-94, 22-25, 133-34, 162; IBM Ex. 584 at 73-76, 121-22, 178-79, 189.)

      81.     In its standard UNIX license agreement, AT&T intended to impose protections

that the intellectual-property law might not otherwise provide for the licensed UNIX software

product and the modifications and derivative works based on that product. (Ex. 7 ¶ 6; Ex. 71 at

90, 222; Ex. 375 ¶ 11; Ex. 333 ¶ 14; see also IBM Ex. 261 at 181-82.)

      82.     The UNIX license agreements required the licensees to treat the modifications

and derivative works they developed based on the licensed UNIX software product as part of the

licensed UNIX software product itself. (Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 138 ¶¶ 3-10; Ex.

12 ¶¶ 8-16; Ex. 375 ¶¶ 4-32; Ex. 7 ¶ 6; Ex. 24 at 134, 228-29, 231-32; Ex. 19 at 146; Ex. 38 ¶¶ 2-

4, 21-25; Ex. 5 at 114-15, 117-18; Ex. 71 at 90; Ex. 69 at 22-23, 36, 47; Ex. 355 ¶¶ 10-13; Ex.

337 ¶¶ 5-8; Ex. 333 ¶¶ 11-13; Ex. 297 at 83-84; see also IBM Ex. 260 at 70; IBM Ex. 584 at 76-

80, 92-93, 95, 159-60, 194-95; IBM Ex. 80 at 111-19, 216; IBM Ex. 513 at 51, 23, 121.)

      83.     AT&T intended and required that the licensee keep confidential all parts of any

modification or derivative work that the licensee developed based on the licensed UNIX

software product. (Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 138 ¶¶ 3-10; Ex. 5 at 130-131; Ex. 12 ¶¶

8-16; Ex. 8 ¶ 6; Ex. 4 ¶ 6; Ex. 41 ¶¶ 2-9; Ex. 77 at 145; Ex. 355 ¶¶ 10-13; Ex. 38 ¶¶ 2-4, 21-25;

Ex. 10 ¶ 5; Ex. 5 at 114-15; Ex. 351 ¶¶ 6-7; Ex. 71 at 89-90, 162-63; Ex. 69 at 25; 44-45, 57,

177-178; 337 ¶¶ 5-8; Ex. 375 ¶¶ 4-32; Ex. 333 ¶¶ 11-13; Ex. 297 at 83-84; <u>see also</u> IBM Ex. 584 at 139-41; IBM Ex. 301 at 340-43.)

84.     A modification or derivative work within the meaning of AT&T's standard UNIX license agreement includes any product that includes any part of, or was developed based on or with exposure to, the licensed UNIX software product.  (Ex. 7 ¶ 6; Ex. 5 at 82-84; 15-52; Ex. 14 ¶ 7, 11; Ex. 4 ¶ 6; Ex. 5 at 113, 145; Ex. 19 at 18, 19, 20, 42, 166-68; Ex. 69 at 44-45, 53-54, 178-184; Ex. 337 ¶¶ 5-8; Ex. 375 ¶¶ 15-16; Ex. 333 ¶¶ 11-13; <u>see also</u> IBM Ex. 584 at 76, 95-97, 120; IBM Ex. 80 at 44-46; IBM Ex. 513, at 51, 127-28; IBM Ex. 295 at 31-32.)

85.     The "exposure" or "contamination" concerns underlying AT&T's standard UNIX license agreements are ones known to IBM.  In 2001, IBM

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

(Ex. 132 at 6.)

86.     Although the licensees owned those parts of the modifications and derivative works that were not part of the licensed UNIX software product, they were nevertheless obligated to keep all parts of the modifications and derivative works confidential.  (Ex. 43 ¶¶ 2-

15; Ex. 337 ¶¶ 2-15; Ex. 138 ¶¶ 3-10; Ex. 5 at 130-131; Ex. 12 ¶¶ 8-16; Ex. 8 ¶ 6; Ex. 4 ¶ 6; Ex.

41 ¶¶ 2-9; Ex. 77 at 145; Ex. 38 ¶¶ 2-4, 21-25; Ex. 10 ¶ 5; Ex. 5 at 114-15; Ex. 71 at 50, 89-90,

162-63; Ex. 69 at 25; 44-45, 57, 177-178; 337 ¶¶ 5-8; Ex. 355 ¶¶ 10-13; Ex. 333 ¶¶ 11-13; Ex.

297 at 83-84; see also IBM Ex. 584 at 139-41; IBM Ex. 301 at 340-43.)

87.     AT&T and its successors-in-interest never agreed to eliminate the foregoing, core

confidentiality protection of the standard UNIX license agreement. (Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶

2-15; Ex. 38 ¶¶ 2-4, 21-25; Ex. 5 at 90-91; Ex. 8 ¶ 11; Ex. 14 ¶ 9; Ex. 7 ¶ 8; Ex. 41 ¶¶ 2-9; IBM

Ex. 261 at 39-41; Ex. 69 at 204; Ex. 375 ¶¶ 4-32; Ex. 333 ¶ 21; Ex. 355 ¶ 19; Ex. 337 ¶ 15.)

88.     AT&T and IBM entered into a side letter that clarified some parts of the IBM

Agreement and amended other parts. The IBM Side Letter did not affect how IBM was

obligated to treat its modifications and derivative works based on the licensed UNIX software

product. (Ex. 77 at 151, 160-61, 163; Ex. 50 ¶¶ 39-41; Ex. 71 at 117, 120, 166-67, 171-72; Ex.

355 ¶ 16; Ex. 333 ¶ 16; Ex. 337 ¶ 9; Ex. 375 ¶¶ 14-17; Ex. 375 ¶¶ 4-32; Ex. 360 ¶ 27; see also

IBM Ex. 80 at 29-31, 33-34.)

89.     The IBM Side Letter did not affect the terms and conditions of any of AT&T's

other UNIX license agreements, including the Sequent Agreement. (Ex. 10 ¶¶ 9-10; Ex. 8 ¶ 12;

Ex. 301 at 232-35; Ex. 5 at 93, 95; Ex. 12 ¶ 13; IBM Ex. 261 at 70-72; Ex. 71 at 212, 225-26; Ex.

333 ¶ 16; Ex. 355 ¶ 16; Ex. 337 ¶ 9; see also IBM Ex. 260 at 40; IBM Ex. 584 at 111, 193-94;

IBM Ex. 295 at 82-84, 146.)

90.     There was no single individual in AT&T's, USL's, Novell's or Santa Cruz's

UNIX licensing group who had the authority to change, or amend, or waive the terms of AT&T's

standard UNIX license agreement. Such a decision required the approval of several individuals,

including members of the legal team.  (Ex. 138 ¶¶ 3-10; Ex. 12 ¶¶ 8-16; Ex. 375 ¶ 14; Ex. 351 ¶ 8; Ex. 41 ¶ 5; Ex. 71 at 223, 236-37; see also IBM Ex. 80 at 53-54; IBM Ex. 584 at 35-37.)

91.    The UNIX license agreement and any written amendments clarifications of or thereto represented the entire understandings between the parties.  (Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 138 ¶¶ 3-10; Ex. 375 ¶ 18; Ex. 71 at 226; see also IBM Ex. 63-65, 68; IBM Ex. 584 at 102-03.)  The AT&T and successor-in-interest representatives were not permitted to make a representation that was contrary to what was in writing, and they did not so do.  (Ex. 41 ¶¶ 2-9; Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 355 ¶¶ 18-21; Ex. 375 ¶ 18; Ex. 138 ¶¶ 3-10 ; Ex. 333 ¶¶ 17-20; Ex. 337 ¶¶ 11-13; see also IBM Ex. 260 at 123; IBM Ex. 584 at 102-03.)

