technology to Linux, stating "[IBM] just add[s] arms and legs and skills to make [projects within Linux] go faster." (Id.)

B.    IBM Illegally Hacks into SCO's Website to Try to Find Evidence.

212.    As described below at Section X.A., SCO reasonably discontinued its sale and marketing of its Linux-related products in May 2003.

213.    On May 14, 2003, SCO suspended all sales and marketing of its entire Linux product line. (IBM Ex. 284 ¶ 3; IBM Ex. 324 at 179, 186; IBM Ex. 296 at 16, 37, 48, 51.)

214.    After May 14, 2003, SCO entered into no further obligations to sell SCO Linux Server 4.0 or any other Linux product. (IBM Ex. 284 ¶ 3; IBM Ex. 296 at 53.) SCO made limited post-May 14 sales to customers in consideration of its obligations to its customers. (IBM Ex. 284 ¶¶ 3-5; IBM Ex. 324 at 188-89; IBM Ex. 296 at 72-73; Ex. 49 ¶¶ 12-14; IBM Ex. 300 at 221-23.) The last sale of Linux Server 4.0 was on May 31, 2004. (IBM Ex. 284 ¶ 4; IBM Ex. 311 at 60.)

215.    SCO permitted access to Linux source code files via its website after May 2003, because of SCO's pre-existing contractual obligations with its customers and with the UnitedLinux consortium. (IBM Ex. 324 at 190-91, 194; Ex. 49 ¶¶ 17-19; Ex. 324 ¶ 4.)

216.    In accordance with its UnitedLinux agreements, SCO provided customers who purchased SCO Linux Server 4.0 with a password to enter at a log-in screen on SCO's download site so that only they would have access. (IBM Ex. 324 at 195; IBM Ex. 311 at 37-38; Ex. 49 ¶¶ 17-19; Ex. 324 ¶ 4.)

217.    The only way a non-customer could access the Linux Server 4.0 code on SCO's download site was to bypass the password-protected security system by hacking into the system.

(Ex. 49 ¶¶ 20-21.)  In addition, the download site contained an explicit notice that access to the Linux Server 4.0 files was limited to SCO customers.  (Id. ¶ 28.)

218.    Between October 31 and December 1, 2003, IBM repeatedly accessed the SCO log-in site but did not obtain access to the SCO Linux Server 4.0 files.  (Id. ¶ 25.)  After news of a bug in the SCO site's security system was reported on internet websites, IBM exploited the bug to bypass the security system, hack into SCO's website, and download the posted files attached.  (Id. ¶¶ 22-27.)  IBM uses (¶ 168) those files as purported evidence in support of this motion.

219.    SCO diligently sought to remove all Linux-related code from its website promptly after expiration of the last of its contractual commitments, on December 31, 2004.  (IBM Ex. 284 ¶ 11; IBM Ex. 324 at 191, 194; IBM Ex. 311 at 37-38, 121; Ex. 49 ¶ 17; Ex. 324 ¶¶ 2-11.)

## IX.    SCO REASONABLY UNDERTAKES TO END ITS LINUX BUSINESS.

### A.    SCO's Suspension of Its Distribution of Linux.

220.    SCO marketed and licensed its Linux product Linux Server 4.0 for only a few months, from November 19, 2002, until May 14, 2003.  (IBM Ex. 284 ¶ 2.)

221.    After filing suit against IBM, SCO considered whether to continue selling and marketing Linux-related products, including SCO Linux Server 4.0.  (Ex. 49 ¶ 12.)  An important issue SCO considered was its obligations to existing SCO customers; SCO took the view that SCO's customers were entitled to order SCO's products and updates from SCO for a period of time after becoming customers.  (Id. ¶ 13.)

222.    SCO decided that the most sensible solution was to suspend its sale and marketing of its Linux-related products (which SCO did effective May 14, 2003), and to continue to allow SCO's pre-existing customers to order such products.  (Id. ¶ 14.)  Since May 14, 2003, SCO has

not entered into any further obligations to sell Linux Server 4.0 or OpenLinux 3.1.1. (IBM Ex. 284 ¶ 3.)

223.    By suspending the sale of its Linux-related products, including the operating system, services, support, professional services, education, and layered applications, SCO lost approximately 5-10% of its revenues. (Ex. 49 ¶ 15.) From May 14, 2003, until May 31, 2004 (when SCO last sold a unit of Linux Server 4.0), SCO sold 83 units and had 79 units returned, for a gross revenue of $1,849. (Id.) After August 5, 2003, there were 401 sales of SCO OpenLinux 3.1.1, for total gross revenue of $50,796. During the same period, 22 copies of this product were returned, so net revenue was $50,025. (IBM Ex. 284 ¶ 5.)

224.    In taking into account the foregoing considerations and reaching the foregoing decisions, SCO never intended to waive its right to enforce its SVRX license agreements against IBM and Sequent. (Ex. 49 ¶ 13.)

225.    Santa Cruz distributed a Linux product in 2000 and 2001, and Caldera System, Inc. also distributed a Linux product in 2000 and 2001. In doing so, neither company intended to waive its rights to enforce its UNIX System V license as relevant against IBM, neither company represented to IBM that its contributions to Linux were permissible under those agreements, and neither company had considered at that time whether IBM's contributions to Linux constituted a breach of the agreements. (Ex. 17 ¶ 11; Ex. 6 ¶ 6; Ex. 18 ¶ 12; Ex. 356 ¶¶ 2-4; see also Ex. 386 ¶ 7, Ex. 378.)

B.    SCO's Protection of Information on Its Website.

226.    SCO has not provided public access to Linux through its website. To the contrary, in order to preclude public access to SCO Linux Server 4.0 Server files, SCO provided

70

customers who purchased this product with a password to enter at a log-in screen on SCO's website, so that only those customers would have access. (Ex. 49 ¶ 19; Ex. 324 ¶ 4.)

227.    After suspending its marketing and distribution of Linux Server 4.0 in May 2003, SCO permitted access to Linux source code files via its website after August 5, 2003, because of SCO's pre-existing contractual obligations with its customers and with the UnitedLinux consortium, from whom it had received the Linux source code used in distribution of Linux Server 4.0. (IBM Ex. 324 at 190-91, 194; Ex. 49 ¶¶ 17-19; Ex. 324 ¶ 4.) SCO complied with those obligations by making the source code available to its customers on its website. In accordance with UnitedLinux, SCO provided customers who purchased SCO Linux Server 4.0 with a password to enter at a log-in screen on SCO's download site so that only they would have access. (IBM Ex. 324 at 195; IBM Ex. 311 at 37-38; Ex. 49 ¶¶ 17-19; Ex. 324 ¶ 4.)

228.    The only way a non-customer could access the Linux Server 4.0 code on SCO's download site was to bypass the password-protected security system by hacking into the system. (Id. ¶¶ 20-21.) In addition, the download site contained an explicit notice that access to the Linux Server 4.0 files was limited to SCO customers. (Id. ¶ 28.)

229.    Between October 31 and December 1, 2003, IBM repeatedly accessed the SCO log-in site but did not obtain access to the SCO Linux Server 4.0 files. (Id. ¶ 25.) After news of a bug in the SCO site's security system was reported on internet websites, IBM exploited the bug to bypass the security system, hack into SCO's website, and download the very files IBM has now attached to its motion. (Id. ¶¶ 22-27.)

230.    The files that IBM hacked remained on SCO's website after August 5, 2003, because of SCO's pre-existing contractual obligations with its customers and with the

UnitedLinux consortium. (Ex. 49 ¶¶ 17-19.) Under the GPL, each time SCO distributed a copy of IBM's purported works in executable form, SCO was to provide the customer "with the complete corresponding machine-readable source code" on a "medium customarily used for software interchange" or with an offer to provide the code at cost. (IBM Ex. 128 § 3.) SCO complied by making the source code available to its customers on its website.

231.    As noted, SCO diligently sought to remove all Linux-related code from its website promptly after expiration of the last of its contractual commitments, on December 31, 2004. (IBM Ex. 284 ¶ 11; IBM Ex. 324 at 191, 194; IBM Ex. 311 at 37-38, 121; Ex. 49 ¶ 17; Ex. 324 ¶ 2-11.)

