judges." Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1439 (7th Cir. 1993) (Posner, J.) (recognizing that "to infer meaning from disparate bits of evidence, some textual, some testimonial, none contested in themselves but the aggregate forming a confused mosaic" is "a task more appropriate for a trier of fact").

The cases IBM cites are inapposite. In Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150 (10th Cir. 1999), for example, the district court had completed a full trial on damages, enabling the Tenth Circuit to review a complete factual record on liability. See id. at 1173. After assigning error to the district court's finding that the contract was unambiguous, the appellate court declined to remand the case and instead resolved the ambiguity on its own. In so doing, the court expressly relied on the "unusual procedural posture" of the case. See id. ("Because of the unusual procedural posture of this issue – an issue decided on summary judgment, yet about which the parties introduced evidence and testimony at trial – we have before us all of the arguments and evidence relevant.").[5] Thus, although the appeals court in Moncrief acted as the fact finder "in the interest of judicial economy," see id. at 1154-55, 1174, that case cannot be read to set forth a district court's authority to resolve contractual ambiguities as a matter of law based on extrinsic evidence.[6] Nor does the case apply to New York law.

---

[5]    IBM's quotation from Moncrief omits the court's acknowledgement that the sole basis for its ruling was the "unusual procedural posture of this case"; recognized that "in most such cases" the court "must remand . . . for findings regarding the interpretation of the ambiguous contract"; and prefaced the very language from the opinion on which IBM relies with the express caveat that in that case "all the extrinsic evidence [was] in." 174 F.3d at 1173, 1174.

[6]    IBM cites a similar case from the Second Circuit, Compagnie Financiere de CIC et de L'Union Europeenne v. Merril Lynch, 232 F.3d 153 (2d Cir. 2000), which also rested on a unique procedural posture. In that case, the court emphasized that, because the summary judgment motion at issue "followed a bench trial, the trial record was before it." Id. at 161. The court also observed that neither party had suggested the existence of additional evidence not already submitted at trial: "The parties

The facts in Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563 (10th Cir. 1989), did not even involve the resolution of an ambiguity through the use of any extrinsic evidence; the case involved a suit to enforce a take-or-pay provision in a sales contract. The Tenth Circuit first affirmed the district court's finding that the contract was not ambiguous, see id. at 565-66, and then, as an independent matter, ruled that the district court had properly granted summary judgment on the issue of the seller's insecurity regarding the buyer's performance, id. at 568-69. As with Moncrief, IBM has ignored the context that makes it plain that the case in no way departs from the settled Tenth Circuit law that prohibits a court from resolving contractual ambiguities on summary judgment by resort to extrinsic evidence.[7]

In using the label the "Involved Persons" to describe the selected witnesses involved in AT&T's UNIX licensing program, IBM evidently means to suggest that the testimony of other individuals irrelevant. IBM even now excludes a witness (Geoff Green) whom it had previously

confirmed at oral argument that the record was complete with regard to extrinsic evidence supporting their interpretations." Id.

[7] In addition, IBM's reliance on the doctrine of contra proferentem is entirely misplaced. Contra proferentem "is applied only in cases where there is an ambiguity in some terminology of the policy [contract] which cannot be resolved by the presentation of extrinsic evidence." Alfin, Inc. v. Pac. Ins. Co., 735 F. Supp. 115, 121 n.5 (S.D.N.Y. 1990). Accordingly, courts have rejected the application of the doctrine in the summary judgment context. See, e.g., Schering Corp. 712 F.2d at 9-10 (refusing to apply contra proferentem because "the party opposing summary judgment propound[ed] a reasonable conflicting interpretation of a material question of fact"). Moreover, contra proferentem applies where one of the contracting parties had no voice in the selection of the contract language, and thereby protects the weaker of two contracting parties with unequal bargaining power. See 67 Wall St. Co. v. Franklin Nat'l Bank, 37 N.Y.2d 245, 249 (1975); Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am., 933 F. Supp. 254, 258-59 (S.D.N.Y. 1996). The cases IBM cites in support of its contra proferentem argument make this very point. In Jacobson v. Sassower, 66 N.Y.2d 991, 993 (1985), the court noted that an ambiguous contract must be construed against the drafter "and favorably to a party who had no voice in the selection of its language," and emphasized the special concerns governing attorney fee arrangements. (emphasis added). In Westchester Resco Co., L.P. v. New England Reinsurance Corp., 818 F.2d 2 (2d Cir. 1987), the court emphasized the particular rule in New York law that ambiguous insurance policies are to be construed against the insurer. Id. at 3. None of these concerns exist in this case, which indisputably involved arms-length deals between sophisticated and well-represented parties.

included as such an involved person, but who subsequently gave unfavorable deposition testimony for IBM, and who is now relegated to the sidelines.

Under the law, courts routinely consider testimony from witnesses who were involved in drafting and enforcing standard contract language, even if they did not sign or were not involved in the negotiation of the particular contract at issue. See, e.g., Schering v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983) (denying plaintiff's motion for summary judgment solely on basis of affidavits of two drafters of standard contractual clause); see also McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 833 (2d Cir. 1988) (considering affidavits of two attorneys at contracting party's outside law firm who were not involved in drafting contract at issue but had "worked to develop similar clauses in similar transactions"). This evidence is relevant if it provides context for the communications and writings exchanged between the parties. See Nat'l Envmtl. Serv. Co. v. Ronan Eng'g Co., 256 F.3d 995, 1003 (10th Cir. 2001). Thus, a party's standard practice is relevant to a determination of that party's intent in adhering to or deviating from that practice in a particular case. Accord EPN Ingenieria S.A. de C.V. v. Gen. Elec. Co., No. 92 Civ. 1563 (KMW), 1996 WL 531867, at *2 (S.D.N.Y. Sept. 19, 1996) (considering defendant's standard contract, which plaintiff signed but defendant did not agree to in this case, as evidence of defendant's intent) (Ex. D); RMLS Metals, Inc. v. Int'l Bus. Mach. Corp., 874 F. Supp. 74, 77 (S.D.N.Y. 1995) (considering defendant's standard contract that was not adopted by the parties as evidence of defendant's intent). IBM's stated position that the UNIX license agreements were generally intended to contain the same core intellectual property protections only reinforces the plain relevance of the testimony from the individuals charged with the drafting and enforcement of the standard license agreements.

110

SCO shows below that the evidence squarely contradicts each of the principal assertions regarding the supposed meaning of the Agreements on which IBM relies in seeking summary judgment. (SCO addresses all of IBM's assertions in its response to IBM's Statement of Undisputed Facts, in Appendix A hereto.) Indeed, the testimony of "involved person" Otis Wilson at his August 2006 deposition underscored that his collective testimony alone (from his previous deposition in the BSD case and his testimony in this case) precludes summary judgment in IBM's favor on the supposed meaning of and AT&T's supposed statements regarding the meaning of the Agreements. (¶¶ 116-24.)

1.   The Core Requirement of Confidentiality.

IBM says it is undisputed that the requirements of confidentiality over the licensed UNIX software product, as well as its modifications and derivative works, were not part of the root of the agreements, but SCO's evidence shows that the confidentiality requirements were a core component of the agreements that remained in the agreements for decades. (¶¶ 63-96.) Such evidence easily defeats IBM's argument that AT&T's interest in protecting its UNIX asset was only a collateral matter, and the agreement says on its face that the license had to treat its derivative works "as part of" the UNIX software product.

Indeed, members of the UNIX license group from the 1980s, 1990s, and 2000s confirm that the obligations of confidentiality were a core component of the agreements. (¶¶ 76-96.) Mr. Wilson's own supervisor in 1985, William Guffey, confirms that the requirements of confidentiality were a core protection. (Ex. 138.)

111

2.      The UNIX Licensing Group.

IBM says it is undisputed that Otis Wilson was the head of the UNIX licensing group in 1985 when the Agreements were executed, but Mr. Wilson himself acknowledges that he had a supervisor in that capacity, and SCO's evidence shows that neither Mr. Wilson nor any other single individual at AT&T, USL or Novell had the authority to modify or amend the standard UNIX license agreement. (¶ 90.)

Mr. Wilson's supervisor in 1985, Mr. Guffey, has testified to his disagreement with Mr. Wilson in all material respects. (Ex. 138.) Members of the UNIX licensing group from each of AT&T, USL, Novell, Santa Cruz, and SCO confirm that any decision to modify or amend the standard UNIX license agreement was a decision requiring the approval of several individuals at different levels of the company. (¶ 90.)

3.      Methods and Concepts.

IBM says it is undisputed that in 1985 AT&T decided to "abandon" its protections for the methods and concepts in UNIX, but SCO's evidence shows that no such decision was made and that AT&T, USL and Novell continued to protect such methods and concepts. (¶¶ 76-96.)

Mr. Wilson himself signed and letters and signed agreements after 1985 requiring licensees to keep the methods and concepts confidential, and members of the UNIX license group from the 1980s, 1990s, and 2000s confirm that those obligations remained in the license agreements. (¶¶ 63-96.) Moreover, his testimony in the BSD litigation flatly contradicts his present stance. (¶¶ 105-24.)

4.      Confidentiality Over Derivative Works.

IBM says it is undisputed that under the Agreements, IBM and Sequent were free to do as they wished with any material in the modifications and derivative works they developed based on the licensed UNIX software product, as long as the material was no UNIX source code, but the plain language of the Agreements belies that interpretation and SCO's evidence shows that AT&T, USL, and Novell intended to preclude the licensees from disclosing any part of such modifications and derivative works. (¶¶ 13-29; ¶¶ 76-96.)

Mr. Wilson himself sent side letters confirming that although licensees may own portions of their modifications and derivative works, they were obligated hold in confidence even those parts of the modifications and derivative works. (¶¶ 65, 66, 74.) Mr. Wilson and his account manager David Frasure testified in 1992, moreover, that the licensees were obligated to treat as part of the licensed UNIX software product anything the licensee had developed with "exposure" to the UNIX software product. (¶¶ 106-09, 128-29.) Mr. Wilson's and Mr. Frasure's contradictory testimony is simply the tip of the iceberg. (¶¶ 63-96.)

Indeed, one of IBM's own initial declarants, Lawrence Bouffard, now clarifies his testimony to make clear that USL and Novell did not purport to draw the distinctions that IBM now draws, between so-called "homegrown" code and other material in a derivative work based on the licensed UNIX software product. (Ex. 50 ¶¶ 19-28.)

Mr. Bouffard he had previously stated that AT&T and USL did not claim the right to "own or control" the portion of a licensee's UNIX flavor that the licensee had developed after licensing the UNIX software product (the "added-on" material), and that is true in the sense that AT&T or USL claimed no right to appropriate such material for itself or for its own uses. (Id. ¶¶

113

20-21.) He now clarifies, however, that in retrospect he cannot recall analyzing while at Santa

Cruz, USL, or Novell whether a licensee could freely distribute such added-on material. (Id. ¶

21.) He explains that he never undertook such analysis for two main reasons:

> "The first reason is that given the licensees' respective businesses, they had no
> compelling reason to want to disclose the source code of their UNIX flavors in the first
> place. The licensees were trying to develop the best UNIX flavors they could to
> distinguish themselves from their competitors in the effort to increase hardware sales by
> selling the hardware with an attractive UNIX operating system; they were not seeking to
> license their UNIX-flavor source code to others, thereby enabling those third parties to
> improve their own UNIX flavors and thereby increase their own hardware sales. In short,
> the operating assumption among AT&T, USL and their licensees was that the licensees
> would keep their UNIX-flavor source code confidential." (Id. ¶ 21.)

> "The second, related reason is that the current circumstances raising the confidentiality
> issue were not ones that were presented to me while I was at USL or Novell. That is, I
> never specifically considered whether a licensee might want to use the added-on material
> to create a UNIX clone outside of the AT&T/USL/Novell royalty framework." (Id. ¶ 21.)

Mr. Bouffard now states clearly, however, that "even if AT&T did not intend to preclude their

licensees from using their "added-on" material for certain purposes, AT&T did not intend to

permit its licensees to use their "added-on" material from their UNIX flavors to create a UNIX

clone outside of the AT&T/USL/Novell royalty framework.

As an example of his point, Mr. Bouffard cites USL's and Novell's source code-

exchange program. (Ex. 50 ¶¶ 24-26.) Under that process, USL would permit one UNIX

licensee to share the code of its UNIX flavor with another UNIX licensee, but only if the second

licensee had a license for the same version of UNIX as the first licensee. (Id. ¶ 24.) The

licensing group did not consider, as part of that process, whether the code the first licensee

wished to show the second licensee was solely added-on code. (Id. ¶ 25.) USL's perspective

was that if the code was part of a UNIX flavor, then the second licensee was obligated to have a

license for the same version of UNIX as the first licensee. (Id.) That was true even though, as

114

the agreements stated, AT&T, USL and Novell did not claim to "own" that portion of a

modification or derivative work that was not part of the licensed UNIX software product. (Id.)

SCO's evidence shows that multiple AT&T, USL and Novell executives and members of

the UNIX licensing group make the exact same point, regarding the source code-exchange

process, that USL and Novell did not seek to draw the distinctions that IBM now says were draw

-- let alone make representations to licensees on that issue. (Exs. 12, 41, 43, 333, 337, 375.) In

addition to the contradictory testimony offered by Messrs. Wilson, Frasure, and Vuksanovich,

and the supportive testimony of Messrs. Green, Cronan, and Rodgers, the witnesses who confirm

SCO's interpretation of the Agreements thus include, among others:

Ira Kistenberg, initially an IBM declarant, who worked for AT&T and USL in the UNIX
licensing group as a Contracts Manager, including on the Sequent Account, from 1984
until 1993. (Ex. 75; Ex. 10.)

Mitzi Bond, who worked for AT&T, USL and Novell in the UNIX licensing group as a
Contracts Manager from 1983 until 1994. (Ex. 14; Ex. 69; Ex. 24.)

Evelyn Davis, who worked for AT&T, USL and Novell in the UNIX licensing group as a
Contracts Manager from 1975 until 1994. (Ex. 4.)

William Guffey, who worked for AT&T from 1969 until 1987 and was the head of
AT&T's Software Services Division, including UNIX licensing, in 1985 and Mr.
Wilson's supervisor. (Ex. 138.)

REDACTED

Marty Pfeffer, who worked for AT&T as its General Counsel regarding UNIX licensing
in the 1980s. (Ex. 8; Ex. 261.)

REDACTED

William Broderick, who has worked for USL, Novell, Santa Cruz and SCO as a Contracts Manager in the UNIX licensing groups and Director of Software Licensing. (Ex. 333; IBM Ex. 297.)

John Maciaszek, who has worked for USL, Novell, Santa Cruz and SCO as a Contract Manager in the UNIX licensing groups.  (Ex. 355; Ex. 360.)

