copyright in such material. In particular, neither SCO nor any other UNIX copyright holder properly released the copyrighted, disputed UNIX material at issue in this case under the GPL.

Neither AT&T, Unix Systems Laboratories ("USL"), Novell, Inc. ("Novell"), Santa Cruz, Caldera International, or SCO have placed a notice on or in any products indicating that they grant the rights "to run, copy, distribute, study, adapt and improve" the infringing UNIX material in Linux without royalties, under the terms of the GPL or any other "open source" license, nor did they ever intend to grant such rights. (Ex. 11; Ex. 233 ¶¶ 4, 6, 13; Ex. 269 ¶¶ 9-14; Ex. 6 ¶¶ 11, 14. Placement of such a notice by the copyright holder in the UNIX material is a prerequisite to granting such rights in the UNIX material under the GPL. (IBM Ex. 128 § 0.)

IBM has put forth no evidence that any UNIX copyright holder contributed the infringing Linux material to Linux or placed an appropriate GPL notice on Linux, or that other Linux contributors actually owned the copyright in the material they contributed. For instance, Mr. Torvalds admits to having incorporated system calls taken from a Unix licensee – Sun Microsystems. (Disputed Fact No. 2 to   Yet, IBM has put forth no evidence showing that Sun granted rights to use such material in Linux.

Furthermore, whether SCO or any other UNIX copyright holder has granted such rights, to whom such rights were granted, what conditions were imposed on such rights, and whether use of the infringing Linux material complies with such conditions, are all disputed legal conclusions, not "Disputed Facts."

**IBM Ex. 5 (SCO's Answer to IBM's Second Amended Counterclaims) ¶ 22:**

The cited source does not support the assertion that such rights have been granted in *all* of Linux, and does not specify any particular portion of Linux in which such rights have been granted.

IBM Ex. 272 (Declaration of Linux Torvalds) ¶ 6; Ex. 221 (Declaration of Ransom

Love) ¶ 7: The cited sources constitute legal conclusions asserted without any supporting factual

basis.

112.    Linux not only adheres to open standards, but also is built and maintained by a
worldwide group of engineers who share the common goal of making open systems and open
source ubiquitous.  (Ex. 106 at 3; Ex. 272 ¶ 7; Ex. 22 ¶ 8.)  Anyone can freely download Linux
and many Linux applications and modify and re-distribute them with few restrictions.  (Ex. 107
at 5; Ex. 272 ¶ 8; Ex. 221 ¶ 9.)

Disputed in that the cited material is inadmissible to support the assertion that a

worldwide group of engineers who build and maintain Linux share the common goal of making

open systems and open source ubiquitous.

113.    The Linux kernel is distributed under the GNU General Public License ("GPL").
The GPL provides that a person receiving code under the GPL "may copy and distribute
verbatim copies of the Program's source code" and "modify [their] copy or copies of the
Program or any portion of it".  (Ex. 272 ¶ 9; Ex. 128 ¶¶ 1, 2; Ex. 107 at 24; Ex. 221 ¶ 10.)  The
GPL also provides that a person receiving code under the GPL receives "a license from the
original licensor to copy, distribute or modify the Program".  (Ex. 128 ¶ 6.)

Disputed to the extent the statement suggests that the foregoing provisions of Linux are

the only ones relevant to the terms under which the Linux kernel is distributed.

L.    USL and Novell.

114.    At approximately the same time Mr. Torvalds began the development of Linux,
Novell acquired (in 1991) an interest in USL, which held all of AT&T's UNIX-related assets,
including AT&T's UNIX licensing agreements and copyrights.  (Ex. 5 ¶ 10; Ex. 182 ¶ 8.)  In
1993, Novell acquired all of the UNIX assets held by USL.  (Ex. 240 ¶ 9.)

Disputed in that IBM Exhibit 240 constitutes, in relevant part, inadmissible evidence.

The declarant is Joseph A. LaSala, Jr. "on behalf of Novell, Inc."  (IBM Ex. 240.)  Mr. LaSala

identifies himself as "Senior Vice President and General Counsel at Novell, Inc."  Although not

mentioned in the declaration, Mr. LaSala was hired by Novell in 2001.  See http://www

.novell.com/company/bios/jlasala.html. Mr. LaSala makes no assertion that he has personal knowledge of any matter contained in the declaration. To the contrary, he asserts that the declaration is "based on Novell's knowledge and understanding of the matters described herein," and that he is authorized to submit the declaration "on behalf of Novell." (IBM Ex. 240 ¶ 4.) Federal Rule of Civil Procedure 56(e) states that affidavits in support of summary judgment motions are required to "be made on personal knowledge." Only in paragraphs 30-36 of the declaration does Mr. LaSala make statements that are based on his personal knowledge. Where the deficiencies in an affidavit make it impossible for the Court to determine "which facts it can accept as based on personal knowledge and which must be rejected as being conjecture or belief," the Court should disregard the entire affidavit. Malek v. Martin Marietta Corp., 859 F. Supp. 458, 460-61 (D. Kan. 1994). Those statements regarding occurrences prior to Mr. LaSala's joining Novell in 2001 were clearly not made upon personal knowledge, constitute inadmissible hearsay, and should be disregarded by the Court. See Perez v. Volvo Car Corp., 247 F. 3d 303, 316 (1st Cir. 2001) (where record made clear that events in question occurred prior to affiant's hiring, parts of affidavit concerning those events "cannot properly be considered"). Additionally, to the extent the entire declaration purports to relay Novell's "understanding" of matters, it should be disregarded as not in accordance with Rule 54(e). See Malek, 859 F. Supp. at 460 ("It is the plaintiff's personal knowledge and not his beliefs, opinions, rumors or speculation, that are admissible at trial and the proper subject of any affidavit."); accord Ricks v. Xerox Corp., 877 F. Supp. 1468, 1470 n.1 (D. Kan. 1995). Specifically, paragraphs 7, 11-28, and 40-43 of the declaration convey on their face Novell's "understanding" of the significance of events and are therefore inappropriate evidence in support

of a summary judgment motion, in addition to the fact that the Federal Rules of Civil Procedure

do not permit Mr. LaSala to declare anything "on behalf of" Novell.

