173.    In the Complaint, SCO did not identify with any specificity what "UNIX trade secrets" it claimed were at issue. (See Ex. 1.) SCO instead described its trade secrets only as "unique know how, concepts, ideas, methodologies, standards, specifications, programming, techniques, UNIX Software Code, object code, architecture, design and schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability and security". (Id. ¶ 105.) SCO did not identify any specific UNIX code upon which it based its claim. (See id.)

Depending on the meaning of the phrases "with any specificity" and "specific UNIX code," disputed to the extent the statement suggests that SCO did not detail the nature of its claims based on what SCO knew at the time. (Ex. 165 ¶ 37.)

174.    SCO filed an Amended Complaint on July 22, 2003. (Ex. 2.) The Amended Complaint did not identify in any greater detail the trade secrets allegedly misappropriated by IBM. (See id.) Again, SCO described its trade secrets only as "unique know how, concepts, ideas, methodologies, standards, specifications, programming, techniques, UNIX Software Code, object code, architecture, design and schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability and security".

Depending on the meaning of the phrase "in any greater detail," disputed to the extent the statement suggests that SCO did not detail the nature of its claims based on what SCO knew at the time. (Ex. 165 ¶ 37.)

175.    SCO thereafter sought, and was granted, permission to file a Second Amended Complaint. (Ex. 3.) In its Second Amended Complaint, filed on February 27, 2004, SCO abandoned its claim for misappropriation of trade secrets altogether. (See id.) In fact, at a hearing on December 5, 2003, SCO acknowledged that there are in fact no trade secrets in UNIX System V. Counsel for SCO stated: "There is no trade secret in UNIX system [V]. That is on the record. No problem with that." (Ex. 414 at 46:2-3.)

Disputed to the extent the statement draws a legal conclusion.

176.    In its Second Amended Complaint, SCO asserts four separate breach of contract claims, all of which rest on the underlying allegation that IBM breached its licenses for the UNIX System V software product. (Ex. 3 ¶¶ 110-72.)

Undisputed.

177.    SCO's First and Third Causes of Action allege that IBM misused source code subject to the IBM and Sequent Software Agreements by contributing such code to Linux. (Ex.

3 ¶¶ 110-36, 143-66.) Specifically, SCO alleges that IBM and Sequent breached ¶¶ 2.01, 2.05, 4.01, 6.03, 7.06(a) and 7.10 of the Software Agreements. (Ex. 3 ¶¶ 112-25.)

Disputed to the extent the statement suggests that SCO does not allege as part of its claim for breach of contract that IBM misused methods, concepts and know-how subject to the IBM and Sequent Software Agreements by contributing such technology to Linux. (IBM Ex. 3.)

178. SCO's claims rest on the proposition that "[t]he AIX work as a whole and the Dynix/ptx work as a whole are modifications of, or are derived from [UNIX] System V". (Ex. 132 at 2.) Under SCO's theory of the case, all of the tens of millions of lines of code ever associated with any technology found in AIX or Dynix, even if that code does not contain any UNIX System V code, is subject to the restrictions of the IBM and Sequent Software Agreements. (See id.)

Depending on the meaning of the phrase "SCO's claims rest on the proposition," disputed to the extent the statement suggests that SCO has brought no claims other than its claims for breach of contract. Depending on the meaning of the phrase "lines of code ever associated with any technology found in AIX or Dynix," disputed to the extent the statement suggests that SCO claims that any technology is subject to the restrictions of the IBM and Sequent Software Agreements if such technology were not included in a modification or derivative work based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.)

179. SCO made this position clear in its opposition to IBM's motion for partial summary judgment on IBM's Tenth Counterclaim. (Ex. 64.) In that brief, SCO argued: "SCO's contract claims do not depend on any proof that IBM contributed original source code from UNIX to Linux. Rather, the theory of SCO's case -- which is based on the plain, unambiguous meaning of the Software Agreements -- is that IBM breached those agreements by contributing code from AIX and Dynix." (Id. ¶ 21.)

Depending on the meaning of the phrase "lines of code ever associated with any technology found in AIX or Dynix" in the prior statement of fact, disputed to the extent the statement suggests that SCO claims that any technology is subject to the restrictions of the IBM

and Sequent Software Agreements if such technology were never included in a modification or derivative work based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.)

180.    SCO's Second and Fourth Causes of Action allege that IBM breached the IBM and Sequent Sublicensing Agreements by continuing to distribute AIX and Dynix after SCO's purported termination of those agreements on June 13, 2003. (See Ex. 311 ¶¶ 137-42, 167-72.)

Depending on the meaning of the term "purported," disputed to the extent the statement suggests that SCO did not properly terminate the agreements. (See SCO's Memorandum in Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright Claim (Fifth Cause of Action).")

181.    These two causes of action ultimately depend on SCO's allegation that IBM "fail[ed] to fulfill one or more of its obligations under the Software Agreements." (Ex. 3 ¶¶ 128, 158.) SCO contends that because IBM breached the IBM and Sequent Software Agreements, SCO had the right unilaterally to terminate the IBM and Sequent Sublicensing Agreements. (See id.) Absent breach of the Software Agreements, therefore, there is no breach of the Sublicensing Agreements.

Disputed to the extent the statement suggests that SCO did not terminate the agreements for IBM's material breach. (See SCO's Memorandum in Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright Claim (Fifth Cause of Action).")

182.    The construction and performance of the IBM and Sequent Software Agreements and the IBM and Sequent Sublicensing Agreements are governed by New York law. (See Ex. 492 ¶ 7.13; Ex. 119 ¶ 7.13; Ex. 120 ¶ 6.05; Ex. 121 ¶¶ 6.05.)

Disputed to the extent the statement draws a legal conclusion.

R.      SCO's Touting and Obfuscation.

183.    From the beginning of this litigation, SCO has touted its claims and the strength of its alleged evidence. (See, e.g., Ex. 367; Ex. 368; Ex. 369.)

Disputed to the extent the statement suggests that SCO's public statements pertained solely to the claims brought in this lawsuit, in that the cited material does not support such a statement.

184.    According to SCO, the issues presented here are the most important issues faced by the software industry in ten years and the future of the industry – indeed, the future of the global economy – hangs in the balance:

    a.  In an article for Salon.com, Sam Williams quotes SCO's CEO Darl McBride as saying, in reference to this case: "There really is no middle ground… The future of the global economy hangs in the balance." (See Ex. 370.)

    b.  In an article from KSL.com, Jed Boal quotes McBride as saying, in reference to this case: "It has become the biggest issue in the computer industry in decades.. . The stakes are extremely high.  The balance of the software industry is hanging on this." (See Ex. 371.)

Disputed to the extent the statement suggests that the quotes pertained solely to the claims brought in this lawsuit, in that the cited material does not support such a statement, and to the extent the statement ignores the following context: In (a), Mr. McBride was referring to the protection of intellectual property rights, particularly in software, their significance to this case, and the importance of the protection of intellectual property rights to the global economy.  In (b), Mr. McBride was referring more broadly to the question of whether Linux could be distributed freely and without greater methods for protection of intellectual property.  IBM's use of Linux to commoditize the operating system, among other impacts, did have and is still having major impacts on the software industry, as set forth in the expert reports of Drs. Gary Pisano and Jeffrey Leitzinger.  (Exs. 281, 282, 283, 284, 285, 286.)  Furthermore, at the time of these articles, this case was receiving a high level of national and international media attention, consistent with it being considered a case of national or even global importance, and consistent with its potential to have great consequence in the software industry.

85

185. SCO's public statements concerning its alleged evidence are no less grandiose:

    a. In an interview with CNet News.com in August 2003, McBride claimed that SCO had found a "mountain of code improperly contributed to Linux. (See Ex. 367.)

    b. In a teleconference with analysts and reporters on May 30, 2003, McBride stated: "Everybody's been clamoring for the code - show us two lines of code. We're not going to show two lines of code, we're going to show hundreds of lines of code. And that's just the tip of the iceberg of what's in this." (See Ex. 368.)

    c. In an interview in LinuxWorld.com, McBride claimed that a "truckload of code" was improperly contributed to Linux. (See Ex. 372.)

    d. In July 2003, in an interview with Business Week, McBride stated that the amount of LINUX code infringing on SCO's intellectual property rights is "gargantuan". (Ex. 480.)

    e. On August 18, 2003, at its SCO Forum in Las Vegas, SCO, through its Senior Vice President Chris Sontag, stated that it had uncovered more than a million lines of improperly copied UNIX code in Linux. (Ex. 383.)

Disputed to the extent the statement suggests that SCO's public statements pertained solely to the claims brought in this lawsuit, in that the cited material does not support such a statement. Disputed to the extent the statement ignores the following context: This and other statements about the volume of code that had been improperly contributed to Linux are truthful. Mr. McBride was referring to the large number of lines of code from derivative works (such as AIX and Dynix) that were identified by SCO consultants. For instance, SCO identified approximately 160,000 lines of code contributed by IBM from its Journaling File System that are derived from System V code and improperly contributed to Linux. (Ex. 144 at Item No. 1.) SCO also identified 1,200,000 lines of code in the form of test suites that IBM contributed improperly to the Linux development. (Ex. 144 at Item Nos. 18, 113-42.)

186. At the same time, SCO refused to disclose the particulars of its claims and alleged evidence. (See Ex. 32; Ex. 33; Ex. 132; Ex. 34.) As a SCO representative stated, it was the company's strategy to obfuscate its alleged evidence. (Ex. 374; Ex. 375.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith (¶¶ 234-93), to the extent the statement suggests that SCO chose not to disclose its evidence for any reason other than to protect what SCO regarded as confidential material (Ex. 165 ¶ 38), and to the extent the statement suggests that SCO's public statements pertained solely to the claims brought in this lawsuit, in that the cited material does not support such a statement.

