# EXHIBIT 389

# Deposition of **LAWRENCE BOUFFARD**

**Date:** February 16, 2007
**Volume:** 1

**Case:** SCO v. NOVELL

SHARI MOSS & ASSOCIATES
877 Cowan Road, Suite A
Burlingame, California 94010
(650) 692-8900
(415) 402-0004
FAX: (650) 692-8909

1  BY MR. JACOBS:

2      Q.   Let's break it down a little bit.

3           Do you see that, first of all, Exhibit 61 is
4  a declaration that you executed on November 10th,
5  2003?

6      A.   I do.

7      Q.   And you see that you'd executed it under
8  penalty of perjury?

9      A.   I do.

10     Q.   And you understood what "penalty of perjury"
11 meant when you executed it?

12     A.   I did.

13     Q.   You understood this was a serious --
14 executing this was a serious matter?

15          MR. NORMAND:  Objection to form.

16          THE WITNESS:  I did.

17 BY MR. JACOBS:

18     Q.   And at the time you executed it, you studied
19 it, and, to the best of your knowledge and belief at
20 the time, it represented your understanding?

21          MR. NORMAND:  Objection to form.

22          THE WITNESS:  It was not written by me.  You
23 know how these things go.  It was provided to me, and
24 I was asked, "Is this an accurate representation of
25 what you said when you met with us?"

Page 58

1      The first go-round, there were several
2 sections that were completely objectionable and
3 wrong. Actually, they didn't reflect what I said,
4 and it was clear that it was trying to get me to say
5 something that they wanted to hear.
6      So I didn't sign it the first go-round, I
7 sent it back to them. And they said, "Well, which
8 paragraphs do you have a problem with?" And I told
9 them.
10      I got another draft, and it still was not
11 what I had said. So I asked them to strike some
12 things, I believe they did, and then we went back and
13 forth a few times.
14      By the last time reading it over, I read it
15 over at that point a little weary of it from the
16 standpoint of, "well, I guess you could interpret
17 what I said that way." Because that's what I was
18 being asked to do: Did we interpret you that way.
19      It's not really a statement of my words.
20 And I understand they never really are -- well, not
21 never. It's only a couple times I've done this. But
22 this was particularly difficult working with them,
23 trying to get it to be how I would characterize
24 things. It became a negotiation of my words rather
25 than a document of my own words.

Page 59

1  BY MR. JACOBS:

2      Q.  Why did you sign it?

3      A.  I signed it -- I said, "Well, I guess you
4  could interpret what I said that way.  There are some
5  things that I would have said differently."  But at
6  that point, I just got kind of tired of the process,
7  and I said that's, you know, close enough.

8      Q.  Close enough that you were comfortable
9  signing it under penalty of perjury that it was true
10 and correct?

11         MR. NORMAND:  Objection to form.

12         THE WITNESS:  Correct.

13 BY MR. JACOBS:

14     Q.  If you skip ahead in the document -- it
15 looks like it's about a third of the way through --
16 you'll come to the Asset Purchase Agreement.  It's
17 after the last of the UNIX licensing documents that
18 are attached to the agreement.

19         The next document.  Let me give you a clip
20 to make it easier.

21         So this is, in fact, what you understood to
22 be the Asset Purchase Agreement when you executed the
23 declaration?

24     A.  Yes.

25     Q.  And what you understood to be an Asset

Page 120

1 time is 1:56.

2                    EXAMINATION

3 BY MR. NORMAND:

4      Q.   Good afternoon, Mr. Bouffard.

5      A.   Good afternoon.

6      Q.   Towards the end of his questions, Mr. Jacobs

7 referred to a second declaration that you executed.

8 Do you recall that?

9      A.   Yes, I do.

10          MR. NORMAND:  I want to mark that declaration

11 as an exhibit.  And it's been marked as Exhibit 1060.

12          (Plaintiff/Counterclaim-Defendant's Exhibit

13 No. 1060 was marked for identification.)

14 BY MR. NORMAND:

15     Q.   The signature line of the declaration is

16 dated November 8th, 2006, with your signature.

17          Did you execute this document on that date?

18     A.   Yes, I did.

19     Q.   And this was the declaration you executed

20 after the process that you described to Mr. Jacobs

21 earlier; is that right?

22     A.   That's correct.

23     Q.   How did that process compare to the process

24 by which you executed your IBM declaration?

25     A.   This process was much more friendly, less

Page 121

1 adversarial, and did not seem to have an overt agenda
2 to establish certain points.
3    Q.  Have you had occasion to read Exhibit 1060
4 in the recent past?
5    A.  Yes, I have.
6    Q.  Is there any language in the exhibit that
7 does not reflect your -- doesn't accurately reflect
8 your views of the issues that are addressed therein?
9    A.  I don't believe so.
10   Q.  I wanted to direct your attention,
11 Mr. Bouffard, to paragraph 29.
12   A.  Okay.
13   Q.  You see in the first paragraph, "Although I
14 did not negotiate the 1995 Asset Purchase Agreement
15 APA for Novell, I had an understanding of the
16 transaction given my job responsibilities at the
17 time, which involved selling UNIX products.  My
18 understanding was that Novell sold its UNIX business
19 to Santa Cruz lock, stock and barrel, and Novell only
20 retained the right to continue receiving binary
21 royalties paid by then-existing UNIX licensees for
22 their distribution of binary products based on their
23 UNIX flavor pursuant to their UNIX sublicensing
24 agreements (the binary royalty stream)."  End quote.
25       Do you see that paragraph?