SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br> Defendant/Counterclaim-Plaintiff. | **IBM'S REDACTED REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S COPYRIGHT CLAIM (SCO'S FIFTH CAUSE OF ACTION)** <br><br> **(ORAL ARGUMENT REQUESTED)** <br><br> Civil No. 2:03-CV-00294 DAK <br><br> Honorable Dale A. Kimball <br><br> Magistrate Judge Brooke C. Wells |

SNELL & WILMER LLP
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JAN 1 2 2007

MARKUS B. ZIMMER, CLERK
BY _____
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

THE SCO GROUP, INC.,

     Plaintiff/Counterclaim-Defendant,

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

     Defendant/Counterclaim-Plaintiff.

**IBM'S REPLY MEMORANDUM IN
FURTHER SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT
ON SCO'S COPYRIGHT CLAIM
(SCO'S FIFTH CAUSE
OF ACTION)**

**(ORAL ARGUMENT REQUESTED)**

**FILED UNDER SEAL PURSUANT TO
9/16/03 PROTECTIVE ORDER,
DOCKET #38**

Civil No. 2:03CV-0294 DAK

Honorable Dale A. Kimball

Magistrate Judge Brooke C. Wells

**Table of Contents**

Page

Table of Authorities ...................................................................................................... iii

Preliminary Statement ..................................................................................................... 1

Statement of Undisputed Facts ....................................................................................... 3

Argument .......................................................................................................................... 4

I.      SCO CANNOT PROVE UNAUTHORIZED COPYING BECAUSE IT FAILED
        TO DISCLOSE ITS CLAIM AS REQUIRED BY THE COURT. ....................................... 4

II.     SCO CANNOT ESTABLISH A PREDICATE BREACH OF CONTRACT .................... 8

        A.      SCO's JFS Allegations Lack Merit. ................................................................ 9

        B.      The Alleged Breach Is Immaterial. ................................................................ 12

III.    SCO CANNOT SHOW THAT IT PROPERLY TERMINATED IBM'S
        LICENSE. ............................................................................................................ 16

        A.      IBM Has an Irrevocable License. .................................................................. 17

                1.      The Plain Language. ........................................................................ 17

                2.      The Extrinsic Evidence. ................................................................... 22

        B.      SCO Failed to Give IBM Proper Notice and an Opportunity to Cure, and
                to Exercise Its Good Faith Best Efforts to Avoid Termination. ........................ 27

                1.      SCO's Procedural Arguments Lack Merit. ...................................... 28

                2.      SCO's Alleged Evidence Falls Flat. ................................................ 29

                3.      SCO Was Not Relieved of Its Obligations Due to Futility. .............. 32

IV.     SCO CANNOT PROVE OWNERSHIP OF A VALID COPYRIGHT. .......................... 38

        A.      Neither the APA Standing Alone, Nor Read Together with Amendment
                No. 2, Transferred the UNIX Copyrights. .................................................... 38

        B.      Neither the Bill of Sale, Nor Contemporaneous Licensing Agreements,
                Evidence SCO's Ownership of the UNIX Copyrights. .................................. 43

     C.     Neither Novell's Post-Sale Conduct, Nor SCO's Extrinsic Evidence, is Sufficient to Establish SCO's Ownership of the Copyrights...............................44

V.     SCO HAS MISUSED ITS ALLEGED COPYRIGHTS....................................................47

Conclusion ......................................................................................................................................48

**<u>Table of Authorities</u>**

Page(s)

**Cases**

<u>Allbrand Discount Liquors v. Times Square Stores Corp.,</u>
399 N.Y.S.2d 700 (App. Div. 1977) .................................................................. 37

<u>Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc.,</u>
222 F.3d 895 (11th Cir. 2000) ......................................................................... 33

<u>Anthony F. Wasilkowski v. Amsterdam Mem. Hosp.,</u>
486 N.Y.S.2d 800 (App. Div. 1985) .................................................................. 29

<u>Arachnid, Inc. v. Merit Indus., Inc.,</u>
939 F.2d 1574 (Fed. Cir. 1991) ....................................................................... 41

<u>Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.,</u>
No. 96-1967, 1996 WL 617335 (S.D.N.Y. Oct. 25, 1996) ................................... 34

<u>Aron v. Gillman,</u>
128 N.E.2d 284 (N.Y. 1955) ............................................................................ 22

<u>Ashley Creek Phosphate Co. v. Chevron,</u>
129 F. Supp. 2d 1299 (D. Utah 2000), <u>aff'd in part</u>, <u>rev'd in part</u>, 315 F.3d
1245 (10th Cir. 2003) ........................................................................................ 3

<u>Baum v. Rockland Cmty. Coll.,</u>
299 F. Supp. 2d 172 (S.D.N.Y. 2003) ............................................................... 26

<u>Bayway Ref. v. Oxygenated Mktg. & Trading,</u>
215 F.3d 219 (2d Cir. 2000) ........................................................................... 13

<u>Bear, Stearns Funding, Inc. v. Interference Group-Nevada, Inc.,</u>
361 F. Supp. 2d 283 (S.D.N.Y. 2005) ............................................................... 13

<u>Beck v. Mfrs. Hanover Trust Co.,</u>
645 F. Supp. 675 (S.D.N.Y. 1986) ................................................................... 14

<u>Bionghi v. Metro. Water Dist. of S. Cal.,</u>
70 Cal. App. 4th 1358 (Cal. Ct. App. 1999) ...................................................... 46

<u>Cablevision Sys. Corp. v. Town of E. Hampton,</u>
862 F. Supp. 875 (E.D.N.Y. 1994), <u>aff'd</u>, 57 F.3d 1062 (2d Cir. 1995) ................ 13

Cambridge Elec. Corp. v. MGA Elec., Inc.,
    227 F.R.D. 313 (C.D. Cal. 2004) ................................................................ 5, 47

Carma Developers, Inc. v. Marathon Dev. Cal., Inc.,
    826 P.2d 710 (Cal. 1992) ........................................................................... 39

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
    Pierce, Fenner & Smith, Inc.,
    232 F.3d 153 (2d Cir. 2000) ...................................................................... 24

Connett v. Justus Enters. of Kan., Inc.,
    68 F.3d 382 (10th Cir. 1995) ..................................................................... 13

Consumers Power Co. v. Nuclear Fuel Servs., Inc.,
    509 F. Supp. 201 (W.D.N.Y. 1981) ........................................................... 32

De Shazer v. Nat'l RV Holdings, Inc.,
    391 F. Supp. 2d 791 (D. Ariz. 2005) .......................................................... 28

Feinman v. Dean Witter Reynolds, Inc.,
    84 F.3d 539 (2d Cir. 1996) ........................................................................ 13

Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.,
    865 F.2d 513 (2d Cir. 1989) ...................................................................... 32

First Nat'l Bank of Omaha v. Three Dimension Sys. Prods.,
    130 F. Supp. 2d 1098 (D. Neb. 1999) ........................................................ 37

Fisk v. Superannuities, Inc.,
    927 F. Supp. 718 (S.D.N.Y. 1996) ............................................................ 14

Garcia v. Cordova,
    930 F.2d 826 (10th Cir. 1991) ................................................................... 13

Gates Rubber Co. v. Bando Chem. Indus., Ltd.,
    9 F.3d 834 (10th Cir. 1993) ........................................................................ 7

Gen. Supply and Constr. Co. v. Goelet,
    241 N.Y. 28 (1925) ................................................................................... 32

Goldstein v. AccuScan, Inc.,
    815 N.E.2d 657 (N.Y. 2004) ..................................................................... 18

Greenfield v. Philles Records, Inc.,
    780 N.E.2d 166 (N.Y. 2002) ..................................................................... 18

Gross v. Burggraf Const. Co.,
    53 F.3d 1531 (10th Cir. 1995) ........................................................................... 15

Haggard v. Kimberly Quality Care, Inc.,
    39 Cal. App. 4th 508 (Ct. App. 1995) ............................................................. 46

Halstead v. McHendry,
    566 P.2d 134 (Okla. 1977) ............................................................................... 19

Hanson v. Capital Dist. Sports, Inc.,
    630 N.Y.S.2d 429 (App. Div. 1995) ................................................................. 28

Hershey Foods Corp. v. Collegiate Mktg., Inc.,
    No. 95-10526, 1997 WL 772768 (S.D.N.Y. Dec. 15, 1997) ............................ 28

Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.,
    858 A.2d 392 (Del. Ch. 2004), aff'd in part, rev'd in part on other grounds,
    872 A.2d 944 (Del. 2005) ................................................................................. 29

Huang v. BP Amoco Corp.,
    No. 00-1290, 2002 WL 84459 (E.D. Pa. Jan. 22, 2002) .............................. 28, 29

Hudson-Port Ewen Assocs., L.P. v. Kuo,
    566 N.Y.S.2d 774 (App. Div. 1991) ................................................................. 26

In re Estate of Stravinsky,
    770 N.Y.S.2d 40 (App. Div. 2003) ................................................................... 22

In re Robbins Int'l, Inc.,
    275 B.R. 456 (S.D.N.Y. 2002) ......................................................................... 26

Int'l Fid. Ins. Co. v. County of Rockland,
    98 F. Supp. 2d 400 (S.D.N.Y. 2000) ................................................................ 22

Jensen v. Traders & Gen. Ins. Co.,
    345 P.2d 1 (Cal. 1959) ..................................................................................... 39

Kalus v. Prime Care Physicians, P.C.,
    799 N.Y.S.2d 115 (App. Div. 2005) ................................................................. 28

Kinek v. Paramount Comm'ns, Inc.,
    22 F.3d 503 (2d Cir. 1994) ............................................................................... 19

Kingsley Arms, Inc. v. Sano Rubin Const. Co., Inc.,
    791 N.Y.S.2d 196 (App. Div. 2005) ................................................................. 28

Kirk v. City of Tulsa, Okla.,
    72 Fed. Appx. 747 (10th Cir. 2003) ................................................................. 15

L.L. Capital Partners, L.P. v. Rockefeller Ctr. Prop., Inc.,
    921 F. Supp. 1174 (S.D.N.Y. 1996) ................................................................. 13

Lauth v. McCollum,
    No. 03-8529, 2004 WL 2211620 (N.D. Ill. Sept. 30, 2004) ................................ 5, 47

Lawrence v. IBP, Inc.,
    No. 94-2027, 1995 WL 261144 (D. Kan. Apr. 21, 1995) ................................... 5, 47

Levine v. NL Indus., Inc.,
    926 F.2d 199 (2d Cir. 1991) ............................................................................. 14

Li'l Red Barn, Inc., v. The Red Barn Sys., Inc.,
    322 F. Supp. 98 (N.D. Ind. 1970) ..................................................................... 41

Lichfield v. Spielberg,
    736 F.2d 1352 (9th Cir. 1984) ............................................................................ 7

Lopp v. Peninsula Sch. Dist. No. 401,
    585 P.2d 801 (Wash. 1978) .............................................................................. 19

Matter of Estate of Flemings,
    542 P.2d 517 (Okla. 1975) ............................................................................... 19

Maytag Corp. v. U.S. Pac. Corp.,
    No. 02-10626, 2004 WL 1175130 (S.D. Iowa May 18, 2004) ........................... 28

Mercury Bay Boating Club, Inc. v. San Diego Yacht Club,
    557 N.E.2d 87 (N.Y. 1990) .............................................................................. 23

Monarch Licensing, Ltd., v. Ritam Int'l, Ltd.,
    24 U.S.P.Q.2d 1456 (S.D.N.Y. 1992) ............................................................... 41

MSF Holding Ltd. v. Fiduciary Trust Co. Int'l,
    435 F. Supp. 2d 285 (S.D.N.Y. 2006) ............................................................... 24

N. Fork Bank & Trust Co. v. Romet Corp.,
    596 N.Y.S.2d 449 (App. Div. 1993) ................................................................. 23

N.E. Sort & Fulfillment Corp. v. Reader's Digest Assoc., Inc.,
    No. 96-13834, 2001 WL 1568336 (N.Y. Sup. Ct. Aug. 30, 2001) ..................... 29

Needham v. Candie's, Inc.,
   No. 01-7184, 2002 WL 1896892 (S.D.N.Y. Aug. 16, 2002)............................................ 28, 37

Niederer v. Ferreira,
   189 Cal. App. 3d 1485 (Ct. App. 1987) ............................................................................ 46

Nycal Corp. v. Inoco PLC,
   No. 98-7058, 1998 WL 870192 (2d Cir. Dec. 9,1998) ...................................................... 15

P.C. Films Corp. v. MGM/UA Home Video Inc.,
   138 F.3d 453 (2d Cir. 1998).......................................................................................... 18, 25

Padovano v. Vivian,
   629 N.Y.S.2d 844 (App. Div. 1995) ................................................................................ 26

Pitcher v. Benderson-Wainberg Assoc. II, Ltd. P'ship,
   715 N.Y.S.2d 104 (Sup. Ct. 2000) ................................................................................ 33, 35

Playboy Enters., Inc. v. Dumas, Inc.,
   53 F.3d 549 (2d Cir. 1995)............................................................................................... 42

Point Prods. A.G. v. Sony Music Entm't, Inc.,
   No. 93-4001, 2000 WL 1006236 (S.D.N.Y. July 20, 2000) ................................ 28, 33, 35, 37

Powerine Oil Co., Inc. v. Superior Court,
   118 P.3d 589 (Cal. 2005) ............................................................................................... 39

Press v. Chem. Inv. Servs. Corp.,
   166 F.3d 529 (2d Cir. 1999)............................................................................................ 14

Radio Television Espanola S.A. v. New World Entm't, Ltd.,
   183 F.3d 922 (9th Cir. 1999)......................................................................................... 41, 42

