SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
  *International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S REDACTED REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S INTERFERENCE CLAIMS (SCO'S SEVENTH, EIGHTH, AND NINTH CAUSES OF ACTION)**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JAN 1 2 2007

MARKUS B. ZIMMER, CLERK
BY _____
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>　　　Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **IBM'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON SCO'S INTERFERENCE CLAIMS (SCO'S SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION)**<br><br>**FILED UNDER SEAL PURSUANT TO 9/16/03 PROTECTIVE ORDER, DOCKET #38**<br><br>Civil No. 2:03CV-0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

## Table of Contents

|  |  | **Page** |
|---|---|---|
| Preliminary Statement | | 1 |
| Statement of Undisputed Facts | | 2 |
| Argument | | 4 |

I. IBM DID NOT INTERFERE WITH ANY OF THE RELATIONSHIPS IDENTIFYED BY SCO ..................... 4

    A. BayStar ..................... 4

    B. Computer Associates, Oracle and Intel ..................... 5

    C. Hewlett Packard ..................... 8

    D. OpenSource Conference in Scottsdale, Arizona ..................... 9

    E. Novell ..................... 10

        1. SCO Did Not Identify Novell As an Entity With Whom IBM Allegedly Interfered ..................... 10

        2. SCO Has Failed to Establish a Genuine Issue of Material Fact With Respect to IBM's Alleged Interference With Novell ..................... 14

    F. "UNIX-on-Intel" Market ..................... 19

II. IBM DID NOT ACT WITH AN IMPROPER PURPOSE OR BY IMPROPER MEANS, AND IBM'S ALLEGED CONDUCT IS PRIVILEGED ..................... 26

    A. SCO Cannot Show An Improper Purpose ..................... 26

    B. SCO Cannot Show Improper Means ..................... 28

        1. IBM's Alleged Breach of Contract Does Not Constitute Improper Means ..................... 29

        2. IBM's Alleged Copyright Infringement and Unfair Competition Do Not Constitute Improper Means ..................... 30

i

       C.      IBM's Alleged Conduct Is Privileged.................................................................. 32

III.     IBM'S ACTIONS DID NOT CAUSE INJURY TO SCO ............................................... 33

       A.      SCO Failed in Discovery to Identify Any Damages Resulting From IBM's Alleged Interference.............................................................................................. 33

       B.      SCO Cannot, in Any Event, Show Causation or Damages.................................. 36

Conclusion ..................................................................................................................................... 39

## Table of Authorities

**Cases**                                                                                                                      **Page**

Adams v. Washburn Univ. of Topeka,
    66 Fed. Appx. 819 (10th Cir. 2003)................................................................................7

Aerotech Res., Inc. v. Dodson Aviation, Inc.,
    91 Fed. Appx. 37, 41 (10th Cir. 2004) .......................................................................31

Ashley Creek Phosphate Co. v. Chevron,
    129 F. Supp. 2d 1299 (D. Utah 2000), aff'd in part, rev'd in part, 315 F.3d 1245...................3

Associated Diving and Marine Contractors v. Union Pac. RR,
    No. 2:01 CV330, 2003 U.S.Dist. LEXIS 21560 (D. Utah July 10, 2003)............................37-8

Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.,
    709 P.2d 330 (Utah 1985)................................................................................33

Barber v. Hallmark Cards, Inc.,
    No. 94-3356, 1996 U.S.App. LEXIS 729 (10th Cir. Jan. 19, 1996)..........................................35

Bower v. Stein Erickson Lodge Owners Ass'n,
    201 F. Supp. 2d 1134 (D. Utah 2002)...................................................................: 19, 23-25

Cambridge Elecs. Corp. v. MGA Elecs., Inc.,
    227 F.R.D. 313 (C.D. Cal 2004)..........................................................................34

Conaway v. Smith,
    853 F.2d 789 (10th Cir. 1988) .............................................................................7

Dalton v. FDIC,
    987 F.2d 1216 (5th Cir. 1993) ..........................................................................15

Gull Labs, Inc. v. Diagnostic Tech. Inc.,
    695 F. Supp. 1151 (D. Utah 1988)......................................................................33

L&M Enters., Inc. v. BEI Sensors & Sys. Co.,
    231 F.3d 1284 (10th Cir. 2000) ........................................................................35

Leigh Furniture & Carpet Co. v. Isom,
    657 P.2d 293 (Utah 1982)...........................................................................passim

Messer v. Amway Corp.,
   106 Fed. Appx. 678 (10th Cir. 2004) ...................................................................7

Mumford v. ITT Commercial Fin. Corp.,
   858 P.2d 1041 (Utah Ct. App. 1993) ............................................................ 22-24

OKI Am., Inc. v. Advanced Micro Devices, Inc.,
   Civ. 04-3171, 2006 WL 2547464 (N.D. Cal. Aug. 31, 2006) .................................15

PPM Fin., Inc. v. Norandal, USA, Inc.,
   297 F. Supp. 2d 1072 (N.D. Ill. 2004) ..............................................................15

Sampson v. Richins,
   770 P.2d 998 (Utah Ct. App. 1989) ..................................................................26

St. Benedict's Dev. Co. v. St. Benedict's Hosp.,
   811 P.2d 194 (Utah 1991) .............................................................................21

Shepard v. Frontier Commc'ns. Servs. Inc.,
   92 F. Supp. 2d 279 (S.D.N.Y. 2000) ................................................................34

Sports Racing Servs. Inc. v. Sports Car Club of Am.,
   131 F.3d 874 (10th Cir. 1997) ........................................................................35

**Rules and Statutes**

Fed. R. Civ. P. 30(b) ...........................................................................................15

Fed. R. Civ. P. 37(c)(1) ......................................................................................34

Fed. R. Civ. P. 56 ............................................................................................2, 3

**Other**

11 J. Moore, Moore's Federal Practice - Civil § 56.14 ...............................................15

Prosser and Keeton on the Law of Torts (5th ed. 1984) 987-88 ............................. 21-22

Defendant/Counterclaim-Plaintiff IBM respectfully submits this reply memorandum in further support of its motion for summary judgment on SCO's interference claims (SCO's Seventh, Eighth and Ninth Causes of Action).

### Preliminary Statement[1]

In its Seventh, Eighth and Ninth causes of action, SCO alleges four types of tortious interference by IBM: (1) "direct" interference with SCO's existing economic relations with Hewlett Packard, Computer Associates, Oracle and Intel — SCO contends that Karen Smith, an IBM employee, contacted each of these companies at the LinuxWorld conference in January 2003 and encouraged them not to do business with SCO; (2) "direct" interference with a SCO investor, BayStar Capital ("BayStar") — SCO contends IBM contacted BayStar, encouraged it to threaten litigation and ultimately to withdraw its investment in SCO; (3) "direct" interference with the September 19, 1995, Asset Purchase Agreement between Novell and the Santa Cruz Operation ("Santa Cruz") — SCO contends that IBM encouraged Novell to assert ownership of the UNIX copyrights that are at issue in this case; and (4) "indirect" interference with SCO's prospective economic relationships with the entire "UNIX-on-Intel" market — SCO contends that IBM made technical contributions to the Linux operating system that made it competitive

---

[1]    Terms are defined and used herein as they were in IBM's opening brief.  In addition, references herein are as follows: cites to "Interference Br. ¶__" refer to IBM's "Statement of Undisputed Facts" in IBM's opening brief, and cites to "IBM Ex. __" refer to the declarations and documents appended to the Declarations of Todd M. Shaughnessy, dated September 25, 2006, November 11, 2006 and January 12, 2007, the Supplemental Declaration of Todd M. Shaughnessy, dated September 25, 2006 and the Second Supplemental Declaration of Todd M. Shaughnessy, dated September 29, 2006.  References to SCO's opposition papers are given as "Opp'n at __", and references to the declarations and documents appended to the Declaration of Brent O. Hatch are cited herein as "SCO Ex. __".

with SCO's products, and Linux ultimately captured a portion of the "UNIX-on-Intel" market that SCO otherwise would have enjoyed.

Each of these claims fails as a matter of law. As to SCO's "direct" interference claims, each of the companies with whom IBM allegedly interfered has testified that no such interference occurred or, in any event, they did not change their relationship with SCO as a result of any conduct by IBM. Ms. Smith likewise confirms that this conduct did not occur. SCO fails to refute any of this testimony directly, but instead tries to manufacture a disputed issue of fact from inadmissible evidence. With respect to what SCO calls its "indirect" or "interference with the market" theory, SCO cites no authority, from Utah or anywhere else, that has recognized such a claim, and those courts that have considered analogous claims have uniformly rejected them. SCO offers no good reason why this Court should invent a theory of recovery never before recognized by a court in Utah (or apparently anywhere else). (See Part I below.)

Even if SCO's inadmissible evidence were considered, and even if the Court were to adopt SCO's novel theory of tortious interference, it remains undisputed that the alleged conduct by IBM was not done for an improper purpose or by improper means and is, in any event, privileged. As a result, SCO's claims fail as a matter of law. (See Part II below.)

Finally, even if SCO somehow could overcome these hurdles, it remains undisputed that SCO has not (and cannot) identify any damages proximately caused by IBM's conduct, and SCO's claims fail as a matter of law for this additional reason. (See Part III below.)

