SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
  *International Business Machines Corporation*


# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>    Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION,<br><br>    Defendant/Counterclaim-Plaintiff. | **IBM'S REDACTED REPLY<br>MEMORANDUM IN FURTHER<br>SUPPORT OF ITS MOTION FOR<br>SUMMARY JUDGMENT ON SCO'S<br>CONTRACT CLAIMS (SCO'S FIRST,<br>SECOND, THIRD AND FOURTH<br>CAUSES OF ACTION)**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>Civil No. 2:03-CV-00294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

RECEIVED CLERK

2007 JAN 12  P 8: 25

U.S. DISTRICT COURT
DISTRICT OF UTAH

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.,<br><br>      Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>      Defendant/Counterclaim-Plaintiff. | **IBM'S REPLY MEMORANDUM IN<br>FURTHER SUPPORT OF ITS MOTION<br>FOR SUMMARY JUDGMENT ON SCO'S<br>CONTRACT CLAIMS (SCO'S FIRST,<br>SECOND, THIRD AND FOURTH CAUSES<br>OF ACTION)**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>**FILED UNDER SEAL PURSUANT TO<br>9/16/03 PROTECTIVE ORDER, DOCKET<br>#38**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C.<br>Wells |

## Table of Contents

|  |  | Page |
|---|---|---|
Preliminary Statement...................................................................................1

Statement of Undisputed Facts .....................................................................6

Argument .....................................................................................................7

I.    SCO CANNOT ESTABLISH A BREACH OF THE AGREEMENTS. .................7

    A.    The Plain Language of the Agreements Forecloses SCO's Theory. ...........9

        1.    SCO's Construction of Section 2.01 is Baseless. ...........................10

        2.    The "Principal Arguments" Underlying SCO's Reading of the Agreements Are Meritless. ...................................................12

    B.    The Overwhelming Extrinsic Evidence Forecloses SCO's Theory...........17

        1.    The Extrinsic Evidence. ................................................................17

        2.    SCO's Six Arguments.....................................................................23

    C.    SCO's Theory Must Be Rejected As Unreasonable. ................................28

        1.    SCO's Theory Is Inconsistent With IBM's Ownership Rights. .........................................................................................28

        2.    SCO's Theory Is Inconsistent With Copyright Law......................30

        3.    SCO's Theory Is Contrary to Public Policy...................................31

        4.    SCO's Theory Leads to an Absurd Result.....................................34

    D.    In Any Case, SCO's Claims Fail on the Evidence, Which SCO Ignores. ..................................................................................................36

        1.    Flaws Relating to *All* the Allegedly Misused Material.................37

        2.    Flaws Specific to Each Category of Allegedly Misused Material. .........................................................................................40

II.    SCO IS ESTOPPED FROM PURSUING ITS THEORY OF BREACH.............45

    A.    New York Law Supports a Finding of Estoppel........................................45

        1.    Integration Clause. .....................................................................47

        2.    SCO's Predecessors in Interest. ................................................49

        3.    SCO's Silence and Inaction. ......................................................52

        4.    Lack of Knowledge......................................................................53

    B.    The Material Facts Relating to Estoppel Are Undisputed. .......................55

        1.    The Analysis of SCO's Purported Expert....................................55

        2.    SCO's "Substantial Evidence" Regarding Reliance......................56

        3.    Amendment X. ............................................................................58

        4.    Other UNIX Flavors. ..................................................................59

        5.    IBM's Investment in AIX. ..........................................................64

III.   THE ALLEGED BREACHES HAVE BEEN WAIVED......................................64

    A.    AT&T and Its Successors Waived SCO's Theory of Breach Long
       Ago......................................................................................................66

    B.    Novell Has Explicitly Waived the Alleged Breaches by IBM. .................72

        1.    The Plain Language of the APA Forecloses SCO's
           Position. .....................................................................................72

        2.    SCO's Extrinsic Evidence Is Irrelevant......................................79

    C.    Through Its Own Conduct, SCO Has Waived Its Purported Rights
       to Claim Breach of Contract. ..................................................................81

IV.    SCO'S CLAIMS RELATING TO RCU ARE BARRED BY THE
    STATUTE OF LIMITATIONS. ..................................................................85

Conclusion ...........................................................................................................90

<u>Table of Authorities</u>

Page(s)

**Cases**

<u>3Com Corp. v. Banco do Brasil, S.A.</u>,
    171 F.3d 739 (2d Cir. 1999)..................................................................... 18

<u>Alfin, Inc. v. Pacific Insurance Co.</u>,
    735 F. Supp. 115 (S.D.N.Y. 1990).......................................................... 28

<u>Am. Book Co. v. Yeshiva Univ. Dev. Fund., Inc.</u>,
    297 N.Y.S.2d 156 (Sup. Ct. 1969) ................................................... 51, 69

<u>Anderson v. Liberty Lobby, Inc.</u>,
    477 U.S. 242 (1986) ................................................................................ 85

<u>Apollo Galileo USA P'ship v. Kingdom Vacations, Inc.</u>,
    No. 01-6847, 2002 U.S. Dist. LEXIS 11025 (N.D. Ill. June 18, 2002) ...................... 68

<u>Apollo Steel Corp. v. Sicolo and Massaro, Inc.</u>,
    752 N.Y.S.2d 493 (App. Div. 2002) ....................................................... 69

<u>Arcadian Phosphates, Inc. v. Arcadian Corp.</u>,
    884 F.2d 69 (2d Cir. 1989)....................................................................... 48

<u>Armstrong v. Virgin Records, Ltd.</u>,
    91 F. Supp. 2d 628 (S.D.N.Y. 2000) ...................................................... 63

<u>Arnold Indus. v. Love</u>,
    63 P.3d 721 (Utah 2002) .......................................................................... 84

<u>Automatic Sys. Developers, Inc. v. Sabratek Corp.</u>,
    No. 93 Civ. 7149, 1993 WL 535670 (S.D.N.Y. Dec. 22, 1993) ................................. 48

<u>Baum v. Rockland Cmty. Coll.</u>,
    299 F. Supp. 2d 172 (S.D.N.Y. 2003) .................................................... 21

<u>Beal Bank v. Melville Magnetic Resonance</u>,
    741 N.Y.S.2d 882 (App. Div. 2002) ....................................................... 21

<u>Beck's Office Furniture and Supplies, Inc. v. Haworth, Inc.</u>,
    Nos. 95-4018, 95-4029, 94 F.3d 655, 1996 WL 466673 (10th Cir. Aug. 16,
    1996) ........................................................................................................ 35

<u>Bennett v. U.S. Lines, Inc.</u>,
    64 F.3d 62 (2d Cir. 1995)......................................................................... 46

<u>Besicorp Group Inc. v. Enowitz</u>,
    652 N.Y.S.2d 366 (App. Div. 1997) ................................................. 47, 55

iii

**Table of Authorities**
(continued)

Page(s)

Bethlehem Steel Co. v. Turner Constr. Co.,
  141 N.E.2d 590 (N.Y. 1957) ................................................................. 80

Boston Concessions Group v. Criterion Ctr. Corp.,
  606 N.Y.S.2d 696 (App. Div. 1994) ........................................................ 65

Bott v. J.F. Shea Co.,
  388 F.3d 530 (5th Cir. 2004) ............................................................ 66, 68

Bouzo v. Citibank,
  96 F.3d 51 (2d Cir. 1996) ................................................................... 19

Brighton Operating Corp. v. Morrison,
  29 N.Y.S.2d 97 (App Div. 1941) ............................................................ 50

Bristol-Myers Squibb Co. v. Ikon Office Solutions, Inc.,
  295 F.3d 680 (7th Cir. 2002) ............................................................... 18

Brock v. Baskin Robbins, USA, Co.,
  No. 99-274, 2003 WL 21309428 (E.D. Tex. Jan. 17, 2003) ............................... 48

Carma Developers, Inc. v. Marathon Dev. Cal., Inc.,
  2 Cal. 4th 342 (1992) ....................................................................... 81

Center v. Hampton Affiliates, Inc.,
  488 N.E. 2d 828 (N.Y. 1985) ................................................................ 63

Chase Manhattan Bank v. New Hampshire Ins. Co.,
  193 Misc. 2d 580, 749 N.Y.S.2d 632 (N.Y. Sup. Ct. 2002) ............................... 32

CMI II, LLC v. Interactive Dev., Inc.,
  No. 05-600589, 2006 WL 2770095 (N.Y. Sup. Ct. Sept. 29, 2004) ........................ 67

Colonize.Com, Inc. v. Perlow,
  No. 03-466, 2003 WL 24256576 (N.D.N.Y. Oct. 23, 2003) ................................ 33

Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.,
  369 N.E.2d 4 (N.Y. 1977) ................................................................... 32

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
Pierce, Fenner & Smith Inc.,
  232 F.3d 153 (2d Cir. 2000) ................................................................ 17

Comvest Consulting, Inc. v. W.R.S.B. Development Co.,
  698 N.Y.S.2d 807 (App. Div. 1999) ......................................................... 69

Connolly v. Harris Trust Co. of Cal.,
  241 B.R. 729 (D. Colo. November 24, 1999) ................................................ 35

iv

**Table of Authorities**
(continued)

Page(s)

Consol. Edison, Inc. v. Northeast Utils.,
    332 F. Supp. 2d 639 (S.D.N.Y. 2004) ........................................................................ 18

Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.,
    427 F.3d 1038 (7th Cir. 2005) ................................................................................... 18

Coplay Cement Co., Inc. v. Willis & Paul Group,
    983 F.2d 1435 (7th Cir. 1993) ................................................................................... 19

DiMartini v. Ferrin,
    889 F.2d 922 (10th Cir. 1991) ................................................................................... 85

Dolgoff Holophase, Inc. v. E.I. Du Pont de Nemours & Co.,
    622 N.Y.S.2d 769 (App. Div. 1995) .......................................................................... 87

Dunlop-McCullen v. Pascarella,
    No. 97 Civ. 0195, 2002 WL 31521012 (S.D.N.Y. Nov. 13, 2002) ............................ 46

Dymo Indus., Inc. v. Monarch Marking Sys., Inc.,
    474 F. Supp. 412 (N.D. Tex. 1979) ........................................................................... 51

EarthWeb, Inc. v. Schlack,
    71 F. Supp. 2d 299 (S.D.N.Y. 1999) .......................................................................... 33

Ely-Cruikshank Co., Inc. v. Bank of Montreal,
    615 N.E.2d 985 (N.Y. 1993) ...................................................................................... 86

EPN Ingenieria S.A. de C.V. v. Gen. Elec. Co.,
    No. 92-1563, 1996 WL 531867 (S.D.N.Y. Sept. 19, 1996) ...................................... 23

Farmers & Bankers Life Ins. Co. v. Allingham,
    457 F.2d 21 (10th Cir. 1972) ..................................................................................... 72

Farni v. Tesson,
    66 U.S. 309 (1862) .................................................................................................... 68

Fashion Bug No. 2100 of Batavia, Inc. v 425 West Main
  Assocsiates (Batavia) LP,
    806 N.Y.S.2d 449 (Sup. Ct. 2005) ............................................................................ 54

FDIC v. Jackson-Shaw Partners No. 46, Ltd.,
    No. 92-20556, 1994 U.S. Dist. LEXIS 21477 (N.D. Cal. August 12, 1994) ............... 84

Fishman v. LaSalle Nat'l. Bank ,
    247 F.3d 300 (1st Cir. 2001) ..................................................................................... 18

Forest Labs. Inc. v. Abbott Labs.,
    No. 96-159, 1999 WL 33299123 (W.D.N.Y. June 23, 1999) .................................... 60

**Table of Authorities**
(continued)

Page(s)

Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.,
    485 N.E.2d 208 (N.Y. 1985) ................................................................. 87

Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,
    111 F.3d 284 (2d Cir. 1997)................................................................. 38

Froid v. Berner,
    649 F. Supp. 1418 (D.N.J. 1986) ........................................................ 59

Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,
    850 N.E.2d 653 (N.Y. 2006)................................................................ 65

Gebbia v. Toronto-Dominion Bank,
    762 N.Y.S.2d 38 (App. Div. 2003)...................................................... 48

Gebbia v. Toronto-Dominion Bank,
    No. 604862/00 (N.Y. Sup. Ct. June 24, 2002)...................................... 48

Gray v. Met Contracting Corp.,
    167 N.Y.S.2d 498 (App. Div. 1957) .................................................... 49

Guild v. Hopkins,
    63 N.Y.S.2d 522 (App. Div. 1946) ...................................................... 87

Healthnow N.Y., Inc. v. APS Healthcare Bethesda, Inc.,
    No. 05-612, 2006 U.S. Dist. LEXIS 13148 (N.D.N.Y. Mar. 10, 2006)...... 68

Hedberg v. Indiana Bell Tel. Co.,
    47 F.3d 928 (7th Cir. 1995).................................................................. 59

Heffernan v. Provident Life & Acc. Ins. Co.,
    45 F. Supp. 2d 1147 (D. Kan. 1999) ................................................... 59

Hellenic Inc. v. Bridgeline Gas Distrib. LLC,
    252 F.3d 391 (5th Cir. 2000)................................................................ 72

Holloway v. King,
    161 Fed. Appx. 122 (2nd Cir. 2005) ................................................... 48

Holm v. C.M.P. Sheet Metal, Inc.,
    455 N.Y.S.2d 429 (App. Div. 1982) .................................................... 52

Hudson-Port Ewen Assocs., L.P. v. Kuo,
    566 N.Y.S.2d 774 (App. Div. 1991) .................................................... 21

I.G. Farben S'holders Org. v. UBS AG,
    05-4041, 2006 U.S. Dist. LEXIS 63347 (E.D.N.Y. Sept. 5, 2006) ....... 51, 69

Imperator Realty Co. v. Tull,
    127 N.E. 263 (N.Y. 1920) ................................................................... 49

**Table of Authorities**
(continued)

Page(s)

In re Caldor, Inc.,
    217 B.R. 121 (Bankr. S.D.N.Y. 1998) ........................................................................ 65

In re Edwards' Will,
    92 N.Y.S.2d 780 (N.Y. Surr. 1949) ........................................................................ 50

In re Indep. Serv. Orgs. Anti-Trust Litig.,
    964 F. Supp. 1469 (D. Kan. 1997) ........................................................................ 63

In re Payroll Express Corp.,
    186 F.3d 196 (2d Cir. 1999) ........................................................................ 24

In re Pubs, Inc. of Champaign,
    618 F.2d 432 (7th Cir. 1980) ........................................................................ 72

In re Robbins Intern., Inc.,
    275 B.R. 456 (S.D.N.Y. 2002) ........................................................................ 21

Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank,
    774 N.E.2d 696 (N.Y. 2002) ........................................................................ 24

Int'l Bus. Machs. Corp. v. Medlantic Healthcare Grp.,
    708 F. Supp. 417 (D.D.C. 1989) ........................................................................ 48

Int'l Chimney Corp. v. 26 W. Spring St. Assocs.,
    561 N.Y.S.2d 933 (App. Div. 1990) ........................................................................ 52

Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.,
    325 N.E.2d 137 (N.Y. 1975) ........................................................................ 51, 69

Israel v. Springs Indus., Inc.,
    No. 98-5106, 2006 U.S. Dist. LEXIS 80863 (E.D.N.Y. Nov. 3, 2006) ...................... 35

Jackson Jordan, Inc. v. Plasser Am. Corp.,
    219 U.S.P.Q. 922 (E.D. Va. 1983), rev'd on other grounds, 747 F.2d 1567
    (Fed. Cir. 1984) ........................................................................ 86

Jacobsen v. Deseret Book Co.,
    287 F.3d 936 (10th Cir. 2002) ........................................................................ 86

Jacobson v. Sassower,
    489 N.E.2d 1283 (N.Y. 1985) ........................................................................ 27

Jensen v. Manila Corp. of the Church of Jesus Christ of Latter-Day Saints,
    565 P.2d 63 (Utah 1977) ........................................................................ 24

Jensen v. Traders & Gen. Ins. Co.,
    52 Cal. 2d 786 (1959) ........................................................................ 81

**Table of Authorities**
(continued)

Page(s)

Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,
 323 F. Supp. 2d 525 (S.D.N.Y. 2004) ............................................................. 31

Johnson v. Flowers,
 No. 05-71937, 2006 WL 212022 (E.D. Mich. Jan 27, 2006) ......................... 46

Kearns v. Manufs. Hanover Trust Co.,
 272 N.Y.S.2d 535 (Sup Ct. 1966) ................................................................. 55

Kling v. Hallmark Cards, Inc.,
 225 F.3d 1030 (9th Cir. 2000) ..................................................................... 63

Koam Produce Inc. v. Dimare Homestead, Inc.
 213 F. Supp. 2d 314 (S.D.N.Y. 2002) .......................................................... 71

Kurzman v. Graham,
 817 N.Y.S.2d 888 (Sup. Ct. 2006) ............................................................... 49

L-3 Commc'ns Corp. v. Kelly,
 809 N.Y.S.2d 482, 2005 WL 3304130 (N.Y. Sup. 2005) .............................. 33

MacLean Assocs., Inc. v. Wm. W. Mercer-Meidinger-Hansen, Inc.,
 952 F.2d 769 (3d Cir. 1991) ........................................................................ 86

Marietta Corp. v. Fairhurst,
 754 N.Y.S.2d 62 (App. Div. 2003) ............................................................... 32

Martin v. Monumental Life Ins. Co.,
 240 F.3d 223 (3d Cir. 2001) ........................................................................ 18

McDarren v. Marvel Entm't Group, Inc.,
 No. 94 Civ. 0910 (LMM), 1995 WL 214482 (S.D.N.Y. Apr. 11, 1995) .................... 65

McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.,
 858 F.2d 825 (2d Cir. 1988) ........................................................................ 22

McManus v. Board of Educ. of Hempstead Union Free School Dist.,
 661 N.E.2d 984 (N.Y. 1995) ....................................................................... 46

Mercury Bay Boating Club, Inc. v. San Diego Yacht Club,
 557 N.E.2d 87 (N.Y. 1990) ......................................................................... 17

Metropolitan Life Ins. v. Datta,
 No. 01-235, 2002 WL 221077 (N.Y. Sup. Ct. Jan. 23, 2002) ......................... 63

Midwest Maintenance & Constr. Co. v. Vela,
 621 F.2d 1046 (10th Cir. 1980) ................................................................... 68

MSF Holding Ltd. v. Fiduciary Trust Co. Intern.,
 435 F. Supp. 2d 285 (S.D.N.Y. 2006) ...................................................... 18, 22

viii

**Table of Authorities**
(continued)

Page(s)

N.Y. State Guernsey Breeders' Co-op v. Noyes,
22 N.Y.S.2d 132 (App. Div. 1940) ........................................................................ 46, 55

Nassau Trust Co. v. Montrose Concrete Prods. Corp.,
436 N.E.2d 1265, 1269-70 (N.Y. 1982) ................................................................ 46, 55

Nat'l Envmtl. Serv. Co. v. Ronan Eng'g Co.,
256 F.3d 995 (10th Cir. 2001) .............................................................................. 22

Nat't Am. Ins. Co. v. Am. Re-Ins. Co.,
358 F.3d 736 (10th Cir. 2004) .............................................................................. 18

National American Ins. Co. v. American Re-Insurance Co.,
358 F.3d 736 (10th Cir. 2004) .............................................................................. 18, 58

NetTech Solutions, L.L.C. v. ZipPark.com,
No. 01 Civ. 2683, 2001 WL 1111966 (S.D.N.Y. Sept. 20, 2001) ............................... 65

New England Mut. Life Ins. Co. v. Caruso,
535 N.E.2d 270 (N.Y. 1989) ................................................................................. 32

Niederer v. Ferreira,
189 Cal. App. 3d 1485 (1987) ............................................................................... 81

Nipkow & Kobelt, Inc. v. North River Insur. Co.,
633 F. Supp. 437 (S.D.N.Y. 1986) ......................................................................... 21

North Fork Bank & Trust Co. v. Romet Corp.,
596 N.Y.S.2d 449 (App. Div. 1993) ....................................................................... 17

Nowak v. Ironworkers Local 6 Pension Fund,
81 F.3d 1182 (2d Cir. 1996) ................................................................................. 19

Nycal Corp. v. Inoco PLC,
988 F. Supp. 296 (S.D.N.Y. 1997) .......................................................... 18, 20, 21, 22

Padovano v. Vivian,
629 N.Y.S.2d 844 (App. Div. 1995) ....................................................................... 21

Peck v. Horrocks Eng'rs,
106 F.3d 949 (10th Cir. 1997) .............................................................................. 35

Peck v. Peck,
649 N.Y.S.2d 22 (App. Div. 1996) ......................................................................... 69

Prater v. CONRAIL,
272 F. Supp. 2d 706 (N.D. Ohio 2003) .................................................................. 84

Proteus Books Ltd. v. Cherry Lane Music Co.,
873 F.2d 502 (2d Cir. 1989) ............................................................................ 24, 27

ix

**Table of Authorities**
(continued)

Page(s)

PSC, Inc. v. Reiss,
    111 F. Supp. 2d 252 (W.D.N.Y. 2000) ........................................................................ 33

Public Service Mutual Ins. v. Harlen Housing Assocs.,
    777 N.Y.S.2d 438 (App. Div. 2004) .......................................................................... 63

Pulaski Materials Co., Inc. v. Milestone Materials, Inc.,
    35 F. Supp. 2d 279 (W.D.N.Y. 1998) ............................................................ 18, 21, 22

Radcliffe Assocs., Inc. v. Greenstein,
    274 A.D. 277 (App. Div. 1948) .................................................................................. 69

Reed, Roberts Assocs., Inc. v. Strauman,
    353 N.E.2d 590 (N.Y. 1976) ......................................................................... 31, 32, 33

Respect, Inc. v. Comm. on the Status of Women,
    815 F. Supp. 1112 (N.D. Ill. 1993) ........................................................................... 83

RGH Liquidating Trust v. Reliance Group Holdings, Inc.,
    No. 600057/2006, 2006 WL 2872525 (N.Y. Sup. Ct. Sept. 27, 2006) ........................ 50

RMLS Metals, Inc. v. Int'l Bus. Machs. Corp.,
    874 F. Supp. 74 (S.D.N.Y. 1995) .............................................................................. 23

Rose v. Spa Realty Assocs.,
    366 N.E.2d 1279 (N.Y. 1977) ................................................................................... 49

Rothschild v. Title Guar. & Trust Co.,
    97 N.E. 879 (N.Y. 1912) ........................................................................................... 46

R-T Leasing Corp. v. Ethyl Corp.,
    494 F. Supp. 1128 (S.D.N.Y. 1980) .......................................................................... 72

RUI One Corp. v. City of Berkeley,
    371 F.3d 1137 (9th Cir. 2004) ................................................................................... 67

Ryder Truck Rental Inc v. Williamstown Wire and Cable Co.,
    309 N.Y.S.2d 508 (N.Y. Sup. 1970) .......................................................................... 53

Sachs v. Cluett Peabody & Co.,
    39 N.Y.S.2d 853 (App. Div. 1943), aff'd 53 N.E.2d 241 (N.Y. 1944) ........................ 89

Sally v. Sally,
    638 N.Y.S.2d 832 (App. Div. 1996) .......................................................................... 21

Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.,
    320 F.3d 1081 (10th Cir. 2003) ................................................................................. 24

Sassower v. Barone,
    447 N.Y.S.2d 966 (App. Div. 1982) .......................................................................... 46

x

**Table of Authorities**
(continued)

Page(s)

Schering v. Home Ins. Co.,
   712 F.2d 4 (2d Cir. 1983)........................................................................... 22

Schock v. United States,
   21 F. Supp. 2d 115 (D.R.I. 1998)............................................................... 86

Scholle Corp. v. Blackhawk Molding Co., Inc.,
   133 F.3d 1469 (Fed. Cir. 1998).................................................................. 46

Sec. Indus. Automation Corp. v. United Computer Capital Corp.,
   723 N.Y.S.2d 668 (App. Div. 2001) .......................................................... 66

Secured Equities Invs., Inc. v. McFarland,
   753 N.Y.S.2d 264 (App. Div. 2002) .......................................................... 50

Shaw v. Regents of the Univ. of Cal.,
   58 Cal. App. 4th 44 (1997) ........................................................................ 75

Simmons v. Westwood Apts. Co.,
   261 N.Y.S.2d 1093 (N.Y. Sup. 1965) ........................................................ 53

Slayko v. Sec. Mut. Ins. Co.,
   774 N.E.2d 208 (N.Y. 2002) ...................................................................... 32

Stanley Tulchin Assocs, Inc. v. Vignola,
   587 N.Y.S.2d 761 (App. Div. 1992) .......................................................... 32

