# Addendum A – Part 1

## Addendum A

### IBM's Undisputed Facts: SCO's Breach of Contract Claim

| | IBM's Statement of Undisputed Fact | SCO's Response | IBM's Reply |
|---|---|---|---|
| 1. | In the 1960s, MIT, AT&T's Bell Labs, and General Electric collaborated on a project, known as Multics, to create a computer operating system that would allow for the simultaneous access by multiple users to a single computer. (Ex. 487 at 26-27; Ex. 384; Ex. 230 ¶ 5.) | Undisputed. | Undisputed. |
| 2. | Multics resulted in an operating system that could accommodate simultaneous users, but the operating system could not support many multiple users and was expensive to operate, and Bell Labs withdrew from the project. (Ex. 384; Ex. 385; Ex. 386; Ex. 230 ¶ 6.) | Undisputed. | Undisputed. |
| 3. | After Bell Labs withdrew from Multics, one of its developers, Ken Thompson, undertook to design an alternative operating system, drawing on the work done in Multics. (Ex. 386.) With others at Bell Labs, including Dennis Ritchie, Mr. Thompson developed an operating system they called Unics. (Ex. 487 at 9; Ex. 387.) At the suggestion of another Bell Labs developer, Brian Kernighan, the name of the operating system was eventually changed to "UNIX". (Ex. 388.) | Undisputed. | Undisputed. |
| 4. | In the years that followed, AT&T developed numerous versions of UNIX and made it widely available to universities and businesses, as well as to the United States government. (Ex. 389.) AT&T permitted licensees, including the University of California at Berkeley ("UC Berkeley"), to develop and add their own features to UNIX and to distribute those features. (Ex. 488 at *1-2, 18; Ex. 275 ¶ 13; Ex. 230 ¶ 8; Ex. 389.) | Disputed to the extent the statement suggests that AT&T had waived any copyright or other legal rights in UNIX by distributing any version of UNIX during that time. (¶ 79.) "The mere fact of publishing a copyrighted work does not give others the right to use, copy, modify, or distribute that work." (IBM Statement of Undisputed Facts in Support of IBM's Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim) ¶ 8.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

| # | Fact Cited | SCO's Response | IBM's Reply |
|---|---|---|---|
| 5. | By the end of the 1970s, UNIX had grown in popularity. Universities throughout the world, including UC Berkeley, began offering educational courses and sponsoring research projects involving UNIX. (Ex. 487 at ¶¶ 9-33; Ex. 389; Ex. 230 ¶ 10.) | Disputed to the extent the statement suggests that any such manual, article, paper or commentary constituted any copyright or other legal rights in UNIX by virtue of any such courses or projects. (¶ 79.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 6. | Numerous manuals, articles and papers were written about UNIX, including no less than seven editions of the "UNIX PROGRAMMER'S MANUAL", which was distributed by Bell Labs with its UNIX operating systems, and the Lions' Commentary on UNIX 6th Edition, written by John Lions. (Ex. 487 at 43, 130; Ex. 385; Ex. 491; Ex. 230 ¶ 11.) | Disputed to the extent the statement suggests that any such manual, article, paper or commentary constituted any waiver by AT&T of any copyright or other legal rights in UNIX. (Ex. 288 at 49-50; Ex. 139 ¶¶ 23-26.) "The mere fact of publishing a copyrighted work does not give others the right to use, copy, modify, or distribute that work." (IBM Statement of Undisputed Facts in Support of IBM's Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim) ¶ 8.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 7. | In 1982, AT&T entered into a consent decree with the U.S. Federal Trade Commission, which provided for the spin-off of the regional Bell operating companies and freed AT&T to enter the computer industry, from which it had previously been barred. (Ex. 487 at 190; Ex. 230 ¶ 19.) | Disputed to the extent the statement draws a legal conclusion, disputed in that the cited material does not properly support the statement. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>The facts stated in IBM's referenced paragraph are fully supported by the cited material.<br><br>SCO's response does not create a genuine issue of fact in that the facts in the referenced paragraph are background and no point purportedly controverted is material to IBM's motion. |

2

| | | Disputed or Undisputed | SCO's Response |
|---|---|---|---|
| 8. | As a result, AT&T developed and sold a commercial version of the UNIX operating system known as UNIX System III. This release met with limited success, however. Many universities and companies had utilized their rights under the AT&T licenses to create their own versions of UNIX, creating confusion and competition in the marketplace. Moreover, companies like Western Electric, a subsidiary of AT&T, continued to sell older UNIX versions. (Ex. 391.) | Disputed to the extent the statement suggests that AT&T developed and sold a commercial version of UNIX solely as a result of the 1982 consent decree, which statement the inadmissible cited material does not properly support. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>SCO's response does not create a genuine issue of fact in that the facts in the referenced paragraph are background and no point purportedly controverted is material to IBM's motion. |
| 9. | In an attempt to end confusion concerning the differing versions of the UNIX operating system, AT&T in 1983 combined various versions of UNIX developed at universities and other companies into UNIX System V, Release I. (Ex. 391.) Later, AT&T released other versions, including System V Release 2.0, System V Release 3.0, and System V Release 4.0. (See Ex. 297 at 32:2-13.) | Disputed to the extent the statement suggests that AT&T developed UNIX System V, Release I solely "in an attempt to end confusion concerning the differing versions of the UNIX operating system," which statement the inadmissible cited material does not properly support. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>SCO's response does not create a genuine issue of fact in that the facts in the referenced paragraph are background and no point purportedly controverted is material to IBM's motion. |
| 10. | Over the years, through various business units and subsidiaries, including AT&T Technologies, Inc. and UNIX System Laboratories, Inc. ("USL"), AT&T licensed various versions of its UNIX operating system, both in source code and object code form. (See Ex. 3 ¶¶ 23-24; Ex. 5 ¶ 9; Ex. 64 ¶ 2.) | Undisputed. | Undisputed. |

3

| | SCO's Statement | IBM's Response |
|---|---|---|
| 11. | AT&T generally licensed its UNIX operating system pursuant to standard form agreements. A software agreement granted the licensee the right to use and modify the source code of the operating system. A sublicensing agreement granted the license the right to furnish sublicensed products based on UNIX System V to customers in object code format. And, a substitution agreement provided that the software agreement and, if applicable, the sublicensing agreement replaced earlier agreements relating to UNIX System V software. (Ex. 282 ¶ 6.) | Undisputed. | |
| 12. | The head of the AT&T division responsible for licensing AT&T UNIX software during this time was Otis Wilson. Mr. Wilson led the UNIX licensing negotiations for AT&T and either personally signed, or authorized the signing of, almost all, if not all, of AT&T's UNIX licensing agreements. (See Ex. 281 ¶ 5; Ex. 282 ¶ 3; Ex. 301 at 41:4-14, 42:7-43:6.) | Depending on the meaning of the terms "responsible for licensing" and "this time," disputed in that Mr. Wilson reported to William Guffey, who was then the head of AT&T's Software Services Division responsible for the UNIX software, through 1985. (Ex. 138 ¶ 3.) Disputed to the extent the statement suggests that Mr. Wilson had the authority to modify or negotiate away the terms of AT&T's standard license agreements. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 13. | Mr. Wilson reported to Michael DeFazio, who was then the head of the overall AT&T organization responsible for the UNIX software, including product management, marketing and licensing. (See Ex. 182 ¶ 1.) As head of the organization, Mr. DeFazio had ultimate responsibility for the terms and conditions of AT&T's UNIX licensing agreements. (See Id. ¶¶ 6-7.) | Disputed in that as of 1985, Mr. Wilson reported to William Guffey, who was then the head of AT&T's Software Services Division responsible for the UNIX software, through 1985. (¶ 105.) Disputed in that Mr. DeFazio did not have the authority to modify or negotiate away the terms of AT&T's standard form UNIX license agreements, and was only one of several individual responsible for interpreting and enforcing the agreements. (¶ 90.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's statement with admissible evidence meeting the requirements of Rule 56. |

4

| | IBM's Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| 14. | Reporting to Mr. Wilson was, among others, David Frasure, who was AT&T's national sales and licensing manager for its UNIX products. (See Ex. 190 ¶ 5; Ex. 302 at 8:1-22.) Mr. Frasure participated in negotiating many of AT&T's UNIX System V licenses, and on occasion signed the agreements on Mr. Wilson's behalf. (See Ex. 302 at 8:13-9:6.) | Undisputed. | Undisputed. |
| 15. | Under the direction of Messrs. DeFazio, Wilson and Frasure, AT&T and its subsidiaries licensed UNIX source code, including UNIX System V source code, to hundreds of licensees. AT&T also licensed many companies to distribute their own UNIX operating systems, such as Hewlett-Packard Co.'s "HP-UX" operating system. (See Ex. 3 ¶¶ 24-27; Ex. 64 ¶ 3.) | Disputed to the extent the statement suggests that Messrs. DeFazio, Wilson and Frasure had the authority to modify the terms of AT&T's standard UNIX license agreements, to the extent the statement suggests that Messrs. DeFazio, Wilson and Frasure were the only individuals under whose direction AT&T licensed its UNIX source code, and to the extent the statement suggests that AT&T licensed any company to distribute their own UNIX operating system in source code format. (¶¶ 76-96.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 16. | The standard software agreements that AT&T used to license UNIX System V source code and related materials set forth the various rights given to licensees and the restrictions imposed on the licensees with respect to such materials. (Ex. 282 ¶ 6.) | Disputed to the extent the statement suggests that AT&T did not license the UNIX System V methods and concepts pursuant to the standard license agreements. (¶ 80.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 17. | Among the provisions in AT&T's early software agreement (including in the IBM Software Agreement and the Sequent Software Agreement) were the following: <br>• Section 2.01: "AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Deemed admitted:Supplements hereto, solely for LICENSEE's own internal business purposes." <br>• Section 2.05: "No right is granted by this Agreement for the use of SOFTWARE | Depending on the meaning of the term "early," (disputed to the extent the statement suggests that AT&T or its successors – in – interest ever abandoned the foregoing protections in the standard UNIX license agreements. (¶¶ 76-96.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

