# Addendum D

## ADDENDUM D: SELECTED TESTIMONY OF INVOLVED PERSONS

I.  **AT&T/USL/NOVELL**

A.  **OTIS WILSON**

1.  *Mr. Wilson Was the Head of the AT&T Group Responsible for UNIX Licensing.*

a.  "Beginning in 1983 until I retired in 1991, I was the head of the group responsible for licensing the UNIX System V operating system worldwide." (Ex. 282 ¶ 3.)

b.  "I am familiar with the ['IBM Agreements'] which were negotiated under my supervision while I was head of the licensing group…David W. Frasure, who reported to me, signed these agreements for me on behalf of AT&T Technologies." (Ex. 281 ¶ 7.)

c.  "I am also familiar with the ['Sequent Agreements'] which were also negotiated under my supervision…I signed these agreements on behalf of AT&T Technologies, Inc." (Ex. 281 ¶ 8.)

d.  "As a result of my role as head of the group responsible for negotiating the IBM Related Agreements and the Sequent Related Agreements, and hundreds of other UNIX System V license agreements, I have a thorough understanding of these agreements and what the parties intended them to accomplish." (Ex. 281 ¶ 9.)

e.  Q.  To what extent, Mr. Wilson, did you interact with AT&T's licensees concerning licensing matters?
…
THE WITNESS:  Oh, I was intimately involved with our licensees.  In other words, everything from discussing software product attributes, licensing agreements, licensing policy, participating in their user group in the way of presentations.  (Ex. 301 at 92:3-15.)

**SECTION REDACTED**

1

SECTION REDACTED

2.    *Section 2.01 Protects Only the UNIX System V Source Code.*

a.    "As my staff and I communicated to our licensees, this provision was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement.  As we understood Section 2.01, any source code developed by or for a licensee and included in a modification or a derivative work would not constitute 'resulting materials' to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein."  (Ex. 282 ¶ 14.)

b.    THE WITNESS:  The -- the restrictive covenant of the licensing agreements only pertained to that portion of the software product originally supplied to our licensees. And so any -- any derivative or modification of work that they produced that contained parts of the software product that they were licensed for had to be protected under the same covenants of the software licensing agreement.

Q.   Did -- did AT&T, as you understand it, Mr. Wilson, intend its licensing agreements to protect anything other than the software product, as that term is defined in the AT&T, UNIX licensing agreements?
...
THE WITNESS:  We did not.

Q.   Did AT&T intend its UNIX licensing agreements to place restrictions on the extent to which its licensees could use, distribute, disclose or transfer modifications and derivative works of the software product independent of any software product included in the modification or derivative work?
...
THE WITNESS:  We did not.  (Ex. 301 at 20:4 - 21:-8.)

c.    The -- anything that was distributed under the scheduled software product source code, object code, materials,

2

documentation remained the property of -- of AT&T. And the code that they developed, independent of that, belonged to the licensee. So we -- the definition was the software product and all of it associated with that particular product was AT&T's. Anything that they developed belonged to the licensee…. In other words, if it didn't contain any of our code, it was their – their work, and not ours. We didn't exercise any assertion of rights to the code that was not contained in the software product. (Ex. 301 at 245:23 – 246:17.)

d.    Q.   [D]id I understand you to say that as you understand the definition of the term software product it includes modifications and derivative works?
…
THE WITNESS:  The software product does not include modifications [or] derivative works.

Q.   All right.  So the term software product, as defined in the AT&T, UNIX licensing agreements, does not, as you understand it, include modifications and derivative works?
…
THE WITNESS:  That's correct.  (Ex. 301 at 333:17 – 334:5.)

SECTION REDACTED

SECTION REDACTED

3. *AT&T Did Not Intend to Assert Ownership or Control Over the Works of its Licensees.*

a. "AT&T and USL did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. Although the UNIX System V source contained in a modification or derivative work continued to be owned by AT&T or USL, the code developed by or for the licensee remained the property of the licensee, and could therefore be used, exported, disclosed or transferred freely by the licensee." (Ex. 282 ¶ 15.)

b. "We never intended to assert ownership or control over any portion of a modification or derivative work that was not part of the original UNIX System V source code provided by AT&T or USL. The licensee was free to use, copy, distribute or disclose its modifications and derivative works, provided that it did not use, copy, distribute or disclose any portions of the original UNIX System V source code provided by AT&T or USL except as permitted by the license agreements." (Ex. 282 ¶ 27.)

c. Q. Did AT&T intend to exercise any control over those portions of modifications or derivative works of the software product that did not include UNIX System V source code?
...
A. No. We didn't -- we did not intend to extend our licensing agreement clauses to anything other than the software product delivered with those -- those agreements. (Ex. 301 at 53:19-54:6.)

d. Q. Did AT&T, Mr. Wilson, intend to assert ownership or control over any portion of a modification or derivative work that was not part of the original UNIX System V source code provided by AT&T or USL?
...
THE WITNESS: No. (Ex. 301 at 73:9-17.)

4

e.    Q.  [D]id AT&T have any right to control any portion of a
modification or derivative work of a software product that
did not include a portion of software product?

...

THE WITNESS:  It did not.  (Ex. 301 at 334:12-18.)

f.    Q.  Did AT&T -- with respect to control, did AT&T intend
to control any modification or derivative work of its
software products, except insofar as such modifications or
derivative works might include a portion of the software
product?

...

A.  No, we did not.

Q.  Did AT&T intend to assert control over its licensees'
products except to the extent those products might include
AT&T's software products?

...

THE WITNESS:  We did not.  (Ex. 301 at 352:19-353:12.)

## SECTION REDACTED

4.    *Licensees Were Free to Use or Disclose Their Own Original Code
and Works However They Saw Fit So Long As They Did Not
Disclose AT&T's UNIX System V Source Code.*

a.    "At least as I understood these sections and discussed them
with our licensees, they do not, and were not intended to,
restrict our licensees' rights to use, export, disclose or
transfer their own products and source code, as long they
did not use, export, disclose or transfer AT&T's UNIX
System V source code along with it.  I never understood
AT&T's software agreements to place any restrictions on
our customers' use of their own original work."  (Ex. 282
¶ 12.)

b.    Q.  As AT&T understood its UNIX licensing agreements,
could its licensees do whatever they wanted with

5

modifications or derivative works of the software product, so long as they did not disclose any portion of the software product that might have been included in the modification or derivative work?

...

THE WITNESS:  That's correct.  (Ex. 301 at 354:5-13.)

SECTION REDACTED

SECTION REDACTED

SECTION REDACTED

5.   *Mr. Wilson gave consistent testimony over a decade ago in the* <u>*BSD*</u> *litigation.*

   a.   [I]t all goes back to the intent that the licensed software products are covered, and that which is ours is ours and that which is yours is yours.  (Ex. 513 at 86:24-87:2.)

   b.   So the intent is to protect that which was ours and that which was theirs and we wanted to make sure we protected our information.  By the same token, we didn't want to take any of their information.  So if it was theirs, it was theirs, and if it was ours, it was ours. (Ex. 513 at 31:23-32:3.)

   c.   But the intent was what's ours and what's yours, and we were trying to protect both parties and having language someone could look at and say, "We understand the intent of the parties involved." (Ex. 513 at 41:17-21.)

   d.   We also were trying to clarify whether someone created something that was yours and not ours and we wanted to make sure we were both clear that we didn't have any ownership rights to anything they had and they didn't have any ownership rights to anything we had.  That was the intent behind all this, this is yours and this is mine, and we didn't want those to mingle, and the intent at the time and in many, many conversations was that both parties were to just make sure they clarified that so they respected each other's rights.  (Ex. 513 at 43:6-17.)

   e.   [I]f you go to folks that were present at the time...you can clarify what the intent of the parties meant, and to the extent those folks are around, I think it will become clear the words said that this is AT&T's and this is the yours. We did not want to have any rights or ownership to anything they created.(Ex. 513 at 47:16-23.)

8

f.  [W]e claimed ownership [to] that [which] was ours and no ownership to that which was yours. The other language was somewhat confusing to some people in that they thought we were trying to assert ownership to anything they created, even though it contained nothing of ours. So this is trying to clarify that what's yours is yours and what's ours is ours. (Ex. 513 at 75:23-76:4.)

g.  [T]he intent is such that we protect our intellectual property and assert no rights in the licensee's intellectual property, and you can see there was clarifications and changes and they were made to better reflect that intent. (Ex. 513 at 76:16-20.)

h.  A. We are asserting our rights and not any rights to anything that's owned by one of our licensees. …We claim no ownership interest that is not a part of the software product. Now, we can wordsmith those words exactly, but the intent is what's yours is yours and what belongs to AT&T belongs to AT&T, so we were trying to get that across.

Q. And you weren't trying to assert restrictions on the part that did not belong to AT&T?

A. That's correct. In other words, if you follow that through, it's yours. I have no jurisdiction whatsoever. (Ex. 513 at 77:4-23.)

6.  *UNIX Licensees Were Not Willing to Surrender Control of Their Original Works.*

a.  "I do not believe that our licensees would have been willing to enter into the software agreement if they understood Section 2.01 to grant AT&T or USL the right to own or control source code developed by the licensee or provided to the licensee by a third party. I understood that many of our licensees invested substantial amounts of time, effort and creativity in developing products based on UNIX System V. The derivative works provision of the software agreement was not meant to appropriate for AT&T or USL the technology developed by our licensees." (Ex. 282 ¶ 16.)

SECTION REDACTED

9

SECTION REDACTED

7.   *AT&T Provided Clarification to Licensees Regarding Their Rights to Do Whatever They Wished With the Portions of Modifications and Derivative Works That They Developed Themselves.*

a.   "In fact, some licensees sought to clarify that, under the agreements, the licensee, not AT&T or USL, would own and control modifications and derivative works prepared by or for the licensee (except for any original UNIX System V source code provided by AT&T or USL and included therein). We provided such clarification to when asked because that is what we understood the language in the standard software agreement to mean in any event. In some cases we provided this clarification orally and in some cases we provided it in writing." (Ex. 282 ¶ 17.)

