# EXHIBIT 18

SNELL & WILMER L.L.P.
Alan L. Sullivan (3152)
Todd M. Shaughnessy (6651)
Amy F. Sorenson (8947)
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (admitted pro hac vice)
David R. Marriott (7572)
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant/Counterclaim-Plaintiff
International Business Machines Corporation*

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

AUG 13 2004

MARKUS B. ZIMMER, CLERK
BY _____
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC.<br><br>Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Defendant/Counterclaim-Plaintiff. | **DEFENDANT/COUNTERCLAIM PLAINTIFF IBM'S REDACTED MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIMS**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>Civil No. 2:03CV0294 DAK<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Brooke C. Wells |

## TABLE OF CONTENTS

Page

Preliminary Statement.................................................................................................. 1

Statement Of Undisputed Facts..................................................................................... 3

    I.      The UNIX Operating System........................................................................ 3

    II.     The Linux Operating System......................................................................... 5

    III.    IBM's And Sequent's Licenses To UNIX System V ..................................... 6

    IV.   AT&T's UNIX Assets. ................................................................................. 7

    V.     SCO's Failure Properly To Provide Evidence In Support Of Its Lawsuit.... 9

    VI.    SCO's Newfound Contract Theory. ............................................................. 13

    VII.   AT&T's Interpretation Of Its UNIX System V Licenses .............................. 18

         A.     Testimonial Evidence.......................................................................... 18

               1.     The Witnesses. ......................................................................... 18

               2.     Testimony Regarding The Software Agreements. .................. 20

         B.     Contemporaneous Documentary Evidence. ........................................ 35

    VIII.  Novell's Waiver Of Any Purported Breaches Of Contract By IBM And Sequent. ................................................................................................ 40

    IX.    SCO Disclosed The Code It Claims Is At Issue............................................ 44

TABLE OF CONTENTS
(continued)

Page

Summary Judgment Standard .................................................................... 46

Argument .................................................................................................... 47

I.      IBM's UNIX SYSTEM V LICENSES DO NOT, AS A MATTER OF
        LAW, RESTRICT IBM FROM DISCLOSING ITS OWN
        HOMEGROWN CODE. ......................................................................... 47

        A.     The IBM And Sequent Software Agreements, By Their Plain
               And Unambiguous Terms, Do Not Pertain To The Code Allegedly
               Contributed By IBM To Linux ................................................... 49

        B.     In Any Event, All Of The Relevant Testimonial And
               Documentary Evidence Supports The Conclusion
               That The Software Agreements Do Not Pertain To
               IBM's Original Code. ................................................................ 56

               1.     The Testimonial Evidence. ........................................ 57

               2.     The Documentary Evidence. ..................................... 63

               3.     The Extrinsic Evidence Is So One-Sided That No
                      Reasonable Fact-Finder Could Agree With SCO's
                      Interpretation Of The Agreements ........................... 66

        C.     SCO's Interpretation Of The Software Agreements Is
               Unreasonable. ........................................................................... 67

II.     NOVELL AND SCO HAVE IN ANY EVENT WAIVED ANY
        PURPORTED BREACH AS A MATTER OF LAW. ............................. 71

        A.     Novell Has Explicitly Waived The Alleged Breaches By IBM .......... 71

        B.     Through Its Own Conduct, SCO Has Waived Its Purported
               Rights To Claim Breach of Contract. ...................................... 74

Conclusion ................................................................................................. 77

# TABLE OF AUTHORITIES

## Cases

AXA Global Risks U.S. Ins. Co. v. Sweet Assocs., Inc.,
   755 N.Y.S.2d 759 (N.Y. App. Div. 2003) ........................................................................71

American Express Bank Ltd. v. Uniroyal, Inc.,
   562 N.Y.S.2d 613 (N.Y. App. Div. 1990) ........................................................................49

Banks v. Rite Aid Corp.,
   No. 1:98CV115K, 2001 WL 1806857 (D. Utah Mar. 15, 2001) ................................ 46-47

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,
   Fenner & Smith, Inc., 232 F.3d 153 (2d Cir. 2000) .........................................................66

Croce v. Kurnit,
   737 F.2d 229 (2d Cir. 1984).............................................................................................64

Elec. Distribs., Inc. v. SFR, Inc.,
   166 F.3d 1074 (10th Cir. 1999) .......................................................................................49

Elsky v. Hearst Corp.,
   648 N.Y.S.2d 592 (N.Y. App. Div. 1996) ........................................................................70

In Re Estate of Flake,
   71 P.3d 589 (Utah 2003)...........................................................................................71, 74

Factors, Etc., Inc. v. Creative Card Co.,
   444 F. Supp. 279 (S.D.N.Y. 1977) ...................................................................................65

Farmland Indus., Inc. v. Grain Board of Iraq,
   904 F.2d 732 (D.C. Cir. 1990).....................................................................................62-63

Farrell Lines, Inc. v. City of New York,
   281 N.E.2d 162 (N.Y. 1972).............................................................................................67

Federal Ins. Co. v. Americas Ins. Co.,
   691 N.Y.S.2d 508 (N.Y. App. Div. 1999) ...................................................................62, 64

General Elec. Capital Co. v. Armadora, S.A.,
   37 F.3d 41 (2d Cir. 1994).............................................................................................65-66

Glezos v. Frontier Inv.,
    896 P.2d 1230 (Utah Ct. App. 1995) ................................................................. 49

Goodman v. Resolution Trust Corp.,
    7 F.3d 1123 (4th Cir. 1993) ............................................................................ 62

In re Grandote Country Club Co.,
    252 F.3d 1146 (10th Cir. 2001) .................................................................. 46, 47

Heidi E. v. Wanda W.,
    620 N.Y.S.2d 665 (N.Y. App. Div. 1994) ........................................................ 74

In re Holocaust Victim Assets Litig.,
    256 F. Supp. 2d 150 (E.D.N.Y. 2003) ........................................................ 53-54

Jacobson v. Sassower,
    489 N.E.2d 1283 (N.Y. 1985) .......................................................................... 66

Johnson v. Werner,
    407 N.Y.S.2d 28 (N.Y. App. Div. 1978) .......................................................... 67

Kaiser-Francis Oil Co. v. Producer's Gas Co.,
    870 F.2d 563 (10th Cir. 1989) ......................................................................... 66

Leighton's Inc. v. Century Circuit, Inc.,
    463 N.Y.S.2d 790 (N.Y. App. Div. 1983) ........................................................ 67

In re Lipper Holdings, LLC,
    766 N.Y.S.2d 561 (N.Y. App. Div. 2003) ........................................................ 67

Litchfield v. Spielberg,
    736 F.2d 1352 (9th Cir. 1984) ......................................................................... 52

Mandelblatt v. Devon Stores, Inc.,
    521 N.Y.S.2d 672 (N.Y. App. Div. 1987) ........................................................ 67

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)......................................................................................... 47

Moncrief v. Williston Basin Interstate Pipeline Co.,
    174 F.3d 1150 (10th Cir. 1999) ....................................................................... 56

Nassau Trust Co. v. Montrose Concrete Prods. Corp.,
    436 N.E.2d 1265 (N.Y. 1982)........................................................................... 65

Ocean Transp. Line, Inc. v. American Philippine Fiber Indus., Inc.,
    743 F.2d 85 (2d Cir. 1984)....................................................................................65

Old Colony Trust Co. v. City of Omaha,
    230 U.S. 100 (1913)............................................................................................64

RJE Corp. v. Northville Indus. Corp.,
    198 F. Supp. 2d 249 (E.D.N.Y. 2002) ......................................................54, 65

R/S Assoc. v. New York Job Dev. Auth.,
    98 N.Y.2d 29 (N.Y. 2002) ................................................................................49

Reape v. New York News, Inc.,
    504 N.Y.S.2d 469 (N.Y. App. Div. 1986) ......................................................67

Rehberger v. Richtberg,
    744 N.Y.S.2d 477 (N.Y. App. Div. 2002) ......................................................49

Rieter v. Tavella,
    549 N.Y.S.2d 888 (N.Y. App. Div. 1990) ......................................................67

Sec. Indus. Automation Corp. v. United Comp. Capital Corp.,
    723 N.Y.S.2d 668 (N.Y. App. Div. 2001) ......................................................76

Soter's Inc. v. Deseret Fed. Sav. & Loan Ass'n,
    857 P.2d 935 (Utah 1993)..................................................................................71

T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc.,
    No. 2001-900, 2002 WL 1311648 (N.Y. App. Term Apr. 2, 2002)..................76

Teachers Ins. & Annuity Ass'n of Am. v. Ocwen Fin. Corp.,
    No. 98 Civ. 7137, 2002 WL 237836 (S.D.N.Y. Feb. 19, 2002) ................. 64-65

This Is Me, Inc. v. Taylor,
    157 F.3d 139 (2d Cir. 1998)..............................................................................53

United Rentals (North America), Inc. v. Keizer,
    355 F.3d 399 (6th Cir. 2004) ............................................................................62

Vault Corp. v. Quaid Software Ltd.,
    847 F.2d 255 (5th Cir. 1988) ............................................................................52

Viacom Int'l, Inc. v. Lorimar Productions, Inc.,
    486 F. Supp. 95 (S.D.N.Y. 1980) ....................................................................65

Westchester Resco Co., L.P. v. New England Reinsurance Corp.,
    818 F.2d 2 (2d Cir. 1987)......................................................................................................66

## Statutes

17 U.S.C. § 101 ........................................................................................................................52

17 U.S.C. § 103(b) ...................................................................................................................70

17 U.S.C. § 106 ........................................................................................................................70

17 U.S.C. § 201(a) ...................................................................................................................70

Defendant/Counterclaim-Plaintiff International Business Machines Corporation ("IBM") respectfully submits this memorandum in support of its motion for partial summary judgment on Plaintiff/Counterclaim-Defendant The SCO Group, Inc.'s ("SCO") breach of contract claims.

### Preliminary Statement

Nearly two decades ago, IBM entered into licensing agreements with AT&T for the source code to the UNIX System V operating system. After all this time, SCO—which played no part in negotiating the agreements but purports recently to have acquired rights to them through a succession of corporate acquisitions—seeks to use the agreements to prevent IBM from contributing its own original source code (not UNIX System V source code) to the public operating system known as Linux. SCO's contract claims rely on an unsupported and unsupportable reading of IBM's agreements with AT&T and should be rejected as a matter of law.[1]

SCO has asserted four separate contract claims against IBM relating to the UNIX System V licenses entered into by IBM and Sequent Computer Systems, Inc. (a company acquired by IBM in 1999) with AT&T. These licenses are in the form of a "Software Agreement", which sets forth the terms under which UNIX System V source code can be used and disclosed, and a "Sublicensing Agreement", which sets forth the terms under which software based on UNIX System V code can be distributed.

