Software Agreement was incorrect.  (¶ 128.)  Consistent with the plain language of the contracts, and the extensive extrinsic evidence reviewed above, Novell stated in its letter that the agreements between AT&T and IBM provide "a straightforward allocation of rights":

> "(1) AT&T retained ownership of its code from the Software Products ('AT&T Code'), and the Agreements' restrictions on confidentiality and use apply to the AT&T Code, whether in its original form or as incorporated in a modification or derivative work, but (2) IBM retained ownership of its own code, and the Agreements' restrictions on confidentiality and use do not apply to that code so long as it does not embody any AT&T Code".

(Ex. 41.)  In accordance with the rights it retained to AT&T's UNIX System V licenses, Novell therefore directed SCO "to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of" the IBM Agreements.  (Id.)

After SCO failed to follow Novell's instruction, on October 10, 2003, Novell sent a letter to SCO that expressly "waive[d] any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T . . .[,] as subject to the confidentiality obligations or use restrictions of the Agreements".  (Ex. 42.)

On February 6, 2004, Novell further directed SCO to waive any purported right to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code.  (¶ 132.)  In its letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software Agreement was misplaced, and stated that "SCO's interpretation of section 2.01 is plainly contrary to the position taken by AT&T, as author of and party to the SVRX licenses".  (Ex. 43.)

After SCO failed to follow Novell's instruction, on February 11, 2004, Novell expressly "waive[d] any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license". (Ex. 44.)

Novell's letters to SCO establish as a matter of law that even if SCO had the right under the IBM and Sequent Software Agreements to prevent IBM from disclosing its or Sequent's original code, Novell explicitly waived such right.

B.     Through Its Own Conduct, SCO Has Waived Its Purported Rights To Claim Breach Of Contract.

Even if SCO's interpretation of the IBM and Sequent Software Agreements were correct (which it is not), SCO itself has also waived any alleged breach by IBM relating to the code IBM is alleged to have improperly contributed to Linux. Under New York law, waiver "may be established . . . by acts and conduct manifesting an intent and purpose not to claim the alleged advantage or from which an intention to waive may reasonably be inferred". Heidi E. v. Wanda W., 620 N.Y.S.2d 665, 665 (N.Y. App. Div. 1994).[14]

In this case, SCO's acts and conduct are plainly inconsistent with an intention to assert a breach of contract against IBM based on the code allegedly at issue. Both before and even after SCO sued IBM, SCO sold to customers and made publicly available on the Internet the code that it claims IBM improperly contributed to Linux. (¶¶ 144-153.) Indeed, this code was still available on SCO's website as recently as August 4, 2004. (¶ 153.) SCO cannot on the one hand market and sell the source code IBM contributed to the Linux operating system, and on the other hand claim that IBM was prohibited by its licensing agreements from contributing that code to Linux.

---

[14]  See also In Re Estate of Flake, 71 P.3d 589, 599 (Utah 2003) (holding that waiver occurs when a party intentionally acts in a manner inconsistent with its contractual rights) (Utah law).

For many years prior to its filing this lawsuit, SCO's principal business was the distribution of the Linux operating system, the development and marketing of software based on Linux, and the provision of Linux-related services to customers. (¶¶ 12, 139.) In fact, in 2002, SCO formed the UnitedLinux partnership with three other Linux distributors with the intention of creating a single uniform Linux distribution designed for business use. (¶ 140.) Just two months before SCO brought suit against IBM, in January 2003, UnitedLinux signed IBM as a technology partner to, among other things, jointly promote UnitedLinux's first Linux distribution, UnitedLinux Version 1.0. (¶ 143.)

SCO does not dispute that its own Linux distributions, including UnitedLinux Version 1.0 (distributed by SCO as "SCO Linux Server 4.0"), which it sold or otherwise made available for more than a year before bringing this suit against IBM, contain code upon which SCO's claims are based. (¶ 144.)

In fact, SCO specifically touted to its customers that its distributions of Linux included the very technology it now complains IBM improperly contributed to Linux. (¶¶ 146-49.) For example, in its January 2002 product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO advertised that the products included new features such as "better SMP scaling up to 32 processors" and "journaling file system support". (Exs. 51 & 52.) Likewise, its November 2002 product announcement for "SCO Linux Server 4.0" stated that the "the core of SCO Linux Server 4.0 is the 2.4.19 Linux kernel" and that "[n]ew features" include "improved journaling file system support", "Asynchronous I/O" and "Enterprise Volume Management Systems (EVMS)". (Ex. 54.) SCO's Technical Overview of SCO Linux 4.0 even emphasized that its product included "JFS (Journaled File System Developed by IBM)". (Ex. 55 (emphasis added).)

Moreover, although SCO claims to have "discontinued" distributing any products containing the source code it claims IBM improperly disclosed, SCO continued to do so after it filed this lawsuit. (¶¶ 150-53.) For example, SCO released its "SCO Linux Server 4.0 for the Itanium Processor Family" product on April 14, 2003, after SCO filed its original Complaint. As with its earlier release of SCO Linux Server 4.0, SCO's product announcement proclaimed that the new features of this product included "improved journaling file system support", "Asynchronous I/O" and "Enterprise Volume Management Systems (EVMS)". (Ex. 56.)

REDACTED

In addition, SCO continued to make the Linux 2.4 kernel available for download from its website well after it commenced this lawsuit. (¶ 153.) This code was still available on SCO's website as recently as August 4, 2004. (Id.) The version of Linux available from SCO's website includes code it claims IBM disclosed in violation of its contracts. (Id.)

Given SCO's extensive promotion and sale of Linux, and of the specific code contributed by IBM therein, for years prior to commencing this suit against IBM, SCO has waived any right to claim that IBM breached its contracts by disclosing such code. SCO cannot openly accept the benefits of IBM's contributions to Linux, and then claim that such contributions were improper. SCO's claims therefore fail as a matter of law for this reason also. See, e.g., Sec. Indus. Automation Corp. v. United Comp. Capital Corp., 723 N.Y.S.2d 668, 669 (N.Y. App. Div. 2001) (affirming grant of plaintiff's cross-motion for summary judgment when defendant's conduct demonstrated waiver of contract claim); T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 2001-900, 2002 WL 1311648, at *1 (N.Y. App. Term Apr. 2, 2002) (granting defendant's cross-motion for summary judgment after finding waiver of contract claim based on plaintiff's conduct) (attached hereto as Exhibit C).

## Conclusion

For the foregoing reasons, IBM respectfully requests that the Court grant IBM summary judgment on SCO's breach of contract (SCO's First, Second, Third and Fourth Causes of Action) claims.

DATED this 13th day of August, 2004.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

Of counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

**EXHIBIT A**

Westlaw.

Not Reported in F.Supp.2d
2001 WL 1806857 (D.Utah)
(Cite as: 2001 WL 1806857 (D.Utah))

Page 1

Only the Westlaw citation is currently available.

