responsible for licensing UNIX System V all state that AT&T intended Section 2.01 to mean the same thing for all its licensees. (See Wilson Decl. ¶ 27; Frasure Decl. ¶ 24; DeFazio Decl. ¶ 20; Kistenberg Decl. ¶ 22; Vuksanovich Decl. ¶ 27.)

112. As Mr. Wilson put it:

> "Whether or not we entered into a side letter or other agreements with our licensees to clarify the treatment of modifications and derivative works, or altered the language of Section 2.01, AT&T's and USL's intent was always the same. We never intended to assert ownership or control over any portion of a modification or derivative work that was not part of the original UNIX System V source code provided by AT&T or USL. The licensee was free to use, copy, distribute or disclose its modifications and derivative works, provided that it did not use, copy, distribute or disclose any portions of the original UNIX System V source code provided by AT&T or USL except as permitted by the license agreements."

(Wilson Decl. ¶ 27.)

113. When informed of the interpretation of the IBM and Sequent Software Agreements that SCO is advancing in this case, the individuals from AT&T who were involved in negotiating the agreements state unequivocally that SCO is wrong. Mr. Wilson states:

> "In my view, any claim that the IBM Software Agreement and the Sequent Software Agreement prohibit the use, export, disclosure or transfer of any code other than UNIX System V code is clearly wrong. Not only did we at AT&T not intend the agreements to be read that way, but we also went out of our way to assure our licensees that that is not what the agreements meant."

(Wilson Decl. ¶ 30.)

Mr. Frasure states:

> "[SCO's] interpretation of the IBM Software Agreement and the Sequent Software Agreement is impossible to reconcile with what I, and I believe others at AT&T Technologies, understood our software agreements to mean. I never suggested, or would have thought to suggest, to our customers that the agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose

33

any UNIX System V code.  Moreover, I do not believe that our customers (particularly large ones like IBM) would have entered into agreements that placed such restrictions on their use of code that they developed.  In fact, some, including IBM, specifically said so."

(Frasure Decl. ¶ 29.)

Mr. DeFazio states:

"[SCO's] claims are, in my view, inconsistent with the provisions of the license agreements generally and the IBM Related Agreements and the Sequent Related Agreements in particular.  I do not believe that anyone at AT&T, USL or Novell intended these agreements to be construed in this way.  In all cases, modifications and licensees' contributions to derivative works are not subject to the confidentiality and other restrictions contained in the license agreements (except for any protected UNIX System V source code actually included therein) because they are owned by the licensees."

(DeFazio Decl. ¶ 31.)

Mr. Kistenberg states:

"I understand that plaintiff claims that Sequent has breached its license agreement with AT&T Technologies by improperly using, exporting, disclosing or transferring Dynix source code, irrespective of whether Sequent has disclosed any specific protected source code from UNIX System V.  At least as I understand the Sequent Agreements, that is simply not consistent with what the parties intended by the agreements."

(Kistenberg Decl. ¶ 24.)

Mr. Vuksanovich states:

"I understand that plaintiff claims that IBM and Sequent have breached their license agreement with AT&T Technologies by improperly using, exporting, disclosing or transferring AIX and Dynix/PTX source code, irrespective of whether IBM or Sequent has disclosed any specific protected source code from UNIX System V.  At least as I understand the IBM Agreements and the Sequent Agreements, that is completely inconsistent with what the parties intended and discussed during the negotiation of the agreements."

(Vuksanovich Decl. ¶ 30.)

**B.**     **Contemporaneous Documentary Evidence.**

114.     Consistent with this testimony regarding the IBM and Sequent Software Agreements, AT&T specifically communicated to all of its UNIX System V licensees at the time, including IBM and Sequent, that Section 2.01 of the standard software agreement should not be construed to mean that AT&T had the right to control the use and disclosure of any code created entirely by its licensees.  (See Wilson Decl. ¶¶ 20-21, Frasure Decl. ¶ 19; Ex. 35 at 64:22-66:3; Kistenberg Decl. ¶ 14; Vuksanovich Decl. ¶ 17.)

115.     In response to concerns raised by numerous of its UNIX System V licensees, AT&T notified all licensees, through seminars hosted by Mr. Frasure and in the April 1985 edition of AT&T's "$ echo" newsletter, that AT&T intended to make certain changes to the standard UNIX System V software agreement to "clarify ownership of modifications or derivative works prepared by a licensee" under Section 2.01.  (Ex. 37 at 5 (emphasis added); see also Ex. 35 at 64:22-66:3, 67:16-73:15.)  These changes were intended only to clarify the original meaning of Section 2.01, not to change it.  (See Wilson Decl. ¶¶ 21-23; Frasure Decl. ¶¶ 19-20; Kistenberg Decl. ¶¶ 17-18; Vuksanovich Decl. ¶¶ 21-22.)

116.     Mr. Frasure testified that at the seminars he hosted, he made clear what AT&T's original intent was with respect to Section 2.01:

> "Q:  And can you just explain for me what it is you told the licensees about Section 2.01?
>
> A:  Just that we, AT&T had no intent to claim ownership to that software code that they developed themselves.  In essence that's what we told them to the extent it did not contain Unix code.  But if they developed it, if they wrote it, it was their code.  They owned that."

(Ex. 35 at 73:6-14.)

117.     The $ echo newsletter was "published by the AT&T Software Sales and Licensing organization for licensees of UNIX System V" and was intended "to reach all UNIX System V licensees through one defined medium" and to keep them "abreast of any product

announcements, policy changes, company business and pricing structures". (Ex. 37; see also Ex.

34 at 66:11-69:3; Ex. 35 at 64:22-66:3, 66:20-67:5.) The guidance published in the newsletter

*was intended to reach, and to apply to, all of AT&T's UNIX System V licensees.* (See Frasure

Decl. ¶ 19; Ex. 35 at 64:22-66:3; Wilson Decl. ¶ 21; Ex. 34 at 69:20-70:15; Kistenberg Decl. ¶

15; Vuksanovich Decl. ¶ 19.)

      118.    Subsequently, in the August 1985 edition of *$ echo*, AT&T announced it had

revised Section 2.01 of its standard software agreement to include language to "assure licensees

that AT&T will claim no ownership in the software that they developed—only the portion of the

software developed by AT&T". (Ex. 38 at 5 (emphasis added)); Ex. 35 at 73:22-76:5.)

      119.    As clarified to better reflect this meaning, Section 2.01 of the standard UNIX

System V software agreement provided as follows:

> "AT&T-IS grants to LICENSEE a personal, nontransferable and
> nonexclusive right to use in the United States each SOFTWARE
> PRODUCT identified in the one or more Supplements hereto, solely for
> LICENSEE's own internal business purposes and solely on or in
> conjunction with DESIGNATED CPUs for such SOFTWARE
> PRODUCT. Such right to use includes the right to modify such
> SOFTWARE PRODUCT and to prepare derivate works based on such
> SOFTWARE PRODUCT, provided that any such modification or
> derivative work that contains any part of a SOFTWARE PRODUCT
> subject to this Agreement is treated hereunder the same as such
> SOFTWARE PRODUCT.  AT&T-IS claims no ownership interest in any
> portion of such a modification or derivative work that is not part of a
> SOFTWARE PRODUCT."

(E.g., Ex. 39 (Software Agreement Number SOFT-000302, between AT&T Information

Systems, Inc. and The Santa Cruz Operation, dated May 6, 1987) (emphasis added); see Wilson

Decl. ¶ 25; Frasure Decl. ¶ 22; Ex. 35 at 76:6-79:12; DeFazio Decl. ¶ 19; Kistenberg Decl. ¶¶ 19-

20; Vuksanovich Decl. ¶¶ 23-24.)

      120.    This revised language of Section 2.01 makes plain that AT&T did not claim a

right to control in any manner original code created by its licensees, and is present in all standard

UNIX System V licenses executed after August 1985. (See Frasure Decl. ¶¶ 22-24; Ex. 35 at 79:1-23; Wilson Decl. ¶¶ 25-27.) Mr. Frasure described his understanding of the revised language at his deposition:

> "Q: . . . [W]hat is your understanding of what AT&T intended and told its licensees Section 2.01 means?
>
> A: It means that any source code developed by the licensee, originated by the licensee, is the property of the licensee. They own that source code, and AT&T makes no claim of ownership in that source code.
>
> Q: Was it the case then from AT&T Technologies' perspective that the licensee could do whatever it wanted with the source code that it developed?
>
> . . .
>
> A: Yes."

(Ex. 35 at 79:1-23.)

121.    As Mr. Wilson and Mr. Frasure again note, however, this revised language was intended only to clarify the original meaning of Section 2.01, not to change it.

Mr. Wilson states:

> "As we communicated at our seminars and in our newsletters to UNIX System V licensees, this new language was intended only to clarify the language in the original Section 2.01, not change its meaning. My licensing group interpreted the language of the original Section 2.01 and this revised Section 2.01 in exactly the same way."

(Wilson Decl. ¶ 25.)

Mr. Frasure states:

> "Again, as we made clear in the newsletter, the revised language was added only to assure licensees that AT&T Technologies did not claim any right to its licensees' original work contained in modifications or derivatives of UNIX System V. The language did not represent in any way a departure from the original intent of Section 2.01."

(Frasure Decl. ¶ 21; see also Kistenberg Decl. ¶ 20; Vuksanovich Decl. ¶ 24.)

