# ADDENDUM F

<u>UNPUBLISHED CASES</u>

<u>Hakim v. Cannon Avent Group, PLC</u>, No. 05-1398, 2007 WL 542697 (Fed. Cir. Feb. 23, 2007)

<u>Metpath, Inc. v. Modern Medicine</u>, 934 F.2d 319, 1991 WL 87534 (4th Cir. 1991)

<u>Morris-Belcher v. Hous. Auth. of City of Winston-Salem</u>, No. 04-255, 2005 WL 1423592 (M.D.N.C. June 17, 2005)

<u>NEC Corp. & NEC Electronics, Inc. v. Intel Corp.</u>, No. C-84-20799, 1989 WL 67434 (N.D. Cal. Feb. 6, 1989)

<u>Phillips v. Greben</u>, No. 04-5590, 2006 WL 3069475 (D.N.J. Oct. 27, 2006)

<u>Rutecki v. CSX Hotels, Inc.</u>, No. 05-00226, 2007 WL 128829 (S.D. W. Va. Jan 12, 2007)

<u>Sipp v. Unumprovident Corp.</u>, 107 Fed. Appx. 867, 877 (10th Cir. 2004)

<u>Stepney v. Gilliard</u>, No. 02-5259, 2006 WL 2226334 (D.N.J. Aug 3, 2006)

<u>Sunroof de Mexico, S.A. v. Webasto Roof Sys., Inc.</u>, No. 05-40031, 2006 WL 1042072 (E.D. Mich. April 19, 2006)

<u>Yumukoglu v. Provident Life & Acc. Ins. Co.</u>, 36 Fed. Appx. 378 (10th Cir. 2002)

(C) 2007 West Group

479 F.3d 1313, 81 U.S.P.Q.2d 1900

--- F.3d ---

**(Cite as: 2007 WL 542697 (Fed.Cir.(La.)))**

United States Court of Appeals,

Federal Circuit.

**Nouri E. HAKIM, Plaintiff-Appellant,**
**v.**
**CANNON AVENT GROUP, PLC, Cannon Rubber**
**Limited and Avent America, Inc.,**
**Defendants-Appellees.**
**No. 2005-1398.**

Feb. 23, 2007.

Background: Patentee sued competitor for infringement of patents for leak- resistant drinking cups. The United States District Court for the Western District of Louisiana, Robert G. James, J., 2005 WL 1793760 and 2005 WL 1793765, granted competitor's motions for summary judgment. Patentee appealed.

Holdings: The Court of Appeals, Newman, Circuit Judge, held that: (1) inventor could not recapture claim scope of the term "opening;" (2) district court was not required to construe claims before invalidating patent based on anticipation; (3) limitations were anticipated by foreign patent; and (4) striking inventor's expert declaration as not grounds for reversal.

Affirmed.

**[1] Patents** 🔑 **168(2.1)**
291k168(2.1)

An applicant can broaden as well as restrict his claims during the procedures of patent examination.

**[2] Patents** 🔑 **110**
291k110

Continuing patent applications may present broader claims than were allowed in the parent.

**[3] Patents** 🔑 **168(3)**
291k168(3)

While applicant had the right to refile application and attempt to broaden the claims for patents for leak-resistant drinking cups, he could not recapture claim scope of the term "opening," to eliminate the sealing mechanism provided by the slitted diaphragm, where claim was surrendered or disclaimed.

**[4] Patents** 🔑 **168(2.1)**
291k168(2.1)

Although a disclaimer made during patent prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited.

**[5] Patents** 🔑 **66(1.3)**
291k66(1.3)

District court was not required to construe claims of patent for leak-resistant drinking cups, before invalidating the patent based on anticipation by a foreign patent, where patentee did not specify what alternative meanings were sought for terms that could affect validity of claim, or how claim "construction" would affect the issue of anticipation.

**[6] Patents** 🔑 **157(1)**
291k157(1)

Claim construction is directed to claims or claim terms whose meaning is disputed as applied to the patentee's invention in the context of the accused device.

**[7] Patents** 🔑 **72(1)**
291k72(1)

"Anticipation" means that the claimed invention was previously known, and that all of the elements and limitations of the claim are described in a single prior art reference. 35 U.S.C.A. § 102.

**[8] Patents** 🔑 **66(1.3)**
291k66(1.3)

Limitations of patent for leak-resistant drinking cups were anticipated by foreign patent which described a device to prevent liquid from flowing when suction was not applied, that is, to block the passage of liquid in the closed position.

**[9] Patents** 🔑 **323.2(5)**
291k323.2(5)

Discretionary ruling, striking inventor's expert declaration as to validity and correct interpretation of his patents for leak-resistant drinking cups, was not grounds for reversal of orders granting summary judgment to competitor in infringement action, absent showing as to

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
479 F.3d 1313, 81 U.S.P.Q.2d 1900
--- F.3d ---
**(Cite as: 2007 WL 542697 (Fed.Cir.(La.)))**

how the trier of fact was led into error, or could reasonably have reached a different decision had inventor's declaration been admitted.

**Patents** 🔑328(2)
291k328(2)

6,321,931, 6,357,620. Cited.

Morris E. Cohen, of Brooklyn, NY, argued for plaintiff-appellant. With him on the brief was Eric W. Buether, Goodwin Gruber, LLP, of Dallas, TX. Of counsel was Brian M. Koide, Crowell & Moring, LLP, of Washington DC.

Joseph A. Calvaruso, Chadbourne & Parke LLP, of New York, NY, argued for defendants-appellees. With him on the brief were Kenneth S. Weitzman and Richard Martinelli.

Before MICHEL, Chief Judge, NEWMAN and RADER, Circuit Judges.

NEWMAN, Circuit Judge.

**\*1** Mr. Nouri E. Hakim sued Cannon Avent Group, PLC, Cannon Rubber Limited, and Avent America, Inc. (together "Avent") in the United States District Court for the Western District of Louisiana, asserting infringement of Hakim's United States Patents No. 6,321,931 (the '931 patent) and No. 6,357,620 (the '620 patent), by Avent's leak-resistant drinking cups. The district court granted Avent's motions for summary judgment that the '931 patent is not infringed and the '620 patent is invalid. [FN1] We affirm these judgments.

THE '931 PATENT
The Hakim inventions are for drinking cups that prevent the spilling of liquid if the cup is tipped over. Hakim's patented cups have a valve through which fluid can pass when suction is applied by a person by way of a drinking spout, whereby the valve closes to seal the cup when a person is not drinking. The specification of the '931 patent describes the preferred embodiment as having a dual sealing mechanism that provides an "extremely secure seal" against spillage:

In accordance with the invention, an improved cup construction and valve assembly is provided which provides an extremely secure seal against accidental liquid flow from the cup spout. Further to the invention, a user places his or her mouth against the spout of the cup assembly to suck liquid out of the cup when desired. The act of sucking at the spout of the cup creates

negative pressure or a partial vacuum against a valve in the cup spout, causing the valve to invert, or turn inside out, either partially or totally, thereby unblocking an opening such as an orifice or slit in the valve assembly. Once the opening is unblocked, liquid can flow freely through the valve and spout.

In contrast, when not in use, the valve sits in a resting, closed position, with the valve pressed against the center seal-off, thereby sealing off the opening or slit in the valve assembly. Thus, in its relaxed state, with no negative pressure applied, the valve sits in a closed position with the fluid opening sealed by the center seal-off. Moreover, in accordance with the dual valve nature of the device in the preferred embodiment, an adjacent valve similarly seals when no negative pressure is applied, thereby blocking off the air vents in the cover of the cup, and further preventing the possibility of fluid flow. Consequently, the closed position provides an extremely secure seal against fluid leakage, such that inadvertent spills or even deliberate attempts to force liquid outside of the cup, such as by turning the cup upside down, or shaking the cup, are ineffective.

'931 Patent, col. 1, line 51 to col. 2, line 10.

During patent prosecution Hakim described his distinctions from the cited references as follows:

Thus two separate mechanisms are both used to close off the passage of liquid through the valve when not in use. The first mechanism involves an inverting, flexible valve material which has a slit therein and responds to suction. The second mechanism involves the use of a blocking element, which is impenetrable to the passage of liquid. The slit sits against the blocking element, sealing or blocking off the slit, to yet further prevent the passage of liquid through the valve.

**\*2** .... By providing both the elastomeric member with a slit and a blocking element, a sealing mechanism is provided which reduces spillage beyond that of either mechanism alone. None of the references cited in the Office Action [Robbins III, Bachman, and Belcastro] teach or suggest such a no-spill mechanism having a slit sitting against a blocking element such as is recited in all of the pending claims.

'931 Application Response, Oct. 2, 2000 (emphases added). Thus during prosecution the presence of the slit in the flexible valve material was emphasized as distinguishing all of the claims from the cited references.

Avent's accused drinking cup has a valve with a flexible

(C) 2007 West Group                                                                          Page 3
479 F.3d 1313, 81 U.S.P.Q.2d 1900
--- F.3d ---
**(Cite as: 2007 WL 542697 (Fed.Cir.(La.)))**

diaphragm having a central opening, but the opening is not a slit that opens and closes, but simply a hole in the diaphragm. The diaphragm rests against a plastic mount that has a conical head that seals the hole. Upon suction by a person seeking to drink, the diaphragm is lifted off the conical head, exposing the hole and permitting fluid to flow from the cup to the drinking spout.

The district court held on summary judgment that Avent's device did not infringe the '931 claims, based on the claim construction that limited the '931 claims to a sealing mechanism that includes a flexible valve material or diaphragm having a slit. Hakim I at *1 ("For the reasons contained in the Report and Recommendation of the Magistrate Judge previously filed herein, and after a de novo review of the entire record and the written objections filed herein, and concurring with the Magistrate Judge's findings under the applicable law"; summary judgment was granted.) Mr. Hakim argues that the claim construction is excessively constricted and that all of the '931 claims do not require a slit that opens and closes with pressure, for claims 1 and 2 use the word "opening," not "slit," for the aperture in the diaphragm. Claim 1 is as follows:

   1. An apparatus for use in a no-spill drinking cup, said apparatus comprising:

   a valve holder, such valve holder comprising at least one valve and a blocking element, said valve comprising a flexible material, said blocking element comprising an area of material which is impenetrable to the flow of liquid, said valve further comprising an opening through said flexible material, said valve having a resting position wherein said flexible material sits with said opening against said blocking element such that said valve is closed to the passage of liquid through said valve, said valve moving into an open position for the passage of liquid through said valve upon the application of negative air pressure to the top of said valve, said open position being a position wherein said flexible member comprising said opening lifts off of said blocking element.

(Emphasis added.) The word "opening" was placed in claims 1 and 2 when Hakim filed a continuation application after receiving a notice of allowance for claims wherein the word "slit" appeared instead of "opening." The filing of the continuation was accompanied by an attorney letter stating that Hakim was broadening claims 1 and 2, and an amendment changing "slit" to "opening" in claims 1 and 2. The continuation claims were allowed without any comment or rejection by the examiner. However, in construing the claims of the continuation patent, the district court held Hakim to his

arguments in the parent application that the invention includes the presence of a slit in the flexible material. The court stated: "Because Hakim did not retract any of his arguments distinguishing the prior art, he is held to the restrictive claim construction he argued during prosecution of the patent." Hakim I at *5 (adopted Magistrate's Report).

**\*3** Hakim argues that the district court improperly relied on the argument in the abandoned parent application. Hakim states that by re-filing the application with broader claims, he avoided any unnecessary restriction that may have crept into the prior prosecution. He states that he informed the examiner that the new claims were broader than those previously allowed, and that when the examiner allowed the new claims without rejection, there is a presumption that the examiner had assured himself of the patentability of the new claims. See United States v. Chemical Foundation, 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") Hakim states that he did what was appropriate when he flagged this change to assist the examiner, and that the claims as granted should not be unnecessarily narrowed by the court.

Avent states that the totality of the prosecution history nonetheless limits Hakim to the embodiment with the slit, for the magistrate judge found: "The prosecution history makes perfectly clear that Hakim specifically distinguished his invention from the prior art by limiting it to an apparatus with both (1) a slit which closes when suction is not applied, and (2) a second closure consisting of a blocking element which the slit rests against." Hakim I at * 5 (adopted Magistrate's Report). Avent states that this was and is the distinction from the prior art, and that the claims are properly limited to this feature whether they use the word "slit" or the word "opening." Avent stresses that when Hakim wrote to the examiner that he was broadening the claims, he did not specifically point out that he no longer intended to be limited to the specific mechanism that he had previously argued was the distinguishing feature of his invention.

[1][2] Hakim points out that a patent applicant is not precluded from filing a continuation application with broader claims. It is recognized that an applicant can broaden as well as restrict his claims during the procedures of patent examination, and that continuing applications may present broader claims than were allowed in the parent. Cf. Symbol Technologies, Inc. v. Lemelson Medical, Education & Research Found., 422

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
479 F.3d 1313, 81 U.S.P.Q.2d 1900
--- F.3d ---
**(Cite as: 2007 WL 542697 (Fed.Cir.(La.)))**

F.3d 1378, 1385 (Fed.Cir.2005) ( "Commonly, and justifiably, one might refile an application to add subject matter in order to attempt to support broader claims as the development of an invention progresses, although entitlement to an earlier filing date for any claimed subject matter may of course be necessary to avoid a statutory bar created by intervening events outlined in 35 U.S.C. § § 102 and 103.").

[3][4] Hakim had the right to refile the application and attempt to broaden the claims. See id. at 1385 ("One may also refile an application even in the absence of any of these reasons [refiling an application in response to a requirement for restriction; refiling in order to present evidence that may not have previously existed; or refiling to support broader claims as the development of an invention progresses], provided that such refiling is not unduly successive or repetitive.") However, an applicant cannot recapture claim scope that was surrendered or disclaimed. The district court did not err in holding that the examiner's action in allowing the continuation claims without further prosecution was based on the prosecution argument in the parent. See Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314, 1324 (Fed.Cir.2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.") (citing Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220-21, 61 S.Ct. 235, 85 L.Ed. 132 (1940), Crawford v. Heysinger, 123 U.S. 589, 602-04, 8 S.Ct. 399, 31 L.Ed. 269 (1887), and Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227, 26 L.Ed. 149 (1880)). Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited. See Springs Window Fashions LP v. Novo Indus., L.P., 323 F.3d 989, 995 (Fed.Cir.2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent. A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement.").

**\*4** The district court correctly ruled that the word "opening" is not correctly construed to eliminate the sealing mechanism provided by the slitted diaphragm. On this construction, the summary judgment of noninfringement of the '931 patent was correct, and is affirmed.

THE '620 PATENT

The '620 patent also describes a valve containing a diaphragm with an opening, but the opening surrounds a conical post protruding from the surface of the blocking element; when suction is applied to the spout of the cup, the diaphragm is lifted off of the blocking element, permitting fluid to flow through the opening. Hakim describes this invention as follows:

In the preferred embodiment, the application of negative pressure to the top of the valve causes an opening in a portion of the valve to move up off of the base of a protruding member extending through that opening. Once the opening is unblocked, liquid can flow freely through the valve and spout.

In contrast, when not in use, the valve sits in a resting, closed position, with the opening pressed against the center seal-off, thereby sealing off the opening, slit or orifice in the valve assembly. Thus, in its relaxed state, with no negative pressure applied, the valve sits in a closed position with the fluid opening sealed by the center seal-off. In the preferred embodiment, the protruding member extends through the opening in a male to female relationship such that the orifice sits tightly on the protruding member against the protruding member's bottom portion and the center seal-off or sealing member's base.

'620 Patent, col. 1, line 51 to col. 2, line 9.

The district court granted summary judgment that the claims of the '620 patent are invalid based on anticipation by Italian Patent No. 594286 (the IT '286 patent). The IT '286 patent was not before the United States examiner, whereupon the district court analyzed the reference to determine its relevance and effect.

A

[5] Hakim argues that the district court erred in invalidating the '620 patent without first construing the claims, citing Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343 (Fed.Cir.2001) for the proposition that an invalidity analysis begins with the construction of the claims.

[6] Claim construction is directed to claims or claim terms whose meaning is disputed as applied to the patentee's invention in the context of the accused device. When there is no dispute as to the meaning of a term that could affect the disputed issues of the litigation, "construction" may not be necessary. We are not told what alternative meanings were sought for terms that might affect validity of the claim, or how claim "construction" would affect the issue of anticipation by the Italian patent.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

479 F.3d 1313, 81 U.S.P.Q.2d 1900                                                              Page 5
--- F.3d ---
**(Cite as: 2007 WL 542697 (Fed.Cir.(La.)))**

Hakim's methodological challenge is without substance.

                                    B

  [7][8] "Anticipation" means that the claimed invention was previously known, and that all of the elements and limitations of the claim are described in a single prior art reference. See Akzo N.V. v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1479 (Fed.Cir.1986) ("Under 35 U.S.C. § 102, anticipation requires that each and every element of the claimed invention be disclosed in a prior art reference.") The magistrate judge found that the drinking cup described in the IT '286 reference and the drinking cup in the '620 patent "are substantially identical in all material respects," explaining:

  **\*5** Both inventions have a flexible valve member or diaphragm, a base and a protruding member or post, called a peduncle in the IT '286 patent. The post extends through a hole in the valve member and, when at rest in its closed position, the valve member sits tightly around the lower portion of the post in both inventions. When a child sucks on the spout, the valve member moves up the post which allows liquid to flow through the hole in the valve member. Both the '620 and the '286 patented apparatuses operate in this manner.

Hakim II, at \*4.

  Hakim argues that the district court erred in deciding the factual issue of anticipation adversely on summary judgment; specifically, the question of whether the IT '286 reference describes a "closed position." Hakim points out that each claim of his '620 patent requires a closed position in which the valve blocks the passage of liquid, and that the IT '286 reference describes a valve that "produces hermetic sealing," i.e. that blocks the passage of air. Hakim argues that a valve can be tight enough to block the passage of air but not strong enough to block the passage of liquid, and that it cannot be assumed that when the IT '286 valve is closed it blocks the passage of liquid.

  The district court rejected this argument, pointing to the IT '286 statement that its purpose is to prevent liquid from flowing when suction is not applied, that is, to block the passage of liquid in the closed position. We discern no error in the district court's analysis of the description of the device shown in the IT '286 or the operation of the valve structure. We agree with the district court that no reasonable jury could find other than that all of the limitations of the '620 claims are present in the IT '286 device, thereby anticipating the '620 invention.

                                    C

  Mr. Hakim also argues that the district court erred in failing to analyze anticipation on a claim-by-claim basis. In particular, Hakim argues that the court ignored the limitation of claim 12 that the flexible valve "begins to invert upon the application of negative pressure." It is correct that each claim must be considered separately, and that the limitations in subordinate claims are relevant to determination of anticipation of those claims by a single reference. However, the district court did discuss the aspect of when the valve begins to invert:

  Finally, Hakim argues that unlike the IT '286 device his device requires that the flexible member "invert" or "begin to invert" and he embarks on semantical gymnastics to create a distinction in the two devices. This is not, as they say, rocket science; both of these extremely simple devices are made so that, when a child sucks on the spout, the flexible member flexes up on the post, breaking the seal, and allowing the flow of liquid. It matters not whether this movement is called inverting, "beginning to invert", flexing, sliding, moving, lifting or any other term denoting its movement. Both devices allow the liquid to flow when suction moves the flexible diaphragm from its "sealed" position on the post.

  **\*6** Hakim II at \*5. Hakim does not state that this analysis is incorrect; he just asserts that this limitation was not separately addressed in the opinion. However, the "begins to invert" limitation of claim 12 was indeed discussed. Reversible error has not been shown on this ground.

  We affirm the district court's conclusion that the '620 device is anticipated by the device in the IT '286 patent, and that the claims were correctly invalidated.

  Hakim's Expert Declaration

  [9] Hakim argues that the district court erred in striking his declaration offered as an expert, and that his testimony provided evidence of the validity and correct interpretation of his patents. The court sustained the exclusion as follows:

  A magistrate judge's non-dispositive order is reviewable under the clearly erroneous and contrary to law standard. 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); Castillo v. Frank, 70 F.3d 382, 385-86 (5th Cir.1995).

  In his Memorandum Order granting the Motion to Strike the Hakim Declaration, Magistrate Judge Kirk concluded that Hakim failed to provide a timely expert report or to submit himself for deposition, that expert testimony is

(C) 2007 West Group                                                          Page 6
479 F.3d 1313, 81 U.S.P.Q.2d 1900
 --- F.3d ---
**(Cite as: 2007 WL 542697 (Fed.Cir.(La.)))**

> not needed by the Court in this case, and that
> Hakim's testimony is self-serving, biased, and
> "of no assistance to the Court in understanding
> the 'technology' involved regarding the simple
> device at issue in this case."

This discretionary ruling is not grounds for reversal, for
we have not been shown how the trier of fact was led into
error, or could reasonably have reached a different
decision had the inventor's declaration been admitted.
This evidentiary ruling was in accordance with the Rules,
and is affirmed.

  AFFIRMED.

    FN1. Hakim v. Cannon Avent Group, PLC, No. 3-02-
1371, 2005 WL 1793760 (W.D.La. May 4, 2005) (the
'931 patent) ("Hakim I "); Hakim v. Cannon Avent Group,
PLC, No. 3-02-1371, 2005 WL 1793765      (W.D.La.
May 4, 2005) (the '620 patent) ("Hakim II ").

 479 F.3d 1313, 2007 WL 542697 (Fed.Cir.(La.)), 81
U.S.P.Q.2d 1900

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
934 F.2d 319 (Table)
**Unpublished Disposition**
(Cite as: 934 F.2d 319,  1991 WL 87534 (4th Cir.(W.Va.)))

NOTICE:  THIS IS AN UNPUBLISHED OPINION.

 (The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.   Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

**METPATH, INCORPORATED, a New Jersey Corporation, Plaintiff-Appellee,**
v.
**MODERN MEDICINE, a West Virginia Corporation, Defendant-Appellant.**
**No. 90-2234.**

Submitted March 28, 1991.

Decided May 29, 1991.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Charles H. Haden, II, Chief District Judge.  (CA- 90-30-2)

Harvey D. Peyton, Calwell, McCormick & Peyton, L.C., Nitro, W.Va., for appellant.

Cynthia Lourena Wilson, Bowles, Rice, McDavid, Graff & Love, Charleston, W.Va., for appellee.

S.D.W.Va.

AFFIRMED.

Before PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges.

PER CURIAM:

**\*\*1** Modern Medicine, Inc., appeals the district court's order granting summary judgment in favor of MetPath, Inc., in this diversity action.   On appeal, Modern Medicine raises three issues.   First, Modern Medicine contends that the district court erred in refusing to accept untimely responses to MetPath's request for admissions.   Next, Modern Medicine contends that the district court erred in failing to accept an affidavit in support of the untimely response to the request for admissions.   Finally, Modern Medicine asserts that there were genuine issues of material fact which should have precluded the district court's grant of summary judgment.   We find that the district court did not err;  accordingly, we affirm.

MetPath, Inc., a New Jersey corporation, performed medical testing for Modern Medicine, Inc., a West Virginia corporation, as part of a contractual arrangement.  Modern Medicine fell behind in its payments, and MetPath brought this diversity action to recover $55,545.66 from Modern Medicine for services rendered.  Modern Medicine denied liability in excess of $50,000, the jurisdictional limit.)

MetPath served by mail a request for admissions on Modern Medicine on March 27, 1990, and filed the request in the district court on March 28.     MetPath requested that Modern Medicine admit that it received a number of invoices, that the invoices accurately reflected work performed by MetPath for Modern Medicine, and that each and every payment made by Modern Medicine was reflected on the invoices.     The invoices were attached to the request for admissions, and Modern Medicine's response was due on April 30, 1990. [FN1]

Modern Medicine failed to respond to the request for admission.   Therefore, on May 23 MetPath moved for default judgment or summary judgment. [FN2] MetPath contended that all of the invoice amounts and payment amounts were admitted as a result of Modern Medicine's failure to respond to the request for admissions, and that therefore, there were no genuine issues of material fact remaining to be resolved through further litigation.

Modern Medicine responded to the request for admissions on June 8.     It admitted to receiving the majority of MetPath's invoices, denied receiving one group of invoices, and denied that MetPath's invoices reflected accurately the services provided by MetPath.  Its only reason for failing to file the responses in a timely fashion was that the invoices were voluminous, and responding required an extensive search through Modern Medicine's records. However, Modern Medicine failed to move for an extension of time prior to the expiration of the 30-day limit.

MetPath moved for ruling on its motion for summary judgment.     MetPath also moved to strike Modern Medicine's June 8 response to the request for admissions as untimely.   Modern Medicine moved to be allowed to file its response out of time, arguing that MetPath would not be prejudiced by the untimeliness of the response. Modern Medicine also moved to file an untimely affidavit of Dr. Elias Haikal, the chief executive officer of Modern Medicine, in response to the request for admissions. MetPath opposed the motion.

**\*\*2** The district court granted MetPath's motion for summary judgment, denying Modern Medicine's motions

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 8

934 F.2d 319 (Table)
**Unpublished Disposition**
(Cite as: 934 F.2d 319, 1991 WL 87534 (4th Cir.(W.Va.)))

to file untimely responses to the request for admissions and granting MetPath's motion to strike Modern Medicine's untimely responses. The court held that Modern Medicine admitted the facts in the request for admissions by failing to timely respond, and that there were no further genuine issues of material fact. MetPath moved to amend the judgment pursuant to Fed.R.Civ.P. 52(a) to specify the amount of judgment ($55,545.66), and the district court granted the motion. Modern Medicine appealed. [FN3]

Modern Medicine does not deny that it failed to respond to the request for admissions in a timely fashion. It also concedes that requests for admissions are deemed admitted if not responded to within the time allowed by Fed.R.Civ.P. 36(a). Rather, Modern Medicine contends that the district court could have granted its motion to file untimely responses and thereby allowed it to withdraw the admissions made by default.

Rule 36 provides in relevant part:

the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

Fed.R.Civ.P. 36(b). The Eighth Circuit has held that failure to file a timely response does not automatically require the court to deem matters admitted; rather, the court may, in its discretion, allow an untimely response. *Gutting v. Falstaff Brewing Corp.*, 710 F.2d 1309, 1312 (8th Cir.1983). The court held that a late response was the equivalent of a motion to withdraw or amend a response, and that amendment could be allowed when the opposing party suffered no prejudice by the amendment. 710 F.2d at 1313. Finally, the court held that prejudice resulted when a party will face difficulty in proving its case because of a "sudden need to obtain evidence required to prove the matter that had been admitted." 710 F.2d at 1314, citing *Brook Village North Assoc. v. General Elec. Co.*, 686 F.2d 66, 70 (1st Cir.1982). In *Gutting*, however, the opposing party was not prejudiced by the late filing of responses because it had already obtained the necessary evidence through depositions.

The Second Circuit has held that "[u]nder compelling circumstances the District Court may allow untimely replies to avoid the admission." *Moosman v. Joseph P. Blitz, Inc.*, 358 F.2d 686, 688 (2d Cir.1966). That court, too, held that an untimely response should only be allowed in the absence of prejudice to the opposing party.

Similarly, the Ninth Circuit has held that in the absence of prejudice to the opposing party or bad faith on the part of the answering party, late responses to requests for admission may be allowed in the district court's discretion. *French v. United States*, 416 F.2d 1149, 1152 (9th Cir.1968).

