Brent O. Hatch (5715)
bhatch@hjdlaw.com
Mark F. James (5295)
mjames@hjdlaw.com
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile:  (801) 363-6666

David Boies (admitted pro hac vice)
dboies@bsfllp.com
Robert Silver (admitted pro hac vice)
rsilver@bsfllp.com
Edward Normand (admitted pro hac vice)
enormand@bsfllp.com
BOIES SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

Stuart Singer (admitted pro hac vice)
ssinger@bsfllp.com
BOIES SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

*Counsel for The SCO Group, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE SCO GROUP, INC., by and through the Chapter 11 Trustee in Bankruptcy, Edward N. Cahn,<br><br>　　　　Plaintiff/Counterclaim-Defendant,<br>vs.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>　　　　Defendant/Counterclaim-Plaintiff. | **THE SCO GROUP, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO REOPEN THE CASE**<br><br>Civil No.: 2:03CV0294<br><br>Honorable Tena Campbell<br><br>**(REDACTED)** |

## **TABLE OF CONTENTS**

BACKGROUND ............................................................................................................................. iii

ARGUMENT ...................................................................................................................................1

      A.     Scope of the Novell Final Judgment. ...........................................................................2

      B.     The Project Monterey Claim. .......................................................................................3

      C.     Status of the Project Monterey Claim. .........................................................................6

      D.     The Tortious Interference Claims. ...............................................................................7

      E.     Status of the Tortious Interference Claims. ................................................................10

CONCLUSION ..............................................................................................................................11

Plaintiff/Counterclaim-Defendant, The SCO Group, Inc. ("SCO"), respectfully submits this Motion to Reopen the Case in order to proceed with SCO's unfair competition claim concerning the Project Monterey joint venture (the "Project Monterey Claim") and with SCO's tortious interference claims alleging that IBM interfered with SCO's market and business relationships (the "Tortious Inference Claims"). The Project Monterey Claim and the Tortious Interference Claims are unaffected by the final judgment entered in SCO v. Novell, Civil No. 2:04CV139 (the "Novell Litigation"), which the Tenth Circuit has now affirmed. This Court need not await the resolution of that litigation, because it has ended.

## BACKGROUND

In March 2010, District Judge Ted Stewart presided over a trial in the Novell Litigation to resolve two issues relevant to this case: (1) whether SCO owns the copyrights to versions of the UNIX operating system in existence when Novell sold the UNIX operating system and business to SCO in 1995, and (2) whether as part of the same 1995 transaction Novell retained rights to waive SCO's claims against IBM that are based on IBM's breach of its licensing agreements, executed in the 1980s, pursuant to which IBM licensed pre-1996 versions of UNIX.

On March 30, 2010, the jury returned a verdict finding that Novell had not transferred to SCO the copyrights to the versions of UNIX that existed at the time of the sale in 1995. On June 10, 2010, Judge Stewart issued findings of fact and conclusions of law, finding that Novell had the right to waive SCO's claims against IBM that are based on IBM's breach of its licensing agreements pursuant to which it licensed pre-1996 versions of UNIX.

Judge Stewart issued a Final Judgment embodying the jury verdict and his findings of fact and conclusions of law (the "Novell Final Judgment").  On July 7, 2010, SCO appealed the Novell Final Judgment to the Tenth Circuit Court of Appeals.

While SCO's appeal of the Novell Final Judgment was pending, SCO filed a Motion for a Status Conference in the instant case, in order to "apprise the Court of the [Novell] Final Judgment" and "request a status conference for the Court to consider the appropriate time and manner to proceed with un-stayed claims in the instant action that are not affected by the Novell Litigation."  (Docket No. 1089 at 1.)

On August 10, 2010, IBM opposed SCO's Motion for a Status Conference on the grounds that "SCO's claims depend on the outcome of SCO's appeal in the Novell Litigation" and "should not be litigated in the absence of IBM's counterclaims."  (Docket No. 1091 at 1.)  IBM did not dispute the fact that its counterclaims in this case are stayed by the Bankruptcy Code, 11 U.S.C. §§ 101.

