Brent O. Hatch (5715)
Mark F. James (5295)
HATCH, JAMES & DODGE, PC
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone:   (801) 363-6363
Facsimile: (801) 363-6666
bhatch@hjdlaw.com
mjames@hjdlaw.com

Stuart Singer (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone:   (954) 356-0011
Facsimile: (954) 356-0022
ssinger@bsfllp.com

David Boies (admitted pro hac vice)
Edward Normand (admitted pro hac vice)
Jason Cyrulnik (admitted pro hac vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone:   (914) 749-8200
Facsimile: (914) 749-8300
dboies@bsfllp.com
enormand@bsfllp.com
jcyrulnik@bsfllp.com

*Counsel for Plaintiff, The SCO Group, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., by and through the Chapter 11 Trustee in Bankruptcy, Edward N. Cahn,<br><br>     Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>     Defendant/Counterclaim-Plaintiff. | **SCO STATEMENT OF RECONCILED AND DISPUTED FACTS AS TO IBM'S MOTION FOR SUMMARY JUDGMENT ON SCO'S UNFAIR COMPETITION CLAIM (SCO'S SIXTH CAUSE OF ACTION)**<br><br>Case No. 2:03-cv-00294 DN<br><br>District Judge David Nuffer |

Pursuant to this Court's Orders of June 12, 2015, and July 14, 2015, Plaintiff/Counterclaim Defendant The SCO Group, Inc. ("SCO") respectfully submits the following Statement concerning "IBM's Statement of Undisputed Facts" and "SCO's Statement of Additional Material Facts" in connection with IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) [Docket No. 782].

Section 1 contains a set of numbered, undisputed facts, with citations to evidence.

Section 2 contains disputed facts from IBM's motion.

Section 3 contains disputed additional facts from SCO's opposition brief.

As to each fact in dispute, SCO has included the opponent's response and the proponent's reply.

SCO recognizes that this Court's Orders of June 12, 2015, and July 14, 2015, directed the parties to furnish the Court with a single, joint submission.  However, despite SCO's persistent, good-faith effort to reach agreement with IBM as to the form of a joint submission, IBM informed SCO today that IBM was unwilling to proceed with filing a Joint Statement that included the three sections set forth in the Court's July 14, 2015, Order for the reasons set forth in the accompanying letter of Jason Cyrulnik.

Dated:  July 20, 2015

HATCH, JAMES & DODGE, P.C.

/s/  Brent O. Hatch
Brent O. Hatch
Mark F. James

BOIES, SCHILLER & FLEXNER LLP
David Boies
Stuart H. Singer
Edward Normand
Jason Cyrulnik

*Counsel for Plaintiff, The SCO Group, Inc.*

## Section 1\*

## UNDISPUTED FACTS

### *Originating from IBM's 56.1 Statement*

1.    [I.1]    SCO filed its original Complaint, which included claims for unfair competition and misappropriation of trade secrets, on March 6, 2003.  (Ex. 1.)

2.    [I.2]    On July 22, 2003, SCO filed an Amended Complaint. (Ex. 2.)  In the Amended Complaint, SCO again asserted claims for unfair competition and misappropriation of trade secrets.  (Ex. 2 ¶¶ 147-53.)

3.    [I.3]    SCO thereafter sought, and was granted, permission to file a Second Amended Complaint.  (Ex. 3.)

4.    [I.4]    SCO's Second Amended Complaint, filed on February 27, 2004, again included an unfair competition claim (the sixth cause of action).  (Ex. 3 ¶¶ 181-188.)  In its Second Amended Complaint, SCO did not assert a claim for misappropriation of trade secrets.  (Ex. 3.)  In fact, at a hearing on December 5, 2003, SCO acknowledged that there are no trade secrets in UNIX System V.  Counsel for SCO stated:  "There is no trade secret in UNIX system [V].  That is on the record.  No problem with that."  (Ex. 414 at 46:2-3.)

5.    [I.5]    SCO then sought leave to file a Third Amended Complaint to add a tenth cause of action.  (Ex. 10 ¶¶ 217-41.)  SCO's proposed tenth cause of action asserted that "IBM misappropriated, and used in its own 'AIX for Power' operating system, substantial copyrighted source code relating to UnixWare System V Release 4 ['SVr4']."  (Ex. 10 ¶ 217.)  SCO further alleged that "IBM obtained access to the copyrighted UnixWare SVr4 code through 'Project Monterey'".  (Ex. 10 ¶ 217.)

6.    [I.6]    In a decision dated July 1, 2005, this Court denied SCO's motion to add a cause of action based upon IBM's alleged copying of code obtained through Project Monterey into AIX.  The Court stated that "SCO has unduly delayed seeking leave to add the proposed cause of action.  It appears that SCO – or its predecessor – either knew or should have known about the conduct at issue before it filed its original Complaint" in March 2003.  (Ex. 58 at 4.)

7.    [I.7]    IBM served interrogatories asking SCO to describe in detail its allegations and alleged evidence of misconduct by IBM.  (Ex. 11.)

---

\*    Paragraphs are consecutively numbered across Sections 1-3, and paragraph numbers are followed by an alternative paragraph number in brackets, beginning with the prefix "I.__" for documents originating from IBM's 56.1 statement, and with the prefix "S.__" for documents originating from SCO's Statement of Additional Material Facts.  These bracketed numbers reflect the paragraph number in the original document from which the current paragraph is derived.

8.    [I.8]    With respect to SCO's unfair competition claim, IBM asked SCO to "describe, in detail, each instance in which plaintiff alleges that IBM engaged in unfair competition, including but not limited to:  (a) the dates on which IBM allegedly engaged in unfair competition; (b) all persons involved in the alleged unfair competition; and (c) the specific manner in which IBM is alleged to have engaged in unfair competition."  (Ex. 11 at Interrogatory No. 7.)

9.    [I.9]    The Court entered three different orders requiring SCO to provide detailed responses to IBM's Interrogatories.  (See Ex. 55; Ex. 56; Ex. 58.)  In the final of those three orders, the Court set December 22, 2005, as the "final deadline for [SCO] to identify with specificity all allegedly misused material" and update its interrogatory responses accordingly. (Ex. 58 at 4.)

10.    [I.10]    SCO filed discovery responses, including Exhibits 31, 32, 33, and 46.

11.    [I.11]    SCO alleges that:

a.    IBM made and continued to make investments in the development of Linux, and secretly advanced and promoted development of Linux without disclosing such activities to SCO, during and at a time when IBM was under a duty to deal fairly with and disclose such competing activities to SCO pursuant to its contractual obligations to SCO under Project Monterey and otherwise.  (Ex. 32 at Interrogatory Response No. 7.)

b.    IBM's unfair competition arose from the relationship it established with SCO as a result of the joint effort between SCO and IBM known as "Project Monterey".  (Ex. 33 at Interrogatory Response No. 7.)

c.    As a result of the formal agreement between SCO and IBM and the numerous representations made by IBM that were calculated to be relied upon by SCO, IBM had a fiduciary obligation to SCO that required IBM to be forthright and truthful in all affairs related to the partnership agreement.  (Ex. 33 at Interrogatory Response No. 7.)

d.    IBM . . . unfairly took advantage of its partnership relations with SCO, unfairly gained access to SCO's business relationships, and unfairly and knowingly diverted SCO's resources away from competition with IBM and toward the purposes of the relationship.  (Ex. 33 at Interrogatory Response No. 7.)

e.    During a substantial part of 1999 IBM was secretly developing plans to cease its planned strategic relationship with SCO . . . and to begin supporting Linux.  (Ex. 33 at Interrogatory Response No. 7.)

12.    [I.16]    In 1994, Intel and Hewlett-Packard (HP) announced their collaboration to create a new 64-bit processor architecture design.  (Ex. 27.)

13.    [I.17]    In or around 1998, IBM began negotiating with Santa Cruz to undertake a joint development project for, among other things, a UNIX-like operating system that would run

on the IA-64 platform.  This project subsequently came to be known as "Project Monterey". (Ex. 24; Ex. 25; Ex. 123; Ex. 86 ¶ 54; Ex. 259 at 30-31.)  At that time, Santa Cruz sold two UNIX products that ran exclusively on Intel's existing 32-bit hardware platform:  UnixWare and OpenServer.  (Ex. 1 ¶¶ 26, 47; Ex. 115 at 5-8.)

14.    [I.19]   On October 26, 1998, IBM and Santa Cruz entered into the JDA, whereby Santa Cruz and IBM agreed among other things to provide resources and technology to pursue these goals.  (Ex. 245.)

15.    [I.21]   In the JDA, IBM also stated its intention to engage in certain marketing activities:  "IBM intends to engage in at least the following marketing activities to market, promote and sell the UnixWare and IA-32 Product on IBM systems in 1999 with a minimum cumulative funding of Five Million Dollars in the first year," followed by a list of ten specific activities.  (Ex. 245 Attachment A, § I.)

16.    [I.22]   IBM also agreed to "make certain IBM middleware available for the UnixWare 7 and IA-32 Product platform based on IBM's own determination of commercial considerations.  At a minimum, however, IBM plans to make the following middleware available for the IA-32 or UnixWare 7 Product:

- MQ-series
- DB2
- eNetwork Directory
- Net.Data
- IBM Websphere
- Commserver
- Tivoli Management Software
- Network Station Manager."

(Ex. 245 Attachment A, § II.)

17.    [I.30]   In May 2001, Santa Cruz finalized the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera International ("Caldera"), ending its investment in and support of the Monterey development effort.  (Ex. 111 at 52; Ex. 244.)

18.    [I.34]   After the start of this litigation, Caldera changed its name to "The SCO Group, Inc."  (Ex. 113 at 4.)

*Originating from SCO's Statement of Additional Material Facts*[†]

19.    [S.1]    The Santa Cruz Operation ("Santa Cruz")[1] was founded in 1979, and in 1983 it delivered the first packaged UNIX System for Intel processor-based PCs.  (Ex. 250 at 1.) Santa Cruz's UNIX operating systems ran on the 32-bit Intel IA-32 microprocessor or "chip." (Ex. 214 at 181047252, ("SCO is the clear leader in providing UNIX operating systems on the IA-32 architecture.").)

20.    [S.2]    As one industry analyst stated, "SCO established the market for advanced operating systems on industry-standard Intel platforms in the 1980s, pioneering such features as a full 32-bit implementation, security, and multiprocessing."  (Ex. 244 at 6.)  At least as far back as 1989, Santa Cruz was described as "the largest vendor of Unix-like operating systems on Intel-based computers."  (Ex. 246 at 1.)

21.    [S.3]    Santa Cruz sold its UNIX-on-Intel operating systems to major corporate customers located throughout the world including NASDAQ, McDonalds, Sherwin Williams, Papa Johns, Daimler Chrysler, BMW and Lucent Technologies.  Santa Cruz's UnixWare product was certified for and sold on a wide variety of OEM IA-32 systems including those from Compaq, HP, Unisys, NCR, Data General, Siemens Nixdorf, FujitsuICL, Olivetti and IBM.  (Ex. 354, ¶ 7; Ex. 362, ¶ 7.)

