UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE SCO GROUP, INC., A DELAWARE CORPORATION;<br><br>               Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>               Defendant. | **ORDER GRANTING IBM'S [782] MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>2:03-CV-00294-DN<br><br>District Judge David Nuffer |

This case arises out of the relationship between The SCO Group, Inc. ("SCO") and International Business Machines Corporation ("IBM") regarding IBM's production of its LINUX operating system. SCO held a majority of the UNIX-on-Intel market with its UNIX operating system in 1998 when IBM and SCO agreed to collaborate to produce a new operating system, Project Monterey. SCO claimed that IBM used this project to gain access SCO's UNIX source code and then copied thousands or millions of lines of that code into LINUX. Because LINUX was offered at no cost in the open-source community, it rapidly displaced UNIX, and SCO's UNIX sales rapidly diminished. SCO publicized the alleged copyright infringement and the alleged wrongs committed by IBM, and IBM argued that SCO's tactics were improper and in bad faith, and that it had the right to use any lines of code it added to LINUX. Previously in this litigation, many claims have been resolved. This order addresses SCO's unfair competition claim, granting summary judgment on that claim in favor of IBM.

1

# TABLE OF CONTENTS

Table of Contents ..................................................................................................................... 2
Case and Motion Background ................................................................................................... 2
Statement of Undisputed Facts ................................................................................................ 6
    A.    SCO's Unfair Competition Claim ................................................................. 7
    B.    SCO's Disclosures. ...................................................................................... 8
    C.    Background on SCO .................................................................................... 12
    D.    Background on IBM and the UNIX-on-Intel Market ......................................... 14
    E.    Project Monterey. ....................................................................................... 15
    F.    The Release of the Project Monterey Operating System ........................................ 25
    G.    IBM's Use of SCO's SVR4 Code in IBM Products ........................................... 26
    H.    The Acquisition of the UNIX Business by Caldera ............................................ 28
    I.    Status of Project Monterey in 2002 ................................................................. 29
Summary JUdgment Standard ................................................................................................. 30
Analysis ................................................................................................................................ 31
    A.    The Independent Tort Doctrine Bars Tort Claims  Where There Is An Express
        Contract Provision ..................................................................................... 32
    B.    SCO's Unfair Competition Claim Is Subsumed by Express Contractual
        Provisions Specifically Governing the SVr4 Code ............................................ 35
    C.    SCO Cannot Rely on the Utah Unfair Competition Act as a Basis for  an Unfair
        Competition Claim ..................................................................................... 38
    D.    SCO and IBM Entered Into an Arms-Length Contract and Did Not Create a Joint
        Venture, Partnership, or Any Other Form of Fiduciary Relationship................... 41
Conclusion ........................................................................................................................... 47
Order ................................................................................................................................... 47

# CASE AND MOTION BACKGROUND

This case has been assigned to multiple judges in the District of Utah since it was filed in

2003. The case was administratively closed by Judge Kimball on September 20, 2007 due to

SCO's filing for bankruptcy,[1] and on September 10, 2010, Judge Campbell denied SCO's

request to re-open the case to resolve two of the several pending motions.[2] SCO filed a motion to

reopen the case to resolve some pending motions,[3] and after the case was reassigned again, that

---

[1] Order Regarding Temporary Administrative Closure of Case, docket no. 1081, filed Sept. 20. 2007.

[2] Order, docket no. 1093, filed Sept. 10, 2010.

[3] The SCO Group, Inc.'s Motion to Reopen the Case, docket no. 1095, filed Nov. 4, 2011.

motion was denied with the intent of keeping the case closed during the bankruptcy.[4] On May 7, 2013, SCO filed a motion for reconsideration of that order.[5] Because IBM did not oppose this motion or the reopening of the case, SCO's motion was granted, the previous order denying the motion to reopen[6] was vacated, and the case was reopened on June 14, 2013.[7]

Following the resolution of separate litigation between Novell, Inc. ("Novell") and SCO,[8] SCO proposed that six of SCO's claims be dismissed with prejudice: breach of IBM Software Agreement (Count I), breach of IBM Sublicensing Agreement (Count II), breach of Sequent Software Agreement (Count III), breach of Sequent Sublicensing Agreement (Count IV), copyright infringement (Count V), and interference with the 1995 Asset Purchase Agreement at issue in the *Novell* case (Count VIII).[9] On July 22, 2013, IBM filed a motion for partial summary judgment regarding remaining claims based on the *Novell* judgment.[10] On December 15, 2014, partial summary judgment was granted in IBM's favor on IBM's counterclaims seeking a declaration of non-infringement of the copyrights to the pre-1996 UNIX source code (IBM's Counterclaims IX and X), and on SCO's unfair competition claim (Count VI) and tortious interference claims (Counts VII and IX) "insofar as they alleged that SCO, and not Novell, owns the copyrights to the pre-1996 UNIX source code and/or that Novell does not have the right to

---

[4] Memorandum Decision and Order Denying Motion to Reopen the Case, docket no. 1109, filed Apr. 24, 2013.

[5] The SCO Group, Inc.'s Motion for Reconsideration of the Court's Order Denying Motion to Reopen the Case, docket no. 1110, filed May 7, 2013.

[6] Memorandum Decision and Order Denying Motion to Reopen the Case, docket no. 1109, filed Apr. 24, 2013.

[7] Order Reopening Case and Vacating Prior Order, docket no. 1115, filed June 14, 2013.

[8] *SCO Group, Inv. v. Novell, Inc.*, Case No. 2:04-cv-00129-TS.

[9] Partial Judgment Dismissing SCO Claims, docket no. 1123, filed July 10, 2013.

[10] IBM's Motion and Memorandum for Partial Summary Judgment on the Basis of the Novell Judgment, docket no. 1126, filed July 22, 2013.

waive IBM's alleged breaches of the licensing agreements pursuant to which IBM licensed pre-1996 UNIX source code."[11]

On March 13, 2015, SCO and IBM filed a Joint Status Report[12] outlining the claims and motions that remain pending. SCO's only remaining claims are unfair competition (Count VI), tortious interference with a contract (Count VII), and tortious interference with prospective a business relationship (Count IX), all of which are challenged by summary judgment motions. IBM has eight pending counterclaims, seven of which are challenged by summary judgment motions.[13] This order addresses only SCO's unfair competition claim.

On September 25, 2006, IBM filed a motion for summary judgment on SCO's unfair competition claim,[14] followed shortly thereafter by a memorandum in support.[15] On November 11, 2006, SCO filed its opposition brief,[16] to which IBM replied on January 12, 2007.[17] The parties argued the motion before Judge Kimball on March 5, 2007.[18] Pursuant to a request in the

---

[11] Memorandum Decision and Order Granting in Part and Denying in Part IBM's Motion for Partial Summary Judgment on the Basis of the *Novell* Judgment, docket no. 1132, filed Dec. 15, 2014.

[12] Docket no. 1134, filed Mar. 13, 2015.

[13] IBM's pending counterclaims are breach of contract (Counterclaim I), a violation of the Lanham Act (Counterclaim II), unfair competition (Counterclaim III), intentional interference with prospective economic relations (Counterclaim IV), a violation of the New York State Unfair and Deceptive Trade Practices Act (Counterclaim V), breach of the General Public License (Counterclaim VI), promissory estoppel (Counterclaim VII), and copyright infringement (Counterclaim VIII). SCO has not challenged IBM's breach of contract counterclaim by dispositive motions.

[14] IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) ("IBM's Unfair Competition Motion"), docket no. 782, filed Sept. 25, 2006.

[15] IBM's Memorandum in Support of Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's Unfair Competition Memorandum"), docket no. 806, filed Sept. 29, 2006.

[16] Plaintiff/Counterclaim-Defendant SCO's Memorandum in Opposition to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) ("SCO's Unfair Competition Opposition"), docket no. 861, filed Nov. 11, 2006.

[17] IBM's Reply Memorandum in Further Support of Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's Unfair Competition Reply"), docket no. 947, filed Jan. 12, 2007.

[18] *See* Minute Entry, docket no. 974, filed Mar. 5, 2007.

March 2015 Joint Status Report[19] to supplement the older briefing, the parties were given the opportunity to provide five additional pages of authority.[20] On May 21, 2015, IBM filed its supplemental brief,[21] and SCO filed its supplement on June 5, 2015.[22]

A status conference was held on June 11, 2015 in which the parties gave brief educational and background summaries on the remaining claims and motions.[23] As part of this background presentation, both parties relied heavily on both Utah and New York case law, agreeing that there wasn't an important distinction in the bodies of law regarding this case and stipulating to the use of both. In that hearing, the parties also agreed to engage in settlement negotiations conducted by a magistrate judge, but were not amendable to a settlement conference when the magistrate judge attempted to arrange one.[24]

Having reviewed the parties' original and supplementary briefing as well as their oral argument before Judge Kimball, it is unnecessary to hold additional oral argument to decide this motion. Therefore, for the reasons stated more fully below, summary judgment is GRANTED in IBM's favor on SCO's unfair competition claim.

---

[19] Docket no. 1134, filed Mar. 13, 2015.

[20] *See* Docket Text Order, docket no. 1142, filed May 28, 205.

[21] IBM's Case Law Update with Respect to Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) and Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh and Ninth Causes of Action) ("IBM's Unfair Competition Supplement"), docket no. 1140, filed May 21, 2015.

[22] SCO's Response to IBM's Case Law Update with Respect to Its Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action) and Its Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh and Ninth Causes of Action) ("SCO's Unfair Competition Supplement"), docket no. 1144, filed June 5, 2015.

[23] *See* Minute Order, docket no. 1150, filed June 11, 2015.

[24] *See* Order Regarding Settlement Conference Referral, docket no. 1155, filed July 7, 2015.

## STATEMENT OF UNDISPUTED FACTS

The below collection of undisputed material facts is distilled from the above listed filings. IBM's Unfair Competition Memorandum provided a statement of facts[25] and separate supporting exhibits.[26] SCO's Unfair Competition Opposition responded to IBM's statement of facts[27] and provided a statement of additional facts[28] and its own set of exhibits. IBM's Unfair Competition Reply replied to SCO's responses to IBM's statement of facts[29] included a one-page addendum in which it objected to SCO's additional facts as lacking foundation and being otherwise irrelevant,[30] although no contradictory evidence was offered to rebut those facts as required under the Federal Rules of Civil Procedure. In the June 11, 2015 hearing, the parties agreed to reconcile the facts on IBM's Unfair Competition Motion and IBM's summary judgment motion[31] regarding SCO's interference claims.[32] The parties were ordered to reconcile the facts on IBM's Unfair Competition motion first, to be completed within 30 days; however, after seeking an extension, the parties failed to reconcile the facts as ordered. Determination of the undisputed facts has been made by the court.

---

[25] IBM's Unfair Competition Memorandum at 2–10.

[26] *See* Declaration of Todd M. Shaughnessy Filed Under Seal Pursuant to 9/16/03 Protective Order, Docket #38 ("IBM's First Exhibits"), docket no. 804, filed under seal on Sept. 25, 2006.

[27] SCO's Unfair Competition Opposition at 53–64, Appendix A: Response to IBM's "Statement of Undisputed Facts."

[28] *Id.* at 3–29.

[29] IBM's Unfair Competition Reply at Addendum A: IBM's Undisputed Facts: IBM Unfair Competition Brief.

[30] *Id.* at Addendum B: IBM's Objections to SCO's Alleged Evidence.

[31] IBM's Motion for Summary Judgment on SCO's Interference Claims (SCO's Seventh, Eighth and Ninth Causes of Action), docket no. 783, filed Sept. 25, 2006.

