1

2

3

4                 IN THE UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

6

7

8

   _____

9                                          )
   THE SCO GROUP, INC.,                    )
10                                         )
                                           )
11                                         )
                     Plaintiff,            )
12                                         )
        vs.                                )    Case 2:03-CV-294
13                                         )
                                           )
14   INTERNATIONAL BUSINESS                )
     MACHINES CORPORATION,                 )
15                                         )
                     Defendant.            )
16                                         )
   _____)

17

18

               BEFORE THE HONORABLE DALE A. KIMBALL

19
                         APRIL 21, 2005

20
               REPORTER'S TRANSCRIPT OF PROCEEDINGS

21
                         MOTION HEARING

22

23

24

25        Reported by:  KELLY BROWN, HICKEN CSR, RPR, RMR

```
 1                      A P P E A R A N C E S

 2      FOR THE PLAINTIFFS:   HATCH, JAMES & DODGE, PC

 3                           BY: BRENT O. HATCH

 4                               Attorney at Law

 5                           10 West Broadway, Suite 400

 6                           Salt Lake City, Utah  84101

 7

 8                           BOIES, SCHILLER & FLEXNER, LLP

 9                           BY:  EDWARD J. NORMAND

10                                SEAN ESKOVITZ

11                                Attorneys at Law

12                           333 Main Street

13                           Armonk, New York 10504

14      FOR THE DEFENDANT:   SNELL & WILMER, LLP

15                           BY:  TODD M. SHAUGHNESSY

16                                Attorney at Law

17                           15 West South Temple

18                           Salt Lake City, Utah  84101

19

20                           CRAVATH, SWAINE & MOORE LLP

21                           BY:  DAVID R. MARRIOTT

22                                Attorney at Law

23                           Worldwide Plaza

24                           825 Eighth Avenue

25                           New York, New York  10019
```

1          SALT LAKE CITY, UTAH, THURSDAY, APRIL 21, 2005

2                          *   *   *   *   *

3          THE COURT:  We're here this afternoon in the matter

4    of The SCO Group vs. International Business Machines

15:06:41  5    Corporation, 2:03-CV-294.  For plaintiff, Mr. Brent Hatch and

6    Mr. Sean Eskovitz and Mr. Edward Normand; correct?

7          MR. NORMAND:  Correct, Your Honor.

8          THE COURT:  For defendant, Mr. David Marriott and

9    Mr. Todd Shaughnessy.

15:06:59 10          MR. MARRIOTT:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          All right.  We have SCO's motion to compel IBM to

13    produce Mr. Palmisano for deposition; SCO's motion for leave

14    to file a third amended complaint, which might touch on the

15:07:17 15    question of defendant wanting or not wanting to narrow the

16    Ninth Counterclaim; and proposed scheduling orders from

17    everyone.

18          Now, the first and third of those motions clearly

19    have no confidentiality problems.  The second one, the motion

15:07:38 20    for leave to file a third amended complaint, there might be

21    some alleged confidential information there, but you can argue

22    it in a way that doesn't refer directly to it.  You can refer

23    to it in exhibits and so on.  So I'm sure for the happy

24    conclusion of the spectators, the courtroom will not be

15:08:01 25    sealed.

1           All right.  Let's take up the motion to compel.

2    Who's going to argue that?

3           MR. ESKOVITZ:  I will, Your Honor.

4           THE COURT:  And you are?

15:08:09  5    MR. ESKOVITZ:  I'm Sean Eskovitz.

6           THE COURT:  You are Mr. Eskovitz.

7           MR. ESKOVITZ:  And, Your Honor, in connection with

8    both of the motions that will be argued this afternoon, we

9    submitted to the Court two separate binders of exhibits that

15:08:33  10   will come up during the argument.

11          THE COURT:  And you've given them to opposing

12   counsel, no doubt?

13          MR. ESKOVITZ:  We have.

14          THE COURT:  Thank you.

15:08:40  15   MR. ESKOVITZ:  Your Honor, SCO seeks to depose

16   Sam Palmisano because before he became IBM's chairman and CEO,

17   he personally spearheaded IBM's multi-billion dollar strategic

18   decision to shift the focus of its operating system business

19   from Unix to Linux, and that strategy is at the center of

15:09:05  20   SCO's claims in this case.  Specifically, SCO alleges that in

21   order to carry out his strategy of quickly upgrading Linux

22   into an operating system that could compete with Unix, SCO's

23   product for business users, IBM took the shortcut of

24   misappropriating SCO's intellectual property in Unix and

15:09:26  25   contributing Unix' enterprise strength features into Linux.

1            Now, Mr. Palmisano spearheaded that IBM Linux

2       strategy when he was the vice-president in charge of IBM's

3       computer server group in late 1999 and early 2000, years

4       before he was installed as the company's CEO and chairman.

5       But IBM has attempted to shield Mr. Paul Palmisano from

6       deposition based on his current positions.

7            They've refused to produce Mr. Palmisano on two

8       grounds.  First, they've argued that he has no knowledge

9       regarding any specific issues that are relevant to this

10      lawsuit; and they've also argued in the alternative that any

11      knowledge he has can be obtained by deposing other individuals

12      within IBM.  And those objections are wrong as a matter of

13      fact and as a matter of law.  And as I'll detail in this

14      argument, Mr. Palmisano clearly has knowledge regarding

15      specific relevant issues about IBM Linux strategy and with

16      respect to the legal position that IBM has taken.  They

17      incorrectly base their refusal to produce Mr. Palmisano on an

18      inapposite body of case law that merely stands for the

19      proposition that in garden variety lawsuits where a party

20      should not be permitted to harass or interfere with the other

21      party's operations simply by attempting to take the deposition

22      of the highest executive of the company, who may have nothing

23      to contribute with respect to the matters at issue in the

24      lawsuit.  And that doctrine has no application here.

25           Mr. Palmisano, as we'll detail, made key senior

1    policy decisions regarding Linux and had direct responsibility

2    for IBM Linux-related activities that are at issue in this

3    case, all while he was vice-president at IBM before he took

4    over his current responsibilities.

15:11:22  5           THE COURT:  If I let you depose him, how long do

6    you want to take?

7           MR. ESKOVITZ:  That was exactly my next point, Your

8    Honor, which is we would comply with the Court's restrictions.

9    It would be a seven-hour deposition one day.  The deposition

15:11:34 10  could be done with a maximum of convenience.  Our offices are

11   actually in Armonk, New York, which IBM is headquartered and

12   Mr. Palmisano has his office.  He literally needs to cross the

13   street or we'll cross the street to depose him.  And we can

14   schedule his deposition with him with advance notice to

15:11:53 15  accommodate his schedule.  So it really is a minimum burden.

16          THE COURT:  You're just happy neighbors there; is

17   that right?

18          MR. ESKOVITZ:  That's right, Your Honor.  It's a

19   small town.  We all get along.

15:11:58 20          I forgot to mention, under all the applicable case

21   law, Mr. Palmisano's personal knowledge of IBM's intent and

22   motive with respect to the Linux strategy requires that he

23   give deposition testimony.  As an initial matter, it is well

24   settled that -- and this is documented in Exhibit A that was

25   submitted to the Court in connection with this motion.

1           THE COURT:  You don't trust our water here?

2           MR. ESKOVITZ:  I don't want to spill it, Your

3    Honor.  I'm prone to that.

4           THE COURT:  Go ahead.  I'm sorry.

15:12:41  5           MR. ESKOVITZ:  It well goes without saying that an

6    order barring litigants to take a deposition is an

7    extraordinary form of relief.  And the parties seeking such an

8    order under the case law that we cited in Exhibit A

9    establishes that the parties seeking to quash a deposition

15:12:58  10   notice bears the burden of showing that the proposed deponent

11   has nothing to contribute.

12          And that is particularly true with respect to the

13   case law cited in Exhibit B, when the deposition that is

14   sought relates to the issues of a company's motivation and

15:13:15  15   intent with respect to implementing a relevant corporate plan

16   or strategy.  The courts recognize that when it comes to the

17   matter of corporate motivation, the high-level executive who

18   proved the strategy or implemented the strategy is the person

19   with the most probative information to give on a deposition.

15:13:36  20          And constructive on that point is the Travelers

21   Rental vs. Ford Motor Company case, which we cited in our case

22   and also in Exhibit B.  And the Court recognizes in that case,

23   District of Massachusetts case, that:

24          Those with greater authority may have

15:13:53  25       the last word on why, in this case the Ford

7

1          Company, formulated and/or administered the

2          plan in the manner in which the lower level

3          executives describe it as being formulated

4          and/or administered.  And as the ultimate

15:14:05   5          authority, their views as to why may be of

6          far greater probative value on the issues of

7          intent and motive than the views of the lower

8          level executives.

9               IBM has told us that they have hundreds of

15:14:20  10     individuals working on their Linux strategy.  And we have, in

11     fact, deposed some of those.  But those individuals are not in

12     a position to tell us why Mr. Palmisano approved the strategy

13     that he approved.  And that is unique knowledge that

14     Mr. Palmisano has that no lower level executive is going to be

15:14:36  15     able to give us in a deposition.  And it is precisely the

16     situation where courts permit high-ranking executives to be

17     deposed.  And certainly, as a matter of law, high-ranking

18     corporate executives are not immune from deposition.

19          It's precisely -- this is precisely the kind of

15:14:54  20     case in which such depositions are appropriate because, as I

21     said, first, Mr. Palmisano was personally involved in

22     formulating and approving the Linux strategy; and, second,

23     that strategy is relevant to numerous issues in this case.

24     And I'll take those two points in turn.

15:15:09  25          First, there can really be no dispute that while he

8

1    was an IBM vice-president Mr. Palmisano was personally

2    involved in and indeed spearheaded IBM's strategy to embrace

3    Linux and guided IBM's Linux-related efforts.

4         In Exhibit C that we've handed up to the Court,

15:15:28  5    there's a *New York Times* article from March 2000 that featured

6    Mr. Palmisano explaining his role in connection with what it

7    described as IBM's ambitious Linux strategy.  The article

8    describes Mr. Palmisano as the leader of that ambitious

9    strategy, the IBM senior executive who pushed both

15:15:48  10   emphatically for the Linux initiative.  It quotes

11   Mr. Palmisano's hand-picked Czar from the technology side of

12   the Linux operation as referring to IBM's Linux strategy as

13   Sam's bet.  And the article quotes Mr. Palmisano --

14        THE COURT:  Sam's bet?

15:16:08  15        MR. ESKOVITZ:  Sam's bet.  It was Mr. Palmisano's

16   bet on Linux on behalf of IBM.

17        And the article quotes Mr. Palmisano as describing

18   that Linux strategy, and this is important to the King Czar

19   case, as driving the Linux momentum at the front because, in

15:16:24  20   his view, moving quickly was imperative for IBM.

21        And as I explained, and I'll get into more, the

22   fact that IBM's motive here was to upgrade Linux as quickly as

23   it possibly could in order to begin to recoup the billions of

24   dollars that they invested into that strategy, it's critical

15:16:42  25   to proof of our contract claim as well as defenses to the

1    copyright claims in this case and for other independent

2    reasons.

3              At Exhibits D and E of the book that Your Honor has

4    are IBM's own descriptions of Mr. Palmisano's contributions.

15:16:57  5    And they credit him in Exhibit D with leading IBM's adoption

6    of the Linux operating environment; and in Exhibit E, as

7    spearheading when he was head of IBM's server and enterprise

8    storage businesses, a major initiative to embrace Linux across

9    IBM's server line.

15:17:26 10              And, indeed, shortly after IBM adopted

11    Mr. Palmisano's Linux strategy in January of 2000,

12    Mr. Palmisano, this is in Exhibit F, publicly announced that

13    IBM would take the lead in the industry by making IBM

14    technologies available to the Linux and open source

15:17:41 15    communities.

16              And as I alluded to earlier, we have taken the

17    deposition of other IBM executives with respect to the Linux

18    strategy, and particularly Mr. Wladawsky-Berger, who I

19    described earlier and the *New York Times* described as IBM's

15:17:54 20    technical Linux Czar.  And Mr. Wladawsky-Berger testified in

21    his deposition, and these are excerpted in Exhibit F, that he

22    reported and made his recommendations directly to

23    Mr. Palmisano; that Mr. Palmisano made the decision that IBM

24    should embrace Linux; and that Mr. Palmisano believed that

15:18:17 25    IBM's Linux strategy was a high priority, important effort for

1    IBM.

2              So I don't think there's really much dispute here

3    that Mr. Palmisano was directly involved and, as the *New York*

4    *Times* described, spearheaded, and as IBM itself describes,

15:18:32 5    spearheaded the strategy.  So the question is, what relevance

6    does the strategy have to SCO's claims?

7              And as I alluded to earlier, there are several

8    independent bases on which the strategy is relevant.  The

9    first one I described already, which is that the corporate

15:18:48 10    motive and intent of IBM in throwing its weight and billions

11    of dollars that have been publicly reported behind Linux is

12    the reason why IBM took the shortcuts that SCO claims it did

13    and misappropriated SCO's code in order to upgrade Linux as

14    quickly as it could to make it enterprise-hardened, is the

15:19:08 15    word that has been described in the industry, to make it a

16    viable competitor with Unix as quickly as possible.  To turn

17    it from a hobbyist's interest into something that -- operating

18    system that would appeal to sophisticated businesses.

19              Second, and maybe even more directly, SCO has tort

15:19:28 20    claims including a claim for unfair competition in its

21    complaint, and it's in Exhibit G.  We cite some case law for

22    the Court, these are in the our briefs, as well, that it is an

23    element of SCO's unfair competition claim to show IBM's bad

24    faith or IBM's corporate intent, its motive.  And that's

15:19:49 25    obviously also relevant to SCO's claim for punitive claims

11

1    under its tort claims.

2              With respect to the unfair competition claim, SCO

3    specifically alleges that IBM has engaged in a course of

4    conduct that is intentionally and foreseeably calculated to

15:20:06  5    undermine and/or destroy the economic value of Unix and to

6    seize the value of Unix for its own benefit and for the

7    benefit of its Linux distribution partners.  Obviously, the

8    evidence that Mr. Palmisano can give as to why IBM and why he

9    on behalf of IBM proof of Linux strategy is evidence that goes

15:20:26  10   to IBM's intent with respect to the tort claims of punitive

11   damages claims.

12             And finally and independently with respect to

13   damages, the evidence of IBM's corporate intent or motive is

14   relevant to the benefit that IBM receives by being able to

15:20:46  15   shortcut the development process and being able to rely on

16   misappropriated Unix code in developing Linux.

17             It bears noting in connection with the relevance

18   point that Mr. Palmisano's Linux documents have already been

19   the subject of two separate court orders from Judge Wells

15:21:09  20   compelling their production.  And those orders recognize the

21   relevance of the high-level documents and Linux -- and IBM's

22   Linux strategy to the claims in this case.

23             Specifically in March 2003, the Court ordered IBM

24   to produce all the documents and materials generated by and in

15:21:31  25   the possession of employees that have been and that are

1    currently involved in the Linux project.  And the Judge

2    specifically provided that IBM was to produce materials and

3    documents relating to IBM's Linux strategy from Mr. Palmisano

4    and other high-level executives.  However, among other

5    deficiencies in IBM's production, they have not produced a

6    single e-mail or other correspondence discussing Linux from

7    Mr. Palmisano's files.

8            We renewed our motion to compel.  Counsel for IBM

9    represented to the Court that it would look again for relevant

10   documents, even though it had already been ordered to do so in

11   March of 2003, and Judge Wells ordered IBM to produce

12   affidavits from the high-level executives concerning the

13   efforts with respect to document production.  After that

14   order, IBM produced additional documents from

15   Mr. Wladawsky-Berger file, but still has not produced any

16   correspondence or e-mails relating to Linux from

17   Mr. Palmisano's own files.  They did not produce any

18   explanation as to why they have not produced any of those

19   documents.  And in response to the Court's order, they simply

20   produced a very source affidavit from Mr. Palmisano that says

21   he gave his lawyers unrestricted access to his files.  But

22   again, no explanation as to why these e-mails had not been

23   produced.

