1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

6

7

8

   _____
9                                         )
   THE SCO GROUP, INC., by and through )
10  the Chapter 7 Trustee in Bankruptcy, )
   Edward N. Cahn,                       )
11                                        )
                                          )
12            Plaintiff,                  )
                                          )
13      vs.                               )      Case 2:03cv00294
                                          )
14                                        )
                                          )
15  INTERNATIONAL BUSINESS MACHINES       )
   CORPORATION,                           )
16                                        )
                    Defendant.            )
17                                        )
   _____)
18

19

20                 BEFORE THE HONORABLE DAVID NUFFER

21                         JUNE 11, 2015

22            REPORTER'S TRANSCRIPT OF PROCEEDINGS

23                 STATUS CONFERENCE HEARING

24

25          Reported by:  KELLY BROWN, HICKEN CSR, RPR, RMR

```
 1                      A P P E A R A N C E S

 2      FOR THE PLAINTIFFS:    HATCH JAMES & DODGE
                               BY:  BRENT O. HATCH
 3                                  Attorney at Law
                               10 W Broadway Ste 400
 4                             SALT LAKE CITY, UTAH  84101

 5                             BOIES SCHILLER & FLEXNER
                               BY:  DAVID BOIES
 6                                  EDWARD J. NORMAND
                                    JASON C. CYRULNIK
 7                                  Attorneys at Law
                               333 MAIN ST
 8                             ARMONK, NY  10504

 9

10      FOR THE DEFENDANT:     SNELL & WILMER
                               BY:  AMY F. SORENSON
11                                  AMBER M. METTLER
                                    Attorneys at Law
12                             15 WEST SOUTH TEMPLE, SUITE 1200
                               SALT LAKE CITY, UTAH  84101
13
                               CRAVATH, SWAINE & MOORE LLP
14                             BY:  DAVID R. MARRIOTT
                                    Attorney at Law
15                             825 EIGHTH AVENUE
                               NEW YORK, NY  10019-7475
16

17

18

19

20

21

22

23

24

25
```

1          SALT LAKE CITY, UTAH, THURSDAY, JUNE 11, 2015

2                        *   *   *   *   *

3          THE COURT:  Good afternoon.  We're convened in

4     SCO Group vs. IBM.  Could we ask counsel to make their

14:40:29  5     appearances, please.

6          MR. HATCH:  Your Honor, on behalf of SCO, Brent

7     Hatch.  With me is Stuart Singer, Ted Normand, Jason Cyrulnik

8     and the company rep Ryan Tibbets.

9          THE COURT:  Thank you.

14:40:40 10          MR. MARRIOTT:  Good afternoon, Your Honor.  David

11    Marriott for Cravath, the Cravath firm.  And with me Amy

12    Sorenson and Amy Mettler from Snell & Wilmer.

13          THE COURT:  Thanks very much.  I don't have my

14    computer.  It got taken away an hour ago, and so the hearing

14:40:57 15    may go a little different than you or I planned.  And I wanted

16    to give you a little introduction of the position that I find

17    myself in.  I often use the analogy of being at home and

18    walking in on the last 10 minutes of a movie and having to

19    asked what happened.  But I don't because I would spoil the

14:41:14 20    movie.

21          But in this case, I have to be really involved in

22    the last part of the movie.  And I thought that this case is

23    more like as if Tolkien had died before he finished the last

24    100 pages of Lord of the Rings and I was assigned to write the

14:41:31 25    rest of the book.

 1          So I'm going to ask you to stay really high level

 2     with me.  If you would assume that I was someone you were

 3     talking to on the soccer field rather than the judge in the

 4     case, that might help me get oriented here.  I do have some

14:41:49  5     specific questions, though, that I want to go through.  Some

 6     of these we have raised with you in some recent e-mails, and

 7     I'd like to go there.  I've got a whole lot of questions.  And

 8     then I wanted to try and get some orientation about the

 9     motions that are pending and how they interrelate with each

14:42:07 10     other and what we ought to do about scheduling those, get your

11     input on that, and how to dispose of those motions.  And in

12     the status report you mentioned mediation, so I wanted to get

13     updated on that.

14          That's the order I intended to proceed, with some

14:42:29 15     specific questions, discussions and claims and motions and

16     scheduling and a discussion of mediation.

17          Do you have a better idea, Mr. Hatch?  Or should we

18     do something in addition or go in a different order?

19          MR. HATCH:  I view that somewhat as a loaded

14:42:45 20     question, but I think that sounds perfectly fine.

21          THE COURT:  Let me just be clear that counsel can

22     always have better ideas because you know a lot more than I do

23     about this case.  So don't be shy.

24          MR. HATCH:  I think part of what our problem is, I

14:42:58 25     don't know if it's similar but it's of a similar kind, is

                                                                    4

1    we're not 100-percent sure what it is you feel you need to

2    know.  So I think going a little broadly at the beginning of

3    what the claims are, I think Mr. Singer will address that from

4    our perspective.

14:43:13  5              THE COURT:  Okay.

6              MR. HATCH:  And then I think as we go I think

7    you'll have more specific questions, and we'll have, I think

8    hopefully have a good idea how to help you.

9              THE COURT:  Well, I hope your broad areas of my

14:43:24 10   ignorance don't frighten you.

11             Could I ask you pull that microphone up.  Somebody

12   had it down for some reason.  Get it to where you can be

13   heard.  Okay.

14             And, Mr. Marriott, any input on this process?

14:43:36 15             MR. MARRIOTT:  Your Honor, that sounds fine to us.

16   What we thought might be helpful when the time comes is give

17   you a brief, very brief, very high level overview of some of

18   the underlying events, which I think will situate some of

19   these claims nicely.  And then we're prepared to address the

14:43:52 20   claims as it helps the Court.

21             THE COURT:  I think that kind of an overview would

22   also help.  I've read the factual allegations in the, what is

23   it, the second amended complaint by now and the amended

24   counterclaim, and those were good histories but they're also

14:44:06 25   11 years old, and some claims have fallen out so some of the

1      facts there may not matter so much.

2              Let me get through some questions, and then we'll

3      go to that high level overview, maybe.

4              MR. HATCH:  Is this more of an informal session?

14:44:20  5      Would you like us to stay here, or how would you like us to

6      handle this?

7              THE COURT:  I'd like you to stay at the tables, but

8      you can stand or sit as you want.  I'm standing because I

9      don't want to die of a heart attack early, and I recommend it

14:44:32 10      to you all.  I'm trying to figure out how we can get the jury

11      on a treadmill, too.  But we're not there yet.

12              In the e-mail that went out yesterday we asked for

13      some clarification.  This is mostly in IBM's court.  SCO sent

14      an e-mail on May 22nd outlining motions and giving us a

14:44:54 15      helpful outline on where supporting exhibits were.  I want to

16      make sure if there are corrections to that, IBM, that you got

17      a chance to make sure that I know what I'm looking.

18              MR. MARRIOTT:  Yes, Your Honor.  We have had a

19      chance to look at it.  And if I may hand up what I've given

14:45:10 20      counsel for SCO --

21              THE COURT:  Okay, sure.

22              MR. MARRIOTT:  We do have some modifications.  What

23      we found is there are some documents which we believe the

24      Court probably should have it doesn't have.  Now, in fairness

14:45:19 25      they haven't had an opportunity to review this.  So we

1   hadn't -- and we prepared it since we saw the e-mail.  I

2   handed it to counsel for SCO.  What I would propose is they

3   take an opportunity to look at it, and if there are any issues

4   we can get back to the Court as to whether it needs to be

14:45:33  5   updated yet again.  This is what we believe is the most

6   current version, Your Honor.

7           THE COURT:  Okay.  Is there somebody on your team,

8   Mr. Hatch, that can be doing that while we talk today?

9           MR. HATCH:  Yeah.  We'll have someone look.

14:45:44  10          THE COURT:  Okay.  Why don't you get that done.

11  And somebody remind me to come back to that, okay, assuming we

12  don't run out of time.  And thanks for having a copy for the

13  law clerk.  I appreciate that.

14          Are we still agreed that -- I think we added the

14:46:13  15  784 motion to the list.  With that addition, have I captured

16  all of the outstanding motions and the objections to the

17  magistrate judge ruling?

18          MR. MARRIOTT:  I believe you have, Your Honor.  All

19  the motions that are before the Court, yes.

14:46:34  20          THE COURT:  You're not adding new substantive

21  motions to this list.

22          MR. MARRIOTT:  That's correct.

23          THE COURT:  Okay.  Just maybe some supporting

24  documents.

14:46:42  25          MR. MARRIOTT:  That's exactly right, Your Honor.

1          THE COURT:  Okay.  That helps me.

2          Are there -- and let me look at your summary.  Does

3     it list the exhibits that go with the 784 motion?

4          MR. MARRIOTT:  It does, Your Honor.

5          THE COURT:  Yeah.  Okay.  It does.  Okay.  So

6     that's another question I had.

7          Now, on the objections/motion for reconsideration

8     of Judge Wells' order, there appeared to be a motion for

9     reconsideration directed to the magistrate judge and

10    objections directed to me or whoever, the district judge.  I

11    found the memorandum in support of objections, that was SCO's

12    memorandum in support of its objections to the magistrate

13    judge order, that's Docket 995.  There's also the motion for

14    reconsideration.  I'm not seeing that in your new list,

15    Mr. Marriott.  Let me see if I've got it.

16         MR. MARRIOTT:  Well, Your Honor, it would be

17    item -- it would be Item 6.  And what we've reflected on

18    Item 6 is what we understood to be still in play, which is

19    effectively the appeal from Magistrate Judge Wells' ruling.

20         THE COURT:  Okay.

21         MR. MARRIOTT:  I don't know, and SCO will have to

22    speak for itself, as to whether it intends to still pursue the

23    reconsideration request.  That is separately not listed as I

24    believe that would be in any case in front of Judge Wells.

25         THE COURT:  Okay.  That's my question, Mr. Hatch.

1    Does SCO want to go back to Judge Wells on the discovery issue

2    or not?

3              MR. HATCH:  No.

4              THE COURT:  Okay.  So can we moot that motion for

14:48:31  5    reconsideration?

6              MR. SINGER:  Yes, Your Honor.

7              THE COURT:  Okay.  I need a docket number on that.

8    Let me see.  That's 986; correct?  Motion for reconsideration

9    of the magistrate court's order is how it's titled.  And 995

14:48:58  10   is the memorandum in support of objections.

11             MR. MARRIOTT:  That's correct, Your Honor.

12             THE COURT:  Can I just ask, you know, this is sort

13   of motion trivia when I've asked you to stay really high

14   level, but were there objections filed in addition to the

14:49:12  15   memorandum, Mr. Hatch?  Or was it just the memorandum?

16             Do you know, Mr. Marriott?

17             MR. MARRIOTT:  So far as I know there was only a

18   memorandum, Your Honor.

19             MR. HATCH:  I think that's right, but let's check.

14:49:28  20             THE COURT:  Okay.  So just take a minute and check.

21             MR. SINGER:  I only see the memorandum, Your Honor.

22             THE COURT:  Okay.  So I'll stop looking for the

23   objection document.  So we have nothing pending in front of

24   the magistrate judge; right, Mr. Hatch?

14:49:49  25             MR. HATCH:  I believe that's correct, Your Honor.

1          THE COURT:  Mr. Marriott?

2          MR. MARRIOTT:  That's correct.

3          THE COURT:  Okay.  Now, as I was trying to match up

4  the claims in this case with the motions, it appears that we

5  have motions related to every claim except for IBM's breach of

6  contract cause of action.  It's first cause of action.  Am I

7  right?

8          MR. MARRIOTT:  Yes, that's correct.

9          THE COURT:  Were all of these motions filed before

10  Judge Stewart's order in the, what was the caption of that

11  case?  SCO vs. Novell?

12          MR. SINGER:  Yes, Your Honor.

13          THE COURT:  Okay.  Were all of these motions

14  briefed before that time?

15          MR. MARRIOTT:  Yes.  They were briefed and they

16  were argued orally.

17          MR. HATCH:  Yes.

18          THE COURT:  Really?

19          MR. HATCH:  Yes.

20          THE COURT:  Before who?

21          MR. MARRIOTT:  Judge Kimball.  Two days of

22  memorable proceedings.

