```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                           DISTRICT OF UTAH

 3                           CENTRAL DIVISION

 4

 5   THE SCO GROUP,                 )

 6            Plaintiff,            )

 7   vs.                           )   CASE NO.  2:03-CV-294DAK

 8   INTERNATIONAL BUSINESS         )

 9   MACHINES CORPORATION,          )

10            Defendant.            )

11   _____)

12

13                    BEFORE THE HONORABLE DALE A. KIMBALL

14                    ------------------------------------

15                           March 1, 2007

16

17

18

19                           Motion Hearing

20

21

22

23
                                Ed Young
24                           Court Reporter
                           247 U.S. Courthouse
25                         350 South Main Street
                           Salt Lake City, Utah
```

1

```
 1                    A P P E A R A N C E S

 2

 3

 4    For Plaintiff:              BRENT HATCH
                                  10 West Broadway
 5                                Suite 400
                                  Salt Lake City, Utah
 6

 7                                EDWARD NORMAND
                                  333 Main Street
 8                                Armonk, New York

 9

10                                STUART SINGER
                                  401 E Las Olas Boulevard
11                                Suite 1200
                                  Fort Lauderdale, Florida
12

13

14
      For Defendant:              DAVID MARRIOTT
15                                MICHAEL BURKE
                                  825 Eighth Avenue
16                                New York, New York

17
                                  AMY SORENSON
18                                TODD SCHAUGHNESSY
                                  15 W South Temple
19                                Suite 1200
                                  Salt Lake City, Utah
20

21

22

23

24

25
```

```
 1    March 1, 2007                                    2:30 p.m.
 2                        P R O C E E D I N G S
 3
 4              THE COURT:  We're here this afternoon in the matter
 5    of SCO v. IBM, 2:03-CV-294.
 6              For plaintiff Mr. Brent Hatch and Mr. Edward Normand
 7    and Mr. Stuart Singer.
 8              MR. SINGER:  Good afternoon, Your Honor.
 9              THE COURT:  Good afternoon.
10              For defendant, Mr. David Marriott and --
11              MR. MARRIOTT:  Good afternoon.
12              THE COURT:  -- Ms. Amy Sorenson, Mr. Michael Burke
13    and Mr. Todd Shaughnessy.
14              MR. SHAUGHNESSY:  Good afternoon, Your Honor.
15              THE COURT:  I understand that you want more time on
16    Wednesday.  We can start at 2:00 on Wednesday, so you have the
17    extra 20 minutes that somebody is asking for.
18              MR. SINGER:  We appreciate that, Your Honor.
19              MR. MARRIOTT:  Thank you, Your Honor.
20              THE COURT:  2:00 on Wednesday.
21              I have a jury out, and if a verdict comes in, then
22    you can all go somewhere else while we get the jury back in to
23    take the verdict.  That has to take precedence.  Sorry about
24    that.
25              First we have IBM's motion on summary judgment on
```

3

```
 1    SCO's contract claims, and SCO's motion for partial summary

 2    judgment or SCO's third cause of action for breach of contract.

 3    45 minutes per side.

 4            Who is going first?

 5            MR. MARRIOTT:  I believe that is me, Your Honor.

 6            THE COURT:  Go ahead.

 7            No one is required to take all of the time asked for,

 8    but --

 9            MR. MARRIOTT:  Thank you.

10            THE COURT:  You, of course, can.

11            MR. MARRIOTT:  We have prepared a book of exhibits,

12    if I may approach for the Court's convenience?

13            THE COURT:  Sure.

14            MR. MARRIOTT:  We have a copy for counsel.

15            THE COURT:  Thank you.

16            MR. MARRIOTT:  Referring Your Honor to tab one, if I

17    may, of the book, there are four contracts that underlie SCO's

18    claims for breach of contract:  The IBM software agreement, the

19    IBM sublicensing agreement, the Sequent software agreement, and

20    the Sequent sublicensing agreement.  And SCO has a separate

21    claim or count with respect to each of those four contracts.

22    IBM is, we respectfully submit, entitled to summary judgement

23    with respect to each of those counts for at least four reasons

24    which are set out at tab two of our book.

25            THE COURT:  And they are also in your briefs.
```

4

```
 1              MR. MARRIOTT:  And they are also in our briefs.

 2              What we would like to do, with the Court's

 3    permission, is focus in the few minutes that we have on the

 4    first three of those reasons.  And then I would like to focus,

 5    Your Honor, on the particular technologies which are at issue

 6    on this motion, those things which SCO contends were

 7    contributed improperly by IBM to Linux.  Those appear, Your

 8    Honor, at tab four of the book.

 9              Let me make clear, if I may, from the outset,

10    something about those four items of technology.  First is the

11    JFS contribution, which is a contribution SCO contends was made

12    by IBM to Linux in violation of the IBM agreements.  That is

13    the first category.

14              The next three categories are the RCU contribution,

15    the LTP contribution, and certain negative know-how and

16    experience.  The allegation by SCO is that those contributions

17    were contributed by IBM to Linux in violation of the Sequent

18    agreements.  Now, we'll come back to those technologies in

19    detail, but let me make a few things absolutely clear about

20    those technologies from the outset.  None of that material,

21    Your Honor, is UNIX System V source code, methods or concepts.

22    None of that material is a modification or a derivative work of

23    Unix System V.  None of it was contributed to Linux by

24    reference to UNIX System V, which this is original IBM work

25    created independent of UNIX System V.  That brings me, Judge,
```

5

1   to the first of the four points I would like to underscore.

2            First, Your Honor, is that SCO can't establish a

3   breach of contract and that is true for three reasons.  The

4   first reason is the plain language of these agreements

5   forecloses SCO's theory.  Second is that the parol evidence,

6   the overwhelming parol evidence forecloses the theory.  The

7   third is that SCO's theory is patently unreasonable, as I

8   intend to demonstrate and, therefore, untenable under the

9   controlling cases.

10           As I said, there are four contracts at issue.  Two of

11  those are the sublicensing agreements.  SCO has not offered in

12  its papers a shred of evidence to demonstrate that IBM breached

13  the sublicensing agreement.  It has not identified which

14  provision it breached.  It has not identified any evidence of

15  breach and it has not explained a breach.  For that reason

16  alone, the two counts related to those contracts, counts two

17  and four, are disposed of without further analysis.

18           That leaves the remaining two claims concerning the

19  software agreements.  Your Honor, let me take the three points

20  as to why summary judgment is appropriate as to each of those.

21  First, the plain language.  There is no dispute here that the

22  contracts at issue concern software product, AT&T's UNIX System

23  V material.  There is also no dispute that IBM has not

24  contributed to Linux any UNIX System V material.  The entire

25  case as it concerns SCO's contracts turns on the so-called

1    Section 2.01 of the agreement, the resulting material

2    provision.

3          That section, however, Your Honor, speaks about the

4    licensee having the right to prepare modifications and

5    derivative works, provided the resulting materials are treated

6    under the contract as confidential.  You'll see that language

7    at tab nine of the book.  It is undisputed, as I said at the

8    outset, that none of the four categories of material at issue

9    is resulting material.  None of it is a modification and

10    derivative work of System V.  For that reason alone the claim

11    fails.

12          Now, faced, Your Honor, with that fact, SCO contends

13    that Section 2.01 not only gives it rights with respect to UNIX

14    System V, and modifications and derivative works, but anything

15    that ever touches or is in any way associated with the

16    modification and derivative works of UNIX System V.  That we

17    respectfully submit stretches the meaning and the language of

18    Section 2.01 to an absurd degree.

19          If I may illustrate, Your Honor.  If you imagine and

20    if you look at the demonstrative to Your Honor's left and to my

21    right, that is a depiction of the Linux operating system.

22    You'll see a series of circles with particular chunks or pieces

23    in it.  Imagine you have a product, Your Honor, with 1,000

24    different pieces to it.  Those pieces represent various

25    components of the system.  So imagine you have this and this is

7

1     Your Honor's product and you have 990 of these pieces, if there

2     are 1,000, and they are Your Honor's.  They are your own

3     original work.

4            Well, imagine that you want to license from others

5     additional material and to add them to your product, and you

6     take the additional ten that make up the 1,000 and you license

7     them to party A and party B and party C.  Let's just assume

8     that one of the items that Your Honor licenses from a third

9     party is licensed from SCO.  It is AT&T's UNIX System V

10    software.  Let's assume that the contracts mean what SCO says

11    they mean.  Your Honor, under SCO's theory of the case, not

12    only is Your Honor -- this is your product which you have

13    licensed other people's materials in part, ten of the 990,

14    under SCO's theory, Your Honor, not only are you required to

15    keep confidential the one part of the 1,000 that you licensed

16    from SCO, you're required to keep confidential the entirety of

17    the product, so as to keep confidential the one.

18           That does not make SCO's case, Your Honor, because

19    IBM has neither disclosed the one, nor has it disclosed in

20    entirety of the product.  So SCO's theory goes to another

21    level.  It says you are required, owner of this product, the

22    1,000 items, to keep confidential anything and everything that

23    is in it, even if you take it out, and even if you license it

24    from a third party who says to you you can do with it what you

25    want, and even if you take out the one item, Judge, and put it

8

1    on the shelf, that material and those 1,000 items, 990 of which

2    are your original work under SCO's theory are controlled by

3    them.  You might own them, they say, but they control them.

4         If you take it out, take out your one and you put it

5    in another product, under their theory they also control the

6    other product, and whatever the other components are in that

7    product.  That, Your Honor, we would respectfully submit is not

8    a reasonable construction of Section 2.01 of the agreement.

9         The second point I want to make concerns the parol

10   evidence.  The overwhelming parol evidence here, Your Honor,

11   compels the conclusion that SCO's theory is not a reasonable

12   construction of the agreement.  By the plain language, Your

13   Honor, parol evidence ought not to be considered.  In the event

14   that Your Honor considers it, we would submit, and it is

15   overwhelmingly in favor of IBM's construction, there are ten

16   individuals, and we called them involved persons in our papers,

17   who were involved in the execution and the negotiations of

18   these agreements, five of them from AT&T, three of them from

19   IBM, two of them from Sequent.  They appear on the scene before

20   Your Honor.  Those individuals have offered specific, and we

21   believe undisputed testimony, that refutes SCO's theory of the

22   case.  If we may share with Your Honor some clips from their

23   depositions.

24         Mr. Wilson.

25         (WHEREUPON, the following deposition clips were

9

1    played.)

2           MR. WILSON:  The only part of the derivative work

3    that would have to be protected under the software agreement

4    would be that portion of the software product that would be

5    contained in a derivative work.

6           To the extent that modifications of derivative work

7    contained portions of the software product, they were to

8    protect the software product portion under the terms of the

9    license agreement, that portion which was theirs, whatever,

10   they can do whatever.

11          The intent was to make sure that we protected the

12   software product.  To the extent that they used that software

13   product and created works which were original works, that was

14   up to them to do what they pleased with those things.

15          When you say those things, you mean that portion of a

16   derivative work that they had developed and that in your view

17   they owned; is that correct?

18          That's correct.

19          MR. MARRIOTT:  That was the head of AT&T's licensing

20   business.

21          (WHEREUPON, the following deposition clips were

22   played.)

23          Mr. Wilson.

24          If they created a derivative work and the derivative

25   work contained zero content of the software product, then they

1    could do as they wish.  If that contained portions of the

2    software product, then they had to abide by the terms and

3    conditions of the agreement with regard to that portion that

4    contained the derivative work, contained the software product.

5    Our agreements only went to the software product itself, not to

6    their original created works.

7            MR. MARRIOTT:  This is the man for AT&T that

8    signed --

9            (WHEREUPON, the following deposition clips were

10   played.)

11           David Frasure.

12           With respect to the agreements that IBM entered into

13   with AT&T, is it your understanding that AT&T through those

14   agreements had any right to control IBM's use of source code

15   that it developed on its own?

16           They had no right to control that software that was

17   developed by IBM.

18           With respect to the agreements that Sequent entered

19   into with AT&T, is it your understanding that AT&T through

20   those agreements, gained any right to control Sequent's use of

21   the source code that it developed on its own?

22           They did not gain any rights to control the software

23   developed by Sequent.

24           Was it the case that from AT&T Technologies'

25   perspective that the licensee could do whatever it wanted with

1    the source code it developed?

2         Yes.

3         Michael DeFazio.

4         The basic idea is that the AT&T USL, Novell code was

5    owned and protected by Novell.  The code developed by our

6    licensees was owned and controlled by them.  When the two went

7    together to market our rules prevailed.  When the two were

8    separate our rules prevailed on ours, and their rules prevailed

9    on theirs.

10        Would you agree, Mr. DeFazio, that the agreements did

11   not and do not give AT&T, USL and Novell or any of their

12   successors or assigns the right to assert ownership or control

13   over modifications and derivative works prepared by its

14   licensees, except to the extent of the original UNIX System V

15   source code included in such modifications and derivative

16   works?

17        That's correct.

18        Stephen Vukasonvich.

19        And any code that IBM modified, in your view, under

20   this provision, IBM thereafter owned?

21        They owned any modification.  They owned their code

22   that they developed, and we owned our code.

23        Ira Kistenberg.

24        By the terms of Section 2.01, did AT&T intend to

25   restrict Sequent's rights to disclose code that Sequent

12

1    developed on its own?

2              If Sequent developed it on its own, AT&T had no

3    rights to it.

4              My question is simply whether it was AT&T's

5    understanding that Sequent would own the modifications and the

6    derivative works that they prepared based on UNIX System V.

7              They owned it to do what they want with it, yes.

8              Were licensees of AT&T free to use and to disclose

9    the modifications or derivative works they created provided

10   they did not use or disclose any portion of licensed UNIX

11   System V source code?

12             Yes.

13             Thomas Cronan.

14             In my discussions with AT&T what they were trying to

15   protect were several derivative works.  They were trying to

16   protect their own System V code.  They felt like they had to

17   protect anything that was shipped around with their code in it.

18   If we separated out our cord from their code they didn't need

19   to protect it.  That was our discussion.

20             Richard McDonough.

21             Another huge issue for us was ownership of whatever

22   we developed, and we wanted to make it clear that whatever we

23   developed we owned.  We weren't making any claim to the code

24   that AT&T owned and developed itself, but we wanted to make

25   certain that anything we or our subcontractors or anybody

1   working for us developed, we owned and had the right to use and

2   license.

3          I would just say that there is no way on God's green

4   earth that I would have entered into an agreement where

5   somebody else owned what IBM was investing tens of millions of

6   dollars in developing.  An agreement never would have happened.

7   So we had to make it clear that whatever IBM developed IBM

8   owned.

9          Jeffrey Mobley.

10         My understanding was that we were free to do whatever

11  we wanted to do with the products we were developing.

12         David Rodgers.

13         My understanding of the license is that the UNIX

14  System V code had to be maintained as the AT&T private property

15  and withheld from disclosure, but if there were other elements

16  of the software product created by Sequent, that those were

17  Sequent's to dispose of as it chose.

18         Roger Swanson.

19         Those parts of the source code that we wrote were not

20  required to be kept confidential under the terms of the

21  agreement, but we could do with them as we saw fit.

22         The aspects of the derivative works that we

23  developed, we could choose to disclose or not disclose.  We had

24  the ownership, we had the control.  That was my understanding.

25         Once, again, that's precisely what our understanding

14

1   was, that once we had made modifications, we still had an

2   obligation to protect that part of the UNIX System V material,

3   according to the restrictions of the agreement, but that work

4   that we had developed ourselves, the source code that we

5   developed, was not included as a part of those confidentiality

6   restrictions.

7              (WHEREUPON, the deposition clips were concluded.)

8              MR. MARRIOTT:  These witnesses, Your Honor, have

9   offered substantial additional testimony, and it is in the

10  papers, and we have provided CD's in the book, and we have

11  provided Your Honor with three hours of the same, should you

12  feel like you need to see that.

13             THE COURT:  I appreciate that.

14             MR. MARRIOTT:  I thought you might.

15             In an attempt to avoid summary judgment, Your Honor,

16  SCO has pointed to the declarations of a number of witnesses.

17  They appear at tab 13 of the book.  These people have the use

18  of the contracts, which they never communicated to IBM as they

19  were not a part of the negotiations, and a number of them were

20  not employed by AT&T at the time the agreement were executed.

