**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**January 2, 2018**

**FOR THE TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

THE SCO GROUP, INC., a Delaware
corporation,

      Plaintiff Counterclaim Defendant -
      Appellant,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

      Defendant Counterclaimant -
      Appellee.

No. 16-4040
(D.C. No. 2:03-CV-00294-DN)
(D. Utah)

---

**ORDER**

---

Before **KELLY**, **EBEL**, and **BACHARACH**, Circuit Judges.

---

    This matter is before the court on appellee International Business

Machines Corporation's *Petition for Panel Rehearing and Request for*

*Rehearing En Banc.* We also have a response from the appellant.

    Upon consideration, that part of the petition seeking panel rehearing is granted in

part and only to the limited extent of the changes made to the attached revised Opinion.

The request for panel rehearing is otherwise denied. The clerk is directed to file the

amended decision attached to this order effective today's date.

The *Petition* and the response were also circulated to all the judges of the court who are in regular active service and who are not recused.  *See* Fed. R. App. P. 35(a).  As no judge on the original panel or the en banc court requested that a poll be called the request for en banc rehearing is denied.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**January 2, 2018**

**FOR THE TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

THE SCO GROUP, INC.,

      Plaintiff Counterclaim Defendant -
      Appellant,

v.                                                         No. 16-4040

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

      Defendant Counterclaimant -
      Appellee.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:03-CV-00294-DN)**

_____

Edward Normand, Boies, Schiller & Flexner LLP, Armonk, New York (Jason C.
Cyrulnik, Boies, Schiller & Flexner LLP, Armonk, New York, Stuart H. Singer, Boies,
Schiller, & Flexner LLP, Fort Lauderdale, Florida, Brent O. Hatch and Mark F. James,
Hatch, James & Dodge P.C., Salt Lake City, Utah, with him on the briefs), for Plaintiff
Counterclaim Defendant-Appellant.

David Marriott, Cravath, Swaine & Moore LLP, New York, New York (Evan R. Chesler,
Cravath, Swaine & Moore LLP, New York, New York, Amy F. Sorenson and Amber M.
Mettler, Snell & Wilmer L.L.P., Salt Lake City, Utah, with him on the briefs), for
Defendant Counterclaimant-Appellee.

_____

Before **KELLY**, **EBEL**, and **BACHARACH**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

This case arises out of a business deal gone wrong.  The Santa Cruz Operation, Inc. (Santa Cruz) entered into a business arrangement with International Business Machines Corp. (IBM) to develop a new operating system that would run on a more advanced processor manufactured by Intel Corporation (Intel).  The parties signed an agreement memorializing this collaborative effort and called it Project Monterey.  Another technology company, The SCO Group, Inc. (SCO), then acquired Santa Cruz's intellectual property assets and now brings this lawsuit for IBM's alleged misconduct during and immediately after Project Monterey.

Project Monterey involved mutual contributions by IBM and Santa Cruz of proprietary materials, including computer code for their respective operating systems.  SCO believes that IBM merely pretended to go along with the arrangement in order to gain access to Santa Cruz's coveted source code.  SCO, the successor-in-interest to Santa Cruz's intellectual property assets, accused IBM of stealing and improperly using this source code to strengthen its own operating system, thereby committing the tort of unfair competition by means of misappropriation.  The district court awarded summary judgment to IBM on this claim based on the independent tort doctrine, which bars a separate tort action where there is no violation of a duty independent of a party's contractual obligations.

SCO also accused IBM of disclosing Santa Cruz's proprietary materials to the computer programming community for inclusion in an open-source operating system called Linux.  When SCO acquired Santa Cruz's assets involved in Project Monterey and then sought licensing agreements from various technology companies, IBM allegedly

instructed SCO's business affiliates and investors to cut ties with SCO.  These alleged efforts to disrupt SCO's business relationships, together with the purportedly improper Linux disclosures, prompted SCO also to file suit against IBM for tortious interference of contract and business relations.  In a separate order, finding insufficient evidence of actionable interference by IBM, the district court granted summary judgment in favor of IBM on these tortious interference claims.

Finally, after the deadline for amended pleadings in this case, SCO sought leave to add a new claim for copyright infringement based on the allegedly stolen source code from Project Monterey.  SCO claimed it had only discovered the essential facts to support this claim in IBM's most recent discovery disclosures.  The district court rejected SCO's proposed amendment for failure to show good cause.

SCO now appeals all three decisions by the district court: (1) the summary judgment order on the misappropriation claim; (2) the separate summary judgment order on the tortious interference claims, and (3) the denial of leave to amend the complaint. We REVERSE and REMAND the district court's summary judgment order on the misappropriation claim, and AFFIRM as to the remaining issues.

## I.   BACKGROUND

### A. <u>UNIX Operating System and Intel Processors</u>

UNIX is a computer software operating system that is widely used in the business or "enterprise" computing environment.[1]  In the late 1960s, AT&T Technologies developed UNIX and began licensing it for widespread enterprise use, and those licensees in turn developed and distributed their own variations of the UNIX platform. One of those distributors, Santa Cruz, created a UNIX variation which eventually dominated the market for UNIX-based operating systems running on Intel processors.

During the 1980s, most other companies were running their UNIX variations on more expensive non-Intel architectures.  Santa Cruz, however, recognized early on that transistors were getting smaller over time, so Intel's cheaper processors were becoming faster and thus more capable of handling the demands of high-power enterprise computing.  Santa Cruz predicted that Intel's less-expensive processors would soon be able to run the UNIX operating system more effectively than earlier iterations of the hardware. By 1998, Intel processors had become as capable as the more expensive alternatives, and Santa Cruz had ultimately become the worldwide market leader for UNIX-on-Intel with 80 percent share of the market.

In contrast to Santa Cruz, IBM had almost no presence in the UNIX-on-Intel market.  Instead, IBM distributed its own UNIX derivative called AIX, which was designed to operate on IBM's own proprietary Power processors.  The product was thus

---

[1] An operating system serves as the link between the computer hardware and the various software programs or applications that run on the computer.

suitably known as AIX for Power.  Recognizing that Santa Cruz had positioned itself as the market leader for UNIX-based systems on the increasingly desirable Intel architecture, IBM began considering the benefits of collaborating with Santa Cruz. Further, IBM knew that Santa Cruz's operating system was based on a more advanced version of the UNIX operating system: UnixWare System V Release 4 (SVr4).  IBM's own AIX platform was based on an earlier and less advanced code, so the opportunity to work with SCO and gain access to the SVr4 code may have been appealing.  Santa Cruz, for its part, also appreciated the advantages of working with IBM, which was a larger company with more resources, retail relationships, and marketing outlets.  So the stage was set for a mutually beneficial cooperative venture.

### B. Project Monterey and the Joint Development Agreement

Before IBM and SCO began working together, most processors (including Intel's chips) operated only at a 32-bit capacity, but in 1994, Intel announced its intention to develop a higher-capacity 64-bit chip called Itanium.  Anticipating Intel's forthcoming Itanium architecture, Santa Cruz and IBM jointly endeavored to build a new UNIX-based operating system that would run on the faster processor.  In October 1998, Santa Cruz and IBM entered into a Joint Development Agreement (JDA) that would govern the mechanics of their collaboration, including licenses, royalties, and project management responsibilities.  This endeavor became known as Project Monterey.

As part of the JDA, each party granted the other a limited license to its own respective technologies for the purpose of developing the IA-64 Product.

After signing the JDA, the parties entered into a Project Supplement that provided: "The

Licensed Materials . . . are to be used *solely* for development of the IA-64 Product."

Aplt. App. 884 (emphasis added). According to SCO, this provision imposed a default

rule that IBM could not use SCO's contributed materials in its own AIX for Power. That

Supplement, however, also included a caveat: "Notwithstanding [that limitation], any

such Licensed Material *included in the IA-64 Product Release 1* shall be licensed

pursuant to the terms and conditions set forth in the [JDA]." Aplt. App. 884 (emphasis

added). In other words, any SCO materials that ultimately found their way into the "IA-

64 Product Release 1" would be licensed to IBM pursuant to the JDA, which in turn

granted IBM a "worldwide, non-exclusive, royalty free" right of use, Aplt. App. 3085,

JDA § 2(d)(2). Under these provisions, IBM would have known that if it wanted to use

SCO's materials in AIX for Power, there must be a "IA-64 Product Release 1" containing

those materials.