92.    The AT&T representatives shared the foregoing understanding and intent regarding the scope of the UNIX license agreements, inasmuch as the scope of the agreements was a common subject of training and discussion within AT&T.  (Ex. 41 ¶¶ 2-9; Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 138 ¶¶ 3-10; Ex. 12 ¶¶ 8-16; Ex. 69 at 58, 133-34, 171-72.)

93.    AT&T regularly informed its licensees that they were obligated to keep confidential all parts of their modifications and derivative works based on the licensed UNIX software product.  AT&T did not tell its licensees otherwise.  (Ex. 43 ¶¶ 2-15; Ex. 337 ¶¶ 2-15; Ex. 12 ¶¶ 8-16; Ex. 71 at 223; Ex. 69 at 32, 158-59, 189-90; Ex. 333 ¶¶ 17-20; Ex. 355 ¶¶ 17-20; Ex. 337 ¶¶ 11-13; see also IBM Ex. 80 at 97, 108; Ex. 137 at 1.)

94.    An Amendment No. X, executed in 1996, further defined IBM's right to use the licensed UNIX software product; the parties to Amendment No. X did not intend to increase any of IBM's rights under its UNIX Agreement and Side Letter, and did not intend to permit IBM to

35

disclose any part of any modification or derivative work based on the licensed UNIX software product. (Ex. 38 ¶¶ 2-4, 17-20; Ex. 50 ¶¶ 36-41.)

95.     The successors to AT&T's UNIX business and license agreements – USL, Novell, Santa Cruz, and SCO – utilized the same standard protections of confidentiality in the license agreements, the same policy of requiring any changes or amendments to the agreements to be in writing, and the same interpretation of the agreements to require the licensees to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX software product. (Ex. 41 ¶¶ 2-9; Ex. 12 ¶¶ 8-16; Ex. 43 ¶¶ 2-15; Ex. 38 ¶¶ 2-4, 21-25; Ex. 337 ¶¶ 2-15; Ex. 333 ¶ 21; Ex. 375 ¶¶ 4-32; Ex. 355 ¶ 19; Ex. 337 ¶ 15; see also ¶ 80, above.)

96.     The executives and managers overseeing and implementing UNIX licensing at AT&T, USL, Novell, Santa Cruz and SCO were not aware of any instance in which a licensee had publicly disclosed any part of its derivative work based on the licensed UNIX software product. (Ex. 50 ¶¶ 27-28; Ex. 12 ¶ 15; Ex. 375 ¶ 32; Ex. 43 ¶ 14; Ex. 71 at 178, 242; Ex. 333 ¶ 20; Ex. 337 ¶ 14; Ex. 355 ¶ 20.)

Ira Kistenberg

97.     IBM relies on a declaration from Ira Kistenberg, the account executive who negotiated Sequent's UNIX license on behalf of AT&T, for its position that only copying of literal UNIX source code is protected by the agreements. (See IBM Mem. 33, 46, 57-62, 67-68; see also IBM Ex. 217 ¶ 22.)

98.     In his more recent declaration, however, Mr. Kistenberg clarified that the UNIX license agreements protect much more than literal source code. (Ex. 10 ¶ 5.) ("AT&T intended that protected modifications and derivatives would include any product that contained any source

36

code that had been copied verbatim from UNIX System V; any copied source code that was similar in substance to the original source code in UNIX System V; any structures, sequences, patterns, ideas, methods or concepts from UNIX System V; and any source code that the licensee developed with the benefit of exposure to the UNIX System V source code."). Mr. Kistenberg has also now acknowledged that the license agreements protected against copying "any structures, sequences, patterns, ideas, methods or concepts from UNIX System V" aside from the express protection for UNIX source code. (Ex. 10 ¶ 5.)

99.     Mr. Kistenberg has further explained that the UNIX structures, sequences, patterns, methods, and concepts were subject to 7.06(a), which prohibits the disclosure of those methods and concepts (even in modified form) "to anyone, except to the employees of the licensee to whom such disclosure was necessary to the use for which AT&T granted rights under the license agreements." (Id. ¶ 6.)

100.    IBM also relies on Mr. Kistenberg's first impression in arguing that the language of the IBM Side Letter meant that AT&T removed use and disclosure restrictions on licensees' modifications and derivatives of UNIX System Five. (See IBM Mem. ¶ 63; see also IBM Ex. 217 ¶ 18.)

101.    Mr. Kistenberg's more recent declaration recalled AT&T's decision to change the language of its agreements (months after the IBM and Sequent agreements had been executed) and clarified that the change related only to ownership, and did not affect the existing use and disclosure restrictions. (Ex. 10 ¶ 8.)

102.    Mr. Kistenberg also rejected the notion that licensees who were not party to side letters or subsequent agreements would receive the benefit of such language, despite IBM's attempted reliance on his prior declaration to support such a claim.  (Ex. 10 ¶ 9.)

103.    With respect to IBM's assertion that Mr. Kistenberg allegedly made certain representations to Sequent regarding the scope of the license agreement.  Mr. Kistenberg also insisted that "the policy of the UNIX licensing group was that any changes to a licensee's software agreement had to be in writing.  I never verbally agreed with any licensee to modify its license in any way without memorializing the modification in writing." (Ex. 10 ¶ 10.)

104.    In his subsequent deposition, moreover, Mr. Kistenberg confirmed each of the foregoing points from his second declaration. (Ex. 75 at 17-23, 25-42, 47-48, 69, 115-118.)  He also explained that he did not understand the interpretation IBM would give to the declaration they asked him to sign. (Ex. 75 at 145-46.)

Otis Wilson

105.    IBM relies on Otis Wilson's testimony to support its position that only copying of literal UNIX source code was protected. (See IBM Mem. ¶¶ 24-26, 43, 46, 50, 54, 57-63, 67-68, 70-71, 85, 280; see also IBM Ex. 282 ¶¶ 12, 14.)  Mr. Wilson confirms that his supervisor in 1985 was William Guffey. (IBM Ex. 301 at 194-96; IBM Ex. 346 at 199-200.)  Mr. Guffey disagrees across the board with Mr. Wilson's assertions regarding the supposed scope of the agreements. (Ex. 138 ¶¶ 3-10.)

106.    Mr. Wilson gave sworn testimony directly contrary to these statements, moreover, when he was deposed in UNIX System Laboratories, Inc. v. Berkeley Software Design, Inc., Civil Action No. 92-1667 (DRD) (D.N.J.) ("BSD"), nearly twelve years closer to the events in

question.  Mr. Wilson testified that AT&T's UNIX software agreements protected far more than just "UNIX System V code," and that he had expressly communicated that view to AT&T's licensees.  (IBM Ex. 513 at 128.)

107.    The BSD case involved a software agreement with substantially similar intellectual-property protections as those found in the IBM and Sequent software agreements. (Compare The Regents of the University of California Agreement (11/12/85) §§ 2.01, 7.06 (Ex. 13) with IBM Agreement (2/1/85) §§ 2.01, 7.06 (IBM Ex. 492) and Sequent Agreement (4/18/85) §§ 2.01, 7.06 (IBM Ex. 119); see also Ex. 10 ¶ 4 (explaining that UNIX commercial, educational, and governmental licenses all provided the same core intellectual-property protections); Ex. 5 at 68, 240 (same); Ex. 8 ¶ 5 (same); Ex. 14 ¶ 10 (same); Ex. 4 ¶ 7 (same)).