232.    Between October 31 and December 1, 2003, IBM repeatedly accessed the SCO log-in site but did not obtain access to the Linux Server 4.0 files. (Id. ¶ 25.) After news of a bug in the website's security system was reported on internet websites, IBM exploited the bug to bypass the security system, hacked into SCO's website, and downloaded the very files IBM has now attached to its motion. (Id. ¶¶ 22-27.)

233.    SCO has made diligent efforts since late 2003 to eliminate the availability of Linux on any current or archived SCO website, and is not currently aware that any version of Linux is available on any such website. (Ex. 324 ¶¶ 2-11.) SCO has never open-sourced its UNIX technology. (Ex. 269 ¶ 10.)

## X. SCO HAS PROCEEDED IN GOOD FAITH IN DISCOVERY AND HAS DISCLOSED IBM'S MISCONDUCT IN DETAIL.

### A. SCO's Good-Faith Efforts in Discovery.

234. SCO has diligently complied with its discovery obligations and, has conscientiously endeavored to respond to all of IBM's discovery requests. SCO has provided IBM with detailed answers, to the extent the information was available to SCO, to all of IBM's interrogatories and other requests, specifically including IBM's requests for detailed information about the source code in Linux on which SCO bases its claims in this case. (See below.)

235. Where SCO could not produce information because IBM had not provided needed discovery (including earlier versions of AIX and Dynix and information concerning IBM's contributions and contributions to Linux), SCO so indicated in its responses. With respect to IBM motions to compel the Magistrate Court found in its March 2004 Order that SCO had made "good faith efforts to comply with the Court's prior order." (See below.)

236. SCO has specifically explained that its ability to identify the source code information that IBM requested was significantly impeded by IBM's failure to produce necessary discovery. (Ex. 148; Ex. 149; Ex. 152; Ex. 153; Ex. 154; Ex. 158.) SCO has explained that its ability to provide the discovery IBM sought was hampered by IBM's failure to produce adequate discovery concerning AIX and Dynix source code as well as design documents, programmer notes, and other information that would assist SCO in identifying contributions that IBM made to Linux in violation of the UNIX license agreements. (Ex. 148; Ex. 149; Ex. 152; Ex. 153; Ex. 154; Ex. 158.)

73

237.    As of July 2004, when IBM filed its first round of summary judgment motions SCO had produced 241 CDs containing hundreds of thousands of pages of documents. (Ex. 157.) SCO had also produced all of the source code for its products in its possession, which exceeds over 700 million lines of code. (Id.)

238.    In addition, over the span of dozens and dozens of pages, SCO had detailed its claims, provided file and line numbers for source code IBM contributed to Linux in violation of its contractual obligations, and otherwise provided all information in its possession requested by IBM or ordered by the Magistrate Court. (Ex. 156.)

239.    SCO repeatedly stated in response to early IBM discovery requests that, absent the production of relevant materials from IBM, SCO would be unable to respond in full or in detail to IBM's requests. On October 23, 2003, for example, SCO initially answered IBM Interrogatories 12 and 13, regarding IBM's contributions to Linux, by stating (among other things) that "SCO notes that it has not received responsive discovery from IBM that would allow it to fully answer this question because part of this information is peculiarly within the knowledge of IBM. (Ex. 152.)

240.    At the time SCO answered those interrogatories it had not received a single line of code from AIX or Dynix from IBM. SCO was thus limited in what it could discover and produce by IBM's failure to provide requested discovery, such as AIX and Dynix source code. (IBM Ex. 64 at 31-32.)

241.    In ruling on IBM's November 2003 motion to compel, on December 12, 2003, the Magistrate Court ordered SCO to "respond fully and in detail to Interrogatory Nos. 12 and 13 as stated in IBM's Second Set of Interrogatories." (Ex. 150 at 2.) The Magistrate Court also

directed SCO to "identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM." (Id.)

242.     In addition, however, based on SCO's demonstration that it did not have sufficient information in its possession to provide much of the detail IBM was requesting, the Magistrate Court's December 20V03 Order also provided that in cases where "SCO does not have sufficient information in its possession, custody, or control to specifically answer any of IBM's requests that are the subject of this order, SCO shall provide an affidavit setting forth the full nature of its efforts, by whom they were taken, what further efforts it intends to utilize and the expected date of compliance." (Ex. 150 at 2.)

243.     In response to the December 2003 Order, SCO undertook exhaustive efforts during the thirty-day period provided by the Order.  In January 13, 2004, SCO produced nearly seventy pages of detailed supplemental and revised answers to IBM's Interrogatories 12 and 13 and other discovery requests. (Ex. 152.)  In these supplemental and revised answers, SCO devoted fourteen pages to identifying, by file and line of code, those materials from Dynix that IBM had copied into Linux. (Id. at 3-17.)

244.     SCO was able to provide this detailed information because IBM had produced limited versions of Dynix source code on December 4, 2003, the day before the hearing on SCO's motion to compel the production of that code, among other items. (Ex. 156.)

245.     SCO also identified other areas of Dynix as well as AIX that appeared to have been contributed to Linux in violation of the license agreements, but because IBM's production of Dynix source code was incomplete, SCO could not provide the detail of identifying files and lines of code, which SCO explained in its responses. (Ex. 152.)

246.    SCO concluded its supplemental and revised response by identifying other technologies that SCO believed IBM had contributed to Linux in violation of its license agreements, including specifying the bases for its belief and its need for IBM's comprehensive source code in order to provide further details.  (Ex. 152 at 26-30.)

247.    In addition to providing the supplemental answers in compliance with the Magistrate Court's December 2003 Order, SCO supplied a declaration, pursuant to that Order, detailing its extensive compliance efforts.  (Ex. 151.)  SCO's declaration detailed the difficulties created by IBM's refusal to provide the necessary source code to SCO and specifically identified the need for complete disclosure of IBM's source code and complete disclosure of IBM's contributions to Linux.  (Id. ¶¶ 19-20.)  The foregoing discovery responses and the certifications therewith uniformly stated that SCO needed additional discovery (and, once such discovery was provided, additional time) to provide further information.

248.    The Magistrate Court thereafter considered SCO's supplemental responses (aa well as SCO's motion to compel discovery from IBM, addressed further below).  In its March 2004 Order, the Magistrate Court recognized that the time limitation in its December 2003 Order had made it difficult for SCO to collect all requested documents and to provide further responses to IBM's interrogatories.  (IBM Ex. 56 at 2.)

249.    The Magistrate Court thus gave SCO an additional forty-five days to provide further discovery pursuant to the earlier Order and "to provide and identify all specific lines of code that IBM is alleged to have contributed to Linux from either AIX or Dynix," to "identify all specific lines of code from UNIX System V from which IBM's contributions from AIX or Dynix are alleged to be derived," to "provide and identify with specificity all lines of code in Linux that

76

it claims rights to," and to "provide and identify with specificity the lines of code that SCO distributed to other parties." (Id.)

250.    The Magistrate Court again recognized the limitations on SCO's ability to provide such information due to IBM's failure to produce the needed AIX and Dynix source code; the Magistrate Court specifically stated that SCO would only be required to identify those specific lines of code IBM had contributed to Linux that SCO could identify "at this time." (Id.)

251.    Contrary to IBM's claims, neither of the Magistrate Court's December 2003 or March 2004 Orders directed SCO to "match up the lines of Linux code to which it claims rights to the specific lines of the UNIX software code from which the Linux code is alleged to derive." The December 2003 Order directed SCO to "identify and state with specificity the source code(s) that SCO is claiming form the bases of their action against IBM" (Ex. 150 ¶ 4), and the relevant provision of the March 2004 Order directed SCO to "identify all specific lines of code from UNIX System V from which IBM's contributions from AIX and Dynix are alleged to be derived." (IBM Ex. 56 ¶ 4.) SCO provided such detailed answers in its January 2004 responses and in its April 2004 update. (Ex. 149; Ex. 155.)