William Murphy, who has worked for Western Electric, AT&T, USL, Novell, Santa Cruz and SCO as a Contract Manager in the UNIX licensing groups.  (Ex. 337.)

REDACTED

The foregoing evidence is an independently sufficient basis for denying IBM's motion for summary judgment on the grounds of both its asserted interpretation of the Agreements and its asserted reliance on supposed representations made to the company by members of the same UNIX licensing groups as the individuals set forth above.

5.     The IBM Side Letter.

IBM says it is undisputed that IBM's Side Letter allowed IBM to use and disclose methods and concepts however it wanted, but the plain language of the Side Letter belies that

116

interpretation and SCO's evidence shows that the Side Letter did not permit IBM to disclose such methods and concepts in its modifications and derivative works, and did not permit IBM openly to disclose the source code of its derivative works. (¶¶ 21-29; ¶¶ 87-89.)

In fact, one of the former USL and Novell executives who had signed a declaration for IBM, Larry Bouffard, now confirms his understanding that although the Side Letter amended IBM's Agreement in certain respects, IBM nevertheless remained obligated to treat its modifications and derivative works as set forth under the standard UNIX license agreement, under which IBM was not permitted openly to disclose any part of its modifications or derivative works to develop an ulicensed UNIX clone, such as Linux. (¶¶ 87-89; Ex. 50 ¶¶ 39-41.)

6.    Integrated Agreements.

IBM says it is undisputed that AT&T intended for the terms of IBM's Side Letter to apply to Sequent, but the plain language of Sequent's Agreement belies that interpretation and SCO's evidence shows that the terms and conditions binding Sequent were as set forth in its Agreement. (¶¶ 13-21.)

IBM also says it is undisputed that AT&T made certain representations regarding the scope of the Agreements that are not reflected in the plain language of the Agreements, but the plain language of the Agreement reflects, and SCO's evidence further shows, that the license agreement and written amendments or clarifications thereto represented the entire understanding between the parties, and that AT&T did not amend or modify any agreement orally. (¶¶ 91-92.)

C.     The Restrictions in the Agreements on
       Disclosures from Derivative Works Is Reasonable.

In effect acknowledging the plain scope of the Agreements, IBM argues that the plain restrictions of the Agreements must be commercially unreasonable and violative of public policy. SCO shows below that each of IBM's arguments fails.

As to the framework of the relevant analysis, IBM acknowledges that, in the event of ambiguity in the Agreements, the relevant extrinsic evidence must include an assessment of the parties' respective businesses and economic incentives at the time of contracting. (IBM Ex. 283 at 31-57.) SCO shows below that such evidence confirms that the plain scope of the Agreements was and is eminently reasonable.

1.     The Parties' Shared Control Rights Under the Agreements.

IBM proposes that neither IBM nor Sequent would have entered into a license agreement with AT&T under which AT&T exercised what IBM calls "control rights" over its and Sequent's "homegrown" material. In so basing its arguments, IBM misconstrues (or else ignores) the eminently reasonable, shared rights between the parties.

In clarifying that it claimed no ownership interest in any portion of a modification or derivative based on the licensed UNIX software product that is not part of the licensed UNIX software product, AT&T made clear that it had no affirmative right to take such "add on" material from its licensees. AT&T could not reach out and appropriate Sequent's work for AT&T's benefit while the Agreement was in place. At the same time, AT&T's foregoing clarification plainly did not address the licensees' obligations of confidentiality. (See Part I.A, above.) The Agreements thus reflect a scenario in which the parties shared what IBM calls "control rights" over the modifications and derivative works – not a situation in which the

118

licensees had no control or claim or right whatsoever to their "homegrown" or "add on" material.

REDACTED

The plain language of other side letters that AT&T wrote to its UNIX licensees confirm the framework of shared rights between AT&T and its licensees regarding their modifications and derivative works. (By IBM's own lights, the terms of such side letters – especially where they were executed after the IBM Side Letter – must apply to all of AT&T's UNIX licensees, including IBM and Sequent.)

Digital, for example, entered into a standard UNIX license agreement on September 21, 1984. On February 21, 1985, AT&T sent a letter under the letterhead of Mr. Wilson (signed by Mr. Frasure) to Digital. (Ex. 26.) Paragraph 3 of the Digital Side Letter states:

> If such derivative work does include any code or embody any confidential and proprietary methods and concepts used in a SOFTWARE PRODUCT, DIGITAL shall have a property right in such derivative work to the extent of any modifications made by DIGITAL, but the exercise of that property right is subject to the terms of the Software and Sublicensing Agreement.

(Ex. 26 ¶ 3 (emphasis added).) Paragraph 3 thus confirms the scope of the standard UNIX license agreement. Although a licensee will have a "property right" in a derivative work "to the extent of any modifications" by the licensee, the Software Agreement sets forth limitations on the exercise of that property right. As among "the terms of the Software and Sublicensing Agreement," the confidentiality restrictions of the Software Agreement must apply to even those portions of the derivative work that the licensee owns. Paragraph 3 thus confirms the distinction between ownership and control.

119

The foregoing framework of shared control rights between AT&T and its UNIX licensees thus belies IBM's arguments based on AT&T's allegedly exclusive "control," and provides the relevant context to examine IBM's assertions of commercial unreasonableness and absurdity arising out of the plain language of the Agreements.

2.      The Agreements Properly Reflect Copyright Law.

IBM argues that one reason for the Court to construe the Agreements contrary to SCO's interpretation is because under that interpretation, AT&T would have secured more protection for its intellectual property than the copyright laws provided.

In its UNIX licenses agreement AT&T specifically sought to secure for itself greater protection for the licensed UNIX software product than the product might have had under the copyright laws. (¶ 81.) Although by the mid-1980s the federal courts had repeatedly held that computer programs and software were copyrightable, see, e.g., Whelan Assocs. v. Jaslow Dental Lab., 609 F. Supp. 1307, 1319-20 (E.D. Pa. 1985); S&H Computer Sys., Inc. v. SAS Inst., Inc., 568 F. Supp. 416, 422 (M.D. Tenn. 1983), there was not a wealth of precedent on the issue. IBM thus seeks to disregard the context in which the parties entered into the Agreements at issue and sensibly agreed, in exchange for direct access to AT&T's intellectual property, to provide AT&T with certain protections that the copyright law may not have provided.

IBM's argument also fails because its core premise, that a party could not protect its intellectual property to any greater extent under contract if that property were protected by other common law or statutory law that applies to that intellectual property, is clearly not the law. It is well established that under a contract, one party may secure greater protection for its intellectual property than the party enjoys under the statutory law. That is particularly true where, as here,

120

under the contract the owner of the intellectual property affords its counterparty special access to the licensed material that the counterparty would not otherwise have had. See, e.g., Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc., 991 F.2d 426, 431-35 (8th Cir. 1993) (holding that the licensor may properly seek to enforce license provision affording the licensor greater rights that it would hold under the copyright laws); Adobe Sys. Inc. v. One Stop Micro, Inc., 84 F. Supp. 2d 1086, 1091-92 (N.D. Cal. 2000) (endorsing expert testimony addressing the utility and efficiency offered by software licenses in comparison to the intellectual-property laws); Computer Assocs. v. State St. Bank & Trust, 789 F. Supp. 470, 475 (D. Mass. 1992) (holding that the applicable limitations on the licensee's use of the programs at issue "must be derived initially from the license agreements, not copyright law").

### 3. The Agreements Are Consistent with Public Policy.

IBM argues (at 87) that where "SCO seeks to control the employment and employability of anyone who ever worked on Dynix," the Agreements as SCO interprets them are "contrary to public policy." This argument fails for three principal reasons:

First, SCO does not interpret the Agreements to impose restrictions on employment or employability as such. SCO does not base any claim of breach on the mere fact that IBM employed former Sequent employees.[8]

---

[8] In concluding otherwise, IBM relies entirely on a somewhat awkwardly worded sentence in a SCO interrogatory response. SCO's supplemental response to IBM Interrogatory No. 4 included the following language:

> The agreements, among other things, allow IBM and Sequent to disclose and use "Software Products" only to and for entities that have the requisite licenses of a scope equivalent to those of IBM and Sequent, respectively. The agreements likewise permit work by persons exposed to such Sequent "Software Products" and knowledge based on such exposure only to and for such licensees of equivalent scope licenses. The

121

Second, the nondisclosure provisions in the license agreements do not raise public- policy concerns. It is well established that contractual restrictions against disclosure of trade secrets, proprietary and confidential information, and derivatives of such material are enforceable. See, e.g., IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 586 (7th Cir. 2002) (recognizing contractual right to protect intellectual property from disclosure and enforcing provision requiring that software customer maintain the software and its related intellectual property confidential); HotSamba, 2004 WL 609797, at *5 (licensee prohibited from transferring derivative works of licensed material); Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions, Inc., 732 F.Supp. 370, 377 (S.D.N.Y. 1989) (enforcing restriction requiring that programmers not disclose confidential information regarding the software of their former employer and enjoining their new employer from further developing competitive product ). Nondisclosure restrictions are enforceable because they do not run counter to, but rather advance, public policy. See, e.g., IDX Sys., 285 F.3d at 586 (observing that nondisclosure restrictions "may make intellectual property more valuable to its producer and thus promote both the creation of knowledge and competitions against other firms"); see also Ex. 278 ¶¶ 81-86.

Contrary to IBM's position, the law makes clear, for example, that an employer may require an employee to maintain the employer's trade secrets both during and after employment, where the obligation to maintain the trade secrets after employment never terminates. See

---

agreements thereby prohibit IBM from making at least a great many of the IBM public disclosures and particular contributions intended to promote and otherwise help develop Linux.

(IBM Ex. 43 at 7-8.) The point of the first two sentences is that IBM and Sequent are allowed to disclose "Software Products" only to equivalent-scope licensees. If IBM's mere acquisition of Sequent and its employees constituted a breach of contract (as a result of what IBM calls the "employability" problem), SCO would have said as much.

Structural Dynamics Research Corp. v. Eng'g Mechanics Research Corp., 401 F. Supp. 1102,

1114 (D. Mich. 1975) (state laws recognized and enforced covenants not to use or disclose

confidential information without reasonability limitations); Zep Mfg. Co. v. B. Harthcock, 824

S.W.2d 654 663 (Tex. Ct. App. 1992) (distinguishing nondisclosure from noncompete covenants

and holding that nondisclosure provision was not subject to reasonable temporal, geographical,

or scope-of-activity limitations); Williston on Contracts (4th ed.)  ("It necessarily follows from

the recognition of a property right in trade secrets that express contracts which prohibit their

disclosure by those entrusted with knowledge of them are valid and may be as broad as is

necessary to protect the owner from injury by the disclosure of the secret or its competitive

use."); Raymond T. Nimmer, Nimmer on Law of Computer Technology § 3:37 (2006) ("While

subject to general contract law considerations, nondisclosure agreements are generally not

subject to special limitations that are typically applied to non-competition agreements with

employees.  The two types of agreements have different goals and much different effects on the

employee and general patterns of competition."); cf. Henry Hope X-Ray Prods., Inc. v. Marron

Carrel, Inc., 674 F. 2d 1336, 1342-43 (9th Cir. 1982) (nondisclosure provision without any time

or space limitations was enforceable where "the disclosure or use of its trade secrets anywhere

could reasonably be expected to harm [plaintiff's] business interests" and provision contained

"implicit temporal limitation that information may be disclosed when it ceases to be

confidential").

  In fact, the courts have enforced contractual restrictions on the disclosure of computer

programs under facts nearly identical to those in this case.  In IDX Systems, a software provider

sued its competitor and former customer, alleging that the competitor had induced the customer

123

to breach nondisclosure provisions of its contract with plaintiff. In particular, the customer had "promised not to allow the software and related materials furnished by IDX to be examined . . . for the purpose of creating another system and vowed in addition not to use or disclose or divulge to others any data or information relating to the system or the technology, ideas, concepts, know-how, and techniques embodied therein." 285 F.3d at 584 (quotations omitted). Despite evidence that the customer's employees, who were also plaintiff's former employees, had made restricted disclosures to the competitor, the district court dismissed the claims holding that "the promises are unenforceable because they are unlimited in temporal and geographic scope, and thus unduly restrain trade." Id. at 584-85. The Seventh Circuit reversed, concluding there was no binding authority requiring "temporal or geographic limits as a condition to the enforcement of a non-disclosure agreement for intellectual property." Id. at 586. Moreover, the court observed that the public policy concerns underlying those limits did not apply to nondisclosure agreements. Id. at 585. Indeed, the court noted, the nondisclosure agreement "may compel rivals such as [competitor] to do more work to develop software independently, but this promotes rather than restricts competition." Id.

Similarly, the provisions in this case precluding IBM from disclosing SCO's invaluable confidential information and the derivatives of it raise no public policy considerations other than promoting healthy innovation and competition in the industry.[9] In fact, as noted above, IBM's

---

[9] The Agreements do not address the licensees' obligation vel non to impose restrictions on what material their former employees may disclose after their employment with the licensee ends. It follows that it is for the licensee to decide whether it believes that such restrictions were necessary for it to remain in compliance with its UNIX license, and for the licensee to impose any such restrictions. In short, contrary to IBM's arguments, the Agreements do not contain any restrictive covenants on former employees, and therefore cannot be violative of "public policy" on any such basis.

REDACTED

Third, with respect to the scope of the Agreements and the manner in which they protect trade secrets and the value of AT&T's UNIX asset, IBM makes its argument from "public policy" without acknowledging the precedent from the New York courts establishing the courts' strong reluctance to decline to enforce a contract on such grounds.  The precedent reflects the courts' strong deference to "freedom of contract."  Slayko v. Sec. Mut. Ins. Co., 98 N.Y.2d 289, 295 (2002); accord New England Mut. Life Ins. Co. v. Caruso, 73 N.Y.2d 74, 81 (1989); see also Wechsler v. Hunt Health Sys., 216 F. Supp. 2d 347, 354 (S.D.N.Y. 2002) (a court should enforce a contract unless a "clear and certain" violation of public policy would result); Pfoh v. Elec. Ins. Co., 788 N.Y.S.2d 441, 442-43 (App. Div. 2005) (rejecting argument that exclusion in auto policy for resident relative of insured was void as against public policy in absence of statutory requirement that such coverage be provided); Chase Manhattan Bank v. New Hampshire Ins. Co., 749 N.Y.S.2d 632, 642-43 (Sup. Ct. 2002) (refusing to declare insurance policy void on public policy grounds; "it is well to remember too that 'the right of private contract is no small part of the liberty of the citizen, and the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare.'") (quoting Miller v. Cont'l Ins. Co., 40 N.Y.2d 675 (1976)).  When considered in the appropriate context, the Agreements plainly do not contradict any "public policy."