115.    As an owner of AT&T's UNIX assets, Novell assumed AT&T's rights and
obligations under its UNIX licenses, including AT&T's UNIX licensing agreements with IBM
and Sequent.  Like AT&T and USL before it, Novell managed UNIX licensing agreements by,
among other things, interpreting, explaining, and enforcing their terms.  (Ex. 240 ¶ 10.)

Disputed in that IBM Exhibit 240 constitutes, in relevant part, inadmissible evidence.

(See response to IBM Paragraph 114.)

116.    In acquiring AT&T's rights to the Agreements, Novell understood them to place
restrictions on the extent to which AT&T's licensees could use UNIX System V.  Novell did not
understand the UNIX licenses to confer on AT&T or Novell (as AT&T's successor) any rights to
the code, methods or concepts of AT&T's and Novell's licensees -- whether or not the licensees'
code, methods or concepts were or had been part of a modification or derivative work of
AT&T's UNIX software product.  (Ex. 240 ¶¶ 11-23.)

Disputed in that there is substantial evidence demonstrating (and easily permitting the

inference) that the members of Novell's UNIX licensing group understood the UNIX licenses to

require the licensees to keep confidential all parts of their modifications and derivative works

based on the licensed UNIX System V software product.  (¶¶ 63-96.)  Disputed in that IBM

Exhibit 240 constitutes, in relevant part, inadmissible evidence.  (See response to IBM Paragraph

114.)

117.    Novell understood that UNIX licensees could do as they wished with any non-
UNIX portions of their modifications and derivative works of the UNIX software product.  That
is how Novell understood its own UNIX license with AT&T.  AT&T made it clear to Novell,
and Novell to AT&T, that Novell, as an AT&T licensee, could do as it wished with its own code,
methods, and concepts.  AT&T stated that it asserted no rights to Novell material, even if
included in a modification or derivative work of UNIX software.  (Ex. 240 ¶¶ 11-23.)

Disputed in that there is substantial evidence demonstrating (and easily permitting the

inference) that AT&T and Novell understood the UNIX licenses to require the licensees to keep

confidential all parts of their modifications and derivative works based on the licensed UNIX

System V software product, and that neither AT&T nor Novell suggested otherwise to each

other. (¶¶ 63-96.)  Disputed in that IBM Exhibit 240 constitutes, in relevant part, inadmissible

evidence.  (See response to IBM Paragraph 114.)

118.    Novell shared its view of its licenses with its new (and AT&T's former) licensees with whom Novell (like AT&T) had frequent dealings. Like AT&T, Novell intended for its licensees to rely on its statements and assurances about what licensees could do and not do with their original works. (Ex. 183 ¶¶ 5-6; Ex. 240 ¶¶ 11-23.)

Disputed in that there is substantial evidence demonstrating (and easily permitting the

inference) that AT&T and Novell understood the UNIX licenses to require the licensees to keep

confidential all parts of their modifications and derivative works based on the licensed UNIX

System V software product, and that neither AT&T nor Novell suggested otherwise to each

other. (¶¶ 63-96.)  Disputed in that like the AT&T licenses, Novell's own UNIX System V

license agreements state expressly that Novell and its licensees intended to exclude any previous

or subsequent discussions from the agreement the parties had reached.  (¶¶ 18, 91-92.)  Disputed

to the extent the statement suggests that licensees did not enter into agreements requiring them to

hold in confidence all parts of their modifications and derivative works based on the licensed

UNIX System V software product.  (¶¶ 13-29, 82-86.)  Disputed to the extent that the statement

suggests that, upon entering into their written agreement, the licensees did not intend to exclude

any previous and subsequent oral discussion from the agreement the parties had reached.  (¶¶ 18,

91-92.)  "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set

forth the terms under which UNIX System V could be used and disclosed by them and under

which they could distribute software programs "based on" UNIX System V."  (IBM Statement of

Undisputed Facts ¶ 50.)Disputed in that IBM Exhibit 240 constitutes, in relevant part,

inadmissible evidence.  (See response to IBM Paragraph 114.)

119.    Novell representatives made clear to Novell's licensees, including IBM and Sequent, that Novell asserted no rights to the licensees' code, methods and concepts and that they could do with them as they wished, whether or not they were included in modifications or derivative works of UNIX software products.  To the extent Novell ever had any right to its licensees' code, methods, and concepts, Novell relinquished it.  (Ex. 240 ¶¶ 11-23.)

Disputed in that substantial evidence shows (and easily permits the inference) that Novell

held no such understanding of the licenses and had no such communications with licensees

regarding rights of disclosure.  (¶¶ 63-96.)  Disputed to the extent the statement suggests that

Novell represented that UNIX System V licensees could do as they wished with "the licensees'

code, methods and concepts" without regard to whether such material was included in the

licensees' modifications or derivative works based on the licensed UNIX System V software

product.  (¶¶ 63-96.)  Disputed to the extent the statement suggests that licensees did not enter

into agreements requiring them to hold in confidence all parts of their modifications and

derivative works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)

Disputed to the extent that the statement suggests that, upon entering into their written

agreement, the licensees did not intend to exclude any previous and subsequent oral discussion

from the agreement the parties had reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the

Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX

System V could be used and disclosed by them and under which they could distribute software

programs "based on" UNIX System V."  (IBM Statement of Undisputed Facts ¶ 50.)  Disputed to

the extent the statement call for a legal conclusion.  Disputed in that IBM Exhibit 240

constitutes, in relevant part, inadmissible evidence.  (See response to IBM Paragraph 114.)

120.    Just as they had before Novell acquired USL, IBM, Sequent and other UNIX licensees exercised ownership and control over their original works, despite the fact that those works were (or had been) part of a modification and derivative work of UNIX System V or were

(or had been) associated in some respect with UNIX System V, such as by publicly disclosing them. (Ex. 561; Ex. 562; Ex. 563; Ex. 567; Ex. 568; Ex. 569; Ex. 571.)

See Response to IBM Statement of Fact No. 90.

121.   Put differently, Novell's UNIX licensees publicly disclosed code, methods, and concepts from their flavors of UNIX after Novell acquired AT&T's UNIX assets. (Ex. 561; Ex. 562; Ex. 563; Ex. 567; Ex. 568; Ex. 569; Ex. 571.)