187.    For example, SCO's counsel indicated in an interview with Maureen O'Gara of LinuxGram in March 2003, at the beginning of the case, that SCO "doesn't want IBM to know what they [SCO's substantive claims] are".  (Ex. 374.)

Depending on the meaning of the term "indicated," disputed in that counsel for SCO made no such statement.  (Ex. 251 ¶¶ 3-8.)  Disputed in that the cited material does not support the proposition that counsel for SCO made the quoted statement.  Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith (¶¶ 234-93) and to the extent the statement suggests that SCO chose not to disclose its evidence for any reason other than to protect what SCO regarded as confidential material (Ex. 165 ¶ 38).  Disputed in that the fact that SCO would not discuss the substance of SCO's claims with a reporter no more evinces a design to obfuscate than does IBM's spokesperson's refusal "to spell out what steps it was taking to monitor the technology it contributes to open-source projects like Linux and to ensure that its Linux development does not violate the intellectual property rights or licenses of others," even though in the article "I.B.M. contends that these matters will be evidence if the SCO suit goes to trial."  (Ex. 170.)

188.    Further, SCO Vice President Gregory Blepp stated in a published interview in April 2004 that "you don't put everything on the table at the start, but instead you bring out arguments and evidence piece by piece".  (Ex. 375.)

87

Disputed in that the statement misquotes the quotation attributed to Mr. Blepp, which is quoted as follows: "There you don't put everything on the table at the start, but instead you bring out arguments and evidence piece by piece." Disputed to the extent the statement suggests that Mr. Blepp did not make his statement in the context of explaining the procedures that govern "legal actions in the United States" and the role of confidentiality ("non-disclosure") agreements in preventing certain information from being released publicly. Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith. (¶¶ 234-93.) Disputed in that the fact that SCO would not discuss the substance of SCO's claims with a reporter no more evinces a design to obfuscate than does IBM's spokesperson's refusal "to spell out what steps it was taking to monitor the technology it contributes to open-source projects like Linux and to ensure that its Linux development does not violate the intellectual property rights or licenses of others," even though in the article "I.B.M. contends that these matters will be evidence if the SCO suit goes to trial." (Ex. 170.) Disputed in that, if said at, Mr. Blepp's statement is not consistent with anything he was instructed by anyone at SCO to say and does not reflect SCO's position or strategy; and in that Mr. Blepp is from Munich, and was a SCO sales person in Germany, and was not familiar with the American legal system. (Ex. 9 ¶¶ 13-16.)

S.    Novell's Waiver of any Purported Breaches.

189.    After SCO filed suit, Novell sent a series of letters to SCO that explicitly waived the purported breaches of contract SCO has asserted IBM committed. (See Ex. 135; Ex. 136; Ex. 137; Ex. 138; Ex. 240 ¶ 29.)

Disputed to the extent the statement draws a legal conclusion and, disputed in that Novell

does not have the right or authority to "waive the purported breaches of contract SCO has

asserted IBM committed." (¶¶ 279-93.)

190.    On October 7, 2003, in a letter from Joseph A. LaSala, Jr. to Ryan Tibbitts,
Novell directed SCO to waive any purported right to assert a breach of the IBM Software
Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V
source code. (Ex. 135; Ex. 240 ¶ 30.) The letter states:

> [P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby
> directs SCO to waive any purported right SCO may claim to require IBM to treat
> IBM Code itself as subject to the confidentiality obligations or use restrictions of
> the Agreements. Novell directs SCO to take this action by noon, MST, on
> October 10, 2003, and to notify Novell that it has done so by that time.

(Ex. 135; Ex. 240 ¶ 32.)

Disputed to the extent the statement draws a legal conclusion and, disputed in that Novell

does not have the right or authority to "direct SCO to waive any purported right to assert a

breach of the IBM Software Agreement." (¶¶ 279-93.)

191.    In the letter, Novell informed SCO that its position that IBM's own homegrown
code "must be maintained as confidential and subject to use restrictions is contrary to the
agreements between AT&T and IBM, including Amendment X, to which Novell is a party".
(Ex. 135; Ex. 240 ¶ 33.)

Disputed to the extent the statement purports to describe the scope of the agreements

between AT&T and IBM or Amendment No. X.  (¶¶ 63-163.)

192.    According to Novell, the agreements between AT&T and IBM provide "a

straightforward allocation of rights":

> (1) AT&T retained ownership of its code from the Software Products ('AT&T
> Code'), and the Agreements' restrictions on confidentiality and use apply to the
> AT&T Code, whether in its original form or as incorporated in a modification or
> derivative work, but (2) IBM retained ownership of its own code, and the
> Agreements' restrictions on confidentiality and use do not apply to that code so
> long as it does not embody any AT&T Code.

(Ex. 135; Ex. 240 ¶ 33.)  Novell concluded that any other interpretation "would defy logic as well as the intent of the parties".  (Ex. 135; Ex. 240 ¶ 31.)

Disputed to the extent the statement purports to describe the scope of the agreements between AT&T and IBM or Amendment No. X.  (¶¶ 63-163.)

193.    After SCO failed to follow Novell's instruction, on October 10, 2003, Novell expressly waived any purported right of SCO's to assert a breach of the IBM Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 136; Ex. 240 ¶ 34.)  Novell states in its letter to SCO:

> Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreements between AT&T and IBM, itself as subject to the confidentiality obligations or use restrictions of the Agreements.

(Ex. 136; Ex. 240 ¶ 34.)

Disputed to the extent the statement draws a legal conclusion.  Disputed in that Novell does not have the right or authority to "expressly waive any purported right of SCO's to assert a breach of the IBM Software Agreement."  (¶¶ 279-93.)  Disputed to the extent the statement purports to describe the scope of the agreements between AT&T and IBM or Amendment No. X. (¶¶ 63-163.)

> [P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license.
>
> Novell directs SCO to take this action by noon, MDT, on February 11, 2004, and to notify Novell that it has done so by that time.

(Ex. 137.)

Disputed to the extent the statement draws a legal conclusion. Disputed in that Novell does not have the right or authority to "waive any purported right to assert a breach of the Sequent Software Agreement." (¶¶ 279-93.) Disputed to the extent the statement purports to describe the scope of the agreements between AT&T and Sequent. (¶¶ 63-163.)

194.    In the letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software Agreement was misplaced, and stated that "SCO's interpretation of Section 2.01 is plainly contrary to the position taken by AT&T, as author of and party to the SVRX licenses". (Ex. 137.)

Disputed to the extent the statement purports to describe the scope of the agreements between AT&T and Sequent. (¶¶ 63-163.)

195.    After SCO failed to follow Novell's instruction, on February 11, 2004, Novell expressly waived any purported right of SCO to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 138; Ex. 240 ¶ 36.) Novell states in its letter to SCO:

> Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license.

(Id.)

Disputed to the extent the statement draws a legal conclusion. Disputed in that Novell does not have the right or authority to "expressly waive any purported right of SCO to assert a breach of the Sequent Software Agreement." (¶¶ 279-93.) Disputed to the extent the statement purports to describe the scope of the agreements between AT&T and Sequent. (¶¶ 63-163.)

196.    Novell also waived any purported right of SCO to terminate the IBM Sublicensing Agreement. (See Ex. 139; Ex. 140; Ex. 240 ¶¶ 37-39.)

Disputed to the extent the statement draws a legal conclusion.  Disputed in that Novell

does not have the right or authority to "waive any purported right of SCO to terminate the IBM

Sublicensing Agreement."  (¶¶ 279-93.)

197.    On June 9, 2003, in a letter from Jack L. Messman to Darl McBride, Novell
informed SCO that under the terms of Amendment No. X, SCO did not have the right to
terminate any of IBM's rights under the Sublicensing Agreement to distribute its AIX software
program.  (Ex. 139; Ex. 240 ¶ 37.)  The letter states:

> Pursuant to Amendment No. X, however, Novell and SCO granted IBM the
> "irrevocable, fully paid-up, perpetual right" to exercise all of the rights under the
> IBM SVRX Licenses that IBM then held.  IBM paid $10,125,000 for the rights
> under Amendment No. X.  Novell believes, therefore, that SCO has no right to
> terminate IBM's SVRX Licenses, and that it is inappropriate, at best, for SCO to
> be threatening to do so.

(Ex. 139; Ex. 240 ¶ 7.)

Disputed to the extent the statement draws a legal conclusion.  Disputed to the extent the

statement purports to describe the scope of Amendment No. X.  (See SCO's Memorandum in

Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright Claim (Fifth Cause

of Action).")

198.    Novell further directed SCO to waive any purported right under its SVRX
Licenses with IBM to terminate IBM's right to distribute AIX under the IBM Sublicensing
Agreement:

> [P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby
> directs SCO to waive any purported right SCO may claim to terminate IBM's
> SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder,
> including any purported rights to terminate asserted in SCO's letter of March 6,
> 2003 to IBM. Novell directs SCO to take this action by noon, MDT, June 12,
> 2003, and to notify Novell that it has done so by that time.

(Ex. 139; Ex. 240 ¶ 38.)

Disputed to the extent the statement draws a legal conclusion.  Disputed in that Novell

does not have the right or authority to "direct SCO to waive any purported right under its SVRX

92

Licenses with IBM to terminate IBM's right to distribute AIX under the IBM Sublicensing Agreement." (¶¶ 279-93.)