RBFC One, LLC, v. Zeeks, Inc.,
   367 F. Supp. 2d 604 (S.D.N.Y. 2005) ............................................................................ 28

Rebh v. Lake George Ventures, Inc.,
   636 N.Y.S.2d 504 (App. Div. 1996) .............................................................................. 28, 36

Reda v. Eastman Kodak Co.,
   649 N.Y.S.2d 555 (App. Div. 1996) .............................................................................. 18, 21

Ricordi & Co. v. Paramount Pictures, Inc.,
   189 F.2d 469 (2d Cir. 1951).......................................................................................... 10

Sally v. Sally,
    638 N.Y.S.2d 832 (App. Div. 1996) ................................................................. 26

Sauer v. Xerox Corp.,
    17 F. Supp. 2d 193 (W.D.N.Y. 1998) ............................................................... 32

SCO Group, Inc. v. Novell, Inc.,
    No. 04-139, 2004 WL 4737297 (D. Utah June 9, 2004)............................ 39, 42, 43

Sheinbrot v. Pfeffer,
    Nos. 935343 & 940649, 1995 WL 432608 (E.D.N.Y. July 12, 1995) .................... 15

Signature Realty, Inc. v. Tallman,
    814 N.E.2d 429 (N.Y. 2004) ............................................................................ 18

Stone v. CGS Distrib. Inc.,
    No. 93-1288, 1994 WL 832021 (D. Colo. Aug. 18, 1994) ............................. 5, 47

Times Mirror Magazines v. Field & Stream Licenses Co.,
    294 F.3d 383 (2d Cir. 2001)............................................................................ 13

Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,
    869 F. Supp. 1130 (S.D.N.Y. 1994) ................................................................. 26

Tracey Rd. Equip., Inc. v. Vill. of Johnson City,
    571 N.Y.S.2d 586 (App. Div. 1991) ................................................................. 26

Trs. of the Bricklayers & Allied Craftworkers v. Charles T. Driscoll Masonry
    Restoration Co., Inc.,
    165 F. Supp. 2d 502 (S.D.N.Y. 2001) .............................................................. 24

Vault Corp. v. Quaid Software Ltd.,
    847 F.2d 255 (5th Cir. 1988)............................................................................. 6

W.W.W. Assocs., Inc. v. Giancontieri,
    566 N.E.2d 639 (N.Y. 1990)....................................................................... 21, 22

Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.,
    946 F.2d 1003 (2d Cir. 1991) .......................................................................... 37

World Series of Casino Gambling, Inc. v. Donald King,
    No. 85-1239, 1986 U.S. Dist. LEXIS 18521 (S.D.N.Y. Oct. 27, 1986) ................. 13

Young v. Dillon Cos., Inc.,
    No. 05-1378, 2006 WL 3236297 (10th Cir. Nov. 9, 2006) ................................. 15

**Statutes**

17 U.S.C. § 201 ............................................................................................................ 10

17 U.S.C. § 204 ............................................................................................................ 41

38 U.S.C. § 211 ............................................................................................................ 19

Fed. R. Civ. P. 11 ......................................................................................................... 31

Fed. R. Civ. P. 37 ........................................................................................................... 7

D. U. Civ. R. 56-1 .......................................................................................................... 3

Cal. Code Civ. P. § 1638 ............................................................................................. 39

Cal. Code Civ. P. § 1639 ............................................................................................. 39

Cal. Code Civ. P. § 1858 ............................................................................................. 39

**Other**

10A C. Wright, et al., Fed. Practice and Procedure § 2726 (2d ed. 1994) .................................. 27

1 D. Nimmer, Nimmer on Copyright § 3.07 (1993) ........................................................ 10

G. Banks, New York Contract Law § 13:11 (2006) ........................................................ 29

6 J. Moore, W. Taggart, Moore's Federal Practice ¶ 56.11[1-4] (2d ed. 1988) ........................... 15

Merriam-Webster Online Dictionary (2006) .................................................................. 19

R. Nimmer & J. Dodd, Modern Licensing Law § 9:16 (2005) ...................................... 25

Defendant/Counterclaim-Plaintiff IBM respectfully submits this reply memorandum in further support of its motion for summary judgment on SCO's copyright claim.

## Preliminary Statement[1]

SCO's copyright claim hinges on IBM's alleged breach of licensing agreements for the AIX operating system. SCO contends that it terminated those agreements as of June 2003, and that IBM's continued distribution of AIX since that time infringes the UNIX copyrights SCO claims to own (but which are actually owned by Novell). After three years of discovery, and after IBM's production of billions of lines of AIX source code, SCO has been able to identify only a single contribution to Linux that SCO contends (incorrectly) came from AIX and breached the agreements — IBM's Journaled Filed System ("JFS").[2] JFS was written entirely by IBM, and contains no UNIX System V source code — under SCO's theory, while IBM owns JFS, SCO has the right to control IBM's disclosure of that code. On the basis of this single

---

[1] Terms are defined and used herein as in IBM's opening brief. In addition, references herein are as follows: cites to "AIX Br. ¶ __" refer to IBM's "Statement of Undisputed Facts" in IBM's opening brief, and cites to "IBM Ex. __" refer to the declarations and documents appended to the Declarations of Todd M. Shaughnessy, dated September 25, 2006, November 11, 2006, and January 12, 2007, the Supplemental Declaration of Todd M. Shaughnessy, dated September 25, 2006, and the Second Supplemental Declaration of Todd M. Shaughnessy, dated September 29, 2006. References to the reply memorandum in further support of IBM's motion for summary judgment on SCO's contract claims are made as "K Reply at __"; for summary judgment on SCO's unfair competition claim as "UC Reply"; and for summary judgment on IBM's claim for declaratory judgment of non-infringement as "DJ Reply". References to SCO's opposition papers are made as "Opp'n at __", and references to the declarations and documents appended to the Declaration of Brent O. Hatch are cited as "SCO Ex. __".

[2] All three of the remaining categories of items that SCO identified as allegedly improper contributions to Linux (i.e., RCU, SMP and testing technologies) purportedly came from Sequent's Dynix/ptx operating system. (See IBM Ex. 59; IBM Ex. 54 at Item Nos. 23, 43, 90, 94, 186-92.) The Court may recall that IBM's production of AIX involved enormous time and expense (see 5/3/05 Shaughnessy Decl. (Docket # 441) at 3-7), all of which was pointless, since SCO identified JFS in its original complaint.

contribution (which amounts to a mere 0.01% of AIX), SCO claims it was entitled to: terminate IBM's decades-old licensing agreements (in the face of contract provisions saying the agreements are "irrevocable" and "perpetual"); cast aside the $2 billion investment IBM made in AIX over the last two decades; and recover copyright damages that SCO claims (erroneously) amount to $13 billion. SCO's claim is incredible on its face.

IBM's opening brief set out multiple independent reasons why SCO's infringement claim lacks merit. SCO seeks to revive the claim in its opposition papers, but fails to adduce admissible evidence sufficient to create a fact question. In fact, SCO fails even to show where in its Final Disclosures it specifically identified a single line of allegedly infringed or allegedly infringing code relating to this claim. Thus, summary judgment should be entered in favor of IBM for at least the following reasons: (1) SCO cannot prove unauthorized copying because it failed to disclose its claims, as repeatedly requested by IBM, and as required by the Court (see Section I below); (2) SCO cannot establish a predicate material breach of contract — i.e., a material breach sufficient to justify termination of IBM's rights to UNIX System V (see Section II below); (3) SCO cannot show that it properly terminated IBM's license to market and distribute AIX based on the alleged breach, since IBM's license is perpetual and irrevocable, and SCO failed to give IBM proper notice and opportunity to cure, or exercise its good faith best efforts to cure (see Section III below); (4) SCO cannot prove ownership of a valid copyright because Novell retained ownership of the UNIX copyrights (see Section IV below); and (5) SCO cannot enforce its alleged copyrights because it has misused them (in multiple respects), further precluding its infringement claim (see Section V below). Summary judgment should thus be entered in favor of IBM.

2

## Statement of Undisputed Facts

IBM's opening papers set out, and support with admissible evidence, sixty-nine statements of undisputed fact. SCO fails properly to contest them, as described in Addendum A, which is incorporated here by reference. Specifically, SCO either fails specifically to controvert IBM's facts, or fails to support its position with admissible evidence. Thus, pursuant to D. U. Civ. R. 56-1(c), IBM's facts should be deemed admitted.

Rather than specifically controvert IBM's statement of facts, SCO offers its own counterstatement of facts. But a party cannot avoid summary judgment based on a counterstatement of facts that does not satisfy the requirements of D. U. Civ. R. 56-1(c). See Ashley Creek Phosphate Co. v. Chevron, 129 F. Supp. 2d 1299, 1303 n.2 (D. Utah 2000), aff'd in part, rev'd in part, 315 F.3d 1245 (10th Cir. 2003).

Not only do SCO's response to IBM's facts and SCO's counterstatement of alleged facts not meet IBM's facts, but they are also comprised of alleged evidence that is immaterial, inadmissible and precluded by order of the Court. IBM objects to both SCO's response to IBM's statement of undisputed facts and to SCO's counterstatement of facts insofar as they rely on inadmissible evidence.[3]

---

[3] As set forth in Addendum B attached hereto, IBM objects to the evidence offered by SCO in its counterstatement on several grounds, including (paragraph references are to SCO's counterstatement): (1) Exceeds Final Disclosures; Precluded By Court Order (¶¶ 5, 8-10, 71); (2) No Foundation/No Personal Knowledge (¶¶ 2-4, 6-7, 11, 23, 36, 37, 55); (3) Improper Opinion (¶¶ 12); (4) Untimely Expert Testimony (¶¶ 5, 8-10, 71); (5) Violates the Parol Evidence Rule (¶¶ 2-4, 6-7, 18-22, 59-61, 64-70); (6) Not consistent with Fed. R. Evid. 702 (¶¶ 5, 10, 71-72, 75; and (7) Irrelevant (¶¶ 18-22, 24-34, 41-50, 59-70, 73-77).

**Argument**

## I.  SCO CANNOT PROVE UNAUTHORIZED COPYING BECAUSE IT FAILED TO DISCLOSE ITS CLAIM AS REQUIRED BY THE COURT.

In its opening brief, IBM explained that SCO's Final Disclosures and interrogatory responses reveal no evidence of unauthorized copying by IBM — none. (AIX Br. ¶ 69; DJ Br. ¶¶ 178, 192-97.) The Final Disclosures do not identify a single version, file, or line of code that IBM is alleged to have infringed by continuing to distribute AIX after SCO's purported termination of IBM's right to do so. (AIX Br. ¶ 69.) IBM further explained that SCO cannot sustain its claims or avoid summary judgment based on assertion alone, and that, in the absence of unauthorized copying by IBM, SCO cannot sustain its claims of infringement.

Despite the silence of its Final Disclosures and interrogatory responses, SCO's opposition brief asserts that                                    SECTION REDACTED                                    and that IBM's continued distribution of AIX violates SCO's copyrights. (Opp'n ¶¶ 71-72, and at 59-62.) According to SCO, it articulated this "legal theory" in its pleadings and otherwise in "discovery", and thus, the argument seems to go, the fact that it did not specifically identify the allegedly infringing material in its Final Disclosures and did not describe its allegations there in detail is of no consequence. (Id. at 60.) While it is true that SCO broadly stated its claim at the outset of the case, it failed altogether to satisfy the Court's orders to specify and detail the claim. (IBM Ex. 55 ¶ 2; IBM Ex. 56 ¶¶ 1-5.) The Court has been perfectly and repeatedly clear that SCO cannot proceed as to allegations and evidence not disclosed with specificity in SCO's Final Disclosures. (IBM Ex. 59 at 2; IBM Ex. 421 at 50; Nov. 30, 2006 Order (IBM Ex. 621).) Thus, the law of the case forecloses SCO's claim.

4

Notably, SCO's failure to disclose the allegations and evidence on which it now seeks to rely is even more egregious than its previous failures to disclose its claims. Following the Court's order setting a final deadline for SCO specifically to identify the allegedly infringing material, SCO sought to sneak by 187 items of allegedly misused material without disclosing even the most basic identifying information. (IBM Ex. 54.) The Court squarely rejected SCO's attempt to do that, holding that it would not be allowed to proceed as to those 187 items. (IBM Ex. 59.) Then SCO sought to use its expert reports to reinvent its case by having them identify as misused a mass of material nowhere identified by SCO in its Final Disclosures. (IBM Exs. 67, 285, 286; SCO Exs. 11, 139, 274.) The Court again ruled that SCO could not proceed as to items not specifically identified in the Final Disclosures, precluding SCO from reinventing its case by expert report. (IBM Ex. 621.) Now SCO seeks to avoid summary judgment based on the identification of allegedly misused material found neither in its Final Disclosures nor in its expert reports. That is plainly impermissible under the Court's orders. Moreover, even independent of the Court's orders, the rules and case law are clear that a party cannot survive summary judgment if it fails to produce, during discovery, evidence supporting a necessary element of its opposition.[4] Thus, SCO's claim fails, and IBM's motion should be granted without any further analysis.

Even if SCO's opposition were not premised on allegations of infringement not specifically disclosed in SCO's Final Disclosures (and thus foreclosed by the law of the case and

---

[4] See, e.g., Lawrence v. IBP, Inc., No. 94-2027, 1995 WL 261144, at *7 (D. Kan. Apr. 21, 1995); Stone v. CGS Distrib. Inc., No. 93-1288, 1994 WL 832021, at *6 (D. Colo. Aug. 18, 1994); see also Lauth v. McCollum, No. 03-8529, 2004 WL 2211620, at *4 (N.D. Ill. Sept. 30, 2004); Cambridge Elec. Corp. v. MGA Elec., Inc., 227 F.R.D. 313, 325 (C.D. Cal. 2004).

controlling authority), its opposition would fail, because the evidence cited by SCO to bolster its

new allegations does not support SCO's position.  As an initial matter, SCO's theory makes no

sense.  SCO's claim that AIX is a derivative work of UNIX System V, Release 4 ("SVr4"),

defies logic.  (See Opp'n at 59-62.)  The IBM Software Agreement grants IBM a license to

UNIX System V, Release 3.2 and earlier, not Release 4.  (See IBM Ex. 124 at 1, "RECITALS".)