### Statement of Undisputed Facts

IBM's opening brief sets forth 67 items of undisputed fact, all of which are supported by admissible record evidence. Despite the volume of its opposition papers, SCO fails to controvert

IBM's undisputed facts, as further described in Addendum A, incorporated herein by reference. SCO does not even attempt to dispute numerous facts, and with respect to those it does purport to dispute, SCO has failed to do so with admissible record evidence as required by Fed. R. Civ. P. 56 and DUCivR 56-1. Because the evidence upon which SCO relies is immaterial and inadmissible, it should be stricken as described in Addendum B. Pursuant to DUCivR 56-1(c), each of the material facts set forth in IBM's opening brief should therefore be deemed admitted.

Rather than specifically controvert IBM's statement of facts, SCO offers its own counterstatement of facts. However, a party cannot avoid summary judgment based on a counterstatement of facts that does not satisfy the requirement of DUCivR 56-1(c). See Ashley Creek Phosphate Co. v. Chevron, 129 F. Supp. 2d 1299, 1303 n.2 (D. Utah 2000), aff'd in part, rev'd in part, 315 F.3d 1245 (10th Cir. 2003). The material facts in support of this motion which remain undisputed, include the following:

First, IBM did not interfere with any of the relationships specifically identified by SCO: BayStar, Computer Associates, Oracle, Intel, Hewlett Packard and Novell. (Opp'n at 47, 50, 53.) Each of these companies, through their representatives, has given sworn testimony that IBM never attempted to convince any of them to cease business activities with SCO and/or that to the extent these companies took any action with respect to SCO it had nothing whatsoever to do with IBM's conduct. (Interference Br. ¶¶ 46-61.) In addition, SCO concedes that IBM's Linux strategy and its technical contributions to Linux were part of an effort to compete with Sun and Microsoft. (Opp'n at 31.) SCO's own expert witness, Dr. Gary Pisano, confirms that IBM adopted its Linux strategy to compete with Sun and Microsoft and that SCO's declining revenues

3

were caused by competition from Linux generally — not from specific conduct IBM directed at SCO. (See SCO Ex. 284 at 5, 15, 21; 286 at 24, 41.)

Second, SCO failed in its discovery obligations to identify Novell properly as an entity with whom IBM allegedly interfered and, in any event, it remains undisputed that IBM did not persuade Novell to assert ownership of the UNIX copyrights. (Interference Br. ¶¶ 56-61.)

Third, SCO has failed to set forth any record evidence supporting its damages theories based on its interference claims. IBM's Interrogatory No. 24 requested that SCO describe "all of the alleged damages to plaintiff that were proximately caused by IBM, including, but not limited to . . . the amount of the alleged damages . . . the basis for the alleged damages . . . [and] the precise methodology by which the damages were calculated". (IBM Ex. 41, at 5.) SCO responded that an answer to this interrogatory would be provided "in expert reports" (id.) but none of SCO's experts have even attempted to describe or quantify SCO's interference damages. Even if SCO's newly-minted damage theories were considered, they still fail as a matter of law.

<u>**Argument**</u>

I.    **IBM DID NOT INTERFERE WITH ANY OF THE RELATIONSHIPS IDENTIFIED BY SCO.**

  A.    <u>BayStar.</u>

SCO addresses BayStar in a scant two paragraphs at the conclusion of its opposition brief. (Opp'n at 53-54.) Mr. Goldfarb of BayStar testified unequivocally that no one from IBM ever contacted him, and that every action BayStar took with respect to its investment in SCO was done for reasons having "nothing whatsoever" to do with IBM. (Interference Br. at 19-20; ¶¶ 46-48.) In response, SCO cites only the Declaration of Darl McBride, and all Mr. McBride can say on the subject is that Mr. Goldfarb told him that IBM had been "on him, on him, on him".

4

(Opp'n at 19; SCO Ex. 165, ¶ 29.)  As pointed out in our opening memorandum, this is inadmissible hearsay and cannot be relied upon to create a disputed issue of fact.  (Interference Br. at 37.)  SCO's opposition does not even mention IBM's hearsay argument or attempt to explain how this testimony possibly could be admissible.

But even if the statement upon which SCO relies was made — and the only credible, admissible evidence proves that it was not — it still would not create a triable issue of fact.  SCO still must demonstrate that the supposed "on him, on him" statement raises a reasonable inference that IBM engaged in misconduct and BayStar took some action because of that misconduct.  Mr. Goldfarb states without reservation that BayStar's actions had "nothing whatsoever" to do with IBM, something SCO does not (and cannot) dispute.  (Interference Br. ¶ 47(b).)  Thus, even if IBM had been "on" Mr. Goldfarb (which it was not), the fact is that BayStar redeemed its SCO shares, retired its SCO investment, and terminated its relationship with SCO for business reasons of its own; namely, as Mr. Goldfarb explains in detail in his declaration, because SCO turned out to be a poorly run company.  Thus, SCO neither provides credible evidence that the statement was made nor raises a genuine issue with respect to the effect of the statement, and its claim fails for both reasons.

B.    Computer Associates, Oracle and Intel.

IBM submitted, in support of its motion, declarations from Computer Associates, Oracle and Intel — disinterested third parties — making clear that IBM did not, as SCO contends, encourage them not to do business with SCO.  Samuel Greenblatt, a senior vice president of Computer Associates and attendee of the LinuxWorld 2003 convention, states without reservation that no one from IBM communicated with anyone at Computer Associates, and that

Computer Associates has not in any way altered its relationship with SCO because of statements or actions by IBM. (IBM Ex. 177 ¶¶ 2-4.) Monica Kumar, Principal Manager of Oracle's Linux Program Office and LinuxWorld 2003 attendee, likewise refuted SCO's assertions with respect to Oracle. (Interference Br. ¶ 49(a).) Luann Gulesarian, the Strategic Relationship Manager in Intel's Sales and Marketing Group, and also an attendee at LinuxWorld 2003, similarly testified that SCO's Intel claim has no basis in fact. (Interference Br. ¶ 49(b).) Ms. Smith likewise confirms that she never spoke with anyone from any of these companies about not doing business with SCO. (Interference Br. ¶ 49(d).)

   To avoid summary judgment, SCO argues that a jury might conclude that each of these individuals is lying — that IBM really did contact them and encourage them not to do business with SCO, despite their unequivocal and uniform denials. (See Opp'n at 48.) As support, SCO does not offer contradictory testimony from an employee of these companies, documents suggesting the alleged conduct occurred or even testimony from its own employees contradicting these declarations. Instead, SCO argues that a jury might conclude these four individuals are lying because after January 2003, each of these companies "further reduced their support for SCO". (Opp'n at 79.) Even the evidence SCO cites in support of its assertion that these companies "further reduced their support" after January 2003, however, does not support this point. On the contrary, SCO's declarants Erik Hughes and Janet Sullivan both confirm in their declarations that these companies reduced their support for SCO long before January 2003. Mr. Hughes states that Intel decreased its support beginning in 2001 — two years before LinuxWorld 2003 — and that "[s]upport from Intel for SCO has dwindled over the last several years". (SCO Ex. 1, ¶ 12 (emphasis added).) Ms. Sullivan states that "September 2001 is the last time Oracle

6

announced a new Oracle database product was [sic] certified to a SCO product" (SCO Ex. 369, ¶ 17), that "SCO's business relationship with Oracle dwindled in the following years" (id. ¶ 20), and that at some undefined time in 2003, "Oracle withdrew OpenUnix8 certification". (Id.) Thus, the evidence upon which SCO relies shows, at best, that SCO's relationship with these companies changed in 2001 — years before LinuxWorld 2003. No jury reasonably could infer from this that IBM contacted these companies in January 2003 — in the face of their unequivocal denials — and SCO has therefore failed to raise a disputed issue of material fact.

Even if SCO could offer evidence that support from these companies was "further reduced" after January 2003, it still would not raise a disputed issue of fact because SCO offers no evidence that any such reduction was caused by IBM's actions. Even if such a "reduction" did occur in January 2003, one could just as easily (and with much more confidence) speculate that it was caused by SCO's public relations assault on Linux, which began at that time. Nor could a jury reasonably infer from Ms. Smith's alleged conversation with Rick Becker of Hewlett Packard (discussed below) that Ms. Smith must also have talked to Computer Associates, Oracle and Intel about SCO. SCO's "reasonable inferences" amount to nothing more than sheer speculation. See Adams v. Washburn Univ. of Topeka, 66 Fed. Appx. 819, 823 (10th Cir. 2003) (finding that "evidence of an opportunity to influence does not amount to evidence of actual influence", and "mere speculation about [a party's] influence is not enough to demonstrate a genuine issue of material fact"); Messer v. Amway Corp., 106 Fed. Appx. 678, 686 (10th Cir. 2004) ("mere speculation, conjecture, or surmise" cannot create a genuine issue of material fact on summary judgment); Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988) ("In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or

7

on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.").

Because SCO has provided no competent evidence that IBM interfered with Computer Associates, Oracle or Intel, and because each of these companies denies that such interference occurred, SCO's claim is untenable.