State v. Home Indem. Co.,
   486 N.E.2d 827 (N.Y. 1985)...................................................................... 19

State v. Home Indemnity Co.,
   486 N.E.2d 827 (N.Y. 1985)...................................................................... 27

Stertz v. Gulf Oil Corp.,
   No. 78-1813, 1988 WL 83188 (E.D.N.Y. July 22, 1988)........................... 89

Stover v. Eagle Prods.,
   No. 93-4047, 1996 U.S. Dist. LEXIS 4893 (D. Kan. Mar. 19, 1996) ........ 35

T & N PLC v. Fred S. James & Co. of New York, Inc.,
   29 F.3d 57 (2d Cir. 1994)........................................................................... 87

T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc.,
   No. 01-900, 2002 WL 1311648 (N.Y. Sup. Ct. April 02 2002) ................. 66

Taylor Engines v. All Steel Engines Inc.,
   192 F.2d 171 (9th Cir. 1951)...................................................................... 83

Terry v. Int'l Dairy Queen, Inc.,
   554 F. Supp. 1088 (N.D. Ind. 1983) .......................................................... 66

xi

**Table of Authorities**
(continued)

Page(s)

Thatcher Enters. v. Cache County Corp.,
    902 F.2d 1472 (10th Cir. 1990)............................................................ 64

Thayer v. Dial Indus. Sales, Inc.,
    85 F. Supp. 2d 263 (S.D.N.Y. 2000)..................................................... 48

The Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.,
    119 F.3d 55 (1st Cir. 1997)................................................................ 64

Thoubboron v. Ford Motor Co.,
    809 A.2d 1204 (D.C. Cir. 2002) ........................................................ 61

TK-7 Corp. v. Estate of Barbouti,
    993 F.2d 722 (10th Cir. 1993)............................................................ 35

TMG-II v. Price Waterhouse & Co.,
    572 N.Y.S.2d 6 (App. Div. 1991) ....................................................... 88

Tom Doherty Assocs. Inc. v. Saban Entm't Inc.,
    869 F. Supp. 1130 (S.D.N.Y. 1994)..................................................... 21

Topps Chewing Gum, Inc. v. Imperial Toy Corp.,
    686 F. Supp. 402 (E.D.N.Y. 1988)...................................................... 66

Total Control, Inc. v. Danaher Corp.,
    324 F. Supp. 2d 658 (E.D.Pa. 2004) ................................................... 18

Town of Ramapo v. Vill. of Spring Valley,
    243 N.Y.S.2d 569 (N.Y. Sup. 1962) ................................................... 55

Towne Gardens, Ltd. v. McDonald's Corp.,
    No. 04-VC-292S, 2005 WL 2406004 (W.D.N.Y. Sept. 29, 2005) ............... 48

Tracey Road Equip., Inc. v. Vill. of Johnson City,
    571 N.Y.S.2d 586 (App. Div. 1991) ................................................... 21

Trustees of Bricklayers and Allied Craftworkers v. Driscoll,
    165 F. Supp. 2d 502 (S.D.N.Y. 2001)............................................ 18, 22

Union Auto. Indem. Ass'n v. Shields,
    79 F.3d 39 (7th Cir. 1996)................................................................ 68

Unisys Corp. v. Hercules, Inc.,
    638 N.Y.S.2d 461 (Sup. Ct. 1996) ..................................................... 68

Urban Holding Corp. v. Haberman,
    556 N.Y.S.2d 337 (App. Div. 1990) ................................................... 68

W.W.W. Assocs., Inc. v. Giancontieri,
    566 N.E.2d 639 (N.Y. 1990)............................................................. 17

**Table of Authorities**
(continued)

Page(s)

Wafer Shave, Inc. v. Gillette Co.,
    857 F. Supp. 112 (D. Mass. 1993) ............................................................. 61

Wanlass v. Gen. Electric Co.,
    148 F.3d 1334 (Fed. Cir. 1998)................................................................. 64

Wechsler v. Hunt Health Sys.,
    216 F. Supp. 2d 347 (S.D.N.Y. 2002)...................................................... 32

Willis v. Harrah's Illinois Corp.,
    No. 98-2655, 1999 WL 313755 (7th Cir. May 9, 1999) .......................... 59

Wyeth v. King Pharmaceuticals, Inc.,
    396 F. Supp. 2d 280 (E.D.N.Y. 2005)...................................................... 65

Zack v. 3000 East Condominium Ass'n,
    762 N.Y.S.2d 459 (App Div. 2003) .......................................................... 46

Zipes v. Trans World Airlines,
    455 U.S. 385 (1982) ................................................................................. 70

Zolar Publ'g Co. v. Doubleday Co.,
    529 F.2d 663 (2d Cir. 1975)..................................................................... 67

**Statutes & Rules**

Cal. Civ. Code §§ 1638, 1639 ........................................................................ 81

Cal. Code Civ. Proc. § 1858 ........................................................................... 81

DUCivR 56-1(c) ......................................................................................... 6, 58

Fed. R. Civ. P. 56........................................................................................... 6

Fed. R. Evid. 402 ........................................................................................... 20

Fed. R. Evid. 602 ........................................................................................... 20

Fed. R. Evid. 701 ........................................................................................... 20

Fed. R. Evid. 702 ............................................................................. 35, 40, 56

Fed. R. Evid. 802 ........................................................................................... 20

U.C.A. 1953 § 57-1-10 .................................................................................. 84

**Other Authorities**

57 N.Y. Jur. 2d Estoppel, Ratification & Waiver § 43 ................................... 52

75 N.Y. Jur. 2d Limitations and Laches § 93 ................................................ 87

xiii

**Table of Authorities**
(continued)

Page(s)

David D. Siegel, <u>New York Practice</u> § 43 (4th Ed. 2006) ................................. 87

N.Y. C.P.L.R. § 203(g) ........................................................................ 87, 88

Restatement (Third) of Unfair Competition § 41 ......................................... 32

William B. Barton, <u>A Study in the Law of Trade Secrets</u>, 13 U. Cin. L. Rev. 507.......... 89

Wright, Miller & Kane, <u>Federal Practice and Procedure: Civil 2d</u> § 2730.1 ................... 19

Defendant/Counterclaim-Plaintiff IBM respectfully submits this reply memorandum in further support of its motion for summary judgment on SCO's breach of contract claims.

## Preliminary Statement[1]

Despite the length of SCO's opposition papers, this motion ultimately turns on a single, over-arching issue: whether IBM's UNIX licensing agreements with AT&T, to which SCO was not a party and with which it had no involvement, give SCO the right to control computer source code that SCO not only had no role in creating but that is the original, copyrighted work of IBM and third parties other than SCO. SCO seeks to obscure the simplicity of the issue in opposition papers that exceed 300 pages. But those papers simply ignore or fail properly to controvert the dispositive facts. Moreover, no set of opposition papers — no matter their volume — can alter the fact that (1) SCO's theory is foreclosed by both the plain language of the Agreements and the overwhelming parol evidence (see Section I); (2) SCO is estopped from pursuing its interpretation, which would, if accepted, give it unending rights (see Section II); and (3) the alleged breaches have been waived in at least three different ways — by SCO's alleged predecessors, by Novell (on behalf of SCO) and by SCO itself (see Section III). IBM is entitled

---

[1] Terms are defined and used herein as they were in IBM's opening brief. In addition, references herein are as follows: cites to "K Br. ¶__" refer to IBM's "Statement of Undisputed Facts" in IBM's opening brief, and cites to "IBM Ex. __" refer to the declarations and documents appended to the Declarations of Todd M. Shaughnessy, dated September 25, 2006, November 11, 2006 and January 12, 2007, the Supplemental Declaration of Todd M. Shaughnessy, dated September 25, 2006 and the Second Supplemental Declaration of Todd M. Shaughnessy, dated September 29, 2006. References to IBM's Reply Memorandum in Support of Its Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim) are cited as "Copyright Reply at __". References to SCO's opposition papers are given as "Opp'n at __" and references to documents appended to the Declaration of Brent O. Hatch are cited herein as "SCO Ex. __".

to summary judgment for each of these reasons, as well as on the grounds that SCO's RCU claim is barred by the statute of limitations. (See Section IV.)

SCO seeks to bury the flaws in its case in over-length generalities. But the flaws cannot be hidden. SCO makes almost no mention of two of the four agreements that IBM is alleged to have breached — the Sublicensing Agreements. Nowhere does SCO identify any provision of the Sublicensing Agreements that IBM is alleged to have breached. Nowhere does it offer any explanation as to how IBM is supposed to have breached the Sublicensing Agreements. And nowhere does it offer any evidence that IBM breached any provision of the Sublicensing Agreements. These failings are fatal. SCO cannot survive summary judgment with respect to claims that it has not disclosed and as to which it has no evidence.

No less notable is SCO's failure to make any meaningful mention of the specific material that IBM is alleged to have misused in violation of the Software Agreements. While SCO's papers seek to perpetuate the false impression that IBM dumped massive amounts of proprietary SCO information into Linux, in fact only four, narrow categories of allegedly misused material remain in the case: (1) IBM's contribution to Linux of a Journaled File System ("JFS"); (2) IBM's Read Copy-Update ("RCU") contribution to Linux; (3) IBM's Linux Test Project ("LTP") contribution to Linux; and (4) general operating system experience or "negative know how". SCO's claim for breach of the Software Agreement between AT&T and IBM turns entirely on category (1), and SCO's claim for breach of the Software Agreement between AT&T and Sequent turns entirely on categories (2)-(4). Even cursory consideration of these specific items — which are original works of IBM or third parties other than SCO; contain no UNIX

2

System V code, methods or concepts; and were not written or created with reference to UNIX System V code or related materials — demonstrates that SCO's claims are untenable.

When all is said and done, SCO's claims depend entirely on its construction of a fourteen-word clause in Section 2.01 of the Software Agreements. The language of Section 2.01 of the Agreements on which SCO relies provides simply that licensees may prepare modifications and derivative works of AT&T's SOFTWARE PRODUCT (i.e., UNIX System V code or related materials), so long as the "resulting materials" are treated like the SOFTWARE PRODUCT. SCO argues that IBM's AIX and Dynix products are "resulting materials", which SCO defines as a "modification" or "derivative" of UNIX System V code or related materials, and that IBM has not treated them "like" AT&T's UNIX System V code or related material. However, whether or not some version of AIX or Dynix might be considered "resulting materials", it is undisputed (and is indisputable) that none of the four categories of allegedly misused material that remains in the case constitutes "resulting materials". Moreover, any breach relating to this material would be immaterial and thus non-actionable, since it is owned by IBM and is either a tiny fraction of the code in any of the relevant operating systems or nothing more than amorphous "experience" and "negative know-how".

While these facts alone are dispositive of SCO's claims for breach of the Software Agreements, the claims also fail for reasons unique to each of the four categories of allegedly misused material at issue. With respect to JFS (the only category that relates to the IBM Agreement), the code that SCO claims IBM misused actually came from IBM's OS/2 operating system, not from AIX. SCO does not, and cannot, claim to have any right to control the source code of IBM's OS/2 product. SCO's evidence with respect to the categories relating to the

3

Sequent Agreement fare no better:  (1) the RCU technology was disclosed in a 1993 patent application years before SCO ever served its complaint, and is thus barred by the statute of limitations; (2) the LTP contribution was never part of the Dynix operating system (much like how the JFS contribution does not come from AIX) and thus is not actionable even assuming SCO's theory of the Agreements is correct; and (3) SCO's general operating system experience or "negative know how" claims fail because SCO does not cite a single provision of the Agreements that prohibits former Dynix programmers from working on Linux, and SCO offers no evidence to contradict the fact that the programmers that it accuses of misuse either (a) did not make any contributions to the files or directories SCO claims they did or (b) did not base their contributions to the listed files or directories on UNIX System V or refer to UNIX System V in making the challenged contributions.

In an effort to obscure these facts, SCO invokes the generalized views of a handful of persons who played no role in negotiating the Agreements and who never communicated their supposed views to IBM.  Putting aside the fact that the plain language of the Agreements is clear and unambiguous, such evidence is irrelevant and inadmissible as a matter of New York law. And even if it were not, no reasonable juror could rely on the extrinsic evidence cited by SCO in view of the overwhelming evidence that the parties did not intend the Agreements as SCO construes them.  Every one of the Involved Persons (i.e., the persons who negotiated and/or executed the Agreements) has offered testimony repudiating SCO's view of the contracts.  That view is, as stated in IBM's opening briefs, patently unreasonable.  If SCO had the right to control any and all software with which UNIX System V code has ever been associated, then it would have extraordinary control over vast quantities of others' property — indeed, much of the

4

software industry, while at the same time IBM and other UNIX licensees would be limited in their ability even to support or market their flavors of UNIX.

Even if all of the foregoing were false (and it is true), SCO is precluded from pursuing its claim under the doctrines of waiver and estoppel. For almost two decades, AT&T and its successors represented to their licensees, including IBM and Sequent, that they could do as they wished with their own works, so long as they did not disclose any original UNIX software. AT&T's licensees, including IBM and Sequent, took AT&T and its successors at their word and publicly disclosed their original works — without objection from AT&T or its successors. IBM and Sequent reasonably relied to their detriment on the statements and conduct of AT&T and its successors, and built their businesses believing that they could do as they wished with their original works. IBM would suffer severe prejudice if it were forced suddenly to stop those businesses in their tracks. While SCO advances a number of arguments against IBM's estoppel defense, none of them bears scrutiny — indeed, most are merely straw men.

SCO's arguments relating to IBM's waiver defense, which (despite SCO's claim) can be decided at summary judgment, are also straw men. Despite the length of SCO's opposition papers, the undisputed evidence demonstrates that the alleged breaches have been waived for at least three independent reasons: (1) AT&T and its successors represented to their licensees for many years that they would not assert control over the original works of their licensees, even if those works were at some point included in a modification or derivative work of AT&T's UNIX software; (2) Novell waived SCO's theory, on SCO's behalf, after the commencement of this case pursuant to Section 4.16(b) of the APA, as Novell explains in its recently filed motion for summary judgment; and (3) SCO itself waived its claims, repeatedly, before and after the filing

5

of this lawsuit, such as by distributing (pursuant to the GPL) the very code that it now claims IBM improperly contributed to Linux and representing and warranting to IBM that anyone receiving the code may copy and distribute verbatim copies of the code. Tellingly, SCO has no response to the equally dispositive fact that SCO gave up any rights that it might have had in the allegedly misused code when it transferred its intellectual property rights in that code to UnitedLinux. At bottom, SCO's opposition amounts to nothing more than an unsupported assertion that its current management believes it is entitled to make whatever claims it likes, irrespective of the evidence.

For these reasons, and as is further discussed below, IBM is entitled to summary judgment on SCO's claims for breach of contract.

## Statement of Undisputed Facts

SCO's opposition papers include a lengthy response to the 294 statements of undisputed fact set out in IBM's opening brief, including a counterstatement of supposed relevant facts. While plainly intended to give the impression that there are genuine issues of material fact, neither SCO's response nor its counterstatement establishes any such issues.

As described in Addendum A, which we incorporate herein by reference, SCO fails specifically to controvert IBM's facts with evidence of record meeting the requirements of Fed. R. Civ. P. 56. For that reason alone, IBM's facts should be deemed admitted, pursuant to Local Rule 56-1(c).[2]

---

[2] Where SCO offers evidence to support its assertion of fact, it often does so by a labyrinth of cross-references to its counterstatement of facts, a technique that plainly fails to meet the specificity requirements of Local Rule 56-1(c). For example, in response to IBM's assertion in its fact ¶ 109, SCO directs the court to SCO's disputed fact statement ¶¶ 1-2, 283-85 of its

Moreover, much of the "evidence" on which SCO relies in opposition is irrelevant or otherwise inadmissible, as is described in Addendum B. For example, since all of the individuals who negotiated and executed IBM's Licensing Agreements with AT&T have offered testimony rejecting SCO's theory, SCO invokes the very general opinions (disconnected from SCO's specific allegations of misuse) of people who might have been employed at AT&T but never communicated their alleged views to IBM. These opinions are inadmissible.

<u>**Argument**</u>

**I.    SCO CANNOT ESTABLISH A BREACH OF THE AGREEMENTS.**

SCO's claims concern four licensing agreements for the UNIX System V operating system: Counts 1 and 3 concern two AT&T Software Agreements (one with IBM and the other with Sequent); and Counts 2 and 4 concern two AT&T Sublicensing Agreements (one with IBM and the other with Sequent). (<u>See</u> IBM Ex. 3 ¶¶ 110-72.) Under the Software Agreements, AT&T licensed the source code of UNIX System V to IBM and Sequent and, under the Sublicensing Agreements, AT&T allowed IBM and Sequent to distribute the binary code of UNIX System V to sublicensees. (K Br. ¶ 11.) While SCO's opposition papers assert generally that there are fact questions as to whether IBM breached the Agreements, those assertions have no more merit than SCO's plethora of public statements about the strength of its evidence.

---

Memorandum in Opposition to IBM's Motion for Summary Judgment on its Tenth Counterclaim. The disputed fact ¶ 2 of SCO's Tenth Counterclaim memorandum directs the court back to disputed fact ¶¶ 1, 283-85 in the same memorandum. The disputed fact ¶ 283 of SCO's Tenth Counterclaim memorandum directs the court back to disputed fact ¶¶ 30, 33, 98 in the same memorandum. The disputed fact ¶¶ 30 and 33 of SCO's Tenth Counterclaim memorandum directs the court back to disputed fact ¶¶ 4, 22 in the same memorandum. And so on.

Notwithstanding the length of its opposition papers, SCO makes almost no mention of the Sublicensing Agreements.[3]  It does not identify any provision of the Sublicensing Agreements that IBM is alleged to have breached; it does not offer any explanation as to how IBM is supposed to have breached the Sublicensing Agreements; and it does not offer any evidence that IBM breached any provision of the Sublicensing Agreements.  While SCO's claims for breach of the Sublicensing Agreements are derivative of and depend upon its claims for breach of the Software Agreements, they are separate claims, and SCO cannot proceed with them in the absence of admissible evidence that IBM breached the Sublicensing Agreements themselves.  Thus, irrespective of the flaws in SCO's Software-Agreement claims, SCO's claims for breach of the Sublicensing Agreements are untenable as a matter of law, and summary judgment should be entered against SCO and in favor of IBM on these claims.

Although SCO's opposition papers discuss IBM's alleged breaches of the Software Agreements at some length, they do no more to substantiate those claims than they do to substantiate SCO's claims for breach of the Sublicensing Agreements.  To justify its theory of the case — with which every one of the individuals who negotiated and executed the Agreements disagrees — SCO (1) relies on a "textual analysis" amounting to a re-write of a single fourteen-word clause in Section 2.01 of the Agreements; (2) resorts to extrinsic evidence from an assortment of witnesses who played no role in negotiating the Agreements and never communicated their generalized views to IBM or Sequent; and (3) cobbles together an

---

[3] The only mention of the Sublicensing Agreements in SCO's argument is at pages 95-96, 101, 103 and 119.  Nothing in these pages comes even remotely close to establishing that IBM breached the Sublicensing Agreements.

explanation as to why its construction of the Agreements is not unreasonable, without addressing the primary problems identified by IBM or grounding its position in admissible evidence.

Notably absent from SCO's forty-plus pages of argument is any mention of the specific material that IBM is alleged to have misused. While SCO's papers continue to perpetuate the false impression that IBM dumped massive amounts of proprietary SCO information into Linux, in fact only four, narrow categories of allegedly misused material remain in the case. We address each of these four categories of allegedly misused material in detail in Section I.D below. But it bears emphasis at the outset that even cursory consideration of the allegedly misused material demonstrates that SCO's claims lack merit. The allegedly misused material is original work of IBM or third parties other than SCO; it contains no UNIX System V code, methods or concepts; it is not a modification or derivative work of UNIX System V; and it was not written or created with reference to UNIX System V code or related materials. Thus, SCO's case turns on the flawed proposition that IBM misused its own code.

A.   The Plain Language of the Agreements Forecloses SCO's Theory.

As stated in IBM's opening papers, the provisions of the Software Agreements that IBM is alleged to have breached pertain to "SOFTWARE PRODUCT[S]", defined as UNIX System V code or related materials. (K Br. ¶¶ 51-56.) Because SCO has not identified (and cannot identify) any UNIX System V code or related materials that IBM is alleged to have misused (K Br. ¶¶ 236-42), SCO seizes on a single clause in Section 2.01 of the Agreement relating to "resulting materials" and construes it to render all of the provisions that IBM is alleged to have breached applicable not only to UNIX System V code and related materials, but also to IBM's own original works. SCO misreads the Agreements.

9

1.    <u>SCO's Construction of Section 2.01 is Baseless.</u>

SCO does not dispute that the allegedly breached provisions pertain to UNIX System V code or related materials. Nor does it dispute that there is no evidence that IBM misused any UNIX System V code or related materials. Rather, acknowledging that its case turns entirely on the "resulting materials" clause in Section 2.01, SCO devotes thirteen pages to a "textual analysis" (of a fourteen-word clause in a six-page agreement), the purported purpose of which is to show that the Agreements, under which IBM and Sequent licensed UNIX System V code and related materials from AT&T, confer on SCO the right to control original IBM material that (1) contains no UNIX System V code, methods or concepts, (2) is not a modification or derivative work of UNIX System V and (3) was not written or created with reference to UNIX System V code or related materials. (Opp'n at 92-104.)

SCO faults IBM for the brevity of its textual analysis (Opp'n at 92, 98), but no extended analysis is required to show that the fourteen words at issue do not preclude the entry of summary judgment in favor of IBM. The language of Section 2.01 on which SCO relies provides simply that licensees may prepare modifications and derivative works of AT&T's SOFTWARE PRODUCT (<u>i.e.</u>, UNIX System V code or related materials), so long as the resulting materials are treated like the SOFTWARE PRODUCT.

> AT&T grants to licensee a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE'S own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, <u>provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT.</u>

(IBM Ex. 492 § 2.01; IBM Ex. 119 § 2.01 (emphasis added).)

10

SCO's claims hinge on the term "resulting materials", which is not defined in the Agreements.  SCO argues that "resulting materials" means that if material has ever come in contact with UNIX System V (or might ever in the future come in contact with UNIX System V), regardless of who created it or the circumstances surrounding its creation, it must forever be treated as part of the SOFTWARE PRODUCT.  That reading, we submit, grossly distorts the plain language.  In our view (and in the view of everyone who was involved in negotiating the agreements), the term "resulting materials" simply means that if IBM adds material to UNIX System V, then the "resulting materials" — containing both IBM's original work and UNIX System V — must be treated as part of the SOFTWARE PRODUCT.  If, however, IBM's original work is separated from UNIX System V, IBM as the owner of that original work is free to do with it as it wishes.

To get from "resulting materials" to control over IBM's original work, SCO argues that "resulting materials" includes "modifications" and "derivative works" of UNIX System V, and that IBM's AIX and Sequent's Dynix, as a whole, are "modifications" or "derivative works" of UNIX System V.  Whether or not that is accurate, it is undisputed that none of the four categories of allegedly misused material is a "modification" or "derivative work" of UNIX System V, as explained below.  Hence, SCO's reliance on Section 2.01 fails at the outset.

Because none of the allegedly misused material is a "modification" or "derivative work" of UNIX System V, Section 2.01 could support SCO's claims only if "resulting materials" is read to include not only "modifications" or "derivative works" of UNIX System V, but also any and all materials that ever have been (or in the future might be) associated in some way with a "modification" or "derivative work" of UNIX System V — in effect, granting SCO the right to

11

control each and every line of source code that has ever been (or in the future might be) associated in any manner with IBM's AIX and Dynix operating systems (and every other UNIX operating system). That reading stretches the language of Section 2.01 beyond recognition — indeed, SCO's own CEO, Mr. McBride, acknowledged in his deposition that such a construction is untenable.

2. The "Principal Arguments" Underlying SCO's Reading of the Agreements Are Meritless.

SCO asserts six "principal arguments" to justify its theory, each of which is discussed individually below, but all suffer from the same basic defects. They ignore the plain language of the Agreements, depend on a distortion of IBM's arguments, look beyond the plain language of the Agreements and ignore the specific allegedly misused material at issue.