| | | | |
|---|---|---|---|
| | PRODUCTS directly for others, or for any use of SOFTWARE PRODUCTS by others." <br><br> • Section 4.01: "LICENSEE agrees that it will not, without the prior written consent of AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the United States." <br><br> • Section 7.06(a): "LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T." <br><br> • Section 7.10: "Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part." <br><br> (Ex. 282 ¶ 12; Ex. 119; Ex. 492.) | | |
| 18. | These provisions concern the UNIX System V source code and related materials — the "SOFTWARE PRODUCT" or "SOFTWARE PRODUCTS" — that AT&T provided to its licensees. The Agreements define "SOFTWARE PRODUCT" as "materials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS". "COMPUTER PROGRAM" is defined as "any instruction or instructions, in source-code or object-code format, for controlling the operation of a CPU". (Ex. 119; Ex. 492.) The provisions do not, by their terms, place restrictions on what licensees can do with their own original works. (Ex. 282 ¶ 12; Ex. 119; Ex. 492.) | Disputed to the extent the statement suggests that AT&T did not license the UNIX System methods and concepts pursuant to the standard software agreements, and, depending on the meaning of the term "their own original works," to the extent that the statement suggests that the terms of AT&T's standard UNIX license agreement do not place restrictions on what licensees can do with their own original works. (¶¶ 13-21.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

6

| | | SCO'S RESPONSE | IBM'S REPLY |
|---|---|---|---|
| 19. | As Messrs. Wilson, DeFazio, and Frasure understood and discussed the provisions with licensees, they do not, and were not intended to, restrict a licensee's right to use, export, disclose or transfer its own products and source code, so long the licensee did not use, export, disclose or transfer AT&T's UNIX System V source code along with it. AT&T's software agreements were not intended to place any restrictions on licensees' use of their own original work. (Ex. 282 ¶ 12; Ex. 182 ¶ 17; Ex. 189 ¶¶ 14-16.) | Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, and Frasure had no such understanding or discussions. (¶¶ 63-163.) Depending on the meaning of the phrases "their own original works" and "its own products and source code," disputed in that AT&T's software agreements were intended to place restrictions on the licensee's modifications and derivative works based on the licensed UNIX software product. (¶¶ 82-86.) | Deemed admitted: The material referred to by SCO does not support SCO's statement. |
| 20. | AT&T's standard software agreements granted licensees the right to modify UNIX System V source code and to prepare derivative works based upon the code. Section 2.01 of AT&T's early software agreement included the following language: Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT. (Ex. 281 ¶ 13; Ex. 182 ¶ 16; Ex. 189 ¶ 15; Ex. 190 ¶ 14.) | Disputed to the extent the statement suggests that the term "SOFTWARE PRODUCT" in the standard UNIX license agreement excludes the methods and concepts embodied therein. (¶ 80.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

7

| | SCO's Statement | Response | IBM's Reply |
|---|---|---|---|
| 21. | As Messrs. Wilson, DeFazio, Frasure and other AT&T representatives communicated to AT&T's licensees, this provision was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement. Any source code developed by or for a licensee and included in a modification or a derivative work would not constitute "resulting materials" to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein. (Ex. 282 ¶ 16; Ex. 190 ¶ 14.) | Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, Frasure and other AT&T representatives had no such understanding and engaged in no such communications. (¶¶ 63-163.) Disputed in that AT&T's license agreements were intended to require licensees to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 82-86.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 22. | AT&T and USL did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. Although the UNIX System V source code contained in a modification or derivative work continued to be owned by AT&T or USL, the code developed by or for the licensee remained the property of the licensee, and could therefore be used, exported, disclosed or transferred freely by the licensee. (Ex. 282 ¶ 15; Ex. 182 ¶ 17; Ex. 190 ¶ 16.) | Disputed in that AT&T and USL intended to require their UNIX System V licensees to hold in confidence all parts of the modifications and derivative works they developed based on the licensed UNIX System V software product, even those parts of such modifications and derivative works as to which AT&T and USL claimed no ownership. (¶¶ 82-86.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

| | IBM's Statement of Fact | SCO's Response | IBM's Reply |
|---|---|---|---|
| 23. | Messrs. Wilson, DeFazio, Frasure and other AT&T representatives did not believe that licensees would have been willing to enter into the software agreement if they had understood Section 2.01 to grant AT&T or USL the right to own or control source code developed by the licensee or provided to the licensee by a third party. They understood that many of AT&T's licensees invested substantial amounts of time, effort and creativity in developing products based on UNIX System V, and they did not intend Section 2.01 to appropriate for AT&T the technology developed by AT&T's licensees. (Ex. 282 ¶ 16; Ex. 182 ¶ 17; Ex. 190 ¶ 29.) | Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, Frasure and other AT&T representatives held no such belief or understanding. (¶¶ 63-163.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 24. | Some licensees sought to clarify that, under the agreements, the licensee, not AT&T or USL, would own and control modifications and derivative works prepared by or for the licensee (except for any original UNIX System V source code provided by AT&T or USL and included therein). Messrs. Wilson, DeFazio, Frasure, and other AT&T representatives provided such clarification when asked because that is what they understood the language in the standard software agreement to mean. In some cases, they provided this clarification orally. In other cases, they provided it in writing, such as in a side letter. (Ex. 282 ¶ 17; Ex. 182 ¶ 18; Ex. 189 ¶ 14; Ex. 190 ¶¶ 17-18.) | Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, Frasure and other AT&T representatives held no such understanding and made no such statements. (¶¶ 63-163.) Disputed in that no side letter permitted any AT&T or USL UNIX System V licensee to distribute any part of its modifications or derivative works based on the licensed UNIX System V software product. (¶¶ 82-88.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that any writing referred to the licensee's "control," which statement the cited material does not support. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

9

| | IBM's Statement | SCO's Response |
|---|---|---|
| 25. | It was Mr. Wilson's view at the time that AT&T could not claim any rights to non-UNIX System V code source (as SCO does here) without raising serious antitrust issues. In light of the divestiture of AT&T in the early 1980s, AT&T as a company was concerned with the potential anticompetitive effects of its actions. As a result, one of the reasons Mr. Wilson made clear to AT&T's licensees that its UNIX System V software agreements did not impose any restrictions on the use or disclosure of their own original code, except insofar as it included UNIX System V code, was to avoid any appearance of any impropriety. (Ex. 282 ¶ 18.) | Disputed in that substantial evidence shows (and easily permits the inference) that Mr. Wilson held no such view and made no such representations. (¶¶ 63-163.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V". (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. The material referred to by SCO does not support SCO's statement. |
| 26. | Because AT&T and USL intended to distribute the UNIX System V source code and related information widely, AT&T understood that it would be difficult to require that the code and related information be kept confidential. Since AT&T believed that its licensees held the same view, its standard UNIX software agreements provided that a license would not be required to keep a software product confidential if it became available without restriction to the general public. (Ex. 282 ¶ 29.) | Disputed in that there was nothing inherent in AT&T's or USL's UNIX licensing program that would result in the disclosure of any confidential UNIX material, modifications, or derivative works. (¶¶ 78-79.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

10

| | SCO's Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| 27. | The exception is set forth in Section 7.06(a) of the standard software agreement: If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE'S obligations under this section shall not apply to such information after such time. (Ex. 119 § 7.06(a).) The license was free to disclose, without any restriction whatsoever, any information that became available without restriction to the general public by acts not attributable to that particular licensee. (Ex. 281 ¶ 30.) | Disputed to the extent the statement suggests that Section 7.06(a) of the standard software agreement embodies the exception as and for the reasons described in Paragraph 26. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 28. | This exception was intended to ensure that the confidentiality restriction applied only to information that needed to be protected — specifically, any trade secrets embodied in UNIX System V source code provided by AT&T or USL. If part or all of the source code were not entitled to be protected as a trade secret, then such software product (or portion of a software product) would be "available without restriction to the general public" within the meaning of the agreements, and no longer protected by any confidentiality restriction. AT&T did not intend to impose a confidentiality obligation beyond what it could enforce under trade secret law. (Ex. 281 ¶ 31.) | Disputed. AT&T intended to require its licensees to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX software product. (¶¶ 82-86.) AT&T sought to obtain more protection under the standard license agreement than AT&T might have under the existing intellectual property law. (¶ 81.) Disputed to the extent the statement suggests that Section 7.06(a) of the standard software agreement embodies the exception as and for the reasons described in Paragraph 26. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