SECTION REDACTED

SECTION REDACTED

11

SECTION REDACTED

SECTION REDACTED

8.    *AT&T Did Not Believe It Could Claim Any Rights To Code Developed By Its Licensees Due To Antitrust Concerns.*

a.    "In fact, although I am not a lawyer, it was my view at the time that we could not claim any rights to non-UNIX System V code source (as the plaintiff here appears to be doing) without raising serious antitrust issues.  In light of the divestiture of AT&T around that time, we as a company were very concerned with the potential anticompetitive effects of our actions.  As a result, one of the reasons we made clear to our licensees that our UNIX System V software agreements did not impose any restrictions on the use or disclosure of their own original code, except insofar

as it included UNIX System V code, was to avoid any appearance of any impropriety." (Ex. 282 ¶ 18.)

9. *IBM and Sequent Would Be Permitted, Under the UNIX Agreements, to Open Source Their Own Code.*

   a. "I do not know whether AIX and Dynix/PTX are sufficiently similar to UNIX System V that they would constitute modifications of, or derivative works based on, UNIX System V. However, even if AIX or Dynix/PTX were modifications of, or derivative works based on, UNIX System V, IBM and Sequent are free to use, export, disclose or transfer AIX and Dynix/PTX source code, provided that they do not use, export, disclose or transfer any UNIX System V source code provided by AT&T or USL (except as otherwise permitted by the agreements). Therefore, IBM and Sequent are free, under the IBM Agreements and the Sequent Agreements, to open source all of AIX and Dynix/PTX other than those portions of the original UNIX System V source code included therein. Even portions of the original UNIX System V source code included in AIX and Dynix/PTX may be open sourced to the extent permitted by the IBM Agreements or the Sequent Agreements." (Ex. 282 ¶ 28.)

10. *SCO's Claims Are Inconsistent with the UNIX Agreements and AT&T's Intent.*

   a. "I understand that plaintiff claims that IBM and Sequent have breached the IBM Agreements and the Sequent Agreements by improperly using, exporting, disclosing or transferring AIX and Dynix/PTX source code, irrespective of whether IBM or Sequent have disclosed any specific protected source code copied from the UNIX System V source code provided by AT&T or USL. In my view, these claims are inconsistent with the provisions of the IBM Agreements and the Sequent Agreements. I do not believe that anyone at AT&T or USL intended these agreements to be construed in this way. In all cases, modifications and derivative works are not subject to the confidentiality and other restrictions contained in the license agreements (except for any protected UNIX System V source code provided by AT&T or USL actually included therein) because they are owned by the licensees." (Ex. 282 ¶ 29.)

b. "In my view, any claim that the IBM Software Agreement and the Sequent Software Agreement prohibit the use, export, disclosure or transfer of any code other than UNIX System V code is clearly wrong. Not only did we at AT&T not intend the agreements to be read that way, but we also went out of our way to assure our licensees that that is not what the agreements meant." (Ex. 282 ¶ 30.)

11. *UNIX Licensees Were Not Required to Protect Methods and Concepts.*

a. As I mentioned earlier, the -- the methods and concepts was in our earlier agreements, and -- and through negotiations with IBM, we later removed that particular clause. Mainly because the -- because time had passed, and the -- pretty much the methods and concepts associated with those software products were pretty well -- pretty much widely known. So it wasn't really necessary to be there. (Ex. 301 at 22:16-24.)

b. Q.  Do you have an understanding, Mr. Wilson, as to whether the term methods or concepts was deleted from IBM's licensing agreements with AT&T?
...
THE WITNESS: Yes, it was deleted.

Q.  Okay.  And what is your understanding as to why it was deleted?
...
THE WITNESS: It was no longer applicable. The -- there was nothing that we could really define as methods and concepts at this time that would be -- would be protected. So we just removed it from the agreement.

Q.  Is there anything, to your understanding, that IBM cannot do properly with respect to UNIX methods or concepts?
...
THE WITNESS: However you might want to define methods and concepts, it just was no longer applicable to the IBM software agreement. So anything contained therein that might be considered a method or concept is -- is no longer applicable.

Q.  As you understand AT&T's intent, at least by the time you left the company, did AT&T seek to enforce rights to

15

methods or concepts of UNIX as they related to any of its licensees?

…

THE WITNESS:  We did not.  (Ex. 301 at 84:15 – 85:25.)

SECTION REDACTED

16

SECTION REDACTED

12.    *AT&T Assured Licensees That They Would Not Be Required to Maintain As Confidential Any Portions of the UNIX Source Code That Became Publicly Available.*

     a.    There was -- there was concern expressed by several licensees, and the program itself, about inadvertent disclosure of software, and would the licensee be held liable for that particular act.  And we -- we assured our licensees that they would not be responsible for the protection of software, which was made publicly available, without any act attributable to them personally or directly. (Ex. 301 at 23:18 – 24:2.)

13.    *UNIX Licensees Did Not Have Confidentiality Restrictions With Regard to Their Own Modifications and Derivative Works.*

     a.    Q.  To the best of your understanding, is it an accurate statement that modifications and derivative works under these AT&T, UNIX licensing agreements are not subject to the confidentiality and other restrictions contained in the agreements, except for any protected UNIX System V source code provided by AT&T or USL actually included in them, because they are owned by the licensees?

17

...

THE WITNESS:  Yes.  I believe that to be true.  (Ex. 301 at 78:21–79:6.)

## SECTION REDACTED

14.   *AT&T Intended to Treat All UNIX Licensees Equally and Apply the Same Licensing Terms to All Licenses.*

a.   It was our policy that any -- any clarification, modification or change to the basic software agreement provided for one licensee was available to all licensees.  And once we did that, we made sure that our -- our staff conveyed that.  In some cases in the way of a side letter to licensees that requested it or through a -- through publication or through telephone calls, but our practice was that any negotiated change, clarification to the software agreements was available to all of our licensees, as well as the -- the pricing structure and so -- what have you.  It was always available to everyone.  (Ex. 301 at 270:7-20.)

## SECTION REDACTED

SECTION REDACTED

15.  *AT&T Wanted to Spread the UNIX Operating System Widely.*

    a.    Q.  Why did AT&T and USL intend widely to distribute the UNIX System V source code and related information, Mr. Wilson?

        …

        THE WITNESS:  We were trying to establish the operating system as a -- as an industry standard, and so we wanted to distribute it to both universities and licensees, non-university licensees in order to -- for that objective.  (Ex. 301 at 90:24 – 91:9.)

    b.    Q.  And why was it of interest to you to make other people familiar with the system?

        …

        THE WITNESS:  Because there was a commercial aspect to that.  Once you were -- something that you were familiar with in college, you could -- once you graduated and went into business, it was a natural vehicle that you'd return to.  And that showed itself in the number of commercial licensees that we eventually had associated with the product.  (Ex. 301 at 98:2-12.)

SECTION REDACTED

16.   *AT&T Later Clarified Section 2.01 to Make Clear Its View That Licensees Were Not Required to Maintain as Confidential Those Portions of Their Modifications or Derivative Works That They Developed Themselves.*

    a.   Several licensees raised the issue of clarification with 2.01, and we, in turn, issued a clarification of that language. The clarification did not change what was meant by 2.01. It was just a clarification of what we --we intended by that language. That was made available to licensees, anyone who asked for it, but it was more widely made available by us going proactively to them through our $ echo newsletter or telephone conversations or at seminars or what have you. (Ex. 301 at 232:4-15.)

SECTION REDACTED

SECTION REDACTED

17.     *AT&T Entered Into a Side Letter With IBM Clarifying That IBM Owned and Controlled the Code That IBM Developed Itself, and the Terms of That Side Letter, As Well As All AT&T Side Letters Generally, Applied to All UNIX Licensees.*

SECTION REDACTED

c.      Q.  And what about the side letters issued by the company, do you believe they reflected the company policy as described in paragraph 43?

        THE WITNESS:  Yes, I do.  (Ex. 301 at 336:16-20.)

SECTION REDACTED

18.     *AT&T's $ echo Publication Accurately Reflected Company Policy With Regard to UNIX Licensing.*

a.      Q.  Do you have a view as to whether, for example, the $ echo publications of AT&T reflected the company's policy as described in -- in paragraph 43?
        ...

21

THE WITNESS:  Yes.  I believe they do.  (Ex. 301 at 336:8-15.)

19.   *No Concerns About "Mental Contamination".*

SECTION REDACTED

20.   *UNIX Licensees Relied On AT&T's Assurances.*

SECTION REDACTED

22

SECTION REDACTED

SECTION REDACTED

**B.**  **DAVID FRASURE**

1.  *Mr. Frasure Was Part of the AT&T Group Responsible For UNIX Licensing, Personally Negotiated the IBM and Sequent UNIX Licensing Agreements, and Signed the IBM Agreements on Otis Wilson's Behalf.*

   a.  "As national sales and licensing manager at AT&T Technologies, I was responsible for the agreements pursuant to which AT&T Technologies licensed and sublicensed Unix software and related materials.  In addition to having responsibility for these agreements, I personally negotiated many of the license agreements and consulted concerning or approved many others."  (Ex. 190 ¶ 5.)

   b.  "I personally negotiated, on behalf of AT&T, its UNIX licensing agreements with IBM and Sequent.  I have firsthand knowledge of those agreements, as well as many other UNIX licensing agreements."  (Ex. 191 ¶ 3.)

SECTION REDACTED

   d.  "In addition to negotiating UNIX license agreements, I (and others at AT&T and USL) communicated with our licensees, before and after the execution of licensing agreements, concerning the parties' respective rights relating to AT&T's UNIX software.  I did so in writing, or on the phone, in face-to-face conversations and in group presentations."  (Ex. 191 ¶ 4.)

2.  *Section 2.01 Protects Only the UNIX System V Source Code*

    a.  "As I understood it, and as I believe AT&T Technologies intended it at the time, Section 2.01 did not in any way expand the scope of the software agreement to restrict our licensees' use, export, disclosure or transfer of their own original code, even if such code was contained in a modification or derivative work of UNIX System V. The purpose of the software agreement was to protect AT&T Technologies' UNIX System V source code, and was never meant to encumber our licensees' own work." (Ex. 190 ¶ 16.)

SECTION REDACTED

3.  *AT&T Did Not Intend to Assert Ownership or Control Over the Works of its Licensees.*

    a.  "To my knowledge, no one at AT&T Technologies ever intended to assert ownership or control over any portion of a modification or derivative work that did not contain our licensed UNIX System V code. Our licensees, including IBM and Sequent, were free to use and disclose the modifications or derivative works they created, provided that they did not use and disclose any portion of the licensed UNIX System V source code except as permitted by the license agreements." (Ex. 190 ¶ 24.)