Although SCO for months perpetuated the illusion that it had evidence that IBM took confidential source code from UNIX System V and "dumped" it into Linux, it has become clear that SCO has no such evidence. Instead, SCO's claims that IBM breached its agreements with AT&T depend entirely on the allegation that IBM improperly contributed certain of IBM's

---

[1] SCO also asserts claims against IBM for copyright infringement, unfair competition and tortious interference. These claims are not at issue in this motion (although SCO's copyright claim depends in part on its contract claims).

original source code, contained in its own AIX and Dynix operating systems (each of which contain tens of millions of lines of source code), to Linux.  According to SCO, because AIX and Dynix allegedly contain some small component of source code from UNIX System V (SCO claims there are approximately 74,000 lines of UNIX System V code in AIX and approximately 78,000 lines in Dynix, which amounts to less than one percent of the total lines of code in AIX and Dynix), IBM is prohibited by its licensing agreements from disclosing any of the other millions of lines of code in AIX or Dynix, even if that code was created by or for IBM and contains no UNIX System V code.

SCO is wrong as a matter of law, and IBM is entitled to partial summary judgment on SCO's contract claims, for at least two independent reasons.

First, the AT&T agreements upon which SCO's claims are based do not preclude IBM from using and disclosing source code that is written by IBM and does not include UNIX System V code (referred to herein as "homegrown" code):

1. The plain and unambiguous language of the agreements imposes no restrictions on the use or disclosure of source code that does not contain UNIX System V code.  (See Section I.A.)

2. The individuals who executed the licenses and were involved in their negotiation, on behalf of both AT&T and IBM, have offered unequivocal testimony that the agreements were not intended and should not be understood to preclude IBM's use and disclosure of homegrown code and contemporaneous documents reflect this interpretation of the licenses. (See Section I.B.)

3. Interpreting the licenses to prohibit the disclosure of homegrown code would be patently unreasonable.  (See Section I.C.)

Second, even if the AT&T agreements could be read to preclude the disclosure of homegrown code—and they cannot be—any breach based upon such a reading has been waived by Novell, Inc. ("Novell") on behalf of SCO, and by SCO itself:

1.     Novell, which at one time owned all rights in the AT&T agreements at issue, retains the right to waive alleged breaches of the agreements, and Novell has exercised that right to effect a waiver of the alleged breaches in this case.  (See Section II.A.)

2.     SCO itself sold or otherwise made available to its customers and the public the code it claims IBM should not have revealed.  By its own conduct, therefore, SCO has waived any right to claim that IBM acted improperly by contributing its code to Linux.  (See Section II.B.)

For these reasons, partial summary judgment should be entered on behalf of IBM on

SCO's claims for breach of contract (SCO's First, Second, Third and Fourth Causes of Action).

## Statement Of Undisputed Facts[2]

### I.     The UNIX Operating System.

1.     The earliest UNIX operating system was developed in 1969 at Bell Laboratories,

then the research division of AT&T Corp. ("AT&T").  (See Ex. 1 (Second Am. Compl.) ¶¶ 1, 23;

Ex. 2 (Ans. to Second Am. Counterclaims)[3] ¶¶ 1, 8; Ex. 4 (SCO's Opp. to IBM's Motion for

Summary Judgment on its Tenth Counterclaim) ¶ 1.)

2.     AT&T developed many different versions of its UNIX operating systems

(including, for example, UNIX Versions 1 through 7, UNIX 32V and UNIX System III).  (See

Ex. 2 ¶ 9.)  The version of UNIX developed by AT&T during the early 1980s was known as

UNIX System V, of which there were multiple subsequent releases (e.g., System V Release 2.0,

---

[2]  The undisputed (and indisputable) facts supporting this motion are set forth in the accompanying declarations of Kathleen Bennett ("Bennett Decl."); Thomas L. Cronan III ("Cronan Decl."); Randall Davis ("Davis Decl."); Michael J. DeFazio ("DeFazio Decl."); David W. Frasure ("Frasure Decl."); Geoffrey D. Green ("Green Decl."); Ira Kistenberg ("Kistenberg Decl."); Richard A. McDonough III ("McDonough Decl."); Jeffrey W. Mobley ("Mobley Decl."); Scott Nelson ("Nelson Decl"); David P. Rodgers ("Rodgers Decl."); Roger C. Swanson ("Swanson Decl."); Joan Thomas ("Thomas Decl."); Steven D. Vuksanovich ("Vuksanovich") and Otis L. Wilson ("Wilson Decl."), and the documents appended to the Declaration of Todd M. Shaughnessy, which are cited herein as "Ex. __".

[3]  IBM's Second Amended Counterclaims are attached as Exhibit 3 to the Shaughnessy Declaration.

System V Release 3.0, System V Release 4.0).  (See Ex. 5 (30(b)(6) Deposition of William M. Broderick) at 32:2-13.)

3.     Over the years, through various business units and subsidiaries, including AT&T Technologies, Inc. and UNIX System Laboratories, Inc. ("USL"), AT&T licensed various versions of its UNIX operating system, both in source code and object code form, to many thousands of persons and entities for their use.  (See Ex. 1 ¶¶ 23-24 ; Ex. 2 ¶ 9; Ex. 4 ¶ 2.)

4.     AT&T also licensed many companies to distribute their own UNIX operating systems, at least some versions of which contained some source code from AT&T's UNIX software.  (See Ex. 1 ¶¶ 24-27; Ex. 4 ¶ 3.)  Such operating systems include Sun Microsystems, Inc.'s "Solaris" operating system, Hewlett-Packard Co.'s "HP-UX" operating system, and Silicon Graphics, Inc.'s "IRIX" operating system.  (See Ex. 1 ¶¶ 24-27; Ex. 4 ¶ 3.)

5.     Like these other companies, IBM developed and distributed a UNIX operating system known as AIX.  (See Ex. 2 ¶ 13.)  In 1999, IBM acquired Sequent Computer Systems, Inc. ("Sequent"), which had itself developed and distributed a UNIX operating system known as Dynix/ptx ("Dynix").  (See id. ¶ 16.)

6.     Like many software programs, IBM's AIX and Dynix operating systems—which each consist of millions of lines of code—contain code from numerous sources, including code written by IBM software engineers (or outside contractors retained by IBM) and also code written by third parties and licensed to IBM for inclusion in AIX or Dynix.  (See Thomas Decl. ¶¶ 4-5; Nelson Decl. ¶¶ 4-5.)  The AIX 5.2.0 release, for example, contains approximately 63 million lines of source code.  (See Thomas Decl. ¶ 4.)  The latest Dynix release contains approximately 30 million lines of source code.  (See Nelson Decl. ¶ 4.)

7.     SCO alleges that it has found approximately 74,000 lines of UNIX System V code in AIX and approximately 78,000 lines of UNIX System V code in Dynix.  (See Ex. 6 (4/19/04

Letter from B. Hatch to T. Shaughnessy) at Exs. E & F.)  SCO does not contend (and in any case

has no evidence) that IBM has misused any of these lines of code.  (See id.)

## II.     The Linux Operating System.

8.     Linux is an operating system originally developed by a student at the University of

Helsinki named Linus Torvalds.  (See Ex. 7 (SCO Linux Introduction Version 1.2) at 1-5.)

Torvalds's idea was to create a new, free operating system.  (See id.)

9.     Torvalds began developing the Linux "kernel", the core of the operating system,

in 1991, and posting news of his project to Internet newsgroups, along with a call for volunteers

to assist in his efforts.  (See Ex. 7 at 1-5.)

10.     Through the use of the Internet, other volunteer programmers collaborated with

Torvalds to develop the source code in the Linux kernel, the first version of which, Version 1.0,

was released to the public in 1994.  (See Ex. 7 at 1-5.)

11.     Linux is an "open source" program, which means, among other things, that its

source code is publicly available, royalty-free, and users have the freedom to run, copy,

distribute, study, adapt and improve the software.  (See Ex. 2 ¶ 22; Ex. 4 ¶ 8.)  Indeed, the source

code for Linux is publicly available for download on the Internet.  (See Ex. 2 ¶ 23.)

12.     In the years since the first public release of Linux, thousands of additional

developers, including developers at IBM and SCO, have contributed to the further development

of Linux.  (See Ex. 2 ¶ 20; Ex. 8 (SCO website pages identifying SCO's contributions to Linux);

Ex. 9 (SCO's Fiscal Year 2000 10K/A) at 15, 22, 26.)  Version 2.4 of the Linux kernel was

released in 2001.  (See Ex. 2 ¶ 20.)

13.     Various companies, such as Red Hat, Inc., offer commercial "Linux

distributions", which typically comprise the Linux kernel, the applications that the kernel runs

(which, with the kernel, comprise a complete operating system), and whatever other programs the

distributor chooses to include in its product.  (See Ex. 2 ¶ 21; Ex. 9 at 5-9, 26.)  SCO is among

the companies that make their own Linux distributions available to the public. (See Ex. 2 ¶ 21; Ex. 9 at 5-9, 26.)

**III.   IBM's And Sequent's Licenses To UNIX System V.**

14.    In the mid-1980s, IBM and Sequent entered into a number of agreements with AT&T concerning UNIX System V, as did hundreds of other companies. (See Ex. 1 ¶¶ 62-69; Ex. 2 ¶¶ 12, 15.)

15.    The basic licensing agreements IBM and Sequent entered into with AT&T, the IBM Software Agreement (Number SOFT-00015), dated February 1, 1985 (Ex. 10), and the Sequent Software Agreement (Number SOFT-000321), dated April 18, 1985 (Ex. 11), were standard form agreements that AT&T utilized at the time to license UNIX System V. (See Wilson Decl. ¶ 6; Frasure Decl. ¶ 11; DeFazio Decl. ¶ 14; Kistenberg Decl. ¶ 7; Vuksanovich Decl. ¶ 10.) The standard software agreements set forth the terms under which UNIX System V can be used and disclosed. (See Exs. 10 & 11; Wilson Decl. ¶ 6; Frasure Decl. ¶ 11; DeFazio Decl. ¶ 14; Kistenberg Decl. ¶ 8; Vuksanovich Decl. ¶ 11.)