United States District Court, D. Utah, Central
Division.

JOE BANKS, et al., Plaintiffs,
v.
RITE AID CORPORATION, Defendant.

No. 1:98CV115K.

March 15, 2001.

Unpublished Opinion
ORDER

KIMBALL, District J.

*1 This matter is before the court on Defendant Rite
Aid Corporation's Motion for Summary Judgment on
Claims of Plaintiffs Who Executed Waiver and
Release Agreements, Motion for Summary Judgment
on Claims of Plaintiffs Who Did Not Receive
Severance Pay, and Motion to Dismiss the Claims of
David Kilgo and Randy Nicholas. A hearing on the
motions was held on March 12, 2001. At the hearing,
Plaintiffs were represented by Benson L. Hathaway,
Jr., and Defendant was represented by Harry Korrell
and Margaret Lent. Having carefully considered the
memoranda and other materials submitted by the
parties, as well as the law and facts relating to
Defendant's motions, and now being fully advised,
the court renders the following Order.

BACKGROUND

Plaintiffs are thirty-four former truck drivers who
worked for Defendant Rite Aid Corporation at its
Ogden distribution center. Their employment was
terminated January 18, 1998, when Rite Aid decided
to outsource its trucking operations to Penske
Logistics, a company that specializes in trucking and
delivery services. Plaintiffs claim their termination
was in breach of an implied employment contract and
in violation of the covenant of good faith and fair
dealing.

Rite Aid gave Plaintiffs approximately two-weeks

notice that they would be terminated. It told them that
they could apply for jobs with Penske or receive a
severance package. The Plaintiffs who were not
offered positions with Penske or who chose not to
work for Penske were offered a severance package of
between eight to thirteen weeks of pay, depending on
their length of service, in exchange for signing a
release agreement that waived all claims related to
their employment or termination.

All of the Plaintiffs received accrued benefits due to
them under Rite Aid's policies, such as unused sick
leave, vacation pay, and supplemental retirement
benefits. Plaintiffs had a claim for unpaid wages or
benefits, but in their opposition to Rite Aid's motions
for summary judgment they acknowledged that
discovery had demonstrated there is no basis for this
claim.

Rite Aid has filed two separate motions for summary
judgment-one against Plaintiffs who signed a release
and one against Plaintiffs who did not. Sixteen of the
thirty-four Plaintiffs signed releases. Rite Aid has
also brought a motion to dismiss the claims of two
plaintiffs, Kilgo and Nicholas, for failure to cooperate
with discovery and violation of court orders.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law. See Fed.R.Civ.P. 56(c).
In applying this standard, the court must construe all
facts and reasonable inferences in the light most
favorable to the nonmoving party. Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986); Wright v. Southwestern Bell Tel. Co., 925
F.2d 1288, 1292 (10th Cir.1991).

*2 Once the moving party has carried its burden,
Rule 56(e) "requires the nonmoving party to go
beyond the pleadings and by ... affidavits, or by the
'depositions, answers to interrogatories, and
admissions on file,' designate 'specific facts showing
that there is a genuine issue for trial." Celotex Corp.
v. Catrett, 477 U.S. 317, 324 (1986); Gonzales v.
Millers Casualty Ins. Co., 923 F.2d 1417, 1419 (10th
Cir.1991). All material facts asserted by the moving

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2001 WL 1806857 (D.Utah)
(Cite as: 2001 WL 1806857 (D.Utah))

party shall be deemed admitted unless specifically controverted by the opposing party. D. Utah R. 202(b)(4). The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp.* 477 U.S. at 322.

In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Clifton v. Craig,* 924 F .2d 182, 183 (10th Cir.), *cert. denied,* 112 S.Ct. 97 (1991).

## MOTIONS FOR SUMMARY JUDGMENT
### 1. At-Will Employment

Rite Aid claims summary judgment on Plaintiffs' claims is appropriate because Plaintiffs were at-will employees who could be terminated at any time. Plaintiffs argue that although there is a presumption of at-will employment under Utah law, this presumption can be overcome by a factual showing that the parties impliedly agreed to terminate the relationship only for cause.

Under Utah law, employment of indefinite duration is at-will unless there is a specific agreement to the contrary. *See Berube v. Fashion Centre Ltd.,* 771 P.2d 1033, 1044 (Utah 1989); *Johnson v. Morton Thiokol,* 818 P.2d 997, 1000- 01 (Utah 1991). To establish an implied-in-fact contract of employment, an employee must meet the standards of a unilateral contract and demonstrate "a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision." *Morton Thiokol,* 818 P.2d at 1002.

In this case, Plaintiffs claim an implied employment contract with Rite Aid is demonstrated by statements in Rite Aid and its predecessors' employee manuals, such as statements indicating that Plaintiffs could look forward to a long future with Rite Aid and that the company reserved the right to "discharge or discipline employees for reasons felt justifiable to the circumstances," and by statements from management to Plaintiffs that they would be with Rite Aid until retirement unless they did something to warrant dismissal.

It is uncontroverted that Plaintiffs were notified that they were at-will employees in their employment applications. In addition, each handbook and manual Plaintiffs received in the course of their employment with Rite Aid and its predecessors contained at-will disclaimers.

*3 The statements in the progressive discipline section of the handbook, which Plaintiffs claim altered their at-will status, do not create an implied in fact contract because the manual contains a clear disclaimer to the employee that the employment is at-will. *See Hodgson v. Bunzl,* 844 P.2d 331, 334 (Utah 1992); *Trembly v.. Mrs. Fields Cookies,* 884 P.2d 1306, 1309 (Utah Ct.App.1994). Moreover, when Plaintiffs received the handbooks, they signed separate acknowledgment forms stating in plain language that the employment was at-will.

In addition, the statements from the handbooks, such as "we look forward to your long and successful career" and "reducing fuel consumption can make the difference between a secure job and a shaky one," and the statements by management to the effect that Plaintiffs could stay at the company until they retired are not specific enough to meet the requirements for a unilateral contract. *Trembly,* 884 P.2d at 1313.

Therefore, this court concludes that Plaintiffs were at-will employees and summary judgment in favor of Rite Aid is appropriate. [FN1]

> FN1. In addition to being at-will employees, in exchange for a severance package, sixteen Plaintiffs signed a waiver and release of claims:
> Employee hereby knowingly and voluntarily ... releases and discharges Rite Aid Corporation ... from any and all claims ... connected with Employee's employment with, or termination from, the Company ... including but not limited to breach of contract, breach of the implied covenant of good faith and fair dealing, ...
> This court finds that given the evidence presented by Plaintiffs no reasonable jury could conclude that the release was unconscionable or signed under duress. Where a valid release exists that would defeat a cause of action, under Utah law, "it is the duty of the court to grant a judgment based thereon." *Horgan,* 657 P.2d at 753 (upholding enforcement of a release and affirming summary judgment for the employer on employee's breach of contract

Not Reported in F.Supp.2d
2001 WL 1806857 (D.Utah)
**(Cite as: 2001 WL 1806857 (D.Utah))**

claim). Therefore, as to the Plaintiffs who signed release agreements, summary judgment is also appropriate based upon the release agreements.