122.   Mr. Frasure explained in particular that the revised language of Section 2.01 had the same meaning as the original language of Section 2.01 that appears in the IBM Software Agreement and the Sequent Software Agreement:

> "Q: Do you understand Section 2.01 as it appears in the Santa Cruz Agreement, to mean anything different than the Section 2.01 in the IBM Agreement that we looked at earlier?
>
> . . .
>
> A: There is no difference in meaning between the two paragraphs.
>
> Q: . . . Do you believe there to be any difference in meaning between Section 2.01 as it appears in the Santa Cruz Agreement and Section 2.01 as it appears in the Sequent Agreement that we looked at earlier?
>
> . . .
>
> A: No. There is no difference."

(Ex. 35 at 80:6-23.)

123.   Moreover, this revised language was intended to apply to all of AT&T's UNIX System V licensees, not just those licensees that executed a new agreement containing the revised Section 2.01. (See Wilson Decl. ¶ 26; Frasure Decl. ¶ 23; Kistenberg Decl. ¶ 21; Vuksanovich Decl. ¶ 26.) Although, as the $ echo newsletter states, AT&T made specimen copies of the revised software agreement available, AT&T did not require its licensees to enter into new agreements. (See id.) Rather, AT&T "intended for all of our UNIX System V licensees to receive the benefit of the changes and clarifications we outlined at our seminars and in the newsletter". (Wilson Decl. ¶ 26; see also Frasure Decl. ¶ 23; Kistenberg Decl. ¶ 21; Vuksanovich Decl. ¶ 26.)

124.    Mr. Frasure elaborated at his deposition:

"A:  We told [UNIX System V licensees] specimen copies were available if, if my account executives [or] licensing people were told that if a licensee called, that they could receive a specimen copy and it would apply, the language in the new specimen copy.  They, that in effect would be the new language of their agreement, although they did not have to sign that.

Some licensees, for whatever reason, wanted to sign a new agreement, and we upgraded their agreement to the new language at no charge.  It was just a matter of signing the new agreement, providing that to them.

But we wanted everyone to know what the changes were and they would have the benefit of that language.

Q:  Did a licensee have to execute a new agreement to get the benefit of the changes?

. . .

A:  No."

(Ex. 35 at 82:20-83:17.)

125.

REDACTED

126.

REDACTED

**VIII.   Novell's Waiver Of Any Purported Breaches Of Contract By IBM And Sequent.**

127.    After this lawsuit was commenced, Novell sent a series of letters to SCO that explicitly waived the purported breaches of contract SCO has asserted IBM committed.  (See Exs. 41, 42, 43 and 44.)

128.    On October 7, 2003, in a letter from Joseph A. LaSala, Jr. to Ryan Tibbitts, Novell directed SCO to waive any purported right to assert a breach of the IBM Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 41.)  The letter states:

> "[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of the Agreements.  Novell directs SCO to take this action by noon, MST, on October 10, 2003, and to notify Novell that it has done so by that time."

(Id.)

129.    In the letter, Novell informed SCO that its position that IBM's own homegrown code "must be maintained as confidential and subject to use restrictions is contrary to the agreements between AT&T and IBM, including Amendment X, to which Novell is a party". (Ex. 41.)

130.    According to Novell, the agreements between AT&T and IBM provide "a straightforward allocation of rights":

> "(1) AT&T retained ownership of its code from the Software Products ('AT&T Code'), and the Agreements' restrictions on confidentiality and use apply to the AT&T Code, whether in its original form or as incorporated in a modification or derivative work, but (2) IBM retained ownership of its own code, and the Agreements' restrictions on confidentiality and use do not apply to that code so long as it does not embody any AT&T Code".

(Ex. 41.) Novell concluded that any other interpretation "would defy logic as well as the intent of the parties". (Id.)

131.    After SCO failed to follow Novell's instruction, on October 10, 2003, Novell expressly waived any purported right of SCO's to assert a breach of the IBM Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 42.) Novell states in its letter to SCO:

> "Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T under the license agreements between AT&T and IBM, itself as subject to the confidentiality obligations or use restrictions of the Agreements."

(Id.)

132.    Additionally, on February 6, 2004, in a letter from Mr. LaSala to Mr. Tibbitts, Novell further directed SCO to waive any purported right to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 43.) The letter states:

> "[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as

41

> subject to the confidentiality obligations or use restrictions of Sequent's SVRX license.
>
> Novell directs SCO to take this action by noon, MDT, on February 11, 2004, and to notify Novell that it has done so by that time."

(Id.)

133.    In the letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software Agreement was misplaced, and stated that "SCO's interpretation of section 2.01 is plainly contrary to the position taken by AT&T, as author of and party to the SVRX licenses". (Ex. 43.)

134.    After SCO failed to follow Novell's instruction, on February 11, 2004, Novell expressly waived any purported right of SCO's to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (Ex. 44.) Novell states in its letter to SCO:

> "Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license."

(Id.)

135.    Novell also waived any purported right of SCO to terminate the IBM Sublicensing Agreement. (See Exs. 45, 46.)

136.    On June 9, 2003, in a letter from Jack L. Messman to Darl McBride, Novell informed SCO that under the terms of Amendment X, SCO did not have the right to terminate

any of IBM's rights under the Sublicensing Agreement to distribute its AIX software program.

(Ex. 45.) The letter states:

> "Pursuant to Amendment No. X, however, Novell and SCO granted IBM the 'irrevocable, fully paid-up, perpetual right' to exercise all of the rights under the IBM SVRX Licenses that IBM then held. IBM paid $10,125,000 for the rights under Amendment No. X. Novell believes, therefore, that SCO has no right to terminate IBM's SVRX Licenses, and that it is inappropriate, at best, for SCO to be threatening to do so."

(Id.)

137.    Novell further directed SCO to waive any purported right under its SVRX

Licenses with IBM to terminate IBM's right to distribute AIX under the IBM Sublicensing

Agreement:

> "[P]ursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell hereby directs SCO to waive any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM. Novell directs SCO to take this action by noon, MDT, June 12, 2003, and to notify Novell that it has done so by that time."

(Id.)

138.    After SCO failed to follow Novell's instruction, on June 12, 2003, Novell

expressly waived any purported right of SCO's to terminate IBM's rights under the IBM

Sublicensing Agreement. (Ex. 46.) Novell states in its letter to SCO:

> "Accordingly, pursuant to Section 4.16(b) of the Asset Purchase Agreement, Novell, on behalf of The SCO Group, hereby waives any purported right SCO may claim to terminate IBM's SVRX Licenses enumerated in Amendment X or to revoke any rights thereunder, including any purported rights to terminate asserted in SCO's letter of March 6, 2003 to IBM."

(Id.)

IX.    **SCO Disclosed The Code It Claims Is At Issue.**

139.    Prior to its filing this lawsuit, SCO's business included the distribution of the Linux operating system, the development and marketing of software based on Linux, and the provision of Linux-related services to customers.  (Ex. 2 ¶ 31; Ex. 9 at 5-9.)

140.    In 2002, SCO formed the UnitedLinux partnership with three other Linux distributors to streamline Linux development and certification around a global, uniform distribution of Linux designed for business.  (Ex. 47 (5/30/02 SCO Press Release).)

141.    UnitedLinux released its first Linux distribution, "UnitedLinux Version 1.0" in November 2002.  (Ex. 48 (11/19/02 UnitedLinux press release).)  UnitedLinux Version 1.0 was marketed and sold by each of the partners in UnitedLinux under its own brand name.  (See id.)

142.    SCO's release of UnitedLinux 1.0 was called "SCO Linux 4".  (Ex. 49 (11/19/02 SCO press release).)

143.    Just two months before SCO filed its Complaint against IBM, UnitedLinux signed IBM as a technology partner  (Ex. 50 (1/14/03 UnitedLinux press release).)  IBM's relationship with UnitedLinux included, among other things, joint marketing activities for UnitedLinux products.  (See id.)

144.    As SCO admits, its distributions of Linux, including its UnitedLinux distribution, contain code that SCO claims IBM improperly contributed to Linux.  (See Ex. 27 at 43.)  In its Revised Response to IBM's interrogatories, SCO stated that the code it identified "is included in any product that contains the Linux kernel 2.4 and above, which is sold or distributed by hundreds of entities around the world", including by SCO.  (Id.)  In particular, SCO conceded that its "SCO Linux Server 4.0" products contain such code.  (Id.)

145.    Although SCO fails to identify them in its interrogatory responses, SCO's earlier Linux distributions also contain code SCO claims IBM improperly contributed to Linux.  (See Exs. 51, 52.)  Among other products, SCO's "OpenLinux Server 3.1.1" and "OpenLinux

Workstation 3.1.1" products, which were released in January 2002, both include the Linux 2.4 kernel. (See Ex. 51 (1/24/02 Product Announcement for OpenLinux Server 3.1.1) at 2; Ex. 52 (1/24/02 Product Announcement for OpenLinux Workstation 3.1.1) at 2; Ex. 53 (30(b)(6) Deposition of Erik W. Hughes) at 16:18-19:18.)

146.    In fact, SCO specifically advertised to its customers that its distributions of Linux included some of the very technology it now complains IBM should not have contributed to Linux. (See Exs. 51, 52, 54, 55, 56.)

147.    For example, in its product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO specifically advertised that the products included new *features such as "better SMP scaling up to 32 processors" and "journaling file system support".* (Ex. 51 at 2; Ex. 52 at 2.)