**\*\*3** In this case, MetPath alleged that it would be prejudiced by Modern Medicine's proposed untimely response. Specifically, MetPath stated that it would be forced to obtain evidence to prove facts admitted by Modern Medicine by default, and that obtaining this evidence would result in significant expense and delay. The district court agreed with this assessment, and granted the motion to strike the untimely response.

The district court's denial of Modern Medicine's motion to file untimely responses may only be overturned upon a showing of abuse of discretion. *999 v. C.I.T. Corp.*, 776 F.2d 866, 869 (9th Cir.1985). The prejudice suffered by MetPath, though not great, was sufficient to support the district court's rejection of Modern Medicine's untimely response to the request for admissions. MetPath may have had to incur expenses in obtaining evidence to prove the facts which Modern Medicine admitted to by default. Further, Modern Medicine could have moved for an extension of time to answer or could have stated that it did not have sufficient information to answer; its efforts to comply with Rule 36 were minimal at best. Therefore, we hold that the district court did not abuse its discretion in refusing to allow the untimely responses to MetPath's request for admissions. *See Dukes v. South Carolina Ins. Co.*, 770 F.2d 545, 548-49 (5th Cir.1985) (plaintiffs' failure to timely respond to request for admission and failure to offer reason for delay justified striking late response; control of discovery committed to sound discretion of district court).

Similarly, Modern Medicine contended that the district court erred in refusing to accept Dr. Haikal's affidavit. The affidavit was filed in response to the request for admissions, and it was untimely; further, it only served to refute matters admitted by default by Modern Medicine. Therefore, the court correctly refused to allow the affidavit.

Finally, Modern Medicine contended that the district court erred in granting summary judgment in favor of MetPath. However, taking the matters admitted by Modern Medicine as conclusive, there was no remaining genuine issue of material fact. Modern Medicine's admission that MetPath had performed services, that it owed money to MetPath for those services, and that it had only paid a small part of that money proved MetPath's

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
934 F.2d 319 (Table)                                              Page 9
**Unpublished Disposition**
(Cite as: 934 F.2d 319, 1991 WL 87534 (4th Cir.(W.Va.)))

claim. Further, MetPath's calculation of the amount due under the invoices was proper. Therefore, summary judgment was properly granted. *Moosman v. Joseph P. Blitz, Inc.,* 358 F.2d 686, 688 (summary judgment may be granted on the basis of admissions made by default).

We affirm the district court's grant of summary judgment in favor of MetPath. We dispense with oral argument because the facts and legal contentions are adequately addressed in the materials before the Court and argument would not significantly aid the decisional process.

*AFFIRMED.*

FN1. Under the Federal Rules of Civil Procedure, requests for admissions are deemed admitted unless denied within 30 days of service. Fed.R.Civ.P. 36. Three days were added because the request for admissions was served by mail, and because the due date fell on a Sunday, the response was due on the following Monday. Fed.R.Civ.P. 6(a), (e).

FN2. Prior to its motion for default or summary judgment, but after the last date for response to the request for admissions, MetPath contacted Modern Medicine by telephone and mail seeking a response. MetPath warned Modern Medicine that it would move for default or summary judgment if Modern Medicine did not respond by May 18.

FN3. Modern Medicine filed a premature notice of appeal while the Rule 52(a) motion was pending, but that appeal was dismissed on the parties' stipulation.

934 F.2d 319 (Table), 1991 WL 87534 (4th Cir.(W.Va.)), Unpublished Disposition

END OF DOCUMENT

(C) 2007 West Group
(Cite as: 2005 WL 1423592 (M.D.N.C.))

Only the Westlaw citation is currently available.

United States District Court,

M.D. North Carolina.

**Joan E. MORRIS-BELCHER, Tiffany C. McCravey,
Risha Hamlin, and Chandra
Sherrill, Plaintiffs,**
v.
**HOUSING AUTHORITY OF THE CITY OF
WINSTON-SALEM, Defendant.
No. 1:04CV255.**

June 17, 2005.

Romallus O. Murphy, Greensboro, NC, for Plaintiffs.

Rachel Beaulieu Esposito, Patricia L. Holland, Cranfill
Sumner & Hartzog, Raleigh, NC, for Defendant.

MEMORANDUM OPINION

BEATY, J.

**\*1** This matter is before the Court on a Motion for
Summary Judgment [Document # 26] by the Defendant
Housing Authority of the City of Winston- Salem
("Defendant" or "Housing Authority"). Also before the
Court is a Motion by Plaintiffs Joan E. Morris-Belcher,
Tiffany C. McCravey, Risha Hamlin, and Chandra
Sherrill (collectively "Plaintiffs") for Leave to File a
Response Out of Time [Document # 31], and a
corresponding Motion by Defendant seeking to strike
Plaintiffs' untimely Response [Document # 37].

Plaintiffs are all former employees of the Housing
Authority and have brought this lawsuit pursuant to 42
U.S.C. § 2000e-5(f) for employment discrimination on
the basis of sex. For the reasons discussed below, the
Court finds that Plaintiffs have failed to establish
excusable neglect as required by Federal Rule of Civil
Procedure 6(b)(2) and Local Rule 6.1(a), and therefore
Plaintiffs' Motion for Leave to File a Response Out of
Time will be DENIED. Defendant's corresponding
Motion to Strike the Untimely Response [Document # 37]
will therefore be GRANTED.

The Court further finds that Plaintiffs have failed to
establish a prima facie case of discrimination, and the
Court concludes that there are no genuine issues of
material fact precluding summary judgment in this case.
Therefore, Defendant's Motion for Summary Judgment
[Document # 26] will be GRANTED.

I. FACTUAL BACKGROUND  [FN1]

FN1. Plaintiffs did not file a timely Response to the
Motion to Dismiss, and the Court in this Opinion denies
Plaintiffs' Motion for Leave to File a Response Out of
Time and grants Defendant's Motion to Strike the
Untimely Response. Therefore, in evaluating the Motion
for Summary Judgment, the Court has summarized the
uncontested facts based on the evidence before the Court
included with Defendant's Motion for Summary
Judgment.

In April 2003, Plaintiffs were each employed as case
managers with the Housing Authority. As case managers,
Plaintiffs had a fair degree of autonomy in scheduling
appointments and making visits to client's homes. On
April 23, 2003, Plaintiffs left work at approximately
12:30 p.m. for lunch together at the Fire Mountain
Restaurant in Kernersville, North Carolina. Plaintiffs
admit that they spent over two hours at lunch together that
day and that they stayed at lunch until after 3:00 p.m.
While at lunch, an individual eating in the restaurant, Mr.
Thomas Penn, ("Mr.Penn") overhead the Plaintiffs'
conversations involving rumors and derogatory
statements regarding their co-workers, supervisors, and
managers at the Housing Authority. During the lunch,
Plaintiffs made jokes regarding one of the managers,
calling her "Shrek" and "Big Foot" because they believed
she was overweight. Plaintiffs also made jokes about
other supervisors' birthmarks and scars, calling one of the
supervisors "Elephant Man" and another "Scarface."
Plaintiffs joked that one of the supervisors was
"incompetent." Plaintiffs discussed their belief that their
supervisor, Ms. Rosalind McClelland, was sexually
involved with Mr. Reid Lawrence, the Executive Director
of the Housing Authority. According to Mr. Penn, and to
Plaintiffs' own admissions in their depositions, Plaintiffs
opined that Ms. McClelland was "sleeping around" for
promotions and that Mr. Lawrence was "screwing
everybody." Plaintiffs also opined that there were
"whores" within the Housing Authority from top to
bottom. Plaintiffs then agreed that if anyone questioned
them regarding their extended lunch break, they could
falsely report that they were conducting home visits with
Housing Authority residents during the time when they
were actually at lunch. Mr. Penn observed the individuals
depart at approximately 3:40 p.m.

**\*2** Mr. Penn was acquainted with some of the
individuals mentioned by the Plaintiffs during lunch, and
decided to call Ms. McClelland at the Housing Authority
to report what he had heard. At a staff meeting later that
week, Plaintiffs were reminded of Housing Authority
lunch policies. Plaintiffs were then individually
confronted with the report from Mr. Penn. Each Plaintiff
admitted having the conversations and violating the one-
hour lunch policy. Nevertheless, Plaintiffs subsequently

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 11

(Cite as: 2005 WL 1423592 (M.D.N.C.))

submitted timesheets claiming to have worked eight hours on the day in question, with only a one-hour lunch. [FN2] Based on Plaintiffs conduct and comments at the lunch, their violation of the one-hour lunch policy, and their falsification of their time records, Plaintiffs were terminated. In their depositions, Plaintiffs admit making these comments, admit violating the one-hour lunch policy, and admit that their terminations were based on the April 23, 2003 lunch. See Morris-Belcher Depo. Vol. I, pp. 43-50, 53, 81-82; Sherrill Depo. Vol. I, pp. 22, 37-41, 71-72, Vol. II, pp. 19-20; McCravey Depo. Vol. I, pp. 23, 27-28, 30, 34, 36, 38, 44-46, 57, 62, 79, 92-95; Hamlin Depo. Vol. I, pp. 47, 51-52, 55-57, 83-84.

FN2. Two of the Plaintiffs later contended that they were entitled to "compensatory time," so that the indication of eight hours of work on April 23 was not incorrect. However, none of the Plaintiffs obtained prior authorization or submitted any required documentation for using compensatory time, as required by Housing Authority policy. In addition, there is no dispute that Plaintiffs took an extended lunch without obtaining prior approval. There is also no dispute that Plaintiffs engaged in the unprofessional public name-calling and gossiping about their supervisors during the lunch.

After being terminated, Plaintiffs filed an EEOC charge and subsequently filed the present lawsuit. In their Complaint, Plaintiffs allege that they were subjected to sexual harassment, were passed up for promotions because promotions and job benefits were based on sexual favoritism, and were terminated based on conduct that would not have been cause for dismissal if they had been male.

On June 29, 2004, the parties submitted a Joint Rule 26(f) Report that provided for a discovery period to run from June 29, 2004 until January 29, 2005. Based on the parties' plan, the Court set the case for trial on the July 11, 2005 calendar, which provided ample time for the parties to present their dispositive motions. On January 26, 2005, the parties requested an extension of the discovery deadline, prompted primarily by Plaintiffs' failure to answer discovery and appear for depositions. Magistrate Judge Dixon denied that request because the extension of the discovery period would not allow sufficient time for dispositive motions. However, the parties subsequently agreed to shorten their deadlines for dispositive motions in order to allow some extension of the discovery deadline. Based on this agreement, Magistrate Judge Dixon entered a Scheduling Order on February 23, 2005 extending the close of discovery until March 21, 2005, and providing that "summary judgment motions are due no later than March 31" and "[m]otion responses are due no later than April 11." The Scheduling Order further provided that "[t]hese dates are firm."

Defendant subsequently filed Motions to Compel and for Sanctions based on Plaintiffs' failure to respond to discovery deadlines, failure to provide requested documents, and failure to appear for scheduled depositions. Magistrate Judge Dixon held a hearing on May 18, 2005, and granted Defendant's Motion for Sanctions based on Plaintiffs' multiple discovery abuses. In his May 26, 2005 Order imposing sanctions, the Magistrate Judge found that "Plaintiffs missed their discovery deadlines repeatedly" and "Defendant has been substantially prejudiced by Plaintiffs' repeated failure to produce timely and thorough discovery responses and by Plaintiffs' unexplained failure to appear for or complete reconvened depositions ." The Magistrate Judge further concluded that "Plaintiffs' failure to produce discovery responses has foreclosed Defendant's ability to complete Plaintiffs' depositions and to adequately prepare for trial ." Based on the scheduled trial date and the fact that the discovery deadline expired three months prior, the Magistrate Judge concluded that "future disclosure of responsive discovery material by Plaintiffs is not a suitable remedy and would further prejudice Defendant." Based on these findings, the Magistrate Judge ordered Plaintiffs to pay Defendant's expenses and attorney's fees related to the Motion for Sanctions and the depositions for which Plaintiffs failed to appear. The Magistrate Judge further recommended that this Court strike the pleadings of Plaintiffs Morris- Belcher, McCravey, Hamlin, and Sherrill for damages for emotional pain, suffering, or mental anguish, and strike the pleadings by Plaintiff Sherrill for loss of income, compensatory damages and backpay based on Plaintiffs' failure to provide timely and complete discovery on these issues. In a subsequent Order, the Magistrate Judge also recommended that Plaintiff McCravey's claims for loss of income, compensatory damages and backpay be stricken based on Plaintiff McCravey's failure to produce requested information relevant to these claims.

*3 On March 31, 2005, within the time specified by the Scheduling Order, Defendant filed the present Motion for Summary Judgment. Plaintiffs did not file a Response to the Motion for Summary Judgment by the April 11 deadline specified in the Court's Scheduling Order. Over five weeks later, on May 20, 2005, Plaintiffs filed a Motion for Leave to File a Response Out of Time, and included a proposed Response and Affidavits. Defendant subsequently filed a Motion to Strike the Untimely Response [Document # 37]. Plaintiffs' Motion for Leave to File a Response Out of Time, Defendant's Motion to Strike, and Defendant's Motion for Summary Judgment are all ripe for disposition. Therefore, in evaluating these motions, the Court will first consider Plaintiffs' Motion for Leave to File their Response Out of Time and Defendant's corresponding Motion to Strike the Untimely

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 12

(Cite as: 2005 WL 1423592 (M.D.N.C.))

Response, and the Court will then consider Defendant's Motion for Summary Judgment.

## II. PLAINTIFFS' MOTION FOR LEAVE TO FILE RESPONSE OUT OF TIME AND DEFENDANT'S CORRESPONDING MOTION TO STRIKE THE RESPONSE

Pursuant to Federal Rule of Civil Procedure 6(b), "[w]hen by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order." Fed.R.Civ.P. 6(b). However, if a motion is made "after the expiration of the specified period," the Court may "permit the act to be done where the failure to act was the result of excusable neglect." Id. Likewise, Local Rule 6.1 provides that "[e]xtensions will not be allowed unless the motion is made before the expiration of the specified time, except upon a showing of excusable neglect." Local Rule 7.3(k) similarly provides that "[t]he failure to file a brief or response within the time specified in this rule shall constitute a waiver of the right thereafter to file such brief or response, except upon a showing of excusable neglect."

Thus, although motions for enlargement of time made before the proscribed period's expiration require only a showing of "cause," where a party waits until after the expiration, "the burden is a more rigorous 'excusable neglect' standard." Curtis v. Norfolk S. Ry. Co., 206 F.R.D. 548, 550 (M.D.N.C.2002). In deciding whether an omission is excusable, "the determination is ... an equitable one, taking account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship., 507 U.S. 380, 395, 113 S.Ct. 1489, 1498, 123 L.Ed.2d 74 (1993). The relevant circumstances include: "[1] the danger of prejudice to the [adverse party] ... [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." Id. Whether an omission is excusable is left to the "sound discretion of the district court." Davidson v. Keenan, 740 F.2d 129, 132 (2d Cir.1984).

**\*4** In the present case, Plaintiffs failed to file a timely Response and did not request an extension of time until five weeks after the expiration of the time set by the Court's Scheduling Order in this case. Therefore, under Federal Rule of Civil Procedure 6(b) and Local Rule 7.3(k), Plaintiffs waived their right to respond unless they can establish "excusable neglect." In support of Plaintiffs'

Motion for Leave to File Out of Time, Plaintiffs' counsel submits that he has been handling other unrelated cases for a disbarred attorney, and that this caseload, coupled with his regular practice and a staff shortage, caused the delay in responding in this matter. Plaintiffs' counsel also contends that "[t]his case, with multiple plaintiffs and several boxes of documents, produced challenges attending to detail."

In evaluating this motion, the Court notes first that Plaintiffs failed to comply with an explicit deadline that was set forth by Magistrate Judge Dixon in his Scheduling Order that he specifically described as being "firm." The Magistrate Judge was initially unwilling to extend the discovery period at the parties' request, based on his concern that such an extension could result in deadlines for dispositive motions that were too close to the trial date. In order to alleviate this concern, the parties voluntarily agreed to shorten the deadlines for dispositive motions. Based on this agreement, the Magistrate Judge's Scheduling Order specifically announced the applicable deadlines, including a due date for Responses of April 11, 2005. Plaintiffs, however, did not file the present motion until May 20, 2005, some thirty-nine days beyond the deadline. Plaintiffs' counsel has been handling this case since its inception, and should have been well aware of the applicable deadlines. In these circumstances, the Court has a significant interest in holding the parties to the agreed-upon deadlines embodied in a Court Order, particularly where the parties represented to the Court that they would comply with those deadlines in order to obtain an extension of the discovery period.

In addition, the Court also notes Plaintiffs' demonstrated pattern of failing to comply with required deadlines in this case, including their failure to answer discovery and to appear for depositions. Plaintiffs' failure to comply with the discovery deadlines ultimately led the Magistrate Judge to impose sanctions and recommend dismissal of certain claims. Thus, Plaintiffs' actions throughout this litigation have demonstrated a disregard of Court-ordered deadlines that resulted in unnecessary delays and prejudice to the Defendant.

Moreover, the Court notes that the professional commitments and busy caseload of an attorney are not ordinarily grounds for finding excusable neglect. See, e.g., Pioneer, 507 U.S. at 398, 113 S.Ct. at 1499 ("[W]e give little weight to the fact that counsel was experiencing upheaval in his law practice at the time."); McLaughlin v. City of LaGrange, 662 F.2d 1385, 1387 (11th Cir.1981) ("The fact that counsel has a busy practice does not establish 'excusable neglect' under Rule 6(b)(2)."); cf. Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 533-34 (4th Cir.1996) (noting that "it was appropriate to hold a client accountable for the mistakes

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 2005 WL 1423592 (M.D.N.C.))

of counsel" and that "[t]he most important of the factors identified in Pioneer for determining whether 'neglect' is 'excusable' is the reason for the failure to file"). The fact that Plaintiffs' counsel has a busy caseload and that this case involved four plaintiffs and "several boxes of documents" does not establish excusable neglect. Moreover, even if Plaintiffs' counsel was too overextended to file a substantive response to the Housing Authority's motion for summary judgment, no reasonable explanation has been given to explain why Plaintiffs did not request an extension of time prior to the expiration of the response period on April 11, 2005.

**\*5** Finally, the Court notes that allowing Plaintiffs' untimely Response would cause significant prejudice to Defendant and would unduly delay this Court's trial calendar. While Defendant had only 10 days to prepare their Motion for Summary Judgment, Plaintiffs have now taken over 7 weeks to prepare their Response. In addition, Defendant is now faced with the prospect of drafting a Reply and evaluating Plaintiffs' Response only a few weeks before trial and a few days before pretrial disclosures are due. To allow Plaintiffs to now file a Response on the eve of trial, long after the discovery period has closed and the deadlines have passed, would result in significant prejudice to Defendant. Moreover, the additional time required for Defendant's Reply and the Court's subsequent consideration of Defendant's Motion for Summary Judgment would unduly delay this Court's trial schedule.

Therefore, after a consideration of all of these factors as discussed above, the Court concludes that Plaintiffs have failed to show excusable neglect. The Court in its discretion therefore concludes that Plaintiffs' Motion for Leave to File a Response Out of Time [Document # 31] should be, and the same is, denied. For the same reasons, Defendant's Motion to Strike the Untimely Response [Document # 37] is granted. Having made that determination, the Court will now turn to a consideration of Defendant's Motion for Summary Judgment.

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There can be "no genuine issue as to any material fact" if the non- moving party fails to "make a showing sufficient to

establish the existence of an element essential to that party's case," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances." ' Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir.1994) (quoting Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir.1967)).

**\*6** When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir.1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." Catawba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir.1992) (en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Id. In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. Anderson, 477 U.S. at 248-49, 106 S.Ct. at 2510; Catawba Indian Tribe, 978 F.2d at 1339. In other words, the nonmoving party must show "more than ... some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Catawba Indian Tribe, 978 F.2d at 1339.

In addition, "[w]hile courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir.1996). Based on this standard, the Court will consider the claims brought by Plaintiffs for sex discrimination in violation of Title VII.

#### B. Analysis of Sex Discrimination Claims Under McDonnell Douglas Scheme

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
Page 14
(Cite as: 2005 WL 1423592 (M.D.N.C.))

Regardless of the type of evidence offered, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir.2004). The judicially-created scheme of proof originally established for use in Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), requires that Plaintiffs first prove, by a preponderance of the evidence, a prima facie case of discrimination. Hill, 354 F.3d at 285. To demonstrate a prima facie case of discrimination under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) an adverse employment action occurred, (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action, and (4) the job remained open or was filled by a similarly qualified applicant outside of plaintiff's class. See McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. at 1824. Once a plaintiff has established her prima facie case, the defendant must respond with evidence that it acted with a legitimate, nondiscriminatory purpose. Id. If the defendant meets this burden of production, the presumption of discrimination created by the prima facie case vanishes, requiring the plaintiff to prove that the defendant's proffered reason is a pretext for discrimination in order to recover. Id. at 804, 93 S.Ct. at 1825. [FN3]

FN3. In light of Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), Plaintiffs are no longer required to show pretext plus some additional evidence of discrimination. Id. at 148, 120 S.Ct. at 2109. In other words, the Court may infer the ultimate fact of discrimination merely from the falsity of Defendant's proffered explanation. Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir.2000). In addition, under the Supreme Court's holding in Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), Plaintiffs may instead offer evidence to support a finding that Defendant's reason, "while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir.2004) (citing Rishel v. Nationwide Mut. Ins. Co., 297 F.Supp.2d 854, 865 (M.D.N.C.2003)). However, in the present case, Plaintiffs have failed to show that Defendant's proffered reason was false or that Plaintiffs' gender was a 'motivating factor' in the decision.

**\*7** Here, Plaintiffs cannot establish a prima facie case of discrimination for two reasons. First, Plaintiffs have admitted that they violated the one- hour lunch policy and made offensive, derogatory comments in public regarding their supervisors and managers. Thus, the Plaintiffs were not meeting their employer's legitimate expectations. In addition, all of their positions were filled by other females, and thus Plaintiffs have not shown that the positions were filled by individuals outside Plaintiffs' protected class. Cf. Brown v. McLean, 159 F.3d 898, 905-06 (4th Cir.1998).

Moreover, even if Plaintiffs had established a prima facie case of discrimination, Defendant has presented a legitimate, non-discriminatory reason for terminating Plaintiffs based on Plaintiffs' abuse of the one-hour lunch policy and Plaintiffs' conduct and statements during the lunch. Plaintiffs have offered no evidence or contentions to show that the reasons offered by Defendant were not the "real reasons" for their termination. In fact, Plaintiffs do not dispute that they were terminated for their conduct at the lunch. Therefore, the Court concludes that Plaintiffs' undisputed conduct at the lunch, specifically their public name-calling and gossiping about their supervisors and managers and their violation of the one-hour lunch policy without approval, was a legitimate, nondiscriminatory reason for their termination.

To the extent that Plaintiffs contend that they were punished more harshly than a male employee would have been for the same violations, Plaintiffs have failed to present any evidence regarding any analogous behavior by a male employee, or any evidence that male employees received a lesser punishment for similar violations. In fact, in their deposition testimony before the Court, Plaintiffs contend that they were discriminated against not because of their gender, but because they were not social friends with the managers and supervisors. See, e.g., Sherrill Depo. Vol. II, p. 70; Hamlin Depo. Vol. I, pp. 107-08, Morris-Belcher Depo. Vol. II, p. 8; McCravey Depo. Vol. II, pp. 9, 11. Plaintiffs contend that those employees who were friends with the managers and supervisors and part of the same social circle were given preferential treatment, regardless of gender. Plaintiffs further contend that they would not have been fired if they had been part of that social group, and that they were treated unfairly because one of the supervisors did not like them. However, the law is clear that giving preferential treatment to friends or social acquaintances does not violate Title VII. See, e.g., Autry v. North Carolina Dep't of Human Resources, 820 F.2d 1384, 1385 (4th Cir.1987) (noting that a "discrimination case is not made out by showing that friendship or politics may have entered into a promotion decision"); Preston v. Wisconsin Health Fund, 397 F.3d 539, 541-42 (7th Cir.2005) ("Neither in purpose nor in consequence can favoritism resulting from a personal relationship be equated to sex discrimination."). Therefore, even if Plaintiffs' contentions were true, they would not establish a claim for sex discrimination. Based on this evidence, the Court

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 2005 WL 1423592 (M.D.N.C.))

concludes that Plaintiffs have failed to present sufficient evidence to raise even an inference that Defendant's decision to terminate Plaintiffs was based on sex discrimination. [FN4]

FN4. The Court notes that even if it were to consider the Plaintiffs' untimely Response and Affidavits, Plaintiffs have still failed to present     sufficient evidence in support of their claims. Plaintiffs' Affidavits consist primarily of unsupported rumors and innuendos that have nothing whatsoever to do with their terminations on April 23, 2003. Thus, even if the Court considered Plaintiffs' untimely submissions, the Court still concludes that there is no inference or basis for concluding that Plaintiffs' terminations were based on their sex. As a result, any claim that the Housing Authority violated Title VII when it terminated Plaintiffs is properly dismissed.

C. Claims of Hostile Work Environment

**8** With respect to Plaintiffs' claims of a "hostile work environment," the evidence properly before the Court provides no support for these claims. A "hostile work environment" claim under Title VII is found "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998). The evidence before the Court does not meet this standard. In this case, none of the Plaintiffs ever raised any sexual harassment complaints while they were employed at the Housing Authority. However, Plaintiffs now apparently assert a claim that they were subjected to a hostile work environment because they suspected that Ms. McClelland was romantically involved with Mr. Lawrence, and they further speculated that Mr. Lawrence awarded Ms. McClelland multiple promotions because of the suspected relationship. However, Plaintiffs have presented no evidence in support of this allegation. In fact, all promotion decisions were made by Ms. Burnetta Evans, who submitted an Affidavit and evidence to show that she, and not any male supervisors, made the promotion recommendations for Ms. McClelland. Ms. McClelland actually was promoted only once, in November 2002, and was later transferred out of the department and then back into the department at the same salary. According to Ms. Evans, none of the Plaintiffs ever even applied for any posted promotions. Moreover, if Plaintiffs could present evidence in support of this contention, even if true, "[p]referential treatment on the basis of a consensual romantic relationship between a supervisor and an employee ... is not sex discrimination." Murray v. City of Winston-Salem, 203 F.Supp.2d 493, 501 (M.D.N.C.2002); see also Becerra v. Dalton, 94 F.3d 145,

149-50 (4th Cir.1996).

During their depositions, Plaintiffs made similar additional contentions of a hostile work environment based on various rumors that they had "heard" and perhaps helped to spread, but presented no evidence of discrimination or harassment. At most, the evidence before the Court reveals that Plaintiffs voluntarily attended an off-site birthday lunch for a co-worker at some point in the past, during which the co-worker received a bag filled with gag gifts that were sexual in nature. However, the gifts stayed in the bag, and only employees who chose to look into the bag saw the contents of the gift bag. Such an event clearly does not rise to the level of sex discrimination. Cf. Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir.1996) (holding that sexual innuendos or comments in a group setting would not support a claim of sex discrimination because "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace"); Cowan v. Prudential Ins. Co., 141 F.3d 751 (7th Cir.1998). In addition, while the evidence may reveal that Mr. Lawrence gave hugs to both male and female employees and invited both male and female employees out to lunch and dinner, there is no basis to conclude that this conduct in any way involved sexual harassment. Cf. Gupta v. Florida Board of Regents, 212 F.3d 571, 584 (11th Cir.2000); Pfeil v. Intecom Telecomm., 90 F.Supp.2d 742, 747- 48 (N.D.Tex.2000). Plaintiffs also contend that they were treated unfairly because one of the female supervisors did not particularly like them. Plaintiffs, however, do not contend that the supervisor's dislike of them was based in any way on Plaintiffs' gender. Of course, such interpersonal conflict does not provide a basis for a sex discrimination claim. See, e.g., Oncale, 523 U.S. at 80, 118 S.Ct. at 1002 ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."); Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772 (4th Cir.1997) ("We have made clear that only harassment that occurs because of the victim's gender is actionable."). Therefore, the Court concludes that Plaintiffs have failed to present sufficient evidence from which a jury could find a hostile work environment or any other discrimination on the basis of sex.