On September 10, 2010, while SCO's appeal of the Novell Final Judgment was pending, this Court denied SCO's Motion for a Status Conference, finding that "the claims in the Novell litigation are inextricably intertwined with the claims in the IBM litigation."  (Docket No. 1093 at 1.)  The Court also stated:  "When the Tenth Circuit Court of Appeals has issued its decision in the Novell litigation (No. 10-4122), either party may move the court to re-open the case.  Until then, the matter will remain administratively closed."  (Id. at 1-2.)

On August 30, 2011, the Tenth Circuit affirmed the Novell Final Judgment.  On September 22, 2011, the Tenth Circuit issued the mandate for the Novell Litigation, bringing

closure to that case. Consistent with the Court's order, SCO now moves the Court to reopen this case.

v

**ARGUMENT**

SCO respectfully moves the Court to reopen this case in order to proceed with SCO's unfair competition claim concerning the Project Monterey joint venture and with SCO's tortious interference claims alleging that IBM interfered with SCO's market position and business relationships.

SCO and IBM formed Project Monterey in late 1998 – three years after the 1995 Novell-to-SCO transaction at issue in the Novell Litigation. IBM's tortious interference also started years after that transaction.

The Project Monterey Claim and the Tortious Interference Claims do not depend on SCO's ownership of the copyrights to the versions of UNIX that existed in 1995 and are not subject to Novell's right to waive SCO's contract claims against IBM. SCO recognizes that its other claims in this case are foreclosed by the Novell Final Judgment.

SCO respectfully requests that the Court rule on IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action), dated September 25, 2006 (Docket No. 782), which motion is directed at the Project Monterey Claim, and IBM's Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action), dated September 25, 2006 (Docket No. 783), which motion is directed at the Tortious Interference Claims.

Although SCO's oppositions to those two summary judgment motions set forth the grounds for the Project Monterey Claim and the Tortious Interference Claims in detail, including numerous IBM internal emails chronicling IBM's wrongful conduct, SCO is prepared to provide

1

such additional briefing or oral argument as the Court may find helpful, especially in light of the Novell Final Judgment.

A.  **Scope of the Novell Final Judgment.**

The Novell Final Judgment drew a bright line with respect to the ownership of UNIX copyrights as between Novell and SCO, as delineated in the 1995 Asset Purchase Agreement between those parties. The Novell Final Judgment adopted Novell's theory that Novell retained the copyrights to UNIX technologies that existed, and that Novell sold to SCO, in 1995. Novell never disputed that SCO owns the copyrights to the UNIX technologies SCO developed after the 1995 sale. In fact, Novell insisted that SCO owns those copyrights. In addition, Novell did not dispute the fact that it sold and transferred to SCO the source code for all versions of UNIX that existed in 1995, including the versions whose copyrights Novell owns under the Novell Final Judgment.

Similarly, the Novell Final Judgment adopted Novell's theory that it had retained waiver rights over claims that are based on breach of certain agreements pursuant to which IBM and other licensees licensed pre-1996 versions of UNIX. Novell's waiver rights thus pertain to SCO's efforts to declare IBM in breach of such licensing agreements (executed in 1985 and 1986).

The Novell Final Judgment thus mooted claims in this case insofar as they were based on SCO's ownership of copyrights to pre-1996 versions of UNIX or were based on IBM's breach of the licensing agreements pursuant to which IBM licensed pre-1996 versions of UNIX. The Project Monterey Claim and the Tortious Interference Claims are not such claims.

**B.**     **The Project Monterey Claim.**

In its unfair competition claim, SCO alleges that IBM misappropriated SCO's valuable UNIX technologies in connection with a joint venture between the parties known as Project Monterey.

In October 1998, IBM and SCO formed Project Monterey in order to develop a UNIX-based computer operating system that would capitalize on the emergence of Intel computer processors (or "chips") as a cost-effective alternative to RISC processors. At that time, Intel was developing its next-generation processor, a 64-bit processor known as Itanium or IA-64. IBM and SCO decided jointly to develop an operating system for the IA-64 platform (the "Project Monterey Operating System"), with the ultimate goal of transitioning their respective UNIX customers to the new processor on the Project Monterey Operating System. This venture was Project Monterey.