---

[†]    IBM did not articulate to SCO any basis for disputing the facts set forth in this Section. Rather, on the afternoon of Saturday, July 18, 2015, IBM (for the very first time) finally sent SCO a draft that addressed SCO's Additional Facts and identified therein thirteen paragraphs from SCO's Facts that IBM disputed, along with the basis for its position.  SCO moved all of those paragraphs to Section 3, along with IBM's newly drafted bases for disputing the facts, and SCO's replies.  With respect to the remainder of SCO's Additional Facts, IBM proposed "redline" edits.  In the spirit of accommodation, and notwithstanding the fact that IBM sent the draft to SCO just before the submission was due, SCO accepted some, but not all, of IBM's requested edits and sent the remaining Additional Facts to IBM for review.  As of the deadline for filing this statement, however, and despite SCO's repeated requests, IBM has not provided SCO with any further guidance as to which, if any, of the remaining SCO statements IBM continues to dispute.  Specifically, SCO asked IBM to identify by paragraph number the remaining SCO facts IBM contends to be "disputed" and that should be moved to Section 3, but IBM declined and stated that it was no longer willing to submit a Joint Statement with the three sections that the Court identified in its July 14 Order.

[1]    The Santa Cruz Operation was historically referred to as "SCO," and many documents in this action use the term "SCO" in reference to that entity.   In May 2001, Santa Cruz transferred its UNIX assets Caldera International.   Immediately after the sale, Santa Cruz changed its name to Tarantella.  Caldera International remained Caldera after the transaction but later, in 2002, changed its name to The SCO Group, Inc.  Thus, in many documents both before and after May 2001, the term "SCO" is used to refer to the entity in possession of the UNIX assets, although that entity changed from Santa Cruz to The SCO Group, previously Caldera, in May 2001.

22.    [S.4]    According to July 1999 IBM document discussing project Monterey: "Research by International Data Corporation (IDC) shows SCO as the leading provider in 1998 of UNIX operating systems with 40.6% of all shipments, regardless of hardware platform. SCO's UnixWare operating system was the fastest-growing UNIX server operating system in 1998, with 58.5% growth over 1997. (Ex. 214 at 181047252 n. 2.)  In terms of revenue, Santa Cruz was the leader in what is referred to as the "UNIX-on-Intel market" to an even greater extent, with an 80% market share.  (Ex. 204 at 1710117641.)

23.    [S.5]    One of SCO's experts discusses (with citations to documentary support) that through the 1990s, the processing capacity of the Intel processor chip was increasing rapidly:  by 1995, Intel began to target its chips to be used in high-performance desktops and servers, and new UNIX servers based on 32-bit Intel chips began to compete against UNIX systems based on the far more expensive RISC chip, which until then had been the preferred chip for enterprise-critical systems; and from 1995 to 1999, shipments of servers based on Intel architecture approximately tripled and, by 2000, servers based on Intel architecture began to dominate the UNIX market.  (Ex. 284 at 18-20.)

24.    [S.6]    By 1998, Intel was developing the first commercial 64-bit chip, called Itanium, with the code name Merced.  (Ex. 214 at 181047251-52; Ex. 249 at 1.)  Capitalizing on its expertise with the Intel IA-32, Santa Cruz began work on porting its operating systems to the Itanium, IA-64 chip.  (Ex. 354, ¶ 8; Ex. 362, ¶ 8.)

25.    [S.7]    The strength of Santa Cruz's market position at this time is described in the expert reports of Dr. Gary Pisano and Dr. Jeffrey Leitzinger, and those findings are incorporated herein by reference.  (Ex. 284 at 40-47, Ex. 281 at 9-20, respectively.)

26.    [S.8]    In contrast to SCO, IBM in 1998 had almost no presence in the market for UNIX-based operating systems on Intel chips.  Instead, IBM had focused its efforts on its operating system called AIX for Power, which ran on servers using IBM's RISC-type Power processor.  (Ex. 214 at 181047252; Ex. 166 at 8:11-9:17.)

27.    [S.9]    Accordingly, IBM began considering the benefits of partnering with Santa Cruz.  A May 6, 1998 IBM document states:  "Tight partnership with SCO to exploit their code, channels, attract ISVs with a single AIX O/S marketed by both companies to be explored."  (Ex. 189 at 1710117588.)

28.    [S.10]  In an IBM confidential memo dated July 30, 1998 concerning IBM's UNIX Strategy, addressed to IBM's CEO Lou Gerstner, IBM's R.M. Stephenson discussed Santa Cruz's competitive position in the Unix-on-Intel market.  (Ex. 204 at 1710117641.)  Lou Gerstner was informed:  "While HP and Sun have been successful at driving commitments to 64-bit Intel, today's clear leader in the UNIX on Intel market is Santa Cruz Operation (SCO) with over 80% of the $3B Unix-Intel market."  (Id.)

29.    [S.11]  An IBM document dated August 5, 1998 related to a "strategic issue discussion" of UNIX and Java, reflecting Mr. Gerstner as an attendee, describes Santa Cruz's strong market position.  Specifically, the document states:  "Based on 1997 estimates, SCO captured 15% of the revenue and 40% of the volume in the UNIX industry [IDC [International

Data Corporation], quoted on SCO's website]. In the segment of UNIX operating systems running on Intel processors, SCO was believed to have 80% of the revenue." (Ex. 197 at 1710136584.) The IBM document further states that "SCO's operating system is an important component for solutions in the Intel high-volume server market" and that "[s]olutions built on SCO provide the robustness and extendibility of UNIX with the cost advantages of an Intel platform." (Id. at 1710136589.)

30.     [S.12] In addition, the August 5, 1998 IBM document describes Santa Cruz's market segments, customers, and applications. (Id. at 17101365890-92.) For instance, it states that independent software vendors ("ISVs") work with Santa Cruz because Santa Cruz has "one of the industry's strongest support infrastructure, with over 10,000 authorized resellers, 100 distributors, 250 vertical solution providers and system integrators, and 140 education centers" and because Santa Cruz had "Dominant market share in Telecom and In-store Systems in Retail Industries (e.g., installed in 14 out of top 16 biggest pharmacies, all major auto-part stores and grocery stores)." (Id. at 1710136591.)

31.     [S.13] Santa Cruz's technology was also attractive to IBM for another reason: Santa Cruz's UnixWare 7 operating system was based on UNIX System V Release 4 ("SVr4") technology, the most recent version of UNIX. (Ex. 354, ¶ 9; Ex. 362, ¶ 9.) In contrast, IBM's AIX operating system was based on an earlier UNIX release. (Ex. 205 at 181017195.) Santa Cruz owned the more recent UNIX source code. (Ex. 227 at 181472999.) IBM had opted not to buy from SCO an upgrade of its UNIX license to the SVr4 code base. (Id.)

32.     [S.14] Like Santa Cruz's UnixWare, Sun Microsystems' UNIX operating system, Solaris, was based on SVr4 code. (Ex. 205 at 181017194.)

33.     [S.15] Some at IBM perceived Sun Microsystems ("Sun") as a significant competitor, and expressed that incorporation of SVr4 code into AIX would help it compete against Sun, whose Solaris product had steadily been gaining market share at the expense of IBM's AIX. (Ex. 285 at 76-77 (quoting contemporaneous documents); Ex. 216 at 181677477-79; see also paragraph S.42, infra, for details on IBM's interest in obtaining the SVr4 code to compete with Sun.)

34.     [S.16] In October 1998, IBM "announced a major UNIX operating system initiative with a number of industry partners" (Ex. 240 at 1), specifically, Santa Cruz, Sequent, and Intel; and this initiative came to be known as Project Monterey. (Ex. 240; Ex. 354, ¶ 9; Ex. 362, ¶ 9; Ex. 17 ¶ 9). Project Monterey was described by IBM as a "major UNIX operating system initiative" (Ex. 214 at 181047251) that would deliver a "single UNIX operating system product line that runs on IA-32, IA-64 and IBM microprocessors, in computers that range from entry-level to large enterprise servers." (Ex. 240 at 1.)

35.     [S.17] In the press release announcing Project Monterey, IBM stated: "We're extending into broader markets with our award-winning AIX software that delivers the reliability and security required of an enterprise-class operating system . . . . Working with these companies, we're capitalizing on the base of proven leadership technologies to deliver the world's best UNIX on Power microprocessor and high-volume Intel microprocessor systems." (Ex. 240 at 1-2.)

36.     [S.18]  The agreement between Santa Cruz and IBM was reflected in a Joint Development Agreement ("JDA"), signed by the parties and dated as of October 1998.  (IBM Ex. 245, at 1710141492; Ex. 214 at 181047251.)

37.     [S.19]  Through the JDA, the parties undertook to jointly develop an operating system that would run on Intel's forthcoming 64-bit chip.  This operating system was defined as the "IA-64 Product" (sometimes referred to herein as the "Project Monterey Operating System"). The "IA- 64 Product" was to be part of a "family of products" that would be sold by IBM and Santa Cruz.  (IBM Ex. 245, at Preamble and § 1.10 (JDA); Ex. 166 at 21:6-9; Ex. 214 at 181047252; Ex. 191 at 1710013164.)

38.     [S.20]  The agreement contemplated that Santa Cruz would continue to develop and sell its 32-bit operating systems and would also be able to upgrade or migrate its customers to the jointly developed Project Monterey Operating System on the 64-bit chip.  (IBM Ex. 245 at Preamble and §§ 1.9 and 9.0-9.4 (JDA); Ex. 214 at 181047252-53; Ex. 176 at 181441556.)

39.     [S.21]  The agreement provided that, after a "generally available" "Release 1" of the IA-64 Product, IBM would earn a license to use any SVr4 source code contained in Release 1 in its existing products, such as AIX for Power.  This would make it easier for customers to migrate from AIX and the Power microprocessor to the Project Monterey Operating System and the 64-bit processor.  (IBM Ex. 245 at § 2(d)2 (JDA); Ex. 81 at § 4 (JDA Supplement B); Ex. 85 at 1710013964 (JDA Amendment 5); Ex. 214 at 181047252-53; Ex. 17 at ¶ 9.)

40.     [S.22]  One of the goals of the agreement was to enable that both SCO customers (using Santa Cruz's UnixWare operating system software on computers with Intel's 32-bit processors) and IBM customers (using IBM's AIX for Power operating system software on computers with IBM's Power processor) to upgrade to the jointly developed Project Monterey Operating System software (the IA-64 Product), which was to be compatible with computers using either the 32-bit or the 64-bit Intel chip or the IBM Power chip.  (Ex. 214 at 181047252-53; Ex. 176 at 181441556 (11-3-98 draft of "SC98, High Performance Networking and Computing:  Executive Overview" stating:  "IBM and SCO offer a smooth migration path from AIX to IA-64 and from UnixWare to IA-64".)

41.     [S.26]  In an e-mail dated October 15, 1998, the same month the JDA was signed, IBM executive William Sandve asked internally, in response to a draft of a planned IBM Linux announcement:  "Does the announce message on Linux needed for 10/26 undermine the SCO alliance and the Monterey Family strategy to the degree that we would need to rethink our SCO relationship plans?"  (Ex. 191 at 1710013164.)