[32] *See* Minute Order, docket no. 1150, filed June 11, 2015.

The headings in this statement of facts are descriptive, not declaratory or substantive.

## A. SCO's Unfair Competition Claim.

1.      SCO filed its original Complaint, which included a claim for unfair competition, on March 6, 2003.[33] SCO's unfair competition claim repeated many of the allegations of its other causes of action, including a claim for misappropriation of trade secrets, but labeled those same allegations as "unfair competition."[34]

2.      On July 22, 2003, SCO filed an Amended Complaint.[35] In the Amended Complaint, SCO again asserted a claim for unfair competition, and again based that claim on much of the same alleged conduct that supported each of its other causes of action.[36]

3.      SCO thereafter sought, and was granted, permission to file a Second Amended Complaint.[37]

4.      SCO's Second Amended Complaint, filed on February 27, 2004, again included an unfair competition claim (the sixth cause of action), which remained an amalgamation of many of its other claims relabeled as "unfair competition."[38] In its Second Amended Complaint, SCO abandoned its claim for misappropriation of trade secrets altogether.[39] In fact, at a hearing on December 5, 2003, SCO acknowledged that there are no trade secrets in UNIX System V. Counsel for SCO stated: "There is no trade secret in UNIX system [V]. That is on the record. No problem with that."[40]

---

[33] Complaint, attached as Exhibit 1 to IBM's First Exhibits.

[34] *Id.* ¶ 118–19.

[35] Amended Complaint, attached as Exhibit 2 to IBM's First Exhibits.

[36] *Id.* ¶¶ 147–53.

[37] Second Amended Complaint, attached as Exhibit 3 to IBM's First Exhibits.

[38] *Id.* ¶¶ 181–88.

[39] *See generally id.*

[40] Transcript of Motion to Compel, dated Dec. 5, 2003, at 46:2–3, attached as Exhibit 414 to IBM's First Exhibits.

5.      SCO then sought and was granted leave to file a Third Amended Complaint to add a tenth cause of action.[41] SCO's tenth cause of action asserted that "IBM misappropriated, and used in its own 'AIX for Power' operating system, substantial copyrighted source code relating to UnixWare System V Release 4 ['SVr4']."[42] SCO further alleged that "IBM obtained access to the copyrighted UnixWare SVr4 code through 'Project Monterey'".[43]

6.      In a decision dated July 1, 2005, this Court denied SCO's motion to add a cause of action based upon IBM's alleged copying of code obtained through Project Monterey into AIX, stating that "the court finds that SCO has unduly delayed seeking leave to assert the proposed cause of action. It appears that SCO–or its predecessor–either knew or should have known about the conduct at issue before it filed its original Complaint."[44]

**B.  SCO's Disclosures.**

7.      IBM served interrogatories asking SCO to describe in detail its allegations and alleged evidence of misconduct by IBM.[45]

8.      With respect to SCO's unfair competition claim, IBM asked SCO to "describe, in detail, each instance in which plaintiff alleges that IBM engaged in unfair competition, including but not limited to: (a) the dates on which IBM allegedly engaged in unfair competition; (b) all persons involved in the alleged unfair competition; and (c) the specific manner in which IBM is alleged to have engaged in unfair competition."[46]

---

[41] Third Amended Complaint ¶¶ 217–41, attached as Exhibit 10 to IBM's First Exhibits.

[42] *Id.* ¶ 217.

[43] *Id.*

[44] Order at 4, filed July 1, 2005, attached as Exhibit 58 to IBM's First Exhibits.

[45] Defendant IBM's First Set of Interrogatories and First Request for the Production of Documents, attached as Exhibit 11 to IBM's First Exhibits.

[46] *Id.* at 4 Interrogatory No.7.

9.      Following IBM's motions to compel further discovery regarding SCO's allegedly incomplete disclosures regarding its allegations and evidence of IBM's alleged misconduct, the Court entered three different orders requiring SCO to provide detailed responses to IBM's Interrogatories.[47] In the final of those three orders, the Court set December 22, 2005, as the "final deadline for [SCO] to identify with specificity all allegedly misused material" and update its interrogatory responses accordingly.[48]

10.      Initially, SCO defined its unfair competition claim as a combination of each of its other causes of action, including its breach of contract claims, its tortious interference claims and its copyright claims.[49]

11.      SCO eventually focused its unfair competition claim upon allegations related to Project Monterey. Specifically, SCO alleges that:

a.      IBM made and continued to make investments in the development of LINUX, and secretly advanced and promoted development of LINUX without disclosing such activities to SCO, during and at a time when IBM was under a duty to deal fairly with and disclose such competing activities to SCO pursuant to its contractual obligations to SCO under Project Monterey and otherwise.[50]

---

[47] *See* Order Granting International Business Machine's Motions to Compel Discovery and Requests for Production of Documents, filed Dec. 12, 2003, attached as Exhibit 55 to IBM's First Exhibits; Order Regarding SCO's Motion to Compel Discovery and IBM's Motion to Compel Discovery, filed Mar. 3, 2004, attached as Exhibit 56 to IBM's First Exhibits; and Order, filed July 1, 2005, attached as Exhibit 58 to IBM's First Exhibits.

[48] Order, filed July 1, 2005, at 4, attached as Exhibit 58 to IBM's First Exhibits.

[49] *See* Plaintiff's Responses to Defendant's First Set of Interrogatories and First Request for the Production of Documents at 11 Interrogatory Response No.7, attached as Exhibit 31 to IBM's First Exhibits; Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories at 29-31 Supplemental Interrogatory Response No.7, attached as Exhibit 32 to IBM's First Exhibits; Plaintiff's Revised Supplemental Response to Defendant's First and Second Set of Interrogatories at 44-56 Supplemental Interrogatory Responses No.7 and 8, attached as Exhibit 33 to IBM's First Exhibits; SCO's Supplemental Response to Interrogatory No. 8 at 2-13 Supplemental Interrogatory Response No.8, attached as Exhibit 46 to IBM's First Exhibits.

[50] Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories at 29-31 Supplemental Interrogatory Response No.7, attached as Exhibit 32 to IBM's First Exhibits.

      b.     IBM's unfair competition arose from the relationship it established with SCO as a result of the joint effort between SCO and IBM known as "Project Monterey."[51]

      c.     As a result of the formal agreement between SCO and IBM and the numerous representations made by IBM that were calculated to be relied upon by SCO, IBM had a fiduciary obligation to SCO that required IBM to be forthright and truthful in all affairs related to the partnership agreement.[52]

      d.     IBM unfairly took advantage of its partnership relations with SCO, unfairly gained access to SCO's business relationships, and unfairly and knowingly diverted SCO's resources away from competition with IBM and toward the purposes of the relationship.[53]

      e.     During a substantial part of 1999, IBM was secretly developing plans to cease its planned strategic relationship with SCO and to begin supporting LINUX.[54]

12.     SCO alleges that "[b]ecause IBM has been developing its plan to replace UnixWare support with Linux support, and because it knew SCO had dedicated its entire enterprise resources to the IBM/UnixWare joint relationship, IBM had a fiduciary obligation to inform SCO of its Linux-related plans long before its Linux public announcement in December

---

[51] Plaintiff's Revised Supplemental Response to Defendant's First and Second Set of Interrogatories at 44-50 Supplemental Interrogatory Response No.7, attached as Exhibit 33 to IBM's First Exhibits.

[52] *Id.*

[53] *Id.*

[54] *Id.*

1999."[55] IBM made a public announcement of its intention to support LINUX at LinuxWorld in March 1999.[56]

13.    SCO also alleges that IBM engaged in unfair competition by copying into IBM's AIX operating system code from the UNIX System V Release Four ("SVr4") operating system that had been included in the Santa Cruz Operation's ("SCO" or "Santa Cruz")[57] UnixWare 7 product.[58] According to SCO, IBM obtained that code during the course of Project Monterey and its use of that code exceeded the scope permitted by the Project Monterey joint development agreement (the "JDA").[59]

14.    When Santa Cruz became aware of the allegedly improper inclusion of Santa Cruz code in AIX for Power remains in dispute[60]

15.    In interrogatory responses, SCO has alleged that IBM began copying Santa Cruz code obtained through Project Monterey into AIX in October 2000.[61] Similarly, in an expert report submitted on behalf of SCO, Christine Botosan writes "I have been asked to assume that

---

[55] Id.

[56] IBM Linux Update, dated Sept. 23, 1999, at 4, attached as Exhibit 21 to IBM's First Exhibits; Expert Report of Jeffery Leitzinger, dated May 19, 2006 ("Leitzinger Report"), at 38, attached as Exhibit 259 to IBM's First Exhibits.

[57] The Santa Cruz Operation was historically referred to as "SCO" and many documents in this action use the term "SCO" in reference to that entity. In May 2001, Santa Cruz transferred its UNIX assets to plaintiff, which was then called Caldera International, Inc. ("Caldera"). Immediately after the sale, Santa Cruz changed its name to Tarantella. Caldera International, Inc. remained Caldera after the transaction but later, in 2002, changed its name to The SCO Group, Inc., the plaintiff in this action, in order to leverage the UNIX assets and business it had acquired. The term "SCO" is used herein, as it is in many documents, to refer to the entity in possession of the UNIX assets, although that entity changed from Santa Cruz to The SCO Group, previously Caldera, in May 2001.

[58] Plaintiff's Revised Supplemental Response to Defendant's First and Second Set of Interrogatories at 44-50 Interrogatory Response No.7, attached as Exhibit 33 to IBM's First Exhibits.

[59] Id.

[60] Declaration of David McCrabb ¶ 16, attached as Exhibit 227 to IBM's First Exhibits; Declaration of Jay F. Petersen ("Petersen Declaration") ¶¶ 16–18, attached as Exhibit 354 to Declaration of Brent O. Hatch ("SCO's Opposition Exhibits"), docket no. 876, filed under seal on Nov. 11, 2006; Declaration of John T. Maciazek ("Maciazek Declaration") ¶ 15, attached as Exhibit 362 to SCO's Opposition Exhibits; Declaration of Doug Michels ("Michels Declaration") ¶ 16, attached as Exhibit 351 to SCO's Opposition Exhibits; Declaration of Alok Mohan ("Mohan Declaration") ¶ 10, attached as Exhibit 17 to SCO's Opposition Exhibits.

[61] See SCO's Supplemental Response to Interrogatory No. 8 at 10, attached as Exhibit 46 to IBM's First Exhibits.

IBM engaged in unfair competition by misusing code provided in Project Monterey to strengthen IBM's proprietary AIX product. I have been told that the disgorgement of IBM's subsequent AIX profits is an appropriate remedy for such unfair competition and that the date from which disgorgement should begin is October 1, 2000."[62]

## C.  Background on SCO

16.     Plaintiff's predecessor, Santa Cruz, was founded in 1979, and in 1983 it delivered the first packaged UNIX System for Intel processor-based PCs.[63] SCO's UNIX operating systems, UnixWare and OpenServer, run on the 32-bit Intel IA-32 microprocessor or "chip."[64]

17.     As one industry analyst described it, "SCO established the market for advanced operating systems on industry-standard Intel platforms in the 1980s, pioneering such features as a full 32-bit implementation, security, and multiprocessing."[65] At least as far back as 1989, SCO was described as "the largest vendor of Unix-like operating systems on Intel-based computers."[66]

18.     SCO sold its UNIX-on-Intel operating systems to major corporate customers located throughout the world including NASDAQ, McDonalds, Sherwin Williams, Papa Johns, Daimler Chrysler, BMW, and Lucent Technologies. SCO's UnixWare product was certified for and sold on a wide variety of OEM IA-32 systems including those from Compaq, Hewlett-

---

[62] Expert Report of Christine A. Botosan, dated May 19, 2006, at 3–4, attached as Exhibit 171 to IBM's First Exhibits.