24           So to date, despite these two prior court orders on

25   this issue, IBM has not provided any explanation for this

13

1    shortcoming in its document production from Mr. Palmisano.

2    Mr. Wladawsky-Berger, and the Court has the testimony,

3    testified that he communicated by e-mail to Mr. Palmisano.

4    And in Exhibit H that the Court has, IBM produced at least one

15:23:18  5    such document, but not from Mr. Palmisano's file.  So we have

6    at least an indication, a confirmation of Mr. Wassenberger's

7    testimony from IBM's production that, in fact, Mr. Palmisano

8    communicated about the Linux strategy in writing --

9            THE COURT:  You mean Exhibit I?

15:23:36  10           MR. ESKOVITZ:  I believe I'm going to get to

11    Exhibit I -- I'm sorry.  You're right.  Sorry, Your Honor.

12    Exhibit I is the IBM-produced document.  And Exhibit J is

13    another e-mail that we found on the Internet from

14    Mr. Palmisano relating to the Linux strategy.  Neither of

15:23:54  15    these documents were produced from IBM's -- from

16    Mr. Palmisano's files.  We still have not received from

17    Mr. Palmisano's files any such Linux-related correspondence.

18           We have a third motion to compel such documents,

19    which are currently pending before the Court.  But what's

15:24:15  20    important for these purposes is that for the very same reasons

21    that the Court has seen fit to order IBM now twice to produce

22    these Linux documents, because it's the same reason why

23    Mr. Palmisano's testimony is relevant to this case, he was a

24    key decisionmaker.  And frankly, Your Honor, given the

15:24:32  25    difficulty that we've had getting documents and getting

1    straight answers about why these shortcomings persist with

2    respect to the production, we should be permitted to explore

3    the adequacy of Mr. Palmisano's document production, as well.

4            As I alluded to earlier, IBM's argument essentially

5    relies on an inapposite body of case law in which parties

6    resisting high-level depositions establish that the potential

7    deponent either had no personal knowledge of the events at

8    issue frequently in the cases of discrimination cases or

9    unfair termination cases where there were no corporate

10   strategies that were at issue, or at least identify the

11   particular witnesses who could provide the testimony that was

12   being offered.  For example, where a plaintiff is looking for

13   financial information, and the defendant says, you can get

14   that from our accountants or from our CFO.  You don't need the

15   CEO for this.

16           Again, Mr. Palmisano is the only person who can

17   explain his reasons, his motives for adopting the policy that

18   he adopted.  And unlike many of the cases in which IBM relies

19   on, they have not provided any affidavits from Mr. Palmisano

20   disclaiming relevant knowledge, and they haven't identified

21   who these witnesses would be.  They've said there's hundreds

22   of people who are involved with the Linux strategy.

23           And finally, I should note that IBM had served

24   notice on SCO for our CEO.  We intend to produce him.  And I

25   don't see any real reason for, you know, IBM's CEO being

1    treated any differently.

2         So Mr. Palmisano is an important witness in the

3    case.  He's got relevant testimony to give.  The case law

4    establishes that that relevant testimony requires him to sit

15:26:31  5    for a deposition.  There's no basis for IBM certainly to

6    resist that deposition, and they certainly haven't met their

7    burden of showing good cause that Mr. Palmisano has nothing to

8    contribute.  Thank you.

9         THE COURT:  Thank you, Mr. Eskovitz.

15:26:45 10        Mr. Marriott?

11        MR. MARRIOTT:  Good afternoon, Your Honor.

12        THE COURT:  Good afternoon.

13        MR. MARRIOTT:  As much as we disagree with SCO with

14   respect to their claims, Your Honor, we recognize that IBM

15:27:04 15   must provide, and, indeed, we have provided, some measure of

16   discovery with respect to their claims.  We have, in fact,

17   provided substantial discovery.  IBM has produced millions of

18   pages of paper.  It's produced hundreds of millions of lines

19   of source code.  And it's made available for deposition very

15:27:23 20   high-level executives, including the head of IBM software

21   business, Steve Mills; Irving Wladawsky-Berger, the person SCO

22   describes to people as IBM's Linux Czar; and the head of IBM's

23   Linux technology center, Dan Frye.

24        Now, we recognize that a person is not protected

15:27:45 25   from deposition merely by virtue of being a CEO or chairman of

1    a Fortune 100 Company.  But the circumstances in this case, we

2    respectfully submit, are such that it does not make sense that

3    Mr. Palmisano be deposed, certainly not at this juncture of

4    the case.  In our judgment, a CEO of a Fortune 100 Company

15:28:01  5    like Mr. Palmisano should not be deposed, except where the

6    information they haven't provided is directly relevant in a

7    case, where they have in this case as described, has unique

8    personal knowledge and the information sought is not available

9    from others, such as the other 300,000-plus persons who are

15:28:19  10    employed at IBM.

11         THE COURT:  SCO says unlike the unusual cases where

12    the CEO is protected from deposition, here this particular CEO

13    had some direct involvement with the set of problems that form

14    the basis of this case.

15:28:33  15         MR. MARRIOTT:  Well, Your Honor, I appreciate

16    that's the contention that SCO makes.  It's SCO's formulation,

17    however, that there is virtually no circumstance under which a

18    CEO would not be subject to deposition because under the SCO

19    view of the world, any person, any CEO who has any personal

15:28:47  20    knowledge of those things over which that person is in charge.

21    And there's no question, and I'll come to it momentarily,

22    Mr. Palmisano has some knowledge with respect to Linux.  We

23    all, indeed, now have some knowledge with respect to Linux.

24    But there's nothing that is unique, Your Honor, about

15:28:58  25    Mr. Palmisano's knowledge with respect to Linux.

1          Whether or not Mr. Palmisano should be deposed is,

2     of course, a matter committed to Your Honor's discretion.  And

3     I would like just in a few minutes offer two reasons why we

4     believe the Court should exercise its discretion not now to

5     require Mr. Palmisano's deposition.  First, Your Honor, is

6     that there is persuasive authority, notwithstanding

7     Mr. Eskovitz' contention of the contrary that the deposition

8     of an apex employee, that is, the CEO or chairman of a company

9     like IBM, should not be deposed except where that person has

10    unique personal knowledge.

11          THE COURT:  I do know what apex means.

12          MR. MARRIOTT:  Pardon?

13          THE COURT:  I know what apex means.

14          MR. MARRIOTT:  I wasn't doubting you did, Your

15    Honor.

16          In the words of the Baine case, which we cite at

17    Pages 6 and 8 of our brief, quote, the legal authority is

18    fairly unequivocal, close quote, on this point.  Moore's

19    Federal Practice says, Your Honor, federal courts, quote:

20          Often are reluctant to permit apex

21       depositions of the highest level corporate

22       officers or managers or who are unlikely to

23       have personal knowledge of the facts sought

24       by the opposing party, close quotes.

25          And in the Cardenas case, which we cite on Pages 3

1    and 4 of our brief, the courts says, the courts, quote:

2             Frequently restrict efforts to depose

3         senior executives where the party seeking a

4         deposition can obtain the same information with

15:30:20  5         less intrusive means or where the party has not

6         established the executive has some unique

7         knowledge pertinent to the issues in the case.

8             And, Your Honor, SCO has made a number of arguments

9    to suggest that that is not a unique personal knowledge, the

15:30:35  10   controlling standard.  In fact, in its papers at Page 8 in its

11   opening brief, SCO suggests that it is well-settled that a

12   company's CEO is subject to deposition where his knowledge is,

13   quote, even arguably relevant, close quote.

14             And that simply is not the test.  None of the cases

15:30:51  15   cited by SCO suggest that is the test.  Indeed, some of the

16   cases cited by SCO, such as the Six West case, which is cited

17   on Page 9 of its brief, makes it quite clear that a unique set

18   of personal knowledge is what the test is.

19             SCO suggests in Footnote 3 and Mr. Eskovitz said

15:31:09  20   again here this afternoon that the doctrine of limiting these

21   depositions to those persons who have unique personal

22   knowledge is somehow inapplicable in cases of this kind.  And

23   it applies to cases that Mr. Eskovitz describes as garden

24   variety cases, Your Honor.

15:31:23  25             In SCO's brief, it says the doctrine is limited to

1    personal injury, employment, and contract cases.  This is,

2    Your Honor, in an important respect a contract case.  And the

3    only case on which SCO relies for the proposition that the

4    doctrine set out, for example, in the Cardenas case is somehow

15:31:41  5    limited to cases of this kind is the Bridgestone/Firestone

6    case.  In Bridgestone/Firestone, the Court there observed

7    nothing other than that a rigid rule is applicable in cases --

8    in cases of whether apex depositions should be taken.  In that

9    case, Your Honor, the Bridgestone/Firestone case, the Court

15:32:00  10   allowed deposition to proceed, but only after substantial

11   discovery, most depositions had been completed, and only after

12   the plaintiff filed a list of specific questions about

13   which -- subjects about which it would question the witnesses

14   in court, in where we would submit there is a greater showing

15:32:15  15   of knowledge, of unique knowledge on the part of the CEO.

16            THE COURT:  Greater than here, you mean?

17            MR. MARRIOTT:  Greater than here, Your Honor.

18            SCO suggests that IBM bear a heavy burden, which is

19   rarely ever met, to avoid deposition of this content.  The

15:32:31  20   cases cited by the parties, Your Honor, as I understand,

21   regarding this were a little more than the proposition that

22   the party seeking a particular form of relief bears the burden

23   to establish a basis for that relief.  Parties seeking to

24   compel a deposition bears the burden to establish a basis for

15:32:46  25   compelling a deposition.  Parties seeking a protective order

1    bears the burden of establishing a basis for a protective

2    order.

3            In this case, SCO seeks to compel the deposition of

4    Mr. Palmisano.  And in our judgment, as we read the cases,

15:32:57 5    SCO, therefore, then bears the burden.  In the Cardenas case,

6    which we cite, the plaintiff there, like SCO here, moved to

7    compel the deposition of executives.  In that case, it was

8    three executives of Prudential.  And applying the unique

9    personal knowledge test, the magistrate judge in that case

15:33:11 10   denied the motion on the grounds that the plaintiff had failed

11   to show that the executives, quote, possessed any information

12   that could not be obtained from lower level employees or other

13   sources, much less their knowledge of plaintiff's allegations

14   was unique.  The District Court then upheld the Court's

15:33:27 15   decision in Cardenas.

16           Most of the cases, Your Honor, on which SCO relies

17   for the proposition that IBM here bears a heavy burden are not

18   even apex deposition cases.  After stating the general

19   proposition that parties seeking a form of relief bears a

15:33:42 20   burden to establish the relief, a number of those cases

21   actually preclude depositions.

22           For example, SCO relies upon Simmons v. Willis for

23   the proposition that courts, quote, rarely will grant a

24   protective order that totally prohibits a deposition, close

15:33:59 25   quotes.

1          Not only was the Simmons case not an apex

2    deposition case, Your Honor, it is a case in which the Court

3    ordered that the deposition sought not to take place.  The

4    courts also granted protective orders in a number of the other

15:34:12 5    cases that SCO cites, such as Frideros, Medlin, Motsinger,

6    Snowden and Cotracom.

7          Your Honor, the second point that I wish to make,

8    and then I will sit down, is that Mr. Palmisano here does not

9    have any unique personal knowledge and it hasn't been shown to

15:34:32 10    that effect.  Mr. Palmisano didn't draft, he didn't execute,

11    he didn't negotiate the agreements that IBM is alleged to have

12    breached.  The agreements were executed in the office in order

13    of 20 years ago by individuals who don't even report to

14    Mr. Palmisano.

15:34:46 15          Mr. Palmisano is obviously familiar with IBM's

16    Linux strategy, but there is no showing here that he has any

17    personal knowledge about that strategy that is unique and that

18    is unknown by other individuals within IBM.  He's not a

19    computer programmer, and he certainly has no particular

15:35:02 20    knowledge of the technology contributions that Mr. Palmisano

21    alleged to have made to the Linux operating system in

22    violation of either contract copy reference --

23          THE COURT:  Is it relevant that you're going to

24    depose SCO's CEO?

15:35:16 25          MR. MARRIOTT:  I don't think it's relevant, Your

1    Honor.  It is true that we intend to depose Mr. McBride.  And

2    with respect to Mr. McBride and Mr. Eskovitz, I think there is

3    a big difference between Mr. Palmisano and Mr. McBride.

4    Mr. McBride is a CEO of a company that by my count has

15:35:29  5    slightly over 100 employees.  Mr. Palmisano is a leader of a

6    company that has more than 300,000 employees.  Mr. McBride, as

7    I would see it, is uniquely positioned to address the

8    questions at issue in this case including issues in our

9    counterclaims that go directly to Mr. McBride's public

15:35:46  10    statements about SCO's alleged evidence.

11              Mr. Palmisano, by contrast, Your Honor, while he

12    has some knowledge in actually Linux' operating system and

13    some involvement there, he doesn't have a perspective with

14    respect to IBM's strategy with respect to Linux, the issue on

15:36:00  15    which SCO intends to acquire discovery I think in any way

16    distinguishes on him.

17              In its opening papers, Your Honor, SCO indicated

18    that it required Mr. Palmisano's deposition with respect to

19    two causes of action, two sets of causes of action: SCO's

15:36:13  20    contract claims against IBM; and IBM's claims in a declaration

21    of non-infringement with respect to IBM's Linux strategy.  For

22    the first time in its reply papers and again here today, SCO

23    suggests that there are additional claims to which

24    Mr. Palmisano's testimony would be relevant.

25              But whatever the claims are, Your Honor,

1    specifically the testimony that SCO contends it requires from

2    Mr. Palmisano relates to IBM's so-called Linux strategy.  And

3    in SCO's words, it wishes to depose Mr. Palmisano regarding,

4    quote, IBM's strong financial motivation to use shortcuts in

15:36:49  5    order to promote Linux' commercial appeal.

6         Although, Your Honor, IBM's motivation for

7    promoting and contributing to Linux is not an element of any

8    of SCO's claims, and although I submit it is of marginal

9    relevance to any of the elements of the claims in the case, we

15:37:07  10   have nevertheless produced thousands of pages of paper

11   relating to that strategy.  There is an enormous body of

12   information in the public domain with respect to that

13   strategy, as indicated by SCO's own papers, which go on at

14   some length about their version of IBM strategy.  And IBM has

15:37:29  15   made available for deposition, Your Honor, three very

16   high-level executives who have to the extent SCO has

17   propounded questions about IBM's Linux strategy undertaken to

18   answer.

19        Putting aside, Your Honor, that strategy is of

15:37:36  20   marginal relevance, putting aside that there's an enormous

21   body of information available about it, there is no showing

22   here that Mr. Palmisano has any unique perspective.  And

23   again, under the scope and view of unique perspective,

24   everyone has a unique perspective, and everyone would be

15:37:49  25   subject to deposition.  In the line of cases that suggests

1    that some unique perspective is required are just dead wrong,

2    because in their view, those cases would be wrongly decided.