23          MR. HATCH:  Yeah.  It was a full docket.

24          MR. SINGER:  It was May-June 2007, Your Honor.

25          THE COURT:  Okay.  You're going to have to refresh

1      me about the procedural history, Mr. Hatch, what happened, or

2      whoever on SCO's side wants to speak to this.  They were

3      briefed.  They were argued.  And then I've got them?

4                 MR. SINGER:  Yes, Your Honor.  Would it be helpful

5      if I spent maybe just two or three minutes on a very high

6      level procedural --

7                 THE COURT:  Procedural.

8                 MR. SINGER:  -- summary?

9                 THE COURT:  Let's do that.

10                MR. SINGER:  The case was filed in 2003.  There was

11     a couple of amended complaints.  There was a denial of motion

12     in 2005 on an additional count.  The parties went into

13     extensive discovery.  Summary judgement motion -- extensive

14     discovery including exchange of expert reports.  There was

15     extensive summary judgement motions filed throughout the

16     latter part of 2006.  There were then hearings which may have

17     begun in March of 2007 which stretched through to June 2007.

18     And those were held by Judge Kimball on two separate cases

19     that -- he had both of these cases, the SCO vs. Novell case

20     and the SCO vs. IBM case.

21                After all of the arguments, the judge decided the

22     SCO vs. Novell case on summary judgement with a summary

23     judgement that found that Novell rather than SCO owned the

24     copyrights at issue.  And based on that ruling several things

25     happened.  First, it wound up leading to a bankruptcy filing

1    by SCO that occurred later in 2007; and second, it put

2    everything on the IBM case on hold pending further proceedings

3    in the Novell case.

4              THE COURT:  Now when you say it put it on hold, the

14:52:55  5    decision about the copyrights that Judge Kimball made --

6              MR. SINGER:  Yes.

7              THE COURT:  -- did he enter a stay in the SCO vs.

8    IBM case?

9              MR. SINGER:  No.  It was not to my recollection a

14:53:05 10   formal stay, although there was an automatic stay as a result

11   of the bankruptcy filing in Delaware.

12             THE COURT:  Sure.  Okay.

13             MR. SINGER:  What proceeded then, there was a

14   release, a relief from that stay that allowed a counterclaim

14:53:19 15   by Novell for certain amounts it claimed were due under its

16   agreements with SCO to proceed to trial, which was necessary

17   to occur to have a final judgment to go up on appeal.  And I

18   believe in 2008 we had that trial, which resulted in a

19   monetary judgment.  At that point we had a final District

14:53:39 20   Court judgment in the Novell case that eliminated SCO's claims

21   on the basis of the summary judgement ruling and had a

22   monetary judgment against SCO.

23             That went up to the 10th Circuit, and the

24   10th Circuit reversed the summary judgement finding that there

14:53:59 25   were disputed issues of fact.  It then -- at that point

12

1    Judge Kimball recused himself from the case, from both the IBM

2    case and from the Novell case.  The Novell case wound up in

3    front of Judge Stewart.  Still no activity is occurring in the

4    IBM case, it being subject at least in part to the stay in the

14:54:23  5    bankruptcy court and in part because the parties wanted to

6    resolve the Novell claims first.

7            THE COURT:  And who had this case at that point if

8    Kimball recused from both?

9            MR. SINGER:  I'm not certain as to who it went to

14:54:35  10   first.  It's gone to several other judges before Your Honor.

11           It went to Judge Campbell.

12           THE COURT:  All right.  Thanks.

13           MR. SINGER:  And at that point, we -- and we're now

14   talking 2009, 2010, we prepared for a jury trial that was held

14:54:52  15   in front of Judge Stewart on the, basically it was a slander

16   of title claim with respect to ownership of the Novell

17   copyrights and whether or not there was slander of title and

18   there were counterclaims by Novell.  The counterclaims by

19   Novell were directed verdicts in favor of SCO before the case

14:55:11  20   went to the jury.  The jury as I think the Court knows came

21   back in favor of Novell, saying that Novell owned the

22   copyrights that had not been transferred to SCO.  This was

23   dealing with the copyright before or at the time of the

24   transfer assets from Novell to Santa Cruz, which was a

14:55:32  25   predecessor of the SCO Group.

1          You then had a second appeal.  I should note you

2     actually then had a number of determinations nonjury by

3     Judge Stewart based on the jury's findings, and those were in

4     favor of Novell on certain issues with respect to contract

14:55:50    5     rights.  All of that then went up to the Second Circuit a

6     second time -- I'm sorry -- to the 10th Circuit a second time,

7     and the 10th Circuit affirmed in full.

8          After that at some point Your Honor received this

9     case, and that brings us to where we are now.  None of the

14:56:13  10     motions for summary judgement that were argued in the IBM SCO

11     case by either party were ever ruled upon by Judge Kimball or

12     any of the succeeding judges from 2007 forward.

13          THE COURT:  Okay.  And I'm thinking I'm chief judge

14     now.  Maybe I should send it all back to him.

14:56:34  15          Mr. Marriott, anything you want to add to that

16     procedural history?

17          MR. MARRIOTT:  Well, I think that was -- I think

18     that was well done, Your Honor.  We do have a little handout

19     here that has a visual chronology that says essentially that

14:56:48  20     with some additional law.  If that would be helpful --

21          THE COURT:  I think it would be helpful.  Has

22     counsel seen it?

23          MR. HATCH:  We have not.

24          MR. MARRIOTT:  They will see it.

14:56:57  25          THE COURT:  Why don't you look at that, too.

14

1    You're doing lots during this hearing, but I'd like to get

2    that at the end, if that's possible.  So thanks for having

3    that.

4            MR. MARRIOTT:  Would you like me to hand that up

14:57:09 5    now?

6            THE COURT:  Why don't you hold off and see if they

7    have any issues.  That would be helpful for us.

8            Why don't we go, then, with the factual -- did you

9    talk about doing some kind of a high level factual overview,

14:57:31 10    as well?

11           MR. SINGER:  Yes, Your Honor.

12           MR. MARRIOTT:  We did.  And I frankly proposed to

13    do it by walking you through the chronology.

14           THE COURT:  Okay.  Well, let's pause for a minute.

14:57:41 15           Were you going to go first on that factual

16    overview?

17           MR. SINGER:  Certainly on our claims we were

18    prepared to do that as to plaintiff.

19           THE COURT:  Okay.  So you're planning on doing

14:57:50 20    claims specific factual overview.

21           MR. SINGER:  It provides some background to the

22    claims as well as a discussion at a very high level of the

23    factual basis for the claims that remain in the case.

24           THE COURT:  Could we go through the contractual

14:58:05 25    relationships?  Is that in your graphic outline?

```
 1              MR. MARRIOTT:  It is, Your Honor.

 2              THE COURT:  Okay.

 3              MR. MARRIOTT:  At a very, very high level.

 4              THE COURT:  Okay.  By the way, I'm a visual

 5    learner.  You'll find that out.  Not to say that I don't like

 6    all the text in your briefs, but when I get a graphic it

 7    sticks with me.  So this will help.

 8              I'd like to go through -- before we get into claims

 9    and breaches, I'd like to go through the establishment of the

10    relationships and the development of the relationships.  It

11    seems to me from what I've read that the trouble started in

12    early 2003?

13              MR. SINGER:  Your Honor, it goes back before then.

14    At a very high level, there were license agreements going back

15    many, many years from SCO's predecessors to IBM that dealt

16    with rights to use UNIX code.

17              THE COURT:  Right.

18              MR. SINGER:  Those were largely, in fact, entirely,

19    I think, the claims under those agreements disposed of by the

20    Novell proceedings.  But that was the beginning of an IBM/SCO

21    relationship with respect to the licensing of those, of that

22    code.

23              The issues that remain in the case relate to a

24    agreement in part, meaning they're not contract claims, but

25    they have an association, with a contract that the parties
```

14:58:21 (line 5)
14:58:37 (line 10)
14:58:54 (line 15)
14:59:12 (line 20)
14:59:29 (line 25)

1    entered into in 1998, which was an agreement between Santa

2    Cruz and IBM for a joint venture, and it was called a joint

3    development agreement.

4              THE COURT:  Is that Project Monterey?

14:59:46  5              MR. SINGER:  That's Project Monterey, Your Honor.

6              THE COURT:  Okay.

7              MR. SINGER:  There may have been other agreements

8    between the parties, but those are the ones that this lawsuit

9    has concern.

14:59:56 10              THE COURT:  Now, when I look at the claims that

11   remain here, I don't have a lot of contract claims left.

12   Certainly subject to the motions, I don't have any.  They're

13   all tort claims.

14             MR. SINGER:  That's correct, Your Honor.

15:00:09 15             THE COURT:  Okay.

16             MR. SINGER:  Our claims.

17             THE COURT:  Okay.  Well, at some risk, I'm going to

18   ask you to take five to ten minutes and go over the factual

19   genesis of the relationship before we get to specific claims.

15:00:21 20   I'm going to turn to you.  Somebody looking at the flip chart

21   to see if it's okay?  Okay.  Because I want you to be able to

22   use your flip chart if that's appropriate.

23             So who's going to do that for SCO?

24             MR. SINGER:  I will, Your Honor.

15:00:34 25             THE COURT:  Okay.

1        MR. SINGER:  We have our own timeline, and I'll be

2    happy to share that with counsel for IBM as well as a couple

3    of copies for Your Honor.

4        THE COURT:  Okay.  Thanks.

15:00:46  5        MR. SINGER:  If I might approach.  This is a

6    timeline and copies of selected documents that relate to our

7    unfair competition.

8        THE COURT:  Thanks.  Go ahead, Mr. Singer.

9        MR. SINGER:  Your Honor, on the timeline that

15:01:09 10    relates to -- and again, we focused on Project Monterey

11    because the earlier license agreement that went back decades,

12    it was amended with IBM is not relevant to the remaining

13    claims.  The parties -- and let me start by saying this, if I

14    might, Your Honor.  Today SCO is as the Court is aware in a

15:01:34 15    liquidation process.  Judge Cahn is the trustee.  That's been

16    true.  It started out as a Chapter 11, became a Chapter 7

17    going back to 2007.  These claims are the last, really the

18    only asset remaining of SCO.

19        But in 1998 when this chronology began, SCO was in

15:01:56 20    a much different position.  SCO at that time was a leader in a

21    market called the UNIX on Intel platform, selling of UNIX

22    software for Intel-based chips.  It had a 40-percent overall

23    market share of the UNIX market, and it had an 80-percent

24    market share of the UNIX on Intel market.  And it had a lot of

15:02:22 25    important customers.  If you went into a McDonald's anywhere

1    in the country to order a hamburger, I think you would be

2    charged out on a computer that ran SCO software.  If you went

3    to the post office, it would be using SCO software there.  If

4    you went to China, I understand, SCO software was there.

15:02:42  5    IBM was very interested in having access to working

6    with SCO on a project that would result in having -- two

7    things they were interested in.  One was there was a 64-bit

8    chip, an Intel chip that was under development.  Its typical

9    name was Itanium.  And Intel was part of this joint venture.

15:03:11  10    And they agreed as part of this joint venture to work together

11    to develop a software version of SCO UNIX that would work on

12    this new chip.  And second, IBM was interested in gaining

13    access to SCO's latest UNIX software which was called SVR-4,

14    which was basically Release 4, a version of UNIX.  And that

15:03:44  15    was the latest and greatest version of UNIX software.

16    And to accomplish those two objectives, the parties

17    had a joint venture agreement where they would work together

18    to seek to produce this joint venture product that would work

19    on this 64-bit chip from Intel, and IBM would have the right

15:04:07  20    to also use this SCO UNIX technology in its own proprietary

21    products.  And it had a very interesting -- a very important

22    objective of using that in products called AIX, which was an

23    IBM proprietary product based on UNIX that would be run on a

24    number of other computers.  And it would be important to IBM

15:04:35  25    in order to be able to compete successfully with Sun and

19

1    Microsoft that they would have access to this SCO UNIX

2    product.

3              Now, under the terms of the joint venture, they

4    would only have access to use this in the event that there was

15:04:53 5    what was called a GA release, a generally available release,

6    of a joint venture product.  And that became a very important

7    term as the parties move forward.

8              Should I continue, Your Honor?

9              THE COURT:  Yeah.  Uh-huh (affirmative).  So I've

15:05:12 10   lost a little bit of the timeframes here.  But you talk about,

11   is it a joint development agreement that was signed in October

12   of 1998?