21  Their testimony, we submit, is no impediment to the entry of

22  summary judgment.  As overwhelming parol evidence, the

23  testimony of those who negotiated and executed these

24  agreements, who communicated their views to IBM, is we submit

25  overwhelming in favor of IBM and against SCO's theory.

1          You looked like you had a question.

2          THE COURT:  I don't.

3          MR. MARRIOTT:  The third reason, Your Honor, why the

4    contract claims fail is that SCO's theory is, as we show in the

5    book at tabs 19 through 23, we think unreasonable as a matter

6    of law.  It is inconsistent with IBM's ownership rights, it is

7    contrary to copyright law, it is against public policy, and it

8    leaves in circumstances I'll explore later, an absurd result.

9          The second point, Your Honor, independent of what we

10   believe is the undisputed evidence of no breach, that I want to

11   emphasize here is that SCO is estopped from pursuing its theory

12   of the case.  For almost two decades following the execution of

13   these agreements, some of these representatives of AT&T and USL

14   and Novell and others, told IBM and other licensees that they

15   could do as they wished with their own original works, so long

16   as they protected AT&T's UNIX System V software.

17         Mr. Wilson, the head of the licensing business, said

18   he on numerous occasions did that.  Mr. Frasure, who executed

19   the agreement on behalf of IBM, as you'll see at tabs 25 and 26

20   of your book, said, quote, that he personally, quote, assured

21   licensees in no uncertain terms that they could do as they

22   wished with their original works.  He, quote, often told people

23   that UNIX licensees could freely use and disclose their

24   original or homegrown UNIX method, code and concepts.

25         Mr. Green, another AT&T representative, also at USL

16

1     and Novell, has testified that, quote, more times than I could

2     remember, close quote, licensees were told that they could do

3     as they wished with their original works.

4            Ms. Tilley of AT&T, then USL, then Novell, said that

5     representatives of AT&T and USL and Novell, quote, consistently

6     informed licensees that they owned their code and that they

7     could do with it as they wished.

8            Mr. Crab, formerly of Santa Cruz and then of Caldera,

9     said that while at Santa Cruz, Santa Cruz told licensees that

10    they were free to do as they wished with their own code,

11    modifications and derivative works, so long as they protected

12    AT&T's System V source code.

13           AT&T and its licensees, Your Honor, took AT&T's

14    licensees like IBM and Sequent, took AT&T at their word.  They

15    publicly disclosed their own original works in the time

16    following the execution of these agreements.  Examples of those

17    disclosures are in the papers we have provided.  There is a

18    cart with books in front of Your Honor in which repeated

19    disclosures were made over decades of the code and the methods

20    and the concepts of AT&T's UNIX System V software.  And, Your

21    Honor, of the modifications and supposed derivative works of

22    that.  Hundreds of books have been written on the subject.

23    Those disclosures are no different, Your Honor, than the kinds

24    of disclosures that SCO has included in its final disclosures.

25           Neither AT&T nor its successors raised any objection

17

1    to those disclosures until this lawsuit became a glimmer in the

2    eye of current management.  SCO's former CEO, Ransom Love, has

3    testified that, quote, after Caldera acquired ownership of UNIX

4    code, and this is at tab 29, even though we were aware that IBM

5    was disclosing homegrown code, we made a conscious decision to

6    take no action against such disclosures.  IBM, Sequent and

7    other licensees no doubt reasonably relied on the repeated

8    statements by AT&T and its successors that they could do as

9    they wished with their own works so long as they protected

10   AT&T.  IBM and Sequent built businesses, Your Honor, on that

11   proposition and invested hundreds of millions of dollars in the

12   idea that they would actually control their own stuff.

13        Estoppel can, no question, be in certain

14   circumstances a fact intensive inquiry.  It is not always

15   appropriate for summary judgment.  Courts can and they do enter

16   summary judgment on grounds of estoppel, and I would

17   respectfully submit, Your Honor, that if there is a case for

18   it, this is it.

19        Third point, Your Honor, the alleged breaches here

20   have been waived.  They have been waived for three reasons.

21   They have been waived because the repeated statements of AT&T

22   and its successors over nearly two decades not only amount to

23   estoppel but they amount to waiver.  I won't repeat that

24   ground.

25        The second reason why there is waiver here, Your

18

1    Honor, is that Novell, the supposed predecessor interest to

2    SCO, exercised its rights under an asset purchase agreement

3    with the Santa Cruz Operation, Inc. to waive the alleged

4    breaches here.  I will come back to that.

5          The second item I would like to focus on, Your Honor,

6    is SCO's own conduct which we believe results in a waiver of

7    alleged breaches here.

8          First, Your Honor, with respect to Novell.  Section

9    4.16B.  If you look at tab 36 of the book, Your Honor, after

10   the commencement of this case Novell exercised its rights under

11   Section 4.16B of the asset purchase agreement to cause a waiver

12   of the alleged breaches here.  The asset purchase agreement

13   says that seller, in this case it was Novell, shall amend -- in

14   addition, seller in its sole discretion, buyer shall amend,

15   supplement, modify or waive any rights under, or shall assign

16   any rights to any SVRX license to the extent so directed in any

17   manner or respect by seller, Novell.

18         In the event that the buyer fails to take such

19   action, the seller, Novell, shall be authorized and is granted

20   the right to take that action on the buyer's behalf.  Well, it

21   is undisputed here that Novell, following the commencement of

22   this case, exercised its rights under 4.16B.  In the dissent

23   letter it asked SCO to waive, and SCO declined to waive and

24   Novell took that action.  The only issue is whether Novell has

25   the right to do that.

19

1          I respectfully submit, Your Honor, that the plain

2     language of Section 4.16B gives Novell that right.  SCO has

3     raised a number of arguments in opposition, some as to the

4     parol evidence, and some as to the plain language of the

5     agreement.  We deal with those arguments in our papers and at

6     tabs 38 and 39 of the book.  Time won't allow me to repeat them

7     here.

8          Let me just say this about SCO's argument.  SCO's

9     reliance on the parol evidence is we submit impermissible, Your

10    Honor, because the plain language controls, and the parol

11    evidence cannot be used to alter the plain language of the

12    agreement.  As to the plain language of the agreement, what SCO

13    says in effect, Your Honor, is that Novell had waiver rights,

14    but it doesn't have waiver rights to the agreement that are at

15    issue in this case, the agreements that IBM is supposed to have

16    breached.  The waiver rights by the terms of Section 4.16B

17    relate to SVRX licenses.  The question is, are the agreements

18    at issue here SVRX licenses?  As we show at tab 40 in Your

19    Honor's book, I submit there is no question that they are.

20    SVRX stands, Your Honor, simply for System V release.  There is

21    no question that the agreements IBM is supposed to have

22    breached are SVRX licenses.  They are agreements licensing

23    System V releases.

24          In a letter from SCO's CEO to the CEO of Novell,

25    following Novell's exercise of its rights under 4.16B,

20

1    Mr. McBride acknowledged that the agreements at issue in this

2    case are SVRX licenses.  He said, and I quote, in your June 9

3    letter, you, referring to Novell, attempt to assert claims on

4    behalf of IBM and with respect to its SVRX licenses with SCO.

5    In SCO's opposition papers, Your Honor, in connection with this

6    exact motion, at paragraph 201, SCO acknowledges that the

7    agreements at issue are SVRX licenses.  It says, quote,

8    effective June 13, 2003, SCO terminated IBM's SVRX license.

9    Effective July 30, 2003, SCO terminated the Sequent SVRX

10   license.  Novell has waived the alleged breaches at issue.

11        The next waiver issue I would like to discuss, Your

12   Honor, concerns SCO's conduct.  This is summarized at tab 41.

13   SCO shipped the exact four categories of code material we're

14   talking about, Your Honor, in its own product.  It shipped it

15   in its United Linux product, and it shipped it in that United

16   Linux product pursuant to the terms of the General Public

17   License or the GPL.  Each of those acts resulted in a waiver of

18   the alleged breaches.  Let me tell you why.

19        First, United Linux.  If you look at tab 43 of the

20   book, Your Honor, SCO was part of an initiative known as United

21   Linux.  As a part of that initiative SCO and its partners

22   assigned any intellectual property rights they had, with the

23   exception that is not relevant here, to the material that ended

24   up in United Linux product.  The material at issue here is in

25   the United Linux product.  If you take a look at, Your Honor,

21

1    tab 44 of the book, you'll see the language of the United Linux

2    agreements.  The United Linux Joint Development Contract says

3    that all intellectual property rights in the software developed

4    pursuance to the JDC, other than the preexisting technology and

5    enhancements, shall be assigned by the members, which SCO is

6    one, and any individual member to the LLC and shall be owned by

7    the LLC.

8            Well, SCO's Linux IV product was, Your Honor,

9    software developed pursuant to the JDC.  We show that at tabs

10   44 and 46 of the book.  Again, the items of information that is

11   supposedly misused here was in that product.  Any rights SCO

12   had to the material at issue, Your Honor, and we respectfully

13   submit they had none, but any rights they had were assigned by

14   them to the United Linux LLC, and they are in no position now

15   to assert any claim of breach with respect to it.

16           With respect to the GPL, the General Public License,

17   again, SCO shipped the material at issue in products that were

18   licensed under the GPL.  What does the GPL say?  The GPL says,

19   among other things, that if you distribute copies of the

20   program covered by the GPL product or for a fee you must give

21   the recipients all the rights that you have.  You must make

22   sure that they too receive and can get the source code.  You

23   give them the right to make copies and to distribute verbatim

24   copies.  So the very material that supposedly represents the

25   breach was put by them in a United Linux product and shipped

22

1    under the General Public License under those terms.  That, too,

2    Your Honor, represents a waiver.

3           Now, if I may, as time is short, with respect to the

4    technology items at issue, and let me say this again, there are

5    four of them.  I would point you to tab 53 of the book where

6    they are listed.  The facts related to these four technology

7    area are at tab 54 of the book.  These four items of technology

8    have one thing in common.  That one thing is dispositive of

9    SCO's claims.  That one thing is that none of those four

10   categories of material is resulting material.  Under their

11   theory of the case, Judge, IBM's liability depends at a minimum

12   on it being resulting material.  They are not, therefore, the

13   claims fail.  None of the four categories include System V

14   methods or concepts, none of them are modifications and

15   derivative works of UNIX System V.  They are original IBM

16   works, just as in my example of the 990 original works of Your

17   Honor, and SCO has under the plain language of the agreement,

18   we submit, no right to control them.

19          There are four, as I said, Your Honor.  The JFS

20   contribution is at issue in the next motion, and with Your

21   Honor's permission, I will argue that in that connection.  Let

22   me just focus on the three remaining ones, the RCU

23   contribution, the LTP contribution, and the negative know-how

24   experience.  The RCU contribution is at tab 58.  Putting aside

25   the fact that it is not resulting material, and putting aside

23

1    the fact that SCO has waived any right to pursue it, SCO's

2    claim with respect to the RCU contribution is barred by the

3    statute of limitation.  The statute of limitations under New

4    York law, which controls, is six years.  RCU was disclosed in a

5    patent application in 1993 and the patent issued in 1995.

6           Under SCO's mistaken theory of the contract, Your

7    Honor, IBM's filing of the patent application amounts to a

8    disclosure.  The statute of limitations ran before the

9    commencement of this claim and the claim is barred.

10          In any event, the witnesses, the only individuals

11   identified by SCO as having anything to do with that, and whose

12   pictures and testimony appear at tab 60, have debunked SCO's

13   claims.

14          The LTP contribution.  Again, putting aside the fact

15   that it is not resulting material, putting aside the fact of

16   waiver and estoppel, SCO's claim with respect to the LTP

17   contribution fails, Your Honor, because it depends on the

18   proposition that the LTP contribution came from the DYNIX

19   operating system, which SCO contends is a modification and

20   derivative work.  It didn't.

21          The LTP contribution was not part of the DYNIX

22   operating system.  The evidence, which we set out at tab 62 of

23   the book, makes that perfectly clear.  It was not a part of it

24   and under their own theory it fails.

25          Lastly, Your Honor, the negative know-how category.

1    This is a category of 11 items of supposedly misused

2    information.  We lay this out at tab 64.  There are two basic

3    brands of claim as it relate to these 11 items.  One of them

4    concerns experience.  Here is what SCO's claim is as it relates

5    to the experience.  It says, as we show at tab 65, Judge, it

6    says IBM has breached its contract by permitting IBM developers

7    exposed to DYNIX PTX methods and concepts to contribute to

8    Linux in the same area for each developer's work.  So anybody

9    that had any exposure to DYNIX can't work in connection with

10   any other operating system in that area.  That is the claim.

11        With respect to the negative know-how, which also

12   appears at 65, the gist of the claim is that people who had

13   some knowledge about DYNIX told people who were working on

14   Linux not to do certain things in DYNIX that they don't think

15   worked.  SCO has identified 16 supposed wrongdoers as it

16   relates to these 11 categories.

17        Those individuals, Your Honor, as I will come to,

18   have offered undisputed testimony that debunks SCO's claim.

19   The claims as to these 11, Your Honor, fail for three quick

20   reasons, and I will sit down.

21        First, Your Honor, the agreements which SCO contends

22   were breached, Your Honor, do not contain any provision which

23   would allow it to preclude IBM employees from using their

24   experience and their general know-how in working on projects

25   other than the one on which they are presently working.  There

1    is no connection drawn in SCO's interrogatory answers or in its

2    paper between the contract and this claimed notion of misuse of

3    experience.

4          Second, Your Honor, though Magistrate Judge Wells

5    allowed SCO to pursue, and declined to throw out in the

6    discovery phase SCO's claim as to these 11 items, she made it

7    perfectly clear in her order, which we have set out in your

8    Honor's binder, that these claims were subject to being, in her

9    judgment, at least, disposed of on summary judgment.

10         Your Honor ordered SCO to provide particularity as to

11   these claims as did Magistrate Judge Wells.  That has never

12   been provided, and for that reason alone they are out.

13         Finally, careful consideration of these items shows

14   that the claim falls apart.  If you look at tab 70, Your Honor,

15   you will see the pictures of each of the 16 individuals who are

16   at issue and what it is they said in testimony that is

17   unrebutted by SCO.  Here is what they said.  They didn't make

18   any contributions to the files or the directories listed, or

19   they didn't base their contributions to the list of files on

20   UNIX System V in making the contributions.

21         You will want to look item by item.  Your Honor, look

22   at tab 71.  For two of these items, and, again, this is

23   undisputed, for two of these items, Your Honor, 188 and 187,

24   the technology which SCO alleges was misused didn't even exist

25   in DYNIX.  For another two of the items, 43 and 94, the

1    material had nothing to do with DYNIX PTX.  It was discoverable

2    outside of IBM.  For five of the items there is absolutely no

3    evidence that the alleged wrongdoers had any experience in the

4    technology area where they were supposed to have misused it in

5    some other area.  SCO admits that with respect to four of them.

6    With respect to items 23 and 90, Your Honor, for two of the

7    items the material was disclosed in marketing materials, and in

8    footnote ten of SCO's opposition papers, it says that any such

9    disclosure -- if the material is inactionable anyway.  Finally,

10   item 189, Your Honor, was based on knowledge available in

11   public literature.

12          As is summarized in tab 72 of the book, SCO's

13   negative know-how claims and its experience claims we think

14   underscore the absurdity of the position.  If SCO's theory is

15   correct that anybody with any experience, not just with UNIX

16   System V, but any modification or derivative work of UNIX

17   System V, is severely constrained in their employment, and that

18   is contrary to public policy as the cases in our papers make

19   clear.

20          The only conceivable reason, the only conceivable

21   reason why AT&T could have wanted to protect IBM, and in my

22   example Your Honor's original works, was to protect the one

23   item that you put in your product.  SCO has acknowledged, Your

24   Honor, and it did it early in the case, that there are no

25   secrets in UNIX System V.  They said that in open court and

1    they withdrew their trade secrets claim.

2         SCO's theory is, finally, inconsistent with IBM's

3    rights of ownership.  It admits that IBM owns the material at

4    issue.  It admits that ownership carries with it the exclusive

5    right to distribute, and yet they take the position, Your

6    Honor, that would nullify as a practical matter IBM's rights of

7    ownership.