SCO further points out that a product release is only regarded as the "IA-64

Product Release 1" if the product is made *generally available*. This requirement is based

on Amendment 5 to the JDA, which provided that if IBM wanted to distribute a "Pre-

Release IA-64 Product" for testing purposes, that pre-release sublicense would terminate

at least by the date of "general availability of the IA-64 Product Release 1." Aplt. App.

5157. Otherwise stated, any distribution of the Monterey system before the product

became *generally available* was regarded merely as a "Pre-Release IA-64 Product," *not*

the actual "IA-64 Product Release 1" itself. Thus, to the extent that IBM wanted a

"worldwide, non-exclusive, royalty free" license to the coveted SVr4 code, it needed to

6

wait until there was a generally available release of the IA-64 Product which included that code.[2]

## C. IBM Transitions Focus from Project Monterey to the Linux Operating System

The success of Project Monterey hinged on the forthcoming availability of Intel's 64-bit Itanium chip.  But Intel was behind schedule in developing and delivering Itanium to market.  Intel announced a target date of 1999, but was substantially delayed, and continued to have development difficulties throughout 1999 and 2000.  These delays caused a decrease in market interest in the IA-64 Product under construction through Project Monterey.

The slump in market interest for the IA-64 Product caused IBM to transition its focus to a competing open-source operating system called Linux.[3]  At the time, Linux occupied the lower end of the computing market as it was designed for lower-capacity desktop computing.  But IBM began to strengthen the Linux platform so that Linux could compete in the enterprise market, which was the focus of Project Monterey's forthcoming UNIX-based product.

---

[2] IBM does not appear to dispute this interpretation.  Moreover, SCO offered evidence that IBM shared this understanding during the course of Project Monterey. For example, an internal IBM memo indicated that IBM believed withdrawal from Project Monterey would mean forfeiting access to Santa Cruz's SVr4 code.  See Aplt. App. 9059-60.

[3] Unlike other UNIX-based systems, Linux is distributed without a fee to users, and the programming code is publicly available to all who want to access or customize it.

7

As part of its contributions to Linux, as early as February 2000, IBM began

disclosing some of Santa Cruz's proprietary UNIX technologies—acquired through

Project Monterey—to the Linux community for the purpose of fortifying Linux as a

commercially viable option for enterprise use.  The evidence suggests that "SCO's

revenues decline[d] precipitously in 2000 through 2002, dropping 74%, immediately after

the first alleged contributions of IBM in February of 2000."  Aplt. App. 7384.  SCO's

sales dropped as customers migrated to Linux, which has been referred to as a "free

UNIX clone."  Aplt. App. 7389.  Because of these declining revenues, SCO relies on

IBM's Linux disclosures as part of the basis for its tortious-interference claim.

IBM's general support for Linux, however, was no secret.  As early as March

1999, IBM publicly announced its support of Linux at a LinuxWorld conference.  But

scaling up Linux to compete in the enterprise market posed a potential conflict with

Project Monterey.  To assuage concerns, IBM began re-assuring the public and Santa

Cruz that Linux and the IA-64 Product would compete in *different* markets, so there was

no conflict.  For example, in August 1999, IBM officers explained publicly that the

Monterey IA-64 Product would target enterprise-level computing needs while Linux was

designed for the smaller-scale computing market.  IBM made similar representations in a

private meeting with Santa Cruz officers in January 2000.  But at least one IBM

executive recognized that such a distinction was fragile:

> The distinction used to position Monterey versus Linux is that
> Monterey is targetted [sic] for high-end servers, where as
> Linux comes in at the lower to mid range of servers.
> However, *this distinction is a fragile one, since IBM is*

> *working as fast as it can to bolster Linux's ability to compete*
> *in the mid to high end range of servers.*

Aplt. App. 5693 (emphasis added).  Construing the evidence in SCO's favor, it may be

that IBM led Santa Cruz to believe its Linux product would not compete against

enterprise-level developers—but IBM was actually working quickly, and without Santa

Cruz's knowledge, to scale up Linux to compete in the enterprise space.  Meanwhile,

IBM maintained that it was fully committed to Project Monterey.  It reaffirmed that

commitment in the January 2000 meeting and, as late as December 2000, IBM stated

publicly that its devotion to the success of the IA-64 Product remained strong.

But a jury could find that IBM's heart was not in Project Monterey.  Throughout

late 1999 and early 2000, IBM executives began recommending "internally that IBM take

more definitive steps to drop Project Monterey and transition even more support to

[Linux]."  Aplt. App. 9591, Dist. Ct. Op. at 24.  In July 2000, another IBM internal report

recommended a "significant reduction in emphasis" in Project Monterey.  Aplt. App.

6202.  Further, IBM's effort to bolster Linux as a potential competitor in the enterprise

space could indicate to a jury that IBM was not fully committed to the success of Project

Monterey, despite its public assurances to the contrary.

### D.  IBM's Alleged Misappropriation of Santa Cruz's Code

In October 2000, IBM used some of the SVr4 code in a *test version* of its own

AIX for Power product, which was intended for certified software developers and "not

intended for general production use."  Aplt. App. 8610.  This appears to have been a

preparatory step in anticipation of later releasing an upgraded AIX for Power product for

general distribution.  But again, IBM would need to make generally available the

Monterey operating system including the SVr4 code before IBM would acquire the

royalty-free license for general distribution of that code in its own products.

With that in mind, IBM announced in April 2001 a forthcoming IA-64 Product,

which included the SVr4 code, and planned to make it available on May 4, 2001.  As

scheduled, IBM released a version of the Monterey operating system on May 4, 2001 as a

Programming Request for Price Quote (PRPQ), which is the term used internally at IBM

to describe beta test releases.  This release lacked what is known as a compiler, which in

this case refers to a software program that translates programming code into a language

readable by the computer processor.  Without a compiler, an operating system cannot be

executed by the processing hardware, but it does not seem that IBM had a confirmed plan

to include a compiler in the product.  Moreover, this Monterey release was offered free of

charge and without support, was not on IBM's price lists, and was not marketed.  In light

of these characteristics, a reasonable jury could find that this PRPQ version was not a

*generally available* release of the product and thus did not entitle IBM to a royalty-free

license to the SVr4 code included therein.[4]

---

[4] One internal e-mail from an IBM executive defending the PRPQ release cuts in the
other direction, explaining that IBM had "a very positive product to deliver" that was
"not under-function for this target delivery" and was "stable and worth release."
Aplt. App. 5167.  But this is a disputed issue of material fact.  On summary judgment
we adopt the version of the facts most favorable to SCO, which suggests that IBM's
May 4, 2001 PRPQ of the Monterey product was not equivalent to a generally
available release.

Moreover, the evidence suggests that IBM was conscious of the inadequacies of this May 4, 2001 release of the Monterey product. For example, an IBM project manager stated in an internal e-mail: "I think the compiler MUST be available in some form or the whole thing just doesn't make sense (*ie* [*Santa Cruz*] *won't buy it*)." Aplt. App. 5194 (italicized emphasis added). And another internal IBM strategy document explained that there was "no confirmed compiler plan" and that IBM would "[c]ontinue to ship AIX 5L as a PRPQ" which would be in "[s]tealth mode only."[5] Aplt. App. 5170. That document also indicated that IBM would "[a]t the appropriate time announce plan not to GA AIX 5L and withdraw the PRPQ" sometime during the "July/August timeframe."[6] Id. What is more, one piece of evidence suggests that IBM appears to have known that the May 4, 2001 PRPQ version might not have been sufficient to acquire the SVr4 license. In one internal e-mail, an IBM employee stated: "As you know, we need to GA this PRPQ to gain rights to [Santa Cruz] code we want for our base AIX product delivery . . . I know the fine lines we are walking here." Aplt. App. 5167.

Nevertheless, despite the deficiencies in the May 4, 2001 release of the Monterey operating system and despite IBM's apparent knowledge of the problem, that very same day IBM released for general distribution a version of its own proprietary AIX for Power product that included the SVr4 code. SCO thus argues that IBM released a "sham"

---

[5] The reference to "AIX 5L" appears to be IBM's shorthand for the product released for operation on Intel's IA-64 processor.