108.    Mr. Wilson further testified in BSD:  "My understanding is that anything created by the university with exposure to the licensed software, based on, contained, a part of, was a derivative work with regard to these documents and had to be treated as licensed software." (IBM Ex. 513 at 51.)

109.    According to Mr. Wilson's BSD testimony, AT&T's license agreement covered a licensee's product that did not contain any UNIX source code if the licensee developed that product with exposure to the licensed UNIX product.  (Id. at 127-28.)

110.    In a deposition in this case, Mr. Wilson admitted that under Section 2.01 of the UNIX license agreement, modifications and derivative works were included in the definition of the protected software product, and thus had to be treated in the same way as the licensed software.  (IBM Ex. 301 at 220; see also id. at 340-43.)

111.     IBM cites Mr. Wilson's testimony in denying that the UNIX software agreements were intended to protect the methods and concepts embodied in UNIX System V.  (IBM Ex. 281 ¶ 14.)  Such testimony is inconsistent with Mr. Wilson's contemporaneous statements and actions.  Just before and well after the IBM Side Letter was signed in February 1985, for example, Mr. Wilson (on behalf of AT&T) repeatedly and expressly sought to protect UNIX "methods and concepts" pursuant to AT&T's software agreements.  (Ex. 26 at 2; Ex. 27; Ex. 28; Ex. 29.)

112.     IBM cites Mr. Wilson in support of its claim that the IBM Side Letter, which addresses a licensee's <u>ownership</u> of modifications and derivative works, shows that AT&T's UNIX licensees were unrestricted in their right to <u>use and distribute</u> such works.  (<u>See</u> IBM Mem. ¶¶ 100, 107, 110, 113; <u>see also</u> Ex. 282 ¶¶ 19-20.)

113.     Contrary to his current declaration, at the time AT&T entered into its software license and side letter agreements with IBM, Mr. Wilson explained that the licensee's ownership rights did not eliminate the contracted use and disclosure restrictions.  (Ex. 26 at 2 (differentiating between the "property rights" of a licensee and the continued restrictions on such property pursuant to the software agreement); Ex. 36 at 3 (same).)

114.     IBM cites the declaration of Mr. Wilson in arguing that whether or not AT&T entered into a side letter or other agreements with its licensees to clarify the treatment of modifications and derivative works, or altered the language of Section 2.01, AT&T's and USL's intent was always the same.  (<u>See</u> IBM Mem. ¶ 63 (citing Wilson Decl. (4/26/04)) (IBM Ex. 282 ¶ 27).)

115.    In deposition testimony, however, Mr. Wilson admitted that side letters such as the one IBM entered into with AT&T could not govern the terms of the AT&T-Sequent UNIX license. (IBM Ex. 301 at 232-35.)

116.    In his August 2006 deposition, Mr. Wilson admitted that he did not have the sole authority at AT&T to make decisions about intellectual property protections, but rather shared authority with his supervisors. (IBM Ex. 346 at 199-200.)

117.    Mr. Wilson admitted that he testified truthfully in the BSD litigation. (Id. at 49-55, 57-60, 72, 97-103, 105-06, 278-80.) He confirmed that, with respect to the restrictions of confidentiality, there was no difference in AT&T's intent between AT&T's standard commercial license agreement, such as Sequent's, and the educational license agreements about which he testified in the BSD case. (Id. at 42-48.)

118.    Asked about the language in the 1983 BSD agreement expressly defining "software product" to include "computer programs prepared by licensee as a modification of or a derivative of the works based on any of the materials solicited or furnished" to the licensee, Mr. Wilson confirmed that AT&T's intent in the 1983 BSD agreement was the same as AT&T's intent in its later license agreements. (Id. at 149-53.)

119.    Mr. Wilson agreed that the licensed UNIX software product included the methods and concepts embodied therein, as well as ideas, know-how and techniques. (Id. at 74-75, 80-82, 179-80.)

120.    Mr. Wilson testified that the IBM Side Letter abandoned protections for methods and concepts, and that the abandonment affected all of AT&T's UNIX licensees. (Id. at 85-86.) Yet he had no explanation for the Digital Side Letter, dated weeks after the IBM Side Letter,

41

which expressly confirmed Digital's obligation to keep the methods and concepts confidential.
(Id. at 90-95.) He also had no explanation for why AT&T's license agreements in 1987
continued to require licensees to hold methods and concepts in confidence for AT&T. (Id. at
145-46.)

121.    With respect to the distinction drawn in Paragraph 3 of the Digital Side Letter
between rights of ownership and obligations of confidentiality, Mr. Wilson was unable sensibly
to reconcile his asserted views of the scope of the license agreements with the language in the
Digital Side Letter. (Id. at 12-30.)

122.    Mr. Wilson disagreed with AT&T attorney Burt Levine's description of the
licensee's obligations of confidentiality with respect to derivative works. (Id. at 161-64.) Mr.
Wilson disagreed with AT&T attorney Marty Pfeffer's testimony to the extent that Mr. Pfeffer
was saying that the licensees were obligated to hold in confidence all parts of their derivative
works. (Id. at 193-97.)

123.    Mr. Wilson agreed with AT&T attorney Geoff Green's testimony that a derivative
work included a product that "somehow includes" the UNIX product or part of the UNIX
product. (Id. at 116-18.) He also acknowledged that if a licensee had been exposed to and had
used the UNIX software product to help create a product, but that product contained no UNIX
software product, that product would nevertheless constitute a derivative work. (Id. at 135-37.)

124.    Mr. Wilson admitted that his understanding of the confidentiality protections for
derivative works, that the licensee was obligated to hold in confidence only the UNIX source
code in the derivative work, was not reflected in the language of the Sequent Agreement. (Id. at

154-55.) In addition, he agreed that the Integration Clause in the Sequent Agreement accurately reflected AT&T's intent. (Id. at 291-92.)

David Frasure

125.   IBM cites from David Frasure to support its claim that the UNIX software agreements protected AT&T from only the literal copying of UNIX source code. (See IBM Mem. ¶¶ 20-24, 43, 46, 58-63, 67-68, 70-71, 105; see also IBM Ex. 190 ¶¶ 12, 14.)

126.   Like Mr. Wilson, Mr. Frasure took a directly contradictory position in his 1992 BSD testimony. Mr. Frasure acknowledged then that modifications and derivative works were to be treated as licensed software under the software agreement. (Ex. 19 at 146.)

127.   Mr. Frasure described an occasion on which he and Mr. Wilson threatened litigation to stop a licensee from distributing a derivative product, without regard for whether that derivative product contained any literal UNIX source code. In so doing, Mr. Frasure explained how the fact that the derivative product was based on UNIX sufficed to ensure that it was subject to the protections of the software agreements. (Id. at 23; see also id. at 121.)

128.   Mr. Frasure repeatedly testified to AT&T's intent to protect the entire universe of products that could be created as a result of UNIX exposure, regardless of whether the resulting product actually contained any UNIX code. (Id. at 20; see also id. at 42, 166-68.)