252.    In April 2004, SCO provided detailed responses corresponding to each of the items in the Magistrate Court's March 2004 Order.   Specifically, SCO provided the additional documents that it had difficulty in collecting and reviewing during the thirty days following the Magistrate Court's December 2003 Order. As to those April 2004 supplemental responses, SCO only had the selected snapshots of AIX and Dynix source code and still had not received any identification of the contributors and specifically what they had contributed to this source code. (Ex. 154.)

253.     SCO then provided detailed exhibits that answered each of the items set forth in

the Magistrate Court's March 2004 Order.  SCO identified, for example, further "specific lines

of code that IBM is alleged to have contributed to Linux from either AIX or Dynix."  (Ex. 155 at

Tabs B and C.)  SCO did so by attaching exhibits further specifying, by file and line, AIX and

Dynix code that IBM had contributed to Linux.  SCO's supplemental discovery represented an

additional 21,000 lines of code.  (Id.)  SCO was able to provide the foregoing information

because IBM had finally produced selected versions of AIX code and additional versions of

Dynix code pursuant to the March 2004 Order.  (IBM Ex. 64 at 38.)

254.     With respect to IBM's contributions to Linux, moreover, SCO responded that

AIX and Dynix, as a whole, are modifications or derivative works based on UNIX System V,

and provided two additional exhibits identifying, by file and lines, the UNIX System V code that

remains in AIX and Dynix and from which AIX and Dynix are derived.  (Ex. 155 at Tabs E and

F.)  SCO attached charts detailing files and lines of code from UNIX System V from which AIX

and Dynix are derived.  (Id.)

255.     SCO further explained that without being provided access to the evolution of AIX

and Dynix, SCO could not further address the requests.  (Ex. 154 ¶ 6.)  As it had previously,

SCO noted that it was limited in its responses based on IBM's failure to provide all requested

discovery.  (Id. ¶ 9.)

256.     With the same limitations caused by IBM's failure to provide complete discovery,

SCO filed responses to IBM Interrogatories in May and June 2004.  As with the SCO's other

discovery responses in the case, SCO noted that its responses to the interrogatories were "based

on the evidence SCO has discovered independently and based on information contained in

78

IBM's limited production to date" and that "[u]pon receiving complete discovery from IBM, including all versions of AIX and Dynix/ptx, there undoubtedly will be further evidence of IBM's contractual breaches and other violations of law." (Ex. 158.)

257.    Within the constraints imposed by IBM's failure to provide foundational discovery, including but not limited to all versions of AIX and Dynix, SCO identified, among other items, what the code identified in its earlier answers constituted (idea, procedure, process, expression, etc.), the limits on its expression, if any, its location in the public domain (if at all), and whether it had been distributed without a copyright notice. (Id.)

258.    SCO has continually supplemented and updated its production of documents since the summer of 2004. SCO produced eight CDs of documents in December 2004, two more CDs in January 2005, four more CDs in July 2005, two more CDs in August 2005, eleven more CDs in November 2005, three more CDs in December 2005, ten more CDs in January 2006, seventeen more CDs in February 2006, sixteen more CDs in March 2006, four more CDs in April 006, two more CDs in May 2006, one more CD in July 2006, and one more CD in October 2006. (Ex. 160.) The only motion to compel that IBM filed after 2003 related to the question of attorney-client privilege regarding SCO's predecessors-in-interest. (See Ex. 312.) (check cite)

B.    IBM's Intransigence in Discovery.

259.    SCO initiated discovery on June 24, 2003, when it asked for a variety of documents, including all versions or iterations of AIX and Dynix since 1999, and also a listing of all persons who worked on AIX and Dynix and the precise contributions of each of these persons to the source code. (Ex. 146.)

260.     After lengthy meet-and-confer sessions, IBM claimed compliance or ongoing efforts at compliance, but SCO was left without this discovery and eventually was forced to file a motion to compel in November 2003 to receive it.  (See Ex. 313.)

261.     On the eve of the hearing on SCO's motion to compel, in early December 2003, IBM produced limited Dynix source code but still no AIX code.  In fact, IBM did not produce AIX code until March 2004 – one year after suit was filed and after ordered to do so by the Magistrate Court.  (IBM Ex. 64 ¶ 46.)

262.     When IBM finally produced the first portions of the necessary source code in December 2003 and March 2004, it provided only selected snapshots of AIX and Dynix and failed to identify the precise contributions of the IBM individuals involved in the development of AIX and Dynix.  (Id.)

263.     In March 2004, following oral argument in February 2004, the Magistrate Court ordered IBM to comply with its discovery obligations by providing specified discovery and supplementing its deficient responses.  (See IBM Ex. 56.)

264.     SCO filed a motion to compel in July 2004, again on the grounds that IBM's responses, this time to the Magistrate Court's March 2004 Order, were deficient.  (See Ex. 314.) In October 2004, the Magistrate Court ordered IBM to "provide affidavits from the Board of Directors, Mr. Palmisano and Mr. Wladawsky – Berger regarding production of all non-privileged documents pertaining to IBM's Linux strategy."  (See Ex. 315.)

265.     In December 2004, SCO filed a motion to compel IBM properly to respond to the Magistrate Court's March 2004 Order and to the October 2004 Order.  (See Ex. 316)  In January 2005, the Magistrate Court ordered IBM to supplement its production.  (See Ex. 317) (check

cite) On IBM's motion for reconsideration, in an April 2005 Order, the Magistrate Court continued to require IBM to supplement its production. (See Ex. 318.)

266.    In January 2005, SCO filed a motion to compel IBM to produce its Chief Executive Officer, Samuel J. Palmisano, for deposition. (See Ex. 319.) The grounds included the plain and indisputable facts that (1) IBM intended to depose SCO's CEO, Darl McBride, for two days, and (2) Mr. Palmisano was obviously a relevant fact witness. (Id.) In July 2005, the Magistrate Court ordered IBM to produce Mr. Palmisano for deposition. (See Ex. 68.)

267.    In September 2005, SCO filed a renewed motion to compel IBM to produce the complete development history of its Linux contributions. (See Ex. 320.) In response, as reflected in the Magistrate Court's October 2005 Order, IBM agreed to produce responsive materials. (See Ex. 321.)

268.    In October 2005, SCO filed a renewed motion to compel IBM to properly respond to the Magistrate Court's March 2004 Order and to the October 2004 Order. (See Ex. 322.) In March 2006, the Magistrate Court ordered IBM to produce certain affidavits and to make certain witness available for deposition. (See Ex. 323.)

269.    In April 2006, SCO filed a motion, in United States District Court for the Middle District of North Carolina, to compel the deposition of Otis Wilson, whom counsel for IBM had come to represent and had refused to make available for deposition. (Ex. 161.) In May 2006, the Magistrate Court in North Carolina ordered Mr. Wilson to appear for deposition. (Ex. 162.)

C.      SCO's December 2005 Final Disclosures.

270.    The District Court's Order of July 1, 2005, set forth new deadlines for completion of discovery, for exchange of expert reports, for filing of dispositive motions, for completion of

pre-trial stipulations and witness and exhibit lists, and, ultimately, for a five-week jury trial set to begin on February 26, 2007.

271.    At IBM's request, the Court also included deadlines for the parties to "identify" all allegedly "misused material" with "specificity," and to update interrogatory answers. The interim deadline for this identification was October 28, 2005, and the final deadline was December 22, 2005. This Court declined to adopt IBM's proposed language for that deadline, which stated that line, version, and file of source code must be provided. (Ex. 163 at 2; see also id. n.2.)

272.    SCO timely and fully complied with both the interim October and final December deadlines. In October 2005, SCO identified 204 items of "misused material" and provided source code references for source code disclosures and specific references to the method and concept disclosures at issue. (Ex. 143; Ex. 144.)

273.    On December 5, 2005, little more than two weeks before the final submissions were due, IBM wrote SCO a letter claiming that the October disclosures were not specific enough and threatening to move to preclude SCO from pursuing any claims regarding allegedly misused material that IBM believed was not properly disclosed. (IBM Ex. 151.)