4.    The Scope of the Agreements Has Always Been Reasonable.

The nature of AT&T's, IBM's and Sequent's respective businesses in the mid-1980s shows that the Agreements are commercially unreasonable and do not produce what IBM calls "absurd" results.

a.    The Significant Advantage of the UNIX Head-Start in the UNIX in Ecosystem That Developed.

UNIX provided a valuable head-start for licensees. By 1983 UNIX was not only a mature and robust operating system resulting from fourteen years of development, but also was the foundation technology for an entire network of skilled software developers, experienced IT services staff, and end users. The head-start would allow licensees to capitalize on the years of software development, significant expense and huge popularity of UNIX in the enterprise-computing arena. Licensees would thus reap the benefits from their investments by fulfilling customer demand with a differentiated "flavor" of UNIX that augmented their own proprietary hardware, other software, and services. (¶¶ 32-42.)

As a result of the revolutionary advantages offered by UNIX, a large number of users, programs, and programmers did and were expected to favor UNIX over competing operating systems. Accordingly, hardware providers in the 1980s became increasingly interested in offering versions of UNIX that would perform well on their hardware. AT&T recognized this landscape and developed a business plan under which AT&T would help hardware providers achieve this aim. (¶¶ 32-42.)

AT&T's business model was to allow other firms to purchase the head-start toward involvement in the UNIX ecosystem. What AT&T sold was the right to use the UNIX foundation to jumpstart the firm's entry into the community of UNIX end-users, UNIX programs,

126

and UNIX programmers. The hardware firm would as a result be able to take part in the UNIX ecosystem quickly and at reasonable cost, thereby avoiding strategically infeasible alternatives like developing a UNIX-compatible operating system from scratch. (¶¶ 32-42.)

What AT&T brought to the table was the foundation. It was up to the licensee to move forward from there, tailoring UNIX to accentuate that particular firm's hardware strengths. Over time, most licensees would add large amounts of code to their UNIX flavor and a great percentage of the resulting Unix code would therefore be code written by the licensee. Even at that point, however, the dynamic would be the same: AT&T would continue to earn revenue based on the resulting Unix flavor, because the licensee developed that flavor in reliance on AT&T's initial head-start contribution. (¶¶ 43-42.)

In other words, while AT&T in fact delivered specific lines of code to its clients, what it really licensed was the head-start that the code made possible. Firms were of course not obligated to purchase a head-start from AT&T. A firm could, for example, attempt to develop a UNIX-compatible operating system entirely from scratch. A firm that took advantage of the head-start, however, could not then escape its royalty and confidentiality obligations just because the head-start had worked and the firm had as a result been able to successfully develop even a substantially further developed UNIX variant. (¶¶ 32-42.)

AT&T had success with its business model. Indeed, between 1985 and 1995, nearly every major hardware firm, including IBM, HP, Sun, Data General, Unisys, NCR, and Compaq, licensed AT&T's UNIX code. (¶¶ 43-47.) AT&T's perception in the mid-1980s of the prospective value of UNIX was further borne out in the years that followed. By the mid-to-late 1980s, there had been an enormous growth in the number of UNIX systems vendors and

applications among large businesses and law firms, and an increasing number of corporate users turned to UNIX for their mission-critical computing needs and independent software vendors (or "ISVs") developed numerous business-related applications for use with it. (¶¶ 43-47.)

b.    The Parties' Commercial Interests Regarding UNIX.

Although IBM licensed UNIX from AT&T in 1985, it was not until the 1990s that IBM fully embraced UNIX. (¶ 51.) By the time IBM did fully embrace it, UNIX offered IBM two decades of development and community adoption as a head-start when compared to developing a completely new operating system from the ground up. IBM had been in the operating-system business for many years, yet it did not have a ready-made or close-to-complete operating system for an open-architecture server system, which is what UNIX was. Clearly, however, it would be much more difficult to develop a new operating systems from scratch than building on the head-start of UNIX. (¶¶ 50-56.)

Sequent also was not pursuing in the mid-1980s an unlicensed UNIX clone. Sequent was an AT&T licensee even before 1985, paying AT&T for the right to build on a combination of AT&T code and code from BSD. The 1985 contract was more of the same; Sequent again signed up to build on AT&T's head-start, and Sequent again was given access to additional AT&T code. Both before 1985 and in 1985, Sequent thus had only one UNIX strategy, and that strategy involved developing a UNIX flavor fully licensed by AT&T. (¶ 57.)

c.    AT&T's UNIX Licenses Made Good Economic Sense.

In sharp contrast to the absence of any compelling reason for IBM or Sequent to loosen the core protections of the AT&T standard UNIX license, AT&T had an overriding interest in protecting the value of its UNIX asset. (¶¶ 48-59.) If AT&T had granted its licensees the right

128

to take source code, methods and concepts from a licensed UNIX flavor and use that material to subsidize the development of a competing, unlicensed UNIX clone, such a grant would have threatened AT&T's ability to profitably license its UNIX foundation. At the same time, neither IBM nor Sequent would have considered that right to be particularly valuable, because neither had any interest in pursuing a UNIX operating system beyond the licensed flavors they were developing. (¶ 58.)

In other words, from an economic perspective, if AT&T allowed IBM to use the product it developed based on the licensed UNIX software product to create or help develop an unlicensed UNIX clone, IBM would be able to destroy AT&T's UNIX asset. AT&T's licensees would migrate from AT&T's UNIX ecosystem to IBM's because IBM could offer the same ecosystem at a lower price, thanks to its exploitation of AT&T's head-start. (¶ 59.)

The operation of AT&T's standard UNIX licenses reflected these basic considerations. AT&T's UNIX licensees were permitted to use the AT&T UNIX foundation internally. They were also permitted to package it with hardware in object code format and to produce flavors that could be sold to equivalent-scope licensees. None of these rights threatened AT&T's UNIX business. The internal use of UNIX could not include the sale of an operating system to third parties; purchasers of hardware would not be able to inspect the source code and thus could not use the AT&T foundation to develop a competing, unlicensed UNIX system; and sales to equivalent-scope licensees at worst would result in disclosure only to parties who already bought from AT&T permission to see source code and thus have already agreed to abide by the above restrictions and confidentiality. AT&T thus protected the full value of its UNIX asset while leaving licensees with broad rights to pursue their legitimate businesses as well. (¶ 60.)

129

IBM and Sequent had no reason to object to these provisions, and the terms of the licenses to which they agreed show that they in fact did not object. Indeed, neither IBM nor Sequent would have considered it a valuable right even to be able to distribute source code, methods and concepts from their UNIX flavors only to equivalent-scope AT&T licensees. Such distributions would only serve to permit the equivalent-scope licensees to develop their own UNIX flavors to sell with their own hardware, thereby hurting IBM's and Sequent's sale of their hardware on which their UNIX flavors operated. (¶ 62.)

In sum, AT&T, IBM and Sequent entered into UNIX license agreements in 1985 that were eminently reasonable from a commercial perspective. Their reasonableness is supported by the expert testimony of Harvard Business School Professor Gary Pisano and clearly suffices to defeat IBM's request for the Court to find that the Agreements are commercially unreasonable and lead to "absurd" results.

Indeed, in repeatedly seeking to buttress its assertions regarding IBM's and Sequent's supposed intent in 1985, IBM acknowledges the relevance of substantial expert evidence that undercuts those assertions. On the premise that the ambiguity of the Agreements makes relevant an economic analysis of the parties' intent and motivation at the time the Agreements were executed, IBM repeatedly cites (as at IBM ¶¶ 80, 81, 130, 289, 291, and 292) the testimony of proposed expert Robert Willig. (IBM Ex. 283.) IBM's reliance on Dr. Willig's views are no support for IBM's request for summary judgment, however, for two main reasons.

First, SCO expert Dr. Gary Pisano directly refutes Dr. Willig's premises and conclusions. Dr. Pisano shows that in 1985 neither IBM nor Sequent was trying to build any operating system from scratch let alone an unlicensed UNIX clone like Linux, without the benefit of AT&T's

head-start.  In contrast, AT&T's business model was to allow other firms to purchase the head-start toward involvement in the UNIX ecosystem that had developed.  Dr. Pisano explains:

> Thus, economic analysis based on undisputed industry facts makes clear that the right at issue in this litigation would not have been granted to IBM or Sequent.  It is a right that would have been expected to cost AT&T far more than it would have been expected to benefit either IBM or Sequent.  This is not a close call.  There are details in these contracts that could be subject to plausible dispute.  But clearly none of these contracts would have authorized IBM to do what it did when it contributed code and concepts to Linux.

(Ex. 286 at 85-86.)  Dr. Pisano concludes:  "AT&T's standard form license agreements reflected these basic considerations."  (Id. at 87.)  AT&T and USL policymakers confirm that "as the owner of the singular UNIX asset, AT&T was not in the business of enabling or subsidizing any of the UNIX licensees to license the source code for their UNIX flavors to others and thereby compete with AT&T in creating binary-royalty revenues."  (Ex. 12 ¶ 6; accord Ex. 375 ¶ 13.)

Second, Dr. Willig's testimony at deposition vitiated his opinions.  Dr. Willig admitted that for his analysis he did not know or had not even considered:

- Whether in the early 1980s IBM sold operating systems for use on any non-IBM hardware (42).

- Whether in the early 1980s IBM sold any operating systems at all (42-43).

- Whether in the early 1980s IBM licensed any source code to anyone (43).

- Whether in the early 1980s IBM sold any software that could run on any non-IBM hardware (43).

- Whether AT&T's UNIX licensees in the 1970s had the right to distribute UNIX in source code form (46).

- Whether in the 1980s AT&T's UNIX licensees were obligated to pay AT&T a royalty fee for their distributions of their UNIX flavors in binary format (49).

131

- Why Sequent did not undertake to develop its own cross-platform operating system from scratch (61).

- Whether as a technical matter Sequent even could have developed its own cross-platform operating system from scratch (61).

- How long it might have taken a company in the 1980s to develop its own cross-platform operating system from scratch (174).

These startling gaps in Dr. Willig's knowledge precluded any reliable or remotely thorough assessment of the industry, and the parties' respective economic incentives, as of 1985.

Just as fundamentally, Dr. Willig conceded that where the premises of his analyses were corrected to reflect SCO's actual interpretation of the Agreements – where the licensees owned parts of their derivative works, but nevertheless had to keep all parts of the derivative work confidential for AT&T – he in fact had not analyzed whether the parties would have agreed to such an arrangement as the jointly optimal one from an economic perspective.  (Id. at 286-90.) That is, Dr. Willig simply had not analyzed from an economic perspective the shared control rights that obtain under SCO's interpretation of the Agreements.  (Id.)  These admissions, and others, render Dr. Willig's opinions both unfounded and irrelevant.

———————————

IBM nevertheless argues (at 89) that the application of SCO's theory in the computer industry today "would generally have far-reaching negative implications."   IBM misses the picture.  Prior to deciding to license the UNIX source code, any company could have decided instead to try to develop its own operating system, including its own UNIX-like operating system, and thereby be free of any control over their "homegrown" material.  (¶¶ 38-42.)  AT&T's capacity to negotiate and obtain partial control over its licensees UNIX flavors was a function of the many years that AT&T and its predecessors had invested in developing UNIX, and that

132

prospective licensees recognized they would have to spend if they wanted to try to develop their own UNIX-like operating system from scratch. (¶¶ 43-62.) The subsequent prevalence of UNIX flavors in the industry – the fact that so many companies decided instead to license the UNIX head-start – serves to reinforce the reasonableness of the terms of the UNIX licenses. (¶¶ 43-62.)

IBM further take issue (at 90) with the "viral quality" of AT&T's license agreements and contends that under those agreements, the owners of UNIX derivative works "would be limited in their ability to support or even market them." IBM thus implies that it is inappropriate for a contract to cover the derivative works of a program, yet the very contract that Linux is distributed under also controls the derivative works of Linux (IBM Ex. 128 at 3), and IBM's own

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

It cannot be that the UNIX license agreements must be interpreted to have a lesser scope simply because AT&T and its successors were enormously successful in a licensing a product pursuant to licenses whose terms the licensees evidently found reasonable.[10]

## II.   THE SUBSTANTIAL EVIDENCE AND THE NEW YORK LAW OF EQUITABLE ESTOPPEL PLAINLY ALLOW SCO TO PURSUE ITS CLAIMS FOR BREACH OF CONTRACT.

IBM's estoppel argument, an inherently fact-specific issue, is no basis for summary judgment, considering both the facts on record and the relevant New York law. Under the law, for example, the plain language of the integration clause in the IBM Agreements is itself an

---

[10]     As to IBM's assertions about technical disclosures of AIX code, methods and concepts in marketing and installing the product, they simply ignore the "material breach" component of the UNIX agreements, and bear no comparison to the wholesale disclosures IBM undertook in the course of its Linux-development efforts. (Ex. 139 ¶¶ 2-22.)

independently sufficient basis on which to deny IBM's Motion. With respect to the facts, contrary to the version of events on which IBM now bases its Motion, concurrent, internal IBM documents demonstrate that IBM had concluded that it was obligated to hold all of AIX in confidence for AT&T. (¶¶ 164-168.) SCO sets forth in detail below why IBM's estoppel argument fails.

The following principle obtains under New York law (as under the law of other jurisdictions): "Whether equitable estoppel applies presents an issue of fact."[11] Bennett v. U.S. Lines, Inc., 64 F.3d 62, 65 (2d Cir. 1995); accord Dunlop-McCullen v. Pascarella, No. 97 Civ. 0195 (PKL) (DFE), 2002 WL 31521012, at *15 (S.D.N.Y. Nov. 13, 2002) (Ex. C) ("Estoppel is usually a question of fact inappropriate for summary judgment."); Besicorp v. Enowitz, 652 N.Y.S.2d 366, 369 (App. Div. 1997) (same).)[12] That precedent applies with particular force where, as here, the question is whether a party should be estopped not by its own prior conduct, but rather by the alleged conduct of its predecessors in interest. Such a scenario further underscores the jury's role in assessing the "equitable" aspect of the asserted estoppel.

A.    New York Law Does Not Support IBM's Estoppel Argument.

---

[11]    As IBM notes in its brief (at 95) the doctrine "rests largely on the facts and circumstances of the particular case." (Quoting Sassower v. Barone, 447 N.Y.S.2d 966, 971 (App. Div. 1982)). Several of the cases used by IBM, including Sassower, are clearly distinguishable on the facts. See id. (estoppel appropriate under "egregious circumstances" presented by parties to original divorce action deciding to preclude attorney's appeal for legal fees); see also Kerns v. Mfrs. Hanover Trust Co., 272 N.Y.2d 535, 540-41 (Sup. Ct. 1966) (estoppel appropriate to prevent executor from arguing ratification of forged deed when executor convinced widow to sign deed).