See Response to IBM Statement of Fact No. 90.

122.   For example, IBM published The Advanced Programmer's Guide to AIX 3.x, which contained source code, methods and concepts from AIX (Ex. 493), and disclosed AIX methods and concepts in patent applications and issued patents including Patent No. 5,202,971 (Ex. 567), Patent No. 5,175,852 (Ex. 499), Patent No. 5,421,011 (Ex. 496), and Patent No 5,428,771. (Ex. 497.) Likewise, Sequent disclosed methods and concepts in patent applications and issued patents including Patent No. 5,442,758 (Ex. 498), and Patent No. 5,185,861 (Ex. 499.)

See Response to IBM Statement of Fact No. 90.   Disputed to the extent that the statement

suggests that AT&T or USL knew or should have known about the substance of IBM's patent

applications. (See Argument, Part IV.)

123.   IBM and Sequent were not alone in disclosing the code, methods, and concepts of their flavors of UNIX. For example, Sun Microsystems, Inc ("Sun") disclosed source code from Solaris, its UNIX flavor, in Solaris Porting Guide (1995) (Ex. 561 at 228), and Solaris Multithreaded Programming Guide (Ex. 562).

See Response to IBM Statement of Fact No. 90.

124.   Like AT&T and USL before it, Novell was aware and understood that its licensees were exercising their full rights of ownership and disclosing the code, methods and concepts of their flavors of UNIX. (Ex. 186 ¶¶ 6-7; Ex. 250 ¶¶ 6-7; Ex. 271 ¶¶ 5-6; Ex. 276 ¶¶ 6-7.) Yet, Novell took no steps to stop its licensees from doing as they wished with their original works. (Ex. 183 ¶¶ 6-7; Ex. 250 ¶¶ 6-7; Ex. 271 ¶¶ 15-16; Ex. 276 ¶¶ 6-7.)

Disputed in that substantial evidence shows (and easily permits the inference) that Novell

representatives did not actually know about such disclosures. (¶ 96.)  The evidence further

shows (and easily permits the inference) that such disclosures, including as made under

copyright protection, were not material breaches of the agreements. (Ex. 139 ¶¶ 2-22.)

125.    Based on its understanding of the Agreements, the statements of Novell representatives and Novell's failure to take any action to preclude licensees from doing as they wished with their original works, IBM continued to develop its flavor of UNIX.  Similarly, Sequent, having received no indication of a different interpretation of the Agreements from Novell, continued to develop its own Dynix operating system.  (Ex. 257 ¶¶ 3-5; Ex. 252 at 67:21-68: 11; 97:25-98:20, 140:12-21; Ex. 596 ¶¶ 2-4.)

Disputed to the extent the statement suggests that IBM and Sequent did not enter into a

written agreement requiring them to hold in confidence all parts of their modifications and

derivative works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)

Disputed to the extent that the statement suggests that, upon entering into their written

agreement, the parties did not intend to exclude any previous and subsequent oral discussion

from the agreement the parties had reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the

Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX

System V could be used and disclosed by them and under which they could distribute software

programs "based on" UNIX System V."  (IBM Statement of Undisputed Facts ¶ 50.)  Disputed

to the extent that the cited material does not support the assertion that IBM or Sequent relied on

"Novell's failure to take any action to preclude licensees from doing as they wished with their

original works" in deciding to continue to develop their AIX and Dynix derivative works.

Disputed to the extent the statement suggests that, absent an "indication of a different

interpretation of the Agreements," IBM and Sequent would not have continued to develop AIX

and Sequent as they did.  (¶¶ 30-62.)  Disputed to the extent the statement suggests that IBM

knew the terms and conditions of any other UNIX licensee's license arrangement.  (Ex. 333 ¶ 23;

Ex. 355 ¶ 23.)

126.                          REDACTED

Sequent likewise invested tens of

millions of dollars in the development and marketing of Dynix and wrote millions of lines of

original source code.  (Ex. 257 ¶ 10; Ex. 252 at 67:21-68:11; 97:25-98:20, 140:12-21; Ex. 181, Ex. G; Ex. 596 ¶¶ 3-4.)

Depending on the meaning of the term "original source code," disputed to the extent the cited material does not identify what lines of code in AIX or Sequent were written by developers without reference or access, or experience based on such reference or access, to the licensed UNIX System V software product.

127.    Neither IBM nor Sequent would have continued to invest in AIX and Dynix as they did if they had believed that Novell (instead of IBM and Sequent) owned and had the right to control their original works, whether or not they were included in a modification or derivative work of UNIX System V.  (Ex. 257 ¶ 6; Ex. 295 at 27:2-25.)

Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V."  (IBM Statement of Undisputed Facts ¶ 50.)  Disputed to the extent the statement suggests that AT&T or any of its successors-in-interest claimed to own IBM's or sequent's "original works."  (¶¶ 76-96.)  Disputed in that IBM and Sequent had compelling reasons to continue to invest in AIX and Dynix as they did under the terms of their UNIX System V license agreements.  (¶¶ 30-62.)

M.    Formation of SCO.

128.    After Novell announced the termination of a project related to Linux, members of Project Corsair (as it was known) left Novell to form Caldera, Inc. ("Caldera"), a predecessor of SCO, in 1994. (Ex. 107; Ex. 440; Ex. 193 ¶ 6; Ex. 221 ¶ 16.)

Disputed in part and undisputed in part.  Caldera, Inc. is not a "predecessor" of SCO to

the extent that term could be construed as making the past actions of Caldera, Inc. attributable to

SCO or indicating that Caldera, Inc. could grant others rights to use the infringed SVr4 material.

(See Disputed Fact No. 4 to IBM's Motion for Summary Judgment on Its Tenth Counterclaim.)

129.    Caldera was formed to develop and market software based on the Linux operating system and to provide related services enabling the development, deployment, and management of Linux-specialized servers. (Ex. 221 ¶ 17; Ex. 107 at 6, 31; Ex. 193 ¶ 7; 242 ¶ 6.)  In fact, Caldera was the first company to invest heavily in the establishment of Linux as an acceptable business solution. (Ex. 221 ¶ 18; Ex. 441.)