199.    After SCO failed to follow Novell's instruction, on June 12, 2003, Novell expressly waived any purported right of SCO to terminate IBM's rights under the IBM Sublicensing Agreement. (Ex. 140; Ex. 240 ¶ 39.)  Novell states in its letter to SCO:

> Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM.

(Ex. 140; Ex. 240 ¶ 39.)

Disputed to the extent the statement draws a legal conclusion.  Disputed in that Novell does not have the right or authority to "expressly waive any purported right of SCO to terminate IBM's rights under the IBM Sublicensing Agreement." (¶¶ 279-93.)

T.    SCO's Failure to Substantiate Its Claims.

200.    Following SCO's refusal to disclose the nature of its claims or its alleged evidence, IBM served interrogatories on SCO asking it to describe in detail its allegations and alleged evidence of misconduct by IBM.  (Ex. 11.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

201.    For example, IBM asked SCO to: "[p]lease identify, with specificity (by product, file and line of code, where appropriate) . . . any confidential or proprietary information that plaintiff alleges or contends IBM misappropriated or misused". (Ex. 11 at Interrogatory No. 1.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

202.    IBM asked SCO: "For . . . any confidential or proprietary information identified in response to Interrogatory No. 1, [to] please identify . . . (b) the nature and source of [SCO's] rights". (See Ex. 11 at Interrogatory No. 2.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

203.    At the same time, IBM also asked SCO to identify how IBM is alleged to have violated SCO's rights. IBM asked SCO: "For . . .any confidential or proprietary information identified in response to Interrogatory No. 1 , [to] please describe, in detail . . . (a) the date of the alleged misuse or misappropriation; (b) all persons involved in any way in the alleged misuse or misappropriation; (c) the specific manner in which IBM is alleged to have engaged in misuse or misappropriation; and (d) with respect to any code or method . . . the location of each portion of such code or method in any product, such as AIX, in Linux, in open source, or in the public domain." (Ex. 11 at Interrogatory No. 4.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

204.    Moreover, IBM asked SCO to: "(1) identify with specificity all the material in Linux to which it claims rights; (2) detail the nature of its alleged rights, such as whether and how the material in which SCO claims rights derives from UNIX; and (3) state whether IBM has infringed SCO's rights and, if so, detail how IBM infringes SCO's alleged rights.  (See Ex. 12 at Interrogatory No. 12.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

205.    Further, IBM asked SCO: "For each line of code and other material identified in response to Interrogatory No. 12, [to] please state whether (a) IBM has infringed plaintiffs rights, and for any rights IBM is alleged to have infringed, describe in detail how IBM is alleged to have infringed plaintiffs rights".  (Ex. 12 at Interrogatory No. 13.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

206.    SCO did not provide IBM with all of the information it requested, and IBM twice moved to compel meaningful responses on October 1, 2003 and November 6, 2003.  (Ex. 62; Ex. 63.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

95

207.    Specifically, IBM asked the Court to require SCO to specify (1) all the material in Linux to which SCO claims rights (i.e. by kernel version *X*, file *Y*, and lines *1-2-3*); (2) the nature of SCO's alleged rights, including whether and, if so, how the material derives from the UNIX software (i.e. if SCO asserts contract, copyright or some other right to the identified code, and how the Linux code identified derives from UNIX version *A*, file *B*, lines *4-5-6)*; and (3) whether IBM has infringed material to which SCO claims rights, and if so, the details of the alleged infringement (i.e. by copying Linux kernel version *X*, file *Y*, lines *1-2-3*, which are copied or derived from UNIX version *A*, file *B*, lines *4-5-6*; or by distributing Linux kernel version *X*, file *Y*, lines *1-2-3*, the structure and sequence of which was copied from UNIX version *A*, file *B*, lines *7-8-9*; or by inducing others to copy (or distribute) Linux kernel version, file *Y*, lines *1-2-3*, which are copied or derived from UNIX version *A*, file *B*, lines *4-5-6*).  (See Ex. 63.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein.)

208.    On December 12, 2003, the Court ordered SCO to provide this information on or before January 12, 2004.  (See Ex. 55.)  The Court ordered SCO to "identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM".  (Ex. 55.)

Disputed to the extent the statement suggests that the Court found that SCO had not proceeded in discovery in good faith, to the extent the statement suggests that the Court had concluded that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems, and to the extent the statement suggests that the Court's Order adopted the requests for relief set forth in IBM's underlying motion.  (¶¶ 239-42.)

209.    In an order dated March 3, 2004, the Court reiterated its December 2003 order, compelling SCO again to provide meaningful responses to IBM's interrogatories, this time on or before April 19, 2004.  (See Ex. 56.)  Specifically, the Court required SCO to "fully comply within 45 days of the entry of this order with the Court's previous order dated December 12, 2003".  (Ex. 56.)  Thus the Court required SCO to "respond fully and in detail to Interrogatory

Nos. 12 and 13 as stated in IBM's Second Set of Interrogatories [which require SCO to specify (1) the material in Linux to which SCO claims rights; (2) the nature of SCO's alleged rights including whether and, if so, how the material derives from UNIX; and (3) whether IBM has infringed material to which SCO claims rights and, if so, the details of the alleged infringement]." (Ex. 55.)

Disputed to the extent the statement suggests that the Court found that SCO had not

proceeded in discovery in good faith, to the extent the statement suggests that the Court had

concluded that IBM was unable to identify those instances in which its employees contributed

technology to Linux from the AIX or Dynix/ptx operating systems, and to the extent the

statement suggests that the Court's Order adopted the requests for relief set forth in IBM's

underlying motion. (¶¶ 243-51.)

210.    Despite the Court's orders, SCO again did not produce the information requested by IBM. (See Ex. 132.)  While SCO identified more materials in Linux to which it claimed rights (albeit without the particularity ordered by the Court and without an adequate explanation as to why it did not provide all of these materials in response to the Court's first order), SCO still did not detail the nature of its alleged rights or describe in detail how IBM was alleged to have infringed SCO's rights. (See Ex. 132.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in

good faith (¶¶ 234-93), to the extent the statement suggests that the Court had concluded that

IBM was unable to identify those instances in which its employees contributed technology to

Linux from the AIX or Dynix/ptx operating systems and to the extent the statement suggests that

the Court's Order adopted the requests for relief set forth in IBM's underlying motion (¶¶ 239-

51).

211.    Despite the Court's order, SCO did not identify a single version, file, or line of System V code, methods, or concepts allegedly misused by IBM.  SCO did not identify a single version, file, or line of AIX or Dynix code, methods or concepts allegedly misused by IBM. And, SCO did not link a single line of allegedly misused Linux code to any version, file, or line of AIX, Dynix or System V code. (See Ex. 132.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein), to the extent the statement suggests that the Court had concluded that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems and to the extent the statement suggests that the Court's Order adopted the requests for relief set forth in IBM's underlying motion (¶¶ 239-51).

212.    Based on SCO's continued failure to comply, IBM moved on May 18, 2004 for partial summary judgment.  (Ex. 65 at 27.)

Disputed to the extent the statement suggests that SCO did not proceed in discovery in good faith or could have provided the requested information without precedent production of material by IBM (¶¶ 234-69), and to the extent the statement suggests that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems, to the extent the statement suggests that the Court had concluded that IBM was unable to identify those instances in which its employees contributed technology to Linux from the AIX or Dynix/ptx operating systems (IBM Statement of Fact No. 238 and material cited therein), and to the extent the statement suggests that the Court's Order adopted the requests for relief set forth in IBM's underlying motion (¶¶ 239-51).

213.    On February 8, 2005, the Court expressed astonishment at SCO's failure of proof, but deferred a decision on the merits of IBM's summary judgment motion until after the close of discovery.  (Ex. 57 at 10.)

Depending on the meaning of the term "failure of proof," disputed to the extent the statement suggests that the Court concluded that SCO had failed to or would be unable upon full discovery to adduce proof to support its claims, which statement the cited material does not support.

214.    The Court set October 28, 2005 as the "Interim Deadline for Parties to Disclose with Specificity All Allegedly Misused Material" and December 22, 2005 as the "Final Deadline for Parties to Identify with Specificity All Allegedly Misused Material". (Ex. 58 at 4.) The Court required SCO "to Update Interrogatory Responses Accordingly". (Ex. 58 at 4; Ex. 418 at 56.)

Undisputed.

U.    SCO's Interim and Final Disclosures.

215.    On October 28, 2005, pursuant to the Court's July 1, 2005, scheduling Order, SCO served its Interim Disclosures. Like its prior discovery responses concerning the allegedly misused materials, SCO failed to describe all of the allegedly misused materials by version, file, and line of code. (Ex. 53.)

Disputed to the extent the statement suggests that the Court had ordered, clearly or otherwise, SCO "to describe all of the allegedly misused materials by version, file, and line of code." (Docket No. 643.)

216.    Upon review of SCO's Interim Disclosures, IBM immediately notified SCO that it failed "to identify the allegedly misused material by version, file and line of code", "to identify and match up the allegedly infringing and allegedly infringed material by version, file and line of code", "to identify the material alleged to have been contributed improperly by version, file and line of code", and to identify, "to the extent the allegedly contributed material is not UNIX System V code, but is in any sense alleged to have been based on or resulted from UNIX System V code, the version, file and line of UNIX System V code from which the allegedly contributed material is alleged to derive or result." (Ex. 151 at 1.)