SCO, in fact, specifically asserts in connection with another pending motion that "IBM's AIX

operating system was based on the earlier UNIX System V Release 3.2", and that "IBM had

opted not to buy from SCO an upgrade of its UNIX license to the SVR4 code base".  (UC Opp'n

¶ 13 (emphasis added).)[5]


### SECTION REDACTED


See Vault Corp. v. Quaid

Software Ltd., 847 F.2d 255, 267 (5th Cir. 1988) (a derivative work "must be substantially

---

[5]


### SECTION REDACTED


[6] In addition, Mr. Rochkind's new declaration (SCO Ex. 139), while suffering from the
same flaws as noted above, should not be considered at all, because it was submitted long after
the expert discovery deadline, as was Dr. Cargill's declaration.  (SCO Ex. 11.)

similar to the [preexisting] work"); accord Lichfield v. Spielberg, 736 F.2d 1352, 1357 (9th Cir.

1984).


### SECTION REDACTED


: Gates Rubber Co. v. Bando Chemical

Industries, Ltd., 9 F.3d 834, 836-38 (10th Cir. 1993);

, Gates Rubber


### SECTION REDACTED


(IBM Ex. 181 ¶ 50.) Furthermore, SCO cannot properly

rely on Dr. Cargill's testimony .                                        because it was untimely

submitted.  Pursuant to the Court's order of May 15, 2006, SCO was required to submit expert

reports in support of its case no later than May 19, 2006.  (IBM Ex. 612 at 1.)  According to the

Court's June 13, 2006 Order, opposing reports were to be submitted on July 17, 2006.  (IBM

Ex. 642 at 2.)  While SCO submitted reports from Dr. Cargill on each of those dates, .

(See SCO

### SECTION REDACTED

Exs. 274, 275.)  Dr. Cargill addressed ·                          · in a rebuttal expert report dated

August 28, 2006 (SCO Ex. 276), long after the deadline for submitting expert testimony in

support of SCO's claims, and at a point when IBM was unable to submit a response.  Thus, SCO

cannot rely on Dr. Cargill's testimony for this additional reason.  See Fed. R. Civ. P. 37(c)

(providing that a party who does not timely disclose information required by Rule 26(a) is not

7

permitted "to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed").

## II.    SCO CANNOT ESTABLISH A PREDICATE BREACH OF CONTRACT.

SCO does not (and could not) dispute that its claim for copyright infringement depends on its establishing that IBM committed a material breach of its UNIX licensing agreements with AT&T (the "Agreements"). Nor does (or could) SCO dispute that whether it can establish such a breach turns on IBM's contribution of JFS to Linux, Item 1 of SCO's Final Disclosures (the "JFS Contribution") (IBM Ex. 54 at Item 1). While SCO argues that the JFS Contribution was a material breach of the Agreements, it fails to adduce admissible evidence to support its position. (Opp'n at 25-30.) Thus, summary judgment should be entered in favor of IBM on SCO's copyright claim because SCO cannot establish a predicate breach.

The flaws in SCO's contract claims are described in IBM's motion for summary judgment as to those claims, and were incorporated into IBM's opening brief in support of its motion for summary judgment as to SCO's copyright claim (the claim at issue in this motion). SCO's brief in opposition to this motion largely incorporates the arguments set out in its response to IBM's motion as to SCO's contract claims. While long on rhetoric, SCO's brief is short on evidence, and is no impediment to the entry of summary judgment, as is described in IBM's reply brief in further support of its motion for summary judgment as to SCO's contract claims. (See K Reply.) Rather than repeat the content of that brief here, we incorporate it by reference, and focus instead on the JFS-specific flaws that SCO ignores. Although SCO's contract claims lack merit as to all of the contributions challenged in SCO's Final Disclosures, its claim relating to JFS is particularly wanting.

8

A.    SCO's JFS Allegations Lack Merit.

Nothing in SCO's opposition papers establishes that the JFS Contribution breached the Agreements.  On the contrary, SCO either ignores or fails properly to controvert the facts entitling IBM to summary judgment.  Hence, in addition to the grounds for summary judgment set out in IBM's briefs relating to SCO's contract claims, SCO's contract claim relating to the JFS Contribution, and thus its copyright claim, fails.

First, SCO's contract claim relating to the JFS Contribution turns on the proposition that it came from AIX.  But it did not.  While the JFS Contribution is similar to code in AIX, it actually came from IBM's OS/2 operating system, to which SCO plainly has no rights.  (IBM Ex. 168 ¶¶ 4-5.)

SECTION REDACTED

But any similarity is not surprising, and does not permit the conclusion that the JFS Contribution came from AIX, because the JFS Contribution is identical to code in OS/2. (IBM Ex. 168 ¶¶ 4-5.)  And the JFS Contribution is similar to code in AIX because the same OS/2 code that IBM contributed to Linux for JFS was also incorporated into AIX.[7]  (IBM

---

[7]

SECTION REDACTED

Ex. 168 ¶ 5.)  Furthermore, the portion of Dr. Ivie's report on which SCO relies (see SCO

Response to IBM ¶¶ 248-50) concerns material that was not specifically identified in SCO's

Final Disclosures, and thus was stricken by Magistrate Judge Wells' order of December 26,

2006.  (IBM Ex. 67 at 9; IBM Ex. 621.)

      Second, even if (contrary to fact) the JFS Contribution were from AIX (as opposed to

OS/2), it is undisputed that the JFS Contribution itself is not a modification or derivative work of

UNIX System V, and that IBM owns it.  (SCO K Opp'n at App. Λ ¶ 236.)  The IBM Side Letter

expressly states:  "modifications and derivative works prepared by or for you are owned by you".

(IBM Ex. 122 ¶ 2.)  Indeed, it is undisputed that IBM holds the registered copyrights in the JFS

Contribution.  (GPL Opp'n at App. A ¶ 24.)  The owner of copyrighted material has the right

(among others) to disclose it.  See 17 U.S.C. § 201(a); 1 David Nimmer, Nimmer on Copyright

§ 3.07 (1993) (citing Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469, 472-73 (2d Cir.

1951)).  To quote SCO:  "Under the Copyright Act, copyright ownership consists of exclusive

rights to, among other things, reproduce, prepare derivative works, and distribute a work."

(Opp'n at 50.)  Likewise, the Agreements make perfectly clear that IBM was free to do as it

wished with its own code.  (K Br. at 82-83.)

      Third, even if the JFS Contribution had not been created independent of UNIX System V,

and even if it were not owned by IBM, SCO has no intellectual property right in the JFS

Contribution, and thus cannot base a claim on it.  It is undisputed that SCO shipped the JFS

---

**SECTION REDACTED**

Contribution with its UnitedLinux product, SCO Linux 4.0. (K Opp'n at App. A ¶ 250.) As discussed in IBM's other briefs, which we incorporate by reference, to the extent SCO had any intellectual property rights in that product, it assigned them to UnitedLinux (with exceptions not relevant here). (DJ Br. ¶¶ 302-08.)

SECTION REDACTED

Thus, any intellectual property right SCO had in the JFS Contribution was assigned by it to UnitedLinux.

Fourth, SCO is estopped from pursuing, and has waived, any claim for breach of contract relating to the JFS Contribution, to which IBM also has a license from SCO. In addition to the grounds for estoppel and waiver set out in IBM's contract and declaratory judgment briefs, SCO's predecessor, Caldera Systems, granted IBM a license to

SECTION REDACTED

(DJ Br. ¶¶ 199-205.) In fact, SCO specifically touted the JFS Contribution as part of its Linux products:

- In SCO's product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO specifically advertised that the products included new features such as "journaling file system support". (IBM Ex. 350 at 2; IBM Ex. 351 at 2.)

- SCO's November 2002 product announcement for "SCO Linux Server 4.0" noted that "New features include . . . improved journaling file system support". (IBM Ex. 352 at 2.)

- SCO's Technical Overview of SCO Linux 4.0 emphasized that its product included "JFS (Journaling File System Developed by IBM)". (IBM Ex. 396 at SCO 1307701.)

If ever there were a case for waiver and estoppel, this is it. Any contention that the JFS Contribution constituted a breach of the IBM Agreement is untenable.

B.   The Alleged Breach Is Immaterial.

Even if (contrary to fact) the JFS Contribution could be considered a breach of the Agreements, it could not be considered a material breach, and thus could not support SCO's copyright claims.

In its opening brief, IBM explained that both New York law and the plain language of the Agreements provide that a contract cannot be terminated except for a material breach. (AIX Br. at 24-26.) SCO does not disagree. SCO simply asserts that: (1) the materiality of the alleged breach cannot be decided at summary judgment; (2) the alleged breach was material because the confidentiality provisions of the Agreements were important; and (3) the JFS Contribution was important to both AIX and Linux, and thus rendered the alleged breach material. (Opp'n at 25-30.) None of these points survives scrutiny.

First, contrary to SCO's contention (Opp'n at 25-28), the materiality of the alleged breach can be decided as a matter of law at summary judgment. SCO nitpicks the cases cited in IBM's opening brief, complaining, for example, that they "present unique fact situations". (Opp'n at 28.) But SCO fails to cite a single case holding that materiality cannot be resolved at summary judgment. In fact, SCO's principal case, Bear Stearns Funding, Inc. v. Interference

Group-Nevada, Inc., 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005), states: "[t]o be sure, there may be circumstances in which the question of materiality is a question of law for the judge".

In addition to the cases cited in IBM's opening brief, many cases have decided the issue of materiality at summary judgment. See, e.g., World Series of Casino Gambling, Inc. v. Donald King, No. 85-1239, 1986 U.S. Dist. LEXIS 18521, at *11 n.1 (S.D.N.Y. Oct. 27, 1986) ("Addendum C hereto) ("in light of the objective standard governing the materiality issue . . . nothing in plaintiff's affidavit would change my conclusion that the three alleged omissions were immaterial as a matter of law"); Cablevision Sys. Corp. v. Town of E. Hampton, 862 F. Supp. 875, 885 (E.D.N.Y. 1994), aff'd 57 F.3d 1062 (2d Cir. 1995) (raising cable rates several days before franchise agreement found immaterial as a matter of law); Bayway Ref. v. Oxygenated Mktg. & Trading, 215 F.3d 219, 222-26 (2d Cir. 2000) (failure to attach a tax clause found immaterial to contract claim as a matter of law); Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996) (deceptive labeling of transaction fees found immaterial to plaintiffs' decisions to purchase and sell securities as a matter of law); L.L. Capital Partners, L.P. v. Rockefeller Ctr. Prop., Inc., 921 F. Supp. 1174, 1183 (S.D.N.Y. 1996) (failure to specify explicit details of potential funding problems in stock offering found immaterial as a matter of law); see also Connett v. Justus Enters. of Kansas, Inc., 68 F.3d 382, 384-86 (10th Cir. 1995) (omission of appraisal figures from a bond offering found immaterial as a matter of law); Garcia v. Cordova, 930 F.2d 826, 828-830 (10th Cir. 1991) (failure to disclose "soft information" to selling shareholders found immaterial as a matter of law).[8]

_____

[8] See also Times Mirror Magazines v. Field & Stream Licenses Co., 294 F.3d 383, 389 (2d Cir. 2001) (alleged breaches based upon certain uses of a trademark and failure to notify plaintiff of termination of negotiations with potential licensees were immaterial as a matter of

Second, SCO argues that the alleged breach was material because the confidentiality provisions of the Agreements were "integral" to them.  (Opp'n 25-26.)

SECTION REDACTED

Putting aside the fact that SCO's own witnesses disagree with this position

it does not follow, as SCO contends, that, just because the confidentiality provisions of the Agreements might have been important as a general matter, every alleged breach of them is material.  Moreover, every single person who negotiated IBM's UNIX Licensing Agreements with AT&T has offered unequivocal testimony rejecting the notion that the JFS Contribution was even a breach of the Agreement, let alone a material breach. (K Br. ¶ 57-63.)

SECTION REDACTED

law); Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 539 (2d Cir. 1999) (four-day delay in delivery of payment was immaterial as a matter of law); Fisk v. Superannuities, Inc., 927 F. Supp. 718, 723-25 (S.D.N.Y. 1996) (omissions in bond offering were immaterial as a matter of law); Levine v. NL Indus., Inc., 926 F.2d 199, 202-03 (2d Cir. 1991) (undisclosed environmental violations were immaterial as a matter of law); Beck v. Mfrs. Hanover Trust Co., 645 F. Supp. 675, 681 (S.D.N.Y. 1986) (misrepresentation concerning distributions by bank was immaterial as a matter of law).

[9] SCO endorses                    testimony and rejects               — though both were formerly employed by SCO's alleged predecessors — in what has become a familiar pattern: if SCO dislikes the testimony, including that of its own declarants, that testimony is just the mistaken personal opinion of the witness; if SCO likes the testimony, however, it becomes the view of every one of its alleged predecessors.  But the law does not permit unprincipled cherry-picking of parol evidence.