C.   Hewlett Packard.

Although Karen Smith disagrees with Rick Becker of Hewlett Packard that she told him IBM was cutting off all business ties to SCO, and suggested that Hewlett Packard do the same, the following facts remain undisputed by SCO:

- Mr. Becker testified that as a result of his conversation with Ms. Smith he did nothing more than decide **REDACTED** (Interference Br. ¶ 52);

- Mr. Becker testified that, after the alleged conversation, **REDACTED** (Interference Br. ¶ 52);

- Hewlett Packard Vice President Joseph Beyers testified that Hewlett Packard continues to this day to do business with SCO, and that any changes in the business relationship between the two companies have nothing to do with IBM (Interference Br. ¶ 53);

- SCO's Rule 30(b)(6) witness and management-level employee Jeffrey Hunsaker testified that SCO has **REDACTED** (Interference Br. ¶ 54(b));

- SCO's Gregory Anderson testified specifically about SCO's relationship with Hewlett Packard after the January 2003 LinuxWorld event, stating that **REDACTED** (Interference Br. ¶ 54(a));

- SCO itself continues to tout the relationship with Hewlett Packard as a **REDACTED** (Interference Br. ¶ 54(c)); and

- Hewlett Packard was the only "Platinum Sponsor" (the highest level) of its 2006 SCOForum event (Interference Br. ¶ 54(d)).

8

SCO makes no effort to dispute any of these facts. Instead, it again insists that Hewlett Packard "decreased its support of SCO" after January 2003. (Opp'n at 82.) SCO again cites the Declaration of Erik W. Hughes to support this assertion, and once again his testimony fails to support the proposition for which it is cited. Mr. Hughes did not testify that Hewlett Packard's relationship with SCO changed after January 2003. Instead, he testified that "HP an IHV (Independent Hardware Vendor) continues to work with SCO as a Tier 2 vendor, but used to work with SCO as a Tier 1 vendor" (SCO Ex. 1, ¶ 13), and that "HP's support for SCO has also declined in recent years" (id. ¶ 14 (emphasis added)). SCO also states that, at some undefined point in the past, Hewlett Packard provided SCO — more likely, Santa Cruz — "with $1 million annually in 'market development funds'" but has reduced this amount to $100,000. (Id. at 14.) This, of course, says absolutely nothing about Ms. Smith's alleged conversation with Mr. Becker in January 2003, which both Mr. Becker and Mr. Beyers testified had no effect whatsoever on Hewlett Packard's relationship with SCO. For the same reasons set forth above in connection with BayStar, Computer Associates, Oracle and Intel, SCO has not and cannot show that IBM's alleged conduct — even if it occurred and even if could rise to the level of tortious interference — had any effect on SCO's business relationship with Hewlett Packard. SCO's claim therefore fails as a matter of law.

      D.      OpenSource Conference in Scottsdale, Arizona.

In support of its motion, IBM submitted the declaration of John Terpstra, in which he testified that IBM did not contact him and that his decision not to have Mr. McBride speak at his OpenSource conference had nothing to do with IBM. (Interference Br. ¶ 55.) On the strength of this declaration, SCO now abandons its claim with respect to Mr. Terpstra:

9

> [I]n light of Mr. Terpstra's declaration submitted in support of
> IBM [sic] motion for summary judgment, SCO is not pursuing this
> aspect of its claim.

(Opp'n at 72.)  As discussed above, IBM submitted substantively identical declarations from

each of the companies with whom SCO alleges IBM interfered.  Each testified that the conduct

about which SCO complains did not occur and that IBM did not cause any of them to change

their business relationships with SCO.  (Interference Br. ¶¶ 46-61.)  SCO fails to explain why

Mr. Terpstra's testimony is sufficient to cause it to abandon its claim, but essentially identical

testimony from other companies does not lead to the same result.  By dropping its claim with

respect to Mr. Terpstra's OpenSource conference, SCO effectively concedes that its interference

claims with respect to the other companies it has named must likewise fail.

     E.    Novell.

          1.    SCO Did Not Identify Novell As an Entity With Whom IBM
               Allegedly Interfered.

As pointed out in IBM's opening memorandum, SCO, in responding to IBM's

interrogatories, informal requests and Court orders, never properly identified Novell as an entity

with whom IBM supposedly interfered.  (Interference Br. ¶¶ 15, 33, 39.)  In its opposition

memorandum, SCO fails in the initial statement of facts and the argument sections even to

attempt a response to this deficiency.  Instead, SCO admits that it failed to identify Novell in its

supplemental response to IBM's Interrogatory No. 8, but states, in one sentence contained in

Appendix A (its Response to IBM's "Statement of Undisputed Facts") that,

> SCO had fully already fully [sic] explained IBM's interference
> with Novell in prior interrogatory responses.  (IBM Ex. 3; IBM Ex.
> 36 at 29-31).  SCO expressly incorporated this prior interrogatory
> response into its answer.  (IBM Ex. 46 at 1, n1.)

(Opp'n at 72-73.)  SCO is simply wrong.

Without repeating the long history of SCO's refusal to provide timely and complete information regarding its interference claims, and its constant reinvention of those claims, the following abbreviated sequence of events illustrates why IBM was justified in believing that SCO was not asserting an interference claim with respect to Novell, and why SCO should not be permitted to do so now. IBM's Interrogatory No. 8 was included in IBM's first set of interrogatories of June 13, 2003. Interrogatory No. 8 asked SCO, among other things, to identify "all agreements" with which SCO alleges IBM interfered, as well as related details, persons involved and specific information about the alleged interference. (Interference Br. ¶ 39.) Some two and one-half years later, after intervening Court orders, informal requests by IBM, confusing and inconsistent supplemental answers to interrogatories by SCO and a series of Rule 30(b)(6) depositions in which SCO witnesses were unprepared, SCO was obligated by December 22, 2005, to update and supplement its responses to interrogatories, including Interrogatory No. 8.

SCO did not supplement its answers by the Court-ordered deadline. Instead, on December 28, 2005, counsel for SCO informed IBM that the list of interference claims would include six companies: BayStar, Hewlett Packard, Oracle, AutoZone, Intel and Novell. (IBM Ex. 70 ¶ 4.) On January 13, 2006, SCO served a revised Supplemental Response to Interrogatory No. 8. (Interference Br. ¶ 35.) The Supplemental Response listed six companies, as SCO's counsel represented it would: BayStar, Hewlett Packard, Computer Associates, Oracle, Intel and John Terpstra's OpenSource Conference. The Supplemental Response, however, omitted AutoZone and Novell and added Computer Associates and the OpenSource Conference. (Interference Br. ¶ 36.) Six months later, and after fact discovery had closed, counsel for SCO confirmed that the Supplemental Response was complete, that it superseded all

11

prior responses to Interrogatory No. 8, and that SCO had no plan to update the Supplemental

Response.  (Interference Br. ¶ 42.)

SCO attempts to explain its failure to identify the Novell interference claim properly by

pointing to a footnote in the Supplemental Response, which purports to incorporate virtually all

of SCO's prior responses, filed over the course of approximately two and one-half years and

comprised of hundreds of pages of material.  (IBM Ex. 46 at 1, n.1.)[2]  However, in none of its

prior responses to Interrogatory No. 8 did SCO identify Novell or the Asset Purchase Agreement.

(See SCO Exs. 31-33, 46.)  Moreover, those prior discovery responses contain conflicting and

contradictory answers concerning SCO's interference claim.  As explained in IBM's opening

brief, SCO's list of companies expanded and contracted, sometimes wildly, yet SCO purports to

have incorporated all of those responses by footnote.  SCO does so even though its counsel

specifically represented that SCO intended to limit its claim to six companies, and expressly

stipulated that the Supplemental Response superseded its prior responses.  Under these

circumstances, SCO's attempt to incorporate by footnote all of its prior, contradictory discovery

responses fails to provide IBM with sufficient notice of SCO's allegations and evidence with

---

[2]   The footnote reads as follows:

SCO hereby incorporates by reference SCO's responses and objections from SCO's
Responses to IBM's First Set of Interrogatories and First Request for the Production of
Documents dated August 4, 2003; Supplemental Response to Defendant's First Set of
Interrogatories dated October 29, 2003; Response to IBM's Second Set of Interrogatories and
Second Set of the Production of Documents dated October 29, 2003; Revised Supplemental
Response to IBM's First and Second Set of Interrogatories dated January 15, 2004; Response to
IBM's Third Set of Interrogatories dated April 19, 2004; Letter dated April 19, 2004, from B.
Hatch to T. Shaughnessy; Amended Responses to IBM's Fourth Set of Interrogatories dated June
25, 2004; Responses to IBM's Fifth Set of Interrogatories dated September 8, 2004; and
Responses to IBM's Sixth Set of Interrogatories and Sixth Request for Production of Documents
dated March 2, 2005 (collectively, SCO's "prior Responses to IBM's Interrogatories").

respect to Novell, particularly since none of SCO's prior answers to Interrogatory No. 8 identify Novell or the Asset Purchase Agreement as a relationship with which IBM interfered.