First, SCO argues that if IBM's interpretation of the Agreement were correct, then "the requirements that 'resulting materials' be 'treated as part of the original SOFTWARE PRODUCT' would be rendered superfluous, because UNIX System V source code is already clearly and indisputably contained within the original SOFTWARE PRODUCT".[4] (Opp'n at 93.) That is incorrect. The mere fact that the Agreements require the protection of UNIX System V *source code* does not mean that that there would be no reason for them separately to require the protection of "resulting materials", which plainly is not the same thing as UNIX

---

[4] SCO also argues that "principal witnesses from whom IBM has submitted declarations were unable to reconcile IBM's reading with this glaring textual problem". (Opp'n at 94.) Putting aside the fact that there is no "glaring textual problem", and parol evidence has no place in a "textual analysis", a fact witness cannot be fairly faulted for not being able to offer a legal counterpoint to SCO's legal arguments, especially where, as here, those arguments are nothing if not confusing.

source code.  Stating that "resulting materials" must be treated like UNIX System V code serves to clarify that a licensee cannot avoid its obligations to protect AT&T's UNIX System V source code simply by modifying or adding to it.

Second, SCO argues that "IBM's reading fails to account for the protection under Section 2.01 for both modifications of the licensed UNIX product and 'derivative works' based on that product". (Opp'n at 94.)  According to SCO, "[i]f IBM were correct in contending that the software agreements protected only literal UNIX source code, there would be no reason to delineate an additional — let alone two additional — categories of products that are distinct from the actual code, but were required to be treated the same as the original licensed UNIX software product". (Opp'n at  94.)  Contrary to SCO's contention, however, IBM's motion does not depend on the proposition that the Agreements protect only UNIX System V *source code*; it depends instead on the proposition that the Agreements do not give SCO control of IBM's original works, when those works are not associated with AT&T's works.  Moreover, IBM's reading does not ignore the fact that the Agreements refer to both "modifications" and "derivative works".  As stated, none of the allegedly misused material is either a modification or a derivative work of UNIX System V source code or related materials.  (See K Br. ¶ 237.)

Third, SCO argues that "IBM's reading is incompatible with Section 2.01's language requiring derivatives or modifications to be treated 'as part of the original SOFTWARE PRODUCT". (Opp'n at 94.)  That is so, SCO says, because the "as part of" language "must mean adding something to the 'original SOFTWARE PRODUCT' that was not already there", and "because source code is already contained in the 'original SOFTWARE PRODUCT', IBM's reading of Section 2.01 (that is, that it covers only UNIX source code) would provide nothing to

13

add (that is nothing to treat 'as part of')". (Id. at 94-95.) Here again, SCO misrepresents IBM's position which neither depends on the proposition that the Agreements protect only UNIX System V *source code* nor ignores Section 2.01's use of the term "as part of". SCO's claim that the "as part of" language must mean "adding something to the 'original SOFTWARE PRODUCT' that was not already there" is unsupported by the plain language of the Agreements. The plain language refers only to protecting "resulting materials", and none of the allegedly misused material constitutes "resulting materials".

Fourth, SCO argues that Section 7.06(a) "not only expressly extended the requirement of confidentiality to all aspects of the 'SOFTWARE PRODUCTS' (which, by virtue of Section 2.01, must be treated identically to any modifications or derivatives based on such SOFTWARE PRODUCTS), but also specifies that protection of the SOFTWARE PRODUCTS includes protection of the 'methods or concepts utilized therein'". (Opp'n at 95.) Putting aside the fact that the IBM Side Letter expressly eliminated the "all aspects" and "methods and concepts" language on which SCO relies (discussed below) — thus foreclosing this argument altogether as to the AT&T/IBM Software Agreement — it depends ultimately on the untenable notion that, read together, Section 2.01 and Section 7.06(a) require that "resulting materials", and thus some original IBM works, be treated as if they are identical to AT&T's SOFTWARE PRODUCT. However, reading the Agreements to require identical treatment of UNIX System V code and original licensee works included in "resulting materials" is inconsistent with the fact that the Agreements define the SOFTWARE PRODUCT to exclude (by defining it differently than) "resulting materials". Moreover, pretending that IBM's original works are the same as AT&T's (as SCO proposes) would lead to absurd results, such as requiring IBM to "return or destroy all

14

copies of" its original works upon termination of the Agreement.  (See IBM Ex. 492 §§ 6.02, 6.03; IBM Ex. 119 §§ 6.02, 6.03.)  If the parties had intended to agree that a licensee's original works (once separated from "resulting materials") be treated in exactly the same way as UNIX System V code, they could easily have done so.  They did not.

Fifth, SCO argues that "further textual evidence undermining IBM's 'literal source code only' theory is found in the plain language of the sublicensing agreements".  (Opp'n at 95-96.)  A "textual analysis" must, by definition, be based on the plain language of the agreements under review (i.e., the Software Agreements), not separate agreements (i.e., the Sublicensing Agreements).  Moreover, contrary to SCO's contention (Opp'n at 96), which is unsupported by any citations, IBM does not contend that the Software Agreements allow it to distribute in source code form for a *fee* a product that the Sublicensing Agreements only allow it to distribute in object code form for a *fee*.  Consistent with the unrebutted testimony of the Involved Persons, IBM contends simply that the Agreements do not preclude it from doing as it wishes with its own original works, so long as it protects AT&T's UNIX System V code and related materials as provided in the Agreements.

Sixth, and finally, SCO argues that "neither the IBM Side Letter nor Amendment X nullified the plain language of Sections 2.01 and 7.06 or otherwise reduced the contractual obligations regarding modifications and derivative works."  (Opp'n at 96-97.)  It is impossible to reconcile this argument with the plain language of either the Side Letter or Amendment X.  The Side Letter expressly states, in connection with Section 2.01, that IBM owns (and thus controls)

its original works (IBM Ex. 122 ¶ 2),[5] and, as stated, it deletes the "all parts of" and "(including methods and concepts therein)" language from Section 7.06 (id. ¶ 9).  In any case, IBM's motion does not depend on either the Side Letter or Amendment X or the protectability of methods and concepts.  With or without the Side Letter and Amendment X, the allegedly breached provisions of the Agreements do not restrict IBM's use of its own original works, once separated from "resulting materials".[6]

In sum, none of SCO's arguments justifies its rewrite of Section 2.01.  All either misstate IBM's position, look beyond the plain language of the Agreements or ignore the specific material at issue.

SECTION REDACTED

---

[5] To nullify the Side Letter, SCO claims that the language in it stating that "modifications and derivative works prepared by or for [IBM] and are owned by [IBM]" merely clarifies that AT&T could not reach out and appropriate IBM's work for AT&T's benefit".   (Opp'n at 100.)  However, even in the absence of an express statement that IBM owned it, AT&T could not "reach out and appropriate IBM's work for AT&T's benefit".

[6] SCO further asserts in the context of its "textual analysis" that IBM ignores the Agreements' merger provisions.  (Opp'n at 97-98.)  But the assertion is untrue and immaterial to a textual analysis, as IBM's textual analysis (unlike SCO's) looks only at the four corners of the Agreements.

B.      The Overwhelming Extrinsic Evidence Forecloses SCO's Theory.

In addition to the fact that the plain language of the Agreements forecloses SCO's theory, it is precluded by the overwhelming extrinsic evidence.  None of SCO's arguments about the extrinsic evidence creates a fact question.

1.      The Extrinsic Evidence.

Where, as here, the plain language of the Agreements forecloses SCO's claims, the Court need not — indeed, may not — look beyond the four corners of the Agreements.  See W.W.W. Assoc., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990); see also North Fork Bank & Trust Co. v. Romet Corp., 596 N.Y.S.2d 449, 450 (App. Div. 1993); Mercury Bay Boating Club, Inc. v. San Diego Yacht Club, 557 N.E.2d 87, 95 (N.Y. 1990).  However, as stated in IBM's opening papers, even if the Court were to find the Software Agreements to be ambiguous and consider extrinsic evidence, SCO's claims fail as a matter of law.  (See K Br. at 91-94.)  The overwhelming extrinsic evidence demonstrates that the parties intended the Agreements to permit IBM and Sequent to do as they wish with their original works, so long as they treat UNIX System V as required by the Agreements.  (K Br. ¶¶ 32-46, 57-71.)

In opposition, SCO insists that "courts may not resort to extrinsic evidence in order to resolve contractual ambiguities as a matter of law".  (Opp'n at 106-07.)  That is wrong, however.  A court can resolve an "'ambiguity in contractual language as a matter of law [where] the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary.'"  Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000) (granting summary judgment on contract claim based on the "overwhelming weight of the extrinsic

17

evidence") (quoting 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 746-47 (2d Cir.

1999)).[7] The reason for this is obvious from Rule 56(c)'s provision that summary judgment is

appropriate where "there is no genuine issue as to any material fact". As one court has

explained, "summary judgment is appropriate in a contract interpretation dispute whenever there

is no genuine issue of fact, a situation that obtains not only when the language is unambiguous,

but also when the language is ambiguous and there is relevant extrinsic evidence, but the

_____

[7] See, e.g. MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285, 302-03 (S.D.N.Y. 2006) (granting summary judgment on contract claim where "the extrinsic evidence before the Court [was] so one-sided as to dispel any dispute of the parties' intent"); Trustees of Bricklayers and Allied Craftworkers v. Driscoll, 165 F. Supp. 2d 502, 512-13 (S.D.N.Y. 2001) (granting summary judgment on contract claim based on extrinsic evidence); Pulaski Materials Co., Inc. v. Milestone Materials, Inc., 35 F. Supp. 2d 279, 283 (W.D.N.Y. 1998) (granting summary judgment on contract claim where "the extrinsic materials contained in the record resolve[d] any apparent ambiguity in the agreement, and that no triable issue of fact remain[ed]"); Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 304 (S.D.N.Y. 1997) (granting summary judgment on contract claim based on "[t]he unrebutted extrinsic evidence of the parties' objective manifestations of intent"); see also Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 740 (10th Cir. 2004) (affirming district court's use of "uncontroverted" parol evidence to resolve an ambiguous contract provision and grant summary judgment); Cont'l Cas. Co. v. Nw. Nat'l Ins. Co., 427 F.3d 1038, 1041 (7th Cir. 2005) (affirming district court's grant of summary judgment on the meaning of an ambiguous contract provision under the principle that "if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed"); Bristol-Myers Squibb Co. v. Ikon Office Solutions, Inc., 295 F.3d 680, 684 (7th Cir. 2002) (stating that "[e]ven if the contract could be considered ambiguous, that does not necessarily mean that there is a jury question. The court itself must still declare the meaning of the contract unless the evidence admitted raised a real issue of fact to be resolved by the jury"); Fishman v. LaSalle Nat'l Bank , 247 F.3d 300, 303 (1st Cir. 2001) (affirming grant of summary judgment because "extrinsic facts permissibly bear on interpretation but are not themselves disputed"); Martin v. Monumental Life Ins. Co., 240 F.3d 223, 233 (3d Cir. 2001) (stating that "[i]f the contract terms are ambiguous or incomplete, and extrinsic evidence is examined, interpretation of the contract becomes a question of fact, unless the extrinsic evidence is conclusive"); Consol. Edison, Inc. v. Northeast Utils., 332 F. Supp. 2d 639, 649 (S.D.N.Y. 2004) (stating that "a court may resolve contractual ambiguity as a matter of law if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation"); Total Control, Inc. v. Danaher Corp., 324 F. Supp. 2d 658, 664 (E.D.Pa. 2004) (stating that "when a contract contains ambiguous language, and a court determines that a reasonable person could reach only one conclusion about the meaning of that language after considering the extrinsic evidence, the meaning of the contract language is to be determined by the court").

extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 299 (S.D.N.Y. 1997).[8]

SCO's opposition thus falls back on its assertion that "the evidence squarely contradicts each of the principal assertions regarding the supposed meaning of the Agreements on which IBM relies in seeking summary judgment". (Opp'n at 111.) As stated in IBM's opening brief, however, IBM and Sequent made clear to AT&T during the negotiations resulting in the Agreements that they must retain ownership and control of their original works, whether or not those works were part of a modification or derivative work of UNIX System V. (K Br. ¶ 38.) None of the AT&T representatives involved in the negotiations expressed any disagreement as to who would own and control IBM's and Sequent's original works. (K Br. ¶ 37.) In fact, the AT&T negotiators explicitly stated that they shared IBM's and Sequent's intent and did not seek to assert ownership or control over their original works. (K Br. ¶ 37.) They indicated that

---

[8] Further, the cases SCO cites are inapposite. Those cases either (1) actually support the idea that summary judgment may be granted on an ambiguous contract, see, e.g., Coplay Cement Co., Inc. v. Willis & Paul Group, 983 F.2d 1435, 1439 (7th Cir. 1993) (noting that "if the extrinsic evidence is undisputed, the determination of the meaning of the contract remains a matter of law"); State v. Home Indem. Co., 486 N.E.2d 827, 829 (N.Y. 1985) (affirming grant of summary judgment in favor of plaintiff where defendants' affidavit "contained nothing to establish that the limitation claimed to result from that term of art had been brought to the attention of those who negotiated on behalf of the [plaintiff] for issuance of the policy, the affidavit did not supply the evidentiary facts needed to present an issue for the jury"); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2730.1 (stating that "when there is no genuine issue as to the meaning of a contract, the mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered"), or (2) decided the issue on other grounds, see, e.g., Bouzo v. Citibank, 96 F.3d 51, 58 (2d Cir. 1996) (stating that "[a]t this stage of the litigation, however, the phrase 'bank pay order' is sufficiently ambiguous to require further proceedings regarding its meaning"); Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996) (concluding "that the district court properly granted summary judgment in favor of the defendants" because the contract in question was unambiguous).

AT&T required only that its licensees protect AT&T's UNIX System V material. (K Br. ¶ 39.) The AT&T negotiators did not believe that AT&T licensees would have entered into their licensing agreements if they believed AT&T's agreements would give it ownership or control over the licensees' original works. (K Br. ¶ 43.)

Moreover, the Agreements were executed on behalf of AT&T by Messrs. Wilson and Frasure. (K Br. ¶ 48.) Mr. McDonough executed the Agreements for IBM, and Mr. Rogers executed them for Sequent. (K Br. ¶¶ 48, 49.) All agree that they were not intended to restrict IBM's use of its original works — whether or not they were or might become part of a modification or derivative work of UNIX System V. (K Br. ¶ 57.) In addition, Mr. DeFazio, the overall head of UNIX licensing, and the other individuals who actually and actively negotiated the Agreements, Messrs. Vuksanovich and Kistenberg, likewise agree that the Agreements were not intended to restrict IBM's use of its original works, even if they were or might become part of a modification or derivative work of UNIX System V. (K Br. ¶¶ 57-59.)

In an attempt to create a fact question, SCO relies on various assertions from individuals who neither negotiated nor executed the Agreements and who in any case never communicated to IBM the generalized statements of subjective intent on which SCO relies, as illustrated in Addendum C. In fact, a number of these individuals were either never employed by AT&T or were not employed by AT&T in 1985 when the Agreements were executed. The testimony of SCO's witnesses is thus irrelevant, lacking in foundation and inadmissible. See Fed. R. Evid. 402, 602, 701, 802. "[W]hen resolving disputes concerning the meaning of ambiguous contract language, unexpressed subjective views have no proper bearing. Only the parties' objective manifestations of intent are considered." Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 302

20

(S.D.N.Y. 1997); see Beal Bank v. Melville Magnetic Resonance, 741 N.Y.S.2d 882, 883 (App. Div. 2002) (rejecting plaintiff's contract interpretation that was supported by "the affidavit of the plaintiff's asset manager, who was not involved in the loan negotiations and who had no personal knowledge of the intent of the parties" because such affidavit "had no probative value"); Sally v. Sally, 638 N.Y.S.2d 832, 834 (App. Div. 1996) (disregarding "expressions of uncommunicated subjective intent, which are insufficient to create a question of fact", on summary judgment); Padovano v. Vivian, 629 N.Y.S.2d 844, 846 (App. Div. 1995) ("Extrinsic evidence of plaintiff's uncommunicated subjective intent is irrelevant."); Tracey Road Equip., Inc. v. Vill. of Johnson City, 571 N.Y.S.2d 586, 588 (App. Div. 1991) (disregarding evidence of intent where there was no evidence that such intent was "communicated by either or both parties to the other"); Hudson-Port Ewen Assocs., L.P. v. Kuo, 566 N.Y.S.2d 774, 777 (App. Div. 1991) ("Since the only extrinsic evidence asserted as the basis for creating a factual issue consists of defendants' uncommunicated subjective intent, summary judgment is appropriate".).[9]

Even if the testimony of SCO's witnesses were considered, it would not impede the entry of summary judgment. The fact remains that the overwhelming extrinsic evidence supports

---

[9] See also Baum v. Rockland Cmty. Coll., 299 F. Supp. 2d 172, 175 n.1 (S.D.N.Y. 2003) (disregarding "subjective but unexpressed intentions of the defendants"); Tom Doherty Assocs. Inc. v. Saban Entm't Inc., 869 F. Supp. 1130, 1139 (S.D.N.Y. 1994) ("The unexpressed subjective intent of one party is not binding on the other."); In re Robbins Int'l, Inc., 275 B.R. 456, 465 (S.D.N.Y. 2002) ("[T]he only germane testimonial evidence is that of the objective manifestations of the parties' intent"); Pulaski Materials Co. v. Milestone Materials, Inc., 35 F. Supp. 2d 279, 283 (W.D.N.Y. 1998) (disregarding affidavit "because it is based upon [affiant's] review and revision of a draft of the contract, and not upon the final contract itself.") Nipkow & Kobelt, Inc. v. North River Ins. Co., 633 F. Supp. 437, 442 n.7 (S.D.N.Y. 1986) (holding that affidavit did not create issue of material fact where declarant "was not involved in negotiating the policy, and it appears that his statement concerning the plaintiff's request is not based on firsthand knowledge of the facts.").

IBM's construction of the Agreements.  Considering the views of SCO's witnesses does not result in a situation where the persons negotiating and executing an agreement are split as to the parties' intent, which might preclude the entry of summary judgment if the plain language of the agreement were ambiguous.  Here, irrespective of the views of SCO's witnesses, the overwhelming parol evidence forecloses SCO's theory.  Every single one of the persons who negotiated and executed the Agreements, on both sides of the table, has offered testimony refuting SCO's revisionist assertions as to the parties' intent.  See, e.g., MSF Holding Ltd., 435 F. Supp. 2d at 302-03 (granting summary judgment on contract claim where "the extrinsic evidence before the Court [was] so one-sided as to dispel any dispute of the parties' intent"); Driscoll, 165 F. Supp. 2d at 512-13 (granting summary judgment on contract claim based on extrinsic evidence); Pulaski Materials Co., 35 F. Supp. 2d at 283 (granting summary judgment on contract claim where "the extrinsic materials contained in the record resolve[d] any apparent ambiguity in the agreement, and that no triable issue of fact remain[ed]"); Nycal Corp., 988 F. Supp. at 304 (S.D.N.Y. 1997) (granting summary judgment on contract claim based on "[t]he unrebutted extrinsic evidence of the parties' objective manifestations of intent").[10]

---

[10] SCO cites a number of cases for the proposition that courts "routinely consider testimony from witnesses who were involved in drafting and enforcing standard contract language, even if they did not sign or were not involved in the negotiation of the particular contract at issue". (Opp'n at 110.)  However, the cases either do not apply New York law or are distinguishable. Nat'l Envmtl. Serv. Co. v. Ronan Eng'g Co., 256 F.3d 995, 1003 (10th Cir. 2001) (applying Oklahoma law and stating that "it is inappropriate to allow testimony regarding one party's unexpressed subjective reservations as evidence that a contract was never formed"); McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 833 (2d Cir. 1988) (interpreting scope of arbitration agreement under the law of the Federal Arbitration Act and stating that "[a]lthough we do not find the post hoc assertions of a litigating attorney to be especially probative in determining the original import of a disputed contract clause, we do find some support for our conclusions in the assertions of the GEICO Corp. official [who was involved in the negotiations leading to the contract at issue] and the other attorneys familiar with industry

To decline summary judgment based on the views of SCO's witnesses would be to find that a reasonable jury could reject the extensive, consistent testimony of all of the individuals from AT&T, IBM and Sequent who negotiated and executed the Agreements — which testimony is illustrated in Addendum D — and to accept in its stead the generalized opinions of individuals who neither negotiated or executed the Agreements nor communicated their subjective intent to IBM or Sequent, most of whom (unlike IBM's witnesses) were not deposed (because SCO disclosed most of its declarations for the first time with its opposition papers) and some of whom either never worked at AT&T or were not employed at AT&T at the time the Agreements were executed.  That, we respectfully submit, would be a truly unreasonable result. See Nycal Corp., 988 F. Supp. at 303 n.42.  No reasonable jury could find for SCO, even without considering the additional reasons why its theory of the case is unreasonable (discussed in Section I.C below).[11]

> 2.    SCO's Six Arguments.

As with its "textual analysis", SCO makes six specific arguments about its alleged extrinsic evidence, none of which bears even the slightest scrutiny.  In fact, like the arguments

---

practice"); Schering v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983) (denying summary judgment because defendant was not given the opportunity to conduct discovery on plaintiff's intent); EPN Ingenieria S.A. de C.V. v. Gen. Elec. Co., No. 92-1563, 1996 WL 531867, at *2 (S.D.N.Y. Sept. 19, 1996) (considering defendant's standard contract, which plaintiff signed but defendant did not agree to in this case, as evidence of plaintiff's intent, not, as SCO claims as evidence of defendant's intent) (Addendum I hereto); RMLS Metals, Inc. v. Int'l Bus. Machs. Corp., 874 F. Supp. 74, 77 (S.D.N.Y. 1995) (applying rule that in determining whether lost profits are available in a contract silent on the subject, the court must "consider what the parties would have concluded had they considered the subject").

[11] SCO invokes excerpts of testimony from certain of the Involved Persons, which, SCO says, is inconsistent with the portions of their testimony on which IBM relies.  But even cursory

SCO makes in support of its "textual analysis", SCO's arguments misrepresent IBM's motion, belabor the irrelevant and ignore the allegedly misused material at issue:

First, SCO contends that "the confidentiality requirements were a core component of the agreements that remained in the agreements for decades". (Opp'n at 111.) Putting aside the AT&T testimony to the contrary    SECTION REDACTED    , whether the confidentiality requirements were a core component of the Agreements says nothing about whether those confidentiality requirements extend to IBM's original works. Again, every one of the witnesses who negotiated the Agreements has testified that they did not. (K Br. ¶¶ 57-63.)

Second, SCO contends that "neither Mr. Wilson nor any other single individual at AT&T, USL or Novell had the authority to modify or amend the standard UNIX license agreements". (Opp'n at 112.) Contrary to SCO's suggestion, however, a corporation is bound by the acts of its agents. See, e.g., Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp., 320 F.3d 1081, 1089 (10th Cir. 2003); In re Payroll Express Corp., 186 F.3d 196, 207 (2d Cir. 1999); Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank, 774 N.E.2d 696, 700 (N.Y. 2002); Jensen v. Manila Corp. of the Church of Jesus Christ of Latter-Day Saints, 565 P.2d 63, 65 (Utah 1977). As much as SCO might like to disparage Mr. Wilson and the other Involved Persons as renegades, it is undisputed that they were authorized to negotiate the Agreements on AT&T's behalf. Moreover, whether or not Mr. Wilson and the other Involved Persons had authority to modify or amend "the standard UNIX licensee agreements", they negotiated the Agreements on behalf of AT&T and, if the views of anyone at AT&T are relevant to the parties' intent, it is

---

consideration of the full testimony of these witnesses reveals the error in SCO's assertion, as illustrated in Addendum D.

theirs. <u>Cf. Proteus Books Ltd. v. Cherry Lane Music Co.</u>, 873 F.2d 502, 509 (2d Cir. 1989) (holding that a court can consider extrinsic evidence not to prove different or additional terms, but "to aid in interpreting ambiguous terms of an integrated contract".)

<u>Third</u>, SCO contends that AT&T, USL and Novell never decided to "abandon" the protection of methods and concepts in UNIX but "continued to protect such methods and concepts". (Opp'n at 112.) Here again, AT&T representatives with authority to act on behalf of the corporation (<u>e.g.</u>, Mr. Wilson) have testified that AT&T ceased pursuing protection of methods and concepts. (K Br. ¶ 101.) Moreover, as shown in IBM's opening papers and not properly controverted by SCO (and thus deemed admitted), AT&T and its successors allowed the methods and concepts of UNIX System V to become available without restriction to the general public, precluding SCO from suing IBM for disclosing them. (K Br. ¶¶ 96-106; Addendum A ¶¶ 96-106; DJ Opp'n ¶ 24.) But in any event, it does not matter — SCO has not identified a single method or concept in UNIX that IBM is alleged to have disclosed in violation of the Agreements.