11

| | IBM's ADDITIONAL FACTS | SCO'S RESPONSE | |
|---|---|---|---|
| 29. | AT&T never attempted to list all the ways in which source code could become "available without restriction to the general public" within the meaning of the software and related agreements. But AT&T, including Mr. Wilson and other representatives, believed that the UNIX System V source code (or any part thereof) would be available without restriction to the general public if, for example, it were (1) published by a party other than the licensee in question; (2) accessible outside the limits of a confidentiality agreement, such as for download from the internet; (3) available because its owner failed, even if by inadvertence or simple negligence, to take sufficient precautions to ensure that it would remain confidential; (4) distributed so widely that contractual confidentiality restrictions would be insufficient to maintain confidentiality; (5) made available to a third party who had the right to disclose the software product (or any part thereof); or (6) distributed under an open-source license like the GNU General Public License (the "GPL"). (Ex. 281 ¶ 32.) | Disputed to the extent the statement suggests that a distribution of the source code or methods or concepts embodied therein, accompanied by a copyright notice, would constitute making such technology "available without restriction to the general public." "The mere fact of publishing a copyrighted work does not give others the right to use, copy, modify, or distribute that work." (IBM Statement of Undisputed Facts in Support of IBM's Motion for Summary Judgment on Its Claim for Copyright Infringement (IBM's Eighth Counterclaim) ¶ 8.) Disputed in that there was nothing inherent in AT&T's or USL's UNIX licensing program that would result in the disclosure of any confidential UNIX material, modifications, or derivative works. (¶¶ 78-79.) Disputed to the extent the statement suggests that the GPL existed when the standard UNIX license agreement was created, which statement the cited material does not support. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 30. | Some licensees requested side letters clarifying or amending AT&T's standard terms or including most-favored customer provisions. AT&T agreed to issue side letters in some circumstances as an accommodation to the licensee, but it nevertheless intended to hold all licensees to the same basic standard. (Ex. 281 ¶¶ 22-26, 43.) | Disputed in that substantial evidence shows (and easily permits the inference) that AT&T did not intend to hold all licensees to the same basic standard without regard to the provisions of any side letters with its licensees. (¶ 89.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

| | IBM Material | SCO Response | IBM Reply |
|---|---|---|---|
| 31. | Although not all of AT&T's licensees had a side letter or most-favored customer provision, AT&T interpreted its license agreements in light of the collective body of UNIX license agreements. For example, the UNIX licensing group used the entire body of side letters to provide its guidance to AT&T's UNIX licensees. AT&T's policy was to deal with a licensee that did not have a most-favored customer provision in a side letter (like Sequent) in the same manner as a licensee that had a side letter with such a provision (like IBM). (Ex. 281 ¶ 43.) | Disputed in that substantial evidence shows (and easily permits the inference) that AT&T did not intend and it was not its policy to hold all licenses to the same basic standard regardless of the provisions of any side letters with its licensees. (¶ 89.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 32. | IBM and Sequent (like many other companies) entered into negotiations with AT&T in the mid-1980s, to replace their existing UNIX licenses with new ones for UNIX System V. Those negotiations led ultimately to execution of the Agreements, which SCO now contends IBM has breached. (See Ex. 178 ¶¶ 4-5; Ex. 190 ¶¶ 6-7; Ex. 217 ¶ 4; Ex. 228 ¶¶ 4-9; Ex. 233 ¶ 4; Ex. 252 ¶ 2; Ex. 266 ¶ 13; Ex. 275 ¶¶ 7-8; Ex. 282 ¶¶ 7-8.) | Undisputed. | Undisputed. |
| 33. | While Messrs. Wilson, DeFazio, and Frasure had primary responsibility for the negotiation and execution of the new IBM and Sequent UNIX licensing agreements, Mr. Steve Vuksanovich and Mr. Ira Kistenberg also participated in the negotiations. (See Ex. 275 ¶ 7; Ex. 217 ¶ 4.) Mr. Vuksanovich was the AT&T account representative assigned to the IBM account. (See Ex. 275 ¶ 8.) Mr. Kistenberg was the AT&T account representative specifically assigned to the Sequent account. (See Ex. 217 ¶ 3.5.) | Disputed to the extent the statement suggests that the standard UNIX license agreement at that time had not been previously drafted by AT&T. (¶¶ 106-18.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

13

| | | | Reply |
|---|---|---|---|
| 34. | IBM was represented in the negotiation of its UNIX licensing agreements by, among others, Messrs. Richard McDonough, Thomas Cronan, and Jeffrey Mobley. Mr. McDonough was the Division Counsel for IBM's System Products Division. (Ex. 228 ¶ 4.) Mr. Cronan was an attorney in IBM's System Products Division. (See Ex. 178 ¶¶ 4-5.) Mr. Mobley was a member of IBM's corporate Commercial & Industry Relations staff. (See Ex. 233 ¶¶ 1, 3-4.) | Undisputed. | Undisputed. |
| 35. | Sequent was represented in the negotiation of its UNIX licensing agreements by, among others, Messrs. David Rodgers and Roger Swanson. Mr. Rodgers was Sequent's Vice President of Engineering. (See Ex. 252 ¶ 2.) Mr. Swanson was Sequent's Director of Software Engineering. (See Ex. 266 ¶¶ 2-3.) | Undisputed. | Undisputed. |
| 36. | The AT&T representatives insisted on licensing its UNIX System V software and related materials pursuant to a standard set of license agreements. They stated that AT&T intended to license and distribute UNIX System V software and related materials broadly and, for the sake of efficiency and ease of administration, wanted to avoid having to draft different agreements with each of its licensees. In addition, they made clear that AT&T wished to license UNIX System V software and related materials evenhandedly; they said they expected to treat all of their licensees the same. (Ex. 178 ¶ 7; Ex. 217 ¶¶ 6-7; Ex. 228 ¶¶ 5-6; Ex. 252 ¶ 6; Ex. 266 ¶ 6; Ex. 275 ¶ 10.) | Disputed in that substantial evidence shows (and easily permits the inference) that AT&T did not intend and it was not its policy to hold all licensees to the same basic standard regardless of the provisions of any side letters with its licensees. (¶ 89.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

14

| | | |
|---|---|---|
| 37. | Mr. Wilson and his staff explained that the proposed agreements controlled what licenses could and could not do with the UNIX System V software products. They stated that the proposed agreements did not allow AT&T to control licensees' use, export, disclosure, or transfer of any software products or source code that licensees developed themselves that did not contain any UNIX System V code. (Ex. 178 ¶ 9; Ex. 228 ¶ 12; Ex. 233 ¶¶ 8-9; Ex. 252 ¶ 7; Ex. 266 ¶ 10.) | Disputed to the extent the statement suggests that Mr. Wilson and his staff held the view and told IBM or Sequent that the proposed agreements did not allow AT&T to control licensees' use, export, disclosure, or transfer of the licensees modifications and derivative works based on the licensed System V software product, in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson and his staff other AT&T representatives held no such understanding and made no such statements. (¶¶ 63-163.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

15

| | SCO's Alleged Undisputed Facts | IBM's Response to SCO's Alleged Undisputed Facts | IBM's Statement of Additional Facts |
|---|---|---|---|
| 38. | Both IBM and Sequent made clear during their respective negotiations that they could not and would not enter into any agreement that did not give them ownership and control of their own original works. The IBM and Sequent negotiators insisted that they had to own and control their own original works, even if they were included in a modifications and derivative work of UNIX System V. (Ex. 178 ¶¶ 13-14; Ex. 228 ¶ 13; Ex. 233 ¶¶ 6, 8; Ex. 252 ¶ 7; Ex. 266 ¶¶ 10-11.) | Disputed in that AT&T's license agreements were intended to require licensees to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product, AT&T would not have entered into a license agreement with any licensee who had stated a contrary view as a condition of entering into the contract, and the plain language of AT&T's standard UNIX System V license agreement made clear that AT&T had entered into no such understanding. (¶¶ 13-163.) Disputed in that the evidence shows (and easily permits the inference) that neither IBM nor Sequent would have imposed any such conditions on their willingness to enter into their agreements. (¶¶ 13-21.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

| # | IBM's Statement | SCO's Response | SCO's Reply |
|---|---|---|---|
| 39. | The AT&T negotiators separately advised both the IBM and Sequent negotiators that AT&T did not seek to preclude ownership and control of their original or homegrown works. In fact, the AT&T negotiators assured IBM and Sequent that the purpose of the restrictions imposed by the AT&T Agreements was to protect AT&T's original code and that IBM and Sequent could do whatever they wanted with their own code so long as they did not use, export, disclose, or transfer AT&T's original code (unless otherwise permitted by the AT&T Agreements). (Ex. 178 ¶ 19; Ex. 228 ¶ 15; Ex. 233 ¶ 16; Ex. 252 ¶ 8; Ex. 266 ¶ 12.) | Disputed in that substantial evidence shows (and easily permits the inference) that the AT&T negotiators gave no such advice or assurances, because they held no such understanding. (¶¶ 63-163.) Disputed to the extent that the statement suggests that the AT&T negotiators had the authority to modify or amend the standard terms of AT&T's standard System V license agreement. (¶¶ 90-91.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted. Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

| | IBM's Statement | SCO's Response | |
|---|---|---|---|
| 40. | The IBM negotiating team would never have agreed to give AT&T the right to own or control IBM's original works. To do so would have represented a dramatic departure from IBM's practices regarding the licensing of third-party code and would have required IBM to change the way it developed products to ensure that it not allow any IBM or third-party code to be introduced into the source code base containing the UNIX System V code (however briefly) unless IBM was prepared forever to yield control of that code to AT&T. (Ex. 178 ¶ 9; Ex. 228 ¶ 18; Ex. 233 ¶ 17.) | Depending on the meaning of the phrase "IBM's original works" and "control," disputed to the extent the statement suggests that the IBM negotiating team did not enter into a written agreement requiring IBM to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that IBM had compelling business reasons to insist on the "control" as described by IBM herein. (¶¶ 30-62.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 41. | So that there would be no confusion, the IBM negotiators told the AT&T representatives with whom they negotiated that IBM intended to include portions of AT&T's UNIX System V code in products with IBM code and to make changes to the AT&T code (such as by adding to it) and thus IBM had the right to ensure that the parties agreed that IBM had the right to do so, without forfeiting any rights (including the right to control) to such IBM products and code. (Ex. 178 ¶ 9.) | Disputed in that substantial evidence shows (and easily permits the inference) that the IBM negotiators made no such statements and asked for no such assurances. (¶¶ 63-163.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