SECTION REDACTED

25

...

## SECTION REDACTED

4.   *Licensees Were Free to Use or Disclose Their Own Original Code and Works However They Saw Fit So Long As They Did Not Disclose AT&T's UNIX System V Source Code.*

    a.    "We did not intend these provisions to restrict our licensees' use, export, disclosure or transfer of anything besides the licensed UNIX System V source code and related materials.  It would be inconsistent with the language of the software agreements, and the intentions of AT&T Technologies in licensing UNIX System V, to say that the provisions apply, for instance, to our licensees' own code (that, for example, they developed)."  (Ex. 190 ¶ 12.)

    b.    "The standard software agreements also granted licensees the right to modify UNIX System V source code and to prepare derivative works based upon the code.  As AT&T Technologies intended the agreements, and as we communicated to our licensees, although the licensees owned their modifications and derivative works (since they created them), and were thus permitted to use or disclose them as they might choose, those portions of the modifications or derivative work consisting of any UNIX System V source code were subject to the same restrictions as the licensed UNIX System V source code."  (Ex. 190 ¶ 13.)

    c.    "[A]s I understand the IBM Agreements and the Sequent Agreements, IBM and Sequent were and are free to use, export, disclose or transfer any AIX and Dynix source code, except for those portions of AIX and Dynix code that contain licensed UNIX System V source code (unless

26

otherwise permitted by the IBM Agreements or the Sequent Agreements)." (Ex. 190 ¶ 26.)

SECTION REDACTED

5.    *UNIX Licensees Were Not Willing to Surrender Control of Their Original Works.*

a.    "I do not believe that our customers (particularly large ones like IBM) would have entered into agreements that placed such restrictions on their use of code that they developed. In fact, some, including IBM, specifically said so." (Ex. 190 ¶ 29.)

6.    *AT&T Provided Clarification to Licensees Regarding Their Rights to Do Whatever They Wished With the Portions of Modifications and Derivative Works That They Developed Themselves.*

a.    "Some of our licensees sought further clarification that they, not AT&T Technologies, owned and controlled the modifications and derivative works prepared by or for them. We invariably provided this requested clarification

27

(both orally and in writing) when asked, because it was in keeping with our original intent with respect to all of our licensees under the standard software agreement." (Ex. 190 ¶ 17.)

b.    "Over the years I assured our UNIX licensees on many occasions that they owned any code, methods or concepts that they developed themselves, whether or not that material was included in a modification or derivative work of our UNIX software. I assured licensees in no uncertain terms that they could do as they wished with their original works as long as they kept our Unix software confidential (unless, of course, it was no longer confidential)." (Ex. 191 ¶ 5.)

c.    "I do not know exactly how many licensees asked what could be done with their original works, but I know that (over the years) I communicated that message to hundreds, if not thousands, of persons or entities. My job included making public presentations and speaking on behalf of AT&T and USL at conferences, such as USENIX, which were usually attended by large groups of people. I was often asked, and often told people, that UNIX licensees could freely use and disclose their original or homegrown UNIX code, methods and concepts -- whether or not they were included in a modification or derivative work of our UNIX software." (Ex. 191 ¶ 6.)

SECTION REDACTED

SECTION REDACTED

r

7.    *SCO's Claims Are Inconsistent with the UNIX Agreements and*
      *AT&T's Intent.*

      a.    "I understand that plaintiff claims that IBM and/or Sequent
      have breached the their license agreements with AT&T
      Technologies by improperly using, exporting, disclosing or
      transferring AIX and Dynix source code, irrespective of
      whether IBM and/or Sequent have disclosed any specific
      protected source code from UNIX System V.  Any such
      claim is, in my view, inconsistent with the provisions of the
      license agreements generally, and the IBM Agreements and
      the Sequent Agreements in particular." (Ex. 190 ¶ 27.)

      b.    "The plaintiff's interpretation of the IBM Software
      Agreement and the Sequent Software Agreement is
      impossible to reconcile with what I, and I believe others at
      AT&T Technologies, understood our software agreements
      to mean.  I never suggested, or would have thought to

29

suggest, to our customers that the agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose any UNIX System V code." (Ex. 190 ¶ 29.)

8. *UNIX Licensees Were Not Required to Protect Methods and Concepts.*

SECTION REDACTED

30

SECTION REDACTED

...

**SECTION REDACTED**

9. *AT&T Assured Licensees That They Would Not Be Required to Maintain As Confidential Any Portions of the UNIX Source Code That Became Publicly Available.*

**SECTION REDACTED**

10. *UNIX Licensees Did Not Have Confidentiality Restrictions With Regard to Their Own Modifications and Derivative Works.*

    a.    "I do not believe that anyone at AT&T Technologies intended our UNIX System V license agreements to be construed to exercise control over original works of our licensees. In all cases, as I understand the agreements and believe they were intended, modifications and derivative works are not subject to restrictions contained in the license agreements on use, export, disclosure or transfer (except for any licensed UNIX System V source code actually included therein) because they are owned by the licensees." (Ex. 190 ¶ 28.)

11. *AT&T Later Clarified Section 2.01 to Make Clear Its View That Licensees Were Not Required to Maintain as Confidential Those Portions of Their Modifications or Derivative Works That They Developed Themselves.*

**SECTION REDACTED**

SECTION REDACTED

SECTION REDACTED

12.     *AT&T Entered Into Side Letters With Individual Licensees to Clarify Certain Licensing Issues, But All UNIX Licensees Received the Benefit of Such Clarifications.*

SECTION REDACTED

SECTION REDACTED

13.   *AT&T Had No Rights, Absent a Separate License, To Its Licensees' Works.*

    a.    "In fact, some of AT&T Technologies' licensees later developed technology that AT&T Technologies wished to integrate into the UNIX System V software.  We entered into cooperative development agreements with a number of these licensees, because we did not otherwise have rights to their modifications or derivative works, or their other standalone works.  Indeed, under the license agreements, we did not even have copies of the modifications and derivative works developed by our licensees in either source or object code form." (Ex. 190 ¶ 25.)

14.   *UNIX Licensees Relied On AT&T's Assurances.*

    a.    "I have no doubt our licensees relied on our statements.  I certainly expected that licensees would take me at my word.  If licensees had not felt they could take me at my word, then it would have been difficult for AT&T to manage its licensing business since a big part of the business was dealing with licensees." (Ex. 191 ¶ 7.)

    b.    "It was my understanding that some of our licensees, like IBM and Sequent, developed their own variants of UNIX and built businesses around them.  Some licensees even disclosed publicly the code, methods and concepts that they had developed and were using in their variants of UNIX.  We of course took no action to stop these activities because they were perfectly consistent with what we told licensees they could do with their original or homegrown material." (Ex. 191 ¶ 8.)

### C.   MICHAEL DEFAZIO

1.    *Mr. DeFazio Was the AT&T, USL, and Novell Manager Who Oversaw the Group Responsible For UNIX Licensing and Had Ultimate Responsibility For the IBM and Sequent Agreemenets.*

a.    "In February 1984, I left Bell Labs and accepted a position with Western Electric, a wholly owned subsidiary of AT&T, where I was the head of the organization responsible for product management, marketing and licensing terms and conditions for the Unix System V operating system.  Western Electric was later renamed 'AT&T Technologies, Inc.' …Among other things, my organization was responsible for the terms and conditions of Unix System V source code license agreements…."  (Ex. 182 ¶ 5.)

b.    "I was ultimately responsible for the terms and conditions of the license agreements executed after I assumed product management responsibilities for the Unix System V operating system in 1984.  These license agreements included the [UNIX] agreements between IBM and AT&T Technologies, Inc."  (Ex. 182 ¶ 6.)

c.    "I was also ultimately responsible for the terms and conditions of the …agreements between [Sequent] and AT&T Technologies, Inc. relating to Unix software."  (Ex. 182 ¶ 7.)

d.    "[In 1991] I was named Executive Vice President, Unix System V Software, of USL.  In that capacity, I had overall business planning, product management and development oversight responsibility for Unix System V, including the terms and conditions of source code license agreements such as the IBM Related Agreements and the Sequent Related Agreements."  (Ex. 182 ¶ 8.)

e.    "In January 1994, I became Executive Vice President, Unix Systems Group, of Novell."  (Ex. 182 ¶ 9.)

f.    "After the sale to Santa Cruz, I remained with Novell where my work focused on its broader networking strategy. I continued to be involved in Novell's remaining Unix business primarily in an administrative and an advisory capacity, including overseeing some administrative items required for Novell to fulfill its responsibilities relating to

the sale. In that capacity, I was involved in certain amendments to the IBM Related Agreements and the Asset Purchase Agreement in 1996." (Ex. 182 ¶ 11.)

g. "Based on my employment at AT&T, USL and Novell, I have firsthand knowledge and experience regarding AT&T's Unix license agreements. During the period from 1984 through 1995, I was the business person with primary responsibility for licensing the Unix operating system for AT&T, USL and Novell." (Ex. 183 ¶ 3.)

h. "With the assistance of legal counsel, I was responsible for establishing the terms of the standard license agreements pursuant to which AT&T, USL and Novell licensed the Unix System V operating system source code to hundreds and perhaps thousands of licensees…As a result, I believe I know what the parties to these agreements understood them to mean and intended them to accomplish. That is, of course, particularly true with respect to the understanding and intent of AT&T, USL and Novell." (Ex. 182 ¶¶ 12-13.)

2. *Section 2.01 Protects Only the UNIX System V Source Code.*

SECTION REDACTED

…

37

SECTION REDACTED

3.   *AT&T, USL, and Novell Did Not Intend to Assert Ownership or*
     *Control Over the Works of Their Licensees.*

　　a.　　"The agreements did not (and do not) give AT&T, USL,
         Novell or any of their successors or assigns the right to
         assert ownership or control over modifications and
         derivative works prepared by its licensees, except to the
         extent of the original Unix System V source code included
         in such modifications and derivative works. AT&T, USL
         and Novell never intended to assert ownership or control
         over modifications and derivative works prepared by its
         licensees, except to the extent of the original Unix
         System V source code included in such modifications and
         derivative works." (Ex. 182 ¶ 17.)

b.  ". . . AT&T, USL and Novell did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original Unix System V source code included in such modifications and derivative works."  (Ex. 182 ¶ 18.)

c.  "While I was the business person with primary responsibility for licensing the Unix operating system for AT&T, USL and Novell, none of those entities sought any ownership or control rights as to the original source code or the related methods and concepts of any Unix developments or additions the licensees themselves created."  (Ex. 183 ¶ 4.)