16.    IBM and Sequent also entered into sublicensing agreements with AT&T. (Exs. 12 & 13.) Like the software agreements, the IBM Sublicensing Agreement (Number SUB-00015A), dated February 1, 1985 (Ex. 12), and the Sequent Sublicensing Agreement (Number SUB-000321A), dated January 28, 1986 (Ex. 13), were standard form agreements utilized by AT&T at the time. (See Wilson Decl. ¶ 6; DeFazio Decl. ¶ 15; Kistenberg Decl. ¶ 7.) The sublicensing agreements set forth the terms under which software programs "based on" UNIX System V can be distributed. (Exs. 11 & 12; Wilson Decl. ¶ 6; DeFazio Decl. ¶ 15.)

17.    The same day that IBM and AT&T entered into the IBM Software and Sublicensing Agreements, they also executed a letter agreement dated February 1, 1985 (the "Side Letter"). (Ex. 14.)

18.     The Side Letter clarified the parties' understanding of certain provisions of the IBM Software and Sublicensing Agreements and amended certain other provisions thereof.  (See Ex. 14 at 1.)

## IV.     AT&T's UNIX Assets.

19.     In 1993, AT&T sold USL, which then held all of AT&T's UNIX-related assets (including AT&T's licensing agreements relating to all its versions of UNIX, such as UNIX System V), to Novell.  (See Ex. 2 ¶ 10.)

20.     In 1995, Novell sold certain of the UNIX assets it had acquired from AT&T, along with other UNIX assets Novell had developed during its ownership of USL (such as the UnixWare software), to The Santa Cruz Operation, Inc. ("Santa Cruz") pursuant to an Asset Purchase Agreement (the "APA"), dated September 19, 1995.  (Ex. 15.)

21.     Notwithstanding Novell's sale to Santa Cruz of most of its UNIX and UnixWare assets, Novell nevertheless retained certain rights with respect to the licenses AT&T had granted for releases of UNIX System V, known as "SVRX Licenses" (System V Release X Licenses). (See Ex. 15 § 4.16 & Schedule 1.1(a)(VI) (listing releases of UNIX System V for which AT&T had granted licenses).)

22.     Specifically, under Section 4.16(a) of the APA, Novell retained the rights to "all royalties, fees and other amounts due under all SVRX Licenses", less a five percent administrative fee to be paid to Santa Cruz for the collection of such royalties.  (Ex. 15 § 4.16(a).)

23.     In addition, under Section 4.16(b) of the APA, Novell retained the right "at [its] sole discretion" to direct Santa Cruz to "amend, supplement, modify or waive any rights under . . . any SVRX License", and to take any such actions on Santa Cruz's behalf if Santa Cruz failed to do so. (Ex. 15 § 4.16(b) (emphasis added).)  In relevant part, Section 4.16(b) of the APA provides:

> "Buyer shall not, and shall not have the authority to, amend, modify or waive any right under or assign any SVRX License without the prior written consent of Seller.  In addition, at Seller's sole discretion and direction, Buyer shall amend, supplement, modify or waive any rights under, or shall assign any rights to, any SVRX License to the extent so directed in any manner or respect by Seller.  In the event that Buyer shall fail to take any such action concerning the SVRX License as required herein, Seller shall be authorized, and hereby is granted, the rights to take any action on Buyer's own behalf."

(Id.)

24.     On October 17, 1996, after Novell's sale of assets to Santa Cruz, IBM, Novell and Santa Cruz entered into Amendment X to the IBM Software and Sublicensing Agreements. (Ex. 16.)

25.     Amendment X specifically acknowledged that as part of the sale by Novell of its UNIX assets to Santa Cruz, "SCO purchased, and Novell retained, certain rights with respect to" the agreements IBM entered into with AT&T, including "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended". (Ex. 16 at 1 (emphasis added).)

26.     Under Amendment X, among other things, IBM was granted by Novell and Santa Cruz, in exchange for a payment of $10,125,000, "the irrevocable, fully-paid-up, perpetual right to exercise all of its rights under [the IBM Software and Sublicensing Agreements] beginning January 1, 1996 at no additional royalty fee". (Ex. 16 at 1, 4.)

27.     Plaintiff SCO, which was then known as Caldera Systems, Inc. ("Caldera"), purports subsequently to have acquired certain of Santa Cruz's business units in August 2000.

(See Ex. 17 (8/2/00 SCO Press Release).)  As part of this acquisition, Caldera allegedly acquired

all of Santa Cruz's assets and rights related to UNIX and UnixWare.  (See id.)

28.     Caldera changed its name to The SCO Group, Inc. in May 2003.  (Ex. 2 ¶ 36.)

**V.     SCO's Failure Properly To Provide Evidence In Support Of Its Lawsuit.**

29.     SCO filed its original Complaint, which featured a claim for the misappropriation

of trade secrets, on March 6, 2003.  (Ex. 18 (Complaint).)  In that Complaint, SCO also alleged

that IBM had breached its UNIX System V license by "subject[ing] SCO's UNIX trade secrets to

unrestricted disclosure, unauthorized transfer and disposition, unauthorized use, and has

otherwise encouraged others in the Linux development community to do the same".  (Id. ¶ 135.)

30.     SCO failed in the Complaint, however, to identify with any specificity what

"UNIX trade secrets" it claimed were at issue.  (See Ex. 18.)  SCO instead described its trade

secrets only as "unique know how, concepts, ideas, methodologies, standards, specifications,

programming, techniques, UNIX Software Code, object code, architecture, design and

schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability and

security".  (Id. ¶ 105.)  SCO did not identify any specific UNIX code upon which it based its

claim.  (See id.)

31.     IBM served its First Set of Interrogatories on June 13, 2003.  (Ex. 19.)  Among

other things, IBM's interrogatories requested that SCO "identify, with specificity (by product,

file and line of code, where appropriate) all of the alleged trade secrets and any confidential or

proprietary information that plaintiff alleges or contends IBM misappropriated or misused".

(Interrogatory No. 1 (emphasis added).)  The interrogatories further requested that SCO identify

the "nature and source of [its] rights" to the code at issue (Interrogatory No. 2 (emphasis added))

and the "origin" of such code (Interrogatory No. 6 (emphasis added)).

32.     Prior to responding to IBM's interrogatories, SCO filed an Amended Complaint

on July 22, 2003.  (Ex. 20.)  The Amended Complaint, however, did not identify in any greater

detail the trade secrets allegedly misappropriated by IBM.  (See id.)  Again, SCO described its

trade secrets only as "unique know how, concepts, ideas, methodologies, standards,

specifications, programming, techniques, UNIX Software Code, object code, architecture, design

and schematics that allow UNIX to operate with unmatched extensibility, scalability, reliability

and security".  (Id. ¶ 161.)

33.     With respect to its breach of contract claims, SCO alleged in the Amended

Complaint only that IBM has misused SCO's "Software Products (including System V source

code, derivative works and methods based thereon)".  (Ex. 20 ¶ 106.)  Although SCO purported

to provide a list of "protected UNIX methods" allegedly misused by IBM (id. ¶ 108), SCO still

failed to identify any code from UNIX System V in which these methods were embodied.  (See

id.)

34.     SCO answered IBM's First Set of Interrogatories on August 4, 2003.  (Ex. 21.)  In

its response to Interrogatory No. 1, SCO stated only that its trade secrets—which it

correspondingly claimed IBM misused in breach of its licensing agreements—"include without

limitation UNIX software design methods for creation and modification of software based on

UNIX System V".  (Id. at 5.)  Again, however, SCO failed to identify any code in UNIX System

V that it claimed to contain trade secrets, or that IBM misused in breach of its licenses.  (See id.)

35.     SCO also failed to provide proper responses to IBM's Second Set of

Interrogatories, which IBM served on September 16, 2003.  (Ex. 22.)  Those interrogatories

requested, among other things, that SCO "identify, with specificity (by file and line of code): (a)

all source code and other material in Linux . . . to which plaintiff has rights; and (b) the nature of

plaintiff's rights, including but not limited to whether and how the code or other material derives

from UNIX."  (Interrogatory No. 12 (emphasis added).)

36.     Based on SCO's continuing refusal to provide more detail regarding its

allegations, IBM moved to compel complete responses to both sets of interrogatories.  (Exs. 23 &

24.) Judge Wells held a hearing on December 5, 2003 to consider IBM's motions to compel. (See Ex. 25 (hearing transcript).)

37.     At the hearing, and despite its earlier pleadings, SCO finally acknowledged that there are in fact no trade secrets in UNIX System V.  Counsel for SCO stated:  "There is no trade secret in Unix system [V].  That is on the record.  No problem with that."  (Ex. 25 at 46:2-3.)

38.     In addition, SCO clarified that the basis of its contract claims against IBM was not that IBM contributed to Linux code that had been literally copied from UNIX System V, but had instead contributed code that had been derived from UNIX System V code.  (Ex. 25 at 13-14.)

39.     At the conclusion of the hearing, Judge Wells granted IBM's motions.  (Ex. 25 at 52-53.)  Judge Wells subsequently issued an Order dated December 12, 2003 directing SCO, among other things, to "identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM" by January 12, 2004. (Ex. 26 (12/12/03 Order) ¶ 4.)

40.     SCO served its "Revised Supplemental Response" to IBM's interrogatories on January 15, 2004, which SCO claimed complied with the December 12, 2003 Order.  (Ex. 27.)

41.     In its Revised Response, SCO did not identify any trade secrets that IBM allegedly misappropriated, from UNIX System V or any other of SCO's allegedly proprietary materials. (See Ex. 27.)

42.     In addition, SCO did not identify a single line of UNIX System V code upon which it based its contract claims.  (See Ex. 27.)  Instead, SCO asserted its claims were based solely on IBM's disclosure of modules of code related to certain technologies contained in IBM's AIX and Dynix software programs.  (See id. at 3-30.)

43.     Specifically, SCO claimed that IBM breached its contract by contributing to Linux specific files and lines of code in AIX and Dynix associated with the Read Copy Update ("RCU"), Journaling File System ("JFS"), Enterprise Volume Management System ("EVMS")

and asynchronous input/output ("AIO") technologies. (<u>See</u> Ex. 27 at 3-30.) In addition, SCO claimed that IBM improperly contributed code for scatter/gather input/output and symmetric multiprocessing ("SMP"), though SCO did not identify the specific code at issue. (<u>See id.</u>) Moreover, SCO did not identify <u>any</u> code in UNIX System V from which any of these technologies in AIX and Dynix were allegedly derived. (<u>See id.</u>)

44.     In a letter dated January 30, 2004, IBM informed SCO that it did not believe that SCO's Revised Response complied fully with Judge Wells' December 12, 2003 Order, principally because "SCO still fails to identify <u>any</u> files or lines of code in its own UNIX System V product that IBM is alleged to have misappropriated or misused". (Ex. 28.)