### 2. Implied Covenant of Good Faith and Fair Dealing

Because of the court's ruling that no implied-in-fact employment contract existed between Plaintiffs and Rite Aid, Plaintiffs claim for the violation of the implied covenant of good faith and fair dealing also fails as a matter of law. The implied covenant of good faith and fair dealing "cannot be construed ... to establish new independent rights or duties not agreed upon by the parties." *Brehany v. Nordstrom,* 812 P.2d 49, 55 (Utah 1991). In other words, where there is no obligation, there can be no claim for breach of the covenant of good faith. *Id.* Therefore, summary judgment on Plaintiffs' claim for violation of the implied covenant of good faith and fair dealing is granted. [FN2]

> FN2. In any event, the statements Plaintiffs rely upon to claim that Rite Aid made a commitment to keeping the employees informed about the company's future-specifically, a statement in Rite Aid's handbook that "we keep associates informed of the standards, expectations, plans and progress of our company," and a statement in a memoranda directed to all drivers that the future of the company "is built with communication, honesty, and open two-way communication"-are too general to create any contractual obligation between the parties. *See Trembly,* 884 P.2d at 1313.

### MOTION TO DISMISS

Rite Aid brings this motion to dismiss based on Kilgo and Nicholas' failure to cooperate in discovery and noncompliance with court orders. Plaintiffs do not oppose the motion as to Kilgo's claims and the motion is mooted by the dismissal of his claims above. Plaintiffs' counsel no longer represents Nicholas and it is unclear whether Rite Aid served Nicholas with its motion for summary judgment or only its motion to dismiss. However, because of his failure to make himself available for deposition, his failure to notify the clerk of his intentions regarding representation in this matter in violation of a court order, his failure to respond to Rite Aid's motion to dismiss, and this court's dismissal of all of the Plaintiffs' claims on the merits, this Court grants Rite Aid's motion to dismiss the claims of Nicholas.

### CONCLUSION

For the foregoing reasons, it is hereby ordered that Defendant's Motion for Summary Judgment on Claims of Plaintiffs Who Executed Waiver and Release Agreements is GRANTED, Defendant's Motion for Summary Judgment on Claims of Plaintiffs Who Did Not Receive Severance Pay is GRANTED, and Defendant's Motion to Dismiss the Claims of David Kilgo and Randy Nicholas is GRANTED. Therefore, this case is dismissed with prejudice.

2001 WL 1806857 (D.Utah)

END OF DOCUMENT

**EXHIBIT B**

Westlaw.

Not Reported in F.Supp.2d
2002 WL 237836 (S.D.N.Y.)
(Cite as: 2002 WL 237836 (S.D.N.Y.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA, Plaintiff and
Counter-
Defendant,
v.
OCWEN FINANCIAL CORPORATION, Defendant
and Counter-Complainant.

No. 98 CIV. 7137(BSJ).

Feb. 19, 2002.

OPINION & ORDER

JONES, District J.

*1 This diversity suit arises out of a dispute
regarding the terms of a Loan Purchase and Sale
Agreement (the "Agreement"), entered into by the
parties on August 13, 1998. The Plaintiff Teachers
Insurance and Annuity Association of America
("Teachers") filed this action on October 10, 1998,
alleging breach of contract and seeking a declaratory
judgment that it is entitled to the $3 million deposit
(the "Deposit") Defendant Ocwen Financial Corp.
("Ocwen") paid into escrow, plus interest. Ocwen
counterclaimed, alleging that Teachers did not fulfill
its obligations under the Agreement, and seeks a
declaratory judgment that it is entitled to a return of
the Deposit, plus interest.

The Agreement sets forth the terms on which
Teachers agrees to sell and Ocwen agrees to purchase
a certain loan (the "Loan") that Teachers had made in
September 1986, in the original principal amount of
$125 million, to St. Louis Station Associates
("SLSA" or the "Borrower"), the owner of the Union
Station property in St. Louis, Missouri. The parties'
dispute in this action centers on whether Teachers
satisfied its obligation to provide certain assurances
to Ocwen pursuant to Section 3.9 of the Agreement.

The court conducted a two-day bench trial beginning

April 3, 2000, during which it heard testimony from
several witnesses for Teachers and Ocwen and
received numerous exhibits in evidence. In addition,
the parties submitted deposition designations and
cross-designations in advance of trial. What follows
constitutes the court's findings of fact and
conclusions of law as required by Fed.R.Civ.P. 52.

FINDINGS OF FACT
I. The Parties

Plaintiff Teachers is a pension fund for colleges and
universities organized under the laws of the State of
New York, with its principal place of business in the
State, City and County of New York. Defendant
Ocwen is a Florida corporation with its principal
place of business in West Palm Beach, Florida. In
this action for breach of contract, the parties to the
contract are Teachers and Ocwen.

Representing Ocwen in the transaction was Marcus
Buerosse, Ocwen's director of large commercial loan
acquisitions, and Roger Simon, senior in-house
counsel for Ocwen. Representing Teachers was Tony
Gramaldi and Jennifer Hochglaube, Teachers' lead
lawyer and lead business-person respectively.

II. Background

In October 1983, SLSA, as owner and lessor, entered
into a lease (the "Master Lease") for the retail space
at Union Station (the "Mall") with the Rouse
Company of Missouri, Inc. ("Rouse"). (TX 9). Rouse
in turn entered into subleases (the "Retail Tenant
Leases") with a wide variety of retail tenants--
approximately 100 in all--for retail space at the Mall.
(Trial Tr. (Buerosse) 352; Txs 70, 74, 76, 89 and 91).

In September 1986, Teachers loaned approximately
$125 million to SLSA (the "Loan"). The Loan is a
mortgage loan with a maturity date of October 1,
2001, collateralized by SLSA's interest in the Mall.
(TX 1). As of the summer of 1998, the principal
balance due on the Loan was approximately $116
million.

*2 By letter dated July 31, 1998, Rouse informed
SLSA that it "has been experiencing a negative cash
flow for a number of years. In that no progress has
been made in our discussions to stop these losses, we
are commencing today to pay rent equal to our cash

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2002 WL 237836 (S.D.N.Y.)
(Cite as: 2002 WL 237836 (S.D.N.Y.))

Page 2

flow from the project. [Rouse] is prepared to discuss other resolutions to this matter, including vacating the space if landlord would prefer a different retail tenant." (Trial Exhibit (TX) 11.) In other words, the rents Rouse was receiving from the retail tenants were less than the rent Rouse owed to SLSA under the Master Lease. By letter dated August 4, 1998, SLSA's counsel gave Rouse notice under the Master Lease that Rouse had failed to pay the rent due on August 1, 1998, and that, "[i]f Rouse's failure to pay rent continues for 10 days from the date of this letter, the failure to pay the same shall be and will constitute an Event of Default as defined in [the Master Lease]. This letter serves as your notice that in case of an Event of Default, Lessor [SLSA] is fully prepared and intends to pursue any and all remedies against you as are available under the [Master] Lease, or at law." (TX 14.)