148.    Similarly, in its product announcement for "SCO Linux Server 4.0", which was based on UnitedLinux Version 1.0, SCO noted that:

> "The core of SCO Linux Server 4.0 is the 2.4.19 Linux kernel. New features include broadened USB support, Logical Volume Manager, improved journaling file system support, POSIX-ACL'S, new O(1) schedule (improves SMP support), Asynchronous I/O, Enterprise Volume Management Systems (EVMS), PCI Hot plug support on supported hardware, NUMA support and many other performance enhancing capabilities".

(Ex. 54 (Product Announcement) at SCO1270430 (emphasis added).)

149.    Likewise, SCO's Technical Overview of SCO Linux 4.0 emphasized that its product included "POSIX Asynchronous I/O", "EVMS", and "JFS (Journaling File System Developed by IBM)". (Ex. 55 (Technical Overview) at SCO1307698-701 (emphasis added).)

150.    Although SCO claims to have "discontinued" distributing any products containing the source code it claims IBM should not have disclosed, it continued to do so after it filed this lawsuit. (See Exs. 53 at 92:1-23; 56, 57, 58, 59.)

151.    For example, SCO released its "SCO Linux Server 4.0 for the Itanium Processor Family" distribution on April 14, 2003, after SCO filed its original Complaint. (See Ex. 56 (Product Announcement).)  In the product announcement, SCO touted the new features of this release, including "improved journaling file system support", "Asynchronous I/O" and "Enterprise Volume Management Systems (EVMS)".  (Id. at SCO1269793.)

152.


REDACTED


153.    Moreover, SCO made available to the public and continues to make available (as recently as August 4, 2004) the Linux 2.4 kernel for download from its website.  (See Bennett Decl. ¶¶ 4-5, 7.)  The version of Linux available from SCO's website includes code SCO claims IBM disclosed in violation of its contracts.  (See Ex. 27 at 43; Bennett Decl. ¶ 5.)

154.    SCO distributed source code for the Linux 2.4 kernel, which is contained in SCO's OpenLinux Server 3.1.1, OpenLinux Workstation and Linux Server 4.0 products, under the terms of the General Public License ("GPL").  (Ex. 60; Ex. 53 at 75:9-12.)  The terms of the GPL permit licensees freely to use, copy, distribute and modify whatever code is provided thereunder.  (Ex. 60.)

### Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to a judgment as a matter of law."  In re Grandote Country Club Co., 252 F.3d 1146, 1149 (10th Cir. 2001); see also Banks v. Rite Aid

<u>Corp.</u>, No. 1:98CV115K, 2001 WL 1806857, at *1 (D. Utah Mar. 15, 2001) (attached hereto as Exhibit A).

Although the Court must view the record in the light most favorable to the non-moving party, the non-moving party cannot rely on unsupported conclusory allegations to create a genuine issue of fact. See <u>In re Grandote</u>, 252 F.3d at 1149. "To withstand summary judgment, the nonmoving party 'must come forward with specific facts showing that there is a genuine issue for trial'". <u>Id.</u> at 1150 (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

<u>Argument</u>

I.     IBM's UNIX SYSTEM V LICENSES DO NOT, AS A MATTER OF LAW, RESTRICT IBM FROM DISCLOSING ITS OWN HOMEGROWN CODE.

As stated above (at ¶¶ 49-65)[5], SCO asserts four causes of action for breach of contract (Counts 1-4) against IBM. SCO's claims concern a set of nearly twenty-year-old licensing agreements for the UNIX System V operating system—the IBM Software Agreement, the IBM Sublicensing Agreement, the Sequent Software Agreement and the Sequent Sublicensing Agreement—and seek redress for a laundry list of alleged breaches. (¶¶ 49-51, 64.) At bottom, however, SCO's contract claims rest entirely upon its (unfounded) charge that IBM improperly contributed certain source code to Linux in violation of the two Software Agreements.[6]

By their terms, the Software Agreements limit the circumstances under which IBM can use and disclose, and thus contribute to Linux, source code from the "SOFTWARE PRODUCT" that IBM licensed from AT&T—UNIX System V. (¶¶ 51, 55.) According to SCO's

---

[5]  The undisputed facts are cited herein (in the "Argument" section of this memorandum) as "¶ __", referring to the relevant paragraph number(s) in the foregoing "Statement of Undisputed Facts".

[6]  SCO's claims for breach of the IBM and Sequent Sublicensing Agreements are merely derivative of and depend entirely upon its claims relating to the IBM and Sequent Software Agreements. (¶¶ 64-65.)

interpretation, however, the Software Agreements go even further and also limit the circumstances under which IBM can use and disclose any source code from its own AIX and Dynix programs, because those programs are alleged to be derived from UNIX System V. (¶¶ 62-63.)

It is undisputed that IBM has not contributed to Linux <u>any</u> source code from the "SOFTWARE PRODUCT" IBM licensed from AT&T nearly twenty years ago—UNIX System V. (¶¶ 31-48, 58 (discussing SCO's failure and refusal to identify any UNIX System V code IBM is alleged to have misused).) Moreover, although SCO alleges that IBM has taken certain code from AIX and Dynix and improperly contributed it to Linux, SCO does not dispute that IBM has not contributed its <u>entire</u> AIX and Dynix programs to Linux. (¶¶ 42-43, 48.) Thus, SCO's claims for breach of contract depend entirely upon whether the IBM and Sequent Software Agreements in fact preclude IBM from contributing to Linux original code that can be found in AIX or Dynix, but is separate from (and does not include) any UNIX System V source code. (¶¶ 62-63.)

As discussed below, the IBM and Sequent Software Agreements do not, as a matter of law, preclude IBM from contributing its or Sequent's homegrown code to Linux. The plain language of the agreements, the extrinsic evidence of the meaning of the agreements and general principles of public policy support only one conclusion—that IBM owns and is free to disclose any source code that it or Sequent creates, so long as that code does not contain UNIX System V code. Accordingly, partial summary judgment should be entered in favor of IBM on SCO's contract claims.

A.      The IBM And Sequent Software Agreements, By Their Plain And Unambiguous
        Terms, Do Not Pertain To The Code Allegedly Contributed By IBM To Linux.

The IBM and Sequent Software Agreements, which (as stated) are the cornerstone of

SCO's contract case, are governed by New York law.  (¶ 66.)[7]  Under New York law, when a

contract's language is "clear, unequivocal and unambiguous, the contract is to be interpreted by

its own language".  R/S Assoc. v. New York Job Dev. Auth., 98 N.Y.2d 29, 32 (N.Y. 2002).  It is

the Court's role, as a matter of law, to interpret unambiguous contracts.  See American Express

Bank Ltd. v. Uniroyal, Inc., 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990); Rehberger v.

Richtberg, 744 N.Y.S.2d 477, 478 (N.Y. App. Div. 2002).

Based upon the plain language of the IBM and Sequent Software Agreements, IBM is

entitled to summary judgment as a matter of law on SCO's contract claims.  There is no genuine

issue of material fact that the agreements do not preclude IBM from contributing to Linux (or

otherwise disclosing) source code that may be found in AIX or Dynix but is separate from (and

does not include) any UNIX System V source code.

The provisions of the IBM and Sequent Software Agreements that IBM is alleged to have

breached pertain to "SOFTWARE PRODUCT[S]".  (¶ 51.)  Specifically:

- Section 2.01 grants licensees a "personal, nontransferable and
  nonexclusive right to use in the United States each SOFTWARE
  PRODUCT identified in the one or more Supplements hereto, solely for
  LICENSEE's own internal business purposes . . . ."

- Section 2.05 provides:  "No right is granted by this Agreement for the use
  of SOFTWARE PRODUCTS directly for others, or for any use of
  SOFTWARE PRODUCTS by others."

---

[7]  As SCO's contract claims are before this Court based on diversity jurisdiction, Utah choice of
law rules determine the applicable law.  See Elec. Distribs., Inc. v. SFR, Inc., 166 F.3d 1074,
1083 (10th Cir. 1999).  Utah law provides that the parties' choice of law in a contract should be
respected.  See id. at 1083-84; see also Glezos v. Frontier Inv., 896 P.2d 1230, 1234 (Utah Ct.
App. 1995).

- Section 4.01 provides: "LICENSEE agrees that it will not, without the prior written consent of AT&T, export, directly or indirectly, SOFTWARE PRODUCTS covered by this Agreement to any country outside of the United States."

- Section 7.06(a) provides: "LICENSEE agrees that it shall hold all parts of the SOFTWARE PRODUCTS subject to this Agreement in confidence for AT&T."

- Section 7.10 provides: "Except as provided in Section 7.06(b), nothing in this Agreement grants to LICENSEE the right to sell, lease or otherwise transfer or dispose of a SOFTWARE PRODUCT in whole or in part."

(Exs. 11 & 12.)

The term "SOFTWARE PRODUCT" as defined in the IBM and Sequent Software Agreements pertains only to the UNIX System V computer program (and certain related materials, such as product documentation, that are identified in the Schedules attached to the agreements). (¶¶ 56-57.) It is undisputed that IBM has not breached any of the above provisions as they relate to a SOFTWARE PRODUCT. As stated above, SCO has not identified (and has refused to identify) any UNIX System V code or related materials that IBM has improperly used, exported, or disclosed in violation of Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10. (¶¶ 31-48, 58.) In response to IBM's interrogatories asking SCO to identify with specificity the lines of code SCO claimed IBM misused in violation of its contracts, SCO did not identify a single line of UNIX System V code. (¶¶ 31-35.) Even after IBM moved to compel complete responses to IBM's interrogatories, resulting in two court orders directing SCO to "identify and state with specificity the source code(s) that SCO is claiming form the basis of their action against IBM", SCO still failed to identify any UNIX System V code. (¶¶ 36-48.) Indeed, the only UNIX System V code SCO has identified to date is UNIX System V code SCO claims to have discovered in AIX and Dynix, but which SCO does <u>not</u> assert IBM has misused in violation of its licenses. (¶¶ 7, 61.)