IV. CONCLUSION

**9** In summary, for the reasons discussed above, the Court concludes that Plaintiffs have failed to establish excusable neglect to justify their failure to file a Response within the time period to which they previously agreed and which was designated as a "firm" deadline by Court Order. Therefore, Plaintiffs' Motion for Leave to File a

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 2005 WL 1423592 (M.D.N.C.))

Response Out of Time [Document # 31] is DENIED, and Defendant's corresponding Motion to Strike the Untimely Response [Document # 37] is GRANTED. Plaintiffs' Proposed Response and Affidavits (submitted as attachments to Document # 31) are ordered STRICKEN.

   In considering Defendant's Motion for Summary Judgment, the Court concludes that Plaintiffs have failed to establish a prima facie case of discrimination, and have failed to present any evidence that would create an inference that they were terminated on the basis of sex. In fact, the evidence is undisputed that Plaintiffs were terminated for their misconduct related to their lunch on April 23, 2003. Plaintiffs have not presented any evidence to show that male employees had been or would have been treated any differently. Plaintiffs have further failed to present any evidence to establish the existence of a hostile work environment or "sexual harassment" that would constitute discrimination on the basis of sex.

   Because there are no genuine issues of material fact, and because there is no evidence from which a reasonable jury could conclude that Plaintiffs were terminated because of their sex, or were subjected to a hostile work environment, the Court concludes that summary judgment is appropriate. Therefore, Defendant's Motion for Summary Judgment [Document # 26] is GRANTED, and Plaintiffs' claims are DISMISSED WITH PREJUDICE.

   To the extent that Plaintiffs have requested a delay in the trial setting of this case [Document # 34], that request is DENIED AS MOOT. Finally, to the extent that the Magistrate Judge in his Order imposing sanctions also recommended that certain of Plaintiffs' claims be dismissed for various discovery abuses, that Recommendation [Document # 32, 39] is now MOOT. However, the Court retains jurisdiction in this matter as necessary to allow the Magistrate Judge to enforce his Order imposing sanctions [Document # 32].

   An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.

   2005 WL 1423592 (M.D.N.C.)

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

Page 17

United States District Court, N.D. California.

**NEC CORPORATION and NEC Electronics, Inc.**
v.
**INTEL CORPORATION.**
**No. C-84-20799-WPG.**

Feb. 6, 1989.

Memorandum of Decision

GRAY, Senior District Judge:

**\*1** In this action, NEC seeks a declaration that Intel's copyrights on its 8086 and 8088 microcodes [FN*] are invalid and/or are not infringed by NEC. Intel has filed a counterclaim for infringement of its copyrights on those microcodes. This case was tried without a jury for eighteen days between April 25 and July 18, 1988. Post-trial briefs were filed, final arguments were heard on July 29, 1988, and the case then was submitted for decision. The issues to be determined and the decision that the court now renders on each are as follows:

1. Are Intel's microcodes for its 8086 and 8088 microprocessors proper subject matter for protection under United States copyright laws (17 U.S.C. § 101 et seq.)? This question is answered in the affirmative.

2. Did Intel forfeit the copyrights that it had obtained for its 8086 and 8088 microcodes because more than a relatively small number of copies of product distributed by its authority did not contain the copyright notice prescribed by 17 U.S.C. § 401, because it failed to make a reasonable effort to cause such notice to be added to those copies after the omission had been discovered, within the meaning of 17 U.S.C. § 405, and because those copies were distributed at times when no express requirement in writing, within the meaning of 17 U.S.C. § 405, mandated such marking? This court concludes that Intel did so forfeit its copyrights.

3. Do the microcodes that NEC produced for its V20, V30, V40 and V50 microprocessors infringe the Intel copyrights for its 8086 and 8088 microcodes? NEC's microcodes do not so infringe.

4. Are NEC's V20 and V30 microprocessors no more than "improvements" upon its uPD 8086 and uPD 8088 microprocessors, which were licensed by Intel under its copyrights? NEC's V20 and V30 microprocessors are not simply "improvements" upon its uPD 8086 and uPD 8088 microprocessors.

The reasons for the foregoing decision are contained in the following discussion:

I. The Copyrightability of Intel's Microcode
A microcode consists of a series of instructions that tell a microprocessor which of its thousands of transistors to actuate in order to perform the tasks directed by the macroinstruction set. As such, it comes squarely within the definition of a "computer program," which Congress added to the Copyright Act in 1980, namely, "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101.

A computer program, even though articulated in object code, is afforded copyright protection as a "literary work" under Section 101, which includes works "expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects ... in which they are embodied." See Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1249 (3d Cir.1983); 17 U.S.C. § 101. For a particular literary work to be copyrightable, two requirements must be satisfied: the work must be "fixed in any tangible medium of expression," and it must be "original." See 17 U.S.C. § 102(a). It is undisputed that Intel's microcode is fixed in a tangible medium of expression. However, NEC challenges the originality of Intel's microcode, and urges two other bases for denying copyright protection.

A. Originality.
**\*2** NEC contends that many of Intel's microsequences are not copyrightable because they consist only of a few obvious steps and thus lack the originality required for copyright protection. NEC refers to Mr. Nimmer's comment that "[i]llustrative of the requirement of minimal creativity are those cases which deny copyright protection to fragmentary words or phrases, non-creative variations of musical compositions and to forms of expression dictated solely by functional considerations." 1 M. Nimmer, Nimmer on Copyright § 2.01[B] at pp. 2-14 to 2-14.1. An example of such type of case is Alberto-Culver Co. v. Andrea Dumon, Inc., 466 F.2d 705, 711 (7th Cir.1972), in which the court held that the phrase "most personal sort of deodorant" was not entitled to copyright protection. NEC seeks to have such a ruling applied to several of the microsequences in the Intel microcode that are very short, involve only a few steps, and are handled almost identically in NEC's accused microcode and by Mr. Davidian in the "Clean Room" microcode (which will be discussed later).

It well may be that, considered alone, several of the microsequences in Intel's microcode consist of "forms of

(C) 2007 West Group

Page 18

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

expression directed solely by functional considerations" lacking even "minimal creativity." But these examples are only small segments of the copyrighted microcode. As Intel points out, any copyrighted work, be it a poem, novel or computer program, can be chopped into parts that could be said to have very few creative steps.

However, for purposes of copyrightability, "[o]riginality means only that the work owes its origin to the author, i.e., is independently created, and not copied from other works," and that the work contains a modicum of originality, i.e., "exceeds that required for a fragmentary work or short phrase." 1 M. Nimmer, Nimmer on Copyright § 2.01[A] at 2-8, § 2.01[B] at 2-15. See also Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 301 (9th Cir.1965). The Intel microcode fully meets this test. There is no evidence that Intel's microcode was other than an independent effort and, overall, Intel's microcode exceeds the required modicum of originality.

B. Microcode As Part Of The Computer.

As stated above, the Copyright Act defines a computer program as "a set of statements or instructions to be used ... in a computer." 17 U.S.C. § 101 (emphasis added). NEC contends that Intel's microcode is a defining element of the computer itself. According to NEC, Intel's microcode does not come within the definition of a computer program because it cannot be used in a computer and also is a defining part of the computer. But, as stated at the outset, Intel's microcode is within the statutory definition of a "computer program," and NEC's semi-semantical argument runs counter to the authority cited by Intel: "There is nothing in any of the statutory terms which suggest a different result [concerning copyrightability] for different types of computer programs based upon the function they serve within the machine." Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1252 (3d Cir.1983) (quoting Apple Computer, Inc. v. Formula Intern, Inc., 562 F.Supp. 775, 780 (C.D.Cal.1983)). See also National Commission on New Technological Uses of Copyright Works, Final Report at 21, which asserted that "[p]rograms should no more be considered machine parts than videotapes should be considered parts of projectors or phonorecords parts of sound reproduction equipment.... That the words of a program are used ultimately in the implementation of a process should in no way affect their copyrightability."

C. Idea v. Expression.

*3 It is an axiom of copyright law that only the expression of an idea is copyrightable, not the idea, itself. This doctrine was announced in Baker v. Selden, 101 U.S. 99, 103 (1879), and a substantial portion has been codified in 17 U.S.C. § 102(b). See Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1250 (3d

Cir.1983). Stemming from Baker v. Selden is the related doctrine of "merger", which was well stated by Judge Browning in Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F.2d 738, 742 (9th Cir.1971):

When the "idea" and its "expression" are thus inseparable, copying the "expression" will not be barred, since protecting the "expression" would confer a monopoly of the "idea" upon the copyright owner free of the conditions and limitations imposed by the patent law.

NEC contends that if substantial similarities do exist between its accused microroutines and those of Intel, they are because of constraints that severely limit the ways in which the "ideas" therein contained can be expressed. NEC therefore urges that such merger of idea and expression forestalls copyrightability, and relies basically upon Morrissey v. Procter & Gamble Co., 379 F.2d 675 (1st Cir.1967), which so held.

However, Mr. Nimmer suggests the appropriate rule to be that the "merger" of idea and expression "will preclude a finding of substantial similarity", thus forestalling a finding of infringement, and he criticized Morrissey as "a questionable extension of this principle." 3 M. Nimmer, Nimmer on Copyright, § 13.03[A] at 13-33 to 13-34.

Although Ninth Circuit cases have not specifically discussed this issue raised by NEC, they appear uniformly to treat the "merger" issue as a question of whether or not there is infringement rather than copyrightability. See Data East USA, Inc. v. EPXY, Inc., No. 87-2294, slip op. at 6 (9th Cir. Nov. 30, 1988); Frybarger v. International Business Machines Corp., 812 F.2d 525, 530 (9th Cir.1987); Sid & Marty Krofft Television v. McDonald's Corp., 562 F.2d 1157 (9th Cir.1977); Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F.2d 738, 742 (9th Cir.1971).

It also seems to me that, as a matter of practicality, the issue of a limited number of ways to express an idea is relevant to infringement, but should not be the basis for denying the initial copyright. The Register of Copyrights will not know about the presence or absence of constraints that limit ways to express an idea. The burden of showing such constraints should be left to the alleged infringer. Accordingly, in the absence of Ninth Circuit authority to the contrary, it is concluded that the relationship between "idea" and "expression" will not be considered on the issue of copyrightability, but will be deferred to the discussion of infringement.

It is the view of this court that NEC's above mentioned objections to the copyrightability of Intel's microcode are not persuasive. On the contrary, the statutory references

(C) 2007 West Group

Page 19

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

discussed at the outset of this section on copyrightability, and particularly the specific definition of "computer program" that Congress enacted in 1980, "reflect Congress' receptivity to new technology and its desire to encourage, through the copyright laws, continued imagination and creativity in computer programming." Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1254 (3d Cir.1983). In light of the foregoing, it is concluded that Intel's microcode was a proper subject for copyright protection and that the copyright registrations contained thereon were initially valid.

II. The Forfeiture By Intel of its Microcode Copyright
**4** The Copyright Act provides that "[w]henever a work protected under this title is published ... by authority of the copyright owner, a notice of copyright ... shall be placed on all publicly distributed copies." 17 U.S.C. § 401(a). The failure by the copyright owner to affix such notice invalidates the copyright unless, as provided in § 405(a):

(1) the notice has been omitted from no more than a relatively small number of copies ... distributed to the public; or

(2) ... a reasonable effort is made to add notice to all copies ... that are distributed to the public ... after the omission has been discovered; or

(3) the notice has been omitted in violation of an express requirement in writing that ... the ... copies ... bear the prescribed notice.

As is discussed below, this court finds that Intel allowed a relatively large number of copies of its microcode to be distributed to the public without the prescribed copyright notice; upon learning of such omission, Intel did not make a "reasonable effort" to correct its oversight; and the omission of the notice by Intel's licensees was not in violation of "an express requirement in writing." Intel therefore has forfeited its copyright protection. See Lifshitz v. Walter Drake & Sons, Inc., 806 F.2d 1426, 1434 (9th Cir.1986).

A. The Required Copyright Notice Was Omitted From More Than A Relatively Small Number Of Copies.
Intel admits that out of approximately 28,000,000 copies of its microcode that were distributed to the public between May 1978 and May 1986, 2,984,000, or about 10.6%, did not contain the required copyright notice. It seems to me that almost 3,000,000 copies of any merchandised article constitute a very substantial number in an absolute sense. However, in using the words "relatively small number", the statute appears to require a comparison between the number of copies without the notice and the total number distributed, in other words, a percentage.

An examination of twenty federal court decisions that have considered the matter discloses none in which 10.6% was held to be a relatively small number. The highest percentage found to have been within the exception is 9%, but in that case the number of items without the affixed notice was only 208, as compared with the almost 3,000,000 here involved. See Flora Kung, Inc. v. Items of Cal., Inc., 84 Civ. 7851 (S.D.N.Y.1984). In contrast, as few as 2,500, which made up only 2.4% of the total distributed, have been held to be more than a relatively small number. See Donald Frederick Evans v. Continental Homes, Inc., 785 F.2d 897, 910 (11th Cir.1986). It also is worthy to note that the opinion concluded that "2,500 copies is a significant number in the absolute sense." Id.

The foregoing authorities are in harmony with my own conclusion that 10.6% of 28,000,000 cannot reasonably be considered to constitute a relatively small number. Accordingly, the § 405(a)(1) exception does not apply. This conclusion makes it unnecessary to adjudicate NEC's contention that, as of December 1984, when this action was filed, 7,940,000 unmarked or improperly marked copies of the Intel microcode had been distributed under license, or 46% of a total of 17,151,000.

B. The Lack Of A Reasonable Effort To Add The Copyright Notices After Discovery Of The Omission.
**5** There appears to be no precise authoritative definition as to what constitutes "a reasonable effort" under § 405(a)(2). The matter must be considered on a case by case basis in which the efforts taken are viewed as a whole in order to determine whether they should be considered reasonable. See Shapiro & Son Bedspread Corp. v. Royal Mills Assoc., 764 F.2d 69, 75 (2d Cir.1985). In the present case, we shall take into account the following factors: When discovery of the failure to add the notice occurred; the time that elapsed between such discovery and the commencement of corrective action; the reasonable sufficiency of the corrective action; the extent of any follow-up to determine implementation by the licensees, and the quantity of copies distributed to the public between discovery and corrective action.

1. When Discovery Occurred.
Intel licensed twelve companies to manufacture, use and sell its 8086/88 microprocessors containing its microcode. The initial licenses to Fujitsu, NEC and Mitsubishi, which were issued between August 1981 and April 1984, contained no mention whatever of an obligation to affix a

(C) 2007 West Group

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

copyright notice. Intel contends that this was an oversight on its part and was due to the fact that these licenses were prepared by the respective licensees. I recognize that Intel's failure to include the requirement of a copyright notice does not constitute abandonment of its copyright. See Donald Frederick Evans v. Continental Homes, Inc., 785 F.2d 897, 912 (11th Cir.1986). However, such an oversight certainly is relevant evidence that protection of its copyright was not high on Intel's list of priorities when the licenses were issued. Lack of active concern in this respect is shown also in the fact that, although Intel had a program to monitor the affixing of the copyright notice to its manuals that it allowed the licensees to reproduce, there was no comparable program to protect the copyright on its 8086/88 microcode until after this litigation began. These circumstances may be considered in evaluating the later alertness, or the absence thereof, that Intel displayed upon learning that its licensees were not placing the copyright notice on their products.

During the period of 1979 through 1981, Intel granted licenses to Harris, Matra-Harris and Siemens which provided that the licensees would place copyright notice on their products only if Intel so requested. Intel made no such request until April 1985, after the filing of this action, and it therefore had no adequate basis upon which to assume that any of these licensees were marking before that date.

In about October 1981, Intel engineers examined one of Fujitsu's licensed products and made a report to Intel's counsel. The engineers either had failed to observe the absence of a copyright notice or neglected to report such fact to counsel, and the latter made no inquiry of the engineers concerning the matter.

In 1982, Intel was aware that AMD was using its own copyright notice, "c AMD 1982", on its licensed product. AMD did so under the theory that its chip topography would be a separately copyrightable "derivative work" or "compilation", and that such a notice would protect its copyright as well as Intel's. Intel knew that such a theory was challenged by the Register of Copyrights but nonetheless specifically allowed AMD to continue its practice. Two years later, in October 1984, an Intel management official was concerned about the way in which AMD was marking its licensed microcode, and he caused the matter to be taken up with Intel's general counsel, who reported that AMD had tentatively agreed to change its marking "ASAP". (Exhibit LV).

**6** On September 5, 1984, Intel's general counsel met with a representative of NEC, and in the course of the discussion asked if NEC was placing the copyright notice on its licensed products. The NEC representative said

that he did not know but would check. Intel received no further response and made no further inquiry until six month later, after this action was filed.

Finally, on about February 8, 1985, the Intel legal department caused devices of Fujitsu and NEC to be purchased on the open market for the purpose of checking for copyright notice as part of its preparation for this litigation. No such notices were found, and this prompted a further inquiry from which, at long last, Intel asserts that it acquired its first knowledge that some of the licensees were improperly affixing its copyright notice.

In light of the foregoing, Intel certainly was either aware or on notice that it had not obliged its licensees to affix an appropriate copyright mark. This circumstance, coupled with the above described incidents, would certainly cause a reasonably alert licensor to be concerned, long before February 8, 1985, as to what its licensees were doing to be in compliance with the Section 405 notice requirements. However, for purposes of this discussion, I shall accept Intel's contention that February 8, 1985, was the date that the omission of notice was discovered and proceed to consider whether Intel was any more alert and vigilant in its corrective action than it had been in monitoring its licensees for conformance with the statutory copyright notice requirements.

2. The Reasonable Sufficiency Of The Corrective Action. In considering the sufficiency of the corrective action taken by Intel, we shall focus upon its dealings with three of the licensees, which are illustrative of the manner in which Intel sought to correct the marking problem.

(a) Fujitsu. On April 5, 1985, Intel sent a letter to Fujitsu which stated that its license required Fujitsu to mark its products with Intel's copyright notice, asserted that Intel regularly asks its licensees to certify that they are so doing, and requested such certification. This letter was inadequate because it did not ask that Fujitsu put a copyright notice on its future output or require its distributors to affix such a notice, and it did not otherwise seek Fujitsu's help in complying with the copyright laws. Further, the letter was misleading because Fujitsu's license did not require that Fujitsu's products bear Intel's copyright notice, Intel never had adopted the practice of requesting certification, and Intel knew that Fujitsu was not marking. However, Intel did persuade Fujitsu to sign a letter on July 11, 1985, asserting that it would begin to affix the copyright notice to new products and to make "reasonable efforts" to add the notice to products in its distribution chain. The first 8086/88 devices marked with Intel's copyright notice were shipped by Fujitsu on about September 6, 1985. Based upon the evidence available, the court interpolates that between February 8

(C) 2007 West Group
1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

and September 6, 1985, Fujitsu distributed approximately 240,000 of its unmarked products. (Exhibit GU).

**\*7** Late in September 1985, Fujitsu recalled for marking the approximately 120,000 8086/88 microprocessors that were in the inventory of its United States subsidiary, FMI. Between February 8, 1985, and the September recall, FMI had sold about 111,000 unmarked devices. Also, Fujitsu never recalled the unmarked inventory of some 46,000 copies in the hands of its distributors in the United States, nor did it make any effort to have that inventory marked with the copyright notice.

On October 14, 1985, eight months after the "discovery", Intel sent stickers bearing Intel's copyright notice to FMI and requested that the latter transmit them to Fujitsu's U.S. distributors to be affixed upon the licensed devices. The affixing of stickers is a laborious and time-consuming task that a person would be reluctant to perform without compensation, and Intel never offered to help defray the cost of adding the stickers or otherwise marking the products in Fujitsu's distribution chain. Further, Intel never made a follow-up inquiry to learn if FMI had delivered the stickers as requested, and we are not aware of any stickers ever having been used by the distributors.

In House of Hatten, Inc. v. Baby Togs, Inc., 668 F.Supp. 251 (S.D.N.Y.1987), the plaintiff, during the pendency of copyright infringement litigation, sent a quantity of adhesive copyright labels to his distributors along with a letter asking that they affix the labels to their inventories and forward some to their own customers to be placed on items previously delivered to the latter without the copyright notice. The plaintiff admitted that it made no effort to monitor the performance that it had requested, and proffered the excuse for this deficiency that " 'the expense would not be worth the trouble.' " Id. at 258. The court was not impressed with such an excuse, and I am obliged to conclude that there was a comparable lack of vigilance here.

Intel's efforts with respect to Fujitsu were substantially less than reasonably could have been expected. On February 8, 1985, the date of "discovery", Fujitsu was shipping licensed 8086/88 devices at the rate of more than 40,000 per month (Exhibits ECEI) and that rate continued until September 6, 1985, when Fujitsu began to affix the copyright notice. This situation required of Intel a prompt and frank acknowledgement to Fujitsu as to the nature of the problem, a request for full assistance in causing the copyright notice to be affixed on all products before final sale to the consumer, and an offer to help defray the cost of marking. Instead, Intel did substantially nothing for two months and then waited an additional three months for an equivocal reply from Fujitsu. Its only other action was to send stickers without a reasonable expectation that they would be affixed, and it never did make inquiry to ascertain whether or not the stickers were used. In the meantime, several hundred thousand unmarked copies of Intel's microcode had been scattered among the public.

**\*8** (b) Oki. Intel first asked Oki to use an Intel copyright notice in February 1985. Oki expressed a willingness to mark and requested the appropriate information. Three months later, on May 17, 1985, Intel advised Oki as to the correct form of notice, which was " Intel 1978," and Oki began marking correctly in October of that year. (Exhibit 503). In the meantime, since February 1985, Oki had been affixing an erroneous copyright notice on about 20,000 licensed units. (Exhibit GU). Intel never made any effort to have a correcting notice affixed to improperly marked products in Oki's inventory or distribution chain.

(c) Harris. On April 4, 1985, Intel wrote to Harris and asked that it certify that it was affixing the proper copyright notice, " Intel 1978," on its licensed products. This was done even though Intel had known at least since November 12, 1984, that Harris had been using its own copyright notices, and even though Intel had recognized that this might be incorrect at least as early as the passage of the Semiconductor Protection Act on October 4, 1984. (Exhibit 457; Tr. Vol. 5 1007: 12-22). Intel received no response to its letter, and Intel did not follow-up to determine whether Harris had begun to mark properly. Finally, on about October 7, 1985, Intel was advised that, as of the first of that month, Harris "is now" affixing the correct Intel copyright notice. (Exhibit 619). I interpolate that about 60,000 unmarked items were distributed by Harris during the period from April 4 to October 1, 1985. (Exhibit GU).

This court is aware that Intel incurred very substantial expense in creating its 8086/88 microcode, that business considerations affected Intel's decisions and their implementation, and that copyright protection should not be removed unless the interests of justice clearly require such action. Congress recognized this in providing that inadvertent distribution of products without the required notice would not result in forfeiture of the copyright if the holder makes "a reasonable effort ... to add notice to all copies ... that are distributed to the public ... after the omission has been discovered." 17 U.S.C. § 405(a)(2). If the words "reasonable effort" are to have any substantial meaning, Intel's conduct here simply cannot be held to have met that standard.

C. Copies Issued in the Absence Of An Express Written Requirement of Marking.

(C) 2007 West Group

Page 22

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

The licenses issued to Fujitsu, Mitsubishi and NEC contained no requirement whatever concerning a copyright notice.   The licenses issued to Harris, Matra-Harris and Siemens provided only that the licensee would affix copyright notice on products distributed by it if Intel so requested.   Such a provision certainly is not an "express requirement in writing" within the meaning of Section 405(a)(3).   Intel made no such request of any of these three licensees until April 1985 at the earliest.   It follows that several hundred thousand unmarked microcodes were distributed by Intel licensees at times when there existed no express requirement in writing that mandated such marking.   Thus, the Section 405(a)(3) exception is not available to Intel.

III. The Noninfringement by NEC's Microcode
A. The Issue Of Substantial Similarity
**\*9** In order to make a prima facie case of infringement, Intel must have a valid copyright, which it did obtain as noted above, establish access by NEC to the copyrighted microcode, which is admitted, and show substantial similarity between the latter and the accused microcode of NEC.   Cooling Systems and Flexibles v. Stuart Radiator, Inc., 777 F.2d 485, 491 (9th Cir.1985).   In seeking to resolve the issue of substantial similarity, I have given careful consideration to the testimony and the conflicting conclusions of the two eminent experts, Dr. Patterson and Dr. Frieder, and I have also taken into account my own impressions upon comparing the respective microcodes in light of the other testimony and the exhibits in the case.   In pursuing this study, I have sought to adhere to the admonition that

[i]n deciding whether there is substantial similarity between the copyrighted work and the accused work, courts do not allow the accused work to be dissected into pieces, and the pieces isolated, as if each stood alone.   Where the accused work reflects an accumulation of similarities, the totality of the taking is to be considered:   "When analyzing two works to determine whether they are substantially similar, courts should be careful not to lose sight of the forest for the trees."   [FN**]   In programming infringement cases involving comprehensive nonliteral similarity, the "trees" are the individual lines of codes, and the "forest" is the detailed design.

Clapes, Lynch & Steinberg, Silicon Epics and Binary Bards:   Determining the Proper Scope of Copyright Protection For Computer Programs, 34 UCLA L.Rev. 1493, 1570 (1987).   Having pondered all of these matters, it is my conclusion that the NEC microcode (Rev. 2), when considered as a whole, is not substantially similar to the Intel microcode within the meaning of the copyright laws.

In the first place, none of the approximately ninety microroutines in the accused microcode are identical to Intel's copyrighted microcode.   Some of the shorter ones are, indeed substantially similar.   See, for example, CAW (Exhibit 705, page 3), ESC (Exhibit 705, page 7), IN variable port (Exhibit 705, page 11), and JMP indirect (Exhibit 705, page 23).   But most of these involve simple, straightforward operations in which close similarity in approach is not surprising.   On the other hand, others of the shorter microroutines of the NEC microcode are substantially different from the comparable Intel items.   See, for example, INT 3 (Exhibit 705, page 14A), INTO (Exhibit 705, page 19A), LES (Exhibit 705, page 28), and NMI sequence (Exhibit 705, page 40).

Most of the approximately forty NEC microroutines that Intel acknowledges not to be substantially similar are much longer than the accused NEC items and are quite different from the comparable Intel items in the manner in which the instructions are expressed.