In 1998, IBM had almost no presence in the market for UNIX operating systems on Intel chips. Instead, IBM had focused its efforts on its UNIX-based operating system named AIX 5L, which ran on IBM's proprietary RISC-type processor named Power ("AIX for Power"). In contrast, SCO not only was the worldwide UNIX market leader in units sold, but was also, as IBM recognized in 1998, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ IBM recognized the critical need to have its own Intel offering.

In order for IBM to transition its AIX for Power customers to the Project Monterey Operating System, the parties agreed that IBM would earn a license to use SCO's UNIX technologies in AIX for Power, as these technologies would facilitate the transition. The parties also agreed that IBM would obtain this license only after making a generally available ("GA")

3

release – that is, a general commercial release, as opposed to a beta release – of the Project Monterey Operating System. SCO agreed to provide this license to IBM, contingent on the commercial release of the Project Monterey Operating System, because SCO was to be compensated through revenue it would receive from the sales of the Project Monterey Operating System and related products.

Despite its partnership with SCO, IBM subsequently decided that Linux – an upstart open-source operating system that was trying to compete with SCO's existing UNIX products (UnixWare and OpenServer) and that would compete with the Project Monterey Operating System once it was completed – offered IBM a more profitable entryway into the UNIX-on-Intel market. While IBM secretly abandoned Project Monterey in favor of its new Linux Strategy, IBM decided that it could not openly withdraw from Project Monterey, for fear of raising legal issues and forfeiting the opportunity to obtain the right to use the UNIX technologies that SCO was bringing to the Project, including technologies that SCO had recently developed precisely for the upcoming IA-64 processors. As one IBM executive explained, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Accordingly, while outwardly pretending to remain committed to Project Monterey, IBM in fact was surreptitiously working behind the scenes to undermine the joint venture to the benefit of its competing products, Linux and AIX for Power. IBM's pattern of deception unfairly deprived SCO of the opportunity to find other partners, upgrade its UNIX products to compete with Linux, and avoid wasting resources on a specious and unproductive "joint" venture.

In addition, IBM directly misappropriated the UNIX technologies that SCO contributed to Project Monterey, by making a sham GA release of the Project Monterey Operating System. IBM's fictional GA release of the Project Monterey Operating System was of a non-functional product that lacked even a compiler – a feature indisputably essential to the operation of an operating system. IBM's own witnesses in this case admitted that an operating system without a compiler cannot legitimately even be called an operating system. Among other IBM efforts to cover up the sham and justify its misappropriation, IBM concocted a price for the "released" Project Monterey product, and even went so far as to send SCO a single check of $256 for the revenues from the purportedly commercial release of the Project Monterey Operating System.

IBM's own internal communications chronicle the deception that IBM perpetrated upon SCO and the public in order to obtain and profit from the UNIX technologies that SCO had contributed to Project Monterey. For example:



At oral argument on IBM's pending motion for summary judgment, counsel for SCO walked Judge Kimball through these and other IBM documents revealing the depth and extent of

5

IBM's deception. (Argument Tr. (Ex. A) at 28:18-34:3.) Immediately following SCO's argument, Judge Kimball asked IBM counsel: "What do you say about these documents here?" IBM counsel first responded: "If I may be clear about the documents, Your Honor, if I may approach – I could not see them, frankly, from over there." (Id. at 46:8-46:14.) After peering at the blow-ups of the documents in the courtroom, IBM counsel responded: "Your Honor, what I say about the documents is the following," and then proceeded to discuss only "the nature of the license IBM obtained pursuant to the JDA," without addressing any of the obvious admissions made in the documents. (Id. at 46:15-47:23.)

It remains undisputed, moreover, that IBM incorporated the misappropriated UNIX technologies into its AIX for Power operating system in competition with SCO starting in May 2001, and that IBM continued to sell AIX for Power with these valuable technologies at least through the time Judge Kimball heard the foregoing oral argument, in March 2007. As IBM executives admitted, the Project Monterey Operating System was never released as a generally available or commercial product – and never would be.