42.     [S.27]  In early 1999, an IBM executive stated that the "SCO/Monterey plans should not be stopped until we have a better plan to move to."  (Ex. 234 at 181349130.)  An undated IBM memorandum describes five options, one of which was the "elimination of SCO" and "[r]eplac[ing] UnixWare with Linux" as IBM's vehicle for entry into the "low end" segment of the UNIX-on-Intel market.  (Ex. 371 at 181526163.)  However, the memorandum cautioned that, under this option, IBM would not attain the right to use the SVr4 code, and therefore SCO and its UnixWare "should be retained in order to have access to SCO's SVR4/5 and other technologies." (Id. at 181526164.)

43.     [S.28]  IBM then began cutting the Monterey budget, causing employees to question the viability of the project:

     a.     A January/February 1999 IBM document states:  "Current budget outlook which factors in a substantial challenge from SG Development and additional unfunded Monterey family line item content, would <u>result in an uncompetitive AIX/Monterey product line by 2H2000</u>."  (Ex. 368 at 181442681.)

     b.     In February 1999, an IBM employee stated in an internal e-mail that IBM was not "investing in the tools to make Monterey successful."  (Ex. 242 at 181016130.)

     c.     In March 1999, an IBM employee stated in an internal e-mail, "I know that this is not an either/or decision, but working on both Monterey and Linux is defocusing."  (Ex. 236 at 181349188.)

     d.     In February 1999, an IBM employee stated in an internal e-mail, "Below is a note that notes the high degree of concern I am hearing from my technical team and others concerning Linux strategy and the collision with Monterey."  (Ex. 187 at 181016068.)

44.     [S.29]  In March of 1999, IBM publicly announced its support of Linux at the LinuxWorld event (IBM Ex. 21 at 4) – a fact which IBM admits in its brief (at ¶ 12).

45.     [S.30]  However, IBM continued to tell SCO and announce publicly that it was also fully supporting Monterey as its enterprise level operating system.  For instance, in an August 10, 1999 article about IBM's support of both Linux and Project Monterey, IBM assuaged concerns:

     IBM's John Prial said Big Blue is comfortable with many operating systems under its roof, and that AIX today and Monterey tomorrow will sell in a different area than Linux. "We're very comfortable having many operating systems," he said. "Monterey will be popular in high business-value transactional systems and heavy-duty business intelligence," Prial said.  Linux, on the other hand, currently is popular in Web servers, file and print servers, and other smaller-scale computers, though that could change two or three years down the line.

(Ex. 252 at 2.)  In addition, IBM made representations directly to SCO that "nothing has changed with respect to the AIX/Monterey initiatives" (Ex. 186 at SCO1235090) and IBM was "pursuing Project Monterey vigorously."  (Ex. 351 ¶¶ 17; <u>see also</u> <u>id.</u> ¶ 22.)

46.     [S.31]  SCO believed IBM's representations.  (Ex. 351, ¶¶ 17-18; Ex. 17 ¶ 10; Ex. 351 ¶ 17.)  In an August 19, 1999 article about IBM's support of Trillian (the IA-64 project for Linux), Santa Cruz CEO Doug Michels was quoted as follows:

     "<u>IBM is not looking at Trillian as an alternative to Monterey</u>.  The real interest in Linux is coming from all the software companies

that sell databases and transaction based tools because they are frustrated that Microsoft more or less gives these things away as part of the Back Office bundle. So they say 'if you give us a free OS, we'll make money from it'."

But Trillian is not intended to make Linux an enterprise class OS and there are no real efforts elsewhere to do so either, he claimed.

(Ex. 253 at 1-2 (emphasis added); see also Ex. 351 ¶ 18.)

47.    [S.32]  However, IBM executive Sheila Harnett stated in an internal November 1999 e-mail:  "The distinction used to position Monterey versus Linux is that Monterey is targeted for high-end servers, whereas Linux comes in at the lower to mid range of servers. However, this distinction is a fragile one, since IBM is working as fast as it can to bolster Linux's ability to compete in the mid to high end range of servers."  (Ex. 175 at 181436864 (emphasis added).)

48.    [S.33]  In late 1999 and 2000, IBM executives made the following recommendations regarding Monterey and Linux:

a.    In an internal October 1999 e-mail, IBM executive Irving Wladawsky-Berger identified as a "possible solution" to a perceived IBM problem, among other things:  "Embrace Linux in a very major way" and "Drop Monterey, with a transition to Linux for whatever commitments we have in place" and "move at lightning speed."  (Ex. 183 at 181668451.)

b.    In an internal November 1999 e-mail, another IBM executive stated:  "Wild thought . . . instead of taking NUMA-Q to Monterey, why don't we take it to Linux.  We then get a high end Intel/Linux play.  (Ex. 301 at 181518284.)  By contrast, a July 1999 IBM document states:  "The Project Monterey line will be strengthened by the incorporation of Sequent's innovative technologies including NUMA architecture . . . ."  (Ex. 214 at 181047252.)

c.    In an internal May 2000 e-mail, IBM executive Steve Mills stated:  "As soon as possible we should announce," among other things, "A transition of our AIX and Monterey efforts to Linux."  Among other things, he stated:  "Monterey will not gain enough industry following to be viable," and, "Our resources and messages are fragmented.  We need a bold move that is without qualification.  We need a single marketing and sales message."  (Ex. 184 at 181669431-32) (emphasis added.)

d.    An IBM internal memorandum expressly recognized that, if IBM opted for this strategy, it would "document identifies one of the "Cons" of delivering a Monterey branded version of Linux as follows:  "Likely to squeeze target opportunities for [SCO's] UnixWare from low end.  Not only is the result loss of revenue for SCO, but this may also damage the volume proposition for Monterey business partners (ISVs, resellers, system integrators, etc.)."  (Ex. 371 at 181526162-63.)

11

49.     [S.35]  In direct contrast to IBM's internal de-emphasis on Monterey, at a December 21, 2000 OEM Council Meeting, IBM's Charlie Reese reassured the Monterey participants, including SCO: "We have a strong commitment to remain focused on Itanium." (Ex. 172 at 181005905.)

50.     [S.36]  Even as IBM was publicly stating its support for Monterey but internally transitioning away from Monterey to Linux, IBM obtained SCO's SVr4 code through the partnership and used it in its non-Intel AIX for Power product.

51.     [S.37]  On October 24, 2000, IBM placed Santa Cruz's SVr4 source code into a PRPQ (IBM's internal name for a beta test version), "early adopters" of AIX for Power (named AIX 5L for Power 5.0), which was intended for certified software developers and "not intended for general production use."  (Ex. 289.)

52.     [S.38]  Then, on May 4, 2001, IBM included Santa Cruz's code in the first "generally available" version (AIX 5L for Power 5.1).  (IBM Ex. 229 at 30:12-15, 30:22-31:10, 33:8-23, 107:21-32; Ex. 229; Ex. 82 at 3-4.)

53.     [S.39]  The SVr4 code IBM placed in AIX for Power was valuable to IBM's strategy for competing with Sun's Solaris operating system.  This was achieved through IBM's use of SVr4 code to enhance the affinity between AIX and both Solaris and Linux.  In addition, IBM used SVr4 code and expertise obtained from Santa Cruz through Project Monterey to mature Linux into a commercially hardened operating system capable of handling mission-critical workloads.  (Ex. 286 at 36-43, 76-77; Ex. 287 at 9, 37-38.)

54.     [S.40]  IBM has continued to use SCO's code in every subsequent version of AIX 5L for Power.  Indeed, IBM is still distributing AIX 5L for Power, which continues to contain SVr4 code, to this day.  (IBM Ex. 229 at 30:12-15, 30:22-31:10, 33:8-23, 107:21-32).

55.     [S.41]  IBM fully recognized that this SVr4 code it was using had come to IBM from SCO via Project Monterey:

     a.     On April 24, 2001, an internal IBM e-mail from Kim Tom listed the "functions/features that are available on AIX 5.1 for Solaris Affinity," and added that in "the next phase we are planning to bring up a number of the base commands to SVR4 level using SCO code."  (Ex. 225 at 181472943.)

     b.     On May 18, 2001, IBM executive William Sandve stated that IBM had secured the SVr4 code that was incorporated into AIX "in our Project Monterey relationship with SCO, who owns the SVR4 code base."  (Ex. 227 at 181472999.)

     c.     On June 15, 2001, Mr. Sandve stated:  "Truss is a SVR4 tool . . . .  Since AIX is not a SVR4 licensee, AIX has never supported this specific tool in the past.  In AIX5.1 however, because of our joint code development with SCO (Project Monterey) who owns the SVR4 source code base, we gained rights to provide this and other selected functionality in our AIX5.1 code release . . . ."   (Ex. 230 at 181473050.)

56.     [S.42]  As discussed above at Paragraph S.15, this SVr4 code was fundamental to IBM's ability to establish greater affinity between its AIX operating system and Sun's SVr4-based Solaris operating system, and thus, lure Sun's customers to IBM.  It was highly valuable to IBM for that reason.  (Ex. 286 at 76-77.)  The value and necessity of SCO's SVr4 code to IBM's strategy to compete against Solaris is reflected in IBM documents detailing how IBM used SVr4 code it gained access to in Project Monterey to create "Solaris Affinity" in AIX for Power.  (Ex. 225 at 181472943; Ex. 373 at 181473004; Ex. 229 at 181473018-19; Ex. 230 at 181473042-43; Ex. 372 at 181473052-53.)

57.     [S.43]  AIX 5L for Power, which ran on RISC – not Intel – architecture was not the "IA-64 Product" under development in Project Monterey, and SCO could not collect any royalties or other benefit from its sales.  (IBM Ex. 245 at §12 (JDA provision setting forth that royalties are only to be paid to SCO for IBM's distribution of Release 1 of the IA-64 product)).  Thus, SCO would benefit and IBM would obtain the right and license to use SCO's SVr4 code it obtained through Project Monterey in AIX for Power only if IBM in good faith completed and released a working, generally available Project Monterey Operating System (the IA-64 Product):

        a.     Project Monterey Supplement B to Agreement Number 4998CR0349 Version 1.0 February 19, 1999, at Section 4, states:  "The Licensed Materials detailed in Attachments 3 and 4 are to be used solely for development of the IA-64 Product.  Notwithstanding the foregoing, any such Licensed Material included in the IA-64 Product Release 1 shall be licensed pursuant to the terms and conditions set forth in the [JDA]."  (Ex. 81 (JDA Supplement B).)

        b.     The fact that Release 1 had to be a "generally available" release is evidenced by Project Monterey Amendment 5 to Joint Development Agreement 4998CR0349, which excepts from royalty payments under the JDA any "distribution of Pre-Release IA-64 Product" – which was defined to mean any distribution that is prior to "general availability of the IA-64 Product Release 1."  (Ex. 85 (JDA Amendment 5, executed October 15, 1999); see also Ex. 17 ¶ 9, Ex. 35 ¶ 15.)