[63] The History of the SCO Group at 1, www.sco.com/company/history.html, attached as Exhibit 250 to SCO's Opposition Exhibits.

[64] IBM Servers, *Project Monterey: A Strategic Approach to Business Computing*, dated July 1999 ("Project Monterey: A Strategic Approach to Business Computing"), at 181047252, attached as Exhibit 214 to SCO's Opposition Exhibits ("SCO is the clear leader in providing UNIX operating systems on the IA-32 architecture.").

[65] Christopher Thompson, *SCOring a Hit against Microsoft Windows NT* at 6, GARTNER (Apr. 21, 1997), attached as Exhibit 244 to SCO's Opposition Exhibits.

[66] Evan Grossman, *UNIX Users Look Forward to Advantages of Intel* '486 at 1, PC WEEK (Apr. 17, 1989), attached as Exhibit 246 to SCO's Opposition Exhibits.

Packard Company ("Hewlett-Packard"), Unisys, NCR, Data General, Siemens Nixdorf, FujitsuICL, Olivetti, and IBM.[67]

19.    In 1998, SCO was the worldwide UNIX market leader in terms of unit shipments, with roughly 40 percent of total market unit sales.[68] In terms of revenue, SCO dominated what is referred to as the "UNIX-on-Intel market" to an even greater extent, with an 80% market share.[69]

20.    At that time, the processing capacity of the Intel processor chip was increasing rapidly. By 1995, Intel began to target its chips to be used in high-performance desktops and servers, and new UNIX servers based on 32-bit Intel chips began to compete against UNIX systems based on the far more expensive RISC chip, which until then had been the preferred chip for enterprise-critical systems. From 1995 to 1999, shipments of servers based on Intel architecture approximately tripled and, by 2000, servers based on Intel architecture began to dominate the UNIX market.[70]

21.    By 1998, Intel was developing the first commercial 64-bit chip, called Itanium, with the code name Merced.[71] Capitalizing on its expertise with the Intel IA-32, SCO began work on porting its operating systems to the Itanium, IA-64 chip.[72]

---

[67] Petersen Declaration ¶ 7; Maciazek Declaration ¶ 7.

[68] Project Monterey: A Strategic Approach to Business Computing at 181047252, n. 2.

[69] Memorandum to L. Gerstner regarding IBM's UNIX Strategy, dated July 30, 1998, at 1710117641, attached as Exhibit 204 to SCO's Opposition Exhibits.

[70] Expert Report of Gary Pisano, Ph.D., dated May 19, 2006, at 18–20, attached as Exhibit 284 to SCO's Opposition Exhibits.

[71] Project Monterey: A Strategic Approach to Business Computing at 181047251–52; Kim Nash, *Behind the Merced Mystique* at 1, CNN.com (July 15, 1998), attached as Exhibit 249 to SCO's Opposition Exhibits.

[72] Petersen Declaration ¶ 8; Maciazek Declaration ¶ 8.

### D.  Background on IBM and the UNIX-on-Intel Market

21.     In contrast to SCO, IBM in 1998 had almost no presence in the market for UNIX-based operating systems on Intel chips. Instead, IBM had focused its efforts on its operating system called AIX for Power, which ran on servers using IBM's RISC-type Power processor.[73]

22.     A May 6, 1998 internal IBM document proposed: "Tight partnership with SCO to exploit their code, channels, attract ISVs with a single AIX O/S marketed by both companies to be explored."[74]

23.     A July 30, 1998 summary of IBM's UNIX Strategy, addressed to IBM's CEO Lou Gerstner, stated: "While HP and Sun have been successful at driving commitments to 64-bit Intel, today's clear leader in the UNIX on Intel market is Santa Cruz Operation (SCO) with over 80% of the $3B Unix-Intel market." [75]

24.     SCO's UnixWare operating system was based on UNIX SVr4 technology, the most recent version of UNIX.[76] In contrast, IBM's AIX operating system was based on the earlier UNIX System V Release 3.2 ("SVr3.2") technology.[77] SCO alleged to own all of the UNIX source code.[78] IBM had opted not to buy from SCO an upgrade of SCO's UNIX license to the SVr4 code base.[79]

---

[73] Project Monterey: A Strategic Approach to Business Computing at 181047252; Deposition Transcript of William Sandve, dated Nov. 19, 2004 ("Sandve Nov. 19, 2004 Depo."), at 8:11–9:17, attached as Exhibit 166 to SCO's Opposition Exhibits.

[74] Port AIX to Merced Investment Fact Sheet, RS/6000 Spring Strategy, Invest/(Reduce) Bridge, dated June 16, 1998, at 1710117588, attached as Exhibit 189 to SCO's Opposition Exhibits.

[75] Memorandum to L. Gerstner regarding IBM's UNIX Strategy, dated July 30, 1998, at 1710117641, attached as Exhibit 204 to SCO's Opposition Exhibits.

[76] Petersen Declaration ¶ 9; Maciazek Declaration ¶ 9.

[77] Email from W. Sandve to J. Graham, dated Jan. 23, 2002, at 181017195, attached as Exhibit 205 to SCO's Opposition Exhibits.

[78] Email from W. Sandve to S. Gordon, H. Armitage, S. Keene, and J. Kruemcke at 181472999, attached as Exhibit 227 to SCO's Opposition Exhibits.

[79] Id.

25. Like SCO's UnixWare, Sun Microsystems's ("Sun") UNIX operating system, Solaris, was based on SVr4 code.[80]

26. "IBM was highly concerned about competition with Sun[,]" and believed that incorporation of SVr4 code into AIX would help it compete against Sun.[81]

### E. Project Monterey.

27. In 1994, Intel and Hewlett-Packard announced their collaboration to create a new 64-bit processor architecture design,[82] and "the intent of the technology agreement [was] to have a single architecture that will replace all others from either company."[83]

28. In or around 1998, IBM began negotiating with Santa Cruz to undertake a joint development project for, among other things, a UNIX-like operating system that would run on the IA-64 platform. This project subsequently came to be known as "Project Monterey."[84] At that time, Santa Cruz sold two UNIX products that ran exclusively on Intel's existing 32-bit hardware platform: UnixWare and OpenServer.[85]

29. Both IBM and Santa Cruz were interested in attempting to leverage and strengthen their existing UNIX-like operating system products as part of Project Monterey. The

---

[80] Email dated Jan. 23, 2002 from W. Sandve to J. Graham at 181017194, attached as Exhibit 205.

[81] Rebuttal to the Report and Declaration of Professor J.R. Kearl by Gary Pisano, dated July 17, 2006, at 76, attached as Exhibit 285 to SCO's Opposition Exhibits.

[82] Paul Barker, *New HP-Intel Pact Could Hit PC Clones Hard*, Computing Canada, July 6, 1994, attached as Exhibit 27 to IBM's First Exhibits.

[83] *Id.*

[84] Options for Distribution and Royalty Flow-Draft 1 ("Options for Distribution and Royalty Flow"), attached as Exhibit 24 to IBM's First Exhibits; Genus: An IBM/SCO UNIX Project Marketing Development Plan ("IBM/SCO UNIX Plan"), attached as Exhibit 25 to IBM's First Exhibits; Asset Purchase Agreement between Novell, Inc. and The Santa Cruz Operation, Inc., dated Sept. 19, 1995, attached as Exhibit 123 to IBM's First Exhibits; U.S. Copyright Registration Statement No. TX 5-856-472, registering IBM's copyright to its work titled "Linux Kernel Support for Series Hypervisor Terminal," dated Feb. 2, 2004, ¶ 54, attached as Exhibit 86 to IBM's First Exhibits; Leitzinger Report at 30–31.

[85] Complaint ¶¶ 26, 47, attached as Exhibit 1 to IBM's First Exhibits; Form 10-K filed by The Santa Cruz Operation, Inc., for fiscal year ended September 30, 1999, at 5–8, attached as Exhibit 115 to IBM's First Exhibits.

goal was to develop and market a "family" of UNIX-like operating system products, including a "Monterey/64" version for the IA-64 Intel processor, a version to run on IBM's proprietary "Power" processor architecture and a version to run on the IA-32 architecture.[86]

30.     In October 1998, a deal between IBM, SCO, Sequent, and Intel was announced, and this deal came to be known as Project Monterey.[87] Project Monterey was described by IBM as a "major UNIX operating system initiative"[88] that would deliver a "single UNIX operating system product line that runs on IA-32, IA-64 and IBM microprocessors, in computers that range from entry-level to large enterprise servers."[89]

31.     In the press release announcing Project Monterey, IBM stated: "We're extending into broader markets with our award-winning AIX software that delivers the reliability and security required of an enterprise-class operating system . . . . Working with these companies, we're capitalizing on the base of proven leadership technologies to deliver the world's best UNIX on Power microprocessor and high-volume Intel microprocessor systems."[90]

32.     On October 26, 1998, IBM and Santa Cruz entered into the JDA, whereby Santa Cruz and IBM agreed to, among other things, provide resources and technology to pursue these goals.[91]

---

[86] IBM-SCO Family Unix Technical Proposal, dated Sept. 2, 1998, attached as Exhibit 23 to IBM's First Exhibits; *see also* Options for Distribution and Royalty Flow; IBM/SCO UNIX Plan; Joint Development Agreement (Agreement Number 4998CR0349) between SCO and IBM, dated Oct. 26, 1998 ("JDA"), attached as Exhibit 245 to IBM's First Exhibits.

[87] Press Release, *IBM Launches Major UNIX Initiative, Significant Support from SCO, Sequent, Intel, and OEMs*, dated Oct. 26, 1998, attached as Exhibit 240 to SCO's Opposition Exhibits; Petersen Declaration ¶ 9; Maciazek Declaration ¶ 9; Mohan Declaration ¶ 9

[88] Project Monterey: A Strategic Approach to Business Computing at 181047251.

[89] Press Release, *IBM Launches Major UNIX Initiative, Significant Support from SCO, Sequent, Intel, and OEMs*, dated Oct. 26, 1998, at 1, attached as Exhibit 240 to SCO's Opposition Exhibits.

[90] Press Release, *IBM Launches Major UNIX Initiative, Significant Support from SCO, Sequent, Intel, and OEMs*, dated Oct. 26, 1998, at 1–2, attached as Exhibit 240 to SCO's Opposition Exhibits.

[91] JDA.

33.     In the JDA, the parties agreed to jointly develop an operating system that would run on Intel's forthcoming 64-bit chip. This operating system was defined as the "IA-64 Product" (sometimes referred to herein as the "Project Monterey Operating System"). The IA- 64 Product was to be the cornerstone of a "family of products" that would be sold by both IBM and SCO.[92]

34.     The agreement contemplated that SCO would continue to sell its 32-bit operating systems and would also be able to upgrade or migrate its customers to the jointly developed Project Monterey Operating System on the 64-bit chip.[93]

35.     Thus, the ultimate goal was that both SCO customers (those using Santa Cruz's UnixWare operating system software on computers with Intel's 32-bit processors) and IBM customers (those using IBM's AIX for Power operating system software on computers with IBM's Power processor) would upgrade to the jointly developed Project Monterey Operating System software (the IA-64 Product), which was to be compatible with computers using either the 32-bit or the 64-bit Intel chip or the IBM Power chip.[94]

36.     In furtherance of IBM and Santa Cruz's intention to create a compatible family of products, both companies granted licenses to the other.[95] For its part, IBM granted Santa Cruz a royalty-free license to certain AIX source code for Santa Cruz's use in its UnixWare product for

---

[92] *Id*. at Preamble and § 1.10; Sandve Nov. 19, 2004 Depo. at 21:6–9; Project Monterey: A Strategic Approach to Business Computing at 181047252; Email from W. Sandve to M. Day, dated Oct. 15, 1998, at 1710013164, attached as Exhibit 191 to SCO's Opposition Exhibits.