3         There are an enormous number of people -- there are

4    a lot of people, not to overstate it, at IBM, Your Honor, who

15:38:04   5    devote their time and their talents and their energies to

6    Linux, and there is no reason why SCO ought not be required at

7    least in the first instance to undertake to obtain the

8    information they seek from those individuals.  They have taken

9    by my count something like three depositions, the individuals

15:38:16   10    that I mentioned, all high-level executives, about Linux, and

11    that's it.  There are many others, Your Honor, who they can

12    learn information about IBM's Linux strategy without troubling

13    Mr. Palmisano about a deposition.

14         Courts have declined in cases that I would submit

15:38:33   15    are not any different from this case to permit apex

16    depositions.  I mentioned the Cardenas case.  You mentioned a

17    couple others.  In the Consolidated Rail case, the Court

18    deferred the depositions of a party's chairman, president,

19    CEO, as well as senior vice-president of operations and

15:38:51   20    vice-president of labor relations.  We produced vice-president

21    level depositions here, Your Honor.  In that case, depositions

22    were put in multiple lawsuits involving breach of contract

23    regarding freight charges, quote, until it has been

24    demonstrated that they have some unique personal knowledge

15:39:07   25    pertinent to the issues in the case, close quote.

1          In the Stone v. Morton case, Judge Boyce granted a

2     protective order preventing plaintiffs from deposing one of

3     Morton International's vice-president in light of his lack of

4     knowledge of facts relative to the action because the

15:39:24  5     plaintiff had not exhausted other methods of discovery.

6          The Evans v. Allstate case, the Court precluded

7     depositions of Allstate's chairman, president, CEO, as well as

8     chief financial officer and senior vice-president where,

9     quote, Allstate has already provided adequate information or

15:39:40 10     the information can alternatively be obtained from other

11     sources without apex officers.

12          In Harris v. Computer Associates, the Court

13     precluded a deposition of an executive computer associate.

14     And in doing that, the Court observed, quote, when a

15:39:55 15     vice-president can contribute nothing more than a lower-level

16     employee, good cause is shown not to take the deposition,

17     close quote.

18          In Baine v. General Motors, the Court quashed a

19     deposition of a GM vice-president for failure to show the

15:40:11 20     information sought could not be obtained from other witnesses,

21     interrogatories and a 30(b)6 deposition.

22          In Mulvey v. Chrysler, the Court found, quote, an

23     orderly discovery process is best served by resorting to

24     interrogatories at this time, without prejudice to a

15:40:26 25     subsequent deposition, close quote.

1          And finally, Your Honor, in the <u>Hughes v. General</u>

2    <u>Motors</u>, the Court denied a motion to take the deposition of

3    GM's president because it found no good cause in that

4    situation.

15:40:37  5          The cases, Your Honor, on which SCO relies are, I

6    respectfully submit, distinguishable.  Mr. Eskovitz mentioned

7    the Travelers case.  It was specifically an antitrust case.

8    And the Court granted deposition, Your Honor, only after at

9    least once deferring the deposition until other depositions in

15:40:54 10   the discovery had been taken.

11          In summary, Your Honor, respectfully, we believe

12   Mr. Palmisano's deposition ought not be allowed and certainly

13   not ought to be allowed now, and if it ever were to be

14   allowed, it ought to be limited to three hours.  Thank you,

15:41:09 15   Your Honor.

16          THE COURT:  Thank you, Mr. Marriott.

17          Mr. Eskovitz, you get to reply.

18          MR. ESKOVITZ:  Thank you, Your Honor.

19          Your Honor, significantly during Mr. Marriott's

15:41:24 20   argument, we didn't hear any attempt to dispute all of the

21   materials that were presented to the Court, many of which come

22   from IBM's own mouth concerning Mr. Palmisano's personal

23   involvement in spearheading, improving, implementing IBM's

24   Linux strategy.  That's a critical fact that distinguishes

15:41:46 25   this case from many, in fact, all of the cases that

1    Mr. Marriott and a litany of cases that Mr. Marriott has

2    discussed in his argument and cited in his brief.  And

3    although Mr. Marriott again repeats the idea that the strategy

4    is not relevant to any of the issues in this case because it

15:42:02  5    is not an element to any of the issues, he ignores the fact

6    that the intent or motive of the company is an element of

7    SCO's tort claim for unfair competition.  And even if it's not

8    an element, it still is relevant, it's obviously important to

9    the contract claims, to SCO's damages claims, to punitive

15:42:23  10    damages under SCO's tort claim.

11    So just to, you know, brush aside this testimony as

12    irrelevant because it's not an element of a claim, which, in

13    fact, it is, kind of misses the boat here.  So the two really

14    undisputable facts that I think dictates Mr. Palmisano's

15:42:41  15    deposition in this case is that he personally spearheaded the

16    strategy, and the strategy is relevant.

17    And the Travelers case is right on point here

18    because it talks about the importance of high-level executive

19    depositions when, in fact, that corporate strategy is at

15:42:57  20    issue.  When the corporation's intent or motive in

21    implementing a strategy is at issue, what Mr. Palmisano

22    decided or why Mr. Palmisano decided it is the most probative

23    evidence of IBM's intent in this case.

24    If Mr. Marriott claims that under our standard,

15:43:14  25    under our standard, there would be -- every case would lead to

1      a deposition of a high-level executive, and that certainly is

2      not the case.  In fact, I would suggest that under

3      Mr. Marriott's standard, there would never be an instance in

4      which a high-level executive could be deposed, not even when

15:43:37  5    the strategy that they approved is at issue in this case could

6      that executive be deposed under IBM's standard.

7            To the contrary, the cases in which Mr. Marriott

8      relies on, and I'll go through on particular ones, if the

9      Court is interested in them, but they're all distinguishable

15:43:54  10   on the basis that the executives did not have any relevant

11     information.  They were termination cases where the executives

12     had nothing to do with the termination or the role of

13     supervising an employee.  They're not the kind of cases where

14     the corporate strategy or corporate intent or motive with

15:44:11  15   respect to strategies are at issue.

16           And Mr. Marriott on the one hand says, you know,

17     we've already deposed a lot of senior executives at IBM, and

18     on the other hand says, we should go depose more of them.  We

19     have got a limited number of depositions in this case.

15:44:28  20   Mr. Palmisano is the person who spearheaded and executed this

21     policy.  We've already asked Mr. Wladawsky-Berger and Mr. Frye

22     a number of questions, and they pointed the finger at

23     Mr. Palmisano as the person who made the decision, as

24     Mr. Wladawsky-Berger put in the *New York Times* article, as

15:44:43  25   Sam's Bet.  This is Mr. Palmisano's strategy.

1          And significantly, and this is a point that IBM

2    ignores in its papers and ignores in its argument, this is

3    Mr. Palmisano's bet while he was the vice-president at IBM

4    before he became IBM's CEO chairman.  The fact that IBM has

15:45:01  5    now elevated him to these positions should not shield him from

6    discovery on the decisions that he made while he was the

7    person spearheading their computer server group.  And I think

8    that point IBM has lost in the shuffle is important for the

9    Court's consideration, as well.

15:45:17  10         Mr. Marriott made a number of arguments.  And if

11   the Court is interested, I can discuss them in detail, about

12   the law that is applicable.  I think even under IBM --

13         THE COURT:  You don't need to discuss them.

14         MR. ESKOVITZ:  The burden obviously shouldn't

15:45:31  15   depend on who filed the motion and doesn't depend obviously on

16   the cause of actions that are at issue.  It's the relevance of

17   the corporate motivation and corporate intent with respect to

18   strategies to the claims in the case, whatever they are.

19         And, frankly, Your Honor, I was blown away by

15:45:53  20   Mr. Marriott's argument that a different standard ought to

21   apply for the two CEOs in this case because of the size of the

22   parties involved.  I respectfully suggest just as IBM intends

23   to depose Mr. McBride on issues of damages on SCO's business

24   model and other issues, just for the same reason

15:46:10  25   Mr. Palmisano should be subject to deposition, particularly

1    since these were decisions that he made before he became IBM's

2    CEO and chairman.

3                 THE COURT:  Thank you.

4                 MR. ESKOVITZ:  Unless the Court has questions.

15:46:24  5    Thank you.

6                 THE COURT:  Thank you.

7                 Let's move to the motion for leave to file amended

8    complaint.  Who's going to argue that?

9                 MR. NORMAND:  I will, Your Honor.

15:46:31 10                THE COURT:  Mr. Normand?

11                MR. NORMAND:  Yes.

12                Good afternoon, Your Honor.  May it please the

13   Court, I'm Ted Normand.

14                The SCO Group has sought leave to file a third

15:46:53 15   amended complaint to add a new claim of copyright

16   infringement.  The facts forming the basis for the new claims

17   are based on documents that we requested before the amendment

18   deadline in this case that IBM produced after the amendment

19   deadline.  I'd like to describe those basic facts very

15:47:08 20   quickly, Your Honor.

21                In the late 1990s, SCO's predecessor in interest,

22   Santa Cruz Operation, owned the source code in Unix System V

23   Version 4 or SVR-4.  IBM gained access to that source code

24   through a joint development arrangement in Santa Cruz called

15:47:28 25   Project Monterey.  Under Project Monterey a project to create

1    an AIX For Itanium Product that could operate on a new

2    hardware --

3                THE REPORTER:  Could you speak up a little more?

4    I'm sorry.

5                THE COURT:  She's having trouble hearing you.

6                THE REPORTER:  Just speak up a little more.  You're

7    dropping your voice, and I'm having trouble hearing you.

8                MR. NORMAND:  With that access, Your Honor, to the

9    SVR-4 source code, IBM copied over 200,000 lines of source

15:47:52 10   code into different versions of IBM's AIX For Power products.

11   And the point of our claim is IBM did so without

12   authorization, and that the documents we've uncovered in the

13   last six to eight months showed that IBM knew it was copying

14   without authorization.

15:48:08 15         We've set out a basic chronology of those facts in

16   tab binders that Your Honor has.  And I will try to walk the

17   line that Your Honor described in terms of describing the

18   documents that we've submitted in the binder that form the

19   basis of the new complaint.  And I'd like to walk through

15:48:27 20   those very quickly, Your Honor.

21                THE COURT:  Okay.

22                MR. NORMAND:  Tab 2, Your Honor, an IBM internal

23   e-mail shows that IBM knows that if it cancelled Project

24   Monterey, it would not have the rights to the SVR-4 code that

15:48:46 25   it put into its product.

1          Tab 3, Your Honor, IBM internal e-mail shows that

2     IBM knows that it could use the SVR-4 code only on the AIX For

3     Itanium products, not on the AIX For Power products into which

4     IBM copied code.

15:49:11  5          Tabs 4 and 5 need to be read together, Your Honor.

6     IBM internal e-mail pointing out that compilers are not

7     included in the PRPQ.  PRPQ is an acronym for "Program Request

8     For Pricing Quote."  It's a reference to the draft AIX For

9     Itanium product that IBM was creating through Project

15:49:37 10    Monterey.

11          Internal IBM e-mail in response to that e-mail.  In

12    response to the assertion that the compiler would not be

13    included in a PRPQ.

14          I think the compiler must be available in

15:49:52 15       some form, or SCO won't buy it.

16          Tab 6, internal IBM e-mail.  IBM is concerned that

17    if they don't call the PRPQ a generally availability product,

18    they won't have the rights to use the SVR-4 code.

19          MR. MARRIOTT:  Your Honor, I apologize for

15:50:13 20    interrupting.  My concern is just that we've moved to quoting

21    from the documents, which as they themselves indicate marked

22    confidential under the protective order.

23          THE COURT:  Well, you can read -- why don't you

24    characterize it rather than quote it.

15:50:27 25          MR. NORMAND:  Yes, Your Honor.  I was making an

1    effort to paraphrase the documents.

2            Tab 7, Your Honor, IBM internal e-mail drawing a

3    distinction between the internal position that IBM has reached

4    with respect to Project Monterey and the external position

15:50:45   5    that IBM should take to the world on whether Project Monterey

6    is continuing.

7            These documents and others like them, Your Honor,

8    form the basis for our proposed amendment.  In response, IBM

9    has not even attempted to oppose the merits of the claim.

15:51:07  10    Instead, IBM has raised several procedural road blocks why we

11    should not be able to bring the amendments, and I think

12    they're wrong in each count.

13            First, there is no undue burden to IBM.  As the

14    Supreme Court has noted, Rule 15 is designed to facilitate the

15:51:23  15    amendment of pleadings except where prejudice to the opposing

16    party would result.

17            There is no prejudice here.  Indeed, IBM's main

18    argument in its opposition brief was that the addition of

19    SCO's claim would interfere with what IBM called its

15:51:37  20    entitlement to a prompt resolution of the litigation.  The

21    magistrate's court discovery orders from January and from

22    yesterday I think have mooted that part of IBM 's undue

23    prejudice argument.  And this Court, of course, denied summary

24    judgment motions and ruled that no summary judgment will be

15:51:54  25    filed until after the close of fact discovery.

1          IBM's other argument for its claim of undue burden

2     was that SCO's proposed claim required additional discovery.

3     As an initial matter, Your Honor, the adverse party's burden

4     of undertaking discovery does not constitute undue burden for

15:52:13  5     purposes of Rule 15.  And that is particularly true here where

6     SCO will not need to take substantial new discovery on its

7     claim where given the new period for fact discovery in this

8     matter, which we think should be extended even further in

9     light of the magistrate's court's order from yesterday, IBM

15:52:31 10    would have more time to take discovery in SCO's new copyright

11    claim than it would have had before the amendment deadline.

12    And where given the new period for fact discovery, SCO's

13    pursuit of the new claim will not prolong discovery.  In each

14    of those respects, there's no undue burden to IBM.

15:52:47 15          In addition, Your Honor, the subject matter of

16    Project Monterey specifically is already involved in the case,

17    has been for sometime and has been with respect to at least

18    three separate claims.  First, Project Monterey is involved in

19    this case by virtue of SCO's own contract and copyright.  SCO

15:53:15 20    will show that IBM not only misappropriated source code in AIX

21    that IBM licensed, but that it misappropriated source code

22    that it had not licensed and contributed such source code to

23    Linux.  IBM ignores this point in its briefing.

24          The second way that Project Monterey is already

15:53:25 25    part of the case, Your Honor, is our claim for unfair

1    competition, which Mr. Eskovitz mentioned.  In that claim, we

2    allege that IBM was engaged in a course of conduct that was

3    intentionally and foreseeable calculated to undermine and/or

4    destroy the economic value of Unix by misappropriation of

15:53:42  5    source code, including specifically in Project Monterey.  And

6    that's at Tab 8 of the binder, Your Honor.

7          By way of example and in response to IBM's

8    interrogatories, and this is at Tab 9, Your Honor, SCO has

9    stated IBM made and continued to make investments in the

15:53:58 10    development of Linux and secretly advanced and promoted in the

11    development of Linux without disclosing such activities to SCO

12    including under Project Monterey.

13          SCO also stated that IBM's conduct forming the

14    basis of a claim of unfair competition included using

15:54:14 15    products, methods and know-how jointly developed by SCO and

16    IBM in Project Monterey.  And we noted in that interrogatory

17    response, Your Honor, that SCO needs to take discovery of IBM

18    where activity of this sort is typically done behind closed

19    doors.  And the documents we walked through, Your Honor, show

15:54:33 20    that.

21          In addition, Your Honor, Project Monterey is

22    already involved in this lawsuit by virtue of IBM's Ninth

23    Counterclaim, which is very (unintelligible).

24          THE COURT:  Which is what?

15:54:43 25          MR. NORMAND:  Very broad, Your Honor.

1          And we quote that in the tabloids.  Ninth

2     Counterclaim states:

3          IBM is entitled to a declaratory judgment that IBM

4     does not infringe, induce the infringement of or contribute to

15:54:54 5     the infringement of any SCO copyright through the

6     reproduction, improvement and distribution of AIX and Dynix,

7     and that some or all of SCO's purported copyrights in Unix are

8     invalid and unenforceable.