13             MR. SINGER:  Yes.  This joint development

14   agreement, which included IBM, Santa Cruz, it also included

15:05:27 15   Intel and a company called Sequent, was entered into in

16   October 26, 1998.

17             THE COURT:  And what did you say the GA and GA

18   release stands for?

19             MR. SINGER:  The GA release means generally

15:05:40 20   available release.

21             THE COURT:  Okay.

22             MR. SINGER:  Essentially it meant not just a beta

23   version of a product, it meant a full-fledged version that you

24   would go to and you buy and generate royalties, and it was out

15:05:53 25   in the market.

1          THE COURT:  And I think you said that your claim

2    was that certain of IBM's rights depended on a GA release.

3          MR. SINGER:  Exactly, Your Honor.  Their rights to

4    take that technology and code which came from SCO and which

5    they otherwise did not have rights to and to move that into

6    their proprietary products depended on the joint venture being

7    out there with a generally available products release, which

8    was an objective -- that's how SCO was going to benefit from

9    the joint venture to have a joint venture product.  Otherwise

10   you would have a joint venture where all the benefit was IBM's

11   of making use of SCO's code in IBM proprietary products.

12         THE COURT:  What's the significance of your

13   March 6, 2001, date?

14         MR. SINGER:  The significance of that is that is

15   two years before the date that this complaint was initiated,

16   March 6, 2003.  And so it has significance to the IBM claims,

17   the unfair competition claim is untimely because it was not

18   brought within two years, not of the statute of limitations,

19   because the statute of limitations for unfair competition is

20   longer than that, but within two years of what under IBM's

21   view is a shortening by contract of the statute of limitations

22   based on a provision of the joint development agreement.  And

23   that provision, which I'm sure you'll hear about if not before

24   then, at the time when you hear argument on the summary

25   judgement motion, talks about claims related to a breach of

1    contract having to be brought within a two-year period.

2    That's why that's designated on the timeline.

3                  THE COURT:  Okay.  So the lawsuit here was filed

4    March 6, 2003.  I assume that -- are you claiming breakdowns

15:07:48  5    or breaches before March 6, 2001?

6                  MR. SINGER:  No.  We maintain that breaches

7    occurred in April -- in May of 2001, because there were three

8    events which occurred in that time period -- well, what we are

9    talking about in April and May in 2001 was a number of events

15:08:17 10    which occurred at that time.

11                  THE COURT:  Okay.  Now you have on your chart that

12    you believe IBM had serious doubts about Monterey and began to

13    strategize about how to get the SVR-4 code.

14                  MR. SINGER:  Yes, Your Honor.

15:08:32 15                  THE COURT:  And you claim that's either motivation

16    or underlying some of your tort claims; right?

17                  MR. SINGER:  That's correct, Your Honor.

18                  THE COURT:  I want to say pre-claim here, so I want

19    to ask Mr. Marriott if he's got comments or something

15:08:46 20    corresponding with this initial timeframe of the relationship.

21    I'm a little bit relieved to think that at least from SCO's

22    viewpoint the JDA is the critical document as far as contract

23    relationships, but I don't have contract claims.

24                  MR. SINGER:  That's correct.  And that's one of the

15:09:05 25    arguments that the parties have before it, before Your Honor

1    in the context in their summary judgement motion.  It's our

2    view that there are independent torts here which can -- it is

3    SCO's -- rather IBM's view that these are all contract claims.

4            THE COURT:  Who argued before Judge Kimball,

5    Mr. Singer?

6            MR. SINGER:  Well, this group did.  I argued a

7    number of the motions, Mr. Normand argued some, Mr. Hatch

8    argued and Mr. James argued some.

9            THE COURT:  Are transcripts of those arguments

10   available?

11           MR. SINGER:  They are.

12           THE COURT:  Okay.

13           Mr. Marriott, what about this preliminary time?

14           MR. MARRIOTT:  May I at this point hand up my --

15           THE COURT:  Yes.  Unless there's some serious

16   problem.

17           MR. NORMAND:  Whether Your Honor finds it useful is

18   up to Your Honor.  It is a piece of advocacy, but they could

19   say the same thing probably about the slides that Mr. Singer

20   handed up.  It's more appropriate for oral argument, but Your

21   Honor may find some guidance.

22           THE COURT:  Sure.  Let's get it up here.  All I can

23   get in summary form is good.

24           MR. SINGER:  Do you have another copy of that by

25   any chance?

1          THE COURT:  Oh, I was going to ask if somebody

2     could tell me about all of the variance of UNIX that I've been

3     hearing about.

4          MR. MARRIOTT:  Would it be okay if I came to the

15:10:22  5     podium, Your Honor?

6          THE COURT:  Sure.

7          MR. MARRIOTT:  All right.  Let me if I may say very

8     general and away from the claims, and I think it's helpful to

9     point Your Honor to the slide, the second slide here, the one

15:10:37 10     I see you have open.  To me, Your Honor, it's critical to

11     understand a couple of things to keep the pieces straight

12     here.  One is who the players are, one is who the operating

13     systems are and one is what the timeline is.

14          So just because I think it's important to

15:10:51 15     understand, the players here are basically AT&T, though not a

16     party; IBM; Novell, not a party; the Santa Cruz Operation,

17     Inc., once known as SCO, which is often confused with the SCO

18     Group, the present plaintiff in this case.  And that

19     distinction we think is enormously important.

15:11:12 20          THE COURT:  Some places I've seen that called

21     original SCO.

22          MR. MARRIOTT:  That is sometimes called that, Your

23     Honor.  And the distinction is we think an important one.  And

24     then there's Caldera Systems, which was effectively a Utah

15:11:25 25     base Linux company that at some point you'll see on the

1    chronology acquired assets from Santa Cruz and then basically

2    shortly before this lawsuit renamed itself the SCO Group.  And

3    sometimes the old SCO and the new SCO, which are distinct

4    companies, get discussed as if they are the same company.  The

15:11:44  5    Santa Cruz, Inc., is actually known as Tarantella.

6              So if you look at the next slide, Your Honor, 3,

7    there are three operating systems to keep in mind, and I won't

8    belabor this.

9              THE COURT:  You better belabor this.  And I've seen

15:11:57 10   other things like DYNIX and some other things.  So belabor

11   this a little bit.

12             MR. MARRIOTT:  Let me say a little bit about each

13   of these.  And I think when we turn to the developed, to the

14   chronology, you'll see how this all fits together.

15:12:09 15             UNIX is an operating system which was originally

16   developed by Bell Laboratories, which at the time was a

17   research division of AT&T.  It was developed in a lot of

18   different versions.  The version that is of most relevant to

19   this case is UNIX System V.  It was licensed in both source

15:12:26 20   code form and in object code form to various persons and

21   various entities over time.  AT&T and later those who followed

22   AT&T in its ownership had the right to license it to IBM, to

23   hp, to Oracle, to Sun and to others.  And that's what brings

24   us to AIX.

15:12:46 25             So some of those companies, Your Honor, like IBM

1     took the code that they licensed from AT&T, and they built

2     around it.  They built their own operating system, their own

3     flavor of UNIX, if you will, and they named those.  And IBM

4     was called AIX.

15:13:02  5          Another company called Sequent, which was

6     subsequently purchased by IBM had its own flavor of UNIX, and

7     that flavor of UNIX was known as DYNIX.  And that's why the

8     Court is seeing DYNIX.  It was a competitor to AIX.

9          THE COURT:  And just remind me.  Were there

15:13:21 10   agreements between either old SCO or new SCO and Sequent?

11         MR. MARRIOTT:  So that's a more challenging

12    question than you might think, Your Honor.  There were

13    agreements between AT&T and its licensees like IBM and Sequent

14    and others.  Those license agreements over time were sold.  So

15:13:43 15   perhaps now is a good time to have you turn to Slide 5.  And

16    let me just take you kind of historically through this quickly

17    because I think this puts it all in context.

18         So these are sort of overlapping timelines, and let

19    me start at the top left, Your Honor and work right, and then

15:14:00 20   you'll see how these intermix with one another.

21         So essentially in 1969, AT&T develops the operating

22    system that later comes to be known as UNIX.  And over the

23    course of the next several years in the decades it licenses

24    that operating system to a number of companies.  And you'll

15:14:15 25   see the dotted line coming out of that blue chronology going

26

1  down to AIX.  It licenses the code to IBM.  IBM creates its

2  own operating system which then has its own timeline.

3      After AT&T for some numbers of years licenses its

4  UNIX product, Your Honor, it sells that business to Novell.

15:14:34  5  And that's where Novell comes into the picture in 1993.

6  Several years later November sells some but not all of its

7  UNIX assets to Santa Cruz.  And then later in 2001 Santa Cruz

8  sells its UNIX assets, but not the entire company, it sells

9  its UNIX assets to Caldera, which is the Utah-based

15:15:01  10  Internet -- actually, the Utah-based Linux company that later

11  changes its name to SCO.  So that's effectively what I've

12  called the AT&T UNIX part of the story.

13      THE COURT:  Okay.

14      MR. MARRIOTT:  So if you look at the next line,

15:15:14  15  what you'll see is in 1986 IBM takes a license from AT&T, as

16  do many other companies, Your Honor, including DYNIX,

17  including Sequent.  With the code license from AT&T and

18  frankly, code license from many others, IBM builds its own

19  operating systems.  And it puts millions of lines of code

15:15:35  20  around and associated with the code that it licenses from

21  AT&T.

22      And in 1996, IBM acquires then from Novell and

23  Santa Cruz because they at the time owned what AT&T once had

24  owned, it acquires from those two companies a perpetual,

15:15:52  25  irrevocable fully paid up license to its, to its then current

1    version of UNIX System V.  And that comes to matter to one of

2    the claims later on.

3              About the same time, Your Honor, that IBM is

4    developing as are others in this marketplace this UNIX based

15:16:09  5    operating system, an undergraduate student at the University

6    of Helsinki by the name of Linus Torvalds comes up with a new

7    operating system which we now call Linux, named in part after

8    him.  And that operating system, very different from these

9    others, is an operating system, where the AT&T systems and the

15:16:25 10    IBM systems were closed.  They were proprietary.  The source

11    code was a well-kept, in part depending on the company, a

12    well-kept secret.

13              The Linux operating system is open.  The source

14    code is available basically on the Internet.  Your Honor could

15:16:40 15    get it right now if it wanted to.  You could log on, you could

16    find the UNIX source code, and with that source code, you

17    could fully develop the program.  And that's what the Linux

18    operating system is.  And it begins roughly in '91 and it

19    continues today.  In '99 IBM announces its support for Linux.

15:16:56 20    And Caldera IPOs is one of the first Linux companies in 2000.

21              All right.  If you look, then, at the following

22    line, Your Honor, we've talked a little about this Project

23    Monterey.  Project Monterey is a -- if you look at the prior

24    slide, it's defined a little bit, it's Page 4.  Monterey in

15:17:18 25    1994, Intel and hp announce a collaboration to create a 64-bit

1    processor architecture that comes to be known as the IA-64.

2              THE COURT:  Is that Itanium?

3              MR. MARRIOTT:  It is.

4              THE COURT:  Okay.

15:17:33  5              MR. MARRIOTT:  So Project Monterey is this joint

6    development agreement between IBM and Santa Cruz among others

7    to develop a UNIX-like operating system that will run on this

8    new-to-be-developed architecture.  And the goal was for IBM

9    and for Santa Cruz to develop and to market a family of

15:17:50  10   UNIX-like operating systems.

11             THE COURT:  This was contemplated to be licensed,

12   not OpenSource.

13             MR. MARRIOTT:  Correct, Your Honor.  And the

14   parties as part of that agreement exchanged licenses.  IBM

15:18:00  15   gave code to Santa Cruz for Santa Cruz to use in the

16   development of its projects.  Santa Cruz gave code to IBM to

17   be used in the development of IBM products, and the parties'

18   shared code was going to be used in the development of this

19   joint project.  This project generally encountered some

15:18:16  20   serious difficulties because among other things and very

21   importantly Intel is quite late with the processor.  It

22   doesn't come when people expect it will come.  There are other

23   difficulties.  And critically from our perspective, from IBM's

24   perspective, its partner Santa Cruz, as you'll see from the

15:18:33  25   chronology, and this brings us to the last line of my

1    chronology, Santa Cruz, Your Honor, several years after the

2    JDA is executed sells it UNIX assets.  It sells its UNIX

3    business, but not the company as a whole.  It sells that

4    business to Caldera, which is a Linux company.  The parties

15:18:55  5    had previously agreed that in the event of a change of

6    control, IBM at its sole discretion could terminate the joint

7    development between IBM and Santa Cruz.  And IBM terminated

8    the joint development agreement between Santa Cruz and IBM.