8         Thank you.

9         THE COURT:  Thank you.

10        Mr. Singer.

11        MR. SINGER:  Thank you, Your Honor.  We also have

12   arguments books, if I might approach?

13        THE COURT:  Please.

14        MR. SINGER:  Your Honor, I would like to begin with

15   why these contract claims matter.  The UNIX operating system

16   developed by AT&T was its crown jewel.  It is the operating

17   system of choice for mission critical application, and it

18   became in the 1990s the leading operating system worldwide.

19        Now, major computer companies like IBM wanted to

20   adopt that system for their own hardware.  They had a choice.

21   They could come up with their own operating system.  In fact,

22   IBM tried.  It is called OS2.  It failed.  IBM, like others,

23   struck a deal with AT&T.  Give us access to your source code so

24   that we can develop our own flavor of UNIX that will run better

25   on our hardware.  AT&T agreed but subject to very strong

1     restrictions, and not just on the original System V code, but

2     on what they knew IBM and others would do with it, the

3     so-called modified and derivative works.

4            They required that those modified and derivative

5     works be treated just like the original software code in

6     language that is as plain as can be in the relative agreements

7     that are enforceable today.  That is why we are here.

8            AT&T preserved its head start in developing UNIX

9     while allowing companies to, for a royalty, develop their own

10    systems that were UNIX systems that, of course, would pay

11    royalties for the object code that would run the various

12    machines.  What they could not do is exactly what IBM has done

13    here, give away that head start by open sourcing of derivative

14    technology that they would never have had if it weren't for

15    access in the first place to System V, and to allow a

16    jump-start to Linux, which has had a tremendous effect on SCO's

17    business.  SCO was the inheritor of AT&T's UNIX business.  SCO

18    dominated with UNIX on the Intel chip platform market, and it

19    had 80 percent of the market in the late 1990s.

20           It did ventures with IBM, as you'll hear more about

21    this on Monday when we have our unfair competition argument,

22    but a joint venture project, Monte Ray, to use SCO's know-how

23    in that field to develop joint products.  IBM then decided to

24    abandon project Monte Ray, and instead to devote technology to

25    Linux and to disclose proprietary UNIX technology.  At tab one

29

1    we just touch on a little bit of that, which is the experts',

2    Mr. Rochkind's and Mr. Ivie's conclusions that IBM's

3    disclosures is what turned Linux into a strong enterprise

4    system.

5            If you turn to the third page, in tab one you see a

6    graphic where IBM's own document shows it directed the strength

7    of AIX and PTX, which is DYNIX, into Linux as their proposed

8    UNIX strategy.  You have a summary of the vast amount of

9    technology just on the issues which are still subject to the

10   Court's order in the case, substantial amounts of technology

11   that have been contributed.  You have Mr. McKenney, who is an

12   IBM secret programmer, who expressly stated in a document that

13   we will mine key ideas from AIX and DYNIX PTX, and that this

14   will make Linux more disruptive to proprietary operating

15   systems like SCO's business.  And the reason they can do this

16   is because they have access to DYNIX PTX source code and access

17   to top operating system experts in AIX and DYNIX.

18           The result, which is depicted graphically on the last

19   slide in section one, is the rapid decline in SCO's open server

20   UNIX new license revenue following those technologies being

21   distributed in early 2000.  That is why these contract claims

22   matter a great deal.

23           I would like to address at the outset why a trial is

24   needed, and why this is not a matter for summary judgment.  One

25   might think that that is obvious just from IBM's presentation.

1    There are hundreds of pages of briefs, reply papers and

2    addendum that are longer, I think, than War and Peace.  40,000

3    pages of exhibits.  We counted 100 plus new cases just cited in

4    their reply brief.  That does not sound like a summary judgment

5    case to us, Your Honor.  It does not sound like a case where

6    you can look at the plain language and you can say SCO does not

7    have a contract claim.

8          I think that it is also clear when we look at the

9    extrinsic evidence that IBM is so heavily relying upon, and

10   because you're talking about both things that occurred over two

11   decades ago, in part, and because you're talking about terms

12   that are not clearly defined, like what does someone mean when

13   they say an original IBM work?  What do they mean when they

14   say, as you heard on the screen, that it was developed without

15   relying on System V?

16         Let's take a look at some of those witnesses just at

17   the front end, and their changes of opinion at different points

18   in the case.  If you look at tab two, the first slide is Otis

19   Wilson.  He says, as you heard, his beliefs as set forth in a

20   declaration that IBM and Sequent are free to open source all of

21   AIX and DYNIX except the original System V code.  14 years ago,

22   however, he gave strikingly different and contradictory

23   testimony in a case, USL versus Berkeley, where he said that

24   anything that that university created with the exposure to

25   licensed software based on, contained a part of, was a

31

1    derivative work and had to be treated as a licensed software,

2    which is, of course, what the plain language of the agreement

3    says.

4              He also wrote that in a 1987 document.  He also

5    confirmed that that testimony was correct at his deposition,

6    and he acknowledged it was no different in intent between a

7    standard operating license and the educational license at issue

8    in that case.

9              On the next page we talk about Mr. Kistenberg,

10   another one of the IBM acknowledged involved persons.  He

11   negotiated the Sequent deal on behalf of Sequent.  They have a

12   declaration from Mr. Kistenberg that said no one at AT&T had

13   intended to assert control over the portion of derivative work

14   that did not contain System V code.  He told a different story

15   in his deposition.

16             In fact, he said in his deposition that he told IBM's

17   counsel that his understanding was that the UNIX software given

18   to any of the licensees, that any time they used the source

19   code to develop derivative products, that that was a part of

20   the System V source code, and that they could not turn around

21   and give it to X, Y, Z companies.  He states that clearly at

22   various places in his deposition.  He says in his deposition

23   that he would never have signed that declaration if he knew the

24   use that IBM would try to interpret his words to mean.

25             Mr. Chatlos, in fact, did exactly that.  When he was

1    confronted with a proposed IBM declaration following the

2    meeting, he said he would sign one that actually reflected what

3    he had discussed, but that the ones presented to him didn't do

4    that and he refused to sign.

5            Mr. Bouffard had his declaration submitted by IBM

6    and, again on the key point we're talking about, these are not

7    collateral points, but it is the key points that IBM wants you

8    to overturn the plain language of the agreement and go with

9    extrinsic evidence on.  They have a declaration from Mr.

10   Bouffard.  He gives a later declaration to SCO which clarifies

11   that when he said there was no right to control or own the

12   modifications, he meant that AT&T couldn't appropriate such

13   material, and said to IBM give us the AIX and we want to sell

14   it for our benefit.  And that he did not mean that IBM had the

15   right to disclose the protected added on material and other

16   code that was in the derivative product.  That is directly

17   contrary to his declaration and the position that IBM takes in

18   this case.

19           Just recently in the Novell case, he gave a

20   deposition and that is the next page which is excerpted here,

21   where he was asked by Novell's counsel as to how it came to be

22   that he signed the declaration that said that ownership and

23   control was with IBM, and he explained that his IBM declaration

24   wasn't written by him, that they went around and around in

25   negotiating the language, and that finally he was worn down.

33

1    He said it wound up being a negotiation of my words rather than

2    a document of my words.

3         Your Honor, this and the other extrinsic evidence is

4    exactly why we have trials.  We want to subject these witnesses

5    to the crucible of cross-examination, and then the truth we

6    believe will emerge.  That cannot be shortcut in this case.

7         I would also like to talk about the assertion that

8    was made that the particular derivative works at issue in this

9    case are just things that were dropped in and had no basis

10   related to System V.  That is manifestly not the case.  I would

11   like to move all the way to tab 50, if you would, in the binder

12   which we provided.

13        This deals with AIX.  It is an excerpt from the

14   report of Mr. Evan Ivie, who was formerly the head of the

15   computer science department at Brigham Young.  He has worked on

16   UNIX all the way back to AT&T.  He is a distinguished expert in

17   the field.  He has studied this, and as his report and

18   underlying testimony show, half of the JFS files were based on

19   System V source code.  If you turn to the second page there we

20   go into a little more detail.  Mr. Hatch in the argument later

21   this afternoon will even have even more detail on this.  He

22   points out that in 1990 or 1991 the first JFS was based on the

23   preexisting system that was derived from UNIX source code

24   licensed from AT&T, and that approximately half of those files

25   were based on UNIX System V source code.  How does he know

34

1    that?  Because if you go back into the discovery of that, they

2    have origin codes where IBM is included within AIX indicating

3    that those came from System V.

4          Now, there is a dispute as to whether or not IBM

5    created the JFS system that was contributed to Linux in a clean

6    room environment from OS2, their own operating system.

7          THE COURT:  Hang on a second.

8          MR. SINGER:  Do you need a moment?

9          THE COURT:  Go ahead, Mr. Singer.

10         MR. SINGER:  Your Honor, that is a disputed fact as

11   to whether or not it came out of OS2 because we have competent

12   expert testimony saying it came from System V.

13         In addition, we have admissions, such as an IBM

14   programmer, who said, and this is also at tab 50, that the

15   System V file system is where this stuff, referring to JFS,

16   where this originated.  It couldn't be more black and white

17   than that.

18         Mr. Davidson's declaration is also further support of

19   the fact that JFS is not some system that just was dropped into

20   AIX and had no relationship to System V and now they are

21   seeking protection over it.  It itself was derived from System

22   V.

23         At tabs 51 and 52 we have a similar analysis with

24   respect to the origins and the relationship of DYNIX RCU.

25   These are not things that were just dropped in and that were

1    extracted to give to Linux.  These were interwoven with the

2    DYNIX operating system.  DYNIX wouldn't operate without them,

3    and those were operating in a DYNIX environment, and they are

4    by every meaning of the word derivatives.

5            Now, Your Honor, I would like to go back now to the

6    legal argument and begin with the fact that there are four

7    claims.  We disagree with IBM on the issue regarding

8    sublicensing contracts.  They had no separate agreement about

9    it in their initial brief.  They said, which we agreed, that

10   they depend on the original underlying primary source code

11   agreement and, therefore, if there is a breach of the software

12   agreement, there is also a breach of the sublicensing agreement

13   for distributing material in violation of the software

14   agreement, and Section 3.03 of the sublicensing agreement makes

15   that clear.

16           Now, there are four and only four legal arguments

17   made by IBM in their summary judgment briefing, their initial

18   briefing, not their reply brief.  I will deal with those here.

19   We urge the Court to disregard all the new and additional

20   arguments put into the reply papers that were not raised in the

21   initial papers.

22           Turning to the plain language, Section 2.01 says that

23   the right being given to IBM includes the right to modify the

24   software product and to prepare derivative works based on such

25   software product provided the resulting material, which we

1    submit are the derivative works, are treated hereunder as a

2    part of the original software product.  That means treated just

3    like the System V code.

4           What does that language not say?  It does not say

5    what IBM suggests.  It does not say that IBM is free to take

6    any part of this and distribute it to whomever they wish in

7    source code form.  The contract between what IBM's position in

8    this case is, and what the agreement says, could not be clearer

9    than just contrasting the two.  In IBM's brief they say that

10   IBM owns and is free to disclose any material that Sequent

11   created so long as it does not contain UNIX System V material,

12   and, as we have seen, that is simply not what 2.01 says.

13          Section 7.06, another part of that agreement, also

14   makes it clear that the licensee has to hold all parts of the

15   software product subject to this agreement and in confidence

16   for AT&T, that it may distribute products only to third parties

17   having licenses of equivalent scope, and that the licensee may

18   obtain materials based on the software products subject to this

19   agreement from such a third party, and use such materials,

20   provided that the licensee treats such materials as if they

21   were a part of the software product.  Think about what that

22   means.  IBM is restricting itself to use materials based on a

23   software product, not the software product as they say just

24   System V, but just based on that from a third party, but can

25   only use those materials if they treat them as part of the

1     software product itself.  That is just like 2.01 suggests.

2            Now, what IBM does not spend any time on are the side

3     letter and amendment X, which clarified and modified in certain

4     respects the IBM AT&T agreement but not the Sequent agreement.

5     We have dealt with that in our briefs because those support our

6     position.  They gave ownership rights over derivative works to

7     IBM, but did not give them a release from the control rights

8     and they could not disclose the source code to others.  That

9     was clear under 706(a) which appears in the '85 letter.  These

10    are by way of tab 8 in the book.  The 1987 letter continues to

11    protect all parts of derivative works.  It indicated that a

12    third-party breach of derivative works cannot do so if it is

13    based on all or any portion of such a derivative work, which is

14    inconsistent with the position IBM takes here today.

15           In 1996 they had an amendment X which had an

16    illustration attached at 3.7, and that illustration was that if

17    company A, a sublicensee, is a general computer system

18    manufacturing system, and it said IBM may not distribute source

19    copies to that company for purposes of making modifications to

20    adapt the sublicensed product as a general operating system for

21    the company's general computer hardware system.  But yet they

22    maintain here that they can open source that to the world to

23    come up with competing operating systems.  Their position

24    simply cannot be squared with the plain language of the

25    agreement.

1          There would be no purpose for the language we saw in

2     2.01 talking about the derivative works if all that was

3     protected was the original course code.  You wouldn't need

4     that.  The source code would then have its own protection.  The

5     only sense that makes is if the derivative works, the resulting

6     work is protected.

7          Now, Your Honor, there is no factual dispute that AIX

8     and DYNIX PTX are derivative works within the meaning of

9     Section 2.01.  At tab 10 in the binder we provide the expert

10    testimony on that point, and admissions from both Sequent and

11    IBM people that these are derivative operating systems based on

12    System V.  We would submit that the combination of that plain

13    language, and the expert testimony together with the plain

14    meaning of the Sequent agreement, is why we're entitled to

15    partial summary judgment on Sequent on the ground, one, that

16    Section 2.01 means what it says, that the derivative work has

17    to protect like the original product and, two, that DYNIX is in

18    fact a derivative of System V, because that is not disputed at

19    either the expert level or the level of the admissions which we

20    have put into the record and excerpted at tab 10.

21         Your Honor, for that reason we don't believe it is

22    necessary to turn to parol evidence in this case.  There is an

23    integration clause that would even exclude doing so.  However,

24    the parol evidence is sharply disputed and it would require a

25    trial.  If one turns to tab 13, and I have already touched on

1    this subject with respect to certain declarations from the very

2    witnesses who IBM relies upon, but beyond that there are over

3    20 witnesses, 20 witnesses who are involved with AT&T and

4    Novell and Santa Cruz in the negotiations, in the

5    administration, in the enforcement of these agreements, who

6    contradict IBM's contract interpretation.

7            I don't have time to go through here now all of this

8    testimony that is in the record and excerpted at tab 14, but it

9    is directly on point.

10           Mitzi Bond, for example --

11           THE COURT:  You said 14.  Do you mean 13?

12           MR. SINGER:  It is 13 that I am referring to right

13   now, Your Honor.

14           THE COURT:  Okay.

15           MR. SINGER:  Behind tab 13, which is the chart, there

16   are excerpts from each of this witnesses and declarations or

17   depositions.

18           Just to touch on one, Mr. Guffey, who during the

19   relevant time period, '80 to '85, was the head of the software

20   services division which included UNIX, and he said I believe

21   that the members of my division and other AT&T employees

22   involved in licensing UNIX share the foregoing understanding

23   because it was a common subject in training and discussion.

24   The licensee was obligated to keep all parts of those

25   modifications and derivative works confidential, including the

1    methods and concepts embodied in those modification and

2    derivative works, just as the licensee was required to keep all

3    parts of the UNIX software product confidential.

4          If one turns to Burn Levine, who was an attorney at

5    the time involved with these agreements at AT&T, and he said

6    nothing in the agreement reduced AT&T's protection for UNIX

7    software, and that it was not limited to the disclosure of just

8    little source code.

9          Beyond those witnesses, let's turn to some of the

10    very witnesses who IBM relies upon.  If we turn to tab 16, we

11    have again Mr. Kistenberg who says exactly the opposite of what

12    IBM relies upon in connection with the testimony that you have

13    heard earlier from IBM.  If we turn to tab 17 you have Mike

14    DeFazio who was there and he supports IBM's position, but he

15    concedes that he really relied on Martin Pfeffer who was the

16    general counsel, who had primary responsibilities for

17    supervising the drafting of these agreement, and Mr. Pfeffer

18    supports our position.