[6] We assume the acronym "GA" to be a reference to "general availability" of the IA-64 Product.

version of the Monterey system in order to legitimize its own general distribution of the AIX for Power product containing Santa Cruz's SVr4 code.  (Aplt. Br. 2, 13.)  This is the essence of SCO's misappropriation claim.[7]


E.  **Santa Cruz Transfers Assets to Caldera International**

Santa Cruz owned a license to use, develop, and distribute its UNIX-based technology.[8]  During the life of Project Monterey, however, Santa Cruz decided to sell its UNIX business to SCO.[9]  In mid-June 2000, Santa Cruz sent IBM an official notice of the

---

[7] SCO's initial claim of misappropriation was based not on the allegedly stolen SVr4 code, but rather on the improper Linux disclosures discussed earlier.  SCO says it discovered the SVr4 code in the AIX for Power product late in the discovery process after filing this lawsuit, which is why the current misappropriation theory differs from the original theory.  IBM does not appear to dispute, however, that a party can change its theory for a particular existing cause of action as new evidence comes to light during the discovery process.  Moreover, the language of SCO's operative complaint encompasses this revised theory.  The cause of action is labeled "unfair competition" and it is based, in part, on "[m]isappropriation of source code, methods, and confidential information of plaintiff," as well as "[u]se of deceptive means and practices in dealing with plaintiff with respect to its software development efforts[.]" Aplt. App. 156.

[8] A company called Novell, Inc. (Novell) purchased the UNIX assets and intellectual property rights from AT&T (the original developer) in 1993, and later sold its UNIX business to Santa Cruz in 1995.  As described in two earlier decisions of this Court, Santa Cruz did *not* receive the full panoply of intellectual property rights in that 1995 transaction, but rather received only a license to use, develop, and distribute Novell's copyrighted UNIX technologies.  See SCO Group, Inc., v. Novell, Inc., 439 F. App'x 688, 691-93 (10th Cir. 2011) (unpublished); SCO Group, Inc. v. Novell, Inc., 578 F.3d 1201, 1204-06 (10th Cir. 2009).

[9] At the time of this transaction, plaintiff SCO went by the name Caldera International.  For consistency and convenience, we use the SCO label to describe plaintiff even at the time that it acquired Santa Cruz's intellectual property rights.

forthcoming asset transfer to SCO.[10]  Hearing no formal objection from IBM, Santa Cruz

followed through with the agreement and, on May 7, 2001, finalized the deal with SCO.

On June 6, 2001, Santa Cruz informed IBM of the consummation of the sale and the

assignment of the rights under the JDA.  IBM then responded on June 19, 2001, formally

objecting to the assignment and officially terminating the JDA, thereby putting a formal

end to Project Monterey.


### F.  IBM's Alleged Direct Interference With SCO's Business Relationships

In late 2002 and early 2003, SCO began investigating the intellectual property

within Linux and discovered that Linux customers were using SCO's proprietary UNIX

technologies.  SCO then devised a licensing strategy whereby Linux users would

purchase from SCO a license to use Linux, as enhanced by SCO's proprietary

technologies.  SCO presented this licensing plan to multiple partners, including Oracle,

Intel, and Computer Associates, all of which responded favorably.  IBM, on the other

hand, objected to the proposed strategy.

IBM asked SCO not to issue its press release announcing and initiating the

licensing plan.  Nevertheless, in January 2003, SCO announced a new business division,

SCOsource, to manage the licensing of its UNIX technologies for Linux customers.  The

---

[10] The JDA governing Project Monterey required Santa Cruz to give IBM notice if
Santa Cruz received an offer by another company to purchase substantially all of
Santa Cruz's assets.  Aplt. App. 3109, JDA § 16.1.  This requirement was apparently
designed to give IBM a reasonable period of time to submit a counteroffer.  Id., JDA
§ 16.2.

13

next day, IBM executive Karen Smith told SCO's CEO Darl McBride that she expected

SCO's approach to "kill Linux."  Aplt. App. 4095.  She further threatened:

> [I]f [SCO] did not drop [its] library licensing program and
> [its] investigation of Linux and withdraw [its] press
> release . . . , that IBM was going [to] cut off all business from
> [SCO] and they were going to encourage partners and
> customers from doing any business with SCO as well.

Id. at 4095.  SCO did not back down.  That afternoon, Smith met with Hewlett-Packard

executive Richard Becker.  According to Becker's deposition,

> [Smith] indicated to [him] that IBM was going to withdraw
> all their business activities from SCO, and that in the interest
> of the best outcome for [IBM's and Hewlett-Packard's] joint
> Linux initiatives that she was going to suggest that HP, and
> [he] was representing HP, and following [him], Intel should
> do the same.

Aplt. App. 2352.

SCO believes that, in addition to Hewlett-Packard, IBM directly communicated

with other SCO business affiliates and investors in an effort to persuade those entities to

refrain from doing business with SCO.  Those entities included Oracle, Computer

Associates, Intel, and Baystar.  SCO presented evidence that, after SCO began

implementing its licensing strategy, these entities began withdrawing or reducing their

business dealings with SCO.  IBM responded, however, with sworn declarations by

executives representing each entity indicating that, to the best of their knowledge, IBM

never approached them about cutting ties with SCO and that any change in business

dealings with SCO was not the result of IBM's statements or actions.  Nevertheless, SCO

asserts that IBM directly interfered with SCO's business relationships by inducing SCO's key investors and affiliates to cease doing business with SCO.

### G. **Procedural Background**

We are now almost fifteen years into this litigation. SCO filed the initial Complaint on March 6, 2003, which included nine claims against IBM.[11] After twice amending its Complaint, SCO sought leave to amend a third time in October 2004, after the deadline for amended pleadings, for the purpose of adding a tenth cause of action for copyright infringement based on IBM's alleged misuse of the SVr4 code. The district court denied that motion, finding insufficient cause to permit the untimely addition of the claim. The case then proceeded but was administratively closed in 2007 after SCO filed for bankruptcy.

Alongside its suit against IBM, SCO also filed suit against another company called Novell, which had publicly claimed that it, rather than SCO, owned the UNIX copyrights. Novell entered into an asset purchase agreement with Santa Cruz in 1995 wherein Novell transferred a license to the UNIX technology to Santa Cruz. Santa Cruz believed that it had received through this asset transfer the UNIX copyrights, and thus the right to license

---

[11] Counts 1 through 4 alleged breaches of the original software and sublicensing agreements between IBM and AT&T (the original UNIX developer), and between Sequent Computer Systems, Inc. (which was later acquired by IBM) and AT&T. Count 5 alleged copyright infringement based on SCO's later-disproven belief that it owned the UNIX copyrights. Count 6 alleged unfair competition by means of, in part, misappropriation. Count 7 alleged tortious interference of SCO's contracts with Linux users and licensees. Count 8 alleged tortious interference of SCO's asset purchase agreement with Novell executed in 1995. Count 9 alleged tortious interference of SCO's specific business relationships.

all derivations and variations of the UNIX system.  That belief, however, ended up being wrong.  In 2011, this Court affirmed a jury verdict that found Santa Cruz did not, in fact, receive the UNIX copyrights in that deal, rather it merely received a license to use, develop, and distribute the UNIX technology.  See SCO Group, Inc. v. Novell, Inc., 439 F. App'x 688 (10th Cir. 2011) (outlining this background).

When the bankruptcy stay was lifted in this case, the district court here re-opened the case in 2013.  Because the Novell litigation had established that SCO did not own the copyrights to the UNIX technologies, SCO voluntarily dismissed many of its claims against IBM that were predicated upon that faulty assumption.  All that remained of SCO's case against IBM were allegations that IBM (1) committed unfair competition by means of misappropriation, and (2) tortiously interfered with SCO's business relationships.[12]  On February 5, 2016, the district court awarded summary judgment to IBM on the misappropriation claim.  In a separate order, on February 8, 2016, the district court also awarded IBM summary judgment on the tortious interference claims.

SCO brings three issues to this Court for appeal: (1) the district court's summary judgment order on the misappropriation claim; (2) the district court's separate summary judgment order on the tortious interference claims; and (3) the district court's denial of leave for SCO to add a claim for copyright infringement after the deadline for amended pleadings.  We address these issues in turn.