129.   Mr. Frasure also testified about a meeting that he had attended with Mr. Wilson, Geoff Green (the sole attorney who has signed a declaration submitted with IBM's motion), and representatives of one of AT&T's licensees in late 1984. (Id. at 96-97.) Mr. Frasure recalled the concept of "mental contamination" that he and Mr. Wilson had used to describe the expansive scope of the protections provided under the software agreements. (Id. at 18-19.) Mr. Frasure

43

also specifically reiterated that AT&T's "exposure" concept was intended to cover products even if they did not contain the UNIX source code.  (See id.)

130.    In his deposition in this case, Mr. Frasure acknowledged that the language of the software agreements does not support IBM's position.  After recognizing that modifications and derivatives of the original product are clearly protected by the agreements, Mr. Frasure qualified that protection by adding the caveat that such modifications and derivatives had to contain literal UNIX source code to be protected – but even then admitted that this position is not supported by the plain language of the software agreements.  (IBM Ex. 302 at 256-57.)

131.    Mr. Frasure also acknowledged that the creation of a "derivative work" does not have to involve literal copying:  "Derivative work means that it was based on Unix.  It was, in other words it was derived from, from Unix.  It also could be that it worked with Unix, but it may not have specific Unix code in it.  But the software itself that would be written by a licensee could not have been written, if you will, without Unix existing."  (Id. at 178 (emphasis added).)

132.    Indeed, in a declaration that he gave to IBM in October 2003 – almost six months before to the March 2004 declaration on which IBM now relies – Mr. Frasure made similar statements that undermine his current position.  In his original declaration, Mr. Frasure recognized that an entire modification or derivative work, and not literal lines of UNIX source code within that work, had to be protected under the software agreements.  He explained that "licensees owned their modifications and derivative works and were permitted to use or disclose them as they might choose, so long as any modification or derivative work containing any part of a software product was treated the same as a software product under the license agreements." (IBM Ex. 189 ¶ 12.)

44

133.    IBM similarly cites Mr. Frasure in attempting to deny protection for UNIX methods and concepts.  (IBM Ex. 190 ¶ 15.)  Mr. Frasure flatly contradicted these statements in his 1992 BSD testimony, when he testified that "the licensed software to me encompasses methods and concepts techniques," so that "to the extent at some point [a licensee] gets involved with the source code, the I – and its methods and concepts, then I think there – there's a restriction on its – on its use."  (Ex. 19 at 45-46.)

134.    Mr. Frasure stressed that there is "more to the agreement" than the protection of UNIX source code itself, and pointed to "other portions of paragraphs that cover methods and concepts and – and stuff."  (Id. at 37.)  Mr. Frasure characterized these protections as a "key part of the agreement."  (Id. at 147.)

135.    When asked about the types of products covered by AT&T's software agreement, Mr. Frasure explained that products containing UNIX methods and concepts were covered.  (Id. at 148.)  Mr. Frasure also acknowledged the application of the methods and concepts protection to work created by a licensee's programmers.  (Id. at 147-48.)  Mr. Frasure also expressed doubts about a licensee's ability to develop genuinely independent, but related products after exposure to UNIX.  (Id. at 169-70.)

136.    In response to questioning about what products could be disclosed under the agreement, Mr. Frasure was hesitant to concede that any product remained unprotected, noting that "if you develop your own system modifications and you use – and it works with the software that was licensed, there is a – there is a very good chance you are revealing methods and concepts just strictly through the interface technique that – that's used."  (Id. at 41-42.)  Mr.

Frasure maintained this position even when asked about products that did not overtly disclose methods or concepts. (Id.)

137.    IBM similarly cites Mr. Frasure in claiming that the IBM Side Letter demonstrates AT&T's intent to relinquish any control over the use and disclosure of derivative works. (See IBM Mem. ¶¶ 24, 43, 46, 58-63, 67-68, 70-71, 105; see also IBM Ex. 190 ¶ 18.) In his deposition in the BSD case, however, Mr. Frasure made clear that the contractual statement of ownership did not in any way alter the contractual restrictions on use and disclosure. (Ex. 19 at 151-152.) Mr. Frasure articulated that distinction numerous times in his BSD testimony. (Id. at 166-67; see also id. at 157-59.) Mr. Frasure also used that distinction to explain the textual change, made later in 1985, to revise AT&T's software agreement in order to reflect substantially similar ownership language from the IBM Side Letter. (Id. at 103; see also id. at 111.) In his testimony in this case, Mr. Frasure acknowledged the distinction between AT&T's ownership rights and AT&T's use and control restrictions. (IBM Ex. 302 at 49.)

Geoff Green

138.    IBM had previously cited the testimony of Geoff Green, who served as an AT&T attorney in its UNIX licensing department, to support its claim that the UNIX software agreements protect against only the literal copying of UNIX source code. (See IBM 8/13/04 Mem. (Ex.311) ¶¶ 80, 93; see also IBM Ex. 200 ¶ 6).) During his deposition, however, Mr. Green admitted that modifications of and derivative works based on the UNIX product were protected under the agreements by the same restrictions that governed the original licensed product, regardless of whether or not a licensee's modification or derivative product contained any UNIX source code. Examining the Sequent Agreement, Mr. Green testified:

> Q: And so any restrictions under the software agreement that applied to the original licensed software product, it was AT&T's intent that the resulting materials would be treated in the same way?
>
> A: Yes.
>
> Q: So that applies, then, to any derivatives or modifications that are based on the original software product?
>
> A: Under this provision, yes.
>
> Q: Is there any requirement in the license agreement that such modifications or derivatives have to include literally copied source code from the original product?
>
> A: In this form of the agreement, no.

(Ex. 5 at 114-15.)

139.    When asked if there was anywhere in the standard UNIX System V license agreement where "the protection for derivatives or modifications" is "limited to those derivatives or modifications that include literally copied source code," Mr. Green responded: "No there isn't. Yes, that is correct." (Id. at 117-18.)

140.    Mr. Green, whose job it was to "change the language to reflect the intent" of AT&T, id. at 109, stated that "the language of the agreement should speak for itself as to -- as to what we did to protect the software." (Id. at 161.)

141.    Mr. Green noted that "something that was based on the licensed product" or "a variation of the product" would fall within the definition of a derivative work. (Id. at 113.) Mr. Green further made clear that literal copying is not required in order for a licensee to create a modification or derivative work subject to the protections of the UNIX software agreements under Section 2.01. (Id. at 145.)

47

142.    Mr. Green agreed that one of the concerns that prompted the protection of UNIX modifications and derivatives was AT&T's concern that "it would be easy for a licensee to copy the intellectual property in UNIX without literally copying the source code." (Id. at 149-50.)

143.    Mr. Green recalled the concept of "mental contamination" articulated by Messrs. Wilson and Frasure, and explained that the UNIX licensing group, and particularly Messrs. Wilson and Frasure, were interested in protecting products created with the benefit of programmers' exposure to UNIX, even if such products did not contain any literal UNIX source code. (Id. at 82-84, 150-52.)

144.    Mr. Green stated that, as per the terms of the license agreements in 1985, modifications and derivatives that contained the "concepts, the ideas, the structure, the organization, the methods from the original licensed product," but did not contain the "source code in the original licensed product" would have been "covered by the agreement" and its various restrictions. (Id. at 130-31.)

145.    Mr. Green further agreed that AT&T would "certainly" be interested "in products that were developed with the benefit of UNIX even if the licensee were to go off and develop that product on its own based on that exposure," claiming that AT&T "would be concerned about whether any of AT&T's intellectual property was involved in the result." (Id. at 90-91.)