274.    As SCO's plan and effort was to provide as much specificity in its December Submission as possible, and as SCO informed IBM at the time, that Submission, which SCO believed fully conformed to the Order and went well beyond what was required in many areas, was viewed as the response to IBM's letter. (IBM Ex. 60 at 4.)

275.    SCO's December Submission consisted of a 466-page principal document organized around 294 items of misused material. (Ex. 144.) SCO and experts did everything

82

they could to ensure that they disclosed all the material they had and that it was organized in the most accessible possible manner. SCO and its experts cited versions, files and lines where available. (Ex. 143.)

276.    The Submission thus provided identification of the person(s) making the disclosure; a description identifying the nature of the improperly disclosed code, method or concept; a summary of the improper disclosure or use; a reference to specific supporting files or documents listed as "sources"; and a list of Linux files believed to contain or to be related to the improperly disclosed materials. (Ex. 144; Ex. 143.)

277.    For most methods and concepts, all or critical parts of the communication comprising the disclosure were reproduced in the "summary" section of the disclosure. Where IBM provided a patch file of code along with the disclosed method (which showed the Linux community how the method or concept might be implemented in Linux), such code was included or the link to the file which IBM identified as containing the code was noted. (Ex. 144; Ex. 143.)

278.    Along with this principal document, SCO provided many thousands of pages of referenced sources which constituted source code files, articles, or copies of the full communications through which the improper disclosure was made. SCO also provided IBM and the District Court with a CD containing the December Submission, with all backup material hyperlinked to each disclosure item so that all source information identified in each disclosure could readily be viewed by clicking on the name of the hyperlinked source file. (Ex. 144.)

## XI.    NOVELL IMPROPERLY PURPORTS TO "WAIVE" SCO'S RIGHTS.

279.    In 2003, Novell sent SCO a series of letters purporting to waive SCO's right to enforce its UNIX license agreements against IBM. (IBM Exs. 135, 136, 137, 138.)

280.     At the time that Novell purported to waive IBM's breaches of the agreements, no binary royalty payments were being made or were expected to be made in the future, under the IBM or Sequent UNIX license agreements.  In Amendment No. X, IBM had agreed to pay SCO a nonrefundable fee of $10.125 million for a perpetual license to distribute certain sublicensed binary products based on the UNIX source code at no additional royalty payment; Amendment X thus effected a buy-out of IBM's future UNIX binary royalty obligations.  (IBM Ex. 124.)

281.     Similarly, by the time Novell purported to waive SCO's source code rights with respect to Dynix (in February 2004), no further royalty payments were being made under Sequent's license; the last such royalty payment to SCO (of only approximately $3,000) was made in the first quarter of 2003.  (Ex. 44 ¶ 3.)

282.     At the time it purposed to direct SCO to waive its rights, Novell was seeking to promote business interests entirely separate from any rights it retained under the APA.  In a series of deals struck between November 2003 and March 2004, Novell and IBM formed a very close Linux partnership:  Novell acquired Linux distributor SuSE Linux, and IBM invested $50 million in Novell to finance part of the acquisition.  (Ex. 45.)

283.     Under the IBM-Novell deal, Novell became a major Linux distributor, allowing IBM to continue its official distance from the Linux distribution channel.  IBM spokesman Mike Darcy stated:  "IBM is not a Linux distributor and has no interest in being in that business."  Hiawatha Bray, Novell to Buy SuSE Linux for $210M; Firm's Commitment to Software Boosted, The Boston Globe, Nov. 5, 2003 (Ex. 46).

284.     Nevertheless, IBM benefits significantly from the Linux distributions made by Novell.  Novell CEO Jack Messman explained the benefits of its partnership with IBM as

84

follows: "IBM stands to gain a great deal of revenue by providing systems, peripheral devices, software and services for Linux." Bob Mims, <u>Novell, IBM and HP unite efforts to put Linux on top: Three companies unite to boost Linux and topple Microsoft</u>, The Salt Lake Tribune, Mar. 25, 2004, at E1 (Ex. 47).

285.    Novell and SCO entered into a Technology License Agreement ("TLA") contemporaneously with the APA.  As contemplated by Section 1.6 of the APA, the Technology License Agreement effected a "license back" to Novell of rights to use the UNIX System V code. (Ex. 48; IBM Ex. 123 § 1.6; IBM Ex. 585 at 271-72.)

286.    Under the TLA, Novell was permitted to use UNIX and UnixWare only for internal purposes and only in bundled products, and then only to the extent that no material part of the bundled product competed with SCO's UnixWare business.  (Ex. 48; Ex. 76 at 44-45.)

287.    The chief negotiators for both Novell and SCO, and other participants in those negotiations, agree that neither SCO nor Novell intended for the APA to grant Novell the sweeping rights over the assets it sold to SCO that IBM argues were granted.  (Ex. 39 ¶ 13; Ex. 40 ¶ 10; Ex. 42 ¶ 5; Ex. 351 ¶ 9; Ex. 50 ¶¶ 29-35; Ex. 76 at 41-42, 53; <u>see also</u> IBM Ex. 260 at 315-16, 318 325, 356.)  The understanding of Novell's designated employee "for achieving a smooth transition of Novell's UNIX customers to SCO" was that "Novell had retained no rights in SVRX source code under the Purchase Agreement," but rather "retained rights to the binary code royalties."  (Ex. 360 ¶ 11.)

288.    Ed Chatlos, who negotiated the APA for Novell, explained that "Paragraph 4.16 of the APA was specifically designed and intended to protect Novell's retained binary product royalty stream" and that Novell retained no "right to waive, or to direct or require SCO to waive,

any of SCO's source code rights, including under customer source code licenses." (Ex. 39 ¶ 13.) Mr. Chatlos confirmed his views at deposition. (Ex. 76 at 41-42, 53.)

289.    Jim Wilt, who negotiated the APA for SCO, confirmed that Paragraph 4.16 of the APA allowed Novell to manage royalty streams, but "not at the expense of SCO's right to enforce its intellectual-property protections under any such licenses, and not to permit Novell to waive any of those protections." (Ex. 40 ¶ 10.) Mr. Wilt also explained that Amendment No. 2 was intended to confirm the parties' intent in this regard. (Id.)

290.    Steve Sabbath, Santa Cruz's former Vice President of Law and Corporate Affairs and a participant in a number of the meetings and discussions with the chief negotiators and attorneys leading up to the APA, similarly refuted the suggestion that Section 4.16(b) gave Novell the right to waive any breach of the intellectual-property protections. According to Mr. Sabbath, IBM's proposed interpretation would permit Novell to eviscerate the entire purpose of the asset-purchase transaction. (Ex. 42 ¶ 5; IBM Ex. 585 at 19-20, 36-37.)

291.    Mr. Sabbath, who was involved in the discussions leading up to Amendment No. 2 and who executed that amendment on Santa Cruz's behalf, has also explained that:

> Amendment No. 2, however, was intended to confirm, among other things, the parties' intent that SCO would obtain ownership of the UNIX copyrights under the APA and that Novell had received no rights with respect to UNIX source code under the APA.  Paragraph B.5 of Amendment No. 2 was specifically intended to make clear that Novell had no right to increase any SVRX licensee's rights to SVRX source code, no right to grant any new SVRX source code licenses, and no right to prevent Santa Cruz from exercising the rights it obtained under the APA with respect to SVRX source code.

(Id. ¶ 6.) Mr. Sabbath confirmed the foregoing views at deposition. (IBM Ex. 585 at 38, 55-58, 84-86.)

292.     Larry Bouffard, Novell's worldwide sales director for UNIX products and the Novell representative who negotiated Amendment No. X for the company, has now clarified his previous declaration.  It was Mr. Bouffard's decision, in reliance on his interpretation of Section 4.16 of the APA, to enter into a buyout of IBM's binary royalty stream between IBM and Novell, purportedly on behalf of Santa Cruz.  Mr. Bouffard confirms that Novell and Santa Cruz entered into Amendment No. 2 "to preclude Novell from undertaking the precise type of unilateral conduct with respect to the UNIX license agreements that I had undertaken with respect to the IBM-Novell buyout."  (Ex. 50 ¶ 33.)  Mr. Bouffard states:

> Amendment No. 2 clarified and reiterated that the only rights Novell possessed in relation to Santa Cruz's UNIX license agreements was a limited right to preclude Santa Cruz from interfering with the binary royalty stream.  I did not understand Novell to have the right to direct SCO to waive any of its rights under its UNIX source code license agreements, let alone to do so unilaterally.