[12]    Two of the cases cited by IBM support this premise. In Besicorp, the New York Appellate Division concluded that "[b]ecause the issues of reliance and estoppel are ones of fact, it was improper for [the trial court] to grant summary judgment in favor of defendant" on the estoppel issue. Besicorp, 652 N.Y.S.2d at 369. In Nassau Trust, the Court did not find the existence of an estoppel, merely that the facts precluded a court from dismissing a defense of estoppel. Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 183 (1982).

New York courts, including the courts cited by IBM have confirmed the following, well seasoned elements for an equitable estoppel:

> The essential elements of an equitable estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

N.Y. State Guernsey Breeders' Co-op v. Noyes, 22 N.Y.S.2d 132, 140 (App. Div. 1940); accord Holm v. C.M.P. Sheet Metal, Inc., 455 N.Y.S.2d 429, 433 (App. Div. 1982). "The elements that pertain to the party asserting the estoppel are commonly termed the elements of detrimental reliance." Holm, 455 N.Y.S.2d at 433. Application of these elements shape "New York's rather restrictive view" of the doctrine. Id. When these essential elements are considered, IBM's argument that SCO is estopped from arguing that IBM has breached the Agreements must fail for any of the following principal reasons:

First, IBM fails to establish as a matter of law any "conduct" on which IBM says it reasonably relied. SCO disputes that the statements regarding IBM's rights in "homegrown" material were made. (¶¶ 63-163.) In addition, the statements IBM cites, even if accepted, do not provide a legal basis for support summary judgment for the various reasons listed below.

Statements Subject to the Integration Clause. The Integration Clause contained in Paragraph 4 of the Agreements clearly controls the ways in which the parties intended to permit amendment and clarification of the Agreements. With respect to statements made during the negotiations between the parties, "neither of the parties shall be bound by any conditions,

135

definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein." (¶ 18.) With respect to amendment or clarification after the execution of the Agreements, the parties also make it clear that the only way the parties would be bound is when the amendment or clarification is "duly set forth on or subsequent to the date of acceptance hereof in writing and signed by a proper and duly authorized representative of the party to be bound thereby." (Id.)

Notwithstanding that clear expression of intent, IBM's argument for estoppel claim depends on "statements"[13] made by AT&T representatives concerning interpretation or clarification of the Agreements to estop SCO from arguing a plain-language breach of the Agreements. This argument improperly seeks to circumvent the integration clauses of the Agreements, under the mistaken view that "equitable estoppel" trumps the express intent of the parties as to amendment or clarification at the execution of their agreement.

Under New York law, any evidence of such statements are barred in the context of an estoppel claim. See Holloway v. King, 161 Fed. Appx. 122, 125 (2d Cir. 2005). IBM has used that principle to its advantage in other litigation. See, e.g., Int'l Bus. Mach. Corp. v. Medlantic Healthcare Gp., 708 F. Supp. 417, 423-24 (D.D.C. 1989) ("IBM has shown that the parole evidence rule would work to exclude evidence of any prior promises or agreements, and, in this Court's view, IBMs' showing controls as against any claim of promissory estoppel."). As in

---

[13]     IBM's evidentiary support for its assertion (at 96) that "AT&T and its successors represented to their licensees . . . that they could do as they wished with their own works" consists of the declaration testimony of nine witnesses who worked for AT&T during the negotiations and then, to varying degrees, for USL and Novell. (See IBM Exs. 182-83, 189, 191, 250, 271, 275-6, 280-81.) These declarants state only that they "assured," "provided the requested clarification [to]," "told," or "informed" licensees that the Agreements permitted them to own and control their own works. The only subsequent written agreement mentioned by any of the declarants is the side letter. No declarant testifies as to any specific dates. No declarant states that he specifically informed IBM or Sequent of these so-called "clarifications."

<u>Medlantic</u>, the text of the integration clause controls the evidence that can be marsalled to support an estoppel claim. The integration clause between AT&T and IBM clearly forbids introduction of evidence of any statements that were made in negotiations and any statements made after execution of the Agreements that were not signed and in writing.

In addition, as an independent matter, IBM cannot have reasonably relied as a matter of law on any purported statement, given the integration clause. <u>See</u> <u>Gebbia v. Toronto-Dominion Bank</u>, 762 N.Y.S.2d 38, 38 (App. Div 2003) (integration clauses forbid party from making a "tenable claim that they reasonably relied upon the representations alleged in support of their estoppel cause of action" (<u>citing</u> <u>Thayer v. Dial Indus. Sales, Inc.</u>, 85 F. Supp. 2d 263, 272 (S.D.N.Y. 2000)); <u>see also</u> <u>Towne Gardens v. McDonalds Corp.</u>, No. 04-CV-292S, 2005 WL 2406004, at *4 (W.D.N.Y. Sept. 29, 2005) (Ex. M) (presence of integration clause in lease created a material question of fact as to whether reliance on letter that did not meet clause's requirements for alteration of agreement was reasonable); <u>Brock v. Baskin Robbins, USA, Co.</u>, No. 5:99-CV-274, 2003 WL 21309428, at *5 (E.D. Tex. Jan. 17, 2003) (Ex. B) ("[I]n the face of a merger and integration clause, as is present in these agreements, and absent fraud apparent from the underlying document, no reliance on these non-written assertions can be reasonable as a matter of law."); <u>G. & V. General Contractors, Inc. v. Goode</u>, No. 86-7408, 1990 WL 79436, at *4 (E.D. Pa. June 7, 1990) (Ex. E) (existence of integration clause meant that "by the terms of the very contract appended to its complaint, plaintiff had no right to 'rightfully rel[y]' on any alleged oral or written representations made to it concerning defendant"). On this additional basis, any alleged statements made to IBM (on which, as shown above, there is a sharply disputed factual issue) is no basis for summary judgment.

The presence of the integration clause also raises an issue of material fact as the intent of AT&T with respect to the "statements" that IBM claims estop SCO's behavior.  IBM must demonstrate that AT&T and its successors-in-interest intended that IBM rely on what the declarants "told" "assured" or "informed" IBM.  In this case, such an intent cannot possibly have arisen in the face of a written provision in the Agreement that expresses AT&T's intent that any statements made prior to execution had no effect on the Agreements and that subsequent statements must be in writing.  See Automatic Sys. Developers, Inc. v. Sabratek Corp., No. 93 Civ. 7149 (VLB), 1993 WL 535670, at *2 (S.D.N.Y. Dec. 22, 1993) (Ex. A) ("Where a contract provision specifies that an additional agreed-upon writing is necessary to any revisions, this clear indication of intent should be honored." (citing Arcadian Phosphates v. Arcadian Corp., 884 F.2d 69, 72-73 (2d Cir. 1989).)  At a minimum, the fact that AT&T agreed to limit amendment or clarification to signed written documents raises an issue of material fact as to whether AT&T intended the statements noted by the declarants to those statements to be acted upon by licensees.

Statements by SCO Predecessors-in-Interest.  IBM relies on statements by AT&T, and possibly USL and Novell.  New York law holds that equitable estoppel is binding on a successor-in-interest only when it "knew of the existence of the facts which operate as a bar to the claim of the grantor."  Int'l Chimney Corp. v. 26 W. Spring St. Assocs., 561 N.Y.S.2d 933, 934-35 (App. Div. 1990) (quoting 31 C.J.S. Estoppel § 133); see also Holm, 455 N.Y.S.2d at 433; 57 N.Y. Jur. 2d Estoppel, Ratification & Waiver § 43 (stating that "a successor in interest is not necessarily subject to an equitable estoppel valid against his or her predecessor, unless the

successor takes the interest with knowledge of the facts creating the estoppel").[14] IBM is

therefore required to establish a factual basis on which to enforce such an estoppel against SCO –

namely, evidence that SCO had ever learned of the supposed statements or representations by its

predecessors in interest but had failed to correct them. See, e.g., Int'l Chimney Corp., 561

N.Y.S.2d at 934 (where there was "no question" that a successor in interest had knowledge of the

facts that gave rise to the estoppel, it was bound by an estoppel effective against the grantor).

IBM cites no case that supports their assumption that SCO is automatically bound by the words

of those same predecessors.[15] IBM fails either to allege or demonstrate with undisputed facts

that SCO had knowledge of any of the alleged statements. This failure, along with IBM's failure

to attribute any of the "statements" directly to SCO, is fatal to IBM's estoppel claim.[16]

---

[14]    The historical basis for the doctrine is that the issuer of the statement and the party being estopped be
the same entity. See White v. LaDue & Fitch, 303 N.Y. 122, 128 (1951) ("It is called an estoppel ....'
Said Lord Coke, 'because a man's own act or acceptance stoppeth or closeth up his mouth to allege or
plead the truth.'" ) (quoting 2 Coke on Littleton, 352a)) (emphasis added).

[15]    The plain language of the cases cited (and quoted) by IBM (at 94-95) support SCO's argument.
See, e.g., McManus v. Board of Educ. of Hempstead Union Free Sch. Dist., 87 N.Y.2d 183, 186-87
(1995) (estoppel precludes "a party" from denying a fact to the detriment of "another party") (emphasis
added); Nassau Trust, 56 N.Y.2d at 184 (estoppel requires "justifiable reliance on the opposing party's
words or conduct " ) (emphasis added); Sassower, 447 N.Y.S.2d at 971 (estoppel "prohibits a person . . .
from asserting rights, the enforcement of which would, through his omissions or commissions, work fraud
and injustice") (quoting Rothschild v Title Guar. & Trust Co., 204 N.Y. 458, 464 (1912)) (emphasis
added); N.Y. State Guernsey Breeders', 22 N.Y.S.2d at 140 (estoppel "forecloses one from denying his
own express or implied admission ") (emphasis added).

[16]    The Nassau Trust case, cited twice by IBM (at 95, 100), contains a particularly strong enunciation
of this principle. The Court quoted a concurrence by Judge Cardozo as the best summary of "the legal
principles at work here." Nassau Trust, 56 N.Y.2d at 185. Judge Cardozo notes that the "fundamental"
principle behind estoppel is that no one shall be permitted to found any claim upon his own inequity or
take advantage of his own wrong," Id. (quoting Imperator Realty Co. v. Tull, 228 N.Y. 447, 457 (1920))
(emphasis added).

Silence or Inaction by SCO.  IBM also suggests (at 96-97) SCO's silence as a basis to purport to estop SCO from arguing a breach.  This claim also fails as a matter of law.  Under New York law, the "elements that give rise to estoppel by silence are: (1) a duty to speak; (2) an opportunity to speak; and (3) injury to another party as a result of the failure to speak.  In re Ellison Assocs., 13 B.R. 661, 675-76 (Bankr. S.D.N.Y. 1981).  "The duty to speak may arise where the facts establish (1) a fiduciary or confidential relationship exists, or (2) one party has superior knowledge, or (3) one party will receive unjust enrichment."  In re Vebeliunas, 252 B.R. 878, 888 (Bankr. S.D.N.Y. 2000).

IBM fails to allege, let alone prove as a matter of law, that SCO had either a duty or an opportunity to speak.  As explained, IBM has not presented any facts (because it cannot) showing that SCO was aware of any of the alleged representations on which IBM claims to have "relied" on in breaching its UNIX licenses.  Thus, SCO did not have an opportunity to disabuse IBM of its purported belief that SCO would not enforce the restrictions in those licenses.  IBM also does not argue, much less prove as a matter of law, that SCO owed it any duty as fiduciary or a confidant, had superior knowledge, or was unjustly enriched by its silence.  See Windsor Plumbing Supply Co. v. Windsor Showroom, Inc., 170 B.R. 503, 525-527 (Bankr. E.D.N.Y. 1994) (defining each element of duty).

Third, IBM has failed to show a lack of knowledge sufficient to support the claim that they "reasonably relied" on the statements at issue here.  As the party seeking estoppel, IBM is required to show a lack of knowledge of the truth as to the facts in question that were concealed or misrepresented.  IBM here claims (at 96) that AT&T, USL and possibly Novell misrepresented or concealed the fact that the Agreements prohibited them from "doing as they

140

wished with their original works." On its face, this claim is not a legal basis for claiming reasonable reliance. As a party to the Agreements, IBM had full knowledge of their scope and meaning, including the existence of the integration clause, and any reliance on extra-contractual assurances is unreasonable as a matter of law. See Fashion Bug No. 2100 of Batavia, Inc. v. 425 W. Main Assocs., 10 Misc. 3d 1053(A) (N.Y. Sup. Ct. 2005) (defendant "was a party to the lease and the amendments and was aware of the 'true facts'. . . . It was not unaware of the lease provision [plaintiff] ultimately sought to enforce, nor was it unaware that it was in breach" and could not claim equitable estoppel).[17]

In addition, Santa Cruz's conduct in 2000 and 2001 with respect to IBM's contributions to Linux is also no basis for an estoppel. IBM does not present any evidence or even argue that it relied on Santa Cruz's conduct during that time in deciding to continue to make contributions to Linux from AIX and Dynix/ptx. Indeed, any such assertion would be inconsistent with IBM's claims that well before 1999, it had decided that it was permitted publicly to disclose any part of AIX that it wanted. To be sure, there is substantial evidence contradicting that alleged view; the point is that nothing that Santa Cruz did or did not do with respect to IBM's contributions could allow IBM to assert an estoppel.

In fact, other evidence defeats any argument from IBM that the company relied on SCO's inaction in making contributions to Linux. The evidence shows that IBM gave SCO's rights no consideration at all. Dan Frye founded and leads IBM's Linux Technology Center, which is the

---

[17]    The McManus case, cited by IBM, denies a claim of equitable estoppel on these exact grounds. McManus, 87 N.Y.2d at 190 ("Petitioner cannot be estopped from asserting a state of facts that were known to all parties throughout the transaction."). Similarly, SCO should not be estopped from asserting a plain language reading of the Agreements that was clearly known to IBM, a signatory to those same Agreements.

organization within IBM dedicated to making technical improvements and technology

disclosures to Linux.  (Ex. 277.)  Mr. Frye's deposition testimony substantially undercuts any

assertion of reliance by IBM.

REDACTED

These admissions are inconsistent with any assertion that IBM was looking to or relying on anything SCO had said or done in determining whether it was permitted to make the UNIX technology contributions to Linux that it made.

B.      IBM's Estoppel Argument Is Based on Sharply Disputed Facts.

In arguing that this Court could enter summary judgment for IBM on the grounds that SCO's predecessors-in-interest have made certain alleged representations to its UNIX licensees, IBM simply ignores the abundant evidence that those predecessors-in-interest did not take the view of the UNIX licenses that IBM claims they did and that those predecessors did not make such representations.