Disputed in part and undisputed in part.  SCO disputes IBM's implication that the actions

of Caldera, Inc. or Caldera Systems prior to May 2001 are attributable to SCO, or that Caldera,

Inc. or Caldera Systems had the power to grant or release rights in the infringed SVr4 material.

The actions of Caldera, Inc. and Caldera Systems prior to May 2001 are not attributable

to SCO and could not grant IBM any rights to use the infringed SVr4 material, because neither

Caldera, Inc. nor Caldera Systems owned copyrights in any UNIX material.  (See Disputed Facts

Nos. 4, 22 to IBM's Memorandum in Support of Its Motion for Summary Judgment on Its Tenth

Counterclaim (Nov. 11, 2006).)

130.    Caldera continued the work done by Novell on Project Corsair to develop a Linux desktop operating system and eventually delivered a product called "Caldera Network Desktop" in 1995. (Ex. 221 ¶ 19; Ex. 440; Ex. 107 at 8; Ex. 283 at 33; Ex. 198 ¶ 8; Ex. 242 ¶ 7.)

Disputed in part and undisputed in part.  SCO disputes IBM's implication that the actions

of Caldera, Inc. or Caldera Systems prior to May 2001 are attributable to SCO, or that Caldera,

Inc. or Caldera Systems had the power to grant or release rights in the infringed SVr4 material.

66

The actions of Caldera, Inc. and Caldera Systems prior to May 2001 are not attributable to SCO and could not grant IBM any rights to use the infringed SVr4 material, because neither Caldera, Inc. nor Caldera Systems owned copyrights in any UNIX material  (See Disputed Facts Nos. 4, 22 to IBM's Motion for Summary Judgment on Its Tenth Counterclaim.)

IBM's cited sources do not indicate that the Linux products created by Caldera, Inc. were created through any affiliation with Novell, or that Novell transferred any rights or copyrights to Caldera, Inc.  (See Disputed Facts Nos. 4, 22 to IBM's Motion for Summary Judgment on Its Tenth Counterclaim.)

131.    Caldera also made code contributions to Linux and helped and encouraged independent software vendors and manufacturers to port their programs to its Linux products in an attempt to provide the types of software that had been unavailable for Linux to that time.  (Ex. 440; Ex. 442; Ex. 221 ¶ 31.)

Disputed in part and undisputed in part.  SCO disputes IBM's implication that the actions of Caldera, Inc. or Caldera Systems prior to May 2001 are attributable to SCO, or that Caldera, Inc. or Caldera Systems had the power to grant or release rights in the infringed SVr4 material.

The actions of Caldera, Inc. and Caldera Systems prior to May 2001 are not attributable to SCO and could not grant IBM any rights to use the infringed SVr4 material, because neither Caldera, Inc. nor Caldera Systems owned copyrights in any UNIX material. (See Disputed Facts Nos. 4, 22 to IBM's Motion for Summary Judgment on Its Tenth Counterclaim.)

132.    To facilitate the porting of Linux to the existing applications in the market that were written primarily for UNIX-based operating systems, Caldera worked on making its Linux products compliant with various UNIX standards, including the X/Open brand for UNIX 95, and the POSIX.1 specification. (Ex. 221 ¶ 32; Ex. 442.)

67

Disputed in part and undisputed in part.  SCO disputes IBM's implication that the actions of Caldera, Inc. or Caldera Systems prior to May 2001 are attributable to SCO, or that Caldera, Inc. or Caldera Systems had the power to grant or release rights in the infringed SVr4 material.

The actions of Caldera, Inc. and Caldera Systems prior to May 2001 are not attributable to SCO and could not grant IBM any rights to use the infringed SVr4 material, because neither Caldera, Inc. nor Caldera Systems owned copyrights in any UNIX material.  (See Disputed Facts Nos. 4, 22 to IBM's Motion for Summary Judgment on Its Tenth Counterclaim.)

133.    To achieve compliance with UNIX standards with its Linux products, Caldera hired software developers that had both UNIX and Linux experience to work on making Linux compliant with UNIX standards.  (Ex. 221 ¶ 35; Ex. 442.)

Disputed in part and undisputed in part.  SCO disputes IBM's implication that the actions of Caldera, Inc. or Caldera Systems prior to May 2001 are attributable to SCO, or that Caldera, Inc. or Caldera Systems had the power to grant or release rights in the infringed SVr4 material.

The actions of Caldera, Inc. and Caldera Systems prior to May 2001 are not attributable to SCO and could not grant IBM any rights to use the infringed SVr4 material, because neither Caldera, Inc. nor Caldera Systems owned copyrights in any UNIX material.  (See Disputed Facts Nos. 4, 22 to IBM's Motion for Summary Judgment on Its Tenth Counterclaim.)

N.    Novell and Santa Cruz Share UNIX Interests.

134.    In 1995, as Caldera was beginning its Linux business, Novell entered negotiations with The Santa Cruz Operation, Inc. ("Santa Cruz") concerning the sale of certain Novell assets relating to its UNIX and UnixWare software products.  (Ex. 239 ¶ 14; Ex. 123.)

Depending on the meaning of the term "certain Novell assets," disputed in that the parties negotiated the sale of Novell's UNIX business assets, and intellectual property, with few limited exceptions.  (¶¶ 169-82.)

135.    On September 19, 1995, Novell and Santa Cruz executed an Asset Purchase Agreement ("APA"). (Ex. 239 ¶ 5.) The parties entered into two Amendments to the APA: Amendment No. 1 on December 6, 1995, and Amendment No. 2 on October 16, 1996. (Ex. 239 ¶ 6; Ex. 502; Ex. 444; Ex. 123.)

Undisputed.

136.    Santa Cruz did not have the financial capacity to pay the purchase price contemplated by Novell for its UNIX assets. (Ex. 182 ¶ 43; Ex. 254 ¶ 10; Ex. 239 ¶ 8.) To bridge the price gap and consummate the transaction, Novell and Santa Cruz agreed that Novell would receive Santa Cruz stock and retain certain UNIX rights. (Ex. 123; Ex. 239 ¶ 8.)

Undisputed.