Depending on the meaning of the word "immediately," disputed to the extent the statement suggests that IBM provided such notice as soon as it had reached its conclusions, and which statement the cited material does not support, disputed to the extent the statement suggests

that the Court had ordered, clearly or otherwise, SCO "to describe all of the allegedly misused

materials by version, file, and line of code." (Docket No. 643.)

217.    IBM notified SCO that unless SCO complied with the specificity required by the
Court's many orders, "IBM intends to ask the Court to preclude SCO from pursuing any claims
regarding allegedly misused material not properly disclosed on or before December 22, 2005".
(Ex. 151 at 2.)

Disputed to the extent the statement suggests that the Court had ordered, clearly or

otherwise, SCO "to describe all of the allegedly misused materials by version, file, and line of

code." (Docket No. 643.)

218.    Thereafter SCO expressly stipulated and agreed with IBM that its claims would
not exceed the Final Disclosures.  In a Stipulation Re Scheduling Order filed with the Court on
December 7, 2005, the parties stipulated and agreed as follows:

1. Both parties are required to identify with specificity any and all material that each
party contends the other has misused no later than December 22, 2005; ...

(c) Neither party shall be permitted to use [the period for discovery relating to the Final
Disclosures] for the purpose of identifying additional misused material not disclosed by
the December 22, 2005, deadline.

(Ex. 481.)

Disputed to the extent the statement purports to summarize the terms of the parties'

stipulation. (Ex. 481.)

219.    On December 22, 2005, SCO served its Final Disclosures, again largely failing to
describe all of the allegedly misused materials by version, file, and line of code and to update its
interrogatory responses.  (Ex. 54.)

Disputed to the extent the statement suggests that the Court had ordered, clearly or

otherwise, SCO "to describe all of the allegedly misused materials by version, file, and line of

code." (Docket No. 643.)  Disputed to the extent the statement purports to characterize the final

disclosures. (Ex. 144.)

220.    Based on SCO's failure to follow the court's orders requiring it to identify all of the allegedly misused materials by version, file, and line of code, IBM moved on February 13, 2006 to preclude certain of SCO's claims. (Ex. 66.)

Disputed to the extent the statement suggests that the Court had ordered, clearly or

otherwise, SCO "to describe all of the allegedly misused materials by version, file, and line of

code." (Docket No. 643.) Disputed to the extent the statement purports to characterize the final

disclosures. (Ex. 144.)

221.    Pending the disposition of IBM's motion, SCO served several expert reports seeking to challenge additional allegedly misused materials that were not identified in its Final Disclosures. IBM then made another motion (which has been fully briefed but not yet argued) to confine and limit the scope of SCO's claims to those materials identified in its Final Disclosures. (Ex. 67.)

Disputed to the extent the statement suggests that the content of the referenced expert

reports included material that the Court had ordered SCO to produce by its Final Disclosures but

that SCO had not included in its Final Disclosures. (Docket No. 707.)

222.    In an order dated June 28, 2006, the Court granted, in part, IBM's February 13, 2006 motion to preclude certain of SCO's claims -- striking from the case SCO's Final Disclosure Item Nos.: 3-22, 24-42, 44-89, 91-93, 95-112, 143-49, 165-82, 193, 232-71, 279-93. (Ex. 59 at 36-38.)

Disputed to the extent the statement suggests that the District Court granted IBM's

motion, to the extent the statement suggests that the order at issue was one "striking from the

case" the material cited in the referenced Item Nos., and to the extent the statement suggests that

the District Court has passed judgment on the content of the order, which statements the cited

material does not support.

223.    In granting IBM's motion in part, the Court held that "SCO should have supplied not only line but version and file information for whatever claims form the basis of SCO's case against IBM". (Ex. 59 at 28.)

Disputed to the extent the statement suggests that the District Court granted IBM's motion, to the extent the statement suggests that the Magistrate Court found that SCO had acted in bad faith in discovery, to the extent the statement suggests that SCO had acted in bad faith in discovery, and to the extent the statement suggests that the District Court has passed judgment on the content of the order, which statements the cited material does not support.

224.    The Court held further that "SCO has had ample opportunity to articulate, identify and substantiate its claims against [IBM]. [SCO's] failure was intentional and therefore willful based on SCO's disregard of the court's orders and failure to seek clarification.  In the view of the court it is almost like SCO sought to hide its case until the ninth inning in hopes of gaining an unfair advantage despite being repeatedly told to put 'all evidence . . . on the table.'"  (Ex. 59 at 32.)

Disputed to the extent the statement suggests that the District Court granted IBM's motion, to the extent the statement suggests that the Magistrate Court found that SCO had acted in bad faith in discovery, and to the extent the statement suggests that the District Court has passed judgment on the content of the order, which statements the cited material does not support.

225.    Finally, the Court held that SCO's conduct prejudiced IBM in that "[requiring IBM to engage in an analysis of millions of lines of code to figure out which code is at issue in hopes of answering such questions is patently unfair given the fact that it was SCO's duty to provide more detailed code in the first place."  (Ex. 59 at 35.)

Disputed to the extent the statement suggests that the District Court granted IBM's motion, to the extent the statement suggests that the Magistrate Court found that SCO had acted in bad faith in discovery, and to the extent the statement suggests that the District Court has passed judgment on the content of the order, which statements the cited material does not support.

226.    Following the Court's order the following "Items" relating to SCO's allegations of IBM's breach of contract relating to the AIX and Dynix operating systems remain in the case: Items 1, 2, 23, 43, 90, 94, 113-42, and 186-92.

Disputed to the extent the statement suggests that the District Court granted IBM's

motion, to the extent the statement suggests that the order at issue was one "striking from the

case" the material cited in the previously referenced Item Nos., and to the extent the statement

suggests that the District Court has passed judgment on the content of the order, which

statements the cited material does not support.

V.    SCO's Failure of Proof.

227.    Despite three orders of the Court, SCO has not adduced any evidence that IBM breached the Agreements. (See Ex. 54.)

Disputed to the extent the statement draws a legal conclusion, and in that the cited

material does not support the statement.

228.    SCO's Final Disclosures identify 294 Items of allegedly misused material. However, only a subset of these Items concerns SCO's claims of breach of contract. (Ex. 54.)

Undisputed.

229.    As a result of the Court's order of June 28, 2006, only 43 of the Items relating to SCO's contract claims remain in the case. (Items 1, 2, 23, 43, 90, 94, 113-42 and 186-92.) These Items concern allegations of misuse relating to AIX and Dynix. (See Ex. 54; Ex. 59.)

Disputed to the extent the statement suggests that the District Court granted IBM's

motion, to the extent the statement suggests that the order at issue was one "striking from the

case" the material cited in the previously referenced Item Nos., and to the extent the statement

suggests that the District Court has passed judgment on the content of the order, which

statements the cited material does not support.

230.    Only one of the remaining 43 Items, Item 1, concerns allegations of misuse relating to AIX. Item 1 concerns IBM's Journaled File System (JFS). (Ex. 54; Ex. 291 ¶ 6.)

103

Disputed to the extent the statement suggests that the order at issue was one "striking

from the case" the material cited in the previously referenced Item Nos., which statements the

cited material does not support.

231.    The remaining 42 Items concern allegations of misuse relating to Dynix.  Item 2 concerns Read-Copy Update (RCU); Items 113-42 concern testing technologies; and Items 23, 43, 90, 94 and 186-92 concern "negative know-how" or "exposure" to Dynix.  (Ex. 54; Ex. 291 ¶ 7.)

Disputed to the extent the statement suggests that the order at issue was one "striking

from the case" the material cited in the previously referenced Item Nos., which statement the

cited material does not support.

232.    Only one of the remaining 43 Items (Item 1) identifies any UNIX System V source code.  That Item identifies 17 lines of code from one version of a UNIX System V file. (See Ex. 54 Item 1, Tab 425; Ex. 291 ¶ 8.)  SCO's experts do not address this file in their expert reports.  (See generally Ex. 285; Ex. 286 ¶¶ 84-122.)  SCO does not allege that IBM publicly disclosed this file to Linux or otherwise.  (See Ex. 54.)

Disputed to the extent the statement suggests that JFS is not derived from UNIX System

V.  (Ex. 277 ¶¶ 95-114 & Exs. C-H.)

233.    Only two of the remaining 43 Items (Items 1 and 2) identify any AIX or Dynix source code.  Thirty of the remaining 43 Items (Items 113-42) identify code from Sequent's SPIE Test Suites as well as code from the Linux Test Project.  (See Ex. 54.)  None of that testing code is part of either the Dynix or Linux operating systems.  (Ex. 287 ¶ 41; Ex. 288 ¶¶ 25, 29; Ex. 291 ¶ 9.)

Disputed in that the SPIE Test Suites are part of the Dynix operating system.  (Ex. 164 at

253-57.)

234.    While the remaining 43 Items do identity Linux kernel source code files or Linux Test Project files 11, of those Items (Items 23, 43, 90, 94, and 186-92) do not identify any versions or lines of code in the Linux kernel or any versions, files or lines of source code from UNIX System V, AIX or Dynix.  SCO simply lists a number of Linux kernel files (without version or line information) for each of those Items and does not offer any evidence (expert or

otherwise) that these files contain any code methods or concepts from UNIX System V, AIX, or Dynix. (See Ex. 54; Ex. 291 ¶ 10.)

Disputed to the extent the statement suggests that SCO was obligated to provide

"versions, files or lines of source code" with respect to all of IBM's allegedly misused material.

(Docket No. 643.)