14

## SECTION REDACTED

(see K Reply at I.B.1).  See also Kirk v. City of Tulsa,

Okla., 72 Fed. Appx. 747, 750 (10th Cir. 2003) (Addendum D hereto) (striking of summary

judgment exhibit for lack of foundation was a sound exercise of district court's discretion);

Young v. Dillon Cos., Inc., No. 05-1378, 2006 WL 3236297, at *7 (10th Cir. Nov. 9, 2006)

(Addendum E hereto) ("Rule 56 precludes the use of inadmissible hearsay testimony in

depositions submitted in support of, or in opposition to, summary judgment.") (quotations

omitted)); Gross v. Burggraf Const. Co., 53 F.3d 1531, 1544 (10th Cir. 1995) (lay opinion not

admissible when not based on personal knowledge); 6 J. Moore, W. Taggart, Moore's Federal

Practice ¶ 56.11[1-4] (2d ed. 1988) ("Depositions may be considered by the district court in

determining a Rule 56 motion to the extent that they are admissible in evidence — i.e., the

testimony is competent, relevant and material.") (internal quotations omitted).[10]

    Third, SCO argues that the alleged breach was material because the JFS Contribution was

an important part of both AIX and Linux.  (Opp'n at 25, 29-30.)  Even if one assumed, arguendo,

---

[10] See also Nycal Corp. v. Inoco PLC, No. 98-7058, 1998 WL 870192, at *3 (2d Cir.
Dec. 9, 1998) (Addendum F hereto) (deposition testimony of plaintiff's CFO and GC was not
relevant, competent or admissible, and therefore was insufficient to defeat summary judgment on
issue of intent, where deponent lacked personal knowledge of the parties' intent); Sheinbrot v.
Pfeffer, Nos. 935343 & 940649, 1995 WL 432608, at *2 (E.D.N.Y. July 12, 1995) (Addendum
G hereto) ("In considering the crossmotions for summary judgment, the court will disregard any
portions of defendant's affidavits and Local Rule 3(g) statement that lack a basis in personal
knowledge, constitute inadmissible hearsay, contain conclusory assertions without proper
foundation, are unsupported by admissible evidence, or address irrelevant matters.") (citations
omitted).

that the JFS Contribution was from AIX, it could not be considered an important part of it.  AIX

5.1.G for POWER consists of 160,198,865 lines of code, while the JFS Contribution consists of

only 16,949 lines of code.  (IBM Ex. 181, Exs. C, G.)  The JFS Contribution was not only small

in size, but was also only one of many file systems in Linux.  (IBM Ex. 208 ¶¶ 86-90.)

        As Michael DeFazio, who was the overall head of AT&T's UNIX licensing effort, and

ultimately responsible for AT&T's UNIX licensing agreements, put it at his deposition:

"AT&T's goal was not here to implement a lot of agreements and then have what I'll call

'gotcha's' with all our licensees on insignificant or minor or trivial violations.  We were

concerned about protecting the core of our intellectual property, and that meant substance and

materiality is what we were focused on from a business side." (IBM Ex. 260 at 248.)  Yet SCO's

entire claim for breach against IBM (as opposed to Sequent) hangs on the JFS Contribution,

which was the original work of IBM and third parties other than SCO.  The JFS Contribution did

not include a single line of code from UNIX System V, or a single method or concept from

UNIX System V — and IBM owns the copyrights to it.  According to SCO's own theory, SCO

has no more than the limited right to control what IBM does with that code.  (IBM Ex. 168 ¶¶ 6-

7.)  Thus, assuming the JFS Contribution was a breach (and it clearly was not), it could not

possibly have been a material breach of the Agreements.  Absent a material breach, SCO's

copyright claim is untenable.

## III.    SCO CANNOT SHOW THAT IT PROPERLY TERMINATED IBM'S LICENSE.

        SCO's infringement claim also lacks merit because it depends on SCO's showing that it

properly terminated the Agreements.  As stated in IBM's opening brief, SCO cannot show that it

properly terminated IBM's license relating to AIX, for at least two independent reasons:

16

(1) IBM has a perpetual and irrevocable license to distribute AIX, and SCO therefore had no right whatsoever to terminate IBM's license; and (2) even assuming (contrary to fact) that the contract allowed termination, SCO:  (a) denied IBM proper notice and an opportunity to cure the alleged breaches of its UNIX licensing agreements; and (b) failed to exercise its good faith best efforts to avoid termination.

     A.    <u>IBM Has an Irrevocable License.</u>

In its opposition papers, SCO argues that there is a fact question as to whether SCO properly terminated the Agreement, and that summary judgment is therefore inappropriate. (Opp'n at 32-34.)  SCO is wrong.

     1.    <u>The Plain Language.</u>

SCO does not dispute that Amendment No. X must be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed.  (<u>See</u> <u>id.</u>)  Nor does SCO dispute that a court may not make a contract for the parties, or vary the terms of a contract, even to accomplish its own "notions of abstract justice or moral obligation".  (AIX Br. at 28.)  Yet SCO urges the Court to do just that in arguing that the plain language of Amendment No. X permitted SCO to terminate IBM's license relating to AIX.

As stated in IBM's opening brief, under the plain language of Amendment No. X, IBM has a perpetual and irrevocable right to distribute AIX.  (AIX Br. ¶ 36.)  The terms "irrevocable" and "perpetual" are plain and commonly understood.  "Irrevocable" means "not to be revoked or recalled; unable to be repealed or annulled".  Similarly, "perpetual" means "continuing or

enduring forever".[11]   (AIX Br. at 28.)  SCO does not dispute these facts, but argues that

Amendment No. X's failure to use the word "non-terminable" demonstrates that IBM's license is

terminable.  (Opp'n at 32.)  As they are employed in Section 1 of Amendment No. X, however,

the terms "irrevocable" and "perpetual" are absolute and all-encompassing, and are not

accompanied by qualifying language that would allow SCO to terminate IBM's license.  (AIX

Br. ¶ 36.)  A perpetual and irrevocable license is non-terminable; a license that can be terminated

is neither perpetual nor irrevocable.  Thus, the fact that Amendment No. X does not use the term

"non-terminable" is irrelevant.[12]

SCO points also to the "notwithstanding" clause in Section 1 of Amendment No. X to

support its position that IBM's license is not really irrevocable and perpetual, but rather

terminable.  (Opp'n at 31-32.)  But this clause makes no mention whatsoever of the preservation

of any right to early termination.  (AIX Br. ¶ 36.)  Instead, the "notwithstanding" clause provides

only that Novell or SCO may seek to "enjoin or otherwise prohibit" any conduct that violates

their rights — a situation not implicated here.  (AIX Br. ¶ 22.)  SCO attempts to stretch the term

"enjoin or otherwise prohibit" beyond its limits to encompass the right to terminate for breach,

---

[11] See also P.C. Films Corp. v. MGM/UA Home Video Inc., 138 F.3d 453, 457 (2d Cir. 1998) (finding the term "perpetual" to be synonymous with "forever" in a film distribution license).

[12] A court may not, of course, imply qualifications or limitations upon express terms such as "irrevocable" or "perpetual" in their absence.  See, e.g., Goldstein v. AccuScan, Inc., 815 N.E.2d 657, 657 (N.Y. 2004); Signature Realty, Inc. v. Tallman, 814 N.E.2d 429, 430 (N.Y. 2004); Reda v. Eastman Kodak Co., 649 N.Y.S.2d 555, 557 (App. Div. 1996).  Indeed, "the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation".  Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 172 (N.Y. 2002) (internal quotation marks omitted).  Plainly, no such burden was borne as to termination in Amendment No. X.

18

but the plain language will not admit of such distortion. "Enjoin" means "to direct or impose <u>by</u> <u>authoritative order</u>",[13] or "to prohibit <u>by a judicial order</u>", and "prohibit" means "to forbid <u>by</u> <u>authority</u>".[14] The phrase "enjoin or otherwise prohibit" thus denotes enforcement by way of court intervention — not by way of a self-executing reserved power under an agreement, such as a right of termination.[15] Furthermore, "prohibit" means "to prevent from doing something"[16] — that is, prospectively. Termination of a license does not prospectively prohibit a breach thereof, but, rather, revokes the party's rights under the license on account of a breach after it has occurred. See <u>Kinek v. Paramount Comm'ns, Inc.</u>, 22 F.3d 503, 509 (2d Cir. 1994) ("all provisions of a contract [should] be read together as a harmonious whole, if possible").

---

[13] Merriam-Webster Online Dictionary (http://www.m-w.com/dictionary/enjoin) (2006) (emphasis added).

[14] Merriam-Webster Online Dictionary (http://www.m-w.com/dictionary/prohibit) (2006) (emphasis added).

[15] A review of case law confirms that "enjoin or otherwise prohibit" is a legal term of art that, indeed, refers to court intervention. <u>See, e.g.</u>, <u>Lopp v. Peninsula Sch. Dist. No. 401</u>, 585 P.2d 801, 802 (Wash. 1978) ("Appellant brought this suit pursuant to RCW 42.30.130 <u>to enjoin</u> <u>and otherwise prohibit</u> the sale of 9.4 million dollars in general obligation bonds of the Peninsula School District, No. 401."); <u>Halstead v. McHendry</u>, 566 P.2d 134 (Okla. 1977) ("Bill J. Halstead (Petitioner) commenced this original proceeding seeking to have this Court assume original jurisdiction <u>to enjoin or otherwise prohibit</u> the execution of a lease agreement between the Board of County Commissioners of Garfield County and the Garfield County Regional Health Facilities Authority (Authority), and <u>to enjoin or otherwise prohibit</u> the issuance of revenue bonds by Authority."); <u>Matter of Estate of Flemings</u>, 542 P.2d 517, 519 (Okla. 1975) ("This order finds that the 'District Court of Oklahoma County, State of Oklahoma, pursuant to 38 U.S.C. § 211(a) does not have jurisdiction <u>to enjoin or otherwise prohibit</u> the Veterans Administration from distributing said fund.'") (emphases added <u>passim</u>).

[16] Merriam-Webster Online Dictionary (http://www.m-w.com/dictionary/prohibit) (2006).

Finally, SCO suggests that IBM's license must be viewed as terminable so that "no contractual provisions be rendered superfluous" and that "contractual provisions are read so as not to conflict with one another". (Opp'n at 31.) SCO does not explain how interpreting Amendment No. X to grant IBM an irrevocable and perpetual (and thus non-terminable) license would render any provision of the agreement superfluous or in conflict with any other provision. Ironically, however, the interpretation SCO espouses violates the very canon of construction upon which SCO relies. It is SCO's construction of Section 1 of Amendment No. X, not IBM's, that renders the "notwithstanding" provision surplusage. For why would Novell (or SCO) have any need to add a clause stating that "the irrevocable nature of the above rights will in no way be construed to limit Novell's or SCO's rights to enjoin or otherwise prohibit IBM from violating any and all of Novell's or SCO's rights under this Amendment No. X, the Related Agreements, or under general patent, copyright, or trademark law", if the term "irrevocable, fully paid-up, perpetual right" in fact already permitted Novell or SCO to terminate the license, without court action, for any material breach whatsoever?

Indeed, SCO can give no account of what protections the addition of the terms "irrevocable" and "perpetual" to Amendment No. X would give IBM, if SCO's interpretation were correct. For, plainly, the right to continued use without further royalty payments is already covered in Amendment No. X by the terms "fully paid-up" and "at no additional royalty fee" (AIX Br. ¶ 36). What, then, do the terms "irrevocable" and "perpetual" add? SCO's answer appears to be that these terms add only the right not to have the license terminated for material breach. (Opp'n at 31-32.) But, as IBM made clear in its opening brief, IBM already had this right under the Agreements and the Side Letter. (AIX Br. ¶ 8; IBM Ex. 122 A.5 ("we will not

terminate your rights for breach, nor will we give notice of termination . . . for breaches we consider to be immaterial").)  SCO's interpretation thus renders the key contractual terms "irrevocable" and "perpetual" superfluous and of no effect whatsoever.  This fact alone is reason enough to reject SCO's construction.  See Reda v. Eastman Kodak Co., 649 N.Y.S.2d 555, 557 (App. Div. 1996) ("[e]ffect and meaning must be given to every term of the contract . . . and reasonable effort must be made to harmonize all of its terms") (citations omitted).  But there is more to preclude SCO's reading.

SCO's interpretation violates well-established rules of construction by reading terms wholesale into Amendment No. X.  SCO seeks to insert the term "absent breach by the licensee", or some similar qualification, into the clause "IBM will have the irrevocable, fully paid-up, perpetual right to exercise all of its rights under the [Agreements]" — where no such clause exists.  New York law, which governs the Agreements (see, e.g., IBM Ex. 492 § 7.13), is clear that courts may not rewrite a contract for the parties.  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to . . . the writing . . . ."  W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990) (emphasis added).[17]

Interpreting the terms "irrevocable" and "perpetual" to mean anything other than "non-terminable" would, in the context of Amendment No. X, lead to an absurd result.  It would have made no sense for IBM to pay over $10 million for a license that SCO could terminate without any obligation to refund the license fee.  (See AIX Br. ¶¶ 19, 36.)  If SCO's interpretation were correct (and it is not), then Novell or Santa Cruz could have terminated IBM's rights within days

---

[17] See also n.12 above.

of Amendment No. X, and retained the entirety of IBM's fully paid-up royalty. (See AIX Br. ¶ 36.) That is nonsensical. Under New York law, the court should "examine the entire contract and consider the relation of the parties and the circumstances under which [the contract] was executed". In re Estate of Stravinsky, 770 N.Y.S.2d 40, 45 (App. Div. 2003); see also Aron v. Gillman, 128 N.E.2d 284, 288 (N.Y. 1955). Absent compelling reason to do so, courts will not adopt contract interpretations that make no economic sense. See Int'l Fid. Ins. Co. v. County of Rockland, 98 F. Supp. 2d 400, 422 (S.D.N.Y. 2000). There is no such reason here.[18]

In sum, based on the plain language of Amendment No. X, SCO could not properly terminate IBM's right to distribute AIX; IBM still has a license to distribute AIX; and SCO's infringement claim necessarily fails.