The only interrogatory answer that SCO identifies as having put IBM on notice of its Novell interference claim is SCO's Response to IBM's Third Set of Interrogatories (April 19, 2004 ("the Response to IBM's Third Set")). There, SCO provided information in answer to IBM's Interrogatory No. 14, which states, "Please describe, with specificity and in detail, all facts concerning each affirmative defense asserted in SCO's Answer to IBM's Amended Counterclaims". (IBM Ex. 36 at 4.) Information with respect to Novell was provided as an explanation of SCO's affirmative defense that "IBM's claims are barred by illegality, collusion, conspiracy and/or lack of clean hands". (Id. at 20.) SCO's explanation of the purported basis for an affirmative defense does not provide IBM notice of SCO's intent to assert an affirmative claim for relief, and is not the equivalent of the specific information regarding the identity of and evidence claimed to support the interference claims that was sought by IBM's Interrogatory No. 8.

Finally, SCO attempts to excuse its failure to include the Novell claim in its Supplemental Response by stating that the Supplemental Response was only intended to identify the scope of its Seventh Cause of Action (Interference with Contract) and its Ninth Cause of Action (Interference with Business Relationships). (Opp'n at 72.) SCO's explanation fails. At the time that the Supplemental Response was served in January 2006, SCO was under a Court-ordered obligation to supplement its answers to all interrogatories. IBM's Interrogatory No. 8 did not limit its requests for information to any specific claim or cause of action. The interrogatory sought information on "all agreements with which plaintiff alleges IBM

13

interfered", and SCO was not at liberty to pick and choose which agreements and interference claims it would include. (Interference Br. ¶ 39.) Moreover, SCO's counsel represented that this claim would be limited to six companies, Novell among them, and that it would supplement its answer to Interrogatory No. 8. (Interference Br. ¶ 34.) Two weeks later, SCO served its Supplemental Responses, which identified six companies, and Novell was not among them. (Interference Br. ¶ 36.) On this basis alone, IBM was justified in concluding that SCO had decided not to pursue an interference claim related to Novell, just as it had decided not to pursue an interference claim related to AutoZone (one of the other companies SCO dropped from its Supplemental Responses).

SCO's failure to provide information regarding the Novell claim is yet another example of a discovery strategy which, if not intentionally designed to do so, certainly resulted in IBM being left entirely in the dark. For this reason alone, IBM is entitled to summary judgment on SCO's Novell claim.

> 2. SCO Has Failed to Establish a Genuine Issue of Material Fact
> With Respect to IBM's Alleged Interference With Novell.

In support of its motion, IBM submitted the declaration of Joseph LaSala, which demonstrates that SCO's Novell claim is unfounded. (Interference Br. ¶¶ 59-61.) Recognizing it is fatal to SCO's claims, SCO urges the Court to disregard the LaSala declaration. (Opp'n at 50-51.) According to SCO, Mr. LaSala lacks personal knowledge because he was employed by Novell beginning in 2001, and his declaration addresses events that occurred prior to that time. That is wrong. The portions of Mr. LaSala's declaration cited in support of this motion involve events that occurred in 2003, during the time Mr. LaSala was employed by Novell as its Senior Vice President and General Counsel. (Interference Br. ¶¶ 59-61; Opp'n at 50 n.9.) They are

14

therefore based on his personal knowledge, or knowledge he is presumed to possess as an officer

of the corporation, as explained below.

Mr. LaSala's declaration may also be considered for events that occurred prior to his

employment because it clearly states that it is submitted on Novell's behalf and that its contents

are "based on Novell's knowledge". (IBM Ex. 240 ¶ 4.)  Nothing in the Federal Rules of Civil

Procedure prohibits a corporation from submitting a declaration through a representative who is

authorized to bind the corporation.  In fact, the Rules specifically contemplate that a duly-

appointed representative can testify on behalf of a corporation "as to matters known or

reasonably available to the organization".  Fed. R. Civ. P. 30(b)(6).  Such testimony is

admissible in support of a motion for summary judgment.[3]  Because the Rules allow a

corporation to present a designated witness to testify as to the corporation's knowledge, a

corporation may similarly present its corporate knowledge in the form of a declaration executed

by an authorized representative.[4]  As Senior Vice President and General Counsel of Novell, Mr.

---

[3]   11 J. Moore, <u>Moore's Federal Practice – Civil</u> § 56.14 ("The testimony of a Rule 30(b)(6) corporate agent deponent may be presented on a motion for summary judgment, even though not based on personal knowledge, because a Rule 30(b)(6) witness need not have personal knowledge of the facts to which he or she testifies."); <u>see also</u> <u>PPM Fin., Inc. v. Norandal, USA, Inc.</u>, 297 F. Supp. 2d 1072, 1085-1086 (N.D. Ill. 2004) (Fed. R. Civ. P. 30(b)(6) witness testifies as to corporation's position and knowledge, which is not necessarily within personal knowledge of witness).

[4]   In fact, it is not uncommon for courts to order a corporation to submit a declaration based on the corporation's knowledge.  See <u>OKI Am., Inc. v. Advanced Micro Devices, Inc.</u>, Civ. 04-3171, 2006 WL 2547464, at *2 (N.D. Cal. Aug. 31, 2006) (ordering a corporation to provide "a sworn declaration from a witness authorized to bind the corporation") (Addendum C hereto). Furthermore, corporate officers are presumed to have personal knowledge of acts of their corporation.  See 11 J. Moore, <u>Moore's Federal Practice – Civil</u> § 56.14.  This is true even where the corporate officer learned of the facts contained in the declaration after they had occurred. Personal knowledge in this context does not require contemporaneous knowledge.  <u>Dalton v. FDIC</u>, 987 F.2d 1216, 1223 (5th Cir. 1993) (finding affidavit of corporate officer was not defective simply because he learned of transaction after it had occurred).

LaSala is Novell's chief legal officer and is presumed to have personal knowledge of Novell's affairs, particularly those relating to legal issues.

SCO next objects to Mr. LaSala's declaration on the grounds that IBM asserted a common interest privilege at the Rule 30(b)(6) deposition of IBM's Scott Handy, and thereby supposedly prevented SCO from exploring the reasons behind Novell's assertion of its rights under the Asset Purchase Agreement. (Opp'n at 51.) SCO's objection is unfounded. First, Mr. Handy testified at length about his knowledge of and efforts to determine whether anyone at IBM had spoken with anyone at Novell about the Asset Purchase Agreement and about the reasons for IBM's $50 million investment in Novell, the Rule 30(b)(6) topics for which he was designated to testify. (See SCO Ex. 306 at 22-23, 63-65.) Second, counsel for IBM properly invoked the attorney client, work product and common interest privileges only as to communications between IBM's lawyers and Novell's lawyers. (Id. at 59.) IBM's motion does not rely on any such communications, and SCO's claim that IBM has used the privilege as "both a sword and shield" (Opp'n at 51) is therefore wrong. Third, Mr. Handy ultimately testified that he was unaware and had no knowledge of any such communications. (See SCO Ex. 306 at 60.) Fourth, if SCO had been dissatisfied in any way with Mr. Handy's supposed lack of preparation or knowledge, SCO has waived any such complaint. The parties' March 17, 2006, Stipulation re Discovery reserved either party's right to bring motions to compel regarding, among other things, privilege logs "or other privilege issues". (Docket No. 651 ¶ 5(d).) Despite reserving the right to do so, SCO chose not to pursue any motions to compel on this issue. Finally, if SCO had been dissatisfied with its inability to ask questions of Mr. Handy, it certainly was not prevented

16

from seeking that information from other witnesses and potential deponents — including Mr. LaSala himself.

In its substantive argument regarding the Novell claim, SCO repeatedly and with unfounded presumption refers to "false contractual assertions" and "false assertions" that were allegedly "induced" by IBM. (Opp'n at 51, 52.) As support, SCO again fails to cite any evidence of any communications between IBM and Novell on this subject, but instead relies on hearsay and speculation. For example, SCO states, "In fact, it was Mr. McBride's impression that Ms. Smith implied that someone from IBM had asked Novell whether Novell, or SCO, held the copyrights." (Opp'n at 52 (emphasis added).) SCO relies upon Mr. McBride's hearsay "impression" about something he believes that Ms. Smith "implied" — but did not state — about something that "someone" — not identified — asked of Novell. In addition to being inadmissible, the question remains: So what? Even if "someone" from IBM asked Novell about its ownership of the UNIX copyrights, it does not follow that such an innocuous question is evidence of interference and inducement by IBM. As unequivocally established by the declaration of Mr. LaSala, the facts are that IBM did not interfere with Novell, and that Novell was not induced by IBM to assert its rights under the Asset Purchase Agreement.

Again relying upon inadmissible hearsay, SCO cites Mr. McBride's declaration in which he refers to supposed statements made and matters "implied" by "Novell executive" Greg Jones. SCO does not further identify Mr. Jones; nor does SCO explain why anything that Mr. Jones supposedly said or did should be indicative of what Novell as a company thought, and why Novell as a company acted as it did. In attempting to link IBM to Mr. Jones, SCO states,

> Mr. Jones implied that Novell had discussed the issue with IBM,
> but he would not directly answer Mr. McBride's question, and

17

> ultimately refused to say anything about the matter without an
> attorney present. A jury can reasonably that [sic] IBM caused
> Novell's change in position with regard to SCO's ownership of
> the copyrights.