<u>Fourth</u>, SCO contends that Mr. Wilson "sent side letters confirming that although licensees may own portions of their modifications and derivative works, they were obligated hold [sic] in confidence even those portions of the modifications and derivative works" and that Mr. Wilson and his account manager, Mr. Frasure, testified in the BSD litigation in 1992 that licensees were obligated to treat as part of the licensed UNIX software "anything that the licensee had developed 'with exposure' to the UNIX software product". (Opp'n at 113.) Neither Mr. Wilson's letters nor his or Mr. Frasure's testimony from the BSD case (which concerned a different set of licensing agreements to which neither IBM nor Sequent was a party

and which were not negotiated by them) provides any support for SCO's theory. In fact, Mr.

Wilson made crystal clear in his 1992 deposition in the BSD case that AT&T's licensees were

free to do as they wished with their original works:

> I think it will become clear the words said that this is AT&T's and this is the [sic]
> yours. We did not want to have any rights or ownership to anything they created.
> . . .

> The intent is what I have stated many times earlier. In other words, the intent is
> such that we protect our intellectual property and assert no rights in the licensee's
> intellectual property, and you can see there was clarifications and changes and
> they were made to try and better reflect that intent. . . .

> We are asserting our rights and not any rights to anything that's owned by one of
> our licensees. . . .

> We claim no ownership interest that is not a part of the software product. . . the
> intent is what's yours is yours and what belongs to AT&T belongs to AT&T. . . .

> In other words, if you follow that through, it's yours. I have no jurisdiction
> whatsoever.

(IBM Ex. 513 at 47: 20-23, 76:15-77:23.)


SECTION REDACTED


Fifth, SCO contends that "the Side Letter did not permit IBM to disclose . . . methods and

concepts in its modifications and derivative works, and did not permit IBM openly to disclose

the source code of its derivative works". (Opp'n at 117.) As stated, SCO misconstrues the Side

Letter, which expressly granted IBM broad rights to the methods and concepts of UNIX System

V (K Br. ¶¶ 54-56), which are now a matter of public record in any case.  (K Br. ¶¶ 96-106.)

While the Side Letter underscores the flaws in SCO's claim for breach of the IBM Agreement,

IBM's motion does not turn on the Side Letter.  But in any event, once again, SCO has not

identified a single method or concept in UNIX System V that IBM is alleged to have misused.

Sixth, and finally, SCO contends "that the license agreement and written amendments or

clarifications thereto represented the entire understanding between the parties, and that AT&T

did not amend or modify any agreement orally".  (Opp'n at 117.)  SCO's point appears to be that

the Agreement included integration clauses.  However, the mere fact that the Agreements include

an integration clause is of little moment.  IBM does not rely on the testimony of the Involved

Persons to alter or to amend the terms of the Agreements but rather to demonstrate the parties'

intent, in the event the Court finds a relevant ambiguity in the plain language of the Agreements.

Proteus Books, 873 F.2d at 509 (holding that a court can consider extrinsic evidence not to prove

different or additional terms, but "to aid in interpreting ambiguous terms of an integrated

contract").  The integration clause thus has no bearing on the extrinsic evidence as it relates to

the objectively manifested intent of the parties.   Hence, like all of SCO's specific arguments

about the extrinsic evidence, this one is beside the point.[12]

---

[12] Further, SCO's contention that IBM's reliance on the doctrine of contra proferentem is
"entirely misplaced" (Opp'n at 109 n.7) actually supports IBM's invocation of this doctrine.
SCO emphasizes the language in Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985),
that "an ambiguous contract must be construed against the drafter "and favorably to a party who
had no voice in the selection of its language'" (Opp'n at 109 n.7 (quoting Jacobson, 489 N.E.2d
at 1284) (emphasis added by SCO).)  Here, it is undisputed that the original Agreements (not
including the IBM side letters and Amendment X) were drafted by AT&T (K Br. ¶ 36) and that
Sequent accepted AT&T's standard-form contract as it was, without any change to the standard
language (K Br. ¶ 44).  Further, SCO's contention that "courts have rejected the application of
the doctrine in the summary judgment context" (Opp'n at 109 n.7) may be true in the few cases it
cites, but it is clearly not always the case.  In State v. Home Indemnity. Co., 486 N.E.2d 827, 829

C.      SCO's Theory Must Be Rejected As Unreasonable.

SCO does not dispute (1) that the rules of construction of contracts require, whenever

possible, that an agreement should be given a fair and reasonable interpretation; (2) that a

contract should not be interpreted to produce a result that is absurd, commercially unreasonable

or contrary to the reasonable expectations of the parties; or (3) that it is against the general policy

of the law to interpret a contract in a way that would produce an unreasonable result or would, in

effect, place one party to the contract at the mercy of the other. (See K Br. at 83-84.) SCO

baldly asserts that its theory is reasonable, but fails to rebut the showing of unreasonableness in

IBM's opening papers.

1.      SCO's Theory Is Inconsistent With IBM's Ownership Rights.

Under SCO's theory it would have the right to control every single one of the many

millions of lines of code that have ever been put into (and that will ever be put into) AIX or

Dynix by IBM or Sequent. (K Br. ¶¶ 178-79.) SCO could co-opt the decades of work and

billions of dollars spent in developing and improving AIX and Dynix simply because those

programs contain, or even once contained, some source code, no matter how negligible, from

UNIX System V. And SCO would have the right to control code that was written by third

---

(N.Y. 1985), which SCO cites for another (equally meritless) proposition, for example, the Court
upheld a grant of summary judgment in plaintiff's favor on contra proferentem grounds where
the defendant had actually submitted extrinsic evidence on an ambiguous contract. Additionally,
Alfin, Inc. v. Pacific Insurance Co., 735 F. Supp. 115, 121 n.5 (S.D.N.Y. 1990), cited by SCO,
held that summary judgment was inappropriate because the court "found that there is extrinsic
evidence which is subject to two reasonable interpretations". Indeed, Alfin also pointed out that
"the subjective views of [the insurer's] officials, never communicated to [the insured] until . . .
litigation cannot establish the parties' intent." Id. at 120. It is thus clear that it is perfectly
appropriate to rely on the doctrine on summary judgment and it is perfectly appropriate on the
facts of this case.

parties and licensed to IBM, even if such third parties have no relationship at all with SCO. At the same time, SCO would have little information about the scope of its rights, (K Br. ¶ 288), and there would be widespread uncertainty about the scope of SCO's rights, including the identity of the persons whose employability it claims to have controlled. (K Br. ¶ 288.) Thus, SCO's reading of the Agreements would not only effectively nullify IBM's ownership of AIX and Dynix; it would effectively expand SCO's ownership rights exponentially. (K Br. ¶ 285.)

Rather than dispute the implications of its theory, SCO simply asserts, for the first time ever (and without citation to the Agreements), that the Agreements "reflect a scenario in which the parties shared . . . control rights over the modifications and derivative works". (Opp'n at 118-19.) SCO's notion of "shared control rights" is, however, made up; there is no support for it in the language of the Agreements.[13] That is no doubt why SCO's only citations are to side letters and other agreements to which neither IBM nor Sequent was a party. Moreover, SCO acknowledges elsewhere that ownership includes the "<u>exclusive</u> rights to, among other things, reproduce, prepare derivative works, and distribute a work". (AIX Opp'n at 50 (emphasis added).) SCO agrees that IBM (not SCO) owns the allegedly misused material. Thus, SCO effectively concedes that IBM, not SCO, has the "exclusive" right to "reproduce, prepare derivative works, and distribute" its homegrown material.

---

13 ·

**SECTION REDACTED**

2. <u>SCO's Theory Is Inconsistent With Copyright Law.</u>

In response to IBM's argument that SCO's interpretation of the Agreements is at odds with the basic principles underlying federal copyright law, SCO argues (again without citation) that "AT&T specifically sought to secure for itself greater protection for the licensed UNIX software product than the product might have had under the copyright laws". (Opp'n at 120.) SCO further contends that IBM's argument fails because "its core premise, that a party could not protect its intellectual property to any greater extent under contract if that property were protected by other common law or statutory law that applies to that intellectual property, is clearly not the law". (<u>Id.</u>)

But SCO misses the point. The problem with SCO's theory is not that AT&T might have sought to secure for itself greater protection than might have been available under the copyright laws; nor is it that AT&T could not protect its intellectual property to any greater extent under contract if that property were protected by other common law or statutory law. The problem, rather, is that as SCO reads the agreements, the author of a preexisting work (here SCO, allegedly) has the right to control all parts of AIX and Dynix (which SCO claims to be IBM and Sequent derivative works), including those original materials created exclusively by IBM and Sequent. Such an interpretation of the Agreements, which give no indication that they were meant to deprive either party of its rights under the copyright laws, is inconsistent with IBM's exclusive rights, as holder of copyrights in the allegedly misused material, to reproduce the allegedly misused material, to prepare derivative works based upon it, and to distribute copies of it.

30

3.  <u>SCO's Theory Is Contrary to Public Policy.</u>

To sidestep the public policy prohibitions against its claim, SCO argues that it "does not base any claim of breach on the mere fact that IBM employed former Sequent employees". (Opp'n at 121.)  However, the fact that SCO does not base any claim of breach "on the mere fact that IBM employed former Sequent employees" does not render it any less offensive of public policy.  At least according to SCO's Final Disclosures and its interrogatory answers (which SCO now seeks to explain away as "somewhat awkwardly worded" (Opp'n at 121 n.8)), SCO's claim about the fourth category of allegedly misused material (experience and negative know-how) hinges on its supposed right to preclude the IBM developers who have worked on and have experience with IBM's Dynix operating system from ever working on any other operating systems.  Thus, SCO's claim for breach of the Sequent Agreement plainly inhibits the flow of services, talent and ideas in violation of public policy.  <u>See Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.</u>, 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004); <u>Reed, Roberts Assocs., Inc. v. Strauman</u>, 353 N.E.2d 590, 592 (N.Y. 1976).

SCO also argues that "contractual restrictions against disclosure of trade secrets, proprietary and confidential information, and derivatives of such material are enforceable".  (Opp'n at 122-25.)  That may be true, at least if the restrictions are reasonable, but it is beside the point.  The problem with SCO's theory is not that it imposes contractual restrictions against the disclosure of trade secrets, proprietary and confidential information, and derivatives of such material, but that it seeks to do so by controlling the employment and employability of a significant sector of the computer industry.  Moreover, as much as SCO seeks to obscure the point, this dispute is not about IBM's disclosure of "SCO's invaluable confidential information"

31

(Opp'n at 124); it is about IBM's alleged disclosure of its own information and IBM's employment of its own skilled programmers.

Finally, SCO claims that New York courts have a "strong reluctance" to decline to enforce a contract on public policy grounds. (Opp'n at 125.) But the cases on which SCO relies do not support this proposition.[14] And numerous cases have refused to enforce theories of breach no more offensive of public policy than the theory under which SCO seeks to control the employment and employability of anyone who ever worked on Dynix. See, e.g., Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4, 6 (N.Y. 1977) (holding unenforceable a restrictive covenant requiring that an employee "not divulge any other information that he has or shall have acquired during his period of employment" because it did "no more than baldly restrain competition") (internal citations omitted).[15] If the cases reveal any judicial reluctance, it

---

[14] SCO's cases are inapposite. See Slayko v. Sec. Mut. Ins. Co., 774 N.E.2d 208, 212 (N.Y. 2002) ("[W]e are reluctant to inhibit freedom of contract by finding insurance policy clauses violative of public policy".); New England Mut. Life Ins. Co. v. Caruso, 535 N.E.2d 270, 273 (N.Y. 1989) (Contracts "are unenforceable only when statute or public policy dictates that the interest in freedom to contract is outweighed by an overriding interest of society".); Wechsler v. Hunt Health Sys., 216 F. Supp. 2d 347, 354 (S.D.N.Y. 2002) (discussing the doctrine of illegality); Chase Manhattan Bank v. New Hampshire Ins. Co., 193 Misc. 2d 580, 593, 749 N.Y.S.2d 632, 642 (N.Y. Sup. Ct. 2002) (discussing the "doctrine that an insured may not recover under an insurance policy for a nonfortuitous loss").

[15] See also Stanley Tulchin Assocs., Inc. v. Vignola, 587 N.Y.S.2d 761, 762 (App. Div. 1992) (holding unenforceable that portion of a restrictive covenant requiring the employee to treat the "'Know- How' he gained as an employee as confidential and . . . neither use nor disclose such 'Know-How' to third parties for a period of three years after his employment"); Reed, Roberts, 353 N.E.2d at 594 (holding a restrictive covenant unenforceable where "[a] contrary holding would make . . . specialists in certain aspects of an enterprise virtual hostages of their employers"); Restatement (Third) of Unfair Competition § 41 cmt. a (2006) ("[A] nondisclosure agreement that encompasses information that is generally known or in which the promisee has no protectable interest, such as a former employee's promise not to use information that is part of the employee's general skill and training (see § 42, Comment d), may be unenforceable as an unreasonable restraint of trade.").

is to enforce the very kind of overreaching on which SCO's claims are based.  See, e.g., Marietta Corp. v. Fairhurst, 754 N.Y.S.2d 62, 66-67 (App. Div. 2003) (stating that "the doctrine of inevitable disclosure is disfavored" and that "the proponent should not be permitted to make an end-run around the [confidentiality] agreement by asserting the doctrine of inevitable disclosure as an independent basis for relief"); see also Reed, Roberts Assocs., 353 N.E.2d at 593; EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999) (the inevitable disclosure doctrine "treads an exceedingly narrow path through judicially disfavored territory" and "its application is fraught with hazards"); PSC, Inc. v. Reiss, 111 F. Supp. 2d 252, 257 (W.D.N.Y. 2000) ("Restrictive covenants limiting an employee's ability to work in his chosen field are not favored by the courts."); Colonize.Com, Inc. v. Perlow, No. 03-466, 2003 WL 24256576 at * 6 (N.D.N.Y. Oct. 23, 2003) ("The doctrine of inevitable disclosure is disfavored in New York because of the State's strong public policy against restrictive non-competition agreements.") (Addendum J hereto); L-3 Commc'ns Corp. v. Kelly, No. 05-14971, 809 N.Y.S.2d 482, 2005 WL 3304130, at *5  (Sup. Ct. Aug. 18, 2005) (stating that "a former employee's knowledge of the intricacies of a former employer's business operation is not a protectable interest sufficient to justify enjoining an employee from utilizing his knowledge and talents in an area") (Addendum K hereto).[16]

---

[16] While SCO does not retreat from most offensive features of its theory (e.g., it continues to claim that IBM breached the Agreements simply by allowing former Dynix programmers to work on Linux or AIX, irrespective of whether those programmers disclosed any confidential material), it effectively acknowledges that its claim about experience and know-how have no support in the Agreements.  (Opp'n at 124 n.9.)

4.   SCO's Theory Leads to an Absurd Result.

Finally, as explained in IBM's opening papers, SCO's theory, if accepted, would have

far-reaching negative implications.  For example:

- If SCO had the right to control all software into which some UNIX System V code was ever included, then it would have extraordinary control over vast quantities of others' property, indeed, the entire software industry.  (K Br. ¶ 284)

- Even where the code, methods and concepts of UNIX System V software are no longer confidential, which is the case (K Br. ¶¶ 96-106; DJ Opp'n ¶ 24), SCO would have the right to control the original works of its licensees.  (K Br. ¶ 285.)

- If SCO had the right to control the code, methods and concepts of all flavors of UNIX, the owners of those products would be limited in their ability to support or even market them.  (K Br. ¶ 286.)

An additional example of the absurdity of SCO's claim appears in Addendum E.

While SCO devotes seven pages to arguing that "the scope of the Agreements has always

been reasonable", it nowhere disputes the implications of its claims.  (See Opp'n at 126-32.)

Those implications by themselves, which must be deemed admitted, are fatal to SCO's claims.

No reasonable juror could find that AT&T would have insisted upon, and IBM and Sequent

would have agreed to, terms imbuing AT&T with the power forever to control the original works

of IBM and Sequent and to limit the employability of the IBM and Sequent software engineers

who were exposed to their own original works.[17]

---

[17] SCO acknowledges that its theory, if accepted, would limit a licensee's ability to support and market its products.  (Opp'n at 133 n.10.)  SCO's only justification is to state that disclosures necessary to support and market a licensee's product would not constitute a "material breach" of the Agreements.  (Id.)  Thus, by its own lights, SCO's theory turns on the proposition that the very agreements that allow IBM and Sequent to create UNIX products preclude them from supporting or marketing those products without being in at least technical violation of AT&T's rights.  Again, a reasonable jury could not adopt such an interpretation.

SCO claims that (1) "UNIX provided a valuable head-start for licensees"; (2) the parties had commercial interests regarding UNIX; and (3) "AT&T's UNIX licenses made good economic sense". (Opp'n at 126-32.)  However, these assertions are either unsupported by admissible evidence or are immaterial, as they simply talk past the proposition to which they purportedly respond.  SCO's arguments about reasonableness are based almost entirely on the rebuttal report of its proposed expert Gary Pisano (SCO Ex. 286), which SCO cites in the guise of responding to the testimony of IBM expert, Dr. Robert Willig.  However, IBM does not rely on Dr. Willig (who is an economist) to demonstrate the absurdity of SCO's claims on summary judgment, precluding SCO's use of Dr. Pisano's rebuttal testimony.[18]  More importantly, Dr. Pisano's testimony is inadmissible under Fed. R. Evid. 702.  Under the pretext of offering expert testimony, Dr. Pisano merely (1) narrates SCO's version of the events surrounding execution of the Agreements (Opp'n ¶¶ 30-62; SCO Ex. 286 at 80-85), which is not expert testimony but fact testimony not based on personal knowledge, TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 731-732 (10th Cir. 1993);[19] and (2) offers his interpretation of the Agreements (e.g., Opp'n at

---

[18] IBM cited Dr. Willig's report (IBM Ex. 283) for descriptions of original works by IBM and Sequent (K Br. ¶¶ 80-81, 291-292) and the fact of IBM's and Sequent's investments in their own operating systems.  (K Br. ¶ 289.)  While Dr. Willig did offer opinions relating to the economic consequences of SCO's claims, IBM did not rely on those opinions anywhere in its opening memorandum.

[19] See also Beck's Office Furniture and Supplies, Inc. v. Haworth, Inc., Nos. 95-4018, 95-4029, 94 F.3d 655, 1996 WL 466673, at *7 (10th Cir. Aug. 16, 1996) (Addendum L hereto); Israel v. Springs Indus., Inc., No. 98-5106, 2006 U.S. Dist. LEXIS 80863 at *48-49, 53 (E.D.N.Y. Nov. 3, 2006) (Addendum M hereto); Connolly v. Harris Trust Co. of Cal., 241 B.R. 729, 742-743. (D. Colo. Nov. 24, 1999); Stover v. Eagle Prods., No. 93-4047, 1996 U.S. Dist. LEXIS 4893 at *32-33 (D. Kan. Mar. 19, 1996) (Addendum N hereto).

131; SCO Ex. 286 at 85-87), which is improper opinion testimony, see Peck v. Horrocks Eng'rs Inc., 106 F.3d 949, 955 (10th Cir. 1997).[20]

    D.    In Any Case, SCO's Claims Fail on the Evidence, Which SCO Ignores.

Finally, as stated at the outset, SCO's 40-plus pages of argument make essentially no mention of the specific material IBM is alleged to have misused. The omission is telling, since consideration of the material at issue lays bare the truly extraordinary nature of SCO's contract claims. To accept SCO's interpretation of the Agreements, the Court would have to conclude that IBM, Sequent and thousands of other UNIX licensees each voluntarily agreed to unleash a virus on the computing world. That virus, in the form of UNIX System V, infected and forever contaminated everything it touched. Thus, if a company like Sequent wrote an entirely original work such as RCU (one of the four categories of misused material that remains in the case), without reference to UNIX System V, and then placed RCU in an operating system that contained UNIX System V code (Dynix/ptx), RCU would be forever infected, and Sequent would lose the ability to use that original work freely (despite owning, and having patented, it). Indeed, the virus would have to be so pervasive that it infected original work that was not even intended for use with UNIX System V. IBM's JFS technology (one of the other categories of allegedly misused material) was created for IBM's OS/2 operating system, not AIX, but under SCO's theory when IBM took that technology out of OS/2 and contributed it both to Linux and

---

[20] SCO spends more than a page attacking the opinions of Dr. Willig. (Opp'n at 131-32.) But, as stated, IBM does not on this motion rely on the opinions of Dr. Willig to which Dr. Pisano responds and thus we do not dwell on defending Dr. Willig's opinions here. Suffice to say that SCO's criticisms are misplaced; they are based largely on misstatements of Dr. Willig's testimony and distortions of the record.

to AIX, it too became infected and IBM lost the ability to use the JFS technology as it wished. And the viral quality of UNIX System V would not be limited to code used in an operating system. IBM's Linux Test Project ("LTP") (another category of allegedly misused material) is not even operating system code; rather, it is software completely separate from the operating system that tests the performance of the operating system. In SCO's view, once used to test an operating system that contains UNIX System V (Dynix), it too became infected and forever compromised. But SCO's theory doesn't end there — even the programmers who were exposed to Dynix, and thereby gained general operating system experience or "negative know how" (the last category of allegedly misused material) were supposedly infected and lost the ability to work on other operating systems.

SCO's claims fail for reasons applicable to all of the allegedly misused materials and for reasons applicable to each of the individual categories of allegedly misused material, which are discussed in turn.

1.     Flaws Relating to *All* the Allegedly Misused Material.

As SCO concedes, its claims turn on the proposition that the allegedly misused material is a modification or derivative work of UNIX System V. This proposition is untenable for at least three reasons applicable to all of the allegedly misused material.

First, as stated in IBM's opening brief: (1) none of the material IBM is alleged to have misused is, or contains, UNIX System V code, methods or concepts, or is, or contains, a modification or derivative work of UNIX System V (K Br. ¶ 237); (2) all of the material IBM is alleged to have misused is original IBM work, or the work of third parties other than SCO and independent of UNIX System V (K Br. ¶ 238); (3) none of the AIX or Dynix material that IBM

37

is alleged to have misused was written by referencing UNIX System V (K Br. ¶ 239); (4) none of the individuals identified by SCO as having been involved with the allegedly improper disclosures referred to or otherwise used non-public UNIX System V source code, methods or concepts in making the challenged Linux contributions (K Br. ¶¶ 240-41); and (5) in making the challenged contributions, the alleged wrongdoers identified by SCO relied on their own creativity and general experience (K Br. ¶ 242). Nowhere in its opposition papers does SCO controvert these facts with admissible evidence, as illustrated in Addendum A. They are, therefore, deemed admitted and dispose of SCO's claims.

Second, even if (contrary to fact) IBM did not own and/or hold copyrights in the allegedly misused material, and SCO somehow acquired rights to that material, SCO gave up any intellectual property rights it had in the allegedly misused material. It is undisputed that SCO Linux 4.0, SCO's UnitedLinux product, included the very code and technologies that SCO claims IBM improperly contributed to Linux. (K Br. ¶ 158.) As further discussed in IBM's other briefs, which we incorporate by reference, to the extent SCO had any intellectual property rights in that product, it assigned them to UnitedLinux (with exceptions not relevant here). (DJ Br. ¶¶ 302-08.)

SECTION REDACTED

Thus, any intellectual property right SCO had in the allegedly misused material was assigned by it to UnitedLinux and cannot form the basis of SCO's claims here.

38

Third, any alleged breach based on the allegedly misused material is immaterial and therefore not actionable, as is further discussed in IBM's opening papers. (AIX Br. at 24-26.) SCO concedes that its claims cannot be based upon an immaterial breach of the Agreements. (Opp'n at 175.) Under New York law, a breach of contract is immaterial unless it "go[es] to the root of the agreement between the parties", and "is so substantial that it defeats the object of the parties in making the contract". Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997) (internal quotations marks omitted). Even if (contrary to fact) the disclosure of IBM's own original works constituted a breach of the Agreements, that breach could not possibly be said to go to the root of the Agreements. The purpose of the Agreements' disclosure provision was to protect the confidentiality of any trade secrets embodied in the UNIX software (K Br. ¶ 28), not the confidentiality of the original works of third parties like IBM. Moreover, the allegedly misused material represents a trivial portion of AIX and Dynix. (K Br. ¶¶ 77-78.) It would be particularly nonsensical to hold that the disclosure of trivial portions of original IBM works constitutes a material breach where, as here, there are (by SCO's own admission) no longer any trade secrets in UNIX System V. (K Br. ¶ 175.)[21]

_____

[21] As further discussed above, SCO's reading of the Agreements would lead to patently absurd results. Under the Agreements, once any UNIX System V material "becomes available without restriction to the general public by acts not attributable to [IBM]" the Agreements' confidentiality restrictions no longer apply. (IBM Ex. 492 § 7.06(a); IBM Ex. 119 § 7.06(a).) If the confidentiality provision applied to IBM's homegrown material, this safe-harbor could never apply, because IBM's own products could not become "available without restriction to the general public" except by acts "attributable to [IBM]". (Id.)