18

| | SCO's Statement of Additional Facts | SCO's Response | IBM's Reply |
|---|---|---|---|
| 42. | Similarly, the Sequent negotiators would never have agreed to give AT&T the right to own or control their original works. (Ex. 252 ¶ 7; Ex. 266 ¶¶ 10-11.) As a small company at the time, it would not have made any sense for Sequent to have entered into an agreement that gave AT&T control over the source code that Sequent developed for its own software products. (Ex. 266 ¶ 11.) Sequent's original or homegrown source code was one of the key assets of the company, and to compromise Sequent's ownership of or control over the code would have required the approval of Sequent's board of directors. (Ex. 295 at 47:9-49:19.) | Depending on the meaning of the phrase "IBM's original works" and "control," disputed to the extent the statement suggests that the Sequent negotiating team did not enter into a written agreement requiring Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-21, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that Sequent had compelling business reasons to insist on the "control" as described by IBM herein. (¶¶ 30-62.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

19

| | SCO's Statement | IBM's Response |
|---|---|---|
| 43. | Messrs. Wilson, Frasure and DeFazio understood that neither IBM nor Sequent would have entered into the proposed UNIX licensing agreements if AT&T had sought and insisted on the right to control any product or code that might in the future be associated with UNIX System V code, except insofar as it might include UNIX System V code. (Ex. 182 ¶ 17; Ex. 190 ¶ 29; Ex. 282 ¶ 16.) No one involved in the negotiation of the Agreements ever suggested that they would give AT&T (or anyone else other than IBM or Sequent) the right to control IBM or Sequent original code. (Ex. 178 ¶¶ 11-12; Ex. 228 ¶ 19; Ex. 233 ¶ 9; Ex. 252 ¶ 7; Ex. 266 ¶ 10.) | Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, Frasure and other AT&T representatives held no such understanding and made no such statements. (¶¶ 53-161.) Depending on the meaning of the phrase "IBM or Sequent original code," disputed to the extent the statement suggests that the Sequent negotiating team did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that IBM or Sequent had compelling business reasons to insist on the "control?" as described by IBM herein. (¶¶ 30-62.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

20

Case 2:03-cv-00294-DN   Document 981-2   Filed 03/13/07   PageID.15870   Page 22 of 51

| | IBM's Statement | SCO's Reasons | IBM's Response |
|---|---|---|---|
| 44. | Based at least in part on AT&T's assurances, IBM and Sequent made the decision to execute licensing agreements that AT&T represented to reflect its standard terms. Sequent agreed to sign the agreements as is, whereas IBM agreed to sign them subject to clarifications and amendments set out in a contemporaneous side letter. IBM wanted to make sure there would be no question that, among other things, AT&T's licensees, not AT&T, would own and control the source code that was developed by the licensee or developed for the licensee by a third party. (Ex. 178 ¶¶ 13-17; Ex. 228 ¶¶ 13-14, 18; Ex. 233 ¶¶ 10-13; Ex. 252 ¶ 7; Ex. 266 ¶ 12.) | Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, Frasure and other AT&T representatives gave no such assurances. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into agreements requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 8, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that IBM or Sequent had compelling business reasons to insist on the "control" as described by IBM herein. (¶¶ 30-62.) | Deemed admitted. Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

21

| | IBM's Fact | SCO's Response | IBM's Reply |
|---|---|---|---|
| 45. | The AT&T negotiators agreed to provide IBM with a side letter, including, among other things, a most-favored customer provision, but stated that a side letter was not necessary because, among other reasons, AT&T did not wish to assert ownership or control over any modifications and derivative works prepared by or for IBM, or by any other of AT&T's licensees for that matter, except to the extent that those portions of the modifications or derivative works contained licensed UNIX System V source code. (Ex. 178 ¶ 16; Ex. 228 ¶¶ 13-14; Ex. 233 ¶¶ 12-13; Ex. 182 ¶¶ 18, 20; Ex. 189 ¶¶ 14-16; Ex. 281 ¶ 17.) | Depending on the meaning of the term "most-favored nation customer provision," disputed in that the term concerns terms other than pricing. (Ex. 333 ¶ 27.) Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, Frasure and other AT&T representatives possessed no such wishes. (¶¶ 63-163.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

22

| | IBM's Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| 46. | AT&T made clear that — side letter or not — AT&T intended to treat all of its licensees the same. Messrs. Wilson, DeFazio, Frasure, Kistenberg, and Vuksanovich intended to hold all licensees to the same basic standard. AT&T's stated policy was to treat all of its licensees essentially the same. (Ex. 182 ¶¶ 18, 20; Ex. 189 ¶¶ 14-16; Ex. 217 ¶¶ 21-22; Ex. 275 ¶¶ 26-27; Ex. 281 ¶ 17.) All were free to do as they wished with their original or homegrown works, so long as they protected AT&T's UNIX software. (See Ex. 182 ¶ 18; Ex. 190 ¶ 26; Ex. 217 ¶ 12; Ex. 275 ¶ 29; Ex. 282 ¶ 28.) | Disputed in that substantial evidence shows (and easily permits the inference) that AT&T did not intend to hold all licensees to the same basic standard without regard to the provisions of any side letters with its licensees. (¶ 89.) Disputed in that substantial evidence shows (and easily permits the inference) that Messrs. Wilson, DeFazio, Frasure and other AT&T representatives gave no such assurances. (¶¶ 63-163.) Depending on the definition of the phrase "original or homegrown works," disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-21, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 47. | IBM and Sequent completed negotiations relating to their UNIX System V licensing agreements beginning in early 1985. (Ex. 119; Ex. 120; Ex. 122; Ex. 492.) | Undisputed. | Undisputed. |
| 48. | IBM executed its agreements with AT&T, including its side letter, on February 1, 1985 (collectively, the "IBM Agreements"). The IBM Agreements were executed by Mr. Frasure on behalf of Mr. Wilson for AT&T and by Mr. McDonough for IBM. (Ex. 120; Ex. 122; Ex. 492.) | Undisputed. | Undisputed. |

23

| # | Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| 49. | Sequent executed its agreements with AT&T on April 18, 1985 and January 28, 1986 (collectively the "Sequent Agreements"). The Sequent Agreements were executed by Mr. Wilson for AT&T and Mr. Rodgers for Sequent. (Ex. 119; Ex. 121.) | Undisputed. | Undisputed. |
| 50. | The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V. (Ex. 119; Ex. 492; Ex. 282 ¶ 6; Ex. 182 ¶ 15.) | Undisputed. | Undisputed. |
| 51. | The Agreements included the following provisions from AT&T's standard Software Agreements, each of which SCO accuses IBM of breaching:<br><br>**Section 2.01:**<br>AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT.<br><br>**Section 2.05:**<br>No right is granted by this Agreement for the use of SOFTWARE PRODUCTS directly for others, or for any use of SOFTWARE PRODUCTS by others.<br><br>**Section 4.01:** | Undisputed. | Undisputed. |

24

| | | AT&T Response | IBM's Reply |
|---|---|---|---|
| | LICENSEE agrees that it will not, without the prior written consent of AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the United States.<br><br>**Section 6.03**<br>If LICENSEE fails to fulfill one or more of its obligations under this Agreement, AT&T may, upon its election and in addition to any other remedies that it may have, at any time terminate all the rights granted by it hereunder by not less than two (2) months' written notice to LICENSEE specifying any such breach, unless within the period of such notice all breaches specified therein shall have been remedied; upon such termination LICENSEE shall immediately discontinue use of and return or destroy all copies of SOFTWARE PRODUCTS subject to this Agreement.<br><br>**Section 7.06(a)**<br>LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T. LICENSEE further agrees that it shall not make any disclosure of any or all of such SOFTWARE PRODUCTS (including methods or concepts utilized therein) to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder. ... If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE's obligations under this section shall not apply to such information after such time. | | |

| | SCO's Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| | **Section 7.10**<br><br>Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part.<br><br>(Ex. 492; Ex. 119.) | | |
| 52. | On their face, the allegedly breached provisions (Sections 2.01, 2.05, 4.01, 6.03, 7.06(a) and 7.10) pertain to AT&T's "SOFTWARE PRODUCT", which is defined by the Agreements as:<br><br>[Materials such as COMPUTER PROGRAMS, information used or interpreted by COMPUTER PROGRAMS and documentation relating to the use of COMPUTER PROGRAMS. Materials available from AT&T for a specific SOFTWARE PRODUCT are listed in the Schedule for such SOFTWARE PRODUCT.<br><br>(Ex. 492 § 1.04; Ex. 119 § 1.04.) | Disputed to the extent the statement suggests that the foregoing provisions relate only to the "software product" in that, on their face, Sections 2.01, 7.06(a) and 7.10 of the Agreements also pertain to any modifications and derivative works that IBM and Sequent develop based on the licensed UNIX System V software product. | Deemed admitted:  Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.  SCO's statement does not refer to any portion of the record on which SCO relies. |
| 53. | The various schedules attached to the IBM and Sequent Software Agreements identify the specific "SOFTWARE PRODUCT" or "SOFTWARE PRODUCTS", and related materials, that AT&T provided under the terms of the agreements.  (Id.)  The particular "SOFTWARE PRODUCT" at issue in this case is "UNIX System V".  (See, e.g., Ex. 125; Ex. 126.) | Disputed to the extent the statement suggests that the agreements do not refer to specific versions of UNIX System V, which statement the cited material does not support. | Deemed admitted:  Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.  SCO's statement does not refer to any portion of the record on which SCO relies.<br><br>The facts stated in IBM's referenced paragraph are fully supported by the cited material. |