SECTION REDACTED

SECTION REDACTED

4. *Licensees Were Free to Use or Disclose Their Own Original Code and Works However They Saw Fit So Long As They Did Not Disclose the UNIX System V Source Code.*

a. "Modifications and derivative works contained Unix System V source code and code developed by or provided to the licensee. The Unix System V source code contained in a modification or derivative work continued to be owned by AT&T, USL, Novell or their successors, while the code developed by or provided to the licensee remained the property of the licensee or provider to the licensee." (Ex. 182 ¶ 17.)

b. "Like all licensees under the agreements, IBM fully owns any modifications of and contributions to derivative works based on Unix System V prepared by or for IBM, and can freely use, copy, distribute or disclose such modifications and contributions to derivative works, provided that IBM does not copy, distribute or disclose any portions of the original System V source code (except as permitted by the IBM Related Agreements)." (Ex. 182 ¶ 18.)

c. ". . . we never intended to assert ownership or control over any portion of a modification or any contribution to a derivative work that was not part of Unix System V. The licensee was free to use, copy, distribute or disclose such modifications and contributions to derivative works, provided that it did not copy, distribute or disclose any portions of the original Unix System V source code (except as permitted by the license agreements)." (Ex. 182 ¶ 20.)

SECTION REDACTED

41

SECTION REDACTED

5.  *UNIX Licensees Were Not Willing to Surrender Control of Their Original Works.*

    a.  "I do not believe that our licensees would have been willing to enter into the software agreement if they understood Section 2.01 to grant AT&T, USL, Novell or their successors or assigns the right to own or control source code developed by or for the licensee." (Ex. 182 ¶ 17.)

SECTION REDACTED

6.  *AT&T, USL, and Novell Provided Clarification to Licensees Regarding Their Rights to Do Whatever They Wished With the Portions of Modifications and Derivative Works That They Developed Themselves.*

    a.  "In fact, some licensees sought to clarify that, under the agreements, the licensee, not AT&T, USL, Novell or their successors or assigns, would own and control modifications

42

and contributions to derivative works prepared by or for the licensee.  When asked, we provided the requested clarification because that is what we understood the language in the standard software agreement to mean in any event." (Ex. 182 ¶ 18.)

b.      "Licensees were told that they owned and could do as they wished with their own original works, even if those works were included in a modification or derivative work of our UNIX software, so long as they protected AT&T's Unix source code." (Ex. 183 ¶ 5.)

SECTION REDACTED

SECTION REDACTED

43

7.    *IBM and Sequent Would Be Permitted, Under the UNIX Agreements, to Open Source Their Own Code.*

    a.    "Although IBM and Sequent were and/or are prohibited from disclosing Unix System V source code (except as permitted by the IBM Related Agreements or the Sequent Related Agreements), IBM and Sequent were and/or are free to use, copy, distribute, or disclose modifications of and contributions to derivative works based on Unix System V, provided that they do not copy, distribute or disclose any portions of the original Unix System V source code (except as permitted by the IBM Related Agreements or the Sequent Related Agreements). Therefore, IBM and Sequent are and/or were free, at least under the AT&T software and related agreements, to open source all of AIX and Dynix/PTX other than those portions of the original Unix System V source code included therein (except as permitted by the IBM Related Agreements or the Sequent Related Agreements)." (Ex. 182 ¶ 22.)

SECTION REDACTED

8.    *SCO's Claims Are Inconsistent with the UNIX Agreements and AT&T, USL, and Novell's Intent.*

    a.    "I understand that plaintiff claims that IBM and/or Sequent have breached the IBM Related Agreements and the

Sequent Related Agreements by using/disclosing Unix methods, derivative works and modifications in violation of the confidentiality and other restrictions contained in those agreements, irrespective of whether IBM and/or Sequent have disclosed any specific protected source code copied from Unix System V. Such claims are, in my view, inconsistent with the provisions of the license agreements generally and the IBM Related Agreements and the Sequent Related Agreements in particular. I do not believe that anyone at AT&T, USL or Novell intended these agreements to be construed in this way. In all cases, modifications and licensees' contributions to derivative works are not subject to the confidentiality and other restrictions contained in the license agreements (except for any protected Unix System V source code actually included therein) because they are owned by the licensees." (Ex. 182 ¶ 31.)

9. *UNIX Licensees Were Not Required to Protect Methods and Concepts.*

a.    "As clarified by its side letter, IBM had no obligation to keep confidential any trade secrets or other information embodied in any of the software products provided to IBM, provided that IBM did not copy the actual source code or refer to the physical documents and materials comprising the software products while developing or providing products or services. IBM was (and is) free to use and disclose any of the ideas, concepts, know-how, methods or techniques embodied in the software products." (Ex. 182 ¶ 29.)

**SECTION REDACTED**

10. *AT&T, USL, and Novell Assured Licensees That They Would Not Be Required to Maintain As Confidential Any Portions of the UNIX Source Code That Became Publicly Available.*

SECTION REDACTED

...

SECTION REDACTED

SECTION REDACTED

...

11.    *UNIX Licensees Did Not Have Confidentiality Restrictions With*
       *Regard to Their Own Modifications and Derivative Works.*

       a.      " . . . we never sought, by way of the confidentiality
               provisions in the software agreements, to assert ownership
               or control over any portion of a modification or any
               contribution to a derivative work that was not part of Unix
               System V.  Such modifications and contributions to

48

derivative works are not subject to the confidentiality restrictions of Section 7.06(a) (except for any protected Unix System V source code actually included therein) because they are owned by the licensees. The licensees are free to use, copy, distribute or disclose such modifications and contributions to derivative works, provided that they do not copy, distribute or disclose any portions of the original Unix System V source code (except as permitted by the license agreements)." (Ex. 182 ¶ 30.)

SECTION REDACTED

12.   *AT&T Wanted to Spread the UNIX Operating System Widely.*

a.   "One purpose of distributing the source code so widely was to promote the widespread adoption of Unix operating systems by ensuring that Unix System V ideas, concepts, know-how, methods and techniques would be widely known and understood by future programmers. AT&T viewed a growing population of Unix– knowledgeable programmers to be a key asset in achieving its goal of making Unix System V pervasive within the information technology marketplace. Furthermore, AT&T intended Unix to be an 'open' operating system, meaning that customers would not be locked in with a particular hardware vendor or a particular operating system vendor. To that end, AT&T published a System V Interface Definition ('SVID'), which provided a complete interface specification that could even be used by AT&T's competitors to develop independently their own Unix -like

49

operating systems. AT&T also created a System V Verification Suite ('SVVS'), which was made available to test the compliance of both sublicensed products based on Unix System V and other Unix-like operating systems with SVID. We also permitted the publication of a book entitled *The Design of the Unix Operating System*, by Maurice J. Bach, which describes the internal algorithms and structures that form the basis of the operating system and their relationship to the programmer interface. We published SVID and SVVS, and permitted the publication of *The Design of the Unix Operating System*, because we were more concerned with promoting the Unix operating system as a de facto industry standard 'open' operating system than we were with protecting Unix trade secrets. Although I am no longer responsible for the distribution of Unix source code, it is my understanding that it has been distributed since my departure from Novell. Based solely on the breadth of its distribution, I doubt there are many, if any, parts of the Unix System V Release 4.x and earlier source code that could be said still to be confidential." (Ex. 182 ¶ 37.)

SECTION REDACTED

SECTION REDACTED

13. *AT&T Entered Into a Side Letter With IBM Clarifying That IBM Owned and Controlled the Code That IBM Developed Itself, and the Terms of That Side Letter, As Well As All AT&T Side Letters Generally, Applied to All UNIX Licensees, Including Sequent.*

SECTION REDACTED

14. *Mental Contamination Was Not of Great Concern to AT&T, USL, or Novell.*

SECTION REDACTED

52

SECTION REDACTED

15.  *AT&T Had No Rights, Absent a Separate License, To Its Licensees' Works*

SECTION REDACTED

16.  *UNIX Licensees Relied On AT&T's Assurances.*

   a.   "We expected that our licensees would accept and rely upon these assurances, and we understood that they did.  I know, for example, that IBM was developing a flavor of Unix to which it was adding original IBM code, methods and concepts, and I understood that it would not have done so if it believed AT&T, USL and Novell would control IBM's original or homegrown works." (Ex. 183 ¶ 6.)

b. "Moreover, we were aware that our licensees were publicly disclosing their own code, methods and concepts, even though they might be part of a modification or derivative work of our Unix software.  They did so through a variety of media -- from highly technical manuals for programmers to more basic books designed for end users.  These publications were not secret.  We did not object to such disclosures because they were within the licensees' rights under the contracts, and were consistent with what we had told them over the years concerning their ownership rights to their source code." (Ex. 183 ¶ 7.)

17. *AT&T Clarified That IBM Would Not Be Liable For Non-Material Breaches of the Confidentiality Portions of the UNIX Licensing Agreements, and That Other Licensees Also Received the Benefit of This Clarification.*

a. ". . . IBM would not be held in breach of the confidentiality provision for immaterial disclosures of source code.  I viewed this language as a clarification, not a substantive change, since I did not believe that a licensee would be held in breach of the standard software agreement for immaterial disclosures.  Even a licensee like Sequent, which did not have a side letter like IBM, would not, under the terms of its agreements with AT&T, be held in breach for disclosing parts of the source code that were not material." (Ex. 182 ¶ 26.)

SECTION REDACTED

SECTION REDACTED

18. *The Protections of UNIX Source Code Under the Licensing Agreements Were No Broader Than Under Copyright and Trade Secret Law*

SECTION REDACTED

...