45.     SCO responded by letter on February 4, 2004, declining to identify any UNIX System V code, and explaining that its claims did not require the identification of UNIX System V code. (Ex. 29.) As SCO put it, "IBM keeps insisting on something that is not part of SCO's claims, so it should come as no surprise that files or lines of code in System V have not been identified." (<u>Id.</u> at 2.)

46.     At a hearing on February 6, 2004, IBM informed Judge Wells that it did not believe that SCO had complied with the December 12, 2003 Order. (<u>See</u> Ex. 30 (hearing transcript) at 4.) Judge Wells subsequently issued an Order on March 3, 2004, directing SCO once again to comply "with the Court's previous order dated December 12, 2003", this time by April 19, 2004. (Ex. 31.) Among other things, the Court directed SCO "to provide and identify all specific lines of code that IBM is alleged to have contributed to Linux from either AIX or Dynix" and "to provide and identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived". (<u>Id.</u> ¶ I.2-3.)

47.     In the meantime, SCO sought, and was granted, permission to file a Second Amended Complaint. (Ex. 1.) In its Second Amended Complaint, filed on February 27, 2004, SCO abandoned its claim for misappropriation of trade secrets altogether. (<u>See id.</u>)

48.     On April 19, 2004, SCO submitted additional discovery responses to IBM, which SCO claimed "fully complied" with the Court's orders. (Ex. 6.)  SCO's April 19, 2004 submission, however, does not even attempt to "identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived", as ordered by the Court. (Ex. 31 ¶ I.3.)  Neither that submission nor any of SCO's other responses to IBM's discovery requests discloses any evidence that IBM contributed to Linux or otherwise disclosed any UNIX System V code or IBM's entire AIX and Dynix programs. (Exs. 6 & 27.)

## VI.    SCO's Newfound Contract Theory.

49.     In its Second Amended Complaint, SCO asserts four separate breach of contract claims, all of which rest on the underlying allegation that IBM breached its licenses for the UNIX System V software program. (Ex. 1 ¶¶ 110-172.)

50.     SCO's First and Third Causes of Action allege that IBM misused source code subject to the IBM and Sequent Software Agreements by contributing such code to Linux. (Ex. 1 ¶¶ 110–136, 143-166.)

51.     Specifically, SCO alleges that IBM and Sequent breached Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10 of the Software Agreements.[4]  (Ex. 1 ¶¶ 112-125.)  Those sections provide as follows:

### Section 2.01

"AT&T grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in

---

[4]  Similar to its claim for breach of the IBM and Sequent Sublicensing Agreements (discussed at ¶¶ 64-65 below), SCO also asserts that IBM breached Section 6.03 of the IBM and Sequent Software Agreements by continuing to use "SOFTWARE PRODUCTS" after SCO's purported termination of the agreements. (See Ex. 27 at 57.)

conjunction with DESIGNATED CPUs for such SOFTWARE
PRODUCT. Such right to use includes the right to modify such
SOFTWARE PRODUCT and to prepare derivative works based on such
SOFTWARE PRODUCT, provided the resulting materials are treated
hereunder as part of the original SOFTWARE PRODUCT."

### Section 2.05

"No right is granted by this Agreement for the use of SOFTWARE
PRODUCTS directly for others, or for any use of SOFTWARE
PRODUCTS by others."

### Section 4.01

"LICENSEE agrees that it will not, without the prior written consent of
AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered
by this Agreement to any country outside of the United States."

### Section 7.06(a)

"LICENSEE agrees that it shall hold all parts of the SOFTWARE
PRODUCTS subject to this Agreement in confidence for AT&T.
LICENSEE further agrees that it shall not make any disclosure of any or
all of such SOFTWARE PRODUCTS (including methods or concepts
utilized therein) to anyone, except to employees of LICENSEE to whom
such disclosure is necessary to the use for which rights are granted
hereunder. . . . If information relating to a SOFTWARE PRODUCT
subject to this Agreement at any time becomes available without
restriction to the general public by acts not attributable to LICENSEE or
its employees, LICENSEE's obligations under this section shall not
apply to such information after such time."

### Section 7.10

"Except as provided in Section 7.06(b), nothing in this Agreement grants
to LICENSEE the right to sell, lease or otherwise transfer or dispose of a
SOFTWARE PRODUCT in whole or in part."

(Exs. 10 & 11.)

52.     IBM's Side Letter with AT&T contains additional language relating to certain of these provisions.  (See Ex. 14.)  In particular, the Side Letter provides:

> "Regarding Section 2.01, we agree that that modifications and derivative works prepared by or for [IBM] are owned by [IBM].  However, ownership of any portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work remains with [AT&T]."

(Id. at 2.)

53.     This additional language in the Side Letter was intended only to clarify the parties' intent in Section 2.01 of the IBM Software Agreement, not to change it.  (Wilson Decl. ¶¶ 19-20; Frasure Decl. ¶¶ 17-18; DeFazio Decl. ¶ 18; Vuksanovich Decl. ¶¶ 15-16; McDonough Decl. ¶¶ 13-14; Cronan Decl. ¶¶ 13-16; Mobley Decl. ¶¶ 10-13.)

54.     In addition, the Side Letter, and later Amendment X, amended Section 7.06(a) of the IBM Software Agreement to provide as follows:

> "LICENSEE agrees that it shall hold SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T.  LICENSEE further agrees that it shall not make any disclosure of such SOFTWARE PRODUCTS to anyone, except to employees of LICENSEE to whom such disclosure is necessary to the use for which rights are granted hereunder. . . . Nothing in this Agreement shall prevent LICENSEE from developing or marketing products or services employing ideas, concepts, know-how or techniques relating to data processing embodied in SOFTWARE PRODUCTS subject to this Agreement, provided that LICENSEE shall not copy any code from such SOFTWARE PRODUCTS into any such product or in connection with any such service. . . .  If information relating to a SOFTWARE PRODUCT subject to this Agreement at any time becomes available without restriction to the general public by acts not attributable to LICENSEE or its employees, LICENSEE's obligations under this section shall not apply to such information after such time."

(Exs. 14 ¶ A.9 & 16 ¶ 6.)

55.     In any case, as is evident on their face, whatever restrictions imposed by Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10 of the IBM and Sequent Software Agreements pertain only to the "SOFTWARE PRODUCT" that is the subject of the agreements.  (Exs. 10 & 11.)

56.     The IBM and Sequent Software Agreements define the term "SOFTWARE

PRODUCT" as:

> "[M]aterials such as COMPUTER PROGRAMS, information used or
> interpreted by COMPUTER PROGRAMS and documentation relating to
> the use of COMPUTER PROGRAMS.  Materials available from AT&T
> for a specific SOFTWARE PRODUCT are listed in the Schedule for
> such SOFTWARE PRODUCT."

(Ex. 10 § 1.04; Ex. 11 § 1.04.)  The various schedules attached to the IBM and Sequent Software

Agreements identify the specific "SOFTWARE PRODUCT"or "SOFTWARE PRODUCTS",

and related materials, that AT&T provided under the terms of the agreements.  (Exs. 10 & 11.)

57.     The particular "SOFTWARE PRODUCT" at issue in this case is "UNIX System

V".  (E.g., Exs. 32 (Supplement No. 1 to the IBM Software Agreement (pertaining to the "UNIX

System V, Release 2.0" computer program and related documentation)) & 33 (Supplement No. 2

to the Sequent Software Agreement (pertaining to the "UNIX System V, Release 2.0" computer

program and related documentation)).)

58.     As stated above (at ¶¶ 31-48), SCO's responses to IBM's interrogatories do not,

however, identify any UNIX System V source code that IBM allegedly contributed to Linux or

otherwise disclosed.  (See Exs. 6 & 27.)

59.     Moreover, SCO's responses to IBM's interrogatories do not identify any UNIX

System V source code from which any of the code that IBM contributed to Linux is allegedly

derived.  (See Exs. 6 & 27.)  Indeed, SCO refused to provide such information because it "is not

part of SCO's claims".  (Ex. 29 at 2.)

60.     It is plain from SCO's discovery responses that SCO has no evidence that any of

the source code IBM contributed to Linux is either literally copied from source code in UNIX

System V or is derived from source code in UNIX System V.  (See Exs. 6 & 27.)  Indeed, SCO

has purported to identify the lines of UNIX System V code that are present in AIX and Dynix,

and <u>none</u> of those lines are among the lines of code SCO claims IBM improperly contributed to Linux. (<u>See</u> Ex. 6 at Exs. E & F.)

61.     In addition, Dr. Randall Davis, Professor of Computer Science and Engineering at the Massachusetts Institute of Technology, has analyzed the specific lines of source code from AIX and Dynix that SCO claims IBM contributed to Linux. (Davis Decl. ¶ 23.) As Dr. Davis has concluded, that code does not contain any portion of source code from UNIX System V and is not substantially similar to any source code in UNIX System V. (<u>See id.</u> ¶ 48.) Accordingly, Dr. Davis opines that the specific code IBM allegedly contributed from AIX and Dynix is neither a modification nor a derivative work of UNIX System V. (<u>See id.</u> ¶ 49.)

62.     SCO's contract claims instead rest entirely on the proposition that "[t]he AIX work as a whole and the Dynix/ptx work as a whole are modifications of, or are derived from [UNIX] System V". (Ex. 6 at 2.) Under SCO's theory of the case, <u>all</u> of the tens of millions of lines of code ever associated with any technology found in AIX or Dynix, even if that code does not contain any UNIX System V code, is subject to the restrictions of the IBM and Sequent Software Agreements. (<u>See id.</u>)

63.     SCO made this position clear in its opposition to IBM's motion for partial summary judgment on IBM's Tenth Counterclaim. (Ex. 4.) In that brief, SCO argued: "SCO's contract claims do not depend on any proof that IBM contributed original source code from UNIX to Linux. Rather, the theory of SCO's case—which is based on the plain, unambiguous meaning of the Software Agreements—is that IBM breached those agreements by contributing code from AIX and Dynix." (Ex. 4 ¶ 21.)

64.     SCO's Second and Fourth Causes of Action allege that IBM breached the IBM and Sequent Sublicensing Agreements by continuing to distribute AIX and Dynix after SCO's purported termination of those agreements on June 13, 2003. (<u>See</u> Ex. 1 ¶¶ 137-42, 167-72.)

65.     These two causes of action ultimately depend on SCO's allegation that IBM "fail[ed] to fulfill one or more of its obligations under the Software Agreement[s]". (Ex. 1 ¶¶ 128, 158.) SCO contends that because IBM breached the IBM and Sequent Software Agreements, SCO had the right unilaterally to terminate the IBM and Sequent Sublicensing Agreements. (See id.) Absent breach of the Software Agreements, therefore, there is no breach of the Sublicensing Agreements.