III. Negotiations Leading up to the Agreement

In the summer of 1998, Teachers and Ocwen began negotiating for the purchase of the Loan by Ocwen. (Trial Tr. (Buerosse) 331-32). In the first week in August, Teachers provided Ocwen with copies of Rouse's July 31 letter to SLSA, and SLSA's August 4 response. (Txs 11, 14). Prior to finalizing and signing the Agreement on August 13, 1998, Ocwen and Teachers discussed Ocwen's concerns as to the possible termination of the Master Lease between Rouse and SLSA. (Trial Tr. (Buerosse) 340-41; (Grimaldi) 85-86). During a telephone conversation between Simon and Grimaldi, Simon expressed concern about the ramifications that a default by Rouse would have for the value of the Loan and collateral. (Simon Dep. 93-5). Specifically, Simon stated that he had been advised by Missouri counsel that in the event of a termination of the Master Lease, the Retail Tenant Leases would terminate as well. This is because there would be no contractual relationship or "privity" between the retail tenants and SLSA. (Trial Tr. (Grimaldi) 42-43; Simon Dep. 99-100). [FN1] Although Grimaldi had not done any legal research or consulted outside counsel regarding this issue, Grimaldi told Simon that the termination of the retail tenant leases, though perhaps a "theoretical possibility," was more of a "legal-technical" concern than a serious one. (Trial Tr. (Grimaldi) 86-87).

FN1. Termination of the Retail Tenant Leases was of particular concern to Ocwen for the following reason: Because Ocwen had determined that SLSA was unlikely to

be able to pay the full amount of the Loan on maturity, Ocwen analyzed not only the Borrower's cash flow, which was needed to service the debt until maturity, but also the value of the Mall as the collateral for the Loan, to which the lender would have to look for refinancing or sale on foreclosure. (Trial Tr. (Buerosse) 335-36). Ocwen perceived the value of the collateral as a function, in part, of the nature of the cash flow. While vacant retail spaces, even if rent was paid for those spaces, would reduce the value of the collateral, Ocwen determined that "vibrant" retail space tenants paying the same rent would enhance the value of the collateral. (Trial Tr. (Reich) 289-90; (Buerosse) 336-38).

Shortly after this conversation, Grimaldi reviewed the Retail Tenant Leases and found that they contained attornment provisions (the "Pre-existing Attornment Provisions" or "Provisions"). [FN2] Grimaldi informed Simon that Teachers had been and was still comfortable with the Pre-existing Attornment Provisions, although Grimaldi did not represent that the Provisions as a matter of law would prevent the termination of the Retail Tenant Leases once the Master Lease terminated. (Trial Tr. (Grimaldi) 87-88, 90). Both Simon and Buerosse, however, had reviewed the Pre-existing Attornment Provisions, and Simon had consulted with outside counsel regarding the Provisions. Simon and Buerosse informed Teachers' the Provisions were inadequate and that Ocwen remained concerned about the effects of the termination of the Master Lease on the validity of the Retail Tenant Leases. (Trial Tr. (Buerosse) 342-48; Simon Dep. 99-101, 235-238, 241-43).

FN2. The Pre-Existing Attornment Provisions state:
If any person shall succeed to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, and if so requested or required by such successor in interest, Tenant shall attorn to such successor in interest and shall execute such agreement in confirmation of such attornment as such successor in interest shall reasonably request.

Not Reported in F.Supp.2d
2002 WL 237836 (S.D.N.Y.)
(Cite as: 2002 WL 237836 (S.D.N.Y.))

Page 3

*3 While the Agreement was being negotiated, the parties discussed what assurances would alleviate Ocwen's concern that a termination of the Master Lease would terminate the Retail Tenant Leases. Simon stated that Ocwen might require that Teachers provide an assignment of rights, leases and rents from Rouse to SLSA ("Assignment"), as well as Subordination, Non-Disturbance and Attornment agreements ("SNDAs" or "NDAs"), signed by certain of the 100 retail tenants, by which those tenants would attorn to SLSA. (Trial Tr. (Buerosse) 344-47; (Grimaldi) 46, 95-96; Simon Dep. 187-88). Simon explained that the NDAs were necessary to complete the broken chain of privity resulting from termination of the Master Lease. (Simon Dep. 193-94, 199; Trial Tr. (Grimaldi) 46, 95). Grimaldi responded that while it would be difficult for Teachers to get NDAs, Teachers would certainly try. (Trial Tr. (Grimaldi) 95-96). Neither Grimaldi nor anyone else from Teachers stated that it would not obtain the requested NDAs. (Trial Tr. (Grimaldi) 97).

IV. Section 3.9 of the Agreement

By August 13, 1998, Teachers was aware that the Pre-existing Attornment Provisions, even when combined with an assignment of rights from Rouse to SLSA, were not satisfactory to Ocwen, and for that reason Teachers agreed to provide further assurances in order to alleviate Ocwen's concerns. (Simon Dep. 295; Trial Tr. (Grimaldi) 97). No agreement had been reached, however, as to precisely what assurances would be required; for example, Ocwen had not yet determined the form of the documents it needed or from which tenants it wanted NDAs. (Simon Dep. 212-13; Trial Tr. (Buerosse) 347; (Grimaldi) 94-94). Because the parties desired to execute the Agreement before Grimaldi left on vacation, the parties agreed to include a general assurances provision in the Agreement. *Id.* Section 3.9, entitled "Closing Condition," sets forth a condition to Ocwen's obligation to purchase the Loan and provides in its entirety as follows:

It shall be a condition to Purchaser's obligation to purchase the Loan that, at least five (5) business days prior to the Closing Date, Seller shall provide assurances satisfactory to Purchaser that the retail tenant leases at the Property will not be terminated, by operation of law or otherwise, due to the termination of that certain lease dated as of October 3, 1983, as amended, by and between St. Louis Station Associates, as lessor, and The Rouse Company of Missouri, Inc., as lessee (as so amended, the "Master Lease"). If Purchaser is not

satisfied, or if Seller fails to timely deliver the assurances required by this Section 3.9, Purchaser may deliver Notice to Seller, not later than three (3) business days prior to the Closing Date, that Purchaser has elected to rescind and cancel this Agreement, in which event, this Agreement will terminate on the date Seller receives the Notice, Purchaser will be entitled to the Deposit and all interest on the Deposit and neither Seller nor Purchaser will have any further rights or obligations to this Agreement.
*4 (TX 1).