Instead, to support its claim that IBM breached the IBM and Sequent Software Agreements, SCO appears to rely on a single sentence in Section 2.01 of the agreements relating to certain "resulting materials". As originally drafted, Section 2.01 grants licensees "the right to modify such SOFTWARE PRODUCT and to prepare derivative works based on such SOFTWARE PRODUCT, provided the resulting materials are treated hereunder as part of the original SOFTWARE PRODUCT". (Ex. 10 § 2.01; Ex. 11 § 2.01.) Based on this language, SCO claims that all of the tens of millions of lines of code contained in IBM's AIX and Dynix programs must be treated like AT&T's UNIX System V program, whether or not portions of that code, standing alone, consist of UNIX System V code or could be considered modifications or derivative works based on UNIX System V. (¶¶ 62-63.)

SCO's interpretation of the IBM and Sequent Software Agreements is not supported by the plain language of Section 2.01 as it was originally drafted. Under even the most expansive reading of the original language of Section 2.01, the "resulting materials" that must be treated as part of the SOFTWARE PRODUCT can consist only of modifications or derivative works of AT&T's UNIX System V source code. The term "resulting materials" cannot be construed to include code that is itself neither a modification of UNIX System V code nor a derivative work of UNIX System V code. The plain language of Section 2.01 precludes such an interpretation.

SCO's focus on IBM's AIX and Dynix programs is therefore misguided. SCO appears to contend that both AIX and Dynix should be considered "resulting materials", because they are (allegedly) modifications or derivative works based on UNIX System V. Whether AIX and Dynix as a whole (each of which consists of tens of millions of lines of source code) are modifications or derivative works of UNIX System V, and are themselves subject to the use and disclosure restrictions in the Software Agreements, is irrelevant. SCO does not—because it

51

cannot—allege that IBM has contributed its <u>entire</u> AIX operating system (which contains approximately 63 million lines of code) and its <u>entire</u> Dynix operating system (which contains *approximately 30 million lines of code) to Linux.* (¶¶ 6, 48.) *Instead, as set forth above (at ¶¶ 42-43),* SCO's case rests solely on IBM's alleged misuse of some comparatively small amount of code (less than 27,000 lines) purportedly contained in AIX and Dynix for technologies such as Read Copy Update ("RCU"), Journaling File System ("JFS"), Enterprise Volume Management System ("EVMS") and asynchronous input/output ("AIO"). SCO's contract claims fail for this reason alone. Even under a broad reading of the original language of Section 2.01 of the agreements, SCO must show that IBM misused code that can be considered a modification or a derivative work based on UNIX System V code. SCO, however, fails to offer any evidence that IBM's purported contributions to Linux (such as RCU, JFS, EVMS and AIO)—extracted from AIX and Dynix and standing alone—are modifications or derivative works of any code in UNIX System V. (¶¶ 31-48, 58-60.)[8] When SCO at last purported to identify the code it claims IBM improperly contributed to Linux—only after IBM had filed two motions to compel seeking such information, and Judge Wells had ordered SCO to provide it—SCO made no attempt to show that such code was a modification or a derivative work of UNIX System V. (¶¶ 42-43.) Informed by IBM of this deficiency, SCO flatly refused to supplement its responses, arguing that

---

[8] A derivative work, under federal copyright law, is "a work based upon one or more preexisting works". 17 U.S.C. § 101. "A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." <u>Id.</u> A derivative work, therefore, "must incorporate in some form a portion of the [preexisting] copyrighted work" and "must be substantially similar to the [preexisting] copyrighted work". <u>Vault Corp. v. Quaid Software Ltd.</u>, 847 F.2d 255, 267 (5th Cir. 1988); <u>accord Litchfield v. Spielberg</u>, 736 F.2d 1352, 1357 (9th Cir. 1984). SCO does not identify any UNIX System V code that is allegedly incorporated into or is substantially similar to any of the code IBM is alleged to have improperly contributed to Linux. (¶¶ 31-48, 58-61.) To the contrary, the only UNIX System V code SCO claims to have discovered in AIX and Dynix is <u>not</u> part of the code that SCO claims IBM improperly contributed to Linux. (¶¶ 7, 61.)

"IBM keeps insisting on something that is not part of SCO's claims, so it should come as no surprise that files or lines of code in System V have not been identified". (¶¶ 44-45.) Indeed, although Judge Wells issued a second order directing SCO specifically "to provide and identify all specific lines of code from Unix System V from which IBM's contributions from AIX or Dynix are alleged to be derived", SCO still fails to offer any evidence that IBM's alleged contributions from AIX and Dynix are modifications or derivative works of any code in UNIX System V. (¶¶ 46-48.)

In addition, Dr. Randall Davis of MIT analyzed the specific lines of code IBM is alleged to have improperly contributed to Linux from AIX and Dynix and concluded that such code does not contain any portion of source code from UNIX System V and is not substantially similar to any source code in UNIX System V. (See Davis Decl. ¶ 45.) Accordingly, Dr. Davis concluded that such lines of IBM code are neither modifications nor derivative works of UNIX System V, as is explained in more detail in his declaration. (See Davis Decl.) Thus, regardless of whether they can be (or were once) found within AIX or Dynix, IBM's alleged contributions to Linux cannot themselves be considered modifications or derivative works based on UNIX System V, and are not subject to any of the provisions of the IBM and Sequent Software Agreements.

Moreover, SCO's argument in any case ignores the plain language of the full agreements that IBM entered into with AT&T concerning UNIX System V and of which AT&T intended for both IBM and Sequent to have the benefit. AT&T specifically agreed in its Side Letter with IBM that, under Section 2.01, AT&T intended only to assert ownership over the "<u>portion or portions of SOFTWARE PRODUCTS included in any such modification or derivative work</u>" prepared by or for IBM. (¶ 52 (emphasis added).)[9] The language of the Side Letter cannot be any more clear

---

[9] Under New York law, the Side Letter (which was executed at the same time as the IBM Software Agreement) must be read together with the IBM Software Agreement. See <u>This Is Me, Inc. v. Taylor</u>, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."); accord <u>In re Holocaust Victim Assets Litig.</u>, 256 F. Supp. 2d 150, 153 (E.D.N.Y. 2003) ("Where several instruments constitute part of the

that AT&T only intended to restrict IBM's use of the UNIX System V code that was <u>included in</u> IBM's modifications and derivative works based on UNIX System V. AT&T plainly, therefore, did not intend to restrict IBM's use of the portions of IBM's modifications and derivative works that <u>did not</u> include UNIX System V code.

Also, as discussed further below (at Section I.B.2), AT&T represented to all of its licensees, including both IBM and Sequent, that they were to have the benefit of the revised language in Section 2.01, which was intended merely to clarify Section 2.01's original meaning. (¶¶ 114-124.) This clarified language provided:

> "AT&T-IS grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivate works based on such SOFTWARE PRODUCT, <u>provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT. AT&T-IS claims no ownership interest in any portion of such a modification or derivative work that is not part of a SOFTWARE PRODUCT."</u>

(Ex. 39 (emphasis added).) As with the Side Letter, this clarified version of Section 2.01 makes plain that AT&T did not intend to assert any rights to "any portion" of IBM's or Sequent's modifications or derivative works that is not part of the UNIX System V code licensed from AT&T.

---

same transaction, they must . . . be interpreted together.") (quoting <u>RJE Corp. v. Northville Indus. Corp.</u>, 198 F. Supp. 2d 249, 263 (E.D.N.Y. 2002).

The plain and unambiguous language of IBM's and Sequent's agreements with AT&T therefore establishes that the use and disclosure restrictions of Sections 2.01, 2.05, 4.01, 7.06(a) and 7.10 of the IBM and Sequent Software Agreements do not apply to original code created by IBM and Sequent.  To the contrary, AT&T expressly disclaimed any purported right to control the use and disclosure of IBM's or Sequent's homegrown code.

REDACTED

Putting the instant case in these exact terms, the plain language of IBM's and Sequent's agreements with AT&T can only be interpreted to mean that IBM and Sequent own the D-E-F code they developed, even if such code is contained within programs such as AIX (A-B-C-D-E-F) or Dynix (A-D-B-E-C-F), and are free to use and disclose

55

D-E-F as they choose, so long as they do not misuse or disclose A-B-C, the UNIX System V code. (Given the actual proportion of the code, the alleged AT&T code in AIX and Dynix (which is less than a hundred thousand lines of code according to SCO) is better represented as A, and AIX and Dynix code (each of which contain tens of millions of lines of code) is better represented as B-C-D-E-F-G-H-I-J-K-L-M-O-P-Q-R-S-T-U-V-W-X-Y-Z-AA-BB-CC-DD-EE-FF, GG, HH, II, JJ, KK, LL, MM, NN, OO, PP, QQ, RR, SS, TT, UU, VV, WW, XX, YY, ZZ, etc., etc.).)

As stated above (at ¶¶ 31-48, 58-63), SCO provides no evidence that the code IBM is alleged to have improperly contributed to Linux from AIX and Dynix—which consists of code for various technologies developed by IBM, such as RCU, JFS, EVMS and AIO—contains any UNIX System V code. Therefore, such code is not subject to any restrictions under the IBM and Sequent Software Agreements, and SCO's contract claims fail as a matter of law.