As I have pondered upon the testimony of the experts and studied the exhibits, I have developed a sympathetic understanding of what Judge Learned Hand meant when he observed in a relevant situation that "the more the court is led into the intricacies of dramatic craftsmanship, the less likely it is to stand upon the firmer, if more naive, ground of its considered impressions upon its own perusal."   Nichols v. Universal Pictures Corp., 45 F.2d 119, 123 (2d Cir.1930).   Also, Intel has proposed a finding and has cited valid authority to the effect that "[t]he test for infringement or substantial similarity is whether the work is recognized by an ordinary observer as having been taken from the copyrighted source." Intel's Proposed Conclusions Of Law, ¶ 5.   For the reasons set forth above, this court concludes, based upon its own perusal, as well as upon the conflicting testimony of the experts, that the ordinary observer, considering the accused microcode as a whole, would not recognize it as having been taken from the copyrighted source.

**\*10** I believe that the foregoing conclusion comes close to resolving the issue of infringement.   However, as pointed out, several of the shorter accused microroutines are substantially similar to Intel's corresponding items, and it is my obligation to "make a qualitative, not quantitative, judgment about the character of the work as a whole and the importance of the substantially similar portions of the work."   Whelan Assoc. v. Jaslow Dental Laboratory, 797 F.2d 1222, 1245 (3d Cir.1986).   Some of these similar microroutines may be very important, and if they result from copying of protected expressions their use by NEC may be enjoined, irrespective of the general lack of similarity between the two microcodes.

(C) 2007 West Group
1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

Page 23

Accordingly, we shall discuss what the evidence indicates as to whether or not actionable copying is responsible for the similarities that do exist in some of the microroutines.

### B. The Evidence Regarding Copying.

In preparing this portion of this memorandum, I am assuming that it will be of particular interest only to Intel and NEC and their respective counsel, and therefore that anyone who reads it will be familiar with the facts. Accordingly, I shall refrain from the extremely arduous and lengthy task of describing or explaining the background circumstances involving the specific issues.

Intel urges several bases for its contention that Mr. Kaneko created NEC's microcode for its V20/V30 microprocessors by copying substantial portions of Intel's 8086/88 microcode. These arguments are found not to be compelling.

### 1. Assessment Of Mr. Kaneko's Expertise.

Intel contends that the indications are that Mr. Kaneko must have copied because of his relative inexperience with microprograms, the arduous schedule imposed upon him within which to write the microprograms and the specifications for the hardware, and the fact that he made relatively few notes as compared to his work on other microprograms. The record shows Mr. Kaneko to have been a very talented young man with an outstanding academic record that is highly relevant to microprocessors, and he previously had completed a substantial assembly language compiler program. Mr. Kaneko testified very creditably that he did not feel himself to have been under great pressure to complete his assignment and that he easily was able to accomplish it in two months, well within the time requested of him. The court also accepts Mr. Kaneko's testimony that the lack of notes stemmed from his conclusion that the task was relatively simple and that he was working alone, as compared with other assignments in which the participation of others made greater note taking more appropriate.

Mr. Kaneko testified in a straightforward manner and displayed considerable technical knowledge in explaining the decisions that he made in the creation of the V20/V30 microcode. He did not contend that he had not been influenced by his experience in previously having disassembled the 8086/88 microcode. Such experience inevitably became part of his expertise, and the acquired knowledge of how Mr. McKevitt created instructions to be executed by the 8086/88 microcode very well may have been a source of ideas that Mr. Kaneko utilized in preparing a microcode for the V20/V30. However, he testified creditably that he did not undertake to copy the 8086/88 microcode, and, as is noted herein, the other

evidence received in the trial of this action by no means impels a contrary conclusion.

### 2. The "Admission" Of Copying.

*11 This court is unable to conclude that Mr. Dominik's testimony concerning the comments of Mr. Suzuki and Mr. Yamamoto disclosed an admission that copying had occurred. Such skepticism is compelled by Mr. Dominik's limited knowledge of the Japanese language, the context in which the inferred words were uttered, the significance of the relationships between the two Japanese men as affecting any evaluation of the meaning of the words that may have been uttered, Mr. Suzuki's denial that the purported interchange took place, and my inability to be certain that Mr. Yamamoto's reported grimace was caused by dismay over learning that copying had occurred as opposed to an upset stomach.

### 3. The "Patch".

The record clearly shows that Mr. Stoll was obliged to alter the Interrupt Sequence for the 8088 microcode by writing a "patch" to overcome a "bug" that was found in the 8088 microprocessor. Inasmuch as the 8086 microprocessor did not have the bug and its microcode therefore did not have or need the patch, separate microcodes were required for the 8086 and 8088. It also was not disputed that Mr. Kaneko wrote a similar patch in creating the Interrupt Sequence of the microcode for the V20 microprocessor and that the V30 did not have either the bug or the patch.

Intel emphatically contends that the foregoing constitutes direct evidence of slavish copying. Intel's rationale is that NEC normally would desire that the microcodes for the V20 and the V30 be able to operate in both microprocessors, and that it would have been preferable to create the hardware of the V20 without the bug and thus avoid the mistake found in the 8088. Accordingly, Intel urges that Mr. Kaneko had no valid independent reason for incorporating the patch into his V20 microcode, and that by doing so he caused the bug to remain in the hardware, thus unnecessarily adopting Intel's unfortunate error and requiring separate microcodes for the V20 and V30.

The logic of this syllogism has given the court considerable trouble. However, it is based upon the premises that Mr. Kaneko wrote his Rev. 0 before the V20 circuitry was functionally created, and that, but for the inadvertent bug, the V30 and the V20 microcodes would have been the same. I believe that the record does not warrant these assumptions.

a. It appears more likely than not that the creation of the circuitry for the V20 microprocessor was in a fairly

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 24

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

advanced stage when Mr. Kaneko created his Rev. 0 microcode. Mr. Kaneko so testified. (See Tr. Vol. 16 2854: 13-22). It is true that in the same reference he acknowledged that the "actual circuit design" of the Bus Interface Unit "had just begun". However, the record tends to indicate that the actual circuit design does not need to be completed in order to give adequate guidance for the creation of a microcode sequence, provided that there has been communicated a functional definition of the hardware. (See Tr. Vol. 16 2907: 5-10). Such a functional definition is all that was given to Mr. Davidian in order to enable him to create the Interrupt Sequence in the Clean Room microcode. (See Exhibit 900, pages 83-84). Accordingly, a reasonable inference is that Mr. Kaneko wrote the Interrupt Sequence into Rev. 0 to be in harmony with V20 hardware that had been sufficiently defined. The design of the V20, which was based upon Intel's 8088, contained the bug, thereby making the incorporation of a patch necessary.

*12 b. It seems evident that at the time that Mr. Kaneko created the Rev. 0 microcode, he was aware and intended that the V20 and V30 microprocessors would have different hardware for the Interrupt Sequences. Mr. Kaneko so testified. (See Tr. Vol. 17 2918: 21-2919: 11). He also testified that at the time he was working on Rev. 0, NEC was concentrating upon the creation of the V20 microprocessor, and that the idea of also developing the V30 came a bit later. This tends to be confirmed by other documents in the record. (See Exhibit AX, page 56-1A, and Exhibit BE, page 30-12). The documentary record also shows that Mr. Kaneko completed Rev. 0 by the end of 1982 and that work began on the V30 microprocessor on about January 13, 1983.

Under these circumstances, and bearing in mind that NEC had the right to make use of the design of the 8088 microprocessor, bug and all, in creating its V20, there is nothing suspicious about Mr. Kaneko's having created a patch to be in harmony with the "bug" in the V20 without being concerned about whether the resulting Interrupt microsequence would operate in the V30.

It is true, as Intel points out, that Mr. Kaneko labeled Rev. 0 as being a microcode for the "8086/88 instruction set". However, there is, of course, a distinction between "instruction set" and "microcode", and the implication in the title that the microcode that Mr. Kaneko was writing would implement the instruction set for both the 8086 and 8088 microprocessors does not necessarily mean that a particular microsequence contained therein would operate on both. The Rev. 0 was an initial tentative draft, and the title that heads such draft does not impair the above conclusion that the patch was created by Mr. Kaneko for the V20 microprocessor. It is very similar to the patch

written by Mr. Davidian for the same microsequence in the Clean Room microcode, and the evidence is that each was independently created.

4. The RESET Microsequence.

The RESET microsequence in Rev. 0 is, indeed, almost identical to its counterpart in the Intel microcode. (See Exhibit 704, page 52). Intel, through Dr. Patterson, points out that there are many alternative ways of writing this microsequence. (See Exhibit ABL). It is noted, however, that substantially all of the alternative ways suggested by Dr. Patterson use the same registers as do Intel and Rev. 0, the only significant fact here being that both Intel and Rev. 0 use these registers in the same sequential order in making up the six lines of the microsequence. Intel asserts that this is a significant indication of copying.

However, Dr. Frieder testified that certain registers go well together; that certain pairings are more natural than others; and the fact that RC, PC (the transcript erroneously reads BC), PSW, RA and RS are in the same order in both the Intel and Rev 0 microsequences reasonably could stem from the similar visions of the model that the respective authors had in mind or from the way that they happened to think about the matter. (See Tr. Vol. 14 2526:8-- 2528:17). His view that this circumstance does not necessarily denote copying tends to be reinforced by an examination of the Clean Room RESET sequence. (See Exhibit 704, page 52). It has the same registers as are contained in Intel and Rev. 0, and they would be in the same order if PSW and RA were to be moved from the second and third lines to the fourth and fifth lines. The first draft of the RESET sequence in the Clean Room microcode is even closer to Rev. 0, the only difference being that the RD register is on the fourth line of the former and the first line of the latter. (See Exhibit 721, page 52). Inasmuch as the Clean Room microcode clearly did not involve any copying, these close similarities suggest the substantial possibility, if not the likelihood, that Mr. Kaneko, also, was guided by his own independent judgment in his selection of the sequential order of the registers.

*13 It should also be noted that Mr. Kaneko changed his RESET sequence substantially in writing Rev. 2, which is NEC's final version of the challenged microcode and thus the only one against which a claim of infringement may be directed. (See Exhibit 705, page 52). Dr. Patterson acknowledged that such changes removed this microsequence from his "substantially similar" list. (See Tr. Vol. 10 1833:3-17; Exhibit ADE, page 126).

5. The DAA/DAS Microsequences.

The Rev. 0 DAA and DAS microsequences were very

(C) 2007 West Group

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

similar to Intel's. (See Exhibit 704, pages 4 and 5). However, Mr. Kaneko made several changes in those microsequences in moving from Rev. 0 to Rev. 2. Intel nonetheless argues that the similarities between Intel's DAA/DAS and those of Mr. Kaneko's Rev. 0 is further evidence of copying, and points out that Dr. Frieder acknowledged that such similarities disclose a " 'possibility' that Mr. Kaneko was making use of his disassembled code when he wrote Rev. 0", and that Rev. 0 " 'could have been copied.' " Intel's Post-Trial Memorandum, page 15, lines 22-27. Of course these microsequences in Rev. 0 could have been copied, and there is a real possibility that Mr. Kaneko made use of the disassembled code when he wrote Rev. 0. As is mentioned above in this memorandum (Page 24), Mr. Kaneko did not deny having been influenced by his experience in having disassembled Intel's microcode. But I do not see how this substantially helps Intel's case. Dr. Frieder referred to DAA and DAS as being "complex and very difficult to understand." (See Tr. Vol. 14 2585:8-10). Let us assume, for purposes of this discussion, that when Mr. Kaneko faced the task of writing these microsequences for Rev. 0 he sought to recall how Intel had handled this difficult problem, or even referred to his character string to make that determination. Let us assume also for purposes of this discussion that he directly copied what he had learned into Rev. 0. If he had stopped there and caused Rev. 0 to be the final microcode, a difficult question would arise as to whether what he had taken from the disassembled 8086/88 constituted the technical "idea" for a solution or the "expression" thereof. See 17 U.S.C. § 102(b); Whelan Assoc. v. Jaslow Dental Laboratory, 797 F.2d 1222, 1234 (3d Cir.1986).

However, as is indicated above, Mr. Kaneko changed the subject microsequences substantially in writing Rev. 2, as Dr. Patterson has acknowledged. (See Tr. Vol. 9 1702:17-24; Tr. Vol. 11 2015:12--2019:14). In See v. Durang, 711 F.2d 141, 142 (9th Cir.1983), the court affirmed the granting of summary judgment for the defendant, the opinion of the court noting that the plaintiff had sought to obtain "early drafts of defendant's play on the theory that they might reflect copying from plaintiff's play that was disguised or deleted in later drafts. Copying deleted or so disguised as to be unrecognizable is not copying." See also Eden Toys, Inc. v. Marshall Field & Co., 675 F.2d 498, 501 (2d Cir.1982), in which the opinion observed that " 'a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiffs'.' " (Quoting from Warner Brothers v. American Broadcasting Companies, 654 F.2d 204, 211 (2d Cir.1981), which quoted 3 M. Nimmer, Nimmer on Copyright § 13.03[B]

at 13-37 (Rev.Ed.1980)). With respect to the DAA/DAS microsequences in Rev. 2, which is the challenged microcode, there remains no basis for a claim of copying or even of substantial similarity.

### 6. The XLAT Microsequence.

*14 Intel notes, through Dr. Patterson, that Mr. Kaneko made a mistake in recording the XLAT portion of the disassembled code by writing "AH" instead of "AL", and that he perpetuated the same mistake in writing Rev. 0. Intel submits that this is a further indication "that Mr. Kaneko made reference to his disassembled source code while he was writing the Rev. 0 microprograms." Intel Post-Trial Memorandum, pages 16-17. For reasons discussed in the preceding subparagraph, such a conclusion, even if correct, is of little significance here.

### 7. Other Presumed Uses Of The Disassembled Code In Preparing Rev. 0.

Intel submits three additional circumstances as being "strongly suggestive" that Mr. Kaneko, in writing Rev. 0, copied from Intel's microcode that he had disassembled:

a. Failure To Take Advantage Of The Dual Bus. Intel points out that "[o]f the 54 programs listed in Exhibit 705, Mr. Kaneko used the dual bus feature of the V-series hardware only 29 times. In contrast, for the same microprograms, Mr. Davidian wrote microcode which took advantage of the dual bus capability of the V-series 55 times." Intel's Post-Trial Memorandum, page 17. Inasmuch as the Intel microcode was not able to accommodate the dual bus at all, Mr. Kaneko's use of it in twenty-seven programs tends to negate a charge of slavish copying. The above quoted fact does no more than suggest that Mr. Davidian was more alert to the opportunities to use the dual bus than was Mr. Kaneko. Also, it may be worthy of note that there are several instances in which the dual bus was not utilized in Rev. 0 but appeared in Rev. 2, which suggests that Mr. Kaneko's awareness of dual bus potential increased as he progressed in refining his microcode (see, for example, microprograms AAA, AAS, DAA, DAS and RESET Sequence).

b. Use Of Intel's Groupings. Intel points to Dr. Patterson's testimony that seven out of thirteen groupings in Rev. 0 were the same as in the Intel microcode, and that in Rev. 1 and Rev. 2 twelve of the thirteen matched Intel's. This raised the suspicion in Dr. Patterson's mind that Mr. Kaneko may have looked at the groupings of the Intel microcode when he made the changes from Rev. 0 to Rev. 1. Perhaps he did take such a look and profit therefrom! But the use of only seven of thirteen in Rev. 0 shows some independence from Intel's handiwork. There appears to be a certain amount of logic in determining

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

what microroutines should be grouped together. It is worthy of note that Mr. Davidian's Clean Room microcode had as many groupings that are the same as Intel's groupings as did Rev. 0. (See Exhibit 884; Tr. Vol. 15 2674:7-8). It may be that Mr. Kaneko turned to Intel's groupings as a "check list" to see if he could gain therefrom additional ideas for groupings to incorporate into Rev. 1. As is discussed in paragraph five hereof, supra, such copying does not constitute infringement.

c. Treatment Of "Illegal" Instructions. Intel suggests that Mr. McKevitt adopted a method of treating "illegal" instructions that was "strongly disfavored and contrary to industry practice" and that Mr. Kaneko adopted the same method in writing Rev. 0. Intel again suggests that this similarity of choices "is extremely unlikely to have occurred other than as a result of Mr. Kaneko's referring at the time to his disassembled source code." Intel's Post-Trial Memorandum, pages 18-20. But, once again, I am willing to assume that when Mr. Kaneko faced the problem of "illegal" instructions, he recalled, or even reexamined, the character string of the disassembled Intel microcode and concluded that he would follow Mr. McKevitt's lead. But Intel does not point to any expression in the final version of Mr. Kaneko's V-series microcode that copies Mr. McKevitt's treatment of "illegal" instructions.

C. The Constraints.
1. The Hardware, Architecture And Specifications.

*15 In seeking to show that there were many alternate ways in which Mr. Kaneko's various microprograms could have been written, and therefore that the substantial similarities to Intel's microcode that did exist stemmed from copying, Intel declined to take into consideration the constraints that limited Mr. Kaneko's choices. Intel contends that NEC could have created a microprocessor compatible with Intel's 8086/88 by using "different hardware, different architecture, different specifications and a different microinstruction format." Intel's Memorandum for the Trial Court, dated June 7, 1988, page 18. However, NEC had a license from Intel to duplicate the 8086/88 microprocessor hardware to the extent comprehended by the Intel patents. Both Dr. Patterson and Dr. Frieder acknowledged that the use of such hardware limited substantially the choices available to Mr. Kaneko in creating the microcode for the V-series. Having granted to NEC a license to duplicate the hardware of its 8086/88 to the extent comprehended by the Intel patents, and having conceded at trial that NEC had a right to duplicate the hardware of the 8086/88 because it was not otherwise protected by Intel, Intel is in no position to challenge NEC's right to use the aspects of Intel's microcode that are mandated by such hardware.

2. The Storage Space.

Intel also asserts that if NEC had utilized all of the storage area (ROM) available to it on its microprocessor, which would have been double the storage space that was available to Intel, any constraint imposed by size would have been removed and a different and better microcode would have resulted. Intel's Memorandum for the Trial Court, dated June 7, 1988, page 18. NEC elected to use part of the ROM space existing on the V-series, in order to accommodate microcode for additional macroinstructions on the same ROM. This also was a legitimate constraint; NEC was not obliged to avoid the similarity that other constraints imposed by creating a larger microcode.

3. The Clean Room.

The Clean Room microcode constitutes compelling evidence that the similarities between the NEC microcode and the Intel microcode resulted from constraints. The Clean Room microcode was governed by the same constraints of hardware, architecture and specifications as applied to the NEC microcode, and copying clearly was not involved. Mr. McKevitt, who created the 8086 microcode for Intel, readily acknowledged that the microarchitecture of the 8086 microprocessor affected the manner in which he created his microcode, and that he would expect that another independently created microcode for the 8086 would have some similarities to his. (See Tr. Vol. 8 1358:10-24). Accordingly, the similarities between the Clean Room microcode and the Intel microcode must be attributable largely to the above mentioned constraints. But the similarities between the Clean Room microcode and Rev. 2 are at least as great as are the similarities between the latter and the Intel microcode. This is made evident by an examination of Exhibit 705. The strong likelihood follows that these similarities, also resulted from the same constraints.

*16 Mr. McKevitt also acknowledged that he would expect that independently created microcode for the 8086 would have fewer similarities in the longer sequences than in the shorter sequences because "there is more opportunity for the longer sequences to be expressed differently." (Tr. Vol. 8 1359:5-10). This is exactly what occurred here; the longer sequences in Rev. 2 and Intel's microcode are not nearly so much alike as are the shorter sequences.

In light of the foregoing, it is reasonable to conclude that the same constraints, rather than copying, were responsible for the principal similarities between Rev. 2 and the Intel microcode.

(C) 2007 West Group

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

### D. Idea v. Expression

As concluded above, overall, and particularly with respect to the longer microroutines, NEC's microcode is not substantially similar to Intel's; but some of the shorter, simpler microroutines resemble Intel's. None, however, are identical. As to these shorter, simpler microroutines, if their underlying ideas are capable of only a limited range of expression, they "may be protected only against virtually identical copying." Frybarger v. International Business Machines, Inc., 812 F.2d 525, 530 (9th Cir.1987). See also Worth v. Selchow & Righter Co., 827 F.2d 572 (9th Cir.1987).

In determining an idea's range of expression, constraints are relevant factors to consider. See Data East USA, v. Epyx, Inc., No. 87-2294 (9th Cir. Nov. 30, 1988). In this case, the expression of NEC's microcode was constrained by the use of the macroinstruction set and hardware of the 8086/88. Mr. McKevitt so testified (Tr. Vol. 8 1358:10-24), Dr. Patterson initially expressed the same opinion (Exhibit R, pages 7598 and 7601), and the close similarities of the Clean Room microcode to Intel's and NEC's microcodes emphatically concur.

Mr. Davidian and Dr. Frieder testified that, in light of these constraints, the shorter, simpler microroutines can be expressed only in a few limited ways, and I agree. (Davidian Tr. Vol. 18 3092:18--3093:13; Frieder as cited in NEC's Supplemented and Annotated Findings of Fact and Conclusions of Law ï 75). These include those microroutines identified as similar in Section A, pages 20-21 above. A good illustration is "ESCAPE". The Clean Room and NEC's version are identical, which is evidence of its constrained nature. Further, Dr. Frieder testified that "ESCAPE" was highly constrained given the existing hardware. (Tr. Vol. 14 2479:10--2480:1).

Accordingly, it is the conclusion of this court that the expression of the ideas underlying the shorter, simpler microroutines (including those identified earlier as substantially similar) may be protected only against virtually identical copying, and that NEC properly used the underlying ideas, without virtually identically copying their limited expression.

### NEC's Challenged V20 and V30 Microcodes As "Improvements" Upon Its uPD 8086 and uPD 8088.

On February 23, 1983, Intel granted a license authorizing NEC to copy Intel's 8086/88 microcode in NEC's uPD 8086 and uPD 8088 microprocessors, "including improvements thereon developed by NEC." A memorandum of understanding mutually executed on September 27, 1984, set the royalties to be paid by NEC.

**\*17** In this litigation, as an alternative argument, NEC asserts that the V20 and V30 microprocessors are "improvements" upon the uPD 8086 and uPD 8088 and that they therefore are covered by the above mentioned license. It is the position of this court that this issue is rendered moot by the above announced decision with respect to forfeiture and noninfringement. However, for purposes of completeness, it will be considered here.

It often is very difficult for a court to determine whether a writing or a physical creation is no more than an improvement over its predecessors, and thus covered by a license, or is an independent item. However, the task becomes much easier if the intent of the parties, particularly the licensee, can be ascertained. As was stated in Riess v. Murchison, 329 F.2d 635, 642 (9th Cir.1964), cert. denied 383 U.S. 946 (1966),

[t]he interpretation which the parties themselves have placed on their contract, as manifested by their conduct subsequent to its formation, has great weight in determining their intent with respect to the meaning of doubtful terms therein.

In this case, the responsible officers of NEC never did consider the V20 and V30 to be simply improvements of the 8086 and 8088. This is shown by the testimony of NEC's principal license negotiator, Shigeo Yamamoto, and of NEC's Engineer Manager of Advanced Microprocessors, Tadashi Izumi. (See Yamamoto Dep. Tr. Vol. II 116:18-117:1; Izumi original trial Tr. Vol. VI 946:2-5). Certainly NEC did not pay any royalties under the license based upon its sales of the V20 and V30. (Tr. Vol. XVIV 3315:1-5). It seems evident that NEC's contention of "improvement" was conceived after this litigation began, and it is rejected.

### Conclusion

For reasons hereinabove set forth, judgment will be entered holding that:

1. The Intel microcode for its 8086 and 8088 microprocessors were proper subjects for protection under United States copyright laws.

2. Intel did forfeit the copyrights that it had obtained for its 8086 and 8088 microcodes because more than a relatively small number of copies of product distributed by its authority did not contain the copyright notice prescribed by 17 U.S.C. § 401, because it failed to make a reasonable effort to cause such notice to be added to those copies after the omission had been discovered, within the meaning of 17 U.S.C. § 405, and because those copies were distributed at times when no express

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177
(Cite as: 1989 WL 67434 (N.D.Cal.))

requirement in writing, within the meaning of 17 U.S.C. § 405, mandated such marking.

  3. The microcodes that NEC produced for its V20, V30, V40 and V50 microprocessors do not infringe the Intel copyrights for its 8086 and 8088 microcodes.

  4. NEC's V20 and V30 microprocessors are not simply "improvements" upon its uPD 8086 and uPD 8088 microprocessors, which were licensed by Intel under its copyrights.

  This memorandum shall constitute findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

    FN* Except as otherwise noted herein, the 8086 and 8088 microcodes may be considered to be identical for purposes of this action, and will be referred to in the singular as the "8086/88 microcode".

    FN** Citing Atari, Inc. v. North American Phillips Consumer Elec. Corp., 672 F.2d 607, 618 (7th Cir.1982).

  1989 WL 67434 (N.D.Cal.), 1989 Copr.L.Dec. P 26,379, 10 U.S.P.Q.2d 1177

END OF DOCUMENT

(C) 2007 West Group
Page 29
(Cite as: 2006 WL 3069475 (D.N.J.))

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court,

D. New Jersey.

**Rodney PHILLIPS, Plaintiff,**
**v.**
**Paul GREBEN, et al., Defendants.**
**Civil No. 04-5590 (GEB).**

Oct. 27, 2006.

Ashton E. Thomas, Elizabeth, NJ, for Plaintiff.

William C. Sandelands, Tomkins, McGuire, Wachenfeld & Barry, LLP, Newark, NJ, for Defendants.

MEMORANDUM OPINION

BROWN, Chief United States District Judge.

**\*1** This matter comes before the Court upon Motion for Appeal of the Magistrate Judge's January 25, 2006 Order by Plaintiff Rodney Phillips (hereinafter "Plaintiff") and upon Motion for Summary Judgment by Defendants Paul Greben, Darlene Roberto, Roselle Board of Education and John Does (hereinafter "Defendants") [Docket Entry # 's 24 and 27]. The action was reassigned to the undersigned on October 26, 2006, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below, Plaintiff's Motion for Appeal is denied and Defendants' Motion for Summary Judgment is granted.

I. BACKGROUND

Plaintiff filed his Complaint on November 15, 2004. The Complaint contains three counts which all allege violations of Plaintiff's Fourteenth Amendment procedural due process rights under Title 42, United States Code, Section 1983. Plaintiff is a teacher in the Roselle, New Jersey public school system, who was hired on June 16, 1997. (Compl., ¶ 9). Plaintiff began instructing as a Subject Area Teacher for students K-12. (Id.). During the spring and summer of 2004, observers who included staff members and Washington Elementary School Principal Nancy Romano reported Plaintiff's behavior as "erratic." (Def. Summary Judgment Motion, p. 7). Thereafter, Principal Romano contacted Superintendent Darlene Roberto, Assistant to the Superintendent Paul Greben and Alan Roth, Esq., the school board's attorney to notify them of Plaintiff's

behavior. (Sandelands Certif. at Exhibit F).

On August 2, 2004, Mr. Greben sent Plaintiff via certified mail a letter advising him that the Roselle Board of Education was meeting on August 4, 2004 and that "the Board of Education may discuss terms and conditions of your employment in the Executive Session." (Id. at Exhibit G). Plaintiff did not physically appear at the meeting but did have union representation appear in his place. (Id. at Exhibit B). At the meeting, Plaintiff's situation was discussed, but tabled because Superintendent Roberto was not present. (Id.).

Thereafter, on or about August 31, 2004, a letter from Superintendent Roberto was sent to Plaintiff via certified mail. The letter stated that the Board of Education "pursuant to N.J.S.A. 18A:1602, hereby orders you to attend a fitness for duty examination based upon reported erratic behavior, which you have displayed." The letter further notified Plaintiff that he would be removed from teaching duties, effective September 8, 2004, pending the results of the examination. (Id. at Exhibit H).