### C. Status of the Project Monterey Claim.

The Project Monterey Claim does not depend on SCO's ownership of the copyrights to the versions of UNIX that existed in 1995 and is not subject to Novell's rights to waive SCO's contract claims against IBM.

SCO submitted uncontroverted proof that IBM incorporated into AIX for Power valuable UNIX technologies that SCO developed after 1995 and whose copyrights indisputably belong to SCO – technologies that were critical for IBM to remain competitive. In his expert report, under

the heading "Source Code IBM Copied from UNIX System V into AIX for Power," SCO expert Marc Rochkind concluded:



Gemini64 was a technology that SCO developed after 1995, precisely for the Intel 64-bit processors that did not even exist until after that year.

In addition, IBM misappropriated UNIX source code into its AIX for Power operating system. While Novell owns the copyrights to the UNIX source code that existed in 1995, SCO indisputably owns the UNIX source code itself, even after the Novell Final Judgment.

The Project Monterey Claim therefore is ripe for adjudication.

D.      **The Tortious Interference Claims.**

The Tortious Interference Claims allege that IBM interfered with SCO's position as the leader in the UNIX-on-Intel market by wrongfully disclosing confidential UNIX technologies to Linux, in order to transform Linux from an upstart operating system for hobbyists to a commercial-grade alternative to SCO's UnixWare and OpenServer operating systems – thereby interfering with SCO's existing customers and prospective business opportunities. These Claims also allege that IBM pressured and encouraged SCO partners and customers to terminate or reduce their relationships with SCO, when SCO pursued remedies for the misappropriation of confidential UNIX technologies into Linux.

In the 1980s, pursuant to its standard UNIX licensing agreements, AT&T granted IBM licenses to two pre-1996 versions of UNIX.  It was undisputed in the Novell Litigation that AT&T sold all its UNIX licensing agreements, including the IBM agreements, to Novell, which in turn sold them to SCO in the 1995 transaction at issue in the Novell Litigation.  SCO is thus the successor-in-interest to AT&T with respect to its UNIX licensing agreements with IBM.

Those agreements required IBM to treat the licensed source code and other UNIX technologies, including the methods and concepts and know-how embodied in the source code, as strictly confidential.  Those licensing agreements also required IBM to apply those same confidentiality restrictions to any derivative (such as AIX) that IBM developed based on the licensed UNIX source code.  IBM's own internal documents dating back to the 1980s, as well as the testimony of its former licensing executives, reveal that IBM acknowledged and originally adhered to those strict restrictions.

In the late 1990s, however, notwithstanding its long history of developing and protecting proprietary software, IBM decided to embrace Linux and the open-source movement.  In making this strategic shift, IBM recognized that SCO was the undisputed leader of the UNIX-on-Intel market and that Linux was far from being a commercial product that could compete with SCO's UnixWare and OpenServer operating systems.  Instead of making the huge investments that would be required legitimately to transform Linux into a commercial product, IBM made deliberated decisions to contribute valuable confidential UNIX technologies to Linux, including technologies that even today are essential to UnixWare and OpenServer.

Starting approximately in 2000, notwithstanding its obligations to SCO under the AT&T UNIX licensing agreements, IBM made substantial disclosures of technologies it was required to

8

keep confidential under those agreements. In addition, IBM misappropriated into Linux confidential UnixWare technologies that SCO contributed to Project Monterey (and that IBM also misappropriated into AIX for Power, as explained above). Because technologies that IBM disclosed to Linux lay at the heart of SCO's UnixWare and OpenServer products, IBM knew that its disclosures to Linux would divert SCO's existing and prospective UnixWare and OpenServer customers to Linux, decimate SCO's leadership position in the UNIX-on-Intel market, and threaten the survival of SCO's UNIX business.

Indeed, thanks in large part to IBM's improper disclosures and contributions to Linux, Linux became an operating system that could be used – at a much lower price – for the same commercial functions as UnixWare and OpenServer. Following those disclosures and contributions, as corporations transitioned their computer systems from UnixWare and OpenServer to Linux, SCO's revenues plummeted 74 percent.