58.     [S.45]  Once IBM used the SVr4 code in AIX for Power, it fully recognized that it could not legitimately back out of Monterey (as some IBM executives had urged) while keeping the code.  On May 11, 2000, IBM executive Helene Armitage stated:

        We will need to renegotiate the rights to ship SVR4 and UW7 capabilities in the AIX base, or remove the code. Actually shipping it with AIX is the preferred direction, because it helps us with Solaris compatibility issues.

(Ex. 96 at 181511617 (emphasis added).)

59.     [S.46]  Similarly, a June 2000, report of the IBM Academy of Technology OS Consultancy states, with regard to a potential revolutionary transition from AIX to Linux, that: "backing off from our Monterey commitments will have nontrivial legal implications."  (Ex. 239 at 181291955 (emphasis added).)

13

60.    [S.47]  IBM was also interested in using SCO's code to advance its Linux initiatives:

a.    On May 11, 1999, IBM executive Krieger sent an e-mail detailing IBM's need for SCO's SVr4 ABI and ELF code in order to implement "game chang[ing]" strategy of making Linux enterprise hardened.  (Ex. 217 at 181510778.)

b.    In July 2000, IBM programmer Kaena Freitas informed his colleagues that IBM would not have the right to include SVr4 code in AIX for Power unless and until there was a "generally available" release of the Project Monterey Operating System:   "I believe the SCO agreement states that if we don't ship the code when we GA Monterey, we will lose the rights to the code."  (Ex. 198 at 1710057885 (emphasis added).)

c.    On September 13, 2000, an internal IBM e-mail from Michael Day stated: "It would be useful to get favorable licensing terms that would allow us to open source the X86 emulation code on IA64 that SCO did, that we have since revamped to support Linux IA32 binaries."  (Ex. 219 at 181525203.)

d.    An undated IBM document states:

If resource availability is not a constraint, delivering an IBM Monterey Linux product should be selected.   This option could be improved upon if we could convince SCO to change their company strategy to be a Linux strategy and remove UnixWare from Monterey product line while keeping SCO involved in Project Monterey.   If not, UnixWare should be retained in order to have access to SCO's SVR4/5 and other technologies.

(Ex. 371 at 181526164 (emphasis added).)

e.    On January 12, 2001, IBM programmer Kaena Freitas explained that SCO code was used to create a Linux affinity package in AIX 5L for Power as a response to Sun.  He acknowledged that IBM would have the right to use SCO's SVr4 code in AIX 5L for Power only if IBM included the SVr4 code in a publicly available version of the Project Monterey Operating System.  (Ex. 221 at 2.)  IBM had to "make this technology available . . . [or] forfeit IBM's rights to the code as signed between IBM and SCO." (Id.)

61.    [S.48]  A May 11, 2000, e-mail from Helene Armitage of IBM states:

If the goal of canceling Monterey is to speed up work on Linux, I can take much more action in parallel with a slower move off Monterey.   If the largest concern is a naked OS, we can probably play the chicken-and-egg game at the launch – saying that ISVs are just coming on board, that this is the first release . . . .

(Ex. 96 at 181511618 (emphasis added).)

62.    [S.50]  A January 27, 2001, an internal IBM e-mail from Warren Washington asks for comments on "our IA plans" including:  "Release AIX 5.1 for IA-64 as an I-Listed PRPQ on the planned April schedule" and "Compilers are not included in the PRPQ . . . ."  (Ex. 97 at 181014956.)  Internally at IBM, an I-Listed PRPQ (Programming Request for Price Quote) is a developmental, beta test version, intended for certified software developers, not for general use, and only available to customers who have IBM lab approval.  It is something entirely different from a GA (Generally Available) release.  (Ex. 72 at 46:14-16; Ex. 289; Ex. 374 at 87:19-88:6; Ex. 166 at 135:2 to 135:4.)

63.    [S.51]  In a January 29, 2001, internal IBM e-mail, IBM employee Rose Ann Roth replied to Warren Washington's January 27 e-mail: "I think the compiler MUST be available in some form or the whole thing just doesn't make any sense (i.e. SCO won't buy it)." (Ex. 97 at 181014956.)

64.    [S.52]  Nevertheless, on April 17, 2001, IBM announced the pretextual availability of AIX 5L for Itanium as an I-Listed PRPQ, and made it "available" on May 4, 2001. (Ex. 89 at 181015076; Ex. 97 at 181014956.)  Unlike the PRPQ of AIX 5L for Power in October 2000, the PRPQ of AIX 5L for Itanium was so spurious it did not even have a compiler to make it work and there was "no confirmed compiler plan." (Ex. 301 at 181015003.)  Moreover, the PRPQ was offered free of charge, without support.  (Id.)

65.    [S.53]  A compiler is a program that takes an application and processes it, or "translates" it, to allow it to run on specific computer architecture.  (Ex. 72 at 142:23-143:1.)  As IBM executive Anthony Befi stated:  "If a compiler wasn't available there wouldn't be applications to run on it, so you wouldn't sell very many." (Id. at 159:4-17.)

66.    [S.54]  IBM's own experts and witnesses have admitted that software not containing a compiler cannot legitimately be called an "operating system."  (IBM Ex. 208 at 28; Ex. 166 at p. 81:7-9.)

67.    [S.55]  Indeed, IBM distributed only 32 copies of the sham PRPQ in 2001.  (Ex. 159 at 1710118968-69.)  Curiously, although IBM did not charge a fee for the premature PRPQ, and therefore owed no royalties pursuant to JDA Amendment 5, IBM tendered to SCO a $256 royalty for these copies.  (Id.; Ex. 85 at 1710013964.)  The PRPQ was not on IBM's price lists, and was not marketed.  (Id.)

68.    [S.56]  In short, this pretextual PRPQ was not the functional, generally available Release 1 contemplated in Project Monterey, and IBM recognized this.  IBM's "AIX 5L for Itanium strategy" was to "continue to ship AIX 5L as a PRPQ" in "stealth mode only." (Ex. 89 at 181015076 (emphasis added).)  In addition, even as it was announcing the premature PRPQ, IBM plotted:  "At the appropriate time announce plan not to GA AIX 5L and withdraw the PRPQ." (Id.)

69.    [S.57]  Nevertheless, IBM shrewdly developed its external positioning on this product in order to try to maximize its appearance of satisfying the Monterey requirements.  On April 4, 2001, William Saulnier sent Ms. Armitage an e-mail containing a draft proposal for the "AIX 5L Announce Positioning Re Itanium." (Ex. 88 at 181028285.)  He stated: "I believe this

proposal does the best possible job to announcing what we intend to do while allowing us some increased flexibility with regard to NUMA-Q directions." (Id.) Ms. Armitage largely rejected his proposal, indicating that she took a "heavy hack" at his thoughts. (Id. at 181028284.) She stated: "I'm concerned that your words define a delayed GA to 2H01 for the AIX product, and do not call the PRPQ GA, so I have taken a stronger hand in stating our delivery." In other words, Ms. Armitage was concerned that Saulnier did not describe the premature PRPQ as "GA" or "generally available." Ms. Armitage then explained: "As you know, we need to GA this PRPQ to gain rights to SCO code we want for our base AIX product delivery – and every [one] is rather tired of me remaining and harping on this point." She then went on to articulate the external position she wanted to see on the product, but acknowledged, "I know the fine lines we are walking here." (Id.)

70.    [S.58]  On April 23, 2001, in an e-mail entitled "IBM Confidential:  Conflicting messages on AIX-5L support for IA/64 Itanium," IBM employee Atul Gupta asked for a clarification of what he described as the "two conflicting messages" that were delivered. (Ex. 90 at 181472978-79.) On May 2, 2001, William Saulnier responded, providing the "[c]urrent messaging in a nutshell":

> AIX 5L is available on POWER and Itanium based servers It is GA [i.e., generally available] on POWER and available as a controlled release on Itanium (due to lack of GA servers at this time)

> IBM plans to move this product to GA status in the future We continue to work with our OEM partners . . . .

(Id. at 181472975 (emphasis added).)  Mr. Saulnier then went on to state:

> There are significant challenges for AIX 5L which will have to be overcome before we would GA the product.  The compiler issue is currently open, the processor is very late, Linux is gaining momentum and capability.

(Id. (emphasis added).)

71.    [S.59]  In contrast to IBM's external "messaging," a July 22, 2001, internal IBM e-mail from Bill Sandve described "[t]he net internal position" as "AIX/IA64 is dead" and "gone" and "not going to happen." (Ex. 91 at 181473067.)

a.    On July 20, 2001, IBM employee Gerry Hackett sent Bill Sandve an e-mail with the subject "AIX on IA64," asking:  "What is the party line when customers indicate interest?" (Id. at 181473068.) Mr. Hackett explained to Mr. Sandve that he was in a briefing for the customer "BP" when the customer expressed interest in AIX on IA64. (Id.)

b.    The next day Mr. Sandve responded by explaining both IBM's "internal position" and its "external position" on AIX on IA-64:

16

<u>The net internal position</u>:  <u>AIX/IA64 is dead</u>.  The IPMT direction to the PDT was that it should not bring forward a plan dcp package for continued product development in 2002.  <u>Do not encourage BP to consider AIX 5L on an XSeries box since it is not going to happen</u>.

The external position:  Although Saulnier and mktg team do not want to distribute any formal statement, even internally, here's what we've been saying:

We have been disappointed in the schedule slips and lack of progress on the rollout of <u>Itanium</u> processors.   Based on the substantial delays and the related lack of near-term interest by many of our ISVs, the AIX/Itanium product is on hold as we evaluate what the right level of investment and should be.  The AIX 5L for Itanium I-PRPQ remains available for evaluation use as may be appropriate.  (It is available only as-is without support, as is the VA complier it was built with).

(<u>Id.</u> at 181473067 (emphasis added).)

   c. Mr. Sandve also acknowledged to a colleague:  "As for Monterey – I think it could have been used to make sure that HP would not have yet another chance to survive in spite of their confused strategy.  The facts are, though, that <u>the rest of IBM just would not support us – when the VA complier [sic] was allowed to drop support for AIX/IA64, the OS was already gone</u>."  (<u>Id.</u> at 181473066 (emphasis added).)

   d. As an I-Listed PRPQ available only to lab-approved IBM customers, the sham May 2001 PRPQ patently was not "generally available."  Nevertheless, IBM in bad faith described this sham to SCO (but to no one else) as a true, "generally available" product.  (Ex. 376 at SCO1184064.)

   72. [S.60]  However, as IBM's Ron Saint Pierre tellingly stated on November 1, 2001:  "<u>Monterey has not gone GA and never will</u>."  (Ex. 86 at 1710066677) (emphasis added.)  Outside observers similarly noted that "AIX for Itanium never went beyond beta."   (Ex. 67 at 2.)

   73. [S.61]  Caldera International (plaintiff SCO) closed its acquisition of the UNIX assets of Santa Cruz on May 7, 2001, three days after the sham PRPQ of the Project Monterey Operating System.  (Ex. 141 at 1710137001.)  This acquisition was publicly announced on about August 1, 2000.  (Ex. 113; Ex. 142.)