[93] JDA at Preamble and §§ 1.9, 9.0–9.4; Project Monterey: A Strategic Approach to Business Computing at 181047252–53; SC98, High Performance Networking and Computing: Executive Overview, draft version, dated Nov. 2, 1998, at 181441556, attached as Exhibit 176 to SCO's Opposition Exhibits.

[94] *See generally* Project Monterey: A Strategic Approach to Business Computing at 181047252–53; SC98, High Performance Networking and Computing: Executive Overview, draft version, dated Nov. 2, 1998, at 181441556, attached as Exhibit 176 to SCO's Opposition Exhibits ("IBM and SCO offer a smooth migration path from AIX to IA-64 and from UnixWare to IA-64").

[95] JDA.

the existing 32-bit Intel processor.[96] In turn, Santa Cruz granted IBM a royalty-free license to

certain UnixWare source code for IBM's use in its AIX operating system tailored to run on

IBM's Power architecture processor.[97] Each party also granted the other a license to use any

code supplied during Project Monterey for the development of the operating system that would

be marketed for use on the forthcoming IA-64 product.[98]

> 37. Specifically, the JDA expressly granted to IBM:

> a worldwide, non-exclusive, royalty free . . ., perpetual and irrevocable . . . right
> and license under SCO's and applicable third parties' copyrights . . . and any trade
> secrets or confidential information in the Licensed SCO Materials and SCO
> Project Work which are included in Deliverables to (i) prepare or have prepared
> Derivative Works, (ii) use, execute, reproduce, display and perform the Licensed
> SCO Materials and SCO Project Work and Derivative Works thereof, (iii)
> sublicense and distribute the Licensed SCO Materials and SCO Project Work and
> Derivative Works thereof either directly or through Distributors, in the form of
> Source Code, Object Code, Documentation, and/or in any other form whatsoever,
> and (iv) grant licenses, sublicenses, and authorizations to others (including
> without limitation IBM Subsidiaries, Distributors and any other third parties), on
> a non-exclusive basis that is equal to the scope of the licenses granted
> hereunder.[99]

> 38. That "worldwide, non-exclusive, royalty free . . . perpetual and irrevocable

. . . right and license" was limited as follows:

> When IBM sublicenses the IA-64 Product containing Licensed SCO Materials
> and/or SCO Project Work in Source Code form or when SCO sublicenses the IA-
> 64 Product containing Licensed IBM Materials and/or IBM Project Work in
> Source Code form, the parties shall not grant the third party the right to further
> grant source sublicenses to the other party's Licensed Materials or Project Work.
> Further, when licensing such Source Code, both e parties shall only grant the right
> to create Derivative Works required for the following purposes:
> 1. Maintenance and support;
> 2. Translation [sic] and localization;
> 3. Porting, optimization and extensions;

---

[96] *Id*. § 2.0(c)(2).

[97] *Id*. §2.0(d)(2); Declaration of David McCrabb ¶ 16, attached as Exhibit 227 to IBM's First Exhibits.

[98] JDA. §§ 2.0(c)(2), 2.0(d)(2).

[99] *Id*. § 2.2(d)(2).

4.  Any other Derivative Works agreed to by SCO and IBM.[100]

39.     In the JDA, IBM also stated its intention to engage in certain marketing activities including to "market, promote and sell the Unixware and IA-32 Product on IBM systems in 1999[.]"[101]

40.     IBM also agreed to make a certain minimum of middleware available for the UnixWare 7 and IA-32, based on IBM's determination of commercial considerations. IBM's plan included Tivoli, WebSphere, and DB2.[102]

41.     Section 15.2 of the JDA, which is entitled "Change of Control," provides:

Notwithstanding Section 15.1, IBM shall have the right to terminate this Agreement immediately upon the occurrence of a Change of Control of SCO which IBM in its sole discretion determines will substantially and adversely impact the overall purpose of the cooperation set forth by this Agreement and applicable Project Supplements or will create a significant risk or material and adverse exposure of IBM's confidential and/or technical proprietary information (which is subject to, and to the extent of, confidentiality restrictions) ("Information"). For the purposes of this Agreement, control shall be deemed to be constituted by rights, contract or any other means which, either separately or jointly and having regard to the consideration of fact or law involved, confer the possibility of exercising decisive influence (other than by an entity currently exercising such influence or any entity controlled by or controlling such entity) on SCO by: (1) owning more than half the equity, capital or business assets, or (2) having the power to appoint more than half of the members of the supervisory board, board of directors or bodies legally representing SCO, or (3) having the right to directly manage SCO's business activities.[103]

42.     Section 22.12 of the JDA, which is entitled "Assignment," provides, in relevant part: "Neither party may assign, or otherwise transfer, its rights or delegate any of its duties or obligations under this Agreement without the prior written consent of the other party."[104]

---

[100] *Id*. § 2.2(e).

[101] *Id*. at Attachment A, § I.

[102] *Id*. at Attachment A, § II.

[103] *Id*. §15.2.

[104] *Id*. § 22.12.

43.     Section 22.3 of the JDA, which is entitled "Choice of Law/Venue," provides:

This Agreement shall be governed by, and the legal relations between the parties hereto shall be determined in accordance with, the substantive laws of the State of New York, without regard to the conflict of law principles of such State, as if this Agreement was executed and fully performed within the State of New York. Each party hereby waives any right to a trial by jury in any dispute arising under or in connection with this Agreement, and agrees that any dispute hereunder shall be tried by a judge without a jury. Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York.[105]

44.     Consistent with the JDA arrangement, IBM repeatedly referred to SCO as a "partner" during the course of Project Monterey:

a.  On May 6, 1998, IBM proposed a "tight partnership with SCO."[106]

b.  In 2000, one IBM employee stated in an email that "we need to recognize that we must treat [SCO] as we would another business partner and follow the appropriate rules and laws regarding … competitive issues."[107]

c.  Even as late as 2002, Mr. Sandve stated in an internal email that "due to our partnership with SCO, we have been able to make AIX closer to SVR4 as best we can."[108]

45.     Although development of the Project Monterey IA-64 operating system proceeded throughout 1999 and 2000, the project encountered substantial difficulties due to delays in Intel's IA-64 processor development schedule. Intel's release of the initial Intel IA-64 processor, code-named "Merced" and officially named Itanium, was substantially delayed. In

---

[105] *Id*. § 22.3.

[106] Port AIX to Merced Investment Fact Sheet, RS/6000 Spring Strategy, Invest/(Reduce) Bridge, dated June 16, 1998, at 1710117588, attached as Exhibit 189 to SCO's Opposition Exhibits.

[107] Email from R. Roth to W. Sandve, dated Feb. 23, 2000, at 181427972, attached as Exhibit 218 to SCO's Opposition Exhibits.

[108] Email from W. Sandve to J. Graham, dated Jan. 23, 2002, at 181017195, attached as Exhibit 205 to SCO's Opposition Exhibits.

1995 and 1996, executives of Itanium co-developer HP hinted that the processor was well underway, and might ship as early as 1997. That date came and went, and eventually 1999 was stated as the target. But that date also came and went. Itanium did not end up shipping until mid-2001.[109]

46.     Once Itanium did arrive, it performed poorly relative to alternatives in the marketplace. As a result, Intel and Hewlett-Packard re-positioned it as primarily an evaluation and development platform, a precursor to the second-generation Itanium 2 "McKinley" release that would enable true production deployments. Neither IBM nor Santa Cruz had any involvement in or control over the development of the Itanium processor.[110]

47.     In addition to creating development difficulties, these delays caused a substantial decrease in market interest and confidence in the forthcoming IA-64 product and thereby the IA-64 operating system then under development by IBM and Santa Cruz.[111]

48.     In early 1999, IBM executives cautioned that the "SCO/Monterey plans should not be stopped until we have a better plan to move to."[112] An IBM team prepared an undated memorandum detailing five options, one of which was the "elimination of SCO" and the "replacing of UnixWare with Linux" as IBM's vehicle for entry into the "low end" segment of

---

[109] Stephen Shankland, *Itanium: A Cautionary Tale*, CNET News.com (Dec. 8, 2005), attached as Exhibit 22 to IBM's First Exhibits; Expert Report of Jonathan Eunice, dated July 17, 2006 ("Eunice Report"), ¶ 57, attached as Exhibit 186 to IBM's First Exhibits; John G. Spooner, *Intel Set To Rattle Server Market With Itanium*, CNET News.com (Jan. 2, 2002), attached as Exhibit 394 to IBM's First Exhibits.

[110] Brian Pereira, *Mckinley Is One to Watch*, NETWORK MAGAZINE INDIA (Mar. 2002), attached as Exhibit 26 to IBM's First Exhibts; Michael Kanellos, *Is Merced Doomed?*, CNET News.com (Jan. 2, 2002), attached as Exhibit 28 to IBM's First Exhibits; Eunice Report ¶ 58.

[111] Brian Pereira, *Mckinley Is One to Watch*, NETWORK MAGAZINE INDIA (Mar. 2002), attached as Exhibit 26 to IBM's First Exhibits; Michael Kanellos, *Is Merced Doomed?*, CNET News.com (Jan. 2, 2002), attached as Exhibit 28 to IBM's First Exhibits; Eunice Report ¶ 59.

[112] Email from R. LeBlanc to S. Mills, dated Jan. 19, 199, at 181349130, attached as Exhibit 234 to SCO's Opposition Exhibits.

the UNIX-on-Intel market.[113] However, the team cautioned that, under this option, IBM would not attain the right to use the SVr4 code, and therefore SCO and its UnixWare "should be retained in order to have access to SCO's SVr4/5 and other technologies."[114]

49.     IBM then began cutting the Project Monterey budget, causing employees to question the viability of the project:

a.     A January/February 1999 IBM department staffing memo observed: "Current budget outlook which factors in a substantial challenge from SG Development and additional unfunded Monterey family line item content, would result in an uncompetitive AIX/Monterey product line by 2000."[115]

b.     At the same time, an IBM employee stated in an internal email that IBM was not "investing in the tools to make Monterey successful."[116]

c.     Another IBM employee stated that "working on both Linux and Monterey [was] defocusing."[117]

d.     Yet another IBM employee related "the high degree of concern I am hearing from my technical team and others concerning Linux strategy and the collision with Monterey."[118]

e.     In March of 1999, IBM publicly announced its support of LINUX at the LinuxWorld event.[119]

---

[113] Document Objective at 181526163, attached as Exhibit 371 to SCO's Opposition Exhibits.

[114] *Id.* at 181526164.

[115] Dept HHTS Status, dated Jan./Feb. 1999, at 181442681, attached as Exhibit 368 to SCO's Opposition Exhibits.

[116] Email from W. Sandve to T. Moore, dated Feb. 24, 1999, at 181016130, attached as Exhibit 242 to SCO's Opposition Exhibits.

[117] Email from P. Horn to R. LeBlanc, dated Aug. 17, 1999, at 181349188, attached as Exhibit 236 to SCO's Opposition Exhibits.