9          IBM lists SVR-4 code as one of the copyrights for

15:55:11 10     which IBM seeks a declaration of non-infringement.  In short,

11     IBM asks the Court to declare that IBM has not infringed any

12     SCO copyrighting in developing AIX.  And in SCO's proposed new

13     copyright claim, we seek to prove such infringement.

14          In fact, IBM has acknowledged that Project Monterey

15:55:32 15     is already subject matter specifically in the lawsuit.  For

16     one thing, in response to our document requests, IBM produced

17     the Project Monterey documents.  In addition, Your Honor, and

18     by way of example, in response to one of our interrogatories,

19     IBM identified 19 Project Monterey witnesses who may have

15:55:49 20     knowledge concerning certain issues in this lawsuit and

21     identified Project Monterey as those persons subject to area

22     of knowledge.

23          SCO has also noticed and deposed two witnesses

24     almost exclusively regarding the subject matter of Project

15:56:03 25     Monterey and IBM's interpretation of the joint development

1    agreement that was the basis for the relationship between IBM

2    and Santa Cruz under Project Monterey.

3                Finally, of how, Your Honor, IBM has acknowledged

4    that Project Monterey is already in this lawsuit is the very

15:56:19  5    first deposition that was taken in this case.  And we quote

6    part of the transcript of that deposition at Tab 12.  The

7    deposition concerned Project Monterey.  Toward the end of the

8    deposition, counsel for IBM specifically asked the witness

9    whether the witness knew that IBM did, in fact, release a

15:56:36  10   product, a Monterey product, worldwide to customers.  In other

11   words, Your Honor, at the very time, the very first deposition

12   in this case, IBM was asking witnesses questions to set up

13   IBM's assertion that its release of the Monterey product was a

14   worldwide product giving IBM authorization to copy the SVR-4

15:56:57  15   code.

16               And I can tell you at the time, Your Honor, we

17   didn't appreciate the important question.  In retrospect, you

18   see what a defensive question it was, that IBM knew Project

19   Monterey was an issue in the case and was trying to collect

15:57:10  20   evidence to defend its pretextual release of the Monterey

21   product in 2001.  At the time of the deposition, we had asked

22   for the Project Monterey documents before the discovery --

23   before the amendment deadline, Your Honor, and yet, we didn't

24   get the documents until after the amendment deadline.  All of

15:57:26  25   the foregoing, Your Honor, shows that SCO's copyright claim

1    would not unduly prejudice IBM.

2            Very briefly, Your Honor, the question of good

3    faith, which is a factor in the Rule 15.  The facts forming

4    the basis of SCO's claim are based on the documents that we've

15:57:41  5    uncovered in the last to six eight months.  IBM's main

6    argument is that if our motion were granted, we would no doubt

7    immediately following the granting of the motion would request

8    for additional discovery.  That was IBM's sole argument for

9    claiming that our motion was made in bad faith.  Of course,

15:58:00  10   the magistrate court orders have mooted that argument.  I

11   won't dwell on the point, but I will point out in our opening

12   brief, we pointed out by the time this motion was argued,

13   either Your Honor or the magistrate court would have decided

14   whether fact discovery would be extended.  So the suggestion

15:58:15  15   that we filed our motion to trump the Court's decision of

16   whether to extend the discovery schedule is an inaccurate one.

17            I think it's clear, Your Honor, that we don't

18   propose the amendment in bad faith and that the amendment

19   would not unduly prejudice IBM.  IBM further argues that SCO

15:58:32  20   has delayed in proposing the amendment and that the amendment

21   would be futile.  We think both of those arguments are

22   incorrect, taking the argument as to the delay first.  IBM

23   first argues that Rule 16 applies because deadline for

24   amendment has passed.  As Your Honor mentioned, there is a

15:58:49  25   relationship between the issue of the scheduling order and our

1    motion to amend, I'd be happy to address that issue.

2         I will move now to the issue of the scheduling

3    order or briefing.  I can say we think there are good reasons

4    and independent reasons why IBM's Rule 16 argument does not

15:59:06  5    make sense.  First, we've proposed a new amendment deadline.

6    We think a new amendment deadline makes sense for at least two

7    reasons.  One, the appointment of the deadline is to allow the

8    parties to conform the evidence to their claims.  Two, the

9    question of whether a prejudice results from a deadline not at

15:59:23 10    issue here.

11         IBM will have more time under the new discovery

12    schedule to take discovery on our new claim than it would have

13    had under the old schedule.  Under the schedule we proposed,

14    even the Court -- the magistrate court's order yesterday,

15:59:36 15    there will be six, seven, eight months of fact discovery even

16    after the proposed amendment deadline.  Under the previous

17    order, I think it was five-and-a-half or six months of

18    discovery that would follow the amendment deadline.  As a

19    practical matter, Your Honor, we think we will succeed for

15:59:52 20    that matter.

21         As a logical matter, we also think Rule 16 doesn't

22    apply for the following reason.  If there is no undue delay by

23    SCO under Rule 15 because SCO's amendment is based on the

24    documents that SCO obtained in discovery, then Rule 16 cannot

16:00:08 25    bar the amendment.  That is because it is undisputed that IBM

1    produced the documents after the amendment deadline, but that

2    we requested the documents before the amendment deadline.  So

3    if there is no undue delay under Rule 15, there's no place for

4    Rule 16.  It doesn't apply.  We asked for the documents

16:00:26  5    before.  We got them afterwards.  We also asked for the

6    documents two or three months into the case, Your Honor, in

7    June of 2003.

8         So the relevant analysis of Rule 15, which I'll

9    turn to now, Your Honor I'm sure is familiar with the refrain

16:00:41 10    from liberal granting of motions to amend, reflect the basic

11    policy that pleadings should enable the claims to be heard on

12    the merits.

13         THE COURT:  I have heard that before.

14         MR. NORMAND:  I suspected it.

16:00:51 15         The rule for undue delay is the following, Your

16    Honor.  Where the parties seeking amendment knows or should

17    have known of the facts upon which the proposed amendment is

18    based but failed to include them in the original complaint,

19    the motion to amend is subject to denial.

16:01:07 20         Our claim is based on facts in the documents that

21    we saw for the first time since the last amendment deadline.

22    Those documents show, as I described, Your Honor, that IBM

23    copied more than 200,000 lines of the SVR-4 code into IBM's

24    AIX For Power product without authorization.  And that during

16:01:24 25    the project, IBM knew that its limited release of the AIX For

1    Itanium product did not authorize IBM to copy the code as it

2    had done.  As soon as we reviewed those documents and

3    undertook an investigation, we brought a proposed claim, and

4    IBM doesn't argue that we weren't diligent in acting after we

5    received the production that they produced after the amendment

6    deadline.

7            Given these basic facts, our amendment is not

8    unduly delayed.  It's not delayed at all.  The function of

9    Rule 15, which provides generally the amendment of pleadings,

10   is to enable a party to assert matters that were overlooked or

11   were unknown at the time he interposed the original complaint

12   or answer.  The Court admitted there is no delay if the

13   plaintiff uncovered the facts supporting the amendment during

14   discovery.

15           And we cited in our brief two cases that we think

16   are good examples in particular of that.  The Journal

17   Publishing case from the Southern District of New York, a

18   three-and-a-half year lapse between the original complaint and

19   the amended complaint were justified where the plaintiffs

20   proposed amended complaint was based at least in part on

21   documents that came to light during discovery.

22           The Koch case, District of Kansas, there is no

23   undue delay to seek leave to amend if plaintiffs acquire

24   knowledge of the facts behind the new claim only through

25   recent discovery.

1              As we see it, Your Honor, IBM would have this Court

2       apply a standard whereby as soon as the plaintiff in

3       litigation had any conceivable basis for bringing a claim, it

4       would be obligated to assert that claim rather than await the

16:03:00  5     production of documents that the plaintiff has requested and

6       expect to bear on the issue.  Again, we take it that that is

7       the point of the amendment deadline.  That is not standard and

8       one that IBM opposes that the Court should impose.  And,

9       indeed, the very point of Rule 15 is to impose a different

16:03:17 10     standard.  Under the precedent, the plaintiff should be

11      entitled to a critical mass of evidence of high probative

12      value supporting the claim.  And that's a quote from the

13      case -- one of the tabs to the binder.

14              And we think, Your Honor, that IBM's own cases make

16:03:33 15     that point.  And we discussed these cases and distinguished

16      them in detail in our reply brief.  I'll mention a few of

17      them.  In particular, from the 10th Circuit, in the Panis

18      case, 10th Circuit 1995, the plaintiff's proposed amendments

19      were not based on new evidence.  In the Pallottino case, 10th

16:03:50 20     Circuit, 1994, the proposed amendment was not based on new

21      evidence.  In the Frank case, 10th Circuit, 1993, plaintiff's

22      counsel conceded that the failure to amend was strategic

23      decision.  In the Woolsey case, 10th Circuit, 1991,

24      plaintiff's counsel acknowledged that no new evidence that was

16:04:09 25     unavailable at the time of the original filing had come to

1    plaintiff's attention.  Those cases make the point that focus

2    on undue delay is on the plaintiff in litigation and

3    plaintiff's efforts to find the documentation to support the

4    new claim.

16:04:22  5         IBM's response to these points is to argue that the

6    question of undue delay requires the Court to impute to the

7    SCO Group the limited knowledge that certain employees of

8    SCO's predecessor Santa Cruz might have regarding the same

9    general subject matter, that is, Project Monterey and products

16:04:41 10   being created.

11        Now, IBM does not argue, nor present any evidence

12   that Santa Cruz or the SCO Group had concluded it actually had

13   a copyright infringement arising out of Project Monterey.  And

14   IBM does not argue, nor present any evidence that anyone from

16:04:56 15  Santa Cruz or the SCO Group knew anything about IBM's internal

16   views of its pretextual release as reflected in the documents

17   that were produced.  What the evidence does show is that those

18   key facts were hidden from view until discovery in this case.

19        And one of the internal IBM documents that I cited

16:05:14 20  earlier illustrates the point, and we'll quote, Your Honor, at

21   Tab 7, but it is the document, internal IBM e-mail that

22   expressly draws the distinction between the internal position

23   that IBM has taken on Project Monterey is not worth pursuing.

24   And in the e-mail the author said, we need to take an external

16:05:33 25  position, and the external position is that Project Monterey

1    goes on.  We're still working on the AIX For Itanium product.

2    That is the kind of information that the world and that we

3    were aware of, the external position.

4           The excerpt from the first deposition taken in this

5    case, and I also mentioned earlier, further illustrates the

6    point.  While IBM was asking witnesses questions to defend its

7    worldwide release, IBM had documents in its possession

8    reflecting the fact that IBM itself did not regard the

9    Monterey product release as one that would authorize IBM to

10   copy the SVR-4 system.

11          Although SCO had served numerous document requests,

12   IBM would not produce the documents in response to those

13   requests until after the amendment deadline.  IBM relies on

14   several documents with respect to Santa Cruz' supposed

15   knowledge.  We believe those documents are not compelling, and

16   they fall into two basic categories.  One, documents that SCO

17   did not see and Santa Cruz did not see and had no reason to

18   see, such as private consulting for its software announcements

19   and memoranda for IBM licensees and manuals that IBM's

20   technical support organization published for IBM licensees.

21   Santa Cruz was not an IBM licensee.

22          The second category of documents show what products

23   certain people envisioned would be created in Project

24   Monterey.  These are not documents that reflect any actual

25   knowledge on the part of anyone at Santa Cruz about any claim

1    for copyright infringement.  These facts are no grounds for

2    the Court to conclude there has been any undue delay on the

3    part of the SCO Group.

4           And it's worth pointing out, Your Honor, because I

16:07:09  5    will briefly get to the point, IBM can and does raise such

6    arguments in support of the statute of limitations argument on

7    futility.  These are accrual arguments that are subject to

8    different standards.  And we put cases in the binder that show

9    the courts analyze the question of undue delay distinctly from

16:07:30 10    the question of whether the limitations period.  I won't dwell

11    on that point, Your Honor, but I do think there are important

12    policy differences between Rule 15 and the application of the

13    statute of limitations.  I quoted Wright, et al, earlier, the

14    function of Rule 15, to enable a party to assert matters that

16:07:43 15    were overlooked or unknown, the purpose of policy underlying

16    all statutes of limitations.  And this is from a Utah Supreme

17    Court case in the last few months, Your Honor.  To promote

18    justice by preventing surprises through the revival of claims

19    that have been allowed to slumber until evidence has been

16:08:00 20    lost, memories have faded, and witnesses have disappeared.

21           None of those things is true here.

22           In addition, Your Honor, there's essentially a

23    policy for statute of limitations conflicts with the policy

24    under Rule 15, which is to promote claims to be brought even

16:08:14 25    if they were overlooked.  That's not the case here, but right

1    from the middle to point out the policy.

2           IBM's next claim under Rule 15 is that our claim

3    would be futile.  And we think that's wrong, as well.  As an

4    initial matter, an amendment is futile only if the proposed

5    amendment could not have withstood a motion to dismiss.

6    That's the general standard.  I'm sure the Court has heard

7    that one, as well.

8           SCO alleges that only through copyright to the

9    SVR-4 code that IBM copied in excess of 200,000 lines of that

10   code into the AIX For Power product.  IBM did it without

11   authorization, that those are the elements of copyright

12   infringement.  IBM does not dispute the merits of those

13   allegations, but they made several procedural arguments.

14          IBM first invokes a statute of limitations

15   provision in the joint development area for JDA.  That

16   provision states:

17          Any legal or other action relating to a breach of

18   disagreement must commence no later than two years from the

19   date of the breach.

20          And the Court cited that in the state of New York.

21   Now, IBM does not dispute that the Court must strictly

22   construe a contractual provision modifying a statute of

23   limitations, which it does.  In fact, under a reasonable

24   instruction, let alone a strict instruction, IBM's

25   interpretation of Section 22.3 does not make sense.  It cannot

1    encompass (unintelligible).

2            THE REPORTER:  Excuse me.  Cannot encompass?

3            MR. NORMAND:  SCO's copyright claim.

4            The reading that IBM offers fails to reconcile

16:09:48  5    other provisions in the JDA and creates an unreasonable

6    result.  First, IBM actually ignores parts of the provision

7    interpreting Section 22.3.  That is, IBM does not even argue

8    that the accrual portion of Section 22.3 applies to SCO's

9    claim.

16:10:06  10           You'll note that the portion of the provision, Your

11   Honor, saying that the claim under Section 22.3 must be

12   commenced no later than two years from the date of the breach.

13   IBM ignores that part of the rule because it creates an

14   unreasonable result.  IBM argues that the rule of the accrual

16:10:22  15   should be the rule of accrual for the copyright act.  And we

16   think the reason that IBM does that is because when you read

17   the provision as a whole, it would mean that under IBM's

18   interpretation, Section 22.3 would eliminate both the rule for

19   when a copyright claim accrues as well as the rule that the

16:10:42  20   plaintiff can bring a copyright claim on the defendant's

21   continuing infringement.  That is not a reasonable reading.

22           If the scope of Section 22.3 were as broad as IBM

23   argues, the copyright claim would have to be commenced within

24   two years of the breach of the contract.  Under that reading,

16:10:58  25   if during Product Monterey IBM copied SCO's code but then

1    waited two years to release the part containing the code,

2    SCO's claim would have been time-barred.  We think that's an

3    unreasonable result.  IBM relied only on the first part of the

4    language of Section 22.3 because it knows the section read as

16:11:18  5    a whole, it creates an unreasonable result.