9         If you then turn, Judge, to the following slide

15:19:13 10    you'll see where the litigation then kind of kicks into gear.

11    So this is Page 6.

12         Caldera goes public in 2000.  It acquires the UNIX

13    business.  Again, it's a Linux company.  It acquires the UNIX

14    business of Santa Cruz in 2001.  It changes its name to now be

15:19:34 15    the SCO Group, and it sues IBM.  And at the time it sues IBM,

16    it sends out 1500 letters essentially to every company, every

17    major company in America, if not the world, essentially

18    saying, Linux has got problems, and you better pay up and sign

19    up for a license with us or we're going to sue you.  They sued

15:19:54 20    IBM.  They sued some other companies.  And that was the

21    beginning of a change, we believe, in the business format of

22    SCO.

23         And then you'll see here some of the items

24    referenced by Mr. Singer in his remarks.  The District Court

15:20:06 25    rules against SCO in the Novell case.  SCO files for

1   bankruptcy, and then eventually the stay is lifted and Your

2   Honor enters partial summary judgment.

3           We've dropped off in this timeline in a box the

4   various summary judgement motions which were made.  The ones

15:20:20   5   in red are those which are effectively moot because they

6   addressed claims that are now by agreement to the parties been

7   rendered irrelevant in view of the Novell decision.  I

8   shouldn't say irrelevant, Your Honor.  I should say the

9   motions themselves are moot.  I'm sorry to interrupt.

15:20:35   10          THE COURT:  So you'll notice my slow rate of

11   absorption here.  The District Court ruling of August 10,

12   2007, was Judge Kimball.

13          MR. MARRIOTT:  Correct.

14          THE COURT:  And then when did the -- there were a

15:20:54   15   couple of appeals that Mr. Singer was outlining went to the

16   10th Circuit.  This August 10th ruling was appealed to the

17   10th Circuit.  It came back when?

18          MR. MARRIOTT:  I don't know that precisely, Your

19   Honor.  Perhaps 2008, 2009.

15:21:10   20          MR. SINGER:  I think it was 2009, Your Honor, when

21   the 10th Circuit reversed and remanded.

22          THE COURT:  Okay.  Then the cases were transferred

23   to different judges.  Judge Stewart held the jury trial when?

24          MR. SINGER:  That was in 2010.

15:21:28   25          THE COURT:  And at the conclusion of the jury trial

1    he entered an order on the judge claims and copyright claims?

2    No.

3              MR. SINGER:  Those were some claims that dealt with

4    the right of IBM to have taken certain actions to waive SCO's

5    rights with respect to what Novell was doing.

6              THE COURT:  Okay.

7              MR. SINGER:  And that came down, I believe in June

8    or July of 2010.

9              THE COURT:  Okay.  And then that was appealed or

10   not?

11             MR. SINGER:  Yes, Your Honor.  That was appealed,

12   and that was affirmed by the 10th Circuit I think about a year

13   and a half to two years later.

14             THE COURT:  And I think that's -- okay.  And on

15   June 14th, 2013, the stay that was lifted, was that me?  Or is

16   that a bankruptcy stay as to these claims or what?  What are

17   we talking about there?

18             MR. MARRIOTT:  Your Honor, the bankruptcy stay was

19   lifted, and then the parties approached the Court.  The case

20   had been administratively closed by Judge Kimball after the

21   Novell decision.  And at some point this court

22   un-administratively closed -- and opened it.  And after some

23   back and forth eventually we were put on the calendar.

24             THE COURT:  Okay.  And then there was some level of

25   briefing, but I granted partial summary judgement for IBM on

1        certain claims based on the Novell decision.

2                    MR. MARRIOTT:  Yes.

3                    THE COURT:  Okay.  And I did that at the end of

4        last year.

15:22:58 5                    MR. MARRIOTT:  You did, Your Honor.  December 15th.

6                    THE COURT:  So the live summary judgement motions

7        are numbered 4 through 8 on this chart.

8                    MR. MARRIOTT:  Correct.

9                    THE COURT:  Okay.  I thought I had another question

15:23:12 10       here.  Let me see.

11                   Tell me again, Mr. Marriott, your view of who

12       Sequent was and how the Sequent agreements, when were they

13       formed and who did they relate to and whether they have any

14       meaning currently.

15:23:26 15                   MR. MARRIOTT:  So if Your Honor looks at Page 5 in

16       the background chronology --

17                   THE COURT:  Uh-huh (affirmative).

18                   MR. MARRIOTT:  -- you'll see that in 1986 IBM

19       licenses code from AT&T and creates what comes to be known as

15:23:39 20       AIX.  About that same time, Sequent, a competitor of IBM like

21       an hp, did its own license with AT&T and created its only

22       product, which it later called, Sequent called its product

23       DYNIX.

24                   THE COURT:  And then IBM eventually acquired

15:23:56 25       Sequent?

1           MR. MARRIOTT:  And then eventually IBM acquired

2     Sequent.  With Sequent, the DYNIX product.  The DYNIX product

3     mattered, Your Honor, to the contract claims that were

4     asserted by SCO.  SCO had asserted against IBM four contract

15:24:07  5     claims, two with respect to AIX, and two with respect to

6     DYNIX, effectively alleging that IBM's contribution of code to

7     Linux breached those agreements.  And those agreements are --

8     the breached claims are by agreement to the parties and not by

9     order of the Court out of the case.  I believe the DYNIX

15:24:27 10     product is for any purpose of SCO's claims irrelevant, but I

11     will let SCO speak for itself on that.

12           THE COURT:  Any dispute, Mr. Singer, about this

13     latest recounting of the chronology or perhaps you think need

14     to be filled in or clarified?

15:24:42 15           MR. SINGER:  Yes, Your Honor.  There are two points

16     which we think need to be filled in or clarified.  On Page 5

17     on the top line where it talks about the development of UNIX,

18     you see a big blank between 1995 and May of 2001.  What we

19     think --

15:25:00 20           THE COURT:  Just a minute.  Oh, yeah.  Okay.

21           MR. SINGER:  On the top line there.

22           THE COURT:  Right.

23           MR. SINGER:  It says, Novell sells some UNIX assets

24     to Santa Cruz.  But it doesn't -- I think it would be accurate

15:25:11 25     to include there that from '95 forward Santa Cruz is actively

34

1    developing a UNIX -- they're taking UNIX technology and

2    continuing to develop it.  And they developed what is called

3    SVR-4, which is diversion of SCO UNIX that came to be, for

4    example, 80 percent of UNIX on Intel market and was what IBM

15:25:35 5    was seeking to acquire in this joint venture.  So I wrote in,

6    SCO develops SVR-4 in its UNIX business, during that timeframe

7    between 1995 and 1998-99.

8              THE COURT:  I'm having a little trouble keeping my

9    mind out of the copyright mode here.  But the copyright claims

15:25:54 10   are gone; right?  Or do you have a copyright right claim

11   still?

12             MR. MARRIOTT:  We have a copyright claim against

13   SCO, Your Honor.  And we believe that their unfair competition

14   claim is preempted by copyright law.  But their copyright is

15:26:07 15   out of the case.

16             THE COURT:  Okay.  But if this was a copyright

17   case, I'd be looking at lines of code from SVR-4 and seeing if

18   they're in your product; right?

19             MR. MARRIOTT:  You would, Your Honor.

15:26:17 20             THE COURT:  But I'm not doing that.

21             MR. SINGER:  Well, Your Honor, to an extent it is

22   still relevant, Santa Cruz and then SCO owns the code.  And

23   this is not affected by a Novell judgment because that all

24   occurred on the issue of what was sold from Novell to Santa

15:26:34 25   Cruz in 1995.

1          THE COURT:  Uh-huh (affirmative).

2          MR. SINGER:  But the code that was then developed

3     by Santa Cruz and SCO going forward from that is clearly

4     SCO's.  There's no real dispute about that.  And that code we

15:26:47 5     contend has as a result of the Project Monterey, they got

6     access to it and then was wrongfully misappropriated by IBM

7     into their own proprietary product.

8          So at point in this case, I think it would be a

9     triable issue, that there is, in fact, a great deal of SCO's

15:27:10 10    SVR-4 code that is in AIX and other products that IBM is

11    marketed.  And that's the misappropriation which is at the

12    heart of our unfair competition claim.

13         THE COURT:  Do you have a copyright on that code?

14         MR. SINGER:  We do, yes.

15:27:28 15    THE COURT:  But you don't have a copyright claim.

16         MR. SINGER:  Yes.  Your Honor --

17         THE COURT:  You've got to help me here.

18         MR. SINGER:  Let me -- we brought an unfair

19    competition claim in the complaint that you have in 2003.  It

15:27:43 20    may have been added in the second amended complaint, but it

21    was in the case.  In 2004, there was a motion to amend to add

22    a copyright infringement claim.  Judge Kimball denied leave to

23    add that claim as untimely in an order that he entered in

24    2005.  IBM argued that there would be a lot of other issues

15:28:04 25    and discovery necessitated if we were to be allowed to amend

1    to have copyright infringement.

2            So we're traveling on our unfair competition claim

3    which we maintain involves a misappropriation of code, but

4    also involves other acts and other reasons why it's an unfair

5    competition claim properly stated.

6            THE COURT:  Okay.

7            Mr. Marriott?

8            MR. MARRIOTT:  Yeah.  What I would say to that,

9    Your Honor, is the following.  SCO sought leave to add to its

10   complaint a copyright claim that challenged the inclusion by

11   IBM in its product of certain code that IBM got access to in

12   Project Monterey.  Judge Kimball said that they were not

13   permitted to do that.  Judge Kimball found the copyright claim

14   untimely.

15           What SCO did instead then after that, Your Honor,

16   is it took the allegations that underlay the copyright claim,

17   and it made them its unfair competition claim.  And that's why

18   we say among other things that unfair competition claim is

19   preempted by the copyright law because effectively what

20   they've done is dress up the copyright claim which

21   Judge Kimball said they could not bring and called it unfair

22   competition.

23           THE COURT:  So this is in your motion 782, this

24   argument you're relating to now?

25           MR. MARRIOTT:  Let me just check the number, Your

1    Honor.  I don't have them, unfortunately.

2              THE COURT:  Just so you know, I always speak in

3    terms of docket number.

4              MR. MARRIOTT:  It is 782, Your Honor.

15:29:26 5              THE COURT:  All right.

6              MR. SINGER:  Your Honor, on that point there is a

7    disagreement with Mr. Marriott.  We believe that that was

8    fairly stated in the unfair competition claim which had

9    already been pled at the time we sought to add a copyright

15:29:37 10   infringement claim, as well.

11             THE COURT:  I'd like to have you, Mr. Singer, now,

12   unless somebody else thinks we need to do something different,

13   I'd like to have you explain SCO's remaining claims, which I

14   understand are causes of action 6, 7 and 9.  And then I'm

15:29:54 15   going to ask for Mr. Marriott to speak to the two motions that

16   are directed against those claims 782 and 783.  And again, I'm

17   looking for just high level shape of what this is.  This is --

18   you're at a barbecue and some guy walks up to you, and this is

19   the kind of discussion I need.

15:30:15 20             MR. SINGER:  Yes.  If I might go to the podium

21   here, Your Honor.

22             MR. MARRIOTT:  I'll get my stuff.  I'm sorry.

23             MR. SINGER:  Your Honor, I will discuss this to the

24   unfair competition claim.  And then if I might, Mr. Hatch will

15:30:34 25   address the tortious interference claims, which the other

1    claims.

2              THE COURT:  Okay.

3              MR. SINGER:  Before I do that, I wanted to complete

4    the answer to the Court's prior question about, is there

15:30:45 5    anything else that should be clarified with respect to the IBM

6    demonstrative exhibit?  And I believe there is one other

7    important point, and that is on Page 4 of their demonstrative.

8              THE COURT:  Okay.

9              MR. SINGER:  Where on the fourth bullet point, it

15:31:05 10   says:  The parties exchanged licenses to one another's

11   existing operating systems.

12             And the part that I think needs to be clarified is

13   that in order for IBM to make use of this SCO technology and

14   IBM proprietary products, you had to have this GA release of

15:31:28 15   joint venture product.  So it was a limitation there.  It

16   wasn't just a general agreement that everyone could use each

17   other's technology.