19          You have at tab 18 Otis Wilson, and Mr. Wilson, as we

20    have seen, contradicted his position that he takes now, closer

21    to the time in the USL case, where he gave sworn testimony and

22    where he said anything that created an exposure to the licensed

23    software or was based on or was a derivative work had to be

24    treated in that way.

25          We have seen with respect to David Frasure, tab 19,

1    another one of the individuals up on the scene, that he

2    specifically said in the USL versus Berkeley case that the UNIX

3    source code had been instrumental in its development, and that

4    that is why it cannot be freely distributed by Berkeley.

5            Mr. Vuksanovich, the other gentleman up there at tab

6    20, says that if there is a single line of UNIX source code in

7    a modification or derivative work, then that modification or

8    derivative work has to be treated like the software product

9    that has been licensed under the agreement.  He agreed with

10   that.  So clearly this is a case where both the subsequent UNIX

11   agreement and the testimony requires a trial.

12           One final point on that, which is at tab 23.  That is

13   that there are documents from IBM that are also inconsistent

14   with what IBM maintains today.  This was an analysis of these

15   very agreements done by IBM.  We put the whole document behind

16   tab 23 for the Court to read.  This analysis was done in 1989,

17   and specifically concluded that all copies of the derivative

18   works of UNIX source code must be treated in exactly the same

19   manner as the UNIX source code as received from AT&T.  Nowhere

20   in this document is there any mention that they could extract

21   parts of the modifications and the derivatives and do with them

22   what they would.  That is something that is a position taken in

23   this litigation.

24           Your Honor, they talk about the parade of horribles

25   that will occur if this interpretation is afforded.  That is

42

1    simply not the case.  There are only two derivative works at

2    issue, AIX and DYNIX.  IBM can use that technology to market

3    product, and they can come up with their own independent

4    operating system, and their employees are not restricted in

5    their work, they simply can't open source the result of that

6    work if it is based on System V.

7          So the consequences of agreeing with our

8    interpretation is simply that our contract is upheld, we

9    receive damages, we receive an injunction against further

10   violations to prevent this head start from being dissipated and

11   being given away to Linux.  No other company that we're aware

12   of has done what IBM had tried to do, even though there have

13   been many licensees.  None of them have come in here and open

14   sourced their source code in the manner that IBM has to enhance

15   Linux.

16         Your Honor, we have put in the book as well the

17   various legal authorities as to why this interpretation is

18   reasonable.  There has been a dispute of experts between

19   Mr. Willick, who they submit, and Mr. Popono, who is a

20   professor at Harvard Business School, and at trial I think that

21   will be interesting testimony, and certainly not something that

22   the Court needs to deal with on summary judgment.

23         Now, with respect to estoppel, at tab 27 we include

24   the fact that estoppel is an issue of fact that we would submit

25   is inherently unsuited for summary judgment.  The requirements

43

1    are that there be some concealment of a material fact by us,

2    and some lack of knowledge regarding these contracts by IBM.

3    That simply is not feasible in this situation.

4          First of all, you have an integration clause which

5    said that the parties can only change the agreement by a signed

6    agreement in writing.  IBM knows that even if it were true that

7    some people told them, well, disregard this and don't believe

8    that, they knew that the only thing they could rely on was a

9    change in writing, and that is in the agreement, and that we

10   submit is why IBM went to the trouble of getting those side

11   letters in 1985 and 1987 and negotiating amendment X in 1996.

12   That is how these things are changed.

13         The case law we cite at tab 28 in our brief say that

14   that is an integral matter for an estoppel claim.  Certainly

15   there can be no concealment of material facts when what

16   allegedly is being concealed is the plain language of the

17   contract.  Now, beyond that there is no competent evidence that

18   establishes that AT&T or any of its successors told IBM or

19   Sequent that they could simply do as they wished.

20         That library shelf of books which was brought in

21   here, there is nothing shown that the specific technology that

22   is at issue in this case is disclosed there.  Many of those, we

23   would submit all of those, have copyright notices, so to the

24   extent there is information it is still protected by our

25   copyrights.  They talk generally about System V but don't

44

1    disclose the information here.  They are welcome to roll in

2    that cart we submit to the jury in this case and make that

3    argument, but that is certainly not a part of a summary

4    judgment proceeding.

5          Now, as to the witnesses who they claim say that AT&T

6    gave them these assurances to do as they wished, that is

7    sharply disputed.  Your Honor, turn to tab 30, if you would, in

8    the binder.  You see there over a dozen witnesses on those two

9    pages that flatly dispute that they or anyone they worked with

10   at AT&T or Novell or Santa Cruz ever told licensees that they

11   could disregard the plain language of those agreements.  At a

12   minimum, even if that is a legally tenable argument for

13   estoppel, it is subject to a factual dispute.

14         Your Honor, specifically, Doug Michels testified, and

15   this is at tab 31, that when there was a concern at Santa Cruz

16   that IBM announced support for Linux, he went to talk to IBM

17   and they assured Santa Cruz, which is now SCO, that they would

18   not commercially harden Linux, and that they would not

19   substantially encroach on Santa Cruz's core market, so that

20   there was nothing here we had to worry about.  Now they claim

21   that is estoppel and waiver.  I submit that there cannot be any

22   evidence of reliance because IBM gave those rights no

23   consideration at all.

24         First of all, let's look at the fact, and they talk

25   about this in connection with waiver, with the distribution of

45

1    Linux, but who was distributing what when?  When did IBM make

2    their Linux decision?  IBM decided to pursue Linux and to

3    distribute technology beginning in '98, and they started the

4    Linux Technology Center in '99, and the first disclosures were

5    at the end of '99 and into 2000.  At that time period, up to

6    May of 2001, these copyrights and contracts were owned by Santa

7    Cruz which was not in the Linux business.  Caldera, which was

8    in the Linux business, did not own them.  Caldera acquired them

9    afterwards, after they had already made this decision and gone

10   forward.

11         But beyond that, Mr. Frye, who is the very head of

12   the IBM Linux Technology Center, specifically denied that he

13   ever gave any consideration to any of these issues with SCO.

14   That is at tab 32.

15         Your Honor, in addition, at tab 34 you have

16   Mr. Sandve's e-mail from IBM, and Mr. Sandve specifically

17   states, because he was asked by one of his superiors, why can't

18   we let you look at the AIX source code?  He says it was because

19   of the 5.3 source code license, and that it would take 50 to

20   $80 million to buy it from SCO even if SCO would deal with it

21   right now.  All these assertions of estoppel and waiver are at

22   a minimum factual issues which have to be decided at trial.

23         Very briefly with respect to the issue of Novell

24   waiving our rights.

25         By the way, one last point on IBM's suggestion that

46

1      Mr. Love waived his rights and that SCO made a knowing waiver.

2      Mr. Love, who IBM did not disclose to the Court, is a paid IBM

3      consultant, he contradicted that in a subsequent declaration,

4      saying that there was never an investigation while he was the

5      C.E.O. of these property rights.  We have submitted

6      declarations, and this is at tab 40, from other members of the

7      board of directors and management directly contradicting his

8      testimony.

9            So all of these issues, and the United Linux issue

10     they raise, and it is treated in the copyright argument which

11     you'll hear later in the week, and they incorporated that in

12     their briefs and we incorporated it in our briefs, and that

13     will be later this week, and so will the issues concerning the

14     other waiver argument they made about our distribution of

15     Linux.  At a minimum there are factual issues that preclude an

16     estoppel and waiver argument.

17           I would like to talk about the issue of Novell's

18     purported waiver of SCO's rights.  This interpretation would

19     make a mockery, Your Honor, of the very asset purchase

20     agreement that was signed by the parties, where it gave the

21     whole business to SCO.  The Court will remember the argument

22     about this in the Novell case a few weeks ago, and yet they

23     maintain that they can come in here and they can prevent SCO

24     from enforcing its intellectual property rights by a contorted

25     interpretation of Section 4.16.  First of all, this issue is

1      resolved in the Novell trial.

2              Secondly, their position is simply flat wrong.  If

3      one turns to tab 43, and Your Honor has seen this section, but

4      4.16 defines the SVRX licenses for purposes of this agreement

5      under item six of the schedule.  That schedule does not list

6      these IBM agreements in item six.  It lists them as a different

7      item, item three.  That is where the software and sublicensing

8      agreements at issue here are listed.  At a minimum, there is an

9      ambiguity in that issue.

10             At tab 46 we present for the Court testimony from the

11     lead negotiators and the businesspeople on both sides of the

12     issue who agree that Novell had no ability to waive IP rights

13     with respect to the source code license at issue here.  That

14     was limited to protect their binary royalties, which were

15     bought out in 1996, and had no continuing role.  Both Chatlook

16     and Wilt, who were the negotiators for Novell and Santa Cruz

17     respectfully, and the other individuals on these pages all

18     agree, and more testimony is being developed every week in the

19     Novell case supporting this position, that they had no ability

20     to waive these rights.

21             That was made clear as well in an amendment in

22     writing to the APA.  It is amendment number two, which is at

23     tab 44.  It says that Novell has no right to increase any SVRX

24     licensee's rights to source code, and may not prevent SCO from

25     exercising its rights with respect to SVRX source code in

48

1    accordance with the agreement.

2            So their position, which may or may not be related to

3    the fact that IBM paid Novell about $50 million right at about

4    the time of this waiver, is not supported by the plain

5    language.  It is not supported by the extrinsic evidence.  It

6    is contrary to the entire purpose of the agreement.  In any

7    event, it will be resolved in the Novell trial.

8            Briefly on the statute of limitations, their final

9    argument, that breach arose from open sourcing to Linux.  That

10   is not the same thing as a patent which restricts the use to

11   IBM.  Only IBM could use it.  That would be consistent with our

12   agreement because IBM has the right to use it.  Open sourcing,

13   which is what occurred during the period when the statute of

14   limitations had not run, it occurred only a few years ago, that

15   is what gives rise to our cause of action.  IBM's patent,

16   therefore, does not begin the statute of limitations.  Their

17   cases do not support that proposition.

18           Your Honor, at tab 49 we briefly point out what the

19   Court is well aware of, the fact that you cannot raise new

20   legal arguments in a reply brief for the first time.  All of

21   these arguments that we heard at the end of Mr. Marriott's

22   presentation about this specific technology are not the four

23   arguments listed in their reply brief.  We are not charged with

24   anticipating everything they might draw from all of the factual

25   material.

49

1          So in addition to the fact that that is new, we have put

2     in testimony related to each of these technologies at tabs 50,

3     51 -- these are all in the record -- 52, which indicates that

4     there is a factual dispute at a minimum with respect to these

5     technologies issues, rather than the legal issues which they

6     base their initial legal brief on, but now presumedly they have

7     found some reason to want to raise new issues in reply.

8          Your Honor, we have established, as I mentioned earlier,

9     that our cross motion for summary judgment should be granted.

10    Their only real argument with respect to that is that you

11    should not issue partial summary judgment.  They note that the

12    courts are in disarray on that issue.  We believe that the

13    better authority is that you can and should issue such a

14    partial summary judgment.  Alternatively, under Rule 56(d)

15    you're entitled, in fact, directed to make such findings if the

16    facts are not in dispute.

17         I would like to save the balance of my time for my

18    rebuttal on the cross motion.

19              THE COURT:  Go ahead, Mr. Marriott.

20              MR. MARRIOTT:  Thank you, Your Honor.

21              First, with respect to the plain language, the

22    provision on which SCO relies, Your Honor, says simply that

23    resulting materials are to be treated hereunder like software

24    product.  Whatever precisely that means, Your Honor, the

25    categories of information that IBM is supposed here to have

1    improperly disclosed are not resulting materials.  And,

2    therefore, the limitation, whatever precisely it is, on

3    materials covered by Section 2.01 is inapplicable.

4            Again, we're talking -- Your Honor, if I may approach

5    with a chart?

6            THE COURT:  You may.

7            MR. MARRIOTT:  If this is the one item, Your Honor,

8    that you licensed as your product as I described previously

9    from SCO, and that is subject to the terms of their agreement,

10   we didn't disclose that.  Nor, Your Honor, did we disclose the

11   derivative work.  The allegation is that IBM took pieces out of

12   its own original works and used them as it wished.  Some of

13   them got put in different products.  That, they say, is a

14   violation of the agreement.

15           That disclosure reveals nothing about this, and that

16   disclosure does not compromise the entirety of the product so

17   that there would be some reason to be concerned about that.

18   Taking this out and putting it here, Your Honor, does not mean

19   that that might be a derivative work, or it might not, and you

20   have to look at that particular thing.  Is that a derivative

21   work?  Under SCO's theory you might have an obligation to limit

22   what you do.  If what you take out is not a derivative work,

23   Your Honor, then it is not subject to the provisions of 2.01 of

24   the agreement.

25           2.01, if it means anything, Your Honor, it relates to

1    precise terms, resulting materials.  The things which IBM has

2    alleged to have taken out, that are not modifications or

3    derivative works or resulting material, can't possibly have

4    been distributed in violation of Section 2.01 of the agreement.

5        Parol evidence, Your Honor.  Mr. Singer points to, as

6    I suggested he would, a long list of individuals who he says

7    have offered testimony to support SCO's case.  He pointed to

8    the testimony from Mr. Wilson who he says, for example, has

9    offered contradictory testimony in a case in 1991.  Your Honor,

10   time won't allow for a line by line recitation of that.  Let

11   me, if I may approach, with one example.

12       In 1992 in the litigation to which Mr. Singer refers

13   and to which he claims Mr. Wilson offered inconsistent

14   testimony, Mr. Wilson offered testimony that is perfectly

15   consistent with the testimony he and the other individuals who

16   negotiated the agreement in this case have given.  If you look,

17   Your Honor, at page 47, he says, quote, we did not -- we, AT&T,

18   did not want to have any rights or ownership to anything they

19   created.  And yet SCO says that while we, IBM, may own our

20   stuff, they control it.  Mr. Wilson said that in 1992 in the

21   litigation in which Mr. Singer claims he offered inconsistent

22   testimony.

23       If you turn to page 76 from that same case, Mr.

24   Wilson said, quote, the intent is what I have stated many times

25   earlier.  In other words, the intent is such that we protect

1    our intellectual property, and assert no rights in the

2    licensee's intellectual property.  Yet SCO asserts the right

3    forever to control IBM works original to it, the disclosure of

4    which couldn't possibly disclose anything owned by SCO.

5           Your Honor, the parol evidence offered by SCO is no

6    impediment to the entry of summary judgment, because the

7    individuals upon which it relies didn't negotiate and execute

8    the agreement.  Your Honor can look at those and decide if

9    there is any contradiction.  That testimony is overwhelmingly

10   in favor of IBM's construction.

11          To decline summary judgment here, Your Honor, is to

12   basically say that a reasonable jury could project the

13   testimony of the individuals who negotiated and executed the

14   agreements on behalf of IBM, and accept in its stead the

15   subjective understanding of individuals who might have been

16   employed at AT&T along with hundreds of thousands of others,

17   but who never communicated their subjective intent to IBM as

18   part of any negotiations.  Under New York law, Your Honor, that

19   testimony is not capable of altering the plain language of the

20   agreement of impeding the entry of summary judgment.

21          The reasonableness of SCO's claim -- Your Honor, if

22   that operating system, if the DYNIX operating system, if the

23   AIX operating system were a General Motors car, and if the

24   chassis of that car, Your Honor, were licensed under the

25   agreements as SCO interprets them, that SCO, Your Honor, would

1    not only control the car in its entirety, but IBM would be

2    unable to take the dice off of the mirror of the car and do

3    what it wanted with those.  It would be unable to take the

4    radio manufactured by Sony and put it in another car.  It

5    couldn't take glass manufactured by PPG and put it in another

6    car.  The design of the car could never be used in connection

7    with any other vehicle.