---

[12] Count 6 encompassed the misappropriation claim; Counts 7 and 9 represented the remaining claims for tortious interference.

## II.   DISCUSSION

### A. <u>Misappropriation</u>

#### 1.   *Applicable Law*

The parties could not agree on which State's law governs SCO's misappropriation claim.  Instead they have stipulated that either the laws of Utah or New York should control, believing there are no material differences in the relevant legal principles.  The district court similarly relied on both Utah and New York law to ground its analysis of this claim.  We cannot, however, analyze this claim without first deciding which State's law should govern.

The JDA provides: "This Agreement shall be governed by, and the legal relations between the parties hereto shall be determined in accordance with, the substantive laws of the State of New York."  Aplt. App. 3112, JDA § 22.3.  Whether SCO's claim ultimately sounds in contract or tort, this provision mandates that "the legal relations between the parties" be adjudicated pursuant to New York law.  <u>Id.</u>  That phrase is sufficiently broad to encompass a claim by one party of unfair competition based on misappropriation.[13] Thus, we rely on New York substantive law to resolve the propriety of summary judgment on SCO's misappropriation claim.

New York courts recognize "two theories of common-law unfair competition: palming off and misappropriation."  <u>ITC Ltd. v. Punchgini, Inc.</u>, 880 N.E.2d 852, 858

---

[13] Moreover, the parties' consensus that the laws of New York and Utah are materially the same on this issue further confirms that our application of New York law should be acceptable to the parties.

(N.Y. 2007).  The gravamen of SCO's claim is misappropriation, which "concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property."  Sidney Frank Importing Co., Inc. v. Beam Inc., 998 F. Supp. 2d 193, 208-9 (S.D.N.Y. 2014) (internal quotation marks omitted) (interpreting New York law); accord Punchgini, 880 N.E.2d at 859.  "To state a claim for the misappropriation theory of unfair competition, a plaintiff must allege that the defendant: (1) misappropriated the plaintiff's labors, skills, expenditures, or goodwill; and (2) displayed some element of bad faith in doing so."  Sidney Frank Importing, 998 F. Supp. 2d at 209 (internal quotation marks, citations omitted).  "In this context, bad faith can be established by a showing of fraud, deception, or an abuse of a fiduciary or confidential relationship."  Schroeder v. Pinterest Inc., 17 N.Y.S.3d 678, 693 (N.Y. App. Div. 2015) (internal citations omitted).

Tracking these requirements, SCO claims that IBM (a) misappropriated the SVr4 code for its own commercial advantage and (b) exhibited bad faith in doing so by pretending to support Project Monterey and releasing a sham version of the IA-64 Product in order to legitimize its use of SCO's code.

## 2.  *Independent Tort Doctrine*

The district court granted IBM's motion for summary judgment after concluding that the "independent tort doctrine" precluded the misappropriation claim.  The independent tort doctrine provides that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."

18

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987).  This separate duty must "spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."  Id. at 194.

When the plaintiff is "essentially seeking enforcement of the bargain," rather than a societal policy or law that gives rise to a duty of care, "the action should proceed under a contract theory."  Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1369 (N.Y. 1992); see also Abacus Fed. Savings Bank v. ADT Sec. Servs., Inc., 967 N.E.2d 666 (N.Y. 2012) (finding no separate liability in tort when the gravamen of the claim was the defendant's failure to make good on its promise to offer functional security services that would prevent a bank burglary).  However, when the defendant has a duty "separate and apart from its contract obligations," then an action in tort will lie.  N.Y. Univ. v. Continental Ins. Co., 662 N.E.2d 763, 768 (N.Y. 1995) (finding no separate liability in tort when the breach of an insurance policy also violated New York statutory insurance law because "the provisions of the Insurance Law are properly viewed as measures regulating the insurer's performance of its contractual obligations, . . . not as a legislative imposition of a separate duty of reasonable care").

For this analysis, we focus not on the *conduct* which might constitute a breach of contract, but instead on the defendant's *duties*.  As an intermediate New York appellate court helpfully explained:

> [T]he focus is not . . . on whether the tortious *conduct* is
> separate and distinct from the defendants' breach of
> contractual duties, for it has long been recognized that

> liability in tort may arise from and be inextricably intertwined
> with that conduct which also constitutes a breach of
> contractual obligations.  Rather, the focus is on whether a
> *noncontractual duty* was violated; a *duty imposed on*
> *individuals as a matter of social policy*, as opposed to those
> imposed consensually as a matter of contractual agreement.

Apple Records, Inc. v. Capitol Records, Inc., 529 N.Y.S.2d 279, 281-82 (N.Y. App. Div.

1988) (emphasis added) (internal citations omitted).   With this in mind, we turn to the

misappropriation claim here.  The district court held that the independent tort doctrine

barred SCO's claim, but in doing so the district court focused too narrowly on IBM's

allegedly wrongful conduct, observing that the same conduct would constitute both

an unfair-competition claim and a breach of the JDA.  But that analysis misses the

point.  What matters is not whether IBM's "use of the code" violated the contract, but

rather whether IBM violated some separate and independent non-contractual duty in

using that code.

    To be sure, the district court devoted some attention to this question, but it

restricted its inquiry to whether there existed a *fiduciary* relationship between the

parties, i.e., a joint venture or partnership, giving rise to a *heightened* duty of care.

The JDA clearly provides that "[t]his Agreement shall not be construed to establish

any form of partnership, agency, franchise or joint venture of any kind between SCO

and IBM, . . [nor] to provide for any sharing of profits or losses between the parties."

Aplt. App. 3113, JDA § 22.5.  So the district court correctly concluded that the

parties were dealing with each other at arms' length and had no fiduciary or

heightened duty toward one another.

But New York does not appear to require a heightened duty incident to a partnership or fiduciary relationship as a predicate to an unfair competition claim— any common-law or statutory duty will suffice.  As the Apple Records court explained, the relevant duties for purposes of the Independent Tort Doctrine are not "exclusive to relationships of trust and confidence, but may also arise from special extraneous circumstances and from the 'legal duty which is due from every man to his fellow, to respect his rights of property and refrain from invading them by force *or fraud*.'"  529 N.Y.S.2d at 282 (emphasis added) (quoting Rich v. N.Y. Central & Hudson River R.R. Co., 87 N.Y. 382, 397 (1882)).  For example, in Sidney Frank Importing Co., Inc. v. Beam Inc., 998 F. Supp. 2d at 210, a federal court applying New York law permitted a whiskey distributor to bring a misappropriation claim against its supplier even though the supply contract addressed the wrongful conduct, and there was no specially recognized relationship between those two entities other than the fact that they did business together.  In another case, Cargill, Inc. v. Sears Petroleum & Transport Corp., 388 F. Supp. 2d 37, 65 (S.D.N.Y. 2005) (interpreting New York law), a misappropriation claim survived alongside a breach-of-contract claim when the breached agreement specifically governed the use of confidentially shared information between the parties, and the parties had not formalized any joint venture between themselves.

Similarly, in this case, while IBM and SCO may not have had a formal partnership or joint venture as a matter of law, they surely enjoyed a business relationship in which each reposed a degree of trust and confidence in the other.

21

Regardless, as a matter of "social policy," see Apple Records, Inc., 529 N.Y.S.2d at 281-82, each had a common-law duty—as all persons and entities do—not to engage in fraudulent or deceptive practices, see Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 178 (2011) (recognizing the New York common law tort of fraudulent misrepresentation).   While the alleged fraud or deceit may emerge from the business relationship structured and defined by the parties' contract, the duty each owes the other not to engage in fraud or deceit exists separate and apart from the JDA.

At the summary judgment stage, it is IBM's burden to show "that there is no genuine dispute as to any material fact[,]" and we are required to draw "all reasonable inferences in the light most favorable to" SCO.   See Ellis v. J.R.'s Country Stores, Inc., 779 F.3d 1184, 1191–92 (10th Cir. 2015) (internal citations and quotations omitted).   In light of IBM's burden, we believe a reasonable jury could find here that regardless of whether IBM performed to the letter of the JDA, IBM nonetheless "misappropriated [SCO's] labor, skills, expenditures or good will" through "fraud [or] deception," see Schroeder, 17 N.Y.S.3d at 693; see also Graubard Mollen Dannett & Horowitz v. Moskovitz, 86 N,Y.2d 112, 112 (1995) (holding that fraud claim could survive summary judgment because "a false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties").   Accordingly, the district court's order cannot be affirmed on this ground.