146.    Mr. Green was at a total loss to explain how IBM's view of the contract would not convert the final clause of Section 2.01 ("provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT") into mere surplusage. (Id. at 113-15, 124-25, 247-48.)

48

147.     IBM also cites Mr. Green to deny that the UNIX software agreements afforded any protection to methods and concepts.  (IBM Ex. 200 ¶ 6.)

148.     In his deposition, however, Mr. Green admitted that methods and concepts were specifically protected by both the use and disclosure provisions of the software agreements.  He stated that, as per the terms of the agreements in 1985 (when both the IBM and Sequent Agreements were executed), modifications and derivatives that contained the "concepts, the ideas, the structure, the organization, the methods from the original licensed product," but did not contain the "source code in the original licensed product" would have been "covered by the agreement" and its restrictions.  (Ex. 5 at 130-31; see also id. at 141-43.)

149.     Further, Mr. Green testified that UNIX methods and concepts were included under the definition of the "SOFTWARE PRODUCT" in Section 1.04 of the software agreements.  (Id. at 106.)  Addressing the specific time frame of April 1985, when the Sequent Agreement was signed (months after the IBM Agreement was signed), Mr. Green acknowledged that the very definition of the "SOFTWARE PRODUCT" term used in Sections 2.01 and 7.06 of the agreements included much more than literal UNIX source code.  (Id. at 106, 147.)

150.     Mr. Green testified that the agreements' protection of modifications and derivatives extended to products created by employing UNIX methods and concepts, even if they did not contain any literal UNIX source code.  (Id. at 142-43.)

151.     Mr. Green further testified that the IBM Side Letter's version of Section 7.06 replaced the explicit "methods and concepts" language with another clause that was designed to protect against copying UNIX methods and concepts.  (Id. at 223; see also id. at 224 (noting again that the revised Section 7.06 was "another way of getting at the methods and concepts").)

49

152.    This continued protection of methods and concepts in the IBM Side Letter is "consistent" with the fact that AT&T specifically included language expressly protecting UNIX methods and concepts in its standard agreements for many years after the IBM and Sequent software agreements were signed. (Id.; see also IBM Ex. 119 § 7.06; IBM Ex. 127 § 7.05; Ex. 31 § 7.05; Ex. 32 §7.04; Ex. 33 § 7.05; Ex. 34 § 7.05; Ex. 35 § 7.05.)

153.    In his recent deposition, Mr. Green also recalled that AT&T distinguished between ownership rights, on the one hand, and the contractual use and disclosure restrictions, on the other, and that he was "sure" he had conversations about that distinction with both Mr. Wilson and Mr. Frasure. (Ex. 5 at 300.)

154.    Mr. Green acknowledged that the merger clause contained in the Sequent and IBM agreements was intended "to make clear that the agreement and its supplements constituted the entire agreement. That's what the language says." (Id. at 93.)

155.    Applying the merger clause to the terms of the Sequent software agreement, Mr. Green explained that Sequent's rights and obligations would be governed only by the agreements that Sequent executed with AT&T. (Id. at 95.)

156.    Mr. Green further testified that, while licensees sometimes received a "most favored nation clause," such provisions were typically specific to the context of pricing, and he was not aware of any such clause relating to the agreements' intellectual-property protections. (Id. at 96.) In any event, Mr. Green acknowledged that no such clause appeared in the Sequent software agreement. (Id. at 96-97.)

<u>David Rodgers</u>

157.    IBM cites David Rodgers, Sequent's former Vice President of Engineering who executed Sequent's Agreement, to support its claim that the license agreements restricted only the literal copying of UNIX source code. (<u>See</u> IBM Mem. ¶¶ 36-39, 42-44, 57-59, 61-62, 125-126, 148; <u>see also</u> IBM Ex. 252 ¶ 8.)  In deposition in this case, however, Mr. Rodgers admitted that the software agreements protected even modifications comprised of "completely new source code." (IBM Ex. 295 at 31-32.)

158.    Mr. Rodgers acknowledged that products created entirely by Sequent would be covered by the software agreements if they were based on the UNIX product.  Mr. Rodgers testified that only "work which had already been created by Sequent" before licensing UNIX and "work that in the future was created by Sequent, <u>not based upon that source code</u>, remained the property of Sequent." (<u>Id.</u> at 27 (emphasis added).)

159.    Further, Mr. Rodgers could not explain how IBM's view of the contract would not render the final clause of Section 2.01 ("provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT") a nullity. (<u>Id.</u> at 101.)

160.    IBM further cites Mr. Rodgers to deny that the UNIX software agreements afforded any protection to methods and concepts. (IBM Ex. 252 ¶ 12.)

161.    In his deposition in this case, however, Mr. Rodgers acknowledged that the software agreements protected UNIX methods and concepts. (IBM Ex. 295 at 159.)  Responding to a hypothetical concerning a product created by a licensee that contains "structures and sequences and organization as it appears in System V," Mr. Rodgers conceded that "if the reason

the similarity was there was because it was just copied, then yeah, I would agree that that would be subject to the constraints." (Id.; see also id. at 137.)

162.    Mr. Rodgers contradicted IBM's other declarants in his recent deposition, discussing what he characterized as the "open-ended" requirement in Section 2.01, which did not address ownership, but rather use and disclosure restrictions.  (IBM Ex. 295 at 128.)  Mr. Rodgers also acknowledged that this understanding applied to a licensee's own source code. (See id. at 135.)

163.    Mr. Rodgers testified about the written, countersigned process through which a licensee or AT&T would change the terms of the written software agreements, directly contradicting IBM's position that the terms of the individual agreements could change even without the parties executing a new agreement or modification.  (IBM Ex. 295 at 169-70.)  Mr. Rodgers acknowledged that Sequent signed the "standard form agreement" and that, aside from price, Sequent did not negotiate or change any terms from that standard agreement.  (See id. at 82-84.)  With regard to the language in the IBM Side Letter that removed the explicit reference to methods and concepts in Section 7.06, Mr. Rodgers acknowledged that no such revision was proposed or made in Sequent's case.  (See id. at 146.)

C.    IBM's and Sequent's Acknowledgement of
       the Restrictive Scope of the Agreements.

164.    IBM claims it never believed it was precluded from doing "as it wished" with what it calls its "homegrown code" in AIX, as opposed to the System V material in AIX, but numerous IBM internal documents draw no such distinction between the two.  In January 2000, for example, IBM          REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

52

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

The document gives no indication that IBM believed it could disclose at the so-called "homegrown" parts of AIX however it saw fit.

165.    Other internal documents further confirm that IBM regarded AIX as UNIX-derivative source code to be kept confidential.

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

53

166.    Other contemporaneous evidence from IBM's own files demonstrates that it did not distinguish between what it now calls "homegrown" material in AIX and the UNIX System V material in AIX for purposes of its obligations of confidentiality.  According to its own

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

167.    Similarly, internal Sequent document confirm that Sequent also drew no such distinctions.  After IBM announced its acquisition of Sequent in 1999, Sequent initiated discussions with Santa Cruz in November 1999 regarding IBM's access to Sequent's Dynix/ptx.

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

Sequent never even raised the possibility with SCO that Sequent was somehow entitled to show to show or give to IBM what IBM now calls Sequent's "homegrown" technology from Dynix/ptx.