(Ex. 50 ¶ 35.)

293.     Kim Madsen was a Manager in the Law and Corporate Affairs group of Santa Cruz at the time of the APA and Amendment No. 2.  In that capacity, she worked with Mr. Wilt and Mr. Sabbath on the negotiation of the APA, and with Mr. Sabbath in the negotiation of Amendment No. 2.  Mr. Madsen testifies:

> Under the APA, Novell also retained rights to certain binary product royalty payments.  That retention of rights allowed Novell to manage that royalty stream within the operation of Santa Cruz's customer source code licenses.  I did not understand the retention to be at the expense of Santa Cruz's right to enforce its intellectual property protections under such licenses or to permit Novell to waive any of those protections, and I never heard anyone from any negotiation team suggest otherwise.  I do not believe that Novell had any right to waive, or to direct or require Santa Cruz to waive, any of its intellectual property rights or protections.

(Ex. 38 ¶ 13.)  With respect to Amendment No. 2, Ms. Madsen explains:

87

My understanding from the negotiations and discussions leading up to the Amendment was that Amendment No. 2 was intended to confirm, among other things, the parties' intent and agreement that Santa Cruz had obtained ownership of the UNIX copyrights under the APA and that Novell had received no rights with respect to UNIX source code under the APA. Paragraph B.5 of Amendment No. 2 was specifically intended to make clear that Novell had no right to increase the rights of any UNIX System V source-code licensee, no right to grant any new such source-code licenses, and no right to prevent Santa Cruz from exercising the rights it obtained under the APA with respect to that source code.

(Ex. 38 ¶ 16.)

## Standard of Decision

The standards for summary judgment under Federal Rule of Civil Procedure 56 are stringent. "Summary judgment should not be granted unless the evidence, viewed in the light most favorable to the party opposing the motion, shows there are no genuine issues of material fact and the moving party is due judgment as a matter of law." Kysar v. Amoco Prod. Co., 379 F.3d 1150, 1155 (10th Cir. 2004) (quoting Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183, 1188 (10th Cir. 2000).)

It is axiomatic that the "moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment," and that "the court must review the record in the light most favorable to the opposing party." Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Thus, the Court "must resolve factual disputes and draw inferences" in favor of the non-moving party, Rogers v. United States, 281 F.3d 1108, 1113 (10th Cir. 2002), and the Court may not "act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences." Boyer v. Bd. of County Comm'rs of Johnson County, 922 F. Supp. 476, 484 (D. Kan. 1996). In short, summary judgment may not be granted unless "the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." David v. City & County of Denver, 101 F.3d 1344, 1355 (10th Cir. 1996).

## Argument

Each of the purported bases for IBM's Motion fails to establish any basis for summary judgment, with respect to either the facts at issue or the relevant precedent.

First, SCO has established a material breach of the Agreements. (Part I, below.) A core, fundamental restriction of the Agreements is that IBM was not entitled publicly to disclose the

89

source code, methods or concepts in AIX or Dynix/ptx. The plain language of the standard UNIX license agreement compels that interpretation, and there is extrinsic evidence spanning decades to confirm it. IBM does not dispute that it made hundreds of disclosures from AIX and Dynix/ptx to Linux, at least dozens of which remain at issue in the case.

Second, IBM's estoppel argument is based on numerous disputed facts and the misapplication of New York law. (Part II, below.) The foregoing extrinsic evidence, and more, further establishes (and easily permits the inference) that neither IBM nor Sequent was ever told that it could openly disclose the source code, methods and concepts they developed even if they were developed as part of a derivative work based on the licensed UNIX software product. In addition, under New York law, the unambiguous and comprehensive integration clauses in the Agreements gave no legal effect to any such alleged representations and made any alleged reliance by IBM or Sequent on such statements unreasonable. Under the law, moreover, the conduct of AT&T, USL, Novell and Santa Cruz cannot bind SCO for purposes of the application of the equitable principle of estoppel.

Third, IBM's waiver argument also is based on numerous disputed facts and a mistaken application of New York law. (Part III, below.) The evidence shows that neither SCO nor its predecessors-in-interest intended to waive their rights precluding their UNIX licensees from disclosing material from their derivative works in material breach of their agreements. Such evidence includes testimony from the members of the UNIX licensing group overseeing the licenses "on the ground" as well as from senior executives and members of the Board of Directors. As a legal matter, moreover, SCO could not be bound by any waivers by its predecessors-in-interest unless SCO knew of those waivers, which it did not and for which IBM

90

presents no evidence to suggest it did.  The evidence also shows IBM's invocation of Novell's purported waiver to lack any basis as a grounds for summary judgment.

Fourth, SCO has timely asserted its claims relating to RCU.  (Part IV, below.)  IBM presents no evidence that any of SCO's predecessors-in-interest knew or should have known of the patent application (in 1993) or the issuance of the patent (in 1995).  The patent application itself was not even public, and the point of the patent was to establish that no one besides the patent-holder was entitled to use RCU.  IBM also presents no evidence that SCO or its predecessor-in-interest knew or should have known that RCU was subsequently incorporated into Sequent's UNIX flavor.  The inclusion of RCU was hardly a well-known fact, and of course the Dynix/ptx source code was not publicly available.

I.      **SCO HAS ESTABLISHED A BREACH OF THE AGREEMENTS.**

IBM does not dispute either that AIX and Dynix/ptx are derivative works within the meaning of the Agreements or that IBM has publicly disclosed technology from AIX and Dynix/ptx to help strengthen Linux.  In addition, SCO has produced substantial evidence demonstrating the foregoing facts.  (¶¶ 192-97.)  Much of this evidence expressly describes or depicts AIX and Dynix/ptx technology being transferred to Linux.  (Ex. 300.)

IBM argues instead that it and Sequent were free to disclose the source code, methods and concepts that it and Sequent developed even if they were developed as part of a derivative work based on the licensed UNIX software product.  IBM bears the burden of demonstrating that its interpretation of the Agreements is correct as a matter of law.  See Trainor v. Apollo Metal Specialities, Inc., 318 F.3d 976, 979 (10th Cir. 2002).  IBM must establish that its reading is the

only reasonable interpretation.  See <u>Jellinick v. Joseph J. Naples & Assocs., Inc.</u>, 296 A.D.2d 75, 78-79 (App. Div. 2002).

IBM does not carry that burden.  SCO demonstrates in its own pending Motion for Partial Summary Judgment on Its Third Cause of Action that the plain language of the Sequent Agreement required Sequent (and then IBM) to hold in confidence all parts of Sequent's derivative works based on the licensed UNIX software product.  The Sequent Agreement was never modified by a side letter or amendment.  In addition, as noted in SCO's Motion, the plain language of the IBM Agreement, Side Letter and Amendment No. X imposed the same requirements on IBM with respect to its own derivative work.

The record further establishes that AIX and Dynix/ptx are such derivative works, also as shown in SCO's pending Motion, and that IBM made numerous contributions to Linux development from those operating systems.  With respect to the extrinsic evidence of the parties' intent under and understanding of the Agreements, moreover, IBM ignores the abundant evidence confirming the foregoing scope of the plain language of the Agreements.

A.   The Plain Language of the Agreements Prohibits
     IBM's Disclosures from AIX and Dynix/ptx.

Although IBM's memorandum in support of its Motion is over one hundred pages long, IBM undertakes no serious textual analysis of the Agreements.  Indeed, such an analysis precludes IBM's cursory plain-language argument.