1.      The Analyses of the Parties' Experts
        Defeat IBM's Version of Events.

The substantial expert evidence that IBM concedes to be admissible further contradicts IBM's assertions about its and Sequent's supposed reliance on statements by AT&T at the time the Agreements were executed.  IBM relies on the expert report of Dr. Robert Willig (Ex. 283) in arguing that IBM and Sequent had overwhelming economic incentives to demand the assurances that IBM says it and Sequent demanded.  IBM argues that such economic considerations are relevant where the contracts, and thus the terms governing the relationship between the parties, are ambiguous.  It follows, by IBM's own analysis, that where economic analysis demonstrates that IBM and Sequent did not have the incentives or business interests that IBM says they had, such evidence undercuts IBM's arguments that it or Sequent relied on any supposed representations by AT&T in deciding whether to enter into the Agreements or how to develop its products under those Agreements.  SCO expert Dr. Gary Pisano has provided that very economic analysis, and Dr. Willig admitted that in fact he had not undertaken to consider the parties'

143

economic incentives and interests under the Agreements as SCO actually interprets, and AT&T actually interpreted, them.  (See Part I.C.4.c, above.)

SCO's expert analysis shows that neither IBM nor Sequent had any significant interest, let alone one that overrode AT&T's countervailing interest in protecting its UNIX asset and business, in securing the right to use so-called "homegrown" material however they wanted.  The evidence confirms (and easily permits the inference that) IBM and Sequent did not demand the representations from AT&T they say they demanded.  SCO's evidence further shows (and, again, easily permits the inference) that as of the early and mid-1990s, IBM understood that the amendment in its side letter regarding methods and concepts applied only to products into which IBM had not copied UNIX source code and for the development of which IBM had not referred to the UNIX software product.  (¶¶ 87-88, 164-68.)  The restrictions on its modifications and derivative works based on the licensed UNIX software product thus remained in place.  In repeatedly seeking to negotiate with USL, Novell and Santa Cruz to loosen those restrictions, IBM confirms that it did not have the view then that it articulates now of the scope of the Agreements.

2.      Substantial Evidence Defeats IBM's Claim of Reliance.

IBM argues by way of declarations that it never believed it was precluded from doing "as it wished" with what it calls its "homegrown code" in AIX, as opposed to the UNIX System V material in AIX, but IBM internal documents draw no such distinction between the two.

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

144

REDACTED PURSUANT TO IBM DESIGNATION OF CONFIDENTIALITY

(Ex. 129 at 181427554) (emphasis added).)  This document directly contradicts, and by itself creates a fact issue regarding, IBM's newly minted assertion that it believe it could disclose at least the "homegrown" parts of AIX however it saw fit.

There is substantial additional evidence providing (and from which a jury could easily infer) that no representations were made to IBM that it was permitted to disclose the "original" material in AIX:

- AT&T's interpretation of its UNIX license agreements was that the licenses were obligated to keep confidential all parts of the modifications or derivative works the licensees developed based on the licensed UNIX software product.  (¶¶ 82-86.)

- AT&T's policy was that the members of its licensing group would never modify or amend any license agreement orally, but rather would reduce any such clarifications or amendments to writing.  (¶¶ 91-92.)

145

- The interpretation of its UNIX license agreements by the members of the UNIX licensing group from the time of USL's control over the UNIX business going forward was that the licenses were obligated to keep confidential all parts of the modifications or derivative works the licensees developed based on the licensed UNIX software product. (¶¶ 82-86.)

- The policy of the UNIX licensing group from the time of USL's control over the UNIX business going forward was that the members of its licensing group would never modify or amend any license agreement orally, but rather would reduce any such modifications or amendments to writing. (¶¶ 91-92.)

On the basis of the foregoing record evidence, the factual aspect of IBM's argument for equitable estoppel is fatally deficient and no basis for summary judgment.

Indeed, IBM relies heavily on the declaration of Sequent representative Roger Swanson, who when deposed was unable to ascribe any meaning whatsoever to portions of the Sequent Agreement, and who subsequently submitted a declaration seeking to augment his deposition testimony. Mr. Swanson argues that prior to the execution of the Sequent Agreement in 1985, AT&T Contracts Manager Ira Kistenberg orally represented to him that Sequent was free to do whatever it wanted with its "homegrown" or "add on" material in the modifications and derivative works it developed based on the licensed UNIX software product.

Mr. Kistenberg's own sworn declaration and subsequent deposition testimony, however, directly contradicts Mr. Swanson's claims. Mr. Kistenberg testified that "the policy of the UNIX licensing group was that any changes to a licensee's software agreement had to be in writing. I never verbally agreed with any licensee to modify its license in any way without memorializing

146

the modification in writing." (Ex. 10 ¶ 10.) He confirmed that testimony at deposition. (Ex. 75 at 21, 22, 36, 41-42.) Mr. Kistenberg could not have stated the matter any clearer. On this additional and independent basis, the factual aspect of IBM's argument for equitable estoppel is fatally deficient and no basis for summary judgment.

        3.      <u>Amendment No. X Defeats IBM's Claim of Reliance.</u>

The very existence of Amendment No. X, as well as IBM's explanation of its supposed effect, also preclude IBM's argument for estoppel as a factual matter. If IBM actually believed that it was obligated to hold in confidence only the licensed UNIX source code, then it would have had no reason to seek relief from that portion of the Side Letter specifying that IBM could not "refer to the physical documents and materials comprising SOFTWARE PRODUCTS" in developing products other than modifications and derivative works. That language in the Side Letter also factually refutes IBM's argument that it believe that it was free to "do as it wished" with any portion of a modification or derivative work that was not the literal UNIX source code. Until 1996, long after IBM's purported reliance on alleged statements and UNIX licensor inaction, the plain language of the Side Letter provided that IBM still was not free to "market" a product that was developed by referring to the UNIX software product, without regard to whether that product contained <u>any</u> UNIX source code.

        4.      The Few Documents Regarding UNIX Flavors
                      <u>Also Are No Basis for Summary Judgment.</u>

IBM further argues that several documents regarding certain licensees' UNIX flavors are evidence that those licensees were free to disclose "original" material from those flavors, and cites a declaration from IBM stating generally that IBM relied on the inaction of the UNIX

licensors (USL and Novell) in concluding that IBM in fact was free to disclose material from AIX to the development of Linux. The argument fails for a myriad of reasons.

First, IBM presents no evidence that anyone at Sequent relied on the cited documents or any others for the proposition that IBM or Sequent was entitled to disclose any part of Dynix/ptx to the public. The vast majority of the disclosures that SCO challenges were made from Dynix/ptx. (¶¶ Exs. 144, 287, 288.)

Second, neither IBM nor Sequent could have reasonably relied on supposed disclosures made from other licensees' UNIX flavors, such as Sun's flavor or HP's flavor, because the terms and conditions governing each UNIX licensee were themselves confidential. (Ex. 333 ¶ 23; Ex. 355 ¶ 23.) Companies like IBM and Sequent would not even have known, and therefore could not have reasonably inferred, if the rights exercised by other licensees meant that IBM and Sequent could exercise any similar rights. Whether IBM and Sequent reasonably relied on the materials they cite, without saying they specifically relied on all or any one of them, is a question that "cannot be determined on summary judgment. See Towne Gardens, 2005 WL 2406004, at *4 (reasonable reliance regarding assertion of equitable estoppel is one of fact).

Third, the content of the documents that IBM cites is not comparable to the content of the IBM disclosures to Linux that SCO challenges, and for that additional reason the documents are not basis for IBM to claim that it reasonably relied on those documents in making its disclosures to Linux from AIX and Dynix/ptx. (Ex. 139 ¶¶ 2-22.) Most of the documents do not disclose internal operating system code, methods, or concepts at all. The few documents that do disclose such material do so at such a general and superficial level that the disclosure would be of no use to operating-system developers, or they disclose material that is so specific to a particular

148

operating system that it would not even be applicable to another operating system, such as Linux. Further, with only one exception, the documents are either confidential documents, patents whose purpose is to prevent the use of the disclosed invention, or materials that are protected by clear copyright language. The exception is a one-page IBM Technical Disclosure Bulletin that comes with no indication that it was ever published or distributed, or that its existence was even know to those outside of IBM. (Ex. 139 ¶¶ 2-22.)

IBM first cites and attaches, for example, part of a document called "AIX Operating System: Programming Tools and Interfaces (1989)" (IBM Ex. 560). IBM provides no evidence at all regarding the distribution of the document. The first page of the excerpt that IBM cites identifies the document as a "manual." In addition, the first page of the document contains multiple copyright notices, including one for AT&T. These facts easily permit the inference that this manual was sent only to IBM's AIX licensees, and was not releasing any material for wide public disclosure. The trivial method describes in the excerpt that IBM submits do not describe any method internal to AIX, but rather relates to the external API. (Ex. 139 ¶ 9.)

Fourth, contemporaneous and subsequent evidence contradicts any claim that IBM relied on such documents for the proposition that it could disclose "original" parts of AIX in the course of Linux development. The evidence, including the very negotiation and execution of Amendment No. X, shows that in the 1980s, 1990s, and 2000s IBM believed it was obligated to hold AIX in confidence under its Agreements. And although IBM submits no evidence that Sequent relied on such documents, the evidence also shows that Sequent regarded itself as obligated to hold Dynix/ptx in confidence except from equivalent-scope licensees. (¶¶ 164-68.)

149

Fifth, the evidence reveals sharply disputed facts on the question of whether the UNIX licensors knew that any licensee was disclosing material from its UNIX flavors. IBM presents no evidence that any such licensor knew of the foregoing documents, or any other particular publication at any particular time. In contrast, SCO's evidence shows that the licensors were not aware that their licensees were making disclosures from their UNIX flavors. (¶ 96.)

The law is clear that a rightholder is not held to a standard of monitoring all patent applications for possible violations of its rights. See Jacobsen v. Deseret Book Co., 287 F.3d 936, 950 (10th Cir. 2002) (a copyright holder has no "duty of inquiry" in the absence of known evidence suggesting a reasons for suspicion); Schock v. United States, 21 F. Supp. 2d 115, 119 (D.R.I. 1998) (duty to investigate is not triggered until a plaintiff receives warning of a potential problem); see also MacLean Assocs., Inc. v. Wm. W. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 780 (3d Cir. 1991) (the copyright holder who supplies software to another does not come "under a never-ending obligation to discover whether anyone to whom he ever supplied his software would copy it. The Copyright Act does not recognize such an obligation."); cf. Jackson Jordan, Inc. v. Plasser Am. Corp., 219 U.S.P.Q. 922, 926 (E.D. Va. 1983) (the commercial release of the infringing product, coupled with the copyright owner's examination of that product, triggers a duty of inquiry).

In addition, the question of whether a party in SCO's position "should have known" about such a disclosure presents a classic question of fact, and therefore cannot properly support IBM's motion. See, e.g., Kling v. Hallmark Cards Inc., 225 F.3d 1030, 1039-41 (9th Cir. 2000) (citing cases) (holding that question of whether copyright owner "should have known" of copyright infringement presents fact issues precluding summary disposition); Armstrong Virgin

Records, Ltd., 91 F. Supp. 2d 628, 640 (S.D.N.Y. 2000) (holding that questions concerning when copyright holder "should have know of the infringement" "do not lend themselves to summary disposition"); In re Indep. Serv. Orgs. Anti-Trust Litig., 964 F. Supp. 1469, 1479 (D. Kan. 1997) (holding that question of whether copyright owner "should have discovered" defendant's infringement presents fact issues precluding summary disposition).  On this additional basis, IBM's reliance on the documents presents no grounds for summary judgment in IBM's favor.

> 5.     The Fact of IBM's Investment in AIX
>        Also Is No Basis for Summary Judgment.

IBM further argues that IBM's decision to invest heavily in developing AIX constitutes evidence of IBM's alleged reliance on the alleged assurances of AT&T and its successors. Given the abundant evidence from which a jury could reasonably infer that there was no such reliance or assurances, however, the mere fact of IBM's substantial investment in AIX is of no moment.  (¶¶ 30-168.)  In addition, a jury could reasonably reach a number of conclusions about that investment other than that it was a function of IBM's alleged reliance on AT&T's alleged misrepresentations.  The evidence shows, for example, that it was in IBM's decided business interests to develop as good a UNIX flavor as it could in order to increase IBM's hardware sales. (¶¶ 30-62.)  There is simply no basis on which the Court could conclude as a factual matter that IBM's AIX investment is evidence of the supposed representations of AIX and its successors.

In all of the foregoing respects, IBM's estoppel argument turns on disputed factual issues and therefore provides no ground for summary judgment.  (See also SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on Its Tenth Counterclaim (Nov. 11, 2006) (addressing IBM's estoppel argument concerning, inter alia, UnitedLinux).)

### III.   THE SUBSTANTIAL EVIDENCE AND THE NEW YORK LAW OF WAIVER PLAINLY ALLOW SCO TO PURSUE ITS CLAIMS FOR BREACH OF CONTRACT.

IBM further argues that Novell has waived SCO's rights under the UNIX software agreements on SCO's behalf, and that SCO has waived those rights itself.

It is well settled that waiver is ordinarily a question of fact and, as such, is "generally ill-suited for summary adjudication." In re Caldor, Inc., 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998) (applying New York law); see also Boston Concessions Group v. Criterion Ctr. Corp., 606 N.Y.S.2d 696, 697 (App. Div. 1994) ("[U]nder New York law, the establishment of a waiver, requiring the intentional relinquishment of a known right, is ordinarily a question of fact which precludes summary judgment."). Where, as here, "a waiver is not express, but found in the acts of a party, summary judgment is not appropriate. An implied waiver is invariably a matter of intention and, therefore, an issue of fact." McDarren v. Marvel Entm't Group, Inc., No. 94 Civ. 0910 (LMM), 1995 WL 214482, at *5 (S.D.N.Y. Apr. 11, 1995) (Ex.H) (emphasis added); see Wyeth v. King Pharmaceuticals, Inc., 396 F. Supp. 2d 280, 290 (E.D.N.Y. 2005) (explaining that implied waiver is "rarely established as a matter of law rather than as a matter of fact" and denying summary judgment on the grounds of disputed facts regarding waiver) accord NetTech Solutions, L.L.C. v. ZipPark.com, No. 01 Civ. 2683, 2001 WL 1111966, at *6 (S.D.N.Y. Sept. 20, 2001) (acknowledging the same principle and denying summary judgment on the grounds of disputed facts regarding waiver) (Ex. I).[18]  As shown below, none of IBM's "waiver" arguments comes close to warranting a departure from that rule in this case.