137.    Under the APA and its Amendments, Santa Cruz obtained a variety of assets, including hundreds of contracts and licenses, various trademarks, source code and binaries to UnixWare products, and physical assets such as furniture and personal computers. (Ex. 123; Ex. 444; Ex. 502; Ex. 239 ¶ 7.)

Depending on the meaning of the term "a variety of assets," disputed in that the parties

negotiated the sale of Novell's UNIX business assets, and intellectual property, with limited

exceptions. (¶¶ 169-82.) Disputed to the extent the statement suggests that Santa Cruz did not

obtain the UNIX copyrights. (¶¶ 169-82.)

138.    Novell retained the right to receive royalty payments under System V Release X ("SVRX") licenses, prior approval rights relating to new SVRX licenses and amended SVRX licenses, the right to direct Santa Cruz to take certain actions relating to SVRX licenses and the right to conduct audits of the SVRX license programs. (Ex. 123 § 4.16; Ex. 239 ¶ 8.)

Disputed to the extent the statement suggests that the rights retained by Novell under the

APA extend beyond the right to continue to receive and protect royalties paid by then-existing

SVRX licensees for their ongoing distribution of SVRX binary products pursuant to UNIX

sublicensing agreements. (¶¶ 279-93.)

139.    Santa Cruz assumed responsibility for administering the collection of royalty payments from SVRX licenses. The APA provided that Santa Cruz would collect and pass through to Novell 100% of the SVRX royalties. In return, Novell agreed to pay Santa Cruz an

administrative fee of 5% of those royalty amounts. Santa Cruz also agreed to pay additional royalties relating to other products. (Ex. 123 § 4.16(a); Ex. 239 ¶ 9.)

Disputed to the extent the words "royalty" or "royalties" in the first three sentences refers to anything other than the royalties paid by then-existing SVRX licensees for their ongoing distribution of SVRX binary products pursuant to UNIX sublicensing agreements, and disputed to extent the word "royalties" in the last sentence suggests that Novell retained any rights to the "other products" other than the right to receive certain contingent payments for the projected (but ultimately unrealized) sales of the "other products." (¶¶ 279-93.)

140.    As specified by Section V.A of Schedule 1.l(b) of the APA, it excluded from the transfer and Novell retained "[a]ll copyrights and trademarks, except for the trademarks UNIX and UnixWare". Amendment No. 2 to the APA addressed copyrights but did not effect the transfer of any copyrights to Santa Cruz. (Ex. 123 § 1.1(b); Ex. 444; Ex. 239 ¶ 10.)

Disputed. The parties intended to have the UNIX copyrights transferred from Novell to Santa Cruz in the APA, and Amendment No. 2 clarified that the parties had so intended. (¶¶ 169-82.)

141.    Novell also retained rights to supervise Santa Cruz's administration of SVRX licenses. (Ex. 239 ¶ 11.)  Section 4.16(b) of the APA provides that:

> Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller.  In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.  In the event that Buyer shall fail to take any such action concerning the SVRX Licenses as required herein, Seller shall be authorized, and hereby is granted, the rights to take any action on Buyer's own behalf.  (Ex. 123 § 4.16(b).)

Depending on the meaning of the phrase "supervise Santa Cruz's administration of SVRX licenses" and the term "SVRX licenses," disputed in that the parties did not intend to

permit Novell to interfere with Santa Cruz's exercise of its rights with respect to SVRX source

code in accordance with the transfer of assets under the APA.  (¶¶ 279-93.)

142.   Novell, therefore, retained the "sole discretion" to direct Santa Cruz to amend, supplement, modify, waive, or assign any rights under or to the SVRX licenses; if Santa Cruz fails to take any such action, the APA specifically granted Novell the right to take these actions on behalf of Santa Cruz.  (Ex. 123 § 4.16(b); Ex. 239 ¶ 8.)  Santa Cruz recognized this right in Amendment X to IBM's Software and Sublicensing Agreements, to which Novell was a party, and which noted that "Novell retained . . . certain rights with respect to" the agreements IBM entered into with AT&T, including "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended".  (Ex. 124 at 1.)

Disputed to the extent the statement suggests that the rights retained by Novell under the

APA extend beyond the right to continue to receive and protect royalties paid by then-existing

SVRX licensees for their ongoing distribution of SVRX binary products pursuant to UNIX

sublicensing agreements (¶¶ __-__), in that the parties did not intend to permit Novell to interfere

with Santa Cruz's exercise of its rights with respect to SVRX source code in accordance with the

transfer of assets under the APA. (¶¶169-82.)

143.   While Novell and Santa Cruz shared ownership of AT&T's UNIX assets (from 1995 to 2001), representatives of Novell and Santa Cruz told SVRX licensees that they could do as they wished with their original code.  They told licensees they were free to do as they wished with their own code, modifications and derivative works, so long as the code, modifications, and derivative works did not contain System V code.  (Ex. 227 ¶¶ 8-11; Ex. 266 ¶¶ 6-13.)

Disputed to the extent the statement suggests that Novell had any ownership rights in

Santa Cruz's UNIX licenses or copyrights.  (¶¶ 169-82.)  Disputed in that substantial evidence

shows (and easily permits the inference) that Novell and Santa Cruz held no such understanding

of the licenses and had no such communications with licensees regarding rights of disclosure.

(¶¶ 63-163.)  Disputed to the extent the statement suggests that Novell or Santa Cruz represented

that UNIX System V licensees could "do as they wished with their own code, modifications and

derivative works" without regard to whether such material was included in the licensees'

71

modifications or derivative works based on the licensed UNIX System V software product.  (¶¶

63-163.)  Disputed to the extent the statement suggests that licensees did not enter into

agreements requiring them to hold in confidence all parts of their modifications and derivative

works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)  Disputed to

the extent that the statement suggests that, upon entering into their written agreement, the

licensees did not intend to exclude any previous and subsequent oral discussion from the

agreement the parties had reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the Sequent

Agreements (collectively "the Agreements") set forth the terms under which UNIX System V

could be used and disclosed by them and under which they could distribute software programs

"based on" UNIX System V."  (IBM Statement of Undisputed Facts ¶ 50.)