235.    SCO has not specifically identified, in the Final Disclosures or elsewhere, a single line of UNIX System V material that IBM is alleged to have misused in violation of its contractual obligations.  Nor has it specifically identified any evidence that IBM misused any UNIX System V code. (Ex. 54; Ex. 291 ¶ 5.)  When IBM raised with SCO its failure to disclose UNIX System V material, SCO stated that "IBM keeps insisting on something that is not part of SCO's claims, so it should come as no surprise that files or lines of code in System V have not been identified".  (Ex. 134 at 2.)

Disputed to the extent the statement suggests that SCO has not shown that Linux versions

2.4 and 2.6 are derivative works of UNIX System V, release 4 under the copyright law.  (Ex.

274.) Disputed to the extent the statement suggests that SCO has not shown that AIX is a

derivative work of UNIX System V, release 4 under the copyright law.  (See SCO's

Memorandum in Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright

Claim (Fifth cause of Action).")

236.    None of the material IBM is alleged to have misused is, or contains, UNIX System V code, methods or concepts, or is, or contains, a modification or derivative work of UNIX System V. (See Ex. 54; Ex. 291 ¶ 11; Ex. 181 ¶¶ 11-50.)

Disputed to the extent the statement suggests that SCO has not shown that Linux versions

2.4 and 2.6 are derivative works of UNIX System V, release 4 within the meaning of the

copyright laws. (Ex. 274.) Disputed to the extent the statement suggests that SCO has not

shown that AIX is a derivative work of UNIX System V, release 4 under the copyright law, or

that SCO has not alleged that IBM's distribution of its AIX operating system post-termination of

its UNIX System V licenses constitutes a violation of SCO's copyrights. (See SCO's

105

Memorandum in Opposition to IBM's "Motion for Summary Judgment on SCO's Copyright

Claim and Fifth Cause of Action).")

237.    All of the material IBM is alleged to have misused in the remaining Items (Items 1-2, 23, 43, 90, 94, 113-42, and 186-92) is original IBM work or the work of third parties other than SCO and independent of System V.  (Ex. 162 ¶ 15; Ex. 248 ¶ 5; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 168 ¶ 6; Ex. 258 ¶¶ 4-5; Ex. 231 ¶¶ 7-8; Ex. 292 ¶ 4; Ex. 507 at 40, 57, 199-200, 225-26, 228; Ex. 293 ¶ 4; Ex. 173 ¶ 4; Ex. 196 ¶ 5; Ex. 235 ¶ 5; Ex. 237 ¶ 5; Ex. 211 ¶ 5; Ex. 216 ¶ 5; Ex. 246 ¶ 4; Ex. 210 ¶ 6; Ex. 263 ¶ 5; Ex. 222 ¶ 5; Ex. 206 ¶¶ 4-5; Ex. 274 ¶ 4; Ex. 161 ¶ 74; Ex. 225 ¶ 5; Ex. 188 ¶ 5.)

REDACTED

REDACTED

238.    None of the AIX or Dynix material that IBM is alleged to have misused was written by referencing UNIX System V. (Ex. 291 ¶ 11.)

Disputed for the reasons set forth in response to IBM Paragraphs 243-276 below.

239.    SCO has identified 25 persons as having been involved with the allegedly improper disclosures:  Barry Arndt, Ben Rafanello, Dave Kleikamp, Mark Peloquin, Steve Best, Dipankar Sarma, Paul McKenney, Martin Bligh, Tim Wright, Pat Gaughen, Wayne Boyer, John George, Haren Babu Myneni, Hien Nguyen, Jim Keniston, Larry Kessler, Hal Porter, Vivek Kashyap, Nivedita Singhvi, Shirley Ma, Venkata Jagana, Jay Vosburgh, Mike Anderson, Mike Mason, Ruth Forester.  (Ex. 291 ¶ 12.)

Disputed for the reasons set forth in response to IBM Paragraphs 243-276 below.

240.    None of these individuals referred to or otherwise used non-public UNIX System V source code, methods, or concepts in making the challenged Linux contributions.  (Ex. 291 ¶ 13; Ex. 162 ¶ 5; Ex. 248 ¶ 5; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 168 ¶ 6; Ex. 258 ¶¶ 4-5; Ex. 231 ¶¶ 7-8; Ex. 292 ¶ 4; Ex. 507 at 40, 57, 199-200, 225-26, 228; Ex. 293 ¶ 4; Ex. 173 ¶ 4; Ex. 196 ¶ 5; Ex. 235 ¶ 5; Ex. 237 ¶ 5; Ex. 211 ¶ 5; Ex. 216 ¶ 5; Ex. 246 ¶ 4; Ex. 210 ¶ 6; Ex. 263 ¶ 5; Ex. 222 ¶ 5; Ex. 206 ¶¶ 4-5; Ex. 274 ¶ 4; Ex. 161 ¶ 4; Ex. 225 ¶ 5; Ex. 188 ¶ 5.)

Disputed for the reasons set forth in response to IBM Paragraphs 243-276 below.

Disputed in that Exhibit 507 does not support the statement.

241.    In making the challenged contributions, the alleged wrongdoers identified by SCO relied on their own creativity and general experience.  (Ex. 291 ¶ 13; Ex. 162 ¶ 5; Ex. 248 ¶ 5; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 168 ¶ 6; Ex. 258 ¶¶ 4-5; Ex. 231 ¶ 7; Ex. 292 ¶ 4; Ex. 507 at 109-10; Ex. 294 ¶ 4; Ex. 173 ¶ 6; Ex. 196 ¶ 5; Ex. 235 ¶ 5; Ex. 237 ¶ 5; Ex. 211 ¶ 5; Ex. 216 ¶ 5; Ex. 246 ¶ 4; Ex. 210 ¶ 6; Ex. 263 ¶ 5; Ex. 222 ¶ 5; Ex. 206 ¶ 5; Ex. 274 ¶ 4; Ex. 161 ¶ 5; Ex. 225 ¶ 5; Ex. 188 ¶ 5.)

Disputed for the reasons set forth in response to IBM Paragraphs 243-276 below.

Disputed in that Exhibit 507 does not support the statement.

W.    Specific Items of Alleged Misuse.

242.    The remaining Items of allegedly misused material all concern original IBM works that can be described in four categories:  (1) IBM's Journaled File System (JFS) contribution; (2) IBM's Read Copy-Update (RCU) contribution; (3) IBM's Linux Test Project (LTP) contributions; and (4) general operating system experience or "negative know how".  (Ex. 291 ¶ 14.)

Depending on the meaning of the phrase "original IBM works," disputed in that the

referenced Items include technology taken from and developed based on modifications and

derivative works based on the licensed UNIX System V software product (¶ 192), and JFS is a

derivative work of UNIX System V (Ex. 277 ¶¶ 95-114 & Exs. C-H.).

      1.     Journaled File System (JFS).

243.

REDACTED

Undisputed.

244.    The allegedly misused JFS material does not concern or include any UNIX System V code, methods, or concepts; it is not a modification or derivative work of UNIX System V; and it was not based on or created with reference to UNIX System V.  (Ex. 291 ¶ 16.)

Disputed.  The misused JFS material is a modification or derivative work of UNIX

System V.  (Ex. 277 ¶¶ 95-114 & Exs. C-H.)

245.    SCO has not specifically identified any UNIX System V material (by version, file or line of code, or otherwise) that it alleges is contained in the allegedly misused JFS material.  (Ex. 291 ¶ 171; see also Ex. 54, Item 1.)  UNIX System V does not have journaling capability in its file system.  (Ex. 286 ¶ 94; Ex. 186 ¶ 100; Ex. 291 ¶ 17.)

Disputed in that the misused JFS material is a modification or derivative works of UNIX

System V.  (Ex. 277 ¶¶ 95-114 & Exs. C-H.)  Disputed in that the cited material does not support

the statement.  Paragraph 100 of IBM Exhibit 186 makes the unsupported statement that "JFS is

REDACTED

108

REDACTED

246.          REDACTED

The allegedly misused JFS material did not contain any UNIX System V code and none of these individuals identified by SCO used or referred to UNIX System V source code in developing JFS. (Ex. 291 ¶ 18; Ex. 168 ¶ 6; Ex. 218 ¶ 5; Ex. 243 ¶ 5; Ex. 248 ¶ 5; Ex. 162 ¶ 5.)

Disputed in that as IBM has itself admitted, UNIX System V source code was used in the

development of JFS. (Ex. 277 ¶¶ 95-114 & n.55 & Exs. C-H.)

247.    The JFS code that IBM contributed to the Linux JFS was originally ported from IBM's OS/2 operating system, not AIX, or was written specifically for the Linux JFS. (Ex. 291 ¶ 19; Ex. 168 ¶¶ 4-5.)

Disputed in that the JFS code that IBM contributed to Linux came from AIX (and

previously UNIX System V). (Ex. 277 ¶¶ 95-114 & n.55 & Exs. C-H.) Disputed in that the

misused JFS material is a modification or derivative works of UNIX System V. (Ex. 277 ¶¶ 95-

114 & Exs. C-H.)

248.    OS/2 did not include any UNIX System V code, and was not based on UNIX System V. (Ex. 291 ¶ 19; Ex. 168 ¶ 7.)

Disputed in that the cited material is neither admissible nor sufficient to support the

proposition in the statement, and in that the JFS in OS/2 is derived from and based on UNIX

System V. (Ex. 277 ¶¶ 95-114 & Exs. C-H.)

249.    Some OS/2 based JFS material was later shipped in IBM's AIX product.  For this reason, the JFS material that IBM contributed to Linux is sometimes mistaken as having originated from AIX.  (Ex. 291 ¶ 20; Ex. 168 ¶ 5.)