### 2.    The Extrinsic Evidence.

Faced with plain language that forecloses its claim, SCO resorts to extrinsic evidence in an effort to create a fact question. As stated in IBM's opening brief, however, the Court need not — indeed, should not — look beyond the four corners of Amendment No. X to conclude that SCO could not properly terminate IBM's license to distribute AIX. (AIX Br. at 32.) New York law dictates that where, as here, the Court is faced with unambiguous and commonly used terms such as "irrevocable" and "perpetual", the Court should look no further than the "four corners" of the Amendment and Agreements to adjudge the rights of the respective parties. See W.W.W. Assocs., 566 N.E.2d at 642; see also N. Fork Bank & Trust Co. v. Romet Corp., 596 N.Y.S.2d

---

[18] Nowhere does SCO dispute that courts applying New York law are especially loath to look beyond the "four corners" of agreements where, as here:  (1) the parties were sophisticated, well-counseled business entities, dealing at arm's length; (2) the agreements were reduced to deliberately prepared and executed written instruments; and (3) the agreements contain explicit merger clauses that prohibit oral modification.  (See AIX Br. at 31.)

449, 450 (App. Div. 1993); <u>Mercury Bay Boating Club, Inc. v. San Diego Yacht Club</u>, 557

N.E.2d 87, 95 (N.Y. 1990).

  In its opening brief, IBM showed that, while the Court should <u>not</u> look to the extrinsic

evidence (because Amendment No. X is unambiguous), the relevant parol evidence also shows

that IBM's license is not terminable. (AIX Br. at 32-34.) SCO takes a different view of the

extrinsic evidence, but it fails properly to controvert the undisputed facts on which IBM relies.

That evidence shows, for example, that:

- IBM approached Novell about amending its UNIX licensing agreements for the purpose of acquiring non-terminable rights to distribute AIX. (AIX Br. ¶¶ 15-18.) IBM wanted to invest further in AIX and develop its AIX business, and did not wish to do so without ensuring that it had a non-terminable right to use AIX. (AIX Br. ¶¶ 15-18.) In IBM's view, it made no sense to undertake enormous further investment in AIX absent the assurance that no one could terminate its rights to use AT&T's software and thereby hold hostage IBM's AIX business. (AIX Br. ¶ 18.) IBM made clear to Novell that it wanted a non-terminable license; Novell understood IBM wanted a non-terminable license; and IBM and Novell (on behalf of itself and Santa Cruz) entered into the April 1996 Amendment, which provided IBM a non-terminable license. (AIX Br. ¶¶ 15-23.)

- When Santa Cruz objected to the April 1996 Amendment, Novell negotiated separately with IBM and Santa Cruz to reach the understanding resulting in Amendment No. X. (AIX Br. ¶¶ 28-30.) IBM reaffirmed its insistence on non-terminable rights to AIX during these subsequent negotiations. (AIX Br. ¶ 29.) Novell understood and agreed that IBM's rights would be non-terminable. (AIX Br. ¶¶ 20, 21, 29.) Santa Cruz initially proposed to revise the language of the irrevocability provision by making it "subject to the provisions of this Amendment". (AIX Br. ¶ 30.) IBM, however, rejected this proposal, and Santa Cruz ultimately agreed to let the irrevocability provision stand as written. (<u>Id.</u>)

- At no point in the negotiations did IBM indicate a willingness to back off of the position that it must have a non-terminable license. (AIX Br. ¶ 31.) At no point did Novell suggest that IBM's license would be terminable. (<u>Id.</u>)

- Amendment No. X was negotiated by IBM on its own behalf, and by Novell on behalf of Novell and Santa Cruz. (AIX Br. ¶ 17.) To the extent Santa

23

Cruz expressed its views to IBM during the negotiations, it was by and through Novell, which was authorized to act on behalf of Santa Cruz. (AIX Br. ¶¶ 17, 28.) IBM and Novell agree that the parties intended for IBM to receive a non-terminable license. (AIX Br. ¶¶ 41-44.)

Where, as here, the relevant parol evidence overwhelmingly supports one view of a contract, summary judgment is appropriate.[19]

Rather than controvert IBM's evidence, SCO refers to: (1) a legal treatise regarding licensing (Opp'n at 31); (2) the Technology Licensing Agreement between Santa Cruz and Novell (the "TLA") (Opp'n at 32); (3)

### SECTION REDACTED

, and one former Novell employee (Mr. Bouffard) (Opp'n at 34). None of this evidence can be used to alter the plain language of Amendment No. X.

First, the TLA has nothing to do with Amendment No. X. It was executed before Amendment No. X, and IBM was not a party to it. (SCO Ex. 48.) The mere fact that it used the word "non-terminable" instead of the terms "irrevocable" and "perpetual" is irrelevant. If anything, it shows that the terms can be used synonymously.

Second, contrary to SCO's suggestion (Opp'n at 31), the statement in the Nimmer treatise on which it relies does not seek to summarize custom and practice in the software industry. See

---

[19] See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 161 (2d Cir. 2000) (affirming grant of summary judgment as to contract interpretation where "the overwhelming weight of the extrinsic evidence support[ed] plaintiffs' contention"); MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285, 302-03 (S.D.N.Y. 2006) (granting summary judgment where the "extrinsic evidence before the Court [was] so one-sided as to dispel any dispute of the parties' intent"); Trs. of the Bricklayers & Allied Craftworkers v. Charles T. Driscoll Masonry Restoration Co., Inc., 165 F. Supp. 2d 502, 510-13 (S.D.N.Y. 2001) (granting summary judgment as to contract interpretation upon consideration of extrinsic evidence).

R. Nimmer & J. Dodd, <u>Modern Licensing Law</u> § 9:16 (2005).  Rather, the treatise merely summarizes case law.  (<u>See</u> IBM Ex. 641.)  Thus, it is inadmissible for the sole reason for which it is offered by SCO.  Even if this were not the case, however, the treatise cites to a single case, and this case does not stand for the proposition that a "breach" exception must be, or even should be, read into the terms "irrevocable" and "perpetual".  <u>See id.</u>  Nor does the treatise discussion support the interpretation that IBM's license is terminable.[20]  The treatise uses the term "irrevocable" as a synonym for "not subject to termination" in the paragraph following the very paragraph cited by SCO.  <u>See id.</u>  Further, the Nimmer treatise goes on to state that an agreement that a license may not be cancelled even for breach may arise "where a remedy that cuts off rights to continue to use the licensed subject matter would cause a harsh forfeiture of the licensee's investment".  <u>Id.</u> at n.1.  Of course, this is precisely IBM's situation regarding its investment in AIX in this case.  (<u>See</u> AIX Br. at 32 and ¶ 18.)

    <u>Third,</u>

SECTION REDACTED

                SCO has not disputed the specific evidence IBM

---

[20] SCO's quotation from <u>Modern Licensing Law</u> purports to summarize <u>P.C. Films Corp. v. MGM/UA Home Video Inc.</u>, 138 F.3d 453 (2d Cir. 1998).  <u>See</u> <u>Modern Licensing Law</u> at § 9:16 n.1.  However, <u>P.C. Films</u> says nothing whatsoever about the right to terminate any sort of license (whether the license be "irrevocable" and "perpetual" or otherwise) for <u>breach</u>, because there is no breach in question before the court in that case.  <u>See</u> <u>P.C. Films</u>, 138 F.3d at 453.  Rather, the court there merely affirms the denial of plaintiff copyright owner's request for a declaratory judgment that a film distribution license had terminated upon the expiration of the original term of the copyright.  <u>See id.</u>  <u>P.C. Films</u> does not address the meaning of the term "irrevocable" in such a context at all, and, in addition, actually <u>supports</u> IBM's reading of the term "perpetual", stating:  "[t]he dictionary definition of 'perpetual' includes 'continuing forever'. . . .  Thus, 'perpetual' is sufficiently synonymous with 'forever' . . .".  <u>Id.</u> at 457.  Further, the court credited testimony from the defendant's vice president that, "in his understanding, the term 'perpetual' mean[s] forever".  <u>Id.</u>

adduced in its opening brief that Santa Cruz had initially sought to revise the language of the irrevocability provision in the April 1996 Amendment (the precursor to Amendment No. X) by, among other things, making it "subject to the provisions of this Amendment", but that IBM had rejected this proposal, and that Santa Cruz had then ultimately agreed to let the irrevocability provision stand as written in the April 1996 Amendment. (AIX Br. ¶ 30.) Nor does SCO claim that it was ever suggested to IBM after this point that its license would be terminable, or that IBM ever retreated from its position during the negotiations that it needed a non-terminable license. (AIX Br. ¶ 31.)

Fourth, the testimony of the Santa Cruz witnesses is irrelevant, because none of them communicated their views to IBM, which negotiated Amendment No. X with Novell.[21] (Opp'n at 34.) While Mr. Bouffard appears to have "clarified" his testimony in very general terms, the supposed clarifications do not refute his more specific testimony about the circumstances leading up to Amendment No. X, nor do they change the fact that Novell understood Amendment No. X to grant IBM a non-terminable license. (IBM Ex. 172 ¶ 15.) Moreover, absent an adequate

---

[21] See Sally v. Sally, 638 N.Y.S.2d 832, 834 (App. Div. 1996) (disregarding "expressions of uncommunicated subjective intent, which are insufficient to create a question of fact", on summary judgment); Padovano v. Vivian, 629 N.Y.S.2d 844, 846 (App. Div. 1995) ("Extrinsic evidence of plaintiff's uncommunicated subjective intent is irrelevant."); Tracey Rd. Equip., Inc. v. Vill. of Johnson City, 571 N.Y.S.2d 586, 588 (App. Div. 1991) (disregarding evidence of intent where there was no evidence that such intent was "communicated by either or both parties to the other"); Hudson-Port Ewen Assocs., L.P. v. Kuo, 566 N.Y.S.2d 774, 777 (App. Div. 1991) ("Since the only extrinsic evidence asserted as the basis for creating a factual issue consists of defendants' uncommunicated subjective intent, summary judgment is appropriate"); Baum v. Rockland Cmty. Coll., 299 F. Supp. 2d 172, 175 n.1 (S.D.N.Y. 2003) (disregarding "subjective but unexpressed intentions of the defendants"); Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 869 F. Supp. 1130, 1139 (S.D.N.Y. 1994) ("The unexpressed subjective intent of one party is not binding on the other."); In re Robbins Int'l, Inc., 275 B.R. 456, 465 (S.D.N.Y. 2002) ("the only germane testimonial evidence is that of the objective manifestations of the parties' intent") (internal quotation marks omitted).

explanation (and none is provided here), a party cannot create a genuine issue of material fact based upon an affidavit in which a witness contradicts himself.  See 10A Charles Alan Wright, et al., Fed. Practice and Procedure § 2726 at 30-31 (2d ed. 1994) (a witness cannot create a conflict at summary judgment by means of an affidavit that is clearly contradictory, without providing "a satisfactory explanation of why the testimony is changed").

In sum, SCO's extrinsic evidence is either inadmissible or irrelevant.  But it can in no case preclude a determination in IBM's favor on the plain language of Amendment No. X.

B.   SCO Failed to Give IBM Proper Notice and an Opportunity to Cure, and to Exercise Its Good Faith Best Efforts to Avoid Termination.

Even if, contrary to fact, the Agreements could actually be terminated, SCO could still not establish that it properly terminated them here.  As stated in IBM's opening brief, SCO:  (1) failed to give IBM the requisite notice and reasonable opportunity to cure the alleged breaches before the purported termination; and (2) failed to exercise its good faith best efforts to avoid termination.  (AIX Br. at 34-37.)  Thus, SCO's infringement claim lacks merit for these additional reasons.

Here again SCO does not specifically controvert with admissible evidence the facts set out in IBM's opening brief.  SCO instead:  (1) seeks to erect procedural barriers to the entry of summary judgment; (2) offers a counterstatement of alleged facts for the apparent purpose of creating a fact question; and (3) argues that it was not even required to provide notice and an opportunity to cure, or exercise its good faith best efforts to resolve the alleged breach short of termination, because it would have been futile to do so.  (Opp'n at 35-42.)

27

1.   <u>SCO's Procedural Arguments Lack Merit.</u>

In an effort to avoid review of its failure to provide notice and opportunity to cure, and its

failure to exercise its good faith best efforts to resolve the dispute short of termination, SCO

argues that whether it provided reasonable notice and an opportunity to cure and whether it

exercised its good faith best efforts to avoid termination are questions that cannot be decided at

summary judgment. (Opp'n at 36.) That is wrong. New York law is clear that these issues can

be decided at summary judgment. <u>See, e.g.</u>, <u>Kingsley Arms, Inc. v. Sano Rubin Const. Co., Inc.</u>,

791 N.Y.S.2d 196 (App. Div. 2005); <u>Kalus v. Prime Care Physicians, P.C.</u>, 799 N.Y.S.2d 115

(App. Div. 2005); <u>RBFC One, LLC, v. Zeeks, Inc.</u>, 367 F. Supp. 2d 604, 624-25 (S.D.N.Y.

2005) (S.D.N.Y. 2005); <u>Hanson v. Capital Dist. Sports, Inc.</u>, 630 N.Y.S.2d 429 (App. Div.