(Id. at 53 (emphasis added).)  Here, SCO relies not only on inadmissible hearsay, but also on Mr.

McBride's subjective belief about something the hearsay declarant "implied". Such "statements"

do not create genuine issues of material fact.

Even if it is assumed, however, that someone from IBM contacted someone at Novell to

discuss Novell's copyrights, SCO has failed to demonstrate a reasonable basis for a jury to

conclude that this contact caused Novell to act as it did. As with IBM's discussion of Hewlett

Packard above (where at least SCO points to an alleged communication between employees of

the two companies), a duly qualified, disinterested representative of Novell has stated that Novell

acted because it owns the copyrights, because it has a right of waiver under the Asset Purchase

Agreement and because it is in Novell's own interest to exercise those rights. (Interference Br. ¶

61.)[5]  Mr. LaSala further states that IBM did not have the ability to require Novell to act, that

IBM did not force or pressure Novell to act and that Novell acted independently of IBM. (Id.)

SCO has failed to put up a viable declarant to counter Mr. LaSala's declaration testimony, just as

it has failed to point to any other admissible evidence which would raise a genuine issue of fact.

As with its other interference claims, SCO's Novell claim fails for this additional reason.

---

[5]  SCO tries in vain to make much of IBM's $50 million investment in Novell, which was
used to help facilitate Novell's acquisition of SuSE, a Linux distributor. (Opp'n at 24-25;
Interference Br. ¶ 60.)  SCO, however, fails to cite the deposition of IBM's Scott Handy in which
he explained in detail all of the reasons why IBM made that investment, none of which had
anything to do with SCO or with any of the claims in this lawsuit. (IBM Ex. 306.)  Again, SCO
ignores direct testimony and evidence on the subject and asks the Court instead to indulge its
fanciful speculation about what "must" have occurred.

F.    "UNIX-on-Intel" Market.

As demonstrated in IBM's opening memorandum, and contrary to SCO's assertion that IBM failed to cite any authority for its position, Utah does not recognize a claim for "indirect interference" or "interference with the market". See, e.g., Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293 (Utah 1982); Bower v. Stein Eriksen Lodge Owners Ass'n., Inc., 201 Fed. Supp. 2d 1134 (D. Utah 2002). (Interference Br. at 48.) Notably absent from SCO's opposition is reference to a single case, from Utah or anywhere else, that has recognized such a claim. SCO's "interference with the market" theory is entirely speculative, and SCO fails to establish a genuine issue of material fact with respect to intentional conduct, actual interference or a protected business interest with which IBM improperly interfered.

SCO begins its argument with the surprising (but unavoidable and accurate) concession that IBM's Linux strategy was, in fact, an effort to compete with Sun and Microsoft. (Opp'n at 31.) It is undisputed that the conduct SCO challenges in this claim was not undertaken by IBM in an effort to compete with SCO at all. This acknowledgement of IBM's legitimate interest in competing in the marketplace is actually less dramatic than statements made by SCO's own expert, Dr. Gary Pisano, in his reports of May 19, 2006 and August 28, 2006. Dr. Pisano argues that IBM adopted its Linux strategy in the late 1990s in an effort to compete with Sun and Microsoft and that SCO's declining revenues were caused by competition from Linux:

●                          REDACTED

(SCO Ex. 284 at 5.)

●                  REDACTED

(Id. at 15.)

19

- REDACTED
    (Id. at 21.)

- REDACTED
    (SCO Ex. 286 at 41.)

- REDACTED (Id. at 24.)

Dr. Pisano unqualifiedly describes IBM's conduct as competition.  When SCO realizes that it lacks an essential element of its "interference with the market" claim, and that its claim is subject to the defense of privileged competition, that same conduct inexplicably becomes intentional interference.

SCO has failed to demonstrate that it had a single, specific contract or an identifiable prospective relationship with a UNIX customer that was subjected to interference by IBM. Given the statistics which SCO proudly touts as evidence of its prior "dominance" of the "UNIX-on-Intel" market, it is frankly incredible that SCO cannot locate a single customer who will step forward and say, "I was a loyal SCO UNIX customer until IBM came along with its Linux strategy and support. I was then forced to switch to Linux". While even that hypothetical statement would not give rise to a claim for tortious interference, the existence of such a customer would at least lend some credence to SCO's claims. The glaring absence of such a customer is telling.

Utah case law on tortious interference consistently recognizes the value of competitive activity which takes place in the "rough and tumble of the marketplace". See Leigh Furniture, 657 P.2d at 307. Even if SCO could establish that it had contracts or relationships in the "UNIX-on-Intel" market, IBM had a legitimate interest in competing for the future business of all of

20

those customers.  In <u>St. Benedict's Dev. Co. v. St. Benedict's Hosp.</u>, 811 P. 2d 194 (Utah 1991),

for example, the plaintiff claimed that the defendant developer of a new office building had

intentionally solicited plaintiff's tenants in an existing building to move to defendant's new

building when the tenants' leases expired.  In analyzing whether the intentional solicitation

constituted tortious interference, the Utah Supreme Court noted:

> Similarly, Boyer, a commercial enterprise and stranger to any
> contract between the hospital and the development company, <u>has a
> legitimate interest in competing for the future business of the
> development company's tenants.</u>

811 P. 2d at 201 (emphasis added).  According to the Utah Supreme Court, the loss of plaintiff's

tenants was an "inevitable by-product of competition" and not tortious interference.  <u>Id.</u> at 201.

Here, IBM competed with Sun and Microsoft.  SCO alleges that such competition, by extension,

affected SCO and resulted in lost "UNIX-on-Intel" customers.  Even if that assertion could be

proven by competent evidence — which SCO has failed to do — the loss of SCO customers is

nothing more than the "inevitable by-product of competition", and like the plaintiff's in <u>St.</u>

<u>Benedicts</u>, SCO's claims fail as a matter of law.

The importance of preserving the right of a commercial enterprise to compete in the

marketplace is further underscored by Prosser, who writes:

> Where the contract interfered with is terminable at will, however,
> the privilege of competition has been recognized.  In such a case
> there is no contract right to have the relation continued, but only an
> expectancy, which is similar to the expectancy of a business that a
> customer will continue to do business with it.  With such an
> expectancy of future relations, and prospective advantage, there
> has been no doubt that a competitor has the privilege of interfering
> to acquire business for himself.  Accordingly, the considerable
> weight of authority holds that there is a privilege of competition
> which extends to inducing the termination of agreements
> terminable at will, whether they concern employment or other

> relations. On the same principle, the defendant may protect its
> legitimate interests, which are not limited to purely competitive
> interests, by interference with the plaintiff's mere prospects for
> business.

W. Page Keeton, ed., Prosser and Keeton on the Law of Torts, 987-88 (5th ed. 1984).  SCO had,

at most, expectations of continued sales of UNIX products and services to its customers.  Such

expectations are not protected from competitive activity by IBM, Microsoft, Sun or any other

commercial enterprise.

In attempting to prove that IBM's once competition and now alleged interference was

intentional, SCO cites the Utah Court of Appeals decision in <u>Mumford v. ITT Commercial Fin.</u>

<u>Corp.</u>, 858 P.2d 1041 (Utah Ct. App. 1993):

> The tort of interference with economic relations is an intentional
> tort.  However, even if the defendant does not act for the purpose
> of interfering or does not desire it but knows that the interference is
> substantially certain to occur as a result of the defendant's action
> and is a necessary consequence thereof, the interference is
> intentional.

(Opp'n at 32 (quoting <u>Mumford</u>, 858 P.2d at 1044).)  But even under this standard, SCO still has

failed to demonstrate that interference with SCO's business relationships was "substantially

certain" to occur and was a "necessary consequence" of IBM's actions.

SCO has not shown that IBM's efforts to compete with Sun and Microsoft would, with

substantial certainty and as a necessary consequence, result in <u>interference</u> with SCO.  Is it

possible that SCO would be harmed by such competition?  Perhaps.  Is it equally possible that

SCO, which was founded as a Linux company, would benefit by such competition?  Absolutely.

SCO, after all, acquired the UNIX assets for the purpose of enhancing its Linux business.  (IBM

Ex. 221 ¶¶ 85, 87-92.)  If, as SCO alleges, it dominated the "UNIX-on-Intel" market, and if SCO

22

likewise was well positioned in the Linux for business market, SCO more than anyone stood to benefit by improvements to Linux.  Therefore, SCO has failed to establish that, even under the Mumford standard, IBM's actions were intentional.

The only cases SCO cites to support its "interference with the market" theory are Leigh Furniture and Mumford.  Neither case, however, supports SCO's position.  In Leigh Furniture, the defendant engaged in a campaign of harassment specifically directed at and designed to interfere with the operation of plaintiff's furniture store.  Leigh Furniture, 657 P.2d at 306.  Similarly, the defendant in Mumford refused to give the plaintiff access to equipment the plaintiff needed to fulfill specific contracts he had signed to haul boats.  Mumford, 858 P.2d at 1043.  The defendant in Leigh Furniture did not interfere with the "retail furniture market" in general and thereby affect plaintiff's furniture store, and the defendant in Mumford did not interfere with the "boat-hauling market" in general, and thereby affect plaintiff's boat-hauling contracts.  Yet those scenarios would be essential for either case to support SCO's "interference with the market" theory.  Instead, in each instance, there was evidence of conduct which the defendant directed at the plaintiff or at an identifiable, protected business interest of the plaintiff.  In other words, direct conduct is required; indirect conduct will not suffice.