SECTION REDACTED

2.     Flaws Specific to Each Category of Allegedly Misused Material.

Entirely independent of the flaws applicable to all of the allegedly misused material, SCO's claims fail for reasons specific to each of the four categories of allegedly misused material, which we discuss in turn based on the claim to which it relates, each of which is summarized in Addendum F.

a.     SCO's Claim as to the IBM Agreement (Count 1).

SCO's claim for breach of the IBM Software Agreement depends entirely on one of the four remaining categories of allegedly misused material, IBM's JFS contribution. (See Item 1 of SCO's Final Disclosures (IBM Ex. 54).) Thus, if SCO cannot establish a breach of the IBM Software Agreement based on its JFS contribution, then IBM is entitled to summary judgment based on SCO's claim for breach of the IBM Software Agreement.

SCO's contract claim relating to the JFS contribution turns on the proposition that the JFS contribution came from IBM's AIX product. However, the JFS contribution did not come from AIX. While the JFS contribution is similar to code in AIX, it actually came from IBM's OS/2 operating system, to which SCO has never claimed to have rights and in which SCO has no rights. (IBM Ex. 168 ¶¶ 4-5, 7.)

SCO relies entirely on the report of its proposed expert witness, Dr. Ivie, in an effort to show that the JFS contribution came from AIX. (See Addendum A ¶¶ 248-50.) However, the portion of Dr. Ivie's report on which SCO relies concerns material that was not specifically identified in SCO's Final Disclosures and was stricken by Magistrate Judge Wells' order of December 26, 2006. (IBM Ex. 67 at 9; IBM Ex. 621.) On this basis alone, IBM is entitled to summary judgment.

40

Even if the cited portion of Dr. Ivie's report had not been stricken, it would be insufficient to create a fact question. Putting aside whether the origin of the JFS contribution is an appropriate subject for expert testimony, Dr. Ivie's opinion is inadmissible under Fed. R. Evid. 702, as it is based entirely on a similarity between the JFS contribution and certain code in AIX. (See SCO Ex. 277 ¶¶ 94-122.) Any such similarity is unsurprising and does not permit the conclusion that the JFS contribution came from AIX, since the JFS contribution is identical to code in OS/2. (IBM Ex. 168 ¶¶ 4-5.) And the JFS contribution is similar to code in AIX because the same OS/2 code that IBM contributed to Linux for JFS was also incorporated into AIX. (IBM Ex. 168 ¶ 5.)

SECTION REDACTED

Further, the supposed comparisons between AIX code and Linux code upon which Dr. Ivie relies are of no evidentiary significance. Some of the code comparisons on their face appear to show that the AIX code was created after the Linux code to which it is compared. A work cannot be derived from another if it was created before the other.

SECTION REDACTED Thus, with respect to these files, either (1) SCO's code comparisons do not show evidence of derivation from AIX or (2) they are not authentic. Either way, SCO's evidence is insufficient to oppose summary judgment.

b.   SCO's Claim as to the Sequent Agreement (Count 3).

SCO's claim for breach of the Sequent Software Agreement depends on the three remaining categories of allegedly misused material: (1) IBM's RCU contribution (see Item 2 of

SCO's Final Disclosures); (2) IBM's LTP contribution (see Items 113-42 of SCO's Final Disclosures); and (3) general operating system experience or "negative know how" (see Items 23, 43, 90, 94 and 186-92 of SCO's Final Disclosures).  (IBM Ex. 54.)  In addition to the fact that none of this material (like the JFS contribution) is a modification or derivative work of UNIX System V,[22] in addition to the fact that SCO transferred any intellectual property rights it had in the material to UnitedLinux, and in addition to the fact that any breach relating to this material would be immaterial, SCO's claim relating to the allegedly misused material at issue fails for the following additional reasons:

First, as is discussed in Section IV below, any claim relating to IBM's RCU contribution is barred by the statute of limitations.  The statute of limitations relating to SCO's contract claims is six years.  Sequent publicly disclosed RCU in a 1993 patent application that was issued in 1995, more than six years prior to March 2003 when SCO filed its complaint.  (K Br. at 111-113.)  For this reason alone, IBM is entitled to summary judgment on SCO's claim relating to RCU.

Second, SCO's claim with respect to the LTP contribution (Items 113-142) turns on the proposition that it comes from Sequent's Dynix product.  If it did not, SCO's claim as to the LTP contribution fails, just as its claim relating to the JFS contribution fails.  As stated in IBM's opening papers, its LTP contribution did not come from Dynix.  (K Br. ¶ 267.)  SCO relies on the report of one of its proposed experts, Mr. Rochkind, to show otherwise.  (Addendum A ¶

---

[22] Even if IBM had not shown that this material is not a modification or derivative work of UNIX System V (as discussed above), SCO would be precluded from showing otherwise. Despite numerous Court orders requiring SCO to demonstrate a link between the allegedly misused material and UNIX System V, SCO failed to do so, as illustrated in Addendum G.

267.) However, Mr. Rochkind's testimony does not create a fact question as to the origin of the LTP contribution.

## SECTION REDACTED

However, SCO draws no connection between the testing technology referred to in the email and the LTP technology cited in Items 113-142.  Indeed, the testing technology referred to in the email (Direct I/O) is not the same as that cited in Items 113-142 (system calls).[23]  Additionally, Mr. Rochkind's deposition confirms that he has no basis for claiming that Items 113-142 were part of the Dynix operating system.

## SECTION REDACTED

This admission alone is sufficient to establish that Mr. Rochkind has no basis for claiming that the testing technologies were part of the Dynix operating system.

## SECTION REDACTED

For example, a dynamometer may be used to test an engine's

---

[23] In fact, the email Mr. Rochkind refers to is the basis of a separate Item (Item 182) that has been precluded due to its lack of specificity.  (See IBM Ex. 59 at 36-38.)  SCO cannot rely on this Item for any purpose, much less for the purpose of attempting to establish that entirely different Items were part of Dynix.

43

horsepower, but that would not make it part of the engine (or the car) even if horsepower testing was "used to develop" the engine.

Third, and finally, with respect to the SCO items concerning general operating system experience or "negative know how" — which, in the context of a discovery dispute, Magistrate Judge Wells referred to as "quite a tenuous position" (IBM Ex. 59 at 36) — SCO effectively concedes it has no claim. Not only does it fail to identify a single provision of a Sequent/AT&T Agreement (or any other agreement, for that matter) that would support a claim for this material, but also it fails to offer any evidence in support of its response to IBM's statement of undisputed facts. (See Addendum A ¶¶ 268-276.) Specifically, SCO offers no evidence to controvert IBM's showing that the allegedly misused "negative know-how" and the contributions by the programmers allegedly "exposed" to Dynix/ptx were original Sequent works created independent of UNIX System V. (Id. ¶ 269.) Nor does SCO offer any evidence to controvert IBM's showing that the programmers allegedly making these disclosures either (a) did not make any contributions to the files or directories listed, or (b) did not base their contributions to the listed files or directories on UNIX System V or refer to UNIX System V in making the challenged contributions.[24] (Id. ¶ 273.)

_____

[24] Moreover, SCO expressly admits with respect to many of the items that (1) in some cases, the programmers allegedly making the disclosures did not have experience in Dynix in the particular technology area cited by SCO (Addendum A ¶ 274); (2) in some cases, the cited technology did not even exist in Dynix (id. ¶ 275); and (3) in some cases, the programmers allegedly making the disclosure testified that the allegedly misused material "had nothing to do with Dynix/ptx" or SCO's own expert agrees that the alleged disclosure "is a technique that may have been discoverable outside of IBM" (id. ¶ 276).

## II.   SCO IS ESTOPPED FROM PURSUING ITS THEORY OF BREACH.

Even if SCO's reading of the Agreements were correct — and it is not — SCO is estopped from pursuing any claim based on that theory.

For almost two decades, AT&T and its successors represented to their licensees, including IBM and Sequent, that they could do as they wished with their own works, so long as they did not disclose any original UNIX software. (K Br. ¶¶ 82-88, 119, 143.) AT&T's licensees, including IBM and Sequent, took AT&T and its successors at their word and publicly disclosed their original works — without objection from AT&T or its successors. (K Br. ¶¶ 90, 120-23, 144-45.) IBM and Sequent reasonably relied to their detriment on the statements and conduct of AT&T and its successors, and built their businesses believing that they could do as they wished with their original works. (K Br. ¶¶ 73-75, 79, 94-95, 125-27, 148-50.) No one could dispute that IBM would suffer severe prejudice if it were forced suddenly to stop those businesses in their tracks. (K Br. ¶¶ 289-94.)

In its opposition papers, SCO argues that "New York law does not support IBM's estoppel argument" and that "IBM's estoppel argument is based on sharply disputed facts". (Opp'n at 133-51.) But neither assertion bears scrutiny. Nothing in SCO's opposition papers justifies denying IBM's motion for summary judgment on estoppel.

### A.   New York Law Supports a Finding of Estoppel.

SCO does not (and could not) dispute that grounds for estoppel exist where (1) a party undertakes a course of action that defines its position with regard to a contractual provision; (2) the opposing party acts in reliance on that position; and (3) the opposing party would suffer damages should the initial party seek to assert a contrary position to the one already taken. See

Nassau Trust Co. v. Montrose Concrete Prods. Corp., 436 N.E.2d 1265, 1269-70 (N.Y. 1982);

N.Y. State Guernsey Breeders' Co-op v. Noyes, 22 N.Y.S.2d 132, 139 (App. Div. 1940).[25]

Rather, SCO seeks to avoid summary judgment on the general grounds that estoppel is
"an inherently fact-specific issue" and on a handful of specific arguments about New York law.
(Opp'n at 133.)  While estoppel is not always appropriate for summary adjudication, there is no
question that where, as here, no genuine issue exists as to any material fact, estoppel can (and
should) be decided on summary judgment.  See, e.g., Zack v. 3000 East Condo. Ass'n, 762
N.Y.S.2d 459, 460-61 (App Div. 2003) (upholding trial court's conclusion at summary judgment
stage that plaintiff was estopped from pursuing claim); Johnson v. Flowers, No. 05-71937, 2006
WL 212022 at *6 (E.D. Mich. Jan. 27, 2006) (granting summary judgment on estoppel claim)
(Addendum O hereto); Scholle Corp. v. Blackhawk Molding Co., Inc., 133 F.3d 1469, 1471
(Fed. Cir. 1998) (upholding grant of summary judgment on defendant's equitable estoppel claim
in patent infringement case where plaintiff knew of alleged patent infringement and did not
assert rights).[26]  The specific arguments that SCO makes about New York law are similarly
unavailing.

---

[25] See also McManus v. Board of Educ. of Hempstead Union Free School Dist., 661 N.E.2d
984, 985-86 (N.Y. 1995) (Estoppel is a bar that "precludes a party from denying a certain [] state
of facts exists to the detriment of another party who was entitled to rely on such facts and had
acted accordingly"); Sassower v. Barone, 447 N.Y.S.2d 966, 971 (App. Div. 1982) ("The
doctrine of equitable estoppel 'prohibits a person, upon principles of honesty and fair and open
dealing, from asserting rights, the enforcement of which would, through his omissions or
commissions, work fraud and injustice.'") (quoting Rothschild v. Title Guar. & Trust Co., 97
N.E. 879 (N.Y. 1912)).

[26] None of SCO's cases holds that estoppel cannot be decided at the summary judgment
phase.  Indeed, one of them, Bennett v. U.S. Lines, Inc., 64 F.3d 62, 65 (2d Cir. 1995), actually
enters a finding of estoppel based on the facts at the summary judgment phase.  The other two
cases simply found issues of material fact in dispute.  See Dunlop-McCullen v. Pascarella, No.

46

1.      Integration Clause.

SCO first argues that New York law forbids a finding of estoppel because the Agreements include an integration clause.  (Opp'n at 135-38.)  According to SCO, the integration clause bars consideration of statements made by AT&T representatives concerning the Agreements, precludes a finding that IBM reasonably relied on any such statements and raises an issue of material fact as to the intent of AT&T with respect to any such statements. (Id.)  SCO is wrong.

Contrary to SCO's suggestion, IBM's estoppel defense is not based solely on statements made by AT&T.  (K Br. ¶¶ 83-95, 143, 199.)  Nor is it even based solely on statements.  (K Br. ¶¶ 93, 124, 146.)  SCO is estopped from asserting its theory of breach based on the statements and conduct of AT&T and its successors over the course of nearly two decades.  Moreover, the integration clause pertains only to statements made prior to execution of the Agreements and to changes or additions to the Agreements.  (IBM Ex. 119 ¶ 4; IBM Ex. 492 ¶ 4.)  SCO is estopped from pursuing its theory of breach without regard to statements made prior to execution of the Agreements or to changes or additions to them.  To the extent SCO argues that the integration clause bars the Court from considering any of the statements that AT&T and its successors made during the years that followed execution of the Agreements, SCO misconstrues the provision. By its terms, the integration clause relates to statements made prior to execution of the

_____

97-0195, 2002 WL 31521012, at *15 (S.D.N.Y. Nov. 13, 2002) (holding that the "issues raised . . . raise questions of material fact that cannot be resolved" in a summary judgment motion) (Addendum P hereto); Besicorp Group, Inc. v. Enowitz, 652 N.Y.S.2d 366, 369 (App. Div. 1997) (finding that issues of material fact prevented dismissal of an estoppel claim at the summary judgment phase).

Agreements, as it is focused on "prior discussions". (IBM Ex. 119 ¶ 4; IBM Ex. 492 ¶ 4.)  In

any case, the UnitedLinux agreements fully satisfy the integration clauses.  Under those

agreements, as stated, SCO transferred its intellectual property rights in the Disputed Code to

UnitedLinux.  The Agreements, which foreclose SCO's claims without regard to any of the other

arguments raised in IBM's motion, were in writing and signed by SCO.[27]

    None of the cases on which SCO relies supports the proposition that the integration

clause bars a finding of estoppel.  Putting aside the fact that most of the cases do not even relate

to equitable estoppel, not a single one of them holds that statements and/or conduct following the

execution of an agreement cannot be used to support a finding of estoppel just because the

agreement contains an integration clause.[28]  Notwithstanding the presence of an integration

---

[27] In addition, the publication, circulated by AT&T to all its UNIX licensees a few months after the Agreements were executed, clearly stated that the UNIX licenses did not cover homegrown materials. (K Br. ¶¶ 64-68.)

[28] More specifically, five of the eight cases SCO cites do not relate to equitable estoppel. See Brock v. Baskin Robbins, USA, Co., No. 99-274, 2003 WL 21309428 (E.D. Tex. Jan. 17, 2003) (relating to promissory estoppel and in any event, not applying New York law) (Addendum Q hereto); Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989) (relating to promissory estoppel); Automatic Sys. Developers, Inc. v. Sabratek Corp., No. 93-7149, 1993 WL 535670, at *2 (S.D.N.Y. Dec. 22, 1993) (relating to an alleged oral agreement) (Addendum R hereto); Thayer v. Dial Indus. Sales, Inc., 85 F. Supp. 2d 263, 271 (S.D.N.Y. 2000) (relating to promissory estoppel); Int'l Bus. Machs. Corp. v. Medlantic Healthcare Grp., 708 F. Supp. 417, 423-24 (D.D.C. 1989) (relating to the parol evidence rule). Two of the cases relate to statements made prior to signing the written agreements. See Holloway v. King, 161 Fed. Appx. 122, 125 (2nd Cir. 2005) (concerning oral statements made during negotiations, and in any event, not considering the integration clause in denying the estoppel claim) (Addendum S hereto); Medlantic Healthcare Grp., 708 F. Supp. at 423-24 (holding that the parol evidence rule barred admission of evidence pertaining to oral representations made prior to signing the written agreements). One of the cases, Towne Gardens, Ltd. v. McDonald's Corp., No. 04-292, 2005 WL 2406004 (W.D.N.Y. Sept. 29, 2005), examines reliance on a writing made subsequent to signing the agreement in the context of waiver, not estoppel (Addendum T hereto). The last case SCO cites, Gebbia v. Toronto-Dominion Bank, 762 N.Y.S.2d 38, 38 (App. Div. 2003), does not discuss the facts of the case. The trial court opinion, however, shows that the plaintiff attempted to enforce an oral agreement that was made prior to execution of an integrated agreement which also contained a provision

clause, a party's statements and conduct after execution of an agreement can give rise to a finding of estoppel. See Rose v. Spa Realty Assocs., 366 N.E.2d 1279, 1283 (N.Y. 1977) (finding defendant was estopped from relying upon an integration clause and statute proscribing oral modifications where plaintiff had relied upon his oral modification); Imperator Realty Co. v. Tull, 127 N.E. 263, 265 (N.Y. 1920) (holding that defendant was estopped from arguing plaintiff rescinded an agreement when he failed to comply with terms of an integrated agreement because of defendant's statement that compliance was unnecessary, and noting that the principle of estoppel applies to integrated agreements); Gray v. Met Contracting Corp., 167 N.Y.S.2d 498, 501 (App. Div. 1957) (allowing an estoppel defense to lie despite an integration clause and statute requiring that changes to agreement be made in writing, and noting that "such an estoppel would not be in conflict with [the statute of frauds] since it would not constitute an oral modification of a written contract, but the application of an ancient equitable principle whereby a person whose conduct had induced reliance thereon may not thereafter bring an action which is inconsistent with that conduct"); Kurzman v. Graham, 817 N.Y.S.2d 888, 892 (Sup. Ct. 2006) (holding that plaintiff was estopped from asserting contractual provision of agreement that contained an integration clause barring oral modifications where defendant relied upon plaintiff's oral assurances).

2.     SCO's Predecessors in Interest.

SCO also argues that it is not bound by statements of AT&T, USL and Novell because "equitable estoppel is binding on a successor in interest only when it 'knew of the existence of

---

directly contradicting the terms of the oral agreement.  Gebbia v. Toronto-Dominion Bank, No. 604862/00 at 8-10 (N.Y. Sup. Ct. June 24, 2002) (Addendum U hereto).

the facts which operate as a bar to the claim of the grantor'". (Opp'n at 138-39.) However, successors in interest inherit their predecessors' legal positions. See, e.g., Brighton Operating Corp. v. Morrison, 29 N.Y.S.2d 97, 98 (App Div. 1941) (holding that plaintiff must continue to pay defendant the same interest that its predecessor had paid); RGH Liquidating Trust v. Reliance Group Holdings, Inc., No. 600057/2006, 2006 WL 2872525, at *5 (N.Y. Sup. Ct. Sept. 27, 2006) (holding that successors in interest are bound by their predecessors' legal positions) (Addendum.V hereto); Secured Equities Invs., Inc. v. McFarland, 753 N.Y.S.2d 264, 266 (App. Div. 2002) (holding that plaintiff was estopped from asserting a contrary position to that asserted by its predecessor-in-interest in a prior proceeding); In re Edwards' Will, 92 N.Y.S.2d 780, 788 (Surr. Ct. 1949) (holding that "[a]ny basis for estoppel must be equitable in respect to the persons against whom it is claimed or their predecessor in interest" (emphasis added).)

Contrary to SCO's contention, it acquired from its alleged predecessor in interest no greater rights than those held by the predecessor to the UNIX assets. If its alleged predecessors' statements and conduct rendered them unable to pursue a certain claim, then SCO's acquisition of that claim could not have vested in SCO the right to enforce it. Likewise, if SCO's predecessors in interest conducted themselves to eliminate or limit their rights to assert the claim, then SCO could not by acquiring the claim revive those extinguished rights. That SCO allegedly had no knowledge of its predecessors' conduct is "unimportant", to borrow the words of the court in Dymo Industries, which rejected precisely the argument SCO makes here in similar circumstances:

> Even though Dymo had no knowledge of the Kind letter [charging infringement] until this suit was filed, it is not relieved of responsibility for the charge of infringement. First, in acquiring Meto's assets including the pending patent,

> Dymo also necessarily acquired no greater property rights than Meto had enjoyed with respect to those assets. If, for example, prior art had rendered Meto unable to enforce a certain patent, Dymo's acquisition of that patent could not have vested in Dymo the right to enforce it. Likewise, if Meto had somehow conducted itself so as to eliminate or limit its rights under a patent, Dymo could not by acquiring the patent revive those extinguished rights. Thus, in acquiring the pending patent, Dymo also acquired the effect that Kind's charge of infringement would have on the pending patent. The nature of estoppel itself also dictates this result. Estoppel is concerned with preventing injury to the deceived defendant. That an assignee of a patent has no knowledge of its predecessor's charge of infringement is unimportant. The significant fact is that the charge, followed by years of silence, misled the defendant.

Dymo Indus., Inc. v. Monarch Marking Sys., Inc., 474 F. Supp. 412, 418-19 (N.D. Tex.

1979) (emphasis added).

Moreover, releasing SCO from the position assumed by its alleged predecessors in interest would violate the fundamental rules of contract law that "an assignee never stands in any better position than his assignor", and that a successor-in-interest is "subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor". Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc., 325 N.E.2d 137, 139 (N.Y. 1975); see also Am. Book Co. v. Yeshiva Univ. Dev. Fund., Inc., 297 N.Y.S.2d 156, 163 (Sup. Ct. 1969) ("the successor in interest to the prior owners step[s] into their shoes, acquiring no greater rights than its predecessors"); I.G. Farben S'holders Org. v. UBS AG, 05-4041, 2006 U.S. Dist. LEXIS 63347, at *26 (E.D.N.Y. Sept. 5, 2006) (a claim "asserted by a successor with no greater right than the predecessor, whose own claim would clearly be invalid, is not 'colorable'") (Addendum W hereto).

The authorities on which SCO relies, which arose in the context of landlord-tenant law, are not to the contrary. They concern the application of principles specific to the conveyance of

real property, which have no relevance here.  See Int'l Chimney Corp. v. 26 W. Spring St. Assocs., 561 N.Y.S.2d 933, 934-35 (App. Div. 1990) (examining whether subsequent owner of land was estopped from denying existence of lease where predecessor in interest had accepted rent for two years); Holm v. C.M.P. Sheet Metal, Inc., 455 N.Y.S.2d 429 (App. Div. 1982) (same); 57 N.Y. Jur. 2d Estoppel, Ratification & Waiver § 43 (talking about grantees of real property).  Moreover, the court in Chimney affirmed a finding of estoppel, Int'l Chimney Corp., 561 N.Y.S.2d at 934 , and the court in Holm described the doctrine of equitable estoppel in terms that foreclose SCO's theory of breach: "Parties are estopped to deny the reality of the state of things which they have made to appear to exist and upon which others have been made to rely", Holm, 455 N.Y.S.2d at 433.[29]

3.     SCO's Silence and Inaction.

In addition to stating affirmatively that IBM and other UNIX licensees could do as they wished with their original works, AT&T and its successors took no action to disabuse IBM and other UNIX licensees of the notion that they could do as they wished with their original works. Although IBM and other UNIX licensees publicly disclosed their original UNIX code, methods and concepts (K Br. ¶¶ 90, 120-23, 144-45), neither AT&T nor any of its successors advised IBM that it could not do so or took any action to stop it from doing so (K Br. ¶¶ 93, 124, 146). In an effort to avoid this fact, SCO argues that silence or inaction cannot give rise to estoppel

---

[29] Nor is there any merit to SCO's claim that the cases cited in IBM's opening brief support SCO's position because they refer to a party being estopped based on its own conduct.  (SCO Br. at 139 n. 15.)  None of the IBM cases in question dealt with the issue of whether a party is bound by the conduct of its predecessors in interest; the mere fact that they held that a party was bound by its own conduct does not in any way mean it is not bound by the conduct of its predecessors in interest, which as stated above, SCO clearly is.

because it had neither a duty nor an opportunity to speak. (Opp'n at 140.) This argument is meritless.

Neither SCO nor its alleged predecessors in interest was entitled to lie in wait. If they took issue with IBM's and others' use of their original UNIX works, they had a duty to say so. "The duty to speak is not necessarily a legal obligation to do so but is founded upon a sense of justice and fair play invoked by the Courts to compel a man to act when in all good conscience an honest man would have acted". Ryder Truck Rental Inc v. Williamstown Wire and Cable Co., 309 N.Y.S.2d 508, 510 (Sup. Ct. 1970) (holding that plaintiff was estopped from alleging that defendant was in breach of his contract where plaintiff should have notified defendant earlier of the breach); see also Simmons v. Westwood Apts. Co., 261 N.Y.S.2d 736, 740 (Sup. Ct. 1965) (holding that plaintiffs should have taken steps to correct an erroneous deed and were therefore estopped from asserting rights under the deed).