26

| | | SCO's Response: | IBM's Reply: |
|---|---|---|---|
| 54. | The IBM Side Letter clarified Section 2.01 as follows:<br><br>Regarding Section 2.01, we agree that that modifications and derivative works prepared by or for [IBM] are owned by [IBM]. However, ownership of any portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work remains with [AT&T]. (Ex. 122 at 2; Ex. 282 ¶¶ 19-20; Ex. 189 ¶ 14; Ex. 182 ¶ 18; Ex. 275 ¶¶ 15-16; Ex. 228 ¶¶ 13-14; Ex. 178 ¶¶ 13-16; Ex. 233 ¶¶ 10-13.) This language clarified that IBM (like all AT&T licensees) owned and controlled its original or homegrown works. (Ex. 282 ¶¶ 19-20; Ex. 189 ¶ 14; Ex. 182 ¶ 18; Ex. 275 ¶¶ 15-16; Ex. 228 ¶¶ 13-14; Ex. 178 ¶¶ 13-16; Ex. 233 ¶¶ 10-13.) | Depending on the meaning of the word "controlled" and the phrase "original or homegrown works," disputed in that the language in Paragraph 2 of the IBM Side Letter did not clarify that IBM (or any other AT&T UNIX System V licensee) was free to publicly disclose even those portions of a modification or derivative work that IBM (or AT&T's other UNIX System V licensees) owned. (¶¶ 87-89.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. The material referred to by SCO does not support SCO's statement. |

27

| | IBM's Statement of Facts | SCO's Response | IBM's Reply |
|---|---|---|---|
| 55. | In addition, the Side Letter, as well as subsequent Amendment No. X, amended Section 7.06(a) of the IBM Software Agreement to provide as follows:<br><br>LICENSEE agrees that it shall hold SOFTWARE PRODUCTS subject to this Agreement In confidence for AT&T. LICENSEE further agrees that it shall not make any disclosure of such SOFTWARE PRODUCTS to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder. . . . Nothing in this Agreement shall prevent LICENSEE from developing or marketing products or services employing ideas, concepts, know-how or techniques relating to data processing embodied in SOFTWARE PRODUCTS subject to this Agreement, provided that LICENSEE shall not copy any code from such SOFTWARE PRODUCTS into any such product or in connection with any such service. . . . If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE's obligations under this section shall not apply to such information after such time.<br><br>(Ex. 122 ¶ A.9; Ex. 124 ¶ 6.) This language clarified, among other things, that IBM (like all AT&T licensees) had no obligation of confidentiality regarding UNIX software that becomes available without restriction to the general public by acts not attributable to IBM. | Disputed in that the foregoing statement omits the third sentence of Paragraph A.9 of the IBM Side Letter: "LICENSEE shall appropriately notify each employee to whom any such disclosure is made that such disclosure is made in confidence and shall be kept in confidence by such employee." | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

| | IBM's Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| 56. | Consistent with AT&T's policy to treat all licensees the same, Paragraph A.12 of the IBM Side Letter provides:<br><br>We agree that all SOFTWARE PRODUCTS, including enhancements to or new versions of existing SOFTWARE PRODUCTS, generally available under the Software Agreement will be made available to you at the fees and under terms, warranties and benefits equivalent to those offered to other licensees.<br><br>(Ex. 122 ¶ A.12.) This language meant that if any other licensee was offered or obtained terms more favorable to the licensee than those contained in the IBM Agreements, then IBM would have the advantage of such more favorable terms as if they had been set forth in the IBM Agreements. (Ex. 281 ¶ 43.) | Disputed to the extent the statement suggests that paragraph A.12 concerned any term other than pricing. (Ex. 333 ¶ 27.) Disputed to the extent that IBM ever licensed any subsequent version of UNIX System V other than the version licensed under its 1985 Agreement and Side Letter. (Ex. 333 ¶ 27.) | Deemed admitted. The material referred to by SCO does not support SCO's statement.<br><br>Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

29

| # | | SCO's Response: | IBM's Reply: |
|---|---|---|---|
| 57. | All of the individuals who executed and negotiated the Agreements, as well as Mr. DeFazio, who had ultimate responsibility for them (collectively, the "Involved Persons"), agree that the Agreements were not intended to, and do not, restrict in any manner the use or disclosure of any original code written by, or for, IBM and Sequent. (See Ex. 178 ¶ 18; Ex. 182 ¶¶ 17-18; Ex. 189 ¶¶ 13-16, 24-29; Ex. 217 ¶ 9; Ex. 228 ¶¶ 11-19; Ex. 233 ¶ 9; Ex. 252 ¶¶ 7-9; Ex. 266 ¶ 8; Ex. 275 ¶ 12; Ex. 282 ¶¶ 14-15, 27-30.) | Disputed to the extent the statement suggests that the "Involved Persons" had the authority to modify the terms of AT&T's standard UNIX license agreements and to the extent the statement suggests that the "Involved Persons" were the only individuals under whose direction AT&T licensed its UNIX source code. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that the "Involved Persons" did not share any such view during their tenure at AT&T. (¶¶ 63-163.) Depending on the definition of the phrase "original code written by, or for, IBM and Sequent," disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.

The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

| | IBM'S STATEMENT | SCO'S RESPONSE | IBM'S REPLY |
|---|---|---|---|
| 58. | None of the Involved Persons understood the Agreements to give AT&T or its successors the right to assert ownership or control over all of the source code of any modifications or derivative works based on UNIX System V. To the contrary, they understood that IBM and Sequent owned, and were permitted to use however they wanted, any modifications or derivative works that they created (or that others created for them) based on UNIX System V software, except for the UNIX System V material that might be contained within their modifications or derivative works. (See Ex. 178 ¶ 17; Ex. 182 ¶ 20; Ex. 190 ¶¶ 14-15; Ex. 217 ¶¶ 10-11; Ex. 228 ¶¶ 13, 15; Ex. 233 ¶¶ 8-9; Ex. 252 ¶ 7; Ex. 266 ¶¶ 10-12; Ex. 275 ¶ 13; Ex. 282 ¶ 15.) | Disputed to the extent the statement suggests that the "Involved Persons" had the authority to modify the terms of AT&T's standard UNIX license agreements and to the extent the statement suggests that the "Involved Persons" were the only individuals under whose direction AT&T licensed its UNIX source code. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that the "Involved Persons" did not share any such view during their tenure at AT&T. (¶¶ 63-163.) Depending on the definition of the phrase "original code written by, or for, IBM and Sequent," disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted. Nothing in SCO's statement specifically controverts IBM's facts meeting the requirements of Rule 56.

The material referred to by SCO does not support SCO's statement, and the testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

31

| | IBM's Alleged Facts | SCO's Response | IBM's Reply |
|---|---|---|---|
| 59. | As the Involved Persons understood the Agreements, they impose no restrictions on IBM's or Sequent's use, export, disclosure or transfer of those portions of any modifications or derivative works of UNIX System V that were created by or for IBM or Sequent and do not contain any UNIX System V source code. (See Ex. 178 ¶ 18; Ex. 182 ¶ 18; Ex. 190 ¶ 24; Ex. 217 ¶ 12; Ex. 228 ¶ 16; Ex. 233 ¶ 6; Ex. 252 ¶ 18; Ex. 266 ¶ 12; Ex. 275 ¶ 12; Ex. 282 ¶ 27.) Under the Agreements, IBM and Sequent are free to use however they want any AIX or Dynix source code, except for the UNIX System V source code or other licensed software products provided by AT&T that may be contained therein (except as otherwise permitted by the AT&T Agreements). (See Ex. 178 ¶ 19; Ex. 182 ¶ 19; Ex. 190 ¶ 26; Ex. 217 ¶ 12; Ex. 228 ¶ 15; Ex. 233 ¶ 14; Ex. 252 ¶ 13; Ex. 266 ¶ 13; Ex. 275 ¶ 29; Ex. 282 ¶ 28.) | Disputed to the extent the statement suggests that the "Involved Persons" had the authority to modify the terms of AT&T's standard UNIX license agreements and to the extent the statement suggests that the "Involved Persons" were the only individuals under whose direction AT&T licensed its UNIX source code. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that the "Involved Persons" did not share any such view during their tenure at AT&T. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