D.    STEPHEN VUKSANOVICH

1.    *Mr. Vuksanovich Was An Account Representative Responsible For UNIX Licensing For AT&T, USL, and Novell, Negotiated the IBM Agreements, and Administered the Sequent Agreements.*

a.    "During the time I was at AT&T Technologies, USL and Novell, from approximately 1984 until 1993, I was an account representative responsible for licensing UNIX System V software to a number of different licensees.  As an account representative, I helped negotiate many

55

licensing agreements for the UNIX software over the years." (Ex. 275 ¶ 6.)

b.   "Among the licensees I was responsible for was [IBM].  As IBM's account representative, I negotiated on behalf of AT&T Technologies, and have extensive firsthand knowledge of, the … agreements between AT&T Technologies and IBM relating to UNIX System V".  (Ex. 275 ¶ 7.)

c.   "I became the account representative responsible for our account with [Sequent] after Ira Kistenberg left the licensing group.  Although I did not participate in the negotiation of the [UNIX] agreements with Sequent, I am familiar with them based on my role in administering Sequent's account in subsequent years".  (Ex. 275 ¶ 8.)

d.   "Based upon my duties and responsibilities at AT&T Technologies, USL and Novell, I have firsthand knowledge and experience regarding the UNIX System V license agreements described in this declaration, including, in particular, the IBM Agreements and the Sequent Agreements.  I believe I know what the parties to these agreements understood them to mean and intended them to accomplish." (Ex. 275 ¶ 9.)

2.   *Section 2.01 Protects Only the UNIX System V Source Code.*

SECTION REDACTED

56

SECTION REDACTED

SECTION REDACTED

3.    *AT&T, USL, and Novell Did Not Intend to Assert Ownership or Control Over the Works of Their Licensees.*

    a.    "AT&T never intended to assert ownership or control over IBM's modifications or derivative works, except to the extent of the Unix System V source code included in such modifications or derivative works."  (Ex. 275 ¶ 16.)

    b.    The UNIX agreements did not give "AT&T Technologies the right to assert ownership or control over modifications or derivative works prepared by its licensees, except to the extent of the Unix source code that was included in such modifications or derivative works."  (Ex. 275 ¶ 14.)

    c.    "To my knowledge, no one at AT&T Technologies ever intended to assert ownership or control over any portion of a modification or derivative work that was not part of our licensed Unix source code base.  Provided that it did not copy, distribute or disclose any portion of the licensed Unix source code (except as permitted by the license agreements), the licensee was free to use, copy, distribute or disclose such modifications or derivative works as it desired."  (Ex. 275 ¶ 27.)

SECTION REDACTED

SECTION REDACTED

SECTION REDACTED

4. *Licensees Were Free to Use or Disclose Their Own Original Code and Works However They Saw Fit So Long As They Did Not Disclose the UNIX System V Source Code.*

    a.    "Our standard software agreements also gave licensees the right to modify a Unix System V source code and to prepare derivative works based upon the code. As I believe we intended the agreements, and as I told our licensees, our licensees owned their modifications and derivative works they prepared based on UNIX System V, and were therefore permitted to do as they wished with those modifications or derivative works, as long as they treated those portions of the modifications or derivative work consisting of any UNIX System V source code the same way they treated the UNIX System V source code that we provided to them." (Ex. 275 ¶ 13.)

    b.    "At any rate, as I understand the IBM Related Agreements and the Sequent Related Agreements, IBM and Sequent are free to use, export, disclose or transfer AIX and Dynix/PTX source code, so long as they do not export, disclose or transfer any portions of the licensed Unix System V source code that might be contained therein." (Ex. 275 ¶ 29.)

    c.    "As an account representative for both IBM and Sequent, I have firsthand knowledge of the UNIX licensing agreements between IBM and Sequent and AT&T. Those licensing agreements, like the UNIX licensing agreements of all of our licensees, were not intended to limit IBM's or Sequent's freedom of action with respect to their original source code, methods, or concepts; they were intended merely to protect AT&T's, USL's and Novell's interest in their own UNIX software." (Ex. 276 ¶ 3.)

SECTION REDACTED

**SECTION REDACTED**

5.   *UNIX Licensees Were Not Willing to Surrender Control of Their Original Works.*

a.   "In fact, we believed that our licensees would not have entered into UNIX licensing agreements with us unless we assured them they could use and disclose their own code, methods and concepts as they wished.  So as not to lose prospective customers, we told licensees that they were free to exercise ownership and control over their own code,

62

methods and concepts without fear that AT&T, USL or Novell would seek to exercise any sort of control or seek any compensation with respect to licensee original works. I made every effort to give our licensees comfort that AT&T, USL and Novell would not seek to prohibit them from using or disclosing their own works." (Ex. 276 ¶ 5.)

**SECTION REDACTED**

6.  *AT&T, USL, and Novell Provided Clarification to Licensees Regarding Their Rights to Do Whatever They Wished With the Portions of Modifications and Derivative Works That They Developed Themselves.*

    a.  "Some of our licensees in fact sought to clarify that they, not AT&T Technologies, would own and control their modifications and derivative works. We always provided this requested clarification, both orlly and in writing, when asked because it was consistent with what we had intended

. . . the standard software agreement to mean all along."
(Ex. 275 ¶ 15.)

b.    "Some of our licensees asked for clarification that they, not
AT&T, USL or Novell, owned and controlled their
modifications and derivative works, including source code,
methods and concepts.  We made clear to them that they
did  --  both orally and in writing."  (Ex. 276 ¶ 4.)

7.    *IBM Was Unwilling To Agree To Protect Methods and Concepts.*

SECTION REDACTED

8.    *AT&T Entered Into a Side Letter With IBM Clarifying That AT&T
Would Only Own and Control the Portion of IBM's Modifications
and Derivative Works That Consisted of Literal UNIX Source
Code.*

SECTION REDACTED

64

SECTION REDACTED

9.  *No Concerns About "Mental Contamination".*

SECTION REDACTED

10.  *UNIX Licensees Relied On AT&T's Assurances.*

a.  "We knew that some of our UNIX licensees were developing their own UNIX variants and that doing so was costing them millions of dollars and significant human resources.  I do not believe that they would have done so if they thought AT&T, USL or Novell would have control over their own code, methods and concepts."  (Ex. 276 ¶ 6.)

b.  Some licensees publicly disclosed the code, methods and concepts of their flavors of UNIX.  We did not begin litigation against our licensees or otherwise object to these disclosures because we saw nothing wrong with them. Again, we repeatedly told our licensees that they could do what they wanted with their own code."  (Ex. 276 ¶ 7.)

E.    **IRA KISTENBERG**

1.    *Mr. Kistenberg Was an Account Executive for AT&T Responsible for UNIX Licensing and Participated in the Negotiation of the Sequent Agreements.*

    a.    "From April 1984 through June 1988, I was an account executive at AT&T Technologies, Inc., responsible for the licensing of UNIX software and related materials."  (Ex. 217 ¶ 1.)

    b.    "I was responsible for managing AT&T Technologies' relationships with the particular licensees assigned to me. During the time I was employed by AT&T Technologies, I reported to David Frasure, and later to Steve Edson, after Mr. Frasure left AT&T Technologies.  I was responsible for the [Sequent] account, among others."  (Ex. 217 ¶ 3.)

    c.    "As the AT&T Technologies account executive responsible for the Sequent account, I participated in the negotiation of the … license agreements between AT&T Technologies and Sequent relating to UNIX System V".  (Ex. 217 ¶ 4.)

    d.    "Based upon my duties and responsibilities at AT&T Technologies, I have firsthand knowledge of the terms and conditions of the UNIX System V licenses we entered into with licensees, including, in particular, the Sequent Agreements.  While I was employed at AT&T Technologies, I participated in negotiations and discussions regarding many such UNIX System V licenses.  It was normally my responsibility to conduct negotiations with a licensee, and then prepare final agreements for signature by the licensee and by Mr. Wilson or Mr. Frasure for AT&T Technologies (or Mr. Edson, after Mr. Frasure's departure)."  (Ex. 217 ¶ 5.)

2.    *Section 2.01 Protects Only the UNIX System V Source Code.*

    a.    "In my understanding, Section 2.01 did not in any way expand the scope of the software agreement to restrict our licensees' use, export, disclosure or transfer of their own original code, even if such code was contained in a modification or derivative work of UNIX System V.  The purpose of the software agreement was to protect AT&T Technologies' UNIX System V source code, and was not meant to claim for AT&T Technologies our licensees' own

work. It would not make sense to me to read this Section 2.01 to place restrictions on code that our licensees created themselves—that code was theirs." (Ex. 217 ¶ 12.)

SECTION REDACTED

3. *AT&T Did Not Intend to Assert Ownership or Control Over the Works of its Licensees.*

    a.    "As I, and others at AT&T Technologies, assured our licensees, this language does not, and was never intended to, give AT&T Technologies the right to assert any control over the modifications or derivative works prepared by our licensees, except to the extent of the licensed UNIX System V source code that was included in such modifications or derivative works." (Ex. 217 ¶ 11.)

    b.    "To my knowledge, no one at AT&T Technologies ever intended to assert ownership or control over any portion of a modification or derivative work that did not contain our licensed UNIX System V code. Our licensees, including Sequent, were free to use and disclose the modifications or derivative works they created, provided that they did not use and disclose any portion of the licensed UNIX System V source code." (Ex. 217 ¶ 22.)

SECTION REDACTED

4. *Licensees Were Free to Use or Disclose Their Own Original Code and Works However They Saw Fit So Long As They Did Not Disclose AT&T's UNIX System V Source Code.*

    a.    "The standard software agreements also granted licensees the right to modify UNIX System V source code and to prepare derivative works based upon the code. As AT&T Technologies intended the agreements, and as we told our

licensees, the licensees owned the modifications and derivative works they prepared based on UNIX System V, and could do whatever they wanted with those modifications and derivative works, as long as they treated those portions of the modifications or derivative work consisting of any UNIX System V source code the same way they treated the UNIX System V source code that we provided to them." (Ex. 217 ¶ 10.)

b. "In any event, as I understand the Sequent Agreements, Sequent was free to use, export, disclose or transfer any Dynix source code, except for those portions of Dynix that consisted of licensed UNIX System V source code." (Ex. 217 ¶ 23.)