66.     The construction and performance of the IBM and Sequent Software Agreements and the IBM and Sequent Sublicensing Agreements are governed by New York law. (See Ex. 10 § 7.13; Ex. 11 § 7.13; Ex. 12 § 6.05; Ex. 13 § 6.05.)

## VII.   AT&T's Interpretation Of Its UNIX System V Licenses.

### A.     Testimonial Evidence.

#### 1.     The Witnesses.

67.     The IBM Software Agreement was executed by David Frasure for AT&T, on behalf of his manager Otis Wilson. (See Ex. 10; Frasure Decl. ¶ 6; Wilson Decl. ¶ 7.) The Sequent Software Agreement was executed by Mr. Wilson for AT&T. (See Ex. 11; Wilson Decl. ¶ 8.)

68.     At the time the agreements were signed, Mr. Wilson was the head of AT&T's department responsible for licensing AT&T's UNIX software, including UNIX System V, worldwide. (See Wilson Decl. ¶ 3; Ex. 34 (Deposition of Otis L. Wilson) at 41:4-14.) Mr. Wilson personally signed almost all of the hundreds of UNIX System V licenses AT&T entered into with its customers. (See Wilson Decl. ¶ 5; Ex. 34 at 42:7-43:6.)

69.     Mr. Wilson reported to Michael DeFazio, who was then the head of the overall AT&T organization responsible for the UNIX software, including product management, marketing and licensing. (See DeFazio Decl. ¶ 1.) As head of the organization, Mr. DeFazio had

the ultimate responsibility for the terms and conditions of the IBM Software Agreement and the Sequent Software Agreement.  (See id. ¶¶ 6-7.)

70.     Mr. Frasure, who reported to Mr. Wilson, was then AT&T's national sales and licensing manager for its UNIX products.  (See Frasure Decl. ¶ 5; Ex. 35 (Deposition of David Frasure) at 8:1-22.)  He participated in negotiating many of AT&T's UNIX System V licenses, and on occasion signed the agreements on Mr. Wilson's behalf.  (See Ex. 35 at 8:13-9:6.)

71.     Mr. Steven Vuksanovich also participated in the negotiation of the IBM Software Agreement on AT&T's behalf.  (See Vuksanovich Decl. ¶ 7.)  Mr. Vuksanovich was the AT&T account representative assigned to the IBM account during the time the agreement was negotiated.  (See id.)

72.     Mr. Ira Kistenberg also participated in the negotiation of the Sequent Software Agreement on AT&T's behalf.  (Kistenberg Decl. ¶ 4.)  Mr. Kistenberg was the AT&T account representative specifically assigned to the Sequent account during the time the agreement was negotiated.  (See id.)

73.     Mr. Geoffrey Green was an attorney for AT&T during the time the IBM and Sequent Software Agreements were entered into.  (Green Decl. ¶¶ 3-5; Ex. 35 at 162:18-20.)  Although Mr. Green does not recall having any involvement in negotiating the agreements (see Green Decl. ¶ 4), at least Mr. Frasure recalls that Mr. Green had some involvement in the negotiations.  (Ex. 35 at 162:18-20.)

74.     Mr. Richard McDonough executed the IBM Software Agreement on behalf of IBM.  (See Ex. 10; McDonough Decl. ¶ 10.)  Mr. McDonough was then the Division Counsel for IBM's System Products Division.  (McDonough Decl. ¶ 4.)

75.     Mr. Thomas Cronan and Mr. Jeffrey Mobley also participated in the negotiation of the IBM Software Agreement on IBM's behalf.  (See Cronan Decl. ¶ 5; Mobley Decl. ¶ 4.)  Mr. Cronan was then an attorney in IBM's System Products Division.  (See Cronan Decl. ¶ 4.)  Mr.

Mobley was a member of IBM's corporate Commercial & Industry Relations staff. (See Mobley Decl. ¶¶ 1, 3.)

76.     Mr. David Rodgers executed the Sequent Software Agreement on behalf of Sequent. (See Ex. 10; Rodgers Decl. ¶ 2.)  Mr. Rodgers was then Sequent's Vice President of Engineering. (See Rodgers Decl. ¶ 2.)

77.     Mr. Roger Swanson was responsible for the negotiation of the Sequent Software Agreement on Sequent's behalf. (See Swanson Decl. ¶ 3.)  Mr. Swanson was then Sequent's Director of Software Engineering. (See id. ¶ 2.)

## 2.     Testimony Regarding The Software Agreements.

78.     AT&T's licensing agreements for UNIX System V, including the IBM Software Agreement and the Sequent Software Agreement, were form agreements, as AT&T intended to apply the same terms to all its licensees. (See Wilson Decl. ¶¶ 10-14, 27; Ex. 34 at 88:9-20; Kistenberg Decl. ¶¶ 6-7; Vuksanovich Decl. ¶ 10.)  As Mr. Frasure states, "our intent was to hold all licensees to the same basic standard". (Frasure Decl. ¶¶ 9, 23-24; see also Ex. 35 at 25:10-26:18.)

79.     All of the individuals who executed the IBM and Sequent Software Agreements on behalf of their respective companies, Mr. Wilson, Mr. Frasure, Mr. McDonough and Mr. Rodgers, agree on the interpretation of AT&T's UNIX System V licenses. (See Wilson Decl. ¶¶ 14-15, 27-30; Ex. 34 at 72:8-73:17, Frasure Decl. ¶¶ 13-16, 24-29, McDonough Decl. ¶¶ 11-19; Rodgers Decl. ¶¶ 7-9; Ex. 36 (Deposition of David P. Rodgers) at 25:15-30:20.)  There is no dispute among them that the IBM Software Agreement and the Sequent Software Agreement were not intended to, and do not, restrict in any manner the use or disclosure of any original code written by, or for, IBM and Sequent. (See id.)

80.     Moreover, other individuals who participated in, and were responsible for, the negotiation of the IBM and Sequent Software Agreements, have the same interpretation.  (See DeFazio Decl. ¶¶ 16-17, 20, 22; Kistenberg Decl. ¶¶ 9, 11-12, 22-24; Vuksanovich Decl. ¶¶ 12-15, 27, 29-30; Green Decl. ¶ 6; Cronan Decl. ¶¶ 9, 11-12, 18-23; Mobley Decl. ¶¶ 6, 8-9, 14-17; Swanson Decl. ¶¶ 8, 10-13.)  Each of these witnesses concurs that the agreements were not intended to place any restrictions on the use or disclosure of code that was written by, or for, IBM and Sequent.  (See id.)

81.     As the witnesses have testified (and as is plain on their face), the sections of the IBM and Sequent Software Agreements that SCO claims IBM has breached—Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10—pertain only to the "SOFTWARE PRODUCT" that is the subject of the agreements, UNIX System V, and not any of IBM's and Sequent's homegrown code.  (See Wilson Decl. ¶ 12; Ex. 34 at 48:20-54:6; Frasure Decl. ¶ 12; Ex. 35 at 34:13-41:17; Ex. 36 at 47:3-49:19; Kistenberg Decl. ¶ 9; Vuksanovich Decl. ¶ 12; Cronan Decl. ¶ 9; Mobley Decl. ¶ 6; Swanson Decl. ¶ 8.)

82.     For example, Mr. Wilson states in his declaration:

> "These provisions set forth our licensees' rights as they relate to the UNIX System V source code and related materials—the 'SOFTWARE PRODUCT' or 'SOFTWARE PRODUCTS'—that AT&T provided to them.  At least as I understood these sections and discussed them with our licensees, they do not, and were not intended to, restrict our licensees' right to use, export, disclose or transfer their own products and source code, as long as they did not use, export, disclose or transfer AT&T's UNIX System V source code along with it.  I never understood AT&T's software agreements to place any restrictions on our customers' use of their own original work."

(Wilson Decl. ¶ 12.)

At his deposition, he further noted:

> "[T]he statement [at paragraph 12 of the declaration] goes . . . to the heart of the licensing program, from the standpoint that we required our licensees to protect the software products under the . . . stipulations in the software agreement, and we did not intend to exercise any control or restriction on those products that did not contain portions of the software products."

(Ex. 34 at 53:7-14.)

83.    Mr. Frasure states similarly in his declaration:

> "Each of these provisions was intended to define the scope of the licensee's rights only with respect to the 'SOFTWARE PRODUCT' or 'SOFTWARE PRODUCTS', in other words, the UNIX System V source code and related materials.  We did not intend these provisions to restrict our licensees' use, export, disclosure or transfer of anything besides the licensed UNIX System V source code and related materials.  It would be inconsistent with the language of the software agreements, and the intentions of AT&T Technologies in licensing UNIX System V, to say that the provisions apply, for instance, to our licensees' own code (that, for example, they developed)."

(Frasure Decl. ¶ 12.)

At his deposition he testified consistently:

> "Q:  Can you tell me what, in your understanding[,] these sections [of the contract] are intended to place restrictions on?
>
> A:  The restrictions were put on the actual Unix System V source code product, that the licensee licensed from us."

(Ex. 35 at 41:6-17.)

84.    According to each of the witnesses, the "resulting materials" that are to be treated as part of the "SOFTWARE PRODUCT" in Section 2.01 of the Software Agreements include only code taken directly from UNIX System V.  (See Wilson Decl. ¶¶ 14-15; Ex. 34 at 55:23-57:14; Frasure Decl. ¶¶ 13-16; Ex. 35 at 42:17-48:25; McDonough Decl. ¶¶ 11-20; Rodgers Decl. ¶¶ 7-9; Ex. 36 at 25:15-30:20; 100:1-102:5; DeFazio Decl. ¶¶ 16-17; Kistenberg Decl. ¶¶

11-12; Vuksanovich Decl. ¶¶ 14-15; Cronan Decl. ¶ 11; Mobley Decl. ¶¶ 8-9; Swanson Decl. ¶ 10.)

85.     The witnesses do not dispute that the "resulting materials" referenced in Section 2.01 do not include homegrown code, even when that code is itself contained in a modification or derivative work based on UNIX System V.  (See Wilson Decl. ¶¶ 14-15; Ex. 34 at 55:23-57:14; Frasure Decl. ¶¶ 13-16; Ex. 35 at 42:17-48:25; McDonough Decl. ¶¶ 11-20; Rodgers Decl. ¶¶ 7-9; Ex. 36 at 25:15-30:20, 100:1-102:5; DeFazio Decl. ¶¶ 16-17; Kistenberg Decl. ¶¶ 11-12; Vuksanovich Decl. ¶¶ 14-15; Cronan Decl. ¶ 11; Mobley Decl. ¶¶ 8-9; Swanson Decl. ¶ 10.)