V. Complying with Section 3.9

On August 13, 1998, once the Agreement (including Section 3.9) was finalized, Simon again gave Grimaldi an indication as to what would suffice to allay Ocwen's concerns and therefore satisfy Section 3.9, reiterating that Ocwen desired both an Assignment and the NDAs; Simon was unable to give Grimaldi a specific number of NDAs at that time, except to say that Ocwen would be reasonable and would not require NDAs from all 100 tenants. (Simon Dep. 156, 187-88; Trial Tr. (Buerosse) 347). The parties agreed that Simon would prepare and forward to Grimaldi draft language for the documents Ocwen wanted, including the NDAs and a list of retail tenants from which Ocwen desired NDAs. (Simon Dep. 300; Trial Tr (Buerosse) 348).

After consultation with Missouri counsel, Simon prepared drafts of a form NDA and a form of the Assignment and forwarded both to Grimaldi by fax dated August 21, 1998. (TX 23; Simon Dep. 214-15). [FN3] In this fax, Simon also included a list of the 29 "critical" retail tenants (the "Key Retail Tenants") that Ocwen had identified as the ones from which Ocwen wanted executed NDAs. (TX 23; Simon Dep. 214-15; Trial Tr. (Reich) 292). Simon further stated: "Our goal is to jointly agree on the form and substance of the SNDA and Assignment early next week. I hope you had an enjoyable vacation and look forward to closing this transaction within the next few weeks." (TX 23). Ocwen thereafter reduced the number of Key Retail Tenants from 29 to 28 because one of the critical tenants, the Hard Rock Café, had a direct lease with SLSA and as a result that lease would not be affected by the Master Lease termination, negating the need for that tenant to sign an agreement attorning to SLSA as its landlord. (Simon Dep. 315; Trial Tr. (Grimaldi) 108).

FN3. Although Grimaldi was on vacation,

Not Reported in F.Supp.2d
2002 WL 237836 (S.D.N.Y.)
(Cite as: 2002 WL 237836 (S.D.N.Y.))

Page 4

he received a copy of the fax by Federal Express. (Trial Tr. (Grimaldi) 56).

Grimaldi understood that both the draft NDAs and the Assignment were requested by Ocwen pursuant to § 3.9 of the Agreement. (Trial Tr. (Grimaldi) 105-06). Grimaldi did not object to the list of Key Retail Tenants, nor did he tell Simon that requesting the 28 NDAs under § 3.9 was unreasonable. (Trial Tr. (Grimaldi) 106-08; Simon Dep. 203). Ocwen never requested from Teachers any documents other than the 28 NDAs and the Assignment pursuant to § 3.9. (Trial Tr. (Grimaldi) 106; Simon Dep. 200-02).

While Grimaldi was away on vacation, Simon received comments on the draft NDAs and Assignment from William Goebel, who was covering for Grimaldi during his absence. (Trial Tr. (Grimaldi) 55, 106-07). On August 24, 1998, in response to Goebel's comments, Simon sent revised drafts of the NDA and the Assignment. (TX 24). Following additional comments by Goebel, on or about August 25, 1998, Simon sent another set of revised drafts. (TX 25; Trial Tr. (Grimaldi) 110). On August 28, 1998, and after a final round of comments from Goebel, Simon forwarded to Goebel an agreed form of the Assignment and stated that John Guy, another Ocwen employee, was sending Hochglaube the agreed NDA form under separate cover. (TX 26).

*5 By September 2, 1998, the parties had reached an agreement as to the forms of the assignment and NDAs. (Trial Tr. (Grimaldi) 112; Simon Dep. 321). On September 2, John Guy forwarded the NDAs that Goebel had approved to Grimaldi, who was home on vacation, and by a copy of that letter sent to Hochglaube 28 NDAs customized for signature by each of the Key Retail Tenants. (TX 27). Grimaldi had a number of objections to the NDAs, including the fact that Teachers was required to be a signatory. (Trial Tr. (Grimaldi) 113). Simon changed the NDAs again, removing Teachers as a signatory and adjusting the NDAs to reflect the termination of the Master Lease between SLSA and Rouse, which had become official pursuant to a letter agreement dated September 4, 1998. Ocwen then sent Teachers a set of the revised NDAs, customized for each of the 28 Key Retail Tenants. (Simon Dep. 336; Trial Tr. (Grimaldi) 57-58, 112-16).

On September 8, Linda Smith, Ocwen's closing manager, sent a list of "outstanding" items to Grimaldi and Julia Hathaway, a paralegal working for Grimaldi. (Trial Tr. (Grimaldi) 118-19). That fax

included among the list of items "outstanding for the [SLSA] transaction ... 4. Provide Non-Disturbance Agreements (*due 5 days from closing,* or 9/11)." (TX 29) (emphasis added). Teachers does not dispute that all of the other items on Smith's list were documents Teachers was required to deliver at the closing (including the Assignment), and that Smith's fax treated the NDAs the same as these other documents. Yet Teachers did not respond to Smith that the NDAs were not required for the closing. (Trial Tr. (Grimaldi) 120). In other words, the September 8 fax revealed that Ocwen considered the NDAs closing documents required under § 3.9, and Teachers took no action to clear up any purported misunderstanding in that regard.

On September 11, 1998, Grimaldi sent the NDAs to SLSA's counsel with a cover letter stating: "Enclosed are the SNDA Agreements that Ocwen Federal has requested we obtain as well as the Estoppel Certificates. Please request that the necessary parties sign each of those Agreements." (TX 31). In that letter, Grimaldi did not distinguish between the Estoppel Certificates, which were clearly required to be delivered at closing under § 3.5(b) of the Agreement, and the NDAs, which he later claimed were not required by § 3.9. Instead, he asked SLSA to have all the documents executed. *Id.*

By September 14, 1998, the date by which the § 3.9 assurances were due under the original Agreement, Teachers did not have the Assignment or the NDAs. (Trial Tr. (Grimaldi) 124). As such, pursuant to a letter dated September 15, 1998, the parties agreed to extend Teachers' time to provide the § 3.9 assurances until September 28, 1998, the new Closing Date. (TX 4). The September 15 letter provided: "Seller shall have until the Closing Date to provide assurances satisfactory to Purchaser that the retail tenant leases at the Property will not be terminated...due to the termination of the Master Lease by the Borrower pursuant to that certain letter agreement dated as of September 4, 1998 by and between [SLSA and Rouse]." (TX 4).