> **B.** **In Any Event, All Of The Relevant Testimonial And Documentary Evidence Supports The Conclusion That The Software Agreements Do Not Pertain To IBM's Original Code.**

Even if the Court finds the IBM and Sequent Software Agreements to be ambiguous, however, SCO's claims still fail as a matter of law. The relevant admissible extrinsic evidence regarding the proper interpretation of the Software Agreements supports the view that the SOFTWARE PRODUCT subject to the use and disclosure restrictions in the agreements includes only UNIX System V source code and those portions of any modifications or derivative works of UNIX System V that consist of UNIX System V source code. (¶¶ 78-124.) In such a case, "where [the] evidence so clearly weighs in one direction that there is no genuine issue of material fact left", summary judgment is appropriate. Moncrief v. Williston Basin Interstate Pipeline Co., 174 F.3d 1150,1173 (10th Cir. 1999).

56

1.    The Testimonial Evidence.

As an initial matter, each of the individuals who executed the IBM and Sequent Software

Agreements has offered sworn testimony that the term "resulting materials" in Section 2.01 was

intended to refer only to the UNIX System V code contained within any modifications or

derivative works prepared by IBM or Sequent:

- Otis Wilson, AT&T's Manager of Software Sales and Marketing, who negotiated
  the IBM and Sequent Software Agreements, and executed almost every UNIX
  System V license entered into by AT&T, including the Sequent Software
  Agreement, states:

  "As my staff and I communicated to our licensees, this provision [Section 2.01]
  was only intended to ensure that if a licensee were to create a modification or
  derivative work based on UNIX System V, any material portion of the original
  UNIX System V source code provided by AT&T or USL that was included in the
  modification or derivative work would remain subject to the confidentiality and
  other restrictions of the software agreement. As we understood Section 2.01, any
  source code developed by or for a licensee and included in a modification or a
  derivative work would not constitute 'resulting materials' to be treated as part of
  the original software product, except for any material proprietary UNIX System V
  source code provided by AT&T or USL and included therein." (Wilson Decl. ¶
  14.)

  Indeed, Mr. Wilson states that he "do[es] not believe that our licensees would
  have been willing to enter into the software agreement if they understood
  Section 2.01 to grant AT&T or USL the right to own or control source code
  developed by the licensee or provided to the licensee by a third party". (Id. ¶ 16.)
  Mr. Wilson, in fact, was of the view at the time "that we could not claim any
  rights to non-UNIX System V code source . . . without raising serious antitrust
  issues". (Id. ¶ 18.)

  Mr. Wilson further states, plainly and unequivocally that:

  "In my view, any claim that the IBM Software Agreement and the Sequent
  Software Agreement prohibit the use, export, disclosure or transfer of any code
  other than UNIX System V code is clearly wrong. Not only did we at AT&T not
  intend the agreements to be read that way, but we also went out of our way to
  assure our licensees that that is not what the agreements meant." (Wilson Decl. ¶
  30 (emphasis added).)

57

- David Frasure, the AT&T Sales Manager who negotiated the IBM and Sequent Software Agreements, and signed the IBM Software Agreement on Mr. Wilson's behalf, states:

"As we assured our licensees, this language [in Section 2.01] does not, and was never intended to, give AT&T Technologies the right to assert ownership or control over modifications or derivative works prepared by its licensees, except to the extent of the licensed UNIX System V source code that was included in such modifications or derivative works. The term 'resulting materials' in the context of the software agreements was intended only to mean those portions of a licensees' modifications or derivative works that included the licensed UNIX System V source code." (Frasure Decl. ¶ 14.)

He further states:

"[SCO's] interpretation of the IBM Software Agreement and the Sequent Software Agreement is impossible to reconcile with what I, and I believe others at AT&T Technologies, understood our software agreements to mean. I never suggested, or would have thought to suggest, to our customers that the agreements precluded them from using or disclosing their own products as they might wish, so long as they did not disclose any UNIX System V code." (Id. ¶ 29 (emphasis added).)

- Richard McDonough, Division Counsel for IBM's System Products Division, who signed the IBM Software Agreement on IBM's behalf, states:

"As I understood the [agreements] between IBM and AT&T Technologies, and as the parties intended those agreements to mean, they did not seek to impose any limitations on the materials separately owned or developed by IBM or AT&T Technologies, respectively. IBM was free to use, copy, distribute or disclose any portion of a modification or derivative work that was not part of a licensed software product provided by AT&T Technologies." (McDonough Decl. ¶ 15.)

He further states:

"There is absolutely no way that IBM would have entered into an agreement with AT&T giving it the right to control IBM code merely because that code was or had once been associated with AT&T code in an IBM product. Never would we have knowingly agreed to a provision that gave AT&T the right to control what IBM did with its own code (or for that matter the code of third parties)." (Id. ¶ 18 (emphasis added).)

- David Rodgers, Sequent's Vice President of Engineering, who signed the Sequent Software Agreement on behalf of Sequent, likewise states that he did not understand Section 2.01 "to give AT&T Technologies the right to assert ownership or control over modifications or derivative works prepared by Sequent, except to the extent that the licensed Unix software product was included in such modifications or derivative works". (Rodgers Decl. ¶ 7.)

  In fact, Mr. Rodgers further states that he "<u>would never have signed</u> an agreement that would grant ownership or control to AT&T Technologies over modifications or derivative works prepared by Sequent to the extent those modifications or derivative works contained no part of the Unix software product licensed from AT&T Technologies". (<u>Id.</u> (emphasis added).)

Moreover, other individuals who were responsible for the negotiation of the IBM and Sequent Software Agreements, on both sides, hold the same view of the IBM and Sequent Software Agreements:

- Michael DeFazio, the AT&T executive with overall responsibility for the licensing of UNIX System V, states:

  "The agreements did not (and do not) give AT&T, USL, Novell or any of their successors or assigns the right to assert ownership or control over modifications and derivative works prepared by its licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. . . . I do not believe that our licensees would have been willing to enter into the software agreement if they understood Section 2.01 to grant AT&T, USL, Novell or their successors or assigns the right to own or control source code developed by or for the licensee. Modifications and derivative works contained UNIX System V source code and code developed by or provided to the licensee. The UNIX System V source code contained in a modification or derivative work continued to be owned by AT&T, USL, Novell or their successors, while the code developed by or provided to the licensee remained the property of the licensee or provider to the licensee." (DeFazio Decl. ¶ 17.)

- Steve Vuksanovich, who was the AT&T account representative for the IBM account and participated in the negotiation of the IBM Software Agreement, states:

  "Our standard software agreements also gave licensees the right to modify UNIX System V source code and to prepare derivative works based upon the code. As I believe we intended the agreements, and as I told our licensees, our licensees owned their modifications and derivative works they prepared based on UNIX System V, and were therefore permitted to do as they wished with those

modifications and derivative works, as long as they treated those portions of the modifications or derivative work consisting of any UNIX System V source code the same way they treated the UNIX System V source code that we provided to them. I recall that during our negotiations IBM specifically wanted to make sure that IBM, and not AT&T, would own and control code that was developed by or for IBM, even if that code was mixed with AT&T's UNIX System V code in a product. I assured IBM that we had the same understanding." (Vuksanovich Decl. ¶ 13.)

- Ira Kistenberg, who was the AT&T account representative for the Sequent account and participated in the negotiation of the Sequent Software Agreement, states:

"In my understanding, Section 2.01 did not in any way expand the scope of the software agreement to restrict our licensees' use, export, disclosure or transfer of their own original code, even if such code was contained in a modification or derivative work of UNIX System V. The purpose of the software agreement was to protect AT&T Technologies' UNIX System V source code, and was not meant to claim for AT&T Technologies our licensees' own work. It would not make sense to me to read this Section 2.01 to place restrictions on code that our licensees created themselves—that code was theirs." (Kistenberg Decl. ¶ 12.)

- Geoffrey Green, an AT&T attorney at the time, states:

"Without disclosing any legal advice I may have rendered . . . I can say that, as I understood AT&T's UNIX System V licensing agreements, AT&T did not intend to assert ownership or control over modifications and derivative works prepared by licensees, except to the extent of the original UNIX System V source code included in such modifications and derivative works. Accordingly, a licensee was free to do with as it wished (*e.g.*, use, copy, distribute or disclose) code developed by or for the licensee in its modifications and derivative works, provided that the licensee did not use, copy, distribute or disclose any portions of the original UNIX System V code provided by AT&T (except as otherwise permitted by the license agreements)." (Green Decl. ¶ 6.)

- Jeffrey Mobley, a member of IBM's corporate Commercial and Industry Relations staff, states:

"Based on my role in negotiating the attached AT&T Agreements, I do not believe there is any merit to the plaintiff's contentions. IBM would never have entered into any agreement that gave AT&T Technologies the right to control IBM's use of source code that IBM wrote itself, that IBM paid others to develop, or that IBM licensed from others. That is why we specifically discussed this issue of ownership of our modifications and derivative works with AT&T Technologies in detail before entering into the AT&T Agreements. AT&T Technologies assured

us repeatedly that the AT&T Agreements were not intended to limit IBM's freedom of action with respect to its original source code and was merely intended to protect AT&T Technologies' interest in its own UNIX System V source code, and I believed them." (Mobley Decl. ¶ 17.)