On or about September 7, 2004, Plaintiff's attorney, Ashton Thomas, wrote to Superintendent Roberto stating that Plaintiff "has not been presented with any allegation to support such a finding [that Plaintiff be subjected to a fitness for duty examination]." (Id. at Exhibit J). No request for a hearing was made, however.

**\*2** In response to Mr. Thomas' letter, the school board's attorney, Mr. Roth, sent a letter which cited N.J.S.A. 18A:16-2 and stated: "[S]tarting in January 2004 and continuing through to the end of the school year, there were ongoing issues between the Principal, Nancy Romano and Mr. Phillips. Ms. Romano addressed them first with Mr. Phillips and then with Darlene M. Roberto ... The issues were so disconcerting to Superintendent Roberto that she transferred Mr. Phillips from his teaching position to teach [at the high school] ... Further ... the Board of Education discussed the issue of requiring Mr. Phillips to attend a fitness of duty examination ... Mr. Phillips was given notice ... but did not attend." The letter went on to provide New Jersey citations upholding the constitutionality of N.J.S.A. 18A:16-2.

Thereafter, by correspondence dated September 9, 2004, Mr. Roth notified Plaintiff through Mr. Thomas that the board of education intended to discuss Plaintiff's fitness for duty examination at its next meeting scheduled for September 13, 2004. The notification was referenced as a Rice Notice. (Id. at Exhibit M).

Plaintiff and his attorney Mr. Thomas appeared at the September 13, 2004 board meeting, and Mr. Thomas spoke on Plaintiff's behalf. The board determined that a

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 2006 WL 3069475 (D.N.J.))

fitness for duty examination was appropriate and ordered that Plaintiff attend said examination. (Id. at Exhibit N). Plaintiff agreed to submit to a fitness for duty examination under protest via letter from Mr. Thomas to Mr. Roth dated September 14, 2004. (Id. at Exhibit O). No request for a hearing was made, nor any notification of intent to appeal. To date, no appeal has been filed.

Plaintiff appeared for the fitness for duty examination on September 15, 2004. In October of 2004, the results of Plaintiff's examination became available. The findings were that Plaintiff was fit for duty. The board adopted the findings and Plaintiff was reinstated to active teaching status in October of 2004. From September 8, 2004 until October, 2004, Plaintiff was placed on paid administrative duty. No wage loss or benefit loss was incurred by Plaintiff as a result of that administrative duty. (Id. at Exhibits B and O).

After Plaintiff filed his Complaint, pretrial discovery ensued. The Honorable Patty Shwartz, United States Magistrate Judge, entered a Pretrial Scheduling Order on June 13, 2005. The Order did not set a deadline by which parties may amend their pleadings. (Docket, Entry # 9). On November 23, 2005, Plaintiff was evaluated by Dr. William Head, Defendants' expert psychiatrist. (Plaintiff's Motion for Appeal, p. 1). Dr. Head's report was allegedly furnished to Plaintiff on December 19, 2005. (Id.). On December 14, 2005, Judge Shwartz entered an Order which directed that discovery be completed no later than January 11, 2006, among other deadlines set. No deadline was set for the parties to amend their pleadings.

*3 Thereafter, on January 3, 2006, Plaintiff forwarded to Judge Shwartz an informal request to amend his Complaint based upon the Dr. Head's written evaluation of Plaintiff. (Docket, Entry # 's 18, 20). On January 11, 2006, Plaintiff forwarded to Defendants a supplemental expert report by Dr. Kleinman. On January 12, 2006, Judge Shwartz entered an Order directing Plaintiff to submit a letter as to whether or not good cause exists under Federal Rule of Civil Procedure 16 to adjust the Pretrial Scheduling Order. (Id. at 20). On January 25, 2006, Judge Shwartz conducted a telephone conference with the parties regarding Plaintiff's request to amend the Complaint and regarding Dr. Kleinman's supplemental expert report. (Id.). During the conference call, Judge Shwartz stated, in part, that "[T]he Court does not find that there is good cause for having waited, until after discovery was closed practically-- more than one month after discovery was closed to raise this request. So, under Rule 16, the Court is denying the application." (Id.). On January 26, 2006, Judge Shwartz entered an Order codifying her findings as stated during the January 25, 2006 conference call and denying Plaintiff's request to amend his Complaint. (Id. at 22). The Order further stated

that Plaintiff was barred from introducing the contents of Dr. Kleinman's supplemental expert report during the doctor's direct testimony, but allowed Plaintiff to permit the expert to testify about the contents of the supplemental report during redirect examination or in Plaintiff's rebuttal case if Defendants "open[ed] the door" to issues implicated in the supplemental report or to rebut the testimony of the Defendants expert. (Id.). On February 6, 2006, Plaintiff filed an appeal of Judge Shwartz's January 26, 2006 Order. (Id. at 24).

## II. STANDARD OF REVIEW

### A. Appeal of a Magistrate Judge's Order

A district court may reverse a magistrate judge's determination of a non- dispositive issue only if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); see also F.R.Civ.P. 72(a); L.Civ.R. 72.1(c)(1); see also Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1113 (3d Cir.1986), cert. denied, 484 U.S. 976 (1987); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 177 F.R.D. 205, 213-14 (D.N.J.1997). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Lo Bosco v. Kure Eng'g Ltd., 891 F.Supp. 1035, 1037 (D.N.J.1995)(quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). A district court may not take into consideration any evidence that was not put forth before the magistrate judge when reviewing the magistrate judge's factual determination. Haines v. Liggett Group, Inc., 975 F.2d 81, 92 (3d Cir.1992). Under the clearly erroneous standard, the reviewing court will not reverse the magistrate judge's determination even if the court might have decided the matter differently. Cardona v. Gen. Motors Corp., 942 F.Supp. at 971 (quoting Toth v. Alice Pearl, Inc., 158 F.R.D. 47, 50 (D.N.J.1994). The court, however, will review a magistrate judge's legal conclusions de novo. Cooper Hosp./Univ. Med. Ctr. v. Sullivan, 183 F.R.D. 119, 127 (D.N.J.1998) (citations omitted).

*4 "Where a magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of that discretion." Id.; see also 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil 2d § 3069 (2d ed.1997)("many matters such as discovery scheduling or disputes might better be characterized as suitable for an abuse-of-discretion analysis"). The deferential standard of review is particularly appropriate in the case where the magistrate judge managed the case from the outset, and thus has a thorough knowledge of the proceedings. Cooper Hosp., 183 F.R.D. at 127 (quoting Public Interest Research Group v. Hercules, Inc., 830 F.Supp. 1525,

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
Page 31
(Cite as: 2006 WL 3069475 (D.N.J.))

1547 (D.N.J.1993), aff'd on other grounds and rev'd on other grounds, 50 F.3d 1239 (3d Cir.1995)).

B. Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir.1996); Healy v. New York Like Ins. Co., 860 F.2d 1209, 1219, n. 3 (3d Cir.1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prod. Co., 789 F.2d 230, 232 (3d Cir.1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 8 F.3d 231, 236 (3d Cir.1995).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

F.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." Anderson, 477 U.S. at 255-56.

**\*5** Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. See Celotex, 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits,

which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," id., "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, n. 12; see also Anderson, 477 U.S. at 247-48 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ... the requirement is that there be no genuine issue of material fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324: see also Lujan v. National Wildlife Fed., 497 U .S. 871, 888 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992) ("To raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), cert. denied, 507 U.S. 912 (1993). Here, the material facts are undisputed, and thus, the matter is ripe for summary judgment.

III. ANALYSIS

A. The Magistrate Judge's January 26, 2006 Order Did not Constitute an Abuse of Discretion and Was Not Clearly Erroneous or Contrary to Law

i. Motion to Amend Complaint

Plaintiff alleges that the Magistrate Judge erred in the January 26, 2006 Order denying Plaintiff's motion to amend the Complaint under F.R.Civ.P. 16(b) for failure to show good cause as no deadline to amend was set forth in the Magistrate Judge's scheduling orders. Because no deadline was set forth, Plaintiff argues that the more liberal standard of F.R.Civ.P. 15(a) should have been applied. Plaintiff points out that Rule 15 provides that requests to amend pleadings "shall be freely given when justice so requires." F.R.Civ. P. 15(a).

Defendants oppose Plaintiff's appeal and argue that review under Rule 16(b) was proper, and that even if the Magistrate Judge had considered Plaintiff's request under Rule 15(a), Plaintiff's request would nevertheless be denied due to the Magistrate Judge's findings of undue prejudice, delay and costs that both parties would incur if the amendment would have been permitted.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 32

(Cite as: 2006 WL 3069475 (D.N.J.))

**\*6** Rule 16(b) provides that a plaintiff must establish good cause before being allowed to amend his pleadings. Further, a Magistrate Judge has the discretion in determining what kind of showing the moving party must make in order to satisfy Rule 16(b)'s good cause requirement. See 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, § 16.14[1][b] (Matthew Bender 3d ed.1997). The determination as to whether good cause exists depends upon the diligence of the moving party (Rule 16(b) advisory committee's note; Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 469 (D.N.J.1990)) and good cause may be satisfied if the movant shows that their delay in filing the motion to amend stemmed from "any mistake, excusable neglect or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order." Newton v. Dana Corp. Parish Division, 1995 WL 368172, at \*1 (E.D.PA.1995) (quoting Gestener Corp. v. Case Equipment Co., 108 F.R.D. 138, 141 (D.Me.1985). Rule 16(b)'s good cause requirement must also be read in conjunction with Rule 15(a)'s directive that leave to amend be "freely given" such that both standards are met before amendment is allowed. Reynolds v. Borough of Avalon, 799 F.Supp. 442, 450 (D.N.J.1992).

Rule 15(a) provides that amendment be granted unless there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment ...." Foman v. Davis, 371 U.S. 178, 182 (1962).

This Court finds that the Magistrate Judge properly considered Rule 16(b) when she denied Plaintiff's motion to amend his Complaint. Although no set date to amend the pleadings was provided in the scheduling orders the Magistrate Judge issued, it was certainly clear that any possibility to amend the pleadings would expire when discovery closed. Further, as the Magistrate Judge noted during the telephone conference conducted on January 25, 2006, most of the factual information needed to support the proposed additional claim was available to Plaintiff well before the expiration of discovery, and as early as the time of Plaintiff's alleged deprivation. See Transcript of January 25, 2006 Telephone Conference. As such, the Magistrate Judge reasonably determined that Plaintiff failed to demonstrate good cause as to such a late attempt to amend his Complaint. The Magistrate Judge then determined, in consideration of Rule 15(a), that to allow such an amendment would unduly prejudice the Defendants, and add additional undue cost and delay. Although it appears that the Magistrate Judge did not directly address the issue of futility, such analysis was not required as each factor is autonomous and each alone can

serve as a basis for denying a request to amend a pleading. See Cornell & Co. V. Occup. Safety and Health Review Comm'n, 573 F.2d 820, 823 (3d Cir.1978) (holding that undue prejudice is the "touchstone for the denial of leave to amend" and that in its absence, a court must then look to the other factors, among which is futility); Leased Optical Departments v. Opti- Center, Inc., 120 F.R.D. 476, 478 (D.N.J.1988) (holding that undue delay is a sufficient ground alone to deny an amendment). [FN1]

FN1. Plaintiff asserts that futility is "central to the decision whether to grant leave to amend" and that if a proposed amendment is not clearly futile, "then a denial of leave to amend is improper ." Plaintiff cites to Harrison Beverage Co. v. Dribeck Importers, 133 F.R.D. 463, 468 (D.N.J.1990) for this proposition. However, after careful review, the Court finds that the Harrison holding does not make such a finding. Rather, the court in Harrison found that undue prejudice or undue delay alone would justify a denial of a proposed amendment, and that only in their absence would a review of futility be necessary.

**\*7** Consequently, the Court finds that the Magistrate Judge's Order was neither clearly erroneous nor contrary to law. Furthermore, the Magistrate Judge has been actively involved in discovery and has a thorough knowledge of the proceedings in this matter and is to be accorded deference under the standard set forth above. Plaintiff has made no showing of an abuse of discretion by the Magistrate Judge and the Court finds none. Therefore, Plaintiff's appeal of the Magistrate Judge's January 26, 2006 Order regarding Plaintiff's motion to amend his Complaint is denied.

ii. Supplemental expert report

Plaintiff next appeals the Magistrate Judges January 26, 2006 Order regarding Dr. Kleinman's supplemental expert report. Plaintiff asserts that because he did not receive Dr. Head's expert report until December 19, 2005, he should not have been held to the January 11, 2006 discovery deadline, and if he was to held to that deadline, the supplemental report by Dr. Kleinman should still be admissible because January 11, 2006 was the last day of discovery pursuant to the Magistrate Judges previous scheduling order.

However, there is no provision within the Magistrate Judges Orders nor within the local or federal civil rules that permit supplemental expert reports. Further, the deadline for expert reports was different than the deadline for discovery. As set forth in Judge Shwartz's October 11, 2005 Scheduling Order, all "responding" expert reports were to be delivered by December 20, 2005. Further, any extensions regarding said deadline had to be requested in

(C) 2007 West Group
(Cite as: 2006 WL 3069475 (D.N.J.))

advance of the expiration of said deadline. Plaintiff failed to do so. If Plaintiff had wanted to file a supplemental expert report to Defendants timely filed responsive report, Plaintiff would first have needed to request permission to file said report, and then request an extension of time with which to obtain and serve said report. Plaintiff did neither. The terms of the scheduling orders were specific and clear.

Despite Plaintiff's failures to request permission to file a supplemental report and for an extension of time with which to serve, the Magistrate Judge nevertheless permitted Plaintiff to utilize the supplemental report in redirect or rebuttal if the issues implicated in the supplemental report are raised by Defendants their cross-examination. As such, the Magistrate Judge's determination regarding Plaintiff's supplemental expert report was neither clearly erroneous or contrary to law. Plaintiff's appeal of the Magistrate Judge's January 26, 2006 Order is denied.

B. Defendants are Entitled to Summary Judgment as a Matter of Law

Defendants move for summary judgment and assert that N.J.S.A. 18A:16-2 is constitutional and that Plaintiff's procedural due process rights were not violated because the board of education complied with the statute's requirements, because Plaintiff failed to avail himself of the procedural safeguards in existence including the right to request a hearing and the right to appeal, and because Plaintiff cannot show a deprivation of employment.

**\*8** N.J.S.A. 18A:16-2 provides, in relevant part, that "[T]he board [of education of any district in the State of New Jersey] may require individual psychiatric or physical examinations of any employee, whenever, in the judgment of the board, an employee shows evidence of deviation from normal, physical or mental health." The constitutionality of N.J.S.A. 18A:16-2 has been upheld both in federal and state courts, with findings that the interest of the State of New Jersey to protect its youth outweighs the individual constitutional rights of the teacher or employee in question. See Hoffman v. Jannarone, 401 F.Supp. 1095 (D.N.J.1975) (rev'd in part); Gish v. Board of Ed. of Borough of Paramus, Bergen County, 145 N.J.Super., 96, 104-105 (App.Div.1976).

Procedurally, the implementation of N.J.S.A. 18A:16-2 requires that the teacher or employee be provided with a statement outlining the reasons the board in question is ordering said teacher or employee to submit to the fitness for duty examination, as well as an opportunity for a hearing, if such a hearing is requested. Further, a teacher or employee has a right to appeal from an adverse decision to the State Board of Education under N.J.S.A.

18A:6- 27. Curcio v. Collingswood Bd. of Educ., 2006 WL 1806455 at \* 10 (slip op.) (D.N.J.2006); Kochman v. Keansburg Board of Education, 124 N.J.Super. 203, 213-14 (Ch. Div.1973). "With such procedural safeguards the application of N.J.S.A. 18A:16-2 will not violate due process." Kochman at 214.

Based on the record before It, this Court cannot find any error regarding the manner or method in which the Roselle Board of Education conducted itself. Further, there is no basis with which to allege any violations of constitutional rights against the superintendent or assistant to the superintendent.

Specifically, Plaintiff alleges that Defendants violated his procedural due process when the board of education compelled Plaintiff to submit to a fitness for duty examination before a full adversarial proceeding was conducted. However, there is no such right set forth in either N.J.S.A. 18A:16-2 or N.J.A.C. 6:3-4A.4(e). Defendants were merely required to provide Plaintiff with a statement of reasons, and with a hearing if one was requested.

Indeed, Defendants did provide two separate statements of reasons which were sent to Plaintiff and his counsel in late August and early September. The first was this letter to Plaintiff dated August 31, 2004, which stated that he was ordered to attend a fitness for duty examination due to "erratic behavior" he had reportedly displayed. The second was a letter to Plaintiff's attorney, Mr. Thomas, from Mr. Roth, the school board's attorney sent in early September. The letter went into detail with regards to Plaintiff's behavior, specifically discussing the issues between Plaintiff and Principal Romano, and the concern that Superintendent Roberto had regarding the issues and that the concern had grown to a level that compelled Superintendent Roberto to transfer Plaintiff from the elementary school to the high school. These letters satisfy the statement of reasons requirement.

**\*9** Further, there is nothing in the record that provides any evidence that Plaintiff requested a hearing. Although Plaintiff references the September 9, 2004 correspondence from Mr. Roth to Plaintiff through Mr. Thomas, the "Rice Notice" is not an acknowledgment of a hearing request, but rather, an acknowledgment of the requirement that this Board notify an individual employee if said employee will be discussed at a future meeting. Therefore, Plaintiff fails to demonstrate that a hearing was ever requested. And although not a requirement of the Board of Education, Plaintiff also failed to avail himself of the appellate process established under Kochman.

Because there are no procedural due process violations presented in the record, all procedural due process

(C) 2007 West Group

Page 34

(Cite as: 2006 WL 3069475 (D.N.J.))

violations alleged in Plaintiff's Complaint shall be dismissed. Further, as no procedural due process violation has been proven, Plaintiff cannot sustain a § 1983 claim, which requires a constitutional rights violation, as both federal and state courts have found that no constitutional rights are violated when N.J.S.A. 18A:16-2 is implemented. See Infra.

Therefore, Plaintiff has provided no question of fact and Defendants are entitled to summary judgment as a matter of law. Plaintiff's Complaint shall therefore be dismissed.

IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Appeal the Magistrate Judge's January 26, 2006 Order is denied and Defendants' Summary Judgment Motion is granted.

2006 WL 3069475 (D.N.J.)

(C) 2007 West Group                                                                    Page 35
(Cite as: 2007 WL 128829 (S.D.W.Va.))

Only the Westlaw citation is currently available.

United States District Court, S.D. West Virginia.

**Heather RUTECKI, Plaintiff,**
v.
**CSX HOTELS, INC., dba The Greenbrier Resort,**
**Defendant.**
**Civil Action No. 5:05-cv-00226.**

Jan. 12, 2007.

John K. Bailey, Charleston, WV, John J. Clark, W. Sam Holland, The Ferraro Law Firm, Miami, FL, for Plaintiff.

Curtis R.A. Capehart, James W. Turner, Wendy Glover Adkins, Huddleston Bolen, Huntington, WV, Devang Desai, Mark R. Antonelli, Gaebe Mullen Antonelli Esco & Dimatteo, Miami, FL, for Defendant.

MEMORANDUM OPINION AND ORDER

THOMAS E. JOHNSTON, United States District Judge.

**\*1** Pending before the Court is Plaintiff's Objection to [the Magistrate Judge's] Order of December 27, 2006, As Such Relates to the Exclusion of Plaintiff's Equine Expert or Alternatively, To Allow Such Expert to Testify As a Lay Witness [Docket 230]. For the reasons stated below, the Magistrate Judge's order is AFFIRMED.

The Court incorporates by reference the procedural history of this case set forth in the Magistrate Judge VanDervort's order, wherein he excludes two of the Plaintiff's experts, including the equine expert who is the subject of this appeal.

Plaintiff had numerous opportunities to make proper expert designations. She did not do so. The last deadline for Plaintiff's expert disclosures was September 14, 2006. No designation was made at that time, but her new counsel asked for additional time, including a new expert disclosure deadline for Plaintiff of October 13. Counsel's October 13 date came and went with no designation. A week later, she named her equine expert, but failed to provide a report with information required by Fed.R.Civ.P. 26(a)(2). On October 26, discovery closed. Next, the Court held a conference on December 12, 2006 to consider, among other things, Plaintiff's motions for additional time, which she said at that time she did not want. No mention was made of late designation of experts at the conference. Within a week thereafter, however, and nearly two months after the close of discovery, a report was produced from Plaintiff's equine expert.

On December 27, 2006, Magistrate Judge VanDervort entered an order excluding Plaintiff's expert witnesses because their disclosures were untimely filed, incomplete, and finding that Plaintiff's failures were neither substantially justified nor harmless. Plaintiff appealed [FN1] the Magistrate Judge's ruling on January 11, 2007, as it pertained to her equine expert, Ms. Ellen Fischer. "Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, a magistrate judge's order on a non-dispositive matter shall not be modified or set aside unless it is 'clearly erroneous or contrary to law.' " Marks v. Global Mortgage Group, Inc., 218 F.R.D. 492, 495 (S.D.W.Va.2003) (Goodwin, J.). This Court "should reverse a magistrate judge's decision in a discovery dispute as 'clearly erroneous' only if the district court is left with a definite and firm conviction that a mistake has been made." Id.

FN1. Plaintiff styles her appeal as an "Objection".

The Court finds that no mistake has been made and largely adopts the findings of the Magistrate Judge. With trial five days away, Plaintiff argues that her failure to disclose her expert's opinion to Defendant was harmless as contemplated by Rule 37(c)(1). The Court disagrees. By the extremely untimely disclosure, Plaintiff has neither given Defendant a sufficient opportunity to depose her proposed expert, nor given Defendant the opportunity to retain an expert of its own to address the issues raised in her report. [FN2] Furthermore, the report contains no indication of the standard by which the expert arrived at her opinion. Responding to Plaintiff's expert cannot be done effectively in such a short period of time. Plaintiff argues that each of the five factors discussed in Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592 (4th Cir.2003) weigh in her favor. However, she cites no law in support of her argument, which falls far short of the mark.

FN2. Incredibly, Plaintiff suggests that Defendant could use one of its equestrian employees as an expert. However, it is the Defendant, not the Plaintiff, who selects the defense experts, and Defendant should have adequate time to do so.

**\*2** This Court generally adopts the analysis of the Magistrate Judge under Southern States. The only new circumstance since the Magistrate Judge's order is that Plaintiff has now provided the tardy report from her equine expert, which may or may not be adequate. However, this report was produced so late that it does not substantively change the analysis of the case under Southern States. While the equine expert's testimony might be helpful and potentially important to Plaintiff's case under the fourth factor of Southern States, that is difficult to appropriately assess at this late date and

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 36

(Cite as: 2007 WL 128829 (S.D.W.Va.))

without the benefit of a deposition and, potentially, an opposing expert's designation by the Defendant.

Plaintiff was given ample opportunity to disclose her expert's report. This case has been pending for nearly two years. At the conference held on December 12, 2006, the Court asked Plaintiff about the pending Motion to Stay and to Modify the Second Amended Scheduling Order and whether Plaintiff needed additional time in light of the approaching January 17, 2007 trial date. Plaintiff represented that she wanted to keep the trial date, even though no expert report had been made available to Defendant. [FN3] Therefore, Plaintiff had her opportunity to ask for more time to comply with the Federal Rules of Civil Procedure and the Scheduling Order of this Court. [FN4] She declined.

FN3. Plaintiff did, however, ask for permission to file a supplemental response to Defendant's outstanding summary judgment motion, which the Court granted. In her response, Plaintiff made no mention of an expert report.

FN4. The Court notes that this is not the first time Plaintiff has failed to fulfill her discovery obligations. On November 13, 2006, Magistrate Judge VanDervort entered an order granting Defendant's motion to compel and sanctions because Plaintiff revoked the general medical authorization prepared by her attorney and failed to produce financial documents. Additionally, Plaintiff was ordered to submit to an orthopedic exam. Following the order, Plaintiff failed to show at her examination.

Magistrate Judge VanDervort's order to exclude her expert witnesses is neither clearly erroneous nor contrary to law, and is hereby AFFIRMED. [FN5]

FN5. As Plaintiff's alternative request, raised in her appeal of the Magistrate Judge's order, to allow the equine expert to testify as a lay witness was raised for the very first time in this appeal, and because it is outside of the scope of the Magistrate Judge's order and the appeal therefrom, the Court will DEFER a ruling on that request at this time, until such time as the Defendant has an adequate opportunity to respond, if it so chooses.

The Court DIRECTS the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

2007 WL 128829 (S.D.W.Va.)

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 107 Fed.Appx. 867)

Page 37

This case was not selected for publication in the Federal Reporter.

 Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,

Tenth Circuit.

**David SIPP, Reverend, Plaintiff-Appellant-Cross-Appellee,**
**v.**
**UNUMPROVIDENT CORPORATION;  Paul Revere Life Insurance Company, Defendants-Appellees-Cross-Appellants.**
**Nos. 03-2055, 03-2066.**

Aug. 20, 2004.

 Background:  Insured under a disability insurance policy sued the insurer for breach of contract, unfair insurance practices, negligent misrepresentation, and malicious conduct justifying punitive damages in connection with insurer's termination of benefits.  United States District Court for the District of New Mexico granted insured's motion for summary judgment on the breach of contract claim and granted insurer's motion for summary judgment on the unfair insurance practices, negligent misrepresentation, and punitive damages claims.

 Holdings:  On cross-appeals, the Court of Appeals, Henry, Circuit Judge, held that: (1) genuine issues of material fact existed as to whether insured was totally disabled; (2) insured satisfied the "regular and personal care" component of the policy's definition of total disability; (3) insured satisfied the requirements for notice pleading regarding his claim for unfair insurance practices violating state statutes; (4) denying insured leave to amend his complaint was not an abuse of discretion; (5) insured failed to prove the "evil motive" or "culpable mental state" required to recover punitive damages; and (6) finding that insured's request for attorney's fees was timely filed was not an abuse of discretion.

 Affirmed in part, reversed in part, vacated in part, and remanded.

West Headnotes

**[1] Federal Civil Procedure 🗝2501**
170Ak2501

 Genuine issues of material fact as to whether insured was totally disabled, for purposes of a disability policy, precluded summary judgment for the insured on his breach of contract claim regarding the insurer's cessation of disability benefits; insurer's experts disagreed with evidence that the insured was totally disabled as a result of his depression.

**[2] Insurance 🗝2556**
217k2556

 Insured under a disability policy satisfied the "regular and personal care" component of the policy's definition of total disability; despite the fact that his visits to psychiatrists were infrequent at best, the insured met with a social worker, discussed his problems with a family counselor, and made his primary care physician aware of his mental health issues, for which the physician prescribed medication to treat his condition.

**[3] Insurance 🗝3571**
217k3571

 Insured satisfied the requirements for notice pleading regarding his claim against an insurer for unfair insurance practices violating New Mexico statutes; the complaint gave fair notice of what the claim was and the grounds on which it rested, the insurer's notice of removal suggested that it was aware of the insured's statutory insurance bad faith claim, and an initial pretrial report jointly signed by the parties included the contention that the insurer's actions constituted "unfair insurance practice prohibited by" statute. Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.; West's NMSA § § 57-12-1 et seq., 59A-16-1 et seq.