In 2003, after the effects of its improper conduct became evident, IBM further isolated SCO in the market by pressuring and encouraging other companies to cease or reduce their business relationships with SCO. It was only at this point – nearly four years into IBM's wrongful efforts to improve Linux at the expense of SCO – that IBM even became aware of Novell's rights to waive SCO's contract claims against IBM. After SCO asserted that it would take action to protect its business, IBM asked Novell to exercise those rights and Novell agreed. Shortly thereafter Novell announced that it would be purchasing one of the world's leading Linux companies with a $50 million investment by IBM. Novell completed the purchase, with that investment, in January 2004.

9

**E.     Status of the Tortious Interference Claims.**

The Tortious Interference Claims do not depend on SCO's ownership of the copyrights to the versions of UNIX that existed in 1995 and are not subject to Novell's rights to waive SCO's contract claims for IBM's breach of its licensing agreements for UNIX.

To the extent that SCO's Tortious Interference Claims are based on IBM's disclosure of pre-1996 UNIX technologies whose copyrights Novell owns under the Novell Final Judgment, SCO does not need ownership of those copyrights in order to bring tort claims based on IBM's obligation to SCO to keep those technologies confidential.  In addition, the Tortious Interference Claims are based on IBM's disclosure of technologies whose copyrights Novell does not own, including derivatives of the UNIX source code that IBM licensed through the AT&T licensing agreements and UnixWare technologies that SCO developed after 1995 and contributed to Project Monterey.

Similarly, to the extent that SCO's Tortious Interference Claims are based on IBM's disclosure of technologies subject to the confidentiality restrictions in the AT&T licensing agreements, Novell's waiver rights under the Novell Final Judgment affect only the contract claims that SCO brought against IBM – not SCO's tort claims based on those improper disclosures.  The fact that Novell waived those contract claims years after the disclosures started does not diminish the impropriety of the disclosures or the damage they caused to SCO.  Indeed, insofar as IBM requires the waiver to avoid liability for breach of contract, Novell's waiver only highlights the wrongfulness of IBM's conduct.  In addition, the Tortious Interference Claims are also based on IBM's disclosure of confidential UnixWare technologies that SCO developed after 1995 and that are unrelated to IBM's AT&T licensing agreements for UNIX.

## CONCLUSION

For the reasons set forth above, SCO respectfully asks the Court to reopen the case in order to proceed with the Project Monterey Claim and the Tortious Interference Claims. Should the Court grant this request, SCO stands ready to provide such additional briefing and argument, and to participate in a status or scheduling conference, as the Court may consider helpful.

DATED this 4th day of November, 2011.

>By:  /s/ Brent O. Hatch
>HATCH, JAMES & DODGE, P.C.
>Brent O. Hatch
>Mark F. James
>
>BOIES, SCHILLER & FLEXNER LLP
>David Boies
>Robert Silver
>Stuart H. Singer
>Edward Normand
>
>*Counsel for The SCO Group, Inc.*

**CERTIFICATE OF SERVICE**

I, Brent O. Hatch, hereby certify that on this 4th day of November, 2011, a true and correct copy of the foregoing **SCO's Memorandum in Support of Its Motion to Reopen the Case** was filed with the Court and served via electronic mail to the following recipients:

>David Marriott, Esq.
>Cravath, Swaine & Moore LLP
>Worldwide Plaza
>825 Eighth Avenue
>New York, New York 10019
>
>Amy F. Sorenson
>Snell & Wilmer LLP
>1200 Gateway Tower West
>15 West South Temple
>Salt Lake City, Utah 84101-1004
>
>*Counsel for Defendant and Counterclaim-Plaintiff International Business Machines Corporation.*

>By: /s/ Brent O. Hatch
>Brent O. Hatch
>HATCH, JAMES & DODGE, P.C.
>10 West Broadway, Suite 400
>Salt Lake City, Utah 84101
>Telephone: (801) 363-6363
>Facsimile: (801) 363-6666