   74. [S.62]  Several weeks before the public announcement, Santa Cruz complied with Section 16.1 of the JDA and provided IBM with a detailed notice of the proposed transaction and an opportunity to tender a counteroffer within 15 days, pursuant to Section 16.2 of the JDA.  (Ex. 206 (6-21-00 Santa Cruz's notice to IBM of Caldera offer).)

   75. [S.64]  In 2001 IBM affirmatively indicated approval of the Santa Cruz-Caldera deal by offering to enter into a Support Services Agreement for AIX 5L for Interim-Board

Systems ("SSA").  (Ex. 291, Ex. 335; Ex.222; Ex. 209; Ex. 354, ¶ 14; Ex. 362, ¶ 12.)  The SSA was drafted to cover any "Generally Available" release of the IA64 Product (but which excluded "Pre-Release" developmental beta distributions such as the forthcoming pretextual PRPQ).  The proposed SSA also included a "no liability" clause that would have released IBM from any intellectual property infringements.  The agreement was not executed.  (Ex. 209 (5-18-01 draft Services Agreement between IBM and Caldera).)

76.    [S.65]  Moreover, long after the announcement of the transaction, IBM reiterated its "strong commitment" to Project Monterey.  At various meetings with executives of both Caldera and Santa Cruz, IBM reiterated its support   (Ex. 172 at 181005905; Ex. 17 ¶ 10; Ex. 351 ¶ 17; Ex. 356 ¶ 6; Ex. 6 ¶ 15.)

77.    [S.66]  Before the transaction was closed, Caldera met with IBM representatives, who affirmatively discussed plans for continuing with Project Monterey.  IBM's team never suggested that IBM intended to terminate the Project or that they thought the Project would not or should not continue once Santa Cruz sold its UNIX assets to Caldera.   (Ex. 356 ¶ 6; Ex. 6 ¶ 15.)  Caldera's representatives were led to believe that IBM would continue the project after the closing.  (Id.)

78.    [S.67]  IBM timed the May 4, 2001 sham PRPQ of the Project Monterey Operating System to occur just three days before the May 7 closing of the Santa Cruz-Caldera transaction. (Ex. 89.)  On the same day, IBM released the first "generally available" version of the SRV4-enhanced AIX 5L for Power.  (Ex. 82.)  Then, shortly after the closing, and after execution of its pretext for claiming that it had earned the right to use the SVr4 code in AIX for Power, IBM invoked Section 15.2 and cancelled the JDA.   (Ex. 207 at 1710013930.)

79.    [S.68]  In light of IBM's pre-closing conduct, IBM's cancellation was a major shock and disappointment to Caldera, since the joint venture with IBM was critically important to Caldera's decision to acquire SCO's UNIX assets and Caldera had fully expected to proceed with IBM on Project Monterey.  (Ex. 362 ¶ 13; Ex. 269 ¶ 8; Ex. 356 ¶ 6; Ex. 6 ¶ 15.)

80.    [S.72]  Furthermore, even if SCO knew by March 2001 that its SVr4 code had been used in IBM's PRPQ beta test release of AIX 5L for Power 5.0 in October 2000, this alone would not have been cause for concern or suspicion, because it was expected that IBM would fulfill its obligations and earn the contingent license to use the SCO code in its other products. In fact, it was expected that an SVr4-enhanced AIX 5L for Power would be a part of the Monterey "family" of operating systems.  SCO certainly did not know in March 2001 that IBM had no intent to fulfill the obligations that would have legitimized its use of that code.  SCO did not actually learn of IBM's use of SVr4 code until 2004, during discovery in this case.  (Ex. 57; Ex. 354 ¶¶ 19-20; Ex. 362 ¶ 15, Ex. 351 ¶ 17.)

81.    [S.73]  IBM was still grappling with its Monterey positioning – in response to a query from SCO – in late 2002, over a year after it terminated the project.  In an October 2002 email, Bill Bulko (assistant to IBM executive Anthony Befi) stated:  "Tony and I were in a conference call with SCO Group (formerly called Caldera) on Friday. . . .  During our discussion, they asked about Project Monterey and what its current status and positioning are.  We told them that it's a PRPQ, and explained what that meant – but neither Tony nor I were confident that we

were up-to-date on what the current 'official response' should be."  (Ex. 57 at 1710015451; Ex. 72, at 38:13-16.)

82.     [S.74]  On November 6, 2002, Mr. Bulko then sent a "Project Monterey update" to Mr. Befi, indicating, "Tony:  you asked me to collect some data on the current status of Project Monterey in order to update you before you meet with SCO (Caldera) again . . . .  Here is a capsule summary of our position with Project Monterey."  (Ex. 84 at 1710015441.)  He then explained:  "The deal was to do joint development, and then establish licensing back and forth between the two companies.  The license would be royalty-free everywhere else except in Monterey.  Even though SCO code is now embedded within AIX, we would only have to pay royalties to SCO when we distributed Monterey."  (Id.)  He further stated:  "Our initial license to SCO code was contingent on our making an attempt to distribute an IA-64 product. Consequently, we need to be clear that we have been trying to distribute Monterey, but no one wants it."  (Id.) (emphasis added).  Mr. Bulko further disclosed that IBM had "no plans to make AIX available on the Itanium platform" and was "planning to EOL [end of life] Monterey by the end of this year."  (Id.)

83.     [S.75]  Although SCO had specifically requested this information, Mr. Befi never relayed this update to SCO.  (Ex. 72 at 57:24-58:2.)

**Section 2**

**DISPUTED FACTS FROM IBM'S MOTION**

84.   [I.12]   SCO alleges that "[b]ecause IBM has been developing its plan to replace UnixWare support with Linux support, and because it knew SCO had dedicated its entire enterprise resources to the IBM/UnixWare joint relationship, IBM had a fiduciary obligation to inform SCO of its Linux-related plans long before its Linux public announcement in December 1999." (Ex. 33 at Interrogatory Response No. 7.)  In fact, IBM made a public announcement of its intention to support Linux at LinuxWorld in March 1999. (Ex. 21 at 4; Ex. 259 at 38.)

> **SCO's Response**:  IBM's public statements did not reveal IBM's true Linux strategy, which included the abandonment of Project Monterey, the duping of Santa Cruz and Caldera, and the misuse of SCO's SVr4 code. (SCO Statement of Additional Material Facts ("SCO AMF") ¶¶ S.25-S.75.)  Moreover, even after the 1999 announcement, IBM deceived Santa Cruz into believing that it would continue to support Project Monterey. (<u>Id.</u>)

> **IBM's Reply**:  There is no evidence that IBM abandoned Project Monterey, duped or deceived Santa Cruz or Caldera, or misused Santa Cruz's SVR4 code.  In any case, none of these allegations supports a claim by SCO of unfair competition.  (IBM's Reply Br. at 15-18.)

85.   [I.13]   SCO also alleges that IBM engaged in unfair competition by copying into IBM's AIX operating system code from the SVr4 operating system that had been included in Santa Cruz's UnixWare 7 product.  (Ex. 33 at Interrogatory Response No. 7.)  According to SCO, IBM obtained that code during the course of Monterey and its use of that code exceeded the scope permitted by the Monterey joint development agreement (the "JDA").  (Ex. 33 at Interrogatory Response No. 7.)

> **SCO's Response**:  SCO has alleged and has evidence of a broad array of fraudulent and deceptive conduct by IBM in connection with Project Monterey.  SCO's unfair competition claim concerning Project Monterey is not merely for "use of code outside the scope of a license."  (See above ¶¶ I.11-I.12; SCO AMF ¶¶ S.25-S.74.)

> **IBM's Reply**:  Following the *Novell* decision, SCO's unfair competition claim is limited to Project Monterey, and the specific allegations disclosed in SCO's interrogatory responses.  There is no evidence that IBM engaged in fraud or deceit.  Nor does SCO have standing to pursue such a claim against IBM concerning Project Monterey.  (IBM's Reply Br. at 15-20.)

86.   [I.14]   Santa Cruz was aware of the allegedly improper inclusion of Santa Cruz code in AIX for Power by August 2000.  (Ex. 227 ¶ 16; see also Exhibits to the Declaration of Todd M. Shaughnessy in support of IBM's opposition to SC0's Motion for Leave to File a Third Amended Complaint (Docket # 345).)

**SCO's Response**:  SCO disputes that Santa Cruz was aware by August 2000 that IBM had improperly included Santa Cruz code in AIX for Power.  Neither Santa Cruz nor SCO knew, or had reason to know, of IBM's improper inclusion of Santa Cruz code in AIX for Power until 2004, or at the least March 2001.  (SCO AMF ¶¶ S.70-S.72.)

**IBM's Reply**:  The Santa Cruz officer in charge of Project Monterey had actual knowledge that IBM included the SVr4 code in AIX for Power as early as August 2000, and his knowledge is imputed to the company.  (IBM's Reply Br. at 7.)  That SCO's declarants purport not to have had personal knowledge of the allegedly improper inclusion of Santa Cruz code in AIX for Power by August 2000 does not show otherwise.

87.    [I.15]   SCO alleges that IBM began copying Santa Cruz code obtained through Project Monterey into AIX in October 2000.  (See Ex. 41 at Interrogatory Response No. 8.)  In an expert report submitted on behalf of SCO, Dr. Christine Botosan writes "I have been asked to assume that IBM engaged in unfair competition by misusing code provided in Project Monterey to strengthen IBM's proprietary AIX product.  I have been told that the disgorgement of IBM's subsequent AIX profits is an appropriate remedy for such unfair competition and that the date from which disgorgement should begin is October 1, 2000."  (Ex. 171 at 3-4.)

**SCO's Response**:  SCO does not dispute that IBM began distributing the SCO code copied into AIX for Power beginning in October 2000.  However, the October 2000 distribution was a beta test primarily limited to certified software developers, with no public "generally available" distribution until May 2001.  (SCO Ex. 289; IBM Ex. 229 at 30:12-15, 30:22-31:10, 33:8-23,107:21-32; SCO Ex. 229; SCO Ex. 82 at 3-4.)

**IBM's Reply**:  SCO's response is beside the point of the IBM's asserted fact.

88.    [I.18]   Both IBM and Santa Cruz were interested in attempting to leverage and strengthen their existing UNIX-like operating system products as part of Project Monterey.  The goal was to develop and market a "family" of UNIX-like operating system products, including a "Monterey/64" version for the IA-64 Intel processor, a version to run on IBM's proprietary "Power" processor architecture and a version to run on the IA-32 architecture.  (Ex. 23; Ex. 24; Ex. 25; Ex. 245.)

**SCO's Response**:  The JDA contemplated the use of Santa Cruz's expertise and technology, particularly its SVr4 and UW7 codes, only for development of the defined "IA-32 Product" and an "IA-64 Product" (IBM Ex. 245 at §§ 1.9, 1.10) – and not the use of Santa Cruz's expertise and technology, particularly its SVr4 and UW7 codes, for development of an operating system "version to run on IBM's proprietary 'Power' processor architecture."

> **IBM's Reply**:  SCO's assertion is unsupported by the cited evidence.  In any case, the assertion is immaterial to the present motion for summary judgment.