[118] Email from M. Kiehl to W. Yates, dated Feb. 23, 1999, at 181016068, attached as Exhibit 187 to SCO's Opposition Exhibits.

f. In an August 10, 1999 article about IBM's support of both LINUX and

Project Monterey, IBM assuaged concerns:

> IBM's John Prial said Big Blue is comfortable with many operating systems under its roof, and that AIX today and Monterey tomorrow will sell in a different area than Linux. "We're very comfortable having many operating systems," he said. "Monterey will be popular in high business-value transactional systems and heavy-duty business intelligence," Prial said. Linux, on the other hand, currently is popular in Web servers, file and print servers, and other smaller-scale computers, though that could change two or three years down the line.[120]

IBM made similar representations privately to SCO.[121]

50. SCO believed IBM's representations.[122] In an August 19, 1999 article about

IBM's support of Trillian (the IA-64 project for LINUX), SCO CEO Doug Michels was quoted

as follows:

> "IBM is not looking at Trillian as an alternative to Monterey. The real interest in Linux is coming from all the software companies that sell databases and transaction based tools because they are frustrated that Microsoft moreorless [sic] gives these things away as part of the Back Office bundle. So they say 'if you give us a free OS, we'll make money from it'."

> But Trillian is not intended to make Linux an enterprise class OS and there are no real efforts elsewhere to do so either, he claimed.[123]

51. Behind the scenes, IBM executives recognized the inherent conflict in supporting

both LINUX and Project Monterey: in November 1999, IBM executive Sheila Harnett stated:

> The distinction used to position Monterey versus Linux is that Monterey is targeted for high-end servers, whereas Linux comes in at the lower to mid range

---

[119] IBM Linux Update, dated Sept. 23, 1999, at 4, attached as Exhibit 21 to IBM's First Exhibits.

[120] Stephen Shankland, *IBM Joins Advanced Linux Effort* at 2, CNET News.com (Jan. 2, 2002), attached as Exhibit 252 to SCO's Opposition Exhibits.

[121] IBM Meeting, dated Jan. 28, 2000, at SCO1235090–91, attached as Exhibit 186 to SCO's Opposition Exhibits; Michels Declaration ¶¶ 17, 22.

[122] Michels Declaration ¶¶ 17–18; Mohan Declaration ¶ 10.

[123] Cath Everett, *SCO Forum: Trillian Project No Threat to Monterey, Claims SCP President* at 1–2, http://www.pcw.co.uk/articles/print/2107749 (Aug. 19, 1999), attached as Exhibit 253 of SCO's Opposition Exhibits; Michels Declaration ¶ 18.

of servers. However, this distinction is a fragile one, since IBM is working as fast as it can to bolster Linux's ability to compete in the mid to high end range of servers.[124]

52.     In late 1999 and 2000, IBM executives began to recommend internally that IBM take more definitive steps to drop Project Monterey and transition even more support to LINUX:

  a.     In October 1999, IBM executive Irving Wladawsky-Berger recommended internally that IBM "embrace Linux in a very major way," "drop Monterey," and "move at lightning speed."[125]

  b.     In May 2000, IBM executive Steve Mills recommended to Samuel Palmisano: "As soon as possible we should announce the following . . . A transition of our AIX and Monterey efforts to Linux"; he explained: "Monterey will not gain enough industry following to be viable," and, "Our resources and messages are fragmented. We need a bold move that is without qualification. We need a single marketing and sales message."[126]

  c.     An IBM internal memorandum expressly recognized that, if IBM opted for this strategy, it "may squeeze target opportunities for [SCO's] UnixWare from low end" and result in "loss of revenue for SCO."[127]

53.     Notwithstanding these recommendations and predictions, IBM did not drop Project Monterey.[128] Rather, without telling SCO, IBM continued Project Monterey while it tried

---

[124] Email from E. Lynch to K. Norsworthy, dated Nov. 30, 1999, at 181436864, attached as Exhibit 175 to SCO's Opposition Exhibits (emphasis added).

[125] Email from I. Wladawsky-Berger to S. Mills, et al., dated Oct. 22, 1999, at 181668451, attached as Exhibit 183 to SCO's Opposition Exhibits.

[126] Email from S. Mills to S. Palmisano, et al., dated Apr. 24, 1998, at 181669431–32, attached as Exhibit 184 to SCO's Opposition Exhibits.

[127] Document Objective at 181526162, attached as Exhibit 371 to SCO's Opposition Exhibits.

[128] Mohan Declaration at ¶ 10; Petersen Declaration ¶ 15; Maciazek Declaration ¶ 14.

to "to make Linux scale up as quickly as possible."[129] By June 2000, the IBM Academy of

Technology OS Consultancy recommended a "significant reduction in emphasis" in Project

Monterey and that IBM "should further develop for Monterey only what is in common with

Power."[130]

54.     In direct contrast to IBM's internal de-emphasis on Project Monterey, at a

December 21, 2000 OEM Council Meeting, IBM's Charlie Reese stated: "We have a strong

commitment to remain focused on Itanium."[131]

### F.  The Release of the Project Monterey Operating System

55.     On January 27, 2001, an internal IBM email proposed: "Release AIX 5.1 for IA-

64 as an I-Listed PRPQ on the planned April schedule" and "Compilers are not included in the

PRPQ. . . ."[132] Internally at IBM, an I-Listed PRPQ (Programming Request for Price Quote)

requires IBM lab approval.[133]

56.     IBM employee Rose Ann Roth stated: "I think the compiler MUST be available

in some form or the whole thing just doesn't make any sense (i.e. SCO won't buy it)."[134]

57.     Nevertheless, on April 17, 2001, IBM announced the availability of AIX 5L for

Itanium as an I-Listed PRPQ, and made it "available" on May 4, 2001.[135] Unlike the PRPQ of

---

[129] Email from I. Wladsky-Berger to R. LeBlanc, et al., dated Mar. 1, 2000, at 181668964, attached as Exhibit 235 to SCO's Opposition Exhibits.

[130] Report of the IBM Academy of Technology Consultancy on Operating Systems Evolution, dated July 13, 2000, at 181291944, attached as Exhibit 239 to SCO's Opposition Exhibits.

[131] OEM Council Meeting, dated December 21, 2000, at 181005905, attached as Exhibit 172 to SCO's Opposition Exhibits.

[132] Email from R. Acosta to M. Payne, dated Jan. 29, 2001, at 181014956, attached as Exhibit 97 to SCO's Opposition Exhibits.

[133] Sandve Nov. 19, 2004 Depo. at 135:2–4.

[134] Email from R. Acosta to M. Payne, dated Jan. 29, 2001, at 181014956, attached as Exhibit 97 to SCO's Opposition Exhibits.

[135] AIX 5L for Itanium Strategy at 181015076, attached as Exhibit 89 to SCO's Opposition Exhibits; Email from R. Acosta to M. Payne, dated Jan. 29, 2001, at 181014956, attached as Exhibit 97 to SCO's Opposition Exhibits.

AIX 5L for Power in October 2000, the PRPQ of AIX 5L for Itanium did not have a compiler to make it work and there was "no confirmed compiler plan."[136] Moreover, the PRPQ was offered free of charge, without support.[137]

58.     Code not containing a compiler cannot be executed.[138]

59.     Indeed, IBM distributed only 32 copies of the PRPQ in 2001.[139] The PRPQ was not on IBM's price lists, and was not marketed.[140]

55.     Despite the delays in the launch of the IA-64 processor, in late April 2001, IBM and Santa Cruz announced the first release of AIX SL for the IA-64 processor on May 4, 2001.[141] That release occurred as scheduled,[142] although it is disputed whether that release was legitimate or pretextual.[143]

### G.  IBM's Use of SCO's SVR4 Code in IBM Products

56.     On October 24, 2000, IBM placed SCO's SVr4 source code into a PRPQ (IBM's internal name for a beta test version), "early adopters" of AIX for Power (named AIX 5L for Power 5.0), which was intended for certified software developers and "not intended for general production use."[144]

---

[136] Unix Vision – proposed, attached as Exhibit 300 to SCO's Opposition Exhibits.

[137] *Id.*

[138] Sandve Nov. 19, 2004 Depo. at 81:7–9.

[139] Letter from J. Fair to K. Madsen, dated Apr. 29, 2002, at 1710118968–69, attached as Exhibit 159 to SCO's Opposition Exhibits.

[140] *Id.*

[141] IBM Press Release, *IBM Breaks Barriers Between Linux and UNIX with AIX 51*, dated Apr. 23, 2001, attached as Exhibit 593 to IBM's First Exhibits; Caldera Systems, Inc. Press Release, *SCO and Caldera Release Technology Preview of AIX 5L-64 Bit UNIX OS for Intel Itanium Processors*, dated Apr. 23, 2001, attached as Exhibit 594 to IBM's First Exhibits; The Santa Cruz Operation, Inc. and Caldera Systems, Inc. Press Release, *SCO and Caldera Release Technology Preview of AIX 5L-64 Bit UNIX OS for Intel Itanium Processors*, dated Apr. 23, 2001, attached as Exhibit 595 to IBM's First Exhibits.

[142] Third Amended Complaint ¶ 236, attached as Exhibit 10 to IBM's First Exhibits; Leitzinger Report at 44.

[143] Third Amended Complaint ¶ 236, attached as Exhibit 10 to IBM's First Exhibits.

[144] AIX 5L For Power Version 5.0, attached as Exhibit 289 to SCO's Opposition Exhibits.

57.     Then, on May 4, 2001, IBM included SCO's code, from Project Monterey, in the first "generally available" version (AIX 5L for Power 5.1).[145]

58.     IBM's "AIX 5L for Itanium strategy" was to "continue to ship AIX 5L as a PRPQ" in "stealth mode only."[146] In addition, even as it was announcing the PRPQ, IBM stated internally: "At the appropriate time announce plan not to GA AIX 5L and withdraw the PRPQ."[147]

59.     On April 4, 2001, IBM executive William Saulnier sent IBM counsel Helene Armitage an email containing a draft proposal for the "AIX 5L Announce Positioning Re Itanium."[148] He stated: "I believe this proposal does the best possible job to announcing what we intend to do . . . ."[149] Ms. Armitage largely rejected his proposal, indicating that she took a "heavy hack" at his thoughts.[150] She stated: "I'm concerned that your words define a delayed GA to 2H01 for the AIX product, and do not call the PRPQ GA." In other words, Ms. Armitage was concerned that Saulnier did not describe the premature PRPQ as "GA" or "generally available." Ms. Armitage then explained: "As you know, we need to GA this PRPQ to gain rights to SCO code we want for our base AIX product delivery – and every [one] is rather tired of me remaining and harping on this point." She then went on to articulate the external position she wanted to see on the product, but acknowledged, "I know the fine lines we are walking here."[151]

---

[145] Deposition Transcript of Bill Sandve, dated Jan. 26, 2006, at 30:12–15, 30:22–31:10, 33:8–23, 107:21–32, attached as Exhibit 229 to IBM's First Exhibits.

[146] AIX 5L for Itanium Strategy at 181015076, attached as Exhibit 89 to SCO's Opposition Exhibits.

[147] *Id.*

[148] Email from S. Dobbs to H. Armitage, dated Apr. 4, 2001, at 181028285, attached as Exhibit 88 to SCO's Opposition Exhibits.

[149] *Id.*

[150] *Id.* at 181028284.