6         The fact that Section 22.3 clearly does provide for

7    a discovery rule of accrual -- excuse me -- that Section 22.3

8    does not provide for a discovery rule of accrual is a reason

9    to reject items of interpretation, not to parse the language

16:11:36 10    as IBM has.

11         In addition, Your Honor, IBM's interpretation fails

12    to reconcile other provisions of the JDA.  You'll see at

13    Tab 19, Your Honor --

14         THE COURT:  20.1.

16:11:51 15         MR. NORMAND:  20.1.  The entire liability of each

16    party for any cause whatsoever regardless of the form of

17    action, whether in contract or tort.

18         Section 20.1 shows the parties knew how to include

19    in broad fashion any claims under the agreement, which is

16:12:06 20    effectively the interpretation IBM gives of Section 22.3.

21    It's not reasonable to give different conditions the same

22    meaning.

23         In addition, Your Honor, we think these arguments

24    made clear that Section 22.3 can reasonably be interpreted as

16:12:27 25    SCO's (unintelligible).  We think that the provision is clear

49

1    in our favor.  At an absolute minimum, the provision is

2    ambiguous.  And because it's ambiguous, the Court cannot

3    resolve the party's intent and, therefore, cannot preclude

4    SCO's amendment at this stage of the proceedings.

16:12:43  5         Given that Section 22.3 does not apply, Your Honor,

6    we enter into the world of accrual of copyright claim and

7    statute of limitations of copyright claim.  There shouldn't be

8    any dispute on this point.  Under the copyright act, every

9    court that has addressed the issue has concluded that the

16:13:01 10   copyright claim in which claims based on infringement that has

11   occurred in the previous four years under the statute of

12   limitations.  I think it's actually three years, Your Honor.

13        IBM argues that there's some dispute in the case

14   law as to the doctrine of continuing infringement.  That's

16:13:16 15   wrong.  There's a dispute as to whether a copyright claim of

16   who brings a claim 10 years after the copyright claim has

17   accrued can recover damages for the entire 10-year period.

18   There is no dispute under the case law that plaintiff who

19   brings a copyright claim can recover the damages for the

16:13:32 20   infringement that has occurred the previous three years.

21   Where the copyright claim accrual and limitations period

22   applies, there is no question that our amendment is not shield

23   from.

24        IBM argues that venue is improper in this court.

16:13:53 25   Given that Section 22.3 does not apply, that argument fails.

1          Finally, Your Honor, I think it is worth noting IBM

2     dismisses too quickly a case showing very clearly that the

3     District Court always has the discretion to determine that the

4     interest of judicial economy regarding pending litigation can

16:14:11  5     override the forum selection.  In the Steward case from the

6     District of Minnesota, 2001, the Court declined to transfer

7     the litigation to the locale specified in the forum selection

8     clause because the Court preferred to have both cases

9     adjudicated simultaneously before the Court that is intimately

16:14:31 10     familiar with the issues in the case.  We think that is the

11     case here, Your Honor.

12          The discovery that SCO must pursue to defend

13     against IBM's Ninth Counterclaim, for example, includes the

14     precise Project Monterey activities underlined in SCO's

16:14:43 15     proposed amendment.  The fact that in this case the documents

16     regarding Project Monterey have already been produced and are

17     being reviewed, and presumably there will be a supplemental

18     production, the parties have already taken other discovery

19     regarding Project Monterey, such as the three depositions I

16:14:56 20     referred to.  The subject matter and many specifics of Project

21     Monterey have already been part of the lawsuit and been made

22     part of the lawsuit.  And whether or not SCO's new claims in

23     the case, SCO will present the facts of IBM's conduct in

24     copying Project Monterey.  Your Honor, in the interest of

16:15:12 25     judicial economy clearly shows that SCO's new claim should not

 1    be split from this litigation.

 2              In short, Your Honor, SCO proposes a good faith

 3    meritorious claim on the basis of facts that SCO uncovered

 4    only recently in discovery in this matter and that SCO could

 5    not have recovered without that discovery or before the

 6    deadline for the amendment of the pleadings.  We proposed a

 7    claim that concerns the very same subject matter that is

 8    already at issue in the case including by virtue of IBM's

 9    counterclaims.  We propose a claim with approximately six to

10    eight months of fact discovery remaining, depending on how

11    Your Honor rules on the issue of scheduling orders.

12              Under the circumstances, Your Honor, we submit the

13    Court should permit SCO to bring its copyright claim.

14              THE COURT:  Thank you, Mr. Normand.

15              Mr. Marriott?

16              MR. MARRIOTT:  Your Honor, there are a number of

17    reasons why the Court should deny SCO's application to amend.

18    I'd like to focus on just two of them without diminishing the

19    importance of those other reasons which I think are adequately

20    addressed in our briefs.

21              THE COURT:  All right.

22              MR. MARRIOTT:  Before I come to those, Your Honor,

23    two quick points.  We believe that SCO's predecessor in

24    interest, Santa Cruz Operation, Inc., granted to IBM and that

25    IBM has a license to use Unix System V Release 4 code, SVR-4

1    code, in its AIX For Power product.  SCO devoted some portion

2    of its presentation to its view of the merits of whether IBM

3    has that license.  The Court cannot resolve that question on

4    this motion.  I don't intend to try Your Honor's patience with

16:17:01  5    inquiring into the merits, except to say we believe that the

6    evidence will show that we have that license.

7        Second, Your Honor, as another preliminary matter,

8    let me just say just a word about the standards that apply to

9    this motion.  There are three.  The first, Your Honor, rose

16:17:16  10   out of this Court's order of June 10, 2004.  The deadline, as

11   Mr. Normand indicates, for amending the pleadings has passed.

12   It passed more than a year ago.  As a result, this motion is

13   untimely, unless SCO can satisfy first the requirement of this

14   Court's order of June 10.  In the order dated June 10, Your

16:17:38  15   Honor said that the scheduling order will not be modified

16   again except upon a showing of extremely compelling

17   circumstances.  Absent a showing of extremely compelling

18   circumstances, the motion should be denied.

19       Second standard, Your Honor, that relates to this

16:17:51  20   claim is Rule 16(b).  Rule 16(b) provides that an amendment

21   shall not be permitted after the deadline for amending the

22   pleadings has passed, except upon a showing of good cause.

23   And as Your Honor knows, the central inquiry there is whether

24   the parties seeking to amend after the deadline has acted in

16:18:12  25   due diligence.

1          The third standard, Your Honor, is the standard

2     that Mr. Normand focuses on primarily.  That is Rule 15 and

3     Rule 15(a), the rule the Court need not reach.  But if it

4     chooses to reach Rule 15, Rule 15 would not permit an

16:18:26  5     amendment where there has been undue delay where there would

6     be prejudice to the party opposing the amendment, which bad

7     faith with an ulterior motive where the proposed amendment is

8     futile or should have been and must be brought in another

9     court.

16:18:39  10          First point, Your Honor, which I would like to make

11    is that SCO has known about the proposed claim, that is to

12    say, its claim that IBM has included Unix System V Version 4

13    code and IBM AIX For Power product for many years, and it has

14    done nothing about it.  If SCO, Your Honor, knew or should

16:19:01  15    have known that IBM included -- that IBM included in AIX For

16    Power SVR-4 code and it knew that before the deadline for

17    amending the pleadings passed, then this motion fails.  If it

18    knew before the deadline passed for amending the pleadings

19    that IBM included that code, Unix System V Release 4 code in

16:19:23  20    its AIX Power Product, then it can't establish good cause, it

21    can't satisfy the requirements of Rule 15, it certainly can't

22    establish compelling circumstances, let alone extremely

23    compelling circumstances.

24          SCO contends, Your Honor, that it did not know and

16:19:36  25    had no reason to know that IBM included SVR-4 code in its AIX

1    For Power product because in SCO's words, IBM's conduct was,

2    quote, an egregious clandestine violation, close quote.  And

3    IBM, quote, took affirmative steps, close quote, to prevent

4    SCO from discovering this alleged clandestine conduct.

16:20:03    5         Those allegations are false.  And with the Court's

6    permission, I intend to show that SCO's internal documents,

7    Your Honor, documents in its possession for many years and in

8    possession of its predecessor interest, show it to be false.

9    I will show also, Your Honor, that the public record makes

16:20:18   10    perfectly clear that SCO and the world knew and understood

11    that IBM had included SVR-4 code in its AIX For Power product.

12    The showing I intend to make, Your Honor, again is not based

13    on the Monterey licensing agreement, so we think it will

14    totally support our position.  This showing is based upon

16:20:35   15    their documents and the public record.

16         If I may approach.

17         THE COURT:  Yes.

18         MR. MARRIOTT:  Your Honor, beginning at Page 2, we

19    lay out at least eight indications in the public record and in

16:21:19   20    SCO's own documents, documents found in its files, that IBM

21    included SVR-4 code in its AIX For Power product.  One,

22    indication one, the purpose of Project Monterey, Your Honor,

23    was to create a family of operating systems, including the AIX

24    For Power product.  It was not, as the SCO brief suggests, a

16:21:42   25    simple afterthought.  And I refer the Court to the last bullet

1    on the page, a SCO presentation at a SCO partner conference in

2    the year 2000.

3              Project Monterey in the presentation said, quote:

4              To establish high-volume, enterprise class

5         Unix platform through...Single scalable Unix

6         product line family for IA-32, IA-64 and IBM

7         Power microprocessors.

8              In a joint IBM/SCO presentation, Your Honor, it

9    states IBM and SCO -- quote:

10             IBM and SCO join forces to deliver the most

11        advanced family of Unix products in the world

12        including AIX, PPC.

13             That's Power PC product.

14             At Page 2 of our book, Your Honor, the second

15   indication found in SCO's documents that it knew or should

16   have known Project Monterey's combined features from both AIX

17   and UnixWare.  If you look, for example, at the last quote on

18   Page 3, Your Honor, May 2, 2001, print-out of the web page for

19   the AIX 5L product, which website was jointly sponsored by IBM

20   and SCO, that is to say, the Santa Cruz Operation, Inc., so

21   its predecessor.  This is a document produced by SCO to us in

22   this litigation.  AIX is, quote, for both Intel Itanium- and

23   IBM Power-based systems, close quote.  AIX 5L is taking IBM's

24   AIX Unix operation system and combining it with the best

25   technologies from SCO's UnixWare operating system.

1        The third indication, Your Honor, is found at

2   Page 4 of the book.  SCO provided IBM with UnixWare/SVR-4 code

3   for inclusion into IBM's AIX For PowerPC Product.  A SCO

4   e-mail dated 10-23-98 states, quote:

5        UnixWare for AI32 and AIX PPC continue to be

6        developed and controlled by SCO and IBM

7        respectfully.  The only difference here is each of

8        us now has access to technology from both UnixWare

9        and AIX which can be added to the existing product

10        lines to increase compatibility and improve the

11        family story.

12        Next bullet, SCO e-mail dated 9-7-99.  Quote:

13        SCO is providing UnixWare technology to IBM

14        for inclusion in AIX.  Thus users should think of AIX,

15        paren, on PowerPC, close paren, SCO's UnixWare on IA32

16        and Monterey on IA64 as becoming the same operating

17        system over the next two years.

18        Indication four, Your Honor, Page 5 of our book.

19        IBM communicated to SCO regarding the inclusion of

20   UnixWare/SVR4 code in AIX For Power.

21        And IBM-SCO Family Unix Technical Proposal, dated

22   9-2-98, produced by SCO in the case states that technology

23   from UnixWare 7 would be incorporated in both AIX or IA-64 and

24   AIX For Power.

25        And IBM presentation also produced by SCO states

1    that the Project Monterey strategy includes a plan to

2    aggressively grow and enhance AIX-Power offering by including,

3    quote, contributions from SCO's UnixWare and Sequent's

4    Dynix/ptx.

16:25:12   5        It lists SVR-4 Print Subsystem as among the common

6    subsystems in the Project Monterey product line, including AIX

7    For Power.

8        And finally, SCO e-mail dated 8-11-00, distributing

9    text of a press release prepared by IBM: refers to AIX 5L

16:25:30  10   running on both Power, the allegedly infringing product,

11   running on both Power in IA64 and notes, quote, that among the

12   Unix System 5 technologies to be incorporated in this release

13   is the SVR-4, the allegedly infringed technology, printing

14   substance.

16:25:46  15        Fifth indication, Your Honor, in the documents is

16   that SCO was aware of the specific UnixWare/SVR-4 code that

17   would be included in AIX For Power.  An IBM-SCO family Unix

18   technology proposal, again produced by SCO in the litigation,

19   lists specific technology from UnixWare 7, the allegedly

16:26:06  20   infringed product in part, to be incorporated into both AIX

21   for IA64 and AIX For Power.  Included are, quote, proc

22   filesystem and SVR-4 Printing subsystem/printcap files, the

23   allegedly infringed product listed in the proposed amended

24   complaint.

16:26:22  25        A joint SCO/IBM document comparing AIX For Power

1    and AIX for IA64:

2            Notes that the SVR-4 print subsystem is common

3        between the two products

4            A SCO-IBM agreement overview, dated 11-4-98 lists,

16:26:38  5    quote, common features/technology, close quote, between

6    UnixWare 7, Monterey IA64, and AIX For PowerPC, including,

7    again, SVR-4 print subsystem, one of the allegedly infringed

8    products.

9            The sixth indication.  SCO and IBM marketed AIX For

16:26:58 10   Power -- SCO and IBM marketed AIX For Power as a product that

11   would include UnixWare/SVR-4 technology.

12           A SCO presentation to its Data Center Acceleration

13   Program, dated 11-4-98.

14           SCO supplying IBM.  SCO, present sentence,

16:27:16 15   supplying IBM with UnixWare 7 APIs and technologies for AIX.

16   It describes AIX on PowerPC as, quote, AIX with UnixWare,

17   close quote.

18           SCO presentation at SCO partner conference 2000.

19   Refers to technology exchanges between AIX, UnixWare and

16:27:35 20   Dynix.  And notes that the Project Monterey strategy includes

21   the plan to, quote, aggressively grow and enhance AIX-Power

22   offering, close quotes, by including, quote, enhancements from

23   SCO's UnixWare and IBM NUMA-Q Dynix/ptx.

24           Seventh, and nearly final indication for today,

16:27:54 25   Your Honor, IBM specifically announced the inclusion of

1    Unix/SVR-4 technologies in AIX 5L For Power.

2            In March 2001, a document entitled, Printing for

3    Fun and Profit under AIX 5L, it's noted that the addition of

4    the SVR-4 print subsystem, the allegedly infringing product --

16:28:14  5    alleged infringed product, rather, is in this release of AIX,

6    it devotes more than 150 pages for the SVR-4 print subsystem.

7            IBM 4-17-01 software announcement for AIX 5L For

8    Power, includes a section titled, SVR-4 Printing Subsystem.

9            A 2001 AIX 5L for Power Version 5.1 release notes

16:28:37 10    includes a section of instructions on how to use SVR-4

11    printing subsystem.

12            The eighth indication, Your Honor, is that

13    contemporaneous industry reports noted the inclusion of

14    UnixWare/SVR-4 code in AIX For Power.

16:28:55 15            And August 8, 2000 -- this is Page 9 in the book.

16    August 8, 2000, "The Register" refers to AIX 5L as an

17    operating system that runs on both the IA64 and Power

18    architectures and that included contributions from, quote, SCO

19    UnixWare and Unix System V standard technologies, quote close.

16:29:16 20            June 2001, report by Andrews Consulting Group

21    describes AIX 5L as, quote, a single Unix for both PowerPC and

22    IA64, close quote.  And notes that, quote, AIX 5L supports a

23    number of Unix System V Release 4, SVR-4, commands and

24    utilities, especially in the printing subsystem, close quote.