18             THE COURT:  And you made that point I think

19   earlier.  Thank you.

15:31:38 20             MR. SINGER:  Your Honor, the unfair competition

21   claim deals with at one level a misappropriation of code but

22   added to it the elements of deception, a sham release and an

23   attempt to deceive SCO as to whether or not, in fact, a

24   generally available release had been made.  And at a very high

15:32:06 25   level, I'd like to focus on that.  And the folder of

1    demonstratives that I provided Your Honor are just a small set

2    of the facts there which are set forth in greater detail in

3    our memorandum in opposition to IBM's motion for summary

4    judgement where we in detail set forth these facts.

15:32:27   5        I think where we are was the parties signing a

6    joint development agreement in October 1998 because it was

7    very important to IBM in order to compete effectively with Sun

8    and Microsoft to try and get this latest version of SCO UNIX

9    that was the leader in the UNIX market.

15:32:47   10       And what happened then is that as things developed

11   into 1999, IBM's priorities changed.  They decided to focus

12   instead of developing an Intel-based product to focus instead

13   on Linux development.  But they wanted to at the same time to

14   have the right to take the SCO UNIX and use it for their

15:33:13   15   proprietary products notwithstanding the fact they weren't

16   keen on continuing to work together with SCO on developing

17   this joint project.

18       And IBM began to incorporate internally into its

19   proprietary products some of this latest SCO UNIX software

15:33:32   20   code.  In fact, some of the -- just a few examples of this

21   documentation are reflected in the documents we put into the

22   folder.

23       Here's a letter which is excerpted from an IBM

24   server group individual, Fred Strietelmeier in July 9, 1999,

15:33:54   25   where he says that:  SCO source code may only be used for

1    development of the AIX on IA-64 program product -- that was

2    the joint venture product -- and to the extent that such SCO

3    source code is not contained in the first release of the

4    generally available AIX on IA-64 program product -- that was a

15:34:19  5    IBM product that they were going to market as a result of the

6    joint venture -- IBM and therefore Sequent will not be

7    licensed to such SCO source code.

8            THE COURT:  So do you contend that the general

9    availability release only entitled IBM to use that code in

15:34:42  10   that generally available release?

11           MR. SINGER:  No, Your Honor.

12           THE COURT:  Okay.  They would have had the right to

13   use it in other settings.

14           MR. SINGER:  Yes.  If, in fact, that was a genuine

15:34:54  15   generally available release of the joint venture product --

16           THE COURT:  Okay.

17           MR. SINGER:  -- then IBM would have had the right

18   to take that and use it in all of their proprietary products.

19   Something that was very valuable to IBM.  But that if, in

15:35:08  20   fact, it was not a true generally available release, if it was

21   as we contend a sham deception, they wouldn't have the right

22   to do that in any of their proprietary products.

23           THE COURT:  Okay.

24           MR. SINGER:  And IBM then internally as they moved

15:35:25  25   away from the idea of the joint venture and toward the idea of

1    working instead with Linux debated internally on how they're

2    going to be able to do that and abandon the joint venture

3    while still being able to use this very valuable source code

4    in their proprietary products.

5    15:35:44         So if Your Honor looks at the second one of the

6    documents that we've excerpted, that's the May 11th, 2000,

7    e-mail from IBM UNIX product management director Bill Sandve,

8    and he says:

9              Thoughts on our major Monterey relationships.  SCO.

10   15:36:01   SCO has the rights to all the code if we cancel the project.

11   Can they take the code in the line of another competitor?  And

12   a little further down:

13             We will need to renegotiate the rights to ship

14   SVR-4, which comes from SCO, and Unixware-7, which was also a

15   15:36:24   SCO product, capabilities in the AIX base or remove the code.

16             So they recognized internally that this belonged to

17   SCO if they weren't going forward with Project Monterey.  And

18   then they said:

19             Actually shipping it with AIX as the preferred

20   15:36:41   direction because it helps us with Solaris compatibility

21   issues.  Solaris was a Sun Microsystems product.  And one of

22   the reasons they wanted to be able to compete more effectively

23   with Sun and also with Microsoft was through getting this

24   code.

25   15:36:56         So what happened, then, was an internal plan that

1    was documented in detail, and again the details are set forth

2    in our statement of facts, to do basically a sham release, to

3    deceive SCO into believing that this was a dually available

4    release of their joint venture product when it wasn't.

15:37:18  5    And one of the reasons that what was released, and

6    now we get to the May 2001 item on our timeline where IBM

7    distributes what is called the PRPQ IA-64 product.  This was a

8    joint venture product.  This is what would give them the right

9    if it was a generally available release to make use of the

15:37:42 10   software in their other proprietary products.  This was the

11   sham.  This didn't even have what's called a compiler.  A

12   compiler is what a computer needs to read, for a machine to

13   read the source code and be able to interpret and use it.

14   And if one looks at the January 29, 2001, e-mail of

15:38:07 15   IBM project manager Rose Ann Roth who said:  I think the

16   compiler must be available in some form or the whole thing

17   just doesn't make sense, i.e., SCO won't buy it.

18   So this is the third of the excerpted documents.

19   If you're with me, Your Honor.

15:38:24 20   THE COURT:  Yeah.  I am.  In fact, I think I'm

21   ahead of you.  The gist of your motion is that the actions of

22   IBM in creating a fake release to take advantage of the

23   license, and you go on to document this with basically a fake

24   royalty of $256 --

15:38:43 25   MR. SINGER:  Precisely.

1          THE COURT:  -- compared to the 12 billion that's

2     been released from AIX, you think that amounts to unfair

3     competition.

4          MR. SINGER:  We do.

15:38:52 5          THE COURT:  Okay.  That's really the kind of

6     overview that I need, so this is very helpful for me.

7          Now, I'd like to hear about the 782 motion, and

8     then I'm going to come back to you, Mr. Singer, and talk about

9     your interference of contract and business relationships

15:39:06 10    claims.  Is that okay?

11         MR. SINGER:  Yes.  If I can just clarify one point,

12    Your Honor.  The $256 that Your Honor mentioned, the reason

13    that that was a sham is there was never any sales of the

14    IA-64 PRPQ product.  There was never a penny.  But they sent a

15:39:25 15   check to SCO of $256 to represent a nominal amount of

16    royalties on a product that, in fact, never had any sales.

17         THE COURT:  Okay.  Thank you.

18         Mr. Marriott, you have a motion against this unfair

19    competition claim.  Give me just a brief overview of what it

15:39:43 20   is.

21         MR. MARRIOTT:  Sure, Your Honor.

22         THE COURT:  My goal in getting these overviews is

23    to understand what they are, the claims and the motions, so we

24    can decide how to schedule their disposition.

15:39:51 25        MR. MARRIOTT:  Sure, Your Honor.  And I will do

```
 1    just that with I hope the understanding that we don't share

 2    their view of that recitation of facts.

 3              THE COURT:  I'm not surprised.

 4              MR. MARRIOTT:  Thank you.

 5              So as to the motion, you can slice and dice this in

 6    different ways, Your Honor, because depending on the sections

 7    of the brief.  But we think about it along five lines.  First

 8    we say that the claim is untimely.  And if Your Honor looks in

 9    the booklet of slides, I've kind of listed these for you.

10    We've listed these for you.  It's at Page 9, Judge.

11              THE COURT:  Okay.

12              MR. MARRIOTT:  So SCO's claim is untimely.

13    Mr. Singer alluded at least to our argument in his opening

14    remarks.  The parties by way of agreement in the joint

15    development agreement for Project Monterey agreed that any

16    claim that related to a breach of the agreement, not just

17    claims for breach of the agreement, but any claim that related

18    to a breach of the agreement is a claim that had to be brought

19    within two years.  We believe this claim clearly relates to a

20    breach of the alleged breach of the GA and therefore had to be

21    brought within two years.  And if Your Honor looks at the

22    timeline as to when IBM was supposed to have misappropriated,

23    the complaint was filed more than two years outside that

24    period.  So we think the claim is time-barred under the agreed

25    upon limitation agreement.  So that's the first point, Your
```

15:40:01 (line 5)
15:40:19 (line 10)
15:40:38 (line 15)
15:40:55 (line 20)
15:41:14 (line 25)

1    Honor.

2              The second point is preemption, and I alluded to it

3    earlier, and I'll endeavor not to repeat it.  But basically

4    the idea is essentially what they've done is say IBM has

15:41:23  5    exceeded the scope of its license.  And in exceeding the scope

6    of its license because they say the trigger to the license was

7    a sham, IBM didn't steal this code from SCO, Your Honor.  IBM

8    didn't find it on a table and take it.  It was given to IBM in

9    connection with Project Monterey.  Their argument essentially

15:41:42 10    is that we simply used it for purposes we weren't allowed to

11    use it because we didn't have the release they claim was

12    required.

13              And that is effectively, Your Honor, we believe a

14    copyright claim.  And it is for that reason we think it is

15:41:53 15    preemptive.  And I think great evidence is in the history of

16    the claim.  They try to bring it as a copyright claim.

17    Judge Kimball says no.  And here we have it as an unfair

18    competition act.  So that's point two.

19              The third point, Your Honor, is they don't

15:42:06 20    introduce evidence that constitutes unfair competition.  I

21    think unfair competition has been defined by the courts much

22    more narrowly than their papers suggest.  Under the law we

23    think it is effectively either palming off or

24    misappropriation.  And while they use the term

15:42:22 25    misappropriation to describe what happened here, we don't

46

1    believe that qualifies legally as misappropriation for

2    purposes of unfair competition.  So we say the conduct

3    challenge doesn't amount to unfair competition under the

4    controlling law.

15:42:33  5         The fourth point, Your Honor, is a bad faith point.

6    Their claim depends we believe on a showing that IBM acted in

7    bad faith.  In our view they can't show and haven't adduced

8    evidence sufficient to permit the inference that IBM acted in

9    bad faith.  And then the last point is we don't believe

15:42:49 10   they've laid out damages to support this claim.

11        THE COURT:  Mr. Singer, what damages do you claim

12   under this claim?  Just roughly, big parameters.

13        MR. SINGER:  The damages here relate to two items

14   in general.  First of all, they took this, and they put it

15:43:05 15   into AIX, which was an unauthorized use, if we're correct,

16   that they basically asked the fruits of the unfair competition

17   was basically the fruits of the misappropriation.  And then

18   they had sales of AIX which otherwise they would have to

19   either disgorge the profits or give us a reasonable royalty on

15:43:24 20   that amount.

21        THE COURT:  Have you had expert work on that?

22        MR. SINGER:  Yes.  Christine Botosan; Dr. Fasano,

23   who is a professor at Harvard Business School, have all

24   tendered reports back in 2006, 2007 on these issues.

15:43:38 25        THE COURT:  Damages wasn't part of summary

1      judgement, just liability.

2              MR. SINGER:  That's correct.

3              THE COURT:  Okay.  And are you seeking punitives on

4      this claim?

15:43:45 5             MR. SINGER:  I'd have to check if punitives have

6      been pled on this, Your Honor.  I will get back to you on

7      that.

8              THE COURT:  Okay.

9              MR. SINGER:  I believe they're in there, but I'm

15:43:58 10    not certain.

11             MR. MARRIOTT:  I believe they're foreclosed, Your

12     Honor, by the joint development agreement.

13             THE COURT:  Punitives are waived in that agreement?

14             MR. MARRIOTT:  That's certainly our position.

15:44:05 15    Whether they share it, that's a different matter.  But that's

16     our position.

17             THE COURT:  No.  I would not expect that anything

18     you say is agreed to.

19             Mr. Singer, I want to have you now give me a high

15:44:14 20    level on interference with contract and business

21     relationships, the factual setting on those.

22             MR. SINGER:  Judge, if I might ask Mr. Hatch to do

23     that part.

24             THE COURT:  Sorry.  Yeah.

15:44:25 25            MR. HATCH:  Your Honor, we have two kind of

1    remaining tortious interference claims.  First under Court 7

2    is our specific claim with regards to specific entities.  And

3    the factual background for that largely is that in roughly the

4    November 2002 to January 2003 timeframe SCO became aware that

15:44:54  5    some of its software was finding its way into Linux and

6    initiated discussions with IBM and others regarding SCO's plan

7    to license its intellectual property that was being used

8    improperly in Linux and its concerns generally over its

9    intellectual property.