8            Estoppel.  The cases are clear, Your Honor, that

9    estoppel can be entered at the summary judgment phase of the

10   case.  AT&T and its successors, again, as we laid out, said

11   over the course of decades that IBM could do and other

12   licensees could do as they wished.  The mere fact that SCO has

13   produced a number of witnesses who say they never said that,

14   and they never heard that, does not make incompetent the sworn

15   testimony of the numerous people laid out in our book.

16           The fact that these books, Your Honor, some of them

17   may have a copyright notice on them does not in any way mean

18   that there wasn't the disclosures of the supposed secrets which

19   SCO claims it seeks to protect.  The integration clause to

20   which Mr. Singer refers, Your Honor, has no bearing on

21   testimony as to statements made over the course of decades that

22   followed the execution of the agreement.

23           Section 4.16B.  Mr. Singer says that IBM's

24   interpretation of 4.16B makes a mockery of the agreement.  Your

25   Honor, under that agreement Novell retained the right to 95

1    percent of the royalties with respect to the licenses.  It is

2    hardly a surprise that Novell would retain the right to waive

3    or to supplement or to change conduct that SCO might engage in

4    that could compromise Novell's interests.  Mr. Singer refers to

5    amendment number two and suggests that that somehow is

6    inconsistent.  Amendment number two, Your Honor, relates to

7    prospective buyouts.  There is no prospective buyout at issue

8    here.  There is no buyout at issue here.  IBM's rights to

9    continue to distribute AIX were already bought out.

10          United Linux.  Mr. Singer didn't to my knowledge

11    address United Linux, and it was raised in our papers, and

12    we'll discuss it on the 7th, Your Honor, in a different context

13    independent of what it means in the context of IBM's claim for

14    a declaration of non-infringement, it precludes SCO's claims

15    here.  A general public license on that is similarly deferred.

16    It has independent meaning here to which SCO has not responded.

17          As to the four categories of alleged or misused

18    information, Mr. Singer suggested that that is somehow new in

19    the reply papers, Your Honor.  I respectfully refer the Court

20    to the statement of undisputed facts in our opening papers.  It

21    is not new.  It was laid out and supported there by undisputed

22    testimony.  If it is new, Your Honor, it is curious that

23    Mr. Singer's binder would have included a set of materials that

24    supposedly refute the testimony there.

25          These specific items at issue here, about which SCO

1 seems to skirt, Your Honor, are items which when examined

2 preclude SCO's claims.  Mr. Singer refers to the RCU

3 contribution and he says it is not barred by the statute of

4 limitations because the disclosure was in a patent application,

5 and a patent application is subject to certain protections.

6 Your Honor, this case is not about misusing a patent, it is

7 about disclosure.  Whether or not a person could practice an

8 invention, which is set out in a patent, is irrelevant to

9 whether the information which supposedly is secret, and

10 supposedly had to be kept confidential, was out there

11 sufficient to start the running of the statute of limitations.

12 The claim as to RCU is barred.

13  Mr. Singer said nothing, Your Honor, as a consequence

14 about the Linux technology project contribution, except to

15 suggest that experts had dealt with it.  The expert testimony

16 on which Mr. Singer relies, Your Honor, is not only mistaken,

17 but it is testimony that Magistrate Judge Wells precluded SCO

18 from proceeding as to because it was not disclosed with

19 particularity in the final disclosures.

20  The e-mail on which SCO's expert, Mr. Rochkind,

21 relies in saying that the Linux LTP contribution was actually

22 from DYNIX is talking about a different set of LTP code than

23 that which is at issue in this case.  Mr. Rochkind's testimony

24 is unsupportive of SCO's position.

25  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Singer.

3          MR. SINGER:  Your Honor, I suppose the short answer

4     is that if DYNIX RCU does not matter, and if JFS does not

5     matter and if they are like the dice on a car, then let's take

6     them out.  Let them go into Linux and take them out.  Let them

7     go into DYNIX and AIX and take them out and see what happens to

8     those systems then.  These are interwoven, as our experts have

9     indicated, with the very operations of those systems, and those

10    systems as a whole are derivative of and they would not exist

11    but for System V.

12         Beyond that, we have shown direct links with respect

13    to JFS to System V.  I quoted Mr. Ivie's testimony and it is in

14    record.  I didn't hear Mr. Marriott say anything about it.  It

15    is interesting that JFS was said by IBM people at the time, and

16    this is in the record, to be the most important contribution to

17    Linux.

18         With respect to RCU, at tab 51 you have testimony

19    from Mr. Rochkind, an acknowledged UNIX expert, showing that it

20    is in Linux and that the DYNIX code is a derivative of System

21    V, and that RCU is interwoven.  So you can't simply take it

22    out.  By the way, he also noted in his report that Linus

23    Torvell wrote that RCU was, quote, fundamental in summarizing

24    Linux 2.543 which was the first version to have that

25    contribution from IBM.  He said the most fundamental stuff is

1    probably RCU and a program called Low Profile.

2            These are not dice hanging down on the dashboard,

3    these are integral contributions that are integral to DYNIX and

4    AIX, and they are derivative of our protected technology, and

5    now they have been wrongly disclosed.

6            The second point which has been made is that the

7    plain language does not support this, but they can't get around

8    the fact that the plain language in both that agreement and the

9    subsequent agreement never provide anywhere an invitation to

10   IBM to disclose materials that they add to these derivative

11   products that is not in someway based on these derivative

12   products.  What we have are snippets of testimony from these

13   witnesses, that I submit really depend on what they mean when

14   they are being asked about original software products or IBM's

15   derivative products, and when you focus on the precise issue,

16   as the testimony we presented here throughout, indicates that

17   they say that it was the intent of AT&T to protect that.  That

18   testimony, if you need to get to extrinsic evidence, is fully

19   admissible and at tab 14.

20           We submit that the cases from the Second Circuit,

21   saying if there is ambiguity, the Court should accept any

22   available extrinsic evidence, and that when you are dealing

23   with form agreements and how they are interpreted generally is

24   relevant, and these are form agreements, and that the course of

25   conduct under them is a strong indication of intent, aside from

1      the fact that virtually everyone up there who they call and

2      admit are involved persons have given contradictory testimony.

3              With respect to 4.16B -- well, first, with respect to

4      the issue of estoppel, the integration clause does more, Your

5      Honor, than simply say that parol evidence should be

6      considered.  This integration clause says any changes to the

7      agreement must be made in writing.  IBM knew that and they got

8      changes in writing, they just didn't give them the rights,

9      which IBM says that they have now, to do anything they wish

10     with those products, and that is why you have not heard very

11     much in this argument about those side letters or amendment X.

12             What that integration clause means is IBM cannot come

13     into court years later and say, oh, we relied on the fact that

14     someone else distributed a book that had a little bit of UNIX

15     in it or something and, therefore, we have the right to

16     disregard our contract.  Or that we heard a licensee was told

17     by someone that you could do it with a derivative product.

18     That is directly in the face of the integration clause that

19     says if you want a change, you get it signed in writing.

20     Beyond that, there is a tremendous dispute where we have a

21     dozen witnesses who were there that said those things were

22     never said to licensees.

23             With respect to the Novell waiver, I didn't hear

24     anything about the fact that 4.16B's definition of the SVRX

25     license refers only to item six and that the IBM agreements in

59

1    issue here are in item three and are expressly not covered.

2    That was made clear in amendment two.  He says, well, amendment

3    two is dealing with future buyouts.  Amendment two was entered

4    into at the same time in 1996 and IBM bought out its remaining

5    royalty obligations.  After that there was absolutely no

6    interest Novell had with respect to how IBM acted under those

7    agreements.

8           Last issue.  There are 281 fact statements they make,

9    40,000 pages of exhibits, and we are not charged with

10   responding to every legal argument in our opposition that might

11   have been made from those.  We entered with four legal

12   arguments in the initial brief.  The fact that they have not

13   extracted three new arguments about RCU, about these tests and

14   others, are not properly considered on this motion for summary

15   judgment and they were not a part of their initial papers.  And

16   because we submitted as a part of the record all of our expert

17   reports, it happens that there is a part of the expert reports

18   that contradict those, and now they are wanting the Court on

19   summary judgment to make rulings about the weight to be given

20   to those expert reports, and we think that is purely

21   inappropriate.

22          Your Honor, I heard virtually nothing about our cross

23   motion with respect to DYNIX, and there is no dispute that

24   DYNIX is, in fact, a derivative product of System V.  If the

25   Court agrees with us and the plain language of 2.01, then that

1    limited but appropriate partial summary judgment should be

2    entered.

3            Thank you very much.

4            THE COURT:  Thank you.  Thanks to you both.

5            I'll take these contract motions under advisement.  I

6    have a jury I have to deal with.  Realistically I think we're

7    looking at about 4:30 to continue with our motion.

8            We'll be in recess on this matter.

9            (Recess)

10           THE COURT:  Welcome back, everyone.  Sorry about the

11   delay.

12           We'll now take up IBM's motion for summary judgment

13   on SCO's copyright claim.

14           Are you arguing this, Mr. Marriott?

15           MR. MARRIOTT:  I am, Your Honor.

16           THE COURT:  You asked for 30 minutes each on this,

17   right?

18           MR. MARRIOTT:  That sounds familiar, Judge.

19           THE COURT:  Go ahead.

20           MR. MARRIOTT:  On the grounds that IBM breached its

21   contractual obligations, and this is IBM, Your Honor, not

22   Sequent, SCO purported to terminate IBM's license to continue

23   to use its AIX product, to distribute that product, and it

24   demanded that IBM shut down its AIX business, which over the

25   course of decades it has invested hundreds of millions of

1    dollars in.  We declined to do that and SCO amended its

2    complaint and asserted copyright infringement.  That is the

3    claim that is at issue with this motion.

4            There are five reasons why summary judgment should be

5    entered in favor of IBM on this motion.  One, SCO can't

6    identify and prove unauthorized copying by IBM.  Two, SCO can't

7    establish a predicate breach of contract.  Three, SCO cannot

8    terminate and did not properly terminate IBM's license.  Four,

9    SCO can't prove that it owns the allegedly infringed

10   copyrights.  Five, SCO has misused those alleged copyrights.

11   With Your Honor's permission I want to focus on just the first

12   three of those.  By the parties in agreement and by order of

13   the Court, the remaining two, four and five, will be addressed

14   at the hearing on May 7th.

15           With that, Your Honor, point one, SCO can't show

16   unauthorized copying by IBM.  This is summarized at tab two of

17   the book which I would like to approach and provide Your Honor.

18           THE COURT:  Sure.

19           MR. MARRIOTT:  We have a copy for counsel.

20           As you know, Your Honor, IBM repeatedly asked over

21   the course of this litigation for SCO specifically to identify

22   the allegedly misused information, and the Court repeatedly

23   ordered SCO to do that as we show at tab 3 of the book.  In a

24   December 2003 order, Magistrate Judge Wells ordered SCO to

25   identify and state with specificity, and this is at tab three,

1    the source codes that form the basis of their action against

2    IBM.

3            Magistrate Judge Wells further ordered that SCO

4    provide detailed answers to IBM's interrogatories as set out

5    and requested in the interrogatories.  She said, for example,

6    that SCO was to identify and state -- SCO was to respond fully

7    and in detail as stated in IBM's first set.  Interrogatory one

8    said identify with specificity all of the confidential or

9    priority information that plaintiff alleges or contends IBM

10   misappropriated or misused.

11           Interrogatory four, likewise, Judge, asked that SCO

12   describe in detail the date of any alleged misuse or

13   misappropriation, and the specific manner in which IBM is

14   alleged to have engaged in the misuse or misappropriation.

15   Magistrate Judge Wells reiterated that order in March of 2004,

16   and then Your Honor set interim and final deadlines for final

17   disclosures, and at this point SCO was required finally to

18   identify with specificity the allegedly misused information.

19           THE COURT:  And you say they have not done that?

20           MR. MARRIOTT:  They have not done that, Your Honor.

21           If you turn in the book to tab four, you will see

22   that in connection with our summary judgment papers, Your

23   Honor, we set out in paragraph 69 the following.  Dispute the

24   Court's orders, SCO has never described by version final line

25   of coding any material allegedly infringed by IBM's

1   post-termination AIX and DYNIX activity.  Moreover, SCO has

2   declined to provide full and detailed responses to IBM's

3   interrogatories directed at SCO's allegations of unauthorized

4   copying.

5          In response, Your Honor, SCO does not dispute that.

6   It says instead, simply, that, in effect, that it was not

7   required to do that.  The Court has since made it abundantly

8   clear in a series of orders that, in fact, SCO was required to

9   do that, Your Honor, and it has still never done that.  For

10  that reason, alone summary judgment on this claim should be

11  entered in IBM's favor.  The orders of the Court were clear

12  that neither party could proceed with respect to any material

13  that wasn't identified as directed by the Court, and SCO has

14  not done that and the claim, Your Honor, should go for that

15  reason alone.

16         Point two, SCO can't establish a predicate breach of

17  contract, as we summarize at tab seven of our book.  SCO's

18  copyright claim here, Your Honor, depends on whether it can

19  show that IBM breached one of its licensing agreements with

20  AT&T.  It is on that basis that SCO purports to terminate IBM's

21  license.  If there is no breach of contract, no predicate

22  breach, then the copyright claim fails as a matter of law.  The

23  problems with SCO's contract claims have been discussed at

24  length in the papers and in the argument, and I don't intend to

25  repeat all of those here, but --

64

1          THE COURT:  Good.

2          MR. MARRIOTT:  Your Honor will recall that I said by

3    way of footnote in connection with the past argument that I

4    would dwell in this argument on the JFS language.

5          THE COURT:  I do remember that.

6          MR. MARRIOTT:  The one of the four not addressed

7    there.

8          Your Honor, SCO's contract claim involves, as I have

9    previously indicated, four contracts.  Two of them are for IBM

10   and two for Sequent.  The Sequent contracts are irrelevant to

11   this predicate breach of contract.  The Sequent contracts were

12   about the distribution of DYNIX, not AIX.  There is absolutely

13   no evidence that IBM has continued to distribute AIX.  This is

14   all about the IBM agreements with AT&T and not the Sequent

15   agreements.

16         As I previously indicated, SCO has offered no

17   evidence and Mr. Singer did not point, Your Honor, to a shred

18   of evidence that IBM breached the sublicensing agreement.

19   SCO's entire case depends upon the IBM software agreement as it

20   relates to this purported cause of action for copyright

21   infringement.  In its final disclosures, Your Honor, the only

22   contribution identified as having been made to Linux in

23   violation of SCO's rights is the JFS contribution.  This claim

24   turns entirely on that.

25         So with that, Your Honor, let me suggest that there

65

1    are at least two reasons, and one of them has a lot of sub

2    reasons, why SCO's claims with respect to JFS fail as a matter

3    of law.  The first of those reasons, Your Honor, is that SCO's

4    allegations of breach with respect to JFS simply lack merit,

5    and the second is that the alleged breach, even if it were a

6    breach, is immaterial as a matter of law and, therefore, can't

7    substantiate the kind of breach necessary to establish a breach

8    of contract.

9          Let's take the first of those, SCO's allegations with

10    respect to JFS lack merit.  That is true, Your Honor, for at

11    least six reasons, and I am going to quickly run through those.

12          THE COURT:  They are at tab ten, right?

13          MR. MARRIOTT:  They are at tab ten, Your Honor.

14    Apparently the binder is not as difficult to follow as --

15          THE COURT:  Not if I can figure it out.  That is

16    right.