3.   _Standing as Assignee of Santa Cruz's Claim_

IBM offers alternative reasons to affirm the summary judgment order.  It first contends that SCO lacks standing to pursue its misappropriation claim.  SCO was not a party to the JDA, rather it was the successor-in-interest to Santa Cruz's intellectual property rights.  In 2000, Santa Cruz assigned to SCO all of its "right, title and interest" in the UNIX technologies, Aplt. App. 5311, including the "rights and privileges pertaining to" the intellectual property, id. at 5312, and all "rights to enforce confidentiality or similar obligations" in relation to the transferred assets, id.  The JDA, however, contained a provision limiting Santa Cruz's assignment power:  "[n]either party may assign, or otherwise transfer, its rights . . . under this Agreement without the prior written consent of the other party."  Aplt. App. 3114, JDA § 22.12.  Because IBM never gave its prior written consent to Santa Cruz's assignment, it argues that SCO did not validly acquire any right from Santa Cruz to sue for misappropriation.

This argument falls flat for two reasons.  First, under New York law, a non-assignment provision that merely prohibits assignment—and does not expressly declare that such assignments _are void or invalid_—merely entitles the aggrieved party to damages.  See Sullivan v. Int'l Fidelity Ins. Co., 465 N.Y.S.2d 235, 237-38 (N.Y. App. Div. 1983) (citing cases).  Without such a clear and express statement of invalidity of assignments included in the contract, the assignment survives and the assignee can enforce the transferred rights against the third party.  Id.  In this case, the JDA merely prohibits assignment without consent—it does not state that nonconsensual assignments are void.

23

Second, and more importantly, the non-assignment provision here specifically forbids the transference of rights "under this Agreement."  Aplt. App. 3114, JDA § 22.12.  We have already held that SCO's lawsuit is not to vindicate rights under the JDA itself, but is instead to vindicate a tort arising from a duty separate and apart from that contract.  Accordingly, even if this non-assignment provision operated to invalidate nonconsensual contractual assignments, the assignment of rights at issue here is outside the scope of that provision.  SCO therefore has standing to bring its misappropriation claim against IBM as an assignee of Santa Cruz's rights.[14]

### 4. *Limitations Period*

IBM next contends that SCO's misappropriation claim is untimely under the contractual limitations period.  The JDA provided: "Any legal or other action related to a breach of this Agreement must be commenced no later than *two (2) years* from the date of the breach . . . ."  Aplt. App. 3113, JDA § 22.3 (emphasis added).  At the outset, SCO objects to the application of this provision to its tort claim which, as earlier discussed, is separate from the contract.  We may assume, without deciding, that the contractual language applies not only to breach-of-contract claims, but also to "[a]ny legal or other action *related to* a breach" of the JDA.  Id. (emphasis added).  Even as a separate tort action, there is no question that SCO's misappropriation claim

---

[14] IBM cites one unpublished federal case, <u>TeeVee Toons, Inc. v. Gerhard Schubert GmbH</u>, No. 00 Civ. 5189, 2006 WL 2463537 (S.D.N.Y. Aug. 23, 2006), for the proposition that a non-party to a contract lacks standing to sue on the contract.  But <u>TeeVee Toons</u> is materially different from the case before us: it did not involve any assignment or transfer of rights to a third party.

is "related to" a breach of the JDA because the JDA expressly deals with the use of SCO's licensed materials.  We thus apply the two-year limitations period to SCO's misappropriation claim, which SCO initially filed on March 6, 2003.

Nevertheless, SCO complied with the contractual limitations period because it filed suit less than two years after its claim accrued.  Under New York law, "[a] tort claim accrues as soon as the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint[.]"  IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 273 (N.Y. 2009) (internal quotation marks, citation omitted).  Recall that the elements of a misappropriation claim are that the defendant "(1) misappropriated the plaintiff's labors, skills, expenditures, or good will[,] and (2) displayed some element of bad faith in doing so."  Sidney Frank Importing, 998 F. Supp. 2d at 209.

SCO's misappropriation theory is predicated on the improper inclusion of the SVr4 code in IBM's AIX for Power product.[15]  That claim accrued when IBM released the AIX for Power operating system containing the SVr4 code on May 4, 2001, which was less than two years before SCO filed its complaint. This release was allegedly undertaken in bad faith because IBM attempted to legitimize its distribution

---

[15] SCO's initial theory of misappropriation was based on IBM's alleged disclosure of confidential materials, acquired through Project Monterey, to the Linux community in order to make Linux competitive in the enterprise computing market.  However, SCO specifically asserts that it only learned of IBM's improper use of the SVr4 code during discovery in this case, at which point its theory shifted to focus on the improper use of that code, rather than the Linux disclosures.

of the SVr4-enhanced AIX product based on a "sham" release of the Monterey

operating system made available on a limited basis that very same day. (Aplt. Br. 13.)

Thus, May 4, 2001, is the date upon which "all elements of the tort [could] be

truthfully alleged in a complaint" against IBM.  IDT Corp., 907 N.E.2d at 273

(internal quotation marks omitted).

To be sure, IBM included the SVr4 code in a beta test version of AIX for

Power in October 2000, but there was nothing improper about that because IBM was

expected to take preparatory steps toward eventually releasing a functional and

publicly available version of its AIX for Power product containing the SVr4 code.

SCO's claim therefore did not accrue at that time.  IBM counters that SCO instructed

its own expert to calculate damages for the misappropriation claim beginning on

October 1, 2000.  But we decline to assign that fact any significance, as SCO cannot

unilaterally change the claim accrual date any more than IBM can change it—and

were SCO to prevail at trial on this claim, a factfinder could certainly disagree with

SCO's damages calculations.  Accordingly, SCO's claim for misappropriation based

on improper use of the SVr4 code in the AIX for Power product accrued on May 4,

2001, well within the contractual limitations period.


### 5. *Copyright Preemption*

IBM argues that SCO's misappropriation claim is preempted by federal

copyright law.  Section 301 of the federal Copyright Act provides: "[A]ll legal or

equitable rights that are equivalent to any of the exclusive rights within the general

scope of copyright . . . and come within the subject matter of copyright . . . are

governed exclusively by" federal copyright law.  17 U.S.C. § 301(a).  In other words,

the Copyright Act "preempts a state common law or statutory claim if: (1) the work is

within the scope of the subject matter of copyright . . . ; and (2) the rights granted

under state law are equivalent to any exclusive rights within the scope of federal

copyright . . . ."  Harold Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533,

1542-43 (10th Cir. 1996) (internal quotation marks, citations omitted).  The parties

do not dispute that the SVr4 code at issue here is copyrightable subject matter, see

Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 533 (6th Cir.

2004), so we proceed on that assumption.  The real battleground is whether SCO's

misappropriation claim is "equivalent" to any of the exclusive rights granted by

federal copyright law.  17 U.S.C. § 301(a).

Section 301 "preempts only those state law rights that may be abridged by an

act which, in and of itself, would infringe one of the exclusive rights provided by

federal copyright law."  Harolds Stores, 82 F.3d at 1543 (quoting Computer Assocs.

Int'l v. Altai, Inc. 982 F.2d 693, 716 (2d Cir. 1992)).  Those exclusive rights include

the rights to reproduce the work, prepare derivative works, distribute copies, and

perform or display the work publicly.  See 17 U.S.C. § 106; see also Harolds Stores,

82 F.3d at 1543.  Accordingly, "if a state cause of action requires an *extra element*,

beyond mere copying, preparation of derivative works, performance, distribution or

display, then the state cause of action is qualitatively different from, and not

subsumed within, a copyright infringement claim and federal law will not preempt

the state action." <u>Gates Rubber Co. v. Bando Chemical Indus., Ltd.</u>, 9 F.3d 823, 847

(10th Cir. 1993) (emphasis added).  The dispositive question, then, is whether a

misappropriation claim under New York law has an "extra element" beyond the

elements of a federal copyright infringement claim.  We hold that it does.