54

168.    Instead, Santa Cruz Contracts Manager Bill Broderick told Sequent:  (1) as a

wholly owned subsidiary of IBM, Sequent did not have the right to disclose its Dynix/ptx

technology to IBM; (2) if Sequent were going to remain a wholly owned subsidiary (rather than

become a division) of IBM, Sequent needed to send SCO a written request to disclose its

Dynix/ptx technology to IBM; and (3) if Sequent were to become a division of IBM, IBM would

be obligated to assume the terms of Sequent's UNIX license as is, because SCO would not

renegotiate that license.  (Ex. 135.)  There were no discussions between the parties regarding

different terms or conditions for any "homegrown" part of Dynix/ptx.  (Ex. 333 ¶¶ 17-20.)

## V.      SANTA CRUZ'S ACQUISITION OF THE UNIX BUSINESS.

### A.      The Parties' Intent in the Asset Purchase Agreement.

169.    In 1995, Novell sold its entire UNIX-related business to SCO's predecessor-in-

interest The Santa Cruz Operation, Inc. (also referred to herein as "SCO").  (See Asset Purchase

Agreement dated Sept. 19, 1995 between Novell and SCO ("APA") Recital A, §§ 1.1(a),

1.3(a)(i), Schedule 1.1(a) (IBM Ex. 123).)

170.    The extrinsic evidence confirms that Santa Cruz had bought the business "lock

stock and barrel."  (Ex. 136.)  The evidence confirms that SCO obtained Novell's UNIX

copyrights through the APA.  (Ex. 39 ¶¶ 6-12; Ex. 9 ¶¶ 6-12; Ex. 351 ¶ 9; Ex. 40 ¶¶ 5-10, 12-16;

Ex. 38 ¶¶ 2-4, 5-16; Ex. 59 Ex. 6 ¶ 4; Ex. 333 ¶ 7; Ex. 355 ¶ 7; Ex. 76 at 36-40; 187; 189; Ex. 42

¶ 4; IBM Ex. 585 at 18-19, 22-25, 32-33, 34-36, 38, 88-90, 97, 264-65, 288, 290.)

171.    The contemporaneous documents confirm Novell's view that Santa Cruz had

acquired the full scope of the UNIX business and licenses.  On October 18, 1995, Mr. Bouffard

stated in an internal Novell document:

> We are obligated to give SCO all information, contracts, assets etc. pertaining to the UnixWare business and the old UNIX source code business. <u>The have bought it lock, stock and barrel.</u> Once the transaction is closed (Nov.-Dec.) we will have no more involvement with this business. Therefore [sic], if a contract is for UnixWare and lets [sic] say NetWare, the UnixWare part if theirs.

(Ex. 136 (emphasis added).)  The document thus plainly confirms Novell's view that Santa Cruz had acquired the full scope of the UNIX business, logically including the UNIX copyrights.

172.    Moreover, Amendment No. 2 to the APA, which was executed on October 16, 1996, confirms that the APA transferred to SCO "the copyrights and trademarks owned by Novell as of the date of the Agreement required for SCO to exercise its rights with respect to the acquisition of UNIX and UnixWare technologies." (IBM Ex. 44 ¶ A; <u>see also</u> Ex. 76 at 50; Ex. 42 ¶ 6; IBM Ex. 585 at 13, 20, 55-58, 85, 165, 184.)

173.    IBM's own internal documents confirm that IBM considered Santa Cruz to be the owner of the UNIX copyrights.  In August 1997, for example,

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

(Ex. 59 (emphasis added).)  IBM thus regarded SCO as the copyright owner, and indisputably did not regard Novell as the copyright owner, of the code.

174.    There was one limited exception to the wholesale transfer of Novell's UNIX business to SCO:  Novell retained the right to continue to receive and protect royalties paid by then-existing UNIX System V ("SVRX") licensees for their ongoing distribution of binary products based on their UNIX flavors pursuant to SVRX sublicensing agreements (the "binary

royalty stream"). (IBM Ex. 123 §§ 1.2(a)-(b), 4.16(a); id. Schedule 1.1(b), Item VIII (excluding from asset sale "All right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16 hereof").) Otherwise, pursuant to the other provisions in the APA, SCO received complete ownership and control of all UNIX source code, including the exclusive right to license the source code for SCO's own benefit and the right to enforce intellectual-property protections against licensees of the source code. (Ex. 39 ¶¶ 9-10; Ex. 40 ¶ 11; Ex. 42 ¶ 6; Ex. 38 ¶¶ 2-4, 5-16; IBM Ex. 444; Ex. 76 at 35, 37-38; 100-110; 194-196; 207-08, 209; Ex. 42 ¶ 6; IBM Ex. 585 at 33-34, 40-41, 98, 264-65.)

175.   The SVRX binary royalties were part of the consideration paid to Novell for the transfer of the UNIX assets to SCO. (IBM Ex. 123 § 1.2(a)-(b).) The parties agreed to this limited exception because Santa Cruz was not able to pay up-front what Novell regarded as the value of the business; the future binary royalty stream bridged the price gap. (Ex. 39 ¶¶ 7, 9, 13; Ex. 40 ¶¶ 6, 9, 10; Ex. 42 ¶ 6; IBM Ex. 585 at 31-32, 94.)

176.   Section 4.16 of the APA governs Novell's rights to the SVRX binary royalty stream. Section 4.16(a) sets out the procedures for SCO's collection and payment to Novell of the royalties, and gave Novell the right to audit those collection efforts. (IBM Ex. 123 § 4.16(a); see also Ex. 301 ¶¶ 7, 9; Ex. 76 at 35, 37-38, 100-10, 194-96, 207-08, 209.) SCO receives a fee for performing this administrative function. (See IBM Ex. 123 § 4.16 (A) ("In consideration of such activities described in the preceding sentence, Seller shall pay to Buyer within 5 days of receipt of SVRX Royalties from Buyer as set forth in the preceding sentences, an administrative fee equal to 5% of such SVRX Royalties."))

177.    Section 4.16(b) protects Novell's interest in the binary royalty stream by providing in relevant part: "In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller." (Id. § 4.16(b).)

178.    The text of Section 4.16 of the APA does not give Novell rights to veto or to waive decisions made by SCO under the software agreements at issue here. (Ex. 39 ¶ 13; Ex. 76 at 41-42, 53; Ex. 42 ¶ 5; IBM Ex. 585 at 19-20, 36-37.) Section 4.16 refers only to SVRX Licenses, not more broadly to software agreements. "SVRX Licenses" is not defined by the APA, but are referenced in Section 4.16 as being listed in "detail" under Item VI of APA Schedule 1.1(a). By contrast, UNIX "Software Agreements" are expressly covered by Item III.L to Schedule 1.1(a) – an Item not referenced anywhere in Section 4.16.

179.    Section 4.16(c) of the APA protects the assets transferred to SCO from interference by Novell, by prohibiting Novell from promoting the sale of SVRX products: "Seller further covenants that immediately following the Closing Date neither it, nor any of its officers, directors or employees shall . . . take any material action designed to promote the sale of SVRX products." (IBM Ex. 123 § 4.16(c).)

B.    The Parties' Intent in Amendments Nos. 1 and 2 to the APA.

180.    Amendment No. 1 to the APA, effective as of the closing of the APA in December 1995, permits SCO to retain all of the SVRX royalties with respect to certain categories of SVRX licenses, including SCO's own SVRX license. (IBM Ex. 502 ¶ E.)