It is well established that no contractual provisions be rendered superfluous, and that contractual provisions are read so as not to conflict with one another.  See <u>Garza v. Mar. Trans. Lines, Inc.</u>, 861 F.2d 23, 27 (2d Cir. 1988); <u>Ronnen v. Ajax Elec. Motor Corp.</u>, 88 N.Y.2d 582, 589 (1996); <u>Merrill Lynch v. Adler</u>, 651 N.Y.S.2d 38, 39 (App. Div. 1996); <u>Ruttenberg v.</u>

Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 178 (App. Div. 1995); Robshaw v. Health Mgmt.,

Inc., 470 N.Y.S.2d 226, 227 (App. Div. 1983).

It also bears mentioning that to support its argument for equitable estoppel, IBM cites

numerous witnesses who acknowledge (often by omission) that they never relied on the language

of the Agreements for their purported understanding of the scope of the Agreements, and who

cannot reconcile the view of the Agreements they are proposing with the language therein.[3]  (¶¶

130, 146, 159.)  IBM and the cited witnesses thus concede that it is not any assertedly plain

language that gives them the rights they say they have over such material.

The plain language of the Agreements directly defeat IBM's arguments about their

supposedly limited scope.  IBM's interpretation fails for the principal reasons set forth below.

First, if IBM's interpretation of the standard UNIX license agreement (such as the

Sequent Agreement) were correct, then the requirement that "resulting materials" be "treated as

part of the original SOFTWARE PRODUCT" would be rendered superfluous, because UNIX

source code is already clearly and indisputably contained within the original SOFTWARE

PRODUCT.  In other words, there would simply be no reason for the contract to require that

source code contained in "resulting materials" be treated "as part of the original SOFTWARE

PRODUCT," because such source code is already covered by the contractual protections

afforded to the original SOFTWARE PRODUCT.

---

[3] To prove an "equitable estoppel" with respect to the Agreements, IBM must prove that its and Sequent's
conduct has not been referable to the terms of the Agreements. New York law requires the parties'
conduct to be "not otherwise compatible with the agreement as written." Rose v. Spa Realty Assocs., 42
N.Y.2d 338, 346 (1977); accord EMI Music Mktg. v. Avatar Records, Inc., 317 F. Supp. 2d 412, 421
(S.D.N.Y. 2004); Towers Charter & Marine Corp. v. Cadillac Ins. Co., 708 F. Supp. 612, 614 (S.D.N.Y.
1989); Matter of Irving O. Farber, PLLC v. Kamalian, 791 N.Y.S.2d 609, 609 (App. Div. 2005).

At their depositions, principal witnesses from whom IBM has submitted declarations were unable to reconcile IBM's reading with this glaring textual problem. (See IBM Ex. 301 at 241, 264-65; IBM Ex. 302 at 256-57; IBM Ex. 295 at 101.) The attorney (Geoff Green) whose testimony IBM cited two years ago, but now declines to cite, was at a complete loss to explain how IBM's interpretation would not convert the final clause of Section 2.01 ("provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT") into mere surplusage. (See Ex. 5 at 111-12, 121-22, 241.) Indeed, IBM declarant Michael DeFazio acknowledged that the "resulting materials" were the "derivative works" (IBM Ex. 260 at 69-70), and IBM's negotiator Richard McDonough admitted that IBM's AIX product constituted "resulting materials" within the meaning of the IBM Agreement (Ex. 79 at 32, 64, 113).

Second, IBM's reading fails to account for the protection under Section 2.01 for both modifications of the licensed UNIX product and "derivative works" based on that product. A modification plainly denotes that a programmer changed or altered portions of a product, but the separate protection under the agreement for "derivative works" clearly reflects an intent under Section 2.01 to cover products that were based on, but did not necessarily include, the original licensed source code. IBM's reading would render meaningless the term "derivative works." If IBM were correct in contending that the software agreements protected only literal UNIX source code, there would be no reason to delineate an additional – let alone two additional – categories of products that are distinct from the actual code, but were required to be treated the same as the original licensed UNIX software product.

Third, IBM's reading is incompatible with Section 2.01's language requiring derivatives or modifications to be treated "as part of" the original SOFTWARE PRODUCT. By definition,

94

treating such materials "as part of the original SOFTWARE PRODUCT" must mean <u>adding</u> <u>something</u> to the "original SOFTWARE PRODUCT" that was not already there.  In other words, because source code is already contained in the "original SOFTWARE PRODUCT," IBM's reading of Section 2.01 (that is, that it covers only UNIX source code) would provide nothing to add (that is, nothing to treat "as part of").

<u>Fourth</u>, Section 7.06(a) of the Agreements includes a specific provision requiring the licensee to hold the "SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T."  The Agreement further specifies in Section 7.06(a) that the licensee "shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder."  Section 7.06(a) of the standard agreement thus not only expressly extended the requirement of confidentiality to all aspects of the "SOFTWARE PRODUCTS" (which, by virtue of Section 2.01, must be treated identically to any modifications or derivatives based on such SOFTWARE PRODUCTS), but also specifies that protection of the SOFTWARE PRODUCTS includes protection of the "methods or concepts utilized therein."  Again, a plain reading of these provisions is directly at odds with IBM's construction.

<u>Fifth</u>, beyond the plain language of Sections 2.01 and 7.06, further textual evidence undermining IBM's "literal source code only" theory is found in the plain language of the sublicensing agreements.  Under those agreements, IBM and Sequent were permitted to distribute "SUBLICENSED PRODUCTS" – defined to include "COMPUTER PROGRAMS in object-code format based on a SOFTWARE PRODUCT subject to the software Agreement"

95

(IBM Ex. 120 § 1.04; IBM Ex. 121 § 1.04) -- under certain conditions and in exchange for sublicensing fees and royalties. (§ 4.01(a).) Thus, under the sublicensing agreements, AT&T licensees were permitted to distribute, for a fee, products "based on a SOFTWARE PRODUCT subject to the Software Agreement" (which, pursuant to Section 2.01 of the software agreements, included any modifications or derivatives of the SOFTWARE PRODUCT), but only in binary format. Significantly, the plain terms of the sublicensing agreements contain no suggestion or requirement that such "SUBLICENSED PRODUCTS" had to be based on the literal UNIX source code; in fact, the sublicensing agreements do not contain any language whatsoever on which IBM could even argue that the agreements limited the coverage of "SUBLICENSED PRODUCTS" to those "based on" the literal UNIX source code.

In light of this plain reading of the sublicensing agreements, IBM's reading of the license Agreements makes no sense. Under IBM's view, a licensee is free to distribute any product that is "based on" the UNIX software product within the meaning of Section 2.01 – but that does not contain any literal copying of UNIX source code – in <u>unprotected source-code format without charging any sublicensing fees</u>. But under the sublicensing agreements, that same product could only be distributed in object code format and at a charge to the licensee. IBM would thus have the sublicensing agreements require licensees to pay for distributions in restricted object code of the very same products that the licensee could distribute in unrestricted source code without charge under the software agreements.

<u>Sixth</u>, as explained above, neither the IBM Side Letter nor Amendment No. X nullified the plain language of Sections 2.01 and 7.06 or otherwise reduced the contractual obligations regarding modifications and derivative works. Indeed, if the intent of the IBM Side Letter was to

cut back the Section 2.01 protections to mere literal source code, as IBM contends, that would have been exceedingly easy to accomplish as a drafting matter. Instead of leaving the "resulting materials" clause of Section 2.01 entirely in place, the IBM Side Letter could have simply added the word "not" before "treated as part of the original SOFTWARE PRODUCT." With that simple change, IBM could have effected the very change that it now reads into the Side Letter – economically, easily, and clearly. Without such a change, however, the plain language of the Agreements precludes the retroactive change that IBM is attempting to make.

Further, the Side Letter did not cover Sequent. Although the Sequent Agreement was entered into just a couple of months _after_ the IBM Agreement and Side Letter, none of the language on which IBM relies from its Side Letter was included in the Sequent Agreement. And there is no textual support whatsoever for IBM's contention that Sequent somehow received the benefit of amendments to IBM's software agreement even though no such language had been included in their written contracts.

To the contrary, the Sequent Agreement contained clear and unambiguous merger language that specifically ruled out after-the-fact "me too" arguments such as those advanced here by IBM (on Sequent's behalf):

> This Agreement and its Supplements set forth the entire agreement and understanding between the parties as to the subject matter hereof and merge all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby. No provision appearing on any form originated by LICENSEE shall be applicable unless such provision is expressly accepted in writing by an authorized representative of AT&T.