---

[18]      The cases IBM cites do not suggest a different rule and are based on facts that are irrelevant to those presented here. In Securities Industry Automation Corp. v. United Computer Capital Corp., 723 N.Y.S.2d 668 (App. Div. 2001), the court found a waiver in light of the uncontradicted evidence and

In New York, "the well known and oft-stated definition of waiver is the 'intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it.'" In re Sanders-Langsam Tobacco Co., 224 B.R. 1, 11 (Bankr. E.D.N.Y. 1998) (quoting United Commodities-Greece v. Fid. Int'l Bank, 64 N.Y.2d 449, 457 (1985).) New York's highest court has recently reiterated that waivers "must be clear, unmistakable and without ambiguity." Prof'l Staff Cong.-City Univ. of N.Y. v. N.Y. State Pub. Employee's Union, -- N.E.2d --, 2006 WL 2945367 (N.Y. Oct. 17, 2006) (Ex. J). The burden of proving a waiver is on the party asserting it. City of N.Y. v. State, 40 N.Y.2d 659, 669 (1976). IBM has not met that burden here.

   A.   IBM's Primary Waiver Argument Is Based on
        Disputed Facts and An Incorrect View of the Law.

IBM first argues in support of its "waiver" claims (at 103): "While IBM does not believe AT&T or its successors ever had control over their licensee's original works, if they did, as SCO contends, they knowingly, intentionally and voluntarily abandoned the right by telling their licensees, including IBM and Sequent, that they could do as they wished with their original works so long as they protected AT&T's UNIX software." This argument is the same as IBM's estoppel argument, and fails for the same reasons set forth in Part II.A, above.

---

under the UCC rule that "where a signed agreement excludes modification except by a signed writing, which was the case here, an attempted modification that does not meet the writing requirement or satisfy the Statute of Frauds may still operate as a waiver." Id. at 669. In T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 2001-900 KC, 2002 WL 1311648 (N.Y. App. Term. Apr. 2, 2002) (Ex. L), the court applied the "well settled" rule that "a shipper's unqualified and unconditional acceptance of a check that was collected by its carrier in payment of merchandise, contrary to the shipping instructions, ratifies the carrier's conduct, and the shipper thereby waives any claim it may have against the carrier for breach of contract." Id. at *1. In Heidi E. v. Wanda W., 620 N.Y.S.2d 665 (App. Div. 1994), the plaintiff indisputably had waived the defendant's right to maintain the confidentiality of plaintiff's medical records "by authorizing her friend to inquire about her condition and concerns." Id.

With respect to the "statements" by employees of AT&T, the presence of the integration clause raises an obvious question of material fact as to whether AT&T could have intended to waive contract provisions via such "statements" when it included an integration clause that expressly nullified all statements made before the execution of the Agreements and only permitted modifications that were written and signed by both parties.

A similar question of material fact exists with respect to whether SCO intended its alleged silence or failure to act regarding the publication of parts of AIX code in manuals and patent applications to effectuate a waiver. Such an issue of intention to unmistakably waive a cause of action is an issue for fact finders, and not appropriate for summary judgment. See Apollo Stell Corp. v. Sicolo and Massaro, 752 N.Y.S. 2d 493, 494 (App. Div. 2002).

As with its estoppel claim, IBM cites no evidence that any party actually asserted to IBM that AT&T was waiving its rights under the Agreements.[19]  Instead, they support their claims with generic statements that AT&T employees "told," "assured" or "informed" customers, with only vague references to dates that they could do as they wish with their own works. Putting aside the fact that these statements are disputed in their entirety by SCO, for the purposes of waiver, the absence of any evidence AT&T ever told IBM that they were free to "do as they wished" raises an issue of material fact as to any potential waiver was sufficiently "clear,

---

[19]     IBM avoids this issue in their brief by stating (at 103) that AT&T waived its rights by "telling SVRX licensees, including IBM and Sequent, . . . that they could do as they wished." The evidentiary support they cite for this statement is paragraphs 82-88, 119 and 143 of their statement of facts.  Those paragraphs, in turn, cite several separate declarations, none of which supports the proposition that any statements were made to IBM.  Only the declaration of Roger Swanson (IBM Ex. 266) maintains that "AT&T Technologies explained the agreements" to him while he was at Sequent.  The declaration does not specify a time frame or a speaker and, as explained previously, is contested by the sworn testimony of Mr. Kistenberg.

unmistakable and without ambiguity." Civil Serv. Employees Ass'n, Inc. v. Newman, 450 N.Y.S.2d 901, 903 (App. Div. 1982).

In addition, New York waiver law makes it clear that a successor-in-interest is bound by a predecessor's waiver only when the successor "has notice of the existence" of the waiver. Tehan v. Thos. C. Peters Printing Co., 421 N.Y.S.2d 465, 467 (App. Div. 1979); accord Stoneybrook Realty, L.L.C. v. Cremktco, Inc., 675 N.Y.S.2d 749, 751 (App. Term. 1998). The "key to the liability" of the successor is notice of the waiver. Rocky 116 L.L.C. v. Weston, 717 N.Y.S.2d 823, 824 (App. Div. 2000). IBM has not alleged that SCO ever knew of the "statements" by its successors that make up the alleged waiver of rights under the Agreements, a fact which is sufficient to deny them summary judgment as to waiver regarding SCO. See Tehan, 421 N.Y.S.2d at 467 (where waiver was "in direct conflict" with contract terms, successor in interest had no notice of waiver and was not subject to it); Rocky 116 L.L.P., 717 N.Y.S.2d at 824-25 ("the petitioner cannot reasonably be said to have had actual or constructive notice of a private waiver wholly inconsistent with" the written agreements between predecessor in interest and other party); Stoneybrook, 675 N.Y.S.2d at 752 (terms of previous waiver did not bind successor in interest with no knowledge of waiver due to lack of agreement between tenant and current landlord).[20]

In addition, IBM does not make the argument explicitly, at least not in its opening brief, but it appears to suggest that Santa Cruz and then Caldera International decided to waive any

---

[20] To the extent IBM claims that SCO's silence has affected a waiver, this too is clearly contrary to precedent. See Peck v. Peck, 649 N.Y.S.2d 22, 23 (App. Div. 1996) (waiver "cannot be inferred from mere silence."); accord Comvest Consulting, Inc. v. W.R.S.B. Dev. Co., 698 N.Y.S.2d 807, 808 (App. Div. 1999).

contract claims against IBM in 2000 and 2001. The purported support for the argument is portions of the declarations of former Santa Cruz executive David McRabb and former Caldera International CEO Ransom Love. The argument fails for four main reasons:

First, SCO's evidence contradicts Mr. McRabb's testimony and shows that Santa Cruz did not know that IBM had made contributions to Linux development in violation of its UNIX license agreements, and did not intend to waive its rights to bring suit against IBM for such violations.[21] (Ex. 17 ¶ 8; Ex. 333 ¶ 20; Ex. 355 ¶ 20; Ex. 337 ¶ 14.)

Second, IBM has presented no evidence that SCO was ever given any notice of Mr. McRabb's mistaken view of events, and the evidence shows (and easily permits the inference) that in fact Mr. McRabb never possessed those views in the first place. (Ex. 17 ¶ 11; Ex. 6 ¶ 6; Ex. 18 ¶ 12; Ex. 356 ¶¶ 2-4.) Absent such notice, as shown above, there can be no waiver attributed to SCO for purposes of its instant claims. SCO timely filed this lawsuit, on March 6, 2003, shortly after learning of IBM's breach, and SCO has always diligently protected and defended its rights under the UNIX license agreements. (Ex. 165 ¶¶ 3-38; Ex. 333 ¶¶ 20-22; Ex. 355 ¶¶ 20-22.)

Third, SCO submits substantial evidence contradicting Mr. Love's testimony and showing that Caldera International/SCO did not know that IBM had made contributions to Linux development in violation of its UNIX license agreements, and did not intend to waive its rights to bring suit against IBM for such violations. The evidence shows that Caldera International's Board of Directors never evaluated or determined whether IBM was in breach of its agreements,

---

[21] There are additional reasons to doubt the accuracy of Mr. McRabb's testimony. Mr. McRabb purports to describe conversations with representatives of Lucent regarding the scope of rights in their derivative works, but in fact Lucent did not even have a source code license under which they were allowed to create derivative works. (Ex. 333 ¶¶ 24-26; Ex. 355 ¶¶ 24-26.)

and that the decision of whether to waive claims for such breaches was one the Board would have participated in making.  (Ex. 18 ¶ 12; Ex. 17 ¶ 11; Ex. 6 ¶ 6.)  That is, the decision was not one for Mr. Love to make himself.

Fourth, any attempt to claim that Santa Cruz's or Caldera International's silence before the filing of the lawsuit directly contradicts New York law.  While waiver "will not be inferred from a doubtful or equivocal act," it "cannot be inferred from mere silence, unless there is a duty to speak."  Rotterdam Square v. Town of Rotterdam, 717 N.Y.S.2d 473, 476 (Sup. 2000); Bank of N.Y. v. Murphy, 645 N.Y.S.2d 800, 802 (App. Div 1996).  IBM has alleged no duty to speak on SCO's part, and has established no reason SCO was not permitted to pursue its claim at any time within the pendency of the relevant statute of limitation.  SCO's silence simply does not support a waiver.

B.      Novell Does Not Have the Waiver Rights IBM Claims.

In its next "waiver" argument, IBM attempts to argue that Novell waived SCO's protections under the UNIX software agreements against SCO's will.

IBM's argument is predicated on its fundamental misinterpretation of the Asset Purchase Agreement ("APA") between Novell and SCO's predecessor-in-interest The Santa Cruz Organization, Inc. (hereinafter "SCO").  Even though Novell sold its entire UNIX business to SCO under that agreement – specifically including all of the UNIX source code, UNIX licensing rights, and UNIX System V agreements – IBM claims that Novell retained the unfettered right to waive any rights under the UNIX System V licenses.  Basic principles of contract construction and extensive and admissible extrinsic evidence (including sworn testimony from the principals on both sides of the APA transaction) contradict IBM's position.

157

1.      IBM's Interpretation of APA Section 4.16(b) Is Inconsistent
         <u>With the Language, Purpose, and Intent of the APA.</u>

In the APA, Novell and SCO agreed that: "It is the intent of the parties hereto that <u>all of
the Business</u> and all of Seller's backlog, if any, relating to the Business be transferred to Buyer."
(IBM Ex. 123 § 1.3(a)(i) (emphasis added).)  The APA defined the "Business" as "the business
of developing a line of software products currently known as Unix and UnixWare, the sale of
binary and source code licenses to various versions of Unix and UnixWare, the support of such
products and the sale of other products which are directly related to Unix and UnixWare."  (IBM
Ex. 123 Recital A.)  Section 1.1(a) thus transferred to SCO "<u>all of Seller's right, title and interest
in and to the assets and properties of Seller relating to the Business</u> (collectively the 'Assets')
identified on Schedule 1.1(a) hereto," (IBM Ex. 123 § 1.1(a) (emphasis added)), which assets
specifically included, among other things:

- "<u>All rights and ownership of UNIX and UnixWare</u> including but not limited
  to," among other things, "all versions of UNIX and UnixWare and all copies
  of UNIX and UnixWare (including revisions and updates in process)," "all
  technical, design, development, installation, operation and maintenance
  information concerning UNIX and UnixWare, including source code," and
  "UNIX Source Code Products," "Binary Product Releases," and "Products
  Under Development," (IBM Ex. 123 Schedule 1.1(a) § I (emphasis added));

- "<u>All of Seller's claims</u> arising after the Closing Date against any parties
  relating to any right, property or asset included in the Business," <u>id.</u> § II
  (emphasis added);

- "<u>All of Seller's rights pertaining to UNIX and UnixWare under any software
  development contracts, licenses and any other contracts</u> to which Seller is a
  party or by which it is bound and which pertain to the Business (to the extent
  that such contracts are assignable)," <u>id.</u> § III (emphasis added);

- All UNIX "<u>Software and Sublicensing Agreements</u> – This includes the
  source code and sublicensing agreements that Seller has with its OEM, End
  User and Educational customers," <u>id.</u> (emphasis added); and

158

- "<u>All contracts relating to the SVRX Licenses</u>" – including for all versions of UNIX System Five that had been licensed to IBM and Sequent, <u>id.</u> § VI (emphasis added).

As part of the consideration that SCO paid Novell for the entire UNIX business, Novell was permitted to continue receiving royalties paid by UNIX System Five ("SVRX") licensees for their distribution, pursuant to sublicensing agreements, of binary (or object) code versions of System Five. <u>See</u> IBM Ex. 123 §§ 1.2(a)-(b), 4.16(a); <u>id.</u> Schedule 1.1(b), Item VIII (excluding from asset sale "All right, title and interest to the SVRX Royalties, less the 5% fee for administering the collection thereof pursuant to Section 4.16 hereof.")  Although Novell thus had a limited financial stake in the future royalties paid under the SVRX licenses, SCO obtained through the APA all rights to the UNIX intellectual property and all rights to develop the UNIX business based on that property.[22]

Section 4.16 of the APA, titled "SVRX Licenses," governed Novell's SVRX binary royalty interests.  Section 4.16(a) set out the procedures for SCO's collection and payment to Novell of the royalties, and gave Novell the right to audit those collection efforts.  Section 4.16(b) set forth legal protections for Novell's future binary-royalty interests.  And Section 4.16(c), in turn, protected SCO's future UNIX business by prohibiting Novell from promoting the sale of SVRX products.

---

[22]    By the time of the APA closing, SCO's business did not contemplate any additional significant sales of SVRX source-code licenses, and the remaining interest in that particular part of the UNIX business consisted primarily of collecting binary royalties attributable to sublicensed object-code product. (Ex. 40 ¶ 11.)  Of course, because the System Five software included substantial intellectual property that SCO was using in later versions of its UNIX and UnixWare products, SCO had a strong continuing interest in protecting that property under the existing SVRX software agreements.  (Id.)

Based on its misinterpretation of a single sentence in Section 4.16(b),[23] removed entirely from context, IBM attempts to argue that the APA gave Novell the unilateral and unfettered right to require SCO to change or to waive, at any time and for any reason, any of SCO's rights (including SCO's right to enforce its intellectual-property protections) under any UNIX System Five agreement. This reading of the APA – on which IBM's entire Novell-related waiver argument rests – cannot entitle IBM to summary judgment for a number of textual reasons.

a.   <u>IBM Misinterprets the Term "SVRX License".</u>

In suggesting that Novell had the authority to waive SCO's intellectual-property protections under the SVRX <u>software agreements</u>, IBM necessarily sweeps such agreements under the definition of "SVRX Licenses"; it is the software agreements that specify the restrictions on licensees' source code rights. The term "SVRX Licenses" is not defined anywhere in the APA,[24] but a plain reading of the agreement reveals IBM's contract interpretation to be wrong. Specifically, the included "Assets" schedule to the APA (Schedule 1.1(a)) expressly refers to the UNIX software agreements (in paragraph III.L) separately from the SVRX Licenses (in paragraph VI). Moreover, to the extent that the software agreements themselves may have been included within "All contracts relating to the SVRX Licenses" phrase in paragraph VI, the use of that broader phrase to describe the "Assets" included in the APA

---

[23]     That sentence states: "In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller." (IBM Ex. 123 § 4.16(b).)