144.    IBM, Sequent and other SVRX licensees continued to use the non-SVRX portions
of their flavors of UNIX as they wished.  (Ex. 564; Ex. 565.)

See Response to IBM Statement of Fact No. 90.

145.    For example, IBM publicly disclosed AIX methods and concepts in AIX/6000:
Internals and Architecture (1996), which included an entire chapter on the Journaled File System
(Ex. 503 at 55-65), and Hewlett-Packard disclosed the methods and concepts behind the
Journaled File System in its version of UNIX called HP-UX in a book titled HP-UX: Tuning and
Performance (2000) (Ex. 565).

See Response to IBM Statement of Fact No. 90.

146.    Representatives of Novell and Santa Cruz were aware and understood that its
licensees were exercising their full rights of ownership and disclosing the code, methods and
concepts of their flavors of UNIX.  Neither company took any steps to preclude them from doing
as they wished with their original works.  (Ex. 183 ¶¶ 6-7; Ex. 250 ¶¶ 116-17; Ex. 271 ¶¶ 5-6;
Ex. 276 ¶¶ 6-7; Ex. 227 ¶¶ 8-11.)

Disputed to the extent the statement suggests that Novell had any ownership rights in

Santa Cruz's UNIX licenses or copyrights.  (¶¶ 169-82.)  Disputed to the extent the statement

suggests that the cited declarants had the authority to modify the terms of the UNIX license

72

agreements, or had the authority to waive any of Santa Cruz's rights under the UNIX System

license agreements. (¶¶ 90.) Disputed in that substantial evidence shows (and easily permits the

inference) that Santa Cruz had no such awareness or understanding. (¶¶ 63-163.) Depending on

the meaning of the term "original works," disputed to the extent the statement suggests that

licensees did not enter into agreements requiring them to hold in confidence all parts of their

modifications and derivative works based on the licensed UNIX System V software product. (¶¶

13-29, 82-86.) The evidence further shows (and easily permits the inference) that such

disclosures, including as made under copyright protection, were not material breaches of the

agreements. (Ex. 139 ¶¶ 2-22.)

     147.   Santa Cruz representatives, including David McCrabb, the President of Santa
Cruz's Server Software Division, told System V licensees that they were free to do as they
wished with their own code, modifications and derivative works, so long as the code,
modifications, and derivative works did not contain System V code. Santa Cruz representatives,
including Mr. McCrabb, told licensees that it interpreted the license agreements in this manner.
(Ex. 227 ¶ 8.)

     Disputed to the extent the statement suggests that Mr. McCrabb had the actual or

apparent authority to speak for Santa Cruz regarding the scope of Santa Cruz's UNIX licenses, or

had the authority to modify the terms of the UNIX license agreements, or had the authority to

waive any of Santa Cruz's rights under the UNIX System license agreements. (¶¶ 76-96.)

Disputed in that substantial evidence shows (and easily permits the inference) that Mr. McCrabb

and his colleagues at Santa Cruz had no such understanding and made no such statements. (¶¶

63-163.) Depending on the meaning of the term "their own code, modifications and derivative

works," disputed to the extent the statement suggests that licensees did not enter into agreements

requiring them to hold in confidence all parts of their modifications and derivative works based

on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that

the statement suggests that, upon entering into their written agreements, the parties did not intend

to exclude any previous or subsequent oral discussions from the agreement the parties had

reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the Sequent Agreements (collectively "the

Agreements") set forth the terms under which UNIX System V could be used and disclosed by

them and under which they could distribute software programs "based on" UNIX System V."

(IBM Statement of Undisputed Facts ¶ 50.)

148.    Based on its understanding of the Agreements, the representations of Novell and
Santa Cruz representatives and Novell's failure to take any action to preclude licensees from
doing as they wished with their original works, IBM continued to develop its flavor of UNIX.
Similarly, Sequent, having received no indication of a different interpretation of the Agreements
from Santa Cruz, continued to develop its own Dynix operating system.  (Ex. 257 ¶¶ 3-5; Ex.
252 at 67:21-68:11; 97:25-98:20, 140:12-21; Ex. 596 ¶¶ 2, 5.)

Disputed to the extent the statement suggests that IBM and Sequent did not enter into a

written agreement requiring them to hold in confidence all parts of their modifications and

derivative works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)

Disputed to the extent that the statement suggests that, upon entering into their written

agreement, the parties did not intend to exclude any previous and subsequent oral discussion

from the agreement the parties had reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the

Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX

System V could be used and disclosed by them and under which they could distribute software

programs "based on" UNIX System V."  (IBM Statement of Undisputed Facts ¶ 50.)  Disputed

to the extent that the cited material does not support the assertion that IBM or Sequent relied on

"Novell's failure to take any action to preclude licensees from doing as they wished with their

original works" in deciding to continue to develop their AIX and Dynix derivative works.

Disputed to the extent the statement suggests that, absent an "indication of a different

74

interpretation of the Agreements," IBM and Sequent would not have continued to develop AIX

and Sequent as they did. (¶¶ 30-62.)

149.            REDACTED
                                        Up to the time it was acquired by IBM,
Sequent likewise invested tens of millions of dollars in the development and marketing of Dynix
and wrote millions of lines of original source code. (Ex. 257 ¶ 10; Ex. 596 ¶¶ 2-4.)

Depending on the meaning of the term "original source code," disputed to the extent the

cited material does not identify what lines of code in AIX or Sequent were written by developers

without reference or access, or experience based on such reference or access, to the licensed

UNIX System V software product.

150.    Neither IBM nor Sequent would have continued to invest in AIX and Dynix as
they did if they had believed that Novell or Santa Cruz (instead of IBM and Sequent) owned and
had the right to control their original works, whether or not they were part of a modification and
derivative work of UNIX System V. (Ex. 257 ¶ 6; Ex. 596 ¶¶ 3-4.)

Disputed to the extent the statement suggests that IBM and Sequent did not enter into a

written agreement requiring them to hold in confidence all parts of their modifications and

derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.)