Disputed in that the JFS code that IBM contributed to Linux came from AIX (and previously UNIX System V).  (Ex. 277 ¶¶ 95-114 & n.55 & Exs. C-H.)  Disputed in that the misused JFS material is a modification or derivative works of UNIX System V.  (Ex. 277 ¶¶ 95-114 & Exs. C-H.)

250.                                     REDACTED

Disputed in that the JFS code that IBM contributed to Linux came from AIX (and previously UNIX System V).  (Ex. 277 ¶¶ 95-114 & n.55 & Exs. C-H.)  Disputed in that SCO did not assign any intellectual property rights in the JFS source code pursuant to the UnitedLinux Joint Development Agreement.  (See SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on Its Claim for Declaratory Judgment of Non-Infringement (IBM's Tenth Counterclaim).)

251.                                     REDACTED

Disputed.  The cited material does not support the statement.

REDACTED

110

REDACTED

252.    SCO has identified thirty files in AIX that contain "origin codes" which, SCO claims, indicate that the files were based on UNIX System V, Release 2 or earlier. (Ex. 54; Ex. 286 ¶ 95; Ex. 291 ¶ 21.)  For these files, the Final Disclosures do not identify a single line of source code in AIX that is alleged to be identical to or substantially similar to any source code in UNIX System V. (Ex. 291 ¶ 21.)  In any event, origin codes are not necessarily indicators of whether a file contains System V material. (Ex. 291 ¶ 21; Ex. 181 ¶¶ 61, n.12.)

Disputed in that SCO has identified 179 files in AIX that contain origin codes for UNIX System V.  (Exs. 287 & 288.)  Disputed in that the evidence shows (and easily permits the inference) that origin codes are reliable indicators of whether a file contains System V material and/or is based on or derived from such material.  (Ex. 139 ¶¶ 34.)

253.    The Final Disclosures draw no connection with any lines of code in UNIX System V and the JFS code that IBM contributed.    REDACTED

Depending on the meaning of the phrase "draw no connection," disputed in that the JFS code that IBM contributed to Linux is derived from UNIX System V.  (Ex. 277 ¶¶ 95-114 & n.55 & Exs. C-H.)          REDACTED

111

REDACTED

254.                     REDACTED

    2.    <u>Read-Copy Update (RCU).</u>

255.       REDACTED

Disputed to the extent the statement suggests that the above-quoted language constitutes

the entire scope of SCO's allegations in Item 2.  (<u>See</u> Ex. 144 Item 2 and the referenced Tabs.)

    256.    IBM's Linux RCU contributions, and the earlier Sequent implementation of RCU in Dynix, do not include any UNIX System V code; they are not modifications or derivative works of UNIX System V; and they were not based on or created with reference to UNIX System V.  They are original IBM work created independent of UNIX System V.  (Ex. 231 ¶ 8; Ex. 258 ¶ 5; Ex. 291 ¶ 124.)

112

REDACTED

257.    SCO has not specifically identified any UNIX System V material (by version, file, or line of code, or otherwise) that it alleges is contained in RCU.  (See Ex. 54 Item 2.)

REDACTED

REDACTED

258.                        REDACTED

Disputed in that the cited material does not properly support the second statement.  In IBM Exhibit 258, the declarant does not deny that his RCU was a modification or derived from UNIX System V.  Depending on the meaning of the phrase "did not use," disputed in that the RCUs at issue were based on or created with reference to UNIX System V.  (Ex. 139 ¶¶ 27-30.)

259.                        REDACTED

113

Disputed in that     REDACTED     conclusions are unsupported, given his exclusive

reliance on the two comparison programs he used.  (Ex. 287 ¶¶ 116-129 & Ex. A.)

260.    Sequent engineers Paul McKenney and John Slingwine filed a patent application
for RCU on July 19, 1993, and the patent was granted on August 15, 1995. (Ex. 231 ¶ 5; See Ex.
498.)  The implementation of RCU in Dynix and the challenged implementation of RCU in
Linux are implementations of the same general concept that is embodied in U.S. Patent #
5,442,758.  (Ex. 231 ¶¶ 4-5; Ex. 291 ¶ 27; Ex. 268 at 117-21.)

Disputed to the extent that the statement suggests that AT&T or USL knew or should

have known about the substance of IBM's patent applications.  (See Argument at __.)

    3.    Testing Technologies.

261.         REDACTED

Undisputed.

262.    The allegedly misused testing technology material does not include any UNIX
System V code; it is not a modification or derivative work of UNIX System V; and it was not
based on or created with reference to UNIX System V.  It was original Sequent work created
independent of UNIX System V. (Ex. 196 ¶ 5; Ex. 173 ¶ 4; Ex. 291 ¶ 29.)

        REDACTED

263.    REDACTED

Disputed to the extent the statement suggests that SCO was obligated to provide

"versions, files or lines of source code" with respect to all of IBM's allegedly misused material.

(Docket No. 643.) Disputed in that the cited material does not support the statement.

REDACTED

264.     SCO fails to identify anyone at IBM or Sequent as involved in misconduct
relating to the SPIE Test Suits.     REDACTED

REDACTED

Disputed in that the cited material does not support the second and

third statements.

265.     SCO identifies no UNIX System V code, methods, or concepts in connection with
Items 113-142. (Ex. 291 ¶ 30.)

Disputed to the extent the statement suggests that SCO was obligated to provide

"versions, files or lines of source code" with respect to all of IBM's allegedly misused material.

(Docket No. 643.) Disputed in that the cited material does not support the statement.  Disputed

REDACTED

266.     The SPIE tests were not part of the Dynix or Dynix/ptx operating systems.  (Ex.
208 ¶ 102; Ex. 288 ¶¶ 25, 29; Ex. 173 ¶ 3; Ex. 196 ¶ 4; Ex. 291 ¶ 30.)

REDACTED                                     at

150-51; Ex. 164 at 256-58.) Disputed in that the cited material does not support the statement.

115

4.       General Operating System Experience.

267.        REDACTED


Undisputed.

268.        REDACTED



Disputed in that the cited material does not support the statement that none of the IBM

contributors to Linux based their work on experience and know-how gained from their exposure

to UNIX System V source code, methods, or concepts, or the statement that all of the materials

that were in fact contributed by the named programmers were original IBM works created

independent of UNIX System V.

269.    SCO identifies no UNIX System V code, methods or concepts (by version, file or
line of code or otherwise) in connection with these Items.  SCO identifies no Dynix/ptx code,
methods, or concepts (by version, file, or line of code) in connection with these Items.  (See Ex.
54; Ex. 291 ¶ 34.)

Disputed to the extent the statement suggests that SCO was obligated to provide

"versions, files or lines of source code" with respect to all of IBM's allegedly misused material.

(Docket No. 643.)

270.    SCO lists Linux files in connection with these Items, but does not identify which
versions or which lines of code in these files contain the allegedly misused material.  SCO also
lists whole directories in Linux without providing any version, file, and line information.  (See
Ex. 54; Ex. 291 ¶ 35.)

Disputed to the extent the statement suggests that SCO was obligated to provide

"versions, files or lines of source code" with respect to all of IBM's allegedly misused material.

(Docket No. 643.)

271.  REDACTED


Undisputed.

272.  For all of these Items, the programmers allegedly making the disclosure either (a) did not make any contributions to the files or directories listed or (b) did not base their contributions to the listed files or directories on UNIX System V or refer to UNIX System V in making the challenged contributions.  (Ex. 291 ¶ 37; Ex. 292 ¶ 4; Ex. 507 at 40, 57, 199-200, 225-26, 228; Ex. 293 ¶ 4; Ex. 235 ¶¶ 3-5; Ex. 237 ¶¶ 4-5; Ex. 211 ¶¶ 3-5; Ex. 216 ¶¶ 3-5; Ex. 246 ¶¶ 4-6; Ex. 210 ¶¶ 4-7; Ex. 263 ¶¶ 4-6; Ex. 222 ¶¶ 4-6; Ex. 206 ¶¶ 4-5; Ex. 274 ¶¶ 3-4; Ex. 161 ¶¶ 4-5; Ex. 225 ¶¶ 4-5; Ex. 188 ¶¶ 4-5.)

Disputed in that the cited material does not support the statement that none of the IBM

contributors to Linux based their work on experience and know-how gained from their exposure

to UNIX System V source code, methods, or concepts, in that Dynix/ptx is a derivative work

based on UNIX System V and contains source code, methods, and concepts from UNIX System

V (¶ 192), and declarants acknowledge their direct experience with Dynix/ptx.

273.  In some cases (Items 186, 187, 190 and 191), the programmers allegedly making the disclosure did not have experience in Dynix in the particular technology area cited by SCO. (Ex. 291 ¶ 38; Ex. 235 ¶ 3; Ex. 237 ¶ 4 ; Ex. 211 ¶ 3; Ex. 274 ¶ 3; Ex. 188 ¶ 4; Ex. 225 ¶ 4.)

Undisputed.

274.  In some cases (Items 187, 188) the cited technology did not even exist in Dynix. (Ex. 291 ¶ 38; Ex. 246 ¶ 6; Ex. 210 ¶ 7; Ex. 263 ¶ 6; Ex. 222 ¶ 6; Ex. 206 ¶ 6.)

Undisputed.

275.  REDACTED

REDACTED

Undisputed.