1995); <u>Hershey Foods Corp. v. Collegiate Mktg., Inc.</u>, No. 95-10526, 1997 WL 772768, at *4-*5

(S.D.N.Y. Dec. 15, 1997) (Addendum H hereto).[22]

---

[22] <u>See also</u> <u>Needham v. Candie's, Inc.</u>, No. 01-7184, 2002 WL 1896892 (S.D.N.Y. Aug.
16, 2002) (Addendum I hereto); <u>Point Prods. A.G. v. Sony Music Entm't, Inc.</u>, No. 93-4001,
2000 WL 1006236 (S.D.N.Y. July 20, 2000) (Addendum J hereto); <u>Rebh v. Lake George
Ventures, Inc.</u>, 636 N.Y.S.2d 504 (App. Div. 1996). Notably, none of the cases upon which SCO
relies discusses New York law regarding notice and opportunity to cure. (<u>See</u> Opp'n at 36
(citing <u>De Shazer v. Nat'l RV Holdings, Inc.</u>, 391 F. Supp. 2d 791, 798 (D. Ariz. 2005) (applying
Arizona law and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 <u>et seq.</u>); <u>Maytag Corp. v.
U.S. Pac. Corp.</u>, No. 02-10626, 2004 WL 1175130, at *4 (S.D. Iowa May 18, 2004) (Addendum
K) (applying Texas law, and explicitly declining to adopt authority cited by plaintiff applying
New York law); <u>Huang v. BP Amoco Corp.</u>, No. 00-1290, 2002 WL 84459, at *3 (E.D. Pa. Jan.
22, 2002) (Addendum L) (applying Pennsylvania law).) Furthermore, none of these cases stands
for the proposition that issues of notice and opportunity to cure generally cannot be decided at
summary judgment, or that summary judgment should not be granted on this basis where the
facts have not been controverted. For example, SCO cites <u>Huang</u> above for the sweeping
proposition that "[t]he issue of whether communications between the parties constitute adequate
notice and opportunity to cure is a 'classic question of material fact which needs to be addressed
by a finder of fact'". (Opp'n at 36.) The complete quotation from the case, however, clearly
limits itself to its facts: "<u>As described, the situation at hand</u> is a classic question of material fact

As a fallback, SCO claims that IBM at least bears the burden of establishing that SCO has not met these conditions precedent to termination. (Opp'n at 37 n.8.) But SCO cites no authority for its position, and courts have stated that, under New York law, the party seeking to terminate the agreement has the burden of demonstrating that all contractual conditions precedent to enforcement of the right to terminate have been satisfied. See Anthony F. Wasilkowski v. Amsterdam Mem. Hosp., 486 N.Y.S.2d 800, 802 (App. Div. 1985) (party seeking to terminate employment agreement for "reasonable cause" bears the burden of proving the condition precedent to right of termination was satisfied); N.E. Sort & Fulfillment Corp. v. Reader's Digest Assoc., Inc., No. 96-13834, 2001 WL 1568336 (N.Y. Sup. Ct. Aug. 30, 2001) (Addendum M hereto) (party terminating agreement must show it has satisfied all contractual conditions precedent to right of termination); Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc., 858 A.2d 392, 417 (Del. Ch. 2004), aff'd in part, rev'd in part on other grounds, 872 A.2d 944 (Del. 2005) (applying New York law) (defendant seeking to terminate agreement "has the burden of demonstrating that all contractual conditions precedent to enforcement of the right to terminate have been satisfied."); see also G. Banks, New York Contract Law § 13:11 (2006) ("[t]he party seeking termination has the burden of proving that it complied with the contractual provision requiring it to give notice of default").

### 2.     SCO's Alleged Evidence Falls Flat.

The evidence on which SCO relies to show that it gave IBM notice and an opportunity to cure, and that it exercised its good faith best efforts to resolve the alleged breach, comes nowhere

---

which needs to be answered by a finder of fact." Huang, 2002 WL 84459, at *3 (emphasis added).

close to creating a fact question on these issues.  SCO points to pre-suit communications, in which it alleges to have tipped off IBM that it might sue, and to the letters SCO sent IBM with its complaint, and in the weeks that followed.  (Opp'n at 37-38.)  In none of the pre-suit communications, however, did SCO ever state that it was even going to sue IBM, let alone state the bases for its claims.  (See SCO ¶¶ 24-27, 31.)  And, as stated in IBM's opening brief, the letter SCO sent with the Complaint and its other post-suit communications gave no meaningful clue as to what SCO was complaining about.  (AIX Br. at 34-36.)

The only communication that could have satisfied SCO's obligations was the letter sent with the Complaint — none of the others allotted IBM a 100-day cure period — and that letter referred only to "trade secret" confidentiality.  (AIX Br. ¶ 51.)  SCO, however, later amended its complaint to eliminate any trade secret claims, and SCO ultimately admitted that it had no colorable trade secret claims whatsoever: "There is no trade secret in UNIX System [V] files. That is on the record.  No problem with that."  (AIX Br. ¶ 51.)  And, of course, SCO could not possibly claim any trade secrets in the JFS contribution itself, because it is owned by IBM, not SCO.  Nor did the March 6 letter indicate what steps SCO believed IBM should take to cure. (AIX Br. ¶ 51.)  Furthermore, any letter sent simultaneously with the filing of a highly publicized lawsuit, as well as the sending of threatening letters to IBM customers, can hardly qualify as a good faith effort to resolve a dispute.  (AIX Br. ¶ 48.)

SCO further contends that IBM's demands for specificity were unreasonable, that SCO was not required to provide specificity, and that it provided as much specificity as it could. (Opp'n at 39.)  No evidence bears out these assertions.  IBM asked no more of SCO than the Court has repeatedly required SCO to provide, than SCO had to have in order to file a complaint

consistent with the requirements of Fed. R. Civ. P. 11, or than SCO finally did provide to IBM after being ordered numerous times to do so by the Court. (AIX Br. ¶¶ 68-69.) Contrary to SCO's suggestion, SCO needed absolutely nothing from IBM to specify for IBM the version, file and lines of code that SCO alleges were improperly contributed to Linux, since Linux is a publicly available operating system. (AIX Br. ¶ 47.)[23]

Finally, SCO faults IBM for not simply confessing liability upon receipt of SCO's complaint. SCO criticizes IBM for not "disavow[ing] its contributions to Linux from AIX", not representing that it "would not make any further such contributions", not suggesting that it "was willing to remove from the Linux kernel any material that it had contributed to Linux development from AIX", and not retracting its statement that it intended to contribute to Linux any part of AIX that IBM or the Linux community saw fit for contribution. (Opp'n 37-39.) Putting aside the fact that, at the time of these alleged IBM omissions, IBM had no idea what SCO's case was about, except at the most general level, IBM's alleged failings do not satisfy the conditions precedent to the right of termination. IBM's "failure" to confess liability (where there was none) could not possibly excuse SCO from providing notice and a reasonable opportunity to

---

[23] In arguing that it could not provide more information than it did, SCO states that it did not have "access to the AIX source code". (Opp'n at 39.) That is pure sophistry. SCO did not require anything from IBM to identify the contribution it claims IBM improperly made, as evidenced by the fact that SCO first identified the JFS Contribution before IBM produced a single line of AIX code in connection with this litigation. (AIX Br. ¶ 46; Opp'n at 38.) Moreover, SCO did have access to AIX code before it filed suit, and used that code in preparing its case, as SCO admitted in its January 15, 2004 Revised Supplemental Response to Defendant's First and Second Set of Interrogatories. (IBM Ex. 33 at 18-30.)

cure, or from exercising its good faith best efforts to resolve the alleged breach. If it could, then such provisions would be meaningless.[24]

As SCO failed to comply with the conditions precedent to its supposed but non-existent right of termination, its purported termination was ineffective, even if (contrary to fact) the Agreements had been terminable. It is well-established under New York law that, where, as here, a contract specifies conditions precedent to the right of cancellation, such as notice, opportunity to cure, and the exercise of good faith best efforts to resolve a breach prior to termination, such conditions must be satisfied before any purported cancellation may be effective. See Consumers Power Co. v. Nuclear Fuel Servs., Inc., 509 F. Supp. 201, 211 (W.D.N.Y. 1981); see also Sauer v. Xerox Corp., 17 F. Supp. 2d 193, 197 (W.D.N.Y. 1998) ("[w]here . . . the parties have agreed to provide notice and an opportunity to cure prior to suing for performance or asserting termination rights under a contract, those covenants must be adhered to"); Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 518 (2d Cir. 1989) (finding that, where defendant did not give timely notice and opportunity to cure as required under agreement, its attempt to terminate agreement was ineffective, as it "did not conform to the [a]greement") (citing Gen. Supply and Constr. Co. v. Goelet, 241 N.Y. 28, 34 (1925)).

3.    SCO Was Not Relieved of Its Obligations Due to Futility.

In a last-ditch effort to avoid its duty to establish the conditions precedent to termination (which right it does not have in any event), SCO argues that the negotiations between SCO and

---

[24] SCO's brief distorts the record as to what IBM said and did not say. But since even SCO's version of events does not meet its burden, we do not dwell on the disconnect between its assertions and the evidence.

IBM during the 100-day termination period were simply "futile", and that "[w]here the conduct of one party to purported 'good faith' discussions regarding termination establishes that further discussions would be futile, the court need not even examine the full scope of the discussions between the parties". (Opp'n at 40.)  According to SCO, which bears the burden of establishing futility,[25] it was futile to talk with IBM, because: (1) IBM had consistently taken the position that its license rights were non-terminable (Opp'n at 40); (2) "well before March 2003, IBM had publicly announced to the open-source community that it believed it could and was willing to open-source 'any part of AIX' that the community considered valuable" (Opp'n at 41); and (3) "IBM never even suggested to SCO that it accepted SCO's view that the contributions from AIX were impermissible" (Opp'n at 41).  None of these reasons can excuse SCO's failure to provide notice and an opportunity to cure the alleged breach, or to exercise its good faith best efforts to resolve the alleged breach.

In New York, the law favors the enforcement of notice and cure provisions.  Point Prods., 2000 WL 1006236, at *4.  The provision of such notice and cure is to be excused only in very limited circumstances — none of which is present here.  See id.  IBM plainly had not expressly repudiated or canceled the Agreements, as SCO contends.  (See Opp'n at 40-42.)  To constitute repudiation of a contract, a party's conduct must "indicate an unequivocal intent to forego performance of [its] obligations under the contract".  Pitcher v. Benderson-Wainberg Assoc. II, Ltd. P'ship, 715 N.Y.S.2d 104, 106 (Sup. Ct. 2000); see also Argonaut P'ship, L.P. v. Sidek,

---

[25] See, e.g., Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 905 (11th Cir. 2000) ("On summary judgment, [the non-movant defendant] bore the burden of introducing evidence to support a reasonable finding that giving notice of the alleged breaches would have been useless.").

S.A. de C.V., No. 96-1967, 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996) (Addendum N hereto) ("For a statement to constitute an anticipatory breach, the announcement of an intention not to perform [must be] positive and unequivocal.") (internal quotations omitted).  IBM's ongoing written and verbal requests of SCO for specifics of its alleged infractions evince nothing approaching an "unequivocal intent" on IBM's part to forego its duties or performance under the Agreements.  (AIX Br. ¶ 52.)

SCO attempts to argue that any good faith efforts to resolve the alleged breach short of termination would have been "useless acts" on the grounds that, over two years before SCO even thought to file its complaint, an IBM executive made a statement that IBM would be willing to contribute any part of AIX to Linux that the Linux community considered valuable.  (See Opp'n at 41.)  It is unclear whether this statement was even made; the alleged speaker does not recall the statement, and it is unclear whether the reporter transcribed his remarks correctly, or in their full context.  (IBM Ex. 632 at 46-49.)  Putting aside the fact that SCO's alleged evidence of the statement is inadmissible, there is no evidence whatsoever that IBM stated that it actually "intended" to contribute any part of AIX to open source that the Linux community considered valuable, as SCO claims (Opp'n at 38), nor that IBM intended to contribute any part of AIX to Linux regardless of whether IBM was legally able to do so or not.  (See IBM Ex. 632 at 46-49.)  It would obviously have been self-defeating for anyone with an intent to engage in supposedly illegal conduct in the future to have made advance public admissions to that effect.  This supposed statement, which was not even alleged to have been formally communicated to SCO, and which, if made, was made in a context having nothing to do with the Agreements, can hardly

be considered evidence of "<u>unequivocal</u>" intent on the part of IBM to forego its specific obligations under the Agreements. <u>Pitcher</u>, 715 N.Y.S.2d at 106.

In addition, SCO's own actions during the "cure period" belie its argument as to IBM's alleged repudiation of the Agreements. If SCO had actually believed that IBM had expressly repudiated the Agreements, as it claims, why would SCO not have attempted to terminate immediately, in December of 2000, or have availed itself of the express provision in Amendment No. X allowing it to enforce its rights by seeking to "enjoin or otherwise prohibit" IBM from proceeding? If, as SCO claims, it was actually "excused from performing [the] futile act" of informing IBM of its supposed breach at all under the relevant authority, then why would SCO have sought to perform this futile act by sending the March 6, 2003 letter in the first place? If SCO was so concerned with resolving what it thought of as "big problems" with IBM in a matter of "hours and days, not weeks and months" as SCO claims (Opp'n at 38), why didn't SCO simply attempt to terminate IBM's licenses immediately, and take advantage of this supposed futility exception?[26]

SCO asks this Court to believe that it waited five months to attempt to terminate IBM's AIX and Dynix licenses when (according to SCO) it could have made this attempt immediately under New York law, and also that SCO met with and corresponded with IBM over the course of this period, even though it had no good reason to do so. SCO only adopts the position that

---

[26] <u>See</u> <u>Point Prods.</u>, 2000 WL 1006236, at *3 ("Providing notice and cure is not required where it would be futile, however . . . . In limited circumstances . . . the terminating party can terminate immediately, without affording the non-performing party notice and an opportunity to cure.").

immediate termination was available to it during this litigation, after the fact, in an effort to excuse its obvious failure to meet the explicit notice requirements under the Agreements.