The case closest to this one is Judge Campbell's decision in Bower v. Stein Erickson Lodge Owners Ass'n, 201 F. Supp. 2d 1134 (D. Utah 2002).  There, the defendant constructed an adjacent building that allegedly blocked the plaintiff's views, and the plaintiff claimed that the "obstructed view lowers both the fair market value and the rentability of [its] condominium".  Id. at 1143.  In effect, the plaintiff claimed that the defendant had interfered with the future market for condominium rentals, and such interference damaged the plaintiff.  The defendant argued,

23

among other things, that it "cannot intentionally interfere with a third party relationship without any knowledge of or notice of a third party relationship" and that "any future interference with renters caused by the construction is speculative". Id. Judge Campbell agreed and granted summary judgment because "the [plaintiff's] allegations of interference with a third party and damages are too speculative". Id. Here, as in Bower, IBM did not engage in any conduct directed at SCO or an identifiable business interest of SCO. Just as the existence of unidentified potential condominium renters or buyers was too speculative to constitute a protected economic interest in Bower, the unidentified, potential and speculative "UNIX-on-Intel" customers of SCO do not amount to a protected economic interest here.[6]

In two instances in its brief, SCO attempts to persuade the Court that Bower does not apply. (Opp'n at 34-35, 38.) SCO first attempts to distinguish Bower by asserting (without citing any evidence in the record) that "IBM knew of the strength of SCO's business relations in the Intel market and the nature of those relationships", which SCO believes is sufficient to establish intentional interference. (Opp'n at 35.) But SCO ignores the quote from Mumford that appears three pages earlier in its brief, stating that the defendant must know that interference is "substantially certain to occur" and is a "necessary consequence" of defendant's action. See Mumford, 858 P.2d at 1044. Even if IBM knew the "strength" or "nature" of SCO's business relationships, that does not mean IBM knew that interference was "substantially certain to occur"

---

[6]   Allowing SCO to proceed with its interference with the market theory would put SCO in the untenable position of having no proof that IBM interfered with, for example, Intel, Oracle or Computer Associates (for the reasons described above), yet recovering damages from IBM for interference with those very companies under the guise of interference with the market as a whole. SCO's "interference with the market" theory is therefore simply a device designed to circumvent its inability to prove its interference claims.

as a "necessary consequence" of IBM's actions, and SCO offers no proof otherwise.  In addition, SCO's attempt to distinguish <u>Bower</u> ignores a fundamental flaw identified by the <u>Bower</u> court:  a plaintiff cannot recover for intentional interference with economic relations when the plaintiff cannot establish the existence of actual third parties with whom the defendant intentionally interfered.  SCO admits it cannot "possibly identify" such third parties in this case.  (Opp'n Br. at 34.)

SCO also argues that IBM has "mis-cited" <u>Bower</u> because there the "[p]laintiff's theory of recovery was prospective: namely that the defendant's construction would injure its future economic relations", whereas here, "SCO has not relied on such a prospective theory".  (Opp'n at 38.)  In doing so, SCO concedes <u>Bower</u> would be dispositive if SCO's claim were based on interference with <u>prospective</u> business relationships (rather than existing ones), but again, SCO claims it "has not relied on such a prospective theory".  This is incorrect.  In SCO's Supplemental Response, the first sentence describing its "interference with the market" theory states: "IBM has interfered with SCO's <u>prospective</u> business relationships in the market for UNIX operating systems on the 32-bit Intel architecture".  (IBM Ex. 46 at 7 (emphasis added).) The response goes on to identify some 156 "Linux users", not one of whom is a former SCO customer, and all of whom are, at best, only "prospective" customers of SCO.  (<u>Id.</u> at 11-13.) SCO's concession that <u>Bower</u> applies to claims for interference with prospective economic relations not only demonstrates that IBM has not "mis-cited" <u>Bower</u>, but also defeats SCO's "interference with the market" theory.

In short, SCO fails to cite a single case which has recognized "interference with the market" as a viable claim, and the Utah cases discussed above and in IBM's opening brief

25

demonstrate that Utah recognizes no such claim.  SCO offers this Court no good reason why it should expand Utah law on tortious interference to recognize such speculative claims, particularly where, as here, SCO admits that IBM's conduct was motivated by a desire to compete with companies other than SCO.

## II.   IBM DID NOT ACT WITH AN IMPROPER PURPOSE OR BY IMPROPER MEANS, AND IBM's ALLEGED CONDUCT IS PRIVILEGED.

Even if SCO could show that IBM intentionally interfered, "directly" or "indirectly", with SCO's economic relationships, it cannot show that IBM did so for an improper purpose, or acted by improper means, and in any event, IBM's conduct is privileged.  For these additional reasons, IBM is entitled to summary judgment.

### A.   SCO Cannot Show An Improper Purpose.

To establish an improper purpose under Utah law, SCO would have to show that IBM acted with ill will towards SCO, amounting to a desire to harm SCO purely for harm's sake, and that such ill will predominated over all other purposes, including IBM's long-range economic goals.  See Leigh Furniture, 657 P.2d at 311; Sampson v. Richins, 770 P.2d 998, 1003 (Utah Ct. App. 1989).  Leigh Furniture provides a useful illustration of the burden SCO faces in making such a claim.  There, the counterclaim-defendant, Leigh Furniture, engaged in a four-year campaign of harassment and intimidation designed to force the counterclaim-plaintiff, Isom, out of business.  Leigh Furniture's goal was to terminate Isom's long-term lease on property Leigh Furniture owned, thereby allowing Leigh Furniture to sell that property for more money.  Leigh Furniture's employees, among other things, harassed Isom's customers, continually confronted him, repeatedly interrupted his sales activities, caused customers to leave his store, made unreasonable demands for audits of his books and records, forced Isom to defend multiple,

26

groundless lawsuits and breached its agreements with him.  See Leigh Furniture, 657 P.2d at
306.  The conduct was so egregious that the Utah Supreme Court not only upheld an award of
punitive damages, but also reversed the trial court's remittitur of those damages.  Id. at 310.  But
even on these facts, the Utah Supreme Court held that Isom could not show an improper purpose.
Although there was "substantial evidence that [Leigh Furniture] deliberately injured Isom's
economic relations", that conduct "was an intermediate step toward achieving the long-range
financial goal of profitably reselling the building free of Isom's interest".  Id. at 308.  "Because
that economic interest seems to have been controlling, we must conclude that the evidence in this
case would not support a jury finding that [Leigh Furniture's] predominate purpose was to injure
or ruin Isom's business merely for the sake of injury alone".  Id.

  Faced with this standard, SCO makes no effort to claim that IBM's "interference with the
market" was done for an improper purpose.[7]  SCO does argue that IBM's alleged interference
with Hewlett Packard and Novell was for an improper purpose.[8]  SCO's evidence, however, does
not even begin to meet its burden.

  With respect to Hewlett Packard, SCO first quotes Mr. Becker's testimony,

REDACTED

---

[7] Indeed, SCO could not do so because, as discussed above, SCO's own expert admits that
IBM's "purpose" was to compete with Sun and Microsoft, not to harm SCO purely for harm's
sake.  (SCO Ex. 284 at 5; SCO Ex. 286 at 41.)

[8] SCO's opposition memorandum says nothing about improper purpose, or improper
means, with respect to its claims regarding BayStar, Computer Associates, Oracle and Intel.  For
this reason alone, summary judgment should be granted on those claims.  But by no stretch of the
imagination could SCO possibly show improper purpose with respect to these claims.

27

and then SCO states, remarkably, that "[s]tanding alone this evidence is sufficient to preclude summary judgment". (Opp'n at 48 (quoting SCO Ex. 118 at 55:6-11).) Even construed in the light most favorable to SCO, this does not begin to show that IBM desired to harm SCO for harm's sake (let alone that ill will predominated over all other economic motives). On the contrary, if accepted as true, it shows that Ms. Smith was motivated by long-range business interests — specifically "the best outcome for our joint Linux initiatives". SCO's argument with respect to Novell's allegedly improper purpose is even worse. Here, SCO jettisons its summary judgment burden entirely — acknowledging that it has no evidence of IBM's intent, SCO simply states that "what motivated IBM's conduct is for a jury to decide". (Opp'n at 52.) As the Utah cases make plain, if IBM's conduct had been motivated by a long-term business interest, and even SCO's version of events shows that clearly was the case, then SCO cannot satisfy the improper purpose prong, as articulated by the Utah Supreme Court in <u>Leigh Furniture</u>.

### B.    SCO Cannot Show Improper Means.

SCO likewise cannot show improper means. To satisfy this requirement, the means used to interfere with a party's economic relations must be contrary to law, "such as violations of statutes, regulations, or recognized common-law rules". <u>Leigh Furniture</u>, 657 P.2d at 308.