In arguing that it owed no duty to IBM, SCO contradicts its position (in opposition to IBM's motion for summary judgment as to SCO's unfair competition claim) that IBM and SCO owe one another fiduciary duties as a result of Project Monterey. (UC Opp'n at 34-43.) While it is not true that IBM and SCO were fiduciaries, there is no question that a confidential relationship existed between IBM and SCO and its predecessors; that SCO had superior knowledge as to the theory of breach that it now asserts; and that SCO would be unjustly enriched if it were allowed to pursue its theory of breach.

4.    Lack of Knowledge.

Finally, SCO argues that New York law precludes a finding that IBM reasonably relied on any representations AT&T and its successors made about the Agreements because "IBM had

53

full knowledge of their scope and meaning". (Opp'n at 140-41.) However, the only case cited

by SCO, <u>Fashion Bug No. 2100 of Batavia, Inc. v 425 West Main Associates (Batavia) LP</u>, 806

N.Y.S.2d 449 (Sup. Ct. 2005), does not support this proposition. <u>Fashion Bug</u> stands for the

unremarkable proposition that a defendant who knows he is in breach of an agreement cannot

use estoppel as a defense, which has no bearing where, as here, what IBM did not know is not

the terms of the Agreements, but that (as an alleged successor to AT&T), SCO would pursue an

interpretation of them that is contrary to nearly two decades of conduct and representations by

AT&T and its successors.[30]

Here, as elsewhere, SCO's opposition ignores the fact that the doctrine of estoppel is

imposed "to prevent the enforcement of rights which would work fraud or injustice upon the

person against whom enforcement is sought and who, in justifiable reliance upon the opposing

party's words or conduct, has been misled into acting upon the belief that such enforcement

would not be sought." <u>Nassau Trust Co. v. Montrose Concrete Prods. Corp.</u>, 436 N.E.2d 1265,

1269 (N.Y. 1982) . The effect of estoppel is to "foreclose[] one from denying his own expressed

or implied admission which has in good faith and pursuance of its purpose been accepted and

acted upon by another". <u>N.Y. State Guernsey Breeders' Co-op v. Noyes</u>, 22 N.Y.S.2d 132, 139

(App. Div. 1940). <u>See also Besicorp Group Inc. v. Enowitz</u>, 652 N.Y.S.2d 366, 369 (App. Div.

---

[30] SCO further asserts (albeit somewhat out of place) that "Santa Cruz's conduct in 2000 and 2001 with respect to IBM's contributions to Linux is also no basis for an estoppel". (Opp'n at 141.) That is so, says SCO, purporting to cite to the deposition testimony of IBM's Dan Frye, because "[t]he evidence shows that IBM gave SCO's rights no consideration at all". (<u>Id.</u>) But the fact that a single witness was unaware of whether specific consideration was given to SCO's rights is of no moment. Moreover, as stated in IBM's opening brief, independent of SCO's "rights", IBM relied on the representations and conduct of AT&T and its successors, including Santa Cruz and SCO, and their inaction (<u>i.e.,</u> failure to complain or sue) in the face of the very conduct about which SCO now complains. (K Br. ¶¶ 93-95, 289-94.)

1997) (holding that equitable estoppel precludes a party "from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct"); Kearns v. Mfrs. Hanover Trust Co., 272 N.Y.S.2d 535, 541 (Sup Ct. 1966) (same); Town of Ramapo v. Vill. of Spring Valley, 243 N.Y.S.2d 569, 571 (Sup. Ct. 1962) (holding that "estoppel is an ethical concept, enforceable when good conscience and honest dealing require it").

B.      The Material Facts Relating to Estoppel Are Undisputed.

Although SCO contends that the facts supporting IBM's estoppel claim are "sharply disputed" (Opp'n at 143), in fact none of the evidence on which SCO relies controverts the facts IBM sets forth in IBM's opening brief. Thus, SCO fails to raise a genuine issue of material fact, and a grant of summary judgment is appropriate.

1.      The Analysis of SCO's Purported Expert.

SCO first argues that "SCO's expert analysis [i.e., the reply report of SCO's Dr. Pisano] shows that neither IBM nor Sequent had any significant interest in securing the right to use so-called 'homegrown' material however they wanted." (Opp'n at 144.) Thus, SCO says, "[t]he evidence confirms (and easily permits the inference that) IBM and Sequent did not demand the representations from AT&T they say they demanded." (Id.)  SCO goes so far as to claim (incorrectly) that IBM has conceded the admissibility of SCO's expert evidence because one of IBM's experts conducted an economic analysis based on the assumption of ambiguity in the Agreements.  (Id. at 143.)

However, Dr. Pisano's testimony, which purports to divine IBM's and Sequent's intent, is no impediment to the entry of summary judgment.  IBM does not concede the admissibility of

55

Dr. Pisano's analysis.   It is not an appropriate subject of expert testimony and therefore inadmissible under Fed. R. Civ. P. 702.  Moreover, it was disclosed (and is therefore admissible) only as rebuttal to testimony of IBM's Dr. Willig that is not used in support of IBM's motion. (SCO Ex. 286.)  Thus, the evidence set out in IBM's opening brief about its and Sequent's interest in having the right to control their original works is undisputed.  Moreover, whether or not IBM and Sequent had an interest in controlling their own code, the undisputed evidence — utterly ignored by SCO's opposition — shows that IBM and Sequent insisted upon the right to control their original works and representatives of AT&T and its successors repeatedly communicated that they could do so.  (K Br. ¶¶ 38-43, 82-89, 117-120, 146-47.)

SCO also argues that its evidence further shows that "IBM understood that the amendment in its side letter regarding methods and concepts applied only to products into which IBM had <u>not</u> copied UNIX source code and for the development of which IBM had <u>not</u> referred to the UNIX software product".  (Opp'n at 144.)  Not only is there no support for this assertion as to IBM's intent, but also it has nothing to do with whether SCO can reverse course to IBM's detriment after two decades of contrary practice.  Again, SCO's Final Disclosures do not identify a single UNIX system method or concept improperly disclosed by IBM.

    2.   <u>SCO's "Substantial Evidence" Regarding Reliance.</u>

SCO argues that IBM cannot establish reliance on the conduct and representatives of AT&T and its successors because (1) an internal IBM email from February 2000 "directly contradicts, and <u>by</u> <u>itself</u> creates a fact issue regarding IBM's newly minted assertion that it believe [sic] it could disclose at least the 'homegrown' parts of AIX however it saw fit", and (2) "[t]here is substantial evidence providing (and from which a jury could easily infer) that no

56

representations were made to IBM that it was permitted to disclose the 'original' material in AIX". (Opp'n at 144-147.) Here again, SCO's assertions cannot be reconciled with the evidence.

As is plain on the face of Mr. Sandve's email, it does not in any way indicate that IBM did not rely on the representations of AT&T and its successors that UNIX licensees could do as they wished with their original works. As SCO is well aware, Mr. Sandve's email refers to AIX/Monterey source code as a whole, which includes some UNIX System V source code; it does not refer to the original IBM components of AIX, independent of AT&T UNIX System V code. Mr. Sandve's email makes that clear in stating that Sun can proceed differently with respect to its Solaris product because it acquired additional rights to disclose UNIX System V source code (i.e., the primary source code rights for their OS base).[31] Moreover, Mr. Sandve has provided documents and unequivocal testimony about the nature and scope of IBM's reliance (K Br. ¶¶ 289-94), which SCO does not even attempt to controvert, and IBM's reliance is therefore deemed admitted. See DUCivR 56-1(c).

SCO's claim that IBM would not have relied on the representations of AT&T and its successors because there were no such representations is equally misguided. In IBM's opening brief, we referred the Court to the sworn testimony of the AT&T, USL, Novell and Santa Cruz individuals who made these representations in the regular course of their employment (K Br. ¶¶ 82-89, 119-21, 146-47) and others who heard them (K Br. ¶¶ 90-91, 125, 148). None of the "evidence" cited by SCO specifically controverts this testimony and does not create a fact

---

[31] Even if (contrary to fact) Mr. Sandve's email indicated a lack of reliance by IBM prior to February 2000, it says nothing about IBM's reliance in the years that followed.

question, as further described in Addendum A. The mere fact that some other AT&T

representative had a different view of the Agreements or did not witness the representations in

question is beside the point. At bottom, SCO's claims that the representations were not made

amount to conjecture that the former AT&T, USL, Novell and Santa Cruz witnesses cited by

IBM are liars. But conjecture cannot defeat a motion for summary judgment. See, e.g., Nat'l

Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 742 (10th Cir. 2004) ("Standing alone, attacks

on the credibility of evidence offered by a summary judgment movant do not warrant denial of a

summary judgment motion."); Willis v. Harrah's Illinois Corp., No. 98-2655, 1999 WL 313755,

*3 (7th Cir. May 9, 1999) (holding that plaintiff "could not establish the existence of a genuine

issue of material fact simply by 'calling everyone else a liar'") (Addendum X hereto).[32]

       3.     Amendment X.

SCO further contends that Amendment X defeats IBM's showing of reliance. (Opp'n at

147.) According to SCO, "[i]f IBM actually believed that it was obligated to hold in confidence

only the licensed UNIX source code, then it would have had no reason to seek relief from that

---

[32] See also Heffernan v. Provident Life & Acc. Ins. Co., 45 F. Supp. 2d 1147, 1149 (D. Kan. 1999) ("[P]laintiff argues that the absence of any supporting documentation raises the inference that Mr. Beebe has lied in his affidavit. Significantly, however, plaintiff has failed to offer any evidence from which a jury could reasonably infer that the facts contained in Mr. Beebe's affidavit do not represent the truth. In the absence of such evidence, the court is left only with plaintiff's speculation that Mr. Beebe's affidavit is untruthful."); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995) ("Hedberg's desired inference, that Pund must have told Knowling of Hedberg's illness before October 12, is not reasonable; it is unsupported speculation. Such speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."); Froid v. Berner, 649 F. Supp. 1418, 1420 (D.N.J. 1986) ("It is not sufficient for plaintiff to merely contend that defendants' affidavits may be untruthful — if that were the sole basis to defeat a motion for summary judgment, then none would ever be granted. In order for plaintiff to be entitled to proceed with discovery, he must present sufficient information to cast doubt upon defendants' factual assertions. Mere suspicion and conjecture are not enough.").

portion of the Side Letter specifying that IBM could not 'refer to the physical documents and material comprising SOFTWARE PRODUCTS' in developing products other than modifications and derivative works." (Id.)  The contention fails, however, because Amendment X provided IBM with additional rights relating to AT&T's Software Products; it did not grant IBM the right to do as it wished with its original works, as IBM already had that right.  (K Br. ¶¶ 37-42, 45, 55.)  There is simply nothing inconsistent about IBM's having the right to freely use its own original works and seeking additional rights to the original works of others.

Nor is there any merit to SCO's further claim that the language in the Side Letter limiting IBM's right to refer to UNIX System V material (which language has since been amended) "factually refutes IBM's argument that it believe [sic] that it was free to 'do as it wished' with any portion of a modification of derivative work that was not the literal UNIX source code." (Opp'n at 147.)  A limitation on IBM's right to refer to UNIX System V code says nothing about its right to use its own original works freely, so long as it satisfies its obligations to keep UNIX System V material confidential.

4.    Other UNIX Flavors.

SCO does not (and could not) dispute that over the last two decades UNIX licensees other than IBM publicly disclosed code, methods and concepts from their UNIX flavors without objection by AT&T or its successors.  Rather, SCO offers a laundry list of arguments, each without merit, as to why these disclosures are irrelevant.

First, SCO argues that IBM "presents no evidence that anyone at Sequent relied on the cited documents or any others for the proposition that IBM or Sequent was entitled to disclose any part of Dynix/ptx to the public".  (Opp'n at 148.)  However, IBM specifically identified

evidence of reliance by IBM and Sequent (which IBM acquired in 1999) in its opening papers. (K Br. ¶¶ 72-81, 95, 127.)  Moreover, the mere fact of the allegedly improper disclosures is adequate evidence of reliance.  Courts routinely infer reliance from the conduct of the party asserting estoppel.  See Forest Labs. Inc. v. Abbott Labs., No. 96-159, 1999 WL 33299123, at *8 (W.D.N.Y. June 23, 1999) (holding that reliance is established where an alleged patent infringer was "lull[ed] into a sense of security" and evidence of such reliance was its "fail[ure] to take affirmative actions to protect itself from an infringement lawsuit") (Addendum Y hereto); Wafer Shave, Inc. v. Gillette Co., 857 F. Supp. 112, 124 (D. Mass. 1993) (same); Thoubboron v. Ford Motor Co., 809 A.2d 1204, 1213 (D.C. 2002) (holding that reliance was proven where party failed to take action in light of opposing party's assurances).

Second, SCO argues that "neither IBM nor Sequent could have reasonably relied on supposed disclosures made from other licensees' UNIX flavors, such as Sun's flavor or HP's flavor, because the terms and conditions governing each UNIX licensee were themselves confidential".  (Opp'n at 148.)  While aspects of AT&T's relationships with its licensees might have been confidential, there is no dispute that all of AT&T's licensees were based on the same form agreement, the relevant terms of which were public knowledge.  (IBM Ex. 190 ¶¶ 10-13, 19-24; IBM Ex. 217 ¶¶ 21-22; IBM Ex. 228 ¶¶ 6-7; IBM Ex. 233 ¶¶ 6-7; IBM Ex. 252 ¶ 10; IBM Ex. 266 ¶ 6; IBM Ex. 275 ¶¶ 10-13, 18-26; IBM Ex. 282 ¶¶ 6, 10-13, 21-26.)  Moreover, AT&T expressly advised IBM that the relevant terms of the Agreements were the same.  (K Br. ¶ 36.)

Third, SCO argues "the content of the documents that IBM cites is not comparable to the content of the IBM disclosures to Linux that SCO challenges, and for that additional reason, the

documents are not basis [sic] for IBM to claim that it reasonably relied on those documents in making its disclosures to Linux from AIX and Dynix/ptx". (Opp'n at 148.)  In fact, the disclosures that support IBM's defense are no different from the alleged disclosures at the heart of SCO's case, as shown in Addendum H.  Indeed, some of them are disclosures from many years ago that SCO and its predecessors ignored for years and that SCO identified in its Final Disclosures but without the required specificity so that SCO is precluded from pursuing them.[33] (IBM Ex. 509; IBM Ex. 510; IBM Ex. 512.)

Fourth, SCO argues that "contemporaneous and subsequent evidence contradicts any claim that IBM relied on such documents for the proposition that it could disclose 'original' parts of AIX in the course of Linux development." (Opp'n at 149.)  According to SCO, the evidence shows that both IBM and Sequent believed they were required to hold AIX and Dynix in confidence under the Agreements.  (Id.)  But at most, the evidence on which SCO relies shows that IBM and Sequent sought to keep AIX and Dynix products, which include some UNIX System V code, confidential.  And whether IBM and Sequent were required to keep AIX and Dynix confidential as a whole (since they included certain UNIX System V code) is different from whether they were required to keep their own original works confidential just because they

---

[33] SCO further argues that "with only one exception, the documents are either confidential documents, patents whose purpose is to prevent the use of the disclosed invention, or materials that are protected by clear copyright language". (Opp'n at 149.)  This argument notwithstanding, all of the documents were public, as most make plain on their face. (See Addendum H.)  One of the two documents SCO mentions in its brief bears a stamp on its cover page from the Cornell University Library (see IBM Ex. 560), and the other has been disclosed nearly 50,000 times according to one online source (see IBM Ex. 508; http://en.wikipedia.org/wiki/IBM_Technical_Disclosure_Bulletin).  Moreover, SCO's Final Disclosures challenge material as misused, despite the fact that it is protected by both patents and copyrights.

might have once been a part of AIX or Dynix. SCO does not contend that IBM disclosed AIX and Dynix, only that it disclosed its own original works that were once part of AIX or Dynix.

Fifth, SCO argues that "the evidence reveals sharply disputed facts on the question of whether the UNIX licensors knew that any licensee was disclosing material from its UNIX flavors". (Opp'n at 150.) However, the mere fact that several former representatives of AT&T and/or its successors claim not to have known of the disclosures is not enough to create a genuine issue of material fact. None of them is competent to offer testimony controverting the testimony of the witnesses on whose testimony IBM's defense is predicated. Those witnesses actually made the representations and thus obviously had knowledge of them. That knowledge is imputed to AT&T and its successors. See Center v. Hampton Affiliates, Inc., 488 N.E.2d 828, 829 (N.Y. 1985) (imputing knowledge of an attorney and director of a corporation to the corporation); Public Service Mutual Ins. v. Harlen Housing Assocs., 777 N.Y.S.2d 438, 439 (App. Div. 2004) (imputing superintendent's knowledge of defective locks to his employer, the building owner); Metropolitan Life Ins. v. Datta, No. 01-235, 2002 WL 221077, at *2 (N.Y. Sup. Ct. Jan. 23, 2002) (imputing knowledge of building's maintenance and security staff that tenant owned a dog to building owner, and finding that building owner was therefore estopped from enforcing a no-pets policy) (Addendum Z hereto).

Moreover, contrary to SCO's alternative contention (Opp'n at 150), the question of whether AT&T and its successors should have known about alleged violations of its rights can be decided at summary judgment.[34] See The Saenger Org., Inc. v. Nationwide Ins. Licensing

---

[34] The cases SCO cites do not hold that a question of whether a rightholder "should have known" of infringing conduct can never be decided on summary judgment and are otherwise

Assocs., Inc., 119 F.3d 55, 66-67 (1st Cir. 1997) (affirming district court's grant of summary

judgment that plaintiff's breach of contract claim was time-barred where plaintiff "had

constructive notice", and "knew or, through reasonable diligence, should have known" of

defendant's actions for more than six years prior to allegations); Wanlass v. Gen. Electric Co.,

148 F.3d 1334, 1336 (Fed. Cir. 1998) (affirming district court's grant of summary judgment for

defendant in laches defense and its finding that plaintiff "knew or should have known" of alleged

patent infringement); Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1476 (10th Cir.

1990) (affirming grant of summary judgment for defendants on grounds of "laches, estoppel,

waiver or public policy" where plaintiff "should have known" of the facts underlying its claim

for approximately seventeen years).  No reasonable question exists as to whether AT&T and its

successors should have known about the disclosures.  Putting aside their actual knowledge of the

disclosures (K Br. ¶¶ 92, 103, 124), the disclosures were publicly made, e.g., Accelerating AIX:

Performance Tuning for Programmers and System Administrators, published by IBM in 1998, is

---

distinguishable from the circumstances here.  See Kling v. Hallmark Cards, Inc., 225 F.3d 1030,
1039-41 (9th Cir. 2000) (discussing in the context of laches for copyright infringement whether
plaintiff was adequately put on inquiry notice to determine if its rights were being violated);
Armstrong v. Virgin Records, Ltd., 91 F. Supp. 2d 628, 640 (S.D.N.Y. 2000) (noting that a
statute of limitations defense involved a question of when the plaintiff "should have known" of
the allegedly infringing behavior, and that although in this case, there was "no reason" plaintiff
should have known of the allegedly infringing behavior, defendant's allegations to the contrary
precluded grant of summary judgment); In re Indep. Serv. Orgs. Anti-Trust Litig., 964 F. Supp.
1469, 1479 (D. Kan. 1997) (noting that plaintiff's affirmative evidence that it did not know of
allegedly infringing behavior precluded summary judgment on statute of limitations and laches
defenses in a copyright infringement suit).

available on Amazon.com at http://www.amazon.com/Accelerating-AIX-Performance-Programmers-Administrators/dp/0201633825.[35]

    5.    <u>IBM's Investment in AIX.</u>

Finally, SCO argues that the "mere fact of IBM's substantial investment in AIX is of no moment". (SCO's Opp'n at 151.) That is true, says SCO, because a jury could infer that AT&T and its successors did not provide IBM any assurances that it could do as it wished with its original works and that IBM did not rely on such assurances. (<u>Id.</u>) SCO further argues that "a jury could reasonably reach a number of conclusions about that investment other than that it was a function of IBM's alleged reliance on AT&T's alleged misrepresentations." (<u>Id.</u>) Absent from SCO's opposition, however, is any evidentiary support for these assertions. Thus, the fact stands that IBM would not have invested in AIX had it not received representations from AT&T and its successors that it could do as it wished with its original works. (K Br. ¶¶ 289-294.)

## III.    THE ALLEGED BREACHES HAVE BEEN WAIVED.

Even if SCO's theory of the case were not foreclosed by the Agreements, and even if SCO were not estopped from pursuing it, summary judgment should be entered in favor of IBM because the alleged breaches have been waived.

SCO seeks generally to avoid summary judgment on the grounds that waiver is ordinarily ill-suited for summary adjudication.[36] (Opp'n at 152.) But numerous cases have entered

---

[35] SCO cites four cases for the proposition that "a rightholder is not held to a standard of monitoring all patent applications for possible violations of its rights". (Opp'n at 150, 152.) The cases, however, concern accrual of claims, not equitable estoppel. Moreover, whether or not a rightholder must monitor patent applications, AT&T and its successors knew (and constructively should have known) of the disclosures at issue, as discussed in the text above.

summary judgment on facts far less compelling than the facts of this case.  See Fundamental

Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 850 N.E.2d 653, 658 (N.Y. 2006)

(holding that "the record establishes as a matter of law that, for a period of time, [plaintiff]

waived enforcement of the noncompete agreement"); Sec. Indus. Automation Corp. v. United

Computer Capital Corp., 723 N.Y.S.2d 668, 669 (App. Div. 2001) (affirming grant of summary

judgment based on waiver where affidavit submitted by the employee most responsible for

administering the lease transactions with defendant and with other similar lessees supported

finding that rights had been waived); T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No.

01-900, 2002 WL 1311648 (N.Y. Sup. Ct. April 02, 2002) (defense of waiver was established

sufficiently to warrant the court as a matter of law to direct judgment in favor of defendant);

Topps Chewing Gum, Inc. v. Imperial Toy Corp., 686 F. Supp. 402, 408 (E.D.N.Y. 1988)

(stating that waiver may be established as a matter of law with "the express declaration of the

[contracting] party, or by (its) undisputed acts or language so inconsistent with (its) purpose to

---

[36] None of the cases cited by SCO hold that waiver cannot be determined on summary
judgment; the cases simply decline to do so.  In fact, two of those cases explicitly recognize that
summary judgment can, in fact, be granted as a matter of law.  NetTech Solutions, L.L.C. v.
ZipPark.com, No. 01-2683, 2001 WL 1111966, at *6 (S.D.N.Y. Sept. 20, 2001) (Addendum AA
hereto); Wyeth v. King Pharmaceuticals, Inc., 396 F. Supp. 2d 280, 290 (E.D.N.Y. 2005).
SCO's other cases are unavailing because they dealt with a contract containing a specific non-
waiver provision (In re Caldor, Inc., 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998)), a case in which
discovery had not even begun and there were "issues of credibility" with regard to the party's
declarants (Boston Concessions Group v. Criterion Ctr. Corp., 606 N.Y.S.2d 696, 697 (App. Div.
1994)), and an allegation of implied waiver where intention was unclear (McDarren v. Marvel
Entm't Group, Inc., No. 94-0910, 1995 WL 214482, at *5 (S.D.N.Y. Apr. 11, 1995)) (Addendum
BB hereto).

stand upon (its) rights as to leave no opportunity for a reasonable inference to the contrary").[37]
As is discussed below, none of SCO's specific arguments is any more availing.

      A.    <u>AT&T and Its Successors Waived SCO's Theory of Breach Long Ago</u>.

As stated in IBM's opening brief, AT&T and its successors represented to their licensees for many years that they would not assert control over the original works of their licensees, even if those works were at some point included in a modification or derivative work of AT&T's UNIX software. (K Br. ¶¶ 82-88, 119, 143.) IBM and Sequent reasonably relied on those representations to their detriment. Thus, SCO's predecessors in interest waived any alleged breach and SCO is estopped from pursuing its theory of the case.

For the most part, SCO's opposition merely repeats the arguments it raises to avoid a finding of estoppel. SCO contends AT&T and its successors could not be held to have waived SCO's theory of breach because (1) the Agreements include an integration clause; (2) "alleged silence or failure to act" cannot support IBM's motion; and (3) "a successor-in-interest is bound by a predecessor's waiver only when the successor 'has notice of the existence' of the waiver". (Opp'n at 153-57.) These arguments have no more merit here than they did with respect to estoppel.