| # | | | 's Reply |
|---|---|---|---|
| 60. | According to the Involved Persons, SCO's theory of the case — that IBM has breached the Agreements by improperly using, exporting, disclosing or transferring AIX and Dynix source code, irrespective or whether IBM has improperly used, exported, disclosed or transferred any protected UNIX System V source code — is inconsistent with the provisions of the Agreements and with the parties' intentions. (See Ex. 178 ¶ 21; Ex. 182 ¶ 31; Ex. 190 ¶ 27; Ex. 217 ¶ 24; Ex. 228 ¶ 17; Ex. 233 ¶ 16; Ex. 275 ¶ 30; Ex. 282 ¶ 29; Ex. 310 at 116:18-118:4.) The Agreements were not intended to limit IBM's or Sequent's freedom of action with respect to their original source code, methods, or concepts and were intended merely to protect AT&T's interest in its own UNIX System V source material. (See Ex. 178 ¶ 22; Ex. 182 ¶ 22; Ex. 190 ¶ 12; Ex. 228 ¶ 18; Ex. 233 ¶ 17; Ex. 276 ¶ 13; Ex. 282 ¶ 12; Ex. 310 at 80:15-19, 117:14-118:4; 124:12-21.) | Disputed to the extent the statement suggests that the "Involved Persons" had the authority to modify the terms of AT&T's standard UNIX license agreements and to the extent the statement suggests that the "Involved Persons" were the only individuals under whose direction AT&T licensed its UNIX source code. (¶¶ 75-96.) Disputed in that substantial evidence shows (and easily permits the inference) that the "Involved Persons" did not share any such view during their tenure at AT&T. (¶¶ 63-163.) Depending on the definition of the phrases "freedom of action" and "original source code, methods, or concepts," disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

33

| | | | |
|---|---|---|---|
| 61. | Section 2.01 of the Software Agreements, as understood by the Involved Persons, was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement. (See Ex. 178 ¶ 11; Ex. 182 ¶ 16; Ex. 190 ¶ 14; Ex. 228 ¶ 12; Ex. 233 ¶ 8; Ex. 282 ¶ 14; Ex. 584 at 176:2-18; Ex. 310 at 30:17-31:5.) Any source code developed by or for a licensee and included in a modification or a derivative work would not constitute "resulting materials" to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein. (See Ex. 178 ¶ 11; Ex. 182 ¶ 16; Ex. 190 ¶ 14; Ex. 217 ¶ 11; Ex. 228 ¶ 12; Ex. 233 ¶ 8; Ex. 252 ¶ 7; Ex. 282 ¶ 14; Ex. 584 at 173:3-174:8.) | Disputed to the extent the statement suggests that the "Involved Persons" had the authority to modify the terms of AT&T's standard UNIX license agreements and to the extent the statement suggests that the "Involved Persons" were the only individuals under whose direction AT&T licensed its UNIX source code. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that the "Involved Persons" did not share any such view during their tenure at AT&T. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.

The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

34

| | IBM's Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| 62. | None of the Involved Persons intended the Agreement to permit AT&T and USL to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. (See Ex. 178 ¶ 15; Ex. 182 ¶ 20; Ex. 190 ¶¶ 14-15; Ex. 217 ¶ 22; Ex. 228 ¶ 13; Ex. 233 ¶ 8; Ex. 252 ¶ 7; Ex. 266 ¶ 10; Ex. 275 ¶ 27; Ex. 282 ¶ 15.) They intended that the code developed by or for the licensee would remain the property of the licensee, and could therefore be used, exported, disclosed or transferred freely by the licensee. (See Ex. 178 ¶ 18; Ex. 182 ¶ 20; Ex. 190 ¶¶ 14-15; Ex. 217 ¶ 23; Ex. 228 ¶ 15; Ex. 233 ¶ 9; Ex. 252 ¶¶ 8-9; Ex. 266 ¶¶ 10, 12; Ex. 275 ¶ 27; Ex. 282 ¶ 15.) | Disputed to the extent the statement suggests that the "Involved Persons" had the authority to modify the terms of AT&T's standard UNIX license agreements and to the extent the statement suggests that the "Involved Persons" were the only individuals under whose direction AT&T licensed its UNIX source code. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that the "Involved Persons" did not share any such view during their tenure at AT&T. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. The material referred to by SCO does not support SCO's statement. The testimony of individuals who did not negotiate or execute the Agreements is irrelevant. |

35

| ¶ | | | SCO's Reply |
|---|---|---|---|
| 63. | Whether or not AT&T entered into a side letter or other agreements with its licensees to clarify the treatment of modifications and derivative works, or altered the language of Section 2.01, AT&T's and USL's intent was always the same. It never intended to assert ownership or control over any portion of a modification or derivative work that was not part of the original UNIX System V source code provided by AT&T or USL. The licensee was free to use, copy, distribute or disclose its modifications and derivative works, provided that it did not use, copy, distribute or disclose any portions of the original UNIX System V source code provided by AT&T or USL except as permitted by the license agreements. (See Ex. 182 ¶ 20; Ex. 190 ¶ 24; Ex. 217 ¶ 22; Ex. 275 ¶ 27; Ex. 282 ¶ 27.) | Disputed in that substantial evidence shows (and easily permits the inference) that AT&T did not intend to hold all licensees to the same basic standard without regard to the provisions of any side letters with its licensees. (¶ 89.) Disputed in that the statement suggests that the "Involved Persons" had the authority to modify the terms of AT&T's standard UNIX license agreements and to the extent the statement suggests that the "Involved Persons" were the only individuals under whose direction AT&T licensed its UNIX source code. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that the "Involved Persons" did not share any such view during their tenure at AT&T. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring IBM and Sequent to hold in confidence all parts of its modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous oral discussion from the agreement the parties had reached. (¶¶ 18-9 ¶ 92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

36

| | IBM's Statement | SCO's Response |
|---|---|---|
| 64. | At about the same time that IBM and Sequent executed the Agreements, other licensees and prospective licensees sought clarification that AT&T and USL did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of any material portions of the original UNIX System V source code provided by AT&T or USL and included in such modifications and derivative works. (See Ex. 217 ¶ 13; Ex. 275 ¶ 17.) | Disputed to the extent the referenced materials are cited for the truth of the proposition that other licensees and prospective licensees sought such clarification, and disputed to the extent the statement suggests that AT&T held the view that the agreements did not preclude the licensees' use, export, disclosure, or transfer of the licensees modifications and derivative works based on the licensed System V software product, in that substantial evidence shows (and easily permits the inference) that AT&T held no such view. (¶¶ 63-163.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 65. | Because of the numerous inquiries it received from licensees, AT&T further clarified the meaning of Section 2.01 of its software license agreements at seminars organized for licensees and in its "$ echo" publication. $ echo was a newsletter that AT&T published for all UNIX System V licensees to keep them informed of AT&T's policies with respect to UNIX System V. AT&T intended the guidance provided in the newsletter to apply to all of its UNIX System V licensees. (See Ex. 190 ¶ 19; Ex. 217 ¶¶ 14-15; Ex. 275 ¶¶ 18-19; Ex. 282 ¶ 21.) | Depending on the meaning of the word "apply," disputed to the extent the statement suggests that AT&T intended the $ echo newsletter to have any binding legal effect. (Ex. 5 at 100-01; Ex. 69 at 120-21; Ex. 10 ¶ 8; Ex. 14 ¶ 4; see also IBM Ex. 301 at 68; IBM Ex. 302 at 246-47.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 66. | The April 1985 edition of $ echo describes presentations made by a member of Mr. Wilson's licensing group, Mr. Frasure, outlining changes that AT&T intended to make to the licensing and sublicensing agreements as a result of discussions that Mr. Wilson and others in his group had with AT&T's licensees. (See Ex. 190 ¶ 20; Ex. 217 ¶ 16; Ex. 275 ¶ 20; Ex. 282 ¶ 22.) | Disputed to the extent that the statement suggests that in April 1985 Mr. Wilson had the lone or ultimate authority over AT&T's UNIX software licensing, or that Mr. Wilson or Mr. Frasure alone had the authority to make any "changes" to the standard licensing and sublicensing agreements. (¶ 90.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

37

| | SCO's statement | SCO's Response | IBM |
|---|---|---|---|
| 67. | As discussed in the newsletter, among the changes AT&T decided to implement, and which were announced at the seminars by Mr. Frasure, were "[l]anguage changes . . . to clarify ownership of modifications or derivative works prepared by a licensee". (See Ex. 190 ¶ 20; Ex. 217 ¶ 17; Ex. 275 ¶ 21; Ex. 282 ¶ 23.) The August 1985 edition of $ echo describes these changes in detail. With respect to Section 2.01, the newsletter states:<br><br>Section 2.01 - The last sentence was added to assure licensees that AT&T will claim no ownership in the software that they developed — only the portion of the software developed by AT&T.<br><br>(See Ex. 190 ¶ 21; Ex. 217 ¶ 18; Ex. 275 ¶ 22; Ex. 282 ¶ 24.) | Depending on the meaning of the term "control" in previous statements, disputed to the extent the statement suggests that AT&T's statement regarding ownership was one relieving the licensees of their existing obligations to keep confidential all parts of their modifications and derivative works based on the licensed UNIX System software product, or to remove that obligation for future licensees. (¶¶ 82-86.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 68. | This change was not intended to alter the meaning of the software agreements, but was meant only to clarify the original intent of Section 2.01. AT&T intended only to make clear to its licensees that AT&T, and later USL, did not claim any right to the licensees' original work contained in modifications or derivatives of UNIX System V. (See Ex. 182 ¶ 20; Ex. 190 ¶ 21; Ex. 217 ¶ 18; Ex. 275 ¶ 22; Ex. 282 ¶ 24.) | Depending on the meaning of the term "any right," disputed to the extent the statement suggests that AT&T intended to relieve the licensees of their existing obligations to keep confidential all parts of their modifications and derivative works based on the licensed UNIX System software product, or to remove that obligation for future licensees. (¶¶ 82-86.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