SECTION REDACTED

68

SECTION REDACTED

5.  *AT&T Provided Clarification to Licensees Regarding Their Rights to Do Whatever They Wished With the Portions of Modifications and Derivative Works That They Developed Themselves.*

    a.  "As I communicated to the licensees that I was responsible for, these provisions were intended to define the scope of the licensee's rights only with respect to the 'SOFTWARE

69

PRODUCT' or 'SOFTWARE PRODUCTS', in other words, the UNIX System V source code and related materials. We did not intend these provisions to restrict our licensees' use, export, disclosure or transfer of any source code that our licensees developed on their own." (Ex. 217 ¶ 9.)

    b.    "A number of licensees requested clarification that they, not AT&T Technologies, owned, and could do what they wanted with, the modifications and derivative works prepared by or for them. We always provided this requested clarification—both orally and in writing—when asked, because it was consistent with the original intent of Section 2.01 of the standard software agreement." (Ex. 217 ¶ 13.)

6.    *AT&T Intended to Treat All UNIX Licensees Equally and Apply the Same Licensing Terms to All Licenses.*

    a.    "As a general rule, we at AT&T Technologies intended to treat of all our licensees in the same way. We never intended to give any one of our licensees an edge over another licensee. To the extent we provided certain clarifications to one licensee or another, we would provide the same clarifications to all of our licensees." (Ex. 217 ¶ 6.)

### SECTION REDACTED

7.    *AT&T Wanted to Spread the UNIX Operating System Widely.*

### SECTION REDACTED

8.    *AT&T Later Clarified Section 2.01 to Make Clear Its View That Licensees Were Not Required to Maintain as Confidential Those Portions of Their Modifications or Derivative Works That They Developed Themselves.*

SECTION REDACTED

II.    **IBM**

    A.    **THOMAS CRONAN**

        1.    *Mr. Cronan Was An IBM Attorney Who Participated In the Negotiations of IBM's UNIX Agreements With AT&T.*

            a.    "I was employed as an attorney in [IBM]'s System Products Division from 1984 to 1992. During that time, I was involved in negotiating, on behalf of IBM, agreements with AT&T Technologies, Inc. ... for the licensing of certain UNIX software and related materials." (Ex. 178 ¶ 1.)

            b.    "I was involved in negotiating the agreements pursuant to which IBM licensed from AT&T Technologies UNIX System V software and related materials." (Ex. 178 ¶ 5.)

            c.    "Based upon my duties and responsibilities at IBM, including in particular my role in negotiating the AT&T Agreements, I have personal knowledge of the terms and conditions of the agreements and know what the parties understood them to mean and intended them to accomplish." (Ex. 178 ¶ 6.)

        2.    *Section 2.01 Protects Only the UNIX System V Source Code.*

            a.    "Based on my discussions with AT&T Technologies, I did not understand this language regarding the treatment of 'resulting materials' to give AT&T Technologies the right to assert ownership or control over all of the source code of any modifications or derivative works based on UNIX System V that we prepared. To the contrary, I understood this language to mean—and I believe AT&T Technologies believed likewise—that IBM had to treat those parts of our modifications or derivative works that contained UNIX System V source code as we would treat the UNIX System V source code itself." (Ex. 178 ¶ 11.)

**SECTION REDACTED**

72

SECTION REDACTED

**SECTION REDACTED**

3.   *AT&T Assured IBM That It Did Not Intend to Assert Ownership or Control Over the Works of its Licensees.*

   a.   "According to its representatives, AT&T Technologies understood IBM's desire to retain ownership and control of its own source code and did not wish to assert ownership or control over any modifications and derivative works prepared by or for IBM, or by any other of AT&T Technologies' licensees for that matter, except to the extent

74

that those portions of the modifications or derivative works contained licensed UNIX System V source code." (Ex. 178 ¶ 15.)

4. *AT&T Assured IBM That It Was Free to Use or Disclose Its Own Original Code and Works However It Saw Fit So Long As IBM Did Not Disclose the UNIX System V Source Code.*

    a. "As I recall, the AT&T Technologies representatives with whom we negotiated assured us that under the standard software agreement, IBM owned, and was permitted to use however we wanted, the modifications or derivative works that we created (or that others created for us) based on the UNIX System V software, except for the UNIX System V source code that might be contained within our modifications or derivative works. AT&T Technologies made clear to us that we could do whatever we wanted with our own original non-UNIX System V source code." (Ex. 178 ¶ 12.)

    b. "As I understood the AT&T Agreements between IBM and AT&T Technologies, therefore, and as I believe the parties intended those agreements, the agreements impose no restrictions on IBM's use, export, disclosure or transfer of those portions of any modifications or derivative works of UNIX System V that were created by or for IBM and do not contain any UNIX System V source code." (Ex. 178 ¶ 18.)

    c. "In any event, as I understand the AT&T Agreements, IBM is free to use however it wants any AIX source code, except for the UNIX System V source code or other licensed software products provided by AT&T Technologies that may be contained therein (except as otherwise permitted by the AT&T Agreements)." (Ex. 178 ¶ 20.)

5. *IBM Was Not Willing to Surrender Control of Their Original Works.*

    a. "I did not understand any of these provisions to allow AT&T Technologies to control IBM's use, export, disclosure or transfer of any software products or source code that we developed ourselves that did not contain any UNIX System V code. Our negotiating team would never have agreed to such terms. To do so would have represented a dramatic departure from IBM's practices

75

regarding the licensing of third-party code and would have required IBM to change the way it developed products to ensure that it not allow any IBM or third-party code to be introduced into the source code base containing the UNIX System V code (however briefly) unless IBM was prepared forever to yield control of that code to AT&T Technologies." (Ex. 178 ¶ 9.)

b.      "Based on my role in negotiating the attached AT&T Agreements, I do not believe there is any merit to the plaintiff's contentions. IBM would never have entered into any agreement that gave AT&T Technologies the right to control IBM's use of source code that it wrote itself or that it licensed from third parties. That is why we specifically discussed this issue of ownership of our modifications and derivative works with AT&T Technologies in detail before entering into the AT&T Agreements. AT&T Technologies assured us repeatedly, and I believed them, that the AT&T Agreements were not intended to limit IBM's freedom of action with respect to its original source code and were intended merely to protect AT&T Technologies' interest in its own UNIX System V source code." (Ex. 178 ¶ 22.)

c.      "No one involved in the negotiation of the AT&T agreements ever suggested that the agreements would give AT&T Technologies (or anyone else other than IBM) the right to control IBM original code. It seems quite clear to me, based on the statements of its representatives, that AT&T Technologies' concern was the protection of its original code only. I have no doubt that the AT&T Technologies' representatives with whom we negotiated the AT&T Agreements understood that IBM would not have entered into the AT&T Agreements if AT&T Technologies had sought and insisted on the right to control any product or code that might in the future be associated with UNIX System V code, except insofar as it might include UNIX System V code." (Ex. 178 ¶ 23.)

SECTION REDACTED

76

SECTION REDACTED

6.      *AT&T Provided Clarification to IBM Regarding Its Rights to Do Whatever It Wished With the Portions of Modifications and Derivative Works That IBM Developed Itself.*

     a.      "So that there would be no confusion, we told the AT&T Technologies' representatives with whom we negotiated the AT&T Agreements that IBM intended to include portions of AT&T's UNIX System V code in products with IBM code and to make changes to the AT&T code (such as by adding to it) and thus IBM had to ensure that the parties agreed that IBM had the right to do so, without forfeiting any rights (including the right to control) to such IBM products and code. AT&T Technologies' representatives advised us that they did not seek to preclude such activities. In fact, they assured us that the purpose of the restrictions imposed by the AT&T Agreements was to protect AT&T's original code and that IBM could do whatever it wanted with its own code so long as it did not use, export, disclose or transfer AT&T's original code (except as otherwise permitted by the AT&T Agreements)." (Ex. 178 ¶ 19.)

7.      *SCO's Claims Are Inconsistent with the UNIX Agreements and The Intent of the Parties.*

     a.      "I have been informed that the plaintiff in this litigation contends that IBM has breached the AT&T Agreements by improperly using, exporting, disclosing or transferring AIX source code, irrespective or whether IBM has improperly used, exported, disclosed or transferred any protected

UNIX System V source code.  Any such claim is, in my view, inconsistent with the provisions of the AT&T Agreements and with the parties' intentions."  (Ex. 178 ¶ 21.)

8.  *AT&T Entered Into a Side Letter With IBM Clarifying That IBM Owned and Controlled the Code That IBM Developed Itself.*

a.  "We insisted that the side letter make clear that IBM would 'own' its modifications and derivative works, because we believed the term signified the broadest possible scope of rights.  In my mind, it ensured that we could do as we wished with modifications and derivative works of UNIX System V code so long as we treated UNIX System V code as required by the AT&T Agreements.  It certainly did not give AT&T (or anyone else, for that matter) the right to control IBM's own code or code written by or for IBM, except insofar as that code might contain UNIX System V code."  (Ex. 178 ¶ 17.)

SECTION REDACTED

SECTION REDACTED

9.     *IBM Relied On AT&T's Assurances.*

SECTION REDACTED

**B.     RICHARD MCDONOUGH**

1.     *Mr. McDonough Was An IBM Attorney Who Negotiated IBM's UNIX Agreements With AT&T and Signed Those Agreements On IBM's Behalf.*

a.     "During the period I was Division Counsel for IBM's Systems Product Division, in or about 1984, IBM sought to license UNIX System V software and related materials

79

from AT&T Technologies. IBM was then licensing certain other UNIX software and related materials from AT&T Technologies. I was involved in negotiating, and I executed on behalf of IBM, the agreements pursuant to which IBM licensed from AT&T Technologies UNIX System V software and related materials." (Ex. 228 ¶ 4.)

2.      *Section 2.01 Protects Only the UNIX System V Source Code.*

SECTION REDACTED

3.      *AT&T Assured IBM That It Did Not Intend to Assert Ownership or Control Over the Works of its Licensees.*

      a.      "The language in the standard software agreement relating to the treatment of resulting materials did not give AT&T Technologies the right to assert ownership or control over modifications or derivative works prepared by its licensees, except to the extent that the licensed UNIX software product was included in such modifications or derivative works. I understood this language to mean that licensees owned their modifications and derivative works and were permitted to use or disclose them as they might choose, so long as any modification or derivative work containing any part of an AT&T Technologies-licensed software product was treated the same as an AT&T Technologies-licensed software product under the license agreements." (Ex. 228 ¶ 12.)