86.     Mr. Wilson of AT&T states:

> "As my staff and I communicated to our licensees, this provision [Section 2.01] was only intended to ensure that if a licensee were to create a modification or derivative work based on UNIX System V, any material portion of the original UNIX System V source code provided by AT&T or USL that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement.  As we understood Section 2.01, any source code developed by or for a licensee and included in a modification or a derivative work would not constitute 'resulting materials' to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein."

(Wilson Decl. ¶ 14.)

87.     Indeed, Mr. Wilson states that he "do[es] not believe that our licensees would have been willing to enter into the software agreement if they understood Section 2.01 to grant AT&T or USL the right to own or control source code developed by the licensee or provided to the licensee by a third party".  (Wilson Decl. ¶ 16; see also Ex. 34 at 57:15-58:20.)  Mr. Wilson, in fact, was of the view at the time "that we could not claim any rights to non-UNIX System V code source . . . without raising serious antitrust issues".  (Id. ¶ 18; see also Ex. 34 at 57:15-58:20, 59:15-61:3.)

88.     Mr. Frasure of AT&T similarly states:

"As we assured our licensees, this language does not, and was never
intended to, give AT&T Technologies the right to assert ownership or
control over modifications or derivative works prepared by its licensees,
except to the extent of the licensed UNIX System V source code that was
included in such modifications or derivative works. The term 'resulting
materials' in the context of the software agreements was intended only to
mean those portions of a licensees' modifications or derivative works
that included the licensed UNIX System V source code."

(Frasure Decl. ¶ 14; see also Ex. 35 at 46:13-48:25.)

89.     Mr. Frasure notes further that, "[o]bviously, any materials created by the licensees

that could not even be considered modifications or derivative works of UNIX System V were not

subject to the software agreements at all. Licensees were free to use and disclose any such

materials." (Frasure Decl. ¶ 15.)

90.     Mr. DeFazio of AT&T likewise states:

"The [software] agreements did not (and do not) give AT&T, USL,
Novell or any of their successors or assigns the right to assert ownership
or control over modifications and derivative works prepared by its
licensees, except to the extent of the original UNIX System V source code
included in such modifications and derivative works. . . . I do not believe
that our licensees would have been willing to enter into the software
agreement if they understood Section 2.01 to grant AT&T, USL, Novell
or their successors or assigns the right to own or control source code
developed by or for the licensee. Modifications and derivative works
contained UNIX System V source code and code developed by or
provided to the licensee. The UNIX System V source code contained in a
modification or derivative work continued to be owned by AT&T, USL,
Novell or their successors, while the code developed by or provided to the
licensee remained the property of the licensee or provider to the licensee."

(DeFazio Decl. ¶ 17.)

91.     Mr. Vuksanovich of AT&T concurs with this interpretation:

"Our standard software agreements also gave licensees the right to modify
UNIX System V source code and to prepare derivative works based upon
the code. As I believe we intended the agreements, and as I told our
licensees, our licensees owned their modifications and derivative works

they prepared based on UNIX System V, and were therefore permitted to do as they wished with those modifications and derivative works, as long as they treated those portions of the modifications or derivative works consisting of any UNIX System V source code the same way they treated the UNIX System V source code that we provided to them.  I recall that during our negotiations IBM specifically wanted to make sure that IBM, and not AT&T, would own and control code that was developed by or for IBM, even if that code was mixed with AT&T's UNIX System V code in a product.  I assured IBM that we had the same understanding."

(Vuksanovich Decl. ¶ 13.)

92.   Mr. Kistenberg of AT&T states:

"In my understanding, Section 2.01 did not in any way expand the scope of the software agreement to restrict our licensees' use, export, disclosure or transfer of their own original code, even if such code was contained in a modification or derivative work of UNIX System V.  The purpose of the software agreement was to protect AT&T Technologies' UNIX System V source code, and was not meant to claim for AT&T Technologies our licensees' own work.  It would not make sense to me to read this Section 2.01 to place restrictions on code that our licensees created themselves—that code was theirs."

(Kistenberg Decl. ¶ 12.)

93.   Mr. Green of AT&T states:

"Without disclosing any legal advice I may have rendered . . . I can say that, as I understood AT&T's UNIX System V licensing agreements, AT&T did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works.  Accordingly, a licensee was free to do with as it wished (*e.g.*, use, copy, distribute or disclose) code developed by or for the licensee in its modifications and derivative works, provided that the licensee did not use, copy, distribute or disclose any portions of the original UNIX System V code provided by AT&T (except as otherwise permitted by the license agreements)."

(Green Decl. ¶ 6.)

25

94.     Mr. McDonough of IBM had the same understanding of Section 2.01 of the IBM

Software Agreement.  He states in his declaration:

> "The language in the standard software agreement relating to the
> treatment of resulting materials did not give AT&T Technologies the
> right to assert ownership or control over modifications or derivative
> works prepared by its licensees, except to the extent that the licensed
> UNIX software product was included in such modifications or derivative
> works.  I understood this language to mean that licensees owned their
> modifications and derivative works and were permitted to use or disclose
> them as they might choose, so long as any modification or derivative
> work containing any part of an AT&T Technologies-licensed software
> product was treated the same as an AT&T Technologies-licensed
> software product under the license agreements."

(McDonough Decl. ¶ 12.)

He further states:

> "As I understood the [agreements] between IBM and AT&T
> Technologies, and as the parties intended those agreements to mean, they
> did not seek to impose any limitations on the materials separately owned
> or developed by IBM or AT&T Technologies, respectively.  IBM was
> free to use, copy, distribute, or disclose any portion of a modification or
> derivative work that was not part of a licensed software product provided
> by AT&T Technologies.
>
> . . .
>
> Based on my role in negotiating and executing the attached AT&T
> Agreements, I cannot understand the basis for plaintiff's contentions that
> the AT&T Agreements restricted IBM's freedom of action with respect
> to any programming code, source code or otherwise, independently
> developed by IBM or its contractors.  There is absolutely no way that
> IBM would have entered into an agreement with AT&T giving it the
> right to control IBM code merely because that code was or had once been
> associated with AT&T code in an IBM product.  Never would we have
> knowingly agreed to a provision that gave AT&T the right to control
> what IBM did with its own code (or for that matter the code of third
> parties)."

(Id. ¶¶ 15, 18.)

95.    Mr. Cronan of IBM similarly states in his declaration:

"Based on my discussions with AT&T Technologies, I did not
understand this language regarding the treatment of 'resulting materials'
to give AT&T Technologies the right to assert ownership or control over
all of the source code of any modifications or derivative works based on
UNIX System V that we prepared.  To the contrary, I understood this
language to mean—and I believe AT&T Technologies believed
likewise—that IBM had to treat those parts of our modifications or
derivative works that contained UNIX System V source code as we
would treat the UNIX System V source code itself."

(Cronan Decl. ¶ 11.)

He states further:

"As I understood the AT&T Agreements between IBM and AT&T
Technologies, therefore, and as I believe the parties intended those
agreements, the agreements impose no restrictions on IBM's use, export,
disclosure or transfer of those portions of any modifications or derivative
works of UNIX System V that were created by or for IBM and do not
contain any UNIX System V source code.

So that there would be no confusion, we told the AT&T Technologies'
representatives with whom we negotiated the AT&T Agreements that
IBM intended to include portions of AT&T's UNIX System V code in
products with IBM code and to make changes to the AT&T code (such as
by adding to it) and thus IBM had to ensure that the parties agreed that
IBM had the right to do so, without forfeiting any rights (including the
right to control) to such IBM products and code.  AT&T Technologies'
representatives advised us that they did not seek to preclude such
activities.  In fact, they assured us that the purpose of the restrictions
imposed by the AT&T Agreements was to protect AT&T's original code
and that IBM could do whatever it wanted with its own code so long as it
did not use, export, disclose or transfer AT&T's original code (except as
otherwise permitted by the AT&T Agreements).

No one involved in the negotiation of the AT&T agreements ever
suggested that the agreements would give AT&T Technologies (or
anyone else other than IBM) the right to control IBM original code.  It
seems quite clear to me, based on the statements of its representatives,
that AT& T Technologies' concern was the protection of its original code
only.  I have no doubt that the AT&T Technologies' representatives with

whom we negotiated the AT&T Agreements understood that IBM would not have entered into the AT&T Agreements if AT&T Technologies had sought and insisted on the right to control any product or code that might in the future be associated with UNIX System V code, except insofar as it might include UNIX System V code."

(Id. ¶¶ 18-19, 23.)

96. Mr. Mobley of IBM agrees:

"[T]he AT&T Technologies representatives with whom we negotiated assured us that under the standard Software Agreement, IBM owned, and was permitted to use however it wanted, the modifications or derivative works that we created, or that others created for us, based on the UNIX System V software, except for any protected UNIX System V source code that might be contained within our modification or derivative works. AT&T Technologies made clear to us that we could do whatever we wanted with original source code that we developed or that was developed for us by others."

(Mobley Decl. ¶ 9.)

Mr. Mobley added:

"Based on my role in negotiating the attached AT&T Agreements, I do not believe there is any merit to the plaintiff's contentions. IBM would never have entered into any agreement that gave AT&T Technologies the right to control IBM's use of source code that IBM wrote itself, that IBM paid others to develop, or that IBM licensed from others. That is why we specifically discussed this issue of ownership of our modifications and derivative works with AT&T Technologies in detail before entering into the AT&T Agreements. AT&T Technologies assured us repeatedly that the AT&T Agreements were not intended to limit IBM's freedom of action with respect to its original source code and was merely intended to protect AT&T Technologies' interest in its own UNIX System V source code, and I believed them."

(Id. ¶ 17.)

97. Mr. Rodgers of Sequent interpreted the Sequent Software Agreement the exact same way. Mr. Rodgers states that Section 2.01 did not give AT&T "the right to assert ownership or control over modifications or derivative works prepared by Sequent, except to the

extent that the licensed Unix software product was included in such modifications or derivative works". (Rodgers Decl. ¶¶ 7-9, 13; see also Ex. 36 at 25:15-30:20.)

98.    In fact, Mr. Rodgers further states that he "would never have signed an agreement that would grant ownership or control to AT&T Technologies over modifications or derivative works prepared by Sequent to the extent those modifications or derivative works contained no part of the Unix software product licensed from AT&T Technologies". (Id. ¶ 7.) As he explained it at his deposition:

> "It would have been foolish of me, as an officer of a venture finance[d] start-up company, to give away the rights to the company's core products in perpetuity. I mean, I certainly would not have done that. So my understanding—and this was confirmed in some phone calls [with AT&T]—my understanding was that what AT&T wanted to hold private was their contribution, their source code contribution, and that that work which had already been created by Sequent and any work that in the future that was created by Sequent, not based upon that source code, remained the property of Sequent."