*6 On or about September 18, Grimaldi told Simon and Buerosse that Teachers wanted to further extend the Closing because it needed more time to get the NDAs. (Simon Dep. 414-15; Trial Tr. (Buerosse) 358). By letter dated September 18, 1998, Grimaldi forwarded a draft First Amendment to the Agreement with a cover letter stating: "Paragraph 5 [which amends Section 3.9 of the Agreement] has been added to permit the one-week extension of the closing date *to allow Teachers more time if necessary*

Not Reported in F.Supp.2d
2002 WL 237836 (S.D.N.Y.)
(Cite as: 2002 WL 237836 (S.D.N.Y.))

to obtain the NDAs." __[FN4]__ (TX 40) (emphasis added). Grimaldi's acknowledgment that the Closing Date might need to be postponed in order to obtain the 28 NDAs evidences Teachers' understanding that the NDAs were part of the assurances to be provided prior to closing, pursuant to § 3.9. (Trial Tr. (Grimaldi) 130-32). By letter dated September 25, 1998, Teachers exercised its right under Paragraph 5 of the First Amendment to extend the Closing Date until October 2, 1998, so as to permit Teachers' to obtain the necessary assurances. During the period leading up to the October 2 Closing Date, Buerosse had several conversations with Hochglaube during which he reiterated that Ocwen expected the 28 NDAs. (Trial Tr. (Buerosse) 360-61). Although Hochglaube did indicate that these agreements would be difficult to obtain, Buerosse told Hochglaube "that they should get as many as they could and that [Ocwen] would review how many they had at [the Closing] and make a determination as to whether or not they were acceptable." (Trial Tr. (Buerosse) 361). During these conversations, Hochglaube never responded that Teachers did not have to provide the NDAs, and Buerosse never absolved Teachers of the obligation to provide them. __[FN5]__ Id. Prior to the Closing Date, Buerosse also spoke with Steve Miller, a representative of SLSA. Buerosse asked Miller how many NDAs SLSA had. Miller assured Buerosse that SLSA was attempting to obtain the NDAs, and that he thought there would be substantial compliance. (Trial Tr. (Buerosse) 364-65). In addition, Simon had numerous conversations with Grimaldi leading up to the Closing Date during which the parties discussed the status of the NDAs. During these conversations, Grimaldi represented that the NDAs had been distributed and that SLSA was working on getting them signed. (Simon Dep. 400-02, 420-21, 470).

> FN4. Paragraph 5 amends Section 3.9 by the addition of the following:
> In the event Seller is unable to provide the assurances required by Section 3.9 by the closing date, then Seller shall be entitled to extend the closing date until October 2, 1998 to allow Seller an additional period to provide those assurance [sic]. Purchaser shall have the right to advise Seller that Section 3.9 has been satisfied, in which event Seller shall not have the right to extend the contract. (TX 40).

> FN5. The court does not credit the testimony of Jennifer Hochglaube that she definitively

told Buerosse Teachers would not get close to 28 NDAs, and that Buerosse responded that he understood and did not expect that. (Trial Tr. (Hochglaube) 195-97).

Meanwhile, in order to cure the default created by the September 4, 1998 agreement between SLSA and Rouse terminating the Master Lease, SLSA requested that Teachers consent to the termination. Counsel for SLSA prepared a draft Consent, which was to be signed by both SLSA and Teachers. The final language of the Consent provides that Teachers had requested SLSA obtain the Key Retail Tenant NDAs for delivery "prior to October 5, 1998 (the 'Closing Date.')" (TX 48). __[FN6]__ The Consent also provided that should SLSA fail obtain the requested NDAs prior to the Closing Date, then SLSA "shall use commercially reasonable efforts and good faith to obtain any remaining [NDAs] after the Closing Date on behalf of Ocwen." This language was added at Ocwen's request in order to ensure that SLSA would continue to attempt to obtain any NDAs that were not presented at the Closing, in the event Ocwen decided to waive its rights to obtain all the Key Retail Tenant NDAs at Closing. (Simon Dep. 205-07). At no point, however, did Simon represent that Ocwen was willing to close with less than the 28 Key Retail Tenant NDAs. (Simon Dep. 209). Although the Borrower executed this Consent prior to the Closing Date, it was not executed by Teachers. (Trial Tr. (Grimaldi) 146-47).

> FN6. Grimaldi confirmed that Teachers had in fact requested that all the Key Retail Tenant NDAs be provided by the Closing Date. (Trial Tr. (Grimaldi) 144).

*7 At the end of September, as the Closing Date approached, Simon once again questioned Grimaldi regarding the NDAs. Grimaldi responded that Teachers had procured only three NDAs thus far, and that ultimately it would be up to Ocwen to decide whether Teachers met its burden under § 3.9 of the Agreement. (Trial Tr. (Grimaldi) 136-37, 141).

By letter agreement dated September 29, 1998, the parties agreed to adjourn the Closing from October 2 to October 5, 1998. (TX 7). Ocwen consented to this extension in part to permit Teachers more time to procure the NDAs. (Simon Dep. 450). On October 2, however, Teachers did not have several of the Closing Documents, including the 28 requested

Not Reported in F.Supp.2d
2002 WL 237836 (S.D.N.Y.)
(Cite as: 2002 WL 237836 (S.D.N.Y.))

Page 6

NDAs. The Closing Date therefore was further extended to October 6, partly in the hope that additional NDAs would continue to come in. (Simon Dep. 456, 470-73).

By telephone conference on or about 5:00 p.m. on October 5, 1998, Buerosse and Simon informed Hochglaube and Grimaldi of Ocwen's decision not to close without the Key Retail Tenant NDAs. (Trial Tr. (Grimaldi) 72; Simon Dep. 220-21). During the phone conference, Teachers represented that it had procured only five or eight of the 28 NDAs requested by Ocwen. (Trial Tr. (Grimaldi) 72). Teachers did not challenge Ocwen's statement that it needed all of the Key Retail Tenant NDAs in order to close. (Simon Dep. 220-21; Trial Tr. (Grimaldi) 72; (Hochglaube) 274).

Teachers formally responded to Ocwen's decision by letter dated October 5, 1998, in which Teachers stated that the Assignment was the only assurance Teachers would provide pursuant to § 3.9. (TX 52). This October 5 letter was the first time Teachers had said to Ocwen that the Assignment was the only assurance required by § 3.9. (Trial Tr. (Grimaldi) 163). Ocwen responded, also by letter, that delivery of the Key Retail Tenant NDAs was a "material condition" to the Closing. (TX 53). By letter dated October 6, 1998, Teachers replied that delivery of the Key Retail Tenant NDAs was not a material condition to the Agreement and reiterated that Teachers had met its obligations under § 3.9. (TX 55).

Despite the letter exchange described above, Simon and Buerosse attended the scheduled Closing at Teacher's offices in New York on October 6, 1998. Ocwen, still hopeful that Teachers would deliver the 28 NDAs, was prepared to close if Teachers provided the NDAs. (Simon Dep. 246; Trial Tr. (Reich) 297-98). On the table containing the documents required for the Closing were the five NDAs Teachers was able to obtain. (Trial Tr. (Grimaldi) 163-64).