- Thomas Cronan, an attorney in IBM's System Products Division, states:

"As I understood the AT&T Agreements between IBM and AT&T Technologies, therefore, and as I believe the parties intended those agreements, the agreements impose no restrictions on IBM's use, export, disclosure or transfer of those portions of any modifications or derivative works of UNIX System V that were created by or for IBM and do not contain any UNIX System V source code.

So that there would be no confusion, we told the AT&T Technologies' representatives with whom we negotiated the AT&T Agreements that IBM intended to include portions of AT&T's UNIX System V code in products with IBM code and to make changes to the AT&T code (such as by adding to it) and thus IBM had to ensure that the parties agreed that IBM had the right to do so, without forfeiting any rights (including the right to control) to such IBM products and code. AT&T Technologies' representatives advised us that they did not seek to preclude such activities. In fact, they assured us that the purpose of the restrictions imposed by the AT&T Agreements was to protect AT&T's original code and that IBM could do whatever it wanted with its own code so long as it did not use, export, disclose or transfer AT&T's original code (except as otherwise permitted by the AT&T Agreements)." (Cronan Decl. ¶¶ 18-19.)

Mr. Cronan further states:

"No one involved in the negotiation of the AT&T agreements ever suggested that the agreements would give AT&T Technologies (or anyone else other than IBM) the right to control IBM original code. It seems quite clear to me, based on the statements of its representatives, that AT&T Technologies' concern was the protection of its original code only. I have no doubt that the AT&T Technologies' representatives with whom we negotiated the AT&T Agreements understood that IBM would not have entered into the AT&T Agreements if AT&T Technologies had sought and insisted on the right to control any product or code that might in the future be associated with UNIX System V code, except insofar as it might include UNIX System V code." (Id. ¶ 23.)

● Roger Swanson, Sequent's Director of Software Engineering, states:

"I did not understand this language in Section 2.01 to give AT&T Technologies the right to assert ownership or control over modifications or derivative works based on UNIX System V prepared by Sequent, except for the licensed UNIX System V code that was included in such modifications or derivative works. In fact, I recall having discussions with AT&T Technologies at the time to clarify that Sequent would own whatever source code we developed.

As a small company at the time, it would not have made any sense for Sequent to have entered into an agreement that gave AT&T Technologies control over the source code that we developed for our own software programs. I never would have agreed to a contract that would grant AT&T Technologies rights in Sequent's proprietary code, as that source code was the core of Sequent's software business." (Swanson Decl. ¶¶ 10-11.)

He states further:

"As the AT&T Technologies explained the agreements to me, Sequent was free to use, export, disclose or transfer all of the code contained in any modifications or derivative works of UNIX System V developed by Sequent, provided that Sequent did not improperly use, export, disclose or transfer any portion of the UNIX System V code we were licensing from AT&T Technologies (except as otherwise permitted by the licensing agreements)." (Id. ¶ 12.)

This testimony on its own establishes that SCO's interpretation of the contract fails as a matter of law. Under New York law, "there [can] be no more compelling evidence of intent than the sworn testimony and affidavits of both parties to the contracts". Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (N.Y. App. Div. 1999). In this case, all the parties to the agreements concur that the IBM and Sequent Software Agreements do not restrict the use and disclosure of any code that IBM or Sequent created on their own.

Courts routinely find summary judgment proper when the "extrinsic evidence presented to the court supports only one of the conflicting interpretations". United Rentals (North America), Inc. v. Keizer, 355 F.3d 399, 410 (6th Cir. 2004); accord Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993) (noting that summary judgment is proper when extrinsic evidence is dispositive of the interpretive issue); Farmland Indus., Inc. v. Grain Board

of Iraq, 904 F.2d 732, 736 (D.C. Cir. 1990) (noting that summary judgment is proper "if that [extrinsic] evidence demonstrates that only one view is reasonable").

As the parties to the IBM and Sequent Software Agreements interpret them the same way, no genuine issue of material fact exists. The IBM and Sequent Software Agreements cannot, as a matter of law, be construed to prohibit IBM's use and disclosure of code in AIX or Dynix, like the code IBM allegedly contributed to Linux, that does not contain any UNIX System V code.

    2.   The Documentary Evidence.

In addition to the testimonial evidence, there is also substantial contemporaneous documentary evidence of the proper interpretation of the IBM and Sequent Software Agreements. In written communications with its UNIX System V licensees (including IBM and Sequent), AT&T consistently confirmed its view that under the UNIX System V software agreements, the licensees owned and controlled any original code they created, except to the extent of any UNIX System V code contained therein.

In 1985, shortly after it began licensing UNIX System V, AT&T notified all its UNIX System V licensees that the standard UNIX System V software agreements—such as the ones entered into by IBM and Sequent—were never intended to claim rights to the licensees' own work. (¶¶ 114-124.)

In the April 1985 *$ echo* newsletter that it sent to its licensees, AT&T announced that it intended to make certain changes to the language of the standard UNIX System V software agreement to "clarify ownership of modifications or derivative works prepared by a licensee" under Section 2.01. (Ex. 37 at 5) (emphasis added). Subsequently, in the August 1985 edition of *$ echo*, AT&T announced it had revised the standard software agreement to include language to "assure licensees that AT&T will claim no ownership in the software that they developed—only the portion of the software developed by AT&T". (Ex. 38 at 5) (emphasis added).

As clarified, Section 2.01 of the standard UNIX System V software agreement provided as follows:

> "AT&T-IS grants to LICENSEE a personal, nontransferable and nonexclusive right to use in the United States each SOFTWARE PRODUCT identified in the one or more Supplements hereto, solely for LICENSEE's own internal business purposes and solely on or in conjunction with DESIGNATED CPUs for such SOFTWARE PRODUCT. Such right to use includes the right to modify such SOFTWARE PRODUCT and to prepare derivate works based on such SOFTWARE PRODUCT, provided that any such modification or derivative work that contains any part of a SOFTWARE PRODUCT subject to this Agreement is treated hereunder the same as such SOFTWARE PRODUCT. AT&T-IS claims no ownership interest in any portion of such a modification or derivative work that is not part of a SOFTWARE PRODUCT."

(Ex. 39 § 2.01 (emphasis added).)

These revisions to Section 2.01, as indicated in the *$ echo* newsletter, were not intended to modify the original software agreements, but only to clarify the original intent of those agreements for every licensee's benefit. (¶¶ 115, 121-24.) Thus, even to the extent that a UNIX System V licensee did not have this specific language in its license, this revised Section 2.01 provides clear guidance as to the proper interpretation of the original Section 2.01.

The documentary evidence of AT&T's interpretation of Section 2.01 of the IBM and Sequent's Software Agreements therefore establishes that the agreements do not restrict IBM's and Sequent's disclosure of homegrown code. It is well-settled that "the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (N.Y. App Div. 1999) (quoting Old Colony Trust Co. v. City of Omaha, 230 U.S. 100, 118 (1913)); see also Croce v. Kurnit, 737 F.2d 229, 235 (2d Cir. 1984) ("[I]t is the parties' practical construction of the contract prior to the commencement of litigation that is compelling."); Teachers Ins. & Annuity Ass'n of Am. v. Ocwen Fin. Corp.,

No. 98 Civ. 7137, 2002 WL 237836, at *8 (S.D.N.Y. Feb. 19, 2002) ("Perhaps the most persuasive evidence of the intention of the parties when entering an agreement is their course of performance under the agreement.") (attached hereto as Exhibit B).[10]  Here, the evidence shows that until SCO brought the instant action, the parties to the contracts at issue consistently interpreted them only to restrict the use and disclosure of UNIX System V source code.

Indeed, given AT&T's unequivocal representations about its interpretation of the software agreements, upon which IBM and Sequent were entitled to, and did, rely, SCO should be equitably estopped from arguing for a different interpretation of the contracts.  Under New York law, equitable estoppel "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought."  Nassau Trust Co. v. Montrose Concrete Prods. Corp., 436 N.E.2d 1265, 1269 (N.Y. 1982).  It would be manifestly unjust for SCO (which was not involved in negotiating the agreements) to be allowed to assert in this case an interpretation of the software agreements contrary to AT&T's consistent statements regarding those agreements since they were first signed in 1985.  See General Elec. Capital Co. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994) (holding that because

---

[10]  Accord Ocean Transp. Line, Inc. v. American Philippine Fiber Indus., Inc., 743 F.2d 85, 91 (2d Cir. 1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent."); RJE Corp. v. Northville Indus. Corp., 198 F. Supp. 2d 249, 263 (E.D.N.Y. 2002) ("When interpreting an ambiguous contract, the subsequent conduct of the parties also is relevant with regard to the parties' intention."); Viacom Int'l, Inc. v. Lorimar Productions, Inc., 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980) ("The practical interpretation of a contract by the parties, manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling weight in the construction of the contract."); Factors, Etc., Inc. v. Creative Card Co., 444 F. Supp. 279, 281-82 (S.D.N.Y. 1977) ("It is hornbook law that where there is ambiguity in a contract the intent of the parties may be ascertained by reference to their subsequent course of conduct.")

one party's conduct indicated agreement with the other party's interpretation of the contract, it was estopped from later asserting a contrary interpretation).

          3.      The Extrinsic Evidence Is So One-Sided That No Reasonable Fact-Finder Could Agree With SCO's Interpretation Of The Agreements.