**[4] Federal Civil Procedure 🗝840**
170Ak840

**[4] Federal Civil Procedure 🗝841**
170Ak841

 Denial to insured of leave to amend his complaint against insurer to add a claim for bad faith in the claims handling process and a claim for the repudiation of the contract was not an abuse of discretion, even though the motion for leave to amend was filed less than a year after the original complaint and only two months after the expiration of the parties' agreed upon deadline for amending the complaint; facts needed to support these claims were known to the insured at the time that the original complaint was filed, and there was potential prejudice to the insured. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[5] Insurance 🗝3376**
217k3376

 Insured, in a breach of contract case against an insurer,

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 107 Fed.Appx. 867)

Page 38

failed to prove the "evil motive" or "culpable mental state" required to recover punitive damages under New Mexico law; the insurer's alleged implication that the insured was forced out of his job as a pastor after becoming involved in some sort of scandal with "a certain female parishioner," insurer's alleged refusal to disclose or produce the psychological reports that formed the basis for a denial of disability benefits, and the insurer's alleged failure to adequately investigate the insured's disability claim were insufficient.

**[6] Insurance** 🔑 **3585**
217k3585

Finding that insured's request for attorney fees was timely filed was not an abuse of discretion under New Mexico law, despite insurer's claim that the insured never pled or requested fees under the governing statute until after the case was disposed of on summary judgment. West's NMSA § 39-2-1.

**\*869** James A. Burke, Santa Fe, NM, Helen Laura Lopez, Rancho de Taos, NM, for Plaintiff-Appellant.

Mark T. Davenport, Monica Luebker, Figari Davenport & Graves, Dallas, TX, Lorna M. Wiggins, Wiggins, Williams & Wigins, Tila Fleming Hoffman, Tila Fleming Hoffman, P.C., Albuquerque, NM, for Defendants-Appellees.

Before KELLY, HENRY, and McKAY, Circuit Judges.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10TH CIR. R. 36.3.

HENRY, Circuit Judge.

Plaintiff David Sipp left his position as a reverend with a New Jersey congregation due to asthma and depression. He applied for benefits under his disability insurance policy, issued by the Paul Revere Life Insurance Co., a subsidiary of defendant UNUMProvident Corporation (UNUM). Rev. Sipp's application for benefits was initially approved, but after he received a few payments under the policy, UNUM informed him that his benefits would be terminated because he was no longer considered disabled. He then filed this action for breach of contract,

unfair insurance practices, negligent misrepresentation, and malicious conduct justifying punitive damages. The district court granted Rev. Sipp's motion for summary judgment on the breach of contract claim and granted UNUM's motion for summary judgment on the unfair insurance practices, negligent misrepresentation, and punitive damages claims. Both parties now appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm in part, reverse in part, and remand for further proceedings.

*I. BACKGROUND*

Rev. Sipp has been an ordained minister of the Christian Missionary Alliance for approximately twenty years. His last position was that of Senior Pastor in a New Jersey congregation and Chaplain for the Union County Sheriff's Office. He served in that position until early 2000.

In 1986, Rev. Sipp purchased a policy from the Paul Revere Life Insurance Co., a subsidiary of UNUM, insuring him against disability that would render him "unable to perform the important duties of [his] regular occupation." App. vol. I, at 98. This type of policy is known as an "own occupation" policy, as distinguished from an "any occupation" policy, because it allows the insured to recover benefits if he cannot perform the duties of his *own* occupation, **\*870** notwithstanding the fact that he might be able to perform the duties of *other* occupations.

Rev. Sipp began seeking medical treatment for asthma and depression in 1999, while still serving as a Senior Pastor in New Jersey. He initially submitted a claim for partial disability benefits to UNUM in January 2000. The attending physician statement submitted with his claim listed his primary diagnosis as asthma and his secondary diagnosis as stress-related depression. Effective April 1, 2000, Rev. Sipp resigned from his position as Senior Pastor and began claiming total disability. Initially, UNUM determined that Rev. Sipp qualified for residual disability for the month of January 2000 and that he met the definition of total disability as of April 1, 2000. Based on these determinations, Rev. Sipp received some benefits under the policy.

In November 2000, Rev. Sipp and his wife moved from New Jersey to New Mexico in hopes that the drier air would help to alleviate Rev. Sipp's asthma. Shortly after arriving in New Mexico, Rev. Sipp began receiving treatment for his asthma from Dr. James Cardasis, who became his primary care physician. The higher altitude and drier air caused Rev. Sipp's asthma to improve significantly, and Dr. Cardasis submitted an attending physician statement to UNUM stating that Rev. Sipp would be unable to work in his occupation through January 31, 2001. App. vol. II, at 291. Dr. Cardasis

(C) 2007 West Group
(Cite as: 107 Fed.Appx. 867)

"d[i]dn't know yet" when Rev. Sipp "could resume some work," and he indicated that he was "awaiting old records" before he could comment. *Id.* The statement listed the nature of Rev. Sipp's illness as asthma, chest pains, and pneumonia, with no mention of depression or any other mental illness. Dr. Cardasis did not provide UNUM with any information regarding Rev. Sipp's depression or resulting psychological impairment, nor did UNUM inquire about Rev. Sipp's psychological health.

In early 2001, Rev. Sipp's claim was reviewed by a UNUM nurse consultant and UNUM consulting pulmonologist, Dr. Alfred Kaplan. In April 2001, Dr. Kaplan called Dr. Cardasis to inquire about Rev. Sipp's prognosis. Dr. Cardasis informed Dr. Kaplan that Rev. Sipp did not have any limitations "from the asthmatic point of view" that would prevent him from returning to work. *Id.* at 310. In addition to the conversation with Dr. Cardasis regarding Rev. Sipp's asthma, UNUM asked a psychiatric case manager and a licensed psychologist to review Rev. Sipp's case file. Both individuals concluded that Rev. Sipp's records did not contain sufficient evidence to support a finding of psychological impairment. The reviews showed that Rev. Sipp had sought some treatment for mental health issues in the past, including seeing a licensed clinical social worker between September 1999 and May 2000, and seeing a counselor between February 2001 and April 2001. The reviews also revealed that Rev. Sipp did not take medication for mental health symptoms and did not receive any mental health treatment whatsoever between May 2000 and February 2001, and that when he did seek treatment in 2001, it was in the form of family counseling with his wife and focused on "marital/parenting issues." App. vol. I, at 133.

In May 2001, UNUM informed Rev. Sipp that it was ceasing disability payments under the policy. Rev. Sipp did not appeal UNUM's decision through its appeals process, despite being informed that he had a right to do so. He subsequently filed the instant action for 1) breach of contract, 2) unfair insurance practices, 3) negligent misrepresentation, and 4) punitive damages in New Mexico state court. UNUM removed the case to the District of **\*871** New Mexico. Though the contract itself was signed in Massachusetts, neither party has contested the application of New Mexico law. *See* 1 ERIC MILLS HOLMES & MARK S. RHODES, APPLEMAN ON INSURANCE § 4.17, at 468 (2d ed.1996) (noting that "[t]here is an increasing recognition that the forum has a vital interest in applying its own law, particularly where its residents may be concerned in some manner. If significant events have occurred there, the court may ignore the earlier doctrines (e.g., the law of the place of contracting controls) and apply the forum's law").

Rev. Sipp filed a motion for leave to file an amended complaint in June 2001; the district court denied the motion, finding that it was untimely and that the information needed to plead the new causes of action was available to Rev. Sipp at the time he filed his original complaint. Rev. Sipp then filed a motion for partial summary judgment, and UNUM filed a cross-motion for partial summary judgment. The district court granted Rev. Sipp's motion for summary judgment on the breach of contract claim, finding that "[Rev.] Sipp is in fact disabled and that Plaintiffs breached their contract by finding otherwise." App. vol. II, at 422 (Dist. Ct. Memo. Op. & Order, dated Sept. 20, 2002). The court granted summary judgment to UNUM on the unfair insurance practices, negligent misrepresentation, and punitive damages claims. The court granted in part Rev. Sipp's motion for attorney fees, finding that Rev. Sipp, as the prevailing party, was entitled to fees but that the time billed by Rev. Sipp's attorney was not reasonable and should therefore be subject to a twenty-percent reduction in hours. Rev. Sipp recovered $33,448.00 in compensatory damages on his breach of contract claim and $51,868.80 in attorney fees.

Rev. Sipp now appeals, arguing that 1) the district court erred in refusing to consider his claim that UNUM committed a breach of contract by denying him access to documents; 2) the district court erred in refusing to consider his statutory claim for insurance bad faith; 3) the district court abused its discretion by denying his motion to file an amended complaint; and 4) the district court erred in refusing to submit the issue of punitive damages to the jury. UNUM cross-appeals, alleging that 1) the district court erred in granting summary judgment to Rev. Sipp on the breach of contract claim; and 2) the district court abused its discretion in granting Rev. Sipp attorney fees.

## II. DISCUSSION

As many of the issues in this case ultimately turn on the question of contractual liability, we first consider whether the district court properly granted summary judgment to Rev. Sipp on his breach of contract claim. Next, we examine whether the district court erred in refusing to consider Rev. Sipp's alternative contractual claim (failure to provide documents as required by the contract) and his statutory unfair practices claim. We then examine whether the court abused its discretion by denying Rev. Sipp's motion to file an amended complaint. Finally, we turn to the issues of punitive damages and attorney fees.

### A. Summary Judgment on Rev. Sipp's Breach of Contract Claim

In its cross-appeal, UNUM argues that the district court erred in granting summary judgement to Rev. Sipp on his breach of contract claim. UNUM contends that

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 40

(Cite as: 107 Fed.Appx. 867)

significant issues of fact existed as to whether Rev. Sipp met the three- part definition of "totally disabled" for purposes of the policy, which defines "total disability" as being 1) "unable to perform the important duties of Your regular occupation;" **872 2) "not engaged in any other gainful occupation;" and 3) "under the regular and personal care of a Physician" as a result of injury or illness.  App. vol. I, at 98.  Specifically, UNUM argues that fact issues existed regarding 1) whether Rev. Sipp's illness was of such a magnitude that he was unable to perform his duties as a result of it, and 2) whether Rev. Sipp was under the regular care of a physician for his disabling condition.  *See* App. vol. I, at 98.  UNUM argues that Rev. Sipp failed to provide *"any* admissible affidavit from a mental health provider concluding that [he] is or was unable to perform the duties of his occupation for mental health reasons after the discontinuance of his benefits," Aples' Br. at 22, and that the district court improperly relied on inadmissible evidence in granting summary judgment to Rev. Sipp.  "Our summary judgment standard of review requires us to determine de novo whether there is any genuine disputed issue of material fact and whether the prevailing party was entitled to judgment as a matter of law." *See Pringle v. United States,* 208 F.3d 1220, 1223 (10th Cir.2000).  Summary judgment is only appropriate in cases in which there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

### 1. Disability Status

[1] UNUM argues that even considering all the evidence "[Rev.] Sipp did not conclusively prove that he was totally disabled such that reasonable minds could not differ."  Aples' Br. at 24.  In support of his breach of contract claim, Rev. Sipp provided medical records from Dr. Jafet Gonzales, who treated Rev. Sipp in April 2001; a letter from Dr. Harry Linneman, a clinical psychologist who began treating Rev. Sipp in early 2002;  and the reports of two experts, one a clinical psychologist and one a vocational evaluator.  UNUM filed a motion to strike these records "as they have not been authenticated and constitute hearsay."  App. vol. I, at 183.  The district court denied the motion to strike and accepted authenticating affidavits that Rev. Sipp later provided.  UNUM argues that this evidence is hearsay and that Rev. Sipp's affidavits did not allow admissibility under any exception to the hearsay rule.  We need not decide whether the district court abused its discretion in denying UNUM's motion to strike, as we conclude that even if the evidence was admissible, it did not support summary judgment for Rev. Sipp.  As UNUM's experts clearly disagreed with the above evidence that Rev. Sipp was totally disabled as a result of his depression, summary judgment was inappropriate.

The district court observed that "the record is replete with medical opinions indicating that Sipp's personality traits and psychological depression interfered with his ability to interact well with his congregation, in what everyone acknowledges is a high-stress job."  App. vol. II, at 441.  Furthermore, the court noted that "[t]he only contrary evidence comes from psychologists who did not examine Sipp and whose opinions are criticized by Plaintiff's consulting psychologist, who did examine Sipp." *Id.* at 439.  Two UNUM experts determined that Rev. Sipp was not conclusively disabled, based on the documents in his internal UNUM file.  Consulting clinical psychologist Jennifer D. Lish conducted a review of all documents included in Rev. Sipp's UNUM file and concluded that "[t]his file does not contain sufficient evidence to document that the Insured's psychiatric symptoms rose to the level that would be expected to preclude occupational functioning."  App. vol. I, at 135.  Similarly, Ann Ward-Bennett, a psychiatric case manager who also reviewed Rev. Sipp's file, concluded that "there is no clear diagnostic **873 formulation ... to support a disabling condition other than an Adjustment Disorder with Mixed Anxiety and Depressed Mood.  Nor does the information that has been submitted support a level of severity consistent with a compromising condition." *Id.* at 133.

However, generally speaking, summary judgment is not advisable in situations in which there is a conflict in expert testimony, even when the evidence leans one way.  *See Zuchel v. Spinharney,* 890 F.2d 273, 275 (10th Cir.1989) ("It makes no difference that [defendant]'s view of the evidence is supported by the majority of the witnesses whose testimony was submitted to the district court at the summary judgment stage.  Neither we, nor the district court, are entitled to weigh evidence or pass on the credibility of witnesses in deciding summary judgment issues.");  *see also Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Co.,* 138 F.Supp.2d 482, 488 (S.D.N.Y.2001) (noting that "where, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment").  Questions such as whether the insured is partially or totally disabled under a specific policy definition usually necessitate a jury determination, and "[c]ourts typically do not apply contract interpretation as a matter of law (absent a statute) to the determination of the insured's disability."  1 ERIC MILLS HOLMES & MARK S. RHODES, APPLEMAN ON INSURANCE § 1.27, at 138 (2d ed.1996);  *see also Olson v. Aetna Life Ins. Co.,* 171 So.2d 548, 548 (Fla.Ct.App.1965) (noting that "[t]he ultimate factual question in this case is whether the insured was totally disabled from performing his duties," and that while "[u]nder certain circumstances, the question of whether disability exists may be one of law, ... more often this is a

(C) 2007 West Group                                                                                                                Page 41
(Cite as: 107 Fed.Appx. 867)

question of fact for determination by the jury.")

The fact that UNUM's contrary evidence came from non-treating physicians certainly may affect the credibility and weight of the evidence, but it does not justify discounting the evidence entirely. For example, in the Social Security disability context, an Administrative Law Judge charged with determining whether a claimant is disabled, "[g]enerally ... give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 416.927(d)(1). In *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), the Supreme Court applied the treating physician preference to the ERISA context, noting that "[a]s compared to consultants retained by a plan, it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual," and acknowledging the "concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." *Id.* at 832 (internal quotation marks omitted). The Court went on, however, to qualify the preference for the opinions of treating physicians: "But the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks." *Id.*

A jury charged with determining whether Rev. Sipp was totally disabled might accord more weight to the opinions of treating physicians and psychologists than to the opinion of non-treating psychologists. But as it "[i]t is the jury's exclusive province to assess the credibility of witnesses **\*874** and determine the weight to be given to their testimony," *Lamon v. City of Shawnee,* 972 F.2d 1145, 1159 (10th Cir.1992), we will not decide whether an expert's opinion based on an examination of Rev. Sipp is entitled to more weight than that of a non-treating psychologist. We hold that such a conflict should not be resolved by summary judgment.

2. Regular and Personal Care of a Physician

[2] UNUM also argues, in the alternative, that Rev. Sipp was not "under the regular and personal care of a Physician," as required by the terms of his disability insurance policy. *See* App. vol. I, at 98. UNUM contends that Rev. Sipp did not receive mental health treatment from a qualified provider between May 2000 and February 2001, and that after that time he saw a psychiatrist on only one occasion in February 2001, and

then waited another eleven months before seeking psychological counseling. The district court rejected UNUM's suggestion that Rev. Sipp only went to see a psychiatrist when he thought he was in danger of losing his benefits. App. vol. II, at 440 (noting that "[t]here is some indication in the record that Sipp was initially reluctant to seek the help of a psychiatrist and resisted taking psychotropic medications, that his reluctance and resistance were symptoms of his depression and his personal techniques for dealing with it, and that he became aware, eventually, that he needed help with his problems and sought out diagnosis ... and counseling").

Despite the fact that his visits to psychiatrists were infrequent at best, Rev. Sipp did seek other types of help. He met with a social worker, discussed his problems with a family counselor, and made Dr. Cardasis, his primary care physician in New Mexico, aware of his mental health issues. Significantly, Dr. Cardasis prescribed medication to treat his condition. The insurance policy defines a "physician" as "any licensed practitioner of the healing arts practicing within the scope of his or her license." App. vol. II, at 258. This definition would include certain licensed social workers, counselors, and psychologists, who are trained in dealing with depression and other mental disorders. We therefore agree with the district court's finding that Rev. Sipp satisfied the "regular and personal care" component of the definition of total disability.

B. Rev. Sipp's Alternative Breach of Contract Theory

In addition to arguing that UNUM committed breach of contract by ceasing disability benefits, Rev. Sipp also argues that UNUM committed breach of contract by refusing to allow him access to various documents. He asserts that UNUM had a contractual duty to provide him with the reports that formed the basis for their denial of benefits.

The district court found it unnecessary to consider this alternative breach of contract claim, holding that "having found as a matter of law that Sipp is in fact disabled and that Plaintiffs breached their contract by finding otherwise, [it] need not consider these alternative arguments for breach of contract." App. vol. II, at 442. On remand, Rev. Sipp may, of course, continue to pursue this theory of liability as an alternative to his other breach of contract theory.

C. Rev. Sipp's Statutory Claim for Unfair Insurance Practices

[3] Rev. Sipp argues that the district court should have considered his claim under the New Mexico Unfair Insurance Practice Act (UIPA), N.M. Stat. Ann. § 59A-

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 107 Fed.Appx. 867)

Page 42

16-1 to -30, and/or the New Mexico **\*875** Unfair Practices Act (UPA), N.M. Stat. Ann. § 57-12-1 to -22, which would have allowed him the opportunity to recover "extra-contractual damages: punitive damages, statutory treble damages or actual damages otherwise available." Aplt's Br. at 20. The inherent authority of a district court to manage its own docket includes the discretion to determine which claims to consider. We review decisions relating to the court's management of its docket for abuse of discretion. *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.,* 296 F.3d 982, 985 (10th Cir.2002).

Rev. Sipp argues that he pled a claim for unfair insurance practices in his original complaint, though he admits that the complaint "was far from a model of clarity," Aplt's Br. at 23, and that even if the claim was not adequately pled in the complaint, it was pled in the Joint Initial Pre-Trial Report, thus giving UNUM adequate notice. First, he notes that the complaint "contained a Fourth Claim for Relief, captioned: 'Unfair Insurance Practices,' " and that the amount of damages claimed in the original complaint would have exceeded those allowable under a breach of contract theory, such that "UNUM was aware of statutory and extra-contractual claims." Aplt's Br. at 21 (citing App. vol. I, at 12-13).

In response, UNUM argues that the complaint did not provide sufficient notice of Rev. Sipp's claim, as it contained only vague allegations of "unfair insurance practices" with no citations to the UIPA or the UPA. UNUM further asserts that Rev. Sipp's attempt to file an amended complaint suggests that he was aware that the claim was inadequately pleaded in the original complaint. Aples' Br. at 17 (arguing that "if Sipp felt his claims *had* been pled under these statutes there would have been no need to file an untimely Motion for Leave to add such causes of action").

Rule 8 of the Federal Rules of Civil Procedure sets forth the requirements for notice pleading, which include
　　(1) a short and plain statement of the grounds
　　upon which the court's jurisdiction depends,
　　unless the court already has jurisdiction and the
　　claim needs no new grounds of jurisdiction to
　　support it, (2) a short and plain statement of the
　　claim showing that the pleader is entitled to
　　relief, and (3) a demand for judgment for the
　　relief the pleader seeks.
Fed.R.Civ.P. 8(a). As the Seventh Circuit has observed, "notice pleading requires the plaintiff to allege just enough to put the defendant on notice of facts providing a right to recovery and not to cite to the appropriate statute creating that right." *Brokaw v. Mercer County,* 235 F.3d 1000, 1023 n. 19 (7th Cir.2000).

Under the heading "Fourth Claim for Relief:  Unfair

Insurance Practices," Rev. Sipp's complaint described the specific conduct that he believed entitled him to relief, including UNUM's reliance on a telephone conversation with Rev. Sipp's physician as a basis for denying benefits; UNUM's implication "that a psychiatric illness is required for coverage, and that [Rev. Sipp] is experiencing a 'stressful life event' which is not covered;" and UNUM's failure "to provide any substantial medical reasons in the letter of termination." App. vol. I, at 13. The complaint further stated that the above acts "do not comply with insurance trade standards of practice," and "violate statutory laws and regulations covering insurance practices." *Id.*

Rev. Sipp's complaint, while assuredly not a model of clarity, did provide a "short and plain statement of the claim," Fed.R.Civ.P. 8(a), and alleged facts "sufficient to give the defendant[s] fair notice of what the claim is and the grounds on which it rests." *Lone Star Indus., Inc. v. Horman Family Trust,* 960 F.2d 917, 922 (10th **\*876** Cir.1992). Furthermore, UNUM's Notice of Removal suggests that it was aware of Rev. Sipp's statutory insurance bad faith claim, as the Notice explicitly stated that "[i]n the Complaint, Plaintiff has asserted three separate counts for breach of contract, *violations of the New Mexico Unfair Practices Act,* a claim for negligent misrepresentation, and a count asserting malicious conduct." App. vol. I, at 16 (emphasis added). We also note that the Initial Pretrial Report, jointly signed by the parties, included the contention that UNUM's actions constituted "unfair insurance practice prohibited by 59-16-20, NMSA." App. vol. I, at 34. Thus, we hold that Rev. Sipp's allegation satisfied Rule 8(a)(2). Because the parties have cited the acts somewhat interchangeably, we leave it up to the district court to determine whether to reinstate the UPA claim, the UIPA claim, or both statutory actions.

### D. Rev. Sipp's Motion for Leave to Amend

[4] Rev. Sipp argues that the district court should have allowed him to amend his complaint to add two new causes of action:  a claim for bad faith in the claims handling process and a claim for the repudiation of the contract. He also sought leave to amend his complaint "to add a claim under the New Mexico Unfiar [sic] Practitc [sic] Act as well as the Unfair Insrucance [sic] Claims Practice Act," App. vol. I, at 46, but as we already determined in Section II.C that Rev. Sipp adequately pled (and, fortunately, adequately spell-checked) a statutory unfair practices claim in his original complaint, we need not address it here.

Rev. Sipp filed his original complaint in state court on November 20, 2001. The parties agreed that he would be allowed until April 11, 2002 to amend his complaint. He

(C) 2007 West Group                                                                                    Page 43
(Cite as: 107 Fed.Appx. 867)

did not amend his complaint within that time frame, but then sought leave to amend his complaint on June 6, 2002. The district court denied Rev. Sipp's Motion for Leave to File a First Amended Complaint upon finding that "the motion is untimely, that the information necessary to plead the new causes of action was known to Plaintiff at the time the original complaint was filed, that Plaintiff offered no explanation for its delay in seeking this amendment, and that allowing this amendment would be prejudicial to Defendants." App. vol. I, at 73 (Order Denying Plaintiff's Motion for Leave to First Amended Complaint, filed July 11, 2002). "We review the district court's denial of a motion to amend a complaint for abuse of discretion." *Hayes v. Whitman,* 264 F.3d 1017, 1026 (10th Cir.2001); *see also* Fed.R.Civ.P. 15(a) ( "[L]eave [to amend] shall be given freely when justice so requires.").

Several factors are typically considered by the courts in determining whether to allow amendment of a complaint. These include whether the amendment will result in undue prejudice, whether the request was unduly and inexplicably delayed, was offered in good faith, or that the party had sufficient opportunity to state a claim and failed.

*Las Vegas Ice & Cold Storage Co. v. Far West Bank,* 893 F.2d 1182, 1185 (10th Cir.1990); *see also Castleglen, Inc. v. Resolution Trust Corp.,* 984 F.2d 1571, 1585 (10th Cir.1993) (citing "a showing of undue delay ..., or undue prejudice to the opposing party, or futility of amendment, etc." as reasons to deny leave to amend a complaint).

" '[W]e have often found untimeliness alone a sufficient reason to deny leave to amend.' " *Hayes,* 264 F.3d at 1029 (quoting *Viernow v. Euripides Dev. Corp.,* 157 F.3d 785, 799 (10th Cir.1998)); *see also **877** Las Vegas Ice & Cold Storage,* 893 F.2d at 1185 ("Untimeliness alone may be a sufficient basis for denial of leave to amend. Contrary to plaintiff's assertion, prejudice to the opposing party need not also be shown."). Denial of leave to amend is particularly appropriate in cases in which the cause(s) of action were available to the plaintiff at the time that the original complaint was filed. *Id.* ("Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial.")

Rev. Sipp argues that most of the cases in which leave to amend has been denied have involved substantially longer periods of delay, sometimes up to several years. His motion for leave to amend, in contrast, was filed less than a year after the original complaint and only two months after the expiration of the parties' agreed upon deadline for amending the complaint. While this is a shorter delay

than in many of the cases in which leave to amend has been denied, the district court emphasized that the new causes of action were known to Rev. Sipp at the time the original complaint was filed and that Rev. Sipp gave "no justifiable reason for the delay." App. vol. I, at 74. The court also concluded that UNUM would be prejudiced by the amendment, as "[t]he discovery deadline expire[d] ... a mere 8 days away" and "[a]llowing the extension would inevitably require reopening discovery and essentially starting this case anew, and would significantly delay the final deposition." *Id.*

While Rev. Sipp contends that he learned new information through depositions that made UNUM's degree of culpability more apparent and made him feel that the new claims were stronger than he previously realized, he admits that the claims could have been pled originally or that the amendments could have been requested earlier. Ultimately, it appears that the facts needed to support these claims were known to Rev. Sipp at the time that the original complaint was filed. Taking into account the untimeliness of the motion, the potential prejudice to UNUM, and Rev. Sipp's concession that the motion could have been made sooner, we hold that the district court did not abuse its discretion when it denied Rev. Sipp's motion for leave to amend.

E. Punitive Damages

[5] Rev. Sipp sought punitive damages based on UNUM's failure to investigate his claim, refusal to provide him with the documents on which they based the denial of benefits, and insinuation that he was forced out of his position as a result of a personal problem with a parishioner. The district court granted UNUM's cross-motion for summary judgment on punitive damages, concluding "[t]here is simply no evidence that Defendants acted maliciously or recklessly in their claims handling process." App. vol. II, at 447. Rev. Sipp argues on appeal that the court erred in granting summary judgment on the issue of punitive damages and that punitive damages should have been submitted to a jury. We review de novo a district court's determination concerning whether sufficient evidence existed to support punitive damages. *Youren v. Tintic Sch. Dist.,* 343 F.3d 1296, 1307 (10th Cir.2003).