89.   [I.20]   In furtherance of IBM and Santa Cruz's intention to create a compatible family of products, both companies granted licenses to the other.  (Ex. 245.)  For its part, IBM granted Santa Cruz a royalty-free license to certain AIX source code for Santa Cruz's use in its UnixWare product for the existing 32-bit Intel processor.  (Ex. 245 §2.0(c)(2).)  In turn, Santa Cruz granted IBM a royalty-free license to certain UnixWare source code for IBM's use in its AIX operating system tailored to run on IBM's Power architecture processor. (Ex. 245 §2.0(d)(2); Ex. 227 ¶ 16.)  Each party also granted the other a license to use any code supplied during Project Monterey for the development of the operating system that would be marketed for use on the forthcoming IA-64 product.  (Ex. 245 §§ 2.0(c)(2), 2.0(d)(2).)

> **SCO's Response**:   Section 2.0(d)(2) of IBM Exhibit 245 was not, however, the final agreement between the parties on this point.  The JDA was subsequently modified by Supplement B to make clear the licenses were "to be used solely for development of the IA-64 Product" and that IBM would <u>not</u> receive a royalty-free license to any UnixWare source code for IBM's use in its AIX for Power operating system unless and until Release 1 of the IA-64 Product was released.  The JDA and Supplement B were then further clarified by Amendment 5 which in effect defined "Release 1" to be a "Generally Available" product release.  (SCO Ex. 81 at § 4 (JDA Supplement B); SCO Ex. 85 at 1710013964 (JDA Amendment 5)) (any release prior to "Generally Available" defined as "Pre-Release").

90.   [I.23]   Section 15.2 of the JDA, entitled "Change of Control," provides:

> Notwithstanding Section 15.1, IBM shall have the right to terminate this Agreement immediately upon the occurrence of a Change of Control of SCO which IBM in its sole discretion determines will substantially and adversely impact the overall purpose of the cooperation set forth by this Agreement and applicable Project Supplements or will create a significant risk or material and adverse exposure of IBM's confidential and/or technical proprietary information (which is subject to, and to the extent of, confidentiality restrictions) ("Information").   For the purposes of this Agreement, control shall be deemed to be constituted by rights, contract or any other means which, either separately or jointly and having regard to the consideration of fact or law involved, confer the possibility of exercising decisive influence (other than by an entity currently exercising such influence or any entity controlled by or controlling such entity) on SCO by:  (1) owning more than half the equity, capital or business assets, or (2) having the power to appoint more than half of the members of the supervisory board, board of directors or bodies

legally representing SCO, or (3) having the right to directly manage SCO's business activities.

(Ex. 245.)

> **SCO's Response**: IBM deceived Santa Cruz and SCO into believing that IBM would not invoke this provision and would continue the Monterey venture after the closing of the Santa Cruz-SCO transaction. (SCO AMF ¶¶ S.61-S.68.)

> **IBM's Reply**: SCO's assertion is unsupported by the cited evidence. In any event, SCO lacks standing to pursue a claim for breach of the Project Monterey agreement, which IBM terminated as expressly permitted by the JDA. (IBM's Reply Br. at 18-20.)

91.    [I.24]   Section 22.12 of the JDA, which is entitled "Assignment," provides, in part: "Neither party may assign, or otherwise transfer, its rights or delegate any of its duties or obligations under this Agreement without the prior written consent of the other party." (Ex. 245.)

> **SCO's Response**: IBM deceived Santa Cruz and SCO into believing that IBM intended to consent to the assignment and continue the Monterey venture with Caldera after the closing of the Santa Cruz-Caldera transaction. (SCO AMF ¶¶ S.61-S.68.)

> **IBM's Reply**: SCO's assertion is unsupported by the cited evidence. In any event, SCO lacks standing to pursue a claim for breach of the Project Monterey agreement, which IBM terminated as expressly permitted by the JDA. (IBM's Reply Br. at 18-20.)

92.    [I.25]   Section 22.3 of the JDA, which is entitled "Choice of Law/Venue", provides:

> This Agreement shall be governed by, and the legal relations between the parties hereto shall be determined in accordance with, the substantive laws of the State of New York, without regard to the conflict of law principles of such State, as if this Agreement was executed and fully performed within the State of New York. Each party hereby waives any right to a trial by jury in any dispute arising under or in connection with this Agreement, and agrees that any dispute hereunder shall be tried by a judge without a jury. Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York.

(Ex. 245.)

**SCO's Response**:  SCO disputes that this provision is relevant to SCO's unfair competition claim.

**IBM's Reply**:  Section 22.3 of the JDA applies to SCO's unfair competition claim.  Section 22.3 expressly governs "[a]ny legal or other action related to a breach of this Agreement", and SCO's unfair competition claim is directly "related to" such an alleged breach.  SCO specifically asserts that "[a]s a result of the formal agreement between SCO and IBM and the numerous representations made by IBM that were calculated to be relied upon by SCO, IBM had a fiduciary obligation to SCO that required IBM to be forthright and truthful in all affairs related to the partnership relationship". (¶ 1l(c).)  Thus, SCO itself identifies the basis of its unfair competition claim as IBM's alleged breach of a duty that purportedly arose from the JDA.

93.    [I.26]  Although development of the Project Monterey IA-64 operating system proceeded throughout 1999 and 2000, the project encountered substantial difficulties due to delays in Intel's IA-64 processor development schedule.  Intel's release of the initial Intel IA-64 processor, code-named "Merced" and officially named Itanium, was substantially delayed.  In 1995 and 1996, executives of Itanium co-developer HP hinted that the processor was well underway, and might ship as early as 1997.  That date came and went, and eventually 1999 was stated as the target.  But that date also came and went.  Itanium did not end up shipping until mid-2001.  (Ex. 22; Ex. 186 ¶ 57; Ex. 394.)

**SCO's Response**:  These delays did not justify IBM's decision to drop the UNIX-based Monterey solution in favor of its Linux strategy, its breaches of fiduciary duties, or IBM's misappropriation of Santa Cruz's SVr4 code.  (SCO AMF ¶¶ S.25-S.74.)

**IBM's Reply**:  SCO's response is unsupported by admissible evidence.  There is no evidence that IBM dropped Project Monterey in favor of Linux or concealed such a decision, possessed or breached any fiduciary duty to SCO, or misappropriated SCO's code.  (IBM's Reply Br. at 11-18.)  In any case, none of these allegations, even if true, gives rise to a claim for unfair competition by SCO against IBM.

94.    [I.27]  Once Itanium did arrive, it performed poorly relative to alternatives in the marketplace.  As a result, Intel and HP re-positioned it as primarily an evaluation and development platform, a precursor to the second-generation Itanium 2 "McKinley" release that would enable true production deployments.  Neither IBM nor Santa Cruz had any involvement in – or control over – the development of the Itanium processor.  (Ex. 26; Ex. 28; Ex. 186 ¶ 58.)

**SCO's Response**:  These performance deficiencies did not justify IBM's concealment of its decision to drop the UNIX-based Monterey solution in favor of its Linux strategy, its breaches of fiduciary duties, or IBM's misappropriation of Santa Cruz's SVr4 code.  (SCO AMF ¶¶ S.25-S.74.)

**IBM's Reply**:  SCO's response is unsupported by admissible evidence. There is no evidence that IBM dropped Project Monterey in favor of Linux or concealed such a decision, possessed or breached any fiduciary duty to SCO, or misappropriated SCO's code.  (IBM's Reply Br. at 11-18.)  In any case, none of these allegations, even if true, gives rise to a claim for unfair competition by SCO against IBM.

95.    [I.28]   In addition to creating development difficulties, these delays caused a decrease in market interest and confidence in the forthcoming IA-64 product and thereby the IA-64 operating system then under development by IBM and Santa Cruz.  (Ex. 26; Ex. 28; Ex. 186 ¶ 59.)

**SCO's Response**:  These performance deficiencies did not justify IBM's concealment of its decision to drop the UNIX-based Monterey solution in favor of its Linux strategy, its breaches of fiduciary duties, or IBM's misappropriation of Santa Cruz's SVr4 code.  (SCO AMF ¶¶ S.25-S.74.)

**IBM's Reply**:  SCO's response is unsupported by admissible evidence. There is no evidence that IBM dropped Project Monterey in favor of Linux or concealed such a decision, possessed or breached any fiduciary duty to SCO, or misappropriated SCO's code.  (IBM's Reply Br. at 11-18.)  In any case, none of these allegations, even if true, gives rise to a claim for unfair competition by SCO against IBM.

96.    [I.29]   Despite the delays in the launch of the IA-64 processor, in late April 2001, IBM and Santa Cruz announced the first release of AIX 5L for the IA-64 processor on May 4, 2001.  (Ex. 593; Ex. 594; Ex. 595.)  That release occurred as scheduled. (Ex. 10 ¶ 236; Ex. 259 at 44.)

**SCO's Response**:  SCO disputes that the so-called "release" of that product – which had no compiler and no support – constituted a "release," and contends that this was a mere pretext by which IBM attempted to deceive Santa Cruz and SCO into believing that IBM had earned the right to use SVr4 code in AIX for Power.  (SCO AMF ¶¶ S.49-S.60.)

97.    [I.31]   Santa Cruz did not obtain IBM's prior written consent to an assignment of the JDA.  Instead, Santa Cruz informed IBM of the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera in a letter dated June 6, 2001.  (Ex. 244.)

**SCO's Response**:  IBM deceived Santa Cruz and SCO into believing that IBM would consent.  (SCO AMF ¶¶ S.61-S.68.)

**IBM's Reply**:  SCO has not tendered any admissible evidence of deceit. Nor would the alleged deceitful conduct give rise to an unfair competition claim by SCO against IBM.  (IBM's Reply Br. at 15-18.)

98.     [I.32]   IBM declined to consent to the assignment of Santa Cruz's rights and obligations under the JDA.  Pursuant to Section 22.12 of the JDA, IBM's consent was necessary for such assignment to take effect.  On the contrary, IBM invoked its right to cancel the JDA under Section 15.2 in a letter dated June 19, 2001.  (Ex. 220.)

> **SCO's Response**:  IBM deceived Santa Cruz and SCO into believing that IBM would consent and would continue with Project Monterey.  (SCO AMF ¶¶ S.61-S.68.).
>
> **IBM's Reply**:  SCO has not tendered any admissible evidence of deceit.  Nor would the alleged deceitful conduct give rise to an unfair competition claim by SCO against IBM.  (IBM's Reply Br. at 15-18.)

99.     [I.33]   Caldera did not acquire Santa Cruz, which continued in business, albeit changing its corporate name to "Tarantella."  (Ex. 244.)