[151] *Id.*

60.     IBM's Ron Saint Pierre stated on November 1, 2001 that "Monterey has not gone GA and never will."[152]

## H.  The Acquisition of the UNIX Business by Caldera

61.     On May 7, 2001, three days after the PRPQ of the Project Monterey Operating System, Santa Cruz finalized the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera, ending Santa Cruz's investment in and support of the Project Monterey development effort.[153]

62.     Santa Cruz did not obtain IBM's prior written consent to an assignment of the JDA. Instead, Santa Cruz informed IBM of the sale of its Server Software and Professional Services divisions and its UNIX-related assets to Caldera in a letter dated June 6, 2001.[154]

63.     Several weeks before the public announcement, Santa Cruz complied with Section 16.1 of the JDA and provided IBM with a detailed notice of the proposed transaction and an opportunity to tender a counteroffer within 15 days, pursuant to Section 16.2 of the JDA.[155]

64.     Although IBM thus had notice of the pending transaction for almost a year, IBM never told Santa Cruz or Caldera that it would not consent to the assignment of the JDA from Santa Cruz to Caldera.[156]

---

[152] Email from P. Malone to R. Saint Pierre, dated Nov. 2, 2001, at 1710066677, attached as Exhibit 86 to SCO's Opposition Exhibits.

[153] Form 10-K, filed by Caldera International, Inc. for the fiscal year ended October 31, 2001, at 52, attached as Exhibit 111 to IBM's First Exhibits; Letter from Kimberlee A. Madsen to R. Lauderdale, dated June 6, 2001 ("June 6, 2001 Madsen-Lauderdale Letter"), attached as Exhibit 244 to IBM's First Exhibits.

[154] *See* June 6, 2001 Madsen-Lauderdale Letter.

[155] Letter from S. Sabbath and G. Seabrook to R. Lauderdale, dated June 21, 2000, attached as Exhibit 206 to SCO's Opposition Exhibits.

[156] Petersen Declaration ¶¶ 12–13; Maciazek Declaration ¶¶ 10–11; Declaration of Jeff Hunsaker ("Hunsaker Declaration") ¶ 6, attached as Exhibit 356 to SCO's Opposition Exhibits.

65.     Moreover, long after the announcement of the transaction, IBM reiterated its

"strong commitment" to Project Monterey, and at various meetings with executives of both

Caldera and Santa Cruz, IBM reiterated its support.[157]

66.     On May 4, 2001, IBM released the PRPQ of the Project Monterey Operating

System[158] and the first "generally available" version of the SVr4-enhanced AIX 5L for Power.[159]

67.     IBM declined to consent to the assignment of Santa Cruz's rights and obligations

under the JDA. Pursuant to Section 22.12 of the JDA, IBM's consent was necessary for such

assignment to take effect. On the contrary, IBM invoked its right to cancel the JDA under

Section 15.2 in a letter dated June 19, 2001.[160]

68.     Caldera did not acquire Santa Cruz, which continued in business, albeit changing

its corporate name to "Tarantella."[161]

69.     After the start of this litigation, Caldera changed its name to "The SCO Group,

Inc."[162]

## I.   Status of Project Monterey in 2002

70.     In an October 2002 email, Bill Bulko (assistant to IBM executive Anthony Befi)

stated:

> Tony and I were in a conference call with SCO Group (formerly called Caldera)
> on Friday. . . . During our discussion, they asked about Project Monterey and
> what its current status and positioning are. We told them that it's a PRPQ, and

---

[157] OEM Council Meeting, dated Dec. 21, 2000, at 181005905, attached as Exhibit 172 to SCO's Opposition Exhibits; Mohan Declaration ¶ 10; Michels Declaration ¶ 17; Hunsaker Declaration ¶ 6; Declaration of Robert Bench ¶ 15, attached as Exhibit 6 to SCO's Opposition Exhibits.

[158] AIX 5L for Itanium Strategy, attached as Exhibit 89 to SCO's Opposition Exhibits.

[159] U.S. Copyright Registration Statement No. TC 5-856-468, dated Feb. 2, 2004, attached as Exhibit 82 to SCO's Opposition Exhibits.

[160] Letter from R. Lauderdale to K. Madsen, dated June 19, 2001, attached as Exhibit 220 to IBM's First Exhibits.

[161] *See* June 6, 2001 Madsen-Lauderdale Letter.

[162] Form 10-K, filed by SCO for the fiscal year ended October 31, 2003, at 4, attached as Exhibit 113 to IBM's First Exhibits.

explained what that meant – but neither Tony nor I were confident that we were up-to-date on what the current 'official response' should be.[163]

71.    On November 6, 2002, Mr. Bulko then sent a "Project Monterey update" to Mr. Befi, indicating, "Tony: you asked me to collect some data on the current status of Project Monterey in order to update you before you meet with SCO (Caldera) again. Here is a capsule summary of our position with Project Monterey."[164] He gave a background summary of the Project Monterey relationship, and then explained: "Even though SCO code is now embedded within AIX, we would only have to pay royalties to SCO when we distributed Monterey."[165] He further instructed: "Our initial license to SCO code was contingent on our making an attempt to distribute an IA-64 product. Consequently, we need to be clear that we have been trying to distribute Monterey, but no one wants it."[166] Mr. Bulko further disclosed that IBM had "no plans to make AIX available on the Itanium platform" and was "planning to EOL [end of life] Monterey by the end of this year."[167]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[168] "An issue of material fact is 'genuine' if a reasonable jury could return a verdict for the nonmoving party."[169] In moving for summary judgment, IBM "bears the burden of showing the absence of a genuine

---

[163] Email from C. Yount to B. Bulko, dated Oct. 22, 2002, at 1710015451, attached as Exhibit 57 to SCO's Opposition Exhibits.

[164] Email from B. Bulko to A. Befi, dated Nov. 6, 2002, at 1710015441, attached as Exhibit 84 to SCO's Opposition Exhibits.

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] FED. R. CIV. P. 56(a).

[169] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).

issue of material fact . . . ."[170] However, as it relates to SCO's claims, IBM "need not negate [SCO's] claim[s], but need only point out to the district court 'that there is an absence of evidence to support [SCO's] case.'"[171] Upon such a showing, SCO "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [SCO] carries the burden of proof."[172] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to defeat a properly supported motion for summary judgment."[173]

## ANALYSIS

IBM's Unfair Competition Motion states three grounds for summary judgment regarding SCO's unfair competition claim: "(1) it is untimely; (2) SCO cannot show that IBM engaged in unfair competition regarding Monterey; and (3) the claim is preempted by federal copyright law."[174] IBM's Unfair Competition Memorandum further develops those arguments. Most important for this ruling is the second argument: that SCO cannot show that IBM engaged in unfair competition because, among other reasons, IBM's alleged conduct would constitute a breach of contract, and "[s]uch claims may not be transmuted into a tort claim such as unfair competition." Because this argument is correct, it is unnecessary to discuss IBM's other bases for summary judgment. As discussed more fully below, (A) tort claims are subsumed in contract claims when the issue is addressed by an express contract provision and not addressed by a separate legal duty; (B) SCO's unfair competition claim is subsumed by express contractual provisions of the JDA that specifically govern the licensing and use of SCO's code; and (C) SCO

---

[170] *Universal*, 22 F.3d at 1529.

[171] *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[172] *Id.* (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990)).

[173] *Id.* (quoting *Anderson*, 477 U.S. at 252).

[174] IBM's Unfair Competition Motion at 2.

and IBM were not joint venturers or partners, and no fiduciary relationship existed, meaning that IBM owed no heightened legal duties to SCO. For these reasons, summary judgment is granted on SCO's unfair competition claim in IBM's favor.

### A.  The Independent Tort Doctrine Bars Tort Claims Where There Is An Express Contract Provision

In the original briefing on IBM's Unfair Competition Motion in 2006, although the parties argued over the application, they generally agreed on the law regarding the independent tort doctrine: under New York precedent, "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated," and the tort claim "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."[175] The tort "must be sufficiently distinct from the breach of contract claim in order to be legally sufficient," and "[i]n order to be independently viable, [it] must arise from a separate legal duty, or be collateral and extraneous to the terms and conditions of the contract that were allegedly breached or cause special damages that are not recoverable under the contract."[176] The law is the same in Utah: where there exists an "express contract provision dealing with the issue, there is no independent duty created here which would create a tort apart from the contractual obligations between the parties."[177]

SCO argued that "[a]lthough some New York cases suggest that a plaintiff may not 'transmogrify' a contract claim into one for tort, this is limited to instances where 'the only

---

[175] *Productivity Software Intern, Inc. v. Healthcare Technologies, Inc.*, 1995 WL 437526 (S.D.N.Y.) (quoting *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987)).

[176] *Medinol Ltd. v. Boston Scientific Corp.*, 346 F.Supp.2d 575, 607 (S.D.N.Y 2004) (citing *Great Earth International Franchising Corp. v. Milks Development*, 311 F.Supp.2d 419, 425 (S.D.N.Y. 2004)).

[177] *Deer Crest Associates I, L.C. v. Deer Crest Resort Group, L.L.C.*, No. 2:04-CV-00220-TS, 2006 WL 722216, *3 (D.Utah Mar. 15, 2006).

interest at stake is that of holding the defendant to a promise.'"[178] However, SCO's citation of the Second Circuit's discussion of the policy underlying the independent tort doctrine does not weaken the doctrine to be less than stated in the more recent cases cited above and acknowledged by SCO. Regardless of the "interest[s] at stake,"[179] "a contract claim may not be pleaded as a tort claim unless a *legal duty independent of the contract* itself has been violated."[180]

SCO also suggests a wrinkle in the independent tort doctrine articulated by the Tenth Circuit in *Equilease Corp. v. State Fed. Sav. And Loan. Assn.*: "where a contract is the mere inducement creating the state of things that furnishes the occasion for the tort, the tort, not the contract, is the basis of the action. . . . [I]f a duty to take care arises from the relation of the parties irrespective of a contract, the action is one of tort."[181] However, the Tenth Circuit's statement relies on a 1926 Oklahoma Supreme Court case. The parties have presented no Utah or New York case law that would suggest that contractual duties could be disregarded by finding that the contract was an inducement to facilitate a tort. However, as the Tenth Circuit stated, it is important to consider "if a duty to take care arises from the relation of the parties irrespective of the contract."[182]

SCO cites a New York appellate decision for the proposition that "[t]he same conduct which constitutes a breach of a contractual obligation may also constitute the breach of a duty arising out of the contract relationship which is independent of the contract itself."[183] The line of

---

[178] SCO's Unfair Competition Opposition at 39–40 (citing *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2nd Cir. 1980) and *Hammer v. Amazon.com*, 392 F.Supp.2d 423 (E.D.N.Y. 2005).

[179] *Id.* (citing *Hargrave*, 636 F.2d at 899).

[180] *Hammer*, 392 F.Supp.2d at 432–33 (internal citations omitted) (emphasis added).

[181] 647 F.2d 1069, 1074 (10th Cir. 1981) (applying Oklahoma law).

[182] *Equilease Corp.*, 647 F.2d at 1074.

[183] SCO's Unfair Competition Opposition at 41 (quoting *Dime Sav. Bank of N.Y. v. Skrelja*, 642 N.Y.S.2d 84 (N.Y. App. Div. 1996)).

cases supporting that proposition deals with claims for breach of a fiduciary duty, which is necessarily a legal duty independent of the contract. Similarly, the Utah Supreme Court has also "recognize[d] that in some cases the acts constituting a breach of contract may also result in breaches of duty that are independent of the contract and may give rise to causes of action in tort."[184] The line of cases used by the Utah Supreme Court references intentional torts and statutorily imposed duties, which again are necessarily legal duties independent of contracts. The consideration of these independent relations is consistent with *Equilease Corp.*

The supplemental briefing by the parties reflects an unchanged independent tort doctrine.[185] SCO again argues that IBM misstates the independent tort doctrine as too narrow. IBM argued that where parties' interests are aligned and plaintiffs reasonably rely on representations of contractual performance, "a 'legal duty . . . would arise out of the independent characteristics of the relationship between' the parties, supporting an independent tort claim, even where that duty was 'assessed largely on the standard of care and the other obligations set forth in the contract.'"[186] However, the case upon which SCO bases this argument dealt with financial investors suing their financial advisor, meaning the "independent characteristics of the relationship" were effectively a fiduciary relationship. Most contracting parties have aligned interests and rely on one another to perform. However, a common contract relationship cannot reasonably create the "independent characteristics" that would give rise to fiduciary-like duties

---

[184] *Culp Const. Co. v. Buildmart Mall*, 795 P.2d 650 (Utah 1990).