16:29:38 25            And finally, September 24, 2001, article, notes

1    that AIX 5L, quote, can be used with both IBM PowerPC

2    processors and the merging Intel IA64 Itanium chips and that

3    AIX 5L, the allegedly infringing product, included a SVR-4

4    compatible printing subsystem, the allegedly infringed

16:30:02  5    product.

6         What's more, Your Honor, SCO contends that it

7    should be allowed to amend because it just discovered evidence

8    of the alleged infringement after it says the deadline passed

9    for amending the pleadings.  And SCO attaches to its opening

16:30:27 10    brief and it includes in the book that it provided the Court

11    today six documents, and it references IBM's AIX For Power

12    code.  And Mr. Normand said by my count today no less than

13    five times, IBM produced these documents for the very first

14    time after the deadline passed for amended pleadings.  That's

16:30:48 15    false.  Three of the six documents, which Mr. Normand refers

16    to, were produced before the deadline for amending the

17    pleadings.  Three of the six.

18         And when it comes to the scheduling order, Your

19    Honor, I have a handout which lays out the chronology.  It may

16:31:02 20    make more sense to talk about it there in greater detail.  It

21    shows the dates on which it was produced and a cover letter of

22    their production.  Let me take one example.  This is Exhibit 6

23    of SCO's opening brief, a piece of this allegedly newly

24    discovered evidence.  It deserves special mention.

16:31:17 25         The document was produced, Your Honor, not among

1        millions of pages of paper, as counsel would have the Court

2        believe.  It was produced on a single CD with less than a box

3        of documents on November 11, 2003, nearly three months before

4        the deadline for amending the pleadings.  SCO's newly

16:31:39  5        discovered evidence, Your Honor, is not so new.

6                On this record, I would respectfully submit that

7        there is no basis for SCO's proposed amendment.  SCO fails to

8        establish good cause.  It fails to satisfy the requirements of

9        15(a), and it certainly fails to establish compelling

16:31:55 10        circumstances, again let alone extremely compelling

11        circumstances, as this Court's June 10, 2004, order requires.

12        In fact, Your Honor, SCO cannot establish a good cause.  To

13        quote the Court on deadlines, which is cited in our papers,

14        the good cause standard primarily considers the diligence of

16:32:13 15        the party seeking the amendment.

16                This party, which had these documents in its files

17        for years, has acted with anything, we respectfully submit,

18        but diligence.  The courts, Your Honor, have refused to

19        find -- putting aside the Court's June 10 order, the courts

16:32:27 20        have refused to find good cause under circumstances no

21        different than these.  And I direct the Court to Pages 10 and

22        11 of the book where we cited a number of cases where the

23        court commonly refused to permit pleadings after the deadline

24        for amendment of pleadings.

16:32:41 25                In the Sipp case, for example, the 10th Circuit

1    affirmed its denial of a motion to file less than a year after

2    the original complaint.  This motion was filed 19 months after

3    the original complaint and only two months after the

4    expiration of deadline of any pleadings.  This motion was

16:32:56  5    filed nine months after the deadline for amending the

6    pleadings.

7         And the Court can see for itself the results of the

8    Brown, Schwinn, Doelle and Proctor & Gamble case.  Of course,

9    I know the Court is familiar, I know, with the Proctor &

16:33:08  10   Gamble case.

11        The Court need not reach Rule 15(a) --

12        THE COURT:  I'm a lot more familiar than I ever

13   wanted to be with Proctor & Gamble.

14        MR. MARRIOTT:  The Court need not reach 15(a)

16:33:18  15   because SCO can't satisfy Rule 16(b), Your Honor.  But if the

16   Court does reach 15(a), the result there is the same.  And

17   Page 13 in our book, we lay out a number of cases in which

18   courts have declined under Rule 15(a) to allow it in because

19   it was untimely.

16:33:32  20        In the Frank case, for example, the 10th Circuit

21   affirmed a denial of a motion to amend when the plaintiff's

22   motion was filed four months after the Court's deadline for

23   amending pleadings.  And the plaintiff knew or should have

24   known of the proposed claim long before that date.

16:33:44  25        Now, Your Honor, SCO offered by my count three

1    reasons to explain its delay.  First of all, Your Honor, it

2    seeks to dismiss the documents, to which I've just referred as

3    ambiguous.  In its papers, it says that the AIX 5L reference

4    might not really be AIX For Power, it might be AIX for IA64

16:34:07  5    only.  It says also that the SVR, that is the System V

6    technology, might not have been SVR-4, which it contends IBM

7    doesn't have a license to, but it might just have been SVR-3,

8    which it acknowledges IBM had a license to.

9            The documents, Your Honor, which I've just reviewed

16:34:23  10   and which we highlight in some limited way on Page 14 are

11   abundantly clear that the references here are not to AIX for

12   IA64 only, but to AIX For Power.  And the documents make

13   abundantly clear that the technology issue is not just SVR-3,

14   but it's SVR-4.  And I won't read them all to Your Honor, but

16:34:45  15   you can see them on Page 14.

16           Now, SCO contends, Your Honor, that it didn't know

17   about this evidence.  And for that proposition, it relies upon

18   the declaration that it submits from one of its employees,

19   Mr. Jay Peterson.  And respectfully, Your Honor,

16:34:57  20   Mr. Peterson's declaration isn't worth much.  It is based on

21   speculation, it is based on improper legal conclusion, and it

22   lacks foundation.  Mr. Peterson is in no position to testify

23   what people in the Santa Cruz Operation, Inc., many years ago

24   as a collective group knew or did not know.  Mr. Peterson can

16:35:15  25   speak to what Mr. Peterson knows and what Mr. Peterson doesn't

1    know.  And what Mr. Peterson knows and doesn't know, frankly,

2    is of little consequence in the face of the evidence here that

3    both the Santa Cruz Operation, Inc., and SCO knew that AIX For

4    Power included SVR-4 code.  Mr. Peterson's professed ignorance

16:35:34  5    cannot be reconciled with the documentary evidence before the

6    Court.

7           Now, finally, Your Honor, SCO suggests that in its

8    papers, that it can't be charged here with the responsibility

9    and the knowledge of its alleged predecessor in interest in

16:35:49  10   the Santa Cruz Operation, Inc.  It can't have it both ways,

11   Your Honor.  From the beginning of this litigation, the SCO

12   grouping has pretended that there is no distinction between it

13   and the Santa Cruz Operation, its predecessor in interest.

14          And I direct, Your Honor, for example to Page 15 of

16:36:08  15   the book.  In SCO's initial complaint, it alleged that it

16   performed the activities undertaken by the Santa Cruz

17   Operation, Inc.  It blurred the distinction, it said, quote:

18          From and after September 1995, SCO

19       dedicated significant amounts of funding

16:36:22  20       and a large number of Unix software engineers,

21       many of whom were original AT&T Unix software

22       engineers, to upgrading UnixWare for high-performance

23       computing on Intel processors, close quotes.

24       It says:

16:36:31  25       In furtherance of Project Monterey, SCO

1          expended substantial amounts of money and

2          dedicated a significant portion of SCO's

3          development team to completion of the project.

4               Your Honor, in 1995, the SCO Group didn't exist.

16:36:43  5  In 1995, its predecessor Caldera Systems, Inc., didn't exist.

6  Santa Cruz Operation, Inc., and the SCO Group are not, not

7  withstanding its prior contentions, the same company.  They

8  are nevertheless predecessors in interest, Your Honor.  And

9  the law is abundantly clear, we laid the cases out at

16:37:02 10 Page 16 in the book, that a party is charged with the

11 knowledge what its predecessor in interest knew or should have

12 known.

13              Even if, Your Honor, even if they didn't know what

14 the documents included, even if you credited Mr. Peterson's

16:37:19 15 declaration, even if they were allowed selectively to identify

16 themselves with the Santa Cruz Operation, Inc., the proposed

17 amendment here is untimely and shouldn't be allowed.  A

18 proposed claim is untimely if the moving party should have

19 known about the claim.

16:37:32 20              And you can see the cases that support that

21 proposition in 17.  Frank v. US West, 10th Circuit, said,

22 quote:

23              It is well-settled in this circuit that

24          the untimeliness alone is a sufficient reason to

16:37:45 25          deny leave to amend, especially when the party

1          filing the motion has no adequate explanation

2          for the delay.

3               Las Vegas Ice, Your Honor, reaches the similar

4     result.

16:37:55  5          The law is clear here, that the SCO Group had a

6     duty to investigate.  Those cases are laid out at Page 18.

7     SCO's own cases, Your Honor, indicate, as laid out in Page 19,

8     that, in fact, it had a duty to investigate.

9               A party who fails to comply with its duty to

16:38:11 10    investigate is charged with knowledge of the facts

11    constituting the infringement, as indicated in the cases laid

12    out at Page 20.

13              The most basic of public investigations, the most

14    basic of internal investigations would have shown, indeed, I

16:38:25 15    submit did show that IBM included SVR-4 code in its AIX For

16    Power product years ago.  They knew it, Your Honor, and this

17    claim is untimely both under Rule 15, Rule 16 and certainly

18    this Court's order of June 10th.

19              The second point, Your Honor, the last point which

16:38:42 20    I intend to make, is that the proposed claim here is not a

21    claim which may properly be brought in this court.

22    Section 22.3 of the JDA, and I refer you to Page 21 of the

23    book, provides, quote:

24              Any legal or other action related to a

16:39:01 25         breach of disagreement must be commenced no

67

1          later than two years from the date of the

2          breach in a court cited in the state of New York.

3              It is undisputed that this proposed claim is a

4     legal or other action.  It is equally undisputed,

16:39:21  5     notwithstanding -- it is equally clear, Your Honor, that the

6     proposed claim here is related to a breach of disagreement.

7              I refer you to the next slide, Page 22 of the book,

8     wherein SCO in the proposed amended complaint and in its

9     opening brief on this motion acknowledge that the proposed

16:39:41 10    claim is a claim relating to a breach of the agreement.  SCO's

11    proposed third complaint says, quote:

12          IBM converted SCO's copyrighted code for

13          IBM's own use in violation of the specific

14          restrictions of the parties' Joint Development

16:39:57 15          Agreement.

16             SCO's opening brief states that IBM, quote, ignored

17    the JDA's restrictions in violation -- I apologize, Your

18    Honor.  It states that IBM ignored the JDA's restrictions on

19    its use of SCO's SVR-4 code and released an Itanium product

16:40:14 20    that did not satisfy the conditions of a product release.

21             You know, SCO obviously didn't bring the claim in

22    New York.  That is reason enough under this provision for this

23    claim not to be included in this case.  It offers in its

24    papers, Your Honor, two arguments as to why that shouldn't be

16:40:30 25    the case and said barely a word about it today.

1          The first argument Mr. Normand mentioned today

2     is -- the only argument that Mr. Normand mentions today is

3     that Section 22.3, which we just read, is inapplicable.  They

4     took the opposite position, Your Honor, in their opening

16:40:50  5     brief, the opposite position.  In their opening brief, they

6     acknowledge that that section applied here.  They brought it

7     up in their opening brief.

8          The law is clear, Your Honor, that a court

9     generally refuses to consider arguments raised for the first

16:41:03 10    time in a reply brief, which this argument of inapplicability

11    is; and in any event, it is a reversal of position, which the

12    courts also decline to consider.  And the authorities for that

13    proposition are set out at Slide 23.

14          Pickering v. USX Corp., refusing to rule on

16:41:21 15    arguments raised for the first time in reply memorandum.

16          Weaver v. University of Cincinnati, stating that

17    the Court would address only the merits of defendants'

18    original contention where defendants shifted their argument in

19    their reply brief.

16:41:30 20          Even if, Your Honor, they hadn't conceded the

21    applicability in their prior papers of Section 22.3, even if

22    that were true, and it's not, that section plainly applies

23    here, Your Honor, a contract must be construed to give meaning

24    to all the terms.  That Section 22.3 is an important term of

16:41:48 25    the contract.  Cases to that effect are laid out at Tab 24.

1          Courts have construed, Your Honor, language

2     comparable to the related-to language here to include

3     non-contract claims, such as SCO's proposed copyright claim.

4          At Page 25, you'll see, for example, the Turtur

16:42:05  5     decision, Your Honor, Second Circuit, holding that, quote,

6     rising out of or related to, close quote, language to apply to

7     a tort as well as a contract claim.

8          In the Ward case, the Court found that the, quote,

9     scope of a relating-to language is broad and intended to cover

16:42:24 10     a much wider scope of disputes, not just those arising under

11     the agreement itself.

12          Courts, Your Honor, have even interpreted more

13     restrictive language, like "arising under" as opposed to

14     "related to" to encompass claims of the kind here used in the

16:42:40 15     forum selection clause.  And those cases are laid out in

16     Page 26.

17          In Monsanto, Your Honor, the Court held, the

18     Federal Circuit, held that if patent claims were subjected to

19     forum selection clause applicable to, quote, all disputes

16:42:51 20     arising under the contract.

21          Second, Your Honor, SCO contends that IBM ought not

22     be allowed to enforce this amending provision here because IBM

23     has waived its rights to the provision.  Two arguments they

24     make.  First one is the argument was waived because IBM failed

16:43:30 25     to assert the defense in its responsive pleadings.  That's

1      wrong for three reasons.

2            First, Your Honor, SCO didn't raise the argument in

3      its opening brief.  It's improper for the reasons that I've

4      already stated.  Second, we haven't submitted a responsive

16:43:53 5      pleading.  The complaint hasn't been allowed in the case yet.

6      Third, Your Honor, we have submitted in the case in connection

7      with their other three complaints four responsive pleadings.

8      In every one of those pleadings, notwithstanding their

9      contentions to the contrary, and this is laid out, Your Honor,

16:44:10 10     at Page 28 of our book, notwithstanding what their brief says,

11     in every one of our responsive pleadings, we have asserted a

12     defense of improper venue.

13            The second and last argument they make with respect

14     to waiver, Your Honor, is that the claim is waived somehow by

16:44:25 15     virtue of IBM's assertion of its Ninth Counterclaim.  Your

16     Honor, Section 22.1 of the Joint Development Agreement -- and

17     that's wrong, by the way, Section 22.1 of the Joint

18     Development Agreement, which is set out at Page 29 of the

19     book, expressly provides:

16:44:43 20            No waiver of any portion of this agreement

21         shall be effective unless it is set forth in a

22         writing which refers to the provisions so affected

23         and is signed by an authorized representative of

24         each party.

16:44:56 25            There is no such writing.

1          Second, to establish waiver, they've got to show a

2    voluntary and intentional abandonment of a known right.  Cases

3    to that effect are set out at 30.  There has been no knowing

4    and intentional abandonment of a known right.  And the case

5    law, Your Honor, indicates that the mere assertion of a

6    counterclaim, as we show at Page 31, is an insufficient basis

7    for final waiver.

8          Finally, they suggest that the Ninth Counterclaim

9    somehow encompasses the proposed claim.  That isn't right,

10   Your Honor.  The Ninth Counterclaim was intended to be narrow

11   in scope.  The Ninth Counterclaim could not have been as broad

12   as they contend because, A, the Court wouldn't have subject

13   matter jurisdiction over it, IBM couldn't have brought a Ninth

14   Counterclaim seeking a declaration of non-infringement with

15   respect to the conduct at issue in their proposed complaint

16   because we hadn't been sued for that, one; and they had never

17   threatened to sue us for that, two.  We lacked a reasonable

18   apprehension suit.  There would have been no subject matter

19   jurisdiction with respect to a claim of that kind.  And in any

20   event, the claim that they contemplate having somehow been

21   swept up in Ninth Counterclaim is a claim that must be

22   brought, if at all, in New York by virtue of the agreement

23   that IBM entered into with its partner in Monterey, the Santa

24   Cruz Operation, Inc.

25          In summary, Your Honor, the motion should be

1    denied.  It should be denied because they've known about this

2    claim from the very beginning of the case, and it should be

3    denied because there is a forum selection clause here which

4    requires this claim to be asserted in New York, not in the

16:46:33  5    state of Utah.