15:45:16 10          In roughly December of 2002, IBM had -- well, prior

11    to that, IBM we believe had started to react with some

12    antagonism towards SCO's plan to undertake this licensing

13    program for people who were using Linux to protect SCO's

14    intellectual property rights.  And in at least one instance

15:45:42 15    IBM's general counsel apparently got quite angry at SCO's

16    plans.  At some point, IBM urged SCO to cancel or delay its

17    announcement.  And SCO agreed to try to work through the

18    issues with IBM to delay its announcement.

19          In January of 2003 when no resolution was reached

15:46:01 20    with IBM, SCO issued a press release regarding its program to

21    protect its intellectual property.  In other words, offering a

22    license to Linux users to protect them from violating SCO's

23    intellectual property that we contended had found its way into

24    Linux.

15:46:22 25          At that point January 2003, SCO's CEO Donald

1    McBride and IBM executive Karen Smith met for breakfast in

2    Linux World.  McBride was asked to retract the announcement to

3    the public, to Linux users by Ms. Smith and SCO.  Mr. McBride

4    refused to do that and asserted claims for breaches of IBM's

15:46:50  5    AIX agreement.  Smith became angry and threatened Mr. McBride

6    that IBM was going to cut off all business relationships with

7    SCO and importantly would tell other SCO partners to cease

8    doing business with SCO, as well.

9         We believe that the facts will show that IBM

15:47:05  10   followed through on their threats with the various companies

11   that we've alleged in the complaint, specifically including hp

12   and others who later than discontinued either -- discontinued

13   their work with SCO or drastically reduced their relationship

14   with them causing damages to SCO.

15:47:27  15        THE COURT:  So which contract was interfered with

16   or contracts?

17        MR. HATCH:  Which contracts were interfered with?

18        THE COURT:  Yeah.  And the business relationships I

19   assume were with all these third parties that SCO has

15:47:41  20   relationships with or prospective relationships.  Is that what

21   you're talking about?

22        MR. HATCH:  The second claim, the more broader

23   claim, which is Claim 9, prospective business relationships

24   claim, these particular contracts, I mean, I don't know that I

15:47:55  25   can specifically state them here.  But they were contracts

1    with Oracle, Hewlett Packard, Computer Associates, Intel.

2              THE COURT:  That's what I was asking.  Yes.  It's

3    those.

4              MR. HATCH:  I don't know the dates or the names.

15:48:08  5        THE COURT:  Okay.  So historically, did those

6    contracts just about by the way?  Were there existing Linux

7    contracts with these people, or are these prior UNIX contracts

8    with these people?

9              MR. HATCH:  I think there were a variety of

15:48:24 10   contracts.  I believe some were other developing contracts.

11   Some were investment contracts.  They were contracts of a

12   variety of natures.  But all of them had in common that they

13   were doing business with SCO, and IBM was aware of it and we

14   believe interfered with those contracts so those companies

15:48:46 15   wouldn't continue to do business or would drastically reduce

16   doing business with SCO.

17             THE COURT:  I don't want to make a misassumption

18   here, but do your interference claims depend on the wrongful

19   actions in the unfair competition claims being proven, or do

15:48:59 20   you see them entirely independent?

21             MR. HATCH:  I think they're interrelated, but they

22   are somewhat independent.  So I think some of the things that

23   Mr. Singer spoke about go to the improper means aspect of the

24   tortious interference, but there are things that are

15:49:15 25   independent here, as well.

1          THE COURT:  Other improper means, you would say.

2          MR. HATCH:  Right.

3          THE COURT:  Okay.  All right.  That's helpful.  Let

4     me hear from Mr. Marriott about the motion 783 that attempts

15:49:26  5     to adjudicate those claims.

6          MR. MARRIOTT:  Yes, Your Honor.  Thank you.  So the

7     interference claims of SCO were historically evolving claims.

8     They in March of 2003 identified seven companies with whose

9     relationships they claim IBM interfered.  And in a series of

15:49:45 10     other events, and you'll see in the papers supporting our

11     motion, that number changed over time.  It went from 7 to 3 to

12     12 to 7 to 4 to 43 to 250 then down to 6 then up to 181 then

13     to 177.  Where we are today, Your Honor, I think is in the

14     following spot.  And if you look at Page 10 of our slides,

15:50:06 15     I'll try to break this out.  They have two claims.  And

16     frankly, just for clarity, there is a little confusion about

17     which of their claims is Count Nine and which is Count Seven.

18     But I think ultimately the parties can sort that out.  But

19     what is clear is that there is a direct interference claim and

15:50:24 20     an indirect interference claim.  And when all is said and

21     done, they accuse IBM of directly having interfered with their

22     relationships with five companies:  BayStar Capital,

23     Hewlett-Packard, Oracle, Computer Sources and Intel.  And our

24     motion, Your Honor, challenges the viability of any claim of

15:50:43 25     interference on a number of different grounds.

1      THE COURT:  Where do you get this limitation of the

2  five companies?

3      MR. MARRIOTT:  That comes through their answers to

4  interrogatories in which they specifically identified through

5  their 30(b)6 witness the companies with whom they say IBM

6  interfered.

7      THE COURT:  Did that get disputed in the briefing

8  and they were adding more?

9      MR. MARRIOTT:  In the briefing on summary

10  judgement, Your Honor, I think it is undisputed that there are

11  five companies with whom they directly interfered.  They then

12  have this what we call, and I believe perhaps they do call it,

13  an indirect interference claim.  And they put an additional

14  170ish companies in that category.

15      THE COURT:  Okay.

16      MR. MARRIOTT:  So I'm speaking first now about the

17  claim as -- our motion as it relates to direct interference.

18      THE COURT:  Right.

19      MR. MARRIOTT:  They've identified five companies,

20  and we have of adduced evidence, Your Honor, which I believe

21  is unrebutted from witnesses or from deposition testimony from

22  representatives of each of those companies that effectively

23  say that is set out in this slide that IBM did not interfere

24  with their relationship with SCO.  And that in any case, their

25  relationship with SCO didn't change in view of anything that

```
 1    was done by IBM.  That evidence we think is fatal to any claim

 2    of improper means.  Similarly, we think the claim fails

 3    because they can't show that we act with an improper purpose.

 4    And finally, we think they fail because they can't show

 5    damages.

 6              So that's the direct interference claim.  And two

 7    of those arguments, Your Honor, apply to the indirect

 8    interference claim, the damages argument and the improper

 9    purpose argument.  But with respect to indirect interference,

10    I think the parties simply have a fundemental difference of

11    view as to whether what they call indirect interference is

12    cognizable as interference under the law.

13              THE COURT:  Do we have disputes on any of these

14    motions about what law applies?

15              MR. SINGER:  Your Honor, I think we're in agreement

16    that on the unfair competition claim it's New York law.  And I

17    think we also have agreement that it's Utah law with respect

18    to tortious interference.

19              MR. MARRIOTT:  The former is true, and the latter

20    is not.  So we agree that New York law applies to the unfair

21    competition claim.  The contract expressly says that.  As to

22    the interference claims, our view is that it doesn't make any

23    difference which law the Court applies.  The claims fail under

24    either Utah law or New York law.  Those are the only two

25    possibilities that I believe any party has offered.  I don't
```

1    know that we've ever agreed that it is Utah versus New York.

2          THE COURT:  Is this expressly discussed in the

3    briefing?

4          MR. SINGER:  I think there's some footnotes.

15:53:15  5          MR. HATCH:  It seems like there is, yeah.

6          MR. MARRIOTT:  There are footnotes, Your Honor.  I

7    don't know that this has been -- I don't know that the other

8    court and the parties have engaged on this as much as we have

9    now in these 30 seconds.

15:53:25  10          MR. HATCH:  My vague recollection is there was a

11    agreement.  But if there wasn't, it would be somewhat

12    consistent with what Mr. Marriott represented.

13          THE COURT:  So New York applies on unfair

14    competition.

15:53:35  15          MR. MARRIOTT:  Correct.

16          THE COURT:  No dispute.

17          MR. MARRIOTT:  No dispute.

18          THE COURT:  You claim that Utah law applies on

19    interference?

15:53:41  20          MR. SINGER:  Your Honor, I believe that we may have

21    taken a position that didn't really matter.  But, you know, we

22    didn't detect at the time of the briefing a significant change

23    between Utah and New York law or difference between Utah and

24    New York law.

15:53:55  25          THE COURT:  I'm going to say it does not matter.

1          MR. MARRIOTT:  Certainly we don't think it matters,

2     Your Honor.

3          THE COURT:  Okay.  Thanks.  That helps.

4          MR. MARRIOTT:  So --

15:54:03  5          THE COURT:  Go ahead.

6          MR. MARRIOTT:  So on the indirect interference

7     claim, Your Honor, we simply don't think that what they allege

8     is indirect interference is cognizable.  And I, frankly,

9     cannot tell entirely from what I heard whether there's any

15:54:17 10   intent or effort on their part to take the conduct that

11    underlay their contract claims and their copyright claims,

12    which are now out of the case by agreement and order of the

13    Court and take that conduct and make it part of the

14    interference claims.  I frankly can't tell.  I don't think

15:54:32 15   that would be proper, if that's what's intended.  But I don't

16    believe that's permissibly part of these claims.

17          THE COURT:  We'll see what's on the briefs on that.

18          Let me ask you a question, Mr. Marriott, before you

19    sit down.  If this is -- if this lawsuit is the only

15:54:49 20   significant asset that SCO has, what's the purpose of your

21    claims if SCO's claims don't succeed at all?

22          MR. MARRIOTT:  Well, if there are, in fact, no

23    assets, Your Honor, the primary purpose is to act as an offset

24    to any claim that they might have as against IBM.

15:55:08 25          THE COURT:  Okay.  And I'm just, you know, just

1   asking because I haven't gone through your claims yet, and I

2   want to, but would it make sense to dispose of the notions on

3   the SCO claims first before going to yours, to the motions on

4   your claims or not?

15:55:22   5          MR. MARRIOTT:  I think that is a reasonable way to

6   proceed, Your Honor.

7          THE COURT:  What do you think, Mr. Singer?

8          MR. SINGER:  Your Honor, I think that makes sense.

9   We think that for the reason Your Honor mentioned, that if

15:55:34   10   there's no assets in SCO and these claims were to be rejected,

11   then the other claims may not be pursued by IBM.  There

12   wouldn't be any sense for them to pursue it.  If the claims as

13   we think they should be proceed, then it would make sense to

14   take up IBM's counterclaims.

15:55:54   15          THE COURT:  That's just a mechanical kind of

16   practical management thing I'm just asking about.

17          MR. SINGER:  So we're in agreement on that point

18   with what Mr. Marriott said.

19          THE COURT:  Okay.  Mr. Marriott, anything else on

15:56:03   20   this?

21          MR. MARRIOTT:  Your Honor, not on the claim

22   directly.  What I would say is I think it does make sense for

23   the Court to take these up piecemeal.  I think they're

24   obviously big.

15:56:13   25          THE COURT:  Well, I'm not going to have two days of

1    argument.

2              MR. MARRIOTT:  Well, whatever argument the Court

3    finds helpful, that's for Your Honor to decide, obviously.

4              THE COURT:  Okay.

15:56:20  5              MR. MARRIOTT:  But we think it would be helpful for

6    the Court to hear to some degree from the parties orally on

7    these, and I think to do it sequentially it makes some good

8    sense.

9              THE COURT:  Okay.  We'll figure that out.

15:56:31  10             Let me ask you, Mr. Singer, on your motion 776, you

11   attacked four of the claims that IBM has raised against SCO.

12   And then on your motion 777, you attacked three claims that

13   IBM -- that IBM has against SCO.  I'm wondering if we ought to

14   talk about those claims in those groups before we move to the

15:57:04  15   motions.  Does that sound like it makes sense?

16             MR. SINGER:  That's fine with us, Your Honor.  I

17   think those are IBM's claims.

18             MR. MARRIOTT:  That's fine with me, Your Honor.

19             THE COURT:  Okay.  So let's do that.  Give me the

15:57:17  20   100,000 foot flyby on these claims.

21             MR. MARRIOTT:  Sure.  I've tried to do that, Your

22   Honor, in the slides.  So if you take a look -- would you like

23   anything on the contract claim or not?  There's no motion

24   directed to the contract claim.

15:57:28  25             THE COURT:  No.  That's fine.