17          MR. MARRIOTT:  The first reason, Your Honor, the JFS

18    contribution did not come from AIX, it came from IBM's OS2

19    operating system.  SCO's theory depends on the proposition that

20    AIX is a derivative work of AT&T's UNIX System V software, for

21    which we don't believe there is adequate evidence in the

22    record, despite Mr. Singer's assertions to the contrary, but

23    assume that it is, Your Honor, the JFS contribution came from

24    IBM's OS2 operating system and it did not come from IBM's AIX

25    operating system.

```
 1              The undisputed evidence shows that.  If you look at
 2    tab 11, Your Honor, you will see evidence to this effect.  The
 3    individual identified by SCO as having made these supposedly
 4    improper contributions have offered their testimony, the people
 5    in the best position to know that it came from OS2 and not from
 6    IBM's AIX operating system.  SCO's claim that it came from
 7    IBM's AIX operating system, Your Honor, is mistaken for the
 8    reasons which we set out at tab 13 of our book.  It relies
 9    principally if not entirely upon the testimony of SCO's Dr.
10    Ivie, and that analysis, Your Honor, relies upon evidence that
11    was required to be put in SCO's final disclosures, and that it
12    didn't put in those final disclosures, and that Magistrate
13    Judge Wells struck at a hearing late last year, an issue in
14    which SCO has taken an appeal.
15              The only evidence they purport even to offer, Your
16    Honor, that could competently demonstrate that and they argue
17    is that of Mr. Ivie.  Mr. Ivie's testimony was untimely
18    provided and it can't support the motion.  In any event, Your
19    Honor, Mr. Ivie's testimony is not competent evidence that JFS
20    came from the AIX operating system as opposed to the OS2
21    operating system.  Dr. Ivie says that there is a similarity
22    between the JFS contribution and the JFS that is in AIX.  Well,
23    that is not a surprising similarity, Your Honor, because the
24    JFS contribution in AIX came from IBM's OS2 operating system,
25    so the similarity on which he relies for these opinions is not
```

1     a similarity that has any probative effect.  That is point one,

2     Your Honor, as to why the JFS contribution allegations fail.

3          Point two.  For this I refer Your Honor to tab 14 of

4     our book.  SCO's claim fails unless the JFS contribution was

5     resulting material.  Their entire theory depends upon, we

6     think, a distorted reading of Section 2.01 of the agreement.

7     But in any case, it depends upon the JFS contribution being

8     resulting material.  As I said in the prior argument, it is

9     not.  The undisputed evidence demonstrates that there is no

10    UNIX System V method, code or concept in that JFS contribution,

11    and that it was created independent of UNIX System V, and the

12    people who created it, Your Honor, the people who supposedly

13    made the contributions have offered testimony to that effect.

14         The only thing on which SCO relies in this connection

15    is the testimony of Mr. Ivie, which testimony again, Your

16    Honor, Magistrate Judge Wells could not properly be relied upon

17    because it was not properly disclosed in the final disclosures.

18         Point three.  As I said in the last argument, Your

19    Honor, IBM owns the JFS contribution.  There is not any dispute

20    about that.  IBM owns it.  IBM has copyrights in that

21    distribution, and SCO concedes that, as you see, at page 15 of

22    the book.  It further concedes in its opposition papers that,

23    quote, under the Copyright Act, copyright ownership consists of

24    exclusive rights to, among other things, reproduce, prepare

25    derivative works, and distribute a work.  IBM owns the

1    contributions and the notion that SCO can control it

2    effectively guts IBM's rights of ownership.  If IBM's rights of

3    ownership mean anything, Your Honor, it means that IBM has the

4    right to do what a copyright holder under the copyright laws

5    has the right to do.

6          Mr. McBride, the CEO of the SCO group, Your Honor,

7    testified in his deposition in a way that is completely

8    contrary to the proposition that SCO can control anything and

9    everything that is in the AIX operating system.  He said the

10    following, quote, I am sure there are things inside of AIX that

11    were not derived from System V or from one of our contractual

12    arrangements, that they would be free to do whatever they

13    wanted.  That appears, Your Honor, in Mr. McBride's deposition

14    which is IBM Exhibit 330, page 231, lines 18 through 23.

15          Fourth point, Your Honor.  Novell waived SCO's right

16    to terminate IBM's license pursuant to 4.16B of the asset

17    purchase agreement.  We discussed this briefly in the last

18    argument.  As we discussed there, the APA expressly gave Novell

19    the right to waive alleged breaches with respect to SVRX

20    licenses.  The only issue, Your Honor, is whether the licenses

21    in question are SVRX licenses.  There is absolutely no question

22    that they are.  Mr. Singer made reference to a schedule in

23    which he says there is some lack of reference to the IBM

24    agreements being SVRX licenses.  Let me walk you through that,

25    Your Honor, if I may.

1          If you don't have the book from the last argument, it

2    is at tab 40 of that book, and I have a copy to hand up.

3          THE COURT:  I might have it.

4          MR. MARRIOTT:  At tab 40 of that book, Your Honor, we

5    walked through why it is that the licenses in question here are

6    SVRX licenses.  Let's take that given Mr. Singer's focus on

7    that issue.  The first sentence of the asset purchase

8    agreement, 4.16A, states that SVRX licenses are those licenses

9    listed in detail under item six of Schedule 1.A hereof.  Item

10   1.A of the asset purchase agreement provides a list of the SVRX

11   licenses that related to various UNIX System V software

12   releases, including System V releases 2.0 and so on.  As well

13   as, quote, all prior UNIX system releases and versions

14   preceding UNIX System V release 2.0.

15         The supplements, Your Honor, to the IBM Sequent

16   agreements which are at issue in this motion identify the

17   licensed software product as consisting of various UNIX System

18   V releases.  Again, as I said in the last hearing, Mr. McBride

19   in a letter to the C.E.O. of Novell conceded that the licenses

20   at issue here are SVRX licenses.  In SCO's own opposition

21   papers in connection with this case acknowledge that the

22   licenses at issue are SVRX licenses.  There is, we respectfully

23   submit, no genuine issue on that question, and as a result the

24   only real argument that SCO has made in opposition with respect

25   to 4.16B falls flat.

```
 1              Fifth point, Your Honor, with respect to the JRS

 2    contribution.  SCO assigned its rights to the JFS contribution

 3    to United Linux, as is illustrated at tab 19 of the book.  We

 4    discussed this briefly in connection with the prior motion

 5    hearing, Your Honor.  But the flaws in SCO's case are

 6    particularly pronounced as they relate to the JFS contribution.

 7              Again, as a member of the United Linux initiative,

 8    SCO assigned all rights, all intellectual property rights that

 9    it had with the exception of those specifically carved out to

10    the United Linux LLC.  SCO's product -- SCO's Linux IV included

11    the JFS contribution.  The JFS contribution was not on the list

12    of exclusions and, in fact, Your Honor, the JDC itself

13    specifically refers to JFS as a part of the joint development

14    product.  And then SCO in its product announcement for its

15    United Linux product touted the product as including the JFS

16    contribution.  Any claim to the JFS contribution, Your Honor,

17    is gone pursuant to SCO's assignment of rights under the United

18    Linux agreement.

19              Sixth point.  SCO licensed the JFS contribution and

20    the GPL, the General Public License.  This is the same basic

21    point as before.  Again, the contribution was included in their

22    product, and the GPL is clear as to what it means, the license

23    in the GPL, and any claim as to that is gone.

24              Now, I said there were two points with respect to --

25    two general points with respect to JFS.  The first is that
```

1    SCO's allegations related to JFS lack merit.  That is the sixth

2    point I just listed.  There is an additional point, Your Honor.

3    That is that even if there were merit to SCO's allegations of

4    breach relating to the JFS contributions, the alleged breach is

5    material.  Assuming SCO has the right to terminate, as we'll

6    talk about in connection with my next point, it does not, but

7    assuming that it did have that right, the right to terminate

8    applies only with respect to breaches that are material

9    breaches of the agreement.

10           The IBM side letter, which Mr. Singer suggests in the

11   last argument IBM had ignored, expressly says that breaches can

12   be used as a basis for termination only if they are material

13   breaches.  In the case law, Your Honor, which we lay out at tab

14   31 of the book, indicates that breaches that are sufficient to

15   permit termination must be material breaches.  A material

16   breach is a breach that frustrates the core of the contract.

17   The cases describe it that it goes to the very purpose or the

18   root of the agreement.

19           The JFS contribution here, Your Honor, could not

20   possibly have gone to the root of an agreement between IBM and

21   AT&T in 1985 that concerned the protection of AT&T's UNIX

22   System V software.  The JFS contribution, Your Honor, again,

23   which is owned by IBM and copyrighted by IBM, represents .01

24   percent of the Linux Kernel.  There are as we show at tab 40 --

25   at tab 34 of this book, a large number of file systems, as much

72

1     as Mr. Singer suggests in the last argument that the JFS is the

2     next greatest thing to sliced bread, that there were 40 some

3     file systems in the Linux operating system, Your Honor.  The

4     JFS contribution could not possibly be considered a material

5     breach of the contract, especially when IBM owns it and when

6     there is no UNIX System V code in it, and when the protections

7     of the software agreement as between IBM and AT&T, if they

8     meant anything, were about ultimately protecting AT&T's UNIX

9     System V source code.  They have conceded there is no UNIX

10    System V -- there is no trade secret in UNIX System V.  And yet

11    the contribution of IBM's own original work could go to the

12    root of an agreement that was about protecting not IBM's

13    original works, but the UNIX System V software?  The arguments,

14    Your Honor, which SCO makes in this regard are dealt with in

15    our papers, and they are dealt with at tab 35 of the book if

16    Your Honor wishes to look at them there.

17          The third point and final point that I wish to make

18    this afternoon, is that SCO cannot establish a predicate --

19    rather cannot establish that it properly terminated IBM's

20    license.  That is true for two reasons.  The first reason, Your

21    Honor, is that IBM has pursuant to an amendment to its original

22    agreement with AT&T a perpetual and irrevocable license.  That

23    is point one.  Point two, Your Honor, is that even if under the

24    language of the original agreement the license could be

25    terminated, SCO failed to abide by the requirements for

73

1    termination.  I will talk Your Honor through those.

2              Let me take now, if I may, each of those in turn.

3    First the irrevocable and perpetual license.  Referring Your

4    Honor to tab 37 of the book, the plain language of amendment X

5    granted IBM a perpetual and irrevocable license.  Amendment X

6    says, and I quote, IBM will have the irrevocable, fully paid up

7    perpetual right to exercise all of its rights under the

8    agreement.  The meaning of the term irrevocable and perpetual

9    is no mystery.  They are clear and they are unambiguous, and

10   some of the definitions of those terms, Your Honor, appear at

11   tab 38 and tab 39 of the book, from a variety of dictionaries.

12             For example, irrevocable is defined to mean

13   impossible to retract or revoke, that which cannot be

14   abrogated, annulled, or withdrawn, not revocable, irreversible,

15   final, unmodifiable, indistinguishable, unalterable, immovable.

16             THE COURT:  I see one that says lasting for eternity.

17   Are you claiming that here?

18             MR. MARRIOTT:  I like that idea, Your Honor, lasting

19   for eternity.  A lasting irrevocable license that lasts for

20   eternity, in a sense, Your Honor.

21             Similarly, with respect to perpetual, which is

22   actually the definition for lasting for eternity, it is also

23   defined, Your Honor, as continuous, without interruption,

24   everlasting, eternal, lasting or destined to last forever.

25             Accordingly, Your Honor, on the plain language of the

1    agreement IBM has a perpetual and irrevocable license.  It does

2    not have a terminable license as SCO suggests, as is required

3    for it to have terminated IBM's license, which is the predicate

4    to this claim of breach of contract.

5         Now, the second point here, Your Honor, is that even

6    if the license were revocable, even if it were not perpetual,

7    and even if SCO could do as it purports to have done here to

8    terminate it, there are under the terms of the agreement before

9    it was amended, to give IBM an irrevocable and perpetual

10   license, requirements that have to be satisfied.  Prior to

11   being able to terminate IBM's license, SCO had to give IBM, and

12   we lay this out at tab 45, SCO had to give IBM notice, it had

13   to give IBM an opportunity to cure, and it had to exercise its

14   good faith best efforts to avoid termination.

15        As shown at tab 46, Your Honor, the case law in New

16   York which controls this agreement is clear that where there

17   are provisions of this kind, that the plaintiff must satisfy

18   the requirements to provide notice and cure and an opportunity

19   for cure and meet its duty of good faith best efforts to

20   resolve the agreement short of termination before it can in

21   fact terminate.  SCO couldn't satisfy any of those three, Your

22   Honor, and for that reason, summary judgment should be entered

23   in IBM's favor as well.

24        Let me take those each briefly.  Notice, SCO's notice

25   letter, Your Honor, which was filed with its complaint in this

1    action, which we have attached in the book at tab 48, accused

2    IBM of improperly disclosing, of misappropriating even SCO's

3    trade secrets.  Well, again, Your Honor, as I have now said at

4    least twice, SCO has conceded that there are no trade secrets

5    in UNIX System V.  It made that concession in open court after

6    it purported to terminate IBM's license.  The notice letter

7    says you misappropriated our trade secrets, stop or we're going

8    to terminate your license.

9         It then admits after it has terminated IBM's license

10    that there are no trade secrets in UNIX System V.  It withdraws

11    its claim for trade secret misappropriation.

12         Opportunity to cure.  Because it never disclosed with

13    any meaningful particularity what it was it was complaining

14    about, Your Honor, IBM was never given an opportunity to cure

15    the alleged breach.  In fact, Your Honor, if I may approach --

16         THE COURT:  You may.

17         MR. MARRIOTT:  Thank you.

18         Following SCO's letter of March 6th in which it

19    indicated that it was going to terminate IBM's license, IBM

20    sent SCO a letter and said, well, what is it that you contend

21    we did?  Please tell us what it is you claim that we need to do

22    to cure this alleged breach.  The response that we received,

23    Your Honor, from Mr. McBride, the C.E.O. of the company said,

24    quote, if you would like further written information regarding

25    IBM's past and continuing violations, we need more information

76

1   from you.  So rather than provide IBM a meaningful opportunity

2   to cure, Your Honor, we were told that before we would learn

3   anything more about what we supposedly had done, we would need

4   to tell SCO what it is that we, in fact, had done.

5          Finally, Your Honor, with respect to good faith and

6   best efforts, again, as you know, and I reluctantly repeat what

7   has been said so many times before, IBM has repeatedly asked

8   SCO in this litigation what it is that we supposedly did.  SCO

9   has repeatedly refused to provide IBM that information and,

10   instead, Your Honor, played what I think is a game of where is

11   the pea?  It has required motion after motion to figure out

12   what exactly it was that IBM supposedly did.

13          It was only after IBM filed motions to compel that we

14   finally learned something of consequence about the JFS

15   contribution, about which so much still remains a mystery.  It

16   simply cannot be, Your Honor, that SCO provided by way of its

17   notice letter, proper notice, a notice 100 days before the

18   supposed termination, that it gave IBM a reasonable opportunity

19   to cure, and that it exercised its good faith best efforts, not

20   just good faith efforts, it is good faith best efforts, and I

21   would respectfully submit that no reasonable juror could

22   conclude in this instance that SCO exercised its good faith

23   best efforts to provide IBM information sufficient to allow a

24   cure of the supposed breach.

25          In summary, Your Honor, summary judgment should be

1    entered in favor of IBM on this motion for five reasons.  The

2    three I touched upon here are that SCO can't establish

3    unauthorized copying by IBM, they can't show a predicate breach

4    of contract, and IBM's license is in any event not a terminable

5    license, and certainly not one that satisfies the conditions to

6    terminate.

7            Thank you.

8            THE COURT:  Thank you, Mr. Marriott.

9            Mr. Hatch.

10           MR. HATCH:  Thank you, Your Honor.  Good to be here.

11           Let me start with what I think is really one of the

12   more obvious ones, and it is IBM's claim that these contracts

13   are not terminable.  I think we need to know more than look at

14   the plain language of the agreement.  And, again, I didn't want

15   to disappoint, so I have a book as well.

16           THE COURT:  I am sure that you do.

17           MR. HATCH:  I just want to be clear that we

18   understand what contract we are talking about.  In 1985 the

19   parties, AT&T, its predecessor to SCO, and IBM entered into two

20   main agreements.  One is the software agreement which covers

21   how the source code itself would be handled.  The same day a

22   sublicense agreement was entered into which allowed IBM to

23   relicense certain products it had, machine readable binary

24   code, and it did not have source code in it.  The termination

25   rights that we're talking about here come from section six in

1    the source code agreement, Section 2.07 and 3.03 of the

2    sublicensing agreement.

3            Now, if you wouldn't mind turning to tab six, that

4    just shows from the software agreement, Section 6.03.  As you

5    can see there, if the licensee fails to fulfill one or more of

6    its obligations under this agreement, AT&T may upon its

7    election, in addition to other remedies it may have, at any

8    time terminate all the rights granted by it hereunder, and it

9    gives a notice provision.  Now, there are similar provisions in

10   the sublicensing agreement.