Misappropriation claims in New York require the victim to demonstrate that

the defendant acted with *bad faith*.  <u>See, e.g.</u>, <u>Schroeder</u>, 17 N.Y.S.3d at 693; <u>Abe's

Rooms, Inc. v. Space Hunters, Inc.</u>, 833 N.Y.S.2d 138, 140 (N.Y. App. Div. 2007);

<u>Saratoga Vichy Spring Co., Inc. v. Lehman</u>, 625 F.2d 1037, 1044 (2d Cir. 1980)

(observing that the "element of bad faith" is central to the misappropriation theory of

unfair competition under New York law); <u>see also</u> 104 N.Y. Jur. 2d <u>Trade Regulation</u>

§ 248 (Aug. 2017) ("The gravamen, or essence, of unfair competition under New

York law is the bad faith misappropriation" of another's property (footnotes

omitted)).  As we discuss above, in this context "bad faith" is not simply a scienter

requirement, which would be insufficient to provide the requisite extra element to

avoid preemption by the Copyright Act.  See <u>Computer Assocs. Intern., Inc.</u>, 982

F.2d at 717 (holding that an action "will not be saved from preemption by elements

such as awareness or intent").  Rather bad faith in the context of an independent New

York unfair competition claim "typically results from fraud, deception, or an abuse of

fiduciary or confidential relationship[,]" Robert L. Haig, <u>Business and Comercial

Litigation in Federal Courts</u>, 105:20 (3d Ed. 2011) (citing <u>Telecom Intern. America,

Ltd. v. AT&T Corp.</u>, 290 F.3d 175, 197 (2d Cir. 2001)), and it forms the basis for a

28

state-law claim whether or not IBM's use of the SVr4 code violated federal copyright law.

By contrast, federal copyright infringement does not require proof of unfair competition as that term has been defined under New York law.  A plaintiff seeking relief for federal copyright infringement must prove only that he "owns a valid copyright" and that the defendant "copied protectable elements of the copyrighted work."  Paycom Payroll, LLC v. Richison, 758 F.3d 1198, 1204 (10th Cir. 2014) (internal quotation marks, citation omitted).  Because misappropriation under New York law is an independent claim with a separate element of bad faith business dealings, SCO's claim is not "equivalent" to a federal copyright infringement claim. Accordingly, it is not preempted by the Section 301 of the Copyright Act.[16]

---

[16] IBM argues that the district court's denial of SCO's attempt to add a copyright infringement claim should be relevant in determining whether the Copyright Act preempts SCO's misappropriation theory.  It is not.  The district court precluded amendment of SCO's complaint for procedural reasons—SCO had failed to demonstrate good cause for why the copyright claim was not included in the initial complaint.  That does not mean that misappropriation under New York law is "equivalent" to a copyright infringement claim for preemption purposes.  Nor does SCO's unsuccessful attempt to amend its complaint prevent SCO from using facts learned during the discovery stage as the basis for its existing causes of action, i.e., misappropriation.  As explained earlier, that is apparently what SCO did here.  After it discovered the presence of the SVr4 code in IBM's AIX for Power product, that discovery became the predominant basis for its existing misappropriation claim, displacing its earlier theory of misappropriation which focused on the confidential materials which IBM allegedly disclosed to the Linux community.

### B. **Tortious Interference**

#### 1. *Applicable Law*

The parties have apparently agreed that Utah law governs SCO's tortious interference claims.[17]  Although the JDA requires that the "legal relations between the parties" are governed by New York law, Aplt. App. 3112, JDA § 22.3, IBM's alleged intermeddling does not concern the legal relations *between* IBM and SCO.  Moreover, SCO's headquarters and principal place of business is in Utah, so that is where it suffered the alleged injury.  Accordingly, we apply the law from the State of Utah in evaluating SCO's tortious interference claims.

Under Utah law, the elements of tortious interference are: (1) *intentional interference* with plaintiff's existing or potential business relationships, (2) the interference is accomplished by *improper means*, and (3) *injury* suffered by plaintiff.  See Eldridge v. Johndrow, 345 P.3d 553, 556 (Utah 2015).[18]  With these elements in mind, SCO offers two theories of tortious interference.  First, SCO alleges that IBM *indirectly* interfered with SCO's business relationships generally in the UNIX-on-Intel market by

---

[17] The district court relied on Utah authorities, and the parties cite Utah cases throughout their briefs before this Court, as they did in the district court.

[18] Before Eldridge v. Johndrow was decided in 2015, Utah courts permitted a plaintiff to prove tortious interference even without improper means, so long as the defendant harbored a predominant improper purpose.  See 345 P.3d at 556; see also Anderson Dev. Co. v. Tobias, 116, P.3d 323, 331 (Utah 2005) ("[O]nly one alternative, either improper purpose or improper means, need be established; a plaintiff need not prove both.").  Eldridge changed the law by repudiating the improper-purpose alternative and requiring improper means to establish a claim for tortious interference.  See 345 P.3d at 565 ("We therefore conclude that the improper-purpose doctrine has not worked well in practice, . . . . It should therefore be abandoned." (internal citation omitted)).

improperly disclosing Santa Cruz's proprietary materials to the Linux community,

thereby causing SCO's customers to prefer Linux over SCO's fee-based UNIX platform.

Second, SCO claims that IBM *directly* interfered with SCO's business relationships by

inducing SCO's affiliates to cut ties with SCO.  We address these in turn.


### 2. *Indirect Interference Through Improper Linux Disclosures*

The district court found that SCO's theory of indirect interference based on IBM's

Linux disclosures is not actionable under Utah law.  SCO asserts that IBM's wrongful

disclosures of proprietary UNIX materials to the open-source community drove SCO's

potential customers away from its fee-based products and toward the free Linux

alternative, resulting in SCO's substantially diminished sales in the UNIX-on-Intel

market.  In other words, this theory is predicated upon a defendant's alleged market-

based activities which may have caused potential customers to refrain from doing

business with the plaintiff.  Whether Utah courts would recognize such a theory as a

tortious-interference claim is an unsettled question of state law.

"[W]hen an appeal presents an unsettled question of state law, we must ordinarily

'attempt to predict how the highest court would interpret the issue.'"  Belnap v. Iasis

Healthcare, 844 F.3d 1272, 1295 (10th Cir. 2017) (alterations omitted) (quoting

Cornhusker Cas. Co. v. Skaj, 786 F.3d 842, 852 (10th Cir. 2015)).  "Further, 'we are

generally reticent to expand state law without clear guidance from the highest court.'"  Id.

(quoting Schrock v. Wyeth, Inc., 727 F.3d 1273, 1284 (10th Cir. 2013)).  In fact, we have

indicated that a party encouraging a federal court to apply a new legal principle under

state law must make a "strong showing" that the highest court of that state would adopt

that principle if presented with the question.  Id. at 1295 ("Absent a strong showing to the

contrary, we are disinclined to predict that the Utah Supreme Court would recognize"

another theory of estoppel); id. at 1296 ("And Defendants fail to make such a strong

showing.").  With this in mind, we turn to Utah law.

Utah law clearly embraces a theory of intentional interference based on evidence

that potential or prospective customers—rather than merely existing customers—were

driven away by the defendant's improper intermeddling.  See, e.g. Anderson Dev. Co. v.

Tobias, 116 P.3d 323, 331 (Utah 2005) ("A claim for intentional interference with

economic relations protects both existing contractual relationships and prospective

relationships of economic advantage not yet reduced to a formal contract." (internal

quotation marks, citation omitted)); Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293,

306 (Utah 1982), overruled on other grounds by Eldridge, 345 P.3d at 553 ("Driving

away an individual's existing or potential customers is the archetypical injury this cause

of action was devised to remedy." (citations omitted)).

Furthermore, Utah law does not require that a defendant *directly* confront the third

party to induce that person to cut economic ties with the plaintiff.  The Utah Supreme

Court's seminal decision in Leigh Furniture & Carpet Co. v. Isom, illustrates this point.

In that case, the defendant committed tortious interference when its representatives

frequently visited plaintiff's "store during business hours to confront him, question him,

and make demands and inquiries regarding the manner in which he was conducting his

business."  Leigh Furniture, 657 P.2d at 306.  These disruptive intrusions "repeatedly

interrupted sales activities, caused [plaintiff]'s customers to comment and complain, and more than once caused a customer to leave the store." Id.  Although there was no direct communication between defendant and the third-party customers who were driven away from plaintiff's business, the Utah Supreme Court nevertheless found this to be actionable interference by the defendant.