181.    Amendment No. 2 to the APA, which was executed on October 16, 1996, states: "This Amendment does not give Novell the right to increase any SVRX licensee's rights to

SVRX source code," and that "Novell may not prevent SCO from exercising its rights with respect to the SVRX source code in accordance with the Agreement." (IBM Ex. 444 ¶ B.5.)

182.    The Amendment further specified that SCO had obtained the copyrights for UNIX. (IBM Ex. 444 ¶ A.) The intent of the parties in Amendment No. 2 was to make clear that Novell did not have right to interfere on in any way waive SCO's rights under the UNIX licensees that SCO had acquired from Novell. (Ex. 39 ¶ 13; Ex. 40 ¶ 10; Ex. 38 ¶¶ 2-4, 14-16; Ex. 42 ¶ 6; Ex. 76 at 41-42, 53.)

C.    Amendment No. X.

183.    The parties to Amendment No. X did not intend to increase IBM's source code rights except in limited ways. (Ex. 38 ¶¶ 2-4, 17-20; Ex. 50 ¶¶ 36-41.)

184.    Amendment No. X states in pertinent part that the "second to last sentence of paragraph 9 of the February 1, 1985 amendment to SOFT-00015 is modified by deleting the words: 'and employees of Licensee shall not refer to the physical documents and materials comprising Software Products subject to this Agreement when they are developing any such products or services or providing any such service.'" (IBM Ex. 124 ¶ 6.)

185.    Amendment No. X further provides: "Except as modified herein, all other terms and conditions of the Related Agreements will remain in effect. This Amendment No. X does not give IBM any additional rights to distribute the Software Product in source code form other than as modified in Section 2 and 3 of this Amendment No. X." (IBM Ex. 124 § 8.)

186.    Amendment No. X also addresses the extent to which IBM could distribute source code of the SOFTWARE PRODUCT to certain third parties. The IBM Sublicensing Agreement gave IBM the right to permit its sub-licensees to distribute the SUBLICENSED PRODUCT, and

the right to use contractors to use a SOFTWARE PRODUCT "to modify a SUBLICENSED PRODUCT derived from such SOFTWARE PRODUCT." (IBM Ex. 120 § 2.05(b).)  The Side Letter expanded on those rights with respect to contractors (as noted above).  (IBM Ex. 122 ¶ 3.)

187.   In 1987, AT&T and IBM had agreed to a new section for the Sublicensing Agreement.  Section 2.05(c) specified that where a LICENSEE had given access to the SOFTWARE PRODUCT source code to a third party to create derivative works and that third party subsequently distributed "sublicensed products based on all or any portion of such a derivative work," such a third party must do so "under the terms of its own Software Agreement and Sublicensing Agreement with AT&T."  (Ex. 137 at 1.)

188.   Specifically, the second sentence of Section 2.05(c) states:  "IBM may not authorize or permit any third party to whom IBM has provided a SOFTWARE PRODUCT pursuant to Section 7.06(b) of the Software Agreement (source code licensee) or paragraph 3 of the February 1, 1985 amendment to the Software Agreement (contractor) to be a DISTRIBUTOR, pursuant to this Sublicensing Agreement, with respect to any SUBLICENSED PRODUCT, derived from such SOFTWARE PRODUCT, which was, in whole or in part, provided by such third party" or its subsidiaries or parents.  (Ex. 137 § 2.05(c).)

189.   Amendment No. X expands on IBM's right to distribute the SOFTWARE PRODUCT to such third parties, but only for specific purposes.  The contractor must be working "in support of the contractor's distribution and support of Sublicensed Products," and only for the "Authorized Purpose" of "making modifications to the Software Products, and furnishing such modifications to IBM and/or distribution of such modifications of Sublicensed Products in

binary form by the contractor to customers directly or through other Distributors," provided that even additional conditions are satisfied.  (IBM Ex. 124 § 2.1.)

190.    Amendment No. X further provides that IBM "may license a Software Product in source code form to an eligible contractor or customer for such contractor's or customer's use in accordance with Section 2," and details the restrictions on that right to license.  (IBM Ex. 124 § 3.) The "Software Product in source code form" is called a "Source Copy."  (Id.)

191.    With respect to IBM's circumscribed right to distribute source code to eligible contractors or customers, Amendment No. X provides scenarios to "clarify and illustrate the relief provided in Subsection 2.1."  (IBM Ex. 124 § 3.7.)  Company A is a "general computer system manufacturing firm" and a sublicensee of the Sublicensed Product:  "IBM may not distribute Source Copies to Company A for purposes of making modifications to adapt the Sublicensed Products as a general operating system for Company A's general computer hardware system."  (IBM Ex. 124 § 3.7.)  Amendment No. X thus does not permit IBM to license the Software Product in source code form to a company to permit the company to modify and adapt the Sublicensed Product as a general operating system for that company.

## VI.    IBM'S CONTRIBUTIONS TO LINUX IN BREACH OF ITS AGREEMENTS.

192.    AIX is a derivative work based on the licensed UNIX software product.  (Ex. 276; Ex. 287; Ex. 288; Ex. 116 at 62; Ex. 139 ¶¶ 32-35; Ex. 11¶ 18; see also IBM Ex. 260 at 127-29; IBM Ex. 80 at 44-46; IBM Ex. 584 at 76, 95-97, 120.)  Dynix/ptx is also a derivative work based on the licensed UNIX software product.  (Ex. 75 at 47-48; Ex. 116 at 62; see also IBM Ex. 260 at 127-29; IBM Ex. 80 at 44-46; IBM Ex. 584 at 76, 95-97, 120.)

193.    IBM specifically decided to make and then made numerous critical contributions of important technology from AIX and Dynix/ptx to Linux development. (Ex. 277, 287; 287, 288; Ex. 300.) SCO identifies those contributions in detail in its December 2005 Final Disclosures, and SCO's experts detail the significance of the disclosures in their initial and rebuttal expert reports. (Exs. 144, 287, 288, 277, 278.) Documentary evidence produced by IBM describes and depicts IBM's movement of AIX and Dynix/ptx technology into Linux. (Ex. 300.)

194.    SCO's Final Disclosures and Expert Reports reveal that IBM disclosed a wealth of technology – in the form of source code, methods, concepts, techniques, and know-how – from both AIX and Dynix/ptx into Linux development. (Exs. 144, 287, 288, 277, 278.)

195.    With respect to AIX, for example, IBM contributed to Linux the source code for the AIX Journaling File System derived from UNIX System V. (Ex. 277 ¶¶ 95-114 & Exs. C-H.). With respect to Dynix/ptx, for example, IBM contributed to Linux the source code for the Read-Copy-Update ("RCU") functionality. IBM made scores of additional contributions of technology from Dynix/ptx in the form of source code, methods, concepts, techniques and know-how.[2] (Exs. 287, 288.)

196.    SCO's experts further explain how and why IBM's AIX and Dynix/ptx contributions have been integral to the development of Linux into a commercially ready operating system. (Exs. 277, 287, 287, 288.) With respect to JFS, for example, IBM contributed the advanced journaling capability that Linux had sorely lacked. (Exs. 277, 278.) With respect

---

[2]      As of the time of this filing, the District Court had not resolved SCO's Objections to the Magistrate Court's Order excluding many of SCO's disclosures as a basis for additional discrete claims of breach of contract.

to RCU, IBM's contribution enabled Linux to run in the types of multi-processing environments had been unable to run on prior to that time.  (Exs. 287, 288.)