(IBM Ex. 119 ¶ 4 (emphasis added).)  IBM ignores this merger clause in its strained attempt to

export its misreading of the IBM Side Letter over to the Sequent Agreement.

      Accordingly, for all of these reasons, as explained in further detail below, there is no

merit to IBM's limited textual argument that it is entitled to summary judgment on SCO's

contract claims as a matter of law.

                1.     The Plain Language of the Sequent Agreement

      The vast majority of the technology disclosures that SCO challenges were made from

Sequent's derivative work, Dynix/ptx.  SCO has filed a motion for partial summary judgment on

the grounds that the plain language of the Sequent Agreement precluded IBM from making the

disclosures it did.  Sequent entered into no side letter amending any portion of its standard UNIX

license agreement.  The unambiguous integration clause of the Sequent Agreement establishes

that the terms of the IBM Side Letter did not affect Sequent's rights.  (¶¶ 13-21.)

      The Sequent Agreement placed significant constraints on Sequent's rights as a result of

its access and exposure to the licensed UNIX software product.  The minimum set of those

constraints are set forth in the plain language of the Agreement, imposing strict requirements on

licensees' use, export, transfer, and disclosure of the UNIX software.  The two cornerstone

protections are found in Sections 2.01 and 7.06 of the Agreement:

        Internal Business Use (Section 2.01):  "AT&T grants [Sequent] a personal,

        nontransferable and nonexclusive right to use in the United States each SOFTWARE

        PRODUCT identified in one or more Supplements hereto, solely for [Sequent's] own

        internal business purposes and solely on or in conjunction with DESIGNATED CPUs for

        such SOFTWARE PRODUCT.  Such right to use includes the right to modify such

<u>SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE</u>

<u>PRODUCT, provided the resulting materials are treated hereunder as part of the original</u>

<u>SOFTWARE PRODUCT.</u>"  (Emphasis added.)

  <u>Non-Disclosure (Section 7.06(a))</u>:  "[Sequent] agrees that it shall hold all parts of

the SOFTWARE PRODUCT subject to this Agreement in confidence for AT&T.

[Sequent] further agrees that shall not make any disclosure of any or all of such

SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone,

except to employees of LICENSEE to whom such disclosure is necessary to the use for

which rights are granted hereunder."

The Agreement thus plainly extended those protections not only to the literal source code in

which the UNIX innovations had been originally expressed, but also to methods and concepts

that were embodied in UNIX.

  AT&T thus permitted its licensees to rely on the innovations in UNIX to develop

modifications and derivative works based on the UNIX software product, "provided the resulting

materials are treated hereunder as part of the original SOFTWARE PRODUCT."  (IBM Ex. 119

§ 2.01.)  Under this provision, if a licensee exercised its right to use the original UNIX software

product to prepare or as the base for modifications or derivative works, then the licensee had to

afford such "resulting materials" all of the same strict protections required by the software

agreement for the original UNIX product itself.  Thus, pursuant to Section 2.01, all of the use,

transfer, export, and confidentiality restrictions that applied to the original UNIX software

product also covered any such modifications or derivative works.  The Agreement further

specifies: "Except as provided in Section 7.06(b), nothing in this Agreement grants to

LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part." (IBM Ex. 119 § 7.10.)  The Agreement thus again prohibits Sequent from disclosing any "part" of the "resulting materials."  (IBM Ex. 119 §§ 2.01; 7.06(a); 7.10.)

2.  The Plain Language of the IBM Agreement, Side Letter, and Amendment No. X.

In addition to its own standard UNIX license agreement, IBM entered into a Side Letter with AT&T, and then in 1996 entered into an Amendment No. X to the Agreement and Side Letter with AT&T's successor-in-interest Santa Cruz.  Neither the Side Letter nor Amendment No. X changed the foregoing core restrictions that applied under AT&T's standard UNIX license agreement.

The Side Letter.  The Side Letter states:  "Regarding Section 2.01, we agree that modifications and derivative works prepared by or for you are owned by you.  However, ownership of any portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work remains with us."  (IBM Ex. 122 ¶ A.2.)  Paragraph A.2 says nothing about IBM's confidentiality obligations, which are addressed in Section 7.06 of the Agreement and Paragraph A.9 of the Side Letter.  IBM says that the ownership clarification must have changed the confidentiality restrictions, because otherwise IBM's ownership was insignificant.  That is incorrect.  Under the clarification, AT&T could not reach out and appropriate IBM's work for AT&T's benefit while the Agreement was in place, as IBM retained ownership rights.  (See Part I.B, below.)

The Side Letter "amends" Section 7.06(a) of the Agreement by "replacing" that Section with a different "7.06(a)."  (IBM Ex. 122 ¶ A.9.)  The opening language of Paragraph A.9 of the Side Letter says that the right to "develop" at issue is one that applies only internally to IBM:

100

IBM "agrees that it shall not make any disclosure of such SOFTWARE PRODUCTS to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder."  (IBM Ex. 122 ¶ A.9.)  Under the first part of Paragraph A.9, IBM "agrees that it shall hold SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T" and "further agrees that it shall not make any disclosure of such SOFTWARE PRODUCTS to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder."  (IBM Ex. 122 ¶ A.9.)  The Side Letter thus repeats the core confidentiality restrictions of the IBM Agreement regarding SOFTWARE PRODUCTS.

Paragraph A.9 then affords IBM a limited right to "develop or market" certain products that the Agreement and Sublicensing Agreement do not permit IBM to "develop or market" – namely, products that are not modifications or derivative works based on the SOFTWARE PRODUCT, but that employ ideas, concepts, know-how or techniques embodied in the SOFTWARE PRODUCTS.  (IBM Ex. 122 ¶ A.9.)  IBM may "develop or market" such products as long as IBM does not copy code from the SOFTWARE PRODUCT into the product or refer to the SOFTWARE PRODUCT in developing the product.

The Side Letter thus does not remove the requirement that, with respect to products that are modifications and derivative works based on the licensed UNIX software product, IBM must continue to honor the confidentiality restrictions on such products.  If IBM could freely disclose those parts of a modification or derivative work that IBM owned, then Paragraph A.9 would not make any sense.  If IBM owned and therefore could disclose, with respect to a derivative work based on the licensed software product, any and all parts that did not contain literal System V

101

source code, then IBM would have been free to "develop or market" a product containing ideas, concepts, know-how and techniques from the software product even where IBM had referred to System V in developing that product – and would have been free to disclose all parts of such a product.

The Side Letter thus addresses the ownership of modifications and derivative works, and does not in any way compromise the strict prohibitions on improper use and disclosure of such works.  Ownership and use rights are not synonymous in the law, and property rights – particularly intellectual-property rights – can be bifurcated along those lines.  See, e.g., HotSamba, Inc. v. Caterpillar Inc., No. 01 C 5540, 2004 WL 609797, at *5 (N.D. Ill. Mar. 25, 2004) (discussing software license agreement that allowed licensee to create derivative works and provided that licensee owned any derivative works it created, but prohibited licensee from transferring any such derivative works to third parties) (Ex. F).  Contractual language addressing ownership should not be understood to define the contracting parties' rights with respect to use, particularly where, as here, the contract unambiguously distinguishes those rights, and addresses them separately and differently.

Amendment No. X.  In amending part of Paragraph A.9 of the Side Letter, Amendment No. X does not give IBM the right to publicly disclose the SOFTWARE PRODUCT or "resulting materials" or ideas, concepts, know-how or techniques therein.

Amendment No. X states in pertinent part that the "second to last sentence of Paragraph A.9 of the February 1, 1985 amendment to SOFT-00015 is modified by deleting the words: 'and employees of Licensee shall not refer to the physical documents and materials comprising Software Products subject to this Agreement when they are developing any such products or

services or providing any such service.'" (IBM Ex. 124 ¶ 6.)  Amendment No. X thus removes only the second of the two conditions that had to be satisfied before Paragraph A.9 of the Side Letter operates to permit IBM to "develop or market" a product that contains the "ideas, concepts, know-how or techniques" embodied in the SOFTWARE PRODUCT but that is not a derivative work based on the SOFTWARE PRODUCT .