[24]     Indeed, although SVRX Licenses is capitalized like the other defined terms in the APA – such as "Business," "Shares," Assets," "Excluded Assets," "Assumed Liabilities," and "Unassumed Liabilities" – unlike those other terms, SVRX Licenses is not defined in the APA. Section 4.16 refers to SVRX licenses "listen in detail under Item VI of Schedule 1.1(a)." The software agreements are not listed in detail or otherwise under Item VI, but rather in Item IV.L of the Schedule – which is not referenced in Section 4.16 at all.

transfer belies any suggestion that the term "SVRX Licenses," standing alone – as it does in Section 4.16(b) – includes such agreements. These considerations – and the fact that the APA specifically refers to "royalties, fees, and other amounts due under all SVRX Licenses," Section 4.16(a) – strongly support a narrower reading of "SVRX Licenses," to refer just to the SVRX product Schedules that, unlike the software agreements themselves, identify all such amounts. (See, e.g., Ex. 56.)  Furthermore, this more precise reading is consistent with the role of Section 4.16 to facilitate the management of Novell's binary royalty interests and, unlike IBM's reading, does not (as described below) run into direct conflict with the purpose of the APA and many of its other key provisions.  Accordingly, IBM's argument is not supported by the language of the provision on which it relies.

> b.    IBM's Interpretation of 4.16(b) Would Defeat
> the Whole Purpose of the APA.

"The words, phrases and sentences employed are to be construed in light of the objectives and fundamental purposes of the parties to the agreement." Leo F. Piazza Paving Co. v. Found. Constructors, Inc., 128 Cal. App. 3d 583, 591 (Ct. App. 1981); see also County of Marin v. Assessment Appeals Bd., 134 Cal. Rptr. 349 (Ct. App. 1976) ("A contract entered into for the mutual benefit of the parties is to be interpreted so as to give effect to the main purpose of the contract and not to defeat the mutual objectives of the parties; language which is inconsistent with the objective of the contract shall be rejected."); Viacao Aerea Sao Paulo, S.A. v. Int'l Lease Fin. Corp., 859 F.2d 924, 1988 WL 103286, at *4 (9th Cir. 1988) (reversing summary judgment because "the language of a contract is to be construed in light of the purposes of the parties to the agreement") (Ex. N).  (Paragraph 9.8 of the APA provides that the APA "shall be

governed by and construed in accordance with the laws of the state of California" (IBM Ex. 123).)

As IBM attempts to read it, Section 4.16(b) of the APA would give Novell the unfettered right to, among other things:

- require SCO to permit any and all SVRX licensees to copy, distribute, export, or even open source the licensed UNIX source code (and all of the protected elements contained in that code) – the very value of the assets SCO had acquired – without any protection or compensation for SCO; and

- direct SCO to waive any of its rights to enforce any licensee's material breach of any SVRX license – even where such rights have no bearing whatsoever on Novell's future binary royalty stream or relate to an SVRX license under which there are no future binary royalties at all.

IBM thus argues that in a single sentence of Section 4.16(b), SCO gave Novell the authority, for any reason or no reason at all, to eviscerate the entire value of the UNIX assets that SCO had acquired through the APA even though Novell's sole continuing interest under the APA was limited to the SVRX binary royalties. That implausible construction of Section 4.16(b) cannot be accepted as a matter of well-settled contract interpretation law.

c.     IBM's Interpretation of Section 4.16(b) Directly Conflicts with Other Key Provisions of the APA.

As a corollary to the requirement that contractual provisions are not be construed as meaningless,[25] it is well settled that a contract which confers certain rights or benefits in one clause will not be construed in other provisions completely to undermine those rights or benefits. See County of Marin, 134 Cal. Rptr. at 353-55 (rejecting interpretation of clause that would have

---

[25]     See, e.g., Heidlebaugh v. Miller, 271 P.2d 557, 559 (Cal. Ct. App. 1954) ("The court will if possible give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable.").

permitted party to unilaterally deny the other party the bargained-for benefit provided for in another clause of the contract); <u>Cooper v. Mart Assocs.</u>, 225 Cal. App. 2d 108, 114-16 (Ct. App. 1964) (holding that contract's waiver clause would not be read to nullify the right to sue provided in another clause, because a "contract is to be construed as a whole," with "each clause helping to interpret the other"). IBM's proposed reading of the second sentence of Section 4.16(b) must fail because it would completely undermine numerous other detailed provisions of the APA. For example:

- Section 1.1 and Schedule 1.1(a) grants to SCO "<u>All rights and ownership</u> of UNIX and UnixWare including but not limited to" the "source code" to the "UNIX Source Code Products" (including UNIX System Five and all prior and subsequent UNIX and UnixWare products. But if Novell had the right to change or cancel any of the intellectual-property protections in the SVRX software agreements, this express asset-transfer provision would be rendered hollow for the same reasons that IBM's contract interpretation would undermine the purpose of the APA itself.

- Section 4.16(a) provides that in consideration for collecting binary royalties and ensuring proper payment of such royalties, "Seller shall pay Buyer within 5 days of receipt of SVRX Royalties from Buyer." But if Section 4.16(b) were as broad as IBM contends, then Novell purportedly could have vitiated this provision by simply requiring SCO to direct licensees to make their royalty payments directly to Novell.

- Section 4.16(c) states: "Seller further covenants that immediately following the Closing Date neither it, nor any of its officers, directors or employees shall . . . take any material action designed to promote the sale of SVRX products." APA § 4.16(c). But if Section 4.16(b) were as broad as IBM contends, then Novell purportedly could have directed SCO to change its SVRX licenses in any of several ways designed to promote the sale of SVRX products, including by requiring SVRX licensees to promote such products.

   d.  <u>IBM Improperly Disregards Amendment No. 2.</u>

Amendment No. 2 to the APA is directly relevant to IBM's argument and expressly confirms the error in its contractual interpretation. <u>See, e.g.</u>, <u>Harm v. Frasher</u>, 181 Cal. App. 2d

405, 412-13 (Ct. App. 1960) ("It is a general rule that several papers relating to the same subject-matter and executed as parts of substantially one transaction, are to be construed together as one contract."); Heston v. Farmers Ins. Group, 160 Cal. App. 3d 402, 417 (Ct. App. 1984) ("The two documents are interrelated and must be read together for purposes of interpretation."). Paragraph B.5 of Amendment No. 2, which was executed on October 16, 1996, begins: "This Amendment does not give Novell the right to increase any SVRX licensee's rights to SVRX source code." (IBM Ex. 444 ¶ B.5 (emphasis added).) If Section 4.16(b) of the APA were as broad as IBM contends, then Novell would have already had the right to direct SCO to amend or supplement any SVRX software agreement in order to increase a licensee's rights to SVRX source code. The first sentence of Paragraph B.5 to Amendment No. 2 confirms the parties' understanding that Section 4.16(b) did not have the broad scope that IBM now proposes.

SCO and Novell also expressly agreed in Amendment No. 2 that "Novell may not prevent SCO from exercising its rights with respect to SVRX source code in accordance with the Agreement." (Id. ¶ B.5 (emphasis added).) This plain language further confirms that, contrary to IBM's argument, Novell had no right to waive SCO's protections for the SVRX intellectual property under the IBM and Sequent software agreements. It also highlights the crucial distinction – which must underlie any reasonable interpretation of the APA – between Novell's limited binary royalty rights and SCO's broad source code rights. This plain language of Amendment No. 2 forbids the very action that Novell seeks to take in preventing SCO from exercising its rights with respect to SVRX source code – and is in itself more than sufficient reason to deny IBM's motion.

2.      The Extrinsic Evidence Directly Refutes
        IBM's Interpretation Of the Parties' Intent.

The discussion above demonstrates that IBM's proposed reading of the APA should be

rejected as a matter of law.  In addition, IBM cannot establish its entitlement to summary

judgment on its claim that Novell waived SCO's rights because the language of the APA

(including the scope of the undefined term "SVRX Licenses" in Section 4.16(b)) and of

Amendment No. 2 is at least ambiguous.[26] Extensive extrinsic evidence of the contracting

parties' intent with respect to those two documents further demonstrates not only that the parties

never intended for Novell to have the broad waiver rights that IBM claims, but also (under

applicable California law) that the APA and Amendment No. 2 are at least ambiguous with

respect to that issue.  See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal.

2d 33, 37 (1968) ("The test of admissibility of extrinsic evidence to explain the meaning of a

written instrument is not whether it appears to be plain and unambiguous on its face, but whether

the offered evidence is relevant to prove a meaning to which the language of the instrument is

reasonably susceptible."); Wolf, 114 Cal. App. 4th at 1351, 1357. ("Where the meaning of the

---

[26]      The "absence of a [contract] definition, though perhaps not dispositve, might weigh, even
strongly, in favor of finding an ambiguity, for example, when the term in question has no generally
accepted meaning outside the context of the [contract] itself."  Bay Cities Paving & Grading, Inc. v.
Lawyers' Mut. Ins. Co., 5 Cal. 4th 854, 867 (Ct. App. 1993).  Indeed, California courts routinely deny
summary judgment where an undefined relevant term is subject to more than one reasonable
interpretation.  See, e.g., Wolf, 114 Cal. App. 4th at 1357 (reversing summary judgment because "the
only way to construe the meaning of the term" was by considering extrinsic evidence); EOTT Energy
Corp. v. Storebrand Int'l Ins. Co., A/S, 45 Cal. App. 4th 565, 574, 578 (Ct. App. 1996) (undefined term
"certainly presents a problem [precluding summary judgment] if the term is reasonably susceptible to
more than one meaning"); cf. Ramming v. Barnard, No. E030334, 2002 WL 393118, at *5 (Cal. Ct. App.
Mar. 13, 2002) ("It cannot seriously be contended that the [agreement] is not ambiguous. For example,
the use of the undefined term 'sale proceeds' is susceptible to many meanings[.]") (Ex. K); accord World
Trade Ctr. Props. v. Hartford Fire Ins. Co., 345 F.3d 154, 190 (2d Cir. 2003) (summary judgment was
properly denied because meaning of undefined term was "an open question as to which reasonable finders
of fact could reach different conclusions").

words used in a contract is disputed, the trial court <u>must</u> provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning"; indeed, "it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face."); <u>So. Cal. Edison v. Super. Ct.</u>, 37 Cal. App. 4th 839, 848 (Ct. App. 1995) ("Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent."); <u>see also</u> <u>Blumenfeld v. R. H. Macy & Co.</u>, 92 Cal. App. 3d 38, 45 (Ct. App. 1979)

The chief negotiators for both Novell and SCO agree that neither SCO nor Novell ever intended for the APA to give Novell the right to waive SCO's protections for its intellectual property under the SVRX software agreements. The sworn declaration of Novell's own principal negotiator, Ed Chatlos, explains:

> Paragraph 4.16 of the APA was specifically designed and intended to protect Novell's retained binary product royalty stream. Based on the foregoing, including my understanding of the parties' intent, I do not believe Novell has any right to waive, or to direct or require SCO to waive, any of SCO's source code rights, including under customer source code licenses.

(Ex. 39 ¶ 13.) Jim Wilt, who negotiated the APA for Santa Cruz, concurs in his sworn declaration:

> Paragraph 4.16 of the APA pertains to the binary royalty income stream that Novell retained through the APA. The parties agreed to the language in Paragraph 4.16(b) in order to allow Novell to manage that royalty stream within the operation of SCO's customer source code licenses – not at the expense of SCO's right to enforce its intellectual property protections under any such licenses, and not to permit Novell to waive any of those protections. I have reviewed Amendment No. 2 to the APA and believe that the language therein confirms that intent. In light of my intent, and based on

> my understanding of the parties' intent, I do not believe that Novell had or
> has any right to waive, or direct or require SCO to waive, any of its
> intellectual property rights or protections.

(Ex. 40 ¶ 10.)  And Steve Sabbath, Santa Cruz's former Vice President of Law and

Corporate Affairs and a participant in a number of the meetings and discussions with the

chief negotiators and attorneys leading up to the APA, has similarly declared:

> I understand that IBM has argued that Section 4.16(b) of the APA gave
> Novell the right to require Santa Cruz to waive any breach of the intellectual
> property protections provided in the SVRX licenses.  That argument is
> contrary to the intent of Paragraph 4.16(b) as I understood it.  Indeed, Santa
> Cruz would never have agreed to give Novell the right under the APA to
> waive such protections under the SVRX licenses because such a right could
> have eviscerated the entire purpose of the APA and the value of the assets
> transferred to Santa Cruz under the APA.

(Ex. 42.)  With respect to Amendment No. 2 to the APA, Mr. Sabbath, who was involved

in the discussions leading up to that amendment and who executed the amendment on

SCO's behalf, has further testified:

> Amendment No. 2 arose as a result of a dispute between Novell and SCO
> concerning Novell's attempt to execute, on Santa Cruz's behalf, a royalty buy-out
> with IBM.  That dispute was ultimately resolved through an amendment to IBM's
> SVRX license that was jointly executed by Santa Cruz, Novell, and IBM.
> Amendment No. 2, however, was intended to confirm, among other things, the
> parties' intent that SCO would obtain ownership of the UNIX copyrights under
> the APA and that Novell had received no rights with respect to UNIX source code
> under the APA.  Paragraph B.5 of Amendment No. 2 was specifically intended to
> make clear that Novell had no right to increase any SVRX licensee's rights to
> SVRX source code, no right to grant any new SVRX source code licenses, and no
> right to prevent Santa Cruz from exercising the rights it obtained under the APA
> with respect to SVRX source code.

(Id. ¶ 6.)  Accordingly, for all of the above reasons, there is no merit to IBM's claim that Novell

had the authority to waive IBM's breaches of the intellectual-property protections in the SVRX

software agreements.

In addition, IBM's proposed reading of the APA would render meaningless the Technology License Agreement ("TLA") that the parties entered into contemporaneously with the execution of the APA. See, e.g., Harm, 181 Cal. App. 2d at 412-13 ("Where two or more written instruments are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived object, they must all be construed together, and effect given if possible to the purpose intended to be accomplished."). As Section 1.6 of the APA contemplated, that TLA effected a "license back" to Novell of the right to use, among other things, the UNIX System V code. (See Ex. 48.) Under the TLA, Novell was permitted to use the licensed code only for internal purposes and only in bundled products (and then only to the extent that the bundled product did not compete with SCO's UnixWare business and the licensed-back technology did not constitute a material part of the product). See id.