Disputed to the extent that the statement suggests that, upon entering into their written

agreement, the parties did not intend to exclude any previous and subsequent oral discussion

from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the

Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX

System V could be used and disclosed by them and under which they could distribute software

programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed

to the extent the statement suggests that AT&T or any of its successors-in-interest claimed to

own IBM's or sequent's "original works," (¶¶ 76-96.) Disputed to the extent the statement

suggests that IBM or Sequent had compelling business reasons to insist on the "control" as described by IBM herein. (¶¶ 30-62.)

O.      SCO's Promotion of Linux and Acquisition of UNIX.

151.    While Novell and Santa Cruz shared an interest in UNIX System V software and related assets, Caldera continued to develop and promote Linux. (Ex. 106 at 2-5.)

Disputed to the extent the statement suggests that Novell had any ownership rights in

Santa Cruz's UNIX licenses or copyrights. (¶¶ 169-82.)

152.    To expand and enhance its Linux business, Caldera acquired the Server Software and Professional Services divisions of Santa Cruz and its UNIX-related assets on May 7, 2001. (Ex. 106 at 16; Ex. 221 ¶ 80.)

Disputed to the extent the statement suggests that Caldera, Inc. made the acquisition, or

made it solely "to expand and enhance its Linux business," which statement the cited material

does not support.

153.    Caldera purchased the UNIX assets of Santa Cruz with an eye toward open-sourcing the UNIX technology to improve Linux. (Ex. 221 ¶ 85; Ex. 471.) Because the UNIX assets were rapidly losing their value and because the market was moving toward Linux, Caldera's CEO, Ransom Love, stated that "UNIX is dead, except as a value add to Linux". (Ex. 221 ¶ 85; Ex. 472.)

Disputed to the extent the statement suggests that either Caldera or Mr. Love immediately

intended to, or ever did, open-source the UNIX technology, to improve Linux or for any other

reason. (Ex. 386 ¶¶ 3-9.[31]) Disputed to the extent the statement suggests that Caldera, Inc.

("Caldera International") made the acquisition, which statement the cited material does not

support. Disputed to the extent the statement suggests that IBM's contributions to Linux in

---

[31]    SCO has submitted a declaration from Ransom Love addressing certain points where Mr. Love was willing to clarify certain aspects of his prior testimony. Mr. Love is a paid consultant for IBM (Ex. 378), and SCO submits that a jury will be required to evaluate his testimony in light of all the facts and circumstances.

material breach of its UNIX System V license agreements were not a substantial factor in the

downturn of Santa Cruz's UNIX business by the time of Caldera's acquisition of the business.

(¶¶ 192-97.)

154.    Although Caldera ultimately did not contribute all of its UNIX assets to Linux
and distributed certain UNIX products, Caldera positioned its Linux products ahead of its UNIX
products.  (Ex. 340 at 31:20-25, 33:12-25, 34:1-12; 55:4-15; Ex. 472.)

Disputed to the extent the statement suggests that IBM's contributions to Linux in

material breach of its UNIX System V license agreements were not a substantial factor in the

downturn of Santa Cruz's UNIX business by the time of Caldera International's acquisition of

the business.  (¶¶ 192-97.)

155.    At the time Caldera acquired Santa Cruz's UNIX assets, Santa Cruz did not
believe it was selling, and Caldera did not believe it was buying, the right to control what all
UNIX System V licensees could do with their original works.  (Ex. 227 ¶¶ 37-38; Ex. 221 ¶¶
107-09.)

Disputed to the extent the statement suggests that Mr. McCrabb had the actual or

apparent authority to speak for Santa Cruz regarding the scope of Santa Cruz's UNIX licenses, or

had the authority to modify the terms of the UNIX license agreements, or had the authority to

waive any of Santa Cruz's rights under the UNIX System license agreements.  (¶ 90.)

Depending on the meaning of the term "their original works," disputed in that substantial

evidence shows (and easily permits the inference) that Mr. McCrabb and his colleagues at Santa

Cruz had no such understanding.  (¶¶ 63-163.)  Depending on the meaning of the term "their

original works," disputed to the extent the statement suggests that licensees did not enter into

agreements requiring them to hold in confidence all parts of their modifications and derivative

works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)  Depending

on the meaning of the term "their original works," disputed to the extent the statement suggests

that Mr. Love specifically considered at the time of acquisition the issue of the extent of Caldera

International control over the modifications and derivative works the licensees had developed

based on the licensed UNIX System V software product.  (Ex. 386 ¶ 7.)

        P.     SCO's Distribution of the Disputed Material.

       156.    In May 2002, SCO formed a partnership, known as UnitedLinux, with three other
Linux distributors, to streamline Linux development and certification around a global, uniform
distribution of Linux designed for business.  (Ex. 348; Ex. 221 ¶¶ 94-96.)

       Disputed to the extent the statement suggests that Caldera International or SCO chose to

undertake Linux activities "instead" of pursuing its UNIX products and services or UNIX

intellectual property rights.  Neither Caldera International nor SCO ever did or intended to waive

intellectual property rights in UNIX as a result of any Linux-related activities.  (See Disputed

Facts Nos. 4-5 to IBM's Motion for Summary Judgment on Its Tenth Counterclaim.)  Caldera

International derived 95% of its revenues from its UNIX products and services.  (See id. No. 83.)

Furthermore, Caldera International nor SCO investigated the infringement of UNIX material in

Linux until late 2002 or early 2003.  (See id. No. 109.)  IBM's cited documents do not support its

assertion that UnitedLinux activities were an alternative to litigation or other pursuit of UNIX

intellectual property rights.

       157.    In a November 2002 launch event co-sponsored by IBM, UnitedLinux released its
first Linux distribution, "UnitedLinux Version 1.0".  (Ex. 407.)  In January 2003, IBM joined
UnitedLinux as a technology partner to, among other things, help promote the recently released
product.  (Ex. 408.)  UnitedLinux Version 1.0 was marketed and sold by each of the partners in
UnitedLinux under its own brand name.  (Ex. 407.)  SCO's release of UnitedLinux was called
"SCO Linux 4".  (Ex. 349.)

       Undisputed.

       158.    SCO Linux 4 included the very code and technologies that SCO claims IBM
improperly contributed to Linux.  (See Ex. 33 at 43; Ex. 44 at 3-22.)  This material includes JFS
(Item 1), RCU (Item 2) and certain "negative know how" (Items 23 and 90).  (See id.)  For the

remaining Items of allegedly misused material, SCO indicates that it has "not presently determined" whether the material is included in its UnitedLinux distribution. (Id.)