X.     Implications of SCO's Theory.

276.     In a nutshell, SCO claims the right to control the code, methods and concepts of any modification or derivative work of System V, even where the code, methods, or concepts do not include or reveal any System V material or were not written or created by SCO or any of its predecessors in interest. (Ex. 43 at 7-8.)     REDACTED

Disputed to the extent the statement refers to all UNIX System V licensees, in that the

cited material does not support such a statement. Depending on the meaning of the term

"control," disputed to the extent the statement suggests that IBM and Sequent did not enter into a

written agreement requiring IBM and Sequent to hold in confidence all parts of their

modifications and derivative works based on the licensed UNIX System V software product (¶¶

13-29, 82-686), and to the extent the statement suggests that AIX and Dynix/ptx are not

derivative works based on UNIX System V (¶ 192). Disputed to the extent the statement

suggests that SCO challenges the employability of programmers as such, which SCO does not

and which statement the cited material does not support. (See Argument at ___.)

277.     SCO's claim depends on the proposition that SCO's alleged predecessor (AT&T) acquired the right to control modifications and derivatives of System V pursuant to its System V licensing agreements. The argument appears to be that SCO has the right to control not only System V, but also the code, methods and concepts of other flavors of UNIX, like AIX and Dynix. In fact, SCO seems to claim that it has the right to control any code, methods, and concepts ever associated with System V. (Ex. 181 ¶ 52.)

Disputed to the extent the statement refers to all UNIX System V licensees, in that the

cited material does not support such a statement. Depending on the meaning of the term

118

"control" and "associated with," disputed to the extent the statement suggests that IBM and

Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence

all parts of its modifications and derivative works based on the licensed UNIX System V

software product.  (¶¶ 13-29, 82-86.)

278.     When informed of the interpretation of the IBM and Sequent Software
Agreements that SCO is advancing in this case, the individuals from AT&T who were involved
in negotiating the agreements state unequivocally that SCO is wrong.  (Ex. 217 ¶ 24; Ex. 189 ¶¶
27-28; Ex. 281 ¶ 28; Ex. 182 ¶ 31; Ex. 275 ¶ 30.)

Disputed to the extent the statement suggests that the cited declarants had the authority to

modify the terms of AT&T's standard form UNIX license agreements, to the extent the

statement suggests that the cited declarants were the only individuals under whose direction

AT&T licensed its UNIX source code, and to the extent the statement suggests that the cited

declarants have not offered conflicting and contradictory sworn testimony and taken conflicting

and contradictory actions.  (¶¶ 63-163.)  Disputed in that other substantial evidence shows (and

easily permits the inference) that the cited declarants did not have such a view during their tenure

at AT&T.  (¶¶ 63-163.)

279.     According to Mr. Wilson, any claim that the IBM Software Agreement and the
Sequent Software Agreement prohibit the use, export, disclosure or transfer of any code other
than UNIX System V code is clearly wrong.  Not only did Mr. Wilson and others at AT&T not
intend the agreements to be read that way, but they also went out of their way to assure AT&T's
licensees that that is not what the agreements meant.  (Ex. 282 ¶ 30.)

Disputed to the extent the statement suggests that Mr. Wilson had the authority to modify

the terms of AT&T's standard UNIX license agreements or was the only individual under whose

direction AT&T licensed its UNIX source code.  (¶¶ 76-96.)  Disputed in that substantial

evidence shows (and easily permits the inference) that Mr. Wilson did not have such a view

during his tenure at AT&T.  (¶¶ 163-63.)  Disputed to the extent the statement suggests that Mr.

Wilson has not offered conflicting and contradictory sworn testimony and taken conflicting and contradictory actions. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.)

280.    SCO's interpretation of the Agreements is impossible to reconcile with what Mr. Frasure (and, he believes, others at AT&T) understood the Software Agreements to mean. Mr. Frasure never suggested, nor would have thought to suggest, to AT&T's customers that the Agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose any UNIX System V code. Moreover, Mr. Frasure did not believe that AT&T's customers (particularly large ones like IBM) would have entered into agreements that placed restrictions of the kind SCO seeks to impose on their use of code that they developed. In fact, some, including IBM, specifically said so. (Ex. 189 ¶¶ 18-26.)

Disputed to the extent the statement suggests that Mr. Frasure had the authority to modify the terms of AT&T's standard UNIX license agreements or was the only individual under whose direction AT&T licensed its UNIX source code. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that Mr. Frasure did not have such a view during his tenure at AT&T. (¶¶ 63-163.) Disputed to the extent the statement suggests that Mr. Frasure has not offered conflicting and contradictory sworn testimony. (¶¶ 125-37.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative

120

works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)  Disputed to

the extent that the statement suggests that, upon entering into their written agreement, the parties

did not intend to exclude any previous oral discussion from the agreement the parties had

reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the Sequent Agreements (collectively "the

Agreements") set forth the terms under which UNIX System V could be used and disclosed by

them and under which they could distribute software programs "based on" UNIX System V."

(IBM Statement of Undisputed Facts ¶ 50.)

281.    According to Mr. DeFazio, SCO's claims are inconsistent with the provisions of
the Agreements.  He does not believe that anyone at AT&T, USL, or Novell intended the
Agreements to be construed as SCO construes them.  In all cases, according to Mr. DeFazio,
modifications and licensees' contributions to derivative works are not subject to the
confidentiality and other restrictions contained in the license agreements (except for any
protected UNIX System V source code actually included therein) because they are owned by the
licensees.  (Ex. 182 ¶ 31.)

Disputed to the extent the statement suggests that Mr. DeFazio had the authority to

modify the terms of AT&T's standard UNIX license agreements or was the only individual

under whose direction AT&T licensed its UNIX source code.  (¶¶ 76-96.)  Disputed in that

substantial evidence shows (and easily permits the inference) that Mr. DeFazio did not have such

a view during his tenure at AT&T.  (¶¶ 63-163.)  Disputed to the extent the statement suggests

that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold

in confidence all parts of its modifications and derivative works based on the licensed UNIX

System V software product.  (¶¶ 13-29, 82-86.)  Disputed to the extent that the statement

suggests that, upon entering into their written agreement, the parties did not intend to exclude

any previous oral discussion from the agreement the parties had reached.  (¶¶ 18, 91-92.)  "The

IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the

terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.)

282.    Despite the fact that SCO's theory is contrary to the plain language of the Agreements and the intent of the individual who negotiated them, it would, if accepted, have far-reaching, negative implications. (Ex. 181 ¶ 51.)

Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Depending on the meaning of the phrase "far-reaching, negative implications," disputed in that prior to deciding to license the UNIX source code, any company could have decided instead to try to develop its own operating system, including its own UNIX-like operating system, and thereby be free of any control over their "homegrown" material reserved to the UNIX licensor. (¶ 42.) AT&T's capacity to negotiate and obtain partial control over its licensees UNIX flavors was a function of the many years that AT&T and its predecessors had invested in developing UNIX, and that prospective licensees recognized they would have to spend if they wanted to try to develop their own UNIX-like operating system from scratch. (¶¶ 32-47.) The subsequent prevalence of UNIX flavors in

the industry – the fact that so many companies decided instead to license the UNIX head-start –

serves to reinforce the reasonableness of the terms of the UNIX licenses.  (¶¶ 32-47.)  Disputed

to the extent the statement suggests that the IBM and Sequent Agreements set forth unreasonable

term or are void on grounds of public policy.  (See Argument at __.)  Disputed to the extent the

statement suggests that all or even a significant amount of the UNIX System V methods or

concepts have been made publicly available without restriction.  (Ex. 139 ¶¶ 23-26; Ex. 278 ¶

86.)

    283.   If SCO had such a right to control modifications and derivative works of System
V, then it would have extraordinary -- indeed, seemingly limitless -- control over the software
industry.  AT&T and its successors widely disseminated information about the code, methods,
and concepts of System V.  System V alone has been licensed for redistribution to thousands of
entities worldwide.  These licensees have combined the code, methods, and concepts of System
V software with hundreds of millions of lines of original non-AT&T code and many thousands
of original, non-AT&T methods and concepts.  For example, certain versions of AIX include
more than 100 million lines of non-AT&T code, methods and concepts.  Thus, if SCO had the
right to control modifications and derivative works of System V, then it would control vast
quantities of others' property.  (Ex. 181 ¶ 53.)

    Depending on the meaning of the terms "original" and "control," disputed on the same

bases as set forth in response to IBM Statement of Fact Paragraph 283.

    284.   The viral quality of SCO's claim would give it control rights well beyond the life
of the System V rights that the "control rights" are purported to protect.  The apparent purpose of
the "control rights" claimed by SCO seems to be to ensure, among other things, the
confidentiality of AT&T System V code, methods, and concepts.  The argument seems to be
prophylactic in nature: by retaining control of its licensees' code, methods, and concepts, SCO
can retain control of any System V code, methods, and concepts that might be included therein.
Even where the code, methods, and concepts of System V are no longer confidential, SCO would
have the right to control the original works of its licensees, System V could become freely
available and SCO's right to control others' works would (under its theory) persist.  (Ex. 181 ¶
54.)

    Depending on the meaning of the term "viral quality," disputed to the extent the

statement suggests that it is inappropriate for a contract to cover the derivative works of a

program, in that the very contract that Linux is distributed under also controls the derivative

works of Linux (Ex. 278 ¶ 84), and IBM's own AIX source-code licenses require that AIX

licensees treat all parts of derivative works of AIX as confidential (Ex. 278 ¶ 85; Exs. 348, 349,

350). The UNIX license agreements cannot be interpreted to have a lesser scope simply because

AT&T and its successors were successful in a licensing a product pursuant to licenses whose

terms the licensees evidently found reasonable. (¶¶ 30-62.) Disputed to the extent the statement

suggests that the IBM and Sequent Agreements set forth unreasonable terms or are void on

grounds of public policy. (See Argument at I.) Disputed to the extent the statement suggests that

all or even a significant amount of the UNIX System V methods or concepts have been made

publicly available without restriction. (Ex. 139 ¶¶ 23-26; Ex. 278 ¶ 86.)