SCO also argues that IBM's conduct established the futility standard due to the fact that IBM took the "unequivocal" position from the outset that its Agreements could not be terminated.  (Opp'n at 40.)  But IBM's position as to SCO's <u>remedies</u> for breach under the Agreements is not relevant to IBM's position as to curing alleged <u>breaches</u> under the Agreements.  Even if IBM believed that SCO could not have terminated its licenses for breach, that does not mean IBM would have refused to remedy a particular alleged breach, had SCO identified that breach and informed IBM as to what it should do to cure.  That is why IBM asked SCO to tell IBM what SCO wanted it to do.  (AIX Br. ¶ 52.)  SCO could still have enforced its rights under the Agreements if IBM did not cure an alleged breach by seeking an injunction or other prohibition, as under general patent, copyright or trademark law.  (AIX Br. ¶ 22.)

Finally, SCO appears to contend that the very fact that the parties had different views as to the extent of their rights under the Agreements somehow establishes the futility of efforts to resolve the alleged breach, and thus permits immediate termination.  (<u>See</u> Opp'n at 41.)  Of course, there would be no point in including clauses in <u>any</u> contract providing for notice, an opportunity to cure, or the exercise of good faith best efforts to resolve breaches short of termination if this were the standard for futility.  Indeed, such provisions can only have effect in precisely those circumstances where the parties <u>do</u> have such diverging views — otherwise, "good faith" and "best efforts" to come to a resolution would obviously be unnecessary.  <u>See</u> <u>Rebh v. Lake George Ventures, Inc.</u>, 636 N.Y.S.2d 504, 505 (App. Div. 1996) (the parties must adhere to cure provisions regarding contract termination when the cause for the termination is

36

"the very situation to which the cure provision was intended to apply"); Needham, 2002 WL
1896892, at *4 (even though defendant employer had allegedly "non-negotiable" position,
plaintiff officer failed to establish that prior notice of his proposed termination of employment
agreement and provision to defendant of opportunity to cure would have been futile); Point
Prods., 2000 WL 1006236, at *4 n.11 ("[B]eyond the mere allegation of fraud and dishonesty,
[the non-movant] has failed to proffer evidence of anything more than a legitimate disagreement
about . . . the Agreement's requirements.  Accordingly, defendant has offered insufficient
evidence to claim futility on this basis.").[27]

SCO cannot at the same time:  (1) deny IBM the information that IBM repeatedly
requested in order to assess and resolve the alleged breach of the Agreements (AIX Br. ¶¶ 68-
69); (2) purport to give IBM the required 100-day notice and 60-day notice specifying the

---

[27] SCO's authorities regarding futility are inapposite.  In Wolff & Munier, Inc. v.
Whiting-Turner Contracting Co., for example, the court notes that it is unclear whether the notice
provision of the agreement even applies on its face to the facts of the case — the futility doctrine
notwithstanding.  See 946 F.2d 1003, 1009 n.6 (2d Cir. 1991).  Unlike in this case, cure in Wolff
would clearly have been physically impossible, as the contract provided only for a cure period of
two days, and the six-building, $68.9 million construction project at issue would have taken
months to complete by the time of the termination.  Id. at 1010.  Furthermore, in Wolff, unlike
here, the party alleged to be in breach of the agreement understood exactly what the other party
wanted it to do to cure the alleged breach (i.e., finish the construction project), yet it still
abandoned the job and made further unjustified demands.  (See id.)  By contrast, SCO never
informed IBM of what steps were required for the alleged breach to be cured.  (AIX Br. ¶¶ 56-
61.)  Nor can SCO's other authorities advance its case:  First Nat'l Bank of Omaha v. Three
Dimension Sys. Prods. applies Arizona law, not New York law, and actually declines to find that
the party allegedly in breach satisfied the high standard for a finding of anticipatory repudiation
— that is, "a positive and unequivocal manifestation that [the party] will not render the required
performance when it is due" — even though that party announced that it refused to correct
seventy-three specific errors identified by the plaintiff in the software product governed by the
agreement.  130 F. Supp. 2d 1098, 1102 (D. Neb. 1999).  Allbrand Discount Liquors v. Times
Square Stores Corp., 399 N.Y.S.2d 700, 701 (App. Div. 1977), does not even involve
termination of an agreement, let alone the issue of an exception to the requirement of strict
compliance with a notice and cure provision.

breaches under the AIX and Dynix Agreements on the basis of non-existent "trade secret" violations (AIX Br. ¶ 51); and then (3) claim that any insufficiencies in the notice it provided IBM are irrelevant, because it actually did not have to give any notice or opportunity to cure in the first place (Opp'n at 40-42). SCO's attempt to have it both ways is the antithesis of genuine notice, opportunity to cure, and good faith best efforts to resolve a breach.

## IV.    SCO CANNOT PROVE OWNERSHIP OF A VALID COPYRIGHT.

IBM is also entitled to summary judgment because SCO has failed to adduce adequate evidence of ownership. SCO's opposition appears to identify a single allegedly infringed UNIX copyright (UNIX System V Release 4.0). (Opp'n at 58.) As stated in IBM's opening brief, the evidence shows that Novell retained ownership in all of the UNIX System V copyrights, and did not transfer them to Santa Cruz pursuant to the APA. (AIX Br. ¶ 14; DJ Br. ¶¶ 296-301.) Thus, SCO could not have acquired the allegedly infringed copyright in its acquisition of the UNIX assets from Santa Cruz, and SCO cannot sustain a claim against IBM for infringing it.[28]

### A.    Neither the APA Standing Alone, Nor Read Together with Amendment No. 2, Transferred the UNIX Copyrights.

SCO's main argument in opposition is premised on the theory that the APA, standing alone, and reaffirmed by Amendment No. 2, transferred ownership of the copyrights in the Allegedly Infringed Works. (Opp'n at 45-48.) SCO, however, cannot escape the fact that the

---

[28] SCO asserts in a footnote that IBM lacks standing to challenge SCO's ownership of the copyrights in the Allegedly Infringed Works, and incorporates by reference its other opposition briefs for support. SCO's standing claim cannot survive scrutiny for the reasons set out in IBM's reply memorandum in further support of its motion for summary judgment on its Tenth Counterclaim, which we incorporate herein by reference. As stated therein, SCO is not entitled to a presumption of ownership, and IBM can challenge SCO's ownership of the allegedly infringed copyright.

plain language of the APA and Amendment No. 2 did not transfer ownership of the copyrights in the Allegedly Infringed Works.

Under California law,[29] the plain language alone governs the meaning of a contract unless that language "involve[s] an absurdity". Cal. Code Civ. P. § 1638; see also Cal. Code Civ. P. §§ 1639, 1858. The California Supreme Court has held that "in the construction of a contract, the office of the court is simply to ascertain and declare what, in terms or in substance, is contained therein, and not to insert what has been omitted or omit what has been inserted". Jensen v. Traders & Gen. Ins. Co., 345 P.2d 1, 3 (Cal. 1959) (citing Cal. Code Civ. P. § 1858); see also Powerine Oil Co., Inc. v. Superior Court, 118 P.3d 589, 598 (Cal. 2005) ("[i]f contractual language is clear and explicit, it governs"); Carma Developers, Inc. v. Marathon Dev. Cal., Inc., 826 P.2d 710, 2 Cal. 4th 342, 374 (1992) ("As a general matter, implied terms should never be read to vary express terms.").

As IBM noted in its opening brief, the plain language of the APA excluded all of the copyrights in the Allegedly Infringed Work. (AIX Br. ¶ 14; DJ Br. ¶¶ 296-301.) Schedule 1.1(b) of the APA expressly provides that Novell retained "all copyrights and trademarks, except for the trademarks UNIX and UnixWare". (IBM Ex. 123 (Schedule 1.1(b) at 2).) Indeed, the Court has already ruled, in SCO Group, Inc. v. Novell, Inc., No. 04-139, 2004 WL 4737297, at *5 (D. Utah June 9, 2004) (Addendum O hereto), that the plain language of the APA did not transfer any copyrights in the Allegedly Infringed Works to SCO:

> Under the APA, Novell agreed that on the Closing Date (December 6, 1995) it
> would assign all assets on Schedule 1.1(a) but that it would transfer no assets
> listed on the Excluded Assets schedule, Schedule 1.1(b). There is no dispute that

---

[29] The APA contains a California choice-of-law provision. (IBM Ex. 123 at § 9.8.)

<u>all copyrights were excluded on Schedule 1.1(b) and, therefore, no copyrights</u>
<u>transferred on the Closing Date under the terms of the APA.</u>

(<u>Id.</u> (emphasis added).)  Therefore, on its face, the APA is unambiguous, and leaves no room for

SCO's argument that "Novell sold its entire UNIX-related business to SCO's predecessor-in-

interest The Santa Cruz Organization, Inc., through the APA".  (Opp'n at 45.)

As a fallback position, SCO also argues that, if the APA alone did not transfer ownership

in the copyrights, then the APA, read together with Amendment No. 2, constitutes a sufficient

transfer under the Copyright Act.  (Opp'n at 47-48.)  However, even together, the APA and

Amendment No. 2 do not constitute an instrument of conveyance sufficient to transfer copyright

ownership.  At most, they constitute a mere promise to assign certain <u>unidentified</u> copyrights in

the future.  Section 1.1(a) of the APA states:

> On the terms and subject to the conditions set forth in this Agreement, <u>Seller will</u>
> <u>sell</u>, convey, transfer, assign and deliver to Buyer and <u>Buyer will purchase and</u>
> <u>acquire</u> from Seller on the Closing Date (as defined in Section 1.7), all of Seller's
> right, title and interest in and to the assets and properties of Seller relating to the
> Business (collectively the "Assets") identified on Schedule 1.1(a) hereto.
> Notwithstanding the foregoing, the Assets to be purchased <u>shall not include those</u>
> <u>assets (the "Excluded Assets") set forth on Schedule 1.1(b)</u>.

(IBM Ex. 123 § 1.1(a) (emphasis added).)  The above-quoted language uses the prospective

language "Seller <u>will</u> sell" and "Buyer <u>will</u> purchase"; nowhere does the APA state Seller

"hereby assigns" or that the Buyer "hereby acquires" any copyrights.  Accordingly, at most, the

APA merely represents a future promise to assign certain "assets and properties" of Novell listed

in Schedule 1.1(a), which as noted above <u>excluded</u> all copyrights pursuant to Schedule 1.1(b).

Similarly, Amendment No. 2, signed more than ten months after the APA, merely states that the

APA "shall be revised" only if SCO demonstrates that there are copyrights (which were not

excluded under Schedule 1.1(b)) owned by Novell that are "required for SCO to exercise its

40

rights with respect to the acquisition of UNIX and UnixWare technologies". (IBM Ex. 444.)
Therefore, even when read together, the APA and Amendment No. 2 constitute, at most, merely
a promise to assign <u>unidentified</u> copyrights in the future.

A mere promise to assign unidentified copyrights in the future is not an actual assignment
sufficient to satisfy the requirements of the Copyright Act for a transfer of ownership. Under
Section 204(a) of the Copyright Act, "[a] transfer of copyright ownership, other than by
operation of law, is not valid unless an <u>instrument of conveyance, or a note or memorandum of
the transfer, is in writing and signed</u> by the owner of the rights conveyed or such owner's duly
authorized agent." 17 U.S.C. § 204(a) (emphasis added); <u>see also</u> <u>Radio Television Espanola
S.A. v. New World Entm't, Ltd.</u>, 183 F.3d 922, 926 (9th Cir. 1999). Under Section 204(a), there
is a sharp distinction between a promise to assign and an actual assignment — a promise to
assign unidentified copyrights is not a valid "instrument of conveyance". <u>See, e.g.</u>, <u>Monarch
Licensing, Ltd., v. Ritam Int'l, Ltd.</u>, 24 U.S.P.Q.2d 1456, 1459 (S.D.N.Y. 1992) (distinguishing
between a promise to assign trademarks and copyrights and an actual execution of assignment of
trademarks and copyrights); <u>Arachnid, Inc. v. Merit Indus., Inc.</u>, 939 F.2d 1574, 1580-81
(Fed. Cir. 1991) (distinguishing between an agreement to assign patents and an actual
assignment of patents); <u>Li'l Red Barn, Inc., v. The Red Barn Sys., Inc.</u>, 322 F. Supp. 98, 107
(N.D. Ind. 1970) ("the rule is well established that a mere agreement for the future assignment of
a trademark is not an assignment"). SCO fails to cite a single case holding that a promise to
transfer ownership of unidentified copyrights in the future constitutes a valid assignment.[30]

---

[30] As noted, the APA and Amendment No. 2 also do not identify with any specificity
which copyrights Novell "will sell" to SCO "if required" for SCO to exercise its rights with
respect to the acquisition of UNIX and Unixware technologies. Thus, the language of the APA

41

In the absence of an actual assignment, the APA and Amendment No. 2, even when read together, do not constitute an instrument under the Copyright Act sufficient to transfer copyright ownership. Indeed, in SCO Group, Inc. v. Novell, Inc., the Court further stated that, "at this stage of the litigation [motion to dismiss], the agreements raise substantial doubt as to whether the APA as amended by Amendment No. 2 qualifies as a Section 204(a) writing". 2004 WL 4737297, at *6. Since that ruling, more than two years have passed, and discovery in both this case and in the case between SCO and Novell has closed. SCO, however, still cannot point to a credible piece of documentary evidence to substantiate its claim that the APA standing alone, or read together with Amendment No. 2, transferred ownership of the relevant copyrights. Therefore, SCO has failed to substantiate how a supposed instrument of conveyance that excludes all copyrights from being transferred, and is framed in terms of unidentified assets that "will be assigned" and are "required" in order to exercise other rights, can satisfy Section 204(a)'s "instrument of conveyance" requirement for transferring copyright ownership.[31]

---

together with Amendment No. 2 is also too indeterminate to meet Section 204(a)'s statutory requirements for a valid instrument of transfer. See Radio Television Espanola S.A., 183 F.3d at 927-28; Playboy Enters., Inc. v. Dumas, Inc., 53 F.3d 549, 563-64 (2d Cir. 1995).