With respect to SCO's "direct" interference claims, SCO does not even attempt to argue that IBM's alleged conduct — persuading Computer Associates, Oracle and Intel not to do business with SCO, encouraging BayStar to withdraw its investment in SCO and encouraging Novell to assert ownership of the UNIX copyrights — violates any statute, regulation or

common law rule. It therefore cannot show improper means, and its "direct" interference claims fail as a matter of law.[9]

With respect to SCO's "interference with the market" claim, SCO argues that IBM's actions satisfy the improper means prong because IBM (1) breached the IBM/AT&T license agreements, (2) violated SCO's copyrights and (3) committed the common law tort of unfair competition. (Opp'n at 39.) These allegedly improper means fail as a matter of law for the reasons discussed in IBM's pending motions with respect to each of these claims. They also fail as a matter of law for the following reasons:

1.   IBM's Alleged Breach of Contract Does Not Constitute Improper Means.

Under Utah law, "a deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an 'improper means.' Because the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in tort (unless the defendant's conduct would constitute a tort independent of the contract)". See Leigh Furniture, 657 P.2d at 309. Instead, for a breach of contract to rise to the level of improper means, SCO must show that IBM's breach of contract was deliberate, and that it was "committed for the immediate purpose of injuring" SCO. Id.

---

[9]   Even assuming (contrary to fact) that IBM contacted BayStar, Computer Associates, Oracle and Intel, and even assuming (contrary to fact) that IBM asked each of them not to do business with SCO, Utah law is clear that "efforts to persuade others . . . not to deal with certain entities" are "legitimate" and do not constitute improper means. See Leigh Furniture, 657 P.2d at 303. Additionally, even if IBM contacted Novell and persuaded it to assert ownership of the UNIX copyrights, SCO has not even attempted to identify any statute, regulation or common-law rule that was violated by IBM. SCO's claims fail for these additional reasons.

Even if SCO could establish a breach of contract, it has offered no evidence whatsoever that IBM committed that breach deliberately and for the immediate purpose of injuring SCO. SCO's "indirect" interference claim is based on IBM's contributions to Linux. In support of its motion, IBM offered evidence that it engaged in its Linux strategy, and made contributions to Linux, in the good faith belief that it was entitled to do so, and that it had no intent to injure SCO. (Interference Br. ¶ 62.) SCO purports to dispute these facts, but the only evidence it cites is Ms. Smith's alleged conversation with Mr. Becker. (Opp'n at 87.)[10]  That conversation, of course, allegedly occurred in 2003, long after IBM began making contributions to Linux and therefore says nothing about IBM's motive or intent for contributing to Linux. And again, SCO's experts say that IBM's motive was to compete with Sun and Microsoft, not to harm SCO. (SCO Ex. 284 at 5; SCO Ex. 286 at 41.) Because SCO offers no evidence that IBM deliberately breached a contract with the specific and immediate purpose of harming SCO, its claim fails as a matter of law.[11]

### 2.   IBM's Alleged Copyright Infringement and Unfair Competition Do Not Constitute Improper Means.

SCO makes passing reference to its copyright infringement and unfair competition claims, but fails to discuss them or explain why the conduct at issue rises to the level of improper means. (Opp'n at 39-40.) Even if SCO were to prevail on its claims for copyright infringement

---

[10]   SCO also purports to incorporate the entirety of its 64-page Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claims (SCO's Sixth Cause of Action). (Opp'n at 87.) SCO's attempt to incorporate by reference its entire brief, legal arguments and all, rather than specifically to controvert IBM's statement with admissible evidence, violates DUCivR 56-1(c).

[11]   SCO also makes an incomprehensible argument concerning statements by IBM about the alleged derivation of its JFS technology, but completely fails to explain what this has to do with showing an immediate intent to harm SCO. (Opp'n at 40.)

and unfair competition, its "interference with the market" claim would still fail as a matter of law for the following reasons:

First, a tortious interference claim is an intentional tort, requiring elements of proof beyond the mere act of copyright infringement or unfair competition. See Aerotech Res., Inc. v. Dodson Aviation, Inc., 91 Fed. Appx. 37, 41 (10th Cir. 2004) (recognizing tortious interference has "separate and distinct" elements from other claims). Thus, SCO's apparent contention that it need not prove anything other than the elements of copyright infringement or unfair competition to prevail on its tortious interference claim is wrong as a matter of law. (SCO Br. at 39.)

Second, to the extent a copyright violation or an act of unfair competition is not undertaken with intent to inflict injury beyond that which would naturally flow from such infringement or competition, it would not constitute improper means for interference purposes. See Leigh Furniture, 657 P.2d at 310. Again, SCO has failed to offer any evidence that IBM's alleged copyright infringement or acts of unfair competition were done "with an intent to inflict injury beyond that contemplated as a result of the mere [infringement or competition]". Id. (internal quotations and citations omitted).

Third, SCO's reliance on its copyright claim to support intentional interference with the "UNIX-on-Intel" market is grossly misplaced. SCO has asserted in this case only one, narrow copyright claim. That claim does not concern IBM's contributions to Linux, but instead relates to SCO's purported termination of IBM's license for its proprietary AIX operating system. SCO claims that IBM's continued distribution of AIX following that purported termination violates SCO's copyrights, and for that claim SCO seeks to recover IBM's profits from AIX. IBM's continued sales of AIX, of course, have absolutely nothing to do with IBM's alleged interference

with the "UNIX on Intel" market by allegedly making improper contributions to Linux. The only other copyright claim upon which SCO could possibly base its "indirect" interference claim is IBM's counterclaim for a declaration of non-infringement. With respect to that counterclaim, however, SCO has not specifically identified a single contribution that IBM made to Linux that SCO claims violated its copyrights. (See IBM Exs. 54-59.) Instead, each and every Linux contribution that SCO has identified as purportedly infringing its copyrights was made by someone other than IBM. Thus, SCO has not identified any copyright infringement by IBM that could possibly constitute improper means sufficient to satisfy this element of tortious interference.

Finally, SCO's attempt to rely on its unfair competition claim presents a tautology: SCO argues here that the Court should not grant summary judgment on its interference claim because it might prevail on its unfair competition claim, and thereby show improper means. At the same time, SCO argues that its "unfair competition allegations and evidence include IBM's interference with SCO's contractual relationships". (See Mem. in Opp'n to Motion for Summ. Judg. on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action), at 51.) In other words, SCO argues the Court cannot dismiss its interference claims because it might prevail on its unfair competition claim, and cannot dismiss its unfair competition claim because it might prevail on its interference claim. IBM respectfully submits that both claims should be dismissed.

C.    IBM's Alleged Conduct Is Privileged.

SCO does not dispute that IBM undertook its Linux strategy, and made contributions to Linux, to further its own competitive interests. Utah law is clear that the protection and advancement of legitimate competitive interests is itself a complete, affirmative defense to a

32

claim of tortious interference.  See Gull Labs, Inc. v. Diagnostic Tech. Inc., 695 F. Supp. 1151,

1155 (D. Utah 1988) ("Competition is a major privilege justifying interference with competitive

advantage, and competitors are not liable for interference with contract if the interference

advances the competitors' own interest and is not otherwise unlawful."); Leigh Furniture, 657

P.2d at 305 n.8 ("The exercise of a legal right constitutes justification and is a complete defense

to an action of tortious intervention of contractual rights."); Atkin, Wright & Miles v. Mountain

States Tel. & Tel. Co., 709 P.2d 330, 337 (Utah 1985) ("Conduct is not actionable, however, if

the defendant only acted to protect his own legitimate interests.").  Where, as here, it is

undisputed that the alleged interference was undertaken to further a competitor's own economic

interests, a tortious interference claim fails as a matter of law.

## III.   IBM'S ACTIONS DID NOT CAUSE INJURY TO SCO.

Finally, even if SCO could overcome all of the foregoing hurdles, it still cannot show

causation or damages.  SCO admits it has made no effort to quantify its damages resulting from

IBM's alleged tortious interference separately, and admits that it has failed entirely to answer

IBM's interrogatory seeking precisely this information.  On this basis alone, IBM's motion

should be granted.  But even if SCO's newly-advanced damages theories were considered by the

Court, its claims would still fail as a matter of law.

### A.   SCO Failed in Discovery to Identify Any Damages Resulting From IBM's Alleged Interference.

IBM's Interrogatory No. 24 asked SCO to describe "all of the alleged damages to

plaintiff that were proximately caused by IBM, including, but not limited to . . . the amount of

the alleged damages . . . the basis for the alleged damages . . . [and] the precise methodology by

which the damages were calculated".  (IBM Ex. 41 at 5.)  In response, SCO merely stated that an

33

answer to this interrogatory would be provided "in expert reports". (Id.)  As shown below, SCO

failed entirely to do so, and IBM is therefore entitled to summary judgment. See Cambridge

Elecs. Corp. v. MGA Elecs., Inc., 227 F.R.D. 313, 313, 321-25 (C.D. Cal. 2004) (eliminating

plaintiff's evidence in opposition to summary judgment motion, and granting motion, because

plaintiff's evidence was not identified in response to defendant's interrogatories); Shepard v.