<u>First</u>, as stated, an integration clause merely limits the extent to which statements made prior to execution of an agreement can be used to modify its terms. <u>RUI One Corp. v. City of</u>

---

[37] <u>See also</u> <u>Terry v. Int'l Dairy Queen, Inc.</u>, 554 F. Supp. 1088, 1095-96 (N.D. Ind. 1983) (finding waiver based on, <u>inter alia</u>, "uncontradicted evidence" that plaintiff-licensees had acted contrary to an alleged license prohibition without objection from and with knowledge of defendant-licensors' predecessors in interest); <u>Bott v. J.F. Shea Co.</u>, 388 F.3d 530, 533 (5th Cir. 2004) (holding that there was waiver as a matter of law where there was "intentional conduct

<u>Berkeley</u>, 371 F.3d 1137, 1148 (9th Cir. 2004) ("An integration clause is an express statement that all prior discussions are superseded by (or 'merged' into) the written agreement").  IBM's waiver defense does not depend on statements made before execution of the Agreements.  Nor does it depend on modification of the Agreements.  Rather, the defense is predicated primarily on the conduct and statements of AT&T and its successors during the nearly two decades that followed execution of the Agreements.  Thus, the integration clause at issue here does not (and could not) preclude a finding of waiver based on the statements of AT&T and its successors after execution of the Agreements.  See <u>Zolar Publ'g Co. v. Doubleday Co.</u>, 529 F.2d 663, 666-68 (2d Cir. 1975); <u>CMI II, LLC v. Interactive Dev., Inc.</u>, No. 05-600589, 2006 WL 2770095, at * 4 (N.Y. Sup. Ct. Sept. 29, 2004) (Addendum CC hereto); <u>Unisys Corp. v. Hercules, Inc.</u>, 638 N.Y.S.2d 461, 462 (Sup. Ct. 1996).  SCO does not cite a single case for the proposition that the integration clause forecloses IBM's waiver defense and there is none.[38]

<u>Second</u>, just as estoppel can be based on silence or inaction and decided at summary judgment (<u>see</u> Section II above), so too can waiver.  See <u>Bott v. J.F. Shea Co.</u>, 388 F.3d 530, 534 (5th Cir. 2004) (affirming grant of summary judgment based on waiver where there was "silence and inaction, for so long a period as to show an intention to yield the right" (internal quotation

---

inconsistent with claiming the right" and "silence and inaction, for so long a period as to show an intention to yield the right").

[38] Moreover, general integration clauses, such as the one here, have been held not to preclude equitable defenses.  <u>See Healthnow N.Y., Inc. v. APS Healthcare Bethesda, Inc.</u>, No. 05-612, 2006 U.S. Dist. LEXIS 13148, at *27-28 (N.D.N.Y. Mar. 10, 2006) (Addendum DD hereto); <u>Urban Holding Corp. v. Haberman</u>, 556 N.Y.S.2d 337, 339 (App. Div. 1990).

omitted)).[39]  The silence and inaction of AT&T and its successors while IBM and others publicly

disclosed code, methods and concepts from their own original UNIX products (such as AIX and

Dynix) for nearly two decades is more than enough of a basis for a finding of waiver.  Like

estoppel, a purpose of the doctrine of waiver is to prevent injustice.[40]  In any event, IBM's

waiver defense is not based solely on silence or inaction.  Again, it is also based on the

statements and conduct of SCO and its predecessors over the course of nearly two decades.  As

stated, AT&T and its successors made clear to their licensees and others that UNIX licensees

could do as they wished with their own original works.[41]

Third, SCO is bound by the statements and conduct of its predecessors in interest,

whether or not it was on notice of them when SCO acquired its interest in Santa Cruz's UNIX

assets in 2001.  As stated, the law is clear that a party can have no more rights than its

---

[39] See also Union Auto. Indem. Ass'n v. Shields, 79 F.3d 39, 42 (7th Cir. 1996) ("Silence can amount to waiver where there is a duty to speak."); Midwest Maint. & Constr. Co. v. Vela, 621 F.2d 1046, 1048 (10th Cir. 1980) ("Silence is not a waiver unless there is a duty or obligation to speak.") (emphasis added); see also Farni v. Tesson, 66 U.S. 309, 313 (1862) (stating that silence can constitute waiver because "[h]e who remains silent when it is his duty and interest to speak, will not be allowed to speak afterwards to the prejudice of another"). As previously noted (see Section II above), SCO and its predecessors were under a duty to speak under the circumstances in this case.

[40] See Apollo Galileo USA P'ship v. Kingdom Vacations, Inc., No. 01-6847, 2002 U.S. Dist. LEXIS 11025, at * 8 (N.D. Ill. June 18, 2002) ("The waiver doctrine is intended to prevent the waiving party from lulling another into a false belief that strict compliance with a contractual duty will not be required and then suing for non-compliance") (Addendum EE hereto).

[41] The cases on which SCO relies are inapposite.  In Peck v. Peck, the court found that a former wife had not waived her right to payments due to her under a divorce settlement by her delay in cashing her ex-husband's checks.  649 N.Y.S.2d 22, 23 (App. Div. 1996).  The court in Apollo Steel Corp. v. Sicolo and Massaro, Inc. denied a summary judgment motion based on waiver without prejudice pending further discovery as to whether the rightholder intended to waive its right.  752 N.Y.S. 2d 493, 494 (App. Div. 2002).  Finally, in Comvest Consulting, Inc. v. W.R.S.B. Development Co., no evidence was presented that the rightholder had relinquished its right, so there was no factual basis for a waiver defense.  698 N.Y.S.2d 807, 808 (App. Div. 1999)

predecessors in interest.[42]  See Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc., 325 N.E.2d at 139

(N.Y. 1975) ; Am. Book Co. v. Yeshiva Univ. Dev. Fund., Inc., 297 N.Y.S.2d 156, 163 (Sup. Ct.

1969); I.G. Farben S'holders Org. v. UBS AG, 05-4041, 2006 U.S. Dist. LEXIS 63347, at *26

(E.D.N.Y. Sept. 5, 2006).

    Other than repeating the arguments it asserts to avoid a finding of estoppel (discussed

above), SCO's only response to IBM's showing that AT&T and its successors waived SCO's

theory of breach is to argue that the evidence IBM submitted as to Santa Cruz and Caldera

International is disputed.  Notably, SCO makes no specific mention of the extensive and

undisputed evidence of statements and conduct by AT&T, USL and Novell, despite the fact that

these statements and this conduct are by themselves dispositive on the issue of waiver.[43]  (K Br.

¶¶ 57-71, 82-89, 116-19, 143, 146-47.)

    In any event, neither the assertions in SCO's brief nor the evidence on which it purports

to rely create a genuine issue of material fact.  David McCrabb, the former President of the

---

[42] The cases upon which SCO relies are unique to New York landlord-tenant law.  Landlord-
tenant law is obviously inapplicable to the facts here.  Furthermore, even in the landlord-tenant
context, subsequent owners are charged with constructive notice of waiver where, as here, the
conduct in question was "continuous, open and notorious".  Radcliffe Assocs., Inc. v.
Greenstein, 82 N.Y.S.2d 680, 681 (App. Div. 1948). At a minimum, IBM's consistent course of
conduct with regard to its own code in this case placed SCO on constructive notice that previous
owners of the UNIX assets had waived any rights to control their licensees' homegrown code.
(K Br. ¶¶ 90-93.)

[43] The closest SCO comes to dealing with this evidence is to say that IBM's defense
depends on "generic statements that AT&T employees 'told,' 'assured' or 'informed' customers
with only vague references to dates". (Opp'n at 154.)  SCO's argument appears to be that no
declarants use the magic word "waive".  However, waiver is not based on talismanic use of the
word waiver.  It turns on equity.  Zipes v. Trans World Airlines, 455 U.S. 385, 398 (1982)
(holding that waiver is to be invoked "when equity so requires").  The fact that AT&T, USL and
Novell representatives repeatedly told licensees that they were free to do as they wished with
their own code and SCO gave up any intellectual property rights it might have had in the code is
sufficient to establish waiver.

Server Software Division of Santa Cruz and President and Chief Operating Officer of Caldera, and Ransom Love, the former CEO of Caldera, have testified that they did not share SCO's new-found theory and/or made clear, on behalf of Santa Cruz and/or SCO, that UNIX licensees could do as they wished with their original UNIX code, methods and concepts.[44]  For example, Mr. McCrabb has testified that:

- he "did not understand or interpret the System V licenses to allow Santa Cruz to control or limit the code, modifications and derivative works, including any methods or concepts therein, which were developed by its licensees" (IBM Ex. 227 ¶ 8)

- the UNIX licenses did not permit Santa Cruz "to limit or prohibit the use or disclosure of the licensees' own code" (id.)

- "System V licensees were free to do as they wished with their own code, modifications and derivative works, so long as the code, modifications and derivative works did not contain System V code" and that "Santa Cruz told licensees that it interpreted the license agreements in this manner" (id.)

SCO's argument that there is a fact dispute as to this evidence is based entirely on the wishful but untenable proposition that Mr. McCrabb and Mr. Love must either be lying or simply mistaken because some at Santa Cruz and Caldera did not know of or share their views.[45]

---

[44] SCO's assertion that Mr. McCrabb's veracity should be questioned because Lucent Technologies "did not even have a source code license under which they were allowed to create derivative works" is without merit.  (Opp'n at 156 n.21.)  While Lucent did not have a license to create modifications and derivative works based on UNIX System V, it did have a license to create modifications based on Santa Cruz's UnixWare source code and to distribute such modifications in binary form.  (SCO Ex. 124 ¶ 2.1.)  Lucent, therefore, would have a similar interest in being certain that Santa Cruz would make no claim in Lucent's original code developed for modifications of Santa Cruz's UnixWare source product.  That Lucent's UNIX license was for UnixWare source code as opposed to UNIX System V source code is irrelevant; as Mr. McCrabb articulated, Santa Cruz's clear policy was to claim no ownership or control rights over code developed by its licensees.

[45] SCO's only evidence in rebuttal to Mr. McCrabb's and Mr. Love's declarations are competing declarations from various SCO executives, board members and employees who merely claim that they were not aware of Mr. McCrabb and Mr. Love's positions and do not

However, even if others at Santa Cruz and Caldera did not know of or share Mr. McCrabb's and Mr. Love's views, that proves nothing about whether Mr. McCrabb and Mr. Love held those views or shared them with others.  No competent evidence contradicts the testimony of Messrs. McCrabb and Love.  See Koam Produce Inc. v. Dimare Homestead, Inc. 213 F. Supp. 2d 314, 323-25 (S.D.N.Y. 2002)  (imputing knowledge of one employee to company despite affidavits from other employees denying any such knowledge because those employees "had no basis for swearing that no [other] employee" had such knowledge).

Contrary to SCO's contention, Mr. McCrabb's and Mr. Love's knowledge, understanding and conduct are binding on Santa Cruz and Caldera.  Mr. McCrabb was President of the Server Software Division of Santa Cruz and President and Chief Operating Officer of Caldera, and Mr. Love was CEO of Caldera.  As key officers of Santa Cruz and Caldera their knowledge and understanding were the knowledge and understanding of Santa Cruz and Caldera.  The knowledge and understanding of a corporate officer, especially key officers such as CEOs and Presidents, is imputed to the corporation.  See Hellenic Inc. v. Bridgeline Gas Distrib. LLC, 252 F.3d 391, 395 (5th Cir. 2001) ("Courts generally agree that the knowledge of directors or key officers, such as the president and vice president, is imputed to the corporation."); see also In re Pubs, Inc. of Champaign, 618 F.2d 432, 438 (7th Cir. 1980) ("If the president . . . of a corporation has knowledge or notice of a fact, knowledge or notice of that fact is generally imputed to the corporation."); R-T Leasing Corp. v. Ethyl Corp., 494 F. Supp. 1128, 1136-37 (S.D.N.Y. 1980) (imputing knowledge of president to company); Farmers & Bankers Life Ins.

—————————————————

share their understandings.  SCO's exhibits impair neither the truth nor the relevance of Mr. McCrabb's and Mr. Love's testimony.

Co. v. Allingham, 457 F.2d 21, 24 (10th Cir. 1972) (imputing knowledge of vice-president to company).

B.    Novell Has Explicitly Waived the Alleged Breaches by IBM.

In addition to the fact that Novell and its predecessors waived SCO's theory of breach long ago, it also waived the alleged breach, on SCO's behalf, after the commencement of this case pursuant to Section 4.16(b) of the APA.

SCO does not dispute that Novell retained the right "at [its] sole discretion" to direct Santa Cruz to "amend, supplement, modify, or waive any rights under . . . any SVRX License", and to take any such actions on Santa Cruz's behalf if Santa Cruz failed to do so. (K Br. ¶ 141 (emphasis added)). Nor does it dispute that Novell invoked its rights and directed SCO "to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of" the IBM Agreements. (K Br. ¶¶ 190-96.) Citing the plain language of the APA and certain extrinsic evidence, SCO argues instead that Novell's waiver rights are inapplicable to IBM's alleged breaches. As is discussed below, SCO's arguments are unavailing.

1.    The Plain Language of the APA Forecloses SCO's Position.

SCO pays lip service to the principle that the plain language of the APA controls but resorts to arguments that turn the plain language of the APA on its head.[46]

---

[46] Subsequent to the filing of IBM's motion, Novell filed its own motion for summary judgment raising the same Section 4.16(b) issues addressed here. See Memorandum In Support of Novell's Motion for Partial Summary Judgment on its Fourth Claim for Relief (No. 2:04cv0139, Docket # 172), dated Dec. 1, 2006 ("Novell Br.").

       a.    <u>The term "SVRX License" includes the Software Agreements at issue.</u>

SCO first argues that the Software Agreements, which IBM is alleged to have breached, are not "SVRX licenses". (Opp'n at 160-61.) But nothing in the APA supports that argument. To begin, "SVRX" is simply an acronym standing for <u>S</u>ystem <u>V</u> Release <u>X</u>, where X represents various UNIX releases. SCO does not and could not dispute that the Software Agreements are agreements that license various UNIX System V releases. For example, the IBM Software Agreement expressly states that "All of UNIX System V, Release 2.0 Version 1 or UNIX System V, Release 2.0 Version 1, International Edition may be used in conjunction with a DESIGNATED CPU (Source)". (IBM Ex. 125, Schedule note 2 at 1710016046.)

Moreover, while the term "SVRX licenses" does not appear in the defined term section of the APA, the APA plainly defines the term for purposes of Section 4.16. The first sentence of Section 4.16(a) refers to "SVRX Licenses" and is immediately followed by the following parenthetical: "as listed in detail under item VI of Schedule 1.1 (a) hereof. . .". (IBM Ex. 123 § 4.16(a).) Item VI of Schedule 1.1(a), in turn, provides a list of "the SVRX Licenses" that relate to various UNIX System V software releases, including UNIX System V Release Nos. 2.0, 2.1, 3.0, 3.1, 3.2, 4.0, 4.1 and 4.2, as well as "[a]ll prior UNIX System releases and versions preceding UNIX System V Release No. 2.0". (<u>Id.</u> at Sch. 1.1(a).) The versions of UNIX System V software that are included within the universe of SVRX licenses listed in Item VI of the APA are those covered in IBM's and Sequent's Agreements. (<u>See</u> IBM Ex. 119; IBM Ex. 492; IBM Ex. 123.)

73

Rather than basing its interpretation on Item VI's list of "SVRX licenses" (which is

specifically referenced in Section 4.16 of the APA), SCO instead points to a different section of

Schedule 1.1, Item III.L, in its attempt to exclude agreements relating to source code from the

definition of "SVRX licenses".[47] Item III.L, however, is not referenced in Section 4.16(a) where

the term "SVRX licenses" is introduced and defined; that section specifically points to Item VI,

which makes no such distinction between agreements relating to source code and binary code.[48]

(IBM Ex. 123 at Sch. 1.1(a).)  SCO's reading is further disproved by Schedule 1.2(b) of the

APA, which confirms that Novell retained rights to any SVRX code under SVRX Licenses —

irrespective of its source or binary nature.[49]  (IBM Ex. 123 at Sch. 1.2(b).)  SCO also attempts to

define the term "SVRX licenses" by using a document not even referenced in the APA:  a

_____

[47] SCO's argument that the term "SVRX Licenses" stands alone in Section 4.16(b) (Opp'n at 160-61) is misleading.  Section 4.16 specifically references Item VI of Schedule 1.1(a), which includes a list of all the SVRX contracts covered, including those related to all of the SVRX releases licensed to IBM and Sequent.  (IBM Ex. 123 at Sch. 1.1(a).)

[48] Moreover, SCO's narrow interpretation of SVRX Licenses produces a result that is contrary to SCO's own conclusion that Novell's Section 4.16(b) authority at least extends to binary agreements.  (Opp'n at 56-58.)  Under SCO's interpretation, SVRX source code licenses are not SVRX Licenses because so-called "software agreements" governing SVRX source code are not mentioned in Item VI of Schedule 1.1 (a) but are "expressly" referred to in Item III.L of that Schedule.  Item VI, however, also does not mention "sublicensing agreements" governing SVRX binary code.  Sublicensing agreements, like software agreements, are expressly referred to in Item III.L of Schedule 1.1 (a).  (IBM Ex. 123 at Sch. 1.1(a).)  SCO's "plain reading", therefore, would mean that Section 4.16(b) applies to neither source nor binary licenses.

[49] Schedule 1.2(b) specifically addresses SCO's obligation to remit to Novell royalty payments "due under the SVRX licenses" in circumstances where SCO converts "SVRx-based customers" to a UnixWare derived product.  (Exhibit 1 to the 12/12/2006 Declaration of Kenneth W. Brakebill, SCO v. Novell, No. 2:04 CV 0139, Docket # 176 at Sch. 1.2(b).)  Schedule 1.2(b) makes clear that "if a customer continues to sell their SVRX based product separately" — not simply their binary SVRX product — "then these SVRx revenues continue to flow to Novell." (Id.)  Further, SCO's royalty obligation to Novell would continue if the converted unit uses a significant amount of "the original SVRX code" "under the SVRX license" rather than being "derived from a source version" of UnixWare (or derivatives thereof).  (Id.)

74

"product Schedule" attached to the AT&T SVRX license agreements. (Opp'n at 161.) There is no textual basis in the APA, however, for using "Schedules" attached to AT&T license agreements to interpret the meaning of SVRX Licenses.[50] See Shaw v. Regents of the Univ. of Cal., 58 Cal. App. 4th 44, 53-55 (1997) (extrinsic evidence should not be used to interpret a disputed contractual term where the contract contains "clear and unequivocal" reference to a document incorporated into the contract to interpret that term).[51]

While the APA is clear on this point, and the Court should not consider extrinsic evidence, even SCO's own conduct after the execution of the APA and its amendments confirms that Novell's rights under the APA, including its waiver authority under Section 4.16(b), are not limited to binary royalty rights. As laid out by Novell in its brief on this subject, SCO and its predecessors have consistently treated "SVRX Licenses" to include agreements relating to all UNIX System V products — not to the smaller universe of binary SVRX products: (1) Santa Cruz passed on to Novell 95% of the revenues received from IBM under Amendment X (which unquestionably granted additional source code rights to IBM), treating those proceeds as subject to the agency relationship created under the APA; (2) SCO has publicly stated that it acts as Novell's "administrative agent in the collection of royalties for customers who deploy SVRX

---

[50] In addition, the product Schedule document that SCO cites actually contradicts its primary assertion that the term SVRX Licenses excludes source licenses. This document — a six-page "Schedule" attached as Supplement No. 1 to the 1985 IBM Software Agreement SOFT-00015 — identifies fees due for use and distribution of both binary and source SVRX products. Thus, even if the product Schedules were to inform the meaning of SVRX Licenses (which they do not), they support the proposition that SVRX Licenses includes source and binary SVRX contracts.

[51] The APA is "governed by and construed in accordance with the laws of the State of California". (IBM Ex. 123 § 9.8.)

technology", without stating any binary limitation; and (3) SCO's CEO Darl McBride specifically referred to IBM's UNIX license agreements as its "SVRX License" in refusing Novell's direction that SCO waive any alleged breaches by IBM.[52]  SCO's own conduct and admissions defeat its narrow interpretation of "SVRX License".

>   b.   IBM's interpretation is consistent with the purpose of the APA.

SCO also argues that IBM's interpretation of Section 4.16(b) would defeat the purpose of the APA.  (Opp'n at 161-62.)  Novell's waiver rights, however, are entirely consistent with the background and purpose of the APA, which established a relationship between Novell and Santa Cruz in which Santa Cruz acts as Novell's agent with regard to the SVRX licensees and associated royalties.  Since Novell retained the right to the royalties under the UNIX System V licenses, it was also agreed that Novell retained certain rights to control the contractual relationships with the licensees.  One of the reasons for this, according to Steve Sabbath of Santa Cruz, was "to ensure that actions by Santa Cruz (or its successors) could not adversely affect Novell's ability to realize the economic benefits flowing from these license agreements".  (IBM Ex. 254 ¶ 12.)

> SECTION REDACTED

---

[52] See Novell Br. at 29-32; IBM Ex. 106; IBM Ex. 646; IBM Ex. 644 at 1.  Mr. McBride also referred to Sequent's UNIX agreements as its "System V Release 4.0 License" in his letter threatening to terminate that license.  (IBM Ex. 154 at 3.)

SECTION REDACTED

Novell's ability to waive breaches of the UNIX licensing agreements is consistent with the control rights it retained. SCO's arguments that such a waiver right would defeat the purpose of the APA by allowing Novell to "eviscerate the entire value of the UNIX assets that SCO had acquired" (Opp'n at 162) are straw men. Novell's incentives are aligned with SCO's because it is entitled to 95% of the UNIX licensing royalties collected by SCO. Novell would, therefore, have no incentive to destroy the value of SCO's UNIX assets. In addition, the UnixWare product and business was a major component of the acquisition, and the value of that asset is unaffected by Novell's waiver rights.

c.     <u>IBM's interpretation is consistent with other provisions of the APA.</u>

Next SCO argues that IBM's interpretation of Section 4.16(b) directly conflicts with other provisions of the APA. (Opp'n at 162-63.) However, Novell's waiver rights do not conflict with other sections of the APA because Novell's interest in retaining certain rights to control the contractual relationships with the UNIX licensees is consistent with the agency relationship established by the APA. Such a reading of Section 4.16(b) does not undermine other provisions of the APA, including those cited by SCO, that set forth the relationship between Novell and Santa Cruz. Novell's waiver in this case pertains squarely to the contractual relationship between Novell and IBM. It does not implicate the UNIX assets that were acquired by Santa Cruz. Novell has waived alleged breaches involving IBM's own original AIX and Dynix code; SCO makes no allegation that IBM has contributed any UNIX System V code to Linux. SCO's interpretation also, like its argument that Novell's waiver rights defeat the

77

purpose of the APA, assumes that, in order to devalue SCO's UNIX assets, Novell would exercise its rights under the APA irrationally and against its own interests.  Such a cynical argument cannot defeat the clear grant of authority contained in Section 4.16(b) of the APA, especially because SCO's interpretation would effectively read that grant out of the agreement, thus denying Novell the bargained-for benefit it clearly provides.

d.    <u>Amendment 2 is irrelevant.</u>

Finally, SCO argues that IBM's interpretation improperly disregards Amendment No. 2 to the APA.  (Opp'n at 163-64.)  Amendment 2, however, does not undermine Novell's waiver rights under the APA, but only addresses Section 4.16 of the APA by setting forth the procedures for how prospective buy-outs with SVRX licensees shall be managed by Novell and Santa Cruz. The subsections cited by SCO in its brief do not change the general agency relationship between Novell and Santa Cruz.  In fact, the provisions that SCO cites are specifically recognized as limited exceptions to the APA, operating "notwithstanding the provisions of Article 4.16, Sections (b) and (c) of the Agreement".  (IBM Ex. 444 at ¶ B.)  Amendment 2 merely established the procedures for management of "any potential transaction with an SVRX licensee which concerns a buy-out of any such licensee's royalty obligations".  (<u>Id.</u>)  Such a clause regarding future buy-outs, however, would not apply to Novell's relationship with IBM since IBM, Novell and Santa Cruz had executed Amendment X, which granted IBM an "irrevocable, fully paid-up, perpetual right to exercise all of its rights" under its UNIX agreements.[53]  (IBM Ex. 124.)  While SCO attempts to isolate certain phrases in Amendment 2 to bolster its argument against Novell's

---

[53] Novell and Santa Cruz, in fact, specifically recognized the existence of Amendment X as a separate agreement by referring to the IBM buy-out in Amendment 2.  (IBM Ex. 444 at ¶ D.)

78

waiver rights under the APA, it is clear that, when viewed in context, Amendment 2 neither alters nor undermines Novell's contractual rights with regard to its relationships with UNIX licensees, especially IBM.