| | | SCO's Response | Reply |
|---|---|---|---|
| 69. | The new language is reflected, for example, in Section 2.01 of a software agreement between AT&T Information Systems Inc. and The Santa Cruz Operation, Inc. entered into in May 1987. That agreement includes the following language: Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided that any such modification or derivative work that any contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT. AT&T IS claims no ownership interest in any portion of each a modification or derivative work that is not part of a SOFTWARE PRODUCT. (Ex. 127 § 2.01 (emphasis added)). | Disputed to the extent the statement suggests that AT&T did not intend to require Santa Cruz to keep confidential all parts of its modifications and derivative works based on the licensed UNIX System software product. (¶¶ 82-86.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 70. | As AT&T communicated at its seminars and in its newsletters to UNIX System V licensees, this new language was intended only to clarify the language in the original Section 2.01, not change its meaning. Mr. Wilson's licensing group interpreted the language of the original Section 2.01 and thus revised Section 2.01 in exactly the same way. (See Ex. 190 ¶ 22; Ex. 217 ¶ 20; Ex. 275 ¶ 24; Ex. 282 ¶ 25.) | Disputed to the extent that the statement suggests that at the time Mr. Wilson had the lone or ultimate authority over AT&T's UNIX software licensing (¶¶ 90-105) and to the extent the statement suggests that AT&T intended to eliminate from their existing or prospective UNIX System V license agreements the obligation on the part of the licensees to keep confidential all parts of their modifications and derivative works based on the licensed UNIX System software product (¶¶ 82-87). | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 71. | Although AT&T made "specimen copies" of the revised software agreement available to its licensees, it did not require that its licensees enter into new agreements. AT&T intended for all of AT&T's UNIX System V licensees to receive the benefit of the changes and clarifications it outlined at its seminars and in the newsletter. (See Ex. 190 ¶ 23; Ex. 217 ¶ 21; Ex. 275 ¶ 26; Ex. 282 ¶ 26.) | Disputed to the extent the statement suggests that AT&T intended to eliminate from their existing or prospective UNIX System V license agreements the obligation on the part of the licensees to keep confidential all parts of their modifications and derivative works based on the licensed UNIX System software product. (¶¶ 82-87.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

39

| | IBM's Statement | SCO's Response | IBM's Reply |
|---|---|---|---|
| 72. | Based in important part on the Agreements and AT&T's repeated and consistent explanations of them, IBM continued the development of and distributed a flavor of the UNIX operating system known as AIX (see Ex. 5 ¶ 13), and Sequent (which IBM acquired in 1999) continued the development of and distributed a flavor of the UNIX operating system known as Dynix (see *id.* ¶ 16). | Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 82-87.) Disputed to the extent the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached. (¶¶ 82-87.) The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Depending on the meaning of the terms "control" and "original works" as used in previous statements, disputed to the extent the statement suggests that AT&T ever represented to IBM or Sequent that those companies would have the right to "control" their "original works" that were part of any modification or derivative work they had developed based on the licensed UNIX System V software product. (¶¶ 63-163.) Depending on the meaning of the term "UNIX flavor," disputed to the extent the statement suggests that AIX and Dynix are not "derivative works" of the licensed UNIX System V software product within the meaning of their agreements, as well as the copyright law. (¶ 192.) Disputed to the extent the statement suggests that IBM or Sequent had compelling business reasons to insist on the "control" as described by IBM herein. (¶¶ 30-62.) | Deemed admitted: The material referred to by SCO does not support SCO's statement.

Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

40

| | SCO's Response | IBM's Reply |
|---|---|---|
| 73. | Both IBM and Sequent invested in the development of AIX and Dynix based on the understanding — reinforced by the repeated assurances of AT&T representatives — that AT&T claimed no interest whatsoever in IBM's and Sequent's original works, even if they might be included in a modification or derivative work of UNIX System V. (Ex. 257 ¶¶ 3-5; Ex. 310 at 298-315, 56:11-57:5, 62:20-63:17, 119:16-120:2, 127:15-128:1.) | Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Depending on the meaning of the term "no interest whatsoever," disputed to the extent the statement suggests that AT&T ever represented to IBM or Sequent that those companies would have the right to "control" their "original works" that were part of any modification or derivative work they had developed based on the licensed UNIX System V software product. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM or Sequent had compelling business reasons to insist on the "control" as described by IBM herein. (¶¶ 30-62.) | Deemed admitted. The material referred to by SCO does not support SCO's statement.<br><br>Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

41

| | IBM's Statement of Facts | SCO's Response | IBM's Reply |
|---|---|---|---|
| 74. | IBM devoted hundreds of millions of dollars and tens of thousands of person-hours to the development and marketing of AIX, including writing many millions of lines of original source code for AIX. Similarly, Sequent spent tens of millions of dollars and hundreds of person-hours in the development and marketing of Dynix, including writing millions of lines of original source code for Dynix/ptx. (Ex. 257 ¶¶ 7-10; Ex. 252 at 97:25-98:20, 140:12-21; Ex. 181, Ex. G; Ex. 596 ¶¶ 3-4.) | Depending on the meaning of the term "original," disputed to the extent the cited material does not identify what lines of code in AIX or Sequent were written by developers without exposure, reference or access, or experience based on such exposure, reference or access, to the licensed UNIX System V software product. | Deemed admitted. Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 75. | AIX and Dynix are comprised of code from numerous sources, including code written by IBM and Sequent software engineers (or outside contractors retained by IBM or Sequent) and also code written by third parties and licensed to IBM or Sequent for inclusion in AIX or Dynix. (See Ex. 270 ¶¶ 4-5; Ex. 236 ¶¶ 4-5.) | Undisputed. | Undisputed. |
| 76. | The overwhelming majority of the code in AIX and Dynix is original IBM or Sequent work, written or created independent of UNIX System V. (Ex. 181, Ex. C, Ex. G.) | Depending on the meaning of the term "original," disputed to the extent the cited material does not identify what lines of code in AIX or Sequent were written by developers without exposure, reference or access, or experience based on such exposure, reference or access, to the licensed UNIX System V software product. | Deemed admitted. Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

42

| | | SCO's | |
|---|---|---|---|
| 77. | For example, AIX 5.1.G for Power is comprised of 123,821 files and 160,198,865 lines of source code. (Ex. 181, Ex. G.) The Final Disclosures identify lines of System V code in any version of AIX. (Ex. 54, Item 1, Tab 425.)  SECTION REDACTED | Disputed to the extent the cited material does not identify what lines of code in AIX or Sequent were written by developers without exposure, reference or access, or experience based on such exposure, reference or access, to the licensed UNIX System V software product.  SECTION REDACTED | Deemed admitted. The material referred to by SCO does not support SCO's statement. SCO's statement fails to identify material facts of record meeting the requirements of Rule 56. The declaration referred to constitutes a supplemental expert report and was not timely disclosed. |
| 78. | The base operating system of Dynix/ptx 4.6.1 alone is comprised of 36,096 files and 10,238,823 lines of source code. (Ex. 181, Ex. G.) Here again, the Final Disclosures identify lines of System V code in any version of Dynix. (Ex. 54, Item 204, Tab 220.)  SECTION REDACTED | Disputed to the extent the statement suggests that Dynix/ptx is not a derivative work based on UNIX System V. (¶ 192.) Disputed to the extent the cited material does not identify what lines of code in AIX or Sequent were written by developers without exposure, reference or access, or experience based on such exposure, reference or access, to the licensed UNIX System V software product. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 79. | SECTION REDACTED | Depending on the meaning of the term "original," disputed to the extent the cited material does not identify what lines of code in AIX were written by developers without exposure, reference or access, or experience based on such exposure, reference or access, to the licensed UNIX System V software product. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |

43

| | | IBM's Reply |
|---|---|---|
| 80. | Among the original IBM works in AIX are Virtual Resource Manager, Logical Volume Manager, Object Data Manager, System Management Interface Tool, Network Install Manager, Web-based System Manager, IBM Java Development Kit, AIX Workload Manager, Dynamic Logical Partitioning, Capacity On Demand, Cluster Systems Management, and many other developments. (Ex. 257 ¶ 8; Ex. 283 ¶ 85.) | Depending on the meaning of the term "original works," disputed to the extent the cited material does not identify whether the works were written by developers without exposure, reference or access, or experience based on such exposure, reference or access, to the licensed UNIX System V software product. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 81. | Among the original Sequent works in Dynix are Read-Copy Update, Symmetric Multiprocessing and Non-Uniform Memory Access capabilities, and functionality for Transmission Control Protocol/Internet Protocol (TCP/IP) networking protocols on parallel computers. (Ex. 283 ¶ 86.) | Depending on the meaning of the term "original Sequent works," disputed to the extent the cited material does not identify whether the works were written by developers without exposure, reference or access, or experience based on such exposure, reference or access, to the licensed UNIX System V software product. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. |
| 82. | Following execution of the Agreements, AT&T and USL communicated with licensees on a regular basis and frequently explained their intent, view, and understanding as to their licensees' rights to their own original materials. (Ex. 191 ¶ 11; Ex. 250 ¶ 4; Ex. 271 ¶¶ 3-4; Ex. 276 ¶¶ 4-5; Ex. 280 ¶¶ 3-4.) | Disputed to the extent the statement suggests that AT&T or USL held the view or told IBM or Sequent that the proposed agreements did not require their licensees to hold in confidence all parts of their modifications and derivative works based on the licensed System V software product. (¶¶ 63-163.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