SECTION REDACTED

80

SECTION REDACTED

4.   *AT&T Assured IBM That It Was Free to Use or Disclose Its Own Original Code and Works However It Saw Fit So Long As IBM Did Not Disclose AT&T's UNIX System V Source Code.*

a.   "As I understood the AT&T Agreements between IBM and AT&T Technologies, and as the parties intended those agreements to mean, they did not impose any limitations on the materials separately owned or developed by IBM or AT&T Technologies, respectively.  IBM was free to use, copy, distribute or disclose any portion of a modification or derivative work that was not part of a licensed software product provided by AT&T Technologies.  Similarly, AT&T Technologies was free to use, copy, distribute or disclose any portion of a licensed software product." (Ex. 228 ¶ 15.)

b.   "In any event, as I understand the AT&T Agreements, IBM is free to use, copy, distribute, or disclose AIX (including source code), provided that it does not copy, distribute or disclose any UNIX System V source code or other licensed software products provided by AT&T Technologies that may be contained therein (except as otherwise permitted by the AT&T Agreements)." (Ex. 228 ¶ 16.)

c.   "AT&T readily agreed to our request as, by all indications, the parties were of the same mind:  the agreements would

81

not prevent IBM from doing as it pleased with its own code so long as it did not disclose AT&T UNIX System V code; the agreements would not interfere with IBM's right to use or disclose non-UNIX System V code, even if it had once been associated with UNIX System V code."  (Ex. 228 ¶ 19.)

SECTION REDACTED

SECTION REDACTED

SECTION REDACTED

SECTION REDACTED

5. *IBM Was Not Willing to Surrender Control of Its Original Works.*

a.   "Based on my role in negotiating and executing the attached AT&T Agreements, I cannot understand the basis for plaintiff's contentions that the AT&T Agreements restricted IBM's freedom of action with respect to any programming code, source code or otherwise, independently developed by IBM or its contractors. There is absolutely no way that IBM would have entered into an agreement with AT&T giving it the right to control IBM code merely because that code was or had once been associated with AT&T code in an IBM product. Never would we have knowingly agreed to a provision that gave AT&T the right to control what IBM did with its own code (or for that matter the code of third parties). In fact, as stated above, IBM felt so strongly about the issue that although AT&T assured us that the language in its standard license agreements could not be read to preclude IBM from using or disclosing code other than UNIX System V code, we insisted that the matter be clarified in the AT&T Side Letter stating that IBM owned its code, without any limitation on our rights of ownership." (Ex. 228 ¶ 18.)

SECTION REDACTED

SECTION REDACTED

6. *SCO's Claims Are Inconsistent with the UNIX Agreements and the Intent of the Parties.*

    a.    "I have been informed that the plaintiff in this litigation contends that IBM has breached the AT&T Agreements by improperly using, exporting, disclosing or transferring AIX source code, irrespective or whether IBM has disclosed any specific protected source code from UNIX System V. Any such claim is, in my view, inconsistent with the clear provisions of the AT&T Agreements, and of the parties' intentions." (Ex. 228 ¶ 17.)

7.   *IBM Did Not Have Confidentiality Restrictions With Regard to Its Own Modifications and Derivative Works.*

SECTION REDACTED

8.   *AT&T Entered Into a Side Letter With IBM Clarifying That IBM Owned and Controlled the Code That IBM Developed Itself, and the Terms of That Side Letter, As Well As All AT&T Side Letters Generally, Applied to All UNIX Licensees.*

    a.   "IBM wanted the agreements to be clarified so that there would be no question that IBM, as a licensee, not AT&T Technologies, would own and control source code developed by IBM or provided to IBM by a third party. AT&T Technologies agreed to provide this clarification in the AT&T Side Letter because, its representatives said, AT&T Technologies understood IBM's desire to retain ownership and control of source code and products prepared by or for IBM, and also that, in any event, that was what AT&T already intended and understood the language in the standard AT&T Software Agreement to mean. They indicated that AT&T Technologies did not

wish to assert ownership or control over modifications and derivative works prepared by or for IBM or by any other of AT&T Technologies' licensees, only over any portion or portions of licensed software products provided by AT&T Technologies included in any such modification or derivative work." (Ex. 228 ¶ 13.)

SECTION REDACTED

9.    *No Concerns About "Mental Contamination".*

SECTION REDACTED

SECTION REDACTED

C.    **JEFFREY MOBLEY**

1.    *Mr. Mobley Was An IBM Employee Who Participated In the Negotiations of IBM's UNIX Agreements With AT&T and Approved Those Agreements on IBM's Behalf.*

a.    "From 1983 through 1993, I was a member of the corporate Commercial and Industry Relations ('C&IR') staff of International Business Machines Corporation ('IBM'). The C&IR staff, among other things, was responsible for reviewing and approving requests from IBM operating units to acquire third-party software for remarketing or incorporation into IBM products, and for providing guidance to IBM operating units involved in software acquisition activities. While I was on the C&IR staff, I was involved in negotiating, on behalf of IBM, agreements with

88

AT&T Technologies, Inc. ('AT&T Technologies') for the licensing of certain UNIX software and related materials." (Ex. 233 ¶ 1.)

b.    "I was the C&IR representative assigned to participate in the negotiations of these agreements together with the staff of the business unit interested in licensing UNIX System V, the Systems Products Division.  I approved the execution of the AT&T Agreements on behalf of C&IR."  (Ex. 233 ¶ 4.)

2.    *Section 2.01 Protects Only the UNIX System V Source Code.*

SECTION REDACTED

3.  *AT&T Assured IBM That It Did Not Intend to Assert Ownership or Control Over the Works of its Licensees.*

    a.  "Based on my discussions with AT&T Technologies, I did not understand this language regarding the treatment of 'resulting materials' to give AT&T Technologies the right to assert ownership or control over all of the source code of any modifications or derivative works based on UNIX System V that we prepared. To the contrary, I understood this language to mean—and I believed AT&T Technologies believed likewise—that IBM had to treat any licensed UNIX System V source code that was included in a modification or derivative work in accordance with the license agreements. I would not have approved of an agreement that provided otherwise." (Ex. 233 ¶ 8.)

    b.  "According to its representatives, AT&T Technologies understood IBM's desire to retain ownership and control of its own source code and did not wish to assert ownership or control over any modifications and derivative works prepared by or for IBM, or by any other of AT&T Technologies' licensees for that matter, except for any protected UNIX System V source code provided by AT&T Technologies that was included in any such modifications or derivative works." (Ex. 233 ¶ 12.)

4.  *IBM Was Free to Use or Disclose Its Own Original Code and Works However It Saw Fit So Long As IBM Did Not Disclose AT&T's UNIX System V Source Code.*

    a.  "IBM wanted to make sure there would be no question that IBM, not AT&T Technologies, would own and control the source code that was developed by IBM or developed for IBM by a third party. This was a critical part of my directive, as a C&IR staff member, to ensure that IBM's freedom of action with respect to its products and business interests would not be compromised." (Ex. 233 ¶ 11.)

    b.  "As I understood the AT&T Agreements between IBM and AT&T Technologies, therefore, and as I believe the parties intended those agreements to mean, the agreements impose no restrictions on IBM's use, export, disclosure or transfer of those portions of any modifications or derivative works of UNIX System V that were created by or for IBM and do not contain any protected UNIX System V source code provided by AT&T Technologies. When AT&T

90

Technologies represented to us, both orally and in the AT&T Side Letter, that IBM had 'ownership' of IBM's modifications and derivative works, AT&T Technologies meant ownership in every possible way—the AT&T Technologies representatives told us in no uncertain terms that AT&T Technologies claimed no right whatsoever to control in any manner what IBM did with its original code." (Ex. 233 ¶ 14.)

c.      "In any event, as I understand the AT&T Agreements, IBM is free to use however it wants any AIX source code, except for any protected UNIX System V source code provided by AT&T Technologies that may be contained therein (except as permitted by the AT&T Agreements)." (Ex. 233 ¶ 15.)

## SECTION REDACTED

5.      *IBM Was Not Willing to Surrender Control of Its Original Works.*

a.      "I did not understand any of these provisions to allow AT&T Technologies to control IBM's use, export, disclosure or transfer of any software products or source code that we developed ourselves or was developed for us by others. The IBM negotiating team would never have agreed to terms that would place such restrictions on IBM, and I, on behalf of the corporate C&IR staff, would never have approved the execution of a contract containing such terms. One of the missions of the C&IR staff was to ensure that IBM's freedom to pursue its product and business interests would not be compromised by restrictions in software license agreements entered into by IBM operating units." (Ex. 233 ¶ 6.)

b.      "As I recall, the AT&T Technologies representatives with whom we negotiated assured us that under the standard

91

Software Agreement, IBM owned, and was permitted to use however it wanted, the modifications or derivative works that we created, or that others created for us, based on the UNIX System V software, except for any protected UNIX System V source code that might be contained within our modification or derivative works. AT&T Technologies made clear to us that we could do whatever we wanted with original source code that we developed or that was developed for us by others." (Ex. 233 ¶ 9.)

SECTION REDACTED

6.   *AT&T Provided Clarification to IBM Regarding Its Rights to Do Whatever It Wished With the Portions of Modifications and Derivative Works That IBM Developed Itself.*

SECTION REDACTED

SECTION REDACTED

7. *SCO's Claims Are Inconsistent with the UNIX Agreements and the Intent of the Parties.*

    a.     "I have been informed that the plaintiff in this litigation contends that IBM has breached the AT&T Agreements by improperly using, exporting, disclosing or transferring AIX source code, irrespective of whether IBM has improperly used, exported, disclosed or transferred any protected UNIX System V source code provided by AT&T Technologies. Any such claim is, in my view, inconsistent with the provisions of the AT&T Agreements and with the parties' intentions." (Ex. 233 ¶ 16.)

    b.     "Based on my role in negotiating the attached AT&T Agreements, I do not believe there is any merit to the plaintiff's contentions. IBM would never have entered into any agreement that gave AT&T Technologies the right to control IBM's use of source code that IBM wrote itself, that IBM paid others to develop, or that IBM licensed from others. That is why we specifically discussed this issue of ownership of our modifications and derivative works with AT&T Technologies in detail before entering into the AT&T Agreements. AT&T Technologies assured us repeatedly that the AT&T Agreements were not intended to limit IBM's freedom of action with respect to its original source code and was merely intended to protect AT&T Technologies' interest in its own UNIX System V source code, and I believed them." (Ex. 233 ¶ 17.)