(Ex. 36 at 27:15-28:14.)

99.    Mr. Swanson of Sequent likewise states:

> "I did not understand this language in Section 2.01 to give AT&T Technologies the right to assert ownership or control over modifications or derivative works based on UNIX System V prepared by Sequent, except for the licensed UNIX System V code that was included in such modifications or derivative works. In fact, I recall having discussions with AT&T Technologies at the time to clarify that Sequent would own whatever source code we developed.
>
> As a small company at the time, it would not have made any sense for Sequent to have entered into an agreement that gave AT&T Technologies control over the source code that we developed for our own software programs. I never would have agreed to a contract that would grant AT&T Technologies rights in Sequent's proprietary code, as that source code was the core of Sequent's software business."

(Swanson Decl. ¶¶ 10-11.)

He further states:

> "As the AT&T Technologies explained the agreements to me, Sequent was free to use, export, disclose or transfer all of the code contained in any modifications or derivative works of UNIX System V developed by Sequent, provided that Sequent did not improperly use, export, disclose or transfer any portion of the UNIX System V code we were licensing from AT&T Technologies (except as otherwise permitted by the licensing agreements)."

(Id. ¶ 12.)

100.   According to the AT&T representatives involved with UNIX System V licensing, a number of AT&T's licensees in fact requested clarification regarding the original language of Section 2.01.  (See Wilson Decl. ¶ 17; Ex. 34 at 58:22-59:13, Frasure Decl. ¶ 17; Ex. 35 at 45:14-46:5, 60:18-62:11, 190:12-23; DeFazio Decl. ¶ 18; Kistenberg Decl. ¶ 13; Vuksanovich Decl. ¶ 15.)  AT&T always provided the same response (both orally and in writing) whenever asked—that AT&T's UNIX System V licensees owned their homegrown code and could use and disclose such code as they wished.  (See id.)

101.   As Mr. Frasure described it at his deposition:

> "We explained to [our licensees] verbally, and if required in writing, that we did not own, tried to clarify that we did not own the source code that they generated themselves.  We had no interest in that."

(Ex. 35 at 46:2-5.)

> "Well, there was just questions that would pretty much on a regular basis come up about the ownership of the derivative works or modifications, and what we were trying to do was to just further define that and to ensure the licensees that AT&T was not trying to take ownership in any of the work that they put in to providing their derivative works of Unix System V."

(Id. at 190:16-23.)

102.   IBM was one of AT&T's licensees that raised such concerns.  (See Wilson Decl. ¶ 19; Frasure Decl. ¶ 18; DeFazio Decl. ¶ 18; Vuksanovich Decl. ¶¶ 13, 16.)

103.     Mr. McDonough relates that IBM specifically requested clarification from AT&T regarding the interpretation of Section 2.01.  (McDonough Decl. ¶¶ 13-14; see also Cronan Decl. ¶¶ 13-17; Mobley Decl. ¶¶ 10-12.)

104.     Mr. McDonough states in his declaration that "IBM wanted the agreements to be clarified so that there would be no question that IBM, as a licensee, not AT&T Technologies, would own and control source code developed by IBM or provided to IBM by a third party". (McDonough Decl. ¶ 13; see also Cronan Decl. ¶¶ 13-17; Mobley Decl. ¶¶ 10-12.)  In response, according to Mr. McDonough, AT&T informed IBM that it "understood IBM's desire to retain ownership and control of source code and products prepared by or for IBM, and also that, in any event, that was what AT&T already intended and understood the language in the standard AT&T Software Agreement to mean".  (McDonough Decl. ¶ 13; see also Cronan Decl. ¶¶ 13-17; Mobley Decl. ¶¶ 10-12.)

105.     Mr. Vuksanovich similarly recalled that "during our negotiations IBM specifically wanted to make sure that IBM, and not AT&T, would own and control code that was developed by or for IBM, even if that code was mixed with AT&T's UNIX System V code in a product". (Vuksanovich Decl. ¶ 13.)

106.     As IBM "was particularly interested in clarifying that it owned the code that it developed, even if it was meshed with UNIX System V", AT&T provided written clarification to IBM in the Side Letter.  (Vuksanovich Decl. ¶ 16.)  As Mr. Vuksanovich explains:

> "This clarification did not, however, represent a substantive change to the standard software agreement.  We were only trying to make more clear what we thought our standard software agreement meant in the first place.  AT&T never intended to assert ownership or control over IBM's modifications or derivative works, except to the extent of the UNIX System V source code included in such modifications or derivative works."

(Id.)

31

107.    Mr. Wilson and Mr. Frasure concur that the Side Letter was intended precisely to confirm the understanding between AT&T and IBM that the IBM Software Agreement did not place any restrictions on IBM's original code.  (See Wilson Decl. ¶¶ 19-20; Ex. 34 at 62:13-65:17; Frasure Decl. ¶ 18; Ex. 35 at 62:12-64:19; see also DeFazio Decl. ¶¶ 18-19.)

108.    Like Mr. Vuksanovich, both Mr. Wilson and Mr. Frasure also emphasize that the clarification provided to IBM did not represent a change to the standard Software Agreement, but merely confirmed what AT&T intended all along.  (See Frasure Decl. ¶ 18; Ex. 35 at 64:8-21; Wilson Decl. ¶ 20; Ex. 34 at 64:23-65:17; see also DeFazio Decl. ¶¶ 18-19.)

109.    Mr. Frasure states:

> "This clarification (and those like it that we provided to other licensees) did not represent a change to the standard software agreement.  It merely spelled out what AT&T Technologies had always intended—that AT&T Technologies did not assert any right to control the use and disclosure of modifications and derivative works prepared by its licensees, except to the extent of the licensed UNIX System V source code included in such modifications and derivative works."

(Frasure Decl. ¶ 18.)

110.    Indeed, as discussed below (at ¶¶ 113-122), because so many licensees requested clarification of the language in Section 2.01 of the standard software agreement, AT&T ultimately decided to make revisions to Section 2.01 expressly to clarify that AT&T's Software Agreements did not place any restrictions on a licensee's original code.  (See Wilson Decl. ¶¶ 25-27; Frasure Decl. ¶¶ 22-24; DeFazio Decl. ¶ 19; Kistenberg Decl. ¶¶ 17-21; Vuksanovich Decl. ¶¶ 20-26.)  This revised language of Section 2.01 (which was intended to apply to all of AT&T's licensees), like the language in the Side Letter, was again intended only to clarify the meaning of the original language of Section 2.01.  (See id.)

111.    Regardless of whether or not a particular licensee was given a written clarification of Section 2.01 in a side letter or in the form of a new agreement, the AT&T witnesses who were

responsible for licensing UNIX System V all state that AT&T intended Section 2.01 to mean the same thing for all its licensees. (See Wilson Decl. ¶ 27; Frasure Decl. ¶ 24; DeFazio Decl. ¶ 20; Kistenberg Decl. ¶ 22; Vuksanovich Decl. ¶ 27.)

112.    As Mr. Wilson put it:

> "Whether or not we entered into a side letter or other agreements with our licensees to clarify the treatment of modifications and derivative works, or altered the language of Section 2.01, AT&T's and USL's intent was always the same. We never intended to assert ownership or control over any portion of a modification or derivative work that was not part of the original UNIX System V source code provided by AT&T or USL. The licensee was free to use, copy, distribute or disclose its modifications and derivative works, provided that it did not use, copy, distribute or disclose any portions of the original UNIX System V source code provided by AT&T or USL except as permitted by the license agreements."

(Wilson Decl. ¶ 27.)

113.    When informed of the interpretation of the IBM and Sequent Software Agreements that SCO is advancing in this case, the individuals from AT&T who were involved in negotiating the agreements state unequivocally that SCO is wrong. Mr. Wilson states:

> "In my view, any claim that the IBM Software Agreement and the Sequent Software Agreement prohibit the use, export, disclosure or transfer of any code other than UNIX System V code is clearly wrong. Not only did we at AT&T not intend the agreements to be read that way, but we also went out of our way to assure our licensees that that is not what the agreements meant."

(Wilson Decl. ¶ 30.)

Mr. Frasure states:

> "[SCO's] interpretation of the IBM Software Agreement and the Sequent Software Agreement is impossible to reconcile with what I, and I believe others at AT&T Technologies, understood our software agreements to mean. I never suggested, or would have thought to suggest, to our customers that the agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose

any UNIX System V code. Moreover, I do not believe that our customers (particularly large ones like IBM) would have entered into agreements that placed such restrictions on their use of code that they developed. In fact, some, including IBM, specifically said so."

(Frasure Decl. ¶ 29.)

Mr. DeFazio states:

"[SCO's] claims are, in my view, inconsistent with the provisions of the license agreements generally and the IBM Related Agreements and the Sequent Related Agreements in particular. I do not believe that anyone at AT&T, USL or Novell intended these agreements to be construed in this way. In all cases, modifications and licensees' contributions to derivative works are not subject to the confidentiality and other restrictions contained in the license agreements (except for any protected UNIX System V source code actually included therein) because they are owned by the licensees."

(DeFazio Decl. ¶ 31.)

Mr. Kistenberg states:

"I understand that plaintiff claims that Sequent has breached its license agreement with AT&T Technologies by improperly using, exporting, disclosing or transferring Dynix source code, irrespective of whether Sequent has disclosed any specific protected source code from UNIX System V. At least as I understand the Sequent Agreements, that is simply not consistent with what the parties intended by the agreements."

(Kistenberg Decl. ¶ 24.)

Mr. Vuksanovich states:

"I understand that plaintiff claims that IBM and Sequent have breached their license agreement with AT&T Technologies by improperly using, exporting, disclosing or transferring AIX and Dynix/PTX source code, irrespective of whether IBM or Sequent has disclosed any specific protected source code from UNIX System V. At least as I understand the IBM Agreements and the Sequent Agreements, that is completely inconsistent with what the parties intended and discussed during the negotiation of the agreements."

(Vuksanovich Decl. ¶ 30.)

**B.**   **Contemporaneous Documentary Evidence.**

114.   Consistent with this testimony regarding the IBM and Sequent Software Agreements, AT&T specifically communicated to all of its UNIX System V licensees at the time, including IBM and Sequent, that Section 2.01 of the standard software agreement should not be construed to mean that AT&T had the right to control the use and disclosure of any code created entirely by its licensees. (See Wilson Decl. ¶¶ 20-21, Frasure Decl. ¶ 19; Ex. 35 at 64:22-66:3; Kistenberg Decl. ¶ 14; Vuksanovich Decl. ¶ 17.)