At the beginning of the Closing, Teachers provided a letter dated October 6, 1998 (the "Guarantee"). (TX 56) The parties had never discussed a guarantee prior to that time, and Teachers' offered it only after the parties' October 5 phone conversation, during which Ocwen definitively stated it would not close without the NDAs. (Trial Tr. (Grimaldi) 164). The Guarantee purported to be a form of assurance, pursuant to § 3.9 of the Agreement. (TX 56; Trial Tr. (Grimaldi) 165). The Guarantee, however, became effective only upon termination of the Retail Tenant Leases or if a

tenant were to take the position that its lease terminates as a result of the termination of the Master Lease; as such, it did not provide assurance that the Retail Tenant Leases would not terminate, as is required under § 3.9. (TX 56; Trial Tr. (Grimaldi) 165; (Reich) 311). Ocwen told Teachers that the Guarantee was not sufficient to satisfy § 3.9, and Ocwen refused to close on the grounds that Teachers failed to deliver the Key Retail Tenant NDAs. (Trial Tr. (Reich) 298-99; (Buerosse) 369-70; Simon Dep. 234-35, 270-71, 445-46).

CONCLUSIONS OF LAW

I. The Parties Behavior Both Prior And Subsequent To The Execution Of The Agreement Reveals That The Parties Intended Section 3.9 To Require The Key Retail Tenant NDAs.

*8 Perhaps the most persuasive evidence of the intention of the parties when entering an agreement is their course of performance under the agreement. _Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 44 (N.Y.App.Div.1999)._ "Generally speaking, the practical interpretation of a contract by the parties to it... before it comes to be the subject of controversy is deemed of great, if not controlling, influence." _Id._ (quoting _Old Colony Trust Co. v. Omaha, 230 U.S. 100 (1913)_). "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." _W. Alton Jones Foundation v. Chevron, 97 F.3d 29, 33 (2d Cir.1996)_ (quoting _Restatement (Second) of Contracts § 202_ cmt. g); see also _IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp., 26 F.3d 370, 374 (2d Cir.1994)_ ("There is no surer way to find out what parties meant, than to see what they have done") (quoting _Brooklyn Life Ins. Co. v. Dutcher, 95 U.S. 269 (1877)_).

The parties course of conduct makes it clear that both Teachers and Ocwen viewed § 3.9 as requiring delivery of the Key Retail Tenant NDAs. In reaching this conclusion, the court relies, inter alia, on the following findings of fact: (1) As soon as the Agreement (including § 3.9) was finalized, Ocwen reiterated its desire for both an Assignment and the NDAs; (2) the parties exchanged draft language for the NDAs and the Assignment, and Ocwen provided a list of "critical" retail tenants (the "Key Retail Tenants") from which NDAs should be sought; (3) Teachers did not object to the list of Key Retail Tenants or inform Ocwen that requesting 28 NDAs pursuant to § 3.9 assurances was unreasonable; (4) on September 8, Ocwen sent Teachers a fax clearly

revealing Ocwen's position that the Key Retail Tenant NDAs were required for the Closing, and Teachers did not object or otherwise indicate that the NDAs were not required for the Closing; (5) Teachers treated the NDAs the same as documents indisputably required for Closing; (6) on September 18, Grimaldi proposed an amendment to § 3.9 that would extend the Closing Date "to allow Teachers more time if necessary to obtain the NDAs"; (7) leading up to the Closing Date, representatives from Ocwen and Teachers had numerous conversations during which Ocwen inquired as to the status of the NDAs, and at no point did Teachers respond that it did not have an obligation to deliver the NDAs; (8) the Consent signed by SLSA confirms Teachers' obligation to deliver the NDAs prior to Closing; (9) the Closing Date was postponed twice more, in part to permit Teachers more time to procure the outstanding NDAs; and (10) no documents other than the Assignment and the Key Retail Tenant NDAs were ever requested by Ocwen pursuant to § 3.9.

In sum, the record clearly demonstrates that the parties intended § 3.9 to require delivery of the NDAs requested by Ocwen. Because Teachers failed to deliver the requested NDAs, Teachers did not fulfill its obligations under the Agreement and Ocwen is entitled to return of the Deposit.

II. Well Settled Contract Principles Require Section 3.9 To Be Construed Consistent With Ocwen's Interpretation

*9 When the parties dispute the meaning of a term in an agreement, the disputed term is to be interpreted in accordance with the meaning attached to the term by one party if, at the time the agreement was made, that party did not know or had no reason to know of any different meaning attached by the other, and the other knew the meaning attached by the first party. See Spence v. Superintendent, Great Meadow Correctional Facility, 219 F.3d 162, 168 (2d Cir.2000) (citing Restatement (Second) of Contracts § 201(2)(b)); see also Trinidad v. King, 1998 WL 823653, *6 (S.D.N .Y. Nov. 24, 1998) ("If the parties had conflicting understandings as to the meaning of a material term, there is [a] contract based on the meaning of the party who is unaware of the ambiguity if the other party knows or has reason to know of the ambiguity.") (internal quotations and citation omitted). Applying these principles to the situation at hand, it is clear that § 3.9 of the Agreement, which requires Teachers to provide assurances *satisfactory to Ocwen* that the Retail Tenant Leases will not terminate due to termination

of the Master Lease, must be interpreted to require NDAs, in accordance with Ocwen's understanding of that provision.

The record is clear that at the time the Agreement was signed (1) Ocwen understood section 3.9 to require Teachers to deliver NDAs, (2) Ocwen had no reason to know of an alternative understanding adopted by Teachers, and (3) Teachers was aware of Ocwen's understanding. During the period prior to the execution of the Agreement on August 13, 1998, Ocwen consistently expressed its concern that the termination of the Master Lease would terminate the Retail Tenant Leases. After being notified of the potential termination of the Master Lease, Ocwen informed Teachers that it would require additional assurances to alleviate this concern; in particular, Ocwen stated that it might require an Assignment as well as NDAs. During its discussions with Teachers, Ocwen explained that the NDAs would serve to complete the broken chain of privity resulting from the termination of the Master Lease--something that the Pre-existing Attornment Provisions and Assignment failed to do. Although Teachers acknowledged that it would be difficult to get the requested NDAs, Teachers recognized Ocwen's desire for them and represented to Ocwen that it would try and obtain them. Teachers did not inform Ocwen that it would not obtain the NDAs.

By the time the Agreement was signed, Teachers was aware that Ocwen did not consider the Pre-existing Attornment Provisions, even when combined with an Assignment, sufficient to allay its concerns. Indeed, Teachers agreed to section 3.9 knowing that Ocwen desired NDAs precisely for this reason. Although no agreement had been reached as to the form of the documents Ocwen needed or from which tenants NDAs would be solicited, it was clear that Ocwen desired some form and number of NDAs, the details of which would be specified after signing.

*10 Ocwen's understanding that § 3.9 required the provision of NDAs was confirmed by Simon's conversation with Grimaldi directly following execution of the Agreement; during this conversation, the parties agreed that Simon would prepare and forward to Grimaldi draft NDAs and a list of retail tenants from which Ocwen desired NDAs. Indeed, until Teachers' October 5 letter sent on the eve of Closing, all parties behaved as if the Key Retail Tenant NDAs were required for Closing. In sum, because Teachers was aware that Ocwen considered NDAs part of the "reasonable assurances" required under § 3.9, and because Ocwen was not aware and

had no reason to be aware of any different meaning attached to section 3.9 by Teachers, section 3.9 must be interpreted as requiring the delivery of NDAs.