Taken together, the extrinsic evidence in this case "is so one-sided . . . that no rational trier of fact" could conclude that the IBM and Sequent Software Agreements prohibit IBM's disclosure of code, such as the code IBM allegedly contributed to Linux, that does not contain any licensed UNIX System V code. Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563, 569 (10th Cir. 1989). Indeed, there is no competent or credible evidence to support SCO's interpretation of the agreements. Accordingly, summary judgment should be granted in IBM's favor on SCO's breach of contract claims even if the Court finds the language of the agreements to be ambiguous. See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 159 (2d Cir. 2000) (holding that a court "may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable fact-finder could decide contrary to one's party's interpretation".)

Summary judgment is especially appropriate in this case, where any ambiguity must be construed against SCO, because AT&T—SCO's alleged predecessor-in-interest—drafted and prepared the standard form agreements used to license UNIX System V. (¶ 78.) See Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it.") (emphasis added); see also Westchester Resco Co., L.P. v. New England Reinsurance Corp., 818 F.2d 2, 3 (2d Cir. 1987) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-

established *contra proferentem* principle requires that the ambiguity be construed against that party.").[11]

C.    SCO's Interpretation Of The Software Agreements Is Unreasonable.

SCO's interpretation of the IBM and Sequent Software Agreements should further be rejected because it is patently unreasonable. Under New York law, the "rules of construction of contracts require, wherever possible, that an agreement should be given a 'fair and reasonable interpretation'". Farrell Lines, Inc. v. City of New York, 281 N.E.2d 162, 165 (N.Y. 1972).

Thus, "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties". In re Lipper Holdings, LLC, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) (internal citations omitted); see also Leighton's Inc. v. Century Circuit, Inc., 463 N.Y.S.2d 790, 792 (N.Y. App. Div. 1983) (Fein, J., dissenting) ("An unreasonable interpretation or an absurd result is to be avoided."); Reape v. New York News, Inc., 504 N.Y.S.2d 469, 470 (N.Y. App. Div. 1986) ("[W]here a particular interpretation would lead to an absurd result, the courts can reject such a construction in favor of one which would better accord with the reasonable expectation of the parties.").[12]

SCO's interpretation of the Software Agreements in this case would plainly produce an absurd and commercially unreasonable result. As set forth above (at ¶¶ 62-63), under SCO's interpretation of the Software Agreements, SCO has the right to control every single one of the tens of millions of lines of code that have ever been put into (and that will ever be put into) AIX or Dynix by IBM. This interpretation would allow SCO to co-opt decades of IBM's work in

---

[11]   See also Johnson v. Werner, 407 N.Y.S.2d 28, 31 (N.Y. App. Div. 1978) (noting that ambiguities in a form contract must be resolved against the author); Rieter v. Tavella, 549 N.Y.S.2d 888, 889 (N.Y. App. Div. 1990) (same).

[12]   Indeed, it is "against the general policy of the law" to interpret a contract in a way that would produce "an unreasonable result" or "would, in effect, place one party to the contract at the mercy of the other". Mandelblatt v. Devon Stores, Inc., 521 N.Y.S.2d 672, 675 (N.Y. App. Div. 1987).

developing and improving AIX and Dynix—by continually adding new capabilities and functionalities—simply because those programs contain, or even once contained, some source code, no matter how negligible, from UNIX System V. SCO's interpretation would also mean that SCO has the right to control code that was written by third parties and licensed to IBM, even if such third parties have no relationship at all with SCO. According to SCO, just because a third party licenses code—that it expended its own resources developing—to IBM, and IBM includes such code in AIX or Dynix, SCO gets to dictate forever after the use and disclosure of that third party's code by IBM. That is plainly unreasonable.

Indeed, under SCO's theory, it has the right to control the work of the hundreds of UNIX System V licensees who at any time used some source code from UNIX System V in one of its own computer programs. This would mean that SCO has the right to control, for example, all of the source code for all of the different functionalities in Hewlett Packard's HP-UX operating system and SGI's IRIX operating system, among others.

The absurdity of SCO's interpretation of the contract is exposed by SCO's very own analogy set forth above (at ¶¶ 125-26): SCO claims to have acquired the rights to the computer program UNIX System V, represented here as A-B-C-D-E-F. Assume that IBM has written a program, such as AIX or Dynix, which contains tens of millions of lines of source code, including certain lines from UNIX System V (less than a hundred thousand according to SCO), A-B-C, but also includes the new source code G-H-I-J-K-L-M-N-O-P-Q-R-S-T-U-V-W-X-Y-Z written by or for IBM. Under SCO's interpretation of the software agreements, because the A-B-C code is present in IBM's program, which (SCO says) might be considered a modification or a derivative work of UNIX System V (because it contains some small percentage (less than 1%) of UNIX System V code), IBM is prohibited from using its own source code G-H-I-J-K-L-M-N-O-P-Q-R-S-T-U-V-W-X-Y-Z (which is tens of millions of lines of code) in other programs. That is true, according to SCO, even if, for example, the M-N-O code was written by a third party and

licensed to IBM for whatever uses IBM sees fit. This is not consistent with the plain language of the IBM and Sequent Software Agreements and is entirely unreasonable. Since the G-H-I-J-K-L-M-N-O-P-Q-R-S-T-U-V-W-X-Y-Z code does not include any A-B-C code, IBM (and others like it that also licensed the A-B-C code) should not be restricted from using and disclosing its own code as it chooses.

For a more concrete example, consider the following. The Encyclopedia Brittanica Company writes and publishes a multi-volume encyclopedia, consisting of thousands of entries and lines of text, that is issued in a different edition annually, i.e., as "Encyclopedia Brittanica 1985". Assume that another company, the New Encyclopedia Company, copies certain of the entries from Encyclopedia Brittanica 1985 under a license similar to the ones IBM and Sequent entered into with AT&T—for example all the entries starting with the letters A, B and C—and incorporates those entries into its own multi-volume encyclopedia, "New Encyclopedia 1986". Under SCO's interpretation of the licenses, the Encyclopedia Brittanica Company has the right to control not just the New Encyclopedia Company's use and disclosure of the entries copied from Encyclopedia Brittanica 1985, but all of the entries in the New Encyclopedia 1986, even the thousands of entries written by the New Encyclopedia Company's own employees starting with the letters D through Z, and even if those entries had been written before New Encyclopedia Company copied any entries from Encyclopedia Brittanica. Moreover, as SCO reads the contract, if the New Encyclopedia Company licensed from the Scholastic Encyclopedia Company entries written by that company for the letter Z, the Encyclopedia Brittanica Company would have the right to control those entries also. Indeed, under SCO's interpretation of the licenses, the Encyclopedia Brittanica Company would have the right to control all entries that will ever be included by the New Encyclopedia Company in future versions of the New Encyclopedia, such as New Encyclopedia 1987, New Encyclopedia 2004 or even New Encyclopedia 2085.

SCO's interpretation of the software agreements is plainly untenable and would, without question, produce an absurd result. It is entirely unreasonable to interpret AT&T's UNIX System V licenses to restrict hundreds of companies, all of whom are SCO's actual or potential competitors in the software industry, from using and disclosing source code that they developed on their own. See Elsky v. Hearst Corp., 648 N.Y.S.2d 592, 593 (N.Y. App. Div. 1996) (holding that contract should not be interpreted to lead to a "commercially unreasonable restriction").

Moreover, as further evidence of the unreasonableness of SCO's theory, SCO's interpretation of the Software Agreements is at odds with the basic principles underlying federal copyright law.

Under the copyright law, the right to copyright a work, and the attendant benefits, "vests initially in the author or authors of the work". 17 U.S.C. § 201(a). The holder of a copyright on a particular work "has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; [and] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending. . . ." 17 U.S.C. § 106. Thus, when IBM, or any other person or entity, writes its own computer code, it automatically gains the exclusive right to copy and distribute that code.

This same principle applies even with respect to derivative works, although the copyright law makes clear that the "copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material". 17 U.S.C. § 103(b). The copyright in such derivative work "is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material". Id. (emphasis added).

Under the copyright law, therefore, it is well-settled that the author of a derivative work has the right to copyright (and thus control the copying and distribution of) any of its own original materials in the derivative work, but has no rights with respect to the preexisting materials. It is also settled that the author of the preexisting materials does not have any rights in the newly-created derivative work, except to the extent of the preexisting materials contained therein.

SCO's interpretation of the IBM and Sequent Software Agreements is not consistent with these basic copyright principles. As SCO reads the agreements, SCO, the author of a preexisting work, has the right to control all parts of IBM's derivative works, including those original materials contributed by IBM. This is an unreasonable interpretation of the language of the IBM and Sequent Software Agreements, which gives no indication that it is meant to deprive either party of its rights under the copyright laws.

II.    NOVELL AND SCO HAVE IN ANY EVENT WAIVED ANY PURPORTED BREACH AS A MATTER OF LAW.

Even if SCO's interpretation of the contracts were not untenable, both Novell, on SCO's behalf, and SCO itself have waived any right to assert claims against IBM relating to IBM's and Sequent's homegrown code. Summary judgment on SCO's breach of contract claims is therefore appropriate for these additional reasons.

A.    Novell Has Explicitly Waived The Alleged Breaches By IBM.

Under New York law, "[w]aiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable". AXA Global Risks U.S. Ins. Co. v. Sweet Assocs., Inc., 755 N.Y.S.2d 759, 760 (N.Y. App. Div. 2003).[13]  In this case, the

---

[13] Under Utah law: "A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence and an intention to relinquish it." In Re Estate of Flake, 71 P.3d 589, 599 (Utah 2003) (quoting Soter's Inc. v. Deseret Fed. Sav. & Loan Ass'n, 857 P.2d 935 (Utah 1993)).

undisputed facts establish that Novell, on SCO's behalf, voluntarily and intentionally abandoned any purported rights against IBM under the Software Agreements.