The parties disagree regarding the standard for punitive damages in New Mexico insurance cases. According to Rev. Sipp, "Under New Mexico law, punitive damages may be awarded for conduct that is malicious, willful, reckless, wanton, fraudulent, or in bad faith. If sufficient evidence exists to prove any one of the enumerated mental states, the trial court is required to instruct the jury on punitive damages." ***878** Aplt's Br. at 11 (internal quotation marks and citations omitted). UNUM

(C) 2007 West Group
(Cite as: 107 Fed.Appx. 867)

disagrees, arguing that "a showing of malice or other increased mental culpable state" is required in order for a plaintiff to recover punitive damages for breach of contract. Aples' Br. at 11.

The New Mexico Supreme Court recently clarified the standard for awarding punitive damages in breach of insurance contract cases. *See Sloan v. State Farm Mut. Auto. Ins. Co.,* 135 N.M. 106, 85 P.3d 230, 232 (N.M.2004). Though *Sloan* establishes a less stringent standard for punitive damages in insurance bad faith cases, the court explicitly distinguishes breach of contract cases and reaffirms the standard set forth in *Paiz v. State Farm Fire & Casualty Co.,* 118 N.M. 203, 880 P.2d 300 (N.M.1994). In *Paiz,* the court reversed a punitive damage award in a breach of contract case, "disavow [ing] the proposition that in a contract case, including one involving an insurance contract, punitive damages may be predicated solely on gross negligence," and holding that "[i]n addition to, or in lieu of, such negligence there must be evidence of an 'evil motive' or a 'culpable mental state.' " *Id.* at 308.

As *Sloan* reiterates that punitive damages can only be awarded in a breach of contract case when there is an "evil motive" or "culpable mental state," we must now turn to whether such evidence existed in this case. According to Rev. Sipp, evidence of the requisite mental state included: UNUM's implication that he was forced out of his job as a Senior Pastor after becoming involved in some sort of scandal with "a certain female parishioner," App. vol. I, at 188; UNUM's refusal to disclose or produce the psychological reports that formed the basis for the denial of benefits; and UNUM's failure to adequately investigate Rev. Sipp's disability claim. While UNUM's conduct is far from admirable, we agree with the district court's determination that "the evidence establishes that [UNUM's] representatives were simply doing their job, without any malicious intent. Whether or not they did their jobs as thoroughly and competently as they could have, [Rev. Sipp] has not shown that their actions rose to the level of malice or reckless conduct so as to justify punitive damages." App. vol. II, at 448 (internal citation and quotation marks omitted). We note, however, that Rev. Sipp may be entitled to punitive damages under the UPA, should he succeed on that claim. N.M. Stat. Ann. § 57-12-10 ("Where the trier of fact finds that the party charged with an unfair or deceptive trade practice or an unconscionable trade practice has willfully engaged in the trade practice, the court may award up to three times actual damages or three hundred dollars ($300), whichever is greater, to the party complaining of the practice.").

F. Attorney Fees

The district court awarded Rev. Sipp $51,868.80 in attorney fees pursuant to N.M. Stat. Ann. § 39-2-1, which provides that

> [i]n any action where an insured prevails against an insurer who has not paid a claim on any type of first party coverage, the insured person may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim.

In their cross-appeal, UNUM argues that Rev. Sipp should not have been granted attorney fees because 1) his request for attorney fees was untimely, and 2) an award of attorney's fees under § 39-2-1 must be predicated on a finding of "unreasonableness" on the part of the insurance company. "We review the award of attorney's fees for abuse of discretion." *Smith *879 v. Diffee Ford-Lincoln-Mercury, Inc.,* 298 F.3d 955, 968 (10th Cir.2002).

1. Timeliness

[6] UNUM contends that Rev. Sipp "never pled or requested fees under this statute [§ 39-2-1] until *after* the case was disposed of on summary judgment, which is certainly not a timely request." Aples' Br. at 27. The district court explicitly rejected "Defendants' argument that the Court should deny attorney fees because a request was not specifically pled under the statute, and is therefore, untimely." App. vol. II, at 460. Moreover, as Rev. Sipp points out, the New Mexico Court of Appeals has previously rejected a defendant's challenge to an award of attorney's fees based on the plaintiff's failure to cite § 39-2-1 until after the fee petition was before the court. *See O'Neel v. USAA Ins. Co.,* 131 N.M. 630, 41 P.3d 356, 365 (N.M.Ct.App.2002) (awarding fees under § 39-2-1 where "the record reveals that [the plaintiff] did request an alternative award of attorney fees under Section 39-2-1 orally and in writing before the court made its final ruling on attorney fees"). UNUM does not provide any case law in support of its position that Rev. Sipp's motion for attorney fees was untimely. In the absence of any supporting authority to the contrary, we hold that the district court did not abuse its discretion in finding that Rev. Sipp's request for attorney's fees was timely filed.

2. Unreasonableness

UNUM's next argument is that an award of attorney's fees under § 39-2-1 must be predicated on a finding of unreasonableness. Section 39-2-1 states:

> In any action where an insured prevails against an insurer who has not paid a claim on any type of first party coverage, the insured person may be awarded reasonable attorney's fees and costs of the action *upon a finding by the court that the*

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group                                                    Page 45
(Cite as: 107 Fed.Appx. 867)

*insurer acted unreasonably in failing to pay the
claim.*

N.M. Stat. Ann. § 39-2-1 (emphasis added). According
to UNUM, the court found that UNUM was "wrong"
without ever making any specific finding regarding
whether it was "unreasonable." Aples' Br. at 27.

On remand, the district court should evaluate making
more specific findings as to the reasonableness or
unreasonableness of UNUM's actions and to consider the
availability, if any, of attorney fees under the UIPA, N.M.
Stat. Ann. § 59A-16-30, and/or the UPA, N.M. Stat. Ann.
§ 57-12-10(c).

### III. CONCLUSION

Given the conflicting testimony of experts regarding
Rev. Sipp's disability, we must REVERSE and REMAND
the district court's grant of summary judgment in favor of
Rev. Sipp on the breach of contract claim. In connection
with that reversal, the district court should reconsider
Rev. Sipp's unfair practices claim under the UIPA and/or
the UPA and the possibility of an award of punitive
damages in connection with that claim. We also
VACATE the award of compensatory damages and
attorney fees and REMAND for further proceedings
consistent with this opinion.

107 Fed.Appx. 867

END OF DOCUMENT

(C) 2007 West Group
(Cite as: 2006 WL 2226334 (D.N.J.))

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court,

D. New Jersey.

**Stanley STEPNEY and Kevin Freeman, Plaintiffs,**
**v.**
**Gary GILLIARD, et al., Defendants.**
**No. 02-5259 (GEB).**

Aug. 3, 2006.

David Uitti, Matthew V. Delduca, Dechert LLP, Lawrenceville, NJ, Richard Anthony Jasaitis, Dechert LLP, Princeton, NJ, Charles Harry Landesman, Froelich & Landesman Law, Kearny, NJ, for Plaintiffs.

Donald L. Beekman, Beekman & Beekman, LLC, Ocean Grove, NJ, Linda Grasso Jones, Cleary, Alfieri, Jones & Hoyle, Esqs., Matawan, NJ, for Defendants.

MEMORANDUM OPINION

BROWN, Chief Judge.

**\*1** This matter comes before the Court upon three separate motions by plaintiff Stanley Stepney ("Plaintiff") appealing the Magistrate Judge's May 12, 2006; May 25, 2006; and July 10, 2006 Orders. The Court, having considered the parties' submissions and having decided the motions without oral argument pursuant to Federal Rule of Civil Procedure 78, and for the reasons discussed below, will deny Plaintiff's motions.

I. BACKGROUND

The extensive facts in this case have been set forth previously by the Court and are repeated here only where relevant to the instant motions. On or about November 13, 2001, plaintiffs Stanley Stepney and Kevin Freeman (referred to collectively as "Plaintiffs") were incarcerated at the Monmouth County Correctional Institution ("MCCI"). (Defendants' Br. at 2.) At approximately 12:00 noon on that date, Plaintiffs allege that after they requested use of MCCI's law library from defendant Gary Gilliard, then a corrections officer at MCCI, "Gilliard without provocation, reason or justification assaulted ... [P]laintiffs, striking both in the face and body." (Complaint at ¶ 10.) Soon after this incident and investigation, defendant Gilliard resigned from his position with the MCCI; his last day of work was December 11, 2001. (Defendants' Br. at 4-5.)

On or about November 1, 2002, Plaintiffs filed the instant Complaint, alleging one count of violation of the Eighth and Fourteenth Amendments of the Constitution and Section 1983 of Title 42 of the United States Code against Gilliard; one count of an intentional tort against Gilliard under New Jersey law; one count of violation of the Eighth and Fourteenth Amendments of the Constitution and Section 1983 against Clifford J. Daniels, warden of the MCCI; one count of violations of the Sixth and Fourteenth Amendments of the Constitution and Section 1983 against Daniels; and a separate count of violations of the Sixth and Fourteenth Amendment and Section 1983 against Edward J. Stominsky as a member of the Monmouth County Board of Chosen Freeholders.

On or about December 2, 2002, defendant Gilliard filed an answer and cross-claim to the Complaint and defendants Daniels and Stominski filed an answer. In 2003, Plaintiffs' respective applications to proceed in forma pauperis were granted and plaintiff Freeman acquired counsel. On or about February 3, 2004, Plaintiff filed a motion for, inter alia, appointment of pro bono counsel. On or about April 8, 2004, Plaintiff motion for appointment of pro bono counsel was denied for failure to satisfy the factors required for appointment of counsel set forth in Tabron v. Grace, 6 F.3d 147 (3d Cir.1993), cert. denied, 510 U.S. 1196 (1994).

On or about April 19, 2005, Plaintiff filed a subsequent motion to appoint counsel. On or about April 20, 2005, defendants Daniels and Stominski (collectively referred to as "the Moving Defendants"), filed a motion for summary judgment. On or about June 10, 2005, defendant Gilliard informed the Court of his reliance on the Moving Defendants' moving papers. On or about June 22, 2005, plaintiff Freeman filed opposition to the motion for summary judgment. Plaintiff was granted several extensions of time to file a brief in opposition, but was ultimately denied any further extensions of time to file opposition papers on November 10, 2005. On December 6, 2005, the Court granted Plaintiff's motion to appoint counsel and granted in part and denied in part the Moving Defendants' motion for summary judgment.

**\*2** On April 19, 2006, Plaintiff's appointed counsel filed a motion to amend/correct the Complaint. On May 15, 2006, the Magistrate Judge entered an Order denying Plaintiff's motion. On May 25, 2006, the Magistrate Judge entered an Order on informal motion denying Plaintiff's request to submit an expert report and precluding Plaintiff from relying on this report at trial. On July 10, 2006, the Magistrate Judge entered an Order on informal motion, inter alia, denying Plaintiff's request for defendant Gilliard's full employment records at MCCI. Thereafter, Plaintiff filed the instant motions appealing the Orders of

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
Page 47
(Cite as: 2006 WL 2226334 (D.N.J.))

the Magistrate Judge.

## II. DISCUSSION

A. Standard of Review for Appeals of Magistrate Judge Orders

A district court may reverse a magistrate judge's determination of a non- dispositive issue only if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); see also Fed.R.Civ.P. 72(a); L. CIV. R. 72.1(c)(1); see also Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1113 (3d Cir.1986), cert. denied, 484 U.S. 976 (1987); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 177 F.R.D. 205, 213-14 (D.N.J.1997). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Lo Bosco v. Kure Eng'g Ltd., 891 F.Supp. 1035, 1037 (D.N.J.1995)(quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). A district court may not take into consideration any evidence that was not put forth before the magistrate judge when reviewing the magistrate judge's factual determination. Haines v. Liggett Group, Inc., 975 F.2d 81, 92 (3d Cir.1992). Under the clearly erroneous standard, the reviewing court will not reverse the magistrate judge's determination even if the court might have decided the matter differently. Cardona v. Gen. Motors Corp., 942 F.Supp. at 971 (quoting Toth v. Alice Pearl, Inc., 158 F.R.D. 47, 50 (D.N.J.1994). The court, however, will review a magistrate judge's legal conclusions under de novo review. Cooper Hosp./Univ. Med. Ctr. v. Sullivan, 183 F.R.D. 119, 127 (D.N.J.1998) (citations omitted).

"Where a magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of that discretion." Id.; see also 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil 2d § 3069 (2d ed.1997)("many matters such as discovery scheduling or disputes might better be characterized as suitable for an abuse-of-discretion analysis"). The deferential standard of review is particularly appropriate in the case where the magistrate judge managed the case from the outset, and thus has a thorough knowledge of the proceedings. Cooper Hosp., 183 F.R.D. at 127 (quoting Public Interest Research Group v. Hercules, Inc., 830 F.Supp. 1525, 1547 (D.N.J.1993), aff'd on other grounds and rev'd on other grounds, 50 F.3d 1239 (3d Cir.1995)).

B. The Magistrate Judge's May 12, 2006 Order Did Not Constitute an Abuse of Discretion and Was Not Clearly Erroneous or Contrary to Law

**\*3** Plaintiff alleges in his first motion that the Magistrate

Judge erred in the May 12, 2006 Order denying Plaintiff's motion to amend the Complaint under the standard set forth in the Federal Rules of Civil Procedure. Plaintiff cites Rule 15, which states that leave to amend the Complaint "shall be freely given when justice so requires." Fed R. Civ. P. 15(a). Plaintiff further cites case law expounding upon the circumstances under which leave is to be granted. (See Pl.'s Br. at 7-8.)

However, it is clear from the Order that the Magistrate Judge properly considered the appropriate standard in denying Plaintiff's motion. The Magistrate Judge cited the same standard set forth in Plaintiff's brief on appeal, where leave to amend shall be granted unless there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment...." Foman v. Davis, 371 U.S. 178, 182 (1962)).

Based on that standard, the Magistrate Judge found undue delay and undue prejudice to the opposing party and therefore denied Plaintiff's motion. Consequently, the Court finds that the Magistrate Judge's Order was neither clearly erroneous nor contrary to law. Furthermore, the Magistrate Judge has been actively involved in discovery and has a thorough knowledge of the proceedings in this matter and is to be accorded deference under the standard set forth above. Plaintiff has made no showing of an abuse of discretion by the Magistrate Judge and the Court finds none. Therefore, Plaintiff's appeal of the Magistrate Judge's May 12, 2006 Order is denied and the Order is affirmed.

C. The Magistrate Judge's May 26, 2006 Order Did Not Constitute an Abuse of Discretion and Was Not Clearly Erroneous or Contrary to Law

With respect to Plaintiff's next appeal, the Court first notes that Plaintiff's attempt at framing the Magistrate Judge's Order as a dispositive ruling is incorrect. Pursuant to 28 U.S.C. § 636 and Local Rule 72. 1, the Court may designate magistrate judges to hear and determine any pretrial matter, except for eight specified motions, which are often deemed dispositive. See NLRB v. Frazier, 966 F.2d 812, 816 (3d Cir.1992). Inclusive of those specified motions, "dispositive" commonly refers to those matters that "dispose of the matter before the district court." Id. at 817. Ultimately, that case "could be read to advise district courts to select the standard of review based on the effect the magistrate's order has on the parties rather than on the general type of order being reviewed." Williams v. American Cyanamid, 164 F.R.D. 615, 617 (D.N.J.1996) (citation omitted). Consequently, the Court finds that the Magistrate Judge's May 25, 2006 Order denying

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 2006 WL 2226334 (D.N.J.))

Plaintiff's request to submit an expert report is not dispositive and can be reviewed under the deferential standard appropriate for discovery disputes and scheduling.

**\*4** Plaintiff alleged in his second motion that his expert report and IME were timely filed. The Scheduling Order entered by the Magistrate Judge on March 1, 2006, memorializes a status conference held with the parties on February 27, 2006, and states that Plaintiff's expert discovery shall be concluded by April 28, 2006. Thereafter, the Magistrate Judge signed a Scheduling Order on May 11, 2006, that memorialized the May 10, 2006, status conference with the parties and stated that Plaintiff's expert discovery shall be concluded by June 22, 2006. Although Plaintiff asserts that he timely served his expert report on May 22, 2006, there is no evidence of such a report on the docket. Although the change of date in the May 11, 2006 Scheduling Order was not specifically referenced in the May 25, 2006 Order, it appears that Plaintiff nonetheless failed to timely serve the expert report and there is no basis for his appeal on this issue.

As for the IME report, the Magistrate Judge's March 1, 2006 Scheduling Order specifically stated that the IME was to be completed by April 7, 2006. Thereafter, no extensions on that date were granted. Although the May 25, 2006 Order references an apparent consensual extension of the date of the IME until April 21, 2006, there is no record of the IME report until it was served by letter dated May 12, 2006. The letter accompanying the IME report does cite the unusual circumstances of this case as an explanation for the delay, but there was no assertion of any leave sought for the delay prior to the submission. Accordingly, Plaintiff does not make any showing that the Magistrate Judge's Order is clearly erroneous or contrary to law. Furthermore, given the discretion accorded the Magistrate Judge in the management of the discovery matters attendant to this matter, the Court finds that the Order did not constitute an abuse of discretion. Therefore, Plaintiff's appeal of the Magistrate Judge's May 12, 2006 Order is denied and the Order is affirmed.

**D. The Magistrate Judge's July 10, 2006 Order Did Not Constitute an Abuse of Discretion and Was Not Clearly Erroneous or Contrary to Law**

Plaintiff alleges that the Magistrate Judge's July 10, 2006 Order was contrary to the Court's December 6, 2005 Order requiring the Moving Defendants to produce the disciplinary records of defendant Gilliard. However, the Magistrate Judge's July 10, 2006 Order denied Plaintiff's request for defendant Gilliard's complete MCCI employment file. Such a request was beyond the scope of

this Court's Order and properly denied.

Plaintiff mischaracterizes the Court's December 6, 2005 Order by stating that it ordered production of "all records from Gilliard's employment file relevant to Plaintiffs' claims...." (Pl.'s Br. at 19.) The December 6, 2005 Memorandum Opinion specifically discussed the disciplinary records present in Gilliard's personnel file at MCCI and the accompanying Order simply required production of Gilliard's disciplinary records. The Order addressed discovery of Gilliard's disciplinary records at MCCI, specifically "any and all allegations of assault made against Officer Gilliard," because they were allegedly already produced by the Moving Defendants. However, the cited exhibit in the Moving Defendants' certification allegedly producing those records was missing. As a result, the Court ordered that those disciplinary records from Gilliard's personnel file be produced again. To the extent that Plaintiff's request preceding this appeal sought discovery of any records beyond Gilliard's disciplinary records, the Magistrate Judge's July 10, 2006 Order was not clearly erroneous nor contrary to law. Consequently, Plaintiff's appeal of the Magistrate Judge's July 10, 2006 Order is denied and the Order is affirmed.

**\*5** Plaintiff requested that the Court expedite its disposition of the instant motion in light of the pending deadline for the parties to submit pre- trial Orders as set forth in the Magistrate Judge's May 11, 2006 Scheduling Order. To that end, the Court addressed the matter as expeditiously as possible and refers the matter back to the Magistrate Judge with leave for the parties to seek amendment to the Scheduling Order if necessary.

III. CONCLUSION

For the foregoing reasons, Plaintiff's motions appealing the Orders of the Magistrate Judge are denied and the Orders are affirmed. An appropriate form of order is filed herewith.

2006 WL 2226334 (D.N.J.)

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
Page 49
(Cite as: 2006 WL 1042072 (E.D.Mich.))

Only the Westlaw citation is currently available.

United States District Court,

E.D. Michigan,

Southern Division.

**SUNROOF de MEXICO, S.A. de C.V., Plaintiff,**
**v.**
**WEBASTO ROOF SYSTEMS, INC., Defendant.**
**No. 05-40031.**

April 19, 2006.

Jeffrey D. Wilson, Michael M. Jacob, Raymond & Prokop, Southfield, MI, for Plaintiff.

Marc D. Kaszubski, O'Reilly, Rancilio, Robert C. Davis, O'Reilly, Rancilio, Sterling Heights, MI, for Defendant.

OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO STRIKE DOCUMENTS (Dkt.# 50)

STEVEN D. PEPE, Magistrate Judge.

**\*1** This is a contract claim by Sunroof de Mexico, S.A. de C.V., a Mexican distributor of Webasto Roof Systems' sunroofs in Mexico, for an alleged 2001 breach of its January 30, 1990 exclusive distributorship agreement. On March 8, 2006, Defendant filed a motion to strike multiple damages documents produced by Plaintiff after deadlines set by this Court in October 20 and December 14, 2005 orders and enforce the December 14th order's warning by precluding Plaintiff's experts from testifying at trial and use of certain documents (Dkt.# 50).

This motion was referred for hearing and determination pursuant to 28 U.S.C. 636(b)(1)(A). The parties submitted briefs and participated in an in- person hearing on April 13, 2006.

Plaintiff contends that this motion, if granted, will be case dispositive because it will undermine its ability to prove its damages at trial. Yet, technically Defendant's motion is not a case dispositive motion under 28 U.S.C. § 636(b)(1)(B). Defendant's current motion requests that for Plaintiff's violation of earlier orders of this Court regarding damages discovery and experts that the Court impose the sanction of excluding certain evidence: (1.) damages documents produced after the date set for production and the extended date allowed for damage document production, as well as (2.) the related testimony of Plaintiff's damage experts that is based on those tardy documents. This is a sanction specifically permitted under Fed.R. Civ. P. 37(b)(2) for failure of a party to comply

with a court order to provide or permit discovery. In this case, as noted in detail below, Plaintiff was ordered to produce certain discovery documents on damages to Defendant by a certain date, and produce an expert report and experts for deposition who were specifically limited to using those documents that Plaintiff had produced to Defendant by the deadline. As will be shown, Plaintiff has violated these orders. Fed.R. Civ. P. 37(b)(2)(B) specifies as a permissible sanction "prohibiting [the disobedient] party from introducing designated matters in evidence." Defendant seeks to prohibit Plaintiff from having its experts testify and from otherwise using any damages evidence beyond that produced by the deadlines specified, and thereafter extended, by this Court. 28 U.S .C. 636(b)(1)(A) lists pretrial duties that a federal district judge can refer to a magistrate judge for hearing and determination consistent with Article III of the U.S. Constitution.

28 U.S.C. 636(b)(1)(A) specifically excludes reference of motions "to suppress evidence in a criminal case", which suggests that Congress considered reference of motions to exclude evidence and allowed them for hearing and determination in civil cases. [FN1] Accordingly, this motion will be considered as referred for hearing and determination. If the Article III judge in reviewing any objections to this opinion and order determines that it is appropriate to review the matter under a "de novo" standard applied to matters handled under 28 U.S.C. 636(b)(1)(B) instead of a "clearly erroneous or contrary to law "standard of 28 U.S.C. 636(b)(1)(A), he may modify the reference and make such findings under such standards as he deems appropriate.

FN1. Ann L. v. X Corp., 133 F.R.D. 433, 435 (W.D.N.Y.,1990) ("Jurisdiction of a magistrate over suppression motions in civil cases under 28 U.S.C. § 636(b)(1)(A) is confirmed by that subparagraph's enumeration of criminal case suppression motions as excluded from subparagraph (b)(1)(A) jurisdiction. The clear inference is that suppression motions in civil cases under Fed .R.Civ.P. 26(c) may be determined by a magistrate, subject to a " 'clearly erroneous or contrary to law' standard of review.").

**\*2** After a thorough consideration of the matter and for the reasons stated below, Defendant's motion is GRANTED.

I. CASE PROCEDURAL BACKGROUND

Plaintiff filed its complaint on January 31, 2005, alleging breach of contract and specifying damages of $14,236, 800.00. A March 3, 2005, scheduling order required discovery to be completed by July 30, 2005, and set a trial

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group                                                              Page 50
(Cite as: 2006 WL 1042072 (E.D.Mich.))

date of February 6, 2006 (Dkt.# 7). A July 26, 2005, stipulated order extended discovery until September 30, 2005 (Dkt.# 11). Plaintiff filed a motion for partial summary judgment on August 3, 2005, (Dkt.# 12). An August 29, 2005, stipulated order extended discovery again until November 30, 2005 (Dkt.# 15). Defendant filed its motion to compel discovery on September 19, 2005, which will be described further below (Dkt.# 16). This motion was granted in part on October 20, 2005, in an order which extended the scheduling order for the third time with discovery to close on January 19, 2006, Plaintiff's expert report due December 1 and Defendants expert report was due January 16 (Dkt.# 21). This order specified that:

  1. On or before November 2, 2005, Plaintiff shall produce to Defendant all remaining documents in support of its request for damages contained in the Complaint.

  2. No documents, other than those produced to Defendant by November 2, 2005, may be used by Plaintiff or Plaintiff's experts to support its claim for damages, except for those produced by Defendant and/or those documents which Plaintiff receives in response to the subpoena it served on Hollandia Sunroofs of Mexico.

    * * *

  5. Plaintiff's expert report on damages shall be submitted on or before December 1, 2005. Plaintiff's expert shall be available to be deposed on or before December 21, 2005.

After Plaintiff missed November 2nd deadline, Defendant filed a motion on November 10, 2005, to strike documents produced by Plaintiff after November 2nd (Dkt.# 23). Plaintiff also missed the December 1, 2005, expert report deadline. On December 2, 2005, Plaintiff filed a motion requesting a fourth extension of discovery and making its expert available within 30 days, noting "This is Plaintiff's first Motion to extend the Court's Scheduling Order." (Dkt.# 31). The motion specifically identifies the statement of issues presented as:

STATEMENT OF THE ISSUE PRESENTED

  Whether Plaintiff should be granted a thirty-day extension to file its final Expert Report and make its expert witness available for deposition?
  Plaintiff's answer: Yes.

The motion mentions that the Plaintiff's expert "Harold Dubrowsky of Grant Thornton advised Plaintiff's counsel by correspondence that additional time was required to finalize his expert report." In its argument Plaintiff asserts:

  Plaintiff and its expert witness have worked diligently to formulate an expert report supporting Plaintiff's claim for damages. Given the difficulties associated with Plaintiff's location and the barriers between Grant Thornton and

Plaintiff (both geographic and linguistic), the development of Plaintiff's expert report has been delayed. Plaintiff's expert believes that a final report can be prepared with an additional 30 days.

  *3 The series of delays in getting Plaintiff's damages documents from the initial disclosures through to the missed November 2 deadline were apparent to all by this time, but those documents, it was believed, were produced to defense counsel in mid-November. Plaintiff's December 2 motion made no request for any modification of paragraph 2 of the October 20, 2005, Order which limited the materials upon which its damages expert could rely to documents produced to Defendant by November 2005. Indeed, it appeared the Plaintiff's December 2 request was for the Plaintiff's expert to have more time to analyze the damages documents and complete his expert report than the 2 weeks allowed from November 14 (when the damages documents were finally assembled and available) to December 1 when the expert report was due.

  In a December 14, 2005, order Defendant's motion to strike and bar the use of the Plaintiff's damage documents was denied (though Plaintiff was ordered to pay Defendant's legal costs (determined to be $4,182 (Dkt.# 53)) associated with bringing the motion). Defendant had sought to exclude Plaintiff's experts from using the damages documents tardily produced by November 14. Yet, after finding substantial compliance with the October 20 order and no prejudice to Defendant, it was determined:

  Therefore, the documents may be used to support Plaintiff's damage claim. No additional documents of Plaintiff may be used by Plaintiff's counsel or expert to support its damage claim.

December 14, 2005, Order; Dkt. # 53, p. 2 (emphasis supplied).