> **SCO's Response**:  Santa Cruz transferred to Caldera its SVr4 code and its unfair competition claims against IBM.  (SCO Ex. 113 at § 1.4; SCO Ex. 114 at ¶¶ 1-9; SCO Ex. 30 at ¶ 2; SCO Ex. 115 at § 1.)
>
> **IBM's Reply**:  The litigation rights that purportedly were transferred to SCO when it purchased Santa Clara's UNIX related assets govern only intellectual property claims.   The assignment does not include the assignment of rights for business torts such as SCO's claim that IBM breached an alleged fiduciary duty by not disclosing to Santa Cruz that it purportedly intended to abandon Project Monterey and instead support Linux.
>
> Because SCO was not a party to the JDA and it has not come forward with any evidence that it was assigned the rights to sue for an alleged breach of a fiduciary duty related to that JDA, it does not have standing to assert that claim.  (IBM's Opening Br. at 21-23.)

100.    [I.35]   SCO has not adduced – and cannot adduce – any evidence to show that IBM engaged in unfair competition, despite three orders of the Court requiring SCO to disclose all such evidence.

> **SCO's Response**:  SCO has come forward with more than ample evidence that IBM engaged in unfair competition.  (SCO AMF ¶¶ S.25-S.74).
>
> **IBM's Reply**:  SCO's purported additional facts are immaterial and/or unsupported by admissible evidence.

**Section 3**

**DISPUTED ADDITIONAL FACTS FROM SCO'S OPPOSITION**

101.    [S.23]  The JDA was an agreement to create an enterprise for profit; it provided for mutual contributions of property and other resources; it called for a measure of joint control over the enterprise; and it required sharing of profits and losses.  (IBM Ex. 245 (JDA) at Preamble and §§ 2.0(a), 4.0, 5.1, 8.0-8.11, 11.3, 12.0-12.5; Ex. 81 (JDA Supplement B) at § 4 and Attachments 3 and 4.)

> **IBM's Response**:  IBM and Sana Cruz unambiguously agreed not to form a joint venture or partnership as stated in Section 22.5 of the JDA, which provides:  "This Agreement shall not be construed to establish any form of partnership, agency, franchise or joint venture of any kind between SCO and IBM, nor to constitute either party as an agent, employee, legal representative, or any other form of representative of the other.  This Agreement shall not be construed to provide for any sharing of profits or losses between the parties."  (IBM Ex. 245, § 22.5.)

> **SCO's Reply**:  IBM's response does not rebut any of the facts in this paragraph.  These facts reflect the economic realities of the relationship created by the JDA, rather than mere labels.  (See SCO Opp'n Br. at 36-37 n.6 ("Although the JDA contains a provision disclaiming an intent to form a joint venture, the courts look to economic realities and disregard labels when the agreement as a whole and surrounding facts show an intent to create such a relationship.  Moreover, a fiduciary relationship arises 'in all cases in which influence has been acquired and abused,' even if the business relationship is less than a joint venture.") (citations omitted).)

102.    [S.24]  Consistent with that arrangement, IBM repeatedly referred to SCO as a "partner" during the course of Project Monterey:

> a.    On May 6, 1998, IBM stated its intent to form a "tight partnership with SCO."  (Ex. 189 at 1710117588 (emphasis added).)

> b.    In 2000, one IBM employee cautioned:  "we need to recognize that we must treat [SCO] as we would another business partner and follow the appropriate rules and laws regarding . . . competitive issues." (Ex. 218 at 181427972 (emphasis added).)

> c.    Even as late as 2002, IBM discussed internally that "due to our partnership with SCO, we have been able to make AIX closer to SVR4 as best we can."  (Ex. 205 at 181017195 (emphasis added).)

> **IBM's Response**:  As stated above, the parties unambiguously agreed not to form a joint venture or partnership.  (IBM Ex. 245, § 22.5.)

> **SCO's Reply**: As above, IBM's response does not rebut any of SCO's facts, and the law looks to the realities, rather than to the labels, of the parties' relationship.

103.   [S.25] As the evidence cited in the following paragraphs will show, IBM, in disregard of its partnership and confidentiality obligations to SCO, secretly transitioned its efforts and focus away from Project Monterey – while continuing the pretext of support and publicly proclaiming its continued commitment to the project.  This was because, after entering into Project Monterey, IBM decided that a competing system, Linux, rather than the Project Monterey Operating System, offered a more profitable entryway for IBM into the UNIX-on-Intel market.  Yet IBM could not overtly withdraw from Monterey without raising legal issues and forfeiting the opportunity to obtain needed SVr4 code for free.

> **IBM's Response**:  The assertions in this paragraph are made without evidentiary citation or support.  SCO cites no evidence that IBM had or disregarded confidentiality obligations to SCO; secretly transitioned away from Project Monterey while feigning support of the project; or impermissibly terminated Project Monterey to pursue Linux.

> **SCO's Reply**:  This paragraph summarizes the facts set forth with extensive evidentiary citation and support in the ensuing paragraphs S.26 to S.75.

104.   [S.34] Notwithstanding these recommendations and predictions, IBM did not "drop Monterey" – at least not publicly and not to SCO.  (Ex. 17 at ¶ 10; Ex. 354 at ¶ 15; Ex. 362 at ¶ 14.)  Rather, without telling SCO, IBM continued to string Monterey along while it tried "to make Linux scale up as quickly as possible."  (Ex. 235 at 181668964.)  By June 2000, the IBM Academy of Technology OS Consultancy recommended a "significant reduction in emphasis" in Monterey and that IBM "should further develop for Monterey only what is in common with Power."  (Ex. 239 at 181291944 (emphasis added).)

> **IBM's Response**:  IBM did not string along Project Monterey to gain access to the SVr4 code.  Instead, the evidence that SCO cites to support this claim demonstrates nothing more than the fact that IBM was aware of and sensitive to its contractual obligations to Santa Cruz (not SCO) with respect to the SVr4 code.  (See, e.g., SCO Exs. 96, 198, 371.)  Moreover, the alleged stringing along of Santa Cruz does not amount to unfair competition actionable by SCO.

> **SCO's Reply**:  The documents cited in IBM's response show, among other things, that IBM personnel were aware that "SCO has the rights to all the code if we cancel the project" (Ex. 96), that IBM personnel "believe[d] the SCO agreement states that if we don't ship the code when we GA [i.e., make 'generally available'] Monterey, we will lose rights to the code" (Ex. 198), and that in evaluating its strategic alternatives, IBM recognized that one of the "Cons" of a strategy in which it overly "Drop[ed] UnixWare from the Project Monterey line and fulfill[ed] the

'low end' need with . . . IBM Monterey Linux" – thus "eliminat[ing]" SCO – was that it would result in "Loss of access to UNIX SVR4/5 technologies for Monterey product line (if SCO does not accept shift to Linux business)" (Ex. 371). Taken together with the evidence of IBM's pretextual, non-functional beta-test version of the Monterey product (described in SCO AMF ¶¶ S.49-S.60), the evidence show that IBM did string along Project Monterey to gain access to the SVr4 code. IBM's assertion that "the alleged stringing along . . . does not amount to unfair competition" is a legal argument that does not rebut any of the facts set forth in this paragraph or elsewhere.

105.   [S.44] IBM acknowledged SCO's intellectual property rights in SVR4 when it twice sought – but failed – to obtain from SCO – the right to use SVR4 code in AIX for Power without a Release 1 of the IA-64 Product.

   a.   In March 1999, IBM proposed an Amendment 2 to the JDA, which would have given IBM the right, among other things, to use SVr4 source code without royalties (and without a Release 1 of the IA-64 Product) in AIX for Power. However, this proposed amendment was never signed as the parties could never agree upon final terms. (Ex. 94.)

   b.   From about March through October 1999, by proposing a Supplement C, IBM again attempted to obtain the right to use SVr4 source code in AIX for Power prior to Release 1 of the IA-64 Product. (Ex. 296 at SCO1241726; Ex. 297 at 181506932.) Internally, IBM acknowledged that Supplement C was "for licensing UW7 technology to AIX in advance of the license we would get from Monterey." (Ex. 297 at 181506932.) SCO viewed the draft Supplement C and the nature of the negotiations as an "end around" SCO's right to certain royalties for the IA-64 Product. (Ex. 299 at SCO1234593; Ex. 298 at SCO1234593; Ex. 297 at 181506932.) Again, this agreement was never signed because the parties could not agree upon the terms. (Ex. 354 ¶¶ 10-11 and Ex. A thereto).)

   **IBM's Response**:  The fact that IBM allegedly considered entering an agreement with SCO regarding the IA-64 product, but then did not, does not show that IBM "affirmatively indicated approval" of the SCO-Santa Cruz transaction as SCO alleges.  (SCO ¶ 64.)

   **SCO's Reply**:  IBM's response does not rebut any of the facts in this paragraph.

106.   [S.49] IBM's "solution" to the problem of the SVr4 code was to put out a pretextual, non-functional PRPQ of the Monterey product, and then quickly terminate the Monterey agreement, leaving IBM with the valuable code and SCO with nothing, as set forth below. Contrary to JDA § 3.0, and for the purpose of sowing confusion, IBM unilaterally branded the so-called Monterey product "AIX 5L for IA-64" or "AIX 5L for Itanium."

**IBM's Response**:  The May 2001 release of the Monterey product was not a "sham," and SCO has not offered any evidence showing that it was.  In fact, the evidence cited by SCO actually undermines its position, as explained in IBM's reply brief.  (IBM's Reply Br. at 16-17.)  In any case, the release of an alleged sham PRPQ would not give rise to an unfair competition claim by SCO against IBM.

**SCO's Reply**:  IBM's conclusory denial and citation to is legal brief do not rebut any of the facts set forth in this paragraph or in paragraphs S.50 to S.60 showing that the May 2001 release of the Monterey product was a sham and that, as stated by IBM's Ron Saint Pierre on November 1, 2001, "Monterey has not gone GA [generally available] and never will."  (Ex. 86 at 1710066677.)  IBM's assertion that "the release of an alleged sham PRPQ would not give rise to an unfair competition claim" is a legal argument that does not rebut any of the facts set forth in this paragraph or elsewhere.

107.  [S.63]  Although IBM thus had notice of the pending transaction for almost a year, IBM never told Santa Cruz or Caldera that it would not consent to the assignment of the JDA from Santa Cruz to Caldera.  IBM's consent was important because, under Section 15.2 of the JDA, IBM was able to cancel the JDA in the event of a change of control.  IBM led Santa Cruz and Caldera to believe that it would not cancel their joint efforts and, in fact, IBM sought and obtained assurances from Ransom Love and David McCrabb, the named CEO and COO of the new company, that they would continue to support Project Monterey.   (Ex. 290, Ex. 334 at 181671481; Ex. 354, ¶¶ 12-13; Ex. 362, ¶¶ 10-11; Ex. 356 ¶ 6.)

**IBM's Response**:  IBM did not conceal its intention to withhold consent to the assignment of the JDA, as explained in IBM's reply brief.  (IBM's Reply Br. at 17.)  In an email to a senior SCO employee dated June 19, 2001, a Santa Cruz employee stated that IBM's decision not to consent to the assignment "should come as no surprise to us, as Ron [Lauderdale of IBM] had told Benoy [Tamang of SCO] and me way back when that this would probably be the case".  (IBM Ex. 619.)

**SCO's Reply**:  IBM's reliance on a single e-mail from a Santa Cruz employee, Steve Sabbath, about what "Ron had told Benoy and me way back when" does not support IBM's position.  In the portion of the e-mail not quoted by IBM, the Santa Cruz employee states:  "Ron [Lauderdale of IBM] pointed out that the work done under the former SCO-IBM contract had been done, and all that remains is licensing rights and royalties.  Ron said that if any future work (e.g. joint development) was to be done by Caldera and IBM, his preference was to enter a new and updated contract.  Off the top of my head, then, I don't see that this refusal causes any issues. . . .  I do think that if IBM wants to be cute, there may be some red tape to work through, but I do think that there is always going to be a route that can be found."  (IBM Ex. 619.)  As this portion of the e-mail indicates, whatever he had been told "way back when" did not lead him to

conclude that IBM intended to discontinue its support of Project Monterey.

108.    [S.69]  As part of the May 2001 transaction in which Caldera/SCO acquired the UNIX business and assets, Santa Cruz assigned to SCO all of Santa Cruz's "right, title, and interest" in the Contributed Assets, which consisted of Santa Cruz's entire UNIX business, including the SVr4 code that IBM misappropriated into AIX for Power.  (Ex. 113 at § 1.4; Ex. 114 ¶¶ 1-9; Ex. 30 ¶ 2; Ex. 115 at § 1).  SCO also acquired all of Santa Cruz's "rights and privileges pertaining to" this intellectual property, including all "rights to enforce confidentiality or similar obligations" in relation to the code, "the right, if any, to sue or bring other actions for past, present and future infringement thereof," and "any and all other forms of intellectual property right or proprietary right recognized anywhere in the world."   (Ex. 115 (IP Assignment) at §§ 1(v)-(vii).)

> **IBM's Response**:  Santa Cruz lacked authority to transfer all of its rights under Project Monterey.  SCO never was a party to the JDA and does not have any rights to sue for a breach of that contract.  (IBM's Opening Br. at 21-23.)  Any assignment SCO obtained from Santa Cruz was not legally enforceable, and does not provide SCO with standing to assert its proposed Monterey claim.  The IP Assignment governs only intellectual property claims.  It does not include the assignment of rights for business torts such as SCO's claim that IBM breached an alleged fiduciary duty by not disclosing to Santa Cruz that it purportedly intended to abandon Monterey and instead support Linux.
>
> **SCO's Reply**:  IBM's response consists solely of legal argument without citation to record evidence and does not rebut any of the facts set forth in this paragraph or elsewhere.

109.    [S.70]  SCO was not aware of IBM's duplicity in March 2001.  (Ex. 354 ¶¶ 16-18; Ex. 362 ¶ 15).  At this time, SCO's management did not know, and had no reason to know, that IBM had placed SCO's SVr4 code into AIX 5L for Power.  SCO also did not know then that IBM had abandoned Project Monterey, that IBM had no intent of issuing a generally available Monterey product, or that IBM was solely interested in deceptively securing the rights to SCO's SVr4 code for other products.  SCO had no reason to suspect IBM's malfeasance until April-June 2001, when IBM announced and delivered both its first "generally available" release of AIX 5L for Power containing SVr4 code and the premature PRPQ of the Project Monterey operating system, promptly followed by the cancellation of the JDA.  (Ex. 354 ¶¶ 16-18; Ex. 362 ¶ 15; Ex. 351¶ 16; Ex. 17 ¶ 10).

> **IBM's Response**:  SCO's citations do not evidence duplicity or deception.  Nor do they show that IBM abandoned Project Monterey or had no intent of issuing a Project Monterey product.   IBM has offered unrefuted evidence that at least one Santa Cruz executive was aware of the allegedly improper inclusion Santa Cruz code in AIX for Power by August 2000.  (IBM's Opening Br. ¶ 14.)

**SCO's Reply**:  IBM's duplicity and deception are evidenced throughout SCO's Statement of Additional Material Facts (*see* ¶¶ S.25-S.75), and IBM's conclusory denial lacks citation or support.  IBM's assertion that it has "offered unrefuted evidence" is false.  IBM's proffered evidence is refuted by the evidence set forth in paragraphs S.70 to S.72.

110.    [S.71] IBM incorrectly asserts that SCO was aware of the allegedly improper inclusion of the SVr4 code in AIX for Power by August 2000.

a.    The <u>first document</u> IBM relies on is a February 2000 presentation prepared by SCO in which SCO spoke <u>prospectively</u> about the Project Monterey roadmap and accurately reflected the agreement and intent of the parties that <u>after</u> a generally available Release 1 of the IA-64 product, then SVr4 code would be used to enhance AIX for Power.  (Ex. 292.)

b.    The <u>second document</u> IBM relies on is an August 11, 2000 internal Santa Cruz email circulating an IBM press release that opens with the announcement IBM would be releasing versions of AIX 5L for Power (IBM's own proprietary system) and AIX 5L for IA-64 (IBM's name for the jointly developed Project Monterey Operating System).  Contrary to IBM's assertion that it "makes clear" SVr4 was in AIX for Power, the release only speaks generally of AIX 5L without distinguishing between the Power and IA-64 architectures. (Ex. 293.)

c.    The <u>third document</u>, a May 2, 2001 webpage screenshot is equally unclear in its reference to "AIX 5L" and does not distinguish between the two architectures.  In any event, May 2001 is after March 2001 and thus is within two years of the date on which SCO filed this suit.  (Ex. 294.)

d.    The <u>fourth document</u>, is an undated (but from the context apparently late Summer 2000) outline which purports to summarize differences between AIX for Power and AIX for IA-64, and is claimed to show that the SVr4 print subsystem is in both offerings.  To the contrary, the stand-alone bullet point "SVR4 subsystem" does not clearly indicate that it is in the AIX for Power product and, moreover, in the context of statements on the second page of the memorandum noting print subsystem differences, the meaning of this bullet point is ambiguous at best.  (Ex. 295.)

e.    Finally, SCO had no knowledge of the industry reports IBM points to, which were not widely circulated at the time and were not sent to SCO.  (Ex. 354 ¶ 19; Ex. 362 ¶ 16.)

**IBM's Response**:  Santa Cruz was aware of the allegedly improper inclusion of Santa Cruz code in AIX for Power by August 2000. (Ex. 227 ¶ 16; see also Exhibits to the Declaration of Todd M. Shaughnessy in support of IBM's opposition to SCO's Motion for Leave to File a Third Amended Complaint (Docket# 345).)  The Santa Cruz officer in charge of Project Monterey had such knowledge as early as August 2000 (IBM's Opening Br. at ¶ 14), and his knowledge is imputed to the company.

While SCO attempts to create a dispute as to its knowledge through the declarations of three individuals who state that they did not personally know that IBM included the SVr4 code in AIX for Power in 2000 (SCO ¶ 70), those individuals cannot testify as to what others at the company knew in 2000.

**SCO's Reply**: IBM's suggestion that a September 2006 statement obtained by IBM of a single former Santa Cruz employee (IBM Ex. 227) is somehow "imputed to the company" is incorrect. In a case that IBM itself cites (IBM Reply Brief at 7), the court confirmed that "[t]he question of imputation of knowledge is a question of fact which must be resolved in light of all the circumstances of the case." Seward Park Hous. Corp. v. Cohen, 734 N.Y.S.2d 42, 51 (N.Y. App. Div. 2001) (quoting Cohen v. Hallmark Cards, Inc., 382 N.E.2d 1145, 1148-49 (N.Y. 1978)). Moreover, even if the former employee's September 2006 statement about what he knew in August 2000 is credited, it does not refute the evidence set forth in paragraphs S.70 to S.72. In addition, SCO objects to the extent that IBM's citation to "Exhibits to the Declaration of Todd M. Shaughnessy in support of IBM's opposition to SCO's Motion for Leave to File a Third Amended Complaint" refers to documents that were not submitted as part of IBM's summary judgment motion. See DUCivR 56-1(f).

111. [S.76] SCO was damaged by IBM's concealment of its intention to cancel Project Monterey, from IBM's misappropriation of the SVr4 code, and the subsequent cover-up. IBM benefited greatly from that misconduct. SCO expert Marc Rochkind has described the substantial SVr4 technology that IBM misappropriated and put into its AIX for Power operating system. (Ex. 287 at 152). IBM's improper actions, which enhanced AIX for Power and gave rise to a free-of-charge Linux operating system that directly competed with SCO's own proprietary operating systems, greatly harmed SCO's business and its ability to compete. (Ex. 281 at 62-68; Ex. 284 at 47-56; Ex. 286 at 20-26.) SCO's damages from IBM's wrongful action are set forth in detail in the expert report and rebuttal report of Christine Botosan (Ex. 270 at 3-4, 10-12; Ex. 272 at 8-9, 24-25) and the rebuttal report of Gary Pisano (Ex. 286 at 76-77), which are incorporated herein by reference.

**IBM's Response**: IBM disputes that SCO was damaged, as explained in IBM's reply brief. (IBM's Reply Br. at 18 n.12.) SCO's only discussion of damages regarding its unfair competition claim is contained in the expert report of Christine Botosan. However, Ms. Botosan's discussion relates only to SCO's claim that IBM's use of the SVr4 technology in AIX for Power was improper, and her analysis is restricted to a calculation of the profits that IBM earned from that alleged misconduct. (SCO Ex. 270; SCO Ex. 286; SCO ¶ 76.) SCO's Mr. Pisano was offered as a rebuttal witness and thus could not properly be used to support an affirmative claim for damages. In any case, his report merely addresses the theoretical competitive advantage of greater compatibility with Solaris and makes no effort to show damages due to unfair competition. (SCO Ex. 286 at 76-77.)

**SCO's Reply**:  IBM's argumentative characterizations of SCO's damages evidence are incorrect.  The experts' opinions speak for themselves.  Mr. Pisano states, among other things:

> I understand that <u>IBM obtained certain SVR4 code</u> from SCO through Project Monterey, and <u>incorporated that code into AIX</u>.  I further understand that IBM used the code for the purpose of <u>enhancing AIX's affinity with Solaris</u>. . . .  It is my opinion that, in so far as this code enhanced AIX's affinity with Solaris, it was <u>highly valuable to IBM and key to IBM's AIX revenues</u>.

(Ex. 286 at 76-77 (emphasis added).)  IBM does not cite any authority for its contention that Mr. Pisano's opinion, disclosed to IBM on August 28, 2006, should not be admitted in support of SCO's unfair competition claim.

In addition, Ms. Botosan has calculated the appropriate measure of recovery due to SCO related to IBM's acts of unfair competition on the understanding that "disgorgement of IBM's subsequent AIX profits is an appropriate remedy for such unfair competition."  (Ex. 270 at 3-4.)

112.   [S.77]  SCO incorporates by reference the facts set forth in SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Eighth Counterclaim, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Contract Claims, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Interference Claims, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on IBM's Tenth Counterclaim, SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim, and SCO's Memorandum in Opposition to IBM's Motion for Summary on SCO's Copyright Claim.

**IBM's Response**:  SCO's incorporation by reference does not comply with the local rules and does not require a separate response.

**SCO's Reply**:  SCO reserves its rights to refer the materials set forth in paragraph S.77 in opposition to this motion.