[185] *See, e.g.*, *Dorset Industries, Inc. v. Unified Grocers, Inc.*, 893 F.Supp.2d 395, 414 (E.D.N.Y. 2012); *Taizhou Zhongneng Import and Export Co., Ltd. v. Koutsobinas*, 509 F. App'x 54, 57 (2nd Cir. 2013) (the tort claim "cannot arise out of the same facts that serve as the basis for a plaintiff's causes of action for breach of contract (internal citations and quotations omitted)); *Board of Managers of Soho North 267 West 124th Street Condominium v. NW 124 LLC*, 984 N.Y.S.2d 17, 18–19 (N.Y. App. Div. 2014).

[186] SCO's Unfair Competition Supplement at 4–5 (citing *Bayerische Landesbank, N.Y Branch v. Aladdin Capital Magmt. LLC*, 692 F.3d 42, 58–59 (2nd Cir. 2012)).

without other, far more defining circumstances, like the financial advisor context referenced by SCO.

It appears that the theme in these New York and Utah cases is that where a heightened duty is imposed as in the fiduciary context or by statute, essentially "aris[ing] from the relation of the parties irrespective of the contract,"[187] those duties are not subsumed in contractual duties. However, where the parties have agreed to certain heightened contractual standards which do not create the independent tort duty, common torts are subsumed in those express contractual duties. For example, in *Sidney Frank Importing Co.*, a whisky importer sued a distillery for breach of contract and unfair competition.[188] The Southern District of New York identified the type of unfair competition claim that could be contract-related but not expressly subsumed in the breach of contract claim: "Cooley's alleged duty under the Agreement to provide whiskey to Plaintiff in quantities specified by purchase orders . . . is distinct from Cooley and Beam's duty not to misappropriate Plaintiff's property for their own use."[189] Simply stated, the independent tort doctrine remains unchanged: an express contractual duty subsumes tort claims that are not based on an independent legal duty.[190]

### B.  SCO's Unfair Competition Claim Is Subsumed by Express Contractual Provisions Specifically Governing the SVr4 Code

In *Sidney Frank Importing Co.*, which SCO offered, the Southern District of New York describes the claim of unfair competition:

> New York courts have recognized two theories of unfair competition claims: "palming off" and misappropriation. Palming off is the sale of goods of one manufacturer as those of another. Misappropriation, the theory which Plaintiff

---

[187] *Equilease Corp.*, 647 F.2d at 1074.

[188] *Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F.Supp.2d 193, 210 (S.D.N.Y. 2014).

[189] *Id.*

[190] *Deer Crest Associates I, L.C.*, 2006 WL 722216 at *3; *Medinol Ltd.*, 346 F.Supp.2d at 607 (citing *Milks Development*, 311 F.Supp.2d at 425).

asserts here, concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property. Misappropriation is also described as taking the skills, expenditures, and labor of a competitor, and misappropriating for the commercial advantage of one person . . . a benefit or property right belonging to another.

To state a claim for the misappropriation theory of unfair competition, a plaintiff must allege that the defendant: (1) misappropriated the plaintiff's labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so.[191]

Here, SCO specifically places its claim, at least in part, within the misappropriation prong of unfair competition,[192] alleging that IBM engaged in "[m]isappropriation of source code, methods, and confidential information" and "[c]ontribution of protected source code and methods for incorporation into one or more Linux software releases, intended for transfer of ownership to the general public."[193] Therefore, the question is whether an express contract provision treats the appropriation of SCO's source code.

In this case, the JDA expressly granted to IBM:

a worldwide, non-exclusive, royalty free . . ., perpetual and irrevocable . . . right and license under SCO's and applicable third parties' copyrights . . . and any trade secrets or confidential information in the Licensed SCO Materials and SCO Project Work which are included in Deliverables to (i) prepare or have prepared Derivative Works, (ii) use, execute, reproduce, display and perform the Licensed SCO Materials and SCO Project Work and Derivative Works thereof, (iii) sublicense and distribute the Licensed SCO Materials and SCO Project Work and Derivative Works thereof either directly or through Distributors, in the form of Source Code, Object Code, Documentation, and/or in any other form whatsoever, and (iv) grant licenses, sublicenses, and authorizations to others (including without limitation IBM Subsidiaries, Distributors and any other third parties), on a non-exclusive basis that is equal to the scope of the licenses granted hereunder.[194]

---

[191] *Sidney Frank Importing Co.*, 998 F.Supp.2d at 210.

[192] SCO's Unfair Competition Supplement at 4.

[193] Second Amended Complaint ¶ 184(a) and (e), docket no. 108, filed Feb. 27, 2014.

[194] JDA § 2.2(d)(2).

That "worldwide, non-exclusive, royalty free . . ., perpetual and irrevocable . . . right and

license" was limited as follows:

> When IBM sublicenses the IA-64 Product containing Licensed SCO Materials
> and/or SCO Project Work in Source Code form or when SCO sublicenses the IA-
> 64 Product containing Licensed IBM Materials and/or IBM Project Work in
> Source Code form, the parties shall not grant the third party the right to further
> grant source sublicenses to the other party's Licensed Materials or Project Work.
> Further, when licensing such Source Code, both e parties shall only grant the right
> to create Derivative Works required for the following purposes:
> 1. Maintenance and support;
> 2. Translation and localization;
> 3. Porting, optimization and extensions;
> 4. Any other Derivative Works agreed to by SCO and IBM.[195]

The use or appropriation of SCO's source code is expressly addressed in the JDA. It is

clear that use of the code is not "collateral and extraneous to the terms and conditions of the

contract that were allegedly breached,"[196] but rather, there exists an "express contract provision

dealing with the issue, [and therefore,] there is no independent duty created here which would

create a tort apart from the contractual obligations between the parties."[197] In fact, determining

that IBM misappropriated the code in question would require a legal conclusion that IBM had

breached the contract. This is unlike the *Sidney Frank Importing Co.* case, discussed above,

where the Southern District of New York was able to distinguish the alleged breach of contract

and the alleged tort because they embraced separate duties. Here, the alleged misappropriation is

inseparable from an alleged breach of the JDA and its licensing provisions because IBM's legal

right to use the source code is at the heart of each claim.

---

[195] *Id*. § 2.2(e).

[196] *Medinol Ltd.*, 346 F.Supp.2d at 607 (citing *Milks Development*, 311 F.Supp.2d at 425).

[197] *Deer Crest Associates I, L.C.*, 2006 WL 722216, at *3.

Even more telling, although the alleged tort claim "must be sufficiently distinct from the breach of contract claim in order to be legally sufficient,"[198] SCO actually based its claim on the allegations that IBM engaged in "[b]reach of contract," "[v]iolation of confidentiality provisions running to the benefit of plaintiff," and "[i]nducing and encouraging others to violate confidentiality provisions."[199] Furthermore, SCO's briefing is replete with characterizations of the IA-64 product being a "sham," but the quality of the IA-64 product is only relevant to the use of SCO's code in the context of the JDA, and SCO essentially sought to drive home the point that IBM's did not sufficiently perform its contractual obligations to reap the benefits of the contract. Although SCO may argue that its unfair competition claim is not subsumed in the parties' contractual duties, not only does the JDA clearly addresses IBM's use of the code, but SCO's own Second Amended Complaint specifically alleges breach of contract as many of the bases for its unfair competition claim. SCO's unfair competition claim cannot survive summary judgment.

### C.  SCO Cannot Rely on the Utah Unfair Competition Act as a Basis for an Unfair Competition Claim

In the 2006 briefing, SCO had originally argued that unfair competition is not simply limited to "palming off" and misappropriation, extending to "broadly encompass[] all forms of 'commercial immorality.'"[200] However, cases SCO cited in 2015 from the same court upon which SCO relied in 2006 for its "commercial immorality" theory clearly stated that "New York courts have recognized two theories of unfair competition claims: 'palming off' and

---

[198] *Medinol Ltd.*, 346 F.Supp.2d at 607 (citing *Milks Development*, 311 F.Supp.2d at 425).

[199] Second Amended Complaint ¶ 184(b)–(d), docket no. 108, filed Feb. 27, 2014.

[200] SCO's Unfair Competition Opposition at 43 (citing *Too, Inc. v. Kohl's Dep't Stores*, 210 F.Supp.2d 402, 405 (S.D.N.Y 2002) ("[u]nfair competition may be based on a wide variety of illegal practices, including misappropriation and other forms of commercial immorality.)).

misappropriation."[201] In SCO's 2006 discussion of the broad unfairness standard, SCO argued in a footnote that a portion of the Utah Code (enacted in 2004 *after* IBM's allegedly tortious acts) created a statutory right to damages for the unlawful, unfair, or fraudulent infringement of a copyright or the violation of a software license.[202] Given the importance of statutorily imposed legal duties under the independent tort doctrine, it is necessary to discuss this statutory argument.

The relevant portion of the Definitions section of the Unfair Competition Act stated in 2004 that:

> "unfair competition" means an intentional business act or practice that:
> (i)      (A) is unlawful, unfair, or fraudulent; and
>          (B) leads to a material diminution in value of intellectual property; and
> (ii) is one of the following:
>          (A) cyber-terrorism;
>          (B) infringement of a patent, trademark or trade name;
>          (C) a software license violation; or
>          (D) predatory hiring practices.[203]

SCO argued that "[e]ven if applied only prospectively, IBM is liable under the statute for SCO's post-2004 damages, because unfair competition is a continuing tort and each sale of AIX for Power is an independent cause of action. . . . Moreover, the statute may be applied retroactively, because, as an addition to the previously existing Unfair Practices Act, it clarified existing law.[204]

SCO was ordered multiple times to disclose the basis of each of its claims but never disclosed any intent to rely upon this statute, and therefore, may not do so now.[205] Although

---

[201] *Sidney Frank Importing Co.*, 998 F.Supp.2d at 210.

[202] SCO's Unfair Competition Opposition at 44 n.11 (citing UTAH CODE ANN. § 13-5a-102(4)(a)).

[203] UTAH CODE ANN. § 13-5a-102(4)(a)

[204] SCO's Unfair Competition Opposition at 44 n.11 (citing *Dep't of Soc. Serv. V. Higgs*, 656 P.2d 998, 1001 (Utah 1982)).

[205] *See* Order Affirming Magistrate Judge's Order of June 28, 2006, docket no. 884, filed Nov. 29, 2006.

SCO's failure to disclose this statute as a basis for its unfair competition claim is alone sufficient, there are other reasons SCO cannot rely on this statute.

First, the statute cannot be applied retroactively because the 2004 enactment of this language was not a clarification, but rather a legislative change. Contrary to SCO's argument, the "clarification" exception, permitting the retroactive application of statutory amendments that only clarify existing law, cannot apply here. The enumeration of a breach of a software license as a form of unfair competition is not a new statutory provision that does not alter a party's substantive rights.[206]

Rather, "the legislature fundamentally altered the substantive rights accorded under Utah law, which previously restricted common law unfair competition claims to palming-off and misappropriation."[207] Describing the enactment of novel statutory language as nothing more than a clarification would result in the unreasonable conclusion that much of newly enacted legislation is generally mere clarification, and therefore, retroactive. Additionally, IBM correctly points out that no Utah statute is retroactive unless expressly stated.[208]

Second, SCO's prospective application argument is flawed because IBM's alleged breach of the JDA occurred nearly four years prior to the effective date of Section 13-5-a-102(4)(a), and therefore, IBM's breach would not have constituted unfair competition. SCO has offered no authority to support an argument that the continuing tort doctrine functions to create, *after* the enactment of a statute, a continuing tort from an alleged breach that did not constitute a tort when

---

[206] *See, e.g.*, *Okland Constr. Co. v. Industrial Comm'n*, 520 P.2d 208, 210-11 (Utah 1974) (applying clarification exception where the phrase "312 weeks" for earlier language of "six years ... weekly compensation" in statute).

[207] IBM's Unfair Competition Reply at 10–11 n.7 (citing *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000).

[208] IBM's Unfair Competition Reply at 10 (citing UTAH CODE ANN. § 68-3-3).

it occurred. For these reasons, SCO cannot rely on Utah's subsequently enacted Unfair

Competition Act to salvage its unfair competition claim.

### D.  SCO and IBM Entered Into an Arms-Length Contract and Did Not Create a Joint Venture, Partnership, or Any Other Form of Fiduciary Relationship

SCO's Unfair Competition Opposition understandably does not focus on the contractual

provisions at issue; rather, SCO argued that a fiduciary duty exists between the parties, thereby

rendering IBM's actions actionable as unfair competition.

SCO argued that it "is not seeking to hold IBM to a promise. . . . Nothing in the JDA

expressly required IBM to inform SCO of its intent to string the project along. SCO['s]

complain[t]s are not about a contractual breach, but of IBM's pattern of deceptive and unfair

conduct."[209] More specifically, SCO complains that IBM deceived Santa Cruz and SCO about its

Project Monterey and LINUX intentions, made a "sham" IA-64 product, and pretended to

support Project Monterey long after it decided to terminate the project, in addition to

misappropriating code.[210]

Preliminarily, the IA-64 product was the central purpose of Project Monterey and the

JDA, and therefore a failure to perform under that contract by offering a "sham" IA-64 product

would necessarily constitute a breach of contract or a breach of the implied covenant of good

faith and fair dealing. Therefore, SCO's remaining allegations include deception regarding

intentions and pretended support. Although SCO's Second Amended Complaint grandly alleges

"conduct that is intentionally and foreseeably calculated to undermine and/or destroy the

economic value of UNIX anywhere and everywhere in the world,"[211] the pleading lacks

---

[209] SCO's Unfair Competition Opposition at 40.

[210] *Id.*

[211] SCO's Second Amended Complaint ¶ 183.

specificity and substance, otherwise identifying these allegations as "[u]se of deceptive means and practices in dealing with plaintiff with respect to its software development efforts."[212]

SCO argued that "despite the fact that SCO's unfair competition claim is, in certain respects, *related* to the contract . . . the claim is actionable because, in view of the joint venture relationship, IBM has independent fiduciary and common law confidentiality duties that are distinct and wholly separate from the contract."[213] Bizarrely, SCO argued that IBM should be precluded from even responding to SCO's allegations of a fiduciary and confidential relationship because they were not disputed in IBM's Unfair Competition Memorandum.[214] However, the local rules limit a reply memorandum to rebuttal of matters raised in the memorandum opposing the motion,[215] necessarily allowing IBM to respond to SCO's discussion of a fiduciary relationship.

SCO's arguments regarding a fiduciary relationship fail for three reasons. First, although SCO offers the alleged fiduciary relationship as a counter to the independent tort doctrine issue, SCO has offered no authority to support its implied argument that an independent fiduciary duty somehow constitutes a claim of unfair competition. To the extent SCO would argue that any alleged fiduciary duties are independent from the JDA and therefore not subsumed in breach of contract, that argument would only support a claim for breach of a fiduciary duty, not unfair competition. Alleging that an independent legal duty exists does not allow SCO to avoid the independent tort doctrine in order to pursue a tort claim that is not based on a breach of that duty.

---

[212] *Id.* ¶ 184(f).

[213] SCO's Unfair Competition Opposition at 42.

[214] *Id.* at 42 n.10.

[215] DUCivR 7-1(b)(3).

Second, the parties did not have a fiduciary relationship. "A fiduciary relationship exists under New York law when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."[216] In Utah, a fiduciary relationship "imparts a position of peculiar confidence placed by one individual in another" and "implies a condition of superiority of one of the parties over the other," while a fiduciary "is a person with a duty to act primarily for the benefit of another" and "is in a position to have and exercise and does have and exercise influence over another."[217] Although "[t]here is no invariable rule which determines the existence of a fiduciary relationship . . . there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other."[218] Clearly, SCO and IBM were two sophisticated business entities, and the facts SCO included in its briefing laud SCO's expertise and capabilities,[219] and are not indicative of inequality, weakness, and dependency in the SCO-IBM relationship.

Moreover, "[b]y their nature, arms-length commercial transactions ordinarily do not involve relationships defined by the New York court as fiduciary."[220] "Under special circumstances a fiduciary duty may be found notwithstanding the existence of a contract—specifically, when there is a 'relationship of higher trust than would arise from the . . . agreement alone.'"[221]

---

[216] *Muller-Paisner v. TIAA*, 289 F. App'x 461, 465 (2nd Cir. 2008) (citations omitted).

[217] *First Sec. Bank of Utah N.A. v. Banberry Dev.Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (citations omitted).

[218] *Id.*

[219] *See* Statement of Undisputed Facts, *supra*, ¶¶ 16–19.

[220] *Muller-Paisner*, 289 F. App'x at 466.

[221] *Zorbas v. U.S. Trust Co. N.A.*, 48 F.Supp.3d 464, 479 (E.D.N.Y. 2014) (citing *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20).

SCO argued that "the 'tight partner' relationship though [sic] SCO placed its 'trust and confidence' in IBM gives rise to a fiduciary relationship."[222] However, the case SCO cites does not apply to the SCO-IBM relationship. In *Muller-Paisner*, the Second Circuit determined that an annuity broker owed a fiduciary relationship to a 70-year-old woman where the defendants had targeted specific advertisements regarding their expertise to her class of people, retired educators, focusing on the defendants' roles as advisors, knowing their advice would be relied upon.[223]

Subsequently, the Southern District of New York specified that *Muller-Paisner* and other similar cases "are inapposite to this case involving two sophisticated business entities" because "those cases . . . involve *unsophisticated* parties, the *elderly*, or the *infirm*."[224] The Southern District of New York further distinguished *Muller-Paisner* from cases like this case: "*Muller-Paisner* dealt with an insurer who allegedly made representations to an *infirm* purchaser of an annuity insurance contract" and "is inapplicable to the arm's-length commercial transaction" where the plaintiff "is not like the *infirm* decedent in *Muller-Paisner* who was *preyed upon* by the defendant in this case."[225] SCO did not attempt to argue that it should be considered as one of those "unsophisticated parties, the elderly, or the infirm," or how IBM should be considered more like the insurance broker who "*preyed upon*" those types of disadvantaged people.[226] Nevertheless, SCO's attempt at creating such a relationship of trust and confidence fails.

---

[222] SCO's Unfair Competition Supplement at 5 (citing *Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2nd Cir. 2008) ("[A] fiduciary duty may arise in the context of a commercial transaction upon a requisite showing of trust and confidence.")).

[223] *Muller-Paisner*, 289 F. App'x at 466.

[224] *Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F.Supp.2d 508, 513 (S.D.N.Y. 2012) (emphasis added).

[225] *Id.* (emphasis added).

[226] *Id.* (emphasis added).

Third, SCO's allegations fall well short of what is required to show the existence of a joint venture or partnership. In New York, "[t]o demonstrate the existence of a partnership, a plaintiff must prove four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners."[227] Similarly, to demonstrate the existence of a joint venture, a plaintiff must prove that:

> (1) two or more parties entered an agreement to create an enterprise for profit, (2) the agreement evidences the parties' mutual intent to be joint venturers, (3) each party contributed property, financing, skill, knowledge, or effort to the venture, (4) each party had some degree of joint management control over the venture, and (5) there was a provision for the sharing of both losses and profits.[228]

"The absence of any one element is fatal to the establishment of a joint venture. . . . Further, a joint venture represents more than a simple contractual relationship. Thus, it is insufficient for a plaintiff to allege mere joint ownership, a community of interest, or a joint interest in profitability."[229] Importantly, "[i]n formulating an agreement to be joint venturers, 'the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract.'"[230] An essential element is the requirement that the parties provided for the sharing in profits and losses.[231]

The process of establishing a joint venture is similar if not identical in Utah. The requirements for the relationship are not exactly defined, but certain elements are essential:

---

[227] *Kids Cloz, Inc. v. Officially For Kids, Inc.*, 320 F.Supp.2d 164, 171 (S.D.N.Y. 2004).

[228] *Id.* (internal quotations and citations omitted).

[229] *Id.* (internal quotations and citations omitted).

[230] *Id.* (citing *Precision Testing Laboratories v. Kenyon Corp.*, 644 F.Supp. 1327, 1349 (S.D.N.Y. 1986)).

[231] *See id.*

The parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be a community of interest in the performance of the common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and unless there is an agreement to the contrary, a duty to share in any losses which may be sustained.

While the agreement to share losses need not necessarily be stated in specific terms, the agreement must be such as to permit the court to infer that the parties intended to share losses as well as profits.[232]

In this case, several elements are lacking. Most directly, the parties unambiguously stated in the JDA that they were not forming a joint venture or partnership:

Each party is acting solely as an independent company. This Agreement shall not be construed to establish any form of partnership, agency, franchise or joint venture of any kind between SCO and IBM, nor to constitute either party as an agent, employee, legal representative, or any other form of representative of the other. This Agreement shall not be construed to provide for any sharing of profits or losses between the parties.[233]

This provision undercuts SCO's argument.

Although SCO is correct that "courts look to economic realities and disregard labels when the agreement as a whole and surrounding facts show an intent to create" a joint venture or partnership,[234] the economic realities of this case support rather than contradict the parties' express rejection of any sort of partnership. For example, SCO states that the JDA required sharing of profits and losses,[235] but the sections SCO cites, §§Sections 11.3 and 12.0–12.5, relate respectively to the ownership of joint inventions and provisions regarding royalties. Provisions governing joint inventions and royalties fall substantially short of a partnership bearing all profits and losses.

---

[232] *Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974) (citing 48 C.J.S. Joint Adventures s 2a).

[233] JDA § 22.5.

[234] SCO's Unfair Competition Opposition at 36–37 n.6.

[235] *Id.*

The existence of fiduciary duties would not result in salvaging SCO's unfair competition claim. SCO and IBM did not have an unequal and unbalanced relationship that would give IBM fiduciary duties toward SCO. SCO and IBM did not create a joint venture or partnership, meaning that IBM owed SCO no fiduciary duties.

## CONCLUSION

Summary judgment is granted to IBM on SCO's unfair competition claim because the alleged misappropriation at the heart of the claim is subsumed in SCO's breach of contract claim, and the independent tort doctrine prevents SCO's re-framing of its contract claim as a tort claim. SCO's alternative arguments also fail. SCO cannot use a later-enacted portion of the Utah Code that was not offered as a basis for this claim or create a joint venture or fiduciary relationship from an otherwise arm's-length contract between two sophisticated business entities.

## ORDER

For the reasons stated above, IT IS HEREBY ORDERED that IBM's Unfair Competition Motion[236] is GRANTED, and summary judgment is granted in IBM's favor on SCO's unfair competition claim (SCO's Sixth Cause of Action).

Dated February 5, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[236] IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action), docket no. 782, filed Sept. 25, 2006.

47