6             THE COURT:  If I let them amend as they want to do,

7    would it affect your motion to narrow the Ninth Counterclaim?

8             MR. MARRIOTT:  Would it affect the motion?  Your

9    Honor --

16:46:47  10            THE COURT:  In other words, would you still want me

11   to grant that motion?

12            MR. MARRIOTT:  Your Honor, the motion with respect

13   to the Ninth Counterclaim is intended simply to reflect IBM's

14   intent to filing a motion.

16:46:58  15            THE COURT:  All right.  So I'll call it a motion to

16   clarify.

17            MR. MARRIOTT:  Call it a motion to clarify.  The

18   motion frankly is of little consequence.  It doesn't make much

19   difference.  SCO doesn't really care, Your Honor, about that

16:47:11  20   motion except for purposes of being able to argue in this

21   connection that somehow the claim is waived.

22            THE COURT:  But my question to you is, if I let

23   them amend, do you care about your motion?

24            MR. MARRIOTT:  I don't care about the motion, Your

16:47:25  25   Honor.

1          THE COURT:  Okay.  Thank you.

2          MR. MARRIOTT:  Thank you.

3          THE COURT:  Reply, Mr. Normand?

4          I assume you'll be brief and efficient.

16:47:40  5          MR. NORMAND:  Thank you, Your Honor.  I'll make an

6  effort to be brief and efficient.  Mr. Marriott has raised

7  some new issues, some new documents and some arguments that

8  I'm hearing for the first time.

9          Just to clear the field, to begin with, Your Honor,

16:47:56 10  the question of when documents were produced, I think we're

11  going to have a factual dispute with IBM about that.  I do not

12  purport to have personal knowledge about when documents were

13  produced, but it is my understanding that the documents had

14  been produced after the amendment deadline.  If we're

16:48:10 15  incorrect, we're incorrect.  It stands that several of the

16  documents at least, as Mr. Marriott concedes, were produced

17  after the deadline.  And this goes to the point of plaintiff's

18  entitlement to collect a core critical mass of highly

19  privilege documents.  There is no question that some of the

16:48:26 20  very important documents were produced after the deadline.

21  And we have not purported to present to the Court with all of

22  the documents.

23          As an overarching matter, Your Honor, there is no

24  argument of undue prejudice from IBM.  And under the Supreme

16:48:40 25  Court precident and under a lot of other precidents, that's

1        the primary overriding factor.  There is no undue prejudice.

2             IBM makes a series of arguments about Rule 16.  We

3        think those arguments misconstrue the case law and are

4        overstated.  Let me note from the onset, Your Honor, that, as

16:49:01   5        I noted in my opening argument, there is no place for Rule 16

6        here.  There may not be a place for Rule 16 because there may

7        be a new amendment deadline.

8             Even if there is not a new amendment deadline, the

9        question, then, is Rule 16, because there is no question that

16:49:15   10       many of the documents, at least, even pending this dispute

11       with IBM over the timing of production of documents, there's

12       no question that some of the documents were produced after the

13       deadline.  If there's been no undue delay and Rule 15 is prior

14       to the deadline, Rule 16 has been placed.  In any event, the

16:49:32   15       questions under Rule 16 as we cite in the briefs is whether

16       the plaintiff uncovered previously unknown facts during the

17       discovery that would support an additional cause of action.

18       The question is whether the supporting facts did not surface

19       when the last amendment deadline had passed.

16:49:48   20            Now, with regard to another matter, IBM spends a

21       lot of time going through the documents, the documents that we

22       had not seen before, internal documents from Santa Cruz.  We

23       think that misses the point entirely.  There is evidence that

24       people at Santa Cruz might have known that as part of the

16:50:02   25       Project Monterey the parties intended to allow copying to

1    happen.  IBM, first of all, argues that there was an

2    authorization, but they don't point to the Court or to us any

3    basis for that supposed authorization.

4           Santa Cruz understood that the product was to be

5    developed.  Santa Cruz understood that there would be sharing

6    of the code as part of the project, but there is no allegation

7    and no proof that anyone at Santa Cruz or SCO actually knew

8    they had a claim.  More importantly, IBM's arguments ignore

9    the key evidence that we've uncovered.  It is highly relevant

10   that IBM itself thought and its product release did not

11   authorize itself to use the code.  And I'd like to walk the

12   Court through that in a little bit more detail.

13          SCO must prove that IBM's copying was unauthorized.

14   Part of that proof is the question of the operation of the

15   JDA.  Very relevant evidence as to the operation of the JDA is

16   how IBM thought the JDA operated.  Accordingly, very relevant

17   evidence to our claim is IBM's view that it was not authorized

18   under the JDA to undertake the copying it did.  There is just

19   no question that that evidence is relevant.  IBM's argument

20   produces the claim that the evidence is irrelevant, that it

21   added nothing, that we could have brought a copyright claim

22   without knowing that IBM thought that the release was

23   pretextual.  I don't think that's true to the extent that an

24   argument is an accrual argument.  And I'll address that in a

25   moment, Your Honor.

1          IBM tends to confront the three reasons that we've

2     offered for why we think it is appropriate.  Some of the

3     reasons are ones that IBM has frankly mischaracterized.  They

4     first discussed the documents and say that we dismissed the

16:52:02 5     documents.  As I said, that misses the point that as many of

6     the documents that are released, they did not either attempt

7     or give any basis for thinking they have copyright claims.

8     And none of the documents suggest that anyone at Santa Cruz

9     knew that IBM itself regards itself as having lack of

16:52:17 10     authorization of the copying of the code.  That is a critical

11     aspect of the claim we propose to bring.  It is an aspect that

12     we could not have discovered possibly until we reviewed the

13     documents in this litigation.

14          Argument -- IBM then argues the issue of whether we

16:52:33 15     should be imputed to have what little knowledge Santa Cruz

16     might have had about the subject matter of the claim.  We

17     think IBM misses the point there, as well, Your Honor.  IBM

18     cites no case for its proposition and for purposes of Rule 15

19     that plaintiff should have knowledge of its predecessor

16:52:54 20     imputed to it.  These are the cases that IBM cites, cases in

21     which the defense of laches had already barred the

22     predecessor's claims when the predecessor purported to assign

23     the claims to the successor.  Those cases make sense.  If

24     laches were to preclude the predecessor's lawsuit, he should

16:53:14 25     not be permitted to escape his untimeliness by selling or

1    giving his patent or other intellectual property rights to a

2    successor to then try to file a timely lawsuit.

3           SCO does not seek to gain any rights that Santa

4    Cruz did not have.  The only issue here is whether SCO can

16:53:30 5    bring a new claim as an amendment in this proceeding.  IBM

6    cites no cases to support its oral argument that knowledge of

7    Santa Cruz, however limited, should be imputed to us.

8           IBM illustrates what I think is its failure to

9    confront our main argument where it says the most basic of

16:53:48 10   public and internal investigations would have revealed the

11   basis for our proposed claim.  That is not true.  It's not

12   remotely true.  We would not have known even with the most

13   intense investigation that IBM itself viewed itself as

14   unauthorized to publish and to copy code as it did.  That's

16:54:08 15   critical evidence, Your Honor.

16          IBM argues that we acknowledged in our opening

17   brief the JDA applied.  That's not true, Your Honor.  Here's

18   the statement we made in our opening brief.

19          SCO recognizes that the parties' JDA for

16:54:24 20       Project Monterey contains a forum selection

21       clause for New York courts.

22          We acknowledge that the JDA contained a forum

23   selection clause.  We weren't obligated to raise every

24   argument, Your Honor, in which 22.3 would not apply.

16:54:40 25          We're also at the height of formality here, Your

1    Honor.  IBM filed an ex-parte motion for leave to file a

2    surreply after they concluded that when we raised the issue of

3    waiver in the applicability provision in our reply brief, they

4    argue that we raised that for the first time.  They got

16:54:54  5    permission to file a surreply.  They filed a 16-page surreply,

6    and we're here arguing the points before Your Honor.  I think

7    it's an incorrect argument, and in any event, a technical one

8    that shouldn't preclude the consideration of merits.

9         As to the interpretation, Your Honor, of

16:55:28  10    Section 22.3 of the JDA, IBM ignores again our main argument,

11    which is by their own lights, the provision doesn't make any

12    sense.  They leave the accrual portion of the provision out

13    because it would give the provision an unreasonable reading.

14    They cite several cases that they say support their arguments,

16:55:46  15    that in light or analogous provisions a forum selection clause

16    should apply.

17         We think those cases make our point.  In contrast

18    to those cases, Section 22.3 does not encompass all claims

19    relating to or arising under the agreement or concerting the

16:55:59  20    parties' rights and duties under the agreement.  That is not

21    the scope of this provision.  That's the scope of 20.1.  It's

22    a reason not to give the reading of 22.3 that IBM does.

23         IBM argues that there's been no waiver of the

24    provision.  We think that's wrong, Your Honor, for one basic

16:56:19  25    reason, which is the scope of the Ninth Counterclaim.  I

1    quoted the Ninth Counterclaim before, and it is extremely

2    broad.  It asks for a declaration of non-infringement.  It

3    does so in plain language.  It was a counterclaim that

4    exceeded the scope, as Mr. Marriott concedes, as praise as

16:56:42  5    written that he exceeds the scope of our claims.  That makes

6    it not a compulsory counterclaim, as Mr. Marriott again

7    explicitly concedes, but a permissible counterclaim.  Parties

8    pursue litigation from one forum constitutes the waiver of

9    that party's ability to enforce the forum selection clause to

16:56:58  10    another forum.

11    The Ninth Counterclaim is permissive.  None of

12    SCO's claims required any fact finder to determine whether

13    IBM's development of AIX violated any SCO copyrights.  We

14    think the precident makes clear that the defendant waives any

16:57:12  15    venue objections when it objects to new issues in the case.

16    10th Circuit held long ago in Thompson, 1962, that the filing

17    of a counterclaim can constitute the waiver of a forum

18    selection clause.

19    IBM cites a more recent 10th Circuit case,

16:57:27  20    Campbell, I believe it's Campbell, in which the Court

21    concludes that if the counterclaim was compulsory, it would

22    not be a waiver.  But the rule as it stands and as we can

23    prove from a variety of precidents is that the defendant

24    voluntarily submits himself to the forum through filing a

16:57:43  25    permissible counterclaim.  We think the plain language of the

1    Ninth Counterclaim makes it clear that it's permissive.

2         I'll address in a moment, Your Honor, the question

3    of whether IBM's re-interpretation of its Ninth Counterclaim

4    makes any sense.  I want to address IBM's brief argument on

5    the non-waiver provision in the JDA.  We cited the case in our

6    briefs that show where the party's conduct constitutes a

7    waiver generally of venue objection, even if there is a

8    no-waiver condition in the contract, that is not a right to

9    the waiver, constitute a waiver, both of the no-waiver

10   provision and of the venue objection generally in federal

11   court.

12        The cases IBM cites don't support its argument.  In

13   the Roboserve case, the Seventh Circuit case, the Court

14   acknowledged only that the waiver of authority in Illinois

15   holds that, Waiver Only in Writing provisions can be waived by

16   words and deeds of the parties.  And I think IBM's Ninth

17   Counterclaim constitutes a deed by which IBM intends to inject

18   new issues into the case.

19        IBM argues that its Ninth Counterclaim shouldn't be

20   read as written.  IBM says its Ninth Counterclaim is not

21   intended to encompass SCO's claims.  And it's filed a motion

22   styled, A Motion For Entry of Order Limiting the Scope of the

23   Ninth Counterclaim.  The motion is fully briefed.  I take it,

24   Your Honor, it will be heard another time.

25        But in sum, in our opposition to that motion, we

1    point out that among other things, IBM filed that motion only

2    having seen after the October 2004 hearing before the

3    magistrate court the evidence of its violation of SCO's

4    copyrights and the evidence that it knew it was not authorized

16:59:20  5    to use SCO's code.

6         IBM doesn't seek leave to amend the counterclaim

7    but seeks leave to ask the Court to enter an unprecedented

8    order that would retroactively limit the scope of

9    (unintelligible).  It's unprecedented.  IBM cites

16:59:37 10   unprecedented to support a motion.  And the motion directly

11   contradicts IBM's argument to this Court in September of 2004,

12   as Your Honor may recall, with respect to our motion to

13   dismiss IBM's Tenth Counterclaim as a permissive one.  IBM

14   argued at that point that what you should control is the plain

16:59:55 15   language of the scope of our copyright claim.  In our view,

16   our copyright claim was more narrow than IBM interpreted it to

17   be.  And we argued that the plain language didn't support

18   IBM's agreement.  And IBM argued that the plain language had

19   to control.  And the Court adopted, as we understand the

17:00:08 20   Court's order, that rule, that the plain language of the

21   counterclaim would control and the plain language of SCO's

22   allegations would control.  I don't see why a different rule

23   would apply in this instance.

24        In short, Your Honor, IBM's argument ignores the

17:00:45 25   crucial fact that there is no undue prejudice.  IBM's argument

                                                                    82

1    deduces the claim without any citation or precedent or

2    authority remotely analogous, that Santa Cruz' limited

3    knowledge should be imputed to us.  And we think those

4    arguments are wrong.

17:01:00  5          And as a last point, Your Honor, the question of

6    the extent of Santa Cruz' knowledge is a statute of

7    limitations accrual question.  It is not a question that is

8    relevant to the policies of Rule 15.  At the very least, Your

9    Honor, the question of when a claim (unintelligible) is a fact

17:01:14  10   question, and we cited cases in our brief showing that it is a

11   fact question, not only requiring discovery, but is one that

12   cannot be resolved in summary judgment.  An intense fact

13   question.  And to the extent that the document, the new

14   document that IBM submitted suggests that Santa Cruz had a

17:01:29  15   certain level of knowledge of copying, which is different from

16   the question of any knowledge of IBM's knowingly unauthorized

17   copying, that IBM acknowledged the copying was unauthorized,

18   that is a fact question.  And the fact that Mr. Marriott has

19   brought in new documents, ones that we have not seen before,

17:01:44  20   only highlights what that question is.  It is no basis for

21   (unintelligible).  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. MARRIOTT:  May I have just a moment, Your

24   Honor?  I can segway easily, if you like, into the scheduling

17:01:58  25   discussion.

1          THE COURT:  But you want -- well, the scheduling

2     discussion is not going to be very lengthy.

3          MR. MARRIOTT:  Perhaps not.

4          THE COURT:  You want to say something?  You want to

17:02:07  5     reply to his reply?

6          MR. MARRIOTT:  I would if I could.

7          THE COURT:  How long?

8          MR. MARRIOTT:  Three minutes.

9          THE COURT:  Then he still gets the last word.  It's

17:02:15  10    his motion.

11         MR. MARRIOTT:  That's fine with me.

12         MR. NORMAND:  Your Honor, that's fine.

13         THE COURT:  I'll give you two minutes.

14         MR. MARRIOTT:  Okay.  Thank you.

17:02:20  15         First, Mr. Normand suggests that he heard nothing

16    from IBM with respect to prejudice.  As I said at the outset,

17    Your Honor, we are not making here all of our arguments.

18    There is no question that it would be prejudice to IBM if this

19    motion would be allowed.  If it would be allowed, it would be

17:02:35  20    prejudice because the forum selection clause would be read out

21    of the contract.  There would be prejudice because new issues

22    would be inserted in this case which are otherwise not here.

23    Like, for example, whether IBM has a license to include Unix

24    System VR-4 code into this product.  That issue is not in this

17:02:51  25    case.  That is the central issue in all likelihood in their

1    proposed claim.

2         The proposed claim, Your Honor, concerns a contract

3    between IBM, a New York corporation, and the Santa Cruz

4    Operation, Inc., a California corporation, not the SCO Group,

17:03:09   5    Inc., a Utah based company.

6         SCO suggests, Your Honor, by way of its inquiry in

7    SCO's arguments that a party is not on notice for purposes of

8    inquiry notice unless that party has all of the evidence,

9    which we indicate the alleged underlying violation.  That's

17:03:23  10    wrong, Your Honor.  If that were the rule, there would be no

11    inquiry notice as a test.

12         Mr. Normand suggests that Rule 15 somehow is

13    oblivious to whether a party knew or should have known.

14    That's a fact question he says the Court couldn't possibly

17:03:37  15    resolve in this posture.  Courts resolve that question all the

16    time in this juncture, Your Honor.  If Mr. Normand were right

17    that that was a fact question and the Court couldn't hear it

18    and consider it, we would never have these decisions laid out

19    in our book in which courts have denied amendments because the

17:03:49  20    party should have known of the alleged misconduct.

21         With respect to the scheduling points, Your Honor,

22    I guess my question is whether the Court intends to hear any

23    argument with respect to that.  If it does not, I'd like to

24    show one other exhibit, which I think is of some consequence

17:04:03  25    to this.

1          THE COURT:  Consequence to this motion?

2          MR. MARRIOTT:  It is.

3          THE COURT:  Or referring to schedule?

4          MR. MARRIOTT:  It is the consequence of both.

17:04:09  5          THE COURT:  Well, show it.  We're going to have a

6    brief discussion about scheduling.

7          Now, tell me how this is of consequence to this

8    motion.

9          MR. MARRIOTT:  I will, Your Honor.  It is of

17:04:31 10   consequence to this motion because this chronology which lays

11   out the events concerns both.  The reason it relates to

12   scheduling, Your Honor, because one of the scheduling

13   questions is whether the Court should enter an order which

14   includes a new deadline for filing amended pleadings.

17:04:46 15          THE COURT:  Yeah, that is one of the questions.

16          MR. MARRIOTT:  Pardon?

17          THE COURT:  That is one of the questions.

18          MR. MARRIOTT:  That is one of the questions.  And

19   that question is also obviously relevant to the motion that

17:04:54 20   SCO should be allowed to amend its complaint.  The documents

21   that SCO contends is the newly discovered evidence are

22   indicated here with asterisks, Your Honor.  At the tabs,

23   you'll see the correspondence which indicates when these newly

24   discovered pieces of the evidence were produced.  There is a

17:05:07 25   factual record, and it is right here.  And this is the record

1    that indicates when the documents were produced.  Three of the

2    six, as I say, were produced before the close of fact

3    discovery.

4           Your Honor, the code in question, IBM AIX For Power

17:05:20    5    product, was produced to SCO in March of 2004, as indicated on

6    this document.  SCO says in its papers that it was relatively

7    easy to determine from those -- from that code that IBM

8    infringed because it says that IBM copied hundreds of

9    thousands of lines of code, to put that code into its AIX For

17:05:39   10    Power product.  SCO had that discovery, Your Honor, by

11    March 4th.  On April 5th, it filed a motion seeking to amend

12    the scheduling orders.  In that motion to amend, which is laid

13    out here in the book, Your Honor, it asks for date after date

14    after date for events in this case.  Not a single one of those

17:05:57   15    dates concerns a date for amending pleadings.

16           The parties appeared before the Court on June 8th,

17    2004, for a hearing with respect to the scheduling order, at

18    which point SCO had had the allegedly critical documents, at

19    which point all of the allegedly critical documents were in

17:06:12   20    its possession, some for more than six months, the code which

21    he said was -- well, that it easily determined was in

22    possession.  And nothing was said at that hearing about a

23    need, Your Honor, to amend the schedule to have a new date for

24    which to file an amended pleading.  That is indicative of

17:06:26   25    there not being either good cause or extraordinarily good

1      circumstances.  Thank you.

2                  THE COURT:  Thank you.

3                  Mr. Normand?

4                  MR. NORMAND:  Thank you, Your Honor.  I won't dwell

17:06:38  5      on the point.  As I said, I don't know personally whether what

6      IBM has represented about the documents is accurate.  To the

7      extent Your Honor thinks it might be relevant, we ask for the

8      opportunity to respond to the submission that they made.

9      Mr. Marriott said earlier that, I think he said three of the

17:06:51  10     six were produced in November of 2003; three of the most

11     relevant were not.  Even as to those that were produced, we

12     received them only a few months before the original amendment

13     of pleadings.  Thank you, Your Honor.

14                 THE COURT:  Thank you.

15                 All right.  Now who's going to talk now about

17:07:04  16     scheduling?  Mr. Marriott?

17                 MR. MARRIOTT:  Yes, sir.

18                 THE COURT:  Who over here?

19                 MR. NORMAND:  Your Honor, I will.

17:07:13  20                 THE COURT:  All right.  Now, I have your proposed

21     schedules.  Talk to me briefly, each of you, about what

22     difference in your proposed, if any, the magistrate's order

23     entered yesterday may make and what difference -- what your

24     proposals would be if I allowed plaintiff to amend or if I

17:07:42  25     didn't allow plaintiff to amend.

1          MR. NORMAND:  Yes, Your Honor.  We have a revised

2     scheduling order.  May I approach?

3          THE COURT:  Yes.  Have you given Mr. Marriott a

4     copy of it?

17:07:52 5          MR. MARRIOTT:  He has, Your Honor.

6          THE COURT:  Okay.  This is your proposed revision;

7     right?

8          MR. NORMAND:  Yes, Your Honor.

9          THE COURT:  And this is after the order yesterday

17:08:07 10    by Magistrate Wells?

11         MR. NORMAND:  Yes, Your Honor.  The modifications

12    to the scheduling order --

13         THE COURT:  Would this be affected by my ruling on

14    the motion to amend?

17:08:16 15         MR. NORMAND:  It would not, Your Honor.  It

16    proposes an amendment deadline.

17         THE COURT:  Okay.

18         MR. NORMAND:  You see near the top of the page,

19    Your Honor, amendment deadline of June 17, 2005.

17:08:28 20         THE COURT:  Okay.

21         MR. NORMAND:  The differences between this revised

22    schedule and the schedule we submitted several weeks before

23    the magistrate's court order relate to merely timing.

24         THE COURT:  Relate to what?

17:08:41 25         MR. NORMAND:  Timing.  The magistrate court order

1    gave IBM, as we understand it, as of yesterday --

2            THE COURT:  Most schedules do relate to timing.

3            MR. NORMAND:  Then I'm right.

4            THE COURT:  You are right.  You are certainly --

17:08:52  5    I'll take judicial notice of the correctness of your last

6    statement.

7            Excuse me.  Go ahead.

8            MR. NORMAND:  Thank you, Your Honor.  I have that

9    going for me.

17:09:00  10           The magistrate court's order gave IBM 90 days from

11   yesterday to comply with the discovery order the magistrate

12   court had originally entered in January.  Accordingly, we've

13   changed our schedule in roughly proportional fashion, moved

14   dates back.  Of course, we moved the fact discovery deadline

17:09:20  15   back 54 days, as indicated in the footnote.  And we've moved

16   most of the other dates back about 90 days.  We don't presume

17   to take a full 90 days that the Court has given.  We would

18   take 70 days.  We think that the delay in the production is

19   relevant to our ability to structure the order as we

17:09:39  20   originally proposed it.

21           THE COURT:  Thank you.

22           Mr. Marriott?

23           MR. MARRIOTT:  Your Honor, I believe that

24   Magistrate Judge Wells' order doesn't change much of our

17:09:51  25   proposed schedule, except that I would suggest that by

1    adjusting outward the dates two months would accommodate the

2    Court's order of yesterday.

3            With respect to the other question, adding that

4    complaint, Your Honor, would from our perspective complicate

17:10:05  5    the case and require a line of discovery which was otherwise

6    not contemplated and which is otherwise not necessary and

7    would require a minimum of nine months additional time.

8            THE COURT:  Have you looked at this?

9            MR. MARRIOTT:  I was handed that at the beginning

17:10:19 10    of the hearing, Your Honor.  I have not studied that.

11            THE COURT:  All right.  Thank you.

12            Now, do either of you -- is there -- would you be

13    able to sleep tonight based on what you've told me about

14    scheduling?  I don't want you to go home and say, oh, gee, I

17:10:36 15    wish I would have said that when we talked about scheduling.

16    That happened to me a few times when I was practicing.  Why

17    didn't I say X?  So is there something else you want to say

18    about scheduling?

19            MR. NORMAND:  Well, I know if I don't say

17:10:50 20    something, Mr. Eskovitz will tell me I should have said

21    something.  Two main points --

22            THE COURT:  That's reason enough.  You don't want

23    your partners calling you in the middle of the night.

24            MR. NORMAND:  Thank you, Your Honor.

17:10:59 25            Mr. Marriott first said he doesn't see how the

1    magistrate's court order changes their proposed schedule.

2    We'll point out that their proposed schedule from a few weeks

3    ago presupposed that they would win a motion for

4    reconsideration.

17:11:11  5          The other point, Your Honor, is the reasons I

6    outlined my argument on the motion to amend, to the extent to

7    the nine-month discovery schedule that IBM proposes for fact

8    discovery, which is what I heard Mr. Marriott say, to the

9    extent that that is premised on Project Monterey discovery, we

17:11:26 10   think that has to be incorrect.  Project Monterey is in the

11   suit.  We don't, SCO, need to take substantial additional

12   discovery.  And there's a six- to eight-month discovery under

13   our schedule that we think is plenty to accommodate Project

14   Monterey.  Thank you.

17:11:42 15          THE COURT:  Thank you.

16          Mr. Marriott, do you want to sleep well tonight?

17          MR. MARRIOTT:  I do, Your Honor.  Project Monterey

18   is not in the case in the sense in which they propose to put

19   it in the case, the words mentioned in the case to be sure.

17:11:52 20   The issues presented by their motion is not here, and I think

21   an additional nine months would be required with respect to

22   that.

23          I don't think, to respond briefly to what

24   Mr. Normand said about my comment about Judge Wells' order, I

17:12:04 25   don't think that doesn't affect the case at all.  I think I

1    said it would shift about two months in the proposed dates.

2         The one thing which I'd like to mention with

3    respect to the proposed schedule is set out in the papers, but

4    I think it deserves special emphasis.  We believe that it is

17:12:18  5    critical that the Court enter a proposed scheduling order that

6    includes a provision which requires both parties to disclose

7    the allegedly misused material, whatever it is, by a date

8    certain, and that the parties then have an opportunity

9    subsequent to the disclosure of that allegedly misused

17:12:34  10   material to take discovery with respect to that material.

11        The Linux Operating System, Unix System V, AIX, and

12   Dynix, include collectively hundreds of millions of lines of

13   code, Your Honor.  When they identified that which IBM has

14   alleged to have misused, we're going to need to take discovery

17:12:53  15   with respect to that identified code.  We're going to need to

16   take discovery with respect to who and when, where, why, how.

17   We're going to need to take discovery with respect to whether

18   it's subject to contracts, whether it's subject to copyright

19   principles.  We're going to need to take discovery with

17:13:07  20   respect to whether it's in public domain, and if so, to what

21   extent.

22        Your Honor, our proposal is that the Court impose

23   an interim deadline, by which the parties disclose, I

24   understand already should have been done, if the parties have

17:13:16  25   additional information they disclose that and that there be a

1    final deadline.  And after that deadline, the target is fixed.

2    The experts are not permitted to disclose additional

3    information in their reports or other pretrial submissions.

4    They're not allowed an opportunity to add additional uses

17:13:33  5    about that which was supposedly misappropriated.  The target

6    is fixed.

7              That's the only way, Your Honor, if there's allowed

8    to be a period of brief fact discovery after that we can

9    properly prepare our defense.  The only other alternative,

17:13:45 10    Your Honor, is to undertake that kind of investigation with

11    respect to the hundreds of millions of lines of code in issue

12    in the case under a hypothetical, yet unasserted theories of

13    liability.  That is impossible, and any scheduling order we

14    respectfully submit should include that kind of provision.

17:14:02 15              Now, they've made various arguments against it,

16    Your Honor.  We've laid out in our papers why none of them are

17    respectfully are any good.  If as they contend we will get

18    this information in the ordinary course, which is their

19    argument, then they ought to have no difficulty agreeing to a

17:14:15 20    schedule in which there is that kind of provision.

21              And respectfully, the reason that they don't

22    particularly care about that provision is that IBM has

23    disclosed to them 700,000-plus lines of code, line for line

24    match up that we contend that they infringed in our copyright

17:14:30 25    claim.  That we don't have.  That we want.  That we think we

94

1          need in order for this case to progress.  Thank you.

2                    THE COURT:  Thank you.

3                    Mr. Normand?

4                    MR. NORMAND:  Thank you, Your Honor.  The parties

17:14:42  5     do disagree over the structure of the fact discovery.  We have

6          proposed that the fact discovery in this case proceed as it

7          does in every other civil case, with mutual discovery.  IBM

8          wants a period of unilateral discovery to begin very shortly.

9          They want that period to begin on August 11th.  That's not

17:15:00 10     enough time for us to review the code.

11                   IBM's unilateral discovery proposal fails for

12         several other reasons in addition, Your Honor.  First, our

13         schedule conforms that mutual discovery contemplated in the

14         federal rules and the one that was structured in the previous

17:15:16 15     schedule orders.  And we think it would be odd if that

16         framework changed as a result of -- as reflected in the

17         magistrate court's January order, IBM's failure to produce

18         relevant evidence for over a year.

19                   IBM can prepare a defense to SCO's claims during

17:15:32 20     the period of mutual fact discovery.  IBM has served

21         interrogatories on SCO, and SCO is under an obligation to

22         respond to those interrogatories.  We will do so as soon as we

23         can.  If it arises that IBM is of the view that it has not

24         received our responses to their interrogatories in enough time

17:15:49 25     to complete discovery, that is an issue to raise with the

```
 1    Court at that point.  The Court is full of arsenal of measures

 2    it can take to allow more time or to preclude us from using

 3    evidence if we haven't produced responses to those

 4    interrogatories in time.

 5           IBM's argument suffers we think also from a very

 6    fundamental flaw.  No one knows better than IBM what they

 7    contributed to Linux, how it was derived, how it was created.

 8    The notion that IBM is flying blind is absurd.

 9           Thank you, Your Honor.

10           THE COURT:  Thank you.

11           Anything else?

12           All right.  Thank you all.  I'll take these motions

13    under advisement and get a ruling out in due course.

14           Court will be in recess.

15           (Whereupon, the court proceedings were concluded.)

16                    *   *   *   *   *

17

18

19

20

21

22

23

24

25
```

17:16:03 (line 5)
17:16:20 (line 10)
17:16:30 (line 15)

```
1    STATE OF UTAH          )

2                           ) ss.

3    COUNTY OF SALT LAKE  )

4              I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6              That as such reporter, I attended the hearing of

7    the foregoing matter on April 21, 2005, and thereat reported

8    in Stenotype all of the testimony and proceedings had, and

9    caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 3 through 96 constitute a full,

11   true and correct report of the same.

12             That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14             And hereby set my hand and seal, this _____ day of

15   _____ 2005.

16

17

18

19

20             _____
                         KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```