58

1          MR. MARRIOTT:  So if you turn to the tort claims,

2    we've essentially grouped these in two buckets, Your Honor.

3    One is what we call the tort claim.  There's four of them.

4    There's a Lanham Act claim, an unfair competition claim, a

15:57:41  5    tortious interference claim, and an unfair and deceptive trade

6    practices claim.  That, for example, is expressly under New

7    York law.  The facts underlying those, Your Honor, are at

8    least summarized in part here.

9          SCO made we believe false and misleading

15:57:57 10    representations about IBM's products, AIX and DYNIX, about its

11    Linux-related products.  It made false representations to

12    IBM's customers about the viability of IBM's products, about

13    the legality of those products, about the rights that IBM had

14    and the rights that IBM did not have.  It falsely claimed, we

15:58:14 15    believe, ownership of IBM's intellectual property as well as

16    ownership created by the OpenSource Community included into

17    Linux.  And it falsely accused we believe IBM of asserting

18    truckloads of ripped off code into the Linux operating system.

19    Those things in the aggregate we believe amount to the

15:58:32 20    violations we've described.  And we have tendered evidence

21    from experts as to what the damage is related to what those

22    claims are.

23          THE COURT:  Now, on SCO's direct -- well, at least

24    on the direct interference claim and maybe on the indirect

15:58:49 25    interference claim, we have arguments about communications and

1    what those communications were.  And then here we have

2    arguments about communications.  I'm going to find it really

3    hard to believe that these facts are undisputed and that

4    summary judgement would be renderable solely on that issue of

15:59:10  5    what was said.  Am I right about that, Mr. Singer and

6    Mr. Marriott?  Or are the other issues on these motions the

7    more pertinent?  That seems hard to me.  Mr. Singer?

8             MR. SINGER:  Your Honor, I agree that the general

9    principle that summary judgement on interference on the

15:59:26 10    grounds of who said what is very doubtful I think in both

11    directions.  There are, however, some grounds of privilege

12    that relate to, because a lot of these are statements about

13    the lawsuit that our summary judgement motion is based upon.

14    And I think Mr. Cyrulnik is prepared to say a few words at

15:59:45 15    whatever time the Court believes is appropriate about that.

16             THE COURT:  So the probative issue is alive.  But

17    I'm just asking.  There's a lot of dispute about what

18    statements were and were not made, isn't there?  I would

19    expect that if you're good lawyers.

16:00:01 20             MR. SINGER:  Mr. Cyrulnik?

21             MR. CYRULNIK:  Yeah.  I'm not sure there's that

22    much dispute about what the statements themselves were.

23             THE COURT:  Okay.

24             MR. CYRULNIK:  I think the parties agree what the

16:00:11 25    statements were.  The question is whether or not IBM has

1    claims that can be asserted based on the types of statements

2    that they're seeking to complain about, because primarily what

3    you heard Mr. Marriott describe a couple minutes ago is SCO

4    either asserting certain things in its pleadings in this case,

5    in motions in this case, in arguments in this case, and then

6    to company's potential targets of additional lawsuits as a

7    result of what we believe was infringement, et cetera, and

8    then statements to the press about those claims.  And so you

9    can break it out into many different parts, but at the end of

10   the day that story basically concerns SCO's efforts to enforce

11   its rights in this courtroom and to explain that enforcement

12   effort to potential licensees and customers and to the press.

13            And to the extent that's what these statements are

14   about, we believe that the claims fail as a matter of law

15   under both the absolute privilege, which is the first ground

16   for our motion; certain statements even if they're not covered

17   by the absolute privilege would at a minimum be covered by the

18   qualified privilege, which is the second ground for our

19   motion; third, each of the four causes of action that IBM has

20   used to try and assert claims with respect to SCO's litigation

21   and related statements, each of them requires an element of

22   bad faith showing.  And we think that there's no issue of fact

23   with respect to IBM's failure to make that showing or create a

24   genuine issue of fact with respect to that allegation.  So

25   that's the third basis for our motion for summary judgement on

1    IBM's second, third, fourth and fifth counterclaims.

2           And then finally, the element of damages, we

3    believe, in this case that IBM has conceded that the

4    statements it's complaining about did not cause IBM damage.

16:02:06   5    To the contrary, you have the unique case here where IBM's own

6    witnesses have conceded that these statements and that SCO was

7    making both in this litigation and in explaining its

8    enforcement effort outside the courtroom, those statements, if

9    anything, helped IBM's Linux business and resulted in profits

16:02:26   10    to IBM.  So we think that because damages is an element to

11    their claim and they've conceded the opposite and we think

12    they have not created a fact issue as to whether or not there

13    were damages, we think that is the fourth basis on which their

14    claims can be dismissed as a matter of law.

16:02:42   15           THE COURT:  It sounds to me that you were the one

16    that was going to speak on this.

17           MR. CYRULNIK:  I just got lucky, yeah.

18           THE COURT:  I'd like to move on to your other

19    claims, Mr. Marriott, then 6, 7 and 8.

16:02:54   20           MR. MARRIOTT:  Sure.  If you look at Page 14, Your

21    Honor, these are what we effectively called Copyright/GPL

22    claims.  And essentially, Your Honor, I think the facts here

23    are largely undisputed.  IBM owns valid copyrights to -- by

24    the way, I think all the facts that matter are undisputed,

16:03:13   25    okay.  Let there be no doubt about that.  IBM owns valid

1    copyrights to many contributions to Linux, about 700,000 lines

2    of code.  IBM granted SCO and really its predecessor because

3    again, we have to keep these apart.  But IBM granted Caldera a

4    license to use IBM's contributions to Linux consistent with

16:03:36  5    the terms of what's known as the GPL, general public license.

6    Our view is that SCO by its campaign against IBM to Linux

7    breached and repudiated the GPL, and in doing that we contend

8    lost its license.  And by losing its license, it no longer had

9    the right to use IBM's 700,000 lines of code, and the

16:03:56 10    undisputed evidence we believe shows that it did.

11           And that in effect, Your Honor, is the copyright

12    claim.  The GPL is directly related to it.  We say they

13    breached the GPL, and we seek a finding of promissory estoppel

14    against them from taking contrary positions.  But

16:04:10 15    fundamentally, those three causes of action are about a

16    copyright.

17           THE COURT:  How does promissory estoppel arise?

18           MR. MARRIOTT:  It's frankly the weaker of the

19    three, Your Honor, candidly.  But it nevertheless exists

16:04:22 20    because they've taken positions about what the GPL means and

21    what it doesn't mean, and we contend they are estopped from

22    reversing course now and in their defense taking different

23    views about what the general license means.

24           So when I say weaker, I don't mean the claim isn't

16:04:39 25    strong.  But it more peripheral is a better word.  It is

1     peripheral to the claim whether or not they have a license.

2                 THE COURT:  Have you relied on that somehow?

3                 MR. MARRIOTT:  That's correct, Your Honor, we did.

4     We gave them -- we allowed them to use the 700,000 lines of

16:04:50  5     code.

6                 THE COURT:  After they made these representations.

7                 MR. MARRIOTT:  That's exactly right.

8                 THE COURT:  Okay.  I follow you.  And your damages

9     from this are what?

16:04:57  10                 MR. MARRIOTT:  Well, for the copyright claim, Your

11     Honor, the damages would be statutory damages at a minimum,

12     and we do have a damages expert who spoke to this.  The

13     damages are not enormous in terms of dollar volume, Your

14     Honor.

16:05:09  15                 THE COURT:  Okay.  Thank you.

16                 Who on SCO's team is speaking on these?

17                 MR. NORMAND:  Thank you, Your Honor.  Let's begin

18     where Mr. Marriott ended.  On the 6th and 7th counterclaims,

19     we don't believe there's any evidence of damages, any actual

16:05:25  20     damages.  There was a statement about attorney's fees, but

21     that's not cognizable actual damages.  So on that basis alone,

22     we think the 6 and 7 can go.  On the 8th there is this claim

23     of statutory damages.  So that would fold into an analysis for

24     each of 6, 7 and 8 on the merits.  And the merits concern as

16:05:44  25     Mr. Marriott's slides capture at the very end essentially the

1    question of whether SCO breached the GPL.  It didn't breach

2    the GPL.  It was authorized to do everything it did.

3         I can go into whatever level of detail Your Honor

4    wants.  Essentially SCO both for a short period of time

16:06:03  5    licensed a Linux product, and for a short period of time and

6    distributed a Linux product.  In both respects there was

7    compliance with the GPL on several different bases.  First of

8    all, the very initial section of the GPL, Section 0 makes

9    clearly how it is that the code is made subject to the GPL.

16:06:23 10    And the copyright holder has to say in the GPL, I'm making

11    this code available.

12         THE COURT:  Now, you're exceeding my level of

13    absorption, so I'm going to move on.

14         MR. NORMAND:  Thank you, Your Honor.

16:06:37 15         THE COURT:  Mr. Marriott, you've got an affirmative

16    motion for summary judgment on this claim.

17         MR. MARRIOTT:  We do, Your Honor.

18         THE COURT:  And this is of all the motions the only

19    affirmative motion for summary judgement; is that right?

16:06:46 20         MR. MARRIOTT:  It's the only one left, correct.

21         THE COURT:  The only one left.  Okay.

22         MR. MARRIOTT:  Because others we made affirmatively

23    the Court granted.

24         THE COURT:  Okay.  Now, has anything in this

16:06:56 25    litigation so far ruled on this issue of compliance with the

1    GPL?

2              MR. MARRIOTT:  No.

3              THE COURT:  Okay.  So this is fresh here.  How much

4    of the material on the motion for spoliation that's contained

16:07:22  5    in the objection briefing, how much of that was given to

6    Judge Wells and how much of it is new on the objection?

7              MR. SINGER:  I think all of it was presented to

8    Judge Wells.  I think the objections are brought on the basis

9    of that record.

16:07:42 10              THE COURT:  Okay.  Is that correct, Mr. Marriott?

11              MR. MARRIOTT:  I would have to double check, Your

12    Honor.  I believe it's correct.  But what I would say is that

13    I think in their reconsideration request which is now

14    withdrawn that they did go beyond what Judge Wells initially

16:07:57 15    had.  But that's, of course, now moot.  I think that's right,

16    but I frankly need to double check.  I don't know for certain.

17              THE COURT:  Okay.  My view of de novo review, just

18    so you know, which I guess Judge Kimball promised that I would

19    do, we will talk about that, is that it is a de novo review of

16:08:18 20    that record, not a new record, okay?  Do you agree,

21    Mr. Singer?

22              MR. SINGER:  I do, Your Honor.

23              THE COURT:  And Mr. Marriott?

24              MR. MARRIOTT:  Absolutely.

16:08:25 25              THE COURT:  Okay.  All right.  Well, now I've

1    already now kind of suggested that maybe we should go to the

2    resolution of the motions that IBM has filed against the SCO

3    claims first to see if we have viable SCO claims.  And if we

4    do, then we would move on.  I think I had a little bit of

16:08:52 5    buy-in from both sides on that.

6                    MR. SINGER:  Yes.

7                    MR. MARRIOTT:  Yes, Your Honor.

8                    THE COURT:  Any preference as to whether we handle

9    those two motions, 782 and 783, together or separately or in

16:09:05 10   which sequence?

11                   Mr. Singer, they're not yours but they're your

12   claims.  What do you think?

13                   MR. SINGER:  We think it makes sense to start with

14   the unfair competition claim and then move to the tortious

16:09:19 15   interference.  The tortious interference builds in part on the

16   unfair competition claim, although it goes beyond it.  So we

17   think that is a logical progression.

18                   THE COURT:  Okay.  I've got to tell you, I think

19   this has been really helpful for me today, so thank you all.

16:09:33 20                   Mr. Marriott, your view on that?

21                   MR. MARRIOTT:  Your Honor, I would probably have

22   flipped them.  But, frankly, it doesn't make that much

23   difference.

24                   THE COURT:  Okay.  Should I read your argument in

16:09:48 25   front of Judge Kimball, Mr. Marriott?

1          MR. MARRIOTT:  I don't want to read it.  But you

2     may well.  I can't get myself to read prior --

3          THE COURT:  Are you also telling me I don't want to

4     listen to your argument in front of me?

16:10:01  5          MR. MARRIOTT:  I'm not saying that.  I think you

6     should read it.

7          THE COURT:  Mr. Singer?

8          MR. SINGER:  We don't think it would hurt to read

9     it.  On the other hand, I think there is -- I believe both

16:10:11 10  parties are interested in arguing the motion in front of Your

11    Honor at some point.

12          THE COURT:  Has much -- how is that argument

13    structured?  Was it by motion?

14          MR. SINGER:  Yes.

16:10:22 15          THE COURT:  Okay.

16          MR. HATCH:  Your Honor, there's one issue there,

17    too.  As I think both the parties used a lot of slides and

18    things.  I don't know if you got the books with the slides in

19    them from Judge Kimball's clerks or whether they still exist.

16:10:35 20  But it may be -- parts of it may be difficult to follow

21    without that.

22          THE COURT:  I'm not saying this would be in lieu

23    of.  I'm saying -- I think you've answered, Mr. Hatch.  If I'm

24    reading the soundtrack of a movie, I'm not going to do that.

16:10:50 25  I'll bring you back into a movie.

1          MR. MARRIOTT:  I think Mr. Hatch is making a very

2     good point.  The parties did prepare demonstratives like we

3     used today.  They were used with that hearing.  If I were in

4     your shoes, Your Honor, then I would want a book that had

16:11:06  5     every party's brief and those demonstratives and argument

6     transcript, and you can do with what you want.  If the Court

7     wants that, I suggest we jointly put it together and give it

8     to Your Honor.

9          THE COURT:  Do you folks still have them?

16:11:18 10          MR. SINGER:  I believe we have the book on the

11     motion for unfair competition.

12          MR. MARRIOTT:  We have them all.

13          MR. SINGER:  I believe we have them.

14          THE COURT:  Okay.  Well, let me give that a little

16:11:27 15     thought, and I may ask you for those.  And that may be my

16     preview so that I can be educated before the hearing.  But I

17     anticipate we're going to have a hearing on this.

18          Let me tell you what I do on summary judgement

19     motions.  And by the way, we'll probably decide the sequence

16:11:45 20     of 776 and 777 and 774 -- 784 later.  But what I do on summary

21     judgement motions is I attempt to reconcile the facts before

22     the hearing.  I go through the facts as presented by each side

23     and methodically decide what's in dispute and what's not.  And

24     I often sanitize or edit facts to remove a disputed element.

16:12:11 25     And it's a fairly laborious exercise.  But I do this so that

1    we get a factual record before we get into the argument,

2    because if I'm arguing varied facts and varied law depending

3    on varied factual scenarios, it's very difficult for me to

4    keep track of.

16:12:35    5    When you brief these motions, the movant filed the

6    set of allegedly undisputed facts and then there was a

7    response that I would guess in some cases did not dispute and

8    in others disputed fully or in part and may have added

9    additional facts which were then responded to in a reply.  I

16:12:55   10    haven't reviewed that in these specific motions.

11    Now, I can sit down in-house and try to reconcile

12    these facts or I can give you homework.  And since it's been

13    so long, I would really strongly like to suggest that counsel

14    attempt to reconcile the facts on the 782 motion and then the

16:13:27   15    783 motion.  You each have word processing versions of those.

16    You could sit together, you know, either virtually or in the

17    same room, and try to arrive at what I'm going to do, anyway.

18    I'm not going to take somebody's disputed fact and prefer it

19    to someone else's.  I can't do it.  And so you're smart enough

16:13:49   20    to know what's genuinely in dispute and what's not.

21    Now, you may only get 90 percent of the way there.

22    But I think that you would help me a lot if you were to do

23    that.  This is a new idea that you haven't had a chance to

24    react to.

16:14:06   25    MR. SINGER:  We're certainly prepared to try and

70

1    sit down with IBM's counsel to work and do that.

2              THE COURT:  What do you think, Mr. Marriott?

3              MR. MARRIOTT:  I certainly would try, Your Honor.

4              THE COURT:  Okay.  You know what I do on motions to

16:14:18  5    suppress?  I find the facts at the end of the hearing, and

6    then I ask the government to prepare an order for my signature

7    using those facts.  And then I tell the defense, you can

8    redline those facts any way you want with other fact findings

9    you think should have been in there.  And usually we arrive at

16:14:37 10    a fairly agreed summary of facts especially since I've given

11    them my view.

12              But on summary judgement it's even easier because

13    you don't have the fluidity of testimony that's given

14    verbally.  You have a written record.  It was proposed.  It

16:14:52 15    was either disputed or not.  There are additional facts that

16    were proposed and they were disputed or not.  I think you can

17    accomplish this.

18              MR. SINGER:  We're certainly willing to try.

19              THE COURT:  In large measurement.  How long do you

16:15:02 20    think you would need to do that?  And this might relate to the

21    mediation issue.  I anticipate setting 782 and then 783, and I

22    do tend to rule from the bench in summary judgement hearings.

23    And then we would go on to the others, if needed.

24              But where should mediation fit in to all of this,

16:15:25 25    Mr. Singer?

1          MR. SINGER:  We are interested and prepared to

2     mediate either before the Court does that or after or both.

3     We think that it's been a long time that these claims have

4     been pending.  As I noted, this is the only remaining asset of

16:15:46  5     SCO.  I think that SCO is in a position if these motions are

6     denied to try the case, if that becomes necessary.  But we are

7     certainly willing to sit down and see if we can work out

8     something that would eliminate that.

9          THE COURT:  For timing you're pretty open.

16:16:05 10          MR. SINGER:  We're open to whatever timing either

11     the Court directs or that IBM is willing to sit down with us.

12          THE COURT:  Are you thinking of having a magistrate

13     judge in this court designated?  Having me propose panel

14     members for you to select from?  Or do you have a mediator in

16:16:24 15     mind, or do you think you could agree on a mediator or

16     mediation team with IBM?

17          MR. SINGER:  Can I consult one moment?

18          THE COURT:  Sure.

19          (Time lapse.)

16:16:58 20          MR. SINGER:  Your Honor, I think because of SCO's

21     position with respect to being in the bankruptcy court, we

22     would prefer that the mediator be a magistrate either selected

23     from a panel or selected by the Court.

24          THE COURT:  Okay.

16:17:10 25          Mr. Marriott, what's your view on timing and the

1   identity of a mediator?

2        MR. MARRIOTT:  Your Honor, as to timing we'll do

3   what Your Honor directs.  I don't -- frankly, while I think

4   this is actually a creative idea, I've never actually sat and

16:17:25   5   done this in connection with a summary judgement motion, so I

6   can't say from experience how long it takes.  But we'll comply

7   with whatever guideline the Court provides.

8        As to a mediator, frankly, what I in my own mind

9   had imagined as being the first step here was for the parties

16:17:41  10   to simply try to do this themselves.  I mean, because frankly,

11   understanding where they're coming from will give us a pretty

12   good sense whether there's much reasonable prospect.  What I'm

13   a little reluctant to do is engage the machinery of whoever

14   the person is, a formal mediator, and have the parties going

16:18:01  15   in and making presentation and doing a mini-trial.  I think

16   that tends to be more likely to cost money and to distract.

17   If we can figure out an initial step whether we're close

18   enough for it to make sense.  To me that would make the most

19   sense and try to resolve it ourselves.  If we can't do that

16:18:17  20   then perhaps the next phase would be involve a mediator.

21        THE COURT:  Mr. Singer?

22        MR. SINGER:  Your Honor, this case has been pending

23   for 12 years in this court.  I think if the parties would have

24   been able to resolve it by themselves that would have happened

16:18:33  25   sometime before now.  So I think the assistance of a mediator

1    would be useful at the outset of any settlement discussion.

2              THE COURT:  Well, let me ask this.  I'm not

3    entirely sure where the mediation concept came from, but it

4    was in the joint status report, it was referenced.  Do you

16:18:54  5    think it would or wouldn't be fruitful, Mr. Marriott?

6              MR. MARRIOTT:  To me, Your Honor, it's entirely a

7    question of what their demand is.

8              THE COURT:  Sure.

9              MR. MARRIOTT:  So that's what I'm trying to figure

16:19:03  10   out.  And if I know that, then I can answer the question.  And

11   I don't.  So rather than have the Court order that we go

12   mediate, make presentations and submit papers when if the

13   number is a nonstarter, we would effectively be wasting the

14   mediator's and the parties' time.  That's what I'm trying to

16:19:20  15   avoid.  A mediator might be effective, but having some

16   understanding of where we are starting gives us a sense of

17   whether this is fruitful or potentially fruitful or not.

18             THE COURT:  Have offers ever been exchanged?

19             MR. SINGER:  There was an effort.  I believe the

16:19:32  20   last effort was before the Novell trial.  There was a

21   mediation involving IBM -- it wasn't a formal mediation,

22   actually, Your Honor.  It was a settlement meeting between us,

23   Judge Cahn, who was a trustee for SCO, in Philadelphia with

24   Mr. Marriott, I believe, was there, and IBM representatives.

16:19:54  25   And that was back, it would have been in 2010.  Since that

74

1       time, there have not been any settlement discussions, let

2       alone a mediation.

3                   THE COURT:  Okay.  Would it do any good for me to

4       order you to exchange offers?

5                   MR. SINGER:  I don't think it can hurt.

6                   MR. MARRIOTT:  I'd be glad to have their offer,

7       Your Honor.

8                   MR. HATCH:  I think he should go first then with

9       that magnanimous response.

10                  THE COURT:  I'm going to give this just a little

11      more thought.  It may be running parallel.  It may be running

12      after some of this.  How long do you think you need to

13      reconcile facts on 782?  Was that the first one?

14                  MR. SINGER:  Would 60 days be appropriate?

15                  MR. MARRIOTT:  That's fine with me.

16                  MR. SINGER:  30 days.  I would say either 30 days

17      or 60.

18                  THE COURT:  Can we do 30?

19                  MR. SINGER:  30 would be fine with us.

20                  MR. MARRIOTT:  That's fine with me, Your Honor.

21                  THE COURT:  I think you can do this in a morning or

22      afternoon.  I'm looking at the other people at the tables,

23      their responses.  I sure they can do this.

24                  MR. MARRIOTT:  I like your optimism, Your Honor.

25                  THE COURT:  Yeah.  Okay.  Let's get those 782 facts

1    within 30 days.  And before I order -- I've got to make sure

2    that's the right number.  Yeah, it is.  And before I order any

3    facts on 783 I want to see how this process goes.  I'm going

4    to give some more thought to the mediation issue or exchanging

16:21:25  5    offers and see where I go there.  Let me look at my check

6    list.

7            When I talk about mediation, to be clear, I'm not

8    talking about mediating this motion or that motion.  I'm

9    talking about mediating the case; right?

16:21:47  10           MR. MARRIOTT:  That's what I understood.

11           MR. SINGER:  That's what we understood, as well,

12    Your Honor.

13           THE COURT:  Anything else we should do here today,

14    Mr. Hatch?  Mr. Singer?

16:21:57  15           MR. SINGER:  Your Honor, unless you wanted to hear

16    something about spoliation motion at this time, I think that

17    would be everything else.

18           THE COURT:  No.  That's actually the area that I'm

19    probably the most comfortable with out of all of this subject

16:22:10  20    matter.  And reading, that's kind of brought back fond

21    memories of magistrate days.

22           Mr. Marriott, anything else you think we ought to

23    do?

24           MR. MARRIOTT:  No, Your Honor.  Thank you for your

16:22:22  25    time.

1          THE COURT:  Thanks very much to everybody.  You've

2     been extremely well prepared.

3          There was the issue of the outstanding motions and

4     related documents.  Did you get a chance to review that?

16:22:33  5          MR. NORMAND:  We did review it, and on its face we

6     didn't see any problems.  Could we take a day or two to make

7     sure?

8          THE COURT:  Sure.  If there's something else,

9     e-mail everybody.  I think we're just rounding it out.

16:22:44  10          Okay.  Thanks.  We're in recess.

11          MR. MARRIOTT:  Thank you, Your Honor.

12     (Whereupon, the court proceedings were concluded.)

13               *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH          )

 2                           ) ss.

 3    COUNTY OF SALT LAKE    )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7    the foregoing matter on June 11, 2015, and thereat reported in

 8    Stenotype all of the testimony and proceedings had, and caused

 9    said notes to be transcribed into typewriting; and the

10    foregoing pages number from 3 through 77 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this _____ day of

15    _____ 2015.

16

17

18

19

20              _____

21                        KELLY BROWN HICKEN, CSR, RPR, RMR

22

23

24

25
```