11           Now, on the same day, to make it even more complex,

12   because these were essentially form agreements, agreements that

13   had in large part been used with other parties.  We often

14   forget, and Mr. Singer alluded to it, but there are similar

15   agreements have been done with many other companies.  IBM is

16   the first one that has taken the approach that we're hearing

17   today.  So IBM wanted some concessions.  Instead of changing

18   the formal contract, they entered into a side letter that exact

19   same day.

20           The side letter modified both the software agreement

21   and the sublicensing agreement.  What is important about that

22   is when it modified the agreement, it expressly called out and

23   identified the sections in the two contracts it was modifying,

24   so it would be very clear what it was modifying.  If Your Honor

25   would turn to tab seven, this is one such section in the side

1    letter.  You'll notice here that, lo and behold, this is

2    actually a modification of the termination rights in both of

3    these two main agreements, Section 6.03 of the software

4    agreement and Section 2.07 and 3.03 of the sublicensing

5    agreement.  So the parties clearly knew and understood, and the

6    plain language was if we're going to modify it, we're going to

7    identify it so you know exactly what we're modifying.  Here

8    you'll notice that it goes to the notice and cure provision

9    that Mr. Marriott talked about, so they thought it was

10   important enough to refer that expressly and that explicitly,

11   even when it was something as minor as changing the notice from

12   60 days to 100 days.  It wasn't even a big part of the

13   contract, and yet they used that type of expressivity.

14           Now, if we go to amendment ten, which is where they

15   claim this was all modified, and if Your Honor does not mind, I

16   would like to use an actual copy of it if we can, instead of

17   the slides and the book.

18           THE COURT:  Okay.

19           MR. HATCH:  Now, this particular amendment ten came

20   to be several years later in 1996.  The purpose of it was very

21   clear.  As IBM had grown tired of trying to manage and account

22   for the royalties that were due under the underlying

23   agreements, they wanted to buy out the royalty stream and have

24   it paid all up front, paid at once.  Okay.  The first

25   underlining that you see that I have in the recitals makes it

80

1    very clear that that is what this amendment is about.  It says

2    in an effort to simplify the royalty requirements contained in

3    the related agreements, the following modifications to the

4    terms and conditions of the related agreements have been

5    mutually agreed to by the parties.  So that is putting in

6    context what is happening here.

7            Now, you'll notice, and it is very interesting here,

8    that the section in which they claim they get a non-terminable

9    right, and, one, it does not mention that word, two, it is

10   unlike the side letter where specific sections of the

11   agreement, the termination sections were agreed to, so the

12   parties know what is being modified, it just says no additional

13   royalty.  That is what was at issue here.

14           Just to juxtapose that, if you look at paragraph two

15   on the next page, you'll see that when they wanted to modify

16   2.05B and 2.05C of the sublicensee agreement they called it out

17   so everyone would know what was being modified.  Now, what was

18   being modified here wasn't a section but a schedule of

19   royalties, and they were paying them up in full.  They were

20   given an irrevocable, fully paid up perpetual right to exercise

21   rights.  So it is very clear, and that should really be the end

22   of it, is that in the plain language, this is not modifying any

23   termination rights in the contract, otherwise they would have

24   said so.

25           The plain language of that provision cannot be read

81

1    to suggest that it completely eliminated the termination

2    provisions, the material termination provisions of both the

3    software agreement and the sublicense agreement without a

4    mention of it.  This is all being read into it by IBM today.

5           Now, that should be enough, but let's look at the

6    language itself.  IBM has raised the issue that somehow

7    irrevocable and fully paid up and perpetual really mean

8    non-terminable.  Well, if you will notice here, what it really

9    does say is it does not say here that they are given an

10   irrevocable license.  They read that, and they say that in the

11   briefs, but that is not the wording here.  The wording is they

12   have been given an irrevocable and fully paid up perpetual

13   right to exercise their rights, in other words, under the

14   related agreement.  Okay.  In other words, as is set out in the

15   recitals they don't have to pay anything else.  No matter what

16   we do, we cannot require them to pay extra money.  This is

17   being paid up now, and if we decide this is a bad deal ten

18   years from now, we can't require them to start paying royalty

19   payments again or another up-front payment or anything of that

20   nature.  That is what perpetual and irrevocable means.  They do

21   not mean non-terminable.  They could have said that and they

22   didn't.

23          Now, we did one other thing, and if you look in that

24   same section, and it actually goes on to the second page, and

25   it goes on because the drafters of this agreement wanted to

1   make it very clear that they really weren't going beyond giving

2   them an irrevocable right and a perpetual right not to pay

3   royalty payments.  They wanted to make it clear that it is not

4   affecting anything else.  It says notwithstanding the above,

5   the irrevocable nature of the above rights will in no way be

6   construed to limit, and now we are talking about very broad

7   language, it is not going to limit SCO's rights to enjoin or

8   otherwise prohibit IBM from violating any of Novell's or SCO's

9   rights under this amendment ten or the related agreement.  One

10  of their rights certainly is termination, but this is broad

11  language because it is saying this contract cannot be read to

12  give you additional rights other than the ones expressly set

13  forth.  It never addressed termination.

14          Now, they say enjoin means all that you can do is

15  court action.  You can seek an injunction for court action.

16  Well, that is not what that means.  In a normal sense of the

17  words, parties when they contract with each other quite often

18  use as authority the contract language itself, and bring back,

19  especially a contract that lasts as long as one like this, to

20  the knowledge of people saying, by the way, you're doing

21  something that you ought not to be doing.  The authority that

22  is cited is the contract itself.

23          Even if that were the case, it says or otherwise

24  prohibited.  With the or being used as the alternative, and to

25  have any meaning at all, it is clearly a broad provision here

83

1    that SCO has the right, has kept all of its rights under the

2    contract and has the ability to do whatever it needs to enforce

3    those rights, including breach.

4          Now, IBM's reading would make all of that just

5    superfluous.  The parties knew that, and if we look at one

6    point in time, of course, Novell sold its rights out and the

7    technology licensing agreement to Santa Cruz, a predecessor to

8    SCO as well.  IBM objects to this because they were not a

9    party, but this was involving the same licensing agreement and

10   rights, and I have a copy at tab 11, and you'll notice there

11   that the same parties here, which were Novell and Santa Cruz,

12   that when they wanted to make something non-terminable they

13   knew how to do it.  They used that language and they said that.

14   They said it was a non-exclusive, non-terminable worldwide fee

15   license.

16         So if we look at just the plain language, what IBM is

17   asking you to do is to read things into it.  They are not

18   making a plain language argument.  They are trying to change

19   the language.

20         Now, we went to Nimmer & Dodd.  Nimmer, as you know,

21   has written a case book on copyrights, but he also with Mr.

22   Dodd did a treatise called Modern Licensing Law.  He addressed

23   this exact point.  At tab 10, the highlighted part, the license

24   contains terms that provide that it is irrevocable or

25   perpetual.  We understand these terms to mean that the license

84

1    cannot be terminated by the licensor or otherwise and except

2    for breach by the licensee.  In other words, SCO in this

3    instance can't take an act to then revoke the rights, revoke

4    the charge in the amendment that they do not have to pay any

5    more royalties, but if IBM breaches the agreement, then that is

6    totally within their control.  IBM argued in the brief that

7    this just gives SCO willy-nilly to be able to cancel any time

8    they want and ruin their investment.  That is absolutely not

9    true and they can't point to any language that allows us to do

10   that.  It is totally in IBM's control.  If you fail the terms

11   of the agreement, they go forward.  If they breach it, we have

12   our remedies.

13         Now, that being a pretty strong statement from

14   Professor Nimmer, they filed an affidavit from Professor Nimmer

15   trying to say, well, it didn't quite mean that.  Well, there

16   are a couple of problems with that.  One, not the least of

17   which is that he is giving expert opinions without any chance

18   to cross-examine, and he has also determined that apparently

19   Mr. Nimmer has represented to us that he is a paid consultant

20   of IBM and that was not disclosed when he gave the declaration.

21   I don't think he's trying to get out of the wording that he put

22   in his treatise has any application whatsoever.

23         Importantly, in their brief, and some of these

24   arguments I just don't understand, but IBM in its brief said,

25   well, we shouldn't listen to what Mr. Nimmer said in his text,

1    in his treatise that he put out for peer review and put out

2    into the world because he is just summarizing cases.  Well, our

3    view is that his book is there and it is called Modern

4    Licensing Law, and it is there to set forth industry practices,

5    and for the industry to rely on and to understand what terms

6    mean.  If he is summarizing cases, then I guess IBM is saying,

7    well, that is the law pronounced by the court, so I didn't know

8    how that helps them in any way.

9           Now, even if somehow Your Honor still said this is

10   ambiguous, okay, I think if it becomes really unclear, then it

11   is not a matter for summary judgment.  Unless the extrinsic

12   evidence is clear, which we think it is, the extrinsic evidence

13   that we have put forward is a number of people, none of whom

14   were employed by SCO, they are all people who were involved in

15   the initial transactions and negotiated it and set it forth,

16   and what was the meaning?  The fact that they don't say

17   non-terminable, can we read that in as evidence as to what they

18   intended?

19          Well, I think what is most telling of that, if you

20   turn to tab 20, is Steven Sabbath.  Mr. Sabbath was Santa

21   Cruz's vice president of law and corporate affairs.  He was

22   Santa Cruz's signatory to amendment X.  He was asked the

23   question, and he said as I said before the phrase irrevocable,

24   fully paid up and perpetual, you usually see that strung

25   together.  Commercial lawyers don't define it.  It's, you know,

86

1    like the sun and the moon.  I mean you don't have to define it.

2    We know what it is.

3          Then Mr. Marriott, who I believe was the one taking

4    this deposition, said and that is because irrevocable means

5    what it means in the ordinary sense of the term.  He said, yes,

6    it does not mean non-terminable in the event of, you know,

7    breach or default.  It just means you're getting -- you pay on

8    time, and we can't change our mind on you and terminate unless

9    you pay more.  We can't charge more.  It is perpetual.  It is

10   forever.  It is a one-time fee.  Okay.  It does not mean

11   anything more than that.

12         Kimberly Madsen, a manager, at tab 21, and she was a

13   manager in the Santa Cruz law department and was there at the

14   time, said that I did not understand amendment ten to preclude

15   termination for breach.

16         Alok Mohan at tab 23, the president and chief

17   executive officer of Santa Cruz, and a high level participant

18   in the negotiations, said that that language did not preclude

19   termination for breach.  No one else during the negotiations

20   contradicted that.

21         Doug Michels at tab 22, and he was a senior executive

22   and later the CEO, he makes it very clear that I would not have

23   agreed to the terms of amendment X if it had been explained to

24   me that way.

25         Now, IBM just raised with you a concept that I kind

1   of enjoyed.  I have to really work to be able to remember it,

2   but it is unexpressed subjective intent.  They claim that,

3   well, gee, if Santa Cruz meant something else they should have

4   told us.  Well, the people who are trying to read a word in

5   here that is not there, it is not SCO, it is IBM.  If anybody

6   had an unexpressed subjective intent it was them, because if

7   they meant that language to mean something different than what

8   it means by its plain language, and what Nimmer meant and what

9   he understood and what businesspeople understood, and they

10  never raised it in these meetings, as indicated by Mr. Michels

11  and others there, then that is unexpressed subjective intent.

12  They are putting new words in and trying to give words

13  different meanings.

14        Now, even Novell's people have the same thing.  When

15  Mr. Singer went through Mr. Bouffard's testimony, and at tab 19

16  is what he said, and he was the other side of that from Novell,

17  he said it was not my view that Santa Cruz was precluded from

18  terminating UNIX source code.  He said the otherwise language

19  includes terminating IBM UNIX license agreement for IBM's

20  actual breaches.  We have plain language and we have authority

21  and we have law and we have extrinsic evidence, all of which

22  point directly to the fact that IBM is trying to read into this

23  contract things that don't exist there.

24        Now, I think we cover pretty well in our brief the

25  arguments Mr. Marriott raised on notice and opportunity to

88

1    cure.  I am not sure how serious an argument that can really

2    be.  I will just say this:  What they forget is that there were

3    a number of meetings, a number of meetings prior to the letter

4    giving notice of potential termination if they did not cure.

5    What basically happened in those meetings, and what I want to

6    show you is kind of how, in a bit, how that started, but if you

7    turn to tab 69, in January of 2003 this is how IBM starts this.

8    In large part SCO starts to became aware of what IBM is up to.

9         At Linux World New York, which is, as I understand

10   it, the world's largest trade show for Linux, the largest

11   conference, Mr. Steven Mills, who was a senior executive at

12   IBM, indicated, and this is from the Computer Reseller News,

13   but in this deposition he confirmed that he said these things.

14   He said IBM will exploit -- that is an interesting choice of

15   words -- exploit its expertise in AIX to bring Linux up to par

16   with UNIX.

17        Then further down he says our deep experience with

18   AIX and its 250-member open source development team -- well, we

19   have found out in discovery that 250-member team are the people

20   who got the UNIX source code and were under the obligations of

21   confidentiality, and they got SCO's copyrighted works and now

22   they are changing.  They are taking all that knowledge and they

23   are now considered their 250-man open source development team,

24   and he says the road to get there is well understood.  Well,

25   they have a great jump-start.  Then he ends it by saying that

1    what their goal is is to obliterate UNIX.

2           Well, they now say, well, gee, if you had just given

3    us a better notice and an opportunity to cure, maybe we could

4    have gone through these things, but through several meetings

5    prior to the filing of the complaint and giving the notice

6    letter, Mr. McBride and others had met with senior people at

7    Novell, and they were basically told, and a lot of this is out

8    of Mr. McBride's affidavit and other places in the record and

9    in our briefs, that if SCO goes forward, we're going to talk to

10   your partners and we're going to destroy your business.  As a

11   matter of fact, Karen Smith, an IBM vice president, went to HP

12   and attempted to get them to withdraw support.  That is going

13   to be the subject of another motion that I think we're hearing

14   Monday.  That is the tone of it.

15          The thing that is kind of important to note is that

16   the notice and opportunity to cure we're supposed to give them

17   is not that we won't file suit because we gave them that.  But

18   in every instance they said to us, in essence, it is futile,

19   we're fixed, it is unequivocal, we know what we're going to do.

20   It does not matter.  We followed the letter of the law and we

21   gave them the letter and gave them 100 days' notice.  They knew

22   what it was about.

23          Here is what they said.  Instead of trying to

24   negotiate with us and to try and cure it -- as a matter of

25   fact, at one point they said we can't meet with you now.  We

```
 1    will meet with you in three months.  At tab 77 this is what
 2    their response was.  This is an IBM press release from the 16th
 3    of June of 2003.  In the second paragraph it says from the
 4    outset, it does not say we just came up with this, from the
 5    outset IBM's position on this lawsuit has been unequivocal.
 6    IBM's licenses are irrevocable and perpetual and fully paid up
 7    and cannot be terminated.  IBM will defend itself vigorously.
 8    The matter will be resolved in the normal legal process.  In
 9    other words, they are now saying there is nothing to negotiate.
10    There is nothing to talk about.  The dispute is fixed as of
11    that moment.
12            In the next paragraph, and this comes up a little
13    later, you'll remember that Mr. Marriott indicated that, well,
14    we didn't know it was about AIX.  Here it is in June, their
15    notice, their press release to the world says IBM will continue
16    to ship, support and develop AIX.  They knew that is what the
17    issue was from day one.  Now they are saying we never disclosed
18    and they didn't know.  That is just simply not true.
19            Let me move quickly to JFS.  Mr. Marriott talked at
20    length about that.  IBM claims that JFS came from OS2.  They
21    gave you a graph.  I would like you to look at the one that we
22    prepared as well from our expert report.  It is at tab 49.
23    Using IBM documents that were produced in discovery, and this
24    is probably the best graphic --
25            THE COURT:  Go ahead.
```

91

1          MR. SINGER:  -- depiction that I can give you, the

2     file system that we're talking about began in UNIX System V.

3     It was owned by AT&T the predecessor of SCO.  IBM licensed that

4     initially and put it in AIX version two back in the early

5     nineties.  Eventually IBM modified and improved the AIX

6     system's version 3.1, and as derivative works, and Mr. Singer

7     has talked about it, used the file system to create a journal

8     file system.

9          We know from, and they say we have no evidence, but

10    if you go to the very next tab, and since time is short I will

11    just do a few of these things, but we know where these things

12    came from.  Your Honor, they say we have not produced anything.

13    Even if we exclude the things that Judge Wells excluded, which

14    we disagree with, and this is just disclosure number one, we

15    made 294 disclosures of taken material and misused materials

16    that are still in this case.  The things I'm pulling from here

17    would be from just this first disclosure.  It is a pile that is

18    about this big.

19         Mr. Baker, who was an IBM executive, in his

20    deposition said would it surprise you -- because they say this

21    came from OS2.  On the chart we are not even to there yet.

22    Would it surprise you if half of the C files in JFS 3.1 have

23    the original code three and are therefore based in part on UNIX

24    source code licensed from AT&T?  The answer, no, it wouldn't

25    surprise me.  Then if you go down to the bottom quote, it says,

1    so it appears as though JFS two, and if you look at the chart

2    that is what was in OS2.  It is their derivative work that

3    originally starts from System V and comes through its

4    improvements and through to the end, and it says it appears

5    that JFS continued to have and continued to include files that

6    were based upon, at least in part, AT&T's UNIX source code,

7    right?  Answer, it appears to be that way.  Well, why does he

8    say that, Your Honor?  Well, if we go to disclosure one, and we

9    look at the files, and if you look at tab 37, and here it is

10   just talking about JFS, there were identified to be 62 C files

11   in JFS.  You'll see that the top 30 came from AT&T.  How do we

12   know that?  Well, the comments, I believe it is from CMVC that

13   the programmers wrote, they state the origin.  The origin says

14   origin three.  All 30 of these, almost half of our entire JFS

15   originated from AT&T.

16          Now, we just heard IBM say it came solely from OS2.

17   That is because they want to write out the prior history.  They

18   want to draw a line in history and don't look in front of it.

19          Your Honor, I will give you this.  This is an extra

20   copy.  What I'm reading from is from tab nine of the first

21   disclosure.

22          From Mr. Baker's testimony that we just read, you'll

23   notice -- let's see.  Mr. Baker is talking about some of this

24   stuff, and you'll remember that at tab 44 Mr. Baker identified

25   that his user ID was 905.  The question was asked, if your

1    using ID was 905 for the CMVC, and that is where the

2    programmers recorded their notes, would you agree that this --

3    he is referring to the exhibit at tab 45 -- is a comment you

4    made into the CMVC at that time?  Answer, yes.

5          Now, this is just one example of many from an IBM

6    programmer.  You'll see Exhibit 887 and it is an e-mail from

7    Baker, and from CMC where he is making comments, and 905 is his

8    number, and what he is saying here is making a comment to the

9    people in his division.  The same is true in the System V file

10   system where this stuff originates.  He does not say OS2.  The

11   only way it could be OS2 is if you drew a line and forgot all

12   the previous stuff and where it started.

13         As we go down that list, over half, according to the

14   testimony of just Mr. Baker who was an IBM employee, over half

15   of JFS as it ended up in Linux came from and originated from

16   the source code here that they were not allowed to give away by

17   contract.

18         Now, Your Honor, if you thumb through this book

19   you'll see, and there are numerous pages, and I have put a

20   bunch of them at tabs 38 through 42 or so, but you'll see here

21   there is a lot of red.  They say we don't disclose anything.

22   These are all disclosures where it is either verbatim or near

23   verbatim.  The AIX, that we just learned from IBM's own mouth

24   is derived from the System V code, is being taken almost

25   wholesale and put into Linux.  They say there is nothing.  That

94

1    is just simply not the case.

2             Now, I think the last point is Mr. Marriott

3    indicated, well, it is not material.  This JFS stuff just does

4    not matter.

5             If I can approach?

6             THE COURT:  Yes.

7             MR. HATCH:  This is an internal IBM e-mail.  If you

8    look on the fourth page, and now they are saying that JFS is

9    .01 percent, and I think during the contract argument I heard

10   him call it just the fuzzy dice on the dash of a car.  Well,

11   let's see what they say when they are not talking to the Court.

12   Let's look and see what they are talking about when they are

13   trying to develop a product and make money.

14            On the third page of this, it says we, IBM, would

15   like to make JFS available to the open source community for

16   several reasons.  I have highlighted the number one reason, a

17   lack of a journal file system on the Linux platform was chosen

18   as the number one deficiency by the Linux community.  That does

19   not sound immaterial to me.  It sounds a lot more than fuzzy

20   dice.

21            There are several instances where I disagree with Mr.

22   Marriott.  I think he misquoted Mr. McBride.  He quoted Mr.

23   McBride for the proposition that he said that they could do

24   whatever they wanted with their code, and I think, just like we

25   saw earlier today with the clips, not everything was read.  Mr.

95

1    McBride's actual testimony was the exact opposite of that.  He

2    said my view of that is that IBM is free to contribute anything

3    they owned to Linux, and that is about as far as IBM went

4    today, except they didn't read the rest of it, except as it

5    relates to either source code that we own or a derivative of

6    that code.  So he is saying exactly what we are saying here,

7    and they're trying so cite and smear Mr. McBride as saying

8    something totally opposite to what is in the case.

9            Your Honor, I think based on that, there clearly is

10   no basis for IBM to get summary judgment granted here and I

11   submit it.

12           Thank you.

13           THE COURT:  Thank you.

14           Mr. Marriott.

15           MR. MARRIOTT:  Thank you, Your Honor.

16           Mr. Hatch said a number of things, Your Honor, which

17   I think simply are not factually correct.  I would point the

18   Court to the papers for that other than take too much time

19   here.

20           THE COURT:  He went overtime so if you want to you

21   can, too.

22           MR. MARRIOTT:  I appreciate that, Your Honor.

23           Contrary to what Mr. Hatch suggests, there are not

24   294 items of allegedly misused information in this case.  There

25   is only one of them, the first item in their final disclosures

1   that is in any way relevant to this motion.  That is the JFS

2   contribution.  The reference to the 294 is, at a minimum,

3   grossly overstated.

4           Mr. Hatch suggests that I misrepresented the

5   testimony of Mr. McBride.  I gave Your Honor a cite and I urge

6   you to look at the cite for yourself.  There is nothing

7   misrepresented about it.  Mr. McBride said that he is sure that

8   there are things in AIX which IBM could properly contribute to

9   Linux.

10          If that is true, Your Honor, and I think Mr. McBride

11   is right, if that is true it is completely inconsistent with

12   their theory of the case, that once you touch something they

13   call it a modification and a derivative work and it is forever

14   controlled by them and IBM can't without their permission

15   disclose it.

16          Mr. Hatch suggested that IBM conceded -- apparently I

17   conceded at the last argument that AIX is a derivative work of

18   AT&T's UNIX System V.  I didn't concede that, Your Honor.  The

19   evidence in the record does not demonstrate that.

20          Let me come to the points, if I may, Your Honor, that

21   were raised in my opening arguments and those to which Mr.

22   Hatch responded and did not respond.  I began, Your Honor, by

23   pointing out that SCO had failed entirely to comply with the

24   Court's order to identify with specificity what it is

25   specifically that represents the infringing material here,

97

1    because of IBM's continued distribution of AIX.  You heard not

2    a word from Mr. Hatch on that.  It is not there.  Because of

3    the Court's orders the claim should be dismissed for that

4    reason alone.

5            With respect to the JFS contribution, Your Honor, I

6    offered two reasons -- six reasons why the JFS allegation lacks

7    merit and one reason as to immateriality.  Mr. Hatch, so far as

8    I could tell, addressed one, Your Honor, of the six arguments

9    as to JFS.  As to that argument he pointed the Court to the

10   testimony principally of SCO's expert Mr. Ivie, who has offered

11   testimony to be sure that JFS comes from the AIX operating

12   system.  The testimony on which they rely was struck by

13   Magistrate Judge Wells.

14           In any event, Your Honor, it is simply incorrect.  If

15   you look at the witnesses who would have personal knowledge to

16   speak to this, people who actually were involved with the

17   contribution, whose testimony is set out in our book, they say

18   in unequivocal terms that it was from the OS2 operating system,

19   not from the AIX operating system.

20           Immateriality, Your Honor.  Mr. Hatch suggests that

21   the alleged breach here is somehow a material breach because

22   there is an internal IBM e-mail from some person saying it

23   looks like the Linux community thinks there is a need for a

24   journal file system.  That does not say anything about whether

25   the specific contribution here was a material breach of the

1   agreement.  The fact that someone might like a certain

2   technology in Linux is entirely a separate question from

3   whether the supposedly improper contribution here was a

4   material breach of the agreement.

5          Again, as we say in our opening papers, Your Honor,

6   there are 40 plus file systems in the Linux operating system.

7   The JFS contribution represented less than .01 percent.  It

8   cannot be, Your Honor, that that represents a material breach

9   when it is owned by IBM and reveals nothing of SCO's code.

10          With respect, Your Honor, to amendment X and the

11   perpetual and irrevocable license, Mr. Hatch suggests that IBM

12   seeks to rewrite the provision of that agreement.  He began his

13   presentation with respect to references to the history of the

14   negotiations.  I would respectfully submit that that

15   description, Your Honor, was riddled with errors and

16   inaccuracies, and I would simply point the Court to the papers

17   and to the sworn testimony of the people who were actually

18   involved in the discussions as to what the purpose of that

19   licensing agreement was, and why it was IBM sought what it

20   sought, and why it was given.  Mr. Hatch focused on the

21   language in the agreement that concerns a fully paid up

22   royalty.  That suggests that amendment X was only about fully

23   paid up royalties.  I would point the Court to the agreement,

24   which you can read for yourself, and see that it was about a

25   heck of a lot more than a fully paid up royalty.

99

```
 1            It is not IBM, Your Honor, that seeks to read
 2    anything into the agreement.  On the contrary, it is SCO that
 3    seeks to read out of the agreement the words perpetual and
 4    irrevocable.  The notion that IBM's license is terminable here
 5    is absolutely at odds with the idea that it has a perpetual and
 6    irrevocable license.  You cannot have a license that is
 7    perpetual and irrevocable and at the same time terminable.
 8    That makes no sense, Your Honor.  It would strain the simple
 9    meaning of the words perpetual and irrevocable beyond
10    recognition.
11            Mr. Hatch points to an excerpt from a treatise from
12    Professor Nimmer and suggests that somehow that is indicative
13    of what the plain meaning of the agreement is.  It is not, Your
14    Honor.  It is not parol evidence here and, in any event, as
15    Mr. Nimmer says in his declaration, the citation is a citation
16    that is misplaced.  Whatever it is, it is not capable of
17    altering the plain and simple language of this agreement.
18            Parol evidence, Your Honor.  The Court need not and,
19    indeed, should not even reach parol evidence on this motion.
20    The language of this is clear.  If you do, however, I would
21    respectfully submit that the only parol evidence that matters
22    is that which was communicated.  That is what New York law
23    provides, Your Honor.  While Mr. Hatch referred to testimony
24    and viewpoints of certain people from Santa Cruz, they didn't
25    negotiate this agreement with IBM.  The agreement was
```

100

1    negotiated between Novell and IBM and between Novell and Santa

2    Cruz.  The Sabbath testimony to which Mr. Hatch refers was

3    never communicated to IBM.  The record does not reflect that it

4    was.

5            Finally, Your Honor, with respect to notice and cure

6    and good faith, I think the record is as set out in the papers

7    and speaks for itself.  A complaint was filed accusing IBM of

8    the misappropriation of trade secrets.  After the termination

9    of the agreement, SCO concedes there are no trade secrets in

10   UNIX System V.  This Court in connection with one of IBM's

11   summary judgment motions, year after the filing of this case,

12   maybe not years, but almost two years after the filing of this

13   case, expressed astonishment at the idea that despite the

14   public assertions of SCO, there had been no production of

15   evidence to support its allegations.  The idea that IBM knew

16   before the filing of the suit, which is what Mr. Hatch

17   suggested, precisely what it is we supposedly did here, and how

18   it is we were to cure it, simply is not supported by the

19   record.

20           Summary judgment should be entered in favor of IBM,

21   Your Honor.

22           Thank you.

23           THE COURT:  Mr. Hatch, briefly.

24           MR. HATCH:  I will keep it brief this time.

25           Your Honor, it is kind of interesting, and I'll make

1    just a couple quick points.  He is now saying that we should

2    read out all of the Santa Cruz people.  What relevance do they

3    have?  Well, if you look at the agreement, it is because they

4    are a party and a signatory.  Mr. Sabbath is a signatory for

5    Santa Cruz right here.  IBM is so desperate here that they want

6    to say you shouldn't even listen to anything that he has to say

7    because he is not relevant.  Well, he was sure relevant to the

8    agreement at the time they signed it.

9            Mr. Marriott has also thrown up, and I think he did

10   in the contract case as well, a real red herring here.  They

11   say what SCO is trying to do is control.  You can't control

12   what we did.  Well, what controls them is not SCO, it is their

13   contractual obligations.  They made a deal that said if you'll

14   give us source code, we'll keep it confidential.  If we develop

15   something with that source code, we will keep the drive source

16   code confidential as well.  That was their choice.  The

17   contract did that, not SCO.

18           Now, if they have got a big picture, and Mr. Marriott

19   is really correct that it is just the fuzzy dice on the

20   dashboard, then take them, the fuzzy dice off the dashboard.

21   They won't do that.  They say, well, it is not material.  This

22   JFS stuff is not important, but they won't take it out.  They

23   knew, as the internal memo we gave you specifically said that,

24   that it was the -- I can't read this note.

25           THE COURT:  You're going to have a hard time

102

1    commenting on it until you can read it.

2           MR. HATCH:  The book that I gave you and this item

3    one, the thick disclosure --

4           THE COURT:  Right.

5           MR. HATCH:  Mr. Marriott kind of alluded to that, and

6    I don't know what he was talking about, but he alluded to Judge

7    Wells striking Ivie and striking things.  Striking stuff from

8    IBM.  That has never been struck.  I don't know what he is

9    talking about there.

10          They want to get away from all of that verbatim

11   copying that we have shown from AIX and Linux, but that hasn't

12   been struck and it is there and that is in the case.  There are

13   294 disclosures that are like that that are in the case.  Some

14   are relevant to other points, I agree with that, but if there

15   is one, just one that I showed you, that in and of itself

16   creates enough of a fact issue for us to go forward.  Dr. Ivie

17   talked about it and it is there and it has not been stricken.

18   IBM did not even move to have it stricken.  I leave you with

19   that.

20          One quick point.  He brought United Linux and I

21   forgot to address that.  That is real interesting and that is

22   really kind of almost a little too cute for this case.  What he

23   fails to tell you with United Linux, is he is saying there is a

24   waiver argument there, but what he falls to tell you is that

25   SCO entered into agreements with other people to build

103

1    something on the existing Linux Kernel.  In other words, they

2    were going to put things in and then give it to the open source

3    community.  Then he said when you put it in, it was all waived.

4    Well, he says this and his brief is very, very ambiguous on

5    this, and so I think it is important for Your Honor to

6    understand this, because they say it in a way that makes it

7    sound like the stuff that SCO put in on top of that Kernel to

8    build a new product is what we waived.

9             What was waived, of course, was the whole thing, but

10   what they don't tell you is unbeknownst, and to be fair there

11   are comments either way, but the JFS system was put into the

12   Kernel and SCO was unaware of that.  That was put in there by

13   IBM.  That is essentially saying IBM can take something in

14   violation of the contract and plug it into a document, and if

15   SCO does not find it out and it uses that and puts it in, that

16   somehow it was waived something.  Waiver requires knowledge and

17   that is not here.  At the very least it is hotly disputed.  I

18   think they were somewhat disingenuous on that as well.

19            Thank you, Your Honor.

20            THE COURT:  Thank you.

21            Well, not surprisingly I will take these motions

22   under advisement and look forward to seeing all or most of you

23   again on Monday at 2:30.

24            Thank you.

25            We'll be in recess.

104

1                MR. SINGER:  Thank you, Your Honor.

2                MR. MARRIOTT:  Thank you, Your Honor.

3                (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25