But SCO's theory of indirect interference goes substantially further than the facts of Leigh Furniture.  In this case, IBM's alleged improper conduct was directed toward the *public* and the *market generally*.  The evidence, when construed in SCO's favor, suggests that IBM improperly disclosed confidential Monterey materials to a public community of interested software developers who then used those contributions to strengthen the open-source Linux platform, which ultimately became a preferable alternative to SCO's fee-based UNIX product, thereby diminishing SCO's customer base.

To be sure, Leigh Furniture endorsed a tortious-interference claim based on *potential* customers who were *not directly contacted* by the defendant, but it does not follow clearly from Leigh Furniture that any improper conduct directed toward the public and the general market would be actionable as a claim for tortious interference whenever a competitor's business relationships suffer as a result of the improper conduct.  That, in effect, would convert almost any claim for illegal market-based activities into a tortious-interference claim, and we find no indication in Utah case law that the state supreme court would accept such an expansive interpretation.  At the very least, because SCO has not cited any controlling case on point, it has failed to make a "strong showing" that the Utah Supreme Court would validate this theory if presented with the issue.  Belnap, 844

33

F.3d at 1295, 1296.  Accordingly, we agree with the district court that SCO's indirect-interference theory is not actionable under Utah law.

### 3.  *Direct Interference by Inducing Business Partners to Cut Ties With SCO*

The district court also granted summary judgment on SCO's direct-interference theory based on IBM's alleged efforts to persuade SCO's business partners and investors to cut ties with SCO.  The district court first concluded that, with the exception of IBM's communications with Hewlett-Packard, there was inadequate evidence to support a finding of direct interference with SCO's business relationships.  But even the Hewlett-Packard evidence was not sufficient because, according to the district court, there was no causal link between IBM's alleged intermeddling with any of the relationships and SCO's injury.  Further, IBM offers an alternative ground to affirm the decision below: that the evidence does not support even an inference that IBM acted with improper means, a required element of tortious interference under Utah law.

The improper-means requirement "is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules."  Leigh Furniture, 657 P.2d at 308.  "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."  Id. (internal quotation marks, citation omitted).  In other words, merely

persuading another company to withdraw its business from a competitor is not, without more, an improper means under Utah law.

Turning to the facts of this case, we agree with the district court that a jury could find IBM attempted to interfere with SCO's relationship with Hewlett-Packard.  After SCO announced its Linux licensing strategy, IBM executive Karen Smith told SCO's CEO that she was going to encourage partners and customers not to do business with SCO.  Smith then followed through with that threat the same day when she suggested to Hewlett-Packard executive Richard Becker that Hewlett-Packard "withdraw all [its] business activities from SCO[.]"  Aplt. App. 2352.

The other business relationships are a different story.  We agree with the district court that there is not enough evidence in this record to conclude that IBM actually interfered with SCO's relationships with Oracle, Computer Associates, Intel, and Baystar.[19]  There is simply no admissible direct evidence that IBM ever confronted these companies.  To the contrary, executives representing each of these companies stated in a sworn declaration that, to the best of their knowledge, IBM never approached them about cutting ties with SCO and that any change in business dealings with SCO was not the

---

[19] SCO did offer some evidence that IBM had attempted to persuade a managing member of Baystar named Lawrence Goldfarb to discontinue Baystar's investment in SCO.  SCO's chief executive Darl McBride submitted a declaration stating that Goldfarb told McBride "that IBM had been 'on him, on him, on him' to retract his support from SCO."  Aplt. App. 5586.  But that evidence would have been inadmissible hearsay, as it was offered out of court to prove the truth of the matter asserted and SCO has not pointed to any hearsay exception on appeal that would have salvaged the statement from exclusion at trial.  Nor can the Court think of an applicable exception. Thus, a jury would not have been entitled to consider this statement so it is not proper to include it in our analysis for the purpose of summary judgment.

result of IBM's statements or actions.  SCO, for its part, counters that circumstantial evidence should trump these self-serving declarations, at least enough to create a triable issue of fact.

Even if that were true, however, IBM's alternative argument nevertheless compels us to dispose of all the allegations of direct interference, including those involving Hewlett-Packard and these other entities.  Under Utah law, "no tortious interference claim can succeed without evidence of improper means." Eldridge, 345 P.3d at 555. That requires that the means be "contrary to law, such as violations of statutes, regulations, or recognized common-law rules." Leigh Furniture, 657 P.2d at 308.  A competitor's attempt merely to convince third parties not to deal with a plaintiff does not meet this requirement.  To confirm that point, the Utah Supreme Court cautioned that the intentional-interference tort ought not sweep within its scope "efforts to persuade others not to . . . deal with certain entities" because that would be a legitimate form of third-party influence.  Id. at 303.

Thus, even if we assume that IBM actually followed through with its threat to persuade industry players not to do business with SCO—as it did with Hewlett-Packard—that conduct would not have been "improper" within the meaning of the Utah tort of intentional interference.  The district court therefore appropriately granted summary judgment on this claim.[20]

---

[20] Because we resolve this claim on the improper-means requirement, we do not address the district court's determination that SCO failed to demonstrate adequate causation for its injury on summary judgment.

## C. __Amendment of Complaint__

After the deadline for amended pleadings, SCO attempted to add a claim for copyright infringement against IBM based on its late discovery of IBM's allegedly unauthorized distribution of the SVr4 code in the AIX for Power product.[21]  The district court denied SCO's request as untimely and likely to expand the litigation.  We review a denial of leave to amend a complaint for abuse of discretion.  E.g. Wessel v. City of Albuquerque, 299 F.3d 1186, 1197 (10th Cir. 2002).  Under that deferential standard, we affirm the district court's order on this issue.

A brief procedural overview will facilitate the analysis.  SCO filed its initial complaint on March 6, 2003, and then timely amended its complaint on July 22, 2003.  IBM responded with counterclaims of its own on August 6, 2003, and then timely amended those on September 25, 2003.  The district court set a deadline of February 4, 2004 for amended pleadings, but allowed SCO and IBM each to file second amended pleadings on February 27, 2004 and March 29, 2004, respectively.

In March and April 2004, IBM produced almost a million pages of documents and dozens of CDs of source code included in AIX.  When SCO reviewed these discovery

---

[21] The original complaint contained a claim for copyright infringement, but that appears to be based on SCO's mistaken belief that it owned the copyrights to all the UNIX technologies, so any unauthorized use of a UNIX variation might have been vulnerable to the copyright owner's challenge.  This later-added copyright claim is based on SCO's discovery that IBM had improperly used SCO's SVr4 code specifically—a claim that is different from SCO's misappropriation claim because the copyright theory does not depend upon proof of bad faith, while misappropriation does.

materials, SCO claims that it learned *for the first time* that AIX contained the SVr4 code which had been copied from Santa Cruz's contributions to Project Monterey. After analyzing this voluminous document production, SCO sought again to amend its complaint on October 14, 2004 to add a claim for copyright infringement based on the unauthorized use of the SVr4 code.[22]

The federal rules of civil procedure provide that "[a] schedule may be modified only for *good cause* and with the judge's consent." Fed. R. Civ. P. 16(b)(4) (emphasis added). Thus, good cause must be shown in order to submit a pleading beyond the deadline set by the district court's scheduling order, which was February 4, 2004 in this case. Rule 15(a)(2) further indicates that "[t]he court should freely give leave [to amend pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). Consistent with this rule, we have held that "[t]he purpose of [Rule 15(a)(2)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." Minter v. Prime Equipment Co., 451 F.3d 1196, 1204 (10th Cir. 2006) (internal quotation marks, citation omitted); accord 6 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1484 (3d ed. 2010).

We turn now to the arguments and the district court's reasoning. In defending its attempt to add a claim after the February 4, 2004 deadline, SCO contended that IBM

---

[22] It also seems that this late-stage discovery is the event that prompted SCO to shift its theory on its existing cause of action for misappropriation. As explained earlier, while the initial misappropriation theory was predicated on IBM's alleged Linux disclosures, SCO's current misappropriation theory is based on the allegedly stolen SVr4 code.

would not be prejudiced because IBM had already asserted a counterclaim for declaratory judgment on SCO's copyrights.  That counterclaim provided: "IBM does not infringe, induce the infringement of, or contribute to the infringement of any SCO copyright through the reproduction, improvement, and distribution of AIX and Dynix, and that some or all of SCO's purported copyrights in UNIX are invalid and unenforceable."[23] Aplt. App. 233.

The district court, however, reasoned that IBM's copyright counterclaim was not intended to encompass literally any SCO copyright, but rather it sought a more limited declaration that IBM was not violating SCO's copyrights to the original UNIX technologies because Santa Cruz never received the UNIX copyrights in the Novell agreement.  After all, SCO had initially filed a copyright infringement claim against IBM on that theory, and IBM's responsive counterclaim should be construed in that context. The district court then reasoned: "Having determined that the [IBM's] Counterclaim was not intended to sweep so broadly, SCO's proposed amendment is no longer the mirror-image of IBM's [copyright] Counterclaim.  To permit the proposed amendment *would expand this already sizable and complex litigation and would serve only to delay its resolution*."  Aplt. App. 1836-37, Dist Ct. Order at 3-4 (emphasis added).  Switching course, the district court stated without explanation that SCO had unduly delayed in asserting the proposed cause of action: "It appears that SCO—or its predecessor—*either knew or should have known about the conduct at issue before it filed its original*

---

[23] "Dynix" is a reference to the UNIX variation developed by Sequent, a company that was subsequently merged into IBM.

*Complaint.*"  Aplt. App. 1837, Dist. Ct. Order at 4 (emphasis added).  For these two reasons, the district court denied SCO's motion to amend.

Notwithstanding the liberal treatment courts ordinarily afford these requests, we cannot say that the district court abused its discretion in finding the absence of "good cause" for the proposed amendment.  The parties had already modified the scheduling order previously and the litigation was certainly sizable and complex at the time. Moreover, while SCO may have genuinely realized the existence of the SVr4 code late in the game, it is not unreasonable to conclude that SCO could have investigated the matter before it filed its original complaint, or at least alleged the claim based on information and belief.[24]  Accordingly, we affirm the denial of leave to amend because the district court did not act outside its broad range of discretion.

### III.   CONCLUSION

The district court's order awarding IBM summary judgment on the misappropriation claim is REVERSED, and the matter is REMANDED for further proceedings consistent with this opinion.

---

[24] This is not inconsistent with our earlier determination regarding SCO's compliance with the two-year contractual limitations period.  We held that the misappropriation claim, which is based on the allegedly unauthorized use of the SVr4 code acquired through Project Monterey, did not accrue until May 4, 2001 because that is the date on which IBM released a purportedly "sham" version of the IA-64 Product to legitimize its use of the SVr4 code in its own AIX for Power product released that very same day, thereby satisfying the requisite element of bad faith under New York law.

The district court's order awarding IBM summary judgment on the tortious interference claims is AFFIRMED.  The district court's order denying SCO leave to amend its complaint is also AFFIRMED.[25]

---

[25] On August 31, 2016, Appellant filed an "Unopposed Motion for Permission to File Opening Brief and Appendix Under Seal."  On September 12, 2016, Appellant filed a supplement to that motion entitled "Appellant's Supplement to its Unopposed Motion for Permission to File Opening Brief and Appendix Under Seal," and on September 16, 2016, Appellant filed a second supplement to that motion entitled "Appellant's Second Supplement to its Unopposed Motion for Permission to File Opening Brief and Appendix Under Seal."

On September 16, 2016, this Court entered an Order ruling on all three motions, largely denying them.  However, as our Order makes clear, the matters identified in paragraph 4 in "Appellant's Supplement to its Unopposed Motion for Permission to File Opening Brief and Appendix Under Seal" filed on September 12, 2016, were to remain "provisionally sealed" subject to a further ruling by the merits panel.

Those documents are identified as the following appendix volumes:  6, 7, 8, 9, 12, 14, 18,19, 20, 21, 22, 25, 36, 37, 38, 39, 40, 43, 44, 45, 46, 47, 48, 52, 53, 54, 55, 56, 61, 62, 63, 64, and 66.

Appellant represents, and Appellee does not oppose, that these materials contain sensitive confidential revenue and profitability information, as well as strategic business and marketing plans.

All record material relevant to our opinion has been disclosed in the opinion itself. The Court sees no need to require further public disclosure of these confidential materials.

Accordingly, the Court affirms its previous provisional order accepting the materials listed above under seal.

This disposes of all open or provisional rulings pertaining to motions to seal in this case.

*The SCO Group, Inc. v. Int'l Business Machines Corp.*, No. 16-4040
**BACHARACH**, J., concurring in part and dissenting in part.

I largely agree with the majority's excellent opinion, but I respectfully disagree on the issue of improper means. The majority concludes that IBM was entitled to summary judgment on the tortious-interference claim based on the absence of evidence that IBM had used improper means. Majority Op. at 34-36. I would instead remand for the district court to consider the issue of improper means in the first instance.

The district court expressly declined to consider this issue, and the parties have given the matter only scant attention in their appeal briefs. IBM devotes less than a page to the issue, and SCO's rejoinder consists of only slightly more than a page. In this short rejoinder, SCO advances six arguments for why IBM had acted with improper means; and we lack any briefing from IBM on these six arguments. In this situation, I believe that we should remand for the district court to decide the issue. *See Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 649 (10th Cir. 2017), *petition for cert. filed sub nom. Jefferson v. Rife*, No. 17-314 (U.S. Aug. 12, 2017).

SCO has otherwise created issues of material fact on the tortious-interference claim.

First, issues of material fact exist on whether IBM directly interfered with SCO's business relationships. As the majority acknowledges, direct evidence exists regarding interference with Hewlett-Packard. Majority Op.

at 34. For the interference with other business relationships, SCO presented three forms of circumstantial evidence:

1.  IBM told SCO that IBM would tell others not to do business with SCO.

2.  IBM told Hewlett-Packard that IBM would tell Intel not to do business with SCO.

3.  Soon afterward, the identified business partners stopped or reduced business with SCO.

The district court regarded this evidence as speculative, but I disagree. IBM's threats to tell other companies to drop SCO, which they soon did, create an issue of material fact on whether IBM carried out its threats. As a result, the evidence of interference was sufficient to avoid summary judgment.

Second, an issue of material fact exists on causation. The proximity in time between IBM's alleged statements and other companies' termination of business with SCO creates a genuine issue of material fact on causation. *See Francis v. Nat'l DME*, 350 P.3d 615, 628-29 (Utah Ct. App. 2015) (reversing a directed verdict on a tortious-interference claim because temporal-proximity evidence supported causation).

Finally, an issue of material fact is present on the existence of damages. SCO was required to pay Baystar $20 million after IBM had allegedly induced Baystar to redeem its SCO shares, and Hewlett-Packard reduced its annual contributions to SCO from $1 million to $100,000.

Based on these financial consequences to SCO, a jury could reasonably find the existence of damages.

*  *  *

I largely agree with the majority's conclusions and analysis. I dissent only on the issue of improper means, which I would remand for the district court to consider in the first instance.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

January 02, 2018

Chris Wolpert
Chief Deputy Clerk

Mr. Jason C. Cyrulnik
Mr. Edward Normand
Boies, Schiller & Flexner
333 Main Street
Armonk, NY 10504

Mr. Brent O. Hatch
Mr. Mark F. James
Hatch, James & Dodge
10 West Broadway, Suite 400
Salt Lake City, UT 84101-0000

Mr. Stuart H. Singer
Boies, Schiller & Flexner
401 East Las Olas Boulevard
Suite 1200
Ft. Lauderdale, FL 33301

**RE:**     **16-4040, SCO Group v. IBM**
        Dist/Ag docket: 2:03-CV-00294-DN

Dear Counsel:

Enclosed is a copy of the court's published order disposing of appellee's petition for rehearing, and a revised opinion issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Please contact this office if you have questions.

Sincerely,

*Elisabeth A. Shumaker*

Elisabeth A. Shumaker
Clerk of the Court

cc:      Evan Chesler
         Peter H. Donaldson
         David Marriott
         Amber M. Mettler
         Thomas G. Rafferty
         Amy F. Sorenson
         Alan L. Sullivan
         Nathan E. Wheatley

EAS/gh