197.    SCO's experts have shown in detail, moreover, how IBM's contributions to Linux from AIX and Dynix/ptx, by bringing Linux into the enterprise, have been a very substantial factor in harming SCO's UNIX business.  (Ex. 281 at 10-24, 45-58, 62-69; Ex. 284 at 39-57; Ex. 283 at 2-73; Ex. 286.)

## VII.   SCO PROPERLY SOLD LICENSES FOR ITS INTELLECTUAL PROPERTY TO LINUX USERS.

A.      SCO's Efforts to Protect Its Rights in UNIX.

198.    Other than through express written agreements and for due consideration, SCO has never intended to waive and has always sought to protect and evidence its rights under the UNIX license agreements.  (Ex. 49 ¶ 3; Ex. 333 ¶¶ 20-21; Ex. 355 ¶¶ 20-21.)

199.    SCO did not know that IBM had contributed source code and other technology to Linux in violation of its (and Sequent's) SVRX software agreements until December 2002 or January 2003.  (Ex. 49 ¶ 5; Ex. 333 ¶ 22; Ex. 355 ¶ 22.)

200.    After filing suit against IBM for breaching the SVRX agreements, SCO further demonstrated its intent to enforce its rights under those agreements by delivering a termination notice to IBM pursuant to Section 6.3 of the SVRX license.  (Ex. 49 ¶ 10.)

201.    SCO attempted to meet and confer with IBM, but IBM failed to cure its breaches during the two-month period provided in SCO's termination letter to IBM.  (Ex. 49 ¶ 11.) Accordingly, effective June 13, 2003, SCO terminated IBM's SVRX license; and effective July

30, 2003, SCO terminated the Sequent SVRX license. (Ex. 49 ¶ 11.)  SCO thus further demonstrated its intent to enforce its rights under those licenses. (Ex. 49 ¶ 11.)

B.      SCO's Distribution of Linux.

202.    SCO and its predecessors copied, advertised, and distributed the Linux kernel and other related Linux software for years before 2003. (IBM Ex. 284 ¶ 9.)

203.    SCO did not know that <u>any</u> of the features mentioned in SCO's advertisements (with the sole exception of the journaling file system support, or "JFS") had been contributed by IBM to Linux. (Ex. 49 ¶¶ 6-8.)  As to that one exception, SCO marketed JFS as "developed by IBM," but did not know that JFS was derived from SCO-licensed code or that IBM had contributed it in breach of the software agreements. (<u>Id.</u> ¶ 8.)

204.    Indeed, SCO did not know that any of the advertised features had been derived from SCO's proprietary software licensed to IBM or had been contributed to Linux by IBM in violation of IBM's agreements with SCO. (Ex. 49 ¶ 7-8; Ex. 6 ¶¶ 3, 6-14.)

205.    Caldera, Inc., Caldera Systems, Inc. and Caldera International, Inc. (collectively, "Caldera"), as noted, also copied, advertised, and distributed the Linux kernel and other related Linux software for years before 2003.  Until approximately June 2001, Caldera was neither the owner of the UNIX copyrights nor the owner of the UNIX license agreements at issue in this case. (Ex. 269 ¶ 9.)

206.    Until 2002, Caldera International did not undertake to determine if IBM's contributions to Linux constituted a breach of its UNIX license agreement. (Ex. 269 ¶¶ 3, 11-14, 17-18; Ex. 6 ¶¶ 3, 6-14; <u>see also</u> Ex. 386 ¶ 7; Ex. 378.)

64

207.    Neither Santa Cruz nor Caldera International ever intended to waive any of its rights under the UNIX license agreements at issue in this case, and never represented to anyone that it believed that IBM's Linux contributions complied with the terms of its UNIX license agreements.  (Ex. 269 ¶¶ 3, 11-14, 17-18; Ex. 6 ¶¶ 3, 6-14; Ex. 333; Ex. 337.)

208.    Neither Santa Cruz nor Caldera International ever intended that its silence on the question of the legality of IBM's contributions to Linux be construed as Caldera International's consent, implied or otherwise, to IBM's contributions to Linux from AIX or Dynix/ptx.  (Ex. 269 ¶¶ 3, 11-14, 17-18; Ex. 6 ¶¶ 3, 6-14; 333 ¶ 21; Ex. 337 ¶ 15.)

## VIII.  IBM DESTROYS RELEVANT EVIDENCE AND ILLEGALLY HACKS INTO SCO'S WEBSITE IN PURSUIT OF EVIDENCE.

### A.    IBM Destroys Relevant Evidence Shortly After SCO Brings Suit.

209.    SCO filed its Complaint on March 6, 2003.  (Ex. 103.)  Among the allegations in the Complaint were the following:

   a.  IBM is precluded by its agreements with SCO from disclosing its UNIX-derivative AIX source code to the Linux development community, because it contains SCO's UNIX source code.  (Id. ¶¶ 91-94.)

   b.  IBM had recently and publicly released parts of AIX for contributions into Linux, in breach of its agreements with SCO.  (Id. ¶¶ 95.)

   c.  IBM had recently and expressly promised to exploit its expertise in AIX to bring Linux up to par with UNIX and then to obliterate UNIX.  (Id. ¶ 98.)

   d.  A large number of the IBM employees devoted to Linux development have, or have had, access to the UNIX source code.  (Id. ¶ 100.)

65

210.    IBM's Linux Technology Center ("LTC") was launched in 2001 to dispose of all or part of UNIX, including its concepts, ideas, and know-how, into an open-source Linux environment.  (Id. ¶ 102(a).)

211.    In makings contributions or disclosures to Linux development, the LTC programmers have relied on expertise and technology from two UNIX-derived operating systems, AIX and Dynix/ptx, developed with the UNIX System V source code, methods, and concepts that IBM licensed from SCO's predecessor-in-interest AT&T.

   a.  Among the pending causes of action that SCO brought based on such allegations were its claims that IBM had engaged in unfair competition, based in part on IBM's "Violation of confidentiality provisions running to the benefit of plaintiff" (Id. ¶ 118(b)); and breach of contract, based on IBM's contributions to Linux development of source code, methods, and concepts that IBM had promised to keep confidential, but instead had subjected to "unrestricted disclosure," "unauthorized transfer and disposition," and "unauthorized use" (Id. ¶¶ 129-36).

   b.  Notwithstanding the filing of the foregoing complaint and the foregoing allegations, discovery in this case has revealed that in early April 2003, IBM

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

   c.
                        REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY
                                                            A sandbox may

66

exist on a developer's computer hard drive or as a link to a copy of source code wherein the developer makes changes. (Ex. 108 at 119-20; Ex. 104 at 54.)

d.        REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

e.        REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

f.  IBM destroyed this evidence after repeatedly and publicly boasting that the Unix-derived expertise and ideas it open-sourced were the critical difference in making Linux usable by enterprises. In an interview with Linux Magazine about the state of the Linux kernel in 2001, for example, IBM programmer Patricia Gaughen stated that Linux was "not where the proprietary Unixes are yet, but we are making much faster progress due to the experienced Dynix/IRIX/AIX/SN1 /Yalnix/ hackers." (Ex. 111.)

g.  In another example, Dan Frye, the Director of the LTC, confirmed in an interview with the Consulting Times that the LTC "wanted skills from across IBM, and we have people from AIX, and OS2 . . . and PTX, and Research and so on." (Consulting Times, Inside IBM – Dan Frye and the Linux Technology Center (undated) (Ex. 112).) Frye also discussed the porting of IBM's proprietary

67