Amendment No. X thus does <u>not</u> permit IBM to publicly disclose any material that IBM is obligated to keep confidential under its Agreement and Side Letter.  Amendment No. X specifically provides:  "Except as modified herein, all other terms and conditions of the Related Agreements will remain effect.  This Amendment No. X does not give IBM any additional rights to distribute the Software Product in source code form other than as modified in Section 2 and 3 of this Amendment No. X."  (IBM Ex. 124 § 8.)  Sections 2 and 3 relate only to IBM's rights to license the SOFTWARE PRODUCT to certain third parties under certain circumstances. Accordingly, under the Side Letter as modified by Amendment No. X, having indisputably copied code from the SOFTWARE PRODUCT into AIX, IBM did <u>not</u> have the right publicly to disclose in piecemeal fashion the AIX source code or ideas, concepts, know-how or techniques therein.

Amendment No. X also addresses the extent to which IBM could distribute source code of the SOFTWARE PRODUCT to certain third parties.  The IBM Sublicensing Agreement gave IBM the right to permit its sublicensees to distribute the SUBLICENSED PRODUCT, and the right to use contractors to use a SOFTWARE PRODUCT "to modify a SUBLICENSED PRODUCT derived from such SOFTWARE PRODUCT."  (IBM Ex. 120 § 2.05(b).)  The Side Letter expanded on those rights with respect to contractors.  (IBM Ex. 122 ¶ 3.)

Amendment No. X expands on IBM's right to distribute the SOFTWARE PRODUCT to certain third parties, but only for specific purposes. The contractor must be working "in support of the contractor's distribution and support of Sublicensed Products," and only for the "Authorized Purpose" of "making modifications to the Software Products, and furnishing such modifications to IBM and/or distribution of such modifications of Sublicensed Products in binary form by the contractor to customers directly or through other Distributors," provided that even additional conditions are satisfied. (IBM Ex. 124 § 2.1.)

Amendment No. X further provides that IBM "may license a Software Product in source code form to an eligible contractor or customer for such contractor's or customer's use in accordance with Section 2," and details the restrictions on that right to license. (IBM Ex. 124 § 3.) The "Software Product in source code form" is called a "Source Copy." (Id.) With respect to IBM's circumscribed right to distribute source code to eligible contractors or customers, Amendment No. X provides scenarios to "clarify and illustrate the relief provided in Subsection 2.1." (IBM Ex. 124 § 3.7.) Company A is a "general computer system manufacturing firm" and a sublicensee of the Sublicensed Product: "IBM may not distribute Source Copies to Company A for purposes of making modifications to adapt the Sublicensed Products as a general operating system for Company A's general computer hardware system." (Id.) Amendment No. X thus does not even permit IBM to license the Software Product in source code form to a company to permit that company alone to modify and adapt the Sublicensed Product as a general operating system for that company. Amendment No. X certainly did not permit IBM to open-source the code that IBM remained obligated to keep confidential.

---

104

IBM's breaches were material. A contract breach is "material" if it goes to the "root of the agreement between the parties." Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) (quotations and citation omitted). Under the plain language of its license agreement, Side Letter, and Amendment No. X, IBM was obligated to keep all parts AIX confidential because IBM was required to treat a derivative work like AIX "as part of" the licensed UNIX software product. That language alone, by definition, proves that AT&T regarded confidentiality surrounding derivative works to be as important as the confidentiality for the licensed UNIX software product.

SCO has also demonstrated why such restrictions were integral and reasonable under the circumstances, and how they served to protect the value of the UNIX asset and business. (¶¶ 32-64.) SCO has also demonstrated that the same core confidentiality protections for the licensed UNIX System V software product and their derivative works remained in the UNIX System V license agreements through the successive sales and transfers of the UNIX business and licenses. (¶¶ 63-96.) On these basis alone, SCO submits, the Court could not properly find as a matter of law that IBM's breaches were immaterial.

In addition to the plain language, extrinsic evidence confirms that the confidentiality provisions go to the root of the Agreements. (¶¶ 76-96.) Where, as here, the question of breach itself turns on disputed issues of fact concerning the parties' intent, it necessarily follows that the question of material breach cannot be resolved as a matter of law. Indeed, "in most cases, the question of materiality of breach is a mixed question of fact and law – usually more of the former and less of the latter – and thus is not properly disposed of by summary judgment." Bear, Stearns, 361 F. Supp. 2d at 395 (citing numerous cases and substantial other authority); accord

Mackinder v. Schawk, Inc., No. 00 Civ. 6098 (DAB), 2005 WL 1832385, at *9 (S.D.N.Y. Aug. 2, 2005) (Ex. G); Calamari & Perillo, The Law of Contracts § 11-18(a) (3d ed. 1987); Williston, on Contracts § 63:3, 440-41 & n.34 (4th ed. 2002). "Treating materiality as primarily a question of fact, best resolved by the jury, is consistent with the 'wavering and blurred' line that divides the material breach from the trivial." Bear, Stearns, 361 F. Supp. at 296 (citation omitted).

SCO has further shown, moreover, that IBM's breaches lead to the very harm that AT&T had precluded in its UNIX System V license agreements, such that as the successor to those agreements, SCO was deprived of "the benefit of the bargain." Bear, Stearns, 361 F. Supp. 2d at 297. That is, by publicly disclosing parts of its UNIX System V derivative work, IBM significantly helped to develop an unlicensed, UNIX-clone operating system in which the owner of UNIX System V and its license agreements had no royalty interest, and which proceeded to destroy the owner's own UNIX business. (¶¶ 192-97.) If there is ambiguity on the margins, as one of IBM's own declarants now acknowledges, the Agreements clearly did not permit licensees to develop such royalty-free clones. (Ex. 50 ¶¶ 19-26.)

SCO has thus further shown that IBM's breaches went to the "root" of its obligations, and therefore constituted a material breach of those obligations. (See also SCO's Memorandum in Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright Claim (SCO's Fifth Cause of Action)," Argument, Part I.)

B.    Any Contractual Ambiguity, as Well as the Extrinsic Evidence, Precludes IBM's Motion on the Meaning of the Agreements.

Courts applying New York law, as well as the Tenth Circuit, have repeatedly held that "in a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d

106

Cir. 1996). That is, courts may not resort to extrinsic evidence in order to resolve contractual ambiguities as a matter of law. See Bouzo v. Citibank, 96 F.3d 51, 58 (2d Cir. 1996); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992); State v. Home Indem., 66 N.Y.2d 669, 671 (1985); Hartford Acc. & Indem. Co. v. Wesolowski, 350 N.Y.S.2d 895, 898 (1973); Ruttenberg v. Data Davidge Sys. Corp., 215 A.D.2d 191, 193 (N.Y. App. Div. 1995); accord Gomez v. Am. Elec. Power Serv. Corp., 726 F.2d 649, 651 (10th Cir. 1984); Met. Paving Co. v. City of Aurora, Colo., 449 F.2d 177, 181 (10th Cir. 1971).[4]

This rule reflects the Court's obligation under Rule 56 to construe all evidence on a motion for summary judgment – including ambiguous contractual terms – in the light most favorable to the non-moving party. Thus, if a contract is ambiguous, there necessarily exists a genuine issue of fact concerning the parties' intended meaning:

> If the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist. If the language is susceptible to different reasonable interpretations, and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment.

Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998) (emphasis added). Because ascertaining the meaning of an ambiguous contract necessarily involves drawing inferences from, and determining the credibility of, extrinsic evidence, see Hartford, 350 N.Y.S.2d at 898, permitting a court to resolve such matters on a motion for summary judgment "would greatly curtail the prerogatives of juries and trial

---

[4]     See also Restatement (Second) of Contracts § 212(2) (1981) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence."); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2730.1, at 273-75 (2d ed. 1983); E. Allan Farnsworth, Contracts § 7.14, at 538-39 (2d ed. 1990).