According to IBM's untenable reading of the APA, however, Novell would have the right to waive, on SCO's behalf, even Novell's own strict obligations with respect to SVRX code under the TLA. By waiving such obligations, Novell could have even given itself the right to continue its UNIX business in competition with SCO – effectively nullifying yet another fundamental purpose of the APA.

C.     SCO's Linux Activities Do Not Constitute a Waiver.

In its third "waiver" argument, IBM contends that SCO's acts and conduct are inconsistent with an intention to assert a breach of contract claim against IBM based on the code allegedly at issue. IBM's "implied waiver" claim fails on both the well-established law and the disputed facts.

168

As noted earlier, "[w]aiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85 N.Y.2d 232, 236 (1995); see also Davison v. Kless, 280 N.Y. 252, 261 (1939) ("Whether an alleged waiver is express or implied, it must be intentional."). In addition, "where a waiver is not express, but found in the acts of a party, summary judgment is not appropriate. An implied waiver is invariably a matter of intention and, therefore, an issue of fact." McDarren, 1995 WL 214482, at *5 (emphasis added).

IBM's argument for implied waiver is thus untenable as a matter of law. Nor is there any factual basis for any claim that SCO has voluntarily and intentionally abandoned its right to pursue IBM's breach of contract. SCO timely filed this lawsuit, on March 6, 2003, shortly after learning of IBM's breach, and SCO has always diligently protected and defended its rights under the UNIX license agreements. (Ex. 165 ¶¶ 3-38; Ex. 333 ¶¶ 20-22; Ex. 355 ¶¶ 20-22.) Indeed, IBM does not even allege (let alone present any evidence) that SCO failed promptly to pursue its rights after learning that IBM had improperly dumped source code into Linux. In light of SCO's diligent enforcement efforts, the Court could not possibly conclude, as a matter of law, that SCO has waived its contract claims.

IBM contends that SCO's "implied waiver" of its contract rights may be found based on (1) SCO's sales of certain Linux products that contained source code improperly contributed by IBM; and (2) SCO's steps in making some of that same code purportedly publicly available on the Internet. These "waiver" claims fail.

1.   SCO Has Not "Waived" Its Contract
     Claims by Distributing Limited Linux Products.

SCO did not own the UNIX assets until June 2001, when (as Caldera International) SCO acquired them from Santa Cruz.  It follows that the Caldera entity (Caldera Systems) that distributed Linux prior to that time could not have "waived" any claims for breach of the UNIX license agreements, and that any purported reliance by IBM on the conduct of Caldera Systems would not have been reasonable.

In addition, insofar as SCO's Linux sales are concerned, and where it cannot raise any failure to satisfy the statute of limitations, IBM's argument reduces to the contention that SCO waived its contract claims by continuing to "distribute" Linux products after SCO learned of IBM's breaches, because SCO could not have possibly waived any of rights before it knew of IBM's conduct.  See K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 827 F. Supp. 985, 989 (S.D.N.Y. 1993) ("A proper claim of waiver should state that the waiving party voluntarily and intentionally relinquished a right, with knowledge of all the facts and circumstances that would constitute the entitlement to that right.").[27]

Caldera, Inc., Caldera Systems, Inc. and Caldera International, Inc. (collectively, "Caldera") copied, advertised, and distributed the Linux kernel and other related Linux software for years before 2003.  Until approximately June 2001, however, none of those entities was the owner of the UNIX copyrights or the owner of the UNIX license agreements at issue.  During the

---

[27]   Further, evidence that SCO "should have known" of its claim or of SCO's "negligence," "oversight," or even "thoughtlessness" would not suffice to show SCO's waiver of its rights.  Leibowitz v. Elsevier Sci., Ltd., 927 F. Supp. 688, 705 (S.D.N.Y. 1996); Madison-Oneida-Herkimer Consortium v. N. Am. Admins., 765 N.Y.S.2d 184, 190 (Sup. Ct. 2003); accord Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 303 (2d Cir. 1996).

time that Caldera International both owned the UNIX license agreement at issue in this case and copied, advertised, and distributed the Linux kernel and other related Linux software, the company did not undertake to determine if IBM's contributions to Linux constituted a breach of its UNIX license agreement. (Ex. 269 ¶¶ 11-18; Ex. 6 ¶¶ 2-12.) Caldera International never intended to waive any of its rights under the UNIX license agreements at issue in this case, and never represented to anyone that it believed that IBM's Linux contributions complied with the terms of its UNIX license agreements.

The same day SCO filed this suit, SCO sent a notice of termination to IBM's Chief Executive Officer, explaining that IBM's right to use or distribute any software product based on UNIX System V, including AIX, would be terminated on June 13, 2003, unless IBM cured those breaches. (Ex. 49 ¶ 10 & Ex. C.) SCO sent a similar notice to IBM regarding Sequent, and Dynix/ptx, on May 29, 2003. (Ex. 49 ¶ 10 & Ex. D.) SCO attempted to meet and confer with IBM, but IBM failed to cure its breaches during the 100-day period provided in SCO's termination letter to IBM. (Ex. 49 ¶ 11.) Sequent also failed to cure its breaches during the two-month period provided in SCO's termination letter to Sequent. (Id.) Accordingly, SCO terminated IBM's contract rights effective June 13, 2003, and terminated Sequent's contract rights effective July 30, 2003. (Id. & Exs. C, D.)

After filing this suit, SCO carefully considered whether to continue selling its Linux products. (Ex. 49 ¶ 12.) SCO considered its obligations to its existing customers. (Id. ¶ 13.) SCO decided that the appropriate solution was to suspend its sale and marketing of its Linux products (effective May 14, 2003), but to continue to permit SCO's pre-existing customers to order Linux products (which IBM appears to describe as the "distribution" of those products).

171

(Id. ¶ 14.)[28]  SCO did not enter into any further obligations to sell Linux Server 4.0 or

OpenLinux 3.1.1 after May 14, 2003.  (IBM Ex. 284 ¶ 3.)[29]

      This evidence precludes any finding that SCO "intended" -- impliedly or otherwise -- to

"waive" any of its contract rights.  Waiver "should not be lightly presumed."  Gilbert Frank Corp.

v. Fed. Ins. Co., 70 N.Y.2d 966, 968 (1988).  Instead, "the intent to waive a right must be

unmistakably manifested, and is not to be inferred from a doubtful or equivocal act."  Navillus

Tile, Inc. v. Turner Constr. Co., 770 N.Y.S.2d 3, 5 (App. Div. 2003); accord ESS & Vee

Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc., 702 N.Y.S.2d 38, 39 (App. Div.

2000).  In filing its suit for breach of contract and terminating the IBM and Sequent software

agreements, SCO clearly manifested its intent to enforce those rights.  It is illogical to suggest, as

IBM does (without any authority), that a clear and unequivocal intent to waive certain rights can

be inferred from acts taken after the filing of a suit to protect those rights.  That SCO continued

to honor pre-existing obligations to its own pre-existing customers does not remotely permit the

inference that SCO intended to discontinue its enforcement of its contract rights.

      IBM's argument amounts to the astonishing claim that its breaches of its contractual

obligations created a situation in which SCO had only two choices when it learned of those

breaches:  (1) abandon its customers and its Linux business overnight, thereby inflicting the

---

[28]     Contrary to IBM's assertion, SCO issued a press release on April 14, 2003, announcing the proposed release of "SCO Linux Server 4.0 for the Itanium Processor Family," but never released or sold the product. (Ex. 49 at Ex. E.)

[29]     By suspending the sale of its Linux-related products – including the operating system, services, support, professional services, education, and layered applications -- SCO lost approximately 5-10% of its revenues. (Ex. 49 ¶ 15.)  In contrast, from May 14, 2003, until May 31, 2004 (when SCO last sold a unit of Linux Server 4.0), SCO sold 83 units and had 79 units returned, for a net revenue of $1,849. (IBM Ex. 284 ¶ 15.)  Since May 14, 2003, SCO has sold 403 units of OpenLinux 3.1.1 and had 51 units returned, for a net revenue of $49,097. (Id. ¶ 5.)

maximum damage on those customers and itself as a result of IBM's breaches; or (2) immunize

IBM for its improper conduct. IBM does not, because it cannot, cite any authority even

suggesting that IBM, through its own improper conduct, could put SCO to such a choice. In

light of all the circumstances – and particularly viewing those circumstances in the light most

favorable to SCO – the Court could not possibly infer, as a matter of law, "a clear manifestation

of intent" on SCO's part "to relinquish the protection" of the software agreements. Gilbert Frank,

70 N.Y.2d at 968.

> 2.     SCO Has Not Made "Publicly Available"
>         Source Code That IBM Misappropriated.

SCO provided customers who purchased Linux Server 4.0 with access to the product

(including source code that is part of the Linux 2.4 kernel) through a confidential and

individualized password for use at the log-in screen to SCO's website. (Ex. 49 ¶ 19.) SCO

continued to make that source code available in that way through December 31, 2004, in light of

SCO's continuing contractual obligations. In its Product Announcement for Linux Server 4.0

(dated November 19, 2002), SCO promised to offer purchasers the "SCO Linux Update Service"

for twelve months, including "Access to an up-to-date repository of UnitedLinux and other

updates for their system." (Id. Ex. E.) When a purchaser registered at SCO's website for the

SCO Linux Update Service, the purchaser was informed of its entitlement to "download and

apply the latest updates" to its SCO Linux Server. (Id.)

Beginning in 2004, SCO stopped making available on its website any version of Linux.

SCO has made diligent efforts since late 2003 to eliminate the availability of Linux on any

current or archived SCO website, and is not currently aware that any version of Linux is

available on any such website. (¶¶ 219, 231, 233.)

Instead, IBM went to illegal lengths to obtain Linux source code from SCO's website. Section 1030(a)(2)(C) of Title 18 of the United States Code, known as "The Computer Fraud and Abuse Act," makes it a felony for an unauthorized user to access a company's website. See, e.g., Creative Computing v. GetLoaded.com LLC, 386 F.3d 930, 933-35 (9th Cir. 2004); Theofel v. Farey-Jones, 359 F.3d 1066, 1078 (9th Cir. 2004); I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc., 307 F. Supp. 2d 521, 523-24, 526 (S.D.N.Y. 2004) (citing cases); see also SCO's Mem. in Opp. to IBM's Motion for Summary Judgment on Its Eighth Counterclaim (Nov. 30, 2004). Between October 31 and December 1, 2003, IBM repeatedly accessed the SCO log-in site but did not obtain access to the SCO Linux Server 4.0 files. (Ex. 49 ¶ 25.) After news of a bug in the website's security system was reported on the Internet, however, IBM exploited the bug to bypass the security system, hacked onto SCO's website, and downloaded the very files that IBM has now attached to its motion. (Id. ¶¶ 25-27.)

Again, in view of all the circumstances, especially as they are construed in the light most favorable to SCO, the fact that IBM impermissibly accessed source code that SCO made available only to its pre-existing customers – and only pursuant to what SCO believed were its contractual obligations to those customers – cannot remotely establish SCO's intentional waiver of its breach-of-contract claims against IBM as a matter of law.

## IV.   SCO HAS TIMELY ASSERTED ITS CLAIMS RELATING TO RCU.

IBM argues that SCO's claims relating to Sequent's disclosure of methods and concepts relating to RCU are time-barred because such methods and concepts were disclosed in a 1993 patent application. For several reasons, the argument is no basis for summary judgment.

First, IBM presents no evidence that any of SCO's predecessors knew or should have known of the patent application (in 1993) or issuance of the patent (in 1995). The question then becomes whether SCO's predecessors "should have known" about either event. As of 1993, patent applications were not even made public until the patent issued. (Ex. 342 (35 U.S.C. § 122 1994), 35 U.S.C. § 122 (2000).) Accordingly, the question is whether SCO's predecessors "should have known" that the RCU described in the patent had issued in 1995. SCO has shown that a rightholder is not held to a standard of monitoring all patent applications for possible violations of its rights, and that whether a party in SCO's position "should have known" about such a disclosure presents a classic question of fact. (See Part II.A.) IBM means to state otherwise by citing Dolgoff Holophase, Inc. v. E.I. Du Point de Nemours & Co., 212 N.Y.S.2d 769 (App. Div. 1995), but that case did not address and plainly did not overrule the long-established precedent under New York law establishing that a plaintiff's claim for breach of contract accrues only when the plaintiff knew or should have known about the breach at issue.

Second, with respect to the issuance of the patent in 1995, the patent of course served to establish that no one besides the patent-holder was entitled to use RCU, and gave no suggestion that IBM would open-source the code in RCU. (Ex. 139 ¶ 7.) The description of RCU in the patent thus hardly constituted an unprotected public disclosure of the methods and concepts therein, and even if SCO's predecessors had or could have known about the patent, would have constituted an immaterial breach of the Sequent Agreement. IBM cites no case even suggesting otherwise. IBM again means to state otherwise by citing Dolgoff, but the court in that case reached no conclusion whatsoever that the non-disclosure agreement at issue was breached upon the filing of a patent application or issuance of a patent.

175

Third, IBM presents no evidence that SCO knew or should have known that, subsequent to the non-public 1993 patent application, the RCU described therein was incorporated into Sequent's UNIX flavor. In contrast, SCO has produced evidence showing that the incorporation of RCU into Dynix or Dynix/ptx was not a well-known fact, even in the computer industry. (Ex. 139 ¶¶ 48-50.) Until such time as SCO's predecessors knew that the RCU described in the patent application or patent had been incorporated into Sequent's UNIX flavor, they would not even have had a reason to consider the patent application or issuance as an improper disclosure under the Sequent Agreement. Sequent's distributions of Dynix and Dynix/ptx do not even appear to have been marked with the RCU patent number. (Id. ¶ 50.) SCO did not know that RCU was in Dynix/ptx until its review of the Dynix/ptx source code produced in this case – which was not publicly available prior to this litigation. (Id. ¶ 50.)

## **CONCLUSION**

SCO respectfully submits, for all of the reasons stated above and as set forth in Appendix A hereto, that this Court should deny IBM's Motion for Summary Judgment on SCO's Contract Claims (SCO's First, Second, Third and Fourth Causes of Action).

DATED this 11th day of November, 2006.

By _____

HATCH, JAMES & DODGE, P.C.
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
Robert Silver (admitted pro hac vice)
Stephen N. Zack (admitted pro hac vice)
Stuart H. Singer (admitted pro hac vice)
Edward Normand (admitted pro hac vice)

*Attorneys for The SCO Group, Inc.*