Undisputed.

159.    In its Revised Response to IBM's interrogatories, SCO stated that the allegedly misused material "is included in any product that contains the Linux kernel 2.4 and above, which is sold or distributed by hundreds of entities around the world", including by SCO. (Ex. 33 ¶ 43.) In particular, SCO conceded that its "SCO Linux Server 4.0" products contain such code. (Id.)

Undisputed.

160.    Although not identified by SCO in its interrogatory responses, SCO's earlier Linux distributions also contain code SCO claims IBM improperly contributed to Linux. (See Ex. 350; Ex. 351.) Among other products, SCO's "OpenLinux Server 3.1.1" and "OpenLinux Workstation 3.1.1" products, which were released in January 2002, both include the Linux 2.4 kernel. (See Ex. 350 at 2; Ex. 351 at 2; Ex. 296 at 16:18-23.)

Disputed in part and undisputed in part.  SCO disputes that IBM's cited sources support

the assertion that Caldera International or SCO distributed the OpenLinux Server 3.1.1 or

OpenLinux Workstation 3.1.1 at any time after January of 2002.

161.    In fact, SCO specifically advertised to its customers that its distributions of Linux included some of the very technology it now complains IBM should not have contributed to Linux. (See Ex. 350; Ex. 351; Ex. 352; Ex. 396; Ex. 353.)

Depending on the meaning of the clause "some of the very technology it now complains

IBM should not have contributed to Linux," disputed to the extent that the statement does not

specify the "very technology" at issue.

162.    For example, in its product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO specifically advertised that the products included new features such as "journaling file system support". (Ex. 350 at 2; Ex. 351 at 2.)

Disputed to the extent that the statement suggests that SCO specifically advertised that

the products included the Journaling File System (or "JFS") taken from AIX, which statement

the cited material does not support.

79

163.    Similarly, in its November 2002 product announcement for "SCO Linux Server 4.0", which was based on UnitedLinux Version 1.0, SCO noted that "[t]he core of SCO Linux Server 4.0 is the 2.4.19 Linux kernel. New features include broadened USB support, Logical Volume Manager, improved journaling file system support". (Ex. 352 (emphasis added).)

Disputed to the extent that the statement suggests that SCO specifically advertised that

the products included the Journaling File System (or "JFS") taken from AIX, which statement

the cited material does not support.

164.    Likewise, SCO's Technical Overview of SCO Linux 4.0 emphasized that its product included "JFS (Journaling File System Developed by IBM)" (Ex. 396 (emphasis added).)

Undisputed.

165.    Although SCO claims to have "discontinued" distributing any products containing the source code it claims IBM should not have disclosed, it continued to do so after it filed this lawsuit. (See Ex. 44; Ex. 45; Ex. 296 at 92:1-22; 353:33 at Tab 121; Ex. 505; Ex. 486.)

Disputed to the extent the statement suggests that SCO did not timely discontinue its

intentional distribution of its Linux products. (¶¶ 220-33.) Disputed to the extent the statement

suggests that, as a legal conclusion, SCO was not entitled reasonably to wind-down its Linux

business in support of its existing customers after bringing this lawsuit.

166.    For example, SCO released its "SCO Linux Server 4.0 for the Itanium Processor Family" distribution on April 14, 2003, after SCO filed its original Complaint. (See Ex. 353; Ex. 1.) In the product announcement, SCO touted the new features of this release, including "improved journaling file system support". (Ex. 353 at SCO1269793.)

Undisputed.

167.    SCO has also produced invoices and other documentation reflecting SCO's continued distribution of its OpenLinux 3.1.1 and Linux Server 4.0 products until at least January 2004. (See Ex. 33 at Tab 121; Ex. 505; Ex. 296; Ex. 486.)

Undisputed.

168.    Moreover, SCO made available to the public as recently as the end of 2004 the Linux 2.4 kernel for download from its website. (See Ex. 45 at 3; Ex. 167 ¶ 11.) The version of

Linux available from SCO's website includes code SCO claims IBM disclosed in violation of its contracts. (See Ex. 44; Ex. 45; Ex. 33 at 43; Ex. 167 ¶¶ 5, 11.)

Undisputed.

169.    In addition, SCO has admitted that it made available to the public for download material that SCO claims IBM improperly contributed to Linux. (See Ex. 44 at 3-22.) This material includes JFS (Item 1), RCU (Item 2) and certain "negative know how" (Items 23 and 90). (See id.) For the remaining Items of allegedly misused material, SCO indicates that it has "not presently determined" whether it made the material available to the public for download. (Id.)

Undisputed.

170.    SCO distributed source code for the Linux 2.4 kernel, which is contained in SCO's OpenLinux Server 3.1.1, OpenLinux Workstation, and Linux Server 4.0 products, under the terms of the GPL. (Ex. 128; Ex. 296 at 75:9-12.) The terms of the GPL permit licensees freely to use, copy, distribute and modify whatever code is provided thereunder. (Ex. 128.)

Disputed to the extent the statement seeks to summarize the terms of the GPL and to the extent the statement draws a legal conclusion.

Q.    SCO's Litigation.

171.    Following its acquisition of Santa Cruz's UNIX assets, Caldera was unable to make a profit, switched management, changed its name to SCO, and adopted a new business model focused on litigation. (See, e.g., Ex. 1; Ex. 141; Ex. 142; Ex. 423; Ex. 427.)

Disputed in that the cited material does not support the assertions.

172.    SCO filed its original Complaint, which featured a claim for the misappropriation of trade secrets, on March 6, 2003. (Ex. 1.) In that Complaint, SCO, among other things, alleged that IBM had breached its UNIX System V license by "subject[ing] SCO's UNIX trade secrets to unrestricted disclosure, unauthorized transfer and disposition, unauthorized use, and has otherwise encouraged others in the Linux development community to do the same". (Id. ¶ 135.)

Depending on the meaning of the term "featured," disputed in that the cited material does not support the assertion that SCO treated its claim for the misappropriation of trade secrets with any higher priority that the other claims brought in the original Complaint.

81