285.    From a practical standpoint, if SCO had the right to control the code, methods,
and concepts of all flavors of UNIX, the owners of those products would be limited in their
ability to support or even market them. To support and market an operating system, it is often
necessary to reference and disclose the code, methods, and concepts of the operating system. If
SCO, as opposed to IBM, had the right to control what IBM could say publicly about the non-
System V code, methods and concepts of AIX, for example, then IBM could not provide
installation and technical assistance without the cooperation of SCO (an IBM competitor). (Ex.
181 ¶ 55.)

Disputed to the extent the statement refers to all UNIX System V licensees, in that the

cited material does not support such a statement. Disputed in that the statement ignores the

"material breach" component of the UNIX System V license agreements, and bear no

comparison to the wholesale disclosures IBM undertook in the course of its Linux-development

efforts. (Ex. 139 ¶¶ 2-22.) Disputed to the extent the statement suggests that the IBM and

Sequent Agreements set forth unreasonable terms or are void on grounds of public policy. (See

Argument at I.)

286.     Moreover, if, as it contends, SCO's "control rights" extend to experience and know-how (positive or negative), then it could control the employment of a significant sector of the computer industry. Many hundreds of thousands of people have been exposed to the code, methods, and concepts of System V and other flavors of UNIX. SCO and its predecessors have disseminated such information to many, many, thousands of persons and entities. Assuming the truth of SCO's claims about the scope of its control rights, it would appear to have the ability to control the employability of these persons. (Ex. 181 ¶ 56.)

Disputed to the extent the statement refers to all UNIX System V licensees, in that the cited material does not support such a statement. Disputed to the extent the statement suggests that SCO interprets the Agreements to impose restrictions on employment or employability as such. SCO does not base any claim of breach on the mere fact that IBM employed former Sequent employees. Disputed to the extent the statement suggests that the IBM and Sequent Agreements set forth unreasonable terms or are void on grounds of public policy. (See Argument at I.) Disputed to the extent the statement suggests that all or even a significant amount of the UNIX System V methods or concepts have been made publicly available without restriction. (Ex. 139 ¶¶ 23-26.)

287.     At the same time, SCO would have little information about the scope of its rights. It could not, as a practical matter, know to what extent its licensees have associated their own original code, methods, and concepts with System V code, methods, and concepts. It could know even less about the extent to which software developers have relied upon public information about the code, methods, and concepts of System V. Thus, if SCO had the right to control modifications and derivative works, there would be widespread uncertainty about the scope of SCO's rights, including the identity of the persons whose employability it claims to have controlled. (Ex. 181 ¶ 57.)

Disputed to the extent the statement suggests that SCO interprets the Agreements to impose restrictions on employment or employability as such. SCO does not base any claim of breach on the mere fact that IBM employed former Sequent employees. Disputed to the extent the statement suggests that the IBM and Sequent Agreements set forth unreasonable terms or are void on grounds of public policy. (See Argument at I.)

125

288.    Based in part on the assurances of AT&T and its successors about what UNIX licensees could do with their original works, IBM and Sequent invested heavily in the development of AIX and Dynix. (Ex. 257 ¶¶ 3-5; Ex. 310 at 29:8-31:5, 56:11-57:5, 62:20-63: 17, 119:16-120:2, 127:15-128:1 (Ex. 257 ¶¶ 3-5, 10; Ex. 283 ¶ 87.) IBM assigned thousands of people to AIX projects. (Ex. 257 ¶¶ 3-5, 10; Ex. 283 ¶ 87.)    REDACTED

Sequent devoted hundreds of person-years to developing Dynix. (Ex. 596 ¶ 4.) Both companies invested at least tens of millions of dollars in developing their businesses around AIX and Dynix. (Ex. 257 ¶ 7, 10; Ex. 283 ¶ 87; Ex. 596 ¶¶ 3-4.)

Disputed in that substantial evidence shows (and easily permits the inference) that no

such assurances were given (¶¶ 63-163), and in that IBM and Sequent otherwise had compelling

reasons to agree to the terms of the contracts they did (¶¶ 30-62.) Disputed to the extent the

statement suggests that IBM and Sequent did not enter into agreements requiring them to hold in

confidence all parts of their modifications and derivative works based on the licensed UNIX

System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement

suggests that, upon entering into their written agreements, the parties did not intend to exclude

any previous or subsequent oral discussions from the agreement the parties had reached. (¶¶ 18,

91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set

forth the terms under which UNIX System V could be used and disclosed by them and under

which they could distribute software programs "based on" UNIX System V." (IBM Statement of

Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that SCO interprets the

Agreements to impose restrictions on employment or employability as such. SCO does not base

any claim of breach on the mere fact that IBM employed former Sequent employees. Disputed

to the extent the statement suggests that the IBM and Sequent Agreements set forth unreasonable

terms or are void on grounds of public policy. (See Argument at ___.)

289.    Both companies added significant quantities of original code to the operating systems. To give an example, the original AT&T SVR2.0 source code totaled 896,204 lines of

code. (Ex. 181 Ex. G.)  The AIX Version 5.1.G for Power contains 160,198,865 lines of code. (Id.)  SCO does not and could not allege that AIX or Dynix incorporate all of any version of System V.  (See Ex. 285 at 22-25.)

Depending on the meaning of the term "original" and "significant quantities," disputed to

the extent the statement suggests that some specific amount of the quoted number of lines of

code in AIX were written without reference to, reliance on, or exposure to the licensed UNIX

System V software product, in that the cited material does not support such an assertion.

290.    Since the initial introduction of the original versions of AIX in 1987, IBM has incorporated new technology and improvements, including Virtual Resource Manager, a Journaled File System, a Logical Volume Manager, an Object Data Manager, a System Management Interface Tool and a Network Install Manager, and others.  (Ex. 257 ¶ 8; Ex. 283 ¶¶ 81-85.)  Subsequent AIX versions integrated even more enhancements, including a Web-based System Manager, an IBM Java Development Kit, an AIX Workload Manager, and many other developments.  (Ex. 257 ¶ 8; Ex. 283 ¶¶ 81-85.)

Depending on the meaning of the term "new technology," disputed in that the cited

material does not support the statement, where the declarant in IBM Exhibit 257 acknowledges

that "Each of these developments . . . are comprised primarily of non-UNIX source code," which

means that they contain UNIX source code, which in turn means that they are modifications and

derivative works of UNIX.

291.    AIX code has been employed in other IBM products, including servers, printers, and multi-protocol routers.  (Ex. 257 ¶ 9; Ex. 283 ¶ 89.)

Disputed in that the cited material in IBM Exhibit 283 is inadmissible evidence based

solely on an expert's description of the unsubstantiated recollections of an IBM employee.

292.    Each of these developments stands on its own right and is comprised of non-UNIX source code.  Some of them can even be considered stand-alone products.  If IBM had believed that these additions to UNIX would have subjected the code to the confidentiality provisions of the licensing agreements, it would not have packaged them with AIX.  Similarly, AIX code has been employed in other IBM products, including servers, printers, and multiprotocol routers.  If IBM ever believed that the IBM code included with AIX in these IBM

products would be subject to the confidentiality provisions of the licensing agreements, AIX would not have been used in these products.  (Ex. 257 ¶ 9.)

Disputed in that the cited material does not support the statement, where the declarant in IBM Exhibit 257 acknowledges that "Each of these developments . . . are comprised primarily of non-UNIX source code," which means that they contain UNIX source code, which in turn means that they are modifications and derivative works of UNIX.  Disputed to the extent the statement suggests that licensees did not enter into agreements requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)  Disputed to the extent that the statement suggests that, upon entering into their written agreements, the parties did not intend to exclude any previous or subsequent oral discussions from the agreement the parties had reached.  (¶¶ 18, 91-92.)  "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V."  (IBM Statement of Undisputed Facts ¶ 50.)  Disputed in that IBM otherwise had compelling reasons for improving AIX as it did.  (¶¶ 30-62.)

293.    In sum, if AT&T or its successors had ever expressed the position SCO asserts in this lawsuit, IBM and Sequent would have directed the vast amount of financial and human resources they spent on AIX and Dynix quite differently.  (Ex. 257 ¶¶ 6, 9; Ex. 596 ¶¶ 3-4.)

Disputed in that substantial evidence shows (and easily permits the inference) that AT&T and its successors-in-interest ever stated, orally or in writing, that its UNIX System V licensees were not obligated to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product.  (¶¶ 13-29, 82-86.)  Disputed to the extent the statement suggests that licensees did not enter into agreements requiring them to hold

in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreements, the parties did not intend to exclude any previous or subsequent oral discussions from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that IBM or Sequent had compelling business reasons to insist on the "control" as described by IBM herein. (¶¶ 30-62.)

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc., hereby certifies that a true and correct copy of the foregoing was served on Defendant/Counterclaim-Plaintiff, International Business Machines Corporation, on this 16th day of February 2007, via CM/ECF to the following:

David Marriott, Esq. (dmarrriott@cravath.com)
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Todd Shaughnessy, Esq. (tshaughnessy@swlaw.com)
Snell & Wilmer LLP
1200 Gateway Tower West
15 West South Temple
Salt Lake City, Utah 84101-1004

/s/ Edward Normand