[31] SCO also focuses on a supposed admission by Novell in a June 6, 2003 press release to support its claim that the APA and Amendment No. 2 transferred ownership of the copyrights. (Opp'n at 48.) SCO, however, ignores the precise wording of the Novell press release. In the press release, Novell stated only that Amendment No. 2 "appears to support" SCO's view that certain unidentified copyrights may have transferred to Santa Cruz. Merely expressing that a document "appears to support" a claim is certainly not an admission of the claim. Novell simply provided a conditional, preliminary evaluation of the Amendment, but did not admit SCO's ownership. (See SCO Group, Inc. v. Novell, Inc., No. 04-139 (D. Utah), Novell's Reply in Support of its Motion to Dismiss Amended Complaint, dated November 8, 2004, PACER No. 56 at 5-6) (hereinafter "Novell Reply Br.").) Indeed, in correspondences with SCO shortly after the June 6 press release, Novell clarified its position that Amendment No. 2 did not effect a transfer of the UNIX copyrights, and Novell in fact asked SCO to explain how Amendment No. 2 could

B.     Neither the Bill of Sale, Nor Contemporaneous Licensing Agreements, Evidence
       SCO's Ownership of the UNIX Copyrights.

SCO also relies in its opposition upon the Bill of Sale executed by Novell and SCO on

the closing date of the APA, and the contemporaneous licensing agreements between the parties,

to support its conclusion that "Novell intended to sell, and sold, to SCO the UNIX-related

copyrights". (Opp'n at 48-49.) However, neither the Bill of Sale, nor the contemporaneous

licensing agreements between SCO and Novell, evidence SCO's ownership of the copyrights.

The Bill of Sale does not change the fact that the plain language of the APA establishes

that Novell retained ownership of the copyrights. Indeed, the Bill of Sale incorporates by

reference the APA provisions that the Court has already determined <u>excluded</u> a transfer of any

copyrights to SCO. The Bill of Sale concerns the transfer of "Assets", which is a defined term in

the APA. (IBM Ex. 123 §1.1(a).) The APA defines "Assets" as those "properties" set forth in

Schedule 1.1(a) that are <u>not excluded</u> under Schedule 1.1(b)'s "Excluded Assets". (<u>Id.</u>) As

noted, the Court has already found that Schedule 1.1(b) excluded the transfer of <u>all copyrights,</u>

including the UNIX copyrights, from Novell to Santa Cruz. <u>See SCO Group, Inc. v. Novell,</u>

<u>Inc.,</u> 2004 WL 4737297, at *5. Therefore, while the Bill of Sale does indeed transfer valuable

"Assets" as listed in Schedule 1.1(a), such "Assets" <u>do not</u> include any copyrights, let alone the

copyrights in the Allegedly Infringing Works. Thus, the Bill of Sale offers no support for SCO's

position that the APA transferred ownership of the copyrights.

Similarly, SCO claims that the "license back of assets" contemplated by Paragraph 1.6 of

the APA and by a separate Technology Licensing Agreement ("TLA") (collectively "the

_____

have effected such a transfer. (<u>See</u> <u>id.</u>) The record is, not surprisingly, devoid of any response
from SCO providing such an explanation.

43

Contemporaneous Licensing Agreements") "further evidence[] SCO's ownership" of the UNIX copyrights. (Opp'n at 48-51.) However, neither of the Contemporaneous Licensing Agreements refers to Novell licensing back any "copyrights", and certainly not any "UNIX copyrights". Instead, like the Bill of Sale, these documents refer to the licensing back of the "Assets" listed in Schedule 1.1(a), which, again, excludes any of the UNIX copyrights pursuant to Schedule 1.1(b).[32] Thus, neither the Bill of Sale nor the Contemporaneous Licensing Agreements supports SCO's position that Novell intended to transfer ownership of the UNIX copyrights.

<blockquote>

C. <u>Neither Novell's Post-Sale Conduct, Nor SCO's Extrinsic Evidence, is Sufficient to Establish SCO's Ownership of the Copyrights.</u>
</blockquote>

Finally, SCO's opposition alludes to Novell's post-sale conduct and to extrinsic evidence in support of SCO's ownership claim to the UNIX copyrights. (Opp'n at 51-57.) Despite SCO's further attempt to focus attention away from the plain language of the APA, SCO still cannot create a material issue of fact sufficient to overcome the fact that Novell retained ownership of the UNIX copyrights.

In arguing that Novell's post-sale conduct evidences SCO's acquisition of the UNIX copyrights, SCO points to five pieces of evidence — none of which alters the plain language of the APA: (1) SCO has shipped countless UNIX products with a SCO copyright; (2) SCO has entered into hundreds of UNIX licensing agreements; (3) the UNIX copyrights were transferred

---

[32] Additionally, implicit in SCO's argument is the assumption that the only "Assets" that Novell would want to license back are the very UNIX copyrights that were excluded under Schedule 1.1(b). The APA, however, contemplated transferring a variety of other valuable "Assets" as listed in Schedule 1.1(a), including, among many other "Assets", technical information and the UNIX source code. Thus, Novell's providing for a "license back" of the valuable Assets listed in Schedule 1.1(a) is in no way inconsistent with its also retaining ownership of UNIX copyrights.

between various entities related to SCO; (4) SCO obtained physical possession of the UNIX copyright registrations; and (5) Novell was silent about ownership of the UNIX copyrights. (Opp'n at 52.)  However, three of these five pieces of alleged "evidence" ((1)-(3)) obviously concern actions taken by SCO, not by Novell.  SCO fails to indicate how its own unlawful conduct could transfer ownership of Novell's copyrights.

The two remaining pieces of evidence provide no support for SCO's position.  With respect to possession of UNIX copyright registrations, Novell also holds UNIX copyright registrations, and did not transfer possession of those registrations to SCO.  (IBM Ex. 634.) Since both Novell and SCO hold UNIX copyright registrations, mere possession of these is insufficient to establish copyright ownership.[33]  The remaining item of "post-sale conduct" cited by SCO pertains to Novell's alleged silence.  Novell, however, was not silent regarding the issue of ownership of the copyrights.  As noted, Novell stated in a May 28, 2003 press release and in subsequent private correspondences with SCO that it retained ownership of the UNIX copyrights.  (See Novell Reply Br. at 5-6.)  Thus, the "post-sale conduct" that SCO points to in its opposition offers no support for its ownership claim.

As a means to further circumvent the plain language of the APA, SCO also argues that, under California law, the Court must consider SCO's extrinsic evidence

SECTION REDACTED _____                    to determine the parties' intent with respect to the APA.

---

[33] Similarly, SCO argues with respect to its claim against IBM for unauthorized copying that SCO's possession of a "late" certificate of registration for SVRr4 satisfies the statutory prerequisites establishing SCO's ownership.  (Opp'n at 58.)  This assertion is without merit for the reasons stated in IBM's reply memorandum in further support of its motion for summary judgment on its Tenth Counterclaim, which we incorporate herein by reference.  Indeed, not even the cases upon which SCO relies support the proposition that late registration establishes copyright ownership.

(Opp'n at 44, 53-58.)  In effect, SCO endeavors to create a material issue of fact by persuading the Court to look outside of the four corners of the APA, which plainly shows that Novell retained ownership of the copyrights.

Under California law, however, extrinsic evidence is inadmissible to contradict the written terms of an agreement that are plain on their face.  See Niederer v. Ferreira, 189 Cal. App. 3d 1485, 1499 (Ct. App. 1987) (a contract that is plain on its face is to be "interpreted by the language therein without resort to extrinsic evidence", and interpretation of unambiguous contract language "is a question of law which may be resolved on summary judgment") (internal citations omitted);  Haggard v. Kimberly Quality Care, Inc., 39 Cal. App. 4th 508, 519-20 (Ct. App. 1995) (refusing to allow extrinsic evidence to contradict written terms of an integrated employment contract, and noting that extrinsic evidence regarding intent "which is contrary to a contract's express terms . . . does not give meaning to the contract; rather it seeks to substitute a different meaning") (internal quotations omitted); Bionghi v. Metro. Water Dist. of S. Cal., 70 Cal. App. 4th 1358, 1363-66 (Cal. Ct. App. 1999) (a party cannot "smuggle extrinsic evidence to add a term to an integrated contract").  Therefore, while SCO correctly points out that parol evidence may be "offered to prove a meaning to which the language of the instrument is reasonably susceptible", here, as the Court has already concluded, there is no way to interpret "[a]ll copyrights" in the Excluded Assets Schedule 1.1(b) to mean anything but that Novell retained ownership of the UNIX copyrights.  (Opp'n at 44-45.)[34]

---

[34] In any case, ample extrinsic evidence supports the view that Novell retained the UNIX copyrights.

**SECTION REDACTED**

46

After a lengthy period of discovery in both this case and in SCO's case against Novell, SCO is still unable to point to any credible piece of documentary evidence to contradict or supersede the plain language of the APA.  A party cannot survive summary judgment if it fails during discovery to produce evidence supporting a necessary element of its opposition.  See, e.g., Cambridge, 227 F.R.D. at 325; Lauth, 2004 WL 2211620, at *4; Lawrence, 1995 WL 261144, at *7; Stone, 1994 WL 832021, at *2.[35]

## V.      SCO HAS MISUSED ITS ALLEGED COPYRIGHTS.

Finally, SCO's infringement claim should be rejected because SCO has misused the allegedly infringed copyrights, and therefore it is not entitled to enforce them.  In its opposition papers, SCO merely relies on and incorporates the arguments set out in its opposition to IBM's motion for summary judgment on its Tenth Counterclaim.  (Opp'n at 62-63.)  None of those arguments bears scrutiny, for the reasons set forth in IBM's reply memorandum in further support of its motion for summary judgment on its Tenth Counterclaim, which we incorporate herein by reference.  Notably, SCO ignores multiple, independent grounds for a finding of misuse, entitling IBM to summary judgment for yet another reason.

---

## SECTION REDACTED

[35] See also Lauth, 2004 WL 2211620, at *4, *6 (granting summary judgment over plaintiff's opposition, which was supported by facts that were "never identified . . . in [plaintiff's] answer to [d]efendants' interrogatories"); Stone, 1994 WL 832021, at *6 (granting summary judgment against plaintiff who, in response to defendant's deposition questions and interrogatories, "could have [but did not] name[] businesses he contacted regarding employment", and did so only in opposition to summary judgment, thereby failing to satisfy his evidentiary burden as to mitigation of damages).

## Conclusion

For the foregoing reasons, summary judgment should be entered in favor of IBM and against SCO on SCO's copyright claim.

DATED this 12th day of January, 2007.

SNELL & WILMER LLP

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson


CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott


Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, NY 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of January, 2007, a true and correct copy of the foregoing was hand delivered to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of March, 2007, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131


/s/ Amy F. Sorenson

<u>INDEX TO ADDENDA</u>

<u>Addendum A</u>:    IBM's Undisputed Facts:  IBM AIX Brief

<u>Addendum B</u>:    IBM's Objections to SCO's Alleged Evidence

<u>Addendum C</u>:    *World Series of Casino Gambling, Inc. v. Donald King*, No. 85-1239, 1986 U.S. Dist. LEXIS 18521 (S.D.N.Y. Oct. 27, 1986)

<u>Addendum D</u>:    *Kirk v. City of Tulsa, Okla.*, 72 Fed. Appx. 747 (10th Cir. 2003)

<u>Addendum E</u>:    *Young v. Dillon Cos., Inc.*, No. 05-1378, 2006 WL 3236297 (10th Cir. Nov. 9, 2006)

<u>Addendum F</u>:    *Nycal Corp. v. Inoco PLC*, No. 98-7058, 1998 WL 870192 (2d Cir. Dec. 9, 1998)

<u>Addendum G</u>:    *Sheinbrot v. Pfeffer*, Nos. 93-5343 & 94-0649, 1995 WL 432608 (E.D.N.Y. July 12, 1995)

<u>Addendum H</u>:    *Hershey Foods Corp. v. Collegiate Mktg., Inc.*, No. 95-10526, 1997 WL 772768 (S.D.N.Y. Dec. 15, 1997)

<u>Addendum I</u>:    *Needham v. Candie's, Inc.*, No. 01-7184, 2002 WL 1896892 (S.D.N.Y. Aug. 16, 2002)

<u>Addendum J</u>:    *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93-4001, 2000 WL 1006236 (S.D.N.Y. July 20, 2000)

<u>Addendum K</u>:    *Maytag Corp. v. U.S. Pac. Corp.*, No. 02-10626, 2004 WL 1175130 (S.D. Iowa May 18, 2004)

<u>Addendum L</u>:    *Huang v. BP Amoco Corp.*, No. 00-1290, 2002 WL 84459 (E.D. Pa. Jan. 22, 2002)

<u>Addendum M</u>:    *N.E.  Sort & Fulfillment Corp. v. Reader's Digest Assoc., Inc.*, No. 96-13834, 2001 WL 1568336 (N.Y. Sup. Ct. Aug. 30, 2001)

<u>Addendum N</u>:    *Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.*, No. 96-1967, 1996 WL 617335 (S.D.N.Y. Oct. 25, 1996)

<u>Addendum O</u>:   *SCO Group, Inc. v. Novell, Inc.*, No. 04-139, 2004 WL 4737297 (D. Utah June 9, 2004)