Frontier Commc'ns. Servs. Inc., 92 F. Supp. 2d 279, 279, 286 (S.D.N.Y. 2000) (refusing to

consider documents submitted in opposition to summary judgment because they were not

produced in response to discovery request); see also Fed. R. Civ. P. 37(c)(1) ("A party who

without substantial justification fails to . . . . amend a prior response to discovery as required by

Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence . . . on a

motion any . . . information that is not so disclosed.")

      With respect to SCO's "direct" interference claims, SCO admits that its expert reports do

not even attempt to describe or quantify these damages. (Opp'n at 90 (Resp. to Undisp. Fact ¶

66(e)).)  SCO's experts do not, for example, quantify (or even discuss) the alleged "loss of

support" from Hewlett Packard, Computer Associates, Oracle or Intel that allegedly occurred

after the January 2003 LinuxWorld event, or the amount of damage to SCO's business caused by

this alleged "loss of support".  SCO does not dispute that its Rule 30(b)(6) witness on this precise

subject was utterly incapable of identifying "any damages that SCO may have suffered with

respect to a particular company with which SCO alleges IBM interfered". (Opp'n at 90 (Resp. to

IBM Undisp. Fact ¶ 66(a)).)  Nor does SCO attempt to explain or quantify these damages in its

opposition to IBM's motion, but instead simply asserts in conclusory fashion that "SCO's loss of

partner support [was] a significant contributory cause of SCO's revenue losses and injury". See

L&M Enters., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1287 (10th Cir. 2000)

("Unsupported conclusory allegations . . . do not create a genuine issue of fact.").

SCO's experts likewise fail even to mention IBM's alleged interference with BayStar and with the Novell Asset Purchase Agreement, and they make no effort to quantify or explain any damage to SCO resulting from that alleged conduct. And SCO's opposition memorandum is completely silent on the issue of damages allegedly caused by IBM's interference with Novell. (See Opp'n at 50-53.)[12] SCO therefore has failed to answer IBM's Interrogatory No. 24 (either directly or through expert reports), refused to produce a corporate witness who could testify meaningfully about such damages, and failed to provide in discovery information from which to determine any damage to SCO resulting from IBM's alleged tortious interference with Hewlett Packard, Computer Associates, Oracle, Intel, Novell or BayStar.

SCO's "interference with the market" claim stands on no better footing. Again, neither SCO's answer to Interrogatory No. 24 nor its expert reports identify any damages to SCO specific to IBM's alleged "interference with the market". Instead, SCO states in its opposition

---

[12]  SCO's experts are silent on the issue of BayStar and its decision to redeem its investment in SCO. In its opposition memorandum, SCO admits, in response to IBM's statement of undisputed facts, that "SCO does not claim any discrete damages resulting from IBM's alleged interference [with BayStar]", and SCO admits that its Rule 30(b)(6) witness on this subject could not identify any damages specific to IBM's alleged interference with BayStar. (SCO Resp. to Undisp. Fact ¶ 66(d).) Contrary to these admissions, SCO's opposition memorandum also states, for the very first time, that its damage with respect to BayStar "is not limited to the partial redemption of preferred stock or cash payment, totaling approximately $20 million but also includes damage to reputation and lost customers". (Opp'n at 54). Because that statement is entirely unsupported and inadmissible, because it is made for the first time in opposition to IBM's motion, and because it conflicts with SCO's corporate testimony on the same subject, it cannot be considered by the Court to create a disputed issue of material fact. See Sports Racing Servs. Inc. v. Sports Car Club of Am., 131 F.3d 874, 893 (10th Cir. 1997) (contradictory affidavit designed to create a sham issue of fact should be disregarded); Barber v. Hallmark Cards, Inc., No. 94-3356, 1996 U.S. App. LEXIS 729, at *6 (10th Cir. Jan. 19, 1996) (same) (Addendum D hereto).

memorandum that these interference damages "are subsumed within and overlap with the injuries caused by IBM's breach of contract and copyright infringement". (Opp'n at 46; see also id. at 90.) Notably, SCO fails to cite any evidence in the record for this statement. This is because SCO, prior to filing its opposition memorandum, has never claimed that its interference damages are "subsumed within" or "overlap" its claimed damages for breach of contract or copyright infringement. Because SCO waited until after fact and expert discovery closed to identify its "indirect interference" damages, despite a specific interrogatory, several Court orders, and an independent obligation to supplement its discovery responses, SCO cannot now make this claim to try and show a disputed issue of fact.[13]

B.    SCO Cannot, in Any Event, Show Causation or Damages.

Even if the Court were to consider SCO's previously-undisclosed damages theories, its claims would still fail as a matter of law. With respect to SCO's "direct" interference claims, SCO cannot show causation or damages because each of the companies with whom IBM allegedly interfered has testified that, to the extent their business relationships with SCO have changed, it is for reasons entirely unrelated to IBM. (See IBM Ex. 117; IBM Ex. 118; IBM Ex. 204; IBM Ex. 240; IBM Ex. 241; IBM Ex. 597.)

As explained above, SCO does not (because it cannot) directly refute this testimony. Additionally, although SCO now attempts to distance itself from these admissions, the reality is that SCO's own witnesses have testified that IBM did not interfere with these business

---

[13] Indeed, because this unsworn statement regarding allegedly "subsumed" damages appears in a memorandum in opposition to summary judgment, as opposed to a supplemental interrogatory response, expert report or even a declaration, SCO still has not offered admissible testimony on this subject and for this additional reason, it should not be considered by the Court.

36

relationships. SCO witnesses, for example, have testified that        REDACTED

REDACTED

(Interference Br. ¶ 50(a)), and any change in SCO's

relationship with Intel was caused by SCO allegedly        REDACTED

(Interference Br. ¶ 50(c)). The unrefuted testimony of each

of these disinterested companies, coupled with SCO's own admissions, demonstrates

conclusively that SCO has suffered no damages in connection with its "direct interference"

claims.

SCO's new damages theory for its "indirect" interference claim also fails as a matter of

law. If, as SCO claims for the first time in its opposition, its "indirect" interference damages are

"subsumed within" or "overlap" its claimed damages for breach of contract or copyright

infringement, then its interference claim is barred by the economic loss doctrine.[14] As explained

above, SCO's copyright claim and associated damages have nothing whatsoever to do with its

interference claim. (See Part II.B.2, above) Therefore, to prevail on its "indirect" interference

claim, SCO must prevail on its contract claims. (See id.) The conduct at issue in this claim —

allegedly making improper contributions to Linux — is the same conduct at issue in SCO's

breach of contract claims, and SCO now admits that contract damages will fully remedy the

alleged harm. The economic loss rule therefore precludes SCO from proceeding in tort. See

Associated Diving and Marine Contractors v. Union Pac. RR, No. 2:01 CV330, 2003 U.S. Dist.

LEXIS 21560 *20 (D. Utah July 10, 2003) ("[I]t is clear that, in Utah, the economic loss doctrine

---

[14] SCO does not say that its "indirect" interference damages have anything to do with its unfair competition claim, and it is beyond question too late for it to do so now.

bars all torts — intentional or otherwise — that are not based upon a duty independent of the parties bargained for contract.") (Addendum E hereto).  Because SCO has now made clear that its "indirect" interference claims are entirely duplicative of its contract claims, the interference claims should be dismissed on this additional basis.

For all of the foregoing reasons, SCO has not and cannot show any injury proximately caused by IBM's alleged interference, and its Seventh, Eighth and Ninth causes of action should therefore be denied as a matter of law.

<u>**Conclusion**</u>

For the foregoing reasons, IBM respectfully submits that the Court should grant IBM

summary judgment on SCO's Seventh, Eighth and Ninth causes of action.

DATED this 12th day of January, 2007.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

39

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of January, 2007, a true and correct copy of the

foregoing was hand delivered to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of March, 2007, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

> Brent O. Hatch
> Mark F. James
> HATCH, JAMES & DODGE, P.C.
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101
>
> Robert Silver
> Edward Normand
> BOIES, SCHILLER & FLEXNER LLP
> 333 Main Street
> Armonk, New York 10504
>
> Stephen N. Zack
> Mark J. Heise
> BOIES, SCHILLER & FLEXNER LLP
> 100 Southeast Second Street, Suite 2800
> Miami, Florida 33131

/s/ Amy F. Sorenson

## INDEX TO ADDENDA

Addendum A:    IBM's Undisputed Facts:  IBM Interference Brief

Addendum B:    IBM's Objections to SCO's Alleged Evidence

Addendum C:    *OKI Am., Inc. v. Advanced Micro Devices, Inc.*, No. 04-3171, 2006 WL 2547464 (N.D. Cal. Aug. 31, 2006)

Addendum D:    *Barber v. Hallmark Cards, Inc.*, No. 94-3356, 1996 U.S. App. LEXIS 729 (10th Cir. Jan. 19, 1996)

Addendum E:    *Associated Diving and Marine Contractors v. Union Pac. RR*, No. 01-330, 2003 U.S. Dist. LEXIS 21560 (D. Utah July 10, 2003)