2.    SCO's Extrinsic Evidence Is Irrelevant.

SCO's opposition resorts to parol evidence in a hopeful attempt to persuade the Court to overlook the plain language of the APA. (Opp'n at 165-68.) As stated in IBM's opening brief, the language of the APA setting forth Novell's continuing rights to AT&T's UNIX System V agreements is plain and unambiguous and can therefore be understood based on its terms alone. No parol evidence is needed to explain the parties' intent. Indeed, it is axiomatic that under New York contract law, a court is prohibited from considering extrinsic evidence when faced with clear and unambiguous contract language. See Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590, 593 (N.Y. 1957). Therefore, the interpretation of Section 4.16(b) of the APA is a question of law suitable for summary adjudication without reference to any other materials. See id. There is no question that Novell retained the right to waive any rights under the UNIX System V licenses entered into by IBM and Sequent, including specifically the IBM Software Agreement and the Sequent Software Agreement.[54]

---

[54] SCO's argument that Novell's waiver rights conflict with the Technology License Agreement ("TLA") between Novell and Santa Cruz is a red herring. (Opp'n at 168.) While Item VI of Schedule 1.1(a) includes all SVRX licenses possessed by Novell prior to the execution of the APA, the TLA was executed contemporaneously with the APA, so would not have been among the SVRX licenses transferred from Novell to Santa Cruz under the APA. Novell's retained rights under the APA to control the contractual relationships with its former UNIX licensees would not have applied to the TLA, so Novell would not have the power, as SCO suggests, to waive its own prospective breaches.

The extrinsic evidence presented by SCO is unavailing in light of the plain language of the APA. Section 4.16(b) of the APA is a broad and unambiguous grant of authority to Novell.[55] It clearly states that Novell may, at its "sole discretion and direction", direct Santa Cruz to "amend, supplement, modify or waive any rights under . . . any SVRX License . . . in any manner or respect". (IBM Ex. 123 at § 4.16(b).) If Santa Cruz refuses to follow that direction, Novell is "authorized, and hereby is granted, the rights to take any action on [Santa Cruz's] own behalf". (Id.) Where the plain language of an agreement is clear and there is no ambiguity, the Court should refuse to consider extrinsic evidence to alter the meaning of the contract. Niederer v. Ferreira, 189 Cal. App. 3d 1485,1499 (1987) (a clear and unambiguous contract is to be "interpreted by the language therein without resort to extrinsic evidence," and that such interpretation "is a question of law which may be resolved on summary judgment"); Cal. Civ. Code §§ 1638, 1639 (plain language alone governs the meaning of a contract unless that language "involve[s] an absurdity"). The California Supreme Court has held that "in the construction of a contract, the office of the court is simply to ascertain and declare what, in terms or in substance, is contained therein, and not to insert what has been omitted or omit what has

---

[55] Even SCO's key witnesses have admitted under cross-examination that a plain reading of the APA belies SCO's argument.

SECTION REDACTED

been inserted". <u>Jensen v. Traders & Gen. Ins. Co.</u>, 52 Cal. 2d 786, 790 (1959) (citing Cal. Code Civ. Proc. § 1858).  That court has also found that "as a general matter, implied terms should never be read to vary express terms".  <u>Carma Developers, Inc. v. Marathon Dev. Cal., Inc.</u>, 2 Cal. 4th 342, 374 (1992).

> C.      <u>Through Its Own Conduct, SCO Has Waived Its Purported Rights to Claim Breach of Contract.</u>

Putting aside the fact that SCO's predecessors in interest waived the alleged breaches, SCO itself did so, repeatedly, before and after the filing of this lawsuit.

In opposition, SCO repeats its claim that waiver cannot be decided at summary judgment and recasts IBM's defense as limited to "SCO's sales of certain Linux products that contained source code improperly contributed by IBM" and "SCO's steps in making some of that same code purportedly publicly available on the Internet".  (Opp'n at 168-74.)  However, waiver can be decided at summary judgment, as discussed above (<u>see</u> Section III.A), and the elements of IBM's defense that SCO ignores are by themselves fatal to SCO's claim.

Contrary to SCO's suggestion, it did not simply distribute, and make available over the Internet, the very code that it now claims IBM improperly contributed to Linux, though — to be sure — it did do that.  Rather, SCO distributed the code, and otherwise made it available, <u>after</u> SCO purports to have discovered the alleged impropriety of IBM's contributions, <u>after</u> SCO filed this lawsuit, and <u>after</u> it purported to suspend its Linux distributions.  Moreover — and this point bears special emphasis, since SCO's opposition papers ignore it completely — SCO distributed the code, and made it available over the Internet, pursuant to the terms of the GNU General Public License or GPL.  In distributing the code under the GPL, SCO represented and warranted

81

to IBM and the world that anyone receiving the code "may copy and distribute verbatim copies of the Program's source code" and "modify [its] copy or copies of the Program or any portion of it". (IBM Ex. 128 §§ 1, 2.) Thus, SCO expressly waived any claim to preclude IBM and others from doing the same.

SCO also ignores the dispositive fact (discussed at pp. 108-110 of IBM's opening brief and easily resolved at summary judgment) that SCO gave up any rights that it might have had in the allegedly misused code, when it transferred its intellectual property rights in that code to UnitedLinux.

## SECTION REDACTED

Notably absent from SCO's opposition brief is any claim that IBM's allegedly improper Linux contributions were not included in the "Software, developed pursuant to the JDC". Hence, assuming SCO had any intellectual property in IBM's contributions in the first place (which, as discussed above, it did not), SCO expressly relinquished them pursuant to the JDC. Thus, SCO's claim that IBM's defense depends entirely on a finding of implied waiver is a diversion of the first order.[56]

---

[56] As described in IBM's Linux DJ briefs, SCO granted IBM a license under the parties' Strategic Business Agreement ("SBA") and the relevant Statement of Work ("SOW") to use the materials included in SCO's Linux products. (DJ Br. at 79.)

## SECTION REDACTED

Even if IBM's waiver defense were based solely on principles of implied waiver (as SCO mistakenly contends), the arguments that SCO offers to justify its sales and distribution of Linux would be unavailing. Indeed, most are entirely beside the point of IBM's defense.

First, SCO argues that it could not have waived the alleged breaches prior to 2001, because it had not yet acquired the allegedly breached UNIX license agreements. (Opp'n at 170.) However, a party may waive a claim even before it has full rights to assert it.[57] Moreover, SCO's conduct and statements after it purports to have acquired the UNIX license agreements are more than enough to establish a basis for waiver. For example, SCO continued to distribute Linux under the GPL for more than three years, and entered into the UnitedLinux Agreements, after it purports to have acquired the UNIX license agreements.

Second, SCO argues that it could not have waived the alleged breaches after it acquired the license agreements in June 2001 and before it filed this suit, because it "did not undertake to determine if IBM's contributions to Linux constituted a breach of its UNIX license agreements". (Opp'n at 171.) Whatever exactly SCO means by this, it is undisputed that Santa Cruz undertook an assessment of whether UNIX code had been improperly contributed to Linux in 1999, as reflected in the Swartz memo. (DJ Br. ¶ 85.) Not only did SCO know about it (IBM

---

[57] Cf. Taylor Engines v. All Steel Engines Inc., 192 F.2d 171, 174 (9th Cir. 1951) (applying to patent law "the broad equitable principle that where one purports, for value, to convey title to personal property which he does not own, as between the grantor subsequently acquiring title and the grantee, the latter should have the property."); Respect, Inc. v. Comm. on the Status of Women, 815 F. Supp. 1112, 1116 n.5 (N.D. Ill. 1993) (noting that "a defense based on the application against [the plaintiff] of a doctrine similar to the property concept of estoppel by deed" might have been argued for against a claim for copyright infringement); see also Arnold Indus. v. Love, 63 P.3d 721, 726 (Utah 2002) (holding that the common law rule of after-acquired title survives and is broader than the real property statute enshrining this principle, U.C.A. 1953 § 57-1-10.).

Ex. 221 ¶ 82), but knowledge of the Swartz memo is imputed to SCO as a matter of law, as Santa

Cruz's supposed successor in interest. Prater v. CONRAIL, 272 F. Supp. 2d 706, 713 (N.D.

Ohio 2003) (knowledge of predecessor-in-interest is imputed to successor); FDIC v. Jackson-

Shaw Partners No. 46, Ltd., No. 92-20556, 1994 U.S. Dist. LEXIS 21477, at *9 n.1 (N.D. Cal.

Aug. 12, 1994) (same) (Addendum FF hereto).  In addition, a party can waive all of its rights in a

given subject matter, whether or not it has fully investigated them.

Third, SCO argues that it could not have waived the alleged breaches after it filed suit

because it suspended its sales and marketing of its Linux products and merely permitted pre-

existing customers to order Linux products.[58]  Contrary to SCO's suggestion, however, it did not

suspend its Linux distributions as soon as it learned of the alleged breaches and filed suit.

SECTION REDACTED             Yet, SCO continued to distribute Linux until

it filed suit on March 6, 2003.  (K Br. ¶ 165.)  In fact, as stated in IBM's opening brief, SCO

continued to distribute Linux (and make it available over the internet) long after SCO purported

to suspend its distribution of Linux in May 2003.  (K Br. at 110.)  It is undisputed that SCO was

selling Linux until at least January 2004 and making it available from its website until at least

the end of 2004.  (K Br. ¶¶ 167-68.)

---

[58] In this connection, SCO repeats its accusation that IBM "went to illegal lengths to obtain Linux source code from SCO's website". (Opp'n at 174.) But SCO offers no evidence — and there is none — to support the assertion, which is in any case irrelevant to whether SCO waived any right to pursue the alleged breaches. See IBM's Reply Memorandum In Support of its Motion for Summary Judgment on its Claim for Copyright Infringement (IBM's Eighth Counterclaim) at 16 at 14.

84

At bottom, SCO's opposition amounts to nothing more than an unsupported assertion that its current management — which, as discussed above, had nothing whatever to do with the Agreements at issue — did not intend to waive its newly-invented theory of breach, which was invented as part of its litigation strategy. Assertions of this sort are inadequate to avoid summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("[A] party opposing . . . summary judgment may not rest upon the mere allegations or denials of his pleadings."); DiMartini v. Ferrin, 889 F.2d 922, 926 (10th Cir. 1991) ("General allegations or denials in the complaint or pleadings are not sufficient to withstand summary judgment.").

## IV.   SCO'S CLAIMS RELATING TO RCU ARE BARRED BY THE STATUTE OF LIMITATIONS.

Finally, even if SCO's misguided theory of breach were correct, even if SCO were not estopped from pursuing it, and even if it has not been waived, SCO's claim relating to RCU is barred by the statute of limitations. Sequent publicly disclosed RCU in a 1993 patent application that was issued in 1995, more than six years prior to March 2003 when SCO filed its complaint. (K Br. at 111-113.) SCO's arguments in opposition are untenable. (Opp'n at 174-75.)

SCO argues that its RCU claim is not untimely because IBM has not shown that SCO or its predecessors knew or should have known about the RCU disclosure or that RCU was part of Dynix. According to SCO, "long-established precedent under New York law" provides that a breach of contract claim accrues only when the plaintiff "knew or should have known about the breach at issue." (Opp'n at 175.) However, SCO cites no authority for this proposition,[59] and its

---

[59] While SCO cross-references four cases cited in Part II.A. of its memorandum, none of those cases support SCO's position. None dealt with a breach of contract claim, none applied the New York statute of limitations (for contracts or otherwise), and three of the cases dealt with

"long-established precedent" does not exist.  In fact, New York's highest court has specifically

rejected SCO's contention, holding that "[k]nowledge of the occurrence of the wrong on the part

of the plaintiff is not necessary to start the Statute of Limitations running in [a] contract

[action]".  Ely-Cruikshank Co., Inc. v. Bank of Montreal, 615 N.E.2d 985, 987 (N.Y. 1993)

("Except in cases of fraud where the statute expressly provides otherwise, the statutory period of

limitations begins to run from the time when liability for wrong has arisen even though the

injured party may be ignorant of the existence of the wrong or injury.") (citations and internal

quotation marks omitted).[60]  With respect to non-disclosure agreements in particular, as stated in

IBM's opening memorandum, "[a] cause of action for damages for breach of a nondisclosure

agreement accrues on the date that the protected information was disclosed, and it does not

continuously accrue on subsequent disclosures."  Dolgoff Holophase, Inc. v. E.I. Du Pont de

Nemours & Co., 622 N.Y.S.2d 769, 770 (App. Div. 1995); see also 75 N.Y. Jur. 2d Limitations

and Laches § 93.

---

laches, not statutes of limitations.  See Jacobsen v. Deseret Book Co., 287 F.3d 936, 950 (10th Cir. 2002); Schock v. United States, 21 F. Supp. 2d 115, 119 (D.R.I. 1998); MacLean Assocs., Inc. v. Wm. W. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 780 (3d Cir. 1991); Jackson Jordan, Inc. v. Plasser Am. Corp., 219 U.S.P.Q. 922, 926 (E.D. Va. 1983), rev'd on other grounds 747 F.2d 1567 (Fed. Cir. 1984).

[60] See also Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 485 N.E.2d 208, 211 (N.Y. 1985) ("To adopt the discovery rule for which plaintiff contends would be inconsistent not only with the purpose of CPLR 9802, but also with the mandate of CPLR 201 that, 'No court shall extend the time limited by law for the commencement of an action'".); T & N PLC v. Fred S. James & Co. of New York, Inc., 29 F.3d 57, 60 (2d Cir. 1994) ("[N]either knowledge of the breach nor cognizable damages are required to start the statute of limitations running at breach."); Guild v. Hopkins, 63 N.Y.S.2d 522, 531 (App. Div. 1946) ("Nor does the existence of a cause of action [for breach of contract] depend upon respondent's knowledge that she has suffered an injury. That she may not have discovered the wrongs complained of until long after they were committed is immaterial.").

Even if (contrary to fact) SCO's RCU claim did not accrue until SCO or its predecessors knew or should have known about the RCU disclosure, it is still time barred.  The New York discovery rule, which is inapplicable to contract claims, provides that "the action must be commenced within two years after . . . actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer." N.Y. C.P.L.R. § 203(g) (emphasis added); <u>see</u> David D. Siegel, <u>New York Practice</u> § 43 (4th Ed. 2006).  Thus, under this rule, SCO's RCU claim was untimely if SCO "could with reasonable diligence" have known about it more than two years before it filed suit.  N.Y. C.P.L.R. § 203(g). There is no genuine dispute that with reasonable diligence SCO could have discovered the RCU disclosure by March 2001.  The RCU patent issued in 1995.  If, as SCO claims, Sequent "had only one UNIX strategy, and that strategy involved developing a UNIX flavor fully licensed by AT&T" (Opp'n ¶ 57), it should have been obvious that Sequent would use its patented operating system methods in its UNIX-flavor operating system.

Also, in 1998 Paul E. McKenney and John D. Slingwine (the inventors of RCU) wrote a paper titled <u>Read-Copy Update:  Using Execution History to Solve Concurrency Problems</u>, which appeared in the October 1998 Parallel and Distributed Systems conference.  (<u>See</u> IBM Ex. 268 at 48; IBM Ex. 231 ¶ 6.)[61]  The paper contains (and SCO quotes in its Item 86) the following language:  "Our implementation of read-copy update uses quiescent-state counters.  An SMP version has been in production in Sequent Dynix/ptx since 1994."  (SCO Ex. 144, Item 86 & Tab- 95 at 5.)  The paper also refers to U.S. Patent # 5,442,758, the RCU patent that was issued

---

[61] This paper forms the basis of Item 86 of SCO's Final Disclosures, and is reproduced at Tab- 95 of the Final Disclosures.  (<u>See</u> SCO Ex. 144, Item 86 & Tab- 95.)

in 1995, for "[m]ore details". (SCO Ex. 144, Tab- 95 at 5, 11.) Thus, SCO "could with reasonable diligence" have discovered that Sequent had disclosed RCU in the patent by October 1998, more than two years prior to the date it filed suit.[62]  N.Y. C.P.L.R. § 203(g); TMG-II v. Price Waterhouse & Co., 572 N.Y.S.2d 6, 7 (App. Div. 1991) (facts supporting plaintiffs' fraud claim could "have been discovered with the exercise of due diligence" when a newspaper ran a "story containing details of . . . fraudulent activities"); Stertz v. Gulf Oil Corp., No. 78-1813, 1988 WL 83188, at *5 (E.D.N.Y. July 22, 1988) ("plaintiffs certainly should have realized they had a claim" after "information sufficient to put the plaintiffs on notice was a matter of public record" in a newspaper article) (Addendum GG hereto).

Lastly, SCO argues that the RCU disclosure would not have started the statute of limitations to run because, as the patent holder, IBM retained the right to prevent others from practicing its invention "thus hardly constitut[ing] an unprotected public disclosure of the methods and concepts therein" and because the disclosure "would have constituted an immaterial breach." (Opp'n at 175.).  But the fact that IBM retained patent rights in the RCU disclosure is

---

[62] SCO's claim that it "did not know that RCU was in Dynix/ptx until its review of the Dynix/ptx source code produced in this case" (Opp'n at 176) is disingenuous.  SCO complains that it did not have access to any Dynix source code until December 2003.  (Opp'n ¶¶ 244, 261; SCO Ex. 156.)  Yet, that did not stop it from matter-of-factly stating in a May 29, 2003 letter that "Sequent's Dynix software product includ[ed] . . . RCU" (IBM Ex. 154) and in its July 22, 2003 Amended Complaint that IBM had disclosed "DYNIX/ptx-based . . . RCU source code and methods". (IBM Ex. 2 ¶ 144; see also id. ¶¶ 138-140, 142, 146.)  SCO either made those statements without any factual support or is being underhanded now in its argument.

irrelevant to whether the disclosure required to obtain the patent was a breach of SCO's rights.[63]

Moreover, putting aside the fact that SCO's materiality argument is at odds with the remainder

of its memorandum, it merely underscores another reason why SCO's RCU claim falls flat:  The

allegedly improper disclosure was, by SCO's own admission, immaterial.

In sum, under the relevant statute of limitations, SCO has simply brought its claim related

to RCU too late.

---

[63] "'Since a patent amounts to publication, it follows that the right to rely on protection under the theory of trade secrets [or a non-disclosure agreement] is lost forever upon the obtaining of a patent because the subject matter is no longer secret.'"  Sachs v. Cluett Peabody & Co., 39 N.Y.S.2d 853, 857 (App. Div. 1943), (quoting William B. Barton, A Study in the Law of Trade Secrets, 13 U. Cin. L. Rev. 507 and holding that "[t]he breach [of the non-disclosure agreement] occurred and the statutory period commenced to run not later than 1930 when, after obtaining letters patent in 1929, defendant registered in the patent office the name 'Sanfordized'"), aff'd 53 N.E.2d 241 (N.Y. 1944).

## Conclusion

For the foregoing reasons, summary judgment should be entered in favor of IBM and against SCO on SCO's claims for breach of contract (SCO's First, Second, Third and Fourth Causes of Action).

DATED this 12th day of January, 2007.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

Of Counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

90

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of January, 2007, a true and correct copy of the foregoing was hand delivered to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of March, 2007, a true and correct copy of the

foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system

to the following:

Brent O. Hatch
Mark F. James
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101

Robert Silver
Edward Normand
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504

Stephen N. Zack
Mark J. Heise
BOIES, SCHILLER & FLEXNER LLP
100 Southeast Second Street, Suite 2800
Miami, Florida 33131

/s/ Amy F. Sorenson

<u>INDEX TO ADDENDA</u>

Addendum A:    IBM's Undisputed Facts:  SCO's Breach of Contract Claim

Addendum B:    IBM's Objections to SCO's Alleged Evidence

Addendum C:    Irrelevance of SCO's Declarants

Addendum D:    Selected Testimony of Involved Persons

Addendum E:    An Illustration of the Absurdity of SCO's Claims

Addendum F:    Categories of Allegedly Misused Material Remaining in the Case

Addendum G:    Versions, Files and Lines of Code Identified for Remaining Items

Addendum H:    Analysis of SCO's Assertions Regarding UNIX Licensees' Disclosure of Homegrown Material

Addendum I:    *EPN Ingenieria S.A. de C.V. v. Gen. Elec. Co.*, No. 92-1563, 1996 WL 531867 (S.D.N.Y. Sept. 19, 1996)

Addendum J:    *Colonize.Com, Inc. v. Perlow*, No. 03-466, 2003 WL 24256576 (N.D.N.Y. Oct. 23, 2003)

Addendum K:    *L-3 Commc'ns Corp. v. Kelly*, No. 14971-05, 809 N.Y.S.2d 482, 2005 WL 3304130 (Sup. Ct. Aug. 18, 2005)

Addendum L:    *Beck's Office Furniture and Supplies, Inc. v. Haworth, Inc.*, Nos. 95-4018, 95-4029, 94 F.3d 655, 1996 WL 466673 (10th Cir. Aug. 16, 1996)

Addendum M:    *Israel v. Springs Indus., Inc.*, No. 96-5106, 2006 U.S. Dist. LEXIS 80863 (E.D.N.Y. Nov. 3, 2006)

Addendum N:    *Stover v. Eagle Prods.*, No. 93-4047, 1996 U.S. Dist. LEXIS 4893 (D. Kan. Mar. 19, 1996)

Addendum O:    *Johnson v. Flowers*, No. 05-71937, 2006 WL 212022 (E.D. Mich. Jan. 27, 2006)

Addendum P: *Dunlop-McCullen v. Pscarella*, No. 97-0195, 2002 WL 31521012 (S.D.N.Y. Nov. 13, 2002)

Addendum Q: *Brock v. Baskin Robbins, USA, Co.*, No. 99-274, 2003 WL 21309428 (E.D. Tex. Jan. 17, 2003)

Addendum R: *Automatic Sys. Developers, Inc. v. Sabratek Corp.*, No. 93-7149, 1993 WL 535670 (S.D.N.Y. Dec. 22, 1993)

Addendum S: *Holloway v. King*, 161 Fed. Appx. 122 (2nd Cir. 2005)

Addendum T: *Towne Gardens, Ltd. v. McDonald's Corp.*, No. 04-292, 2005 WL 2406004 (W.D.N.Y. Sept. 29, 2005)

Addendum U: *Gebbia v. Toronto-Dominion Bank*, No. 604862/00 (N.Y. Sup. Ct. June 24, 2002)

Addendum V: *RGH Liquidating Trust v. Reliance Group Holdings, Inc.*, No. 600057/2006, 2006 WL 2872525 (N.Y. Sup. Ct. Sept. 27, 2006)

Addendum W: *I.G. Farben S'holders Org. v. UBS AG*, No. 05-4041, 2006 U.S. Dist. LEXIS 63347 (E.D.N.Y. Sept. 5, 2006)

Addendum X: *Willis v. Harrah's Illinois Corp.*, No. 98-2655, 1999 WL 313755 (7th Cir. May 7, 1999)

Addendum Y: *Forest Labs. Inc. v. Abbott Labs.*, No. 96-159, 1999 WL 33299123 (W.D.N.Y. June 23, 1999)

Addendum Z: *Metropolitan Life Ins. v. Datta*, No. 01-235, 2002 WL 221077 (N.Y. Sup. Ct. Jan. 23, 2002)

Addendum AA: *NetTech Solutions, L.L.C. v. ZipPark.com*, No. 01-2683, 2001 WL 1111966 (S.D.N.Y. Sept. 20, 2001)

Addendum BB: *McDarren v. Marvel Entm't Group, Inc.*, No. 94-0910, 1995 WL 214482 (S.D.N.Y. Apr. 11, 1995)

Addendum CC: *CMI II, LLC v. Interactive Brand Development, Inc.*, 824 N.Y.S.2d 753, 2006 WL 2770095 (Sup. Ct. 2006)

Addendum DD: *Healthnow New York v. APS Healthcare Bethesda, Inc.*, 05-612, 2006 U.S. Dist. LEXIS 13148 (N.D.N.Y. Mar. 10, 2006)

Addendum EE:   *Apollo Galileo USA P'ship v. Kingdom Vacations, Inc.*, No. 01-6847, 2002 U.S. Dist. LEXIS 11025 (N.D. Ill. June 18, 2002)

Addendum FF:   *FDIC v. Jackson-Shaw Partners No. 46, Ltd.*, No. 92-20556, 1994 U.S. Dist. LEXIS 21477 (N.D. Cal. Aug. 12, 1994)

Addendum GG:   *Stertz v. Gulf Oil Corp.*, No. 78-1813, 1988 WL 83188 (E.D.N.Y. July 22, 1988)