44

| | IBM's ... | ... | ... |
|---|---|---|---|
| 83. | AT&T and USL representatives communicated to licensees, including IBM and Sequent, that they owned and could do as they wished with their own original works, even if those works might be included in a modification or derivative work of UNIX System V, so long as they protected AT&T's UNIX System V source code. (Ex. 183 ¶ 5; Ex. 191 ¶¶ 4-6; Ex. 250 ¶¶ 3-4; Ex. 271 ¶¶ 3-4; Ex. 276 ¶¶ 4-5; Ex. 280 ¶¶ 3-5.) | Disputed in that substantial evidence shows (and easily permits the inference) that AT&T and USL held no such understanding and made no such statements. (¶¶ 63-163.) Depending on the definition of the phrase "original works," disputed to the extent the statement suggests that the licensees did not enter into written agreements requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreements, the parties did not intend to exclude any previous or subsequent oral discussions from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 84. | Some licensees sought to clarify that, under the agreements, they, not AT&T or USL, would own and control modifications and derivative works prepared by or for the licensees (except for any original UNIX System V source code provided by AT&T or USL and included therein). (Ex. 182 ¶ 18; Ex. 189 ¶ 17; Ex. 275 ¶¶ 15-17; Ex. 281 ¶¶ 12-16.) | Disputed to the extent the referenced materials are cited for the truth of the proposition that other licensees sought such clarification, and disputed to the extent the statement suggests that AT&T held the view that the agreements did not preclude the licensees' use, export, disclosure, or transfer of the licensees modifications and derivative works based on the licensed System V software product, in that substantial evidence shows (and easily permits the inference) that AT&T had no such intent. (¶¶ 63-163.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |
| 85. | Mr. Wilson and members of this staff stated, orally and in writing, that AT&T's licensees, not AT&T or USL, would own and control modifications and derivative works prepared by | Disputed to the extent the statement suggests that AT&T ever represented to IBM or Sequent that those companies were not obligated to hold in confidence all parts of their modifications and | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by |

45

| | | |
|---|---|---|
| or for the licensee (except for any original UNIX System V source code provided by AT&T or USL and included therein). (Ex. 182 ¶ 18; Ex. 189 ¶¶ 17-22; Ex. 271 ¶¶ 3-5; Ex. 275 ¶ 25; Ex. 280 ¶¶ 3-5; Ex. 282 ¶ 17.) | derivative works based on the licensed UNIX System V software product. (¶¶ 63-163.) Disputed to the extent that the statement suggests that Mr. Wilson or the "members of this staff" had the lone or ultimate authority over AT&T's UNIX software licensing, or that Mr. Wilson or any "member of his staff" had the authority to amend the licensing and sublicensing agreements. (¶¶ 76-96.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold In confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Disputed to the extent the statement suggests that AT&T ever represented to IBM or Sequent that those companies would have the right to "control" their "original works" that were part of any modification or derivative work they had developed based on the licensed UNIX System V software product. (¶¶ 63-163.) Disputed to the extent that the cited material does not support the assertion that AT&T or USL ever represented in writing that any licensee would "control" any part of the modifications or derivative works It developed based on the licensed UNIX System | SCO does not support SCO's statement.<br><br>The cited material fully supports IBM's statement that AT&T and USL represented to their licensees that those companies would have the right to control their original works. |

| | | V software product. | |
|---|---|---|---|
| 86. | For example, Mr. Frasure, who continued to work with and for Mr. Wilson until he retired, was in daily communication with UNIX licensees. He personally communicated with them both in writing and orally, and participated in conferences that clarified AT&T's position regarding ownership of code that licensees developed themselves. Mr. Frasure assured licensees that they owned any code they developed themselves, or that third parties developed on their behalf and that they could disclose their code to whomever they wanted, just as long as they kept UNIX System V source code confidential. (Ex. 191 ¶¶ 4-6.) | Disputed in that substantial evidence shows (and easily permits the inference) that Mr. Frasure held no such understanding of the licenses and had no such communications with licensees regarding rights of disclosure. (¶¶ 63-163.) Disputed to the extent that the cited material does not support the assertion that Mr. Frasure had any such communications in writing. | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement.  The facts stated in IBM's referenced paragraph are fully supported by the cited material. |
| 87. | Similarly, Mr. DeFazio, who remained head of the overall AT&T/USL/Novell organization responsible for UNIX software until 1997, made sure licensees understood they could do as they wished with their original works, even if they might have been included in a modification or derivative work of UNIX System V, and that AT&T and USL had no interest in maintaining the confidentiality of code their customers developed. (Ex. 183 ¶¶ 4-5.) | Disputed to the extent the statement suggests that Mr. DeFazio had the authority to modify the terms of AT&T's standard UNIX license agreements or was the person under whose ultimate direction AT&T licensed its UNIX software product. (¶¶ 76-96.) Disputed in that substantial evidence shows (and easily permits the inference) that Mr. DeFazio held no such understanding of the licenses and had no such communications with licensees regarding rights of disclosure. (¶¶ 63-163.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56. Further, the material referred to by SCO does not support SCO's statement. |

47

| | SCO's Statement of Additional Facts | SCO's Response | IBM's Reply |
|---|---|---|---|
| 88. | In addition to dealing with licensees on a daily basis regarding the Agreements, AT&T and USL communicated with their licensees at users conferences, such as USENIX (an organization that supports the development of UNIX variants), and in other public presentations. Representatives of AT&T and USL emphasized that these licensees, including IBM and Sequent, could do as they wished with their own original material. (Ex. 255 ¶¶ 6-7.) | Disputed to the extent the statement suggests that AT&T or USL stated in any such communications that UNIX System V licensees "could do as they wished with their own original material" without regard to whether such material was included in the licensees' modifications or derivative works based on the licensed UNIX System V software product. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) Depending on the meaning of the term "their own original material," disputed to the extent the statement suggests that AT&T ever represented to its licensees that they would have the right to "do as they wished" with their "original works" that were part of any modification or derivative work they had developed based on the licensed UNIX System V software product. (¶¶ 63-163.) | Deemed admitted: Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.<br><br>The material referred to by SCO does not support SCO's statement. |

48

| | | SCO's Response | IBM's Reply |
|---|---|---|---|
| 89. | AT&T and its representatives intended for their licensees to rely upon their statements and assurances about what licensees could and could not do with their original works. (Ex. 183 ¶ 6; Ex. 191 ¶ 7; Ex. 250 ¶¶ 4-5; Ex. 271 ¶ 5; Ex. 276 ¶¶ 4-5.) | Depending on the meaning of the term "original works," disputed to the extent the statement suggests that AT&T ever represented to its licensees that they would have the right to "do as they wished" with their "original works" that were part of any modification or derivative work they had developed based on the licensed UNIX System V software product. (¶¶ 63-163.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted. Nothing in SCO's statement specifically controverts IBM's facts with admissible evidence meeting the requirements of Rule 56.

The material referred to by SCO does not support SCO's statement. |

49

| | | | |
|---|---|---|---|
| 90. | Taking Mr. Wilson and his colleagues at their word, IBM, Sequent and other UNIX licensees exercised ownership and control over their original works, despite the fact that those works had been part of a modification and derivative work of UNIX System V or had been associated in some respect with UNIX System V code, such as by publicly disclosing them. (Ex. 508; Ex. 509; Ex. 510; Ex. 511; Ex. 512; Ex. 559; Ex. 560; Ex. 561; Ex. 562; Ex. 563; Ex. 564; Ex. 565; Ex. 566; Ex. 567; Ex. 568; Ex. 569; Ex. 570; Ex. 571.) | Disputed in that the referenced exhibits do not disclose internal operating system source code, methods or concepts at all, disclose operating system source code, methods or concepts at only a general and superficial level such that the disclosure would be of no use to operating system developers or disclose material that is so specific to a particular operating system that it would not be applicable to another operating system, such as Linux, are confidential documents, patents whose purpose is to prevent the use of the disclosed invention, or materials that are protected by clear copyright language; and/or give no indication that they were published or distributed, or that their existence was ever known to individuals outside of IBM. (Ex. 139 ¶¶ 222.) Disputed to the extent the statement suggests that IBM and Sequent did not enter into a written agreement requiring them to hold in confidence all parts of their modifications and derivative works based on the licensed UNIX System V software product. (¶¶ 13-29, 82-86.) Disputed to the extent that the statement suggests that, upon entering into their written agreement, the parties did not intend to exclude any previous and subsequent oral discussion from the agreement the parties had reached. (¶¶ 18, 91-92.) "The IBM Agreements and the Sequent Agreements (collectively "the Agreements") set forth the terms under which UNIX System V could be used and disclosed by them and under which they could distribute software programs "based on" UNIX System V." (IBM Statement of Undisputed Facts ¶ 50.) | Deemed admitted. The material referred to by SCO does not support SCO's statement.<br><br>SCO's statement fails to identify material facts of record meeting the requirements of Rule 56. The declaration referred to constitutes a supplemental expert report and was not timely disclosed. |

50