8.     *AT&T Entered Into a Side Letter With IBM Clarifying That IBM Owned and Controlled the Code That IBM Developed Itself.*

SECTION REDACTED

94

SECTION REDACTED

III.   **SEQUENT**

    A.   **ROGER SWANSON**

        1.   *Mr. Swanson Was Director of Software Engineering for Sequent and Participated In the Negotiation of Sequent's UNIX Agreements With AT&T.*

            a.   "From January 1983 until late 1988, I served as Sequent's Director of Software Engineering.  As Director of Software Engineering, I was involved in negotiating several agreements with AT&T Technologies, Inc. ('AT&T Technologies') for the licensing of certain UNIX software and related materials.  I reported to David Rodgers, the Vice President of Engineering during this time."  (Ex. 266 ¶ 2.)

            b.   "As Director of Software Engineering at Sequent Computer Systems, Inc. ('Sequent'), I was involved in the negotiation of several agreements with AT&T Technologies, Inc. ('AT&T') for the licensing of certain UNIX System V software and related material."  (Ex. 599 ¶ 3.)

        2.   *Section 2.01 Protects Only the UNIX System V Source Code.*

            a.   "I did not understand this language in Section 2.01 to give AT&T Technologies the right to assert ownership or control over modifications or derivative works based on UNIX System V prepared by Sequent, except for the licensed UNIX System V code that was included in such modifications or derivative works.  In fact, I recall having discussions with AT&T Technologies at the time to clarify that Sequent would own whatever source code we developed."  (Ex. 266 ¶ 10.)

        3.   *AT&T Assured Sequent That It Was Free to Use or Disclose Its Own Original Code and Works However It Saw Fit So Long As It Did Not Disclose AT&T's UNIX System V Source Code.*

            a.   "As I understood these provisions from my discussions with AT&T Technologies, they set forth the terms that Sequent had to follow with respect to the UNIX System V source code we were licensing from AT&T Technologies. I did not understand the Software Agreement to restrict Sequent's use, export, disclosure or transfer of anything other than such UNIX System V code, and certainly not

any code written by Sequent for any of its own software programs." (Ex. 266 ¶ 8.)

b.    "As the AT&T Technologies explained the agreements to me, Sequent was free to use, export, disclose or transfer all of the code contained in any modifications or derivative works of UNIX System V developed by Sequent, provided that Sequent did not improperly use, export, disclose or transfer any portion of the UNIX System V code we were licensing from AT&T Technologies (except as otherwise permitted by the licensing agreements)." (Ex. 266 ¶ 12.)

c.    "In any event, as I understood the AT&T Agreements, Sequent was free to use the original source code it developed for Dynix and Dynix/ptx in any way it desired, provided that Sequent treated any UNIX System V source code that might be contained therein consistent with the terms of the AT&T Agreements." (Ex. 266 ¶ 13.)

SECTION REDACTED

97

SECTION REDACTED

4.    *Sequent Was Not Willing to Surrender Control of Their Original Works.*

a.    "As a small company at the time, it would not have made any sense for Sequent to have entered into an agreement that gave AT&T Technologies control over the source code that we developed for our own computer systems.  I never would have agreed to a contract that would grant AT&T Technologies rights in Sequent's proprietary code, as that source code was the core of Sequent's software business." (Ex. 266 ¶ 11.)

b.    "During these negotiations, I told AT&T's representatives that Sequent intended to use and modify the licensed UNIX System V source code in connection with Sequent's development of a new operating system for proprietary hardware, which came to be known as Dynix/ptx.  I told AT&T's representatives that it was important to us that any source code that we developed in connection with Dynix/ptx would be owned and controlled by Sequent, and that this new source code would belong to Sequent and was Sequent's to distribute as it saw fit." (Ex. 599 ¶ 3.)

c.    "The key product goal for Sequent in its early days as a new company was the development of a UNIX-based multiprocessor system, which to the best of our knowledge had not been accomplished before.  We did not want AT&T to have control over any of the software modifications we developed to make the UNIX system that we had licensed operate on our multiprocessor hardware. We would have been at a significant disadvantage if a third party were to disclose our enhancements to a Sequent competitor.  Before the agreements were executed, I asked

98

AT&T's representatives to confirm that Sequent's understanding of the AT&T Agreements was correct because it was important to the way Sequent would operate its business." (Ex. 599 ¶ 4.)

5.    *AT&T Provided Clarification to Sequent Regarding Its Rights to Do Whatever It Wished With the Portions of Modifications and Derivative Works That Sequent Developed Itself.*

    a.    "AT&T's representatives confirmed that Sequent's understanding was exactly what AT&T intended by the AT&T Agreements.  They told me that they did not intend the AT&T Agreements to give AT&T the right to assert ownership or control over modifications or derivative works based on UNIX System V prepared by Sequent, except for the licensed UNIX System Code that was included in such modifications or derivative works." (Ex. 599 ¶ 5.)

6.    *SCO's Claims Are Inconsistent with the UNIX Agreements and the Intent of the Parties.*

    a.    "I understand that SCO claims IBM has breached the Sequent Agreement by using, exporting, disclosing or transferring Dynix/ptx source code, regardless of whether IBM has used, exported, disclosed or transferred any protected UNIX System V source code.  That theory is inconsistent with both how I understood the AT&T Agreements at the time they were executed and how AT&T's representatives explained their understanding of the Software Agreement to me." (Ex. 599 ¶ 6.)

7.    *Sequent Relied On AT&T's Assurances.*

    a.    "Subsequent to the execution of the AT&T Agreements, Sequent invested in the development of its own operating system for multiprocessors, Dynix/ptx.  Sequent invested millions of dollars in and devoted countless person-hours to developing, Dynix/ptx, which contained certain source code from UNIX System V, based on the understanding that AT&T claimed no interest in Sequent's original works, even if such a work might be included in a modification or derivative work of UNIX System V.  In addition, Sequent also applied for numerous patents for technologies related to Dynix/ptx.  Part of my responsibilities at Sequent included working with our patent attorney to develop

patents for the unique computer methods that we developed and included in Dynix/ptx. Because Sequent understood that the Software Agreements did not require Sequent to hold Dynix/ptx methods developed by Sequent in confidence for AT&T, it was free to apply for patents related to such Dynix/ptx methods and thus disclose such methods to the public." (Ex. 599 ¶¶ 7-8.)

## B.   DAVID RODGERS

1.   *Mr. Rodgers Was Sequent's Vice President of Engineering and Signed the UNIX Agreements With AT&T On Sequent's Behalf.*

    a.   "During the time I served as Vice President of Engineering at Sequent, I executed several agreements with AT&T Technologies, Inc. ('AT&T Technologies') for the licensing of certain Unix software and related materials." (Ex. 252 ¶ 2.)

    b.   "Although I did not personally negotiate the Sequent Agreements with representatives of AT&T Technologies, I carefully reviewed the agreements myself and with other Sequent employees before executing them and have personal knowledge of the parties' understanding of, and intent behind, the terms and conditions of the agreements." (Ex. 252 ¶ 5.)

2.   *Section 2.01 Protects Only the UNIX System V Source Code.*

SECTION REDACTED

100

SECTION REDACTED

SECTION REDACTED

SECTION REDACTED

3.    *Sequent Was Free to Use or Disclose Its Own Original Code and Works However It Saw Fit So Long As Sequent Did Not Disclose AT&T's UNIX System V Source Code.*

a.    "As I understood the Software Agreement between Sequent and AT&T Technologies, Sequent was free to use, copy,

103

distribute or disclose any modifications or derivative works
developed by Sequent, provided that it did not copy,
distribute or disclose any portion of the licensed Unix
software product source code (except as otherwise
permitted by the licensing agreements)." (Ex. 252 ¶ 8.)

b.     "It is my understanding that Sequent's Dynix software
products might include some small parts of the licensed
Unix System V source code, although I do not personally
know whether it does or not. I also do not know whether
Dynix is so similar to Unix System V that it may properly
be viewed as a 'derivative work' based on Unix System V,
particularly in light of the fact that Dynix was originally
created using Berkeley Software Design ('BSD') Unix as a
base and not AT&T Technologies' Unix System V. In any
event, as I understood the Sequent Agreements, Sequent
was free to use, copy, distribute, or disclose Dynix
(including source code), provided that it did not copy,
distribute or disclose any Unix System V source that might
be contained therein (except as otherwise permitted by the
licensing agreements)." (Ex. 252 ¶ 9.)

SECTION REDACTED

104

SECTION REDACTED

4.    *Sequent Not Willing to Surrender Control of Its Original Works.*

a.    "I did not understand this language to give AT&T Technologies the right to assert ownership or control over modifications or derivative works prepared by Sequent, except to the extent that the licensed Unix software product was included in such modifications or derivative works. I would never have signed an agreement that would grant ownership or control to AT&T Technologies over modifications or derivative works prepared by Sequent to the extent those modifications or derivative works contained no part of the Unix software product licensed from AT&T Technologies." (Ex. 252 ¶ 7.)

SECTION REDACTED

SECTION REDACTED

5.  *AT&T Provided Clarification to Sequent Regarding Its Rights to Do Whatever It Wished With the Portions of Modifications and Derivative Works That Sequent Developed Itself.*

SECTION REDACTED

6.  *Sequent Was Not Required to Protect Methods and Concepts.*

SECTION REDACTED

106

SECTION REDACTED

7.      *AT&T Assured Sequent That It Would Not Be Required to
        Maintain As Confidential Any Portions of the UNIX Source Code
        That Became Publicly Available.*

SECTION REDACTED

107

**SECTION REDACTED**

8.   *Sequent Did Not Have Confidentiality Restrictions With Regard to Its Own Modifications and Derivative Works.*

a.   "As I understood the agreement regarding confidentiality, Sequent had no obligation to keep confidential any information embodied in any of the software products provided to Sequent, provided that Sequent did not disclose source code (except as otherwise permitted by the license agreements).  In addition, as I discuss above, Sequent had no obligation to keep confidential any modification or derivative work developed by Sequent that did not include Unix System V source code.  Sequent was free to use, copy, distribute or disclose such modifications and derivative works, provided that it did not copy, distribute or disclose any portions of the licensed Unix source code (except as otherwise permitted by the license agreements.)" (Ex. 252 ¶ 13.)

**SECTION REDACTED**

108

SECTION REDACTED