115.   In response to concerns raised by numerous of its UNIX System V licensees, AT&T notified all licensees, through seminars hosted by Mr. Frasure and in the April 1985 edition of AT&T's "*$ echo*" newsletter, that AT&T intended to make certain changes to the standard UNIX System V software agreement to "clarify ownership of modifications or derivative works prepared by a licensee" under Section 2.01. (Ex. 37 at 5 (emphasis added); see also Ex. 35 at 64:22-66:3, 67:16-73:15.) These changes were intended only to clarify the original meaning of Section 2.01, not to change it. (See Wilson Decl. ¶¶ 21-23; Frasure Decl. ¶¶ 19-20; Kistenberg Decl. ¶¶ 17-18; Vuksanovich Decl. ¶¶ 21-22.)

116.   Mr. Frasure testified that at the seminars he hosted, he made clear what AT&T's original intent was with respect to Section 2.01:

> "Q:  And can you just explain for me what it is you told the licensees about Section 2.01?
>
> A:  Just that we, AT&T had no intent to claim ownership to that software code that they developed themselves.  In essence that's what we told them to the extent it did not contain Unix code.  But if they developed it, if they wrote it, it was their code.  They owned that."

(Ex. 35 at 73:6-14.)

117.   The *$ echo* newsletter was "published by the AT&T Software Sales and Licensing organization for licensees of UNIX System V" and was intended "to reach all UNIX System V licensees through one defined medium" and to keep them "abreast of any product

announcements, policy changes, company business and pricing structures". (Ex. 37; see also Ex.

34 at 66:11-69:3; Ex. 35 at 64:22-66:3, 66:20-67:5.) The guidance published in the newsletter

was intended to reach, and to apply to, all of AT&T's UNIX System V licensees. (See Frasure

Decl. ¶ 19; Ex. 35 at 64:22-66:3; Wilson Decl. ¶ 21; Ex. 34 at 69:20-70:15; Kistenberg Decl. ¶

15; Vuksanovich Decl. ¶ 19.)

      118.     Subsequently, in the August 1985 edition of $ echo, AT&T announced it had

revised Section 2.01 of its standard software agreement to include language to "assure licensees

that AT&T will claim no ownership in the software that they developed—only the portion of the

software developed by AT&T". (Ex. 38 at 5 (emphasis added)); Ex. 35 at 73:22-76:5.)

      119.     As clarified to better reflect this meaning, Section 2.01 of the standard UNIX

System V software agreement provided as follows:

> "AT&T-IS grants to LICENSEE a personal, nontransferable and
> nonexclusive right to use in the United States each SOFTWARE
> PRODUCT identified in the one or more Supplements hereto, solely for
> LICENSEE's own internal business purposes and solely on or in
> conjunction with DESIGNATED CPUs for such SOFTWARE
> PRODUCT. Such right to use includes the right to modify such
> SOFTWARE PRODUCT and to prepare derivate works based on such
> SOFTWARE PRODUCT, provided that any such modification or
> derivative work that contains any part of a SOFTWARE PRODUCT
> subject to this Agreement is treated hereunder the same as such
> SOFTWARE PRODUCT. AT&T-IS claims no ownership interest in any
> portion of such a modification or derivative work that is not part of a
> SOFTWARE PRODUCT."

(E.g., Ex. 39 (Software Agreement Number SOFT-000302, between AT&T Information

Systems, Inc. and The Santa Cruz Operation, dated May 6, 1987) (emphasis added); see Wilson

Decl. ¶ 25; Frasure Decl. ¶ 22; Ex. 35 at 76:6-79:12; DeFazio Decl. ¶ 19; Kistenberg Decl. ¶¶ 19-

20; Vuksanovich Decl. ¶¶ 23-24.)

      120.     This revised language of Section 2.01 makes plain that AT&T did not claim a

right to control in any manner original code created by its licensees, and is present in all standard

UNIX System V licenses executed after August 1985.  (See Frasure Decl. ¶¶ 22-24; Ex. 35 at 79:1-23; Wilson Decl. ¶¶ 25-27.)  Mr. Frasure described his understanding of the revised language at his deposition:

> "Q: . . . [W]hat is your understanding of what AT&T intended and told its licensees Section 2.01 means?
>
> A:  It means that any source code developed by the licensee, originated by the licensee, is the property of the licensee.  They own that source code, and AT&T makes no claim of ownership in that source code.
>
> Q:  Was it the case then from AT&T Technologies' perspective that the licensee could do whatever it wanted with the source code that it developed?
>
> . . .
>
> A:  Yes."

(Ex. 35 at 79:1-23.)

121.    As Mr. Wilson and Mr. Frasure again note, however, this revised language was intended only to clarify the original meaning of Section 2.01, not to change it.

Mr. Wilson states:

> "As we communicated at our seminars and in our newsletters to UNIX System V licensees, this new language was intended only to clarify the language in the original Section 2.01, not change its meaning.  My licensing group interpreted the language of the original Section 2.01 and this revised Section 2.01 in exactly the same way."

(Wilson Decl. ¶ 25.)

Mr. Frasure states:

> "Again, as we made clear in the newsletter, the revised language was added only to assure licensees that AT&T Technologies did not claim any right to its licensees' original work contained in modifications or derivatives of UNIX System V.  The language did not represent in any way a departure from the original intent of Section 2.01."

(Frasure Decl. ¶ 21; see also Kistenberg Decl. ¶ 20; Vuksanovich Decl. ¶ 24.)

122.   Mr. Frasure explained in particular that the revised language of Section 2.01 had the same meaning as the original language of Section 2.01 that appears in the IBM Software Agreement and the Sequent Software Agreement:

> "Q: Do you understand Section 2.01 as it appears in the Santa Cruz Agreement, to mean anything different than the Section 2.01 in the IBM Agreement that we looked at earlier?
>
> . . .
>
> A: There is no difference in meaning between the two paragraphs.
>
> Q: . . . Do you believe there to be any difference in meaning between Section 2.01 as it appears in the Santa Cruz Agreement and Section 2.01 as it appears in the Sequent Agreement that we looked at earlier?
>
> . . .
>
> A: No. There is no difference."

(Ex. 35 at 80:6-23.)

123.   Moreover, this revised language was intended to apply to all of AT&T's UNIX System V licensees, not just those licensees that executed a new agreement containing the revised Section 2.01.  (See Wilson Decl. ¶ 26; Frasure Decl. ¶ 23; Kistenberg Decl. ¶ 21; Vuksanovich Decl. ¶ 26.)  Although, as the $ echo newsletter states, AT&T made specimen copies of the revised software agreement available, AT&T did not require its licensees to enter into new agreements.  (See id.)  Rather, AT&T "intended for all of our UNIX System V licensees to receive the benefit of the changes and clarifications we outlined at our seminars and in the newsletter".  (Wilson Decl. ¶ 26; see also Frasure Decl. ¶ 23; Kistenberg Decl. ¶ 21; Vuksanovich Decl. ¶ 26.)

124.    Mr. Frasure elaborated at his deposition:

"A:  We told [UNIX System V licensees] specimen copies were available
if, if my account executives [or] licensing people were told that if a
licensee called, that they could receive a specimen copy and it would
apply, the language in the new specimen copy.  They, that in effect would
be the new language of their agreement, although they did not have to
sign that.

Some licensees, for whatever reason, wanted to sign a new agreement,
and we upgraded their agreement to the new language at no charge.  It
was just a matter of signing the new agreement, providing that to them.

But we wanted everyone to know what the changes were and they would
have the benefit of that language.

Q:  Did a licensee have to execute a new agreement to get the benefit of
the changes?

. . .

A:  No."

(Ex. 35 at 82:20-83:17.)

125.

REDACTED

126.

REDACTED

## VIII.   Novell's Waiver Of Any Purported Breaches Of Contract By IBM And Sequent.

127.     After this lawsuit was commenced, Novell sent a series of letters to SCO that explicitly waived the purported breaches of contract SCO has asserted IBM committed.  (See Exs. 41, 42, 43 and 44.)

128.     On October 7, 2003, in a letter from Joseph A. LaSala, Jr. to Ryan Tibbitts, Novell directed SCO to waive any purported right to assert a breach of the IBM Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 41.)  The letter states:

> "[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of the Agreements.  Novell directs SCO to take this action by noon, MST, on October 10, 2003, and to notify Novell that it has done so by that time."

(Id.)

129.     In the letter, Novell informed SCO that its position that IBM's own homegrown code "must be maintained as confidential and subject to use restrictions is contrary to the agreements between AT&T and IBM, including Amendment X, to which Novell is a party". (Ex. 41.)

130.    According to Novell, the agreements between AT&T and IBM provide "a straightforward allocation of rights":

> "(1) AT&T retained ownership of its code from the Software Products ('AT&T Code'), and the Agreements' restrictions on confidentiality and use apply to the AT&T Code, whether in its original form or as incorporated in a modification or derivative work, but (2) IBM retained ownership of its own code, and the Agreements' restrictions on confidentiality and use do not apply to that code so long as it does not embody any AT&T Code".

(Ex. 41.) Novell concluded that any other interpretation "would defy logic as well as the intent of the parties". (Id.)

131.    After SCO failed to follow Novell's instruction, on October 10, 2003, Novell expressly waived any purported right of SCO's to assert a breach of the IBM Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 42.) Novell states in its letter to SCO:

> "Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreements between AT&T and IBM, itself as subject to the confidentiality obligations or use restrictions of the Agreements."

(Id.)

132.    Additionally, on February 6, 2004, in a letter from Mr. LaSala to Mr. Tibbitts, Novell further directed SCO to waive any purported right to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 43.) The letter states:

> "[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as

41

subject to the confidentiality obligations or use restrictions of Sequent's SVRX license.

Novell directs SCO to take this action by noon, MDT, on February 11, 2004, and to notify Novell that it has done so by that time."

(Id.)

133.    In the letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software Agreement was misplaced, and stated that "SCO's interpretation of section 2.01 is plainly contrary to the position taken by AT&T, as author of and party to the SVRX licenses". (Ex. 43.)

134.    After SCO failed to follow Novell's instruction, on February 11, 2004, Novell expressly waived any purported right of SCO's to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 44.) Novell states in its letter to SCO:

"Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license."

(Id.)

135.    Novell also waived any purported right of SCO to terminate the IBM Sublicensing Agreement. (See Exs. 45, 46.)

136.    On June 9, 2003, in a letter from Jack L. Messman to Darl McBride, Novell informed SCO that under the terms of Amendment X, SCO did not have the right to terminate