### III. Ocwen Acted Reasonably In Requesting The Key Retail Tenant NDAs And Refusing To Close Without Them

Even if the parties cannot be said to have agreed that § 3.9 required the delivery of the Key Retail Tenant NDAs, Ocwen acted reasonably in refusing to close without the requested NDAs. Section 3.9 of the Agreement, which requires Teachers to provide assurances satisfactory to Ocwen that the Retail Tenant Leases will not be terminated, is a form of "satisfaction" clause. "When a contract conditions performance upon the satisfaction of one party and is ambiguous as to the applicable standard of satisfaction, courts generally require performance to the satisfaction of a reasonable man..." _Misano di Navigazione, SpA v. United States_, 968 F.2d 273, 274-75 (2d Cir.1992) (_citing Restatement (Second) of Contracts § 228 (1981)_) ("When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance...and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied.")). All parties agree that this objective standard, as opposed to a subjective standard, should be applied in this case.

Applying this standard, this court finds that Ocwen's refusal to close with only five of the 28 requested NDAs was objectively reasonable. In reaching this conclusion, the court puts itself in the position of Ocwen, the purchaser of a $116 million mortgage loan secured in part by a defaulted, soon-to-be terminated Master Lease and valued in part based upon the existing Retail Tenant Leases.

Upon being notified that the Master Lease would likely terminate, Ocwen's in-house senior counsel consulted with local Missouri counsel concerning the effects of this termination. Missouri counsel advised that the Master Lease would cause the Retail Tenant Leases to terminate, and that the Pre-existing Attornment Clauses were insufficient to prevent termination of the Retail Tenant Leases because there was a lack of privity between the borrower and the subtenants. Relying on the opinion of its Missouri counsel, as well as that of its own in-house counsel, Ocwen ultimately concluded that NDAs, in addition to an Assignment, were required to alleviate this

concern. Accordingly, Ocwen worked with its Missouri counsel and Teachers' representatives toward obtaining the desired NDAs.

*11 Significantly, Teachers did little to challenge the conclusions upon which Ocwen premised its request for NDAs. Upon hearing of Ocwen's concern regarding termination of the Retail Tenant Leases, Teachers--without conducting any legal research on the issue--dismissed it as a "legal-technical[ity]." (Trial Tr. (Grimaldi) 86). While Teachers' legal representative did state that Teachers continued to regard the Pre-existing Attornment Provisions as sufficient to address this concern, he did not represent that these Provisions, as a matter of law, would prevent the termination of the Retail Tenant Leases. (Trial Tr. (Grimaldi) 88). Moreover, although Teachers now claims that the Assignment in itself is sufficient to address Ocwen's concern and to satisfy § 3.9, Teachers did not impart this belief to Ocwen until after the October 5 phone conference during which Ocwen informed Teachers of its decision not to close without the Key Retail Tenant NDAs. [FN7] (Trial Tr. (Grimaldi) 163). Finally, although aware that Ocwen had consulted Missouri counsel regarding this issue and had concluded that it would require the 28 Key Retail Tenant NDAs plus an Assignment, Teachers never presented Ocwen with an opinion of Missouri counsel indicating NDAs were not necessary to address Ocwen's concerns, or that another combination of documents would suffice. Indeed, Teachers did not even contact Missouri counsel regarding this issue until well after the October 6 Closing Date had passed. (Trial Tr. (Grimaldi) 87). Instead, as outlined in detail above, Teachers actively worked with Ocwen to obtain the requested NDAs, both parties behaving as if the Key Retail Tenant NDAs were required, pursuant to § 3.9, to Close.

> FN7. Similarly, as indicated above, Teachers' last minute offer of a Guarantee does not make Ocwen's decision any less reasonable, as the Guarantee did not address Ocwen's specific concern regarding termination of the Retail Tenant Leases.

In sum, it was reasonable for someone in Ocwen's position to conclude that the delivery of five of the twenty-eight Key Retail Tenant NDAs, even if combined with the Assignment, was insufficient to assure Ocwen that the Retail Tenant Leases would not be terminated.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
2002 WL 237836 (S.D.N.Y.)
(Cite as: 2002 WL 237836 (S.D.N.Y.))

CONCLUSION

For the reasons stated above, this court directs entry
of judgment in favor of Ocwen (1) declaring that
Ocwen is entitled to return of the $3 million Deposit
paid into escrow pursuant to the Agreement, plus the
interest that has accrued on that amount, and (2)
dismissing Teachers' Complaint. The Clerk of Court
is directed to close this case.

SO ORDERED:

2002 WL 237836 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**EXHIBIT C**

Westlaw.

Not Reported in N.Y.S.2d                                                                    Page 1
2002 WL 1311648 (N.Y.Sup.App.Term), 2002 N.Y. Slip Op. 40231(U)
(Cite as: 2002 WL 1311648 (N.Y.Sup.App.Term))

Supreme Court, Appellate Term, New York,
2nd and 11th Judicial Districts.

T.W.A. TRADING, INC., Appellant,
v.
GOLD COAST FREIGHTWAYS, INC.,
Respondent.

No. 2001-900 K C

April 2, 2002.

Appeal by plaintiff from an order of the Civil Court, Kings County (B. Balter, J.), entered May 24, 2001, which denied its motion for partial summary judgment on the issue of liability and granted defendant's cross motion for summary judgment dismissing the complaint.

PRESENT:   PESCE,   P.J.,   ARONIN   and PATTERSON, JJ.:

MEMORANDUM.

*1 Order unanimously affirmed without costs.

After reviewing the record and issues raised on this appeal, we find that the defense of ratification and waiver was established sufficiently to warrant the court as a matter of law to direct judgment in favor of defendant (see, CPLR 3212[b]). It is well settled that a shipper's unqualified and unconditional acceptance of a check that was collected by its carrier in payment of merchandise, contrary to the shipping instructions, ratifies the carrier's conduct, and the shipper thereby waives any claim it may have against the carrier for breach of contract (see, Rathbun v. Citizens' St. Co. of Troy, 76 N.Y. 376; Givoldi, Inc. v. United Parcel Serv., 286 A.D.2d 220, 729 N.Y.S.2d 25; Freedman & Slater, Inc. v. Great Lakes Forwarding Corp., 7 A.D.2d 978, 183 N.Y.S.2d 684; Compuknit Ind. v. Mercury Motors Express, 72 Misc.2d 55, 337 N.Y.S.2d 918). Thus, the court's award of summary judgment in favor of defendant should not be disturbed.

2002 WL 1311648 (N.Y.Sup.App.Term), 2002 N.Y.

Slip Op. 40231(U)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works