As is set forth above (at ¶¶ 20-23), Novell retained certain rights to AT&T's UNIX System V licenses (including IBM's and Sequent's) when it sold them to Santa Cruz (from whom SCO eventually acquired its purported rights to the licenses). In particular, under the parties' 1995 Asset Purchase Agreement, Novell retained the right "at [its] sole discretion" to direct Santa Cruz to "amend, supplement, modify, or waive any rights under . . . any SVRX License", and to take any such actions on Santa Cruz's behalf if Santa Cruz failed to do so. (Ex. 15 § 4.16(b) (emphasis added).) Indeed, Santa Cruz recognized as much in Amendment X to IBM's Software and Sublicensing Agreements, to which Novell was a party, and which specifically noted that "Novell retained . . . certain rights with respect to" the agreements IBM entered into with AT&T, including particularly "Software Agreement SOFT-00015 as amended" and "Sublicensing Agreement SUB-00015A as amended". (Ex. 16 at 1 (emphasis added).)

The language of the Asset Purchase Agreement setting forth Novell's continuing rights to AT&T's UNIX System V agreements is plain and unambiguous and can therefore be understood based on its terms alone. No parol evidence is needed to explain the parties' intent. There is no question that Novell retained the right to waive any rights under the UNIX System V licenses entered into by IBM and Sequent, including specifically the IBM Software Agreement and the Sequent Software Agreement.

There is also no question that Novell invoked its rights. On October 7, 2003, after SCO commenced this lawsuit against IBM, Novell informed SCO by letter that its interpretation of the

72

Software Agreement was incorrect. (¶ 128.) Consistent with the plain language of the contracts, and the extensive extrinsic evidence reviewed above, Novell stated in its letter that the agreements between AT&T and IBM provide "a straightforward allocation of rights":

> "(1) AT&T retained ownership of its code from the Software Products ('AT&T Code'), and the Agreements' restrictions on confidentiality and use apply to the AT&T Code, whether in its original form or as incorporated in a modification or derivative work, but (2) IBM retained ownership of its own code, and the Agreements' restrictions on confidentiality and use do not apply to that code so long as it does not embody any AT&T Code".

(Ex. 41.) In accordance with the rights it retained to AT&T's UNIX System V licenses, Novell therefore directed SCO "to waive any purported right SCO may claim to require IBM to treat IBM Code itself as subject to the confidentiality obligations or use restrictions of" the IBM Agreements. (Id.)

After SCO failed to follow Novell's instruction, on October 10, 2003, Novell sent a letter to SCO that expressly "waive[d] any purported right SCO may claim to require IBM to treat IBM Code, that is code developed by IBM, or licensed by IBM from a third party, which IBM incorporated in AIX but which itself does not contain proprietary UNIX code supplied by AT&T . . .[,] as subject to the confidentiality obligations or use restrictions of the Agreements". (Ex. 42.)

On February 6, 2004, Novell further directed SCO to waive any purported right to assert a breach of the Sequent Software Agreement based on IBM's use or disclosure of code that does not contain any UNIX System V source code. (¶ 132.) In its letter, Novell reiterated that SCO's reliance on Section 2.01 of the Software Agreement was misplaced, and stated that "SCO's interpretation of section 2.01 is plainly contrary to the position taken by AT&T, as author of and party to the SVRX licenses". (Ex. 43.)

After SCO failed to follow Novell's instruction, on February 11, 2004, Novell expressly "waive[d] any purported right SCO may claim to require Sequent (or IBM as its successor) to treat Sequent Code as subject to the confidentiality obligations or use restrictions of Sequent's SVRX license". (Ex. 44.)

Novell's letters to SCO establish as a matter of law that even if SCO had the right under the IBM and Sequent Software Agreements to prevent IBM from disclosing its or Sequent's original code, Novell explicitly waived such right.

B.  Through Its Own Conduct, SCO Has Waived Its Purported Rights To Claim Breach Of Contract.

Even if SCO's interpretation of the IBM and Sequent Software Agreements were correct (which it is not), SCO itself has also waived any alleged breach by IBM relating to the code IBM is alleged to have improperly contributed to Linux. Under New York law, waiver "may be established . . . by acts and conduct manifesting an intent and purpose not to claim the alleged advantage or from which an intention to waive may reasonably be inferred". Heidi E. v. Wanda W., 620 N.Y.S.2d 665, 665 (N.Y. App. Div. 1994).[14]

In this case, SCO's acts and conduct are plainly inconsistent with an intention to assert a breach of contract against IBM based on the code allegedly at issue. Both before and even after SCO sued IBM, SCO sold to customers and made publicly available on the Internet the code that it claims IBM improperly contributed to Linux. (¶¶ 144-153.) Indeed, this code was still available on SCO's website as recently as August 4, 2004. (¶ 153.) SCO cannot on the one hand market and sell the source code IBM contributed to the Linux operating system, and on the other hand claim that IBM was prohibited by its licensing agreements from contributing that code to Linux.

---

[14]  See also In Re Estate of Flake, 71 P.3d 589, 599 (Utah 2003) (holding that waiver occurs when a party intentionally acts in a manner inconsistent with its contractual rights) (Utah law).

For many years prior to its filing this lawsuit, SCO's principal business was the distribution of the Linux operating system, the development and marketing of software based on Linux, and the provision of Linux-related services to customers. (¶¶ 12, 139.)  In fact, in 2002, SCO formed the UnitedLinux partnership with three other Linux distributors with the intention of creating a single uniform Linux distribution designed for business use. (¶ 140.)  Just two months before SCO brought suit against IBM, in January 2003, UnitedLinux signed IBM as a technology partner to, among other things, jointly promote UnitedLinux's first Linux distribution, UnitedLinux Version 1.0. (¶ 143.)

*SCO does not dispute that its own Linux distributions, including UnitedLinux Version 1.0 (distributed by SCO as "SCO Linux Server 4.0"), which it sold or otherwise made available for more than a year before bringing this suit against IBM, contain code upon which SCO's claims are based.* (¶ 144.)

In fact, SCO specifically touted to its customers that its distributions of Linux included the very technology it now complains IBM improperly contributed to Linux. (¶¶ 146-49.)  For example, in its January 2002 product announcements for OpenLinux Server 3.1.1 and OpenLinux Workstation 3.1.1, SCO advertised that the products included new features such as "better SMP scaling up to 32 processors" and "journaling file system support". (Exs. 51 & 52.)  Likewise, its November 2002 product announcement for "SCO Linux Server 4.0" stated that the "the core of SCO Linux Server 4.0 is the 2.4.19 Linux kernel" and that "[n]ew features" include "improved journaling file system support", "Asynchronous I/O" and "Enterprise Volume Management Systems (EVMS)". (Ex. 54.)  SCO's Technical Overview of SCO Linux 4.0 even emphasized that its product included "JFS (Journaled File System <u>Developed by IBM</u>)". (Ex. 55 (emphasis added).)

Moreover, although SCO claims to have "discontinued" distributing any products containing the source code it claims IBM improperly disclosed, SCO continued to do so after it filed this lawsuit. (¶¶ 150-53.) For example, SCO released its "SCO Linux Server 4.0 for the Itanium Processor Family" product on April 14, 2003, after SCO filed its original Complaint. As with its earlier release of SCO Linux Server 4.0, SCO's product announcement proclaimed that the new features of this product included "improved journaling file system support", "Asynchronous I/O" and "Enterprise Volume Management Systems (EVMS)". (Ex. 56.)

REDACTED

In addition, SCO continued to make the Linux 2.4 kernel available for download from its website well after it commenced this lawsuit. (¶ 153.) This code was still available on SCO's website as recently as August 4, 2004. (Id.) The version of Linux available from SCO's website includes code it claims IBM disclosed in violation of its contracts. (Id.)

Given SCO's extensive promotion and sale of Linux, and of the specific code contributed by IBM therein, for years prior to commencing this suit against IBM, SCO has waived any right to claim that IBM breached its contracts by disclosing such code. SCO cannot openly accept the benefits of IBM's contributions to Linux, and then claim that such contributions were improper. SCO's claims therefore fail as a matter of law for this reason also. See, e.g., Sec. Indus. Automation Corp. v. United Comp. Capital Corp., 723 N.Y.S.2d 668, 669 (N.Y. App. Div. 2001) (affirming grant of plaintiff's cross-motion for summary judgment when defendant's conduct demonstrated waiver of contract claim); T.W.A. Trading, Inc. v. Gold Coast Freightways, Inc., No. 2001-900, 2002 WL 1311648, at *1 (N.Y. App. Term Apr. 2, 2002) (granting defendant's cross-motion for summary judgment after finding waiver of contract claim based on plaintiff's conduct) (attached hereto as Exhibit C).

## Conclusion

For the foregoing reasons, IBM respectfully requests that the Court grant IBM summary judgment on SCO's breach of contract (SCO's First, Second, Third and Fourth Causes of Action) claims.

DATED this 13ᵗʰ day of August, 2004.

SNELL & WILMER L.L.P.

Alan L. Sullivan
Todd M. Shaughnessy
Amy F. Sorenson

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

Of counsel:

INTERNATIONAL BUSINESS MACHINES CORPORATION
Donald J. Rosenberg
Alec S. Berman
1133 Westchester Avenue
White Plains, New York 10604
(914) 642-3000

*Attorneys for Defendant/Counterclaim-Plaintiff*
*International Business Machines Corporation*

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.