  Reiteration of this limit on Plaintiff's coming up with more damages documents was specifically requested by defense counsel at the December 13 hearing. In order to impress on Plaintiff's counsel that continued disregard of its discovery obligations would not be forgiven the next time, at the December 13 hearing it was stated "I will put as Draconian language in this next order as I can and this time I will mean it."

  Plaintiff's December 2 motion for "a thirty-day extension to file its final Expert Report and make its expert witness available for deposition" was granted (Dkt. # 3 8). The December 14, 2005, order specified:

  Plaintiff shall be permitted to submit its expert report to the offices of defense counsel on or before 4:45 PM on January 3, 2006, on the following conditions: (1) within fourteen (14)

(C) 2007 West Group                                                                              Page 51
(Cite as: 2006 WL 1042072 (E.D.Mich.))

days of a stipulation or court determination as to amount, Plaintiff shall pay the costs including attorney fees Defendant incurred in filing and/or defending these two motions; (2) Plaintiff's experts, both Harold Dubrowsky and Hector Bautista Esquivel, shall be made available at Plaintiff's expense (including both travel and translator expenses) for deposition at defense counsel's offices in Michigan on or before January 31, 2006; (3) Defendant's expert report shall be submitted on or before March 31, 2006, with a deposition to occur on or before April 14, 2006. Failure of either side to comply with the terms of this order shall result in the waiver of its right to have an expert testify at trial on damages and any consequences resulting from this exclusion.

**\*4** Id. at p. 2-3 (emphasis supplied).

Because the Court was not requested to modify its October 20 order limiting Plaintiff's experts to the damages documents produced to Defendant in November, this December 14 order fully anticipated that the 30 days extension to produce the expert report would comply with that November condition as modified and reiterated by the December 14 order.

Defendant filed its motion for summary judgment on December 13, 2005 (Dkt. # 36). [FN2]

FN2. Both parties' dispositive motions were denied on March 31, 2006 (Dkt # 56).

II. THE CURRENT MOTION

Defendant's current motion revolves around a repeated pattern of Plaintiff's failure to meet this Court's deadlines and specific orders to provide the documents and expert accounting support for the $14,236,800.00 damages claim it specifically pled over a year ago in its January 31, 2005, complaint.

Defendant has attempted to obtain adequate evidence of damages from Plaintiff. Such information was not forthcoming in the March 2005 initial disclosures, nor in response to the document requests accompanying Defendant's May requests for admissions, nor in the documents produced in conjunction with the October deposition of Plaintiff's president. When Defendant's August 2005 interrogatories and request for production also produced insufficient responses, Defendant filed a motion to compel production. Defendant's motion to compel was heard on October 19, 2005, at which time there had already been two extensions of the discovery and motion cut off dates, originally set on March 24, for July 30 and August 30. The new discovery cut off date

was November 30. As noted above Plaintiff was ordered on October 20 to provide Defendant with all documents in its possession that support its claim for damages on or before November 2, 2005. Plaintiff was warned that it could not use any documents on damages at trial not produced by that date. The documents were being brought and sent from Las Vegas by one of Plaintiff's attorneys. While he arrived back in Michigan late on November 2 with some of the documents and others being sent, the documents were not fully made available for inspection by defense counsel until November 4, 2005. Apparently those portions desired were copied for Defendant's counsel by November 14, 2005.

Defendant filed a motion to enforce this Court's October 20 Order and strike the damages documents for Plaintiff's failure to comply with the October 20 Order after a pattern of repeated delays and neglect of its discovery production obligations. On December 14, 2005, Defendant's motion to strike the documents was heard and denied "notwithstanding the logic of their assertion that court orders are to be obeyed, the short time difference in the production, what appears to be a good faith, albeit belated, effort that constituted substantial compliance with the October 19 order, and the lack of prejudice in the few day delay to Defendant does not warrant the sanction Defendant seeks. Therefore, the documents may be used to support Plaintiff's damage claim." (Dkt. # 3 8). But as noted above, this Order specified that, "No additional documents of Plaintiff may be used by Plaintiff's counsel or expert to support its damage claim." The parties were also warned that failure to comply with the terms of the December 14, 2005, order "shall result in the waiver of its right to have an expert testify at trial on damages and any consequences resulting from this exclusion." Id. (emphasis added).

**\*5** The parties agree that subsequent to the December 14, 2005, Order the following events transpired:

December 21-22, 2005--Plaintiff's counsel and United States based accounting expert, meet with Plaintiff and the expert's affiliated Mexican field office accountant in Mexico City in order to complete its expert damage report.
January 3, 2005--Plaintiff's expert report is forwarded to Defendant.
January 30 and 31, 2006--Defendant deposes Plaintiff's expert witnesses.
February 23, 2006--Plaintiff's produce 1,370 documents which their expert's relied on in formulating their damages calculations.

(Dkt.# 52, p. 5).

Defendant's current motion asks that the Court strike all documents produced after the Court's November 14, 2005, deadline and Plaintiff's experts and expert report,

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group                                                     Page 52
(Cite as: 2006 WL 1042072 (E.D.Mich.))

pursuant to the Court's December 14, 2005 order.

Defendant contends that 1,347 of these 1,370 pages of documents had not been produced before. It is also not disputed that Plaintiff's expert relied on certain, if not all, of these added documents in forming his expert opinion and in preparing his expert report. At the hearing on this motion, defense counsel asserted that Plaintiff's expert acknowledged that he could not have prepared a suitable damages report based on the documents produced to Defendant by November 14, 2005. This need for additional documents apparently necessitated the December 21-22, 2005, trip to Mexico by Plaintiff's United States based expert. At the hearing Plaintiff's counsel acknowledged that even the methodology for measuring damages changed from that noted to the Court at earlier hearings.

Defendant argues it has been prejudiced by taking the deposition of Plaintiff's experts and having its expert prepare a report without having knowledge of these added documents beforehand

II. ANALYSIS

Unlike the earlier hearing when Defendant's motion to strike the damages documents was denied because of Plaintiff's substantial compliance within a few weeks of the deadline and no showing of prejudice, here there has not been substantial compliance and the 100 plus days delay in producing these new damages documents has prejudiced the defendant, who acted in reliance on the incomplete November document production, deposed Plaintiff's experts and purportedly prepared a defense expert report. Plaintiff does not allege that it complied or even essentially complied with the December 14, 2005, Order. Instead, Plaintiff bemoans the consequences of this Court enforcing its orders and threatened sanctions. Plaintiff's counsel once again argues the obstacles he faced in obtaining documents from his foreign client and again asks the Court to disregard the sanctions that were so unequivocally expressed. Yet, the problems of production from Plaintiff could and should have been anticipated by the summer or early fall of last year. One must look with suspicion at the facts surrounding this last production.

Plaintiff's December motion only sought more time for its expert to complete his report. Yet, Plaintiff's counsel has had at least since last summer to get a clear outline of documents his expert needed to prepare a damages report. Why these documents could apparently be obtained on the expert's two day trip to Mexico on December 21 and 22, but not in the many months before the November deadline is unexplained. [FN3] Plaintiff did not raise the issues of a need to gather more documents from Mexico at the

October 19, 2005, hearing on Defendant's motion to compel discovery, nor at the December 13, 2005, hearing on Defendant's motion to strike documents, even though his damages expert apparently planned to head south a week later. After Plaintiff's counsel became aware that its experts required more documents and prior to the production of its expert report and/or deposition of his expert there was never a motion filed by Plaintiff seeking more time to produce its own discovery or seeking relief from the October 20 or December 14 orders limiting the data base for its expert. Indeed, Plaintiff did not even inform defense counsel of the existence of these newly retrieved documents prior to or in conjunction with the production of the expert report and expert deposition. [FN4] Instead, it delayed production of these documents until February 23, 2005, after allowing Defendants to rely on its expert report, produced January 3rd, and expert depositions, taken January 30-31 st. Therefore, while striking the tardy documents and Plaintiff's damages experts may well be fatal to Plaintiff's proof of damages, Plaintiff's actions and inactions in light of the Court's previous warnings justify such an outcome.

FN3. With the new mass of documents obtained on this December trip to Mexico, Plaintiff's expert was apparently able t prepare a damages report to meet the January 3, 2006, extended deadline.

FN4. It appears from Defendant's counsel argument at the hearing in this matter that one of Plaintiff's experts may have testified at his January 2006 deposition, after his report was submitted, that he did not rely on the documents produced in November 2005, thereby giving Defendant some notice that other documents were used. Yet, these documents were not produced at the deposition by Plaintiff or his experts.

**\*6** While discovery sanctions limiting evidence properly imposed under Fed.R.Civ.P. 37(b)(2) do not need to meet the standards for a formal dismissal of a claim, the facts here would meet those more strenuous standards. The Sixth Circuit considers four factors when considering dismissal under either Rule 37(b)(2) or Rule 41(b):

'(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.'(quoting Knoll v. Am. Tel. & Tel. Co., 176 F.3d 359, 363 (6th Cir.1999)). 'Although no one factor is dispositive, dismissal is proper if the record demonstrates delay or contumacious conduct' Id.

Bryant v. U.S., ex rel. U.S. Postal Service, 2006 WL

(C) 2007 West Group
Page 53
(Cite as: 2006 WL 1042072 (E.D.Mich.))

305661, *3 (6th Cir.2006).

At a minimum, Plaintiff is at fault for failing to comply with Defendant's discovery requests and the Court's orders to produce its damages documents. Now Defendant has been prejudiced by the fact that Plaintiff did not produce its damages documents for its expert prior to Plaintiff producing its expert report and experts for depositions. Plaintiff's argument that these documents were not requested until after the deposition is without merit because Defendant had no notice that any other documents existed before that time and because there was already a court order in place stating that all documents that would be allowed to support of damages had been produced as of November 14, 2005.

Regarding the Knoll / Bryant third criterion, Plaintiff had been warned of the sanctions for non-compliance in two previous orders. The October 20, 2005, Order stated that only documents produced by November 2, 2005, could be used to support Plaintiff's claim for damages. The December 14, 2005, Order allowed documents produced by November 14, 2005, to be used to support Plaintiff's claim for damages, but was explicit that Plaintiff and its experts could rely on no other documents. That Order was also explicit that the sanction for non-compliance would be a "waiver of its right to have an expert testify at trial on damages and any consequences resulting from this exclusion". This Order was issued the day after Plaintiff's counsel was warned at the hearing that the next order will contain "Draconian language" for any further failure to comply and this time the Court "will mean it."

The undersigned has considered and in the past imposed less drastic sanctions for Plaintiff's failure to comply with discovery requests and orders. Plaintiff was allowed to produce documents late in violation of the October discovery Order, required instead to pay Defendant's attorney fees in connection with attempting to enforce the Order and produce its experts for deposition in Michigan.

Plaintiff's counsel requested at the hearing an alternative sanction of only striking the additional documents produced in February 2006 but allow its experts to testify. Yet, this would involve reopening discovery for a new expert report and further depositions. Defense counsel suggested that, based on the testimony of Plaintiff's experts, it was unlikely if not impossible for Plaintiff's expert to produce a damages report on the documents produced on or before November 14. Because of the complexities and uncertainties as to the feasibility of such an approach, it should not be entertained by way of an oral motion to allow a new Plaintiff damages report and testimony.

*7 The motion before the Court is to strike the report and testimony of Plaintiff's experts that were based on materials not produced to Defendant in the time period allowed and preclude use of the new damages documents at trial. The analogy used at the hearing on this motion to strike was that Plaintiff was given a deadline, and then an extended deadline, to produce the "deck of cards" on damages that it wished to use in this case. Then, without prior notice nor prior Court permission Plaintiff chose to add a significant number of cards to the deck that had been used in formulating its expert damages report. While after the expert depositions Plaintiff finally decided to provide the Defendant the modified deck of damages documents, this does not undo nor justify the prior wrongdoing. Plaintiff's counsel again asks for "pardon" instead of "permission." Plaintiff has received multiple discovery deadline extensions, and has used up its "pardon" after missing the earlier November 2, 2005, document production deadline and its December 1, 2005, expert report deadline. The reasonable "storehouse of credits" that attorneys generally have with indulgent courts has, in this case, run out. While striking the expert report and any use of the new documents produced in February 2006 and any expert testimony based on them is a harsh sanction, it should come as no surprise in light of the clear warnings. Nor, on the facts of this case, is it unwarranted. Plaintiff was given ample opportunity to comply with Defendant's discovery requests and this Court's orders. Its failure to do so has drawn the promised penalty. At some point court-ordered deadlines must be met or threatened sanctions imposed. To hold otherwise in this case would retard the orderly processing of civil litigation, needlessly increase the transaction costs for all and erode the stature of courts by rendering all of its orders negotiable.

Accordingly, Defendant's motion to strike is granted and Plaintiff's additional damages documents produced in February 2006 are stricken from the discovery, Plaintiff's expert report is stricken, any expert who participated in preparing the report based on the stricken documents is stricken from the witness list and may not testify at trial, nor may there be any testimony at trial based on the stricken documents.

SO ORDERED.

2006 WL 1042072 (E.D.Mich.)

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 36 Fed.Appx. 378)

Page 54

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,

Tenth Circuit.

**Dr. Mina YUMUKOGLU, Plaintiff-Counter-Defendant-Appellant,**
v.
**PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, Defendant-Counter-Claimant-Appellee.**
**No. 01-2200.**

May 30, 2002.

Insured physician, who suffered stroke, brought state court action against disability insurer following termination of his benefits, asserting, inter alia, claims for breach of contract, bad faith, and intentional infliction of emotional distress (IIED). Action was removed. The United States District Court for the District of New Mexico, Black, J., granted partial summary judgment for insurer, 131 F.Supp.2d 1215, on bad faith and IIED claims, and later granted summary judgment for insurer on contract claim. Insured appealed. The Court of Appeals, Henry, Circuit Judge, held that: (1) insurer's refusal to continue payment of benefits to insured did not rest entirely on frivolous basis, as required for bad faith and IIED claims under New Mexico law, and (2) court would not consider claim of whether insured was entitled to emotional distress damages or attorneys' fees on his breach of contract claim under New Mexico law, as it was not addressed by insured.

Affirmed.

West Headnotes

**[1] Damages** 🗝57.46
115k57.46
(Formerly 115k56.10)

**[1] Insurance** 🗝3360
217k3360

Disability insurer's refusal to continue payment of benefits to insured physician, who suffered stroke, did not rest entirely upon frivolous basis, as required for bad faith and intentional infliction of emotional distress (IIED)

claims under New Mexico law; insurer relied on opinions of its medical analysts, who opined that insured's medical records did not support a finding of total disability, as well as on neurologist's opinion that insured was trying to fake brain injury, such that insurer's decision was not totally baseless.

**[2] Federal Courts** 🗝915
170Bk915

Court of Appeals would not consider claim of whether insured physician was entitled to emotional distress damages or attorneys' fees on his breach of contract claim, as insured only addressed whether New Mexico law applied to determination and failed to address district court's alternative holding that such remedies were not available, under New Mexico law, absent showing of bad faith.

**\*379** Before HENRY and PORFILIO, Circuit Judges, and SAM, District Judge. [FN*]

FN* The Honorable David Sam, United States District Judge for the District of Utah, sitting by designation.

ORDER AND JUDGMENT  [FN**]

FN** This order and judgment is not binding precedent, except under the doctrines of res judicata, collateral estoppel, and law of the case. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

HENRY, Circuit Judge.

Dr. Mina Yumukoglu sued Provident Life & Accident Insurance Company ("Provident") after a dispute arose as to Provident's failure to pay insurance benefits. The district court granted summary judgment in favor of Provident. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I. BACKGROUND

In 1983, Dr. Yumukoglu, a gastroenterologist, purchased a disability insurance policy from Provident. The policy specified that Provident would make certain monthly payments to Dr. Yumukoglu in the event that Dr. Yumukoglu acquired a "total disability." Aplt's App. at 70 (Provident letter, dated June 17, 1999, at 1). Under the given policy, a "total disability" would be one that rendered Dr. Yumukoglu "unable to perform the substantial and **\*380** material duties of a [g]astroenterologist." *Id.*

(C) 2007 West Group

Page 55

(Cite as: 36 Fed.Appx. 378)

In late 1997, Dr. Yumukoglu suffered a vertebral basilar stroke;  the stroke left Dr. Yumukoglu experiencing certain long-term medical effects. While the parties now agree that those effects currently render Dr. Yumukoglu totally disabled within the meaning of the insurance policy, Provident was, for some number of years, not entirely convinced.

Beginning in May of 1998, Provident began paying Dr. Yumukoglu full disability benefits, though under a reservation of rights.  Over the next thirteen months, Provident utilized a number of methods in attempting to evaluate the veracity of Dr. Yumukoglu's claimed total disability. These methods included Provident's review of (1) the reports of Dr. Yumukoglu's attending physicians (Drs. Palmer, Mladinich, and Burg), (2) surveillance videotape of Dr. Yumukoglu (from October 8, 1998 and January 12, 1999), (3) the reports of several Provident analysts (Drs. Geer and Curtis and Ms. Leger, a disability case manager with a degree in nursing) who compared Dr. Yumukoglu's claimed disabilities to his behavior as recorded in the surveillance videotapes, (4) the report of Dr. Yumukoglu's neuro-psychologist (Dr. Shute) in which that neuro-psychologist concluded that Dr. Yumukoglu was probably attempting to fake a poor performance (i.e.'malingering') on the tests administered by that neuro-psychologist, and (5) the report of Provident's own neuro-psychologist (Dr. Goldsmith) who likewise concluded that Dr. Yumukoglu was probably malingering. Based upon the review just described, Provident terminated benefit payments on June 17, 1999.

Dr. Yumukoglu sued Provident in New Mexico state court, alleging (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) intentional infliction of emotional distress, and (4) certain unspecified statutory violations of the New Mexico Unfair Trade Practices Act. As a remedy for the breach of contract violation, Dr. Yumukoglu sought the resumption of full disability benefit payments, all back-payments (with interest), punitive damages, emotional distress damages, and attorneys' fees.  Provident, invoking diversity jurisdiction, removed the case to the United States District Court for the District of New Mexico.

On February 2, 2001, the district court granted summary judgment to Provident as to each of Dr. Yumukoglu's claims, except the alleged breach of contract. As to the (1) breach of the duty of good faith and fair dealing and (2) intentional infliction of emotional distress claims, the district court concluded that these claims required Dr. Yumukoglu to demonstrate that Provident acted in bad faith in withholding payments from Dr. Yumukoglu and that, under New Mexico law and even viewing the evidence in the light most favorable to Dr. Yumukoglu, no rational juror could so conclude.  As to Dr.

Yumukoglu's New Mexico Unfair Trade Practices Act claim, the district court found that Dr. Yumukoglu had failed to adequately plead a violation of any particular section of that Act.

On May 30, 2001, the district court granted summary judgment to Provident in relation to Dr. Yumukoglu's final claim, that for breach of contract.  The court did so by concluding that, even assuming the validity of the breach of contract claim, Provident had already provided Dr. Yumukoglu with all of the relief available via this claim.  First, the district court noted that, subsequent to the time at which Dr. Yumukoglu filed this lawsuit, Provident (on the basis of further testing conducted pursuant to this litigation) had resumed the payment of full disability benefits, including the payment, with interest, of all back- **381** payments owed to Dr. Yumukoglu;  thus Provident had already provided the first two remedies requested by Dr. Yumukoglu as to the breach of contract claim.  Second, the district court observed that the court's February 2, 2001 determination that Dr. Yumukoglu could not establish bad faith necessarily foreclosed the possibility of punitive damages. Finally, the district court concluded that, under either Louisiana or New Mexico law (whichever was applicable), Dr. Yumukoglu was not entitled to either emotional distress damages or attorneys' fees on his breach of contract claim.

Dr. Yumukoglu timely appealed.  On appeal, Dr. Yumukoglu contends that the district court erred in granting summary judgment to Provident (1) as to Dr. Yumukoglu's claims of (a) breach of the duty of good faith and fair dealing and (b) intentional infliction of emotional distress and (2) as to Dr. Yumukoglu's claimed emotional distress and attorneys' fees remedies (remedies allegedly available upon establishment of Dr. Yumukoglu's breach of contract claim).

II. DISCUSSION

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Old Republic Ins. Co. v. Durango Air Serv., Inc.,* 283 F.3d 1222, 1225 (10th Cir.2002). "Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Sizova v. National Inst. of Standards & Tech.,* 282 F.3d 1320, 1328 (10th Cir.2002) (quoting Fed.R.Civ.P. 56(c)). Utilizing this standard of review, we consider Dr. Yumukoglu's contentions of error in turn.

A. Whether the District Court Erred in Granting

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group

Page 56

(Cite as: 36 Fed.Appx. 378)

Summary Judgment, in Favor of Provident, as to Dr. Yumukoglu's Claims of (1) Breach of the Duty of Good Faith and Fair Dealing and (2) Intentional Infliction of Emotional Distress?

 [1] Under New Mexico law (which the parties agree governs the alleged (1) breach of the duty of good faith and fair dealing and (2) intentional infliction of emotional distress), Dr. Yumukoglu must demonstrate that Provident's refusal to pay rested upon an entirely "frivolous" basis. *Jackson v. Nat'l Life Ins. Co. v. Receconi,* 113 N.M. 403, 827 P.2d 118, 134 (1992). Demonstration that Provident relied upon such a "frivolous" basis requires evidence that Provident's decision featured "[a]n utter or total lack of foundation" and "[constituted] an arbitrary or baseless refusal to pay, lacking any arguable support in the wording of the insurance policy or the circumstances surrounding the claim." *Jackson,* 827 P.2d at 134; *see also Suggs v. State Farm Fire and Cas. Co.,* 833 F.2d 883, 890-91 (10th Cir.1987) (noting that, in the context of an insurer's failure to pay on a policy-holder's claim, New Mexico law defines bad faith as a "frivolous or unfounded failure to pay") (internal quotation marks omitted); *Chavez v. Chenoweth,* 89 N.M. 423, 553 P.2d 703, 709 (Ct.App.1976) (same). Given the *Jackson* standard, we conclude that the district court correctly determined that Dr. Yumukoglu offered, and could offer, no facts tending to establish such an "arbitrary and baseless refusal to pay." *Jackson,* 827 P.2d at 134.

 In June of 1999, Provident concluded that Dr. Yumukoglu was not, in fact, totally disabled within the meaning of the given insurance contract. Undeniably, this conclusion *382 featured at least some support in the circumstances surrounding Dr. Yumukoglu's claim: Provident's decision was not "utter[ly] or total[ly] lack[ing]" in any relevant foundation. *Id.* Specifically, Provident relied on the conclusions of Dr. Curtis and Ms. Leger, each of whom found that Dr. Yumukoglu's medical records did not support a finding of total disability. *See, e.g.,* Aplt's App. at 112 (Medical Consultant Review, completed by Dr. Curtis and dated July 26, 1999, at 3) (concluding: "[Dr. Yumukoglu] seems to be capable of performing the duties of a gastroenterologist"). Similarly, Dr. Goldsmith determined that Dr. Yumukoglu's performance during neuro-psychological testing suggested that Dr. Yumukoglu was trying to fake a brain injury. *See, e.g.,* Aplt's App. at 103 (Confidential Psychological IME Review, completed by Dr. Goldsmith and dated June 15, 1999, at 2) (concluding: "[I]t appears that [Dr. Yumukoglu] selectively responded to test items in order to influence the outcome of the evaluation and support his claim of a disabling organic disorder"). This evidence demonstrates that Provident's decision to discontinue the payment of disability benefits was not

baseless.

 Dr. Yumukoglu's response is to argue that a rational juror might have found these facts, even taken together, not to constitute any *reasonable* basis for the denial of benefits. The jury might have concluded, for instance, that reliance upon the mere absence of evidence of total disability (rather than requiring affirmative evidence that such a disability does not exist) is unreasonable. If Dr. Yumukoglu could establish that New Mexico law requires Provident to establish the existence of some *reasonable* basis for denying Dr. Yumukoglu's claim, then Dr. Yumukoglu's case would be a remarkably close one. After-all, reasonableness is generally a question for the jury and a rational jury, on these facts, just might conclude that, given that Provident discontinued Dr. Yumukoglu's benefit payments without any affirmative evidence that Dr. Yumukoglu's mental state was such as to permit him to return to work, Provident lacked a reasonable basis by which to discontinue those payments. As we have concluded, however, New Mexico law simply contains no such reasonableness requirement. *See Jackson,* 827 P.2d at 134 (announcing the standard as one requiring demonstration of an *"utter or total"* lack of foundation for an assertion of nonliability--an *arbitrary or baseless* refusal to pay, lacking *any* arguable support in the wording of the insurance policy or the circumstances surrounding the claim") (emphasis added); *Suggs,* 833 F.2d at 891 (reversing, under New Mexico law and on a claim of bad faith, a district court's failure to enter judgment as a matter of law--in favor of an insurance company--where the policy-holders "[did] not seriously argue that at least some evidence existed which would suggest that [one of the policy-holders] had the opportunity and the motive to set the fire").

 Because no rational jury could have concluded that Provident lacked *any* basis, in the circumstances of Dr. Yumukoglu's disability claim, to discontinue the payment of benefits to Dr. Yumukoglu, we affirm the district court's grant of summary judgment, in favor of Provident, as to Dr. Yumukoglu's claims that Provident (1) breached the duty of good faith and fair dealing and (2) intentionally inflicted emotional distress.

 **B. Whether the District Court Erred in Granting Summary Judgment, in Favor of Provident, as to Dr. Yumukoglu's Claimed Emotional Distress and Attorneys' Fees Remedies?**

 The district court concluded that Dr. Yumukoglu could recover neither emotional *383 distress damages nor attorneys' fees on his breach of contract claim. The district court so concluded based upon alternative holdings: (1) if Louisiana law governs the availability of those remedies, those remedies, absent a showing of bad

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

(C) 2007 West Group
(Cite as: 36 Fed.Appx. 378)

Page 57

faith, are per se unavailable on a breach of contract claim and (2) if New Mexico law governs the availability of those remedies, those remedies, again absent a showing of bad faith, are unavailable as to Dr. Yumukoglu's particular breach of contract claim.

 [2] Dr. Yumukoglu devotes several pages of both his opening and reply briefs to arguing that New Mexico law governs the availability of emotional distress damages and attorneys' fees as to the breach of contract claim. Dr. Yumukoglu, however, utterly fails to acknowledge, much less challenge, the district court's alternative holding that, even if New Mexico law does apply, New Mexico law does not permit recovery of the requested remedies.

 We decline to venture, unassisted, into consideration of whether New Mexico law would permit recovery of either emotional distress damages or attorneys' fees as to Dr. Yumukoglu's breach of contract claim; thus we affirm the district court's conclusion that neither remedy was available to Dr. Yumukoglu. *See GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1387-88 (10th Cir.1997) ("[Appellant] fails to address the district court's alternative ground for granting summary judgment[, in favor of the appellee, as to appellant's fraud claim]--that there was no evidence of misrepresentation.... [Appellant] has therefore conceded that there was no misrepresentation, and consequently cannot establish an essential element of its fraud claim."); *United States v. Hatchett,* 245 F.3d 625, 644-45 (7th Cir.2001) ("In situations in which there is one or more alternative holdings on an issue, ... failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.") (internal quotation marks omitted); *see also, e.g., Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1547 (10th Cir.1995) ("[I]t is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for appeal.") (internal quotation marks omitted).

 III. CONCLUSION

 For the reasons set forth above, we AFFIRM the district court's grant of summary judgment in favor of Provident.

 36 Fed.Appx. 378

 END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo